**EXHIBIT A**

**DUCT DOCTOR®**


**FRANCHISE AGREEMENT BETWEEN**
**DUCT DOCTOR USA, INC.**

**AND**


# CREATIVE BUILDING SOLUTIONS, LLC
## A Missouri Limited Liability Company

TABLE OF CONTENTS

**PAGE**

1.  GRANT OF FRRANCHISE ........................................................................................2
2.  TERM AND RENEWAL ...........................................................................................3
3.  OPERATING ASSISTANCE......................................................................................5
4.  FEES AND OTHER PAYMENTS ..............................................................................6
5.  LICENSED MARKS ..................................................................................................9
6.  STANDARDS OF OPERATION.............................................................................11
7.  OPERATIONS MANUAL ........................................................................................18
8.  ADVERTISING AND MARKETING ......................................................................19
9.  MODIFICATIONS ...................................................................................................21
10. STATEMENTS, RECORDS AND FEE PAYMENTS ..............................................22
11. COVENANTS NOT TO COMPETE AND MAINTAIN CONFIDENTIALITY..........23
12. TRANSFER AND ASSIGNMENT ..........................................................................25
13. DEFAULT AND TERMINATION ...........................................................................29
14. POST TERM OBLIGATIONS .................................................................................32
15. DISPUTE RESOLUTION AND CORRESPONDING PROCEDURES ....................34
16. INSURANCE............................................................................................................37
17. FRANCHISEE'S OWNERSHIP AND ORGANIZATION ........................................38
18. TAXES, PERMITS AND INDEBTEDNESS ............................................................38
19. INDEMNIFICATION AND INDEPENDENT CONTRACTOR ...............................39
20. WRITTEN APPROVALS, WAIVERS AND AMENDMENT...................................39
21. NOTICES..................................................................................................................40
22. GOVERNING LAW .................................................................................................40
23. SEVERABILITY AND CONSTRUCTION..............................................................41
24. ENTIRE AGREEMENT ...........................................................................................42
25. FORCE MAJEURE ..................................................................................................42
26. ACKNOWLEDGEMENTS.......................................................................................42
27. NO IMPLIED COVENANT.....................................................................................43
28. SUBMISSION OF AGREEMENT...........................................................................43

SCHEDULES:
Schedule A -     Initial Franchise Fee, Territory, Ownership and Related Matters
Schedule B -     Intentionally Deleted
Schedule C -     Authorization for Electronic Funds Transfer
Schedule D -     Personal Guaranty of Franchisee's Principal Owners
Schedule E -     Agreement Not to Compete and Confidentiality Agreement
Schedule F -     Confidentiality and Non-Solicitation Agreement for Employees

## DUCT DOCTOR USA, INC. FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (the "Agreement") is made and entered into as of the 8th _____ day of July , 2019 (the "Effective Date"), by and between DUCT DOCTOR USA, INC., a Georgia corporation ("we," "us," "our," or "Franchisor"), and CREATIVE BUILDING SOLUTIONS, LLC, a Missouri limited liability company, whose place of organization, form, and principal business address are set forth on Schedule "A" attached to this Agreement ("Franchisee", "you" or "your").

RECITALS

**WHEREAS,** Franchisee desires to enter into an agreement with Franchisor to obtain the rights to operate a Duct Doctor® business (the "Franchised Business") using the system developed by Franchisor or its affiliate, including standardized methods and procedures for the operation of a business offering residential and commercial air duct cleaning and other indoor air quality services as may be developed by Franchisor in the future, distinctive specifications for equipment; sales techniques, marketing, advertising, and procedures for operation and management of a Duct Doctor business in the manner set forth in this Agreement and in the Operations Manual provided by Franchisor and modified from time to time (the "Duct Doctor System" or "System"); and

WHEREAS, Franchisor and its franchisees use certain trade names, trademarks and service marks including, without limitation, the service mark "Duct Doctor" in connection with the Duct Doctor System (the "Licensed Marks"). The rights to all such Licensed Marks as are now, or hereafter will be, designated as part of the Duct Doctor System will be owned exclusively by Franchisor or its affiliate and be used for the benefit of Franchisor, its affiliate and Franchisor's franchisees to identify to the public the source of the products and services marketed thereunder; and

WHEREAS, you have applied to us for a franchise to use the System, and we desire to grant you a franchise to use the System, all subject to the terms and conditions of this Agreement and such application has been approved in reliance upon all of the representations made therein; and

WHEREAS, the Franchisee appreciates and acknowledges the importance of the Franchisor's standards of quality, appearance and service as a necessity of owning and operating a franchise outlet in conformity with the Franchisor's standards and specifications, and

WHEREAS, the Franchisee represents and warrants that the Franchisee is not a party to or subject to any order or decree of any court or government agency which would limit or interfere in any way with the performance by the Franchisee of the obligations under this Franchisee Agreement; and

WHEREAS, the Franchisee represents and warrants that neither the Franchisee nor any person or firm cooperating, assisting or acting with the Franchisee in connection with the opening of this franchise, or upon whom or which he may be relying for any assistance in this matter, direct or indirect, financial or otherwise, is a party to any contract, agreement or arrangement which limits, prohibits or purports to limit or prohibit the Franchisee's entering into this Franchise Agreement or performing the Franchisee's obligations hereunder;

- 1 -

NOW, THEREFORE, the parties in consideration of the undertakings and commitments of each party to the other party set forth herein, hereby mutually agree as follows:

## 1.   GRANT OF FRANCHISE

1.1   **Grant of Franchise**. The Franchisor shall grant to the Franchisee subject to the terms conditions and obligations herein contained, the right and license to operate a residential and commercial air duct cleaning and indoor air quality business under the trade name and style DUCT DOCTOR and to use in connection therewith the Franchisor's System at, and only at, a mutually agreeable location and which shall be provided for on Schedule "A" within ten (10) days of the date of the Franchisor's approval of the Franchisee's location for the Franchised Business (hereinafter referred to as the "Premises").

1.2   **Uniform Standards**. You acknowledge and agree that the central feature of a franchise system is a consistent method of operation at all Duct Doctor Franchised Businesses in the System; and that, as a result, it is essential to the high standards and goodwill of the franchise system that each franchisee, including you, strictly comply with all of our rules, guidelines, standards, specifications, plans, programs, methods, techniques, and procedures, all of which are contained in our confidential operations manual ("Operations Manual") and this Agreement. You also acknowledge and agree (i) that we may modify all or any part of the System to adapt to changes in the marketplace, economic conditions, business conditions, the demands of consumers, our business needs and the needs of the System; (ii) that such modifications may include additions to, deletions from, or modifications to the services or products you offer for sale, sell or deliver in your Franchised Business, which modifications may include modifications to our proprietary Marks; (iii) that you agree that you expect us to change or modify the System; (iv) that you covenant, warrant, represent, and agree that you will comply with all rules, guidelines, standards, specifications, plans, programs, methods, techniques and procedures, and the Operations Manual related to the System, as we add to, delete from, and modify any or all of them from time to time, and with this Agreement. We agree that no modifications will materially and unreasonably increase your obligations as are set forth in this Agreement.

1.3   **Non-Exclusivity**. The parties expressly agree that the license granted herein relates solely to the Territory identified on Schedule "A" (the "Protected Territory") and affords to the Franchisee no rights regarding such other franchises or other territories, if any, as the Franchisor in its sole discretion may elect to make available to the Franchisee or to other franchisees or for the Franchisor's own use in the future. The Franchisee expressly acknowledges and agrees that this license is non-exclusive, and that the Franchisor retains, among others, the right, in its sole discretion:

1.3.1   To grant other franchises and/or licenses for its Proprietary Marks in addition to those franchises and/or licenses already granted to existing franchisees on any terms and conditions we deem appropriate outside of Franchisee's Territory.

1.3.2   To develop and establish other franchise or licensed systems for the same or similar products or services utilizing the same or similar Proprietary Marks, or any other Proprietary Marks now or hereafter designated as part of the System licensed by this Agreement and to grant franchises and/or licenses thereto without providing the Franchisee any right therein.

- 2 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

1.3.3    To operate, and to grant others the right to operate Duct Doctor Franchised Businesses located anywhere outside your Protected Territory under any terms and conditions we deem appropriate and regardless of proximity to your business location.

1.3.4    To acquire the assets or ownership interests of one or more businesses providing services similar to those provided by Duct Doctor businesses, and franchising, licensing, or creating similar arrangements with respect to these businesses once acquired, wherever these businesses (or the franchisees or licensees of these businesses) are located or operating (including in Franchisee's Protected Territory).

1.3.5    To be acquired (whether through acquisition of assets, ownership interests or otherwise, regardless of the form of transaction), by a business providing products and services similar to those provided by Duct Doctor businesses, even if such business operates, franchises and/or licenses competitive businesses in your Protected Territory.

1.4    **Operation of Franchise Limited to Territory; Incidental Advertising**. Franchisee may not provide services, market or solicit business outside of the Protected Territory unless otherwise approved in writing by Franchisor. In order to be granted the right to solicit business outside of the Protected Territory, Franchisee must meet the following conditions.  If you violate this restriction, Franchisor has the right to terminate the Franchise Agreement.

1.4.1    The area in which Franchisee wishes to provide service to clients is not included in another franchisee's territory or in a territory currently served by a Duct Doctor business owned by Franchisor or an affiliate of Franchisor.

1.4.2    Franchisee may not explicitly direct any advertising to clients or potential clients outside the Protected Territory.

1.4.3    When the area is granted to another franchisee, Franchisee agrees to immediately stop providing services to clients in the area and, upon Franchisor's request, turn over Franchisee's list of clients in the external area to the franchisee to which the area has been granted without seeking or accepting any compensation for doing so. Franchisee will immediately take all steps necessary to completely discontinue any advertising that Franchisee has directed to clients in the area.

1.5    **Reasonable Business Judgment**. We acknowledge and agree that we will, and you acknowledge and agree that we may, use Reasonable Business Judgment, as defined in Paragraph 23.4.2 of this Agreement, in the exercise of our rights, discharge of our obligations, and exercise of our discretion under this Agreement, and in all circumstances where we are required to give our consent, unless this Agreement expressly provides some other standard.

2.    **TERM AND RENEWAL**

2.1    **Initial Term**. This Agreement will take effect upon its execution by all parties (the "Effective Date"), and unless previously terminated pursuant to this Agreement the term of this Franchise Agreement shall be for a period of ten (10) years (the "Initial Term").

2.2.    **Renewal Term**. If the Franchisee wishes this Franchise Agreement to be renewed by Franchisor for additional terms of ten (10) years each (the "Renewal Term") the Franchisee shall provide Franchisor written notice of its request for renewal not less than nine (9) months or more than twelve (12) months prior to the end of the term of this Franchise Agreement. Franchisor shall not unreasonably withhold its approval of such request for renewal provided, however, that in order to be considered for renewal the Franchisee agrees to comply with the following conditions:

2.2.1    The Franchisee is not, when the request for renewal is made, nor at any time between the request and the date of renewal, in default of any provision of this Franchise Agreement, any amendment hereof, or successor hereto or any other agreement between the Franchisee and Franchisor or its affiliates, and the Franchisee has been in substantial compliance with the terms and conditions of all such agreements during the term of this Agreement;

2.2.2    The Franchisee is in financial good standing.  For purposes of this Subsection 2.2.2, "Financial Good Standing" means the following, without limitation; (i) Franchisee has fulfilled in a timely manner, all of its monetary obligations towards Franchisor, Franchisor's affiliates and designated suppliers; (ii) Franchisee has not made a late payment to Franchisor, Franchisor's affiliates, or designated more than 3 times within the prior 9 months; (iii) Franchisee has made all required reports to Franchisor in a timely manner; and (iv) there are no currently open financial audits.

2.2.3    The Franchisee executes Franchisor's then-current Franchise Agreement for renewal franchises, which may contain terms and conditions materially different from those set forth herein, including, without limitation, the then-current rate for royalties, minimum product purchase requirements, advertising and other payments as such Franchise Agreement may provide, but not franchisee's Protected Territory; provided, however, that the Franchisee shall not be required to pay any additional initial franchise fee as may be set forth in the then-current Franchise Agreement.

2.2.4    Franchisee shall pay a renewal fee of ten (10%) percent of the then-current Initial Franchise Fee.

2.2.5    The Franchisee shall execute a general release under seal, in a form satisfactory to Franchisor, substantially similar to Schedule "H", of any and all claims it may have against Franchisor and its officers, directors, shareholders, members, managers and employees, in their corporate and individual capacities, including without limitation, all claims arising under any federal, state or local law, rule or ordinance. If this franchise is situated in a state whose law, at the time of renewal, prohibits the giving of a general release as a condition for the renewal of a franchise, then this Paragraph 2.2.5 shall not, in such event, be a condition to renewal of this franchise, unless a release of some, but not all, claims is permitted, in which instance the Franchisee shall give a release to the extent permitted.

2.2.6    The Franchisee has made or has provided for such renovation and modifications as Franchisor then requires of new franchisees entering the System, including, without limitation, computer hardware and software, equipment, furnishings and vehicles in accordance with the standards of the Franchisor.

2.2.7    The Franchisee completes any additional education or training programs that the Franchisor may then require for franchisees upon renewal.

- 4 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

**3.       OPERATING ASSISTANCE**

3.1       **Assistance Prior to Opening.** Prior to Franchisee's Opening Date, Franchisor will provide Franchisee with the following assistance, on the same basis as it will from time to time make available to other Duct Doctor franchisees:

3.1.1       Loan Franchisee or provide Franchisee with access to the electronic version of one copy of the Operations Manual. Franchisor may modify the Operations Manual by written or on-line supplements of which Franchisee will receive copies or receive links to print documents.

3.1.2       Review the Franchisee's proposed location for the Franchised Business and grant approval to the proposed location if it meets Franchisor's standards. Franchisor neither offers nor provides any other services in this regard.

3.1.3       Franchisor will provide on-site assistance to Franchisee with the formulation of an initial marketing plan for the Franchised Business.

3.1.4       Franchisor will provide initial training to you and your designated Manager and technicians.

3.1.5       Franchisor will provide franchisee with Franchisor's mandatory specifications for required equipment and supplies needed to operate the Franchised Business and facilitate the installation of the proprietary truck-mounted air duct cleaning apparatus.

3.1.6       Franchisor will establish a presence for the Franchised Business on any internet web site that Franchisor has established for the Franchise System.

3.2       **Ongoing Assistance.** After Franchisee's Opening Date, Franchisor or its designee will make the following assistance available to Franchisee:

3.2.1       Provide reasonable consultation and advice in response to Franchisee's inquiries about specific administrative and operating issues. Franchisee is solely responsible for the day to day operation of the Franchised Business. Franchisor may decide how best to communicate such consultation and advice to Franchisee, whether by telephone, in writing, electronically or in person. The method chosen by Franchisor may be different than the methods used by Franchisor for other franchisees.

3.2.2       Administer the National Marketing Fund (when implemented) and approve advertising that Franchisee creates for Franchisee's local use.

3.2.3       Make goods and services available to Franchisee either directly or through approved suppliers.

3.2.4       Periodically revise the Operations Manual to incorporate new developments and changes in the Duct Doctor System and provide Franchisee with a hard copy or electronic copy of all updates.

- 5 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

3.2.5    We may also hold statewide, regional, or national conferences to discuss promotional techniques, performance standards, advertising programs and general topics. You are required to attend those conferences. We may charge a fee for these conferences; you must pay for all of your travel and lodging expenses.

3.2.6    Provide such general advisory assistance and field support as we deem helpful to you, in our discretion, in the ongoing operation, advertising and promotion of your Franchised Business.

3.2.7    We will conduct periodic inspections of the Business licensed herein and periodic evaluation of the services rendered by the Franchisee.

3.2.8    Provide Franchisee with access to advertising and promotional items and materials that Franchisor may develop for promotion of the System. Franchisor is not however, required to develop any advertising or promotional items or materials. Franchisee will be required to purchase the advertising materials if Franchisor so directs and if Franchisee desires to use them, including all costs of shipping.

3.2.9    Use our efforts to maintain high standards of quality, appearance and professionalism and service of the Franchised Business.

3.2.10    We will provide training on new products and services that we may make available to you to offer at the Franchised Business.

3.2.11    We will, at your request, examine information or samples provided by you about products or services which are not approved by us but which you would like to offer from your Franchise. We will decide based on the information supplied by you and by information we might obtain somewhere else, whether or not to approve the product or service you have presented to us. We will provide you with our approval or disapproval within 90 days of receiving your written request. You must pay all of our expenses in connection with any examination, testing or inspection.

3.2.12    Provide additional optional training is available on an as-needed basis for an additional fee of $500 per day per trainer plus travel, room and board expenses for each trainer.

3.2.13    Provide a call center to take incoming calls of Franchisee and to set customer appointments.  The Franchisor will provide this service at no cost to Franchisee for the first six (6) months of Franchisee's operation.

3.2.14    We will maintain a telephone advisory service to provide a prompt response to your technical, administrative and management questions regarding the operation of your franchise.

**4.       FEES AND OTHER PAYMENTS.**

In consideration of the license granted herein, the Franchisee shall pay to the Franchisor the following fees:

- 6 -

4.1      **Initial Franchise Fee.** In consideration of the execution of this Agreement, Franchisee agrees to pay Franchisor an initial franchise fee in the amount set forth in the Schedule "A" to this Agreement (the "Initial Franchise Fee"). The minimum Initial Franchise Fee will be the sum of Twenty-Five Thousand Dollars ($25,000) for a Territory that contains approximately 250,000 people each. The Initial Franchise Fee for additional contiguous counties that are purchased at the time of the execution of the Franchise Agreement is priced at One Hundred Dollars ($100) per One Thousand (1,000) population.

4.2      **Refund of Initial Franchise Fee.** Franchisor will refund Fifteen Thousand Dollars ($15,000) of the Initial Franchise Fee that you have paid if you do not satisfactorily complete the initial training program within 90 days of the execution of this Agreement.

4.3      **Truck Mounted Air Duct Cleaning Equipment.** Franchisee must purchase from our affiliate and sole approved vendor, the proprietary truck mounted air duct cleaning equipment which will be installed on the approved truck chassis that you are required to purchase.

4.4      **Continuing Royalty Fee.**

4.4.1      The Franchisee shall pay to the Franchisor, a continuing monthly royalty fee (the "Royalty Fee"), during the term of this Franchise Agreement, without offset, credit or deduction of any nature, the following sums, based upon Franchisee's Gross Revenue during the previous month, with a minimum monthly Royalty Fee of Seven Hundred Fifty ($750.00) (the "Minimum Royalty Fee") which shall commence on the first anniversary of the opening of the Franchised Business.  The monthly Royalty due is as follows, based on Calendar year cumulative Gross Revenue:

| Gross Revenue | Royalty |
|---|---|
| $1 - $200,000 | 8% |
| $200,001 - $400,000 | 7% |
| $400,001 - $600,000 | 6% |
| $600,001 and over | 5% |

Gross Revenue derived from residential services shall be subject to the monthly Royalty in the month in which the services were rendered to the customer.  Gross Revenue derived from commercial services shall be subject to the monthly Royalty in the first to occur of the following; (i) the month the revenue is actually collected; or (ii) 90 days from the date the services were rendered to the customer.

