## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| PAULETTE HOLLOWAY, | **Case No.:** |
| Plaintiff, | |
| v. | **COMPLAINT AND** **DEMAND FOR JURY TRIAL** |
| NEWREZ LLC d/b/a SHELLPOINT MORTGAGE SERVICING, EQUIFAX INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC. and TRANS UNION LLC, | 1. **FCRA, 15 U.S.C. § 1681,** *et seq.* |
| Defendants. | |

Plaintiff Paulette Holloway ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.,* against Defendants Newrez LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint"), Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union LLC ("Trans Union") (Equifax, Experian, and Trans Union are referenced collectively as "CRA Defendants").

//

## I.   __INTRODUCTION__

1.      Plaintiff's Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.,* by the CRA Defendants. Plaintiff contends CRA Defendants, each a consumer reporting agency, failed to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports, and consequently reported inaccurate information about Plaintiff. "Consumer reports" under 15 U.S.C. § 1681a(d) include both credit file disclosures obtained directly by Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

2.      Plaintiff's Complaint also alleges violations of the FCRA against Shellpoint for failing to conduct a reasonable reinvestigation after receiving notice of Plaintiff's disputes from Experian, Equifax, and Trans Union.

## II.   __JURISDICTION AND VENUE__

3.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

4.      Venue in the Northern District of Georgia is proper pursuant to 28 U.S.C. § 1391 because Defendants regularly transact business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

### III.   PARTIES

5.      Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

6.      Plaintiff is a natural person who resides in Covington, Georgia.

7.      Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

8.      Defendant Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f).  On information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Experian's principal place of business is located at 475 Anton Boulevard, Costa Mesa, California 92626.

9.      Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). On information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information

3

concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661. Trans Union can be served through its registered agent, Illinois Corporation Service Company, located at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

10.     Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f).  On information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties.  Equifax's principal place of business is located at 1550 Peachtree Street, NW, Atlanta, Georgia 30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

11.     Defendant Shellpoint is engaged in the business of collecting debt. Shellpoint is also a *furnisher*, as contemplated in 15 U.S.C. § 1681s-2.  Upon information and belief, Shellpoint is regularly engaged in the business of furnishing credit information to the consumer reporting agencies.  Shellpoint is headquartered at 1100 Virginia Drive, Suite 125, Fort Washington, PA 19034.

Shellpoint can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia, 30092.

12.   During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Georgia and conducted business in the State of Georgia on a routine and systematic basis.

13.   CRA Defendants regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 USC § 1681a(d), to third parties. CRA Defendants regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. § 1681a(f) of the FCRA.

14.   During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

15.   Any violations by Defendants were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

## IV.   **FACTUAL BACKGROUND**

16.   Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

17.   The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

18.   Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

19.   The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

20.   The CRA Defendants, who are the three major consumer reporting agencies in the United States, regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports.

21.    CRA Defendants regularly obtain consumer bankruptcy information to include in consumer reports.

22.    CRA Defendants' consumer reports generally contain the following information: (i) <u>Header/Identifying Information:</u> this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) <u>Tradeline Information</u>: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) <u>Public Record Information</u>: this section typically includes public record information, such as bankruptcy filings; and (iv) <u>Credit Inquiries</u>: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

23.    CRA Defendants obtain consumer information from various sources. Some consumer information is sent directly to CRA Defendants by furnishers, and other information is independently gathered by CRA Defendants from third party providers, vendors or repositories, like computerized reporting services such as PACER and Lexis-Nexis.

24.    CRA Defendants regularly seek out and procure public record information, including consumer bankruptcy filing and discharge information, with the intention of including it on the consumer reports CRA Defendants sell to third parties such as lenders.

25.    The diligence CRA Defendants exercise in uncovering and recording consumer bankruptcy filings is not replicated in CRA Defendants' subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

26.    The vast majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from the CRA  Defendants to make lending decisions.

27.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and dates of delinquencies contained in CRA Defendants' reports.

28.    The information CRA Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Score(s).

29.     FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

30.     FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

a.     "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

b.     The "amount of debt" a consumer owes has a major impact on their credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

31.     Lenders also consider a consumer's debt-to-income ratio ("DTI") based on the total amount of debt reported by CRA Defendants in consumer

reports.  DTI compares the total amount a consumer owes to the total amount a consumer earns.

