IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN THE MATTER OF<br>THE EXTRADITION OF<br>DANTE JEVON ERICSON OTTLEY | Criminal Action No.<br><br>1:22-MJ-716-JKL |

### GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF EXTRADITION

The United States of America, by Ryan K. Buchanan, United States Attorney, and Leanne M. Marek, Assistant United States Attorney for the Northern District of Georgia, files this Memorandum of Law in Support of Extradition of Dante Ottley.

On August 9, 2022, United States Magistrate Judge John K. Larkins III issued a provisional arrest warrant for fugitive Dante Jevon Ericson Ottley ("Ottley") (Doc. 13), with a view towards his extradition to Sint Maarten, pursuant to 18 U.S.C. § 3184 and the extradition treaty (the "Treaty") between the United States and the Kingdom of the Netherlands (the "Netherlands"), which applies to Sint Maarten.[1]  In support of the request for Ottley's extradition, the Netherlands submitted the appropriate documents to the U.S. Department of State. By statute,

---

[1] *See* Extradition Treaty Between the United States of America and the Kingdom of the Netherlands, U.S.-Neth., June 24, 1980, 35 U.S.T. 1334 ("the 1980 Treaty"), *as amended by* the Agreement comprising the instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed at Washington on 25 June 2003, as to the application of the Extradition Treaty Between the United States of America and the Kingdom of the Netherlands signed at the Hague on 24 June 1980, U.S.-Neth., Sept. 29, 2004, S. TREATY DOC. NO. 109-14 (2006) (the "Agreement"), with Annex (collectively, the "Treaty"), and related exchange of notes.  The Annex reflects the integrated text of the provisions of the 1980 Treaty and the Agreement. An exchange of notes concluded on September 29, 2009, extended application of the Agreement to the Netherlands Antilles, and a diplomatic note dated October 6, 2010, confirmed the continued application of the Agreement to Sint Maarten (collectively, the "2009–10 Notes").

this Court must hold a hearing to consider the evidence the Netherlands has presented and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184.

The United States respectfully submits this memorandum to set forth the procedural and factual background of the case and to explain the legal standards and unique protocols that govern extradition proceedings under 18 U.S.C. § 3184. As detailed herein, the extradition request fulfills the relevant Treaty requirements. The Court should therefore "certify the same" to the Secretary of State, who will decide whether to surrender Ottley "according to the treaty." *Id.*[2]

## BACKGROUND

### I. Procedural History

On August 9, 2022, the United States, in fulfilling its treaty obligations, initiated this extradition proceeding by filing a Complaint pursuant to 18 U.S.C. § 3184 and the Treaty. (Doc 1.) In the Complaint, the United States requested that the Court issue a warrant to arrest Ottley under Article 11 of the Treaty, which provides for the provisional arrest of a fugitive pending a formal request for extradition.[3] (*Id.*) On the same date, Judge Larkins issued an arrest warrant for Ottley based on two Sint Maarten offenses that occurred on December 31, 2018 – (1) co-perpetrating the manslaughter of M. Gomez Lopez ("Victim 1"), in violation of Sint Maarten Criminal Code ("SMCC") Article 2:259; and (2) co-

---

[2] After the court completes its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 829 (11th Cir. 1993). "The Secretary exercises broad discretion and may properly consider myriad factors, including humanitarian ones, affecting both the individual defendant as well as foreign relations, which the extradition magistrate may not." *Id.*

[3] Pursuant to Article 11(4), provisional arrest would be terminated if the Netherlands did not submit its formal extradition request to the United States within sixty days of Ottley's arrest. (Doc. 16-1 at 19).

perpetrating the attempted manslaughter of W. James ("Victim 2"), in violation of SMCC Articles 1:119 and 2:259 (Doc. 13). On September 8, 2022, the United States Marshals Service executed the warrant, arresting Ottley in the Northern District of Georgia. (*Id.*)

On September 15, 2022, Ottley made an initial court appearance (Doc. 11), the government filed a Memorandum of Extradition Law and Request for Detention Pending Extradition Proceedings (Doc. 9), and the Court issued an Order of Detention without prejudice (Doc. 11). On November 10, 2022, Ottley filed a Motion to Terminate Provisional Arrest and Dismiss Case, based on his mistaken belief that the United States did not receive a timely extradition request after provisional arrest occurred. (Doc. 14). The government subsequently filed a response and sur-reply at the direction of the Court to Ottley's Motion to Dismiss. (Doc. 19, 25). The Motion to Dismiss is currently pending before the Court.

The government filed a copy of the Netherlands' extradition request with the Court on December 9, 2022; the extradition request reflects that it was submitted to the U.S. Department of State by diplomatic note dated October 31, 2022, which was within sixty days of Ottley's provisional arrest. (Doc. 16-1) The request seeks Ottley's extradition on charges of manslaughter, attempted manslaughter, and a firearms violation, but the firearms offense is not forwarded to the Court for consideration. (*See* February 13, 2023, Amended Declaration of Stacy Hauf, attached as Exhibit A). The Court scheduled the extradition hearing for March 7, 2023. (Doc. 24).

## II. Factual Background

Sint Maarten seeks the extradition of Ottley to serve a sentence of twenty years' imprisonment imposed for a conviction on charges of manslaughter and attempted manslaughter, in violation of Articles 1:119 and 2:259 of the Sint Maarten criminal code. (Doc.16-1 at 45). The Netherlands presents the following evidence in support of its extradition request:

On the evening of December 31, 2018, Ottley and co-perpetrator Stevevanus Orilius Junior Richardson ("Richardson") were at the nightclub El Capitan in Sint Maarten. (*Id.* at 43). According to Ottley, Richardson, and Victim 2, Victim 1 approached Ottley and accused him of participating in a fatal shooting earlier that month. (*Id.*) Camera footage from El Capitan showed Ottley and Richardson leaving the nightclub later that night but remaining in the parking lot. (*Id.*) Shortly thereafter, Victim 1 and Victim 2 left the nightclub, and an altercation took place with Ottley and Richardson. (*Id.*) Although Ottley and Richardson both claimed self-defense, camera footage revealed that Ottley and Richardson, in fact, were the initial aggressors. (*Id.*)

Ottley first pushed Victim 1, and Richardson then punched Victim 1 two more times. (*Id.*) Victim 1 then fled with both Ottley and Richardson in pursuit. (*Id.*) Camera footage showed that 1.16 seconds after Victim 1 initially fled, Ottley shot Victim 1 from behind. (*Id.*) Richardson then immediately fired a total of six shots at Victim 1, hitting Victim 1 five times, two of which were in the back. (*Id.*) When Victim 2 saw Ottley and Richardson shoot Victim 1, he began to run. (*Id.*) Ottley chased down Victim 2 and fired one shot at Victim 2. (*Id.*) Richardson then fired no less than eight shots at Victim 2, hitting him several times. (*Id.*) However, two

of the bullets were stopped by the bulletproof vest Victim 2 was wearing, and only Victim 2 survived. (*Id.*)

The police received an alert of the reported shooting at 1:35 A.M. (*Id.*) As the police arrived at the scene, Ottley and Richardson were fleeing the scene. (*Id.*) Although the police pursued, Ottley and Richardson escaped. (*Id.*) Two days after the shooting, both Ottley and Richardson turned themselves in to authorities. (*Id.*) They both confessed to being at the scene of the shooting, illegally possessing firearms, and shooting the victims. (*Id.*) However, contrary to the camera footage, Ottley and Richardson claimed they acted out of self-defense. (*Id.*)

The Court of First Instance found it proven that Ottley and Richardson intentionally had killed Victim 1 and intentionally had attempted to kill Victim 2. (*Id.* at 44). But the Court of First Instance decided Ottley and Richardson acted out of self-defense and did not impose a punishment for manslaughter or attempted manslaughter.[4] (*Id.*) The Court of First Instance convicted Ottley and Richardson of illegal possession of a firearm and sentenced them to 21 months' imprisonment and three years' probation, of which six months were suspended. (*Id.*) Because Ottley and Richardson had already spent 18 months in pretrial detention, they were released from prison upon the Court of First Instance's verdict. (*Id.*)

The public prosecutor appealed the verdict to the Court of Appeal. (*Id.*) Both Ottley and Richardson were present at the appeal hearing on March 8, 2022. (*Id.*) On March 31, 2022, the Court of Appeal rejected both Ottley's and Richardson's

---

[4] In the Sint Maarten legal system, this finding by the Court of First Instance is not the same as an acquittal. (Doc.16-1 at 44).

claims of self-defense, convicted them for the manslaughter and attempted manslaughter charges, sentenced Ottley to twenty years' imprisonment, and ordered their immediate arrest.[5] (*Id.*) Neither Ottley nor Richardson were present when the verdict was rendered, and they both entered the United States one day after the Court of Appeals verdict was announced. They were provisionally arrested in the Northern District of Georgia at the request of the Sint Maarten authorities on September 9, 2022. (*Id.*)

**ARGUMENT**

## I.     General Principles of Extradition

The extradition process is *sui generis*. While extradition is primarily an executive responsibility, judicial officers have a statutorily defined role in the process—to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge." 18 U.S.C. § 3184. The court executes this function by conducting a hearing pursuant to 18 U.S.C. § 3184. The Secretary of State, and not the Court, then decides whether to surrender the fugitive to the requesting country. 18 U.S.C. §§ 3184, 3186; *Martin*, 993 F.2d at 828-29. "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d

---

[5] Ottley appealed his verdict at the Supreme Court in the Hague, and the appeal is still pending. (*Id.*) According to Sint Maarten authorities, the Supreme Court reviews only the procedural aspects of the case and does not make any findings about the facts of the case. (*Id.*) Therefore, the verdict of the Court of Appeal ordering the immediate arrest of Ottley is enforceable, and Ottley cannot request the suspension or termination of his detention. (*Id.*)

103, 110 (1st Cir. 1997). At the extradition hearing, the Court considers the materials from the requesting country and determines whether the legal requirements for certification – as defined in the Treaty, statutes, and case law – are satisfied. *See Martin*, 993 F.2d at 828-29.[6]

Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense for which extradition is sought. *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). If the Court finds the requirements for certification satisfied, it must provide the certification to the Secretary of State, together with a copy of any testimony from the hearing, and it must commit the fugitive to the custody of the U.S. Marshals Service to await the Secretary's final determination regarding surrender. *See* 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828.

In fulfilling his or her function under section 3184, a judge should construe liberally the applicable extradition treaty in order to effect its purpose, namely, to surrender fugitives to the requesting country. *See e.g., Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 14 (1936); *Factor v. Laubenheimer*, 290 U.S. 276, 301 (1933); *Vardy v. United States*, 529 F.2d 404, 406 (5th Cir. 1976). As a district court in this circuit explained:

> [A] narrow and restricted construction is to be avoided as not consonant with the principles deemed controlling in the interpretation of international agreements. Considerations which should govern the diplomatic relations between nations, and the good

---

[6] For a discussion of the unique procedures that govern an extradition hearing, *see* Part III, *infra*.

> faith of treaties, as well, require that their obligations should be liberally construed so as to effect the apparent intentions of the parties to secure equality and reciprocity between them.

*McElvy v. Civiletti*, 523 F. Supp. 42, 47 (S.D. Fla. 1981) (citations omitted). Accordingly, the Treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor*, 290 U.S. at 298. The United States does not expect foreign governments to be versed in our criminal laws and procedures. *Grin v. Shine*, 187 U.S. 181, 184 (1902). Thus, "[f]orm is not to be insisted upon beyond the requirements of safety and justice." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).

