IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF DANTE JEVON ERICSON OTTLEY | Criminal Action No. 1:22-MJ-716-JKL |

## DANTE OTTLEY'S RESPONSE IN OPPOSITION TO EXTRADITION

Comes now Defendant, Dante Javon Ericson Ottley, by and through undersigned counsel, and hereby files his Response In Opposition To The Government's Memorandum Of Law In Support Of Extradition.  In Response thereto, Defendant shows as follows:

**I.      Mr. Ottley Adopts and Incorporates the Arguments Previously Raised in His Motion To Dismiss and Reply Brief (Docs. 14, 22).**

As an initial matter, Mr. Ottley adopts and incorporates into this Response the arguments he previously raised in his Motion To Dismiss (Doc. 14) and his Reply Brief to that Motion (Doc. 22).  Additionally, for the reasons set forth in those pleadings, Mr. Ottley submits that the government's extradition request should be denied and that he should be released immediately.

1

## II. Extraditing Mr. Ottley to Sint Maarten Would Violate Due Process.

It is well documented that the prisons in Sint Maarten are overcrowded and the conditions are inhumane. In fact, the Netherlands Institute for Human Rights has declared that surrendering someone to Sint Maarten to serve a prison sentence would be tantamount to subjecting them to torture or degrading punishment. Dept. for Execution of Judgments of the ECHR, Netherlands Institute for Human Rights, *Communication with regard to the execution of the judgment of the European Court of Human Rights in the case of Corallo v. The Netherlands*, Feb. 14, 2019, at 2 (NIHR Report), attached hereto as Exhibit A. See, Also, George v. The Netherlands and Other Applications Decisions, April 15, 2021, European Court of Human Rights, Fourth Section Decision, Application no. 63169/19 (awarding agreed-upon damages for poor detention conditions while held in Sint Maarten), attached hereto as Exhibit B. The overcrowding has led to the release of many people convicted or still waiting for trial. Yet, for some unknown reason, the Netherlands has requested that Mr. Ottley be extradited to serve a sentence in these conditions. Extraditing Mr. Ottley to Sint Maarten, where he would arbitrarily be subjected to inhuman treatment, is tantamount to subjecting him to cruel and unusual punishment without due process.

Though the Court's review of a request for extradition is limited, extradition is still "subject to the constraints of the Constitution," and the reviewing court

must ensure that extradition would not run afoul of constitutional protections. *Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 829 (11th Cir. 1993). Reason being, "[t]he constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations." *Id. See also Mironescu v. Costner*, 480 F.3d 664, 670 (4th Cir. 2007) ("[T]he Executive . . . lacks the discretion to extradite a fugitive when extradition would violate his constitutional rights."); *Ahmad v. Wigen*, 726 F. Supp. 389, 412 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990) ("[T]he courts are not, and cannot be, a rubber stamp for the other branches of government in the exercise of extradition jurisdiction."). It is, therefore, within the province of this Court to deny extradition where it would infringe upon the person's constitutional rights, and the Court should do so here.

Both the European Court of Human Rights and the Netherlands Institute for Human Rights have investigated the conditions in the jails and prisons in Sint Maarten and have concluded that they are not fit for housing human beings. *See Corallo v. The Netherlands* (No. 29593/17), Eur. Ct. H.R. (2018); NIHR Report. There are numerous issues with the prisons and jails in Sint Maarten. They are unsanitary, there is inadequate ventilation, detainees spend long hours in multi-person cells, and they lack of access to medical attention, sunlight, protection from violence, and programing or educational resources, lack of access to sunlight. Corallo at ¶ 231. Indeed, the United States Department of State has recognized that

"prison conditions in some detention centers on Sint Maarten . . . do not meet minimum international standards." U.S. Department of State, *2021 Country Reports on Human Rights Practices: Netherlands*, https://www.state.gov/reports/2021-countr-reports - on-human-rights-practices/netherlands/ (last visited Feb. 27, 2023 at 1:13 PM). These conditions worsened after Hurricanes Irma and Maria. NIHR Report at 2.

All of these issues are exacerbated, and caused in part, by the lack of space. Kim Hendriksen, *Prisoners: situation in Sint Maarten's prison still bad*, CARIBBEAN NETWORK (Dec. 15, 2021), https://caribbeannetwork.ntr.nl/2021/12/15/prisoners-situation-in-sintmaartens-prison-still-bad. Point Blanche Prison, the main detention facility in Sint Maarten, has a maximum capacity of 80 males and 7 females. Sint Maarten Parliament, *Py22-23 Public Meeting #12*, at 1:30-1:33, YOUTUBE (Jan. 19, 2023), https://www.youtube.com /watch?v =R9nHMQvFwdo, at 1:31:53-1:32:09. Curiously, despite the impacts of hurricanes and seemingly worsening conditions, the capacity for male detainees at Point Blanche has increased from 70 to 80 over the last few years. *Id.* at 1:33:14-1:33:29. Because of this overcrowding, many people awaiting trial will be detained at police stations, where they are only supposed to be held for a maximum of ten days. *See* NIHR Report at 2; Hendriksen, *Prisoners: situation in Sint Maarten's prison still bad*.

The lack of capacity in the jails in prisons in Sint Maarten has led to arbitrary detention. While some people awaiting trial are held at police station or Point Blanche prison, many others are released. There is no apparent reason for this disparate treatment. *Py22-23 Public Meeting #12*, at 1:32:26-1:33:12. Indeed, some people convicted by a trial court in Sint Maarten will be released, or a prison sentence will not even be imposed, "regardless of the offense . . . because an even somewhat human form of detention is no longer possible." NIHR Report at 3; *Py22-23 Public Meeting #12*, at 1:32:26-1:33:12. Someone in Mr. Ottley's position—who was acquitted at the trial level and awaiting a final ruling form an appellate court—would not ordinally be brought into custody. Why the Netherlands is requesting extradition so it may detain Mr. Ottley, where there is not enough room to house him, is unclear. The arbitrariness in which those awaiting trial or prison sentences are permitted to be released means some people will be subjected to cruel punishments without any sort of due process.

In sum, the prison conditions in Sint Maarten are inhumane, and the Court should decline to extradite Mr. Ottley. *See Ahmad*, 726 F. Supp. 389, 412-15 (noting international standard that extradition should be refused based on "anticipation of torture, cruel conditions of incarceration or lack of due process"). Substantive Due process requires that the government "protect or care for citizens in two situations: first, in custodial and other settings in which the state has limited the

individuals' ability to care for themselves; and second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992). In other words, the government cannot aid and abet the deprivation of someone's liberty by affirmatively placing them in harm's way. Taking steps to allow for cruel and unusual punishment, which would otherwise be prohibited by the Eighth Amendment, or arbitrary punishment generally, amounts to a violation of due process. *Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 3041326, at *17 (S.D. Fla. June 6, 2020).

Importantly, Judges in the Netherlands have refused extradition of people in its county because of the "inhumane" conditions of the requesting country, citing the European convention on human rights. See, https://www.theguardian.com/world/2019/may/10/dutch-court-blocks-extradition-of-man-to-inhumane-uk-prisons, last accessed February 28, 2023. The Dutch Court noted:

> The situation is still not good and the letter of 24 April 2019 [from the director general of prisons] gives no assurance that the situation is now different from before. Nor is there a guarantee that the person claimed will not be placed in HMP Bedford, HMP Birmingham or HMP Liverpool after surrender.

*Id*. The Court continued:

> In these circumstances, the expectation that the situation will improve rapidly is not sufficient to assume that the real risk of inhumane treatment has actually disappeared. The already established real danger of inhuman or degrading treatment in these establishments has not been eliminated.

*Id.*

Here, the United States government owes a similar duty to Mr. Ottley as that embodied in the Netherland Court decision because it has taken him into custody and is holding him against his will. *See Santamorena v. Georgia Mil. Coll.*, 147 F.3d 1337, 1340 (11th Cir. 1998) (defining "special relationship" the state has with persons in custody). Because Mr. Ottley is in federal custody and has no control over whether he is extradited, whether he will be subject to the cruel and inhumane conditions in the prisons of Sint Maarten without any form of due process is entirely up to the federal government. The Court should not allow this decision to go unchecked. The federal government must work within the bounds of the constitution, as "[t]he constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations." *Martin*, 993 F.2d at 829. Extraditing Mr. Ottley to Sint Maarten would violate due process and the Court should deny the request.

