EXHIBIT "B"

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 01/15/2019 09:56:42

| BUSINESS INFORMATION | |
|---|---|
| **BUSINESS NAME** | : Southeastern Roofing Company, LLC |
| **CONTROL NUMBER** | : 17030874 |
| **BUSINESS TYPE** | : Domestic Limited Liability Company |

| BUSINESS INFORMATION CURRENTLY ON FILE | |
|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : 3651 Peachtree Parkway, Suite E-303, Suwanee, GA, 30024, USA |
| **REGISTERED AGENT NAME** | : Jonathan Sparks Esq. |
| **REGISTERED OFFICE ADDRESS** | : 10692 Medlock Bridge Road, Suite 200, Johns Creek, GA, 30097, USA |
| **REGISTERED OFFICE COUNTY** | : Fulton |

| UPDATES TO ABOVE BUSINESS INFORMATION | |
|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : 7380 McGinnis Ferry Rd, Ste 100, Suwanee, GA, 30024, USA |
| **REGISTERED AGENT NAME** | : Bill Lipman |
| **REGISTERED OFFICE ADDRESS** | : 7380 McGinnis Ferry Rd, Ste 100, Suwanee, GA, 30024, USA |
| **REGISTERED OFFICE COUNTY** | : Gwinnett |

| AUTHORIZER INFORMATION | |
|---|---|
| **AUTHORIZER SIGNATURE** | : David Kronenfeld |
| **AUTHORIZER TITLE** | : Attorney In Fact |

Control Number : 17030874

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
**313 West Tower**
**2 Martin Luther King, Jr. Dr.**
**Atlanta, Georgia 30334-1530**

## CERTIFICATE OF AMENDMENT
### NAME CHANGE

 I, **Brian P. Kemp**, the Secretary of State and the Corporation Commissioner of the State of Georgia, hereby certify under the seal of my office that

**American Roofing Company Johns Creek LLC**
**a Domestic Limited Liability Company**

has filed articles/certificate of amendment in the Office of the Secretary of State on 05/08/2018 changing its name to

**Southeastern Roofing Company, LLC**
**a Domestic Limited Liability Company**

 and has paid the required fees as provided by Title 14 of the Official Code of Georgia Annotated. Attached hereto is a true and correct copy of said articles/ certificate of amendment.

WITNESS my hand and official seal in the City of Atlanta and the State of Georgia on 06/15/2018.



Brian P. Kemp
Secretary of State



**Brian P. Kemp**
Secretary of State

**OFFICE OF SECRETARY OF STATE**
**CORPORATIONS DIVISION**
2 Martin Luther King Jr. Dr. SE
Suite 313 West Tower
Atlanta, Georgia 30334
(404) 656-2817
sos.georgia.gov/corporations

RECEIVED
SECRETARY OF STATE
INTAKE DIVISION

2018 MAY -8  AM 9: 39

# Articles of Amendment
# to Articles of Organization

## Article One

The name of the limited liability company ("company") is:

American Roofing Company Johns Creek LLC

## Article Two

The date the articles of organization were filed was: March 13, 2017

## Article Three

The company hereby adopts the following amendment to change the name of the company. The new name of the company is:

Southeastern Roofing Company, LLC

## Article Four
*(Check, and if applicable complete, one of the following)*

[✔] The articles of amendment shall be effective upon the filing with the Secretary of State.

[ ] The articles of amendment shall be effective on: _____ at _____.
                                                        (Date)                    (Time)

**IN WITNESS WHEREOF, the undersigned has executed these Articles of Amendment on**

May 1, 2018
_____
(Date)

Signature _____

David Kronenfeld
_____
Print Name

Capacity (choose one option only):  [ ] Organizer
                                    [ ] Member
                                    [ ] Manager
                                    [ ] Court-Appointed Fiduciary
                                    [✔] Attorney-in-fact

Email Address: dkronenfeld@cotneycl.com

**Form CD 115**
(Rev. 4/2015)

Control Number : 17030874

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
**313 West Tower**
**2 Martin Luther King, Jr. Dr.**
**Atlanta, Georgia 30334-1530**

### CERTIFICATE OF ORGANIZATION

I, Brian P. Kemp, the Secretary of State and the Corporation Commissioner of the State of Georgia, hereby certify under the seal of my office that

## American Roofing Company Johns Creek LLC

a **Domestic Limited Liability Company**

has been duly organized under the laws of the State of Georgia on **03/13/2017** by the filing of articles of organization in the Office of the Secretary of State and by the paying of fees as provided by Title 14 of the Official Code of Georgia Annotated.

WITNESS my hand and official seal in the City of Atlanta
and the State of Georgia on 03/21/2017



Brian P. Kemp
Secretary of State

## ARTICLES OF ORGANIZATION

*Electronically Filed*
Secretary of State
Filing Date: 3/13/2017 6:55:59 PM

### BUSINESS INFORMATION

| | |
|---|---|
| **CONTROL NUMBER** | 17030874 |
| **BUSINESS NAME** | American Roofing Company Johns Creek LLC |
| **BUSINESS TYPE** | Domestic Limited Liability Company |
| **EFFECTIVE DATE** | 03/13/2017 |

### PRINCIPAL OFFICE ADDRESS

| | |
|---|---|
| **ADDRESS** | PO BOX 304, Trion, GA, 30753, USA |

### REGISTERED AGENT'S NAME AND ADDRESS

| NAME | ADDRESS |
|---|---|
| William Benefield | 530 E. Washington St, Chattooga, Summerville, GA, 30747, USA |

### ORGANIZER(S)

| NAME | TITLE | ADDRESS |
|---|---|---|
| Bill Lipman | ORGANIZER | 1535 Bramble Bush way, suwanne, GA, 30024, USA |
| William Benefield | ORGANIZER | 530 E. Washington st, Summerville, GA, 30747, USA |

### OPTIONAL PROVISIONS

N/A

### AUTHORIZER INFORMATION

| | |
|---|---|
| **AUTHORIZER SIGNATURE** | Sandra Weaver |
| **AUTHORIZER TITLE** | Manager |

# 2022 Partnership Interest

## Southeastern Roofing Company LLC

### 82-1144637

**Partner Name:**

William L Lipman                                                                 51%

Avinash E Reddy                                                                 49%

William L Lipman: _____ 4 / 22 / 2022 /

Avinash E Reddy: _____ 4 / 22 / 2022 /

Notary: _____ 4 / 22 / 2022 /

*[Notary seal: CATHERINE WELBORN, NOTARY PUBLIC, GWINNETT COUNTY, GA, Exp. Mar. 1, 2026]*

SOUTH EASTERN
ROOFING COMPANY

Southeastern Roofing Company 3400 Rivergreen Court STE 300 Duluth GA 30096

Scanned with CamScanner

```
IN RE: AVI REDDY          )
                          )
                          )
                          ) Policy No.: 53-131194-00
                          ) Claim No. : 300-0046904-2022
                          )
                          ) D/L      : January 19, 2022
                          )
                          )

              ********
```

Examination Under Oath of AVI REDDY
by Matt Foster; before J. Robin Sawyer,
Certified Court Reporter, #4882-9574-0787-9168,
for the State of Georgia; 10:00 a.m. on Thursday,
June 2, 2022, at 3400 Rivergreen Court,
Duluth, Georgia 30096


Signature reserved.


Janice S. Baker & Associates, Inc.
235 Peachtree Street, NE
Atlanta, Georgia 30303

(404)969-1206

1

A P P E A R A N C E S

ON BEHALF OF INSURER,

    Matt Foster, SCLA
    Senior Field Investigator Special Investigation Unit
    █████████████████████████████████
    █████████████████████████████████
    █████████████████████████████████

    Also appearing:  Shelly Love, Auto-Owners Investigator

ON BEHALF OF THE INSURED,

    Joshua A. Millican, Esquire
    Law Office of Joshua A. Millican, PC
    The Grant Building, Suite 607
    44 Broad Street, NW
    Atlanta, Georgia 30303
    ████████████████████████

I N D E X

                                        PAGE

Examination Under Oath

By Mr. Foster:                            6




Disclosure:                             140




Certificate:                            141




Errata:                                 142

TRANSCRIPT CODES

```
. . .              denotes incomplete thought
[sic]              denotes word/phrase written verbatim
(ph)               denotes word spelt phonetically
(unintelligible)   denotes word cannot be understood
```

INDEX TO EXHIBITS

PAGE

Exhibit No. 1,
Buyer's agreement for vehicle:                    46

Exhibit No. 2,
4023 bank statement, 2021:                        57

Exhibit No. 3,
4023 bank statement, 2021:                        57

Exhibit No. 4,
Atlanta police incident report:                   80

Exhibit No. 5,
Affidavit Statement of Total Theft:               83

Exhibit No. 6,
Renasant Bank line of credit:                     101

Exhibit No. 7,
Renasant Bank loan activity report:               104

Exhibit No. 8,
January 2022 loan statement:                      106

Exhibit No. 9,
January 2022 revolving credit:                    108

Exhibit No. 10,
July 2021 Renasant Bank statement:                115

Exhibit No. 11,
8188 account statement:                           120

Exhibit No. 12,
First Avenue funding transfer
Account 8718:                                     122

4

INDEX TO EXHIBITS CONTINUED

PAGE

Exhibit No. 13,
Bank statement:                             126

Exhibit No. 14,
Auto-Owners EUO demand letter:              134

(Reporter's disclosure presented to counsel.)

```
 1              P R O C E E D I N G S

 2                                10:07 a.m.

 3   Whereupon,

 4                    AVI REDDY

 5     was given the oath and testified as follows:

 6              EXAMINATION UNDER OATH

 7   BY MR. FOSTER:

 8     Q    This will be the Examination Under Oath of Avi

 9   Reddy as a representative of Southeastern Roofing

10   Company, LLC pursuant to the provisions under Auto-

11   Owners Insurance Company, Policy No. 53-131194-00 issued

12   to Southeastern Roofing Company, LLC.

13     This examination is in reference to Claim No.

14   300-0046904-2022 for a reported automobile theft loss

15   that occurred on or about January the 19th of 2022.

16     Avi, my name is Matt Foster.  I'm an investigator

17   with Auto-Owners Insurance Company.  I'm not an

18   attorney.

19     Do you understand that?

20     A    Yes.

21     Q    I see that you have elected to retain Joshua

22   A. Millican as your attorney and he's with you today; is

23   that correct?

24     A    Yes, he is.

25     Q    At any time during the examination if you need
```

1   to take a break or use the restroom, simply let me know

2   and we will take a break.

3        Do you understand that?

4        A    Yes, sir.

5        Q    I know before we went on the record we talked

6   about a lot of these housekeeping-type rules, but now

7   that we're on the record, we're going to go through them

8   again just to make sure that you understand.

9        This process is called an Examination Under Oath.

10  With us today is a court reporter who will take down

11  everything that we discuss.

12       It's important your answers be verbal so that the

13  record is clear.  Head nods along with uh-huhs and huh-

14  uhs should be avoided.  So if the question requires a

15  yes or no response, please provide a yes or no response.

16       Do you understand?

17       A    Yes.

18       Q    You're allowed to give an explanation of any

19  of your responses.  You're also allowed to reference any

20  materials that you may have with you today.

21       Do you understand that?

22       A    Uh-huh.

23       Q    Yes?

24       A    Yes.

25       Q    If you understand the question -- excuse me.

7

1      If you don't understand the question, just let me

2   know that you don't understand.  I'm not here to trick

3   you in any way.  I may can ask it in a different way,

4   make it make sense for you.

5      However, if you do provide a response to a question

6   that I've asked, then I'm going to assume that you

7   understood the question as it was asked.

8      Do you understand that?

9      A    Yes, sir.

10     Q    Following your Examination Under Oath, the

11  court reporter will prepare a transcript.  We'll send

12  the transcript to you or your attorney for review.

13     The transcript will include a piece of paper called

14  an errata sheet that you can make any changes that you

15  deem necessary to the testimony that you give here

16  today.

17     We will require that you sign the errata sheet in

18  front of a notary regardless of if any changes are made

19  to the testimony.

20     The transcripts are yours to keep.  You don't have

21  to send the full transcripts back to us.  We just need

22  the errata sheet signed and notarized with any necessary

23  changes that you've made.

24     Do you understand that?

25     A    Yes, sir.

1      Q    Please note that until we receive the signed

2  and notarized errata sheet back, the Examination Under

3  Oath process will have not been deemed completed.

4      Do you understand that?

5      A    Yes, sir.

6      Q    Are you currently under the influence of any

7  drugs or alcohol?

8      A    No, sir.

9      Q    Do you have any memory problems or any mental

10  illness that would impact your ability to answer

11  questions here today?

12      A    No, sir.

13      Q    Your policy requires your cooperation in

14  participating in the examination, and we certainly

15  appreciate your appearance here today.

16      I just want to remind you that we expect your full

17  cooperation in completing the examination in its

18  entirety.  This includes answering all the questions

19  that are asked of you today and returning the signed and

20  notarized errata sheet that we previously mentioned.

21      Failure to perform these duties under your policy

22  could jeopardize your claim.

23      Do you understand that?

24      A    Yes, sir.

25      Q    As a final note before we begin, I'd like to

9

1   remind you of the fraud provision in your policy.  This

2   provision basically states that if you conceal any

3   material fact, if you lie to us, if you make material

4   misrepresentations, you run the risk of having your

5   claim denied.

6        Do you understand that?

7        A    Yes, sir.

8        Q    It's important and crucial that you're honest

9   and forthcoming with me during your examination here

10  today.

11       Mr. Reddy, will you please state your full legal

12  name for me, please?

13       A    Avinash Eraragam Reddy.

14       Q    You're going to have to spell your first and

15  middle name, please.

16       A    A-v, as in Victor, i, as in indigo, n, as in

17  Nashville, a, as in apple, s, as in Sam, h, as in

18  Hector, first name.

19       Middle name, E, as in elephant, r, as in radio, a,

20  as in apple, r, as in radio, a, as in apple, g, as in

21  golf, a, as in apple, m, as in McDonald's.

22       Q    And your last name is Reddy?

23       A    R-e-d-d-y.

24       Q    And what's your date of birth, Mr. Reddy?

25       A    July 9, 1994.

1      Q     And where do you reside, currently?

2      A     Currently, I live on 661 Auburn Avenue.  My

3    lease just ended over in Sandy Springs.

4      Q     661 Auburn Avenue, is that in Duluth?

5      A     That is in Atlanta.

6      Q     Atlanta, okay.

7      A     It's right off the Belt Line.

8      Q     How long have you lived there?

9      A     Lease ended maybe a month ago, just staying at

10   one of my buddies' places until I try to close on this

11   house-type situation.

12     Q     At the time of the loss in January, where were

13   you residing?

14     A     4860 Long Island Drive, and that's Atlanta,

15   Georgia 30342, Sandy Springs.

16     Q     Is that the lease you were referring to that

17   just expired?

18     A     Yes.

19     Q     Okay.  Was that a house?

20     A     Yeah.

21     Q     How long did you live at 4860 Long Island

22   Drive?

23     A     I think 14 months.

24     Q     Are you currently married?

25     A     No.

11

1      Q     Have you ever been married?

2      A     No.

3      Q     You have any children?

4      A     No.

5      Q     In January of 2022, was anyone else living

6    with you at 4860 Long Island Drive?

7      A     Yes.  It was a recording artist that I

8    currently manage for Universal Music Group.  His name is

9    Reese Thornton, stage name Camino.

10      Q     What's the stage name?

11      A     Camino.

12      Q     Camino?

13      A     Like an El Camino.

14      Q     Gotcha.

15      A     He's got a song called Burning Fire if you

16    want to check it out.

17          This is going to be a very, very interesting story.

18    I've found this here.  But it is all the truth as funny

19    as it may be.

20      Q     So the recording artist, Reese Thornton, lived

21    with you at Long Island Drive; is that correct?

22      A     Yes.

23      Q     In January of 2022?

24      A     Yes.

25      Q     Did he move with you to 661 Auburn Avenue?

1      A    No.

2      Q    At the time of the loss in January, did

3   anybody else live with you there?

4      A    I mean, there was people that stayed at the

5   house.  I mean, it was like a five-bedroom house.  So

6   you've got like producer people come.  I was trying to

7   help finish out the LP 1 or album 1.

8      But I don't believe anyone like traditionally moved

9   in.  An acquaintance I had growing up by the name of

10  Eric Halpern, he moved in later.  I don't believe it was

11  in January, but I know it was like the end term of the

12  lease.

13     But let's just say Eric Halpern just to -- because

14  the lease ended May-ish.  Yeah, it was '22.  Yeah, he

15  would have been there.

16     Q    Okay.  So it sounds like you definitely do

17  some work in the music industry?

18     A    I do not attempt to, but I have a commonality

19  which is trying to help people that, A, I initially

20  believe will work hard.  So I try to adhede [sic] on

21  them, apply for them in which they can also succeed.

22     Q    Do you have some sort of music producing

23  company or anything like that?

24     A    No.  I mean, I kind of operated it out of the

25  same entity that my ownership in Southeastern resides

1   in, so just to kind of summate it up.

2       But that's about it while I was doing music.  I

3   currently now own a -- own part of a venue that is of

4   the same type of scenario in which -- frankly, it's why

5   we're here today.

6       But, yeah, that's kind of all my -- having to do

7   with music.  I'm more of a financial operations, like

8   business oriented-type.

9       Q    What do you mean about why we're here today?

10      A    My car was stolen outside of that venue.

11      Q    Okay.  And we'll get more into that as we

12  progress through the examination.

13      Have you always lived in Georgia?

14      A    No.  I grew up -- where I was born,

15  technically, Christiana Hospital in Delaware, but I was

16  West Philadelphia born and raised, similar to the Fresh

17  Prince of Bel Air.

18      Q    That's exactly what I was going to mention.

19      A    Collegeville, Pennsylvania; smaller place,

20  kind of shitty town, but I didn't know any better.

21  Moved here when I was in the fourth, third maybe, to

22  Alpharetta and lived in Georgia ever since.

23      Q    When did you say you moved to Alpharetta?  I'm

24  sorry.

