**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **RUSSELL ERICKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE NO.:** |
| **v.** | ) | |
| | ) | |
| **3M COMPANY,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## COMPLAINT

This is an action under Title I of the Americans with Disabilities Act of 1990, as amended (the "ADA"), and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices based on disability and to provide appropriate relief to Russell Erickson  ("Erickson"), who was adversely affected by them. Erickson alleges that Defendant 3M Company ("Defendant" or "3M"), discriminated against him when it denied his request for a reasonable accommodation of remote work assignment and failed to provide an alternative reasonable accommodation, and discharged him on pretextual grounds under Defendant's absenteeism policy. Erickson further alleges that Defendant continuously retaliated against Erickson for engaging in statutorily protected activity, including but not limited to his request and use of a reasonable accommodation of temporary leave, by denying his request

1

to work remotely, provide leave and constructively discharging him with the knowledge and intent to interfere with Erickson's eligibility for leave was affirmatively  stated by the Defendant's third-party administrator.

## JURISDICTION AND VENUE

1.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345.  This action is authorized and instituted pursuant to: Section 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-5(f)(1) and (3) and 2000e-6, and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.  The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Northern District of Georgia, Atlanta Division.

## PARTIES

3.  Plaintiff, Russell Erickson, is authorized to bring this action under Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3).

4.  Defendant a Foreign Profit Corporation and can be served upon its Registered Agent, Corporation Service Company, Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

5.    At all relevant times, Defendant has conducted business in the State of Georgia and has continuously maintained at least 15 employees.

6.    At all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce within the meaning of Section 101(5) of the ADA, 42 U.S.C. § 12111(5), and Section 101(7) of the ADA, 42 U.S.C.§ 12111(7), which incorporate by reference Sections 701(g) and (h) of Title VII, 42 U.S.C. § 2000e(g) and (h).

7.    At all relevant times, Defendant has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

## ADMINISTRATIVE PROCEDURES

8.    On 02/09/2021, Erickson files Charge No. 410-2021-03359 with the Equal Employment Opportunity Commission within 180 days of the latest adverse action alleging on-going violations of the ADA by Defendant.

9.    On February 7, 2023, the Equal Employment Opportunity Commission issued a Notice of Rights.

10.    Erickson files this lawsuit within 90 days of receipt of the Notice of Rights issued by the EEOC.  All conditions precedent to the institution of this lawsuit have been fulfilled.

## STATEMENT OF FACTS

11.  Erickson was hired by Ceradyne, Inc. on 9/12/2005, in Lexington, Kentucky.

12.  Defendant acquired Ceradyne and established the entity as a 3M Company on or about November 28, 2012.

13.  Erickson was diagnosed with immune suppressed condition during his employment at Lexington, Kentucky.

14.  Erickson transferred to Clarkston, Georgia on November 14, 2011.

15.  Erickson identified his immune suppressed condition to Gerald Brooks, Night Shift Supervisor, of Clarkston, Georgia.

16.  During the relevant period, health insurance negotiates the cost of medication to $2,300.00 per month.

17.  Medication cost to insurance is $179,400.00. (6 years, 6 months @ $2,300.00)

18.   Defendant 3M is self-insured for employee health care coverage.

19.   Erickson is a qualified individual with a disability under Sections 3 and 101(8) of the ADA, 42 U.S.C. §§ 12102 and 12111(8).  Erickson has multiple related physical and mental impairments. These impairments substantially limit several major life activities.  Erickson's mental impairment, related to a traumatic brain injury substantially limits the major life activity of the operation of his brain.

20.    Erickson's physical impairment renders him a "high risk" individual with respect to COVID-19. As a "high risk" individual, Erickson's risks of serious complication, serious illness, and death because of contracting the COVID-19 virus and/or any variant thereof are increased.

21.    Throughout his employment with Defendant, Erickson occasionally traveled to doctor's appointments during or around the workday, with the approval of his supervisor, Human Resources, and Defendant 3M management.

