# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **CAMILLE MCKINLEY** | : |
| | : |
| **Plaintiff,** | : CIVIL ACTION FILE NO.: |
| | : |
| **v.** | : _____ |
| | : |
| **AETNA LIFE INSURANCE COMPANY** | : |
| | : |
| **Defendant.** | : |
| _____ | : |

## COMPLAINT

COMES NOW, CAMILLE MCKINLEY, the Plaintiff in the above-captioned action, and files this Complaint against the Defendant, AETNA LIFE INSURANCE COMPANY ("Aetna"), showing the Court as follows:

## PARTIES AND JURISDICTION

### 1.

The Plaintiff brings this civil action under 29 U.S.C. §1132(a)(1)(B) to recover monetary benefits under an insurance policy (the "Policy") that Aetna issued to the Plaintiff's former employer, The Coca-Cola Company ("Coca-Cola"), and to clarify to her right to receive future benefits under that Policy.

2.

The Policy provides group long-term disability insurance coverage to eligible Coca-Cola employees.

3.

Aetna identifies the Policy as policy number: GP-737568.

4.

The Policy relates to an employee welfare benefit plan (the "Plan") established and maintained by Coca-Cola for the benefit of its employees.  The Plaintiff's claims under the Policy are governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, *et seq.*

5.

The Plaintiff is a former employee of Coca-Cola who was a "participant" under the Plan as contemplated by 29 U.S.C. § 1002(7).

6.

The Policy funds benefits that become payable under the Plan and sets forth terms and conditions under which disability benefits become payable.

7.

Aetna funds benefits that become payable under the Policy.

8.

At the time the claims alleged herein arose, the Plaintiff was covered under the Policy.

9.

This Court has original subject matter jurisdiction over these claims pursuant to 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

10.

This Court has personal jurisdiction over Aetna, and venue is proper in this Court, pursuant to 29 U.S.C. §1132(e)(2).

11.

Aetna may be served with process through its registered agent, C T Corporation System, 289 S. Culver Street, Lawrenceville, Georgia 30046.

12.

The Plaintiff has been a resident of this federal district at all times relevant to the claims asserted in this complaint.  The breaches of the Policy hereinafter alleged occurred within this district.

## <u>FACTS COMMON TO ALL CLAIMS</u>

### 13.

Subject to its terms, the Policy provides for payment of monthly benefits to covered Coca-Cola employees who become disabled and unable to work because of an illness or injury.

### 14.

The Policy provides a "Test of Disability" as follows:

From the date you first became disabled and until monthly benefits are payable for 24 months you meet the test of disability on any day that:

- You cannot perform the **material duties** of your **own occupation** solely because of an **illness, injury** or disabling pregnancy-rated condition; and
- Your earnings are 80% or less of your **adjusted predisability earnings**.

***After the first 24 months of your disability*** that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness**, **injury** or disabling pregnancy-related condition.

The Policy defines "reasonable occupation" as gainful activity:

- For which you are, or may become, fitted by education, training, or experience; and
- Which results in, or can be expected to result in, an income of more than 80% of your **adjusted predisability earnings**.

4

15.

Benefits become payable under the Policy after the covered employee satisfies a 180-day benefit elimination period during which the employee meets the test of disability set forth in the Policy.

16.

The Plaintiff was injured in a motorcycle accident in which she sustained a concussion on July 22, 2017.

17.

On or prior to October 25, 2018, the Plaintiff became unable to perform the material duties of her own occupation at Coca-Cola due to symptoms and impairments caused by a combination of illnesses.

18.

The illnesses that contribute to the Plaintiff's disabling symptoms and impairments included:

- post-concussion syndrome,

- ocular motor dysfunction,

- dysautonomia, including Postural Orthostatic Tachycardia Syndrome (POTS),

- Functional Neurological Disorder (FND), and

- Carpal tunnel syndrome,

as well as other illnesses identified in her medical records contained in Aetna's record of this claim.

19.

Due to her illnesses, the Plaintiff has been unable to perform her regular work activity for Coca-Cola or perform any other gainful occupation in which she could earn 80% of her adjusted pre-disability earnings since on or before October 25, 2018.

