# Exhibit 5

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| W.K., E.H., M.M., R.P., M.B., D.P., A.F., C.A., R.K., K.P., and T.H., <br><br> Plaintiffs, <br><br> v. <br><br> RED ROOF INNS, INC., FMW RRI NC, LLC, RED ROOF FRANCHISING, LLC, RRI WEST MANAGEMENT, LLC, VARAHI HOTEL, LLC, WESTMONT HOSPITALITY GROUP, INC., and RRI III, LLC, <br><br> Defendants. | CIVIL ACTION FILE <br><br> NO. 1:20-CV-5263-MHC <br><br> JURY TRIAL DEMANDED <br><br> Pursuant to Fed. R. Civ. P. 38 |

**<u>SECOND AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

JURISDICTION & VENUE ........................................................ 3

THE PARTIES ............................................................................ 3

   I.   THE PLAINTIFFS ............................................................ 3

   II.  THE DEFENDANTS ......................................................... 6

      A.   Identity of Defendants ................................................ 6

      B.   Relationships Among Defendants at Red Roof Corporate
          Locations and Non-Corporate Locations ................... 9

FACTUAL ALLEGATIONS ..................................................... 11

   I.   TRAFFICKING AT THE SMYRNA RED ROOF ............................ 11

      A.   The Smyrna Red Roof Defendants knew or should have
          known sex trafficking and prostitution were occurring
          at the Smyrna Red Roof ........................................... 11

          1.  Defendants knew of sex trafficking and prostitution
              at the Smyrna Red Roof ................................... 11

          2.  Publicly available reviews confirmed the prevalence of
              commercial sex and other criminal activity at the
              Smyrna Red Roof ........................................... 18

          3.  The trafficking and prostitution activity at the Smyrna
              Red Roof was open and obvious ........................... 23

          4.  The Smyrna Red Roof Defendants knew or should have
              known about arrests and criminal activity at the
              Smyrna Red Roof ........................................... 29

          5.  Numerous signs of Plaintiffs' trafficking should have
              been obvious to Defendants ................................ 31

      B.   Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. were
          each sold for sex at the Smyrna Red Roof ...................... 37

          1.  The Trafficking of W.K. at the Smyrna Red Roof .............. 38

i

    2. The Trafficking of E.H. at the Smyrna Red Roof ............... 40

    3. The Trafficking of M.M. at the Smyrna Red Roof ............. 43

    4. The Trafficking of R.P. at the Smyrna Red Roof ............... 45

    5. The Trafficking of M.B. at the Smyrna Red Roof ............... 46

    6. The Trafficking of D.P. at the Smyrna Red Roof ............... 46

    7. The Trafficking of A.F. at the Smyrna Red Roof ............... 48

II.   TRAFFICKING AT THE ATLANTA RED ROOF ........................... 48

  A.   The Atlanta Red Roof Defendants knew or should have known sex trafficking and prostitution were occurring at the Atlanta Red Roof. ................................................. 48

    1. The conditions at the Atlanta Red Roof gave Defendants actual and constructive knowledge of sex trafficking and prostitution there. ................................. 48

    2. Publicly available online reviews of the Atlanta Red Roof confirmed the prevalence of commercial sex and other criminal activity there. ................................. 52

    3. The Atlanta Red Roof Defendants knew or should have known about arrests and criminal activity at the Atlanta Red Roof. ................................................. 56

  B.   Plaintiffs W.K., R.P., C.A., R.K., and K.P. were each sold for sex at the Atlanta Red Roof. ................................. 61

    1. The Trafficking of W.K. at the Atlanta Red Roof ............... 64

    2. The Trafficking of R.P. at the Atlanta Red Roof ............... 64

    3. The Trafficking of C.A. at the Atlanta Red Roof ............... 65

    4. The Trafficking of R.K. at the Atlanta Red Roof ............... 67

    5. The Trafficking of K.P. at the Atlanta Red Roof ............... 68

III. DEFENDANTS' FAILURE TO RESPOND TO TRAFFICKING AT THE SMYRNA RED ROOF AND ATLANTA RED ROOF ....... 69

IV. THE RELATIONSHIPS AMONG THE DEFENDANTS ................. 71

  A.   RRI's Operation of Non-Corporate Locations ........................... 71

   1. **RRI's control over its non-corporate locations mirrors that over its corporate locations.** ........................................... 71

   2. **RRI has controlled the operations of the Smyrna Red Roof since Varahi, a non-corporate franchisee, purchased the location.** ........................................... 79

  B. **RRI's Operation of Corporate Locations** .................................. 84

   1. **During corporate ownership at the Smyrna Red Roof, Westmont and RRI ultimately controlled the location's operation.** ...................................................................... 85

   2. **At all relevant times, Westmont and RRI ultimately controlled the operation of the Atlanta Red Roof.** ............. 88

**CLAIMS FOR RELIEF** ........................................................................ 91

 I. **VIOLATIONS OF THE GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT** ............ 91

  A. **Defendants engaged in acts of racketeering activity.** ............. 91

   1. **Keeping a Place of Prostitution** ................................. 91

   2. **Aiding and Abetting Prostitution** ............................. 93

   3. **Aiding and Abetting Pimping** ................................. 93

   4. **Sexual Servitude in Violation of State Law** ........................ 95

  B. **The acts of racketeering activity formed a pattern.** ............. 100

 II. **NUMBERED COUNTS** ................................................................ 104

  **COUNT I** ........................................................................ 104

  **COUNT II** ........................................................................ 106

  **COUNT III** ........................................................................ 108

  **COUNT IV** ........................................................................ 117

  **COUNT V** ........................................................................ 128

  **COUNT VI** ........................................................................ 129

  **COUNT VII** ........................................................................ 132

  **COUNT VIII** ........................................................................ 138

**III. ADDITIONAL THEORIES OF RECOVERY** ................................... 143

  **ALTER EGO** ........................................................................ 143

  **JOINT VENTURE** ................................................................ 146

**IV. PLAINTIFF T.H.** .................................................................... 150

  **A. The sex trafficking of T.H. at the Atlanta Red Roof** ............. 150

  **B. T.H.'s Claims Against Defendants** ......................................... 154

    **COUNT IX** ...................................................................... 154

    **COUNT X** ........................................................................ 156

    **COUNT XI** ....................................................................... 158

    **COUNT XII** ..................................................................... 164

  **C. Additional Theories of Recovery for T.H.
  (Alter Ego and Joint Venture)** .................................................. 169

COMES NOW Plaintiffs in the above-styled action and hereby file their Second Amended Complaint as follows:

## INTRODUCTION[1]

1.       For more than a decade, the Red Roof Inn located at 2200 Corporate Plaza, Smyrna, Georgia, 30080 (the "Smyrna Red Roof") and the Red Roof Plus+ located at 1960 North Druid Hills Road NE, Atlanta, Georgia, 30329 ("Atlanta Red Roof") have been known centers of commercial sex.  Buyers of commercial sex, sex traffickers, and law enforcement are familiar with these hotels' reputations for sex trafficking and prostitution.

2.       Employees at all levels, from hotel cleaning staff to the CEO of Red Roof Inns, Inc., knew of the rampant sex trafficking and prostitution at these two hotels.

3.       Even after an anti-trafficking advocate personally informed Red Roof Inn, Inc.'s CEO and general counsel of sex trafficking at the Smyrna Red Roof—including the presence of a man listed on the Georgia Sex Offender Registry with a lengthy criminal history of sex crimes involving minors, even supplying pictures of the man at the location—the trafficking continued. And

---

[1] Paragraphs in the Introduction, Jurisdiction and Venue, and Parties sections apply to all claims and all Plaintiffs.  Unless otherwise noted, the same is true for paragraphs in the Factual Allegations section.

Defendants continued to profit from the rental of rooms for sex trafficking and prostitution.

4.     Plaintiffs W.K, E.H., M.M., R.P., M.B., D.P., and A.F. are trafficking victims who were sold for sex at the Smyrna Red Roof, while Plaintiffs W.K., R.P., C.A., R.K., K.P., and T.H. are trafficking victims who were sold for sex at the Atlanta Red Roof.  Plaintiffs file this lawsuit to seek redress from Defendants under federal and state law.

5.     Defendants knew or should have known that the Smyrna Red Roof and the Atlanta Red Roof Ventures violated the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. 1595(a) ("TVPRA").  And because Defendants knowingly benefited from participation in ventures under the TVPRA, they are liable to Plaintiffs under the TVPRA.

6.     Defendants knowingly permitted the Smyrna Red Roof and Atlanta Red Roof to be used for prostitution in violation of Georgia law.  Because Plaintiffs are sex trafficking victims who were injured by Defendants' keeping places of prostitution and related offenses, Defendants are also liable to Plaintiffs under the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO").

7.     Further, Defendants breached duties imposed by law, assumed by contract, and voluntarily undertaken by them, and because Defendants knew

#3188307v1

2

or should have known of the foreseeable risk of sex trafficking, prostitution, and other crimes at the Smyrna Red Roof and Atlanta Red Roof, Defendants are liable to Plaintiffs for their negligence under Georgia law.

## JURISDICTION & VENUE

8. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under 18 U.S.C. § 1595(a), and pursuant to 28 U.S.C. § 1367 because Plaintiffs' state law claims form part of the same case or controversy as their federal law claims.

9. Defendants are subject to personal jurisdiction in this district and division.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

## THE PARTIES

## I.     THE PLAINTIFFS

11. All eleven Plaintiffs, proceeding anonymously, are victims of sex trafficking.[2]  Seven of the Plaintiffs—W.K, E.H., M.M., R.P., M.B., D.P., and

---

[2] Plaintiff T.H.'s right to proceed anonymously is subject to this Court's review of her contemporaneously filed motion requesting leave to do so.  This Court has already granted the other Plaintiffs such leave.

A.F.—were trafficked for commercial sex at the Smyrna Red Roof. Six of the Plaintiffs—W.K., R.P., C.A., R.K., K.P., T.H.—were trafficked for commercial sex at the Atlanta Red Roof.

12.    As a result of the control, force, fraud and coercion exerted over Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., A.F., C.A., R.K., K.P., and T.H. by their traffickers, Plaintiffs were incapable of managing the ordinary affairs of life until they escaped captivity or the control of their traffickers.

13.    W.K. is a citizen of the United States of America and a resident of the State of Georgia. From approximately 2013 through 2014, Plaintiff W.K. was trafficked for sex as a minor at the Smyrna Red Roof and at the Atlanta Red Roof.

14.    E.H. is a citizen of the United States of America and a resident of the State of Georgia. From approximately 2014 through 2018, Plaintiff E.H. was trafficked for sex at the Smyrna Red Roof.

15.    M.M. is a citizen of the United States of America and a resident of the State of Georgia. From approximately 2010 through 2017, Plaintiff M.M. was trafficked for sex at the Smyrna Red Roof.

16.    R.P. is a citizen of the United States of America and a resident of the State of Georgia. From approximately 2012 through 2016, Plaintiff R.P. was trafficked for sex at the Smyrna Red Roof. From approximately 2012 through

at least 2017, Plaintiff R.P. was trafficked for sex at the Atlanta Red Roof.

17. M.B. is a citizen of the United States of America and a resident of the State of Florida. From approximately 2015 through 2016, Plaintiff M.B. was trafficked for sex at the Smyrna Red Roof.

18. D.P. is a citizen of the United States of America and a resident of the State of Georgia. In 2017, Plaintiff D.P. was trafficked for sex at the Smyrna Red Roof.

19. A.F. is a citizen of the United States of America and a resident of the State of Arizona. In 2010 and 2011, Plaintiff A.F. was trafficked for sex at the Smyrna Red Roof.

20. C.A. is a citizen of the United States of America and a resident of the State of Georgia. From approximately 2009 through 2014, Plaintiff C.A. was trafficked for sex at the Atlanta Red Roof.

21. R.K. is a citizen of the United States of America and a resident of the State of Texas. From approximately 2009 through 2013, Plaintiff R.K. was trafficked for sex at the Atlanta Red Roof.

22. K.P. is a citizen of the United States of America and a resident of the State of Nebraska. From approximately 2011 through 2014, Plaintiff K.P.

was trafficked for sex at the Atlanta Red Roof.[3]

## II. THE DEFENDANTS

### A. Identity of Defendants

23.    Westmont Hospitality Group, Inc. ("Westmont") is a Texas corporation with its principal place of business in Houston, Texas.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Westmont may be served with process by serving its registered agent Capitol Corporate Services, Inc. at 206 E. 9th Street, Suite 1300, Austin, Texas, 78701.

24.    Red Roof Inns, Inc. ("RRI") is a Delaware corporation with its principal place of business in New Albany, Ohio.  It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia that have resulted in injuries in Georgia.  RRI may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia,

---

[3] Allegations specific to T.H. begin at paragraph 587.

30092.

25.     FMW RRI NC, LLC ("FMW") is a Delaware limited liability company with its principal place of business in Houston, Texas. It regularly conducted business in the State of Georgia, derived substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  FMW may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

26.     Red Roof Franchising, LLC ("Red Roof Franchising") is a Delaware limited liability company with its principal place of business in New Albany, Ohio. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia.  Red Roof Franchising may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, GA 30092, USA.

27.     RRI West Management, LLC ("RRI West") is a Delaware limited liability company with its principal place of business in Houston, TX.  It regularly conducts business in the State of Georgia, derives substantial

revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. RRI West may be served with process by serving its registered agent Capitol Services, Inc. at 1675 S State St. Suite B, Dover, DE 19901.

28.     Varahi Hotel, LLC ("Varahi") is a Georgia limited liability company with its principal place of business at 2200 Corporate Plaza, Smyrna, Georgia, 30080. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Vahari may be served with process by serving its registered agent Bharat Patel at 2200 Corporate Plaza, Smyrna, Georgia, 30080.

29.     RRI III, LLC ("RRI III") is a Delaware limited liability company with its principal place of business in Houston, Texas. It regularly conducts business in the State of Georgia, derives substantial revenue from services rendered in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. RRI III may be served with process by serving its registered agent CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia, 30046.

30.     Collectively, Westmont, FMW, RRI West, RRI, Red Roof Franchising,

and Varahi are the "Smyrna Red Roof Defendants."

31.     Collectively, Westmont, RRI III, RRI West, RRI, and Red Roof Franchising, are the "Atlanta Red Roof Defendants."

**B.     Relationships Among Defendants at Red Roof Corporate Locations and Non-Corporate Locations**

32.     Some hotel locations bearing the Red Roof brand are corporately owned—meaning they are owned and operated by corporate entities that are ultimately owned by Westmont and RRI.  For the purposes of this complaint, locations ultimately owned by Westmont and RRI are referred to as "corporate locations."  Other hotel locations are owned by corporations or individuals outside of Westmont and RRI.  They are referred to here as "non-corporate locations."[4]

33.     The primary difference between a corporate location and a non-corporate location is whether all of the corporate participants involved are ultimately owned by Westmont and RRI.  If Westmont and RRI are the ultimate parent of all the companies involved—whether franchisor, franchisee, or manager—then the location is a corporate one.  If the location

---

[4] For the purposes of this complaint, locations owned by Westmont are referred to as "corporate locations," while those with ownership outside of Westmont and RRI are referred to as "non-corporate locations."  While defendants may refer to themselves as "independent," in practice the operation of non-corporate locations is anything but independent.

is owned by an entity that, like Varahi, is not a subsidiary or corporate affiliate of Westmont and RRI, then the location is a non-corporate location.

34.    Corporate locations and non-corporate locations are structured similarly using a franchisor-franchisee model, through which a series of contracts define the participants' relationships.  The specific responsibilities are spelled out in the participants' contracts and policies.

35.    RRI ultimately exercised control over the day-to-day operations at both corporate and non-corporate locations, whether by operating and managing the locations directly as corporate locations or by exerting such a high degree of control over non-corporate locations that, functionally, RRI controlled the operation of the non-corporate locations just as it did at the corporate locations.

36.    During all times relevant to this suit, the Atlanta Red Roof was a corporate location.

37.    From at least 2010 through December 2012, the Smyrna Red Roof was also a corporate location.

38.    In December 2012, as more fully described below, the ownership of the Smyrna Red Roof was transferred to Varahi, and the Smyrna Red Roof became a non-corporate location.

39.    Additional facts regarding the relationships among the Defendants and ownership and control of the Defendants are set out below in ¶¶ 306–388.

## FACTUAL ALLEGATIONS

### I.    TRAFFICKING AT THE SMYRNA RED ROOF

**A.    The Smyrna Red Roof Defendants knew or should have known sex trafficking and prostitution were occurring at the Smyrna Red Roof.**

**1.    Defendants knew of sex trafficking and prostitution at the Smyrna Red Roof.**

40.    Defendants had direct knowledge of sex trafficking and prostitution at the Smyrna Red Roof through their employees.  Employees included local hotel employees ("hotel employees") who worked at the hotel itself and corporate employees of RRI ("corporate employees") who visited the hotels involved for the purpose of monitoring the revenue, occupancy, online reviews, and physical premises of the hotel.

41.    Sometime in 2011–2012, Cobb County police notified the then-general manager of the Smyrna Red Roof that sex traffickers had paid a former general manager and a hotel employee to act as lookouts.  Despite this notice, the employee continued working at the hotel for six more months.

42.    From at least 2010 through December 2012, the Smyrna Red Roof was a corporate location, and RRI employed all of the hotel employees who

worked there.  As a result, notice to the then-general manager constituted notice to RRI.

43.     Smyrna Red Roof hotel employees acted as lookouts for traffickers, alerting them to the presence of law enforcement, through at least 2018. These hotel employees' knowledge, support, assistance and facilitation of trafficking and prostitution constitutes knowledge, support, assistance and facilitation by their employers.

44.     In addition to the knowledge of the hotel employees, corporate employees of RRI also had direct knowledge of trafficking and prostitution at the Smyrna Red Roof.

45.     Jay Moyer, Vice President of Operations for RRI, in addition to various other RRI employees, regularly visited the Smyrna Red Roof to inspect the hotel and discuss the hotel's revenue and performance.

46.     From at least 2010 through December 2012, when the Smyrna Red Roof was a corporate location, Mr. Moyer frequently stayed at the Smyrna Red Roof for 2–3 nights at a time, several times each year.  During these stays, Mr. Moyer had the opportunity to personally and directly observe the conditions, including the rampant sex trafficking and prostitution at the Smyrna Red Roof.

47.     Mr. Moyer eventually refused to stay overnight at the Smyrna Red

Roof.

48.     On information and belief, Mr. Moyer ultimately refused to stay overnight at the Smyrna Red Roof anymore because of the open and obvious criminal activity, including but not limited to sex trafficking and prostitution, that he observed while at the Smyrna Red Roof.

49.     From December 2012 through at least 2018, while the Smyrna Red Roof was owned by Varahi, Vickie Lam, among others, inspected the hotel several times a year on behalf of RRI.  During these inspections, Ms. Lam had the opportunity to observe the conditions, including the rampant sex trafficking and prostitution at the Smyrna Red Roof.

50.     In addition to the knowledge of the hotel employees and RRI corporate employees, RRI's then-President and CEO, Andrew Alexander, also had direct knowledge of sex trafficking and prostitution at the Smyrna Red Roof. In 2015, a hospitality industry executive and anti-trafficking advocate sent several online articles detailing sex trafficking at the Smyrna Red Roof (including articles from the ATLTrafficking website, described below), directly to Mr. Alexander.  Mr. Alexander is a lawyer and previously served as RRI's Senior Vice President and General Counsel.

51.     On or around December 4, 2015, the hospitality industry executive followed-up and spoke with Mr. Alexander on the phone, describing the

rampant and ongoing commercial sex trafficking at the Smyrna Red Roof. On the same day, following that call, the hospitality industry executive emailed Mr. Alexander additional details of the sex trafficking at the Smyrna Red Roof and supplied him with information on how to prevent sex trafficking.

52.     In the December 4, 2015 phone call, the hospitality industry executive identified—by name—a suspected sex trafficker who was operating at the Smyrna Red Roof and who was listed on the Georgia Sex Offender Registry and who had a lengthy criminal history of sex crimes involving minors.  The hospitality industry executive told Mr. Alexander this was "[o]ne example of a Red Roof Inn appearing to be involved in trafficking."

53.     Mr. Alexander's only response to this information was to have RRI's general counsel, George Limbert, call the hospitality industry executive to find out who owned the website where the articles were published.

54.     The hospitality industry executive then sent Mr. Limbert the same information previously sent to Mr. Alexander and again asked when the company would take action to address the open sex trafficking at the Smyrna Red Roof.

55.     Again, around December 22, 2015, weeks after the hospitality industry executive's first communication with Mr. Alexander, the hospitality industry

executive again emailed him, this time copying Mr. Limbert, and alerting both of them that the previously identified trafficker was seen at the location again.

56.     Among other things, the email reported that the trafficker "was seen outside your manager's office last night [at the] Red Roof Inn mentioned in the report [the Smyrna Red Roof].  His background is very clear[,] and he appears to be using your hotel regularly and is quite friendly with your manager. … I hope Red Roof takes action on this sad situation."

57.     On both the telephone call and via e-mail, the hospitality industry executive referred Red Roof Inn to End Child Prostitution and Trafficking (ECPAT-USA) and encouraged them to study the Tourism Child-Protection Code of Conduct (the "Code") in the United States to learn about what the hospitality industry was doing to help prevent trafficking.[5]

58.     In addition to the direct notice provided to Defendants through their employees, Defendants were also notified of the existence of at least two public websites devoted specifically to warning members of the public about drug activity, sex trafficking and prostitution at the Smyrna Red Roof.

---

[5] *See The Tourism Child-Protection Code of Conduct*, ECPAT-USA, *available at* www.ecpatusa.org/code/ (last visited Dec. 29, 2020).

59.     "Red Roofie Blog," began in 2014 and warned of drug activity and prostitution at the Smyrna Red Roof.  It also warned travelers, especially families, not to stay at the hotel.[6]

60.     Another website, www.atltrafficking.com ("ATLTrafficking"), highlighted instances of sex trafficking at hotels in Atlanta and published more articles about the Smyrna Red Roof than any other hotel in the city.

61.     An ATLTrafficking article, published on or around January 13, 2016, about the Smyrna Red Roof stated, among other things:

    a.     "Any day of the week, dozens of girls are trafficked out of this location, some of whom look underage, even as young as 12;" and

    b.     "Private investigators recently observed a young woman being trafficked repeatedly at the Red Roof in Smyrna over a 3 day period while her 7 week old baby slept at the foot of the bed in which she was entertaining 'client' after 'client.'"

