# EXHIBIT 1

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This Amended and Restated Employment Agreement (the "*Agreement*") is entered into this 14th day of December, 2012 (the "*Amendment and Restatement Date*"), by and between Ascension Insurance, Inc., a Delaware corporation (the "*Employer*") and Todd Bryant ("*Executive*") (each a "*Party,*" and together, the "*Parties*"). This Agreement amends, restates and supersedes the Employment Agreement between the Parties, effective January 1, 2008, as such agreement was previously amended.

WHEREAS, the Employer and Executive originally entered into an Employment Agreement effective January 1, 2008 (the "*Original Agreement*") in connection with Employer's acquisition of substantially all of the assets of Group & Executive Benefits, Inc.;

WHEREAS, effective as of October 15, 2010, the Parties entered into Amendment No. 1 to Employment Agreement (the "*First Amendment*") pursuant to which the Parties amended the Original Agreement on the terms set forth in the First Amendment;

WHEREAS, Executive has requested a guaranty that the Purchased Common Units (as defined in Section 7.17) will have a minimum value upon the closing of a Capital Event (as defined in Section 7.17);

WHEREAS, Employer wishes to accommodate Executive and to assist Executive in achieving a minimum economic benefit in connection with Executive's Purchased Common Units upon the closing of a Capital Event during the Employment Period (as defined in Section 2);

WHEREAS, to memorialize Employer's accommodation of Employee and other matters, the Parties wish to amend and restate the Original Agreement, as amended by the First Amendment, and in connection therewith, to incorporate certain of the provisions of the Original Agreement as amended by the First Amendment into one agreement, all as provided on the terms and conditions set forth herein; and,

WHEREAS, the Employer desires to continue to employ Executive on the terms and conditions set forth herein, and Executive is willing to accept such continued employment on such terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    *Employment and Acceptance.* The Employer shall employ Executive, and Executive shall accept employment, subject to the terms of this Agreement, effective as of January 1, 2008 ("*Employment Effective Date*").

2.    *Term.* Subject to earlier termination pursuant to Section 5 of this Agreement, the employment relationship hereunder shall continue from the Employment Effective Date until the third anniversary of the Employment Effective Date (the "*Initial Employment Period*") and shall extend for successive one (1) year terms thereafter, unless either Party shall have given thirty (30) days written notice to the other prior to the expiration of the Initial Employment Period or extended term, that it does not wish to extend the Employment Period. As used in this Agreement, the "*Employment Period*" shall refer to the period beginning on the Employment Effective Date and ending on the date Executive's employment terminates in accordance with this Section 2 or Section 5.

3.      *Duties and Title.*

3.1      *Title.*  Subject to the power and authority of the Board of Directors of the Employer to designate titles and reporting relationships, Executive shall serve in the full-time capacity of a licensed sales representative/producer of Employer with the title of President of Ascension Benefits & Insurance Solutions of Georgia business unit (formerly known as the Bryant Wharton business unit of Employer) (the "*Business Unit*") and shall report directly to the Chief Executive Officer of the Employer or his or her designee.

3.2      *Duties.*  Executive shall devote his best efforts and his full business time and attention to the business and affairs of the Employer and shall have full power and authority to exercise the duties and responsibilities of a licensed sales representative/producer of Employer as set forth in the policies of Employer, such duties and responsibilities to include, without limitation, assistance in the supervision of Employer's employees who provide support to Executive's Book of Business (as defined herein), as determined by the person to whom Executive directly reports.  In Executive's capacity as a licensed sales representative/producer, Executive shall perform such services and duties in connection with the business, affairs and operations of Employer as may be assigned or delegated to Executive from time to time by Employer. Notwithstanding the foregoing, Executive shall have flexibility in determining his business schedule and the amount of time spent in Employer's office(s) and shall not be required to adhere to a schedule or minimum hours requirement prescribed by Employer so long as Executive is meeting the financial goals for the Business Unit that are mutually agreed upon between Employer and Executive. In addition, Executive shall not be required, at any time under this Agreement, to perform his duties under this agreement at a principal business location more than 10 miles from the present office location of the Business Unit.

4.      *Commission, Bonus and Benefits by the Employer.*  As compensation for services rendered pursuant to this Agreement, the Employer shall provide Executive the following during the Employment Period:

4.1      *Commission.*  Executive shall be eligible for commissions (Existing Book of Business Commissions and New Business Commissions) based upon a percentage of Executive's Book of Business or New Business, as more fully described in *Exhibit A* attached hereto.  For purposes of this Agreement, (a) "*Book of Business*" means the accounts set forth on *Exhibit A* attached hereto and any new accounts hereafter originated or serviced by Executive, (b) "*New Business*" has the meaning set forth on such *Exhibit A*, (c) "*Existing Book of Business Commissions*" are determined as described in *Exhibit A*, and (d) "*New Business Commissions*" are determined as described in *Exhibit A*.

4.2      *Management Bonus.*

(a)      During such portion of the Employment Period that ends on or before December 31, 2010 (the "*Management Bonus Period*"), Executive shall be eligible to receive a quarterly management bonus in the amount of 6.06% of the Adjusted EBITDA (as defined below).  "*Adjusted EBITDA*" shall mean EBITDA as defined in the Asset Purchase Agreement, dated December 21, 2007, by and between Employer, Ascension Insurance Holdings, LLC, a Delaware limited liability company, Group & Executive Benefits, Inc., Executive and Bruce Wharton (the "*Purchase Agreement*") of the Business (as defined in the Purchase Agreement), except that the term "Business" as used in the EBITDA definition in the Purchase Agreement shall also include (i) all additional businesses that are hereafter acquired by Employer as part of, or which otherwise become part of, the Bryant Wharton business unit of the Employer and (ii) businesses (to the extent not otherwise covered above) for which Executive has significant management responsibility. For clarification purposes, Adjusted EBITDA shall:  (1) include the management bonus expense, (2) be calculated on a quarterly basis, (3) reflect the previous 3 months'

Adjusted EBITDA, and (4) be paid within thirty (30) days after each calendar quarter end (that is, each March 31, June 30, September 30 and December 31) during the Management Bonus Period.

(b)     If and when Adjusted EBITDA and the management bonus is calculated as of the end of each fourth quarter (ending December 31) during the Management Bonus Period, it is revealed that the Company has overpaid the Executive's management bonus payments during any of the previous three quarters, the Company shall have the right to deduct any overpayment amount from the management bonus payable for such fourth quarter and, if the overpayment amount is not then satisfied from such deduction, Executive shall remit to Company the amount necessary to remedy the balance of such unsatisfied overpayment amount.     Alternatively, if such calculations reveal that the Company has underpaid Executive management bonus payments during any of the previous three quarters, the Company shall include the amount of such underpayment with the management bonus payable for such fourth quarter.

(c)     After the Management Bonus Period, Executive shall no longer be eligible to receive any management bonus.

4.3     *Participation in Employee Benefit Plans*.  Executive shall be entitled, if and to the extent eligible, to participate in all of the applicable benefit plans of the Employer, which may be available to other executives of the Employer, pursuant to the terms of such plans and on the same terms as other executives of the Employer.     Notwithstanding the foregoing, each year that Executive is employed by Employer, Employer shall provide Executive with additional compensation in the form of a contribution to Executive's 401(k) or other similar benefit plan (or the payment from Employer to Executive of cash in lieu of the foregoing) equal to not less than seven percent (7%) of Executive's wage income as reported by Employer on Executive's Form W-2 for such year.  Such contribution or amounts will not exceed the maximum allowed under the Executive's 401(k) or other similar benefit plan and shall be made or paid to Executive on at least a quarterly basis.

4.4     *Expense Reimbursement; Limitation on Payments for Value-Added Services*.

(a)     Executive shall be entitled to receive reimbursement for all reasonable business expenses incurred by him in connection with his duties under this Agreement in accordance with the policies of the Employer as in effect from time to time; provided, however, that (i) car payments and/or car lease payments will not be reimbursed; (ii) expenses of Value-Added Services (defined below) will not be reimbursed, and (iii) following the Management Bonus Period, (x) for calendar years ending on or before December 31, 2012, no expense reimbursement for any calendar year shall exceed three-fourths of one percent (0.75%) of the value of Executive's Book of Business as of the last day of the immediately preceding calendar year and (y) for calendar years ending after December 31, 2012, no expense reimbursement for any calendar year shall exceed one percent (1.00%) of the value of Executive's Book of Business as of the last day of the immediately preceding calendar year (such .75% and 1.00%, each an "*Expense Cap*").  For purposes of this Section 4.4(a), the value of Executive's Book of Business at a point in time is the then current value of continuing policies or insurance accounts placed by or through Employer and assigned by Employer to one of the accounts of Executive that comprise Executive's Book of Business based upon the annualized agency revenue from any commission, brokerage fee, or any other form of compensation or remuneration attributable to such accounts (less any commissions payable to third-party brokers related to such accounts and less the proportionate value of any accounts shared with any other producer of Employer).

(b)     (i) In connection with providing Insurance Services and Insurance Products to Clients (as such terms are defined in Section 6.1(b)), the Parties agree that Employer or a member of the Ascension Group may pay third parties to provide services to such Clients and that Executive may incur expenses to retain telemarketers for the purpose of generating leads to grow Executive's Book of Business (hereinafter such third party and telemarketer services, collectively the "*Value-Added Services*").  Value-

Added Services include any services provided by a third party for which Employer or another member of the Ascension Group must pay such third party (including, but not limited to, services such as payroll services, data services, video enrollment services, health coaching, etc. that are provided by a third party for which Employer or a member of the Ascension Group must pay such third party).

(ii) To the extent that, as of December 31, 2012 and each December 31st thereafter during the Employment Period (each a "Calendar Year"), the total payments made in such Calendar Year by Executive, Employer or a member of the Ascension Group for Value-Added Services provided to or in connection with accounts that comprise the Book of Business exceeds five percent (5%) of the Value of Executive's Book of Business (as defined in Section 7.17) as of December 31 of such Calendar Year (the "*VAS Cap*"), Employer shall reduce Executive's immediately following compensation payment by the full amount of the excess and, if such compensation payment is insufficient to recover the amount, the following compensation payment(s), as necessary. Executive acknowledges and agrees that if and when the Ascension Resource Group adopts guidelines with respect Value-Added Services, such guidelines will apply to all Ascension Group producers, including Executive.

Employer acknowledges that certain accounts comprising Executive's Book of Business are "50% of" accounts as specifically set forth on Exhibit A. In the event that an account is a "50% of" account as set forth on Exhibit A, for purposes of calculating the excess payments in this Section 4.4(b) (ii), fifty percent (50%) of the payments made by Employer or a member of the Ascension Group for Value-Added Services with respect to a "50% of" account shall be used.

