# EXHIBIT 2

# FIRST AMENDMENT
## TO
## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This First Amendment to Amended and Restated Employment Agreement (the "Amendment") is effective January 1, 2014 (the "Amendment Effective Date"), by and between Ascension Insurance, Inc., a Delaware corporation ("Employer") and Todd Bryant ("Executive") (each a "Party" and together, the "Parties").

WHEREAS, Executive has been employed by  Employer prior to the Amendment Effective Date pursuant to the Amended and Restated Employment Agreement dated December 14, 2012 (the "Agreement");

WHEREAS, Employer delivered a Notice of Non Extension (the "Notice") of the Agreement to Executive on November 19, 2013 notifying Executive of Employer's desire not to extend the Employment Period under the Agreement and advising Executive that the Agreement would terminate effective end of day on December 31, 2013;

WHEREAS, Employer wishes to rescind the Notice and continue to employ Executive at will for an additional one-year period in accordance with Section 2 of the Agreement on revised terms and conditions and Executive wishes to continue to be employed at will by Employer on revised terms and conditions;

WHEREAS, Employer and Executive desire to amend the Agreement to reflect the agreed-upon revised terms and conditions;

NOW, THEREFORE, in consideration of continued employment by Employer under the terms and conditions of the Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      The Notice is hereby rescinded and of no further force and effect.

2.      Section 3.1 of the Agreement is deleted in its entirety and is replaced by the following:

   "3.1   *Title*.  Subject to the power and authority of the Board of Directors of the Employer to designate titles and reporting relationships, Executive shall serve in the full-time capacity of a licensed sales representative/producer of Employer with the title of President of Ascension Benefits & Insurance Solutions of Georgia business unit (formerly known as the Bryant Wharton business unit of Employer) (the "Business Unit") or such other title as is designated by Employer from time to time, and shall report directly to the Eastern Region Managing Director of the Employer or such other individual(s) as is designated by Employer from time to time."

3.      A new Section 4.7 is added to the Agreement as follows:

   "4.7   *Modifications Proposed by Executive*.  Executive agrees that, prior to November 15, 2014, Employer shall not consider any proposed increases to Executive's Existing Book of Business Commissions, Executive's New Business Commission, the Expense Cap, the VAS Cap or the Capital Event Consideration."

4.      Section 5.2 of the Agreement is deleted in its entirety and is replaced by the following:

1

"5.2    *Involuntary Termination by the Employer Without Cause*. (a) The Employment Period may be terminated by Employer without cause upon prior written notice to Executive, such termination to be effective as of the date set forth in such notice. If Executive's employment is terminated by the Employer without Cause (as defined under Section 5.6), Executive shall be entitled to receive the following: (i) Executive's accrued but unpaid base salary to the date of termination; (ii) benefits set forth in Section 4.3, if any, to the date of termination; (iii) Executive's accrued but unpaid vacation, if any, to the date of termination; (iv) expenses reimbursable under Section 4.4 incurred but not yet reimbursed to Executive to the date of termination; and (v) a severance amount, payable in installments in accordance with the customary payroll practices of the Employer, equal to the Monthly Base Rate in effect as of the date of termination for a period of three (3) months following the date of termination (the "Severance"). "Monthly Base Rate" means the amount calculated by dividing the total commissions paid to Executive during the six (6) month period immediately prior to the date of termination by six (6).

(b)    Notwithstanding the foregoing, Executive shall not be entitled to receive any Severance payments pursuant to Section 5.2(a) (and Executive shall forfeit all rights to such payments) unless Executive has executed and delivered to Company a general release in form attached hereto as Exhibit B (the "General Release"), and such General Release remains in full force and effect, has not been revoked and is no longer subject to revocation, within sixty (60) days after the date of termination (the "60-Day Period") and Executive shall be entitled to receive such payments only so long as Executive has not breached the provisions of the General Release or breached the provisions of Section 6 of this Agreement that survive termination or any other agreement between Executive, on the one hand, and Employer or any other member of the Ascension Group, on the other hand. If the General Release is timely executed and delivered and no longer subject to revocation as provided in the preceding sentence, then the following shall apply:

