## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| Wilmington Trust, National Association, as Securities Intermediary, <br><br> Plaintiff, <br><br> v. <br><br><br> Ameritas Life Insurance Corp., <br> Defendant. | Case No.: _____ <br><br> **COMPLAINT** |

Plaintiff, Wilmington Trust, National Association, as Securities Intermediary ("Securities Intermediary")[1], by and through its undersigned counsel, for its Complaint against defendant, Ameritas Life Insurance Corp. (the "Insurer"), alleges upon personal knowledge as to its own conduct, and upon information and belief with respect to the intent and conduct of others, as follows:

## INTRODUCTION

1.     This is an action for damages with respect to an adjustable life insurance policy (the "Policy") bearing policy number U000036824 issued on

---

[1] Wilmington Trust, National Association, as Securities Intermediary at all relevant times has acted in a ministerial capacity solely as Securities Intermediary for the beneficial owner (current and previous) of the life insurance policy at issue in this case, not in its individual capacity.

February 1, 2007 by Union Central Life Insurance Company ("Union Central"), a predecessor of defendant, Ameritas Life Insurance Corp. ("Ameritas"),[2] to the Jacqueline Leone Irrevocable Life Insurance Trust (the "Trust") insuring the life of Mrs. Jacqueline Leone ("Mrs. Leone" or the "Insured") in the specified amount of $6 million.

2.      Jacqueline Leone passed away on November 23, 2022; as the Policy owner, Securities Intermediary timely submitted a claim for the death benefit under the Policy to Insurer; and Insurer has wrongfully failed to pay the death benefit due and owing for over 120 days. Instead of paying the claim, Insurer commenced an action in federal court in Nebraska against Securities Intermediary (which court lacks personal jurisdiction over Securities Intermediary), in violation of the Policy's incontestability clause, contesting the validity of the Policy on the ground that the Insurer issued the Policy as part of an illegal stranger originated life insurance ("STOLI") scheme, and, therefore, in violation of insurable interest laws. But the Policy is valid and enforceable under either and both Florida and Georgia law, and Insurer was aware of the facts that it now belatedly relies upon to contest the Policy's validity in the wrong court despite the Insurer having demanded, received, and

---

[2] References herein to the "Insurer" include defendant Ameritas Life Insurance Corp. and Union Central Life Insurance Company.

accepted premium payments from Securities Intermediary and from prior owners for many years, and represented that the Policy was valid and enforceable.

3.      Securities Intermediary was not involved with the origination of the Policy or any alleged STOLI activity. Securities Intermediary became the owner and beneficiary of record of the Policy on behalf of its prior customer who purchased the Policy on the tertiary market, without objection from the Insurer, over a decade after the Policy was issued by the Insurer to the Trust and before the current customer became the beneficial owner.

4.      Securities Intermediary seeks damages for Insurer's breach of contract and bad faith conduct, or, in the alternative, should the Policy be found to be invalid, return of all premium paid to Insurer in connection with the Policy.

## **THE PARTIES**

5.      Securities Intermediary is the current owner and beneficiary of record of the Policy, as securities intermediary for its customer. Securities Intermediary is a national banking association organized and existing under Delaware law with principal offices in Wilmington, Delaware. Securities Intermediary is not a citizen of Georgia for purposes of diversity jurisdiction.

6.      At all times herein mentioned, Securities Intermediary acts solely as securities intermediary for its customer and does not act in its individual capacity. *See* O.C.G.A. § 11-8-102 (defining "securities intermediary").

7.      Insurer is a life insurance company incorporated under the laws of the State of Nebraska, and registered to do business in Georgia. Insurer's principal place of business is in Lincoln, Nebraska and Insurer's registered agent in Georgia is located in Marietta, Georgia, Cobb County.

8.      Effective July 1, 2014, Union Central merged into its parent company, Ameritas.

## JURISDICTION & VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 USC § 1332 because there is complete diversity of citizenship between the parties, and the matter in controversy exceeds $75,000.

