# EXHIBIT B

November 1, 2021

**GENERAL MEMORANDUM OF AGREEMENT OF AUGUST 1, 2021**
**between**
**ALLIANCE OF MOTION PICTURE AND TELEVISION PRODUCERS**
**and**
**INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES,**
**MOVING PICTURE TECHNICIANS, ARTISTS AND ALLIED CRAFTS**
**OF THE UNITED STATES, ITS TERRITORIES AND CANADA**
**FOR THE THEATRICAL AND TELEVISION MOTION PICTURE AREA**
**STANDARDS AGREEMENT**

This Memorandum of Agreement is entered into as of August 1, 2021 between the International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, its Territories and Canada (hereinafter referred to as the "IATSE"), on its own behalf and on behalf of the Local Unions whose jurisdictions are covered by the 2021 IATSE Area Standards Agreement (such International Alliance and Locals being referred to individually as the "Union" and collectively as the "Unions"), on the one hand, and the Alliance of Motion Picture and Television Producers (hereinafter "AMPTP") on behalf of those Producers which have effectively consented to be part of the single multi-employer bargaining unit (each hereinafter respectively referred to as the "Employer" and collectively referred to as the "Employers" and listed on Exhibit "A" attached hereto), on the other hand.

This Memorandum of Agreement modifies the Theatrical and Television Motion Picture Area Standards Agreement between the IATSE and the Employers which became effective on August 1, 2018.

All of the provisions of the current Area Standards Agreement between the parties shall remain the same, unless otherwise specifically changed as noted herein. As soon as practicable, this Memorandum of Agreement will be reduced to formal contract language. This Memorandum of Agreement is not contract language, except where the context clearly indicates otherwise.

The provisions herein shall be effective on the first Sunday following notice of ratification, unless a contrary date is specified, in which case such provision shall be effective as of the date so specified.

In consideration of the mutual agreements herein contained, the parties hereto agree as follows:

1.    **Term**

The term of the Agreement shall be three (3) years, beginning August 1, 2021 and terminating on July 31, 2024.

2.   **Wages**

a.   Minimum contract wage rates shall be increased by three percent (3%) effective August 1, 2021, provided that this Agreement is ratified no later than sixty (60) days after this Memorandum of Agreement is fully executed, and there is no work stoppage by the members of the IATSE between July 31, 2021 and the ratification of this Agreement.  Minimum contract wages shall be increased by an additional three percent (3%) effective July 31, 2022, and by an additional three percent (3%) effective July 30, 2023.  These increases shall be compounded.

b.   Modify the "Maryland" and "Non-Maryland" hourly wage rate tables in Appendix A and the Washington D.C. rates in Article 3(A)(3) to provide the following minimum hourly wage rates for Art Department Coordinators and Assistant Production Office Coordinators under the "Television" column:

$23.50/hour effective August 1, 2021 (subject to the same conditions described in Item 2.a. above regarding the minimum wage increase in the first year of the Agreement); $24.50/hour effective July 31, 2022; and $26.00/hour effective July 30, 2023.

During the term of the 2021 Area Standards Agreement, the minimum hourly wage rates set forth in this Item 2.b. shall not be adjusted under Paragraphs D.(2) ("Low Budget SVOD Programs") or D.(3) ("Mid-Budget SVOD Programs") of Sideletter 12 re: Productions Made for New Media.

*Make conforming changes, including by revising footnote 5 as it relates to the Art Department Coordinator and Assistant Production Office Coordinator classifications to apply to theatrical motion pictures only.*

c.   *Add the following Sideletter to the Area Standards Agreement to provide:*

"Dear Matt:

"This will confirm that during the negotiations for the 2021 Area Standards Agreement, the parties agreed that an Employer may individually negotiate with an Art Department Coordinator or Assistant Production Office Coordinator employed on a theatrical motion picture or on a High Budget SVOD Program to which the wage rates and working conditions applicable to a theatrical motion picture apply (as provided in Paragraph F.(4)(a)(iv) of the Sideletter re: Productions Made for New Media) to employ the Art Department Coordinator or Assistant Production Office Coordinator on a daily or weekly basis with an hourly rate.  Nothing in this Sideletter shall prevent an Employer from employing an Art Department Coordinator or Assistant Production Office Coordinator on a theatrical motion picture or on a High Budget SVOD Program to which the wage rates and working conditions applicable to a theatrical motion picture apply (as

provided in Paragraph F.(4)(a)(iv) of the Sideletter re: Productions Made for New Media) on an 'on call' basis.

"It is understood that Art Department Coordinators or Assistant Production Office Coordinators employed on a daily or weekly basis as described above shall receive overtime and premium payments in accordance with Article 3(D)."

*Make conforming changes, including by revising footnote 5 as it relates to the Art Department Coordinator and Assistant Production Office Coordinator classifications to apply to theatrical motion pictures only, and to make reference to the Sideletter above.*

3.    **Fringe Benefits**

a.      Increase all health contribution rates in Article 5 of the Agreement by $6.00 per day effective August 1, 2021, provided that this Agreement is ratified no later than sixty (60) days after this Memorandum of Agreement is fully executed, and there is no work stoppage by the members of the IATSE between July 31, 2021 and the ratification of this Agreement.

Except as to employees covered under the Area Standards Agreement and working in Hawaii and San Diego, California, all such amounts shall be allocated to the IATSE National Health and Welfare Fund.  For employees working under the Area Standards Agreement in Hawaii, such amounts shall be allocated to the IATSE Local 665 Health and Welfare Trust Fund.  For employees working under the Area Standards Agreement in San Diego, California, such amounts shall be allocated to the San Diego Theatrical Health and Welfare Trust Fund.

b.      The aggregate daily benefit plan contribution rate shall be increased by an additional $6.00 per day effective July 31, 2022 and by an additional $7.00 per day effective July 30, 2023.

Allocation of the foregoing increases shall be made by mutual agreement of the AMPTP (on behalf of the Employers) and the IATSE at least sixty (60) days in advance of July 31, 2022 and July 30, 2023, respectively.  The parties may agree to different allocations for each of the rates listed in Article 5(A)(1)-(8):

(1)      "Non-Maryland fringe rates"
(2)      "Maryland fringe rates"
(3)      Southeastern Michigan
(4)      Washington, D.C.
(5)      Maine, Massachusetts, New Hampshire, Rhode Island, Vermont
(6)      Las Vegas
(7)      Hawaii
(8)      Oregon and Washington

In the event the AMPTP and IATSE do not mutually agree upon the allocation before the deadline described in the preceding sentence, the entire increase shall be allocated to health, unless the IATSE National Pension Fund is less than eighty percent (80%) funded or is projected to have a negative credit balance during the seven (7) year projection period, based on the preliminary actuarial valuation results for the year of the increase, in which case at least half of the increase shall be allocated to pension.

4. **Overtime**

Modify Article 3(D)(2) to provide that an employee will be paid two (2) times the employee's regular hourly rate for all hours worked after twelve (12) hours of work on any work day (other than for Distant Hires) on:

a. a pilot, other than a pilot made for basic cable or The CW and other than a two (2) hour pilot for which there is no series commitment at the time of the pilot order;

b. an episode of a series, other than the first season of a series made for basic cable or The CW; or

c. a one-time television motion picture, other than a long-form television motion picture

which commences principal photography on or after the first Sunday that falls 90 days after the AMPTP receives notice of ratification. The foregoing shall not apply to a mini-series.

*Contract language changes are as follows:*

*Modify Article 3(D) ("Overtime and Premium Pay") as follows:*

"(D)   Overtime and Premium Pay

"(1)   One and one-half times the employee's regular hourly rate will be paid for all hours worked after eight (8) hours of work on the first through the fifth work days in a workweek or after forty (40) straight time hours of work in a workweek, and for the first twelve (12) hours worked (or for the first fourteen (14) elapsed hours if applicable under subparagraph (2) below) on a sixth work day in a workweek.

"(2)   (i)   Two (2) times the employee's regular hourly rate will be paid for all hours worked after twelve (12) hours of work on any work day when an employee is employed on a theatrical motion picture. ~~, except that on television productions, employee shall be paid two (2) times the employee's regular basic hourly rate for all hours worked after fourteen (14) elapsed hours.~~

"(ii)    Two (2) times the employee's regular hourly rate will be paid for all hours worked after fourteen (14) elapsed hours when the employee is employed on a television production, except:

"Two (2) times the employee's regular hourly rate will be paid for all hours worked after twelve (12) hours of work on any work day (other than for Distant Hires) when the employee is employed on any of the following productions which commence principal photography on or after [*insert the date that is the first Sunday that falls 90 days after the AMPTP receives notice of ratification*]:

"(A)    a pilot, other than a pilot made for basic cable or The CW and other than a two (2) hour pilot for which there is no series commitment at the time of the pilot order;

"(B)    an episode of a series, other than the first season of a series made for basic cable or The CW; or

"(C)    a one-time television motion picture, other than a long-form television motion picture.

"(For clarity, employees employed on a mini-series shall be paid double time after fourteen (14) elapsed hours.)

"(3)    Two (2) times the employee's regular hourly rate will be paid for all hours worked on a seventh workday in the employee's workweek or on a holiday.

"(4)    Overtime and premium rates will be paid in one-tenth hour increments.  Overtime and premium rates may not be compounded."

5.    **Rest Periods**

*Modify Article 3.(F) to provide as follows:*

"(F)    Rest Periods

"The following provisions apply to employees employed on a motion picture, program, part of a mini-series or episodes of a series which commences principal photography on or after [*insert the date that is the first Sunday after 90 days following the AMPTP's receipt of notice of ratification*]. Otherwise, Article 3(F) of the 2018 Agreement shall apply.

"(1)    Daily Rest Period

"The rest period following dismissal shall be ten (10) hours for employees who are employed as Local or Nearby Hires.

"The rest period following dismissal shall be nine (9) hours for employees who are employed as Distant Hires, except that in the event that an employee employed as a Distant Hire works fourteen (14) or more hours on two (2) consecutive days for the same Employer on the same production, there will be a ten (10) hour rest period commencing upon the employee's dismissal on the second consecutive day so worked and continuing each day thereafter that the employee works for the same Employer on the same production until the employee either works a day of fewer than fourteen (14) hours or the employee has a day off.  The exception in the preceding sentence shall not apply to pilots nor to series in their first season of production.

"(2)    Weekend Rest Period[1]

"(i)    Weekend Rest Period for Employees Who Work a Five (5) Consecutive Day Workweek

"An employee who works five (5) consecutive days in the workweek shall be entitled to a weekend rest period of fifty-four (54) hours, inclusive of the daily rest period.

"The weekend rest period may be reduced to fifty (50) hours, inclusive of the daily rest period, in the following circumstances:

"(a)    the fifth day of the workweek is no longer than twelve (12) hours worked; and either

"(b)    1)    exterior night shooting, as called for in the script, is scheduled for the fifth day of the workweek;

"2)    work on the fifth day of the workweek takes place at a shooting location, access to which is limited to certain hours; or

"3)    work on the fifth day of the workweek is delayed due to a health and safety concern as a result of weather or a natural hazard that occurs during the course of the employee's work shift.

---

[1] If the production's first workweek is a partial workweek, the weekend rest period shall apply as if it were a full workweek.

"(c)     Employer may utilize the foregoing exceptions:

"1)     once on a one-time motion picture 66 minutes or more but less than 85 minutes in length;

"2)     no more than once every six (6) weeks on episodic series and mini-series; or

"3)     twice on a theatrical motion picture or a one-time motion picture 85 minutes or more in length.

"(ii)    <u>Weekend Rest Period for Employees Who Work a Six (6) Consecutive Day Workweek</u>

"An employee who works six (6) consecutive days in the workweek shall be entitled to a rest period of thirty-two (32) hours, inclusive of the daily rest period.

"(iii)    <u>Weekend Rest Period for Employees Whose Sixth Day Worked Occurs on the Seventh Day of the Workweek</u>

"An employee whose sixth day worked occurs on the seventh day of the workweek shall be entitled to a rest period of thirty-two (32) hours, inclusive of the daily rest period.  The rest period shall be measured from dismissal on the employee's fifth consecutive day of work to the start of the employee's work day on the seventh day of the workweek.

"(iv)    The foregoing rest periods shall not apply to a workweek shift.

"(v)    Measurement of the weekend rest period shall be the same as applies to the daily rest period under the Area Standards Agreement, except that measurement of the weekend rest period for Distant Hires shall be "set-to-set," or if the employee is not employed on a set, worksite-to-worksite.

"(3)    The penalty for invasion of the rest period as provided herein shall be payment of additional straight time for all invaded hours.

"(4)    The foregoing provisions of this Article 3(F) do not apply to employees employed on an 'on call' basis."

6.    **Meals**

a.    Employers and the IATSE agree to work with the DGA and/or production executives in an effort to ensure that employees covered by the Area Standards Agreement are provided the opportunity to take contractually-prescribed meal breaks.  A meeting of representatives of the AMPTP, IATSE and DGA to discuss

the provision of meal periods to the IATSE in a timely manner shall take place as soon as practicable but in no event later than January 31, 2022.

b.      Employers agree that the IATSE may request meetings on an Employer-by-Employer basis to discuss recurring issues with the provision of meal breaks to employees covered by the Area Standards Agreement.

c.      Within thirty (30) days of notice of ratification, the AMPTP will issue a bulletin emphasizing the importance of providing employees with a meal break during the day.  The bulletin shall set forth the meal period requirements in Article 4 of the Area Standards Agreement.

d.      <u>Meal Penalty Increase</u>

*Modify Article 4(D) as follows:*

"(D)    (1)      Except as provided in subparagraph (2) below, meal penalty for delayed meals shall be computed as follows:

"First half-hour meal delay
or fraction thereof . . . . . . . . . . . . . . . . . . . . . $ 7.50

"Second half-hour meal delay
or fraction thereof . . . . . . . . . . . . . . . . . . . . . $10.00

"Third and ~~each succeeding~~ <u>fourth</u> half-hour
meal delay or fraction thereof . . . . . . . . . . . . $12.50

"<u>Fifth and each succeeding half-hour meal delay or</u>
<u>fraction thereof</u> . . . . . . . . . . . . . . . . . . . . . . . . $25.00

"<u>For any workweek in which an employee is entitled to more</u>
<u>than twenty (20) meal period penalties, all subsequent meal period penalties for</u>
<u>that employee in that workweek shall be compensated at one (1) hour of pay at the</u>
<u>prevailing rate for each one-half (½) hour of meal delay or fraction thereof.</u>

"(2)    Meal penalty for delayed meals for employees employed on television motion pictures shooting in a studio shall be computed as follows:

"First half-hour meal delay
or fraction thereof . . . . . . . . . . . . . . . . . . . . . $ 8.50

"Second half-hour meal delay
or fraction thereof . . . . . . . . . . . . . . . . . . . . . $11.00

> "Third and ~~each succeeding~~ <u>fourth</u> half-hour
> meal delay or fraction thereof. . . . . . . . . . . . . $13.50
>
> "<u>Fifth and each succeeding half-hour meal delay or
> fraction thereof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $25.00</u>
>
> "<u>For any workweek in which an employee is entitled to more
> than twenty (20) meal period penalties, all subsequent meal period penalties for
> that employee in that workweek shall be compensated at one (1) hour of pay at the
> prevailing rate for each one-half (½) hour of meal delay or fraction thereof."</u>

7.   **Productions Made for New Media**

   a.   *Modify the preamble to the Sideletter re: Productions Made for New Media as
   follows:*

   "This Sideletter confirms the understanding of the International Alliance of
   Theatrical Stage Employees (hereinafter "the IATSE"), on the one hand, and the
   Alliance of Motion Picture and Television Producers, on behalf of the Employers
   listed in Exhibit "A" which it represented in negotiations for the IATSE Theatrical
   and Television Motion Picture Area Standards Agreement of ~~2018~~2021
   (hereinafter "the Area Standards Agreement"), on the other hand, (collectively "the
   parties"), concerning the terms and conditions applicable to the production of
   dramatic, scripted motion pictures that are made for the Internet, mobile devices, or
   any other new media platform in existence as of August 1, 2009 (hereinafter
   collectively referred to as "New Media").[footnotes omitted]

   "With respect to such productions intended for initial use in new media, the parties
   agree as follows:  ~~The parties mutually recognize that the economics of New Media
   production are presently uncertain and that greater flexibility in terms and
   conditions of employment is therefore mutually beneficial.  If one or more business
   models develop such that New Media production becomes an economically viable
   medium, then the parties mutually recognize that future agreements should reflect
   that fact."~~

b.   **Low Budget SVOD Programs**

*Add a new Paragraph D.(2) to the Sideletter re: Productions Made for New Media (and renumber the existing Paragraph D.(2) as D.(3)) as follows:*

"**D.**   **Terms and Conditions of Employment on Original New Media Productions (Other than an Original "High Budget SVOD Program")**

\*\*\*

"(2)   Low Budget SVOD Programs

"(a)   The terms and conditions set forth in this Paragraph D.(2) shall be applicable prospectively only.  They shall not apply to:

"(i)   any program or series that would otherwise qualify as a "Low Budget SVOD Program" within the meaning of this Sideletter, for which the principal photography of the program, in the case of a one-time program, or the principal photography of the first episode, in the case of a series, commenced prior to August 1, 2022; or

"(ii)   any program or series that would otherwise qualify as a "Low Budget SVOD Program" within the meaning of this Sideletter, for which the principal photography of the program or the first episode of the series commenced after August 1, 2022, if such program or series was produced pursuant to the terms of a *bona fide* license agreement with fixed and definite terms entered into by the Employer prior to August 1, 2022.

"However, if such license agreement is entered into subject to conditions precedent, then all such conditions must be satisfied prior to August 1, 2022.

"Any program or series described in subparagraphs (i) or (ii) above shall be subject to Paragraph D.(1) of this Sideletter.  However, with respect to any such program or series described in subparagraphs (i) or (ii) above, if the licensee orders additional programs or episodes pursuant to the terms of the license agreement after August 1, 2022 and the Employer has the right to negotiate with respect to the material terms and conditions of the license for the

additional programs or episodes, then such additional programs or episodes shall be subject to this Paragraph D.(2).[2]

"Notwithstanding the foregoing, the Employer shall not reduce the terms and conditions of employment previously provided to IATSE-represented employees on programs or series covered by subparagraphs (i) or (ii) above.

**"(b)**     Low Budget SVOD Programs Defined

"The terms and conditions set forth in Paragraph D.(2)(c) of this Sideletter shall be applicable only to covered original, live action dramatic new media productions (other than an "Experimental New Media Production") made for initial exhibition on a subscription video-on-demand consumer pay platform which meet the following criteria (hereinafter **"Low Budget SVOD Programs"**):

| **"Length of Program as Initially Exhibited\*** | **"Low Budget" Threshold** |
| --- | --- |
| 20-35 Minutes | Less than $900,000 |
| 36-65 Minutes | Less than $1,750,000 |
| 66 Minutes or more | Less than $2,100,000 |

"\* Original, live action dramatic new media productions which are less than 20 minutes in length and made for initial exhibition on a subscription video-on-demand consumer pay platform are not subject to this Paragraph D.(2), and, instead, are subject to Paragraph D.(1) of this Sideletter, regardless of their budgets.

---

[2]   In the event that the Employer asserts that a program or series is grandfathered under the provisions of the second paragraph of Paragraph D.(2)(a) above, a limited number of representatives of the IATSE, subject to the execution of a confidentiality agreement satisfactory in form to the Employer, may inspect those portions of the license agreement that are relevant to determine whether the Employer had the right to renegotiate with respect to the material terms and conditions of the license for the additional programs or episodes.  All information received or reviewed by representatives of the IATSE shall be kept confidential, and neither the IATSE nor its representatives shall disclose any such information, except as necessary to enforce its rights under this Agreement.

"(c)    Terms and Conditions

"The terms and conditions applicable to a Low Budget
SVOD Program shall be those set forth in the 2021 Area
Standards Agreement for a long-form television motion
picture, except that:

"(i)    Employees employed on a Low Budget SVOD
Program in the "Maryland" and "Non-Maryland"
areas shall be paid at the applicable "Pilot, Long-
Form and First Year of One-Hour Episodic Series"
rates for the period two periods prior to the period in
question (e.g., during the period July 31, 2022 to July
29, 2023, the wage rates for the period August 2,
2020 to July 31, 2021 shall apply). The minimum
rates for employees working in Washington, D.C.
shall be the "television" rates set forth in Article
3(A)(3) for the period two periods prior to the period
in question (e.g., during the period July 31, 2022 to
July 29, 2023, the wage rates for the period August
2, 2020 to July 31, 2021 shall apply). The minimum
rates for employees working in Las Vegas and
Hawaii shall be as provided in Paragraph D.(2) of the
Sideletter re: Productions Made for New Media to
the 2021 Producer-IATSE Basic Agreement;

"(ii)   Paragraph E.(5) of this Sideletter shall apply; and

"(iii)  Rest periods shall be as provided in Article 3(F) of
the 2021 IATSE Area Standards Agreement."

*Make conforming changes, including but not limited to modifying the second
sentence of Paragraph B. of the Sideletter re Productions Made for New Media to
refer to Paragraph D.(1) rather than "Paragraph D."*

c.   **Mid-Budget SVOD Programs**

*Modify Paragraph D.(2) of the Sideletter re: Productions Made for New Media as follows (conform footnote numbers as necessary):*

"**D.   Terms and Conditions of Employment on Original New Media Productions (Other than an Original "High Budget SVOD Program")**

****

"(~~23~~) (a)   The terms and conditions set forth in this Paragraph D.(~~23~~) shall not apply to any program or series that continues in production on or after [*the first Sunday following the AMPTP's receipt of notice of ratification*] and which qualified as a "Legacy"[3] Mid-Budget SVOD Program or series, and continues to qualify as a "Legacy" Mid-Budget SVOD Program or series, pursuant to Paragraph D.(2)(a)(i) or (ii) of the Sideletter re Productions Made for New Media to the 2018 Area Standards Agreement.

"In addition, the terms and conditions set forth in this Paragraph D.(3) shall not apply to a Mid-Budget SVOD Program or episodes of a Mid-Budget SVOD series, the principal photography of which commences on or after [*the first Sunday following the AMPTP's receipt of notice of ratification*] pursuant to a license agreement entered into prior to [*the first Sunday following the AMPTP's receipt of notice of ratification*].[4]  Paragraph D.(2) of the Sideletter re

---

[3] "During the 2021 negotiations, the parties agreed as a matter of housekeeping to rename "grandfathered" Mid-Budget SVOD Programs and series as "Legacy" Mid-Budget SVOD Programs and series.

[4] "If the licensee orders additional Mid-Budget SVOD Programs or episodes of a Mid-Budget SVOD series, the principal photography of which will commence on or after [*the first Sunday following the AMPTP's receipt of notice of ratification*], pursuant to a license agreement entered into prior to [*the first Sunday following the AMPTP's receipt of notice of ratification*], and the Employer has the right to negotiate with respect to the material terms and conditions of the license for the additional programs or episodes, then the Mid-Budget SVOD Program or episodes of the Mid-Budget SVOD series shall be subject to the terms of the Sideletter re Productions Made for New Media to the 2021 Area Standards Agreement.  In the event that Employer asserts that a Mid-Budget SVOD Program qualifies as a "Legacy" Mid-Budget SVOD Program under the provisions of the second paragraph of Paragraph D.(3)(a) above, a limited number of representatives of the IATSE, subject to the execution of a confidentiality agreement satisfactory in form to Employer, may inspect those portions of the license agreement that are relevant to determine whether the Employer had the right to renegotiate with respect

<u>Productions Made for New Media to the 2018 Area Standards Agreement shall apply instead, except that minimum wage and fringe rates shall be subject to the increases negotiated during the 2021 negotiations.</u>

"The terms and conditions set forth in this Paragraph D.(2) shall be applicable prospectively only.  They shall not apply to:

"(i)   any program or series that would otherwise qualify as a "Mid-Budget SVOD Program" within the meaning of this Sideletter, for which the principal photography of the program, in the case of a one-time program, or the principal photography of the first episode, in the case of a series, commenced prior to August 1, 2019; or

"(ii)   any program or series that would otherwise qualify as a "Mid-Budget SVOD Program" within the meaning of this Sideletter, for which the principal photography of the program or the first episode of the series commenced after August 1, 2019, if such program or series was produced pursuant to the terms of a *bona fide* license agreement with fixed and definite terms entered into by the Employer prior to August 1, 2019.

"However, if such license agreement is entered into subject to conditions precedent, then all such conditions must be satisfied prior to August 1, 2019.

"Any program or series described in subparagraphs (i) or (ii) above shall be subject to Paragraph D.(1) of this Sideletter.  However, with respect to any such program or series described in subparagraphs (i) or (ii) above, if the licensee orders additional programs or episodes pursuant to the terms of the license agreement after August 1, 2019 and the Employer has the right to negotiate with respect to the

_____

to the material terms and conditions of the license for the additional programs or episodes.  All information received or reviewed by representatives of the IATSE shall be kept confidential, and neither the IATSE nor its representatives shall disclose any such information, except as necessary to enforce its rights under this Agreement.

