IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL WATCHULONIS,

        Plaintiff,

        v.

CITY OF ATLANTA,

OFFICER JEFF CANTIN,
in his individual capacity,

OFFICER CARLOS THOMAS,
in his individual capacity,

OFFICER JACK BENTLEY,
in his individual capacity,
and
OFFICER MIKE DOE,
in his individual capacity (complete
name not yet known)

        Defendants.

CIVIL CASE NO.:

## **VERIFIED COMPLAINT**

COMES NOW Michael Watchulonis, a Plaintiff in the above styled action

and files this his Complaint for injunctive relief and damages.

This is a civil rights action under 42 U.S.C. § 1983, the First, Fourth and Fourteenth Amendments to the United States Constitution and Georgia law. Michael Watchulonis ("the Plaintiff") alleges that he was confronted by Defendant-law enforcement officers who (1) interfered with his filming in violation of the First Amendment and (2) later illegally and unconstitutionally detained, intimidated, harassed and threatened him.  Officers even demanded to review his footage, and delete any video footage they decided that they did not want the public to see.  Plaintiff alleges both that interference with filming prior to detention was in violation of the First Amendment, and later unlawful and unreasonable detention (with freedom from arrest premised on allowing officers to delete images) was in retaliation for the exercise of his First Amendment rights, even if there was arguable probable cause or probable cause for some minor crime under the Fourth Amendment.

The City of Atlanta has a policy and practice of interfering with and often pre-textually arresting citizens and journalists for filming police activities.  This policy and custom is demonstrated by repeated filming arrests, settlements in

litigation around those filming arrests, court mandated policy and training reforms regarding filmers' rights, contempt findings related to failure to implement those reforms, and statements from the highest level of the Atlanta Police Department endorsing pretextual arrests for filming.

**PARTIES**

1.

Plaintiff Michael Watchulonis is a resident of the State of Georgia, United States citizen, and over the age of eighteen. Watchulonis is a journalist and documentary filmmaker who has produced more than two dozen factual films interviewing subjects and capturing events around the world. As a producer for Atlanta's WTBS Public Affairs department, he covered events and people in Metro Atlanta, receiving 29 regional Emmy Awards for documentary, Public Affairs, News & Information, and Magazine programming. He also served as the Executive Producer for GameTap News.

2.

Defendant City of Atlanta is a municipality whose policies and practices were a moving force in constitutional violations here. The City can be served at:

55 Trinity Ave. SW, Atlanta GA 30303. At all times relevant to this lawsuit,
Defendant City of Atlanta acted under the color of law.

3.

Defendant Jeff Cantin is a Major employed by the City of Atlanta Police
Department. The headquarters of the City of Atlanta Police Department are
located at 226 Peachtree St SW, Atlanta GA 30303 in Fulton County, Georgia.
Defendant Jeff Cantin may be served at this address. At all times relevant to this
lawsuit, Defendant Jeff Cantin acted under the color of law. Defendant Jeff
Cantin is sued in his individual capacity.

4.

Defendant Carlos Thomas is an Officer employed by the City of Atlanta
Police Department. The headquarters of the City of Atlanta Police Department
are located at 226 Peachtree St SW, Atlanta GA 30303 in Fulton County, Georgia.
Defendant Carlos Thomas may be served at this address. At all times relevant to
this lawsuit, Defendant Carlos Thomas acted under the color of law. Defendant
Carlos Thomas is sued in his individual capacity.

5.

Defendant Jack Bentley is a Sergeant employed by the City of Atlanta Police Department. The headquarters of the City of Atlanta Police Department are located at 226 Peachtree St SW, Atlanta GA 30303 in Fulton County, Georgia. Defendant Jack Bentley may be served at this address. At all times relevant to this lawsuit, Defendant Jack Bentley acted under the color of law. Defendant Jack Bentley is sued in his individual capacity.

6.

Defendant Mike Doe is an Officer by the name of "Mike" who joined Defendant Jeff Cantin in interrogating, intimidating, harassing, and detaining Plaintiff Watchulonis. It is believed that Defendant Doe may be employed by the City of Atlanta Police Department or Georgia Bureau of Investigation. Defendant Doe will be served once his identity becomes fully known. At all times relevant to this lawsuit, Defendant Doe acted under the color of law. Defendant Doe is sued in his individual capacity. Defendant Mike Doe will hereinafter be referred to as "Defendant Mike."

