# Exhibit "F"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COREY TOOLE,

     Plaintiff,

v.

CITY OF ATLANTA,
DEPUTY CHIEF RODNEY
BRYANT, DEPUTY CHIEF
JOSEPH SPILLANE, OFFICER
ZORN, OFFICER PARKER,
OFFICER BOWSER, OFFICER
DOE, individually,

     Defendants.

|  |  |
|---|---|
| | CIVIL ACTION<br>NO. 1:16-CV-02909-CAP-CMS |

## O R D E R

Corey Toole brought this action against the above-captioned defendants, seeking damages for violations of various federal and state laws. In his amended complaint Toole asserted the following counts against the City of Atlanta and all defendant Atlanta Police Department employees in their individual capacity: (1) violation his Fourth Amendment rights, pursuant to 42 U.S.C. § 1983 ; (2) violation his First Amendment rights, pursuant to 42 U.S.C. § 1983; (3) violation of federal law pursuant to 42 U.S.C. § 2000aa; and (4) state law claims for false imprisonment, assault,

battery, and malicious prosecution pursuant to O.C.G.A. §§ 51-2-70,[1] 51-1-13;
51-1-14; and 51-7-44. The court dismissed the individual claims against
Deputy Chief Bryant, Sergeant Bowser, and Officer Parker with prejudice
[Doc. No. 98]. The state law claims (Count IV) against the City have also been
dismissed with prejudice [Doc. No. 52].

Currently before the court is the City of Atlanta, Sgt. Zorn, and Deputy
Chief Spillane's motion for summary judgment on all counts [Doc. No. 99]. In
Toole's response to the defendants' motion for summary judgment, he
"concedes that the federal claim under 42 U.S.C. § 2000aa fail (sic) as a
matter of law and affirmatively dismisse[d] the claim" while also "dismiss[ing
the] claims against Chief Deputy Spillane in his individual capacity" [Doc.
103 at 5]. Only Toole's Fourth and First Amendment § 1983 claims against
the City and Sgt. Zorn (Counts I and II) and the state law tort claims against
Sgt. Zorn (Count IV) remain.

For the reasons set forth below, the defendants' motion for summary
judgment [Doc. No. 99] is DENIED as to Counts I and II, and GRANTED as
to Count IV.

---

[1] O.C.G.A. § 51-2-70 is not a code section. In his response to the defendants'
summary judgment motion, Toole indicates that the proper code section is
O.C.G.A. § 51-7-20 [Doc. No. 103 at 48].

## I.     Background

Many of the facts underlying this case are hotly contested. But at this stage in the proceedings, the court views the evidence in the light most favorable to the non-moving party. Therefore, the following facts are presented in that manner, unless otherwise noted.

On August 9, 2014, in Ferguson, Missouri, Michael Brown Jr., an 18-year-old African American man, was shot six times and fatally wounded by Darren Wilson, a 28-year-old white police officer. A grand jury was convened, and on November 24, 2014, it decided not to indict Wilson. In the days that followed, citizens across the country expressed their concern with what many viewed as another in a string of unpunished, racially-motivated, police-involved shootings. Some expressed their concerns through social media or other technological platforms, but others—like Corey Toole—participated in protests, marches, and other public demonstrations.

In preparation for the Ferguson, Missouri grand jury's decision, and in anticipation of citizens' response, the Atlanta Police Department (APD) began preparing for potential protests as early as October 28, 2014. On November 25, 2014, the day after the grand jury decided not to indict Wilson, the APD received confirmation that a demonstration protesting the grand jury

decision would occur in downtown Atlanta. The demonstration began with a rally at Underground Atlanta. After that, the protestors began marching.

During the protest, the APD blocked the streets using a "leapfrogging" technique. This is where officers block off portions of the protest route, on a rolling basis, keeping pace with the protestors. This is done in lieu of blocking off the streets for the duration of the protest to minimize the protestors' effect on traffic.

Most of the protest was peaceful. But some protestors did leave the downtown surface streets and marched onto Interstate 75/85 for an unknown distance before being removed from the interstate and returned to the surface streets by the APD. Toole was among those protestors that marched along, and had to be removed from, the interstate. At some point, certain protestors also became violent and engaged in acts of vandalism. There is no indication Toole was among these protestors.

As the protestors marched north along Peachtree Street, Deputy Chief Spillane—who was in charge of field operations during the protest— recommended to Chief of Police George Turner that Chief Turner issue a dispersal order. Because of the vandalism, Deputy Chief Spillane was worried about a second highway breach and the destruction of businesses along the

route. Chief Turner agreed with this recommendation and the dispersal order was issued shortly thereafter.

When the dispersal order was issued, Toole was at or near the intersection of Peachtree Street and Ivan Allen Boulevard. Around this same time Sergeant Aaron Zorn—the only individual defendant remaining and a member of the APD's arrest team—was ordered to clear the street and arrest anyone in the street at the intersection of Peachtree Street and Ivan Allen Boulevard. Toole admits to hearing the APD's orders to get out of the street. And while it is undisputed that Toole was arrested at the intersection of Peachtree Street and Ivan Allen Boulevard, the details surrounding his arrest are very much in dispute.

According to Toole, who was filming the protest on his Apple iPhone, he got on the sidewalk immediately after he heard APD officers directing protestors to vacate the street. He then heard other protestors exclaiming that the APD was arresting people who—like him—were recording the protest. As Toole continued to film, he was pulled into the street by Sgt. Zorn and thrown to the ground. Sgt. Zorn then placed flex cuffs on Toole's wrists. Toole's phone continued to film throughout the arrest, and he can be heard on the recording indicating that he was on the sidewalk at the time of his arrest.

As a result of being thrown on the ground by Sgt. Zorn, Toole suffered injuries to his face and back, as well as a chipped or broken tooth.

