## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| MICHAEL BRACY, | § | |
| | § | |
| Plaintiff, | § | CASE NUMBER |
| | § | |
| v. | § | |
| | § | |
| SAGE APARTMENT | § | |
| COMMUNITIES, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| _____ | / | |

## VERIFIED COMPLAINT FOR FAILURE TO ACCOMMODATE DISABILITY AND DISABILITY RETALIATION, RACIAL HARASSMENT, FAILURE TO MAINTAIN ACCURATE RECORD OF HOURS WORKED, FAILURE TO PAY EARNED WAGES, AND STATE LAW BREACH OF CONTRACT

**COMES NOW** Michael Bracy, Plaintiff in the above-styled action, and files this Verified Complaint.

### PARTIES, JURISDICTION AND VENUE

**1.**

Plaintiff Michael Bracy is an individual resident of DeKalb County, Georgia.

**2.**

Defendant Sage Apartment Communities, Inc. ("Sage") is a Nevada corporation authorized to conduct business in Georgia. Sage may be served with

process through its Registered Agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia  30092.

**3.**

This Complaint includes actions for violation of the Americans With Disabilities Act, as amended, 42 USC §§12101 *et seq*. ("ADA"), to recover for failure to accommodate a disability in violation of the ADA and for ADA retaliation. This Complaint also includes a claim of race discrimination under Title VII, 42 USC §2000e.  This Complaint also includes claims under the Fair Labor Standards Act, 29 USC §§201 *et seq.* ("FLSA"), of failure to maintain an accurate record of hours worked and failure to pay all earned wages.  This Complaint also includes claims for attorney's fees and litigation expenses associated with each of the ADA, Title VII, and FLSA claims.  This Court has original jurisdiction over these claims under 28 USC §1331.

**4.**

Plaintiff asserted claims of ADA failure to accommodate, retaliation, and Title VII racial harassment against Defendant in a filing with the Equal Employment Opportunity Commission ("EEOC") within 180 days of Defendant's last discriminatory act.

**5.**

The EEOC issued a Notice of Right to Sue less than ninety days prior to the filing of Plaintiff's Complaint.  A true and correct copy of the EEOC's letter is attached hereto as Exhibit 1.

**6.**

This Court has subject matter jurisdiction over Plaintiff's state law claim under both diversity jurisdiction and supplemental jurisdiction.

**Plaintiff Michael Bracy's Background and Duties for Sage**

**7.**

Plaintiff Michael Bracy is a 65-year old African American male former employee of Sage who has been diagnosed with Multiple Sclerosis ("MS").  He was continuously employed by Sage and its four predecessors for over 28 years at the Park Trace apartment community, until Sage terminated him May 26, 2021.

**8.**

Park Trace is a high-rise apartment community for senior citizens which is located in DeKalb County, Georgia.  It has 169 units on eight floors.

**9.**

Park Trace is managed by Sage.

**10.**

Upon information and belief, Park Trace is owned by Sage.

**11.**

Plaintiff Bracy's title was "Maintenance Supervisor" for the Park Trace apartment community.

**12.**

Sage never provided Mr. Bracy with a written job description. Sage also did not notify Mr. Bracy of any changes to his existing duties or title at Park Trace when Sage assumed management of Park Trace.

**13.**

Pursuant to the customs already in place when Sage assumed the management of Park Trace, Mr. Bracy's duties as of that date were the following:

- Together with a more junior employee whom he supervised, Mr. Bracy was responsible for performing or overseeing the maintenance needs of the entire Park Trace apartment community, including performing basic

plumbing (repairing minor leaks and blockages), minor elevator repairs, and small appliance repair and replacement; light bulb replacement; and procuring estimates for and supervising more sophisticated repair work performed by contractors.

- Mr. Bracy performed in tandem with the other maintenance employee such two-person jobs as moving the dempster dumpster for trash pickup and removing and replacing air conditioner window units in individual apartments.

- Mr. Bracy and the other employee whom he supervised shared equally the responsibility of being on-call to respond to maintenance emergencies during weekends and during evenings after their normal work hours.  Mr. Bracy and the other employee each had one week on-call, followed by one week not on-call. The on-call employee was required to carry the on-call phone (which had to be charged and turned-on) at all times while on-call.

- When contractors were needed to perform more extensive repairs that were beyond Mr. Bracy's skillset, Mr. Bracy was responsible for identifying the need and procuring estimates from contractors for review and approval by higher ranking employees.  The higher ranking

employees were required to approve engagement before a contractor identified by Mr. Bracy could be engaged. Once the contractor had been engaged, Mr. Bracy was responsible for supervising the contractor's work.

## 14.

Despite his "Supervisor" title, Mr. Bracy was permitted little opportunity to supervise any employees, including the other maintenance employee. Mr. Bracy's input was rarely sought by Sage in the hiring and evaluation of other maintenance staff. He was not treated or respected by Sage as an actual manager or supervisor.

### Mr. Bracy's MS Diagnosis and Agreed ADA Accommodations

## 15.

While working as Maintenance Supervisor at Park Trace under a prior employer, before Sage assumed management of Park Trace, Mr. Bracy was diagnosed with MS. MS is generally acknowledged under applicable law to meet the definition of disability under the ADA. Based on his MS symptoms, Mr. Bracy requested and received a disability accommodation under the ADA from his then-employer.

**16.**

Commencing with the prior employer and continuing until Sage assumed management of Park Trace, Mr. Bracy's agreed ADA accommodations included:

- Avoiding temperature extremes, such as working outside during particularly hot or cold days;

- Assistance with pushing/pulling/lifting heavy items such as the dempster dumpster and air conditioner window units, with an agreement that he would not be required to perform these duties by himself;

- Five-minute rest breaks every thirty minutes;

- Avoiding the use of ladders other than occasionally ascending to the two lowest rungs, such as to change a light bulb, because he would become dizzy when he was tired and he risked falling off the ladder and injuring himself; and

- Avoiding overtime other than one or two occasional hours.

**17.**

Mr. Bracy's ADA accommodation with his prior employer, continuing until Sage assumed management of Park Trace, included an agreement that his work

schedule would be adjusted downward during the weeks that he was on-call so that his on-duty hours and his on-call hours combined would not significantly exceed forty hours in a week. This accommodation was adopted in order to limit Mr. Bracy's overtime work so that he would have adequate rest and thereby limit the impact of his MS on his ability to perform his duties.

**18.**

The reason for the agreed ADA accommodations of rest breaks and limitations on overtime work was that Mr. Bracy's MS symptoms become more pronounced (making work more difficult and injury more likely) in the absence of rest.

