# EXHIBIT B

## INCHINS BAMBOO GARDEN FRANCHISING LLC

### FRANCHISE AGREEMENT

### WITH

SUNIL KONDA, RAVI RAMISETTI, VALAPRASAD CHALLA & PRASAD GVSRK

AUSTIN, TX

**DATE:** March 6ᵗ , 2012

Franchisee: *Sunil Konda, Ravi Ramisetti, Valaprasad Challa & Prasad GVSRK*

ADDRESS: *3107 South I35, Suite 760*
*Round Rock, TX 78664-9345*

EFFECTIVE
DATE: *March 6th, 2012*

**THIS AGREEMENT** (the "**Agreement**") is between INCHINS BAMBOO GARDEN FRANCHISING LLC, a Georgia limited liability company, located at 11105 State Bridge Road, Suite 200, Alpharetta, Georgia 30022 ("**Franchisor**") and the franchisee listed above ("**Franchisee**") who agree as follows:

## 1.   PURPOSE

1.1   **Mark and Licensed Methods.** Franchisor has developed methods for establishing, operating, and promoting restaurants offering Indian-Chinese cuisine, beverages, and related restaurant and carry out services under the service mark  INCHIN'S BAMBOO GARDEN™ per se and in combination with the logo as set forth on Exhibit 1 attached hereto (the "**Mark**") and Franchisor's proprietary and confidential techniques, expertise, and knowledge in establishing, operating, and promoting restaurants and related methods of doing business as the same may be modified by Franchisor at any time and from time to time (the "**Licensed Methods**").

1.2   **Establishment of Restaurants.** Franchisor grants to others the right to establish and operate restaurants under the Mark and using the Licensed Methods.

1.3   **Franchisee Restaurant.** Franchisee recognizes and acknowledges the benefits to be derived from being identified and associated with Franchisor, and being able to utilize the Mark and the Licensed Methods in the operation of a restaurant and therefore desires to establish a restaurant operating under the Mark and the Licensed Methods at a location selected by Franchisee in the exercise of its own business judgment. Franchisor is willing to grant Franchisee the right to operate a Restaurant under the terms and conditions contained in this Agreement.

## 2.   GRANT OF FRANCHISE

2.1   **Grant of Franchise.** Franchisor grants to Franchisee, and Franchisee accepts from Franchisor, the right to use the Mark and Licensed Methods in connection with establishing and operating a restaurant at the location described in Section 3 (the "**Restaurant**"). Franchisee agrees to use the Mark and Licensed Methods, as they are changed, improved, and further developed by Franchisor from time to time, only in accordance with the terms and conditions of this Agreement.

**INCHINS BAMBOO GARDEN FRANCHISING LLC**
**FRANCHISE AGREEMENT**

**TABLE OF CONTENTS**

Page

1. PURPOSE ................................................................................................ 1
   1.1   Mark and Licensed Methods ........................................................... 1
   1.2   Establishment of Restaurants .......................................................... 1
   1.3   Franchisee Restaurant .................................................................... 1

2. GRANT OF FRANCHISE ..................................................................... 1
   2.1   Grant of Franchise ......................................................................... 1
   2.2   Scope of Franchise Operations ....................................................... 2

3. FRANCHISED LOCATION AND TARGET AREA ............................. 2
   3.1   Franchised Location; Franchised Area ............................................ 2
   3.2   Limitation on Franchise Rights ...................................................... 2
   3.3   Special Products ............................................................................ 2
   3.4   Franchisee's Right of First Refusal ................................................ 2
   3.5   Franchisor's Reservation of Rights ................................................ 4

4. INITIAL FEES ....................................................................................... 5
   4.1   Initial Franchise Fee ...................................................................... 5
   4.2   Senior Executive Processing Fee ................................................... 5
   4.3   Operating Assets Fee ..................................................................... 5
   4.4   Décor Signature Mural Fee ............................................................ 6
   4.5   Interior Décor Package Fee ............................................................ 6
   4.6   Private Label Food Products Fee .................................................... 7

5. PERIODIC PAYMENTS ........................................................................ 7
   5.1   Royalty .......................................................................................... 7
   5.2   Gross Sales .................................................................................... 7
   5.3   Senior Executive Compensation .................................................... 7
   5.4   Payment Method ............................................................................ 8
   5.5   Travel and Living Expense Reimbursement .................................... 8
   5.6   Failure to Report Gross Sales ........................................................ 9
   5.7   Application of Payments ................................................................ 9
   5.8   Interest on Overdue Payments ....................................................... 9
   5.9   Administrative Charges .................................................................. 9

6. DEVELOPMENT OF FRANCHISED LOCATION ............................. 9
   6.1   Approval of Franchised Location ................................................... 10
   6.2   Lease Review ................................................................................. 10
   6.3   Schedule ........................................................................................ 10
   6.4   Mandatory Site Visits .................................................................... 10
   6.5   Requested Site Visits ..................................................................... 10
   6.6   Conversion and Design .................................................................. 10
   6.7   Interior Décor ................................................................................ 11
   6.8   Signs ............................................................................................. 11
   6.9   Equipment ..................................................................................... 11
   6.10  Permits and Licenses ..................................................................... 12
   6.11  Commencement of Operations ...................................................... 12
   6.12  Continuous Operation .................................................................... 12
   6.13  Insurance ....................................................................................... 12
   6.14  Music Service ................................................................................ 13

7.  TRAINING ........................................................................................................ 13
    7.1  Initial Training Program ...................................................................... 13
    7.2  Additional Training Programs ............................................................ 14

8.  OPERATIONS MANUAL ................................................................................ 14
    8.1  Operations Manual ............................................................................... 14
    8.2  Changes to Operations Manual ........................................................... 14

9.  DEVELOPMENT ASSISTANCE .................................................................... 15
    9.1  Franchisor's Development Assistance .................................................. 15

10. OPERATING ASSISTANCE ........................................................................... 16
    10.1  Franchisor's Assistance ...................................................................... 16
    10.2  Senior Executive (Food Production) ................................................... 16
    10.3  Kitchen Staff Requirement ................................................................. 17

11. FRANCHISEE'S OPERATIONAL COVENANTS .......................................... 17
    11.1  Business Operations ........................................................................... 17
    11.2  Maximum Borrowing Limitation ....................................................... 21

12. ADVERTISING ............................................................................................... 21
    12.1  Approval and Use of Advertising ....................................................... 21
    12.2  Grand Opening .................................................................................... 22
    12.3  Marketing and Promotion Fee ............................................................ 22
    12.4  Local Advertising ............................................................................... 24
    12.5  Regional Advertising Programs .......................................................... 24

13. QUALITY CONTROL ..................................................................................... 25
    13.1  Standards and Specifications .............................................................. 25
    13.2  Inspections ......................................................................................... 25
    13.3  Restrictions on Services and Products ............................................... 25
    13.4  Approved Suppliers ............................................................................ 25
    13.5  Requests for Change of Supplier ....................................................... 25

14. MARK, TRADE NAMES AND PROPRIETARY INTERESTS ....................... 26
    14.1  Mark .................................................................................................... 26
    14.2  Confidential Information and Trade Secrets ...................................... 27
    14.3  Trademark Infringement ..................................................................... 28
    14.4  Franchisee's Business Name ............................................................... 29
    14.5  Change of Mark .................................................................................. 29
    14.6  Litigation ............................................................................................ 29

15. REPORTS, RECORDS AND FINANCIAL STATEMENTS ........................... 30
    15.1  Franchisee Reports ............................................................................. 30
    15.2  Financial Records Use and Access ..................................................... 31
    15.3  Books and Records ............................................................................. 31
    15.4  Audit of Books and Records ............................................................... 31

16. TRANSFER ...................................................................................................... 31
    16.1  Transfer by Franchisee ....................................................................... 31
    16.2  Pre-Conditions to Franchisee's Transfer ........................................... 32
    16.3  Franchisor's Approval of Transfer ..................................................... 33
    16.4  Right of First Refusal ......................................................................... 33
    16.5  Transfer by Franchisor ....................................................................... 34
    16.6  Franchisee's Death or Disability ........................................................ 34

17. TERM AND RENEWAL ........................................................................................ 34
    17.1   Term ........................................................................................................ 34
    17.2   Renewal .................................................................................................. 34
    17.3   Exercise of Renewal .............................................................................. 35

18. DEFAULT AND TERMINATION ........................................................................ 35
    18.1   Termination by Franchisee ..................................................................... 35
    18.2   Termination by Franchisor - Effective Upon Notice .............................. 35
    18.3   Termination by Franchisor - Thirty Days Notice ................................... 37
    18.4   Failure to Comply with Reporting Requirements ................................... 37
    18.5   Right to Purchase ................................................................................... 38
    18.6   Obligations to Franchisee Upon Termination or Expiration .................. 39
    18.7   State and Federal Law ............................................................................ 40
    18.8   Assumption of Management ................................................................... 40

19. BUSINESS RELATIONSHIP ............................................................................... 41
    19.1   Independent Businesspersons ................................................................. 41
    19.2   Payment of Third Party Obligations ...................................................... 41
    19.3   Indemnification ...................................................................................... 41

20. RESTRICTIVE COVENANTS ............................................................................. 41
    20.1   Non-Competition During Term .............................................................. 41
    20.2   Branded Business ................................................................................... 42
    20.3   Post-Termination Covenant Not to Compete ......................................... 42
    20.4   Termination by Franchisor and Liquidated Damages ............................ 43
    20.5   Confidentiality of Proprietary Information ............................................ 44
    20.6   Confidentiality Agreement ..................................................................... 44

21. DISPUTES ........................................................................................................... 44
    21.1   Governing Law/Consent to Venue and Jurisdiction .............................. 44
    21.2   Waiver of Jury Trial ............................................................................... 45
    21.3   Remedies ................................................................................................ 45
    21.4   Limitation of Claims .............................................................................. 45
    21.5   Dispute Resolution Process .................................................................... 46

22. SECURITY INTEREST ....................................................................................... 48
    22.1   Collateral ................................................................................................ 48
    22.2   Obligations Secured ............................................................................... 48
    22.3   Additional Documents ........................................................................... 48
    22.4   Possession of Collateral ......................................................................... 48
    22.5   Remedies of Franchisor in Event of Default .......................................... 48
    22.6   Special Filing as Financing Statement ................................................... 49

23. MISCELLANEOUS PROVISIONS ..................................................................... 49
    23.1   Modification ........................................................................................... 49
    23.2   Entire Agreement ................................................................................... 49
    23.3   Delegation by Franchisor ....................................................................... 50
    23.4   Agreement Effective .............................................................................. 50
    23.5   Review of Agreement ............................................................................. 50
    23.6   Attorneys' Fees ...................................................................................... 50
    23.7   Injunctive Relief .................................................................................... 50
    23.8   No Waiver .............................................................................................. 50
    23.9   No Right to Set-Off ................................................................................ 51
    23.10  Invalidity ................................................................................................ 51
    23.11  Notices ................................................................................................... 51
    23.12  No Agency Relationship ........................................................................ 51

23.13    Usage ......................................................................................................................... 51
23.14    Counterparts ............................................................................................................. 51
23.15    Acknowledgment ..................................................................................................... 51

| EXHIBITS | | INITIAL SECTION REFERENCE |
|---|---|---|
| 1 | Mark | 1.1 |
| 2 | Addendum — Franchised Location and Initial Fees | 3.1 |
| 3 | Consumables –as listed on Exhibit 3-A, 3-B, 3-C | 4.3 |
| 4 | Authorization Agreement for Prearranged Payments | 5.4 |
| 5 | Insurance Requirements | 6.10 |
| 6 | Addendum — Bookkeeping Services Agreement and Direct Debit Authorization | 15.1 |
| 7 | Statement of Ownership | 16.1 |
| 8 | Termination Agreement and Mutual Release of Claims | 16.2 and 17.2(d) |
| 9 | Guaranty and Assumption of Franchisee's Obligations | 20.1 |
| 10 | Franchisor Trade Dress | 18.6(b) |

**EXHIBIT 2**
**TO FRANCHISE AGREEMENT**

**FRANCHISED LOCATION AND INITIAL FEES**

1.     **Target Area.**   The Target Area, referred to in Section 3.1 of the Franchise Agreement, shall be:

3107 South I35, Ste 760
RoundRock, TX 78664-9345

The Franchised Location shall be deemed accepted by Franchisor upon acceptance by Franchisor of the site and lease pursuant to Section 6 of the Agreement.

Franchisee acknowledges that: (a) Franchisor's acceptance does not constitute a guarantee, recommendation, or endorsement of the Franchised Location or the Target Area and that the success of the Restaurant to be operated at the Franchised Location is dependent upon Franchisee's abilities as an independent businessperson; and (b) when the Franchised Location is accepted by Franchisor, Franchisor has complied with its obligations under the Agreement to assist Franchisee by providing criteria for the Franchised Location and determining fulfillment of the requisite criteria for the Franchised Location, such determination based on information provided by Franchisee.

2.     **Initial Franchise Fee.**   Franchisee shall pay to Franchisor an Initial Franchise Fee of $25,000 as referenced in Section 4.1 of the Franchise Agreement,.

3.     **Initial Senior Executive (Food Production) Processing Fees.**   Franchisee shall pay to Franchisor the Senior Executive (Food Production) Processing Fee $10,000 as referenced in Section 4.2 of the Franchise Agreement.

4.     **Senior Executive Compensation Reimbursement and Chef Guaranty Fee.**   Franchisee shall pay to Franchisor an annual amount equal to the sum of: (a) of $54,000 (all applicable employee withholding and employment taxes) and (b) a cost of living differential based upon the cost of living in the Metropolitan Statistical Area (as defined by the U.S. Office of Management and Budget) in which the Franchised Location is located compared to the median cost of living in all U.S. Metropolitan Statistical Areas (the "**SE Annual Compensation**"), payable in twelve equal monthly installments on the first day of each calendar month, as the Senior Executive Compensation, referenced in Section 4.2 of the Franchise Agreement. The amount described in Section 4(a) above is subject to an annual increase of up to 5% per year. An additional one week of compensation is payable to Franchisor for the services of a substitute Senior Executive (Food Production) who shall serve during the one week annual vacation to which the regular Senior Executive (Food Production) is entitled.

In the event that, after the Franchised Location has been open and operating for at least sixty (60) days, the Senior Executive (Food Production) is required to work seven days in any week, Franchisee shall pay to Franchisor an amount equal to the quotient of the SE Annual

described on Exhibit 2 (the "**Target Area**").  Franchisee shall select and acquire a location for the Restaurant within the Target Area.  Franchisee shall select and propose to Franchisor for acceptance a specific site for the Franchised Location in the Target Area, which Franchisor shall have the right to accept or reject in accordance with the terms set forth in this Agreement.  Franchisee acknowledges and agrees that the Franchised Location will be a specific numbered street or mall address at which the Restaurant will be physically located.  Franchisee shall also be entitled to an exclusive area encompassed by a radius of twenty (20) miles measured from the front door of the Restaurant (the "**Franchised Area**") in which Franchisor will not itself use, or grant another franchise for the use of, the Mark and the Licensed Methods.  The Franchised Location cannot and will not under any circumstances be defined as a geographic area or be described in terms other than the specific numbered street or mall address proposed by Franchisee and accepted by Franchisor.  During the term of this Agreement, the Franchised Location shall be used exclusively to operate the Restaurant.

3.2     **Limitation on Franchise Rights**.  The rights granted to Franchisee are for the specific Franchised Location and cannot be transferred to any other location, except with Franchisor's prior written approval.  The Mark and Licensed Methods are licensed only for the Franchised Location.

3.3     **Special Products**.  From time to time, Franchisor may offer supplemental programs to be incorporated in certain Restaurants ("**Special Products**").  Franchisee may not offer a Special Product except with Franchisor's prior written permission.

3.4     **Franchisee's Right of First Refusal**.  In the event Franchisor desires to open and operate a Restaurant under the Mark in the area encompassed by a radius of twenty (20) miles around the Franchised Area (the "**Right of First Refusal Area**"), or in the event Franchisor desires to grant a license of the Mark to third parties in the Right of First Refusal Area, Franchisor and Franchisee shall proceed as follows:

(a)     Franchisor shall give written notice to Franchisee of its intention to open and operate a Restaurant in the Right of First Refusal Area or to grant a license for the use of the Mark by a third party in the Right of First Refusal Area.  Such written notice shall specify (i) the exact location where the Restaurant is to be opened, or the exact geographic area to be licensed, (ii) if determined, the terms upon which Franchisor proposes to open and operate such Restaurant or the terms upon which Franchisor is prepared to offer a license for use of the Mark to such third party, and (iii) the lease terms which Franchisor or the third party has obtained for such location, if any or a statement that Franchisor intends to commence negotiations with the landlord with respect to such lease terms;

(b)     Upon receipt of the written notice from Franchisor, Franchisee shall determine whether it desires to open a Restaurant at the location specified in Franchisor's written notice. Franchisee shall have thirty (30) days from the date it receives Franchisor's written notice affirmatively to notify Franchisor in writing of its intention to open a Restaurant at the location specified;

(c)     If Franchisor does not receive notification from Franchisee in accordance with this Section 3.4, Franchisor or any of its affiliates may then open a Restaurant under the Mark or Franchisor may license the use of the Mark to a third party at the location without compensation or consideration of any kind to Franchisee. However, in the event Franchisor or such third party does not have a fully executed lease for the location specified within one hundred twenty (120) days from the date of Franchisor's written notice provided under this Section 3.4, then the provisions of this Section 3.4 shall again become effective with respect to the location specified in such written notice; provided, however, that as long as good faith negotiations for a lease for such location are being diligently pursued, such time period shall be extended until a lease is executed or such good faith negotiations cease to continue;

(d)     In the event Franchisee notifies Franchisor under this Section 3.4 of its intention to open a Restaurant at the location specified and Franchisor intends to commence negotiations with the landlord with respect to a final lease for such location, Franchisor and Franchisee shall each participate in such negotiations; provided, however, as between Franchisor and Franchisee, Franchisor shall have the exclusive right to control such negotiations and to make all decisions as to the acceptance or rejection of lease terms.  In the event that Franchisee is unwilling to accept any lease terms offered by the landlord which are acceptable to Franchisor, Franchisee shall have the right to so notify Franchisor and, upon the giving of such notice, Franchisee shall be deemed to have

2

withdrawn completely without liability of any kind and no longer have any rights with respect to such location. Franchisor may then open a Restaurant under the Mark or Franchisor may license the Mark to a third party at such location without compensation or consideration of any kind to Franchisee. In the event Franchisor is unwilling to accept any lease terms offered by the landlord, and Franchisee is willing to accept such lease terms, notwithstanding Franchisor's recommendation not to accept such lease terms, Franchisee shall have the right to continue to negotiate with the landlord and to accept a lease for such location upon such lease terms then offered by the landlord. Franchisor shall give notice to Franchisee that it has determined that the lease terms are unacceptable to it and, upon the giving of such notice, Franchisor shall no longer have the right to participate in the negotiations with respect to such location and Franchisee shall be free to make the determination as to whether it desires to accept a lease for such location.  In the event that the lease terms being offered by the landlord are satisfactory to Franchisor and Franchisee or to Franchisee alone and a lease for such location is to be executed by Franchisee, Franchisee shall execute a lease for such location and the provisions of Section 6 of this Agreement shall be applicable to such lease provided that the time periods in Section 6.3 shall run from the date of the signing of the lease for the location;

(e)      In the event Franchisor or any of its affiliates opens a Restaurant in the Right of First Refusal Area in accordance with the foregoing provisions and subsequently receives a bona fide written offer and application from a third party to purchase such Restaurant and to obtain a license of the Mark for use in the operation of such Restaurant, Franchisor shall give Franchisee written notice and a copy of such bona fide written offer.  Such written notice shall specify the exact location where the Restaurant is located.  Franchisee shall determine whether it desires to purchase such Restaurant on the terms contained in such written offer.  Franchisee shall have seven (7) days from the date it receives Franchisor's written notice affirmatively to notify Franchisor of its intention to purchase such Restaurant in accordance with the terms of the written offer.  Franchisee shall then have sixty (60) days from the date of its notice to Franchisee to close the purchase of such Restaurant.  Upon the failure of Franchisee to comply with either or both of the foregoing conditions, Franchisor shall be free to sell such Restaurant in accordance with the terms of the written offer without any further obligation to Franchisee;

(f)      In the event Franchisor or any of its affiliates opens a Restaurant or grants a license for use of the Mark by third parties in the Right of First Refusal Area in accordance with the foregoing provisions, then Franchisee may not open a Restaurant within a twenty (20) mile radius of a Restaurant so opened by Franchisor or by such third parties or such larger area as is described as the noncompetition radius in the lease for such Restaurant, if any; and

(g)      Notwithstanding any of the foregoing provisions to the contrary, Franchisee's rights under this Section 3.4 shall be subject at all times to the satisfaction of the following conditions precedent:

(i)      Franchisee shall be in compliance with all of its obligations under this Agreement including, without limitation, its obligation to make all payments due Franchisor in a timely manner; and

(ii)      Franchisee shall meet the then current qualification standards applicable to a prospective licensee of Franchisor who desires to execute a Franchise Agreement with Franchisor and open a Restaurant under the Mark.

