## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA

APARNA HARRIS,                )
                         )
    Plaintiff,        )        CIVIL ACTION FILE
                         )        NO.:
v.                            )
                         )
FIRST UNUM LIFE               )
INSURANCE COMPANY,            )
                         )
    Defendant.        )

## COMPLAINT

COMES NOW Plaintiff, Aparna Harris ("Ms. Harris"), and files this Complaint against Defendant First Unum Life Insurance Company ("Unum"), showing the Court as follows:

## HISTORY, JURISDICTION AND PARTIES

### 1.

This is an action under the Employee Retirement Income Security Act of 1974 as amended ("ERISA"), 29 U.S.C. § 1001 et seq., to recover Long-Term Disability ("LTD") benefits under the terms of an employee welfare benefit plan (hereafter "the LTD Plan" or "the Plan") maintained by McKinsey & Company, and to clarify and/or enforce Plaintiff's rights under the Plan.

### 2.

The Plan is an "Employee Welfare Benefit Plan" as defined by ERISA, 29

U.S.C. § 1002(1).  A copy of the Plan is attached as Exhibit A.

3.

Jurisdiction is based on ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

4.

Venue is proper in the United States District Court for the Northern District of Georgia pursuant to 29 U.S.C. § 1132(e)(2) because the breach of Unum's duties alleged herein occurred in Georgia.

5.

Unum is a New York corporation that conducts business in the State of Georgia.

6.

This Court has personal jurisdiction over Defendant Unum.

7.

Defendant Unum may be served at 1225 Franklin Avenue, Suite 250, Garden City, New York 11530.

8.

Ms. Harris is a "participant" in the Plan, as defined by ERISA, 29 U.S.C. §

1002(7).

9.

The Plan is insured by a group policy of insurance issued by Defendant Unum.

10.

Unum has made all decisions concerning Plaintiff's claim for benefits and has handled all communications concerning Plaintiff's claim.

11.

On information and belief, all benefits under the Plan are paid from the general assets of Defendant Unum.

12.

Under the Plan, Unum promised to pay disability benefits as follows:

DISABILITY

When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:

1.  disability; and

2.  regular attendance of a physician.

The proof must be given upon request and at the insured's expense.

The monthly benefit will not:

1.  exceed the insured's amount of insurance; nor

2.  be paid for longer than the maximum benefit period.

The amount of insurance and the maximum benefit period are shown in the policy specifications.

13.

The Plan defines "disability" as follows:

> "Disability" and "disabled" mean that because of injury or sickness:
>
> 1.  the insured cannot perform each of the material duties of his regular occupation; or
>
> 2.  the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:
>
>     a.  performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and
>
>     b.  earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

## **HISTORY OF CLAIM**

14.

The allegations of paragraphs 1 through 13 are hereby realleged as if set forth herein verbatim.

15.

Ms. Aparna "Mini" Harris previously worked in McKinsey & Company's "people function," a group that was responsible for, among other things, reorganizing McKinsey's internal structure. Her duties included setting compensation and performance metrics for various positions and integrating various departments and career paths into McKinsey's overall structure.

16.

The uncontroverted evidence in the record is that Ms. Harris excelled in her highly demanding job.

17.

Ms. Harris has had issues with coccyx pain dating back to the birth of her second child in 2005.

18.

While initially resolved with a steroid injection and dormant for several years, Ms. Harris's coccyx pain returned over time and became increasingly painful.

19.

By early 2020, Ms. Harris had begun experiencing severe pain in her left buttock while sitting, which she attributed to the non-ergonomic way she had been sitting to compensate for her coccyx pain.

20.

Over time, the left buttock pain significantly worsened and spread into her left thigh and leg.

21.

From 2020 to the present, Ms. Harris has undergone innumerable therapeutic and diagnostic procedures to address her left buttock and leg pain, including invasive

procedures such as spine and nerve injections and nerve ablation procedures.

22.

Despite her intensive treatment, Ms. Harris has not received any lasting relief from her left buttock and leg pain.

23.

At approximately the same time as her left buttock and leg symptoms were worsening, Ms. Harris began to experience neuropathic pain in all four extremities, including burning nerve pain in her feet that is quickly exacerbated by standing in place.

