# Exhibit A

 **SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
Suite 500, Marquis 1
245 Peachtree Ctr. Ave
Atlanta, GA 30303-9913

Date: January 11, 2023

Charletta Victoria Payton
157 Moury Ave SE
Apt 2715
Atlanta, GA 30315

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision. Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision. The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter. The form is available at https://www.ssa.gov/forms/ha-520.html. Please write the Social Security number associated with this case on any appeal you file. You may call (800) 772-1213 with questions.

Please send your request to:

**Appeals Council**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice. The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Charletta Victoria Payton (BNC#: 21D2837F83497)                Page 2 of 3

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP2 (03-2010)

See Next Page

Charletta Victoria Payton (BNC#: 21D2837F83497)                      Page 3 of 3

**If You Have Any Questions**

1. Visit www.ssa.gov for fast, simple, and secure online service.
2. Call us at **1-800-772-1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1-800-325-0778**. Please mention this notice and decision when you call.
3. You may also call your local office at (866) 931-9946.

Social Security
Ste 2860 Flr 28
401 W Peachtree St NW
Atlanta, GA 30308-9972

**How are we doing?** Go to www.ssa.gov/feedback to tell us.

Melinda L. Dula
Administrative Law Judge

Enclosures:
Decision Rationale

cc:      Kathleen Flynn
         315 W. Ponce De Leon
         Avenue, Suite 940
         Decatur, GA 30030

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

| IN THE CASE OF | CLAIM FOR |
|---|---|

Charletta Victoria Payton
(Claimant)

Supplemental Security Income

21D2837F83497

(Wage Earner)

(Beneficiary Notice Control Number)
*Social Security Number removed for your protection*

## JURISDICTION AND PROCEDURAL HISTORY

On November 5, 2020, the claimant filed an application for supplemental security income, alleging disability beginning July 9, 2019.  The claim was denied initially on April 19, 2021, and upon reconsideration on September 17, 2021.  Thereafter, the claimant filed a written request for hearing received on October 21, 2021 (20 CFR 416.1429 *et seq.*).  The claimant appeared and testified at a hearing held on October 19, 2022, in Atlanta, GA. The claimant is represented by Kathleen Flynn, an attorney. Sandra M Bruff, an impartial vocational expert, also appeared at the hearing.

The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 416.1435(a)).

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since November 5, 2020, the date the application was filed.

## APPLICABLE LAW

See Next Page

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975). If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p). If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)). An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it

or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965).  If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, she is not disabled.  If the claimant is not able to do other work and meets the duration requirement, she is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912 and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant has not engaged in substantial gainful activity since November 5, 2020, the application date (20 CFR 416.971 *et seq*.).**

The claimant worked after the application date, but this work activity did not rise to the level of substantial gainful activity.  During testimony, the claimant stated that she worked as Southwest Food Excellence last year for approximately one-month, full-time. However, she worked six and one-half hours a day, which is not full-time. Nevertheless, her duties included cooking, making trays and heating the trays for school children at the Sylvan Middle School.  She stopped working due to a disagreement regarding a no-show for work.  A review of the claimant's earnings shows that in 2020, the claimant earned $2,467.42 and $8,878.33 in2021 (Exhibits B-15D and B-16D).

The claimant's earnings have not risen to the level of "substantial gainful activity" as defined in 20 CFR § 416.974.

Accordingly, the claimant has not engaged in substantial gainful activity since allegedly becoming disabled.

**2.   The claimant has the following severe impairments: Migraines, Insomnia, Major Depressive Disorder-moderate, Generalized Anxiety Disorder and Post-traumatic Stress Disorder (PTSD) (20 CFR 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

The claimant also alleges that she has cervical cancer. During testimony, the claimant stated that she has heavy menstrual cycles and that the last time she was checked by a doctor, she was told that her cervix looked good. Cervical biopsies related to STD and their symptoms found a high grade squamous intraepithelial lesion but did not reveal the lesions as cancerous as they were noted as not consistent with carcinoma (Exhibit B-2F).

Therefore, due to the lack of objective signs, symptoms, findings and/or treatment, the undersigned finds that there is no medically determinable impairment of cervical cancer involved in this matter. The unsupported allegation of an impairment is not sufficient to establish the existence of an impairment or the existence of a severe impairment, unless medical signs and laboratory findings exist to demonstrate the existence of such impairment.

