UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DAN CAPEL,<br><br>        Plaintiff,<br><br>v.<br><br>FULLSTORY, INC., SCOTT VOIGT,<br>and GABBY SIRNER-COHEN,<br><br>        Defendants. | Civil Action File<br><br>No. _____ |

## COMPLAINT

Dan Capel ("Capel"), for his complaints against Defendants FullStory, Inc. ("FullStory"), Scott Voigt ("Voigt"), and Gabby Sirner-Cohen ("Sirner-Cohen") (FullStory, Voigt and Sirner-Cohen collectively referred to as "Defendants"), hereby states as follows:

### Introduction

1.     FullStory discriminated against Capel on the basis of his religious beliefs and expression of those beliefs, then defamed him by, *inter alia,* mischaracterizing his expressions, and then retaliated against him for his opposition to discrimination and participation in the Equal Employment Opportunity Commission's ("EEOC") process.

2.      While Capel was employed with FullStory, Capel expressed his heartfelt religious beliefs on his personal social media accounts supporting adoption over abortion, opining that women have babies and suggesting the need for a rational discussion about the wisdom of transitioning children.  FullStory disagreed with Capel's religious beliefs and sought to require him not to engage in such speech.  At first, instead of silencing his religious expressions altogether, FullStory offered an accommodation to his religious beliefs by requiring only that Capel add a disclaimer to certain posts that the beliefs were his own and not those of FullStory.  Capel immediately complied with this accommodation.  However, intolerant employees of FullStory demanded action be taken against Capel because of his religious expressions, and FullStory rescinded the accommodation FullStory itself had deemed reasonable and then terminated Capel for expressing his heartfelt religious beliefs.

3.      Thereafter, FullStory, Voigt and Sirner-Cohen defamed Capel for exercising his heartfelt religious beliefs by falsely accusing him to all FullStory employees of being transphobic and of having engaged in unspecified activities that made him unemployable.

4.      After FullStory terminated Capel, he filed a charge of discrimination with the EEOC.  FullStory retaliated against Capel and defamed him to his new

employer by falsely accusing him of 1) not disclosing his access to FullStory documents until going to work for a FullStory competitor, 2) violating an agreement with FullStory and 3) violating state and federal laws which, if true, would require Capel to be, among other things, a liar and a thief.

5.      FullStory violated Title VII of the Civil Rights Act of 1964 ("Title VII") when it pressured Capel to betray his religious beliefs, failed to ultimately accommodate Capel's religious beliefs, terminated Capel from his employment because of his religious beliefs and his expression of those beliefs, and retaliated against Capel for his opposition to FullStory's discrimination and for Capel's participation in the EEOC's process to seek redress for FullStory's discrimination.

6.      FullStory defamed Capel by falsely accusing him of concealing his access to FullStory documents until the day he went to work for a FullStory competitor, violating federal and state trade secrets statutes and violating covenants with FullStory and publishing these false accusations to Capel's new employer.

7.      FullStory and Sirner-Cohen, FullStory's Chief People Officer, defamed Capel by falsely alleging to employees at FullStory that Capel made "deeply problematic" statements regarding the LGBTQ+ community, made additional statements "harmful to the transgender and non-binary communities" and that Capel's comments violated "existing company social media policies and

compromise FullStory's ability to create a safe working environment for our colleagues."

8.     FullStory and Voigt, FullStory's Chief Executive Officer, defamed Capel by falsely accusing Capel, in an all-employee meeting, of making transphobic comments and that the employees too would have terminated Capel if they knew what FullStory and Voigt knew Capel had done.

9.     FullStory, in exchange for Capel adding a disclaimer to certain online posts, offered to allow Capel to keep his employment with FullStory with no adverse employment actions in regard to such posts.  Capel added the requested disclaimer and was nonetheless terminated.  As a result, FullStory breached its agreement with Capel, and FullStory is estopped from asserting such posts were a legitimate basis for his termination.  Further, the fact that FullStory offered this as an accommodation to his religious beliefs before terminating him despite his compliance demonstrates FullStory's admission that the withdrawn accommodation would have been a reasonable one and would have protected whatever interest, if any, FullStory had.

## Jurisdiction, Venue, and Parties

10.     The civil rights action raises federal questions under Title VII of the Civil Rights of 1964, 42 U.S.C. § 2000e.  Thus, this Court has federal question jurisdiction under 28 U.S.C. § 1331.

11.     This Court has supplemental jurisdiction over the non-federal claims under 28 U.S.C § 1367 because such claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

12.     This Court has authority to award the requested declaratory relief under 28 U.S.C.§§ 2201-02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C.§ 1343 and Federal Rule of Civil Procedure 65; the requested damages under 28 U.S.C. § 1343; and costs and attorneys' fees under 42 U.S.C. §§ 1988 and 2000e-5(k).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because events, giving rise to the claims detailed in this complaint occurred within the Northern District of Georgia, Atlanta Division.  On information and belief, all Defendants reside in the State of Georgia and are within the judicial jurisdiction of this Court.  Venue is also proper under Title VII because this district is where the unlawful employment practice is alleged to have been committed, the employment records relevant to such practice are maintained and administered, and Capel would have worked but for the alleged unlawful employment practice.  *See* 42 U.S.C. § 2000e-5(f)(3).

