EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 410-2022-09146 |

_____ and EEOC
*State or local Agency, if any*

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Dan Capel | (801) 655-3732 | 10-14-1977 |

Street Address / City, State and ZIP Code
4583 Wingfield Way, Flowery Branch, GA, 30542

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| FullStory | Over 500 | (678) 337-1868 |

Street Address / City, State and ZIP Code
1745 Peachtree Rd NW Suite G, Atlanta, GA 30309

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| EEOC RECEIVED 2022-09-08 | | |

Street Address / City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☐ SEX  ☒ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☒ OTHER (Specify) Failure to provide religious accommodation

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 7-15-22    Latest: 7-29-22
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):
See attached.

**EXHIBIT 1**

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

September 6, 2022
Date / Charging Party Signature

NOTARY – When necessary for State or Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

## Detailed Facts for EEOC Charge of Discrimination

Dan Capel was terminated for his expressions of his religious beliefs by FullStory, with FullStory failing to provide an accommodation for those beliefs.

### 1.     Dan's heartfelt religious beliefs

Understanding Dan's background is fundamental to understanding the genuineness of his religious belief motivating his comments and need for a religious accommodation. Dan grew up in the Church of Jesus Christ of Latter-day Saints (the "Church of Jesus Christ") as the oldest of ten siblings.

The center of Dan's life has always been his relationship with God. His religion has always been the core of his family's life. Each Sunday they attended church for three hours. Dan's father baptized him at age eight at a local church building in Spanish Fork, Utah. During high school, Dan would go to church every weekday morning at 5:45 for an hour of religious instruction before heading to school. He served in multiple church youth leadership positions, organizing activities for students his age, which would typically consume Wednesday evenings and frequently consume the weekends.

Before going to college, Dan accepted his calling as a missionary for a two-year assignment to South Carolina. There, Dan and his assigned companions would ride bicycles to knock on doors and share their faith, as well as performing service work going to hospitals and engaging in two hours of bible study every morning. His family paid for him to go on the mission, and Dan lived on a mere $135 per month to pay for personal food and other expenses.

After his mission, Dan went to college at Utah Valley State College (now Utah Valley University). In addition to holding down a job while attending school, Dan was involved in the Institute Program on campus, where students would study the gospel throughout the day. Dan served on the student council for that Institute Program for two years.

In 2003, Dan met his wife Valerie, and, four months and a day after meeting, they married in the Salt Lake City temple. The sealing of family for a husband and wife for all eternity is the final of all the ordinances in which any member of the Church of Jesus Christ can participate. Dan performed each of the ordinances and continues to meet with his bishop (congregational leader) every two years to affirm his continued belief of and adherence to the teachings and doctrines of the Church of Jesus Christ. This meeting every two years allows him to remain worthy and recommended, as evidenced by a card signed by Dan and his ecclesiastical leaders that he carries with him, to enter any of the nearly 200 temples of the Church of Jesus Christ around the world. Eleven months after getting married, Dan and Valerie had their first son, Pierce, the first of their five children, with the youngest, Vivian, arriving as a surprise ten years after the birth of their fourth child. They continue their faith tradition within their own family. Pierce has prepared for his missionary service and will be leaving in early October to spend two years in Brazil teaching the Gospel of Jesus Christ to those who desire to hear it. This missionary service will be funded with money earned and saved by Pierce and additional money expected to be provided by Dan.

Dan continues to be very active in his church. The Church of Jesus Christ teaches that just as Jesus suffered, by proxy, for the sins of all mankind, church members perform ordinances by proxy for ancestors in temples. Dan frequently goes to the temple to perform such service work, engaging in the same actions and promises that he participated in for himself. Those people will have the opportunity to accept or reject those ordinances done in their behalf when taught the gospel after their time in mortality, assuming they did not have that opportunity while in mortality

### 2. Dan's work at FullStory

Dan came to work at FullStory in 2018. Dan Bonnet hired Dan as the first Enterprise Account Executive at the company and tasked him with developing a sales process to win big deals with large (over 5,000 employees) organizations. Dan developed a very successful process that drove FullStory into the enterprise space and drove the company's success and expansion, selling FullStory's services to prominent multiple large, national corporations, including, FullStory's largest paying customer, and training other salespeople on enterprise sales. These enterprise sales successes by Dan drove further sales throughout the organization, both because of the process Dan set up and because other salespeople were able to point to the customers Dan had landed as evidence of the company's value to potential customers.

Dan was so successful in building the enterprise sales organization at FullStory that he was promoted into management on August 1, 2021. This resulted in far more work for less money, but Dan felt compelled to help the company because his expertise was needed to educate the sales team on how to sell enterprise deals. Dan's boss at the time of his promotion, Mark Ouellette, was surprised Dan was willing to take on the management role, given that Dan's compensation would step down even if he hit his targets. Dan expressed the need to train employees on the enterprise sales process and the opportunity to grow the company as a whole, which all employees, including Dan, would benefit from because of their stock ownership. Dan even delayed his paternity leave by almost a year to get the new team up and running.

