**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

WARREN D. ROGERS, an individual )
)
    Plaintiff, )
)
    v. )
) Case No.
ZACHARY A. STATON, an individual, )
)
    Defendant. )
)
)

# COMPLAINT

Plaintiff Warren Rogers files this Complaint for **Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Violation of the Computer Fraud and Abuse Act – 18 U.S.C § 1030,** *et seq.* against Defendant Zachary Staton and states as follows:

## Nature of the Dispute

1.    This is an action for damages based on the breach of the non-competition provisions of the Operating Agreement ("Operating Agreement") for Complete Cremation Care LLC.  Plaintiff Warren Rogers and Defendant Zachary Staton are the members and managers of Complete Cremation Care LLC. Complete Cremation Care is a Delaware limited liability company that provides

cremation machine maintenance and repair services throughout the United States. The Operating Agreement for Complete Cremation Care prohibits its members and managers from engaging in business activities that compete with the business of Complete Cremation Care.

2.      In February 2023, Mr. Staton and several associates launched Triple Crown Construction Services LLC, a cremation machine repair and maintenance company that directly competes with Complete Cremation Care.  Mr. Staton has used leads generated by Complete Cremation Care to generate business for Triple Crown Construction Services.  Mr. Staton has used internal documents prepared for Complete Cremation Care for the marketing and business operations of Triple Crown Construction Services.  And, through the efforts of Mr. Staton, several of the contractors who performed services for Complete Cremation Care all now work for Triple Crown Construction Services.  Mr. Staton or an associate revoked Mr. Rogers' access from the Google Workspace for the business, eliminated his access to the company's corporate documents, which were stored in the cloud, and deleted Mr. Rogers' e-mail account for Complete Cremation Care.  In violation of the Operating Agreement, Mr. Staton essentially moved the business and business platform of Complete Cremation Care to Triple Crown Construction Services, while claiming to Mr. Rogers that leads were non-existent, that its staff could not

perform its work, and that the clients of Complete Cremation Care no longer needed its services.  Mr. Staton then eliminated Mr. Rogers' access to all business records for the company, essentially shutting the company down and making it impossible for Mr. Rogers to access business, marketing, accounting, financial, legal, and banking records.  Mr. Rogers is seeking damages and other relief from Mr. Staton for his breach of the Operating Agreement and fiduciary duties.

## Parties

3.      Plaintiff Warren Rogers is a resident of Texas.  Mr. Rogers' address is 3571 Far West Boulevard #3189, Austin, Texas 78731.  Mr. Rogers is a member and manager of Complete Cremation Care.  Mr. Rogers provided financial, accounting, and operational support for Complete Cremation Care.

4.      Defendant Zachary Staton is a resident of Kentucky.  Mr. Staton's residence is 3368 Hibernia Pass, Lexington, KY 40509.  Mr. Staton is a member and manager of Complete Cremation Care.  Mr. Staton coordinated the sales, repair, and maintenance business of Complete Cremation Care.

## Venue and Jurisdiction

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and

because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.     Venue is proper in this Court under Section 10.7 of the Operating Agreement.  Section 10.7 of the Operating Agreement contains an exclusive forum selection clause.  Section 10.7 states:

> The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Company, whether in contract, tort or otherwise, shall be brought in a state or federal court of competent jurisdiction located in Atlanta, Georgia.  Each of the parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

7.     Personal jurisdiction exists over Mr. Rogers and Mr. Staton under Section 10.7 of the Operating Agreement because Mr. Rogers and Mr. Staton irrevocably consented to the exclusive jurisdiction of a state or federal court of competent jurisdiction located in Atlanta, Georgia in any such suit and irrevocably waived, to the fullest extent permitted by law, any objection to the laying of venue of any such suit or that any such suit has been brought in an inconvenient forum.

8.     Section 10.5 of the Operating Agreement contains a Delaware choice of law clause.  In federal court, the effect of a contractual forum selection clause in

diversity cases is determined by federal not state law. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir. 1995). Except in unusual cases, forum-selection clauses control. *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 64 (2013). Forum selection clauses are presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable. *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983). The forum selection clause in the Operating Agreement was not the result of fraud or overreaching. Under Section 10.12 of the Operating Agreement, "Each Member represents and warrants to the Company, the Board of Managers and the other Members that it has sought and obtained (or has voluntarily and knowingly decided not to seek and obtain after having ample opportunity to do so) the advice of independent legal counsel of its choice regarding all legal issues pertaining to its acquisition of an Interest in the Company including the federal income tax consequences of ownership of an Interest in the Company and the application of the securities laws to an investment in the Company." The enforcement of the forum selection clause does not violate

public policy.  Under Delaware law, private parties may agree to conduct all potential litigation arising out of a contract in a single jurisdiction.  *Process and Storage Vessels, Inc. v. Tank Servs., Inc.*, 541 F. Supp. 725, 733 (D. Del. 1982). Finally, because the parties involved in this dispute are based in multiple states, enforcement of the forum selection clause would not result in litigation so seriously inconvenient as to be unreasonable.  As a result, the forum selection clause is presumptively enforceable.

## General Allegations

### Complete Cremation Care – Operating Agreement

9.      Complete Cremation Care provides maintenance and repair services for cremation machines throughout the United States.  Complete Cremation Care is a Delaware limited liability company formed on September 7, 2022.  The effective date of its Operating Agreement is September 7, 2022.  A copy of the Operating Agreement is attached hereto as **Exhibit 1**.

10.      Mr. Rogers and Mr. Staton are the sole members of Complete Cremation Care.  Mr. Rogers and Mr. Staton each own a 50% Membership Interest in Complete Cremation Care.

11.     Section 3.8 of the Operating Agreement prohibits the members of Complete Cremation Care from competing with the business of Complete Cremation Care.  It states as follows:

a.  During the term of the Company, each Member and its Affiliates may engage in any business activity for such Member's own profit or advantage, provided such activity does not directly compete with the business of the Company.

b.  No Member, or any Affiliate of a Member, shall be obligated to account to the Company or to the other Members for any profits or income earned or derived from outside activities or businesses, provided such activities or businesses do not directly compete with the business of the Company.

c.  No Member, or any Affiliate of a Member, shall be obligated to inform the Company or the Members of any business opportunity of any type or description, unless such business opportunity may reasonably be expected to compete with the business of the Company.

12.     Complete Cremation Care is managed by a Board of Managers. Under Section 4.1(b) of the Operating Agreement, the Board of Managers is

comprised of Mr. Rogers and Mr. Staton.  The Board of Managers exclusively manages the business and affairs of Complete Cremation Care.

13.     Section 4.8 of the Operating Agreement prohibits the managers of Complete Cremation Care from competing with the business of Complete Cremation Care.  It states:

a. During the term of the Company, the Managers and their respective Affiliates may engage in any business activity for such Manager's own profit or advantage, provided such activity does not directly compete with the business of the Company.

b. No Manager, or any Affiliate of a Manager, shall be obligated to account to the Company or to the Members for any profits or income earned or derived from other such activities or businesses, provided such activities or businesses do not directly compete with the business of the Company.

c. No Manager, or any Affiliate of a Manager, shall be obligated to inform the Company or the Members of any business opportunity of any type or description, unless such business opportunity may reasonably be expected to compete with the business of the Company.

14.     Under Section 10.5 of the Operating Agreement, all issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement are governed by and construed in accordance with the internal laws of the State of Delaware.

### Complete Cremation Care – Business Operations

15.     Throughout the United States, there are a limited number of companies that provide cremation machine repair and maintenance.  At the same time, there is significant demand for these services throughout the United States.  As a result, Complete Cremation Care was profitable within a few months of its formation.

16.     Complete Cremation Care primarily used four contractors to perform repair and maintenance services.  Its contractors were Stevin Staton and Brandon Staton (Defendant Zachary Staton's brothers), Sammy Reed, and Christopher "Shane" Leffingwell.

17.     Complete Cremation Care generated leads through its website (cremationrepair.com) and through a lead generation service.  Phone calls to Complete Cremation Care would be directed to Mr. Staton's phone.  If Mr. Staton was not available, phone calls would be routed to an answering service.  The answering service would deliver messages to Mr. Staton and Mr. Rogers.

18.     For example, the lead generation efforts of Complete Cremation Care resulted in Northern Indiana Crematory Corp. as a lead.  Northern Indiana Crematory Corp. is based in Fort Wayne, Indiana and operates several crematoria. This company is an affiliate of Minnick Services.

19.     The lead generation efforts of Complete Cremation Care also resulted in the Kaminski Family Funeral Homes & Crematorium as a lead.  Kaminski is based in Justice, Illinois.

## Triple Crown Construction Services

20.     In January 2023, Mr. Staton introduced two friends to Mr. Rogers for the purpose of making an investment in Complete Cremation Care.  Mr. Staton's friends, Ben V. DeVary and his brother Len C. "Coby" DeVary, met with Mr. Rogers in late January to discuss the possibility of investing in Complete Cremation Care.  Following the meeting, the DeVary brothers decided not to make an investment in Complete Cremation Care.

21.     On February 2, 2023, Ben V. DeVary formed Triple Crown Construction Services LLC, a Florida limited liability company.  The principal address of the company is 10205 Collins Avenue, Unit 1407, Bal Harbour, Florida 33154.  This address is the home residence of Ben V. DeVary.

