IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| KIMBERLY HALL-COSTLEY, | Civil Action No. |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| NORTHSIDE HOSPITAL, INC., | |
| Defendant. | |

## **COMPLAINT**

COMES NOW the Plaintiff, Kimberly Hall-Costley (hereinafter "Hall-Costley"), and files this Complaint to be answered by the Defendant Northside Hospital, Inc. (hereinafter "Northside") pursuant to the Federal Rules of Civil Procedure.

## I.       **JURISDICTION AND VENUE**

1.       The jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1331 (Federal question), and 28 U.S.C. 1343(3) (depravation of constitutional or Federal statutory right), 29 U.S.C. §216(b) (damages, right of action, attorney's fees, costs), and 29 U.S.C. §217 (injunction proceedings).

2.     Venue is proper pursuant to 28 U.S.C. 1391 (all parties are located within the Northern District of Georgia, Atlanta Division).

3.     This is a suit authorized and instituted pursuant to Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended, including the Civil Rights Act of 1991 codified as 42 U.S.C. 2000(e)*et. sq.* as amended, and/or 42 U.S.C. 1981*,* providing for relief against racial discrimination and retaliation.

## II.     PARTIES

4.     Plaintiff, Hall-Costley, is over the age of nineteen, is a citizen of the United States, and is a resident of Fulton County, Georgia, which is located in the Northern District of Georgia, Atlanta Division.

5.     Defendant, Northside operates its business in Fulton County, Georgia, which is located in the Northern District of Georgia, Atlanta Division.

6.     Defendant, Northside has in excess of 15 employees at all times material to the Complaint.

## III.     ADMINISTRATIVE PROCEDURES

7.     On September 9, 2022, Hall-Costley filed her EEOC Charge alleging race/color discrimination, and retaliation.

8.    On or about March 8, 2023, Hall-Costley received her Right to Sue Letter.

9.    Hall-Costley timely files this lawsuit within 90 days of receipt of her right to sue.

## IV.    STATEMENT OF FACTS

10.    Northside is a healthcare system that, among other things, manages physician's medical practices and operates five hospitals.

11.    Hall-Costley is white.

12.    At all times material to the complaint, Hall-Costley worked for Northside as a Nurse Clinical Manager in the Labor and Delivery Department (L&D) within Northside's Women's Services Division.

13.    L&D had three managers: Hall-Costley (white), Kathy Miles (white) and Cindy Miles (black).

14.    Hall-Costley's and Cindy Miles' direct supervisor was Kathy Miles, Nurse Operations Manager in L&D.

15.    Kathy Miles reported directly to Melissa Sisson, Director of the Women's Services Division.

16.   In 2021, Northside recognized L&D had been experiencing significantly high turn-over, high vacancy, a heavy reliance on premium pay, and low employee satisfaction and engagement.

17.   Northside received complaints from the staff (through two primary spokespeople) stating they felt underappreciated, underpaid, and that their voice was not heard.

18.   As a result of these complaints, Northside Human Resources held focus groups to look into the issues of overuse of overtime, high turnover, and low morale.

19.   One primary concern was staffing and their schedules, as the staff had been complaining about their schedules and the unfairness shown by the scheduler, Janese Hardrick for the past year.

20.   Janese Hardrick was responsible for scheduling.

21.   Janese Hardrick reported to Kathy Miles.

22.   Staff complained Janese Hardrick was unfair with scheduling and showed favoritism.

23.   Janese Hardrick spoke to staff unprofessionally.

24.   Kathy Miles did nothing to make the relationship between Janese Hardrick and staff more favorable.

25.     The staff wanted Janese Hardrick removed from her position.

26.     Different leadership members went to Kathy Miles and Melissa Sisson various times to discuss how the removal of Janese Hardrick would be a morale booster for staff and would stop staff from leaving the unit.

