# EXHIBIT

# A

CIVIL ACTION NO. 23-C-02926-S

**[ ] MAGISTRATE [X] STATE [ ] SUPERIOR - COURT GWINNETT COUNTY, GEORGIA**

DATE FILED 5/3/2023

ATTORNEY OR PLAINTIFF(s), ADDRESS & TELEPHONE NUMBER

STATESBORO ERECTORS, INC.

Wesley C. Taulbee, Esq.

Clay Taulbee Myers, LLC

201 S Main St., Ste. C

Statesboro, Georgia 30458

**PLAINTIFF(S)**
VS.
AUTO-OWNERS INSURANCE COMPANY

OWNERS INSURANCE COMPANY

NAME, ADDRESS & TELEPHONE # OF PARTY TO BE SERVED

**DEFENDANT(S)**

Owners Insurance Company

c/o Registered Agent, CT Corporation System

289 South Culver Street

**GARNISHEE**

Lawrenceville, Georgia 30046

Other attached documents to be served: Summons, Gen. Civil

Info. Form, Complaint and Plaintiff's First Discovery

## SHERIFF'S ENTRY OF SERVICE
I HAVE THIS DAY SERVED THE WITHIN ACTION AND SUMMONS AS FOLLOWS:

**[ ] PERSONAL** Upon the following named defendant: _____

**[ ] NOTORIOUS** Upon defendant _____
By leaving a copy of the action and summons at the most notorious place of abode in the county.

Delivered the same to_____ described as follows: approximate age
yrs; approximate weight_____pounds; approximate height_____feet and _____inches, domiciled at residence of the defendant.

**[ ] CORPORATION** Upon corporation OWNERS INSURANCE COMPANY _____

By serving _____, in charge of the office and
place of business of the corporation in this county.

By serving CT CORPORATION SYSTEM _____, its registered agent.

**[ ] TACK & MAIL** By posting a copy of the same to the door of the premises designated in the affidavit and/or summons, and on the same day of such posting, by depositing a true copy of the same in the United States mail First Class mail, in an envelope properly addressed to the defendant(s) at the address shown in the summons, containing adequate notice to the defendant(s) to answer said summons at the place stated in the summons.

**[ ] NON EST** Did not serve because after a diligent search the defendant could not be found in the jurisdiction of the court.

_____

_____

This _____ day of ___N_._____, 20__.

SHERIFF DOCKET_____ PAGE_____          _____
                                                              DEPUTY

TIME: _____ ___. M.

CLERK OF STATE COURT
GWINNETT COUNTY, GEORGI
**23-C-02926-S**
5/3/2023 12:47 PI
TIANA P. GARNER, CLER

## IN THE STATE COURT OF GWINNETT COUNTY

### STATE OF GEORGIA

**STATESBORO ERECTOR INC.,**

_____

PLAINTIFF

CIVIL ACTION
NUMBER: 23-C-02926-S5

VS.

**AUTO-OWNERS INS. CO.,**

**OWNERS INSURANCE CO.,**

_____

DEFENDANT

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**  Owners Insurance  Co.

   You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Wesley C. Taulbee, Esq.
Clay Taulbee Myers, LLC
201 S. Main St., Ste. C
Statesboro, GA 30458

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This _____ day of _____, 20_____.

3rd day of May, 2023

Tiana P. Garner
Clerk of State Court

By_____
                      Deputy Clerk

**INSTRUCTIONS:** Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

E-FILED IN OFFICE - CB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-02926**

**5/2/2023 10:54 AM**
TIANA P. GARNER, CLERK

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| STATESBORO ERECTORS, INC., | § § § | |
| Plaintiff, | § § | 23-C-02926 |
| v. | § § | Civil Action No. |
| AUTO-OWNERS INSURANCE COMPANY and OWNERS INSURANCE COMPANY, | § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § | |

## **COMPLAINT**

COMES NOW, Statesboro Erectors, Inc., Plaintiff herein ("Plaintiff" or "Statesboro"), and hereby files this action against Auto-Owners Insurance Company and Owners Insurance Company, respectfully showing the Court as follows:

### **Parties, Jurisdiction, and Venue**

1.

Plaintiff is a resident of the State of Georgia.

2.

Defendant Auto-Owners Insurance Company ("Auto-Owners") is a foreign insurance company authorized to transact business in the State of Georgia, with its principal office located at 6101 Anacapri Boulevard, Lansing, Michigan 48917. Auto-Owners and its sister company Owners Insurance Company issued a commercial general liability policy to Plaintiff. Auto-Owners and its officers, agents and employees are subject to the jurisdiction and venue of this Court because the tort, wrong, or injury occurred in Georgia and its registered agent is in Gwinnett County.

1

3.

Service can be made on Auto-Owners by serving its registered agent, CT Corporation System, located at 289 South Culver Street, Lawrenceville, Georgia 30046.

4.

Defendant Owners Insurance Company ("Owners") is a foreign insurance company authorized to transact business in the State of Georgia, with its principal office located at 6101 Anacapri Boulevard, Lansing, Michigan 48917. Owners and its sister company Auto-Owners issued a commercial general liability policy to Plaintiff. Owners and its officers, agents and employees are subject to the jurisdiction and venue of this Court because the tort, wrong, or injury occurred in Georgia and its registered agent is in Gwinnett County.

5.

Service can be made on Owners by serving its registered agent, CT Corporation System, located at 289 South Culver Street, Lawrenceville, Georgia 30046.

6.

Jurisdiction and venue are proper in this Court.

**Background Facts**

7.

On or around May 6, 2021, King Steel, Inc ("King Steel"), a subcontractor, entered into a subcontract (the "Subcontract") with Plaintiff as a subcontractor for certain construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia (the "Project"). *See* Subcontract between King Steel and Statesboro Erectors, Inc. (May 6, 2021), attached as Exhibit A.

2

8.

The Subcontract, for which King Steel is the "Steel Fabricator" and Plaintiff is the subcontractor, was for Plaintiff to provide erection and related services for the Project. *See* Subcontract.

9.

Specifically, the Subcontract provides that the "Scope of Work" for Plaintiff is to "(1) prepare all necessary temporary bracing drawings and/or critical lift plans, and (2) perform all work and furnish all supervision, management, labor, materials, tools, equipment, cranes, safety equipment and procedures, licenses and permits, supplies and all other things necessary for the complete, proper and safe erection of the structural steel" in accordance with the plans of the Project. *See* Subcontract.

10.

However, the Subcontract "Exclusions to Schedule A" expressly states that Plaintiff will **not** be responsible for the "[f]urnishing of materials other than those materials required to <u>execute the erection</u> of the project" and that Plaintiff will not be responsible for the "miscellaneous] steel installed by others." [emphasis added] *See* Subcontract.

11.

Under the Subcontract, Plaintiff was not responsible for the cost of the structural steel used in the Project. *See* Subcontract.

12.

Under the Subcontract, Plaintiff was not responsible for providing any onsite safety representative for the Project. *See* Subcontract.

3

13.

The Subcontract did not require Plaintiff to provide a PE Developed/Stamped Erection Plan for the Project. *See* Subcontract.

14.

The Subcontract did not require Plaintiff to provide for King Steel's Management Time for the Project. *See* Subcontract.

15.

At all relevant times, both King Steel and Plaintiff were working under the general contractor Griffco Design/Build, Inc. ("Griffco") to construct the Project. *See* Subcontract.

16.

On October 9, 2021, while Plaintiff was working on the Erection, a steel collapse occurred at the Project (the "Steel Collapse"), causing damage above and beyond the original contractual obligations of the Subcontract and beyond the scope of the immediate work.

17.

At the time of the Steel Collapse, Plaintiff was operating in a manner consistent with the Subcontract as set forth in Paragraphs 9-14 above.

**The Policy**

18.

On or about October 22, 2020, Owners issued Commercial General Liability Policy Number 132318-80144613-20, with a policy term from December 16, 2020 to December 16, 2021, to Statesboro (the "Policy"). A copy of the Policy is attached as Exhibit B.

4

19.

The Policy provides $1,000,000 of coverage per occurrence, $2,000,000 aggregate coverage to Statesboro for "other than products-completed operations", and $1,000,000 aggregate coverage for Products-Completed Operations. *See* Policy.

20.

In exchange for coverage under the Policy, Statesboro paid a premium to Owners in the amount of $10,145.00. *See* Policy.

21.

Included in the premium paid by Statesboro is coverage for "subcontracted work – in connection with construction, reconstruction, repair or erection of buildings." *See* Policy.

22.

The Policy was in effect, and Statesboro was current on all premium payments at the time of the steel collapse that occurred on Saturday October 9, 2021.

23.

Statesboro gave Owners timely notice of the October 9, 2021 steel collapse and the potential claim that may be made on the Policy for damages incurred as a result.

24.

Statesboro complied with the Policy requirements for providing notice of a possible claim to Owners.

25.

Statesboro has complied with all of the Policy requirements.

26.

Exclusion j of the Policy provides the following "business risk exclusion": "This insurance

5

does not apply to: . . . 'Property damage' to . . . (5) That **particular part** of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations; or (6) That **particular part** of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." *See* Policy. [emphasis added]

27.

Exclusion k of the Policy provides the following "business risk exclusion": "This insurance does not apply to: . . . 'Property damage' to 'your product' arising out of it or any part of it." *See* Policy.

28.

Exclusion l of the Policy provides the following "business risk exclusion": "This insurance does not apply to: . . . 'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard'." *See* Policy.

29.

Exclusion m of the Policy provides the following "business risk exclusion": "This insurance does not apply to: . . .    'Property damage' to 'impaired property' or property that has not been physical injured, arising out of: (1) A defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work'; or (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms. This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use."

6

30.

In pertinent part, the Policy provides the following definitions:

- "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
    a.  It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
    b.  You have failed to fulfil the terms of a contract or agreement;
    if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

- "Your work":
    a.  Means:
        (1) Work or operations performed by you or on your behalf; and
        (2) Materials, parts or equipment furnished in connection with such work or operations.

*See* Policy.

## The Correspondence

31.

On March 1, 2022, King Steel sent a demand letter to Plaintiff seeking payment for the costs incurred in replacing the steel structure at the Project. *See* Letter from Marvin Brown to Kelly Brown, attached as Exhibit C. Notice of the claim was provided to Owners.

32.

On April 29, 2022 Statesboro notified Owners of an updated King Steel claim, attached as Exhibit D.

33.

On July 7, 2022, King Steel sent a demand for payment and mediation to Statesboro. *See* Letter from Denise M. Motta to Wesley C. Taulbee, attached as Exhibit E.

34.

King Steel's July 7, 2022 demand letter sought payment from Statesboro for, among other

damages, the costs of the following: structural steel, onsite safety representative, PE Developed/Stamped Erection Plan, and King Steel's management time.

35.

On September 16, 2022, Statesboro's counsel sent a letter to Owners' counsel requesting that Owners participate in the September 19, 2022 mediation with King Steel concerning King Steel's requested damages of at least $468,266.89. *See* Letter from Wesley Taulbee to Boyd Jones, attached as Exhibit F.

36.

The September 16, 2022 letter also set forth Statesboro's coverage position, i.e., that the exclusions asserted by Owners are inapplicable to the claims presented by King Steel. *See* Sept. 16, 2022 Letter.

37.

Owners refused to participate in the September 19, 2022 mediation. *See* Letter from Wesley Taulbee to Aaron Varnado dated October 24, 2022, attached as Exhibit G.

38.

Statesboro and King Steel ultimately reached a final settlement as to all of King Steel's claims in the amount of $456,874.00. *See* Oct. 24, 2022 Letter.

39.

On October 24, 2022, Statesboro sent a demand letter to Owners requesting reimbursement for the payment made to King Steel. *See* Oct. 24, 2022 Letter.

40.

On December 7, 2022, Owners sent its response to Statesboro's demand letter. *See* Letter from Michael Kendall to Wesley Taulbee, attached as Exhibit H.

8

41.

In the December 7, 2022 letter, Owners noted that the demand from King Steel for which Statesboro was seeking reimbursement was for the damages incurred by King Steel "to replace the steel structure itself", which consisted of "additional structural steel . . . and joists to replace the structural steel damaged in the collapse" and "additional costs including an on-site safety representative, an erection plan prepared by a professional engineer, and additional project management." *See* Dec. 7, 2022 Letter.

42.

Owners denied coverage in the December 7, 2022 letter, contending that "property damage to Statesboro's work is excluded by the business risk exclusions", specifically "exclusions j, k, l, and m of the Policy[.]" *See* Dec. 7, 2022 Letter.

43.

Because of Owners' wrongful denial of coverage, Statesboro was forced to hire its own counsel to negotiate with King Steel and ultimately settle with King Steel in the amount of $456,874.00.

## COUNT I: BREACH OF CONTRACT

44.

Under the Policy, Owners has contractual duties, among others, to provide liability insurance to Statesboro, which includes a duty to provide coverage for "subcontracted work – in connection with construction, reconstruction, repair or erection of buildings." *See* Policy.

45.

By virtue of its denial of coverage for the damages requested of Statesboro by King Steel, Owners breached its contractual duties.

9

46.

Owners' wrongful breach of its contractual duties caused Statesboro to hire counsel to represent it against the claim asserted by King Steel and at mediation and necessitated Statesboro to settle with King Steel.

47.

Because Owners wrongfully breached its contractual duties to Statesboro, Statesboro suffered damages of $456,874.00.

**COUNT II: BAD FAITH**

48.

O.C.G.A. § 33-4-6 provides that in the event of a loss covered by a policy of insurance, and the refusal of the insurer to pay the loss within 60 days after a demand has been made by the holder of the policy, and a finding that the insurer's refusal to pay was in bad faith, the insurer shall be liable to the policyholder for not only the loss, but also fees for the bad faith denial, and all reasonable attorney's fees.

49.

More than 60 days have passed since Statesboro demanded indemnification from Owners pursuant to the demand made by King Steel.

50.

Counsel for Statesboro advised Owners of King Steel's claim in April of 2022. In that correspondence, Statesboro demanded indemnification from Owners pursuant to the Policy.

51.

Coverage is afforded for the damages requested of Statesboro by King Steel under the Policy.

10

52.

Statesboro has complied with all of the provisions of the Policy such that coverage has not lapsed, expired, or otherwise become ineffective.

53.

To date, Owners has refused to indemnify Statesboro for the damages requested by King Steel and ultimately paid by Statesboro.

54.

Statesboro has complied with all of the procedural requirements for recovering bad faith penalties from Owners as provided for in O.C.G.A. § 33-4-6.

55.

Owners' refusal to indemnify Statesboro and Owners' denial of coverage under the Policy were done in bad faith, and Owners is liable to Statesboro, in addition to the foregoing loss, for a sum equal to 50 percent of the liability Statesboro incurred as a result of the claim raised by King Steel, plus reasonable attorney's fees incurred by Statesboro pursuant to O.C.G.A. § 33-4-6.

**WHEREFORE,** Statesboro respectfully requests that this Court:

(a) Enter judgment in favor of Statesboro on all claims;

(b) Have a trial by a jury on all issues so triable;

(c) Award all costs and fees to Statesboro and against Owners; and

(d) Award such other and further relief as the Court may deem just and proper.

## **TRIAL BY JURY**

Statesboro hereby demands a trial by jury on all matters contained herein to the full extent allowable under the law.

11

Respectfully submitted this 28th day of April, 2023.

Clay Taulbee & Myers, LLC

/s/ Wesley C. Taulbee
Wesley C. Taulbee
Georgia Bar No. 368972
*Attorney for Plaintiff*

201 S. Main Street, Suite C
Statesboro, Georgia 30458
(912) 225-3951
wes@ctmjustice.com

E-FILED IN OFFICE - CB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-02926**
**5/2/2023 10:54 AM**
TIANA P. GARNER, CLERK

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| STATESBORO ERECTORS, INC., | § § § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No. |
| AUTO-OWNERS INSURANCE COMPANY and OWNERS INSURANCE COMPANY, | § § § § | JURY TRIAL DEMANDED 23-C-02926 |
| Defendants. | § § § | |

## NOTICE OF FILING

COMES NOW, Statesboro Erectors, Inc., Plaintiff herein ("Plaintiff" or "Statesboro"), and

hereby files this Notice of Filing for the following:

Exhibit A to the Complaint.

Respectfully submitted this 28th day of April, 2023.

Clay Taulbee & Myers, LLC

/s/ Wesley C. Taulbee
Wesley C. Taulbee
Georgia Bar No. 368972
*Attorney for Plaintiff*

201 S. Main Street, Suite C
Statesboro, Georgia 30458
(912) 225-3951
wes@ctmjustice.com

1

EXHIBIT

A

tabbies

# KING STEEL, INC.

## SUBCONTRACT AGREEMENT WITH ERECTOR

This Agreement is made by and between **KING STEEL, INC.** ("Steel Fabricator") and the Subcontractor identified below. The Steel Fabricator and Subcontractor in consideration of the mutual promises and benefits flowing to each of the parties hereto as hereinafter stated, do mutually agree as follows:

### 1.    THE PARTIES AND THE PROJECT

DATE:   May 6, 2021

AGREEMENT/P.O. NO.:        2104-05

STEEL FABRICATOR:            King Steel, Inc.
                             353 Swanson Drive
                             Lawrenceville, GA 30043-8533

SUBCONTRACTOR (Struct Steel):   Statesboro Erectors
                                2760 Country Club Rd
                                Statesboro, GA 30458

PROJECT:                     Ken's Foods
                             160 King Mill Road
                             McDonough, GA 30253

OWNER:                       Ken's Foods
                             One D'Angelo Drive
                             Marlborough, MA 01752

CONTRACTOR                   Griffco Design/Build Inc.
                             1701 Barrett Lakes Blvd NW Ste 285
                             Kennesaw, GA 30144

### 2.    CONTRACT DOCUMENTS.

This Agreement between the Steel Fabricator and the Subcontractor consists solely of the following documents (collectively the "Contract Documents"):

- This Agreement, which includes the following attachments ("Attachments"):
  - Scope of Work, attached as Exhibit A;
  - Exclusions to Schedule A:
    Misc steel installed by others.
    Furnishing of materials other than those materials required to execute the erection of the project (examples are rigging, welding wire, temporary bracing cables, etc.) are by others;
- 2021 Subcontract Terms and Conditions, which are incorporated by reference as if fully set forth herein;
- Change Orders to this Agreement; None at this time
- Affidavit of Subcontractor for Partial Release of Liens and Claims for Progress Payment and Affidavit of Subcontractor for Final Release and Waiver of Liens and Claims; attached as Exhibit E;
- The agreement between Contractor and Steel Fabricator and any documents incorporated therein ("Steel Fabricator Agreement"), but only to the extent that the Steel Fabricator Agreement relates to the Work contemplated by this Agreement.  A copy of this agreement is available upon request.

# KING STEEL, INC.

- The agreement between Owner and Contractor, including any attachments thereto; ("Prime Contract"), but only to the extent that the Prime Contract relates to the Work contemplated by this Agreement and is incorporated into the Steel Fabricator Agreement. A copy of this agreement is available upon request and to the extent such agreement has been given to Steel Fabricator.

## 3.    SCOPE OF WORK

3.1.    The Subcontractor shall (1) prepare all necessary temporary bracing drawings and/or critical lift plans, and (2) perform all work and shall furnish all supervision, management, labor, materials, tools, equipment, cranes, safety equipment and procedures, licenses and permits, supplies and all other things necessary for the complete, proper and safe erection of the structural steel in full accordance with the plans, specifications, and all work incidental thereto, in strict accordance with the terms of the Subcontract, and to the satisfaction of the Contractor and the Owner ("Work"). The subcontractor is aware of FAA requirements regarding lighting and flagging of crane as well as "boom up" and "boom down "procedures. FAA permit is by others.

3.2.    The Subcontractor shall prepare and submit to the Steel Fabricator within 30 days of the effective date of this Subcontract all temporary bracing drawings, samples and other submittals required by the Subcontract. Submittals shall be subject to approval by the Contractor and Owner's Architect or Engineer. Submittals must comply with all Subcontract requirements; approval of non-conforming submittals shall not relieve the Subcontractor of the obligation to comply with the Subcontract. No submittal, approved or not, shall modify any requirements of the Subcontract.

3.3.    Subcontractor's designated representative shall report to the Steel Fabricator's project Superintendent before beginning work on the Project and periodically thereafter as required by the Steel Fabricator. The Subcontractor shall maintain daily logs in a form and degree of detail acceptable to the Steel Fabricator and shall submit them to the Steel Fabricator at its office at the end of each week.

3.4.    All erection and site work shall be in accordance with all OSHA requirements and shall also meet specific site requirements as set forth by the Contractor and Owner.

## 4.    BONDS

4.1.    Subcontractor shall not provide a performance or payment bond.

## 5.    PAYMENT

5.1.    **Basis and Amount of Payment**. The Steel Fabricator shall pay the Subcontractor the lump sum amount of Six Hundred Ninety-One Thousand Dollars ($691,000) for performance of the Subcontract Work in accordance with the Subcontract requirements, subject to additions and deductions made by change order or authorized by other provisions of the Subcontract. Payments shall be made in accordance with the 2021 Subcontract Terms and Conditions. For clarity, the amount of this subcontract is established as follows:

$590,000- Erect Structural Steel
$ 20,000- Compactor
$ 25,000- Increase Crane Size from 90 Ton to 160 Ton
$ 16,000- Increase Crane Size from 160 Ton to 330 Ton
$ 40,000- Provide Pins (if not accepted by GC this amount will be deducted via Change Order)
$691,000- Amount of Subcontract (excludes erection of misc metals)

2

## KING STEEL, INC.

**Clarifications:**

Two erection crews to be utilized: one in the high roof area (Seq 1-4) and one in the low roof area (Seq 5-9) with erection of both areas occurring simultaneously.

No cranes are allowed on the slab (forklifts are allowed with acceptance by the GC of loading criteria being a condition of allowance).

All equipment utilized on the slab will have "diapers", tire covers, etc. to protect the slab from leaks or marking. Erector is aware the slab is a finished product and will take reasonable care to protect the surface (and integrity) of the slab.

    **5.2.**    The Applications for Payment shall be submitted on the 15th of the month. Subject to the 2021 Subcontract Terms and Conditions, Progress Payments and Final Payment shall be made to Subcontractor within fourteen (14) days of Steel Fabricator's receipt of payment from the Owner or Contractor for the Subcontractor's work.

**6.**    **TIME**

    **6.1.**    Time is of the essence of this Subcontract. The Subcontractor shall commence work on October 4, 2021 and shall prosecute the work in a manner that will not delay the completion of the Project. Subcontractor shall complete its Work on or before January 5, 2022 subject to modifications agreed upon by the parties and as set forth in the 2021 Subcontract Terms and Conditions ("Contract Time").

3

1203676:2

KING STEEL, INC.

7.     **NOTICES.**

    **7.1.**    All notices shall be addressed to the parties Designated Representatives set forth below, and shall be considered as delivered when postmarked, if dispatched by registered mail, or when received in all other cases:

    **7.1.1.**    The Steel Fabricator's Designated Representative, or Agent is:
Name:  Paul Swanson
Address: 353 Swanson Drive, Lawrenceville, GA 30043
Phone: 770 963 3888
Cell Phone: 404-328-8861
Email: pswanson@kingsteelinc.net

    **7.1.2.**    The Subcontractor's Designated Representative, or Agent is:
Name: Clay Mock
Address: 2760 Country Club Rd, Statesboro, GA 30458
Phone: 912-531-4696
Email: clay@statesboroerectors.com

8.     **DESIGNATION OF COMPETENT PERSON(S)**

    **8.1.1.**    In accordance with the Section 18 of the 2021 Subcontract Terms and Conditions, the Subcontractor's "Competent Person(s)" who shall be responsible for safety on behalf of Subcontractor shall be:

Name: Clay Mock
Address: 2760 Country Club Rd, Statesboro, GA 30458
Phone: 912-531-4696
Email: clay@statesboroerectors.com

9.     **Entire Agreement.** The terms and conditions of this Agreement shall constitute the entire agreement between Steel Fabricator and Subcontractor and may not be altered except as set forth herein, and supersedes all prior or contemporaneous negotiations, representations, or agreements, oral or written, between the parties. Any additional or different provisions contained in any acknowledgements, proposals, sales memoranda, invoices or in other documents issued against or in response to this Subcontract that purport to alter or vary any of the terms and conditions of this Subcontract are hereby rejected and objected to in advance and shall not become a part of the parties' Subcontract unless otherwise specifically agreed in a writing signed by the parties.