4.4.2      Payment of Continuing Fees.  All continuing fees due to Franchisor shall be paid by electronic funds transfer through the Automated Clearing House (ACH) transfer on the tenth (10th) day of each month during the Term in the following month based on Gross Revenues in the previous month. Certain other payments due by Franchisee to Franchisor may be collected at such times as Franchisor shall designate.

4.5      "**Gross Revenue**" means the aggregate of all monies and receipts derived from all services and products sold in your Duct Doctor business before payment of any referral fees or customer discounts not approved by Franchisor; all revenue derived from the operation of the Franchised Business and the exploitation of the franchise system and/or the Marks by you and whether the Gross Revenue is

- 7 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

evidenced by cash, credit, services, property or other means of exchange. Gross Revenue also includes the proceeds of any insurance payments intended to replace your revenue as a result of the interruption of your business. Gross Revenue does not include (a) all sales taxes imposed by governmental authorities directly on sales and actually collected from customers, provided these taxes are added to the selling price, and are, in fact paid by you to the appropriate governmental authority, or (b) cash refunds and credit given to customers provided the related sales have been included in Gross Revenue for which royalties were previously paid.

4.6     **National Marketing Fund Fee.** Franchisor shall have the right to require Franchisee to pay to Franchisor, without offset, credit or deduction of any nature, a National Marketing Fund Fee in the amount of Two (2%) of Franchisee's Gross Revenue.

4.7     **Supplier Evaluation Service Fee.** Franchisor's current supplier evaluation service fee payable in connection with requested approval by Franchisee of a then non-approved supplier is $1,000. This service fee is nonrefundable and is due at the time request of approval is submitted to Franchisor. Franchisor reserves the right to modify this service fee at any time upon notice to Franchisee.

4.8     **Other Charges and Service Fees.** Franchisee understands and agrees that the Duct Doctor System is developing and that there may be other charges and service fees that will be agreed upon between Franchisee and Franchisor and assessed to Franchisee either by Franchisor or vendors in connection with existing components of the System or the addition of modified or new components to the System. Franchisee agrees to pay all such other charges and service fees in a timely manner.

4.9     **Annual Increase in Fixed Fees or Fixed Payments.** Franchisor reserves the right to increase the amount of any fixed fee or fixed payment due Franchisor under this Agreement or a related agreement ("Annual Increase"). An Annual Increase to each particular fixed fee or fixed payment may occur only once during any calendar year and may not exceed the corresponding cumulative increase in the Index since the date of this Agreement or, as the case may be, the date that the last Annual Increase became effective for the particular fixed fee or fixed payment being increased. Any and all Annual Increases will be made at the same time during the calendar year. "Index" refers to the Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average for all Items (1982 - 1984 100), not seasonally adjusted, as published by the United States Department of Labor, Bureau of Labor Statistics. If the Index is discontinued or revised during the term of this Agreement, such other governmental index or computation with which it is replaced must be used in order to obtain substantially the same result as would be obtained if the Index had not been discontinued or revised.

4.10    **Method of Payment and Electronic Funds Transfer.** Unless otherwise agreed between Franchisor and Franchisee, all fees and other amounts paid to Franchisor or any affiliate must be made in the form of an electronic or similar funds transfer in the appropriate amount(s) from Franchisee's bank account. Franchisor reserves the right to require Franchisee to pay any fees due under this agreement at any intervals Franchisor may designate and by such means as Franchisor may specify from time to time. Franchisee agrees to execute and deliver to its bank and to Franchisor those documents necessary to authorize such withdrawals and to make payment or deposit as directed by Franchisor. A form of authorization for electronic transfer of funds is attached hereto as Schedule "C". Franchisee further agrees that it will not thereafter terminate such authorization so long as the Franchise Agreement is in effect. Franchisee agrees that it will not close such bank account without prior notice to Franchisor and the

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

establishment of a substitute bank account permitting such withdrawals. Franchisee also agrees that in the event that a direct electronic funds transfer, or other withdrawal program is not available at the bank at which it currently does its business, it will take all reasonable and necessary steps to establish an account at a bank which does have such a program.

4.11    **Payment and Interest on Late Payments.** Except as may otherwise be provided in this Agreement, fees and other amounts due under this Agreement, must be paid 10 days after the date of the invoice from Franchisor. Franchisor will initiate payment on all invoices from Franchisee's bank account 10 days after the date of the invoice by electronic funds transfer as provided in Section 4.1.12, above. If any fee or other amount due under this Agreement is not paid when it is due, Franchisee will pay a late fee of Seventy-Five ($75.00) Dollars plus interest on any balance due from the date due until such amount is paid in full at the highest then-applicable legal rate for open account business credit not to exceed one and one-half percent (1.5%) per month. This charge will accrue whether or not Franchisor or Franchisee exercise their respective rights to terminate this Agreement pursuant to Article 13 hereof.

4.12    **Application of Payments.** All payments by Franchisee pursuant to this Article 4 will be applied in such order as Franchisor may designate from time to time. Franchisee agrees that it may not designate an order for application of any fees different from that designated by Franchisor and expressly acknowledges and agrees that Franchisor may accept fees paid pursuant to different instructions without any obligation to follow such instructions, even if such payment is made by its terms conditional on such instructions being followed. This provision may be waived only by written agreement signed by Franchisor, which written agreement must be separate from the check or other document or medium constituting or transmitting payment.

4.14    **Taxes on Payments and Currency.** In the event that any taxing authority, wherever located, imposes any future tax, levy, or assessment on any payment Franchisee makes to Franchisor, (excluding income tax) Franchisee must, in addition to all payments due to Franchisor, pay such tax, levy, or assessment. All fees and other amounts due Franchisor, or any affiliate thereof, under this Agreement, or any other agreement related to Franchisee's ownership or operation of the Franchised Business, are stated in United States dollars and must be paid in United States dollars.

4.15    **Insufficient Funds, Closed Accounts, and Other Payment Issues.**  It is the responsibility of the Franchisee to maintain an account or credit card on file with the Franchisor to properly ACH, Charge, or Debit any applicable fees owed to the Franchisor.  It is the responsibility of the Franchisee to ensure that proper balances are available to cover any and all fees that may be pulled, charged or debited.  In the event that the Franchisee uses the payment method on file for the Franchisee, and the amounts are unable to be charged by the Franchisor for any reason, a fee of $50 per occurrence will be charged to the account of the Franchisee.  Upon notice of the inability to charge the account, the Franchisee shall have 15 days to remedy the issue and submit updated information for the Franchisor to resubmit any and all charges.

## 5.    LICENSED MARKS

5.1    **Ownership.** Franchisee expressly acknowledges Franchisor's rights in and to the Licensed Marks and agrees not to represent in any manner that Franchisee has acquired any ownership rights in the Licensed Marks. Franchisee agrees not to use any of the Licensed Marks or any marks,

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

names or indicia which are or may be confusingly similar in its own corporate or business name, e-mail address or domain name except as authorized in this Agreement. Franchisee further acknowledges and agrees that any and all goodwill associated with the Duct Doctor System and identified by the Licensed Marks will inure directly and exclusively to the benefit of Franchisor and that, upon the termination or expiration of this Agreement for any reason, no monetary amount will be assigned as attributable to any goodwill associated with Franchisee's use of the Licensed Marks.

5.2     **Authorized Use.**  Franchisee understands and agrees that any use of the Licensed Marks other than as expressly authorized by this Agreement, without Franchisor's prior written consent, may constitute an infringement of Franchisor's rights therein and that the right to use the Licensed Marks granted herein does not extend beyond the expiration or termination of this Agreement. Franchisee expressly covenants that, during the term of this Agreement and thereafter, Franchisee will not, directly or indirectly, commit any act of infringement or contest or aid others in contesting the validity of Franchisor's right to use the Licensed Marks or take any other action in derogation thereof. Franchisee must identify itself as the owner of the Franchised Business (in the manner Franchisor prescribes) in conjunction with any use of the Licensed marks including, without limitation, on invoices, contracts, timesheets, checks, receipts, and business stationary, as well as such conspicuous locations as Franchisor may designate in writing at the premises of the Franchised Business.

5.3     **Infringement.**  Franchisor will have the sole right to handle disputes with third parties concerning Franchisor's ownership of, rights in, or Franchisee's use of, the Licensed Marks or the Duct Doctor System. Franchisee must immediately notify Franchisor in writing if Franchisee receives notice, or learns, of any: (i) improper use of any of the Licensed Marks or elements of the Duct Doctor System; (ii) use by any third party of any mark, design, logo or commercial symbol which, in Franchisee's judgment, may be confusingly similar to any of the Licensed Marks; (iii) use by any third party of any business practice which, in Franchisee's judgment, unfairly simulates the Duct Doctor System in a manner likely to confuse or deceive the public; or (iv) claim, challenge, suit or demand asserted against Franchisee based on Franchisee's use of the Licensed Marks or the Duct Doctor System. Franchisor will have the right to take any action it deems appropriate, including, without limitation, to take no action, and the sole right to control any legal proceeding or negotiation arising out of any infringement, challenge or claim or otherwise relating to the Licensed Marks or the Duct Doctor System.  Franchisee must not settle or compromise any claim, suit or demand asserted against it and agrees to be bound by Franchisor's decisions in handling disputes regarding the Licensed Marks and the Duct Doctor System. Franchisee must cooperate fully with Franchisor and execute any documents and perform any actions that, in Franchisor's judgment, may be necessary, appropriate or advisable in the defense of such claims, suits or demands and to protect and maintain Franchisor's rights in the Licensed Marks and the Duct Doctor System. Unless it is established that a third-party claim asserted against Franchisee is based, directly or indirectly, on Franchisee's misuse of the Licensed Marks or the Duct Doctor System, Franchisor agrees to defend Franchisee against the third-party claim, and hold Franchisee harmless from any claims or damages, provided Franchisee has notified Franchisor immediately after learning of the claim and fully cooperates in the defense of the action. Because Franchisor will defend the third-party claim, Franchisee is not entitled to be reimbursed for legal or other professional fees or costs paid to independent legal counsel or others in connection with the matter.  Franchisee, on behalf of itself and its owners, hereby waives any claim against Franchisor, Franchisor's Affiliates, and their respective officers, directors, shareholders, employees and agents based on third party claims involving the Licensed Marks or the Duct Doctor System including, without limitation, for lost profits or consequential damages of any kind.

- 10 -

5.4     **Operation Under Licensed Marks.** Franchisee must use only the Licensed Marks which Franchisor designates and must use them only in the manner Franchisor authorizes and permits. Franchisee further agrees and covenants to operate and advertise only under the names or marks from time to time designated by Franchisor for use by similarly situated franchisees of Franchisor; to adopt and use the Licensed Marks solely in the manner prescribed by Franchisor, to refrain from using the Licensed Marks to perform any activity or to incur any obligation or indebtedness in such a manner as may, in any way, subject Franchisor to liability therefore; to observe all laws with respect to the registration of trade names and assumed or fictitious names, to include in any application therefore a statement that Franchisee's use of the Licensed Marks is limited by the terms of this Agreement, and to provide Franchisor with a copy of any such application and other registration document(s); to observe such requirements with respect to trademark and service mark registrations and copyright notices as Franchisor may, from time to time, require, including, without limitation, affixing "SM," "TM," or "®" adjacent to all such Licensed Marks in any and all uses thereof; and to utilize such other appropriate notice of ownership, registration and copyright as Franchisor may require.  The Franchisee shall not use the Licensed Marks or any part or form thereof as part of the Franchisee's corporate or other legal name.

5.5     **Modification/Replacement of Licensed Marks.** Franchisor reserves the right to designate one or more new, modified or replacement Licensed Marks for use by franchisees and to require the use by Franchisee of any such new, modified or replacement Licensed Marks in addition to or in lieu of any previously designated Licensed Marks. Any expenses or costs associated with the use by Franchisee of any such new, modified or replacement Licensed Marks will be the sole responsibility of Franchisee, however, Franchisor will reimburse you for your pre-approved expenditures incurred in compliance with this provision in excess of Five Thousand Dollars ($5,000).

5.6     **Non-Exclusive License.** The license of the Licensed Marks granted to Franchisee herein is nonexclusive and Franchisor retains the right, among others, to (i) use the licensed marks itself in connection with selling products and services; (ii) grant other licenses for the Licensed Marks; and (iii) develop and establish other systems using the Licensed Marks, similar marks, or any other marks, and to grant licenses thereto without providing any rights therein to Franchisee.

6.      **STANDARDS OF OPERATION**

6.1     **Site Location and Lease of Premises.** Franchisee may operate the Franchised Business from a home office, or at Franchisee's option, may secure real estate, by purchase or lease, for the operation of the Franchised Business. Within ninety (90) days of the Effective Date of this Agreement, Franchisee agrees to acquire a proposed location (the "Premises") for the Franchised Business that is acceptable to Franchisor. If Franchisee does not operate the Franchised Business from a home-based office, Franchisee agrees to use the Premises solely for the operation of the Franchised Business in the manner and pursuant to the standards prescribed herein, in the Operations Manual or otherwise in writing, and to refrain from using or permitting the use of the Premises for any other purpose or activity at any time.

6.2     **Opening of the Franchised Business.** Franchisee must open its Duct Doctor business for business within one hundred eighty (180) days of the Effective Date of this Agreement.

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

6.3    **Quality Standards for Fixtures, Equipment and Supplies.** All fixtures, equipment, vehicles and supplies for the Franchised Business must meet the quality standards set forth in Franchisor's Operations Manual or otherwise in writing, subject to compliance with applicable laws and regulations.

6.4    **Signage.** Subject to compliance with applicable laws and regulations, Franchisee must acquire all signs as required by Franchisor for use at or in connection with the Franchised Business.

6.5    **Training.** Prior to the Opening Date and within one hundred twenty (120) days of signing this Agreement, as determined by Franchisor, taking into consideration the completion of the installation of the truck-mounted duct cleaning equipment, Franchisee must complete Franchisor's initial training program ("Initial Training"). Franchisee and its designated and approved Manager and technicians must complete Franchisor's Initial Training program to the satisfaction of Franchisor. Failure to complete the Initial Training to Franchisor's satisfaction may result in the termination of this Agreement.

6.5.1. To assist Franchisee in the operation of Franchisee's business, Franchisor may offer additional training programs and/or refresher courses to Franchisee, Franchisee's Manager and/or Franchisee's technicians. Franchisee must attend and satisfactorily complete training on any new products or services offered by Franchisor as a condition to receiving Franchisor's permission to offer those products and services to customers. Franchisor may require Franchisee's attendance at these programs and/or courses. Franchisee is responsible for the expenses of Franchisee, and Franchisee's employees, including transportation to and from the training site and lodging, meals, and salaries during such training. The additional training programs and refresher courses will be at Franchisor's then-current tuition for such training.

6.6    **Hiring and Supervision.**

6.6.1 Franchisee will have sole authority and control over the day-to-day activities of its employees. Franchisee must hire and at all times maintain a sufficient number of qualified, competent personnel, in order to offer prompt, courteous and efficient service to the public, and otherwise operate the Franchised Business in compliance with the System. To protect and maintain the goodwill of the Marks and the System, all employees, engaged in the operation of Franchisee's Franchised Business during working hours must dress conforming to Franchisor's standards, must present a neat and clean appearance (wearing Franchisor's uniforms) in conformance with Franchisor's reasonable standards and must render competent professional service to the customers of Franchisee's business. All technicians must be appropriately licensed where required and must pass a drug screen prior to their hiring.

6.6.2 The Franchised Business must be under the supervision of the Franchisee (or, if the Franchisee is a business entity, the Franchisee's designated and fully trained Manager) who will devote his or her full time and energy to the operation of the Franchised Business.

6.6.3 Franchisee is responsible for all employment decisions of the Franchised Business, including hiring, firing, training, promotion, wage and hour requirements, recordkeeping, supervision and discipline of employees. All employees must pass any applicable tests required by any governmental entity, submit to pre-employment and random drug tests, and have a criminal background

- 12 -

investigation performed. Franchisee is responsible and assumes liability for all hiring decisions. We will not be considered as "joint-employers" of any of your employees.

6.7    **Maintenance of Premises and Vehicles.** Franchisee agrees to maintain the Premises, and all fixtures, furnishings, signs and equipment thereon, in conformity with Franchisor's then-current standards at all times during the term of this Agreement and to make such repairs and replacements thereto as Franchisor may require. Without limiting the generality of the foregoing, Franchisee specifically agrees:

6.7.1    To keep the Premises and all equipment at all times in a high degree of repair, order and condition, including, without limitation, replacement of, and/or maintenance and repair to, all fixtures, furnishings, signs and equipment as Franchisor may from time to time reasonably direct;

6.7.2    To meet and maintain at all times all governmental standards and ratings applicable to the operation of the Franchised Business or such higher minimum standards and ratings as set forth by Franchisor from time to time in its Operations Manual or otherwise in writing; and

6.7.3    To cause its employees to wear apparel which conforms strictly to the specifications, design, color and style approved by Franchisor from time to time.

6.7.4    Franchisee shall ensure the continual operation of the Global Positioning Satellite System ("GPS") that is installed in every truck by Franchisor's affiliate. Franchisee further agrees to allow Franchisor to install GPS systems on all other trucks or vehicles used by Franchisee in the Franchised Business. Franchisor shall be responsible for the payment of all monitoring fees of the GPS systems.

6.8    **Operation of the Franchised Business.** Franchisee agrees to comply with all rules, regulations, policies and standards for the Duct Doctor System, which by their terms are mandatory, including, without limitation, those contained in the Operations Manual. Franchisee must operate and maintain the Franchised Business solely in the manner and pursuant to the standards prescribed herein, in the Operations Manual or in other written or electronically published materials provided by Franchisor to Franchisee from time to time and must make such repairs and replacements to the Premises and the duct cleaning equipment as Franchisor may require to ensure that Franchisor's required degree of quality, service and image is maintained and must refrain from deviating therefrom and from otherwise operating in any manner which adversely reflects on Franchisor's name and goodwill or on the Licensed Marks. Without limiting the generality of the foregoing, Franchisee specifically agrees as follows:

6.8.1    To purchase, install and use, at Franchisee's expense, all such fixtures, furnishings, signs and equipment, all as may be required by Franchisor, as Franchisor may prescribe from time to time and to refrain from purchasing, installing or using on, about or in connection with the Premises any such item not meeting Franchisor's standards and specifications.