32.    A consumer's income, however, is not included in his or her consumer report; only his or her amount of debt is. Consumers enter their income into credit applications. Therefore, DTI is not calculated in a consumer's credit score but is a factor in credit decisions.

33.    Lenders consider a consumer's DTI when deciding whether to approve financing and the credit terms thereof.

34.    The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for the consumer to obtain credit, and the credit terms will be worse (e.g., higher interest, lower credit limits).

35.    A consumer who has obtained a bankruptcy discharge and has a consumer report that is inaccurately reporting outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account were accurately reporting with a zero-dollar balance.

36.    CRA Defendants are well aware that the effect of a Discharge Order in a Chapter 13 Bankruptcy is to discharge unsecured debts that are listed in the debtor's bankruptcy petition.

37.     CRA Defendants are further aware that the default rule is that all unsecured debts will be listed and discharged in Chapter 13 bankruptcy and that only on rare occasions will an unsecured debt not be discharged upon completion of a Chapter 13 plan.

38.     Additionally, information indicating that a specific debt has not been discharged, but instead was successfully challenged through an adversary proceeding, is retrieved from the same sources from which CRA Defendants independently obtain consumer bankruptcy case information.

39.     CRA Defendants are also notified of consumer bankruptcies by furnishers of information, and from the information CRA Defendants independently gather from third parties.

40.     CRA Defendants' unreasonable policies and procedures cause them to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 13 Bankruptcy.

41.     CRA Defendants implemented an automated software "bankruptcy scrub" procedure in 2009 following a settlement agreement in *White v. Experian Info. Sols., Inc*., No. SACV 05-1070 DOC (MLGx), (C.D. Cal. 2008), which will

automatically update certain accounts to zero balance and "discharged in bankruptcy" when they pre-date a Chapter 7 bankruptcy filing date.

42.     CRA Defendants failed to implement such an automated procedure for unsecured Chapter 13 debts, even though CRA Defendants know that upon discharge, such debts are treated the same as Chapter 7 debts (discharged with zero balance), as long as the debts were listed in the petition. CRA Defendants also know that debtors must swear under penalty of perjury that they have listed "all" of their unsecured debts.

43.     CRA Defendants' unreasonable policies and procedures cause them to regularly report consumer information without verifying its accuracy.

44.     CRA Defendants' unreasonable policies, procedures and/or algorithms consistently fail to identify and update unsecured pre-bankruptcy Chapter 13 debts as required by § 1681e(b).

45.     CRA Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating the information as required by § 1681e(b), despite possessing information that establishes that the reported information is inaccurate, and/or that is inconsistent with the reported information.

46.     Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, CRA Defendants frequently report information regarding pre-bankruptcy debts based on incomplete or knowingly inaccurate information.

47.     CRA Defendants regularly publish consumer information that conflicts with information provided by data furnishers to CRA Defendants, already included in CRA Defendants' credit files, contained in public records that CRA Defendants regularly access, and/or sourced through CRA Defendants' independent and voluntary efforts.

48.     Further, CRA Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished or reported information, and/or information contained in Defendants' own files.

49.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against CRA Defendants for their inaccurate consumer reporting following a Chapter 13 discharge.

50.     Thus, CRA Defendants are on continued notice of their inadequate post-bankruptcy reporting procedures, which cause CRA Defendants to report inaccurate balances, account statuses, payment histories, and/or payment statuses.

*Plaintiff's Bankruptcy*

51.   Plaintiff filed a Chapter 13 Bankruptcy on or about September 13, 2018, in the United States Bankruptcy Court for the Northern District of Georgia (Case No. 18-65397-jrs).

52.   Plaintiff complied with all obligations and made all Chapter 13 Plan payments during the Chapter 13 Bankruptcy.

53.   Accordingly, Plaintiff received an Order of Discharge on or about June 27, 2022.

54.   Thereafter, Plaintiff was not personally liable for her unsecured dischargeable debts, and those debts had a zero-dollar balance after the bankruptcy discharge.

*CRA Defendants' Post-Bankruptcy Reporting*

55.   CRA Defendants prepared one or more consumer reports concerning Plaintiff after she was discharged from Chapter 13 Bankruptcy.