## II. The Requirements for Certification are Satisfied

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See In re Extradition of Martinelli Berrocal*, 2017 WL 3776953, at *10 (S.D. Fla. Aug. 31, 2017) (citing *Martin*, 993 F.2d at 828); *In re Extradition of Shaw*, 2015 WL 3442022, at *5 (S.D. Fla. May 28, 2015) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Yapp v. Reno*, 26 F.3d 1562, 1565 (11th Cir. 1994); and *Hill v. United States*, 737 F.2d 950, 951 n.l (11th Cir. 1984)). Each of these elements is present in this case.

### A. The Court has Authority Over the Proceedings

The extradition statute authorizes "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or

any judge of a court of record of general jurisdiction of any State" to conduct extradition proceedings. 18 U.S.C. § 3184; *see also, e.g.*, *Martin*, 993 F.2d at 828. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993). This District's Standing Order 14-02(3)(g) expressly authorizes magistrate judges to conduct extradition proceedings. This Court is therefore authorized to conduct the hearing in this case.

### B. This Court has Jurisdiction Over Ottley

A court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 (a court "may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue [its] warrant for the apprehension of the person so charged"); *Pettit v. Walshe*, 194 U.S. 205, 219 (1904); *Grin*, 187 U.S. at 185. In this case, Ottley was arrested in the Northern District of Georgia, and therefore, the Court has jurisdiction over him. (*See* Doc. 13).

### C. The Treaty is in Full Force and Effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See* 18 U.S.C. § 3184; *see also Kastnerova v. United States*, 365 F.3d 980, 987 (11th Cir. 2004) (dismissing *habeas* petition challenging certification of extradition, because, among other reasons, district

court did not err in determining extradition treaty to be valid). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the Department of State, attesting that there is a treaty in full force and effect between the United States and the Netherlands, as applied to Sint Maarten. In this case, Stacy Hauf, an Attorney Adviser in the Office of Law Enforcement and Intelligence for the Department of State, has supplied a Declaration attesting that there is a treaty in full force and effect between the United States and Sint Maarten. (Ex. A, Amended Hauf Decl., at ¶ 2). The Court must defer to the Department of State's determination in this regard. *See*, *e.g.*, *Kastnerova*, 365 F.3d at 985-87; *Arias Leiva v. Warden*, 928 F.3d 1281, 1286 (11th Cir. 2019) (("[C]ourts must defer to the determination of the executive branch in deciding whether an extradition treaty remains in force." (emphasis in original, internal quotation marks omitted)); *see also Martinelli Berrocal*, 2017 WL 3776953, at *11 (noting that "every Circuit Court, including our own, has deferred to the executive branch" as to whether an extradition treaty is in force).

### D. The Treaty Covers the Offenses for Which Extradition is Sought

Extradition treaties create an obligation for the United States to surrender fugitives under certain circumstances. Here, the Treaty provides for the extradition of fugitives charged with, or convicted of, an extraditable offense. Treaty Article 2(1) defines "[e]xtraditable offenses" as (a) offenses "referred to in the Appendix to this Treaty which are punishable under the laws of both Contracting Parties"; or (b) offenses, "whether listed in the Appendix to this Treaty or not, provided they are punishable under the Federal laws of the United

States of America and the laws of the Kingdom of the Netherlands." (Doc. 16-1 at 12). This definition applies regardless of whether the parties' laws "place the offense within the same category of offenses or denominate an offense by the same terminology." *Id.* As relevant here, extradition "shall be granted in respect of" an extraditable offense "[f]or prosecution, if the offense is punishable under the laws of both Contracting Parties by deprivation of liberty for a period exceeding one year." *Id.* Extradition "shall also" be granted for (a) "attempts to commit or participation in an extraditable offense, including participation in an association of persons whose intention it is to commit the offense"; and (b) "any extraditable offense when, for the purpose of granting jurisdiction to the United States Government, transportation of persons or property, the use of the mails or other means of carrying out interstate or foreign commerce is also an element of the specific offense." *Id.* at 13.[7] The Appendix to the Treaty includes murder and manslaughter as extraditable offenses. *Id.* at 24-25; *see also* Ex. A, Amended Hauf Decl. at ¶ 5 ("The offenses for which extradition is sought are covered under Article 2 of the Annex and 2 of the Schedule of Offenses appended to the Annex").

In assessing whether the Treaty covers the crimes for which extradition is sought, the Court should examine the description of Ottley's alleged conduct and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See, e.g.*, *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir.

---

[7] The Treaty further provides that "[w]hen extradition has been granted in respect of an extraditable offense, it may also be granted in respect of any other extraditable offense which would otherwise not be extraditable only by reason of the operation of" Article 2(2). (Doc. 16-1 at 13).

2000); *United States v. Cardoso*, No. 04-mc-128, 2005 WL 1228826, *4 (M.D. Fla. May 10, 2005) ("Acts are considered criminal in the United States if they would be unlawful under federal statutes, the law of the state where the accused is found, or by a preponderance of the states.") (citing *Wright v. Henkel*, 190 U.S. 40, 61 (1903)).

The requirement that the alleged criminal conduct constitute a serious offense in both the requesting and surrendering countries is known as the doctrine of "dual criminality." *See, e.g., Gallo-Chamorro*¸ 233 F.3d at 1306. For purposes of establishing dual criminality, a requesting country need not establish that its crimes are identical to ours. *Schmeer v. Warden of Santa Rosa Cty. Jail*, No. 14-cv-285, 2014 WL 5430310, at *2 (N.D. Fla. Oct. 22, 2014) ("Dual criminality requires only that the 'particular act charged is criminal in both jurisdictions[.]'") (quoting *Collins v. Loisel*, 259 U.S. 309, 312 (1922)).

The Supreme Court noted in *Collins v. Loisel* that dual criminality is not a technical concept involving a comparison of elements of the two countries' offenses:

> The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the *particular act* charged is criminal in both jurisdictions.

259 U.S. 309, 312 (1922) (emphasis added); *accord Gallo-Chamorro,* 233 F.3d at 1307. The requesting country is obliged neither to produce evidence on all elements of an offense nor to establish that its crimes are identical to ours. *Kelly v. Griffin*, 241 U.S. 6, 15 (1916). Moreover, the Court should "approach challenges to extradition

with a view toward finding the offense within the treaty," *McElvy*, 523 F. Supp. at 48, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers." *Grin*, 187 U.S. at 184.

As stated above, the description in the extradition request of the conduct underlying the charges at issue satisfies the Treaty's dual criminality requirement. The conduct underlying the Sint Maarten offense of co-perpetrating the manslaughter[8] of Victim 1 would be punishable here as voluntary manslaughter under statutes including 18 U.S.C. § 1112 and O.C.G.A. § 16-5-2, which carry a maximum term of imprisonment of fifteen and twenty years, respectively.[9] Further, the conduct underlying the Sint Maarten offense of co-perpetrating the attempted manslaughter of Victim 2 would be punishable here under statutes including 18 U.S.C. § 1113 (attempted manslaughter, which

---

[8] The extradition request indicates that under Sint Maarten law, "murder" means taking another's life intentionally and with premeditation, while "manslaughter" means taking another's life intentionally. (Doc. 16-1 at 74).

[9] 18 U.S.C. § 1112 provides that (a)Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
Voluntary—Upon a sudden quarrel or heat of passion.
Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death. ()Within the special maritime and territorial jurisdiction of the United States,
Whoever is guilty of voluntary manslaughter, shall be fined under this title or imprisoned not more than 15 years, or both;
Whoever is guilty of involuntary manslaughter, shall be fined under this title or imprisoned not more than 8 years, or both.

O.C.G.A. § 16-5-2 provides that (a) A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.
(b) A person who commits the offense of voluntary manslaughter, upon conviction thereof, shall be punished by imprisonment for not less than one nor more than 20 years.

carries a potential penalty of seven years imprisonment),[10] and O.C.G.A. §§ 16-5-2 (voluntary manslaughter), O.C.G.A. 16-4-1 (criminal attempt).[11] Accordingly, the Treaty covers the crimes for which extradition is sought.

### E. The Request Establishes Probable Cause that Petitioner has Committed the Offense

The standard of proof to find the evidence "sufficient to sustain the charge," 18 U.S.C. § 3184, is the familiar domestic requirement of probable cause, *see*, *e.g.*, *Kastnerova*, 365 F.3d at 987. The court determines whether probable cause exists to believe that the person before it committed the crimes for which extradition is sought. *See Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) ("The magistrate . . . looks only to see if there is evidence sufficient to show reasonable ground to believe the accused guilty.");[12] *Jimenez v. Aristeguieta*, 311 F.2d 547, 562 (5th Cir. 1962) (stating that extradition judge "should not require evidence to convince himself that the defendant was guilty, but only that 'furnishing good reason to believe that the crime alleged had been committed by the person charged with having committed it'") (quoting *United States v. Burr*, 25 Fed. Cas. 2, 12 (C.C.D. Va. 1807)). Probable cause exists, if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused. *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). The Court should apply a "totality of the circumstances analysis and make a practical, common sense decision whether,

---

[10] 18 U.S.C. § 1113 provides, as relevant here, that whoever, within the special maritime and territorial jurisdiction of the United States, attempts to commit manslaughter, shall be imprisoned not more than seven years, fined, or both.

[11] O.C.G.A. § 16-4-1 provides, "A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime." O.C.G.A. § 16-4-6(b) provides that attempted manslaughter may be punished up to one half of the maximum period of time permitted for the completed offense, ten years in this case.

[12] The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), adopted as precedent decisions the former Fifth Circuit rendered before October 1, 1981.

given all the circumstances, there is a fair probability that the [fugitive] committed the crime[s]."' *Martinelli Berrocal*, 2017 WL 3776953, at *28 (quoting *Matter of Extradition of Garcia*, 825 F. Supp. 2d 810, 838 (S.D. Tex. 2011).

The probable cause standard is lower than the preponderance standard.[13] "Probable cause does not require an officer's suspicion to be more likely true than false." *In re Extradition of Correa*, No. 17-MC-14059-UNA, 2017 WL 6492089, at *5 (S.D. Fla. Dec. 18, 2017) (citing *Texas v. Brown*, 460 U.S. 730, 742 (1983)). "Probable cause means 'the existence of a reasonable ground to believe the accused guilty' of the crime charged." *Id.* (quoting *Escobedo v. United States*, 623 F.2d 1098, 1102 (5th Cir. 1980)). "Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict." *Fernandez*, 268 U.S. at 312. The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve(s) only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (citation omitted).

An extradition hearing is "in the nature of a preliminary hearing," not a trial. *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164 (11th Cir. 2005). The court conducts "essentially the same preliminary inquiry typically required for issuance of a search warrant or an arrest warrant for crimes committed in this country — a

---

[13] *See Navarette v. California*, 572 U.S. 393, 397, (2014) (stating that the standard for an investigative stop is "'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause") (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *Gerstein*, 420 U.S. at 121 ("[T]he nature of the [probable cause] determination itself . . . does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands . . . .") (citation omitted); *Doe v. Smith*, 809 F. App'x 638, 648 (11th Cir. 2020) (stating that "[p]robable cause is not a high bar" and does not even require a showing by a preponderance of the evidence) (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019)).

familiar task for any magistrate judge." *Haxhiaj v. Hackman*, 528 F.3d 282, 287 (4th Cir. 2008) (citing *Eain v. Wilkes*, 641 F.2d 504, 508–09 (7th Cir.1981) (explaining that an extradition request must "be supported by sufficient evidence to show . . . that there is sufficient justification for the individual's arrest had the charged crime been committed in the United States"); *Collins*, 259 U.S. at 312 (stating that extradition court's function is not to determine whether the evidence is sufficient to justify a conviction); *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006) ("The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings.").