### III.  Mr. Ottley's "Conviction" Should be Considered an Accusation.

Whether a conviction *in absentia* is considered a conviction or an allegation is an open question. *See Haxhiaj v. Hackman*, 528 F.3d 282, 291 (4th Cir. 2008). This

7

distinction is important because the Court may determine that probable cause exists solely on the existence of a judgment of conviction, but if extradition is sought based on an accusation, the Court must consider other evidence and make a probable cause determination independently. *See Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991).

The Court does not need to delve into this issue, however, because Mr. Ottley was not convicted *in absentia*. He was acquitted at the trial level. Sint Maarten's Court of First Instance found that no crime was committed because Mr. Ottley acted in self-defense. *See* Judgement of The Court of First Instance of Sint Maarten, attached hereto as Exhibit C. While Mr. Ottley was absent, the appellate court reversed, finding that he did not act in self-defense. Mr. Ottley has appealed this finding to the highest court, and the order finding him not guilty may be reinstated. Considering these circumstances, the Court should consider Mr. Ottley's "conviction" as a mere allegation. It should therefore require more evidence than the appellate court's ruling to find probable cause.

## VI. The Government's Request Fails to Establish Probable Cause That Mr. Ottley has Committed Any Extraditable Offense.

Before an extradition request can be granted, the court must determine "whether there is evidence sufficient to sustain the charge under the provisions of

the proper treaty or convention, or, in other words, whether there is probable cause." *Santos v. Thomas*, 830 F.3d 987, 991 (9th Cir. 2016) (*en banc*) (citations omitted). While the overall "extradition process is shared between the executive and judicial branches," the "probable cause determination has been placed squarely in the judiciary's hands." *Santos*, 830 F.3d at 991, 1007. The extradition judge does not "serve merely as a rubber stamp," but must "make an independent determination that the accused committed the crimes alleged." *In re Extradition of Platko*, 2123 F. Supp. 2d 1129, 1239 (S.D. Cal. 2002) (citations omitted).

### A. The Government Bears the Burden of Establishing Probable Cause.

The government bears the burden of offering "evidence that 'will support a reasonable belief that [the extraditee] was guilty of the crime charged.'" *In re Extradition of Okeke*, 1996 WL 622213, *5 (D.N.J. Sept. 5, 1996) (quoting *Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d Cir. 1990)). While "the government's evidence need only be properly authenticated" to be admitted, Courts have cautioned against "conflat[ing] the admissibility standard with the standard required to satisfy probable cause." *Santos*, 830 F.3d at 1006. "Simply because evidence has been authenticated does not mean any evidence the government submits is sufficient to satisfy probable cause. Were that the case, the judiciary's role in the extradition process would be meaningless." *Id.* Instead, the court must "assess whether, based on the evidence,

the person could be brought to trial for the same crime in the United States." *Id.* at 993.

> ### B. The Court May Admit and Consider Explanatory Evidence.

A party seeking to avoid extradition can "present his own evidence to explain away the requesting government's evidence of probable cause," *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005) (*en banc*). Generally, "explanatory" evidence is admissible, but "contradictory" evidence is not. *Santos*, 830 F.3d at 992. Broadly speaking, this means that an extraditee may present "evidence rebutting probable cause," but cannot present "evidence in defense." *Collins v. Loisel*, 259 U.S. 309, 316 (1922).

> ### C. This Court Can Consider The Evidence Relied Upon By The Court of First Instance When Determining That The Government Has Not Established Probable Cause That An Offense Was Committed.

In Mr. Ottley's case, Sint Maarten's Court of First Instance has already determined that no crime was committed. *See,* Exhibit C. The Court of First Instance, as the initial factfinder in this case, heard all competent evidence firsthand and, after careful analysis, determined that Mr. Ottley committed no crime, other than firearms possession, which in not part of the extradition request. As outlined in the Judgement, the Court heard evidence on three separate days over the course

of seven months. *Id* at p.1. After reviewing all the evidence, including witness statements and security camera footage, the Court determined that Mr. Ottley and his co-defendant were not the aggressors in this incident:

> Based on the available camera footage, it can be determined that *Gomez Lopez sought out suspect Ottley,* first inside the nightclub and afterwards on the parking lot of the club. He says things to which Defendant Ottley reacts emotionally. Gomez Lopez is not afraid of, or impressed, by the much more heavily built suspect Ottley…. The camera images also show that *Gomez Lopez made death threats against the suspects:* Gomez Lopez appears to *repeatedly make intimidating shooting movements with his hand in the direction of the suspects.* It is also established that James, who always remained near the suspects and Gomez Lopez and clearly interfered with the conflict, was wearing a bulletproof vest at the time. It cannot be established that he was carrying a weapon at the time, but it cannot be ruled out either. After all, it follows from the images and from James' statements that the visitors of "El Capitan" were not searched upon arrival.

*Id* at pp. 4-5 (emphasis supplied).

The Court further concluded that Mr. Ottley and his co-defendant acted in self-defense and that, therefore, they were not guilty of the crimes as charged (the very same crimes the government now asserts there exists probable cause to show occurred):

> On the basis of all that has been considered above, the Court concludes that the facts and circumstances on which the defendants based their plea of emergency self-defense

(excess) have become plausible. Therefore, that the
defendants were the first to draw a weapon is not
established. *The Court finds that the defendants had to
defend themselves from an immediate unlawful assault by
Gomez Lopez and James.* At the time Gomez Lopez drew
his weapon, the defendants were standing between Gomez
Lopez and the bulletproof vest wearing James, and no
meaningful alternative defense option existed for the
defendants other than to shoot Gomez Lopez. Evading was
not possible…. *The conclusion is that the appeal to self-
defense succeeds and the proven firearms violence is not
punitive.*

*Id* at p. 6 (emphasis supplied).

As set forth above, when making a probable cause determination in this
extradition proceeding, this Court can consider the same "explanatory" evidence that
was considered by the Court of First Instance. While Mr. Ottley acknowledges that
a subsequent appellate court in Sint Maarten reached a different conclusion from the
Court of First Instance (indeed yet another court remains to rule on Mr. Ottley's
appeal and may reach another conclusion), this subsequent decision does not
preclude this Court from making its own independent probable cause determination,
especially since the judgment was issued *in absentia.* Were that to be the case, this
Court's requirement to find probable cause would be merely a ministerial formality,
something which is directly contradicted the Eleventh Circuit caselaw cited by the
government in its brief. Doc. 26 at 9. Therefore, Mr. Ottley respectfully requests
that this Court consider the facts and evidence presented to the Court of First
Instance when making its probable cause determination. Based on a review of this

evidence, Mr. Ottley submits that this Court will reach the same conclusion as the Court of First Instance and determine that the government has not met its burden to establish probable cause that Mr. Ottley committed an extraditable crime.

**WHEREFORE**, for all the foregoing reasons, Mr. Ottley respectfully requests that this Court deny the government's request for extradition.

Dated: This 1st day of March, 2023.

Respectfully Submitted,

*/s/ Mildred Geckler Dunn*
Mildred Geckler Dunn
Georgia Bar No. 323373

*/s/ Michelle McIntyre*
Michelle McIntyre
Georgia Bar No. 164231

Attorneys for Dante Ottley

Federal Defender Program, Inc.
Centennial Tower, Suite 1500
101 Marietta Street, NW
Atlanta, Georgia 30303
404-688-7530
Millie_Dunn@FD.org
Michelle_McIntyre@FD.org



EUROPEAN COURT OF HUMAN RIGHTS
COUR EUROPÉENNE DES DROITS DE L'HOMME

THIRD SECTION

**CASE OF CORALLO v. THE NETHERLANDS**

*(Application no. 29593/17)*

JUDGMENT

STRASBOURG

9 October 2018

*This judgment is final but it may be subject to editorial revision.*



COUNCIL OF EUROPE

CONSEIL DE L'EUROPE

**In the case of Corallo v. the Netherlands,**

The European Court of Human Rights (Third Section), sitting as a Committee composed of:

     Dmitry Dedov, *President,*

     Alena Poláčková,

     Jolien Schukking, *judges,*

and Fatoş Aracı, *Deputy Section Registrar,*

     Having deliberated in private on 18 September 2018,

     Delivers the following judgment, which was adopted on that date:


## PROCEDURE

1. The case originated in an application (no. 29593/17) against the Kingdom of the Netherlands lodged with the Court under Article 34 of the Convention for the Protection of Human Rights and Fundamental Freedoms ("the Convention") by Mr Francesco Corallo, is a Dutch national who was born in Italy in 1960. At the time of lodging the application, he was detained in Sint Maarten in the Caribbean part of the Kingdom of the Netherlands. He is currently staying in Italy.