25      A    I think 2001.

1      Q      Okay.

2      A      21 years ago, wow.  I still don't claim

3  Georgia, which is strange.  Now, it's the majority of my

4  life.

5      Q      You've been here longer, yeah.

6      A      I know.  And I'm just like . . .

7      Q      What's your cell phone number?

8      A      ████████████

9      Q      Do you have any other cell phones?

10     A      No.

11     Q      What about email address?

12     A      ██████████████████████  is the new one.

13  The same email address as ███████████████████████

14  I've got a personal one that's ████████████████████

15     And then ████████████████  has been stripped from me

16  due to the University of Georgia, apparently.  All my

17  contacts got deleted.  I got no warning.

18     Q      Did you go to UGA?

19     A      I did.

20     Q      When did they strip your email from you?

21     A      It's got to be a couple years ago.  I

22  graduated in '17.  Maybe from 2020, maybe 2019; I'm not

23  sure exactly.

24     I just remember losing all my contacts in my phone

25  and then realizing that they were not there somehow as

1   well as a lot of passwords to various things.

2        Q     What did you major in at UGA?

3        A     I started out in biology, and then I ended up

4   in finance.  Finance is actually how my more correct

5   friends have corrected how you traditionally pronounce

6   it, the study of versus financing something.

7        But since it's a recording, I've figured I'd use

8   the right one.

9        Q     Is that what your degree was in?

10       A     Yes.

11       Q     Finance?

12       A     Yes, finance.  It helped me not in my career,

13   ironically.

14       Q     I imagine finance could help in any avenue

15   that you get involved in.

16       A     You would think, but the world has kind of

17   changed in a way that the classes that we learned and

18   the things that we do, do not relate or correlate in the

19   environment that is today's business operations.

20       The world is moving too fast for us to have the

21   curriculum of, I mean, general concepts of accounting.

22       But I love the Dawgs.  But entrepreneurial --

23       Q     Go Dawgs.

24       A     Entrepreneurial program never really helped me

25   much.  They sure do ask for donations, though, any

16

1   chance they get.

2       Q    Was it a bachelor's degree in finance?

3       A    Yep.

4       Q    Did you go to any graduate school?

5       A    Straight out into the working world and

6   failing at many a different ventures.

7       Q    And did you say you graduated in 2017 from

8   UGA?

9       A    Yep.  I was supposed to graduate in '16, but

10  the swap over kind of killed me.  I took a lot of

11  organic chemistry for no reason.  That was my --

12      Q    Ouch.

13      A    That was my elective.

14      Q    Brave man.

15      A    Yeah.

16      Q    So what did you do when you got out of

17  college?

18      A    First, I was kind of in this blur of trying a

19  different -- a bunch of different entrepreneurial

20  ventures.  I didn't have any really, like, capital to go

21  off of.

22      So when I was a junior, I started doing this.  And

23  it kind of culminated out where I was trying to find as

24  many different opportunities in which I could use my

25  intellect versus the capital to convince different

17

1   business owners from real estate to restaurants to

2   anything to just find that one opportunity to which I

3   could latch onto and run with.

4        So what I did out of college, I was failing at that

5   in any single way.  I linked up with a gentleman by the

6   name of Parker Lipman, who was the stepson of the

7   founder of Zaxby's, who had convinced me that there was

8   a pot of gold at the end of following him down that.

9        But I didn't realize he -- he had the access to the

10  things by being related, but there's a very big stepson

11  dissonance between him and Zach McLeroy.

12       I actually have a letter from Zach telling us when

13  they -- because I tried to redo the supply chain for

14  Zaxby's, like redo the -- from cups to napkins to pens

15  to anything.

16       I was actually going to change the cup from foam to

17  paper.  And turns out the neblurize [sic] would melt if

18  you used paper due to the fact that it was insulated on

19  the foam side.  But I'd put together this whole picture

20  by then.

21       But in the letter, I pissed off his purchasing guy

22  because I was going like P&P in a bunch of random

23  places.  And that was that guy's little drive through

24  the department.

25       And the letter pretty much read "In the spirit of

18

1  friends and family, please cease and desist" to me and

2  his stepson.

3     So that was about around that time.  And -- but the

4  first thing I did, which I finally got a little bit of

5  traction, was I was flipping dirt, as I called it.  But

6  I was securing land opportunities for national

7  homebuilders.

8     And in that capacity, there was -- I was just a

9  rogue agent with a spreadsheet, a Google maps login in

10  QS Public, or something like that, where you -- the tax

11  assessor in which I would find serialized topography,

12  all sorts of stuff, and put together deals for

13  homebuilders and pitch them on it whenever they would

14  answer my calls, which -- yeah.

15     Q    You were cold calling homebuilders on

16  property --

17     A    I was cold calling property owners and trying

18  to flip it to homebuilders.  But no one had given me any

19  formal knowledge of any of this.

20     I took UG Office of Real Estate class that you can

21  get your license with.  So I went through that course.

22  Didn't get my actual license, and just got as much

23  knowledge I needed.  And then pulled it all together and

24  started trying to get homebuilders to buy into it.

25     And my buddy's dad who was supposed to help me do

1   it, Sean Davis -- Sean Davis's dad, Davis Property is

2   the name of the company, but he was more interested in

3   me just teeing up properties for him and giving me a

4   fraction of the cut of anything as a consultant versus

5   actually mentoring me.

6        So I got in this dilemma to where I was calling him

7   and trying to hang out with my friend at his parents'

8   house because he lived over there to just get in contact

9   with his dad.

10       But then he went on vacation to Italy for like

11  three weeks and didn't tell me.  So I was like there

12  ain't shit that I can do with that.  Obviously, this

13  guy's not taking it seriously.

14       Mom's hammering me to take my resume to a bunch of

15  places.  But then that's where I kind of took it upon my

16  own.  My buddy, I don't necessarily need him.  I got all

17  the pieces here.  I can put them together.

18       And I just started calling the homebuilders and

19  going on White Pages and digging up their numbers, the

20  presidents and this and that.

21       Which is ironically what led me to this company

22  because Bill, my partner you met over there, is, like,

23  golf buddies with all these national presidents.  And

24  one of them was -- I was trying to get in contact with

25  and he said he'd put together the deal.

1       So that was like my -- like, I had one property

2   tied up for him and then take down before they allotted

3   out, but the second portion of that was there was this

4   big piece right on Georgia 400, 71 acres.  I remember

5   like it was yesterday.

6       It was three owners.  Two of them were brothers

7   that were in litigation with each other.  And the other

8   guy died, so it's five of his kids.

9       And I was putting it together with bubble gum and

10  popsicle sticks, because this thing was hairy.

11      And one of the brothers that was in litigation was

12  like my go-to.  He thought since my name was Avi, it was

13  Avraham, like Jewish.  I'm not Jewish, for the record.

14      And he loved me for that.  At no point did he,

15  like, really ask if I was Jewish.  He would just say

16  Shabbat Shalom or something, like Happy Sabbath on

17  Saturdays.

18      But I had talked to him forever, and he was --

19  we're talking about this 70-some-year-old property

20  developer that kind of lost his wit.  I remember, I

21  think he got some surgery to get that -- had to get some

22  of his brain wave . . .

23      But long story short, that was the big piece that

24  I -- was coveted by all these builders, and they were

25  like, man, this thing's got some hair on it.  You're

21

1   going to make some money off this thing, but you're

2   going to earn it.  And I was like naïve and telling them

3   I would do anything to make it work.

4       So it was -- six months of my time went by and I

5   got a letter of intent from Century Communities.  I was

6   fresh in the age of 23.  It was like 10.2 million bucks

7   and I negotiated like a 5 percent fee on it.

8       And, I mean, you're talking right in the top of the

9   ninth inning is where I get a call from this guy.

10      I remember seeing that number, seeing my name,

11  seeing 5 percent and saying, shit, I actually -- like, I

12  actually did something, like, substantial there.

13      And this man calls me, and he says:  Hey, son, I

14  was looking at this, how some of our community is going

15  for what are going to be developed or redistricted due

16  to Denmark High School.

17      I don't know if you're familiar with the lay of the

18  land over there, but I am, acutely.  And it was on South

19  Forsyth.  And I know a lot of people, when somebody says

20  South Forsyth because good education, yada, yada, yada.

21      Denmark took Central, which was not as desirable,

22  which makes no difference here nor there to me.  I went

23  to public school through and through.  And I'll send my

24  kids to public regardless.

25      But pretty much the piece of land went from being

22

1  worth like 10 million and change and all these different

2  people that I had to bring in at different times and

3  said:  This is the best price you're ever going to get.

4      It made, financially, little to no sense for them

5  to do it.  But they were doing it.  And I was part of

6  it, so I wasn't asked the questions.

7      And they dropped it overnight to 7 and change, blew

8  up the whole deal, and just got jack shit for six, seven

9  months of my time.

10     But --

11     Q    Was that around 2012?

12     A    This was after I graduated college --

13     Q    Okay.

14     A    -- so this was around 2017 --

15     Q    I'm sorry.  Gotcha.

16     A    -- and I had done it in the offices of

17  American Roofing Johns Creek, which was a office that is

18  about as big as my desk right now with less windows and

19  sunlight.

20     But I remember it was me, Bill, and Parker.  And

21  during the time, I was utilizing the office space

22  because it was available and it was down the street from

23  my folks' house.

24     And I remember Bill saying:  Don't quit your day

25  job, son.

1       And then it was either before or after this, I'm

2   trying to remember, that we had talked about using this

3   as a, quote, unquote, beta test for a branch of a

4   roofing company where it's based on insurance

5   restoration.

6       And he said he needed a business guy.  His son was

7   the guy who wouldn't do any of the work or -- so Bill,

8   my partner, his biological son is Parker.  Parker's

9   stepdad is Zach McLeroy of Zaxby's.

10      So I was just here with both of them.  And Parker

11  prides himself over connecting the dots and trying to

12  ask for some money for it, which is valuable but is not

13  nearly as valuable as he believes.

14      So he'll -- I mean, he'll never read the current

15  transcript, but it would be very funny if he did.  But

16  I'll put that on the record in any court.

17      It's just that he teed me up to his dad to say

18  "hey, he can come and help you here," as in me.

19      But that's kind of how I got my staggered start

20  into this business then becoming an owner and clawing

21  for that and then clawing to like where it is today.

22      But I mean it was nothing back then.

23      So to answer your question, that's what I was

24  doing.

25      Q    Okay.  Let's talk about Southeaster Roofing

24

1   Company.

2        A    Yes.

3        Q    How long have they been around?

4        A    March 13, 2017, is the date it was registered

5   as American Roofing Johns Creek.

6        Q    When did it change to Southeastern Roofing

7   Company?

8        A    After we bought out the branch owner, William

9   Benefield of Trion, Georgia under American Roofing.  It

10  was -- the deal structure was we were going to buy

11  when -- we, meaning me and Parker, as I was tied to that

12  horse now.  His dad had the other half.

13       And as a part of it, getting his shares out, we

14  couldn't have the name, so we changed over to

15  Southeastern Roofing Company.  And I brought the logo

16  that I had from a friend of mine, Vasadili (ph.)

17  Ventures from prior.

18       Q    Was American Roofing Company a corporation?

19       A    His entity?

20       Q    Yes.

21       A    I believe it was a corporation.  I mean, it's

22  an LLC, so technically it's a corporation.

23       Q    But like an S-corp, did they have

24  shareholders?

25       A    I think -- I mean, William had to be a -- he

25

1  does a lot of stuff that, I mean, I don't know about.

2  But who knows?  Someone could have convinced him to make

3  it an S or C or something depending on any given day.

4       Now he said it's like an ESOP now that his boys own

5  it.  I don't even know.  He's a good guy, though.

6       Q    When did you become an owner in Southeastern

7  Roofing Company, LLC?

8       A    Technically that day, so let's call it

9  September of 2017.  But I think we bought him out in

10  July of '18, or something like that.

11      I'm working through this with our attorneys trying

12  to clear up the lack of an operating agreement currently

13  and getting everything, like, situated correctly.

14      Q    And forgive me if I'm asking questions that

15  you've already answered, but I'm just trying to clarify.

16      A    No, man.

17      Q    So American Roofing Company was purchased --

18      A    American Roofing Johns Creek, so we were a

19  separate entity than American Roofing Company.

20      We operated as a branch, so not technically a

21  franchisee.  I remember not being able to say the "F"

22  word because we had a different structure and

23  everything.

24      But it was American Roofing Johns Creek, LLC, and

25  then it was a name change amendment that went to

26

1    Southeastern Roofing Company.

2        Q    And that's when you bought the American -- the

3    named American Roofing Company from William Benefield?

4        A    We did not by the name; we just could not don

5    the name American Roofing.  So we changed it to

6    Southeastern Roofing Company.

7        I liked it because it sounded like it, like, real,

8    it's been around for a while, kind of like SEC.

9    (Indiscernible) it's carved in the Plymouth Rock.

10   Because that was about around the time that that movie

11   had come out, so I remember saying that.

12       Q    Essentially, though, American Roofing Company

13   became Southeastern Roofing Company, LLC; is that

14   correct?

15       A    No.  American Roofing Company Johns Creek, LLC

16   was -- became Southeastern Roofing Company.  American

17   Roofing Company is a separate organization to which I

18   had no principal ownership nor vested interest in.

19       Q    I understand that.  But you didn't buy the

20   rights to the name or --

21       A    No.

22       Q    -- or the shares from --

23       A    Just a part of the buy/sell agreement was that

24   we couldn't name ourselves American Roofing Company

25   because we were American Roofing Company Johns Creek.

                                                      27

1      Q    So what have you gained from William Benefield

2   and his company?

3      A    A  lot of antiquated methods, but an

4   introduction, I guess, into the industry that I am

5   trying to currently upheave into a semblance of, like,

6   correction.

7      Because I believe there's a lot of innate problems

8   with not only construction but the relationship between

9   insurance carriers, contractors, and property and

10  casualty claims in respect to property owners.

11     Q    At the time that Southeastern Roofing Company,

12  LLC donned its name, that was a name change amendment

13  then to the existing American Roofing Johns Creek?

14     A    Yes.

15     Q    Okay.

16     A    Georgia Secretary of State and all that jazz.

17     Q    And at that time, you had ownership in

18  Southeastern Roofing Company, LLC; is that correct?

19     A    Yes.

20     Q    Was it the 49 percent that it is today?

21     A    No.  It was 24 and a half.  The split was 51

22  Bill, 24 and half me, 24 and a half Parker Lipman.

23     Q    When did you reach 49 percent ownership?

24     A    2021; part of this whole dealings with was at

25  some point -- well, actually, I know when -- Parker got

1   in like a RZR-type accident on a Polaris-type vehicle in

2   Gainesville, broke his leg, which isn't really conducive

3   to getting up on roofs nor walking around and knocking

4   doors, which is as much as I can say the company was at

5   the time.  That's what it is.

6        And then he just, like, didn't work.  And I had

7   gotten him to a point where he was like actually working

8   and like tangibly making money, earning money.  Big

9   difference.  But that's when he stopped working.  He

10  kind of faded away from the organization.

11       And then he was teeing up for an operating, but

12  eventu- -- he gave me like four and a half, yeah,

13  percent equity at some point during that transition

14  because he felt bad that I was working so much and he

15  wasn't.

16       And to be honest, I work twice as much now in hours

17  than I did back then.  So he came back -- because we

18  used to pay for his truck, and he would come back

19  whenever the truck payment was due.

20       And I just said:  Hey, listen, bud, this is like

21  how this is going to go.

22       And we, like, had a verbal commitment to getting

23  his equity out.  Bill was like:  Well, should we leave

24  him something, because he might want to work?  And I

25  said:  No, because I don't be resentful.

1       And this is like an open conversation between them

2   all.  And I told him he was better off with us as like a

3   partner than -- not an equity partner, but like

4   maintaining a beneficial relationship versus trying to

5   hold on to equity.

6       Because, like, what I'm doing for like these

7   employees here is actually scaling the company up,

8   migrating in a bunch of different vehicles, whether it

9   be like a claims company, a marketing company, a roofing

10  company.

11      I got a tech plan I'm working on that kind of

12  cleans up the property adjusting deal.  And it's really

13  cool.  I can talk about that one for four hours long.

14      But we're going to become like this larger scale

15  organization.  And I told him it was better off for us

16  being able to use our resources and his ability to

17  connect people and actually do something he liked rather

18  than doing unfulfilling cause of working here

19  technically, being resentful to anyone out in the, like,

20  public when he was asked about why this company had

21  grown and he obviously had been wheel-spinning, trying

22  to pedal whatever short-term, like, get-rich-quick idea

23  had been given to him.

24      But I was always trying to tell him, like, build

25  the foundation, like, we should have -- put our heads

1   down, we work on it.  And, like, at the end of the road,

2   you will actually have it versus the vanity of the

3   perception that you have it.

4       He's had access to all the stuff to Zaxby's, and,

5   like -- it's like "shake 'em plain" [sic] and all this,

6   but the reality was I wanted him to actually, like,

7   authentically, like, build something for himself versus

8   doing the other stuff.

9       Q    Did you buy out his equity?

10      A    Parker's?

11      Q    Yes.

12      A    Yeah.  It's like a structured purchase, so

13  that's what I'm cracking down.  But as far as the 2021

14  tax trends, which we're doing currently with all these

15  weird government credit stuff, that's how it's going to

16  bode on that equity side.

17      Q    So you're -- in 2021, you purchased Parker's

18  equity for Southeastern Roofing Company, LLC?

19      A    Yes.

20      Q    What month would this have been?

21      A    I would assume it's going to be top of --

22           MR. MILLICAN:  Don't assume.

23           THE WITNESS:  -- Jan. '21.

24           MR. MILLICAN:  Don't assume, just answer.

25                    //////////

31

1   BY MR. FOSTER:

2       Q    Yeah.  Just -- just --

3       A    We don't have a hard date on it because we

4   want to make sure that everything's correct, so I'd have

5   to go to our corp trans, because the whole thing's been

6   agreeing on that, operating agreement and transition.