22.    Erickson communicated his condition to Defendant on a continuous basis inclusive of detailed medical  information in seeking reasonable working accommodations.

23.    On a regular basis beginning in or about March and April 2020 and continuing through 2020, employees working at Erickson's work location were testing positive for COVID-19, and a corporate communication informed all employees of its support during this period of  COVID-19.

24.    Erickson was the victim of a home invasion / robbery on October 30, 2016.

25.    Erickson suffered a Traumatic Brain Injury, broken eye sockets, and other severe injuries during the attack.

26.    Erickson spent four days on Life Support and nine additional days in the hospital.   Erickson was approved for 12 weeks under the Family Medical Leave Act.

27. On December 30, 2016, Erickson was released to return to work.

28. On January 23, 2017, Erickson's treating physician, Dr. Burke, updated Erickson's medical release to allow Erickson to work 40 hours with no restrictions.

29. Management determined Erickson had  returned to work too soon, and at the request of the Plant Manager, Seth Greenspan, an appointment was scheduled with Erickson's neurologist, Dr. Burke, the Company Nurse, Heather Schultz, and Erickson on February2, 2017.

30. It was decided that Erickson would return to work for 4 hours a day for two months, and then be reevaluated.

31. Erickson was required to open a new Short Term Disability claim to cover hours less than 8 hours per day worked on the new schedule.

32. On April 20, 2017, was allowed to progress to working 6 hours per day.

33. On May 8, 2017, the Short-Term Disability claim was denied.

34. On May 23, 2017, Erickson appealed the denied claim.

35. On May 23/2017, the decision was made that Erickson would remain at six hours per day for another month, until June 26, 2017.

36. On June 26, 2017, Erickson was released to work 40 hours per week with no restrictions.  On Erickson's appeal, Short Term Disability was denied retroactively back to April 28, 2017, going forward.

37. Upon returning to 40 hours per week, Human Resources designated the loss of pay to Sick Time, so the wages were restored.

38. Beginning on September 6, 2017, it was mandatory that Erickson's department work 10 hours per day.

39. All cross training and future promotion would stop due to mandatory 10-hour workdays.  Cross training resumed on May 1, 2018.

40. Erickson was singled out to work 60 hours per week while no other coworker in his department or classification was required to do so.

41. On September18, 2017, Erickson was accused of using an excess of water (60 gallons) to clean the Spray Dryer, causing the pit to overflow.

42. Maintenance monitored each individual and found Erickson's coworkers used 25 gallons of water contributing to the alleged overflow and Erickson had only used 10 gallons.

43. Michael Davidson in maintenance was asked about the pit overflow problem and he stated there had not been an overflow and that the situation had been manufactured.

44. Dr. Burke, on Erickson's behalf sent a letter to Defendant's Corporate HR detailing the risk to Erickson working expanded hours and on October 16, 2017, Erickson was informed the mandatory 10-hour workdays would stop immediately.

45. In correspondence, on October 27, 2017, and December 8, 2017, Dr. Burke and Inge Thulin, President and CEO of Defendant 3M, recognized Erickson as a remarkable employee and individual.

46. On February 4, 2018, Erickson wrote a letter to Mr. Anderson, Corporate Human Resources addressing a job evaluation conducted while Erickson was out on short term disability.

47. Erickson's performance  rating at expertise level had been reduced from a 3 to a 2, and further reduced to a level 1, halting any chance of advancement, and punishing Erickson for his injury.

48. On February 13, 2018, Erickson was forced into performing a process that requires 2 people.

49. While Erickson in trying to complete three different tasks within the process, Spray Dry material got away from him creating excessive dust that set off the fire alarm.

50. The Cold Isostatic Press had been tampered with, causing the decompression rate to slow to the point it was impossible to complete the scheduled tasks.  On February 14, 2018, Peter Fearon, Joe Crowe, operations managers, and Erickson met for a "Verbal Coaching Session." Erickson was told that action was to be the end of the matter.

51. When Joe Calicchio, on-site Human Resources, returned to work on February 16, 2018, he reopened his investigation by requesting a statement followed by a "Documented Coaching Session" Write Up.