20.

The Plaintiff's pre-disability salary at the time she stopped working for Coca-Cola was $162,666.96 per year.

21.

Since the time she stopped working for Coca-Cola, the Plaintiff has met the Policy's "test of disability" and all other conditions and prerequisites set forth in the Policy to receive benefits under the Policy.

22.

After she stopped working due to disability, the Plaintiff made a timely claim for benefits under the Policy.

23.

Among other evidence supporting her claim, the Plaintiff submitted a report from a neuropsychologist at Emory Hospital, Anthony Stringer, Ph.D., ABPP/CN, who performed a forensic neuropsychological evaluation in March 2019, and reported that among other things, the neurocognitive testing elicited "somatic response to stress which took the form of a panic attack with acute interruption in speech production and cognition outside her volitional control."  Dr. Stringer diagnosed the Plaintiff with functional neurological disorder ("FND") and reported "it is likely the case that she experiences subtler interruptions in the flow and efficiency of cognition… when experiencing stress.  Therefore, the stress and pressure associated with her work environment is likely to make it extremely difficult for her to function at this time."

24.

Aetna initially approved the Plaintiff's disability claim by letter dated November 21, 2019, and began paying her monthly disability benefits under the Policy.

25.

On December 4, 2019, Aetna sent the Plaintiff a letter stating that she was required to also apply for Social Security disability benefits.

26.

The Policy allows Aetna to offset any Social Security disability benefits the Plaintiff receives against the amount Aetna is required to pay the Plaintiff under the Policy.

27.

Soon thereafter, The Hartford Financial Services Group, Inc or one of its subsidiaries (the "Hartford") began administering the Plaintiff's claim for ongoing benefits under the Aetna Policy.

28.

Hartford conducted an interview with the Plaintiff.

29.

Hartford also employed an investigator to surveil the Plaintiff in January and February 2021. The surveillance showed only intermittent activity, all of which was consistent with what the Plaintiff told Hartford she was able to perform in their interview. None of the activities the Plaintiff was able to perform during surveillance were similar to her past work activities for Coca-Cola.

30.

Hartford then arranged for the Plaintiff to undergo another neuropsychological evaluation with Nick DeFilippis, Ph.D., a neuropsychologist

that it selected through a vendor it routinely uses for this purpose.

31.

In his report related to that neuropsychological evaluation, Dr. DeFilippis noted that the Plaintiff appeared to fatigue over the course of the day, developed difficulty with expressive speech when she became tired during the testing, and developed a "far away" look in her eyes that suggested to him she had increased difficulty concentrating.

32.

The neuropsychological evaluation by Dr. DeFilippis included multiple validity tests and, according to Dr. DeFilippis, the Plaintiff passed all of them.

33.

Dr. DeFilippis opined that the Plaintiff is suffering from a genuine illness known as somatic symptom disorder, which he asserts is just another name for FND, the diagnosis assigned by Dr. Stringer.

34.

In responding to a series of questions from Hartford, Dr. DeFilippis responded "yes" when asked whether the testing "substantiated impairment in functioning that would impact work activities," and specifically noted that the Plaintiff's condition would render her unreliable in work attendance.  He also

concluded that stress would exacerbate her symptoms.

35.

Hartford sent Dr. DeFilippis summaries of the Plaintiff's surveillance videos, but Dr. DeFilippis reported that the activities shown are consistent with the activities the Plaintiff admitted she can perform and are not relevant to his conclusions on her work impairment.

36.

Despite having this corroborating evidence of ongoing work impairment, Hartford terminated the Plaintiff's benefits by letter dated October 30, 2020.

37.

The Plaintiff submitted an administrative appeal of that decision to Hartford on April 27, 2022.

38.

The Plaintiff's written notice of appeal specified that she was asserting a claim and requesting review of not only the remaining period of benefits that were subject to the Policy's Test of Disability that applied during the first 24-months of benefits, but also a review of her qualification for continuing benefits under the Policy's Test of Disability that applies beyond the 24-month benefits period.