62.     On or around January 21, 2016, ATLTrafficking specifically identified—by name and photograph—traffickers staying at the Smyrna Red Roof and quoted a hotel employee:

    a.     "admit[ing] that much of the information contained in" an article

_____

[6] Red Roofie Blog: Avoid Red Roof Inn Smyrna Georgia.
http://redroofie.blogspot.com/p/reviews.html (last visited Dec. 29, 2020).

published on the site "regarding sex trafficking occurring in their

rooms is true;" and

b.      "confirm[ing] that the national Red Roof Corporate office is aware

of the situation, as well as the franchise owner."

63.      On or around January 27, 2016, ATLTrafficking posed the question: "What is it going to take for Red Roof Corporate (614-744-2600) to pull the franchise rights from this owner?" It also encouraged "[c]oncerned citizens" to "call the Cobb County elected officials as well as the Red Roof Corporate offices right away," and provided contact information for RRI, its communications department, and its public relations agency.

64.      Smyrna Red Roof Defendants were aware of the publicly available information on both the "Red Roofie Blog" and the ATLTrafficking websites. The hospitality industry executive specifically provided the ATLTrafficking articles to RRI's then-CEO.

65.      The Smyrna Red Roof defendants monitored online postings such as the "Red Roofie Blog" and ATLTrafficking. Additional details about the Smyrna Red Roof Defendants' monitoring of online reviews and public information is described below. On information and believe, the Smyrna Red Roof Defendants received information, complaints, and notices of trafficking and prostitution from others, like the hospitality industry executive, who

were concerned about sex trafficking and prostitution at the Smyrna Red
Roof.

> **2.     Publicly available reviews confirmed the prevalence
> of commercial sex and other criminal activity at the
> Smyrna Red Roof.**

66.     The Smyrna Red Roof Defendants were aware of online reviews and
their content regarding the Smyrna Red Roof.

67.     RRI maintains an online reputation management system that conducts
real-time monitoring and scrutinizes social media references, online reviews,
complaints, news reports, and other references to both its corporate locations
and non-corporate locations—including the Smyrna Red Roof and Atlanta
Red Roof—in real time.  This system monitors customer feedback, safety
threats, police reports, and news articles mentioning its hotels.  Through
these systems, RRI receives daily information about the hotels bearing its
brand.

68.     Online review scores and ratings are an important part of RRI's
evaluation metrics for hotel performance.  Through the relevant time, both
when the Smyrna Red Roof was a corporate location and when it was a non-
corporate location, RRI monitored online reviews at its hotels on a constant
basis.  Indeed, RRI represents that "our president receives all of our
Tripadvisor Reviews to his email daily."

69.     RRI also knew or should have known of the reviews in this Complaint and other reviews because of the monitoring referenced above, but also because RRI republishes online reviews on its own website,

https://www.redroof.com/property/ga/smyrna/RRI088#trip-advisor-section.

70.     Not only did RRI monitor online reviews, including but not limited to Tripadvisor reviews, of its locations, such as the Smyrna Red Roof and the Atlanta Red Roof, it also required hotel employees to respond to reviews.

71.     As a result of RRI's policies regarding online reviews, all the Smyrna Red Roof Defendants (Westmont, RRI, Red Roof Franchising, RRI West, FMW, and Varahi) and the Atlanta Red Roof Defendants (Westmont, RRI, Red Roof Franchising, RRI West, and RRI III) had notice of the content of publicly available online reviews.

72.     Both during the location's corporate ownership and during Varahi's ownership of the Smyrna Red Roof Inn, RRI corporate employees routinely contacted the hotel employees at the Smyrna Red Roof regarding specific negative online reviews in response to customer complaints.

73.     Bharatkumar Patel, a Varahi Hotel, LLC member, actually responded to many of the online reviews, confirming Varahi's actual knowledge of guest complaints of prostitution and related crime.

74.     Numerous publicly available online reviews of the Smyrna Red Roof

reported prostitution and other criminal activity at the hotel.[7]

75.   A July 7, 2013 review stated:

> **Prostitutes everywhere** .... There were prostitutes at a couple
> doors too. Around midnight we heard loud yelling and looked out
> our window. Seven (yes seven!) cop cars were directly in front of
> our room and were arresting someone as a prostitute stood 5 feet
> from our window.  It was hard to sleep to say the least.  The only
> security I felt was the fact our dog was with us.  Don't stay here!!!

76.   An August 12, 2014 review, stated:

> **PROSTITUTION – COCK ROACHES – AND DOG POOP!**
> Deluxe ROOM
> DO NOT GO THERE!!!!! My worst experience ever! Saw
> prostitution, dogs pooping outside, loitering, dead cockroaches in
> my room.  I askd thm 2 come get it up th clerk said he could
> "bring me a broom!"[] NOT! ... I wouldn't send my enemy here!
> Unless you want crackheads and prostitutes and don't mind ....

> In response, Mr. Patel wrote:

> I am wrinting [sic] deep apology for prostitution came in our
> property. I just hire new security person for watch night for any
> one who make any kind of problem.this will not happen again.

77.   Another August 2014 review stated:

> This hotel is unsanitary and a hotbed for criminal activity....
> Dirty pillow cases, **blood on the floor**, bugs, cigarette burns
> everywhere, **prostitutes, and drug activity right outside our**

---

[7] Bold emphasis, where included in ¶¶ 75–85, is added.  Certain of these
reviews are attached as Exhibit A.

**door**, which had no lock because apparently it had been kicked in by the police. The desk clerk couldn't have cared less.

Mr. Patel also responded to this review, confirming that he read it.

78.     A September 2014 review, stated:

I am in the room right now scared! ... I watched as a young girl did the 2 fingers to her eyes and a point to guy across to other building only to push him a min later and say"10 dollars? Im a dime baby you no im worth more than that!" Then the traffic throughout the day.... **its a drug and prostitute headquarters**. Im a young male well over 6ft tall and fear for my safety! I smoke cigarettes religiously and have quit and made a promise to never do it again because I had to stand outside and witness these acts and wonder if I would be jumped! ... oh and now I hear shamika making a quick buck in the next room, classy! The roof is red and so are the sheets! ... Im starving from the thc in the air, ... Just waiting for the gun fire as I already planned my emergency plan over and over in my head! ... wish me the best in the next hour as I use all my strength to grab all my bags and run for the truck, I did not sign up for this!

Mr. Patel also responded to this review, confirming that he read it.

79.     A September 7, 2014 review stated:

**Nothing but a dope and prostitution den!!** The room was nasty .... Kind of scary with men hanging out in lobby while checking in.  The parking lot was filled with young people drinking and smoking dope.  I believe it should be condemned! Avoid at all costs.  You would be better off sleeping in your car.

Mr. Patel also responded to this review, confirming that he read it.

80.    A July 2015 review stated:

Bed bugs crawling on top of the bedding, **prostitutes roaming the facility, drug deals taking place in the walkways,** loitering in the office people sitting ... unsavory characters every where [sic], not recommended for anyone. If it were possible to give less than 1 star I would needless to say, this review was captured in less than 15 minutes at the establishment. BEWARE!!

Mr. Patel also responded to this review, confirming that he read it.

81.    An August 2015 review stated:

DO NOT STAY HERE. Terrible place to stay.... **Prostitutes and drug dealers roam the parking lot.** There are at least 5 people on the parking lot all hours of the night..

Mr. Patel also responded to this review, confirming that he read it.

82.    An August 8, 2015 review stated:

DO NOT stay here! ... **There were shady people hanging out outside of our room door at all hours of the night and there was open prostitution occurring on the property. There are at least 5 people on the parking lot all hours of the night**.

Mr. Patel responded to this review and apologized that "people wear

[sic] hanging out in the hallway" and said, "I will hire security man for night.

i will make sure it will not happen again."

83.    An August 2015 review stated:

Ok so I get there, she tells me system down I seen people just hanging out in lobby. Just sitting smelled really funny, housekeepers steal and look real shady. Needs more cameras **lots of prostitution going on and I know the staff know. They will call peoples room when the police come and say don't answer. I seen this happen to me** .... This hotel is a trap spot for $60 do not put your life at risk! BaD AREA!!!!!!

Mr. Patel also responded to this review, confirming that he read it.

84. A September 2015 review stated:

I recently stayed here ... I was approached from 2 officers informing us that we needed to place all our belongings inside and lock our vehicles because **this is a high drug area & prostitution area.**

Mr. Patel's also responded to this review, confirming that he read it.

85. A May 17, 2016 review, stated:

Ok to start do not stay here .... **There were drug dealers (fake thugs), prostitution, and for two days straight there were police leaving the premises.** ... The 1st day of me checking in I found blood on the bathroom door, walls and floor.

### 3. The trafficking and prostitution activity at the Smyrna Red Roof was open and obvious.

86. It was a common occurrence at the Smyrna Red Roof for girls and women to hang over balconies and stand in open doorways to advertise their availability for commercial sex.

87. Room doors at the Smyrna Red Roof Inn open from the rooms onto

outdoor breezeways facing the hotel's parking lot, making trafficking activity, violence, police activity, and other activity in or around room entrances visible from the parking lot and easily observed by hotel employees.

88.     So many people came to the Smyrna Red Roof to purchase commercial sex that traffickers took to directing car traffic in the parking lot to increase efficiency and to maximize profits.  Hotel employees at the Smyrna Red Roof witnessed and permitted this activity.

89.     Hotel employees also saw traffickers beat sex trafficking victims in the public parking lot, giving hotel employees knowledge of the force and coercion that is a well-known sign of sex trafficking.

90.     Other examples of force and coercion used by traffickers were observed by a Smyrna Red Roof hotel employee.  This hotel employee observed that traffickers operating at the Smyrna Red Roof used force to recruit additional victims while there.  For example, if a woman tried to prostitute herself without a trafficker, traffickers at the Smyrna Red Roof would either chase her off the property or force her to work for them.

91.     Smyrna Red Roof security guards, who were supposed to prevent and report illegal activity, instead partied with guests—including traffickers— drinking and using drugs with them.

92.     One security guard told a Smyrna Red Roof hotel manager that other

managers were aware of this behavior but that manager did not discourage the security guards from partying with guests while the guests were drinking and/or using drugs.

93.    At least one Smyrna Red Roof security guard purchased sex from a woman being trafficked at the location while he was on duty.

94.    Smyrna Red Roof security guards also purchased drugs from the traffickers at the Smyrna Red Roof.

95.    A Smyrna Red Roof hotel employee estimated that from roughly 2010 through at least 2016, a significant portion of the location's business—at times a majority—came from renting hotel rooms to sex traffickers and prostitutes.

96.    At any given time, the same hotel employee estimated there were 10 to 12 different traffickers operating at the Smyrna Red Roof, many of whom controlled more than one victim and some of whom controlled 4 to 5 victims at a time.

97.    The same hotel employee also estimated that persons selling drugs and commercial sex at times constituted 50% to 75% of the hotel's occupancy.

98.    While being trafficked at the Smyrna Red Roof Inn, the Plaintiffs were each required to see multiple buyers of commercial sex every day.

99.    Many other sex trafficking victims at the Smyrna Red Roof also saw

multiple buyers of commercial sex each day while being trafficked there.

100.   Given the number of victims and the number of buyers of commercial sex each victim was required to see, it was common for there to be more than 100 buyers of commercial sex at the Smyrna Red Roof during any given day.

101.   Further, a Smyrna Red Roof hotel employee estimated that during the time he worked at the location—from 2008 through 2016—there were often more than 100 buyers of commercial sex at the Smyrna Red Roof every day.

102.   Commercial sex buyers were present at the Smyrna Red Roof throughout the day, every day.

103.   The Smyrna Red Roof Defendants were aware of short-term rentals of rooms by buyers of commercial sex and the purpose for which these rooms were rented.

104.   From at least 2013 through at least 2018, there were signs displayed both at the front desk and night window of the Smyrna Red Roof reading, "NO REFUNDS AFTER 15 MINUTES."

 

105.   This sign shows that not only were Varahi, Red Roof Franchising, and RRI aware of the presence of commercial sex on the property, but that commercial sex was so prevalent that it was recognized and accepted as part of their regular operations, and they created a no-refund policy to address it.

106.   The sign also shows that Varahi, Red Roof Franchising, and RRI understood its clientele and adapted their operations in response. Specifically, they understood their clientele consisted largely of buyers and sellers of commercial sex, who accepted a public pronouncement of this policy without questioning its purpose.

107.   The sign was visible to anyone who came to the front desk or night

window, including RRI corporate employees, like Jay Moyer and others, who were responsible for auditing and inspecting the property on behalf of RRI.

108. The sign and its meaning, was mentioned in multiple publicly available online reviews[8] of the Smyrna Red Roof, including:

    a.    A March 2014 review stating,

        When you see a sign in the lobby that says: no refunds after 15 minutes of checking in, take heed!

    b.    An August 2014 review stating,

        I have stayed at the red roof inn in many locations and I was shocked to see the shape and ambiance of this one. It is true, drug dealers and thugs in the hallway and the parking lot. No exaggeration. The sign, "no refunds after 15 min" is a clear indication that there is something really wrong going on here. …

    c.    A November 2015 review stating,

        When you enter the lobby the first thing you notice is a sign that reads, "No refunds after 15mins." This should have been our first sign to run.

    d.    A December 2015 review stating,

        Arrived at the hotel, first thing we meet were a couple telling us to look over our room because they found piss and blood in theirs. Think they even said it was their second room. We walked to our room, first thing we see is a load of bugs on the floor, walls and door. Blood on both beds, floor and ceiling. Spots on the towel. And mold on the beds. I really don't wanna know how all of this happened, but this

---

[8] Certain of these reviews are attached as Exhibit B.

hotel was horrible. Should have turned around after we meet the couple in the reception and read the "no refund after 15 mins" but it was almost 01.00.

e.     A September 2016 review stating,

Sign in lobby says "No refunds after 15 minutes." I have never seen that in any other motel.

f.     An August 2017 review stating,

There is a sign in the lobby that says no refunds after 15mins. Now I know why. Don't stay here.

109.   Upon information and belief, before 2018, no RRI corporate employee ever removed the sign or directed Varahi to do so.

> **4.     The Smyrna Red Roof Defendants knew or should have known about arrests and criminal activity at the Smyrna Red Roof.**

110.   When the Smyrna Red Roof was a corporate location, company policy required hotel managers not only to monitor online reviews but also to complete incident reports when police were called and those incident reports were required to be sent directly to RRI.

111.   Similarly, since December 2012, when the Smyrna Red Roof was acquired by Varahi, the franchise agreement between Varahi and Red Roof Franchising obligates Varahi to report safety or security events at the property, including police activity and arrests, to Red Roof Franchising.

112.   Upon information and belief, Varahi made these reports when such

events occurred and sent them to Red Roof Franchising.

113.   In fact, numerous arrests and law enforcement visits did occur at the Smyrna Red Roof during the relevant time, both when it was a corporate location and a non-corporate location, and the Smyrna Red Roof Defendants—based on their contractual obligations and other facts—knew or should have known about this activity.

114.   During a December 2010 prostitution sting conducted at the Smyrna Red Roof by the Metro Atlanta Child Exploitation Task Force and the Marietta Police Department, law enforcement rescued a 16-year-old trafficking victim and arrested an 18-year-old on prostitution charges.

115.   A March 2011 Cobb County Police arrest report noted that the Smyrna Red Roof "is known for problems with drugs and prostitution" and was a "hotbed of illegal activities."

116.   In a June 2011 report of theft at the Smyrna Red Roof, the victim reported that "a pimp and a prostitute" stole her property "because she refused to work for [the pimp]."

117.   On April 18, 2012, police responded to a dispute at the Smyrna Red Roof between a guest and a Smyrna Red Roof hotel employee after the hotel refused a guest's demand to refund his money after he was, among other things, "harassed by prostitutes."

118.   On June 28, 2012, a victim called the police to report that another woman named "Daisy" stole money from a victim and left that victim stranded at the Smyrna Red Roof after the victim performed commercial sex acts for two buyers.

119.   On March 6, 2013, a 19-year-old woman was arrested at the Smyrna Red Roof for prostitution and drug possession by Cobb County Police, who reported the operation was "in reference to complaints of suspected prostitution occurring in the area" from "business owners, patrol officers working the area and the general public."

120.   On January 1, 2015, police arrested James Roche for pimping and keeping a place of prostitution at the Smyrna Red Roof after he beat a sex trafficking victim so badly that she could no longer move.

121.   On October 1, 2017, police rescued a woman from the Smyrna Red Roof who had been kidnapped, forced into prostitution, and held against her will at the location for several days.

### 5.      Numerous signs of Plaintiffs' trafficking should have been obvious to Defendants.

122.   Over the course of approximately 9 years, seven Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. were held at the Smyrna Red Roof Inn by at least eleven traffickers.  Their victimization followed a pattern that was

readily observable and should have been obvious to hotel employees based on information available to the public at large and to the hotel industry in particular.

123.   For example, as early as 2001, City of Atlanta officials publicly warned of sex trafficking at area hotels and of the relationship between prostitution and sex trafficking.

124.   Nearly 20 years ago, the Atlanta Journal-Constitution published a series called *Selling Atlanta's Children*, describing the problem of sex trafficking in the City.  In that series, an Atlanta City Council official was quoted identifying hotels in particular as a venue for sex trafficking.[9]

125.   In 2011, then-Georgia Attorney General Sam Olens initiated a well-

---

[9] Jane O. Hansen, *Selling Atlanta's Children: Runaway Girls Lured into the Sex Trade are being Jailed for Crimes while their Adult Pimps go Free*, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, *The Pimps: Prostitution's Middle Man Slides by in Court*, The Atlanta Journal-Constitution, Jan. 7, 2001; Jane O. Hansen, *Feds, Police Elsewhere Finding Solutions*, Atlanta Journal-Constitution, Jan. 8, 2001 ("Atlanta City Councilman Derrick Boazman said it's also time to crack down on hotels where adult men take children. 'We need to go after these hotel owners who should know what's happening when someone walks in with a 13-year-old girl,' Boazman said."); Jane O. Hansen, *When Danger is as Close as a Phone*, The Atlanta Journal-Constitution, Jan. 9, 2001; Jane O. Hansen, *Police Plan Child Prostitution Unit*, The Atlanta Journal-Constitution, April 28, 2001; *see also*, Jane O. Hansen, *Selling Atlanta's Children: What Has and Hasn't Changed*, Special to CNN, July 18, 2015, https://www.cnn.com/2015/07/17/us/child-sex-trafficking-update-hansen/index.html (last visited Dec. 29, 2020).

publicized, multiyear campaign to combat sex trafficking in Georgia. Attorney General Olens worked with the Georgia General Assembly to strengthen Georgia's human trafficking law by enhancing the penalties under the state's criminal statute.

126.   In 2013, Attorney General Olens announced a statewide campaign called "Georgia's Not Buying It" to combat child sex trafficking.  As part of the campaign, AG Olens' office "collaborated with partners to conduct trainings and increase awareness," which included "multiple trainings for the … hotel industry."[10]

127.   On September 15, 2013, the Georgia legislature passed O.C.G.A. § 16-5-47 requiring hotels to post sex trafficking notices "in each public restroom for the business or establishment and either in a conspicuous place near the public entrance of the business or establishment or in another conspicuous location in clear view of the public and employees where similar notices are customarily posted."  The statute requires that the notice "provide information giving individuals a method to contact the National Human Trafficking Hotline and the Statewide Georgia Hotline for Domestic Minor Trafficking."  Failure to comply with O.C.G.A. § 16-5-47 is a misdemeanor.

---

[10] https://law.georgia.gov/press-releases/2013-03-18/attorney-general-olens-law-enforcement-announce-campaign-fight-sex (last visited Dec. 29, 2020).

128.   Upon information and belief, Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi did not comply with O.C.G.A. § 16-5-47.

129.   In 2016, AG Olens announced a statewide campaign to combat child sex trafficking entitled, "Unmasked."  The campaign featured a public-service announcement, which played on various TV and radio stations.[11]

130.   In 2015, then-Acting Deputy Attorney General Sally Yates identified Atlanta as an "epicenter" of sex trafficking.

131.   In 2010, the Department of Homeland Security ("DHS") issued guidance to hotel companies identifying warning signs of sex trafficking at hotels.  The Smyrna Red Roof Defendants also knew or should have known of this guidance.

132.   According to DHS, hotel staff should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, and the presence of multiple

---

[11] https://law.georgia.gov/press-releases/2016-04-26/attorney-general-sam-olens-announces-statewide-campaign-combat-child-sex (last visited Dec. 29, 2020).

computers or cell phones.[12]

133. The Smyrna Red Roof Defendants knew or should have known of these statements by federal, state, and local officials and of the requirements of Georgia law.

134. The Smyrna Red Roof Defendants knew or should have known of the ECPAT-USA and the Code.

135. The Code was first written in 1998, and it was signed by Carlson Companies in 2004, by Wyndham, Hilton, and Delta in 2011, and by Sabre Holdings in 2012.

136. As early as 2011, ECPAT-USA partnered with hospitality brands to co-develop training for hotel employees to help them recognize indicators of human trafficking, including the commercial sexual exploitation of children.

137. ECPAT-USA has also published a number of indicators of trafficking to help hospitality and tourism businesses identify and combat trafficking. Those indicators include paying for rooms using cash or gift cards, paying for multi-day stays one day at a time, requesting isolated rooms or rooms close to an exit, wearing the same attire or attire that is revealing or inappropriate

---

[12] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Dec. 29, 2020).

for the weather, and possessing few personal belongings.

138.   During their trafficking at the Smyrna Red Roof, Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. each exhibited signs of trafficking identified in the DHS guidance and by ECPAT-USA.

139.   For example, Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. each regularly requested an unusually large volume of towels and bed linens.

140.   Moreover, the trash cans in the rooms in which the victims were trafficked contained an extraordinary number of used condoms, and sex paraphernalia like personal lubricant and lingerie was visible within the rooms.  Additionally, the rooms contained more cell phones than registered occupants.

141.   The foot traffic of men to and from the hotel rooms in which Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. and other victims were held at the Smyrna Red Roof evidenced trafficking.  Both the volume of men coming and going and the fact that they generally stayed in a room for less than a half-hour at a time evidenced trafficking.

142.   This foot traffic would have been visible on the Smyrna Red Roof's security cameras, which captured footage all over the property and transmitted to live monitors in the location's front office.

143.   The deteriorating physical condition of Plaintiffs W.K., E.H., M.M.,
R.P., M.B., D.P., and A.F. also would have been visible to hotel staff at the
Smyrna Red Roof and anyone else who interacted with them.  Plaintiffs'
outward physical appearance often reflected bruises or other evidence of
physical beatings by their respective traffickers.  Their physical appearance
suggested malnourishment, poor hygiene, fatigue, and sleep deprivation.