4.5     *Capital Event Incentive Compensation*. Upon the occurrence of a Capital Event (as defined in Section 7.17) during the Employment Period, Executive shall be entitled to receive the following, as applicable:

(a)     Upon the occurrence of a Capital Event, Executive may exercise one, but not both, of the following options:

(i) (A) Executive may require Employer to pay Executive the Capital Event Incentive Amount (as defined in Section 7.17). In such instance, immediately prior to the closing of the Capital Event and within the time frame necessary so the Employer will receive the Capital Event Consideration (as defined in Section 7.17), Executive shall transfer to Employer free and clear of encumbrances of any nature and kind all of Executive's rights, title and interests in and to Executive's Purchased Common Units. As soon as reasonably possible before the closing of the Capital Event, Executive shall notify Employer in writing of Executive's election pursuant to this Section 4.5(a)(i) to receive payment upon transfer of Executive's rights, title and interests in the Purchased Common Units. In the event Executive elects this option, the Parties agree that the amount paid to Executive by Employer pursuant to this Section 4.5(a)(i) shall be recovery of Executive's cost; provided however, neither Party shall have any liability to the other Party for any adverse tax consequences if any applicable taxing authority determines that such amount is not a recovery of cost. In no event, pursuant to this Section 4.5(a)(i) shall Executive be entitled to receive from Employer or any Person (as defined in Section 7.17) an amount in excess of the Capital Event Incentive Amount. In the event Executive elects to transfer Executive's Purchased Common Units to Employer, Employer shall deliver the Capital Event Incentive Amount (less applicable withholdings, if any) to Executive within thirty (30) days following Employer's receipt of certificates evidencing all of Executive's Purchased Common Units. In the event that certificates evidencing Executive's Purchased Common Units are in the possession of Employer or Ascension Insurance Holdings, LLC, Employer shall deliver the Capital Event Incentive Amount (less applicable withholdings, if any) to Executive within thirty (30) days following the closing of the Capital Event. Executive agrees to take such other action as Employer may reasonably require in connection with the transfer of Purchased Common Units to Employer, including without limitation the delivery of customary representations and warranties that the transfer of the Purchased Common Units is made free and clear of encumbrances of any nature and kind. (B) If the transaction described in Section 4.5(a)(i)(A) would cause Employer to experience adverse tax

4

consequences or is otherwise considered to be disadvantageous to Employer based upon the advice of counsel or other professional advisor, at Employer's option, Holdings and Executive shall exchange the Purchased Common Units held by Executive for a number of shares of common stock (the "Subsidiary Shares") of one of Holdings' Subsidiaries (the "Issuing Subsidiary") having a fair value equal to the Purchased Common Units.  Immediately following the closing of the exchange of such Purchased Common Units, but prior to the Capital Event, the Issuing Subsidiary shall redeem (and Holdings shall cause such Issuing Subsidiary to redeem), and Executive shall sell to the Issuing Subsidiary, all of the Subsidiary Shares for an amount equal to the Capital Event Incentive Amount.  (C) If the transactions described in Section 4.5(a)(i)(A) and (B) are not permitted under Holdings or its Subsidiaries' credit agreement(s) or note purchase agreement(s), the transactions described in Section 4.5(a)(i)(A) or (B) shall not be effected.  Instead, Executive shall participate in the Capital Event and receive Capital Event Consideration and Employer's sole obligations shall be to pay Executive the amount, if any, by which the Capital Event Incentive Amount exceeds the Capital Event Consideration.  The Parties agree that amounts paid by Employer pursuant to this Section 4.5(a)(i)(C) shall be:  paid by Employer to Executive within thirty (30) days following the closing of the Capital Event; incentive compensation paid by Employer to Executive; taxable as incentive compensation; and, subject to tax withholdings pursuant to Section 7.12 of this Agreement; or,

(ii)     Executive may retain and not surrender to Employer Executive's Purchased Common Units, in which case Executive shall not be entitled to receive any amount pursuant to this Section 4.5 from Employer or any Person affiliated with Employer in connection with the Executive's Purchased Common Units, and the Employer shall have no obligation to Executive under this Section 4.5 under any circumstances before or after the closing of the Capital Event (including without limitation, no obligation in the event of a subsequent Capital Event).   If Executive does not notify Employer in writing of its election and take the necessary actions described in Section 4.5(a) before the closing of a Capital Event, Executive shall be deemed to have elected to retain Executive's Purchased Common Units pursuant to this Section 4.5(a)(ii) and shall be deemed to have irrevocably waived rights to receive any amounts pursuant to this Section 4.5 from Employer or any Person affiliated with Employer.

(b)     Notwithstanding any other provision of this Agreement other than the second sentence of this Section 4.5(b), if prior to a Capital Event Executive's employment is terminated for any reason whatever, including termination by Employer without Cause (as defined in Section 5.6) or termination due to Executive's death or disability, effective on Executive's termination, the provisions of this Section 4.5 shall automatically and without further action terminate and be of no force and effect with no duties or obligations owed by either Party to the other pursuant to this Section 4.5.  Provided however, if within six (6) months immediately prior to the closing of the Capital Event, Employer terminates Executive's employment without Cause, the rights, benefits, duties and obligations of each Party pursuant to this Section 4.5 shall continue to be in force and effect with respect to such Capital Event.  Notwithstanding any other provision of the Agreement, amounts, if any, paid by Employer to Executive pursuant to Section 4.5 shall be offset by any amounts owed by Executive to Employer.

(c)     For the avoidance of doubt, nothing set forth in this Section 4.5 shall be construed or interpreted to amend any provision of the Executive Purchase and Exchange Agreement, the Registration Agreement, the Unitholders Agreement, or the Operating Agreement (as Registration Agreement, Unitholders Agreement and Operating Agreement are defined in the Executive Purchase and Exchange Agreement).

4.6     *Modifications by Employer.*  After the Amendment and Restatement Date and prior to the earlier of the closing of a Capital Event or the second anniversary of the Amendment and Restatement Date, without Executive's prior written consent, Employer shall not reduce: the Executive's Existing Book of Business Commissions below 38% (below 35% until December 31, 2012), the Executive's New Business Commissions below 40%, the Expense Cap, or the VAS Cap.  After a Capital Event or the second anniversary of the Amendment and Restatement Date, prior to any reduction in Executive's Existing

Book of Business Commissions below 38%, Executive's New Business Commissions below 40%, the Expense Cap, or the VAS Cap, Employer agrees to have one or more discussions with Executive regarding the contemplated reduction(s) and any Capital Event planning, business unit compensation restructuring, lender or investor demands, profitability improvement strategies, changes in market conditions, implementation of strategic plans, or other reason(s) for the contemplated reduction(s). Employer further agrees to provide Executive an opportunity, reasonable under the circumstances, to provide input to Employer with respect to such reduction(s) and the reason(s) therefor before any reduction is implemented.

5.     *Termination of Employment*.

5.1     *Voluntary Termination By Executive*.   Executive may voluntarily terminate the Employment Period by providing prior written notice to Employer, such termination to be effective as of the date set forth in such notice.  If Executive voluntarily terminates employment for any reason, Executive shall be entitled to receive the following:  (a) Executive's accrued but unpaid base salary to the date of termination; (b) benefits set forth in Section 4.3, if any, to the date of termination; (c) Executive's accrued but unpaid vacation, if any, to the date of termination; (d) expenses reimbursable under Section 4.4 incurred but not yet reimbursed to Executive to the date of termination; and (e) any accrued but unpaid management bonus under Section 4.2 earned during the Management Bonus Period.

5.2     *Involuntary Termination by the Employer Without Cause*.  The Employment Period may be terminated by Employer without cause upon prior written notice to Executive, such termination to be effective as of the date set forth in such notice. If Executive's employment is terminated by the Employer without Cause (as defined under Section 5.6), Executive shall be entitled to receive the following:  (a) Executive's accrued but unpaid base salary to the date of termination; (b) benefits set forth in Section 4.3, if any, to the date of termination; (c) Executive's accrued but unpaid vacation, if any, to the date of termination; (d) expenses reimbursable under Section 4.4 incurred but not yet reimbursed to Executive to the date of termination; (e) a severance amount, payable in installments in accordance with the customary payroll practices of the Employer, equal to the projected amount of commissions that Executive would have received over the subsequent six (6) months (or twelve (12) months if Executive's employment is terminated without Cause on or after January 1, 2013); and (f) any accrued but unpaid management bonus under Section 4.2 earned during the Management Bonus Period.  In the event that Executive terminates his employment due to Employer's failure to make timely payment of an Earn-Out Payment under the terms of the Purchase Agreement, such termination shall be deemed to be an involuntary termination by Employer without Cause under this Section 5.2, except that any such termination shall not result in any severance payment amount under clause (e) above. Notwithstanding any other provision of this Agreement, it is agreed and understood that Executive shall be entitled to receive the amounts set forth in clause (e) of this Section 5.2 if and only if Executive is in full compliance with the provisions of Section 6 of this Agreement that survive its termination.

5.3     *Involuntary Termination by the Employer For Cause*.  The Employment Period may be terminated by Employer for Cause at any time upon delivery to Executive of written notice, such termination to be effective on the date such notice is given, unless another date is specified in such notice. If Executive's employment is terminated by the Employer for Cause, Executive shall be entitled to receive the same payments and benefits set forth in Section 5.1.

5.4     *Termination Due To Death or Disability*.  The Employment Period shall terminate automatically upon Executive's death and may be terminated at any time upon delivery to Executive of written notice in the event of Executive's permanent and total disability (such termination to be effective as of the date specified in such notice).  If Executive's employment is terminated due to death or permanent and total disability, Executive or his heirs shall be entitled to receive the same payments and benefits set forth in Section 5.1.

5.5     *Termination Pursuant to Section 2 Notice*.  In the event Executive's employment is terminated due to the delivery by Executive or Employer to the other Party of a notice described in Section 2, Executive shall be entitled to receive the same payments and benefits set forth in Section 5.1.

5.6     *Definition of Cause*.  For purposes of this Agreement, the term "*Cause*" means (i) the commission of a felony or a crime involving moral turpitude or the commission of any other act or omission involving dishonesty or fraud with respect to the Employer or its parent, subsidiaries or affiliates or any of their referral sources; (ii) gross negligence, willful misconduct with respect to the Employer or its parent, subsidiaries or affiliates; (iii) conduct tending to bring the Employer or its parent, subsidiaries or affiliates into substantial public disgrace or disrespect; or (iv) any breach of this Agreement, material or otherwise, which breach is not cured within 30 days after written notice thereof by Employer to Executive.