(1)    To the extent any such cash payment to be provided is not "deferred compensation" for purposes of Code Section 409A, then such payment shall commence upon the first scheduled payment date immediately after the date the General Release is timely executed and delivered and no longer subject to revocation (the "Release Effective Date"), provided that, if the 60-Day Period includes days in two separate calendar years, the Release Effective Date shall not under any circumstances be earlier than the first day of the later of the two calendar years. The first such cash payment shall include payment of all amounts that otherwise would have been due prior to the Release Effective Date under the terms of this Agreement applied as though such payments commenced immediately upon termination of employment, and any payments made after the Release Effective Date shall continue as provided herein. The delayed payments shall in any event expire at the time such payments would have expired had such payments commenced immediately following Executive's termination of employment.

(2)    To the extent any such cash payment to be provided is "deferred compensation" for purposes of Code Section 409A, then such payment shall commence upon the first scheduled payment date immediately after the sixtieth (60th) day following Executive's termination of employment. The first such cash payment shall include payment of all amounts that otherwise would have been due prior thereto under the terms of this Agreement had such payments commenced immediately upon Executive's termination of employment, and any payments made after the sixtieth (60th) day following Executive's termination of employment shall continue as provided herein. The delayed payments shall in any event expire at the time such payments would have expired had such payments commenced immediately following Executive's termination of employment.

Notwithstanding any other payment schedule provided herein to the contrary, if Executive is deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), then any payment that is considered deferred compensation under Code Section 409A payable on account of a "separation from service" shall be made on the date which is the earlier of (I) the expiration of the six (6)-month period measured from the date of such "separation from service" of Executive and (II) the date of Executive's death (the "Delay Period") to the extent required

under Code Section 409A. Upon the expiration of the Delay Period, all payments delayed pursuant to the immediately preceding sentence (whether they otherwise would have been payable in a lump sum or in installments in the absence of such delay) shall be paid to Executive in a lump sum, and all remaining payments due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein."

5.    Section 5.6 of the Agreement is deleted in its entirety and is replaced with the following:

"5.6    *Definition of Cause*.  For purposes of this Agreement, the term "Cause" means (i) the commission of a felony or a crime involving moral turpitude or the commission of any other act or omission involving dishonesty or fraud with respect to the Employer or its parent, subsidiaries or affiliates or any of their referral sources; (ii) gross negligence, willful misconduct with respect to the Employer or its parent, subsidiaries or affiliates; (iii) conduct tending to bring the Employer or its parent, subsidiaries or affiliates into substantial public disgrace or disrespect; (iv) any breach of this Agreement, material or otherwise, which breach is not cured within 30 days after written notice thereof by Employer to Executive; (v) failure of Executive to attend the annual sales meeting and repeated failure of Executive to attend bi-weekly sales meetings of which Executive has been given reasonable advance notice, which failure has not been approved by Employer in writing, and provided attendance of bi-weekly sales meetings may be by remote means (e.g. telephonic or webcast) if remote attendance is reasonably efficacious; (vi) complaint(s) involving Executive's failure to comply with the Employer's written policies and procedures, which complaint(s) Employer determines to be serious, substantiated and credible after conducting an investigation of such complaint(s) including a discussion with Executive regarding such complaint(s); (vii) failure of Executive to support any lawful initiative or program of Employer; (viii) the gross insubordination of Executive as reasonably determined by Employer; (ix) failure of Executive to participate in organizational or leadership training provided by Employer of which Executive has been given reasonable advance notice, which failure has not been approved by Employer in writing; or, (x) subject to reasonable advance scheduling (taking into account reasonable scheduling issues, such as vacation and personal time and client commitments) and the ability of Executive to participate in such meetings by remote means (i.e. telephonic or webcast) if remote participation is reasonably efficacious, failure of Executive to participate in meetings with the Chief Executive Officer or Chief Financial Officer of Employer, which failure has not been approved by the Chief Executive Officer or Chief Financial Officer, as applicable, in writing.  Approval of the Employer or Chief Executive Officer or Chief Financial Officer, as applicable, referenced in subsections (v), (ix) and (x) of this Section 5.6 shall not be unreasonably withheld, conditioned or delayed."