10.      Venue lies within this District under 28 U.S.C. §§ 1391(a)(1), (a)(2), and 1391(b) because Insurer conducts business through its agent in the Northern District of Georgia and a substantial part of the events and/or omissions giving rise to the claims herein occurred in the Northern District of Georgia.

## FACTS

### The Trust

11.     On November 28, 2006, Mrs. Leone caused the Trust to be created. The beneficiary of the Trust was Mrs. Leone's husband, William Leone. The trustee of the Trust was Kenneth A. Shapiro.

12.     Mrs. Leone signed the Trust Agreement in Palm Beach, Florida, the State where she resided at the time.

13.     Florida-based insurance agent Bradley Grant Gee also signed the Trust Agreement, and witnessed Mrs. Leone's signature thereof, in Palm Beach, Florida. Mrs. Leone's and Mr. Gee's signatures were notarized by a Florida notary public.

14.     Mrs. Leone's husband, Mr. Leone, also signed the Trust Agreement in Palm Beach, Florida, and his signature was notarized by a Florida notary public.

15.     Kenneth A. Shapiro signed the Trust Agreement in Fulton County, Georgia. Mr. Shapiro's signature was notarized by a Georgia notary public.

16.     The Trust had an insurable interest in Mrs. Leone's life.

### The Policy Application

17.     In 2007, the Trust applied to Insurer for the Policy, and Insurer issued the Policy to the Trust on February 1, 2007.

18.    At the time the Policy Application was submitted to Insurer, Mrs. and Mr. Leone, and Mr. Gee all resided in Miami, Florida.

19.    Accordingly, Mrs. Leone signed the Policy Application, section "Part II-Medical," in Miami, Florida. This part of the application provides current medical information necessary to the Insurer to permit it to assess risk and determine premium charges.

20.    Courts examine where a policy application is in fact signed. *See e.g.*, *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126 (2d Cir. 2018).

21.    The Policy Application states that Part I "Agreement," was signed by someone in Georgia but does not specify where the Insured signed.

22.    The Policy Application states that Mrs. Leone had a gross annual unearned income of $200,000 and a net worth of $6.5 million.

23.    The Policy contains a provision that states: "**CONFORMITY WITH LAWS** This policy is subject to the laws of the state where the application is signed." (emphasis in the original).

24.    Where it is ambiguous whether the state where the application is signed refers to the actual or purported location where the application was signed, courts "resolve any ambiguity against" the insurer, "the contract's drafter." *Id.*, at 134 (citations omitted).

25.     The Policy contains a provision stating:

Except for disability benefits, in the absence of fraud, *we* will not contest this policy after it has been in force while the *insured* is alive for two years from the *issue date* nor will *we* contest any increased benefits later than two years after the effective date for such increased benefits. If *you* did not request the increase or if evidence of insurability was not required, *we* will not contest the increase. As used herein, increased benefits shall include any favorable policy changes requested by *you*. If this policy is reinstated, the incontestable period will start over again beginning on the reinstatement date, but only for statements made in the application for reinstatement. (emphasis in the original).

26.     The Trust applied for and took out a loan with Barclays Bank PLC to finance payment of premium to Insurer for the Policy. The Barclays Bank PLC life insurance financing loan application states that Mrs. Leone's assets comprised personal savings or inheritance and ownership or sale of business, real property or other property, and that Mrs. Leone's income of $200,000 annually was unearned and that she had a net worth of $6.5 million. Mrs. Leone, Mr. Leone, and Mr. Shapiro signed the life insurance financing application.

27.     The premium financing loan was issued on or around February 28, 2007 and it, among other things, granted Barclays Bank PLC a lien of all Trust assets, including, without limitation, Trust accounts.

28.     The life insurance financing loan was recourse to assets other than the Policy.

29.     On or about April 30, 2009, Insurer notified Mr. Shapiro that the release of the assignment of the Policy from Bank of NY as collateral agent for Barclays Bank PLC was complete.