~~material terms and conditions of the license for the additional programs or episodes, then such additional programs or episodes shall be subject to this Paragraph D.(2).[5]~~

~~Notwithstanding the foregoing, the Employer shall not reduce the terms and conditions of employment previously provided to IATSE-represented employees on programs or series covered by subparagraphs (i) or (ii) above.~~

"(b)    Mid-Budget SVOD Programs Defined

"The terms and conditions set forth in Paragraph D.(~~2~~3)(c) of this Sideletter shall be applicable only to original, live action dramatic new media productions made for initial exhibition on a subscription video-on-demand consumer pay platform which meet the following criteria (hereinafter "Mid-Budget SVOD Programs"):

| **Length of Program as Initially Exhibited*** | **"Mid-Budget" Threshold** |
| --- | --- |
| 20-35 Minutes | $900,000 or more but less than $1,300,000 |
| 36-65 Minutes | $1,750,000 or more but less than $2,500,000 |
| 66 Minutes or more | $2,100,000 or more but less than $3,000,000 |

"* Original, live action dramatic new media productions which are less than 20 minutes in length and made for initial exhibition on a subscription video-on-demand consumer pay

---

~~[5] In the event that the Employer asserts that a program or series is grandfathered under the provisions of the second paragraph of Paragraph D.(2)(a) above, a limited number of representatives of the IATSE, subject to the execution of a confidentiality agreement satisfactory in form to the Employer, may inspect those portions of the license agreement that are relevant to determine whether the Employer had the right to renegotiate with respect to the material terms and conditions of the license for the additional programs or episodes. All information received or reviewed by representatives of the IATSE shall be kept confidential, and neither the IATSE nor its representatives shall disclose any such information, except as necessary to enforce its rights under this Agreement.~~

platform are not subject to this Paragraph D.(23) and, instead, are subject to Paragraph D.(1) of this Sideletter, regardless of their budgets.

"(c)    Terms and Conditions

"The terms and conditions for employees employed on a Mid-Budget SVOD Program shall be those set forth in the ~~2018~~2021 Area Standards Agreement for a long-form television motion picture, except that:

"(A)    Employees employed on a Mid-Budget SVOD Program shall be paid at the "Pilot, Long-Form and First Year of One-Hour Episodic Series" wage rates for the period ~~two periods~~ prior to the period in question (*e.g.*, during the period ~~August 2, 2020~~ July 31, 2022 to ~~July 31, 2021~~ July 29, 2023, the wage rates for the period ~~July 29, 2018~~ August 1, 2021 to ~~August 3, 2019~~ July 30, 2022 shall apply). The minimum rates for employees working in Washington, D.C. shall be the "television" rates set forth in Article 3(A)(3) for the period prior to the period in question (*e.g.*, during the period July 31, 2022 to July 29, 2023, the wage rates for the period August 1, 2021 to July 30, 2022 shall apply). The minimum rates for employees working in Las Vegas and Hawaii shall be as provided in Paragraph D.(2) of the Sideletter re: Productions Made for New Media to the 2021 Producer-IATSE Basic Agreement;

"(B)    Paragraph E.(5) of this Sideletter shall apply; and

"(C)    Rest periods shall be as provided in Article 3(F)~~(1)~~ of the ~~2018~~2021 IATSE Area Standards Agreement."

d.    **High Budget SVOD Programs**

See attached charts for changes to terms and conditions for High Budget SVOD Programs.

e.    Renew the Sideletter re: Productions Made for New Media, subject to the modifications provided herein.

8. **Martin Luther King Jr. Day**

Martin Luther King Jr. Day shall be added as a holiday effective January 1, 2022 pursuant to Sideletter No. 1 when the Memorandum of Agreement for the 2021-2024 Producer - IATSE Basic Agreement is ratified.

9. **Diversity, Equity and Inclusion**

a. The parties agree to convene a meeting of the Joint Diversity and Inclusion Task Force within thirty (30) days of the AMPTP's receipt of notice of ratification. The Task Force will consider a Local by Local approach to improving diversity, equity and inclusion.

b. *Add a new Article 25 to the Area Standards Agreement to provide as follows:*

**"ARTICLE 25 – DIVERSITY, EQUITY AND INCLUSION**

"(A)    **Statement of Commitment.**

"Acknowledging the critical importance of diversity, equity, and inclusion in the entertainment industry, Employer and the IATSE, including the Local Unions, mutually reaffirm their commitment to make good faith efforts to increase employment opportunities for individuals from 'underrepresented populations' in order to foster a more inclusive, equitable, and diverse workforce in the motion picture industry. Historically, 'underrepresented populations' have traditionally been defined as women, racial and ethnic minorities, LGBTQIA, persons with a disability and other protected categories; however, underrepresented classifications may vary per craft.

"In furtherance of this commitment, Employers, in partnership with the IATSE and the Local Unions, seek to create one or more diversity, equity and inclusion initiatives that are designed to enhance employment opportunities, as well as equip participants with the requisite knowledge, skills and credentials to work successfully in the motion picture crafts."

"(B)    **Self-Identification Data**.

"During the 2021 negotiations, the parties discussed the efforts that have been made by the Employers and the Local Unions to obtain information about the personal characteristics of their employees and membership through voluntary self-identification. The IATSE, along with the Local Unions, and the Employers recognize that obtaining such information is useful in expanding access to employment opportunities for under-represented groups and for tracking the success of their efforts to diversify the workforce. To that end, the IATSE and the Local Unions agree to encourage their members to voluntarily self-identify when

requested to do so by either a Local Union or an Employer, including when members are completing new membership paperwork for a Local Union or start paperwork for an Employer. The IATSE and the Local Unions further agree to share with the AMPTP any diversity statistics that they currently possess or develop in the future.

"(C)   **Training Program Opportunities**.

"(1)   The parties shall discuss the development, administration and oversight of program(s) for on-the-job training within the motion picture industry in the various job classifications covered by the IATSE Area Standards Agreement. The goal of the training program(s) shall be to enhance employment for individuals who are under-represented in this industry. The types of training programs established may vary depending on the experience of the candidates and the requirements of the classification for which the training is provided.

"(i)   Working Internship Programs. It is expected that all Local Unions will participate with the Employers in developing working internship programs within their jurisdictions, which will operate in addition to existing training programs. Elements of the working internship program shall include:

"(a)`   Outreach. The parties will identify and coordinate with various established local community groups, along with the Employers' studio departments involved in recruitment and any other appropriate employment resources, for the purpose of identifying candidates for training programs from under-served communities and/or currently under-represented groups, taking into consideration local hiring demographics. Employer may request the resumes of candidates and may separately interview them before placement with the company. Each Employer may select from among these candidates (or from other sources) to fill working intern assignments on that company's productions.

"(b)   The training program(s) will include pre-training by community organizations and/or others, such as pre-training to teach set protocol, use of equipment, department information, call sheets, safety and other information. All working interns shall be required to complete Safety Training, HP1 and A training before commencing work, which may be accessed through CSATF and the IATTF.

"(c)   The Local Union(s) and Employers commit to support working interns prior to and/or during the working intern's assignment.

"(d)   Recognizing the value of a mutual commitment to the success of the working intern, Employers agree that working intern(s) will be assigned to a Department in consultation with and with the

support of the Department Head (or other appropriate bargaining unit personnel in the absence of a Department Head). The Local Unions agree to encourage their members to participate in and support the working intern program(s). Once a working intern is placed within a Department, the Department Head and other appropriate bargaining unit personnel shall assist in mentoring, training and developing the working intern, and other crew members likewise shall facilitate opportunities for the working intern to learn.

"(e)     Subject to subparagraph (d) above, and after the working intern completes any pre-training and/or craft orientation, the Employer shall assign the working intern to a production. The working intern may be assigned work on different productions, including productions of entities related to or affiliated with the Employer. During the assignment, the working intern may learn and perform bargaining unit work within an otherwise fully staffed department. Working interns in this capacity will not displace any crew members working under the terms of the applicable IATSE collective bargaining agreement and will be an additional position in the department. It is understood that the working internship assignment need not be for consecutive days or periods of time.

"(f)     Once the individual has completed the working internship program as determined by the Employer, the Employer may assign the individual to work under the minimum rates, terms and conditions of the Area Standards Agreement for which they have gained working intern experience. The individual may be assigned as a member of the regular crew in the same department in which he or she had been working or on another production or in another assignment.

"(ii)    The parties reaffirm their commitment to seek under-represented individuals for on-the-job training through vocational or educational institutions or organizations.

"(iii)   IATTF/CSATF shall keep a record of individuals who successfully completed the training programs.

"(iv)    [*Funding/cost-sharing of the training program(s) to be determined.*]

"(v)     The parties agree that the foregoing training program(s) (and any other training programs developed by the parties) is (are) not the only training program permitted under this Agreement; rather, the parties may mutually agree to additional training program(s) on an Employer-by-Employer basis with the same goals. Any existing Union-Employer training program covering the job classifications covered under the IATSE Area Standards Agreement may continue.

"(vi)    Individuals who have successfully completed agreed-upon training program(s) outlined in subparagraphs (i) and (v) above shall be added to the referral list of the applicable Local.

"(vii)    The parties agree to create a joint mentorship program within the Local Unions to foster connections between mentors and individuals from under-represented groups or under-served communities entering the industry workforce through the programs described in this provision with the goal of expanding access to those individual's opportunities for employment in the industry."

10.   **Mileage**

   a.   *Modify Article 8(C) as follows:*

   "(C)    Mileage Allowance

   "Unless offered transportation ~~transported~~ by the Employer, employees traveling to any production location outside the "production zone" shall be paid a mileage allowance calculated at thirty cents (30¢) per mile from the edge of the zone to the production location for all such authorized use of the employee's vehicle, except that employees employed on a production that commences principal photography on or after July 31, 2022 shall be paid a mileage allowance calculated at the then-current IRS rate.  Alternatively, the Employer may make other arrangements with the employee for payment as allowed under applicable law (e.g., car allowance).

   b.   *Modify Article 8(E) as follows:*

   "(E)    Local and Nearby Hires

   "Local and Nearby Hires shall be paid "set to set."  If an employee is required to use his or her personal vehicle during the work day to travel between multiple locations, whether inside or outside the production zone, such employee shall be paid a mileage allowance calculated at thirty cents (30¢) per mile, except that employees employed on a production that commences principal photography on or after July 31, 2022 shall be paid a mileage allowance calculated at the then-current IRS rate.  Alternatively, the Employer may make other arrangements with the employee for payment as allowed under applicable law (e.g., car allowance).  It is understood that if transportation is offered by the Employer, no mileage reimbursement of any kind is required."

11.   **Per Diem**

Increase the per diem in Article 3(I) by six dollars ($6.00) (two dollars ($2.00) each for breakfast, lunch and dinner) effective the first Sunday following the AMPTP's receipt of notice of ratification.

12.   **Weekly Living Allowance**

*Modify Article 3(H)(2) as follows:*

"(2)   "Nearby Hires" shall be paid a weekly living allowance of no less than $532.00 ~~$392.00~~ per week (~~$427.00~~ $567.00 per week effective [*the first Sunday following the AMPTP's receipt of notice of ratification*] ~~December 30, 2018~~; ~~$462.00~~ $602.00 per week effective July 31, 2022 ~~August 4, 2019~~ and ~~$532.00~~ $637.00 per week effective July 30, 2023 ~~August 2, 2020~~), or ~~$56.00~~ $76.00 per day prorated (~~$61.00~~ $81.00 per day prorated effective [*the first Sunday following the AMPTP's receipt of notice of ratification*] ~~December 30, 2018~~; ~~$66.00~~ $86.00 per day prorated effective July 31, 2022 ~~August 4, 2019~~ and ~~$76.00~~ $91.00 per day prorated effective July 30, 2023 ~~August 2, 2020~~)."

13.   **Sick Leave**

*Modify Article 23(A) of the Area Standards Agreement as follows:*

"(A)   ~~California~~ Sick Leave

"(1)   Accrual. ~~Commencing July 1, 2015,~~ e~~E~~ligible employees covered by the IATSE Area Standards Agreement shall accrue one (1) hour of paid sick leave for every thirty (30) hours worked ~~in California~~ for the Employer, up to a maximum of forty-eight (48) hours or six (6) days. (In lieu of the foregoing hourly accrual of paid sick leave, and provided that advance notice is given to the employee, an Employer may elect to provide employees, upon their eligibility to use sick leave as provided below (*i.e.*, upon working thirty (30) days ~~in California~~ for the Employer and after their ninetieth (90[th]) day of employment ~~in California~~ with the Employer (based on days worked or guaranteed), with a bank of twenty-four (24) hours or three (3) days of sick leave per year, such year to be measured, as designated by the Employer, as either a calendar year or starting from the employee's anniversary date. Under this elected option, such banked sick leave days may not be carried over to the following year.) Employees employed outside California shall be eligible for such sick leave commencing February 1, 2022.

"(2)   To be eligible to accrue paid sick leave, the employee must have worked for the Employer for at least thirty (30) days ~~in California~~ within a one (1) year period, such year to be measured, as designated by the Employer, as either a calendar year or starting from the employee's anniversary date. Sick leave may be used in minimum increments of four (4) hours upon oral or written request after the eligible employee has

been employed by the Employer ~~in California~~ for ninety (90) days (based on days worked or guaranteed), such period to be measured, as designated by the Employer, as either a calendar year or starting from the employee's anniversary date. Reasonable advance notification of the need for sick leave is required if the use is foreseeable; otherwise, notice is required as soon as practicable. Sick days accrued on an hourly basis shall carry over to the following year of employment; however, the Employer may limit the use of such accrued time to no more than twenty-four (24) hours or three (3) days during each year of employment as defined by the Employer in advance. <u>To the extent the employee is eligible for paid sick leave in a jurisdiction with a law that cannot be waived in a collective bargaining agreement, any sick leave paid pursuant to the law shall count towards satisfying the Employer's obligations to provide paid sick leave under this Article 23(A).</u>

"(3)    A day of paid sick leave shall be equal to eight (8) hours' pay for hourly <u>or daily</u> employees. Four (4) hours of paid sick leave shall be equal to four (4) hours' pay for hourly employees <u>(at the employee's straight time hourly rate)</u>. To the extent that an employee works in a classification for which the rate of pay is subject to individual negotiation, and the employee negotiates a weekly guarantee, the rate of paid sick leave shall be computed on the basis of one-fifth (1/5th) of the employee's weekly rate for a day of paid sick leave (and fifty percent (50%) thereof if a four (4) hour increment of sick leave is taken). Replacements for weekly employees (including "on-call" employees) may be hired on a *pro rata* basis of the weekly rate regardless of any contrary provision in this Agreement. The employee shall not be required to find a replacement as a condition of exercising his right to paid sick leave.

"(4)    Sick leave may be taken for the diagnosis, care or treatment of an existing health condition of, or preventive care for, the employee or the employee's "family member."[10] Sick leave also may be taken by an employee who is a victim of domestic violence, sexual assault or stalking.

"(5)    Accrued, unused sick leave is not paid out on termination, resignation or other separation of employment. If the employee is rehired by the Employer within one (1) year of the employee's separation from employment, the employee's accrued and unused sick leave is reinstated, and the employee may begin using the accrued sick leave upon rehire if the employee was previously eligible to use the sick leave or once the employee becomes eligible as provided above.

---

[10] "Family member" means any of the following: (1) a biological, adopted or foster child, stepchild, legal ward or a child to whom the employee stands *in loco parentis*; (2) a biological, adoptive or foster parent, stepparent or legal guardian of the employee or the employee's spouse or registered domestic partner or a person who stood *in loco parentis* when the employee was a minor child; (3) a spouse; (4) a registered domestic partner; (5) a grandparent; (6) a grandchild; or (7) a sibling.

"(6)     Employer shall include information in the employee's start paperwork to advise the employee of the designated Employer representative whom the employee may contact to confirm eligibility and the amount of accrued sick leave available under this ~~California~~ Sick Leave Policy.  Such start paperwork also shall advise the employee which period (*i.e.*, calendar year or the employee's anniversary date) the Employer selected to measure the thirty (30) day and ninety (90) day eligibility periods and the cap on accrual set forth in subparagraph (2) above or which period (*i.e.*, calendar year or the employee's anniversary date) the Employer selected to apply the bank of three (3) sick days as provided in subparagraph (1) above.  Employer also shall notify the IATSE of the name and contact information of the designated Employer representative.

"(7)     Any Employer that<u>, as of June 30, 2015,</u> ~~has~~ <u>had</u> a sick leave policy, or paid leave or paid time off policy that permits the use of paid sick time~~, as of June 30, 2015~~ <u>with respect to eligible employees working in California or that, as of February 1, 2022, has a sick leave policy, or paid leave or paid time off policy that permits the use of paid sick time for all other eligible employees,</u> may continue such policy in lieu of the foregoing.  Nothing shall prevent an Employer from negotiating a sick leave policy with better terms and conditions.  There shall be no discrimination or retaliation against any employee for exercising his or her right to use paid sick leave.

"(8)     Any dispute with respect to sick leave for employees covered under this Agreement shall be subject to the grievance and arbitration procedures provided therein."

## 14.   **Payroll Documents**

*Modify Article 13(C) as follows:*

"(C)     Upon request by the Union, the Employers shall provide the Union with genuine copies of all payroll documents, start forms and other employee records for all employees working in covered crafts and classifications.  The Employer shall cooperate in good faith with the Union in any audit of this production undertaken by the Union or its agents <u>and shall endeavor in good faith to provide all requested documents within thirty (30) business days of the request.</u>"

## 15.   **Weather-Permitting Calls and Cancellations**

*Modify Article 11(B) and 11(C) to provide as follows:*

"(B)     The Employer may issue a "weather-permitting" call for <u>extreme heat, extreme cold, extreme wind,</u> snow, sleet, ice storms<u>, fire hazard as identified by the National Weather Service, smoke conditions</u> or hurricanes to employees prior to their dismissal for the day and to persons not on payroll up to twelve (12) hours before their call time (even if a call had previously been given).  The Employer shall provide notice to the Union upon the issuance of a "weather-permitting" call.  <u>Inadvertent failure to provide notice to the Union shall not be subject to grievance and arbitration.</u>  The Employer may

cancel a "weather-permitting" call up to four (4) hours prior to the call time.  In the event a daily employee is notified not to report to work, he or she shall be paid four (4) hours of pay at straight time, and the Employer shall contribute one-third (1/3) of the amount due under Article 5; however, if the notification to the daily employee is untimely, the daily employee shall be paid for an eight (8) hour minimum call.

"In the event an 'on call' employee is notified not to report to work, he or she shall be paid one-half (½) of one-fifth (1/5) of his or her weekly rate, and the Employer shall contribute one-third (1/3) of the amount due under Article 5; however, if the notification to the 'on call' employee is untimely, or the Employer authorizes the 'on call' employee to work that day, the 'on call' employee shall be paid for the day.

"The foregoing is in addition to the Employer's rights under Section 11(C) below. The Union agrees that it will not unreasonably deny a request by the Employer to issue a 'weather-permitting' call under this paragraph for other weather conditions.

"(C)    Notwithstanding the above, the Employer may cancel calls due to inclement weather (extreme heat, extreme cold, extreme wind, snow, sleet, ice storms, fire hazard as identified by the National Weather Service, smoke conditions or hurricanes), provided that the Employer provides notice to the Union as soon as practicable.  The employees must be notified of the cancellation no later than 8:00 p.m. the night before the call.  This provision shall also be applicable to calls for the first day of a new workweek (*e.g.*, Monday) so long as the Employer makes the effort to inform employees on the last day of the preceding workweek (*i.e.*, Friday in the case of a Monday call) of the possibility that the call will be cancelled and the employee is notified of the cancellation before 8:00 p.m. on the evening prior to the call (*i.e.*, Sunday in the case of a Monday call.)  The Union agrees that it will not unreasonably deny a request by the Employer to cancel a call under this subparagraph (C) due to other weather conditions."

*Make conforming changes.*

16.    **Four (4) Hour Minimum Call**

*Modify Article 3(B) as follows (and renumber Article 3(B)(2) as 3(B)(3)):*

"(B)    Work Day

"(1)    Except as provided in subparagraph (2) below, ~~A~~a work day consists of a minimum of eight (8) hours, excluding meal periods.

"(2)    A four (4) hour minimum call shall apply for any day on which an employee does not work and reports for training at the request of an individual Employer. In the event that the four (4) hours are exceeded, the employee shall be paid for a minimum of eight (8) hours."

17.     **Housekeeping – Update Sick Leave Waivers**

*Modify Article 23(B) as follows:*

"(B)     Other Sick Leave Laws

"The Union expressly waives, to the full extent permitted by law, application of the following to all employees employed under this Agreement: the Paid Sick Leave Ordinance of Berkeley, California (Municipal Code Chapter 13.100); Oakland Paid Sick Leave Ordinance (Municipal Code Section 5.92.030.); the Seattle Paid Sick and Safe Time Ordinance (Ordinance No. 123698); Chapter 18.10 of Title 18 of the Municipal Code of the City of Tacoma, Washington (enacted by Ordinance No. 28275); all requirements pertaining to "paid sick leave" in Chapter 37 of Title 5 of the Municipal Code of Emeryville, California (including, but not limited to, Chapter 37.01.e), 37.03, 37.07.a)1)B.ii. and 37.07.f)); Article 8.1 of Title 23, Chapter 2 of the Arizona revised Statutes; and any other ordinance, statute or law requiring paid sick leave that is hereafter enacted within the jurisdiction of this Agreement. It is understood that the Union and the AMPTP shall memorialize any such waiver for any newly-enacted law by letter agreement."

18.     **Housekeeping – Renew Commitment for Mandatory Safety and Harassment Prevention Training (Article 21(B)(2))**

The parties renew their commitment to implementation of mandatory safety and harassment prevention training, and will meet to discuss said implementation following the conclusion of negotiations.

**FOR THE ALLIANCE OF MOTION PICTURE AND TELEVISION PRODUCERS, ON BEHALF OF THE COMPANIES LISTED ON EXHIBIT "A" ATTACHED HERETO**

_____     Date:_____
Carol A. Lombardini, President

**FOR THE INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES AND MOVING PICTURE TECHNICIANS, ARTISTS AND ALLIED CRAFTS OF THE UNITED STATES AND CANADA**

_____     Date:_____
Matthew D. Loeb, International President

**EXHIBIT "A"**
**Companies Represented by the AMPTP**
**in the 2021 IATSE Area Standards Agreement Negotiations**

7 Friends Pictures Inc.
20th Century Studios, Inc.
300 Pictures, Inc.
1440 Productions LLC
4423 Productions LLC
ABC Signature, LLC fka Touchstone
 Television Productions, LLC
Adobe Pictures, Inc.
Alive and Kicking, Inc.
Ambient Sounds Productions LLC
Apple Studios LLC
Apple Studios Louisiana LLC
B-Cam Productions LLC
Backlight Productions LLC
Base Light Productions LLC
Big Indie Pictures, Inc.
Bonanza Productions Inc.
Breakout Kings Productions LLC
Brightstar Fox Productions LLC
Broken Foot Productions, Inc.
Camdrew Productions LLC
Canada Premiere Pictures Inc.
Castle Rock Pictures, Inc.
CBS Studios Inc.
Charlestown Productions LLC
Chime Productions, LLC
Classic Films Inc.
Columbia Pictures Industries, Inc.
Corporate Management Solutions, Inc. dba
 CMS Productions
Cranetown Media LLC
Crown City Pictures Inc.
Delta Blues Productions LLC
Digital 49 Productions, Inc.
Dutch Boy Productions, LLC

DW Studios Productions LLC
Eye Productions Inc.
Film 49 Productions, Inc.
Focus Features Productions LLC
Fox Alternative Entertainment, LLC
FRB Productions, Inc.
FTP Productions, LLC
Grass Skirt Digital Productions, Inc.
GWave Productions, LLC
Hazardous Productions, LLC
Hop, Skip & Jump Productions, Inc.
Horizon Scripted Television Inc.
Hostage Productions, Inc.
Island Film Studios, LLC
It's Possible Productions, LLC
Jax Media, LLC
Jay Squared Productions LLC
Kapital Productions, LLC
Kenwood TV Productions, Inc.
Keystone TV Productions LLC
Kiki Tree Pictures Inc.
Lennox House Pictures Inc.
LGTV Productions, Inc.
Linear Productions LLC
Lions Gate Productions, LLC
Louisiana Premiere Productions LLC
Main Gate Productions LLC
Main Lot Productions LLC
Marvel Film Productions LLC
Marvel Picture Works LLC
Mesquite Productions, Inc.
Metro-Goldwyn-Mayer Pictures Inc.
MGM Television Entertainment Inc.
Minim Louisiana Productions, Inc.
Minim Productions, Inc.

Mutiny Pictures Inc.
Netflix Studios, LLC
Netflix Productions, LLC
New Line Productions, Inc.
New Regency Productions, Inc.
Ninjutsu Pictures, Inc.
NM Talent Inc.
NS Pictures, Inc.
Olive Avenue Productions LLC
On The Brink Productions, Inc.
One Eighty Productions LLC
Open 4 Business Productions LLC
Orange Cone Productions LLC
Pacific 2.1 Entertainment Group, Inc.
Paige Productions, Inc.
Palladin Productions LLC
Parallax TV Productions Inc.
Paramount Pictures Corporation
Paramount Worldwide Productions Inc.
Patch Bay Productions LLC
Picrow, Inc.
Picrow Streaming Inc.
PP21 Productions LLC
Produced Bayou, Inc.
Proximity Productions LLC
Random Pictures Inc.
Red Zone Pictures, Inc.
Redemption Pictures, Inc.
Riverboat Productions, LLC
Rose City Pictures, Inc.
Rozar Pictures, LLC
S&K Pictures, Inc.
Salty Pictures, Inc.
San Vicente Productions, Inc.
Scope Productions, LLC
Screen Gems Productions, Inc.
Singular Productions LLC
SLO Productions Inc.
Smallville Studios Inc.