7.

All defendants reside in the Northern District of Georgia.

## JURISDICTION AND VENUE

8.

This case presents a federal question under the First, Fourth and

Fourteenth Amendments, and this Court has subject matter jurisdiction under 28

U.S.C. § 1331.  Under 28 U.S.C. §§ 1331 and 1343(a)(3)&(4), the Court can

entertain an action to redress a deprivation of rights guaranteed by the United

States Constitution, and the Court has jurisdiction under 28 U.S.C. § 1367 to hear

an action to redress a deprivation of rights guaranteed by the laws and the

Constitution of the State of Georgia.

9.

This Court has personal jurisdiction of the Defendants under 28 U.S.C. §

1367 and GA. CONST., art. I, § 1, ¶¶ V, XIII.

10.

Venue is proper in the Northern District of Georgia under 28 U.S.C. §

1391(b) because all actions complained of occurred within the boundaries of this

judicial district and Defendants reside within this district.

11.

All of the parties herein are subject to the jurisdiction of this Court.

12.

Attorney's fees and costs are authorized under 42 U.S.C. § 1988.

## FACTUAL ALLEGATIONS

### 13.

On June 15, 2022, shortly before 10am Mr. Watchulonis parked his car in the Intrenchment Creek Trailhead parking lot – a public parking lot. There were no signs limiting access to the area that is historically freely used by members of the public.  After exiting his car, Mr. Watchulonis donned his plate carrier that was clearly marked with a "PRESS" badge on the front and back. His purpose in arriving at the Intrenchment Creek Park was to work on a story surrounding the Intrenchment Creek Park, land swap, and proposed Atlanta police training facility controversies.

### 14.

Mr. Watchulonis was walking along the public walking, hiking and biking trails of Intrenchment Creek Park for approximately 45 minutes.  Mr. Watchulonis observed no signage stating that the area where he was walking was not open to the public or was otherwise restricted. Mr. Watchulonis did not veer off the trails.

15.

At approximately 10:45a.m., Mr. Watchulonis noticed two four-wheel ATV's and began filming them. He assumed these vehicles might be law enforcement vehicles, and stayed at least a hundred yards away, not wanting to interfere with police operations or give them a reason to interact with him. He filmed from that distance, and then began backing away down the trail. He began recording on his Canon camera when he heard the police ATVs approaching him from the rear.

16.

At approximately 10:57a.m., Mr. Watchulonis was approached by two police officers on an ATV who began to interfere with his newsgathering. Defendant Carlos Thomas stated that Mr. Watchulonis "cannot be in there," and stated that Mr. Watchulonis was trespassing.  The officer did not (1) identify what parts of the historically open area where Mr. Watchulonis was walking were now not open to the public, (2) did not indicate that he had authority to speak for the owner of the property, or (3) provide a route or (4) time to comply with the officer's desire that he move to some unknown other location.

Defendant Thomas stated at the time that Mr. Watchulonis was not being detained – but nevertheless stated that he would be escorted out of the area because he was allegedly trespassing. Defendant Thomas ultimately ordered Mr. Watchulonis to walk in a direction of a "gate." Mr. Watchulonis was forced to cease his intended newsgathering in order to peacefully and fully comply with the order, but also explained that this path was not where he came into the area and parked.  Mr. Watchulonis was no longer permitted to engage in his intended newsgathering activities, may or may not have been siezed at this point, though he reasonably believed he was being seized and not free to leave based upon the officer's tone and orders.

17.

Approximately seven minutes into the encounter several more officers arrived on additional ATV's. One of those officers – Defendant Jack Bentley approached Mr. Watchulonis, informed him that he was being detained, and that the officers would escort him out.  At this time, Mr. Watchulonis was in the process of following and complying with the orders of the Officer Thomas to disperse the undefine prohibited area and was not being permitted to film the

encounter.

18.

Mr. Watchulonis was then ordered into an ATV and driven some distance away where – approximately eleven minutes into the encounter – he was addressed by Defendant Jeff Cantin. At that point Defendant Cantin informed Mr. Watchulonis that he was under arrest for criminal trespassing.