Sgt. Zorn remembers the situation differently. According to him, Toole remained in the roadway at the intersection of Peachtree Street and Ivan Allen Boulevard after the APD began ordering the protestors onto the sidewalk. As Sgt. Zorn moved Toole away from the other protestors to place flex cuffs on him, two unidentified APD officers placed Toole on the ground and Sgt. Zorn secured the flex cuffs. The two unidentified officers then escorted Toole to the APD's paddy wagon. Sgt. Zorn testified that he was unaware Toole was filming at the time of his arrest.

During the arrest, Toole's cell phone fell out of his hand. It was retrieved from the street and placed back in his pocket after he was frisked. He was also issued an arrest citation for violating Atlanta City Ordinance § 106-81(9), pedestrian in roadway, before being placed in the paddy wagon. Sgt. Zorn, as the arresting officer, issued the citation. The citation was ultimately dismissed, and Toole was not prosecuted.

## II. Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure authorizes summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The

6

party seeking summary judgment bears the burden of demonstrating that no dispute as to any material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156 (1970); *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In determining if the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson*, 74 F.3d at 1090. Once the moving party has adequately supported its motion, the nonmovant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In deciding a motion for summary judgment, it is not the court's function to decide issues of material fact but to decide only if there is such an issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). The applicable substantive law will identify those facts that are material. *Id.* at 247. Facts that in good faith are disputed, but which do not resolve or affect the outcome of the case, will not preclude the entry of summary

7

judgment as those facts are not material. *Id.* Genuine disputes are those by which the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* "Genuine" factual issues must have a real basis in the record. *See Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (citations omitted).

## III. Toole's § 1983 claims against Sgt. Zorn and the City of Atlanta

Toole asserts § 1983 claims against the City and Sgt. Zorn, in his individual capacity, for violating Toole's First and Fourth Amendment rights. Section 1983 says:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

There are two basic elements to a § 1983 claim. A plaintiff must show (1) that he has been deprived of a right secured by an appropriate federal law and (2) that the defendant was acting under color of state law in depriving him of this right. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). There is no

dispute that the defendants were acting under color of state law, so the court's analysis will focus solely on whether the defendants violated Toole's constitutional rights.

### A. Is Sgt. Zorn entitled to qualified immunity on Toole's Fourth and First Amendment claims?

Toole seeks to impose personal liability upon Sgt. Zorn for violating his Fourth Amendment rights against unlawful seizure, false arrest, and malicious prosecution. Toole further claims that his First Amendment rights were violated because the arrest prevented him from filming police activity. Sgt. Zorn claims the doctrine of qualified immunity shields him from liability.[2]

"Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When properly applied, [qualified immunity] protects all but the

---

[2] It is imperative to remember that when resolving questions of qualified immunity at summary judgment, "the facts [are] 'taken in the light most favorable the party asserting the injury.'" *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

To claim qualified immunity, a defendant must first show he was performing a discretionary function. *Moreno v. Turner*, 572 F. App'x 852, 855 (11th Cir. 2014). "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply. *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009). A plaintiff demonstrates that qualified immunity does not apply by showing that "(1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation." *Moreno*, 572 F. App'x at 855.

Under this framework, the first issue is whether Sgt. Zorn was "acting within the scope of [his] discretionary authority." *Moore v. Pederson*, 806 F.3d 1036, 1042 (11th Cir. 2015). The term "discretionary authority" includes "all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Id.* (internal quotations omitted). Because Toole admits that Sgt. Zorn was acting within the scope of his discretionary authority, [Doc. No. 103 at 22], "the burden shifts to [Toole] to demonstrate that qualified immunity is inappropriate." *Moore*, 806 F.3d at 1042.

So there are two remaining inquiries: (1) can Toole show a factual dispute exists regarding whether there was a violation of his Fourth and First Amendment rights; and, if so (2) were those rights were clearly established at the time in question?

### 1. Were Toole's Fourth and First Amendment rights violated?

Toole claims Sgt. Zorn violated his Fourth Amendment rights by conducting a warrantless arrest for disorderly conduct without probable cause. Toole further claims that this arrest occurred while he was protesting and filming police activity, thereby violating his First Amendment rights.

### a. Fourth Amendment

A warrantless arrest in a public place violates the Fourth Amendment if there was no probable cause to arrest the suspect for a crime. *Jones v. Brown*, 649 F. App'x 889, 890 (11th Cir. 2016). But the converse of these principles is also true: "the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). *See also Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998) ("Because we hold that the officers had arguable probable cause to arrest [the plaintiff] for

disorderly conduct, we must hold that the [defendant] officers are also entitled to qualified immunity from the plaintiffs' First Amendment claims.").

"Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Brown*, 608 F.3d at 734. It requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). Thus, "innocent behavior frequently will provide the basis for a showing of probable cause." *Id.* "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released." *Baker v. McCollan*, 443 U.S. 137, 145 (1979).

But even without actual probable cause, a police officer is entitled to qualified immunity if he had "arguable" probable cause to arrest the plaintiff. *See Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as [Sgt. Zorn] could have believed that probable cause existed to arrest [Toole]." *Redd*, 140 F.3d at 1382 (quoting *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)). *See also Wood v. Kesler*,

323 F.3d 872, 878 (11th Cir. 2003) ("[T]he inquiry is . . . whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed.").

If an officer has probable cause, arguable probable cause, or no probable cause, "depends on the elements of the alleged crime and the operative fact pattern." *Brown*, 608 F.3d at 735. The rationale behind qualified immunity is that an officer who acts reasonably should not be held personally liable merely because it appears, in hindsight, that he might have made a mistake. *Id.* The concept of arguable probable cause therefore allows for the possibility that an officer might "reasonably but mistakenly conclude that probable cause is present." *Id.* Under governing precedent, such an officer cannot be held personally liable for false arrest.

Toole was arrested for disorderly conduct. Specifically, he was arrested for violating Atlanta Ordinance § 106-81(9), which states:

> It shall be unlawful for any person within the corporate limits of the city to engage in any conduct described in the following subsections; provided, however, that no person shall be convicted of any of the following sections upon a showing that the predominant intent of such conduct was to exercise a constitutional right to: . . . (9) Stand or remain in or about any street, sidewalk, overpass or public way so as to impede the flow of vehicular or pedestrian traffic, and to fail to clear such street, sidewalk, overpass or public way after being ordered to do so by a police officer or other lawful authority[.]