**19.**

The reason for the agreed ADA accommodation of limiting ladder use to the two lowest rungs was that, when ascending ladders, Mr. Bracy sometimes became dizzy.  It was dangerous for him to climb up more than a couple of rungs in case he became dizzy and fell.

**20.**

Prior to Sage acquiring Park Trace, Mr. Bracy's then-employer complied with his agreed ADA accommodations.

**Sage's Initial Adverse Actions and Mr. Bracy's Reinstatement Following Settlement**

**21.**

Soon after Sage assumed management of Park Trace, Mr. Bracy notified Sage that he had existing ADA accommodations.  Sage notified him that it would continue to allow the existing agreed ADA accommodations.

**22.**

After Sage assumed management of Park Trace, Mr. Bracy and the other maintenance employee were generally able to meet Sage's maintenance needs despite his ADA accommodations.

**23.**

At Sage's request, Mr. Bracy provided updated information regarding his MS to Sage in January 2019.  Less than one month after Mr. Bracy provided the requested update, and without engaging in any ADA interactive process, Sage terminated Mr. Bracy for "health reasons" on February 4, 2019.

**24.**

When terminating Mr. Bracy on February 4, 2019, Sage claimed that Mr. Bracy was no longer capable of performing his duties, despite an absence of

supporting evidence.  Mr. Bracy's written annual review given less than a month before his February 4, 2019 termination stated that he met or exceeded expectations.

**25.**

Mr. Bracy filed EEOC Charge Number 410-2019-03467 following his February 4, 2019 termination.  Thereafter, Mr. Bracy and Sage entered into a written settlement agreement (the "2019 Settlement Agreement") and Mr. Bracy was reinstated by Sage to the position of Maintenance Supervisor at Park Trace effective May 2, 2019.  A true and correct copy of the 2019 Settlement Agreement is attached hereto as Exhibit 2.

**26.**

Following his reinstatement as Sage's Maintenance Supervisor at Park Trace on May 2, 2019, Mr. Bracy reported directly to the on-site Sage Property Manager at Park Trace, and indirectly to Dan Cervantes at Sage's corporate offices in California.  The agreed ADA accommodations that had been established prior to Sage assuming management of Park Trace remained in effect.  The 2019 Settlement Agreement obligated Sage to engage in good faith in the ADA interactive process prior to adopting any change to Mr. Bracy's agreed ADA accommodations.

**27.**

When Mr. Bracy was reinstated by Sage on May 2, 2019, Sage had three full-time employees who were responsible for maintenance and cleaning at Park Trace. Those employees consisted of Mr. Bracy, another maintenance employee who reported to Mr. Bracy, and a housekeeper. Sage also had a floating painter who was based elsewhere and handled significant painting tasks at several apartment communities owned or managed by Sage, including at Park Trace.

**28.**

As of Mr. Bracy's May, 2019 reinstatement by Sage, the other maintenance employee at Park Trace was responsible for small paint jobs; the floating painter was called on to perform larger painting jobs at Park Trace; and the housekeeper was responsible for general common area cleaning, grounds pickup, trash pickup, transferring trash to the dempster dumpster, keeping the dempster dumpster area clean, and cleaning vacated apartments at Park Trace. Because none of the responsibilities listed in this Paragraph were assigned to Mr. Bracy, these responsibilities were not discussed as a part of the ADA interactive process either before Mr. Bracy's February 2019 termination or upon Mr. Bracy's May 2019 reinstatement by Sage.

**29.**

Immediately following his May, 2019 reinstatement, Mr. Bracy was on-call 33% of the time on evenings and weekends, as the other maintenance employee and the housekeeper were on-call the other 67% of evenings and weekends. This division of labor allowed Mr. Bracy to obtain needed rest to avoid exacerbating his MS symptoms, and it also allowed compliance with Sage's agreed ADA accommodation that Mr. Bracy would be required to work no more than a couple of hours of overtime per week.

**30.**

During the first few weeks after Mr. Bracy's May 2, 2019 reinstatement, Sage sometimes allowed Mr. Bracy time off during his normal weekday work schedule to compensate him for additional time he had spent resolving emergencies while on-call during evenings and weekends.

**31.**

Before Mr. Bracy's 2019 termination, and following his May 2019 reinstatement, his hands-on plumbing duties were limited to minor emergency repairs, with contractors hired by Sage and working under his supervision being responsible for major plumbing work. Because hands-on plumbing work beyond

minor emergency repairs was not one of Mr. Bracy's duties, this work was not discussed as a part of the ADA interactive process either before Mr. Bracy's February 2019 termination or upon Mr. Bracy's May 2019 reinstatement by Sage.

### Sage's Unilateral Alterations to Mr. Bracy's Terms and Conditions of Employment and Failure to Engage in the ADA Interactive Process

### 32.

On or about June 9, 2020, Mr. Bracy met with Sage management to review his ADA accommodations and both parties agreed that his accommodations were still working.  As of that date, the following remained unchanged from Mr. Bracy's May 2019 reinstatement:  Mr. Bracy's MS, Mr. Bracy's job duties, the duties that others were responsible for performing for Sage, and Mr. Bracy's agreed ADA accommodations.

### 33.

As of the June 9, 2020 meeting, Mr. Bracy was able to perform all of his assigned duties with the ADA accommodations to which Sage had agreed.

### 34.

Eight days after the June 9, 2020 meeting, Sage commenced unilaterally changing the terms and conditions of Mr. Bracy's employment without engaging in

the ADA interactive process.

**35.**

Sage barred Mr. Bracy from turning off his personal cell phone (which was different than Sage's on-call phone) during his non-work hours, even when he was not on-call.  Sage gave this order to Mr. Bracy without providing any business explanation for this new requirement and despite the fact that another Sage employee was required to monitor Sage's on-call phone when Mr. Bracy was not on-call.  Sage gave this order to Mr. Bracy without engaging in the interactive process regarding the potential impact of this change on Mr. Bracy's ADA accommodation needs.

**36.**

On or about July 19, 2020, Sage terminated the other maintenance employee assigned to Park Trace and instead engaged a temporary worker who was assigned limited responsibilities.  Despite Mr. Bracy having the title of Maintenance Supervisor, Mr. Bracy had no role in the termination of the other maintenance employee or in the engagement of the temporary worker.

**37.**

After engaging the temporary worker for Park Trace, Sage notified Mr. Bracy that the temporary worker had activity restrictions for "insurance reasons."  The

temporary worker's activity restrictions included a requirement that Mr. Bracy must accompany the temporary worker anytime the temporary worker entered a resident's apartment.   Upon information and belief, the restriction against the temporary worker entering a resident's apartment unsupervised existed because the temporary worker had a criminal record.