In the event that Franchisee fails to satisfy both of such conditions precedent at any time during the term of this Agreement, its rights under this Section 3.4 shall be suspended during such period of time and shall be reinstated at the time Franchisee has once again satisfied such conditions precedent.

3.5      **Franchisor's Reservation of Rights.**  Franchisee acknowledges that, except as expressly provided herein, the franchise granted under this Agreement is nonexclusive, that Franchisee has no territorial protection, except for the Franchised Area, and that Franchisor retains the right to:  (a) use, and license others to use, the Mark and Licensed Methods for the operation of restaurants using the Mark and the Licenses Methods at any location other than a location within the Franchised Area; (b) use the Mark and Licensed Methods in connection with services and products, promotional and marketing efforts or related items, or in alternative channels of distribution other than a physical restaurant located within your Franchised Area, without regard to location within or outside of the Franchised Area; (c) use, and license the use of, alternative proprietary trademarks or service marks or methods in connection with the operation of restaurants or other businesses under names which are not the same as or confusingly similar to the Mark, which businesses may be the same as, or similar to, or different from

3

restaurants operating under the Mark; and (d) to engage in any other activities not expressly prohibited in this Agreement.

## 4.   INITIAL FEES

4.1      **Initial Franchise Fee.**  Franchisee agrees to pay to Franchisor, concurrently with signing this Agreement, an initial franchise fee ("**Initial Franchise Fee**") in the amount set forth on Exhibit 2.  Franchisee acknowledges and agrees that the Initial Franchise Fee represents payment for the initial grant of the right to use the Mark and Licensed Methods, that Franchisor has fully earned the Initial Franchise Fee upon receipt and that the Initial Franchise Fee is not refundable to Franchisee under any circumstances after it is paid.

4.2      **Senior Executive (Food Production) Processing Fee.**  Franchisee agrees to pay to Franchisor, concurrently with signing this Agreement, a fee for recruiting and processing a senior executive-food production (the "**Senior Executive (Food Production)**") for placement at the Franchised Location in the amount set forth on Exhibit 2 (the "**Senior Executive (Food Production) Processing Fee**").  The Senior Executive (Food Production) will be primarily responsible for, and will direct, the management of the food production operations for the Franchised Location, set policies and goals with authority to make major decisions regarding food production and authority to hire and fire or transfer employees of Franchisee working in the food procurement and production areas.  Franchisor will cause the Senior Executive (Food Production) to be well aware and fluent in all of the operations of the Restaurant.  At the time of opening of the Franchised Location, and a specific date set thereon, the franchisee will pay corporate directly for the Senior Executive (Food Production).

Franchisee will provide, in writing, in advance at least thirty (30) days prior to the opening of the Restaurant, of the specific date upon which the Restaurant will open for business.  Reimbursement of the Senior Executive's Compensation is payable by Franchisee to Franchisor effective upon the above-specified date, and onwards irrespective of the date of the actual opening of the Restaurant.

Franchisee acknowledges and agrees that the Senior Executive Processing Fee is payment to Franchisor to recruit, process an application, employ and train a Senior Executive (Food Production) for the Franchised Location, that Franchisor has fully earned the Senior Executive Processing Fee upon receipt and that the Senior Executive Processing Fee is not refundable to Franchisee under any circumstances after it is paid.

4.3      **Operating Assets Fee.**  Franchisee agrees to pay to Franchisor the sum set forth on Exhibit 2 in payment for consumables, furniture, and décor items (the "**Operating Assets Fee**").  The number of each item of consumables to be provided shall be as set forth on Exhibit 3-A.  The furniture and décor items provided shall be as set forth on Exhibit 3-B and Exhibit 3-C.  Because the furniture, décor items, and some of the consumables have to be ordered substantially in advance, the Franchisee will pay the amount as per Exhibit 2 to Franchisor concurrently with the signing of this Agreement.  Franchisee acknowledges and agrees that the Operating Assets Fee is payment to Franchisor for the purchase of the property described on Exhibit 3, that Franchisor has fully earned the Operating Assets Fee upon receipt and that the Operating Assets Fee is not refundable to Franchisee under any circumstances after it is paid.

Franchisor will order the Operating Assets set forth on Exhibits 3-A, 3-B and 3-C upon receipt of such payment.  The Operating Assets will be shipped to Franchisee, f.o.b. Atlanta, Georgia.  Those Operating Assets shall be the property of Franchisee upon delivery to the carrier in Atlanta.  In the event that the Franchisee is not ready to open the Restaurant, Franchisee shall be responsible for the storage of the consumables at its expense and for the movement of those items from storage to the Restaurant when they are ready to open the Restaurant.

Any additional consumables beyond the quantities listed on Exhibits 3-A, 3-B and 3-C will be available for purchase from the Franchisor in accordance with a price list to be established by Franchisor.  The price list will be subject to additions for freight, packing, and delivery charges and all applicable taxes.

Franchisee will also determine the time of delivery of the said consumables at the time of the initial signing of the agreements, as the payments for the said consumables have to be made in timely manner to ensure that.

Franchisee acknowledges and agrees that the Operating Assets Fee is payment to the Franchisor for the initial consumable, furniture and decor items to be used in the operation of the Restaurant, that Franchisor has fully earned the Operating Assets Fee upon receipt and that the Operating Assets Fee is not refundable under any circumstances after it is paid.

4.4      **Décor Signature Mural Fee.** Franchisee agrees to pay to Franchisor, at least 60 days prior to the date scheduled for the opening of the Restaurant, a décor signature mural fee (the "**Decor Signature Mural Fee**") in the amount set forth in Exhibit 2. Franchisee acknowledges and agrees that the Décor Signature Mural Fee represents payment for the proprietary mural to be painted on two of the main walls in the Restaurant that is part of the trade dress of all of Franchisor's Restaurants, that Franchisor has fully earned the Signature Mural Fee upon receipt and that the Décor Signature Mural Fee is not refundable to Franchisee under any circumstances after it is paid.

4.5      **Interior Décor Package Fee.**  Franchisee agrees to pay to Franchisor, upon the signing of the lease for the premises of the Restaurant, a proprietary interior décor package fee (the "**Interior Décor Package Fee**") in the amount set forth in Exhibit 2.  Franchisee acknowledges and agrees that the Interior Décor Package Fee represents payment for the various items of interior décor (e.g., wall hangings and various and assorted Chinese artifacts) that Franchisor purchases in China and imports to Atlanta, Georgia that is part of the trade dress of all of Franchisor's Restaurants, that Franchisor has fully earned the Interior Décor Package Fee upon receipt and that the Interior Décor Package Fee is not refundable to Franchisee under any circumstances after it is paid.

4.6      **Private Label Food Products Fee.**  Franchisee agrees to purchase from Franchisor all of the requirements of the Restaurant for our private label noodles, sauces and rice that are served in all of our Restaurants (the "Private Label Food Products").  The purchase price for the Private Label Food Products is payable in full upon delivery to the Restaurant.  We fully earn the purchase price when paid.  It is not refundable under any circumstances.

## 5.      PERIODIC PAYMENTS

5.1      **Royalty.**  Franchisee will pay to Franchisor a weekly royalty fee ("**Royalty Fee**") equal to eight percent (8%) of the total amount of its Gross Sales, defined in Section 5.2, generated from or through the Restaurant.

5.2      **Gross Sales.**  As used herein, "**Gross Sales**" is defined as sales of any kind for all services or products from or through the Restaurant, including any sale of services or products made for cash or upon credit, or partly for cash and partly for credit, regardless of collection of charges for which credit is given, and regardless of whether such sale is conducted in compliance with or in violation of the terms of this Agreement, or whether such sale is at the Franchised Location or off-site, but exclusive of discounts, sales taxes, or other similar taxes and credits.  Gross Sales also include the fair market value of any services or products received by Franchisee in barter or exchange for its services and products.

5.3      **Senior Executive Compensation and Chef Guaranty Fee.**  Franchisor will provide the services of the Senior Executive (Food Production) for the Restaurant during the two week period prior to the opening of the Restaurant and during all of the operating hours of the Restaurant.  The Senior Executive (Food Production) will be an employee of Franchisor and will be paid directly by Franchisor. Franchisee will:  (a) reimburse Franchisor for the salary and other expenses connected with the employment of the Senior Executive (Food Production), including but not limited to the employer's contribution to Social Security, workers' compensation, and costs of other benefits (the "**Senior Executive Compensation**") as set forth on Exhibit 2; and (b) pay to Franchisor a Chef Guaranty Fee in respect of the Senior Executive (Food Production) in an amount equal to .5% of Gross Sales.  This reimbursement shall be on a monthly basis, based upon the estimated costs, and payable a month in advance.  The Chef Guaranty Fee payment shall be made monthly at the same time as the payment of the Royalty Fee.  In the event that, after the Restaurant has been open and operating at least 60 days, the Senior Executive (Food Production) works seven days a week without a day off, then the Senior Executive (Food Production) will be entitled to compensation for such days work and you will be required to reimburse us for the extra days of work at the then-current average daily compensation of the Senior Executive (Food Production).  The cost for the Senior Executive Compensation may increase up to a maximum amount of 5% annually to cover salary increases and increases in other costs.  Franchisor

shall have the sole authority to determine the amount of any salary increases given to the Senior Executive (Food Production), subject to the maximum amount of increase set forth above.  In addition to the Senior Executive Compensation, an amount equal to one weeks' compensation shall be payable to a substitute Senior Executive (Food Production) who shall serve during the one week of vacation to which the Senior Executive (Food Production) is entitled.

5.4     **Payment Method.**  Payments of Senior Executive Compensation will be paid monthly in advance on the first day of each calendar month (the "**Monthly Due Date**") and will be made available to Franchisor through direct debit and by electronic funds transfer on the Monthly Due Date.  Payments of Royalty Fees, Senior Executive Compensation and Marketing and Promotion Fees (as defined in Section 12.3) will be paid weekly and will be made available to Franchisor through direct debit and by electronic transfer, due on Thursday (for the preceding Monday through Sunday period), or such other specific day of the week which Franchisor designates from time to time (the "**Weekly Due Date**").  Upon the request of Franchisor and in no event later than thirty (30) days before the Restaurant opens, Franchisee shall execute an Authorization Agreement, in the form attached to this Agreement as Exhibit 4, for pre-authorized payment of Royalty Fees, Senior Executive Compensation and Marketing and Promotion Fees and other amounts due from Franchisee under this Agreement or otherwise, through direct debit and by electronic transfer of funds from Franchisee's bank account to Franchisor's bank account.  On the Tuesday preceding each Weekly Due Date, Franchisee shall report to Franchisor by telephone, electronic means, or in written form, as Franchisor directs (as more fully described in Section 15), Franchisee's Gross Sales and such additional information requested by Franchisor.  Franchisor shall have the right to verify such payments of Royalty Fees, Senior Executive Compensation and Marketing and Promotion Fees from time to time as it deems necessary in any reasonable manner.  If Franchisee fails to have sufficient funds in its account or otherwise fails to pay any payment of Royalty Fees, Senior Executive Compensation, Marketing and Promotion Fees or administrative charges due as of the Monthly Due Date or Weekly Due Date, as the case may be, Franchisee shall owe, in addition to such Royalty Fee Payments, interest at the rate of one and one-half percent (1.5%) per month (or portion thereof) on the amount of the delinquent payment; provided, however, in no event shall Franchisee be required to pay interest at a rate greater than the maximum commercial contract interest rate permitted by applicable law.

At all times during the term of this Agreement, Franchisee shall maintain a balance of $5,000 in the bank account identified on Exhibit 4 to provide for payment by direct debit of payments of Royalty Fees, Senior Executive Compensation, Marketing and Promotion Fees and administrative charges.

Franchisor may require Franchisee to pay the payments of Royalty Fees, Senior Executive Compensation and Marketing and Promotion Fees and other amounts due under this Agreement by means other than automatic direct debit whenever Franchisor deems appropriate, and Franchisee agrees to comply with Franchisor's payment instructions.

5.5     **Travel and Living Expenses Reimbursement.**  Franchisee will reimburse Franchisor for Franchisor's travel and living expenses when Franchisor's personnel travel to the site of the Restaurant, including the travel and living expenses of the Senior Executive (Food Production).  Such reimbursement prior to the opening of the Restaurant is limited to a maximum aggregate amount of $5,000.  In addition, Franchisee will reimburse Franchisor for the actual compensation of the Senior Executive (Food Production) for such visits prior to the opening of the Restaurant at the average daily rate of compensation being paid to the Senior Executive (Food Production). This expense reimbursement is applicable to all visits made to the Restaurant by Franchisor's personnel whether prior to or after the opening of the Restaurant.

5.6     **Failure to Report Gross Sales**.  In the event Franchisee fails to report Gross Sales as required above, for any weekly operating period, Franchisor shall be authorized to debit Franchisee's bank account in an amount equal to the sum of:  (a) $850 or the average of the last four weeks' Royalty Fee payments, whichever is higher, in payment of the Royalty Fee for such weekly operating period; (b) the actual amount of the Senior Executive Compensation for such weekly operating period; (c) $200 in payment of the Marketing and Promotion Fee for such weekly operating period; and (d) $150 in payment of the administrative charge due and payable to Franchisor pursuant to Section 5.8.

5.7     **Application of Payments.**  Notwithstanding any designation Franchisee might make, Franchisor may apply any payments made by Franchisee to any of Franchisee's past due indebtedness to Franchisor or its

affiliates.  Franchisee acknowledges that Franchisor has the right to set-off any amounts Franchisee owes Franchisor or its affiliates against any amounts Franchisor or its affiliates might owe Franchisee.

5.8     **Interest on Overdue Payments.**  Interest at the rate of one and one-half percent (1.5%) per month or the maximum interest rate permitted by applicable law, whichever is less, shall accrue on all overdue payments in favor of Franchisor.

5.9     **Administrative Charges**.  In the event Franchisee fails to report Gross Sales on the Tuesday before each Weekly Due Date or fails to have funds on deposit in Franchisee's bank account on the Weekly Due Date in an amount equal to the aggregate of the Royalty Fee, Senior Executive Compensation and Marketing and Promotion Fee then due, Franchisee shall be obligated to reimburse Franchisor for administrative costs incurred by Franchisor in investigating and causing a cure of such default in the amount of One Hundred Fifty Dollars ($150.00) per occurrence.

## 6.     DEVELOPMENT OF FRANCHISED LOCATION

6.1     **Approval of Franchised Location.**  Franchisee may operate the Restaurant at any Franchised Location selected by Franchisee.  Franchisor will provide site selection criteria and other suggestions and recommendations with respect to the Franchised Location of the Restaurant but, ultimately, the Franchised Location of the Restaurant must be selected by Franchisee.  Franchisor recommends that Franchisee follow Franchisor's site selection procedures in locating a Franchised Location for the Restaurant, but Franchisee is authorized to use other site selection criteria if it so desires.  Franchisee shall submit a completed site submittal package, including demographics and other materials requested by Franchisor, containing all information reasonably required by Franchisor to assess a proposed Franchised Location and to make suggestions and recommendations with respect to the proposed Franchised Location.  As part of the site submittal package, Franchisee shall submit to Franchisor evidence of a due diligence investigation with respect to the use of any trade name for a restaurant located in the Target Area that uses any of the words contained in the Mark in such trade name.  Franchisee shall be solely responsible for the thoroughness and accuracy of such investigation.

6.2     **Lease Review.**  Franchisee shall allow Franchisor to review any lease or purchase agreement for the Franchised Location before executing the same.  In its discretion, Franchisor shall have the right to require any lease agreement for the Franchised Location to be collaterally assigned to Franchisor as security for Franchisee's performance of its obligations under this Agreement.  In such case, a form of collateral assignment of lease will be negotiated with, and approved by, the landlord under the lease.  Prior to its execution, Franchisee's proposed lease agreement for the Franchised Location must be reviewed by Franchisor.  Such review is for the benefit of Franchisor, and Franchisee acknowledges that Franchisor's review of a lease agreement for the Franchised Location does not constitute a recommendation, endorsement, or guarantee by Franchisor of the suitability of the Franchised Location or the lease agreement, and Franchisee should take all steps necessary to ascertain whether the Franchised Location and lease agreement are acceptable to Franchisee.  Franchisee shall deliver a copy of the signed lease for the Franchised Location and such collateral assignment (if required) to Franchisor with five (5) days after it is signed.

6.3     **Schedule.**  Franchisee shall open the Restaurant for business no later than 240 days from the date this Agreement is signed.  Franchisor will extend the time in which Franchisee has to open the Restaurant for business for one 90 day period in the event Franchisee, in the judgment of Franchisor which need not be exercised in a reasonable manner, has demonstrated diligent good faith efforts to open the Restaurant and factors beyond Franchisee's reasonable control prevent Franchisee from meeting this deadline and Franchisee requests in writing an extension of time before the end of the 240 day period.  Franchisee shall provide Franchisor with notice of a specific date for the opening of the Restaurant at least 60 days prior to the opening of the Restaurant.

6.4     **Mandatory Site Visits.**  Franchisor shall visit the Restaurant six times prior to opening at the following times:

> ▪      Initial preview of locations;

- At the time of approval of the site of the Restaurant;

- At the organizational meeting of contractors to award construction contracts prior to the start of construction;

- At the mid-point of construction;

- Two weeks prior to the opening of the Restaurant; and

- At the grand opening of the Restaurant.

6.5.    **Requested Site Visits.**  At the request of Franchisee, Franchisor shall visit the Restaurant prior to opening as many times as are reasonably necessary to assist Franchisee in preparing the Restaurant for opening, subject to the reimbursement for travel and living expenses provided for in Section 5.5.

6.6    **Conversion and Design.**  Franchisee acknowledges that the layout, design, decoration and color scheme of the Restaurant are an integral part of the Licensed Methods, and, accordingly, Franchisee shall convert and decorate the Franchised Location in accordance with Franchisor's plans, designs, and specifications.  Franchisee also shall obtain Franchisor's written consent to any conversion, design, or decoration of the Franchised Location before remodeling or decorating begins, recognizing that such remodeling and decoration, and any related costs, are Franchisee's sole responsibility.

6.7    **Interior Décor.**

(a)    Franchisor will provide Franchisee with the décor signature mural that is part of the trade dress of all of the Restaurants.  The mural is proprietary to Franchisor and serves to differentiate the Restaurants from those of others.  The mural will be painted on two of the main walls of the Restaurant that are most visible from within the Restaurant.

(b)    Franchisor will provide Franchisee with an interior décor package that Franchisor imports from China.  The interior décor package is proprietary to Franchisor and serves to differentiate the Restaurants from those of others.  The interior décor package consists of wall hangings and various and assorted Chinese artifacts selected by Franchisor to provide a unique Chinese atmosphere to the Restaurant.

6.8    **Signs.**  Franchisee shall purchase or otherwise obtain for use at the Franchised Location and in connection with the Restaurant the maximum number and size of signs allowed by applicable building codes or sign ordinances, which signs shall comply with Franchisor's standards and specifications.  It is Franchisee's sole responsibility to ensure that all signs comply with applicable local sign ordinances, building codes, and zoning regulations. Any modifications to Franchisor's standards and specifications for signs due to local sign ordinances, codes, or regulations shall be submitted to Franchisor for prior written approval.  Franchisee acknowledges that the Mark, or any other name, symbol, or identifying mark on any signs, shall be used only in accordance with Franchisor's standards and specifications and only with Franchisor's prior written approval.

6.9    **Equipment.**  Franchisee shall purchase or otherwise obtain for use in connection with the Restaurant the equipment, including delivery vehicles (if utilized), computer hardware and software and a point of sale system, of a type and in an amount which complies with Franchisor's standards and specifications and only from suppliers or other sources approved by Franchisor from time to time.  Franchisee acknowledges that the type, quality, configuration, capability, and performance of the Restaurant equipment are all standards and specifications which are a part of the Licensed Methods.  Franchisee shall purchase or lease for use in the Restaurant an electronic cash register or point of sale computer system ("**System**") approved by Franchisor that accurately records every sale or other transaction.  Franchisee shall purchase, or Franchisor, an affiliate or an approved supplier may license to Franchisee for the license fee it determines, software to be used by Franchisee in conjunction with the System. Franchisee shall submit any required reports in a format designated from time to time by Franchisor.  Franchisee grants Franchisor the right to access the System and to obtain sales, sales mix, and revenue information directly by modem or otherwise.  Franchisee acknowledges that Franchisor will use information from required reports primarily

to make business and marketing decisions.  Franchisee shall be obligated to upgrade or update the System and the software, at Franchisee's sole cost, to meet Franchisor's then-current standards and specifications and to address technological developments or events.  Franchisor has no obligation to reimburse Franchisee for any of these costs.