24.

She also began to suffer extreme sensitivity (allodynia) to even light touch on her legs to the point that long pants or even the feel of bedsheets contacting the affected areas became intolerable to her.

25.

After ruling out other conditions such as generalized polyneuropathy and median or ulnar neuropathy with an electromyography / nerve conduction study (EMG/NC), Ms. Harris's neurologist diagnosed her with small fiber neuropathy. The

diagnosis would later be objectively confirmed by skin biopsy.

26.

Ms. Harris first went out of work temporarily due to her symptoms in December 2020 and January 2021, returning to work part-time on February 2, 2021.

27.

Ms. Harris's medical records from that time noted only minor symptom improvement while she was out of work, which was attributed to "not sitting hardly at all through the day."

28.

Other medical records from the same time documented that Ms. Harris "isn't getting any better and worries that she might be getting worse," that she was frustrated with her lack of improvement, and that she reported it was "exhausting to be in pain day after day, week after week."

29.

From March 2021 until October 2021, Ms. Harris continued to work part-time despite worsening pain and discomfort.

30.

During this interval Ms. Harris reports originally planning to work approximately 4 hours per day, three days per week. However, she reports she

frequently worked more hours than planned in a week due to the demands of her job.

31.

While working part-time, Ms. Harris was unable to tolerate sitting (due to left buttock and leg pain and allodynia) or standing (due to small fiber neuropathy) for any significant amount of time.

32.

As a result, Ms. Harris had to work primarily from the "cobra position" on her bed, lying on her stomach with her laptop before her.

33.

Working in the "cobra" position would inevitably strain Ms. Harris's neck after a time and cause her to work the remainder of her workday from her knees on the floor with her laptop on her bed.

34.

During this time, Ms. Harris was also prescribed medications to treat her pain, which when taken had a sedative effect and impaired her concentration and ability to work.

35.

Ms. Harris carefully limited her use of medications during times when she would have to work to avoid the impairing side effects.

36.

In June 2021, Ms. Harris's neurologist, Dr. David Williams, documented that her symptoms had recently been "modestly better" which he noted meant she was able to have "two or three 'good days' in a row." He further clarified, however, that her "[g]ood days are not pain free, just not in tears at the end of the day."

37.

In the same note, Dr. Williams recorded that Ms. Harris's "paresthesias in her hands feel like they are getting a bit worse."

38.

On June 14, 2021, Dr. Williams completed an Attending Physician's Statement (APS) form for Unum. Dr. Williams wrote that Ms. Harris "is unable to sit or stand for more than a few minutes at a time due to debilitating, severe left-sided sciatica pain. As a result she should limit work to four hours pre day, three days per week."

39.

On August 17, 2021, Unum approved Ms. Harris's claim for partial disability benefits to compensate her for her loss of income caused by her inability to work full-time.

40.

By October 2021, Ms. Harris's medical records reflected that she was "no longer able to manage" working even part-time.

41.

Dr. Williams recorded that Ms. Williams was "hardly able to work at all due to pervasive pain," that she had reduced her hours even further and was trying and failing to increase back to four hours, three days per week. He wrote that she "needs to go out from work completely."

42.

After more than a year in severe pain, unable to sit or stand for extended periods without exacerbating her symptoms, Ms. Harris went fully out of work on October 15, 2021.

43.

Agreeing that Ms. Harris was now totally disabled instead of partially disabled, Unum continued to pay her long-term disability benefits beyond October 2021.

44.

Over the next several months, Ms. Harris continued to receive both diagnostic and therapeutic interventions from her pain management physician, Dr. Erik Shaw,

the director of the pain clinic at the prestigious Shepherd Center in Atlanta.

45.

Despite Dr. Shaw's expertise and persistent efforts, Ms. Harris did not receive any meaningful and lasting relief from the various procedures he performed.

46.

Ms. Harris also continued during this time to treat with Dr. Williams for small fiber neuropathy.

47.

Both Dr. Shaw and Dr. Williams documented Ms. Harris's lack of improvement in their treatment notes from October 2021 through June 2022, when Unum would terminate her LTD benefits.