**3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

As discussed below, the medical evidence does not contain the objective signs, symptoms, or findings, or the degree of functional limitations necessary for the claimant's impairments, considered singly or in combination, to meet or equal the severity of any sub-section of the above-mentioned listings or any other section contained in Appendix 1. In reaching this conclusion, the Administrative Law Judge has considered the opinions of the state agency medical consultants who evaluated the issue at the administrative review process and reached the same conclusion (20 CFR § 404.1527(f) and 416.927(f)). The Administrative Law Judge also notes no treating or examining medical source has stated the claimant has an impairment or combination of impairments that meets or equals the criteria of any listed impairment.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

The claimant alleged when she filed this application for supplemental security income that her ability to work was limited due to major depression, anxiety and PTSD (Exhibit B3E). During testimony and in Function Reports, the claimant says she cannot work because her medications cause fatigue, and that she is sluggish. She experiences classic depressive symptoms that include loss of interest in activities, crying, isolation and lack of concentration. She also reported that she has panic attacks that involve a racing heartbeat and feeling out of body that occur every other day. She stays with a friend and watches television all day . She can perform household chores that include cooking, cleaning and laundry, which also includes folding, sweeping,

mopping and washing dishes.  The claimant reports memory problems and limited social interaction.  She reported having difficulty with getting along with family, friends and neighbors and authority figures, such as police and supervisors. She is unable to handle stress or changes in routine and has insomnia with nightmares/bad dreams when she does sleep well  (Exhibit B6E).

Regarding the claimant's polysubstance use, she testified that she attended a class with groups and has been clean since last year. She continues to go twice a month. Noted is that the evidence does not indicate that the claimant continues to drink and/or use street drugs, as there are no laboratory results with objective proof of using/drinking, and no reports by providers that she was under the influence.

Also during testimony, the claimant stated that PTSD is due to thinking about what happened to her in childhood and to her grandmother who lost an eye and was physically abused.

As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because the claimant's overall course of treatment shows that her depressive and anxiety-related symptoms waxed and waned but that she was never a danger to self or others.  She regularly attended her appointments for medication management and therapy, was always compliant with her medications, and her lows were frequently situational in nature.  The claimant was always noted as alert and cooperative, with moods that varied from depressed/anxious to euthymic.  She was able to do her daily routine, household chores and during her treatment, there were no recommendations that she receive inpatient mental health treatment nor did she seek any inpatient treatment on her own by presenting to an emergency department (ED) with complaints, signs or symptoms of a mental health disorder.

The evidence shows that the claimant has depression, anxiety and PTSD for which she receives treatment in the form of medication management, individual and group therapy. She has the classic depression symptoms of feeling hopeless, sad and lost, with no interest in doing things. Anxiety-related symptoms consisted of constantly thinking, feeling jittery and overwhelmed and panic attacks.  She rated her symptoms nine out of 10, on a scale of one-to-10, and stated that her symptoms are most severe at night. Her PHQ score on this visit was 16, indicative of moderate depression.  Her cannabis and cocaine use disorders were noted as in sustained remission Exhibit B-6F and B-8F).

The evidence also shows that the claimant's symptoms waxed and waned, as seen on an April 9, 2021, appointment with psychiatrist Dr. Alicia Lindsay who noted that after only two weeks on her medications, the claimant stated that she felt better, and that although the medications are helping with depression, she might need a higher dose.  She reported daily fatigue, getting only six hours of  sleep per night, difficulty falling asleep due to racing thoughts, being on her phone or watching TV.  Also, during this visit with Dr. Lindsay,  the claimant reported she was fired from Zaxby's for yelling at customer for not wearing a mask, as she experienced panic attacks due to COVD-19 and worried about contracting it.   The claimant endorsed using alcohol socially, but no marijuana, cocaine or heroin (Exhibit B6F, pp. 12, 13 and 46).

However, Dr. Lindsay noted the claimant was future oriented as she expressed a desire to go roller skating but did not have the energy or enjoyment in doing so. The claimant denied side

effects, and was noted as having no evidence of decompensation at the time and not at an imminent elevated risk to harm self or others. Dr. Lindsay continued Trazodone for nightly insomnia (Exhibit B-6F, p.12).

During a November 19, 2021, visit with psychiatrist Dr. Rhonda Reid notes show the claimant reported continued depressive and anxiety symptoms and requested a medication decrease due to side effect of sedation at work (Exhibit 6F, p. 39). Later, the claimant reported medication side effects of nightmares, muscle tension and night sweats (Exhibit B-6F, p. 47).