14.    Suit is timely against FullStory under 42 U.S.C.§ 2000e-5(e)(1) because Capel filed a timely charge of discrimination with the EEOC against FullStory on September 8, 2022, *see* Exhibit A, and received on March 8, 2023, from the EEOC a notice of his right to bring this suit, *see* Exhibit B.[1]

15.    Dan Capel is a Christian member of the Church of Jesus Christ of Latter-day Saints (the "Church of Jesus Christ") who worked at FullStory until he was terminated in July of 2022.  At relevant times, Capel was a resident of Flowery Branch, Georgia.

16.    On information and belief, FullStory is a corporation with its principal place of business in Atlanta, Georgia with its principal offices at 1745 Peachtree Road NW, Suite G, Atlanta, Georgia.  Counsel for FullStory, Shira R. Yoshor at Greenberg Traurig, LLP, 1717 Arch Street, Suite 400, Philadelphia, Pennsylvania 19103, has agreed to accept service of this lawsuit.

17.    On information and belief, Gabby Sirner-Cohen is the Human Resources Director for FullStory, domiciled in Georgia and subject to the personal

---

[1] After receipt of the notice of right to sue on March 8, 2023, Capel filed an additional charge of discrimination with the EEOC on April 6, 2023, against FullStory for violations of Title VII's anti-retaliation provisions. *See* Exhibit C.   The facts relating to this charge will be addressed herein, as they also relate to Capel's defamation claims, although relief for such charge is not sought herein, at this time.  Leave to amend this complaint to seek such relief will be sought if and when the EEOC issues a notice of right to sue in regard to this additional charge of discrimination.

jurisdiction of this Court.  Counsel for Sirner-Cohen, Shira R. Yoshor at Greenberg Traurig, LLP, 1717 Arch Street, Suite 400, Philadelphia, Pennsylvania 19103, has agreed to accept service of this lawsuit.

18.     On information and belief, Scott Voigt is the Chief Executive Officer of FullStory, domiciled in Georgia and subject to the personal jurisdiction of this Court.  On information and belief, Voigt works at FullStory's principal offices and can be served at such location.

### Factual Background

**Capel's Sincere Religious Beliefs - Background**

19.     Capel grew up in the Church of Jesus Christ as the oldest of ten siblings.

20.     The center of Capel's life has always been his relationship with God. His religion has always been the core of his family's life.  Each Sunday they attended church for three hours.  Capel's father baptized him at age eight at a local church building in Spanish Fork, Utah.  During high school, Capel would go to church every weekday morning at 5:45 for an hour of religious instruction before heading to school.  He served in multiple church youth leadership positions, organizing activities for students his age, which would typically consume Wednesday evenings and frequently consume the weekends.

21.     Before going to college, Capel accepted his calling as a missionary for a two-year assignment to South Carolina.  There, Capel and his assigned companions would ride bicycles to knock on doors and share their faith, as well as performing service work going to hospitals and engaging in two hours of bible study every morning.  His family paid for him to go on the mission, and Capel lived on a mere $135 per month to pay for personal food and other expenses.

22.     After his mission, Capel went to college at Utah Valley State College (now Utah Valley University).  In addition to holding down a job while attending school, Capel was involved in the Institute Program on campus, where students would study the gospel throughout the day.  Capel served on the student council for that Institute Program for two years.

23.     In 2003, Capel met his wife Valerie, and, four months and a day after meeting, they married in the Salt Lake City temple.  The sealing of family for a husband and wife for all eternity is the final of all the ordinances in which any member of the Church of Jesus Christ can participate.  Capel performed each of the ordinances and continues to meet with his bishop (congregational leader) every two years to affirm his continued belief of and adherence to the teachings and doctrines of the Church of Jesus Christ. This meeting every two years allows him to remain worthy and recommended, as evidenced by a card signed by Capel and his

ecclesiastical leaders that he carries with him, to enter any of the nearly 200 temples of the Church of Jesus Christ around the world.

24.    Capel continues to be very active in his church.  The Church of Jesus Christ teaches that just as Jesus suffered, by proxy, for the sins of all mankind, church members perform ordinances by proxy for ancestors in temples.  Capel frequently goes to the temple to perform such service.

25.    FullStory was well aware of Capel's religious beliefs stating in its position paper to the EEOC that "[M]ost members of management knew that Capel was a religious member of the Church of Latter-Day Saints…"

**Capel's Employment at FullStory**

26.    Capel came to work at FullStory in 2018.  Capel was the first Enterprise Account Executive at FullStory and developed a sales process to win big deals with large (over 5,000 employees) organizations.   In fact, Capel developed a very successful process that drove FullStory into the enterprise space and drove the company's success and expansion, selling FullStory's services to many of FullStory's largest paying customers, and training other salespeople on enterprise sales.  These enterprise sales successes by Capel drove further sales throughout the organization, both because of the process Capel set up and because other salespeople were able to point to the customers Capel had landed as evidence of the company's

value to potential customers.  Capel was so successful in building the enterprise sales organization at FullStory that he was promoted into management on August 1, 2021.