At the time Dan stepped into management, no other salesperson had sold more annual recurring revenue before stepping into management. At the time, Dan's contributions accounted for approximately 10% of total revenue. In his first six months leading the Enterprise East team, his team achieved nearly twice the expected quota and contributed approximately 10% more to the company's annual revenue. Dan did not just meet his ever-increasing quotas but blew them out of the water. Dan was extremely successful and valuable for FullStory, and his star was on the rise. He was committed as ever to the success of FullStory.

### 3. Dan's Title VII protected conduct

Then, in July 2022, in the wake of the *Dobbs* decision from the Supreme Court on abortion, Dan's faith compelled him to share on his personal LinkedIn page an article about a Texas company that offered employees a stipend to choose adoption over abortion. Dan's post was very reasonable in tone, stating, "I love this approach. There is no need for a company to sponsor the taking of innocent life. There are so many families out there that would love to adopt a child." But a woman named Kayla Lindke, who is not employed by FullStory, commented to debate Dan on whether a company should incentivize employees to carry a pregnancy to term. In doing so, Ms.

Lindke referred to a person who can become pregnant as "pregnancy-capable people" and "a person with the capacity for pregnancy."

Dan responded, again reasonably, that he would prefer employers simply stay silent on such things but, since they are not, he prefers to see "children adopted over having their innocent lives terminated." In that response, he included a parenthetical comment responding to Ms. Lindke's awkward references to women, describing "someone with the capacity to get pregnant, also known as a woman (adult human female)," and "those who can impregnate (adult human males)." Ms. Lindke responded by falsely accusing Dan of being transphobic and tagging FullStory's LinkedIn account.

Dan responded, "Nope. I am not scared of anyone based on their sexual and/or gender preferences. I do, however, believe in science and also believe statistics have directional value." Then, after some discussion, Cassandra Scholnick, a FullStory employee, posted, "I'm glad that the company we both work for has support for pregnancy-capable people and thanks for out[]ing yourself as someone who clearly hates 'adult human females[.]' [I]'ll stay clear of you."

Dan responded respectfully, telling Ms. Scholnick:

> Also, I'm glad you've found a home here at FullStory. Welcome! I've been here for over four years and found it to be a wonderful collection of people from all walks of life. We have different backgrounds, opinions, and values. Sometimes those can come into conflict. I've always found when that is the case that we still treat each other with respect. We allow for a broad range of thought and we respectfully consider each other's opinions and acknowledge that there are things we can learn from one another.
>
> Finally, I do not hate anyone. The post originated as I care deeply for others, including the unborn.
>
> Again, welcome to FS! I hope you love it here!

Despite Dan's respectful response, Ms. Scholnick again continued arguing, posting a response criticizing Dan's beliefs and including a statement that, "I would never impose my religious beliefs (because let's be real, that[']s what this is about) on anyone else." In Dan's response, he acknowledged the religious nature of his comments and emphasized the importance of an employer respecting religious liberties:

> I'm not the one who brought religion up, you did. Let's be clear on that. For anyone that actually believes their chosen religious tenants, of course those beliefs will inform their world view and their opinion. **Yes, my statements are in line with my religious beliefs.** I'm not pushing them on you or anyone else. **I made a post online that is in line with my faith** and world view and you reacted. You didn't have to engage. You could have just moved on. You didn't.

> Does that mean you are pushing your religious beliefs on me when you pushed back? Talk about the pot calling the kettle black! **Thankfully for both of us, our religious freedom is protected in this wonderful country we both live in. Would you have FS step on my or your religious liberties?**

(emphasis added). Then, incredibly and to Dan's surprise and disappointment, FullStory proceeded to do just that, step on his religious liberties.

### 4. FullStory terminated Dan for expressing his religious beliefs

Mark Ouellette was the first to call Dan about the posts. Mr. Ouellette told Dan the posts were causing problems internally and with customers and prospects. He mentioned one customer, Groupon, with whom Jeff Dalo was working. He told Dan that a FullStory competitor had commented on the post, and Mr. Dalo was concerned about its effect on the customer relationship. Mr. Ouellette then improperly asked that Dan take the posts down. Dan responded that he would not do so, citing that FullStory takes positions on such issues frequently. Dan told Mr. Ouellette that the call he should have received was one thanking him for sharing his opinion and being respectful.