22.     When conducting business for Triple Crown, Mr. Staton identifies himself as the principal of Triple Crown.  Upon information and belief, Mr. Staton is a member of Triple Crown.

23.     Since February 2023, Triple Crown Construction Company has performed repair and maintenance on cremation machines owned by Northern Indiana Crematory Corp. and the Kaminski Family Funeral Homes & Crematorium.  Mr. Staton's contact with both companies was the result of leads generated by Complete Cremation Care.  Mr. Staton then used these contacts to generate business for Triple Crown Construction Services.

24.     Upon information and belief, Triple Crown Construction Services has generated clients and business from other companies that were leads originally generated by Complete Cremation Care.

25.     Because of the success of Complete Cremation Care, Mr. Rogers and Mr. Staton decided to expand the scope of services provided by Complete Cremation Care and to conduct business under the d/b/a Titan Refractory.  Instead of only servicing human crematoria, Mr. Rogers and Mr. Staton planned for Complete Cremation Care d/b/a Titan Refractory to provide construction, maintenance, and repair services for human and animal crematoria, commercial and industrial businesses, and residential purposes.  As part of this planning

11

process, Mr. Rogers developed marketing materials for Titan Refractory.
Mr. Rogers worked closely with Sammy Reed to develop these materials.  These
materials included a marketing brochure for Titan Refractory.  The brochure was
stored on a Google drive for Complete Cremation Care.

26.     Complete Cremation Care used a Google workspace for e-mail and
data storage.  This workspace was associated with the domain www.carbon-
reclamation.com.  Carbon Reclamation LLC is a Wyoming limited liability
company that Mr. Rogers formed in May 2022 with Mr. Staton, Brian Patton, and
Helena Jackson.  Carbon Reclamation did not pursue any substantial business
activities.  Instead of forming a new Google workspace for Complete Cremation
Care, Mr. Rogers and Mr. Staton used the Google workspace for Carbon
Reclamation because it was already established, and it was more efficient than
creating a new Google workspace.

27.     On February 27, 2023, either Mr. Staton or Mr. Reed created a new
domain for Triple Crown Construction Services.  That domain is
www.3crownservices.com.  They also created a new Google workspace for Triple
Crown.

28.     On multiple occasions between February 15 and 23, 2023, Sammy
Reed downloaded and made copies of the Titan Refractory brochure, which was

located on the Complete Cremation Care Google Drive.  At some point in the spring of 2023, Mr. Reed or Mr. Staton removed Mr. Rogers' access to this Titan Refractory brochure on the Google Drive for Complete Cremation Care.

29.     In the spring of 2023, Triple Crown Construction Services created a Linkedin page (https://www.linkedin.com/company/triple-crown-construction-services/).  Mr. Reed created and maintains this Linkedin page.  On its Linkedin page, Triple Crown posted a brochure of services which is a copy of the Titan Refractory brochure that Mr. Rogers and Mr. Reed prepared together.

30.     In late March 2023, Mr. Staton's brother, Stevin Staton, and Mr. Reed viewed, copied, shared, and downloaded multiple documents created for the business of Complete Cremation Care.  Mr. Reed was terminated on March 17, 2023, and at the time Mr. Reed was viewing, copying, and sharing documents, he no longer worked for Complete Cremation Care.  On March 25, 2023, Mr. Reed shared a folder called "Copy of Purchase Orders" with the user sammy@3crownservices.com.  This e-mail address is Mr. Reed's Triple Crown Construction Services e-mail address.  The affidavit of Trenton L. Walton summarizing this activity is attached hereto as **Exhibit 2**.

31.     On May 11, 2023, Mr. Staton or Mr. Reed, without authorization, changed the password on the e-mail account that Mr. Rogers used for the business

of Complete Cremation Care.  Either Mr. Staton or Mr. Reed then deleted the account and blocked Mr. Rogers' access to both his e-mail account and all Complete Cremation Care documents stored on the Google drive.  Previously, Mr. Rogers and Mr. Staton had administrative access to manage the Google Workspace for Complete Cremation Care.  After this change, only Mr. Staton could manage the platform, add or edit users, and add or edit e-mail addresses.

32.     As a result of this conduct, Mr. Rogers no longer has access to legal, business, operational, marketing, financial, accounting, and banking records of Complete Cremation Care, and Mr. Rogers no longer has access to many Complete Cremation Care on-line accounts because these accounts require two-factor authentication.  Without access to his e-mail address, Mr. Rogers cannot complete the authentication necessary to access these accounts.  These actions have essentially shut down the business of Complete Cremation Care.

33.     As recently as May 26, 2023, Mr. Rogers was contacted by Jevon Banks of Inspired Life Cremations in Las Vegas.  Mr. Banks inquired whether Complete Cremation Care was still providing repair and maintenance services.  Mr. Rogers cannot respond to this request because Mr. Staton has eliminated Mr. Rogers' e-mail account and access to the business files of Complete Cremation Care.  Further, even if Mr. Rogers had access to these files, he cannot

14

offer services to Inspired Life Cremations because Mr. Staton has moved the staff of Complete Cremation Care to Triple Crown.

34.     In May 2023, either Mr. Staton or Mr. Reed deleted all conversations, documents, and data on the Slack channel used for Complete Cremation Care.

35.     In late 2022, Complete Cremation Care purchased three used Crawford 500 animal cremation machines.  Complete Cremation Care sold one of the machines, and Mr. Staton stored the remaining two machines at the home of Brian Patton, a friend and business associate, or put them into service.  Mr. Patton now works for Triple Crown Construction Services.  Upon information and belief, Triple Crown Construction Services has sold these two cremation machines, even though they were purchased by Complete Cremation Care.

36.     Mr. Staton has never informed Mr. Rogers of his work for Triple Crown Construction Services or notified Mr. Rogers of the existence of Triple Crown Construction Services.  Mr. Staton concealed the existence of Triple Crown Construction Services and repeatedly made excuses why certain projects of Complete Cremation Care could not be completed and why Complete Cremation Care was no longer generating substantial new business.  Mr. Staton never explained that he had shifted the business platform and business of Complete Cremation Care to Triple Crown Construction Services.

## First Cause of Action
### (Breach of Contract)

37.     Mr. Rogers incorporates by reference all averments contained within this Complaint.

38.     On September 7, 2022, Mr. Rogers and Mr. Staton entered into the Operating Agreement.  The Operating Agreement is a valid, enforceable agreement that sets forth the rights and obligations of the members and managers of Complete Cremation Care.

39.     Mr. Rogers has fully performed all conditions, covenants, and terms of the Operating Agreement.

40.     Mr. Staton has materially breached the Operating Agreement in his capacity as a member and manager of Complete Cremation Care.  Mr. Staton materially breached the Operating Agreement by engaging in a business activity that directly competes with Complete Cremation Care, by not accounting to Mr. Rogers for profits and income derived from Triple Crown, and by not informing Mr. Rogers of business opportunities, like Triple Crown that competes with the business of Complete Cremation Care.

41.     Mr. Staton's actions and omissions constitute material breaches of the Operating Agreement.

42.     As a direct and proximate result of Mr. Staton's breaches, Mr. Rogers has incurred substantial damages.  As further relief, Mr. Rogers demands a complete accounting of all profits and income that Mr. Staton, and other staff of Complete Cremation Care, have derived from Triple Crown.

## Second Cause of Action
### (Breach of Covenant of Good Faith and Fair Dealing)

43.     Mr. Rogers incorporates by reference all averments contained within this Complaint.

44.     A covenant of good faith and fair dealing is implied in every agreement subject to Delaware law.  The implied covenant of good faith and fair dealing requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.

45.     Defendant breached the covenant of good faith and fair dealing by engaging in the conduct alleged in this Complaint, which deprived Mr. Rogers of the benefits of the protections of the Operating Agreement.

46.     As a direct and proximate result of these breaches of the covenant of good faith and fair dealing implied in the agreements and certifications as alleged

above, Mr. Rogers has suffered harm to its detriment in an amount according to proof at trial, but not less than the jurisdictional minimum of this Court.

## Third Cause of Action
### (Breach of Fiduciary Duty)

47.     Mr. Rogers incorporates by reference all averments contained within this Complaint.

48.     Under Delaware law, Mr. Staton, as manager of Complete Cremation Care, owed fiduciary duties to Mr. Rogers.

49.     Mr. Staton breached his fiduciary duties to Mr. Rogers by operating a business that directly competed with Complete Cremation Care, by using leads generated by Complete Cremation Care to benefit Triple Crown, by using the marketing and other business documents of Complete Cremation Care for the business of Triple Crown, and by engaging the staff of Complete Cremation Care to work for Triple Crown.

## Fourth Cause of Action
### (Violation of the Computer Fraud and Abuse Act – 18 U.S.C § 1030, *et seq.*)

50.     Mr. Rogers incorporates by reference all averments contained within this Complaint.

51.     The Google workspace and e-mail account that Mr. Rogers used for Complete Cremation Care business was used in or affects interstate commerce and are therefore "protected computers" under § 1030(e)(2)(B).

52.     On May 11, 2023, Mr. Staton or Mr. Reed intentionally and knowingly changed the password that Mr. Rogers used for his Complete Cremation Care e-mail account and to access the documents of Complete Cremation Care.  This eliminated Mr. Rogers' administrative access to the Google Workspace.  Mr. Rogers' e-mail account was subsequently deleted.  As a result of this conduct, Mr. Rogers no longer has access to his e-mail account or the digital business records of Complete Cremation Care.