27.     Kathy Miles and Melissa Sisson pushed back, and Janese Hardrick was not removed from that position.

28.     Many staff members left due to changing schedules.

29.     The second concern was that Kathy Miles was not available to the staff.

30.     Kathy Miles was the top boss in Labor and Delivery.

31.     Kathy Miles did not work her hours, and this angered the staff for years.

32.     The staff wanted Kathy Miles to be accountable to the unit.

33.     Melissa Sisson, Director, Kathy Miles' boss, was aware of this ongoing complaint.

34.     As a result of this ongoing complaint, Melissa Sisson changed Kathy Miles' hours to 6:00 a.m. to 2:00 p.m., five days a week, to accommodate her schedule.

35.     Kathy Miles maintained this schedule for a couple of months, then reverted back to her old hours of: 8:00 or 9:00 a.m to 1:00 or 2:00 p.m.

36.     Staff knew that Kathy Miles would leave on certain Fridays to go get her hair colored.

37.     The staff remained angry at Kathy Miles for failing to work her hours and be accountable to the unit.

38.     Another concern was that staff wanted the three managers, including Hall-Costley, to be more visible on the unit.

39.     Staff wanted a clinical manager on night shift.

40.     Staff wanted more pay.

41.     Staff wanted better communication from leadership to the staff.

42.     The focus group concluded Kathy Miles did not avail herself to the staff, Kathy Miles didn't work her hours as scheduled, Kathy Miles needed to communicate better with the staff, there needed to be a clinical manager on night shift, and the employees sought higher pay.

43.     Nothing in the investigation implicated Hall-Costley except that she needed to be more visible to the unit.

44.     By June, 2021, Northside had already implemented a plan in place to alleviate the concerns which included a strategy for more manager visibility.

45.    Nine months later, in March, 2022, a nurse, Lorin Atkinson (white), was giving report to a travel nurse, Tyasia Winguard (black), over the phone.

46.    Atkinson attempted to pronounce a Malaysian patient's last name but did so incorrectly.

47.    Winguard, the nurse to whom the report was being given, felt Atkinson used a racial slur (the n-word) when she stated the patient's name.

48.    On or about March 8, 2022, Atkinson self-reported the incident to Hall-Costley in tears as she was upset it appeared she had used a racial slur when she was just trying to pronounce the unusual name. She admitted she nervously laughed when it happened.

49.    Hall-Costley counseled Atkinson she needed to be mindful of how that could be interpreted by the nurse she was giving the report to as well as anyone overhearing her conversation in the care team. Hall-Costley told Atkinson if she found herself in that situation again, she should just spell the name.

50.    Hall-Costley determined there was no discriminatory intent.

51.    Winguard complained to Katrina Peak (black), a manager in Family Centered Care, and the matter was escalated to Human Resources and the Director of Women's Services.

52.    Winguard never complained to Hall-Costley directly.

53.     Hall-Costley received a text from Katrina Peak, Clinical Manager for FCC, that one of the nurses came to her crying, stating it was a race issue, someone used the n-word then laughed, and she did not know how to handle it.

54.     Hall-Costley immediately called Katrina Peak and explained she was aware of the conversation. Hall-Costley supported Atkinson explaining what happened, stating she did not mean to offend the nurse or use the name as a joke, and explained it was a simple mispronunciation of a name.

55.     After the conversation with Katrina Peak, Hall-Costley suggested to Atkinson that she apologize to Winguard to which Atkinson agreed.

56.     On or about March 9, 2022, Kathy Miles and Melissa Sisson asked Hall-Costley to document the incident and send it to HR. Hall-Costley did that and showed same to Melissa Sisson before submitting. Sisson told Hall-Costley that she might want to reword some of the documentation as Hall-Costley brought the fact that Katrina Peak brought race to the forefront of the discussion escalating the incident which was determined to be race-neutral. Hall-Costley did not rewrite the document and submitted it to HR.

57.     Hall-Costley did not think it would be fair for someone to be terminated for the honest mispronunciation of a name so she described her

conversation with Atkinson to HR, and explained she determined it was an honest mispronunciation of a name--not a racial slur.