10.    **Acceptance.** In the event that Subcontractor is given a notice to proceed, directed to purchase material, or otherwise directed by Steel Fabricator to commence any of the Work contemplated by this Subcontract prior to the Subcontractor signing this Subcontract, Subcontractor upon commencement of such work shall be deemed to have accepted all of the Terms and Conditions of this Subcontract as set forth herein. No amendment or modification of any provision of these Terms and Conditions shall be binding unless the same is in writing, signed by the party to be bound, and is specifically described as an amendment or modification of these Terms and Conditions.

BOTH PARTIES HAVE READ AND UNDERSTAND THIS SUBCONTRACT. THIS SUBCONTRACT IS NOT BINDING UPON THE STEEL FABRICATOR UNTIL ACCEPTED AND SIGNED BY AN OFFICER OF THE STEEL FABRICATOR.

    IN WITNESS WHEREOF, and intending to be bound thereby, the parties have executed this Subcontract effective as of the day and year set forth above.

| KING STEEL, INC. | STATESBORO ERECTORS |
|---|---|
| By: _Paul Swanson_ | By: _____ |
| Title: _PROJ. MANAGER_ | Title: _____ |

4

## KING STEEL, INC.
## 2021 SUBCONTRACT TERMS AND CONDITIONS

1.    **SCOPE OF WORK**

1.1.    **AISC Code of Standard Practice.** Subcontractor and Steel Fabricator agree that the Work shall be provided in accordance with the terms of this Agreement and the American Institute of Steel Construction Code of Standard Practice for Buildings and Bridges, the edition as set forth in the Contract Documents.

1.2.    With respect to the Subcontract Work, the Subcontractor shall assume toward the Steel Fabricator all obligations, risks and responsibilities which the Steel Fabricator has assumed towards the Contractor and Owner under the Contract Documents including, without limitation, all requirements relating to the scope, quality, quantity, timeliness of the work, warranties, safety, insurance, inspections, confidentiality, indemnification, change orders, claims, lien rights, insurance, compliance with laws, clean-up, and intellectual property.

1.3.    The Subcontractor acknowledges that it has been informed the Contract Documents are available for its inspection at the Steel Fabricator's offices at all reasonable times, and that the Subcontractor has inspected the Contract Documents to the extent it feels necessary to understand all of the requirements applicable to the Subcontract Work.

1.4.    In carrying out all of its Subcontract Work, the Subcontractor shall comply with all applicable laws, regulations, ordinances, rules, codes, statutes, and other requirements of local, state or federal governmental authorities having jurisdiction over the Project ("Laws"), including, without limitation, Laws relating to payment of or working conditions for employees, non-discrimination, immigration, employment taxes, health or safety of employees and other persons, licensing statutes or rules, and building codes.

1.5.    The Subcontractor shall obtain and pay for all permits, fees, and licenses necessary for execution of the Subcontract Work.

1.6.    The Subcontractor shall provide to the Steel Fabricator, within five (5) days of the effective date of this Subcontract, the names and addresses of all material manufacturers, suppliers, and sub-subcontractors the Subcontractor intends to use in completing the Subcontract Work. Should any of those proposed be unacceptable to the Contractor, or Owner, the Subcontractor shall use another supplier, manufacturer or sub-subcontractor acceptable to the Steel Fabricator, at no additional charge to the Steel Fabricator, if the original choice is defective, does not meet the requirements of the construction documents, or is deficient in areas of performance or financial position.

1.7.    The Subcontractor's Superintendent or Foreman shall attend all progress and safety meetings while the Subcontract Work, or any part of it, is in progress, or as requested by the Steel Fabricator, and shall be prepared to address schedules, manpower, deliveries, and relevant safety issues. Representatives of sub-subcontractors whose work is critical under the current schedule may also be required to attend these meetings.

2.    **PAYMENT**

2.1.    **Progress Payments.**

2.1.1.    Within ten (10) calendar days of the effective date of this Subcontract, the Subcontractor shall submit to the Steel Fabricator a schedule of values for all Subcontract Work to be done on a lump sum price basis, showing the amount included in each principal category of Subcontract Work to be done for the lump sum price. If the Steel Fabricator approves the schedule of values, it shall serve as the basis for progress payments as to all lump sum price work. If the breakdown is not approved, the Steel Fabricator shall establish a reasonable breakdown as a basis for progress payments as to lump sum price items.

2.1.2.    The Subcontractor shall submit to the Steel Fabricator Applications for Payment on the AIA Document G702/703 (1992), or a similar form approved by Steel Fabricator.   Each Application for Payment shall describe the Work performed during the preceding payment period for which payment is requested, as specified in the form, and include such other information and back-up documentation as the Steel Fabricator may reasonably require. Among other things, but without limitation, the Subcontractor may be required to provide

*5*

1203676:2

KING STEEL, INC.

invoices to verify costs incurred and claimed, certified payrolls and lien and claim waivers in a form acceptable to the Steel Fabricator. All lien waivers shall be in the form prescribed in **Exhibit G**.

**2.1.3.** **Retainage.** Retainage shall be withheld from each progress payment as set forth in the Steel Fabricator Agreement, and if none specified, 10%.

**2.1.4.** **Conditions Precedent.** To the fullest extent allowable by law, receipt of payment by the Steel Fabricator from the Owner and Contractor shall be a condition precedent for payment to the Subcontractor by the Steel Fabricator except as noted in paragraph 2.1.5. The obligations under this clause are severable. The inapplicability of this paragraph due to statute, court decision, or any other basis shall not nullify, reduce, or limit other obligations set forth herein. The Subcontractor agrees that progress payments are subject to the absolute condition precedent that the (1) Owner, Contractor, and Steel Fabricator have approved the Subcontract Work as being in accordance with the Subcontract (including applicable Contract Documents requirements), (2) that the Subcontractor has provided the Steel Fabricator with satisfactory proof it has paid all amounts it owes in connection with the Subcontract, including providing lien waivers in a form acceptable to Steel Fabricator and Contractor which include Exhibit G, (3) that the Owner or Contractor has actually paid the Steel Fabricator for that Subcontract Work, (4) Steel Fabricator has received a signed copy of this Agreement from Subcontractor, and (5) Steel Fabricator has received the proper Certificates of Insurance demonstrating the insurance requirements are met. Failure to satisfy any of these conditions shall constitute a failure by the Subcontractor to have performed in accordance with the provisions of this Subcontract. The Steel Fabricator shall not be required to pay the Subcontractor amounts in excess of those actually accepted and paid by the Contractor or Owner with respect to any Subcontract Work.

**2.1.5.** Modify Paragraph 2.1.4 as follows: The Steel Fabricator will pay the Subcontractor within 60 days of the due date of their progress payments, regardless of whether the Steel Fabricator has been paid or not by the Contractor, as long as the Subcontractor has met the other requirements of Paragraph 2.1.4. Payment of withheld retainage shall be in accordance with Paragraph 2.2. *Any monies not paid within 60 Day Period can be charged 1.5% Late Fee. [initials]*

**2.1.6.** All material and work covered by progress payments, wherever located, is automatically the property of the Steel Fabricator or, if the Contract Documents so provide, the property of the Owner. This provision shall not relieve the Subcontractor from the sole responsibility and liability for all work and materials upon which payments have been made, until final acceptance of them by the Owner. The fact that a progress payment has been made with respect to any portion of the Subcontract Work shall not constitute an acceptance of that work if it is defective or otherwise not in conformity with the Subcontract, and shall not constitute a waiver of any of the Steel Fabricator's, Contractor's or the Owner's rights or remedies against the Subcontractor with respect to any defects or other failures to conform to the Subcontract, including applicable requirements of the Contract Documents.

**2.1.7.** **Acceptance of Payment.** Subcontractor's acceptance of periodic progress payments shall constitute a waiver of any and all claims by the Subcontractor against Steel Fabricator, Contractor, the Owner, and Architect, through the date of the Application for Payment.

**2.2.** **Final Payment.**

**2.2.1.** Within ten (10) days after completing the Subcontract Work, the Subcontractor shall submit to the Steel Fabricator a written Application for Final Payment on the AIA Document G702/703 (1992), which is supported by such back-up documentation and further information as the Steel Fabricator may reasonably require.

**2.2.2.** To the fullest extent allowable by law, receipt of payment by the Steel Fabricator from the Owner and Contractor shall be a condition precedent for final payment to the Subcontractor by the Steel Fabricator. The obligations under this clause are severable. The inapplicability of this paragraph due to statute, court decision, or any other basis shall not nullify, reduce, or limit other obligations set forth herein. The Subcontractor agrees that final payment is subject to the absolute conditions precedent that (1) the Steel Fabricator, Contractor, and the Owner have approved the Subcontract Work as being in accordance with the Subcontract (including applicable Contract Documents requirements), (2) that the Subcontractor has provided the Steel Fabricator satisfactory proof it has paid all amounts it owes in connection with the Subcontract, including providing

6

## KING STEEL, INC.

lien waivers in a form acceptable to Steel Fabricator and Contractor, which includes Exhibit G, (3) that the Owner or Contractor has actually paid Steel Fabricator in full for the Subcontract Work, and (4) Steel Fabricator has received all warranty documentation required by the Contract Documents. Failure to satisfy any of these conditions shall constitute a failure by the Subcontractor to have performed in accordance with the provisions of this Subcontract so that payment shall not be due.  The Steel Fabricator shall not be required to pay the Subcontractor in final payment or retainage any amounts in excess of those actually accepted and paid by the Owner with respect to any Subcontract Work. The Subcontractor is not entitled to interest on final payments, or retainage amounts, paid after the date set forth herein.

2.2.3.

2.2.4.    **Acceptance of Payment.** Acceptance of final payment shall constitute a waiver of all of the Subcontractor's claims for further compensation or claims under the Subcontract.

2.3.    **Withholding on Applications for Payment.**

2.3.1.    The Steel Fabricator may withhold funds from any progress payment to the Subcontractor, or from final payment, to the extent that may be necessary to cover all costs associated with (1) defective Subcontract Work not remedied; (2) third-party claims which may be or have been filed against the Steel Fabricator as a result of matters relating to the Subcontract Work, or reasonable evidence indicating probable filing of such claims; (3) failure of the Subcontractor to make prompt payment to sub-subcontractors or suppliers for labor, materials or equipment; (4) reasonable evidence that lump sum price items cannot be completed for the unpaid balance of the agreed lump sum price; (5) damage to property of the Steel Fabricator, the Contractor, the Owner or another contractor or subcontractor working at the Project; (6) reasonable evidence that the Subcontract Work will not be completed within the Contract Time; (7) failures to carry out the Work in accordance with the Subcontract or the Steel Fabricator's directions; or (8) any material breach of the Subcontract.  This remedy of withholding payment is not exclusive.

2.3.2.    The Subcontractor agrees that the Steel Fabricator may pay all materialmen, suppliers, laborers, sub-subcontractors and any other persons who have not been paid the monies due them in connection with this Subcontract, and that the Steel Fabricator may credit the amount of any such payment against amounts otherwise due the Subcontractor. Payments may be made directly to the materialmen, suppliers, laborers, sub-subcontractors, or by joint check, whichever shall seem more advantageous to the Steel Fabricator, in its sole discretion. This provision, allowing direct payment to materialmen, suppliers, laborers, sub-subcontractors, is intended for the protection of the Steel Fabricator only, and does not confer rights upon anyone not a direct party to this Subcontract, as a third-party beneficiary or otherwise. Monies retained by the Steel Fabricator as a result of the Subcontractor's failure to make payments to materialmen, suppliers, laborers, sub-subcontractors shall be regarded as trust funds that may be paid directly to the materialmen, suppliers, laborers, sub-subcontractors, and consequently, any such payments made, whether directly or by joint check, shall not constitute bankruptcy preferences. However, no amounts the Steel Fabricator pays to the Subcontractor in good faith, and which do not subsequently reach materialmen, suppliers, laborers, sub-subcontractors shall give rise to liability of the Steel Fabricator to the materialmen, suppliers, laborers, sub-subcontractors.

2.3.3.    The Subcontractor agrees that all payments made to the Subcontractor, whether by joint check or otherwise, shall be used by the Subcontractor first to pay amounts due to materialmen, suppliers, laborers, sub-subcontractors supplying labor or materials for the Subcontract Work, and that only money remaining after such payments are made may be used for any other purpose. Monies paid by joint check shall be deemed to have been paid fully to the materialmen, suppliers, laborers, sub-subcontractors named as a joint payee, unless the Steel Fabricator agrees otherwise in writing. The Steel Fabricator may require that all materialmen, suppliers, laborers, sub-subcontractors who is to receive payment by joint check acknowledge in writing that it will demand payment to it of the full amount of the check, and will not remit any portion thereof to the Subcontractor.

3.    **INSURANCE AND INDEMNIFICATION**

7

1203676:2

# KING STEEL, INC.

**3.1.    General Requirements.** The Subcontractor and all sub-subcontractors at all tiers shall obtain and maintain Workers' Compensation Insurance, Employer's Liability Insurance, Commercial (Comprehensive) General Liability Insurance (including contractual liability insurance covering Subcontractor's obligations under this Agreement), and Comprehensive Automobile Liability Insurance. Steel Fabricator, Contractor, Owner, and others required by the Contract Documents shall be named as an additional insured on the Subcontractor's, and all sub-subcontractors at all tiers, Commercial (Comprehensive) General Liability policy and all applicable insurance required in this Sections. Subcontractor shall procure and maintain at all times during the course of the Work (including corrective or warranty work) the required insurance with limits of liability not less than those listed below, or the limits required by the Steel Fabricator Agreement, whichever is greater. Policies shall be in a form satisfactory to Steel Fabricator and issued by insurers licensed to do business in the state where the Project is located and who are rated no lower than A by Best Insurance Guide.

### 3.1.1.    WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY.

Statutory coverage in each state in which Subcontractor's employees are engaged in the performance of the Work;

Employer's Liability:

| | | |
|---|---|---|
| $1,000,000 | - | bodily injury for each accident |
| $1,000,000 | - | policy limit for bodily injury by disease |
| $1,000,000 | - | for each employee for bodily injury by disease |

### 3.1.2.    COMMERCIAL GENERAL LIABILITY.

| | | |
|---|---|---|
| $2,000,000 | - | general aggregate |
| $2,000,000 | - | products and completed operations aggregate |
| $1.000,000 | - | personal and advertising injury |
| $1,000,000 | - | each occurrence |

Coverage Details:

Coverage shall be by Standard Commercial General Liability Occurrence Form including:

.1    Personal and Advertising Injury, Contractual Liability, Explosion, Collapse, Broad Form Property Damage, Independent Contractors, and Products and Completed Operations.

.2    This policy shall add Steel Fabricator, Contractor, and Owner as an insured thereunder by proper endorsement.

### 3.1.3.    AUTOMOBILE LIABILITY.

Limits of liability:  $1,000,000 per accident

Coverage details: All owned, non-owned and hired vehicles

**3.1.4.    PROFESSIONAL LIABILITY.** If Subcontractor is required to provide an Engineering Erection Plan or other design services as part of its Work, Subcontractor shall provide Professional Liability Insurance in an amount not less than $1,000,000 in the general aggregate and per each occurrence.

**3.1.5.    EXCESS OR UMBRELLA LIABILITY.** Subcontractor shall include Excess or Umbrella Liability insurance in an amount not less than $5,000,000.

**3.2.    Evidence of Insurance.** Subcontractor shall furnish Steel Fabricator with certificates of insurance (or certified copies of its insurance policies), which Subcontractor warrants and represents is a true and accurate representation of Subcontractor's and all sub-subcontractors at all tiers existing insurance coverage. This certificate

8

### KING STEEL, INC.

shall indicate all endorsements, including Steel Fabricator, Contractor, and Owner if applicable, as additional insured by standard endorsements CG2010 (07/04) and CG237 (07/04). No progress payment will be made unless Steel Fabricator has been furnished evidence of required coverages and endorsements as required by this Subcontract. Subcontractor Work may not begin until the Subcontractor has delivered satisfactory evidence to the Steel Fabricator that all required insurance is in place. Any delays in the completion of the Subcontract Work due to the Subcontractor's failure to obtain or maintain insurance shall be treated as delays due to the Subcontractor's breach of contract.

**3.3.** Products and completed operations coverage shall extend and continue in effect through and until the claim's limitation period set forth in the applicable state statute of repose exists, then through the period set forth in the applicable statute of limitations for the state in which the project is constructed.

**3.4.** **Cancellation, Renewal or Modification.** All insurance policies shall contain a provision that the coverages afforded thereunder shall not be cancelled or not renewed, nor restrictive modifications added, until least thirty (30) days prior written notice has been given to Steel Fabricator unless otherwise specifically required in the Subcontract Documents.

**3.5.** **Failure to Maintain Insurance.** If the Subcontractor fails to obtain the required insurance coverage, or if that coverage is permitted to lapse, or is canceled or ceases to be in effect, for any reason, at any time before the Subcontract Work is completed (or such later date as is specified by the Contract Documents), that event shall constitute a material breach entitling the Steel Fabricator to terminate the Subcontractor for default, or at Steel Fabricator's option it may purchase such coverage and charge the expense thereof to the Subcontractor or withhold amounts sufficient to cover any such insurance lapse.

**3.6.** **Waiver of Subrogation.** Subcontractor and Steel Fabricator hereby waive rights of subrogation, except such rights as they may have to the proceeds of such insurance, against each other and each other's employees, agents, affiliates, consultants and contractors to the extent such claims are covered by insurance provided under this Agreement by either party, provided, however, that no such waiver shall apply to claims arising out of, or related to, alleged professional negligence on the part of Subcontractor. If the policies of insurance referred to in this Section require an endorsement to provide for continued coverage where there is a waiver of subrogation, the owners of such policies will cause them to be so endorsed.

**3.7.** Subcontractor's Indemnity, General. TO THE FULL EXTENT PERMITTED BY LAW, THE SUBCONTRACTOR AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS THE STEEL FABRICATOR, CONTRACTOR, ARCHITECT, AND THE OWNER, AND THEIR RESPECTIVE OFFICERS, AGENTS AND EMPLOYEES AND ANY OTHER PERSON OR ENTITY AS REQUIRED BY THE CONTRACT DOCUMENTS ("INDEMNIFIED PARTIES") FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, INJURIES, FINES, PENALTIES, LOSSES, EXPENSES (INCLUDING ATTORNEYS' FEES), DAMAGES AND LIABILITIES OF EVERY NATURE, INCLUDING CONTRACTUAL LIABILITY ("LOSSES"), ARISING FROM OR RELATING TO WORK PERFORMED BY THE SUBCONTRACTOR ON THE PROJECT, OR RELATING TO THE PRESENCE ON THE PROJECT OF THE SUBCONTRACTOR'S EMPLOYEES OR THE EMPLOYEES OF ITS SUB-SUBCONTRACTORS AT ANY TIER, TO THE EXTENT OF THE SUBCONTRACTORS, ITS EMPLOYEES OR AGENTS NEGLIGENCE, ACTS OR OMISSIONS. THE SUBCONTRACTOR'S OBLIGATIONS UNDER THIS ARTICLE SHALL BE IN ADDITION TO ANY INDEPENDENT LIABILITY IMPOSED BY THE CONTRACT DOCUMENTS. WITHOUT LIMITATION, THIS INDEMNITY SHALL EXTEND TO LOSSES ARISING FROM THE SUBCONTRACTOR'S VIOLATIONS OF LAWS. THE SUBCONTRACTOR'S INDEMNITY OBLIGATIONS UNDER THIS PARAGRAPH SHALL NOT BE LIMITED BY APPLICABLE WORKERS' COMPENSATION LAWS, AND, AS RESPECTS THIS INDEMNITY, THE SUBCONTRACTOR HEREBY EXPRESSLY WAIVES ALL IMMUNITIES AND DEFENSES THAT IT MAY HAVE UNDER SUCH LAWS. FURTHER, SUBCONTRACTOR SHALL BE RESPONSIBLE FOR PAYING THE LEGAL COSTS (INCLUDING ATTORNEYS FEES) FOR THE ATTORNEY OF STEEL FABRICATOR'S CHOOSING RELATING TO ANY CLAIM COVERED BY THIS PROVISION.

**3.8.** Subcontractor's Indemnity, Liens. To the extent that any liens may legally attach to any portion of the Owner's property or the Project, the Subcontractor agrees to defend, indemnify and hold harmless the Steel Fabricator, Contractor and the Owner, and their successors in interest, from and against any and all mechanic's liens

9

## KING STEEL, INC.

or other liens, or claims of rights to enforce liens, including any related expenses and legal fees, against the Project or the improvements to be erected thereon arising out of any Work to be performed or labor or materials to be furnished under the Subcontract. Neither final payment nor acceptance of the improvements erected hereunder shall constitute a waiver of this indemnity. If any such lien or claim for lien shall at any time be filed, the Subcontractor shall promptly cause the lien to be removed (by bonding or otherwise), or shall reimburse the Steel Fabricator for all costs it incurs or may be compelled to pay in discharging any such lien or satisfying any such claim, including all attorneys' fees and costs.

4.      **SUBCONTRACTOR'S OBLIGATIONS**

4.1.      The Subcontractor shall carefully examine this Contract and the Contract Documents, identify those portions affecting its work, and notify the Steel Fabricator in writing of any deficiencies, discrepancies, ambiguities, inconsistencies, or errors before proceeding with the affected work.

4.2.      The Subcontractor represents that it is fully able, qualified and experienced to perform the work required by this Subcontract. It acknowledges that, before executing the Subcontract, the Subcontractor has ascertained, by its own independent investigation, the general and local conditions involved in performing the Subcontract Work including, without limitation, the location of the work, accessibility and character of the site, and all other matters which could affect the work or it's cost under this Subcontract. The Subcontractor has verified all information furnished by the Steel Fabricator or others and is satisfied with its correctness and accuracy.

4.3.      **Labor Harmony.**

4.3.1.      Subcontractor shall be responsible for the maintenance and observance of sound labor practices by itself and its subcontractors, and shall take all steps reasonably necessary to avoid labor disputes and the potential delay and disruption arising therefrom. Subcontractor shall not be excused from performance of its work, nor shall Subcontractor be granted an extension of time for performance of its work, on account of a delay caused by any illegal activity of any labor organization directed against Subcontractor, Steel Fabricator, Contractor, the Project or any subcontractor of the Subcontractor working at the site.

4.3.2.      The Subcontractor shall not employ persons, means, materials or equipment which may cause strikes, work stoppages or any disturbance of workers employed by the Steel Fabricator or other contractors or subcontractors employed in connection with the Project. Should Subcontractor fail to comply with the foregoing provisions, Steel Fabricator shall have the right, in addition to any other rights and remedies provided by this Agreement or other Contract Documents or by law, after 48 hours written notice, to terminate this Agreement or any part thereof or the employment of the Subcontractor for all or any portion of the Work, and for the purpose of completing the Work, to enter upon the premises and take possession of the Project. Subcontractor shall be responsible for any damages or losses suffered by Steel Fabricator, Contractor, Owner, and any Separate contractors as a result of Subcontractor's failure to comply with this Paragraph.

5.      **TIME**

5.1.      The Subcontractor shall participate and cooperate in scheduling the times and sequences required in the Subcontractor's Work and shall work in strict accordance with any schedule provided by the Steel Fabricator, including any updated or modified schedules. If necessary, to assure such prompt performance, the Subcontractor shall accelerate its performance, at its own cost, to make up any delays caused by its own actions or omissions or those of its subcontractors or suppliers. If the Subcontractor fails to do so, the Steel Fabricator may itself take whatever actions it deems necessary to expedite material deliveries or completion of work, and charge the resulting costs to the Subcontractor.