6.8.2    To maintain in sufficient supply, and use at all times, only operating products, materials, supplies and expendables, as conform with Franchisor's then-current standards and specifications and to refrain from using non-conforming items without Franchisor's prior consent.

- 13 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

6.8.3    To sell and to offer for sale all such services and products as Franchisor may, from time to time require, and only those which Franchisor may, from time to time approve, which are not subsequently disapproved, as meeting its quality standards and specifications. In addition to any remodeling, repairs, replacement and redecoration required by this Article 6, in order to introduce new services and product through all Duct Doctor Businesses, Franchisee may be required to expend additional amounts on new, different or modified software, equipment or fixtures necessary to offer such new services or products.

6.8.4    To use such standardized accounting forms, accounting systems, reporting forms and other forms as may be developed from time to time by Franchisor and to file such forms with Franchisor in a timely manner as may be required by Franchisor.

6.8.5    To record all billings and maintain all business information and records associated with the Franchised Business using the reporting systems, business management software, and associated equipment specified by Franchisor in the Operations Manual and to maintain, without alteration, all information and categories required by Franchisor. Franchisee hereby authorizes Franchisor to access all information maintained by Franchisee whether by inspection of the Premises or through other means of electronic retrieval, as Franchisor deems necessary it its sole discretion at any time. Franchisee acknowledges that all of Franchisee's business information, customer information and customer lists are the property of Franchisor.

6.8.6    To obtain and install and maintain at the Franchised Business, at Franchisee's sole cost and expense, all computer hardware and software Franchisor requires. Franchisee will use such computer systems and software to record all client information, for your accounting and bookkeeping functions, for scheduling, for Internet communication and email, for extranet programs, and as Franchisor may otherwise specify. Franchisee must obtain independent support for all hardware and software. Franchisee must obtain and maintain an approved Payment Card Industry (PCI) compliance program for the Franchised Business. Franchisor may suggest third party PCI compliance vendors to Franchisee, but Franchisee is solely responsible for its own PCI compliance at the Franchised Business.

6.9    **Participation in Promotions.** Franchisee agrees to participate in system-wide and applicable regional promotions and advertising campaigns that Franchisor originates or approves. These may include promotions via the Internet, e-commerce, electronic media or other media. Franchisee also agrees to participate at its sole expense in all client loyalty, gift certificate and similar programs created by Franchisor.

6.10    **Purchases.** Franchisee acknowledges and agrees that Franchisee's obligations set forth in this Agreement and the Operations Manual are reasonable and necessary for the operation of the Franchised Business and to maintain uniformity throughout the Duct Doctor System. Franchisee acknowledges that Franchisor may designate a sole approved supplier of any product and that Franchisor or Franchisor's affiliated companies may be the sole source of supply. **FRANCHISEE UNDERSTANDS AND AGREES THAT THE FRANCHISOR OR FRANCHISOR'S AFFILIATE(S) MAY BE THE SOLE APPROVED SUPPLIER OF THE EQUIPMENT THAT YOU MAY USE IN PROVIDING SERVICES TO CUSTOMERS OF YOUR FRANCHISED BUSINESS. FRANCHISEE UNDERSTANDS AND AGREES THAT FRANCHISOR OR FRANCHISOR'S AFFILIATE(S) ARE AND WILL LIKELY REMAIN THE SOLE SOURCE OF**

- 14 -

**SUPPLY FOR THE EQUIPMENT AND THAT FRANCHISOR OR FRANCHISOR'S AFFILIATE(S) WILL SET THE PRICE AT WHICH THOSE ITEMS ARE SOLD TO FRANCISEE AND THAT FRANCISOR AND ITS AFFILIATE(S) EXPECT TO GENERATE PROFITS FROM SUCH SALES.**

6.10.1  Recognizing that preservation of the Duct Doctor System depends upon product and service uniformity and the maintenance of Franchisor's trade dress, Franchisee agrees to purchase certain signs, furnishings, supplies, fixtures, equipment, inventory, and all items bearing the Marks or logo exclusively from Franchisor or from approved or designated third party suppliers as Franchisor specifies, from time to time, in the Operations Manual and otherwise in writing. Franchisee hereby acknowledges that Franchisor, Franchisor's affiliate and/or a third party may be one of several, or the only, approved supplier of any item.

6.10.2  In the event Franchisee wishes to purchase any unapproved item, including inventory, and/or acquire approved items from an unapproved supplier, Franchisee must provide Franchisor the name, address and telephone number of the proposed supplier, a description of the item Franchisee wishes to purchase, and purchase price of the item, if known. Franchisee also must pay Franchisor the current Supplier Evaluation Fee as described in Section 4.7. At Franchisor's request, Franchisee must provide Franchisor, for testing purposes, a sample of the item Franchisee wishes to purchase. If Franchisor incurs any costs in connection with testing a particular product or evaluating an unapproved supplier at Franchisee's request, Franchisee or the supplier must reimburse Franchisor for Franchisor's reasonable testing costs, regardless of whether Franchisor subsequently approves the item or supplier. Nothing in the foregoing will be construed to require Franchisor to approve any supplier. Franchisor may base Franchisor's approval of any such proposed item or supplier on considerations relating not only directly to the item or supplier itself, but also indirectly to the uniformity, efficiency, and quality of operation Franchisor deems necessary or desirable in Franchisor's System as a whole. Nothing herein will require Franchisor to approve any suppliers for a given item, which approval might, in Franchisor's judgment, result in higher costs or prevent the effective or economical supervision of approved suppliers. Franchisor may revoke Franchisor's approval of products or suppliers when Franchisor determines that such products or suppliers no longer meet Franchisor's standards. Upon receipt of written notice of such revocation, Franchisee must cease purchasing products from such supplier. Franchisee must use products purchased from approved suppliers solely in connection with the operation of Franchisee's business and not for any competitive business purpose.

Franchisor may establish business relationships, from time to time, with suppliers who may produce, among other things, certain furnishings, supplies, fixtures, equipment and inventory according to Franchisor's proprietary standards and specifications or private label goods which Franchisor has authorized and prescribed for sale by System franchisees ("System Suppliers"). Franchisee recognizes that such products are essential to the operation of the Franchised Business and to the System generally. Franchisee further recognizes that Franchisee's failure to pay System Suppliers may interfere with such suppliers' willingness to supply the System which may result in other System franchisees' inability to obtain product or ability to obtain product only on less favorable credit terms. Accordingly, Franchisee agrees to pay System Suppliers as and when due.

6.11  **Hours of Business.** Unless otherwise specifically approved by Franchisor, Franchisee's business must be open for the conduct of business at such times and for the minimum number of hours

- 15 -

specified by Franchisor in the Operations Manual, as may be amended from time to time or, if different, for such hours as may be required by the terms of any lease of the Premises; and Franchisee must at all times staff the Franchised Business with such number of employees and operate the business diligently so as to maximize the revenues and profits therefrom.

6.12    **Printed Materials.** Franchisee must use only business stationery, business cards, marketing materials, advertising materials, printed materials or forms which have been approved in advance by Franchisor. Any and all supplies or materials purchased, leased or licensed by Franchisee must always meet those standards specified by Franchisor in the Operations Manual or otherwise in writing.  Franchisor also reserves the right to specify the useful life or promotional timeline of the advertising materials and additionally where they can be purchased to adhere to brand standards.

6.13    **Identification of the Franchised Business.** In all advertising displays and materials at the Franchised Business, Franchisee must, in such form and manner as may be specified by Franchisor in the Operations Manual, notify the public that Franchisee is operating the business licensed hereunder as a Franchisee of Franchisor and must identify its Duct Doctor Business in the manner specified by Franchisor in the Operations Manual. Franchisee will also post a notice at its Franchised Business notifying all of its employees that they are employees of Franchisee and not Franchisor in the manner prescribed by Franchisor.

6.14    **Client Complaints.** Franchisee must respond promptly to client complaints and take such other steps as may be specified by Franchisor in the Operations Manual or otherwise to ensure positive client relations.

6.15    **Third Party Actions.** Franchisee must notify Franchisor in writing within five (5) days of any written threat or the actual commencement of any action, suit or proceeding, or of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality which may adversely affect the operation or financial condition of the Franchised Business.

6.16    **Inspection of the Business Premises.** Franchisee hereby grants to Franchisor and its agents the right to enter upon the Premises, without notice, at any reasonable time for the purpose of conducting inspections of the Premises, Franchisee's books, records, computer hardware and software, and other business equipment and vehicles, and Franchisee agrees to render such assistance as may reasonably be requested and to take such steps as may be necessary immediately to correct any deficiencies detected during such an inspection upon the request of Franchisor or its agents.

6.17    **Possible Variation in Certain Standards.** Because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor specifically reserves the right and privilege to vary standards for any franchisee based upon the peculiarities of a particular site or circumstance, density of population, business potential, population of trade area, licensing requirements, existing business practices or any other conditions which Franchisor deems to be of importance to the successful operation of such franchisee's business. Franchisee will have no recourse against Franchisor on account of any variation from standard specifications and practices granted to any franchisee and will not be entitled to require Franchisor to grant Franchisee a like or similar variation hereunder.

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

6.18     **Attendance at Annual Convention.** Franchisor may hold an annual convention (the "Convention") at a location we select. We will determine the topics and agenda for the Convention to serve the purpose among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and our personnel regarding business operations, and recognizing franchisees for their achievements. Franchisee or Franchisee's representative must attend the Convention and to pay our then-current registration fee. If we charge a registration fee for the Annual Convention, you must pay the fee regardless of whether you attend. All expenses, including Franchisee's transportation to and from the Annual Convention, and lodging, meals, and salaries during the Annual Convention, are the responsibility of Franchisee.

6.19     **Intellectual Property Belongs to Franchisor.** If Franchisee, Franchisee's employees, or principals develop any new concept, process or improvement in the operation or promotion of the Franchised Business, or the Duct Doctor System, Franchisee will promptly notify Franchisor and provide Franchisor with all necessary related information, without compensation. Any such concept, process, or improvement will become Franchisor's sole property and Franchisor will be the sole owner of all patents, patent applications, trademarks, copyrights and other intellectual property rights related thereto. Franchisee and Franchisee's principals hereby assign to Franchisor any rights Franchisee may have or acquire therein, including the right to modify such concept, process or improvement, and otherwise waive and/or release all rights of restraint and moral rights therein and thereto. Franchisee and Franchisee's principals agree to assist Franchisor in obtaining and enforcing the intellectual property rights to any such concept, process or improvement in any and all countries and further agree to execute and provide Franchisor with all necessary documentation for obtaining and enforcing such rights. Franchisee and Franchisee's principals hereby irrevocably designate and appoint Franchisor as Franchisee's agent and attorney-in-fact to execute and file any such documentation and to do all other lawful acts to further the prosecution and issuance of patents or other intellectual property rights related to any such concept, process or improvement. In the event that the foregoing provisions of this Section 6.19 are found to be invalid or otherwise unenforceable, Franchisee and Franchisee's principals hereby grant to Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense the use of the concept, process or improvement to the extent such use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights therein.

6.20     **Personal Guaranty of Franchisee's Principal Owners**. Franchisee covenants, warrants, and agrees that when Franchisee signs this Agreement, and at all times thereafter, Franchisee will cause each owner of  Five percent (5%) equity in Franchisee, (each, a "Principal Owner") and each successor to any or all of them, to execute and deliver, in his or her individual capacity, the form of Personal Guaranty attached to this Agreement as Schedule "E".

6.21     **Compliance with Laws.** Franchisee will operate the Franchised Business in strict compliance with all applicable federal, state, and local statutes, regulations, rules, ordinances.  Franchisee will: (i) strictly comply with all applicable wage, hour, anti-discrimination, and anti- harassment Laws, and the Americans with Disabilities Act, as amended from time to time; and the successor legislation to any and all of them; (ii) duly file all tax returns Franchisee is required to file; (iii) duly pay all taxes Franchisee is obligated to pay; and (iv) obtain and maintain in good standing all necessary licenses, permits, and other required forms of governmental approval required of Franchisee in order to operate the Franchised Business. You must furnish us with copies of all licenses upon our request.

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

6.22    **Patriot Act Compliance.** Franchisee hereby covenants, warrants, agrees, represents, and certifies to Franchisor that neither Franchisee nor any of Franchisee's directors, officers, shareholders, partners, members, employees, or agents, nor any of Franchisee's affiliates, or their directors, officers, shareholders, partners, members, employees, or agents, nor any other direct or indirect interest holders of any of the foregoing: (i) are or have been listed on any Governmental Lists (as defined in Paragraph 6.23.1 of this Agreement): (ii) are or have been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No.13224 (Sept. 23, 2001), or any other similar prohibitions contained in the rules and regulations of OFAC (as defined in Paragraph 6.23.2 of this Agreement) or in any enabling legislation or other Presidential Executive Orders in respect thereof; (iii) have been indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any offenses under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA Patriot Act"); (iv) are or have been under investigation by any Governmental Authority (as defined in Paragraph 7.5.3 of this Agreement) for alleged criminal activity; or (v) have or have had a reputation in the community for criminal or unethical behavior.  As used in this Paragraph 6.23 of this Agreement, the following definitions apply:

6.22.1    "Governmental Lists" means any of the following lists: (i) the "Specially Designated Nationals and Blocked Persons List" maintained by OFAC; (ii) any other list of terrorists, terrorist organizations, or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC; or (iii) any similar list maintained by the United States Department of State, the United States Department of Commerce, or any other Governmental Authority, or pursuant to any Executive Order of the President of the United States.

6.22.2    "OFAC" means the Office of Foreign Assets Control, United States Department of the Treasury, or any other office, agency, or department that succeeds to the duties of OFAC.

6.22.3    "Government Authority" means all federal, state, local, foreign, or other governmental or regulatory agencies, authorities (including self-regulating authorities), instrumentalities, commissions, boards, and bodies.

# 7.    OPERATIONS MANUAL

7.1    **Compliance with Operations Manual.** In order to protect the reputation and goodwill of the businesses operating under the Duct Doctor franchise system and to maintain standards of operation under the Licensed Marks, Franchisee must conduct the Franchised Business operated under the System in accordance with various written instructions, including technical bulletins and confidential manuals (hereinafter and previously referred to collectively as the "Operations Manual"), including such amendments thereto, as Franchisor may publish from time to time, all of which Franchisee acknowledges belong solely to Franchisor and are on loan from Franchisor during the term of this Agreement. When any provision in this Agreement requires that Franchisee comply with any standard, specification or requirement of Franchisor, unless otherwise indicated, such standard, specification or requirement will be as set forth in this Agreement or as may, from time to time, be set forth by Franchisor in the Operations Manual.

7.2    **Confidential Use.** Franchisee must at all times use its best efforts to keep the Operations Manual and any other manuals, materials, goods and information created or used by Franchisor and

- 18 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

designated for confidential use within the Duct Doctor System and the information contained therein as confidential and limit access to employees of Franchisee on a need-to-know basis. Franchisee acknowledges that the unauthorized use or disclosure of Franchisor's confidential information or trade secrets will cause irreparable injury to Franchisor and that damages are not an adequate remedy. Franchisee accordingly covenants that it will not at any time, without Franchisor's prior written consent, disclose, use, permit the use thereof (except as may be required by applicable law or authorized by this Agreement), copy, duplicate, record, transfer, transmit or otherwise reproduce such information, in any form or by any means, in whole or in part, or otherwise make the same available to any unauthorized person or source. Any and all information, knowledge and know-how not known about the System and Franchisor's products, services, standards, procedures, techniques and such other information or material as Franchisor may designate as confidential will be deemed confidential for purposes of this Agreement.

7.3     **Revisions.** Franchisee understands and acknowledges that Franchisor may, from time to time, revise the contents of the Operations Manual to implement new or different requirements for the operation of the Franchised Business, and Franchisee expressly agrees to comply with all such changed requirements which are by their terms mandatory, provided that such requirements will also be applied in a reasonably nondiscriminatory manner to comparable businesses operated under the Duct Doctor System by other franchisees. Franchisee acknowledges that Franchisor may provide updates to the Operations Manual electronically over its website. Franchisee agrees, therefore, to periodically check Franchisor's website on at least a weekly basis, for such updates. The implementation of such requirements may require the expenditure of reasonable sums of money by Franchisee. Franchisee must at all times ensure that its copy of the Operations Manual is kept at the Premises and kept current and up to date. In the event of any dispute as to the contents thereof, the terms and dates of the master copy thereof maintained by Franchisor at its principal place of business will be controlling.

## 8.     ADVERTISING AND MARKETING

8.1     **National Marketing Fund.** When established, Franchisee must contribute the amount specified in Section 4.6 herein (the "National Advertising Fee") to our National Marketing Fund. The National Advertising Fee is in addition to the Local Advertising Requirement. The National Advertising Fee is due and is payable in the same manner as the monthly Royalty Fee. Franchisor and Affiliate owned Duct Doctor Businesses will contribute to the National Marketing Fund in the same manner and in the same amounts as Franchised Businesses are required to contribute under this Agreement. Franchisor or Franchisor's designee, which may be our affiliate, will maintain and administer the National Marketing Fund, as follows:

8.1.1     Franchisor will direct all National Marketing Fund marketing programs with sole discretion over the creative concepts, materials, media placement, and allocation of funds.

8.1.2     Franchisee understands and agrees that the National Marketing Fund is intended to maximize general public recognition and acceptance of the Marks for the benefit of the Duct Doctor System and that Franchisor and Franchisor's designees have no obligation in administering the National Marketing Fund to make expenditures for Franchisee that are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee or geographic region benefits directly or pro rata from National Marketing Fund advertising or promotional activities.

- 19 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

8.1.3    The National Marketing Fund may be used to meet any and all costs of preparing, maintaining, and administering advertising and promotional programs, including without limitation: (i) the cost of preparing and conducting television, radio, magazine, newspaper, direct mail, Internet advertising campaigns, and other advertising and promotional activities; (ii) employing advertising and public relations agencies; (iii) providing promotional brochures, and other advertising and marketing tools and materials; (iv) the establishment of a customer call center; and (v) paying the reasonable compensation of Franchisor's employees or other third parties providing services related to any activity relating to the National Marketing Fund. Franchisor will not use money from the National Marketing Fund to pay any of Franchisor's general operating expenses except for reasonable administrative costs, out-of-pocket expenses, and overhead that relates to the administration or direction of the National Marketing Fund and advertising or promotional programs, including without limitation conducting market research, preparing marketing and advertising materials, collecting and accounting for assessments for the National Marketing Fund, and defending any claims against the National Marketing Fund. Franchisor does not have any obligation to Franchisee or any other contributor to the National Marketing Fund to act to collect delinquent contributions from other National Marketing Fund contributors. The National Marketing Fund shall not be used to advertise the sale of franchises; however, advertising and promotional materials, including Franchisor's web site may contain information or designated pages that reference the availability of Duct Doctor franchise opportunities.