56.   In Plaintiff's consumer reports, CRA Defendants included the bankruptcy case number, court, filing date and the fact that Plaintiff's bankruptcy had been discharged.

57.   CRA Defendants also reported Plaintiff's credit history in individual "tradelines," including names of credit accounts, account numbers, account types,

responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the dates of the last status update.

58.     CRA Defendants reported Plaintiff's bankruptcy filing and bankruptcy discharge information (date/court/chapter) in the Public Records section and individual tradelines of Plaintiff's consumer reports.

59.     CRA Defendants obtained notice of Plaintiff's bankruptcy discharge through their routine, independent collection of consumer information from third party vendors such as Lexis-Nexis, as well as from furnishers that provide data regarding the individual tradelines reported by CRA Defendants in Plaintiff's consumer reports.

60.     CRA Defendants are aware that CRAs are generally required to report unsecured accounts included in a consumer's Chapter 13 Bankruptcy with a status of "discharged through bankruptcy" and/or with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

*Allegations Specific to Credit Reporting Regarding Bank of America*

61.     Experian and Trans Union should have reported **all** of Plaintiff's unsecured dischargeable pre-petition debt as included in or discharged in Chapter 13 Bankruptcy, and/or with a zero-dollar balance, but did not.

62.    Rather than accurately report the discharged debts, Experian and Trans Union inaccurately reported Plaintiff's Bank of America Account (the "B of A Account"), ending with \*\*\*\*\*\*\*\*\*\*\*\*5783 and opened in May 2015, which pre-dated Plaintiff's bankruptcy filing.

63.    The *unsecured* B of A Account was included in Plaintiff's bankruptcy and discharged on or about June 27, 2022.  Therefore, the B of A Account should have been reported as discharged in bankruptcy and/or with a zero-dollar balance.

64.    However, Trans Union and Experian inaccurately reported the discharged B of A Account with a status of "CHARGE OFF," and as having a balance of $1,051.00 instead of a zero-dollar balance.

65.    The status of "Charge Off" in the consumer credit reporting industry means that a debt may still be owed, especially where, as here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradelines indicate there is a balance and/or past due balance owed on the account before or after the "charge-off."

66.    The national consumer reporting agencies specifically acknowledge that a "charge-off" generally means consumers are still legally responsible for paying the debt.

67.    According to Experian, creditors typically "charge off" accounts after they have been delinquent; *i.e.,* gone without any scheduled payments for six months. A charge-off does not mean the consumer's debt is forgiven; the consumer is still legally responsible for paying the outstanding amount.

68.    Trans Union and Experian did not indicate that the B of A Account was discharged in bankruptcy or report the B of A Account with a zero-dollar balance, despite reporting Plaintiff's bankruptcy in the public records section of Plaintiff's consumer report and reporting other pre-bankruptcy accounts as "Discharged/Included in Bankruptcy Chapter 13" and/or with zero balances.

69.    Notably, the other national CRA, Equifax, did not inaccurately report the B of A Account like Trans Union and Experian.

70.    Upon information and belief, Bank of America ("BofA") furnished information to Trans Union and Experian that indicated Plaintiff's BofA Account debt was included or discharged in bankruptcy and/or had a zero-dollar balance after the bankruptcy discharge, but Trans Union and Experian rejected or otherwise overrode the data they received.

71.    Alternatively, upon information and belief, Trans Union and Experian knew from past experiences that BofA furnished inaccurate information regarding discharged debts or has historically failed to employ reasonable procedures to

ensure it properly updates consumer debts after a Chapter 13 Bankruptcy is discharged.

72.    Nevertheless, Trans Union and Experian blindly relied on the information provided by BofA, even though this information conflicted with or was contradicted by information contained in Experian and Trans Union's records, as well as Experian and Trans Union's knowledge regarding Plaintiff's bankruptcy and discharge.

73.    Experian and Trans Union's reliance on the furnisher, BofA, was therefore unreasonable.

74.    Experian and Trans Union inaccurately reported that Plaintiff owed a balance that she did not actually owe, and also reported an inaccurate account status.

75.    Experian and Trans Union inaccurately reported the B of A Account as a "CHARGE OFF" with a balance owed after the B of A Account was discharged in Chapter 13 Bankruptcy and therefore had a zero-dollar balance.