Because an extradition hearing is not a trial, the country requesting extradition is not obligated to present all of its evidence to the United States or to rehearse its trial before a U.S. court. *See Charlton v. Kelly*, 229 U.S. 447, 461 (1913); *Collins*, 259 U.S. at 316, "[T]he foreign government is not required to present its entire case in this country. The evidence presented need only 'support a reasonable belief that [the fugitive] was guilty of the crime[s] charged.'" *Austin v. Healey*, 5 F.3d 589, 605 (2d Cir.1993), *cert. denied*, 510 U.S. 1165 (1994).

Further, the material the requesting country does cite should be taken as true. *See, e.g., Martinelli Berrocal*, 2017 WL 3776953, *35 (stating that the extradition court "must accept as true all of the statements and offers of proof by the demanding state, reserving the weighing of evidence . . . for the courts in the requesting country"); *In re Solis*, 402 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005); *In re Lukes*, No. 2:02-MC-23-FTM, 2003 WL 23892681, at *4 n.6 (M.D. Fla. May 8, 2003); *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997) (stating that the court "'must accept as true all of the statements and offers of proof by the

demanding state,' even if they contain hearsay.") (quoting *In re Extradition of Marzook*, 924 F. Supp. 565, 592 (2d Cir. 1996) (alteration omitted)); *Ahmad v. Wigen*, 726 F. Supp. 389, 399–400 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990); *Desautels v. United States*, 782 F. Supp. 942, 944 n.2 (D. Vt. 1991); *In re Extradition of Atta*, 706 F. Supp. 1032, 1050–51 (E.D.N.Y. 1989) ("The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for the purposes of this determination.") (citing *Collins*, 259 U.S. at 315-16).

In the case of a conviction, the Court's determination that there is probable cause may be based solely upon the existence of a judgment of conviction in the requesting country. *Compare* Article 9(3)(b) (requiring in a pre-conviction case "such evidence as, according to the law of the Requested State, would justify that person's arrest and committal for trial . . ."), *with* Article 9(4) (addressing the required information for post-conviction cases and excluding any reference to language in Article 9(3)(b)); *Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991) (agreeing that when "there has been a judgment of conviction (entered by a foreign court), there is no need for an 'independent' determination of probable cause: the relator's guilt is an adjudicated fact which *a fortiori* establishes probable cause") (citation omitted);[14] *Sidali v. I.N.S.*, 107 F.3d 191, 196 (3d Cir. 1997), *cert. denied*, 522 U.S. 1089 (1998).[15] A number of courts have held that even an *in absentia* conviction provides sufficient evidence of criminality to establish probable cause. *See, e.g.*, *Arias Leiva*, 928 F.3d at 1294 (noting that "the fact that a foreign tribunal has convicted the defendant" constituted evidence warranting the extradition court's

---

[14] In *Spatola*, the defendant was present for his trial in the foreign court.
[15] In *Sidali*, the defendant similarly was present for his trial in the foreign court.

probable cause finding);[16] *Esposito v. I.N.S.*, 936 F.2d 911, 914 (7th Cir. 1991) ("Even if Esposito were correct that *in absentia* convictions ought not to be treated as evidence of guilt, they may certainly stand for something less: at the very least, *in absentia* convictions properly constitute probable cause to believe that the petitioner is guilty of the crimes in question.");[17] *Haxhiaj*, 528 F.3d at 291 (holding that, "[e]ven assuming that the fact of an *in absentia* conviction by itself is an insufficient basis *per se* for a finding of probable cause," probable cause is established where an "appellate opinion [which affirms an *in absentia* conviction] go[es] well beyond the mere verdict, summarizing the underlying evidence amassed against Haxhiaj and his co-conspirators"). Thus, the Court should conclude that Ottley's conviction is sufficient for a finding of probable cause.

But, even if the Court were inclined to delve deeper into the facts presented by the Sint Maarten, those facts are more than sufficient to establish probable cause. Here, Sint Maarten's submissions in support of extradition establish probable cause to believe that Ottley co-perpetrated the manslaughter of Victim 1 and the attempted manslaughter of Victim 2. Sint Maarten's Minister of Justice, Anna E. Richardson, at the request of Sint Maarten's Public Prosecutor's Office, has submitted a certified statement in support of extradition. The Minister's statement cites evidence including (1) the complaint Victim 2 filed on December 31, 2018, stating that he saw and heard Ottley shoot Victim 1 and that Ottley shot him multiple times as he ran away; (2) camera footage from the El Capitan nightclub showing Ottley shoot Victim 1 at least four times and shoot Victim 2 at least once;

---

[16] Arias was present for his trial but fled before the verdict.

[17] *Esposito* was a case arising under the Board of Immigration Appeal's ability to waive exclusion and deportation, rather than an extradition.

(3) the autopsy report of Victim 1 revealing 9 gunshot wounds caused by six gunshots found on the body and death caused by internal bleeding due to gunshots; (4) testimony of a police officer relating that he saw multiple gunshot wounds in Victim 2 as well as Victim 2's bulletproof vest that stopped at least two bullets; and (5) the medical statement of a surgeon who examined multiple gunshot wounds on Victim 2 as well as severe blood loss that could have caused death. (Doc. 16-1 at 64-65).

Finally, to the extent Ottley attempts to present any credibility or evidentiary claims in effort to subject the extradition request to a reasonable doubt standard, such arguments would be an improper attempt to exceed the narrow scope of an extradition hearing. *See Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1452 (9th Cir. 1987) ("An extradition proceeding is not a trial; the relevant determination is confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the extraditee for trial."); *In re Extradition of Bilanovic*, No. 1:08-MJ-74, 2008 WL 5111846, at *9 (W.D. Mich. Dec. 3, 2008) (rejecting fugitive's claim that probable cause was absent where government failed to present physical evidence including DNA, explaining that "[t]his is not a criminal proceeding . . . , and the reasonable doubt standard does not apply").

Accordingly, the request satisfies the probable cause requirement, and all the elements to certify extradition are present.

## III.    There Are No Other Bars to Extradition

Ottley previously raised three arguments in his Motion to Dismiss the Provisional Arrest. The government anticipates that Ottley will rely on these arguments in opposing the certification of the extradition request, and therefore,

the government addresses them again in this pleading. His claims do not warrant denial of certification of his extraditability, and the Court should reject them for the reasons summarized below.

### A. Ottley's Appeal Does Not Render the Extradition Request Improper

Ottley claims that The Netherlands failed to provide "a statement that the sentence has final and binding effect and is enforceable" in its extradition request, as required by Article 9(4). In its extradition request, The Netherlands stated that, notwithstanding Ottley's appeal to the Supreme Court in the Hague, "the Appeal Court's decision with regard to the detention is [sic] has final and binding effect and is enforceable, because the detention was ordered by the Court of Appeal and that decision cannot be appealed as such." Doc. 16-1 at 79. The fact that Ottley has appealed his conviction in The Netherlands does not mean that the sentencing decision of the competent court no longer has "final and binding effect" or is no longer "enforceable." Indeed, Ottley does not claim that any sentencing proceedings remain outstanding or that his sentence could not currently be enforced.

The State Department has issued a supplemental declaration explaining Article 9(4) and how it applies in Ottley's case. *See* Supp. Hauf Decl. at ¶ ¶ 3-6, attached as Exhibit B. The Court should defer to the State Department's interpretation of the Treaty. "It is well settled that the Executive Branch's interpretation of a treaty is entitled to great weight." *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (citation and internal quotations mark omitted); *see also, e.g., Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive,

the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight"); *United States v. Duarte-Acero*, 296 F.3d 1277, 1282 (11th Cir. 2002) ("[T]he State Department's interpretation of a treaty is entitled to great deference"); *cf. Arias Leiva v. Warden*, 928 F.3d 1281 (11th Cir. 2019) (finding that the U.S.-Colombia extradition treaty was in full force and effect because, *inter alia*, both the United States and Colombia understand it to be in effect).

The State Department's declaration explains that Article 9(4)'s "requirements of having 'final and binding effect' and being 'enforceable' refer to the sentencing decision of the competent court." (Ex. B at ¶ 4). It goes on to explain that "Article 9(4) applies these requirements to 'the sentence,' not the conviction. *Id*. Notably, the declaration points out that "the words 'final and binding effect' and 'enforceable' in this context cannot reasonably mean that the sentence must be inalterable or no longer subject to any kind of legal challenge." (Ex. B at ¶ 5). This is for good reason. Such an interpretation would preclude the extradition of individuals who have been convicted and sentenced if there is any mechanism for them to seek to vacate or commute their sentence, no matter how frivolous such a request would be. (*Id*.). Under the U.S. legal system, this would mean that a sentence would never have final and binding effect for purposes of extradition if the defendant could still file a habeas petition or seek a pardon from the President or Governor. An interpretation of the Treaty that yields such a result, and limits the ability of the contracting parties to extradite convicted fugitives, should be avoided. *See Factor*, 290 U.S. at 298-300.

The declaration concludes that Sint Maarten has complied with the relevant requirement of Article 9(4) of the Annex because it has "provided a statement that the sentencing decision by the Appeal Court is the final decision of the competent court, is binding on the parties to the decision, and is enforceable against the defendant." (Ex. B at ¶ 6).

### B. The Netherlands Provided Information That Shows the Extent to Which the Sentence Was Carried Out

Ottley claims that the Netherlands did not provide the necessary information regarding his sentence and the amount of time remaining for the sentence as required by Article 9(4). The Treaty requires "a statement showing to what extent the sentence has not been carried out." (Doc. 16-1 at 16). The extradition request states, "In this case that means that the 15 months that Ottley spent in pretrial detention (from January 2019 up to and including March 2020) will be deducted from the 20 years imposed by the Court of Appeal. Thus, the sentence has not been carried out yet." (Doc. 16-1 at 44). Accordingly, The Netherlands provided the necessary information to determine the extent to which Ottley's 20-year sentence has not been carried out and therefore complied with Article 9(4).

### C. Article 5 Does Not Bar Ottley's Extradition

Ottley claims that Article 5(b) of the Treaty bars his extradition as a United States citizen because his right to be free from double jeopardy under the U.S. Constitution was violated when he was convicted by the Court of Appeal after having been acquitted by the trial court. As briefly discussed below, he is incorrect for several reasons.

As a preliminary matter, double jeopardy is irrelevant to this case because Ottley has not been prosecuted in St. Maarten more than one time for the same offense. He was subjected to one prosecution in St. Maarten in accordance with their criminal laws. As explained below, St. Maarten and the United States have different criminal procedure laws, but that does not change the fact that he has not been prosecuted more than once by the same sovereign.

Moreover, the U.S. Constitution does not apply to criminal proceedings in The Netherlands, and nothing in Article 5 establishes otherwise. Instead, the language of the Treaty is all that is relevant for purposes of considering to what extent double-jeopardy principles govern Ottley's extradition.

Article 5 states:

> Extradition shall not be granted when:
> a. The person sought is being proceeded against, has been prosecuted, or has been tried and convicted or acquitted by the Requested State for the offense for which extradition is requested; or,
> b. The person sought is otherwise immune from prosecution for the offense for which extradition is requested by reason of the law in the Requested State related to prior jeopardy.

For extradition requests submitted by The Netherlands, Article 5(a) bars extradition when the person sought has already been prosecuted in the United States for the same offense for which extradition is sought. This clause essentially seeks to operate as the double jeopardy provision under the U.S. constitution would had all of the proceedings been domestic. Article 5(b) provides that, if extradition is not otherwise barred by Article 5(a), extradition may still be prohibited if U.S. double jeopardy law otherwise provides for immunity from prosecution. Article 5(a) and 5(b) must be read in conjunction because Article

5(b) refers to a person sought being "otherwise" immune from prosecution; the "otherwise" immune provision refers to a basis for immunity distinct from the double jeopardy protections already addressed by Article 5(a). As noted above, Article 5(a) already contains the protection granted by U.S. double jeopardy law, which protects against extradition where the person sought has been tried for the same offense in the United States. While Article 5(b) may account for a provision of law relevant in The Netherlands when the United States is the country requesting extradition, there is no basis under U.S. law to be "otherwise immune from prosecution" that is "related to prior jeopardy" in this case. Accordingly, in this case, Article 5(b) does not add anything to what Article 5(a) already covers and does not pose any additional bar to Ottley's extradition.