2. The applicant was represented before the Court by Mrs C. Reijntjes-Wendenburg, a lawyer practising in Maastricht. The Dutch Government ("the Government") were represented by their Deputy Agent, Mrs K. Adhin, from the Ministry of Foreign Affairs.

3. On 20 April 2017 the applicant applied to the Court requesting an interim measure under Rule 39 of the Rules of Court, terminating his detention in the Philipsburg Police Station in Sint Maarten. The Court rejected this request on 24 April 2017.

4. On 24 April 2017 the application was communicated to the Government.

5. On 12 July 2017 the Court rejected a second request by the applicant for an interim measure under Rule 39, terminating his detention in the Philipsburg Police Station.


## THE FACTS

### I. THE CIRCUMSTANCES OF THE CASE

6. On 21 November 2016 the Civil and Criminal Court (*Tribunale Civile e Penale*) of Rome decided to issue a warrant for the applicant's arrest, as he was suspected of tax evasion, money laundering, embezzlement and

membership of a transnational criminal organisation. On 13 December 2016, *via* a "Red Notice" issued through Interpol, the Italian judicial authorities requested the applicant's provisional arrest (*voorlopige aanhouding*) for the purpose of extradition. On the same day the applicant was arrested in Sint Maarten, brought before the Procurator General (*procureur-generaal*) and detained in Philipsburg Police Station.

7. On 15 December 2016 the applicant was brought before the investigating judge (*rechter-commissaris*), who found the continuance of the applicant's provisional arrest lawful.

8. In the days following his arrest the applicant was visited several times by a doctor, who found that the applicant had received treatment for a malignancy on his tongue in 2015, and that this should be monitored regularly. In addition, the applicant's blood pressure was too high. He was prescribed medication, and after a few days the applicant's blood pressure had sufficiently decreased. According to a letter from the doctor to the public prosecutor, dated 23 December 2016, the applicant was in good health, was not experiencing any exacerbations of past ailments at that time, and his blood pressure was responding well to medical treatment. The doctor concluded that there were no medical impediments to the applicant's detention.

9. On 19 December 2016 the applicant lodged an application with the Joint Court of Justice of Aruba, Curaçao, Sint Maarten and of Bonaire, Sint Eustatius and Saba (*Gemeenschappelijk Hof van Justitie van Aruba, Curaçao, Sint Maarten en van Bonaire, Sint Eustatius en Saba*, hereinafter "the Joint Court"), requesting the suspension of his detention. The applicant argued under Article 5 § 1(f) of the Convention that deprivation of liberty should be the *ultimum remedium*, in that a person should only be deprived of his liberty when this was strictly necessary and the aim pursued could not be achieved in a less restrictive manner. In his opinion, his fragile state of health and considerable business interests in Sint Maarten opposed (a continuation of) his detention. The Procurator General opposed suspension of the applicant's detention, arguing that there was a high risk of absconding, given that the applicant was a wealthy businessman in whose home two identity cards from Columbia and the Dominican Republic had been found during a search, and that he had use of a private jet in the United States of America. Against this background, only deprivation of liberty could prevent the applicant from finding ways to evade extradition.

10. On 20 December 2016 the Sint Maarten prosecution authorities apparently decided to transfer the applicant from Sint Maarten to Curaçao, another country within the Kingdom of the Netherlands. The applicant filed an appeal against that decision with the Joint Court.

11. On 4 January 2017 the Joint Court rejected the applicant's request for suspension of his detention. It found that, under Article 5 § 4 of the Convention, it was competent to examine the lawfulness of the applicant's

detention. It noted that the applicant had not established that he was unable to receive adequate medical care in detention or that his business interests were at risk. It further took into account that the Italian authorities had not yet filed a formal extradition request, whereas the forty-day time-limit for doing so under Article 16 § 4 of the European Convention on Extradition had not yet expired. The Joint Court, taking all interests at stake into consideration – including the Procurator General's substantiated claim that there was a high risk of absconding – decided to reject the applicant's request for suspension of his detention. No further appeal lay against that decision.

12. On 12 January 2017 the formal request for the applicant's extradition to Italy, dated 30 December 2016, was received by the Minister Plenipotentiary of Sint Maarten (*Gevolmachtigd Minister van Sint Maarten*).

13. On 3 February 2017 the Procurator General filed a request for the applicant's extradition with the Joint Court. A hearing was initially fixed for 21 March 2017 but, at the applicant's request, was rescheduled for 16 May 2017.

14. On 7 February 2017 the applicant filed a fresh application with the Joint Court, requesting that his detention be either terminated or suspended. He argued, *inter alia*, that the prospects of his extradition being found permissible were at best highly doubtful, in the absence of guarantees by the Italian authorities that he would be allowed to serve a possible prison sentence in Sint Maarten or elsewhere in the Kingdom of the Netherlands and that a sentence imposed in Italy would be converted into a penal sanction prescribed by Dutch law for the same offence. He further argued that his serious health condition – considered in the light of the inadequate medical care and hygiene in the detention centres of Sint Maarten, as found by the Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT) in various reports – and his considerable business interests necessitated suspension of his detention pending extradition. He lastly argued that the police cells in which he had been held since 13 December 2016 were neither intended nor suitable for longer periods of detention.

15. On 22 February 2017 the Joint Court accepted the applicant's appeal against the decision of 20 December 2016 to transfer him to Curaçao. It found that the Procurator General of Sint Maarten was not competent under the applicable statutory provisions to have free use of the detention facilities in other countries within the Kingdom. It therefore quashed the decision of 20 December 2016 and prohibited the Sint Maarten Public Prosecution Department or the Procurator General from transferring the applicant from his place of detention in Sint Maarten to another place of detention in another country within the Kingdom.

16. On 8 March 2017 the Joint Court rejected the applicant's request of 7 February 2017. As regards the permissibility of the extradition request, it considered that it could not act in anticipation of the actual extradition procedure. The question before it at that time concerned the lawfulness of the detention pending extradition. On this point, it found that all formalities for the applicant's detention pending extradition had been satisfied. It noted that the Procurator General was opposed to terminating or suspending the detention, arguing that there was still a high risk of absconding. It further noted that the personal situation of the applicant relating to his medical situation and business interests – the grounds he relied on in his request – had already been taken into account in its decision of 4 January 2017, and it did not appear that, two months later, there were facts or circumstances which should lead to another conclusion. Lastly, the Joint Court saw no reason to grant the applicant bail.

17. On 13 March 2017 the applicant was visited by a dentist, who diagnosed a gum/periodontal infection around a tooth which had to be extracted. In addition, the dentist prescribed antibiotics and a disinfectant for irritated gums. The dentist recommended that the applicant be provided with vitamin B and iron to cope with vitamin and mineral deficiencies. He further recommended that the applicant be seen by a dentist every three to four months to avoid similar infections. On 3 April 2017 the dentist reported that the infection had subsided but the build-up of plaque was already visible again, and this was probably due to the lack of possibilities for adequate oral hygiene.

18. Meanwhile, on 21 March 2017 the applicant had lodged a new petition with the Joint Court, requesting either termination or suspension of his detention, or a transfer to the sickbay at Point Blanche Prison in Sint Maarten. Relying on a CPT report of 25 August 2015 (see paragraph 29 below) and the Court's considerations in the case of *Muršić v. Croatia* ([GC], no. 7334/13, §§ 138-41, ECHR 2016), the applicant argued that there was at least a strong presumption that the conditions of his detention should be regarded as contrary to Article 3 of the Convention. On this point, he submitted that for three months he had been staying in a cell measuring 16 square metres which he often had to share with five or sometimes even six other persons. Furthermore, the cells were dark and unhygienic and there was a foul smell. He further submitted that the unhygienic circumstances had caused the infection diagnosed by the dentist on 13 March 2017.

19. On 12 April 2017 the Joint Court rejected the applicant's request of 21 March 2017. It noted that the Procurator General opposed the request, submitting that it was a fact of common knowledge that the prison infrastructure of Sint Maarten offered room for improvement, but that this was the responsibility of the Minister of Justice of Sint Maarten. The applicant could be transferred to Curaçao, where the conditions of detention were better, but the applicant had opposed such a transfer. If he consented to

a transfer, he could find himself a spacious single-occupancy cell in Curaçao within a matter of days. The Joint Court further noted that on two previous occasions it had considered and rejected requests filed by the applicant to suspend or terminate his detention, and it found no substantial change of (personal) circumstances warranting a different finding as regards the applicant's deprivation of liberty. In this respect the Joint Court took into account that during the hearing on 4 April 2017, on which his request was examined, it was confirmed that the applicant by that time was no longer detained in a multi-occupancy cell, but in a single-occupancy cell, that he daily received vitamins and that, if he wished so, he could see a doctor or dentist. It also took into account that, in reply to an explicit question it had put to him about a possible voluntary transfer to Curaçao, the applicant had indicated that this was not an option for him. Lastly, it found no medical reason for the applicant to be transferred to the sickbay of Point Blanche Prison.