7       Q    To be clear, I'm not asking you to assume

8   anything.  I'm only asking what you know.  And if I ask

9   you to generalize something, like give me an idea, that

10  means just a general idea of when this took place.

11      I understand there was a conversation between you

12  and Parker and Bill and there had to be some sort of

13  agreement.  Sounds like it's some sort of verbal

14  agreement to -- for Parker to sell his equity to you,

15  and then it's a structured purchase that's set up some

16  way to --

17      A    Yes.

18      Q    -- fund it.  And I'm trying to figure out when

19  that happened.

20      So you're telling me that you don't have a date

21  certain.  You're trying to figure that out, the --

22      A    Yeah.

23      Q    From somebody that's not a financial guru,

24  like I think in terms if I go to the bank and get a loan

25  and I can tell you May 14th of 2021, I got a loan and

32

1    this is when I become -- when I signed the agreement.

2         Is there a date where y'all signed paperwork or

3    anything like that regarding the --

4         A    Not for the last piece.  So there's a date on

5    the 29 percent.  But that last piece going up is what

6    we're reworking the operating agreement.

7         But verbally, which, ultimately, meant that it does

8    more so in Georgia than anywhere else, that's where

9    everyone's on the same page as far as duties and

10   activity that in 2021, call it January, on the docs that

11   that's when the structure would have taken place.

12        So we're just effectively doing that agreement.

13   But now, understand that there's no written agreement to

14   it, but also that's why crossing the T's and dotting I's

15   with all the attorneys because life happens and I've got

16   to deal with a bunch of different moving pieces.

17        Q    What is the verbal agreement?

18        A    That Parker's equity will be bought out paying

19   80 grand a year over the next three years.  I would help

20   him build a house with our resources.  And his equity

21   would then be relinquished from himself to myself due to

22   the fact that I've worked 20 hours a day and --

23             MR. MILLICAN:  Can we take a break for a

24        second?

25             THE WITNESS:  Yeah.

1          MR. FOSTER:  Yeah.  Let's take a break.

2          (Off the record at 10:45 a.m.)

3          (On the record at 10:50 a.m.)

4    BY MR. FOSTER:

5    Q    So we're talking about the agreement for

6    purchasing Parker's equity out of Southeastern Roofing

7    Company.

8          I understand that there's a verbal agreement

9    regarding the purchase of his equity to give you the 49

10   percent ownership in Southeastern Roofing Company and

11   the agreement is $80,000 a year over the next three

12   years for the purchase price; is that accurate?

13   A    It is accurate.  It's going to be 2021.  It

14   will be reflected on the tax returns in a similar

15   fashion.  And I don't want to speculate on the date when

16   I'm not privy to it, but 2021.

17   Q    That's fine.  I understand.  It's not that you

18   have a written document you can produce that shows a

19   specific date.  This is all verbal and this has been

20   kind of ongoing conversations over a period of time, it

21   sounds like.

22         Is that correct?

23   A    Under -- yes.

24   Q    Have any payments been made to Parker in

25   regards to this verbal agreement?

34

1       A      Yes.

2       Q      How many and how much?

3       A      Every month from his vehicle to insur- --

4   health insurance to payments based on various acts.  I

5   can't give you the direct amount, but it is in

6   correlation with the purchase agreement.

7       Q      So whatever money was being paid to Parker for

8   his vehicle, for his health insurance, all of that got

9   rolled into the $80,000 a year.

10      Is that right?

11      A      Yes.

12      Q      And the other owner of Southeastern Roofing

13  Company, LLC is William Lipman; is that correct?

14      A      Yes.

15      Q      And that's Parker's father?

16      A      Yes.

17      Q      William goes by Bill; right?

18      A      William does go by Bill.

19      Q      Do you have any ownership in any other

20  companies other than Southeastern Roofing Company, LLC?

21      A      ARRC, Limited is the company I own the equity

22  in.  I've got as of currently --

23      Q      All right.  Stop for a second.  ARC, Limited;

24  is that right?

25      A      ARRC.

1      Q    I'm sorry.  ARRC, Limited; you have -- what is

2  ARRC Limited?

3      A    Sole prop LLC.

4      Q    What does ARRC, Limited do?

5      A    Just owns Southeast Roofing Company shares

6  under as an organization, and I am the sole prop of

7  that.

8      Q    Does it have -- other than a -- does it

9  actually perform any roofing -- scratch that.

10     Does ARRC, Limited actually do any day-to-day

11 operations regarding payments, receipt of money,

12 inspecting roofs, anything like that?

13     A    No.

14     Q    It's strictly a vehicle for --

15     A    Asset holding funds.

16     Q    Okay.  And what does Southeastern Roofing

17 Company do exactly?

18     I know you do roofs.  What else do you do?

19     A    Are we talking currently or date of loss?

20     Q    We're talking in January of 2022.

21     A    We assist property owners in the insurance

22 claims process as it relates to construction as we

23 perform those construction activities as defined by the

24 insurance carrier.

25     Q    What do you mean by you assist the property

1   owners?

2       A    Explanation of the process of how the

3   construction works and payment schedules.

4       Q    You do residential and commercial?

5       A    Yes, sir.

6       Q    And in January of 2022, was it limited to just

7   roofs or did you do full-out renovations, remodeling?

8       A    Roofing, siding, mostly exterior services; and

9   everything structural was subcontracted out.  Actually,

10  I would say 98 percent of our work was subcontracted

11  out.

12      Q    That was one of my next questions is your

13  employee base.  How many employees, W-2 folks, do you

14  have at Southeaster Roofing Company?

15      A    W-2, somewhere in the neighborhood of between

16  70 and 80.

17      Q    What do your W-2 employees do?

18      A    Clerical work, supervisory activities over the

19  subcontractors, managerial operations, building,

20  researching, developing technology as it relates to

21  software, ERPs, CRN-type deals.

22      Q    The people that are actually putting the roofs

23  on the houses, are those subcontractors?

24      A    Yes.

25      Q    1099 folks?

1       A       Yes.  Organizations that have to sign up on

2   our sub agreements and maintain proper insurance.

3       Q       How does Southeastern Roofing Company find

4   clients?

5       A       Knock doors, digital marketing via Facebook,

6   Google, and other digital vehicles.

7       Q       Some of your W-2 folks, are they people in the

8   field that are knocking on doors?

9       A       In the managerial capacity; there's a

10  consultant basis that they come in on, strictly

11  commission, not directed basis, but the employees are

12  the ones that actually manage branches of the

13  organization.

14      Q       Explain the branches of your organization.

15      A       An operator model; this is corporate here in

16  Atlanta.  We have multiple, let's call them, claims

17  organizations in which they give us the claim paperwork,

18  carrier information, property information from the

19  owner, inspection reports, et cetera.

20      They hand them over here to corporate.  Corporate

21  then dispatches work orders and/or production related

22  items in order to take the insurance carrier's scope of

23  work and produce that in the construction of their home

24  or building.

25      Q       So the claims organization part of it, is that

38

1  where these managerial consultant folks fall under?

2      A    Yes.  They mostly perform property

3  inspections, though.  That's actually technically all

4  they're doing.  They perform property inspections.  They

5  base claims off their experience with the property

6  owners.

7      We don't coerce anyone into filing them due to the

8  fact that it doesn't help us as an organization if they

9  file a claim and it does not get approved because

10  there's no work.

11     But all of them will guide them through how the

12  process typically works in our experience.

13     Q    How many locations does Southeastern Roofing

14  Company have?

15     A    We've got Atlanta, Jackson, Kentucky, Raleigh,

16  Nashville, Jackson, Mississippi.

17     Q    Okay.  I'm trying to write this down and keep

18  following you.

19     A    Oh -- oh, sorry.

20     Q    So Jackson --

21     A    Atlanta; Jackson, Mississippi; Raleigh, North

22  Carolina; Charlotte, North Carolina; Nashville,

23  Tennessee; Louisville, Kentucky; Birmingham, Alabama.

24     I believe that's it.

25     Q    Atlanta, Georgia; Jackson, Mississippi,

39

1    Raleigh, North Carolina; Charlotte, North Carolina;

2    Nashville, Tennessee; Louisville, Kentucky; and

3    Birmingham, Alabama.

4        A    Yes.

5        Q    And we're in the Atlanta location?

6        A    Yes.

7        Q    Which is -- the physical address is in Duluth?

8        A    Yes.

9        Q    Are those states the typical geographical area

10   that Southeastern Roofing Company operates in?

11       A    Yes.

12       Q    Do you travel outside of those states for

13   work?

14       A    Do I?

15       Q    Do -- does Southeastern Roofing Company travel

16   outside of those states for work?

17       A    It would be highly atypical.  Except

18   Louisville and Indiana, Louisville, Kentucky is right on

19   the border of Indiana, so Indiana is in there as well.

20       Q    So in addition to the branch states that you

21   mentioned, you also do work in Indiana?

22       A    Yes.

23       Q    Any other states that you do work in on a

24   typical basis?

25       A    No, not on a typical basis.

1     Q    What is your official role in the company?

2    Other than 49 percent owner, what is your official role?

3     A    Chief financial officer.

4     Q    Who directly reports to you?

5     A    Every single department aside from residential

6    sales.

7     Q    Who does residential sales report to?

8     A    Vice presidents of sales, plural, and then

9    they report to Bill.

10     Q    So ARRC, Limited is your asset holding company

11    that -- and that's just you; you're the sole owner of

12    that company?

13     A    Yes.

14     Q    Do you have any other businesses that you own?

15     A    June '22 -- no, I helped organize Southeastern

16    Claims Adjusting, but I'm not a principal owner.

17     Q    Is Southeastern Claims Adjusting affiliated

18    with Southeastern Roofing Company?

19     A    In the capacity of working together, but

20    they're separate organizations that operate in their own

21    lanes.

22     Q    Do they have joint ownership by somebody other

23    than you?

24     A    There is no joint ownership.

25     Q    Okay.  We're going to spend some time talking

1    about finances involving Southeastern Roofing Company --

2    A    Uh-huh.

3    Q    -- but I think we want to talk about the loss

4    some and about the car that we're here to discuss.

5    A    Yes.

6    Q    So let's talk about the 2017 Audi.

7    A    Uh-huh.

8    Q    Tell me when you purchased the car.

9    A    I don't have the buyer's agreement from the --

10   the material documentation for it.  I purchased it from

11   a Porsche dealership in Naples, I believe, in 2019.

12   What is it, '22?  2019.

13       The buyer's order was in the vehicle in the glove

14   compartment when it got stolen.

15            MR. MILLICAN:  We provided you a copy of that,

16        so whatever the date on that would be the most

17        accurate.

18            MR. FOSTER:  Yes, sir.  If we can -- we'll

19        make that as an exhibit in a minute.

20            MR. MILLICAN:  Okay.

21   BY MR. FOSTER:

22   Q    I was just trying to get an idea of when you

23   purchased it.  And you bought it from a Porsche dealer

24   in Naples; correct?

25   A    Yes.

42

1    Q    And it's a 2017 Audi R8.  The last four on the

2  VIN that I have is 3925.

3       And to keep me from saying the 2017 Audi R8 over

4  and over and over again, if I say the car, do you

5  understand that that's what I'm talking about?

6    A    Yes.

7    Q    Okay.  So you purchased the car from the

8  Porsche dealership.  What was the purchase price?

9    A    It was 110,000 plus tax, ad valorem, et

10  cetera.

11    Q    And how was it paid for?

12    A    Via a line of credit in Renasant Bank that was

13  secured.

14    Q    The car was used as collateral on the line of

15  credit?

16    A    No.  We had CDs that were used as collateral

17  that was on the line of credit.

18    Q    I thought I saw on one of the documents you

19  provided that the car was listed as collateral on a loan

20  with Renasant Bank or a line of credit, one of the two.

21       But I'm hoping you can explain the way the

22  financing has worked on that vehicle over time.

23       Has it changes?  Has it always been under this line

24  of credit?

25    A    It started out to where we had a half a

1   million dollar line to purchase vehicles, and in doing

2   so, we had to have a certificate of deposit with

3   Renasant for them to secure said line with the vehicles.

4        And as we purchased the Audi, it was under that

5   line.  But since it didn't fall into a truck or

6   something like that, then it became its own vehicle.

7   But it was -- they were both secured by certificates of

8   deposit.

9        Q    Who is the titled owner of the Audi, the car?

10       A    Southeastern Roofing Company.

11       Q    Are you on the title as well?

12       A    Yes.

13       Q    Is Renasant Bank listed as the lien holder?

14       A    Yes.

15       Q    Do they have the title?

16       A    Yes.

17       Q    You don't have a paper copy of the title

18   laying around here, I'm assuming?

19       A    No.

20       Q    Okay.

21       A    Trying to think.  No, it's just the insurance.

22       Q    Okay.  So you took out the -- excuse me.  You

23   had a line of credit with Renasant Bank.  Was that line

24   of credit, did it predate the purchase of the Audi?

25       A    The trucks, yes; the credit was given in order

44

1   to allow us the ability to purchase additional vehicles.

2       Q    So you already had an established line of

3   credit --

4       A    Yes.

5       Q    -- with certificates of deposits used as

6   collateral for that line of credit?

7       A    Yes.

8       Q    That was typically used to purchase work

9   trucks?

10      A    Yes.

11      Q    Then you wanted to buy the Audi, and you used

12  the line of credit to purchase the Audi, initially; is

13  that correct?

14      A    Initially, I attempted to do so, and I -- from

15  my understanding, I believe Renasant then split the line

16  into two different lines based on that original line.

17      Q    What was the purpose of the purchase of the

18  car?

19      A    As a company vehicle.

20      Q    Who was the principal driver?

21      A    I, Avi Reddy, principal driver.

22      Q    And what did you use it for in connection with

23  the business?

24      A    Drive to and from work, but also use it as a

25  mechanism to enhance the sales in the commercial realm

1  to differentiate ourselves from other contractors in

2  industry.

3    Q    Not too many roofers pulling up in a 2017

4  Audi, then; right?

5    A    Not from my understanding, but I would venture

6  to say I've see some with some Lamborghini Aventadors

7  that drive around Florida.  So I don't think that's my

8  expertise on the local roofing community.

9    Q    I'm going to hand you and your attorney what

10  I've marked as Exhibit 1 here.

11         (Exhibit No. 1 was marked for identification.)

12    Is that the buyer's order and agreement that you

13  were telling me about regarding the purchase of the

14  vehicle?

15    A    Yes, sir.

16    Q    Can you tell me the date?

17    A    The date was June 18, 2020.

18    Q    And the purchase price?

19    A    $109,500.

20    Q    And what's the total?

21    A    Including taxes, et cetera?

22    Q    Yes.

23    A    $118,056.73.

24    Q    And was that full amount funded by the line of

25  credit at Resanant Bank?

1       A     Yes.

2       Q     Was there any down payment made?

3       A     Yes.   Inadvertently, they had messed up the

4   payment schedule and not only charged us the down

5   payment but also an accelerated payment on the car that

6   was made for two to three months on the initial term

7   until I caught it in my audit.

8       Q     Explain that to me, the term payment.   I mean

9   because I'm looking at -- I'm looking at a purchase

10  agreement, but I don't have a typical finance agreement

11  like I would see where if I wanted to go buy a car and I

12  get a loan with whoever and they put it on terms and I

13  sign the agreement.

14      You're using a line of credit to purchase a

15  vehicle.   So explain the terms of that purchase to me.

16      A     So a line of credit essentially is just a

17  mechanism in which we collateralize it with the

18  certificates of deposit, and I believe at the time they

19  gave us a two to one on the CDs.

20      So put a quarter of million up for the CDs,

21  Renasant offered a half million dollar line at the

22  primary plus, give or take three points.

23      And from that standpoint, it was only supposed to

24  be as we utilized the line that then the clock starts

25  ticking on the interest and the payments.

1      But as they split the line off to a different line

2  from the trucks to the cars, where it was my vehicle and

3  then those -- not those out there, but similar ones, so

4  I think they classified it as an executive vehicles

5  purchases, they then did not do that, and they were

6  charging us for the whole $200,000 line when it had not

7  been being used.

8      So we were paying the interest as well as principle

9  on the line.  So the payment schedule was incorrect by

10  the bank initially as the line was going.  Because when

11  I purchased this vehicle, it was only supposed to be the

12  here's the principle amount against as well as the

13  interest, but they started paying off the $200,000.

14      Q    Do you know at the time of the purchase of the

15  car, the Audi, what the existing balance was on the line

16  of credit?

17      A    The -- this should have been a separate line

18  as they pointed up 200,000, so there has been nothing

19  taken out on that line.

20      The balance of the trucks, I can't speculate over

21  quantitatively, and my capacity as CFO doesn't allow me

22  to do so.

23      Q    So the payments on the line of credit were

24  incorrect, according to you.  But what were they?  What

25  were they requiring?  After you purchased the Audi with

48

1   the line of credit, when was the first payment due?

2      A    I believe a month after the purchase price --

3   or after the purchase was made.

4      Q    And how much was it?

5      A    How much was it supposed to be or how much did

6   they take out?

7      Q    How much was the actual payment?

8      A    I believe they were taking out something in

9   the neighborhood of $6000.

10      Q    Was is set up on a draft?

11      A    Yes; because we bank with Resanant Bank so

12   they set up the line and just AC-bendered (ph.) it.

13      Q    So they just reached in and took out like

14   $6000?

15      A    Yes.

16      Q    What was it supposed to be?

17      A    2000- -- I believe it comes to like 2300,

18   something like that.

19      Q    And when did you catch the error?

20      A    Two to three months later.

21      Q    I believe you said it was in an audit you

22   caught the error?

23      A    Yeah.  We were in the process of reconciling a

24   lot of our financials because this total -- it was just

25   like a moving target, so, yeah, privy to it.

1     Q     Did you call Renasant Bank?

2     A     Yeah, I called Chris Braun, our local banker.

3     Q     What was his last name?

4     A     Braun, B-r-a-u-n.

5     Q     Is that the person you usually deal with at

6  Renasant Bank?

7     A     Yeah.  But in this case, Dallas, D-a-l-l-a-s,

8  is the vehicle guy, because the thing about Chris, he

9  always just passes the buck.