52. Thereafter, Erickson was requested to speak with the Company Nurse, Heather Schultz, and the Employee Assistance Program Representative, Milton Gay. During the conversation Nurse Schultz brought up a statement Erickson had told Milton Gay in confidence as part of the confidential EAP process.

53. On February 14, 2018, I was allowed to be on the Diversity, Inclusion, and Innovation Team, led by Vice President Denise Rutherford, Corporate Human Resources, if there was no travel, cost to the company, and it was all on my own time.

54. On August 23, 2016, a Policy was put in place that an employee must notify Management anytime they leave the building. Within a month, Supervisor Tom Dill, ended his use of the Policy, informing Erickson and his co-workers notifications had become overwhelming for him and discontinued requiring notice any further.

55. On February 19, 2018, Erickson was informed that the policy of notification when leaving the building was to be "strictly enforced."  Erickson learned he was singled out and was the only employee required to adhere to this policy.

Erickson was told any failure to comply with the policy would be grounds for termination.

56. On March 7, 2018, Erickson texted Supervisor, Joe Crowe, "I'm just verifying that this is the last day to be texting you as I leave for the day, per your request this morning."   Crowe responded, "Yes. You are correct."   At that time, Erickson was the only employee required to text his supervisor each time he left the building for his 30 min lunch.

57. On March 29, 2018, Emory University filmed on site for PBS, a TV segment called "Your Fantastic Mind." Erickson was profiled in the segment.

58. On May 21, 2018, Erickson's supervisor Joe Crowe escorted Erickson to the Nurses' office, where Crowe remained as a witness.  Nurse Schultz stated to Erickson that he needed to open an ADA claim. Nurse Schultz stated that it was something new they were doing, and that Erickson's disability was now going to be monitored by the Short-Term Disability company, Sedgwick Insurance.

59. At that time,  Erickson had been released to work 40 hours with no restrictions. Erickson responded that he needed to discuss anything dealing with his recovery with his doctor.

60. Schulz insisted that Erickson open the claim before she would allow him to leave her office.

61. Schultz called Sedgwick, and Erickson was compelled to open the claim.

62. When Erickson informed his neurologist, Dr. Burke, of the situation, Dr. Burke was adamant Erickson to NOT open a claim!  Dr. Burke did not affirm Erickson's disability as Erickson had returned to 40 hours a week with no restrictions.

63. As a result, Erickson's doctor would not approve of the proposed company extension of Erickson's work hours to include overtime.  The Company's request of "some overtime" was too vague.  Erickson could then be compelled to work unlimited hours of overtime, adversely affecting his ongoing recovery. Up to 50 hours a week was agreed upon.

64. On May 24, 2018, Erickson met with management to discuss his  concern of being subject to a Hostile Work Environment.

65. Erickson was doing the same work as another coworker, Trevor Barnes, but not receiving equal pay.

66. On July 27, 2018, there was an occurrence with Barnes directed hostile remarks toward Erickson.

67. Rico Holmes, department lead person,  also directed abusive language toward Erickson around the same time.

68. On October 16, 2018, Erickson filed Charge 410-2018-08136 with the EEOC based on reported incidents.

69. On November 7, 2018, Erickson filed Charge 410-2019-00985 with the EEOC for retaliation.

70. On April 1, 2019, Dr. Bondulich issues Sick Note for Erickson to be off work from April 2, 2019 until April 8, 2019.

71. On November 11, 2019, Erickson corresponded with Denise Rutherford, Senior VP of Corporate Affairs, reaching out with ideas to heal identified discrimination issues at the facility.

72. On November 11, 2019, the same day, Rutherford, responds, putting Erickson in touch with Brian Ronningen, HR Director for Corporate Affairs.

73. On November 19, 2019, Ronningen gets Maryann Thomas, Holly Whitcomb, and Maureen Tholen involved in the situation.

74. Team building and healing exercises were not allowed by Clarkston Management.

75. On January 1, 2020, Michael Roman, 3M Chief Executive Officer, signs the EEO Affirmative Action statement, referring to the 3M Policy on harassment and discrimination.