39.

In connection with her appeal, the Plaintiff submitted the report of objective eye testing she had on December 12, 2019, known as Videonystagmography ("VNG"), that was performed by an otolaryngologist, Lawrence Weiss, M.D., and audiologist, Jiovanne Hughart, AUD.  The VNG showed abnormal ocular motility with eye movements indicating a problem with her central nervous system.

40.

In connection with her appeal, the Plaintiff also submitted a June 7, 2021 addendum report from the audiologist, Hughart, who explained that the VNG showed the Plaintiff has delayed optokinetic tracking and abnormal corrective movements known as saccade, which indicates she has difficulty tracking moving visual stimuli, causing images to become blurry.

41.

In connection with her appeal, the Plaintiff also submitted a report from a neurologist, La Tai Brown, M.D., who performed additional ocular testing on the Plaintiff on February 9, 2021, which included video ocular graphing known as Eye-Sync Technology that is used in the context of concussion injuries.

42.

According to Dr. Brown, this testing showed that the Plaintiff suffers from

11

impaired gaze stability in her right eye which can cause vision to blur or induce a sense of disorientation, fogginess and dizziness when focusing on visual targets and impair her ability for "looking up and down and other activities such as scrolling on computer."   Dr. Brown concluded that the Plaintiff most likely suffered these problems as a result of her concussion and that they would cause her fatigue with ocular related movements.

43.

The Plaintiff also sent Hartford a portion of the actual video produced with her eye tracking testing that shows her difficulty focusing her eyes on text as she attempts to read text on a screen.

44.

In connection with her appeal, the Plaintiff also submitted reports from the Plaintiff's treating cardiologist, Howard J. Snapper, M.D., who has diagnosed her with dysautonomia which is a physical disorder of the branch of the autonomic nervous system that regulates heart rate, blood pressure, sweating, and body temperature.   Among other evidence, Dr. Snapper performed objective testing known as a tilt table test on December 23, 2019, that showed the Plaintiff has evidence of POTS.

45.

Recognized symptoms of dysautonomia include balance problems, noise/light sensitivity, blurred vision/visual disturbances, ongoing tiredness, brain fog/forgetfulness/lack of focus, heart rate and blood pressure swings, and uncontrolled sweating, among others.

46.

Dr. Snapper's records also reference the results of electrocardiograms (ECGs) performed on December 23, 2019 and October 6, 2019 showing the Plaintiff suffers from Bradycardia (abnormally low heart rate) while at rest.

47.

In connection with her appeal, the Plaintiff also submitted reports of a brain SPECT scan performed on February 19, 2021 and March 20, 2021, and a related addendum report from Jay Faber, M.D., a board-certified psychiatrist.  According to Dr. Faber, the SPECT scan showed, among other abnormalities, that the Plaintiff experienced decreased activity in her cerebellum which is associated with problems with eye alignment and movement "leading to challenges with direction, positioning and reading."

48.

Dr. Faber also reported that the Plaintiff showed difficulties with her

working memory during his testing.  Additionally, Dr. Faber reviewed the data from Dr. DeFilippis' neuropsychological testing and explained that although her WAIS-IV (IQ) scores fall within the normal bell curve "there is a 10-point discrepancy between her verbal comprehension score and full scale IQ" which can reflect a difficulty with reading.

49.

In connection with her appeal, the Plaintiff also submitted records from one of her treating neurologists, Jorge Juncos, M.D., who diagnosed the Plaintiff with FND and POTS and endorsed her disability claim.

50.

In connection with her appeal, the Plaintiff also submitted the report of a functional capacity evaluation ("FCE") that tested the Plaintiff's ability to perform simulated physical work activities.

51.

The FCE included several validity screens, and the Plaintiff passed them all.

52.

Based on the FCE testing, the evaluator concluded that the Plaintiff is functioning at below the full sedentary work capacity and is not capable of working a full 8-hour workday at any physical demand level.

14

53.

In connection with her appeal, the Plaintiff also submitted reports of EMG-nerve conduction testing showing she suffers from severe carpal tunnel syndrome (median nerve entrapment at wrist) in her right wrist and moderate-severe carpal tunnel syndrome in her left wrist.