144.   Additionally, Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F.
each engaged in other behavior while being trafficked at the Smyrna that
should have put hotel staff on notice that the women were being trafficked.
Plaintiffs each failed to make eye contact with others, lacked control of money
and other personal belongings, and were closely monitored by the men who
were trafficking them.

145.   Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. were forbidden
by their respective traffickers to keep any money while they were held at the
Smyrna Red Roof; their traffickers each took the money Plaintiffs collected
from buyers daily.

**B.    Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. were
each sold for sex at the Smyrna Red Roof.**

146.   From 2010 through 2018, Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P.,
and A.F. were each trafficked at different times at the Smyrna Red Roof Inn.

147.   As further alleged below, Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. were sometimes trafficked with other victims, including minor victims. During their stays at the Smyrna Red Roof, Plaintiffs often witnessed other victims being trafficked at the Smyrna Red Roof by different traffickers.

148.   Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P. and A.F. are not the first sex trafficking victims to allege they were held at the Smyrna Red Roof.  Four other victims have filed suit against the Smyrna Red Roof Defendants related to their trafficking from 2010–2016.

### 1.   The Trafficking of W.K. at the Smyrna Red Roof

149.   From approximately 2013 through 2014, when she was 16 years old, W.K. was sold for sex numerous times from hotel rooms at the Smyrna Red Roof. Her stays there typically lasted 2–3 days at a time.

150.   W.K. was trafficked at the Smyrna Red Roof with two other minor victims of sex trafficking.  At the time, the other minors with whom W.K. was trafficked were 13 or 14 years old—even younger than she was.  Each girl, including W.K., was forced to have sex with numerous men each day.  At times, the children were forced to have sex together, with the same man at the same time.  At other times, the other girls would hide in the bathroom when one was with a buyer.

151.   W.K. witnessed other traffickers and victims at the Smyrna Red Roof, including one trafficker who rented as many as five rooms at one time, holding two sex trafficking victims in each room.

152.   While being trafficked at the Smyrna Red Roof, W.K. saw 80–100 buyers come and go each day.  Those buyers generally stayed at the location for less than a half hour at a time.

153.   Multiple Smyrna Red Roof employees knew W.K.'s trafficker and bought drugs from him and other traffickers at the hotel.

154.   An employee at the Smyrna Red Roof stood and watched while W.K.'s trafficker choked her in an exterior breezeway of the hotel.  The employee looked directly at W.K., and then walked by without doing anything to stop the assault, assist W.K., or call for help.

155.   In December 2014, W.K.'s trafficker beat and choked her in the Smyrna Red Roof hotel room, grabbed her by the hair, and dragged her into the bathroom where he attempted to drown her in the bathtub.  While doing this, W.K.'s trafficker held her face under the water and screamed, "Bitch, I'll kill you."

156.   W.K. was able to escape and police arrested her trafficker, who was convicted of aggravated assault and false imprisonment for his actions at the Smyrna Red Roof.

157.   Even though the local newspaper reported on this incident,[13] and it was known to Varahi, RRI, and Red Roof Franchising, Smyrna Red Roof employees received no additional safety or security training in response to this incident.

### 2. The Trafficking of E.H. at the Smyrna Red Roof

158.   From approximately 2014 through 2018, E.H. was trafficked dozens of times each year from hotel rooms at the Smyrna Red roof.  E.H.'s stays at the Smyrna Red Roof typically lasted a week.  E.H. routinely checked in and out of the hotel multiple times in a month.

159.   E.H. was trafficked so frequently at the Smyrna Red Roof that buyers who frequented the hotel would ask other sex trafficking victims if they had seen E.H. or knew whether she was there at the time.

160.   E.H. was often trafficked at the Smyrna Red Roof together with two or three other victims.  E.H. witnessed numerous other traffickers at the Smyrna Red Roof, each accompanied by groups of victims.

161.   E.H.'s refusal to look men in the eye while at the Smyrna Red Roof is a

---

[13] *See, e.g., Police: Marietta Man Tried to Kill 16-year-old*, Marietta Daily Journal (Dec. 16, 2014), https://www.mdjonline.com/news/police-marietta-man-tried-to-kill--year-old/article_1ef10907-7df1-53d3-bb4a-37038e97cc0f.html  (last visited Dec. 29, 2020).

well-known sign of trafficking that would have been apparent to employees of the hotel. E.H.'s trafficker also ordered her not to speak to other sex traffickers or look other sex traffickers in the eye while she was at the Smyrna Red Roof because of the danger of "choosing up" or being taken by another trafficker.[14]

162. When trafficked at the Smyrna Red Roof, E.H. was forced to have sex with 10–15 men each day.

163. The high volume of buyer traffic at the Smyrna Red Roof was obvious. For example, E.H. and two other victims with whom she was trafficked once stayed a few doors down from another trafficker and two other victims being sold for sex at the Smyrna Red Roof. At this time, all five of these victims were forced to have sex with multiple men per day at the Smyrna Red Roof, generating a constant volume of foot traffic to and from these rooms

---

[14] Among the many dangers a sex trafficking victim confronts is the risk of "choosing up" or leaving her sex trafficker for another sex trafficker. If a victim looks a trafficker in the eye (who is not her current trafficker), even if inadvertently, she has "chosen" that trafficker and comes under his control. As a result, traffickers threaten their victims with violent punishment, lest they lose their source of income. The result is that sex trafficking victims carefully avoid eye contact with men who are not their trafficker. *Winn v. Sec'y of Corr.*, No. CV 17-9144-DOC (AFM), 2018 WL 4262458, at *16 (C.D. Cal. July 19, 2018), *report and recommendation adopted,* No. CV1709144DOCAFM, 2018 WL 4261895 (C.D. Cal. Sept. 6, 2018). Failure to make eye contact is a well-recognized sign of sex trafficking.

indicative of sex trafficking.

164.    At one point, while E.H. was being held at the Smyrna Red Roof, E.H.'s trafficker "traded" one of the victims he was trafficking to another trafficker in exchange for money and one of the victims the second trafficker was trafficking.

165.    While being trafficking at the Smyrna Red Roof, E.H. was once tied down, beaten, and force-fed cocaine so that she could be sold to more commercial sex buyers that day.

166.    Multiple Smyrna Red Roof employees knew E.H.'s trafficker, knew she was being trafficked, and actively assisted her traffickers by functioning as lookouts.  The employee would call the traffickers' hotel rooms to warn them if law enforcement was on-site or en route or if the volume of foot traffic to and from rooms was drawing law enforcement attention or guest complaints.

167.    While E.H. was having sex with buyers in a rented room at the Smyrna Red Roof, her trafficker would loiter outside the hotel room, in the parking lot and common areas, until the buyer left.  He would repeat this behavior each time a new buyer arrived.

168.    E.H. was frequently photographed and made the subject of videos at the Smyrna Red Roof.  The photographs and videos were used in online advertisements to bring more buyers of commercial sex to the hotel.  In some

videos, E.H. is shown outside her room at the Smyrna Red Roof.

169.   Housekeepers at the Smyrna Red Roof knew E.H. was being trafficked at the hotel.  They assisted E.H.'s trafficker by bringing stacks of towels to her room multiple times during the day, so that E.H. could clean herself between each of the numerous commercial sex buyers to whom she was sold.

170.   Multiple security guards at the hotel repeatedly paid E.H.'s trafficker for sex with E.H. This occurred while they were on duty at the Smyrna Red Roof.

### 3.   The Trafficking of M.M. at the Smyrna Red Roof

171.    From approximately 2010 through 2017, M.M. was trafficked from hotel rooms at the Smyrna Red Roof.  At different times, four separate traffickers sold M.M. for sex from the Smyrna Red Roof.  Her traffickers usually paid for the rooms in cash or with gift cards.  M.M.'s stays at the Smyrna Red Roof typically lasted at least one week and sometimes as long as two weeks.

172.   M.M. was generally trafficked at the Smyrna Red Roof together with two or three other victims.  M.M. also witnessed numerous other traffickers at the Smyrna Red Roof, who were at times each accompanied by groups of trafficking victims.  While being trafficked at the Smyrna Red Roof, M.M.

witnessed an average of 10–15 other victims being trafficked there each night.

173.  When she was trafficked out of the Smyrna Red Roof, M.M. was forced to have sex with up to 8 men per day.

174.  Multiple Smyrna Red Roof hotel employees knew M.M.'s traffickers and actively assisted them by functioning as lookouts.  The employee would call the traffickers' hotel room to warn them if law enforcement was on-site or en route or if the volume of foot traffic to and from rooms was drawing law enforcement attention or guest complaints.

175.  When M.M. was having sex with buyers in a guest room at the Smyrna Red Roof, at least one of her traffickers would hang out in the front office with Smyrna Red Roof hotel employees.

176.  One of M.M.'s traffickers took photographs of M.M. outside at the Smyrna Red Roof, which he then used for online advertisements.

177.  The same trafficker, while trafficking M.M. at the Smyrna Red Roof, also used a schedule for posting multiple online advertisements daily.  He would begin posting advertisements at 5:00 a.m. to attract buyers to the Smyrna Red Roof on their way to work.  He then posted again between 10:30–11:00 to attract buyers on their lunch break and again from 3:30–4:30 to attract buyers after work.

178.   The stream of buyers for commercial sex coming through the Smyrna Red Roof at regular and established time intervals further suggested trafficking was occurring there.

179.   Other incidents occurred at the Smyrna Red Roof that were known to the hotel employees and gave notice of criminal activity at the location. For example, after smoking crack cocaine a buyer who lived at the Smyrna Red Roof became paranoid and manic while purchasing sex from M.M.  M.M. fled to the parking lot out of fear for her safety and hid, partially undressed, behind a car.  The buyer ran out of the room completely naked looking for M.M.  The buyer then ran naked into the front office looking for M.M. and yelled that M.M. was trying to kill him.  The staff of the hotel gave the man a hand towel and told him to return to his room.  They did not call the police.

### 4.   The Trafficking of R.P. at the Smyrna Red Roof

180.   From about 2012 through 2016, R.P. was trafficked numerous times from hotel rooms at the Smyrna Red Roof.  At different times, two separate traffickers trafficked R.P. from the Smyrna Red Roof.  Her traffickers usually paid for the rooms in cash.  R.P.'s traffickers kept her at the Smyrna Red Roof for as long as two weeks at a time.

181.   At times, R.P.'s traffickers trafficked her alone at the Smyrna Red Roof and at other times with additional sex trafficking victims.  R.P. also

witnessed numerous other victims being trafficked at the Smyrna Red Roof by other traffickers and witnessed numerous traffickers at the hotel.

182.   When she was trafficked out of the Smyrna Red Roof, R.P. was forced to have sex with more than 10 men per day.

### 5.    The Trafficking of M.B. at the Smyrna Red Roof

183.   In 2015 and 2016, M.B. was trafficked from hotel rooms at the Smyrna Red Roof.  M.B.'s stays there lasted up to 4 nights at a time.

184.   M.B. also witnessed other trafficking victims and sex traffickers at the Smyrna Red Roof when she was being trafficked there.

185.   When she was trafficked out of the Smyrna Red Roof, M.B. was forced to have sex with on average 10 men per day.

186.   While M.B. was being trafficked at the Smyrna Red Roof, M.B. was in a room with her trafficker when a group of four other traffickers broke into the room and beat M.B. and her trafficker before stealing the money and belongings in the room.  The altercation was loud and spilled outside the room.  Although hotel staff were able to hear and observe the beating and robbery, they did nothing.

### 6.    The Trafficking of D.P. at the Smyrna Red Roof

187.   On multiple occasions in 2017, D.P. was trafficked from hotel rooms at the Smyrna Red Roof.  D.P.'s stays there lasted up to a week at a time.

188.   D.P. also witnessed other trafficking victims and sex traffickers at the Smyrna Red Roof.

189.   When she was trafficked out of the Smyrna Red Roof, D.P. was forced to have sex with as many as 10 men per day.

190.   Multiple Smyrna Red Roof hotel employees knew D.P.'s trafficker and were aware that he was trafficking D.P. for sex at the hotel.

191.   While D.P. was being trafficked at the Smyrna Red Roof, she was frequently beaten by her trafficker, and the bruises and other evidence of her beatings were visible to hotel employees.  She also had loud arguments with her trafficker at the hotel, which attracted the hotel security guard.  Instead of calling the police, the hotel security guard told the trafficker to be more discrete so that the "real cops" would not come to the hotel.

192.   During her weeks-long stays on the property, D.P. survived on snacks from the Smyrna Red Roof vending machine, which was located in a public area of the hotel visible to staff and others.  D.P.'s frequent trips to the vending machine revealed to hotel employees the many visible signs of sex trafficking she displayed, including for example, her deteriorating physical condition and inappropriate clothing.

### 7. The Trafficking of A.F. at the Smyrna Red Roof

193.   In 2010 and 2011, A.F. was trafficked from hotel rooms at the Smyrna Red Roof.  A.F.'s stays there lasted up to a week at a time.

194.   A.F. also witnessed other trafficking victims and sex traffickers at the Smyrna Red Roof.

195.   When she was trafficked out of the Smyrna Red Roof, A.F. was forced to have sex with up to 5 men per day.

## II.   TRAFFICKING AT THE ATLANTA RED ROOF

### A.   The Atlanta Red Roof Defendants knew or should have known sex trafficking and prostitution were occurring at the Atlanta Red Roof.

#### 1.   The conditions at the Atlanta Red Roof gave Defendants actual and constructive knowledge of sex trafficking and prostitution there.

196.    The Smyrna Red Roof and Atlanta Red Roof are located less than 15 miles apart in the greater Atlanta area.

197.   The Smyrna Red Roof and Atlanta Red Roof were, from at least 2009 through December 2012, both corporate locations.

198.   During this period, several RRI corporate employees worked at both Smyrna Red Roof and Atlanta Red Roof.  For example, a general manager of the Smyrna Red Roof also worked one day a week at the Atlanta Red Roof. The knowledge of RRI corporate employees who worked at or observed the

Smyrna Red Roof and the Atlanta Red Roof was the knowledge of RRI.

199.   It is reasonable to infer that an employee who worked at both the Smyrna Red Roof and the Atlanta Red Roof was familiar with the conditions at both locations.

200.   The conditions at the Smyrna Red Roof location should have put the Atlanta Red Roof Defendants—who themselves knew or should have known the signs of sex trafficking—on notice of the possibility of trafficking occurring at other, nearby locations, like the Atlanta Red Roof.

201.   Trafficking at the Atlanta Red Roof was also open and obvious.

202.   Room doors at the Atlanta Red Roof Inn open from the rooms onto outdoor breezeways facing the hotel parking lot, making trafficking activity, violence, police activity, and other activity in or around room entrances visible from the parking lot and easily observed by hotel employees.

203.   One of C.A.'s and R.K.'s traffickers frequently used the Atlanta Red Roof and would come and go with between 3 and 5 victims in tow, while each victim wore revealing clothing often inappropriate for the weather.  The trafficker would yell at and berate C.A., R.K. and the other victims in the presence of front office employees at the Atlanta Red Roof, calling them "bitches" and "hoes."

204.   Accompanied by C.A., R.K., and this group of victims, the trafficker

simultaneously rented multiple rooms at the Atlanta Red Roof. Though the group generally stayed for multiple days at a time, the trafficker paid by the day, rather than paying in total. When the group would leave the hotel, hotel employees would ask them whether they should hold the rooms for the group for the next day.

205. This conduct was observable and observed by Atlanta Red Roof hotel employees, and therefore, known by their employer. These hotel employees' knowledge of trafficking and prostitution constitutes knowledge of their employer(s).

206. Atlanta Red Roof hotel employees purchased illegal drugs from traffickers, including C.A.'s and R.K.'s trafficker, in the hotel parking lot.

207. Atlanta Red Roof hotel employees solicited sex trafficking victims for sex at the hotel.

208. Atlanta Red Roof hotel employees would act as lookouts and call sex traffickers at the hotel to warn them when law enforcement was present at or on the way to the hotel.

209. Atlanta Red Roof employees would also monitor the amount of buyer traffic to rooms and warn traffickers to slow or stop that traffic if it had been too heavy. They also cautioned traffickers if other guests complained.

210. The Atlanta Red Roof employees' knowledge, support, assistance and

facilitation of trafficking and prostitution constitutes knowledge, support, assistance and facilitation by their employers.

211. W.K., R.P., C.A., R.K., K.P., and T.H. are not the first sex trafficking victims to allege they were held at the Atlanta Red Roof. Four other victims have filed suit against the Atlanta Red Roof Defendants related to their trafficking there from 2010–2016.

212. RRI corporate employees monitor the revenue, occupancy, online reviews, and physical premises of each hotel bearing the Red Roof brand. Those employees included Jay Moyer, who monitored corporate locations, including the Atlanta Red Roof.

213. The Atlanta Red Roof Defendants did know or should have known about the same public statements made by City of Atlanta and other local officials warning that the City is an "epicenter" of sex trafficking and of the relationship between prostitution and sex trafficking and the same 2010 DHS guidance issued to hotel companies identifying warning signs of sex trafficking at hotels, set out in ¶¶ 123–32 above and incorporated here as if fully restated.

214. The Atlanta Red Roof Defendants knew or should have known of these statements by federal, state, and local officials and of the requirements of Georgia law.

215.   The Atlanta Red Roof Defendants knew or should have known of the

ECPAT-USA and the Code.

> **2.     Publicly available online reviews of the Atlanta Red
> Roof confirmed the prevalence of commercial sex
> and other criminal activity there.**

216.   The Atlanta Red Roof Defendants were aware of online reviews and

their content regarding the Atlanta Red Roof.

217.   Online review scores and ratings are essential to RRI's evaluation

metrics on hotel performance.

218.   As described in ¶¶ 67–71 above and incorporated by reference as if

restated here, throughout the relevant time period, RRI actively monitored

online reviews at its hotels on a daily basis.  For example, RRI job postings

represent "our president receives all of our Tripadvisor Reviews to his email

daily."

219.   RRI's own website publishes publicly available reviews from

TripAdvisor. RRI also knew or should have known of the reviews in this

Complaint and other reviews because of the monitoring referenced above, but

also because RRI published such online reviews on their own website,

www.redroof.com/property/ga/atlanta/RRI130.

220.   RRI monitored the online reviews of the Atlanta Red Roof, including

but not limited to Tripadvisor reviews, required hotel managers to respond to

certain reviews, and used the reviews in its performance metrics for the location.

221.  Furthermore, as part of its supervision and control of the Atlanta Red Roof, if the hotel manager's resolution is not satisfactory to RRI, RRI would fine the hotel manager.

222.  RRI's policies regarding online reviews put Atlanta Red Roof Defendants at a minimum, on inquiry notice of the content of publicly available online reviews.

223.  RRI routinely contacted the Atlanta Red Roof hotel employees regarding specific negative online reviews in response to customer complaints.

224.  Numerous publicly available online reviews of the Atlanta Red Roof reported prostitution and crime at the location.[15]

225.  A July 2012 review stated:

> I was surprised, however, at **all of the open drug dealing going on in the rooms and parking lot**... . I complained upon checkout.  They had a practiced look of surprise on their faces but I do not believe for a minute that the staff does not know what is going on in this hotel.

226.  A July 2012 review, stating:

---

[15] Emphasis, where included in ¶¶ 225–37, is added. Certain of these reviews are attached as Exhibit C.

#3188307v1

Prostitution sting.  **During the stay, there was a prostitution sting.**  The next night at 2:00 AM, a prostitute knocked on my door wanting to know if I wanted "company."

227.   A 2014 review, stating:

Dirty orgy smell in both rooms I had.  Smoke like smell only drowned out by the semen and bleach.  Weird activity late at night.  **Pimp next door wasn't happy with his ladies take for the night apparently.**

228.   A May 2016 review, stating:

... it was pretty obvious that the **local prostitutes were visiting a room a few doors down.  Something I know RRI is pretty familiar with.**

229.   An August 2016 review, stating:

Within the first hour, my brother and his friend were **approached by prostitutes who wanted them to come with them.**

230.   A 2016 review, stating:

**If prostitutes and drugs are what your looking for this is your spot** .... Passed out vomitus covered people in parking lot 2 days out of three.  Seman splattered on mirror... . Felt so bad for the "working women" with their personal items in garbage bags that I gave away 3 tote bags.

231.   A November 2016 review, stating:

The hotel was being used by prostitutes and Shady characters were always coming and going.

232.   A December 2016 review, stating:

#3188307v1

54

Drug dealers and pimps hanging around outside ... .

233. A January 2017 review, stating:

> If you enjoy the smell of marijuana coming from 10% of the rooms and prostitutes setting up shop next to you then this is the place for you!

234. A 2017 review, stating:

> ... A hooker/drug dealer was set up 2 doors down and **had many visitors during the day/night** ....

235. A 2017 review, stating:

> ... This place is Disgusting **there are hookers that are staying here and that is not the least of my worries** .... There is also lots of drug use here someone just overdosed. I found crack on the floor ... .

236. An October 2018 review, stating:

> People that paid for rooms there looked like addicts and sex workers.

237. A 2019 review, stating:

> ... I saw a drug deal, it looks like **another room had suspicious women coming in and out and multiple men going in** ....

238. The frequency and severity of the complaints made in the online reviews of the Atlanta Red Roof make it implausible that these reviews and the activity they reported were unknown to the Atlanta Red Roof Defendants.

### 3. The Atlanta Red Roof Defendants knew or should have known about arrests and criminal activity at the Atlanta Red Roof.

239. RRI and/or Westmont policies required Atlanta Red Roof managers not only to monitor online reviews but also to complete incident reports when police were called and send those incident reports to RRI.

240. Additionally, the franchise agreement between RRI III and Red Roof Franchising obligated RRI III to report safety or security events at the property, including police activity and arrests, to Red Roof Franchising.

241. Upon information and belief, these reports were actually made when such events occurred.

242. In fact, numerous arrests and law enforcement operations did occur at the Atlanta Red Roof during the relevant time, and the Atlanta Red Roof Defendants—based on their contractual obligations and other facts—knew or should have known about this activity.

243. In June 2011, police located a car in the parking lot of the Atlanta Red Roof matching the description of a vehicle "given during a look-out at Roll Call," police requested a detective "from the Special Victims Unit" to respond to the scene after locating approximately $8,000.00 in cash in the car.

244. Police conducting "a business check" at the Atlanta Red Roof in June 2011 "due to the large number of residential burglaries in the area" arrested

one man and cited another on scene for loitering for drugs.

245.   The DeKalb County Vice Unit conducted an undercover operation in which they bought marijuana at the Atlanta Red Roof in September 2011 "in reference to illegal drug activity and prostitution."