6.      *Protection of Trade Secrets and Other Confidential Information; Restrictive Covenants; Cooperation*.  Executive acknowledges that, in the course of Executive's employment with Employer, Executive will become familiar with Trade Secrets and other Confidential Information of the Employer and other members of the Ascension Group.     For the purposes of this Agreement, "*Ascension Group*" means Employer and any other Person directly or indirectly controlling, controlled by or under common control with Employer.  Executive further acknowledges that Executive's services will be of special, unique and extraordinary value to the Employer and the Ascension Group.  Therefore, Executive and the Employer agree as follows:

6.1     *Definitions*.  For purposes of this Section 6, the following terms shall have the meaning set forth below:

(a)     "*Business*" means the business of the members of the Ascension Group while this Agreement is in effect, including, without limitation, the business relating to the selling of insurance in the United States and elsewhere and engaging in the business of placing directly or through other insurance agencies a full array of commercial insurance products and related services, including but not limited to, commercial property and casualty insurance, workers' compensation, crop insurance, personal lines and wholesale life insurance, student medical and accident health insurance, health, accident and athletic insurance plans, employee benefits (including, without limitation, life, health, disability and ancillary coverages, and related services, including, without limitation, benefit planning and administration, manager and employee communications and enrollment) market analysis, third party administration of insurance claims, administration of a program for ambulance claims, and administration of a medical and dental provider network for self-insured health insurance programs.

(b)     "*Client*" means any group, company or Person to or for whom or which: (i) the Employer or any other member of the Ascension Group has actually sold, provided or placed any insurance products, including, but not limited to, insurance policies, bonds, employee benefit plans, or other insuring agreements or programs ("*Insurance Products*"); or (ii) the Employer or any member of the Ascension Group is rendering any services, including, but not limited to, claims management, claims administration, enrollment services, premium payment consolidation, program administration, loss prevention, or other consulting services ("*Insurance Services*"); provided that in the case of either clauses (i) or (ii) above, such Insurance Products are still then in effect with (or Insurance Services are still then being provided to) such group, company or Person, or an ongoing business relationship then exists with the Employer or any other member of the Ascension Group.  "*Client*" shall also mean any group, company or Person from whom or which the Employer or any other member of the Ascension Group has received referrals of Business, other Clients, or Prospective Clients.

(c)     "*Confidential Information*" means all Trade Secrets and other information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential" or "proprietary"), in any form or medium, relating to the business of the Employer and the Ascension Group,

disclosed to Executive or of which Executive became aware as a consequence of the Executive's relationship with Employer, including results from business, historical or projected financial results, budgets, financial forecasts, staffing plans, strategies, know-how, inventions, sales products, services, research or development, Corporate Opportunities, acquisitions, acquisition opportunities, acquisitions under consideration, acquisition targets, divestitures, divestiture opportunities, divestitures under consideration, risk management practices, or Trade Secrets of the Employer or of any other member of the Ascension Group. Confidential Information includes, but is not limited to, (i) the Employer's programs, analyses, sales and marketing strategies, marketing and promotional plans and practices, pricing, rate structures, profit margins, health care plans or programs designed for Clients, Prospective Clients or patients, health, accident or athletic insurance plans or programs for students, participants in athletic or recreational activities, Clients, and patients, (ii) Clients and Prospective Clients, including, without limitation, Client and Prospective Client lists, the following information regarding Clients and Prospective Clients: identifying information, Salesforce.com data, risk characteristics and requirements, identity and preferences of key personnel, loss and claims histories, financial data and performance, payroll, employee information, student or athlete information, end-user information relating to Insurance Products or Insurance Services, policy and contract renewal and expiration dates and data, policy terms, conditions and rates, underwriting data, and specialized needs, and the confidential information of Clients and Prospective Clients, (iii) information about, contractual arrangements with, and personnel files of employees of the Employer or any other member of the Ascension Group, former employees of the Employer and any other member of the Ascension Group, prospective employees of the Employer or any other member of the Ascension Group, or independent contractors, suppliers, or distributors of the Employer or any other member of the Ascension Group, or other third parties with whom the Employer or any member of the Ascension Group has or had contractual relationships, and (iv) any other information developed or used by the Employer or the Ascension Group that is not known generally to the public and that gives the Employer or any member of the Ascension Group an advantage in the marketplace, as well as all notes memoranda, compilations reports and other documents prepared by Executive or other employees of Employer or any member of the Ascension Group containing any such information.

(d) "*Corporate Opportunities*" means all bona-fide business, commercial and investment opportunities or offers presented to Executive or to which Executive becomes aware which relate to the Business or any other business of any of the members of the Ascension Group at any time during the Employment Period.

(e) "*Material Contact*" means the contact between Executive and each Client or Prospective Client: (i) with whom or which the Executive dealt on behalf of the Employer; (ii) whose dealings with the Employer were coordinated or supervised by the Executive; (iii) about whom Executive obtained confidential information in the ordinary course of business as a result of such Executive's association with the Employer; or (iv) who receives products or services authorized by the Employer, the sale or provision of which results or resulted in compensation, commissions, or earnings for the Executive within two years prior to the date of Executive's termination.

(f) "*Prospective Client*" means any group, company or Person to whom or which the Employer or any other member of the Ascension Group has made material efforts toward providing any Insurance Products or Insurance Services offered by the Employer or another member of the Ascension Group, without regard to whether a binding agreement has been entered into with such group, company or Person. "*Material efforts*" include, but are not limited to, the issuance of a firm price quote, marketing presentations, or drafting and negotiation of any contractual agreement, where such efforts create a reasonable possibility of the Employer or another member of the Ascension Group doing business with such group, company or Person.

(g) "*Trade Secrets*" means information, without regard to form, including, but not limited to, technical or nontechnical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, or lists of actual or potential Clients,

Prospective Clients, customers or suppliers, which is not commonly known by or available to the public and which information derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6.2     *Confidential Information.*   Executive agrees that Executive shall not (other than as required by Executive's job duties with the Employer) reveal to anyone any Confidential Information, and Executive further agrees that Executive will not use in any way any Confidential Information of the Employer or of any other member of the Ascension Group, other than in connection with Executive's work for the Employer.   The obligations of confidentiality and restrictions on use set forth in the immediately preceding sentence shall remain in effect for the duration of Executive's employment with the Employer and for a period of twenty-four (24)  months thereafter, provided that, as to any item of Confidential Information that continues to be a Trade Secret under applicable law, such obligations of confidentiality and restrictions on use shall remain in effect as to such item for the maximum time allowed by applicable law.  Executive agrees to deliver to the Employer at the termination of Executive's employment, or at any other time the Employer may request, all Confidential Information (including all copies thereof and any electronic versions of such materials) that Executive may then possess or have under Executive's control (including all such Confidential Information in electronic form).

6.3     *Ownership of Property.*   Executive acknowledges that all inventions, innovations, improvements, developments, methods, processes, programs, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any Confidential Information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) that relate to the Ascension Group's actual or anticipated business (as to which significant use of corporate resources has occurred), research and development, or then existing products or services and that are conceived, developed, contributed to, made, or reduced to practice by Executive (either solely or jointly with others) while employed by the Employer (including any of the foregoing that constitutes any proprietary information or records) ("*Work Product*") belong to the Employer and Executive hereby assigns, and agrees to assign, all of the above Work Product to the Employer. Any copyrightable work prepared in whole or in part by Executive in the course of Executive's work for any member of the Ascension Group shall be deemed a "work made for hire," under the copyright laws, and Employer shall own all rights therein.   To the extent that any such copyrightable work is not a "work made for hire," Executive hereby assigns and agrees to assign to the Employer all right, title, and interest, including without limitation, copyright in and to such copyrightable work. Executive shall promptly disclose such Work Product and copyrightable work to the Employer and perform all actions reasonably requested by the Employer (whether during or after the Employment Period) to establish and confirm the Employer's ownership (including, without limitation, assignments, consents, powers of attorney, and other instruments).

6.4     *Third Party Information.*   Executive understands that the Employer or other members of the Ascension Group will receive from third parties confidential or proprietary information ("*Third Party Information*") that may be subject to a duty on the part of Employer or another member of the Ascension Group to maintain the confidentiality of such information and to use it only for certain limited purposes. Without in any way limiting the provisions of Section 6.2 above, Executive will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than personnel of the Employer who need to know such information in connection with their work for the Employer) or use, except in connection with Executive's work for the Employer, Third Party Information unless expressly authorized by the Employer in writing or unless and to the extent, in each case with the prior written consent of such third party, the Third Party Information (a) becomes generally known to and available for use by the public other than as a result of Executive's acts or omissions to act, (b) was known to Executive prior to Executive's employment with Employer, or (c) is required to be disclosed pursuant to any applicable law or court order. The obligations of confidentiality and restrictions on use set forth in the

immediately preceding sentence shall remain in effect for the duration of Executive's employment with the Employer and for a period of twenty-four (24) months thereafter, provided that, as to any item of Third Party Information that continues to be a Trade Secret under applicable law, such obligations of confidentiality and restrictions on use shall remain in effect as to such item for the maximum time allowed by applicable law.

6.5     *Use of Information of Prior Employers*.  During the Employment Period, Executive will not improperly use or disclose any confidential information or trade secrets, if any, of any former employers or any other Person to whom Executive has an obligation of confidentiality, and will not bring onto the premises of the Employer any unpublished documents or any property belonging to any former employer or any other Person to whom Executive has an obligation of confidentiality unless consented to in writing by the former employer or Person. Executive will use in the performance of Executive's duties only information that (a) is generally known and used by Persons with training and experience comparable to that of Executive and that is (i) common knowledge in the industry or (ii) is otherwise legally in the public domain, (b) is otherwise provided or developed by the Employer, or (c) in the case of materials, property or information belonging to any former employer or other Person to whom Executive has an obligation of confidentiality, is approved for such use in writing by such former employer or Person.

6.6     *Noncompetition and Nonsolicitation*.    Executive has and will, on behalf of the Employer or another member of the Ascension Group, in the course of Executive's employment: (a) customarily and regularly solicit, assist in, or supervise the solicitation of Clients or Prospective Clients; (b) customarily and regularly engage, or assist or supervise other employees in engaging in making sales, obtaining orders or contracts for products or services, and placing insurance products or services for Clients or Prospective Clients; (c) communicate frequently and receive Confidential Information from Clients and Prospective Clients; (d) develop and maintain (and assist other employees in developing and maintaining) customer relationships with Clients; (e) serve as a liaison between the Employer and Clients, (f) provide customer service and support to Clients, or assist or supervise other employees in providing service and support to Clients, and (g) perform such duties and services as a key employee or professional. Notwithstanding any provision of any agreement between the Parties, as an inducement to the Employer to enter into this Agreement, and as additional consideration for employment by the Employer under this Agreement and the various benefits and payments provided in conjunction therewith – and in consideration of: (i) the Employer's provision to Executive of Trade Secrets and other Confidential Information; (ii) the substantial relationships that Executive has and will form with specific Clients or Prospective Clients; (iii) Client and Prospective Client good will; and (iv) the extraordinary or specialized training which has been and/or will be provided to Executive – for a period of twenty-four months after the termination of Executive's employment with the Employer for any reason (the "*Restriction Period*"), Executive will not:

(A)     (i) in the Territory engage, either directly or indirectly, as a principal or for Executive's own account or solely or jointly with others, or as a stockholder (or owner of other ownership interests) in any Person, in any business that Competes with the Business Unit (as defined in Section 3.1) or other operations of the Employer or the Ascension Group. For purposes of this Section 6.6(A), the term "*Territory*," shall mean the 100-mile radius from 5825 Medlock Bridge Parkway, Johns Creek, Georgia, and the term "*Competes with*" means conducts, sells, authorizes, offers or provides activities, products or services of the type conducted, sold, authorized, offered, or provided by Employer or any other member of the Ascension Group within twenty-four (24) months prior to termination of Executive's employment with Employer. (ii) Notwithstanding the provisions of Section 6.6(A)(i), Executive shall not be precluded from (x) being a stockholder in a mutual fund or a diversified investment company, (y) being a passive owner of not more than 2% in the aggregate of the outstanding stock of any class of a corporation, any securities of which are publicly traded, or (z) being an owner of not more than two-thirds in the aggregate of the outstanding equity or ownership interest of BWT Risk Advisors, LLC ("BWT") and participating in the business of BWT so long as such involvement with BWT shall be limited to the

10

following activities: customary service on the board of BWT; serving as an officer of BWT; participation in BWT's business decisions customarily reserved to equity holders; involvement in the hiring, engagement and/or termination of employees and independent contractors of BWT; reviewing financial statements of BWT; participating in BWT decisions related to significant expenditures; discussing the business activities of BWT; receiving distributions or dividends from BWT; acting as a lessor or landlord to BWT; and, receiving commissions for the referral of business to BWT prior to the Amendment and Restatement Date, which referrals were not in violation of any agreement between the Parties at the time of such referral.