6.    The definition of "*House Account*" set forth in Section 7.17 of the Agreement is amended to delete the following:  ", including without limitation the "Ascension Corporate – TBBW" account and the "Ascension Ins. – TBBW" account listed on Annex 1 to Exhibit A."

7.    The definition of "*Value of Executive's Book of Business*" set forth in Section 7.17 of the Agreement is amended to add the following sentence to the end of such definition:  "For the avoidance of doubt, the Value of Executive's Book of Business as of the Amendment and Restatement Date is $2,214,445."

8.    Exhibit A and Annex 1 thereto of the Agreement are deleted in their entirety and are replaced with the new Exhibit A attached to this Amendment and incorporated herein.

9.    Without limiting any other provision of the Agreement or this Amendment, Executive hereby expressly reaffirms as of the Amendment Effective Date the covenants and commitments set forth in Section 6 of the Agreement.  Executive acknowledges and agrees that such covenants and commitments are reasonable and necessary for the protection of Employer and are an essential inducement to Employer rescinding the Notice and continuing to employ Executive as of the Amendment Effective Date.

10.     This Amendment amends the Agreement pursuant to <u>Section 7.4</u> of the Agreement. Except as specifically modified by this Amendment, the Agreement shall remain in full force and effect, provided that, in the event that any provision in this Amendment conflicts with the Agreement or any other agreement, policy, plan or arrangement between the Executive and Employer, the terms of this Amendment shall govern.

11.     This Amendment may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. Facsimile or electronic signatures shall be as valid as original signatures.

*[Remainder of this page intentionally left blank; Signature page follows.]*

IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby, have executed this Amendment as of January 1, 2014.

Ascension Insurance, Inc.                                   Todd Bryant

_Edward Nathan Page_ (signature)

Name:  Edward Nathan Page

Title:  Chief Financial and Operating Officer

IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby, have executed this Amendment as of January 1, 2014.

Ascension Insurance, Inc.

Todd Bryant

_____

Name: _____

Title: _____

4

EXHIBIT A

(1) As of November 21, 2013, Executive's "Book of Business" is as follows:

| Executive Book of Business Existing as of October 15, 2010 Accounts – Not Shared | Commission percentage paid to Executive |
|---|---|
| | 38% |
| A/C Sales Corporation | 38% |
| AE Design | 38% |
| Air Quality Systems | 38% |
| Alexander Gallo Holdings | 38% |
| All Convention Cleaners | 38% |
| AMR Business Products | 38% |
| Banguilan, Albert | 38% |
| Bauman, Bradley | 38% |
| Beacon Technical Industries, Inc. | 38% |
| Blount Sanford Contracting | 38% |
| Boone & Newsome Investments, LLC | 38% |
| Boone, Shelli | 38% |
| Bryant, Russell | 38% |
| City of Alpharetta | 38% |
| City of Cumming | 38% |
| City of Dunwoody | 38% |
| City of Johns Creek | 38% |
| City of Sandy Springs | 38% |
| City of Union City | 38% |
| City of Woodstock | 38% |
| Conklin Intracom | 38% |
| Custom Drywall | 38% |
| CustomBytes | 38% |
| Data Supplies Incorporated | 38% |
| Dr. J. Richard Collins | 38% |
| Ed Castro Landscape | 38% |
| Ed Voyles Automotive Group | |

| | |
|---|---|
| | 38% |
| Elite Services Termite & Pest | 38% |
| Elrod Development | 38% |
| Evans Tool & Die | 38% |
| Forester, Shannon | 38% |
| Fox, Gregory | 38% |
| Gastroenterology Specialists of Gwinnett | 38% |
| Gill Plumbing Company | 38% |
| Gwynn Management Company | 38% |
| Harp Business Services | 38% |
| Hill Manufacturing Company, Inc. | 38% |
| Honda Carland | 38% |
| Impact Consulting | 38% |
| Innerface Architectural Signage, Inc. | 38% |
| International Thermocast | 38% |
| iXP Georgia, LLC | 38% |
| Kravitz, Les | 38% |
| Lark Builders | 38% |
| Liberty Furniture Industries, Inc. | 38% |
| LMS Intellibound | 38% |
| Loia Budde | 38% |
| M&M Creative Inc | 38% |
| Manufactured Duct & Supply (MDS), Inc | 38% |
| Mayoue Gray Eittreim, P.C. | 38% |
| McColeman, Buddy | 38% |
| Metro Waterproofing | 38% |
| MI Holdings | 38% |
| Mincey Marble | 38% |
| Morris, Eloise | 38% |
| Next Marketing | 38% |
| Nicholson, David | |