30.     Insurer was aware of the premium financing loan by virtue of Barclays Bank PLC recording a collateral assignment to the Policy with Insurer on a form supplied by and filed with Insurer, which Insurer subsequently noted had been released.

31.     Securities Intermediary was not involved in the creation of the Trust, the premium financing loan, or the Policy Application to Insurer.

**<u>Changes in Policy Ownership and Beneficiaries</u>**

32.     On or about May 10, 2010, approximately three (3) years after the Policy was issued, and more than one (1) year after the expiration of the Policy's incontestability provision, Mr. Shapiro executed a Policyowner's Change of Service Request whereby the Trust changed the owner and beneficiary of the Policy.

33.     On or about May 17, 2010, Insurer acknowledged, without objection, the change of ownership and beneficiary for the Policy.

34.     Other ownership and beneficiary changes for the Policy were submitted to, and processed and acknowledged by, Insurer without objection between 2010 and 2019.

35.     On or about May 23, 2019, Securities Intermediary became the owner and beneficiary of the Policy on behalf of its prior customer. Its prior customer and each succeeding customer, in acquiring the beneficial rights to the Policy, acquired all rights of all prior policy owners to recover any amounts due and payable under the Policy, including any premium amounts that may be returned by Insurer for any reason.

36.     Insurer confirmed the change of ownership and beneficiary to Securities Intermediary without objection as of June 5, 2019.

37.     Since becoming the owner and beneficiary of the Policy on behalf of its customer, Securities Intermediary has held the Policy in a securities account for the benefit of its customer and is the current record owner and beneficiary of the Policy on behalf of its customer.

38.     Since Securities Intermediary became the owner and beneficiary of the Policy on behalf of its customer, all Policy premiums have been duly and timely paid, there are no outstanding premium payments, and Securities Intermediary on behalf of its customer has otherwise performed all obligations under the Policy.

39.     Over the years, Insurer demanded and accepted premium payments for the Policy and issued written communications to Securities Intermediary, as well as all prior owners, stating or indicating that the Policy was valid and in force, and

representing the Policy was not void. Insurer did these things, reasonably making Securities Intermediary and all prior owners believe that the Policy was in fact valid and in force, and that premium should continue to be paid for it for years until Mrs. Leone died and Securities Intermediary submitted a death claim to Insurer.

40.   Mrs. Leone passed away on November 23, 2022.

41.   Securities Intermediary duly and timely submitted notice of death to Insurer.

**The Insurer Contests the Policy in 2023**

42.   Rather than pay the death benefit claim, and prior to notifying Securities Intermediary that it was denying the claim, on March 21, 2023, Insurer commenced an action against Securities Intermediary in the United States District Court for the District of Nebraska contesting the Policy's validity captioned, *Ameritas Life Insurance Corp. v. Wilmington Trust, National Association, as Securities Intermediary*, No. 4:23-cv-03035 (D. Neb.).

43.   Securities Intermediary does not have sufficient minimum contacts with Nebraska for the federal court there to exercise personal jurisdiction over it.

44.   Hence, Securities Intermediary has commenced this action to recover damages for Insurer's breach of contract and bad faith conduct.

45.     In the Nebraska action, Insurer seeks to rescind the Policy yet it has failed to offer to return all premium as required by law, including premium it demanded and accepted after it knew, among other things, that the Policy was issued to a Trust, that premium financing was used to pay premium on the Policy and that the Policy was subsequently sold on the secondary, and then tertiary life settlements markets.

**Insurer's Past Conduct from 2007 through 2023**

46.     Insurer's conduct of accepting (and not returning) premium payments; regularly issuing annual statements, illustrations, verifications of coverage, premium and lapse notices and other correspondence; and in all respects treating the Policy as if it were valid and enforceable at all times prior to Insurer receiving the death claim, each of which represented to Securities Intermediary that Insurer believed the Policy to be valid and enforceable, are acts that were committed with the intent to induce Securities Intermediary to believe that Insurer considered the Policy to be valid and enforceable, and induce Securities Intermediary to continue to pay premium to Insurer to keep the Policy in force.