Stage 6 Films, Inc.
Stalwart Productions LLC
Storyteller Production Co., LLC
Stu Segall Productions, Inc.
Theoretical Pictures, Inc.
Triple Point Productions LLC
Turner Films, Inc.
TVM Productions, Inc.
Twentieth Century Fox Film Corporation
    dba 20th Television
Universal City Studios LLC
Universal Content Productions LLC
Upside Down Productions Inc.
Vertical Hold Productions LLC
Walt Disney Pictures
Warner Bros. Pictures
Warner Bros. Television
Warner Specialty Productions Inc.
Warner Specialty Video Productions Inc.
Waveform Productions LLC
Woodridge Productions, Inc.
YNFS Productions LLC

# THEATRICAL AND TELEVISION MOTION PICTURE
# AREA STANDARDS AGREEMENT OF 2018

Term of Agreement:

August 1, 2018 - July 31, 2021

# TABLE OF CONTENTS

Page

Article 1 – Recognition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Article 2 – Scope and Application of Agreement . . . . . . . . . . . . . . . . . . 2

Article 3 – Minimum Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   (A)  Wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   (B)  Work Day . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   (C)  Workweek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   (D)  Overtime and Premium Pay . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   (E)  Administration of Workweek and Related Premium Pay
         Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   (F)  Rest Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   (G)  Production Centers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   (H)  Work Outside a "Production Center," Local, Nearby and
         Distant Hires . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   (I)   Per Diem . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   (J)   Liability Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   (K)  Idle Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   (L)  Work in Higher Classification . . . . . . . . . . . . . . . . . . . . . . 15
   (M)  Courtesy Housing and Transportation . . . . . . . . . . . . . . . . 15

Article 4 – Meals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Article 5 – Benefit Plan Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Article 6 – 401(k) Plan Merger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Article 7 – Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Article 8 – Travel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
   (A)  Production Zone . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
   (B)  Nearby Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   (C)  Mileage Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   (D)  Travel Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   (E)  Local and Nearby Hires . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   (F)  Distant Hires . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   (G)  "Travel Only" Day . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   (H)  Travel-and-Work or Work-and-Travel . . . . . . . . . . . . . . . . 25

Article 9 – Payment of Wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Article 10 – Safety and Specialized Work . . . . . . . . . . . . . . . . . . . . . . . 25

Page

Article 11 – Cancellation of Calls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Article 12 – Enabling Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Article 13 – Union Access, Union Representative and Union Reports . 28

Article 14 – No Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Article 15 – Grievance Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Article 16 – No Strike or Lockout . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Article 17 – Union Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Article 18 – Title Credits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Article 19 – Principle of Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Article 20 – Set Teachers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Article 21 – IATSE Training Trust Fund . . . . . . . . . . . . . . . . . . . . . . . . 31

Article 22 – Payroll Deposit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Article 23 – Sick Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Article 24 – Term of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Exhibit "A" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Sideletters:
   Sideletter No. 1 – Holidays/Bereavement Leave . . . . . . . . . . . . . 40
   Sideletter No. 2 – Wage Rates for First Two Persons Hired
      Locally in Specified Departments in Washington, D.C. . . . . . . 41
   Sideletter No. 3 – Jurisdiction Over Aerial Balloons and Base
      Camp Power Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
   Sideletter No. 4 – Meeting Re Covering Employees Within
      Local #479's and Local #493's Jurisdiction . . . . . . . . . . . . . . . 43
   Sideletter No. 5 – Scope and Application of Agreement . . . . . . . 44
   Sideletter No. 6 – Notice of Employment Opportunities and
      Opportunity to Refer Qualified Persons . . . . . . . . . . . . . . . . . . 45
         Appendix "A" to Sideletter No. 6 . . . . . . . . . . . . . . . . . . . . 46

Page

Sideletter No. 7 – Pension and Health Contributions for Certain
   Individuals with Prior Work Experience Under the Local #52
   Agreement Who Work Under the IATSE Area Standards
   Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
Sideletter No. 8 – Pension and Health Contributions for Certain
   Individuals with Prior Work Experience Under the Local #161
   Agreement Who Work Under the IATSE Area Standards
   Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Sideletter No. 9 – Pension Contributions for Persons Employed
   Under the Administration of Local USA 829 . . . . . . . . . . . . . 50
Sideletter No. 10 – Work Performed Outside the United States
   or its Territories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
Sideletter No. 11 – Travel Coordinators . . . . . . . . . . . . . . . . . . . . 53
Sideletter No. 12 – Productions Made for New Media. . . . . . . . . 54
Sideletter No. 13 – Pension Contributions for Persons Employed
   under the IATSE Area Standards Agreement Who Are
   Participants in the Pension Fund of Make-up Artists and Hair
   Stylists Union – Local #798 . . . . . . . . . . . . . . . . . . . . . . . . . . 73
Sideletter No. 14 – Guidelines Regarding Extended Work
   Days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
Sideletter No. 15 – Productions Made for Basic Cable or
   The CW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
Sideletter No. 16 – Made-For-Home-Video Productions . . . . . . . 79

Appendix A – Crafts and Classifications Wage Schedule. . . . . . . . . . . 80

Appendix B – Payroll Company Deductions . . . . . . . . . . . . . . . . . . . . . 98

Appendix C – Daily Projectionist Hire . . . . . . . . . . . . . . . . . . . . . . . . 102

Appendix D – I.A.T.S.E.-Producer Project Information Sheet . . . . . . 103

## THEATRICAL AND TELEVISION MOTION PICTURE
## AREA STANDARDS AGREEMENT OF 2018

THIS AGREEMENT is made and entered into as of this first day of August, 2018 between the International Alliance of Theatrical Stage Employees and Moving Picture Technicians, Artists, and Allied Crafts of the United States, its Territories and Canada, AFL-CIO (hereinafter referred to as the "Union"), on the one hand, and the Alliance of Motion Picture and Television Producers (hereinafter referred to as the "AMPTP"), on behalf of those Employers listed in Exhibit "A" of this Agreement, all of which constitute a multi-employer bargaining unit (each hereinafter referred to as "the Employer" and collectively referred to as "the Employers"), on the other hand.

The Employer is engaged in the production of theatrical and/or television motion pictures in the United States, Puerto Rico or the U.S. Virgin Islands, but outside the jurisdiction of the 2018 Producer-I.A.T.S.E. Basic Agreement and the 2018 West Coast Studio Local Agreements, outside the jurisdiction of Stage Employees, Local #16, outside the jurisdiction of Local #476 (the State of Illinois) and outside the geographic scope of the New York production Local Agreements (*i.e.,* the Agreements with Motion Picture Studio Mechanics, Local #52; Motion Picture Script Supervisors and Production Office Coordinators, Local #161; Theatrical Wardrobe Union, Local #764; Make-Up Artists and Hair Stylists, Local #798; and United Scenic Artists, Local USA-829). The Union represents persons who possess the knowledge and skills that are required to produce such pictures. The Employer employs, or intends to employ, persons represented by the Union within the geographical area described above and it is the intent of these parties to enter into this Agreement to establish the wages, hours and working conditions of such employees.

### ARTICLE 1 – RECOGNITION

The Employer acknowledges that the Union has demonstrated to its satisfaction that a majority of employees in an appropriate collective bargaining unit have designated the Union as their representative for purposes of negotiating their wages, hours and working conditions. The collective bargaining unit consists of:

(A)   All employees (other than transportation department employees, Location Managers and Assistant Location Managers, except as set forth herein) hired by the Employer or its agents within the geographical area described in the Preamble to this Agreement to work in said area in the crafts or classifications listed in Appendix A to this Agreement;

(B)   Transportation Coordinators, Transportation Captains and Drivers who are hired by the Employer or its agents to work in Puerto Rico; and

(C)   Location Managers and Assistant Location Managers who are hired by the Employer or its agents to work in the States of Colorado, Maine, Maryland, Massachusetts, New Hampshire, New Mexico, Louisiana (excluding Baton Rouge and Shreveport), Rhode Island, Tennessee, Vermont and Virginia, and in Puerto Rico and Washington D.C., other than individuals hired in Los Angeles County under the Producer-Studio Transportation Drivers, Local #399, Location Managers Agreement, Second Assistant Directors hired in the New York Area or within a seventy-five (75) mile radius of Chicago under the DGA Basic Agreement or Assistant Location Managers or others employed in the States of New York, New Jersey and Connecticut under an Agreement with Theatrical Drivers and Helpers, Local Union No. 817, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, to perform the duties of a Location Manager or Assistant Location Manager.

The collective bargaining unit excludes production assistants, camera department employees, editorial employees, other post-production employees, guards, transportation department employees other than those mentioned in subparagraph (B) above and Location Managers and Assistant Location Managers other than those mentioned as included in subparagraph (C) above.

The Employer hereby recognizes the Union as the exclusive representative of the employees in the bargaining unit.

### ARTICLE 2 – SCOPE AND APPLICATION OF AGREEMENT

(A)   This Agreement covers all work traditionally associated with dramatic, scripted motion pictures (whether film, digital or video), including, but not limited to, the crafts and classifications listed in Appendix A of this Agreement, performed by persons hired by or on behalf of the Employer or its agents in the geographical area described in the Preamble of this Agreement to work in said areas, except that the work of Location Managers and Assistant Location Managers is covered by this Agreement only when performed in the States of Colorado, Maine, Maryland, Massachusetts, New Hampshire, New Mexico, Louisiana (excluding Baton Rouge and Shreveport), Rhode Island, Tennessee, Vermont and Virginia, and in Puerto Rico and Washington D.C., and the work of Transportation Coordinators, Transportation Captains and Drivers is covered by this Agreement only when performed in Puerto Rico.

(B)   The parties recognize the existence of past subcontracting practices within the multi-employer bargaining unit established by the IATSE Basic Agreement.

The Employer, as a matter of preservation of work for employees who have historically and traditionally performed work under the crafts and classifications which are common to both this Agreement and the IATSE Basic Agreement, agrees that as to bargaining unit work of a type which has not heretofore been subcontracted pursuant to such Agreements, the Employer will subcontract such bargaining unit work to any other person, corporation, joint venture or entity only:  (1) if the Employer first notified the IATSE in writing of its intention to subcontract, and (2) the direct labor costs of the person, corporation, joint venture or entity who will perform such work under said subcontract are not less than the direct labor costs set forth in this Agreement; or (3) if the Employer lacks the requisite technology, facilities or equipment to perform the work.

In order to effectively enforce the provisions of this Article 2(B), the Employer agrees that records in its possession or those to which the Employer has access pertaining to direct labor costs will be made available for inspection within twenty (20) days after a written request therefor by the IATSE.

A complaint by the IATSE of a violation of this Article 2(B) shall be subject to the Grievance Procedure set forth in Article 15 of this Agreement.

(C)   (1)   The Employer shall provide written notice to the IATSE General Office with the following information, if known (or may submit the information, if known, in the form of a Project Information Sheet, attached as Appendix D to this Agreement) for each theatrical motion picture, television motion picture and covered New Media production on which employees are employed under this Agreement no later than two (2) weeks after opening a production office for such motion picture or production.

Such notice shall contain at least the following information, if known:

(a)   Project Title;

(b)   Signatory Employer;

(c)   Production Compan(ies), if different from Signatory Employer;

-3-

(d)    Project Type (feature, television, direct-to-video/DVD or New Media);

(e)    Applicable Special Conditions sideletter or New Media sideletter, if any;

(f)    Whether the covered New Media production is a "Mid-Budget SVOD" Program covered by the Sideletter re: Productions Made for New Media;

(g)    Applicable High Budget SVOD budget tier and subscriber tier, for High Budget SVOD productions covered by the Sideletter re: Productions Made for New Media;

(h)    Number of episodes in the initial order;

(i)    Production office address and phone number;

(j)    Line Producer/UPM/Labor Relations contact(s) with phone number(s) and email address(es);

(k)    Payroll service, if applicable.

For episodic series, it is understood and agreed that the foregoing requirement is satisfied by providing a notice (or Project Information Sheet) at the commencement of production of the first season of such episodic series.

For productions on which employees covered by this Agreement and/or the IATSE Basic Agreement are employed, it is understood and agreed that only one (1) combined notice or Project Information Sheet need be submitted.

This provision shall not apply when employees are hired under this Agreement to work outside the United States.

There shall be no penalty for inadvertent failure to comply with this provision.

(2)    Upon request of the Employer, the Local shall expeditiously supply the Employer with a referral list of individuals who have work experience in the production of motion pictures, together with the address, contact number and skill of each such individual. The Local shall refer qualified persons in a non-discriminatory manner. For employees on the referral list, the address shown on the list shall be used in determining whether the employee is to be treated as a Local Hire, a Nearby Hire or Distant Hire.

(3)    The Employer agrees to continue the practice of advising the Union when a "family company" is producing a motion picture under the Agreement.  The Employer agrees that "family companies" which utilize the Agreement will be bound thereto for the term of the Agreement.

(D)    The wages, benefits, hours and working conditions set forth in this Agreement are minimum conditions only.  Employees are entitled to negotiate better conditions with the Employer on an individual basis, provided that any resulting agreement may not abrogate any of the conditions of this Agreement.  Any employee enjoying better conditions will not have his or her wages, benefits, hours and working conditions reduced in any way as a result of this Agreement.

(E)    During the 2015 negotiations, the Employers agreed to recognize the Union as the exclusive bargaining representative of individuals employed under this Agreement in the Set Teacher classification as an accretion to the existing bargaining unit under this Agreement.  The parties recognize that the work of a Set Teacher is bargaining unit work of a type that has heretofore been subcontracted and that such work may continue to be subcontracted.

(F)    During the 2015 negotiations, the Employers agreed to recognize the Union as the exclusive bargaining representative of individuals employed under this Agreement in the Location Manager and Assistant Location Manager classifications in the States of Colorado, Maine, Maryland, Massachusetts, New Hampshire, New Mexico, Louisiana (excluding Baton Rouge and Shreveport), Rhode Island, Tennessee, Vermont and Virginia, and in Puerto Rico and Washington, D.C. as an accretion to the existing bargaining unit under this Agreement.

The foregoing does not apply to any Location Manager or Assistant Location Manager hired in Los Angeles County under the Producer–Studio Transportation Drivers, Local #399, Location Managers Agreement, any Second Assistant Director hired in the New York Area or within a seventy-five (75) mile radius of Chicago under the DGA Basic Agreement or Assistant Location Managers or others employed in the States of New York, New Jersey and Connecticut under an Agreement with Theatrical Drivers and Helpers, Local Union No. 817, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, to perform the duties of a Location Manager or Assistant Location Manager in the geographic areas identified above.

The Employer may continue to assign the duties of a Location Manager or Assistant Location Manager to persons not covered under this Agreement who have customarily performed such duties in the past.

The Employer shall have freedom of selection of employees in the Location Manager and Assistant Location Manager classifications.

### ARTICLE 3 – MINIMUM CONDITIONS

(A)   <u>Wages</u>  The minimum hourly wage rates for the crafts and classifications covered by this Agreement shall be no less than those provided in subsections (1) through (5) below.  These increases shall be compounded.

(1)   (a)   The "Maryland rates" set forth in Appendix A shall apply to employees working under this Agreement in **California** (but outside San Diego, outside the jurisdiction of Local 16 and outside the scope of the Producer - IATSE Basic Agreement and West Coast Studio Local Agreements), **Florida, Maryland** and **Southeastern Michigan**.  "Southeastern Michigan" is defined as the counties of Lapeer, Lenawee, Livingston, Macomb, Monroe, Oakland, Sanilac, St. Clair, Washtenaw and Wayne.

(b)   Within **Southeastern Michigan**, as defined in Article 3(A)(1)(a) above, the first two persons hired locally in the property, grip and electric departments shall be paid at the Key and 2nd rates, respectively.

(2)   (a)   The "non-Maryland rates" set forth in Appendix A shall apply to employees working under this Agreement in **Alabama, Alaska, Arizona, Arkansas, Colorado, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan (outside Southeastern Michigan** as defined in Article 3(A)(1)(a))**, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada (outside Las Vegas), New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pittsburgh (PA), Puerto Rico, San Diego (CA), South Carolina, South Dakota, Tennessee, Texas, U.S. Virgin Islands, Utah, Virginia, Washington, West Virginia, Wisconsin** and **Wyoming**.

(b)   Within **Cuyahoga County, Ohio**, the first two persons hired locally in the property, grip and electric departments shall be paid at the Key and 2nd rates, respectively.

(3)   In **Washington, D.C.,**[1,2] the following wage rates shall apply:

| Effective July 29, 2018 - August 3, 2019 | | |
|---|---|---|
| | features | television |
| Key | $46.66 | $45.52 |
| 2nd | 43.17 | 41.66 |
| 3rd | 38.92 | 37.80 |
| Utility | 33.63 | 30.86 |

| Effective August 4, 2019 - August 1, 2020 | | |
|---|---|---|
| | features | television |
| Key | $48.06 | $46.89 |
| 2nd | 44.47 | 42.91 |
| 3rd | 40.09 | 38.93 |
| Utility | 34.64 | 31.79 |

| Effective August 2, 2020 - July 31, 2021 | | |
|---|---|---|
| | features | television |
| Key | $49.50 | $48.30 |
| 2nd | 45.80 | 44.20 |
| 3rd | 41.29 | 40.10 |
| Utility | 35.68 | 32.74 |

---

[1] The first two persons hired locally in the property, grip and electric departments shall be paid at the Key and 2nd rates, respectively.

[2] Set Teachers and Location Managers shall be employed on an "on call" basis at rates subject to individual negotiation.  Assistant Location Managers shall be paid at the 2nd rate.

(4)    In **Maine, Massachusetts, New Hampshire, Rhode Island** and **Vermont,** the following rates shall apply:[3]

| Effective July 29, 2018 - August 3, 2019 | | |
|---|---|---|
| | features | television |
| Key | indiv. neg. | Maryland rates |
| 2nd | $40.11 | Maryland rates |
| 3rd | 37.04 | Maryland rates |
| Utility | 30.44 | Maryland rates |

| Effective August 4, 2019 - August 1, 2020 | | |
|---|---|---|
| | features | television |
| Key | indiv. neg. | Maryland rates |
| 2nd | $41.31 | Maryland rates |
| 3rd | 38.15 | Maryland rates |
| Utility | 31.35 | Maryland rates |

| Effective August 2, 2020 - July 31, 2021 | | |
|---|---|---|
| | features | television |
| Key | indiv. neg. | Maryland rates |
| 2nd | $42.55 | Maryland rates |
| 3rd | 39.29 | Maryland rates |
| Utility | 32.29 | Maryland rates |

(5)    In **Las Vegas (NV)** and **Hawaii,** the rates in the Producer - IATSE Basic Agreement shall apply, except that Set Teachers shall be employed on an "on call" basis at rates subject to individual negotiation.  The parties hereby confirm the Employer's right to pay on a fractional workweek basis for employees employed on a weekly basis in Las Vegas and Hawaii who work less than a full workweek either before or after one full workweek of employment.

---

[3] Set Teachers and Location Managers shall be employed on an "on call" basis at rates subject to individual negotiation.  Assistant Location Managers employed on features shall paid at the 2nd rate.

(B)   Work Day

(1)   A work day consists of a minimum of eight (8) hours, excluding meal periods.

(2)   A work day starting on one calendar day and running into the next calendar day shall be credited to the first calendar day, except that an employee whose work shift overlaps into a holiday or from a holiday into the next day shall be paid at double time for those hours worked on the calendar holiday.

(C)   Workweek

A workweek consists of either five (5) consecutive or six (6) consecutive work days out of any seven (7) consecutive calendar days, commencing with the first day worked.  (The sixth day worked need not be consecutive when the employer has established a regular workweek consisting of five (5) days.)  The workweek may be shifted two (2) times without incurring additional costs during principal photography for each production (in the case of episodic television, the workweek may be shifted two (2) times between hiatus periods (*i.e.,* between the commencement or resumption of production and a cessation of principal photography for the series for at least one week)).  Any workweek shift shall be subject to a minimum thirty-two (32) hour rest period.

In addition to the shift in the workweek outlined in the preceding paragraph, the IATSE agrees that it will not unreasonably deny a request to shift the workweek of production employees without incurring additional costs when a production travels to a new city.

The parties hereby confirm that the foregoing paragraphs governing shifts in the workweek allow separate shifts on the main unit and the second unit, meaning that both the main unit and the second unit of a motion picture are entitled to shift the workweek.  The workweeks may or may not be the same to begin and may or may not be the same once shifted.  They may also be shifted at different times.

(D)   Overtime and Premium Pay

(1)   One and one-half times the employee's regular hourly rate will be paid for all hours worked after eight (8) hours of work on the first through the fifth work days in a workweek or after forty (40) straight time hours of work in a workweek, and for the first twelve (12) hours worked on a sixth work day in a workweek.

(2)    Two times the employee's regular hourly rate will be paid for all hours worked after twelve (12) hours of work on any work day, except that on television productions, employee shall be paid two (2) times the employee's regular basic hourly rate for all hours worked after fourteen (14) elapsed hours.

(3)    Two (2) times the employee's regular hourly rate will be paid for all hours worked on a seventh workday in the employee's workweek or on a holiday.

(4)    Overtime and premium rates will be paid in one-tenth hour increments.  Overtime and premium rates may not be compounded.

(E)    Administration of Workweek and Related Premium Pay Provisions

The parties hereby confirm that the "workweek" provision set forth in Article 3(C) above and the related premium provision for work on a sixth or seventh day in the workweek set forth in Article 3(D) above are to be administered on a uniform basis consistent with the Producer – IATSE Basic Agreement.  For example, an individual shall be paid at time-and-one-half for a sixth day only if that is the employee's sixth day worked within his workweek.

(F)    Rest Periods

(1)    The rest period following dismissal shall be ten (10) hours for "on production" daily employees and for "off production" daily employees assigned to a production, employed as Local or Nearby Hires on a part of a mini-series or on an episode of a series described below in subparagraphs (i), (ii) or (iii), which part or episode commences principal photography on or after December 3, 2018:

(i)    Any mini-series made for free or pay television or basic cable or that meets the definition of a "Mid-Budget SVOD" Series or a "High Budget SVOD" Series (as defined in Paragraphs D.(2) or F.(2), respectively, of the Sideletter re Productions Made for New Media (hereafter "Mid-Budget SVOD" Series or "High Budget SVOD" Series); or

(ii)    Any one-hour episodic series made for free or pay television or basic cable or a 36 to 65 minute "Mid-Budget SVOD" or "High Budget SVOD" episodic series that is in its second or subsequent season of production; or

(iii)   Any one-half hour single camera episodic series made for free or pay television or basic cable or a 20 to 35 minute single camera "Mid-Budget SVOD" or "High Budget SVOD" episodic series that is in its second or subsequent season of production.

(This provision shall not apply to pilots nor to series in the first season of production.)

(2)   For all other daily employees, the rest period following dismissal shall be nine (9) hours, except that in the event that an employee works fourteen (14) or more hours on two (2) consecutive days for the same Employer on the same production, there will be a ten (10) hour rest period commencing upon the employee's dismissal on the second consecutive day so worked and continuing each day thereafter that the employee works for the same Employer on the same production until the employee either works a day of fewer than fourteen (14) hours or the employee has a day off.  The exception in the preceding sentence shall not apply to pilots nor to series in their first season of production.

(3)   Employees who do not receive a full rest period as provided herein shall receive additional straight time for all invaded hours.

(G)   Production Centers

(1)   Each of the cities listed below shall be established as a "production center."  Each "production center" encompasses an area within a thirty (30) mile radius of its City Hall.  Any individual who is hired from within the jurisdiction of the Local Union administering the Agreement to work within a designated production center will be treated as a Local Hire (and is therefore not entitled to a living allowance).

The list of production centers is as follows:

| State | Production Center | |
|---|---|---|
| Alaska | Anchorage | |
| Arizona | Phoenix, Tucson | |
| California | Sacramento, San Diego | |
| Colorado | Denver | |
| Florida | Fort Lauderdale, Miami, Orlando | |
| Georgia | Atlanta | |
| Hawaii | Honolulu | |
| Louisiana | New Orleans, Shreveport | |
| Maryland | Baltimore | |
| Massachusetts | Boston | *(continued)* |

| *(continued)* | State | Production Center |
|---|---|---|
| | Michigan | Detroit |
| | Minnesota | Minneapolis - St. Paul |
| | Missouri | St. Louis |
| | Nevada | Las Vegas |
| | New Mexico | Albuquerque, Santa Fe |
| | North Carolina | Charlotte, Wilmington |
| | Ohio | Cleveland |
| | Oregon | Portland |
| | Pennsylvania | Pittsburgh |
| | Puerto Rico | San Juan |
| | Tennessee | Nashville |
| | Texas | Austin, Dallas-Ft. Worth, Houston, San Antonio |
| | Utah | Salt Lake City |
| | Virginia | Richmond |
| | | Washington, D.C. |
| | Washington | Seattle |

(2)    In addition, any place where a television pilot or series is based will be treated as a "production center" for that television pilot or series, whether or not that city appears on the above list of designated production centers, thereby making all persons hired within the geographical jurisdiction of the Local Union administering the Agreement on the pilot or series "Local Hires."  In the event that a pilot based outside of a designated production center leads to an initial order for a series that is not located within the geographical jurisdiction of the Local Union where the pilot was based, the Employer shall make a retroactive payment to or on behalf of those employees who were employed on the pilot under this Agreement and who would otherwise have qualified as Nearby Hires of: (a) the living allowance as provided in Article 3(H)(2), (b) daily benefit plan contributions for any idle seventh day as provided in Article 3(K)(2), and (c) the applicable travel allowance for "travel only" days as provided in Article 8(G)(ii). Payments shall be based on the rate in effect at the time the work was performed on the pilot.