19.

During the initial encounters with Defendant Thomas, Defendant Bentley, and Defendant Cantin, Mr. Watchulonis repeatedly and consistently explained to all officers involved that (1) he was a journalist, (2) he parked his vehicle in a public parking lot of the Intrenchment Creek Park, (3) he followed the public trails while walking through the forest, (4) he never encountered any sign or barrier indicating that he was no longer on public property, and that – (5) if by some chance he was unknowingly trespassing – he was happy to leave whatever area the officers were claiming he was not supposed to travel through if they directed him to a path to do so and gave him an opportunity to do so. Mr. Watchulonis repeated these statements several times throughout the duration of

11

his detention to each of the defendants.

20.

Though his newsgathering was being interfered with by Defendants, Mr. Watchulonis was fully compliant with all officers' instructions and orders at all times during his interaction with defendants and throughout his detention.

21.

Upon informing Defendant Cantin of where he parked his car, Mr. Watchulonis was told by Defendant Cantin that "Anybody that parks in that park is one of your little forest people," referring to individuals that oppose the land swap and construction of Atlanta police training center. "Land Swap" is a term that refers to a land swap between DeKalb County and Blackhall Studios involving 40 acres of the Intrenchment Creek Park and is currently subject of a pending lawsuit and intense public debate. (See for example https://www.stoptheswap.org for more information.)

22.

Approximately one hour and fourteen minutes into his detention Mr. Watchulonis was informed by Defendant Cantin that Defendant Mike (identified

herein as Mike Doe) was going to come over and talk to Mr. Watchulonis.

Defendant Mike Doe arrived about a minute later, wearing plain clothes and

carrying a notepad.  On information and belief, Mike Doe is also a police officer

for the City of Atlanta.

23.

Defendant Mike Doe asked Mr. Watchulonis if he would be willing to talk

to him about his involvement or association with Defend the Forest issue.

24.

Shortly thereafter, and while seized and threatened with arrest, Defendant

Mike Doe stated: "I am going to ask you to delete all the footage that you have

today since it has been obtained illegally to begin with – and depending on how

the rest of this interview goes will determine whether or not you are going to be

arrested … if you are cooperative with us … I mean again … I think this is a

story where I think you want to have access to both sides."

25.

Defendant Mike Doe then asked Mr. Watchulonis: "Would you be willing

to delete the footage obtained today?" Mr. Watchulonis responded: "Guys – I'm

a journalist! Delete my footage?" Defendant Mike Doe replied: "Delete the

footage from today – that's right." Mr. Watchulonis responded: "I can't delete

footage guys!"

26.

Defendant Mike Doe then threatened Mr. Watchulonis stating that

Defendant Cantin would arrest Mr. Watchulonis and seize his camera if he failed

to comply with orders to show images to law enforcement and delete the footage

of his reportorial investigation on the command of Defendant officers.

27.

After some further verbal exchange Defendant Mike Doe stated: "We're

trying to work with you. I mean – it's up to you!"

28.

When Mr. Watchulonis reiterated that he would not delete images or show

the officers his footage, Defendant Mike Doe stated: "Let's go ahead and seize

it!"

29.

Some time later Defendant Mike Doe said to Defendant Cantin: "Major – if

14

you are okay … let's issue [Mr. Watchulonis] a citation … give him back his gear…"

30.

Defendant Mike Doe added: "I'm sure our paths will cross again down the road!"

31.

Ultimately Mr. Watchulonis was released without being issued a citation after a detention that lasted approximately one and a half hours, and which included threats of arrest, intimidation, harassment, and demands that Mr. Watchulonis show and delete his footage on command of the Defendant officers.

32.

Before being allowed to leave, Defendant Mike ordered Mr. Watchulonis to let Defendant Mike take his picture. Mr. Watchulonis was forced to comply with this order. In connection with taking Mr. Watchulonis' picture, Defendant Cantin stated that they document everyone who goes into the forest.

33.

All defendants had actual knowledge that Mr. Watchulonis was not

criminally trespassing and had no probable cause or arguable probable cause for any offense.

34.