ATLANTA, GA., CODE OF ORDINANCES § 106-81(9). Under the plain language of

§ 106-81(9), Sgt. Zorn must have had arguable probable cause to believe that

Toole (1) was in the street so as to impede vehicular traffic;[3] and (2) failed to

clear the street after being ordered to do so by Sgt. Zorn or another police

officer. So the analysis will focus on whether the undisputed facts correlate

with the elements of Atlanta Ordinance § 106-81(9).[4] *See Brown*, 608 F.3d at

735.

It is undisputed that the intersection of Ivan Allen Boulevard and

Peachtree Street—where Toole was arrested—was closed to traffic at the

time of his arrest. The defendants admitted this [Doc. No. 110-1 at ¶ 7], and

in Toole's pre-arrest video the street is free of traffic. It is also undisputed

that Toole was arrested for being in that intersection, and not for previously

being in the street somewhere else along the protest route. *See* Toole's Arrest

Citation [Doc. No. 99-3 at 93] (indicating that the "Place of Offense" was

---

[3] While an individual can be arrested under § 106-81(9) for impeding vehicular or pedestrian traffic, all of the evidence and argument before the court center around whether Toole was impeding vehicular traffic.

[4] Typically "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest," because an officer is entitled to qualified immunity if he had probable cause to arrest the plaintiff for any offense. *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty., Fla.*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992). But Sgt. Zorn does not claim he had probable cause to arrest Toole for any offense other than a violation of Atlanta Ordinance § 106-81(9).

"Peachtree St./Ivan Allen"). Based on this, Toole argues that Sgt. Zorn could not have had probable cause—either actual or arguable—to believe that Toole was violating § 106-81(9) because he was walking in a street that was closed to traffic.

Sgt. Zorn responds, claiming that the court should examine the factual events leading up to the arrest. Specifically, Sgt. Zorn points out that the protest, as a whole, was becoming more violent, Toole was ordered to get out of the street at a different location 15 minutes before his arrest but continued to walk in the street, and that Toole was ordered to vacate the intersection of Peachtree Street and Ivan Allen Boulevard just prior to his arrest.

But viewing the totality of the circumstances does not change the outcome. There is no evidence showing that Toole was part of the violent portion of the protests, and Sgt. Zorn did not arrest Toole for walking in the street 15 minutes prior to his arrest. Toole's arrest citation clearly indicates that the "Place of Offense" was Peachtree Street and Ivan Allen Boulevard— not on the interstate or another street where traffic was not blocked off—and that he was arrested for "Ped. In Roadway" and not for violently protesting.

Sgt. Zorn further argues that the only reason the APD had to employ the "leapfrogging" roadblock technique—where officers temporarily block portions of the protest route on a rolling basis, keeping pace with the

15

protestors, instead of blocking off the whole route at once—was because the protestors were marching in the street. He adds that the APD continually ordered the protestors to remain on the sidewalk throughout the march. Sgt. Zorn concludes that "logic dictates that APD would not need to employ [the leapfrogging] technique if the protestors, including [Toole], were not blocking the street" [Doc. No. 110 at 7].

But logic dictates that police cannot stop traffic—using patrol cars and barriers—to allow protestors to march in the street, and then arrest Toole for blocking traffic. And having reviewed the video evidence, [Doc. No. 100], the court finds that there were times when the protestors remained on the sidewalks, and other times they were permitted to march down the middle of the street. What remains consistent throughout all the videos is the absence of vehicular traffic due to the APD's use of barricades and patrol cars to bar traffic from the protest route. Particularly, while the court cannot determine from Toole's pre-arrest video [Doc. 100, Ex. M] if Toole was in the street at the time of his arrest, it can determine that the intersection was closed to traffic. Also, it appears that that most of the individuals in the street were APD officers, not protestors, which makes the claim that Toole who was blocking traffic even more dubious.

Based on these facts, Sgt. Zorn did not have arguable probable cause to believe Toole was violating the first element of Atlanta Ordinance § 106-81(9). Because "[w]hile the arguable-probable-cause standard does not require an arresting officer prove every element of a crime before making an arrest, it at least forbids a police officer from ignoring the obvious fact that a critical element of the crime is glaringly missing." *Larosa v. City of Sweetwater*, No. 13-21585-CIV, 2014 WL 4793001, at *4 (S.D. Fla. Sept. 25, 2014). Having applied "the elements of the alleged crime [to] the operative fact pattern," *Brown*, 608 F.3d at 735, Sgt. Zorn did not have arguable probable cause to believe Toole violated Atlanta Ordinance § 106-81(9). It is undisputed that the intersection where Sgt. Zorn arrested Toole was closed to traffic—making it impossible for Toole to impede traffic—and there is conflicting testimony regarding Toole's compliance with the APD officers' orders to get out of the street.

**b.   First Amendment**

Toole also has a First Amendment right (subject to some time, manner, and place restrictions not applicable here) to protest and film police conduct without being detained or ordered to stop. *Keating v. City of Miami*, 598 F.3d 753, 764 (11th Cir. 2010) (finding that the dispersal of a crowd demonstrators who were exercising their freedom of expression violated the protestors' First

17

Amendment rights); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (holding that plaintiff "had a First Amendment right . . . to photograph or videotape police conduct" because "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest").

It is undisputed that Toole was participating in a protest on the day he was arrested. It is also undisputed that he was filming the protest on his phone at the time of his arrest. But "the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest." *Brown*, 608 F.3d at 734. Put another way, if Toole was arrested with probable—or arguable probable—cause while he happened to be protesting or filming police activity, his First Amendment claim would be extinguished along with his Fourth Amendment claim. *Redd*, 140 F.3d at 1383 ("Because we hold that the officers had arguable probable cause to arrest [the plaintiff] for disorderly conduct, we must hold that the [defendant] officers are also entitled to qualified immunity from the plaintiffs' First Amendment claims.").