## 38.

As a result of the temporary worker's activity restrictions, Mr. Bracy was forced to carry a heavier workload than he had been carrying for Sage.  Because the temporary worker was not permitted to enter a resident's apartment unsupervised, and because on-call work often occurred within individual residents' apartments, the temporary worker's activity restrictions precluded assigning on-call work to the temporary worker.  Consequently, Mr. Bracy was required to be on-call anytime he was not working his regular schedule.

## 39.

Sage prioritized the activity restrictions assigned to the temporary worker over Mr. Bracy's existing, agreed ADA accommodations.

**40.**

Sage made no effort to engage in the ADA interactive process when it unilaterally imposed the changes to Mr. Bracy's work schedule following termination of the other maintenance employee and engagement of the temporary worker who had activity restrictions.  As a result of this unilateral change by Sage to Mr. Bracy's work schedule, Mr. Bracy was required to either work or be available to work 24 hours per day, seven days per week, continuously, from July 19, 2020 until late October, 2020, approximately ninety straight days.

**41.**

While on-call continuously for approximately ninety straight days, Mr. Bracy was not given days off during the week to accommodate weekend and overnight on-call work.  During those approximately ninety straight days, Mr. Bracy worked more than just the couple of hours of overtime that were a part of his agreed ADA accommodation.  He could never fully rest during his off-hours, out of a fear that he would sleep through a call from management or a resident and be disciplined for failing to timely respond.

**42.**

After unilaterally requiring Mr. Bracy to assume all maintenance duties for all

of Park Trace without engaging in the ADA interactive process, in the summer of 2020 Sage assigned additional duties to Mr. Bracy.  Sage terminated its housekeeper and simultaneously increased its cleaning efforts due to COVID-19, assigning all of the housekeeper's duties as well as the additional COVID-19-related cleaning duties to Mr. Bracy.

**43.**

The weekday housekeeping duties that Sage unilaterally assigned to Mr. Bracy in the summer of 2020 required him to walk the entire grounds of the apartment community and, when necessary, bend over to pick up cigarette butts and beer cans, as well as heavy items such as old tires, appliances, and other large pieces of trash to place on the curb.

**44.**

The weekend housekeeping duties that Sage unilaterally assigned to Mr. Bracy in the summer of 2020 included cleaning common areas of the Park Trace apartment community three times per day every Saturday and every Sunday.

**45.**

Mr. Bracy was not given any days off during the week and was not relieved

of evening and weekend on-call duties when Sage unilaterally assigned weekend housekeeping duties to him.

**46.**

No duties were removed from Mr. Bracy's already-full schedule as the Maintenance Supervisor when Sage unilaterally assigned weekday and weekend housekeeping duties to him.

**47.**

Mr. Bracy has not been paid all earned wages, including earned overtime wages, for the approximately ninety straight days he worked between July 19, 2020 and late October 2020.

**48.**

When unilaterally changing the terms and conditions of Mr. Bracy's employment, Sage failed to engage in the ADA interactive process.

**49.**

Because Mr. Bracy has MS, he faced an enhanced risk of complications and even death if exposed to COVID-19.  Sage's unilateral changes to the terms and conditions of Mr. Bracy's employment increased his exposure to other people who

might have COVID-19, and ignored the enhanced risks he faced from COVID-19 because of his MS.

**50.**

Mr. Bracy initially attempted to perform the weekday and weekend housekeeping duties Sage had unilaterally assigned to him, because he feared discipline by Sage if he were to refuse.

**51.**

After a few weeks, Mr. Bracy was unable to keep up the pace of work required by Sage's unilateral assignment of additional duties to him.

**52.**

Sage disciplined Mr. Bracy on October 6, 2020, accusing him of performance issues and labeling him as "lazy" despite his having worked every weekday and every weekend for approximately ninety days and having been on-call during his "off hours" continuously for nearly ninety days.

**53.**

On October 7, 2020, Mr. Bracy, through his counsel, contacted Sage's counsel to address the unilateral changes to his duties, including the assignment of additional duties previously assigned to other employees, the weekend work, and the nearly

ninety days of being continuously either on-duty or on-call.  Through counsel, Mr.
Bracy acknowledged that employee vacancies sometimes necessitate temporary
changes to employee duties and inquired how much longer his increased workload
was expected to continue.  This inquiry represented an effort by Mr. Bracy to procure
Sage's participation in the interactive process required by both the ADA and the
2019 Settlement Agreement.

**54.**

Sage delayed responding to Mr. Bracy's efforts to engage in the interactive
process for approximately three weeks.  During those dates, Sage continued to
require Mr. Bracy to perform all of the duties that Sage had unilaterally imposed on
him, including requiring him to be either working or on-call 24 hours per day, seven
days per week.

**55.**

Sage finally responded through counsel to the substance of Mr. Bracy's
inquiries on October 26, 2020.  On that date, rather than engage in the ADA
interactive process, Sage through its counsel responded that Mr. Bracy should stop
running to counsel simply because he was unhappy; that he (Sage's counsel) was not
going to "nit pick"; and that Mr. Bracy could always leave if he was unhappy.

**56.**

In response to Mr. Bracy's explicit request, through counsel, that Sage engage in the interactive process, on October 26, 2020 Sage's counsel refused to "referee" the matter despite having promised three weeks previously that he would, indeed, engage in the interactive process on behalf of Sage.

**57.**

In further response to Mr. Bracy's explicit request, through counsel, that Sage engage in the interactive process, on October 26, 2020 Sage's counsel instructed that Mr. Bracy should "tone down his rhetoric" and "stop threatening to call counsel every time he's disciplined". These instructions amounted to both a refusal by Sage to engage in the interactive process and threats that continued efforts by Mr. Bracy to insist that Sage engage in the interactive process required by both the ADA and the 2019 Settlement Agreement would result in further discipline of Mr. Bracy. Such threats amounted to threats that Sage would retaliate against Mr. Bracy if he continued to attempt to assert his federally protected rights.

**58.**

Following the threats from Sage's counsel, no one from Sage reached out

directly to Mr. Bracy to engage in the ADA interactive process that Mr. Bracy had specifically requested through his counsel.

**59.**

On November 5, 2020, just ten days after Sage's counsel had refused to discuss Mr. Bracy's accommodations and issued threats against Mr. Bracy, Sage prepared a performance improvement plan for Mr. Bracy, accusing him of "lounging" when he should be working, notwithstanding his having worked every weekday and every weekend for approximately ninety straight days and having been on-call during his "off hours" continuously for nearly ninety days. This PIP, while stating that it was effective immediately, was not delivered to Mr. Bracy until November 23, 2020, eighteen days after it went into effect.