6.10    **Permits and Licenses.**  Franchisee agrees to obtain all permits and licenses required for the lawful construction and operation of the Restaurant together with all certifications from government authorities having jurisdiction over the Franchised Location that all requirements for construction and operation have been met, including, without limitation, zoning, access, sign, health, fire, and safety requirements; building and other required construction permits; licenses to do business; fictitious name registrations; sales tax permits, health and sanitation permits and fire inspection clearances.  Franchisee agrees to obtain all customary contractors' sworn statements and partial and final lien waivers for construction, remodeling, decorating, and installation of equipment at the Franchised Location.  Franchisee shall keep copies of all health department, fire department, building department, and other reports of inspections on file and available for inspection by Franchisor.  Franchisee shall immediately forward to Franchisor any such reports or inspections in which Franchisee has been alleged not to be in compliance with the underlying regulation.

6.11    **Commencement of Operations.**  Unless otherwise agreed in writing by Franchisor and Franchisee, Franchisee has 240 days from the date of this Agreement (which may be extended by 90 days as provided by Section 6.3) within which to commence operation of the Restaurant.  Franchisee shall obtain the written consent of Franchisor prior to commencing operation of the Restaurant, which consent shall not be unreasonably withheld, but cannot be granted until Franchisor has accepted the Franchised Location and Franchisee has: (a) successfully completed the initial training program; (b) paid all fees and other amounts due to Franchisor; (c) furnished copies of all insurance policies required by this Agreement; (d) built out and equipped the Franchised Location in accordance with Franchisor's standards and specifications and received a certificate of occupancy from Franchisor; (e) purchased an inventory of approved products and supplies; (f) obtained all governmental permits required for the operation of the Restaurant; and (g) otherwise completed all other aspects of developing the Restaurant as Franchisor has reasonably required.

6.12    **Continuous Operation.**  Unless otherwise approved by Franchisor, the Restaurant will be open and operated continuously during the full term of this Agreement during the hours specified by Franchisor or permitted under the lease for the premises of the Restaurant, whichever is fewer, at a minimum; provided Franchisee shall have the right to operate the Restaurant for additional hours if it so desires.

6.13    **Insurance**.

(a)    Franchisee shall at all times maintain in force, at its sole expense, public liability insurance and general casualty insurance (including fire, theft, water damage and extended coverage) covering the Restaurant and the contents thereof, workers' compensation and other insurance coverages as required by Franchisor, all as described on Exhibit 5.  From time to time, Franchisor may require Franchisee to carry additional types of insurance coverage or to increase the amounts of the insurance coverages set forth on Exhibit 5.

(b)    Franchisee shall furnish a certificate of insurance, satisfactory to Franchisor, no later than 10 days before the Restaurant opens for business showing the required insurance to be force and stating that the insurance will not be cancelled or changed except upon at least 30 days written notice to Franchisor.

(c)    Franchisee agrees that all insurance policies obtain by Franchisee pursuant to Section 6.10 above shall be primary coverage, the applicable limits of which shall be exhausted before any benefits (defense or indemnity) may be obtained under any other insurance (including self-insurance) providing coverage to Franchisor.  In the event payments are required to be made under the insurance policies of Franchisor or self-insurance (whether for defense or indemnity) before the applicable coverage limits for the insurance policies obtained by Franchisee are exhausted, then Franchisee shall reimburse, hold harmless and indemnify Franchisor and its insurers for such payments.  Franchisor shall notify its insurers of this Agreement and shall use best efforts to obtain the following endorsement on each policy it obtains pursuant to Section 6.10 above:

The applicable limits of this policy shall be applied and exhausted before any benefits may be obtained (whether for defense or indemnity) under any other insurance (including self-

insurance) that may provide coverage to Inchins Bamboo Garden Franchising LLC. All insurance coverage obtained by Inchins Bamboo Garden Franchising LLC shall be considered excess insurance with respect to this policy, the benefits of which excess insurance shall not be available until the applicable limits of this policy are exhausted.

(d)     In the event Franchisee fails to obtain and maintain the insurance coverages required by this Section 6.10. Franchisor may purchase such insurance coverages on behalf of Franchisee and Franchisee shall be obligated to reimburse Franchisor for the cost thereof.

6.14     **Music Service.** Franchisee shall purchase or otherwise obtain for use in connection with the Restaurant a music service of a type that complies with applicable law and Franchisor's standards and specifications and only from the suppliers or other sources approved by Franchisor from time to time. The music service may consist of a license for the use of commercial radio from The American Society of Composers, Authors and Publishers ("**ASCAP**") or Broadcast Music, Inc. ("**BMI**") or a subscription to Sirius/XM Satellite Radio or other approved subscription music service. Franchisee shall cause such music service to be operational in the Restaurant during all hours of operation of the Restaurant.

# 7.     TRAINING

7.1     **Initial Training Program.** Franchisee (or, if Franchisee is a corporation, partnership, or limited liability company, its managing shareholder, partner, or member (the "**Managing Owner**") and the person designated by Franchisee to assume primary responsibility for managing the Restaurant (the "**Designated Manager**") must attend and successfully complete the initial training program offered by Franchisor at one of Franchisor's designated training facilities. The Managing Owner and the Designated Manager are eligible to participate in Franchisor's initial training program without paying any tuition or fee. In the event Franchisee wishes to have more than two persons attend Franchisor's initial training program, the charge for each additional attendee is $2,000 per person up to a maximum of $5,000. Franchisee shall be responsible for any and all travel and living expenses incurred in connection with attending the training program as well as wages or salaries, if any, of the person(s) receiving training. Franchisee (or the Managing Owner) and the Designated Manager must successfully complete the initial training program before Franchisee begins operating the Restaurant. Franchisor reserves the right to waive all or a portion of the training program or alter the training schedule.

Franchisee (or its Managing Owner) and its Designated Manager may request additional training during the initial training program, to be provided at no additional charge, if Franchisee (or the Managing Owner) and the Designated Manager do not feel completely trained in the operation of the Restaurant at the conclusion of the regular training program. However, if Franchisee (or its Managing Owner) and the Designated Manager satisfactorily complete Franchisor's initial training program, and do not inform Franchisor in writing at the end of the initial training program that Franchisee (or its Managing Owner) and the Designated Manager do not feel completely trained in the operation of the Restaurant, then Franchisee will be deemed to have been trained sufficiently to operate the Restaurant.

Franchisor will provide supplemental training at any time during the term of this Agreement including for replacement or additional Designated Managers upon the request of Franchisee. Upon receipt of a request for supplemental training, Franchisor will schedule a training session within thirty (30) days thereafter. In the event the supplemental training can be provided at regularly scheduled training sessions of Franchisor, there will be no charge to Franchisee for such training. If the supplemental training is to be conducted at specially conducted training sessions, the charge for each attendee shall be $2,000 up to a maximum of $5,000. Franchisee shall be responsible for all travel and living expenses of its personnel during such additional training programs.

7.2     **Additional Training Programs.** Franchisor reserves the right to conduct training programs or seminars in Atlanta, Georgia or at locations to be determined by Franchisor from time to time to discuss relevant business trends and share new information relating to the business of the Restaurant. Attendance at the training programs or seminars is optional unless Franchisor gives Franchisee at least thirty (30) days' prior written notice that the training programs or seminars are mandatory, in which case Franchisee (or its Managing Owner) or its Designated Manager is required to attend. Franchisor shall not require Franchisee to attend any on-going training

programs or seminars more than four (4) times a year.  Each mandatory training program and seminar shall not last more than three (3) days.  All such mandatory training will be offered without tuition or a fee; provided, however, Franchisee will be responsible for any and all transportation and living expenses incurred in attending such additional training programs or seminars.

## 8.     OPERATIONS MANUAL

8.1     **Operations Manual.**  Franchisor agrees to loan to Franchisee one (1) or more manuals, technical bulletins, or other written or videotaped materials (collectively referred to as "**Operations Manual**") covering the Restaurant's operating and marketing techniques and any Special Product(s) applicable to the Restaurant. Franchisee agrees that it shall comply with the Operations Manual as an essential part of its obligations under this Agreement.  Franchisee shall at all times be responsible for ensuring that its employees and all other persons under its control comply with the Operations Manual in all respects.  Franchisee shall not duplicate the Operations Manual nor disclose its contents to persons other than employees or officers who need the information to perform their jobs.

8.2     **Changes to Operations Manual.**  Franchisor reserves the right to revise the Operations Manual from time to time as it deems necessary to update operating and marketing techniques or standards and specifications in any manner, including up dates contained in monthly newsletters.  Franchisee, after receiving any updated information, shall promptly update its copy of the Operations Manual as instructed by Franchisor and conform its operations to the updated provisions which shall supersede the previously existing techniques, standards and specifications.  Franchisee acknowledges that the master copy of the Operations Manual maintained by Franchisor at its principal office controls in the event of a dispute over its contents.

## 9.     DEVELOPMENT ASSISTANCE

9.1     **Franchisor's Development Assistance.**  To assist Franchisee in establishing the Restaurant, Franchisor shall provide the following:

(a)     Financial services consisting of (i) a review and analysis of the credit and financial aspects of Franchisee's franchise application to ascertain whether Franchisee has met certain financial and credit criteria established by Franchisor for qualifying franchise applications (such financial criteria are established solely for Franchisor's own internal purposes; satisfaction of such criteria is not intended to serve, and should not be relied upon by Franchisee, as an indicator of the likelihood of Franchisee's ability to develop or successfully operate the Restaurant or to obtain financing, if applicable); and (ii) providing assistance (the manner and extent of which shall be in Franchisor's discretion) with (A) seeking and selecting financing sources for the development and operation of the Restaurant, (B) seeking and selecting insurance coverages as required pursuant to this Agreement, (C) analyzing and reviewing the unit economic model for the Restaurant, and (D) monitoring and tracking the construction/build-out costs of the Restaurant relative to the construction/build-out budget prepared by Franchisee.

(b)     Assistance related to accepting a site for the Restaurant, although Franchisee acknowledges that Franchisor has no obligation to select or acquire a site on behalf of Franchisee.  Franchisor's assistance will consist of, at a minimum, providing general criteria for an acceptable site and determining whether a proposed site fulfills the requisite criteria prior to formal acceptance of a site selected by Franchisee.  Site selection, acquisition, and development shall be the sole obligation of Franchisee, except as set forth in this Agreement or any other written agreement executed by Franchisor.  Franchisee acknowledges that Franchisor is under no obligation to provide additional site selection services other than as set forth in a written, executed agreement and that Franchisor's acceptance of the site does not imply or guarantee the success or profitability of the site in any manner whatsoever.

(c)     Advice regarding the standards and specifications for the build out (including compliance with local ordinances and building codes), interior design, layout, floor plan, signs, designs, color, and decor of the Restaurant and obtaining the required permits for the Restaurant (e.g., occupancy, health and sanitation and sign permits).

(d)     Advice regarding the standards and specifications for the equipment, supplies, and materials used in, and the menu items offered for sale by, the Restaurant and advice regarding selecting suppliers for and purchasing such items.

(e)     Guidance in implementing advertising and marketing programs, operating and sales procedures, and bookkeeping and accounting programs.

(f)     The initial training in accordance with Section 7.1.

(g)     Opening assistance consisting of one or more representatives of Franchisor on site at the Franchised Location for not less than five (5) days to assist Franchisee in opening the Restaurant; provided, however, that Franchisee shall hire and be exclusively responsible for the training, compensation, and control of its employees engaged in the day to day operation of the Restaurant.

(h)     One (1) copy of the Operations Manual, as described in Section 8, which shall be loaned to Franchisee during the term of this Agreement.

With the exception of Franchisee's obligations under this Agreement and matters relating to the use of the Mark, the Licensed Methods, the Franchisor Trade Secrets and the Franchisor Trade Dress (all as defined in this Agreement), the advice and recommendations provided by Franchisor are subject to the independent business judgment of Franchisee and Franchisee shall not be obligated to follow such advice and recommendations.

## 10.     OPERATING ASSISTANCE

10.1    **Franchisor's Assistance**.  Franchisor agrees that, during Franchisee's operation of the Restaurant, Franchisor or its designated representatives shall make available to Franchisee the following assistance:

(a)     Upon the reasonable request of Franchisee, telephone consultation regarding the continued operation and management of a Restaurant and advice regarding Restaurant services, product quality control, menu items, and customer relations issues.

(b)     Access to advertising and promotional materials developed by Franchisor through the Marketing and Promotion Fund (as defined below).

(c)     On-going updates of information and programs regarding menu items and their preparation, the business of the Restaurant and the Licensed Methods, including information about special or new services or products developed and made available to franchisees of Franchisor.

(d)     The initial training program to replacement or additional Designated Managers during the term of this Agreement.  Although Franchisor does not currently charge a tuition or fee, Franchisor reserves the right to charge a tuition or fee, payable in advance, commensurate with the then-current published prices of Franchisor for such training.  Franchisee shall be responsible for all travel and living expenses incurred by its personnel during the training program.

(e)     At the request of Franchisee, Franchisor shall visit the Restaurant after the opening of the Restaurant as many times as reasonably necessary to assist Franchisee, subject to the reimbursement for travel and living expenses provided for in Section 5.5.

10.2    **Senior Executive (Food Production)**.

(a)     The Senior Executive (Food Production) shall be an employee of Franchisor at all times. Franchisee shall not have the right to terminate the employment of the Senior Executive (Food Production) at any given time during the course of this Agreement.  The initial Senior Executive (Food Production) shall be placed at the Restaurant and remain there during the first two years of operation of the Restaurant.  If Franchisee is not

12

satisfied with the performance of the Senior Executive (Food Production), Franchisee will notify Franchisor immediately by delivery of a notice citing specific facts which constitute a failure to meet objective standards of performance applicable to the Senior Executive (Food Production). Franchisor will review the cited facts and, at its discretion, will set forth remedies for corrective actions to be taken by the Senior Executive (Food Production) within 30 days of the notice from Franchisee. After the second anniversary of the opening of the Restaurant, in the event Franchisee requests that Franchisor remove the Senior Executive (Food Production) from working in the Restaurant and such request is based upon the failure to remedy a bona fide lack of performance previously cited by Franchisee in a notice to Franchisor, Franchisor will, within 30 days of Franchisor's request, make arrangements to replace the Senior Executive (Food Production) at the Restaurant. In such case, Franchisee acknowledges that Franchisee will be responsible for all the relocation expenses of both the departing Senior Executive (Food Production) and the replacement Senior Executive (Food Production). The relocation expenses for which Franchisee shall be responsible are the actual expenses incurred by Franchisor up to a maximum of $5,000 and will include all of the relocation expenses incurred by Franchisor (U-Haul charges, transfer of vehicle, airfare, etc.). Franchisor reserves the right to replace the Senior Executive (Food Production) at any time, but only when Franchisor has an immediate replacement to fill the position. In the event Franchisor chooses to replace the Senior Executive (Food Production), Franchisor will be responsible for all of the relocation expenses incurred.

        (b)    Franchisor shall cause the Senior Executive (Food Production) to monitor the business model of the Restaurant and oversee compliance with efficient kitchen operation. The Senior Executive (Food Production) shall be the sole authority as to the selection and production of the cuisine that is to be offered by the Restaurant. The Senior Executive (Food Production) will manage and supervise all operations of the kitchen, but will not be involved in the operation or management of other departments of the Restaurant. Franchisee will assist the Senior Executive (Food Production) in settling into the geographic area of the Franchised Location by assisting him in finding an apartment and/or relocating. To avoid any interruption and ensure smooth flow of activities in the food procurement and production of the Restaurant, Franchisor will provide replacement of Senior Executive (Food Production), at its cost, from its corporate headquarters if and when such necessity arises. If a chef or other specialist staff for the food production department is required by Franchisee in any emergency, Franchisor will endeavor to provide replacement on an interim basis from its headquarters. In such event, Franchisee will pay all expenses including travel, salary and related expenses for said staff.

        10.3    **Private Label Food Products**. Franchisee will purchase the entire requirements of the Restaurant for noodles, sauces and rice from Franchisor (and only Franchisor). Franchisor will provide to Franchisee, upon order, the private label noodles, sauces and rice that are prepared pursuant to Franchisor's unique proprietary recipes. From time to time, Franchisor will provide Franchisee with current price lists for such products.

        10.4    **Kitchen Staff Requirement**. Franchisee will comply with the Kitchen Staff Required Criteria in the Operations Manual. In that regard, Franchisee will be responsible for the hiring of kitchen staff consisting of an Assistant Chef, Assistant Cook, Fryer, Food Preparers and Dishwasher. The Senior Executive (Food Production) will provide advice and consultation in hiring employees of the Restaurant who will serve as additional personnel for the kitchen; provided, however, the Senior Executive (Food Production) shall not be responsible for the actual hiring and retention of such Kitchen Staff which shall be the sole responsibility of the Franchisee.

## 11.    FRANCHISEE'S OPERATIONAL COVENANTS

        11.1    **Business Operations.** Franchisee acknowledges that it is solely responsible for the successful operation of the Restaurant and that the operation of the Restaurant is required to be in compliance with the terms of this Agreement and the Operations Manual. In addition to all other obligations contained in this Agreement and the Operations Manual, Franchisee agrees that:

        (a)    Franchisee shall maintain the Restaurant as a clean, safe, and high quality operation and shall promote and operate the business of the Restaurant in accordance with the Operations Manual so as not to detract from or adversely reflect upon the name and reputation of Franchisor and the goodwill associated with the Mark. The Restaurant will be used solely for the operation of a Pan Asian cuisine restaurant and for no other purpose.

(b)    (i)    Franchisee will conduct itself and operate the Restaurant in compliance with all applicable laws, regulations, and other ordinances and in such a manner so as to promote a good public image in the business community.  Franchisee will be solely and fully responsible for obtaining any and all licenses to operate the Restaurant.  Franchisee shall keep copies of all health department, fire department, building department, and other similar reports of inspections on file and available for inspection by Franchisor.  Franchisee shall immediately forward to Franchisor any such reports or inspections in which Franchisee has been alleged not to be in compliance with the underlying regulation.

(ii)    Franchisee will maintain a log of all customer complaints regarding the dining experience at the Restaurant (including the customer's name, address and telephone number) and a description of Franchisee's actions to resolve such complaints to the customer's satisfaction.  The customer complaint log shall be maintained in electronic format and a copy of such log for each calendar month shall be delivered to Franchisor within ten (10) days after the end of each calendar month.  In the event Franchisor's review of the customer complaint log determines that any customer complaints have not been properly resolved, Franchisor shall notify Franchisee of such determination, along with a description of the proper resolution of such complaints.  In addition, if Franchisor so directs, Franchisee agrees to issue discounts or complimentary meals to customers whose complaints were not satisfactorily resolved by Franchisee in the first instance.  A notification by Franchisor to Franchisee under this Section 11.1(b)(2) shall be deemed a notice of default for purposes of Section 18.2(m) below.

(c)    Franchisee acknowledges that proper management of the Restaurant is important and shall ensure that Franchisee (or its Managing Owner) or a Designated Manager who has completed the initial training program will be responsible for managing the Restaurant.  Franchisee acknowledges that Franchisor has the right to change the menu of food products to be served in the Restaurant from time to time.  In such event, Franchisee agrees that, at its expense, it will send the Senior Executive (Food Production) for the Restaurant to a location in the United States designated by Franchisor for training in the preparation of any new or different menu items.

(d)    Franchisee acknowledges that Franchisor requires and authorizes Franchisee to offer only authorized products and services as described in the Operations Manual, which may include authorized food and beverage products, and related restaurant and carry out or delivery services (if utilized).  Franchisee shall maintain at all times a sufficient supply of all menu items and related food and paper products to ensure, insofar as possible, that such items are at all times available to its customers.  Franchisee shall offer all types of services and products from time to time prescribed by Franchisor and shall not offer any other types of services or products, or operate or engage in any other type of business or profession, from or through the Restaurant, unless Franchisor's written consent is first obtained.

(e)    Franchisee shall promptly pay when due all taxes and other obligations owed to third parties, including, without limitation, all federal, state, and local taxes and any and all accounts payable or other indebtedness incurred by Franchisee in operating the Restaurant.

(f)    Franchisee shall comply with all agreements with third parties related to the Restaurant, including, in particular, all provisions of any lease agreement for the Franchised Location.