48.

In the two months before Unum terminated her benefits, Ms. Harris underwent two left posterior femoral cutaneous nerve blocks, two Botox piriformis injections, and a PRP injection to the trochanteric tendon, but none of the procedures gave Ms. Harris lasting relief.

49.

On May 19, 2022, a paper-only medical review of Ms. Harris's disability claim was performed at Unum's orders by Dr. Monica Grafals.

50.

Based upon information in the claim file, it appears that Dr. Grafals is an employee of Unum, designated as an "On-Site Physician" or "OSP."

51.

As an employee of Unum, Dr. Grafals' employment is subject to Unum's continued goodwill and Dr. Grafals herself is subject to the control and oversight of Unum.

52.

Dr. Grafals opined in conclusory fashion that the "existence, intensity, frequency, and duration of the claimant's reported symptoms are not consistent with physical exam findings, diagnostic test findings and treatment intensity."

53.

As evidence allegedly supporting her opinion, Dr. Grafals cited Ms. Harris's normal lumbar MRI, her normal EMG/NCS, and the fact that she reported some (temporary) improvement in response to treatments employed by Dr. Shaw.

54.

Ms. Harris does not claim to be disabled by a medical condition that would cause a lumbar MRI or EMG/NCS to be abnormal. These findings are therefore meaningless to assessing her disability.

55.

On May 19, 2022, Dr. Grafals sent a letter to Dr. Williams, asking him to agree with her opinion that Ms. Harris "is capable of performing his [sic] occupational demands as documentation does not contain any physical exam findings or functional deficits."

56.

On May 31, 2022, Dr. Williams responded that he did _not_ agree with Dr. Grafals. He wrote: "She has severe, intractable sciatica pain that makes it impossible for her to sit or stand for longer than a few minutes at a time. Medications used to treat her pain also impair concentration and attention."

57.

On June 7, 2022, Ms. Harris was seen by physical therapist Christopher Nesbitt at the Shepherd Center, who documented that Ms. Harris's "neuropathic pain has limited her ability to work, tolerate activities of daily living, sit, stand, and walk." On examination, he noted "[t]enderness to palpation of left gluteus minimus, gluteus medius, and piriformis."

58.

In describing Ms. Harris's pain, Mr. Nesbitt stated her "small fiber neuropathy pain is greater left vs right mostly distal to her knees, mostly ankles and feet. Without

medication her hands feel like there are crushing shards of glass in her hands. She describes brief pains radiating in her legs as Pings. She has constant burning in bilateral feet. Standing and sitting are worst, with pain increasing over the course of the day. Her most comfortable position is in prone with her feet floating off the edge."

59.

On June 16, 2022, Unum terminated Ms. Harris's LTD benefits, citing Dr. Grafals' medical review.

60.

Unum's termination letter parroted Dr. Grafals' vague and conclusory assertion that the "existence, intensity, frequency, and duration of [Ms. Harris's] reported symptoms are not consistent with physical examination findings, diagnostic test results, and treatment intensity."

61.

Unum's letter also claimed, falsely, that "the last time [Ms. Harris] filled a prescription for hydrocodone was in June 2021," which Unum asserted "would appear to indicate your pain level is well controlled on your current regimen."

62.

The letter stated that Dr. Williams' records did "not include any documentation regarding functional deficits" or "findings of neurological deficits" – two further false statements about the medical record.

63.

In terminating benefits, Unum had also obtained opinions from two other employee-reviewers, Dr. Zachary Gross and nurse Janice Albert.

64.

As employees of Unum, Dr. Gross and nurse Albert are/were subject to Unum's control and oversight.

65.

Both Dr. Gross and nurse Albert were provided with Dr. Grafals' opinions prior to reviewing Ms. Harris's claim.

66.

Both Dr. Gross and nurse Albert wrote brief reports agreeing with Dr. Grafals' opinions and adding their own false or misleading rationales for denying Ms. Harris's claim.

67.

Nurse Albert was responsible for the false assertion that Ms. Harris had not filled her pain medication in many months, and Dr. Gross was responsible for the false claim that Dr. Williams had not documented any neurological or functional deficits.