During an April 27, 2022, visit with LPC Soo Hyun Kim, the claimant reported that her PTSD resulted from rape and abuse at age six or seven by strangers. She also witnessed abuse of her grandmother by the grandmother's boyfriend. The claimant's father passed away when she was age six and her mother passed away when the claimant was nine. She was sexually and physically abused again from age 13 by other people. Although LPC Kim diagnosed the claimant with PTSD, and at moderate risk of harm to self or others, she made no change in treatment noted the claimant will likely benefit from continuing her psychiatric and medication management (Exhibit B-8F, pp. 46).

Case manager Keith Phillips was assigned to the claimant to assist with medical/mental health appointments, housing, medication, etc. On May 4, 2022, Mr. Phillips noted that he was able to easily engage the claimant, worked well with her on housing-related matters and that the claimant's response was good. She obtained and presented all documents that she was asked to bring, and she was able to upload and complete all of the required forms to apply for housing (Exhibit B-6F, p. 58).

On a June 1, 2022, group participation assessment rating form, the claimant scored well on areas that include paying attention-5, communicative-5, alertness-5, cooperativeness-4, appropriateness-5 and appearance-5. A June 10, 2022, clinic visit with PCP Dr. Reid shows the claimant was future oriented and by now had stable housing, income, strong social support and regularly attending appointments. There was no evidence of decompensation at this time, she was not at an imminent elevated risk of harm to self or others and denied SI/HI/AVH. Dr. Reid noted the claimant would benefit from continued outpatient management (Exhibit B-6F, pp. 55).

Although the claimant reported she was feeling depressed due to family issues, breaking up with her boyfriend, and staying with different relatives, she also reported that her depressed and anxious moods were better with bupropion. She was getting six hours of sleep and stated that her energy and concentration were better. She was able to do her daily activities and reported only occasional memory issues (Exhibit B-6F, 39, 46, 47, 57, 58, 61, 62 and 63). Clinic notes from Dr. Stallworth-Jackson show that the claimant reported a period of non-compliance with previous medication. However, there is no evidence to show that the claimant's symptoms deteriorated and required inpatient mental health treatment (Exhibit B-8F, p. 11).

In understanding, remembering or applying information, the claimant has a mild limitation. The claimant was often described as alert and oriented and although she reported that she has memory issues, none were evidenced during treatment. She was compliant with her medications and appointments and knew when to ask for increases and decreases to the dosage of her

medications based on their effectiveness or side effects. She was also able to recall her history of childhood and family abuse, give the necessary information to apply for housing and pull up the information on the computer and complete the application independently.

In interacting with others, the claimant has a moderate limitation. The claimant reported she was fired from Zaxby's because she yelled at a customer for not wearing a mask. She also reported during a waning period that she can become irritable. However, there is no evidence to indicate the claimant was difficult to get along with or had difficulties in general getting along with others. Even with her history of polysubstance abuse, there is no reported of arrests or other maladaptive behaviors that could indicate ongoing limitations in this domain of functioning. Accordingly, the undersigned has determined the claimant experiences moderate limitations in this domain of functioning, and can occasionally interact with the public, co-workers, and supervisors.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. In addition to memory issues, the claimant reported difficulty with her ability to maintain concentration. However, mental health treatment notes show the claimant's attention was adequate for the evaluation. The claimant stated that she is able to perform household chores and can do each in 15 to 20 minutes each or longer (Exhibit B-6E). She was often noted as forward looking and engaged in her treatment with no reports of disinterest, noncooperation or missed appointments. Nevertheless, the undersigned has determined the claimant experiences moderate limitations in this domain of functioning, and is limited to simple, routine jobs; not involving fast-paced production.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The evidence shows that the claimant experienced waxing and waning symptoms. However, she did not seek emergency room or require inpatient mental health hospitalization. She was compliant with her medication and appointments and was forward thinking. The claimant expressed her desire to get better mentally and participated regularly in activities related to her mental health treatment. Accordingly, the undersigned has determined the claimant has a moderate limitation in this domain of functioning and is limited to making simple work-related decisions and few, if any workplace changes.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. As to the "C" criteria of Listing 12.04, the evidence does not reveal the claimant has a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation on her ability to perform basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, or that she has experienced repeated episodes of decompensation, has a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or changes in the environment has been predicted to cause her to decompensate, or that she has a current history of one or more years' inability to function outside a highly supportive living arrangement.