**Capel's Title VII Protected Conduct**

27.    In July 2022, in the wake of the *Dobbs* decision from the Supreme Court on abortion, Capel's faith compelled him to share on his personal LinkedIn page an article about a Texas company that offered employees a stipend to choose adoption over abortion.  Capel's post was very reasonable in tone, stating, "I love this approach.  There is no need for a company to sponsor the taking of innocent life. There are so many families out there that would love to adopt a child."  But a woman named Kayla Lindke, who is not employed by FullStory, commented to debate Capel on whether a company should incentivize employees to carry a pregnancy to term. In doing so, Ms. Lindke referred to a person who can become pregnant as "pregnancy-capable people" and "a person with the capacity for pregnancy."

28.    Capel responded, again reasonably, that he would prefer employers simply stay silent on such things but, since they are not, he prefers to see "children adopted over having their innocent lives terminated."  In that response, he included a parenthetical comment, describing "someone with the capacity to get pregnant, also known as a woman (adult human female)," and "those who can impregnate

(adult human males)."  Ms. Lindke responded by falsely accusing Capel of being

transphobic and tagging FullStory's LinkedIn account.

29.    Capel responded, "Nope. I am not scared of anyone based on their

sexual and/or gender preferences. I do, however, believe in science and also believe

statistics have directional value." Then, after some discussion, Cassandra Scholnick,

a FullStory employee, posted, "I'm glad that the company we both work for has

support for pregnancy-capable people and thanks for out[]ing yourself as someone

who clearly hates 'adult human females[.]' [I]'ll stay clear of you."

30.    Capel responded respectfully, telling Ms. Scholnick:

> Also, I'm glad you've found a home here at FullStory.
> Welcome! I've been here for over four years and found it
> to be a wonderful collection of people from all walks of
> life. We have different backgrounds, opinions, and values.
> Sometimes those can come into conflict. I've always
> found when that is the case that we still treat each other
> with respect. We allow for a broad range of thought and
> we respectfully consider each other's opinions and
> acknowledge that there are things we can learn from one
> another.
>
> Finally, I do not hate anyone.  The post originated as I care
> deeply for others, including the unborn.
>
> Again, welcome to FS! I hope you love it here!

31.    Despite Capel's respectful response, Ms. Scholnick continued arguing,

posting a response criticizing Capel's beliefs and including a statement that, "I

would never impose my religious beliefs (because let's be real, that[']s what this is about) on anyone else."  In Capel's response, he acknowledged the religious nature of his comments and emphasized the importance of an employer respecting religious liberties:

> I'm not the one who brought religion up, you did. Let's be clear on that. For anyone that actually believes their chosen religious tenants, of course those beliefs will inform their world view and their opinion. **Yes, my statements are in line with my religious beliefs.** I'm not pushing them on you or anyone else. **I made a post online that is in line with my faith** and world view and you reacted. You didn't have to engage. You could have just moved on. You didn't. Does that mean you are pushing your religious beliefs on me when you pushed back? Talk about the pot calling the kettle black! **Thankfully for both of us, our religious freedom is protected in this wonderful country we both live in. Would you have FS step on my or your religious liberties?**

(emphasis added).  Then, incredibly and to Capel's surprise and disappointment, FullStory proceeded to do just that, step on his religious liberties.

**FullStory terminated Capel for Expressing His Religious Beliefs**

32.    Mark Ouellette, with FullStory and Capel's boss, was the first to call Capel about the posts.  Mr. Ouellette told Capel the posts were causing problems internally and with customers and prospects.  He told Capel that a FullStory competitor had commented on the post.  Mr. Ouellette then improperly asked that Capel take the posts down.  Capel responded that he would not do so, citing that

FullStory takes positions on such issues frequently.  Capel told Mr. Ouellette that the call he should have received was one thanking him for sharing his beliefs and being respectful.

33.    Within the hour, FullStory CEO Voigt called Capel, despite Voigt being on vacation at the time and Capel being out on paternity leave.  Voigt told Capel that Capel could probably guess why he was calling, but that it may not be in the context Capel expected.  **Voigt, as CEO of FullStory, specifically told Capel that he was not going to ask him to take the posts down.**  He instead suggested a resolution by having Capel amend the post to say that the position he took in the post was his own and not that of FullStory.  Capel immediately agreed and added language to his post reading, "This should go without saying, but this is my personal opinion and not that of my employer."

34.    Thereafter, Genna Weinstein ("Weinstein"), FullStory's People Operations and Human Resources Senior Director, texted Capel requesting a call.  When Capel called, Weinstein improperly requested that Capel take the post down because it was causing issues internally, *i.e.,* employees such as Ms. Scholnick, who disagreed with Capel's religious views, were criticizing him on the company's Slack and demanding action.  Capel respectfully declined.  Capel told her that every side can and should be able to express its opinions.  Capel told Weinstein that his posts

represented his religious views and beliefs and was open to discussing ways to revise the posts but still be able to express such views and beliefs.  Weinstein told Capel she would be in touch with next steps and made no mention of any action being taken against the employees attacking Capel on Slack (something done on a FullStory-sponsored site as opposed to Capel's comments being made on a non-company, personal site).

35.    Within a few days, Weinstein again texted Capel to set up a call for the next morning.   During that call, in which counsel for FullStory participated, Weinstein told Capel that to remain at FullStory, he would be required to:

- Remove the "problematic" comments from his post;
- Remove another post Capel had made on Facebook the week before;
- Make a sincere apology for his beliefs;
- Attend inclusivity training; and
- Accept a demotion.