Within the hour, FullStory CEO Scott Voigt called Dan, despite Mr. Voigt being on vacation at the time and Dan being out on paternity leave. Mr. Voigt told Dan that Dan could probably guess why Mr. Voigt was calling, but that it may not be in the context Dan expected. **Mr. Voigt, as CEO of FullStory, specifically told Dan that he was not going to ask him to take the posts down.** He instead suggested a resolution by having Dan amend the post to say that the position he took in the post was his own and not that of FullStory. Mr. Voigt explained that he was just trying to protect his company. Dan immediately agreed and added language to his post reading, "This should go without saying, but this is my personal opinion and not that of my employer."

Despite Dan's complying with FullStory's CEO's offer of resolution, Jamie Garverick, FullStory's head of sales (with the title Chief Revenue Officer), called Dan within a few days, saying that the post was causing issues internally and was distracting and improperly requested that Dan take it down. Dan respectfully declined, and Mr. Garverick thanked Dan for taking his call.

Genna Weinstein, FullStory's People Operations and Human Resources Director, texted Dan requesting a call. When Dan called, Ms. Weinstein also improperly requested that Dan take the post down because it was causing issues internally, *i.e.*, employees such as Ms. Scholnick and Mr. Dalo, who disagreed with Dan's religious views, were criticizing him on the company's Slack and demanding action. Dan responded that he appreciated the request but respectfully declined. Dan told her that every side can and should be able to express its opinions.[1] How was it right for FullStory to even ask this? Ms. Weinstein told Dan she would be in touch with next steps and

---

[1] As an example, FullStory created a Pride Flag logo for its LinkedIn account for Pride Month, and all employees, whether they agreed to support such sentiment or not, had the Pride Flag displayed on their LinkedIn profiles by identifying as FullStory employees.

made no mention of any action being taken against the employees attacking Dan on Slack (something done on a FullStory-sponsored site as opposed to Dan's comments made on a non-company site).

Within a few days, Ms. Weinstein again texted Dan to set up a call for the next morning. During that call, where FullStory General Counsel David Woolston was also a participant, Ms. Weinstein told Dan that to remain at FullStory, he would be required to perform five requirements:

- Remove the "problematic" comments from his post;
- Remove another post Dan had made on Facebook the week before;
- Make a sincere apology for his beliefs;
- Attend inclusivity training; and
- Accept a demotion.

Disappointed that FullStory (and the executives with whom Dan had a close bond) had allowed itself to be pressured by an intolerant mob into targeting one of its most loyal and valuable employees for his religious expressions, Dan declined but asked that Ms. Weinstein send the requirements in writing. He also told Mr. Woolston that he felt like his constitutional rights (his right to religious expression) were being violated, and Mr. Woolston inexplicably disagreed. On that call, Ms. Weinstein told Dan that FullStory would begin the offboarding and termination process and, incredibly, that the termination paperwork had already been generated the day before.

FullStory sent Dan a letter explaining those requirements, and Dan responded that he was not comfortable complying with those. When Dan refused to delete the post and apologize for his religious beliefs, FullStory fired him.

FullStory's actions were especially surprising given its frequent admonitions to employees to "Bring your whole self to work" and its statement expressing the same sentiment as one of "Our Most Important Policies" in its handbook. They are also surprising given that Dan's comments were fully compliant with FullStory's Social Networking and Blogging policy, which urges FullStory employees to, "Always be fair and courteous to fellow FullStorians, customers, vendors, suppliers, or people with whom you work on behalf of the Company." Dan's comments were very courteous (even welcoming one of his tormentors to the company) and violated none of those policies. Dan was also informed that the policies had been updated due to this "incident" but when Dan followed up requesting the details as to the changes, he was told by Ms. Weinstein that she was unable to provide those details. Of course, FullStory's polices, either as they were when Dan was employed or as revised after Dan's termination, do not override Title VII.

After terminating Dan, FullStory rubbed salt in his wounds by sending a defamatory email about him to all FullStory employees. Gabby Sirner-Cohen, FullStory's Chief People Officer, falsely claimed in the email that "recent statements Dan Capel made about the LGBTQ+ community were deeply problematic." She also falsely claimed that "Dan made additional, subsequent public statements on social media that are harmful to the transgender and non-binary communities." She stated that Dan had declined to remove the "harmful comments" and "is no longer a FullStory employee." Ms. Sirner-Cohen then went on to announce a series of training steps the company would be implementing around "inclusion." In a subsequent call with the entire

company, Mr. Voigt, individually and as CEO, echoed these defamatory comments, insinuating that Dan had committed additional egregious actions when stating to the company that there were facts most employees were not aware of, and, if they had been, that they would have taken the same course of action in firing Dan. Mr. Voigt even went so far as to threaten the employment of any other employees that wished to exercise their religious freedoms by telling them to resign if they disagreed. Mr. Voigt's betrayal was especially hurtful to Dan, given that Mr. Voigt knew Dan well enough to know the sincerity of the religious beliefs Dan was espousing and given their shared passion for FullStory's success. Mr. Voigt's false characterization of Dan's religious expressions was also particularly damaging to Dan because Mr. Voigt lent his own credibility to the demonization of Dan, which will affect Dan's ability to continue relationships with other FullStory employees that are important to Dan personally.