53.     Before deleting Mr. Rogers' access to the Complete Cremation Care Google workspace, Mr. Staton and Sammy Reed viewed, downloaded, copied, and shared documents for Complete Cremation Care business so that these documents could be used for the business of Triple Crown.  This access was not authorized by the Board of Managers of Complete Cremation Care and the purpose of the access was to obtain something of value, and/or to cause damage and/or loss, including loss of data and damage to Mr. Rogers and Complete Cremation Care.  This included damage to Complete Cremation Care's existing and prospective customer and vendor relationships.

19

54.     Mr. Staton and Mr. Reed's access was without authorization and/or in excess of authorized access.  Complete Cremation Care and its Board of Managers did not provide Mr. Staton or Mr. Reed with authorization to use their credentials to access Complete Cremation Care's Google workspace for the benefit of anyone other than Complete Cremation Care.

55.     This unauthorized access began in February 2022 and continued into April 2023, even after Mr. Reed no longer worked for Complete Cremation Care.

56.     Mr. Staton and Mr. Reed further exceeded their authorized access when they accessed Complete Cremation Care's shared workspace to obtain information, including valuable proprietary information and trade secrets, with the intent to divert and steal Complete Cremation Care's business with its customers and vendors.

57.     Mr. Staton and Mr. Reed knowingly, intentionally, and without authorization caused damage to Mr. Rogers and Complete Cremation Care when they changed Mr. Rogers' password, deleted Mr. Rogers' access to Complete Cremation Care's shared workspace, and deleted Mr. Rogers' e-mail account.

58.     Mr. Staton and Mr. Reed knowingly and with intent to defraud accessed Complete Cremation Care's protected Google workspace without authorization and/or exceeded authorization when they unauthorizedly copied

Complete Cremation Care's proprietary and confidential information to personal drives or shared files with Triple Crown in order to obtain information and valuable trade secrets for their own personal gain and to divert and steal Complete Cremation Care's business with its customers and vendors.

59.     As a result of Mr. Staton and Mr. Reed's knowing and intentional unauthorized access and his intent to defraud, Mr. Staton, and by extension Triple Crown, obtained data and information the value of which exceeds $5,000 in the relevant one-year period.

60.     Mr. Staton and Mr. Reed's unauthorized conduct has caused Mr. Rogers damage or losses in excess of $5,000.

61.     Mr. Staton's unauthorized and fraudulent access of servers and computer files affected interstate commerce because Complete Cremation Care and Triple Crown conduct business in several states and its protected computers are connected to the internet.

62.     Mr. Staton's intentional conduct caused Mr. Rogers damages and entitles Mr. Rogers to recover damages, exemplary damages, attorney's fees, and injunctive relief.

63.     Mr. Staton's conduct was conscious, intentional, wanton and malicious, entitling Mr. Rogers to an award of punitive damages.

WHEREFORE, Plaintiff prays for a judgment against Defendant as follows:

a.  For compensatory damages, and all other damages allowable under the law, sustained by Plaintiff;

b.  For equitable relief, injunctive relief, or both, including an accounting of all profits that Mr. Staton and others have derived from Triple Crown;

c.  For payment of costs of suit herein incurred;

d.  For both pre-judgment and post-judgment interest at the maximum rate allowable at law on any amounts awarded;

e.  For payment of the expenses of litigation, including reasonable attorneys' fees, as may be allowable under applicable law; and

f.  For such other and further relief as the Court may deem just and proper.

Dated: May 31, 2023

STITES & HARBISON, PLLC

By:    */s/* William D. Newcomb
      WILLIAM D. NEWCOMB
      Georgia Bar No. 148484
      JEFFREY C. HOFFMEYER
      Georgia Bar No. 132231
      *Attorneys for Plaintiff*
      *Warren Rogers*

303 Peachtree Street, N.E., Suite 2800
Atlanta, Georgia 30308
(404) 739-8873

MOYE WHITE LLP

*By:*    */s/* David M. "Merc" Pittinos
      David M. "Merc" Pittinos
      Colorado Bar No. #35732
      *Attorneys for Plaintiff*
      *Warren Rogers*

(Pro hac admission to be filed)

1400 16th Street, 6th Floor
Denver, Colorado 80202
(303) 292-2900
(303) 292-4510 (facsimile)

# EXHIBIT 1

**OPERATING AGREEMENT**

**OF**

**COMPLETE CREMATION CARE LLC**

**A Delaware Limited Liability Company**

**Effective Date: September 7, 2022**

**OPERATING AGREEMENT**
**OF**
**COMPLETE CREMATION CARE LLC**

THIS OPERATING AGREEMENT (this "Agreement") of Complete Cremation Care LLC, a Delaware limited liability company (the "Company"), is effective as of September 7, 2022 (the "Effective Date"), by and among Warren Rogers and Zach Staton, as the initial managers of the Company (each a "Manager" and collectively, the "Managers"); and those Persons identified as members on Exhibit A attached hereto and incorporated herein (each a "Member" and collectively, the "Members").   Unless otherwise indicated, capitalized terms used in this Agreement shall have the meanings specified in Article 11 of this Agreement.

**RECITALS**

WHEREAS, a Certificate of Formation for the Company was filed with and accepted by the Delaware Secretary of State on September 7, 2022; and

WHEREAS, the Managers and the Members desire to set forth the terms and conditions pursuant to which the Company shall be operated and to set forth the rights, duties and obligations of the Managers and the Members to the Company.

**AGREEMENT**

NOW THEREFORE, IN CONSIDERATION OF THE MUTUAL PROMISES, COVENANTS AND UNDERTAKINGS HEREIN SPECIFIED, WITH THE INTENT TO BE OBLIGATED LEGALLY AND EQUITABLY, THE PARTIES HERETO AGREE AS FOLLOWS:

**ARTICLE 1**
**ORGANIZATION**

1.1     Formation.  On September 7, 2022, the Company was formed as a Delaware limited liability company upon acceptance of the Company's Certificate of Formation ("Certificate", which term shall include any amendments) by the Delaware Secretary of State pursuant to the Delaware Limited Liability Company Act, as amended (the "Act"). The Company shall continue in existence until terminated by the provisions of this Agreement or as provided by law.

1.2     Name.  The name of the Company is "Complete Cremation Care LLC".  The name of the Company may be changed or modified by the Board of Managers at any time and from time to time.

1.3     Purpose.  The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act, as determined by the Board of Managers.

1.4     Principal Office; Registered Office and Registered Agent.  The Company's principal place of business shall be at 3571 Far West Blvd #3189, Austin, TX, 78731.  The Company's registered office and registered agent for service of process in the State of Delaware

DocuSign Envelope ID: 88096C67-451C-46CE-A334-89B32A2EA873

shall be as specified in the Certificate. The registered office and registered agent for service of process in any other state in which the Company conducts business, if any, shall be determined by the Board of Managers. The Board of Managers may change the Company's principal office, or the Company's registered office or registered agent in any state in which the Company conducts business, at any time and from time to time.

1.5     <u>Income Tax Status</u>. It is the intent of the Members that the Company shall be treated as a partnership for US federal, state, and local income tax purposes. No Manager or Member shall make an election for the Company to be classified as other than a partnership pursuant to Treasury Regulations Section 301.7701-3.

## ARTICLE 2
## CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

2.1     <u>Capital</u> Contributions.

(a)     Each Member has been issued the Membership Interest specified with respect to such Member on <u>Exhibit A</u> in exchange for an initial Capital Contribution to the Company, as reflected in the books and records of the Company. The Members shall have the right, but not the obligation, to make additional Capital Contributions to the Company in accordance with the provisions of <u>Section 2.1(b)</u>.

(b)     If the Board of Managers determines the Company needs additional capital for any reason, upon obtaining the approval of a Supermajority Vote of the Members, the Board of Managers may deliver written notice of such determination ("<u>Capital Call Notice</u>") to each Member, which notice shall specify the total amount of capital required by the Company at such time ("<u>Aggregate Capital Call Amount</u>") and the date by which the Company needs the additional capital ("<u>Contribution Deadline</u>"). Upon receiving any Capital Call Notice, each Member shall have the right, but not the obligation, to make a Capital Contribution to the Company on or before the Contribution Deadline in an amount equal to such Member's Proportionate Share of the Aggregate Capital Call Amount.

2.3     <u>Capital Accounts</u>. A separate capital account ("<u>Capital Account</u>") shall be maintained for each Member in accordance with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.

2.4     <u>Return of Capital</u>. Except as otherwise specifically provided in this Agreement, no Member shall have the right to demand the return of, or withdraw, any or all of that Member's Capital Contribution(s) prior to the dissolution and winding up of the Company. No Member or Manager guarantees the return of any Member's Capital Contribution(s). No Member or Manager is required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contribution(s). No Member shall have the right to receive interest on any Capital Contribution or its Capital Account balance.

2.5     <u>Contributions Not Enforceable by Third Parties</u>. No third party shall have the right to call for or to otherwise require any Member to make any Capital Contribution, or to otherwise require any Member to loan or contribute funds to the Company.

# ARTICLE 3
# MEMBERS

3.1     <u>Member Information</u>.  The name, mailing address, and percentage of Membership Interest of each Member are specified on <u>Exhibit A</u> to this Agreement. The Board of Managers shall update <u>Exhibit A</u> upon the issuance or Transfer of any Membership Interests to any new or existing Member in accordance with this Agreement (which shall not constitute an amendment of this Agreement requiring the consent or approval of any Member).