58.    On or about March 24, 2022, Bridget Green (black), a decision maker and Vice President in HR, told Hall-Costley that the n-word should never come out of a white person's mouth, that it was "equivalent to committing a crime, like murder and now all that is left is to figure out the punishment." Melissa Sisson, Director was in attendance at this meeting.

59.    Hall-Costley stated Atkinson did not state the n-word, she mispronounced the unusual name, but Green refused to accept the explanation.

60.    Instead of de-escalating the situation, Green became hostile toward Hall-Costley, and escalated the matter telling Hall-Costley "*someone's* got to pay for this".

61.    Bridgett Green told Hall-Costley that she would be the mediator between Hall-Costley and Katrina Peak due to the fact they had differing opinions on the incident. Peak had inferred Hall-Costley was a racist, but they still had to work together.

62.    Hall-Costley told Kathy Miles and Cindy Miles that Bridget Green (black) VP of HR, told her the n-word should never come out of a white person's mouth, and that it was equivalent to committing a crime like murder and now all

that is left is to figure out the punishment; and finally, Katrina Peak had accused her of being a racist. Hall-Costley told them she felt threatened by this statement and was fearful for her job.

63.    HR continued its investigation into the allegations against Atkinson.

64.    After Hall-Costley's conversation with Green, the VP of HR, HR began investigating Hall-Costley.

65.    On May 25, 2022, Human Resources cleared Atkinson of any discrimination--which backed up the conclusions Hall-Costley already made.

66.    Also, in May, 2022, Hall-Costley was accused of not handling a second race-based incident that occurred back in February, 2022, correctly.

67.    On or about February 3, 2022, Jennifer Hogan (white), Clinical Supervisor, Night Shift, notified Hall-Costley that another employee, Katherine Anderson (white), made inappropriate comments about white men's body parts, showed photographs of herself to co-workers, and stated she would be a better fit for taking care of black patients because she had a biracial child.

68.    Hogan texted Hall-Costley on February 3, 2022, to make her aware she had already reported Katherine Anderson's comments to Kim Walker in Employee Relations on January 21, 2022.

69.     Northside Hospital's Workplace Violence and Bullying policy which clearly states "supervisors are encouraged to contact Human Resources/Employee Relations."

70.     Hall-Costley reached out to Kim Walker the next day to coordinate the investigation and discuss the allegations of Hogan. Kim Walker reported she was already reviewing the incident. Hall-Costley scheduled a call with Kim Walker, but she did not accept the call.

71.     When a white supervisor writes up a black employee, they are told to be quiet, to retract the write up, and simply place a note in the employee's file which is in violation of company policy.

72.     For example, Kathy Sanford, (black) Clinical supervisor, came at Rhonda Singletary (white), Clinical supervisor, for an incident that occurred on the floor.

73.     Kathy Sanford cussed and threatened Rhonda Singletary.

74.     Rhonda Singletary wrote up the incident and submitted it to Hall-Costley, Kathy Miles and Melissa Sisson.

75.     Kathy Miles and Melissa Sisson investigated the incident themselves excluding Hall-Costley from the investigation.

76.    Kathy Miles and Melissa Sisson excluded Hall-Costley because they knew Hall-Costley would recommend termination of Kathy Sanford as this was not her first incident.

77.    A member of leadership should never threaten or cuss at any employee.

78.    Upon completion of their investigation, it was forwarded to HR (all black) which in turn counseled, Rhonda Singletary, the victim, stating she had a part in it as well, and told her she needed to communicate better.

79.    Rhonda Singletary received a verbal warning for being the victim.

80.    Kathy Sanford received a written warning for the incident when she should have been terminated for the incident.

81.    Approximately, two months later, Kathy Sanford threatened another white employee, which also did not result in her termination.

82.    Hall-Costley complained to Kathy Miles about the difference in Singleton's and Sanford's treatment and the fact she should have been terminated, not protected.