5.2.      If the Subcontractor fails to adhere to the established schedules, or misses any milestone in any such schedule, or if the Subcontractor abandons the job or fails to have its workers on the Site and productively employed for three (3) days or more, the Steel Fabricator may direct the Subcontractor to accelerate its work, by

1(

1203676:2

## KING STEEL, INC.

incurring overtime, double-shifting, expediting deliveries, or otherwise. The Subcontractor shall promptly comply with such a direction, at its own cost and without adjustment to its compensation, unless it is determined that the Subcontractor was entitled to a Change Order extending the time within which to complete the Subcontract Work. Further, if the Subcontractor's acceleration causes the Steel Fabricator to incur additional costs, the Subcontractor shall pay those costs, without reimbursement by the Steel Fabricator, unless it is determined that the Subcontractor is entitled to a Change Order extending its time. If the Subcontractor disagrees with an order to accelerate, it shall nevertheless comply, and may pursue a claim as provided in this Subcontract.

  **5.3.** The Subcontractor shall be entitled to such extensions of time as the Steel Fabricator may receive from the Owner or Contractor, to the extent that they are applicable to the Subcontract Work, and to no other extensions of time.

  **5.4.** The Subcontractor will coordinate its work with the work of the Contractor and other subcontractors, so that no delays or interference will occur in the completion of the any part or all of the Project.

  **5.5.** **Delays and Acceleration**. If Subcontractor's work is delayed, disrupted, suspended, interfered with, accelerated, or it experiences stacking of trades, inefficiencies, or impacts upon the work ("Impact Events") for any reason not caused by Subcontractor, and if Subcontractor has followed the notice provisions contained in the Terms and Conditions and Contract Documents, Subcontractor may request a change to the Contract Sum and/or Contract Time; however, to the extent the Impact Events are caused by the Contractor, Owner, or a third party, the Subcontractor shall only be entitled to an adjustment to the Contract Sum and/or Contract Time to the extent Steel Fabricator receives an adjustment for Subcontractor's work from the Owner or Contractor. Steel Fabricator agrees to participate with Subcontractor in negotiations with the Contractor and Owner regarding any changes to the Contract Sum and/or Contract Time relating to Subcontractor's work. To the extent the Impact Events are caused by the negligence of Steel Fabricator, and if Subcontractor has followed the notice provisions contained in the Terms and Conditions, it may request a change to the Contract Sum to allow for direct costs and/or Contract Time. Except as stated in this paragraph, Subcontractor shall not be entitled to and shall make no other claim for damages arising out of or relating to delays, disruptions, suspensions, interferences, accelerations, stacking of trades, inefficiencies or impacts upon the work, including, but not limited to any delays in starting the work under this Agreement.

  **5.6.** **Liquidated Damages. NOT APPLICABLE**

**6.**  **SUBCONTRACTOR'S LIABILITY**

  **6.1.** The Subcontractor hereby assumes the entire responsibility and liability for all work, supervision, labor, and materials provided hereunder and for all equipment, supplies and other things provided by the Subcontractor until final acceptance of the work by the Owner. In the event of any loss, damage or destruction thereof from any cause, the Subcontractor shall be liable for it, and shall repair, rebuild and make good the loss, damage or destruction at the Subcontractor's own cost.

  **6.2.** The Subcontractor shall be liable to the Steel Fabricator for all costs, including attorneys' fees, that the Steel Fabricator incurs as a result of the Subcontractor's failure to perform its work in strict compliance with this Subcontract, including the Contract Documents requirements applicable to the Subcontract Work. Such costs shall include, but not be limited to, actual costs and liquidated damages arising from delay damage claims the Owner makes against the Steel Fabricator as a result of delays the Subcontractor caused, the Steel Fabricator's increased costs to perform the Contract work as a result of delays or improper work caused by the Subcontractor, warranty and rework costs arising from the Subcontractor's Work, liability for accidents to persons or property caused by the

## KING STEEL, INC.

Subcontractor, or litigation costs and attorneys' fees arising from actions to enforce this Subcontract, to recover for its breach, or to deal with third-party claims arising from the Subcontractor's breach of this Subcontract.

**6.3.** In the event that it becomes necessary for Steel Fabricator to supply labor, either by request or because of Subcontractor's negligence or default of its obligations hereunder, it is agreed that the costs of such supplemental or replacement labor will be backcharged to Subcontractor's account on a basis of Steel Fabricator's actual costs plus taxes, insurance and fringe benefits, plus seven percent (7%) for Steel Fabricator's general administration and overhead plus three percent (3 %) profit for Steel Fabricator's having to subcontract out such supplemental or replacement subcontract work.

**6.4.** N/A

## 7. CHANGES TO SUBCONTRACT TIME, PRICE, OTHER TERMS

**7.1.** The Steel Fabricator may, at any time, unilaterally or by agreement with the Subcontractor, without notice to the Subcontractor's sureties, make changes in the Subcontract Work. Any unilateral order directing a change shall be in writing signed by the Steel Fabricator, and any agreement between the Steel Fabricator and the Subcontractor changing the Subcontract Work shall be in writing and signed by both the Steel Fabricator and the Subcontractor. Any work completed without a written signed change order from the Steel Fabricator is at the expense of the Subcontractor. The Subcontractor shall perform the work as changed without delay, whether or not there has been any resolution of any claims the Subcontractor may have made for adjustments due to the change directive. Failure to proceed promptly with changed work shall constitute a material breach of the Subcontract.

**7.2.** The Subcontractor shall submit to the Steel Fabricator any requests for adjustment in the price, time or other provisions of the Subcontract as a result of changes directed by the Owner or as a result of deficiencies or discrepancies in the Contract Documents or unforeseen site conditions. Such requests and notice shall be submitted in writing by the Subcontractor as required by this Agreement. The Steel Fabricator shall likewise promptly notify the Subcontractor if the Steel Fabricator requests a reduction in the Subcontractor's compensation as a result of a change. Subcontract adjustments shall be made only to the extent that the Steel Fabricator is entitled to relief from, or must grant relief to the Owner or Contractor. If a change involved the work of more than one subcontractor or of the Steel Fabricator itself, the Subcontractor shall be entitled only to a reasonably allocable share of the total adjustments made by any Change Order from the Owner to the Steel Fabricator. The Subcontractor's allocable share shall be determined by the Steel Fabricator, after allowance of the Steel Fabricator's normal overhead, profit and other interest in any recovery by making a reasonable apportionment, if applicable, between the Subcontractor, the Steel Fabricator and other subcontractors or persons with interest in the adjustment. This Paragraph shall apply to all equitable adjustments or other relief allowed by the Contract Documents. The Subcontractor's recovery of its allocable share of adjustments obtained from the Owner shall be its full and only remedy or compensation as a result of Owner-directed changes, deficiencies or discrepancies in the Contract Documents, or unforeseen site conditions.

**7.3.** If the Authorized Representative of the Steel Fabricator (identified as hereinafter provided) orders changes, independent of the Owner, Contractor or the Contract Documents, and those changes materially affect the cost of performing the Subcontract Work, the Subcontractor shall be entitled to an equitable adjustment in the Subcontract Price, which must be set forth in a Change Order signed by the Authorized Representative of the Steel Fabricator. In accepting any such Change Order, the Subcontractor agrees that the adjustment contained in it constitutes full and complete compensation for all work required by the change, including any delays, disruptions, inefficiencies, impacts, escalations, impacts, or other consequences or costs, direct or indirect, that result from the change, and that no further adjustment shall be sought with respect to that change.

**7.4.** If the Steel Fabricator requests, the Subcontractor shall submit, within five (5) calendar days, a reasonable price quotation for proposed changes. If the Subcontractor does not submit such a price quotation, and the Steel Fabricator is required to submit a price to the Contractor and/or Owner for work including a Subcontract change, the Steel Fabricator shall use its best estimate of the proposed change as it affects the Subcontract Work in the quotation to the Contractor and/or Owner. That estimate shall be the maximum equitable adjustment due to the Subcontractor for the change.

1203676:2

KING STEEL, INC.

**7.5.** In all cases of claims or change order requests not involving Contractor or Owner-initiated changes, claims of deficiencies in the drawings or specifications, or unforeseen site conditions, Change Orders shall be priced on a lump sum basis where the parties reach agreement, or else shall be limited to direct material and direct labor costs, and the mark-up set forth in the Contract Documents, and if none is stated, marked up by seven percent (7 %) for overhead and three percent (3%) for profit. Direct labor for this purpose shall include applicable payroll taxes and fringes required by the Laws or applicable collective bargaining agreement, and direct material shall include taxes and delivery charges.

8. **CLAIMS AND DISPUTES**

**8.1.** **Notice of Claims/Claim Procedures.** The Subcontractor shall provide written notice of all claims or disputes, including requests to change the Contract Time or Contract Sum, and any other submissions or information required by the Contract Documents, within five (5) business days in which the Subcontractor knew or should have known of such claims or 2 business days prior to the date required by the Steel Fabricator Agreement, whichever is earlier. The Subcontractor's failure to comply with these provisions with respect to any claim shall be deemed a waiver of the claim.

**8.2.** **Disputes Involving the Contractor or Owner.** Subcontractor agrees that any and all disputes involving the Contractor and/or Owner shall be governed by the applicable notice, claim, dispute resolution, choice of law, and venue requirements in the applicable Steel Fabricator Agreement and/or Prime Contract.

**8.3.** **Dispute involving solely the Steel Fabricator.** The Subcontractor agrees that any and all claims or disputes arising out of or related to this Subcontract, solely involving the Steel Fabricator, shall be subject to mediation which shall be a condition precedent to arbitration. All claims not resolved in mediation shall be subject to arbitration. The parties shall mutually agree upon an arbitrator who is a construction lawyer with at least ten (10) years of construction law experience. The arbitrator shall require exchange by the parties of documents relevant to the issues raised by any claim, defense, or counterclaim on which the producing party may rely in support of or in opposition to any claim, defense, or counterclaim, with due regard for eliminating undue burden and expense and the expedited and lower cost nature of arbitration. At the request of a party, the arbitrator may at his or her discretion order the deposition of witnesses; however, depositions shall be limited to a maximum of three (3) depositions per party, each a maximum of six (6) hours duration.

**8.3.1.** **Agreement to Joinder or Consolidation.** Subcontractor hereby agrees that Steel Fabricator shall have the right to include Subcontractor, by consolidation, joinder or in any other manner, in any arbitration proceedings involving the Owner, Contractor, or any other person or entity, regardless of who originally initiated such proceedings. The foregoing agreement to arbitrate shall be specifically enforceable under the Federal Arbitration Act.

**8.3.2.** **Venue.** Unless Steel Fabricator elects otherwise, any mediation or arbitration proceedings hereunder shall be held in Gwinnett County, Georgia. Subcontractor agrees that this forum is convenient, accepted and does not pose difficulty with either the availability of witnesses or documents.

**8.3.3.** **Award.** The award rendered by the arbitrators shall be binding and final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

**8.4.** **Duty to Continue Work.** Provided that the Steel Fabricator has promptly paid the Subcontractor all amounts due under this Subcontract, other than those subject to a good faith dispute, the Subcontractor shall proceed with the Subcontract Work, including any disputed portion thereof, without interruption or delay, while any claim or dispute is being considered, arbitrated or litigated. Failure to continue to work diligently during the pendency of a dispute or claim shall constitute a material breach of the Subcontract.

9. **DAMAGE NOTIFICATION**

**9.1.** Notice of damage or additional cost for which the Subcontractor alleges the Steel Fabricator is responsible (and which is not otherwise more specifically addressed herein) shall be filed in writing with the Steel Fabricator within five (5) business days from commencement of such alleged damage or additional cost. The Subcontractor shall make no claim for extra or additional work unless the work is done pursuant to a written change

12

KING STEEL, INC.

order executed by Steel Fabricator's Designated Representative. Only the Designated Representative of the Steel Fabricator shall have authority to bind the Steel Fabricator to change orders or other written orders authorizing extra work or payment therefore.

## 10.   INTELLECTUAL PROPERTY

**10.1.   Patents.** The Subcontractor shall defend, indemnify, and save harmless the Steel Fabricator, Contractor and the Owner from any and all claims or suits for infringements of patents or violations of patent rights, and shall indemnify the Steel Fabricator, Contractor and the Owner from all costs or expenses arising from such claims or suits, including attorneys' fees, to the extent that such claims or suits arise in connection with the Subcontract Work.

**10.2.   Work for Hire.** Subcontractor acknowledges and agrees that any product, ideas, drawings, plans, specifications, renderings, models, BIM Models, computer files, or other electronically generated Construction Documents, or other work provided as part of the Work ("Work Product") for Steel Fabricator are commissioned works for which Steel Fabricator alone shall be vested of any and all ownership rights, including copyrights, trademarks, service marks, or potential patent rights, which rights shall vest in Steel Fabricator, and Subcontractor assigns all such rights to Steel Fabricator. Subcontractor shall retain no right, ownership or title in any product or ideas resulting from its services to Steel Fabricator or any associated letters patent, trademarks, copyrights, trade secrets, or other proprietary rights (the "Intellectual Property"). Subcontractor's contribution to any Steel Fabricator Project is understood and agreed to constitute work made for hire owned by Steel Fabricator. The contributions made or to be made by Subcontractor in association with any Steel Fabricator Project are understood and agreed to be specially commissioned work to which Steel Fabricator shall be the exclusive owner of all rights, including without limitation any and all copyrights, patents, trademarks, trade secrets and any other proprietary or intellectual property rights rendered in association with, or embodied in any Steel Fabricator Project. Work Product shall be deemed Confidential Information.

**10.3.   Assignment.** Without limiting the foregoing, to the extent any product or ideas resulting from Subcontractor's Work may not be a "work for hire" within the meaning of any governing law, Subcontractor agrees to assign, transfer and convey and hereby does assign, transfer and convey to Steel Fabricator any of Subcontractor's right, title and interest in and to any product or ideas rendered by Subcontractor in association with, or embodied in any Steel Fabricator Project, including but not limited to any and all Intellectual Property associated with the Subcontractor's contribution thereto. Steel Fabricator shall have the right to obtain and to hold in their name copyright registrations and other similar protection of Intellectual Property in any Steel Fabricator Projects that may be available worldwide.

## 11.   INSPECTION AND ACCEPTANCE

**11.1.** The Subcontractor shall provide appropriate facilities at all reasonable times for the Steel Fabricator's, Contractor's or the Owner's inspection of the work or materials provided under this Subcontract. The inspection may be at the Project site or at any place where such work or materials may be in preparation, manufacture, storage, or installation. The Subcontractor shall promptly replace or correct any work or materials which the Steel Fabricator, Contractor, or the Owner rejects as failing to conform to the requirements of the Subcontract. If the Subcontractor does not do so within a reasonable time, the Steel Fabricator shall have the right to do so and to charge the cost to the Subcontractor, or deduct the cost from payments otherwise due or to become due to the Subcontractor. If, in the Steel Fabricator's opinion, it is not expedient to correct or replace all or any part of the rejected work or materials, the Steel Fabricator may, at its option, deduct from payments due, or to become due, to the Subcontractor, such amounts as, in the Steel Fabricator's reasonable judgment, represent (i) the difference between the fair value of the rejected work or materials and its value if it had complied with the Subcontract, or (ii) the cost of correction, whichever is higher.

**11.2.** If any of the Subcontractor's work or materials are wrongfully rejected by the Owner, the Subcontractor's remedy for that wrongful rejection shall be limited to the Steel Fabricator's remedy under the Contract Documents.

13

## KING STEEL, INC.

**11.3.** The Subcontract Work shall be accepted or rejected according to the terms of the Contract Documents. However, unless otherwise specifically agreed in writing, entrance and use by the Owner or the Contractor, shall not constitute acceptance of the Subcontract Work.

## 12.  TERMINATION

### 12.1.  Default Termination.

**12.1.1.** The Subcontractor agrees that it materially breaches the Subcontract if the Subcontractor (i) fails promptly to pay for materials, supplies, labor, or other items purchased or used in connection with the Subcontract Work, (ii) fails to pursue the Subcontract Work promptly, in accordance with the Subcontract and the schedules established by the Owner or the Steel Fabricator, or misses any milestones that have been established in the schedule, (iii) fails, due to strikes, picketing, boycotts, cessations of work, or for any other reason, to supply a sufficient number of properly skilled supervisors, workmen, or sufficient amounts of materials, equipment, or supplies of the appropriate quality to properly and expeditiously carry on Subcontract Work, (iv) interferes with, disrupts, or threatens to interfere with or disrupt the operations of the Steel Fabricator, the Owner, or any other laborer, materialman, supplier, subcontractor, or other person working on the Project, whether due to labor disputes, picketing, boycotting, or any other reason, (v) has filed against it any lien for unpaid taxes for federal, state or municipal authorities, (vi) files a voluntary petition under any chapter of the Bankruptcy Code, has an involuntary petition filed against it, makes a general assignment for the benefit of its creditors, or has a receiver appointed, (vii) allows any insurance required under the Subcontract to lapse, has such insurance canceled, or otherwise fails to maintain all required coverages for the full term required by the Subcontract, (viii) fails, upon demand, promptly to comply with any Subcontract provision relating to the removal of liens that have been placed upon the Project or relating to defense of lien claims, (ix) fails promptly to indemnify the Steel Fabricator against any payment bond claims asserted as a result of the Subcontractor's failure to pay its sub-subcontractors or suppliers, or (x) fails to carry out the Subcontract Work in a proper, workmanlike manner, and in full compliance with the specifications. This list is not intended to be exhaustive, and other breaches by the Subcontractor may also be material.

**12.1.2.** If the Subcontractor materially breaches the Subcontract, the Steel Fabricator may terminate the Subcontract for default upon five (5) calendar days' written notice to the Subcontractor. The termination shall take effect five (5) calendar days after the date of the notice. However, the termination will not take effect if (1) the Subcontractor cures the breach to the Steel Fabricator's satisfaction before the effective date of the termination, and the Steel Fabricator so notifies the Subcontractor, or (2) with respect to breaches that cannot reasonably be cured within five (5) calendar days, the Subcontractor has, within the five (5) calendar days, taken meaningful steps towards curing the breach and presented the Steel Fabricator with a definite plan to cure the breach, which is acceptable to the Steel Fabricator. Upon such a termination, the Steel Fabricator may, at its option, enter onto the premises and take possession, for the purpose of completing the work, of all materials and equipment of the Subcontractor. The Steel Fabricator may complete the Work itself or through others, by whatever method the Steel Fabricator deems expedient.

**12.1.3.** All sub-subcontracts or supply agreements which the Subcontractor enters into to carry out the Subcontract Work shall include a provision that the sub-subcontractor or supplier agrees its agreement may be assigned, upon the termination of the Subcontractor for default, to the Steel Fabricator. The Steel Fabricator shall have the right, but not the obligation, to accept assignment of any or all such contracts. In case of termination for default, the Subcontractor shall not be entitled to receive any further payment until the Subcontract Work has been fully completed and accepted by the Owner. At such time, if the unpaid balance of the Subcontract Price exceeds the expense incurred by the Steel Fabricator in completing the work, together with any additional costs or consequential damages occasioned by the Subcontractor's default, the excess shall be paid to the Subcontractor. If the unpaid balance of the Subcontract Price is less than the expense the Steel Fabricator incurred in completing the work, together with any additional costs or consequential damages occasioned by the Subcontractor's default, the Subcontractor shall pay the difference to the Steel Fabricator.

**12.1.4.** If a termination for default, or any action taken pursuant to it, is determined to be wrongful, the termination shall be deemed to have been a termination for convenience, and the Subcontractor's sole remedy shall be as provided in Paragraph 12.3 of the Subcontract. In such cases, the Subcontractor shall not be entitled to recover the value of Subcontract Work that it had not performed as of the termination, anticipated profits upon such work, loss of business, or loss of profits on other projects or projects lost or foregone.

14

## KING STEEL, INC.

**12.2.** In the event of the termination of the Contract Documents between General Contractor and Steel Fabricator, this Subcontract may also be terminated, upon written notice of Steel Fabricator to Subcontractor, and in such case, the termination shall be treated as a termination for convenience in accordance with Paragraph 12.3.

**12.3.   Termination for Convenience.**

**12.3.1.** The Steel Fabricator may, upon written notice to the Subcontractor, terminate this Subcontract for any reason whatsoever. Termination for convenience may be exercised at the sole discretion of the Steel Fabricator, the exercise of which need not be reasonable, and regardless of whether the Subcontractor is or is not in default. Such a termination for the convenience of the Steel Fabricator will be effective immediately upon the Subcontractor's receipt of the notice of termination. The Subcontractor's sole and exclusive remedy for termination for convenience shall be payment of the following:

**12.3.1.1.** Mobilization costs, but only to the extent that they represent actually incurred and documented costs paid for the transport or set-up of equipment or materials, or similar tasks necessary to the commencement of the work.

**12.3.1.2.** For lump sum price items (other than the line item for mobilization on any schedule of values), a percentage of the agreed lump sum price based on the reasonable value of the work properly performed up to the time of the termination.

**12.3.1.3.** For unit price items, the agreed unit price multiplied by the number of units actually and properly completed as of the time of termination and accepted by the Owner.

**12.3.1.4.** Reasonable and documented costs the Subcontractor incurs in terminating any sub-subcontracts or rental or purchase agreements in effect at the time of the termination, without any mark-up for overhead or profit.

**12.3.2.** A termination for convenience shall not relieve the Subcontractor of any responsibility it would otherwise have under the Subcontract to correct work that is defective or otherwise not in conformity with the Subcontract, or to pay any costs arising from such defective or nonconforming work. The Steel Fabricator does not waive any right or claim to damage which it had under the Subcontract prior to termination, and may pursue or continue to pursue any cause of action arising from actions or omissions of the Subcontractor before termination.

## 13.   RESPONSIBILITY FOR WORK

**13.1.** The Subcontractor is responsible for the protection of the Subcontract Work, including all materials contained therein or stored at the Project site, until final acceptance thereof by the Owner. The Steel Fabricator shall not be responsible for damages to the Subcontractor's work caused by others, including other subcontractors.

## 14.   WARRANTIES

**14.1.** Subcontractor warrants and agrees to provide a warranty for its Work for the same warranty period and under the same terms as set forth in the Steel Fabricator Agreement and Contract Documents. Subcontractor agrees to make good, at its own expense and at the convenience of the Owner, any defect in material or workmanship which may occur or develop prior to the end of the warranty period. To the extent Steel Fabricator is given notice of the need for warranty work, Steel Fabricator shall provide such notice to Subcontractor within three (3) business days. If no warranty period is otherwise specified in the Steel Fabricator Agreement or Contract Documents, the Subcontractor warrants, for a period of one year from substantial completion of the Project, or such longer time as the Contract Documents require, that the Subcontract Work is in full conformity with the Subcontract, and is free from defects in workmanship or materials.

**14.2.** All guarantees and warranties herein provided shall extend to the Owner, and other awarding authority, and to Steel Fabricator. The foregoing shall be in addition to, and not in lieu of, any and all warranties and remedies required by the Contract Documents or provided by law.

15

1203676:2

## KING STEEL, INC.

**14.3.** **Non-Waiver.** No warranty shall be deemed waived by reason of any inspection, acceptance or payment therefore. Each warranty expressed or implied will remain in effect for the period prescribed by law or the period prescribed by terms as set forth in the Steel Fabricator Agreement or Contract Documents, whichever is longer.

**14.4.** **No Limitation of Warranty or Remedy.** Steel Fabricator expressly rejects and objects in advance to any disclaimer or limitation by Subcontractor of any applicable warranties, express or implied, made by or deemed by Subcontractor, its agents or parties to whom it deals in connection with the performance of this Agreement. Steel Fabricator rejects and objects in advance to any disclaimer or limitation on remedies against Subcontractor, its agents or suppliers in connection with the sale of materials, goods, or services covered by this Agreement.

**14.5.** **Quality Standards.** Subcontractor shall comply with the standards of quality specified by this Agreement in addition to those customary in the industry if no requirement is specified. Steel Fabricator's Quality Representative shall be afforded free access during working hours to the plants of Subcontractor and its sub-suppliers in order to monitor compliance with the quality requirements. Steel Fabricator's right to inspect, examine, and test the goods shall extend through the manufacturing process, the time of shipment and a reasonable time after arrival at the final destination.