8.1.4    Franchisor reserves the right to terminate the National Marketing Fund at any time, provided, however, no termination will be effective until all monies in the National Marketing Fund have been spent for advertising or promotional purposes or returned to their contributors in proportion to their contributions.

8.1.5    Franchisor will prepare an accounting of the books of the National Marketing Fund annually and will provide you with a copy of such accounting upon Franchisee's written request. Franchisor reserves the right, at Franchisor's option, to require that such annual accounting be prepared by an independent certified public accountant selected by Franchisor and paid for by the National Marketing Fund.

8.1.6    Franchisee acknowledges and agrees that Franchisor will not be acting as and shall not be charged with being or construed to be, a trustee, fiduciary, agent, or in any other special capacity in relation to the National Marketing Fund, to Franchisee or to any other contributor to the National Marketing Fund.

8.2    **Cooperative Advertising and/or other Marketing Programs.** Franchisee must participate in all cooperative advertising and/or marketing programs as are from time to time prescribed by Franchisor. The terms and conditions required for participation in any such co-op advertising program or programs will be as specified in the Operations Manual.

8.3    **Local Advertising.** Franchisee shall spend Two percent (2%) of its monthly Gross Revenue to promote the Franchised Business in the Territory.  Upon Franchisor's request, Franchisee shall furnish evidence of its required expenditures.

- 20 -

8.4     **Franchisor's Control Over Advertising Materials**. Franchisee must use only advertising and marketing materials that Franchisor has provided to Franchisee or that Franchisor has approved in advance. In the event Franchisee desires to use advertising and marketing materials that Franchisor has provided to Franchisee, Franchisee must submit to Franchisor a description of the media in which Franchisee proposes to use them for Franchisor's consent prior to such use. Franchisor will have ten (10) days in which to approve or disapprove the use of such materials in the media proposed. If Franchisor does not approve the use of such materials within ten (10) days after Franchisor receives them from Franchisee, they will be deemed not approved. In the event Franchisee desires to use advertising and marketing materials that Franchisor has not provided, Franchisee must submit such advertising and promotional materials, together with a description of the media in which Franchisee proposes to use them, to Franchisor for Franchisor's review prior to such use. Franchisor will have ten (10) days in which to approve or disapprove such materials and their use in the media proposed. If Franchisor does not approve the use of such materials or media within ten (10) days after we receive them from you, they will be deemed not approved. All advertising must prominently display the Licensed Marks and must comply with any standards for use of the Licensed Marks Franchisor establishes as set forth in the Operations Manual or otherwise in writing. Franchisor may require Franchisee to discontinue the use of any advertising or marketing material, within time frames prescribed by Franchisor, at Franchisee's sole cost and expense. Franchisee acknowledges and agrees that all advertising materials provided by Franchisor on behalf of the System are protected by copyright and are Franchisor's exclusive property.

8.5     **Franchisor's Control Over Print, Web, Televised and Other Media**. In the event that the Franchisee is approached to provide advertising, expertise, or interviews for national, local or other sources, Franchisee must contact Franchisor for explicit permission to carry out the request. Franchisor will have ten (10) days in which to approve or disapprove the request. If Franchisor does not approve the request within ten (10) days after Franchisor receives it from Franchisee, it will be deemed not approved. At the Franchisor's sole discretion, we can designate someone other than you, the Franchisee, to participate in the request or have another individual assist you in the request.  Franchisee acknowledges and agrees that it is in the best interest of the Brand, to provide media outlets or other requests with the best professionals that we have to offer to promote the brand and properly represent the entire Duct Doctor system.

8.6     **Website Matters** Franchisee may not establish or maintain a Web Site, splash page or other presence on the Internet through any internet or social networking site in connection with the operation of the Franchised Business, including, but not limited to Facebook, LinkedIn, Pinterest, Google+, Twitter, Instagram or YouTube, that uses any variation of the Marks or references the System. Franchisor will have sole control over the establishment and maintenance of any social networking sites for the Franchised Business. Franchisee may not establish social media accounts outside of what is established by the Franchisor. Franchisee is not permitted to use any Mark in any domain name that is not provided or pre-approved by Franchisor. Franchisor may establish a website that provides information about the System and Franchisor's products and services. Franchisor may use part of the monies from the National Marketing Fund that Franchisor collects under this Agreement to pay or reimburse the costs associated with the development, maintenance and update of such web site. Franchisor will be the web master, either directly or through a third party, or have the right to control such website. Franchisor owns the pages, marks, and assets of all websites and social networking accounts associated with the Franchised Business.

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

8.6.2  Franchisee acknowledges that Franchisor is the lawful, rightful and sole owner of the Internet domain name www.ductdoctor.com and other Internet domain names registered by Franchisor, and unconditionally disclaims any ownership interest in those or any similar Internet domain name. Franchisee agrees not to register any Internet domain name in any class or category that contains words used in or similar to any brand name owned by Franchisor or Franchisor's affiliates or any abbreviation, acronym, phonetic variation or visual variation of those words.

## 9.  MODIFICATIONS.

9.1  **Modifications to the System.** Franchisee agrees that Franchisor may modify all or any part of the System to adapt to changes in the marketplace, economic conditions, business conditions, the law, demands of consumers, Franchisor's business needs, and the needs of the System. Franchisee further agrees that such modifications may include additions to, deletions from, or modifications to the products and services Franchisee offers for sale or deliver through the Franchised Business; modifications to any or all of the rules, guidelines, standards, specifications, plans, programs, methods, techniques, and procedures related to the Franchised Business; and additions, deletions, from, and modifications of the Marks. Franchisee agrees that it expects Franchisor to change the System and warrants, covenants, and agrees to comply with all rules, guidelines, standards, specifications, plans, programs, methods, techniques, procedures and Confidential operations manuals, related to the System, as we add to, delete from, and modify any or all of them from time to time, and with this Agreement. Franchisor agrees that such additions to, deletions from, and modifications of such rules, guidelines, standards, specifications, plans, programs, methods, techniques, procedures, and Confidential Operations Manuals, will not materially and unreasonably increase Franchisee's obligations set forth in this Agreement. Franchisor reserves the right to change or modify the Licensed Marks. Franchisor may adopt and use new or modified trade names, trademarks, service marks, logos, equipment, software, products, techniques or concepts. Franchisor may add new and different services and products and withdraw services or products or change their names or image; redesign the trade dress, software programs and equipment or fixture standards; or discontinue them as Franchisor considers appropriate. Franchisee must accept and use the changes as if they were part of this Agreement. If changes are related to the Licensed Marks, then Franchisee will have one hundred twenty (120) days from the date of notice to implement any such changes under this Section 9.1.

9.2  **Test Marketing.** If Franchisor permits Franchisee to participate in any new service or product concept test, Franchisee agrees to do so in compliance with Franchisor's standards and requirements.

## 10.  STATEMENTS, RECORDS AND FEE PAYMENTS

10.1  **Maintenance of Records.** Franchisee must obtain the right to use, maintain and update (including any required replacements) the accounting system prescribed by Franchisor in the Operations Manual, or otherwise. Franchisee must, in a manner satisfactory to Franchisor, maintain original, full and complete register records, accounts, books, data, licenses, contracts and supplier invoices which will accurately reflect all particulars relating to Franchisee's business and such statistical and other information or records as Franchisor may require and keep all such information for not less than seven (7) years, even if this Agreement is no longer in effect. Upon Franchisor's request, from time to time, Franchisee must furnish Franchisor with copies of any or all supply invoices reflecting purchases by the

- 22 -

Franchised Business. In addition, Franchisee must compile and provide to Franchisor any statistical or financial information regarding the operation of the Franchised Business, the products sold by it or data of a similar nature as Franchisor may reasonably request for purposes of evaluating or promoting the Franchised Business or the Duct Doctor System in general.

10.2    **Examination of Records.** Franchisor and its designated agents, including accountants and auditors, will have the right to examine and audit such records, accounts, books and data at all reasonable times at the place(s) where such records, accounts, books and data are maintained by or for Franchisee to ensure that Franchisee is complying with the terms of this Agreement. Franchisor has the right to have an independent third party audit the records, accounts, books and data of Franchisee. If the examination reveals that any financial information Franchisee reported, and any amounts Franchisee paid Franchisor, or its affiliates are less than the amounts Franchisor calculates, Franchisee must immediately pay Franchisor the amount owing in accordance with the corrected report, plus interest as provided in this Agreement. If the examination reveals a discrepancy of 2% or more of the amount that Franchisee should have paid or reported, Franchisee also must pay and reimburse Franchisor for all expenses connected with the examination. This may include reasonable accounting and legal fees and travel expenses. Franchisor also may exercise any other remedies Franchisor may have under this Agreement.

10.3    **Reports.** Upon Franchisor's request, Franchisee will prepare and furnish Franchisor with signed reports and returns of customer billings, bank statements, monthly unaudited profit and loss statements, use and gross receipt taxes and complete copies of any state or federal income tax returns covering the operation of the Franchised Business and such other reports as Franchisor may reasonably request, all of which Franchisee must certify as true and correct.  Franchisee must provide the following reports to Franchisor in the form prescribed by Franchisor; (i) Royalty Report on or before the 10th day of each month; (ii) Advertising Fund Report on before the 10th day of each month; (iii) annual Profit and Loss Statement, Balance Sheet and complete copy of business tax return on or before 120 days following the end of Franchisee's fiscal year.

## 11.    COVENANTS NOT TO COMPETE AND MAINTAIN CONFIDENTIALITY

11.1    **Franchisee Defined.** Unless otherwise specified, the term "Franchisee" as used in this Article 11 will include, collectively and individually, all owners, guarantors, officers, directors, members, managers, partners, as the case may be, and holders of any ownership interest in Franchisee.

11.2    **Confidential Information.** For purposes of this Agreement, "Confidential Information" means any information that the Franchisor regards as confidential or proprietary. "Confidential Information" includes, but is not limited to, the whole or any portion of know-how, knowledge, methods, specifications, processes, procedures and/or improvements relating to the Duct Doctor System, the Operations Manual, the methods of site selection, marketing methods, recruiting, service analysis and selection, service methods and skills, prospective and current customer information, employee information, and any other business information that is not generally known to Franchisor's competitors, as well as the content of this Agreement and any other document executed in connection with this Agreement.

11.3    **Non-Use and Non-Disclosure of Confidential Information.** Franchisee acknowledges that over the term of this Agreement, Franchisee will receive Confidential Information

- 23 -

which Franchisor has developed over time and at great expense. Franchisee acknowledges and agrees that Franchisor's Confidential Information is not generally known in the industry and is beyond Franchisee's own present skills and experience, and that it would be expensive, time consuming and difficult for Franchisee to develop. Franchisee further acknowledges that Franchisor's Confidential Information provides a competitive advantage and would be valuable to Franchisee in the development of its business. Accordingly, Franchisee acknowledges that it will not, during the term of this Agreement or for a continuous period of twenty-four (24) months immediately following the expiration, transfer or termination of this Agreement, use any Confidential Information for any purpose except to operate the Franchised Business. Franchisee will not disclose any Confidential Information to any individual, entity or organization, except to any of Franchisee's representatives to the extent necessary for the operation of the Franchised Business, and only after the representatives are advised of the confidential nature of the information and agree to maintain its confidentiality.

Notwithstanding the foregoing, you are authorized to disclose the terms of this Agreement to any lender providing you financing for the Franchised Business as well as to your landlord. The protections granted hereunder will be in addition to and not in lieu of all other protections for such trade secrets and Confidential Information as may otherwise be afforded in law or in equity.

11.4     **Non-Compete Covenants.** Franchisee agrees that it will receive valuable training, goodwill, and Confidential Information that it otherwise would not receive or have access to but for the rights licensed to it under this Agreement. Franchisee therefore agrees to the following non- competition covenants:

11.4.1   Franchisee covenants that during the term of this Agreement that it will not divert or attempt to divert any business, client or potential client or customer of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, or to do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Licensed Marks or the Duct Doctor Franchise System.

11.4.2   Franchisee covenants that during the term of this Agreement that it will not either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in any business, other than the one authorized by this Agreement or any other agreement between Franchisor and Franchisee that would be considered to be a Competing Business. For purposes of this Section 11.4, a "Competing Business" is any business that provides (i) residential or commercial air duct cleaning services and indoor air quality services; or (iii) any product or service that Franchisee sold or offered to customers or prospective customers as part of the Duct Doctor Franchise System during the term of this Agreement.

11.4.3   Franchisee covenants that it will not, for a period of twenty-four (24) months after the expiration, non-renewal, transfer or termination of this Agreement, regardless of the cause of termination, or within twenty-four (24) months of the sale of the Franchised Business or any interest in Franchisee, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in any Competing Business within fifty (50) miles of the Protected Territory of the former Franchised Business or within fifty (50) miles and the Protected Territory of any other Duct Doctor Franchisee.

- 24 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

11.4.4   Franchisee covenants that it will not, for a period of twenty-four (24) months after the expiration, non-renewal or termination of this Agreement, regardless of the cause of termination, or within twenty-four (24) months of the sale of the Franchised Business or any interest in Franchisee, solicit business from customers of Franchisee's former Franchised Business, or contact any of Franchisor's suppliers or vendors for any competitive business purpose, or solicit any of its former employees, or the employees of any Duct Doctor Franchised Business operated by another franchisee, Franchisor or Franchisor's affiliates to discontinue employment.

11.4.5   The parties agree that each of the foregoing covenants will be construed as independent of any other covenant or provision of this Agreement. In the event any court of competent jurisdiction determines that the geographical limits, time period or line of business defined by this Article 11 is unreasonable, Franchisee and Franchisor agree that such a court of competent jurisdiction may determine an appropriate limitation to accomplish the intent and purpose of this Section, and the parties, and each of them, agree to be bound by such determination.

11.5   **Limited Exclusion.** The restrictions contained in Section 11.4 will not apply to ownership of less than five percent (5%) of the shares of a company whose shares are listed and traded on a national securities exchange if such shares are owned for investment only, and are not owned by an officer, director, employee or consultant of such publicly-traded company.

11.6   **Employees.** Franchisee must ensure that all of its principals, office and sales employees, and members of Franchisee's immediate family with access to Franchisor's Confidential Information execute a confidentiality and non-compete agreement in the form substantially similar to the agreement attached as Schedules "E" and "F", respectively, to this Agreement, or as Franchisor otherwise prescribes. Franchisee must furnish Franchisor a copy of each executed agreement.

## 12.   TRANSFER AND ASSIGNMENT

12.1   **Transfer by Franchisor.** Franchisor will have the right to transfer all or any part of its rights or obligations herein to any person or legal entity, including to any competitor of Franchisor which agrees to assume Franchisor's obligations hereunder.

12.2   **Transfer by Franchisee.** Franchisee understands and acknowledges that the rights and duties created by this Agreement are personal to Franchisee and that Franchisor has granted Franchisee the right to operate the Franchised Business in reliance on many factors, including, without limitation, the individual or collective character, skill, aptitude and business and financial capacity of Franchisee and Franchisee's principals. Accordingly, neither Franchisee nor any person owning any direct or indirect equity interest therein, will, without Franchisor's prior written consent, directly or indirectly sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber any interest in this Agreement or any portion or aspect thereof, or any equity or voting interest in Franchisee (any such act or event is referred to as a "Transfer"). Any such purported Transfer occurring by operation of law or otherwise, including any assignment by a trustee in bankruptcy, without Franchisor's prior written consent will be a material default of this Agreement.

12.3   **Representations as to Ownership.** Franchisee represents that as of the execution of this Agreement its equity and voting control is owned as shown in Schedule "A" hereto. If Franchisee, or

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

any approved successor thereof, is a partnership, limited liability company or privately-held corporation, Franchisee will submit to Franchisor prior to any proposed Transfer of an equity or voting interest, and at any other time upon request, a list of all Owners reflecting their respective present and/or proposed direct or indirect interests in Franchisee, in such form as Franchisor may require.

12.4 **Conditions to Franchisor's Consent to Transfer.** Franchisee understands and acknowledges the vital importance of the performance of Franchisee to the market position and overall image of Franchisor. Franchisee also recognizes the many subjective factors that comprise the process by which Franchisor selects a suitable Franchisee. Franchisor will not unreasonably withhold its consent to a Transfer by Franchisee of any interest in this Franchise or any equity or voting interest in Franchisee and such consent will remain a subjective determination and will include, but not be limited to, the following conditions:

12.4.2   The transferee must demonstrate to Franchisor's sole satisfaction that it meets all of Franchisor's requirements for becoming a Franchisee, including, without limitation, that it meets Franchisor's financial, entrepreneurial, and managerial and business standards then in effect for similarly situated franchisees, possesses a good moral character, business reputation and satisfactory credit rating, will comply with all instruction and training requirements of Franchisor and has the aptitude and ability to operate the Franchised Business (as may be evidenced by prior related business experience or otherwise).

12.4.3   As of the effective date of the proposed Transfer, all obligations of Franchisee hereunder and under any other agreements between Franchisee and Franchisor are fully satisfied.

12.4.4   Franchisee has satisfied all monetary obligations owed to Franchisor, its affiliates and its designated suppliers.

12.4.5   Franchisee has been in substantial compliance with the Franchise Agreement and all other agreements between Franchisee and Franchisor, its affiliates, or its designated suppliers through the initial and any renewal term of this Agreement;

12.4.6   As of the effective date of the proposed Transfer, all obligations of the proposed transferee to the Franchisor, its affiliates, and designated suppliers (if any) must be fully satisfied.

12.4.7   As of the effective date of the proposed Transfer, the transferee must have the unconditional right to occupy the Premises.

12.4.8   The proposed transferee does not have an interest in a business which is competitive with the Franchised Business.

12.4.9   Franchisee or the transferee must pay to Franchisor a transfer fee equal to Twenty-Five (25%) percent of the then-current Initial Franchise Fee for a comparable Territory (the "Transfer Fee").

12.4.10  The transferor must execute a general release under seal where required, in a form satisfactory to Franchisor, of any and all claims against Franchisor, its parent, subsidiaries, affiliates

- 26 -

and their officers, directors, attorneys, Owners and employees, in their corporate and individual capacities, including, without limitation, claims arising under federal, state and local laws, rules and ordinances arising out of, or connected with, the performance of this Agreement in the form substantially similar to Schedule "G".

   12.4.11  The proposed transferee must execute Franchisor's then-current form of franchise agreement, which may contain terms and conditions substantially different from those in this Agreement, for an initial term equal to the time remaining on the Initial Term of this Agreement as of the date of such Transfer, which will be provided in writing as requested by Franchisee when listing the business for sale.

   12.4.12  The transferee and/or its designated managerial personnel must have completed, to Franchisor's satisfaction, the training then required of comparable System franchisees.