76.    Experian and Trans Union failed to indicate that the Account had a zero-dollar balance and/or was included/discharged in Chapter 13 Bankruptcy, and instead inaccurately reported the BofA Account as a "CHARGE OFF."

77.    Experian and Trans Union's reporting of the BofA Account is patently false and therefore inaccurate.

78.    If not patently false, Experian and Trans Union's reporting of the B of A Account is materially misleading and therefore inaccurate.

*Allegations Specific to Plaintiff's Shellpoint Account Dispute*

79.    Following Plaintiff's bankruptcy discharge, the CRA Defendants reported the payment status for Plaintiff's Shellpoint mortgage account tradeline, account number ending in ***872 (the "Shellpoint Account") as: a) 30-days late as of July and August 2022; b) timely as of September and October 2022; and c) 30-days late as of November 2022 (and all following months).

80.    The CRA Defendants' reporting of the Shellpoint Account payment status was wrong.   Plaintiff was not late on any payments concerning the Shellpoint Account.

81.    When Plaintiff filed her bankruptcy in September 2018, she was two months' payments in arrears.

82.    Plaintiff's confirmed Chapter 13 bankruptcy plan called for Plaintiff to make regular monthly payments directly to Shellpoint, while the allowed $1,679.48 pre-bankruptcy arrearage was repaid/cured through bankruptcy plan payments.

83.     Plaintiff completed payments on her Bankruptcy Plan and received her Chapter 13 discharge in late-June 2022.  By making all timely payments on her Bankruptcy Plan, Plaintiff legally cured the prior arrearage on the mortgage.

84.     A "Notice of Final Cure Payment" filed by the bankruptcy trustee in the bankruptcy proceeding confirmed the cure of the prior Shellpoint Account arrearage.

85.     Plaintiff also timely made all regular monthly payments on the mortgage during the Chapter 13 proceedings.

86.     Plaintiff therefore was NOT 30 days late on her Shellpoint payments when she emerged from her bankruptcy in late-June 2022.

87.     Since her bankruptcy ended, Plaintiff has timely made all monthly payments on the mortgage to Shellpoint.

88.     On or about November 10, 2022, Plaintiff accordingly submitted a dispute of the reported Shellpoint Account late payment statuses to the CRA Defendants (the "Shellpoint Dispute").

89.     Plaintiff mailed a letter to Defendant Trans Union which set forth the Shellpoint Dispute.

90.     Trans Union received Plaintiff's dispute letter.

91.     Upon information and belief, Trans Union forwarded Plaintiff's Shellpoint Dispute to Shellpoint.

92.     Upon information and belief, Shellpoint received Plaintiff's dispute from Trans Union.

93.     Shellpoint did not conduct any meaningful investigation of Plaintiff's dispute, and did not inform Trans Union that Plaintiff's Shellpoint Account payments were timely.

94.     Following the dispute, Trans Union continued to report the Shellpoint Account late payments.

95.     Plaintiff also mailed a letter to Defendant Equifax which set forth the Shellpoint Dispute.

96.     Equifax received Plaintiff's dispute letter.

97.     Upon information and belief, Equifax forwarded Plaintiff's dispute to Shellpoint.

98.     Upon information and belief, Shellpoint received Plaintiff's dispute from Equifax.

99.     Shellpoint did not conduct any meaningful investigation of Plaintiff's dispute, and did not inform Equifax that Plaintiff's Shellpoint Account payments were timely.

100.  Following the dispute, Equifax continued to report the Shellpoint Account late payments.

101.  Plaintiff mailed a letter to Defendant Experian which set forth the Shellpoint Dispute.

102.  Experian received Plaintiff's dispute letter.

103.  Upon information and belief, Experian forwarded Plaintiff's Shellpoint Dispute to Shellpoint.

104.  Upon information and belief, Shellpoint received Plaintiff's dispute from Experian.

105.  Shellpoint did not conduct any meaningful investigation of Plaintiff's dispute and did not inform Experian that Plaintiff's Shellpoint Account payments were timely.