Because it is undisputed that Ottley has not been prosecuted, let alone acquitted, in the United States of the same or even a similar offense for which extradition is requested, Article 5 does not apply. *See In the Matter of Grynsztein*, No. 15-mc-80918, 2015 WL 6039845, at *6 (S.D. Fla. Oct. 15, 2015) (holding that Article 5 of the Treaty between the United States and the Netherlands did not apply to a defendant who was previously acquitted of certain criminal charges in the Netherlands but had not been acquitted of those charges in the United States).

Moreover, Ottley's argument inappropriately seeks an interpretation of Article 5 that would essentially preclude extraditions to a requesting country simply because their criminal procedures differ from those in the United States. Such an interpretation should be avoided because it contradicts general extradition law and practice. Individuals are commonly extradited to countries

with different criminal procedures than the United States. St. Maarten's criminal procedure provides for a de novo review of the facts of a case by an appellate court. While that differs from the criminal procedure of the United States, that is not a basis to dismiss the provisional arrest. Indeed, the Treaty, particularly Article 5, does not apply the U.S. Constitution to The Netherlands, regardless of Ottley's status as a citizen of both countries.

## IV.    An Extradition Hearing Follows Unique Procedures

### A. Special Rules Apply

The purpose of an extradition hearing is to decide the sufficiency of foreign charges under the applicable treaty, not guilt or innocence—that is for the foreign court.  *See Neely v. Henkel*, 180 U.S. 109, 123 (1901); *Benson v. McMahon*, 127 U.S. 457, 463 (1888); *Afanasjev*, 418 F.3d at 1165; *see also Martin*, 993 F.2d at 828.  Accordingly, the procedural framework that governs extradition hearings "gives to the demanding country advantages most uncommon to ordinary civil and criminal litigation," *Sayne*, 418 F.2d at 685, including the following:

The Federal Rules of Evidence and Criminal Procedure do not apply.  *See* Fed. R. Crim. P. 1(a)(5) (stating that "extradition and rendition of a fugitive" are not governed by these rules); Fed. R. Evid. 1101(d)(3) (evidence rules are inapplicable to "miscellaneous proceedings such as . . . extradition or rendition"); *Afanasjev*, 418 F.3d at 1165.  Instead, "unique rules of wide latitude govern reception of evidence" in extradition hearings.  *Sayne*, 418 F.2d at 685 (citation and internal quotation marks omitted).

Hearsay is permitted.  *See, e.g., Collins*, 259 U.S. at 317; *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Hoxha*, 465 F.3d at 561; *Haxhiaj*, 528 F.3d at 292.  "[U]nsworn

statements of absent witnesses may be acted upon by the committing magistrate." *Collins*, 259 U.S. at 317. "Papers offered by the foreign country must be accepted." *Sayne*, 418 F.2d at 685. Additionally, the fugitive is not entitled to cross-examine witnesses. *See Ordinola v. Hackman*, 478 F. 3d 588, 608 (4th Cir.), *cert. denied*, 128 S. Ct. 373 (2007); *Bingham*, 241 U.S. at 517. And credibility determinations are reserved for the foreign court. *See Santos v. Thomas*, 830 F.3d 1002-03 (9th Cir. 2016) (*en banc*) (defense evidence that poses a "conflict of credibility" is inadmissible contradictory evidence); *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993); *Matter of Extradition of Singh*, 124 F.R.D. 571, 573 (D.N.J. 1987).

Further, the fugitive "cannot introduce any evidence which would be admissible upon a trial under an issue of not guilty," and he "cannot introduce evidence in the nature of a defense, such as insanity or alibi." *Id.* Rather, he "may only introduce evidence rebutting probable cause." *Id.* "Evidence which 'tends to obliterate probable cause *may* be considered but not merely that which contradicts it." *Martin v. Warden, Atlanta Pen.*, 804 F. Supp. 1530, 1533 (N.D. Ga. 1992) (internal quotation marks, alteration, and citations omitted) (emphasis added), *aff'd*, 993 F.2d 824 (11th Cir. 1993); *see also Correa*, 2017 WL 6492089, at *3 ("Generally, evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible.") (internal quotation marks and citations omitted); *Shaw*, 2015 WL 3442022, at *4 ("[E]vidence which tends merely to contradict the requesting country's case ('contradictory evidence') is inadmissible."). If the fugitive offers

any evidence, the court rules on its admissibility in accordance with these principles.

### B. Written Submissions are Sufficient; No Live Witnesses are Required

Extradition treaties do not contemplate live witness testimony at extradition proceedings because requiring witness testimony "would defeat the whole object of the treaty." *Bingham*, 241 U.S. at 517 (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he lacked opportunity to cross-examine those witnesses); *see also Collins*, 259 U.S. at 317; *United States v. Zanazanian*, 729 F.2d 624, 626–27 (9th Cir. 1980) (stating that unsworn written statements may properly form the basis for extradition); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980) (same). Accordingly, a finding of extraditability typically is based entirely on the authenticated documentary evidence and information the requesting government provides. *See, e.g.*, *Bovio*, 989 F.2d at 259-61 (finding Swedish investigator's statement sufficient to establish probable cause); *Martin v. United States*, No. 3:16-MJ-434-DSC, 2017 WL 2198341, at *2 (W.D.N.C. May 18, 2017) (citing to summary of video recording); *In re Extradition of Jarosz*, 800 F. Supp. 2d 935, 947–48 (N.D. Ill. 2011) ("So long as the exhibits submitted by the requesting nation are certified and authenticated in accordance with the relevant statute, the evidence may come from a prosecutorial report."); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433–34 (S.D. Fla. 1993) (finding documents and statements sufficient for extradition to Honduras), *aff'd*, 28 F.3d 116 (11th Cir. 1994).

The Treaty governs certification of documents introduced during an extradition hearing. Article 9 lists the submissions the requesting state must make in support of extradition. That article also provides that documents bearing "the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization," and explains that "should territorial application of this Treaty be extended in accordance with Article 20 (1)(b) of the U.S.-EU Extradition Agreement," "Ministry of Justice" shall mean what is "specified in the exchange of diplomatic notes pursuant thereto." (Doc. 16-1 at 17). Here, as territorial application of the Treaty has been extended to Sint Maarten in accordance with Article 20(1)(b) of the Agreement, under Article 9(6) of the Treaty and the aforementioned exchange of notes, documents that bear the certificate or seal of Sint Maarten's Ministry of Justice are admissible in extradition proceedings without further certification, authentication, or other legalization. The Netherlands has complied with the Treaty's requirements for authentication by submitting documents that bear the certificate or seal of the Netherlands' Ministry of Foreign Affairs and Sint Maarten's Ministry of Justice; the documents are therefore admissible in these proceedings.

### C. Matters Other Than Sufficiency of Evidence are Generally Left to the Secretary of State; Rule of Non-Inquiry

Other than the criteria the Court considers to certify Ottley's extradition, all matters a fugitive might raise as defenses to extradition are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186. In making extradition determinations, "[t]he Secretary exercises broad discretion and may

properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review." *Sidali v. I.N.S.*, 107 F.3d 191, 195 n.7 (3d Cir. 1997); *see also Hurtado v. U.S. Atty. Gen.*, 401 F. App'x 453, 456 (11th Cir. 2010). The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the receiving country. *See Ntakirutimana v. Reno*, 184 F.3d 419, 430 (5th Cir. 1999). This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State," within the Executive's "powers to conduct foreign affairs." *See In re Kaine*, 55 U.S. 103, 110 (1852).

CONCLUSION

WHEREFORE, the Court should, pursuant to 18 U.S.C. § 3184, certify the Ottley's extraditability to Sint Maarten for (1) co-perpetrating manslaughter and (2) co-perpetrating attempted manslaughter so that the Secretary of State may consider whether extradition is warranted.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

*Leanne Marek*

/s/ LEANNE M. MAREK
*Assistant United States Attorney*
Georgia Bar No. 270935
Leanne.marek@usdoj.gov

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Millie Dunn

*Counsel to Dante Ottley*

February 14, 2023

/s/ LEANNE M. MAREK

LEANNE M. MAREK

*Assistant United States Attorney*

Exhibit A

DISTRICT OF COLUMBIA, ss:

## AMENDED DECLARATION OF STACY HAUF

I, Stacy Hauf, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Dante Jevon Ericson Ottley. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties. This amended declaration replaces my earlier declaration of December 5, 2022.

2. The relevant and applicable treaty provisions in full force and effect between the United States and the Netherlands are found in the Extradition Treaty between the United States of America and the Kingdom of the Netherlands, signed at The Hague on 24 June 1980 (the "1980 Treaty"), and the Agreement Comprising the Instrument as Contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed at Washington on 25 June 2003, as to the Application of the Extradition Treaty between the United States of America and the Kingdom of the Netherlands signed at The Hague on 24 June 1980, signed at The Hague on 29 September 2004 (the "Agreement"), with annex and related exchange of notes. The annex to the Agreement (the "Annex") reflects the integrated text of the provisions of the 1980 Treaty and the Agreement on Extradition between the United States of America and the European Union signed at Washington on 25 June 2003. An exchange of notes concluded on 29 September 2009 extended application of the Agreement to the Netherlands Antilles, and a diplomatic note dated 6 October 2010 confirmed the continued application of the Agreement to Sint Maarten. Copies of the Agreement, Annex, and notes are attached to this declaration.

3. In accordance with the provisions of the Annex, the Embassy of the Netherlands submitted a diplomatic note, dated 31 October 2022, formally requesting the extradition of Dante Jevon Ericson Ottley to serve a sentence in Sint Maarten. The Ministry of Justice of Sint

Maarten submitted supplemental information in the case by letter to the Department of Justice dated 22 November 2022. Copies of the note and letter are attached to this declaration.

4. In accordance with Article 19 of the Annex, the Government of the United States of America appears in court in the United States on behalf of the Netherlands, and represents the interests of, the Netherlands in any proceeding that arises out of a Dutch request for Extradition. The Netherlands provides the same legal representation in its courts on behalf of the United States with regard to extradition requests made by the United States.

5. The manslaughter and attempted manslaughter offenses for which extradition is sought are covered under Article 2 of the Annex and 2 of the Schedule of Offenses appended to the Annex. The offense of illegal possession of a firearm and ammunition is not forwarded to the Court for consideration.

6. Under Article 9(6) of the Annex, documents that bear the certificate or seal of the Ministry of Foreign Affairs of the Netherlands are admissible in extradition proceedings without further certification, authentication, or other legalization. In addition, as territorial application of the Annex has been extended to Sint Maarten in accordance with Article 20(1)(b) of the U.S.-EU Extradition Agreement, under Article 9(6) of the Annex and in accordance with the exchange of notes, documents that bear the certificate or seal of the Ministry of Justice of Sint Maarten are also admissible in extradition proceedings without further certification, authentication, or other legalization. Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in The Hague. The Netherlands and Sint Maarten, in submitting documents in the instant case that bear the certificate or seal of the Ministry of Foreign Affairs of the Netherlands and the Ministry of Justice of Sint Maarten, have complied with the Annex with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on February 13, 2023.