20. On 20 April 2017 the applicant was visited by his general practitioner, who, in a written statement dated 23 April 2017, expressed surprise at the fact that the applicant had only been seen by a doctor once whilst in detention. The general practitioner found that the applicant's blood pressure was too high. In addition, he found that the scar caused by the surgical removal of the malignancy on the applicant's tongue could give cause for concern, and recommended that the applicant be seen by a specialist as soon as possible.

21. On 20 June 2017, following a hearing held on 16 May 2017, the Joint Court declared the applicant's extradition permissible on the basis of the facts as set out in the decision of 21 November 2016 of the Civil and Criminal Court of Rome, facts which also constituted criminal offences under the laws of Sint Maarten. Having found that the extradition request complied with the applicable formal and material requirements, the Joint Court advised the Governor (*Gouverneur*) of Sint Maarten to proceed with the applicant's extradition to Italy. The applicant filed an appeal in cassation with the Supreme Court (*Hoge Raad*).

22. On 23 June 2017 the Joint Court rejected a fourth request by the applicant for suspension of his detention pending extradition. The applicant had filed that request during the hearing of 16 May 2017, arguing, *inter alia*, that his detention was not or was no longer compatible with his rights under Article 3, Article 5 and Article 6 § 2 of the Convention because of the deplorable conditions and duration of his detention, and the lack of justification for his detention. The Joint Court noted, amongst other things, that the applicant was a very wealthy man who had travelled extensively in the past and who apparently had close ties with the Dominican Republic, from where extradition would not be possible. It further noted that the applicant had been detained at Philipsburg Police Station since his arrest because, being a wealthy man, he could not be held in the remand centre of

Point Blanche Prison for safety reasons, which, in the circumstances, justified his detention at the Philipsburg Police Station. In respect of the duration of his detention at that facility, the Joint Court noted that, although on legal grounds it had prohibited the Sint Maarten Prosecution Department from transferring the applicant – who had fiercely opposed such a transfer – to a place of detention in another country within the Kingdom of the Netherlands, it remained open to the applicant to consent voluntarily to such a transfer. It further held that, despite the critical submissions of the defence about the applicant's conditions of detention, and taking all circumstances of the case at hand into account, the detention situation was not unlawful.

23.  On 4 August 2017, after the applicant had withdrawn his appeal in cassation on 21 July 2017 without indicating any specific reason, the Governor of Sint Maarten approved the applicant's extradition. On 16 August 2017 the applicant was extradited to Italy.

## II.  RELEVANT DOMESTIC LAW AND PRACTICE

### A.  Constitutional background

24.  Until 10 October 2010 the Kingdom of the Netherlands consisted of three countries, namely the Netherlands, Aruba and the Netherlands Antilles. The Netherlands Antilles consisted of the islands Bonaire, Curaçao, Sint Maarten, Sint Eustatius and Saba. Between 2000 and 2005 referenda were held on all the islands of the then Netherlands Antilles on the status of each island within the Kingdom. Except for Sint Eustatius, all the islands voted for the dissolution of the Netherlands Antilles. The islands reached a final agreement on a new constitutional order within the Kingdom of the Netherlands on 15 December 2008. The Netherlands Antilles ceased to exist when the amended Charter for the Kingdom of the Netherlands (*Statuut voor het Koninkrijk der Nederlanden*) entered into force on 10 October 2010.

25.  In the new constitutional structure, in accordance with the outcome of the referenda, Curaçao and Sint Maarten acquired the status of countries within the Kingdom, making them full, autonomous partners within the Kingdom and responsible for their own national government and legislation. Aruba retained the separate country status it had already had since 1986. Bonaire, St Eustatius and Saba (also collectively referred to as "the BES Islands") have become a special municipality (*openbaar lichaam*) of the Netherlands.

### B.  Relevant domestic law of Sint Maarten

26.  Article 3 of the Constitution (*Staatsregeling*) of Sint Maarten reads:

"No person shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."

27.  Article 27 of the Constitution of Sint Maarten, in so far as relevant, provides as follows:

"1.  All persons have the right to personal liberty. No person may be deprived of his liberty other than under rules to be imposed by a legal regulation as referred to in Article 81(f) and 81(g), in the event of: ...

g. lawful arrest or detention of persons against whom action is being taken with a view to deportation or extradition. ...

3.  Everyone who is deprived of his liberty shall be entitled:

a. to take proceedings by which the lawfulness of his detention shall be decided speedily by a court and his release ordered if the detention is not lawful; ..."

28.  Article 30 of the Constitution of Sint Maarten reads in its relevant part, as follows:

"1. All persons who are deprived of their freedom shall be treated humanely and with respect for the dignity inherent to the human person.

2. Barring exceptional circumstances, suspects shall be kept separate from convicted offenders and may claim separate treatment in accordance with their status as a non-convicted person. ..."

## III.  RELEVANT INTERNATIONAL MATERIAL

29.  Relevant extracts of the report of the CPT on its visit to the Caribbean part of the Kingdom of the Netherlands from 12 to 22 May 2014 (CPT/Inf (2015) read as follows:

"SINT MAARTEN ...

229.  Access to a doctor is not a right provided for in the CCP (Code of Criminal Procedure in force on Sint Maarten) and the Police Code of Conduct (Article 17) only places a duty on police officers to consult with a doctor if necessary. Nevertheless, in practice, persons detained at Philipsburg Police Station could request access to a doctor or a nurse who were on call 24 hours a day. Further, it appeared that the nurse visiting sentenced prisoners every day could also examine police detainees. However, there was no screening of detained persons and requests to see a doctor were not always followed up promptly. For example, the delegation met an elderly man who appeared to have suffered a broken finger at the time of his arrest some 10 days prior to the delegation's visit and who had still not been seen by a doctor or a nurse.

The CPT recommends that persons deprived of their liberty by the police be expressly guaranteed the right of access to a doctor from the very outset of deprivation of liberty. ... Further, all persons remanded at Philipsburg Police Station should undergo a proper medical assessment for as long as it is used as a remand facility.

4.  Philipsburg Police Station

230.  Since the 2002 visit, a new police detention facility has been constructed at the back of the Police Station. The facility consists of 12 cells with an official capacity of 26 places.

At the time of the visit, the detention facility was under the operational responsibility of Point Blanche Prison, staffed by four prison officers during the day (7 a.m. to 7 p.m.) and three prison officers at night. All persons held by the police for more than a few hours would be transferred to this facility. However, the facility was also being used to hold remand and sentenced prisoners due to the overcrowding and on-going renovations at Point Blanche Prison. When the delegation visited the facility, it was holding seven persons considered to be under police custody (i.e. who had been detained for less than 10 days since their apprehension), three juveniles and 16 prisoners. Numbers often exceeded the official capacity; for example, there had been 31 persons held the night prior to the delegation's visit.

231.  The conditions of detention were extremely poor. The cell area was dark and dank; cells had little access to natural light and the artificial lighting in the corridors was insufficient for reading purposes; there was inadequate ventilation and many of the sanitary annexes in the cells emitted a foul smell. In several cells, there was leakage from the sanitary annexes, which were not fully partitioned from the rest of the cell. In the larger cells (16 m²) there were two sets of bunk beds for four persons but it was quite usual for an additional two or three persons to be kept overnight in these cells, sleeping on a mattress on the floor. Many of the mattresses were dirty and worn, or consisted of broken pieces of foam held together by a sheet. Moreover, during the first 10 days of detention (the period considered as police custody) staff confirmed that detained persons were not provided with sheets, a pillow or a towel. A number of persons displayed rashes all over their bodies. There were also no call bells in the cells which meant that detained persons had to shout repeatedly to attract the attention of staff, often resulting in terse exchanges.

The situation was exacerbated by the fact that there was no regime in place. Sentenced inmates were offered two periods of up to one hour each in a courtyard and those in police custody up to one hour. There were no other activities and no access to television or radio.

Some people had been held in these conditions for several months.

The CPT recommends that urgent steps be taken to improve the conditions of detention at Philipsburg Police Station, in particular:

• all detained persons should be provided with at least 4 m² of living space per person in multi-occupancy cells;

• all detained persons should be provided with their own bed;

• all detained persons should be provided with a sheet, pillow and towel from the moment they are accommodated in this facility, as well as with hygiene products and cleaning materials for the cell;

• ventilation and access to natural light should be improved;

• all sanitary annexes should be partitioned up to the ceiling and leaking toilets and pipes repaired;

• all cells should be equipped with a call bell.