10    Q     Chris sent you to Dallas?

11    A     Yep.

12    Q     What's Dallas's last name?

13    A     Ustrud, or something like that.

14    Q     Okay.  Do you know a spelling for Ustrud?

15    A     I don't; it's speculative, but it starts with

16  a U.

17    Q     And how was it corrected, or was it corrected?

18    A     They said -- they didn't give us the money

19  back; they just lowered the payments going forward.

20    Q     And what did they lower them to?

21    A     The 2000-change number.

22    Q     Okay.

23    A     The 2000 and some, I've got to dig into it.

24    Q     But those payments were made by Southeastern

25  Roofing?

50

1     A    Yes.

2     Q    Aside from calling Renasant and correcting the

3  payments that are owed on the car, had anything else

4  changed on that line of credit for the car at the time

5  of the loss?

6     A    No.  We had actually continued -- I still pay

7  it.  I see it go out every month since the actual loss,

8  plus pay the insurance, too, since the loss, which is

9  another thing that we just went through.

10     Q    And I know that you are still working on

11  getting your tax returns done, so we don't have those

12  yet; is that correct?

13     A    Uh-huh.  Yes.

14     Q    Yes.  Okay.  But you can provide those, the

15  Southeastern Roofing Company's tax returns from 2020 and

16  2021?

17     A    Yes, sir.

18     Q    They filed their own tax returns?  When I say

19  they, I mean Southeastern Roofing Company files its own

20  tax returns; correct?

21     A    Yes.

22     Q    A couple of the documents you provided to me

23  were mislabeled.  I got a Renasant Bank statement that

24  was labeled for -- or two of them.  One was labeled

25  January of 2022, and the other one was labeled February

51

1    2022.

2         But when I opened them, neither one of those

3    statements were -- this is the last four -- 4023 is the

4    last four of the account number.

5         Neither one of those statements correlated with

6    January or February of 2022. So I'm going to need --

7    still need January and February of 2022.

8         A    What was the account number ending in, 4023?

9         Q    So the last -- 4023.

10        A    Okay.  I've got to figure out what account

11   that is.

12        Q    Okay.  While we're talking about accounts,

13   let's go through that right now.

14        A    Uh-huh.  Yes.

15        Q    How many checking accounts does Southeastern

16   Roofing Company have?

17        A    We have a -- an operating account, payables

18   account, a money market that's technically a savings.

19        The operating, the payables, the PUD account, I

20   would say three checking accounts and the rest would be

21   savings or certificates of deposits.

22        Q    So you have three checking accounts, one of

23   them is the operating account?

24        A    Yes.

25        Q    Do you know the last four of that?

1      A      8718.

2      Q      I figured you did.

3      A      I know that one.  The 4023, I believe is

4  either payables account, PUD account.  I've just got

5  to --

6      Q      You said the payables account, or what was the

7  other account?

8      A      It's called a PUD account.

9      Q      What is a PUD account?

10      A      Bill calls it that.  It's a colloquial

11  reference for "pay upon death" of Bill.  It was like

12  a -- something for his kids.  It didn't make sense.

13      I named it that, but there's no documentation of it

14  at all.

15      It's just a checking account

16      Q      What's it used for?

17      A      Primarily to just -- I like to take the

18  operating account and then any, like, excess funding in

19  there so that it doesn't just -- it's like a psychology

20  to having it all lumped in one account.

21      But I want to make sure that I have the payables

22  over here.  But also Bill just had a side of like

23  110,000 that he wanted to make sure was in an account

24  that somehow validated his working in 2017 for like --

25  it was like undistributed income.

53

1    Q    Was the account used to pay bills or make

2  purchases or any- --

3    A    Yeah.  I mean we just use it as a traditional

4  checking account, so the difference to me is none.

5    Q    While it has a different name, it's still used

6  as a -- do y'all still dip into it and use the account?

7    A    Yes.

8    Q    Exactly.

9    A    Yes.

10   Q    It's not like you put money in a checking

11  account and just let it stay there.

12   A    That's -- yeah, that's why it makes no

13  difference to me.

14       That's a money market, though.  I think the class

15  for that is checking, because I believe a money market

16  is technically savings.

17   Q    The two sets of checking account statements

18  that I have, one account ends in the 8718, which is the

19  operating account, and the other account ends in 4023.

20       So it sounds like there's another account that I

21  don't have statements from, this PUD account.

22   A    I believe the -- I might have been incorrect.

23  I thought it was for like checking accounts, but, yeah,

24  you have -- as of January, you should have had the 8718

25  account.

1      And then is the -- I mean, can I look it up?

2      Q    Absolutely.

3      A    It will take me like four seconds.

4      Q    Anything you can reference to help you with

5  accuracy, dates, amounts --

6      A    Well, I want to make you sure you've got all

7  the bank account information, because it wouldn't make

8  any sense otherwise.

9      Yeah.  It would just be that, the money market

10 account.  The payables account wasn't open in January.

11     Q    So there's ano- -- the checking account called

12 the payables account was opened after the January of

13 2022 loss?

14     A    It was closed, but we reopened it because of

15 the -- we closed it after the whole government, like,

16 funding thing shut down because we wanted to have a

17 separate account for it.

18     But then they reopened it.  Like, so we reopened it

19 because they wanted to keep the same account

20 information.  But it didn't really make a difference.

21     Q    You're giving me a lot of the side stuff, but

22 really what I'm after is just tell me how many accounts,

23 money market accounts, savings accounts, checking

24 accounts.  And I'm interested in what you had in January

25 of 2022.

1      A    I apologize.  There was three accounts in

2   January of 2022.

3      Q    And they are?

4      A    The operating account, the PUD account as well

5   as a payroll account by the name.

6      Q    All of these were with Renasant?

7      A    Yes.

8      Q    And the 8718 account, that correlates with the

9   operating account?

10      A    Yes, sir.

11      Q    Do we know what 4023, what account that

12   correlates with?

13      A    It's a payroll account, checking account.

14      Q    Do you know the last four of the PUD account?

15      A    Yes; it is 2775.

16      Q    I don't have those records.

17      A    Oh, I can got you the PUD account.

18           MR. MILLICAN:  Which records?

19           MR. FOSTER:  The PUD account.

20           MR. MILLICAN:  The PU- -- okay.

21   BY MR. FOSTER:

22      Q    I'm referring it as that because that's what

23   you called it.  I had no idea what that was until you

24   explained it to me.

25      A    Yeah.  I mean, I want you to have everything,

56

1    so it makes no difference to us.

2         Q    Since we were talking about a couple of the

3    statements that were mislabeled for January of 2022 and

4    February of 2022, this is one of them.

5         This is Exhibit 2.

6             (Exhibit No. 2 was marked for identification.)

7         The last four is 4023.

8         A    Uh-huh.

9         Q    So that would be the payroll account; is that

10   correct?

11        A    Yes.

12        Q    I believe that was the one that was labeled

13   January of -- in the document package that I got, it was

14   labeled as January of 2022, but you can tell --

15        A    It's January '21.

16        Q    -- that it's not January of 2022.

17        A    Right.

18        Q    And the same think goes -- I'm going to mark

19   another one as Exhibit 3.

20             (Exhibit No. 3 was marked for identification.)

21        And it's the same account, 4023.

22        But I want to be clear that these two documents

23   don't represent the titles that they were in the

24   document package that I got.

25        Exhibit 2 and Exhibit 3 are both for 2021; correct?

57

1    A    Yes.

2    Q    Okay.  So you understand that I still need on

3    account 4023 -- account ending in 4023, I still need

4    January of 2022 and February of 2022?

5    A    Yes, sir.

6    Q    Do you know what the balance was in the 4023

7    account at the time of the theft?

8    A    I do not.  I can't speculate on --

9    Q    Can you look it up?

10    A    Yeah.  Well, let's see.  The date was

11    January --

12    Q    January the 19th.

13    A    -- 19th.  So it was $1044.96.

14    Q    That's $1044.96?

15    A    Yes.

16    Q    While you're in there, can you look up the

17    balance in account number 8718 on January 19th of 2022?

18    A    Yes.  It was anywhere from -- the day started

19    out as $6594.78 and then it ended at $63,047.54.

20    Q    So between $6500 and $63,000, roughly?

21    A    Yes.  On January 19, 2022, yes.

22    Q    What about the account ending in 2775?

23    A    2775; January 19th, it says $20,028.68.

24    Q    A little over 20,000?

25    A    Yep.

58

1     Q    Let's talk about the loss.  We're going to

2     talk some more about finances, but there's only so much

3     of that I can absorb at one time.

4     A    Yeah.

5     Q    Let's talk about the car.

6     A    Yep.

7     Q    Tell me what happened.

8     A    So to keep things as succinct as possible, I

9     was sitting here about 9, 9:30 at night.  I was eating

10    dinner with one of our superintendents.

11         He had gotten pinged via our Slack channel that he

12    had left the locks on the garden part of -- Domaine is

13    the venue, so it's the door part that's adjacent to the

14    parking lot.

15         He left the locks on the inside instead of the

16    outside.  And that was apparently in violation of some

17    OSHA standard.

18         So he asked myself if he could -- if I wanted to go

19    out there with him.  And I said:  Sure, I'll look at the

20    construction.

21         We went onsite.  I brought my Audi.  He pulled his

22    Silverado 2500.

23         And then as we were walking through the other set

24    of gates, which is the primary entrance, because the set

25    of gates we were fixing were the locks on the inside,

59

1   we -- I saw a car jut in between our two cars.

2       And this is about 9:45, maybe 10 o'clock at night,

3   to the best that I can recall currently.

4       And I remember locking it twice, because that was

5   strange that someone in the lot that was the majority

6   open would park right between our two vehicles, so --

7   and in the middle of Midtown.

8       So we walked in, he changed the locks.  I tell him:

9   Do you have the keys to the pool area?  Because as of

10  right now in June, we just actually renovated that, so

11  we were moving from the garden to the pool.

12      And then when, as we were walking through the pool

13  area, we then walked up the catwalk into the main venue

14  space.

15      And I was just going through different ideas of how

16  I wanted the venue to look and what I think would drive

17  the most traffic in.

18      And we spent about 30 minutes in there just walking

19  around, because the whole place is about 26,000 square

20  feet.

21      We walked out the front door, lock up.  And then as

22  we're walking up the lot, he sees his vehicle, and

23  his -- one of the windows was shattered.

24      And when we saw it, I said:  Damn, if they got you,

25  then they definitely got me.

60

1     Big truck, so mine would have been behind it.  As I

2   walk out, I only had my window, like, in the parking

3   lot.

4     And I texted my insurance agent, because I actually

5   saw him earlier that day because I was revising our

6   health insurance coverage to, like, be more inclusive.

7     And then I called the police.  They didn't show up.

8   They had cruisers going by, but they didn't pull in.

9     Called them again after 45 minutes, called them

10  again.  They showed up like two and a half hours later,

11  probably around like 1 o'clock, something like that.

12    It was getting real late at night and we're just

13  sitting in the lot and it was -- it was a cold night and

14  he just had a giant jacket on, I remember.

15    And I told them that his blinds (ph.) had gotten

16  stolen out of his truck and my car is just totally gone.

17    So from then, I just got an Uber back to Long

18  Island and then Uber to work the next morning after

19  coming in like 3, 4 o'clock.  But, yeah, that was it.

20    Q    Okay.  So I have a few follow-ups and

21  clarifications that I need.

22    This was a supervisor you were with?

23    A    Superintendent --

24    Q    Superintendent?

25    A    -- or project manager/superintendent hybrid-

61

1    type role.

2        Q    What was this individual's name?

3        A    Roy, R-o-y, Abdallah, A-b-d-a-l-l-a-h.

4        Q    Do you have Roy's phone number?

5        A    Yeah.

6        Q    Can I have it?

7        A    Yes.  His number is ████████████

8        Q    Roy Abdallah?

9        A    A-b-d-a-l-l-a-h.

10       Q    ███████████

11       A    Yes.

12       Q    And Roy drives a Chevy Silverado?

13       A    Yeah.  It was our fleet truck, so he was

14   driving a company vehicle.

15       Q    Y'all were here in this office when you were

16   having dinner; is that correct?

17       A    Yep.

18       Q    And the project you were working on, can

19   you -- you kept -- you said it once, but you kept going

20   back to calling it the venue.

21            What was the name of the venue?

22       A    Domaine Atlanta.

23       Q    Domaine Atlanta.  What is Domaine Atlanta?

24       A    Domaine Atlanta is a 26,000 square foot

25   concert venue.

1    Q    Southeastern Roofing Company was performing

2  some work there?

3    A    Yes; the exterior garden at the time.

4    Q    What were y'all doing to the garden?

5    A    We -- well, it was uninhabited for a while, so

6  we actually just built it up.  The pergola fence,

7  exterior fence outdoors, like set concrete for the

8  handrails, like a remodel.

9    Q    And he received a phone call from someone with

10 Domaine Atlanta?  Roy?  At the time that y'all left; is

11 that correct?

12   A    No.  His boss at Southeastern Slacked him and

13 said that the locks were on the inside.  That's a

14 violation of OSHA standards.  And he wanted them swapped

15 to the outside.

16   Q    Slack is a messaging platform; correct?

17   A    Yes, yes.

18   Q    And what's the boss's name that had messaged

19 Roy on Slack?

20   A    Michael Henderson.

21   Q    Michael Henderson?

22   A    Yes.

23   Q    What time do you think it was when you left

24 here?

25   A    It would be around 9 o'clock at night.

63

1    Q    And the objective was to go to Domaine Atlanta

2  and fix the locks?

3    A    He was going to fix the locks.  I was going to

4  actually check on the construction, because I made a

5  habit to check on it every night before I went home.

6    Q    That's something you did was check on the

7  construction every night?

8    A    I just wanted to validate what they were

9  actually doing compared to what they were telling me

10  they were doing, because I sold the job.  So I wanted to

11  make sure we were actually doing it correctly.

12    Q    When did you start that project?

13    A    It had to be October.  We subcontracted it

14  out, but they said that they were going to take a couple

15  weeks.  And it just kept expanding out and out and out,

16  lack of workforce.

17    Q    Did you have a written contract on that job?

18    A    Yes.

19    Q    Do you remember how much the contract was for?

20    A    It was originally $96,000, I believe.

21    Q    Did it change?  You said originally 96,000.

22    A    Because eventually we added on the pool and

23  then paint and stuff like that.

24    Q    When did the scope change?

25    A    As we progressed through the garden, then we

64

1   worked on -- we started out with the garden, and about

2   two weeks in, we were only supposed to paint the pool,

3   and then we ended up remodeling the pool.

4       Q    Did you execute a new contract at that point?

5       A    Yes.

6       Q    And what was the total amount of the job then?

7       A    So the garden was at 100 grand, and then the

8   pool, I believe, is 185,000.

9       Q    And that was added in 2021 as well, the

10  pool --

11      A    Yes.

12      Q    -- parts of the contract?

13      A    Yeah.

14      Q    Okay.  So you go to Domaine Atlanta.  And you

15  and Roy park your vehicles.

16      And can you describe the area where you parked?

17      A    There is a pay -- self-service pay lot right

18  next to Domaine Atlanta.  There's -- it's also adjacent

19  to the garden and the pool that we had to fix these

20  fences to.

21      Now, that's the only parking there because all the

22  decks close down at night.  So you pay there.  You pay

23  the ticket service.  And then because it's United

24  Parking, they overcharge you.  So I think it's like $30.

25      Q    Is that where you go to the little kiosk

1  and --

2     A     Yes.

3     Q     -- get the ticket?

4     A     Yes.

5     Q     What was the -- or can you describe the

6  vehicle that pulled in, in between you and Roy?

7     A     Had to be from the '90s.  It was like a sedan-

8  type vehicle later than the 2000's.  It was an older

9  sedan, more compact car.

10     Q     Do you remember color?

11     A     It was darker, I would say like a brownish

12  or a -- because I saw it adjacent to my point of view.

13  Because as I'm walking into the garden, I looked left

14  and saw them jut in.

15     And then I just looked over, and I -- I just

16  remember vividly knowing that that was strange because

17  that's when I locked my car twice.  And that's why also

18  whenever the police officer asked if I locked my car, I

19  knew emphatically that it was locked.

20     Q     How many sets of keys did you have to the 2017

21  Audi?

22     A     Two; I had one that was on my person and then

23  the other got -- there -- somewhere in the move, it was

24  lost between, like, my old house and the Long Island

25  location.

1        Q     When you purchased the car, did you have --

2        A     Two sets.

3        Q     -- two sets of keys?

4        A     Yes.

5        Q     And then at some point in time when you moved

6    to the Long Island address, one set of keys got lost; is

7    that correct?

8        A     Yes.

9        Q     And we're talking about a key fob?

10       A     Yeah, just a key fob.

11       Q     Do you know when that would have been?  When

12   did -- I remember us talking about your addresses.  When

13   was it that you moved to Long Island?  To 4860 Long

14   Island Drive; correct?

15       A     Yes.  It was like March or April of 2020.

16   Because I know where they were at my old house, because

17   I had them in a drawer.  So there was a built-in.  So

18   they had to get moved somewhere.

19       Q     Did you ever see them after you moved to 4860

20   Long Island Drive?  By them, I mean the set of missing

21   keys.

22       A     No.

23       Q     So from the time you moved in March or April

24   of 2020 until the time of the loss, you just had the one

25   key; is that correct?

67

1       A    Yes.

2            MR. MILLICAN:  Excuse me.  Can I just clarify?

3       Do you mean 2021, March or April of 2021?

4            THE WITNESS:  Of the moving?

5            MR. MILLICAN:  Yeah.  Well, let me make it

6       easier.

7            THE WITNESS:  Yes, yes, yes.

8            MR. MILLICAN:  Yeah.  Because you said 14

9       months, and then --

10           THE WITNESS:  Yes.

11           MR. MILLICAN:  -- plus you didn't get the car

12      till June of 2020.  So I just wanted to clarify.