76. On February 13, 2020, Erickson received a dismissal letter for both previous filed charges and a Notice of Rights letter from the EEOC.

77. Erickson chose not to file a lawsuit, hoping things would improve.

78. On August 14,2020, 181 days later and one day past the 90 days in which Erickson could have exercised his right to bring a lawsuit, Erickson was terminated under the Defendant's point absentee program.

79. Erickson fully documented that the absentee points assessed during January 2020 under the program were directly related to the Covid-19 outbreak and medically related to his disability.

80. Erickson was out sick on January 8-9, January 15-16, and January 29-30.

81. Erickson normally would have had his absences charged as one event however, in this one instance the Defendant charged points separately.

82. Erickson's medical file shows that the absences were due to Erickson having Covid.   Extensive communication between the Defendant, Sedgwick and Erickson's doctors exists evidencing Defendant was on notice of Erickson's condition in January 2020 and the underlying cause of the absences.

83. Nevertheless, on January 28, 2020, Erickson received Documented Verbal Warning (Step 1) for an attendance violation.

84. Also on January 28, 2020, Erickson received Performance Correction Written Warning (Step 2).

85. On January 30, 2020, Erickson submitted his application for FMLA covering the January absences and was denied.

86.  On February 11, 2020, Dr. Bondulich submits  FMLA paperwork to request Sedgwick for Jan 8,9,15,16,29 and 30, reflecting a return to work on February 2, 2020.

87.  In early February 2020, Erickson sees Dr. Spaulding with Covid Symptoms and was instructed to shelter in place and make appointment with a Dr. Dretler ASAP.

88.  On February 18, 2020, Erickson receives Performance Correction – Final Written – One Day Suspension

89.  On February 25, 2020, Nurse Schultz called Sedgwick and the absences of January 8,9,15 & 16 are denied due to late reporting and cannot be appealed or overturned.

90.  On March 4, 2020, Dr. Burke writes letter to Defendant's Corporate HR defending January absences and requesting the Defendant  to rectify the situation.

91.  On March 14, 2020, Governor Kemp Issued First Order to Shelter in Place, effective until 04/13/2020 at 11:59 pm.

92.  On March 24, 2020, at 5:00am, Erickson receives a Written Warning for allegedly disrespecting the Company Nurse on February 25,2020.  Seth Greenspan (Plant Manager), Lydia Lively (HR – on phone in SC), Curtis Godfrey (Supervisor) was present.  Erickson did not sign the Written Warning as

any conflict between Erickson and the Nurse arose out the handling of his

medical issues and that he was very uncomfortable with her to the extent he had

asked a supervisor to  always be present so that he would never be alone with

her.

93.  On March 25, 2020, Erikson provides doctor's note to self-isolate (Dr.

Dretler).

94.  On March 25,2020, Erickson applied for FMLA through 3M

Disability Programs.

95.  On March 25, 2020, Erickson receives approval through Short Term

Disability beginning March 24, 2020, through April 5, 2020. The period covered

by his remaining available1.80 weeks of FMLA.

96.  On March 31, 2020, Dr. Claudio Bondulich submits STD paperwork

(amended 05/15/2020) to shelter in place from 03/24/2020 until 06/12/2020.

97.  On April 20, 2020, Erickson was out sick. Notification via

conversation with Calicchio.

98.  On April 3, 2020, Governor Kemp's Order to Shelter in Place takes

effect, until 04/13/2020 11:59pm.

99.  On April 8, 2020, Governor Kemp extends the Order to Shelter in

Place until 04/30/2020 at 11:59pm. Revised to 05/13/2020.

100.     On April 3, 2020, Erickson was screened for Covid-19 at Ethne Health with Doctor's Excuse (Dr. Robert Contino, MD) to shelter in place from April 3, 2020, through April 8, 2020.

101.   On April 24, 2020, Dr. Dretler (Infectious Disease Specialists of Atlanta), adds Clinical Summary Document to Erickson's chart showing Covid.