54.

In connection with her appeal, the Plaintiff also submitted a January 7, 2021 summary report from the Plaintiff's therapist, Jennifer Hawkins, APC, NBCC, CCTP, who, among other things, explained that she had been treating the Plaintiff for 13 months, and that while the Plaintiff's functional ability varies from day to day, including some "very good" days when she is able to get out of her house, attend appointments in person, and run errands, the Plaintiff continues to require naps during the day, and has had to cancel her in-person sessions and switch to remote sessions approximately 40% of the time due to flares in her symptoms.

55.

In connection with its evaluation of the Plaintiff's appeal, Hartford engaged the services of a private company, Claims Eval, to provide it with medical peer review reports.

15

56.

Claims Eval regularly provides services to disability insurers such as Aetna and Hartford and earns a majority of its revenues from services it performs for insurance companies.

57.

Claims Eval produced four separate Peer/Medical Review reports, all dated May 23, 2022. The Peer/Medical Review reports appear to have been electronically signed by an ophthalmologist, Dr. Asher Neren, M.D., a neurologist, Lev Grinman, M.D., a cardiologist, Malcom McHenry, M.D., and a psychologist, Juan Gutierez, Ph.D., respectively.

58.

These peer review reports show on their face that they were not produced independently by the reviewers, but instead were prepared in whole or in part by someone on behalf of Claims Eval or Hartford.

59.

In a June 10, 2022 letter to Hartford, the Plaintiff's attorney addressed the Plaintiff's suspicion that someone other than the reviewing physicians was involved in preparing the reviewers' reports for them.

60.

Claims Eval then produced addendum reports purportedly from these same four reviewers, all dated June 24, 2022.  Two of those addendum reports recite the identical phrase "My initial review was completed independently, fully and fairly" and the other two recite the same sentence omitting only the word "initial."

61.

None of the Claims Eval peer reviewers personally examined, evaluated, or performed any testing on the Plaintiff.

62.

In his May 23, 2022 peer report, Dr. Neren, admitted, among other things, that the Plaintiff's "test results document deficits," and he specifically acknowledged that "there was indication for ocular gaze holding on target problems in the right eye," and that "[o]n 06/07/21, test suggested difficulty following visual stimuli in rightward and leftward direction," and "[o]n 08/10/21 FCE, the claimant scored poorly during typing examination …"  In his June 24, 2022 addendum, Dr. Neren also acknowledged that "[t]he submitted gaze video of 3/24/21 documents irregular tracking of text" while reading.  However, Dr. Neren cited the Plaintiff's ability to drive her car in heavy traffic for an hour during one of the days she was surveilled in January 2020, showed the Plaintiff was capable of

performing work on a computer.

63.

Dr. Neren's suggestion that driving in traffic is the equivalent to performing sustained computer work is wrong and lacks reasonable basis or support.

64.

In his May 23, 2022 peer report, Dr. Grinman acknowledged, among other things, that that the Plaintiff's "records include neurological deficits on exams," that on June 21, 2021, "mental fog with speech arrest and cumulative memory loss were apparent on exam" that the Plaintiff's March 20, 2021 "SPECT scan and WebNeuro Test results revealed some abnormalities," and that her August 10, 2021 FCE showed she fell into the "poor category during a typing examination" and that the FCE evaluator concluded it would be "almost impossible for her to sustain even a part-time job."  However, in his May 23, 2022 peer report and June 24, 2022 addendum, Dr. Grinman, discounted these finding by pointing to the fact that the Plaintiff was able to perform limited activity including driving in traffic in January 2020 and suggesting that the visual and cognitive demands of driving in traffic are the equivalent to performing sustained mental and visual work activities using a computer.

65.

Dr. Grinman's suggestion that the visual and cognitive demands of driving in traffic and performing sustained mental and visual work activities using a computer are equivalent is wrong and lacks reasonable basis or support.

66.