246.   In November 2011, police made a drug arrest in the parking lot at the Atlanta Red Roof during a routine patrol of the area, which they noted was "known to be an area heavy in drug sales and prostitution."

247.   During a November 2011 patrol of the Atlanta Red Roof, a location police described as "known for prostitution and drug activity," DeKalb County police arrested a woman for loitering for sex and noted that she was the "female listed on [a] website for implied prostitution."  The woman "admitted that she ha[d] been prostituting out of room #307 for the past day" and "was at another room previously during the week but moved" after police showed her "the ad, which clearly show[ed] her face and body."

248.   In March 2012, police responded to a call from the shift manager at the Atlanta Red Roof after two guests fled the scene following an encounter with the manager.  Police recovered a suitcase the guests had thrown over the third-floor balcony containing "a larger block of compacted green leafy substance which smelled and appeared to be marijuana … wrapped by plastic."

249.   Police increased patrols in the area around the Atlanta Red Roof in March 2012 after a "recent shooting" at the location.

250.   In May 2012, police responded to a call from the Atlanta Red Roof security guard and the night clerk, who called police after they received a report of a loud disturbance in a room "that sounded like a possible assault." The guard and night clerk told police that when they went to the room to investigate, they saw two people leave the room and rush to a car in a "hurried manner."  Once in the room, the security guard and night clerk found blood on the door, "blood spatters on the floor and on the bed," and broken glass on the floor near the microwave and door.

251.   In June 2012, DeKalb County Police patrolling the area arrested a man in the parking lot of the Atlanta Red Roof after a search of his car uncovered "several small baggies for distribution, 12 syringe needles, 2 prescription bottles containing 4 pink prescription pills (suspected methadone)," and "a small baggie containing a white powder substance" that "field tested positive for cocaine." Police also recovered "a syringe and a plastic bag containing a clear rock-like substance," which "field tested positive for methamphetamine" from the arrestee's pocket.

252.   When United States Marshals were dispatched to the Atlanta Red Roof in September 2012 "in reference to a wanted person believed to be staying"

there, they located the wanted person in a room with "a scale with white powder and a hand gun with the serial number filed off … laying in plain sight."

253.   In September 2012, the DeKalb County Police Department's Vice Unit conducted an undercover operation "targeting females that engage in acts of prostitution by advertising their services over the Internet.  The operation was conducted at the Atlanta Red Roof Inn."  An undercover officer responded to an advertisement on Backpage.com offering "the company of two girls."  After the officer arrived and negotiated the sexual acts available, police entered the room and recovered crack and powder cocaine and MDMA from the women in "three small bags," which "appeared to be packaged for distribution."

254.   Police responded to the Atlanta Red Roof in April 2013 after an armed robbery of a man and a woman.  The female victim reported to police that the night before her pimp had dropped her and another woman off at bars "on Buford Hwy to solicit some men for sex."  The female victim brought the male victim back to her room, and when the male victim refused to pay the agreed upon price after the two had sex, her pimp "came into the room and took the rest of the money at gunpoint."

255.   In May 2013, police cited a man at the Atlanta Red Roof "for loitering

for sex." Police first encountered the man and a female companion in the hotel lobby. The man later told police that the woman he was with "refused to give him a blow job even though he was paying her."

256. During a May 2013 undercover operation conducted by the DeKalb County Police Department Vice Unit, police arrested two women for prostitution at the Atlanta Red Roof after responding to an advertisement on Backpage.com.

257. In July 2013, police responded to the Atlanta Red Roof after a woman was beaten by the man and two women she had been staying with at that location when she told them she wanted to leave. The woman reported to police that the group who beat her had been involved with "solicitation activity" and that they "frequent[ed] this motel and [got] different rooms frequently as well." Though the woman said she had been with the group "for about a month," she had "no accurate information" to identify the suspects.

258. In May 2014, an undercover operation conducted by the DeKalb County Vice Unit at the Atlanta Red Roof resulted in two arrests for prostitution and a third for possession of a stolen firearm. The two women arrested for prostitution were seen leaving a first-floor room on the way to a third-floor room where they had arranged to meet the undercover officer for sex. When police searched the first-floor room after the takedown, they found two other

women accompanied by a man in possession of a stolen firearm. The women reported to police that the man had instructed them the previous day to hide the firearm in one of their purses.

259. On April 10, 2016, Brookhaven Police officers patrolling the area in response to an "increase of illegal narcotics and prostitution activity in the immediate area" encountered a man who had rented a room using a forged Illinois ID waiting in a car in the parking lot. In the room the man had rented, meanwhile, officers found a 17-year-old girl and a 41 year-old man who told officers he came to the hotel in response to an advertisement he found on Backpage.

260. These facts support an inference that the Atlanta Red Roof Defendants—all owners and operators of hotels in a city particularly known for a problem with sex trafficking—had actual or constructive knowledge of sex trafficking at their hotels.

### B. Plaintiffs W.K., R.P., C.A., R.K., and K.P. were each sold for sex at the Atlanta Red Roof.

261. At various times spanning from 2009 through 2017, five Plaintiffs— W.K., R.P., C.A., R.K. and K.P.—were each trafficked at the Atlanta Red Roof Inn.

262. As further alleged below, Plaintiffs W.K., R.P., C.A., R.K., and K.P.

were sometimes trafficked with other victims, including minor victims. Even when they were trafficked alone, Plaintiffs often witnessed other victims being trafficked at the Atlanta Red Roof by different traffickers.

263. These five Plaintiffs were held at the Atlanta Red Roof by at least 6 different traffickers over at least 8 years. Their victimization followed a pattern that was observable and should have been obvious to hotel staff.

264. The volume of foot traffic of men to and from the hotel rooms in which Plaintiffs W.K., R.P., C.A., R.K., K.P., and other victims were held at the Atlanta Red Roof, generally staying for less than a half hour at a time, evidenced trafficking.

265. The rooms in which Plaintiffs W.K., R.P., C.A., R.K., and K.P. were trafficked at the Atlanta Red Roof evidenced numerous known and visible signs of sex trafficking. Frequently, the trash cans in the rooms contained an extraordinary number of used condoms, and sex paraphernalia like personal lubricant and lingerie was visible within the rooms. The rooms also contained more cell phones than registered occupants.

266. During their trafficking at the Atlanta Red Roof, Plaintiffs W.K., R.P., C.A., R.K., and K.P. each exhibited signs of trafficking identified in the DHS guidance and by ECPAT-USA.

267.   The deteriorated physical condition of Plaintiffs W.K., R.P., C.A., R.K., and K.P., while they were trafficked at Atlanta Red Roof, would have been visible to hotel staff and to anyone who saw them there. Plaintiffs' outward physical appearance often reflected bruises or other evidence of physical beatings by their traffickers.  Their physical appearances suggested malnourishment, poor hygiene, fatigue, and sleep deprivation—all known signs of trafficking.

268.   The failure of Plaintiffs W.K., R.P., C.A., R.K., and K.P. to make eye contact with others, lack of control, lack of money, and monitoring by their respective traffickers were also known signs that they were each trafficking victims.

269.   Plaintiffs also regularly requested an unusually large volume of towels and bed linens, another known sign that W.K., R.P., C.A., R.K., and K.P. were victims of sex trafficking.

270.   Plaintiffs W.K., R.P., C.A., R.K., and K.P. were forbidden by their respective traffickers to keep any money while they were held at the Atlanta Red Roof; their traffickers each took the money Plaintiffs collected from buyers daily.

### 1. The Trafficking of W.K. at the Atlanta Red Roof

271.  In 2014, when she was 16 years old, W.K. was trafficked out of hotel rooms at the Atlanta Red Roof.

272.  W.K. was trafficked at the Atlanta Red Roof with two other minor victims of sex trafficking.  At the time, the girls with whom W.K. was trafficked were 13 or 14 years old—even younger than she was.  Each girl, including W.K., was forced to have sex with numerous men each day.  At times, the children were forced to have sex together, with the same man at the same time.  At other times, the other girls would hide in the bathroom when one was with a buyer.

### 2. The Trafficking of R.P. at the Atlanta Red Roof

273.  From 2012 through 2017, R.P. was trafficked numerous times from hotel rooms at the Atlanta Red Roof.  The Atlanta Red Roof was the hotel at which R.P. was trafficked most frequently, and she was there on separate occasions with at least two different traffickers.

274.  The fact that R.P. was present at the Atlanta Red Roof so frequently—and in the company of different traffickers—should have alerted hotel employees that she was subject to the force, coercion, or control of others.

275.  R.P. also witnessed other trafficking victims and sex traffickers at the Atlanta Red Roof.

276. When she was trafficked out of the Atlanta Red Roof, R.P. was forced to have sex with as many as 10 men per day and, for at least one of her traffickers, had to meet a quota of $900 per day. Her trafficker would collect her quota from her each day while she was held at the Atlanta Red Roof.

277. Dozens of times, R.P. was photographed and made the subject of videos at the Atlanta Red Roof to be used in online advertisements to bring more buyers of commercial sex to the hotel.

### 3. The Trafficking of C.A. at the Atlanta Red Roof

278. From 2009–2014, C.A. was trafficked by two different traffickers on dozens of different occasions out of hotel rooms at the Atlanta Red Roof, where her stays lasted up to a week at a time.

279. The fact that C.A. was present at the Atlanta Red Roof so frequently— and in the company of different traffickers—should have alerted staff at the location that she was subject to the force, coercion, or control of others.

280. When she was trafficked out of the Atlanta Red Roof, C.A. was forced to have sex with as many as 12 men per day.

281. C.A. also witnessed other trafficking victims and sex traffickers at the Atlanta Red Roof.

282. As noted above, one of C.A.'s traffickers would frequently come and go from the building with C.A. and multiple other victims. The trafficker would

often yell at and berate the 3–5 women and girls he kept in tow, each wearing revealing clothing often in appropriate for the weather.  At times, the trafficker yelled at the victims—including C.A.—calling them "hoes" and "bitches" in front of hotel employees in the front office of the Atlanta Red Roof.  This activity should have alerted staff at the location that C.A., and others with her, were subject to the force, coercion, or control of others.

283.   Accompanied by this entourage of victims, one of C.A.'s traffickers rented multiple rooms at the same time at the Atlanta Red Roof to increase the frequency of buyers at the Atlanta Red Roof.

284.   One of C.A.'s traffickers was friendly with the employees at the Atlanta Red Roof.  Hotel employees would frequently purchase drugs from sex traffickers in the hotel parking lot. When the group of victims and C.A.'s trafficker left the hotel, hotel employees would ask the group if they intended to utilize the hotel again the next day, or if they needed the employees to hold rooms for them.

285.   In or around 2011, C.A. fought with her trafficker in the parking of the Atlanta Red Roof, a fight that would have been visible and audible to hotel employees.

### 4.     The Trafficking of R.K. at the Atlanta Red Roof

286.   From 2009–2013, R.K. was trafficked on numerous separate occasions out of hotel rooms at the Atlanta Red Roof.

287.   When she was trafficked out of the Atlanta Red Roof, R.K. was forced to have sex with approximately 10 men per day. One of her traffickers required a daily quota of at least $1,000 while at the Atlanta Red Roof. Her trafficker would collect her quota from her each day while she was held at the Atlanta Red Roof.

288.   R.K. also witnessed other trafficking victims and sex traffickers at the Atlanta Red Roof.

289.   As noted above, one of R.K.'s traffickers would frequently come and go from the building with R.K. and multiple other victims.  The trafficker would often yell at and berate the 3–5 women and girls he kept in tow, each wearing revealing clothing often in appropriate for the weather.  At times, the trafficker yelled at the victims—including R.K.—calling them "hoes" and "bitches" in front of hotel employees in the front office of the Atlanta Red Roof.  This activity should have alerted staff at the location that R.K., and others with her, were subject to the force, coercion, or control of others.

290.   Accompanied by this entourage of victims, R.K.'s trafficker rented multiple rooms at the same time at the Atlanta Red Roof to increase the frequency of buyers at the Atlanta Red Roof.

291.   R.K.'s trafficker was friendly with the employees at the Atlanta Red Roof.  Hotel employees would frequently purchase drugs from sex traffickers in the hotel parking lot.

292.   When the group of victims and R.K.'s trafficker left the hotel, hotel employees would ask the group if they intended to utilize the hotel again the next day, or if they needed the employees to hold rooms for them. The group generally paid for rooms on a day-to-day basis, rather than paying for all nights of their stay together when they checked out.

### 5.      The Trafficking of K.P. at the Atlanta Red Roof

293.   From 2011–2014, K.P. was trafficked on dozens of different occasions out of hotel rooms at the Atlanta Red Roof, where her stays lasted up to a week at a time.

294.   K.P. also witnessed other numerous other trafficking victims and sex traffickers at the Atlanta Red Roof, including C.A. and R.K. and their traffickers.  K.P. estimated that there were between two and ten traffickers at the Atlanta Red Roof, each with their own victims, at any given time.

## III. DEFENDANTS' FAILURE TO RESPOND TO TRAFFICKING AT THE SMYRNA RED ROOF AND ATLANTA RED ROOF

295. Defendants could have, but did not, take sufficient action in response to known sex trafficking at the Smyrna Red Roof or the Atlanta Red Roof.

296. Before the trafficking of Plaintiffs E.H., M.M., R.P., M.B., and D.P. at the Smyrna Red Roof ended and before the trafficking of R.P. at the Atlanta Red Roof ended, Andrew Alexander, RRI's then-president and CEO, was notified of sex trafficking at the Smyrna Red Roof.

297. Defendants could have terminated the Smyrna Red Roof or Atlanta Red Roof as Red Roof franchise locations—an action RRI has taken at other hotel locations where sex trafficking is alleged to have occurred.

298. The termination of a franchise location severely impacts the operation of the hotel, and consequently, disrupts the operation of commercial sex and trafficking operations conducted there.

299. That is, if RRI had terminated the Smyrna Red Roof or Atlanta Red Roof as franchise locations, then the trafficking ventures that victimized Plaintiff may have been disrupted. At a minimum, the termination of the Smyrna Red Roof and/or the Atlanta Red Roof as franchise locations would have meant that Defendants would cease profiting from Plaintiffs' trafficking.

300. Instead of ensuring that it did not profit from Plaintiffs' trafficking,

#3188307v1

69

Defendants prioritized hotel revenue and profits over guest safety.

301.   In September 2015, RRI terminated its franchise agreement with a hotel in Charlotte, North Carolina after the hotel was the subject of media scrutiny following a prostitution sting that uncovered child sex trafficking at the hotel during the 2012 Democratic National Convention.

302.   Later that same year, RRI was specifically and directly informed of sex trafficking—including of minors—at the Smyrna Red Roof, given the name of the suspected sex trafficker, and sent pictures and information connecting that sex trafficker to hotel employees at the Smyrna Red Roof Inn.  But RRI did not terminate its franchise agreement for the Smyrna Red Roof.

303.   Before December 2012 and while the Smyrna Red Roof was a corporate location, a general manager of the Smyrna Red Roof began calling police to the hotel and refusing to rent rooms to people who appeared to be engaged in illegal activity.  Instead of commending her efforts, RRI Vice President of Operations Jay Moyer told the manager "you need to sell rooms" and "you need to get your numbers up."

304.   To this day, RRI has not terminated its franchise agreement with Varahi for the Smyrna Red Roof.  RRI continues to profit from the operation of and rental of rooms at the Smyrna Red Roof.

305.   Similarly, commercial sex trafficking, including that of Plaintiffs W.K.,

R.P., C.A., R.K., K.P., and T.H. continued at the Atlanta Red Roof—a location owned, operated, and controlled by Defendants Westmont and RRI and other Defendant entities they owned and controlled—even after the Atlanta Red Roof Defendants had every reason to know of the trafficking occurring there. Defendants Westmont and RRI continue to profit from the operation of and rental of rooms at the Atlanta Red Roof.

## IV.   THE RELATIONSHIPS AMONG THE DEFENDANTS

### A.   RRI's Operation of Non-Corporate Locations

#### 1.   RRI's control over its non-corporate locations mirrors that over its corporate locations.

306.   Although the ownership structure of corporate locations relative to non-corporate locations differs, the degree to which RRI controls the locations' day-to-day operations does not.  In fact, RRI publicly touts the exceptionally close relationship between RRI and its non-corporate franchisees.  Then-RRI President and CEO Andrew Alexander stated, "Our relationship with our franchisees is as close as you can get."

307.   Alexander further emphasized that non-corporate franchisees have "direct access to [him] and other leaders at the company, something that's unheard of at larger franchising companies."

308.   The requirements imposed by RRI at its non-corporate locations went far beyond brand uniformity and extended to the day-to-day operations of those locations.

○      **Employee Training and Performance**

309.   Among other things, RRI imposed standardized training methods for employees at non-corporate locations.

310.   For example, from at least December 2012 through at least 2018, RRI conducted mandatory training of every general manager of the Smyrna Red Roof through its RED Advantage Training Program.  This training is conducted at RRI's training center in Ohio and covers every aspect of a hotel's operations.

311.   RRI also conducted mandatory training of every guest service representative and manager at the Smyrna Red Roof from at least December 2012 through at least 2018 through its Field Training Program.  Pursuant to that program, RRI employees traveled to the Smyrna Red Roof to train all categories and types of employees, including front desk and guest relations, housekeeping, and maintenance on all aspects of their job requirements and the operation of the Smyrna Red Roof, including customer service, booking and reservations, audit and accounting procedures, among others.

312.   At RRI's option, from at least December 2012 through at least 2018, RRI could require Varahi to pay for further mandatory remedial training from RRI if the hotel failed to meet quality or guest satisfaction requirements, including scores affected by tracked online reviews.

313.   RRI also required non-corporate franchisees to purchase uniforms for their employees to wear.

### o   Means and Use of Online Reservation System

314.   RRI mandates that its non-corporate locations participate in RediStay, the reservation system used by both its corporate and non-corporate locations.

315.   The RediStay system, which has been in place since at least 2011 and through at least 2018, books reservations, performs check-in and check-out functions, manages rates and room inventory, collects and transmits data from guests to RRI, and automates front desk and operational record keeping for the hotels.

316.   RRI owns the RediStay System and owns and provides all of the software, equipment, communications facilities, personnel, and services used to operate RediStay.

317.   The guest information and data the RediStay system collects is transmitted directly to RRI.

318.   RRI required the Smyrna Red Roof, after it was purchased by Varahi, to use the RediStay system.

> o   **Requirements for Equipment Used at Location**

319.   RRI controlled the day-to-day operations of its non-corporate locations, including Varahi, by mandating the use of certain equipment, supplies, and technology.

320.   For example, RRI required its non-corporate franchisees purchase a Property Management System from RRI.  The Property Management System was, according to RRI, necessary for the non-corporate franchisee to interface with the reservation system, the use of which was also mandated.

321.   RRI also required its non-corporate franchisees to purchase specific equipment and services from designated suppliers, including their credit card terminals, bar code scanners, credit interface services, and website hosting services for photographs and virtual tours of the non-corporate locations.

> o   **Participation in Promotion and Marketing Programs**

322.   RRI controlled the day-to-day operations of its non-corporate locations, including Varahi, by mandating participation in RRI's marketing campaigns and promotions.

323.   For example, from at least December 2012 through at least 2018, RRI required non-corporate franchisees to participate in its "Kids Stay Free" promotions, Preferred Member, and customer loyalty programs.

324.   RRI also required non-corporate franchisees to pay a monthly marketing and reservation fee, through which RRI reimbursed itself for expenses of marketing, from at least December 2012 through at least 2018.

325.   RRI disclaimed any fiduciary obligation over the funds collected from its non-corporate franchisees via these marketing and reservation fees and retained sole discretion regarding whether and how funds would be spent.

o   **On-site Security**

326.   RRI controlled the day-to-day operations of its non-corporate locations, including Varahi, by mandating policies related to on-site safety and security.

327.   From at least December 2012 through 2018, RRI exerted control over the Smyrna Red Roof's security operations and required Varahi's employees to report every safety or security incident at the property, including arrests, directly to RRI.  RRI also required Varahi to consult with RRI before speaking with the media regarding any such safety and security incidents.

328.   The security requirements imposed by Red Roof Inn on its non-corporate franchisees were also the subject of testimony in Fulton County in 2013.  Harshvina Zaver, a then-owner of a hotel property on Fulton

Industrial Boulevard, sought to convert the property to a Red Roof Inn. Though her permit was initially denied because of the high rate of crime on the property, Ms. Zaver relied on Red Roof Inn's standards manual to assure hearing officers that the hotel would be safe. "Once we are a [Red Roof] franchise property we are required to go by every rule in that standards manual."

329.   Ms. Zaver further testified that RRI required locations to provide security for guests' safety.

330.   At that hearing, an attorney representing the franchisee explained RRI's standards more fully:

> [A]s a Red Roof franchisee my client has a substantial liability to Red Roof.  If the franchise is not maintained, they have personal liability for breakage and termination fees to Red Roof.  If they don't adhere to the Red Roof standards, relative security, and maintenance and operation of the property and that franchise is terminated or revoked, they can be subjected to substantial penalties by Red Roof.

331.   Following this testimony, the County granted the permit and the Red Roof location was permitted to open.

### o   **Hours of Operation**

332.   From at least December 2012 through at least 2018, RRI controlled the day-to-day operations of its non-corporate locations, including Varahi, by mandating their hours of operation.  RRI required its non-corporate

franchisees, including Varahi, to operate their locations 24 hours a day, every day.  Before authorizing any departure from this requirement, RRI required non-corporate franchisees to seek its approval and RRI had to provide such approval in writing.

o     **Pricing Standards**

333.   From at least December 2012 through at least 2018, RRI controlled the day-to-day operations of its non-corporate locations, including Varahi, by mandating conformity with RRI's requirements on room rates.

334.   Non-corporate franchisees who violated these rate requirements were subject to a penalty.

o     **Mandatory Responses to Online Reviews and Guest Complaints**

335.   RRI controlled the day-to-day operations of its non-corporate locations, including Varahi, by mandating responses to online reviews.

336.   RRI used an internal system to monitor, among other things, the Trip Advisor scores guests give its properties, corporate and non-corporate alike.

337.   RRI analyzes this data and delivers analysis, feedback, direction, and requirements to both corporate and non-corporate locations daily, including

to the Atlanta Red Roof and to the Smyrna Red Roof, both while it was a corporate location and after it was a non-corporate location owned by Varahi.