(B)     either directly or indirectly by assisting others, solicit or attempt to solicit any business from any Clients and Prospective Clients with whom Executive had Material Contact for the purpose of providing Insurance Products or Insurance Services that are competitive with or are the same, similar to, or of the type conducted, authorized, offered, or provided by Employer or any member of the Ascension Group within two (2) years prior to the termination of Executive's employment;

(C)     either directly or indirectly by assisting others, induce Clients or induce Prospective Clients with whom Executive had Material Contact to terminate, cancel, not renew or not place business with the Employer or any other member of the Ascension Group;

(D)     perform or supervise the performance of Insurance Services of the type sold or provided by the Employer or any member of the Ascension Group within two (2) years prior to the termination of Executive's employment on behalf of any Clients or on behalf of Prospective Clients with whom Executive had Material Contact;

(E)     either on Executive's own account or on behalf of any person, organization or entity, recruit or solicit for employment, attempt to recruit or solicit for employment, or induce or endeavor to cause to leave employment of the Employer or of any other member of the Ascension Group any employee of the Employer or of any other member of the Ascension Group (y) with whom Executive came into contact during Executive's last twelve (12) months of employment with the Employer, or about whom Executive obtained Confidential Information during Executive's employment with the Employer, and (z) who is known by Executive at the time of such recruitment, solicitation, inducement, endeavor or attempt to then be employed by the Employer or any other member of the Ascension Group; or

(F)     directly or indirectly acquire or attempt to acquire an interest in any business relating to the business of the Employer or any other member of the Ascension Group, and with which Employer (or with which any other member of the Ascension Group) has entertained discussions or has requested and received information relating to the acquisition of such business by the Employer (or by any other member of the Ascension Group) in the 2-year period immediately preceding Executive's termination of employment.

The foregoing covenants shall also apply during the Employment Period, except with respect to activities of Executive performed on behalf of, and for the benefit of, the Employer or any other member of the Ascension Group. As such covenants apply to the Employment Period, the Employment Period shall be substituted for any time period specified in the covenant.

6.7     *Non-Disparagement*. Executive agrees that, during the Employment Period and for a reasonable period of time thereafter (not to be shorter than the Restriction Period), Executive shall not disparage or encourage others to disparage Employer or any other member of the Ascension Group or any of their respective past and present employees, officers, directors, members, managers, investors, products or services. For purposes of this Agreement, the term "*disparage*" includes, without limitation, comments or statements to the press, to Ascension Group employees or to any individual or entity with whom a member of the Ascension Group has or is actively pursuing a business relationship (including,

without limitation, any actual or potential vendor, supplier, customer or distributor) that would adversely affect in any manner: (a) the conduct of any business of a member of the Ascension Group (including, without limitation, any business plans or prospects) or (b) the business reputation of any member of the Ascension Group.

6.8     *Cooperation*.  Upon the receipt of reasonable notice from the Employer (including notice on behalf of the Employer by its outside counsel), Executive agrees that, while employed by the Employer, and, subject to Executive's other business commitments, for a reasonable period to time thereafter (not to be shorter than the Restriction Period), Executive will respond and provide information with regard to matters in which Executive has knowledge as a result of Executive's employment with the Employer and will provide reasonable assistance to the Employer, any other member of the Ascension Group, and their respective representatives in defense of any claims that may be made against the Employer, and will assist the Employer in the prosecution of any claims that may be made by Employer or by any other member of the Ascension Group, to the extent that such claims may relate to the Employment Period.  Executive agrees to promptly inform the Employer if Executive becomes aware of any lawsuits involving such claims that may be filed or threatened against the Employer or any other member of the Ascension Group.  Executive also agrees to promptly inform the Employer (to the extent Executive is legally permitted to do so) if Executive is asked to assist in any investigation of the Employer or any other member of the Ascension Group (or their respective actions), regardless of whether a lawsuit or other proceeding has then been filed against the Employer or such other member of the Ascension Group with respect to such investigation, and shall not do so unless legally required. If Executive is required to provide any services pursuant to this Section 6.8 following the Employment Period, upon presentation of appropriate documentation, the Employer shall reimburse Executive for reasonable out-of-pocket expenses incurred in connection with the performance of such services.

6.9     *Corporate Opportunities*. During the Employment Period, Executive shall submit to Employer all Corporate Opportunities. Unless approved by the Employer in writing and in advance, Executive shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Executive's own behalf or on behalf of any Person that is not a member of the Ascension Group.

6.10     *Revisions and Severability*.  In the event that any of the foregoing covenants in this Section 6, or any portion thereof, shall be held to be unenforceable, invalid or against public policy for any reason, (a) the Parties hereto agree that the maximum duration, scope or geographical area enforceable, valid and consistent with public policy shall be substituted for the stated period, scope or area and that revisions to the restrictions contained herein to cover such maximum duration, scope or geographical area are to be made to the extent permitted by law, and (b) the remainder of the Agreement, and those portions thereof which are not held to be unenforceable, invalid or against public policy or which are so revised, shall continue to be valid and enforceable as though the portions held to be unenforceable, invalid or against public policy were not a part hereof.  In the event the Restriction Period applicable to any subsection of this Section 6 is deemed to exceed the maximum period of time which a court of competent jurisdiction would deem enforceable, the time for the purpose of such subsection of this Section 6 shall be deemed to be the maximum time period which such court of competent jurisdiction would deem valid or enforceable. The provisions of Section 6 are intended to provide the maximum protection afforded to the Employer under Georgia's Restrictive Covenants Act and O.C.G.A. 13-8-50, et seq., as the same may be amended, supplemented or superseded.

6.11     *Remedies*. Executive acknowledges and agrees that the covenants set forth in this Section 6 of this Agreement are reasonable and necessary for the protection of the Employer's business interests, that irreparable injury will result to the Employer if Executive breaches them, and that in the event of Executive's actual or threatened breach of such provisions, the Employer will have no adequate remedy at law. Executive thus agrees that in the event of any actual or threatened breach of Section 6 of this Agreement, the Employer shall be entitled to immediate injunctive and other equitable relief, without the necessity of posting of bond or other security, in order to enforce, or prevent any violations of, the

provisions thereof. Nothing contained herein shall be construed as prohibiting the Employer from pursuing any other remedies available to it for breach or threatened breach, including, without limitation, the recovery of damages.

6.12 *Additional Acknowledgments.* Executive acknowledges that the provisions of Section 6 are in consideration of good and valuable consideration as set forth in this Agreement. In addition, Executive agrees and acknowledges that the restrictions contained in Section 6 do not preclude Executive from earning a livelihood, nor do they unreasonably impose limitations on Executive's ability to earn a living. Executive agrees and acknowledges that the potential harm to the Employer of the non-enforcement of Section 6 outweighs any potential harm to Executive of its enforcement by injunction or otherwise. Executive acknowledges that the Employer has and will have extensive goodwill in the Territory and that the goodwill extends through each geographic area within the Territory. Executive further acknowledges that Executive has carefully read this Agreement and has given careful consideration to the restraints imposed upon Executive by this Agreement, and is in full accord as to their necessity for the reasonable and proper protection of Confidential Information of the Employer now existing or to be developed in the future.

7. *Other Provisions.*

7.1 *Notices.* Any notice or other communication required or which may be given hereunder shall be in writing and shall be delivered personally, sent by facsimile transmission or sent by certified, registered or express mail, postage prepaid or overnight mail and shall be deemed given when so delivered personally or sent by facsimile transmission or, if mailed, four (4) days after the date of mailing or one (1) day after overnight mail, as follows:

If to the Employer, to:

> Ascension Insurance, Inc.
> 1277 Treat Blvd.
> Suite 650
> Walnut Creek, California 94596
> Attn: Chief Executive Officer

> Ascension Insurance, Inc.
> 2345 Grand Boulevard, Suite 610
> Kansas City, Missouri 64108
> Attn: General Counsel

If to Executive, to Executive's home address reflected in the Employer's records.

7.2 *Entire Agreement.* This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, written or oral, with respect thereto, including but not limited to, the Original Agreement, as amended by the First Amendment.

7.3 *Representations and Warranties by Executive.* Executive represents and warrants that he is not a party to or subject to any restrictive covenants, legal restrictions or other agreements in favor of any entity or person which would in any way preclude, inhibit, impair or limit Executive's ability to perform his obligations under this Agreement, including, but not limited to, non-competition agreements, non-solicitation agreements or confidentiality agreements.

7.4 *Waiver and Amendments.* This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the Parties or, in the case of a waiver, by the Party waiving compliance. No delay

on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

7.5 *Governing Law.* This Agreement shall be governed and construed in accordance with the laws of the State of Georgia applicable to agreements made and/or to be performed entirely within that State, without regard to conflicts of laws principles.

7.6 *Assignment.* This Agreement and all of Executive's rights and duties hereunder, shall not be assignable or delegable by Executive. Any purported assignment or delegation by Executive in violation of the foregoing shall be null and void *ab initio* and of no force and effect. This Agreement may be assigned by the Employer to a person or entity which is an affiliate or a successor in interest to substantially all of the business operations of the Employer. Upon such assignment, the rights and obligations of the Employer hereunder shall become the rights and obligations of such affiliate or successor person or entity.

7.7 *Successors; Binding Agreement.* This Agreement shall inure to the benefit of and be binding upon personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

7.8 *Counterparts.* This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. The counterparts of this Agreement may be executed and delivered by facsimile or other electronic signature by any Party to any other Party and the receiving Party may rely on the receipt of such document so executed and delivered by facsimile or other electronic means as if the original had been received.

7.9 *Headings.* The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of terms contained herein.