| | |
|---|---|
| | 38% |
| Patton, Tammy | 38% |
| PayPlus Communications | 38% |
| Peachtree Baker | 38% |
| Peachtree Distributing, Inc. | 38% |
| Peters, Jamin | 38% |
| Plumbing Distributors, Inc. | 38% |
| Precision Plumbing Services | 38% |
| Rabinovich, Aleksandr D | 38% |
| Razzouk Enterprises | 38% |
| Regency Title Company, LLC | 38% |
| Regulated Capital Consultants | 38% |
| Sandy Springs Hospitality & Tourism | 38% |
| Seamans, Patricia | 38% |
| Sherlock's | 38% |
| Shumate Mechanical | 38% |
| Smith, Adcock & Company | 38% |
| Smith, Laura | 38% |
| Southern Champion Construction, Inc | 38% |
| Steve Hightower Hair Artists | 38% |
| Strongin, Seth | 38% |
| Suarez, Cristian | 38% |
| Swift, Currie, McGhee, & Hiers | 38% |
| Talking Heads Studio | 38% |
| Taylor Consulting | 38% |
| Teak , Thomas | 38% |
| The Bicycle Wheel | 38% |
| The Cooks Warehouse | 38% |
| Thomas, Kathy | 38% |
| Topping , Thomas S | 38% |
| Travis Pruitt & Associates | |

| | 38% |
|---|---|
| Turner, Susan | 38% |
| Weissman, Nowack, Curry & Wilco | 38% |
| Whole World Theatre | 38% |
| Worldwide Inc | 38% |
| Zombik, Jessica | 38% |
| Zortman, Stephanie | |

| Executive "New Business" Accounts – Not Shared (Accounts After October 15, 2010) | Commission percentage  paid to Executive |
|---|---|
| | 40% |
| ATZ Inc. | 40% |
| Bryant, Corina | 40% |
| Canongate Golf Clubs | 40% |
| Carlson , Sara | 40% |
| City of Brookhaven | 40% |
| City of Doraville | 40% |
| City of Milton | 40% |
| City of Suwanee | 40% |
| Cruz, Isidro | 40% |
| Davis, Kevin | 40% |
| Dew Learning LLC | 40% |
| eGPS Solutions | 40% |
| Elliott, Joshua | 40% |
| Essential Resources Inc | 40% |
| Fayette County | 40% |
| Finley, Farah M | 40% |
| Ford, Jason | 40% |
| Giel, Allison | 40% |
| Hemphill, Samuel | 40% |
| Johnson, Danny | 40% |
| Jones , Laura | |

9

| | |
|---|---|
| Jones , Pamela | 40% |
| Jones, Calvin A | 40% |
| Kahua | 40% |
| Point to Point Land Surveyors, Inc | 40% |
| Price , Randy | 40% |
| Reeves Contracting Company | 40% |
| Roberts, Lucy | 40% |
| Sammons, Jennifer | 40% |
| Santoro, Angela | 40% |
| Schwartz, John | 40% |
| Sequoia Golf Management | 40% |
| Smith, Adrian | 40% |
| Southern Wall Systems | 40% |
| Spark Inc formerly Vitalawn | 40% |
| Stephens, David | 40% |
| Thomas , Zachary | 40% |
| Wilson, Nicole | |