47.     Insurer has been paid and has accepted almost two million dollars in premiums from Securities Intermediary and from prior owners, all of which Insurer intends to retain without honoring the Policy.

11

48.     Alternatively, Insurer considered the Policy valid irrespective of premium financing on the Policy, and subsequent sale of the Policy after issuance on the secondary and then tertiary life settlements markets, and has wrongfully failed to pay the death benefit and sued Securities Intermediary in Nebraska on a false premise that the Policy is void when in fact Insurer considered the Policy to be valid for 16 years.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

49.     Securities Intermediary repeats and realleges each and every allegation above as if fully set forth herein.

50.     At the time the Policy was applied for and issued, the Insured, Jacqueline Leone, resided in Florida. Her husband, the beneficiary of the Trust that owned the Policy, also resided in Florida. Insurer's agent who produced the Policy, Bradley Grant Gee, resided and was licensed in Florida.

51.     The Trust Agreement was signed by the Insured, Insurer's agent, and the Trust's beneficiary in Florida.

52.     The Policy Application, Part-II Medical, was signed in Florida.

53.     The Policy provides that it "is subject to the laws of the state where the application is signed."

54.     The Policy was signed, in part and by the Insured, in Florida; consequently, by the specific language that the Insurer included in its form wording, the Policy is subject to the laws of the State of Florida to the extent those laws vary from Georgia, another state where the Policy Application was signed in part.

55.     The Policy is an insurance contract, and interpretation of insurance contracts is governed by the law of the place of making. Insurance contracts are considered made at the place where the contract is delivered.

56.     The Policy was delivered to the Insured and her husband, the Policy owner's beneficiary, and/or to the life insurance producer in Florida.

57.     Florida law applies to interpretation of the Policy without consideration of the conformity with law provision.

58.     The Policy was not contested until March 21, 2023, when Insurer filed the federal Nebraska action contesting the Policy's validity.

59.     Florida's insurable interest statute provides in pertinent part:

Any individual of legal capacity may procure or effect an insurance contract on his or her own life or body for the benefit of any person, but no person shall procure or cause to be procured or effected an insurance contract on the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives, or to any person having, at the time such contract was made, an insurable interest in the individual insured. The insurable interest need not exist after the inception date of coverage under the contract.

*Wells Fargo Bank, N.A. v. Pruco Life Ins. Co.*, 200 So. 3d 1202, 1205 (Fla. 2016).

60.    Florida's incontestability statute provides:

Every insurance contract shall provide that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue except for nonpayment of premiums and except, at the option of the insurer, as to provisions relative to benefits in event of disability and as to provisions which grant additional insurance specifically against death by accident or accidental means.

*Id*.

61.    At inception, the Policy had insurable interest because the Insured's husband, William Leone, had an insurable interest in the life of his wife, the Insured. Under Florida law, the Policy is valid and enforceable and may not be challenged by Insurer.

62.    Even under Georgia law, which Insurer will argue applies to interpretation of the Policy, the Policy would be valid and enforceable.

63.    Georgia's insurable interest statute "does not prohibit buying insurance on one's own life with the unilateral intent to sell the policy to a third party with no insurable interest." *Crum v. Jackson Nat'l Life Ins. Co.*, 315 Ga. 67, 70, 880 S.E.2d 205, 207 (2022). In other words, insurable interest "must exist at the time the contract of [life] insurance becomes effective but need not exist at the time the loss occurs." *Id*. at 73. Thus, "under Georgia law, a life-insurance policy taken out by the insured on his own life with the intent to sell the policy to a third party with

14

no insurable interest, but without a third party's involvement when the policy was procured, is not void as an illegal wagering contract." *Id*. at 80-81.