(H)   Work Outside a "Production Center," Local, Nearby and Distant Hires

(1)   For  work outside a "production center," as defined in subparagraph (G) above:

(a)    a "Local Hire" is any person who resides within sixty (60) miles of the production location;

       (b)   a "Nearby Hire" is any person who resides outside sixty (60) miles of the production location and within the geographical jurisdiction of the Local Union administering the Agreement; and

       (c)   a "Distant Hire" is any person who resides outside the geographical definition of a "Nearby Hire" in a given production area.

       The IATSE and the Employers agree to cooperate in an effort to resolve the status of those persons originally hired as "Local Hires" who may fall within the definition of "Nearby Hires" merely because of a change in shooting location when the production office remains in the same place.

       (2)   "Nearby Hires" shall be paid a weekly living allowance of no less than $392.00 per week ($427.00 per week effective December 30, 2018; $462.00 per week effective August 4, 2019 and $532.00 per week effective August 2, 2020), or $56.00 per day prorated ($61.00 per day prorated effective December 30, 2018; $66.00 per day prorated effective August 4, 2019 and $76.00 per day prorated effective August 2, 2020).

       (3)   "Distant Hires" shall be provided with reasonable single occupancy hotel accommodations.

       (4)   The Employer shall request employees to sign a written statement attesting to their principal residency.  A false statement of residency may result in immediate discharge.  The Employer shall notify the IATSE if an employee refuses to sign a written statement of residency.

       (5)   If the Employer replaces a Nearby Hire or a Distant Hire with a Local Hire, it shall either give two (2) weeks notice to the Nearby or Distant Hire of the replacement or, if such Nearby Hire or Distant Hire is replaced prior to receiving two (2) weeks notice, the Employer shall pay to any such Nearby Hire the balance of the living allowance that the Nearby Hire would have received had he continued working for the full two (2) week notice period or, in the case of a Distant Hire, shall pay to the Distant Hire the balance of the cost of housing for such Distant Hire plus per diem that the Distant Hire would have received had he continued working for the full two (2) week notice period.

       (6)   The Employer agrees that it will discuss with the local Business Representative whether special accommodations may be appropriate for employees who are required to report to a production

location which is within a sixty (60) mile radius of the employee's residence but which, because of limited access by road, cannot be reached by a majority of the crew without driving in excess of sixty (60) miles.

    (I)   <u>Per Diem</u>

        (1)   The Employer shall pay per diem to Distant Hires, as defined in Article 3(H)(1)(c) above, at the following rates per day:

| Breakfast | $9.50 |
| Lunch | $14.00 |
| Dinner | <u>$30.00</u> |
| Total Per Diem | $53.50 |

        (2)   Any meals provided by the Employer may be deducted from per diem at the above-stated rates.

    (J)   <u>Liability Insurance</u>

        The Employer must carry appropriate liability insurance and provide workers' compensation coverage for all employees.

    (K)   <u>Idle Pay</u>

        (1)   <u>Distant Hires</u>

        The Employer shall pay each employee housed on distant location four (4) hours' pay at the employee's scale hourly rate for each idle day in a workweek and shall make benefit plan contributions on behalf of each such employee in the amount specified in this Agreement for each such idle day; however, no such employee shall receive more than two (2) days of idle pay in a workweek, except as a result of a workweek shift pursuant to Article 3(C).

        (2)   <u>Nearby Hires</u>

        For six (6) day workweeks only, the Employer shall contribute the daily benefit plan contribution on behalf of each such employee in the amount specified in this Agreement for each idle seventh day.

(L)   Work in Higher Classification

If any part of the workday is worked in a higher classification than the classification under which the employee is called for work, the higher rate shall prevail for the entire workday.  The employee reverts to his regular classification the next day unless notified to the contrary.  However, the provisions of this Article do not apply unless the employee is assigned to work in the higher classification for two (2) hours or more.

(M)   Courtesy Housing and Transportation

Upon request of an employee who is required to work in excess of fourteen (14) hours and who advises the Employer that he/she is too tired to drive home safely, Employer shall provide the employee either courtesy housing or round trip transportation from the designated crew parking area to home and return at the Employer's expense.[4]  Employer shall have no responsibility for the personal vehicle of an employee who elected to use his or her personal vehicle in lieu of Employer-provided transportation.

## ARTICLE 4 – MEALS

(A)   Meal periods shall not be less than one-half (½) hour nor more than one (1) hour in length.  Not more than one meal period shall be deducted from work time for an employee during the minimum call.  A second meal period may be deducted from work time for those employees who work in excess of the minimum call.  The minimum guarantee of work time after a second meal shall be one and one-half hours except when such meal is provided at the Employer's expense.  With the exception of "off production" employees, meals shall be provided by the Employer or a meal allowance shall be paid.  However, when the Employer furnishes meals to a shooting unit, and an "off production" crew is working on the same site at the same time for the same production, the Employer will either furnish meals to the "off production" crew or pay the "off production" crew a meal allowance.  The Employer need not provide a meal or a meal allowance whenever suitable eating facilities are readily available in the vicinity of the production location.  Suitable eating facilities do not include gas stations, convenience stores, facilities with a single menu item or facilities without seating where employees can consume a meal.  Payments of per diem to an employee shall be deemed to satisfy the meal allowance obligation.

---

[4] Round trip transportation may include public transportation if reasonable under the circumstances.

(B)   The employee's first meal period shall commence within six (6) hours following the time of first call for the day; succeeding meal periods shall commence within six (6) hours after the end of the preceding meal period.  An employee's first meal period shall commence no earlier than two (2) hours after such employee reports for work except that persons called up to two (2) hours earlier than the regular crew call who are provided with a non-deductible hot breakfast and time to sit and eat (within one (1) hour before or after the regular crew call) will have their first deductible meal period due at the same time as a meal is due for the regular crew.

(C)   Meal intervals may be extended twelve (12) minutes without penalty when used for completing a camera setup in progress or one-half hour for wrap if the employee is dismissed within one-half hour.  If the employee is not dismissed within said one-half hour extension, meal penalty shall be computed from the end of the sixth hour following the previous meal.

(D)   (1)   Except as provided in subparagraph (2) below, meal penalty for delayed meals shall be computed as follows:

> First half-hour meal delay or fraction thereof. . .  $ 7.50
>
> Second half-hour meal delay or fraction thereof  $10.00
>
> Third and each succeeding half-hour meal delay or fraction thereof . . . . . . . . . . . . . . . . . . . . . . . . $12.50

(2)   Meal penalty for delayed meals for employees employed on television motion pictures shooting in a studio shall be computed as follows:

> First half-hour meal delay or fraction thereof. . .  $ 8.50
>
> Second half-hour meal delay or fraction thereof  $11.00
>
> Third and each succeeding half-hour meal delay or fraction thereof . . . . . . . . . . . . . . . . . . . . . . . . $13.50

If a dispute should arise whether a television motion picture is shooting in a "studio," the Local Union and the Labor Relations Department representative of the Employer shall endeavor to resolve such dispute.  Should they fail to do so, the matter shall be submitted to the International President of the IATSE and the President of the AMPTP, or their respective designees, for resolution without waiver of

the right of either party to submit the dispute to arbitration under Article 15.

Such meal penalty shall be in addition to the compensation for work time during the delay and shall not be applied as part of any guarantee.

(E)   As an alternative to the foregoing provisions of this Paragraph as they relate to "on production" employees, the Producer, at its option, may institute "French Hours" on a daily basis for "on production" employees, with the approval of a majority of the IATSE-represented crew.  Hot catered food shall be available during the shooting day.  An employee's consent to the use of a "French Hours" meal system shall not be a condition of employment.

(F)   The Employer shall establish a "hotline" phone number on each production which shall be given only to the local Business Representative.  The local Business Representative shall be entitled to use the "hotline" to alert the Employer's representatives that employees who were not provided a meal and who were instead allowed to obtain a meal from eating facilities in the vicinity of the production location were given insufficient time to eat and travel to and from the eating facility. The Employer and the Union agree to discuss the situation.

## ARTICLE 5 – BENEFIT PLAN CONTRIBUTIONS

(A)   For each employee in a craft or classification covered by this Agreement, the Employer shall make a daily contribution to the "IATSE National Benefit Funds" (*i.e.,* the IATSE National Health and Welfare Fund, Plan C, the IATSE National Pension Fund, Plan C, and the IATSE Annuity Fund), unless the Employer and the IATSE agree otherwise. The rate and allocation of such contribution shall be as follows:[5]

(1)   In **Alabama, Alaska, Arizona, Arkansas, Colorado, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan (outside Southeastern Michigan), Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada (outside Las Vegas), New Mexico, North Carolina, North Dakota, Oklahoma, Pittsburgh (PA),**

---

[5] Only for areas that apply the "Maryland" or "non-Maryland" fringe rates, once during the term of the Agreement, upon sixty (60) days' advance notice to the Employers, the Union will have the right to reallocate contributions from the IATSE Annuity Fund to the IATSE National Health and Welfare Fund, provided that the reallocation results in a uniform allocation for all groups who are under the "Maryland" fringe rates and/or a uniform allocation for all groups who are under the "non-Maryland" fringe rates.  The Union shall provide notice to the AMPTP and Employers of said allocation.

**Puerto Rico, San Diego (CA),**[6] **South Carolina, South Dakota, Tennessee, Texas, U.S. Virgin Islands, Utah, Virginia, West Virginia, Wisconsin** and **Wyoming:** the "non-Maryland fringe rates" shall be applicable.  The "non-Maryland" fringe rates are as follows:

| Effective July 29, 2018 - August 3, 2019 | Theatrical | Television |
|---|---|---|
| Health and Welfare | $90.00 | $90.00 |
| Annuity | 17.00 | 13.00 |
| Pension (Def. Ben.) | 11.00 | 11.00 |
| TOTAL: | $118.00 | $114.00 |

| Effective August 4, 2019 - August 1, 2020 | Theatrical | Television |
|---|---|---|
| Health and Welfare | $94.00 | $94.00 |
| Annuity | 17.00 | 13.00 |
| Pension (Def. Ben.) | 11.00 | 11.00 |
| TOTAL: | $122.00 | $118.00 |

| Effective August 2, 2020 - July 31, 2021 | Theatrical | Television |
|---|---|---|
| Health and Welfare | $99.00 | $99.00 |
| Annuity | 17.00 | 13.00 |
| Pension (Def. Ben.) | 11.00 | 11.00 |
| TOTAL: | $127.00 | $123.00 |

(2)   In **California** (outside San Diego, outside the jurisdiction of Local 16 and outside the scope of the Producer - IATSE Basic Agreement and West Coast Studio Local Agreements), **Florida, Maryland** and **Ohio,**[7] the "Maryland fringe rates" shall apply.  The "Maryland fringe rates" are as follows:

---

[6] The Employer shall make contributions on behalf of employees employed within the jurisdiction of Local 122 as follows: (a) health and welfare contributions shall be made to the San Diego Theatrical Health and Welfare Trust Fund; and (b) the amount allocated to pension and annuity contributions shall be made solely to the IATSE Annuity Fund.

[7] Pension contributions for employees hired within the jurisdiction of Local 209 shall be made to the Local 27 Pension Plan.

| **Effective July 29, 2018 – August 3, 2019** | Theatrical | Television |
|---|---|---|
| Health and Welfare | $94.00 | $94.00 |
| Annuity | 19.00 | 15.00 |
| Pension (Def. Ben.) | 11.00 | 11.00 |
| TOTAL: | $124.00 | $120.00 |

| **Effective August 4, 2019 – August 1, 2020** | Theatrical | Television |
|---|---|---|
| Health and Welfare | $98.00 | $98.00 |
| Annuity | 19.00 | 15.00 |
| Pension (Def. Ben.) | 11.00 | 11.00 |
| TOTAL: | $128.00 | $124.00 |

| **Effective August 2, 2020 – July 31, 2021** | Theatrical | Television |
|---|---|---|
| Health and Welfare | $103.00 | $103.00 |
| Annuity | 19.00 | 15.00 |
| Pension (Def. Ben.) | 11.00 | 11.00 |
| TOTAL: | $133.00 | $129.00 |

(3)   In **Southeastern Michigan**,[8] the following fringe rates shall apply:

For the period July 29, 2018 through August 3, 2019: Features – $135.00 per day ($98.00 per day health contribution; $37.00 per day pension contribution); Television – $125.00 per day ($92.00 per day health contribution; $33.00 per day pension contribution).

For the period August 4, 2019 through August 1, 2020: Features – $139.00 per day ($102.00 per day health contribution; $37.00 per day pension contribution); Television – $129.00 per day ($96.00 per day health contribution; $33.00 per day pension contribution).

---

[8] "Southeastern Michigan" is defined as the counties of Lapeer, Lenawee, Livingston, Macomb, Monroe, Oakland, Sanilac, St. Clair, Washtenaw and Wayne.

For the period August 2, 2020 through July 31, 2021: Features – $144.00 per day ($107.00 per day health contribution; $37.00 per day pension contribution); Television – $134.00 per day ($101.00 per day health contribution; $33.00 per day pension contribution).

Health contributions are payable to the IATSE National Benefit Plans Health Fund; pension contributions are payable to the Locals 38 and 812 Pension Plan.[9]

(4)     In **Washington, D.C.,** the following fringe rates shall apply:

For the period July 29, 2018 through August 3, 2019: Features – $136.00 per day; Television – $126.00 per day.

For the period August 4, 2019 through August 1, 2020: Features – $140.00 per day; Television – $130.00 per day.

For the period August 2, 2020 through July 31, 2021: Features – $145.00 per day; Television – $135.00 per day.

The $4.00 per day increase in fringe rates that is effective on each of July 29, 2018 and August 4, 2019 and the $5.00 per day increase that is effective on August 2, 2020 shall be allocated to the IATSE National Health and Welfare Fund.

(5)     In **Maine, Massachusetts, New Hampshire, Rhode Island** and **Vermont,** the following fringe rates shall apply:

For the period July 29, 2018 through August 3, 2019: Features – $133.00 per day; Television – the "Maryland fringe rates" apply.

For the period August 4, 2019 through August 1, 2020: Features – $137.00 per day; Television – the "Maryland fringe rates" apply.

For the period August 2, 2020 through July 31, 2021: Features – $142.00 per day; Television – the "Maryland fringe rates" apply.

---

[9] Pension contributions on behalf of Production Office Coordinators, Assistant Production Office Coordinators and Art Department Coordinators who are represented by Local 161 and employed in Southeastern Michigan shall be payable to the IATSE National Pension Fund Plan C, rather than the Locals 38 and 812 Pension Plans.

The $4.00 per day increase in fringe rates that is effective on each of July 29, 2018 and August 4, 2019 and the $5.00 per day increase that is effective on August 2, 2020 shall be allocated to the IATSE National Health and Welfare Fund.

(6)   In **Las Vegas (NV),** the following fringe rates shall apply:

For the period July 29, 2018 through August 3, 2019: $92.32 per day health fund contribution payable to the IATSE National Health and Welfare Fund and 8% of gross pension contribution payable to the NRA – IATSE Local 720 Joint Trust Fund.

For the period August 4, 2019 through August 1, 2020: $96.32 per day health fund contribution payable to the IATSE National Health and Welfare Fund and 8% of gross pension contribution payable to the NRA – IATSE Local 720 Joint Trust Fund.

For the period August 2, 2020 through July 31, 2021: $101.32 per day health fund contribution payable to the IATSE National Health and Welfare Fund and 8% of gross pension contribution payable to the NRA – IATSE Local 720 Joint Trust Fund.

(7)   In **Hawaii,** the following fringe rates shall apply:

For the period July 29, 2018 through August 3, 2019: $2.10 per hour plus $70.00 per day welfare contribution payable to IATSE Local 665 Health and Welfare Trust Fund and $2.10 per hour payable to Local 665 Annuity Trust Fund, plus an additional $10.00 per day pension contribution.

For the period August 4, 2019 through August 1, 2020: $2.10 per hour plus $74.00 per day welfare contribution payable to IATSE Local 665 Health and Welfare Trust Fund and $2.10 per hour payable to Local 665 Annuity Trust Fund, plus an additional $10.00 per day pension contribution.

For the period August 2, 2020 through July 31, 2021: $2.10 per hour plus $79.00 per day welfare contribution payable to IATSE Local 665 Health and Welfare Trust Fund and $2.10 per hour payable to Local 665 Annuity Trust Fund, plus an additional $10.00 per day pension contribution.

(8)   In **Oregon** and **Washington**, the following fringe rates shall apply:

For the period July 29, 2018 through August 3, 2019: Features – $133.00 per day; Television – the "non-Maryland fringe rates" apply.

For the period August 4, 2019 through August 1, 2020: Features – $137.00 per day; Television – the "non-Maryland fringe rates" apply.

For the period August 2, 2020 through July 31, 2021: Features – $142.00 per day; Television – the "non-Maryland fringe rates" apply.

The $4.00 per day increase in fringe rates that is effective on each of July 29, 2018 and August 4, 2019 and the $5.00 per day increase that is effective on August 2, 2020 shall be allocated to the IATSE National Health and Welfare Fund.

(B)   Contributions shall be made directly to the appropriate benefit plans.  The Employer agrees to execute any documents necessary to make or complete any required contribution to any of the plans.

(C)   It is understood that the bargaining parties and the Trustees of the Retirement and Health Plans to which contributions hereunder are remitted will take all necessary steps to assure the tax deductibility of employer contributions under the provisions of the Internal Revenue Code as it now exists or is hereafter amended.  In the event that all or any part of said contribution amount is or becomes non-tax-deductible, the bargaining parties shall negotiate in good faith with respect to that portion of the contribution which is not tax-deductible.

### ARTICLE 6 – 401(k) PLAN MERGER

(A)   The parties recognize that the IATSE 401(k) Plan previously established in 2002 was merged into the IATSE Annuity Plan as of December 31, 2009.  The Annuity Plan is administered by an independent service provider chosen by the bargaining parties.

(B)   The Plan shall operate in accordance with the following:

(1)   There will be no Employer contributions to the 401(k) feature of the IATSE Annuity Plan.

(2)    Either the Union and/or the participants in the Plan shall pay any management or administrative costs.

(3)    The Employers and the Union will take such measures, particularly with respect to design of the Plan, as are required to limit the liability of the Employers.

(4)    The Plan shall warrant to the Employers that it will timely discharge its duties and responsibilities, so as to avoid any liability for the Employers.

(5)    The Employers agree to transmit salary deferrals in accordance with rules and procedures established by the Plan's trustees.

## ARTICLE 7 – HOLIDAYS

The following days shall be recognized as holidays:  New Year's Day, Presidents' Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving and Christmas Day.  If any of the above-named holidays falls on a Sunday, the following Monday shall be considered the holiday and if any of the above-named holidays falls on a Saturday, the preceding Friday shall be considered the holiday, except that during six (6) day workweeks, Saturday holidays will be recognized on Saturday.

Pay for holidays which are not worked shall be calculated on the basis of eight (8) hours (at the employee's regular straight time hourly rate).  In order for an employee to be eligible for pay for a holiday which is not worked, an employee must work the scheduled workday before and the scheduled workday after the holiday.  (If the next scheduled work day after the holiday follows a hiatus of one (1) week or more, no holiday pay shall be payable.)  There shall be no pay for any holiday not worked for employees working on long-form television productions, pilots, or the first season of any one-hour television series.

Work on any holiday shall be paid at a premium rate in accordance with Article 3, Paragraph (B)(2) and (D)(3).

## ARTICLE 8 – TRAVEL

(A)  <u>Production Zone</u>

The "production zone" is defined as the area within a circle which has a radius of thirty (30) miles measured from the Employer's production office.

(B)   Nearby Location

Employees requested to report to any production location outside the "production zone" shall be paid travel time and a mileage allowance as described herein, unless the Employer provides transportation.  The Employer shall provide transportation to all production locations to all employees who are housed by the Employer.

(C)   Mileage Allowance

Unless transported by the Employer, employees traveling to any production location outside the "production zone" shall be paid a mileage allowance calculated at thirty cents (30¢) per mile from the edge of the zone to the production location for all such authorized use of the employee's vehicle.

(D)   Travel Time

Employees shall be paid at their rate in effect for all time traveling to and from any production location outside the "production zone," measured from the edge of the zone to the production location.

(E)   Local and Nearby Hires

Local and Nearby Hires shall be paid "set to set."  If an employee is required to use his or her personal vehicle during the work day to travel between multiple locations, whether inside or outside the production zone, such employee shall be paid a mileage allowance calculated at thirty cents (30¢) per mile.

(F)   Distant Hires

Distant Hires shall be paid portal-to-portal.  In all cases, this shall be based on the time of travel from the housing accommodations provided to the Distant Hires generally and the applicable production location.

(G)   "Travel Only" Day

(i)   For any day of the week (including holidays) on which a "Distant Hire" travels to or from distant location at the beginning or end of employment or at the beginning or end of any hiatus period, he shall receive an allowance of four (4) hours of pay at straight time or pay for time actually traveled, whichever is greater, but in no event more than eight (8) hours of pay at straight time.

(ii)   For any day (including holidays) on which a "Nearby Hire" who is required to report outside a production center travels to or from distant location at the beginning or end of employment or at the beginning or end of any hiatus period, he shall receive an allowance of two (2) hours of pay at straight time or pay for time actually traveled, whichever is greater, but in no event more than eight (8) hours of pay at straight time.

(H)   Travel-and-Work or Work-and-Travel

Travel time within the minimum eight (8) hour workday shall be paid for as work time and computed towards the commencement of double time (for work after twelve (12) or fourteen (14) hours in a day), but shall not be paid for at the double time rate.  If travel time occurs outside the minimum eight (8) hour workday, it shall be deemed to be work time, but shall not be used in determining the commencement of hours at which double time is paid.  However, travel time occurring outside the minimum eight (8) hour workday and between the hours of 6:00 p.m. and 6:00 a.m., when sleeping accommodations are provided, shall not be deemed to be travel time or work time.

## ARTICLE 9 – PAYMENT OF WAGES

Wages must be paid to employees no later than the Friday following the end of each production workweek.

## ARTICLE 10 – SAFETY AND SPECIALIZED WORK

(A)   The Employer will not require any employee to perform any work that the employee reasonably considers to present a clear and present danger to his or her health and safety.  No employee shall be discharged or otherwise disciplined for refusing to work on a job that exposes the individual to a clear and present danger to life or limb, or for making a good faith report to the First Assistant Director, the Unit Production Manager or his or her supervisor relating to the safety of another employee exposed to a clear and present danger to life or limb.

(B)   The employees selected to perform specialized work and Producer are to negotiate and agree upon a rate in advance for such work and, if no agreement is so reached, the employee will not jeopardize working opportunities by refusing to perform such work.  The employee may seek assistance from the Business Representative of the Union in connection with these negotiations, provided that there is no delay to the production in doing so.  The Business Representative need not be present for the negotiations.

If an employee is required to sign a waiver for any state or governmental agency or owner of private property and refuses to sign such waiver, such employee may be replaced, but such refusal shall not limit such employee's future employment opportunities with Producer.

When Producer knows in advance that such a waiver is required, Producer will advise the Union of the situation.

(C)   (1)   The Employer will strictly conform with all recognized industry health and safety standards and all applicable health and safety rules and regulations.

(2)   Call sheets shall identify the name and phone number of the Employer's safety contact, which may be an individual or a department, as well as the phone number for the Employer's safety hotline.

(D)   (1)   For taking motion pictures on aerial flights or submarine diving, employee shall receive sixty dollars ($60.00) per flight or dive, but with a maximum of payment in a single shift of one hundred eighty dollars ($180.00).

(2)   Any employee designated by Producer to work completely under water using a diving mask, air helmet or diving suit, including skin diving, will be paid a bonus of twenty-five percent (25%) of his rate in effect at the time of such performance for the entire work shift, except when the total time required by the employee to perform such work, including diving, is less than one (1) hour.

(3)   Any employee designated and required by Producer to dive to a depth of fifteen (15) feet or more in water using a diving mask, air helmet or diving suit, including skin diving, will be paid an allowance of sixty dollars ($60.00) for each dive with a maximum payment in a single shift of one hundred eighty dollars ($180.00). Such allowance shall supersede and replace the twenty-five percent (25%) bonus referred to in subparagraph (2) above. When an employee is required to dive under water twenty (20) feet or more, he shall be accompanied by another diver.

(E)   The following provisions shall be applicable to employees required to be under water when performing their work:

(1)   A dressing room shall be provided.

(2)   Hot drinks or nourishment shall be available if water is cold.

(3)   A rest period of ten (10) minutes shall be allowed for each hour so worked.  Not more than two (2) consecutive hours shall elapse without a rest period.

(4)   In the event safety conditions so warrant, it shall be the practice of underwater workers in the performance of such work to work jointly in pairs.

(F)   (1)   Producer will provide suitable wearing apparel for abnormally cold or wet work.

(2)   When required by Producer to work in water three (3) feet or more in depth for a period of an aggregate of at least four (4) hours during any workday, employee will be paid a fifteen percent (15%) bonus for all hours worked during the work shift.

## ARTICLE 11 – CANCELLATION OF CALLS

(A)   In the event of cancellation for previously-called employees, it is understood that if notification is not given by 6:00 p.m. of the previous day's work, then the employee shall be paid an eight (8) hour minimum call.

(B)   The Employer may issue a "weather-permitting" call for snow, sleet, ice storms or hurricanes to employees prior to their dismissal for the day and to persons not on payroll up to twelve (12) hours before their call time (even if a call had previously been given). The Employer shall provide notice to the Union upon the issuance of a "weather-permitting" call.  The Employer may cancel a "weather-permitting" call up to four (4) hours prior to the call time.