All Atlanta police officers are specifically trained that it is illegal and a violation of APD SOP 2011 (see *infra*) for them to seize a reporter, interfere with filming, and demand and threaten a citizen into showing and deleting his footage. Defendants knew that Mr. Watchulonis was a journalist and Defendant Mike Doe openly acknowledged that fact at least twice.

35.

Mr. Watchulonis was interfered with in his filming and later detained solely because he was seen filming and/or because (as the officers opined without basis) he supported the views of the "little forest people" – a reference to individuals that hold a political opinion in opposition to the land swap and construction of the police training facility.

36.

Mr. Watchulonis was detained even though there was no arguable probable cause, probable cause or any ground to believe he was engaged in any

criminal activity. Mr. Watchulonis parked in a public parking lot, was on a

public trail, and there was no signage to the contrary.  When an officer claimed

that he was trespassing, he complied with the officers' demands to disperse and

followed the officers' directions in doing so.

37.

Mr. Watchulonis would not have had his newsgathering interfered with or

later ultimately been seized and detained for a period of time of one and a half

hours but for his filming and/or the assumption of Defendants that he supported

viewpoints supportive of the Defend the Forest protesters and contrary to those

of the officers regarding the construction of a police training facility.

38.

The City of Atlanta Police Department Standard Operating Procedure

APD.SOP.2011 specifically Section 4.1.1 provides:

> All employees shall be prohibited from interfering with a citizen's
> right to record police activity by photographic, video, or audio
> means.  This prohibition is in effect as long as the recording by the
> citizen does not physically interfere with the performance of the
> officer's duties. (Attached hereto as Ex A).

The City of Atlanta Police Department Standard Operating Procedure

17

APD.SOP.2011 specifically Section 4.1.2 provides:

> All employees shall be prohibited from intentionally deleting or
> destroying the original or sole copy of any photograph, audio, or
> video recording of police activity created by a member of the public.

39.

Under prior court federal orders regarding filming referenced in The City
of Atlanta Police Department Standard Operating Procedure APD.SOP.2011,
officers are required to attend training on these requirements.

40.

Each of the Defendants had specific subjective and objective knowledge of
the unconstitutionality of their interference with filming, and their
unconstitutional demand to delete images.

**City of Atlanta's Custom, Complete Lack of Monitoring and Contempt of
Court in Failing to Adopt Court Required Policies and Training Regarding
Rights of Citizens and Journalists to Film Police Activity**

41.

The City of Atlanta, as a matter of policy and practice, has routinely and
customarily interfered with and often arrested citizens solely for constitutionally
protected filming or photographing of police activity.

18

42.

At least six prior legal matters have been settled by the City of Atlanta involving officers who interfered with and arrested citizens for constitutionally protected filming or photographing of police activity. Several other instances, some leading to litigation, have occurred where officers interfered with and arrested citizens for constitutionally protected filming or photographing of police activity.

43.

In *Anderson v. City of Atlanta*, No. 11-CV-33980SCJ (N.D.Ga. 2011), Plaintiff Felicia Anderson, brought her case against the City of Atlanta and one of its police officers alleging, among other things, that she was falsely arrested for photographing police activity that occurred in public and that this arrest was conducted pursuant to an unlawful policy and practice of the Atlanta Police Department ("APD").

44.

The parties ultimately reached a settlement on Ms. Anderson's claims that included a Consent Order requiring the City to: (A) add specific language to the

Atlanta Police Department's Standard Operating Procedure ("SOP") prohibiting officers from deleting or destroying recordings of police activity; (B) upgrade the penalty for officers who interfere with the public's right to record, or who delete or destroy these recordings, to a dismissal category offense; and (C) train officers every two years regarding these new changes to the SOP. The court-ordered language prohibiting officers from deleting or destroying recordings was never added to the Atlanta Police Department SOP, and the required training regarding these collective revisions was not timely entered and conducted and neither the policy nor the training were in place at the time of this incident despite existing court orders.  The Order required the City of Atlanta to "permanently … implement" specific revisions to the APD SOP and "to conduct mandatory in-person training of all Atlanta police officers every two years regarding these SOP revisions."

45.

More than two years later, in deliberate indifference to both the existing Consent Order and to the obvious need for the policy and training outlined, the City still had not complied with the straightforward obligations imposed upon it

by the Order.  The City was held in contempt.  (Contempt Order Attached hereto as Exhibit B.)