But the opposite is also true. If police arrested Toole illegally (i.e., without probable cause) while he was exercising his First Amendment rights, he would have a claim that these First Amendment rights were also violated.

*See, e.g.*, *Keating*, 598 F.3d at 765 (holding that when officers engaged in unlawful conduct to disperse protestors, the protestors' First Amendment rights were violated). It is already established that Toole was arrested under Atlanta Ordinance § 106-81(9) without actual or arguable probable cause. Therefore, Toole has shown that Sgt. Zorn violated Toole's First Amendment rights when he stopped Toole from continuing to protest and film by arresting him without probable cause.

### 2. Were Toole's First and Fourth Amendment rights clearly established when he was arrested?

Despite these factual disputes, Sgt. Zorn is still entitled to qualified immunity unless Toole can also show that his constitutional rights were clearly established at the time of his arrest.

To be clearly established, a right must be well-established enough "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate" and thus given the official fair warning that his conduct violated the law. *Id.*; *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc) ("The critical inquiry is whether the law provided [the

officer] with 'fair warning' that [his] conduct violated the Fourth [or First] Amendment.").

To prove that a constitutional violation was clearly established, the plaintiff must show "(1) that a materially similar case has already been decided, giving notice to the police; (2) that a broader, clearly established principle should control the novel facts in this situation; or (3) this case fits within the exception of conduct which so obviously violates the constitution that prior case law is unnecessary." *Keating*, 598 F.3d at 766 (quotations omitted, alterations adopted) (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)).

### a.   Fourth Amendment

Toole cites numerous cases which he claims show that his Fourth Amendment right to be free from searches and seizures, without probable cause, was clearly established at the time of his arrest. But most of the cases he cites are district court or state appellate court opinions, which fall outside the Eleventh Circuit's mandate that clearly established law must be created through precedent from the Supreme Court, the Eleventh Circuit, or (in this case) the Supreme Court of Georgia, so the court cannot consider them.[5] *See*

---

[5] Toole also directs the court to *WBY, Inc. v. DeKalb Cty., Ga.*, 695 F. App'x 486 (11th Cir. 2017) and *Wilkerson v. Seymour*, 626 Fed. App'x 816 (11th Cir.

*Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012). And of Toole's cases which qualify under *Terrell*, the court agrees with Sgt. Zorn's contention that these cases are factually distinguishable and do not establish that Toole had a clearly established Fourth Amendment right, under the circumstances, to be free from arrest.

First Toole relies on *Thorton v. City of Macon*, 132 F.3d 1395 (11th Cir. 1998) and *Davis v. Williams*, 451 F.3d 759 (11th Cir. 2006), which both deal with arrests for obstruction of justice. *Thorton* deals with a squabble between two former roommates over a set of car keys and a mattress which was left in the apartment. *Thorton, id.* at 1398. In *Davis*, the plaintiff was arrested for obstruction, handcuffed, and transported in a K-9 unit's dog cage after he came outside of his residence to inquire why officers were blocking his street. *Davis*, 451 F.3d at 763–64. Toole also relies on *Childs v. Dekalb Cty.*, 286 F. App'x 687 (11th Cir. 2008) and *Williamson v. Mills*, 65 F.3d 155 (11th Cir. 1995). In those cases, the officers admitted they conducted the arrest because the plaintiff was documenting undercover police activity. *Childs, id.* at 697 (writing down undercover officer's license plate number); *Williamson, id.* at 156–57 (photographing undercover officer at veteran's

2015). But *WBY, Inc.* and *Wilkerson* were both decided after Toole's 2014 arrest, making them inapplicable to this analysis as well.

rally). Finally, Toole directs the court to *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130 (11th Cir. 2007), where the plaintiff was arrested for obstructing a law enforcement officer when she asked an officer to move his patrol car so she could access her driveway. While these cases all support the general proposition that citizens have a Fourth Amendment right to be free from arrests without probable cause, the Supreme Court has instructed that "[courts] do not define clearly established law at such a "high level of generality." *Reichle*, 566 U.S. at 665 n.5.

However, the Eleventh Circuit's opinion in *Killmon v. City of Miami,* 199 F. App'x 796 (11th Cir. 2006) is factually similar to the case at hand, thus clearly establishing Toole's right to protest without being arrested (absent probable cause). In *Killmon* union activists protested at the Free Trade Area of the Americas summit held in Miami, Florida. *Id.* at 797. Police gave a dispersal order to the protestors, directing some of them—the plaintiffs—onto a set of nearby railroad tracks. *Id.* at 798. Other officers then arrested the plaintiffs for trespassing on the railroad tracks, in violation of Florida Statutes § 810.09. *Id.* The four elements which must be satisfied to establish the crime of trespass under § 810.09 are: (1) willfully entering upon or remaining in any property; (2) other than a structure or a conveyance; (3) without being authorized, licensed or invited; (4) where notice against

entering or remaining is given either by actual communication to the offender or by posting, fencing or cultivation. *Smith v. State*, 778 So.2d 329, 330 (Fla. Dist. Ct. App. 2000).