**60.**

Without disclosing that the PIP had been drafted, Mr. Bracy's supervisor finally met with Mr. Bracy on November 12, 2020. This was the first meeting at which Sage addressed its unilateral departure from Mr. Bracy's agreed ADA accommodations, including the assignment of two other employees' duties to Mr. Bracy and the requirement that Mr. Bracy be either at work or on-call 24 hours a day, seven days per week.

**61.**

During the November 12, 2020 meeting, Mr. Bracy's supervisor finally acknowledged that Mr. Bracy was working more than forty hours per week and offered to allow him to take off time to compensate therefor.

**62.**

Because (unknown to Mr. Bracy) Sage had already drafted but not delivered the PIP dated November 5, 2020 that accused him of "lounging", Sage's November 12, 2020 offer to allow Mr. Bracy to take time off during the week to compensate for his weekend and evening work was not a good faith offer to compensate him but instead an effort to create evidence of "lounging" during the week as had been alleged in the PIP.

**63.**

The PIP that had been drafted on November 5, 2020 was delivered to Mr. Bracy on November 23, 2020.

**64.**

Soon after delivering the PIP dated November 5, 2020, Sage required Mr. Bracy to paint an interior room in an apartment.  This was a new duty, as Sage had previously assigned painting to other employees.  Sage unilaterally assigned painting

duties to Mr. Bracy without first engaging in the ADA interactive process with Mr.

Bracy.

**65.**

Although Sage provided a respirator mask for Mr. Bracy's use in connection

with his newly-assigned painting duties, he grew dizzy and nearly fainted when he

attempted to use the mask while painting.  He then refused to continue trying to paint

under those conditions, because he feared that doing so would endanger his health.

Without having engaged in the interactive process before assigning this new duty to

Mr. Bracy, Sage disciplined him for his refusal to continue to attempt to paint after

he nearly fainted.

**66.**

On December 23, 2020, Sage placed Mr. Bracy on paid administrative leave

for five days because Mr. Bracy was unable to safely perform the new painting duties

that Sage had unilaterally assigned to him without engaging in the ADA interactive

process.

**67.**

Mr. Bracy began the process of filing Charge Number 410-2021-01669 with

the EEOC in response to being placed on leave for refusing to continue to try to paint while using the respirator mask that had caused him to nearly faint.

**68.**

Following a five-day administrative leave that commenced on December 23, 2020, Sage suspended Mr. Bracy without pay until February 1, 2021.  Sage denied Mr. Bracy's request that he be allowed to apply his accrued paid time off to the dates of his suspension, resulting in him receiving no pay for several weeks.

**69.**

During his December 2020 and January 2021 suspension without pay, Sage required Mr. Bracy to obtain medical documentation from his treating physician to determine whether he could safely use a respirator to paint even though performing painting had not been a part of Mr. Bracy's duties prior to November 2020 and even though the painting duties had been assigned to Mr. Bracy unilaterally by Sage.

**70.**

During December 2020 and January 2021, Sage refused to allow Mr. Bracy to return to performing his regular duties as Maintenance Supervisor pending his delivery to Sage of medical documentation regarding respirator use.

**71.**

In late January 2021, Mr. Bracy's treating physician confirmed that he could *probably* use *a* respirator safely, without giving an opinion regarding Mr. Bracy's ability to use the specific respirator provided by Sage that had caused him to nearly faint.

**72.**

After receiving the statement referenced in the preceding Paragraph, Sage reinstated Mr. Bracy and unilaterally added painting to his job description for the first time without engaging in the ADA interactive process and despite Mr. Bracy having nearly fainted when trying to use the specific respirator provided by Sage to paint.

**73.**

Thereafter, Mr. Bracy continued to have difficulty using the respirator provided by Sage to paint.

**74.**

When assigning the painting duty to Mr. Bracy, Sage did not remove any of his existing responsibilities despite the fact that he was already being required by

Sage to provide all maintenance and all housekeeping services for Park Trace 24 hours per day and seven days per week.

**75.**

By issuing a PIP, unilaterally assigning new and unsafe duties, and depriving Mr. Bracy of pay for over a month, Sage forced Mr. Bracy to choose between continued loss of pay and likely termination, or acceptance of new and unsafe duties that he had not previously been responsible for performing.

**76.**

Mr. Bracy has never been paid for the weeks he was on unpaid suspension.

**77.**

Once he was reinstated in February 2021, Mr. Bracy resumed his duties as Maintenance Supervisor.  He continued to be either on-duty or on-call 24 hours per day, seven days per week.  He continued to be on duty during weekdays.  He continued to be on duty half days on Saturdays and half days on Sundays performing the terminated housekeeper's cleaning duties along with the new COVID-related cleaning duties.  He continued to be on-call all hours of every week whenever he was not on-duty.  He continued to be assigned all of the additional duties that Sage

had unilaterally assigned to him since June 2020, even though Sage had never engaged in the interactive process with him regarding any of those additional duties.

**78.**

Mr. Bracy was notified on April 13, 2021 that he was being placed on another PIP, in a document dated April 8, 2021.

**79.**

The April 2021 PIP included allegations of failure to perform duties that were not a part of Mr. Bracy's job description.  Mr. Bracy acknowledged receipt while disputing the allegations in the PIP.

**80.**

Mr. Bracy was terminated May 20, 2021, for "failure to follow directions."

**81.**

As of the date of his termination, Mr. Bracy was able to perform and was performing each of the duties that existed as of the date of his reinstatement by Sage on May 2, 2019.

**82.**

Sage did not engage in the ADA interactive process with Mr. Bracy with

respect to any change to his assigned duties at any time between May 2, 2019 and May 20, 2021.

### 83.

Sage's unilateral changes to Mr. Bracy's duties between May 2, 2019 and May 20, 2021 were not reasonably necessary.

### 84.

Sage's unilateral changes to Mr. Bracy's duties between May 2, 2019 and May 20, 2021 were imposed on him in an effort to force him to either quit or be terminated for failure to perform the additional unilaterally assigned duties.

### Mr. Bracy's Residence On-Site at Park Trace

### 85.

Mr. Bracy lived in an apartment on-site at Park Trace during all of the dates that he was employed by Sage.

### 86.

Allowing Mr. Bracy to live on-site at Park Trace did not limit the number of apartments available for rent, because his apartment was configured in a way that rendered it unrentable to a paying tenant.

**87.**

Mr. Bracy's residence on-site benefited Sage by permitting Sage to promote the presence of an on-site maintenance employee.