(g)    (i)    Franchisee acknowledges that Franchisor requires all Restaurants operated by its franchisees to use the Franchisor Trade Dress and to maintain a uniform appearance for the mutual benefit of all Restaurants.  Franchisee shall use the Franchisor Trade Dress and to maintain the Restaurant, both interior and exterior, in conformity with such uniform appearance, and Franchisee shall follow Franchisor's advice and recommendations on the appearance of the Restaurant.  Franchisee shall cause such changes to be made in the Franchisor Trade Dress and appearance of the Restaurant as may be specified by Franchisor from time to time; provided, however, that such changes and upgrades in any calendar year during the term of this Agreement shall cost no more than the stun of one percent (1%) of Franchisee's Gross Sales for the immediately preceding calendar year plus any unspent amount carried over from a previous calendar year as described below (the "**Annual Capital Expenditure Amount**").  No such requests shall be made by Franchisor during the first year of the term of this Agreement.  In the event that, during any calendar year, Franchisor does not make any such requests or the requests by Franchisor do not require the expenditure of the entire Annual Capital Expenditure Amount, Franchisee shall have the option to cause the Annual Capital Expenditure Amount (or any remaining portion thereof) to be spent for

the purposes of refurbishing the appearance of the Restaurant and replacing fixtures as Franchisee shall determine during such calendar year or to allow such unspent amount to carry over to the next calendar year and be aggregated with the Annual Capital Expenditure Amount for the next calendar year to establish the maximum amount of expenditure in the next calendar year.  In addition, Franchisee shall refurbish the Restaurant at the end of each five (5) year period during the term of this Agreement as may be required by Franchisor.  For purposes of this Agreement, the term "**refurbish**" shall mean such changes in exterior and interior signage, painting, flooring, lighting, seating, dinnerware and utensils as are necessary to bring the Restaurant up to the then-current standard for the design format of the Restaurants generally.

(ii)     Franchisee shall submit to Franchisor a copy of all architectural drawings and specifications for the construction of the Restaurant showing leasehold improvements and interior design, including a lighting plan, a reflective ceiling plan, storefront elevation and interior elevations including floor layout, wall treatments, decoration, colors, fixtures, floor coverings and finishes and signs, for approval prior to the opening of the Restaurant.  Franchisor shall notify Franchisee of its approval or disapproval of the proposed drawings and specifications within ten (10) days of receipt thereof by Franchisor.  In the event of Franchisor's disapproval, Franchisor's notice to Franchisee shall specify the changes to be made by Franchisee in said drawings and specifications, and Franchisee shall make the changes specified by Franchisor prior to commencement of construction of the Restaurant.  Upon approval by Franchisor of the drawings and specifications for the Restaurant, Franchisee shall construct and equip the Restaurant in accordance with such drawings and specifications using approved materials and fixtures and equipment.  In the event that Franchisee fails to submit such drawings and specifications to Franchisor for approval prior to the opening of the Restaurant, or in the event the Restaurant as opened fails to conform to such drawings and specifications and the uniform appearance of all Restaurants required by Franchisor, Franchisor shall have the right to require Franchisee to make such changes in the structure, leasehold improvements, interior design and appearance as are necessary to have the Restaurant conform to the uniform appearance for all Restaurants required by Franchisor.  Franchisee shall not commence construction of any Restaurant until the location of such Restaurant has been accepted by Franchisor and the lease for the Restaurant and the architectural drawings and specifications for the construction of the Restaurant have been approved by Franchisor, and Franchisee acknowledges and agrees that Franchisor may take action to prevent the opening of the Restaurant in the event Franchisee fails to obtain such acceptance and approval from Franchisor.  Franchisee shall open the Restaurant for business no later than one hundred twenty (120) days after the execution of the lease for the premises of the Restaurant.

(iii)     In the event Franchisee, at any time during the term hereof, shall remodel, refurbish, rebuild or relocate the Restaurant, the same shall be deemed to be the opening of a new Restaurant and the provisions of Section 11.1(g)(2) shall be applicable, and Franchisee shall comply with such provisions.

(h)     Franchisee shall at all times during the term of this Agreement own and control the Restaurant.  Upon request of Franchisor, Franchisee shall promptly provide satisfactory proof of such ownership to Franchisor.  Franchisee represents that the Statement of Ownership attached as Exhibit 7 is true, complete, accurate, and not misleading.  Franchisee shall promptly provide Franchisor with a written notification if the information contained in the Statement of Ownership changes at any time during the term of this Agreement and shall comply with the applicable transfer provisions contained in Section 16.  Franchisee acknowledges that, if Franchisee is other than an individual(s), Franchisor requires that the individual owners, shareholders, partners or members of Franchisee guarantee the performance of Franchisee and execute the Guaranty and Assumption of Franchisee's Obligations attached to this Agreement as Exhibit 9.

(i)     Franchisee shall at all times during the term of this Agreement keep its Restaurant open during the business hours designated by Franchisor from time to time in the Operations Manual.  Any deviations from the required hours must be approved in advance in writing by Franchisor.

(j)     Franchisee shall procure, maintain, and provide evidence of insurance for the Restaurant and its operations of the types, in the amounts, and with such terms and conditions as Franchisor from time to time prescribes in the Operations Manual or otherwise.  All of the required policies of insurance shall name Franchisor as additional insureds and provide for thirty (30) days' advance written notice to Franchisor of their cancellation or modification.

(k)      Franchisee will provide proof of insurance to Franchisor at least 10 days before beginning operations at the Restaurant.  The proof of insurance shall also show evidence that the insurer has been authorized to inform Franchisor in the event any policies lapse or are canceled or modified.  Franchisor has the right to change the insurance Franchisee is required to maintain by giving Franchisee reasonable prior notice.  Noncompliance with these insurance provisions shall be deemed a material breach of this Agreement.  In the event of any lapse in insurance coverage, then, in addition to all other remedies, Franchisor shall have the right to demand that Franchisee cease operations of the Restaurant until coverage is reinstated or, alternatively, to pay any delinquencies in premium payments and charge the same to Franchisee.

(l)      Franchisee acknowledges and agrees that the programs as funded by the Marketing Fund (as defined in Section 12.3) are intended to increase general public recognition and acceptance of the Mark for the benefit of Franchisor and its franchisees.  Franchisee understands and acknowledges that the marketing programs to be implemented by Franchisor will be utilized to maximize general public recognition of the Mark and that Franchisor does not undertake any obligation in administering such program to ensure that expenditures are proportionate or equivalent to Franchisee's contributions or that Franchisee will benefit directly or pro-rata from advertising and promotional programs.  Franchisee further acknowledges that it understands the purposes and manner of administering the Marketing Fund and authorized Franchisor to conduct the operation of the Marketing Fund in accordance with the provisions of this Agreement.

(m)      Franchisor's personnel shall have the right to enter upon the premises of the Restaurant at any reasonable time for the purpose of examining the Restaurant, conferring with Franchisee and inspecting and checking merchandise, furnishings, fixtures and operating methods to ensure that the integrity of the Mark is being maintained.  Franchisor shall have the right to require Franchisee to discontinue any practices which are not of high quality in the trade or which do not uphold the integrity of the Mark.  All such inspections, examinations and conferences shall be at the sole cost and expense of Franchisor.

(n)      Franchisor shall have the right to photograph the Restaurant, its operations and exterior and interior, and the new items offered by the Restaurant and to use any such photograph in any of its publicity or advertising including, without limitation, in the website maintained by Franchisor.  Franchisor shall provide to Franchisee, promptly upon request by Franchisee, copies of such photographs at Franchisor's cost.

(o)      Franchisee acknowledges that it has been advised by Franchisor to consult with its own advisors with respect to the legal, financial and other aspects of this Agreement, the business franchised hereby, and the prospects for that business.  Franchisee acknowledges that it has either consulted with such advisors or has deliberately declined to do so.

(p)      Franchisee affirms that all information set forth in all applications, financial statements and submissions to Franchisor is true, complete and accurate in all respects, with Franchisee expressly acknowledging that each of Franchisor and Franchisor is relying upon the truthfulness, completeness and accuracy of such information.

(q)      Franchisee acknowledges and agrees that, in the negotiation of the terms of this Agreement, the governing law and jurisdiction and venue provisions set forth in Section 21 hereof were bargained for between Franchisee and Franchisor and consideration was given to Franchisee in respect of other terms of this Agreement based upon Franchisee's willingness to agree to such provisions.

11.2    **Maximum Borrowing Limitation.**  Franchisee acknowledges and agrees that the maximum amount of indebtedness that the Franchised Restaurant may service shall be a maximum of One Hundred Forty Thousand Dollars ($140,000).  The balance of the initial investment in the Franchised Restaurant must be in the form of equity contributions from the owners of Franchisee.  Franchisee shall not borrow in excess of this maximum permitted indebtedness without Franchisor's prior written consent.  Franchisee acknowledges that excess indebtedness will adversely affect the Franchised Restaurant's operational results.

## 12.    ADVERTISING

12.1    **Approval and Use of Advertising.**  Franchisee shall obtain Franchisor's prior written approval of all written advertising or other marketing or promotional programs regarding the Restaurant not previously approved by Franchisor including, without limitation, "Yellow Pages" advertising, newspaper ads, flyers, brochures, coupons, direct mail pieces, specialty and novelty items, radio and television advertising, Internet "web" pages, and other home pages or domain names on any common carrier electronic delivery system.  Any proposed uses not previously approved by Franchisor shall be submitted to Franchisor at least ten (10) business days prior to publication, broadcast, or use.  If Franchisor's written approval is not received within ten (10) business days from the date it received the material, the material is deemed disapproved.  Franchisor will have the final decision on all creative development of advertising and promotional messages.  We reserves the right to require Franchisee to discontinue the use of any advertising or marketing materials.  Franchisee acknowledges that advertising and promoting the Restaurant in accordance with Franchisor's standards and specifications are essential aspects of the Licensed Methods, and Franchisee agrees to comply with all advertising standards and specifications of Franchisor.  Franchisee agrees that it will conduct all advertising in a dignified manner and to conform to Franchisor's requirements and standards.  Franchisee also agrees to participate in any promotion campaigns and advertising and other programs that Franchisor establishes periodically.

12.2    **Grand Opening.**  Franchisee agrees to conduct a grand opening advertising and promotional program for the Restaurant at the time and in the manner specified by Franchisor and agrees to spend a minimum of Five Thousand Dollars ($5,000) for the grand opening program.  Franchisee agrees to provide Franchisor with a summary of grand opening program expenditures within one hundred twenty (120) days after the Restaurant opens.  Franchisee's grand opening program will utilize the marketing and public relations programs and media and advertising materials that Franchisor has either developed or approved.

12.3    **Marketing and Promotion Fee.**  Franchisee agrees to pay to Franchisor, in addition to Royalty Fee Payments, a Marketing and Promotion fee ("**Marketing and Promotion Fee**") of one percent (1%) of the total amount of Franchisee's Gross Sales.  The Marketing and Promotion Fee shall be in addition to and not in lieu of Franchisee's Local Advertising Expenditure.  The following terms and conditions will apply to the Marketing and Promotion Fee payment:

(a)    The Marketing and Promotion Fee shall be payable weekly, concurrently with the payment of the Royalty Fee Payments, based on Gross Sales (as defined in Section 5.2) for the immediately preceding reporting period.  Franchisee shall execute an Authorization Agreement for pre-authorized payment of Marketing and Promotion Fees through direct debit and by electronic transfer of funds from Franchisee's bank account to the bank account designated by Franchisor.  Any Marketing and Promotion Fee collected by Franchisor will be deposited by Franchisor in one or more accounts of Franchisor (referred to collectively as the "**Marketing Fund**"), with all such funds designated as "INCHIN'S BAMBOO GARDEN Marketing and Promotion Fund."  Payment of the Marketing and Promotion Fees will be subject to the same interest charges as the Royalty Fee Payments.  Upon written request by Franchisee, Franchisor will make available to Franchisee, no later than one hundred twenty (120) days after the end of each calendar year, an annual unaudited financial statement for the Marketing Fund which indicates how deposits to the Marketing Fund have been spent.  Franchisor has the right to deposit into the Marketing Fund any advertising, marketing, or similar allowances paid by suppliers who deal with the Restaurant and with whom Franchisor has agreed that it will (or if Franchisor otherwise chooses to) so deposit these allowances.  Franchisor or its affiliates will contribute to the Marketing Fund on the same basis as franchisees in respect of restaurants operated by them under the Mark.

(b)    The Marketing Fund will be administered and controlled by Franchisor and may be used for production and placement of media advertising, direct response literature, direct mailings, brochures, collateral advertising material, surveys of advertising effectiveness, other advertising or public relations expenditures relating to advertising Restaurant services and products, providing professional services, materials, and personnel to support the marketing function, and creating, producing, and implementing websites for Franchisor and/or its franchisees.  Franchisor may reimburse itself for administrative costs, independent audits, reasonable accounting, bookkeeping, reporting, and legal expenses, taxes, and other reasonable direct and indirect expenses incurred by Franchisor or its authorized representatives in connection with the programs funded by the Marketing Fund; provided, however, such reimbursement shall be only in such amounts as are necessary to make Franchisor whole without providing a profit

17

to it.  The Marketing Fund will not be Franchisor's asset.  Franchisor will not be liable for any act or omission that is consistent with this Agreement and done in good faith.  Franchisor may spend in any fiscal year more or less than the aggregate contribution of all Restaurants to the Marketing Fund in that year and the Marketing Fund may borrow from Franchisor or others to cover deficits or invest any surplus for future use.  All interest earned on monies contributed to the Marketing Fund will be used to pay advertising costs before other assets of the Marketing Fund are expended.  Franchisor may cause the Marketing Fund to be incorporated or operated through a separate entity at such time as Franchisor deems appropriate, and such successor entity, if established, will have all rights and duties specified in this Section.  Franchisor undertakes no obligation to ensure that the Marketing Fund benefits each Restaurant in proportion to its respective contributions.  Franchisor is not obligated to expend the Marketing Fund within any particular period or in any particular manner.  The Marketing Fund's primary purpose is to support sales by all of the Restaurants operating under the Mark and to build brand identity.  Franchisee agrees to participate in any promotion campaigns and advertising and other programs that the Marketing Fund establishes periodically.  Company shall not be a third-party beneficiary with respect to contributions made to the Marketing Fund by other Franchisees of Franchisor.

(c)     Franchisor reserves the right to make expenditures from the Marketing Fund for advertising on behalf of the franchise system that Franchisor, in its discretion, deems necessary and appropriate for the franchise system.  Franchisor reserves the right to select the media used for such advertising and to determine whether such advertising will be conducted on a local, regional or national level.  Franchisor also reserves the right to choose the source of the creation of the advertising material.  Franchisor does not have an obligation to spend any specific amount in the area or territory where any Restaurant is located.

(d)     Franchisor has the right, but no obligation, to use collection agents and institute legal proceedings to collect Marketing Fund contributions at the Marketing Fund's expense.  Franchisor also may forgive, waive, settle, and compromise all claims by or against the Marketing Fund.  Franchisor may at any time defer or reduce contributions to the Marketing Fund by a franchisee and, upon thirty (30) days' prior written notice to Franchisee, reduce or suspend Fund contributions and operations for one (1) or more periods of any length and terminate (and, if terminated, reinstate) the Marketing Fund.  If Franchisor terminates the Marketing Fund, it will distribute all unspent monies to the contributors in proportion to their respective Fund contributions during the preceding twelve (12) month period.

(e)     Franchisor shall make available, upon request, annual unaudited financial statements for the Marketing Fund certified as accurate by Franchisor.

(f)     Franchisor shall cause all affiliate-owned Restaurants to contribute to the Marketing Fund as a pro rata basis with all of franchised Restaurants contributing to the Marketing Fund.  The amount of the annual contribution to the Marketing Fund by the affiliate-owned Restaurants shall be an amount equal to the annual expenditures from the Marketing Fund as of December 31 in each year multiplied by a fraction, the numerator of which is the number of affiliate-owned Restaurants and the denominator of which is the total of all franchised and affiliate-owned Restaurants.  Franchisor shall cause such contribution to be made on or before January 31 in the succeeding year.

12.4    **Local Advertising.**  Franchisee agrees to spend not less than one percent (1%) of the total amount of its Gross Sales each calendar quarter for local marketing and advertising of the Restaurant ("**Local Advertising Expenditure**").  Franchisor may request that Franchisee prepare and submit a quarterly report to Franchisor which accounts for the use of the Local Advertising Expenditure no later than ten (10) days following the end of each calendar quarter during the term of this Agreement.  In the event Franchisee fails to make the Local Advertising Expenditure as required, Franchisee hereby authorizes Franchisor to debit Franchisee's bank account in the manner provided in Section 5.4 above in the amount of the Local Advertising Expenditure and to spend such amount in local advertising of the Restaurant on behalf of Franchisee.

12.5    **Regional Advertising Programs.**  Although not obligated to do so, Franchisor may create a regional advertising program ("**Regional Advertising**") for the benefit of the restaurants operating under the Mark located within a particular region.  Franchisor has the right to:  (a) allocate any portion of the Marketing and Promotion Fund to the Regional Advertising program; and (b) collect and designate all or a portion of the Local Advertising Expenditure for a Regional Advertising program.  If a Regional Advertising program is established,

Franchisor may increase the Local Advertising Expenditure by one percent (1%); provided that in no event shall Franchisee be required to spend more than a total of five percent (5%) of its Gross Sales, in the aggregate, for the Local Advertising Expenditure, Regional Advertising, and Marketing and Promotion Fee contributions, including Yellow Pages advertising.  Franchisor has the right to determine the composition of all geographic territories and market areas for the implementation of Regional Advertising and promotion campaigns and to require that Franchisee participate in such Regional Advertising programs as and when established by Franchisor.  The fees designated to the Regional Advertising programs may be used to pay regional, multi-regional or national marketing expenses.  If a Regional Advertising program is implemented on behalf of a particular region, Franchisor reserves the right to establish an advertising cooperative for a particular region to enable the cooperative to self-administer the Regional Advertising program, and Franchisee agrees to participate in such cooperative according to the cooperative's then current rules and procedures and to abide by the cooperative's then current decisions.  Franchisor may at any time, upon thirty (30) days' prior written notice to Franchisee, suspend a Regional Advertising program or cooperative operations for one (1) or more periods of any of any length and terminate (and if terminated reinstate) the Regional Advertising program or cooperative.

## 13.     QUALITY CONTROL

13.1     **Standards and Specifications.**  Franchisor will make available to Franchisee standards and specifications for services and products offered at or through the Restaurant and the uniforms, recipes, materials, forms, menus, items, and supplies to be used in connection with the Restaurant.  Franchisor reserves the right to change standards and specifications for services and products offered at or through the Restaurant or for uniforms, recipes, materials, forms, items, and supplies upon thirty (30) days' prior written notice to Franchisee.  Franchisee agrees to accept such changes and to implement them promptly in the operation of the Restaurant.

13.2     **Inspections.**  Franchisor shall have the right to interview customers of the Restaurant, to inspect the Franchised Location and to examine and copy the books, records, and documents relating to the operation of the Restaurant, including, without limitation, the inventory, products, equipment, materials, or supplies, to ensure compliance with all standards and specifications set by Franchisor.  Franchisor shall conduct such inspections during regular business hours without prior notice to Franchisee.

13.3     **Restrictions on Services and Products.**  Franchisee is prohibited from offering or selling any services or products from or through the Restaurant that has not been previously authorized by Franchisor.

13.4     **Approved Suppliers.**  Franchisee shall purchase all equipment, products, services, supplies, and materials required for the operation of the Restaurant from manufacturers, suppliers, or distributors designated by Franchisor or, if there is no designated supplier for a particular product, service, supply, or material, from such other suppliers who meet all of Franchisor's specifications and standards as to quality, composition, finish, appearance, and service and adequately demonstrate their capacity and facilities to supply Franchisee's needs in the quantities, at the times, and with the reliability requisite to an efficient operation.  Franchisor reserves the right to designate, from time to time, a single supplier for any services, products, equipment, supplies, or materials and to require Franchisee to use such a designated supplier exclusively, which exclusive designated supplier may be Franchisor or one of its affiliates.  Franchisor and its affiliates may receive payments from suppliers on account of such suppliers' dealings with Franchisee and other franchisees and may use all amounts so received without restriction and for any purpose Franchisor and its affiliates deem appropriate (unless Franchisor and its affiliates agree otherwise with the supplier).  Franchisor may from time to time revoke its approval of particular products or suppliers when it determines, in its reasonable discretion, that such products or suppliers no longer meet its standards.  Upon your receipt of written notice of such revocation, you must cease to use any disapproved products and cease to purchase from any disapproved supplier.  Franchisee must use products purchased from suppliers solely for the purpose of operating the Restaurant and not for any other purpose, including, for example, resale.