**Ms. Harris's Appeal**

68.

On December 13, 2022, with the assistance of counsel, Ms. Harris appealed Unum's decision to terminate her benefits, responding to the deeply flawed and biased reports of Dr. Grafals, Dr. Gross, and nurse Albert.

69.

Ms. Harris's appeal included the results of a Functional Capacity Evaluation (FCE), the "gold standard" objective test for measuring and establishing physical work restrictions. The FCE objectively confirmed Ms. Harris had below-sedentary work capacity.

70.

Based on the FCE results, the testing provider determined Ms. Harris would be incapable of sitting or standing in place more than "Occasionally" (up to one-third of the workday) and that she was unable to meet the minimum strength

requirements of sedentary work (ability to lift/carry up to 10 lbs.). These are three independent grounds on which Ms. Harris is physically disqualified from performing sedentary work, the lowest demand-level of work available in the national economy.

71.

Ms. Harris's appeal also included a detailed statement from Dr. Shaw responding to Unum's termination rationales. Dr. Shaw wrote that "[d]espite our interventions, Ms. Harris continues to suffer persistent severe pain that prevents her from sitting for long periods of time." Dr. Shaw further stated his belief that "Ms. Harris is completely credible in her symptom complaints and in reporting her response to the various treatments we've tried."

72.

Dr. Shaw also endorsed the findings of the FCE, writing that "the results of the FCE are also consistent with my opinion regarding her abilities, with my examination findings, and with my treatment of her over the last year and a half. The upshot is that Ms. Harris cannot sit or stand for more than a couple hours in total in a given day and that she cannot be expected to meet the physical demands of any job, even at the sedentary level. I believe that these limitations are entirely appropriate given her overall condition and in agreement with my examination and

medical opinion."

73.

In response to Unum's rationales for terminating benefits, Dr. Shaw emphasized that he "do[es] not keep medical records for the purpose of documenting a disability claim," but that nevertheless he did not believe "any reasonable doctor could review my notes and conclude anything other than Ms. Harris is disabled."

74.

Dr. Shaw wrote that "Dr. Grafals cherry-picked my notes to emphasize Ms. Harris's improvement to our various treatments, without consideration for the fact that her relief has been partial and/or short lived . . . . My notes do not say and are not intended to say that she has improved to the point of being able to return to work." He also restored context to some of the isolated notations Dr. Grafals had inappropriately seized upon as evidence of alleged improvement and work ability.

75.

Dr. Shaw concluded: "Based on my experience, training and education, and having regularly treated Ms. Harris for almost two years, I conclude that she is disabled. That conclusion has also now been confirmed by an *objective* Functional Capacity Evaluation."

76.

Ms. Harris's appeal also included a detailed first-person narrative statement from Ms. Harris herself, briefer statements from several witnesses, and updated medical records, all of which were consistent with each other and supported that Ms. Harris was totally disabled.

77.

Finally, Ms. Harris's appeal contained pharmacy records definitively refuting Unum's assertion that Ms. Harris had not filled her pain medications and that her pain must therefore be well controlled.

**Unum's Appeal Review**

78.

On January 12, 2023, Unum responded to Ms. Harris's appeal by sharing with her the report of yet another non-examining paper medical reviewer, Dr. Arlen Green.

79.

Dr. Green opined that "the weight of the medical evidence and file information does not support restrictions and limitations precluding the performance of the outlined occupational demands as of 06/16/22."

80.

Dr. Green stated that Ms. Harris's FCE results were "appreciated and considered," but Dr. Green still chose to disregard them entirely. He asserted that "without correlating findings on exams such as sensory loss, weakness, allodynia, or further significant abnormalities, the results of the evaluation do not correlate with other pieces of medical evidence."

81.

Dr. Green also claimed that Ms. Harris's "chronic pain complaints and reported difficulty sitting/standing for prolonged periods are inconsistent with findings on exams, diagnostic testing, and reported and observed activities." In other words, Dr. Green asserted that Ms. Harris was lying about her symptoms and limitations.

82.