See Next Page

As to the "C" criteria of Listing 12.06, the evidence does not reveal the claimant experiences a complete inability to function independently outside the area of her home.  The claimant is compliant with all appointments, including group therapy, indicating an ability to function outside the area of her home and be around others.  In addition, progress notes and reports from treating and examining physicians do not contain any references that the claimant has problems interacting or communicating.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning.  The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant should avoid concentrated exposure to unprotected heights and hazardous machinery. The claimant is limited to simple, routine jobs; not involving fast-paced production, and make simple work-related decisions and few, if any workplace changes. She can occasionally interact with the public, co-workers, and supervisors.  She would be absent one day monthly and would be off task no more than ten percent daily in addition to standard breaks and lunch (at or away from the workstation).**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

See Next Page

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As discussed above, the claimant has insomnia and was prescribed Trazodone for sleep. However, In June 2022, Dr. Reid noted the claimant reported that she self-discontinued trazodone due to waking up with headaches. However, Dr. Reid re-prescribed trazodone in the same dosage as before (Exhibit B-6F, pp. 62, and 64).

A July 22, 2022, clinic visit with psychiatrist Dr. Brittany Stallworth-Jackson shows the claimant had endorsed insomnia. However, on this visit, she stated that her symptoms have improved since her last visit in June 2022 and denied side effects (Exhibit B-8F, p.10).

A physical examination performed on August 8, 2022, by physicians' assistant Chelsey Hennessee, shows the claimant reported she is compliant with her medications, and did not report headaches or insomnia or side effects from her medications. And during an August 22, 2022, visit with Dr. Stallworth-Jackson, the claimant reported that her sleep is okay and that she sleeps six hours per night. In addition, she stated that her energy and concentration have been adequate, and she even reported boredom during free time daily. However, she did not report that she takes naps during her free time (Exhibit B-8F, pp. 3-6, 9 – 10 and 13).

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

In reaching the above-stated residual functional capacity, the Administrative Law Judge recognizes that internist Dr. J. Harvey and psychiatrist Dr. L. Leduc, the state agency medical consultants who evaluated the evidence of record concluded the claimant is capable of performing work at the any exertional level and capable of performing the mental demands of work-like activities (Exhibits 1A and 4A). The undersigned finds these opinions persuasive because they are consistent with and supported by the totality of the evidence that fails to show the claimant has complaints or impairments that would limit her ability to lift/carry. Also, although  treatment notes show that the claimant's depressive and anxiety-related symptoms waxed and waned and that she reported a period of noncompliance, she was consistently noted as not in imminent risk of harm to self or others; required no inpatient mental health treatment and in spite of her waxing and waning symptoms, she was able to follow through and participate in the process of finding housing.

On June 2, 2022, psychiatrist Dr. Rhonda Reid opined the claimant has fair (which she defined as severely limited and unable to function one-third of workday) ability to follow rules, interact with supervisors, use judgment, function independently and adjust to simple job instructions. Dr. Reid also opined the claimant had poor to no ability to relate to coworkers, deal with the public,

deal with work stress and maintain attention and concentration.  As far as making social adjustments, Dr. Reid opined the claimant is good at maintaining personal appearance, but fair with behaving in an emotional stable manner, relating predictable in social settings and demonstrate reliability. Dr. Reid also opined that the claimant has marked limitations in all areas of mental functioning; her mental health treatment is ongoing, which diminishes the symptoms of the claimant's mental disorder (Exhibit B-5F).

However, Dr. Reid's opinions regarding the claimant's social functioning are not persuasive as they are not consistent with nor supported by the evidence that shows that during testimony, the claimant stated that she has no real problems with others, which is supported by the evidence. She has no legal history and there is no evidence to indicate the claimant was difficult to get along with or had difficulties in general with getting along with others.  Even with her history of polysubstance abuse, there is no reported of maladaptive behaviors that could be attributed to substance abuse or not.  The evidence does not indicate ongoing limitations in this or any other domain of functioning, and any ongoing limitations are not marked based on the evidence. Therefore, Dr. Reid's opinions regarding the claimant's functioning are not persuasive.

With regard to Dr. Reid's opinion that the claimant has marked limitations in the area of understanding, remembering or applying information, this opinion is not persuasive because it is not consistent with or supported by the evidence that shows the claimant presented to her appointments with no missed appointments due to memory problems.  She was able to recall her history back to childhood and connect her history to PTSD.  She was able to pull up and complete forms on the computer that were required to apply for housing.  The claimant understood all instructions regarding medication and therapy and there are not notes from any treatment personnel that stated the claimant was thought to be confused or required assistance with understanding her responsibility in treatment.