36.    This call was the first time FullStory requested that Capel also remove a Facebook post unrelated to the LinkedIn post.  The Facebook post was suggesting that there should be a rational discussion regarding the wisdom of transitioning children and Capel posted a link to an article quoting many young people who had transitioned and were now transitioning back.  These young people were warning of the dangers of transitioning children.  As Capel made clear to FullStory, this post

- 14 -

was also in line with his religious beliefs and an expression of such beliefs.  FullStory did not explain why an article quoting detransitioners calling for a rational discussion about the wisdom of transitioning children would need to be taken down but was clear that he would be terminated should he not remove the post.

37.    Disappointed that FullStory (and the executives with whom Capel had a close bond) had allowed itself to be pressured by an intolerant mob into targeting one of its most loyal and valuable employees for his religious beliefs and expressions, Capel declined but asked that Weinstein send the requirements in writing.  He also told counsel for FullStory that he felt his constitutional rights (his right to religious beliefs and expressions) were being violated.  On that call, Weinstein also told Capel that FullStory would begin the offboarding and termination process and, incredibly, the termination paperwork had already been generated the day before.

38.    FullStory sent Capel a letter explaining the requirements for continued employment, and Capel responded that he was not comfortable complying with those.  When Capel refused to delete the posts, accept a demotion and apologize for his religious beliefs, FullStory fired him.

39.    FullStory's actions were especially surprising given its frequent admonitions to employees to "Bring your whole self to work" and its statement

expressing the same sentiment as one of "Our Most Important Policies" in its handbook.   They are also surprising given that Capel's comments were fully compliant with FullStory's Social Networking and Blogging policy, which urges FullStory employees to, "Always be fair and courteous to fellow FullStorians, customers, vendors, suppliers, or people with whom you work on behalf of the Company."   Capel's comments were very courteous (even welcoming one of his tormentors to the company) and violated none of those policies.   Capel was also informed that the policies had been updated due to his "incident" but when Capel followed up requesting the details as to the changes, he was told by Weinstein that she was unable to provide those details.   Of course, FullStory's polices, either as they were when Capel was employed or as revised after or in connection with Capel's termination, do not override Title VII.

**Capel's Sincere Religious Beliefs – Leading to Termination**

40.   Capel's comments regarding male and female capabilities and abortion were both motivated by his sincerely held religious beliefs.  The Church of Jesus Christ issued an official statement (from the highest of church authorities, the First Presidency and the Quorum of the Twelve Apostles) in 1995 stating church doctrine on gender that guides Capel's religious beliefs that our God intended gender is an immutable characteristic:

> All human beings—male and female—are created in the image of God. Each is a beloved spirit son or daughter of heavenly parents, and, as such, each has a divine nature and destiny. Gender is an essential characteristic of individual premortal, mortal, and eternal identity and purpose. [2]

Accordingly, Capel's religious beliefs include that gender other than birth gender is against God's plan, and his comments identifying persons who can become pregnant as women and those who can impregnate as males were an expression of those beliefs.

41.    Likewise, Capel's religious belief that abortion is wrong is based upon his faith.  The Church of Jesus Christ has issued an official statement on abortion consistent with Capel's statements:

> The Church of Jesus Christ of Latter-day Saints believes in the sanctity of human life. Therefore, the Church opposes elective abortion for personal or social convenience, and counsels its members not to submit to, perform, encourage, pay for, or arrange for such abortions. [3]

---

[2] "The Family: A Proclamation to the World," https://www.churchofjesuschrist.org/study/scriptures/the-family-a-proclamation-to-the-world/the-family-a-proclamation-to-the-world?lang=eng, retrieved August 28, 2022.

[3] "The Church of Jesus Christ of Latter-Day Saints: Abortion," https://newsroom.churchofjesuschrist.org/official-statement/abortion, retrieved August 28, 2022.

Capel's expression of support for an adoption program over one that funded abortion was a protected expression of this religious belief.

42.     Further, the Church of Jesus Christ and its officers regularly emphasize the obligation of its followers to be active in communities and to express their values. Church of Jesus Christ doctrine teaches this is especially important in democratic societies, where laws are determined by the people.  When Capel shared his beliefs about the immutability of gender and his preference for promoting adoption over abortion, he was following this teaching.

43.     Notably, the very LinkedIn conversation for which Capel was fired directly commented on the religious nature of his expressions, with Capel stating, "Yes, my statements are in line with my religious beliefs . . .  I made a post online that is in line with my faith and world view . . ."  Likewise, it was apparent to anyone reading the posts their religious nature.  In that same exchange before Capel described specifically the religious nature of his expressions, Ms. Scholnick stated, "I would never impose my religious beliefs (because let's be real, that[']s what this is about) on anyone else."  By the time FullStory made the decision to terminate

Capel, there would have been no question that his expressions were a religious practice expressing his religious beliefs.[4]

**Defendants' Defamation of and Retaliation Against Capel**

44.    After terminating Capel, FullStory rubbed salt in his wounds by sending a defamatory email about him to all FullStory employees.  Sirner-Cohen, individually and as FullStory's Human Resources Director, falsely claimed in the email that "recent statements Capel made about the LGBTQ+ community were deeply problematic."  She also falsely claimed that "Capel made additional, subsequent public statements on social media that are harmful to the transgender and non-binary communities and that Capel's comments violated "existing company social media policies and compromise FullStory's ability to create a safe working environment for our colleagues."  She stated that Capel had declined to remove the "harmful comments" and "is no longer a FullStory employee."  Sirner-Cohen then went on to announce a series of training steps the company would be implementing around "inclusion."