## 5. FullStory's termination of Dan for expressing his religious beliefs violated Title VII

In terminating Dan for his expressions of his religious beliefs, FullStory violated Title VII. "An employer may not make an [employee's] religious practice, confirmed or otherwise, a factor in employment decisions."[2] The prohibition on discrimination extends to all aspects of [an employee's] religious observance and practice, as well as belief."[3]

Dan's comments regarding factual male and female capabilities and abortion were both motivated by his sincerely held religious beliefs. The Church of Jesus Christ issued an official statement (from the highest of church authorities, the First Presidency and the Quorum of the Twelve Apostles) in 1995 stating church doctrine on gender that guides Dan's religious beliefs that our God intended gender is an immutable characteristic:

> All human beings—male and female—are created in the image of God. Each is a beloved spirit son or daughter of heavenly parents, and, as such, each has a divine nature and destiny. Gender is an essential characteristic of individual premortal, mortal, and eternal identity and purpose.[4]

Dan understood this to mean that identification as a gender other than birth gender is against God's plan, and his comments identifying persons who can become pregnant as women and those who can impregnate as males were an expression of those beliefs.

Likewise, Dan's religious belief that abortion is wrong is based upon his faith. The Church of Jesus Christ has issued an official statement on abortion consistent with Dan's statements:

---

[2] *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 783 (2015).

[3] 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(j).

[4] "The Family: A Proclamation to the World," https://www.churchofjesuschrist.org/study/scriptures/the-family-a-proclamation-to-the-world/the-family-a-proclamation-to-the-world?lang=eng, retrieved August 28, 2022.

> The Church of Jesus Christ of Latter-day Saints believes in the sanctity of human life. Therefore, the Church opposes elective abortion for personal or social convenience, and counsels its members not to submit to, perform, encourage, pay for, or arrange for such abortions.[5]

Dan's expression of support for an adoption program over one that funded abortion was a protected expression of this religious belief.

Further, the Church of Jesus Christ and its officers regularly emphasize the obligation of its followers to be active in communities and to express their values. Church doctrine teaches this is especially important in democratic societies, where laws are determined by the people. When Dan shared his beliefs about the immutability of gender and his preference for promoting adoption over abortion, he was following this teaching.

Notably, the very LinkedIn conversation for which Dan was fired directly commented on the religious nature of his expressions, with Dan stating, "Yes, my statements are in line with my religious beliefs . . . I made a post online that is in line with my faith and world view . . ." Likewise, it was apparent to anyone reading the posts their religious nature. In that same exchange before Dan described specifically the religious nature of his expressions, Ms. Scholnick stated, "I would never impose my religious beliefs (because let's be real, that[']s what this is about) on anyone else." By the time FullStory made the decision to terminate Dan, there would have been no question that his expressions were a religious practice expressing his religious beliefs.

As evidenced by the calls made to Dan by numerous members of management, FullStory has referenced internal turmoil created by the post and its potential effect on FullStory customers to justify its discrimination against Dan. But it has long been the law that an employer may not discriminate in order to cater to customer preferences.[6] FullStory's repeated efforts to get Dan to suppress his religious views on his personal LinkedIn page to purportedly protect business constitute further repeated admissions of its violations of Title VII.

Further, any effort by FullStory to contend it was not acting because of Dan's religious beliefs but rather to protect LGBTQ+ persons will be unavailing. The analysis for liability is – was the action taken based on heartfelt religious beliefs, and the actions taken by Dan clearly were. Then, the next question is – was he fired for those actions, and, as FullStory has already admitted, he was. FullStory's motivation is not the issue but rather its actions (regardless, FullStory, fully aware Dan's speech involved his religious beliefs, chose to ignore that this speech was protected and fired him for it).

The termination discriminates against him on the basis of his religious beliefs and practices, and it resulted from FullStory's failure to accommodate Dan's religious beliefs and practices.

---

[5] "The Church of Jesus Christ of Latter-Day Saints: Abortion," https://newsroom.churchofjesuschrist.org/official-statement/abortion, retrieved August 28, 2022.

[6] *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385 (5th Cir. 1971), cert. denied, 404 U.S. 950 (1971).

Notably, FullStory's CEO initially recognized what an appropriate accommodation to Dan's religious beliefs was when he offered a resolution by having Dan edit his post to reflect that his opinions were his own and not FullStory's. Dan immediately complied with this request, only to have FullStory then insist on additional actions that refused to accommodate Dan's religious beliefs and practices.