3.2     <u>Member Liability</u>.  Except as otherwise required by applicable law or the express provisions of this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company or any other Member, whether arising in contract, tort or otherwise, solely by reason of being a Member.

3.3     <u>Member Participation</u>.  Except as otherwise provided in this Agreement or under the Act, the Members (in their capacity as such) shall have no right to take part, directly or indirectly, in the active management or control of the business of the Company, and the Members (in their capacity as such) shall not have the right or authority to act for or bind the Company. Unless expressly provided for in this Agreement or expressly required by mandatory provisions of the Act, no Member (in its capacity as such) shall have the right to vote on, consent to, approve or otherwise take action with respect to any matter relating to the Company or its business and affairs. Whenever the vote, consent or action of the Members is required pursuant to the provisions of this Agreement or the Act, such vote, consent, or action shall be deemed to require a Supermajority Vote of the Members.  Each Member entitled to vote shall be entitled to one vote upon each matter submitted to a vote of the Members, and such vote shall be weighted according to such Member's Membership Interest at the time of the vote.

3.4     <u>Additional Members</u>.  Any Person may be admitted as an additional Member of the Company ("<u>Additional Member</u>") in connection with the issuance or sale of Membership Interests by the Company only with the prior written approval of a Supermajority Vote of the Members. Any Person admitted as an Additional Member shall execute an amendment or joinder to this Agreement evidencing such Additional Member's consent to be bound by the provisions of this Agreement.

3.5     <u>No Withdrawal</u>.  So long as a Member continues to hold any Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Membership Interest, such Person shall no longer be a Member.

3.6     <u>Member Meetings</u>.  The Board of Managers may (but shall not be required to) hold an annual meeting of the Members at such place as the Board of Managers may determine or may at any time call for a vote without a meeting of the Members on matters on which the Members are entitled to vote.  Meetings may be held either in person or by means of telephone or video conference or other communications device that permits all Members participating in the meeting to hear each other, at the offices of the Company or such other place (either within or outside the

State of Delaware) as may be determined from time to time by the Board of Managers. Written notice of a meeting of the Members shall be given to each Member at least forty-eight (48) hours prior to such meeting.

3.7     Actions by Members Without a Meeting.  Any matter or action that is to be voted on, consented to or approved by the Members may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by electronic transmission, by a Member or Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted.

3.8     Other Activities.  During the term of the Company, each Member and its Affiliates may engage in any business activity for such Member's own profit or advantage, provided such activity does not directly compete with the business of the Company. No Member, or any Affiliate of a Member, shall be obligated to account to the Company or to the other Members for any profits or income earned or derived from outside activities or businesses, provided such activities or businesses do not directly compete with the business of the Company. No Member, or any Affiliate of a Member, shall be obligated to inform the Company or the Members of any business opportunity of any type or description, unless such business opportunity may reasonably be expected to compete with the business of the Company.

# ARTICLE 4
# MANAGEMENT

4.1     Management of the Company.

(a)     The business and affairs of the Company shall be managed, operated and controlled by or under the direction of a board of managers (the "Board of Managers"). The Board of Managers shall be comprised of natural Persons.

(b)     The Board of Managers shall be comprised of up to three (3) Managers. The Board of Managers shall initially be comprised of two (2) Managers, Warren Rogers and Zach Staton.  A Person serving as a Manager shall hold office until such Person's death, incapacity, dissolution, resignation or removal.  A Manager need not be a Member or a natural person. The number of Managers of the Company may be increased or decreased at any time pursuant to a Supermajority Vote of the Members, provided the Company shall have at least one (1) Manager at all times.

(c)     Subject to Section 4.4, the business and affairs of the Company shall be managed exclusively by the Board of Managers.  The Board of Managers shall direct, manage, and control the business of the Company to the best of the Board of Managers' abilities, and subject to Section 4.4, the Board of Managers shall have the full and complete authority, power, and discretion to make any and all decisions and to do any and all things which the Board of Managers deems necessary or desirable for that purpose.

(d)     Without limiting the generality of the foregoing, but subject to Section 4.4, in addition to any other rights and powers which the Board of Managers may possess under applicable law or pursuant to this Agreement, the Board of Managers shall have all specific rights,

4

powers, and authorities required or appropriate to the Board of Managers' management of the Company's business and affairs to be exercised in such manner, in such form, at such times, and to such extent as the Board of Managers, in each Manager's best, good faith discretion, determines, which shall include, without limitation, the full power and authority to execute on behalf of the Company any and all agreements, contracts, certificates, leases, subleases, licenses, conveyances, deeds, mortgages, checks, drafts, promissory notes and other instruments, and the execution thereof by a Manager shall be the only execution necessary to bind the Company thereto.

4.2     <u>Quorum; Vote Required</u>.

(a)     A majority of the Managers serving on the Board of Managers shall constitute a quorum for the transaction of business at a meeting of the Board of Managers. No action at any meeting of the Board of Managers may be taken unless the appropriate quorum is present. If a quorum shall not be present at a meeting, then the Managers present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(b)     Each Manager shall have one (1) vote on all matters submitted to the Board of Managers. Unless otherwise specified in this Agreement, all actions taken by the Board of Managers must be approved by a majority of the Managers then in office.

4.3     <u>Action without a Meeting</u>. Any matter that is to be voted on, consented to or approved by the Board of Managers may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by electronic transmission, by all of the Managers then in office. Such consent shall have the same force and effect as a vote at a meeting where a quorum was present. A record shall be maintained by the Board of Managers of each such action taken by written consent.

4.4     <u>Major Decisions</u>. Notwithstanding any provision of this Agreement to the contrary, the prior written approval of a Supermajority Vote of the Members shall be required for the Company to take or implement any of the following actions:     The expenditure, or the incurrence of any obligation to make an expenditure, of funds, unless the expenditure is made in the ordinary course of business and the amount expended is less than $50,000. For the avoidance of doubt, the approval of a Supermajority Vote of the Members shall not be required under this provision to pay regularly scheduled debt service payments, real estate taxes then due and payable, ordinary course utility costs, or other similar non-discretionary type expenses;

(b)     The acquisition, by purchase, exchange, lease, assignment or otherwise, of any asset or group of related assets by the Company with an aggregate purchase price in excess of $50,000;

(c)     The disposition, by sale, exchange, lease, assignment or otherwise, of any asset or group of related assets by the Company with an aggregate fair market value in excess of $50,000;

5

(d)     The entry into any transaction or agreement between the Company and any Restricted Person, or the entry into any transaction or agreement pursuant to which any Restricted Person will pay remuneration to or receive remuneration from the Company;

(e)     The appointment of any Officer of the Company, or the determination of the compensation payable by the Company to any Officer;

(f)     The borrowing of any money by the Company or the granting of any lien, claim, encumbrance or security interest by the Company with respect to any asset(s) of the Company, or the modification, extension, renewal, change, or prepayment in whole or in part of any borrowing or financing of the Company;

(g)     The lending of any money by the Company;

(h)     The issuance by the Company of any guaranty with respect to the obligations of any other Person;

(i)     The sale or issuance of additional Membership Interests by the Company;

(j)     The admission of any Person as an Additional Member or Substitute Member;

(k)     The merger, conversion, consolidation, or other reorganization of the Company;

(l)     The sale of all or substantially all of the Company's assets;

(m)     The modification or amendment of this Agreement or the Certificate;

(n)     The dissolution of the Company;

(o)     The commencement of any litigation by the Company;

(p)     The filing by the Company of a voluntary petition in bankruptcy or a voluntary petition in liquidation, or the consent by the Company to the filing of an involuntary petition in bankruptcy or an involuntary petition in liquidation; or

(q)     The acceptance and/or making of any settlement, compromise or payment of any claim or series of claims that relate to the same occurrence giving rise to the claim(s) (i) asserted against the Company or any of its property and assets that exceed $50,000 per occurrence (including claims covered by any policy of insurance maintained by the Company) or (ii) asserted by the Company that exceed $50,000 per occurrence.

4.5     Removal; Resignation.

(a)     A Person may be removed as Manager only for Cause, pursuant to a Supermajority Vote of the Members.

DocuSign Envelope ID: 88096C67-451C-46CE-A333-89B33A2EA873

(b)      A Person may resign as Manager at any time by giving at least thirty (30) days prior written notice to the Members, provided the Members may waive or shorten the notice period in writing.  Upon the death, incapacity, dissolution or bankruptcy of a Person, such Person shall be deemed to have resigned as Manager of the Company effective as of the date of such Person's death, incapacity, dissolution or bankruptcy.

4.6      <u>Vacancies</u>.  Upon any vacancy occurring in the position of Manager for any reason, the Members shall promptly select and appoint a Person to serve as Manager pursuant to a Supermajority Vote of the Members. Any Person appointed as a Manager pursuant to this <u>Section 4.6</u> shall serve as a Manager until such Person's death, incapacity, dissolution, removal or resignation, and shall have all of the rights and obligations of the original Manager of the Company.