83.    In May and June, 2022, approximately once a week, Hall-Costley asked Kathy Miles when she would have the meeting with Katrina Peak and Bridget Green. During these conversations, Hall-Costley would reiterate the fact

Bridget Green threatened her that "*someone* was going to have to pay", that a white person should not use the n-word and same made her feel uncomfortable.

84.    On July 8, 2022, less than three (3) weeks of the conclusion of the investigation into the Atkinson Incident of which Hall-Costley participated in, and within weeks of the conversations with Kathy Miles, Cindy Miles and Melissa Sisson, Hall-Costley was terminated.

85.    Hall-Costley was shocked as her termination was out of the blue and not expected.

86.    Hall-Costley was told the reason for her termination was "the organization is moving in a different direction and you are no longer a good fit".

87.    On August 5, 2022, the Defendant announced in the Friday update Hall-Costley "had chosen a different path" which was false.

88.    In November, 2022, Toni Anderson was hired to replace Hall-Costley as Clinical Manager of Labor and Delivery.

89.    In November, 2022, Northside told the EEOC the focus groups determined Hall Costley was the weakest in leadership, which was false. The plan to address the only employee concern as to Hall-Costley for more visibility, had already been implemented back in June, 2021, and most of the focus group's determinations dealt with correcting Kathy Miles' actions.

90.     To the EEOC, Northside claimed Hall-Costley did not directly address the Atkinson incident when, in fact, she directly addressed the situation when it occurred.

91.     In November, 2022, Northside told unemployment Hall-Costley was laid off because "there was no work" which is false and is a completely different reason than "going in a different direction", Hall-Costley "had chosen a different path" or that the focus groups found Hall-Costley to be the weakest leader.

92.     Within the same Friday update listed above, the Defendant stated they were experiencing a "great amount of growth" establishing the statement made to unemployment is false.

93.     Within the same Friday update listed above, the Defendant discussed "the new" hires, thereby establishing the statement made to unemployment is false.

94.     There were three black Human Resources employees who handled the complaints and the termination of Hall-Costley.

95.     Northside would not initially return Hall-Costley's belongings to her.

96.     HR never returned Hall-Costley's phone calls or emails.

97.     Hall-Costley was forced to enlist the help of a co-worker, Jennifer Bargeron to meet her outside with her personal belongings.

98.    Hall-Costley finally got her personal belongings out of her office on August 14, 2022.

99.    In October, 2022, Kathy Miles was promoted to Women's Services Operation and Project Manager.

100.   In December, 2022, Melissa Sisson Director retired as the Director of Women's Services, however, she was brought back as a consultant in January, 2023.

101.   All of Hall-Costley's evaluations were exemplary while working at Northside.

## V.  CLAIMS

### COUNT 1-RETALIATION

102.   Hall-Costley engaged in the following protected activities:

a)      Hall-Costley participated in the investigation of the Atkinson's alleged use of a racial-slur on or about March 9, 2022, wherein she determined Atkinson mispronounced an unusual name and did not make a racial slur or joke;

b)      Hall-Costley refused to retract the language in her March 9, 2022, statement accusing Katrina Peak of bringing race to the forefront and escalating the Atkinson matter;

c)      Hall-Costley told Bridgette Green that Atkinson did not use a racial slur, that she mispronounced an unusual name on or about March 24, 2022;

d)      Hall-Costley told Kathy Miles and Cindy Miles on or about March 24, 2022, that Bridget Green (black) VP of HR, told her the n-word should never come out of a white person's mouth, that it was equivalent to committing a crime like murder and now all that is left is to figure out the punishment; and finally, Katrina Peak accused her of being a racist. Hall-Costley told them she felt threatened by this statement and was fearful for her job; and

e)      Hall-Costley had multiple conversations in late May and June, 2022, with Kathy Miles questioning when the mediation between herself and Katrina Peak would take place, stating she felt threatened by Bridgette Green telling her "someone was going to pay" for mispronouncing the name, that a white person should not use the n-word, and those threatening conversations made her feel uncomfortable.