## 15. TAXES AND PERMITS

**15.1.** Except as otherwise provided in the Contract Documents, the Subcontractor agrees to pay, comply with, and hold the Steel Fabricator harmless against (i) the payment of all contributions, taxes, duties, or premiums which may be payable by it under federal, state or local law arising out of the performance of this Subcontract, and (ii) all sales, use or other taxes of whatever nature leveled or assessed against the Owner, the Contractor, Steel Fabricator, or the Subcontractor arising out of this Subcontract, including any interest or penalties. The Subcontractor waives any and all claims for additional compensation because of any increase in the aforementioned contributions, taxes, duties or premiums, unless payment for such increases is specifically provided for in the Contract Documents.

**15.2.** The Subcontractor shall obtain and pay for all permits, licenses, fees and certificates of inspection necessary for the prosecution and completion of the Subcontract Work. It shall arrange for all necessary inspections and approvals by public officials, subject to coordination of same with the Steel Fabricator.

## 16. FACILITIES

**16.1.** **Use of the Contractor's Facilities.** The Subcontractor shall not use the Contractor's material, vehicles, equipment, gas, electricity, water or other services, appliances, or facilities without the prior written consent of the Contractor's superintendent. If such written consent is obtained, the Subcontractor shall pay the Contractor's reasonable charges upon demand. The Subcontractor agrees to use any of the Contractor's material, vehicles, equipment or other services, appliances, or facilities "as is" and at the Subcontractor's own sole risk. The Subcontractor agrees to defend, indemnify, and hold harmless the Contractor and Steel Fabricator from and against all claims, demands, liabilities, and expenses, including attorneys' fees, arising from or relating to such use by the Subcontractor. Steel Fabricator will not provide any special hoist, cranes, rigging, or elevator service for raising of Subcontractor's men or materials, unless prior agreement has been reached on such services.

**16.2.** **Use of Subcontractor's Facilities.** Subcontractor shall make available to Steel Fabricator and all of its subcontractors, for reasonable periods of time, equipment, ladders, scaffolding, etc., necessary for Steel Fabricator and said subcontractors to complete the work to be performed under the Subcontract.

## 17. LIENS AND CLAIMS

**17.1.** **Waiver of Liens and Claims.** As a prerequisite for payment, Subcontractor shall provide, in the forms attached as Exhibit 1 and in a form as required by the Contractor and Owner, Lien Waivers and Claim Waivers. Subcontractor agrees to execute and/or obtain from its Subcontractors and suppliers, such further releases and/or waivers of lien and lien rights as may be required by this Agreement or requested by the Steel Fabricator.

**17.2.** **Bond to Release Liens.** If liens are filed, despite this waiver, the Subcontractor shall cause them to be discharged, by posting a bond with the appropriate authorities or otherwise, within five calendar (5) days of notice. If such liens are not so discharged, the Steel Fabricator may avail itself of any remedies allowed by law or equity, including, without limitation, itself taking appropriate measures to remove the liens, and charging the

16

## KING STEEL, INC.

resulting costs, including attorneys' fees, to the Subcontractor, withholding the amount of such costs from future payments to the Subcontractor, and/or terminating the Subcontract for default.

**17.3. Failure to Make Payments.** The Subcontractor shall immediately reimburse the Steel Fabricator for any amounts that are paid out under the Steel Fabricator's payment bond for the Project, if any, due to the Subcontractor's failure to make payments due, and/or for any costs, including attorneys' fees, that are incurred as a result of such failures by the Subcontractor. If the Steel Fabricator incurs, via indemnity obligations or otherwise, any costs or expenses whatsoever as a result of the Subcontractor's failure timely to pay amounts it owes to sub-subcontractors, suppliers, or others in connection with the Subcontract Work, the Subcontractor shall immediately reimburse the Steel Fabricator for such costs, including attorneys' fees.

## 18. OWNER'S APPROVAL OF SUBCONTRACTOR

**18.1.** This Subcontract may be contingent upon the Owner's approval of the Subcontractor, and materials and products being furnished by the Subcontractor. If, within five (5) business days after written notice to the Subcontractor of any disapproval by the Owner, the Subcontractor fails to overcome the Owner's objection, the Steel Fabricator shall have the right to cure the problem or to terminate the Subcontract for default or if the Owner disapproves of the Subcontractor, this Subcontract shall be deemed void *ab initio*.

## 19. SAFETY

**19.1.** The Subcontractor is being selected by the Steel Fabricator as a competent contractor with respect to the Subcontract Work. Therefore, the Subcontractor is required to perform its work in a safe manner. The Steel Fabricator is relying upon the skill and expertise of the Subcontractor to protect workers on the job site. The Subcontractor shall comply with all applicable local, state, or federal safety and health requirements, including OSHA as applicable. In accordance with state or federal requirements or both, the Subcontractor shall formulate and implement its own safety rules and regulations to promote safe and orderly prosecution of the work. Such rules shall provide for frequent and regular inspection of the job site, materials and equipment by competent persons designated by the Subcontractor. Competent persons mean those capable of identifying existing and predictable hazards and who have the authority to take prompt corrective measures to eliminate them. The Subcontractor shall also follow any safety rules that the Owner, Contractor, Steel Fabricator, or Contract Documents may impose, as well as any safety directions that may be issued by the Steel Fabricator. The Subcontractor also agrees to comply with any safety directions or rules reasonably issued by the Owner, Contractor, or the Steel Fabricator to prevent injury or assure compliance with applicable law, whether or not the Subcontractor agrees that those directions or rules are actually required in order to comply with applicable law, and to do so without demanding further compensation from the Steel Fabricator for such compliance.

**19.2. STEEL FABRICATOR HAS A ZERO TOLERANCE POLICY IN REGARD TO THE SAFETY OF WORKERS ON PROJECTS. SUBCONTRACTOR SHALL MEET OR EXCEED ALL REQUIREMENTS OF ALL FEDERAL, STATE AND LOCAL OCCUPATIONAL HEALTH AND SAFETY ADMINISTRATION (OSHA) REGULATIONS AND LAWS AT ALL TIMES WHILE PERFORMING WORK. A "COMPETENT PERSON" AS DEFINED BY OSHA SHALL BE EMPLOYED BY SUBCONTRACTOR AND SHALL BE ON SITE AT ALL TIMES WHEN WORK IS BEING PERFORMED IN ORDER TO ASSURE COMPLIANCE WITH REQUIRED SAFETY STANDARDS. FAILURE TO COMPLY WITH ALL OR PART OF THE REQUIREMENTS OF THIS PARAGRAPH CONSTITUTE GROUNDS FOR STEEL FABRICATOR TO STOP WORK UNTIL DEFICIENCIES ARE CORRECTED OR, IF REPEATED VIOLATIONS OCCUR, TO TERMINATE THIS SUBCONTRACT. COSTS, DIRECT OR INDIRECT, RESULTING FROM SUCH CORRECTIVE MEASURES CAUSED BY SUBCONTRACTOR SHALL BE BORNE SOLELY BY THE SUBCONTRACTOR.**

**19.3. Hazardous Materials.** Subcontractor shall comply in all respects with federal, state and local laws and regulations regarding the communication of hazards to all persons including, but not limited to, Subcontractor's employees and other employees at the site. Before introducing hazardous substances to the site, Subcontractor shall so advise the Steel Fabricator in writing, and shall provide to the Steel Fabricator and to other employers on site all information necessary to prevent risk of harm to any individual. Such information shall

17

KING STEEL, INC.

include, but not be limited to: the name(s) of any hazardous substances, material safety data sheets, and information regarding the labeling system in use, necessary protective measures and procedures for safe handling of the hazardous substance. Subcontractor shall provide supplemental information as necessary. In the event Subcontractor encounters on the site material which might reasonably be considered to contain polychlorinated biphenyl (PCB), asbestos or other hazardous material, the Subcontractor shall immediately stop work in the affected area and report the condition to Steel Fabricator both verbally and in writing. The work in the affected area shall resume either (a) when it has been determined that PCB, asbestos or other hazardous material is not present or (b) in compliance with applicable laws and regulations regarding PCB, asbestos or the identified hazardous material.

## 20.  MISCELLANEOUS

    **20.1.    All Work Covered by Subcontract**. If Subcontractor has commenced performance of its work hereunder and received from Steel Fabricator payments on account thereof prior to the execution of this Subcontract, it is specifically understood that all such work shall be included in the work to be performed under this Subcontract, and all such payments, as well as all future work to be performed hereunder, shall be in conformity with and subject to the terms and conditions hereunder.

    **20.2.    Clean-Up**. The Subcontractor shall at all times keep the Project site free from rubbish, debris, waste, or surplus materials resulting from its operations. The Subcontractor shall turn over the Subcontract Work in such condition as to permit the next succeeding or intervening work to be commenced without further cleaning. At the completion of the Subcontract Work, such work is to be clean and, in a condition, acceptable to the Owner. If the Subcontractor fails to comply with provisions of this Paragraph, the Steel Fabricator may perform such cleaning and charge the cost to the Subcontractor, or deduct the cost from future payments otherwise due or to become due to the Subcontractor.

    **20.3.    Independent Contractor**. The Steel Fabricator has contracted with the Subcontractor, and the Subcontractor is acting at all times pursuant to this Subcontract, as an independent contractor.

    **20.4.    Separate Agreements with Others**. The Subcontractor shall not enter into any agreements with the Owner, Contractor, or Architect with respect to the Project without first obtaining the Steel Fabricator's written consent. Subcontractor agrees to bind all sub-subcontractors and suppliers to the same terms and conditions as those set forth in this Agreement.

    **20.5.    Assignment**. This Subcontract and/or the proceeds from it shall not be sublet or assigned, in whole or in part, without the prior written consent of an officer of the Steel Fabricator.

    **20.6.    Premium Time**. Subcontractor shall bill no charges for premium time, with respect to the work included in the Subcontract except upon the prior written order of Steel Fabricator. Said order shall specify the amount of additional compensation or credit to be applied to the amount of this Subcontract. Field overtime authorized by Steel Fabricator is to be billed on a cost basis, including insurance and taxes. An allowance for 0% overhead and 5% profit will be approved.

    **20.7.    Applicable Law/Venue**. This Subcontract shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to its conflict provisions.

    **20.8.    Severability and Waiver**. The partial or complete invalidity of any one or more provisions of this Subcontract shall not affect the validity or continuing force and effect of any other provision. The failure of the Steel Fabricator to insist, in any one or more instances, upon the performance of any of the terms, covenants, or conditions of this Subcontract, or to exercise any right herein, shall not be construed as a waiver of relinquishment of such term, covenant, conditions or right as respects further performance.

    **20.9.    Contract Interpretation**. The various documents comprising the Subcontract are to be treated as complementary. If there is a conflict among them, the Subcontractor shall promptly notify the Steel Fabricator and obtain a direction before proceeding. Unresolved conflicts shall be resolved as follows: this Subcontract and its Exhibits shall take precedence over other documents.

18

## KING STEEL, INC.

**20.10.    Right of Recoupment or Offset.** The Subcontractor authorizes the Steel Fabricator to recoup or offset against amounts otherwise due and owing to the Subcontractor under the Subcontract, any and all amounts due to the Steel Fabricator from the Subcontractor, regardless of the origin of such obligations.

**20.11.    Retention and Audit of Records.** Subcontractor shall maintain all financial, construction, drawings, and performance records related to the Project for any time period required by law or until any applicable statute of limitations has expired but, in any case, not less than three (3) years after final payment has been made. Such records shall include, but not be limited to, accounting records, written policies and procedures, subcontract files, proposals, all documentation for reimbursable expenses and invoices (bank ledgers, cancelled checks, etc.), estimates, change orders, contracts, insurance documents, payroll documents and time sheets, memoranda and correspondence. Steel Fabricator shall have access to any books, documents, papers, and records of Subcontractor which are directly pertinent to the Project, for the purpose of making audits, examinations, excerpts, and transcriptions. Subcontractor shall ensure that Steel Fabricator has this right with respect to Subcontractor's subcontractors, suppliers, and consultants. If the audit identifies overpricing, overcharges, Subcontractor shall reimburse Steel Fabricator for such costs within a reasonable time not to exceed thirty (30) days.

**20.12.    Compliance with Immigration Laws.** Subcontractor agrees that it shall be obligated to comply with all requirements imposed on employers under IRCA with regard to every Subcontractor employee ("Contract Worker") who will perform services for Subcontractor, where such service is provided in connection with Subcontractor's performance of this Agreement. Subcontractor further agrees that Subcontractor is the "employer" as that term is defined at 8 C.F.R. Section 274a 1(g), and that Steel Fabricator is not the "employer" as so defined, with regard to such Contract Workers. In furtherance of its duties as employer under IRCA of Contract Workers directly employed by Subcontractor, Subcontractor agrees to do the following:

**20.12.1.    Complete USCIS Form I-9 for all Contract Workers.** Subcontractor agrees that it has sole responsibility for completing Form I-9 for all Contract Workers who provide services as an employee of Subcontractor as part of Subcontractor's performance of this Agreement and that it will do so and will further update such Form to the extent required by law. Subcontractor further warrants that all Subcontractor's employees who complete Form I-9 for such Contract Workers will be knowledgeable of all Form I-9 requirements including, but not limited to, knowledge of which documents do and do not satisfy the requirements of Form I-9, and that such employees will otherwise complete Form I-9 in full compliance with IRCA.

**20.12.2.    Subcontractor's Warranty of Employment Authorization for all Contract Workers.** Subcontractor hereby warrants that no Contract Worker directly employed by Subcontractor will provide services pursuant to this Agreement until Subcontractor has completed Form I-9 for such Contract Worker in the manner required by IRCA. Subcontractor further warrants that it has taken all necessary steps to comply with IRCA and that Subcontractor believes all Contract Workers directly employed by Subcontractor are authorized to work in the United States.

**20.12.3.    Indemnification and Hold Harmless.** Subcontractor agrees that in any event any government agency determines that any Contract Worker directly employed by Subcontractor to perform duties under this Agreement is not authorized for employment in the United States, Subcontractor shall indemnify and hold harmless Owner, Steel Fabricator, Contractor, and any of Steel Fabricator's agents, employees, officers, directors, trustees or other persons acting on Steel Fabricator's behalf, from any liability incurred by Steel Fabricator, Contractor or Owner as a result of such determination. Such indemnification shall include, by way of example but not in any way limited to, any civil or criminal fines or penalties, assessed or alleged, and any costs incurred in responding to or participating in any government investigation, finding, recommendation, hearing, appeal or any other proceeding, including attorney's fees and costs.

.1203676:2

KING STEEL, INC.

**Basis for Amount of Subcontract:**
$590,000- Erect Structural Steel
$ 20,000- Compactor
$ 25,000- Increase Crane Size from 90 Ton to 160 Ton
$ 16,000- Increase Crane Size from 160 Ton to 330 Ton
$ 40,000- Provide Pins (if not accepted by GC this amount will be deducted via Change Order)
$691,000- Amount of Subcontract (excludes erection of misc metals)

**Clarifications:**
Two erection crews to be utilized: one in the high roof area (Seq 1-4) and one in the low roof area
(Seq 5-9) with erection of both areas occurring simultaneously.
No cranes are allowed on the slab (forklifts are allowed with acceptance by the GC of loading criteria
being a condition of allowance).
All equipment utilized on the slab will have "diapers", tire covers, etc. to protect the slab from leaks or
marking. Erector is aware the slab is a finished product and will take reasonable care to protect the
surface (and integrity) of the slab. Erector will be responsible for spills and damage due to negligence.

*Erector must have!!*
*90-100 Ft Boons on slab.*
*10K-12K Forklift on slab.*
*Diaper Agreed.*
*No Crane on slab.*

1203676:2

# KING STEEL INC.

353 Swanson Drive
Lawrenceville, GA 30043-8533
Telephone (770) 963-3888
Fax (770) 407-7619

| | | | | |
|---|---|---|---|---|
| **TITLE:** | Revised Contract Drawings | | **CHANGE ORDER** | |
| | | | **NO.** | 1 |
| **PROJECT:** | 2104 Ken's Foods | | **DATE:** | 06/17/2021 |
| | | | **JOB:** | 2104 |
| | | | **CONTRACT/PO:** | 2104-05 |
| **TO:** | Attn: Kelly Brown | | **CONTRACT DATE:** | 05/06/2021 |
| | Statesboro Erectors | | | |
| | 2760 Country Club Road | | | |
| | Statesboro, GA 30458 | | | |
| | Phone:912-871-7766 | | | |

| Num | Item | Description | Ref | Qty | Unit | Unit Price | Amount |
|---|---|---|---|---|---|---|---|
| 1 | | Addendum D | | 0.000 | LS | 0.00 | 1,200.00 |
| 2 | | Permit Set | | 0.000 | LS | 0.00 | 10,000.00 |

| | |
|---|---|
| **Item Total:** | $11,200.00 |
| **Total:** | $0.00 |
| **Total:** | $11,200.00 |

| | |
|---|---|
| The original Contract Sum was | $691,000.00 |
| The net change by previously authorized Change Orders is | $0.00 |
| The Contract Sum prior to this Change Order was | $691,000.00 |
| The Contract Sum will be increased by this Change Order in the amount of | $11,200.00 |
| The new Contract Sum including this Change Order will be | $702,200.00 |
| The Contract Time will be increased by | 0 days |
| The date of Substantial Completion as of this Change Order therefore is | Unchanged |

**ACCEPTED**

| Statesboro Erectors | King Steel Inc | |
|---|---|---|
| By: | By: | By: |
| Kelly Brown | Paul Swanson | |
| Date: 6-22-21 | Date: | Date: |

CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-0292**
**5/2/2023 10:54 AM**
TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| STATESBORO ERECTORS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. |
| AUTO-OWNERS INSURANCE COMPANY and OWNERS INSURANCE COMPANY, | § § § § | JURY TRIAL DEMANDED 23-C-02926 |
| Defendants. | § § § | |

## **NOTICE OF FILING**

COMES NOW, Statesboro Erectors, Inc., Plaintiff herein ("Plaintiff" or "Statesboro"), and hereby files this Notice of Filing for the following:

Exhibit B to the Complaint.

Respectfully submitted this 28<u>th</u> day of April, 2023.

Clay Taulbee & Myers, LLC

<u>/s/ Wesley C. Taulbee</u>
Wesley C. Taulbee
Georgia Bar No. 368972
*Attorney for Plaintiff*

201 S. Main Street, Suite C
Statesboro, Georgia 30458
(912) 225-3951
wes@ctmjustice.com

EXHIBIT
**B**

*Addition umbrella
policy*

18-0425-00
GLENN-DAVIS & ASSOCIATES
23452 HIGHWAY 80 E
STATESBORO GA 30461-0844



### *Auto-Owners.*
# INSURANCE
### LIFE · HOME · CAR · BUSINESS

PO Box 30660 · Lansing, MI 48909-8160
517.323.1200

10-22-2020

Owners Insurance Company

> You can view your policy or change your paperless options at
> any time online at www.auto-owners.com.

STATESBORO ERECTORS INC
2760 COUNTRY CLUB RD
STATESBORO GA 30458-9727

Your agency's phone number is 912-489-3716.

RE: Policy 132318-80144613-20

Thank you for selecting Auto-Owners Insurance Group to serve your insurance needs! Feel free to contact your independent Auto-Owners agent with questions you may have.

Auto-Owners and its affiliate companies offer a full complement of policies, each of which has its own eligibility requirements, coverages and rates. Please take this opportunity to review your insurance needs with your Auto-Owners agent, and discuss which company and program may be most appropriate for you.

Auto-Owners Insurance Company was formed in 1916. Our A++ (Superior) rating by A.M. Best Company signifies that we have the financial strength to provide the insurance protection you need. The Auto-Owners Insurance Group is comprised of six property and casualty companies and a life insurance company.

*Serving Our Policyholders and Agents Since 1916*

Agency Code    18-0425-00                                                Policy Number    132318-80144613

59321 (7-00)

# NOTICE
**Georgia**

The laws of the State of Georgia prohibit insurers from unfairly discriminating against any person based upon his or her status as a victim of family violence.

59321 (7-00)                                                                           Page 1 of 1

Agency Code   18-0425-00                                                      Policy Number   132318-80144613

59390 (11-20)

# NOTIFICATION OF POSSIBLE CHANGES
# IN COVERAGE FOR TERRORISM

Dear Policyholder:

The Terrorism Risk Insurance Act (including ensuing Congressional actions pursuant to the Act) will expire on December 31, 2027 unless the Federal government extends the Act.  What this means to you is the following:

1.   Subject to policy terms and conditions, the enclosed policy will provide insurance coverage for certified acts of terrorism as defined in the Act only until December 31, 2027.

2.   A conditional endorsement entitled, Conditional Exclusion Of Terrorism Involving Nuclear, Biological Or Chemical Terrorism (Relating To Disposition Of Federal Terrorism Risk Insurance Act) is enclosed.  This conditional endorsement will only apply if the Act is not extended or if the Act is revised to increase statutory deductibles, decrease the federal government's share in potential losses above the statutory deductibles, change the levels, terms or conditions of coverage and we are no longer required to make terrorism coverage available and elect not to do so.  It will not apply if the Act is simply extended.

3.   The conditional endorsement will provide coverage for an incident of terrorism pursuant to the terms and conditions of the policy only if the incident does not involve nuclear, biological or chemical material.

4.   A premium charge for the conditional endorsement will be applied effective January 1, 2028.  The premium will be pro rated for the remainder of the policy term and is one-half of the current premium charge appearing in the Declarations for TERRORISM - CERTIFIED ACTS.  However, it will only be made if the Terrorism Risk Insurance Act (including ensuing Congressional actions pursuant to the Act) is not extend.  Revised Declarations will be mailed to you after January 1, 2028.

5.   If the Act is extended without any revision, the enclosed policy will continue to provide coverage for certified acts of terrorism.  The conditional endorsement will not be activated and the changes in coverage or premium referenced above will not apply.

6.   If the Act is extended with revisions or is replaced, and we are required or elect to continue to offer coverage for certified acts of terrorism, we may amend this policy in accordance with the provisions of the revised Act or its replacement.

This notice is for informational purposes only.

If you have any questions concerning your policy or this notice, please contact your Auto-Owners agency.

59325 (12-19)

# NOTICE OF PRIVACY PRACTICES

## What We Do To Protect Your Privacy

At Auto-Owners Insurance Group*, we value your business and we want to retain your trust.  In the course of providing products and services, we may obtain nonpublic personal information about you.  We assure you that such information is used only for the purpose of providing our products and services to you.

## Protecting Confidentiality

Our agents and Company associates may have access to nonpublic personal information only for the purpose of providing our products or services to you.  We maintain physical, electronic and procedural safeguards against unauthorized use of your nonpublic personal information.

## Information We Obtain

To assist in underwriting and servicing your policy, we may obtain nonpublic personal information about you.  For example, we routinely obtain information through applications, forms related to our products or services, from visiting www.auto-owners.com, and your transactions with us.  We may obtain such information from our affiliates, independent insurance agents, governmental agencies, third parties, or consumer reporting agencies.

The type of information that we collect depends on the product or service requested, but may include your name, address, contact information, social security number, credit history, claims history, information to properly investigate and resolve any claims, or billing information.  We may obtain your medical history with your permission.  The nature and extent of the information we obtain varies based on the nature of the products and services you receive.

## The Internet and Your Information

If you would like to learn about how we gather and protect your information over the Internet, please see our online privacy statement at www.auto-owners.com/privacy.

Generally, Auto-Owners may use cookies, analytics, and other technologies to help us provide users with better service and a more customized web experience.  Our business partners may use tracking services, analytics, and other technologies to monitor visits to www.auto-owners.com.  The website may use web beacons in addition to cookies.  You may choose to not accept cookies by changing the settings in your web browser.

Information obtained on our websites may include IP address, browser and platform types, domain names, access times, referral data, and your activity while using our site; who should use our web site; the security of information over the Internet; and links and co-branded sites.

## Limited Disclosure

Auto-Owners Insurance Group companies do not disclose any nonpublic personal information about their customers or former customers except as permitted by law.  We do not sell your personal information to anyone.  We do not offer an opportunity for you to prevent or "opt out of" information sharing since we only share personal information with others as allowed by law.