   12.4.13   The transferee must obtain all licenses and/or registrations necessary to operate the Franchised Business.

   12.4.14   Franchisor may, depending on all of the applicable circumstances, waive any of the above conditions and qualifications, especially for transfers among original Owners, transfers to trusts created for the benefit of a spouse or children and transfers to family members.

   12.4.15   Franchisee and its principals, owners, officers, directors, and employees agree to comply with the post-termination provisions of this Agreement including the non-competition and non-disclosure covenants.

   12.4.15   Franchisee and Transferee agree to perform all maintenance and upgrades required to bring the Franchised Business up to Franchisor's then current standards, including upgrading any computer hardware and software, and replacing any Service Vehicles that do not meet Franchisor's then-current requirements for new System Franchisees, as Franchisor may require.

   12.4.16   Franchisee or transferee must provide Franchisor a copy of the executed purchase agreement relating to the proposed transfer with all supporting documents and schedules, including transferee's assumption of and agreement to faithfully perform all of Franchisee's obligations under this Agreement, for Franchisor's prior written approval.

   12.4.17   Franchisee must request that Franchisor provide the prospective transferee with Franchisor's current form of disclosure document.

   12.4.18   Franchisor's approval of the transfer will not constitute a waiver of any claims Franchisor may have against the transferring party.

   12.4.19   Franchisor will have the right to disclose to any prospective transferee such revenue reports and other financial information concerning Franchisee and Franchisee's Business as Franchisee has supplied Franchisor hereunder.

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

12.4.20   In any event, Franchisor may withhold or condition Franchisor's consent to any transfer as Franchisor deems appropriate based on the circumstances of the transfer or otherwise.

12.5     **Transfer to Entity.** If the Franchisee wishes to transfer the Franchise Agreement or any interest therein to a corporation or limited liability company which shall be controlled by the Franchisee, which corporation is being formed for the financial planning, tax or other convenience of the Franchisee, the Franchisor's consent to such transfer shall be conditioned upon the following requirements:

12.5.1   The corporate Franchisee shall be newly organized and its articles of incorporation (or like documents) shall provide that its activities are confined exclusively to the operation of the Franchised Business.

12.5.2   The Franchisee shall retain total ownership of the outstanding stock or other capital interest in the transferee entity, and the Franchisee shall act as the principal officer or officers and directors thereof.

12.5.3   All obligations of the Franchisee to Franchisor and to the landlord shall be fully paid and satisfied prior to the Franchisor's consent.

12.5.4   The entity assignee shall enter into a written agreement with Franchisor expressly assuming the obligations of this Franchise Agreement and all other agreements relating to the operation of this business or the use and occupancy of the Premises. If the consent of any other contracting party to any such agreement be required, the Franchisee shall have obtained such written consent and provided the same to the Franchisor prior to the Franchisor's consent.

12.5.5   All owners of Five percent (5%) of the stock or other ownership interest of the transferee entity shall enter into an agreement with the Franchisor jointly and severally guaranteeing the full payment of the entity's obligations to the Franchisor and the performance by the transferee entity of all the obligations of the Franchise Agreement.

12.5.6   Each stock certificate or other ownership interest certificate of the transferee entity shall have conspicuously endorsed upon the face thereof a statement in a form satisfactory to the Franchisor that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon transfers and assignments by this Franchise Agreement.

12.5.7   Copies of the transferee entity's Articles of Incorporation, Articles of Organization, or documents including resolutions of the Board of Directors authorizing entry into this Franchise Agreement shall be promptly furnished to the Franchisor. Any amendment to any such documents shall also be furnished to the Franchisor immediately upon adoption.

12.5.8   The term of the transferred franchise shall be the unexpired term of this Franchise Agreement.

12.5.9   The payment of an administrative fee of Five Hundred and No/100 ($500.00) Dollars.

- 28 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

12.6    **Franchisee May Not Encumber this Agreement.** The Franchisee shall not, without the prior written consent of the Franchisor, enter into any agreement to borrow money ancillary to which the lender acquires or purports to acquire the right, upon default by the borrower, to assume ownership or control of, or to execute upon, any franchise rights or any ownership interest in this Franchise Agreement. This franchise and this Franchise Agreement may not be used as collateral for borrowing without the prior written consent of the Franchisor. The Franchisee, in connection with any borrowing, will provide to the lender a copy of this Franchise Agreement and call the lender's attention specifically to this provision.

12.7    **Transfer in the Event of Death or Mental Incapacity.** Upon the death or mental incapacity (as reasonably determined by an independent third party such as a licensed doctor) of any person with any direct or indirect interest in Franchisee, the executor, administrator, or personal representative of such person must transfer his interest to a third party approved by Franchisor within six months after the death or incompetence. Such transfers will be subject to the same conditions as set forth in Section 12.4. If the heirs or beneficiaries of any such person are unable to meet the conditions in Section 12.4 hereof, Franchisor may terminate this Agreement. If the transfer is to the spouse or adult child who has otherwise been approved by Franchisor, no Transfer Fee shall be charged.

12.8    **Consent to Transfer not a Waiver.** Franchisor's consent to a Transfer of any interest in Franchisee will not constitute a waiver of any claims it may have against the transferring party, nor will it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferee.

12.9    **Noncompliance**. Any Transfer that does not comply with this Section 12 shall be null and void.

12.10    **Franchisor's Right of First Refusal**. If Franchisee determine at any time to Transfer any interest in Franchisee or the Franchised Business as set forth in Section 12 of this Agreement, Franchisee will obtain a bona fide executed written offer to purchase such interest from a responsible and fully-disclosed purchaser and will submit an exact copy of such offer to Franchisor, along with any other information concerning the proposed transfer and/or transferee as Franchisor may request. Franchisor will, for a period of thirty (30) days from the date Franchisor receives such documented offer, have the right, but not the obligation, exercisable by written notice to Franchisee, to purchase all of such interest for the price, minus any sales commission that would have been payable as a result of the proposed sale, and on substantially the terms and conditions contained in such offer; provided, however, Franchisor may substitute cash for any other form of consideration proposed in such offer. Franchisor may deduct from the purchase price any unpaid debts Franchisee owes to Franchisor and may pay out of the purchase price any of Franchisee's unpaid trade creditors. If Franchisor does not exercise such right of first refusal, Franchisee may complete such Transfer of such interest to such purchaser on the same terms as offered to Franchisor, subject to the provisions of Section 12. If such Transfer to such proposed Transferee is not completed within sixty (60) days after delivery of such offer to Franchisor, or if the proposed Transferee makes any proposed material modification to such offer, Franchisor will again have the right of first refusal set forth in this Section 12.10.

## 13.    DEFAULT AND TERMINATION

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

13.1 **Automatic Termination.** This Agreement will automatically terminate without notice or an opportunity to cure upon the occurrence of any of the following, which Franchisee agrees constitute good cause for termination:

13.1.2 <u>Voluntary Bankruptcy</u>. If Franchisee makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudicated bankrupt or insolvent, files or acquiesces in the filing of a petition seeking reorganization or arrangement under any federal or state bankruptcy or insolvency law, or consents to or acquiesces in the appointment of a trustee or receiver for Franchisee or the Franchised Business.

13.1.3 <u>Involuntary Bankruptcy</u>. If proceedings are commenced to have Franchisee adjudicated bankrupt or to seek Franchisee's reorganization under any state or federal bankruptcy or insolvency law, and such proceedings are not dismissed within sixty (60) days, or a trustee or receiver is appointed for Franchisee or the Franchised Business without Franchisee's consent, and the appointment is not vacated within 60 days.

13.1.4 <u>Unauthorized Transfer</u>. If Franchisee purports to sell, transfer or otherwise dispose of Franchise or any interest in the Franchise Business in violation of Section 12 hereof.

13.2 **Termination With Notice and Without Opportunity to Cure.** Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

13.2.1. <u>Criminal Acts/Other Misconduct</u>. If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or take part in any criminal misconduct or other misconduct that negatively impacts the Licensed Marks or the operation of the Franchised Business.

13.2.2. <u>Fraud</u>. If Franchisee or Franchisee's Principal Owners commit any fraud or misrepresentation in the operation of the Franchised Business.

13.2.3. <u>Misrepresentation</u>. If Franchisee or Franchisee's Principal Owners make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to any financial misrepresentation.

13.2.4. <u>Failure to Complete Training</u>. If Franchisee fails to complete the Initial Training as provided in Section 6.5.

13.2.5. <u>Repeated Breaches</u>. If Franchisor sends Franchisee more than 2 notices to cure pursuant to Sections 13.3 or 13.4 hereof in any 12-month period, regardless of whether the breaches have been cured.

13.2.6. <u>Misuse of the Licensed Marks or Confidential Information</u>. If Franchisee or Franchisee's principals materially violate any provision hereof pertaining to the Licensed Marks or Confidential Information or misuse the Licensed Marks or Confidential Information.

- 30 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

13.2.7.  <u>Violation of Health or Safety Code</u>. If Franchisee violates any health, safety or sanitation law, ordinance or regulation or operates the Franchised Business in a manner that presents a health or safety hazard to customers, or the general public.

13.2.8.  <u>Violation of In-term Restrictive Covenant</u>. If Franchisee violates the in-term restrictive covenant contained in Section 11.

13.2.9.  <u>Liens</u>. If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within 30 days.

13.2.10.  <u>Insolvency</u>.  If Franchisee or any of Franchisee's principals become insolvent.

13.2.11.  <u>Abandonment</u>. If Franchisee voluntarily or otherwise abandons the Franchised Business. The term "abandon" includes any conduct which indicates a desire or intent to discontinue the Franchised Business in accordance with the terms of this Agreement and will apply if Franchisee fails to operate the Franchised Business for a period of fourteen (14) or more consecutive business days without Franchisor's prior written approval.

13.2.12.  <u>Insurance</u>. Franchisee fails to maintain insurance or to repay Franchisor for insurance paid for by it, or otherwise fail to adhere to the requirements of Section 16.

13.2.13.  <u>Government Regulations</u>. Franchisee fails, within thirty (30) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business.

13.2.14.  <u>Government Actions</u>. Any government action is taken against Franchisee that results in any obligation upon Franchisor which in Franchisor's sole judgment is uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation.

13.2.15.  <u>Anti-Terrorist Activities</u>. Franchisee fails to comply with the provisions of Section 6.23.

13.2.16.  <u>Insufficient Funds</u>. If there are insufficient funds in Franchisee's bank account to cover a check or EFT payment to Franchisor three (3) or more times within any twelve (12) month period.

13.2.17.  <u>Breach of Other Agreements</u>. If Franchisee commits any fraud, criminal acts or other misconduct or makes any misrepresentation or omission to Franchisor relating to any other agreement with Franchisor or Franchisor's affiliates.

13.2.18.  Commission of the third incident of providing services, marketing or soliciting outside of Franchisee's territory as defined in Section 1.5.5 herein.  If Franchisee provides services, markets or solicits business outside of its Territory without Franchisor's written consent.

13.3     **Termination Upon Notice and 15 Days' Opportunity to Cure.** Franchisor has the right to terminate this Agreement if any of the following defaults remain uncured after expiration of the 15-day cure period:

13.3.1     <u>Nonpayment</u>. If Franchisee fails to pay as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's major suppliers or vendors.

13.3.2     <u>Under-reporting of Gross Sales</u>. If any audit reveals that Franchisee has understated Franchisee's royalty or advertising payments, or Franchisee's local advertising expenditures, by more than 2%, or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any 12-month period, as described in Section 10.

13.3.3     <u>Failure to Open</u>. If Franchisee fails to commence operations of the Franchised Business by the Opening Date, as described in Section 6.2 of this Agreement.

13.3.4     <u>Interruption of Service</u>. If Franchisee fails to maintain the prescribed months, days or hours of operation at the Franchised Business.

13.3.5     <u>Failure to Personally Supervise Business Operations or Employ Adequate Personnel</u>. If Franchisee fails to personally, or through an approved manager, supervise the day-to- day operation of the Franchised Business or fails to employ a sufficient number of qualified, competent personnel as Franchisor requires from time to time.

13.3.6     <u>Quality Control</u>. If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual.

13.3.7     <u>Licenses and Permits</u>. Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

13.4     **Termination With Notice and 30 Day Opportunity to Cure.** Franchisor has the right to terminate this Agreement after notice and expiration of a 30-day cure period if Franchisee fails to perform or comply with any one or more of the terms or conditions of this Agreement which are not specifically enumerated in Sections 13.1, 13.2, or 13.3 of this Agreement, or any ancillary agreements between Franchisee and Franchisor or any agreement between Franchisee and any of Franchisor's affiliates.

13.5     **Nonwaiver.** Franchisor's delay in exercising or failing to exercise any right or remedy under this Agreement or Franchisor's acceptance of any late or partial payment due hereunder will not constitute a waiver of Franchisor's rights against Franchisee.

13.6     **Step In Rights.** In addition to Franchisor's right to terminate this Agreement, and not in lieu of such right, or any other rights Franchisor may have against Franchisee, upon a failure to cure any default within the applicable time period (if any), Franchisor has the right, but not the obligation, to enter upon the premises of the Franchised Business and exercise complete authority with respect to the operation of the Franchised Business until such time as Franchisor determines that the default has been cured, and Franchisee is otherwise in compliance with this Agreement. In the event Franchisor exercises

- 32 -

the rights described in this Section, Franchisee must reimburse Franchisor for all reasonable costs and overhead, if any, incurred in connection with its operation of the Franchised Business including, without limitations, costs of personnel for supervising and staffing the Franchised Business and their travel and lodging accommodations, as well as pay a fee of up to $500 per day. If Franchisor undertakes to operate the Franchised Business pursuant to this Section, Franchisee agrees to indemnify and hold Franchisor (and Franchisor's representative(s) and employees) harmless from and against any fines, claims, suits or proceedings which may arise out of Franchisor's operation of the Franchised Business.

13.7     **Franchisor's Right to Withhold Services or Products.** During any period of uncured default by Franchisee, Franchisor shall have the right to withhold or discontinue providing all services to Franchisee, including but not limited to the right to suspend Franchisee's right to purchase products from Franchisor's affiliates.

## 14.     POST TERM OBLIGATIONS

14.1     **Obligations upon Termination, Expiration, Non-Renewal or Transfer.** Upon the termination, expiration, non-renewal, or transfer of this Agreement for any reason, Franchisee must immediately:

14.1.2     Cease to be a franchisee of Franchisor under this Agreement and cease to operate the former Franchised Business under the System. Franchisee must not thereafter, directly or indirectly, represent to the public that the former Franchised Business is or was operated or in any way be connected with the Duct Doctor Franchise System, or hold itself out as a present or former Franchisee of Franchisor;

14.1.3     Pay all sums owing to Franchisor. Upon termination for any default by Franchisee, such sums will include actual damages, costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by Franchisor as a result of the default;

14.1.4     Return to Franchisor the Operations Manual, Confidential Information, and all trade secrets, confidential materials, and other property owned by Franchisor. Franchisee may not retain a copy or record of any of the foregoing, provided, however, that Franchisee may retain its copy of this Agreement, any correspondence between the parties and any other document which Franchisee reasonably needs for compliance with any applicable provision of law. Business cards, brochures, marketing materials and other promotional materials must be returned to Franchisor. Upon Franchisor's request, Franchisee must sell all of its product or chemical inventory to Franchisor at Franchisee's cost;

14.1.5     Provide Franchisor a complete list of Franchisee's employees, clients, customers, and contacts and their respective addresses and any outstanding obligations Franchisee may have to any third parties, and all business records of Franchisee that Franchisor may request;

14.1.6     Cease to use in any manner whatsoever, including in Franchisee's business operations and advertising, any methods, procedures, technology or other component of the Duct Doctor System in which Franchisor has any right, title or interest. Franchisee agrees that Franchisor or a designated agent may enter upon the Premises at any time to make such changes and take possession of

such items at Franchisee's sole risk and expense and without liability for trespass or compensation to Franchisee; and

14.1.7   Cease to use the Licensed Marks and any other marks and indicia of operation associated with the Duct Doctor System including stationary and other printed matter and remove all trade dress, physical characteristics, color combinations and other indications of operation under the Doctor System from the Premises and vehicles. Without limiting the generality of the foregoing, Franchisee agrees that in the event of any termination or expiration of this Agreement, it will remove all signage bearing the Licensed Marks, and remove any items which are characteristic of the Duct Doctor System trade dress from the Premises and vehicles. Franchisee agrees that Franchisor or a designated agent may enter upon the Premises at any time to make such changes at Franchisee's sole risk and expense and without liability for trespass or compensation to Franchisee.

14.1.8   Make the following provisions concerning the Franchisor's proprietary truck-mounted air duct cleaning apparatus within thirty (30) days of the expiration, termination, or non-renewal of the Franchise Agreement:

14.1.8.1 Franchisee shall offer the truck cab and chassis along with the proprietary body and equipment package to Franchisor's affiliate which will purchase the foregoing items based on the following valuation; (i) the cab and chassis will be valued at Blue Book value; (ii) the proprietary body and equipment package will be valued at the current book value or the original cost minus reasonable depreciation.  Franchisee shall make an election to sell the combined cab, chassis and equipment or may retain the cab and chassis.  Should Franchisee elect to retain the cab and chassis, it shall deliver the truck to Franchisor's headquarters for removal of the body and equipment package at Franchisee's expense.

14.1.8.2 Franchisee may, in the alternative dispose of the truck-mounted air-duct cleaning apparatus by having it destroyed by a commercial disposal company acceptable to Franchisor and providing Franchisor with certification of destruction in a form acceptable to Franchisor.

14.1.8.3 In the event Franchisee shall fail or refuse to comply with the provisions of Section 14.1.7, Franchisee shall be responsible for the payment of Franchisor's costs and expenses, including, but not limited to attorney's fees and costs of litigation incurred by Franchisor in enforcing this Section 14.1.7.

14.2      **Damages, Costs and Expenses Resulting.** In the event of termination for any default by Franchisee, Franchisee must promptly pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation will give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of Franchisee's personal property, furnishings, equipment, signs, fixtures and inventory related to the operation of the Franchised Business.

## 15      DISPUTE RESOLUTION AND CORRESPONDING PROCEDURES.

15.1      **Mediation.** All claims or disputes between Franchisee and Franchisor or their respective affiliates arising under, out of, in connection with or in relation to this Agreement, the parties' relationship, the Franchised Business, or any of the parties' respective rights and obligations arising out

of this Agreement, must be submitted first to mediation prior to a hearing in binding arbitration (except as noted in Section 15.3 below). Such mediation will take place in Atlanta, Georgia (or Franchisor's then-current headquarters) under the auspices of the Judicial Arbitration and Mediation Services ("JAMS"), in accordance with the JAM's Commercial Mediation Rules then in effect. Franchisee may not commence any action against Franchisor or its affiliates with respect to any such claim or dispute in any court unless mediation proceedings have been terminated either: (i) as the result of a written declaration of the mediator(s) that further mediation efforts are not worthwhile; or (ii) as a result of a written declaration by Franchisor. Each party will bear their own costs of mediation and share equally the filing fee imposed by JAMS and the mediator's fees. We reserve the right to specifically enforce Franchisor's right to mediation. Prior to mediation, and before commencing any legal action against Franchisor or its affiliates with respect to any such claim or dispute, Franchisee must submit a notice to Franchisor, which specifies in detail, the precise nature and grounds of such claim or dispute.