106.  Following the dispute, Experian continued to report the Shellpoint Account late payments.

*Plaintiff's Damages*

107.  Following the discharge of Plaintiff's Bankruptcy on June 27, 2022, Plaintiff applied for credit with various entities.

108.  CRA Defendants' inaccurate reporting of the B of A Account and the Shellpoint Account (collectively, "the Accounts"), along with additional

information belonging to Plaintiff, was published to various creditors by the CRA Defendants during the process of Plaintiff's credit applications.

109.   Upon information and belief, had Experian and Trans Union accurately reported the B of A Account with a zero balance, Plaintiff's credit scores and/or DTI would have been better.

110.   Experian and Trans Union's reporting of an additional $1,051.00 of debt which Plaintiff does not actually owe negatively increases DTI since the debt is substantially greater, but the income is unchanged.

111.   The false increased debt also negatively impacts the 30% of credit score which is based on the debt owed divided by credit limits, which impacts post-discharge consumers even more than those who have not filed bankruptcy.

112.   The Defendants' inaccurate reporting of the Shellpoint Account late payments negatively affected Plaintiff's credit by making her appear less creditworthy.

113.   As a direct result of Defendants' inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

114.   As a direct result of Defendant's inaccurate reporting, Plaintiff also suffers actual damages in the form of postage expenses and attorneys' fees incurred related to Defendants' inaccurate reporting.

115.   Additionally, Plaintiff suffers interference with daily activities, including emotional distress, including, without limitation, emotional and mental anguish, humiliation, stress, anger, loss of sleep, frustration, shock, embarrassment and anxiety.

### V.   COUNT I
**Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b)**
**(Experian and Trans Union)**

116.   Plaintiff incorporates by reference all of the above factual allegations of this Complaint as though fully set forth herein at length.

117.   The FCRA requires CRAs, like Experian and Trans Union, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

118.   Experian and Trans Union negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of credit information pertaining to pre-bankruptcy debts after a consumer receives a Discharge Order.

119.   In this case, Experian and Trans Union inaccurately reported debts related to accounts that Experian and Trans Union knew were unsecured and pre-dated Plaintiff's Chapter 13 Bankruptcy and were included and discharged by Plaintiff's bankruptcy discharge, and should therefore have reported with a zero-dollar balance.

120.   Experian and Trans Union independently sought information about Plaintiff's bankruptcy filing and discharge and voluntarily reported this information in Plaintiff's consumer reports.

121.   When Experian and Trans Union voluntarily procured and published Plaintiff's bankruptcy information, they had an obligation to ensure they followed reasonable procedures to report the bankruptcy discharge and its effect(s) with maximal accuracy.

122.   Despite knowledge of these legal obligations, Experian and Trans Union willfully and consciously breached their known duties and deprived Plaintiff of her rights under the FCRA. Experian and Trans Union knew or should have known of their obligations under the FCRA, especially those pertaining to reporting discharged unsecured debts with a zero-dollar balance.

123.   These obligations are well established by the plain language of the FCRA, promulgated by the Federal Trade Commission, detailed case law and

evidenced in prior cases involving Experian and Trans Union from which Experian and Trans Union are on notice of their unreasonable procedures concerning the reporting of Chapter 13 discharged unsecured debts.

124.   Experian and Trans Union knew or should have known that the effect of a Discharge Order on unsecured debts in a Chapter 13 Bankruptcy is to discharge all statutorily dischargeable unsecured debts other than those that have been successfully challenged in an adversary proceeding.

125.   Experian and Trans Union know that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

126.   Additionally, Experian and Trans Union possess or could easily obtain substantial written materials that detail CRAs' duties and obligations under the FCRA, including those that apply when consumers file for Chapter 13 Bankruptcy.

127.   Yet in this case, Experian and Trans Union reported the BofA Account, which was unsecured and pre-dated Plaintiff's bankruptcy, as a "CHARGE OFF" account with a balance owed after discharge, instead of a zero-dollar balance.

128.   Experian and Trans Union had actual knowledge of Plaintiff's bankruptcy and Discharge Order, as evidenced by the information they published

in Plaintiff's consumer reports, including the bankruptcy case number, court, date of filing and date of discharge.

129.   Experian and Trans Union are also on notice from other tradelines reported by Experian and Trans Union that indicate Plaintiff's accounts were included in and discharged in bankruptcy.