STACY HAUF

Attachments:

      1. Copies of Note and Letter

      2. Copy of Agreement, Annex, and Notes



Ministry of Foreign Affairs

Amber Kluesener
Department of State
Office of the Legal Adviser
Law Enforcement and Intelligence
2201 C Street, N.W., Room 5419

**Embassy of the Kingdom of the Netherlands**

4200 Linnean Avenue NW
Washington, DC 20008
USA

**Contact**
Marlys Gomez

T  +1 (202) 274 2512
F  +1 (202) 364 2670
marlys.gomez@minbuza.nl

Date     October 31, 2022
Re       Request for Extradition D.J.E. Ottley

**Encl.**
Extradition Request

The Embassy of the Kingdom of the Netherlands presents its compliments to the Department of State and has the honor to request, in respect to article 9 of the Extradition Treaty between the Kingdom of the Netherlands and the United States of America (as amended by the EU-US treaty of June 25, 2003), the Extradition of Dante Jevon Ericson OTTLEY, born on April 19, 1994 in Sint Maarten.

Please find enclosed detailed information regarding the mentioned case.

The Embassy of the Kingdom of the Netherlands avails itself of this opportunity to renew to the Department of States the assurances of its highest consideration.



Ambassadors Office
Washington, D.C.


**MINISTRY OF JUSTICE**
Sint Maarten

Anna E. Richardson
**Minister of Justice**
Government Administration Building
Soualiga Road 1, Pond Island,
Great Bay - St. Maarten
**T:** (+1721) 542 0007
**F:** (+1721) 542 0170

# URGENT

**To:**
**The competent authorities of the United States of America**

Our reference: UITL-SXM-U-2022012

Subject: supplement to the extradition package of D.J.E. OTTLEY

Most Honourable Colleague,

I hereby present to you a supplemental declaration made by the Attorney General in Sint Maarten with regards to the extradition of

**Dante Jevon Ericson OTTLEY**, born on April 19, 1994 in Sint Maarten.

I thank the United States judicial authorities in advance for their cooperation in this matter.

With the highest regards,

Philipsburg, 22 November, 2022

Anna E. Richardson
Minister of Justice

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 10-201.16

---

## EXTRADITION

**Agreement Amending the**
**Treaty of June 24, 1980**
**Between the**
**UNITED STATES OF AMERICA**
**and the NETHERLANDS**

Signed at The Hague September 29, 2004

*with*

Annex

*and*

Exchange of Notes



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# NETHERLANDS

## Extradition

*Agreement amending the treaty of June 24, 1980.*
*Signed at The Hague September 29, 2004;*
*Transmitted by the President of the United States of America*
        *to the Senate September 28, 2006 (Treaty Doc. 109-14,*
        *109th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
        *July 29, 2008 (Senate Executive Report No. 110-12,*
        *110th Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
        *September 23, 2008;*
*Ratified by the President December 11, 2008;*
*Exchange of Instruments of Ratification at*
        *Washington September 29, 2009;*
*Entered into force February 1, 2010.*
*With annex and exchange of notes.*

**AGREEMENT COMPRISING THE INSTRUMENT AS CONTEMPLATED
BY ARTICLE 3(2) OF THE AGREEMENT ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA AND THE EUROPEAN UNION
SIGNED AT WASHINGTON ON 25 JUNE 2003,
AS TO THE APPLICATION OF THE EXTRADITION TREATY
BETWEEN THE UNITED STATES OF AMERICA
AND THE KINGDOM OF THE NETHERLANDS
SIGNED AT THE HAGUE ON 24 JUNE 1980**

The Government of United States of America

and

the Government of the Kingdom of the Netherlands,

have agreed as follows:

*Article 1*

As contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 (hereafter "the U.S.-EU Extradition Agreement"), the Governments of the United States of America and the Kingdom of the Netherlands acknowledge that, in accordance with the provisions of this Agreement, the bilateral Extradition Treaty between the United States of America and the Kingdom of the Netherlands signed 24 June 1980 (hereafter "the 1980 Extradition Treaty") is applied in relation to the U.S.-EU Extradition Agreement, under the following terms:

1

a) Pursuant to Article 5(1) of the U.S.-EU Extradition Agreement, Article 9(1) of the Annex to this Agreement shall be applied in place of Article 9(1) of the 1980 Extradition Treaty;

b) Pursuant to Article 5(2) of the U.S.-EU Extradition Agreement, Article 9(6) of the Annex to this Agreement shall be applied in place of Article 9(6) of the 1980 Extradition Treaty;

c) Pursuant to Article 7(1) of the U.S.-EU Extradition Agreement, Article 9(7) of the Annex to this Agreement shall be applied to supplement the provisions of the 1980 Extradition Treaty;

d) Pursuant to Article 8(2) of the U.S.-EU Extradition Agreement, Article 10(3) of the Annex to this Agreement shall be applied to supplement the provisions of the 1980 Extradition Treaty;

e) Pursuant to Article 10 of the U.S.-EU Extradition Agreement, Article 14 of the Annex to this Agreement shall be applied in place of Article 14 of the 1980 Extradition Treaty;

f) Pursuant to Article 13 of the U.S.-EU Extradition Agreement, Article 7(1) of the Annex to this Agreement shall be applied in place of Article 7(1) of the 1980 Extradition Treaty;

g) Pursuant to Article 14 of the U.S.-EU Extradition Agreement, Article 10 *bis* of the Annex to this Agreement shall be applied to supplement the provisions of the 1980 Extradition Treaty.

*Article 2*

The Annex to this Agreement reflects the text of the provisions of the 1980 Extradition Treaty and the U.S.-EU Extradition Agreement as a result of paragraph 1 of this Agreement. This integrated text shall apply upon entry into force of this Agreement.

2

*Article 3*

This Agreement shall apply to the United States of America and the Kingdom of the Netherlands in Europe. The Application of the 1980 Extradition Treaty to the Netherlands Antilles and Aruba shall remain unaffected by the U.S.-EU Extradition Agreement. Accordingly, this Agreement shall not apply to the Netherlands Antilles or Aruba unless the United States of America and the European Union, by exchange of diplomatic notes in accordance with Article 20(1)(b) of the U.S.-EU Extradition Agreement, agree to extend its application to them. Such application may be terminated in accordance with Article 20(2) of the U.S.-EU Extradition Agreement.

*Article 4*

In accordance with Article 16 of the U.S.-EU Extradition Agreement, this Agreement shall apply to offenses committed before as well as after it enters into force.

*Article 5*

This Agreement shall not apply to requests for extradition made prior to its entry into force.

*Article 6*

(a)  This Agreement shall be subject to the completion by the United States of America and the Kingdom of the Netherlands of their respective applicable internal procedures for entry into force. The Governments of the United States of America and the Kingdom of the Netherlands shall thereupon exchange instruments indicating that such measures have been completed. This Agreement shall enter into force on the date of entry into force of the U.S.-EU Extradition Agreement.

3

(b)     In the event of termination of the U.S.-EU Extradition Agreement, this
        Agreement shall be terminated at the same time and application of the
        original text of the 1980 Extradition Treaty shall resume six months after the
        notice of termination.


        IN WITNESS WHEREOF, the undersigned, being duly authorized by their
respective Governments, have signed this Agreement.


        DONE at *The Hague*    , in duplicate, *29 September 2004*  ,
in the English and Dutch languages, both texts being equally authentic.


For the Government of the                    For the Government of the
United States of America                     Kingdom of the Netherlands


4

**ANNEX**

ARTICLE 1:  Obligation to Extradite

The Contracting Parties agree to extradite to each other, subject to the provisions described in this Treaty, persons found in the territory of one of the Contracting Parties who have been charged with an offense, found guilty of committing an offense, or are wanted for the enforcement of a judicially pronounced penalty involving a deprivation of liberty or detention order.

ARTICLE 2:  Extraditable Offenses and Jurisdiction

1.    Extraditable offenses under this Treaty are:

a.    Offenses referred to in the Appendix to this Treaty which are punishable under the laws of both Contracting Parties;

b.    Offenses, whether listed in the Appendix to this Treaty or not, provided they are punishable under the Federal laws of the United States of America and the laws of the Kingdom of the Netherlands.

In this connection it shall not matter whether or not the laws of the Contracting Parties place the offense within the same category of offenses or denominate an offense by the same terminology.

2.    Extradition shall be granted in respect of an extraditable offense:

a.    For prosecution, if the offense is punishable under the laws of both Contracting Parties by deprivation of liberty for a period exceeding one year;

b.    For the imposition of a penalty or detention order, if the offense is punishable under the laws of both Contracting Parties by deprivation of liberty for a period exceeding one year; or

c.    For the enforcement of a penalty or detention order for such an offense, if the duration of the penalty or detention order still to be served amounts to at least four months.

5

3. Extradition shall be granted in respect of an extraditable offense committed outside the territory of the Requesting State if:

a. The courts of the Requested State would be competent to exercise jurisdiction in similar circumstances, or

b. The person sought is a national of the Requesting State.

4. Subject to the conditions set out in paragraphs 1, 2 and 3, extradition shall also be granted:

a. For attempts to commit or participation in an extraditable offense, including participation in an association of persons whose intention it is to commit the offense;

b. For any extraditable offense when, for the purpose of granting jurisdiction to the United States Government, transportation of persons or property, the use of the mails or other means of carrying out interstate or foreign commerce is also an element of the specific offense.

5. When extradition has been granted in respect of an extraditable offense, it may also be granted in respect of any other extraditable offense which would otherwise not be extraditable only by reason of the operation of paragraph 2.

ARTICLE 3: Territorial Application

For the purpose of this Treaty the territory of a Contracting Party shall include all territory under the jurisdiction of that Contracting Party, including airspace and territorial waters.

ARTICLE 4: Political and Military Offenses

1. Extradition shall not be granted when in the view of the Requested State the offense for which extradition is requested is of a political character, is connected with an offense of a political character, or it is established that extradition is requested for political purposes.

6

2. For the purpose of this Treaty a murder or willful crime against the life or physical integrity of a Head of State or Head of Government of one of the Contracting Parties or a member of that person's family, including attempts to commit such offenses, shall not be deemed to be offenses within the meaning of paragraph 1.

3. Extradition shall not be granted when the offense for which extradition is requested is a purely military offense.

4. It shall be the responsibility of the Executive Authority of the Requested State to decide on any question raised under this Article, except to the extent that the national laws of that State expressly grant such powers to its courts.

## ARTICLE 5: Prior Jeopardy for the Same Offense

Extradition shall not be granted when:

a. The person sought is being proceeded against, has been prosecuted, or has been tried and convicted or acquitted by the Requested State for the offense for which extradition is requested; or,

b. The person sought is otherwise immune from prosecution for the offense for which extradition is requested by reason of the law in the Requested State relating to prior jeopardy.

## ARTICLE 6: Lapse of Time

Extradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the law of the Requested State.

## ARTICLE 7: Capital Punishment and Special Circumstances

1. Where the offense for which extradition is sought is punishable by death under the laws in the Requesting State and not punishable by death under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty if imposed

7

shall not be carried out. If the Requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions. If the Requesting State does not accept the conditions, the request for extradition may be denied.

2.  In special circumstances, having particular regard to the age, health or other personal condition of the person sought, the Executive Authority of the Requested State may refuse extradition if it has reason to believe that extradition will be incompatible with humanitarian considerations.

### ARTICLE 8: Extradition of Nationals

1.  In the event there is a treaty in force between the Contracting Parties on the execution of foreign penal sanctions, neither Contracting Party may refuse to extradite its own nationals solely on the basis of their nationality.

2.  As long as there is no treaty in force between the Contracting Parties on the execution of foreign penal sanctions, neither Contracting Party shall be bound to extradite its own nationals, but the Executive Authority of the Requested State shall, if not prevented by the law of that State, have the power to extradite them if, in its discretion, it be deemed proper to do so.

3.  If extradition is not granted solely on the basis of the nationality of the person sought, the Requested State shall, at the request of the Requesting State, submit the case to its competent authorities for the purpose of prosecution, provided that the offense constitutes a criminal offense under the law of that State and that State has jurisdiction over the offense.