Moreover, the CPT recommends that persons should not be detained at Philipsburg Police Station in excess of three days and in any event never longer than 10 days. The facility is totally inappropriate for holding remand and sentenced prisoners, and the CPT recommends that they be moved to alternative accommodation as soon as possible."

30. On 25 August 2015 the CPT published the response of the Netherlands Government to its findings. In respect of the recommendations concerning the right of access to a doctor, the Government stated:

> "The Minister of Justice will bring the above recommendations to the attention of the St Maarten Police Force. Under the terms of article 3 of the Constitution of St Maarten, no one may be subjected to torture or to cruel, inhuman or degrading treatment or punishment. Article 30 of the Constitution states that all persons who have been deprived of their liberty must be treated humanely and with respect for the inherent dignity of the human person. Articles 41 and 48 of the code of conduct for the St Maarten Police Force state that the Minister of Justice shall take steps to ensure that a person taken into custody has access in any case to essential medical care and that police officers must consult a doctor if the person in custody asks for medical assistance or if there are any indications that the person requires such assistance. Finally, police officers are obliged to notify a doctor specified by the person in custody at the latter's request. The officer may not impose any restrictions on the doctor in relation to the medical examination or treatment.
>
> It should be added that on the basis of article 10 of the Prison Rules, detainees are entitled to be treated by a qualified doctor or dentist of their own choice, at their own expense, if they so request. It is a basic principle in this regard that no police officer will be present during any medical examination of a detainee, provided this is not prejudicial to the security situation."

31. As regards the recommendations in respect of the conditions of detention in Philipsburg Police Station, the response reads:

> "In spite of the limited capacity and financial resources, the government will attempt to comply with these recommendations in the short term. To achieve this, the detention facility at the Police Station will need to be renovated and equipped with the necessary additions. In view of current financial constraints, it is not possible to indicate a concrete timeframe for these improvements."

# THE LAW

## I. ALLEGED VIOLATION OF ARTICLE 3 OF THE CONVENTION

32. The applicant complained that the conditions of his detention at Philipsburg Police Station had amounted to treatment proscribed by Article 3 of the Convention, which reads as follows:

> "No one shall be subjected to torture or to inhuman or degrading treatment or punishment."

33. The Government contested that argument.

## A. Admissibility

34. The Court notes that this complaint is not manifestly ill-founded within the meaning of Article 35 § 3 (a) of the Convention. It further notes that it is not inadmissible on any other grounds. It must therefore be declared admissible.

## B. Merits

35. The applicant submitted *inter alia* that he had been detained in a multi-occupancy cell of 16 square metres from 13 December 2016 until 29 March 2017, and from 4 to 12 April 2017. During those periods he had shared this cell with 5 to 6 persons. For the other parts of his detention period in Sint Maarten he had been held in a single-occupancy cell of 12 square metres. The toilet in the multi-occupancy cell had leaked and had not been covered. Detainees had partitioned off the sanitary area with towels and sheets. The multi-occupancy cell had been equipped with two sets of bunk beds for four detainees. It was the rule rather than the exception that one or two additional detainees were held in the cell, who during the night would sleep on mattresses on the floor. As regards the single-occupancy cell, the applicant submitted that the cell was not even furnished with basic equipment, such as a cupboard, table and chair. He further submitted that there had been no structure to the detainees' days, that medical care had been insufficient, and that he had been kept locked in his cell for twenty-three hours a day. He also pointed out that the building structure of the cells had not provided for direct access to natural light or ventilation.

36. The Government submitted that, following the publication of the CPT report on its visit in May 2014, improvements had been made to the detention facilities of Philipsburg Police Station, taking into account the recommendations formulated by the CPT. As regards the applicant's situation, the Government submitted that the he had been individually detained in a cell of almost 12 square meters, that he had been provided with sheet, towel and that he had purchased a pillow *via* the inmate canteen programme, that he had been provided with hygiene products and that there were no leakages. According to the Government, this meant that of the CPT's recommendations only the requirement of a call bell had not been fulfilled. As regards the conditions prior to this situation, when the applicant had been detained in the multi-occupancy cell, the Government submitted that it was unable to comment for lack of detailed information. The Government admitted that the circumstances under which the applicant had been detained in Sint Maarten had not been ideal, but submitted that the conditions in which he had been held pending his extradition to Italy had not been of such a nature that he should be regarded as having been subjected to treatment prohibited by Article 3 of the Convention.

37.  The Court notes that the applicant has been kept in detention in poor conditions and that his description of these conditions has not been disputed by the Government. The Court has further noted the findings of the CPT in respect of the detention facility where the applicant has been held pending the extradition proceedings and the Government's response to these findings (see paragraphs 30-31 above).

38.  The Court refers to the principles established in its case law regarding inadequate conditions of detention (see, for instance, *Muršić v. Croatia* [GC], no. 7334/13, §§ 96-101, ECHR 2016, and *Khlaifia and Others v. Italy* [GC], no. 16483/12, §§ 163-67, ECHR 2016 (extracts)). It reiterates in particular that a serious lack of space in a prison cell weighs heavily as a factor to be taken into account for the purpose of establishing whether the detention conditions described are "degrading" from the point of view of Article 3 and may disclose a violation, both alone or taken together with other shortcomings (see *Muršić*, cited above, §§ 122 and 141, and *Ananyev and Others v. Russia*, nos. 42525/07 and 60800/08, § 149, 10 January 2012).

39.  The Court has examined all the material submitted to it and noted, in particular, that the applicant has been detained for more than eight months – of which 114 days in a multi-occupancy cell – in a detention facility of which the CPT considered that persons should not be detained there for more than three days and in any event never longer than ten days as the facility at issue is totally inappropriate for holding remand prisoners (see paragraph 29 above). Although the Government submitted that the recommendations of the CPT had been fulfilled to a large extent and that the detention conditions in the Philipsburg Police Station had been improved, it was unable to specify this statement in respect of the applicant's claim relating to the multi-occupancy cell, for lack of detailed information (see paragraph 36 above). In these circumstances that Court considers that there has been a breach of Article 3 of the Convention.

## II. ALLEGED VIOLATION OF ARTICLE 5 AND ARTICLE 6 § 2 OF THE CONVENTION

40.  The applicant further complained under Article 5 and Article 6 § 2 of the Convention that the Joint Court had failed to conduct an adequate examination of the possibility of suspending his detention. In its relevant part, Article 5 provides:

"1. Everyone has the right to liberty and security of person. No one shall be deprived of his liberty save in the following cases and in accordance with a procedure prescribed by law: ...

... (f) the lawful arrest or detention of a person to prevent his effecting an unauthorised entry into the country or of a person against whom action is being taken with a view to deportation or extradition. ...

> ... 4. Everyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings by which the lawfulness of his detention shall be decided speedily by a court and his release ordered if the detention is not lawful ..."

41. The Court reiterates at the outset the fundamental importance of the guarantees contained in Article 5 for securing the right of individuals in a democracy to be free from arbitrary detention at the hands of the authorities. It is for that reason that the Court has repeatedly stressed in its case-law that any deprivation of liberty must not only have been effected in conformity with the substantive and procedural rules of national law, but must equally be in keeping with the very purpose of Article 5, namely to protect the individual from arbitrariness (see *Chahal v. the United Kingdom*, 15 November 1996, § 118, *Reports of Judgments and Decisions* 1996‑V). However, Article 5 § 1 (f) does not demand that detention be reasonably considered necessary, for example, to prevent the individual from committing an offence or fleeing. It is therefore immaterial whether the underlying decision to expel can be justified under national or Convention law (see *Chahal*, cited above, § 112; *Slivenko v. Latvia* [GC], no. 48321/99, § 146, ECHR 2003‑X; *Sadaykov v. Bulgaria*, no. 75157/01, § 21, 22 May 2008; and *Raza v. Bulgaria*, no. 31465/08, § 72, 11 February 2010). However, any deprivation of liberty under the second limb of Article 5 § 1 (f) will be justified only for as long as deportation or extradition proceedings are in progress. If such proceedings are not prosecuted with due diligence, the detention will cease to be permissible under that provision. In other words, the length of the detention for this purpose should not exceed what is reasonably required (see, *Chahal*, cited above, § 113; *A. and Others v. the United Kingdom* [GC], no. 3455/05, §§ 164, 19 February 2009; *Mikolenko v. Estonia*, no. 10664/05, § 63, 8 October 2009; and *Raza*, cited above, § 72).