13           MR. FOSTER:  Thank you.

14           THE WITNESS:  Yes.

15  BY MR. FOSTER:

16      Q    March or April of 2021, that's when you moved

17  to Long Island Drive; correct?

18      A    Yes.

19      Q    And from the time that you moved in March or

20  April of 2021 until 48- -- excuse me, until January of

21  2022, you only had the one key to operate the car?

22      A    Yes.

23      Q    And at the time of the loss, you had that key

24  with you?

25      A    Yes.

1      Q     Because you remember hearing the beep, beep

2   and locking the car?

3      A     Twice.

4      Q     Did you have your cell phone with you at the

5   time of the loss?

6      A     Yes.

7      Q     That's your ███████████ ?

8      A     Yes.

9      Q     Is that the number you used to call the

10  police?

11     A     Yes.

12     Q     What type of phone do you have?

13     A     iPhone 12.

14     Q     You like iPhones?

15     A     It depends on the day.

16     Q     I'm an Android guy.  I never can get the

17  Apple.  I have to get my -- I have two sons that I have

18  to get to walk me through what to do with Apple

19  products.

20     A     I really liked the Apple ones until I started

21  getting into the tech side of things, and then I really

22  started to despise how this thing blocks everything.

23     Q     Is that iPhone 12 the same phone that you had

24  at the time of the loss?

25     A     Yes.

1      Q    Is the phone number ▮▮▮▮▮▮▮ the phone

2    number you had at the time of the loss?

3      A    Yes.

4      Q    And at the time of the loss, did you have any

5    other cell phone numbers?

6      A    No.

7      Q    Did you have any other physical cell phones

8    that you used?

9      A    No.  I mean, the only thing I can think of is

10   potentially Roy's phone to call while I was on the phone

11   or doing something, but no.  It was --

12     Q    The reason I ask that is sometimes you can

13   have a phone that doesn't necessarily have an active SIM

14   card or phone number but you can use Wi-Fi calling.

15     A    Oh, no.

16     Q    So did you have a separate phone that --

17     A    No.

18     Q    -- you used for other phone calls?

19     A    No.  I have one phone only.

20     Q    Okay.  I imagine doing what you do, you have

21   to keep that cell phone as your lifeline with you, like,

22   all the time.

23     A    It's terrible, honestly.  It breeds anxiety,

24   like -- I'm like . . .

25     Q    Did you file a claim on the Silverado?

1      A    I believe so.  But I know I filed a police

2   report.  I told my agent about it, and I think there's

3   only one current claim there.  But I described it and

4   got everything situated up, but essentially my –– was

5   things to follow-up on.

6      Q    What was stolen out of the vehicles?

7      Let's just start with the car.  What was stolen out

8   of your car?

9      A    A briefcase, I had $9800 in cash, a laptop, a

10  reMarkable, and a pair of sunglasses.  I left my COVID

11  card, I remember that.  Yeah, that was it.

12     Q    What type of briefcase?

13     A    It was a Louis Vuitton briefcase that Parker's

14  stepdad had given to him and he gave me for something.

15     Q    Where was it at?

16     A    It was –– there is a front trunk area.

17     Q    It was in that front or whatever you would ––

18     A    Yeah.

19     Q    –– call that?

20     A    Called it a frunk.

21     Q    Frunk?

22     A    There you go.

23     Q    And the cash, where was the cash?

24     A    In the briefcase.

25     Q    What was the purpose of the $9800?

71

1     A     My recording artist friend had gotten some

2     deal with a Rolex dealer in Buford that he could get

3     them at retail.  And he was getting them from the guy at

4     retail and then selling them.

5          But -- so give him money to sell them, and when he

6     sold them, then he would give us our split.  I remember

7     it was like 9800 bucks, because he was supposed to give

8     me 10 grand but -- the principle-plus whatever back --

9     but shorted me $200.

10         Q     Is that the person that was living with you?

11         A     Yes.

12         Q     Reese Thornton?

13         A     Yes.

14         Q     Camino?

15         A     Camino.

16         Q     When did -- when did he give you the $9800?

17         A     Speculating, a few weeks before that.

18         Q     And you put it in your car, and it had been

19    there the whole time?

20         A     I had it in my briefcase, because I figured

21    that was the safest place to always have it.  And

22    ironically that was the "stupiding" moment thing.

23         Q     Where was your laptop at?

24         A     Briefcase.

25         Q     Sunglasses?

72

1       A       They were in a pocket of the center console.

2       Q       What type of sunglasses were they?

3       A       Jay-Z, it was like Cardio sunglasses.

4       Q       And the laptop, what brand was it?

5       A       It was a Lenovo ThinkBook Gen 2.  I think a

6    Plus Gen 2.  It's a very hard laptop to find now.

7       Q       And so the Silverado, the glass was broken out

8    of it; is that correct?

9       A       Yes.

10      Q       What glass was broken out?

11      A       The passenger's side back window, I believe.

12      Q       Was there something taken out of the

13   Silverado?

14      A       Yeah.  They took a bunch -- like some comedy

15   stuff, some personal stuff.  I don't know exactly.  I

16   believe it was on the report, but I'd have to ask him.

17      I told him to make a list of it when he got there,

18   because he was all freaking out about his insurance.

19   And I told him that we were like -- I was like, this is

20   a company vehicle.  We were on a, like, company

21   property.  Like, you were at the following address.

22   Because I don't think he's ever had to deal with that

23   personally.

24      Q       So you go into Domaine Atlanta, you and Roy.

25   Roy goes to fix the lock on the gate.  You take a look

1  at the garden to make sure everything's going according

2  to plan.

3      A    Uh-huh.

4      Q    Is that correct?

5      A    Yes.

6      Q    And whenever you're finished looking at the

7  job, he's finished fixing the lock, then you decide to

8  leave.

9      Do you know what time that is whenever you're

10  walking back to your car?

11      A    10:45-ish, I believe.  Maybe it was between 10

12  and 11, because I remember I spent like 30 minutes in

13  the venue talking about stuff.

14      Q    So you walked from the parking lot, go into

15  the venue, and you're in the venue for approximately 30

16  minutes?

17      A    Yeah; or like 45.

18      Q    So 30 to 45 minutes you were in the venue?

19      A    Yes.

20      Q    Then you come back outside.

21      Did you hear any glass breakage, anything while you

22  were in there?

23      A    I heard -- I was telling him earlier, I heard

24  a car like -- you can tell it's when a sports car turned

25  on, and I didn't think anything of it because in Midtown

74

1    you hear Hellcats and all sorts.

2         So I'm just thinking, all right, whatever, it's

3    just some guys.  But we walked in -- but every time that

4    we replay it, everyone's like that was when it happened.

5         Q    Was there anybody else there besides you and

6    Roy?

7         A    No.  It was me and him in this giant dark

8    place.

9         Q    Did you have lights inside?

10        A    I mean, I turned on a few, but there was,

11   like -- you know, just whatever I could.  I don't think

12   I even knew how to operate the -- it's like a hundred-

13   year-old building, so . . .

14        Q    This parking lot that you were in -- we're not

15   talking about a parking deck; we're talking about a

16   parking lot; correct?

17        A    Open -- yeah.  Open lot.  It was terrible.

18        Q    What -- did you have to go to the kiosk and

19   print out a ticket for the lot --

20        A    Yes.

21        Q    -- whenever you parked?

22        A    Yeah.  I don't even believe I did that due to

23   the fact that I thought I was going to be quick when I

24   said we were going to check the locks and then I made it

25   a whole thing.

1      Q    I was going to ask you if you still had the

2   ticket.

3      A    Yeah.  I didn't -- I do not have a ticket for

4   it.  I have similar tickets, but no.

5      Q    Not from that night?

6      A    No.

7      Q    What about Roy, did -- does he still have his

8   ticket?

9      A    I could not recall.  I didn't ask him or even

10  think about it at the time.

11     Q    When you walked out to the parking lot, you

12  see Roy's truck --

13     A    Yes.

14     Q    -- first.

15     A    Yes.

16     Q    Is that correct?

17     A    Yeah.

18     Q    And he's the one that noticed that the glass

19  was broken?

20     A    Yes.

21     Q    And then you realized that your car was

22  completely gone?

23     A    Yes.

24     Q    Is that correct?

25     A    Yes.

1      Q    And did you see anything on the ground?

2      A    My window, I saw a Black & Mild, made a joke

3   about it saying that was a clue.  And I don't -- at was

4   like an ATL spoof thing.  But saw that.

5      And that -- no, that was it.  It was -- because the

6   window kind of, due to whatever, like, the factory tint

7   art is, has like some integrity.  It sticks it together.

8   So it was just like this mushed up piece.

9      Q    Did you take any pictures at the scene?

10      A    Yeah; of the window and the -- I think I sent

11   them in.  I mean, I definitely --

12      Q    You did take photographs at the scene?

13      A    Yeah.

14      Q    Okay.  Are you pull those -- you're pulling

15   those up on your phone now?

16      A    Yeah.  I mean, I'm assuming I'm going to have

17   to put them in a drive somewhere, but I just want to

18   validate what I have.

19          MR. MILLICAN:  Email them to me, and then I'll

20      make sure to send them.

21          THE WITNESS:  Okay.

22   BY MR. FOSTER:

23      Q    Send those to your attorney so that he can get

24   the pictures from the scene.

25      A    Yeah.

77

1     Q    And whatever it was you took, if you took

2    pictures of the windows, if you took pictures of his

3    truck, if you took a picture of an overview of the

4    parking lot, like you may not think it's relevant, but

5    if it's from that night and that area around the time of

6    the theft, then I'd like to see them.

7     A    Yeah.

8     Q    Did you take pictures of the venue when you

9    went in?

10    A    No, not that night.  I said it was me doing

11   it, but no.  Because I was just record, and then paging

12   people for not doing the correct thing.

13    Q    I understand.  That's why I asked.  I figured

14   if you went by to check on it, you may have taken some

15   photographs, videos, or something.  But that night you

16   didn't take any inside the venue?

17    A    No.  I only have about three videos, but I'd

18   probably been there 40 nights in a row at that point.

19    Q    So you come back outside.  It's 10:45, 11

20   o'clock or so; is that correct?

21    A    Yes.

22    Q    We're talking p.m. --

23    A    Yes.

24    Q    -- on January the 19th?

25    A    Yes.

1     Q     You call the police.  It takes them a while to

2   get there.

3     A     A while is an understatement, yeah; two and a

4   half hours.

5     Q     Okay.  Police finally show up, and talk me

6   through what happened from there.

7     A     Police show up.  I tell them what has

8   happened.  Two officers show up at the same time for

9   some reason.

10      And then different routes; one says they'll take

11   the whatever code for grand theft auto and the other

12   says he'll take the break in.

13      And I asked him about the situation.  And he says

14   that this is like the worst lot in Midtown.  And then

15   I'm just talking about the police force and how there's

16   a lack thereof in the area and someone needs to do

17   something about that.

18      But talked to them for a little bit.  It started

19   raining.  And then I just wrote down what I could.

20      The officer seemed a bit distracted and really

21   trying to make me just, like, move.  But I mean, I'm

22   like, dude, like two and a half hours later and my car

23   is gone.  And we're just like -- okay, okay.

24      All right.  Here's your number like --  like I

25   didn't ask him --

79

1    Q    Okay.  Did you check any surveillance cameras

2   or check to see if the area had any sur- --

3    A    They didn't have any surveillance cameras

4   especially on the main lot.

5    Q    A lot of those parking lots will have a camera

6   right on the exit, but there was no camera in that lot?

7    A    There's not even a camera on the kiosk.

8    Q    I'm going to hand you what I've marked as

9   Exhibit 4.

10        (Exhibit No. 4 was marked for identification.)

11       This looks like to me it's the incident report,

12   Atlanta Police Department, Case No. 220200105.

13       Does this look like the incident report associated

14   with the theft of your Audi?

15    A    Yes.

16    Q    Have you read this police report before?

17    A    No.

18    Q    Will you take a minute and look over it for

19   me, because I'm going to ask you some questions related

20   to it?  Mainly I want to make sure that the report's

21   accurate and correct.

22       So if there is anything that's incorrect in the

23   report, I'm going --

24    A    All right.

25    Q    -- need you to tell me about it.

80

1       A    Yes.

2            MR. FOSTER:  Let's go off the record a minute.

3            (Off the record at 12:02 p.m.)

4            (On the record at 12:17 p.m.)

5   BY MR. FOSTER:

6       Q    So during the break I asked you to take a look

7   at Exhibit 4, which is the Atlanta Police Department

8   Case No. 220200105 incident report.

9       Is this the incident report related to the theft of

10  your Audi?

11      A    Yes.

12      Q    Is there anything contained in this report, in

13  your review of the report, that is inaccurate in any

14  way?

15      A    It's missing the sunglasses but –– oh, and the

16  cash was 9800.

17      Q    Okay.  So the cash is 9800 instead of

18  10,000 ––

19      A    Yes.

20      Q    –– and the report's missing the sunglasses?

21      A    Yes.

22      Q    Other than that, everything else on the police

23  report is accurate?

24      A    Yes.

25      Q    Did y'all repair the glass on the Silverado?

                                                        81

1      A    Yeah.  Roy asked me the next day, it's a work

2    truck, so can he get on that?  And I said:  Get it

3    repaired.  We'll turn in the invoice to insurance.

4      Q    Do you have a copy of that invoice?

5      A    I'm sure I do.  I'll go about finding that.

6      Q    Did you tell me you Uber'd home?

7      A    Yes.  Oh, I didn't Uber home.  Roy drove me

8    home.

9      Q    Roy took you home and --

10     A    Yes.

11     Q    -- you Uber'd to work?

12     A    Yes.

13     Q    Is that correct?

14     A    Yes.

15     Q    Do you have any other -- at the time of the

16   loss, did you have any other personal vehicles that you

17   drove?

18     A    No.

19     Q    So the Audi was basically your business

20   vehicle and your get-around vehicle for personal use; is

21   that right?

22     A    Yes.  But at this time in life, I was only

23   working and going home, which is sad but -- and it also

24   something that a lot of the people here could probably

25   corroborate.

1      Q      You put in a lot of hours?

2      A      Yeah.   I sacrificed the life for it.

3      Q      Okay.   I'm going to hand you what I've marked

4   as Exhibit 5.

5             (Exhibit No. 5 was marked for identification.)

6      If you will, take a minute and look at that.

7      Do you recognize that document?

8      A      Yes; the one I filled out.

9      Q      So you completed this document; is that

10  correct?

11     A      Yes.

12     Q      And on the second page, is that your

13  signature?

14     A      Yes.

15     Q      Everything contained -- in the Affidavit of

16  Automobile Total Theft, which is the subject of Exhibit

17  5, is everything contained in this exhibit correct?

18     A      No.   It -- the vehicle was locked; should

19  check yes.

20     Q      So the section that says was vehicle locked

21  and it was left blank, that should be checked yes?

22     A      Yes, sir.

23     Q      Other than that, is everything else correct?

24     A      Yes.

25     Q      When did you first become notified of the

83

1    recovery of the vehicle?

2         A    The next day, I believe.

3         Q    Do you remember what time?

4         A    I don't want to assume.  It was in the

5    evening.

6         Q    Who contacted you?

7         A    Someone who represented themself as a

8    detective; I just -- I'm only saying that because I just

9    assumed that was correct based on what was happening at

10   the time.  Because the number, I didn't have saved.

11        Q    Okay.  So you believe it was an Atlanta PD

12   detective?

13        A    Yeah.

14        Q    Okay.  You don't remember their name?

15        A    No.

16        Q    What did they tell you?

17        A    They said that they were in civilian clothes

18   and they were looking at the car and that they were

19   going to attempt to make a -- it sounded very like --

20   I'm trying not to, like, story-tell.

21        But they said that they were going to attempt to

22   recover the vehicle, and if they get it, would be at S&W

23   Atlanta tow facility.

24        Q    Was it a male or female?

25        A    Male.

84

1      Q      Did they tell you how they found it?

2      A      No.

3      Q      Did they tell you where it was at?

4      A      He -- they -- he said to come to the west

5   side.

6      Q      Did they tell you where it was located when

7   they recovered it?

8      A      No.

9      Q      Did you go meet with this individual?

10     A      No.  I was in traffic for about two hours from

11   them, 85, and then got there by the time it was dark.

12     Q      Got there where?

13     A      Sorry.  The S&W tow place.

14     Q      S&W Towing?

15     A      Yes.

16     Q      And who did you meet with at S&W Towing?

17     A      The representative there.  There was a lady at

18   the front desk, and I told her the situation.  And she

19   corroborated it.

20         I believe she said they were closed and I couldn't

21   get it.  And then it was back and forth for about 15, 20

22   minutes.  Then she said I could get it.

23         I got in the car.  It was strange.

24     Q      What time of day is this when you're there?

25     A      This is -- had to be 10, maybe.

1     Q     10 o'clock at night?

2     A     Yeah, 9, 10 o'clock at night.

3     And she said I needed to produce ownership.  And I

4     looked in the car for the buyer's warranty that was in

5     the glove box.  That wasn't there.

6     I was really just pissed off that they got my

7     briefcase that was in the truck, mostly because of the

8     laptop because it's got all my stuff on it.

9     And you can tell I was -- I still am, but yeah.

10    And then she eventually let us get the vehicle.

11    Q     Did somebody drive you down there, or did you

12    drive there yourself?

13    A     Ryan, my buddy from the venue in which I sold

14    the job to, I drove our fleet truck over to pick him up,

15    because I knew I could it on the way to S&W and then

16    he'd drive the truck and I would drive my car.

17    Q     What's Ryan's last name?

18    A     Rearden, R-e-a-r-d-e-n.

19    Q     Do you have Ryan's phone number?

20    A     Yeah.  Ryan's phone number is 336-978-0174.

21    Q     So you picked Ryan up in the company -- in a

22    company truck?

23    A     Yes.

24    Q     You drive to S&W Towing in Atlanta sometime

25    around 9 or 10 o'clock at night, and they finally let

86

1  you drive the Audi off the lot; is that correct?