102.  On April 30, 2020, Governor Kemp extended Order to Shelter in Place until June 12,2020.

103.  In May 2020, Defendant 3M HR sends corporate letter acknowledgingCovid-19 and its policies to support employee safety throughout the company.

104.  On May 5, 2020, Dr. Claudio Bondulich submits STD paperwork for Erickson to shelter in place from May 5, 2020 until June 11, 2020.

105.  On June 18, 2020, Erickson sends Rutherford an email, seeking to go back to school, to improve his chances of advancement.

106.  On June 22, 2020, received an Approval Letter from Sedgwick for March 24, 2020, through May 28, 2020.

107.  On June 22, 2020, Erickson receives an FMLA Approval Letter from the 3M Disability and Leave Service Center, from March 23, 2020, through June 11, 2020, using 11.60 weeks of entitled leave.

108.  On June 26, 2020, Rutherford, 3M Senior VP of Corporate Affairs, sends Companywide update on Covid-19 in the US.

109. On June 26, 2020, Erickson receives a Denial Letter from Sedgwick for May 29, 2020, through June 11, 2020.

110. On June 29, 2020, Dr. Dretler provides Stay at Home request for Ericson to self-isolate.

111. On July 1, 2020, Greg Couves (Plant Operations Manager for USA – Canada) informs employees that there have been four cases of Covid at Erickson's work location.

112. On July 1, 2020, Erickson receives  a request from Sedgwick for the Release of Medical Records and Attending Provider Statement.

113. On July 14, 2020, Dr. Bondulich appealed the Sedgewick Denial of  May 29, 2020 through June 11, 2020, asking to reconsider under Governor Kemp's Emergency Orders to shelter in place.

114. On August 13, 2020, Erickson receives a Denial Letter from Sedgwick for June 29, 2020, through present.

115. On August 14, 2020, Erickson was terminated by phone by Lydia Lively, followed by a letter.

116. On August 19, 2020, the 3M Disability Program acknowledges appeal, and a Sedgewick Appeals Specialist will review the case.

117. On August 18, 2020, Diane Beene, ADA Job Accommodation Specialist after reviewing the file guarantees to save Erickson's employment.

118. On August 19, 2020, Erickson prepares a letter to Rutherford requesting the chance to transfer away from Clarkston.

119. On August 19, 2020, Dr Burke assists Erickson in drafting the final letter.

120. On August 20, 2020, Erickson receives a letter from Diane Beene, Sedgwick closing ADA request due to termination.

121. On September 14, 2020, Rutherford, sends a letter to Erickson that she will have his termination investigated.

122. On September 16, 2020, Sedgwick had Dane Street (Dr. Katzenstein) do a first level appeal third party review of Erickson's case.

123. On October 6, 2020, Dr Burke writes letter to Beene, (Appeals Specialist), appealing termination.

124. On October 8, 2020, Beene suspends review for 14 days, sets a  Determination would be made by November 16, 2020.

125. On December 17, 2020, Brianna sent Dane Street Addendum Report by Dr Katzenstein, responding to Dr. Burke's appeal of termination.

126. On January 14, 2021, Street (Dr. Katzenstein) adds Addendum Report to claim.

127. On January 19, 2021, Brianna Busch, Appeals Specialist, suspends review of appeal for 21 days.

128. On September 1, 2022, Erickson received a W-2 from Defendant based on Rutherford's investigation, reversing the wrongful suspension, and in an amount paying for the suspension without pay in March 2021.

129. Erickson was vindicated in his contemporaneous challenges to his termination that his termination had not violated the Attendance Policy.

130. Erickson's request for, receipt of, and use of FMLA leave as an alternative temporary accommodation was statutorily protected activity.

131. Erickson applied for FMLA and personal leave to avoid returning to the workplace and risking exposure.

132. Defendant was aware that Erickson's leave applications were handled by its third-party administrator and terminated Erickson during that process.