In his May 23, 2022 peer review report, Dr. Gutierrez noted some of the Plaintiff's evidence of impairment, including abnormalities in her SPECT scan and WebNeuro testing, but discounted her evidence based on her statement that the Plaintiff's video surveillance "revealed [her] ability to perform a full day of activity in early 2020."

67.

On the day of the January 2020 surveillance Dr. Gutierrez was referring to, the Plaintiff went home and took a one-hour nap in the late morning before her doctor's appointment later that day and also had a one hour relaxation massage between appointments to help her recover from those activities both before driving home in traffic.  This was not the equivalent to a full day of meaningful activity.

68.

In the course of the appeal process, the Plaintiff also submitted a September 18, 2022 letter from one of her treating neurologists, Jorge Juncos, M.D.  Dr.

Juncos diagnosed and treated the Plaintiff for FND and identified a link between FND and the Plaintiff's other documented illnesses, including dysautonomia and ocular motor dysfunction.

69.

Dr. Juncos explained that FND symptoms have an "organic basis" and "unique physiology often involving the autonomic nervous system." Dr. Juncos explained that, among other things, the Plaintiff has consistent findings of "visuospatial dysfunction and resulting eye movement abnormalities that make it difficult for her to focus. Recurrent difficulty focusing causes severe fatigue while performing any work that requires sustained attention."

70.

Dr. Juncos explained that one:

> characteristic of FND is the fluctuation, even intermittency of its symptoms.  On a given day the patient can appear normal, while sometime later can appear totally disabled.  Common fluctuations in attention are exemplified by the *brain fog* reported by [the Plaintiff].

71.

Dr. Juncos reviewed the actual video surveillance from January 2020 that the Claims Eval peer reviewers relied upon and reported that:

> "[t]he circumstances of the video were not representative of those that serve as a trigger to [the Plaintiff's] symptoms.  The triggers include sustained attention, multitasking, and staring at a computer monitor.  These activities

20

are impossible to avoid at work but were simply absent during the filming…"

72.

Dr. Juncos reported that the Plaintiff's evidence taken together "supports her incapacity and thus inability to work."

73.

FND is a physical illness that is not subject to the Policy's 24-month benefit limitation.

74.

In an October 5, 2022 second addendum report, Hartford's neurologist peer review consultant, Dr. Grinman, agreed with Dr. Juncos' opinion that the evidence-based medical literature agrees that FND is not itself a product of mental illness such as depression and anxiety.

75.

During the appeal process, the Plaintiff submitted a report from her treating brain injury rehabilitative specialist, Benjamin Behrendt, DC, MSc, FABBIR, FACFN, who identified differences in the eye movements needed for driving versus computer work. Dr. Berendt also explained that during ocular testing with reading, the Plaintiff demonstrated "considerable instability with increased regression" and that her scores fell within a 4th grade reading level. Dr. Berendt

reported that "[c]omputer activity is going to exacerbate her symptoms with rapid eye movements performed in scrolling and transferring data."

76.

The Plaintiff has a Master's degree in electrical engineering.

77.

During the appeal process, the Plaintiff also submitted an August 22, 2022 letter from her therapist, Jennifer Hawkins, APC, NBCC, CCTP, who, among other things, reviewed the January 2020 video surveillance and noted several things shown in the video which are consistent with the Plaintiff's condition, including scenes of her taking breaks to pause and sit in her car both after arriving at destinations and after getting back into the car, and noted that during their one-hour therapy sessions, the Plaintiff demonstrates difficulty staying engaged in conversation, that those sessions appear to leave her depleted, and that she has even allowed the Plaintiff to rest in an empty office after her session before driving home on occasions.

78.

In an October 17, 2022 second addendum report, however, the peer reviewer, Dr. Neren, continued to equate the visual demands needed to drive a car in traffic for one hour with the ability to perform the visual skills associated with

computer work.

79.

In response to Dr. Neren, the Plaintiff also submitted to Hartford a report of additional visual testing by Michael L. Serrano, O.D., dated January 12, 2023, that showed:

> significant dysfunction with near gaze functions that are most important for reading and close visual activities such as using computer monitors.  While driving involves an element of near gaze activity it is not the equivalent of what is involved in typical office desk work.