338.   From at least December 2012 through at least 2018, non-corporate franchisees who failed to resolve guest complaints in accordance with RRI's policies were required to reimburse RRI for expenses RRI incurred in resolving the guest complaint and to pay RRI a guest relations intervention fee if RRI communicated with the guest or otherwise took action to resolve the complaint.  This guest relations intervention fee was subject to modification by RRI at any time.

339.   RRI routinely contacted Varahi regarding negative online reviews regarding the Smyrna Red Roof from at least December 2012 through at least 2018 and required Varahi to respond to negative online reviews within a designated time period.

340.   From at least December 2012 through at least 2018, RRI used its online reputation management system to exert substantial control over its franchisees, including Varahi.  If ratings were not satisfactory to RRI, it would issue a warning to the franchisee, giving it a set period of time in which to correct the issues.  If the manager's resolution was not satisfactory to RRI, RRI would then fine the location manager in an amount left to RRI's discretion.  Further, RRI had the authority to terminate and has at times

terminated franchise agreements based on the failure to resolve customer satisfaction problems.

> o **RRI Made Non-Corporate Franchisees Subject to Policies Adopted in the Future**

341. RRI made non-corporate franchisees, including Varahi, subject to rules or policies that RRI may adopt in the future.

342. For example, RRI obligated non-corporate franchisees, including Varahi, to operate locations in accordance with RRI procedures, policies, specifications and standards, which RRI had the authority and sole discretion to amend at any time.

343. RRI also retained the sole and exclusive authority to amend its Preferred Member Program, in which RRI required the participation of non-corporate franchisees like Varahi.

344. While RRI permitted non-corporate franchisees like Varahi to choose some of the equipment, products, and services used in operation of their locations, RRI also retained the authority to revoke at any time its permission for non-corporate franchisees to use that equipment and those products, and services.

> **2. RRI has controlled the operations of the Smyrna Red Roof since Varahi, a non-corporate franchisee,**

purchased the location.[16]

345. Beginning with Varahi's purchase of the Smyrna Red Roof in December 2012, the Smyrna Red Roof was no longer a corporate location.

346. As further described below, from at least December 2012 through at least 2018, RRI (with and through Red Roof Franchising) and Varahi together controlled, operated, and managed the Smyrna Red Roof.



---

[16] Applicable to claims brought by Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P.

#3188307v1

o  **Financial Benefit**

347.   Beginning in December 2012 and continuing through at least 2018, Varahi, RRI, and Red Roof Franchising each knowingly received a financial benefit of some kind, whether revenue or royalty, from each room rental at the Smyrna Red Roof.

o  **Entity Ownership**

348.   Varahi purchased the hotel and property at the Smyrna Red Roof Inn from FMW in December 2012, at which time Varahi became the owner, non-corporate franchisee, and nominal manager of the location.

349.   After Varahi purchased the location in December 2012, Varahi as franchisee entered into a franchise agreement with Red Roof Franchising acting as franchisor.

350.   RRI owned and controlled Red Roof Franchising, and through Red Roof Franchising, RRI was in fact the franchisor for the Smyrna Red Roof Inn.

351.   For the purposes of operating and managing the Smyrna Red Roof from December 2012 through 2018, RRI and Red Roof Franchising functioned as a single entity.  Red Roof Franchising had no employees and conducted no business at the Smyrna Red Roof independent of RRI.

352.   Beginning in December 2012 and continuing through at least 2018, Varahi employed the staff and nominally managed the day-to-day operations of the Smyrna Red Roof.

353.   Through its agreements with Varahi—the terms of which RRI dictated—RRI in fact controlled the day-to-day operations of the Smyrna Red Roof from December 2012 through at least 2018.

354.   RRI entered into agreements with Varahi that incorporated and bound Varahi to other contracts and programs during the time from December 2012 through at least 2018, including the Franchise Agreement, the Standards Manual, the RediCard Member Program, Reservation System and Marketing Program, the Volume Plan Plus Program, the RediBill Program, the RediStay program, and the Red Advantage Training Program (together, "the Red Roof Programs").

355.   The Red Roof Programs mandated policies, procedures, and operational practices regarding the Smyrna Red Roof's daily operations.  Together, the Complaint refers to these documents as "the Franchisor Contracts."

356.   Through the Franchisor Contracts, from December 2012 through at least 2018, RRI mandated Varahi's compliance with requirements and prohibitions, dictating how Varahi staff at the Smyrna Red Roof interacted with guests and conducted all business operations.

357. The Franchisor Contracts specified that "every detail of the System is important to Franchisor ... in order to develop and maintain the Standards and public image of the System ... Franchisee agrees to comply with the Standards and not deviate from them."

358. Pursuant to the Franchisor Contracts, RRI reserved the right, from at least December 2012 through at least 2018, to discontinue and terminate its relationship with Varahi if it determined that the Smyrna Red Roof "fail[ed] to maintain Franchisor's Standards or comply with Franchisor's procedures as set forth in the Manuals[.]"

359. Through at least 2012 to at least 2018, RRI accepted and ratified the conduct of Varahi and its employees, agents, and representatives.

360. RRI, Red Roof Franchising, and Varahi are each directly liable to Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. for their own conduct with respect to Smyrna Red Roof from December 2012 through 2018 forward.

361. Additionally, RRI is vicariously liable for the actions and knowledge of Red Roof Franchising and Varahi with respect to the Smyrna Red Roof from December 2012 to 2018 because of the level of control RRI exerted over these companies.

362. Further, RRI is liable for the actions of Red Roof Franchising and Varahi with respect to the Smyrna Red Roof from December 2012 through

2018 because they are alter egos of RRI or because RRI, Red Roof Franchising, and Varahi are together engaged in a joint venture.

### B. RRI's Operation of Corporate Locations

363. Westmont and RRI jointly own, operate, and profit from hundreds of Red Roof Inns around the country, including the two locations that are the subject of this suit—the Smyrna Red Roof and Atlanta Red Roof.

364. Westmont owns RRI. Together, Westmont and RRI, via a network of corporate entities, owned and operated both the Smyrna Red Roof during its corporate ownership and the Atlanta Red Roof at all relevant times.

365. These corporate entities exist mostly on paper and do not have their own employees, offices, or operations independent of Westmont and RRI. Several of these companies—FMW, RRI III, RRI West, Red Roof Franchising—are named Defendants.

366. As described below, Westmont and RRI used a franchisor-franchisee model to operate even its corporate locations. On paper, different corporate entities entered contracts as the franchisor, the franchisee, and the manager at both the Smyrna Red Roof and the Atlanta Red Roof. In reality, all of these corporate entities were ultimately owned and controlled by Westmont and RRI.

367. Westmont and RRI, along with the entities they ultimately owned and controlled, are each directly liable to Plaintiffs W.K., M.M., R.P., A.F., C.A., R.K., and K.P. for their own conduct with respect to Smyrna Red Roof while that location was a corporate location and the Atlanta Red Roof, which was at all relevant times a corporate location.

368. Additionally, Westmont and RRI are vicariously liable for the actions and knowledge of FMW, RRI III, RRI West, and Red Roof Franchising with respect to the Smyrna Red Roof because of the level of control Westmont and RRI exerted over these companies.

369. Further, Westmont and RRI are liable for the actions and knowledge of FMW, RRI III, RRI West, and Red Roof Franchising with respect to the Smyrna Red Roof and Atlanta Red Roof because they are alter egos of Westmont and RRI or because Westmont, RRI, FMW, RRI III, RRI West, and Red Roof Franchising are together engaged in a joint venture.

      **1.**    **During corporate ownership at the Smyrna Red Roof, Westmont and RRI ultimately controlled the location's operation.[17]**

370. As further described below, Westmont (with and through FMW and RRI West) and RRI (with and through Red Roof Franchising) controlled,

---

[17] Applicable to claims brought by Plaintiffs M.M, R.P., and A.F.

#3188307v1

operated, and managed the Smyrna Red Roof from at least 2010 through

December 2012, when the location was a corporate location.



  o  **Financial Benefit**

371. From at least 2010 through 2012, FMW, RRI West, RRI, and Red Roof

Franchising each knowingly received a financial benefit of some kind,

whether revenue or royalty, from each room rental at the Smyrna Red Roof.

  o  **Entity Ownership**

372.   From at least 2010 through December 2012, Westmont owned and controlled FMW and, through FMW, owned the Smyrna Red Roof.  During this time, FMW owned the Smyrna Red Roof and the property on which it sits.  FMW, though not independent of Westmont and RRI, functioned as the location franchisee.

373.   FMW as franchisee entered a franchise agreement with Red Roof Franchising acting as franchisor.

374.   RRI owned and controlled Red Roof Franchising, and through Red Roof Franchising, RRI was in fact the franchisor for the Smyrna Red Roof Inn.

375.   From at least 2010 through December 2012, Westmont owned and controlled RRI West and, through RRI West, was the management company at the Smyrna Red Roof.  RRI West managed the Smyrna Red Roof during this period.

376.   During the Smyrna Red Roof's corporate ownership, RRI employed the employees working at the Smyrna Red Rood.

377.   For the purposes of owning, operating, and managing the Smyrna Red Roof from at least 2010 through 2012, FMW, RRI West, Red Roof Franchising, Westmont, and RRI functioned as a single entity, with Westmont and RRI controlling the other entities as detailed above.

378.   From at least 2010 through December 2012, FMW, RRI West, and Red Roof Franchising had no employees and conducted no business at the Smyrna Red Roof independent of RRI or Westmont.

379.   In December 2012, FMW sold the hotel and property at the Smyrna Red Roof Inn to Varahi. From this point forward, FMW and RRI West were no longer involved at the Smyrna Red Roof Inn.

### 2. At all relevant times, Westmont and RRI ultimately controlled the operation of the Atlanta Red Roof.[18]

380.   As further described below, Westmont (with and through RRI III and RRI West) and RRI (with and through Red Roof Franchising) controlled, operated, and managed the Atlanta Red Roof from at least 2009 through at least 2017.

---

[18] Applicable to claims brought by Plaintiff W.K., R.P., C.A., R.K., and K.P.



 o **Financial Benefit**

381. From at least 2009 through 2017, RRI III, RRI West, RRI, and Red Roof Franchising each knowingly received a financial benefit of some kind, whether revenue or royalty, from each room rental at the Atlanta Red Roof.

 o **Entity Ownership**

382. From at least 2009 through at least 2017, Westmont owned and controlled RRI III and, through RRI III, owned the Atlanta Red Roof.  During this time, RRI III owned the Atlanta Red Roof and the property on which it sits.  RRI III, though not independent of Westmont and RRI, functioned as the location franchisee.

383.  RRI III as franchisee entered a franchise agreement with Red Roof Franchising acting as franchisor.

384.  RRI owned and controlled Red Roof Franchising, and through Red Roof Franchising, RRI was in fact the franchisor for the Smyrna Red Roof Inn.

385.  From at least 2009 through at least 2017, Westmont owned and controlled RRI West and, through RRI West, was the management company at the Atlanta Red Roof.  RRI West managed the Atlanta Red Roof.

386.  From at least 2009 through at least 2017, RRI employed the employees working at the Atlanta Red Roof.

387.  For the purposes of owning, operating, and managing the Atlanta Red Roof from at least 2009 through at least 2017, RRI III, RRI West, Red Roof Franchising, Westmont, and RRI functioned as a single entity, with Westmont and RRI controlling the other entities as detailed above.

388.  From at least 2009 through at least 2017, RRI III, RRI West, and Red Roof Franchising had no employees and conducted no business at the Atlanta Red Roof independent of RRI or Westmont.

## CLAIMS FOR RELIEF

## I. VIOLATIONS OF THE GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT[19]

### A. Defendants engaged in acts of racketeering activity.

#### 1. Keeping a Place of Prostitution

389.   Keeping a place of prostitution in violation of Georgia law is racketeering activity.  O.C.G.A. §§ 16-6-10, 16-14-3(5)(A)(vii).

390.   While confined and detained against their will as alleged above, Plaintiffs and other victims were forced to perform sexual acts in exchange for money or other items of value.

391.   The Smyrna Red Roof and the individual rooms it rented to sex traffickers offered seclusion or shelter for the practice of prostitution.  While having or exercising control over the use of the Smyrna Red Roof and the individual rooms located therein, Smyrna Red Roof Defendants RRI, Red Roof Franchising and Varahi knowingly granted and permitted the use of the Smyrna Red Roof and individual rooms therein for the purpose of prostitution.  Smyrna Red Roof Defendant Varahi confirmed this grant and permission by allowing its employees to act as lookouts for traffickers while

---

[19] The allegations in this section are common to Counts I, II, V, and VI and, unless otherwise noted, Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., C.A., R.K., and K.P.

prostitution was taking place, affirmatively acting to prevent the detection and disruption of that activity by law enforcement.  In addition, after being alerted to prostitution taking place at the Smyrna Red Roof, Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi ratified and confirmed this grant and permission by failing and refusing the halt the activities of sex traffickers they knew were operating out of that hotel.  Further, RRI's CEO and its general counsel ratified and confirmed this grant and permission by failing and refusing to halt the activities of sex traffickers they knew were operating out of that hotel.

392.   The Atlanta Red Roof and the individual rooms it rented to sex traffickers offered seclusion or shelter for the practice of prostitution.  While having or exercising control over the use of the Atlanta Red Roof and the individual rooms located therein, the Atlanta Red Roof Defendants knowingly granted and permitted the use of the Atlanta Red Roof and individual rooms therein for the purpose of prostitution.  Atlanta Red Roof Defendant RRI ratified and confirmed this grant and permission by having its employees act as lookouts for traffickers while prostitution was taking place, affirmatively acting to prevent the detection and disruption of that activity by law enforcement.  In addition, after being alerted to prostitution taking place at the Atlanta Red Roof, the Atlanta Red Roof Defendants ratified and

confirmed this grant and permission by failing and refusing the halt the activities of sex traffickers they knew were operating out of that hotel.

### 2. Aiding and Abetting Prostitution

393. Prostitution in violation of Georgia law is racketeering activity. O.C.G.A §§ 16-6-9, 16-14-3(5)(A)(viii).

394. Defendant Varahi violated O.C.G.A § 16-6-9 at the Smyrna Red Roof when, acting through its employees who served as lookouts for sex traffickers, they aided and abetted prostitution of Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. and other victims were forced into prostitution there.

395. Defendant RRI violated O.C.G.A § 16-6-9 at the Atlanta Red Roof when, acting through its employees who served as lookouts for sex traffickers, it aided and abetted the prostitution of Plaintiffs W.K., R.P., C.A., R.K., K.P., T.H. and other victims were forced into prostitution there.

### 3. Aiding and Abetting Pimping

396. Pimping in violation of Georgia law is racketeering activity. O.C.G.A §§ 16-6-11, 16-14-3(5)(A)(vii).

397. Defendant Varahi violated O.C.G.A § 16-6-11 at the Smyrna Red Roof when, acting through its employees who served as lookouts for sex traffickers, it aided and abetted sex traffickers by warning them of police activity, guest complaints, and buyer activity so intensive that it was likely to attract the

attention of law enforcement or cause guest complaints. This aided and abetted the traffickers, who were offering or agreeing to procure prostitutes for others, in violation of O.C.G.A § 16-6-11(1) and offering or agreeing to arrange meetings of persons for the purpose of prostitution, in violation of O.C.G.A § 16-6-11(2).

398.   Defendant Varahi violated O.C.G.A § 16-6-11(4) at the Smyrna Red Roof when it aided and abetted, as set forth in the above paragraph and elsewhere, traffickers who received money or other things of value from prostitution, without lawful consideration, knowing it was earned in whole or in part from prostitution.

399.   Defendant RRI also violated O.C.G.A § 16-6-11 at the Atlanta Red Roof when, acting through its employees who served as lookouts for sex traffickers, it aided and abetted the traffickers by warning them of police activity, guest complaints, and buyer activity so intensive that it was likely to attract the attention of law enforcement or cause guest complaints. This aided and abetted traffickers who were offering or agreeing to procure prostitutes for others, in violation of O.C.G.A § 16-6-11(1), and offering or agreeing to arrange meetings of persons for the purpose of prostitution, in violation of O.C.G.A § 16-6-11(2).

400.   Defendants RRI also violated O.C.G.A § 16-6-11(4) at the Atlanta Red
Roof when it aided and abetted, as set forth in the above paragraph and
elsewhere, traffickers who received money or other things of value from
prostitution, without lawful consideration, knowing it was earned in whole or
in part from prostitution.

### 4.   Sexual Servitude in Violation of State Law

401.   Trafficking a person for sexual servitude in violation of Georgia law is
racketeering activity.   O.C.G.A. §§ 16-14-3(5)(A)(vi), 16-5-46.

402.   "Sexual Servitude" means any sexually explicit conduct or performance
involving sexually explicit conduct that is induced or obtained by coercion or
deception or from an individual who is under the age of 18 years and for
which anything of value is directly or indirectly given, promised to, or
received by any individual.   O.C.G.A. § 16-5-46(a)(8)(A), (B).

403.   A person violates O.C.G.A § 16-5-46(c)(1) when they knowingly subject
an individual to or maintain an individual in sexual servitude.   Plaintiffs and
other victims were subjected to and maintained in sexual servitude in
violation of O.C.G.A. § 16-5-46(c)(1) when sex traffickers coerced them into
sexually explicit conduct for which something of value, directly or indirectly,
was given, promised to, or received by someone.

404. Defendant Varahi violated O.C.G.A § 16-5-46(c)(1) at the Smyrna Red Roof when, acting through its employees, it aided and abetted sex traffickers by serving as lookouts for them, warning the traffickers of police activity, guest complaints, and buyer activity so intensive that it was likely to attract the attention of law enforcement or cause guest complaints. This conduct was intended to maintain victims, including Plaintiff W.K., a person then under the age of 18 years, and Plaintiffs E.H., M.M., R.P., M.B., and D.P., in sexual servitude by preventing their sexual servitude from coming to the attention of law enforcement and preventing the victims from being rescued, so that the traffickers and Varahi could continue to make money from their sexual servitude.

405. Defendant RRI violated O.C.G.A § 16-5-46(c)(1) at the Atlanta Red Roof when, acting through its employees, it aided and abetted sex traffickers by serving as lookouts for them, warning the traffickers of police activity, guest complaints, and when buyer activity became so intensive that it was likely to attract the attention of law enforcement or cause guest complaints. This conduct was intended to maintain victims, including Plaintiffs W.K., R.P., C.A., R.K., K.P., and T.H., in sexual servitude by preventing their sexual servitude from coming to the attention of law enforcement and the victims

from being rescued, so that the traffickers and RRI could continue to make money from their sexual servitude.

406.   A person violates O.C.G.A § 16-5-46(c)(2) when they knowingly recruit, entice, harbor, transport, provide, solicit, patronize, or obtain by any means an individual for the purpose of sexual servitude.

407.   Defendant Varahi violated O.C.G.A §§ 16-5-46(c)(2) and 16-5-46(c)(3) at the Smyrna Red Roof when, acting through its employees, it aided and abetted traffickers who, in turn, knowingly benefited financially and received things of value from the sexual servitude of Plaintiffs and others.  More specifically, Varahi aided and abetted traffickers by serving as lookouts for them, warning the traffickers of police activity, guest complaints, and buyer activity so intensive that it was likely to attract the attention of law enforcement or cause guest complaints.  This conduct was intended to prevent the trafficking from coming to the attention of law enforcement and to prevent victims, including Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P., from being rescued, so that the traffickers and Varahi could continue to make money by harboring and providing Plaintiffs and other victims for the purpose of sexual servitude.  Through its conduct, Varahi maximized the financial benefit derived from the sexual servitude of these Plaintiffs and other victims, both for the traffickers and for itself.

408.   Defendant RRI violated O.C.G.A §§ 16-5-46(c)(2) and 16-5-46(c)(3) at the Atlanta Red Roof when, acting through their employees, they aided and abetted traffickers who, in turn, knowingly benefited financially and received things of value from the sexual servitude of Plaintiffs and others.  More specifically, RRI aided and abetted traffickers by serving as lookouts for them, warning the traffickers of police activity, guest complaints, and buyer activity so intensive that it was likely to attract the attention of law enforcement or cause guest complaints.  This conduct was intended to prevent the trafficking from coming to the attention of law enforcement and victims, including Plaintiffs W.K., R.P., C.A., R.K., K.P., and T.H., from being rescued, so that the traffickers and RRI could continue to make money by harboring and providing Plaintiffs and other victims for the purpose of sexual servitude.  Through its conduct, RRI ratified the action of its employees and maximized the financial benefit derived from the sexual servitude of these Plaintiffs and other victims, both for the traffickers and for itself.

409.   Defendant Varahi also violated O.C.G.A § 16-5-46(c)(2) at the Smyrna Red Roof when it harbored Plaintiff W.K., a person then under the age of 18 years, and Plaintiffs E.H., M.M., R.P., M.B., and D.P. as well as other victims, for the purpose of sexual servitude.

410.   Defendant RRI also violated O.C.G.A § 16-5-46(c)(2) at the Atlanta Red Roof when it harbored Plaintiffs W.K., R.P., C.A., R.K., K.P., T.H., as well as other victims, for the purpose of sexual servitude.

411.   A person violates O.C.G.A § 16-5-46(c)(3) when they knowingly benefit financially or by receiving anything of value from the sexual servitude of another.

412.   Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi violated O.C.G.A. § 16-5-46(c)(3) when they knowingly benefited financially and by receiving things of value from the sexual servitude of Plaintiff W.K., a person then under the age of 18 years, and Plaintiffs E.H., M.M., R.P., M.B., and D.P., as well as others, occurring at the Smyrna Red Roof.

413.   The Atlanta Red Roof Defendants violated O.C.G.A § 16-5-46(c)(3) when they knowingly benefited financially and by receiving things of value from the sexual servitude of Plaintiffs W.K., R.P., C.A., R.K., K.P., T.H., as well as others, occurring at the Atlanta Red Roof.

414.   Defendants' agents performed conduct which is an element of the violations of O.C.G.A. § 16-5-46 alleged above while acting within the scope of their office or employment and on behalf of Defendants.  The conduct of Defendants' agents constituted a pattern of illegal activity that one or more

agents of each Defendant knew or should have known was occurring and that Defendants repeatedly ratified and confirmed.

### B. The acts of racketeering activity formed a pattern.

415. Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi and each of the Atlanta Red Roof Defendants engaged in more than two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions.

416. Each violation of O.C.G.A. § 16-5-46(c) by Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi and each of the Atlanta Red Roof Defendants constitutes a separate offense that does not merge with any other offense. O.C.G.A. § 16-5-46(j).

417. Each rental of an individual room to a sex trafficker for the purpose of offering seclusion or shelter for the practice of prostitution constitutes a separate act of racketeering activity.