7.10 *Severability.* If any term, provision, covenant or restriction of this Agreement, or any part thereof, is held by a court of competent jurisdiction of any foreign, federal, state, county or local government or any other governmental, regulatory or administrative agency or authority to be invalid, void, unenforceable or against public policy for any reason, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected or impaired or invalidated. Executive acknowledges and agrees that the restrictive covenants contained in Section 6 or elsewhere are a condition of this Agreement and are reasonable and valid in temporal scope and in all other respects and are subject to the provisions of Section 6.10.

7.11 *Judicial Modification.* If any court or other tribunal determines that any of the covenants in this Agreement, or any part of any of them, is invalid or unenforceable, the remainder of such covenants and parts thereof shall not thereby be affected and shall be given full effect, without regard to the invalid portion. If any court or other tribunal determines that any of such covenants, or any part thereof, is invalid or unenforceable because of the geographic or temporal scope of such provision, such court or other tribunal shall reduce such scope to the minimum extent necessary to make such covenants valid and enforceable. Executive acknowledges and agrees that the restrictive covenants contained in Section 6 are a condition of this Agreement and are reasonable and valid in temporal scope and in all other respects and are subject to the provisions of Section 6.10.

7.12 *Tax Withholding.* The Employer is authorized to withhold from any payment or benefit provided hereunder, the amount of withholding taxes due any federal, state or local authority in respect of such benefit or payment and to take such other action as may be necessary in the opinion of the Employer to satisfy all obligations for the payment of such withholding taxes. In the event the Employer does not

14

make such deductions or withholdings, Executive shall indemnify the Employer for any amounts paid with respect to any such taxes, together with any interest, penalties and related expenses thereto.

7.13     *Arbitration.*   Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by binding arbitration, the hearing to be held in the Atlanta, Georgia area in accordance with the Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association then in effect.  The panel of arbitrators for selection shall be drawn from the Atlanta Metropolitan Area.  The costs of the arbitration shall be borne by the Employer except for a filing fee of $150 for Executive.  Discovery shall be limited to one set of written discovery, exchange of documents, and two depositions unless otherwise ordered by the Arbitrator for good cause. Prior to initiating a demand for arbitration, the parties shall mediate the dispute by selecting a mediator from the American Arbitration Association panel of mediators in the Atlanta Metropolitan Area.

7.14     *Insurance.*  The Employer, at its discretion, may apply for and procure in its own name and for its own benefit life and/or disability insurance on Executive in any amount or amounts considered available.  Executive agrees to cooperate in any medical or other examination, supply any information, and to execute and deliver any applications or other instruments in writing as may be reasonably necessary to obtain and constitute such insurance.  Executive hereby represents that he has no reason to believe that his or her life is not insurable at rates now prevailing for healthy men or women of his or her age.

7.15     *Remedies.*  Each of the Parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.  The Parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court or other tribunal (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement. Executive acknowledges and agrees that the restrictive covenants contained in Section 6 are a condition of this Agreement and are subject to the provisions of Section 6.11.

7.16     *Section 409A Compliance.* The intent of the Parties is that payments and benefits under this Agreement comply with Internal Revenue Code Section 409A and the regulations and guidance promulgated thereunder (collectively "*Code Section 409A*") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith.  In no event whatsoever shall Employer be liable for any additional tax, interest or penalty that may be imposed on Executive by Code Section 409A or damages for failing to comply with Code Section 409A.

7.17     *Definitions.*  For the purposes of this Agreement, the following terms shall have the meanings set forth below:

"*Capital Event*" means (a) any sale, transfer or issuance or series of sales, transfers and/or issuances of any Equity Interests by any holders thereof or Parent itself which results in any Person or group of Persons (as the term "group" is defined in the Securities Exchange Act), other than PCap and its respective affiliates, possessing the voting power (pursuant to applicable law, contract or otherwise) to elect a majority of the members of the Board of Managers of Parent at the time of such sale, transfer or issuance or series of sales, transfers and/or issuances, or (b) any sale or transfer of all or substantially all of the assets of Parent and its subsidiaries on a consolidated basis in any transaction or series of transactions (in either case, whether by merger, consolidation, sale or transfer of Equity Interests, sale or transfer of Employer's consolidated assets or otherwise).

"*Capital Event Consideration*" means the dollar value of the consideration (cash or securities into which Executive's Purchased Common Units are exchanged) received by Executive for Executive's Purchased Common Units upon the occurrence of a Capital Event.

"*Capital Event Incentive Amount*" shall mean the following, as applicable:

$916,000 if the Value of Executive's Book of Business as of the closing of a Capital Event is 90% or more of the Value of Executive's Book of Business as of the Amendment and Restatement Date;

$732,800 if the Value of Executive's Book of Business as of the closing of a Capital Event is 80% to 89.99% of the Value of Executive's Book of Business as of the Amendment and Restatement Date;

$549,600 if the Value of Executive's Book of Business as of the closing of a Capital Event is 70% to 79.99% of the Value of Executive's Book of Business as of the Amendment and Restatement Date;

$250,000 if the Value of Executive's Book of Business as of the closing of a Capital Event is less than 70% of the Value of Executive's Book of Business as of the Amendment and Restatement Date.

In no event shall the Capital Event Incentive Amount exceed $916,000.

"*Equity Interest*" means Units of Parent (as such Units are defined in the Parent's Third Amended and Restated Limited Liability Agreement, as the same may be amended and/or restated from time to time), securities convertible into or exchangeable for Units of Parent, and options, warrants or other rights to acquire Units of Parent.

"*Executive Purchase and Exchange Agreement*" means the Executive Purchase and Exchange Agreement by and among Employer, Ascension Insurance Holdings, LLC and Executive dated January 4, 2008.

"*House Accounts*" are accounts insuring risks of or providing benefits for any member of the Ascension Group, including without limitation the "Ascension Corporate – TBBW" account and the "Ascension Ins. – TBBW" account listed on Annex I to Exhibit A.

"*Parent*" means Ascension Insurance Holdings, LLC, a Delaware limited liability company.

"*PCap*" means, collectively, Parthenon Investors III, L.P., a Delaware limited partnership, PCAP Associates, a Delaware limited partnership, J&R Founders' Fund II, L.P., a Delaware limited partnership and Parthenon Capital Partners Fund, LP, a Delaware limited partnership.

"*Person*" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, investment fund, any other business entity, and a governmental entity or any department, agency or political subdivision thereof.

"*Purchased Common Units*" has the meaning set forth in Section 2 of the Executive Purchase and Exchange Agreement.

"*Unit Cost*" means $916,000, Executive's cost to acquire the Purchased Common Units.

"*Value of Executive's Book of Business*" means, at any point in time, the then current value of the continuing Insurance Products or Insurance Services (as defined in Section 6.1(b)) placed by or through

Employer and assigned by Employer to one of the accounts of Executive that comprise Executive's Book of Business based upon the trailing twelve months agency revenue received from the Book of Business, less any commissions or other compensation payable to third-party brokers related to the Book of Business and less the proportionate value of any accounts shared with any other producer of Employer. Provided however, for the purposes of this definition, the "Book of Business" shall exclude any and all House Accounts.

*[Remainder of this page intentionally left blank; Signature page to follow]*

**\*\* THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION\*\***

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound hereby, have executed this Agreement as of the above written date.

ASCENSION INSURANCE, INC.

By:_____
Name:    Joe Tatum
Title:    Chief Executive Officer

EXECUTIVE

_____
Todd Bryant

Agreed to solely with respect to
Section 4.5(a)(i)(B) of this Agreement:

ASCENSION INSURANCE HOLDINGS, LLC

By:      _____
Name:   _____
Title:    _____

*Signature Page to Employment Agreement*

**\*\* THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION\*\***

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound hereby, have executed this Agreement as of the above written date.

ASCENSION INSURANCE, INC.

By: _____

Name:   Joe Tatum
Title:   Chief Executive Officer


EXECUTIVE

_____

Todd Bryant


Agreed to solely with respect to
Section 4.5(a)(i)(B) of this Agreement:

ASCENSION INSURANCE HOLDINGS, LLC

By:   _____
Name:   _____
Title:   _____

*Signature Page to Employment Agreement*

18

**\*\* THIS AGREEMENT CONTAINS AN ARBITRATION PROVISION\*\***

IN WITNESS WHEREOF, the Parties hereto, intending to be legally bound hereby, have executed this Agreement as of the above written date.

ASCENSION INSURANCE, INC.

By:_____
Name:    Joe Tatum
Title:    Chief Executive Officer

EXECUTIVE

_____
Todd Bryant

Agreed to solely with respect to
Section 4.5(a)(i)(B) of this Agreement:

ASCENSION INSURANCE HOLDINGS, LLC

By:_____
Name:   Robert S. Schneider
Title:   EVP, CFO and Treasurer

*Signature Page to Employment Agreement*

18

## Exhibit A

(1)  Todd Bryant's "Book of Business" is as follows:

(a)  **100% of:**

    1)  Revenue – TB ((Existing Account #5001)
    2)  Referral Income – TB ((Existing Account #5101)
    3)  Bonus Income – TB (Existing Account #5201)
    4)  New Business Revenue – TB ( New Business Account #N5001)
    5)  New Business Referral Income – TB (New Business Account #N5101)
    6)  New Business Bonus Income – TB (New Business Account #N5201)

(b)  **50% of:**

    1)  Revenue – TBBW (Existing Account #5003)
    2)  Referral Income – TBBW (Existing Account #5103) (For clarification purposes, this account shall not include any referral income produced by any producer of the Business other than Executive.)
    3)  Net CoBroker Revenue = Revenue – CoBrokers (Existing Account #5060) *minus* CoBroker Commissions (Existing Account #8010)
    4)  Bonus Income – TBBW (Existing Account #5203)
    5)  Co-Broker Bonus Income – TBBW (Existing Account #5044)
    6)  New Business Revenue– TBBW (New Business Account #N5003)
    7)  New Business Referral Income – TBBW (New Business Account #N5103)
    8)  New Business Net CoBroker Revenue = Revenue – CoBrokers (New Business Account #N5060) *minus* CoBroker Commissions (New Business Account #N8010)
    9)  New Business Bonus Income – TBBW (New Business Account #N5203)
    10) New Business Co-Broker Bonus Income – TBBW (New Business Account #N5044)

(2)  Todd Bryant's Commission Schedule is as follows:

(a) For the Book of Business existing as of October 15, 2010, Existing Book of Business Commissions equal to 25% through December 31, 2010, 35% from January 1, 2011 through December 31, 2012, and 38% for the portion of the Employment Period, if any, that begins on January 1, 2013. The parties agree that future changes in this commission percentage are not contemplated. For purposes of clarification, such existing Book of Business includes the accounts set forth in Annex I to this Exhibit A. The parties agree that as soon as reasonably practicable, Employer will transfer the servicing of all House Accounts (as defined in Section 7.17 above)  serviced by the Business Unit to another entity or business unit. Accordingly, effective January 1, 2013, all House Accounts are hereby removed from Executive's Book of Business, and are deleted from Annex I to this Exhibit A to the extent such House Accounts appear on Annex I to this Exhibit A. Notwithstanding any other provision of this Exhibit A or the Agreement, on and after January 1, 2013, any compensation payments to Executive shall not include commissions with respect to House Accounts (as defined in Section 7.17 above).