| Executive Book of Business Existing as of October 15, 2010 – "Shared with Wharton"¹ | Commission percentage  paid to Executive |
|---|---|
| American Family Day | 19% |
| Atlanta Fixture & Sales | 19% |
| BWT Risk Advisors | 19% |
| Lewis, Unknown | 19% |
| Max Lagers Grill and Brewery | 19% |
| One Source | 19% |
| Premier Kids Care | 19% |
| Urban Land Institute | 19% |
| Achoo! | 19% |
| Airflotek | 19% |
| ArtLite Office Supply | 19% |
| Atlanta Nephrology Referral Center | 19% |
| BurdgeCooper Company, Inc | 19% |

| | |
|---|---|
| Car Stereo Plus | 19% |
| Collins & Tabor Investigators | 19% |
| Combined Services, Inc | 19% |
| Contract Hardware | 19% |
| Ducar, James | 19% |
| Fred Lott Construction | 19% |
| Greenleaf Recycling | 19% |
| Hill Street Warehouse | 19% |
| Hop City Inc | 19% |
| Integritax Inc. | 19% |
| KMG Pool Service | 19% |
| Lowman, Robert | 19% |
| Mulberry Farms | 19% |
| Murray Barnes | 19% |
| Pinecrest Academy Inc. | 19% |
| Pritchett, Ball & Wise | 19% |
| Ready Rent-All, Inc. | 19% |
| Reid & Reid Contractors, LLC | 19% |
| Rifkin DDS | 19% |
| Southern Landscape Supply, LLC | 19% |
| The Victory Group | 19% |

| Executive "New Business" Accounts – "Shared with Wharton"[1] (Accounts after October 15, 2010) | Commission percentage paid to Executive |
|---|---|
| Silverboard, Jamie | 20% |

| Executive Book of Business Existing as of October 15, 2010 – Shared With Outside Cobroker | Commission percentage paid to Executive |
|---|---|
| Container Technology | 38% |
| Dixie Seal & Stamp | 38% |
| Dixie Seal & Stamp - Vol Dental (new LOB after 10/15/10) | 40% |
| On Site Systems, Inc. | 38% |
| Perimeter North Internal Medicine | 38% |
| PowerPlan, Inc | 38% |
| Profitmaster Displays, Inc. | 49% |
| Ray Group Consulting Engineers | 38% |
| Test and Balance Corporation | 38% |

11

| Executive Book of Business Existing as of October 15, 2010 – Shared With Outside Cobroker and "Shared with Wharton"[1] | Commission percentage paid to Executive |
| --- | --- |
| | 19% |
| Air Technics | 12.50% |
| All Season Siding | 19% |
| Benchmark Trophy Center | 12.50% |
| Boia Corp | 12.50% |
| Buckhead Midtown Vacuum | 12.50% |
| Corporate Steam X | 12.50% |
| Guardian Products | 12.50% |
| Hill Foley Rossi | 19% |
| Holland Video Productions, Inc | 18.13% |
| LazerSpot | 12.50% |
| M Burky & Associates | 13.13% |
| Marietta Drywall | 12.50% |
| Media Graphix | 12.50% |
| Performance Associates | 12.50% |
| Planet Studio | 12.50% |
| Southern Economic | 12.50% |
| Universal Business Solutions | 17.50% |
| Mabrey Firm | 13.13% |
| Natural Body International | |

[1] "Shared with Wharton" accounts shall also be known as "50% of" accounts.

(2) Executive's Commission Schedule is as follows:

(a) For the Book of Business existing as of October 15, 2010, Existing Book of Business Commissions equal to 25% through December 31, 2010, 35% from January 1, 2011 through December 31, 2012, and 38% for the portion of the Employment Period, if any, that begins on January 1, 2013. The parties agree that future changes in this commission percentage are not contemplated. For purposes of clarification, Exhibit A above sets forth the "Book of Business existing as of October 15, 2010" accounts as of November 21, 2013 (including the commission percentages paid to Executive with respect to each such account). Notwithstanding any other provision of this Exhibit A or the Agreement, on and after January 1, 2013, any compensation payments to Executive shall not include commissions with respect to House Accounts (as defined in Section 7.17 above).

(b) For New Business, as defined in this Exhibit A, New Business Commissions equal to 40% effective October 16, 2010. The parties agree that future changes in this commission percentage are not contemplated.