64.     The Policy had insurable interest because the owner was a trust created by the Insured and the trust beneficiary was Insured's husband, William Leone. Securities Intermediary was not involved in procurement of the Policy. Under Georgia insurable interest law, the Policy is valid and enforceable.

65.     Under both and either Florida and/or Georgia law, the Policy is valid and enforceable.

66.     The Policy, by its terms, provides that Insurer shall make payment of the Policy's death benefit upon receipt of due proof of the Insured's death; and that Insurer shall be barred from challenging the Policy's validity after the Policy has been in force during the Insured's lifetime for two years from the date of issuance.

67.     Following the Insured's death, Securities Intermediary sent Insurer proof of death, and otherwise provided Insurer with all other information Insurer needed to process the death claim.

68.     Insurer failed to pay the death benefit to Securities Intermediary.

69.     Insurer filed the Nebraska action in 2023 contesting the Policy's validity more than two years after the Policy was issued.

70.    Insurer breached the Policy by failing to pay the Policy's death benefit to Securities Intermediary.

71.    Insurer further breached the Policy by filing the Nebraska action contesting the validity of the Policy more than two years after the Policy had been issued.

72.    Securities Intermediary has performed all of its duties and obligations under the Policy.

73.    As a result of the aforementioned breaches by Insurer, Securities Intermediary has been damaged in a sum to be determined by the trier of fact after trial, which damages include, but are not limited to, $6 million, representing the principal amount of the Policy's death benefit, plus applicable interest, as well as the fees and costs that Securities Intermediary has incurred and will continue to incur as a result of Insurer belatedly contesting the Policy's validity.

## SECOND CAUSE OF ACTION
**(Bad Faith Breach of the Covenant of Good Faith and Fair Dealing)**

74.    Securities Intermediary repeats and realleges each and every allegation above as if fully set forth herein.

75.    Securities Intermediary is the record owner and beneficiary of the Policy.

16

76.    The Policy is valid and enforceable under either and/or both Florida and Georgia law.

77.    Following the Insured's death, Securities Intermediary timely submitted a death claim to Insurer at least 60 days prior to filing this action, and Securities Intermediary has otherwise performed all duties and obligations under the Policy.

78.    Prior to filing this action, Securities Intermediary properly and timely submitted to Insurer a formal demand for payment pursuant to O.C.G.A. § 33-4-6.

79.    Instead of responding to the death benefits claim, Insurer filed the Nebraska federal action against Securities Intermediary contesting the Policy's validity.

80.    Insurer knew among other things, that the Policy was issued to a Trust, premium financing was used to pay premium on the Policy and the Policy was subsequently sold after issuance on the secondary, and then tertiary life settlements markets. Having this knowledge, Insurer never stopped demanding, receiving and accepting premium payments, regularly issuing annual statements, illustrations, verifications of coverage, premium and lapse notices and other correspondence, and in all respects treating the Policy as if it were valid and enforceable at all times prior to Insurer receiving the death claim. Insurer accepted almost two million dollars of

premium for the Policy since 2007. Insurer did this while intending to rescind the Policy after receiving a death claim, and intending to keep all premiums paid which kept the Policy in force.

81.    Insurer's failure to pay the death benefit is motivated by bad faith.

82.    Under the terms of the Policy and the facts surrounding Insurer's response to Securities Intermediary's death benefits claim, Insurer had no good cause for resisting, delaying payment, and failing to respond to the death benefits claim.

83.    Securities Intermediary is damaged in the amount of $6 million.

84.    As a result of Insurer's bad faith conduct, pursuant to O.C.G.A. § 33-4-6, in addition to the loss of $6 million, Securities Intermediary is also entitled to not more than $3 million, representing 50 percent of the liability of Insurer for the loss, and all of Securities Intermediary's reasonable attorney's fees for the prosecution of this action against Insurer.

85.    Securities Intermediary is also entitled to attorneys' fees pursuant to O.C.G.A. § 13-6-11.

86.    Within 20 days of bringing this action, Securities Intermediary will, in addition to making service of process, mail to the Georgia Commissioner of Insurance a copy of the demand and complaint by first-class mail.