In the event a daily employee is notified not to report to work, he or she shall be paid four (4) hours of pay at straight time, and the Employer shall contribute one-third (1/3) of the amount due under Article 5; however, if the notification to the daily employee is untimely, the daily employee shall be paid for an eight (8) hour minimum call.

In the event an "on call" employee is notified not to report to work, he or she shall be paid one-half (½) of one-fifth (1/5) of his or her weekly rate, and the Employer shall contribute one-third (1/3) of the amount due under Article 5; however, if the notification to the "on call" employee is untimely, or the Employer authorizes the "on call" employee to work that day, the "on call" employee shall be paid for the day.

The foregoing is in addition to the Employer's rights under Section 11(C) below.  The Union agrees that it will not unreasonably deny a request by the Employer to issue a "weather-permitting" call under this paragraph for other weather conditions.

(C)   Notwithstanding the above, the Employer may cancel calls due to inclement weather (snow, sleet, ice storms, hurricanes), provided that the Employer provides notice to the Union as soon as practicable. The employees must be notified of the cancellation no later than 8:00 p.m. the night before the call.  This provision shall also be applicable to calls for the first day of a new workweek (*e.g.*, Monday) so long as the Employer makes the effort to inform employees on the last day of the preceding workweek (*i.e.*, Friday in the case of a Monday call) of the possibility that the call will be cancelled and the employee is notified of the cancellation before 8:00 p.m. on the evening prior to the call (*i.e.*, Sunday in the case of a Monday call.)  The Union agrees that it will not unreasonably deny a request by the Employer to cancel a call under this subparagraph (C) due to other weather conditions.

## ARTICLE 12 – ENABLING CLAUSE

On each production, on a case-by-case basis, the Employer or the Union may request certain modifications to the terms and provisions contained in this Agreement which are production-specific.  The Union or the Employer, as applicable, shall give consideration to said modifications and make reasonable efforts to respond to the other party within three (3) business days of the receipt of the request.  Any such modifications to this Agreement shall be by a Letter of Understanding.

## ARTICLE 13 – UNION ACCESS, UNION REPRESENTATIVE AND UNION REPORTS

(A)   The Employer will permit an authorized representative of the Union access to all production sites where bargaining unit employees are performing work.

(B)   The Union may appoint one or more Job Stewards for each production.  The Employer will not discriminate against the Steward(s) in any way because of his or her duties as a Steward.

(C)   Upon request by the Union, the Employers shall provide the Union with genuine copies of all payroll documents, start forms and other employee records for all employees working in covered crafts and classifications.  The Employer shall cooperate in good faith with the Union in any audit of this production undertaken by the Union or its agents.

(D)   Upon request by the Union, the Employer shall provide to the Union a complete current crew list which notes those employees classified as "nearby" or "distant" hires pursuant to Article 3(H) of this Agreement.

## ARTICLE 14 – NO DISCRIMINATION

There shall be no discrimination against any employee due to race, color, creed, religion, sex, sexual preference, age, qualified disability, national origin or Union membership.  The matters covered in this Article are not subject to the provisions of Article 15, "Grievance Procedure."

## ARTICLE 15 – GRIEVANCE PROCEDURE

(A)   Any dispute between the Union and the Employer concerning the interpretation and/or application of this Agreement which cannot be initially resolved by the Business Representative of the Local Union administering this Agreement and the Unit Production Manager or Producer's representative, or thereafter by an International Representative of the IATSE and a designated representative of the Employer, may be submitted to arbitration by either party for resolution. The International Union and the Labor Relations representative of the Employer must approve any agreement reached by the applicable Local Union and the Employer's Production Manager (or Producer) when settling grievances.  If an arbitrator cannot be mutually agreed upon, then one will be selected from an arbitration panel obtained from the American Arbitration Association, unless it is not available, in which case the arbitrator shall be selected from a panel obtained from the Federal Mediation and Conciliation Service ("FMCS").  The arbitrator and parties will follow the labor arbitration rules of the AAA or the FMCS, as applicable.  The arbitrator's decision shall be final and binding on the parties.  The arbitrator shall have the power to determine the specific grievance or dispute, but shall not have the power to amend, modify or effect a change in any of the provisions of the agreement, nor to determine jurisdictional disputes.

(B)   The arbitration shall take place in the closest major city to where the alleged violation occurred or elsewhere by mutual agreement. All costs associated with the arbitration shall be borne by the party incurring them except that the cost of the arbitrator and hearing shall be split equally between the parties.

(C)   Any grievance or claim shall be deemed waived if it is not reduced to writing and submitted to the other party within the later of: (1) thirty (30) days following the incident giving rise to the claim; or (2)

within thirty (30) days after the aggrieved party knows of the facts giving rise to the claim, but in no event later than forty-five (45) days following the close of principal photography on that production at that location.  In the case of episodic series, it is understood that each episode shall be considered a separate production.  Notwithstanding the foregoing, any grievance or claim for health and welfare or retirement contributions shall be deemed waived if it is not reduced to writing and submitted to the other party within ninety (90) days after the date such contributions were due.

## ARTICLE 16 – NO STRIKE OR LOCKOUT

During the term of this Agreement, there shall be no strikes, picketing, work stoppages or other interference with work by the Union, or any lockout by the Employer.  Employees have the right to observe and shall not be required to cross any lawful picket line.

## ARTICLE 17 – UNION SECURITY

Wherever permitted by law, employees covered by this Agreement, as a condition of employment, shall become and thereafter remain members in good standing of the Union on and after the thirtieth day of their employment or thirty (30) days following the execution of this Agreement, whichever is the later date.  To the extent that any federal or state statute does not permit the form of union security herein provided, then and in that event, this Agreement shall be deemed to provide for the maximum form of union security permitted by law.

As defined and applied in this Article 17, the term "member in good standing of the Union" means a person who offers to pay (and, if the Union accepts the offer, pays) Union initiation fees and dues as financial obligations in accordance with the requirements of the National Labor Relations Act.

## ARTICLE 18 – TITLE CREDITS

Title credits may be given to all department heads and key employees in accordance with standard industry practice.  The form in which screen credits are given need not conform to an employee's classification and no presumptions shall flow from the form of such credit.  The Employer shall give title credit to the IATSE by displaying its official seal in accordance with standard industry practice.

## ARTICLE 19 – PRINCIPLE OF ASSISTANCE

The principle of assistance shall be applicable in all classifications in the performance of bargaining unit work.

## ARTICLE 20 – SET TEACHERS

Set Teachers shall sign all necessary authorizations in order for an Employer to conduct a criminal record check, social security trace and sex offender registry search prior to an engagement.

## ARTICLE 21 – IATSE TRAINING TRUST FUND

(A)   The Employer shall make contributions to the IATSE Training Trust Fund for each employee in a craft or classification covered by this Agreement in the amount of fifteen cents ($0.15) per hour for each hour worked by such employee, up to a maximum of twelve (12) hours per day.  Contributions for employees whose rates are subject to individual negotiation shall be made on the basis of twelve (12) hours per day.

(B)   Contributions to the IATSE Training Trust Fund shall be made based on the following understanding with the IATSE (and the parties agree to recommend to the Trustees of the IATSE Training Trust Fund the adoption of the following, including amending the Trust Agreement to the extent needed):

(1)   Subject to administrative and overhead expenses, and except as otherwise approved by the Trustees after August 1, 2015, the purpose of contributions made by employers in the motion picture and television industry shall be to provide safety training for employees in the motion picture and television industry.

(2)   During the term of the 2018 Area Standards Agreement, safety training (with a minimum of the A1 and A2 safety courses) and harassment prevention training shall be mandatory.  Representatives of the IATSE and representatives of the AMPTP will convene a meeting following the date of ratification to discuss the implementation of the mandatory training programs, including establishing the date on which the programs will become mandatory.  The parties will devise a method to reflect an individual's successful completion of the training program.

(3)   The IATSE Training Trust Fund shall be operated in a non-discriminatory manner.  Attendance at safety training provided or

sponsored by the IATSE Training Trust Fund and the selection of
trainers shall be without regard to Union membership.

(4)   The IATSE Training Trust Fund shall authorize the
appointment of advisory committees to review and develop safety
training specifically for the motion picture and television industry,
subject to final approval of the Trustees.  Any such advisory committee
shall be comprised of an equal number of Union-appointed members and
of AMPTP-appointed members in a number to be determined.

(5)   The IATSE Training Trust Fund commits to provide
accurate and complete record-keeping accessible to employers, which
may be satisfied through the use of an outside vendor.  Such record-
keeping shall be in accordance with regulatory requirements and shall
include at a minimum:  attendance sign-in sheets with printed names and
signatures, completed tests based on curriculum taught, a copy of the
curriculum, documentation showing the length of training, the date and
location of training and the trainer.

(6)   The AMPTP shall appoint five (5) Employer Trustees
to the IATSE Training Trust Fund and shall maintain the majority of the
Employer-appointed Trustees at all times.  There shall be no alternate
Trustees.

(7)   Following the appointment of the AMPTP Trustees, the
parties shall request that the Trustees address:  (a) voting processes,
including use of proxies, standard unit (block) voting and deadlock
procedures; (b) quorum requirements of at least one AMPTP-appointed
employer Trustee and one other employer Trustee appointed by any
other individual employer and an equal number of Union-appointed
Trustees; and (c) audit and collection policies and procedures.

## ARTICLE 22 – PAYROLL DEPOSIT

In order to secure performance of the Employer's payroll
obligations under this Agreement, the parties agree as follows:

(A)   In the event that an Employer (1) has filed for bankruptcy
protection or had a trustee/receiver appointed to handle its affairs within
five (5) years prior to the commencement of principal photography on a
given production; (2) has no prior history with the IATSE; or (3) fails to
make payroll in a given payroll period, the Union may require such
Employer to deposit with a payroll company of the Employer's choosing
an amount equal to two (2) weeks of estimated payroll plus two (2)
weeks of fringe benefit contributions for covered employees.  Such
amount shall be used solely for the purpose of satisfying amounts owed

to covered employees and/or benefit fund(s), as applicable, under this Agreement.

(B)   The Employer shall provide the Union with written verification of the payroll company's consent to hold the deposit, which must be executed by the payroll company.

(C)   No later than four (4) weeks after the completion of principal photography for the production, the Union shall advise the Employer of any outstanding payroll obligations to the employees employed on the production and/or the respective benefit fund(s).  Upon the expiration of such four (4) week period, the payroll company, with the approval of the Union, shall remit the amounts due for any undisputed items to the employee(s) to whom and/or benefit fund(s) to which such amounts are due and shall remit the balance of the deposit to the Employer, less an amount sufficient to pay the disputed payroll items, if any, which shall remain deposited with the payroll company.

(D)   Any amounts relating to disputed wage claims plus fringe benefit contributions thereon shall remain deposited with the payroll company pending the settlement or resolution pursuant to Article 15 of this Agreement of claims relating thereto.  For purposes of any arbitration hereunder, the arbitrator shall have the power to determine only claims relating to the payment of wages and benefit contributions thereon.

(E)   The foregoing shall not apply (1) to an Employer signatory to the IATSE Basic Agreement which, together with its related or affiliated entities, has made Supplemental Markets payments to the Motion Picture Industry Pension and Health Plans in an aggregate amount of not less than fifteen million dollars ($15,000,000) (or has made Post '60s payments of not less than six million dollars ($6,000,000)) during the three (3) year period beginning January 1, 1994 and ending on December 31, 1996, or in any subsequent three (3) consecutive year period, or (2) to any of its related or affiliated entities.

(F)   In lieu of making a deposit as required above, a signatory producer may obtain and provide to the IATSE a letter of guarantee from any commercial financial institution or from an Employer, or its related or affiliated entities, that meets the requirements of Paragraph (E) above, stating that it unconditionally guarantees the fulfillment of payroll obligations and fringe benefit contributions due employees under the Area Standards Agreement with respect to a particular motion picture.

(G)   In the event that an Employer fails to make a required deposit as set forth herein, the IATSE may direct the covered employees to withhold services from that Employer on the production from which the deposit is sought until the deposit is made or a letter of guarantee is provided as set forth in Paragraph (F) above.

## ARTICLE 23 – SICK LEAVE

(A)   <u>California Sick Leave</u>

(1)   <u>Accrual</u>.  Commencing July 1, 2015, eligible employees covered by the IATSE Area Standards Agreement shall accrue one (1) hour of paid sick leave for every thirty (30) hours worked in California for the Employer, up to a maximum of forty-eight (48) hours or six (6) days. (In lieu of the foregoing hourly accrual of paid sick leave, and provided that advance notice is given to the employee, an Employer may elect to provide employees, upon their eligibility to use sick leave as provided below (*i.e.,* upon working thirty (30) days in California for the Employer and after their ninetieth (90th) day of employment in California with the Employer (based on days worked or guaranteed), with a bank of twenty-four (24) hours or three (3) days of sick leave per year, such year to be measured, as designated by the Employer, as either a calendar year or starting from the employee's anniversary date.  Under this elected option, such banked sick leave days may not be carried over to the following year.)

(2)   To be eligible to accrue paid sick leave, the employee must have worked for the Employer for at least thirty (30) days in California within a one (1) year period, such year to be measured, as designated by the Employer, as either a calendar year or starting from the employee's anniversary date.  Sick leave may be used in minimum increments of four (4) hours upon oral or written request after the eligible employee has been employed by the Employer in California for ninety (90) days (based on days worked or guaranteed), such period to be measured, as designated by the Employer, as either a calendar year or starting from the employee's anniversary date.  Reasonable advance notification of the need for sick leave is required if the use is foreseeable; otherwise, notice is required as soon as practicable.  Sick days accrued on an hourly basis shall carry over to the following year of employment; however, the Employer may limit the use of such accrued time to no more than twenty-four (24) hours or three (3) days during each year of employment as defined by the Employer in advance.

(3)   A day of paid sick leave shall be equal to eight (8) hours' pay for hourly employees.  Four (4) hours of paid sick leave shall be equal to four (4) hours' pay for hourly employees.  To the extent that

an employee works in a classification for which the rate of pay is subject to individual negotiation, and the employee negotiates a weekly guarantee, the rate of paid sick leave shall be computed on the basis of one-fifth (1/5th) of the employee's weekly rate for a day of paid sick leave (and fifty percent (50%) thereof if a four (4) hour increment of sick leave is taken). Replacements for weekly employees (including "on-call" employees) may be hired on a *pro rata* basis of the weekly rate regardless of any contrary provision in this Agreement. The employee shall not be required to find a replacement as a condition of exercising his right to paid sick leave.

(4)    Sick leave may be taken for the diagnosis, care or treatment of an existing health condition of, or preventive care for, the employee or the employee's "family member."[10] Sick leave also may be taken by an employee who is a victim of domestic violence, sexual assault or stalking.

(5)    Accrued, unused sick leave is not paid out on termination, resignation or other separation of employment. If the employee is rehired by the Employer within one (1) year of the employee's separation from employment, the employee's accrued and unused sick leave is reinstated, and the employee may begin using the accrued sick leave upon rehire if the employee was previously eligible to use the sick leave or once the employee becomes eligible as provided above.

(6)    Employer shall include information in the employee's start paperwork to advise the employee of the designated Employer representative whom the employee may contact to confirm eligibility and the amount of accrued sick leave available under this California Sick Leave Policy. Such start paperwork also shall advise the employee which period (*i.e.,* calendar year or the employee's anniversary date) the Employer selected to measure the thirty (30) day and ninety (90) day eligibility periods and the cap on accrual set forth in subparagraph (2) above or which period (*i.e.,* calendar year or the employee's anniversary date) the Employer selected to apply the bank of three (3) sick days as provided in subparagraph (1) above. Employer also shall notify the IATSE of the name and contact information of the designated Employer representative.

---

[10] "Family member" means any of the following: (1) a biological, adopted or foster child, stepchild, legal ward or a child to whom the employee stands *in loco parentis*; (2) a biological, adoptive or foster parent, stepparent or legal guardian of the employee or the employee's spouse or registered domestic partner or a person who stood *in loco parentis* when the employee was a minor child; (3) a spouse; (4) a registered domestic partner; (5) a grandparent; (6) a grandchild; or (7) a sibling.

(7)     Any Employer that has a sick leave policy, or paid leave or paid time off policy that permits the use of paid sick time, as of June 30, 2015, may continue such policy in lieu of the foregoing. Nothing shall prevent an Employer from negotiating a sick leave policy with better terms and conditions.  There shall be no discrimination or retaliation against any employee for exercising his or her right to use paid sick leave.

(8)     Any dispute with respect to sick leave for employees covered under this Agreement shall be subject to the grievance and arbitration procedures provided therein.

 (B) <u>Other Sick Leave Laws</u>

The Union expressly waives, to the full extent permitted by law, application of the following to all employees employed under this Agreement: the Paid Sick Leave Ordinance of Berkeley, California (Municipal Code Chapter 13.100); the Seattle Paid Sick and Safe Time Ordinance (Ordinance No. 123698); Chapter 18.10 of Title 18 of the Municipal Code of the City of Tacoma, Washington (enacted by Ordinance No. 28275); all requirements pertaining to "paid sick leave" in Chapter 37 of Title 5 of the Municipal Code of Emeryville, California (including, but not limited to, Chapter 37.01.e), 37.03, 37.07.a)1)B.ii. and 37.07.f)); Article 8.1 of Title 23, Chapter 2 of the Arizona revised Statutes; and any other ordinance, statute or law requiring paid sick leave that is hereafter enacted within the jurisdiction of this Agreement. It is understood that the Union and the AMPTP shall memorialize any such waiver for any newly-enacted law by letter agreement.

## ARTICLE 24 – TERM OF AGREEMENT

The term of this Agreement shall commence on August 1, 2018 and shall remain in full force and effect for three (3) years, terminating on July 31, 2021. Unless otherwise expressly provided herein, the terms and conditions of this Agreement shall be effective August 1, 2018.

**FOR THE ALLIANCE OF MOTION PICTURE AND TELEVISION PRODUCERS, ON BEHALF OF THE COMPANIES LISTED IN EXHIBIT "A" OF THIS AGREEMENT**

By: _____   Dated: September 3-, 2019
    Carol A. Lombardini
    President, AMPTP

**FOR THE INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES AND MOVING PICTURE TECHNICIANS, ARTISTS AND ALLIED CRAFTS OF THE UNITED STATES, ITS TERRITORIES AND CANADA**

By: _____   Dated: 9/10/19
    Matthew D. Loeb
    International President, IATSE

# EXHIBIT "A"

## Companies Represented by the AMPTP
## in the 2018 IATSE Area Standards Agreement Negotiations

7 Friends Pictures Inc.
300 Pictures, Inc.
1440 Productions LLC

ABC Signature Studios, Inc.
Adobe Pictures, Inc.
Alive and Kicking, Inc.

Bonanza Productions Inc.
Broken Foot Productions, Inc.

Canada Premiere Pictures Inc.
Castle Rock Pictures, Inc.
CBS Films Inc.
CBS Studios Inc.
Charlestown Productions LLC
Chime Productions, LLC
Classic Films Inc.
Columbia Pictures Industries, Inc.
Crown City Pictures Inc.
Corporate Management Solution,
   Inc.

Delta Blues Productions LLC
Digital 360 Productions, Inc.
Digital 49 Productions, Inc.
Dutch Boy Productions, LLC
DW Studios Productions L.L.C.

Eye Productions Inc.

Film 49 Productions, Inc.
Focus Features Productions LLC
FTP Productions, LLC

Grass Skirt Digital Productions,
   Inc.
GWave Productions, LLC

Hazardous Productions, LLC
Hop, Skip & Jump Productions,
   Inc.
Horizon Productions, Inc.
Horizon Scripted Television, Inc.
Hostage Productions, Inc.

Jay Squared Productions LLC

Kapital Productions, LLC
Kiki Tree Pictures Inc.

Lennox House Pictures Inc.
Louisiana Premiere Productions
   LLC

Main Gate Productions LLC
Marvel Film Productions LLC
Marvel Picture Works LLC
Metro-Goldwyn-Mayer Pictures
   Inc.
MGM Television Entertainment
   Inc.
Minim Productions, Inc.
Mutiny Pictures Inc.

New Line Productions, Inc.
New Regency Productions, Inc.
Ninjutsu Pictures, Inc.
NS Pictures, Inc.

Olive Avenue Productions, LLC
On the Brink Productions, Inc.
Open 4 Business Productions LLC
Orange Cone Productions LLC

Pacific 2.1 Entertainment Group, Inc.
Paige Productions, Inc.
Palladin Productions LLC
Paramount Pictures Corporation
Paramount Worldwide Productions, Inc.
Picrow, Inc.
Picrow Streaming Inc.
Picrow Features Inc.
PP21 Productions LLC
Produced Bayou Productions, Inc.

Random Pictures Inc.
Red Zone Pictures, Inc.
Redemption Pictures, Inc.
Riverboat Productions, LLC
Rose City Pictures, Inc.
Rozar Pictures, LLC

S&K Pictures, Inc.
Salty Pictures, Inc.
San Vicente Productions, Inc.
Scope Productions, LLC
Screen Gems Productions, Inc.
Shovel Buddies, LLC
SLO Productions Inc.
Smallville Studios Inc.
Stage 6 Films, Inc.
Stalwart Films, LLC
Storyteller Productions Co., Inc.
Stu Segall Productions, Inc.

Theoretical Pictures, Inc.
Touchstone Television Productions, LLC d.b.a. ABC Studios
Turner Films, Inc.
TVM Productions, Inc.
Twentieth Century Fox Film Corporation

Universal Cable Productions LLC
Universal City Studios LLC
Upside Down Productions Inc.

Walt Disney Pictures
Warner Bros. Pictures
Warner Bros. Television
Warner Specialty Productions Inc.
Warner Specialty Video Productions Inc.
Wiip Productions, LLC (f.k.a. Tornado Productions, LLC)

YNFS Productions LLC

As of October 1, 2001

Thomas C. Short
International President
International Alliance of Theatrical Stage Employes
1430 Broadway, 20th floor
New York, New York  10018

    **Re:**   **Holidays/ Bereavement Leave**

This will confirm the agreement reached in the 2001 negotiations for a successor
agreement to the Theatrical and Television Motion Picture Area Standards
Agreement of October 1, 1998 concerning holidays and bereavement leave.
During those negotiations, the parties agreed that in the event that the Employers
agree to add Martin Luther King, Jr.'s birthday as a holiday under the Producer -
IATSE Basic Agreement, the same will automatically be added as a holiday under
this Area Standards Agreement.  The parties likewise agreed that if the Employers
agree to add a bereavement leave provision to the Producer - IATSE Basic
Agreement, the same provision shall automatically be included under this Area
Standards Agreement.

Each party to the Area Standards Agreement hereby confirms its concurrence with
the foregoing by executing in the space below reserved for its signature.

                             Sincerely,

                             _____

                             [Employer]

**ACCEPTED AND AGREED:**

/s/ Thomas C. Short
Thomas C. Short
International President

Sideletter No. 1
- 40 -

As of August 1, 2006
Revised as of August 1, 2009

Matthew D. Loeb
International President
International Alliance of Theatrical Stage Employees
1430 Broadway, 20th Floor
New York, New York  10018

**Re:**   **Wage Rates for First Two Persons Hired Locally in Specified
Departments in Washington, D.C.**

This will confirm the agreement reached in the 2009 negotiations for a successor
agreement to the Theatrical and Television Motion Picture Area Standards
Agreement of August 1, 2006 concerning employment of the first two persons
hired locally in certain departments in Washington, D.C.  During those
negotiations, the parties agreed that, for the term of the 2009 Area Standards
Agreement only, they would continue their consistent past practice of engaging the
first two persons hired locally in Washington, D.C. in the wardrobe, electrical
rigging and grip rigging departments at the Key and 2nd rates, respectively.

Each party to the Area Standards Agreement hereby confirms its concurrence with
the foregoing by executing in the space below reserved for its signature.

Sincerely,

_____
[Employer]

**ACCEPTED AND AGREED:**

/s/ Matthew D. Loeb_____
Matthew D. Loeb
International President

As of August 1, 2006

Thomas C. Short
International President
International Alliance of Theatrical Stage Employes
1430 Broadway, 20th Floor
New York, New York  10018

This will confirm the agreement reached during the negotiations for a successor agreement to the Theatrical and Television Motion Picture Area Standards Agreement of 2001 that the IATSE has jurisdiction over aerial balloons and base camp power sources under the IATSE Area Standards Agreement to the same extent as under the Producer – I.A.T.S.E. Basic Agreement.

Sincerely,

_____
[Employer]

**ACCEPTED AND AGREED:**

/s/ Thomas C. Short_____
Thomas C. Short
International President

As of August 1, 2006
Revised as of August 1, 2009

Matthew D. Loeb
International President
International Alliance of Theatrical Stage Employees
1430 Broadway, 20th Floor
New York, New York  10018

Employees hired from the geographical jurisdiction of Local 479 to perform services in Savannah, Georgia (which is actually within the jurisdiction of Local 491) shall nevertheless be treated as "Nearby Hires" if they reside more than sixty (60) miles from the production location.

Employees hired to work within the geographical jurisdiction of Local 493 in St. Louis, Missouri, who reside more than sixty (60) miles from the production location, but within the state of Missouri, shall be treated as "Nearby Hires."