46.

In November 2014, several individuals covering the Ferguson demonstrations in downtown Atlanta had their cameras taken away from them by APD officers as these individuals attempted to film police activity. One of them was Tyson Paul, a photojournalist for 11AliveNews, whose arrest by police officers during his coverage of the protests has been the subject of numerous news stories. Another was John Ruch, a freelance journalist for *Creative Loafing*, whose arrest by police officers during his coverage and constitutional rights being violated resulted in litigation. See *Ruch v. City of Atlanta*, No. 1:15-cv-03296-MHC (N.D. Ga. 2015).

47.

In *Calhoun v. City of Atlanta*, No. 1:09-CV-3286-TCB (N.D.Ga. 2011), the City of Atlanta entered into a Consent Order whereby the City agreed to permanently revoke or amend all APD SOPs regarding warrantless searches, arrests, and investigatory detentions and frisks without reasonable articulable suspicion. As

part of that order, the City agreed to "prohibit Atlanta police officers from interfering in any way with a citizen's right to make video, audio, or photographic recordings of police activity, as long as such recording does not physically interfere with the performance of an officer's duty." (Consent Order Attached hereto as Exhibits C/D).  The *Calhoun* Order required that the City of Atlanta conduct mandatory, in-person trainings by non-APD trainers for all sworn APD employees. This included training about officers being prohibited from interfering with citizens' right to record police activity. The Order required that the City of Atlanta provide recurring training on this issue to every sworn APD officer every two years.

48.

Despite these orders, APD did not add the court-ordered language prohibiting officers from deleting or destroying recordings to its SOP and failed to conduct the first of the court-ordered training regarding the change in SOP until June 2015.  Well over two years later, in deliberate indifference to both consent orders and to the obvious need for the policy and training outlined, the

City still had not complied with the straightforward obligations imposed upon it by the orders.

49.

In *Calhoun* as well, the City of Atlanta was held in contempt of court for its repeated failure to adopt policies and trainings required by existing Court orders dealing specifically with not interfering with citizens' photographing or filming of police activities. (Contempt Order attached hereto as Exhibit E).

50.

In 2019, the City of Atlanta was denied summary judgment as to their policy and custom of arresting persons for filming in a 2016 case where Atlanta police officers again arrested a citizen for filming police activity during a protest. *Toole v. City of Atlanta*, No. 1:16-02909-CAP (N.D. Ga. 2016) (Summary Judgment Order attached hereto as Exhibit F). The Defendants interlocutory appeal was rejected by the Eleventh Circuit. *Toole v. City of Atlanta,* 798 Fed. Appx. 381 (11th Cir. 2019). That case ultimately settled in 2020.

51.

In 2021, the City of Atlanta was again sued when a photo-journalist was arrested while filming police activity. *Hassan v. City of Atlanta,* No. 1:21-CV-04629-TWT (N.D. Ga. 2021). After a motion to dismiss was rejected, including claims of municipal liability, the City of Atlanta settled that case in April 2023.

52.

In December 2022, a citizen was arrested for filming under the hands-free driving law at the general area where Plaintiff was arrested. Deputy Atlanta Police Department Chief Carven Tyus, in a public meeting endorsed and ratified the pre-textual arrest stating "We had an individual who was out attempting to film officers," Tyus said in the meeting. "We were able to get him with the hands-free law as he drove by filming our officers, so we were able to lock him up."

53.

The actions of the Atlanta Police Department in arresting filmers, including Plaintiff and others, at the location of the proposed Atlanta Police

training center has been condemned by the Georgia Chapter of the Society of Professional Journalists.

54.

The City of Atlanta's deliberate indifference to the need for conformance with policies through training and monitoring, made patently clear by the Consent Orders entered into and then violated for years, was a moving force for similar constitutional violations. Moreover, a custom was created of repeatedly interfering and often arresting citizens who are legally photographing or filming police activity.

55.

On information and belief, the City of Atlanta has never reprimanded or otherwise disciplined any Atlanta Police Officer for arresting a citizen or journalist for filming despite its own Atlanta Citizen Review Board having recommended discipline in some cases that came before it and despite at least six settlements of lawsuits concerning filming in public places.