The plaintiffs filed § 1983 claims for false arrest, arguing that the police did not have probable cause—or even arguable probable cause—to arrest them. *Killmon,* 199 F. App'x at 798. The Eleventh Circuit affirmed the district court's denial of the defendant's motion to dismiss on the basis of qualified immunity because there was not arguable probable cause for the officers to arrest them for trespassing.[6] *Id.* The protesters alleged that they were directed onto the railroad tracks by police officers, which negated the 'willfully entering' element of the trespassing charge. *Id.* at 800. The plaintiffs' allegation that the law enforcement's response to the protest was highly coordinated was also persuasive to the Eleventh Circuit, making it was reasonable to infer that the arresting officers knew that the dispersed protesters were directed onto the railroad tracks by other police officers, so

---

[6] It is inconsequential that the *Killmon* decision arose on a motion to dismiss, because a right can become clearly established based on the allegations in a complaint. *See, e.g.*, *Keating*, 598 F.3d at 766 (relying on *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1185 (11th Cir. 2009), which was before the Eleventh Circuit on a motion to dismiss, for the proposition that peaceful picketing and leafletting are clearly established rights under the First Amendment).

that the arresting officers should have known the protesters were not on the tracks willfully. *Id.* The court concluded that the "[p]rotesters were arrested in violation of their clearly established Fourth Amendment rights." *Id.*

Very similar facts exist here. A dispersal order was given to the protestors. This was quickly followed by Toole's arrest, pursuant to Atlanta Ordinance § 106-81(9), pedestrian in roadway. But the police were blocking the roadway Toole was standing in, preventing traffic from using the street. As discussed earlier, *see* supra, Part III.A.1.a, this police conduct negated an essential element of the crime. And the APD response to this protest was highly coordinated; the undisputed evidence shows the APD prepared for the protest for approximately one month, utilized barricades and patrol cars to line the protest route, had different "teams" with assigned duties (such as Sgt. Zorn's "arrest team"), and used drones to monitor the protest. Based on this, it is safe to assume that Sgt. Zorn was aware that the APD was utilizing the leapfrog roadblock technique—thereby negating the 'impeding traffic' element of the charged crime. Just as the officers in *Killmon* knew or should have known that their decision to disperse the protestors caused the plaintiffs to go onto the railroad tracks (somewhere they would not normally be allowed to go) while simultaneously negating an element of the crime the protestors were charged with (willfully entering the railroad tracks), Sgt.

24

Zorn knew or should have known that the APD's decision to block off the roads along the protestors' route allowed them to walk into the street (somewhere they would not normally be allowed to go) while simultaneously negating an essential element of the crime (impeding vehicular traffic).

The fact that the protestors in *Killmon* were directed onto the railroad tracks because of that dispersal order, while Toole was in the street when the APD issued its dispersal order, makes no difference. The record is clear that traffic was not flowing through the intersection during that time. Therefore, the fact remains that Sgt. Zorn was well aware—due to the APD's highly coordinated response—that an essential element of the charged offense was absent the moment the APD blocked off the street.

Because Sgt. Zorn violated Toole's clearly established Fourth Amendment rights, he is not entitled to summary judgment on Count I on the basis of qualified immunity.

### b.   First Amendment

Toole's First Amendment right to protest and document police activity was also clearly established at the time he was arrested. The Eleventh Circuit has long held that the First Amendment protects the right to gather information about what public officials do on public property, including the right to record matters of public interest. *See, e.g.*, *Blackston v. Alabama*, 30

25

F.3d 117, 120 (11th Cir. 1994) (finding that plaintiffs' interest in filming

public meetings is protected by the First Amendment). And it repeatedly held

in the years prior to Toole's arrest that this includes the right of all citizens to

photograph or videotape police conduct. *See, e.g.*, *Bowens v. Superintendent of*

*Miami S. Beach Police Dep't*, 557 F. App'x 857, 863 (11th Cir. 2014) (plaintiff,

who was standing in the street and on the sidewalk, had First Amendment

right to photograph police as they were arresting—and allegedly

mistreating—another individual); *Abella v. Simon*, 522 F. App'x 872, 874

(11th Cir. 2013) (plaintiff has a First Amendment right to photograph police);

*City of Cumming*, 212 F.3d at 1333 ("agree[ing] with the [plaintiffs] that they

had a First Amendment right, subject to reasonable time, manner and place

restrictions, to photograph or videotape police conduct").

Because Sgt. Zorn violated Toole's clearly established First Amendment

rights, he is not entitled to summary judgment on Count II on the basis of

qualified immunity.

## B.     Did the City of Atlanta had a policy, custom, or practice that caused the violation of Toole's Fourth and First Amendment rights?

Under § 1983, any "person" who, under color of law, causes a United

States citizen to be deprived of a constitutional right may be liable at law or

in equity. 42 U.S.C. § 1983. In 1978 the Supreme Court determined that

municipalities are "persons" under § 1983, and therefore subject to liability.
*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).
And while the Supreme Court has said municipalities do not receive qualified
immunity from suit, *Leatherman v. Tarrant Cty. Narcotics Intelligence &
Coordination Unit*, 507 U.S. 163, 166 (1993), municipal liability under § 1983
is strictly limited. *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir.
2003).

To impose § 1983 liability on a municipality, a plaintiff must show: (1)
his constitutional rights were violated; (2) the municipality had a custom or
policy that constituted deliberate indifference to that constitutional right;
and (3) the policy or custom caused the violation. *McDowell v. Brown*, 392
F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton v. Harris*, 489 U.S.
378, 388 (1989)). Because it is established that facts exist which could show
that Toole's Fourth and First Amendment rights were violated, *see* supra
Part III.A.1., the court will focus its analysis on elements two and three.

### 1. Did the City have a policy or custom that constituted a deliberate indifference to the protestors' First and Fourth Amendment rights?

A municipality can be held liable under § 1983 only where its policies,
customs, or practices are the moving force behind the constitutional violation.
*Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Toole sets forth

two theories of liability for why the City could be held responsible for his unconstitutional arrest. First, he claims that the City had an unconstitutional policy of arresting protestors—and violating their Fourth and First Amendment rights—because Deputy Chief Spillane was acting as a final policy maker on behalf of the City when he gave the order to arrest any individuals in the street. Second, he claims that the City had a custom of allowing the APD to violate protestors' Fourth and First Amendment rights because it was deliberately indifferent to officer training. The City disputes both these theories.