**88.**

One wall of Mr. Bracy's apartment at Park Trace contained an emergency communications station that buzzed in the apartment every time a resident pressed a buzzer to request maintenance assistance, without regard to the time of day or day of the week.

**89.**

Prior to June 2020, Sage had more than one employee to share on-call duties, and Mr. Bracy could ignore the emergency buzzers in his apartment during the evenings and weekends that he was not on-call.  Instead, he was permitted to assume that the person who was on-call would be separately monitoring emergencies using other communications equipment provided for that purpose by Sage.

**90.**

Once the other Sage maintenance employee and the housekeeper were terminated in June and July 2020, Sage required Mr. Bracy to monitor the emergency communications station in his apartment any time he was not working his normal

shift.  This meant that he was either on-duty or on-call 24 hours per day, seven days per week.

## 91.

The frequency and nature of tenant requests for maintenance assistance during Mr. Bracy's on-call hours varied over time.

## 92.

Emergencies to which Mr. Bracy had to respond when he was on-call included broken air conditioners, heater malfunctions, and plumbing leaks.  These emergencies tended to occur two or three times every week.

## 93.

While on-call, Mr. Bracy also had to let residents into the building or into their apartments if they were locked out.

## 94.

On at least one occasion while he was on-call, Mr. Bracy had to get out of bed and use a wet vac to clean up a water leak in the middle of the night.

## 95.

When he was on-call, Mr. Bracy could not simply wait until the following

workday to respond to broken air conditioners in the summer, malfunctioning heaters in the winter, gushing water, or apartment lockouts.  Instead, he had to wake up and tend to each of these emergencies immediately, regardless of the time of day or the day of the week, or risk disciplinary action by Sage.

**96.**

Mr. Bracy documented all of his on-call work in writing.

### Mr. Bracy's Eviction Following His Termination

**97.**

After terminating Mr. Bracy in February 2019, Sage gave Mr. Bracy notice to vacate the on-site apartment at Park Trace.

**98.**

After the 2019 Settlement Agreement was executed, Sage retracted its 2019 notice to vacate and allowed Mr. Bracy to remain in the apartment on-site at Park Trace.

**99.**

On May 26, 2021, six days after terminating Mr. Bracy the final time, Sage gave Mr. Bracy notice that he had two weeks to vacate the on-site apartment at Park

Trace.  This notice violated Georgia law requiring that landlords provide a minimum of sixty days' notice to vacate to a tenant at will.

**100.**

Fearing formal eviction by Sage if he did not immediately move out, with a resulting negative impact on his credit report that might limit his ability to qualify for other housing, Mr. Bracy promptly moved out of the apartment despite having no other place to live.  As a result, in 2021 Mr. Bracy was homeless for several weeks while he attempted to locate new housing.

**Sage's Failure to Maintain a Record of and**

**Pay for All Hours Mr. Bracy Worked**

**101.**

Mr. Bracy did not supervise two or more employees during the three years immediately preceding the filing of this action.

**102.**

Sage does not have an accurate and complete record of the hours worked by Mr. Bracy during the three years immediately preceding the filing of this action.

**103.**

Sage has not paid Mr. Bracy all regular and overtime wages earned by him during the three years immediately preceding the filing of this action.

## COUNT ONE

## ADA FAILURE TO ACCOMMODATE DISABILITY

**104.**

Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1-103 of this Complaint.

**105.**

Plaintiff has been disabled with MS at all times relevant.

**106.**

Plaintiff had agreed ADA accommodations in place with his prior employer at Park Trace when Sage assumed management of Park Trace.

**107.**

When Sage assumed management of Park Trace, Plaintiff notified Sage of his existing ADA accommodations and Sage confirmed that it would continue to honor those ADA accommodations without any changes.

**108.**

Plaintiff's agreed ADA accommodations were unchanged between the date Sage assumed management of Park Trace and Plaintiff's reinstatement as an employee of Sage effective May 2, 2019.

**109.**

From May 2, 2019 until Plaintiff's termination on May 20, 2021, Sage never engaged in the ADA interactive process regarding any potential changes to Plaintiff's terms and conditions of employment.

**110.**

Between May 2, 2019 and Plaintiff's termination on May 20, 2021, Sage made multiple unilateral changes to the terms and conditions of Plaintiff's employment.

**111.**

Sage failed to engage in the ADA interactive process when it unilaterally barred Plaintiff from turning off his personal cell phone even when he was not on duty and not on-call.  When Sage unilaterally imposed this new requirement on Plaintiff, Sage failed to demonstrate that the status quo ante was unreasonably burdensome to its business operations.

**112.**

Sage failed to engage in the ADA interactive process when it terminated the other full-time maintenance worker at Park Trace, did not replace that worker, and unilaterally assigned all of that worker's duties to Plaintiff.  This unilateral change to Plaintiff's duties required Plaintiff to perform the duties of two employees and necessitated that Plaintiff work more hours than had been promised by Sage in Plaintiff's agreed ADA accommodations.  When Sage unilaterally imposed these new duties on Plaintiff, Sage failed to demonstrate that the status quo ante was unreasonably burdensome to its business operations.

**113.**

Sage failed to engage in the ADA interactive process when it terminated the housekeeper at Park Trace, did not replace the housekeeper at Park Trace, and unilaterally assigned the Park Trace housekeeper's duties to Plaintiff even though those duties had not previously been assigned to Plaintiff and even though those duties were physically taxing.  When Sage unilaterally imposed these new duties on Plaintiff, Sage failed to demonstrate that the status quo ante was unreasonably burdensome to its business operations.

**114.**

Sage failed to engage in the ADA interactive process when it unilaterally assigned weekend COVID-19-related cleaning duties at Park Trace to Plaintiff even though those duties had not previously been assigned to Plaintiff and even though those duties required Plaintiff to work seven days each week in contravention of his agreed ADA accommodations limiting the number of extra hours he would be required to work each week.  When Sage unilaterally imposed these new duties on Plaintiff, Sage failed to demonstrate that the status quo ante was unreasonably burdensome to its business operations.

**115.**

Sage failed to engage in the ADA interactive process when, after engaging a temporary worker, it prioritized the temporary worker's activity restrictions over Plaintiff's agreed ADA accommodations and required the Plaintiff to perform additional duties that contravened Plaintiff's agreed ADA accommodations.  When Sage unilaterally prioritized the temporary worker's activity restrictions over Plaintiff's agreed ADA accommodations and abandoned some of Plaintiff's agreed ADA accommodations so as to prioritize the temporary worker's activity

restrictions, Sage failed to demonstrate that the status quo ante was unreasonably burdensome to its business operations.