13.5     **Requests for Change of Supplier.**  In the event Franchisee desires to purchase products, services, supplies, or materials from manufacturers, suppliers, or distributors other than those previously approved by Franchisor, Franchisee shall, prior to purchasing any such products, services, supplies, or materials, give Franchisor a written request to change supplier which shall specify the reason for the requested change.  Franchisor shall notify Franchisee in writing of its approval or rejection of the proposed supplier within thirty (30) days of its receipt of

Franchisee's request; provided, however, if Franchisor has not completed its investigation of the proposed supplier or does not then have all of the facts necessary to render a judgment, Franchisor shall have the right to reject the proposed supplier at that time. Franchisor may from time to time inspect any manufacturer's, supplier's, or distributor's facilities and products to assure proper production, processing, storing, and transportation of products, services, supplies, or materials to be purchased from the manufacturer, supplier, or distributor by Franchisee. Permission for such inspection shall be a condition of the continued approval of such manufacturer, supplier, or distributor. Franchisor may, for any reason whatsoever, elect to withhold approval of the manufacturer, supplier, or distributor; however, in order to make such determination, Franchisor may require that samples from a proposed new supplier be delivered to Franchisor for testing prior to approval and use. A charge not to exceed the actual cost of the test up to a maximum amount of $1,000 per product may be made by Franchisor and shall be paid by Franchisee.

### 14.     MARK, TRADE NAMES AND PROPRIETARY INTERESTS

14.1   **Mark.**

(a)     Franchisee acknowledges that Franchisor has the sole right to license and control Franchisee's use of the Mark and that such Mark shall remain under the sole and exclusive ownership and control of Franchisor. Franchisee acknowledges that it does not acquire any right, title, or interest in the Mark except for the right to use the Mark in operating its Restaurant under this Agreement. The Restaurant shall be identified by the Mark and operated using the Licensed Methods and the Franchisor Trade Dress at all times during the full term of this Agreement. Franchisee shall display the Mark prominently at the Restaurant, on packaging and serving materials, and in connection with forms, advertising, and marketing, all in the manner Franchisor prescribes. Franchisee further agrees that no other trademark or service mark other than INCHIN'S BAMBOO GARDEN™, or such other trademarks specified by Franchisor shall be used in the marketing, promotion, identification, or operation of the Restaurant, except with Franchisor's prior written consent and except for trademarks appearing on goods or products used in the operation of the Restaurants. Franchisee may not use any of the Mark, except as allowed by Franchisor in writing, as part of any entity name, domain name or electronic mail address it maintains on the Internet, the World Wide Web, or any other similar proprietary or common carrier electronic delivery system. Franchisee shall use the Mark in the Target Area only in accordance with the terms and conditions of this Agreement and will not intentionally and/or knowingly do anything adversely to affect or impair the integrity of the Mark or the goodwill and prestige that the Mark enjoys with the public.

(b)     Franchisee acknowledges Franchisor's ownership and title to the Mark that is used in connection with the operation of Restaurants identified as INCHIN'S BAMBOO GARDEN™ as well as any copyrights or distinctive features of the labeling used in connection with the Mark and the distinctive business format and trade dress of the retail stores operated under the Mark. Franchisee acknowledges that Franchisee shall not, directly or indirectly or through any other entity directly or indirectly related to Franchisee or its shareholders/ partners/members, if any, acquire or claim adversely to Franchisor any right, title or interest in and to the Mark per se or in combination with any other term or trademark or any such copyrights or distinctive features of the labeling used in connection with the Mark or the distinctive business format and trade dress used in the retail stores operated under the Mark. Franchisee acknowledges that each and every use of the Mark by Franchisee under this Agreement shall at all times inure to the benefit of Franchisor and Franchisee shall execute any and all documents that may be submitted to Franchisee reasonably necessary to carry out the intention of this covenant. This covenant shall survive the expiration or termination of this Agreement for any reason.

(c)     Franchisee shall identify itself in all correspondence and other forms of business communications (excluding advertising) in its own name, followed by the words "d/b/a INCHIN'S BAMBOO GARDEN™ under license from Inchins Bamboo Garden Franchising LLC." Franchisee shall post notices in prominent places within the Store stating that Franchisor is the owner of the Mark and Franchisee is an independent operator and licensed user of the Mark. In the event Franchisee is required to register INCHIN'S BAMBOO GARDEN™ as a business or trade name, at the request of Franchisor, Franchisee shall deliver to Franchisor an executed termination of such registration to be held in escrow by Franchisor pending expiration or termination of this Agreement, at which time Franchisor is authorized by Franchisee to file such termination with the appropriate governmental authorities.

(d)     Franchisee shall immediately notify the Franchisor of any apparent infringement of or challenge to Franchisee's use of the Mark, or any adverse claim of rights to the Mark, and Franchisee shall not communicate with any person other than the Franchising Entities and counsel for the Franchisor or Franchisee's counsel in connection with any such infringement, challenge or claim.  Franchisee shall proceed with the Franchisor in accordance with the provisions of Section 14.6 hereof with respect to any such infringement, challenge or claim.

14.2     <u>**Confidential Information and Trade Secrets**</u>.

(a)     Franchisee hereby acknowledges and agrees that Franchisor owns and controls the distinctive plan for establishing, operating, and promoting Restaurants and all related licensed methods of doing business, previously defined as the Licensed Methods, which include, but are not limited to, recipes, menu items, and cooking methods; technical restaurant equipment standards; order and take-out fulfillment methods; customer relations; marketing techniques; written promotional materials and Operations Manual contents; advertising; and accounting systems, all of which constitute trade secrets of Franchisor, and Franchisee acknowledges that Franchisor has valuable rights in and to such trade secrets.  Franchisee further acknowledges that it has not acquired any right, title, or interest in the Licensed Methods, except for the right to use the Licensed Methods in operating the Restaurant as provided in this Agreement, and that any and all innovations, additions, or improvements made to the Licensed Methods, even if created by Franchisee, shall belong to Franchisor.

(b)     In addition, Franchisee has had access to certain proprietary and confidential information provided by Franchisor as a result of becoming a franchisee of Franchisor and participating in its franchise training and support programs including, without limitation, the Operations Manual and other written materials delivered as part of such training and support programs and that Franchisee hereby agrees to maintain the confidentiality of such proprietary and confidential information. For purposes of this Agreement, "**Franchisor Confidential Information**" shall mean any confidential or other proprietary information owned by Franchisor or any confidential or proprietary information that is disclosed under the terms of the Franchise Agreement by Franchisor to Franchisee to assist Franchisee in performing its obligations under the Franchise Agreement.  For purposes of this Agreement, "**Franchisor Trade Secrets**" shall mean all of the information including, without limitation, any formulas, patterns, compilations, programs, devices, methods, techniques, processes, expertise and know-how developed by Franchisor and used in the operation of the Restaurants and set forth in the Franchisee and other written materials delivered to Franchisee and in oral communications delivered to Franchisee during franchise training and franchise operations support.  Franchisee shall also include the Licensed Methods and the Franchisor Trade Secrets.

Franchisor Confidential Information shall not include information which:  (i) is or becomes public knowledge without any action by, or involvement of Franchisee; (ii) is received by Franchisee from a third party without a duty of confidentiality; or (iii) is disclosed pursuant to any judicial or other governmental order, provided that Franchisee gives Franchisor sufficient prior notice to contest such order; or (iv) relates to the act of knocking on doors to solicit customers for the business.

Franchisee agrees:  (i) not to disclose, directly or indirectly, to any third party any portion of the Franchisor without the prior written consent of Franchisor; (ii) not to use or exploit the Franchisor except to the extent permitted under this Agreement; (iii) to take all reasonably necessary precautions to protect the confidentiality of the Franchisor received hereunder and exercise at least the same degree of care in safeguarding the Franchisor as Franchisee would with his own confidential information; and (iv) promptly advise Franchisor in writing upon learning of any unauthorized use or disclosure of the Franchisor.

Franchisee acknowledges and agrees that Franchisor believes that the Franchisor Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, persons other than franchisees of Franchisor who can obtain economic value from the disclosure and use thereof.

(c)     Franchisee acknowledges and agrees that the combination of the distinctive and identifying interior and exterior store layout, signage, design and décor features used by Franchisor as part of the uniform appearance of all Restaurants operating under the Mark, including, without limitation, the items of décor, fixtures and accessories described on <u>Exhibit 10</u> (the "**Franchisor Trade Dress**") has been created and developed by Franchisor for the exclusive use of franchisees of Franchisor and that Franchisee's rights to use the Franchisor

Trade Dress are derived solely through this Agreement.  Franchisee agrees that, upon expiration or termination of this Agreement, all rights of Franchisee to use the Franchisor Trade Dress shall cease and terminate.

14.3    **Trademark Infringement**.  Franchisee agrees to notify Franchisor in writing or any possible infringement of the Mark or use by others of a trademark confusingly similar to the Mark coming to its attention.  Franchisee acknowledges that Franchisor shall have the sole right to determine whether any action will be taken in response to any possible infringement or illegal use and to control any action taken.  Franchisee agrees to fully cooperate with Franchisor in any litigation or other action.

14.4    **Franchisee's Business Name.**  Franchisee acknowledges that Franchisor has a prior and superior claim to the INCHIN'S BAMBOO GARDEN™ trade name.  Franchisee shall not use the words "INCHIN'S BAMBOO GARDEN" in the legal name of its corporation, partnership, or any other business entity.  Franchisee also agrees not to register or attempt to register a trade name using the words "INCHIN'S BAMBOO GARDEN" or any portion thereof in Franchisee's name or that of any other person or business entity without the prior written consent of Franchisor.

14.5    **Change of Mark**.  In the event Franchisor decides to modify or discontinue use of any of the Mark, or to develop additional or substitute mark, Franchisee shall, within a reasonable time after receipt of written notice, take such action, at Franchisee's sole expense, necessary to comply with such modification, discontinuation, addition, or substitution.  Franchisor need not reimburse Franchisee for its direct expenses of changing the Restaurant's exterior or interior signs, for any loss of revenue due to any modified or discontinued Mark, or for its expenses of promoting a modified or substitute trademark or service mark.

14.6    **Litigation.**

(a)    In the event a suit in equity or action at law is brought against Franchisee and/or Franchisor alleging that Franchisee and/or Franchisor has no right to use the Mark in connection with the Restaurant, Franchisor, with the cooperation of Franchisee, shall assume the defense of such suit or action.  Such defense shall be controlled and coordinated by trademark counsel, as chosen by Franchisor.  Except to the extent that such litigation is the result of Franchisee's use of the Mark in a manner inconsistent with the terms of this Agreement, Franchisor shall bear all costs of maintaining such defense.

(b)    (i)    With respect to the use of the Mark by unlicensed third parties, if Franchisee requests Franchisor to take legal action to protect or enforce its trademark rights in Target Area, Franchisor, with the cooperation of Franchisee, shall take such legal action as Franchisor deems appropriate in order to protect or enforce Franchisee's and/or Franchisor's trademark rights.  Such legal action shall be controlled and coordinated by trademark counsel, as chosen by Franchisor.  Franchisor shall bear the costs of taking such action to protect or enforce the trademark rights.  Any proceeds recovered as a result of such legal action shall be the sole property of Franchisor.

(ii)    (A)    In the event Franchisee believes that an unlicensed third party is using a name confusingly similar to INCHIN'S BAMBOO GARDEN™ in the Target Area, Franchisor and Franchisee shall attempt to agree on a mutually acceptable course of action to be taken to protect or enforce the trademark rights.  In the event any such course of action is taken, such action shall be controlled and coordinated by trademark counsel; as chosen by Franchisor, and Franchisor and Franchisee shall share equally the costs of taking such action to protect or enforce the trademark rights.  Any proceeds recovered as a result of such action shall be shared equally by Franchisee and Franchisor.

(B)    If Franchisor does not believe the use of the name by a third party is confusingly similar to INCHIN'S BAMBOO GARDEN™ based upon the advice of its counsel, Franchisee may proceed alone to take such action as it deems appropriate to protect or enforce its trademark rights under this Agreement, and Franchisee shall bear all costs of such action.  Franchisor shall provide Franchisee full cooperation to enable Franchisee to enforce its trademark rights under this Agreement if Franchisee decides to take such action; provided, however, Franchisor shall not involuntarily become a party to such action.  Any proceeds recovered by Franchisee as a result of such action shall be the sole property of Franchisee.

(c)     Franchisee and Franchisor agree that each party shall keep the other promptly informed of any use of the Mark or any use of a name confusingly similar to INCHIN'S BAMBOO GARDEN™ by unlicensed third parties in the Target Area.

(d)     Notwithstanding the foregoing provisions, Franchisor shall have no obligation to Franchisee under this Section 14.6 in respect of any third party use of any of the words contained in the Mark that is, or should have been, identified in the due diligence investigation by Franchisee described in Section 6.1 of this Agreement.

## 15.     REPORTS, RECORDS AND FINANCIAL STATEMENTS

15.1     **Franchisee Reports.**  Franchisee shall retain a full-time professional accountant (approved in writing by Franchisor) to provide bookkeeping services (at Franchisee's expense), and that accountant shall agree in writing (on a form acceptable to Franchisor) to provide timely financial statements required by this Section 15. During the first twelve calendar months after the opening of the Restaurant, Franchisee agrees to engage HRP Hitesh, Certified Public Accountants, Duluth, Georgia ("**HRP Hitesh**") pursuant to the engagement letter attached as Exhibit 6 to this Agreement.  After such twelve calendar month period, Franchisee agrees to give serious consideration to engaging HRP Hitesh on an ongoing basis, but shall have the right to engage another accounting firm subject to the prior written approval of Franchisor.  If Franchisee fails to provide such financial statements more than two (2) times in any twelve (12) month period, then, in addition to any other remedies, Franchisor may require Franchisee to use the bookkeeping services described on Exhibit 6 at the then-current fee for such services. Franchisee also shall provide to Franchisor financial and accounting reports in the manner and form Franchisor requires, including:

(a)     Weekly summary reports, submitted by no later than the Due Date each week (defined in Section 5.3) and containing information relative to the previous weekly reporting period operations;

(b)     Any other data, information, and supporting records reasonably requested by Franchisor from time to time (including, without limitation, daily and weekly reports of product sales by category);

(c)     Within fifteen (15) days after the end of each month, an income statement of the Restaurant for such month and for the fiscal year to date, prepared in accordance with generally accepted accounting principles ("**GAAP**") consistently applied, in Franchisor's recommended format; and

(d)     Within ninety (90) days after the end of Franchisee's fiscal year, which shall be the calendar year, an income statement and balance sheet of the Restaurant for such fiscal year (reflecting all year-end adjustments) and a statement of changes in cash flow of the Restaurant, prepared in accordance with GAAP, consistently applied and in Franchisor's recommended format.  Franchisor reserves the right to require Franchisee to engage a certified public accountant to perform a review of Franchisee's financial statements on an annual basis.

15.2     **Financial Records Use and Access**.  Franchisor reserves the right to disclose data derived from all financial and accounting reports received from Franchisee.  Franchisor reserves the right to require that Franchisee install and maintain a telephone modem and dedicated line at the Restaurant which Franchisor may access to obtain sales information and data of the System (defined in Section 6.6), and Franchisee agrees to cooperate with Franchisor's procedures regarding the System.  With respect to the operation and financial condition of the Restaurant, Franchisee agrees to furnish Franchisor the required financial and accounting reports in the form prescribed by Franchisor, which may include, without limitation, computer diskette, electronic mail, and facsimile transmission.

15.3     **Books and Records.**  Franchisee shall maintain all books and records for its Restaurant in accordance with GAAP consistently applied and preserve such records, including cash register tapes, shift reports, weekly operating summaries, and sales tax returns, for at least three (3) years after the fiscal year to which they relate.

15.4    **Audit of Books and Records.**  Franchisee shall permit Franchisor or its representatives to inspect and audit the books and records of the Restaurant at any reasonable time at Franchisor's expense.  If any audit discloses a deficiency in amounts owed to Franchisor, then such amounts shall become immediately payable to Franchisor by Franchisee, with interest from the date such payments were due at the lesser of two percent (2%) per month or the maximum commercial contract interest rate allowed by law.  In addition, if such audit discloses that the Gross Sales of the Restaurant have been understated by two (2%) or more during the audit period, Franchisee shall pay all reasonable costs and expenses Franchisor incurred in connection with such audit up to a maximum amount of $200 per day.

## 16.    TRANSFER

16.1    **Transfer by Franchisee.**  Franchisee agrees that the rights and duties created by this Agreement are personal to Franchisee (and its shareholders, partners, members, or owners, as identified on Exhibit 7, if Franchisee is a corporation, partnership, or limited liability company, or other business entity) and that Franchisor has entered into this Agreement in reliance upon Franchisor's perceptions of the individual or collective character, skill, aptitude, attitude, business ability, and financial capacity of Franchisee (and its shareholders, partners, members, or owners).  Accordingly, without Franchisor's prior written consent, which will not be unreasonably withheld, neither this Agreement (nor any interest in this Agreement) nor any part or all of the ownership of Franchisee may be transferred to any person or entity who is not a shareholder, partner, member or owner of Franchisee on the date hereof.  Any unauthorized transfer is a breach of this Agreement and shall be deemed void and of no effect *ab initio*.  As used in this Agreement, the term "transfer" includes Franchisee's (or an owner's) voluntary, involuntary, direct, or indirect assignment, sale, gift, or other disposition of any interest in:  (1) this Agreement; (2) the Franchisee entity; (3) the Restaurant governed by this Agreement; or (4) all or a substantial portion of the assets of the Restaurant.

16.2    **Pre-Conditions to Franchisee's Transfer.**  Franchisee agrees that there may be no transfers of any kind before the Restaurant has opened for business and has operated for a period of at least six (6) months.  Franchisor shall not be obligated to approve a proposed transfer unless Franchisee (and its owners) is in full compliance with this Agreement.  Franchisor shall not unreasonably withhold its approval of a proposed transfer that meets all the applicable requirements of this Section.  The proposed transferee and its owners must be individuals of good moral character and otherwise meet Franchisor's then applicable standards for new franchisees.

If the proposed transfer is of this Agreement and the Restaurant, or a controlling interest in Franchisee, or is one of a series of transfers (regardless of the time period over which these transfers take place) which in the aggregate transfer this Agreement and the Restaurant or a controlling interest in Franchisee, all of the following conditions must be met before or concurrently with the effective date of the transfer:  (a) all amounts due and owing pursuant to this Agreement or otherwise payable by Franchisee to Franchisor, its affiliates, or any third parties whose claims Franchisor has guaranteed on behalf of Franchisee, if any, are paid in full; (b) Franchisee has submitted to Franchisor all reports and statements required under this Agreement; (c) Franchisee has not violated any provision of this Agreement, the lease of the Restaurant's premises, or any other agreement with Franchisor during both the sixty (60) day period before Franchisee requested Franchisor's consent to the transfer and the period between Franchisee's request and the effective date of the transfer; (d) the proposed transferee agrees to operate the Restaurant as an INCHIN'S BAMBOO GARDEN™ Restaurant, signs the then-current form of franchise agreement, the provisions of which may differ materially from any and all of those contained in this Agreement, and satisfactorily completes the initial training program of Franchisor; (e) Franchisee provides written notice to Franchisor at least thirty (30) days prior to the proposed effective date of the transfer and includes information reasonably detailed to enable Franchisor to evaluate the terms and conditions of the proposed transfer, which at a minimum includes a written offer from the proposed transferee; (f) the proposed transferee provides information to Franchisor sufficient for Franchisor to assess the proposed transferee's business experience, aptitude, and financial qualification, and Franchisor approves the proposed transferee as a franchisee; (g) neither the transferee nor its owners or affiliates operate or have an ownership interest m a Competitive Business (defined in Section 20.1); (h) Franchisee's landlord consents to allow Franchisee to transfer the Restaurant's lease to the transferee; (i) if Franchisee or its owners finance any part of the purchase price, Franchisee and/or its owners agree that all of the transferee's obligations under promissory notes, agreements, or security interests reserved in the Restaurant are subordinate to the transferee's obligation to pay fees and other amounts due to Franchisor and otherwise to comply

24

with this Agreement; (j) the acquiring person or entity shall execute a Franchise Agreement with Franchisor containing terms and conditions substantially similar to this Agreement and the rate of the royalty fee set forth in Section 5.1 shall become the then-current rate being charged to new franchisees of Franchisor and the fees payable shall become the then-current fees being charged to new franchisees of Franchisor; (k) Franchisee executes a Termination Agreement and Mutual Release of Claims, in a form satisfactory to Franchisor, of any and all claims against Franchisor, its affiliates, and their respective shareholders, officers, directors, employees, and agents, the current form of which is attached as <u>Exhibit 8</u>; (l) Franchisee abides by all post-termination covenants, including, without limitation, the covenant not to compete set forth in Section 20.3; (m) if Franchisee is an individual transferring this Agreement and the Restaurant to an entity wholly-owned by Franchisee, Franchisee agrees both to remain personally responsible for the entity's performance of its obligations under this Agreement and to continue to comply personally with all obligations under this Agreement; and (n) the Guaranty and Assumption of Franchisee's obligations (<u>Exhibit 9</u>) as executed by the Bound Parties (as defined in Section 20.3) on the date of the Franchise Agreement shall remain in effect notwithstanding the transfer of this Agreement and the Restaurant and those persons who executed the Guaranty and Assumption of Franchisee's obligations will continue to be bound hereby notwithstanding the execution of the Termination Agreement and Mutual Release of Claims.