Specifically, Dr. Green asserted that notations in the medical records of "normal gait, normal motor strength, and range of motion of the extremities and lumbar/cervical spine" and her ability to "walk continuously for 6 minutes in the FCE" were inconsistent with her stated restrictions and limitations and the FCE's objective findings.

83.

Dr. Green also asserted that Ms. Harris's personal activities, such as her ability to walk with a friend, were inconsistent with her reported restrictions and limitations.

84.

In addition, Unum also produced a report from its own employee-nurse, Allison Purtell.

85.

Ms. Purtell asserted that "[a]lthough [Ms. Harris] has consistently reported coccyx pain, severe intractable sciatic pain, and idiopathic small fiber neuropathy in her extremities which limit her ability to sit and stand for any length of time, the exam findings do not correlate with the severity of her reports. She presents as alert and in no acute distress, she ambulates well and does not use any assistive device. There is tenderness noted in the lumbar back and left hip however there is no evidence of any muscle wasting or atrophy of the lower extremities." In other words, nurse Purtell asserted that Ms. Harris was lying about her symptoms and limitations.

86.

Ms. Purtell also emphasized that Ms. Harris had normal strength in her extremities on examination, that there had been no "urgent care or ED visits for intractable pain," and that Ms. Harris was able to perform her activities of daily

living (dressing, bathing, eating, etc.) and walk with a friend.

**Ms. Harris's Response**

87.

On March 15, 2023, Ms. Harris provided her response to the medical reviews of Dr. Green and nurse Purtell.

88.

Ms. Harris's response included another detailed rebuttal by Dr. Shaw of Unum's reviewers' reports. Dr. Shaw wrote: "I have reviewed Dr. Green's report in detail and I categorically disagree with him."

89.

Regarding Dr. Green's decision to ignore the FCE findings, Dr. Shaw wrote that Dr. Green had "not provided any compelling reason for disregarding the objective FCE results."

90.

Dr. Shaw wrote that because Ms. Harris "suffers from chronic nerve pain due to idiopathic small fiber neuropathy," as opposed to nerve pain "caused by nerve compression in the spine," none of the findings cited by Dr. Green or nurse Purtell undermined her symptom complaints or the FCE results.

91.

Based on Ms. Harris's diagnosis, Dr. Shaw noted that Unum's appeal reviews were full of misleading and irrelevant assertions. For instance, there would be "no reason to think she would have reduced strength or range of motion," "no reason she would be unable to walk normally," "no reason to expect muscle atrophy," and "no reasonable expectation that she would have an abnormal lumbosacral plexus" because the lumbosacral plexus was not the origination site for any of her symptoms or issues.

92.

Dr. Shaw wrote that Dr. Green either "doesn't understand the difference between upper and lower motor neuron issues, the distinction between Abeta and Adelta and C fibers, or is ignoring their functional differences. Small fiber neuropathy is a sensory dysfunction and would have no impact on her motor function. It is a disorder of disabling pain with a yet unknown cause. To wit, none of the findings from Dr. Green or his nurse have <u>any</u> bearing whatsoever on Ms. Harris's medical conditions."

93.

Dr. Shaw also responded to the unreasonableness of Dr. Green's demands as to what information should be contained in a treating provider's medical records

with respect to disability. Dr. Shaw stated that "[o]bviously, not all of Ms. Harris's symptoms or relevant findings are documented in every office visit or examination, but all the findings one would expect to see with Ms. Harris's conditions are documented in her records during the last 2 years. . . . A certain symptom or finding may not have been checked on a particular day, but that doesn't make that day's note inconsistent with her complaints or with her overall history."

94.

Dr. Shaw further wrote that "Dr. Green is essentially saying that to satisfy him, I must do a full hour-long exam every time I see [Ms. Harris], re-establishing 3 years of history by examination at every appointment."

95.

Dr. Shaw continued that he does "not keep medical records for the purpose of documenting a disability claim," and that he is "not writing down every appointment that Ms. Harris is incapable of sitting for more than a few minutes at a time without significant pain. I already know that and have known that since I started treating her. In fact, that's why I'm treating her. If Dr. Green's complaint is that it's not obvious enough from my records that Ms. Harris cannot sit, maybe he should have examined her himself."