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the lack of physical evidence supports the claimant's ability to perform at all exertional levels.  The evidence shows that the claimant was relatively high functioning, but she still has diagnoses of depression, anxiety and PTSD with continued treatment.  However, the evidence supports finding the claimant capable of following simple instructions, making simple, work-related decisions, few if any workplace changes and performing simple jobs that do not require fast-paced production.  The evidence also support finding the claimant can have interaction with supervisors, coworkers and the public, but such interaction must take place no more than occasionally.

**5.   The claimant has no past relevant work (20 CFR 416.965).**

**2.   The claimant was born on April 24, 1992 and was 28 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).**

**3.   The claimant has a limited education (20 CFR 416.964).**

**4.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).**

See Next Page

**5.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

The claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations.  To determine the extent to which these limitations erode the occupational base of unskilled work at all exertional levels, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as laundry worker, DOT 361.685-018, 397,000 jobs; floor cleaner, DOT 381.687-034, 900,000 jobs and janitor, DOT 381.687-018, 500,000 jobs in the national economy

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in *the Dictionary of Occupational Titles*, the SCO or experience, education or training.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines.

**6.   The claimant has not been under a disability, as defined in the Social Security Act, since November 5, 2020, the date the application was filed (20 CFR 416.920(g)).**

Charletta Victoria Payton (BNC#: 21D2837F83497)                    Page 12 of 12

## **DECISION**

Based on the application for supplemental security income filed on November 5, 2020, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ *Melinda L. Dula*
_____
Melinda L. Dula
Administrative Law Judge

January 11, 2023
_____
Date

# LIST OF EXHIBITS

### Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | B1A | T16 Initial Disability Determination Explanation | | 2021-04-14 | 12 |
| Y13 | B2A | T16 Initial Disability Determination Transmittal | | 2021-04-14 | 1 |
| Y13 | B3A | T16 Recon Disability Determination Transmittal | | 2021-09-17 | 1 |
| Y13 | B4A | T16 Recon Disability Determination Explanation | | 2021-09-17 | 8 |

### Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | B1B | Fee Agreement for Representation before SSA | | 2020-12-09 | 2 |
| Y13 | B2B | SSA-1696 - Claimant's Appointment of a Representative | | 2020-12-09 | 4 |
| Y13 | B3B | T16 Notice of Disapproved Claim | | 2021-04-19 | 10 |
| Y13 | B4B | Request for Reconsideration | | 2021-06-28 | 1 |
| Y13 | B5B | Fee Agreement for Representation before SSA | | 2021-06-28 | 2 |
| Y13 | B6B | SSA-1696 - Claimant's Appointment of a Representative | | 2021-06-28 | 4 |
| Y13 | B7B | T16 Disability Reconsideration Notice | | 2021-09-17 | 3 |
| Y13 | B8B | Request for Hearing by ALJ | | 2021-10-29 | 1 |

| | | | | |
|---|---|---|---|---|
| Y13 | B9B | Fee Agreement for Representation before SSA | 2021-10-29 | 2 |
| Y13 | B10B | SSA-1696 - Claimant's Appointment of a Representative | 2021-10-29 | 4 |
| Y13 | B11B | Request for Hearing Acknowledgement Letter | 2021-11-17 | 15 |
| Y13 | B12B | Hearing Notice | 2021-11-26 | 25 |
| Y13 | B13B | SSA-1696-SUP2 - Representative's Withdrawal of Acceptance of Appointment | 2021-12-07 | 1 |
| Y13 | B14B | Fee Agreement for Representation before SSA | 2020-11-05 | 2 |
| Y13 | B15B | SSA-1696 - Claimant's Appointment of a Representative | 2020-12-09 | 4 |
| Y13 | B16B | Request for Hearing by ALJ | | 1 |
| Y13 | B17B | Notice Of Hearing Reminder | 2022-02-02 | 1 |
| Y13 | B18B | Notice to Show Cause for Failure to Appear | 2022-03-08 | 3 |
| Y13 | B19B | SSA-1696 - Claimant's Appointment of a Representative | 2022-06-14 | 5 |
| Y13 | B20B | On the Record Request | 2022-06-14 | 2 |
| Y13 | B21B | COVID Hearing Agreement Form | 2022-06-14 | 3 |
| Y13 | B22B | Fee Agreement for Representation before SSA | 2022-06-14 | 1 |
| Y13 | B23B | SSA-1696 - Claimant's Appointment of a Representative | 2022-06-14 | 4 |
| Y13 | B24B | Hearing Notice | 2022-07-29 | 35 |
| Y13 | B25B | Notice Of Hearing Reminder | 2022-09-21 | 8 |
| Y13 | B26B | SSA-1696 - Claimant's Appointment of a Representative | 2022-10-18 | 5 |