45.    In a subsequent call with the entire company, Voigt, individually and as FullStory's CEO, repeated these defamatory comments and stated that Capel had

---

[4] Of course, under Title VII, an employer has a duty to accommodate even unconfirmed religious beliefs, practices, or observances.

committed additional egregious actions and that there were facts most employees were not aware of, and, if they had been, that they too would have taken the same course of action in firing Capel. Voigt even went so far as to threaten the employment of any other employees that wished to exercise their religious freedoms by telling them to resign if they disagreed.  Contrary to Voigt's allegations, there were no "other" egregious actions that had been taken by Capel, and there were no facts for which, had employees been aware, they would have fired Capel.  The reasonable interpretation of Voigt's statements that there were such actions and facts was to state or imply statements of fact about Capel that were false.

46.    Sirner-Cohen and Voigt's false statements regarding Capel's religious expressions were particularly damaging to Capel because Sirner-Cohen and Voigt lent their own credibility to the demonization of Capel, which has affected Capel's ability to continue relationships with other FullStorians that are important to Capel personally.

47.    There was no need to include all FullStory employees—or any FullStory employees—on the communications by Sirner-Cohen and Voigt regarding Capel.  By including all employees of FullStory, FullStory, Voigt and Sirner-Cohen were communicating the false information about Capel to employees who had no reason to receive the communication by virtue of their duty or authority.  Certainly,

if FullStory wanted to inform employees about its policies or changes in policies, it could have done so without defaming or even mentioning Capel.

48.     When Sirner-Cohen and Voigt made these communications, they were doing so under direct authority from FullStory by virtue of their positions within the company: Voigt was the CEO and, therefore, expressly authorized his own statements and those of Sirner-Cohen.  Further, general counsel for FullStory was intimately involved in the dealings and communications regarding Capel.  Further, Voigt's comments ratified those made by Sirner-Cohen on behalf of FullStory.

49.     FullStory has retaliated against Capel because of his participation in a complaint of discrimination and in the EEOC's investigation and mediation and because of his opposition to FullStory's discrimination by making false and misleading negative statements about him to his new employer, maliciously attempting to interfere with his employment at that new employer, making oppressive requests to Capel through his attorney related to his employment covenants agreement, and threatening baseless litigation against Capel.

50.     When Capel refused to accept FullStory's attempts to interfere with the exercise of his religious freedoms and after the termination of his employment for the same, FullStory and key members of its management began a campaign of defaming and retaliating against him for making a complaint of discrimination.

- 21 -

51.   Within only a few hours after a failed mediation before the EEOC on January 23, 2023, FullStory continued its defamation of and retaliation against Capel for continuing his Title VII claims:

a.   By letter dated January 23, 2023, FullStory told Mr. Capel's new employer that Mr. Capel was in violation of state and federal statutes, which he was not; thereby, *inter alia*, asserting that Capel acquired documents without authorization, (when, in fact, he had been authorized to receive such documents) and that Capel made an improper use of such documents (when, in fact, there was no such use);

b.   By letter dated January 23, 2023, FullStory, venting its malice toward Capel, told Capel's new employer that FullStory had just learned on January 3, 2023 (the day Capel went to work for his new employer) that Capel had not returned FullStory documents.  In fact, FullStory was aware during Capel's employment that he had access through his personal iCloud account to FullStory documents given FullStory provided employees laptops for business use that required such downloads in order to use the full functionality of such laptops (also making false FullStory's statements that such information was protected confidential information under the cited statutes or

- 22 -

otherwise).  Regardless, Capel had informed FullStory on December 14, 2022 of his access to certain FullStory documents.  Additionally, after FullStory was informed on December 14, 2022 that Capel had access to FullStory documents, 18 days passed without action or substantive response from FullStory.  Then, Capel, through counsel, repeatedly sought direction from FullStory as to how to dispose of the documents since an employment covenants agreement prevented Capel from doing so without direction from FullStory.  Yet, in the retaliatory and defamatory letter venting FullStory's malice toward Capel to Capel's new employer, FullStory asserted that Capel failed to return such documents to FullStory, knowing that Capel had repeatedly, by that time, offered to return the documents or destroy them but could not do so without direction from FullStory, which had not been given.  Further, on January 18, 2023, Capel by Dropbox link had returned the documents to FullStory; yet, FullStory falsely led Capel's new employer to believe, by the letter dated January 23, 2023, that he had not returned the documents;

c.  In a further and obvious attempt to retaliate against Capel for his participation in the EEOC process and opposition to FullStory's

discrimination and to get Capel to drop his Title VII claim or risk termination from his new employment and demonstrating its malice toward Capel, FullStory demanded, without basis or authority, sworn statements from Capel and his new employer regarding FullStory documents and a forensic examination of Capel's new employer's electronic devices (and reserving the right to bring legal action). Nonetheless, Capel agreed to provide the requested affidavit. FullStory then rejected its own offer and insisted on a search for any hard copies of any FullStory documents that Capel might have which, in additional to being a baseless request, would involve an FBI style search of his home.