4.7      <u>Officers</u>. Subject to <u>Section 4.4</u>, the Board of Managers may appoint individuals as officers of the Company (the "<u>Officers</u>") as the Board of Managers deems necessary or desirable to carry on the business of the Company. The Board of Managers may delegate to such Officers such power and authority as the Board of Managers deems advisable. No Officer need be a Member or Manager. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his or her successor is designated by the Board of Managers or until his or her earlier death, incapacity, resignation or removal. Any Officer may resign at any time upon written notice to the Board of Managers. The Board of Managers may remove any Officer, with or without Cause, at any time; provided, however, the prior approval of a Supermajority Vote of the Members shall be required for the Board of Managers to remove any Officer without Cause. A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Board of Managers with the approval of a Supermajority Vote of the Members.  The amount of compensation payable by the Company to any Officer shall be determined by a Supermajority Vote of the Members.

4.8      <u>Time Devoted; Other Activities</u>.  The Managers shall devote such time as is reasonably necessary to manage the Company's business and affairs and to carry out each Manager's obligations under this Agreement.  It is expressly understood and agreed that the Managers shall not be required to devote their entire business time or business resources to the business of the Company.  During the term of the Company, the Managers and their respective Affiliates may engage in any business activity for such Manager's own profit or advantage, provided such activity does not directly compete with the business of the Company.  No Manager, or any Affiliate of a Manager, shall be obligated to account to the Company or to the Members for any profits or income earned or derived from other such activities or businesses, provided such activities or businesses do not directly compete with the business of the Company. No Manager, or any Affiliate of a Manager, shall be obligated to inform the Company or the Members of any business opportunity of any type or description, unless such business opportunity may reasonably be expected to compete with the business of the Company.

4.9      <u>Standard of Care</u>.  To the fullest extent permitted by applicable law, no Covered Person shall be liable, in damages or otherwise, to the Company, the Members or any of their Affiliates for any act or omission in connection with or in any way relating to the Company's business or affairs, except in the case of any act or omission with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final and non-appealable decision,

DocuSign Envelope ID: 88096C67-451C-46CE-A333-89B83A2EA873

judgment or order that such act or omission resulted from such Covered Person's bad faith, gross negligence, willful misconduct, fraud or a material breach of this Agreement.  Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), such Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  No Covered Person in any way guarantees the return of the Members' capital or a profit from the operations of the Company, and no Covered Person shall be responsible to the Members because of a loss of that Member's investment or a loss in operations, provided, however, that the foregoing shall not limit any Covered Person's liability in connection with any loss that has been occasioned by any act by such Covered Person that constitutes fraud, gross negligence, willful misconduct or a material breach of this Agreement.

4.10     Duties.  This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by applicable law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to the Members and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that such provisions expressly restrict or eliminate the duties (including fiduciary duties) and liabilities of a Covered Person otherwise existing at law or in equity are agreed by the Members to replace such other duties and liabilities of such Covered Person.

4.11     Indemnification.  To the fullest extent permitted by the Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement, only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse each Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "Losses") to which such Covered Person may become subject by reason of any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, *provided*, that (a) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company, and (b) such Covered Person's conduct did not constitute fraud, gross negligence, willful misconduct or a material breach of this Agreement. The provisions of this Section 4.11 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 4.11 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person. The provisions of this Section 4.11 shall survive the dissolution, liquidation, winding up and termination of the Company.  If this Section 4.11 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 4.11 to the fullest extent permitted

8

DocuSign Envelope ID: 88096C67-451C-46CE-A332-89B82A2EA873

by any applicable portion of this <u>Section 4.9</u> that shall not have been invalidated and to the fullest extent permitted by applicable law.

4.12    <u>Deadlock</u>.

(a)    If at two (2) successive meetings of the Board of Managers, the Managers are unable to reach a decision by the required vote regarding a Fundamental Issue submitted for consideration by the Board of Managers at such meetings (a "<u>Deadlock</u>"), the Board shall refer the matter subject to the Deadlock to the Members, who shall attempt to resolve such matter within twenty (20 business days after referral to them of the Deadlocked issue (or, if mutually agreed by the Members, a longer period of time). Any resolution agreed to by the Members shall be final and binding on the Company and the Members.

(b)    During the continuation of any Deadlock, the Company shall continue to operate in a manner consistent with its prior practices and this Agreement until such time as such Deadlock is resolved. If the Deadlock is with respect to the approval of the Company's annual business plan or budget, the Company shall operate its business in accordance with the business plan or budget then in effect.

(c)    If the Members are unable reach agreement as to the Fundamental Issue within the time period set forth in Section 4.12(a) (including any agreed extensions), the Deadlock shall be mediated (the "<u>Mediation</u>") within 15 business days from the date a written request for mediation is made by any Member. The Mediation shall take place in Austin, Texas. The Mediation shall be conducted before a single mediator to be agreed upon by the Members. If the Members cannot agree on the mediator, each Member shall select a mediator and such mediators shall together unanimously select a neutral mediator who will conduct the mediation. Each Member shall bear the fees and expenses of its mediator and all the Members shall equally bear the fees and expenses of the final mediator. The decision of the mediator shall be final and binding on the Members.

## ARTICLE 5
## DISTRIBUTIONS

5.1    <u>Timing and Priority of Distributions</u>.  Subject to applicable law and the provisions of <u>Article 9</u>, distributions of Available Cash Flow may be made among the Members at such times and in such amounts as determined by the Board of Managers.  All distributions of Available Cash Flow shall be made to the Members in the following order of priority:

(a)    First, to the Members, *pro rata*, in proportion to their Unreturned Contribution Amounts, until each Member's Unreturned Contribution Amount is reduced to zero; and

(b)    Thereafter, to the Members, *pro rata*, in proportion to their Membership Interests.

5.2    <u>Withholding</u>. The Company is hereby authorized at all times to make payments with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Partnership Representative based on the advice of legal or tax counsel to the

Company) to withhold or make payments to any federal, state, local or foreign taxing authority with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member.  Any funds withheld from a distribution by reason of this <u>Section 5.2</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.

## ARTICLE 6
## <u>ALLOCATIONS</u>

6.1     <u>Allocation of Net Profits</u>.  Subject to <u>Sections 6.3 and 9.3</u>, for each Fiscal Year, Net Profits shall be allocated among the Members as follows:

(a)     First, if the Company has allocated Net Losses to the Members in any prior Fiscal Year, to the Members in a manner and amount that will offset, in reverse order of priority, such prior allocations of Net Losses (taking into account any prior Net Profits allocations under this <u>Section 6.1(a)</u>); and

(b)     Second, to the Members in proportion to their Membership Interests.

6.2     <u>Allocation of Net Losses</u>.  Subject to <u>Sections 6.3 and 9.3</u>, for each Fiscal Year, Net Losses shall be allocated among the Members as follows:

(a)     First, if the Company has allocated Net Profits to the Members in any prior Fiscal Year, to the Members in a manner and amount that will offset, in reverse order of priority, such prior allocations of Net Profits (taking into account any prior Net Losses allocations under this <u>Section 6.2(a)</u>);

(b)     Second, to the Members in proportion to their positive Capital Account balances until all such Capital Account balances have been eliminated; and

(c)     Third, to the Members in proportion to their Membership Interests.

6.3     <u>Compliance with Regulations</u>. The provisions of <u>Sections 2.2, 6.1 and 6.2</u> are intended to comply with Regulation section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation.  In furtherance of the foregoing, Section 704 of the Code and the Regulations issued thereunder, including, but not limited to, the provisions of such Regulations addressing qualified income offset provisions, minimum gain chargeback requirements and allocations of deductions attributable to nonrecourse debt and partner nonrecourse debt (as defined in Regulation section 1.704-2(b)(4)), are hereby incorporated by reference.  If, as a result of the provisions of Section 704 of the Code and such Regulations, Net Profits or Net Losses are allocated to the Members in a manner that is inconsistent with the manner in which the Members intend to allocate such items as reflected in <u>Sections 6.1 and 6.2</u>, to the extent permitted under such Regulations, items of future income, gain, deduction and loss shall be allocated among the Members so that, to the extent possible, the allocations to each Member are equal to the allocations that would have been made to such Member absent the provisions of Section 704 of the Code and such Regulations.  The Board of Managers shall be authorized to make appropriate amendments to the allocations of items pursuant to <u>Sections 6.1 and 6.2</u> if necessary in order to comply with Section 704 of the Code or applicable Regulations thereunder.

10

DocuSign Envelope ID: 88096C67-451C-46CE-A339-09B98A2EA873

6.4     Tax Allocations.  For United States federal, state and local income tax purposes, items of income, gain, loss, deduction and credit shall be allocated to the Members in accordance with the allocations of the corresponding items for Capital Account purposes under the foregoing provisions of this Article 6, except that items with respect to which there is a difference between tax and book basis will be allocated in accordance with Section 704(c) of the Code, the Regulations thereunder and Regulation section 1.704-1(b)(4)(i).

6.5     Allocations in Respect of Transferred Interest.  If, during any Fiscal Year, any Membership Interest is Transferred in compliance with the provisions of Article 8, Net Profits, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Membership Interest for such Fiscal Year shall be allocated using any permissible method under the Code, as determined by the Board of Managers.

## ARTICLE 7
## ACCOUNTING AND BANKING

7.1     Books and Records.  The Board of Managers shall keep proper and complete books of account of the Company's business, including but not limited to all records required to be maintained by the Company pursuant to the Act or any other applicable law ("Records").  The Records shall be kept at the Company's principal place of business and shall be open to inspection by any Member or such Member's authorized representative at any reasonable time during business hours.