103.   Hall-Costley suffered the following adverse actions:

a) Bridgette Green became visibly hostile toward Hall-Costley threatening her, with the statement, "someone was going to pay for this";

b) When HR began investigating Hall-Costley after she told Bridgette Green Atkinson did not use a racial slur, that she mispronounced an unusual name;

c) When Hall-Costley was accused of mishandling the Hogan incident when Hall-Costley attempted to handle it upon notification of the incident and it was Employee Relations who did not coordinate efforts with Hall-Costley;

d) When Hall-Costley was terminated; and

e) When HR refused to return Hall-Costley's emails and phone calls requesting her personal belongings.

104. Hall-Costley has established causation and pretext because of and including, but not limited to, the following:

a) each of the adverse actions occurred within close temporal proximity of the protected activities;

b) the decision-makers were each black;

c) one decision-maker specifically told Hall-Costley that

"someone would have to pay" for the alleged racial slur;

d)    The Defendant stated the focus group found Hall-Costley the "weakest in leadership" which was false, as it mostly addressed many of Kathy Miles actions;

e)    Hall-Costley was accused of inappropriately handling the Atkinson matter which was false, as HR came to the same conclusion as Hall-Costley–that Atkinson did not engage in racial discrimination;

f)    Hall-Costley was accused of not handling the Hogan matter directly with Employee Relations which was false, as Hall-Costley directly reported it to Employee Relations and attempted to work with them yet it was Employee Relations who would not work with Hall-Costley;

g)    The Defendant claimed there was "no work for Hall-Costley", which was false, as they were experiencing growth and hiring;

h)    The Defendant claimed Hall-Costley "had chosen a different path" which was false, as Hall-Costley did not make any choices to leave and was totally surprised by her termination; and

i)  The reasons for her termination and other adverse actions changed over time depending on who the Defendant was speaking with.

105.  Hall-Costley has established a convincing mosaic of circumstantial evidence that retaliation occurred as stated in paragraphs 102-104 above.

106.  As a proximate cause and cause in fact of said retaliation, the Plaintiff was caused to suffer the following injuries and damages: lost wages (front and back pay with interest); lost benefits; compensatory damages, including, but not limited to: damage to career, shame, humiliation, embarrassment, stress, anxiety, anger, helplessness, sadness, emotional distress, pain, suffering, fear of inability to care for her family and out of pocket expenses.

## COUNT 2- RACE/COLOR DISCRIMINATION- DISPARATE TREATMENT

107.  Hall-Costley is a member of a protected class as she is white.

108.  Hall-Costley was qualified for her position as she had already been performing the position.

109.  Hall-Costley was accused of inappropriately handling the Atkinson and Hogan incidents supporting racist behavior which was false.

110.  Hall-Costley engaged in the conduct reporting incidents accurately and factually, and in a timely fashion, which is not a violation of any work rule.

111.   Hall Costley was terminated from her employment.

112.   The stated reasons for termination were pretext because, including, but not limited to:

    a)    The Defendant stated the focus group found Hall-Costley the "weakest in leadership" which was false, as it mostly addressed many of Kathy Miles' actions;

    b)    Hall-Costley was accused of inappropriately handling the Atkinson matter which was false, as HR came to the same conclusion as Hall-Costley–that Atkinson did not engage in racial discrimination;

    c)    Hall-Costley was accused of not handling the Hogan matter directly with Employee Relations which was false, as Hall-Costley attempted to work with Employee Relations who would not work with Hall-Costley;

    d)    The Defendant claimed there was "no work for Hall-Costley", which was false, as they were experiencing growth and hiring;

    e)    The Defendant claimed Hall-Costley "had chosen a different path" which was false, as Hall-Costley did not make any choices to leave and was totally surprised by her termination;

and

f)      The reasons for her termination and other adverse actions changed over time depending on who the Defendant was speaking with.

113.   Kathy Sanford (black) engaged in far worse conduct of cursing and threatening multiple employees, yet she was simply given a written warning.

114.   Hall-Costley has established a convincing mosaic of circumstantial evidence that intentional discrimination occurred as stated in paragraphs 107-113 above.