When sharing information with third parties to help us conduct our business, we require them to protect your personal information.  We do not permit them to use or share your personal information for any purpose other than the work they are doing on our behalf or as required by law.

59325 (12-19)

Agency Code   18-0425-00                                                     Policy Number   132318-80144613

The types of information disclosed may include personal information we collect as necessary to service your policy or account, investigate and pay claims, comply with state and federal regulatory requests or demands, and process other transactions that you request.  Third parties that receive disclosures may include your independent agent, regulators, reinsurance companies, fraud prevention agencies, or insurance adjusters.

## How Long We Retain Your Information

We generally retain your information as long as reasonably necessary to provide you services or to comply with applicable law and in accordance with our document retention policy.  We may retain copies of information about you and any transactions or services you have used for a period of time that is consistent with applicable law, applicable statute of limitations or as we believe is reasonably necessary to comply with applicable law, regulation, legal process or governmental request, to detect or prevent fraud, to collect fees owed, to resolve disputes, to address problems with our services, to assist with investigations, to enforce other applicable agreements or policies or to take any other actions consistent with applicable law.

In some circumstances we may anonymize your personal information (so that it can no longer be associated with you) for research or statistical purposes, in which case we may use this information indefinitely without further notice to you.  This allows the specific information collected (name, email, address, phone number, etc.) to become anonymous, but allows Auto-Owners to keep the transaction or engagement data.

## Changes to the Privacy Policy

We will provide a notice of our privacy policy as required by law.  This policy may change from time to time, but you can always review our current policy by visiting our website at www.auto-owners.com/privacy or by contacting us.

## Contact Us

Auto-Owners Insurance Company
Phone: 844-359-4595 (toll free)
Email: privacyrequest@aoins.com

*Auto-Owners Insurance Group includes, Auto-Owners Insurance Company, Auto-Owners Life Insurance Company, Home-Owners Insurance Company, Owners Insurance Company, Property-Owners Insurance Company and Southern-Owners Insurance Company.

59325 (12-19)                                                                          Page 2 of 2

# *Owners*

Page   1

Issued   10-22-2020

INSURANCE COMPANY
6101 ANACAPRI BLVD., LANSING, MI 48917-3999

**TAILORED PROTECTION POLICY DECLARATIONS**

AGENCY   GLENN-DAVIS & ASSOCIATES
18-0425-00             MKT TERR 087        912-489-3716

Renewal Effective     12-16-2020

**POLICY NUMBER     132318-80144613-20**

Company Use                 80-23-GA-1312

INSURED   STATESBORO ERECTORS INC

ADDRESS   2760 COUNTRY CLUB RD

STATESBORO  GA  30458-9727

Company
Bill

| Policy Term | |
|---|---|
| 12:01 a.m. to | 12:01 a.m. |
| 12-16-2020 | 12-16-2021 |

In consideration of payment of the premium shown below, this policy is renewed.  Please attach this Declarations and attachments to your policy.  If you have any questions, please consult with your agent.

55039 (11-87)

**COMMON POLICY INFORMATION**

**Business Description:**     Steel Erection Compa

**Entity:**     Corporation

| | PREMIUM |
|---|---|
| THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PART(S): | |
| COMMERCIAL GENERAL LIABILITY COVERAGE | $10,145.00 |
| **TOTAL** | **$10,145.00** |
| **PAID IN FULL DISCOUNT** | **$945.00** |
| **TOTAL POLICY PREMIUM IF PAID IN FULL** | **$9,200.00** |

**THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**
The Paid in Full Discount does not apply to fixed fees, statutory charges or minimum premiums.

Premium shown above for commercial general liability coverage is an advanced premium deposit and may be subject to audit.

Forms that apply to all coverage part(s) shown above (except garage liability, dealer's blanket, commercial automobile, if applicable):
55003   (07-12)     59390   (11-20)

A 09% Cumulative Multi-Policy Discount applies.  Supporting policies are marked with an (X).
Comm Umb(X)  Comm Auto(X)  WC(X) Life( )  Personal( )  Farm( ).

Countersigned By: _____

Page  2

| | |
|---|---|
| Owners Ins. Co. | Issued     10-22-2020 |

| | | |
|---|---|---|
| AGENCY   GLENN-DAVIS & ASSOCIATES<br>18-0425-00              MKT TERR 087 | Company<br>Bill | POLICY NUMBER   132318-80144613-20<br>80-23-GA-1312 |
| INSURED   STATESBORO ERECTORS INC | | Term   12-16-2020  to  12-16-2021 |

55040 (11-87)

### COMMERCIAL GENERAL LIABILITY COVERAGE

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| General Aggregate | $2,000,000 |
| (Other Than Products-Completed Operations) | |
| Products-Completed Operations Aggregate | $1,000,000 |
| Personal And Advertising Injury | $1,000,000 |
| Each Occurrence | $1,000,000 |
| **COMMERCIAL GENERAL LIABILITY PLUS ENDORSEMENT** | |
| Damage to Premises Rented to You | $300,000  Any One Premises |
| (Fire, Lightning, Explosion, Smoke or Water Damage) | |
| Medical Payments | $10,000  Any One Person |
| Expanded Coverage Details See Form: | |
| Extended Watercraft | |
| Personal Injury Extension | |
| Broadened Supplementary Payments | |
| Broadened Knowledge Of Occurrence | |
| Additional Products-Completed Operations Aggregate | |
| Blanket Additional Insured - Lessor of Leased Equipment | |
| Blanket Additional Insured - Managers or Lessors of Premises | |
| Newly Formed or Acquired Organizations Extension | |
| Blanket Waiver of Subrogation | |

Twice the "General Aggregate Limit", shown above, is provided at no additional charge for each 12 month period in accordance with form 55885.

**AUDIT TYPE:** Annual Audit

Forms that apply to this coverage:

| | | | | |
|---|---|---|---|---|
| 59350  (01-15) | 55405  (07-08) | 55146  (06-04) | 55068  (08-89) | IL0021  (07-02) |
| IL0017  (11-85) | IL0262  (02-15) | CG2037  (10-01) | CG2010  (10-01) | 55200  (06-96) |
| 55298  (05-17) | CG3201  (12-04) | CG2106  (05-14) | 55352  (05-17) | CG2294  (10-01) |
| 55423  (05-17) | CG0001  (04-13) | 55513  (05-17) | CG2109  (06-15) | 55029  (05-17) |
| CG2196  (03-05) | CG2132  (05-09) | CG2147  (12-07) | 55885  (05-17) | 55373  (05-17) |
| CG2010  (04-13) | 59321  (07-00) | 59325  (12-19) | 59390  (11-20) | |

Page  3

Owners Ins. Co.

| | | Issued    10-22-2020 |
|---|---|---|

| AGENCY | GLENN-DAVIS & ASSOCIATES | | Company | POLICY NUMBER | 132318-80144613-20 |
|---|---|---|---|---|---|
| | 18-0425-00          MKT TERR 087 | | Bill | | 80-23-GA-1312 |

| INSURED | STATESBORO ERECTORS INC | | Term  12-16-2020  to  12-16-2021 |
|---|---|---|---|

---

## LOCATION 0001 - BUILDING 0001

**Location:**  2760 Country Club Rd, Statesboro, GA 30458-9727

**Territory:**  003                                           **County:**  Bulloch

| CLASSIFICATION | CODE | SUBLINE | PREMIUM BASIS | RATE | PREMIUM |
|---|---|---|---|---|---|
| Commercial General Liability Plus Endorsement Included At 7.5% Of The Premises Operation Premium | 00501 | Prem/Op | Prem/Op Prem Included | Included | Included |
| Amendment Of Location & Project Aggregate Limits Of Insurance Endorsement Included At 2% Of The Premises Operations Premium | 00502 | | Prem/Op Prem | | |
| Contractors - Executive Supervisors Or Executive Superintendents | 91580 | Prem/Op Prod/Comp Op | Payroll $86,440 $86,440 | Each 1000 22.107 .648 | $1,911.00 $56.00 |
| Contractors - Subcontracted Work - In Connection With Construction, Reconstruction, Repair Or Erection Of Buildings | 91585 | Prem/Op Prod/Comp Op | Total Costs If Any If Any | Each 1000 1.228 2.548 | Included Included |
| Metal Erection - Decorative Or Artistic | 97650 | Prem/Op Prod/Comp Op | Payroll If Any If Any | Each 1000 18.766 10.487 | Included Included |
| Metal Erection - Nonstructural Noc | 97653 | Prem/Op Prod/Comp Op | Payroll $310,694 $310,694 | Each 1000 13.764 10.047 | $4,276.00 $3,122.00 |
| Additional Interests | 49950 | | | | |
| 55373 Blnkt Add'L Ins-O/L/C | | Prod/Comp Op | Flat Charge | | $500.00 |
| Cg2037 10-01 Add'L Ins - O/L/C | | | | | |
| 1. Caddell Construction | | Prod/Comp Op | Flat Charge | | $50.00 |
| 2. Choate Construction | | Prod/Comp Op | Flat Charge | | $50.00 |
| Cg2010 10-01 Add'L Ins-Excl Prod | | | | | |
| 1. Caddell Construction | | Prem/Op | Flat Charge | | $20.00 |
| 2. Choate Construction | | Prem/Op | Flat Charge | | $20.00 |
| Cg2010 04-13 Add'L Ins-Excl Prod | | | | | |
| 1. Rai Construction | | Prem/Op | Flat Charge | | $20.00 |
| 2. Benning Construction | | Prem/Op | Flat Charge | | $20.00 |

| COMMERCIAL GENERAL LIABILITY COVERAGE - LOCATION 0001 SUMMARY | PREMIUM |
|---|---|
| TERRORISM - CERTIFIED ACTS    SEE FORM: 59350, 55405, 59390 | $100.00 |
| LOCATION 0001 | $10,145.00 |

POLICY NUMBER:

**COMMERCIAL GENERAL LIABILITY**
**CG 20 10 10 01**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name of Person or Organization: |
| --- |
| CADDELL CONSTRUCTION CO (DE) LLC<br>CHOATE CONSTRUCTION |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**A.** **Section II - Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of your ongoing operations performed for that insured.

**B.** With respect to the insurance afforded to these additional insureds, the following exclusion is added:

**2.** **Exclusions**
This insurance does not apply to "bodily injury" or "property damage" occurring after:

**(1)** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; or

**(2)** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

---

**CG 20 10 10 01**                    © ISO Properties, Inc., 2000                    **Page 1 of 1**

POLICY NUMBER:                                                              **COMMERCIAL GENERAL LIABILITY**
                                                                           **CG 20 37 10 01**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - COMPLETED OPERATIONS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| **Name of Person or Organization:**<br>CADDELL CONSTRUCTION CO (DE) LLC<br>CHOATE CONSTRUCTION |
|---|
| **Location And Description of Completed Operations:** |
| **Additional Premium:** |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**Section II - Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" at the location designated and described in the schedule of this endorsement performed for that insured and included in the "products-completed operations hazard".

**CG 20 37 10 01**                          © ISO Properties, Inc., 2000                          **Page 1 of 1**

COMMERCIAL GENERAL LIABILITY
CG 20 10 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s) | Location(s) Of Covered Operations |
|---|---|
| RAI CONSTRUCTION<br><br>BENNING CONSTRUCTION<br><br>CHOATE CONSTRUCTION | |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. | |

**A. Section II - Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:

1. Your acts or omissions; or
2. The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

1. The insurance afforded to such additional insured only applies to the extent permitted by law; and
2. If coverage provided to the additional insured is required by a contract or agreement, the

CG 20 10 04 13 

© Insurance Services Office, Inc., 2012

Page 1 of 2

Agency Code   18-0425-00                                                                  Policy Number   132318-80144613

insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

This insurance does not apply to "bodily injury" or "property damage" occurring after:

1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

2. That portion of "your work" out of which the injury or damage arises has been put to its

intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance**:

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

1. Required by the contract or agreement; or

2. Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

CG 20 10 04 13                          © Insurance Services Office, Inc., 2012                          Page 2 of 2

55405 (7-08)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CONDITIONAL EXCLUSION OF TERRORISM INVOLVING NUCLEAR, BIOLOGICAL OR CHEMICAL TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART

**A. Applicability Of This Endorsement**

1.  The provisions of this endorsement will apply if and when one of the following situations occurs:

    a.  The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act of 2002 (including ensuing Congressional actions pursuant to the Act), terminates; or

    b.  The Program is renewed, extended or otherwise continued in effect:

        (1)  With revisions that increase insurers' statutory percentage deductible or decrease the federal government's statutory percentage share in potential terrorism losses above such deductible, or that results in a change in the level or terms or conditions of coverage; and

        (2)  We are not required by the Program to make terrorism coverage available to you and elect not to do so.

2.  When this endorsement becomes applicable in accordance with the terms of A.1.a. or A.1.b., above, it supersedes any terrorism endorsement already endorsed to this policy that addresses "certified acts of terrorism".

3.  If this endorsement does NOT become applicable, then any terrorism endorsement already endorsed to this policy, that addresses "certified acts of terrorism", will remain in effect. However, if the Program is renewed, extended or otherwise continued in effect with revisions that change the level or terms or conditions of coverage, and we are required to offer you the revised coverage or to provide revised coverage to those who previously accepted coverage under the Program, then we will take the appropriate steps in response to the federal requirements.

**B.** The following definition is added and applies under this endorsement wherever the term terrorism is enclosed in quotation marks.

"Terrorism" means activities against persons, organizations or property of any nature:

1.  That involve the following or preparation for the following:

    a.  Use or threat of force or violence; or

    b.  Commission or threat of a dangerous act; or

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Copyright ISO Properties, Inc., 2004

    **c.**  Commission or threat of an act that inter-
feres with or disrupts an electronic, com-
munication, information, or mechanical
system; and

  **2.**  When one or both of the following applies:

    **a.**  The effect is to intimidate or coerce a
government or the civilian population or any
segments thereof, or to disrupt any segment
of the economy; or

    **b.**  It appears that the intent is to intimidate or
coerce a government or the civilian popu-
lation, or to further political, ideological,
religious, social or economic objectives or to
express (or express opposition to) a philo-
sophy or ideology.

**C.**  The following exclusion is added:

**Exclusion Of "Terrorism"**
We will not pay for "bodily injury", "property dam-
age", "personal injury" or "advertising injury" caused
directly or indirectly by "terrorism", including action in
hindering or defending against an actual or expected
incident of "terrorism". All "bodily injury", "property
damage", "personal injury" or "advertising injury" is
excluded regardless of any other cause or event that
contributes concurrently or in any sequence to such

injury or damage. This exclusion applies only when
one or more of the following are attributed to an inci-
dent of "terrorism":

**1.**  The "terrorism" is carried out by means of the
dispersal or application of radioactive material,
or through the use of a nuclear weapon or
device that involves or produces a nuclear
reaction, nuclear radiation or radioactive
contamination;

**2.**  Radioactive material is released, and it appears
that one purpose of the "terrorism" was to rel-
ease such material;

**3.**  The "terrorism" is carried out by means of the
dispersal or application of pathogenic or poi-
sonous biological or chemical materials; or

**4.**  Pathogenic or poisonous biological or chemical
materials are released, and it appears that one
purpose of the "terrorism" was to release such
materials.

Multiple incidents of "terrorism" which occur within a
72-hour period and appear to be carried out in
concert or to have a related purpose or common
leadership will be deemed to be one incident,
regardless of whether this endorsement was in
effect during the entirety of that time period or not.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Agency Code   18-0425-00                                                      Policy Number   132318-80144613

59350 (1-15)

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM
## AND
# IMPORTANT INFORMATION REGARDING TERRORISM RISK INSURANCE COVERAGE

It is agreed:

1.  With respect to any one or more certified acts of terrorism, we will not pay any amounts for which we are not responsible because of the application of any provision which results in a cap on our liability for payments for terrorism losses in accordance with the terms of the federal Terrorism Risk Insurance Act of 2002 (including ensuing Congressional actions pursuant to the Act).

2.  Certified act of terrorism means any act certified by the Secretary of the Treasury, in consultation with:

    a.  the Secretary of Homeland Security; and
    b.  the Attorney General of the United States

    to be an act of terrorism as defined and in accordance with the federal Terrorism Risk Insurance Act of 2002 (including ensuing Congressional actions pursuant to the Act).

3.  Under the federal Terrorism Risk Act of 2002 (including ensuing Congressional actions pursuant to the Act) a terrorist act may be certified:

    a.  if the aggregate covered commercial property and casualty insurance losses resulting from the terrorist act exceed $5 million; and

    b.  (1)  if the act of terrorism is:

        a)  a violent act; or

        b)  an act that is dangerous to human life, property or infrastructure; and

        (2)  if the act is committed:

        a)  by an individual or individuals as part of an effort to coerce the civilian population of the United States; or

        b)  to influence the policy or affect the conduct of the United States government by coercion.

All other policy terms and conditions apply.

# IMPORTANT INFORMATION REGARDING TERRORISM RISK INSURANCE COVERAGE

The Terrorism Risk Insurance Act of 2002 was signed into law on November 26, 2002.  The Act (including ensuing Congressional actions pursuant to the Act) defines an act of terrorism, to mean any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States to be (i) an act of terrorism; (ii) to be a violent act or an act that is dangerous to human life, property or infrastructure; (iii) to have resulted in damage within the United States or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and (iv) to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

Subject to the policy terms and conditions, this policy provides insurance coverage for acts of terrorism as defined in the Act.

Any coverage for certain commercial lines of property and casualty insurance provided by your policy for losses caused by certified acts of terrorism are partially paid by the federal government under a formula established by federal law.  Under this formula, the government will reimburse us for 85% of such covered losses that exceed the statutory deductible paid by us.  However, beginning January 1, 2016 the share will decrease 1% per calendar year until it equals 80%.  **You should also know that in the event aggregate insured losses exceed $100 billion during any year the Act is in effect, then the federal government and participating United States insurers that have met their insurer deductible shall not be liable for the payment of any portion of that amount of the loss that exceeds $100 billion.  In the event that aggregate insured losses exceed $100 billion annually, no additional claims will be paid by the federal government or insurers.**  This formula is currently effective through December 31, 2020 unless extended.

The premium charge, if any, for this coverage is shown separately on the attached Declarations page.  In the event of a certified act of terrorism, future policies also may include a government assessed terrorism loss risk-spreading premium in accordance with the provisions of the Act.

Please contact us if you would like to reject coverage for certified acts of terrorism.

E-FILED IN OFFICE - CB
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-02926**
**5/2/2023 10:54 AM**
TIANA P. GARNER, CLERK

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| STATESBORO ERECTORS, INC., | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. |
| AUTO-OWNERS INSURANCE COMPANY and OWNERS INSURANCE COMPANY, | § § § § § | JURY TRIAL DEMANDED 23-C-02926 |
| Defendants. | § § | |

## NOTICE OF FILING

COMES NOW, Statesboro Erectors, Inc., Plaintiff herein ("Plaintiff" or "Statesboro"), and

hereby files this Notice of Filing for the following:

Exhibits C - F to the Complaint.

Respectfully submitted this <u>28th</u> day of April, 2023.

Clay Taulbee & Myers, LLC

<u>/s/ Wesley C. Taulbee</u>
Wesley C. Taulbee
Georgia Bar No. 368972
*Attorney for Plaintiff*

201 S. Main Street, Suite C
Statesboro, Georgia 30458
(912) 225-3951
wes@ctmjustice.com

1



**EXHIBIT**

Office Address:
353 Swanson Drive
Lawrenceville, Georgia 30043-8533
Fax (770) 407-7619

Plant Location:
251-B Hosea Road
Lawrenceville, Georgia 30046-4605
Fax (770) 963-3442

March 1, 2022

**Sent Via Email: kelly@statesboroerectors.com**
Mr. Kelly Brown
President
Statesboro Erectors, Inc.
2760 Country Club Road
Statesboro, BA 30458

      Re:    Ken's Food Project, Subcontract No. 2104-05
            **Claim and Demand for Payment**
            **<u>CONFIDENTIAL SETTLEMENT COMMUNICATION</u>**

Dear Mr. Brown:

      On May 6, 2021, King Steel, Inc. ("King Steel") and Statesboro Erectors ("Statesboro") entered into a Subcontract wherein Statesboro agreed to provide erection and related services for the Ken's Foods Project located in McDonough, Georgia (the "Project"). On October 9, 2021, there was a steel collapse during erection of the Project by Statesboro. According to information obtained by King Steel, the collapse appears to have occurred due to lack of temporary cables or bracing for steel columns.

      King Steel was required to supply additional structural steel (including shop drawings, materials, shop labor, freight, and paint) and joists to replace the structural steel damaged in the collapse. King Steel also incurred additional costs as a result of the collapse including an <u>on-site safety representative</u>, an erection plan prepared and stamped by a professional engineer, and additional project management. King Steel has incurred <u>damages of at least $426,291.89.</u>

Thank you,

Marvin Brown

Digitally signed by Marvin Brown
DN: C=US, E=mbrown@kingsteelinc.net, O=King Steel, CN=Marvin Brown
Date: 2022.03.02 14:25:01-05'00'

Marvin Brown
President

1



**EXHIBIT**

**D**

LAW OFFICES
## TAULBEE, RUSHING, SNIPES, MARSH & HODGIN, LLC

12 SIEBALD STREET
POST OFFICE BOX 327
STATESBORO, GEORGIA 30458
www.statesborolawgroup.com

DAN R. TAULBEE
STEPHEN T. RUSHING
DANIEL B. SNIPES (GA & SC)
LAURA T. MARSH
WESLEY C. TAULBEE
SCOTT A. HODGIN
CHRISTOPHER R. GOHAGAN (GA & SC)
CHARLIE MCCOOK

P: 912-764-9055
F: 912-764-8687
E: awall@statesborolawgroup.com

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**RECEIPT NO: 7017 1450 0000 1727 2183 (Principal Office)**
**RECEIPT NO: 7017 1450 0000 1727 2190 (Registered Agent)**
**RECEIPT NO: 7017 1450 0000 1727 2206 (Contractor)**

April 29, 2022

Ken's Food, Inc
2 Sun Court, Ste. 400
Peachtree Corners, GA 30092

Ken's Food, Inc.
P.O. Box 849
Marlborough, MA 01752-0849

King Steel, Inc.
353 Swanson Drive
Lawrenceville, Georgia 30043-8533

RE:   CLAIM OF LIEN – 160 KING MILL ROAD, MCDONOUGH, GEORGIA

TO WHOM IT MAY CONCERN:

Please find the enclosed Claim of Lien which was filed by Statesboro Erectors, Inc. against the above-referenced property on April 29, 2022. This notice is being provided to you pursuant to O.C.G.A. § 44-14-361.1(a)(2) as you have been identified as the owner or contractor (as agent for the owner) of this property.

Sincerely,
TAULBEE RUSHING SNIPES
MARSH & HODGIN, LLC

Ashley Wall
Paralegal to Christopher R. Gohagan

P: (912) 764-9055
F: (912) 764-8687
E: awall@statesborolawgroup.com

BK:1664 PG:149-150
Filed and Recorded
Apr-29-2022 02:23 PM
DOC# 2022 - 007714
SABRIYA HILL
CLERK OF SUPERIOR COURT
HENRY COUNTY, GA
Participant ID: 7084885854

RETURN RECORDED DOCUMENT TO:
Taulbee, Rushing, Snipes, Marsh & Hodgin, LLC
c/o Christopher R. Gohigan
12 Siebald Street, Statesboro, Georgia 30458

COUNTY OF HENRY          }
                         }
STATE OF GEORGIA         }

### CLAIM OF LIEN

This claim of lien expires and is void 395 days from the date of filing of the claim of lien if no notice of commencement of lien action is filed in that time period. The owner is hereby further notified that said owner has the right to contest this lien.