15.2    **Arbitration.**  If not resolved by mediation and except as qualified below, any dispute between Franchisee and Franchisor or their respective affiliates arising under, out of, in connection with or in relation to this Agreement, the parties' relationship, or the Franchised Business must be submitted to binding arbitration in Atlanta, Georgia (or Franchisor's then-current headquarters) in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the Judicial Arbitration and Mediation Services ("JAMS") then in effect. Any arbitration must be on an individual basis and the parties and the arbitrator will have no authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claim or any proceedings involving their parties. In the event a court determines that this limitation on joinder of or class action certification of claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts. The Federal Arbitration Act, as amended, will govern the rights and duties of the parties to this Agreement to resolve any disputes by arbitration. The following will supplement and, in the event of a conflict, govern any arbitration: The matter will be heard before a single arbitrator from the JAM's list of arbitrators. The arbitrator must follow the law and not disregard the terms of this Agreement. The arbitrator must have at least 5 years of significant experience in franchise law. Each party must bear its own costs of arbitration; provided, however, that the neutral or the single arbitrator's fee will be shared equally by the parties.

The arbitrator's award must be rendered within 7 days of the close of the hearing and will include all fees, costs and attorneys' fees for Franchisor if Franchisor is the prevailing party. The arbitrator will have no authority to determine class action claims and will have no authority to amend or modify the terms of the Agreement. To the extent permitted by applicable law, no issue of fact or law may be given preclusive or collateral estoppel effect in any arbitration, except to the extent such issue may have been determined in another proceeding between the parties.

Judgment upon the award of the arbitrator must be submitted for confirmation to the Superior Court of Gwinnett County, Georgia (or a court of general jurisdiction in the county of Franchisor's then-current headquarters) and, if confirmed, may be subsequently entered in any court having competent jurisdiction. The decision of the arbitrator(s) will be final and binding on all parties to the dispute; however, the arbitrator(s) may not under any circumstances: (1) stay the effectiveness of any pending termination of this Agreement; (2) assess punitive or exemplary damages, or (3) make any award which extends, modifies or suspends any lawful term of this Agreement or any reasonable standard of business. This agreement to arbitrate will survive any termination or expiration of this Agreement.

- 35 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

15.3     **Exceptions to Arbitration.** Notwithstanding Section 15.2, the parties agree that the following claims will not be subject to arbitration:

1.      any action for declaratory or equitable relief, including, without limitation, seeking preliminary or permanent injunctive relief, specific performance, other relief in the nature of equity to enjoin any harm or threat of harm to such party's tangible or intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder.

2.      any claim of Franchisor of non-payment by Franchisee of any fee or other sum due by Franchisee to Franchisor.

15.4     **Prior Notice of Claims.** As a condition precedent to commencing an action for damages or for violation or breach of this Agreement, Franchisee must notify Franchisor within thirty (30) days after the discovery of the violation or breach and grant Franchisor reasonable opportunity to cure any alleged default.  Failure to timely give such notice will preclude any claim for damages.

15.5     **Third Party Beneficiaries.** Franchisor's officers, directors, shareholders, agents and/or employees are express third-party beneficiaries of this Agreement, each having authority to specifically enforce the right to mediate/arbitrate claims asserted against such person(s) by Franchisee. As a condition precedent to commencing an action for damages or for violation or breach of this Agreement, Franchisee must notify Franchisor within thirty (30) days.

15.6     **No Right to Offset.** Franchisee may not withhold all or any part of any payment to Franchisor or any of its affiliates on the grounds of Franchisor's alleged nonperformance or as an offset against any amount Franchisor or any of Franchisor's affiliates allegedly may owe Franchisee under this Agreement or any related agreements.

15.7     **Venue.** Nothing contained in this Agreement will prevent Franchisor or Franchisee from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard such party's interests. In the event of any litigation arising out of this Agreement or based upon the relationship between the parties, venue for any such litigation shall be any court of general jurisdiction in Gwinnett County, Georgia or the United States District Court for the Northern District of Georgia, Atlanta Division. Franchisee hereby accepts and submits to, generally and unconditionally, for itself and with respect to its property, the jurisdiction of any such courts in any such action or proceeding and hereby waives, to the greatest extent permitted by applicable law defenses based on jurisdiction, venue, or forum non conveniens. The provisions of this Section 15.7 shall be self-executing and shall remain in full force and effect after the termination or expiration of this Agreement. Franchisee acknowledges that this Agreement has been entered into in the State of Georgia, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Atlanta, Georgia, including but not limited to assistance, support and the development of the System.

15.8     **Limitation on Actions.** The parties further agree that no cause of action arising out of or under this Agreement may be maintained by either party against the other unless brought before the

- 36 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after the complaining party becomes aware of facts or circumstances reasonably indicating that such party may have a claim against the other party hereunder, whichever occurs sooner, and that any action not brought within this period will be barred as a claim, counterclaim, defense or set-off.

15.8.1 Franchisee hereby waives the right to obtain any remedy based on the alleged fraud, misrepresentation, or deceit by Franchisor, including, without limitation, rescission of this Agreement, in any arbitration, judicial, or other adjudicatory proceeding arising hereunder, except upon a ground expressly provided in this Agreement, or pursuant to any right expressly granted by any applicable statute expressly regulating the sale of franchises, or any regulation or rules promulgated thereunder.

15.9     **Waiver of Punitive Damages.** Franchisee hereby waives to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special or consequential damages (including, without limitation, lost profits) against Franchisor arising out of any cause whatsoever (whether such cause be based in contract, negligence, strict liability, other tort or otherwise) and agrees that in the event of a dispute, Franchisee's recovery is limited to actual damages. If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions will continue in full force and effect, including, without limitation, the waiver of any right to claim any consequential damages.

15.10    **Jury Trial Waiver.** With respect to any proceeding not subject to arbitration, the parties hereby agree to waive trial by jury in any action, proceeding or counterclaim, whether at law or equity, regardless of which party brings suit. This waiver will apply to any matter whatsoever between the parties hereto which arises out of or is related in any way to this Agreement, the performance of either party, and/or Franchisee's purchase from Franchisor of the franchise and/or any goods or services.

## 16     INSURANCE

16.8     **Lines of Insurance.** Franchisee must, at its expense and no later than upon commencement of the business contemplated by this Agreement, procure and maintain in full force and effect throughout the term of this Agreement the lines of insurance enumerated in the Operations Manual which will be in at least such minimum amounts as may from time to time be required by Franchisor, and which must name Franchisor and any parties it may designate as additional insureds, including the following:

16.8.1 General Liability on an occurrence basis with limits not less than $1,000,000 per occurrence / $2,000,000 aggregate per policy year.

16.8.2 Automobile liability coverage, with the following minimum limits of liability (i) the greater of the amount required by law or One Million and ($1,000,000) Combined Single Limits or equivalent.

16.8.3 Workers' Compensation and Employer's Liability insurance as required by law in Franchisee's state of operation.  It is also suggested that this covers the owner or sole proprietor.

- 37 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

16.8.4 Any other insurance not listed here but required by applicable law, rule, regulation, ordinance or licensing requirements; and any updates as made from time to time in the operations manuals.

16.8.5 Franchisor reserves the right to change the types and amounts of insurance required under this Agreement. Franchisee agrees, at its own expense, to conform its insurance coverage to Franchisor's requirements.

16.8.6 Franchisee must obtain and maintain insurance coverage from the insurance company(ies) specified by Franchisor.

16.9     **Insurance Certificates.** Franchisee must make timely delivery of certificates of all required insurance to Franchisor, each of which must contain a statement by the insurer that the policy will not be cancelled or materially altered without at least written notice per state statutory guidelines to Franchisor. Franchisee agrees to carry such insurance as may be required by the lease of the Approved Location or by any of Franchisee's lenders or equipment lessors and such workers compensation insurance as may be required by applicable law. Franchisee must add Franchisor to all insurance contracts as an additional insured per state guidelines under the insurance policies, the cost of which will be paid by Franchisee.

16.10     **Notification of Claims.** Franchisee will give Franchisor notice of any Claim against Franchisee or the Franchised Business immediately upon Franchisee receiving notice of any such Claim. Franchisee will respond to all Claims within the time required by law. Franchisee will cooperate with Franchisor or our designee in every manner and in all respects to defend Franchisee or Franchisor against any and all Claims which cooperation may require Franchisee, among other things, to appear at administrative or other hearings to present or reinforce Franchisee's or Franchisor's defenses.

16.11     **No Relief from Indemnity Requirement.** The procurement and maintenance of such insurance will not relieve Franchisee of any liability to Franchisor under any indemnity requirement of this Agreement. Franchisee must, at its expense and no later than upon commencement of the business contemplated by this Agreement, procure and maintain in full force and effect throughout the term of this Agreement the types of insurance enumerated in the Operations Manual or otherwise in writing which must be in such amounts as may from time to time be required by Franchisor and which must designate Franchisor as an additional insured as required by this written agreement.

16.12     **Administrative Fee.** If Franchisee fails to comply with the minimum insurance requirements set forth herein, Franchisor has the right to obtain such insurance and keep same in force and effect and Franchisee must pay Franchisor, on demand, the premium cost thereof and administrative costs of 18% in connection with Franchisor's obtaining the insurance. Franchisor has the right to increase or otherwise modify the minimum insurance requirements upon state statutory notice to Franchisee, and Franchisee must comply with any such modification within the time specified in said notice.

## 17     FRANCHISEE'S OWNERSHIP AND ORGANIZATION

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

17.8    **Disclosure of Ownership Interests.** Franchisee and each of its Owners represents, warrants and agrees that Schedule "A" is current, complete and accurate. Franchisee agrees that updates to Schedule "A" attached hereto will be furnished promptly to Franchisor, so that Schedule "A" (as so revised and signed by Franchisee) is at all times current, complete and accurate. Each Owner must be an individual acting in his or her individual capacity, unless Franchisor waives this requirement.

17.9    **Organizational Documents.** If Franchisee is, or at any time becomes, a business corporation, partnership, limited liability company or other legal entity, Franchisee and each of its Owners represents, warrants and agrees that: (a) Franchisee is duly organized and validly existing under the laws of the state of its organization; (b) Franchisee has the authority to execute and deliver the Franchise Agreement and all related agreements and to perform its obligations under all such agreements; (c) the articles of incorporation, partnership agreement or other organizational documents recite that the issuance, transfer or pledge of any direct or indirect legal or beneficial ownership interest in Franchisee is restricted by the terms of the Franchise Agreement; and (d) all certificates representing direct or indirect legal or beneficial ownership interests now or hereafter issued bear a legend in conformity with applicable law reciting or referring to such restrictions.

17.10   **Personal Guaranty Covenants and Assumption of Obligations.** Each Owner of a Five percent (5%) interest in Franchisee must sign and irrevocably be bound by the Personal Guarantee included as Schedule "D".

## 18    TAXES, PERMITS AND INDEBTEDNESS

18.1    **Taxes.** Franchisee must promptly pay when due any and all federal, state and local taxes including, without limitation, unemployment and sales taxes, levied or assessed with respect to any services or products furnished, used or licensed pursuant to this Agreement and all accounts or other indebtedness of every kind incurred by Franchisee in the operation of the business licensed hereunder.

18.2    **Permits.** Franchisee must comply with all federal, state and local laws, rules and regulations and timely obtain any and all permits, certificates and licenses for the full and proper conduct of the business licensed hereunder.

18.3    **Full and Sole Responsibility for Debts and Obligations.** Franchisee hereby expressly covenants and agrees to accept full and sole responsibility for any and all debts and obligations incurred in the operation of the Franchised Business.

## 19    INDEMNIFICATION AND INDEPENDENT CONTRACTOR

19.1    **Indemnification.** Franchisee and Franchisee's Owners waive all claims against Franchisor for damages to property or injuries to persons arising out of the operation of the Franchised Business. Franchisee must fully protect, indemnify and hold Franchisor and its owners, directors, officers, successors and assigns and its affiliates harmless from and against any and all claims, demands, damages and liabilities of any nature whatsoever arising in any manner, directly or indirectly, out of or in connection with or incidental to the operation of the Franchised Business (regardless of cause or any concurrent or contributing fault or negligence of Franchisor or its affiliates) or any breach by Franchisee or Franchisee's failure to comply with the terms and conditions of this Agreement. Franchisee shall

- 39 -

indemnify Franchisor for any liability arising from labor or employment law violations, including from Franchisee's acts and omissions and the acts and omissions of Franchisee's employees. Franchisor also reserves the right to select its own legal counsel to represent its interests, and Franchisee must reimburse Franchisor for its costs and attorneys' fees immediately upon Franchisor's request as they are incurred.

19.2    **Cost of Enforcement or Defense.** If Franchisor is required to hire an attorney or spend any money to enforce this Agreement or to defend against any claim because Franchisee has not performed its obligations under this Agreement, Franchisor will be entitled to recover reasonable attorneys' fees and other expenses in enforcing the obligation or in defending against the claim.

19.3    **No Fiduciary Relationship; Independent Contractor Status.** In all dealings with third parties including, without limitation, franchisees, employees, suppliers, and clients, Franchisee must disclose in an appropriate manner acceptable to Franchisor that it is an independent entity licensed by Franchisor. Nothing in this Agreement is intended by the parties neither to create a fiduciary relationship between them nor to constitute Franchisee as a subsidiary, joint venture, partner, agent or employee of Franchisor for any purpose whatsoever. It is understood and agreed that Franchisee is an independent contractor and is in no way authorized to make any warranty or representation on behalf of Franchisor other than those contained in any disclosure document prepared by Franchisor for use by Franchisee, nor is Franchisee authorized to create any obligation or enter into any contract binding on Franchisor.

## 20    WRITTEN APPROVALS, WAIVERS, AND AMENDMENT

20.1    **Approval Process.** Whenever this Agreement requires Franchisor's prior approval, Franchisee must make a timely written request. Unless a different time period is specified in this Agreement, Franchisor will respond with its approval or disapproval within thirty (30) calendar days. In addition, Franchisor's approval will not be unreasonably withheld.

20.2    **No Waiver.** No failure of Franchisor to exercise any power reserved to it by this Agreement and no custom or practice of the parties at variance with the terms hereof will constitute a waiver of Franchisor's right to demand exact compliance with any of the terms herein. A waiver or approval by Franchisor of any particular default by Franchisee will not be considered a waiver or approval by Franchisor of any preceding or subsequent breach by Franchisee of any term, covenant or condition of this Agreement.

20.3    **Amendments.** No amendment changes or variance from this Agreement will be binding upon Franchisor or Franchisee except by mutual written agreement. If an amendment of this Agreement is executed at Franchisee's request, any legal fees or preparation cost in connection therewith must be paid by Franchisee.

20.4    **Non-uniform Agreements.** No warranty or representation is made by Franchisor that all other agreements with Duct Doctor franchisees heretofore or hereafter issued by Franchisor do or will contain terms substantially similar to those contained in this Agreement. Further, Franchisee recognizes and agrees that Franchisor may, due to local business conditions or otherwise, waive or modify comparable provisions of other franchise agreements granted to other Duct Doctor franchisees in a non-uniform manner, subject, however, to those provisions of this Agreement which require Franchisor to act toward its franchisees and franchise owners on a reasonably nondiscriminatory basis.

- 40 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

## 21    NOTICES

Any notice required to be given hereunder must be in writing and be mailed by registered or certified mail, hand-delivered by a recognized courier service, personally delivered, or telecopied and acknowledged by appropriate means. Notices to Franchisee must be addressed to it at the address listed on the first page of this Agreement. Notices to Franchisor must be addressed to Franchisor at: 5555 Oakbrook Parkway, Suite 660, Norcross, Georgia 30093, Attention: Kenneth S. Stricklin, with a copy to Joseph J. Gottlieb, Esq., Shires Peake & Gottlieb, LLC, 284 North Main St., Alpharetta, Georgia 30009. Either party may modify or change its address for delivery of notice by notifying the other party in writing in a timely manner of such modification or change. Any notice complying with the provisions hereof will be deemed received five days after the date of mailing or on the actual date of receipt, as the case may be, whichever is earlier.

## 22    GOVERNING LAW

All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. Sections 1 et seq.). Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.) or other federal law, this Agreement, the franchise, and all claims arising from the relationship between Franchisor and Franchisee (and/or any of our affiliates) and Franchisee will be governed by the laws of the State of Georgia, without regard to its conflicts of laws rule. Should however, the restrictive Covenants set forth in Section 11 herein be deemed unenforceable under Georgia law, the law of the state in which the Franchised Business is located, shall be applied solely to the interpretation and enforcement of those covenants. This Agreement will become a valid and enforceable contract when we accept it and sign it in Norcross, Georgia. Franchisee and Franchisor expressly agree that this Agreement has been made in the State of Georgia, that substantially all performance of the obligations hereunder has been and will be rendered in the State of Georgia, and that there is a regular stream of business activity between Franchisee and franchisor from and into the State of Georgia.

## 23    SEVERABILITY AND CONSTRUCTION

23.1    **Severability.** Should any provision of this Agreement be for any reason held invalid, illegal or unenforceable, such provision will be deemed restricted in application to the extent required to render it valid, and the remainder of this Agreement will in no way be affected and will remain valid and enforceable for all purposes, both parties hereto declaring that they would have executed this Agreement without inclusion of such provision. In the event such total or partial invalidity or unenforceability of any provision of this Agreement exists only with respect to the laws of a particular jurisdiction, this Article 23 will operate upon such provision only to the extent that the laws of such jurisdiction are applicable to such provision. Each party agrees to execute and deliver to the other any further documents which may be reasonably required to effectuate fully the provisions hereof. Franchisee understands and acknowledges that Franchisor will have the right to reduce the scope of any covenant of this Agreement binding upon Franchisee, or any portion hereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof, and Franchisee agrees that it will comply forthwith with any covenant as so modified, which will be fully enforceable.

- 41 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

23.2   **Execution in Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, but such counterparts together will constitute one and the same instrument.

23.3   **Headings and Captions.** The headings and captions contained herein are for the purposes of convenience and reference only and are not to be construed as part of this Agreement. All terms and words used herein will be construed to include the number and gender as the context of this Agreement may require. The parties agree that each section of this Agreement will be construed independently of any other section or provision of this Agreement.