130.   Experian and Trans Union received notice of Plaintiff's bankruptcy discharge through public records, their own files, and information provided by data furnishers.

131.   Experian and Trans Union had prior notice of their unreasonable procedures for reporting discharged debt.

132.   Experian and Trans Union also possessed information from which Experian and Trans Union should have known the information reported about Plaintiff was inaccurate, as Plaintiff's consumer reports include the date the consumer filed bankruptcy, whether the consumer obtained a bankruptcy discharge, as well as the date the inaccurate unsecured tradeline account/debt arose or was otherwise opened by the consumer.

133.   Experian and Trans Union violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiff's consumer file/report.

134.   Experian and Trans Union also violated 15 U.S.C. § 1681e(b) by failing to report accurate information when Experian and Trans Union knew or should have known the information they were reporting is inaccurate and/or otherwise contradicted by information known by Experian and Trans Union, reported to Experian and Trans Union, and/or reasonably available to Experian and Trans Union.

135.   Experian and Trans Union's violations of 15 U.S.C. § 1681e(b) were willful.

136.   Alternatively, Experian and Trans Union's violations of 15 U.S.C. § 1681e(b) were negligent.

137.   Experian and Trans Union's inaccurate reporting damaged Plaintiff's creditworthiness.

138.   Plaintiff suffers actual damages, including a decreased credit score, loss of credit opportunities, and other financial harm caused by Experian and Trans Union inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

139.   Due to Experian and Trans Union's inaccurate reporting, Plaintiff also suffered economic harm and interference with daily activities caused by other harm

including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, loss of sleep, frustration, shock, embarrassment, and anxiety.

140.   Experian and Trans Union are each a direct and proximate cause of Plaintiff's damages.

141.   Experian and Trans Union are each a substantial factor in Plaintiff's damages.

142.   Therefore, Experian and Trans Union are individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

## VI.   COUNT II
### Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681i
### (The CRA Defendants)

143.   Plaintiff incorporates by reference all of the above factual allegations of this Complaint as though fully set forth herein at length.

144.   When a consumer disputes the accuracy or completion of information included in a CRA's credit file, the FCRA requires the consumer reporting agency to either conduct a reasonable investigation into the disputed information **or** delete the disputed information from the consumer's credit file within thirty (30) days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

145.   When conducting its reinvestigation of disputed information in a consumer report, the consumer reporting agency ("CRA") is required to "review and consider all relevant information submitted by the consumer."

146.   Additionally, the CRA must notify the person who furnished the disputed information of the consumer's dispute within five business days of its receipt.  When notifying the furnisher of the consumer's dispute, the CRA is to "include all relevant information regarding the dispute that the agency received from the consumer." 15 U.S.C. § 1681i(a)(2)(A).

147.   Thus, the CRA Defendants violated the FCRA by failing to perform a reasonable reinvestigation of the disputed information even after Plaintiff notified them of their inaccurate reporting of the Shellpoint Account.

148.   Instead of reasonably reinvestigating Plaintiff's dispute, the CRA Defendants continued to report late payments for the Shellpoint Account.

149.   The CRA Defendants' acts, as described above, were done willfully and knowingly; or, alternatively, were negligent.

150.   The CRA Defendants' inaccurate reporting of the Shellpoint Account damaged Plaintiff's creditworthiness.

151.   Plaintiff also suffered damages in the form of expenses for postage and incurred attorney's fees.

152.   Plaintiff suffers actual damages, including a decreased credit score, loss of credit opportunities, and other financial harm caused by Defendants inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

153.   Plaintiff also suffered economic harm and interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, loss of sleep, frustration, shock, embarrassment, and anxiety.

154.   CRA Defendants are each a direct and proximate cause of Plaintiff's damages.

155.   CRA Defendants are each a substantial factor in Plaintiff's damages.

156.   Therefore, CRA Defendants are individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

## <u>COUNT III</u>
**Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)**
**(Shellpoint)**

157.   Plaintiff incorporates by reference all of the above factual allegations of this Complaint as though fully set forth herein at length.