### ARTICLE 9: Extradition Procedures and Required Documents

1.  The request for extradition and supporting documents shall be transmitted through the diplomatic channel, which shall include transmission as provided for in paragraph 7 of this Article.

2.  The request for extradition shall be accompanied by:
a.  All available information concerning the identity, nationality, and probable location of the person sought;

8

b. A statement of the facts of the case including, if possible, the time and location of the crime;

c. The provisions of the law describing the essential elements and the designation of the offense for which extradition is requested;

d. The provisions of the law describing the punishment for the offense;

e. The provisions of the law providing for jurisdiction when the offense was committed outside of the territory of the Requesting State.

3. A request for extradition relating to a person sought for the purpose of prosecution shall be accompanied by:

a. The original or a certified copy of the warrant of arrest issued by a judge or other competent judicial officer of the Requesting State; and

b. Such evidence as, according to the law of the Requested State, would justify that person's arrest and committal for trial if the offense had been committed there, including evidence establishing that the person sought is the person to whom the warrant of arrest refers.

4. A request for extradition relating to a convicted person shall be accompanied by:

a. The original or certified copy of the judgment of conviction pronounced by a court of the Requesting State;

b. Evidence establishing that the person sought is the person to whom the conviction refers.

If the person was found guilty but not sentenced, the request for extradition shall be accompanied by a statement to that effect by the appropriate court and by the original or certified copy of the warrant of arrest.

If the convicted person was sentenced, the request for extradition shall be accompanied by the original or certified copy of the sentence imposed, a statement that the sentence has final and binding effect and is enforceable and a statement showing to what extent the sentence has not been carried out.

5. The documents to be submitted in support of the request for extradition, in accordance with this Article and Article 10, shall be translated into the language of the Requested State.

6.  Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall, for the United States of America, mean the United States Department of Justice; and, for the Kingdom of the Netherlands, the Ministry of Justice of the Netherlands, or, should territorial application of this Treaty be extended in accordance with Article 20 (1)(b) of the U.S.-EU Extradition Agreement, as specified in the exchange of diplomatic notes pursuant thereto.

7.  If the person whose extradition is sought is held under provisional arrest by the Requested State, the Requesting State may satisfy its obligation to transmit its request for extradition and supporting documents through the diplomatic channel pursuant to paragraph 1 of this Article, by submitting the request and documents to the Embassy of the Requested State located in the Requesting State. In that case, the date of receipt of such request by the Embassy shall be considered to be the date of receipt by the Requested State for purposes of applying the time limit that must be met under Article 11 of this Treaty to enable the person's continued detention.

### ARTICLE 10: Additional Evidence

1.  If the competent authority of the Requested State considers that the evidence furnished in support of the request for the extradition of a person sought is not sufficient to fulfill the requirements of this Treaty, that State shall request the submission of necessary additional evidence. The Requested State may set a time limit for the submission of such evidence and, upon the Requesting State's application, may grant a reasonable extension of such time limit.

2.  If the person sought has been taken into custody and the additional evidence or information submitted is not sufficient, or if such evidence or information is not received within the period specified by the Requested State, that person may be discharged from custody. However, such discharge shall not bar either the continued consideration of the request on

10

the basis of supplemented documents, or, if a final decision has already been taken, the submission of a subsequent request for the same offense. In such a case it shall be sufficient if reference is made in the subsequent request to the supporting documents already submitted, provided these documents will be available at the extradition proceedings.

3. Such additional evidence or information may be requested and furnished directly between the United States Department of Justice and the Ministry of Justice of the Netherlands.

Article 10 bis: Sensitive information in a request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

ARTICLE 11: Provisional Arrest

1. In case of urgency, either Contracting Party may request the provisional arrest of any accused or convicted person. Application for provisional arrest may be made either through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice in the Netherlands or, should application of this Treaty be extended in accordance with Article 20 (1)(b) of the U.S.-EU Extradition Agreement, as specified in the exchange of diplomatic notes pursuant thereto.

2. The application shall contain: a description of the person sought, including, if available, the person's nationality; a brief statement of the facts of the case including, if possible, the time and location of the offense; a statement of the existence of a warrant of arrest or a judgment of conviction against that person; and a statement that a request for extradition of the person sought will follow.

11

3. On receipt of such an application the Requested State shall take the appropriate steps to secure the arrest of the person sought. The Requesting State shall be promptly notified of the result of its application.

4. Provisional arrest shall be terminated if, within a period of 60 days after the apprehension of the person sought, the Requested State has not received the formal request for extradition and the supporting documents mentioned in Article 9.

5. The termination of provisional arrest pursuant to paragraph (4) shall not prejudice the extradition of the person sought if the extradition request and the supporting documents mentioned in Article 9 are delivered at a later date.

## ARTICLE 12: Decision and Surrender

1. The Requested State shall promptly communicate through the diplomatic channel to the Requesting State the decision on the request for extradition.

2. The Requested State shall give the reasons for any complete or partial rejection of the request for extradition.

3. If the extradition has been granted, surrender of the person sought shall take place within such time as may be prescribed by the law of the Requested State. The competent authorities of the Contracting Parties shall agree on the time and place of the surrender of the person sought. If, however, that person is not removed from the territory of the Requested State within such time as may be agreed, that person may be set at liberty and the Requested State may subsequently refuse extradition for the same offense.

## ARTICLE 13: Delayed Decision and Temporary Surrender

After a decision on a request for extradition has been rendered in the case of a person who is being proceeded against or is serving a sentence in the territory of the Requested State for a different offense, the Requested State may:

a. Defer the surrender of the person sought until the conclusion of the proceedings against that person, or the full execution of any punishment that may be or may have been imposed; or

b. Temporarily surrender the person sought to the Requesting State solely for the purpose of prosecution. The person so surrendered shall be kept in custody while in the Requesting State and returned at the conclusion of the proceedings against that person in accordance with conditions to be determined by mutual agreement of the Contracting Parties.

<u>ARTICLE 14: Requests for Extradition or Surrender made by Several States</u>

1. If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the Executive Authority of the Requested State shall determine to which State, if any, it will surrender the person.

2. If the Kingdom of the Netherlands receives an extradition request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, its Executive Authority shall determine to which State, if any, it will surrender the person.

3. In making its decision under paragraphs 1 and 2 of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

a. whether the requests were made pursuant to a treaty;

b. the places where each of the offenses was committed;

c. the respective interests of the requesting States;

d. the seriousness of the offenses;

e. the nationality of the victim;

f. the possibility of any subsequent extradition between the requesting States; and

g. the chronological order in which the requests were received from the requesting States.

13

### ARTICLE 15: Rule of Speciality

1. A person extradited under this Treaty shall not be detained, tried or punished in the territory of the Requesting State for an offense other than that for which extradition has been granted, nor be extradited by that State to a third State, unless:

a. That person has left the territory of the Requesting State after extradition and has voluntarily returned to it;

b. That person has not left the territory of the Requesting State within 30 days after being free to do so; or

c. The Executive Authority of the Requested State has consented to detention, trial, or punishment of that person for an offense other than that for which extradition was granted, or to extradition to a third State. For this purpose, the Requested State may require the submission of any document or statement mentioned in Article 9, including any statement made by the extradited person with respect to the offense concerned.

These stipulations shall not apply to offenses committed after extradition.

2. If the charge for which the person was extradited is legally altered in the course of proceedings, that person may be prosecuted or sentenced provided the offense under its new legal description is:

a. Based on the same set of facts contained in the extradition request and its supporting documents; and

b. Punishable by the same maximum penalty as, or a lesser maximum penalty than, the offense for which that person was extradited.

### ARTICLE 16: Simplified Extradition

If the extradition of a person sought is not obviously precluded by the law of the Requested State and provided the person sought irrevocably agrees in writing to extradition after personally being advised by a judge or competent magistrate of other rights granted in formal extradition proceedings and the protection afforded by them that this person would lose, the Requested State may grant extradition without a formal extradition proceeding having taken place. In this case Article 15 shall not be applicable.

14

### ARTICLE 17: Surrender of Property

1.  To the extent permitted under the law of the Requested State and subject to the rights of third parties, which shall be duly respected, all articles, instruments, objects of value or documents relating to the offense, whether or not used for its execution, or which in any other manner may be evidence for the prosecution, shall at the request of the Requesting State be seized and surrendered upon the granting of the extradition. The property mentioned in this Article shall be handed over even if the extradition cannot be effected due to the death, escape or disappearance of the person sought.

2.  The Requested State may condition the surrender of property upon a satisfactory assurance from the Requesting State that the property will be returned to the Requested State as soon as possible.

### ARTICLE 18: Transit

1.  Either Contracting Party may authorize the other transit through its territory of a person surrendered by a third State. The Contracting Party requesting transit shall provide the information mentioned in Article 11, paragraph 2, through channels provided in that Article. No such authorization is required where air transportation is used and no landing is scheduled on the territory of the other Contracting Party.

2.  If an unscheduled landing on the territory of the other Contracting Party occurs, transit shall be subject to the provisions of paragraph 1. That Contracting Party may detain the person to be transited for a period of 96 hours while awaiting the request for transit.

### ARTICLE 19: Expenses

1.  The Requested State shall review for legal sufficiency documentation in support of an extradition request prior to submission to its judicial authorities and shall present the request of the Requesting State to such authorities.

15

2.   Expenses related to the translation of documents supporting the request for extradition and to the transportation of the person sought shall be borne by the Requesting State. All other expenses related to the extradition request and proceedings shall be borne by the Requested State. No pecuniary claim, arising out of the arrest, detention, examination and surrender of persons sought under the terms of this Treaty, shall be made by the Requested State against the Requesting State.

ARTICLE 20:  Denunciation

Either Contracting Party may terminate this Treaty at any time by giving notice to the other Party and the termination shall be effective six months after the date of receipt of such notice.

16

## APPENDIX: SCHEDULE OF OFFENSES

1. Murder; assault with intent to commit murder.
2. Manslaughter.
3. Malicious wounding; inflicting grievous bodily harm.
4. Arson.
5. Rape; indecent assault; incest; bigamy.
6. Unlawful sexual acts with or upon children under the age specified by the laws of both the Requesting and Requested States.
7. Wilful abandonment of a minor or other dependent person when the life of that minor or that dependent person is or is likely to be injured or endangered.
8. Kidnapping; abduction; false imprisonment.
9. Robbery; burglary; larceny; embezzlement.
10. Fraud, including obtaining property, money or valuable securities by false pretenses, deceit, falsehood, or other fraudulent means.
11. Bribery, including soliciting, offering and accepting.
12. Extortion.
13. Receiving, possessing or transporting anything of value knowing it to have been unlawfully obtained.
14. Offenses relating to criminal breach of trust.
15. An offense against the laws relating to counterfeiting and forgery; including the forging of seals, trademarks, documents, or use of such forgeries.
16. An offense against the laws relating to international transfers of funds.
17. An offense against the laws relating to importation, exportation or transit of goods, articles, or merchandise, including violations of the customs laws.
18. Offenses relating to slavery or the illegal transporting of persons.
19. Offenses against the laws relating to bankruptcy.
20. Offenses against the laws relating to prohibition of private monopoly or unfair trade practices.
21. Perjury; subornation of perjury; making a false statement to a government agency or official.
22. Offenses relating to wilful evasion of taxes and duties.

17

23. Any act or omission intended or likely to: (a) endanger the safety of an aircraft in flight or of any person on board such aircraft; or (b) destroy or render any aircraft incapable of flight.

24. Any unlawful seizure or exercise of control of an aircraft in flight by force or violence, or by threat of force or violence, or by any other form of intimidation.

25. Any unlawful act or omission intended or that is likely to endanger the safety of any person in a railway train or in any vessel or other means of transportation.