42. In the present case, the applicant was detained for extradition purposes between 13 December 2016 and 16 August 2017, for a total period of eight months and three days. After having received a formal request for extradition from the Italian authorities, the Prosecutor General filed a request for the applicant's extradition on 3 February 2017 with the Joint Court. A hearing on the permissibility of his extradition was initially scheduled for 21 March 2017, but, at the applicant's request, was rescheduled for 16 May 2017 (see paragraph 13 above). On 20 June 2017, the Joint Court declared the applicant's extradition permissible. The applicant filed an appeal in cassation with the Supreme Court, which he withdrew on 21 July 2017. On 4 August 2017 the Governor of Sint Maarten approved the applicant's extradition and on 16 August 2017 he was extradited (see paragraphs 21 and 23 above).

43. Taking into account these circumstances, the Court has found no evidence indicating any arbitrariness in respect of the applicant's detention pending extradition, or, more particularly, bad faith, deception or unjustified

delays in respect of the authorities' conduct (see, *a contrario*, *Bozano v. France*, 18 December 1986, § 60, Series A no. 111, and *Čonka v. Belgium*, no. 51564/99, § 41, ECHR 2002‑I).

44. Further noting the reasoned decisions by the Joint Court on the applicant's requests for suspension or termination of his detention from which it transpires that the applicant's personal circumstances as well as the Prosecutor General's substantiated claim that there was a high risk of absconding were taken into account and balanced (see paragraphs 11, 16, 19 and 22 above), the initiative taken by the Sint Maarten prosecution authorities to transfer the applicant to Curacao, and the expeditiousness of the extradition proceedings, the Court is of the opinion that the facts of the case do not disclose any appearance of a violation of his rights under Article 5 of the Convention.

45. It follows that this part of the application must be rejected, in accordance with Article 35 §§ 3 and 4 of the Convention.

46. In so far as the applicant alleges a violation of Article 6 § 2 of the Convention, which guarantees the right to the presumption of innocence, the Court reiterates that this right is one of the elements of a fair criminal trial guaranteed by Article 6 § 1 (see *Allenet de Ribemont v. France*, 10 February 1995, § 35, Series A no. 308, and *Natsvlishvili and Togonidze v. Georgia*, no. 9043/05, § 103, ECHR 2014 (extracts)). The Court further reiterates that the words "determination ... of a criminal charge" in Article 6 § 1 of the Convention relate to the full process of examining an individual's guilt or innocence in respect of a criminal offence, and not merely, as is the case in extradition proceedings, to the process of determining whether or not a person may be extradited to a foreign country (see, for instance, *Raf v. Spain* (partial dec.), no. 53652/00, ECHR 2000-XI).

47. Having considered the applicant's submissions under Article 6 § 2 in the light of all the material in its possession, the Court finds that, in so far as the matters complained of are within its competence, they do not disclose any appearance of a violation of this provision.

48. It follows that this part of the application must also be rejected in accordance with Article 35 §§ 3 and 4 of the Convention.

## III. APPLICATION OF ARTICLE 41 OF THE CONVENTION

49. Article 41 of the Convention provides:

> "If the Court finds that there has been a violation of the Convention or the Protocols thereto, and if the internal law of the High Contracting Party concerned allows only partial reparation to be made, the Court shall, if necessary, afford just satisfaction to the injured party."

## A.  Damage

50.  The applicant claimed 10,000 euros (EUR) in respect of non-pecuniary damage.

51.  The Government disputed that claim.

52.  Having regard to the specific circumstances of the case and in particular that it is undisputed that it was possible for the applicant to seek a voluntary transfer to another detention facility within the Kingdom of the Netherlands whereas his refusal to do so has remained unexplained by him, the Court, ruling on an equitable basis, awards EUR 5,000 euros for the non-pecuniary damage sustained by the applicant.

## B.  Costs and expenses

53.  The applicant also claimed EUR 9,449.11 for the costs and expenses incurred before the Court, including EUR 2,520 for two successive requests for an interim measure under Rule 39 of the Rules of Court.

54.  The Government disputed that claim, submitting that the costs concerning the two requests for an interim measure, both rejected by the Court, should not be taken into account..

55.  According to the Court's case-law, an applicant is entitled to the reimbursement of costs and expenses only in so far as it has been shown that these have been actually and necessarily incurred and are reasonable as to quantum. In the present case, regard being had to the above criteria and bearing in mind that the two successive Rule 39 requests have been rejected and that the applicant's complaints under Article 5 and Article 6 § 2 have been declared inadmissible, the Court awards, making its own assessment on an equitable basis and on the information contained in the case file, the applicant EUR 5,500 for his costs and expenses, plus any tax that may be chargeable.

## C.  Default interest

56.  The Court considers it appropriate that the default interest rate should be based on the marginal lending rate of the European Central Bank, to which should be added three percentage points.

## FOR THESE REASONS, THE COURT, UNANIMOUSLY,

1. *Declares* the complaint under Article 3 of the Convention concerning the conditions of the applicant's detention at Philipsburg Police Station admissible and the remainder of the application inadmissible;

2.  *Holds* that there has been a violation of Article 3 of the Convention;

3.  *Holds*

   (a)  that the respondent State is to pay the applicant, within three months the following amounts:

      (i)  EUR 5,000 (five thousand euros), plus any tax that may be chargeable, in respect of non-pecuniary damage;

      (ii)  EUR 5,500 (five thousand and five hundred euros), plus any tax that may be chargeable to the applicant, in respect of costs and expenses;

   (b)  that from the expiry of the above-mentioned three months until settlement simple interest shall be payable on the above amount at a rate equal to the marginal lending rate of the European Central Bank during the default period plus three percentage points;

4.  *Dismisses* the remainder of the applicant's claim for just satisfaction.

Done in English, and notified in writing on 9 October 2018, pursuant to Rule 77 §§ 2 and 3 of the Rules of Court.

Fatoş Aracı                                  Dmitry Dedov
Deputy Registrar                            President



EUROPEAN COURT OF HUMAN RIGHTS
COUR EUROPÉENNE DES DROITS DE L'HOMME

## FOURTH SECTION

## DECISION

Application no. 63169/19
Olises Dion GEORGE against the Netherlands
and 2 other applications
(see appended table)

The European Court of Human Rights (Fourth Section), sitting on 25 March 2021 as a Committee composed of:
> Armen Harutyunyan, *President,*
> Jolien Schukking,
> Ana Maria Guerra Martins, *judges,*
and Viktoriya Maradudina, *Acting Deputy Section Registrar,*

Having regard to the above applications lodged on the various dates indicated in the appended table,

Having regard to the formal declarations accepting a friendly settlement of the cases,

Having deliberated, decides as follows:

## FACTS AND PROCEDURE

The list of applicants is set out in the appended table.

The applicants were represented by Ms C. Reijntjes-Wendenburg, a lawyer practising in Valkenswaard.

The applicants' complaints under Article 3 of the Convention concerning poor conditions of their detention in the Police Complex of Philipsburg in Sint Maarten were communicated to the Dutch Government ("the Government").

The Court received the friendly-settlement declarations, signed by the parties, under which the applicants agreed to waive any further claims against the Netherlands in respect of the facts giving rise to these applications, subject to an undertaking by the Government to pay them the amounts detailed in the appended table. The amounts awarded in respect of costs and expenses incurred in the proceedings at the domestic level (as indicated in the table attached below) will be converted into United States



COUNCIL OF EUROPE
CONSEIL DE L'EUROPE

GEORGE v. THE NETHERLANDS AND OTHER APPLICATIONS DECISION

dollars at the rate applicable on the date of payment. All amounts indicated in the appended table will be payable to the respective applicants within three months from the date of notification of the Court's decision.

In the event of failure to pay the amounts set out in the declarations within the above-mentioned three-month period, the Government undertake to pay simple interest on them, from the expiry of that period until settlement, at a rate equal to the marginal lending rate of the European Central Bank during the default period plus three percentage points.

The payment will constitute the final resolution of the cases.

## THE LAW

Having regard to the similar subject matter of the applications, the Court finds it appropriate to examine them jointly in a single decision.

The Court takes note of the friendly settlements reached between the parties. It is satisfied that the settlements are based on respect for human rights as defined in the Convention and the Protocols thereto and finds no reasons to justify a continued examination of the applications.

In view of the above, it is appropriate to strike the cases out of the list.

For these reasons, the Court, unanimously,

*Decides* to join the applications;

*Decides* to strike the applications out of its list of cases in accordance with Article 39 of the Convention.