2      A    Yes.

3      Q    Did you have to sign any paperwork with them?

4      A    I believe I signed a release.

5      Q    And that's when you discovered that you were

6  missing your cash and your laptop and the briefcase --

7      A    Yes.

8      Q    -- and all those things that were not in the

9  vehicle anymore; is that correct?

10      A    Yeah.

11      Q    Did you ever talk to police again after this?

12      A    I don't think so; not that I can recollect.

13      Q    The loss location listed on the police report

14  is 1138 Peachtree Street, Northeast, in Atlanta,

15  Georgia.

16      That's the lot where the vehicle was stolen from, I

17  assume?

18      A    Yes.

19      Q    There's also an address listed for the

20  recovery location.

21      Do you know where that vehicle was actually

22  recovered?

23      A    No.

24      Q    There's a location listed of 387 Joseph E.

25  Boone Boulevard, Northwest, Atlanta, Georgia 30314.

1      Are you familiar with that area?

2      A    No.  It was downtown.

3      Q    On the night that the loss occurred, were you

4  at that area at any time at 387 Joseph E. Boone

5  Boulevard, Northwest in Atlanta?

6      A    No.

7      Q    The police report mentions a witness.

8      Do you know the information related to the witness,

9  or name and contact information?

10     A    Are you referring to the blue SUV statement?

11     Q    That's correct.

12     A    No.  I actually -- this was the first time I

13 ever saw that, so I was like -- no.

14     Q    Do you know what blue SUV they could be

15 talking about?

16     A    No.

17         MR. MILLICAN:  For clarification, sorry,

18     you're talking about the recovery report?  It was

19     not where the vehicle was found, if I understand

20     it.

21         MR. FOSTER:  There's -- that's right.  The

22     Exhibit 4 is the incident report that contains a

23     supplement talking about the recovery.

24 BY MR. FOSTER:

25     Q    And so we're talking about the recovery of the

1   vehicle.  And there's a narrative within the supplement

2   where it talks -- where it mentions a witness.

3       A    Yes.

4       Q    And reading directly from the Exhibit 4, it

5   says:  The witness advised that she saw a black male

6   suspect exit the R8 and enter a blue SUV.

7       So I was just trying to see if you had any idea who

8   this person could be.

9       A    No.  Do you know if they got arrested?  I

10  thought they got arrested.

11      Q    Do you know if there was an arrest made?

12      A    No.  But I'd always assumed it since there was

13  a recovery.

14      Q    But you're not aware of any arrests that have

15  been made?

16      A    No.

17      Q    And you don't remember talking to the police

18  after the recovery anymore?

19      A    No.

20      Q    How do you think somebody stole your car?

21      A    The detective said that there's two groups,

22  one that, like, will just break in and take the keys and

23  one that steals an immobilizer, which I liken to like a

24  serial number type key code.

25      And I would assume that that's -- I can't assume,

1   but he said that if you had the keys on you, then there

2   was someone stealing your immobilizer.

3        And then he speculated that someone had, like,

4   tailed me or followed me, then got the code, which is

5   even more concerning.

6        But regardless, that's the only way I can think of

7   because I had the keys on me.

8        Q    So after you picked the vehicle up from the

9   tow yard, where do you go?

10       A    I had to drop Ryan off at the venue because he

11  was working or meeting with someone.  And then I got

12  this like a -- like, to say violated, weird feeling

13  driving back where, like, you see all your stuff just

14  disheveled and, like, smashed.  And it makes me, like,

15  cringe thinking about it.

16       And then so I drove there.  I was dropping him off.

17  And then I just -- I remember feeling like really weird,

18  so I, like, stopped.

19       But then I realized that I was, like, in the same

20  lot that -- because it was right next to it.  That's

21  where we were dropping off.

22       So I just, like, pulled in to the actual, like,

23  building and closed the whatever gate, and then sat

24  there and talked to, like, some of the staff for a

25  second and then went home.

1    Q    Did you have any issues with your car when you

2  crunk it up the tow yard?

3    A    Yeah.  It was -- it was weird, but at the same

4  time I think it was the shellshock of like -- well, one,

5  it was 20 degrees outside and my window's smashed.  So

6  I'm shivering driving.

7    And I know at one point, like, I veered off the

8  road, but I -- I don't know.  It was just -- it was a

9  very weird moment, because I've never experienced

10  anything like this where, like, you kind of felt like

11  almost exposed.

12    There was like a violation in a sense of, like --

13  it was -- it was just weird.  I can't really -- but --

14    Q    You picked this car up on January the 20th; is

15  that right?  I want to make sure I have the date right.

16    A    Yes.

17    Q    So you picked the car up on January the 20th,

18  9 or 10 o'clock at night, sometime like that --

19    A    Yeah.

20    Q    -- from S&W towing.

21    You're describing a lot of things emotionally --

22    A    Yeah, yeah, yeah, yeah.  Sorry.

23    Q    -- and physically that you're feeling.

24    What about the car, did you have any issues with

25  the car when you picked it up from the tow yard?

91

1      A    Yes.  I -- there was -- the only reason I

2  explained that was because there was not as much

3  noticing it until I had, like, woken up and then I saw,

4  like, the check engine and it said "turn it off."

5      Like, there was a lot of, like -- it was throwing

6  codes that were concerning.  And then I had to go to

7  work.

8      But it was just -- I don't know what I'm talking

9  about in like the actual mechanism of cars, but it just

10  didn't feel correct.

11      Q    What do you mean by "throwing codes"?

12      A    Like, it threw a code that said "turn engine

13  off now."   And --

14      Q    Was that on your way home?

15      A    That was -- I remember taking -- I have a

16  photo of it the morning of when I took a picture of the

17  glass and everything.

18      On the way home, I believe there was some check

19  engine light or something.

20      But due to the fact that I just felt everything was

21  just trashed that I wasn't super alert or weary [sic]

22  of, like, what was happening at that time.

23      Q    When did you first notice the engine light,

24  check engine light came on?

25      A    As soon as I woke up in the morning and tried

1   to go to work.

2        Q    The 21st --

3        A    Yes.

4        Q    -- of January?

5        A    Yes.

6        Q    And you're not certain if the check engine

7   light was on or off on your way home?

8        A    If it was on in the morning, then it had to be

9   on, on the way home.  But it was the first time that I

10  had turned on the car.  And it said "turn off."  It said

11  "turn off car."  Like, it just flashes a big red thing

12  that says "check it," so . . .

13       Q    You drove from S&W Towing.  You went to the

14  venue, which was right at the loss location?

15       A    Yes.

16       Q    Correct?

17       A    Yes.

18       Q    And -- to drop Ryan off.  You stopped in there

19  for a brief period of time.

20       Do we know how long that was?

21       A    Couldn't have been long than 20 minutes.

22       Q    Did you get out of the car?

23       A    Yeah.

24       Q    And after you left the venue/loss location,

25  did you drive straight home?

1    A    Yes.

2    Q    To Long Island Drive?

3    A    Uh-huh.

4    Q    Did you make any stops?

5    A    I had to get gas because there was no gas in

6  it.  So I stopped at some gas station on Mount Paran.

7  It's like an old-timey gas station.

8    Q    Do you know how much gas was in it at the time

9  the theft occurred?

10    A    At the time the theft occurred, no.  I know it

11  was not enough gas to get to work the next morning, and

12  so I filled it up that night.

13    Q    I didn't know if you might remember filling it

14  up the day of --

15    A    Oh --

16    Q    -- or anything like that?

17    A    -- no.

18    Q    Okay.

19    A    And it -- it's got terrible gas mileage.  I

20  was pretty much like filling it up every couple days

21  coming here from Sandy Springs, so . . .

22    Q    So you get up to come to work on January the

23  22nd; and -- is that correct?

24    A    19th was that night --

25    Q    I'm sorry.

1       A     -- the 21st.

2       Q     The 21st, January the 21st.  You get up to

3  come to work on January the 21st, and that's the first

4  time that you noticed the check engine light that had

5  come on that says "turn engine off"?

6       A     Yeah.  And then --

7       Q     What did you do?

8       A     -- I brought it here just because I couldn't

9  keep it at my house.  So --

10      Q     When you say brought it here, did you drive it

11 here?

12      A     Yes.  And at that point I was just driving

13 real, like, cautiously slow because I was running to

14 work, honestly.

15      But I texted Ari, my agent and I said, hey, this --

16 there's like a bunch of shit happening so, like, I want

17 this to be, like, known so that you know what's

18 happening, because at that point I'd had no, like,

19 insurance dealings with it.

20      So I brought it here, parked it.  And then went to

21 work and a bunch of employees told me -- sorry.

22      Q     You said you texted your agent?

23      A     Yeah.

24      Q     Was that on the 21st?

25      A     Yeah.

1    Q   And what did you tell your agent?

2    A   I was just breaking down some of the stuff

3 that was -- like, I had noticed because it was actually

4 light outside.

5    Q   Do you have a copy of that text?

6    A   Yeah.  I'll send that to him.  But I, like,

7 notated the glass.  I took pictures of, like -- as soon

8 as that thing flashed on, like everything kicked into --

9 I took a picture of that and, like, all the broken glass

10 that was there, the ripped glove, the lockbox, and,

11 like, everything, like, I just mainly could.

12    And then I texted him when it was driving all,

13 like, weird.

14    Q   So you took photos of the turn engine off --

15    A   Yeah, yeah, yeah, yeah.

16    Q   -- code that was being thrown --

17    A   Uh-huh.

18    Q   -- and the glass and things like that.  And

19 that was on the morning of January 21st?

20    A   Yeah.  It was like 8 o'clock going to work.

21    Q   Okay.  What was the car doing?  I know you

22 said you were driving it slow, but was it -- I mean,

23 mechanically, can you describe anything different about

24 the way the engine was running or the way the car was

25 running?

96

1    A    It was -- I mean, I don't really know much

2    about, like, the actual, like -- like, I'm not a car

3    aficionado.  But it just -- you could just feel it was

4    off when and it was driving almost unsteadily.

5        But when you drive a car for, I mean, an extended

6    period of time, and, like, I'm akin to kind of the gear

7    shifts and like all that.  But like, there was, like,

8    some, like, jerk-type motions when I would stop and,

9    like -- it was just -- I knew something seemed off just

10   in general.

11       And I just equated the whole situation to a bunch

12   of people doing God knows what to the car, that they

13   would take it out in Atlanta.

14       Q    Had the "turn engine off now" signal ever come

15   on before?

16       A    No, not in, like, an alarm, like flashing

17   light like that.  Like, I've had a -- like, nothing

18   check engine, like, really, but I've had, like, oil

19   pressure low on because the thing drinks oil.

20       So I had to take care of that.  But no, that was

21   the first time anything's -- it's ever driven truly,

22   like, differently.

23       Q    Describe what prior issues you had with the

24   car.  You said you had some issues with the oil

25   pressure?  It had thrown codes before?

97

1       A     I wouldn't call them issues.  It's just it is

2    what it is.  It's, like, the car drinks oil and it

3    drinks gas just because, I mean, it's a V10 engine.

4       Like, I don't know everything in the world about

5    these vehicles, but, like, I do know that miles per

6    gallons is terrible and then it will, like -- it will

7    take -- now, from that end, the only other issue I had

8    was it got hit previously.

9       That was, I believe, on the same policy, but that

10   was like a whole collision repair type deal.

11      Q     When did that happen?

12      A     I don't know.  I would have to refer back to

13   the documentation on that.  But Performance Auto, went

14   with a three or four month span of them having it.

15      Q     Where was the damage on the car?

16      A     It was -- it has a carbon fiber wing-looking

17   thing.  It's like a scoop out.  And then someone had hit

18   me from the side and the wing fell off and the fender

19   and the sides kind of broke through it.

20      Q     Which side of the car?

21      A     It was the passenger's side.

22      Q     Front or rear?

23      A     Rear, I guess.  But it's all -- I mean, this

24   car's so -- like, it's only a two-seater so it's all the

25   same.

1      Q    Well, are we talking about close to the rear

2    wheel?

3      A    Yes, rear wheel, back wing thing, fender.

4      Q    Behind the rear wheel?

5      A    No.  It was on the side, because it was like a

6    side-swipe with the way --

7      Q    Okay.

8      A    -- it hit me.  It kind of threw it around.

9      Q    Did you have that repaired?

10     A    Yes.

11     Q    Performance --

12     A    Performance Auto.

13     Q    -- Auto?  Other than the accident with the

14   damage that you had repaired, and you said that you had

15   some -- it drank oil --

16     A    Yeah.

17     Q    -- is I think the way you put it to me, did

18   you have to put oil in it regularly?

19     A    I would say your kind of normal, like,

20   changes.  I remember it going off, but you would only

21   have to, like, top it versus change the whole thing.

22     Q    How often did you have to top off the oil?

23     A    I couldn't say as to how frequent.  Maybe

24   quarterly, something like that.

25     Q    Did you do it yourself?

99

1       A    No.  I bring it to High Tech or Audi Atlanta

2  to do it.  But yeah, I think that's about it.

3       Q    How much oil would they put in?

4       A    I don't know that.  I know --

5       Q    The light would come on and then you would

6  take it to them?

7       A    Yeah.  I mean, the light would come on and

8  then, I mean, it would give you like a range.  So it

9  feels like quarterly but as far as -- it would just come

10  on and I'd fill it up with oil or take it to one of

11  those places.

12      Q    Did you ever try to sell that Audi?

13      A    No.

14      Q    What all repairs have you made or maintenance

15  have you done to the Audi since the time you've had it?

16      A    I got it wrapped, which is like a vinyl wrap,

17  and then the wheels were black.  But it -- I mean, the

18  windows were whatever tint they were prior.  So yeah, it

19  was just the wrap and the wheels, really.

20      Q    So you're talking upgrades to the car?

21      A    Yeah.  As far as the maintenance stuff, but --

22      Q    But I'm talking repairs and maintenance.  I

23  appreciate you telling me about the upgrades, but by

24  repairs and maintenance --

25      A    Yeah, yeah.

1      Q    -- I mean things that break that you have to

2  fix, regular oil change, brakes, things like that.

3      A    Nothing that I can think of besides from

4  actual collisions.

5      Q    I'm assuming you had the oil changed in it

6  regularly; is that right?

7      A    Yeah, whatever normal frequency it was.  I

8  just knew it -- so my auto ranked -- that's how it goes.

9      Q    Who normally changed the oil?

10     A    It was either High Tech Suspension or Audi

11  Atlanta.

12     Q    Do you remember the last time you had the oil

13  changes prior to the theft?

14     A    No, I couldn't -- maybe when High Tech did the

15  rotors and stuff, whenever the last invoice was from

16  them most probably.

17     Q    Bear with me a minute, please.

18     A    I hear you.

19     Q    I'm going to hand you what I've marked as

20  Exhibit 6.

21          (Exhibit No. 6 was marked for identification.)

22     Do you recognize that document?

23     A    Yes.  That is the $200,000 line of credit on

24  the vehicle.

25     Q    The account number on that, is it ████████

1    █████?

2         A    Yes.

3         Q    And it states that the $200,000 loan was

4    originated on June 24th, 2020, with the Audi as

5    collateral; is that right?

6         A    Yes.

7         Q    And is that where the funds came from to

8    purchase the Audi?

9         A    Yes.

10        Q    Can you explain the $200,000?

11        So the balance is $200,000 on the original balance.

12   Why would it showed $200,000 when the car was 118,000?

13        A    So that was the extension of the total of the

14   line of credit that they were willing to give us.  And

15   utilizing the money for the Audi at 117-, that's why

16   they were only supposed to charge us for 118- principle

17   interest.

18        That's what the original payments were, 200- at

19   that.  But that's not how it worked, and that's not

20   how -- what we agreed to.  So that's when they changed

21   it back down.

22        Q    Did you get the full $200,000?

23        A    No.  They only paid off a portion, so they

24   didn't give us any access.

25        Q    Okay.  So the $200,000 isn't reflective of the

1   ac- --

2        A    It was just like an approved for $200,000.

3        Q    So you were approved for 200,000, you got

4   118- --

5        A    Yes.

6        Q    -- to pay for the car, and then they started

7   charging you for the full 200-?

8        A    Yes.

9        Q    Is that correct?

10       A    Yes.

11       Q    And that was taken out by Southeastern

12  Roofing?

13       A    Yes.

14       Q    Do you have to sign a letter of guarantee or

15  anything like that personally on the line of credit?

16       A    I don't believe so.  I'll have to verify if I

17  have in this case, but I believe it was done via having

18  a certificate of deposit collateralizing the monies too.

19       Q    Do you make the payments on the line of credit

20  or does Southeastern Roofing?

21       A    Southeastern Roofing; it's direct debit.

22       Q    And that comes out of the --

23       A    Operating.

24       Q    -- operating account?

25       A    Yes.

103

1      Q    I'm going to hand you what I've marked as

2  Exhibit 7.

3           (Exhibit No. 7 was marked for identification.)

4      That looks like a loan activity report; is that

5  right?

6      A    Yes.

7      Q    It has the same account number as the prior

8  exhibit, as Exhibit 6, but it states that the loan was

9  taken out for $98,550.

10     Is this a correction of the line of credit?  Is

11 that what that reflects?

12     Explain the differences to me.

13     A    Well, they debited us $20-some thousand on the

14 original -- like, I don't know if it was the initiation,

15 but upon that audit process this is what we found.

16     So I'm assuming this is this the -- well, this

17 should be the correction to not only us paying that, but

18 the payments -- they didn't charge principle for about

19 three months and then they started hitting us for six

20 grand, six grand, six grand.

21     And that's when we started truing up to it to say,

22 hey, that's not correct and to go forward.  But having

23 that, we -- I originally thought it was a mistake when

24 they did the 98,550 compared to the purchase price until

25 we found the additional debit from Renasant for 20-some

1   thousand that, I guess, was allocated towards a down

2   payment to it.

3        That's why it was confusing from multiple angles.

4   And it has -- I never -- I'm not surprised you can't

5   figure it out, too, but it was just equally as confusing

6   to us because it supposed to all just be in the $500,000

7   line, but then they separated it and then they messed it

8   up.