133. The effects of the practice(s) complained of above have been to deprive Erickson of equal employment opportunities and otherwise adversely affect his status as an employee because of his disabilities and/or because he engaged in protected activity.

134. The unlawful employment practices complained of above were intentional.

135. The unlawful employment practices complained of above were done with malice and/or with reckless indifference to Erickson's federally protected rights.

## STATEMENT OF CLAIMS

### Count I – ADA Discrimination

136. The allegations in the preceding paragraphs are incorporated by reference as if set forth herein.

137. Upon information and belief, Defendants would not have discharged Plaintiff had he not had a disability, record of disability or had he not been regarded as disabled.

138. Defendants intentionally, with malice and reckless indifference to Plaintiff's rights, violated the ADA by treating him differently than his non-disabled coworkers, by refusing to accommodate his disability and by terminating him, despite knowing that the ADA required equal terms, conditions, and privileges of employment for all employees and reasonable accommodations for employees with a disability or record of disability.

139. Defendants' actions amount to a violation of the ADA, 42 U.S.C. § 12112, which prohibits discrimination based on disability.

140. As a direct and proximate result of Defendant's intentional discrimination, Plaintiff has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including health insurance benefits.

141. In addition, Defendant's actions have caused, continue to cause, and will cause

the Plaintiff to suffer damages for physical pain and suffering, emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses all in an amount to be established at trial.

142. Moreover, Plaintiff is entitled to be reinstated to employment by Defendants and, if reinstatement is not feasible under the circumstances, Plaintiff is entitled to an award of damages for future lost wages and benefits of employment.

## Count II – Retaliation

143. By this reference, Plaintiff incorporates the factual allegations set forth above as if fully set forth herein.

144. Plaintiff has exhausted his administrative remedies regarding his retaliation claims.

145. Discrimination under the ADA includes retaliating against an individual who objects to conduct that he reasonably believes to be in violation of ADA.

146. Plaintiff's internal grievances of discrimination, and his subsequent charges of discrimination with EEOC, were protected conduct under the ADA.

147. 3M retaliated against Erickson in several ways, including but not limited to consideration of his previous protected activity, arbitrarily increasing his duties, continuing to openly discuss his disability in a disrespectful and unprofessional manner, terminating his employment, and refusing to consider him for reemployment.

148. 3M's acts of retaliation have caused injury to Erickson, including lost wages, and emotional distress, for which he is entitled to recover damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** the Plaintiff respectfully requests that this Court:

A.     Grant a permanent injunction enjoining Defendant, its officers, agents, servants, employees, attorneys, successors, assigns and all persons in active concert or participation with Defendant, from engaging in any employment practices which discriminate based on disability by denying reasonable accommodations to disabled employees, discharging employees based on the disability, and by taking adverse employment actions against persons who engage in protected activity under the ADA.

B.     Order Defendant to institute and carry out policies, practices and programs which provide equal employment opportunities for all employees with disabilities and/or who engage in protected activity, and which eradicate the effects of its past and present unlawful employment practices.

C.     Order Defendant to make Erickson whole, by providing appropriate back pay in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices.

D.     Order Defendant to make Erickson whole, by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described above, in amounts to be determined at trial.

E.      Order Defendant to make Erickson whole, by providing compensation for past and future non-pecuniary losses resulting from the unlawful practices described above, including inconvenience, emotional pain and suffering, anxiety, stress, depression, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

F.      Order Defendant to pay Erickson  punitive damages for its malicious and reckless conduct described above, in amounts to be determined at trial.

G.      Grant such further relief as the Court deems necessary and proper in the public interest.

H.      Award Erickson his costs of this action.

## JURY TRIAL DEMAND

The Plaintiff requests a jury trial on all questions of fact raised by this Complaint.

Respectfully submitted this the 5th day of May 2023.

/s/*Howard R. Evans*

Howard R. Evans
Ga. Bar No. 292865

Howard R. Evans & Associates
1868 Independence Square, Suite D
Atlanta, Georgia 30338
(770) 377-9521
Email: attorney4hrlaw@gmail.com