80.

Dr. Serrano reported that the Plaintiff's reading comprehension testing utilizing high school level material was only 70%.

81.

Dr. Serrano also explained that the visual requirement for driving a car in the State of Georgia is only "20/60 [vision] in one eye and at least 140-degrees in field vision."   Dr. Serrano explained that "there is a difference between driving a car and complex processing of data, which is what [the Plaintiff] is to perform every day."

82.

Hartford failed to send Dr. Serrano's objective test results or reports to Dr. Neren or Dr. Grinman for their consideration.

23

83.

During the appeal review process, the Social Security Administration determined that the Plaintiff was disabled from performing gainful work activity and approved her disability claim.

84.

On March 17, 2023 Hartford notified the Plaintiff that it had denied her appeal.

85.

The Plaintiff has exhausted her administrative remedies under the Plan and Policy.

86.

Hartford's decisions to terminate the Plaintiff's benefits under the Policy and Plan and to deny her appeal of that decision were wrong, unreasonable, arbitrary and capricious.

87.

Hartford's appeal review process involved a selective review of the Plaintiff's medical evidence that failed to credit her evidence supporting work impairments.

88.

Hartford failed to give appropriate weight to the decision by the Social Security Administration despite encouraging the Plaintiff to apply for those benefits.

89.

When evaluating the Plaintiff's claim and appeals, Hartford had structural conflicts of interest based on its relationship with the insurer, Aetna.

90.

The decision to terminate the Plaintiff's benefits under the Policy and deny her appeal were influenced by Hartford's conflict of interest.

## COUNT ONE

## CLAIM FOR BENEFITS

## AND RELIEF UNDER 29 U.S.C. § 1132(a)(1)(B)

91.

The Plaintiff hereby repeats and realleges the allegations contained in each of the preceding paragraphs of this Complaint as if set forth verbatim herein.

92.

The evidence that the Plaintiff submitted to Aetna and Hartford in support of

her claim demonstrates that she has met the Policy's test of disability on a continuous basis since on or before the date she stopped working and has satisfied all conditions set forth in the Policy and Plan for receiving benefits.

93.

The decision to deny the Plaintiff's claim for benefits under the Policy was wrong, unreasonable, arbitrary, and capricious.

94.

Aetna and Hartford failed to establish or follow reasonable claim procedures in connection with the evaluation of this claim.

95.

Aetna and Hartford failed to provide the Plaintiff a full and fair review.

96.

Pursuant to 29 U.S.C. § 1132(a)(1)(B), the Plaintiff is entitled to an award of benefits under the Policy from the date Hartford terminated her benefits on or about October 29, 2020 and continuing through the date of judgment and will be entitled to continue receiving such benefits into the future.

97.

The Plaintiff is entitled to recover interest accruing on the aforesaid benefits.

26

## COUNT TWO

## ATTORNEYS' FEES

### 98.

The Plaintiff hereby repeats and realleges the allegations contained in each of the preceding paragraphs of this complaint as if set forth verbatim herein.

### 99.

The Plaintiff has retained counsel to represent her in this matter and is entitled to an award of costs, including reasonable attorneys' fees against Aetna, pursuant to ERISA, 29 U.S.C. § 1132(g)(1).

WHEREFORE, the Plaintiff, prays for relief in the following forms:

(a)  An award of benefits under the Policy, plus pre-judgment interest accruing on all principal sums awarded to the Plaintiff;

(b)  An award of attorneys' fees relating to the Plaintiff's claims; and

(c)  That the Plaintiff be awarded such additional and further legal and equitable relief as the Court deems just and proper.

Respectfully submitted this 5th day of May, 2023.

EVANS WARNCKE ROBINSON, LLC

By:     /s/ Douglas M. Robinson
        Douglas M. Robinson
        Georgia Bar No. 610100
        Attorney for Plaintiff
        191 Peachtree Street, NE
        Suite 3980
        Atlanta, Georgia 30303
        Telephone: (404) 841-9400
        Facsimile: (478) 202-7453
        d.robinson@ewrlawfirm.com