418. Each act of aiding and abetting prostitution constitutes a separate act of racketeering activity.

419. Each act of aiding and abetting pimping constitutes a separate act of racketing activity.

420.   The acts of racketeering activity engaged in and aided and abetted by Defendants were interrelated by distinguishing characteristics and were not isolated incidents.

421.   As to each of the Smyrna Red Roof and Atlanta Red Roof Defendants, the acts of racketeering they engaged in and aided and abetted were interrelated by distinguishing characteristics, including but not limited to:

   a.   commercial sex taking place with a high degree of frequency over the course of several years at a hotel owned by Defendant Westmont through a subsidiary, franchised by Defendant RRI through Defendant Red Roof Franchising, and managed by Westmont through Defendant RRI West;

   b.   commercial sex taking place with a high degree of frequency over the course of several years at a hotel owned by Defendant Varahi, franchised by Defendant RRI through Defendant Red Roof Franchising, and functionally managed by RRI, though Varahi was ostensibly responsible for the location's management;

   c.   deriving financial benefit by renting rooms to traffickers knowing that those traffickers were engaged in sexual servitude, pimping and prostitution;

  d. warning sex traffickers when law enforcement was present or making inquiries, thereby reducing the likelihood that the trafficking would be detected and the Plaintiffs and other victims would be rescued;

  e. warning sex traffickers when guests complained about their activities, thereby reducing the likelihood that the trafficking would be reported to law enforcement and Plaintiffs and other victims would be rescued; and

  f. the involvement of Defendants RRI and Red Roof Franchising in racketeering activity involving sex trafficking, keeping a place of prostitution, pimping and prostitution at both the Smyrna Red Roof and Atlanta Red Roof.

422. As to each of the Smyrna Red Roof and Atlanta Red Roof Defendants, the acts of racketeering had the same or similar intents, including but not limited to acquiring money, directly or indirectly, through a pattern of racketeering activity.

423. As to each of the Smyrna Red Roof and Atlanta Red Roof Defendants, the acts of racketeering had the same or similar results, in that they did acquire money or facilitate the acquiring of money, directly or indirectly, through a pattern of racketeering activity.

424.   As to Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi and each of the Atlanta Red Roof Defendants, the acts of racketeering had the same or similar accomplices, including but not limited to hotel employees, corporate employees, and sex traffickers.

425.   As to Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi and each of the Atlanta Red Roof Defendants, the acts of racketeering had the same or similar victims, including Plaintiff W.K., E.H., M.M., R.P., M.B., and D.P., and others, who were forced to engage in sexual acts in exchange for money at Defendants' hotels.

426.   As to Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi and each of the Atlanta Red Roof Defendants, the acts of racketeering had the same or similar methods of commission, including but not limited to employees acting as lookouts for sex traffickers, shielding the traffickers' activities from detection by law enforcement and preventing the rescue of Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., C.A., R.K., K.P., T.H. and other victims, thereby harboring, holding, confining, and detaining persons who were forced to engage in sexual acts in exchange for money at Defendants' hotels and ratifying such conduct by their employees and agents.

## II. NUMBERED COUNTS

## COUNT I
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-4(a)
### (Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. Against Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi)

427.  Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. repeat and incorporate the allegations set forth in ¶¶ 40–145; 295–388; and 389–426, above, as if fully set forth herein.

428.  As set forth above in ¶¶ 391–428, above, Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in or control of personal property, including money, through a pattern of racketeering activity.

429.  The conduct in violation of the Georgia RICO Act in which Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi participated continued to within 5 years of the filing of this action.

430.  Upon information and belief, the conduct of Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi in violation of O.C.G.A. § 16-14-4 has not terminated.

431. Plaintiffs W.K., E.H., M.M., R.P. M.B., and D.P. have suffered substantial physical, emotional, and psychological harm, as well as other injuries as a direct and proximate result of the acts of racketeering activity and violations of Georgia RICO committed by Smyrna Red Roof Defendants RRI, Red Roof Franchising and Varahi.

432. Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi are liable to Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. for three times their damages in an amount to be proven at trial, their attorneys' fees, and their costs of investigation and litigation.

433. The wrongful actions of Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

434. Because Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT II

### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-4(c)
### (Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. Against Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi)

435.   Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. repeat and incorporate the allegations set forth in ¶¶ 40–195; 295–388; and 389–426, above, as if fully set forth herein.

436.   Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a).

437.   Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi knowingly and willfully joined a conspiracy involving a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained.  More specifically, this conspiracy involved making money by operating the Smyrna Red Roof Inn as a venue for sexual servitude, prostitution, and pimping.

438.   Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi committed acts of racketeering activity and overt acts in furtherance of the Smyrna Red Roof Sex Trafficking Conspiracy, including those alleged above.

439.   The predicate acts and overt acts committed by the participants in the Smyrna Red Roof Sex Trafficking Conspiracy number in the thousands and took place over nearly a decade.

440.   The conduct in violation of the Georgia RICO Act in which Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi participated by committing an act of racketeering activity or an overt act continued to within 5 years of the filing of this action.

441.   Upon information and belief, the conduct Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi in violation of O.C.G.A. § 16-14-4 has not terminated.

442.   Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. have suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the acts of racketeering activity and violations of Georgia RICO committed by Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi.

443.   Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi are liable to Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. for three times their damages in an amount to be proven at trial, their attorneys' fees, and the costs of investigation and litigation.

444. The wrongful actions of Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiffs W.K., E.H., M.M, R.P., M.B., and D.P. for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

445. Because Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

**COUNT III**
**TVPRA, 18 U.S.C. § 1595**
**(Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P. and A.F.**
**Against Smyrna Red Roof Defendants Westmont, RRI, FMW, Red**
**Roof Franchising, RRI West, and Varahi)**

446. Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P. and A.F. repeat and incorporate the allegations set forth in ¶¶ 40–195 and 295–379, above, as if fully set forth herein.

447. In violation of 18 U.S.C. § 1595(a), each Smyrna Red Roof Defendant— Westmont, RRI, Varahi, FMW, Red Roof Franchising, and RRI West— knowingly benefited from participation in a venture that it knew or should have known engaged in sex trafficking.

## Direct Liability

448.   The Smyrna Red Roof Defendants are each directly liable to each Plaintiff under 18 U.S.C. § 1595(a) because they each knowingly benefited from participation in a venture that each Smyrna Red Roof Defendant knew or should have known violated 18 U.S.C. § 1591.

449.   The Smyrna Red Roof Defendants each knowingly participated in a venture that operated the Smyrna Red Roof.  This venture, which Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P. and A.F. call the "Smyrna Red Roof Venture," included not only the Smyrna Red Roof Defendants but also their employees, including employees who were complicit in and supported, assisted, and/or facilitated trafficking at the location.

450.   The Smyrna Red Roof Venture was in or affecting interstate commerce.

451.   The Smyrna Red Roof Defendants were associated in fact and assumed the risk of operating the Smyrna Red Roof and the Smyrna Red Roof Venture.  The Smyrna Red Roof Defendants participated in the Smyrna Red Roof Venture by, among other things, operating the Smyrna Red Roof hotel.

452.   FMW participated in the Smyrna Red Roof Venture from at least 2010 through December 2012 by, among other things, owning the hotel and property.  FMW contracted with Red Roof Franchising via a franchise agreement.

453.   RRI West participated in the Smyrna Red Roof Venture from at least 2010 through December 2012 by, among other things, managing the property.

454.   Red Roof Franchising participated in the Smyrna Red Roof Venture from at least 2010 through December 2012 by, among other things, contracting with FMW via a franchise agreement.

455.   Westmont participated in the Smyrna Red Roof Venture from at least 2010 through December 2012 by, among other things, managing and operating the Smyrna Red Roof through RRI West, which Westmont owned and controlled.  In the same time period, Westmont also participated in the Smyrna Red Roof Venture through its ownership and control of FMW, which owned the Smyrna Red Roof.

456.   RRI participated in the Smyrna Red Roof Venture from at least 2010 through December 2012 by, among other things, employing the staff at the Smyrna Red Roof.  In the same time period, RRI also participated in the Smyrna Red Roof Venture through its ownership and control of Red Roof Franchising, which contracted with FMW via a franchise agreement.

457.   From December 2012 through at least 2018, Varahi participated in the Smyrna Red Roof Venture by owning and nominally managing and operating the Smyrna Red Roof.  Varahi contracted with Red Roof Franchising via a

franchise agreement.

458.   From December 2012 through at least 2018, Red Roof Franchising participated in Smyrna Red Roof Venture by, among other things, contracting with Varahi via a franchise agreement.

459.   From December 2012 through at least 2018, RRI participated in the Smyrna Red Roof Venture through its ownership and control of Red Roof Franchising, which contracted with Varahi via a franchise agreement.  In the same time period, though Varahi owned and ostensibly operated the Smyrna Red Roof, RRI also participated in the Smyrna Red Roof Venture because it exercised such a high degree of control over the Smyrna Red Roof's operation and management that RRI functionally operated and managed the Smyrna Red Roof Inn, with Varahi acting as its agent.

460.   From at least 2010 through at least 2018, the Smyrna Red Roof Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator.  For example—and at a minimum—the complicit hotel employees who acted as lookouts for the persons who trafficked Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P. and A.F., as well as for other traffickers, and who facilitated trafficking at the location could be liable under § 1591 as perpetrators as well as beneficiaries under the TVPRA.

461.   From at least 2010 to 2012, RRI was the employer of the hotel employees at the Smyrna Red Roof, including hotel employees who acted as lookouts for the persons who trafficked Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P. and A.F., as well as for other traffickers, and who facilitated trafficking at Smyrna Red Roof.  Therefore, RRI directly participated in acts of trafficking in violation of § 1591.

462.   From at least December 2012 to at least 2018, Varahi was the employer of the hotel employees at the Smyrna Red Roof, including hotel employees who acted as lookouts for the persons who trafficked Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P. and A.F., as well as for other traffickers, and who facilitated trafficking at Smyrna Red Roof.  Therefore, Varahi directly participated in acts of trafficking in violation of § 1591.

463.   At least one of the participants in the Smyrna Red Roof Venture facilitated the trafficking of each of Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. at the Smyrna Red Roof knowing—or acting with reckless disregard for the likelihood—that these Plaintiffs' traffickers were employing means of force, threats of force, fraud, coercion or some combination thereof to cause these Plaintiffs to engage in commercial sex.

464.   As to Plaintiff W.K., at least one of the participants in the Smyrna Red Roof Venture facilitated Plaintiff W.K.'s trafficking at the Smyrna Red Roof

knowing—or acting with reckless disregard for the likelihood—that Plaintiff W.K.'s trafficker would cause her to engage in commercial sex.

465. Further, at least one of the participants in the Smyrna Red Roof Venture had a reasonable opportunity to observe Plaintiff W.K. while she was being trafficked at the Smyrna Red Roof.

466. In the course of the Smyrna Red Roof Venture, hundreds of buyers paid to have sex with Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. at the Smyrna Red Roof.

467. The Smyrna Red Roof Defendants knew that they were participating in a venture, the Smyrna Red Roof Venture, and they knew or should have known that the Smyrna Red Roof Venture violated the TVPRA because the Smyrna Red Roof Defendants (and their agents and representatives) saw the signs of sex trafficking exhibited by Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F., their traffickers, the rooms in which Plaintiffs were trafficked, the frequent traffic of hundreds of male buyers to Plaintiffs' rooms, and the numerous other victims being trafficked at the hotel.

468. Furthermore, both RRI and Varahi had direct knowledge of the trafficking of Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. because of their complicit employees who, among other things, acted as lookouts for

the persons who trafficked Plaintiffs, as well as for other traffickers, and who participated in acts of trafficking in violation of § 1591.

469.  Based on the facts alleged in ¶¶ 40–195; 295–305; and 363–79, above, and incorporated here by reference, FMW, RRI West, and Westmont knew or should have known about sex trafficking at the Smyrna Red Roof from at least 2010 through December 2012, during the time FMW owned and RRI West managed the location.

470.  Based on the facts alleged in ¶¶ 40–195 and 295–362, above, and incorporated here by reference, Varahi knew or should have known about sex trafficking at the Smyrna Red Roof from December 2012 through at least 2018, during the time Varahi owned and nominally managed the location.

471.  Based on the facts alleged in ¶¶ 40–195 and 295–379, above, and incorporated here by reference, RRI and Red Roof Franchising knew or should have known about the sex trafficking at the Smyrna Red Roof from at least 2010 through at least 2018.

472.  Additionally, both Red Roof Franchising and RRI knew or should have known what they contractually obligated themselves to know through franchise and other agreements.  That is, Red Roof Franchising and RRI knew or should have known about every safety and security incident that occurred at the Smyrna Red Roof because its franchise agreements required

franchisees to report every safety and security incident that occurred there.

473.   Further, RRI also knew or should have known about sex trafficking at the hotel—including the trafficking of Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F.—because the CEO and general counsel of RRI were both told directly about that trafficking and RRI's involvement in it.

474.   The Smyrna Red Roof Defendants each knowingly benefited from the Smyrna Red Roof Venture by receiving a percentage of the revenue generated by the Smyrna Red Roof's operation.

## Vicarious Liability

475.   Alternatively, Westmont and RRI are also vicariously liable under the TVPRA under the same theories outline above because their control of operations at the Smyrna Red Roof exceeded imposing uniformity in brand standards and instead extended to controlling the day-to-day operations of the hotel and the venture that caused harm to Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F.

476.   From at least 2010 through December 2012, while the Smyrna Red Roof Inn was a corporate location, Westmont and RRI ultimately controlled the day-to-day operation of the location, notwithstanding the ostensible involvement of FMW, RRI West, and Red Roof Franchising, as set out above in ¶¶ 363–379.  Based on this control, Westmont and RRI are vicariously

liable for the actions of FMW, RRI West, and Red Roof Franchising in violation of the TVPRA as alleged above in ¶¶ 446–74.

477.   From at least 2010 through December 2012, while the Smyrna Red Roof was a corporate location, Westmont was the principal and controlled the actions of its agents, FMW and RRI West.  Accordingly, Westmont is vicariously liable for the actions of FMW and RRI West in violation of the TVPRA as alleged above in ¶¶ 446–74.

478.   From at least 2010 through December 2012, while the Smyrna Red Roof was a corporate location, RRI was the principal and controlled the actions of Red Roof Franchising.  Accordingly, RRI is vicariously liable for the actions of Red Roof Franchising in violation of the TVPRA as alleged above in ¶¶ 446–74.

479.   From at least December 2012 through 2018, while the Smyrna Red Roof Inn was a non-corporate location, RRI ultimately controlled the day-to-day operation of the location, notwithstanding the ownership and ostensible management and operation of Varahi, as set out above in ¶¶ 306–62.  Based on this control, RRI is vicariously liable for the actions of Varahi in violation of the TVPRA as alleged above in ¶¶ 446–74.

480.   From at least December 2012 through 2018, while the Smyrna Red Roof was a non-corporate location, RRI was the principal and controlled the

actions of its agent, Varahi. Accordingly, Westmont is vicariously liable for the actions of Varahi in violation of the TVPRA as alleged above in ¶¶ 446–74.

### Damages

481.   Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. have each suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Smyrna Red Roof Defendants' conduct and their participation in the sex trafficking ventures at the Smyrna Red Roof.

482.   The Smyrna Red Roof Defendants are liable to Plaintiffs W.K., E.H., M.M., R.P., M.B., D.P., and A.F. for their damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

483.   All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs.

### COUNT IV
### Negligence
### (Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. Against the Smyrna Red Roof Defendants Westmont, RRI, FMW, Red Roof Franchising, RRI West, and Varahi)

484.   Plaintiffs repeat and incorporate the allegations set forth in ¶¶ 40–195 and 295–379, above, as if fully set forth herein.

## Negligence During Corporate Ownership

485.  From at least 2010 through at least December 2012, FMW—and Westmont through FMW, which Westmont owned and controlled—owned the Smyrna Red Roof.  Because of their ownership of the location, both FMW and Westmont had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

486.  From at least 2010 through at least December 2012, RRI West—and Westmont through RRI West, which Westmont owned and controlled—managed the Smyrna Red Roof.  Because of their management of the location, both RRI West and Westmont had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

487.  From at least 2010 through at least December 2012, Red Roof Franchising—and RRI through Red Roof Franchising, which RRI owned and controlled—imposed the operating requirements and controlled the operation of the Smyrna Red Roof.  RRI also employed the employees who worked at the Smyrna Red Roof in this time.  Because of their operation of and control over the location, both Red Roof Franchising and RRI had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

488.  From 2010 through December 2012, Plaintiffs M.M. and R.P. were invitees of Smyrna Red Roof to whom Westmont, FMW, RRI West, RRI, and Red Roof Franchising owed a duty of care to keep the Smyrna Red Roof safe from unlawful acts on their premises.

489.  From at least 2010 through at least December 2012, Smyrna Red Roof Defendants Westmont, FMW, RRI West, RRI, and Red Roof Franchising had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Smyrna Red Roof.

490.  From at least 2010 through at least December 2012, Smyrna Red Roof Defendants Westmont, FMW, RRI West, RRI, and Red Roof Franchising negligently failed to keep the Smyrna Red Roof location safe and negligently failed to protect their invitees, including Plaintiffs M.M. and R.P. adequately and properly in breach of their duty of care.  These Smyrna Red Roof Defendants were negligent, and their negligence proximately caused Plaintiffs' injuries by:

   a.  Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

   b.  Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

c.   Negligently failing to provide appropriate and effective security personnel during Plaintiffs' trafficking at the hotel;

d.   Negligently failing to properly inspect and maintain the premises;

e.   Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotel;

f.   Negligently failing to properly retain, hire, train, and supervise said employees;

g.   Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

h.   Negligently failing to inspect, patrol, or appropriately monitor the property;

i.   Negligently failing to remediate a long history of crime at the Smyrna Red Roof and the area nearby;

j.   Negligently failing to warn invitees of known hazards at the property; and

k.   Negligently representing to invitees that the property was safe.

491.  From 2010 through December 2012, Smyrna Red Roof Defendants Westmont, FMW, RRI West, RRI, and Red Roof Franchising each had a duty to keep the premises safe for guests and invitees, including Plaintiffs M.M.

and R.P.  Based on the facts alleged in ¶¶ 40–195; 295–305; and 363–79, above, and incorporated here by reference, Smyrna Red Roof Defendants Westmont, FMW, RRI West, RRI, and Red Roof Franchising each had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof.  Despite their actual and constructive knowledge, Smyrna Red Roof Defendants Westmont, FMW, RRI West, RRI, and Red Roof Franchising negligently failed to protect invitees, including Plaintiffs M.M. and R.P. from the risks of sex trafficking.

492.   As a direct and proximate result of the actions and/or inactions of Smyrna Red Roof Defendants Westmont, FMW, RRI West, RRI, and Red Roof Franchising, Plaintiffs M.M. and R.P. suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

493.   Alternatively or in addition to the above, Westmont is vicariously liable for the negligence of FMW and RRI West and the damages caused to Plaintiffs M.M. and R.P. thereby from at least 2010 through December 2012 because Westmont controlled the actions and operations of FMW and RRI West, as set out above in ¶¶ 363–79, such that FMW and RRI West were agents of Westmont, their shared principal

494.  Alternatively or in addition to the above, RRI is vicariously liable for the negligence of Red Roof Franchising and the damages caused to Plaintiffs M.M. and R.P. thereby from at least 2010 through December 2012 because RRI controlled the actions and operations of Red Roof Franchising, as set out above in ¶¶ 363–79, such that Red Roof Franchising was the agent of RRI, its principal.

495.  The wrongful actions of Smyrna Red Roof Defendants Westmont, FMW, RRI West, RRI, and Red Roof Franchising from at least 2010 through December 2012, as related to the Smyrna Red Roof, constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiffs M.M. and R.P. for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

496.  Plaintiffs M.M. and R.P. are entitled to an award of punitive damages without limitation or cap because the actions of Smyrna Red Roof Defendants Westmont, FMW, RRI West, RRI, and Red Roof Franchising and their employees from at least 2010 through December 2012 were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

497.  The actions of Smyrna Red Roof Defendants Westmont, FMW, RRI West, RRI, and Red Roof Franchising from 2010 through December 2012 evidenced a species of bad faith, were and are stubbornly litigious, and have caused Plaintiffs M.M. and R.P. undue expense. Thus, Plaintiffs M.M. and R.P. are entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-11-68(e), as well as any other statutory or common law basis.

### Negligence During Non-Corporate Ownership

498.  From December 2012 through 2018, Red Roof Franchising—and RRI through Red Roof Franchising, which it owned and controlled—imposed the operating requirements and ultimately controlled the operation of the Smyrna Red Roof.  Because of their operation of and control over the location, both Red Roof Franchising and RRI had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

499.  From December 2012 through 2018, Varahi owned the Smyrna Red Roof and had the legal duty to keep the premises safe and secure with due regard for the safety of its invitees.

500.  From December 2012 through 2018, Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. were invitees of Smyrna Red Roof Defendants RRI, Red Roof

Franchising, and Varahi, who owed a duty of care to their invitees to keep the Smyrna Red Roof safe from unlawful acts on their premises.

501. From December 2012 through 2018, Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Smyrna Red Roof.

502. From December 2012 through 2018, Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi negligently failed to keep the Smyrna Red Roof location safe and negligently failed to protect their invitees, including Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P., adequately and properly in breach of their duty of care. These Smyrna Red Roof Defendants were negligent, and their negligence proximately caused Plaintiffs' injuries by:

    a.    Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

    b.    Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

    c.    Negligently failing to provide appropriate and effective security personnel during Plaintiffs' trafficking at the hotel;

    d.    Negligently failing to properly inspect and maintain the

premises;

e.   Negligently failing to properly train and supervise their
     employees regarding sex trafficking at the hotel;

f.   Negligently failing to properly retain, hire, train, and supervise
     said employees;

g.   Negligently failing to ensure business policies, systems, and
     security were adequately followed and implemented;

h.   Negligently failing to inspect, patrol, or appropriately monitor
     the property;

i.   Negligently failing to remediate a long history of crime at the
     Smyrna Red Roof and the area nearby;

j.   Negligently failing to warn invitees of known hazards at the
     property; and

k.   Negligently representing to invitees that the property was safe.

503.  From December 2012 through 2018, Smyrna Red Roof Defendants RRI,
Red Roof Franchising, and Varahi each had a duty to keep the premises safe
for guests and invitees, including Plaintiffs W.K., E.H., M.M., R.P., M.B., and
D.P.  Based on the facts alleged in ¶¶ 40–195 and 295–362, above, and
incorporated here by reference, Smyrna Red Roof Defendants RRI, Red Roof
Franchising, and Varahi each had knowledge of, or in the exercise of

reasonable care should have had knowledge of the threat of sex trafficking at the Smyrna Red Roof.  Despite their actual and constructive knowledge, Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi negligently failed to protect invitees, including Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P., from the risks of sex trafficking.