(b) For New Business, as defined in this *Exhibit A*, New Business Commissions equal to 40% effective October 16, 2010. The parties agree that future changes in this commission percentage are not contemplated.

"*New Business*" means those new accounts of Executive (including, without limitation, new lines of coverage that were not in place on existing customer accounts as of October 15, 2010) which, after October 15, 2010, are first placed by or through Employer and assigned by Employer to one of the New Business Accounts in the Book of Business noted above (or any new New Business Accounts hereafter created by Employer and made a part of Executive's Book of Business). New Business does not include any lines of coverage existing as of October 15, 2010 on any of the Employer accounts (i.e. House Accounts) set forth in Annex I to this Exhibit A or on any other accounts which were Employer accounts on or before October 15, 2010.

(c)  Notwithstanding any other provision of this Exhibit A or the Agreement but subject to Section 2(d) below of this Exhibit A, in the event that an account becomes a part of Executive's Book of Business after January 1, 2013, and such account is assigned to Executive and any one or more other Ascension Group or third-party producers or brokers under a split commission arrangement to which Employee and Employer agree, agency revenue with respect to such account will be adjusted proportionately to the agreed upon commission split.   Total compensation paid to Executive and any third party or Ascension Group producer or broker shall not exceed 40% on any such account, unless such account is a retirement benefit in connection with which Employer has agreed to pay the co-producer a 50% commission, in which case the total compensation paid to Executive and such co-producer shall not exceed 50%.  The cap of 40% (50% for retirement benefit accounts) described in the immediately preceding sentence shall not apply to business in place under a split commission arrangement existing as of January 1, 2013.

(d) Notwithstanding any other provision of this Exhibit A or the Agreement, with respect to the "50% of" accounts set forth in Section 1 above of this Exhibit A, for the purposes of computing commissions on any accounts that become part of Executive's Book of Business after January 1, 2013, the percentage and other adjustments described in Section 1(b) above of this Exhibit A shall not be applied before applying the commission percentage.  The Executive's commission percentage will be applied to the agency revenue received in connection with the account, then such amount will be reduced by amounts paid to any Co Producer(s)/CoBroker(s), and the remainder shall be divided equally between Executive and Bruce Wharton ("Wharton").  For example, assume that Executive and Wharton share a "50% of" New Business account in connection with which Employer receives $30,000 in agency revenue.  Further assume that Co Producer/CoBroker Commissions are paid on such account at the rate of 10%.  Executive would receive $4,500, calculated as follows: [($30,000 x .40 ) – ($30,000 x .10)  divided by 2].  For the avoidance of doubt, the method of computing commissions described in this Section 2(d) with respect to new "50% of" account business shall not apply to "50% of" account business in place as of January 1, 2013.

**Annex I to Exhibit A**

9:59 AM
12/20/10
Accrual Basis

# Bryant Wharton 2006
## Income by Customer Summary
### October 2009 through September 2010

| | Oct 09 - Sep 10 |
|---|---|
| City of Alpharetta - TB | 157,332.91 |
| City of Roswell -TB | 154,933.31 |
| Alexander Gallo Holdings - TB | 133,775.41 |
| Shumate Mechanical 11/08 - TB | 113,924.61 |
| City of Union City - TB | 111,741.17 |
| City of Sandy Springs 08 - TB | 109,976.77 |
| City of John Creek/09 - TB | 94,752.22 |
| Ed Voyles 09 - TB | 93,871.15 |
| LMS 08  - TB | 92,555.29 |
| City of Woodstock 08 - TB | 72,128.80 |
| Swift Currie Mcghee  - TB | 68,446.64 |
| Honda Carland - TB | 52,920.19 |
| Weissman, Nowack - TB | 52,310.88 |
| Innerface - TB | 44,081.05 |
| Data Supplies 1/08- TB | 42,206.64 |
| Macsteel  - TB | 40,429.72 |
| Evans Tool & Die - TB | 38,493.33 |
| Plumbing Distributors - TB | 38,150.00 |
| Metro Waterproofing - TB | 34,315.83 |
| City of Dunwoody 09 - TB | 34,122.33 |
| Benise Dowling - TB | 30,437.24 |
| Lark Builders - TB | 28,035.16 |
| Hill Mfg. - TB | 26,889.07 |
| First Cherokee Bank -  TB | 26,239.03 |
| Worksite/AGH - TB | 25,598.03 |
| Liberty Furniture - TB | 21,421.56 |
| Travis Pruitt - TB | 21,317.23 |
| Stone Age Designs - TB | 19,612.77 |
| Southern Champion -  TB | 18,447.70 |
| Mincey Marble - TB | 16,763.97 |
| Aldridge Connors/New - TB | 15,778.71 |
| IXP/09 - TB | 15,736.66 |
| Atlanta Flooring 11/08 - TB | 11,602.57 |
| Blount Stanford - TB | 10,297.53 |
| Gill Plumbing  - TB | 10,210.03 |
| Benchmark Building 9/08 - TB | 9,373.77 |
| Worksite/City of John Creek - TB | 8,946.18 |
| Gastroenterology Spec. -  TB | 8,801.17 |
| Beacon Technical - TB | 8,034.30 |
| Conklin - TB | 7,720.60 |
| Baker Paint & Contracting  - TB/LOST | 7,388.14 |
| Ed Castro 08  - TB | 6,759.43 |
| City of Cumming - TB | 6,741.26 |
| Imaje - TB | 6,701.62 |
| Lola Budde  - TB | 6,665.20 |

9:59 AM
12/20/10
Accrual Basis

# Bryant Wharton 2006
## Income by Customer Summary
### October 2009 through September 2010

| | Oct 09 - Sep 10 |
|---|---|
| Impact Consulting - TB | 5,678.18 |
| Mobility Designs - TB | 5,580.28 |
| Next Marketing - TB | 5,445.10 |
| Integrated Systems - TB | 5,207.35 |
| Georgia Mechanical/10 - TB | 5,099.90 |
| Air Quality System  - TB | 4,424.06 |
| Covenant Christian School - TB | 4,137.31 |
| Dr J Richard Collins, - TB | 3,924.43 |
| Elrod Development – TB | 3,653.91 |
| Bryant - TB | 3,209.60 |
| Custom Drywall - TB | 3,070.05 |
| International Thermocast - TB | 2,848.73 |
| Cooks Warehouse - TB | 2,838.20 |
| Sherlock's - TB | 2,799.06 |
| David Stephens Tile - TB | 2,775.51 |
| Updchmark Trophy/10 - TB | 2,772.38 |
| Electrical Design -TB | 2,593.81 |
| Dr. Rolf Meinhold 09 - TB | 2,311.02 |
| Atlanta Home Theater - TB | 2,254.02 |
| Hemisphere Eng  - TB | 2,249.98 |
| Peachtree Distributing - TB | 2,100.00 |
| Greater Atlanta Title 7/08 - TB | 2,028.37 |
| Precision Plumbing 08 - TB | 1,966.20 |
| Harp Ink - TB | 1,926.52 |
| Regency Title Co - TB | 1,912.31 |
| Whole World Theater - TB | 1,875.35 |
| Razzouk Enterprises  - TB | 1,847.34 |
| Competitive Solutions - TB | 1,825.00 |
| M & M Creative Inc.- TB | 1,752.19 |
| EBS Property - TB | 1,660.11 |
| Administrative Support/HPA Arch 09 - TB | 1,626.68 |
| Allen-Thatcher Assoc - TB | 1,602.48 |
| Telplus Comm. - TB | 1,598.59 |
| Sandy Springs Hospitality Group 08 - TB | 1,597.92 |
| Bryant, Russell  - TB | 1,534.24 |
| AE Design/Professionsal SVCS Gr - TB | 1,524.78 |
| Alpharetta Gastro. - TB | 1,286.61 |
| Gwynn Management - TB | 1,283.94 |
| Dr. Charles A Lindsay, DMD - TB | 1,263.88 |
| Morris, Eloise - TB | 1,246.70 |
| Johnston, Susan - TB | 1,212.76 |
| Pete Wallace - TB | 1,162.39 |
| ASC, LLC/HPA Arch - TB | 1,079.27 |
| Oxy-Plus - TB | 1,062.28 |
| Bauman & Co.- TB/LOST | 1,052.49 |

9:59 AM
12/20/10
Accrual Basis

# Bryant Wharton 2006
# Income by Customer Summary
### October 2009 through September 2010
#### Oct 09 - Sep 10

| | |
|---|---:|
| Benevolink - TB | 1,008.00 |
| Nicholson, David - TB | 1,001.01 |
| Harish, Dwarak. - TB | 990.88 |
| Brock Clay Goverment 09 - TB | 986.64 |
| The Bicycle Wheel - TB | 877.00 |
| Steve Hightower Hair - TB | 876.16 |
| Topping, Thomas - TB | 864.99 |
| Sebastian, Joshi - TB | 861.30 |
| Smith, Jacarda - TB | 852.52 |
| Custom Bytes 09 - TB | 830.16 |
| Kahn, Daniel - TB | 814.89 |
| Resnick, John - TB | 807.56 |
| AMR Business Products - TB | 792.30 |
| Professional SVCS Integrated Gr. - TB | 773.56 |
| Davis, Kevin - TB | 769.96 |
| Mahoney, Matthew - TB | 751.00 |
| Gunsallus, Kristin - TB | 698.72 |
| Sumpter, Wesley - TB | 670.12 |
| Patton, Tammy - TB | 604.68 |
| Sight & Sound - TB | 557.30 |
| Fox, Gregory - TB | 550.78 |
| Garone, Michael - TB | 524.68 |
| Young, Kristen - TB | 522.70 |
| O'Shea, Shelia - TB | 495.20 |
| Dorfman, Rachel - TB | 494.64 |
| North Atlanta Internal Med 09 - TB/AM | 462.52 |
| Sun Architectural - TB | 458.92 |
| Wint, William - TB | 454.60 |
| Thomas, Kathy - TB | 443.33 |
| Smith, Charlotte - TB | 438.00 |
| Strongin, Seth - TB | 432.00 |
| MacXperts - TB | 425.78 |
| Regulated Capital Consult/10 - TB | 423.36 |
| Cordale, Inc - TB | 389.73 |
| Craft, James - TB | 380.78 |
| Turner, Susan - TB | 376.24 |
| GH Taylor - TB | 372.36 |
| Wu, Cheng - TB | 350.68 |
| Haygood Contracting - TB | 345.41 |
| Bauman, Bradley - TB | 341.48 |
| Boone, Shelli - TB | 334.16 |
| Thomas, Tesk - TB | 320.38 |
| Peters, Jamin - TB | 318.92 |
| Charles Les - TB | 315.97 |
| Zortnan, Stephanie - TB | 309.16 |