"New Business" means those new accounts of Executive (including, without limitation, new lines of coverage that were not in place on existing customer accounts as of October 15, 2010) which, after October 15, 2010, are first placed by or through Employer and assigned by Employer to one of the New Business Accounts in the Book of

12

Business noted above (or any new New Business Accounts hereafter created by Employer and made a part of Executive's Book of Business). For purposes of clarification, Exhibit A above sets forth the "New Business" accounts as of November 21, 2013 (including the commission percentages paid to Executive with respect to each such account).

(c) Notwithstanding any other provision of this Exhibit A or the Agreement but subject to Section 2(d) below of this Exhibit A, in the event that an account becomes a part of Executive's Book of Business after January 1, 2013, and such account is assigned to Executive and any one or more other Ascension Group or third-party producers or brokers under a split commission arrangement to which Employee and Employer agree, agency revenue with respect to such account will be adjusted proportionately to the agreed upon commission split. Total compensation paid to Executive and any third party or Ascension Group producer or broker shall not exceed 40% on any such account, unless such account is a retirement benefit in connection with which Employer has agreed to pay the co-producer a 50% commission, in which case the total compensation paid to Executive and such co-producer shall not exceed 50%. The cap of 40% (50% for retirement benefit accounts) described in the immediately preceding sentence shall not apply to business in place under a split commission arrangement existing as of January 1, 2013.

(d) Notwithstanding any other provision of this Exhibit A or the Agreement, with respect to accounts shared with Bruce Wharton ("Wharton") that become part of Executive's Book of Business after January 1, 2013, Executive's commission percentage will be applied to the agency revenue received in connection with the account, then such amount will be reduced by amounts paid to any Co Producer(s)/CoBroker(s), and the remainder shall be divided equally between Executive and Wharton. For example, assume that Executive and Wharton share a New Business account in connection with which Employer receives $30,000 in agency revenue. Further assume that Co Producer/CoBroker Commissions are paid on such account at the rate of 10%. Executive would receive $4,500, calculated as follows: [($30,000 x .40 ) – ($30,000 x .10) divided by 2]. For the avoidance of doubt, the method of computing commissions described in this Section 2(d) with respect to new accounts shared with Wharton shall not apply to "Shared with Wharton" account business in place as of January 1, 2013.

**EXHIBIT B**

I, Todd Bryant, in consideration of and subject to the performance by Ascension Insurance, Inc. (together with its affiliates, the "*Company*"), of its obligations under the Amended and Restated Employment Agreement, as amended, made and entered into effective as of the 14ᵗʰ day of December, 2012 (the "*Agreement*"), do hereby release and forever discharge as of the date hereof Ascension Insurance Holdings, LLC, the Company and their respective affiliates and subsidiaries and all present, former and future directors, officers, agents, representatives, employees, successors and assigns of Ascension Insurance Holdings, LLC, the Company and their respective affiliates and subsidiaries and direct or indirect owners (collectively, the "*Released Parties*") to the extent provided below. Terms used herein but not otherwise defined shall have the meanings given to them in the Agreement.

1. I understand that any Severance payments paid or granted to me under Section 5.2 of the Agreement represent, in part, consideration for signing this General Release and are not salary, wages or benefits to which I was already entitled. I understand and agree that I will not receive the Severance payments specified in Section 5.2 of the Agreement unless I execute this General Release and do not revoke this General Release within the time period permitted hereafter or breach this General Release. Such payments and benefits will not be considered compensation for purposes of any employee benefit plan, program, policy or arrangement maintained or hereafter established by the Company or its affiliates. I also acknowledge and represent that I have received all payments and benefits that I am entitled to receive (as of the date hereof) by virtue of any employment by the Company.

2. Except as provided in paragraph 4 below and except for the provisions of the Agreement which expressly survive the termination of my employment with the Company, I knowingly and voluntarily (for myself, my heirs, executors, administrators and assigns) release and forever discharge the Company and the other Released Parties from any and all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present (through the date this General Release becomes effective and enforceable) and whether known or unknown, suspected, or claimed against the Company or any of the Released Parties which I, my spouse, or any of my heirs, executors, administrators or assigns, may have, which arise out of or are connected with my employment with, or my separation or termination from, the Company (including, but not limited to, any allegation, claim or violation, arising under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991, as amended; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act of 1990, as amended; the Family and Medical Leave Act of 1993, as amended; the Worker Adjustment Retraining and Notification Act, as amended; the Employee Retirement Income Security Act of 1974, as amended; any applicable Executive Order Programs; the Fair Labor Standards Act, as amended; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or procedures of the Company; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, defamation; or any claim for costs, fees, or other expenses, including attorneys' fees incurred in these matters) (all of the foregoing collectively referred to herein as the "*Claims*").