87.     As a result of Insurer's bad faith conduct, pursuant to O.C.G.A. § 33-25-10, in addition to the loss of $6 million, 50 percent of the liability of Insurer for the loss, and Securities Intermediary's reasonable attorneys' fees for the prosecution of this action, Securities Intermediary is also entitled to interest computed beginning 30 days after the date of death of Mrs. Leone, until the date of payment of the death benefit, at the legal rate of interest of 7 percent per annum simple interest.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment and Return of Premium)

88.     Securities Intermediary repeats and realleges each and every allegation above as if fully set forth herein.

89.     Securities Intermediary timely and fully paid all premiums due on the Policy, and Insurer has received accepted almost two million dollars in premiums from Securities Intermediary and from prior owners in connection with the Policy.

90.     Securities Intermediary's customer succeeded to, among other things, "all income, payments and proceeds relating to or arising out of" the purchase and sale of the Policy and "all rights of recourse or recovery against any third party, and all other claims, rights and causes of action, relating to or arising out of" the purchase and sale of the Policy.

91.     O.C.G.A. § 33-24-3(i) provides in relevant part that "[i]n the case of a void contract, the insurer shall not be liable on the contract but shall be liable to

19

repay to the person or persons who have paid the premiums all premium payments without interest."

92.    Should the Court find that the Policy is void, O.C.G.A. § 33-24-3(i) requires Insurer to return all premiums paid to Insurer in connection with the Policy, yet Insurer has failed to offer to return premium.

93.    Moreover, should the Court find that the Policy is void, no coverage would have ever attached and, therefore, the premiums paid to Insurer in connection with the Policy would not have been earned, and must be returned.

94.    Under such circumstances, it would be also inequitable for Insurer to retain the premiums paid to it in connection with the Policy.

**DEMAND FOR RELIEF**

**WHEREFORE**, Plaintiff Wilmington Trust, National Association, as Securities Intermediary, demands judgment in its favor as follows:

A.    $6 million, representing the Policy's death benefit; and

B.    Not more than $3 million, representing 50 percent of Insurer's liability for the loss, pursuant to O.C.G.A. § 33-4-6; and

C.    All reasonable attorneys' fees expended in the prosecution of this action, pursuant to O.C.G.A. §§ 33-4-6 and 13-6-11; and

D.    Interest at the rate of 12 percent per annum simple interest, pursuant to

O.C.G.A. § 33-25-10; or,

E.    Alternatively, in the event that the Policy is declared void, return of all

premium paid to Insurer in connection with the Policy; and

K.    Such other and further relief in favor of Securities Intermediary as the

Court deems just and proper.

Dated:  May 10, 2023

By:  /s/ *Dan. F. Laney*
        Dan F. Laney
        Georgia Bar Number 435290
        Cole McFerren
        Georgia Bar Number 409248
        **SMITH GAMBRELL RUSSELL LLP**
        1105 West Peachtree Street, N.E.,
        Suite 1000
        Atlanta, Georgia 30309
        Tel: (404) 815-3500
        Fax: (404) 815-3509
        dlaney@sgrlaw.com
        cmcferren@sgrlaw.com


        /s/ *Julius A. Rousseau*
        Julius A. Rousseau, III
        (*Pro hac vice* to be filed)
        Michael Cryan (*Pro hac vice* to be filed)
        Anna Mandel (*Pro hac vice* to be filed)
        **ARENTFOX SCHIFF LLP**
        1301 Avenue of the Americas, 42nd Fl.
        New York, NY 10019
        Tel: (212) 484-3900

21

Fax: (212) 484-3990
jule.rousseau@afslaw.com
michael.cryan@afslaw.com
anna.mandel@afslaw.com

*Attorneys for Plaintiff, Wilmington Trust,
National Association, as Securities
Intermediary*