Sincerely,

_____
[Employer]

**ACCEPTED AND AGREED:**

/s/ Matthew D. Loeb
Matthew D. Loeb
International President

As of August 1, 2006

Thomas C. Short
International President
International Alliance of Theatrical Stage Employes
1430 Broadway, 20th Floor
New York, New York  10018

**Re:    Scope and Application of Agreement**

The Employers agree to continue to work with the IATSE on a case-by-case basis in connection with work done within the jurisdiction of the Theatrical and Television Motion Picture Area Standards Agreement that would otherwise be covered by the Supplemental Videotape or Digital Agreements if done in Los Angeles County.

Sincerely,

_____
[Employer]

**ACCEPTED AND AGREED:**

/s/ Thomas C. Short_____
Thomas C. Short
International President

Sideletter No. 5
- 44 -

As of August 1, 2006

Thomas C. Short
International President
International Alliance of Theatrical Stage Employes
1430 Broadway, 20th Floor
New York, New York  10018

    **Re:   Notice of Employment Opportunities and Opportunity to Refer Qualified Persons**

Dear Tom:

As a result of the negotiations leading up to the Theatrical and Television Motion Picture Area Standards Agreement of 2006, the parties agreed that further clarification of the obligations set forth in Article 2(C) of the Agreement was in order.  The parties agreed that the attached letter dated April 15, 2003 (marked as "Appendix 'A'"), sent by Carol Lombardini to Matt Loeb, accurately clarifies those obligations and should be appended to the Agreement as a sideletter.

                Sincerely,

                _____
                [Employer]

**ACCEPTED AND AGREED:**

/s/ Thomas C. Short
Thomas C. Short
International President

April 15, 2003

Matt Loeb
International Vice President
International Alliance of Theatrical Stage Employes
1430 Broadway, 20th Floor
New York, New York  10018

> **Re:    IATSE Area Standards Agreement; Local Union to Have Notice of
> Employment Opportunities and Opportunity to Refer Qualified Persons**

Dear Matt:

Article 2(C) of the 1998 Southeast Area Standards Agreement between the International Alliance of Theatrical Stage Employes and the Employer provided as follows:

> "Whenever the Employer is in need of persons to perform work covered by this Agreement, it will give the appropriate Local Union notice and an opportunity to refer qualified persons in a non-discriminatory manner.  The Employer will give good faith consideration to all persons referred by the Union."

This language was changed in the successor Agreement to the 1998 Southeast Area Standards Agreement, the 2001 IATSE Area Standards Agreement, to read as follows:

> "Upon request of the Employer, the Local shall expeditiously supply the Employer with a referral list of individuals who have work experience in the production of motion pictures, together with the address, contact number and skill of each such individual.  The Local shall refer qualified persons in a non-discriminatory manner.  For employees on the referral list, the address shown on the list shall be used in determining whether the employee is to be treated as a Local Hire, a Nearby Hire or Distant Hire."

This will confirm that the change in language was not intended to alter the Employer's obligation to give the appropriate Local Union notice and an opportunity to refer qualified persons whenever an Employer seeks to hire employees under the Area Standards Agreement.  The use of the phrase "upon request of the Employer" was not intended to give the Employer discretion whether or not to notify the Local Union, but rather to indicate that the Local Union was to furnish the Employer with a referral list of qualified employees when so requested by the Employer.

Appendix "A" to
Sideletter No. 6 (page 1 of 2)

- 46 -

Matt Loeb
April 15, 2003
Page 2

This will also confirm that although the 2001 IATSE Area Standards Agreement, unlike the 1998 IATSE Southeast Area Standards Agreement, does not explicitly so provide, the Employer will continue to give good faith consideration to those on the referral list supplied by the Local Union, with the right of final selection reserved to the Employer.

Please feel free to use this letter as an expression of our mutual intent in bargaining this clause in order to clear up any questions with respect to the Employer's obligation to notify the Local Union of work opportunities for employees covered under the IATSE Area Standards Agreement.

Sincerely,


/s/Carol A. Lombardini
Carol A. Lombardini

cc:     Alliance Bargaining Committee
        J. Nicholas Counter III
        Thomas C. Short

Appendix "A" to
Sideletter No. 6 (page 2 of 2)

- 47 -

As of August 1, 2006

Thomas C. Short
International President
International Alliance of Theatrical Stage Employes
1430 Broadway, 20th Floor
New York, New York  10018

    **Re:** **Pension and Health Contributions for Certain Individuals with**
           **Prior Work Experience Under the Local #52 Agreement Who**
           **Work Under the IATSE Area Standards Agreement**

Dear Tom:

This will confirm the agreement reached concerning the submission of pension
and health contributions for individuals who are hired in New York or New Jersey
to perform work covered under the IATSE Area Standards Agreement.  Any such
individual who has previously worked under the Local #52 Agreement and is a
participant in the Motion Picture Industry Pension and Health Plans shall have
pension and health and Individual Account Plan contributions made on his or her
behalf to the Motion Picture Industry Pension and Health Plans, at the same rates
as are applicable under the IATSE Basic Agreement, in lieu of contributions being
made to the appropriate Plan(s) at the applicable rate specified in Article 5 of the
IATSE Area Standards Agreement.

                    Sincerely,

                    _____

                    [Employer]

**ACCEPTED AND AGREED:**

/s/ Thomas C. Short_____
Thomas C. Short
International President

As of March 3, 2007

Thomas C. Short
International President
International Alliance of Theatrical Stage Employes
1430 Broadway, 20th Floor
New York, New York  10018

      **Re:**    **Pension and Health Contributions for Certain Individuals with
              Prior Work Experience Under the Local #161 Agreement Who
              Work Under the IATSE Area Standards Agreement**

Dear Tom:

This will confirm the agreement reached concerning the submission of pension
and health contributions for individuals who are hired in New York, New Jersey or
Connecticut to perform work covered under the IATSE Area Standards
Agreement.  Effective March 3, 2007, any such individual who has previously
worked under the Local #161 Agreement and is a participant in the Motion Picture
Industry Pension and Health Plans shall have pension and health and Individual
Account Plan contributions made on his or her behalf to the Motion Picture
Industry Pension and Health Plans, at the same rates as are applicable under the
IATSE Basic Agreement, in lieu of contributions being made to the appropriate
Plan(s) at the applicable rate specified in Article 5 of the IATSE Area Standards
Agreement.

              Sincerely,

              _____

              [Employer]

**ACCEPTED AND AGREED:**

/s/ Thomas C. Short
Thomas C. Short
International President

**ALLIANCE OF MOTION PICTURE AND TELEVISION PRODUCERS**
15301 Ventura Boulevard, Building E, Sherman Oaks, CA 91403
Tel: 818.995.3600 • Fax: 818.285.4450 • www.amptp.org

Carol A. Lombardini                                        Direct: 818.935.5930
President

As of October 1, 2009
Revised as of August 1, 2015
Revised as of August 1, 2018

Mr. Matthew Loeb
International President
International Alliance of Theatrical Stage Employees
207 West 25th Street, 4th Floor
New York, New York  10001

**Re:   Pension Contributions for Persons Employed under the IATSE Area
        Standards Agreement for whom Local USA 829 has been Assigned as
        the Administrative Local Union**

Dear Matt:

This will confirm the agreement reached concerning the submission of pension
contributions on behalf of those persons employed under the IATSE Area
Standards Agreement for whom Local USA 829 has been assigned by the IATSE
as the Administrative Local Union pursuant to Appendix B of that Agreement.  In
lieu of making contributions to the IATSE National Pension Fund on behalf of
such persons, the Employer shall instead make contributions to the United Scenic
Artists Local USA 829 Pension Fund.  Employer shall make contributions to the
United Scenic Artists Local USA 829 Pension Fund, the IATSE National Health
and Welfare Fund and the IATSE Annuity Fund in the aggregate amount that is
otherwise applicable under Article 5.A.(5) of the Area Standards Agreement, with

Matt Loeb
As of October 1, 2009; Revised as of August 1, 2015; Revised as of August 1, 2018
Page 2

the allocation of said aggregate amount to be determined from time to time, but
not more frequently than once per year, by United Scenic Artists, Local USA 829.
Local USA 829 shall provide notice to the AMPTP and Employers of said
allocation.

Sincerely,

Carol A. Lombardini
President, AMPTP


**ACCEPTED AND AGREED:**

Matthew D. Loeb
International President

As of August 1, 2012
Revised as of August 1, 2015

Mr. Matthew Loeb
International President
International Alliance of Theatrical Stage Employees
1430 Broadway, 20th Floor
New York, New York 10018

**Re:     Work Performed Outside the United States or its Territories**

Dear Matt:

This sideletter confirms the understanding reached during the 2012 negotiations that should an Employer elect to employ a person within the geographical area described in the Preamble of this Agreement to perform work outside the limits of the United States and its territories in any of the job classifications covered hereunder, in the production of motion pictures, the provisions of this Agreement do not apply to such employment, except that the Employer shall make benefit plan contributions to the Plan(s) applicable to the geographical area in which the employee is hired at the applicable rate set forth in Article 5 of the Agreement for seven (7) days per week (which amount may be prorated for partial workweeks at the beginning and end of employment), provided that the applicable Trust Agreements permit such contributions. The bargaining parties agree to make a recommendation to the Directors of the respective benefit plans to amend the applicable Trust Agreements, if required, to allow such contributions.

If the foregoing comports with your understanding of our agreement, please so indicate by executing the sideletter in the space reserved for your signature.

Sincerely,

Carol A. Lombardini
President, AMPTP

**ACCEPTED AND AGREED:**

Matthew D. Loeb
International President

Sidletter No. 10
- 52 -

As of August 1, 2009

Matthew D. Loeb
International President
International Alliance of Theatrical Stage Employees
1430 Broadway, 20th Floor
New York, New York  10018

     **Re:**   **Travel Coordinators**

Dear Matt:

Any individual assigned to work in the production office at a production location on a full-time basis solely for the purpose of making travel arrangements for production employees who is working under the supervision of the Production Office Coordinator shall be covered under the IATSE Area Standards Agreement as an Assistant Production Office Coordinator.

               Sincerely,

               _____
               [Employer]

**ACCEPTED AND AGREED:**

/s/ Matthew D. Loeb
Matthew D. Loeb
International President

**ALLIANCE OF MOTION PICTURE AND TELEVISION PRODUCERS**

15301 Ventura Boulevard, Building E, Sherman Oaks, CA 91403
Tel: 818.995.3600 • Fax: 818.285.4450 • www.amptp.org

Carol A. Lombardini                                               Direct: 818.935.5930
President

As of August 1, 2012
Revised as of August 1, 2015
Revised as of August 1, 2018

Matthew D. Loeb
International President
International Alliance of Theatrical Stage Employees
207 West 25th Street, 4th Floor
New York, New York  10001

   **Re:   Productions Made for New Media**

Dear Matt:

This Sideletter confirms the understanding of the International Alliance of
Theatrical Stage Employees (hereinafter "the IATSE"), on the one hand, and the
Alliance of Motion Picture and Television Producers, on behalf of the Employers
listed in Exhibit "A" which it represented in negotiations for the IATSE Theatrical
and Television Motion Picture Area Standards Agreement of 2018 (hereinafter
"the Area Standards Agreement"), on the other hand, (collectively "the parties"),
concerning the terms and conditions applicable to the production of dramatic,
scripted motion pictures that are made for the Internet, mobile devices, or any
other new media platform in existence as of August 1, 2009 (hereinafter
collectively referred to as "New Media").[1, 2]  With respect to such productions

---

[1] This Sideletter applies to the production of certain types of programs intended primarily for use
in New Media and does not cover work involved in the selection of content for, design or
management of any website or any other New Media platform on which productions made for
New Media appear.

[2] The Employer agrees to work with the IATSE on a case-by-case basis in connection with work
performed on productions made for new media that are outside the scope of this Sideletter, but
that would otherwise be covered by the "Sideletter re Productions Made for New Media" under
the Supplemental Videotape Agreement if done in Los Angeles County.

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 2

intended for initial use in new media, the parties agree as follows:
The parties mutually recognize that the economics of New Media production are
presently uncertain and that greater flexibility in terms and conditions of
employment is therefore mutually beneficial. If one or more business models
develop such that New Media production becomes an economically viable
medium, then the parties mutually recognize that future agreements should reflect
that fact.

A.    **Recognition**

The Employer recognizes the IATSE as the exclusive bargaining
representative of employees employed within the classifications
covered by the Area Standards Agreement on dramatic, scripted
motion pictures which are intended for initial exhibition in New
Media, but excluding documentaries and "Experimental New Media
Productions," as that term is defined below, within the geographic
scope covered by said Agreement.

B.    **Coverage**

Coverage shall be at the Employer's option with respect to
"Experimental New Media Productions." Should the Employer elect
to cover an Experimental New Media Production, the terms and
conditions applicable to employment on Original New Media
Productions, as set forth in Paragraph D. below, shall apply.

An "Experimental New Media Production" is defined as any Original
New Media Production: (1) for which the actual cost of production
does not exceed: (a) $15,000 per minute of program material as
exhibited, and (b) $300,000 per single production as exhibited, and
(c) $500,000 per series of programs produced for a single order; and
(2) on which fewer than four (4) employees as hereinafter described
are working in job classifications covered by, and within the
geographic scope of, an industry-wide agreement between Employers
and the IATSE, or a Local thereof, which agreement covers television

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 3

production as well as productions made for new media. With respect to any employee working within the geographic scope of the Producer-IATSE Basic Agreement (hereinafter "the Basic Agreement") or the Producer-IATSE Videotape Electronics Supplemental Basic Agreement (hereinafter "the Videotape Agreement"), such employees shall include any person listed on the Industry Experience Roster established by the Basic Agreement, or on the New Media Roster established pursuant to Paragraph E.(3) of the Sideletter re Productions Made for New Media in the Basic Agreement or, in the case of employees working in classifications with no Roster, any person who has thirty (30) or more days of work experience within the last three (3) years, either alone or in combination, under the West Coast Studio Local Agreement covering that classification, the Videotape Agreement, or on New Media productions covered under the Sideletter re Productions Made for New Media in the Basic or Videotape Agreement.[3] With respect to any employee working within the respective classifications and geographic scope of an industry-wide agreement described in the first sentence of this paragraph other than the Basic Agreement or the Videotape Agreement, such employees shall include any person who has thirty (30) or more days of work experience within the last three (3) years under any such agreement, and/or on New Media Productions covered under any such agreement.[4] In determining whether fewer than four (4) such employees are employed on the production, the following employees shall not be counted: employees not specifically charged to the production or who are included in general overhead; projectionists and in-house publicists (but not unit publicists); and employees engaged in post-production or distribution functions, including, but not limited to, editing and looping,

---

[3,4] The Employer shall be entitled to rely on the representation of the employee as to whether he or she meets the "thirty (30) or more days of work experience within the last three (3) years" requirement.

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 4

regardless of where or when those functions are performed, but excluding the editor, provided that such editor is working in conjunction with the shooting company.

The actual cost of the Experimental New Media Production shall consist of all direct costs actually incurred in connection with the Production.  The only costs excluded in determining the actual cost of production shall be development costs, overhead charges, financing costs (*i.e.,* loan origination fees, gap fees, legal fees and interest), contingency of up to ten percent (10%), essential elements insurance costs, the cost of the completion bond, marketing expenses, contingent payments to talent or other parties which are based on the proceeds derived from the exploitation of the Production and received after recoupment of the negative cost, and delivery items required by sales agents, distributors or sub-distributors (*i.e.,* delivery materials beyond the answer print, NTSC Video Master if the Production is delivered on videotape, or the digital equivalent if the Production is delivered in a digital format).

If the Employer began production of an "Experimental New Media Production" which the Employer elected not to cover under the terms of this Sideletter, but subsequently employs four (4) or more employees on the production who meet the description in the second or third sentences of the second paragraph of this Paragraph B., and are not excluded pursuant to the fourth sentence of said paragraph (but including at least one (1) employee covered under this Sideletter), then said production shall automatically be deemed covered hereunder, starting from the first day on which at least four (4) or more such employees are so employed on the production and continuing until the production is finished.

Employer shall use reasonable efforts to notify the IATSE that it intends to cover an "Experimental New Media Production" by the start of principal photography.

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 5

**C.    Terms and Conditions of Employment on Derivative New Media Productions (Other Than a "High Budget" Dramatic New Media Production Made for Initial Exhibition on a Subscription Video-on-Demand Consumer Pay Platform ("High Budget SVOD Program"))**

A "Derivative New Media Production" is a production for New Media (other than a "High Budget SVOD Program" as defined in Paragraph F. below) based on an existing television motion picture covered by the Area Standards Agreement that was produced for "traditional" media – *e.g.,* a free television, basic cable or pay television motion picture ("the source production") – and is a dramatic, scripted program.

Employees may be employed by an Employer and assigned to a Derivative New Media Production as part of their regular workday on the source production.  The work for the Derivative Production shall be considered part of the workday for the Employees on the source production and shall trigger overtime if work on the Derivative Production extends the workday on the source production past the point at which overtime would normally be triggered on the source production.  All other terms and conditions, including benefits, shall continue as if the employee were continuing to work on the source production.

In all other situations, terms and conditions of employment on a Derivative New Media Production are freely negotiable between the Employee and the Employer, except for those provisions identified in Paragraph E. below.

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 6

**D.   Terms and Conditions of Employment on Original New Media Productions (Other than an Original "High Budget SVOD Program")**

(1)   Terms and conditions of employment on Original New Media Productions (other than a "Mid-Budget SVOD Program" as defined in Paragraph D.(2) below and other than an Original "High Budget SVOD Program" as defined in Paragraph F. below) are freely negotiable between the Employee and the Employer, except for those provisions identified in Paragraph E. below.

(2)   (a)   The terms and conditions set forth in this Paragraph D.(2) shall be applicable prospectively only.  They shall not apply to:

(i)   any program or series that would otherwise qualify as a "Mid-Budget SVOD Program" within the meaning of this Sideletter, for which the principal photography of the program, in the case of a one-time program, or the principal photography of the first episode, in the case of a series, commenced prior to August 1, 2019; or

(ii)   any program or series that would otherwise qualify as a "Mid-Budget SVOD Program" within the meaning of this Sideletter, for which the principal photography of the program or the first episode of the series commenced after August 1, 2019, if such program or series was produced pursuant to the terms of a *bona fide* license agreement with fixed and definite terms entered into by the Employer prior to August 1, 2019.

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 7

However, if such license agreement is entered into subject to conditions precedent, then all such conditions must be satisfied prior to August 1, 2019.

Any program or series described in subparagraphs (i) or (ii) above shall be subject to Paragraph D.(1) of this Sideletter. However, with respect to any such program or series described in subparagraphs (i) or (ii) above, if the licensee orders additional programs or episodes pursuant to the terms of the license agreement after August 1, 2019 and the Employer has the right to negotiate with respect to the material terms and conditions of the license for the additional programs or episodes, then such additional programs or episodes shall be subject to this Paragraph D.(2).[5]

Notwithstanding the foregoing, the Employer shall not reduce the terms and conditions of employment previously provided to IATSE-represented employees on programs or series covered by subparagraphs (i) or (ii) above.

---

[5] In the event that the Employer asserts that a program or series is grandfathered under the provisions of the second paragraph of Paragraph D.(2)(a) above, a limited number of representatives of the IATSE, subject to the execution of a confidentiality agreement satisfactory in form to the Employer, may inspect those portions of the license agreement that are relevant to determine whether the Employer had the right to renegotiate with respect to the material terms and conditions of the license for the additional programs or episodes. All information received or reviewed by representatives of the IATSE shall be kept confidential, and neither the IATSE nor its representatives shall disclose any such information, except as necessary to enforce its rights under this Agreement.

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 8

(b)   Mid-Budget SVOD Programs Defined

The terms and conditions set forth in Paragraph D.(2)(c) of this Sideletter shall be applicable only to original, live action dramatic new media productions made for initial exhibition on a subscription video-on-demand consumer pay platform which meet the following criteria (hereinafter "Mid-Budget SVOD Programs"):

| Length of Program as Initially Exhibited* | "Mid-Budget" Threshold |
|---|---|
| 20-35 Minutes | $900,000 or more but less than $1,300,000 |
| 36-65 Minutes | $1,750,000 or more but less than $2,500,000 |
| 66 Minutes or more | $2,100,000 or more but less than $3,000,000 |

* Original, live action dramatic new media productions which are less than 20 minutes in length and made for initial exhibition on a subscription video-on-demand consumer pay platform are not subject to this Paragraph D.(2) and, instead, are subject to Paragraph D.(1) of this Sideletter, regardless of their budgets.

(c)   Terms and Conditions

The terms and conditions for employees employed on a Mid-Budget SVOD Program shall be those set forth in the 2018 Area Standards Agreement for a long-form television motion picture, except that:

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 9

       (A)    Employees employed on a Mid-Budget SVOD Program shall be paid at the "Pilot, Long-Form and First Year of One-Hour Episodic Series" wage rates for the period two periods prior to the period in question (*e.g.*, during the period August 2, 2020 to July 31, 2021, the wage rate for the period July 29, 2018 to August 3, 2019 shall apply);

       (B)    Paragraph E.(5) of this Sideletter shall apply; and

       (C)    Rest periods shall be as provided in Article 3(F)(1) of the 2018 IATSE Area Standards Agreement.

## E.    Other Provisions

The following provisions apply to Original and Derivative New Media Productions (other than a "Mid-Budget SVOD Program" as defined in Paragraph D.(2) above and other than a "High Budget SVOD Program" as defined in Paragraph F. below):

(1)   <u>Union Security</u>

The provisions of Article 17, "Union Security," of the Area Standards Agreement shall apply to New Media Productions, except that the requirement to become a member in good standing of the Union shall not apply until an individual has been employed for at least thirty (30) workdays on New Media Productions covered under this Sideletter, or for a combined total of thirty (30) workdays on New Media Productions covered under this sideletter and on motion pictures covered under the Area Standards Agreement.

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 10

(2)   Pension, Health and Annuity Plans

On covered New Media Productions budgeted at $25,000 or less per minute (using the same cost elements as described in the third paragraph of Paragraph B. above), Employer's only obligation hereunder shall be to contribute to the applicable Health and Welfare Plan on behalf of each employee covered under the terms of this Sideletter $50.00 per day in lieu of any amounts required under Article 5 of the Area Standards Agreement.

On New Media Productions budgeted at more than $25,000 per minute (using the same cost elements as described in the third paragraph of Paragraph B. above), or when Employees are assigned by the Employer to a Derivative New Media Production as part of their regular workday on the source production, Employer shall be obligated to make pension, health and welfare and annuity contributions (to the extent applicable) in accordance with the applicable provisions of Article 5 of the Area Standards Agreement.

(3)   Preference of Employment

There shall be no preference of employment of any kind or nature in the employment of Employees on New Media Productions hereunder.

(4)   Grievance and Arbitration

Any dispute with regard to the interpretation or application of this Sideletter shall be resolved in accordance with the grievance procedure set forth in Article 15 of the Area Standards Agreement, except that the Union's rights and responsibilities under the grievance procedure shall be administered exclusively by the IATSE.

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 11

(5)   Staffing

It is expressly understood and agreed that there shall be no
staffing requirements on Productions made for New Media and
that there will be full interchange of job functions among
Employees, so that a single Employee may be required to
perform the functions of multiple job classifications.

(6)   No Strike, No Lockout

During the term of this Agreement, the Union agrees not to
engage in any strike, sympathy strike or work stoppage against
the Employer.  The Employer agrees not to engage in any
lockout of its Employees employed hereunder during the term
of this Agreement.

(7)   No Other Terms Applicable

Except as expressly provided in this Sideletter, no other terms
and conditions of the Area Standards Agreement shall be
applicable to Employees employed on New Media Productions.

F.   **"High Budget" Derivative and Original Dramatic New Media
Productions Made for Initial Exhibition on a Subscription Video-
on-Demand Consumer Pay Platform**

(1)   Prospective Application

The terms and conditions set forth in this Paragraph F. shall be
applicable prospectively only.  They shall not apply to:

(a)   any program or series that would otherwise qualify as a
"High Budget SVOD Program" within the meaning of
this Sideletter, for which the principal photography of

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 12

the program, in the case of a one-time program, or the principal photography of the first episode, in the case of a series, commenced prior to November 1, 2015; or

(b) any program or series that would otherwise qualify as a "High Budget SVOD Program" within the meaning of this Sideletter for which the principal photography of the program or the first episode of the series commenced after November 1, 2015, if such program or series was produced pursuant to the terms of a *bona fide* license agreement with fixed and definite terms entered into by the Employer prior to November 1, 2015. However, if such license agreement is entered into subject to conditions precedent, then all such conditions must be satisfied prior to November 1, 2015.

Any program or series described in subparagraphs (a) or (b) above shall continue to be subject to the terms of Sideletter No. 12 Re: Productions Made for New Media under the 2012 Area Standards Agreement. However, with respect to any such program or series described in subparagraphs (a) or (b) above, if the licensee orders additional programs or episodes pursuant to the terms of the license agreement after November 1, 2015 and the Employer has the right to negotiate with respect to the material terms and conditions of the license for the additional programs or episodes, then such additional programs or episodes shall be subject to the terms of this Sideletter.

Notwithstanding the foregoing, the Employer shall not reduce the terms and conditions of employment previously provided to IATSE-represented employees on programs or series covered by subparagraphs (a) or (b) above.

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 13

(2)   <u>"High Budget SVOD Programs" Defined</u>

The terms and conditions set forth in Paragraph F. of this
Sideletter shall be applicable only to original and derivative
dramatic new media productions made for initial exhibition on
a subscription video-on-demand consumer pay platform which
meet the following "high budget" criteria (hereinafter "High
Budget SVOD Programs"):

| **Length of Program as Initially Exhibited\*** | **"High Budget" Threshold** |
|---|---|
| 20-35 Minutes | $1,300,000 and above |
| 36-65 Minutes | $2,500,000 and above |
| 66 Minutes or more | $3,000,000 and above |

\* Programs less than 20 minutes are not considered "high
budget" for the purpose of this Sideletter, regardless of their
budgets.