56.

The repeated pretextual arrests of citizens and journalists for filming police

activity have created a custom demonstrated by settlements, contempt findings,

lack of monitoring, and even recent statements of a high ranking Deputy Chief

establish a custom that was a moving force for Plaintiff's arrest.

57.

The failure to discipline any officers in a decades-long custom and practice

of pretextually arresting persons for filming, in cases where the City of Atlanta

has repeatedly settled lawsuits filed on such issues, demonstrated deliberate

indifference to the rights of persons to film police activity and a moving force in

Plaintiff's unconstitutional arrest.

**COUNT I**
**42 U.S.C. § 1983: Interference with Reporting and Filming Prior to Detention in**
**Retaliation for Filming (First Amendment)**
**(As to All Defendants)**

58.

Paragraphs 1 through 57 are hereby re-alleged as if fully pled herein.

59.

Defendants interfered with Mr. Watchulonis filming and reporting activities prior to his detention and impaired his ability to engage in permissible reporting.

60.

Defendants' interference with filming prior to detention was an effort to terminate Mr. Watchulonis' filming activities because Defendants wanted to limit transparency and because they were concerned that Mr. Watchulonis' might be a supporter of the viewpoint of protesters.

61.

The law was clearly established well before 2022 that an officer of the state cannot detain or prolong the detention of a person for their exercise of freedom of speech, and particularly the right to film.

62.

Mr. Watchulonis is entitled to nominal, presumed and actual damages for particularized loss of his free speech and press rights because he was unable to capture images as a result of that pre-detention interference with filming.

27

## COUNT II
### 42 U.S.C. § 1983: Violation of the First Amendment Right to Film through Seizure and Detention in Violation of and Retaliation for the Exercise of First Amendment Rights
### (As to all Defendants)

63.

Paragraphs 1 through 57 are hereby re-alleged as if fully pled herein.

64.

After their initial interference with Mr. Watchulonis' filming, Defendants subsequently deliberately initiated and carried out a physical detention/seizure of Plaintiff because he exercised his rights to free speech and press by filming and/or because they supposed he supported a viewpoint contrary to those supporting the police training center.

65.

Mr. Watchulonis was (1) detained for one hour and a half, (2) harassed, and (3) threatened with an arrest if he did not show the officer his footage and then delete his footage on the Defendant officers' command.

66.

Mr. Watchulonis had a constitutionally protected right to refuse to show

officers his footage (under threat of arrest if he refused to do so).

67.

Mr. Watchulonis had a clear constitutionally protected right not to delete

footage (under threat of arrest if he refused to do so).  All Defendant officers had

subjective knowledge of this law through specific APD SOP 2011 and training

under that SOP.  Defendants were specifically trained regarding these rights, and

Atlanta Police Department SOP's related thereto, as the result of federal court

orders in prior cases regarding the right to film.

68.

The law was clearly established well before 2022 that an officer of the state

cannot detain or prolong the detention of a person for their exercise of freedom

of speech, and particularly the right to film.

69.

Defendants' actions punished the Plaintiff for his exercise of his First

Amendment rights and to prevented him from further exercising his First

Amendment rights by abruptly cutting off his filming and threatening him that

their "paths will cross again."

70.

Plaintiff Watchulonis would not have been detained for one hour and a half, harassed and intimidated but for (and in retaliation for) his exercise of his First amendment rights and/or because Defendants supposed he supported a viewpoint contrary to those supporting the police training center.

71.

Mr. Watchulonis alleges that he was detained for one and a half hours when otherwise similarly situated individuals not engaged in the same sort of protected speech or expression had not been so detained.  Citizens routinely and historically have parked, hiked and rode bicycles in the area where Plaintiff was passing through, and officers have not subjected such persons to detention or arrest.

72.

Mr. Watchulonis alleges that no person has been detained for one hour and a half, harassed, and threatened with an arrest on an alleged basis of a suspicion of criminal trespass when they were not engaged in the type of protected speech Mr. Watchulonis was engaged in at this location.

73.

Defendants' actions caused Mr. Watchulonis emotional distress, loss of liberty, and interfered with his reporting activities and freedom of movement.

74.