### a. Did the City have an unconstitutional policy of arresting protestors enacted by Deputy Chief Spillane?

To determine if a policy or action represents official municipal policy, the court must decide if the decision at issue was made by "those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). According to Toole, Deputy Chief Spillane has final policymaking authority when it comes to the law enforcement actions of the APD, so when he issued the dispersal order he created an official policy of arresting protestors who were filming, without

probable cause, which in turn violated Toole's constitutional rights. The City responds, arguing that it was not Deputy Chief Spillane who gave the dispersal order, but even if it was, he does not have final policymaking authority for the APD, so his decisions cannot be imputed on the City as an official policy.

Viewing the facts in the light most favorable to the plaintiff, the evidence supports the City's position that Deputy Chief Spillane was not the individual who issued the dispersal order and made the decision to begin arresting protestors in the street.

It is undisputed that Deputy Chief Spillane was in charge of field operations during the protest. Part of that role required him to advise Chief of Police George Turner of the protestors' activities. This included updating Chief Turner when the protestors marched onto the interstate and when some individuals began acting violently or engaged in acts of vandalism. Deputy Chief Spillane's testimony—which is unchallenged—indicates that he advised Chief Turner that some of the protestors were breaking windows and that the march was again approaching the highway, which could cause another highway breach. He then suggested that Chief Turner issue a dispersal order. Chief Turner approved Deputy Chief Spillane's

29

recommendation and issued the dispersal order, which Deputy Chief Spillane

passed down to the officers under his command.

Because the evidence shows that Chief Turner, not Deputy Chief

Spillane, decided to issue the dispersal order, it is unnecessary for this court

to determine if Deputy Chief Spillane is a final policy maker for the APD in

law enforcement matters.[7]  And even if Deputy Chief Spillane did issue the

dispersal order, Toole presented no evidence showing that Deputy Chief

Spillane has policymaking authority within the APD. The APD's Policy

Manual indicates that the Chief of Police is the "chief executive officer of the

Department" and has the sole authority to "manage, direct, and control the

operations and administration of the Department." ADP.SOP.1010. According

to the same SOP, the rank of Deputy Chief (of which there are multiple,

including Spillane) is the third highest rank in the APD.

> **b.** **Did the City have a policy or custom of violating rights
> which arose out of deliberately indifferent training?**

Even if there was no official policy enacted by Deputy Chief Spillane

that caused the constitutional violations in question, Toole can still survive

summary judgment if he can show a factual dispute exists with regards to

---

[7] Toole did not argue that Chief Turner is a final policy maker, so the court
will not conduct that analysis.

30

whether the City has failed to train its police officers about the public's right to participate in protests—and film police activity while doing so. This is because, in limited circumstances, a municipality's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of a custom for purposes of § 1983.

But a municipality's culpability for a constitutional violation is at its most tenuous when liability turns on the municipality's failure to train its employees. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985) (plurality opinion) (stating that liability arising from a custom of inadequate training is "far more nebulous, and a good deal further removed from the constitutional violation, than was the [officially promulgated] policy in *Monell*"). To overcome this, the plaintiff must show that the municipality's failure to train its employees amounts to a "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton*, 489 U.S. at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id*. at 389.

"[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397,

31

410 (1997). So when a city's policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.* at 407. A city's "policy of inaction" despite notice that inaction may cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in de facto *respondeat superior* liability on municipalities—a result [the Supreme Court] rejected in *Monell* . . ." *Id.* at 392; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . .").

The City claims that the APD trains its officers extensively on upholding citizens' First and Fourth Amendment rights. It submitted to the court voluminous Standard Operating Procedures and training materials, some of which specifically deal with warrantless arrests and citizens' rights to film and photograph police activities. As evidence of the effectiveness of its training, the City points to Toole's own deposition, where he testifies that he

32

witnessed approximately 50 people with their phones out during the protest but that he did not see the APD arrest any of those individuals. The City further claims that Toole did not provided evidence showing a history of widespread, similar constitutional violations by the APD which would put the City on notice of a need to provide further training.

Toole responds by pointing to two cases involving violations of citizens' Fourth and First Amendment rights by the APD—*Calhoun v. Pennington*[8] and *Anderson v. City of Atlanta*[9]—which he contends shows not only a pattern of constitutional violations, but also a deliberate indifference to those violations.

In *Calhoun*, the APD raided two adjacent bars, citing some of the bar employees for violations relating to allegedly unlicensed adult entertainment. *Calhoun* at Doc. No. 44. The APD officers also detained all the patrons in both bars, making them lie on the ground and searching them. *Id.* When some of the patrons questioned why they were being detained and requested the officers' names and badge numbers, they were allegedly threated, subjected to excessive force, and detained for a significantly longer period of time in a separate area. *Id.* Several of the patrons sued for, among other

---

[8] 1:09-CV-3286-TCB (N.D. Ga.) [hereinafter *Calhoun*].
[9] 1:11-CV-3398-SCJ (N.D. Ga.) [hereinafter *Anderson*].

things, violations of their First and Fourth Amendment rights. *Id.* The case was settled in 2010, and in addition to a monetary settlement with the patrons, the City agreed to make significant changes to its First and Fourth Amendment officer training. *Calhoun* at Doc. No. 265. This included, among other things, promises to (1) revoke or amend unconstitutional APD policies regarding warrantless searches, arrests, and investigative stops; (2) prohibit interference with audio and video recordings; (3) conduct mandatory training for all APD sworn employees regarding the changes outlined in the settlement and the law regarding warrantless searches and arrests; and (4) to provide recurring training on those topics for all officers every two years. *Calhoun* at Doc. No. 265-1.