**116.**

Sage failed to engage in the ADA interactive process when it unilaterally adopted the requirement that Mr. Bracy be either on-duty or on-call 24 hours per day, seven days per week, abandoning Plaintiff's agreed ADA accommodation of only requiring him to work a couple of hours of overtime per week in order to allow him to obtain adequate rest between work shifts.  When Sage unilaterally imposed the 24/7 on-duty or on-call obligation on Plaintiff, Sage failed to demonstrate that the status quo ante was unreasonably burdensome to its business operations.

**117.**

Sage failed to engage in the ADA interactive process when it unilaterally assigned painting duties to Plaintiff despite Plaintiff not having had such duties previously and despite Plaintiff's report that he could not paint using the respirator provided by Sage without fainting.  When Sage unilaterally assigned painting duties to Plaintiff, Sage failed to demonstrate that the status quo ante was unreasonably burdensome to its business operations.

**118.**

Sage failed to accommodate Plaintiff's disability when it punished Plaintiff for failing to perform unilaterally assigned additional duties.

**119.**

The punishments imposed by Sage when Mr. Bracy was unable to perform unilaterally assigned additional duties included but were not limited to issuing disciplinary write-ups to Plaintiff; placing Plaintiff on multiple performance improvement plans; labeling Plaintiff as lazy and accusing him of lounging; accusing Plaintiff of "nit picking" when he attempted to enforce his rights; and placing Plaintiff on unpaid leave with no authorization to use accrued paid time off to force him to agree to perform newly assigned duties that he could not safely perform.

**120.**

Sage violated its obligation to engage in the ADA interactive process when it unilaterally withdrew from Plaintiff the agreed accommodation of providing another employee to assist with two-person jobs such as lifting and moving air conditioner units; removing furniture and other heavy or bulky items from vacated apartments; and maneuvering the dempster dumpster into place.

**121.**

Sage violated its obligation to engage in the ADA interactive process when it punished Plaintiff for failing to perform by himself the two-person jobs described in the preceding Paragraph.

**122.**

When it unilaterally took the actions alleged in Paragraphs 120 and 121, Sage failed to demonstrate that continuing to assign a second person to assist Plaintiff with two-person jobs was unreasonably burdensome on Sage.

**123.**

When it unilaterally took the actions alleged in Paragraphs 120 and 121, Sage harmed Mr. Bracy by requiring him to perform without assistance physically taxing work that required two people to perform the work.

**124.**

When it unilaterally withdrew the agreed accommodation of permitting Mr. Bracy five-minute rest breaks every thirty minutes and instead began to label him as "lazy" and to accuse him of "lounging" if he took the agreed breaks, Sage violated its obligation to engage in the ADA interactive process.

**125.**

When it unilaterally took the actions alleged in the preceding Paragraph, Sage failed to demonstrate that continuing to permit Mr. Bracy to take five-minute rest breaks every thirty minutes was unreasonably burdensome on Sage.

**126.**

When it unilaterally took the actions alleged in Paragraph 124, Sage harmed Mr. Bracy and placed him at risk of workplace injury by requiring him to perform physically taxing work without adequate rest.

**127.**

Sage harmed Plaintiff by failing to engage in the ADA interactive process before unilaterally assigning new duties to him.

**128.**

Sage harmed Plaintiff by failing to honor agreed ADA accommodations.

**129.**

Sage harmed Plaintiff by punishing Plaintiff for his physical inability and failure to perform unilaterally assigned new duties.

**130.**

Sage harmed Plaintiff by requiring Plaintiff to work more than forty hours per week and failing to compensate Plaintiff for all hours worked.

**131.**

Plaintiff is entitled to an award of compensatory damages arising from Sage's failure to engage in the ADA interactive process; Sage's failure to accommodate Plaintiff's disability; Sage's punishment of Plaintiff for his inability and failure to perform unilaterally assigned new duties; and Sage's failure to pay Plaintiff for all hours worked.  The amount of Plaintiff's damages will be established at trial.

**132.**

Sage's conduct alleged in this Count One was willful or with conscious indifference to the consequences and was undertaken with a specific intent to cause harm to Plaintiff.  Sage's actions support an award of punitive damages in an amount to be determined by the enlightened conscience of an impartial jury.

**133.**

Plaintiff is entitled to an award of attorney's fees and litigation expenses upon resolution of this Count One in his favor.

**WHEREFORE**, Plaintiff Michael Bracy prays for Judgment against Sage under Count One as follows:

a.  Compensatory damages pursuant to the ADA in an amount to be determined at trial;

b.  Punitive damages pursuant to the ADA;

c.  Attorney's fees and litigation expenses pursuant to the ADA;  and

d.  Such other and further relief as the Court deems appropriate.

## COUNT TWO

## ADA RETALIATION

### 134.

Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1-103 of this Complaint.

### 135.

Plaintiff has asserted his federally-protected rights against Sage under the ADA in an EEOC filing dated March 12, 2019 that resulted in a settlement and reinstatement of Plaintiff by Sage effective May 2, 2019.

### 136.

Plaintiff has asserted his federally-protected rights against Sage under the

ADA in written communications by Plaintiff's counsel to Sage's counsel seeking Sage's compliance with its continuing obligation to engage in the ADA interactive process in October 2020.

### 137.

Plaintiff has asserted his federally-protected rights against Sage under the ADA in telephonic communications between Plaintiff's counsel and Sage's counsel seeking Sage's compliance with its continuing obligation to engage in the ADA interactive process in October 2020.

### 138.

Plaintiff has asserted his federally-protected rights against Sage under the ADA in an EEOC filing dated December 26, 2020 after Plaintiff was placed on unpaid administrative leave for his physical inability to perform the new duty of painting that had been unilaterally-imposed by Sage.

### 139.

Plaintiff has asserted his federally-protected rights against Sage under the ADA in multiple and continuing efforts by Plaintiff to procure Sage's compliance with its obligations to engage in the ADA interactive process through and including the date of his termination on May 20, 2021.

**140.**

Each of the activities alleged in Paragraphs 135-139 constituted an exercise by Plaintiff of his federally protected rights under the ADA.

**141.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage refused to engage in the ADA interactive process during the final two years of Plaintiff's employment with Sage.

**142.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage punished Plaintiff for his failure or physical inability to perform duties assigned to him unilaterally by Sage without Sage having first engaged in the ADA interactive process.

**143.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage placed Plaintiff on unpaid administrative leave for his physical inability to safely perform the unilaterally-assigned new duty of painting using the respirator provided by Sage.