If Franchisor approves the proposed transfer, Franchisee or the proposed transferee will pay Franchisor a transfer fee in an amount equal to twenty-five percent (50%) of the then-current Initial Franchise Fee being charged by Franchisor, which fee is required to cover Franchisor's reasonable expenses related to the transfer, including training; provided, however, that no transfer fee will be charged (and Franchisor's right of first refusal will not apply) for a transfer by Franchisee to an entity wholly-owned by Franchisee, between owners of a Franchisee entity, or to a spouse or the children of a Franchisee (or owner of the Franchisee) upon the death or disability of Franchisee (or owner) so long as the transfer does not result in a change of control of the Franchisee.

A person will be deemed to have a controlling interest in Franchisee if that person has the right to vote twenty-five percent (25%) or more of the voting securities or other forms of ownership interest of a corporation, partnership, or other form of entity, or is entitled to receive twenty-five percent (25%) or more of the net profits of any such entity, or is otherwise able to direct or cause the direction of that entity's management or policies.

16.3    **Franchisor's Approval of Transfer.**  Franchisor shall have thirty (30) days from the date upon which Franchisee has delivered the written notice to Franchisor requesting a transfer and all of the supplemental information required in connection with such request in which to approve or disapprove, in writing, Franchisee's proposed transfer. Franchisee acknowledges that the proposed transferee shall be evaluated by Franchisor based on the same criteria as are currently being used to assess new franchisees and that the proposed transferee shall be provided with such disclosures required by state or federal law. Franchisor may review all information regarding the Restaurant that Franchisee gives the transferee, and Franchisor may give the transferee copies of any reports that Franchisee has given Franchisor or Franchisor has made regarding the Restaurant.

16.4    **Right of First Refusal.**  Franchisee grants to Franchisor a thirty (30) day right of first refusal to purchase such rights, interest, or assets on the same terms and conditions as are contained in the written notice set forth in Section 16.2(c) exercisable during the thirty (30) day period described in Section 16.3; provided, however, the following additional terms and conditions shall apply:  (a) the right of first refusal will be effective for each proposed transfer, and any material change in the terms or conditions of the proposed transfer shall be deemed a separate offer for which Franchisor shall have a new thirty (30) day right of first refusal; (b) the thirty (30) day right of first refusal period will run concurrently with the period in which the Franchisor has to approve or disapprove the proposed transferee; (c) if the non-cash consideration or manner of payment offered by a proposed transferee is such that Franchisor cannot reasonably be expected to furnish the same, then Franchisor may purchase the interest proposed to be sold for the reasonable cash equivalent.  If the parties cannot agree within a reasonable time on the cash consideration, an independent appraiser shall be designated by Franchisor, whose determination will be binding upon the parties; all expenses of the appraiser shall be paid for equally by Franchisor and Franchisee; and, despite subparagraph (b), Franchisor will have fifteen (15) days after determination of the cash consideration to exercise its right of first refusal; and (d) if Franchisor chooses not to exercise its right of first refusal, Franchisee shall be free to complete the transfer subject to compliance with Sections 16.2 and 16.3.

16.5    **Transfer by Franchisor.**  Franchisee acknowledges that Franchisor maintains a staff to manage and operate the INCHIN'S BAMBOO GARDEN™ System and that staff members can change from time to time.

25

Franchisee represents that it has not signed this Agreement in reliance on any shareholder, director, officer, or employee remaining with Franchisor in that capacity. Franchisor may change its ownership or form of organization and/or assign and transfer this Agreement and any other agreement freely without restriction.

16.6   **Franchisee's Death or Disability.**  Except as otherwise provided in Section 16.2, upon the death or permanent disability of Franchisee (or an individual controlling a Franchisee entity), the personal representative of such person shall transfer Franchisee's interest in this Agreement or such interest in the Franchisee entity to an approved third party. Such disposition of this Agreement or such interest (including, without limitation, transfer by bequest or inheritance) shall be completed within a reasonable time, not to exceed one hundred twenty (120) days from the date of death or permanent disability (unless extended by probate proceedings), and shall be subject to all terms and conditions applicable to transfers contained in this Section 16; provided, however, that for purposes of this Section, there shall be no transfer fee charged by Franchisor. Failure to transfer the interest within said period of time shall constitute a breach of this Agreement. The term "**permanent disability**" shall mean a mental or physical disability, impairment, or condition that is reasonably expected to prevent or actually does prevent Franchisee (or an owner controlling a Franchisee entity) from supervising the management and operation of the Restaurant for a period of one hundred twenty (120) days from the onset of such disability, impairment, or condition. In any event, the Restaurant shall at all times be managed by a Designated Manager who has complied with all of Franchisor's training requirements, regardless of any death or permanent disability covered by this Section.

## 17.   TERM AND RENEWAL

17.1   **Term.**  The initial term of this Agreement is for a period of ten (10) years from the Effective Date, unless sooner terminated.

17.2   **Renewal.**  At the end of the initial term, Franchisee shall have the option to renew its franchise rights for two additional five (5) year terms, so long as Franchisee:

(a)   Has complied with all provisions in this Agreement during the initial term, including the payment on a timely basis of all Royalty Fees and other fees. "**Compliance**" shall mean, at a minimum, that Franchisee has not received written notification from Franchisor of a breach more than four (4) times during the initial term;

(b)   Is not in default or under notification of breach of this Agreement at the time it gives notice under Section 17.3;

(c)   Agrees to upgrade and remodel the Restaurant at Franchisee's sole expense (the necessity of which shall be at Franchisor's option) to conform with the then-current Operations Manual requirements;

(d)   Executes a Termination Agreement and Mutual Release of Claims, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates and their respective shareholders, officers, directors, employees, and agents arising out of or relating to this Agreement or the parties' relationship, the current form of which is attached as Exhibit 8; and

(e)   Executes the then-current form of Franchise Agreement, which agreement may contain terms materially different from those in this Agreement, including terms changing the Royalty Fee and other fee amounts; provided that Franchisee shall not be required to pay a new Initial Franchise Fee.

17.3   **Exercise of Renewal**.  Franchisee may exercise its option to renew by giving written notice of such exercise to Franchisor not more than one (1) year nor less than one hundred eighty (180) days prior to the expiration of the initial term. Franchisee must also pay a renewal fee of Five Thousand Dollars ($5,000) to Franchisor concurrently with the execution of the then-current Franchise Agreement to cover Franchisor's expenses related to reviewing Franchisee's operations and approving the renewal. If Franchisee fails to comply with any of the conditions listed above (other than execution of the new Franchise Agreement or payment of the renewal fee),

Franchisor shall give notice to that effect to Franchisee no later than ninety (90) days before expiration of the initial term.

## 18.   DEFAULT AND TERMINATION

18.1   **Termination by Franchisee.**  Franchisee shall have the right to terminate this Agreement if Franchisor materially fails to comply with this Agreement and fails to cure its default within thirty (30) days after delivery of written notice of the default from Franchisee.  Notwithstanding the foregoing, if the breach is curable but is of a nature which cannot reasonably be cured within such thirty (30) day period and Franchisor has commenced and is continuing to make good faith efforts to cure the breach, Franchisor shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate.  Any termination by Franchisee other than in accordance with this Section will be deemed a termination by Franchisee without cause.

18.2   **Termination by Franchisor - Effective upon Notice.**  Franchisor shall have the right, at its option, to terminate this Agreement and all rights granted Franchisee, without affording Franchisee any opportunity to cure any default (subject to any state laws to the contrary, in which case state law shall prevail), effective upon delivery to Franchisee of a termination notice, upon the occurrence of any of the following events:

(a)   **Unauthorized Opening.**  If Franchisee begins operating the Restaurant without having obtained Franchisor's prior written consent, as required in Section 6.8;

(b)   **Unauthorized Disclosure.**  If Franchisee or any person under Franchisee's control intentionally or negligently discloses to any unauthorized person, or copies or reproduces, the contents or any part of the Operations Manual or any other trade secrets or confidential information of Franchisor;

(c)   **Fraud or Conduct Affecting the Mark.**  If Franchisee commits fraud in connection with the purchase or operation of the Restaurant or otherwise engages in conduct that, in the sole judgment of Franchisor, materially impairs the goodwill associated with the Mark;

(d)   **Fraudulent Practices.**  Franchisee engages in fraudulent practices, including, but not limited to, submitting false information on the Exhibits to this Agreement, false reports, reports containing material misstatements or omissions or financial statements, whether prior to or after the date hereof (including, without limitation, a material understatement of Gross Sales as provided in Section 5);

(e)   **Abandonment.**  If Franchisee fails to operate the Restaurant or otherwise abandons the Restaurant for a period of five (5) consecutive days, or any shorter period that indicates an intent by Franchisee to discontinue operation of the Restaurant, unless and only to the extent that full operation of the Restaurant is suspended or terminated due to fire, flood, earthquake, or other similar causes beyond Franchisee's control and not related to the availability of funds to Franchisee;

(f)   **Insolvency; Assignments.**  If Franchisee becomes insolvent or is adjudicated a bankrupt; or any action is taken by Franchisee, or by others against Franchisee, under any insolvency, bankruptcy, or reorganization act (this provision might not be enforceable under federal bankruptcy law, 11 U.S.C. §§ 101 et seq.); or if Franchisee makes an assignment for the benefit of creditors; or a receiver is appointed for Franchisee;

(g)   **Unsatisfied Judgments: Levy; Foreclosure.**  If any material judgment (or several judgments which in the aggregate are material) is obtained against Franchisee and remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas or other appeal bond has been filed); or if execution is levied against Franchisee's business or any of the property used in operating the Restaurant and is not discharged within five (5) days; or if the real or personal property of Franchisee's business shall be sold after levy by any sheriff, marshal, or constable;

(h)   **Criminal Conviction.**  If Franchisee (or any of its Bound Parties, as defined in Section 20.1) is convicted of a felony, a crime involving moral turpitude, or any crime or offense reasonably likely, in the

sole opinion of Franchisor, to materially and unfavorably affect the Licensed Methods, Mark, and associated goodwill and reputation;

(i)    **Failure to Make Payments.**  If Franchisee fails to maintain the minimum balance in the bank account identified on <u>Exhibit 4</u> as required by Section 5.4 or fails to pay any amounts due Franchisor or its affiliates within ten (10) days after delivery of notice that such fees or amounts are overdue;

(j)    **Financial Reporting.**  If Franchisee intentionally underreports Gross Sales in any amount or negligently underreports Gross Sales by five percent (5%) or more during any reporting period;

(k)    **Failure to Complete Training or Open.**  If Franchisee (or its Managing Owner and Designated Manager) fails to complete the initial training program to Franchisor's satisfaction or to commence operations of the Restaurant within the required time period;

(l)    **Misuse of Mark.**  If Franchisee misuses or fails to follow Franchisor's directions and guidelines concerning use of the Mark and fails to correct the misuse or failure within ten (10) days after delivery of notice from Franchisor;

(m)    **Repeated Noncompliance.**  If Franchisee has received three (3) notices of default from Franchisor within a twelve (12) month period, regardless of whether the defaults were cured by Franchisee;

(n)    **Right to Possession of Property.**  If Franchisee loses the right to occupy the Restaurant's premises because of its default under the lease or sublease or defaults under any agreement related to use or operation of the Restaurant;

(o)    **Unauthorized Transfer.**  If Franchisee sells, transfers, or otherwise assigns the franchise, an interest in the franchise or Franchisee entity, this Agreement, the Restaurant, or a substantial portion of the assets of the Restaurant without complying with the provisions of Section 16; or

(p)    **Termination of Other Franchise Agreement.**  If Franchisor issues a notice of termination with respect to any other franchise agreement between Franchisor and Franchisee (or any other legal entity in which Franchisee, or one of its owners with at least a twenty-five percent (25%) ownership interest in Franchisee, is the sole owner or managing owner) governing the operation of another Restaurant.

18.3    **Termination by Franchisor - Thirty Days Notice.**  Franchisor shall have the right to terminate this Agreement (subject to any state laws to the contrary, in which case state law shall prevail), effective upon delivery of thirty (30) days' prior written notice to Franchisee, if Franchisee breaches any other provision of this Agreement, including, but not limited to, if Franchisee fails to comply with the Operations Manual, and fails to cure the default during such thirty (30) day period.  In that event, this Agreement will terminate without further notice to Franchisee, effective upon expiration of the thirty (30) day period. Notwithstanding the foregoing, if the breach is curable, but is of a nature which cannot reasonably be cured within such thirty (30) day period and Franchisee has commenced and is continuing to make good faith efforts to cure the breach, Franchisee shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate.  In the event the Franchisee fails to comply within the time period, the Franchisor will call in the Senior Executive (Food Production) to its corporate headquarters, and at that time the Franchisee will be in full default of the agreement.

18.4    **Failure to Comply with Reporting Requirements.**  If Franchisee fails to prepare and submit any statement or report required under Section 15, then Franchisor shall have the right to treat Franchisee's failure as good cause for termination of this Agreement.  In addition to all other remedies available to Franchisor, in the event that Franchisee fails to prepare and submit any statement or report required under Section 15 for two (2) consecutive reporting periods, Franchisor shall be entitled to make an audit, at the expense of Franchisee, of Franchisee's books, records, and accounts, including Franchisee's bank accounts.  The statements or reports not previously submitted shall be prepared by or under the direction and supervision of an independent certified public accountant selected by Franchisor.  In addition to its other rights and remedies, if Franchisee fails to comply with the reporting requirements under Section 15, Franchisor shall have the right to collect, in addition to the interest on any overdue

payments, Eight Hundred Fifty Dollars ($850) per week for Royalty Fees and One Hundred Dollars ($100) per week for advertising payments (or a greater amount if Franchisor reasonably estimates that the Restaurant is generating higher Gross Sales), provided that any amounts will be reconciled and adjusted as needed when Franchisor receives actual Gross Sales amounts.

18.5    **Right to Purchase.**   Except in the case of a renewal under Section 17, upon termination or expiration of this Agreement for any reason, Franchisor shall have the option to purchase the Restaurant, or a portion of the assets of the Restaurant (including any furniture, fixtures, equipment and improvements), and which may include, at Franchisor's option, all of Franchisee's leasehold interest in and to the real estate upon which the Restaurant is located, but not including any other interest in real property. The purchase price for the assets to be transferred will be an amount equal to twenty percent (20%) of the annual Gross Sales of the Restaurant during the twelve (12) calendar months immediately preceding the date of termination or expiration and will be adjusted by setting off any amount then owing by Franchisee to Franchisor or its affiliates, including any amounts paid by Franchisor to cure Franchisee's defaults with third parties such as landlords (the decision to pay such cure amounts to be the sole decision of Franchisor).  The following additional terms shall apply to Franchisor's exercise of this option:

(a)     Franchisor's option shall be exercisable by providing Franchisee with written notice of its intention to exercise the option no later than the effective date of termination, in the case of termination (unless Franchisee terminates without notice or Franchisor terminates for cause, in which case Franchisor shall have thirty (30) days after receipt of actual notice of the termination or such additional time as is reasonably necessary given the circumstances), or at least thirty (30) days prior to the expiration of the term of the franchise, in circumstances where no renewal is granted;

(b)     Franchisor and Franchisee agree that the terms and conditions of this right and option to purchase may be recorded, if deemed appropriate by Franchisor, in the real property records, and Franchisor and Franchisee further agree to execute such additional documentation as may be necessary and appropriate to effectuate such recording;

(c)     The closing for the purchase will take place no later than sixty (60) days after delivery of written notice of Franchisor's exercise of its option is given to Franchisee.  Franchisor has the unrestricted right to assign this option to purchase at any time.  Franchisor will pay the purchase price in full at the closing or, at its option, in twenty-four (24) equal consecutive monthly installments, with interest at a rate equal to the prime lending rate as specified in *The Wall Street Journal* less 2%, as of the date of closing.  Franchisee must sign all documents of transfer reasonably necessary for purchase of the Restaurant by Franchisor, which documents shall include all customary representations and warranties from Franchisee as to ownership and condition of, and title to, the assets of the Restaurant being transferred.  All assets must be transferred free and clear of all liens and encumbrances, with all sales and transfer taxes paid by Franchisee.  Franchisee and its owners further agree to sign general releases, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its shareholders, officers, directors, employees, agents, successors, and assigns; and

(d)     Franchisee agrees that it shall be obligated to operate the Restaurant, according to the terms of this Agreement, during the period in which Franchisor is deciding whether to exercise its option to purchase and until the closing takes place, and that a condition to closing is that the Restaurant has remained open during that time period.  Franchisor may decide not to exercise its option to purchase at any time before closing if it determines that any of the conditions noted above have not been or cannot be satisfied.

In the event that Franchisor does not exercise its right to repurchase Franchisee's Restaurant as set forth above, Franchisee will be free, after such termination or expiration, to keep or to sell to any third party all of the physical assets of its Restaurant; provided, however, that all Mark are first removed in a manner approved in writing by Franchisor.

18.6    **Obligations of Franchisee Upon Termination or Expiration.**   Franchisee is obligated upon termination or expiration of this Agreement to immediately:

(a) Pay all Royalty Fees and other amounts then owed Franchisor or its affiliates pursuant to this Agreement or otherwise;

(b) Cease identifying itself as an INCHIN'S BAMBOO GARDEN™ franchisee and cease using any of the Mark, trade secrets, signs, symbols, devices, trade names, or other materials of Franchisor including, without limitation, all of the items of Franchisor Trade Dress described on Exhibit 10 attached hereto;

(c) Immediately cease to identify the Franchised Location as being, or having been, associated with Franchisor and immediately cease using the Mark and Licensed Methods;

(d) Dispose of all Franchisor Trade Dress and all signs, sign-faces, advertising materials, forms, and other materials bearing any of the Mark as provided in Exhibit 10 attached hereto;

(e) Immediately deliver to Franchisor the Operations Manual and all other information, documents, and copies which are proprietary to Franchisor;

(f) Promptly take such action required to cancel all fictitious or assumed name or equivalent registrations relating to its use of any of the Mark or, at the option of Franchisor, assign the same to Franchisor;

(g) Notify the telephone company and all telephone directory publishers of the termination or expiration of Franchisee's right to use any telephone number and any regular, classified, or other telephone directory listings associated with any of the Mark and to authorize their transfer to Franchisor or its designee. Franchisee acknowledges that, as between Franchisee and Franchisor, Franchisor has the sole rights to and interest in all telephone, telecopy, or facsimile machine numbers and directory listings associated with any Mark. Franchisee authorizes Franchisor, and hereby appoints Franchisor and any of its officers as Franchisee's attorney-in-fact, to direct the telephone company and all telephone directory publishers to transfer any telephone, telecopy, or facsimile machine numbers and directory listings relating to the Restaurant to Franchisor or its designee, should Franchisee fail or refuse to do so, and the telephone company and all telephone directory publishers may accept such direction or this Agreement as conclusive of Franchisor's exclusive rights in such telephone numbers and directory listings and Franchisor's authority to direct their transfer; and

(h) Abide by all restrictive covenants set forth in Section 20 of this Agreement.

18.7   **State and Federal Law.**   THE PARTIES ACKNOWLEDGE THAT, IN THE EVENT THAT THE TERMS OF THIS AGREEMENT REGARDING TERMINATION OR NON-RENEWAL ARE INCONSISTENT WITH APPLICABLE STATE OR FEDERAL LAW, SUCH LAW SHALL GOVERN FRANCHISEE'S RIGHTS REGARDING TERMINATION OR NON-RENEWAL OF THIS AGREEMENT.

18.8   **Assumption of Management.**   Franchisor has the right (but not the obligation), under the circumstances described below, to enter the Restaurant and assume the Restaurant's management for any time period it deems appropriate. Franchisor reserves the right to discontinue such assumption of management at any time and to exercise its rights of termination at such time. If Franchisor assumes the Restaurant's management, Franchisee must pay Franchisor (in addition to the Royalty Fee and Marketing and Promotion Fee) a management fee in the amount of twelve percent (12%) of the Restaurant's Gross Sales up to a maximum amount of $5,000 per calendar month, plus Franchisor's direct out-of-pocket costs and expenses, during the management period. If Franchisor assumes the management of the Restaurant, Franchisee acknowledges that Franchisor will have a duty to utilize only reasonable efforts and will not be liable to Franchisee or its owners for any debts, losses, or obligations the Restaurant incurs, or to any of Franchisee's creditors for any supplies or services the Restaurant purchases, while Franchisor manages the Restaurant.