96.

Dr. Shaw concluded that Ms. Harris's disability has been proven to the extent it can be by objective means and that in his opinion "[d]isability is not a close question in this case."

97.

Ms. Harris's response also included the reports of not one, but two independent physicians who, unlike Dr. Green, examined Ms. Harris in-person before opining on her functional abilities.

98.

Dr. Keith Raziano, a pain management specialist, examined Ms. Harris and concluded that Ms. Harris was incapable of working in even a sedentary capacity. Notably, Dr. Raziano has been retained by several insurers to perform disability IME's. Dr. Raziano noted that during examination Ms. Harris could not sit upright for more than 5 continuous minutes or to stand for long periods and that she resorted to a supine or prone position during the examination.

99.

Dr. Raziano found on examination that Ms. Harris had "verifiable discomfort to palpation of the bilateral upper and lower extremities with light touch and pin prick. Additionally, the bilateral upper and lower extremities were examined while

she was distracted and she still indicated pain with examination despite distraction."

100.

As to Ms. Harris's left hip and buttock pain, Dr. Raziano found the lack of diagnosis/etiology did not cause him to question her veracity. He also noted that the left hip/buttock issues were "on top of the already disabling small fiber neuropathy," which he assessed was "causing the vast majority of her discomfort and disability."

101.

Like Dr. Shaw, Dr. Raziano found Ms. Harris's ability to walk completely consistent with her diagnoses and symptom complaints.

102.

Dr. Raziano concluded that Ms. Harris's pain complaints were credible and consistent with her presentation and with his examination findings, agreeing with the opinions of Dr. Shaw and "manifestly disagree[ing] with the findings of Dr. Green."

103.

Ms. Harris was also examined by a neurologist, Dr. Larry D. Empting, who also provided a detailed history in his report.

104.

Dr. Empting performed a neurological exam and found numerous sensory

deficits, including "distal decreased vibration," "decreased cold more prominently than vibration distal more than proximal and normalizes by the knees," "pin hyperalgesia that is diffuse and goes up to the ankle and is worse distal more than proximal," and "mechanical allodynia with compression of the foot laterally and also plantar palpation."

105.

Dr. Empting noted Ms. Harris "has symptoms of numbness, pain with light touch such as carpet texture or night sheets giving her pain to light touch, or classic touch allodynia. On top of that she has mechanical induced pain, i.e. mechanical allodynia in the entire plantar and dorsal surface of the foot. We can see even with simple pin she has increased pain response or pin hyperalgesia. These are all classic neuroscience based abnormal painful sensation induced by damaged nerves, or neuropathic pain. We can see that this started out more distally in the toes and has worked its way up toward the ankle, and we would expect that to slowly worsen over time, unfortunately.".

106.

Regarding her left hip/buttock pain, Dr. Empting found that it prevents her from sitting for significant periods of time.

107.

Dr. Empting concluded that Ms. Harris's providers "have exceptionally documented how [her] painful disorders impair her, and I very much and thoroughly and within reason medical certainty agree that she **clearly is totally permanently disabled**."

108.

Also included with Ms. Harris's response was the report of a subject matter expert regarding FCEs, David Bledsoe, OTR/L, CIR.

109.

Mr. Bledsoe reviewed the FCE performed by Mr. Navarro and found that the test results were valid and reliable as demonstrated by the results of embedded tests of effort and validity.

110.

Mr. Bledsoe also responded directly to Dr. Green's criticisms of the FCE, concluding that "[n]othing in Dr. Green's report causes this reviewer to question the reliability and validity of Ms. Harris's FCE performances. Nor has Dr. Green credibly refuted any of Mr. Navarro's conclusions or recommendations. In my opinion, the FCE results accurately and reliably support patient's current inability to work a full day at the sedentary level, much less to work a full-time schedule.

**Unum's Final Decision Completely Ignored Ms. Harris's Response**

111.

On April 14, 2023, Unum sent a letter to Ms. Harris upholding its decision to terminate benefits.

112.

Unum did not have any of the medical evidence or additional information submitted by Ms. Harris in March 2023 reviewed by a medical professional.