| Y13 | B27B | Fee Agreement for Representation before SSA | | 2022-10-19 | 3 |

## **Non-Disability Development**

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | B1D | Application for Supplemental Security Income Benefits | | 2020-11-27 | 11 |
| Y13 | B2D | Detailed Earnings Query | | 2021-12-10 | 2 |
| Y13 | B3D | Summary Earnings Query | | 2021-12-10 | 1 |
| Y13 | B4D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2021-12-10 | 2 |
| Y13 | B5D | Certified Earnings Records | | 2021-12-10 | 1 |
| Y13 | B6D | Certified Earnings Records | | 2022-02-22 | 2 |
| Y13 | B7D | WHAT - Work History Assistant Tool | | 2022-02-22 | 3 |
| Y13 | B8D | Detailed Earnings Query | | 2022-02-22 | 3 |
| Y13 | B9D | Summary Earnings Query | | 2022-02-22 | 1 |
| Y13 | B10D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2022-02-22 | 2 |
| Y13 | B11D | Other Query | | 2022-05-04 | 3 |
| Y13 | B12D | Other Query | | 2022-05-04 | 2 |
| Y13 | B13D | Certified Earnings Records | | 2022-10-12 | 2 |
| Y13 | B14D | WHAT - Work History Assistant Tool | | 2022-10-12 | 3 |
| Y13 | B15D | Summary Earnings Query | | 2022-10-12 | 1 |
| Y13 | B16D | Detailed Earnings Query | | 2022-10-12 | 3 |
| Y13 | B17D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2022-10-12 | 2 |

## **Disability Related Development**

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| Y13 | B1E | Work History Report | | | to 2020-11-27 | 8 |
| Y13 | B2E | Disability Report - Field Office | | | to 2020-11-27 | 3 |
| Y13 | B3E | Disability Report - Adult | | | to 2020-11-27 | 10 |
| Y13 | B4E | Work Activity Report EE | | | to 2020-11-27 | 12 |
| Y13 | B5E | Function Report - Adult | | Payton, Charletta Victoria | to 2021-02-05 | 9 |
| Y13 | B6E | Function Report - Adult | | Payton, Charletta Victoria | to 2021-02-15 | 11 |
| Y13 | B7E | Disability Report - Appeals | | | to 2021-06-28 | 6 |
| Y13 | B8E | Disability Report - Field Office | | | to 2021-06-28 | 2 |
| Y13 | B9E | Disability Report - Appeals | | | to 2021-06-28 | 8 |
| Y13 | B10E | Disability Report - Field Office | | | to 2021-10-29 | 2 |
| Y13 | B11E | Disability Report - Appeals | | | to 2021-10-29 | 6 |
| Y13 | B12E | Resume of Vocational Expert | | | | 2 |
| Y13 | B13E | Report of Contact | | | to 2022-02-28 | 1 |
| Y13 | B14E | Education Records - Non Medical | | Atlanta Public Schools | 2002-12-17 to 2022-06-21 | 128 |
| Y13 | B15E | Report of Contact | | | to 2022-07-06 | 1 |
| Y13 | B16E | Resume of Vocational Expert | | | | 4 |
| Y13 | B17E | Correspondence regarding efforts to obtain evidence | | | to 2022-09-22 | 2 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|

| Y13 | B1F | Hospital Records | Peachford Hospital | 2007-11-04 to 2007-11-04 | 14 |
| Y13 | B2F | Outpatient/Inpatient Rehabilitation Records | Grady Behavioral Health Clinic | 2017-03-06 to 2020-11-20 | 1158 |
| Y13 | B3F | Office Treatment Records | Grady Behavioral Health Clinic | 2021-04-09 to 2021-07-21 | 20 |
| Y13 | B4F | Office Treatment Records | Georgia Deprtament Of Juvenile Justice | 2006-08-24 to 2007-11-21 | 61 |
| Y13 | B5F | Mental RFC Assessment | Drr. Rhonda Reid | to 2022-06-02 | 7 |
| Y13 | B6F | Hospital Records | Grady Memorial Hospital | 2021-02-03 to 2022-06-10 | 65 |
| Y13 | B7F | Hospital Records | Georgia Regional Hospital | 2005-05-05 to 2007-04-10 | 243 |
| Y13 | B8F | Hospital Records | Grady Memorial Hospital | 2022-08-08 to 2022-08-22 | 16 |