52.   FullStory, to the time of the filing of this complaint, has continued to make oppressive requests to Mr. Capel and threaten baseless litigation against him.

53.   FullStory's counsel was authorized by FullStory to make the statements she made to Capel's new employer.

**Capel's Damages**

54.   Capel has and will continue to suffer significant harm because of the actions of Defendants. While Capel has obtained new employment, Defendants' actions have negatively impacted his compensation and prospects. Additionally, due

to the mandated nature of reference checking and backchanneling in the software as a service industry, prior to hiring someone into such a position, any conversation with a potential future employer would likely include damaging comments from current, future, or past FullStory employees that would negatively impact Capel's employability because of the defamatory and discriminatory accusations and statements made by FullStory and its officers and employees. Moreover, Capel's new position requires him to build up a new pipeline of leads, with his commission earning capacity being delayed for years compared to his earning capacity at FullStory. This issue is exacerbated for Capel because of the FullStory stock options that terminated before vesting as a result of Capel's termination and, as of yet, Capel has not been granted stock options from his new employer and, in the event such options are received they will have a delayed vesting schedule.

55.    At the time of his termination, Capel was making $200,000 as base salary and $200,000 for his target commission, which he had more than achieved during each full year of his employment with FullStory. In addition to that, Capel was entitled to a generous benefits package that was worth approximately $25,000 per year. But perhaps the most substantial portion of Capel's compensation were his stock options. FullStory openly stated to the broader sales team that when FullStory completes an initial public offering at the level it expected, its shares

should easily be worth $80 or more dollars per share, based on recent IPOs of other similar/adjacent companies.  Capel exercised all of his stock options on shares that vested, but he still had more than 17,000 unvested shares at the time of his termination.  Capel's unvested shares, the bulk of which would have vested by the end of July 2023 (and a minor amount over the following year and a half), which were lost because of his illegal termination, would have a value of $1,313,560.40 if the target IPO price projected by FullStory was met.  Capel is also entitled to the value of the additional options that would have been granted during Capel's remaining tenure at FullStory but for the wrongful termination.

56.    Capel will suffer diminished earnings in the future based upon the reputational effects of the defamatory statements made by Defendants.

57.    The wrongful termination by FullStory and subsequent retaliation and defamation by Defendants are also having a significant impact on Capel and his family, causing him severe financial and emotional distress.  Given the significant value Capel has contributed to FullStory during his more than four years of service, the disruption or ruination of personal relationships with officers, leaders, and others within the company, and the fact that the termination was for something so personal as his religious beliefs, makes the termination particularly hurtful.

## Causes of Action

**A.    FullStory violated Title VII by discriminating against Capel because of his religious beliefs and practices.**

58.    Capel realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs as if fully set forth herein.

59.    Title VII prohibits employers from discharging or otherwise discriminating against employees because of their religion, which includes all aspects of religious belief, observance, and practice. 42 U.S.C. § 2000e–(j) and 2(a).

60.    Capel made comments on his personal online social media that expressed his sincerely held religious beliefs.

61.    Capel's religious beliefs require him to share those beliefs with others as he did on his personal online social media.

62.    FullStory knew that Capel's comments on his personal online social media constituted the practicing of his religion and that they were expressions of Capel's religious beliefs.

63.    FullStory violated Title VII's anti-discrimination provisions when the company terminated Capel for his religious beliefs and for engaging in the religious practice of sharing his religious beliefs. 42 U.S.C. § 2000e–2(a).

64.    As a result of FullStory's discrimination and retaliation against Capel for his exercise of protected rights under Title VII, FullStory terminated Capel's

employment and thereby inflicted substantial monetary and nonmonetary harm on Capel for which he is entitled to declaratory, compensatory, and injunctive relief, including payment of back pay, front pay, emotional distress, loss of reputation, pre-and-post-judgment interest, and attorney's fees.

65.     FullStory showed malice or reckless indifference toward Capel's federally protected rights under Title VII, entitling Capel to punitive damages.

66.     In the alternative, Capel's religion was a motivating factor in FullStory's termination of Capel's employment, in violation of 42 U.S.C. § 2000e-(m).

**B.     FullStory violated Title VII by failing to accommodate Capel's religious beliefs.**

67.     Capel realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs as if fully set forth herein.

68.     Title VII obligates employers to reasonably accommodate employees of faith, even when applying an "otherwise-neutral policy" to an employee's religious practice. 42 U.S.C. § 2000e-(j).

69.     Capel made comments on his personal online social media that expressed his sincerely held religious beliefs.

70.     Capel's religious beliefs require him to share those beliefs with others as he did in his personal online social media comments.

71.    FullStory knew that Capel's comments on his personal online social media constituted the practicing of his religion and that they were expressions of Capel's religious beliefs.

72.    Title VII required FullStory's policies to give way to the need for an accommodation of Capel's religious beliefs and practices.

73.    FullStory violated Title VII by failing to accommodate Capel's religious beliefs and practices, including when FullStory applied its social media policies to Capel's communications on his personal online social media.

74.    FullStory acknowledged that at least one reasonable accommodation was available to Capel for his religious beliefs: adding a disclaimer that his statements were his personal beliefs and not those of FullStory.  But when Capel complied with this proposed accommodation, FullStory withdrew the accommodation by terminating him anyway.