7.2     Reports and Information to Members.  The Board of Managers shall use reasonable efforts to cause the Company to deliver to each Member, within ninety (90) days after the end of each Fiscal Year, a statement of the amount of such Member's share of the Company's taxable income or loss for such Fiscal Year and information relating to the nature thereof (including copies of IRS Schedule K-1), in sufficient detail to enable such Member to prepare its federal, state and local income tax and information returns.  If requested by a Member, the Company shall cause to be prepared, within ninety (90) days after the end of each Fiscal Year, a financial report of the Company for the Fiscal Year, which contains a balance sheet as of the last day of the year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

7.3     Bank Accounts.  The Board of Managers shall cause the Company's funds to be maintained in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of the Managers, the Members or any other Person.  The Board of Managers shall determine the institution(s) at which the accounts shall be opened and maintained, the types of accounts, and the Persons who shall have signatory authority with respect to the accounts and the funds therein.

7.4     Partnership Representative. The Members hereby appoint Warren Rogers as the "partnership representative" as provided in Section 6223(a) of the Code (the "Partnership Representative"), it being the intent of the Members that the same Person serve as a Manager and the Partnership Representative of the Company.  Accordingly, if Warren Rogers resigns or is removed as Manager, Warren Rogers shall be deemed to have resigned or to have been removed as the Partnership Representative and, if Zach Staton is still a Manager, Zach Staton shall be

automatically appointed as the Partnership Representative. If Warren Rogers and Zach Staton both are no longer a Manager, any Person who is currently a Manager or is next appointed to fill a vacancy in the position of Manager shall also be deemed to have been appointed as the Partnership Representative.

(a)     The Partnership Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by taxing authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with the Partnership Representative and to do or refrain from doing any or all things reasonably requested by the Partnership Representative with respect to the conduct of examinations by taxing authorities and any resulting proceedings. Each Member agrees that any action authorized by a Supermajority Vote of the Members and taken by the Partnership Representative in connection with audits of the Company shall be binding upon such Member and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company. The Partnership Representative shall promptly notify the Members if any tax return of the Company is audited and upon the receipt of a notice of final partnership administrative adjustment or final partnership adjustment. Without the prior authorization of a Supermajority Vote of the Members, the Partnership Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency or enter into any settlement agreement relating to items of income, gain, loss or deduction of the Company with any taxing authority.

(b)     To the extent permitted by applicable law and regulations, the Company will annually elect out of the Revised Audit Procedures pursuant to Code Section 6221(b). In the event of an audit of the Company that is subject to the Revised Audit Procedures, the Partnership Representative shall not make any elections or take any material actions that are available to be made or taken by the Company under the Revised Audit Procedures (including any election under Code Section 6226), except with the prior authorization of a Supermajority Vote of the Members. If an election under Code Section 6226(a) is made, the Company shall furnish to each Member for the year under audit a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment, and each Member shall take such adjustment into account as required under Code Section 6226(b). To the extent that the Company does not make an election under Code Section 6221(b) or Code Section 6226, the Company shall use commercially reasonable efforts to (i) make any modifications available under Code Section 6225(c)(3), (4), and (5), and (ii) if requested by a Member, provide to such Member information allowing such Member to file an amended federal income tax return, as described in Code Section 6225(c)(2), to the extent such amended return and payment of any related federal income taxes would reduce any taxes payable by the Company.

(c)     Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes and any tax deficiency imposed pursuant to Code Section 6226) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member.

## ARTICLE 8
## TRANSFER & BUY-SELL PROVISIONS

8.1     Transfer Restriction.

(a)     No Member shall have the right or ability to Transfer all or any part of its Membership Interest, except with the prior written approval of the Board of Managers.

(b)     Notwithstanding Section 8.1(a), an Interest may be Transferred by operation of law.  Any Person that acquires an Interest in the Company pursuant to the death, dissolution, adjudication of incompetence, divorce or bankruptcy of a Member shall hold such Interest as a Transferee and shall not have any rights of a Member unless admitted as a Substitute Member in accordance with Section 8.2.  The death, dissolution, adjudication of incompetence, divorce or bankruptcy of a Member shall not be an event that shall cause the dissolution of the Company.

8.2     Substitution of Members.  Any transferee of a Membership Interest may be admitted to the Company as a substitute Member ("Substitute Member") only if (a) the requirements of Section 8.1 of this Agreement are satisfied, or the Board of Managers has waived (in writing) satisfaction of such requirements, (b) the admission of such transferee as a Member is approved by a Supermajority Vote of the Members, (c) such transferee executes an amendment or joinder to this Agreement evidencing such transferee's consent to be bound by the provisions of this Agreement, and (d) such transferee pays any reasonable expenses in connection with its admission as a Substitute Member; provided, however, the admission of a Substitute Member shall not result in the release of the Member who assigned the Membership Interest from any liability that such Member may have to the Company prior to the transfer of her, his or its Membership Interest.

8.3     Transfers in Contravention of Restrictions.

(a)     Any purported Transfer of any Membership Interest in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books or otherwise be recognized by the Company, and the purported transferee in any such Transfer shall not be treated (and the purported transferor shall continue to be treated) as the owner of such Membership Interest for all purposes of this Agreement. Any Member that purports to Transfer its Interest in contravention of this Article 8 shall (i) thereafter be deemed to hold such Interest as a Transferee and shall forfeit all of the rights of a Member under the Act and this Agreement, and (ii) indemnify and hold the Company and the other Members harmless from and against any damages, losses, liabilities, claims or expenses (including the reasonable cost of investigating and defending against any such claims, including reasonable attorneys' fees) incurred by any of them as a result of such purported Transfer.

(b)     Each Member hereby acknowledges the reasonableness of the restrictions on the Transfer of Membership Interests imposed by this Agreement in view of the Company purposes and the relationship of the Members.  Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

13

8.4     Rights of Transferee.  Any Transferee of a Member's Interest that is not admitted to the Company as a Substitute Member pursuant to Section 8.2 shall be entitled only to allocations and distributions with respect to the Interest held by such Transferee in accordance with this Agreement, and to the fullest extent permitted by applicable law, shall not be entitled to (a) vote on or otherwise participate with respect to any Company matters or actions, (b) receive any information or accounting of the affairs of the Company, (c) inspect the books or records of the Company, or (d) any other rights of a Member under the Act or this Agreement; provided, however, the Interest held by such Transferee and any future Transfers thereof shall be subject to all of the provisions of this Agreement to the same extent and in the same manner as if such Transferee had been admitted as a Substitute Member.

8.5     Compliance with Securities Laws.  If requested by the Board of Managers, prior to engaging in any Transfer, the transferring Member shall deliver to the Company an opinion of counsel satisfactory to the Board of Managers stating that (a) the Transfer does not violate the Securities Act or applicable state securities laws; (b) the Transfer will not require the Company to register as an investment company under the Investment Company Act of 1940, as amended; (c) the Transfer will not require a Manager or any Affiliate to register as an investment adviser under the Investment Advisers Act of 1940, as amended; (d) the Transfer will not cause the Company to lose its status as a partnership for federal income tax purposes or cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulation Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3); (e) the Transfer will not result in the assets of the Company being deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company; (f) the Transfer will not affect the Company's existence or qualification as a limited liability company under the Act; and (g) the Transfer will not violate applicable law.

## ARTICLE 9
## DISSOLUTION AND WINDING UP

9.1     Company Dissolution.  The Company shall be dissolved only upon the decision of a Supermajority Vote of the Members to dissolve the Company, or upon the entry of a decree of judicial dissolution pursuant to the Act.  On the Company's dissolution, the Company's assets shall be liquidated and its affairs wound up by the Board of Managers.

9.2     Liquidating Distributions.  Upon the dissolution of the Company, the Board of Managers shall take full account of the Company's assets and liabilities, shall liquidate the assets of the Company as promptly as is consistent with obtaining the fair market value thereof, and shall apply and distribute the proceeds in the following order of priority:

(a)     First, to pay all outstanding debts and liabilities of the Company (to the extent that such debts and liabilities are then due);

(b)     Second, to fund a reasonable reserve for contingent liabilities of the Company; and

(c)     Third, to the Members in accordance with Section 5.1.

14

DocuSign Envelope ID: 88096C67-451C-46CE-A333-89B32A2EA873

Liquidating distributions shall be made by the end of the Company's taxable year in which the Company is liquidated, or if later, within (90) days after the date of such liquidation.  Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look solely to the assets of the Company for the return of that Member's positive Capital Account balance and shall have no recourse for such Member's Capital Contribution(s) and/or share of Net Profits (upon dissolution or otherwise) against a Manager or any other Member.

9.3     Target Final Balances.  The allocation provisions of this Agreement are intended to result in Capital Account balances upon the completion of the liquidation of the Company that are equal to zero after all amounts are distributed to the Members pursuant to this Agreement ("Target Final Balances").  To the extent that the allocation provisions of this Agreement would not produce the Target Final Balances, the Board of Managers shall make such allocations of Net Profits and Net Losses as are necessary to produce such Target Final Balances; provided, however, that (a) nothing set forth in this Section 9.3 shall be deemed to require that any Member has a "deficit restoration obligation", as defined in Treasury Regulation Section 1.704–1(b)(2)(ii)(c), and (ii) Section 9.4 shall govern in all respects.   Notwithstanding the other provisions of this Agreement, allocations of gross income and deductions shall be made prospectively in relation to a liquidation and retroactively with respect to Fiscal Years for which amended returns may still be filed as necessary to produce such Target Final Balances.