115.   As a proximate cause and cause in fact of the unlawful and discriminatory treatment, Costley was caused to suffer the following injuries and damages: termination from her position, lost wages (front and back pay with interest); lost benefits; compensatory damages, including, but not limited to: damage to career, shame, humiliation, embarrassment, stress, anxiety, anger, helplessness, sadness, emotional distress, pain, suffering, fear of inability to care for her family, and out of pocket expenses.

## COUNT 3- RACE DISCRIMINATION-
## DISCRIMINATORY DISCHARGE

116.   Hall-Costley is a member of a protected class as she is white.

117.   Hall-Costley was terminated which is an adverse action:

118.  Hall-Costley was terminated because she is white.

119.  The stated reasons for termination were pretext because, including, but not limited to:

a)  The Defendant stated the focus group found Hall-Costley the "weakest in leadership" which was false, as it mostly addressed many of Kathy Miles actions;

b)  Hall-Costley was accused of inappropriately handling the Atkinson matter which was false, as HR came to the same conclusion as Hall-Costley–that Atkinson did not engage in racial discrimination;

c)  Hall-Costley was accused of not handling the Hogan matter directly with Employee Relations which was false, as Hall-Costley attempted to work with Employee Relations, yet it was Employee Relations who would not work with Hall-Costley;

d)  The Defendant claimed there was "no work for Hall-Costley", which was false, as they were experiencing growth and hiring;

e)  The Defendant claimed Hall-Costley "had chosen a different path" which was false, as Hall-Costley did not make any choices to leave and was totally surprised by her termination;

and

f)      The reasons for her termination and other adverse actions changed over time depending on who the Defendant was speaking with.

120.  Hall-Costley has established a convincing mosaic of circumstantial evidence that discriminatory discharge occurred as stated in paragraphs 116-119 above.

121.  As a proximate cause and cause in fact of the unlawful and discriminatory discharge, Hall-Costley was caused to suffer the following injuries and damages: termination from her position, lost wages (front and back pay with interest); lost benefits; compensatory damages, including, but not limited to: damage to career, shame, humiliation, embarrassment, stress, anxiety, anger, sadness, helplessness, emotional distress, pain, suffering, fear of inability to care for her family, and out of pocket expenses.

## VI.    DAMAGES

122.    The Plaintiff was caused to suffer lost wages (front and back pay with interest), lost benefits, compensatory damages including, but not limited to damage to career, damage to reputation, shame, humiliation, embarrassment, stress, anxiety, anger, fear, helplessness, sadness, emotional distress, pain,

suffering, fear of inability to care for her family and out of pocket expenses.

123.     Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant's unlawful policies and practices set forth herein unless enjoined by this Court.

124.     The Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and this suit for back pay and  front pay (with interest), compensatory damages, punitive damages, attorney' fees, expenses, costs, injunctive relief, and declaratory judgment is his only means of securing adequate relief.

## VII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, the plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1.     Enter an Order requiring the defendant to make the plaintiff whole by awarding her reinstatement, lost wages (front and back plus interest), compensatory and punitive damages, out of pocket expenses, loss of benefits, including medical, retirement, pension, seniority, and other benefits of employment.

2.     The Plaintiff further prays for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorney's fees and expenses.

**THE PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY.**

Respectfully submitted this 2nd day of June, 2023,

**BARRETT & FARAHANY**

s/*Amanda A. Farahany*
Amanda Farahany
Georgia Bar No. 646135

P.O. Box 530092
Atlanta, GA 30343
(404) 214-0120
amanda@justiceatwork.com

s/ *Patricia A. Gill*
Patricia A. Gill[1]
ASB-0780-I66P

BARRETT & FARAHANY
2 20th Street North, Suite 900
Birmingham, AL 35203
Phone: 205-564-9005
Direct: 205-390-1953
Email: trish@justiceatwork.com

*Attorneys for Plaintiff*

---

[1] Application for Pro Hac Vice will be forthcoming with the court.