STATESBORO ERECTORS, INC., a subcontractor, materialman and mechanic, files this preliminary notice of lien rights in the amount of TWO HUNDRED FIFTY-NINE THOUSAND SEVEN HUNDRED THIRTY-FOUR DOLLARS AND 0/100 CENTS ($259,734.00) as of March 9, 2022, plus interest on the following described property:

All that tract or parcel of land situate, lying and being in Land Lots 219, 220, 229, and 230 of the 7th District, Henry County, Georgia, and being more particularly described as follows:

Beginning at a ½ inch rebar set at the intersection of the westerly right of way of King Mill Road (having an 80 foot right of way width) with the northwesterly right of way of King Mill Court (having an 80 foot right of way width); thence from said Point of Beginning as thus established, proceeding along the eight of way of King Mill Court, South 16 Degrees 17 Minutes 47 Seconds West, a distance of 973.23 feet to a ½ inch rebar set; thence continuing along said right of way, South 16 Degrees 25 Minutes 16 Seconds West, a distance of 574.72 feet to a 5/8 inch rebar found on the northeasterly right of way of Interstate Highway 75 (right of way width varies); thence proceeding along said Interstate Highway No. 75, the following courses and distances: North 28 Degrees 03 Minutes 36 Seconds West, a distance of 160.04 feet to a concrete monument found; North 20 Degrees 28 Minutes 12 Seconds West, a distance of 91.14 feet to a concrete monument found; North 29 Degrees 25 Minutes 05 Seconds West, a distance of 508.47 feet to a concrete monument found North 28 Degrees 21 minutes 23 Seconds West, a distance of 798.82 feet to a concrete monument found; and North 26 Degrees 58 Minutes 47 Seconds West, a distance of 339.32 feet to a point; thence leaving the right of way of Interstate Highway 75, North 51 Degrees 58 Minutes 02 Second East, a distance of 233.49 feet to a ½ inch rebar found; thence North 51 Degrees 58 Minutes 02 Seconds East, a distance of 839.64 feet to a 5/8 rebar found on the southerly right of way of Norfolk Southern Railway (having a 50 foot right of way width) thence along said railway

BK:1664 PG:150

following a counterclockwise curve with an acre distance of 195.94 feet, having a radius of 597.87 feet, subtended by a chord bearing and distance of South 47 degrees 56 Minutes 49 Seconds East 195.06 feet to a 5/8 inch rebar found on the westerly right of way of King Mill Road, thence along said right of way, the following courses and distances, South 10 Degrees 43 Minutes 15 Seconds East, a distance of 321.99 feet to a point, thence following a counterclockwise curve with an acre distance of 502.89, having a radius of 612.00 feet, subtended by a chord bearing and distance of South 34 Degrees 20 Minutes 49 Seconds East, 488.86 feet to a ½ inch rebar set being the Point of Beginning, containing 35.04 acres shown on ALTA/ACSM Land Title survey for Highwoods Realty Limited Partnership, Highwoods Properties, Inc. & Chicago Title Insurance Company, made by Travis Pruitt & Associates, Inc. dated October 10, 2006.

and improvements thereon. The owner of said property is KENS FOOD, INC., having a principal office address of P.O. BOX 849, MARLBOROUGH, MA 01752-0849 and having its registered agent within the state of Georgia at 2 SUN COURT, STE. 400, PEACHTREE CORNERS, GA 30092.

The lien is claimed for the following labor, material, and services furnished by Lienor for improving said property: Steel erection, decking, detailing, and related services for PROPERTY located at 160 King Mill Road, McDonough, Georgia 30253, in the amount of TWO HUNDRED FIFTY-NINE THOUSAND SEVEN HUNDRED THIRTY-FOUR DOLLARS AND 0/100 CENTS ($259,734.00). The last date of delivery of materials and services under this job was March 9, 2022.

This 29 day of April 2022.

TAULBEE, RUSHING, SNIPES,
MARSH & HODGIN, LLC

CHRISTOPHER R. GOHAGAN
Georgia Bar No.: 313902
ATTORNEY FOR
STATESBORO ERECTORS, INC.

P.O. Box 327
Statesboro, Georgia 30459
P: (912) 764-9055
F: (912) 764-8687



DENISE M. MOTTA
DMOTTA@GRSM.COM
DIRECT DIAL: (502) 371-1253

**GORDON&REES**
SCULLY MANSUKHANI
**YOUR 50 STATE PARTNER™**

ATTORNEYS AT LAW

325 W. MAIN STREET
WATERFRONT PLAZA
SUITE 2300
LOUISVILLE, KY 40202
WWW.GRSM.COM

July 7, 2022

**Sent Via Email: wtaulbee@statesborolawgroup.com**
Wesley C. Taulbee, Esq.
Taulbee, Rushing, Snipes, Marsh & Hodgin, LLC
P.O. Box 327
Statesboro, GA 30459

> Re:   Ken's Food Project, Subcontract No. 2104-05
> **DEMAND FOR PAYMENT AND MEDIATION**

Dear Mr. Taulbee:

As you know, Gordon & Rees Scully Mansukhani LLP has been retained by King Steel, Inc. ("King Steel"), in relation to the pending claims arising from the Ken's Food Project, Subcontract No. 2104-05 (the "Project"). This letter is sent in follow up to prior demands issued to Statesboro Erectors, Inc. ("Statesboro") by King Steel for payment dated March 1, 2022, March 9, 2022, and May 5, 2022.

On March 1, 2022, King Steel outlined its claim against Statesboro in the amount of at least $426,291.89, as well as the contractual basis for its right to withhold payment from Statesboro. Further, on March 9, 2022, King Steel advised Statesboro that Griffco Design/Build, Inc. ("Griffco") had asserted a deductive change order claim against King Steel arising from the collapse in the amount of $410,385.27, as well as damages not yet calculated by Griffco.

Statesboro's insurer, Auto-Owners Insurance, agreed to pay a portion of Griffco's claim in the amount of $410,385.27 and a partial settlement was entered into between King Steel and Statesboro. Prior to and in connection with the partial settlement, Auto Owners agreed to evaluate the remaining $29,588.00 of Griffco's claim. Although backup supporting the additional damages incurred by Griffco was submitted on May 23, 2022, Auto-Owners has not agreed to pay the remaining portion of the claim, and multiple requests for an update on status have been ignored.

As explained previously, King Steel has incurred damages of its own in connection with the collapse. Auto-Owners has denied King Steel's claim. Therefore, King Steel is left with no other option but to again demand immediate payment from Statesboro in the amount of $468,266.89:

Mr. Wesley C. Taulbee
July 7, 2022
Page 2

| | Amount |
|---|---|
| Structural Steel (including shop drawings, material, shop labor, frieght, paint) | $207,498.56 |
| Replacement Joists (Vulcraft) | $83,661.00 |
| Onsite Safety Representative | $9,680.00 |
| PE Developed/Stamped Erection Plan | $34,166.00 |
| King Steel Management Time (approximate time spet by President and Executive Vice President) | $10,000.00 |
| **Subtotal** | $345,005.56 |
| OHP (15%) | $51,750.83 |
| Sales Tax | $27,773.00 |
| Legal Expenses | $14,149.50 |
| Griffco Backcharges 5/3/22 | $439,973.27 |
| Partial Settlement of Griffco Backcharges | -$410,385.27 |
| **Total Due\*** | **$468,266.89** |

*Amount does not include Griffco or Owner Damages, Costs, or Backcharges, Liquidated Damages, or Delay Claims which are expressly reserved from any resolution of King Steel's Damages

**Structural Steel Replacement**

| | |
|---|---|
| Bolts | $2,208.75 |
| Raw Materials | $142,187.54 |
| Galvanizing | $542.27 |
| Primer | $2,030.00 |
| Detailing | $10,660.00 |
| Shop Labor (718 x $65/hour) | $46,670.00 |
| Shipping | $3,200.00 |
| **Total Structural Steel** | **$207,498.56** |

Pursuant to ¶8.3 of the Subcontract, King Steel demands that the parties proceed to mediation as a condition precedent to arbitration. Below please find a list of construction lawyers with at least 10 years of experience for consideration as either a mediator or arbitrator for this matter:

Neale Johnson
John Harens
Ty Laurie
Jennifer Fletcher

Mr. Wesley C. Taulbee
July 7, 2022
Page 3

     John Hinchey
     Thomas Abernathy

     Please contact me no later than July 11, 2022, to select a mediator so we can schedule mediation as expeditiously as possible. If I do not hear from you by that date, I will reach out to the above mediators to obtain information regarding their availability.

                    Very truly yours,

                    Denise M. Motta



**EXHIBIT**

**F**



## CLAY TAULBEE MYERS
TRIAL LAWYERS

www.ctmjustice.com

**CHARLES L. CLAY**

**JAMES P. MYERS**

3373 PEACHTREE ROAD

SUITE 115

ATLANTA, GA 30326

(404) 949-8118

**WESLEY C. TAULBEE**

213 S. MAIN ST., SUITE C

SATATESBORO, GA 30458

Wes@ctmjustice.com

(912) 682-0181

September 16, 2022

Boyd Jones
Busch, Reed, Jones & Leeper, P.C.
639 Whitlock Avenue
Marietta, Georgia  30064

Re:   Statesboro Erectors Inc. / King Steel, Inc. / Auto-Owners
      Claim No.:    300-0556104-2021
      Policy No.:   80144613
      Date of Loss: October 9, 2021

Dear Mr. Jones:

As you know, our firm has the privilege of representing Statesboro Erectors, Inc. in connection with the above-referenced claim. To-date, we still have not received any response in regard to whether Auto Owners intends to participate in the Mediation with Neale T Johnson serving as Mediator beginning at 9:30 a.m. on September 19, 2022. I re-enclose a copy of King Steel's demand for payment and mediation originally received on July 7, 2022.   I also provide Statesboro Erectors, Inc.'s coverage position below.

King Steel is claiming damages of at least $468,266.89. Statesboro Erectors contends it is owed in excess of $450,000.00 for work completed by not yet paid on the project. King Steel is withholding payments in connection with its outstanding damage claims. We believe it is in the best interest of all parties to seek a reasonable, global resolution to this matter on September 19, 2022. Should Auto Owners refuse to adequately participate in the mediation and/or any settlement as between Statesboro Erectors and King Steel, Statesboro Erectors intends to pursue a declaratory judgment action for all damages, including attorney fees, expenses, and penalties, against Auto Owners.

To-date, Auto Owners appears to be taking the position that a substantial portion of the damages claimed by King Steel, Inc. are excluded under the "your work" provision of the policy. Given the scope of Statesboro Erectors Inc.'s, contract in this case, as well as the scope of the work being performed on October 9, 2021, compared to the catastrophic damages arising out of the "unforeseen accident" that occurred, the "business risk exclusion" is inapplicable to the majority of the claims still at issue. See Transp. Ins. Co. v. Piedmont Constr. Group, LLC, 301 Ga. App 17, 18-19(2009) (upholding summary judgment for the insured on coverage and bad faith claims) See Also Board of Regents v. Piedmont Constr. Group, LLC, 2008 WL 7907397. Georgia law provides that:

> Georgia courts  (***6 ) typically examine the following facts of each case when reviewing business-risk exclusions: First, the type and extent of construction work that the contractor is performing at the time of the accident and, second, the extent that the damages resulting from the contractor's accident may exceed the contractor's contractual duties. In short, the court asks itself, "Will the payment of insurance proceeds effectively cause an insurance company to guarantee the contractor's work?" If the answer is yes, the business-risk exclusions apply, and the claim is denied. However, if the court finds that the payment of proceeds results from a negligent act causing damage above and beyond the original contractual obligations or to other property, the business-risk exclusions do not apply, and the insurance company should pay the claim.

id. at 19

In Transp. Ins. Co., a contractor was working in a dorm room as part of a multi dorm room renovation project. A fire started that caused damage to a significant portion of the building. Similarly, the incident allegedly occurred while an employee was placing a single beam in a particular location. Even assuming negligence and causation (Statesboro Erector's believes that valid defenses exist, however, Auto Owners already has paid claims to Griffco) the catastrophic damage clearly exceeds the scope of the work that was being performed. The claimed damages also exceed the scope of Statesboro Erector's original scope of work and contract. Statesboro Erector's was not responsible for the cost of the structural steel under its original contract; nor was any on sight safety representative required; and no P E Developed / Stamped Erection Plan was called for in any original contract.

In addition, the Damage to Property Exclusion is inapplicable because the property was not in the care, custody, and/or control of either Statesboro Erectors, or King Steel at the time of the collapse, because the steel had been erected and was the owner's property. These items constitute the bulk of King Steel's outstanding claims.

Beyond the Damage to Property Exclusion, the Performing Operations Exclusion is inapplicable because the allegation is not that the damage was caused by the performance of operations, but by an alleged failure to perform operations. Similarly, none of the damage is alleged to be repairs, and none of the damage to the steel was caused by work on those particular pieces of steel. Finally,

any Damage to Your Work Exclusion is inapplicable, because Statesboro's work was to erect steel, and the damage in this case was not to the work, but to already erected steel in the structure.

Therefore, we continue to urge Auto Owners to participate in the upcoming Mediation in hopes that all parties can reach a mutual global resolution.

If you have any questions, please do not hesitate to give me a call.

Best regards.

Very truly yours,

Wesley C. Taulbee

WCT/hhc

CLERK OF STATE COUR
GWINNETT COUNTY, GEORGI
**23-C-02926-S**
5/3/2023 12:47 PI
TIANA P. GARNER, CLER

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| STATESBORO ERECTORS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 23-C-02926-S5 |
| AUTO-OWNERS INSURANCE COMPANY and OWNERS INSURANCE COMPANY, | § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § § | |

## NOTICE OF FILING

COMES NOW, Statesboro Erectors, Inc., Plaintiff herein ("Plaintiff" or "Statesboro"), and

hereby files this Notice of Filing for the following:

Exhibits G - H to Complaint.

Respectfully submitted this 28<u>th</u> day of April, 2023.

Clay Taulbee & Myers, LLC

<u>/s/ Wesley C. Taulbee</u>
Wesley C. Taulbee
Georgia Bar No. 368972
*Attorney for Plaintiff*

201 S. Main Street, Suite C
Statesboro, Georgia 30458
(912) 225-3951
wes@ctmjustice.com

1

**EXHIBIT**

**G**



# CLAY TAULBEE MYERS
TRIAL LAWYERS

www.ctmjustice.com

**CHARLES L. CLAY**
Chuck@ctmjustice.com
**JAMES P. MYERS**
Jim@ctmjustice.com
3372 Peachtree Road
Suite 115
Atlanta, GA 30326
(404) 949-8118

**WESLEY C. TAULBEE**
201 S Main St., Suite C
Statesboro, GA 30458
Wes@ctmjustice.com
(912) 214-4771

October 24, 2022

**Via Email: Varnado.Aaron@aoins.com**
**Certified Mail 7021 1970 0001 8326 4939**
Aaron Varnado
Auto-Owners Insurance
Stone Branch Claim Office
PO Box 839
Lithonia, GA 30058

| | | |
|---|---|---|
| RE: | Our Client/Your Insured: | Statesboro Erectors, Inc. |
| | Policy Number: | 80-144613 |
| | Claim Number: | 300-556104-2021 |
| | Date of Loss: | 10/09/2021 |
| | Loss Location: | 160 King Mill Rd., McDonough, GA |

Dear Mr. Varnado:

As you know, our firm has the privilege of representing Statesboro Erectors, Inc. in connection with a loss that occurred on October 9, 2021, at 160 King Mill Rd., McDonough, GA. Although Auto-Owners Insurance made an internal determination that Statesboro Erectors was responsible for the loss at issue, and paid claims made on behalf of Griffco Design/Build, Inc. ("Griffco") totaling $439,973.27, it has refused to pay any and all claims asserted by King Steel, Inc. ("King Steel"). In addition, Auto-Owners Insurance refused to participate and/or contribute in any way to Mediation between Statesboro Erectors, Inc., and King Steel on September 19, 2022.
As outlined in the July 7, 2022, demand previously provided to Auto-Owners from Denise M. Motta, Esq., King Steel claimed damages totaling $468,266.89, plus any future attorney's fees, expenses, and interest. A copy of the previously provided demand letter is attached hereto as Exhibit "A." Statesboro Erectors, Inc. and King Steel ultimately reached a final settlement as to all of King Steel's claims for $456,874.00. A copy of the Final Settlement Agreement and Release of Claims is attached hereto as Exhibit "B." Therefore, pursuant to O.C.G.A. § 33-4-6, I am

Aaron Varnado, Auto-Owners Insurance
10/24/2022
Page 2

sending this demand for payment and reimbursement to Statesboro Erectors, Inc. by Auto-Owners under the above-referenced policy, and in relation to the loss on October 9, 2021, in the amount of $456,874.00. Should Auto-Owners fail to pay this valid claim, it will constitute bad faith, entitling Statesboro Erectors, Inc. to seek an additional $228,437.00, plus all reasonable attorney's fees arising out of any declaratory judgment action. See O.C.G.A. § 33-4-6(a). This offer will be automatically withdrawn sixty-one (61) days after receipt, without any further action necessary by Statesboro Erectors, Inc.

If you have any questions and/or need any additional information, please do not hesitate to give me a call. Thank you for your attention to this matter.

Best regards.

Very truly yours,

CLAY TAULBEE & MYERS, LLC

Wesley C. Taulbee

WCT/hhc

Enclosures
cc: Kelly Brown



# KENDALL | MANDELL, LLC
### ATTORNEYS AT LAW
3152 Golf Ridge Boulevard, Suite 201
Douglasville, Georgia 30135
Telephone: (770) 577-3559
Facsimile: (770) 577-8113

Michael C. Kendall
Samantha R. Mandell
D. Scott Mercer
Michael C. Kendall, II
Sylvia H. Cobb
John Christian Kendall
Nicholas B. Tuz

Writer's Extension: 225
E-mail: mckendall@kendallmandell.com

December 7, 2022

Wesley C. Taulbee, Esq.
CLAY TAULBEE & MYERS, LLC
201 S Main Street, Suite C
Statesboro, Georgia 30458

Re:   Insured:          Statesboro Erectors, Inc.
      Policy Number:    132318-80144613-20
      Date of Loss:     10/09/2021
      Claim Number:     300-556104-2021
      Loss Location:    160 King Mill Road, McDonough, Georgia

## DEMAND LETTER RESPONSE

Dear Mr. Taulbee:

The undersigned and this law firm represent Auto-Owners Insurance Company and Owners Insurance Company in this matter. Please direct your future communications to us.

This correspondence is in response to your demand letter dated October 24, 2022, and improperly issued on behalf of the insured to Auto-Owners Insurance Company in regard to Claim Number 300-556104-2021, filed on Policy Number 132318-80144613-20 (the "Policy"), arising from a construction related loss that occurred on or about October 9, 2021 (the "Accident"). According to the demand letter, Statesboro Erectors, Inc. ("Statesboro") entered into a final settlement agreement with King Steel, Inc. ("King Steel") in the amount of $456,874.00. Statesboro now seeks payment and reimbursement under the above-referenced policy in the amount of $456,874.00.

Owners Insurance Company ("Owners") has completed its investigation into the claim and the attendant circumstances.  As we understand the facts, King Steel and Statesboro entered into a contract on May 6, 2021 for certain construction work at the property located at 160 King Mill Road, McDonough, Georgia. The subcontract states that King Steel is the "Steel Fabricator," and Statesboro is the subcontractor, "Struct Steel." The "Scope of Work" under that contract states that Statesboro shall ( 1)

Wesley C. Taulbee, Esq.
December 7, 2022
Page 2

prepare all necessary temporary bracing drawings and/or critical lift plans, and (2) perform all work and shall furnish all supervision, management, labor, materials, tools, equipment, cranes, safety equipment and procedures, licenses and permits, supplies and all other things necessary for the complete, proper and safe erection of the structural steel in full accordance with the plans, specifications, and all work incidental thereto, in strict accordance with the terms of the Subcontract, and to the satisfaction of the Contractor and the Owner ("Work"). Statesboro warranted its work in this regard. The amount of the subcontract was $691,000. That amount includes the cost to erect structural steel and operational costs.

King Steel sent a demand letter to Statesboro on March 1, 2022. The letter stated that King Steel and Statesboro entered into a subcontract on May 6, 2021. The subcontract indicates that Statesboro agreed to provide erection and related services for a Ken's Foods Project located in McDonough, Georgia (the "Project"). It appears that both King Steel and Statesboro were working under the general contractor, Griffco Design/Build, Inc. ("Griffco"), to construct the Project. On October 9, 2021, there was a steel collapse during erection of the Project, which was allegedly caused by Statesboro. According to the initial demand letter, the collapse occurred either because of human error, lack of temporary cables, or lack of bracing to steel columns.

As a result, King Steel was required to supply additional structural steel (including shop drawings, materials, shop labor, freight, and paint) and joists to replace the structural steel damaged in the collapse. That letter also states King Steel incurred additional costs including an on-site safety representative, an erection plan prepared by a professional engineer, and additional project management. King Steel allegedly incurred damages of at least $426,291.89 to replace the steel structure itself. King Steel demanded payment of those damages from Statesboro.

On March 9, 2022, King Steel sent a supplemental demand letter, alleging that Griffco submitted a deductive change order for Griffco's alleged costs associated with the steel collapse in the amount of $410,385.27. Griffco later made additional deductive change orders bringing the total amount to $452,393.27. These damages are allegedly associated with replacing and repairing other property that was damaged by the steel collapse. Owners had these numbers reviewed and agreed to pay for resulting damage caused by the steel collapse.

## THE POLICY

Owners issued a commercial general liability policy (the "Policy") to Statesboro, policy number 132318-80144613-20, with effective dates of December 10, 2020 to December 10, 2021. In pertinent part, the Policy provides:

Wesley C. Taulbee, Esq.
December 7, 2022
Page 3

## COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**SECTION I – COVERAGES**
**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
1. **Insuring Agreement**
    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

    …

    b. This insurance applies to "bodily injury" and "property damage" only if:
        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        …

2. **Exclusions**
    This insurance does not apply to:

    …

j. **Damage To Property**
    "Property damage" to:

        …

    (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
    (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

        …

Wesley C. Taulbee, Esq.
December 7, 2022
Page 4

**k.  Damage To Your Product**
   "Property damage" to "your product" arising out
   of it or any part of it.
**l.  Damage To Your Work**
   "Property damage" to "your work" arising out of
   it or any part of it and included in the "products-
   completed operations hazard".
   This exclusion does not apply if the damaged
   work or the work out of which the damage arises
   was performed on your behalf by a
   subcontractor.

**m.  Damage To Impaired Property Or Property
   Not Physically Injured**
   "Property damage" to "impaired property" or
   property that has not been physically injured,
   arising out of:
   **(1)** A defect, deficiency, inadequacy or danger-
      ous condition in "your product" or "your
      work"; or
   **(2)** A delay or failure by you or anyone acting
      on your behalf to perform a contract or
      agreement in accordance with its terms.
   This exclusion does not apply to the loss of use
   of other property arising out of sudden and acci-
   dental physical injury to "your product" or "your
   work" after it has been put to its intended use.
**n.  Recall Of Products, Work Or Impaired
   Property**
   Damages claimed for any loss, cost or expense
   incurred by you or others for the loss of use,
   withdrawal, recall, inspection, repair, replace-
   ment, adjustment, removal or disposal of:
   **(1)** "Your product";
   **(2)** "Your work"; or
   **(3)** "Impaired property";
   if such product, work, or property is withdrawn or
   recalled from the market or from use by any per-
   son or organization because of a known or sus-
   pected defect, deficiency, inadequacy or danger-
   ous condition in it.

   ...

Wesley C. Taulbee, Esq.
December 7, 2022
Page 5

## SECTION V – DEFINITIONS

...

**8.** "Impaired property" means tangible property, other
than "your product" or "your work", that cannot be
used or is less useful because:

    **a.** It incorporates "your product" or "your work" that
is known or thought to be defective, deficient,
inadequate or dangerous; or

    **b.** You have failed to fulfill the terms of a contract
or agreement;

    if such property can be restored to use by the repair,
replacement, adjustment or removal of "your pro-
duct" or "your work" or your fulfilling the terms of the
contract or agreement.

...

**13.** "Occurrence" means an accident, including continu-
ous or repeated exposure to substantially the same
general harmful conditions.

...