23.4   **Interpretation of Rights and Obligations.** The following provisions apply to and govern the interpretation of this Agreement, the parties' rights under this Agreement, and the relationship between the parties.

23.4.1   Franchisor's Rights. Whenever this Agreement provides that Franchisor has a certain right, that right is absolute, and the parties intend that Franchisor's exercise of that right will not be subject to any limitation or review. Franchisor has the right to operate, administrate, develop, and change the System in any manner that is not specifically precluded by the provisions of this Agreement, although this right does not modify any express limitations set forth in this Agreement.

23.4.2   Franchisor's Reasonable Business Judgment. Whenever Franchisor reserves discretion in a particular area or where Franchisor agrees to exercise its rights reasonably or in good faith, Franchisor will satisfy its obligations whenever it exercises Reasonable Business Judgment in making a decision or exercising a right. Franchisor's decisions or actions will be deemed to be the result of Reasonable Business Judgment, even if other reasonable or even arguably preferable alternatives are available, if Franchisor's decisions or actions are intended, in whole or significant part, to promote or benefit the System generally even if the decision or action also promotes Franchisor's financial or other individual interests. Examples of items that will promote or benefit the System include, without limitation, enhancing the value of the Licensed Marks, improving customer service and satisfaction, improving product quality, improving uniformity, enhancing or encouraging modernization and improving the competitive position of the System.

## 24   ENTIRE AGREEMENT

This Agreement and all exhibits to this Agreement constitute the entire agreement between the parties and supersede any and all prior negotiations, understandings, representations, and agreements. Nothing in this or in any related agreement, however, is intended to disclaim the representations Franchisor made in the franchise Disclosure Document it furnished to Franchisee.

Franchisee acknowledges that it is entering into this Agreement as a result of its own independent investigation of Franchisor's franchise offering and not as a result of any representations about Franchisor made by its shareholders, officers, directors, employees, agents, representatives, independent contractors, or franchisees that are contrary to the terms set forth in this Agreement, or in any disclosure document, prospectus, or other similar document required or permitted to be given to Franchisee pursuant to applicable law.

- 42 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

25      **FORCE MAJEURE**.

In the event of an act of God, terror, war, insurrection, civil commotion, strike, lockout, or embargo; or lack of materials or telephone transmissions specified or reasonably necessary in connection with the operation of your Franchised Business or the System; or fire, unavoidable casualties, and any other occurrence, event, or condition beyond the reasonable control of Franchisee or Franchisor, whichever is applicable (a "Force Majeure"), Franchisor or Franchisee, as applicable, will be relieved of their respective obligations to the extent that Franchisee or Franchisor are necessarily prevented, or materially hindered or delayed, in such performance during the period of such Force Majeure. The party whose performance is affected by a Force Majeure shall give prompt written notice to the other party of such Force Majeure.

26      **ACKNOWLEDGMENTS**

**26.1.     The Franchisee acknowledges that it has conducted an independent investigation of the business licensed hereunder to the extent of the Franchisee's desire to do so, and the Franchisee recognizes and acknowledges that the business venture contemplated by this Franchise Agreement involves business risks, and that its success will be largely dependent upon the ability of the Franchisee as an independent businessman. The Franchisor expressly disclaims the making of, and the Franchisee acknowledges that it has not received, any warranty or guarantee, express or implied, that the Franchisee will be successful in this venture or that the business will attain any level of sales volume, profits or success.**

**26.2     The Franchisee acknowledges and agrees that: (i) all obligations of Franchisor under this Agreement are owed by Franchisor alone; and (ii) no other entity, including without limitation Franchisor's and our affiliates' directors, officers, shareholders, partners, members, employees, agents, or attorneys shall be subject to liability under this Agreement.**

**26.3     The Franchisee acknowledges that it and each of its owners has received, fully read and understood, and all questions have been answered regarding, a copy of our Franchise Disclosure Document with all exhibits at least fourteen (14) calendar days prior to signing any binding documents or paying any sums.**

**26.4     The Franchisee understands, acknowledges and agrees that there may be instances where Franchisor has varied, or will vary, the terms on which Franchisor offers franchises, the charges Franchisor (and/or Franchisor's affiliates) make or otherwise deal with our franchisees to circumstances of a particular transaction, the particular circumstances of that franchisee, or otherwise.**

**26.5     The Franchisee acknowledges that it has not received nor relied on (nor has Franchisor or any representative of Franchisor provided, except as may have been contained in the Franchise Disclosure Document received by Franchisee): (i) any sales, income or other projections of any kind or nature; or (ii) any statements, representations, charts, calculations or other materials which stated or suggested any levels or range of sales, income, profits or cash flow; or (iii) any representations as to any profits Franchisee may realize in the operations of the franchise business**

- 43 -

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

or any working capital or other funds necessary to reach any "break- even" or any other financial levels.

26.6     **Variances.** **Franchisee acknowledges and agrees that: i) Franchisor may from time to time approve exceptions or changes to the standards and specifications of the System (including without limitation the amount and payment terms of any fee) that Franchisor deems necessary or desirable under particular circumstances (the "Variances");Franchisee will have no right to require Franchisor to disclose any Variances to Franchisee or grant Franchisee the same or similar Variances; and (iii) other franchisees, whether existing now or in the future, may operate under different forms of agreement, and that as a result their rights and obligations may differ materially from yours.**

26.7     **The Franchisee acknowledges that it (and each of its owners, if an entity) has had the opportunity and has been advised us to have this Agreement and all other documents reviewed by its own attorney, accountant or and/or other advisor, and that Franchisee has read, understood, had an opportunity to discuss, and agrees to each provision of this Agreement.  Franchisee agrees that it has been under no compulsion to sign this Agreement.**

## 27     NO IMPLIED COVENANT.

Franchisee and Franchisor have negotiated the terms of this Agreement and agree that neither party shall claim the existence of an implied covenant of good faith and fair dealing to contravene or limit any express written term or provision of this Agreement.

## 28     SUBMISSION OF AGREEMENT.

Submission of this Agreement to Franchisee does not constitute an offer to enter into a contract. This Agreement will become effective only on its execution by Franchisee and Franchisor and will not be binding on Franchisor unless and until it is signed by Franchisor's authorized officer and delivered to you.

**IN WITNESS WHEREOF,** the parties hereto, intending to be legally bound hereby, have duly executed and delivered this Agreement, which may be executed in duplicate the day and year first above written.

Franchisor:                                              Franchisee:

**Duct Doctor USA, Inc.**                    **Creative Building Solutions, LLC**

By: _Glade Stricklin_                         By: _Ben Allison_
Kenneth S. Stricklin, CEO                        Benjamin Allison, President of
                                                 BEA Management, LLC, its Sole Member

Creative Building Soultions, LLC
Duct Doctor Franchise Agreement

**FRANCHISE AGREEMENT**
**SCHEDULE "A"**

**INITIAL FRANCHISE FEE, TERRITORY, APPROVED LOCATION,**
**AND FRANCHISEE OWNERSHIP**

1.        Initial Franchise Fee: N/A


2.        Description of Territory: Within the metropolitan area known as Kansas City Missouri including only the counties of Jackson, Clay and Platte


3.        Franchisee's Principal Business Address, Telephone Number, Cell Phone Number, Facsimile Number, and E-Mail Address:

>       4130 NE Port Dr.
>       Lee's Summit, Missouri 64064
>       Tel.: (816) 503-8900
>       Cell: _____
>       Fax: _____
>       Email: info@ductdoctorkc.com


4.        Address of Approved Location is Illustrated on Attached Territory Map.

_____


5.        Name and Address of Each Owner of Franchisee and Percentage of Ownership:

BEA Management, LLC -                          100%
Members of BEA Management, LLC –
        Benjamin Allison                        100%

6.        Form of Franchisee (check applicable entity):
_____   Corporation;
_____   Partnership;
_____   Limited Partnership;
  X     Limited Liability Company;
_____   Sole Proprietorship;
Other (Specify)   _____

Organized Under the Laws of the State or Commonwealth of:  Missouri


Creative Building Solutions, LLC
Duct Doctor Franchise Agreement

**FRANCHISE AGREEMENT**
**SCHEDULE "C"**

ELECTRONIC DEBIT AUTHORIZATION

Authorization Agreement for Direct Payments (ACH Debits)

       I (we) hereby authorize DUCT DOCTOR USA, INC., hereinafter called FRANCHISOR, to initiate debit entries to my (our) Checking Account Savings Account (select one) indicated below at the depository financial institution named below, heafter called DEPOSITORY, and to debit the same to such account. I (we) acknowledge that the origination of ACH transactions to my (our) account must comply with the provisions of U.S. law.

Depository Name:_____     Branch:_____

City:_____State:_____Zip:_____

Routing Number:_____Account Number:_____

This authorization will remain in full force and effect until FRANCHISOR has received written notification from me (or either of us) or its termination in such time and in such manner as to afford FRANCHISOR and DEPOSITOR a reasonable opportunity to act on it.

Name(s):_____          ID                    Number:
_____(Please Print)

Date:_____     Signature: _____

NOTE: DEBIT AUTHORIZATIONS <u>MUST</u> PROVIDE THAT THE RECEIVER MAY REVOKE THE AUTHORIZATION ONLY BY NOTIFYING THE ORIGINATOR IN THE MANNER SPECIFIED IN THE AUTHORIZATION

FRANCHISE AGREEMENT
SCHEDULE "D"

**PERSONAL GUARANTY OF FRANCHISEE'S PRINCIPAL OWNERS**

**THIS GUARANTY** is given this ___8th___ day of ___July___, 20___19___

By (list each guarantor):  Benjamin Allison, Takashi Yano

In consideration of, and as an inducement to, the execution of that certain Franchise Agreement (the "Agreement") on this date by Duct Doctor USA, Inc. ("us," "we," or "our"), each of the undersigned personally and unconditionally (a) guarantees to us and our successors and assigns, for the term of the Agreement (including any extensions, renewals and modifications thereof) and afterward as provided in the Agreement, that CREATIVE BUILDING SOLUTIONS, LLC ("Franchisee") will punctually pay and perform each and every undertaking, agreement,  and covenant set forth in the Agreement (including any amendments or modifications of the Agreement) and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement (including any amendments or modifications of the Agreement), both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, including the non-competition, confidentiality, transfer, and arbitration requirements.

Each of the undersigned consents and agrees that: (i) his or her direct and immediate liability under this Guaranty will be joint and several, both with Franchisee and among other guarantors; (ii) he or she will render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (iii) this liability will not be contingent or conditioned upon our pursuit of any remedies against Franchisee or any other person; (iv) this liability will not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which we may from time to time granted to Franchisee or to any other person, including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims (including the release of other guarantors), none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Agreement (including extensions), for so long as any performance is or might be owed under the Agreement by Franchisee or its owners, and for so long as we have any cause of action against Franchisee or its owners; and (v) this Guaranty will continue in full force and effect for (and as to) any extension or modification of the Agreement and despite the transfer of any interest in the Agreement or Franchisee, and each of the undersigned waives notice of any and all renewals, extensions, modifications, amendments, or transfers.

Each of the undersigned waives: (i) all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the undersigned's execution of and performance under this Guaranty; and (ii) acceptance and notice of acceptance by us of his or her undertakings under this Guaranty, notice of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed, protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed, and any other notices to which he or she may be entitled.

If we are required to enforce this Guaranty in a judicial or arbitration proceeding, and prevail in such proceeding, we shall be entitled to reimbursement of our costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses,

- 1 -

Creative Building Solutions, LLC
Duct Doctor Franchise Agreement

whether incurred prior to, in preparation for, or in contemplation of the filing of any such proceeding. If we are required to engage legal counsel in connection with any failure by the undersigned to comply with this Guaranty, the undersigned shall reimburse us for any of the above- listed costs and expenses we incur.

Subject to the arbitration obligations and the provisions below, each of the undersigned agrees that all actions arising under this Guaranty or the Agreement, or otherwise as a result of the relationship between us and the undersigned, must be commenced in the state or federal court of general jurisdiction in whose district our headquarters is then located and each of the undersigned irrevocably submits to the jurisdiction of those courts and waives any objection he or she might have to either the jurisdiction of or venue in those courts. Nonetheless, each of the undersigned agrees that we may enforce this Guaranty and any arbitration orders and awards in the courts of the state or states in which he or she is domiciled.

**IN WITNESS WHEREOF,** each of the undersigned has affixed his or her signature on the same day and year as the Agreement was executed.

**SIGNATURES OF EACH GUARANTOR**

| | |
|---|---|
| *Ben Allison* | Jul 08 2019 |
| Benjamin Allison | Date |
| Takashi Yano | Date |

- 2 -

Creative Building Solutions, LLC
Duct Doctor Franchise Agreement

**FRANCHISE AGREEMENT**
**SCHEDULE "E"**

### AGREEMENT NOT TO COMPETE AND CONFIDENTIALITY AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into the ____8th____ day of July, 2019 (the "Effective Date"), by and between **DUCT DOCTOR USA, INC**., a Georgia corporation ("Franchisor"), **CREATIVE BUILDNG SOLUTIONS, LLC**, a Missouri limited liability company ("Franchisee"), and BENJAMIN ALLISON and BROOKS M. INGRASSIA, individual residents of the state of Missouri, ("Owner" or "I").

### RECITALS

A.  Owner is an owner of equity in or a key employee of Franchisee, a franchisee of Franchisor pursuant to a Franchise Agreement dated _____Jul 08 2019_____ (the "Franchise Agreement").

B.  Franchisor owns a wide variety of confidential information and trade secrets.  Franchisor is granting Franchisee and Owner access to its confidential information, trade secrets, and other methods and procedures.  Franchisor needs to secure the confidentiality of its confidential information, the secrecy of its trade secrets, and its other methods and procedures, so that Franchisor's legitimate interests, including without limitation the interests of Franchisor's other franchisees, and the integrity and goodwill of Franchisor and its affiliates, and the integrity of Franchisor and such affiliates' various businesses, are protected.

C.  Franchisor would not have entered into the franchise relationship with Franchisee unless Franchisee agreed to have Owner sign this Covenant, agree to be bound by it, and agree to comply with it.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of all of which Owner hereby acknowledges, Owner hereby covenants, warrants, represents, and agrees as follows:

1.  **Definitions**.  As used in this Covenant:

1.1 Competitive Business.  "Competitive Business" will mean: (i) owning, maintaining, operating, engaging in, or having any interest in, any business that offers for sale, sells, or delivers residential and commercial air duct cleaning and indoor air quality services as are offered by Duct Doctor franchised businesses, as such services are modified from time to time, or any services confusingly similar thereto (a "Competitive Business"), other than another business operating under an agreement with Franchisor or any affiliate of Franchisor; (ii) acting as a director, officer, partner, member, employee, independent contractor, consultant, principal, or proprietor, or participating or assisting in the establishment or operation of any business engaged in a Competitive Business; or (iii) diverting or attempting to divert any business from Franchisee's Duct Doctor business, or from any businesses operating under the Franchisor's System, or from other systems Franchisor or its affiliates may develop.

1.2 Confidential Information.  "Confidential Information" means any information that Franchisor discloses to Franchisee that Franchisor designates as confidential, or that, by its nature, would reasonably be expected to be held in confidence or kept secret, whether such disclosure occurred prior to or after the Effective Date of this Agreement.  Without limiting the definition of "Confidential Information," all the following shall be conclusively presumed to be Confidential Information whether

- 3 -

or not Franchisor designates them as such: (i) all information that Franchisor has marked or designated as confidential; (ii) Franchisor's Operations Manual, together with all similar directives and documentation; (iii) Franchisor's training programs and the material contained in them; (iv) Franchisor's methods, system, equipment, and agreements, related to the development, opening, and operation of Duct Doctor businesses; (v) Franchisor's cost information; and (vi) all other information that Franchisor provides to Franchisee in confidence, except where such information is a Trade Secret.

1.3 <u>Trade Secret</u>. "Trade Secret" means information that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who may obtain economic value from its disclosure or use, whether Franchisee or Owner obtained such information prior to or after the Effective Date of the Franchise Agreement. Without limiting the definition of "Trade Secret," all the following shall be conclusively presumed to be Trade Secrets whether or not Franchisor designates them as such: (i) all customer lists, whether related to the franchised business or otherwise, and the contact information of such customers; (ii) Franchisor's advertising, marketing, and public relations strategies; (iii) Franchisor's marketing analyses; (iv) products and services that Franchisor proposes to introduce, but that it has not yet introduced; and (v) Franchisor's expansion plans.

1.4 <u>System</u>. "System" will mean businesses operating under the "Duct Doctor" trademarks, trade names, service marks, logotypes, and other commercial symbols.

2. **<u>Covenant Not to Compete</u>**.

2.1 <u>Covenant Not to Compete During the Term of the Franchise Agreement</u>. Owner agrees that he/she will not, during the term of the Franchise Agreement, individually or jointly with others, directly or indirectly, by, though, on behalf of, or in conjunction with, any person or entity: (i) own, maintain, operate, engage in, or have any interest in, any business engaged in a Competitive Business, other than as an owner of Franchisee, without Franchisee's and Franchisor's prior written consent, except that Owner may passively own or hold less than five percent (5%) of the shares of any publicly-traded business engaged in a Competitive Business; (ii) act as a director, officer, employee, independent contractor, consultant, principal, agent, or proprietor, or otherwise participate or assist in the establishment or operation of, directly or indirectly, any business engaged in a Competitive Business; or (iii) divert or attempt to divert any business from Franchisee's Duct Doctor business, from Franchisor, or from any businesses operating under the Franchisor's System or other systems Franchisor or its affiliates may develop.

2.2 <u>Covenant Not to Compete After the Term of the Franchise Agreement</u>. Owner covenants that he/she will not, beginning with the date of the termination, expiration, or non-renewal of the Franchise Agreement, and continuing for two (2) years thereafter, within Franchisee's Protected Territory or former Protected Territory, or within fifty (50) miles of the boundary of the Franchisee's Protected Territory or former Protected Territory, individually or jointly with others, by, though, on behalf of, or in conjunction with, any person or entity: (i) own, maintain, operate, engage in, or have any interest in, any business engaged in a Competitive Business, without Franchisee's and Franchisor's prior written consent, except that Owner may passively own or hold less than five percent (5%) of the shares of any publicly-traded business engaged in a Competing Activity; (ii) act as a director, officer, partner, member, employee, independent contractor, consultant, principal, agent, or proprietor, or otherwise, or participate or assist in the establishment or operation of,  any business engaged in a Competitive Business.

- 4 -

Creative Building Solutions, LLC
Duct Doctor Franchise Agreement

3. **Ownership and Protection of Confidential Information and Trade Secrets**.