158.   The FCRA requires that, upon receipt of a consumer's dispute from a CRA, furnishers of information like Shellpoint must conduct an investigation with respect to disputed information, review all relevant information, and report the results of the investigation to the consumer reporting agency.  If the investigation reveals the information is incomplete or inaccurate, the furnisher must report those results to all consumer reporting agencies to which the furnisher has provided the inaccurate information.

159.   Shellpoint knew or should have known about its obligations under the FCRA.  These obligations are well established in the plain language of the FCRA, promulgated by the Federal Trade Commission, and detailed in case law.

160.   Additionally, Shellpoint possesses or could easily obtain substantial written materials that detail its duties as furnisher under the FCRA.  Despite knowing these legal obligations, Shellpoint acted consciously in breaching its known duties and deprived Plaintiff of his rights under the FCRA.

161.   Plaintiff disputed the Shellpoint Account through all three CRA Defendants.

162.   Thereafter, the CRA Defendants forwarded Plaintiff's disputes to Shellpoint, notifying Shellpoint that Plaintiff was disputing the information it had furnished about the account.

163.   Shellpoint received notice of Plaintiff's dispute and failed to reasonably investigate or otherwise take corrective measures, despite possessing all relevant knowledge necessary to report the Account accurately.

164.   Shellpoint continues to furnish inaccurate information about Plaintiff to all three CRAs, even though Shellpoint possessed all relevant information about the Shellpoint Account and the inaccuracies that Plaintiff disputed.

165.   The inaccurate Shellpoint Account reporting materially and adversely affects Plaintiff's credit standing.

166.   On at least one occasion within the past two years, by example only and without limitations, Shellpoint violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiff's disputes submitted to the CRA Defendants.

167.   Shellpoint violated 15 U.S.C. §§ 1681n and 1681o of the FCRA by engaging in willful and negligent noncompliance of 15 U.S.C. § 1681s-2(a), (b), and engaging in conduct that violates 15 U.S.C. § 1681s-2(a), (b), including

a.   Willfully and negligently failing to conduct an investigation of Plaintiff's disputes, despite possessing knowledge, information, and records to substantiate Plaintiff's dispute;

b.    Willfully and negligently failing to review all relevant information concerning Plaintiff's dispute;

c.    Willfully and negligently failing to report the results of investigations to the relevant consumer reporting agencies;

d.    Willfully and negligently failing to report to the CRA Defendants that the disputed information is indeed inaccurate;

e.    Willfuly and negligently failing to properly participate, investigate, and comply with the reinvestigations that were conducted by any and all consumer reporting agencies concerning the inaccurate information disputed by Plaintiff;

f.    Willfully and negligently continuing to furnish and disseminate inaccurate credit, account and other information concerning Plaintiff to the CRA Defendants, despite actual knowledge of the falsity of the reported information; and

g.    Willfully and negligently failing to comply with the requirements for furnishers of information enumerated in 15 U.S.C. § 1681s-2(b).

168.   Shellpoint unreasonably refused to take corrective measures required by the FCRA to correct and/or update Plaintiff's consumer information furnished to the CRA Defendants.

169.   Shellpoint's       inaccurate       reporting       damaged       Plaintiff's creditworthiness.

170.   Plaintiff also suffered damages in the form of expenses for postage and incurred attorney's fees.

171.   Plaintiff suffers actual damages, including a decreased credit score, loss of credit opportunities, and other financial harm caused by Shellpoint inaccurately reporting late payment statuses for the Shellpoint account.

172.   Plaintiff also suffered economic harm and interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, loss of sleep, frustration, shock, embarrassment, and anxiety.

173.   Shellpoint is a direct and proximate cause of Plaintiff's damages.

174.   Shellpoint is a substantial factor in Plaintiff's damages.

175.   Therefore, Shellpoint is liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants for the following:

(a)   An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

(b)   An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

(c)   An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2);

(d)   An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

(e)   Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## VIII.  JURY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.

//

36

RESPECTFULLY SUBMITTED this 26th day of April 2023.

**CONSUMER ATTORNEYS**

By: */s/Jenna Dakroub*
Jenna Dakroub (SBN: 385021)
8245 N. 85th Way
Scottsdale, AZ 85258
T: (602) 807-1525
F: (718) 715-1750
E: jdakroub@consumerattorneys.com

*Attorneys for Plaintiff*
*Paulette Holloway*

37