26. Piracy, mutiny, or any mutinous act committed on board a vessel.

27. Malicious damage to property.

28. Offenses against the laws relating to the traffic in, or the possession, production or manufacture of narcotic drugs, cannabis, psychotropic drugs, cocaine and its derivatives, and other dangerous drugs and chemicals.

29. Offenses against laws relating to poisonous chemicals or substances injurious to health.

30. Offenses against the laws relating to firearms, ammunition, explosives, incendiary devices or nuclear materials.

31. Offenses against the laws relating to the abuse of official authority.

32. Offenses against the laws relating to obstruction of justice.

33. Offenses relating to securities and commodities.

34. Facilitating or permitting the escape of a person from custody.

35. Incitements to violence.

36. Any other act for which extradition may be granted in accordance with the laws of both Contracting Parties.

18

No. 34

I have the honor to refer to the Agreement between the United States of America and the Kingdom of the Netherlands, signed this day, comprising the instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed at Washington 25 June 2003, as to the application of the Extradition Treaty between the United States of America and the Kingdom of the Netherlands signed at The Hague 24 June 1980. In view of the signature of this instrument, I wish to clarify the legal status of certain notes relating to the 1980 Extradition Treaty and to the 2003 U.S.-EU Extradition Agreement.

On 31 December 1985, the Government of the Kingdom of the Netherlands conveyed to the Government of the United States of America a diplomatic note confirming that, inter alia, the 1980 Extradition Treaty continues to apply to the Netherlands Antilles and to Aruba. The Extradition Agreement signed this day provides that the application of the 1980 Extradition Treaty to the Netherlands Antilles and to Aruba shall remain unaffected by the 2003 U.S.-EU Extradition Agreement. As a result,

the 1980 Extradition Treaty in its original form shall continue to apply to the Netherlands Antilles and to Aruba.

On 11 July 1991, the United States of America and the Kingdom of the Netherlands exchanged diplomatic notes constituting an understanding between the two governments regarding the extradition of nationals pursuant to the 1980 Extradition Treaty. This exchange of diplomatic notes shall continue to be applied in relation to Article 8 of the annex to the Extradition Agreement signed this day.

It is also noted that the 2003 U.S.-EU Extradition Agreement includes an explanatory note that "reflects understandings regarding the application of certain provisions of the Agreement" and constitutes an integral part of it. The understandings set forth in the explanatory notes are binding upon both the parties to the 2003 U.S.-EU Extradition Agreement and the member states of the European Union, and thus are applicable as well to the corresponding provisions of the Extradition Agreement signed this day.

If the foregoing understandings are shared by the Kingdom of the Netherlands, I have the honor to propose that this Note and Your Excellency's Note in reply shall constitute an understanding between the two Governments.

I avail myself of this opportunity to renew to Your Excellency the assurances of my highest consideration.

Embassy of the United States of America,

The Hague, September 29, 2004.



His Excellency
Mr. C.M. Sobel
Ambassador of the United States of America
At the Hague


The Hague, 29 September 2004


I have the honor to acknowledge receipt of your Note of today's date, which reads as follows:

"I have the honor to refer to the Agreement between the United States of America and the Kingdom of the Netherlands, signed this day, comprising the instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed at Washington 25 June 2003, as to the application of the Extradition Treaty between the United States of America and the Kingdom of the Netherlands signed at the Hague 24 June 1980. In view of the signature of this instrument, I wish to clarify the legal status of certain notes relating to the 1980 Extradition Treaty and to the 2003 U.S.-EU Extradition Agreement.

On 31 December 1985, the Government of the Kingdom of the Netherlands conveyed to the Government of the United States of America a diplomatic note confirming that, inter alia, the 1980 Extradition Treaty continues to apply to the Netherlands Antilles and to Aruba. The Extradition Agreement signed this day provides that the application of the 1980 Extradition Treaty to the Netherlands Antilles and to Aruba shall remain unaffected by the 2003 U.S.-EU Extradition Agreement. As a result, the 1980 Extradition Treaty in its original form shall continue to apply to the Netherlands Antilles and to Aruba.

On 11 July 1991, the United States of America and the Kingdom of the Netherlands exchanged diplomatic notes constituting an understanding between the two governments regarding the extradition of nationals



pursuant to the 1980 Extradition Treaty. This exchange of diplomatic notes shall continue to be applied in relation to Article 8 of the annex to the Extradition Agreement signed this day.

It is also noted that the 2003 U.S.-EU Extradition Agreement includes an explanatory note that "reflects understandings regarding the application of certain provisions of the Agreement" and constitutes an integral part of it. The understandings set forth in the explanatory notes are binding upon both the parties to the 2003 U.S.-EU Extradition Agreement and the member states of the European Union, and thus are applicable as well to the corresponding provisions of the Extradition Agreement signed this day.

If the foregoing understandings are shared by the Kingdom of the Netherlands, I have the honor to propose that this Note and Your Excellency's Note in reply shall constitute an understanding between the two Governments.

I avail myself of this opportunity to renew to Your Excellency the assurances of my highest consideration".

I have the honor to confirm that the understanding described above is also the understanding of the Kingdom of the Netherlands and that Your Excellency's Note together with this Reply Note shall constitute an understanding between the two Governments.

I avail myself of this opportunity to renew to Your Excellency the assurances of my highest consideration.

Mr. J.P.H. Donner
Minister of Justice

i

**DEPARTMENT OF STATE**
**WASHINGTON**

The United States Department of State has the honor to refer the Embassy of the Kingdom of the Netherlands to the attached Diplomatic Note SGS9/07281 dated      June 9, 2009, from the General Secretariat of the Council of the European Union referring to the Agreement on Extradition between the United States of America and the European Union, signed at Washington on June 25, 2003 (the U.S.-EU Extradition Agreement), and proposing that, pursuant to Article 20(1)(b) thereof, the U.S.-EU Extradition Agreement shall also apply, in relation to the Kingdom of the Netherlands, to the Netherlands Antilles and Aruba, in accordance with the terms set out in its note.  The United States of America agreed to this proposal by Diplomatic Note USEU 2009-31 dated June 16, 2009, which is also attached hereto.

The United States of America notes that Article 20(1)(b) of the U.S.-EU Extradition Agreement and Article 3 of the Agreement comprising the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed at Washington on June 25, 2003, as to the application of the Extradition Treaty between the United States of America and the Kingdom of the Netherlands signed at The Hague on June 24, 1980, signed at The Hague on September 29, 2004 (the U.S.-Netherlands Extradition Agreement), provide for

**DIPLOMATIC NOTE**

such an exchange of diplomatic notes between the United States and the European Union relating to territorial application. Article 20(1)(b) of the U.S.-EU Extradition Agreement requires the exchange to be duly confirmed by the relevant European Union Member State. The United States of America hereby invites the Kingdom of the Netherlands, by way of a response to this note, to confirm that the U.S.-EU Extradition Agreement and the U.S.-Netherlands Extradition Agreement shall also apply, in relation to the Kingdom of the Netherlands, to the Netherlands Antilles and Aruba, as from the date of the entry into force of the U.S.-EU Extradition Agreement and the U.S.-Netherlands Extradition Agreement, in accordance with the terms set out in the above-referenced diplomatic notes between the United States of America and the European Union.

It is also the understanding of the United States of America that the Agreement on Mutual Legal Assistance between the United States of America and the European Union, signed at Washington on June 25, 2003, (the U.S.-EU Mutual Legal Assistance Agreement) and the Agreement comprising the Instrument as contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance between the United States of America and the European Union signed at Washington on June 25, 2003, as to the application of the Treaty between the United States of America and the Kingdom of the Netherlands on Mutual Assistance in Criminal Matters signed at The Hague on June 12, 1981, signed at The Hague on September 29, 2004 (the U.S.-Netherlands MLA Agreement), shall not be applied to the Netherlands Antilles and Aruba until their respective requisite national legislation has been enacted, and the United States of America and the European Union have exchanged diplomatic notes, duly confirmed by the Kingdom of the Netherlands, in accordance with Article 16(1)(b) of the U.S.-EU

Mutual Legal Assistance Agreement and Article 3 of the U.S.-Netherlands MLA Agreement. The United States of America would appreciate the confirmation of the Kingdom of the Netherlands, by way of a response to this note, that it shares this understanding regarding territorial application of the U.S.-EU Mutual Legal Assistance Agreement and the U.S.-Netherlands MLA Agreement.

Department of State.

    Washington, September 29, 2009

Enclosure:

1. Diplomatic Note SGS9/07281 dated June 9, 2009 from the General Secretariat of the Council of the European Union

2. Diplomatic Note USEU 2009-31 dated June 16, 2009 from the United States Mission to the European Union



Koninkrijk der Nederlanden

The Royal Netherlands Embassy presents its complements to the Department of State and has the honor to acknowledge receipt of the Diplomatic Note from the Department of State, dated September 29, 2009.

The Embassy wishes to confirm that the Agreement on Extradition between the United States of America and the European Union, signed at Washington on June 25, 2003 (the U.S.-EU Extradition Agreement) and the Agreement comprising the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed at Washington on June 25, 2003, as to the application of the Extradition Treaty between the United States of America and the Kingdom of the Netherlands signed at The Hague on June 24, 1980, signed at The Hague on September 29, 2004 (the U.S.-Netherlands Extradition Agreement) shall apply to the Netherlands Antilles and Aruba as from the date of the entry into force of the U.S.-EU Extradition Agreement and the U.S. – Netherlands Extradition Agreement, in accordance with the terms set out in the attached exchange of notes between the United States of America and the European Union dated June 9 and June 16, 2009.

The Embassy also confirms the understanding of the United States of America that the Agreement on Mutual Legal Assistance between the United States of America and the European Union, signed at Washington on June 25, 2003, (the U.S.-EU Mutual Legal Assistance Agreement) and the Agreement comprising the Instrument as contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance between the United States of America and the European Union signed at Washington on June 25, 2003, as to the application of the Treaty between the United States of America and the Kingdom of the Netherlands on Mutual Assistance in Criminal Matters signed at The Hague on June 12, 1981, signed at The Hague on September 29, 2004 (the U.S.-Netherlands MLA Agreement) shall not be applied to the Netherlands Antilles or Aruba until their respective requisite national legislation has been enacted, and the United States of America and the European Union have exchanged diplomatic notes, duly confirmed by the Kingdom of the Netherlands, in accordance with Article 16(1)(b) of the U.S.-EU Mutual Legal Assistance Agreement and Article 3 of the U.S.-Netherlands MLA Agreement.

The Royal Netherlands Embassy avails itself of this opportunity to renew  to the Secretary of State the assurances of its highest consideration.

Washington D.C., September 29, 2009

The Department of State
Office of Treaty Affairs
Harry S. Truman Building
2201 C Street, NW
Washington D.C. 20520

USEU 2009-31

The United States Mission to the European Union presents its compliments to the General Secretariat of the Council of the European Union and has the honor to acknowledge receipt of Note Number SGS9/07281 dated June 9, 2009, which reads as follows:

"The General Secretariat of the Council of the European Union presents its compliments to the Mission of the United States of America to the European Union and has the honour to refer to the Agreement on Extradition between the European Union and the United States of America, signed at Washington on 25 June 2003, and, in particular, to Article 20.1(b) thereof.

In this respect, the General Secretariat of the Council, on behalf of the European Union, has the honour to invite the United States of America to agree, by way of a reciprocal note, to the request that the aforementioned Agreement shall also apply, in relation to the Kingdom of the Netherlands, to the Netherlands Antilles and Aruba in accordance with the terms set out below.