Done in English and notified in writing on 15 April 2021.

[signature_p_2]

Viktoriya Maradudina  
Acting Deputy Registrar

Armen Harutyunyan  
President

2

GEORGE v. THE NETHERLANDS AND OTHER APPLICATIONS DECISION

# APPENDIX

## List of applications raising complaints under Article 3 of the Convention

## (inadequate conditions of detention)

| No. | Application no. Date of introduction | Applicant's name Year of birth | Representative's name and location | Date of receipt of Government's declaration | Date of receipt of Applicant's declaration | Amount awarded for non-pecuniary damage per applicant (in euros)[1] | Amount awarded for costs and expenses per application (domestic proceedings) (in euros) to be converted to US dollars [2] | Amount awarded for costs and expenses per application (Strasbourg proceedings) (in euros) [3] |
|---|---|---|---|---|---|---|---|---|
| 1. | 63169/19 09/12/2019 | **Olises Dion GEORGE** 1990 | Reijntjes-Wendenburg Claudia Valkenswaard | 23/02/2021 | 25/02/2021 | 1,300 | 581 | 2,550 |
| 2. | 64133/19 16/12/2019 | **Clive Veron REYMOND** 1983 | Reijntjes-Wendenburg Claudia Valkenswaard | 23/02/2021 | 25/02/2021 | 3,300 | 1,246 | 1,300 |
| 3. | 7320/20 05/02/2020 | **Arnold Nico JOHN** 1983 | Reijntjes-Wendenburg Claudia Valkenswaard | 23/02/2021 | 25/02/2021 | 1,800 | 510 | 2,012.50 |

---

[1] Plus any tax that may be chargeable to the applicants.
[2] Plus any tax that may be chargeable to the applicants.
[3] Plus any tax that may be chargeable to the applicants.

## JUDGMENT

**THE COURT OF FIRST INSTANCE OF SINT MAARTEN**

Case numbers:          100.00003/19 AND  100.00004/19

Pronounced on:         March 11th, 2020

Contradiction

**Verdict of this Court**

in the criminal case against the suspects:

Dante Jevon Ericson OTTLEY
Born on April 19th, 1994 on Sint Maarten
Residing at Sucker Garden Road # 179
Presently detained


And

Stevevanus RICHARDSON
Bon on March 26th, 1999 on Sint Maarten
Residing at Lime Road # 18
Presently detained


**What this case is about**

In an early morning shooting incident of December 31st, 2018, two visitors to the nightclub "El Capitan" are seriously injured; one of them succumbs to his injuries the same day. Images from surveillance cameras show the run-up to the incident and the incident itself. After a few days, two suspects reported to the police. They admit to having shot the victims with firearms, but say they acted in self-defense.

**Investigation of the case.**

*The court investigation*
The hearing took place on August 14, 2019, on December 11th, 2019 and on February 26th, 2020. The suspects appeared each time, assisted by E. Sulvaran, LLM - lawyer on Curacao, S. Bommel, LLM and S. Rosenburg, LLM, lawyers on Sint Maarten (the latter was not present on the last day of the hearing).

*The Prosecutor's Claim*
Prosecutor E. Ahbata, LLM, requested at the hearing that the Court declares manslaughter, attempted manslaughter and prohibited firearms possession proven and sentences both defendants to 22 years in prison.



2

Case number: 100.00003/19 and 100.00004/19

*The position of the defense*
The defense has argued for an acquittal or dismissal from all prosecutions for the firearms violence, but has not defended against the suspicion of illegal possession of weapons.


**The indictment**
the suspects have been charged with what is stated in the summons. The text of the indictment is attached to this judgment as Annex I.


Formal preliminary questions
It is the opinion of the Court that the writ of summons is valid, that it has jurisdiction to hear the case, that the prosecution is admissible in its prosecution and that there are no grounds for suspension of the proceedings.


Valuation of the evidence
A compilation of images captured by surveillance cameras was shown at the hearing. It shows, among other things, that one of the suspects has an altercation with the victim Gomez Lopez. That altercation spirals out of control and then the suspects open fire on the victims Gomez Lopez and James.

Gomez Lopez died of his injuries in hospital shortly after the incident. James was hit in the arm and legs by multiple bullets and suffered potentially fatal injuries.

The defendants stated at the hearing on February 26th, 2020, that they recognized themselves in the images shown in Court, that they were armed with small arms on the day of the incident and that Ottley, with his revolver and Richardson, with his Glock, fired bullets at the victims Gomez Lopez and James.

On the basis of the legal evidence summarized above and included in Annex II, containing facts and circumstances that give grounds for the conviction, it has been legally and convincingly proven that each of the suspects has committed the charges in such a way that:

1.      on ~~or about~~ December 31st, 2018 on Sint Maarten, he, together and in association with another, ~~at least alone~~, intentionally ~~and with or without premeditation~~, robbed a person named M.M. Gomez Lopez of his life; after all, the suspect and/~~or~~ his co-perpetrator with that intention ~~and whether or not with calm deliberation and quiet consultation, at least after a (short) pre-decided decision~~, shot several times,



Case number: 100.00003/19 and 100.00004/19

at least once with the help of one or more firearm(s) one or more bullet(s) into and/or through the body of said Gomez Lopez, as a result of which said Gomez Lopez died.

2. that on or about December 31, 2018 on Sint Maarten, he, together and in association with another person, at least alone, in execution of the intended crime to deliberately, with or without premeditation, rob a person named W.E. James of his life, with that intent, and whether or not after calm deliberation and deliberation, at least after a decision made (shortly) beforehand, several times, at least once, with the aid of one or more a firearm(s), have/has shot one or more bullets in and/or through the leg, or at least through the body of said James and/or shot several times in the direction of said James, while the intended crime was not completed.

3. that on or about December 31, 2018 in Sint Maarten, together and in association with another, at least alone, he had one or more firearm(s) within the meaning of the Firearms Ordinance,(including a revolver brand: Taurus model CTC and of caliber .38 Special) and whether several cases (including caliber .38 Special) in his possession.

Punishability of the facts and qualification of the proven facts.

Both defendants argue that they acted in self-defense.

*Defendants' invocation of self-defense (excess)*
The defense also produced a compilation of camera footage, one that includes more footage of the events leading up to the shooting incident. In response to that footage, defendant Ottley brought forward that he was out with co-defendant Richardson and some friends and girlfriends at the "El Capitan" nightclub. There he was suddenly accosted by Gomez Lopez, who accused him of having something to do with a deadly shooting incident earlier that month.
Suspect Ottley reacted indignantly because he considered the man killed in that incident to be a close friend and moreover, for his own safety, he wanted the rumor, that he was involved in that shooting incident, stopped. An altercation ensued at the nightclub, during which, according to defendant Ottley, he received death threats from Gomez Lopez for the first time that night.
Both suspects Ottley and Richardson then walk outside, followed moments later by Gomez Lopez and James. While going outside, Ottley is warned by a guard that James is wearing a bulletproof vest and has a weapon. Outside, the argument escalated further. Victim Gomez Lopez promised both suspects that they would not leave the club alive that night, and while suspect Ottley is speaking with James, he notices that James is indeed wearing a bulletproof vest and that he is carrying a weapon.
At some point, both suspects stand between the victims Gomez Lopez and James. Suspect Ottley then sees Gomez Lopez pull out a firearm, and thereupon he and his co-defendant Richardson draw their own weapons and shoot, first at Gomez Lopez then at James who is running away.



James lay wounded on the ground. Suspect Ottley took his weapon from him and then he and co-defendant Richardson ran off.

The defense emphasized that the serious and repeated verbal threats made to the two defendants posed an imminent, immediate danger to them, from which they could not escape. For wherever they went, they were always followed by Gomez Lopez and James. They didn't dare get into their car and drive away, given the numerous examples of people on St. Maarten being liquidated while sitting in their cars. Unknown persons had previously shot at suspect Ottley's residence several times. Out of fear and for their personal protection, both suspects carried a weapon from that point on. Just before the fatal moment, the suspects felt trapped between Gomez Lopez and James. Seeing Gomez Lopez draw a firearm, the suspects, in shock and panic, shot both men.

*Prosecutor's response to the invocation of self-defense (excess).*
The prosecutor stated that the defendants came up with an alternative scenario not once, but twice, raising questions. Their first statement to the police contained falsehoods and was apparently mendacious. The statement made at the hearing was aligned with the case file. However, that file does not support the defendants' account. Thus, it cannot be determined that Gomez Lopez had a firearm at the time of the incident. Moreover, he was under the influence and unsteady on his feet and did not pose a threat in that state. It is certain that he was shot in the back, that does not fit in with an attack against which the suspects had to defend themselves. Nor did James pose any threat to the suspects: he ran away when he was shot at. That there was an emergency self-defense situation is therefore not plausible and the invocation of self-defense (excess) must be rejected.