9        Q    Yes, sir.  You can see why I'm a little --

10       A    Yeah.  And I -- I get that totally.

11       Q    -- confused.  And I'm trying to just make

12   sense of the loan and the payments and the balances --

13       A    Yes.

14       Q    -- associated with the car.

15       But this Exhibit 7, which is the loan activity,

16   that dollar amount is 90- -- the original dollar amount

17   that it shows there of $98,550, you believe that was

18   after the correction was made and after they'd allocated

19   $20,000 for what you believe is the down payment --

20       A    Yes.

21       Q    -- and whatever payments were made, and then

22   they made a correction.  And that that document is the

23   correct document related to the -- what should have

24   been --

25       A    Yes.

1      Q      -- the original amount.

2      A      Yes.  Most difficult car loan that they could

3  have possibly -- you couldn't make it up if you tried.

4      Q      For just a Southern country boy like myself,

5  it is very challenging to wrap my head around.

6      A      It was --

7      Q      But I appreciate you helping me understand.

8      A      Well, I apologize for you having to find that

9  in reverse after I tried to make sense of it, but . . .

10     Q      Small bank.

11     A      Yeah.

12     Q      We have a lot of exhibits because there's just

13  a lot of these documents that we have to go through.

14     A      I understand it.

15     Q      I'm going to hand you what I've marked as

16  Exhibit 8.

17            (Exhibit No. 8 was marked for identification.)

18       That looks like a loan statement from January of

19  2022.

20       This is a different account number, ████████ --

21     A      Uh-huh.

22     Q      -- with a balance of $207,707 that was due in

23  February of 2022.

24       What is this for?

25     A      This is another line of credit, but it's based

1    on our accounts receivable.  So it's the biggest kind of

2    thing in the business is getting all, like, the carriers

3    and then the property owners to pay us, so this is them

4    loaning money against how much we have to be paid.

5         So it revolves at like 90 days.

6         Q    Okay.  So was that balance paid?

7         A    This is them offering us another line of

8    credit to swap over, and then we pay it.  They debit the

9    10 grand for -- like, they're just taking it down,

10   because I told them that ideally we don't want to have

11   this line of credit and actually just be able to run --

12   that was actually why we did the credit company in the

13   first place, or we partnered with them.

14        Q    So Exhibit 8 is not related to the financing

15   of this car, it's related to a line of credit on your

16   accounts receivable --

17        A    Yes.

18        Q    -- is that correct?

19        A    Yes.

20        Q    And the funds from that line of credit, what

21   are they used for?

22        A    Operating expenses of the business, because as

23   we scale, we have to pay labor, pay materials, get

24   vendors.

25        Q    I'm handing you what I've marked as Exhibit 9.

1            (Exhibit No. 9 was marked for identification.)

2       What is this a loan for?

3       A    This is the same revolving line just chunking

4  it down.  375,000 --

5       Q    That's the same revolving line of credit as

6  the accounts receivable line of credit?

7       A    Yeah.  It started out as 500-.

8       Q    Are you trying to phase out that line of

9  credit?  Is that the idea?

10      A    The idea is just to function, like, truly

11 based on -- at some point when you grow, you'll just

12 stabilize and sit in that.

13      Because it's not going to grow 100 percent year

14 over year over year over year, so yeah, the goal is not

15 to pay interest or the fees associated with it.

16      Q    So was that $375,000, that's just used for

17 operating expenses?

18      A    Yeah.  It's the same exact type of product.

19      Q    So this just shows the line of credit.

20      Exhibit 8 is a statement date from January 28th,

21 2022.  Exhibit 9 is a statement date from February 17th,

22 2021.

23      So from February 17th, 2021 until January 28th,

24 2022, that line of credit had dropped from $375,000 to

25 $205,000; is that correct?

108

1       A    Yes.

2       Q    Okay.  And this is the same account?

3       A    Yes.

4       Q    Same line of credit?

5       A    Yes.

6       I apologize just on that, having to figure it out.

7       Q    I'm right here with you trying to --

8       A    I know.  I know.  I thought I was the only one

9   who had to do it, but . . .

10      Q    I received some account statements from a

11  credit card it looks like you've got with Capital One.

12      Is that your primary credit card, the Capital One

13  card?

14      A    Capital One, but they didn't have a big enough

15  limit, so then we got to like Ramp.  Those are the

16  primary company ones.

17      Q    Okay.  So you've got -- I know you've got

18  Ramp.

19      A    Yes.

20      Q    And then you've got Capital One.

21      Capital One has -- as I went through the statements

22  on Capital One, I noticed that it looked like you and

23  Bill primarily use the Capital One card; is that right?

24      A    Yeah, we're the only ones, the physical cards.

25      Q    Okay.  I saw some, it looked like, flight

109

1   tickets, and -- do you -- do you and Bill typically fly

2   for the company?

3      A   It's only when we have, like, got to go visit

4   the branches or we've got to do -- like, we have these

5   sales trips that they -- res guys go on.

6      Q   It makes a lot more sense when we started

7   talking and you were telling me about how many branches

8   that you had.

9      A   Yeah.  And they're -- they get all soft about

10   not being here and part of the mix, so we've got to show

11   face.

12      Q   You've got some revolving lines of credit

13   associated with the car.  And you have a separate one

14   for the trucks; is that right?

15      A   Yes.

16      Q   And that's not reflected in these statements

17   that we've gone through so far; is that correct?

18      A   The car --

19      Q   I mean, the car one, yes.

20      A   Yeah, yeah, yeah.

21      Q   I'm talking the trucks --

22      A   That was in the line of credits, yeah.

23      Q   Yeah, the trucks --

24      A   Yes.

25      Q   -- you have a separate one for the fleet

1   trucks.

2       A    Yes.

3       Q    It was originally supposed to be all one, then

4   they separated it out; is that right?

5       A    Yeah, and they separated it out.  And then we

6   sold those trucks but we got a bunch of fleet trucks.

7       Q    And the revolving line of credit associated

8   with the accounts receivable, that's the one we just

9   talked about that's --

10      A    Yes.

11      Q    -- progressively gone down.  The line of

12  credit has gone down --

13      A    Yes.

14      Q    -- because you're trying to phase that out?

15      A    Yes.

16      Q    Are there any other lines of credit?

17      A    Jan. '21; not to my knowledge.

18      Q    In January of 2022, is --

19      A    Oh, sorry.  Jan. '22.  I'm sorry.  I

20  apologize.

21           No.  We had -- oh, yeah.  We had -- technically

22  there's a factoring company that also factors like the

23  last part of our -- we would have to sell them invoices

24  and they would send us money for them.

25           But it's a more expensive vehicle.  It's just that

                                                    111

1  I didn't think we would, like, jump up like we did.  And

2  we use them as well, First Avenue Funding.

3      But I don't believe that's considered an actual

4  line of credit; it's just they're willing to buy

5  invoices and pay us for them minus the fee.

6      Q    So you have clients that you're trying to

7  collect from?

8      A    Yeah.

9      Q    And you sell it to First Avenue Funding to go

10  get their money however they want to go get it and --

11      A    And then they'll pay us.  But you don't want

12  to do it all the time because it's expensive to do so.

13      But in, like, points of, like, hyper growth where

14  you know you're going to get it back, then -- because, I

15  mean, we're only like one, one and a half percent bad

16  debt -- or really .51 percent.

17      But I didn't -- I was like -- you always make your

18  projections conservative.  But when you beat them, it's

19  a blessing but it's also a curse, because the blessing

20  is like where life is today, the curse is like having

21  to -- because, like, you're paying off labor, paying off

22  materials, and then as soon as it comes back, it washes

23  over.

24      Q    I'm not trying to get too technical into the

25  aspects of how this works with --

112

1    A    Not at all.

2    Q    -- selling off invoices, but there has to

3  be -- what would -- why would a company want to sell off

4  an invoice instead of just going and collecting the

5  payment themselves if you know it's expensive?

6    So it costs you money off of what you could have

7  done it yourself.  What type of -- I mean, what type of

8  fees are we talking about?

9    Like, let's just use an example.  You have a

10  $10,000 -- because I like -- it's easy numbers for me.

11    A    Yeah.

12    Q    You have a $10,000 bill that you sell to them.

13  What do you get out of that?

14    A    So they'll give you -- the $10,000 bill,

15  they'll give you eight grand up front, but they'll also

16  tailor back the rest of it as they get paid or as you

17  get paid and pay them minus the fee.

18    The fee will be 200, 300 bucks.

19    I consider it expensive, because from an AVR

20  standpoint, it's not what I like.  But our business is

21  turning receivables.  Getting money back in 90, 120 days

22  is not uncommon for construction and insurance and

23  property owners.  So it's like a --

24    Q    So it increases your immediate cash flow.

25    A    Yeah.  It also --

1    Q    That's the reason you would do it?

2    A    Exactly.  But to the tune of it's -- it's

3    cyclical.  So it's just kind of like a safe mechanism to

4    continue to operate the business, inherently.

5         But now, thankfully, everything's kind of kosher.

6    It doesn't really operate as a true bank account or a

7    line like a bank.  It's just a company you work with.

8    Q    What other debts does Southeastern Roofing

9    have?

10   A    That's it; and the materials, the labor, and

11   their subs.

12   Q    Do you own any of the buildings --

13   A    No.

14   Q    -- that you're in?

15   A    This one?  I wish.

16   Q    But you pay rent here?  You lease this

17   building?

18   A    Yeah.

19        I'm sorry.  I've never seen anyone do this, ever.

20        Yes, we lease this.

21   Q    Okay.

22   A    This is subleased from a tech company.

23   Q    And the other branches that you have, they

24   lease those buildings as well?

25   A    Yes.

1    Q    Okay.  Then you've got the Ramp credit account

2    and the Capital One credit cards that we talked about.

3    A    Yes.

4    Q    Any other credit cards?

5    A    No.

6    Q    I'm going to hand you what I've marked as

7    Exhibit 10.

8         (Exhibit No. 10 was marked for

9         identification.)

10    We may have to both share this document because I

11    was running out of paper when I started printing all

12    these out.

13    A    And I didn't give you all the checks.  There

14    were so many checks.

15    Q    So this is Exhibit 10.  This is a statement

16    from Renasant Bank.  It is account number 8718.

17    A    Yes.

18    Q    If you'll flip to page 5 -- and this is from

19    July of 2021; is that right?

20    A    Yes.

21    Q    Yes, okay.  Look to page 5 for me, please.

22    A    Yes.

23    Q    There's a $100,000 payment to, looks like,

24    American Express.

25    A    Uh-huh.

115

1    Q    Is that a different credit card?

2    A    So whenever -- because I actually have like

3    $300,000, at the time it was a 290- credit limit with

4    American Express.  It's my personal card.

5         So I've got to pay ABC and then the company's got

6    to reimburse that back.  So we have to write on our

7    balance sheet as such to keep the --

8    Q    Okay.  Let's -- again, you're talking to a

9    simple --

10   A    I'm sorry.

11   Q    -- country fellow.  Let's make it simple.

12        You have a personal credit line with American

13   Express --

14   A    Yes.

15   Q    -- with a limit of 290,000?

16   A    Yes.

17   Q    That's what you told me?

18   A    Yes.

19   Q    And what was the purpose of that $100,000

20   payment?

21        That payment went to your credit personal card?

22   A    Yes.  So that I -- it's a reimbursement for

23   the material expenses that I paid for on that card.

24   Q    Do you typically pay material expenses out of

25   your personal account?

1     A     On that card; I don't pay them out of my

2  personal bank account.

3     Q     But your personal credit card account, do you

4  typically pay business expenses out of your personal

5  credit card account?

6     A     Only ABC Supply because of the amount of the

7  transaction versus the lines on the other cards.

8           But now, like today, we've got -- our company has

9  credit there, so that's what I was in the process of

10 building.

11    Q     So you've got -- ABC Supply is a roofing

12 supply company, I assume?

13    A     Yes.

14    Q     You purchased materials using your personal

15 AMEX card, and then the company reimburses you when you

16 turn in receipts?

17    A     Yes.  So we have all those.

18    Q     Turn to page 6.  I believe there's another

19 $100,000 one.

20    A     Yeah.  For example, I just paid ABC off our

21 current company card because it had a limit of $249,000

22 yesterday because -- or two days ago.

23          I didn't mark terms up, but as I have that line

24 with American Express, I'd rather chunk it down in what

25 are payments for them.

1    Q   It just seems like -- so you've got $100,000

2    even and another $100,000 even.  That seems like an odd

3    payment to make for an invoice for building supplies.

4        So you chunked $100,000 and then chunked another

5    $100,000, and that was supposed to be representative of

6    all of your expenses, material expenses at that time?

7    A   It's all expenses that were paid for, so --

8    but the line, you've got to have -- it's a $300,000

9    line.

10       But if I'm trying to -- if I've got that card and

11   we have a job that's got additional material payments,

12   I've got to pay down that 300,000 to 200,000 if I want

13   to keep using those credit terms with ABC, which, I

14   mean -- and they know they're going to get their

15   payments on time.

16       So then I've got to chunk those older payments down

17   so I can buy additional material on the card.

18   Q   So is the -- was the AMEX payments then

19   representative of some old purchases you had made or new

20   purchases to keep from putting it on the business

21   account with ABC?

22       Does that make sense?

23   A   I'm confused in the way of the question.

24   Q   Okay.  I understand.

25       I'm trying to figure out, you're paying your AMEX

1   bill and you're throwing $100,000 in two different

2   payments in July of 2021?

3       A    Yes.

4       Q    And you're telling me you're using that

5   American Express, your personal American Express credit

6   card, to purchase materials.

7       But are these recent purchases you made, or is this

8   like purchases you made several months ago and now

9   you're paying yourself back so that you can make

10  additional purchases?

11      A    It would have been -- it took -- it revolves,

12  so it's just the recent ones that come due to whatever

13  that end of the month term is.

14      But I'm trying to -- at this point, chunk back

15  more, and so you want to utilize the limits you have but

16  also you want to utilize, like, the time you have with

17  it.

18      So in this case, it's like we're going, we're

19  going, we're going.  Well, American Express pays ABC,

20  but AB- limited American Express because they've only

21  got 15-, 20 grand left.

22      But I need 100- or whatever in invoices or, like,

23  material payments this week to come on.  So you -- I

24  just move the train along.

25      And American Express, we're good, the company's

1    good.

2         Q    Do you have copies of the receipts that you

3    provided to Southeastern Roofing --

4         A    Yes.

5         Q    -- regarding these materials?

6         A    Yes.

7         Q    Okay.  And you only use your American Express,

8    your personal American Express credit card account, for

9    using purchases at ABC as far the company goes?

10        A    Yes.

11        Q    Do you use it personally as well?

12        A    Yeah, but to a factor, nil, considering -- I'm

13   using it for the limit, not to, like, buy Uber Eats on

14   it.

15        Q    This is another account statement, the account

16   8718 -- the account ending in 8718.

17        I'll make this Exhibit 11.

18             (Exhibit No. 11 was marked for

19             identification.)

20        You had another -- it's page 5 or 6 of that

21   document, there was another $50,000 payment.

22        A    Yep.

23        Q    Is that the same system that we just talked

24   about before where you're --

25        A    Yeah, American Express --

1       Q    Right.

2       A    -- you're probably going to see it every

3  month.  I mean, you would . . .

4       Q    That same document, on September 9th -- so if

5  you'll go to September 9th, there was $105,000 transfer

6  from this checking account to ██████████

7       It looks like that's the same last four digits of

8  the account you gave me for the PUD account.

9       A    Yes.

10       Q    Is that correct?

11       A    Yeah.

12       Q    Okay.  So that was money that was taken and

13  moved to the --

14       A    Yeah, the PUD account.

15       Q    That's right.  And on September 30th, there's

16  another one of $50,000.

17       A    I just didn't -- so I -- PUD account is in

18  here somewhere.

19       Q    And that PUD account is used for accounts

20  receivable too?

21       A    PUD account I had just factored into our

22  operating like accounts because it literally has no

23  purpose.  I don't understand why he wants to do it like

24  that.  I wish I could explain it where it makes sense.

25       It makes no sense or whatever.

1        Q      We talked about First Avenue Funding.

2        A      Uh-huh.

3        Q      And I noticed First Avenue Funding in your

4    statements.

5        A      Yes.

6        Q      So this seems like a good time to talk about

7    it a little bit more.

8               (Exhibit No. 12 was marked for

9               identification.)

10       I put the sticker in a different spot, and I put it

11   in exactly the wrong place.

12       So this is a statement, account number ending in

13   8718.  And we're talking about a period of time from

14   September 30th, 2021 to October 31st of 2021.

15       And it looks like on October 28th -- if you'll flip

16   to October 28th --

17       A      Uh-huh.

18       Q      -- there's a wire transfer to First Avenue

19   Funding of $211,000 and some change.

20       A      Yep.

21       Q      Explain that to me.

22       A      Paying off the invoices that they bought.

23       Q      Okay.  So those are -- that's all related to

24   those invoices?  All of it?

25       A      How that is they are, all of that.

1     Q    I saw another -- so if I see something that

2     says BNF, First Avenue Funding, is that the same place?

3     A    Yeah.  I don't know what BNF is, but First

4     Avenue Funding is billed the only . . .

5     Q    I also noticed withdrawals to American

6     payroll.  For example, October 14th of 2021, $58,163.

7          As a -- that's different than multiple smaller

8     payroll withdrawals that go to individuals throughout

9     the month of October.

10         So what types of employees are paid in this manner?

11    A    It's -- they call it American payroll, because

12    for some reason the payroll processors have us as like

13    American Roofing Johns Creek, whatever in their payroll

14    deal to Southeastern.

15         I mean, it's stupid.  It's not supposed to be that

16    way.  But that's either -- I guess in '21 that would

17    have been CertiPay doing that.  It was the W-2s and then

18    the 1099 for the actual, like, payroll is what this is.

19    Q    So American R. payroll is reflective of your

20    old name?

21    A    Yes, like American Roofing Johns Creek.

22    Q    And that represents the payroll for your W-2

23    employees?