504.   As a direct and proximate result of the actions and/or inactions of Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi, Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

505.   Alternatively or in addition to the above, RRI is vicariously liable for the negligence of Varahi because, as set out above in ¶¶ 306–62, above, RRI controlled the day-to-day operations of the Smyrna Red Roof from December 2012 through 2018, including the time, method, and manner of Varahi's performance in operating the location, such Varahi was under Georgia law the agent or employee of RRI and not an independent contractor.

506.   The wrongful actions of Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi from December 2012 through at least 2018, as related to the Smyrna Red Roof, constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise

the presumption of conscious indifference to consequences, rendering them liable to Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

507.   Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. are entitled to an award of punitive damages without limitation or cap because the actions of Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi and their employees from December 2012 through at least 2018 were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

508.   The actions of Smyrna Red Roof Defendants RRI, Red Roof Franchising, and Varahi from December 2012 through at least 2018 evidenced a species of bad faith, were and are stubbornly litigious, and have caused Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. undue expense. Thus, Plaintiffs W.K., E.H., M.M., R.P., M.B., and D.P. are entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-11-68(e), as well as any other statutory or common law basis.

## COUNT V

## Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act, <u>O.C.G.A. § 16-14-4(a)</u>
## (Plaintiffs W.K., R.P., C.A., R.K., and K.P. Against Atlanta Red Roof Defendants Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)

509.   Plaintiffs W.K., R.P., C.A., R.K., and K.P. repeat and incorporate the allegations set forth in ¶¶ 196–305; 363–88; and 389–426, above, as if fully set forth herein.

510.   As set forth above in ¶¶ 389–426, the Atlanta Red Roof Defendants violated <u>O.C.G.A. § 16-14-4(a)</u> by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

511.   The conduct in violation of the Georgia RICO Act in which the Atlanta Red Roof Defendants participated continued to within 5 years of the filing of this action.

512.   Upon information and belief, the conduct of the Atlanta Red Roof Defendants in violation of <u>O.C.G.A. § 16-14-4</u> has not terminated.

513.   Plaintiffs W.K., R.P., C.A., R.K., and K.P. have suffered substantial physical, emotional, and psychological harm, and other damages as a direct and proximate result of the violations of Georgia RICO committed by the Atlanta Red Roof Defendants.

514.   The Atlanta Red Roof Defendants are liable to Plaintiffs W.K., R.P., C.A., R.K., and K.P. for three times their damages in an amount to be proven at trial, their attorneys' fees, and their costs of investigation and litigation.

515.   The wrongful actions of the Atlanta Red Roof Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiffs W.K., R.P., C.A., R.K., and K.P. for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

516.   Because the Atlanta Red Roof Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT VI
## Violations of Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-4(c)
### (Plaintiffs W.K., R.P., C.A., R.K., and K.P. Against Atlanta Red Roof Defendants Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)

517.   Plaintiffs W.K., R.P., C.A., R.K., and K.P. repeat and incorporate the allegations set forth in ¶¶ 196–305; 363–69; and 380–88, above, as if fully set forth herein.

518.   The Atlanta Red Roof Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a).

519.   The Atlanta Red Roof Defendants knowingly and willfully joined a conspiracy involving a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Atlanta Red Roof Sex Trafficking Conspiracy").  More specifically, this conspiracy involved making money by operating the Atlanta Red Roof Inn as a venue for sexual servitude, prostitution, and pimping.

520.   Each of the Atlanta Red Roof Defendants committed acts of racketeering activity and overt acts in furtherance of the Atlanta Red Roof Sex Trafficking Conspiracy, including those alleged above.

521.   The predicate acts and overt acts committed by the participants in the Atlanta Red Roof Sex Trafficking Conspiracy number in the thousands and took place over several years.

522.   The conduct in violation of the Georgia RICO Act in which the Atlanta Red Roof Defendants participated continued to within 5 years of the filing of this action.

523.   Upon information and belief, the conduct of the Atlanta Red Roof Defendants in violation of O.C.G.A. § 16-14-4 has not terminated.

524.   Plaintiffs W.K., R.P., C.A., R.K., and K.P. have suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the acts of racketeering activity and violations of Georgia RICO committed by the Atlanta Red Roof Defendants.

525.   The Atlanta Red Roof Defendants are liable to Plaintiffs W.K., R.P., C.A., R.K., and K.P. for three times their damages in an amount to be proven at trial, their attorneys' fees, and the costs of investigation and litigation.

526.   The wrongful actions of the Atlanta Red Roof Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiffs W.K., R.P., C.A., R.K., and K.P. for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

527.   Because the Atlanta Red Roof Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT VII
## TVPRA, <u>18 U.S.C. § 1595</u>
## (Plaintiffs W.K., R.P., C.A., R.K., and K.P. Against Atlanta Red Roof Defendants Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)

528.  Plaintiffs W.K., R.P., C.A., R.K., and K.P. repeat and incorporate the allegations set forth in ¶¶ 196–307; 363–69; and 380–88, above, as if fully set forth herein.

529.  In violation of <u>18 U.S.C. § 1595(a)</u>, each Atlanta Red Roof Defendant— Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—knowingly benefited from participation in a venture that it knew or should have known engaged in sex trafficking.

### Direct Liability

530.  The Atlanta Red Roof Defendants are each directly liable to Plaintiffs W.K., R.P., C.A., R.K., and K.P. under <u>18 U.S.C. § 1595(a)</u> because they each knowingly benefited from participation in a venture that each Atlanta Red Roof Defendant knew or should have known violated <u>18 U.S.C. § 1591</u>.

531.  The Atlanta Red Roof Defendants each knowingly participated in a venture that operated the Atlanta Red Roof.  This venture, which Plaintiffs call the "Atlanta Red Roof Venture," included not only the Atlanta Red Roof Defendants but also their employees, including employees who were complicit in and supported, assisted, and/or facilitated trafficking at the location.

532.   The Atlanta Red Roof Venture was in or affecting interstate commerce.

533.   The Atlanta Red Roof Defendants were associated in fact and assumed the risk of operating the Atlanta Red Roof and the Atlanta Red Roof Venture. The Atlanta Red Roof Defendants participated in the Atlanta Red Roof Venture by, among other things, operating the Atlanta Red Roof hotel.

534.   RRI III participated in the Atlanta Red Roof Venture from at least 2009 through at least 2017 by, among other things, owning the hotel and property. RRI III contracted with Red Roof Franchising via a franchise agreement.

535.   RRI West participated in the Atlanta Red Roof Venture from at least 2009 through at least 2017 by, among other things, managing the property.

536.   Red Roof Franchising participated in the Atlanta Red Roof Venture from at least 2009 through at least 2017 by, among other things, contracting with RRI III via a franchise agreement.

537.   Westmont participated in the Atlanta Red Roof Venture from at least 2009 through at least 2017 by, among other things, managing and operating the Atlanta Red Roof through RRI West, which Westmont owned and controlled.  In the same time period, Westmont also participated in the Atlanta Red Roof Venture through its ownership and control of RRI III, which owned the Atlanta Red Roof.

538.   RRI participated in the Atlanta Red Roof Venture from at least 2009

through at least 2017 by, among other things, employing the staff at the Atlanta Red Roof.  In the same time period, RRI also participated in the Atlanta Red Roof Venture through its ownership and control of Red Roof Franchising, which contracted with RRI III via a franchise agreement.

539.   From at least 2009 through at least 2017, the Atlanta Red Roof Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator.  For example—and at a minimum—the complicit hotel employees who acted as lookouts for the persons who trafficked Plaintiffs W.K., R.P., C.A., R.K., and K.P., as well as for other traffickers, and who facilitated trafficking at the location could be liable under § 1591 as perpetrators as well as beneficiaries under the TVPRA.

540.   From at least 2009 through at least 2017, RRI was the employer of the hotel employees at the Atlanta Red Roof, including hotel employees who acted as lookouts for the persons who trafficked Plaintiffs W.K., R.P., C.A., R.K., and K.P., as well as for other traffickers, and who facilitated trafficking at the Atlanta Red Roof.  Therefore, RRI directly participated in acts of trafficking in violation of § 1591.

541.   As to Plaintiffs W.K., R.P., C.A., R.K., and K.P., at least one of the participants in the Atlanta Red Roof Venture facilitated their trafficking at

the Atlanta Red Roof knowing—or acting with reckless disregard for the likelihood—that W.K.'s, R.P.'s, C.A.'s, R.K.'s, and K.P.'s respective traffickers were employing means of force, threats of force, fraud, coercion or some combination thereof to cause her to engage in commercial sex.

542. As to Plaintiff W.K., at least one of the participants in the Atlanta Red Roof Venture facilitated her trafficking at the Atlanta Red Roof knowing—or acting with reckless disregard for the likelihood—that Plaintiff W.K.'s trafficker would cause her to engage in commercial sex.

543. Further, at least one of the participants in the Atlanta Red Roof Venture had a reasonable opportunity to observe Plaintiff W.K. while she was being trafficked at the Atlanta Red Roof.

544. In the course of the Atlanta Red Roof Venture, hundreds of buyers paid to have sex with Plaintiffs W.K., R.P., C.A., R.K., and K.P. at the Atlanta Red Roof.

545. The Atlanta Red Roof Defendants knew that they were participating in a venture, the Atlanta Red Roof Venture, and they knew or should have known that the Atlanta Red Roof Venture violated the TVPRA because the Atlanta Red Roof Defendants (and their agents and representatives) saw the signs of sex trafficking exhibited by Plaintiffs, their traffickers, the rooms in which Plaintiffs were trafficked, the frequent traffic of hundreds of male

buyers to Plaintiffs' rooms, and the numerous other victims being trafficked at the hotel.

546.   Furthermore, RRI had direct knowledge of the trafficking of Plaintiffs W.K. and R.P. because of their complicit employees who, among other things, acted as lookouts for the persons who trafficked Plaintiffs, as well as for other traffickers, and who participated in acts of trafficking in violation of § 1591.

547.   Based on the facts alleged in ¶¶ 196–305; 363–69; and 380–88, above, and incorporated here by reference, the Atlanta Red Roof Defendants knew or should have known about sex trafficking at the Atlanta Red Roof.

548.   Additionally, both Red Roof Franchising and RRI knew or should have known what they contractually obligated themselves to know through franchise and other agreements.  That is, Red Roof Franchising and RRI knew or should have known about every safety and security incident that occurred at the Atlanta Red Roof because its franchise agreements required franchisees to report every safety and security incident that occurred there.

549.   The Atlanta Red Defendants each knowingly benefited from the Atlanta Red Roof Venture by receiving a percentage of the revenue generated by the Atlanta Red Roof's operation.

### Vicarious Liability

550.   Alternatively, Westmont and RRI are also vicariously liable under the

TVPRA under the same theories outline above because they ultimately controlled the day-to-day operation of the location, notwithstanding the ostensible involvement of RRI III, RRI West, and Red Roof Franchising, as set out above in ¶¶ 363–69 and 380–88.  Based on this control, Westmont and RRI are vicariously liable for the actions of RRI III, RRI West, and Red Roof Franchising in violation of the TVPRA as alleged above in ¶¶ 528–49.

551.   From at least 2009 through at least 2017, Westmont was the principal and controlled the actions of its agents, RRI III and RRI West.  Accordingly, Westmont is vicariously liable for the actions of RRI III and RRI West in violation of the TVPRA as alleged above in ¶¶ 528–49.

552.   From at least 2009 through at least 2017, RRI was the principal and controlled the actions of Red Roof Franchising.  Accordingly, RRI is vicariously liable for the actions of Red Roof Franchising in violation of the TVPRA as alleged above in ¶¶ 528–49.

### Damages

553.   Plaintiffs W.K., R.P., C.A., R.K., and K.P. have suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Atlanta Red Roof Defendants' conduct and their participation in the sex trafficking venture at the Atlanta Red Roof.

554.   The Atlanta Red Roof Defendants are liable to Plaintiffs W.K., R.P.,

C.A., R.K., and K.P. for their damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

555.   The Atlanta Red Roof Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs W.K., R.P., C.A., R.K., and K.P.

**COUNT VIII**
**Negligence**
**(Plaintiffs W.K., R.P., C.A., R.K., and K.P. Against the Atlanta Red Roof Defendants Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)**

556.   Plaintiffs W.K., R.P., C.A., R.K., and K.P. repeat and incorporate the allegations set forth in ¶¶ 196–305; 363–69; and 380–88, above, as if fully set forth herein.

557.   From at least 2009 through at least 2017, RRI III—and Westmont through RRI III, which Westmont owned and controlled—owned the Atlanta Red Roof.  Because of their ownership of the location, both RRI III and Westmont had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

558.   From at least 2009 through at least 2017, RRI West—and Westmont through RRI West, which Westmont owned and controlled—managed the Atlanta Red Roof.  Because of their management of the location, both RRI

West and Westmont had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

559.   From at least 2009 through at least 2017, Red Roof Franchising—and RRI through Red Roof Franchising, which RRI owned and controlled—imposed the operating requirements and controlled the operation of the Atlanta Red Roof.  RRI also employed the employees who worked at the Atlanta Red Roof in this time.  Because of their operation of and control over the location, both Red Roof Franchising and RRI had the legal duty to keep the premises safe and secure with due regard for the safety of their invitees.

560.   From at least 2009 through at least 2017, Plaintiffs W.K., R.P., C.A., R.K., and K.P. were invitees of the Atlanta Red Roof to whom the Atlanta Red Roof Defendants owed a duty of care to keep the Atlanta Red Roof safe from unlawful acts on their premises.

561.   From at least at least 2009 through at least 2017, the Atlanta Red Roof Defendants had authority and discretion regarding whether and how to take certain measures to provide for the safety and security of invitees at the Atlanta Red Roof.

562.    From at least at least 2009 through at least 2017, the Atlanta Red Roof Defendants negligently failed to keep the Atlanta Red Roof location safe and negligently failed to protect their invitees, including Plaintiffs W.K., R.P.,

C.A., R.K., and K.P., adequately and properly in breach of their duty of care. The Atlanta Red Roof Defendants were negligent, and their negligence proximately caused the injuries of Plaintiffs W.K., R.P., C.A., R.K., and K.P. by:

a. Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the premises safe;

b. Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

c. Negligently failing to provide appropriate and effective security personnel during Plaintiffs' trafficking at the hotel;

d. Negligently failing to properly inspect and maintain the premises;

e. Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotel;

f. Negligently failing to properly retain, hire, train, and supervise said employees;

g. Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

h. Negligently failing to inspect, patrol, or appropriately monitor the property;

#3188307v1

140

    i.    Negligently failing to remediate a long history of crime at the Atlanta Red Roof and the area nearby;

    j.    Negligently failing to warn invitees of known hazards at the property; and

    k.    Negligently representing to invitees that the property was safe.

563.  From at least 2009 through at least 2017, the Atlanta Red Roof Defendants each had a duty to keep the premises safe for guests and invitees, including Plaintiffs W.K., R.P., C.A., R.K., and K.P. Based on the facts alleged in ¶¶ 196–305; 363–69; and 380–88, above, and incorporated here by reference, the Atlanta Red Roof Defendants each had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Atlanta Red Roof. Despite their actual and constructive knowledge, the Atlanta Red Roof Defendants negligently failed to protect invitees, including Plaintiffs W.K., R.P., C.A., R.K., and K.P. from the risks of sex trafficking.

564.  As a direct and proximate result of the actions and/or inactions of the Atlanta Red Roof Defendants, Plaintiffs W.K., R.P., C.A., R.K., and K.P. suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

565.   Alternatively or in addition to the above, Westmont is vicariously liable for the negligence of RRI III and RRI West and the damages caused to Plaintiffs W.K., R.P., C.A., R.K., and K.P. thereby from at least 2009 through at least 2017 because Westmont controlled the actions and operations of RRI III and RRI West, as set out above in ¶¶ 363–69 and 380–88, such that RRI III and RRI West were agents of Westmont, their shared principal

566.   Alternatively or in addition to the above, RRI is vicariously liable for the negligence of Red Roof Franchising and the damages caused to Plaintiffs W.K., R.P., C.A., R.K., and K.P. thereby from at least 2009 through at least 2017 because RRI controlled the actions and operations of Red Roof Franchising, as set out above in ¶¶ 363–69 and 380–88, such that Red Roof Franchising was the agent of RRI, its principal.

567.   The wrongful actions of the Atlanta Red Roof Defendants from at least 2009 through at least 2017, as related to the Atlanta Red Roof, constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiffs W.K., R.P., C.A., R.K., and K.P. for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

568.   Plaintiffs W.K., R.P., C.A., R.K., and K.P. are entitled to an award of punitive damages without limitation or cap because the actions of the Atlanta

Red Roof and their employees from at least 2009 through at least 2017 were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

569.   The actions of the Atlanta Red Roof Defendants from at least 2009 through at least 2017 evidenced a species of bad faith, were and are stubbornly litigious, and have caused Plaintiffs W.K., R.P., C.A., R.K., and K.P. undue expense. Thus, Plaintiffs W.K., R.P., C.A., R.K., and K.P. are entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-11-68(e), as well as any other statutory or common law basis.

## III.    ADDITIONAL THEORIES OF RECOVERY

### ALTER EGO

570.   Under Georgia law, any judgment against FMW, RRI III, or RRI West shall be recoverable against Westmont because Westmont is the alter ego of FMW, RRI III, and RRI.

571.   FMW, RRI III, and RRI West were created by Westmont and share the same office as Westmont.

572.   From at least 2010 through December 2012, as to the Smyrna Red Roof:

#3188307v1

a.      Westmont exerted complete control over FMW and RRI West's finances, policies, and business practices as to the Smyrna Red Roof;

b.      Westmont employees conducted all the business of FMW and RRI West as to the Smyrna Red Roof;

c.      Westmont controlled the means and methods of how FMW and RRI West conducted any business related to the Smyrna Red Roof;

d.      Westmont's control over FMW and RRI West was used to allow Westmont to profit from sex trafficking, including that of Plaintiffs M.M., R.P., and A.F., at the Smyrna Red Roof, while attempting to avoid liability for doing so.

573.   From at least 2009 through at least 2017, as to the Atlanta Red Roof:

a.      Westmont exerted complete control over RRI III and RRI West's finances, policies, and business practices as to the Atlanta Red Roof;

b.      Westmont employees conducted all the business of RRI III and RRI West as to the Atlanta Red Roof;

c.      Westmont controlled the means and methods of how RRI III and RRI West conducted any business related to the Atlanta Red

Roof;

    d.    Westmont's control over RRI III and RRI West was used to allow Westmont to profit from sex trafficking, including that of Plaintiffs W.K., R.P., C.A., R.K., and K.P., at the Atlanta Red Roof, while attempting to avoid liability for doing so.

574. Under Georgia law, any judgment against Red Roof Franchising shall be recoverable against RRI because RRI is the alter ego of Red Roof Franchising.

575. From at least 2010 through December 2012, as to the Smyrna Red Roof, and from December 2012 through 2018, as to the Atlanta Red Roof:

    a.    RRI exerted complete control over Red Roof Franchising's finances, policies, and business practices;

    b.    RRI employees conducted all the business of Red Roof Franchising;

    c.    RRI controlled the means and methods of how Red Roof Franchising conducted its daily business;

    d.    RRI's control over Red Roof Franchising was used to allow RRI to profit from sex trafficking, including of Plaintiffs M.M., R.P., and A.F. at the Smyrna Red Roof and Plaintiffs W.K., R.P., C.A., R.K., and K.P. at the Atlanta Red Roof, while attempting to avoid

liability for doing so.

## JOINT VENTURE

576.   Under Georgia law, any judgment against FMW or RRI West relating to their conduct at the Smyrna Red Roof shall be recoverable against Westmont because Westmont was engaged in a joint venture at the Smyrna Red Roof with FMW and RRI West, and each is liable for the acts and omissions of the other.

577.   From at least 2010 through December 2012,

    a.    the Smyrna Red Roof was a joint undertaking for profit that included Westmont, FMW, and RRI West;

    b.    Westmont, FMW, and RRI West exerted collective control over, and each had a right of control over, the Smyrna Red Roof; and

    c.    Westmont, FMW, and RRI West had joint proprietary interests in the Smyrna Red Roof such that they each shared in the profits and losses of the hotel.

578.   Under Georgia law, any judgment against Red Roof Franchising relating to its conduct at the Smyrna Red Roof shall be recoverable against RRI because was engaged in a joint venture at the Smyrna Red Roof with Red Roof Franchising, and each is liable for the acts and omissions of the other.

579.   From at least 2010 through at least 2018, during both the corporate and non-corporate ownership of the Smyrna Red Roof,

    a.   the Smyrna Red Roof was a joint undertaking for profit that included Red Roof Franchising and RRI;

    b.   Red Roof Franchising and RRI exerted collective control over, and each had a right of control over, the Smyrna Red Roof; and

    c.   Red Roof Franchising and RRI had joint proprietary interests in the Smyrna Red Roof such that they each shared in the profits and losses of the hotel.

580.   Under Georgia law, any judgment against RRI III or RRI West relating to their conduct at the Atlanta Red Roof shall be recoverable against Westmont because Westmont was engaged in a joint venture at the Atlanta Red Roof with RRI III and RRI West, and each is liable for the acts and omissions of the other.

581.   From at least 2009 through at least December 2017,

    a.   the Atlanta Red Roof was a joint undertaking for profit that included Westmont, RRI III, and RRI West;

    b.   Westmont, RRI III, and RRI West exerted collective control over, and each had a right of control over, the Atlanta Red Roof; and

      c.      Westmont, RRI III, and RRI West had joint proprietary interests in the Atlanta Red Roof such that they each shared in the profits and losses of the hotel.

582.   Under Georgia law, any judgment against Red Roof Franchising relating to its conduct at the Atlanta Red Roof shall be recoverable against RRI because was engaged in a joint venture at the Atlanta Red Roof with Red Roof Franchising, and each is liable for the acts and omissions of the other.

583.   From at least 2009 through at least 2017,

      a.      the Atlanta Red Roof was a joint undertaking for profit that included Red Roof Franchising and RRI;

      b.      Red Roof Franchising and RRI exerted collective control over, and each had a right of control over, the Atlanta Red Roof; and

      c.      Red Roof Franchising and RRI had joint proprietary interests in the Atlanta Red Roof such that they each shared in the profits and losses of the hotel.

584.   Under Georgia law, any judgment against RRI or Westmont relating to their conduct at the Smyrna Red Roof from at least 2010 through December 2012 or the Atlanta Red Roof from at least 2009 through at least 2017, shall be recoverable against the other because Westmont and RRI were engaged in a joint venture at the Smyrna Red Roof and Atlanta Red Roof, and each is

liable for the acts and omissions of the other.