9:59 AM
12/20/10
Accrual Basis

# Bryant Wharton 2006
## Income by Customer Summary
October 2009 through September 2010

| | Oct '09 - Sep '10 |
|---|---|
| Garone, Jessica - TB | 304.80 |
| Thruston, Erin - TB | 281.60 |
| Frank, Kathleen - TB | 274.25 |
| Dr Colette Hall - TB | 264.74 |
| MI Holdings - TB | 263.08 |
| Schwartzwald, Alan - TB | 254.24 |
| Hicks, Jeffrey - TB | 243.68 |
| Kravitz, Les - TB | 220.68 |
| Collins,Richard - TB | 216.61 |
| Sandaled Feet Ministries - TB | 211.50 |
| Wheeler Kolb - TB | 204.00 |
| Rollins, Rober - TB | 199.27 |
| Manner, Polly - TB | 198.00 |
| Southern Molding - TB | 191.34 |
| Ladd, Jeremy - TB | 190.92 |
| Smith, Ashley - TB | 184.24 |
| Boykin, Milton - TB | 181.96 |
| Miller, Amanda - TB | 178.00 |
| Suratt - TB | 169.85 |
| Gaskill, Leslie - TB | 164.24 |
| Turner, Katherine - TB | 164.09 |
| Rabinovich, Aleksa - TB | 160.82 |
| Talking Heads Studio - TB | 150.00 |
| Bryan, Jay - TB | 147.10 |
| Sanders, Kathryn - TB | 146.14 |
| Rabinovich, Ilya - TB | 145.99 |
| Greenpoint - TB | 138.24 |
| Fulton Communications - TB | 133.51 |
| Benchmark Worksite - TB | 129.98 |
| Varner, John - | 126.81 |
| Thomas, Zachary - TB | 121.40 |
| Bangulian, Albert - TB | 115.05 |
| Price Tele. - TB | 111.08 |
| Strigle, Chris - TB | 107.35 |
| Lowther, Shaun - TB | 106.45 |
| Santoro, Anegla - TB | 105.78 |
| Forester, Shannon - TB | 101.04 |
| Taylor Consulting 09 - TB | 91.84 |
| Topping, Kristen - TB | 88.20 |
| Roth, Sunnie - TB | 88.18 |
| Yang, Chih - TB | 85.36 |
| O'Berry, William - TB | 79.77 |
| Richardson, Shannon - TB | 74.20 |
| Dubuc, Brian - | 73.81 |
| Carillon - TB | 72.00 |

9:59 AM
12/20/10
Accrual Basis

# Bryant Wharton 2006
## Income by Customer Summary
October 2009 through September 2010

| | Oct 09 - Sep 10 |
|---|---|
| Stinnett, Leonard - TB | 68.40 |
| Artistic Kitchens - TB/LOST | 61.84 |
| Weld, Thomas - | 58.82 |
| Innis, Sherri - TB | 51.50 |
| Berger, David - TB | 49.20 |
| Warzon, Leah - TB | 47.40 |
| Smith, Adrian - TB | 46.64 |
| Shearon, Steven - TB | 41.75 |
| Township Res.- TB | 39.60 |
| Bryan, Dillon - TB | 39.18 |
| Carter, Harold - TB | 37.86 |
| Knowlagent401(K)- TB | 37.62 |
| Hanceri, Adela - TB | 33.49 |
| Sammons, Jenn - TB | 32.40 |
| Stephens, Kristina - TB | 31.68 |
| Main, Darlene - TB | 31.47 |
| Governor's Towne Club - TB/Lost | 28.40 |
| MacDonald, Gavin - TB | 26.26 |
| Acura Carland - TB | 24.89 |
| Giel, Allison - TB | 24.78 |
| Torri, Jessica - TB | 19.16 |
| Brown, Khadigah - TB | 18.90 |
| Burce, Charlotte - TB | 14.30 |
| Sebastian, Fiorus - TB | 12.96 |
| Price, Stephen - TB | 11.98 |
| Doster, Sherry - DG | 5.32 |
| Topping Assoc. - TB/DG | 2.25 |
| Poovey - TB | 0.46 |
| guardian - TB | 0.00 |
| Howe, Shannon - CW | 0.00 |
| Payne, Kimberly - TB | -4.59 |
| **TOTAL** | **2,102,714.06** |

10:27 AM
12/20/10
Accrual Basis

# Bryant Wharton 2006
## Income by Customer Summary
### October 2009 through September 2010

| | Oct 09 - Sep 10 |
|---|---|
| ZC Sterling - JW/TBBW | 220,669.81 |
| Ascension Corporate - TBBW | 113,805.85 |
| Cypress - JW/TBBW | 108,747.12 |
| Phoenix Aviation - RS/BWTB | 56,306.72 |
| Atlanta Fixture & Sales - RS/TBBW | 38,086.47 |
| Premier Kids Care - RS/TBBW | 21,453.36 |
| Buckhead Bank - TBBW/Lost | 21,140.94 |
| McCalla Raymer, LLC 12/08 - TBBW/Lost | 18,918.42 |
| Atlanta Oriental Food - RS/TBBW | 12,567.31 |
| Ascension Ins. - TBBW | 11,658.91 |
| Pinecrest Academy - TBBW | 9,753.84 |
| OneSource Business Solutions - TBBW/LOST | 8,810.62 |
| Smith Adcock & Co - LC/TBBW | 7,485.11 |
| Southern Catholic - BWTB/LOST | 7,391.10 |
| The Amerivap System - TBBW | 6,585.88 |
| Vigilar - LC/TBBW/Lost | 6,315.77 |
| Cypress - JW/TBBW | 6,268.30 |
| Knowlagent - TBBW/Lost | 5,894.77 |
| Age of Travel - TBBW | 5,075.07 |
| GEO Creative - LC/TBBW | 4,954.38 |
| Joel Aycock, PC - RS/TBBW | 4,858.95 |
| Bryant Wharton - TBBW | 4,805.40 |
| Bullock Mannelly - RS/BWTB | 4,507.81 |
| BWT - TBBW | 4,370.87 |
| Integritax 08 - RS/BWTB | 4,283.08 |
| Dawson Jones - BWTB | 4,127.76 |
| Fred Lott Const. - RS/BWTB | 3,914.17 |
| Insurance House - JW/Lost | 3,779.88 |
| People Strategy - TBBW | 3,483.93 |
| An Attorney and Lawy - LC/TBBW | 3,426.04 |
| ZC Sterling - JW/TBBW | 3,392.66 |
| A/C Sales Corp - TBBW | 3,389.24 |
| Peppers Heating & Air - LC/TBBW/LOST | 2,977.14 |
| Elite Services - TBBW | 2,833.17 |
| Tucker Concrete - KT/TBBW/Lost | 2,635.71 |
| CHMK & Assoc. - RS/TBBW/Lost | 2,278.85 |
| The Wood Image - TBBW | 2,219.25 |
| Eagle Packaging - RS/ BWTB | 2,053.92 |
| Worldwide - TBBW | 1,917.21 |
| Peachtree Towers - RS/TBBW | 1,843.46 |
| All Convention Cleaners - LC/TBBW | 1,659.58 |
| Urban Land Inst. - TBBW | 1,603.51 |
| City of Baldwin - TBBW | 1,570.77 |
| American Family Day - LC/TBBW | 1,526.03 |
| Max Lagers - RS/TBBW | 1,521.11 |

10:27 AM
12/20/10
Accrual Basis

## Bryant Wharton 2006
## Income by Customer Summary
### October 2009 through September 2010

| | Oct '09 Sep '10 |
|---|---|
| Wolfe, Linda - RS/TBBW | 1,308.52 |
| Pinecrest Academy - Aflac - TBBW | 1,229.99 |
| Brightline - BWTB | 1,228.21 |
| Artlite Office Supplies - RS/TBBW | 1,213.41 |
| Varner, John - | 1,204.87 |
| Branch, Debra - TBBW | 1,044.58 |
| Digital Positions - TBBW | 1,039.38 |
| Goodwill Ind of Mid | 1,035.00 |
| Courier Express - CBRS/Lost11/09 | 1,023.98 |
| Lager's - RS/TBBW | 1,014.88 |
| Hackay & Smith - LC/TBBW/Lost | 965.61 |
| Boone & Newsome - TBBW | 947.63 |
| Murray Barnes - TBBW | 933.33 |
| Aelera Resources - TBBW | 905.36 |
| Powers, Christopher - TBBW | 900.04 |
| Hitchcock, Mathew - TBBW | 882.64 |
| First Evangelical Church - | 874.45 |
| Fatheree, Charles - LC/TBBW | 816.45 |
| Aviation Atlanta - LC/TBBW | 808.13 |
| Chatham Landscape - AACB/Lost | 802.47 |
| Insurance House - JW/Lost | 640.49 |
| Capital Funding 09 - RS/TBBW | 611.71 |
| Studio J - RS/ BWTB | 525.03 |
| Test and Balance 10/08 - AAHP | 522.94 |
| Integral Systems - | 522.58 |
| Collins, Kenneth - KT/TBBW | 518.47 |
| Riccetti, Karen - TBBW | 498.38 |
| Parker, Anne - LC/TBBW | 497.44 |
| Mt. Vernon Int. Med.- KT/TBBW | 495.34 |
| All Systems 9/09 - JS | 444.72 |
| Leonard, Rickman - LC/TBBW | 432.69 |
| EAO50 | 418.26 |
| Tempus IT Staffing - BWTB | 415.36 |
| Mod - | 410.40 |
| Trimedco Inc. - KT/TBBW | 337.52 |
| Superior Photocopay - KT/TBBW | 332.32 |
| EA086 | 324.66 |
| Innovative Outdoors - RS/ BWTB | 302.81 |
| Williams, Maxwell - unknown | 283.95 |
| Brady, Jean - | 273.51 |
| Kesler, Steve - KT/TBBW | 270.83 |
| Northside Nephrology - LC/TBBW | 266.19 |
| Tuten, Rex - LC/TBBW | 256.29 |
| Business Mgmt. Sys. - RS/ BWTB/Lost | 256.10 |
| Cast Iron Soil Pipe Inst/10 - PL | 250.30 |