3. I represent that I have made no assignment or transfer of any right, claim, demand, cause of action, or other matter covered by paragraph 2, above.

14

4.  I agree that this General Release does not waive or release any rights or claims that I may have under the Age Discrimination in Employment Act of 1967, as amended, which arise after the date I execute this General Release. I acknowledge and agree that my separation from employment with the Company in compliance with the terms of the Agreement shall not serve as the basis for any claim or action (including, without limitation, any claim under the Age Discrimination in Employment Act of 1967).

5.  I agree that I hereby waive all rights to sue or obtain equitable, remedial or punitive relief from any or all Released Parties of any kind whatsoever, including, without limitation, reinstatement, back pay, front pay, attorneys' fees and any form of injunctive relief. Notwithstanding the above, I further acknowledge that I am not waiving and am not being required to waive any right that cannot be waived under law, including the right to file an administrative charge or participate in an administrative investigation or proceeding; provided, however, that I disclaim and waive any right to share or participate in any monetary award resulting from the prosecution of such charge or investigation or proceeding.

6.  Notwithstanding anything in this General Release to the contrary, I am not waiving any of my vested rights as specifically provided for under the Company's 401(k) plan.

7.  In signing this General Release, I acknowledge and intend that it shall be effective as a bar to each and every one of the Claims hereinabove mentioned or implied. I expressly consent that this General Release shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any state statute that expressly limits the effectiveness of a general release of unknown, unsuspected and unanticipated Claims), if any, as well as those relating to any other Claims hereinabove mentioned or implied. I acknowledge and agree that this waiver is an essential and material term of this General Release and that without such waiver the Company would not have agreed to the terms of the Agreement. I further agree that in the event I should bring a Claim seeking damages against the Company, or in the event I should seek to recover against the Company in any Claim brought by a governmental agency on my behalf, this General Release shall serve as a complete defense to such Claims to the maximum extent permitted by law. I further agree that I am not aware of any pending claim of the type described in paragraph 2 as of the execution of this General Release.

8.  I agree that neither this General Release, nor the furnishing of the consideration for this General Release, shall be deemed or construed at any time to be an admission by the Company, any Released Party or myself of any improper or unlawful conduct.

9.  I agree that I will forfeit all amounts payable by the Company pursuant to the Agreement if I challenge the validity of this General Release. I also agree that if I violate this General Release by suing the Company or the other Released Parties, I will pay all costs and expenses of defending against the suit incurred by the Released Parties, including reasonable attorneys' fees, and return all payments received by me pursuant to the Agreement on or after the termination of my employment.

10. I agree that this General Release and the Agreement are confidential and agree not to disclose any information regarding the terms of this General Release or the Agreement, except to my immediate family and any tax, legal or other counsel I have consulted regarding the meaning or effect hereof or as required by law, and I will instruct each of the foregoing not to disclose the same to anyone. The Company agrees to disclose any such information only to any tax, legal or other counsel of the Company as required by law.

11.  Any non-disclosure provision in this General Release does not prohibit or restrict me (or my attorney) from responding to any inquiry about this General Release or its underlying facts and circumstances by the Securities and Exchange Commission (SEC), the National Association of Securities Dealers, Inc. (NASD), any other self-regulatory organization or governmental entity.