(3)   <u>"Tier 1" and "Tier 2" Defined</u>

For purposes of Paragraph F.(4) below, Tier 1 and Tier 2 shall
be defined as follows:

| Program Length | Budget Tier |
|---|---|
| 20-35 Minutes | Tier 1: $2,100,000 or more |
| | Tier 2: $1,300,000 or more but less than $2,100,000 |
| 36-65 Minutes | Tier 1: $3,800,000 or more |
| | Tier 2: $2,500,000 or more but less than $3,800,000 |

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 14

| Program Length | Budget Tier |
|---|---|
| 66-95 Minutes | Tier 1: $4,000,000 or more |
| | Tier 2: $3,000,000 or more but less than $4,000,000 |
| 96 Minutes or more | Tier 1: $4,500,000 (plus $2,250,000 for each additional 35 minutes or portion thereof) or more |
| | Tier 2: $3,000,000 or more but less than $4,500,000 (plus $2,250,000 for each additional 35 minutes or portion thereof) |

(4)     Terms and Conditions

        (a)     The terms and conditions for employees employed on High Budget SVOD Programs in Tier 1, as defined in subparagraph (3) above, that are intended for initial exhibition on a subscription video-on-demand consumer pay platform with 20 million or more subscribers in the United States and Canada shall be as set forth in the 2018 Area Standards Agreement for a television motion picture, subject to the following modifications:

                (i)     The applicable "Maryland" or "non-Maryland" rates set forth in Appendix A for "Pilots, Long-Form and First Year of One-Hour Episodic Television Series" shall apply to one-time High Budget SVOD Programs, High Budget SVOD pilots and the first year of any High Budget SVOD series.  The minimum rates for employees working in Washington, D.C. on such High Budget SVOD Programs shall be the "television" rates set forth in

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 15

Article 3(A)(3).  The minimum rates for employees working in Las Vegas and Hawaii on such High Budget SVOD Programs shall be as provided in Paragraph G.(4)(a) of the Sideletter re: Productions Made for New Media to the 2018 Producer-IATSE Basic Agreement.

(ii)  The applicable "Maryland" or "non-Maryland" rates set forth in Appendix A for "All Other Television" shall apply to the second and subsequent years of any High Budget SVOD series.  The minimum rates for employees working in Washington, D.C. on the second and subsequent years of a High Budget SVOD series shall be the "television" rates set forth in Article 3(A)(3).  The minimum rates for employees working in Las Vegas and Hawaii on the second and subsequent years of any High Budget SVOD series shall be as provided in Paragraph G.(4)(a) of the Sideletter re: Productions Made for New Media to the 2018 Producer-IATSE Basic Agreement.

(iii)  On a one-time High Budget SVOD Program, a High Budget SVOD pilot or during the first year of any High Budget SVOD series, Employer shall not be required to make any payment under Article 7 for holidays which are not worked.

(iv)  The wage rates, fringe rates and working conditions applicable to theatrical motion pictures, as set forth in this Agreement, shall apply to a live action High Budget SVOD Program that is 96 minutes or more in length and budgeted at over $30 million *[to be increased by the wage*

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 16

> *increases in each year of the agreement]*[6] (other than a pilot, episode of a series or part of a mini-series) and that is intended primarily for use on a subscription consumer pay video-on-demand new media service with 20,000,000 or more domestic subscribers.[7]

> The foregoing applies only to a High Budget SVOD Program that is subject to a license agreement entered into on or after January 1, 2019 (or, in the absence of a license agreement, the principal photography of which commences on or after January 1, 2019).

(b)   The terms and conditions for employees employed on High Budget SVOD Programs in Tier 2, as defined in subparagraph (3) above, that are intended for initial exhibition on a subscription video-on-demand consumer pay platform with 20 million or more subscribers in the United States and Canada, or for High Budget SVOD Programs that are intended for initial exhibition on a subscription video-on-demand consumer pay platform with fewer than 20 million subscribers in the United

---

[6] The budget threshold increases to over $30,900,000 million effective August 4, 2019 and to over $31,827,000 million effective August 2, 2020.

[7] The budget shall be determined by the production costs, including the "above" and "below the line" costs and "pre-production" and "post-production" costs. Production costs shall not include: (a) the costs of the premium for a completion bond; (b) a contingency fund not to exceed ten percent (10%) of the budget; (c) costs reimbursed by insurance; and (d) overages caused by a force majeure event or governmental action. Employer shall provide the IATSE, upon request, with a report of the actual expenditures of the production ("Final Expenditure Report") and such other relevant materials as the IATSE may require which show the actual cost of the production. All information received or reviewed by professionals shall be confidential and neither the IATSE nor its representatives or retained professionals shall disclose any such information except as necessary to enforce their rights under the Agreement.

Sideletter No. 12

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 17

States and Canada, shall be as set forth in the 2018 Area
Standards Agreement for a television motion picture,
subject to the following clarifications and modifications:

(i)     The applicable "Maryland" or "non-Maryland"
        rates set forth in Appendix A for "Pilots, Long-
        Form and First Year of One-Hour Episodic
        Television Series" shall apply to a one-time High
        Budget SVOD Program, a High Budget SVOD
        pilot, and the first three years of any High Budget
        SVOD series.  The minimum rates for employees
        working in Washington, D.C. on such High
        Budget SVOD Programs shall be the "television"
        rates set forth in Article 3(A)(3).  The minimum
        rates for employees working in Las Vegas and
        Hawaii on such High Budget SVOD Programs
        shall be as provided in Paragraph G.(4)(b) of the
        Sideletter re: Productions Made for New Media to
        the 2018 Producers-IATSE Basic Agreement.

(ii)    The applicable "Maryland" or "non-Maryland"
        rates set forth in Appendix A for "All Other
        Television" shall apply to the fourth and
        subsequent years of any High Budget SVOD
        series.  The minimum rates for employees working
        in Washington, D.C. on the fourth and subsequent
        years of any High Budget SVOD series shall be
        the "television" rates set forth in Article 3(A)(3).
        The minimum rates for employees working in Las
        Vegas and Hawaii on the fourth and subsequent
        years of any High Budget SVOD series shall be as
        provided in Paragraph G.(4)(b) of the Sideletter re:
        Productions Made for New Media to the Basic
        Agreement.

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 18

       (iii)    On a one-time High Budget SVOD Program, a High Budget SVOD pilot or during the first two years of any High Budget SVOD series, Employer shall not be required to make any payment under Article 7 for holidays which are not worked. During the third year of any High Budget SVOD series, employees who are eligible for unworked holiday pay under Article 7 shall be paid for unworked holidays on the basis of four (4) hours (at the employee's regular straight time hourly rate). Thereafter, payment for unworked holidays shall be as provided in Article 7.

   (c)    The second paragraph of Paragraph C. of this Sideletter shall apply to a Derivative New Media Production that falls within the definition of a High Budget SVOD Program as provided in this Paragraph F.

   (d)    For purposes of determining applicable terms and conditions under this subparagraph (4), the number of subscribers in the United States and Canada shall be determined as of July 1st of each year of the Agreement. For a High Budget SVOD series, the number of subscribers in the United States and Canada that applies to the first episode of the season shall apply to the entire season.

**G.**    Representatives of the IATSE shall have the right to review the budget of a covered new media production solely for the purpose of determining whether the covered new media production falls within the definition of a Mid-Budget SVOD program as set forth in Paragraph D. (2) above or a High Budget SVOD Program, and, if so, whether the production meets the budget break in Tier 1 or Tier 2 as set forth in Paragraph F.(3) above. Employer agrees to cooperate and provide requested relevant additional information about the budget

Matthew D. Loeb
Productions Made for New Media
Revised as of August 1, 2018
Page 19

that is reasonably available to it.  All information received or reviewed by representatives of the IATSE shall be kept confidential, and neither the IATSE nor its representatives shall disclose any such information, except as necessary to enforce its rights under this Agreement.

**H.**    **"Sunset" Clause**

The parties recognize that these provisions are being negotiated at a time when the business models and patterns of usage of productions in New Media are in the process of exploration, experimentation and innovation.  Therefore, the provisions of this Sideletter shall expire on the termination date of the Area Standards Agreement and will be of no force and effect thereafter.  No later than sixty (60) days before that expiration date, the parties will meet to negotiate new terms and conditions for reuse of productions made for New Media.

The parties further acknowledge that conditions in this area are changing rapidly and that the negotiation for the successor agreement will be based on the conditions that exist and reasonably can be forecast at that time.

Sincerely,

Carol A. Lombardini
President, AMPTP

**ACCEPTED AND AGREED:**

Matthew D. Loeb
International President

**ALLIANCE OF MOTION PICTURE AND TELEVISION PRODUCERS**
15301 Ventura Boulevard, Building E, Sherman Oaks, CA 91403
Tel: 818.995.3600 • Fax: 818.285.4450 • www.amptp.org

Carol A. Lombardini
President

Direct: 818.935.5930

As of August 1, 2015

Mr. Matthew Loeb
International President
International Alliance of Theatrical Stage Employees
207 West 25th Street, 4th Floor
New York, New York  10001

**Re:    Pension Contributions for Persons Employed under the IATSE
Area Standards Agreement who are Participants in the Pension
Fund of Make-up Artists and Hair Stylists Union – Local #798**

Dear Matt:

This will confirm the agreement reached concerning the submission of pension
contributions on behalf of those persons employed under the IATSE Area
Standards Agreement who are participants in the Pension Fund of Make-Up
Artists & Hair Stylists Union – Local 798 – IATSE ("Local #798 Pension Fund").
In lieu of making contributions to the IATSE National Pension Fund or to any
other pension plan specified in Article 5 on behalf of such persons, the Employer
shall instead make contributions to the Local #798 Pension Fund.  Employer shall
make contributions to the Local #798 Pension Fund, the IATSE National Health
and Welfare Fund and the IATSE Annuity Fund in the aggregate amount that is
otherwise applicable under Article 5(A)(1), (2), (3), (6), (7) or (8) of the Area
Standards Agreement.  When the pension component of the aggregate contribution
is specified, that amount shall be contributed to the Local #798 Pension Fund.
When the pension component is not so specified, the parties shall agree upon an
allocation among the various benefit funds and the amount to be contributed to the
Local #798 Pension Fund.  Notwithstanding the foregoing, employees who are
qualified in the IATSE National Pension Fund may have their pension

contributions made to the IATSE National Pension Fund, as provided in Article 5(A)(1), (2), (3), (6), (7) or (8), by individually executing the necessary documents to ensure direction of such contributions to the IATSE National Pension Fund.

Sincerely,

Carol A. Lombardini
President, AMPTP

**ACCEPTED AND AGREED:**

Matthew D. Loeb
International President

## GUIDELINES REGARDING EXTENDED WORK DAYS

Theatrical and television productions are budgeted for specified hours of production. There are cost deterrents which encourage the production to be on budget and on time.

When an extended work day is necessary, the need for same should be identified as far in advance as possible so that appropriate planning may occur.

The following guidelines set forth common sense measures which should be considered when extended work days are necessitated:

1.  Sleep deprivation, which may be caused by factors other than an extended work day, should be identified by the employee. The American Automobile Association (AAA) cautions drivers as to the following danger signs:

    - Eyes closing by themselves
    - Difficulty in paying attention
    - Frequent yawning
    - Swerving in lane

    AAA warns that drivers experiencing any of these danger signs could fall asleep at any time. AAA recommends three basic solutions - sleep, exercise and caffeine. AAA urges drivers who are too drowsy to drive safely to pull off the road to a safe area, lock the doors and take a nap - even twenty minutes will help. Upon waking, the driver should get some exercise and consume caffeine for an extra boost.

2.  Any employee who believes that he/she is too tired to drive safely should notify an authorized representative of the Producer before leaving the set. In that event, the Producer will endeavor to find alternative means of transportation or provide a hotel room or a place to rest. Such request may be made without any fear of reprisal and will not affect any future employment opportunities.

3.    When the production company anticipates an extended work day, the employees should be encouraged to carpool.

4.    When an extended work day is necessary, appropriate beverages and easily metabolized foods should be available.

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**

15301 Ventura Boulevard, Building E, Sherman Oaks, CA 91403
Tel: 818.995.3600 • Fax: 818.285.4450 • www.amptp.org

Carol A. Lombardini                                                      Direct: 818.935.5930
President

As of August 1, 2015

Mr. Matthew Loeb
International President
International Alliance of Theatrical Stage Employees
207 West 25ᵗʰ Street, 4ᵗʰ Floor
New York, New York  10001

**Re:    Productions Made for Basic Cable or The CW**

Dear Matt:

This will confirm the agreement reached in the 2015 negotiations for a successor
agreement to the Theatrical and Television Motion Picture Area Standards
Agreement of August 1, 2012 to apply the following special conditions to
productions made for basic cable and The CW:

a.      <u>Wages</u> - For employees working under the Area Standards Agreement in the
areas covered by Article 3(A)(1) and (4), the "Maryland rates" set forth in
Appendix A for "Pilots, Long-Form and First Year of One-Hour Episodic
Series" shall apply to a pilot and during the first, second and third seasons
of any series; for employees working under the Area Standards Agreement
in the areas covered by Article 3(A)(2), the "Non-Maryland rates" set forth
in Appendix A for "Pilots, Long-Form and First Year of One-Hour Episodic
Series" shall apply to a pilot and during the first, second and third seasons
of any series; and for employees working under the Area Standards
Agreement in the areas covered by Article 3(A)(5), the rates set forth in the
"Made for Television Long-Form Agreement Rate Schedules" of the
Producer - I.A.T.S.E. Basic Agreement shall apply to a pilot and during the
first season of any series, and the rates set forth in the Sideletter Re: Special
Conditions for One-Half Hour and One-Hour Pilots and One-Hour Series
(Other than Pilots or Series Made for Basic Cable) of the Producer -

I.A.T.S.E. Basic Agreement shall apply during the second and third seasons of any series as if they were the first and second seasons of such series.

b.     <u>Holidays Not Worked</u> - On a pilot and during the first two seasons of any series, Employer shall not be required to make any payment under Article 7 for holidays which are not worked.  During the third year of any series, employees who are eligible for unworked holiday pay under Article 7 shall be paid for unworked holidays on the basis of four (4) hours (at the employee's regular straight time hourly rate).  Thereafter, payment for unworked holidays shall be as provided in Article 7.

Sincerely,

Carol A. Lombardini
President, AMPTP

**ACCEPTED AND AGREED:**

Matthew D. Loeb
International President

**ALLIANCE OF MOTION PICTURE & TELEVISION PRODUCERS**

15301 Ventura Boulevard, Building E, Sherman Oaks, CA 91403
Tel: 818.995.3600 • Fax: 818.285.4450 • www.amptp.org

Carol A. Lombardini
President

Direct: 818.935.5930

As of August 1, 2015

Mr. Matthew Loeb
International President
International Alliance of Theatrical Stage Employees
207 West 25th Street, 4th Floor
New York, New York  10001

Re:   **Made For Home Video Productions**

Dear Matt:

This will confirm the agreement reached in the 2015 negotiations for a successor
agreement to the Theatrical and Television Motion Picture Area Standards
Agreement of August 1, 2012 that the terms of the Theatrical Low Budget
Agreement shall apply to employees employed under the Area Standards
Agreement on a motion picture made for the home video market, the production of
which commences on or after August 1, 2015.

Sincerely,

Carol A. Lombardini
President, AMPTP

**ACCEPTED AND AGREED:**

Matthew D. Loeb
International President

Sideletter No. 16

## APPENDIX A

## IATSE AREA STANDARDS
## CRAFTS AND CLASSIFICATIONS WAGE SCHEDULE

1) The following minimum wage scale shall be effective for the period commencing July 29, 2018 to and including August 3, 2019.

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **CONSTRUCTION, PAINT & SCENIC** | | | | | | |
| Coordinator | per individual negotiation | per individual negotiation | per individual negotiation | $35.47 | per individual negotiation | per individual negotiation |
| Draftsperson | $34.68 | $32.36 | $33.94 | 29.27 | $27.99 | $28.54 |
| Foreman | 40.85 | 37.80 | 40.11 | 35.47 | per individual negotiation | per individual negotiation |
| Gang Boss | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| Shop Crafts Person | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Prop/Model Makers | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Construction Divers | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Utility Technicians [1] | 30.06 | 29.27 | 30.06 | 26.20 | 24.92 | 25.43 |
| Buyer | 37.04 | 34.68 | 36.23 | 29.27 | 27.99 | 28.54 |
| Tool Person (MD) | 34.68 | 32.36 | 33.94 | N/A | N/A | N/A |
| Key Scenic Artist (MD) | per individual negotiation | per individual negotiation | per individual negotiation | N/A | N/A | N/A |
| Scenic Foreperson | 40.85 | 37.80 | 40.11 | 32.36 | 31.00 | 31.61 |
| Set Painters | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |

[1] Utility Persons may be hired at the ratio of one (1) utility person for each five (5) full journeyman hired in the construction department (journeyman does not include the forepersons and gang boss classifications). This ratio shall be suspended for the striking of scenery after the last day of principal photography. No strike personnel shall have their current wage diminished as a result of this provision.

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **CONSTRUCTION, PAINT & SCENIC** (continued) | | | | | | |
| Graphic Artist [2] | $34.68 | $32.36 | $33.94 | $32.36 | $31.00 | $31.61 |
| Scenic Artist | 34.68 | 32.36 | 33.94 | 32.36 | 31.00 | 31.61 |
| Sign Painters/Writers | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| On Set Painters | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| Sculptors/Plasterers | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| **PROPS** | | | | | | |
| Prop Master | 40.85 | 37.80 | 40.11 | 35.47 | per individual negotiation | per individual negotiation |
| Assistant Prop Master/ Prop Assistant | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| Buyer | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Prop Weapons | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| On Set Picture Cars/Boats | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Marine Coordinator | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| Boat Handlers | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Prop Person | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| **SET DRESSING** | | | | | | |
| Set Decorator | per individual negotiation | per individual negotiation | per individual negotiation | 35.47 | per individual negotiation | per individual negotiation |
| Lead Person | 40.85 | 37.80 | 40.11 | 32.36 | 31.00 | 31.61 |
| Draper/Upholsterer | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Buyer | 40.85 | 37.80 | 40.11 | 29.27 | 27.99 | 28.54 |

---

[2] When engaged by the Employer, Graphic Artists shall be paid the same as the Scenic Artist. No employee employed on a production as a Graphic Artist on August 1, 2018 shall have his or her rate reduced on that production as a result of this agreement. The parties recognize that the work of a Graphic Artist has historically been performed and may continue to be performed by others within the bargaining unit (including but not limited to a Costume Designer) as well as others outside of the bargaining unit, including outside contractors.

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **SET DRESSING** (continued) | | | | | | |
| First Dresser        (MD) | $37.04 | $34.68 | $36.23 | N/A | N/A | N/A |
| Dressers, On Set, Off Set, Swing Gang | 34.68 | 32.36 | 33.94 | $29.27 | $27.99 | $28.54 |
| **GREENS** | | | | | | |
| Greens Persons/ Foreman | 40.85 | 37.80 | 40.11 | 35.47 | per individual negotiation | per individual negotiation |
| First Greens | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| On Set Greens | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| **WARDROBE** | | | | | | |
| Wardrobe Supervisor | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Costume Designer | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Assistant Costume Designer | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Key Wardrobe/ Lead Set Wardrobe | 40.85 | 37.80 | 40.11 | 32.36 | 31.00 | 31.61 |
| Assistant Key (non-MD) | N/A | N/A | N/A | 29.27 | 27.99 | 28.54 |
| Costumer/Buyer/ Stylist | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Set Costumer | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Key Tailor/Fitter (MD) | 37.04 | 34.68 | 36.23 | N/A | N/A | N/A |
| Seamstress/Tailor/ Stitcher/Sewer | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| **GRIPS** | | | | | | |
| Key | 40.85 | 37.80 | 40.11 | 35.47 | per individual negotiation | per individual negotiation |
| Best Boy Grip | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **GRIPS** (continued) | | | | | | |
| Dolly Grip | $37.04 | $34.68 | $36.23 | $32.36 | $31.00 | $31.61 |
| Crane Operators | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Grips | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Pre-Riggers | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| **ELECTRIC** | | | | | | |
| Gaffer | 40.85 | 37.80 | 40.11 | 35.47 | per individual negotiation | per individual negotiation |
| Best Boy | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| Generator Operator | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| Electrician | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Lighting Programmer | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| Pipe Rigging | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| **SPECIAL EFFECTS** | | | | | | |
| Coordinator/Key | 40.85 | 37.80 | 40.11 | 35.47 | per individual negotiation | per individual negotiation |
| Effects Assistant/ Charge Person | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| Additional Effects/ Mechanical Effects/ Powder Person | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |
| Divers | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| **SOUND** | | | | | | |
| Mixer/Recordist | 40.85 | 37.80 | 40.11 | 35.47 | per individual negotiation | per individual negotiation |
| Boom Person/Assistant | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| Cable Utility Person | 34.68 | 32.36 | 33.94 | 29.27 | 27.99 | 28.54 |

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **VIDEO ASSIST** | | | | | | |
| VTR/Playback | $40.85 | $37.80 | $40.11 | $35.47 | per individual negotiation | per individual negotiation |
| Non-Record Video/ Video Assist | 34.68 | 32.36 | 33.94 | 29.27 | $27.99 | $28.54 |
| **CRAFTS SERVICE** | | | | | | |
| Key Crafts Service | 37.04 [3] | 34.68 [3] | 36.23 [3] | 32.36 | 31.00 | 31.61 |
| Crafts Service Assistant | 34.68 [3] | 32.36 [3] | 33.94 [3] | 29.27 | 27.99 | 28.54 |
| **FIRST AID** | | | | | | |
| First Aid (EMT, Paramedic, RN) | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| **SCRIPT SUPERVISOR** | | | | | | |
| Script Supervisor (if hired locally) [4] | 40.85 | 37.80 | 40.11 | 35.47 | per individual negotiation | per individual negotiation |
| **HAIR AND MAKE-UP** | | | | | | |
| Key Hair/ Key Make-Up (if hired locally) [4] | 40.85 | 37.80 | 40.11 | 35.47 | per individual negotiation | per individual negotiation |
| Assistant Hair/ Assistant Make-Up (if hired locally) [4] | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |
| **PRODUCTION OFFICE** | | | | | | |
| Production Office Coordinator (if hired locally) [4,5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |

---

[3] All off and on production labor except for active construction will be performed by Craft Service.

[4] Unless otherwise represented by another IATSE Local Union.

[5] Employed on an "on call" basis.

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **PRODUCTION OFFICE** (continued) | | | | | | |
| Assistant Production Office Coordinator (if hired locally) [4,5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| **ART DEPARTMENT** | | | | | | |
| Art Department Coordinator (if hired locally) [5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| **PROJECTION** | | | | | | |
| Daily Projectionist (Appendix C) | $34.68 | $32.36 | $33.94 | $29.27 | $27.99 | $28.54 |
| **TRANSPORTATION** (Puerto Rico Only) | | | | | | |
| Transportation Coordinator | N/A | N/A | N/A | 35.47 | per individual negotiation | per individual negotiation |
| Transportation Captain | N/A | N/A | N/A | 32.36 | 31.00 | 31.61 |
| Driver | N/A | N/A | N/A | 29.27 | 27.99 | 28.54 |
| **SET TEACHER** | | | | | | |
| Set Teacher [5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| **LOCATION** (Select Locations Only) | | | | | | |
| Location Manager [5,6] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Assistant Location Manager [6] | 37.04 | 34.68 | 36.23 | 32.36 | 31.00 | 31.61 |

---

[4] Unless otherwise represented by another IATSE Local Union.

[5] Employed on an "on call" basis.

[6] These rates apply to employment on theatrical and television motion pictures in the states of Colorado, Maryland, New Mexico, Louisiana (excluding Shreveport and Baton Rouge), Tennessee and Virginia, and in Puerto Rico, and on television motion pictures in the states of Maine, Massachusetts, New Hampshire, Rhode Island and Vermont.

2) The following minimum wage scale shall be effective for the period commencing with August 4, 2019 to and including August 1, 2020.

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **CONSTRUCTION, PAINT & SCENIC** | | | | | | |
| Coordinator | per individual negotiation | per individual negotiation | per individual negotiation | $36.53 | per individual negotiation | per individual negotiation |
| Draftsperson | $35.72 | $33.33 | $34.96 | 30.15 | $28.83 | $29.40 |
| Foreman | 42.08 | 38.93 | 41.31 | 36.53 | per individual negotiation | per individual negotiation |
| Gang Boss | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| Shop Crafts Person | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Prop/Model Makers | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Construction Divers | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Utility Technicians [1] | 30.96 | 30.15 | 30.96 | 26.99 | 25.67 | 26.19 |
| Buyer | 38.15 | 35.72 | 37.32 | 30.15 | 28.83 | 29.40 |
| Tool Person       (MD) | 35.72 | 33.33 | 34.96 | N/A | N/A | N/A |
| Key Scenic Artist       (MD) | per individual negotiation | per individual negotiation | per individual negotiation | N/A | N/A | N/A |
| Scenic Foreperson | 42.08 | 38.93 | 41.31 | 33.33 | 31.93 | 32.56 |
| Set Painters | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |

[1] Utility Persons may be hired at the ratio of one (1) utility person for each five (5) full journeyman hired in the construction department (journeyman does not include the forepersons and gang boss classifications). This ratio shall be suspended for the striking of scenery after the last day of principal photography. No strike personnel shall have their current wage diminished as a result of this provision.