Mr. Watchulonis seeks nominal, actual, presumed and punitive damages for the interference with his right to film resulting from the point of detention onward.

**COUNT III**
**42 U.S.C. § 1983: Unlawful Seizure in violation of the Fourth Amendment**
**(As to All Defendants)**

75.

Paragraphs 1 through 57 are hereby re-alleged as if fully pled herein.

76.

Prior to his detention, Defendants Officers Cantin, Thomas, and Bentley interfered with Mr. Watchulonis, right to film and interfered with his recording and reporting, and ultimately Officer Cantin forced Mr. Watchulonis to cease filming.

77.

When Defendants Cantin and Mike Doe fully detained/seized Mr. Watchulonis for one hour and a half, they harassed, intimidated and threatened him with an arrest because he was exercising his First Amendment right to film, because he refused to show or delete images and because the officers supported a viewpoint in favor of the police training facility construction at the location.

78.

The law was clearly established well before 2022 that an individual has a First Amendment protected right to film the police and to be free from police interference with this right.

79.

The law was clearly established well before 2022 that an officer of the state cannot detain or prolong the detention of a person for their exercise of a First Amendment right to film.

80.

The conduct of Defendants in causing and procuring the detention of Plaintiff without arguable probable cause constituted an unreasonable seizure of

his person in violation of the Fourth Amendment.

81.

Mr. Watchulonis parked in a longstanding public parking lot, walked a well-used public trail, and there was no signage to the contrary.  Moreover, the first few minutes of conversation with Mr. Watchulonis dispelled any doubt as to Mr. Watchulonis' intent and knowledge of the alleged trespass. Having the knowledge that the area where Mr. Watchulonis entered and walked was not marked in any way as being off limits, having the knowledge that in fact Mr. Watchulonis followed the trails that were connected to a public parking lot, and hearing Mr. Watchulonis' explanation as to how he entered the area all defendants knew that Mr. Watchulonis could not have trespassed "knowingly" and therefore could not have committed the offense of criminal trespass.

82.

None of the Defendants ultimately issued any criminal trespass citation.

83.

Even assuming arguendo that Mr. Watchulonis was legally detained on suspicion of criminal trespass – the detention was "unreasonable" under the

Fourth Amendment.  The circumstances, duration and manner of the detention was clearly unreasonable and violated Mr. Watchulonis' Fourth Amendment rights including demands that Mr. Watchulonis show the officers his images and delete those images they ordered deleted upon threat of arrest.

84.

The law was clearly established well before 2022 that an officer of the state cannot cause someone to be detained without arguable probable cause and the facts alleged here do not support even arguable probable cause.

85.

The law was clearly established well before 2022 that an officer of the state cannot unreasonably prolong one's detention, and the facts alleged here show that the justifications for prolonging detention were clearly unconstitutional ones – to interfere with the right to film, to force Mr. Watchulonis to show the officers his constitutionally protected reportage/footage and to force him to delete footage under threat of arrest.

86.

Mr. Watchulonis seeks nominal, actual, presumed and punitive damages

34

for his unreasonable detention.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands the following:

a) That this action be tried by a jury;

b) That judgment be entered in favor of Plaintiff and against each individual Defendant for nominal, actual, presumed, special, compensatory and punitive damages (and nominal, presumed and actual damages as to the City of Atlanta) for each violation of the Plaintiff's constitutional rights in an amount to be determined by the enlightened conscience of fair and impartial jurors;

c) That an injunction issue to prevent future arrests or interference with filming of Plaintiff while filming in public places and not involved in any criminal conduct;

c) That Plaintiff be awarded attorney's fees and reasonable expenses of litigation;

e) That all costs of this action be taxed against Defendants; and

f) That the Court award any additional or alternative relief as may be deemed appropriate under the circumstances.

Respectfully submitted this 16th day of May 2023.

/s/ Gerald Weber
Georgia Bar No. 744878

Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, GA 31107
(404) 522-0507
wgerryweber@gmail.com

/s/Drago Cepar, Jr.
Drago Cepar, Jr.
Georgia Bar No. 142362

1900 The Exchange, Suite 490
Atlanta, Georgia 30339
Phone: 770-940-3233
Fax: 770-874-2987
dragoceparlaw@gmail.com