In *Anderson*, the plaintiff was arrested while she was photographing APD officers as they arrested her neighbor. *Anderson* at Doc. No. 1. The officers allegedly confiscated her camera, deleted some photographs she took of them, and arrested her without probable cause. *Id.* She sued for, among other things, violations of her First and Fourth Amendment rights. *Id.* In 2012 this case was also settled, and (like *Calhoun*) in addition to paying the plaintiff a monetary settlement the City agreed to make changes to its officer training. *Anderson* at Doc. No. 16. Specifically, it agreed to (1) permanently revise APD policies regarding police interference with citizens' rights to

34

record; (2) make interference with a citizen's right to record a terminable offense; and (3) <u>require mandatory in-person training of all APD officers every two years regarding the new filming policies, to be given concurrently with the training required in the *Calhoun* settlement</u>. *Id.*

Toole points out that, in both cases, the City admitted that it failed to implement the required changes and conduct the bi-annual training prior to Toole's arrest in November 2014. On March 13, 2015, after a contempt hearing, the *Anderson* court found that the APD—based partially on their own admissions—failed to (1) implement the required SOPs regarding police interference with citizens' right to record; and (2) conduct the mandatory in-person training of all APD officers every two years regarding police interference with citizens' right to record. *Anderson* at Doc No. 31. Less than a week later, on March 19, 2015, the *Calhoun* court found that the APD failed to (1) revoke or amend unconstitutional APD policies regarding warrantless searches, arrests, and investigative stop; and (2) conduct mandatory training for all APD officers every two years regarding the warrantless searches, arrests, and investigative stops. *Calhoun* at Doc. No. 289. Just as it did in *Anderson*, the APD acknowledged its failure to comply with the *Calhoun* settlement. *Id.*

The City responds by emphasizing that Toole has not provided evidence of a history of widespread abuse of citizens' constitutional rights that would put the city on notice of a need to train. It then dismisses its noncompliance with the court orders in *Anderson* and *Calhoun* as "technical noncompliance" specific to the requirements of those settlements and court orders. And it repeatedly argues that "the *Calhoun* and *Anderson* orders do[ ] not show that APD Officers were not trained on the citizen's right to film and photograph police officers [sic] activities."

While the city is correct that a widespread pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train, *Bryan Cty.*, 520 U.S. at 409, this is not the only way to show deliberate indifference. Any way that a plaintiff can show "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.* at 407. But without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights. *Id.*

36

Here, Toole has shown that the APD admitted that it violated the First and Fourth Amendment rights of the *Calhoun* and *Anderson* plaintiffs. He has shown that the City, when settling those cases in 2010 and 2012, respectively, agreed to amend its policies specifically as they relate to those violations, and further agreed to train all APD officers on these new policies every two years. By doing so, he created a factual dispute around whether the City knew that it needed to alter or bolster its training to prevent First and Fourth Amendment violations by its officers.

Next, Toole showed that the City admitted it had not fulfilled either of those promises in the years leading up to his arrest in November 2014. Because of this noncompliance, which the *Calhoun* and *Anderson* courts both found to be inexcusable, the City was subject to additional sanctions in both instances. *Calhoun* at Doc. No. 289. *Anderson* at Doc. No. 31. This creates a factual dispute about whether the City had actual or constructive notice that its First and Fourth Amendment training caused officers to violate citizens' constitutional rights, and if the City was deliberately indifferent to citizens' rights when it decided not to implement the court-ordered training described above.

**2. Did the City's deliberate indifference to training cause the violation of Toole's Fourth and First Amendment rights?**

37

Finally, to prevail at summary judgment, Toole must also show that there is a causal connection between the APD's failure to train its officers and the harm he suffered. Put another way, he must show that "the identified deficiency in [the APD's] training program [is] closely related to the ultimate injury." *Canton,* 489 U.S. at 391. The City makes the conclusory argument that he can't meet this burden because he cannot show that the training was inadequate. But Toole identified deficiencies in APD policies and training as they relate to warrantless arrests and the filming of police activity. Clearly, conduct he is complaining of is "closely related" to these very same subjects. And while the City maintains that its training was sufficient and did not cause the constitutional violations, it has not made any arguments showing that Sgt. Zorn was doing anything other than what he was trained to do.

Because there is a factual dispute about whether the APD has a custom or policy of inadequately training its officers on citizens' First and Fourth Amendment rights, and about whether that custom or policy caused Toole's constitutional rights to be violated, the City is not entitled to summary judgment on Toole's § 1983 claims.

## IV. Toole's state law claims against Sgt. Zorn

Toole also asserts state law tort claims of false imprisonment, assault, battery, and malicious prosecution (Count IV) against Sgt. Zorn in his

38

individual capacity. Sgt. Zorn has moved for summary judgment based on the doctrine of official immunity. Specifically, Sgt. Zorn claims that Toole cannot show that he acted with actual malice when arresting Toole.

Georgia's official immunity doctrine "offers public officers and employees limited protection from suit in their personal capacity." *Cameron v. Lang*, 549 S.E.2d 341, 344 (Ga. 2001). The doctrine applies differently depending on if the officer was engaged in a ministerial or discretionary act. *Tisdale v. Gravitt*, 51 F. Supp. 3d 1378, 1398–99 (N.D. Ga. 2014) (noting differing standards of liability between an official's ministerial and discretionary acts). Because there is no dispute that Sgt. Zorn's acts were discretionary,[10] the court need only address official immunity as it applies to discretionary acts.

Georgia's constitution provides officers with official immunity for discretionary acts unless "they act with actual malice or with actual intent to cause injury in the performance of their official functions." GA. CONST. art. I, § 2, ¶ IX(d); *see also* O.C.G.A. § 36-33-4 ("Members of the council and other officers of a municipal corporation shall be personally liable to one who

---

[10] "Toole concedes that the actions of Defendants [sic] Zorn were discretionary, but Toole alleges a factual basis for malice under Georgia law" [Doc. No. 103 at 43].

39

sustains special damages as the result of any official act of such officers if done oppressively, maliciously, corruptly, or without authority of law."). "Actual malice is a demanding standard: it requires an officer to act with a deliberate intention to do a wrongful act." *Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016) (internal citations and quotations omitted). Intent to injure is a similarly demanding standard: it requires an officer to act with "intent to cause the harm suffered by the plaintiff." *Tisdale*, 51 F. Supp. 3d at 1399.