**144.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage refused to permit Plaintiff to use accrued paid time off when he was placed on unpaid administrative leave for his physical inability to safely perform the unilaterally-assigned new duty of painting using the respirator provided by Sage.

**145.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage refused to reinstate Plaintiff after placing him on administrative leave in December 2020, in an effort to force Plaintiff to agree to perform unilaterally-assigned painting duties that were unsafe for him.

**146.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage withdrew agreed ADA accommodations without engaging in the interactive process and without demonstrating that the agreed ADA accommodations were unreasonably burdensome to Sage.

**147.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage labeled Plaintiff as lazy if he was unable to perform his assigned duties in the absence of the agreed ADA accommodations.

**148.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage labeled Plaintiff as lazy when he insisted on availing himself of the agreed ADA accommodations.

**149.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage has accused Plaintiff of "lounging" notwithstanding the agreed ADA accommodation of five-minute rest breaks every thirty minutes.

**150.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage has accused Plaintiff of "lounging" if he was unable to perform his assigned duties in the absence of the agreed ADA accommodations.

**151.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage has accused Plaintiff of "lounging" when he insisted on availing himself of the agreed ADA accommodations.

**152.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage has labeled Plaintiff as "nit picking" when he insisted on availing himself of the agreed ADA accommodations.

**153.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage has subjected Plaintiff to disciplinary write-ups and placed Plaintiff on performance improvement plans when he was unable to perform his assigned duties in the absence of the agreed ADA accommodations.

**154.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage terminated Plaintiff for pretextual reasons.

**155.**

In response to Plaintiff's exercises of his federally protected rights under the ADA, Sage ordered Plaintiff to vacate his apartment at Park Trace with just two weeks' notice, in violation of Georgia law.

**156.**

The actions alleged in Paragraphs 141-155 each constituted adverse actions against Plaintiff.

**157.**

The adverse actions alleged in Paragraphs 141-155 were each undertaken by Sage in response to Plaintiff's assertions of his federally protected rights as alleged in Paragraphs 135-139.

**158.**

A causal connection exists between the actions alleged in Paragraphs 135-139 and the actions alleged in Paragraphs 141-155, such that the adverse actions by Sage alleged in Paragraphs 141-155 were undertaken in retaliation for the actions alleged at Paragraphs 135-139.

**159.**

Plaintiff has incurred financial losses as a result of Sage's retaliation.

**160.**

Plaintiff is entitled to injunctive relief barring Sage from future retaliation.

**161.**

Plaintiff is entitled to an award of compensatory damages associated with Sage's retaliation, in an amount to be proven at trial.

**162.**

Sage's conduct alleged in this Count Two was willful or with conscious indifference to the consequences and was undertaken with a specific intent to cause harm to Plaintiff.  Sage's actions support an award of punitive damages in an amount to be determined by the enlightened conscience of an impartial jury.

**163.**

Plaintiff is entitled to an award of attorney's fees and litigation expenses associated with this Count Two.

**WHEREFORE**, Plaintiff Michael Bracy prays for Judgment against Sage under Count Two as follows:

a.  Injunctive relief under the ADA barring future retaliation by Sage;

b.  Compensatory damages under the ADA in an amount to be determined at trial;

c.  Punitive damages under the ADA;

d.  Attorney's fees and litigation expenses under the ADA; and

e.  Such other and further relief as the Court deems appropriate.

## COUNT THREE

## RACIAL HARASSMENT

### 164.

Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1-103 of this Complaint.

### 165.

At the same time as Sage was refusing to honor Plaintiff's agreed ADA accommodations and failing to engage in the ADA interactive process when unilaterally changing the terms and conditions of Plaintiff's employment, Sage responded to Plaintiff's efforts to enforce his agreed ADA accommodations by labeling Plaintiff, an African American male, with racial stereotypes, including accusing him of "lounging", being "lazy", and "nit picking".

**166.**

Sage's use of the racially-charged labels alleged at Paragraph 165 represented an effort by Sage to paint Plaintiff as the source of his own performance failures despite Sage's failure to honor Plaintiff's agreed ADA accommodations.

**167.**

Sage's use of the racially-charged labels alleged at Paragraph 165 represented an effort by Sage to intimidate Plaintiff from exercising his federally-protected rights to ADA accommodations.

**168.**

Sage's use of racial stereotypes to describe Plaintiff constituted racial harassment in violation of Title VII for which Plaintiff is entitled to an award of compensatory damages.

**169.**

Sage's conduct alleged in this Count Three was willful or with conscious indifference to the consequences and was undertaken with a specific intent to cause harm to Plaintiff. Sage's actions support an award of punitive damages in an amount to be determined by the enlightened conscience of an impartial jury.

**170.**

Plaintiff is entitled to an award of attorney's fees and litigation expenses associated with this Count Three.

**WHEREFORE**, Plaintiff Michael Bracy prays for Judgment against Sage under Count Three as follows:

a.  Compensatory damages under Title VII in an amount to be determined at trial;

b.  Punitive damages under Title VII;

c.  Attorney's fees and litigation expenses under Title VII; and

d.  Such other and further relief as the Court deems appropriate.

## COUNT FOUR

## FAIR LABOR STANDARDS ACT

**171.**

Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1-103, 111-116, and 130 of this Complaint.

**172.**

Plaintiff was a non-exempt employee of Sage whose wages were subject to the FLSA at all times relevant.

**173.**

Sage failed to maintain an accurate and complete record of all hours worked by Plaintiff as required by 29 USC §211(c).

**174.**

Sage failed to pay Plaintiff for all hours worked, including but not limited to paying Plaintiff for all earned overtime wages, as required by 29 USC §216(b).

**175.**

Pursuant to 29 USC §216(b), Plaintiff is entitled to an award of damages against Sage equal to the sum of all earned wages, including earned overtime wages, for which Sage has not paid Plaintiff.

**176.**

Pursuant to 29 USC §216(b), Plaintiff is entitled to liquidated damages against Sage equal to the amount of all wages awarded to Plaintiff.

**177.**

Pursuant to 29 USC §216(b), Plaintiff is entitled to an award of attorney's fees and litigation expenses associated with this Count Four.

**WHEREFORE**, Plaintiff Michael Bracy prays for Judgment against Sage under Count Four as follows:

a. An award under the FLSA equal to all earned and unpaid wages, including earned and unpaid overtime wages, in an amount to be determined at trial;

b. Liquidated damages under the FLSA in an amount equal to the award of all earned and unpaid wages;

c. Attorney's fees and litigation expenses under the FLSA; and

d. Such other and further relief as the Court deems appropriate.