Franchisor may assume the Restaurant's management under the following circumstances:

(a) If Franchisee fails to operate or otherwise abandons the Restaurant for a period of five (5) consecutive days or any shorter period that indicates an intent by Franchisee to discontinue operation of the Restaurant, unless and only to the extent that full operation of the Restaurant is suspended or terminated due to fire,

flood, earthquake, or other similar causes beyond Franchisee's control and not related to the availability of funds to Franchisee; or

(b)     If Franchisee fails to comply with any provision of this Agreement and does not cure the failure within the time period Franchisor specifies in its notice to Franchisee.

The exercise of Franchisor's rights under this Section 18.9 will not affect Franchisor's right to terminate this Agreement which shall continue in effect not withstanding such assumption of management.

## 19.     BUSINESS RELATIONSHIP

19.1     **Independent Businesspersons**.   The parties agree that each of them is an independent businessperson, their only relationship is solely by virtue of this Agreement, and no agency or fiduciary relationship is created under this Agreement. Neither party is liable or responsible for the other's debts or obligations, nor shall either party be obligated for any damages to any person or property directly or indirectly arising out of the operation of the other party's business.  Franchisor and Franchisee agree that neither of them will hold themselves out to be the agent, employer, or partner of the other and that neither of them has the authority to bind or incur liability behalf of the other.

19.2     **Payment of Third Party Obligations**.   Franchisor shall have no liability for Franchisee's obligations to pay any third parties, including, without limitation, any product vendors, or for any sales, use, service, occupation, excise, gross receipts, income, property, or other taxes levied upon Franchisee, Franchisee's property, the Restaurant, or Franchisor in connection with the sales made or business conducted by Franchisee (except any taxes Franchisor is required by law to collect from Franchisee with respect to purchases from Franchisor).

19.3 **Indemnification**.  Franchisee agrees to indemnify, defend, and hold harmless Franchisor, and all of its affiliates, and the members, directors, officers, employees, agents, successors, and assignees of Franchisor, and all of its affiliates (the "**Indemnified Parties**"), against, and to reimburse them for, all claims, obligations, and damages described in this Section 19.3, any and all third party obligations described in Section 19.2, and any and all claims and liabilities directly or indirectly arising out of the operation of the Restaurant or the use of the Mark and Licensed Methods in any manner, except for, and then only to the extent caused solely by, Franchisor's negligence.  For purposes of this indemnification:  (a) "**claims**" shall mean and include all obligations, actual and consequential damages, and costs reasonably incurred in the defense of any claim against Franchisor, including, without limitation, reasonable accountants', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses.  Franchisor shall have the right to defend any such claim against it at Franchisee's expense and agree to settlements or take any other remedial, corrective, or other actions. This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement; and (b) notwithstanding the fact that the Senior Executive (Food Production) is an employee of Franchisor, Franchisee shall be responsible for all actions taken by the Senior Executive (Food Production) in the operation of the Restaurant and shall indemnify and hold Franchisor harmless from any and all such actions.

## 20.     RESTRICTIVE COVENANTS

20.1     **Non-Competition During Term.**  Franchisee acknowledges that, in addition to the license of the Mark, Franchisor also has licensed commercially valuable information which comprises the Licensed Methods, including, without limitation, operations, marketing, advertising, trade secrets and related information and materials, and that the value of this information arises not only from the time, effort, and money which went into its compilation but also from the usage by all franchisees. Franchisee therefore agrees that, other than the Restaurant, neither Franchisee nor any of Franchisee's officers, directors, shareholders, members, partners or other owners, nor any spouse of Franchisee or any of these individuals, all of whom shall execute the Guaranty and Assumption of Franchisee's Obligations attached hereto as Exhibit 9 (individually, a "**Bound Party**" and collectively, the "Bound Parties"), shall during the term of this Agreement:

(a)      Have any direct or indirect interest as a disclosed or beneficial owner in a "Competitive Business," as defined below, wherever located or operating.

(b)      Perform services as a director, officer, manager, employee, consultant, representative, agent, or otherwise for a Competitive Business, wherever located or operating;

(c)      divert or attempt to divert any business related to the Restaurant, Franchisor's business, or any other INCHIN'S BAMBOO GARDEN™ franchisee by direct inducement or otherwise, or divert or attempt to divert the employment of any employee of Franchisor, or any of its affiliates, or another franchisee, to any Competitive Business; or

(d)      Directly or indirectly solicit or employ any person who is employed by Franchisor or any of its affiliates.

The term "**Competitive Business,**" as used in this Agreement, shall mean any business operating, or granting franchises or licenses to others to operate, a restaurant or other food service business deriving more than ten percent (10%) of its gross receipts, excluding gross receipts relating to the sale of alcoholic beverages, from the sale of food that is Pan Asian (other than another Restaurant operated by Franchisee); provided, however, neither Franchisee nor the other Bound Parties shall be prohibited from owning securities in a Competitive Business if such securities are listed on a stock exchange or traded on the over-the-counter market and represent five percent (5%) or less of that class of securities issued and outstanding.  Franchisee agrees that nothing in this Section 20 shall be construed to grant Franchisee any protected territory.

20.2      **Branded Business.**  During the term of this Agreement, neither Franchisee nor any other Bound Party will operate, directly or indirectly, any Branded Business within a one-quarter (1/4) mile radius of the Restaurant without the written consent of Franchisor, which consent shall not be unreasonably withheld.  The term "**Branded Business**" means any business marketed by a franchisor or chain under a locally, regionally, or nationally known or registered trademark or service mark.

20.3      **Post-Termination Covenant Not to Compete.**  In the event of a termination of this Agreement due to a default hereunder by Franchisee and if Franchisor does not receive payment of all amounts then due to Franchisor for any reason, including, without limitation, liquidated damages pursuant to Section 20.4 below because the law of the state in which Restaurant is located renders such provision unenforceable or for any other reason, then in such event, for a period of two (2) years from the effective date of termination or expiration of this Agreement for any reason, or the date on which Franchisee and all other Bound Parties begin to comply with this Section, whichever is later, neither Franchisee nor any other Bound Party shall have any direct or indirect interest as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative, agent, or in any other capacity in any Competitive Business located or operating within a fifty (50) mile radius of the former Franchised Location or within a fifty (50) miles radius of any other Restaurant existing on the later of the effective date of termination or expiration of this Agreement or the date on which Franchisee and all other Bound Parties begin to comply with this Section.  The restrictions of this Section shall not be applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent five percent (5%) or less of the number of shares of that class of securities issued and outstanding.  Franchisee and the other Bound Parties expressly acknowledge that they possess skills and abilities of a general nature and have other opportunities for exploiting such skills.  Consequently, enforcement of the covenants made in this Section will not deprive them of their personal goodwill or ability to earn a living.  This provision shall survive termination of this Agreement and Franchisor shall have the right to injunctive relief to enforce this provision in addition to such other relief to which it may be entitled in law and equity.

20.4      **Termination by Franchisor and Liquidated Damages**.  Franchisee has agreed to operate the Restaurant under the Mark in compliance with this Agreement for the full term of this Agreement.  If Franchisee should fail to do so, Franchisee acknowledges that Franchisor would be damaged in several ways, including but not limited to:  (a) loss of future Royalty Fee Payments, (b) loss of future Marketing and Promotion Fees used to market the Restaurants under the Mark, (c) loss of Senior Executive Compensation, (d) loss of representation in the area served by the Restaurant, and (e) injury to the goodwill of the Mark.  Franchisee acknowledges that it is difficult to estimate the revenues of the Restaurant over a period of years and that elements of Franchisor's damages not directly

calculated from the Restaurant's revenues are inherently difficult to calculate, although such damages are real and meaningful to Franchisor and the other Restaurants operating under the Mark. Franchisor's damages in the event of termination would not be easily ascertained, would be difficult to estimate accurately, and the proof thereof would be burdensome and costly, and Franchisor and Franchisee agree that liquidated damages (as calculated below) are not a penalty and represent a reasonable estimate of just and fair compensation of Franchisor for the damages that it would suffer. In the event this Agreement is terminated, such termination shall not affect the obligations of Franchisee hereunder to take action or abstain from taking action after the termination hereof as required by this Section 20. In the event of such termination, (a) Franchisor shall be entitled to recover from Franchisee, and Franchisee shall be obligated to promptly pay to Franchisor, all fees and payments provided for herein that have then accrued to Franchisor or its Affiliates pursuant to other provisions of this Agreement up to the date of such termination (without limiting Franchisee's obligations to pay to Franchisor any payments that relate to the period prior to the date of such termination, but that are not billed to Franchisee prior to the date of such termination), and (b) if such termination is due to a default by Franchisee of any of its obligations under this Agreement, Franchisee shall also promptly pay to Franchisor liquidated damages in an amount equal to the product of: (i) the number of years (full and partial) remaining in the term of this Agreement, (ii) the aggregate amount of Royalty Fee Payments, Marketing and Promotion Fees and Senior Executive Compensation due and payable to Franchisor for the period of the twelve full calendar months immediately preceding the date of such termination, and (iii) a factor of sixty percent (60%). In addition to such liquidated damages, Franchisor shall have the right to recover reasonable attorneys' fees and court costs incurred in collecting such sums plus Interest on all amounts due pursuant to this Section 20.4 from the date of such termination until paid. The legal remedies hereunder shall not preclude Franchisor from any equitable remedies to which it may be entitled under applicable law. Franchisee's obligation to pay Franchisor liquidated damages, if applicable, and other sums pursuant to this Section 20.4 shall survive termination of this Agreement.

20.5    **Confidentiality of Proprietary Information.**  Franchisee shall treat all information it receives which comprises the Licensed Methods (including, without limitation, the Operations Manual) as proprietary and confidential and not use such information in an unauthorized manner or disclose the same to any unauthorized person. Franchisee agrees that all such material is the sole property of Franchisor. Franchisee acknowledges that the Mark and the Licensed Methods have valuable goodwill attached to them, that their protection and maintenance are essential to Franchisor, and that any unauthorized use or disclosure of the Mark and Licensed Methods will result in irreparable harm to Franchisor. All ideas, concepts, techniques, or materials concerning a Restaurant, whether or not protectable intellectual property and whether created by or for Franchisee or its owners or employees, must be promptly disclosed to Franchisor and will be deemed Franchisor's sole and exclusive property, part of the INCHIN'S BAMBOO GARDEN™ System, and works made-for-hire for Franchisor. To the extent any item does not qualify as a "work made-for-hire" for Franchisor, Franchisee assigns ownership of that item, and all related rights to that item, to Franchisor and must sign whatever assignment or other documents Franchisor requests to evidence ownership or to assist Franchisor in obtaining intellectual property rights in the item.

20.6    **Confidentiality Agreement.**  Franchisor reserves the right to require that Franchisee cause each of its Bound Parties and Designated Managers (and, if applicable, the spouse of a Designated Manager) to execute a Nondisclosure and Noncompetition Agreement containing the above restrictions in a form approved by Franchisor.

## 21.    DISPUTES

21.1    **Governing Law/Consent to Venue and Jurisdiction.**  Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et seq.) or other federal law, this Agreement and the relationship created hereby shall be governed, construed, interpreted and enforced under the laws of the State of Georgia, and any dispute between the parties, whether arising under this Agreement or from any other aspect of the parties' relationship, shall be governed by and determined in accordance with the substantive laws of the State of Georgia, without regard to its conflicts of laws principles; provided, however, that the provisions of Section 20 of this Agreement shall be governed, construed, interpreted and enforced under the laws of the state in which the Restaurant is located, without regard to its conflicts of laws principles. Franchisee and Franchisor have negotiated regarding a forum in which to resolve any disputes arising between them and have agreed to select a forum in order to promote stability in their relationship. Therefore, if a claim is asserted in any legal proceeding involving Franchisee or any Bound Party (as defined in Section 20.1) and Franchisor, the parties agree that the exclusive venue for disputes between them shall be in the courts of the state of Georgia with jurisdiction over the

City and County of Atlanta, Georgia, or the United States District Court for the Northern District of Georgia, and each party waives any objection it might have to the personal jurisdiction of or venue in such courts.

21.2    **Waiver of Jury Trial.**  Franchisor, Franchisee, and the Bound Parties each waive their right to a trial by jury.  Franchisee, the Bound Parties, and Franchisor acknowledge that the parties' waiver of jury trial rights provides the parties with the mutual benefit of uniform interpretation of this Agreement and resolution of any dispute arising out of this Agreement or any aspect of the parties' relationship.  Franchisee, the Bound Parties, and Franchisor further acknowledge the receipt and sufficiency of mutual consideration for such benefit.

21.3    **Remedies.**  Except as set forth in Section 21.4, the court will have the right to award any relief which it deems proper in the circumstances, including, without limitation, money damages (with interest on unpaid amounts from the date due), lost profits, specific performance, injunctive relief, and attorneys' fees and costs. The parties agree that any claim for lost earnings or profits by Franchisee shall be limited to a maximum amount equal to the net profits of the Restaurant for the prior year as shown on Franchisee's federal income tax return.  The parties further agree that, in addition to such other damages awarded by the court, if this Agreement is terminated because of a Franchisee default, Franchisee shall be liable to Franchisor for a lump sum amount equal to the net present value of the Royalty Fees and Marketing and Promotion Fees that would have become due following termination of this Agreement for the period this Agreement would have remained in effect but for Franchisee's default.  Royalty Fees and Marketing and Promotion Fees for purposes of this Section shall be calculated based on the Restaurant's average monthly Gross Sales for the twelve (12) months preceding the termination date.

21.4    **Limitation of Claims.**  Franchisee and the Bound Parties agree not to bring any claim asserting that the Mark is generic or otherwise invalid and not eligible for registration as the Principal Register.  Except with regard to Franchisee's obligation to pay Franchisor and its affiliates Royalty Fee payments, the Marketing and Promotion Fee and other advertising fees, and other payments due from Franchisee pursuant to this Agreement or otherwise, any claims between the parties must be commenced within one (1) year from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claim, or such claim shall be barred. The parties understand that such time limit might be shorter than otherwise allowed by law.  Franchisee and the Bound Parties agree that their sole recourse for claims arising between the parties shall be against Franchisor or its successors and assigns.  Franchisee and the Bound Parties agree that the shareholders, directors, officers, employees, and agents of Franchisor and its affiliates shall not be personally liable nor named as a party in any action between Franchisor and Franchisee or any Bound Party.  Franchisor, Franchisee, and the Bound Parties further agree that, in connection with any such proceeding; each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates.  Any such claim which is not submitted or filed as described above will be forever barred. The parties agree that any proceeding will be conducted on an individual, not a class-wide, basis, and that a proceeding between Franchisor and Franchisee or the Bound Parties may not be consolidated with another proceeding between Franchisor and any other person or entity.  No party will be entitled to an award of punitive or exemplary damages (provided that this limitation shall not apply to statutory penalties such as those set forth in 15 U.S.C. § 1117(a)).  No previous course of dealing shall be admissible to explain, modify, or contradict the terms of this Agreement.  No implied covenant of good faith and fair dealing shall be used to alter the express terms of this Agreement.

21.5    **Dispute Resolution Process.**

(a)    In the event of any controversy, dispute or claim (individually, a "**Claim**" and collectively, "**Claims**") arising out of or relating to this Agreement, or any modification, amendment or extension to this Agreement, or the breach thereof, including any claim to rescind or set aside any of the same other than: (i) disputes involving the use of the Mark or the Licensed Methods; (ii) suits to enforce the in-term and post-term noncompetition agreements of Franchisee and the Bound Parties; or (iii) actions by Franchisor for the collection of amounts due from Franchisee (collectively, the "**Non-Mediation Matters**"), representatives of the Franchisor and Franchisee shall meet in good faith as set forth in this Section 21.5 in an effort to resolve the dispute.

(b)    The disputing party shall give the other part) written notice (the "**Notice**") of the dispute within thirty (30) days of becoming aware of the existence of the dispute.  The Notice shall describe in reasonable detail the dispute and shall name a designee to participate in the meeting described in this section.  Within fifteen

(15) days of receipt of the Notice, the other party shall appoint a designee to meet and confer in an attempt to resolve the dispute.  The failure of either party to appoint a designee or to present that designee for a meeting shall be considered a material breach of this Agreement.  The designees of Franchisor and Franchisee shall meet at Franchisor's corporate offices at a time mutually acceptable to them to attempt to settle the dispute in good faith.  This meeting shall be held within thirty (30) days after receipt of the disputing party's Notice.  In the event that no resolution of the dispute is reached within thirty (30) days following the meeting, the dispute shall be submitted for a non-binding mediation with a mediator selected from a list of mediators to be obtained from the CPR Institute for Dispute Resolution ("**CPR**").  Upon expiration of the thirty (30) day period following the meeting, either Franchisor or Franchisee may petition the CPR for a regional list of mediators to be sent to both Franchisor and Franchisee.  Within ten (10) days after receipt of such list, each of Franchisor and Franchisee shall choose three names from the regional list provided by CPR and submit such names to the other party.  If any of these names match, such person shall act as the mediator for the dispute.  In the event that none of the names match, and if Franchisor and Franchisee cannot otherwise agree on a mediator, the mediator shall be chosen by CPR.  The costs and expenses of the mediation process shall be shared equally by Franchisor and Franchisee.

(c)      The mediator shall promptly hear presentations from Franchisor and Franchisee in such manner and at such times and locations as shall be determined by the mediator.  The mediator may request, and Franchisor and Franchisee shall provide, any documents that in the mediator's sole opinion will assist in resolving the dispute.  The mediator shall review the dispute and offer to Franchisor and Franchisee his or her comments on their respective positions.  Franchisor and Franchisee may have ex parte communication with the mediator as deemed necessary by either party or the mediator.  Neither Franchisor nor Franchisee shall be bound by any comments, conclusions or decisions of the mediator.  All verbal and written communications between Franchisor and Franchisee or among Franchisor, Franchisee and the mediator, issued and prepared in connection with this Section, shall be deemed prepared and communicated in furtherance and in the context of the dispute settlement and shall be exempt from discovery and production and shall not be admissible into evidence in any proceeding for the resolution of this dispute.  No legal proceedings for the resolution of the dispute shall be commenced by Franchisor or Franchisee until the conclusion of this mediation, which shall in no event extend past one hundred and twenty (120) days from the receipt of the Notice.  Upon conclusion of the mediation, each of Franchisor and Franchisee shall have all rights and remedies available to it at law or in equity; provided, however, that to the fullest extent permitted by law, Franchisor and Franchisee hereby waive their respective rights to trial by jury in any suit, action or proceeding against Franchisee, Franchisor, as the case may be, which may be filed in the courts identified in Section 21.5(g) below.

(d)      The periods set forth in this Section 21.5 may be extended or shortened by mutual agreement of the parties.  In no event shall a party who has refused or failed to participate in the dispute resolution process described in this Section 21.5 be permitted to commence legal proceedings without first complying with the provisions of this Section 21.5.

(e)      The parties hereto agree that notwithstanding, and in addition to, the rights and remedies available hereunder, each of Franchisor, on the one hand, and Franchisee, on the other hand, reserves the right to seek and obtain temporary restraining orders or other emergency temporary or preliminary equitable injunctive relief from the courts of the state of Georgia or the federal courts situated in the Northern District of Georgia, to preserve the status quo by enjoining or restraining a party hereto pending mediation hereunder or to compel mediation as provided herein, and the parties hereto acknowledge and agree to the right to seek such relief.  The parties hereto expressly agree and acknowledge that seeking relief from the courts as provided in this Section 21.5 shall not be deemed a waiver of any party's right to mediate nor shall the existence or exercise of such right be deemed to be an adequate remedy at law in connection therewith.

(f)      Each party shall bear its own attorneys' fees and expenses and the fees and expenses of other experts or professionals utilized by such party in connection with the mediation provided for herein.

(g)      Each of the parties hereto (including the Bond Parties) hereby irrevocably consents and submits to the exclusive personal jurisdiction of United States District Court for the Northern District of Georgia and the courts of the state of Georgia over any suit or action to compel mediation in accordance with the provisions of this Section 21 between Franchisor and Franchisee, and irrevocably agrees that venue is proper in such courts for may such suit or action and that all claims with respect thereto may be heard and determined in either such court.

35

Service of process in any such suit or action may be made in the manner in this Agreement set forth for the giving of notices and the same shall constitute valid personal service for all purposes, each party, hereby waiving personal service by other means.