113.

Unum's letter implied that it was not required to review the new information because Ms. Harris's "evaluations occurred more than eight months after the relevant time period and do not provide contemporaneous information regarding your client's functional capacity in June 2022."

114.

Unum ignored that its own (paper-only) medical reviews took place more than 6 months after June 2022.

115.

Unum utterly disregarded Dr. Shaw's detailed response Dr. Green and nurse Purtell, despite Dr. Shaw very specifically refuting the rationales that their opinions relied upon.

116.

The probative value of Dr. Shaw's statement and Ms. Harris's independent medical examinations was a question of medical judgment that Unum was required by regulation to have evaluated by a qualified, independent medical professional.

117.

Unum's final decision letter continued to rely upon false and misleading statements about the medical record and rationales that had been completely refuted by Ms. Harris's treating providers and examining testing providers.

118.

On information and belief, Unum has adopted an internal policy or practice of refusing to have medical evidence reviewed that is produced to it in rebuttal to its appeal reviews.

**Unum's Violations of Full and Fair Review**

119.

Unum failed to strictly adhere to its obligations under ERISA's "full and fair review" claims regulation, 29 C.F.R. § 2560.503-1, in numerous ways, including, but not limited to, the following:

- Unum violated its regulatory duty to have all of Ms. Harris's medical evidence reviewed by an independent, qualified medical professional;

- Unum violated its regulatory duty to ensure the impartiality and independence of the employee medical consultants it retained to review Ms. Harris's claim;

- Unum engaged in a selective review of the medical evidence; and

- Unum violated "full and fair review" in such other ways as will be proven in litigation.

120.

Unum's violations of ERISA's regulatory procedural requirements were significant and substantial, not harmless or *de minimis*.

121.

Based on the foregoing, the Court should review this matter *de novo*, without deference to Unum's benefit determination.

## COUNT I: BENEFITS DUE UNDER 29 U.S.C. § 1132(a)(1)(B)

122.

Plaintiff hereby repeats and realleges the allegations of Paragraphs 1 through 121 above, as if set forth verbatim herein.

123.

Defendant Unum's refusal to pay LTD benefits beyond June 16, 2022, is wrong, unreasonable, violates the terms of the Plan, and is contrary to the weight of

credible evidence in its claim file.

124.

Ms. Harris is entitled to additional LTD benefits under the Plan retroactive to June 17, 2022, and continuing through the date of this Court's final judgment.

125.

Ms. Harris is further entitled to interest on all past due amounts pursuant to ERISA 29 U.S.C. § 1132(a)(1)(B).

126.

Ms. Harris has retained counsel to represent her in this matter, and is entitled to an award of costs, including a reasonable attorney's fee, pursuant to ERISA 29 U.S.C. § 1132(g)(1).

127.

WHEREFORE, Ms. Harris prays for relief in the following forms:

a) An order finding Defendant's termination of Plaintiff's benefits was *de novo* wrong and/or an abuse of discretion;

b) An award of long-term disability benefits retroactive to June 17, 2022, and continuing through the date of this Court's judgment, plus prejudgment interest and Plaintiff's reasonable expenses of litigation, including a reasonable attorney's fee;

    c) A clarification of Plaintiff's rights under the plan, ordering Unum to continue paying disability benefits unless and until Ms. Harris returns to work or unless and until there is evidence of significant improvement in Ms. Harris's medical conditions establishing that she can reliably and consistently resume full-time work at McKinsey & Company; and

    d) Such other and further relief as the Court may deem just and proper.

Respectfully submitted, this 30th day of May, 2023.


                        **EVANS WARNCKE ROBINSON, LLC**

                        By: */s Jeffrey S. Warncke*
                             Jeffrey S. Warncke
                             Georgia Bar No. 737850
                          */s Steven J. Mitchell*
                             Steven J. Mitchell
                             Georgia Bar No. 669018

Attorneys for Plaintiff
191 Peachtree Street NE
Suite 3980
Atlanta, Georgia 30303
P:  404.841.9400
F:  888.738.5949
E:  j.warncke@ewrlawfirm.com
E:  s.mitchell@ewrlawfirm.com