75.    As a result of FullStory's discrimination and retaliation against Capel for his exercise of protected rights under Title VII and its failure to provide a reasonable accommodation for Capel's religious beliefs and practices, FullStory terminated Capel's employment and thereby inflicted substantial monetary and nonmonetary harm on Capel for which he is entitled to declaratory, compensatory,

and injunctive relief, including payment of back pay, front pay, emotional distress, loss of reputation, pre-and-post-judgment interest, and attorney's fees.

76.    FullStory showed malice or reckless indifference toward Capel's federally protected rights under Title VII, entitling Capel to punitive damages.

**C.    FullStory and Sirner-Cohen defamed and libeled Capel by Sirner-Cohen's email to FullStory employees.**

77.    Capel realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs as if fully set forth herein.

78.    Sirner-Cohen's email to FullStory falsely claimed that "recent statements Capel made about the LGBTQ+ community were deeply problematic." She also falsely claimed that "Capel made additional, subsequent public statements on social media that are harmful to the transgender and non-binary communities" and that Capel's comments violated "existing company social media policies and compromise FullStory's ability to create a safe working environment for our colleagues."

79.    The statements in her email were false.

80.    These statements were not made in good faith in the performance of a private duty.  FullStory and Sirner-Cohen each knew the statements made by them to be false when they were published.

81.    Most of the employees to whom these statements were sent had no work-related reason to receive the information and had no direct duty or authority related to the information.

82.    Each of the statements was made with the authorization of FullStory.

83.    Sirner-Cohen's email was also ratified by FullStory by virtue of Voigt's statements.

84.    These statements have harmed Capel's reputation with his colleagues at FullStory and were calculated to allow Capel's colleagues' imaginations to run wild as to the true nature of these false statements—as well as all others to whom such statements were made or relayed, including potential future employers.

85.    The statements were false and malicious defamation of another, expressed in print and tending to injure the reputation of Capel and exposing him to public hatred, contempt, or ridicule.

86.    The statements thus constitute libel under Ga. Code. Ann. § 51-5-1 and common law defamation under Georgia law.

87.    Moreover, the statements constitute defamation *per se* under Georgia law because they accuse Capel of immoral conduct, because they reference his trade, office, or profession and are calculated to injure him therein, and because they accuse Capel of being guilty of some debasing act which may exclude him from society.

88.     In today's society, had Capel actually made statements harmful to the transgender and non-binary communities or deeply problematic statements about the LGBTQ+ community, such comments would have been debasing to Capel and may have excluded him from society.

89.     In the alternative, the statements have caused Capel special damages in the form of lost compensation with his new employer.

90.     FullStory and Sirner-Cohen knew the statements were false when they were made, or, in the alternative, acted with reckless disregard for their truth.

91.     Further, FullStory and Sirner-Cohen made the statements with evil intent, including an animus to Capel's expression of his religious beliefs, to discourage him from asserting his Title VII rights and to chill the Title VII rights of all FullStory employees.

92.     To the extent FullStory or Sirner-Cohen asserts a privilege under Ga. Stat. Ann. § 51-5-7, such privilege is inapplicable under Ga. Stat. Ann. § 51-5-7 because the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted.

93.     Capel requested a retraction by FullStory and Sirner-Cohen more than seven (7) days before the filing of this complaint and no retraction was made.

**D.     FullStory and Voigt defamed and slandered Capel by Voigt's statement to FullStory employees.**

94.     Capel realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs as if fully set forth herein.

95.     In a phone call with all FullStory employees, Voigt, individually and on behalf of FullStory as its CEO, echoed the defamatory comments of Sirner-Cohen and stated that Capel had committed additional egregious actions and that there were facts most employees were not aware of, and, if they had been, that they too would have taken the same course of action in firing Capel. Voigt even went so far as to threaten the employment of any other employees that wished to exercise their religious freedoms by telling them to resign if they disagreed.

96.     Contrary to Voigt's allegations, there were no other egregious actions that had been taken by Capel, and there were no facts that, had employees been aware, they would have fired Capel.

97.     The reasonable interpretation of Voigt's statements that there were such actions and facts was to state or imply statements of fact about Capel that were false.

98.     These statements were not made in good faith in the performance of a private duty.  FullStory and Voigt each knew the statements made by them or on their behalf to be false when they were published.

99.     Each of the statements was made with the authorization of FullStory.

100.   These statements by FullStory and Voigt have harmed Capel's reputation with his colleagues at FullStory and were calculated to allow Capel's colleagues' imaginations to run wild as to the true nature of these false statements— as well as all others to whom such statements were made or relayed, including potential future employers.

101.   The statements were false and malicious defamation of another, expressed in print and tending to injure the reputation of Capel and exposing him to public hatred, contempt, or ridicule.

102.   The statements thus constitute slander under Ga. Code. Ann. § 51-5-4 and common law defamation under Georgia law.

103.   Moreover, the statements constitute defamation *per se* under Georgia law because they accuse Capel of immoral conduct, because they reference his trade, office, or profession and are calculated to injure him therein, and because they accuse Capel of being guilty of some debasing act which may exclude him from society.

104.   In today's society, had Capel actually made statements harmful to the transgender and non-binary communities or deeply problematic statements about the LGBTQ+ community, such comments would have been debasing to Capel and may have excluded him from society.