9.4     Requirements upon "Liquidation".   Notwithstanding anything set forth in this Agreement to the contrary, if the Company is "liquidated" (or if any Member's Interest in the Company is "liquidated") (as that term is defined in Treasury Regulations Section 1.704-1(b)(2)(ii)(g)) and any Member's Capital Account (or, as the case may be, the Capital Account of the Member whose Interest is "liquidated") has a deficit balance, such Member(s) shall have no obligation to contribute all or any portion of such deficit balance to the capital of the Company.

9.5     Certificate of Cancellation.  Following the dissolution of the Company, the Board of Managers shall cause a certificate of cancellation to be filed with the Delaware Secretary of State in accordance with the Act.

# ARTICLE 10
# MISCELLANEOUS

10.1     Complete Agreement.  This Agreement and the Certificate constitute the complete and exclusive agreement of the parties regarding the subject matter of this Agreement, and replace and supersede all prior written and oral agreements or statements by and among the parties hereto regarding the subject matter hereof.

10.2     Amendments.  The provisions of this Agreement may be amended, modified or supplemented at any time pursuant to a written instrument executed or otherwise approved by a Supermajority Vote of the Members.  Any such written amendment or modification will be binding upon the Company, each Manager and each Member.

10.3     Binding Effect.   Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding on, and inure to the benefit of, the parties and their

DocuSign Envelope ID: 88896C67-451C-46CE-A333-89B32A2EA873

respective heirs, personal and legal representatives, executors, administrators, successors and assigns.

10.4    Interpretation; Severability.  If any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied because this Agreement was prepared by or at the request of a particular Member or that Member's counsel.  If any provision of this Agreement or its application to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other Persons or circumstances is not affected and such provision shall be enforced to the greatest extent permitted by law.

10.5    Governing Law.  All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

10.6    Waiver of Jury Trial.  EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

10.7    Submission to Jurisdiction.  The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Company, whether in contract, tort or otherwise, shall be brought in a state or federal court of competent jurisdiction located in Atlanta, Georgia. Each of the parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Service of process, summons, notice or other document delivered by registered mail in accordance with Section 10.9 shall be effective service of process for any suit, action or other proceeding brought in any such court.

10.8    Attorneys' Fees.  If any party hereto institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the substantially prevailing party in the suit, action or proceeding shall be awarded, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action or proceeding, including reasonable attorneys' fees and expenses and court costs.

10.9    Notices.  Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, "Notice") given under this Agreement shall be in writing and shall

be served personally or delivered by first class, registered or certified, return receipt requested, U.S. mail, postage prepaid. Notices may also be given by electronic transmission (such as facsimile or email), provided a complete copy of any notice so transmitted shall also be mailed in the same manner as required for a mailed notice. Notices shall be deemed received at the earlier of actual receipt or three (3) business days following deposit in U.S. mail, postage prepaid. Notices shall be directed to the Board of Managers and the Company at the Company's principal place of business as specified in <u>Section 1.4</u> of this Agreement, and to a Member at the address shown on <u>Exhibit A</u>; provided that a Member may change such Member's address for notice by giving written Notice to the Board of Managers and all other Members in accordance with this <u>Section 10.9</u>.

10.10    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

10.11    <u>Conflict between Agreement and Act</u>. The rights, powers, duties, obligations and liabilities of the Members and Board of Managers shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member or Manager are different by reason of any provision of this Agreement than they would be under the Act in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control in all respects.

10.12    <u>Legal Representation</u>.  Each Member represents and warrants to the Company, the Board of Managers and the other Members that it has sought and obtained (or has voluntarily and knowingly decided not to seek and obtain after having ample opportunity to do so) the advice of independent legal counsel of its choice regarding all legal issues pertaining to its acquisition of an Interest in the Company including the federal income tax consequences of ownership of an Interest in the Company and the application of the securities laws to an investment in the Company.

## ARTICLE 11
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings specified below or elsewhere in this Agreement and when not so defined shall have the meanings specified in the Act:

"<u>Affiliate</u>" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), Controls, is Controlled by, or is under common Control with, such Person.

"<u>Aggregate Contribution Amount</u>" means, with respect to any Member, an amount equal to the aggregate amount of Capital Contributions made by such Member to the Company.

"<u>Available Cash Flow</u>" means the amount of cash which the Board of Managers reasonably deems available for distribution, after taking into account (a) the Company's current financial obligations, (b) anticipated Company expenditures and obligations, and (c) those amounts the

DocuSign Envelope ID: 88096C67-451C-46CE-A333-89B82A2EA873

Board of Managers deems commercially reasonable and necessary to withhold as reserves for the Company's usual and customary expenses regarding the business.

"Capital Contribution" means the amount of money and the fair market value of any property (other than money) contributed to the Company with respect to the Membership Interest held by a Member.

"Cause" means (a) the commission of any act of fraud, misappropriation, embezzlement or theft, or other act of dishonesty in connection with the business of the Company, as finally determined by a court of competent jurisdiction; (b) conviction of, or guilty plea to, any crime of moral turpitude or crime punishable as a felony that materially adversely affects the Company or its business; or (c) gross neglect of duties and responsibilities to the Company, or any breach of this Agreement, that materially adversely affects the Company or its business.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of any succeeding law).

"Control" means, when used with respect to any specified Person, the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "Controlling" and "Controlled" shall have correlative meanings.

"Covered Person" means each Member, Manager, Officer, employee, agent or representative of the Company, including the Partnership Representative.

"Deadlock" has the meaning set forth in Section 4.12(a).

"Fiscal Year" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to the Company's taxable year.

"Fundamental Issue" means any of the following matters: (a) adopting or amending the Company's business plans and budgets; (b) making a capital call or request for additional contributions to the Company; (c) entering into a consolidation, reorganization, merger or sale of substantially all of the assets of the Company or any other similar transaction; (d) acquiring an interest in another Person, firm or business $50,000; or (e) initiating or settling any litigation or arbitration proceeding involving the Company$50,000.

"Supermajority Vote" or "Supermajority Vote of the Members" means the affirmative vote, consent or approval of Members then entitled to vote whose aggregate Membership Interests are greater than sixty-six percent (66%) of the total Membership Interests of all Members then entitled to vote with respect to the matter in question.

"Manager" or "Managers" means the initial Managers named in the preamble to this Agreement, and any other Person(s) appointed as a Manager of the Company, from time to time, in accordance with the terms of this Agreement.

"Mediation" has the meaning set forth in Section 4.12(c).

18

"<u>Members</u>" shall mean, collectively, (a) those Persons identified as members on <u>Exhibit A</u> as of the Effective Date and (b) any other Person subsequently admitted as a member of the Company in accordance with this Agreement.  Any reference to a "Member" shall be to any one of the Members unless the context clearly indicates otherwise.

"<u>Membership Interest</u>" or "<u>Interest</u>" shall mean a Member's entire interest in the Company, including the Member's economic interest, the right to vote on or participate in the management of the Company (subject to the limitations of this Agreement), and the right to receive information concerning the business and affairs of the Company.  The Membership Interest of each Member shall be expressed as a percentage interest and shall be set forth on <u>Exhibit A</u>.

"<u>Net Losses</u>" shall mean, for each Fiscal Year, the losses and deductions of the Company determined in accordance with accounting principles consistently applied from year to year employed under the method of accounting selected by the Board of Managers, and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, as adjusted to comply with the Capital Account maintenance requirements of Treasury Regulations Section 1.704-1(b).

"<u>Net Profits</u>" shall mean, for each Fiscal Year, the income and gains of the Company determined in accordance with accounting principles consistently applied from year to year employed under the method of accounting selected by the Board of Managers, and as reported, separately or in the aggregate, as appropriate, on the Company's information tax return filed for federal income tax purposes, as adjusted to comply with the Capital Account maintenance requirements of Treasury Regulations Section 1.704-1(b).

"<u>Person</u>" means an individual, partnership, limited partnership, limited liability company, corporation, trust, estate, association or any other entity.

"<u>Prime Rate</u>" means the rate published from time to time in the "Money Rates" section of The Wall Street Journal or any successor publication thereto as the "prime rate" then in effect; provided, that if such rate of interest, as set forth from time to time in the "Money Rates" section of The Wall Street Journal, becomes unavailable for any reason as determined by the Board of Managers, "Prime Rate" shall mean the rate of interest announced publicly by Citibank, N.A. or any successor thereto in New York, New York, from time to time, as its "base rate" or "prime rate".

"<u>Proportionate Share</u>" means, with respect to any Member, a share equal to a fraction (expressed as a percentage), the numerator of which is such Member's Membership Interest, and the denominator of which is the aggregate of the Membership Interests of all Members included within the applicable group.

"<u>Restricted Person</u>" means (i) each Member, (ii) each Manager, (iii) each Officer, and (iv) each Affiliate of a Member, Manager or Officer.

"<u>Revised Audit Procedures</u>" means the partnership audit procedures enacted under Section 1101 of the Bipartisan Budget Act of 2015.

DocuSign Envelope ID: 88096C67-451C-46CE-A331-09B33A2EA873

"Securities Act" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"Transfer" or "Transferred" shall mean any sale, assignment, transfer, conveyance, pledge, hypothecation, or other disposition voluntarily or involuntarily, by operation of law, with or without consideration, or otherwise (including, by way of intestacy, will, gift, bankruptcy, receivership, levy, execution, charging order or other similar sale or seizure by legal process) of all or any portion of any Membership Interest.