**16.** "Products-completed operations hazard":

    **a.** Includes all "bodily injury" and "property dam-
age" occurring away from premises you own or
rent and arising out of "your product" or "your
work" except:

        **(1)** Products that are still in your physical
possession; or

        **(2)** Work that has not yet been completed or
abandoned. However, "your work" will be
deemed completed at the earliest of the
following times:

            **(a)** When all of the work called for in your
contract has been completed.

            **(b)** When all of the work to be done at the
job site has been completed if your con-
tract calls for work at more than one job
site.

            **(c)** When that part of the work done at a job
site has been put to its intended use by
any person or organization other than
another contractor or subcontractor
working on the same project.

        Work that may need service, maintenance,
correction, repair or replacement, but which
is otherwise complete, will be treated as
completed.

...

Wesley C. Taulbee, Esq.
December 7, 2022
Page 6

**17.** "Property damage" means:
  **a.** Physical injury to tangible property, including all
     resulting loss of use of that property.  All such
     loss of use shall be deemed to occur at the time
     of the physical injury that caused it; or

  **b.** Loss of use of tangible property that is not physi-
     cally injured.  All such loss of use shall be
     deemed to occur at the time of the "occurrence"
     that caused it.

       ...

**21.** "Your product":
  **a.** Means:
     **(1)** Any goods or products, other than real prop-
        erty, manufactured, sold, handled, distrib-
        uted or disposed of by:
        **(a)** You;
        **(b)** Others trading under your name; or
        **(c)** A person or organization whose busi-
           ness or assets you have acquired; and
     **(2)** Containers (other than vehicles), materials,
        parts or equipment furnished in connection
        with such goods or products.

       ...

**22.** "Your work":
  **a.** Means:
     **(1)** Work or operations performed by you or on
        your behalf; and
     **(2)** Materials, parts or equipment furnished in
        connection with such work or operations.

### COVERAGE DENIAL

      Collectively, exclusions j, k, l, and m of the Policy are referred to as "business
risk" exclusions. Here, any property damage to Statesboro's work is excluded by the
business risk exclusions, including exclusion j and l. The Policy specifically defines
"your work" to mean "[w]ork or operations performed by you or on your behalf." The
subcontract entered into between Statesboro and King Steel provides that Statesboro is
to "perform all work and shall furnish all supervision, management, labor, materials,
tools, equipment, cranes, safety equipment and procedures, licenses and permits,
supplies and all other things necessary for the complete, proper and safe erection of the
structural steel." The Policy excludes "property damage" to "your work" arising out of it
or any part of it. The construction of the steel structure qualifies as "your work."
Therefore, any costs that Statesboro incurred in replacing or repairing the steel
structure installed are excluded by the Policy.

Wesley C. Taulbee, Esq.
December 7, 2022
Page 7

     The erection of the steel structure falls within Statesboro's "scope of work." Thus, any damage caused to the steel structure and any costs incurred in replacing or repairing the steel structure are excluded by the Policy. This conclusion is further supported by the fact that Statesboro warranted its work, and warranties are included within the definition of "your work". Finally, the definition of "your work" also includes materials furnished in connection with such work.  The definition does not require that such materials be furnished "by" the insured, only that those materials be furnished in connection with the insured's work.

     For each of these reasons, the Policy does not afford coverage for the requested damages contained in your October 24, 2022 demand letter.

     Although Owners maintains that the explanation set forth herein adequately and in good faith supports rejection of the October 24, 2022 demand, Owners expressly reserves the right to assert other policy defenses supporting denial in the future. All rights, terms, conditions, and exclusions in the above-referenced Policy are in full force and effect and are completely reserved. No term or condition is waived by virtue of not being expressly cited or relied upon herein. No action by any employee, agent, attorney or other person on behalf of Owners shall waive or be construed as having waived any right, term, condition, exclusion or any other provision of the Policy or applicable Georgia law.

     If you have any questions, please do not hesitate to contact me.

                       Very truly yours,

                       KENDALL | MANDELL, LLC

                       Michael C. Kendall

MCK/sl

E FILED IN OFFICE
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-02926-S**
**5/3/2023 12:47 PI**
TIANA P. GARNER, CLER

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| STATESBORO ERECTORS, INC., | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 23-C-02926-S5 |
| AUTO-OWNERS INSURANCE COMPANY and OWNERS INSURANCE COMPANY, | § § § § | |
| Defendants. | § § § | |

### CERTIFICATE PURSUANT TO UNIFORM STATE COURT RULE 5.2

COMES NOW Statesboro Erectors, Inc., Plaintiff in the above-styled matter, and files its

Certificate in compliance with Uniform State Court Rule 5.2 certifying that counsel has served the

following pleadings: Plaintiff's First Interrogatories to Defendants and Plaintiff's First Request for

Production of Documents to Defendants in the above-styled case by electronically filing through

Odyssey and by service from the Gwinnett County Sheriff's Department upon the following:

Auto-Owners Insurance Company         Owners Insurance Company
CT Corporation System                 CT Corporation System
289 South Culver Street               289 South Culver Street
Lawrenceville, Georgia 30046          Lawrenceville, Georgia 30046

Respectfully submitted this 3rd day of May, 2023.


Clay Taulbee & Myers, LLC

/s/ Wesley C. Taulbee
Wesley C. Taulbee
Georgia Bar No. 368972
*Attorney for Plaintiff*

201 S. Main Street, Suite C
Statesboro, Georgia 30458
(912) 225-3951
wes@ctmjustice.com

1

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| STATESBORO ERECTORS, INC., | § § § | |
| Plaintiff, | § § § | |
| v. | § § | Civil Action No. |
| AUTO-OWNERS INSURANCE COMPANY and OWNERS INSURANCE COMPANY, | § § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § § | |

**PLAINTIFF STATESBORO ERECTORS, INC.'S FIRST INTERROGATORIES
TO DEFENDANT OWNERS INSURANCE COMPANY**

Pursuant to Georgia Rules of Civil Procedure 26 and 33, Plaintiff Statesboro Erectors, Inc. hereby requests that Defendant Owners Insurance Company respond separately in writing and under oath to the following interrogatories, within the time allowed by law, with a copy of the responses being served upon the undersigned counsel for the Plaintiff at Clay, Taulbee & Myers, LLC, 201 S. Main Street, Suite C, Statesboro, Georgia 30458. These interrogatories shall be deemed continuing to the extent permitted by Rule 26 so as to require Defendant to serve supplemental answers upon Plaintiff if Defendant, or its attorneys or agents, obtain further information between the time the answers are served and the time of trial.

**DEFINITIONS**

1. "Defendant" or "you" or "your" refers to Owners Insurance Company, its agents, employees, or representatives.

2. "Plaintiff" or "Statesboro" or the "Insured" refers to Statesboro Erectors, Inc.

3. "King Steel" refers to King Steel, Inc., the subcontractor who entered into a subcontract

with Plaintiff for certain construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia.

4.  The "Subcontract" refers to the subcontract entered into by King Steel and Plaintiff on May 6, 2021 for certain construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia.

5.  The "Project" means the construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia for which King Steel and Plaintiff entered into the Subcontract.

6.  The "Policy" refers to Commercial General Liability Policy Number 132318-80144613-20 issued on October 22, 2020 by Defendant to Statesboro, with a policy term from December 16, 2020 to December 16, 2021.

7.  The "Collapse" refers to the steel collapse that occurred at the Project on October 9, 2021.

8.  The "Claim" means the claim made by Statesboro under the Policy.

9.  "Document", whether singular or plural, shall mean documents and other tangible things, including electronically stored information ("ESI"), defined in the broadest sense permitted by the Georgia Rules of Civil Procedure, and shall include without limitation originals or, if such are not available, true copies of all memoranda, reports, evaluations, correspondence, interoffice communications or memoranda, agreements, contracts, invoices, checks, journals, ledgers, telegraphs, telexes, facsimiles, handwritten notes, periodicals, pamphlets, emails, text messages, computer or business machine data and printouts, accountant's work papers, accountant's statements and writings, notations or records of meetings, books, papers, diaries, promissory notes, evidences of indebtedness, security agreements, loan applications, leases, documents creating or reflecting security interests, loan agreements, financing statements, deposit slips, advertising,

2

office manuals, employee manuals, logs, spreadsheets, databases, rules and regulations, photographs reports of experts, drafts and copies of any of the foregoing, or such documents as are not an identical copy of an original or where such copy contains any commentary or notation whatsoever that does not appear on the original, tape, video, or data recordings or other sound or visual production materials and any other written matter, tangible or physical objects, however produced or reproduced, upon which words or phrases are affixed and from which by appropriate transfixion such matter or tangible thing may be produced in the possession, custody or control of Defendant or its agents, attorneys, or employees.

10. "Person" means any natural person, corporation, partnership, proprietorship, association, governmental entity, agency, group, organization or group of persons.

## INTERROGATORIES

**Interrogatory No. 1:** State the full name, business address, job title, and contact information of any and all persons who assisted in preparing the answers to these Interrogatories; and specify for which Interrogatory such person assisted in providing answers.

**Interrogatory No. 2:** List the names, addresses, and telephone numbers of all persons (other than your own agents, employees, or representatives) believed or known by you, your agents, employees, representatives, or attorneys to have any knowledge concerning the Claim, specifying: the subject matter about which the witnesses have knowledge; whether you have obtained any documents, had any communication with or obtained any statement (oral, written and/or recorded) from any of said witnesses; the date any such document was obtained, communication had, or statement taken; the identity of the person receiving such document, having such communication, or taking such statement; and, the identity of the person who has the present possession, custody, and control of any such document, correspondence, or statements.

**Interrogatory No. 3:** Identify all persons who, on your behalf and/or at your direction, or on behalf of or at the direction of any of your agents, employees, or representatives, participated in the investigation, evaluation, adjusting, handling, or payment/denial of the Claim involved in this action, specifying: the nature of the participation of each person; the dates of participation of each person; and, the identification of any document produced or used by each person, including, but not limited to, any written rules, regulations, guidelines, standards, training manuals, seminar information, or any other document used by each person in performing his or her duties and/or which affected, in any way, any decision made by such person on the Claim.

**Interrogatory No. 4:** State in detail what was or had been done in regard to the investigation of the Claim and what information you had available to you at the time a determination was made on the Claim.

**Interrogatory No. 5:** Identify all experts who, on your behalf and/or at your direction, or on behalf of or at the direction of any of your agents, employees, or representatives, participated in the investigation of the Claim involved in this action, specifying: a summary of all opinions expressed by such expert and the basis and reasons therefore; the data or information considered by the expert in forming his or her opinion; and, identifying any report, evaluation, estimate, or other document produced or used by said expert.

**Interrogatory No. 6:** Identify all persons employed by you during the relevant time period, with executive and/or supervisory responsibility and/or authority, for company policy and procedure relating to coverage under the Policy and any conditions precedent to or exclusions from coverage, including, but not limited to, any conditions or exclusions found to be applicable to the Claim, specifying: the job title and regular duties of each person; the identify of all documents relating to applicable policies and procedures; the date such policies and procedures were originally

4

formulated; and, the method or manner by which the agents, employees, and representatives of your company are notified of, informed, trained and supervised relating to the implementation or application of said policies and procedures.

**Interrogatory No. 7:** State whether Plaintiff has complied with any and all conditions precedent entitling it to the benefits of its policy of insurance with you as a result of the Steel Collapse, and if your answer is "no", specify: each condition precedent which has not been performed by Plaintiff; any notice, communication, correspondence or document given by you to Plaintiff relating to any such conditions precedent; identify any other document, correspondence or communication relating to any such condition precedent and Plaintiff's alleged failure to comply therewith.

**Interrogatory No. 8:** Identify all means, methods, or modes of communication by which your Insured **may** notify you of the Claim involved in this action, specifying: the nature of the communication, e.g., by telephone, filling out a website form, launching and communicating through a mobile application; how the communication is kept, e.g., stored in a paper file, stored electronically, stored in audio format; where the communication is kept; the retention policy for each such communication; and the names and job titles of each person who have possession, custody, or control of such communications.

**Interrogatory No. 9:** Identify all means, methods, or modes of communication by which your Insured **did** notify you of the Claim involved in this action, specifying: the nature of the communication, e.g., telephone, website form, mobile application; how the communication is kept, e.g., stored in a paper file, stored electronically, stored in audio format; where the communication is kept; the retention policy for each such communication; and the names and job titles of each person who have possession, custody, or control of such communication.

5

**Interrogatory No. 10:**  Identify each and every document you received from or sent to your Insured, during the relevant time period, including, but not limited to any document relating to the Steel Collapse, the Project, the Policy, King Steel, or any other matter relating to the Claim.

**Interrogatory No. 11:**  State whether you have taken a statement from your Insured, and if so, specify: the date(s) such statement was taken; the identity of the person taking the statement; the identity of any document or recording related to any statement; and, a summary of any statement.

**Interrogatory No. 12:** State whether you have communicated with any other insurer with respect to the Claim at issue, and if so, specify: the date(s) of such communication; the name and job title of the person with whom your agent, employee, or representative spoke; the name and job title of your agent, employee, or representative who communicated with any other insurer with respect to the Claim; the identity of any document or recording related to such communication; and, a summary of such communication.

**Interrogatory No. 13:**  Identify each and every person who ever communicated with the Plaintiff concerning the Claim on your behalf, specifying: the date(s) of such communication; the name and job title of each such person; the identity of any document or recording related to such communication; and, a summary of such communication.

**Interrogatory No. 14:**  Identify which of your representatives is best qualified to testify as the policy, practice, and procedure of adjusting the Claim at issue in this matter.

**Interrogatory No. 15:**  State the basis for Defendant's claim that the Claim is barred by exclusion j of the Policy.

**Interrogatory No. 16:**  State the basis for Defendant's claim that the Claim is barred by exclusion k of the Policy.

**Interrogatory No. 17:**  State the basis for Defendant's claim that the Claim is barred by exclusion

6

l of the Policy.

**Interrogatory No. 18:** State the basis for Defendant's claim that the Claim is barred by exclusion m of the Policy.

**Interrogatory No. 19**:   Identify the relationship between you and Auto-Owners Insurance Company.

This $\underline{24^{th}}$ day of April, 2023.

Clay Taulbee & Myers, LLC

/s/ Wesley C. Taulbee
Wesley C. Taulbee
Georgia Bar No. 368972
*Attorney for Plaintiff*

201 S. Main Street, Suite C
Statesboro, Georgia 30458
(912) 225-3951
wes@ctmjustice.com

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| STATESBORO ERECTORS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. |
| AUTO-OWNERS INSURANCE COMPANY and OWNERS INSURANCE COMPANY, | § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § § | |

**PLAINTIFF STATESBORO ERECTORS, INC.'S
FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS
TO DEFENDANT OWNERS INSURANCE COMPANY**

Pursuant to Georgia Rules of Civil Procedure 26 and 34, Plaintiff Statesboro Erectors, Inc. hereby requests that Defendant Owners Insurance Company respond separately in writing and under oath to the following requests, within the time allowed by law, with a copy of the responses and responsive documents being served upon the undersigned counsel for the Plaintiff at Clay, Taulbee & Myers, LLC, 201 S. Main Street, Suite C, Statesboro, Georgia 30458. These requests shall be deemed continuing to the extent permitted by Rule 26 so as to require Defendant to serve supplemental answers upon Plaintiff if Defendant, or its attorneys or agents, obtain further information between the time the answers are served and the time of trial.

**INSTRUCTIONS**

1. These requests require you to search for and produce all responsive documents in your possession, custody, or control. This includes all documents in your corporate files, employee and agent files, back-up files, cloud or other computing files, or any other locations (on-site or off-site). It further includes all documents in the possession of your attorneys or their agents. In

addition, this includes all documents possessed by persons or entities who are within your control. This also includes all documents, whether kept in electronic or paper format.

2.   Whenever production is requested of a document which is no longer in your possession, custody or control, your response should identity the document by name, number, form or description, the date created, the date which the document was most recently in your possession, custody or control, the disposition of the document, and the identity of the person or persons now in possession, custody, or control of such document.   If the document has been destroyed, the response should state the date of its destruction, the reason for its destruction, the identity of the person or persons who destroyed the document, and the identity of the person who directed that the document be destroyed.

3.   If you object to part of a request and refuse to answer that part, please state your objections and answer the remaining portion of that request.   For example, if you object to the scope or time period of the request and refuse to answer for that scope or time period, state your objection and answer the request for the scope or time period you believe is appropriate.   For each instance in which you interpose an objection to a request, you are requested to identify each and every document withheld from production on the basis of that objection.

4.   If you have withheld from production documents that are responsive to these requests on the basis of any objection, you are advised that those documents must be preserved and not altered, lost, or destroyed.   You are on notice that Plaintiff contends such documents are relevant and discoverable, and alteration or destruction of potentially relevant documents may constitute improper spoliation of evidence.

5.   If any of the following requests cannot be responded to in full after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying your

2

inability to answer the remainder, and stating whatever information and documents you have concerning the unanswered portions. If your response is qualified in any particular, please set forth the details of such qualifications.

6. In the event you wish to assert the attorney-client privilege or work product doctrine, or any other privilege on the basis of which you intend to withhold production of a document that is responsive to any of the following specific requests, then as to each document subject to such assertion, you are requested to provide Plaintiff with identification of such document in writing in a "privilege log." This "privilege log" is to include the nature of the document, the sender, the author, the recipient of the original, the recipient of each copy, the date, the names appearing on any circulation list of the department associated with such document, a summary statement of the subject matter of such document in sufficient detail to permit the Court to reach a determination in the event of a motion to compel, and an indication of the basis for assertion of the privilege or the like.

7. If you do not know the meaning of a word that is not defined below in the Definitions section of this document, you are requested to use the dictionary definition of the word. If the dictionary definition of the word does not resolve an ambiguity, you are invited to contact the undersigned counsel to inquire as to the word's meaning, so as to avoid unnecessary objections and delay in the discovery of this matter.

8. These requests include all "electronically stored information" ("ESI") in your possession, custody, or control as to each and every document requested. ESI is requested to be produced in both native format and searchable PDF or TIFF files (with complete original metadata fields). If a proprietary or unique platform is required in order to read, review, or interpret the data in the ordinary course of business, you are required to identify said platform and make it available for

3

inspection and review.

9.  All responsive documents are requested to be organized so that each document produced is identified with the Request for Production Number(s) to which that document is responsive.

## **DEFINITIONS**

1.  "Defendant" or "you" or "your" refers to Owners Insurance Company, its agents, employees, or representatives.

2.  "Plaintiff" or "Statesboro" or the "Insured" refers to Statesboro Erectors, Inc.

3.  "King Steel" refers to King Steel, Inc., the subcontractor who entered into a subcontract with Plaintiff for certain construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia.

4.  The "Subcontract" refers to the subcontract entered into by King Steel and Plaintiff on May 6, 2021 for certain construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia.

5.  The "Project" means the construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia for which King Steel and Plaintiff entered into the Subcontract.

6.  The "Policy" refers to Commercial General Liability Policy Number 132318-80144613-20 issued on October 22, 2020 by Defendant to Statesboro, with a policy term from December 16, 2020 to December 16, 2021.

7.  The "Collapse" refers to the steel collapse that occurred at the Project on October 9, 2021.

8.  The "Claim" means the claim made by Statesboro under the Policy.

9.  "Document", whether singular or plural, shall mean documents and other tangible things, including electronically stored information ("ESI"), defined in the broadest sense permitted by the

4

Georgia Rules of Civil Procedure, and shall include without limitation originals or, if such are not available, true copies of all memoranda, reports, evaluations, correspondence, interoffice communications or memoranda, agreements, contracts, invoices, checks, journals, ledgers, telegraphs, telexes, facsimiles, handwritten notes, periodicals, pamphlets, emails, text messages, computer or business machine data and printouts, accountant's work papers, accountant's statements and writings, notations or records of meetings, books, papers, diaries, promissory notes, evidences of indebtedness, security agreements, loan applications, leases, documents creating or reflecting security interests, loan agreements, financing statements, deposit slips, advertising, office manuals, employee manuals, logs, spreadsheets, databases, rules and regulations, photographs reports of experts, drafts and copies of any of the foregoing, or such documents as are not an identical copy of an original or where such copy contains any commentary or notation whatsoever that does not appear on the original, tape, video, or data recordings or other sound or visual production materials and any other written matter, tangible or physical objects, however produced or reproduced, upon which words or phrases are affixed and from which by appropriate transfixion such matter or tangible thing may be produced in the possession, custody or control of Defendant or its agents, attorneys, or employees.

10. "Person" means any natural person, corporation, partnership, proprietorship, association, governmental entity, agency, group, organization or group of persons.

## REQUESTS FOR PRODUCTION

All requests are continuing in nature, and Plaintiff requests the Defendant supplement its responses to these requests if Defendant acquires documents in the future which would apply to these requests. The documents being requested are described as follows:

1. A full and complete copy of the Policy issued by Defendant to Plaintiff, together with any Declaration of Coverage page with a sworn statement of a corporate officer of Defendant attesting to the coverage and authenticity of the Policy.

2. All documents, communications and/or other evidence, in any format, made and/or kept by Defendant in the regular course of business, relating to notice to Defendant of the Claim, including, but not limited to, entries in a claims-tracking system (or any other type of system, however described or denominated, wherein activity on claims is recorded, hereinafter referred to as "CTS"), activity log, assignment of claim form, call-center report or notification, computer print-out of notice, first notice of loss report, report from agent of loss, and/or correspondence from Plaintiff or King Steel, their attorneys, or anyone else on the Plaintiff's behalf, including another insurer.

3. All documents, communications and/or other evidence, in any format, made and/or kept by Defendant in the regular course of business, relating to confirmation of the Defendant's receipt of notice of the Claim, including, but not limited to, entries in CTS, activity log, claim notes or email, telephone messages, or interoffice memoranda, by, between, from, to, or among any of Defendant's employees, Insured's agent, Insured, King Steel, King Steel's agent, and/or other insurer relating to the Claim, during the relevant time period.

4. All documents, reports, and/or other evidence, in any format, made and/or kept by Defendant in the regular course of business, relating to any investigation of the Claim.

5. All records of correspondence and/or communications, in any format, made and/or kept by Defendant in the regular course of business, by, between, to , from, or among Defendant and any other party, including, but not limited to, investigators, inspectors, claim

6

representatives, claim companies hired to administer claims during the relevant time period, other insurers, relating to the Claim made by the Insured.

6. Any documents or other evidence, in any format, made and/or kept by Defendant in the regular course of business, relating to any statement and/or any comments, descriptions, explanations, or remarks of any kind, made by the Insured, during the relevant time period, to Defendant or any person or entity known to Defendant concerning the Claim.

7. The current resume, credentials, or curriculum vitae of any and all persons who investigated the Claim and made a determination, or prepared a report, which purported to describe the facts, cause, or any other details of the Claim.

8. Any and all documents and other evidence, in any format, identified in Defendant's Answers to Plaintiff's First Interrogatories, not covered above.

9. To the extent not already produced, Defendant's entire claim and underwriting file and any and all documents relating to this case or Claim except for privileged documents. For any privileged documents, please produce a privilege log.

10. All manuals, guides, handbooks, policies and procedures checklists, and any other document utilized by Defendant and its employees, agents, or representatives relating to the adjustment of the Claim made by the Insured during the relevant time period, including documents concerning the tracking of notices provided by the Insured, the receipt of Defendant of such notice, and the notices provided by Defendant to Insured with respect to the Claim.

These Requests are deemed to be continuing so as to require supplemental productions at any time additional documents responsive to these Requests become available. Plaintiff reserves its right to amend these Requests as new information becomes available.

This 24th day of April, 2023.