3.1 Ownership.  Owner acknowledges and agrees that Franchisor's Confidential Information and Trade Secrets are and shall remain Franchisor's sole and exclusive property and that: (i) they are expressly copyrighted by copyright notice and hence protected under the U.S. Copyright Act, or they are unpublished works nonetheless protected under the U.S. Copyright Act; (ii) they include Franchisor's valuable confidential information and trade secrets; and (iii) Franchisor has made and will continue to make substantial investment in the Confidential Information and Trade Secrets, which investment may be recouped only if Franchisor's rights set forth in the provisions of the Franchise Agreement governing the protection of Franchisor's intellectual property, Franchisor's rights set forth in this Agreement, Franchisor's rights established by law, and Franchisor's other rights arising out of or related to Franchisor's intellectual property, are honored.

3.2 Acknowledgments.  Owner acknowledges and agrees that the Confidential Information and Trade Secrets are not, by definition, generally known in the trade; that they are beyond Owner's present skill and experience; and that for Owner to develop such Confidential Information and Trade Secrets on its own would be expensive, time-consuming, and difficult.  Owner further acknowledges and agrees that the Confidential Information and Trade Secrets would, if disclosed to a third party or used by me in violation of this Agreement, provide the third party or me with an unfair competitive advantage, and that they would be economically valuable to the third party or me in the development of a competing business or otherwise.

3.3 Protection.  In recognition, acknowledgment, and agreement with this Agreement, and in consideration of Franchisor's grant of a Duct Doctor Franchise to Franchisee, and in further consideration of the disclosure of the Confidential Information and Trade Secrets to me, Owner covenants, warrants, represents, and agrees that:

3.3.1    He/she will not, during the term of the Franchise Agreement: (i) appropriate or use any Confidential Information or Trade Secret for any purpose other than the operation of Franchisee's franchised business; (ii) use any Confidential Information or Trade Secret at any place except Franchisee's franchised business; (iii) disclose or reveal any portion of the Confidential Information or Trade Secrets to any person, other than to Franchisee's directors, officers, owners, management employees, and others who have a legitimate business need to know of them in order to further the operation of Employer's franchised business; or (iv) disclose any Confidential Information or Trade Secret to any other person or entity except as Franchisee or Franchisor expressly authorize.

3.3.2    He/she will not, for two (2) years after the termination or non-renewal of the Franchise Agreement: (i) appropriate or use any Confidential Information for any purpose; or (ii) disclose any Confidential Information to any other person or entity.

3.3.3    He/she will not, at any time after the termination or non-renewal of the Franchise Agreement: (i) appropriate or use any Trade Secret for any purpose; or (ii) disclose any Trade Secret to any other person or entity.

3.3.4    He/she will not copy, duplicate, record, or otherwise reproduce any of the Confidential Information or Trade Secrets, in whole or in part; store such Confidential Information or Trade Secrets in a computer database; or otherwise make such Confidential Information or Trade

Secrets available to any third party, except as set forth in this Agreement or as Franchisor specifically authorizes.

      3.3.5    He/she will at all times use my best efforts to prevent unauthorized copying or disclosure of any Confidential Information or Trade Secrets.

      3.3.6    Franchisor may from time to time modify the form of confidentiality agreement that Franchisor requires individuals like Owner to sign.  If Franchisor modifies such form, Owner will, on Franchisee's or Franchisor's request, duly execute, date, and deliver originals of such modified confidentiality agreement to Franchisee or Franchisor so that Franchisee or Franchisor actually receives such originals by the end of ten (10) days after Franchisee's or Franchisor's request for them.

4. **Unfair Competition**.  Owner acknowledges and agrees that, and hereby directs any third party construing this Agreement, including without limitation any court, mediator, master, or other party acting as a trier of fact or law, to conclusively presume that: (i) any breach by Owner of Sections 2 or 3 of this Agreement constitutes a deceptive and unfair trade practice and unfair competition; and (ii) Section 3 of this Agreement are Franchisee's and Franchisor's reasonable effort under the circumstances to maintain the confidentiality of Franchisee's or Franchisor's Confidential Information and the secrecy of their Trade Secrets.

5. **Works Made for Hire**.  If Franchisee directs Owner to create works derived from any Confidential Information or Trade Secrets, such works shall be deemed works made for hire and Franchisee shall own all copyrights in such works, subject to its obligations to assign such rights to Franchisor.

6. **Burden of Proof**.  If a dispute arises as to whether particular information is Confidential Information or a Trade Secret, Owner agrees that it will bear the burden of proving that such information is outside the ambit of "Confidential Information" or "Trade Secrets" subject to this Agreement.

7. **Remedies**.  If Owner defaults under this Agreement, or if Owner threatens any default, or if any default appears to be imminent, Owner acknowledges and agrees that: (i) Employer and Franchisor shall be entitled to all remedies at law or in equity or otherwise for such default or threatened or imminent default; and (ii) Employer and Franchisor shall be entitled, in addition to any other remedies Employer and Franchisor may have at law or in equity or otherwise, to a preliminary and permanent injunction and a decree for specific performance of the terms of this Agreement without the necessity of showing actual or threatened damage and without being required to furnish a bond or other security.

8. **Directives**.  If there is any dispute related to this Agreement, Owner hereby directs any third party construing this Agreement, including without limitation any court, mediator, master, or other party acting as a trier of fact or law:

      8.1 To conclusively presume that the restrictions set forth in Sections 2 and 3 are reasonable and necessary in order to protect: (i) Franchisee's and Franchisor's legitimate business interests, including without limitation the interests of Franchisor's other franchisees, the interests of Franchisor's franchisees and sub franchisees, and the integrity of the System; (ii) the confidentiality of Franchisor's confidential information and the secrecy of Franchisor's trade secrets; (iii) Franchisor's investment in the System; and (iv) the goodwill associated with the System.

- 6 -

8.2 To conclusively presume that Sections 2 and 3 were made freely and voluntarily by me, as a skilled and experienced businessperson to whom Franchisee and Franchisor delivered good and valuable consideration.

8.3 To conclusively presume that the restrictions set forth in Section 2 will not unduly burden my ability to earn a livelihood.

8.4 To conclusively presume that Owner's violation of any of the terms of Section 2 of this Covenant: (i) was accompanied by the misappropriation and inevitable disclosure of Franchisee's and Franchisor's confidential information, trade secrets, and other methods and procedures; and (ii) constitutes a deceptive and unfair trade practice and unfair competition.

9. **Enforcement**.  Owner acknowledges and agrees that:

9.1 Each of the covenants set forth in this Agreement shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant set forth in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision in a proceeding to which Franchisor is a party, Owner will be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of Sections 2 or 3.

9.2 Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in Sections 2 or 3 of this Agreement, or any portion thereof, without my consent, effective immediately on delivery by Franchisor of written notice of such reduction to me; and Owner will immediately comply with any covenant as so modified.

9.3 The existence of any claims Owner may have against Franchisee or Franchisor, whether or not they arise from this Agreement, shall not constitute a defense to the enforcement by Franchisee or Franchisor of the provisions of this Agreement.

10. **Injunctive Relief**.  Owner agrees that any failure to comply with the requirements of this Agreement will cause Franchisee and Franchisor irreparable harm for which they have no adequate remedy at law.  Therefore, Owner agrees that Franchisee and Franchisor will have the right to injunctive relief, including without limitation a decree for specific performance, to compel Owner to comply with this Agreement, without the necessity of showing actual or threatened damage and without being required to furnish a bond or other security.

11. **Construction**.

11.1    Governing Law.  All matters arising out of or related to this Agreement, including without limitation all matters arising out of or related to the making, existence, construction, enforcement, and sufficiency of performance of this Agreement, shall be determined exclusively in accordance with, and governed exclusively by, the laws of the State of Georgia applicable to agreements made and to be entirely performed in the State of Georgia, which laws shall prevail in the event of any conflict of laws.

11.2    Forum, Venue, and Jurisdiction.  In the event of any dispute arising out of or related to this Agreement, including without limitation any dispute arising out of or related to the making of this Agreement, such dispute shall be resolved exclusively through litigation.  The exclusive forum and

- 7 -

venue for such litigation shall be the state or federal court having jurisdiction over the subject matter in or for the city or county where Franchisor's principal place of business is located. Owner hereby irrevocably accepts and submits to, generally and unconditionally, the exclusive jurisdiction of any such state or federal court having jurisdiction over the subject matter and hereby waive all defenses based on jurisdiction, venue, or forum non conveniens.

11.3     <u>Waiver of Trial By Jury</u>.  I hereby waive trial by jury in any litigation arising out of or related to this Agreement.

11.4     <u>Attorneys' Fees</u>.  In the event of any dispute or litigation arising out of or related to this Agreement, including without limitation any dispute or litigation arising out of or related to the making of this Agreement, Owner will pay Franchisee and Franchisor, on demand, their costs, including without limitation their reasonable attorneys' fees and costs, and further including without limitation their reasonable attorneys' fees and costs of appeal, and further including without limitation their reasonable attorneys' fees and costs of collection, so that they actually receive such amounts by the end of ten (10) days after they demand payment.  In the event of any default under this Agreement, Owner will pay Franchisee and Franchisor, on demand, their costs arising out of or related to such default, including without limitation their reasonable attorneys' fees and costs, and further including without limitation their reasonable attorneys' fees and costs of collection, so that they actually receive such amounts by the end of ten (10) days after they demand payment.

12. **<u>Miscellaneous</u>**.

12.1     <u>Construe in Favor of Enforcement</u>.  In the event of any dispute, litigation, or like event or occurrence arising out of or related to my obligations set forth in this Agreement, or arising out of or related to the matters set forth in this Agreement, Owner hereby directs any third party construing this Agreement, including without limitation any court, mediator, master, or other party acting as trier of fact or law, to construe the provisions of the Covenants contained herein broadly in favor of enforcement.

12.2     <u>Merger; Entire Agreement, Compliance</u>.  This Agreement sets forth the entire agreement between Franchisee and Franchisor on the one hand, and Owner on the other hand, fully superseding any and all prior negotiations, agreements, representations, or understandings, whether oral or written, related to the subject matter of this Agreement.  Owner hereby expressly affirms that there are no oral or written agreements, "side-deals," arrangements, or understandings between Franchisee or Franchisor on the one hand, and Owner on the other hand, except as expressly set forth in this Agreement.  No course of dealing, whether occurring before or after the date Owner signed this Agreement, shall operate to amend, terminate, or waive any express written provision of this Agreement.

12.3     <u>Partial Invalidity</u>.  If any provision of this Agreement is declared invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it valid and enforceable; and if it cannot be so modified, then severed.  The balance of this Agreement shall remain in full force and effect, and Owner agrees that it would have signed it as so modified.

12.4     <u>Successors and Assigns</u>.  This Agreement shall be binding on the parties, their personal representatives, successors, heirs, and assigns.

Creative Building Solutions, LLC
Duct Doctor Franchise Agreement

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, agreeing to be legally bound hereby, the parties have duly executed and delivered this Agreement as of the date set forth above.

**Owner:**

_Ben Allison_

Benjamin Allison

Date: ___Jul 08 2019___, 20_____

**Key Employee:**

_Brooks M Ingrassia_

Brooks M. Ingrassia

Date: ___Jul 08 2019___, 20__

**Franchisor:**

**Duct Doctor USA, Inc.**

By: _Glade Stricklin_

Kenneth S. Stricklin, CEO

**Franchisee:**

**Creative Building Solutions, LLC**

By: _Ben Allison_

Benjamin Allison, President of BEA Management, LLC, Its Sole Member

- 9 -

Creative Building Solutions, LLC
Duct Doctor Franchise Agreement

**FRANCHISE AGREEMENT**

**SCHEDULE "F"**

**CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT**
**FOR EMPLOYEES AND INDEPENDENT CONTRACTORS OF FRANCHISEE**

I, by my signature set forth below, agree to comply with and to be bound by this Confidentiality and Non-Solicitation Agreement (the "Agreement").

I am an employee or independent contractor of _____ (the "Employer"). Employer is a franchisee of Duct Doctor USA, Inc. ("Franchisor"). Franchisor owns certain confidential information and trade secrets; and, in order to induce Franchisor to disclose such Confidential Information to Employer, Franchisor and Employer have required me to execute this Agreement.

I acknowledge and agree that I will receive consideration from my agreement to comply with and to be bound by this Agreement, in that without this Agreement, Employer would not employ me.

I further acknowledge that I am not employed by Duct Doctor USA, Inc., Employer's franchisor but that I am solely employed by an independent Franchisee of Franchisor.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of all of which I hereby acknowledge, I agree as follows:

1. **Definitions**. As used in this Agreement:

1.1 "Confidential Information" means any information related to Employer or Franchisor that Employer or Franchisor discloses to me that either designates as confidential; or that, by its nature, would reasonably be expected to be held in confidence or kept secret. Without limiting the definition of "Confidential Information", all the following shall be conclusively presumed to be Confidential Information whether or not Employer or Franchisor designates them as such: (i) Franchisor's Confidential Operations Manuals; (ii) Employers' and Franchisor's cost information; (iii) materials describing the Franchisor's franchise network; (iv) Franchisor's training materials; and(v) other information Employer or Franchisor gives to me in confidence, except where such information is a Trade Secret.

1.2 "Trade Secret" means information that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. Without limiting the definition of "Trade Secrets," all the following shall be conclusively presumed to be Trade Secrets whether or not Employer or Franchisor designates them as such: (i) Employer's or Franchisor's methods and procedures; (ii) Employer's or Franchisor's sources of supply; and (iii) Employer's or Franchisor's advertising, marketing, and public relations strategies.

1.3 The terms "Confidential Information" and "Trade Secret" do not include, regardless of the means of disclosure: (i) information generally known to the trade or the public at the time Employer or Franchisor disclose it to me; (ii) information that becomes known to the trade or the public after Employer or Franchisor disclose it to me, unless it becomes known due to my breach of this Agreement; or (iii) information I can prove was known to me at the time Employer or Franchisor disclosed it to me.

2. **Protection of Confidential Information and Trade Secrets**. I acknowledge and agree that the Confidential Information and Trade Secrets are not, by definition, generally known in the trade;

- 10 -

that they are beyond my present skill and experience; and that for me to develop such Confidential Information and Trade Secrets on my own would be expensive, time consuming, and difficult. I further acknowledge and agree that the Confidential Information and Trade Secrets would, if disclosed to a third party or used by me in violation of this Agreement, provide the third party or me with a competitive advantage, and that they would be economically valuable to the third party or me in the development of a competing business or otherwise. Accordingly, in consideration of Employer's or Franchisor's disclosure of the Confidential Information and Trade Secrets to me, I covenant, warrant, and agree that:

2.1     I will not, during the Term of this Agreement: (i) appropriate or use any Confidential Information or Trade Secret for any purpose other than at those designated by Employer, in furtherance of Employer's business, and pursuant to Employer's direction; (ii) use any Confidential Information or Trade Secret at any place except at Employer's Duct Doctor Franchised Business; (iii) disclose or reveal any portion of the Confidential Information or Trade Secrets to any person, other than to Employer's directors, officers, owners, management employees, or others who have a legitimate business need to know of them in order to further Employer's business; or (iv) divulge or use any Confidential Information or Trade Secrets for the benefit of any other person or entity except as Employer or Franchisor expressly authorize.

2.2     I will not, for two (2) years after the termination or expiration of my employment with Employer for any reason: (i) appropriate or use any Confidential Information for any purpose; or (ii) divulge or use any Confidential Information for the benefit of any other person or entity.

2.3     I will not, at any time after the termination or expiration of my employment with Employer for any reason: (i) appropriate or use any Trade Secret for any purpose; or (ii) divulge or use any Trade Secret for the benefit of any other person or entity.

2.4     I will not copy, duplicate, record, or otherwise reproduce any of the Confidential Information or Trade Secrets, in whole or in part; store such Confidential Information or Trade Secrets in a computer retrieval or data base; or otherwise make such Confidential Information or Trade Secrets available to any third party, except as set forth in this Agreement or as Employer or Franchisor specifically authorize.

2.5     I will make all reasonable efforts and take all reasonable precautions required to prevent unauthorized copying or disclosure of any Confidential Information or Trade Secrets.

2.6     On termination or expiration of my employment with Employer for any reason, or when I am no longer assigned to work with any Confidential Information or Trade Secrets, I will promptly surrender to Employer all copies of any Confidential Information or Trade Secrets and any notes, memoranda, and like material concerning or derived from the Confidential Information or Trade Secrets.

3.     **Unfair Competition**. I acknowledge and agree that: (i) any breach by me of Section 2 of this Agreement shall may be conclusively presumed to constitute unfair competition; and (ii) Sections 1 and 2 of this Agreement are a reasonable effort under the circumstances to maintain the confidentiality of Employer's or Franchisor's Confidential Information and the secrecy of their Trade Secrets.

4.     **Non-Solicitation of Clients and Customers of Employer.** Employee agrees other than on behalf of Employer, Employee shall not solicit for him/herself, or any person, entity or business combination, the provision of commercial or residential air duct cleaning and interior air quality services to any of Employer's clients or customers for whom or which Employee performed the foregoing services on behalf of Employer during the period of eighteen (18) months immediately prior to Employee's termination of employment with Employer. This covenant will continue during the term of Employee's employment with Employer and for a period of two (2) years thereafter.

- 11 -

5.      **Works Made for Hire**. If Employer directs me to create works derived from any Confidential Information or Trade Secrets, such works shall be deemed works made for hire and Employer shall own all copyrights in such works, subject to its obligations to assign such rights to Franchisor.

6.      **Remedies**. I agree that I shall be liable to Franchisor for any and all damage, damages, loss, losses, costs, and expenses, including reasonable attorneys' fees, caused by my willful or negligent use or disclosure of any Confidential Information, Trade Secret, or information contained therein, in violation of this Agreement. I acknowledge and agree that Franchisor is an intended third- party beneficiary of this Agreement and is entitled to enforce any provision of this Agreement.

7.      **Limitation.** I understand that this is not an employment agreement of any kind, and that I am an "at-will" employee unless otherwise provided in a written employment agreement with Employer.

8.      **Construction**. This Agreement shall be governed for all purposes by the laws of the State of Georgia and shall be construed to maximize protection for Franchisor's rights in the Confidential Information, Trade Secrets, and goodwill. If any provision of this Agreement is declared void or unenforceable, such provision shall be deemed severed, and the balance of the Agreement shall remain in full force and effect.

**(SIGNATURES CONTINUED ON FOLLOWING PAGE)**

Duct Doctor FDD 2019 v.1

IN WITNESS WHEREOF, agreeing to be legally bound hereby, I have duly set my hand and seal to this Confidentiality Agreement and have duly executed and delivered this Confidentiality Agreement as of the date set forth below.

_____     _____
Employee                                    Witness

_____     _____
Print Name                                  Print Name

Date:_____, 20\_\_\_\_     Date:_____, 20\_\_\_\_

Address:                                    Address:
_____     _____
_____     _____
_____     _____

- 13 -

Duct Doctor FDD 2019 v.1