The General Secretariat of the Council takes note of the Agreement comprising the Instrument as contemplated by Article 3, paragraph 2(a) of the Agreement on Extradition between the European Union and the United States of America, signed at Washington on 25 June 2003, as to the application of the Extradition Treaty between the United States of America and the Kingdom of the Netherlands signed at the Hague on 24 June 1980, signed by representatives of the United States of America and the Kingdom of the Netherlands at the Hague on 29 September 2004 (hereinafter referred to as the 2004 U.S.-Netherlands Extradition Instrument). Article 9(6) of the Annex to the 2004 U.S.-Netherlands Extradition Instrument provides that, in the event that the Agreement on Extradition between the European Union and the United States of America shall be extended to the Netherlands Antilles and Aruba, the European Union and the United

**DIPLOMATIC NOTE**

States shall agree as to the authorities of the Netherlands Antilles and Aruba responsible for certification of documents in extradition proceedings. The European Union wishes to notify the United States of America that the certifying authorities for the Netherlands Antilles and Aruba shall be their respective Ministries of Justice.

In addition, Article 11(1) of the Annex to the 2004 U.S.-Netherlands Extradition Instrument provides that, in the event that the Agreement on Extradition between the European Union and the United States of America shall be extended to the Netherlands Antilles and Aruba, the European Union and the United States shall agree as to the authorities of the Netherlands Antilles and Aruba responsible for sending and receiving provisional arrest requests, in the event that the diplomatic channel is not utilized for this purpose. The European Union wishes to notify the United States of America that the authorities for the Netherlands Antilles and Aruba for this purpose shall be their respective Ministries of Justice. It is also the understanding of the European Union that extradition requests and communications in aid thereof shall be transmitted directly between the United States and the Netherlands Antilles and Aruba.

The General Secretariat of the Council wishes to point out that this Note cancels and replaces the General Secretariat's previous Note, addressed to the Mission of the United States on 25 March 2009, ref.no. SGS 9/03991.

The General Secretariat of the Council of the European Union avails itself of this opportunity to renew to the Mission of the United States of America to the European Union the expression of its highest consideration."

The Mission of the United States of America has the honor to confirm that the proposal set out in the General Secretariat's Note is acceptable to the the United States of America and that the General Secretariat's Note, and this response, shall constitute an agreement between the United States of America and the European Union.

DIPLOMATIC NOTE

The Mission of the United States of America to the European Union avails itself of this opportunity to renew to the General Secretariat of the Council of the European Union the assurances of its highest consideration.

United States Mission to the European Union,

Brussels, June 16, 2009

DIPLOMATIC NOTE



**COUNCIL OF THE EUROPEAN UNION**
**GENERAL SECRETARIAT**

Brussels, 9 June 2009

**NOTE**                    SGS9/07281

The General Secretariat of the Council of the European Union presents its compliments to the Mission of the United States of America to the European Union and has the honour to refer to the Agreement on Extradition between the European Union and the United States of America, signed at Washington on 25 June 2003, and, in particular, to Article 20.1(b) thereof.

In this respect, the General Secretariat of the Council, on behalf of the European Union, has the honour to invite the United States of America to agree, by way of a reciprocal note, to the request that the aforementioned Agreement shall also apply, in relation to the Kingdom of the Netherlands, to the Netherlands Antilles and Aruba in accordance with the terms set out below.

The General Secretariat of the Council takes note of the Agreement comprising the Instrument as contemplated by Article 3, paragraph 2(a) of the Agreement on Extradition between the European Union and the United States of America, signed at Washington on 25 June 2003, as to the application of the Extradition Treaty between the United States of America and the Kingdom of the Netherlands signed at the Hague on 24 June 1980, signed by representatives of the United States of America and the Kingdom of the Netherlands at the Hague on 29 September 2004 (hereinafter referred to as the 2004 U.S.-Netherlands Extradition Instrument). Article 9(6) of the Annex to the 2004 U.S.-Netherlands Extradition Instrument provides that, in the event that the Agreement on Extradition between the European Union and the United States of America shall be extended to the Netherlands Antilles and Aruba, the European Union and the United States shall agree as to the authorities of the Netherlands Antilles and Aruba responsible for certification of documents in extradition proceedings. The European Union wishes to notify the United States of America that the certifying authorities for the Netherlands Antilles and Aruba shall be their respective Ministries of Justice.

In addition, Article 11(1) of the Annex to the 2004 U.S.-Netherlands Extradition Instrument provides that, in the event that the Agreement on Extradition between the European Union and the United States of America shall be extended to the Netherlands Antilles and Aruba, the European Union and the United States shall agree as to the authorities of the Netherlands Antilles and Aruba responsible for sending and receiving provisional arrest requests, in the event that the diplomatic channel is not utilized for this purpose. The European Union wishes to notify the United States of America that the authorities for the Netherlands Antilles and Aruba for this purpose shall be their respective Ministries of Justice. It is also the understanding of the European Union that extradition requests and communications in aid thereof shall be transmitted directly between the United States and the Netherlands Antilles and Aruba.

The General Secretariat of the Council wishes to point out that this Note cancels and replaces the General Secretariat's previous Note, addressed to the Mission of the United States on 25 March 2009, ref.no. SGS 9/03991.

The General Secretariat of the Council of the European Union avails itself of this opportunity to renew to the Mission of the United States of America to the European Union the expression of its highest consideration.



175 Rue de la Loi,
1048 Brussels, Belgium



Koninkrijk
der Nederlanden

The Embassy of the Kingdom of the Netherlands presents its compliments to the United States Department of State and, with regard to the international agreements that have been concluded between the United States of America and the Kingdom of the Netherlands, has the honour to inform the Ministry as follows.

The Kingdom of the Netherlands currently consists of three parts: the Netherlands, the Netherlands Antilles and Aruba. The Netherlands Antilles consists of the islands of Curaçao, Sint Maarten, Bonaire, Sint Eustatius and Saba.

With effect from 10 October 2010, the Netherlands Antilles will cease to exist as a part of the Kingdom of the Netherlands. From that date onwards, the Kingdom will consist of four parts: the Netherlands, Aruba, Curaçao and Sint Maarten. Curaçao and Sint Maarten will enjoy internal self-government within the Kingdom, as Aruba and, up to 10 October 2010, the Netherlands Antilles do.

These changes constitute a modification of the internal constitutional relations within the Kingdom of the Netherlands. The Kingdom of the Netherlands will accordingly remain the subject of international law with which agreements are concluded. The modification of the structure of the Kingdom will therefore not affect the validity of the international agreements ratified by the Kingdom for the Netherlands Antilles; these agreements will continue to apply to Curaçao and Sint Maarten.

The other islands that have until now formed part of the Netherlands Antilles – Bonaire, Sint Eustatius and Saba – will become part of the Netherlands, thus constituting 'the Caribbean part of the Netherlands'. The agreements that now apply to the Netherlands Antilles will also continue to apply to these islands; however, the Government of the Netherlands will now be responsible for implementing these agreements.

Royal Netherlands Embassy, 4200 Linnean Avenue, Washington, D.C. 20008
phone: (202) 274 2601, fax: (202) 362 2367, e-mail: was-plvcdp@minbuza.nl

1

A status report of the agreements that apply to Curaçao, St Maarten and/or the Caribbean part of the Netherlands will be sent to the United States Department of State in the near future.

The Embassy would appreciate receiving a Note in reply confirming that the United States Department of State has taken note of the foregoing.

The Embassy of the Kingdom of the Netherlands avails itself of this opportunity to renew to the United States Department of State the assurances of its highest consideration.

Washington, 6 October 2010



The United States Department of State
Office of the Legal Adviser, Room 6423
Harry S. Truman Building
2201 C Street, NW
Washington D.C. 20520

Royal Netherlands Embassy, 4200 Linnean Avenue, Washington. D.C. 20008
phone: (202) 274 2601, fax: (202) 362 2367, e-mail: was-plvcdp@minbuza.nl

2

# Exhibit B

DISTRICT OF COLUMBIA, ss:

## DECLARATION OF STACY HAUF

I, Stacy Hauf, declare and say as follows:

1. I am an Attorney Adviser for the Department of State, Washington, DC, in the Office of Law Enforcement and Intelligence. This office is the primary office in the Department of State responsible for extradition, including the negotiation and implementation of extradition treaties. My responsibilities require that I be familiar with international law enforcement matters affecting the United States, including extradition matters. This declaration is intended to provide supplemental information related to the request submitted by Sint Maarten for the extradition of Dante Jevon Ericson Ottley. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and the Netherlands, as extended to Sint Maarten, are found in the Extradition Treaty between the United States of America and the Kingdom of the Netherlands, signed at The Hague on 24 June 1980 (the "1980 Treaty"), and the Agreement Comprising the Instrument as Contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed at Washington on 25 June 2003, as to the Application of the Extradition Treaty between the United States of America and the Kingdom of the Netherlands signed at The Hague on 24 June 1980, signed at The Hague on 29 September 2004 (the "Agreement"), with annex and related exchange of notes. The annex to the Agreement (the "Annex") reflects the integrated text of the provisions of the 1980 Treaty and the Agreement on Extradition between the United States of America and the European Union signed at Washington on 25 June 2003.

3. Article 9(4) of the Annex addresses "[a] request for extradition relating to a convicted person." It provides in part, "If the convicted person was sentenced, the request for extradition shall be accompanied by . . . a statement that the sentence has final and binding effect and is enforceable . . . ." In accordance with this provision of the Annex, Sint Maarten provided the following statement: "the Appeal Court's decision with regard to the detention [of Ottley] is [sic]

2

has final and binding effect and is enforceable, because the detention was ordered by the Court of Appeal and that decision cannot be appealed as such," while also noting that Ottley has filed an appeal in cassation at the Supreme Court in The Hague. (As Sint Maarten explains, an appeal in cassation means that "the Supreme Court only reviews the procedure that has been followed in the appeal" and "won't take any decisions about the facts of the case.") This statement satisfies the requirement set forth in Article 9(4).

4. The requirements of having "final and binding effect" and being "enforceable" refer to the sentencing decision of the competent court. Indeed, Article 9(4) expressly applies these requirements to "the sentence," not the conviction. This interpretation is supported by the context in which the relevant provision of Article 9(4) should be understood. The preceding paragraph of Article 9(4), which addresses what information must be included in an extradition request for a person who has been found guilty but not yet sentenced, states, "If the person is found guilty but not sentenced, the request for extradition shall be accompanied by a statement to that effect by the appropriate court and by the original or certified copy of the warrant of arrest." It does not require the requesting state to provide a statement confirming that the conviction has final and binding effect or is enforceable. There is similarly no such requirement when the person sought has been found guilty and sentenced. Interpreting Article 9(4) otherwise would illogically impose different requirements for the finality of a conviction based on whether or not the person has been sentenced.

5. Moreover, the words "final and binding effect" and "enforceable" in this context cannot reasonably mean that the sentence must be inalterable or no longer subject to any kind of legal challenge. Such an interpretation would preclude the extradition of individuals under the Annex who have been convicted and sentenced if there is any available mechanism by which they could seek to vacate or commute their sentences, no matter how frivolous. For example, under U.S. law, a person who has been convicted and sentenced could file a direct appeal or a collateral challenge, or pursue a sentence commutation or pardon from the relevant executive authority at any time. Thus, a U.S. criminal sentence may never have "final and binding effect" under an alternative interpretation. As the Annex provides for extraditing convicted individuals who have been sentenced, Article 9(4) should not be read in a manner that could effectively void the ability of the contracting parties to do so.

3

     6.  For the foregoing reasons, the requirement set forth in the last paragraph of Article 9(4) requiring confirmation that the sentence has "final and binding effect" is satisfied when the requesting state affirms that the sentencing decision is the final and binding decision of the competent court.  Accordingly, because Sint Maarten has provided a statement that the sentencing decision by the Appeal Court is the final decision of the competent court, is binding on the parties to the decision, and is enforceable against the defendant, it has complied with the relevant requirement of Article 9(4) of the Annex.

     I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

     Executed on February _8_, 2023.

                                STACY HAUF