*Assessment*
In order to assess the defendants' appeal on grounds of punishment exclusion or exclusion of guilt, it must first be established what happened on the day in question. That determination is not easy, partly because of the defendants, who apparently lied to the police and came up with a modified account at the trial, but also because of others who, as witnesses gave statements, that cannot possibly be true.

Based on the available camera footage, it can be determined that Gomez Lopez sought out suspect Ottley, first inside the nightclub and afterwards on the parking lot of the club. He says things to which Defendant Ottley reacts emotionally. Gomez Lopez is not afraid of, or impressed, by the much more heavily built suspect Ottley.

The statement by the suspects that the conflict arose when the suspect Ottley was accused of being involved in a previous fatal shooting incident, is confirmed, among other things, in the statement by James. The Court therefore accepts that as an established fact.



Case number: 100.00003/19 and 100.00004/19

The camera images also show that Gomez Lopez made death threats against the suspects: Gomez Lopez appears to repeatedly make intimidating shooting movements with his hand in the direction of the suspects. It is also established that James, who always remained near the suspects and Gomez Lopez and clearly interfered with the conflict, was wearing a bulletproof vest at the time. It cannot be established that he was carrying a weapon at the time, but it cannot be ruled out either. After all, it follows from the images and from James' statements that the visitors of "El Capitan" were not searched upon arrival.

Did Gomez Lopez have a gun at the nightclub? The Public Prosecution Department thought that this was quite possible and therefore conducted an investigation into this, even though no such indication was found at the crime scene. James had stated that earlier that night out, he had seen how Gomez Lopez fired a shot into the air with a pistol. On their way to the "El Capitan", James and Gomez Lopez made a stopover at Gomez Lopez's house and since James had not seen the gun after that, he assumed that Gomez Lopez was not carrying a weapon at the time of the incident. However, no firearm was found during a search of Gomez Lopez's house. There is no indication that Gomez Lopez left his weapon at home. The images on which Gomez Lopez is shot are vague, only shadows can be recognized and no details that can provide a definitive answer. It is therefore plausible that the victim Gomez Lopez still had a firearm in his possession at the time of the incident.

The defendants state that Gomez Lopez pulled out a weapon, that they feared for their lives at the time, that they wanted to defend themselves, and then, out of fear and panic, they fired first at Gomez Lopez and then at James. Self-defense may have been the motive.

If the statement of the suspects is ignored, the question arises what motivated them to open fire on the two victims. The camera images show the body language of the two suspects just before the incident. The suspect Ottley seems to be outraged and incensed at Gomez Lopez, not so much aggressively. The suspect Richardson looks tense. And then suddenly fifteen shots are fired for just under four seconds. Why do two young men who can keep up with society, open fire on Gomez Lopez and James, apparently out of nowhere? In a sudden fierce bout of anger? And if that's the case, why is the rage directed at James, a person who appears calm in the footage and who no one claims to have stirred things up that night? All questions that have not been answered. It is therefore not plausible, in the given circumstances, that the suspects committed their act in sudden violent anger. A motive other than self-defense has not been put forward, nor is such obvious.



Case number: 100.00003/19 and 100.00004/19

Should we then depart from the scenario put forward by the defendants? Or are there contra-indications to this? After all, victim Gomez Lopez was shot in the back, which at first glance does not indicate that he assumed an attacking posture. The footage shows Gomez Lopez running away from the suspects shortly before the suspects opened fire. There is no indication that Gomez Lopez and James knew the suspects were armed. It is conceivable that Gomez Lopez pulled out his weapon before turning toward the suspects, and that the suspects saw that. Therefore, the mere fact that Gomez Lopez was shot in the back does not stand in the way of the scenario alleged by the defendants. It was further argued that the victims Gomez Lopez and James would not pose a threat to the defendants. Gomez Lopez was under the influence, the suspects appeared physically stronger than the victims, the suspects were in the company of friends, and furthermore, they were in a nightclub owned by Ottley's uncle. All these circumstances, however, do not take away from the danger posed by firearms in the possession of Gomez Lopez and James. Finally, it must be remembered that the lie in the defendants' first statement consisted only of the fact that they were not shooting with their own weapons, but with weapons taken from Gomez Lopez and a third party. At the hearing they admitted to having used their own weapons, otherwise their account remained the same throughout.

On the basis of all that has been considered above, the Court concludes that the facts and circumstances on which the defendants based their plea of emergency self-defense (excess) have become plausible. Therefore, that the defendants were the first to draw a weapon is not established.

The Court finds that the defendants had to defend themselves from an immediate unlawful assault by Gomez Lopez and James. At the time Gomez Lopez drew his weapon, the defendants were standing between Gomez Lopez and the bulletproof vest wearing James, and no meaningful alternative defense option existed for the defendants other than to shoot Gomez Lopez. Evading was not possible. The suspects were followed on their way out by victims Gomez Lopez and James, and the suspects could not be required to leave by car during those threats, given the previous shooting incidents in which victims were liquidated behind the wheel of their cars. The instantaneous unlawful assault required the defendants to continue to defend themselves by also shooting at the runaway James. It must be remembered that the shooting incident occurred within seconds and that the self-defense situation was not over until James was disarmed.

The conclusion is that the appeal to self-defense succeeds and the proven firearms violence is not punitive.



7

The proven prohibited possession of firearms is preempted by and punishable under Articles 3 and 11 of the Firearms Ordinance, and is qualified as follows:

**Violation of the provisions of Article 3 of the Firearms Ordinance.**

No facts or circumstances have become plausible that preclude the punishability of the proven offenses.

### Punishability of defendants

No facts or circumstances have become plausible that preclude the punishability of the defendants.

The defendants are therefore punishable for the above proven offenses.

### Imposition of punishment

Subsequent punishment shall be in accordance with the seriousness of the acts committed, the circumstances under which they were committed and based on the person and personal circumstances of the accused, as revealed during the investigation at the hearing. In this regard, the Court takes into particular consideration the following:

The defendants both brought an illegal firearm into a nightclub. The uncontrolled possession of firearms poses a great danger to society as a whole, and this case, illustrates that the use of those weapons can lead to irreparable suffering for victims and bereaved. Illegal firearm possession is therefore severely punished on good grounds. It is especially serious that the suspects carried the firearm in public, at night and to an event open to the public (entertainment). This cannot be met with anything other than a lengthy prison term.

Part of the sentence will be imposed on a suspended basis, to deter the suspects from committing another criminal offense in the future.

### Claim of the disadvantaged party

Since no punishment or measure has been imposed on the defendants in respect of the firearms violence, the disadvantaged claim cannot be received.



Case number: 100.00003/19 and 100.00004/19

**Applicable legal requirements**

In addition to the statutory provisions already cited, the penalty to be imposed is based on the articles 1:19, 1:20, and 1:21 of the Penal Code, as they were at the time of the proven offense.



Case number: 100.00003/19 and 100.00004/19

**DECISION:**

The Court:

declares legally and convincingly proven that the suspects committed the charges under 1, 2 and 3;

declares not proven any more or different charges that the defendants have been charged with, and acquits them thereof;

declares the proven facts under 1 and 2 not punishable;

acquits the accused of all legal proceedings in respect of the proven charges under counts 1 and 2;

qualifies the proven facts under 3 as described above;

declares the proven facts under count 3 punishable to this extent and the defendants punishable therefore.

sentences the suspects to **21 months** in prison;

orders that the time spent detained by the defendants and the pretrial detention before the execution of this verdict, be deducted in the execution of the imposed prison sentence;

determines that part of this sentence, to the amount of **6 months**, shall not be enforced, unless the Court may later order otherwise because the defendants have committed an offense before the end of a probationary period of **3 years**;

lifts the order of pre-trial detention, effective from the time the duration of pre-trial detention becomes equal to that of the unconditional portion of the imposed sentence;

declares the disadvantaged party inadmissible in his claim and determines that he can only bring the claim in the civil court.

This verdict was rendered by Judge J. Snitker, assisted by L.J.M. Klop (trial registrar), and pronounced on March 11, 2020 in the presence of the trial registrar at the public hearing of the General Court of Sint Maarten.

Ruling of the Registrar

Cheryl Labega
Certified Sworn Translator
(Fed. Decree No. 79 of November 20th, 1981)