24    A    Yes, out of CertiPay.

25    Q    Okay.  CertiPay, is that what you're saying?

```
 1      A     Yeah.  It's a weird system.  They have W-2s,

 2   1099s, but you could also pay EIN -- I'm sorry.

 3      Q     I feel like I'm in accounting school.

 4      A     I know.  It's -- I don't mean to do it.  I'm

 5   trying to explain but not -- but you pay labor with it,

 6   so we use that.

 7      Q     Can you provide records of disbursements to

 8   the owners of the company including yourself from

 9   January of 2020 through present?

10      A     Yes.

11      Q     On October 6th of 2021 -- and this is all in

12   this Exhibit 12.

13      On October 6th of 2021, you cashed a check from the

14   main Southeastern Roofing account for $25,000.  Is that

15   a regular payroll disbursement?

16      A     Is that myself or --

17      Q     Yeah, October 6th of 2021.

18      A     October 6th . . .

19      Q     I think it's actually -- like I said, we have

20   to share.

21      A     Hey, I'll give it back.

22      You're good, man.

23      No, because we never would pay ourselves regularly.

24   It's always like irregular just to be through type

25   deals.
```
                                                          124

1     Q    So you don't have a set distribution that's

2  $25,000 a month?  It's just an irregular distribution?

3     A    No.  We stay on monthly, but, quite frankly, I

4  mean, I want to make sure that the pay is --

5     Q    That's the check I was referencing.

6     A    Yeah.  We've got it in our books, like, yeah,

7  that's John, but it's probably in reference to those

8  monthly being paid back.

9     Because I kind of had like a moment of -- I -- me

10  and Bill had this kind of thing going on where it was

11  like two for one.  Bill's out working himself.  So I

12  don't really want to --

13     Q    So that's not a payroll disbursement, a normal

14  one, but it is -- I mean, that's -- you're obviously

15  getting paid $25,000, but there is no set $25,000 a

16  month?

17     A    Yeah.  It -- it would -- it's a back-dated

18  payment.

19     Q    Back-dated payment?  Okay.

20     A    Yes.

21     Q    Who is Anka (ph.) Nicalaescu,

22  N-i-c-a-l-a-e-s-c-u?  Anka?

23     A    Is it a check?

24     Q    Yes.  It was a check written for $30,000 on

25  January 12th of 2022.

1      A    Can I see it?

2      Q    This is Exhibit 13.

3           (Exhibit No. 13 was marked for

4    identification.)

5      A    It's either waiver or fraud.

6      Q    Give me a second.  There it is.  It's up

7    there.

8      A    Fraud -- are you talking about the check that

9    is different?  We've been hitting our bank for them.

10   That one's fraud.  That one's fraud.

11        There aren't done with us.  I actually had 20 grand

12   come in today on this.

13     Q    Okay.  So explain that to me.

14     A    Someone photocopied a check, because we give

15   checks out to, obviously, labor crews live.  And then

16   they have proceeded to copy and paste numbers.

17        Someone actually bought Mastiff puppies with one.

18   Adorable, but also didn't pay for them.

19     Q    So you had some stolen checks or photocopies

20   of checks, and they were fraudulently using --

21     A    Yes.

22     Q    -- your business account?

23        And so that was one of the ones that was --

24     A    Yeah.  They were going to use -- it's random.

25   And Renasant wouldn't let us close the account, or told

                                                    126

1   us not to close the account, to go ahead and do the

2   check deposited pay-type service.  And that's --

3        Q     And when did this start?

4        A     Maybe December or prior.

5        Q     December of 2021?

6        A     I -- I -- I couldn't speculate, honestly.  I

7   would just be making it up.

8        We have it documented, though.  I'll get it for

9   you.

10       Q     On Exhibit 13 on pages 17 to 18, there's a

11   whole list of returned checks.

12       Are these checks associated with --

13       A     Fraud.

14       Q     -- the fraud?

15       A     Yep.  You're talking about -- so reliving all

16   the memories.

17       Q     Is this still an ongoing issue?

18       A     It happened today, $28,121.  And I'm like,

19   John, check the ACH problem.  He's like, they don't

20   even -- our bank's shit, literally.

21       It's just they -- they'll open it up and say it's

22   open, but we can't do it.  And then we'll have to file

23   all these forms just to verify that it's not fraudulent

24   checks.  And when it's not been checks, it's on the

25   ACH's.

1     Q    Has the business been impacted by the

2   fraudulent checks on a day-to-day basis?

3     A    I mean, it's a pain in the ass, so burden-

4   wise, yes.

5     Q    Financially?

6     A    No.  Because I can -- if I ever need money,

7   I'm hitting up First Ave.  And then the Renasant, not

8   going through fraudulent, so . . .

9     Q    Do you have any income outside of Southeastern

10  Roofing?

11    A    I was supposed to make more money off a

12  recording artist, but no.

13    Q    Do you make any money off of Camino?

14    A    No.

15    Q    Or any other recording artist?

16    A    I had made some money off of him previously to

17  do his, like, advance, but COVID happened, record labels

18  started to really dry up, so not recently.

19    Q    I understand that you don't have a normal

20  payroll or pay disbursement.  How -- tell me how you're

21  paid.

22    A    Distributions from profit, a backdated salary-

23  type deal.  Besides that, I had -- previously in the

24  company, I mean regularly paying ourselves.

25        And I had traunches of money where Camino would get

128

1   dispersed money, Universal Music Group paying me, like,

2   I don't know, different chunks of salaried amounts.

3        So -- I'm sorry --

4        Q    Let's talk about 2021, because this happened

5   in January of 2022.  So in 2021, what was your income

6   from Southeastern Roofing?

7        A    Maybe 150- to 200,000 plus.

8        Q    Okay.  Is that reflective of a salary plus

9   your --

10       A    Salary plus distributions --

11       Q    -- distributions?

12       A    -- yeah, plus anything that was of 2020.

13       Q    What is your salary?  What's your normal

14  salary?

15       A    Technically, ten grand a month, usually --

16  9250, it was originally something like that.

17       Q    Speak up for me, please.

18       A    I'm trying to think.  It was around $10,000 a

19  month.

20       Q    And you can think to yourself all you want,

21  but if you start --

22       A    No.

23       Q    -- talking, she's trying to hear what you're

24  saying.

25       A    I appreciate it.  Yeah, no.

                                                        129

1      Q    I'm not trying to be ugly.  It's just --

2      A    No.

3      Q    -- you're going on the record whatever you're

4  thinking to yourself.

5      A    Yeah.

6      Q    You're actually not thinking to yourself.

7      A    At all.

8      Q    Do you have ownership in Domaine Atlanta?

9      A    In Grae' Hospitality, now, yes.

10     Q    But you didn't at the time of the loss?

11     A    No.

12     Q    So Domaine Atlanta's, I guess, official name,

13  it has a different name?

14     A    Yeah.  It's Grae' Hospitality, LLC is the --

15  the --

16     Q    Grae' Hospitality, LLC?

17     A    Yes.

18     Q    Does it do business as Domaine Atlanta?

19     A    It's -- I'm not sure how that structurally

20  works currently, because I'm fresh into it.  So, like, I

21  don't even have the documents signed.

22     Q    Are you partners with Ryan?

23     A    Now; he wanted me to help clean up his books.

24     Q    When did that start?

25     A    March, he had asked me.

                                                        130

1      Q      March 2022?

2      A      Yeah.

3      Q      Are you on a salary with them?

4      A      Nope.

5      Q      How do you get paid?

6      A      From them?

7      Q      Yeah.

8      A      Blue sky at the end of the day.  I'm just

9  doing it for my buddy.

10     Q      So you're not making any money from Domaine

11  Atlanta?

12     A      Zero.  Actually technically, not -- but my

13  company can bill them for construction work.  And,

14  eventually, his four years of eating crow will pay off.

15  So I do what I can.

16     Q      What about Southeastern Claims Adjusting, do

17  you have any ownership in that?

18     A      Nope.

19     Q      I think we mentioned it before, you said there

20  was no joint ownership in Southeastern Claims?

21     A      (No verbal response).

22     Q      Do you know who took your car?

23     A      No.

24     Q      Did you ask somebody to take your car?

25     A      No, I did not.

131

1     Q     Did you stage the theft at all?

2     A     No.

3     Q     Did you blow the engine up after you recovered

4     the car?

5     A     No.

6     Q     Were you involved in any type of scheme

7     related to having your car taken and filing an insurance

8     claim with the insurance company in order to gain the

9     proceeds from the car?

10    A     No, sir.

11          MR. FOSTER:  Let's go off the record.

12          (Off the record at 1:34 p.m.)

13          (On the record at 1:44 p.m.)

14    BY MR. FOSTER:

15    Q     On the night of the loss, I know that you

16    called police from your cell phone.

17    A     Uh-huh.

18    Q     And I know that -- well, other than calling

19    the police, is there anybody else that you called or

20    texted between the time you left here until you got

21    home?

22    A     The time I left here, meaning --

23    Q     This office when you left with Roy after

24    having dinner and you went to the venue, Domaine

25    Atlanta, I know you called the police to report the

1    theft of the vehicle.

2        But was there any other calls and texts that you

3    made that night?

4        A    Yeah.  I mean, there was probably dozens and

5    dozens of them.  I'm constantly talking to these guys

6    about, like, jobs or I mean, people that -- that may --

7    that night alone as to this car that was going on.

8        Like, I put the car on this, like, Instagram, ATL-

9    speak thing where they post like different occurrences

10   of, like, crimes, kind of like Citizen.

11       I was, man, who sees this car?  Then --

12       Q    Hold on a second.  You made a post on

13   Instagram?

14       A    To them to, like, put out the word, because

15   it's like the live kind of feedback "where is this

16   vehicle?"

17       Q    Do you have a copy of that post?

18       A    Yeah.  I'm going to send it to him to send it

19   to you.

20       Q    Okay.  What time did you make that post?

21       A    I would have to say, like, aft- -- I probably

22   called Skip, called the police, waited.  And then when I

23   realized no one was coming, I made the post.

24       Q    You had plenty of time on your hands

25   between --

1      A     Yeah, I --

2      Q     -- when you called to when the police arrived;

3  right?

4      A     I was in this lot, man.  I . . .

5      Q     When you went to go pick up the car, you were

6  in the company truck?

7      A     Uh-huh.

8      Q     And you went and picked Ryan up.

9      A     Yes.

10     Q     And you went to the tow yard.

11     A     Yes.

12     Q     What happened to the company truck?

13     A     Ryan drove it back.

14     Q     I thought you told me you drove Ryan back.

15     A     That was a mistake, honestly.

16     Q     Okay.  So you drove Ryan -- I mean, excuse me.

17     A     Ryan drove the truck --

18     Q     Ryan drove the truck back?

19     A     -- yes.

20     Q     You did not drive him back?

21     A     No.

22     Q     I'm going to hand you what I've marked as

23  Exhibit 14.

24            (Exhibit No. 14 was marked for

25            identification.)

1       And take a minute to look at that document.

2       That's the Examination Under Oath demand that I had

3  sent.  I just want to make sure that -- does it look

4  like an accurate representation of the letter that I

5  sent to you?

6       A    Yes.

7       Q    Did you get a copy of it?

8       A    Yes.

9       Q    I'm assuming that's why you're here today?

10      A    Yes.

11      Q    There's a document -- while you're there on

12 page 2, there's a document demand.  So we're going to

13 take just a few minutes and go through this.  Okay?

14      A    Uh-huh.

15      Q    So one of the things that we had required you

16 to produce is a copy of the original bill of sale,

17 finance agreement, or any other documentation related to

18 the purchase of the 2017 Audi R8.

19      And we have talked a lot about the different

20 financial vehicles used and how that was done.

21      There isn't an actual finance agreement that's

22 directly correlated to this 2017 Audi R8; right?

23      A    No, it's -- yeah, it's on a line of credit.

24      Q    We also obtained some invoices and receipts

25 from the Audi place related to some maintenance that

135

1    you've had done on the car --

2         A    Yes, sir.

3         Q    -- and different things.  We've got a copy of

4    monthly statements associated with any loan on the Audi

5    from February of 2021 to January of 2022.

6         You do understand that we still need the documents

7    that you had produced that were titled January of 2022

8    and --

9         A    But they were '21.

10        Q    That's right.  We need those produced for the

11   2022 year.

12        Copies of all bank account statements from

13   Southeastern Roofing Company, LLC.

14        You understand and know that the one account that

15   we didn't have, is it 21- --

16        A    Yeah, the PUD account.

17        Q    Yes.  The PUD account, that was not produced,

18   and we still need a copy of --

19        A    Yes.

20        Q    -- those documents.

21        A    100 percent.

22        Q    Copies of any and all credit card account

23   statements for Southeastern Roofing Company, LLC.

24        We've got the Capital One account statements, and

25   we also have some information -- some statements you

136

1   provided from Ramp.

2       When did you take out the Ramp account?

3       A    As soon as I found out about it.

4       Q    Roughly when was that?

5       A    Oh, I'm sorry.  I -- it should be whenever the

6   first statement was.

7       Q    The first statement?  Okay.

8       And what was the purpose of the -- what is the

9   purpose of the Ramp account?

10      A    Building company, like, corporate credit, so

11  that I could not have to use my personal American

12  Express line.

13      Q    The American Express card that you've made

14  pay- -- that Southeastern Roofing Company has made

15  payments to that you used for business purchases, we're

16  going to require you to produce copies of those

17  statements as well.

18      A    That's fine.

19      Q    Okay.  We also need the copies of the federal

20  and state income tax returns for 2020 and 2021 for

21  Southeastern Roofing Company, which I know that you're

22  working on but that we don't have yet.

23      A    As soon as I get out of this, I'm jumping on

24  my tax, because it's federal credit, so . . .

25      Q    Is there anything that we haven't talked about

137

1  today that you would like to add to your testimony?

2      A    No.

3      Q    Are you concealing any information from me

4  that could be material to my claim investigation?

5      A    No.

6      Q    Are you hiding anything from me?

7      A    No.  I mean, I've sent all the documents that

8  I have and took photos.

9      Q    We're also going to need the photographs --

10      A    Yes.

11      Q    -- that you took as well.

12      There has been some documentation that's been

13  requested, some we've discovered while we were here --

14      A    Yeah.

15      Q    -- talking today that hasn't been produced.

16      We're going to reserve our right to continue the

17  Examination Under Oath once those documents come in.

18  It's not always necessary.  Sometimes the documents and

19  information are self-explanatory.

20      But I am reserving our rights to reconvene the

21  Examination Under Oath at a later date to question you

22  about the documents that I don't have in front of me

23  right now.

24      Also, as stated before, we'll send you a copy of

25  the transcript at our expense.  You'll be required to

138

1    sign the errata sheet and send it back to us.

2        Please note that until we receive the signed and

3    notarized errata sheet back, the Examination Under Oath

4    process will have not been deemed completed and failure

5    to do so could jeopardize your coverage under the

6    policy.

7        Do you understand that?

8    A    Yes, sir.

9        MR. FOSTER:  You want me to send it to you?

10       MR. MILLICAN:  Yes, please.

11       MR. FOSTER:  Okay.

12       MR. FOSTER:  Thank you for your time here

13       today, and at this time we'll just suspend the

14       Examination Under Oath.

15       (Proceedings suspended at 1:51 p.m.)

16

17

18

19

20

21

22

23

24

25

DISCLOSURE

STATE OF GEORGIA          EUO of Avi Reddy
COUNTY OF ROCKDALE        June 2, 2022


     Pursuant to Article 8.B of the Rules and
Regulations of the Board of Court Reporting of the
Judicial Council of Georgia, I make the following
disclosure:


I am a Georgia Certified Court Reporter.  I am here
as an independent contractor for Janice S. Baker &
Associates.

Janice Baker & Associates was contacted by Matt
Foster, Auto-Owners Insurance Company to provide
court reporting services for this Examination Under
Oath.

Janice Baker & Associates will not be taking this
Examination Under Oath under any contract that is
prohibited by O.C.G.A. 15-14-37(a) and (b).



June 2, 2022

                    _J. Robin Sawyer_
           _____

                    J. Robin Sawyer

              #4882-9574-0787-9168

140

C E R T I F I C A T E

G E O R G I A:

ROCKDALE:


     I hereby certify that the foregoing transcript
was stenographically recorded by me, as stated in
the caption; the colloquies, statements, questions,
and answers thereto were reduced to typewriting
under my direction and supervision; and the
transcript is a true and correct record of the
testimony/evidence given to the best of my ability.

     I further certify that I am not a relative or
employee or attorney or counsel of any of the
parties, nor am I a relative or employee of such
attorney or counsel, nor am I financially
interested in the action.

June 2, 2022



_____

*J. Robin Sawyer*

J. Robin Sawyer, CVR

Certified Court Reporter

#4882-9574-0787-916

141

E R R A T A   S H E E T

I do hereby certify that I have read all questions

propounded to me and all answers given by me on June 2,

2022, taken before J. Robin Sawyer and that:

    1)   There are no changes noted.

    2)   The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil

Procedure and/or the Official Code of Georgia Annotated

9-11-30(e), both of which read in part:  Any changes in

the form or substance which you desire to make shall be

entered upon the deposition...with a statement of the

reasons given...for making them.  Accordingly, to assist

you in effecting corrections, please use the form below:

Page No.        Line No.       should read:


And the reason for the change is:


Page No.        Line No.       should read:


And the reason for the change is:


Page No.        Line No.       should read:


And the reason for the change is:

142

Page No.          Line No.          should read:


And the reason for the change is:


Page No.          Line No.          should read:


And the reason for the change is:


Page No.          Line No.          should read:


And the reason for the change is:


Page No.          Line No.          should read:


And the reason for the change is:


Page No.          Line No.          should read:


And the reason for the change is:


Page No.          Line No.          should read:


And the reason for the change is:


Page No.          Line No.          should read:

143

And the reason for the change is:


Page No.        Line No.        should read:


And the reason for the change is:


Page No.        Line No.        should read:


And the reason for the change is:


If supplemental or additional pages are necessary,

please furnish same in typewriting annexed to the

interview.


                        _____

                        _____

                        (name and signature of deponent.)

     Sworn to and subscribed before me,

     this the      day of      , (year).


     Notary Public


144