585. From at least 2010 through December 2012,

    a.   the Smyrna Red Roof was a joint undertaking for profit that included Westmont and RRI;

    b.   Westmont and RRI exerted collective control over, and each had a right of control over, the Smyrna Roof; and

    c.   Westmont and RRI had joint proprietary interests in the Smyrna Red Roof such that they each shared in the profits and losses of the hotel.

586. From at least 2009 through at least 2017,

    a.   the Atlanta Red Roof was a joint undertaking for profit that included Westmont and RRI;

    b.   Westmont and RRI exerted collective control over, and each had a right of control over, the Atlanta Red Roof; and

    c.   Westmont and RRI had joint proprietary interests in the Atlanta Red Roof such that they each shared in the profits and losses of the hotel.

## IV.    PLAINTIFF T.H.

### A.    The sex trafficking of T.H. at the Atlanta Red Roof

587.    Along with the five Plaintiffs identified in paragraphs 4 and 11 (W.K., R.P., C.A., R.K., and K.P.), Plaintiff T.H. was trafficked for commercial sex at the Atlanta Red Roof.

588.    As a result of the control, force, fraud and coercion exerted over T.H. by her traffickers, T.H. was incapable of managing the ordinary affairs of life until she escaped captivity or the control of her trafficker.

589.    T.H. is a citizen of the United States of America and a resident of the State of Texas.  From approximately 2009 through 2011, Plaintiff T.H. was trafficked for sex at the Atlanta Red Roof, including at times when she was a minor.

590.    During this time, she was trafficked by two different traffickers, sometimes with other victims, including minor victims.  Even when trafficked alone, T.H. often witnessed other victims being trafficked at the Atlanta Red Roof by different traffickers.

591.    The victimization of T.H. followed a pattern that was observable and should have been obvious to hotel staff.

592.   The volume of foot traffic of men to and from the hotel rooms in which Plaintiff T.H. and other victims was held at the Atlanta Red Roof, generally staying for less than a half hour at a time, evidenced trafficking.

593.   The rooms in which Plaintiff T.H. was trafficked at the Atlanta Red Roof evidenced numerous known and visible signs of sex trafficking. Frequently, the trash cans in the rooms contained an extraordinary number of used condoms, and sex paraphernalia like personal lubricant and lingerie was visible within the rooms.  The rooms also contained more cell phones than registered occupants.

594.   During her trafficking at the Atlanta Red Roof Plaintiff T.H. exhibited signs of trafficking identified in the DHS guidance and by ECPAT-USA.

595.   The deteriorated physical condition of Plaintiff T.H., while she was trafficked at the Atlanta Red Roof, would have been visible to hotel staff and to anyone who saw her there.  T.H.'s outward physical appearance often reflected bruises or other evidence of physical beatings by her traffickers. Her physical appearance suggested malnourishment, poor hygiene, fatigue, and sleep deprivation—all known signs of trafficking.

596.   The failure of Plaintiff T.H. to make eye contact with others, lack of control, lack of money, and monitoring by her traffickers were also known signs that she was a trafficking victim.

597.   Plaintiff T.H., and other victims of trafficking that were trafficked alongside her, regularly requested an unusually large volume of towels and bed linens, another known sign that T.H. was a victim of sex trafficking. While she was still a minor, T.H. would make these kinds of requests daily to the front desk and cleaning staff.

598.   Plaintiff T.H. was forbidden by her traffickers to keep any money while she was held at the Atlanta Red Roof; her traffickers each took the money she collected from buyers daily.

599.   From 2009 to 2011, T.H. was trafficked on numerous separate occasions out of hotel rooms at the Atlanta Red Roof.  T.H.'s stays at the Atlanta Red Roof lasted from 3 days to one week.

600.   When she was trafficked out of the Atlanta Red Roof, T.H. was forced to have sex with approximately 10 men per day.  Her traffickers required a daily quota of at least $1,000 while at the Atlanta Red Roof.  Her traffickers would collect her quota from her each day while she was held at the Atlanta Red Roof.

601.   T.H. also witnessed other trafficking victims and sex traffickers at the Atlanta Red Roof.

602.   As noted above, one of T.H.'s traffickers would frequently come and go from the building with T.H. and multiple other victims.  The trafficker would

often yell at and berate the 3 to 5 women and girls he kept in tow, each wearing revealing clothing often inappropriate for the weather. At times, the trafficker yelled at the victims—including T.H.—calling them "hoes" and "bitches" in front of hotel employees in the front office of the Atlanta Red Roof. This activity should have alerted staff at the location that T.H., and others with her, were subject to the force, coercion, or control of others.

603. Accompanied by this entourage of victims, T.H.'s traffickers rented multiple rooms at the same time at the Atlanta Red Roof to increase the frequency of buyers at the Atlanta Red Roof.

604. T.H.'s traffickers were friendly with the employees at the Atlanta Red Roof. Hotel employees would frequently purchase drugs from sex traffickers in the hotel parking lot.

605. When the group of victims and T.H.'s traffickers left the hotel, hotel employees would ask the group if they intended to utilize the hotel again the next day, or if they needed the employees to hold rooms for them.

606. The group generally paid for rooms on a day-to-day basis, rather than paying for multiple nights of their stay at one time. T.H. often interacted with Atlanta Red Roof employees when she went to the front desk to pay in cash for that night's stay.

607.   Commercial sex trafficking, including that of Plaintiff T.H., continued at the Atlanta Red Roof—location owned, operated, and controlled by Defendants Westmont and RRI and other Defendant entities they owned and controlled—even after the Atlanta Red Roof Defendants had every reason to know of the trafficking occurring there.  Defendants Westmont and RRI continue to profit from the operation of and rental of rooms at the Atlanta Red Roof.

608.   Westmont and RRI, along with the entities they ultimately owned and controlled, are each directly liable to Plaintiff T.H., for their own conduct with respect to the Atlanta Red Roof, which was at all relevant times a corporate location.

### B.   T.H.'s Claims Against Defendants

### COUNT IX
### Violations of the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-4(a)
### (Plaintiff T.H. Against Atlanta Red Roof Defendants Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)

609.   T.H. repeats and incorporates the allegations set forth in ¶¶ 196–305; 363–369; 380–388; 389–426; 587–608, above, as if fully set forth herein.

610.   As set forth above in ¶¶ 389–426, the Atlanta Red Roof Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

611.   The conduct in violation of the Georgia RICO Act in which the Atlanta Red Roof Defendants participated continued to within 5 years of the filing of this action.

612.   Upon information and belief, the conduct of the Atlanta Red Roof Defendants in violation of O.C.G.A. § 16-14-4 has not terminated.

613.   Plaintiff T.H. has suffered substantial physical, emotional, and psychological harm, and other damages as a direct and proximate result of the violations of Georgia RICO committed by the Atlanta Red Roof Defendants.

614.   The Atlanta Red Roof Defendants are liable to Plaintiff T.H. for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

615.   The wrongful actions of the Atlanta Red Roof Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiff T.H. for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

616.   Because the Atlanta Red Roof Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

# COUNT X

## Violations of Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-4(c)
### (Plaintiff T.H. Against Atlanta Red Roof Defendants Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)

617.   Plaintiff T.H. repeats and incorporate the allegations set forth in ¶¶ 196–305; 363–369; 380–388; 389–426; and 587–608, above, as if fully set forth herein.

618.   The Atlanta Red Roof Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a).

619.   The Atlanta Red Roof Defendants knowingly and willfully joined a conspiracy involving a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly (the "Atlanta Red Roof Sex Trafficking Conspiracy").  More specifically, this conspiracy involved making money by operating the Atlanta Red Roof Inn as a venue for sexual servitude, prostitution, and pimping.

620.   Each of the Atlanta Red Roof Defendants committed acts of racketeering activity and overt acts in furtherance of the Atlanta Red Roof Sex Trafficking Conspiracy, including those alleged above.

#3188307v1

621.   The predicate acts and overt acts committed by the participants in the Atlanta Red Roof Sex Trafficking Conspiracy number in the thousands and took place over several years.

622.   The conduct in violation of the Georgia RICO Act in which the Atlanta Red Roof Defendants participated continued to within 5 years of the filing of this action.

623.   Upon information and belief, the conduct of the Atlanta Red Roof Defendants in violation of O.C.G.A. § 16-14-4 has not terminated.

624.   Plaintiff T.H. has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the acts of racketeering activity and violations of Georgia RICO committed by the Atlanta Red Roof Defendants.

625.   The Atlanta Red Roof Defendants are liable to Plaintiff T.H. for three times their damages in an amount to be proven at trial, their attorneys' fees, and the costs of investigation and litigation.

626.   The wrongful actions of the Atlanta Red Roof Defendants constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiff T.H. for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

627.   Because the Atlanta Red Roof Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages

## COUNT XI
## TVPRA, 18 U.S.C. § 1595
### (Plaintiff T.H. Against Atlanta Red Roof Defendants Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)

628.   Plaintiff T.H. repeats and incorporates the allegations set forth in ¶¶ 196–305; 363–369; 380–388; and 587–608, above, as if fully set forth herein.

629.   In violation of 18 U.S.C. § 1595(a), each Atlanta Red Roof Defendant—Westmont, RRI, RRI III, RRI West, and Red Roof Franchising—knowingly benefited from participation in a venture that it knew or should have known engaged in sex trafficking.

### Direct Liability

630.   The Atlanta Red Roof Defendants are each directly liable to Plaintiff T.H. under 18 U.S.C. § 1595(a) because they each knowingly benefited from participation in a venture that each Atlanta Red Roof Defendant knew or should have known violated 18 U.S.C. § 1591.

631.   The Atlanta Red Roof Defendants each knowingly participated in a venture that operated the Atlanta Red Roof.  This venture, which Plaintiffs

call the "Atlanta Red Roof Venture," included not only the Atlanta Red Roof

Defendants but also their employees, including employees who were complicit

in and supported, assisted, and/or facilitated trafficking at the location.

632.   The Atlanta Red Roof Venture was in or affecting interstate commerce.

633.   The Atlanta Red Roof Defendants were associated in fact and assumed

the risk of operating the Atlanta Red Roof and the Atlanta Red Roof Venture.

The Atlanta Red Roof Defendants participated in the Atlanta Red Roof

Venture by, among other things, operating the Atlanta Red Roof hotel.

634.   RRI III participated in the Atlanta Red Roof Venture from at least 2009

through at least 2017 by, among other things, owning the hotel and property.

RRI III contracted with Red Roof Franchising via a franchise agreement.

635.   RRI West participated in the Atlanta Red Roof Venture from at least

2009 through at least 2017 by, among other things, managing the property.

636.   Red Roof Franchising participated in the Atlanta Red Roof Venture

from at least 2009 through at least 2017 by, among other things, contracting

with RRI III via a franchise agreement.

637.   Westmont participated in the Atlanta Red Roof Venture from at least

2009 through at least 2017 by, among other things, managing and operating

the Atlanta Red Roof through RRI West, which Westmont owned and

controlled.  In the same time period, Westmont also participated in the

Atlanta Red Roof Venture through its ownership and control of RRI III, which owned the Atlanta Red Roof.

638. RRI participated in the Atlanta Red Roof Venture from at least 2009 through at least 2017 by, among other things, employing the staff at the Atlanta Red Roof. In the same time period, RRI also participated in the Atlanta Red Roof Venture through its ownership and control of Red Roof Franchising, which contracted with RRI III via a franchise agreement.

639. From at least 2009 through at least 2017, the Atlanta Red Roof Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator. For example—and at a minimum—the complicit hotel employees who acted as lookouts for the persons who trafficked Plaintiff T.H., as well as for other traffickers, and who facilitated trafficking at the location could be liable under § 1591 as perpetrators as well as beneficiaries under the TVPRA.

640. From at least 2009 through at least 2017, RRI was the employer of the hotel employees at the Atlanta Red Roof, including hotel employees who acted as lookouts for the persons who trafficked Plaintiff T.H., as well as for other traffickers, and who facilitated trafficking at the Atlanta Red Roof. Therefore, RRI directly participated in acts of trafficking in violation of § 1591.

641.   As to Plaintiff T.H., at least one of the participants in the Atlanta Red Roof Venture facilitated her trafficking at the Atlanta Red Roof knowing—or acting with reckless disregard for the likelihood—that T.H.'s traffickers were employing means of force, threats of force, fraud, coercion or some combination thereof to cause her to engage in commercial sex.

642.   Further, at least one of the participants in the Atlanta Red Roof Venture had a reasonable opportunity to observe Plaintiff T.H. while she was being trafficked at the Atlanta Red Roof.

643.   In the course of the Atlanta Red Roof Venture, hundreds of buyers paid to have sex with Plaintiff T.H. at the Atlanta Red Roof.

644.   The Atlanta Red Roof Defendants knew that they were participating in a venture, the Atlanta Red Roof Venture, and they knew or should have known that the Atlanta Red Roof Venture violated the TVPRA because the Atlanta Red Roof Defendants (and their agents and representatives) saw the signs of sex trafficking exhibited by Plaintiffs, their traffickers, the rooms in which Plaintiffs were trafficked, the frequent traffic of hundreds of male buyers to Plaintiffs' rooms, and the numerous other victims being trafficked at the hotel.

645.   Based on the facts alleged in ¶¶ 196–305; 363–369; 380–388; and 587–608, above, and incorporated here by reference, the Atlanta Red Roof

Defendants knew or should have known about sex trafficking at the Atlanta Red Roof.

646.   Additionally, both Red Roof Franchising and RRI knew or should have known what they contractually obligated themselves to know through franchise and other agreements.  That is, Red Roof Franchising and RRI knew or should have known about every safety and security incident that occurred at the Atlanta Red Roof because its franchise agreements required franchisees to report every safety and security incident that occurred there.

647.   The Atlanta Red Defendants each knowingly benefited from the Atlanta Red Roof Venture by receiving a percentage of the revenue generated by the Atlanta Red Roof's operation.

### Vicarious Liability

648.   Alternatively, Westmont and RRI are also vicariously liable under the TVPRA under the same theories outline above because they ultimately controlled the day-to-day operation of the location, notwithstanding the ostensible involvement of RRI III, RRI West, and Red Roof Franchising, as set out above in ¶¶ 363–369 and 380–388.  Based on this control, Westmont and RRI are vicariously liable for the actions of RRI III, RRI West, and Red Roof Franchising in violation of the TVPRA as alleged above in ¶¶ 630–647.

649.   From at least 2009 through at least 2017, Westmont was the principal

and controlled the actions of its agents, RRI III and RRI West. Accordingly, Westmont is vicariously liable for the actions of RRI III and RRI West in violation of the TVPRA as alleged above in ¶¶ 528–549.

650. From at least 2009 through at least 2017, RRI was the principal and controlled the actions of Red Roof Franchising. Accordingly, RRI is vicariously liable for the actions of Red Roof Franchising in violation of the TVPRA as alleged above in ¶¶ 630–647.

## Damages

651. Plaintiff T.H. has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Atlanta Red Roof Defendants' conduct and their participation in the sex trafficking venture at the Atlanta Red Roof.

652. The Atlanta Red Roof Defendants are liable to Plaintiff T.H. for their damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

653. The Atlanta Red Roof Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff T.H. to suffer.

## COUNT XII
## Negligence
### (Plaintiff T.H. Against the Atlanta Red Roof Defendants Westmont, RRI, RRI III, RRI West, and Red Roof Franchising)

654.   Plaintiff T.H. repeats and incorporates the allegations set forth in

¶¶ 196–305; 363–369; 380–388; 587–608 above, as if fully set forth herein.

655.   From at least 2009 through at least 2011, RRI III—and Westmont

through RRI III, which Westmont owned and controlled—owned the Atlanta

Red Roof.  Because of their ownership of the location, both RRI III and

Westmont had the legal duty to keep the premises safe and secure with due

regard for the safety of their invitees.

656.   From at least 2009 through at least 2011, RRI West—and Westmont

through RRI West, which Westmont owned and controlled—managed the

Atlanta Red Roof.  Because of their management of the location, both RRI

West and Westmont had the legal duty to keep the premises safe and secure

with due regard for the safety of their invitees.

657.   From at least 2009 through at least 2011, Red Roof Franchising—and

RRI through Red Roof Franchising, which RRI owned and controlled—

imposed the operating requirements and controlled the operation of the

Atlanta Red Roof.  RRI also employed the employees who worked at the

Atlanta Red Roof in this time.  Because of their operation of and control over

the location, both Red Roof Franchising and RRI had the legal duty to keep

the premises safe and secure with due regard for the safety of their invitees.

658.   From at least 2009 through at least 2011, Plaintiff T.H. was an invitee

of the Atlanta Red Roof to whom the Atlanta Red Roof Defendants owed a

duty of care to keep the Atlanta Red Roof safe from unlawful acts on their

premises.

659.   From at least at least 2009 through at least 2011, the Atlanta Red Roof

Defendants had authority and discretion regarding whether and how to take

certain measures to provide for the safety and security of invitees at the

Atlanta Red Roof.

660.   From at least at least 2009 through at least 2011, the Atlanta Red Roof

Defendants negligently failed to keep the Atlanta Red Roof location safe and

negligently failed to protect their invitees, including Plaintiff T.H.,

adequately and properly in breach of their duty of care.  The Atlanta Red

Roof Defendants were negligent, and their negligence proximately caused the

injuries of Plaintiff T.H.:

   a.   Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary
        care to keep the premises safe;

   b.   Negligently violating O.C.G.A. § 41-1-1 by creating and
        maintaining a nuisance;

    c.    Negligently failing to provide appropriate and effective security personnel during T.H.'s trafficking at the hotel;

    d.    Negligently failing to properly inspect and maintain the premises;

    e.    Negligently failing to properly train and supervise their employees regarding sex trafficking at the hotel;

    f.    Negligently failing to properly retain, hire, train, and supervise said employees;

    g.    Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

    h.    Negligently failing to inspect, patrol, or appropriately monitor the property;

    i.    Negligently failing to remediate a long history of crime at the Atlanta Red Roof and the area nearby;

    j.    Negligently failing to warn invitees of known hazards at the property; and

    k.    Negligently representing to invitees that the property was safe.

661. From at least 2009 through at least 2011, the Atlanta Red Roof Defendants each had a duty to keep the premises safe for guests and invitees, including Plaintiff T.H.  Based on the facts alleged in ¶¶ 196–305; 363–369;

380–388; and 587–608, above, and incorporated here by reference, the Atlanta Red Roof Defendants each had knowledge of, or in the exercise of reasonable care should have had knowledge of the threat of sex trafficking at the Atlanta Red Roof.  Despite their actual and constructive knowledge, the Atlanta Red Roof Defendants negligently failed to protect invitees, including Plaintiff T.H., from the risks of sex trafficking.

662.   As a direct and proximate result of the actions and/or inactions of the Atlanta Red Roof Defendants, Plaintiff T.H. suffered substantial physical, emotional, and psychological harm and other damages in an amount to be proven at trial.

663.   Alternatively or in addition to the above, Westmont is vicariously liable for the negligence of RRI III and RRI West and the damages caused to Plaintiff T.H. thereby from at least 2009 through at least 2011 because Westmont controlled the actions and operations of RRI III and RRI West, as set out above in ¶¶ 363–369 and 380–388, such that RRI III and RRI West were agents of Westmont, their shared principal

664.   Alternatively or in addition to the above, RRI is vicariously liable for the negligence of Red Roof Franchising and the damages caused to T.H. thereby from at least 2009 through at least 2011 because RRI controlled the actions and operations of Red Roof Franchising, as set out above in ¶¶ 363–

369 and 380–388, such that Red Roof Franchising was the agent of RRI, its principal.

665. The wrongful actions of the Atlanta Red Roof Defendants from at least 2009 through at least 2011, as related to the Atlanta Red Roof, constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiff T.H. for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

666. Plaintiff T.H. is entitled to an award of punitive damages without limitation or cap because the actions of the Atlanta Red Roof and their employees from at least 2009 through at least 2011 were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

667. The actions of the Atlanta Red Roof Defendants from at least 2009 through at least 2011 evidenced a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff T.H. undue expense. Thus, Plaintiff T.H. is entitled to recover the necessary expenses of litigation, including an award of reasonable attorney's fees and expenses required by this action, pursuant to O.C.G.A. § 13-6-11 and/or O.C.G.A. § 9-11-68(e), as well as any other statutory or common law basis.

### C. Additional Theories of Recovery for T.H. (Alter Ego and Joint Venture)

668. Plaintiff T.H. repeats and incorporates the allegations set forth in ¶¶ 570–571; 573–574; 580–584; and 586, as if fully set forth herein.

669. Westmont's control over RRI III and RRI West was used to allow Westmont to profit from sex trafficking, including that of Plaintiff T.H., at the Atlanta Red Roof, while attempting to avoid liability for doing so.

670. RRI's control over Red Roof Franchising was used to allow RRI to profit from sex trafficking, including of Plaintiff T.H., at the Atlanta Red Roof, while attempting to avoid liability for doing so.

\*     \*     \*

WHEREFORE, Plaintiffs pray for a judgment to be awarded to them and against Defendants for the following:

a) Process issue as provided by law;

b) Actual damages in amounts to be shown at trial from the Defendants;

c) All general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

d) A trial by jury; and

e) Such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

This 5th day of March, 2021.

*/s/ John E. Floyd*
John E. Floyd
Georgia Bar No. 266413
floyd@bmelaw.com
Tiana S. Mykkeltvedt
Georgia Bar No. 533512
mykketlvedt@bmelaw.com
Manoj S. Varghese
Georgia Bar No. 734668
varghese@bmelaw.com
Amanda Kay Seals
Georgia Bar No. 502720
seals@bmelaw.com
Michael R. Baumrind
Georgia Bar No. 960296
baumrind@bmelaw.com

BONDURANT, MIXSON & ELMORE, LLP
1201 West Peachtree Street, N.W., Suite 3900
Atlanta, GA 30309
(404) 881-4100 – Telephone
(404) 881-4111 – Facsimile

Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
jtonge@atclawfirm.com
Georgia Bar No. 303999

#3188307v1

ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 – Telephone
(770) 822-9680 – Facsimile

## <u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that the foregoing SECOND AMENDED

COMPLAINT has been prepared with one of the following font and point

selections approved by the Court in LR 5.1., NDGA.  Specifically, the above-

mentioned pleading was prepared using Century Schoolbook, 13-point font.

Respectfully submitted,

*/s/John E. Floyd*
John E. Floyd
Georgia Bar No. 266413
floyd@bmelaw.com