10:27 AM
12/20/10
Accrual Basis

# Bryant Wharton 2006
## Income by Customer Summary
### October 2009 through September 2010

| | Oct '09 - Sep '10 |
|---|---|
| Schulz, Danka - unknown | 247.16 |
| Carla Chapman Hort - TBBW | 233.44 |
| Solution Seekers -  GH | 204.39 |
| Hamlin Air Condition - KT/CBDB | 204.26 |
| Associated Fuel - OS | 204.00 |
| Williams, Matthew - unknown | 193.92 |
| Houde - | 193.80 |
| Wagner, Hanna | 188.54 |
| Yarboro, Melissa - KT/TBBW | 188.30 |
| Cohn, Jason - TBBW | 182.09 |
| Vazquez, Keenan - TBBW | 173.04 |
| Premier Installation - TBBW | 169.43 |
| Georgia Pediatric Cardiology -LC/TBBW | 167.48 |
| Fatheree, Katherine - TBBW | 157.73 |
| Morrison Supply -  LC | 156.00 |
| Liberty Enviornmental - RS/ BWTB | 155.77 |
| DSI - JW | 155.30 |
| Sims, Pamela - | 150.94 |
| Jeffery B. Hicks, P.C. - TBBW | 137.12 |
| Venderkley, Emily - | 136.64 |
| Master Adhesives - AANR/Lost | 130.55 |
| Richport Properties - KT/TBBW | 122.46 |
| Midtown Con - BW | 99.00 |
| Formento, D -  TBBW | 96.97 |
| Agilience - DG | 96.90 |
| Printech label - OS | 96.00 |
| AE Schluter -  BW | 87.74 |
| KAH dba Good Olde | 87.62 |
| City Wide Plumbing - KTCBMCM | 84.00 |
| Watkins, Ira -  RS/TBBW | 79.33 |
| Worklife Financial - BW | 75.69 |
| Rothlis, Christopher - BW | 74.82 |
| McFadden, Rachel -  KT/TBBW | 72.87 |
| Boone, Shelli - TB | 72.64 |
| Artisan Home Crafter - | 72.57 |
| Performance Builders -  KT | 72.00 |
| Omega Metals - TBBW | 67.90 |
| Jordan & Skala - JS | 65.04 |
| Meneses, Leigh - | 64.22 |
| Weld, Thomas - | 58.82 |
| Sanders, Chris - | 40.36 |
| Fort Apache -  SH | 39.98 |
| Applied Document Sol. - CBJE/Lost | 36.00 |
| H&H Custom Woodworks - OS | 36.00 |
| Noon, Alycen - | 33.38 |

10:27 AM
12/20/10
Accrual Basis

# Bryant Wharton 2006
## Income by Customer Summary
### October 2009 through September 2010

| | Oct '09 - Sep '10 |
|---|---|
| AutoPro - OS | 24.00 |
| Air Control Atlanta - OS | 24.00 |
| Ferguson, Susan | 21.09 |
| Santoro, Anegla - TB | 20.82 |
| Doster, Sherry - DG | 15.96 |
| Campbell, James - RS | 15.90 |
| Ducar, James - TBBW | 15.46 |
| Low Country BBQ - AARS/Lost | 11.57 |
| Straka, Joseph - TBBW | 11.31 |
| Greg Holland - OS | 10.71 |
| Stinnett, Leonard - TB | 7.60 |
| JLW Development - AAML | 6.07 |
| Carter, Lisa | 5.45 |
| Energy Savers of Georgia - | 5.10 |
| Payne, Kimberly - TB | 4.59 |
| Cartersville - unknown | 3.92 |
| Lowman, Robert - TBBW | 3.60 |
| Cardozo Engineering | 2.50 |
| Hall, Christina - KT | 1.82 |
| Benchmark Trophy - AANR | 1.00 |
| Fredrick J Han - TBBW | 0.38 |
| Click Tactics - | 0.00 |
| Ayres, Robert - Haas & Dodd | 0.00 |
| Jova Daniels Busby - BW | 0.00 |
| Preferred Personnel Sol. - RS/ BWTB | 0.00 |
| Lenox Financial 10/1 - KT/Lost | -17.02 |
| Boyken International - AANR/Lost | -42.98 |
| Air Freight - BW/CR | -43.35 |
| M L Peachtree - BW/CR | -55.65 |
| Universal Steel Struct. - LC | -330.51 |
| **TOTAL** | **801,940.06** |

10:33 AM
12/20/10
Accrual Basis

# Bryant Wharton 2006
## Income by Customer Summary
### October 2009 through September 2010

| | Oct '09 - Sep '10 |
|---|---|
| Lazer Spot -  BWT | 87,502.03 |
| Emergint - MH | 42,713.82 |
| Hettich - KJV/IEM | 41,029.51 |
| Akin Ford - AACB | 33,107.33 |
| Powerplan Consultants - AANR | 29,958.06 |
| JP Turner -  BWT | 29,420.71 |
| Earl Small's Harley - PW | 27,099.94 |
| Advantage Ind. Auto -  AACB | 19,187.70 |
| RS Andrews - CB/MOB | 16,529.10 |
| Test and Balance 10/08 - AAHP | 16,159.25 |
| Natural Body 7/08 - BWT | 15,844.27 |
| Advantage Fire -  PW | 15,683.48 |
| Auto Doors -  JB | 15,452.92 |
| Reddy Solutions - GH | 14,405.48 |
| Dixie Seal & Stamp - AACB | 12,115.17 |
| Hays Financial  - AACB | 11,371.79 |
| Warner Mayou - CBRS | 10,933.98 |
| Alpharetta Internal Med -  CBMM | 9,248.99 |
| The Southern Link - GH | 9,098.97 |
| Akin Automotive - AACB | 8,383.54 |
| Manufactured Duct -  PB | 8,005.39 |
| Hill Foley Rossi - MH | 7,234.03 |
| Dr. Pradeep Sinha -  AACB | 7,230.91 |
| Courier Express - CBRS/Lost11/09 | 6,658.51 |
| Guardian Products -  MH | 6,647.46 |
| Boyken International - AANR/Lost | 6,061.65 |
| Dr Abraham- KJV/IEM | 5,972.44 |
| Special Olympics - AARS | 5,693.46 |
| Accessories Unlimited - MH | 5,314.05 |
| Marietta Drywall - BWT | 5,060.98 |
| Planet Studio - MH | 5,060.21 |
| Cameron & Associates - JE | 4,927.58 |
| Perimeter North - AACB | 4,696.90 |
| Moon Bros, Inc/10 – BW/AANR | 3,973.49 |
| Fang Chemicals -  CBMM | 3,933.05 |
| Financial Mgnt. (FMSI) - PW | 3,600.00 |
| JLS Technical - CR | 3,353.78 |
| Container Technologies  -AACB | 3,187.55 |
| Shamrock Printing -   GH | 3,141.53 |
| Dr.Terry J Orme - AACB | 3,077.15 |
| Ray Group - CBMM | 3,023.67 |
| Colorchrome - AANR | 2,967.15 |
| Vesta Holdings - AACB | 2,947.05 |
| On Site Systems - AALL | 2,836.64 |
| Performance Associates1/09 - MH | 2,814.41 |

10:33 AM
12/20/10
Accrual Basis

**Bryant Wharton 2006**
**Income by Customer Summary**
October 2009 through September 2010

| | Oct '09 - Sep 10 |
|---|---|
| Joe Powell Associates - JS/BWT | 2,510.21 |
| Solution Seekers -  GH | 2,306.22 |
| Lanier Color - AARW | 2,227.27 |
| Media Graphix- MH | 2,195.13 |
| Galileo Vacuum  - DK | 2,190.00 |
| Habersham Properties - AACB/09 | 2,170.00 |
| Medical Maintanance - CBMH | 2,055.05 |
| Extreme Powersports - PW | 2,010.00 |
| G Squared M, -  BWCBKT | 1,848.51 |
| Premier Orthopedic - MM | 1,634.56 |
| Bola Corp - MH | 1,622.25 |
| Buckhead Midtown Vacuum - MH | 1,493.23 |
| All Season Siding -  MH | 1,467.24 |
| Corporate Steamx 08  - MH | 1,465.30 |
| Baldwin Brass/Skriba -  AACB | 1,282.07 |
| J M  Baker Co. -  MH | 1,266.41 |
| Capital City Sprinkler - MH | 1,235.02 |
| Dahlonega Country Day - MH | 1,175.04 |
| Bird, Mabrey -  CBRS | 1,173.44 |
| Good Old Days  - MH/BWT | 1,161.84 |
| Golf Warehouse Sales - JE | 1,156.68 |
| Johnson & Garrison -  MH | 1,099.93 |
| Waste Eliminator - JS/BWT | 1,037.87 |
| Southern Economic -  KT/MH | 1,007.05 |
| Callidus Resource Gr 09 - MH | 956.12 |
| Averest - KT/MH | 925.27 |
| Air Freight - BW/CR | 912.94 |
| M  Burky & Associates -  MH | 904.20 |
| Bird Law Group - CBRS | 883.06 |
| Ga Capt Fire Protection - MH | 823.36 |
| ServePro - SL | 793.14 |
| Benchmark Trophy -  AANR | 726.14 |
| The Penrake Co. - MH | 692.56 |
| Master Adhesives -  AANR/Lost | 652.75 |
| Evolutions Salon -  MH | 576.36 |
| Encyclomedia - AAML | 570.28 |
| Elzey Electrical - BWT | 569.57 |
| Taylor Construction - AACB | 436.01 |
| Fernando, Anne -  MH | 403.40 |
| M L Peachtree - BW/CR | 314.26 |
| The Mabry Firm - CBRS | 284.44 |
| Laser Craft -  CBRS/Lost | 273.96 |
| Marjac -kt MH | 223.84 |
| Hedrick, Kristy -  MH | 209.46 |
| Universal Business Sol - KT/MH | 207.21 |

10:33 AM
12/20/10
Accrual Basis

# Bryant Wharton 2006
## Income by Customer Summary
### October 2009 through September 2010

| | Oct 09 - Sep 10 |
|---|---|
| Fields, Ronald - MH | 186.21 |
| Insight Systems - AAML | 183.22 |
| Fort Apache - SH | 180.94 |
| KMV Enterprises 08 - MH | 154.51 |
| Fields, April - MH | 150.57 |
| Michael Phelan DMD - BWT | 109.04 |
| Brewhouse Cafe-DG/BWT | 107.95 |
| Metro Directories 08 - BWT/Lost | 97.92 |
| Par-Technology - MH | 89.17 |
| JLW Development - AAML | 85.68 |
| Air Technics - KT/MH | 64.02 |
| Rawlins Enterprises - MH/CBDS | 60.00 |
| Hammond, Charles - MH | 42.12 |
| Reed Propane - MH/CBLH | 41.30 |
| Hedrick, B - MH | 39.32 |
| Pigott, Sherri - MH | 39.26 |
| Pigott, Garrett - MH | 38.72 |
| Manier, Arnold - MH | 33.50 |
| Giallanza, Michael - MH | 28.77 |
| Northpoint Citi - LC/MH | 18.00 |
| Pattco Printer - KT/MH | 16.29 |
| Pigott, Ryker - MH | 15.32 |
| Pumping Solutions - MH | 9.97 |
| Hodges, Brooke - BWT/CBMM | 7.50 |
| Low Country BBQ - AARS/Lost | 7.35 |
| Hedrick, H - MH | 6.00 |
| Lazau, Adrian - CBMM | 4.40 |
| Current, Inc. - KT/MH/Lost | 0.00 |
| Chatham Landscape - AACB/Lost | -106.71 |
| **TOTAL** | **635,504.07** |

635,504.07

222426.4245