12.  I agree to reasonably cooperate with the Company in any internal investigation, any administrative, regulatory, or judicial proceeding or any dispute with a third party. I understand and agree that my cooperation may include, but not be limited to, making myself available to the Company upon reasonable notice for interviews and factual investigations; appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process; volunteering to the Company pertinent information; and turning over to the Company all relevant documents which are or may come into my possession all at times and on schedules that are reasonably consistent with my other permitted activities and commitments. I understand that in the event the Company asks for my cooperation in accordance with this provision, the Company will reimburse me solely for reasonable out-of-pocket expenses (including any travel, lodging and meals), upon my presentation of appropriate documentation. Except to the extent that this paragraph of this General Release may be inconsistent with Section 6.8 of the Agreement, such Section 6.8 of the Agreement shall remain in effect following the termination of my employment in accordance with its terms.

13.  I agree not to disparage the Company, any other member of the Ascension Group (as defined in the Agreement), or any of the past and present investors, officers, directors, members, managers, employees, products or services of the Company or of any other member of the Ascension Group, and to keep all confidential and proprietary information about the past or present business affairs of the Company and the other members of the Ascension Group confidential, unless a prior written release from the Company is obtained.  I further agree that as of the date hereof, I have returned to the Company any and all property, tangible or intangible, relating to its business or to the business of any other member of the Ascension Group, which I possessed or had control over at any time (including, but not limited to, company-provided credit cards, building or office access cards, keys, computer equipment, manuals, files, documents, records, software, customer data base and other data) and that I shall not retain any copies, compilations, extracts, excerpts, summaries or other notes of any such manuals, files, documents, records, software, customer data base or other data. Except to the extent that this paragraph 13 of this General Release may be inconsistent with Sections 6.2 and 6.7 the Agreement, such Sections 6.2 and 6.7 of the Agreement shall remain in effect following the termination of the Agreement in accordance with their terms.

14.  I represent that I am not aware of any claim by me other than the claims that are released by this General Release.  I acknowledge that I may hereafter discover claims or facts in addition to or different than those which I now know or believe to exist with respect to the subject matter of the release set forth in paragraph 2, above, and which, if known or suspected at the time of entering into this General Release, may have materially affected this General Release and my decision to enter into it.  Nevertheless, I hereby waive any right, claim or cause of action that might arise as a result of such different or additional claims or facts and I hereby expressly waive any and all rights and benefits confirmed upon me by the provisions of California Civil Code Section 1542, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

16

Being aware of such provisions of law, I agree to expressly waive any rights I may have thereunder, as well as under any other statute or common law principles of similar effect.

15. Notwithstanding anything in this General Release to the contrary, this General Release shall not relinquish, diminish, or in any way affect any rights or claims arising out of any breach by the Company or by any Released Party of the Agreement after the date hereof.

16. Whenever possible, each provision of this General Release shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this General Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this General Release shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

BY SIGNING THIS GENERAL RELEASE, I REPRESENT AND AGREE THAT:

1. I HAVE READ IT CAREFULLY;

2. I UNDERSTAND ALL OF ITS TERMS AND KNOW THAT I AM GIVING UP IMPORTANT RIGHTS, INCLUDING BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; THE EQUAL PAY ACT OF 1963, AS AMENDED, THE AMERICANS WITH DISABILITIES ACT OF 1990, AS AMENDED; AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED;

3. I VOLUNTARILY CONSENT TO EVERYTHING IN IT;

4. I HAVE BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT AND I HAVE DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION I HAVE CHOSEN NOT TO DO SO OF MY OWN VOLITION;

5. I HAVE HAD AT LEAST 21 DAYS FROM THE DATE OF MY RECEIPT OF THIS RELEASE SUBSTANTIALLY IN ITS FINAL FORM ON _____ __, ____ TO CONSIDER IT AND THE CHANGES MADE SINCE THE _____ __, ____ VERSION OF THIS RELEASE ARE NOT MATERIAL AND WILL NOT RESTART THE REQUIRED 21-DAY PERIOD;

6. I UNDERSTAND THAT I HAVE SEVEN DAYS AFTER THE EXECUTION OF THIS RELEASE TO REVOKE IT AND THAT THIS RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED;

7. I HAVE SIGNED THIS GENERAL RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE ME WITH RESPECT TO IT; AND

8. I AGREE THAT THE PROVISIONS OF THIS GENERAL RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY AND BY ME.

SIGNED:_____

DATE: [_____ __, ____]

17