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **CONSTRUCTION, PAINT & SCENIC** (continued) | | | | | | |
| Graphic Artist [2] | $35.72 | $33.33 | $34.96 | $33.33 | $31.93 | $32.56 |
| Scenic Artist | 35.72 | 33.33 | 34.96 | 33.33 | 31.93 | 32.56 |
| Sign Painters/Writers | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| On Set Painters | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| Sculptors/Plasterers | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| **PROPS** | | | | | | |
| Prop Master | 42.08 | 38.93 | 41.31 | 36.53 | per individual negotiation | per individual negotiation |
| Assistant Prop Master/ Prop Assistant | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| Buyer | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Prop Weapons | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| On Set Picture Cars/Boats | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Marine Coordinator | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| Boat Handlers | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Prop Person | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| **SET DRESSING** | | | | | | |
| Set Decorator | per individual negotiation | per individual negotiation | per individual negotiation | 36.53 | per individual negotiation | per individual negotiation |
| Lead Person | 42.08 | 38.93 | 41.31 | 33.33 | 31.93 | 32.56 |
| Draper/Upholsterer | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Buyer | 42.08 | 38.93 | 41.31 | 30.15 | 28.83 | 29.40 |

---

[2] When engaged by the Employer, Graphic Artists shall be paid the same as the Scenic Artist. No employee employed on a production as a Graphic Artist on August 1, 2018 shall have his or her rate reduced on that production as a result of this agreement. The parties recognize that the work of a Graphic Artist has historically been performed and may continue to be performed by others within the bargaining unit (including but not limited to a Costume Designer) as well as others outside of the bargaining unit, including outside contractors.

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **SET DRESSING** (continued) | | | | | | |
| First Dresser        (MD) | $38.15 | $35.72 | $37.32 | N/A | N/A | N/A |
| Dressers, On Set, Off Set, Swing Gang | 35.72 | 33.33 | 34.96 | $30.15 | $28.83 | $29.40 |
| **GREENS** | | | | | | |
| Greens Persons/ Foreman | 42.08 | 38.93 | 41.31 | 36.53 | per individual negotiation | per individual negotiation |
| First Greens | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| On Set Greens | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| **WARDROBE** | | | | | | |
| Wardrobe Supervisor | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Costume Designer | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Assistant Costume Designer | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Key Wardrobe/ Lead Set Wardrobe | 42.08 | 38.93 | 41.31 | 33.33 | 31.93 | 32.56 |
| Assistant Key (non-MD) | N/A | N/A | N/A | 30.15 | 28.83 | 29.40 |
| Costumer/Buyer/ Stylist | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Set Costumer | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Key Tailor/Fitter (MD) | 38.15 | 35.72 | 37.32 | N/A | N/A | N/A |
| Seamstress/Tailor/ Stitcher/Sewer | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| **GRIPS** | | | | | | |
| Key | 42.08 | 38.93 | 41.31 | 36.53 | per individual negotiation | per individual negotiation |
| Best Boy Grip | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **GRIPS** (continued) | | | | | | |
| Dolly Grip | $38.15 | $35.72 | $37.32 | $33.33 | $31.93 | $32.56 |
| Crane Operators | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Grips | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Pre-Riggers | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| **ELECTRIC** | | | | | | |
| Gaffer | 42.08 | 38.93 | 41.31 | 36.53 | per individual negotiation | per individual negotiation |
| Best Boy | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| Generator Operator | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| Electrician | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Lighting Programmer | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| Pipe Rigging | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| **SPECIAL EFFECTS** | | | | | | |
| Coordinator/Key | 42.08 | 38.93 | 41.31 | 36.53 | per individual negotiation | per individual negotiation |
| Effects Assistant/ Charge Person | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| Additional Effects/ Mechanical Effects/ Powder Person | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |
| Divers | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| **SOUND** | | | | | | |
| Mixer/Recordist | 42.08 | 38.93 | 41.31 | 36.53 | per individual negotiation | per individual negotiation |
| Boom Person/Assistant | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| Cable Utility Person | 35.72 | 33.33 | 34.96 | 30.15 | 28.83 | 29.40 |

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **VIDEO ASSIST** | | | | | | |
| VTR/Playback | $42.08 | $38.93 | $41.31 | $36.53 | per individual negotiation | per individual negotiation |
| Non-Record Video/ Video Assist | 35.72 | 33.33 | 34.96 | 30.15 | $28.83 | $29.40 |
| **CRAFTS SERVICE** | | | | | | |
| Key Crafts Service | 38.15 [3] | 35.72 [3] | 37.32 [3] | 33.33 | 31.93 | 32.56 |
| Crafts Service Assistant | 35.72 [3] | 33.33 [3] | 34.96 [3] | 30.15 | 28.83 | 29.40 |
| **FIRST AID** | | | | | | |
| First Aid (EMT, Paramedic, RN) | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| **SCRIPT SUPERVISOR** | | | | | | |
| Script Supervisor (if hired locally) [4] | 42.08 | 38.93 | 41.31 | 36.53 | per individual negotiation | per individual negotiation |
| **HAIR AND MAKE-UP** | | | | | | |
| Key Hair/ Key Make-Up (if hired locally) [4] | 42.08 | 38.93 | 41.31 | 36.53 | per individual negotiation | per individual negotiation |
| Assistant Hair/ Assistant Make-Up (if hired locally) [4] | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |
| **PRODUCTION OFFICE** | | | | | | |
| Production Office Coordinator (if hired locally) [4, 5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |

[3] All off and on production labor except for active construction will be performed by Crafts Service.

[4] Unless otherwise represented by another IATSE Local Union.

[5] Employed on an "on call" basis

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **PRODUCTION OFFICE** (continued) | | | | | | |
| Assistant Production Office Coordinator (if hired locally) [4,5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| **ART DEPARTMENT** | | | | | | |
| Art Department Coordinator (if hired locally) [5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| **PROJECTION** | | | | | | |
| Daily Projectionist (Appendix C) | $35.72 | $33.33 | $34.96 | $30.15 | $28.83 | $29.40 |
| **TRANSPORTATION** (Puerto Rico Only) | | | | | | |
| Transportation Coordinator | N/A | N/A | N/A | 36.53 | per individual negotiation | per individual negotiation |
| Transportation Captain | N/A | N/A | N/A | 33.33 | 31.93 | 32.56 |
| Driver | N/A | N/A | N/A | 30.15 | 28.83 | 29.40 |
| **SET TEACHER** | | | | | | |
| Set Teacher [5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| **LOCATION** (Select Locations Only) | | | | | | |
| Location Manager [5,6] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Assistant Location Manager [6] | 38.15 | 35.72 | 37.32 | 33.33 | 31.93 | 32.56 |

[4] Unless otherwise represented by another IATSE Local Union

[5] Employed on an "on call" basis.

[6] These rates apply to employment on theatrical and television motion pictures in the states of Colorado, Maryland, New Mexico, Louisiana (excluding Shreveport and Baton Rouge), Tennessee and Virginia, and in Puerto Rico, and on television motion pictures in the states of Maine, Massachusetts, New Hampshire, Rhode Island and Vermont.

3)   The following minimum wage scale shall be effective for the period commencing August 2, 2020 to and including July 31, 2021.

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **CONSTRUCTION, PAINT & SCENIC** | | | | | | |
| Coordinator | per individual negotiation | per individual negotiation | per individual negotiation | $37.63 | per individual negotiation | per individual negotiation |
| Draftsperson | $36.79 | $34.33 | $36.01 | 31.05 | $29.69 | $30.28 |
| Foreman | 43.34 | 40.10 | 42.55 | 37.63 | per individual negotiation | per individual negotiation |
| Gang Boss | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| Shop Crafts Person | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Prop/Model Makers | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Construction Divers | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Utility Technicians [1] | 31.89 | 31.05 | 31.89 | 27.80 | 26.44 | 26.98 |
| Buyer | 39.29 | 36.79 | 38.44 | 31.05 | 29.69 | 30.28 |
| Tool Person          (MD) | 36.79 | 34.33 | 36.01 | N/A | N/A | N/A |
| Key Scenic Artist          (MD) | per individual negotiation | per individual negotiation | per individual negotiation | N/A | N/A | N/A |
| Scenic Foreperson | 43.34 | 40.10 | 42.55 | 34.33 | 32.89 | 33.54 |
| Set Painters | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |

---

[1] Utility Persons may be hired at the ratio of one (1) utility person for each five (5) full journeyman hired in the construction department (journeyman does not include the forepersons and gang boss classifications). This ratio shall be suspended for the striking of scenery after the last day of principal photography. No strike personnel shall have their current wage diminished as a result of this provision.

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **CONSTRUCTION, PAINT & SCENIC** (continued) | | | | | | |
| Graphic Artist [2] | $36.79 | $34.33 | $36.01 | $34.33 | $32.89 | $33.54 |
| Scenic Artist | 36.79 | 34.33 | 36.01 | 34.33 | 32.89 | 33.54 |
| Sign Painters/Writers | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| On Set Painters | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| Sculptors/Plasterers | 36.79 | 34.33 | 36.01 | 31.05 | $29.69 | 30.28 |
| **PROPS** | | | | | | |
| Prop Master | 43.34 | 40.10 | 42.55 | 37.63 | per individual negotiation | per individual negotiation |
| Assistant Prop Master/ Prop Assistant | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| Buyer | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Prop Weapons | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| On Set Picture Cars/Boats | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Marine Coordinator | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| Boat Handlers | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Prop Person | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| **SET DRESSING** | | | | | | |
| Set Decorator | per individual negotiation | per individual negotiation | per individual negotiation | 37.63 | per individual negotiation | per individual negotiation |
| Lead Person | 43.34 | 40.10 | 42.55 | 34.33 | 32.89 | 33.54 |
| Draper/Upholsterer | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Buyer | 43.34 | 40.10 | 42.55 | 31.05 | 29.69 | 30.28 |

---

[2] When engaged by the Employer, Graphic Artists shall be paid the same as the Scenic Artist. No employee employed on a production as a Graphic Artist on August 1, 2018 shall have his or her rate reduced on that production as a result of this agreement. The parties recognize that the work of a Graphic Artist has historically been performed and may continue to be performed by others within the bargaining unit (including but not limited to a Costume Designer) as well as others outside of the bargaining unit, including outside contractors.

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **SET DRESSING** (continued) | | | | | | |
| First Dresser        (MD) | $39.29 | $36.79 | $38.44 | N/A | N/A | N/A |
| Dressers, On Set, Off Set, Swing Gang | 36.79 | 34.33 | 36.01 | $31.05 | $29.69 | $30.28 |
| **GREENS** | | | | | | |
| Greens Persons/ Foreman | 43.34 | 40.10 | 42.55 | 37.63 | per individual negotiation | per individual negotiation |
| First Greens | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| On Set Greens | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| **WARDROBE** | | | | | | |
| Wardrobe Supervisor | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Costume Designer | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Assistant Costume Designer | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Key Wardrobe/ Lead Set Wardrobe | 43.34 | 40.10 | 42.55 | 34.33 | 32.89 | 33.54 |
| Assistant Key (non-MD) | N/A | N/A | N/A | 31.05 | 29.69 | 30.28 |
| Costumer/Buyer/ Stylist | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Set Costumer | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Key Tailor/Fitter (MD) | 39.29 | 36.79 | 38.44 | N/A | N/A | N/A |
| Seamstress/Tailor/ Stitcher/Sewer | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| **GRIPS** | | | | | | |
| Key | 43.34 | 40.10 | 42.55 | 37.63 | per individual negotiation | per individual negotiation |
| Best Boy Grip | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **GRIPS** (continued) | | | | | | |
| Dolly Grip | $39.29 | $36.79 | $38.44 | $34.33 | $32.89 | $33.54 |
| Crane Operators | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Grips | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Pre-Riggers | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| **ELECTRIC** | | | | | | |
| Gaffer | 43.34 | 40.10 | 42.55 | 37.63 | per individual negotiation | per individual negotiation |
| Best Boy | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| Generator Operator | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| Electrician | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Lighting Programmer | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| Pipe Rigging | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| **SPECIAL EFFECTS** | | | | | | |
| Coordinator/Key | 43.34 | 40.10 | 42.55 | 37.63 | per individual negotiation | per individual negotiation |
| Effects Assistant/ Charge Person | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| Additional Effects/ Mechanical Effects/ Powder Person | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |
| Divers | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| **SOUND** | | | | | | |
| Mixer/Recordist | 43.34 | 40.10 | 42.55 | 37.63 | per individual negotiation | per individual negotiation |
| Boom Person/Assistant | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| Cable Utility Person | 36.79 | 34.33 | 36.01 | 31.05 | 29.69 | 30.28 |

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **VIDEO ASSIST** | | | | | | |
| VTR/Playback | $43.34 | $40.10 | $42.55 | $37.63 | per individual negotiation | per individual negotiation |
| Non-Record Video/ Video Assist | 36.79 | 34.33 | 36.01 | 31.05 | $29.69 | $30.28 |
| **CRAFTS SERVICE** | | | | | | |
| Key Crafts Service | 39.29 [3] | 36.79 [3] | 38.44 [3] | 34.33 | 32.89 | 33.54 |
| Crafts Service Assistant | 36.79 [3] | 34.33 [3] | 36.01 [3] | 31.05 | 29.69 | 30.28 |
| **FIRST AID** | | | | | | |
| First Aid (EMT, Paramedic, RN) | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| **SCRIPT SUPERVISOR** | | | | | | |
| Script Supervisor (if hired locally) [4] | 43.34 | 40.10 | 42.55 | 37.63 | per individual negotiation | per individual negotiation |
| **HAIR AND MAKE-UP** | | | | | | |
| Key Hair/ Key Make-Up (if hired locally) [4] | 43.34 | 40.10 | 42.55 | 37.63 | per individual negotiation | per individual negotiation |
| Assistant Hair/ Assistant Make-Up (if hired locally) [4] | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |
| **PRODUCTION OFFICE** | | | | | | |
| Production Office Coordinator (if hired locally) [4,5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |

[3] All off and on production labor except for active construction will be performed by Crafts Service.

[4] Unless otherwise represented by another IATSE Local Union.

[5] Employed on an "on call" basis.

| Crafts and Classifications | "Maryland" Minimum Hourly Wage Rates | | | "Non-Maryland" Minimum Hourly Wage Rates | | |
|---|---|---|---|---|---|---|
| | Theatrical Motion Pictures | Television | | Theatrical Motion Pictures | Television | |
| | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television | | Pilots, Long-Form and First Year of One-Hour Episodic Series | All Other Television |
| **PRODUCTION OFFICE** (continued) | | | | | | |
| Assistant Production Office Coordinator (if hired locally) [4,5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| **ART DEPARTMENT** | | | | | | |
| Art Department Coordinator (if hired locally) [5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| **PROJECTION** | | | | | | |
| Daily Projectionist (Appendix C) | $36.79 | $34.33 | $36.01 | $31.05 | $29.69 | $30.28 |
| **TRANSPORTATION** (Puerto Rico Only) | | | | | | |
| Transportation Coordinator | N/A | N/A | N/A | 37.63 | per individual negotiation | per individual negotiation |
| Transportation Captain | N/A | N/A | N/A | 34.33 | 32.89 | 33.54 |
| Driver | N/A | N/A | N/A | 31.05 | 29.69 | 30.28 |
| **SET TEACHER** | | | | | | |
| Set Teacher [5] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| **LOCATION** (Select Locations Only) | | | | | | |
| Location Manager [5,6] | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation | per individual negotiation |
| Assistant Location [6] Manager | 39.29 | 36.79 | 38.44 | 34.33 | 32.89 | 33.54 |

---

[4] Unless otherwise represented by another IATSE Local Union.

[5] Employed on an "on call" basis.

[6] These rates apply to employment on theatrical and television motion pictures in the states of Colorado, Maryland, New Mexico, Louisiana (excluding Shreveport and Baton Rouge), Tennessee and Virginia, and in Puerto Rico, and on television motion pictures in the states of Maine, Massachusetts, New Hampshire, Rhode Island and Vermont.

**APPENDIX B**

Employer has informed the Union that it will be utilizing the services of a payroll company for employees on each film production. At the commencement of each production, the Company shall notify the Union of the applicable payroll company serving said production.

No more frequently than once per calendar month, Employer shall require such payroll company to provide the Union with an earnings report for employees covered under this Agreement.

Employer shall not object to such payroll company deduction of all appropriate union dues/service fees from all wages earned by the employees covered by this Agreement who have executed the appropriate payroll deductions authorization form and shall request such payroll company to honor the Union's request for such deductions and to include a copy of the "Payroll Deduction Consent Form" with all start packages for all covered employees (see Appendix A), and to notify the Union of any covered employee who does not voluntarily sign the "Payroll Deduction Consent Form."

The address where these deductions are to be sent is:

**Local 7** (State of Colorado)
1475 Curtis St.
Denver, CO 80202
Phone: 303-534-2423          FAX: 303-534-0216

Mailing Address:
P.O. Box. 103
Denver, CO 80201

**Local 38** (Southeastern Michigan)
900 Pallister Ave.
Detroit, MI 48202
Phone: 313-870-9570          FAX: 313-870-9580

**Local 122** (San Diego, Palm Springs, Palm Desert, Hemet, Banning, Elsinore/29
          Palms, California)
3737 Camino del Rio South, Suite 307
San Diego, CA 92108
Phone: 619-640-0042          FAX: 619-640-3840

**Local 161** (for Script Supervisors, Production Office Coordinators and
          Assistant Production Office Coordinators hired locally in the States of
          Alabama, Illinois (other than Cook County), Louisiana, Michigan, Ohio and
          Tennessee)
630 Ninth Avenue, Suite 1103
New York, New York 10036
Phone:  212-977-9655          FAX:  212-977-9609

**Local 209** (State of Ohio)
1422 Euclid Ave., Suite 1604
Cleveland, OH 44115-1902
Phone: 216-621-9537          FAX: 216-621-3518

**Local 477** (State of Florida)
3780 SW 30th Avenue
Fort Lauderdale, FL  33312
Phone:  305-594-8585          FAX: 954-440-3362

**Local 478** (State of Louisiana, Southern Mississippi and Mobile, Alabama and
   vicinity)
511 N. Hennessey Street
New Orleans, LA  70119
Phone:  504-486-2192          FAX:  504-483-9961

**Local 479** (State of Georgia, except for Savannah, and Alabama, except for Mobile
   and vicinity)
4220 International Parkway, Suite 100
Atlanta, GA  30354
Phone: 404-361-5676          FAX: 404-361-5677

**Local 480** (State of New Mexico)
1418 Cerrellos Road
Santa Fe, NM  87501
Phone:  505-986-9512          FAX:  505-672-7909

Mailing Address:
P.O. Box 5351
Santa Fe, NM 87502

**Local 481** (States of Maine, Massachusetts, New Hampshire, Rhode
   Island and Vermont)
10 Tower Office Park, Suite 218
Woburn, MA  01801
Phone:  781-376-0074          FAX:  781-376-0078

**Local 484** (States of Texas and Oklahoma)
4818 East Ben White Blvd., Suite 204
Austin, TX  78741
Phone: 512-385-3466          FAX:  512-385-3370

**Local 487** (States of Maryland, Virginia and Washington, D.C.)
101 N. Haven Street
Baltimore, MD  21210
Phone:  410-732-0414          FAX: 636-223-3205

Mailing Address:
P.O. Box 16315
Baltimore, Maryland 21224

**Local 488** (States of Oregon and Washington) (Portland Office)
5105 SW 45th Avenue, Suite 204
Portland, OR 97221
Phone: 503-232-1523          FAX: 503-232-9552

**Local 489** (Greater Pittsburgh, Pennsylvania Area)
P.O. Box 100056
Pittsburgh, PA  15233
Phone: 412-403-4890          FAX: 412-820-2621

**Local 490** (State of Minnesota)
312 Central Avenue, S.E. #398
Minneapolis, MN  55414
Phone: 612-627-0490          FAX: 612-627-9734

**Local 491** (States of North and South Carolina and Savannah, Georgia)
1924 South 16th Street
Wilmington, NC  28401
Phone: 910-343-9408          FAX: 910-343-9448

**Local 492** (States of Tennessee and Northern Mississippi)
310 Homestead Rd.
Nashville, TN  37207
Phone: 615-386-3492          FAX: 615-460-7492

**Local 493** (State of Missouri)
5214 Chippewa Street
St. Louis, MO  63109
Phone: 314-353-4931          FAX: 314-353-4931

**Local 494** (Puerto Rico and the U.S. Virgin Islands)
Calle Romerillo #8
Urb. San Ramón
San Juan, Puerto Rico  00927
Phone: 787-764-4672          FAX: 787-756-6323

Mailing Address:
2000 Carr. 8177
PMB 236 Suite 26
Guaynabo, PR 00966-3762

**Local 665** (State of Hawaii)
501 Sumner Street, Suite 605
Honolulu, HI 96817
Phone: 808-596-0227          FAX: 808-591-8213

**Local 720** (Las Vegas, Nevada)
3000 S. Valley View Boulevard
Las Vegas, NV 89102-7802
Phone: 702-873-3450          FAX: 702-873-1329

**Local 798** (States of Tennessee and Mississippi)
70 West 36th Street, Suite 4A
New York, New York 10018
Phone: 212-627-0660          FAX: 212-627-0664

**Local USA 829** (for Costume Designers, Assistant Costume Designers, Scenic
    Artists, Painters, Sculptors and Plasterers, Set Designers/Model Makers and
    Illustrators in the States of Maine, Massachusetts, New Hampshire, Rhode
    Island and Vermont.)
United Scenic Artists Local USA 829
29 West 38th Street
15th Floor
New York, NY 10018
Phone: 212-581-0300          FAX: 212-977-2011

## APPENDIX C

The Producer may hire a daily Projectionist to run dailies, if such dailies require the skills and abilities of a Projectionist.  Said Projectionist may be employed on an "as needed" basis, and shall be compensated under the applicable rate in Appendix A with a minimum hourly rate equal to the 3rd rate.  Projectionists may be employed for a minimum of four (4) hours.

The Employer shall make a daily contribution to the IATSE National Benefit Plans in the total amount of $118.00 effective July 29, 2018 ($122.00 effective August 4, 2019; and $127.00 effective August 2, 2020) for each work day or portion thereof worked by the Employee.  The aforementioned $4.00 per day increase in the contribution rate that is effective on each of July 29, 2018 and August 4, 2019 and the $5.00 per day increase that is effective on August 2, 2020 shall be allocated to the IATSE National Health and Welfare Fund.

**APPENDIX D**
***IATSE-PRODUCER PROJECT INFORMATION SHEET***
Please complete the following, if known, for each project employing employees covered by the IATSE Basic Agreement ("BA")
and/or the Area Standards Agreement ("ASA") and working in the United States.
*Please send completed form to notices@iatse.net*

PROJECT TITLE: _____ DATE: _____

SIGNATORY PRODUCER / EMPLOYER: _____ PRODUCTION COMPANY: _____

☐ FEATURE          ☐ DIRECT-TO-VIDEO

☐ TELEVISION:

    INTENDED FOR EXHIBITION ON:  ☐ Network  ☐ Basic Cable  ☐ Pay TV  ☐ Other: _____

    TYPE:  ☐ Game Show/Non Dramatic  ☐ Pilot  ☐ Episodic Series  ☐ Long Form/ Mini Series  ☐ Other: _____

    LENGTH:  ☐ ½ Hour  ☐ 1 Hour  ☐ Other: _____

☐ NEW MEDIA: Platform Name: _____ Total # of Episodes in Initial Series Order (if applicable): _____

    LENGTH: ☐ Under 20 minutes   ☐ 20 minutes or more

    TYPE:  ☐ Pilot  ☐ Episodic Series  ☐ Long Form/ Mini Series  ☐ Other: _____

    ☐ Covered New Media Production (other than High Budget SVOD Program):

        BUDGET:  ☐ $25,000 or less per minute  **OR**  ☐ more than $25,000 per minute

    ☐ Mid-Budget SVOD Program  [☐ 20-35 Minutes, $900,000-$1,300,000. ☐ 36-65 Minutes, $1,750,000 -$2,500,000.
        ☐ 66 Minutes or more, $2,100,000 - $3,000,000.]

    ☐ High Budget SVOD Program:

| 20-35 Minutes | 36-65 Minutes | 66-95 Minutes | 96 Minutes or More |
|---|---|---|---|
| ☐ $1,300,000 or more | ☐ $2,500,000 or more | ☐ $3,000,000 or more | ☐ $3,000,000 or more |
| If platform has 20 million or more domestic subscribers (15 million or more domestic subscribers under the 2015 Basic Agreement or Area Standards Agreement), also check the appropriate box below if the budget meets or exceeds the applicable figure: | | | |
| ☐ $2,100,000 or more | ☐ $3,800,000 or more | ☐ $4,000,000 or more | ☐ $4,500,000 (plus $2,250,000 for each additional minute or portion thereof) or more |

PRODUCTION LOCATION(S): _____

POST-PRODUCTION LOCATION(S): _____

PRINCIPAL PHOTOGRAPHY START DATE: _____

LABOR RELATIONS CONTACT: _____

    Tel: _____ Email: _____

UNIT PRODUCTION MANAGER / LINE PRODUCER: _____

    Tel: _____ Email: _____

PRODUCTION OFFICE INFO:

    Address: _____ Address 2: _____

        City: _____ State / Province: _____ Postal Code: _____ Country: _____

        Tel: _____ Email: _____

PAYROLL SERVICE: _____