Actual malice does not include the reckless disregard for the rights and safety of others. *Selvy v. Morrison*, 665 S.E.2d 401, 405 (Ga. Ct. App. 2008). "A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs." *Id. See also Mitchell v. Parker*, 271 F. Supp. 3d 1364, 1381 (N.D. Ga. 2017) (testimony that arresting officer harbored a personal vendetta to do plaintiff harm for more than a year prior to the arrest); *Marshall v. Browning*, 712 S.E.2d 71, 74 (Ga. Ct. App. 2011) (finding no evidence of personal animus as it related to one officer and granting him qualified immunity). In other circumstances, an officer's actions can be so egregious that they, in and of themselves, show an intent commit an unlawful act. *Mitchell*, *id.* (once plaintiff was handcuffed and was no longer

40

resisting, one officer gouged plaintiff's eye while the other lifted the plaintiff's arms up behind his back to a height sufficient to separate his shoulders); *Marshall*, *id.* (holding that manufacturing evidence or knowingly presenting perjured testimony is enough to uphold a finding of actual malice).

Conversely, "[a]ctual malice does not include implied malice, or the reckless disregard for the rights and safety of others." *Selvy*, 665 S.E.2d at 405 (holding that "poor judgment, rude behavior, and reckless disregard for the rights and safety of others" does not constitute actual malice). *See also Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1333 (11th Cir. 2006) (holding that although sheriff's deputies acted unreasonably and violated plaintiff's Fourth Amendment rights in arresting plaintiff after their warrantless entry into his home, deputies were entitled to official immunity under Georgia law on state law claims because plaintiff failed to demonstrate that the deputies possessed a deliberate intention to do wrong sufficient to satisfy the actual malice standard).

Toole presents no direct evidence of actual malice. Instead he asks the court to infer that Sgt. Zorn acted with actual malice because Toole was compliant during the arrest, but Sgt. Zorn nonetheless forcefully threw him on the ground and placed a knee on his back, injuring him and breaking a tooth—all without probable cause. In other words, he argues that Sgt. Zorn's

41

actions are so egregious that they, in and of themselves, show an intent

commit an unlawful act. In making this argument, he relies on *Harper v*

*Perkins*, 459 F. App'x 822 (11th Cir. 2012), and *Hicks v. Moore*, 422 F.3d

1246 (11th Cir. 2005). But both these cases are distinguishable.

Harper is inapposite because the court relied on the plaintiff's

allegations (it was ruling on a motion to dismiss) that the officers discharged

their tasers multiple times for the sole purpose of injuring the plaintiff

because they were angry that he ran from the officers. *Harper, id.* at 828. As

stated earlier, Toole has presented no evidence that Sgt. Zorn conducted the

arrest for the sole purpose of injuring him. And in *Hicks*, the male officer

defendant instructed the female suspect to stand directly behind him while

he pulled her arms around his body to take her fingerprints. 422 F.3d at

1249. The officer told the plaintiff that this method ensured more accurate

fingerprints, but in reality it was done so that the plaintiff's breasts and

pelvis to repeatedly touched the officer. *Id.* at 1249–50. The undisputed

evidence in *Hicks* showed that the officer disregarded his training and opted

to use a method which was "inadvisable" and placed him "at risk" because it

required that he stand in very close proximity to a suspect with his back

turned. *Id.* at 1250. This led the court to the inescapable conclusion that the

sole purpose of the officer's actions was to make the plaintiff's breasts and

pelvis touch him every time he took a fingerprint. *Id.* at 1254. But Toole did not present any evidence that Sgt. Zorn disregarded his training and opted to use an inadvisable method of handcuffing and detaining Toole to gain some personal satisfaction.

Viewing the facts in the light most favorable to Toole, the court finds that Zorn is entitled to official immunity on the state law claims. Evidence of excessive force is usually insufficient for a finding of actual malice. *See, e.g.*, *Dukes v. Deaton*, 852 F.3d 1035, 1045 (11th Cir. 2017), *cert. denied*, 138 S. Ct. 72 (2017) (holding that the officer's use of flash bang grenade before entering room, although the occupants were asleep at the time, at most establishes recklessness, not malice, so officer was entitled to official immunity); *Phillips v. Hanse*, 637 S.E.2d 11, 14 (Ga. 2006) (granting official immunity to officer who allegedly rammed a fleeing vehicle during a high-speed chase on the interstate in a major city, causing a crash which resulted in the death of another driver and significant injuries to three minor passengers, because although the officer's conduct was reckless, there was no evidence this was done to physically harm the suspect or any other individual); *Tittle v. Corso*, 569 S.E.2d 873, 877 (Ga. Ct. App. 2002) (threatening and slamming compliant subject onto the hood of patrol car—without more—does not establish actual malice).

It may well have been excessive for Sgt. Zorn to throw Toole to the ground and place his knee in Toole's back, but these actions fall somewhere between the unnecessary use of force in *Tittle* (threatening the plaintiff then slamming him onto the hood of the patrol car) and the deadly PIT maneuver used in *Phillips* or the unnecessary use of flashbangs on the sleeping plaintiffs in *Dukes*. And none of those actions rose to the level of actual malice. Just as in those cases, while the evidence may ultimately show that Sgt. Zorn went above and beyond what was necessary to conduct the arrest, it does not show that his reason for doing was to injure or harm Toole.

Because Toole has not set forth evidence showing that Sgt. Zorn acted with actual malice when he arrested Toole, Sgt. Zorn is entitled to summary judgment, on the basis of official immunity, on Toole's state law claims (Count IV).

## V.      Conclusion

For the foregoing reasons, the defendants' motion for summary judgment [Doc. No. 99] is GRANTED IN PART and DENIED IN PART. Specifically, it is DENIED as to Counts I and II, and GRANTED as to Count IV. Count III is DISMISSED with prejudice.

The parties are ORDERED to file their proposed consolidated pretrial order within 30 days from the date of this Order. *See* LR 16.4, NDGa.

So ORDERED this 26th day of March, 2019.


/s/CHARLES A. PANNELL, JR.
CHARLES A. PANNELL, JR.
United States District Judge