## COUNT FIVE

## STATE LAW BREACH OF CONTRACT

## (BREACH OF CONTRACTUAL OBLIGATION TO ENGAGE IN INTERACTIVE PROCESS)

### 178.

Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1-133 of this Complaint.

### 179.

Pursuant to Paragraph 1.b. of the parties' 2019 Settlement Agreement, Sage undertook a contractual obligation to engage with Mr. Bracy in the ADA interactive

process in good faith.

**180.**

Sage breached the 2019 Settlement Agreement by failing to engage in the ADA interactive process when it unilaterally barred Plaintiff from turning off his personal cell phone even when he was not on duty and not on-call.

**181.**

Sage breached the 2019 Settlement Agreement by failing to engage in the ADA interactive process when it terminated the other full-time maintenance worker at Park Trace, did not replace that worker, and unilaterally assigned all of that worker's duties to Plaintiff.

**182.**

Sage breached the 2019 Settlement Agreement by failing to engage in the ADA interactive process when it terminated the housekeeper at Park Trace, did not replace the housekeeper, and unilaterally assigned the housekeeper's duties to Plaintiff even though those duties had not previously been assigned to Plaintiff and even though those duties were physically taxing.

**183.**

Sage breached the 2019 Settlement Agreement by failing to engage in the

ADA interactive process when it unilaterally assigned weekend COVID-19-related cleaning duties at Park Trace to Plaintiff even though those duties had not previously been assigned to Plaintiff and even though those duties required Plaintiff to work seven days each week in contravention of his agreed ADA accommodations limiting the number of extra hours he would be required to work each week.

**184.**

Sage breached the 2019 Settlement Agreement by failing to engage in the ADA interactive process when, after engaging a temporary worker at Park Trace, Sage prioritized the temporary worker's activity restrictions over Plaintiff's agreed ADA accommodations and required the Plaintiff to perform additional duties that contravened Plaintiff's agreed ADA accommodations.

**185.**

Sage breached the 2019 Settlement Agreement by failing to engage in the ADA interactive process when it unilaterally imposed a 24/7 on-duty or on-call obligation on Plaintiff, abandoning Plaintiff's agreed ADA accommodation of only requiring him to work a couple of hours of overtime per week in order to allow him to obtain adequate rest between work shifts.

**186.**

Sage breached the 2019 Settlement Agreement by failing to engage in the ADA interactive process when it unilaterally assigned painting duties to Plaintiff despite Plaintiff not having had such duties previously.

**187.**

Sage breached the 2019 Settlement Agreement by failing to engage in the ADA interactive process when it punished Plaintiff for failing to perform unilaterally assigned additional duties.

**188.**

Sage breached the 2019 Settlement Agreement by failing to engage in the ADA interactive process when it unilaterally withdrew the agreed accommodation of providing another employee to assist Plaintiff with two-person jobs such as lifting and moving air conditioner units; removing furniture and other heavy or bulky items from vacated apartments; and maneuvering the dempster dumpster into place.

**189.**

Sage breached the 2019 Settlement Agreement by failing to engage in the ADA interactive process when it punished Plaintiff for failing to perform two-person jobs by himself, such as lifting and moving air conditioner units; removing furniture

and other heavy or bulky items from vacated apartments; and maneuvering the dempster dumpster into place.

**190.**

Sage breached the 2019 Settlement Agreement by failing to engage in the ADA interactive process when it unilaterally withdrew the agreed accommodation of permitting Mr. Bracy five-minute rest breaks every thirty minutes and instead began to label him as "lazy" and accuse him of "lounging" if he took the agreed breaks.

**191.**

Sage breached the 2019 Settlement Agreement by failing to engage in the ADA interactive process when it assigned new duties to Plaintiff.

**192.**

Sage breached the 2019 Settlement Agreement by failing to honor Plaintiff's agreed ADA accommodations.

**193.**

Sage breached the 2019 Settlement Agreement by punishing Plaintiff for his physical inability and failure to perform unilaterally assigned new duties.

**194.**

Sage breached the 2019 Settlement Agreement by requiring Plaintiff to work more than forty hours per week and failing to compensate Plaintiff for all hours worked.

**195.**

Plaintiff Bracy suffered damages as a result of Sage's breach of the 2019 Settlement Agreement.

**196.**

Plaintiff is entitled to an award of compensatory damages arising from Sage's breaches of the 2019 Settlement Agreement.  The amount of Plaintiff's damages will be established at trial.

**197.**

Sage's conduct constitutes bad faith and stubborn litigiousness, and has caused Plaintiff unnecessary trouble and expense.  Plaintiff has incurred expenses in connection with his efforts to enforce his rights, and accordingly, he is entitled to recover from Sage all costs of litigation associated with this Count Five of the Complaint, including reasonable attorney's fees, pursuant to O.C.G.A. §13-6-11.

**WHEREFORE**, Plaintiff Michael Bracy prays for Judgment against Sage under Count Five as follows:

    a.  Compensatory damages for breach of the 2019 Settlement Agreement in an amount to be determined at trial;

    b.  Attorney's fees and litigation expenses as to this Count pursuant to O.C.G.A. §13-6-11; and

    c.  Such other and further relief as the Court deems appropriate.

**PLAINTIFF MICHAEL BRACY PRAYS FOR TRIAL BY A TWELVE-PERSON JURY.**

Respectfully submitted,

**THE MYER LAW FIRM**
Attorney for Plaintiff Michael Bracy
*/s/ Mari L. Myer*
MARI L. MYER
Georgia Bar No. 533020

125 East Trinity Place, Suite 308
Decatur, Georgia  30030
404-601-4125
mmyer@myerlawatlanta.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| MICHAEL BRACY, | § | |
| | § | |
| Plaintiff, | § | CASE NUMBER |
| | § | |
| v. | § | |
| | § | |
| SAGE APARTMENT | § | |
| COMMUNITIES, INC., | § | |
| | § | |
| Defendant. | § | |
| | § | |

**VERIFICATION UNDER PENALTY OF PERJURY**

Pursuant to 28 USC §1746, Michael Bracy declares under penalty of perjury that the facts contained in the within and foregoing "**VERIFIED COMPLAINT FOR FAILURE TO ACCOMMODATE DISABILITY AND DISABILITY RETALIATION, RACIAL HARASSMENT, FAILURE TO MAINTAIN ACCURATE RECORD OF HOURS WORKED, FAILURE TO PAY EARNED WAGES, AND STATE LAW BREACH OF CONTRACT**" are true and correct to the best of his knowledge and belief.

_____
MICHAEL BRACY

Executed on _May 10_, 2023.