(h)     Each of the parties hereto (including the Bond Parties) hereby irrevocably consents and submits to the personal jurisdiction of the United States District Court for the Northern District of Georgia and the courts of the state of Georgia over all Non-Mediation Matters and hereby agrees that venue is proper in such courts for any Non-Mediation Matter.  To the fullest extent permitted by law, Franchisor and Franchisee hereby waive their respective rights to a trial by jury in any Non-Mediation Matter.  The parties acknowledge and agree that the rights of Franchisor under this Agreement with respect to the use of the Mark and the Licensed Methods and the enforcement of the in-term and post-term noncompetition Agreements of Franchisee are of a specialized and unique character and that immediate and irreparable damage will result to Franchisor if Franchisee fails or refuses to perform its obligations under this Agreement and, notwithstanding any election by Franchisor to claim damages from Franchisee as a result of any such failure or refusal, Franchisor may, in addition to any other remedies and damages available, seek an injunction in a court of competent jurisdiction to restrain any such failure or refusal.

## 22.     SECURITY INTEREST

22.1     **Collateral.**  Franchisee grants Franchisor a security interest ("**Security Interest**") in all of the furniture, fixtures, equipment, signage, and realty (including Franchisee's interests under all real property and personal property leases) of the Restaurant, together with all similar property now owned or hereafter acquired, additions, substitutions, replacements, proceeds, and products thereof, wherever located, used in connection with the Restaurant.  All items in which a security interest is granted are referred to as the "**Collateral.**"

22.2     **Obligations Secured.**  The Security Interest is to secure performance of all of the obligations of Franchisee under this Agreement (including, without limitation, all of the obligations of Franchisee under Section 20) and the payment of the following (the "**Indebtedness**"):

(a)     All amounts due under this Agreement or otherwise by Franchisee;

(b)     All sums which Franchisor may, at its option, expend or advance for the maintenance, preservation, and protection of the Collateral, including, without limitation, payment of rent, taxes, levies, assessments, insurance premiums, and discharge of liens, together with interest;

(c)     All expenses, including reasonable attorneys' fees, which Franchisor incurs in connection with collecting any or all of the amounts secured hereby or in enforcing or protecting its rights under the Security Interest and this Agreement; and

(d)     All other present or future, direct or indirect, absolute or contingent, liabilities, obligations, and indebtedness of Franchisee to Franchisor or third-parties under this Agreement, however created, and specifically including all or part of any renewal or extension of this Agreement, whether or not Franchisee executes any extension agreement or renewal instruments.

22.3     **Additional Documents.**  Franchisee will from time to time as required by Franchisor join with Franchisor in executing any additional documents and one or more financing statements pursuant to the Uniform Commercial Code (and any assignments, extensions, or modifications thereof) in form satisfactory to Franchisor.

22.4     **Possession of Collateral.**  Upon the occurrence of a default by Franchisee and termination of Franchisee's rights under this Agreement, Franchisor shall have the immediate right to possession and use of the Collateral.

22.5     **Remedies of Franchisor in Event of Default.**  Franchisee agrees that, upon the occurrence of any default set forth above, the full amount remaining unpaid on the Indebtedness secured shall, at the option of Franchisor and without notice, become due and payable immediately, and Franchisor shall then have the rights, options, duties, and remedies of a secured party under, and Franchisee shall have the rights and duties of a debtor

under, the Uniform Commercial Code of the state of Georgia, including, without limitation, Franchisor's right to take possession of the Collateral and without legal process to enter any premises where the Collateral may be found. Any sale of the Collateral may be conducted by Franchisor in a commercially reasonable manner.  Reasonable notification of the time and place of any sale shall be satisfied by mailing to Franchisee pursuant to the notice provisions set forth below.

       22.6    **Special Filing as Financing Statement**.  Franchisor is hereby authorized by Franchisee to file one or more Financing Statements as Franchisor may determine are necessary to perfect the security interest granted hereunder.  This Agreement shall be deemed a Security Agreement and a Financing Statement.  This Agreement may be filed for record in the real estate records of each county in which the Collateral, or any part thereof, is situated and may also be filed as a Financing Statement in the counties or in the office of the Secretary of State, as appropriate, in respect of those items of Collateral of a kind or character defined in or subject to the applicable provisions of the Uniform Commercial Code as in effect in the appropriate jurisdiction.

### 23.       MISCELLANEOUS PROVISIONS

       23.1    **Modification.**  No amendment, waiver, or modification of this Agreement shall be effective unless it is in writing and signed by Franchisor and Franchisee.  Franchisee acknowledges that, notwithstanding the foregoing, Franchisor may modify its standards and specifications and operating and marketing techniques set forth in the Operations Manual unilaterally under any conditions and to the extent to which Franchisor deems necessary to protect, promote, or improve the Mark and the quality of the Licensed Methods.

       23.2    **Entire Agreement.**

       (a)    This Agreement contains the entire agreement between the parties and supersedes any and all prior agreements concerning its subject matter.  Franchisee agrees and understands that Franchisor shall not be liable or obligated for any oral representations or commitments made prior to the execution of this Agreement or for claims of negligent or fraudulent misrepresentation, and that no modifications of this Agreement shall be effective except those in writing and signed by both parties.  Franchisor does not authorize and will not be bound by any representation of any nature other than those expressed in this Agreement.  Franchisee further acknowledges and agrees that no representations have been made to it by Franchisor regarding projected sales volumes, market potential, revenues, profits of Franchisee's Restaurant, or operational assistance other than as stated in this Agreement or in any disclosure document provided by Franchisor or its representatives.  Any policies that the Franchisor adopts and implements from time to time are subject to change, are not a part of this Agreement, and are not binding on Franchisor.  Nothing in this Agreement is intended to disclaim the representations made in the Franchise Disclosure Document that Franchisor furnished to you.

       (b)    No document or agreement which is not an Exhibit to this Agreement or specifically incorporated herein by reference shall be deemed to be part of this Agreement.  Documents or agreements referred to herein but not an Exhibit to this Agreement or specifically incorporated herein by reference are not part of this Agreement.  This Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties; provided, however, that Franchisee may assign this Agreement and its rights hereunder (including, without limitation, an assignment by operation of law) only upon compliance with the provisions of Section 16 hereof.  The rights, duties and obligations of Franchisor hereunder shall be fully assignable by Franchisor without the consent of Franchisee.  Expiration or early termination of this Agreement shall not affect:  (i) the enforceability of any covenants, duties and obligations of any of Franchisor or Franchisee which are in effect prior to such expiration or termination or which, by their express terms, survive such expiration or termination; or (ii) the obligation of Franchisee to make payment to Franchisor of any monetary obligations which have accrued but have not been paid at the date of such expiration or termination.

       23.3    **Delegation by Franchisor.**  From time to time, Franchisor shall have the right to delegate the performance of any portion or all of its obligations and duties under this Agreement to third parties, whether the same are agents of Franchisor or independent contractors with which Franchisor has contracted to provide such services.  Franchisee agrees in advance to any such delegation by Franchisor of any portion or all of its obligations under this Agreement.

23.4    **Agreement Effective.**  This Agreement shall not be effective until accepted by Franchisor as evidenced by dating and signing by an officer of Franchisor.

23.5    **Review of Agreement.**  Franchisee acknowledges that it has had a copy of Franchisor's Franchise Disclosure Document in its possession for not less than ten (10) full business days or 14 calendar days, as applicable, and this Agreement in its possession for not less than five (5) full business days, during which time Franchisee has had the opportunity to submit same for professional review and advice of Franchisee's choosing prior to freely executing this Agreement.

23.6    **Attorneys' Fees.**  In the event of any default on the part of either party to this Agreement, in addition to all other remedies, the party in default will pay the prevailing party (as determined by the decision-maker in the proceeding) all amounts due and all damages, costs, and expenses, including reasonable attorneys' fees, incurred by the prevailing party in any legal action or other proceeding as a result of such default, plus interest at the lesser of two percent (2%) per month or the highest commercial contract interest rate allowable by law accruing from the date of such expenditure.  Additionally, if Franchisee withholds any amounts due Franchisor, Franchisee shall reimburse Franchisor's costs of collecting such amounts, including reasonable attorneys' fees and expenses.

23.7    **Injunctive Relief**.  Nothing herein shall prevent Franchisor or Franchisee from seeking injunctive relief in appropriate cases to prevent irreparable harm.

23.8    **No Waiver.**  Franchisor and Franchisee may, by written instrument, unilaterally waive any obligation of or restriction upon the other under this Agreement.  No acceptance by Franchisor of any payment by Franchisee and no refusal, neglect or failure of Franchisor or Franchisee to exercise any right under this Agreement or to insist upon full compliance by the other with its obligations hereunder or with any specification, standard, operating procedure or rule shall constitute a waiver of any provision of this Agreement.

23.9    **No Right to Set Off.**  Franchisee shall not be allowed to set off amounts owed to Franchisor or its affiliates for Royalties, fees, or other amounts due against any monies owed to Franchisee, which right of set off is hereby expressly waived by Franchisee.

23.10    **Invalidity.**  If any provision of this Agreement is held invalid by any tribunal in a final decision from which no appeal is or can be taken, such provision shall be deemed modified to eliminate the invalid element, and, as so modified, such provision shall be deemed a part of this Agreement as though originally included.  The remaining provisions of this Agreement shall not be affected by such modification.

23.11    **Notices.**  All notices required to be given under this Agreement shall be given in writing, by certified mail, return receipt requested, or by an overnight delivery service providing documentation of receipt, at the address set forth in the first paragraph of this Agreement, or at the address of the Franchised Location (after the Restaurant has first opened for business), or at such other addresses as Franchisor or Franchisee may designate from time to time, and shall be deemed delivered (a) on the date shown on the return receipt or in the courier's records as the date of delivery or (b) on the date of first attempted delivery, if actual delivery cannot for any reason be made.

23.12    **No Agency Relationship**.  Except as expressly provided herein:  (a) neither party in any way constitutes or appoints the other party to be its agent or legal representative for any purpose whatsoever; (b) neither party is granted any right, power, privilege or authority to assume or create any obligation, express or implied, on behalf of, or in the name of the other part), or to make any purchase for the account of, or to bind the other party in any manner or thing whatsoever; and (c) neither party has the right, power, privilege or authority to accept summons or legal process for the other party.

23.13    **Usage.**  All words used herein in the singular shall extend to and include the plural, and vice versa, and all words in any gender shall extend to and include all genders.

23.14    **Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute duplicate originals.

23.15   **Acknowledgment.**  BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL.   FRANCHISEE ACKNOWLEDGES THAT:

(A)   THE SUCCESS OF THIS BUSINESS VENTURE INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON FRANCHISEE'S ABILITY AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS; AND

(B)   NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED; AND

(C)   NO STATEMENT, REPRESENTATION, OR OTHER ACT, EVENT, OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT AND IN ANY FRANCHISE DISCLOSURE DOCUMENT SUPPLIED TO FRANCHISEE, IS BINDING ON FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT; AND

(D)   FRANCHISEE HAS HAD AN OPPORTUNITY TO THOROUGHLY EXAMINE THE RESTAURANTS OPERATING UNDER THE MARK IN THE ATLANTA, GEORGIA AREA, THE BUSINESS MODEL, THE SET-UP OF SUCH RESTAURANTS, AND THE REPRESENTATIVES OF FRANCHISOR HAVE ANSWERED ALL QUESTIONS OF FRANCHISEE.  FRANCHISEE ACKNOWLEDGES, THOUGH, THAT FRANCHISEE UNDERSTANDS THAT THERE IS A SUBSTANTIAL ELEMENT OF RISK INVOLVED IN THE RESTAURANT BUSINESS GENERALLY AND THAT EVEN THOUGH THE BUSINESS MODEL OF FRANCHISOR MAY BE SUCCESSFUL AT ANY INDIVIDUAL LOCATION, FRANCHISEE AGREES THAT FRANCHISOR WILL NOT BE RESPONSIBLE IN ANY WAY FOR ANY BUSINESS LOSSES THAT THEY MIGHT INCUR.   FRANCHISEE FURTHER ACKNOWLEDGES THAT, WHILE FRANCHISOR WILL PROVIDE ADVICE IN REGARD TO THE SELECTION OF THE FRANCHISED LOCATION AND THE ESTABLISHMENT OF THE BUSINESS, THE FINAL DECISIONS AS TO THE FRANCHISED LOCATION, CAPITALIZATION, OPERATIONS, AND PERSONNEL (OTHER THAN THE SENIOR EXECUTIVE (FOOD PRODUCTION) REST WITH THE FRANCHISEE AND THAT FRANCHISOR IS NOT RESPONSIBLE IN ANY WAY FOR ANY FINAL DECISIONS MADE.

(E)   THE SUBMISSION OF THIS AGREEMENT TO FRANCHISEE FOR EXECUTION DOES NOT CONSTITUTE AN OFFER, AND THIS AGREEMENT SHALL BECOME EFFECTIVE ONLY UPON THE EXECUTION HEREOF BY FRANCHISOR AND FRANCHISEE AND THE PAYMENT BY FRANCHISEE OF THE CONSIDERATION PROVIDED FOR HEREIN.  THIS AGREEMENT SHALL NOT BE BINDING ON FRANCHISOR UNLESS AND UNTIL IT SHALL HAVE BEEN ACCEPTED AND SIGNED BY AN AUTHORIZED OFFICER OF FRANCHISOR AT ITS CORPORATE HEADQUARTERS AND SHALL THEN BE DEEMED TO BE A CONTRACT ENTERED INTO IN THE STATE OF GEORGIA.  THE DATE OF EXECUTION BY FRANCHISOR SHALL BE CONSIDERED THE DATE OF EXECUTION OF THIS AGREEMENT.

(F)   COMPANY HAS READ ALL OF THE FOREGOING AGREEMENT AND HEREBY ACCEPTS AND AGREES TO EACH AND ALL OF THE PROVISIONS, COVENANTS AND CONDITIONS THEREOF.

**[Signatures on following page]**

39

**IN WITNESS WHEREOF,** the parties have executed this Franchise Agreement as of the Effective Date shown on the first page hereof.

**INCHINS BAMBOO GARDEN FRANCHISING LLC**

By: _____

Title: _____CFO_____

Date: _____March 6th, 2012_____

**FRANCHISEE:**

Sign here if you are taking the franchise as an
**INDIVIDUAL(S)**

(Note: use these blocks if you marked on Exhibit 7 that you are an individual or a partnership but the partnership is not a separate legal entity)

_____Sunil ade_____
                Signature

Print Name: ___SUNIL KONDA_____

Date: ___2|24|12_____

_____
                Signature

Print Name: _Valaprasad Challa_____

Date: ___2|24|12_____

_____
                Signature

Print Name: _Ravi Ramisetti_____

Date: ___2|24|12._____

_____
                **Signature**

Print Name: _____

Date: _____

Sign here if you are taking the franchise as a
**CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP**

_____
        Print Name of Legal Entity

By: _____

                **Signature**

Print Name: _____

Title: _____

Date: _____

**EXHIBIT 1**
**TO FRANCHISE AGREEMENT**

**MARK**



**EXHIBIT 2**
**TO FRANCHISE AGREEMENT**

**FRANCHISED LOCATION AND INITIAL FEES**

1.    **Target Area.**    The Target Area, referred to in Section 3.1 of the Franchise Agreement, shall be:

3107 South I35, Ste 760
RoundRock, TX 78664-9345

The Franchised Location shall be deemed accepted by Franchisor upon acceptance by Franchisor of the site and lease pursuant to Section 6 of the Agreement.

Franchisee acknowledges that: (a) Franchisor's acceptance does not constitute a guarantee, recommendation, or endorsement of the Franchised Location or the Target Area and that the success of the Restaurant to be operated at the Franchised Location is dependent upon Franchisee's abilities as an independent businessperson; and (b) when the Franchised Location is accepted by Franchisor, Franchisor has complied with its obligations under the Agreement to assist Franchisee by providing criteria for the Franchised Location and determining fulfillment of the requisite criteria for the Franchised Location, such determination based on information provided by Franchisee.

2.    **Initial Franchise Fee.**    Franchisee shall pay to Franchisor an Initial Franchise Fee of $25,000 as referenced in Section 4.1 of the Franchise Agreement,.

3.    **Initial Senior Executive (Food Production) Processing Fees.**    Franchisee shall pay to Franchisor the Senior Executive (Food Production) Processing Fee $10,000 as referenced in Section 4.2 of the Franchise Agreement.

4.    **Senior Executive Compensation Reimbursement and Chef Guaranty Fee.**    Franchisee shall pay to Franchisor an annual amount equal to the sum of: (a) of $54,000 (all applicable employee withholding and employment taxes) and (b) a cost of living differential based upon the cost of living in the Metropolitan Statistical Area (as defined by the U.S. Office of Management and Budget) in which the Franchised Location is located compared to the median cost of living in all U.S. Metropolitan Statistical Areas (the "**SE Annual Compensation**"), payable in twelve equal monthly installments on the first day of each calendar month, as the Senior Executive Compensation, referenced in Section 4.2 of the Franchise Agreement. The amount described in Section 4(a) above is subject to an annual increase of up to 5% per year. An additional one week of compensation is payable to Franchisor for the services of a substitute Senior Executive (Food Production) who shall serve during the one week annual vacation to which the regular Senior Executive (Food Production) is entitled.

In the event that, after the Franchised Location has been open and operating for at least sixty (60) days, the Senior Executive (Food Production) is required to work seven days in any week, Franchisee shall pay to Franchisor an amount equal to the quotient of the SE Annual

for the proprietary mural to be painted on two of the main walls of the Restaurant that is part of the trade dress of all of Franchisor's Restaurants, that Franchisor has fully earned the Signature Mural Fee upon receipt and that the Décor Signature Mural Fee is not refundable to Franchisee under any circumstances after it is paid.

7.      **Proprietary Interior Décor Package Fee.**    Franchisee agrees to pay to Franchisor, upon the signing of the lease for the premises of the Restaurant, a proprietary interior décor package fee (the "**Proprietary Interior Décor Package Fee**") in the amount of $25,000.  Franchisee acknowledges and agrees that the Proprietary Interior Décor Package Fee represents payment for the proprietary interior décor package that Franchisor purchases in China and imports to Atlanta, Georgia that is part of the trade dress of all of Franchisor's Restaurants, that Franchisor has fully earned the Proprietary Interior Décor Package Fee upon receipt and that the Proprietary Interior Décor Package Fee is not refundable to Franchisee under any circumstances after it is paid.

8.      **Private Label Food Products.**    Franchisee agrees to purchase from Franchisor all of the requirements of the Restaurant for our private label noodles, sauces and rice that are served in all of our Restaurants (the "Private Label Food Products").  The purchase price for the Private Label Food Products is payable in full upon delivery to the Restaurant.  We fully earn the purchase price when paid.  It is not refundable under any circumstances.

9.      **Training.**    The following individuals shall attend Franchisor's initial training program, as described in Section 7.1 of the Franchise Agreement: _____ _____, and, of these individuals, the **Designated Manager** shall be: _____.

**IN WITNESS WHEREOF,** the parties have executed this Addendum to Franchise Agreement as of the Effective Date.

**INCHINS BAMBOO GARDEN FRANCHISING LLC**

By: _____

Title: _____CFD_____3/6/12_____

**FRANCHISEE:**

Sign here if you are taking the franchise as an
**INDIVIDUAL(S)**

(Note: use these blocks if you marked on Exhibit 7
that you are an individual or a partnership but the
partnership is not a separate legal entity)

_____Sunil Konda_____

Signature

Print Name: __SUNIL KONDA____

Date: _____2/24/12_____

_____

Signature

Print Name: _Ravi Ramisetti_____

Date: ___2/24/12_____

_____

**Signature**

Print Name: _____ Valaprasad Challa

Date: ___2/24/12_____

_____

**Signature**

Print Name: _____

Date: _____

Sign here if you are taking the franchise as a
**CORPORATION, LIMITED LIABILITY
COMPANY OR PARTNERSHIP**

_____

Print Name of Legal Entity

By: _____

**Signature**

Print Name: _____

Title: _____

Date: _____

**EXHIBIT 3**
**TO FRANCHISE AGREEMENT**

**CONSUMABLES**

**EXHIBIT 3-A**

|  |  | Quantity |
|---|---|---|
| 1. | Table Placemats (2 + 2) | 40,000 + 5,000 |
| 2. | Plastic carry bags | 20,000 |
| 3. | To Go Menus | 15,000 |
| 4. | Business Cards | 10,000 |
| 5. | Letterheads + Invitation Cards | 600 + 100 |

**EXHIBIT 3-B**
**TO FRANCHISE AGREEMENT**

| | | |
|---|---|---|
| 1. | Crockery | As per Exhibit 3-C |
| 2. | Rickshaw | 1 |
| 3. | Foo Dogs with stands | 2 |
| 4. | Sofa set with tables | 1 set |
| 5. | Leather folders for menus | 75 |
| 6. | Main Menus | 300 |