105.   In the alternative, the statements have caused Capel special damages in the form of lost compensation at his new employer.

106.   FullStory and Voigt knew the statements were false when they were made, or, in the alternative, acted with reckless disregard for their truth.

107.   FullStory and Voigt made the statements with evil intent. including an animus to Capel's expression of his religious beliefs, to discourage him from asserting his Title VII rights and to chill the Title VII rights of all FullStory employees.

108.   To the extent FullStory or Voigt asserts a privilege under Ga. Stat. Ann. § 51-5-7, such privilege is inapplicable under Ga. Stat. Ann. § 51-5-7 because the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted.

**E.   FullStory defamed and libeled Capel to Capel's new employer.**

109.   Capel realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs as if fully set forth herein.

110.   FullStory defamed Capel by falsely accusing him, in writing, of concealing his access to FullStory documents until the day he went to work for a FullStory competitor and violating federal and state trade secrets statutes and violating covenants with FullStory and publishing these false accusations to Capel's

new employer.  FullStory defamed Capel by falsely stating, in writing, that he had not returned FullStory documents when he had and publishing these false statements to Capel's new employer.

111.   FullStory defamed Capel by falsely accusing him, in writing, of misappropriating the trade secrets of FullStory by improper means or conspired to use improper means to misappropriate FullStory's trade secret and publishing these false statements to Capel's new employer.

112.   These statements were not made in good faith in the performance of a private duty.  FullStory knew the statements made by it or on its behalf to be false when they were published.

113.   Each of the statements was made with the authorization of FullStory.

114.   These statements have harmed Capel's reputation with his new employer.

115.   The statements were false and malicious defamation of another, expressed in print and tending to injure the reputation of Capel and exposing him to public hatred, contempt, or ridicule.

116.   The statements thus constitute libel under Ga. Code. Ann. § 51-5-1 and common law defamation under Georgia law.

117.   Moreover, the statements constitute defamation *per se* under Georgia law because they reference Capel's trade, office, or profession and are calculated to injure him therein.

118.   In the alternative, the statements have caused Capel special damages in the form of lost compensation with his new employer.

119.   FullStory knew the statements were false when they were made, or, in the alternative, acted with reckless disregard for their truth.

120.   FullStory made the statements with evil intent, including an animus to Capel's expression of his religious beliefs, to discourage him from asserting his Title VII rights and to harm or destroy Capel's relationship with his new employer.

121.   To the extent FullStory asserts a privilege under Ga. Stat. Ann. § 51-5-7, such privilege is inapplicable under Ga. Stat. Ann. § 51-5-7 because the privilege is used merely as a cloak for venting private malice and not bona fide in promotion of the object for which the privilege is granted.

122.   Capel requested a retraction by FullStory more than seven (7) days before the filing of this complaint and no retraction was made.

**F.    Capel will amend to add retaliation claim once he receives his notice of right to sue.**

123.   Capel realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs as if fully set forth herein.

124.   Capel has not yet received his notice of right to sue from the EEOC on his charge of discrimination alleging FullStory retaliated against him.

125.   Once he receives that notice of right to sue, Capel will seek leave to amend this Complaint to assert a Title VII retaliation claim against FullStory.

**Prayer for Relief**

Wherefore, Capel respectfully requests that this Court:

1.   Award all damages and recovery to Capel to which he is entitled at law and equity, including back pay, front pay, nominal damages, reputational damages, lost income and earning capacity, emotional distress, pain and suffering, humiliation, loss of enjoyment of life, actual damages, and future damages;

2.   Award Capel his reasonable and necessary attorney's fees;

3.   Award Capel prejudgment interest and post-judgment interest;

4.   Award Capel punitive damages;

5.   In the alternative, award Capel nominal damages;

6.   In addition to or in the alternative, declare that FullStory has utilized its policies and practices to violate employees' rights under Title VII;

6.   Grant a permanent injunction enjoining FullStory, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it from failing to accommodate the sincerely held religious beliefs of its employees;

7.      Grant a permanent injunction enjoining FullStory, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it from retaliating against employees who request accommodations for their sincerely held religious beliefs;

8.      Order FullStory to institute and carry out policies, practices, and programs which provide equal employment opportunities, and which eradicate the effects of its past and present unlawful employment practices; and

9.      Grant such further relief as the Court deems necessary and proper at law and in equity.

[Remainder of this page intentionally left blank]

## JURY TRIAL DEMAND

Capel requests a jury trial.

Respectfully submitted this 1st day of June, 2023.

**PRYOR & BRUCE**

_/s/ Bobby G. Pryor_

Bobby G. Pryor
*Pro Hac Vice* Application Forthcoming
Dana G. Bruce
*Pro Hac Vice* Application Forthcoming
302 N. San Jacinto St.
Rockwall, TX 75087
(972) 771-3933 (Phone)
bpryor@pryorandbruce.com
dbruce@pryorandbruce.com

**PARKS, CHESIN & WALBERT, PC**

_/s/ Jennifer K. Coalson_

Jennifer K. Coalson
Georgia Bar No. 266989
Evan P. Drew
Georgia Bar No. 747996
75 14th St. NE, Suite 2600
Atlanta, GA 30309
(404) 873-8000 (Phone)
jcoalson@pcwlawfirm.com
edrew@pcwlawfirm.com

*Counsel for Plaintiff Dan Capel*