"Transferee" means any Person that is the recipient of a Membership Interest pursuant to a Transfer made in compliance with Article 8, but that is not admitted as a Substitute Member as provided in Section 8.2.

"Treasury Regulations" means the Income Tax Regulations promulgated under the Code, as published and in force as of the date hereof, and corresponding provisions of succeeding Income Tax Regulations.

"Unreturned Contribution Amount" means, with respect to any Member, (a) such Member's Aggregate Contribution Amount, at any given point in time, *reduced by* (b) the aggregate amount of all distributions made to such Member pursuant to Section 5.1(a) as of such point in time.

Except where the context clearly requires to the contrary: (i) all references in this Agreement to designated "Section" or "Sections" are to the designated Section or Sections and other subdivisions of this Agreement; (ii) "including" means "including, without limitation"; (iii) words importing the singular number or plural number shall include the plural number and singular number respectively; (iv) words importing the neuter gender shall include the masculine and feminine genders and vice versa; and (v) references to "or" shall be deemed to be disjunctive but not necessarily exclusive (i.e., unless the context dictates otherwise, "or" shall be interpreted to mean "and/or" rather than "either/or").

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement to be effective as of the Effective Date.

**MANAGERS:**

_____
Warren Rogers

_____
Zach Staton

**MEMBERS:**

_____
Warren Rogers

_____
Zach Staton

OPERATING AGREEMENT OF COMPLETE CREMATION CARE LLC
SIGNATURE PAGE

# EXHIBIT A

## Member Information

| Member (Name\Address) | Percentage of Membership Interest |
|---|---|
| 1. Warren Rogers<br>3571 Far West Blvd #3189<br>Austin, TX, 78731<br>Email: warren.david.rogers@gmail.com | 50% |
| 2. Zach Staton<br>3368 Hibernia Pass<br>Lexington, KY 40509 | 50% |
| **TOTAL:** | **100.00%** |

**EXHIBIT 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| WARREN D. ROGERS, an individual | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. |
| ZACHARY A. STATON, an individual, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## Affidavit of Trenton L. Walton

I, Trenton L. Walton state and declare as follows:

1.      I am over the age of 18 and am competent to testify about the matters contained herein.

2.      I am a Certified Computer Forensic Examiner (CCE), #684 Certified Cyber Crime Investigator (CCCE), #341, and Licensed Private Investigator #PI1.0000371 at Forensic Discovery, and I have personal knowledge of the matters attested to herein.

3.      I am the president of Forensic Discovery, LLC.  Prior to founding Forensic Discovery, I served as both the Chief Technology Officer and National Director of Legal Technology for U.S. Legal Support, advising corporations and law firms regarding projects ranging from comprehensive, large-scale data preservation and internal investigations to customized technological solutions.  I have in-depth expertise in performing digital forensic investigations on computers and cloud systems regarding computer user activity, data exfiltration and other behaviors.

4.     I was the co-founder and president of Cumulus Data, Inc., with its flagship product eCloudCollect™ which was acquired in August 2014 by ZApproved (Seattle, WA).  I built a system that allowed for the forensic remote cloud-based acquisitions from email servers.  The software product was also able to perform targeted remote forensic collections from Windows computers.

5.     I'm a past member of the Sedona Conference Working Group on Electronic Document Retention and Production (WG1) and previously assisted in developing the Sedona Cloud Computing recommendations.

6.     I am a Certified Computer Forensic Examiner (CCE)® #684 from the International Society of Forensic Computer Examiners. I am a Certified Cyber Crime Investigator (CCCE), #341 from the National White Collar Crime Center. I have also received past certifications as a Certified AccessData Examiner (ACE)®, with an additional specialized certification in Windows Forensics by AccessData. In addition, I have received other certifications in the field of eDiscovery platforms and processes.

7.     I am an accomplished speaker who has given more than 300 continuing education seminars for both attorneys and insurance claims professionals over the past 15 years.

8.     I hold a Bachelor of Science in Computer Information Sciences and a Bachelor of Business Administration in Entrepreneurial Management from Texas Christian University.

9.     I was retained by Moye White LLP to conduct a digital forensics investigation on Google workspace associated with the domain www.carbon-reclamation.com.

10.    I am being paid $300 per hour for my activities in connection with this report.  This compensation is not contingent on the nature of my findings or the outcome of this proceeding.

11.    On 05/03/2023 I was provided access to the Google workspace carbon-reclamation.com,  VIA user  warren@carbon-reclamation.com.  From what I understand, this domain was used for the business Complete Cremation Care LLC. I was able to capture some of the Google domain system logs for a preliminary analysis.

12.     After performing my preliminary investigation, I identified activity associated with data theft and destruction by the users zach@carbon-reclamation.com, stevin@carbon-reclamation.com, sammy@carbon-reclamation.com, and sammy@3crownservices.com. I was instructed by the attorney Mr. Pittinos and his client, Mr. Rogers, to perform a full preservation of the documents and activity in the domain carbon-reclamation.com.

13.     On 05/11/2023 I started a Google Vault Data Export of the carbon-reclamation.com to properly preserve the data and activity in the domain. It typically takes up to twenty-four hours for this export process to complete. Within a few hours after I started the preservation, I was notified that the user I used, warren@carbon-reclamation.com, had its access revoked and was possibly deleted.

14.     During my examination of the initial logs that were collected, I was able to determine there was activity consistent with data theft and data destruction on the Google Drive associated with the Google workspace for carbon-reclamation.com.

15.     Such theft and destruction falls within several general categories:

**A.     Summary of Activity**

a.  I was informed that the content from the presentation document titled "Titan" or "Titan Copy" that belonged to the domain carbon-reclamation.com was used to generate the "Triple Crown Construction Services" brochure that is currently shown on Triple Crown Construction Services LinkedIn page, https://www.linkedin.com/company/triple-crown-construction-services/.

i.  The presentation document "Titan" was downloaded by user sammy@carbon-reclamation.com on the following dates and times:

1.  02/15/2023 2:34 PM (-07:00)

2.  02/15/2023 3:07 PM (-07:00)

3.  02/21/2023 9:38 AM (-07:00)

    ii. On 02/23/2023 1:03 PM (-07:00) user sammy@carbon-reclamation.com made a copy of the "Titan" document.

    iii. On 05/03/2023 during my examination I attempted to access the "Titan" document through user warren@carbon-reclamation.com using the document id "1JJ6eaEgPZsjjbWkBiXOR7M80JSkoG-yEermgonganRY" and was able to confirm that Mr. Rogers no longer had access to the document and that the user sammy@carbon-reclamation.com was the assigned owner.

b. Key organizational folders belonging to the domain carbon-reclamation.com were viewed and/or downloaded between 3/25/2023 and 3/30/2023. The folders included "Purchase Orders", "PO - CCC', "Flanner", "SOWs", "Flanner Buchanan", "CCC", and "CCC-Todo's Notes".

    i. On 03/25/2023 8:11 PM (-06:00) the user sammy@carbon-reclamation.com viewed the folder "Purchase Orders" then made a copy of the folder to "Copy of Purchase Orders". This folder was then shared with the user sammy@3crownservices.com which is out of the organization.

    ii. On 03/27/2023 10:53 AM (-06:00) the user sammy@carbon-reclamation.com viewed the folders "PO - CCC', "Flanner", "SOWs", "Flanner Buchanan", and "CCC".

    iii. On 03/30/2023 11:41 AM (-06:00) the user stevin@carbon-reclamation.com viewed and downloaded the folder "CCC-Todo's Notes". This user was then deleted by the user zach@carbon-reclamation.com the following day.

c. Users and documents belonging to carbon-reclamation.com were deleted.

    i. On 03/31/2023 10:00 AM (-06:00) the user zach@carbon-reclamation.com deleted the users stevin@carbon-reclamation.com, james@carbon-reclamation.com,

randy@carbon-reclamation.com,      and      sammy@carbon-reclamation.com.

B.    **Recommendations**

a.  For the court to take into account that because of the actions taken by the user zach@carbon-reclamation.com in late March 2023 and because of actions taken on May 11, 2023, the vast majority of logs and documents related to the data theft and destruction may be destroyed.

b.  That Mr. Staton is instructed to provide me full Google Apps admin access to the domain carbon-reclamation.com so I can perform a proper preservation and complete my investigation.

c.  That I be provided full Google Apps admin access to the domain 3crownservices.com in order for me to preserve and investigate the activity and data within this domain. During this investigation I would like to determine if there is any intellectual property belonging to carbon-reclamation.com within their storage.

I declare under penalty of perjury that the foregoing Affidavit is true and correct to the best of my present knowledge.

**FURTHER AFFIANT SAYETH NAUGHT.**

Trenton L. Walton
Certified Computer Forensic Examiner (CCE), #684 Certified Cyber Crime Investigator (CCCE), #341, and Licensed Private Investigator #PI1.0000371, Forensic Discovery

STATE OF COLORADO                    )
                                     )      ss.
COUNTY OF Denver                     )

     The foregoing was subscribed and sworn before me this 25 th day of May, 2023, by Trenton L. Walton.

     My commission expires _04/28/2025_____.

     Witness my hand and official seal.

     [SEAL]

                                    Notary

JOHN DUMABOK
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20054009830
MY COMMISSION EXPIRES 04/28/2025