Clay Taulbee & Myers, LLC

/s/ Wesley C. Taulbee
Wesley C. Taulbee
Georgia Bar No. 368972
*Attorney for Plaintiff*

201 S. Main Street, Suite C
Statesboro, Georgia 30458
(912) 225-3951
wes@ctmjustice.com

8

FILED IN OFFICE
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
23-C-02926-S
5/3/2023 12:47 PM
TIANA P. GARNER, CLERK

**General Civil and Domestic Relations Case Filing Information Form**

☐ Superior or ☒ State Court of __Gwinnett_____ County

| For Clerk Use Only | |
|---|---|
| Date Filed _____ | Case Number 23~C-02926-95 |
| MM-DD-YYYY | |

**Plaintiff(s)**

__STATESBORO ERECTORS, INC.__

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**

__AUTO-OWNERS INSURANCE__
__COMPANY and OWNERS__

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

__INSURANCE COMPANY__

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

Plaintiff's Attorney __Wesley C. Taulbee____   Bar Number __368972____   Self-Represented ☐

### Check One Case Type in One Box

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☒ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Dissolution/Divorce/Separate Maintenance
- ☐ Family Violence Petition
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

**Post-Judgment – Check One Case Type**
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Modification
- ☐ Other/Administrative

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____   _____
Case Number                Case Number

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is an interpreter needed in this case? If so, provide the language(s) required. _____
Language(s) Required

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.
_____
_____

Version 1.1.18

CIVIL ACTION NO. 23-C-02926-S

[ ] MAGISTRATE [X] STATE [ ] SUPERIOR - COURT
GWINNETT COUNTY, GEORGIA

DATE FILED 5/3/2023

ATTORNEY OR PLAINTIFF(s), ADDRESS & TELEPHONE NUMBER

STATESBORO ERECTORS, INC.

Wesley C. Taulbee, Esq.

Clay Taulbee Myers, LLC

201 S Main St., Ste. C

Statesboro, Georgia 30458

PLAINTIFF(S)
VS.
AUTO-OWNERS INSURANCE COMPANY

OWNERS INSURANCE COMPANY

DEFENDANT(S)

NAME, ADDRESS & TELEPHONE # OF PARTY TO BE SERVED

Auto-Owners Insurance Company

c/o Registered Agent, CT Corporation System

289 South Culver Street

Lawrenceville, Georgia 30046

GARNISHEE

Other attached documents to be served: Summons, Gen. Civil

Info. Form, Complaint and Plaintiff's First Discovery

## SHERIFF'S ENTRY OF SERVICE
I HAVE THIS DAY SERVED THE WITHIN ACTION AND SUMMONS AS FOLLOWS:

[ ] **PERSONAL**   Upon the following named defendant:

[ ] **NOTORIOUS** Upon defendant _____
By leaving a copy of the action and summons at the most notorious place of abode in the county.

Delivered the same to_____ described as follows: approximate age

yrs; approximate weight_____pounds; approximate height_____feet and_____inches, domiciled at residence of the defendant.

[\] **CORPORATION** Upon corporation AUTO-OWNERS INSURANCE COMPANY

By serving _____, in charge of the office and
place of business of the corporation in this county.

By serving CT CORPORATION SYSTEM _____ , its registered agent.

[ ] **TACK & MAIL** By posting a copy of the same to the door of the premises designated in the affidavit and/or summons, and on the same day of such posting, by depositing a true copy of the same in the United States mail First Class mail, in an envelope properly addressed to the defendant(s) at the address shown in the summons, containing adequate notice to the defendant(s) to answer said summons at the place stated in the summons.

[ ] **NON EST** Did not serve because after a diligent search the defendant could not be found in the jurisdiction of the court.

_____

_____

This _____ day of _____, 20____.

SHERIFF DOCKET_____PAGE_____   _____
                                                                          DEPUTY

TIME: _____. M.

Q:\ Magforms\Forms\MAG 10-10 Sheriff's Entry of Service

E-FILED IN OFFICE - RJ
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-02926-S5**
5/3/2023 12:47 PM
TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY

## STATE OF GEORGIA

**STATESBORO ERECTOR INC.,**

PLAINTIFF

CIVIL ACTION
NUMBER: 23-C-02926-S5

VS.

**AUTO-OWNERS INS. CO.,**

**OWNERS INSURANCE CO.,**

DEFENDANT

## SUMMONS

TO THE ABOVE NAMED DEFENDANT: Auto-Owners Ins. Company

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Wesley C. Taulbee, Esq.
Clay Taulbee Myers, LLC
201 S. Main St., Ste. C
Statesboro, GA 30458

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This _____ day of _____, 20_____.

3rd day of May, 2023

Tiana P. Garner
Clerk of State Court

By_____
Deputy Clerk

INSTRUCTIONS: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
23-C-02926-S
5/3/2023 12:47 PM
TIANA P. GARNER, CLERK

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| STATESBORO ERECTORS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 23-C-02926-S5 |
| AUTO-OWNERS INSURANCE COMPANY and OWNERS INSURANCE COMPANY, | § § § § | |
| Defendants. | § § § | |

## CERTIFICATE PURSUANT TO UNIFORM STATE COURT RULE 5.2

COMES NOW Statesboro Erectors, Inc., Plaintiff in the above-styled matter, and files its

Certificate in compliance with Uniform State Court Rule 5.2 certifying that counsel has served the

following pleadings: Plaintiff's First Interrogatories to Defendants and Plaintiff's First Request for

Production of Documents to Defendants in the above-styled case by electronically filing through

Odyssey and by service from the Gwinnett County Sheriff's Department upon the following:

Auto-Owners Insurance Company          Owners Insurance Company
CT Corporation System                   CT Corporation System
289 South Culver Street                  289 South Culver Street
Lawrenceville, Georgia 30046             Lawrenceville, Georgia 30046

Respectfully submitted this 3rd day of May, 2023.

Clay Taulbee & Myers, LLC

/s/ Wesley C. Taulbee
Wesley C. Taulbee
Georgia Bar No. 368972
*Attorney for Plaintiff*

201 S. Main Street, Suite C
Statesboro, Georgia 30458
(912) 225-3951
wes@ctmjustice.com

1

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| STATESBORO ERECTORS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. |
| AUTO-OWNERS INSURANCE COMPANY and OWNERS INSURANCE COMPANY, | § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § § | |

## PLAINTIFF STATESBORO ERECTORS, INC.'S FIRST INTERROGATORIES TO DEFENDANT AUTO-OWNERS INSURANCE COMPANY

Pursuant to Georgia Rules of Civil Procedure 26 and 33, Plaintiff Statesboro Erectors, Inc. hereby requests that Defendant Auto-Owners Insurance Company respond separately in writing and under oath to the following interrogatories, within the time allowed by law, with a copy of the responses being served upon the undersigned counsel for the Plaintiff at Clay, Taulbee & Myers, LLC, 201 S. Main Street, Suite C, Statesboro, Georgia 30458. These interrogatories shall be deemed continuing to the extent permitted by Rule 26 so as to require Defendant to serve supplemental answers upon Plaintiff if Defendant, or its attorneys or agents, obtain further information between the time the answers are served and the time of trial.

### DEFINITIONS

1. "Defendant" or "you" or "your" refers to Auto-Owners Insurance Company, its agents, employees, or representatives.

2. "Plaintiff" or "Statesboro" or the "Insured" refers to Statesboro Erectors, Inc.

3. "King Steel" refers to King Steel, Inc., the subcontractor who entered into a subcontract

1

with Plaintiff for certain construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia.

4. The "Subcontract" refers to the subcontract entered into by King Steel and Plaintiff on May 6, 2021 for certain construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia.

5. The "Project" means the construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia for which King Steel and Plaintiff entered into the Subcontract.

6. The "Policy" refers to Commercial General Liability Policy Number 132318-80144613-20 issued on October 22, 2020 by Defendant to Statesboro, with a policy term from December 16, 2020 to December 16, 2021.

7. The "Collapse" refers to the steel collapse that occurred at the Project on October 9, 2021.

8. The "Claim" means the claim made by Statesboro under the Policy.

9. "Document", whether singular or plural, shall mean documents and other tangible things, including electronically stored information ("ESI"), defined in the broadest sense permitted by the Georgia Rules of Civil Procedure, and shall include without limitation originals or, if such are not available, true copies of all memoranda, reports, evaluations, correspondence, interoffice communications or memoranda, agreements, contracts, invoices, checks, journals, ledgers, telegraphs, telexes, facsimiles, handwritten notes, periodicals, pamphlets, emails, text messages, computer or business machine data and printouts, accountant's work papers, accountant's statements and writings, notations or records of meetings, books, papers, diaries, promissory notes, evidences of indebtedness, security agreements, loan applications, leases, documents creating or reflecting security interests, loan agreements, financing statements, deposit slips, advertising,

2

office manuals, employee manuals, logs, spreadsheets, databases, rules and regulations, photographs reports of experts, drafts and copies of any of the foregoing, or such documents as are not an identical copy of an original or where such copy contains any commentary or notation whatsoever that does not appear on the original, tape, video, or data recordings or other sound or visual production materials and any other written matter, tangible or physical objects, however produced or reproduced, upon which words or phrases are affixed and from which by appropriate transfixion such matter or tangible thing may be produced in the possession, custody or control of Defendant or its agents, attorneys, or employees.

10. "Person" means any natural person, corporation, partnership, proprietorship, association, governmental entity, agency, group, organization or group of persons.

**INTERROGATORIES**

**Interrogatory No. 1:** State the full name, business address, job title, and contact information of any and all persons who assisted in preparing the answers to these Interrogatories; and specify for which Interrogatory such person assisted in providing answers.

**Interrogatory No. 2:** List the names, addresses, and telephone numbers of all persons (other than your own agents, employees, or representatives) believed or known by you, your agents, employees, representatives, or attorneys to have any knowledge concerning the Claim, specifying: the subject matter about which the witnesses have knowledge; whether you have obtained any documents, had any communication with or obtained any statement (oral, written and/or recorded) from any of said witnesses; the date any such document was obtained, communication had, or statement taken; the identity of the person receiving such document, having such communication, or taking such statement; and, the identity of the person who has the present possession, custody, and control of any such document, correspondence, or statements.

. . .

**Interrogatory No. 3:**  Identify all persons who, on your behalf and/or at your direction, or on behalf of or at the direction of any of your agents, employees, or representatives, participated in the investigation, evaluation, adjusting, handling, or payment/denial of the Claim involved in this action, specifying: the nature of the participation of each person; the dates of participation of each person; and, the identification of any document produced or used by each person, including, but not limited to, any written rules, regulations, guidelines, standards, training manuals, seminar information, or any other document used by each person in performing his or her duties and/or which affected, in any way, any decision made by such person on the Claim.

**Interrogatory No. 4:**  State in detail what was or had been done in regard to the investigation of the Claim and what information you had available to you at the time a determination was made on the Claim.

**Interrogatory No. 5:**  Identify all experts who, on your behalf and/or at your direction, or on behalf of or at the direction of any of your agents, employees, or representatives, participated in the investigation of the Claim involved in this action, specifying: a summary of all opinions expressed by such expert and the basis and reasons therefore; the data or information considered by the expert in forming his or her opinion; and, identifying any report, evaluation, estimate, or other document produced or used by said expert.

**Interrogatory No. 6:**  Identify all persons employed by you during the relevant time period, with executive and/or supervisory responsibility and/or authority, for company policy and procedure relating to coverage under the Policy and any conditions precedent to or exclusions from coverage, including, but not limited to, any conditions or exclusions found to be applicable to the Claim, specifying: the job title and regular duties of each person; the identify of all documents relating to applicable policies and procedures; the date such policies and procedures were originally

4

formulated; and, the method or manner by which the agents, employees, and representatives of your company are notified of, informed, trained and supervised relating to the implementation or application of said policies and procedures.

**Interrogatory No. 7:** State whether Plaintiff has complied with any and all conditions precedent entitling it to the benefits of its policy of insurance with you as a result of the Steel Collapse, and if your answer is "no", specify: each condition precedent which has not been performed by Plaintiff; any notice, communication, correspondence or document given by you to Plaintiff relating to any such conditions precedent; identify any other document, correspondence or communication relating to any such condition precedent and Plaintiff's alleged failure to comply therewith.

**Interrogatory No. 8:** Identify all means, methods, or modes of communication by which your Insured **may** notify you of the Claim involved in this action, specifying: the nature of the communication, e.g., by telephone, filling out a website form, launching and communicating through a mobile application; how the communication is kept, e.g., stored in a paper file, stored electronically, stored in audio format; where the communication is kept; the retention policy for each such communication; and the names and job titles of each person who have possession, custody, or control of such communications.

**Interrogatory No. 9:** Identify all means, methods, or modes of communication by which your Insured **did** notify you of the Claim involved in this action, specifying: the nature of the communication, e.g., telephone, website form, mobile application; how the communication is kept, e.g., stored in a paper file, stored electronically, stored in audio format; where the communication is kept; the retention policy for each such communication; and the names and job titles of each person who have possession, custody, or control of such communication.

5

**Interrogatory No. 10:**  Identify each and every document you received from or sent to your Insured, during the relevant time period, including, but not limited to any document relating to the Steel Collapse, the Project, the Policy, King Steel, or any other matter relating to the Claim.

**Interrogatory No. 11:**  State whether you have taken a statement from your Insured, and if so, specify: the date(s) such statement was taken; the identity of the person taking the statement; the identity of any document or recording related to any statement; and, a summary of any statement.

**Interrogatory No. 12:** State whether you have communicated with any other insurer with respect to the Claim at issue, and if so, specify: the date(s) of such communication; the name and job title of the person with whom your agent, employee, or representative spoke; the name and job title of your agent, employee, or representative who communicated with any other insurer with respect to the Claim; the identity of any document or recording related to such communication; and, a summary of such communication.

**Interrogatory No. 13:**  Identify each and every person who ever communicated with the Plaintiff concerning the Claim on your behalf, specifying: the date(s) of such communication; the name and job title of each such person; the identity of any document or recording related to such communication; and, a summary of such communication.

**Interrogatory No. 14:**  Identify which of your representatives is best qualified to testify as the policy, practice, and procedure of adjusting the Claim at issue in this matter.

**Interrogatory No. 15:**  State the basis for Defendant's claim that the Claim is barred by exclusion j of the Policy.

**Interrogatory No. 16:**  State the basis for Defendant's claim that the Claim is barred by exclusion k of the Policy.

**Interrogatory No. 17:**  State the basis for Defendant's claim that the Claim is barred by exclusion

l of the Policy.

**Interrogatory No. 18:**  State the basis for Defendant's claim that the Claim is barred by exclusion

m of the Policy.

This 24th day of April, 2023.

Clay Taulbee & Myers, LLC

/s/ Wesley C. Taulbee
Wesley C. Taulbee
Georgia Bar No. 368972
*Attorney for Plaintiff*

201 S. Main Street, Suite C
Statesboro, Georgia 30458
(912) 225-3951
wes@ctmjustice.com

7

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| STATESBORO ERECTORS, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. |
| AUTO-OWNERS INSURANCE COMPANY and OWNERS INSURANCE COMPANY, | § § § § | JURY TRIAL DEMANDED |
| Defendants. | § § § | |

### PLAINTIFF STATESBORO ERECTORS, INC.'S
### FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS
### TO DEFENDANT AUTO-OWNERS INSURANCE COMPANY

Pursuant to Georgia Rules of Civil Procedure 26 and 34, Plaintiff Statesboro Erectors, Inc. hereby requests that Defendant Auto-Owners Insurance Company respond separately in writing and under oath to the following requests, within the time allowed by law, with a copy of the responses and responsive documents being served upon the undersigned counsel for the Plaintiff at Clay, Taulbee & Myers, LLC, 201 S. Main Street, Suite C, Statesboro, Georgia 30458. These requests shall be deemed continuing to the extent permitted by Rule 26 so as to require Defendant to serve supplemental answers upon Plaintiff if Defendant, or its attorneys or agents, obtain further information between the time the answers are served and the time of trial.

### INSTRUCTIONS

1. These requests require you to search for and produce all responsive documents in your possession, custody, or control. This includes all documents in your corporate files, employee and agent files, back-up files, cloud or other computing files, or any other locations (on-site or off-site). It further includes all documents in the possession of your attorneys or their agents. In

1

addition, this includes all documents possessed by persons or entities who are within your control. This also includes all documents, whether kept in electronic or paper format.

2.   Whenever production is requested of a document which is no longer in your possession, custody or control, your response should identity the document by name, number, form or description, the date created, the date which the document was most recently in your possession, custody or control, the disposition of the document, and the identity of the person or persons now in possession, custody, or control of such document.  If the document has been destroyed, the response should state the date of its destruction, the reason for its destruction, the identity of the person or persons who destroyed the document, and the identity of the person who directed that the document be destroyed.

3.   If you object to part of a request and refuse to answer that part, please state your objections and answer the remaining portion of that request.  For example, if you object to the scope or time period of the request and refuse to answer for that scope or time period, state your objection and answer the request for the scope or time period you believe is appropriate.  For each instance in which you interpose an objection to a request, you are requested to identify each and every document withheld from production on the basis of that objection.

4.   If you have withheld from production documents that are responsive to these requests on the basis of any objection, you are advised that those documents must be preserved and not altered, lost, or destroyed.  You are on notice that Plaintiff contends such documents are relevant and discoverable, and alteration or destruction of potentially relevant documents may constitute improper spoliation of evidence.

5.   If any of the following requests cannot be responded to in full after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying your

2

inability to answer the remainder, and stating whatever information and documents you have concerning the unanswered portions.  If your response is qualified in any particular, please set forth the details of such qualifications.

6.  In the event you wish to assert the attorney-client privilege or work product doctrine, or any other privilege on the basis of which you intend to withhold production of a document that is responsive to any of the following specific requests, then as to each document subject to such assertion, you are requested to provide Plaintiff with identification of such document in writing in a "privilege log."  This "privilege log" is to include the nature of the document, the sender, the author, the recipient of the original, the recipient of each copy, the date, the names appearing on any circulation list of the department associated with such document, a summary statement of the subject matter of such document in sufficient detail to permit the Court to reach a determination in the event of a motion to compel, and an indication of the basis for assertion of the privilege or the like.

7.  If you do not know the meaning of a word that is not defined below in the Definitions section of this document, you are requested to use the dictionary definition of the word.  If the dictionary definition of the word does not resolve an ambiguity, you are invited to contact the undersigned counsel to inquire as to the word's meaning, so as to avoid unnecessary objections and delay in the discovery of this matter.

8.  These requests include all "electronically stored information" ("ESI") in your possession, custody, or control as to each and every document requested.  ESI is requested to be produced in both native format and searchable PDF or TIFF files (with complete original metadata fields).  If a proprietary or unique platform is required in order to read, review, or interpret the data in the ordinary course of business, you are required to identify said platform and make it available for

3

inspection and review.

9. All responsive documents are requested to be organized so that each document produced is identified with the Request for Production Number(s) to which that document is responsive.

## DEFINITIONS

1. "Defendant" or "you" or "your" refers to Auto-Owners Insurance Company, its agents, employees, or representatives.

2. "Plaintiff" or "Statesboro" or the "Insured" refers to Statesboro Erectors, Inc.

3. "King Steel" refers to King Steel, Inc., the subcontractor who entered into a subcontract with Plaintiff for certain construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia.

4. The "Subcontract" refers to the subcontract entered into by King Steel and Plaintiff on May 6, 2021 for certain construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia.

5. The "Project" means the construction work at the property located at 160 King Mill Road, McDonough, Henry County, Georgia for which King Steel and Plaintiff entered into the Subcontract.

6. The "Policy" refers to Commercial General Liability Policy Number 132318-80144613-20 issued on October 22, 2020 by Defendant to Statesboro, with a policy term from December 16, 2020 to December 16, 2021.

7. The "Collapse" refers to the steel collapse that occurred at the Project on October 9, 2021.

8. The "Claim" means the claim made by Statesboro under the Policy.

9. "Document", whether singular or plural, shall mean documents and other tangible things, including electronically stored information ("ESI"), defined in the broadest sense permitted by the

Georgia Rules of Civil Procedure, and shall include without limitation originals or, if such are not available, true copies of all memoranda, reports, evaluations, correspondence, interoffice communications or memoranda, agreements, contracts, invoices, checks, journals, ledgers, telegraphs, telexes, facsimiles, handwritten notes, periodicals, pamphlets, emails, text messages, computer or business machine data and printouts, accountant's work papers, accountant's statements and writings, notations or records of meetings, books, papers, diaries, promissory notes, evidences of indebtedness, security agreements, loan applications, leases, documents creating or reflecting security interests, loan agreements, financing statements, deposit slips, advertising, office manuals, employee manuals, logs, spreadsheets, databases, rules and regulations, photographs reports of experts, drafts and copies of any of the foregoing, or such documents as are not an identical copy of an original or where such copy contains any commentary or notation whatsoever that does not appear on the original, tape, video, or data recordings or other sound or visual production materials and any other written matter, tangible or physical objects, however produced or reproduced, upon which words or phrases are affixed and from which by appropriate transfixion such matter or tangible thing may be produced in the possession, custody or control of Defendant or its agents, attorneys, or employees.

10. "Person" means any natural person, corporation, partnership, proprietorship, association, governmental entity, agency, group, organization or group of persons.

## REQUESTS FOR PRODUCTION

All requests are continuing in nature, and Plaintiff requests the Defendant supplement its responses to these requests if Defendant acquires documents in the future which would apply to these requests. The documents being requested are described as follows:

1.  A full and complete copy of the Policy issued by Defendant to Plaintiff, together with any Declaration of Coverage page with a sworn statement of a corporate officer of Defendant attesting to the coverage and authenticity of the Policy.

2.  All documents, communications and/or other evidence, in any format, made and/or kept by Defendant in the regular course of business, relating to notice to Defendant of the Claim, including, but not limited to, entries in a claims-tracking system (or any other type of system, however described or denominated, wherein activity on claims is recorded, hereinafter referred to as "CTS"), activity log, assignment of claim form, call-center report or notification, computer print-out of notice, first notice of loss report, report from agent of loss, and/or correspondence from Plaintiff or King Steel, their attorneys, or anyone else on the Plaintiff's behalf, including another insurer.

3.  All documents, communications and/or other evidence, in any format, made and/or kept by Defendant in the regular course of business, relating to confirmation of the Defendant's receipt of notice of the Claim, including, but not limited to, entries in CTS, activity log, claim notes or email, telephone messages, or interoffice memoranda, by, between, from, to, or among any of Defendant's employees, Insured's agent, Insured, King Steel, King Steel's agent, and/or other insurer relating to the Claim, during the relevant time period.

4.  All documents, reports, and/or other evidence, in any format, made and/or kept by Defendant in the regular course of business, relating to any investigation of the Claim.

5.  All records of correspondence and/or communications, in any format, made and/or kept by Defendant in the regular course of business, by, between, to, from, or among Defendant and any other party, including, but not limited to, investigators, inspectors, claim

6

representatives, claim companies hired to administer claims during the relevant time period, other insurers, relating to the Claim made by the Insured.

6. Any documents or other evidence, in any format, made and/or kept by Defendant in the regular course of business, relating to any statement and/or any comments, descriptions, explanations, or remarks of any kind, made by the Insured, during the relevant time period, to Defendant or any person or entity known to Defendant concerning the Claim.

7. The current resume, credentials, or curriculum vitae of any and all persons who investigated the Claim and made a determination, or prepared a report, which purported to describe the facts, cause, or any other details of the Claim.

8. Any and all documents and other evidence, in any format, identified in Defendant's Answers to Plaintiff's First Interrogatories, not covered above.

9. To the extent not already produced, Defendant's entire claim and underwriting file and any and all documents relating to this case or Claim except for privileged documents. For any privileged documents, please produce a privilege log.

10. All manuals, guides, handbooks, policies and procedures checklists, and any other document utilized by Defendant and its employees, agents, or representatives relating to the adjustment of the Claim made by the Insured during the relevant time period, including documents concerning the tracking of notices provided by the Insured, the receipt of Defendant of such notice, and the notices provided by Defendant to Insured with respect to the Claim.

These Requests are deemed to be continuing so as to require supplemental productions at any time additional documents responsive to these Requests become available. Plaintiff reserves its right to amend these Requests as new information becomes available.

This 24<u>th</u> day of April, 2023.

Clay Taulbee & Myers, LLC


/s/ Wesley C. Taulbee
Wesley C. Taulbee
Georgia Bar No. 368972
*Attorney for Plaintiff*

201 S. Main Street, Suite C
Statesboro, Georgia 30458
(912) 225-3951
wes@ctmjustice.com