IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JANE DOE I AND JOHN DOE,<br>Individually and as Next Friends of<br>JANE DOE II, a Minor,<br><br>      Plaintiffs,<br><br>v.<br><br>FULTON COUNTY SCHOOLS;<br>FULTON ACADEMY OF SCIENCE<br>AND TECHNOLOGY;<br>FOUNDING FOURTEEN, INC;<br>DR. MIKE LOONEY,<br>In His Individual Capacity;<br>DR. CINDY LOE, In Her Individual<br>Capacity; DR. JEFF ROSE, In His<br>Individual Capacity; ANDREA COOPER<br>GATEWOOD, In Her Individual Capacity;<br>ANNETTE HIGGINS, In Her Individual<br>Capacity; CHRISTOPHER<br>MAHONEY, In His Individual<br>Capacity; ASHLEY STINGER, In Her<br>Individual Capacity; STAN J.<br>BEINER, In His Individual Capacity;<br>PETER EPSTEIN, In His Individual<br>Capacity; JOSEPH AKPAN, In His<br>Individual Capacity; and JUNE<br>ERICKSON, In Her Individual Capacity,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>FILE NO. _____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COME NOW Plaintiffs in the above-styled action and file this Complaint, as follows:

## INTRODUCTION

1.

Robert Allen Vandel ("Vandel") was hired as a teacher at the Fulton Academy of Science and Technology ("FAST") charter school despite a **documented record of sexually harassing and assaulting minor female students** in his care. According to Vandel's file with the Georgia Professional Standards Commission ("GPSC"), at least seven (7) students and fourteen (14) teachers presented written complaints against Vandel for grooming minors for sexual encounters, sexual harassment, and sexual assault **prior to his hiring at FAST**.[1] While employed at FAST, Vandel's misconduct continued, and he was reported on multiple occasions by teachers and students for his continuing practice

---

[1] In addition, the GPSC had disciplined Vandel for "misrepresentation or falsification" for failing to disclose that he had been convicted for writing bad checks and had been charged with sexual battery and simple battery.  Moreover, GPSC had suspended his teacher's certification more than once (for violation of Code of Ethics for Educators Standard 2 ("Abuse of Students") for sexually harassing behavior and Standard 10 for conduct impairing his ability to function professionally and conduct detrimental to the health, welfare, discipline, and morals of his students).

of grooming, sexual harassment, and sexual assault. Vandel's ongoing misconduct at FAST was remarkable in its similarity to and continuity with his well-documented prior misconduct at other schools. Even though FAST and Defendants were aware of these reports, and despite hiring him with knowledge of his documented record of outrageous misconduct, they refused to take action to appropriately investigate Vandel's behavior, separate him from minor female students, or terminate his employment. Because of Defendants' deliberate indifference to and reckless disregard for Vandel's misconduct, the misconduct continued. As a direct result of Defendants' indifference and these reckless breakdowns of supervision and failure to act, Vandel was able to isolate Minor Jane Doe II, groom her, sexually harass her, and sexually assault her.

<div align="center">2.</div>

Defendants failed to supervise Vandel, a sexual predator of minors, and consequently Minor Jane Doe II, who attended FAST as a student for 6th, 7th, and part of 8th grade during the 2017-2018, 2018-2019, and 2019-2020 school years, was repeatedly groomed, sexually harassed, and sexually assaulted by Vandel, a teacher employed by Fulton County Schools ("FCS") at FAST.

<div align="center">3.</div>

FCS; FCS Superintendent Mike Looney; FCS Superintendent Cindy Loe;

FCS Superintendent Jeff Rose; Charter Schools Coordinator Andrea Gatewood; FAST Principal Annette Higgins; FAST Principal Christopher Mahoney; FAST Principal Ashley Stinger; FAST Principal Stan J. Beiner; Assistant Principal for FAST Middle School Peter Epstein; Founding Fourteen, Inc. ("Founding Fourteen"); CEO/Chair/Governing Board Member of Founding Fourteen and Chair/Governing Board Member of the Board of FAST Joseph Akpan; and Board member (and former CEO/Chair/Officer) of Founding Fourteen and Board member (and former Chair/Officer) of FAST June Erickson, knew or should have known that Vandel had a history of inappropriate behavior and inappropriate physical contact with students and staff members, both before and during his tenure at FAST, and they failed to take appropriate steps to protect students like Minor Jane Doe II.

<div align="center">4.</div>

The sexual harassment and assault of Minor Jane Doe II by Vandel was the direct consequence of the willful and intentional refusal to act to protect students like Minor Jane Doe II by the school system and school, its leaders, and its employees and by the Georgia corporation Founding Fourteen as demonstrated by the following. **First**, upon information and belief, sexual harassment and assault are a systemic problem in this school district. **Second**, Vandel had an established

<div align="center">4</div>

history, known to Defendants, of inappropriate behavior, inappropriate physical contact, and sexual harassment and assault of students and staff at his prior employment and at FAST. **Third**, Defendants FCS, Founding Fourteen, FAST, Principal Higgins, and the Board Members of FAST and Founding Fourteen (including Defendants Erickson and Akpan) hired Vandel despite the numerous complaints made against Vandel at previous institutions, other criminal, dangerous, and/or dishonest conduct by Vandel, and the clear threat that he posed to students. **Fourth**, Defendants FCS, Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, and the Board Members of FAST and Founding Fourteen (including Defendants Erickson and Akpan) allowed Vandel to continue in his employment, with full access to students, after being made aware of complaints of inappropriate conduct involving Vandel while he was employed at FAST, in violation of clear and unambiguous policies and state law. **Fifth**, Defendants FAST, Founding Fourteen, Higgins, Mahoney, Stinger, Beiner, Epstein, and the Board Members of FAST and Founding Fourteen (including Defendants Erickson and Akpan) knowingly allowed Vandel to breach school policies, and thereby groom minor female students, by isolating and providing minor female students with favorable treatment, candy, and ice cream, in clear violation of clear and unambiguous policies. **Sixth**, Defendants created and engendered an environment of

intimidating, punishing, and blaming those that reported misconduct; failing to train school officials and employees on how to handle complaints of sexual harassment, assault, and inappropriate contact between adult employees and students; and avoiding the creation of written records evidencing misconduct. **Seventh**, Defendants FCS, FAST, Founding Fourteen, Looney, Loe, Rose, Gatewood, Higgins, Mahoney, Stinger, Beiner, Epstein, and the Board Members of FAST and Founding Fourteen (including Defendants Erickson and Akpan) failed to report Vandel's inappropriate conduct to state officials; dismissed complaints against Vandel; and failed to ensure the adequate provision of social or emotional support to Minor Jane Doe II. **Eighth**, Defendants Beiner and Epstein inconceivably blamed Minor Jane Doe II for Vandel's conduct.

<div align="center">5.</div>

Plaintiffs bring Georgia and federal law claims, and each and every permissible, proper, and authorized claim for damages and attorney's fees, including claims under 20 U.S.C. § 1681 *et. seq.*, 42 U.S.C. § 1983 ("Section 1983 claim"), Title IX of the Education Amendments Act of 1972 ("Title IX claim"), and state law against Defendants for the injuries Plaintiffs suffered, and continue to suffer, as a result of Defendants' deliberate indifference, reckless disregard, and intentional conduct, which led to Minor Jane Doe II's sexual harassment and

<div align="center">6</div>

assault.

## **PARTIES**

6.

Jane Doe I, John Doe, and Minor Jane Doe II are pseudonyms for the real parties in interest in this action. As a result of the highly sensitive and personal nature of the facts in this Complaint, Plaintiffs' full identities have been concealed from public court filings in order to prevent those not directly involved in this action from learning their identities and making their identities public. Plaintiffs' right to privacy with respect to these matters outweighs any other interest that may exist.

7.

Plaintiffs Jane Doe I, John Doe, and Minor Jane Doe II are citizens of the United States and are residents of Fulton County, Georgia.

8.

Plaintiffs Jane Doe I and John Doe are the parents and natural guardians of Minor Jane Doe II and are bringing this action in their individual capacity and on behalf of their daughter Minor Jane Doe II.

9.

Minor Jane Doe II was the victim of unlawful sexual harassment, assault,

abuse, and other misconduct by her FAST middle school teacher Vandel during the 2017-2018, 2018-2019, and 2019-2020 school years, when she was 11, 12, and 13 years old, respectively.

<div align="center">10.</div>

Defendant Fulton County Schools ("FCS") is a public educational agency organized, existing, and conducting business under the laws of the State of Georgia, with its principal place of business in Fulton County, Georgia. FCS operates and exercises control and management over nearly 100 schools within its school district, including Defendant FAST. FCS was responsible for the protection of the health and safety of Minor Jane Doe II, as well as for the administration, maintenance, operation, and oversight of its schools and employees, including Defendants Looney, Loe, Rose, Gatewood, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson, each of which are employees and/or agents of FCS, responsible for the administration, supervision, and oversight of FCS employees. In addition to its duties outlined in the Georgia Constitution, Defendant FCS was responsible for ensuring compliance with Title IX of the Education Amendments Act of 1972 so that FAST received all per-pupil and other funding to which it was entitled.

<div align="center">11.</div>

<div align="center">8</div>

Defendant FCS may be served with process through its attorney of record, Brandon Moulard, Parker Poe Adams & Bernstein, LLP, 1075 Peachtree Street N.E., Suite 1500, Atlanta, Georgia 30339.

12.

Defendant Fulton Academy of Science and Technology ("FAST") is a charter school within the Fulton County School System having its principal place of business in Fulton County, Georgia. Defendant FAST was responsible for ensuring compliance with Title IX of the Education Amendments Act of 1972 so that it received all per-pupil and other funding to which it was entitled by agreement with FCS.

13.

Defendant FAST may be served with process through its attorney of record, Thomas Barton, Coles Barton, LLP, 150 South Perry Street, Suite 100, Lawrenceville, Georgia 30046.

14.

Defendant Founding Fourteen, Inc. ("Founding Fourteen") is a Georgia nonprofit corporation that contracted with FCS and the Georgia State Board of Education to operate FAST and be bound to all the provisions of the Charter Schools Act of 1998, O.C.G.A. §§ 20-2-2060 *et seq.* Founding Fourteen is liable

for the actions of its agents, employees, and board members through the doctrine of respondeat superior. *See* Exhibit A, First Amended and Restated Bylaws of Founding Fourteen, Inc., available at https://drive.google.com/file/d/1oOoG78n8F8fCJ-P6IlF3P1UtsnGaiP6q/view (last visited June 9, 2023).

<div align="center">15.</div>

Defendant Founding Fourteen may be served with process through its attorney of record, Thomas Barton, Coles Barton, LLP, 150 South Perry Street, Suite 100, Lawrenceville, Georgia 30046.

<div align="center">16.</div>

Defendant Dr. Mike Looney ("Looney") is the Superintendent of FCS, including FAST, and has held the position since June 2019. He is being sued in his individual capacity. Looney was responsible for instituting reasonable policies and measures designed to address sexual harassment, abuse, and inappropriate contact between adult FCS employees and students, and for ensuring the adequate provision of social services to students, as well as access to support to address students' physical, social, and emotional needs. Looney failed to institute reasonable policies and measures designed to prevent sexual harassment, assault, and inappropriate contact between adult FCS employees and students and also

<div align="center">10</div>

failed to ensure the adequate provision of social services to students, as well as access to support to address students' physical, social, and emotional needs. Looney further failed to supervise subordinates to ensure that they were following FCS policies and procedures and executing their job duties in accordance with federal and state law. Looney also failed to provide sufficient training to school officials and employees on how to handle complaints of sexual harassment, assault, and inappropriate contact between adult FCS employees and students. In addition to his duties outlined in the Georgia Constitution, Defendant Looney was responsible for ensuring compliance with Title IX of the Education Amendments Act of 1972 so that FAST received all per-pupil and other funding to which it was entitled by agreement with FCS.

17.

Defendant Looney may be served with process through his attorney of record, Brandon Moulard, Parker Poe Adams & Bernstein, LLP, 1075 Peachtree Street N.E., Suite 1500, Atlanta, Georgia 30339.

18.

Defendant Dr. Cindy Loe ("Loe") was the Interim Superintendent of FCS, including FAST, from November 2018 until Looney became superintendent in June 2019. She is being sued in her individual capacity. Loe was responsible for

instituting reasonable policies and measures designed to address sexual harassment, abuse, and inappropriate contact between adult FCS employees and students, and for ensuring the adequate provision of social services to students, as well as access to support to address students' physical, social, and emotional needs. Loe failed to institute reasonable policies and measures designed to prevent sexual harassment, assault, and inappropriate contact between adult FCS employees and students and also failed to ensure the adequate provision of social services to students, as well as access to support to address students' physical, social, and emotional needs. Loe further failed to supervise subordinates to ensure that they were following FCS policies and procedures and executing their job duties in accordance with federal and state law. Loe also failed to provide sufficient training to school officials and employees on how to handle complaints of sexual harassment, assault, and inappropriate contact between adult FCS employees and students. In addition to his duties outlined in the Georgia Constitution, Defendant Loe was responsible for ensuring compliance with Title IX of the Education Amendments Act of 1972 so that FAST received all per-pupil and other funding to which it was entitled by agreement with FCS.

19.

Defendant Loe may be served with process through her attorney of record, Brandon Moulard, Parker Poe Adams & Bernstein, LLP, 1075 Peachtree Street N.E., Suite 1500, Atlanta, Georgia 30339.

20.

Defendant Dr. Jeff Rose ("Rose") was the Superintendent of FCS, including FAST, from June 2016 until October 2018. He is being sued in his individual capacity. Rose was responsible for instituting reasonable policies and measures designed to address sexual harassment, abuse, and inappropriate contact between adult FCS employees and students, and for ensuring the adequate provision of social services to students, as well as access to support to address students' physical, social, and emotional needs. Rose failed to institute reasonable policies and measures designed to prevent sexual harassment, assault, and inappropriate contact between adult FCS employees and students and also failed to ensure the adequate provision of social services to students, as well as access to support to address students' physical, social, and emotional needs. Rose further failed to supervise subordinates to ensure that they were following FCS policies and procedures and executing their job duties in accordance with federal and state law. Rose also failed to provide sufficient training to school officials and employees on how to handle complaints of sexual harassment, assault, and inappropriate contact

between adult FCS employees and students. In addition to his duties outlined in the Georgia Constitution, Defendant Rose was responsible for ensuring compliance with Title IX of the Education Amendments Act of 1972 so that FAST received all per-pupil and other funding to which it was entitled by agreement with FCS.

21.

Defendant Rose may be served with process through his attorney of record, Brandon Moulard, Parker Poe Adams & Bernstein, LLP, 1075 Peachtree Street N.E., Suite 1500, Atlanta, Georgia 30339.

22.

Defendant Andrea Cooper Gatewood ("Gatewood") was the Charter Schools Coordinator for FCS, including FAST, at all times relevant in this Complaint. She is being sued in her individual capacity. Gatewood was responsible for instituting reasonable policies and measures designed to address sexual harassment, abuse, and inappropriate contact between adult FCS employees and students, and for ensuring the adequate provision of social services to students, as well as access to support to address students' physical, social, and emotional needs. Gatewood failed to institute reasonable policies and measures designed to prevent sexual harassment, assault, and inappropriate contact between adult FCS employees and students and also failed to ensure the adequate provision of social services to

students, as well as access to support to address students' physical, social, and emotional needs. Gatewood further failed to supervise subordinates to ensure that they were following FCS policies and procedures and executing their job duties in accordance with federal and state law. Gatewood also failed to provide sufficient training to school officials and employees on how to handle complaints of sexual harassment, assault, and inappropriate contact between adult FCS employees and students. Defendant Gatewood was responsible for ensuring compliance with Title IX of the Education Amendments Act of 1972 so that FAST received all per-pupil and other funding to which it was entitled by agreement with FCS.

<p style="text-align:center">23.</p>

Defendant Gatewood may be served with process through her attorney of record, Brandon Moulard, Parker Poe Adams & Bernstein, LLP, 1075 Peachtree Street N.E., Suite 1500, Atlanta, Georgia 30339.

<p style="text-align:center">24.</p>

Defendant Annette Higgins ("Higgins") was principal of FAST from the school's opening in 2016 until the end of the 2017-2018 school year. At the start of the 2017 school year, Higgins, along with FCS, Founding Fourteen, FAST, and the Board Members of FAST and Founding Fourteen (including Defendants Erickson and Akpan), hired Vandel as a science teacher at the school with knowledge of his

<p style="text-align:center">15</p>

prior record and outrageous conduct toward minor female students. Higgins ignored, and failed to properly and sufficiently investigate, Vandel's teaching history, including the multiple instances and allegations of sexual harassment and violence that tracked his entire teaching career. Higgins created and maintained a culture at FAST that discouraged teachers, staff, and students from making reports or complaints to the administration. Higgins allowed Vandel to remain at FAST, unsupervised and without appropriate restrictions around his interactions with FAST students. As principal of FAST, Higgins had the authority to fire, suspend, reprimand, report, and issue corrective measures to protect students.

25.

Defendant Higgins may be served with process through her attorney of record, Thomas Barton, Coles Barton, LLP, 150 South Perry Street, Suite 100, Lawrenceville, Georgia 30046.

26.

Defendant Christopher Mahoney ("Mahoney") was principal of FAST for the fall semester of the 2018-2019 school year. Mahoney created and maintained a culture at FAST that discouraged teachers, staff, and students from making reports or complaints to the administration. Despite knowing of Vandel's prior record and outrageous conduct toward minor female students, Mahoney allowed Vandel to

remain at FAST, unsupervised and without appropriate restrictions around his interactions with FAST students. As principal of FAST, Mahoney had the authority to fire, suspend, reprimand, report, and issue corrective measures to protect students.

<div align="center">27.</div>

Defendant Mahoney may be served with process through his attorney of record, Meredith Guerrero, Drew Eckl & Farnham, 303 Peachtree Street NE, Suite 3500, Atlanta, Georgia 30308.

<div align="center">28.</div>

Defendant Ashley Stinger ("Stinger") was principal of FAST for the spring semester of the 2018-2019 school year. Stinger created and maintained a culture at FAST that discouraged teachers, staff, and students from making reports or complaints to the administration. Stinger received reports of sexual harassment by Vandel upon female students and staff at FAST and failed to appropriately investigate, report the allegations to the GPSC or other state officials, reprimand Vandel, or ensure the adequate provision of social services to students, as well as access to support to address students' physical, social, and emotional needs. Stinger allowed Vandel to remain at FAST, unsupervised and without appropriate restrictions around his interactions with FAST students. As principal of FAST,

Stinger had the authority to fire, suspend, reprimand, report, and issue corrective measures to protect students.

29.

Defendant Stinger may be served with process through her attorney of record, Thomas Barton, Coles Barton, LLP, 150 South Perry Street, Suite 100, Lawrenceville, Georgia 30046.

30.

Defendant Stan Beiner ("Beiner") was principal of FAST, a position he began with the 2019-2020 school year. On May 20, 2019, Defendant Akpan announced to the FAST community that the FAST Governing Board had hired Beiner to be the principal of FAST starting June 1, 2019. Beiner created and maintained a culture at FAST that discouraged teachers, staff, and students from making reports or complaints to the administration. Beiner received reports of sexual harassment by Vandel upon female students (including Minor Jane Doe II) and staff at FAST and failed to appropriately investigate, report the allegations to the GPSC or other state officials, reprimand Vandel, or ensure the adequate provision of social services to students (including Minor Jane Doe II), as well as access to support to address students' physical, social, and emotional needs. Despite having knowledge of Vandel's prior record and outrageous conduct toward

minor female students, Beiner allowed Vandel to remain at FAST, unsupervised

and without appropriate restrictions around his interactions with FAST students.

As principal of FAST, Beiner had the authority to fire, suspend, reprimand, report,

and issue corrective measures to protect students.

31.

Defendant Beiner may be served with process through his attorney of record,

Thomas Barton, Coles Barton, LLP, 150 South Perry Street, Suite 100,

Lawrenceville, Georgia 30046.

32.

Defendant Peter Epstein ("Epstein") was assistant principal at FAST for the

middle school, a position he began with the 2018-2019 school year. Epstein

maintained a culture at FAST that discouraged teachers, staff, and students from

making reports or complaints to the administration. Epstein received reports of

sexual harassment by Vandel upon female students (including Minor Jane Doe II)

and staff at FAST and failed to appropriately investigate, report the allegations to

the GPSC or other state officials, reprimand Vandel, or ensure the adequate

provision of social services to students (including Minor Jane Doe II), as well as

access to support to address students' physical, social, and emotional needs.

Epstein allowed Vandel to remain at FAST, unsupervised and without appropriate

restrictions around his interactions with FAST students.

33.

Defendant Epstein may be served with process through his attorney of record, Thomas Barton, Coles Barton, LLP, 150 South Perry Street, Suite 100, Lawrenceville, Georgia 30046.

34.

Defendant Joseph Akpan is CEO/Chair/Governing Board Member of Founding Fourteen and Chair/Governing Board Member of the Board of FAST. Akpan failed to institute reasonable policies and measures designed to prevent sexual harassment, assault, and inappropriate contact between teachers and students. Akpan failed to supervise his subordinates, including Higgins, Mahoney, Stinger, Beiner, and Epstein, to ensure that they were following FAST policies and procedures and executing their job duties in accordance with federal and state law. Despite receiving reports of Vandel's inappropriate conduct toward Minor Jane Doe II and student bullying that resulted therefrom, Akpan failed to appropriately investigate, report the allegations to the GPSC or other state officials, reprimand Vandel, or ensure the adequate provision of social services to Minor Jane Doe II, as well as access to support to address her physical, social, and emotional needs. As Chair of the Boards of Founding Fourteen and FAST, Akpan had the authority

to have Vandel fired, suspended, reprimanded, reported, and issued corrective measures to protect students.

35.

Defendant Akpan may be served with process through his attorney of record, Thomas Barton, Coles Barton, LLP, 150 South Perry Street, Suite 100, Lawrenceville, Georgia 30046.

36.

Defendant June Erickson ("Erickson") is the former CEO/Chair/Officer of Founding Fourteen and former Chair/Officer of the Board of FAST. After leaving those roles, Erickson continued as a Governing Board Member of Founding Fourteen and FAST through all relevant time periods of this Complaint. Erickson received reports of sexual harassment by Vandel upon female students and staff at FAST, including Minor Jane Doe II, and failed to take appropriate actions to correct or prevent the abuse (and student bullying that resulted therefrom), appropriately investigate, report the allegations to the GPSC or other state officials, reprimand Vandel, or ensure the adequate provision of social services to Minor Jane Doe II, as well as access to support to address her physical, social, and emotional needs. Erickson declined to allow an appropriate investigation of Vandel and would not allow Defendant Mahoney to fire Vandel. Erickson failed to

supervise her subordinates, including Higgins, Mahoney, Stinger, Beiner, and Epstein, to ensure that they were following FAST policies and procedures and executing their job duties in accordance with federal and state law. As a Governing Board Member of Founding Fourteen and FAST, Erickson had the authority to have Vandel fired, suspended, reprimanded, reported, and issued corrective measures to protect students.

37.

Defendant Erickson may be served with process through her attorney of record, Thomas Barton, Coles Barton, LLP, 150 South Perry Street, Suite 100, Lawrenceville, Georgia 30046.

## **JURISDICTION AND VENUE**

38.

This Court has original jurisdiction over Plaintiffs' Section 1983 claims because they arise under the Constitution and laws of the United States. 28 U.S.C. § 1331; U.S. Const., Amend. 14; 42 U.S.C. § 1983.

39.

This Court has original jurisdiction over Plaintiffs' Title IX claims because they arise under the Constitution and laws of the United States. 28 U.S.C. § 1331;

U.S. Const., Amend. 14; 20 U.S.C. § 1681(a).

40.

This Court has supplemental jurisdiction over related state law claims

pursuant to 28 U.S.C. § 1367.

41.

Venue is proper in the Atlanta Division of the United States District Court

for the Northern District of Georgia as a substantial part of the events and

omissions giving rise to the claims in this action occurred in Fulton County,

Georgia, which is encompassed within the Atlanta Division of the Northern

District of Georgia.

## **FACTS**

### **Defendants Had a Duty to Maintain and Foster a Safe Educational Environment for Minor Jane Doe II and All Students at FAST**

42.

FCS is an "educational program or activity receiving federal financial

assistance" within the meaning of Title IX of the Education Amendments of 1972,

20 U.S.C. § 1681(a).

43.

FCS, by and through the Fulton County Board of Education, operated and

maintained, at all relevant times, the public-school system for school-age children

in Fulton County, Georgia.

44.

Founding Fourteen petitioned the Fulton County Board of Education to create FAST as a charter school within the FCS public-school system in 2014. *See* Exhibit B, current Charter for FAST, available at http://www.fastk8.org/about-us__trashed/charter/ (last visited June 9, 2023).

45.

FAST was created as a charter school within the FCS public-school system and has been in operation since 2016.

46.

FAST has been operated by Defendant Founding Fourteen since its creation.

47.

The Boards of FAST and Founding Fourteen include the same personnel. For example, in the spring of 2020, Defendant Joseph Akpan was Chair of both the Board of FAST and the Board of Founding Fourteen, and Defendant Erickson was a Member of both the Board of FAST and the Board of Founding Fourteen.

48.

FCS and FAST received, at all relevant times, federal funds to ensure that all students have equal educational opportunities and access to education.

49.

During the 2017-2018 school year, Minor Jane Doe II was a student at FAST. She was 11 years old at the time.

50.

During the 2018-2019 school year, Minor Jane Doe II was a student at FAST. She was 12 years old at the time.

51.

During the 2019-2020 school year, Minor Jane Doe II was a student at FAST. She was 13 years old at the time.

52.

Under Defendants' watch, Vandel engaged in criminal, sexual predatory acts against Minor Jane Doe II and other students at FAST. Defendants failed to protect Minor Jane Doe II and the other students at FAST. Defendants knew or should have known of Vandel's propensity to commit unlawful sexual acts upon minor female students, yet they did nothing to stop Vandel or protect Minor Jane Doe II or other students from harm.

53.

Defendants Looney, Loe, Rose, Gatewood, Higgins, Mahoney, Stinger, Beiner, and Epstein were, at all relevant times, "mandatory reporters" under Title

IX, FCS policies, and Georgia law. Despite their lawful duty to report, Defendants did nothing to protect Minor Jane Doe II or the other children under their care.

### Vandel's History of Sexual Violence and Harassment of Minor Female Students at Previous Schools Was Known by Defendants

54.

In 2003, while employed as a teacher at Midland Middle School in Columbus, Georgia, multiple students, teachers, and parents reported inappropriate sexual behavior by Vandel to another teacher at the school. Multiple students accused Vandel of inappropriate contact by touching their shoulders, thighs, buttocks, and hitting them with a ruler. Additionally, Vandel was accused of inappropriate communications by using pet names for, and making sexual comments to, female students.

55.

On February 1, 2003, the Columbus Ledger Enquirer reported that:

A popular eight-grade science teacher accused of inappropriately touching female students in class was arrested Thursday afternoon by Columbus police. . . . Police records show that at least four female students have reported Vandel having "touched them on the buttocks or inner thigh." One student reported Vandel allegedly struck her on the buttocks with a ruler. All of the incidents . . . are alleged to have occurred inside classrooms . . . ." [Muscogee County School Superintendent John Phillips stated that] [a]s soon as we had an inclination that there were accusations, we turned it over to DFACS and to the Professional Standards Commission then to police.

56.

Vandel's pattern of grooming, sexual harassment, and sexual assault at Midland Middle School included, but was not limited to, the following:

a. Grooming and creating relationships of intimacy and trust with minor female students (including using candy, favoritism, isolation, and inappropriately sexual and familiar interactions to groom young girls).

b. Giving certain students flirtatious, sexually suggestive, and inappropriate nicknames (such as "cutie pie," "flirt," "care bear," and "perv").

c. Making overt sexually suggestive and harassing comments to students and teachers.

d. Touching minor female students inappropriately and sexually, including massaging their shoulders, touching their inner thighs, and touching their buttocks.

e. Suggesting minor female students call him outside of school hours.

f. Inviting minor female students to his home to pick up personal gifts, candy, etc., when his wife was not home.

57.

The GPSC investigated the allegations made against Vandel and interviewed multiple students and teachers regarding their experiences with Vandel.

58.

Fourteen (14) teachers expressed concerns regarding Vandel's behavior and interactions with minor female students at Midland Middle School. These concerns included:

- Teacher 1[2] reported an interaction between a student and Vandel where Vandel had grabbed a student's thigh and made sexually suggestive remarks.

- Teacher 2 reported that Vandal gave a student the nickname "Cutie Pie" and gave her "back rubs." Teacher 2 confirmed that Vandel gave or attempted to give similar "back rubs" to "a lot of the female staff members."

- Teacher 3 reported witnessing repeated problematic interactions between Vandel and female students, including preferential treatment, wrapping his arms around female students' waists, and making

---

[2] As a result of the highly sensitive and personal nature of the facts in this Complaint, the identities of the Teachers and Students have been concealed from public court filings in order to prevent those not directly involved in this action from learning their identities and making their identities public. Plaintiffs will make the names of these individuals known to Defendants immediately upon request.

sexually suggestive remarks regarding female students.

- Teacher 4 reported that Vandel made them feel very uncomfortable by the remarks he made to female students. The teacher also reported that she received unwanted back rubs from Vandel. The teacher reported that many other female teachers reported similar levels of discomfort with Vandel.

- Teacher 5 reported that a female student complained that Vandel had rubbed the student's back and made her uncomfortable.

- Teacher 6 reported that she witnessed Vandel "hit a student on the behind with a ruler."

- Teacher 7 complained of "extensive sexual harassment" by Vandel.

- Teacher 8, Teacher 9, Teacher 10, and Teacher 11 reported Vandel for making them feel uncomfortable as a result of sexually inappropriate conduct, for isolating female students for extended periods of time, for having inappropriate physical contact with female students, and for making sexually suggestive comments to students.

- Teacher 12 and Teacher 13 complained of sexually inappropriate conduct by Vandel, and Teacher 13 reported that students came to her with similar complaints about Vandel's sexually inappropriate

behavior.

- Teacher 14 reported that a student told her that Vandel treated her differently than other female students and that he would inappropriately get very physically close to her and make her feel uncomfortable.

59.

Seven (7) minor female students at Midland Middle School also reported issues with Vandel, which included, but were not limited to, the following:

- Student 1 reported that Vandel put "his hand on [her] behind" when he talked to her and that Vandel showed her preferential treatment, including inviting her to his house to pick up a Christmas present. Student 1 also reported that Vandel "put his hand on [her] inner thigh and rubbed [her] thigh up and down" when she was talking to him.

- Student 2 reported that Vandel puts his hand on her behind when he talked to her and that "one time when [she and her friend were] talking to him, he put his hand on [their] inner thigh and rubbed [her] thigh up and down." Student 2 also reported that Vandel showed her preferential treatment, including inviting her to his house to pick up a Christmas present.

- Student 3 reported that Vandel "touched [her] butt when [she] ask[ed] questions" and he "put his hand on [her] butt and still talk[ed] to [her] while holding [her] butt." Student 3 also reported that another female student "was talking to him about her grade and he was sitting in his chair and [she] walked right up to him and he grabbed her by her waist and pulled her to him and then he held her butt."

- Student 4 reported that Vandel "touched [her] butt once," and when she asked questions, he came over her and rubbed her shoulder, which made her "uncomfortable."

- Student 5 reported that before Christmas, "Vandel came by and hit [her] on the bottom with a ruler" and when she "came back from Christmas break he smacked [her] on the bottom with a ruler again."

- Student 6 reported that Vandel made explicit, sexually suggestive comments to her while describing two gummy bears stuck together in a head-to-toe position; that "another time he walked around his desk and grabbed [her] thigh;" that "another day he walked behind [her] and grabbed [her] around [her] waist;" and that "sometimes he would wink and stare at [her] for a long time, [which] made [her] feel very, very weird and uneasy."

- Student 7 reported that Vandel made repeated inappropriate comments towards her, including calling her "cutie" on a daily basis, and suggested that he would date her if he was 50 years younger.

60.

Vandel was subsequently arrested and charged with four counts of sexual battery and one count of simple battery against students.

61.

Vandel resigned from Midland Middle School in the wake of his arrest and the reports of sexual harassment and assault that were made against him.

62.

In 2006, the GPSC released the findings of its investigation and determined that the student and teacher witnesses were credible and that Vandel's defenses were not credible.

63.

An Administrative Law Judge of the Office of State Administrative Hearings determined that Vandel "committed clear violations" of the Code of Ethics for Educators Standard 2 ("Abuse of Students") "by failing to maintain a professional relationship with his students and by repeatedly engaging in sexually harassing behavior through his words and actions," and Standard 10 ("Professional

Conduct") "by engaging in conduct that seriously impaired his ability to function professionally in his employment position . . . [and] was detrimental to the health, welfare, discipline and morals of his students." Consequently, Vandel's teaching certificate was suspended for eighteen (18) months.

64.

After a subsequent review of the case, the GPSC determined a greater sanction was appropriate to reflect the seriousness of Vandel's conduct and increased his suspension from eighteen (18) months to two (2) years.

65.

These charges, investigations, orders, and suspensions were available to Defendants and listed on Vandel's teaching certificate record.

66.

Additionally in 2006, Vandel was also investigated and reprimanded by the GPSC for "misrepresentation or falsification" because he failed to disclose and report to the GPSC that he had written bad checks and was convicted of doing so, and that he had been charged with sexual battery and simple battery.

67.

In 2019, Vandel's teacher's certification was again suspended by GPSC for showing up at school after drinking and smelling heavily of alcohol. Several

female teachers reported Vandel for this incident, which Vandel admitted.

68.

FCS and FAST policies require fingerprinting, background checks, and a pay-for-service investigation search engine for all hires. Defendants FCS, Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, and the Board Members of FAST and Founding Fourteen (including Defendants Erickson and Akpan) knew and/or should have known of Vandel's history of misconduct and discipline.

69.

Despite Vandel's documented history of grooming, sexually harassing, and sexually assaulting minor female students and female teachers, prior criminal charges and convictions, prior discipline for showing up at school under the influence of alcohol, findings of violations of the Code of Ethics for Educators, and multiple teaching Certificate suspensions, Defendants FCS, Founding Fourteen, FAST, Higgins, and the Board Members of FAST and Founding Fourteen (including Defendants Erickson and Akpan) hired Vandel to work as a middle school teacher at FAST.

### Vandel's Predatory Behavior Towards Female Students and Staff Continued at FAST and was Known by Teachers, Administrators, and Founding Fourteen Board Members

34

70.

Before Vandel's sexual assault on Minor Jane Doe II, FAST school officials and Board Members and Founding Fourteen Board Members had actual knowledge of multiple prior incidents involving Vandel and minor female students and female teachers at FAST.

71.

In 2018, Defendant Higgins disclosed to Defendants Stinger, Beiner, and/or Epstein that there had been previous allegations of sexual misconduct against Vandel at his former school and wanted to make them aware. A lot of the other FAST teachers were gossiping about it at that time.

72.

Vandel's pattern of grooming, sexual harassment, and sexual assault at FAST was almost identical to his behavior at Midland that was investigated by the GPSC and was contained within public records, including his teaching records. Vandel's continued pattern of abuse and grooming at FAST included the following:

   a. Grooming and creating relationships of intimacy and trust with minor female students (including using candy, favoritism, isolation, and inappropriately sexual and familiar interactions to groom young girls).

b. Giving certain students flirtatious, sexually suggestive, and inappropriate nicknames.

c. Making overt sexually suggestive and harassing comments to students and teachers.

d. Touching minor female students inappropriately and sexually, including massaging their shoulders, touching their inner thighs, and touching their buttocks.

e. Suggesting minor female students call him outside of school hours.

f. Inviting minor female students to his home to pick up personal gifts, candy, etc., when his wife was not home.

73.

It was widely known among the teachers, administrators, and staff working at FAST that Vandel would routinely invite individual and small groups of minor female students to his room during lunch breaks and would provide candy and ice cream to them. This was prohibited by school policy. Yet, despite this widespread knowledge, Defendants FAST, Founding Fourteen, Higgins, Mahoney, Stinger, Beiner, Epstein, and the Board Members of FAST and Founding Fourteen (including Defendants Erickson and Akpan) did not take any action to prevent, deter, or prohibit Vandel's conduct and knowingly allowed Vandel to disregard

school policies, and thereby groom minor female students.

<center>74.</center>

Multiple minor female students at FAST were subjected to grooming, sexual harassment, and sexual assault by Vandel, through his showing of favoritism, providing minor female students with additional candy, making up nicknames for minor female students, and touching minor female students' shoulders, breasts, buttocks, and thighs.

<center>75.</center>

Teacher 15, a teacher at FAST during the 2018-2019 school year and a former principal at another Atlanta school, reported Vandel's inappropriate conduct throughout her employment at FAST, but Defendants turned a blind eye to, and in fact punished her for, reporting his misconduct. The experience of Teacher 15 is detailed as follows:

    a. When Teacher 15 started working at FAST in 2018, it was a new school with many teachers that had not taught before, were not certified, had not undergone ethics training, and did not know about basic educational requirements, such as mandatory reporting and individualized education programs. Teacher 15 was an older, experienced teacher and other teachers oftentimes came to her for advice.

b. FAST had a custom and practice of not following ethics training because the administration viewed its charter school status as a start-up environment in which such things were not necessary. In fact, Teacher 15 had to explain what a mandatory reporter was to multiple staff members.

c. Teacher 15 observed that the FAST administration would get angry with anyone who tried to improve the school's operations and that it was acceptable behavior to not be doing the right thing.

d. Other teachers complained to Teacher 15 on multiple occasions about Vandel's inappropriate behavior.

e. Vandel made sexualized comments to Teacher 15 and other teachers about how they looked in their tight jeans and was sexually suggestive and inappropriate with several minor female students.

f. Teacher 15 was deeply concerned that the school and administration were allowing Vandel to be alone with minor female students and, as a result, pulled her own daughter out of FAST.

g. According to Teacher 15, Defendants FCS, FAST, Founding Fourteen, Mahoney, Stinger, Epstein, and Erickson were aware of Vandel's inappropriate behavior towards students and other teachers for a long time but did nothing about it.

h.  Teacher 17 told Teacher 15 that the FAST administration asked her to keep an eye on Vandel since the day he was hired because they were aware that he had a prior record and knew of the accusations against him.

i.  Teacher 15 observed that Vandel had a "type" and seemed to flirt with young, fit girls with long hair and that this was known by other staff at FAST.

j.  Teacher 15 observed that Vandel regularly gave minor female students candy and ice cream, which was against FAST's official school policy, but that FAST and its administration, including Defendants Mahoney and Stinger, knowingly allowed Vandel—and only Vandel—to do so anyway.

k.  Teacher 15 observed Vandel flirting and inappropriately interacting with a minor female, sixth-grade student (Student 8) and was very concerned. Teacher 16 approached Teacher 15 about her own concerns regarding Vandel's interactions with Student 8, and they both agreed to report it to Defendant Stinger. When Teacher 15 reported her concerns, Defendant Stinger became angry with her, saying she could not believe Teacher 15 would bad-mouth Vandel or say something like that about him. Defendant Stinger further shamed Teacher 15 for reporting Vandel's

sexual harassment of minor female students by reminding her that Vandel had once delivered a meal to Teacher 15 when her daughter was in the hospital. Teacher 15 implored Defendant Stinger to keep an eye on Vandel, but Defendant Stinger told Teacher 15 that she was disgusted with her. Defendant Stinger's harsh response made Teacher 15 begin to doubt herself.

l.  FAST had an unofficial custom or policy of meeting reports of misconduct with disbelief and ridicule; punishing and blaming the one reporting the misconduct; and quieting any further discussion of the misconduct. As an example, FAST's administration told Teacher 15 that she was being dramatic for raising her concerns about Vandel and was very tough on her from that point forward. FAST's administration also told Teacher 15 that her perspective was her fault because she did not understand the challenges of a start-up charter school. Teacher 15 thought such challenges should include problems with carpool, not problems that put children at risk or included reprimanding teachers for reporting misconduct.

m. Despite her report, Teacher 15 continued to see Vandel talking to and interacting with minor female students at FAST in totally inappropriate

ways.

n. FAST's administration also allowed Vandel to get away with things for which other teachers were held accountable. For instance, Vandel treated one minor female student very badly, telling her to shut up and that she was stupid, and mocking her weight. Teacher 15 thought it was overly familiar and inappropriate and reported it to Defendant Epstein, but Defendant Epstein thought it was funny and did not discipline Vandel. The following week, a female teacher was written up for telling a student to shut up, however, Vandel received no similar rebuke for almost identical behavior.

o. Teacher 15 later discovered that Defendant Stinger told Vandel about Teacher 15's report about him, and Vandel began acting differently around her. Teacher 15 told Defendant Stinger that she had made the school a very uncomfortable place for her by sharing her concerns with Vandel and, as a result, resigned, effective April 5, 2019, because she could no longer work at FAST in that environment.

p. As another example of FAST's unofficial custom or policy of punishing and blaming those that report misconduct, Teacher 15 encountered a minor female student who told other students she was going to kill them.

In connection with her mandatory reporting duties, and so as to not lose her teaching certification, Teacher 15 reported the incident to FAST administration and told the student's mother about what had been said. Defendant Stinger and the FAST administration got upset with her for telling the girl's mother about the incident because it was the school's custom to keep a lot of things from students' families.

q. On March 24, 2019, Teacher 15 emailed Defendant Stinger, Defendant Erickson, and another member of the Founding Fourteen Board/FAST Governing Board, Yvonne Fowlkes, about her ongoing concerns regarding Vandel. In that email, Teacher 15 stated that Vandel had "a documented case" of inappropriate conduct with teenage girls; that Defendant Erickson knew "there was a record" on Vandel; that Defendant Stinger was "aware of all of this and sadly she did nothing;" and that Defendant Epstein "was also aware of the fact the kids were hanging out in [Vandel's teaching area] during recess and lunch with no adult in there." She reported in her email that teachers feared coming forward "because they know what happens at FAST when [they] speak up," but that she was doing so "[b]ecause those girls in [Vandel's] class love [that] man" and Defendants Stinger and Erickson would "do nothing

to protect" them. Teacher 15's email was shared with FAST's entire board.

r.  The next day, on March 25, 2019, Defendants Stinger and Akpan notified Teacher 15 that the "FAST administration" determined to place her on leave until her final date of employment and instructed her not to return to campus for any reason, even to tell her students and colleagues goodbye. In addition, Defendants Stinger and Akpan notified Teacher 15 that FAST would be deducting $1,000.00 from her final paycheck for failing to provide a 60-day notice of her resignation.

s.  Teacher 15 reported Vandel's inappropriate behavior because she was alarmed by it, yet she was ultimately punished for doing so. Teacher 15 observed that no one would say anything about Vandel after they saw what happened to her.

t.  According to Teacher 15, FCS and FAST hated any bad press brought on by teacher conduct and avoided creating written records concerning such misconduct, which produced a breeding ground for bad things to happen. In fact, Defendant Beiner actively worked to have all negative online reviews of the school removed. Teacher 15 observed that the human resources department would come after those that stated anything

negative about the county, reported anything to the police, or reported misconduct of any kind. Teachers were scared and discouraged to report anything.

u. One FAST teacher asked Teacher 15 if she thought she would be ok if she reported Vandel, and Teacher 15 told her that she must take her commitment to the students more seriously than worrying about what the human resources department would do, but the teachers were scared.

v. After leaving FAST, Defendant Mahoney called Teacher 15 and admitted that he told Defendant Erickson on multiple occasions that he wanted to fire Vandel, but that Defendant Erickson would not let him do so. Defendant Mahoney told Teacher 15 that Vandel had a record and had done some things to students and that Vandel should never have been hired because he had lost his certification due to inappropriate relationships with minor female students. Defendant Mahoney was upset that Defendant Erickson would not let him fire Vandel.

w. Defendant Mahoney also shared with Teacher 15 that he had tried to fire another FAST teacher in December 2018 for watching pornography in the classroom, but, similarly, Defendant Erickson would not permit him to do so, in order to avoid any bad press. Instead, Defendant Erickson

insisted that Defendant Mahoney require the teacher to resign instead of terminating him. Because Defendant Erickson would not allow the teacher to be terminated, FAST was required to pay out his contract, and the teacher was never reported. Defendant Erickson then erroneously told FAST teachers that Defendant Mahoney paid the teacher a lot of money to leave the school, purportedly to portray Defendant Mahoney in a negative light. The Board, including Defendant Erickson, ultimately fired Defendant Mahoney from FAST.

x. Teacher 15 observed that Defendant Erickson was very close with, and a big supporter of, Vandel. In fact, Defendant Erickson complained when a student, which was a member of her family, was placed in Teacher 15's class instead of Vandel's class and ultimately had the student reassigned to Vandel's class.

76.

Teacher 16, a teacher at FAST during the 2017-2018 and 2018-2019 school years, also reported Vandel for similar behavior:

a. Teacher 16 made at least four (4) separate reports to the FAST administration about her concerns regarding Vandel from 2017-2019. Two (2) of Teacher 16's reports regarded "sexual misconduct."

45

b. One report involved a minor female, sixth-grade student (Student 8), who sought out Teacher 16 and told her that Vandel messed with her hair and would walk behind her in class and touch and rub her shoulders and neck a lot. The minor female student asked Vandel more than once to stop, but he did not stop. Student 8 also reported to Teacher 16 that Vandel leaned in too close when he talked to her. Teacher 16 reported all of this to Defendant Stinger, but she refused to believe Teacher 16, said Student 8 would have told her those things if they really happened, and did not perform an investigation.

c. Another report involved a young female teacher (Teacher 18), who told Teacher 16 that Vandel said and texted inappropriate things to her and that she asked him to stop, but that Vandel responded by telling her in the hallway: "I know you won't tell anyone about us, sweetie." Teacher 18 was worried that she would get in trouble at FAST for reporting Vandel's conduct. Teacher 16 reported all of this to the FAST administration, but they told her they would not and could not do anything about it.

d. Teacher 16 also reported Vandel for animal abuse on two occasions.

77.

Defendant Stinger told another FAST teacher, Teacher 19, that she was

aware minor female students were hanging out at lunchtime with Vandel in his classroom, which was a temporary trailer detached from the main school building, with no other adult staff members present. Defendant Stinger reported to Teacher 19 that this, and watching the girls spend time alone with Vandel, made her uncomfortable. Defendant Stinger told Defendants Beiner and Epstein that they should move Vandel's classroom into the main building to cover all of their bases.

78.

Another teacher at FAST, Teacher 20, reported to Defendant Stinger that a co-worker, Teacher 21, became uncomfortable when Vandel called Teacher 21 "cutie."

79.

FAST should have performed a thorough, formal investigation of Vandel based upon its knowledge of Vandel's prior incidents, along with multiple teachers' complaints regarding strikingly similar misconduct.

80.

The comments and actions of Defendants Stinger and Erickson, which were designed to preclude and thwart efforts to report Vandel's conduct and thereby protect FAST and Vandel, resulted in and evidenced a deliberate intent to harm

Minor Jane Doe II.

<div align="center">81.</div>

In keeping with their practice of hiding and dismissing the allegations of sexual misconduct against Vandel, Defendants failed to notify or report Vandel's conduct to the Division of Family and Children Services of the Department of Human Services or an appropriate police authority, district attorney, or child welfare agency.

<div align="center">

**<u>Vandel Grooms, Harasses, and Sexually Assaults Minor Jane Doe II</u>**

82.

</div>

In August 2017, Minor Jane Doe II was a happy, 11-year-old sixth grader enrolled at FAST, who did well in school and loved to perform ballet.

<div align="center">83.</div>

When school started, FAST teacher Vandel quickly took a fancy to her and began perpetrating a pattern of grooming behavior that continued over the course of two-and-a-half school years. According to Minor Jane Doe II, Vandel showed a surprising amount of interest in her.

<div align="center">84.</div>

Before ever becoming her teacher, Vandel started by calling Minor Jane Doe II nicknames, like "Blondie" and "Ballerina," giving her "high-fives" in the school

<div align="center">48</div>

hallways, pulling her pigtails, treating her special, and giving her extra attention.

85.

Vandel's inappropriate conduct escalated when Minor Jane Doe II was placed in his science class in the seventh grade. Vandel, who then had daily interaction with Minor Jane Doe II, singled her out by showering her with favoritism and gifting her with extra candy, ice cream, class "money," and personal, typed notes.

86.

Vandel's affection for Minor Jane Doe II became physical when he began rubbing her shoulders and pulling her hair from behind, at least once a week, while she was in his classroom.

87.

As a result of Vandel's overt grooming tactics, other students began bullying and ridiculing Minor Jane Doe II at school.

88.

Despite knowing of past accusations against Vandel in prior teaching positions, which involved grooming, sexual harassment, and sexual assault of middle school girls, FAST failed to prevent Vandel's grooming and increasing abuse of Minor Jane Doe II.

89.

As Minor Jane Doe II entered the eighth grade, Defendants continued to allow Vandel to manipulate his position of trust in order to groom, sexually harass, and sexually abuse Minor Jane Doe II. Minor Jane Doe II was placed in Vandel's homeroom class, in addition to being in his science class.

90.

On one occasion, Vandel pulled Minor Jane Doe II out of her classroom, cornered her in the hallway, and told her she had the most beautiful eyes he had ever seen.

91.

Vandel's interactions quickly escalated into more overt sexual contact, including squeezing and caressing her shoulders, reaching down near her breasts, and letting his hand linger on her body. At times, Vandel squeezed her shoulder so hard that it hurt. This inappropriate physical contact occurred repeatedly and on a consistent basis, up to three or four times a day, during the school year.

92.

During one incident, Vandel smacked Minor Jane Doe II on the buttocks in the front of the classroom as she bent down to pick up a piece of paper. When she

turned around, she saw Vandel smiling at her.

93.

On yet another occasion, Vandel leaned over Minor Jane Doe II while she was taking a test and fondled her arm, pulling her arm hair in a manner that was painful for her. After staring at her arm in disbelief and discomfort, Minor Jane Doe II looked up to see multiple classmates staring back with concern.

94.

Vandel's unwanted and inappropriate attention toward Minor Jane Doe II was the subject of considerable gossip among classmates and led to Minor Jane Doe II's increased harassment, bullying, and cyber bullying by her fellow students at FAST.

95.

Throughout October and November of 2019, Jane Doe I and John Doe emailed the FAST Administration on multiple occasions about the constant bullying and sexually harassing behavior that other FAST students inflicted upon Minor Jane Doe II and requested support from the school. Yet, Defendants failed to acknowledge, investigate, or address their repeated concerns.

96.

In November and December of 2019, multiple male students approached

Teacher 22, a teacher at FAST, on **three separate occasions** to report Vandel's

inappropriate sexual behavior toward Minor Jane Doe II.

<center>91.</center>

Thereafter, Teacher 22 pulled Minor Jane Doe II out of class to talk with her

about the reports regarding Vandel's inappropriate sexual conduct toward her.

Minor Jane Doe II told Teacher 22 that Vandel touched her in class, let his hand

linger on her shoulder, complimented her "beautiful eyes," and made her feel

uncomfortable. She also told Teacher 22 that Vandel messaged other minor female

students late at night. Teacher 22 told Minor Jane Doe II that Vandel made her feel

uncomfortable as well and that he had messaged her late at night.

<center>97.</center>

Teacher 22 reported these discussions about Vandel to FAST administrators

in charge of protecting Minor Jane Doe II, yet they humiliated and rebuked Minor

Jane Doe II, turned a blind eye to Vandel's abuse, and sought to protect Vandel

over Minor Jane Doe II. At that time, Teacher 22 also reported her own sexual

harassment by Vandel, which occurred when she was bending over a copier to fix

it and Vandel told her, in front of several students, that if she kept "bending over

like that he was going to have to do something about it." Teacher 22, who had been

warned about Vandel by other FAST teachers, felt considerably embarrassed by

<center>52</center>

his sexually harassing comment.

98.

On December 2, 2019, after learning of Vandel's sexual assault on Minor Jane Doe II and the additional reports by Teacher 22, Defendant (Principal) Beiner and Defendant (Vice Principal) Epstein interrogated Minor Jane Doe II alone in the school office midday, without her parents present or even being made aware, about the allegations regarding Vandel's sexual misconduct.

99.

Despite not knowing Defendant (Principal) Beiner and Defendant (Vice Principal) Epstein very well, Minor Jane Doe II began to share with them that Vandel squeezed her shoulders and pulled her hair. Without allowing Minor Jane Doe II to fully share her concerns, Defendant (Principal) Beiner and Defendant (Vice Principal) Epstein immediately silenced Minor Jane Doe II and told her that Vandel would be "mortified" to hear of how she "perceived" his behavior. Defendant (Principal) Beiner also chastised, blamed, and demeaned Minor Jane Doe II for wearing uniform pants that he described as "too tight." These blame-shifting remarks stopped Minor Jane Doe II from sharing any further information regarding Vandel's grooming and sexually inappropriate behavior. The actions of Defendants Beiner and Epstein were so callously outrageous that they evidenced a

deliberate intent to harm Minor Jane Doe II, as well as Jane Doe I and John Doe.
Defendants thereafter failed to provide appropriate social services to Minor Jane
Doe II, who was a victim of sexual assault at the hands of Vandel, their employee.

100.

Even more shocking, after these two male authority figures confronted
Minor Jane Doe II, an embarrassed, frightened, and confused twelve-year-old girl,
about the sexually abusive behavior of another male authority figure, no one
reached out to notify Jane Doe I or John Doe I of the meeting or the allegations
involving Vandel's sexual abuse of their daughter—instead, they learned of both
from Minor Jane Doe II after school. That evening, at 6:42 p.m., Jane Doe I sent
Defendant (Principal) Beiner an email indicating her dismay and dissatisfaction
with the FAST Administration's mishandling of the situation and failure to notify
her or John Doe of their private meeting with Minor Jane Doe II. Jane Doe I
indicated she was astounded that Defendant (Principal) Beiner had not yet
contacted them to discuss what happened. She also indicated that Minor Jane Doe
II's mental health had been affected and that they were fearful to send Minor Jane
Doe II to school at FAST, given the dangerous environment. After 8:00 p.m. that
evening, in response to Jane Doe I's email, Defendant (Principal) Beiner finally
called Jane Doe I and John Doe, yet he attempted to downplay the situation, shut

them up, and make their complaints and allegations of misconduct disappear. The actions of Defendant Beiner evidenced a deliberate intent to harm Jane Doe I and John Doe.

<div align="center">101.</div>

In keeping with their practice of hiding and dismissing the allegations of sexual misconduct against Vandel, Defendant (Principal) Beiner, Defendant (Vice Principal) Epstein, and other FAST administrators failed to notify or report Vandel's conduct to the Division of Family and Children Services of the Department of Human Services or an appropriate police authority, district attorney, or child welfare agency.

<div align="center">102.</div>

Following these traumatic experiences, and with much trepidation and anxiety, Minor Jane Doe II was forced to continue attending Vandel's class through the end of the semester in order to receive credit for certain high school level courses she was taking. However, as a result of the FAST administrators' deliberate indifference and shocking non-action, Jane Doe I and John Doe felt their only recourse to protect Minor Jane Doe II from FAST's abusive environment was to withdraw her from the school mid-year and enroll her in a private school, which

they did upon her completion of the semester in December 2019.

103.

On January 17, 2020, without yet knowing the full extent of Vandel's sexual assault on Minor Jane Doe II, Jane Doe I emailed Defendants' Governing Board regarding Defendants' failure to protect Minor Jane Doe II from Vandel's inappropriate physical touching and from repeated bullying and sexual harassment from other students, despite persistent complaints from Jane Doe I and John Doe. Jane Doe I also emailed Defendant Akpan and Defendant Erickson regarding same. Yet, Defendants still allowed Vandel to remain in his role as a FAST middle school teacher, creating an opportunity for him to commit further acts against FAST students, and failed to provide social support services to Minor Jane Doe II.

104.

In response, Defendant Akpan, chair of the FAST/Founding Fourteen Boards, notified Jane Doe I that that there would be an investigation into her complaints, and that he would follow up at the conclusion of the investigation.

105.

In the meantime, Jane Doe I spoke with Defendant Erickson by phone and told her that Vandel rubbed Minor Jane Doe II's shoulders and cornered her in the hallway to tell her she had the most beautiful eyes he had ever seen. She also told

Defendant Erickson about the continued bullying that Minor Jane Doe II had endured over the years.

106.

On January 23, 2020, in an effort to seek further support from the Board, Jane Doe I emailed Defendant Akpan and indicated that she had sent Defendant Erickson evidence of the bullying Minor Jane Doe II had been experiencing.

107.

On January 30, 2020, Defendant Akpan called a meeting of the FAST Governing Board. The following individuals were present: Defendant Akpan, Defendant Erickson, Scott Boze, Brian Fitzpatrick, and Les Barchard. The parties moved to enter an Executive Session, and after meeting for over an hour, no action items were published publicly.

108.

On February 2, 2020, Defendant Akpan called Jane Doe I, but he indicated that he was not allowed to tell her anything because the school's lawyers were involved, since she used the term "sexual misconduct" in her January 2020 email. Jane Doe I never received any further follow-up communication regarding the conclusion or findings of any purported investigation. The willful and wanton misconduct of Defendants Akpan and Erickson in failing to appropriately

investigate the multiple complaints of Jane Doe I regarding Minor Jane Doe II; failing to communicate any investigative findings to Minor Jane Doe II's parents; and failing to provide Minor Jane Doe II with social services after learning of Vandel's inappropriate conduct evidenced deliberate intent to harm Jane Doe I, John Doe, and Minor Jane Doe II.

<div align="center">109.</div>

Vandel admitted and pleaded guilty to the sexual molestation of Minor Jane Doe II. Vandel was criminally convicted of this crime.

<div align="center">110.</div>

Defendants failed to adequately investigate the allegations and complaints against Vandel throughout Minor Jane Doe II's attendance at FAST and failed to institute reasonable measures to prevent Vandel from grooming, sexually harassing, and sexually assaulting Minor Jane Doe II. Defendants also failed to ensure the adequate provision of social services to Minor Jane Doe II or access to support to address her physical, social, and emotional needs. Defendants failed to adequately investigate, or institute reasonable measures to prevent the sexual harassment, assault, and resultant persistent bullying of Minor Jane Doe II.

<div align="center">111.</div>

Prior to Vandel's assault on Minor Jane Doe II, FAST engaged in continued

and unofficial customs, policies, and practices of deliberate indifference to the risk of harassment, assault, and resultant bullying of young female students. These unofficial customs, policies, and practices included:

    a.  Placing Vandel in a room separated from the remainder of the teaching and administrative staff, which allowed him to engage in the exact same inappropriate behavior towards minor female students at FAST that he did at Midland Middle School;

    b.  Ignoring an official policy that prohibited teachers from giving candy or ice cream to students, and allowing Vandel to openly and brazenly give students candy and ice cream to facilitate his grooming efforts;

    c.  Ignoring official policies to create written reports for accusations of sexual harassment, abuse, and molestation, and instead encouraging only verbal reports to avoid creating documented actionable incidents that would reflect badly on the school;

    d.  Deleting emails, messages, and other compromising information regarding complaints at the school;

    e.  Sweeping serious concerns and reports under the rug to avoid bad publicity;

    f.  Failing to investigate, address, prevent, stop, or provide support for

persistent acts of bullying and refusing to follow anti-bullying policies;

g.  Refusing to follow the Fulton County sexual harassment policies and training, and the State and Federal requirements of mandatory reporting of sexual harassment and assault, including harassment and assault of students and teachers by Vandel;

h.  Refusing to report accusations of Vandel's inappropriate behavior with minor female students or sexual misconduct by Vandel;

i.  Downplaying and victim-blaming credible concerns about sexual harassment and assault by Vandel; and

j.  Failing to provide adequate or meaningful social services to minor female students who were victimized while under the care of Defendants.

These continued and unofficial customs, policies, and practices were the moving force behind Vandel's violations and led to Vandel believing his inappropriate conduct was acceptable at FAST.

112.

Prior to Vandel's assault on Minor Jane Doe II, despite having actual knowledge of the reports regarding Vandel's inappropriate student contact at

FAST, Defendants failed to:

    a.   Investigate the multiple complaints regarding Vandel's inappropriate contact and harassment of students;

    b.   Adequately supervise Vandel to prevent him from physically and sexually harassing other students, including victims like Minor Jane Doe II;

    c.   Conduct a formal or informal disciplinary hearing for Vandel;

    d.   Remove Vandel from his position at FAST;

    e.   Institute reasonable corrective measures aimed at ferreting out the possibility of employees like Vandel grooming, harassing, and assaulting students like Minor Jane Doe II again;

    f.   Warn school employees and students of Vandel's inappropriate behavior;

    g.   Protect Minor Jane Doe II and other students from physical and emotional abuse and sexual harassment;

    h.   Adequately train school employees on how to handle complaints of inappropriate contact;

    i.   Record incidents involving physical and sexual harassment against Minor Jane Doe II and others;

j.   Maintain records of physical and sexual harassment complaints and student disciplinary records;

k.   Ensure the adequate provision of social services or access to support to address the physical, social, and emotional needs of Minor Jane Doe II and others;

l.   Enforce FCS rules, policies, and regulations; and

m.   Conduct a sufficient investigation, which would have resulted in Vandel never being hired at FAST, if performed with reasonable diligence.

113.

Prior to Vandel's assault on Minor Jane Doe II, Defendants had actual knowledge of Vandel's history of inappropriate contact and sexual harassment of students.

114.

Defendants' actual knowledge of the threat presented by Vandel posed a substantial risk that Vandel would commit future acts of sexual harassment and abuse that were severe, pervasive, and objectively offensive.

115.

Despite Defendants' receipt of multiple reports of Vandel's inappropriate

conduct and sexual harassment, no Defendant chose to intervene appropriately.

116.

Defendants willfully and intentionally created an environment at FAST where teachers were chastised, intimidated, and punished for making formal reports regarding misconduct, which led to teachers' refusal to come forward and deliberate harm to Minor Jane Doe II.

117.

Consistent with FCS, FAST, and Founding Fourteen's policy, practice, and unofficial custom of failing to appropriately supervise and discipline employees and sweeping publicly-damaging issues under the rug, Defendants failed to take appropriate disciplinary action against Vandel despite multiple reports of harassment and inappropriate student contact. Defendants also failed to provide appropriate and necessary social services to Minor Jane Doe II as a result of Vandel's grooming and inappropriate conduct and resulting harassment and bullying, despite multiple requests from Jane Doe I and John Doe.

118.

FCS, FAST, and Founding Fourteen were willfully and deliberately indifferent to Vandel's history of inappropriate contact with students at FAST and other schools and the threat posed by Vandel to the students of FAST in at least

one of the following ways:

    a.  Failing to appropriately discipline employees, including Vandel;

    b.  Failing to investigate complaints raised by students and employees regarding sexual harassment, physical abuse, or inappropriate contact by Vandel;

    c.  Failing to protect students like Minor Jane Doe II from sexual harassment, physical abuse, or inappropriate contact;

    d.  Failing to adequately supervise employees like Vandel that posed a substantial risk of harm to students at FAST;

    e.  Failing to adequately supervise, monitor, and provide social services support to students like Minor Jane Doe II;

    f.  Failing to know of the whereabouts of all employees and students;

    g.  Failing to monitor and employ effective key control measures;

    h.  Failing to suspend, discipline, remove, or report employees like Vandel who had a history of inappropriate contact with minor female students;

    i.  Failing to properly notify parents/legal guardians whenever an employee engages in inappropriate conduct with a student;

    j.  Failing to institute reasonable corrective measures aimed at preventing

known aggressors and harassers like Vandel from grooming, sexually

harassing, and sexually assaulting minor female students;

k.  Failing to warn students, parents/legal guardians, and other employees

of employees like Vandel that have a history of inappropriate contact

with students;

l.  Failing to adequately train school employees on how to handle

complaints of sexual harassment, physical abuse, or inappropriate

contact;

m.  Failing to make a record of incidents involving harassment, abuse, or

inappropriate contact involving employees like Vandel; and

n.  Failing to remove violent and dangerous employees from their

positions.

<div align="center">119.</div>

Defendants' response or lack thereof was clearly unreasonable in light of the

known circumstances.

<div align="center">**<u>Vandel Sexually Assaults Another FAST Student</u>**</div>

<div align="center">120.</div>

After Jane Doe I and John Doe withdrew Minor Jane Doe II from FAST at

the end of 2019, Vandel turned his attention to minor female Student 9, who was a

friend and neighbor of Minor Jane Doe II, and began grooming her in the same manner that he groomed Minor Jane Doe II. Initially, Vandel began rubbing Student 9's shoulders like he rubbed Minor Jane Doe II's shoulders, moving his hands downward to touch her breasts, every day in class.

121.

Just a few short months later, in the early months of 2020, Vandel isolated Student 9 in his classroom and imprisoned, sexually assaulted, sexually battered, and forcibly raped Student 9 by inserting his penis in her vagina, causing her to bleed. Student 9 squirmed, resisted, and told Vandel to stop. After completing the rape, Vandel took a towel from his desk and used it to clean the blood off of Student 9 and himself before placing the towel back into the desk. Throughout the rape, Vandel told Student 9 that she was a "good girl." After cleaning up, Vandel gave Student 9 some ice cream and told her that he would not tell anyone what Student 9 had done.

## Vandel Surrenders his Teaching License

122.

Following the rape of Student 9, FAST's Information Technology Director Jenny Steele found multiple inappropriate messages that Vandel initiated with minor female students at FAST using the school's virtual technology.

123.

Ms. Steele alerted Defendant (Principal) Beiner to Vandel's inappropriate messages.

124.

The inappropriate messages Vandel sent students using FAST's virtual technology were of the same or similar nature as the verbal comments and physical conduct he had directed towards students at FAST and a prior school.

125.

On June 9, 2020, Vandel left FAST.

126.

On June 15, 2020, Vandel took a teaching position at another school, Lyndon Academy. Defendants did nothing to inform or warn Lyndon Academy of Vandel's history of sexually inappropriate, harassing, and assaulting conduct towards students and teachers.

127.

On October 8, 2020, Vandel voluntarily surrendered his Georgia teaching certification.

128.

On August 31, 2021, Student 9 reported Vandel's rape and sexual assault to

her mother, and Student 9's parents reported Vandel's rape and sexual assault to the police.

129.

On September 2, 2021, Vandel was arrested at his new teaching position at Lyndon Academy.

130.

On September 3, 2021, Defendant (Principal) Beiner communicated to all parents of FAST that Vandel had been arrested. Despite the multiple reports of Vandel's inappropriate sexual conduct toward minor female students, including Minor Jane Doe II, and teachers at FAST over many years, Defendant (Principal) Beiner implied in his message that such reports, including Student 9's, may not have been true ("We must remember there is a child to be protected and a man's life that's balancing on the truth being told.").

131.

Vandel admitted to and pleaded guilty to the sexual assault, rape, and imprisonment of Student 9. Vandel was criminally convicted of these crimes.

### Minor Jane Doe II Has Suffered and Continues to Suffer as a Result of Defendants' Deliberate Indifference

132.

Defendants subjected Minor Jane Doe II to sexual harassment and assault

that barred her from accessing an educational opportunity and benefit. Minor Jane Doe II lost all confidence in her safety at FAST. Not only was she sexually assaulted by the male authority figure in charge of teaching and protecting her, but Minor Jane Doe II was also subjected to constant bullying from other FAST students as a result of Vandal's grooming behavior and Defendants' non-action. Minor Jane Doe II was also subjected to an improper interview by two male administrators and was blamed by them for reporting Vandel's actions and made to feel at fault for the way she was dressed.

133.

Minor Jane Doe II was further traumatized by learning that, after she withdrew from FAST, Vandel subsequently turned his attention to her friend, Student 9, and employed the same grooming techniques that eventually led to a horrific rape. Minor Jane Doe II shared with Student 9 the details of her experience with Vandel.

134.

As a result of Defendants' deliberate indifference and non-action, Minor Jane Doe II requires counseling and social services, which Defendants also neglected to provide, despite repeated requests from Jane Doe I and John Doe. Defendants created an intimidating, hostile, and offensive educational environment

that seriously affected the psychological well-being of Minor Jane Doe II.

135.

As a direct and proximate result of the Defendants' wrongful conduct, Minor Jane Doe II suffered serious injuries including physical injuries, extreme indignities and humiliation, severe emotional distress, mental anguish, loss of liberty, and a violation of that what she considers most sacred and personal.

136.

Jane Doe I and John Doe have incurred and will continue to incur medical expenses and consequential damages in connection with the violations Minor Jane Doe II has suffered as a direct and proximate result of the Defendants' wrongful conduct.

137.

Defendants are responsible for the injuries Minor Jane Doe II has suffered and will suffer in the future as a result of the incidents at issue, as well as the medical expenses and other consequential damages Jane Doe I and John Doe have incurred and will incur in the future as a result of Minor Jane Doe II's injuries and Defendants' wrongful conduct.

## CAUSES OF ACTION

### Count I: Negligent Hiring

**(Defendants FCS, Founding Fourteen, FAST, Higgins, Akpan, Erickson)**

138.

Plaintiffs adopt and incorporate herein by reference each and every allegation made in paragraphs 1–137 above as if fully set forth herein.

139.

Founding Fourteen, as a Georgia Registered Nonprofit corporation, is subject to state law claims.

140.

Pursuant to the Hidden Predator Act, O.C.G.A. § 9-3-33.1, the State has waived sovereign immunity for childhood sexual abuse cases brought against government entities and employees. Defendants FCS, FAST, and Higgins are not entitled to immunity.

141.

Defendants Akpan and Erickson are not state employees or agents and are not entitled to immunity.

142.

Vandel submitted an application for employment as a teacher at FAST on June 20, 2017.

143.

FCS, Founding Fourteen, FAST, Higgins, Akpan, Erickson hired Vandel as a teacher at FAST prior to the start of the 2017-2018 school year.

144.

Defendants FCS, Founding Fourteen, FAST, Higgins, Akpan, and Erickson had a duty to exercise ordinary care and diligence and to not hire a person that they knew or should have known posed a risk of harm.

145.

Defendants FCS, Founding Fourteen, FAST, Higgins, Akpan, and Erickson knew or should have known that Vandel was not suited for employment as a teacher and posed a risk to the minor female students at FAST.

146.

Despite knowing that Vandel posed a risk to minor female students, FCS, Founding Fourteen, FAST, Higgins, Akpan, and Erickson hired Vandel to work at FAST.

147.

The hiring of Vandel by Defendants FCS, Founding Fourteen, FAST, Higgins, Akpan, and Erickson, despite knowing Vandel posed a risk to minor female students, enabled Vandel to sexually harass and assault Minor Jane Doe II, causing her to endure injuries and damages.

**Count II: Negligent Supervision, Retention, Undertaking**

**(Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, Erickson)**

148.

Plaintiffs adopt and incorporate herein by reference each and every allegation made in paragraphs 1–137 above as if fully set forth herein.

149.

Founding Fourteen, as a Georgia Registered Nonprofit corporation, is subject to state law claims.

150.

 Pursuant to the Hidden Predator Act, O.C.G.A. § 9-3-33.1, the State has waived sovereign immunity for childhood sexual abuse cases brought against government entities and employees. Defendants FAST, Higgins, Mahoney, Stinger, Beiner, and Epstein are not entitled to immunity.

151.

Defendants Akpan and Erickson are not state employees or agents and are not entitled to immunity.

152.

Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson undertook the duty of providing educational and

social services and protection for FAST students, including Minor Jane Doe II.

153.

Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson owed a duty of care to the students of FAST, including Minor Jane Doe II, to ensure that they properly supervised all teachers at FAST, to make sure that the teachers of FAST followed all policies and procedures, and to appropriately respond to improper conduct by teachers of FAST towards students at FAST.

154.

Between the start of the 2017-2018 school year and his termination on June 9, 2020, Vandel worked as a teacher at FAST under the supervision of Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson.

155.

Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson had a duty to exercise due care and diligence in supervising and controlling Vandel as a teacher.

156.

Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner,

Epstein, Akpan, and Erickson breached the duty owed to Minor Jane Doe II to ensure that she, as a student of FAST, was safe by ignoring reports from people within the FAST community, including teachers and students, regarding Vandel's grooming, sexual harassment, and sexual assault of minor female students and staff. Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson also breached the duty owed to Minor Jane Doe II by failing to provide her with appropriate social services in response to Vandel's grooming, sexual harassment, and sexual assault on her.

157.

Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson breached their duty by failing to properly supervise Vandel, allowing him to violate multiple FAST policies and procedures including, but not limited to: giving candy and ice cream to students; closing his door to be alone with minor female students; isolating minor female students in his classroom, with no other teachers or administrators present; and inappropriately touching and interacting with minor female students.

158.

Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson breached their duty to Minor Jane Doe II by failing

to adopt and enforce adequate rules, policies, and procedures for teachers and staff.

159.

Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson breached their duty to Minor Jane Doe II by failing to supervise, manage, monitor, and oversee the safety of students while on FAST's campus and by failing to provide appropriate social services in response to a teacher's grooming, sexual harassment, and sexual assault of minor female students.

160.

Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson failed to exercise due care and diligence in their supervision and retention of Vandel by not having policies and procedures in place to prevent Vandel's grooming, sexual harassment, and sexual assault of minor female students, including Minor Jane Doe II, and/or failing to enforce the existing policies.

161.

Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson breached their duty by improperly retaining Vandel as an employee of FAST despite receiving reports of improper conduct, and their

knowledge that Vandel was violating FAST policies and procedures.

162.

As a direct and proximate result of the acts and omissions of Defendants Founding Fourteen, FAST, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson, Minor Jane Doe II suffered physical and emotional damages, which will continue into the future. Plaintiffs have incurred substantial and significant expenses relating to the injuries and damages Minor Jane Doe II suffered as a result of Defendants' negligence.

## Count III:   Negligent Undertaking

## (Defendants FCS, Looney, Loe, Rose, and Gatewood)

163.

Plaintiffs adopt and incorporate herein by reference each and every allegation made in paragraphs 1–137 above as if fully set forth herein.

164.

Pursuant to the Hidden Predator Act, O.C.G.A. § 9-3-33.1, the State has waived sovereign immunity for childhood sexual abuse cases brought against government entities. Defendants FCS, Looney, Loe, Rose, and Gatewood are not entitled to immunity.

165.

In addition, or in the alternative, to Count II, Defendants FCS, Looney, Loe, Rose, and Gatewood were negligent in the ways set forth in Count III.

166.

Defendants FCS, Looney, Loe, Rose, and Gatewood undertook, for consideration, the duty of providing educational and social services and protection for its students, including Minor Jane Doe II.

167.

Defendants FCS, Looney, Loe, Rose, and Gatewood should have recognized as necessary the protection of Minor Jane Doe II's person and promulgated policies and procedures to protect minor students from inappropriate misconduct by teachers and authority figures and to provide appropriate social services stemming therefrom.

168.

Defendants FCS, Looney, Loe, Rose, and Gatewood were negligent in failing to protect Minor Jane Doe II from being sexually harassed and assaulted by Vandel and in failing to provide appropriate social services to Minor Jane Doe II.

169.

Defendants FCS, Looney, Loe, Rose, and Gatewood were responsible for

ensuring compliance with Title IX of the Education Amendments Act of 1972.

170.

Defendants FCS, Looney, Loe, Rose, and Gatewood failed to ensure that Defendants FAST, Higgins, Mahoney, Stinger, Beiner, and Epstein adopted and implemented policies and procedures consistent with FCS policies and procedures, including those mandated by federal and state law, and in doing so allowed FAST to adopt and promulgate policies and procedures that were inconsistent with FCS policies and procedures.

171.

As a direct and proximate result of the acts and omissions of Defendants FCS, Looney, Loe, Rose, and Gatewood, Vandel was able to sexually harass and assault Minor Jane Doe II.

172.

As a direct and proximate result of the acts and omissions of Defendants FCS, Looney, Loe, Rose, and Gatewood, Minor Jane Doe II suffered physical and emotional damages, which will continue into the future. Plaintiffs have incurred substantial and significant expenses relating to the injuries and damages Minor Jane Doe II suffered as a result of Defendants' negligence.

**Count IV:   Violation of Substantive Due Process (42 U.S.C. § 1983):**

**Fourteenth Amendment Due to a Willful Failure by Defendants to Follow Their own Policies and Procedures and an Unofficial Custom, Policy, or Practice of Allowing Misconduct by Vandel**

**(Defendants FCS, FAST, Founding Fourteen, Looney, Loe, Rose, Gatewood, Higgins, Mahoney, Stinger, Beiner, Akpan, Erickson)**

173.

Plaintiffs adopt and incorporate herein by reference each and every allegation made in paragraphs 1–137 above as if fully set forth herein.

174.

Plaintiffs bring this action under 42 U.S.C. § 1983, which allows for claims against defendants acting under the color of law for the deprivation of rights that are afforded under the Constitution, specifically for the deprivation of the substantive due process rights to Minor Jane Doe II, which are provided by the 14th Amendment.

175.

At all relevant times, FCS, FAST, Looney, Loe, Rose, Gatewood, Higgins, Mahoney, Stinger, and Beiner acted under color of state law.

176.

In addition to, or in the alternative to, the allegations of paragraphs 139, 141, 149, and 151, Founding Fourteen, Akpan, and Erickson were acting under color of

state law.

<center>177.</center>

At all relevant times, Minor Jane Doe II was a United States citizen and protected by the rights afforded to her under the Constitution of the United States of America.

<center>178.</center>

Under the 14th Amendment of the Constitution, Minor Jane Doe II had a constitutional right to liberty and bodily security, which Defendants violated through the adoption of unofficial customs and policies and through decisions made by the final decisionmakers that led to Minor Jane Doe II being sexually harassed and assaulted while in the care and supervision of Defendants.

<center>179.</center>

Defendants FCS, Founding Fourteen, FAST, Higgins, Akpan, and Erickson were the final decisionmakers and policy makers regarding the initial employment of Vandel. Defendants Higgins, Mahoney, Stinger, and Beiner, as Principals of FAST, were the final decisionmakers and policy makers on policies regarding: (1) the selection, retention, transfer, promotion, termination, and disciplining of faculty and staff; (2) how to investigate, respond to, and manage reports of sexual harassment and assault against students by employees, including teachers; (3)

<center>81</center>

reporting to parents the dangers posed by employees of FAST between the start of the 2017-18 school year and the sexual harassment and assault of Minor Jane Doe II; and (4) providing social services to minor students impacted and injured through sexual harassment and assault by a teacher.

<p align="center">180.</p>

In addition to, or in the alternative to, the allegations of paragraph 179, the Board of FAST (including Defendants Akpan and Erickson) was the final decisionmaker and policy maker regarding the employment of Vandel. The Board of FAST (including Defendants Akpan and Erickson) was the final decisionmaker and policy maker for policies regarding: (1) the selection, retention, transfer, promotion, termination, and disciplining of faculty and staff; (2) how to investigate, respond to, and manage reports of sexual harassment and assault against students by employees, including teachers; (3) reporting to parents the dangers posed by employees of FAST between the start of the 2017-18 school year and the sexual harassment and assault of Minor Jane Doe II; and (4) providing social services to minor students impacted and injured through sexual harassment and assault by a teacher.

<p align="center">181.</p>

In addition, or in the alternative, to the allegations of paragraphs 179 and

<p align="center">82</p>

180, Defendants FCS, Looney, Loe, Rose, and Gatewood were the final

decisionmakers and policy makers regarding the initial employment of Vandel.

Defendants FCS, Looney, Loe, Rose, and Gatewood were also the final

decisionmakers and policy makers for policies regarding: (1) the selection,

retention, transfer, promotion, termination, and disciplining of faculty and staff; (2)

how to investigate, respond to, and manage reports of sexual harassment and

assault against students by employees, including teachers; (3) reporting to parents

the dangers posed by employees of FAST between the start of the 2017-18 school

year and the sexual harassment and assault of Minor Jane Doe II; and (4) providing

social services to minor students impacted and injured through sexual harassment

and assault by a teacher.

<p style="text-align:center">182.</p>

The final policy maker(s) deliberately and willfully hired Vandel as a faculty

member at the school despite the knowledge they had or should have had regarding

Vandel's documented history of grooming, sexual harassment, and sexual assault

of female middle school students.

<p style="text-align:center">183.</p>

The final policy maker(s) failed to conduct an adequate background check of

Vandel and/or was deliberately indifferent to information in Vandel's background

<p style="text-align:center">83</p>

check that should have prevented his hiring. Vandel's public record contained

within the GPSC reveals that he had previously been accused and found

responsible for the repeated grooming, sexual harassment, and sexual assault of

minor female middle school students. Yet, Vandel was hired to take a position

teaching minor female middle school students, including Minor Jane Doe II, at

FAST.

184.

If Defendants had conducted an adequate background check, Vandel's

record of repeated grooming, sexual harassment, and sexual assault would have

informed Defendants that hiring him at FAST would result in the deprivation of a

student's federally protected rights to liberty and bodily security.

185.

The final decision maker(s) at all relevant times had authority to decide

and/or adopt a course of action in response to each of the complaints of grooming,

sexual harassment, sexual assault, and bullying raised by students, teachers, and

parents.

186.

At the time of and prior to Vandel's assault on Minor Jane Doe II,

Defendants had actual knowledge of prior complaints regarding Vandel's

inappropriate contact and sexual harassment with students at FAST, and with students at other institutions prior to his employment with FAST. This prior information included:

    a. Reports from fourteen (14) teachers and staff at Midland Middle School, which were contained within Vandel's public GPSC record;

    b. Reports from six (6) students at Midland Middle School, which were contained within Vandel's public GPSC record; and

    c. Multiple reports from teachers and students at FAST.

<div align="center">187.</div>

FCS and FAST's express policies required Defendants to:

    a. Conduct an adequate background check on all new hires, prior to hiring them;

    b. Appropriately discipline employees for misconduct, including sexual misconduct;

    c. Investigate complaints raised by students, employees, and parents regarding sexual harassment, physical abuse, or inappropriate contact by a teacher and any attendant bullying resulting therefrom;

    d. Protect students, like Minor Jane Doe II, from grooming, sexual harassment, physical abuse, or inappropriate contact by a teacher and

<div align="center">85</div>

any attendant bullying resulting therefrom;

e.  Adequately supervise employees that pose a substantial risk of harm to others;

f.  Adequately supervise and monitor students, like Minor Jane Doe II;

g.  Know of the whereabouts of all employees and students;

h.  Suspend, discipline, remove, or report employees who have inappropriate contact, including sexual contact, with students;

i.  Properly notify parents/legal guardians whenever an employee engages in inappropriate conduct and/or sexually harasses a student;

j.  Institute reasonable corrective measures aimed at preventing known aggressors and harassers from grooming, sexually harassing, and sexually assaulting students;

k.  Warn students, parents/legal guardians, and other employees of employees that have a history of inappropriate contact with students;

l.  Adequately train school employees on how to respond to complaints of sexual harassment, physical abuse, or inappropriate contact;

m. Adequately train school employees on how to make complaints of sexual harassment, physical abuse, or inappropriate contact;

n.  Record incidents involving harassment, abuse, or inappropriate

contact involving employees;

o.  Provide social services to minor students impacted and injured through harassment, abuse, or inappropriate contact by a teacher;

p.  Prevent violent and dangerous employees from remaining in their positions; and

q.  Report cases of sexual harassment and inappropriate contact between teachers and students to the GPSC.

188.

Notwithstanding their own express policies, Defendants willfully had an unofficial policy, practice, or custom of failing to:

a.  Properly investigate Vandel's background or conduct an adequate background check on Vandel prior to hiring him;

b.  Review the public records for Vandel that are contained within the GPSC;

c.  Appropriately discipline Vandel;

d.  Investigate complaints raised by students, employees, and parents regarding sexual harassment, physical abuse, or inappropriate contact by Vandel and the attendant bullying of Minor Jane Doe II resulting therefrom;

e.  Protect Minor Jane Doe II and other female students from grooming, sexual harassment, assault, or inappropriate contact by Vandel and the attendant bullying that resulted therefrom;

f.  Adequately supervise Vandel, despite knowledge that he posed a substantial risk of harm to others;

g.  Adequately supervise and monitor students, including Minor Jane Doe II;

h.  Know of the whereabouts of all employees and students, including Vandel and Minor Jane Doe II;

i.  Suspend, discipline, remove, or report Vandel, who had a history of inappropriate contact with minor female students, despite having final authority to do so;

j.  Properly notify parents/legal guardians when Vandel engaged in inappropriate conduct with a student;

k.  Institute reasonable corrective measures aimed at preventing Vandel, a known aggressor and harasser, from grooming, sexually harassing, and sexually assaulting minor female students;

l.  Warn students, parents/legal guardians, and other employees of Vandel's history of grooming, sexual harassment, and sexual assault

of minor female students;

m. Adequately train school employees on how to respond to complaints of sexual harassment, physical abuse, or inappropriate contact;

n. Adequately train school employees on how to make complaints of sexual harassment, physical abuse, or inappropriate contact;

o. Make a record of incidents involving harassment, abuse, or inappropriate contact involving Vandel;

p. Provide social services to Minor Jane Doe II following Vandel's sexual harassment and assault of her and the bullying that resulted therefrom;

q. Remove Vandel from his position, despite having the final authority to do so; and

r. Report cases of sexual harassment and inappropriate contact between Vandel and minor students to the GPSC.

189.

Prior to Vandel's assault on Minor Jane Doe II, FAST engaged in continued and unofficial customs, policies, and practices of deliberate indifference to the risk of harassment and assault of minor female students. These customs, policies, and practices included:

a. Placing Vandel in a room separated from the remainder of the teaching and administrative staff, which allowed him to engage in the exact same inappropriate behavior towards minor female students at FAST that he did at Midland Middle School;

b. Ignoring an official policy that prohibited teachers from giving candy or ice cream to students, and instead adopting an unofficial custom and policy of allowing Vandel to openly and brazenly give students candy and ice cream to facilitate his grooming efforts;

c. Ignoring official policies to create written reports for accusations of sexual harassment, abuse, and molestation, and instead encouraging only verbal reports to avoid creating documented actionable incidents that would reflect badly on the school;

d. Deleting emails, messages, and other compromising information regarding complaints at the school;

e. Sweeping serious concerns and reports under the rug to avoid bad publicity;

f. Failing to investigate, address, prevent, stop, or provide support for persistent acts of bullying and refusing to follow anti-bullying policies;

g.  Refusing to follow the Fulton County sexual harassment policies and
    training, and the State and Federal requirements of mandatory
    reporting of sexual harassment and assault, including harassment and
    assault of students and teachers by Vandel;

h.  Refusing to report accusations of Vandel's inappropriate behavior
    with minor female students or sexual misconduct by Vandel; and

i.  Downplaying and victim-blaming credible concerns about sexual
    harassment and assault by Vandel.

These continued and unofficial customs, policies, and practices were the
moving force behind Vandel's violations and led to Vandel believing his
inappropriate conduct was acceptable at FAST.

190.

In spite of Defendants' knowledge of Vandel's grooming, sexual
harassment, and sexual assault of other minor female students and faculty
members, both at FAST and previous institutions, Defendants failed to take any
actions to protect students from Vandel. In addition, Defendants failed to conduct
any formal investigation of Vandel, despite repeated reports of inappropriate
conduct. Instead, time after time, Defendants protected Vandel from investigation
and provided him with no reprimands, sanctions, or suspensions prior to the sexual

assault of Minor Jane Doe II.

191.

Defendants acted willfully and with deliberate indifference by ignoring the actions of Vandel, and in doing so, failed to protect Minor Jane Doe II and deprived her of her liberty and interest in being free from psychological and bodily abuse.

192.

Defendants' willful actions and deliberate indifference led to the deprivation of rights afforded to Minor Jane Doe II under the 14th Amendment of the United States Constitution.

193.

As a direct and proximate result of Defendants' willful failure to enforce their policies and procedures, Minor Jane Doe II suffered physical, emotional, and psychological injury.

194.

Plaintiffs are entitled to recover from Defendants all compensatory, special, economic, consequential, general, and all other damages permissible under federal law.

**Count V:    Violation of Substantive Due Process (42 U.S.C. § 1983):
Fourteenth Amendment due to a Failure to Take Corrective Action**

**(Defendants FCS, FAST, Founding Fourteen,
Higgins, Mahoney, Stinger, Beiner, Akpan, Erickson)**

195.

Plaintiffs adopt and incorporate herein by reference each and every

allegation made in paragraphs 1–137 above as is fully set forth herein.

196.

Plaintiffs bring this action under 42 U.S.C. § 1983, which allows for claims

against defendants acting under the color of law for the deprivation of rights that

are afforded under the Constitution, specifically for Vandel's invasion of Minor

Jane Doe II's bodily integrity, as protected by the 14th Amendment.

197.

At all relevant times, FCS, FAST, Higgins, Mahoney, Stinger, and Beiner

acted under color of state law.

198.

In addition to, or in the alternative to, the allegations of paragraphs 139, 141,

149, and 151, Founding Fourteen, Akpan, and Erickson were acting under color of

state law.

199.

At all relevant times, Minor Jane Doe II was a United States citizen and

protected by the rights afforded to her under the Constitution of the United States of America.

<p style="text-align:center">200.</p>

Under the 14th Amendment of the Constitution, Minor Jane Doe II had a constitutional right to liberty and bodily security, which Defendants violated through the adoption of unofficial customs and policies and through decisions made by the final decisionmakers that led to Minor Jane Doe II being sexually harassed and assaulted while in the care and supervision of Defendants.

<p style="text-align:center">201.</p>

From the time they held their position as Principal at FAST through the sexual harassment and assault of Minor Jane Doe II, Defendants Higgins, Mahoney, Stinger, and Beiner were the final decisionmakers and policy makers regarding: (1) the retention, transfer, promotion, termination, and disciplining of faculty, including Vandel; and (2) the provision of social services to minor students, including Minor Jane Doe II, who were impacted and injured through sexual harassment and assault by a teacher.

<p style="text-align:center">202.</p>

In addition to, or in the alternative to, the allegations of paragraph 201, the Board of FAST (including Defendants Akpan and Erickson) was the final

<p style="text-align:center">94</p>

decisionmaker and policy maker regarding: (1) the retention, transfer, promotion, termination, and disciplining of faculty, including Vandel; and (2) the provision of social services to minor students, including Minor Jane Doe II, between the start of the 2017-18 school year and the sexual harassment and assault of Minor Jane Doe II.

203.

Defendants deprived Minor Jane Doe II of the protections afforded to her by the Constitution by allowing Vandel to continue grooming, sexually harassing, and sexually assaulting minor female students at FAST, culminating in Minor Jane Doe II's sexual harassment and assault.

204.

During his employment at FAST, Vandel engaged in a persistent pattern of abuse of minor female students by grooming, sexually harassing, and sexually assaulting them.

205.

Prior to Vandel's sexual harassment and assault of Minor Jane Doe II, Defendants were aware of Vandel's persistent pattern of abuse of minor female students, through public records maintained by the GPSC and multiple reports by FAST teachers and students.

206.

Prior to Vandel's sexual harassment and assault of Minor Jane Doe II,

Defendants deliberately and willfully ignored Vandel's persistent pattern of abuse

of minor female students by failing to:

a. Report the abuse to the appropriate individuals and entities;

b. Appropriately investigate the allegations of abuse;

c. Reprimand Vandel or limit his ability to be alone with minor female students;

d. Suspend Vandel; or

e. Remove Vandel from his position as a teacher at FAST.

207.

As a direct and proximate cause of the willful actions and deliberate

indifference of Defendants, Minor Jane Doe II was deprived of liberty and bodily

integrity.

208.

Plaintiffs are entitled to recover from Defendants all compensatory, special,

economic, consequential, general, and all other damages permissible under federal

law.

**Count VI:   Violation of Substantive Due Process (42 U.S.C. § 1983):
Fourteenth Amendment Due to a Willful Failure by Defendants to Follow**

**Their own Policies and Procedures and an Unofficial Custom, Policy, or Practice of Allowing Misconduct by Vandel**

**(Defendants FCS, Looney, Loe, Rose, and Gatewood)**

209.

Plaintiffs adopt and incorporate herein by reference each and every allegation made in paragraphs 1–137 above as if fully set forth herein.

210.

Plaintiffs bring this action under 42 U.S.C. § 1983, which allows for claims against defendants acting under the color of law for the deprivation of rights that are afforded under the Constitution, specifically for the deprivation of the substantive due process rights to Minor Jane Doe II, which are provided by the 14th Amendment.

211.

At all relevant times, Defendants acted under color of state law in their administration of and obligation to monitor and protect students at FAST.

212.

At all relevant times, Minor Jane Doe II was a United States citizen and protected by the rights afforded to her under the Constitution of the United States of America.

213.

Minor Jane Doe II had a constitutional right to liberty and bodily security, which was violated by being sexually harassed and assaulted while in the care of Defendants and the staff and employees at FAST.

214.

Defendants FCS, Looney, Loe, and Rose, as FCS superintendents, and Defendant Gatewood, as assistant superintendent for FCS charter schools, were the final policymakers for creating procedures in FCS charter schools, including FAST: (1) for responding to reports of sexual harassment and assault; and (2) for the provision of social services to minor students impacted and injured through sexual harassment and assault by a teacher.

215.

Defendants FCS, Looney, Loe, Rose, and Gatewood adopted improper customs, practices, and policies for the Fulton County School System that demonstrated deliberate indifference to the sexual harassment and assault of students by teachers and the attendant student bullying that resulted therefrom. This deliberate indifference is demonstrated through:

> a. Failure to provide sufficient training to administrators, teachers, and
>    staff in the Fulton County School System regarding their response to

reports of sexual harassment and violence against students, and their provision of social services for students so impacted and injured;

b. Failure to properly implement the Fulton County School System sexual assault policy, anti-bullying policy, and investigative processes; and

c. Failure to require charter schools and administrators who learn of sexual harassment and molestation of students by teachers to provide social services to the student(s) and put in place interim measures to protect students while the complaints are fully investigated.

These continued and unofficial customs and practices were the moving force behind Vandel's violations and led to Vandel believing his inappropriate conduct was acceptable at FAST.

216.

FCS official policies required FCS, Looney, Loe, Rose, and Gatewood to require all schools, including FAST, to:

a. Investigate all personnel accused of violations of FCS's sexual assault policy;

b. Appoint an investigator to evaluate reports of sexual harassment and molestation;

c.  Impose interim measures on teachers accused of violating the sexual

assault policy; and

d.  Sanction teachers found to have violated the sexual assault policy.

217.

Defendants FCS, Looney, Loe, Rose, and Gatewood engaged in continued

and unofficial customs, policies, and practices of deliberate indifference to the risk

of harassment and assault of minor female students, which included:

a.  Failure to require Vandel to be investigated for violations of FCS's

sexual assault policy;

b.  Failure of FCS to appoint an investigator to evaluate the reports of

sexual harassment and molestation made against Vandel;

c.  Failure to impose interim measures on Vandel while he was

investigated for sexual harassment and molestation of minor female

students and teachers at FAST; and

d.  Failure to sanction Vandel for violations of the sexual assault policy.

These continued and unofficial customs, policies, and practices were the

moving force behind Vandel's violations and led to Vandel believing his

inappropriate conduct was acceptable at FAST.

218.

Due to Defendants' violations of FCS's policies, Minor Jane Doe II was exposed to, and sexually harassed and assaulted by, Vandel.

219.

As a direct and proximate result of the willful failure by Defendants FCS, Looney, Loe, Rose, and Gatewood to enforce FCS's policies and procedures, Minor Jane Doe II suffered physical, emotional, and psychological injury.

220.

Plaintiffs are entitled to recover from Defendants all compensatory, special, economic, consequential, general, and all other damages permissible under federal law.

**Count VII:  Violation of Equal Protection (42 U.S.C. § 1983):
Fourteenth Amendment Due to Defendant's Discrimination
Against Minor Jane Doe II Due to Her Sex and Gender**

**(Defendants FCS, FAST, Founding Fourteen,
Looney, Loe, Rose, Gatewood, Higgins, Mahoney,
Stinger, Beiner, Epstein, Akpan, Erickson)**

221.

Plaintiffs adopt and incorporate herein by reference each and every allegation made in paragraphs 1–137 above as if fully set forth herein.

222.

Plaintiffs bring this action under 42 U.S.C. § 1983, which allows for claims

against Defendants acting under the color of law, who deprived an individual of their constitutionally protected rights; treated reports of sexual harassment against females differently than other genders, thereby violating the 14th Amendment; and directly and proximately caused the injuries suffered by Minor Jane Doe II.

223.

Gender and sex are constitutionally protected interests that give rise to a cause of action under 42 U.S.C. § 1983.

224.

As a female, Minor Jane Doe II was a member of a constitutionally protected class.

225.

Upon information and belief, Defendants have treated reports of sexual harassment and sexual violence against female students differently than they treated other reports. After learning of Vandel's sexual assault on Minor Jane Doe II and additional reports of Vandel's inappropriate conduct from Teacher 22, Defendant (Principal) Beiner and Defendant (Vice Principal) Epstein, both adult males, interrogated Minor Jane Doe II alone and outside the presence of her parents; silenced her when she began telling them about Vandel's sexually inappropriate behavior; told her that Vandel would be "mortified" to hear of how

she "perceived" his behavior; and chastised, blamed, and demeaned Minor Jane Doe II for wearing uniform pants that Defendant (Principal) Beiner described as "too tight."

<p style="text-align:center">226.</p>

Defendants' policies required them to adequately train or supervise school employees to:

a. Appropriately discipline employees, including Vandel;

b. Investigate complaints raised by students and employees regarding sexual harassment, physical abuse, or inappropriate contact by Vandel;

c. Protect students like Minor Jane Doe II from sexual harassment, physical abuse, or inappropriate contact, and provide her with appropriate social services;

d. Adequately supervise employees like Vandel that posed a substantial risk of harm to students at FAST;

e. Adequately supervise, monitor, and provide social services support to students like Minor Jane Doe II;

f. Know of the whereabouts of all employees and students;

g. Monitor and employ effective key control measures;

h. Suspend, discipline, remove, or report employees like Vandel who had a

history of inappropriate contact with minor female students;

i.  Properly notify parents/legal guardians whenever an employee engages in inappropriate conduct with a student;

j.  Institute reasonable corrective measures aimed at preventing known aggressors and harassers like Vandel from grooming, sexually harassing, and sexually assaulting minor female students;

k.  Warn students, parents/legal guardians, and other employees of employees like Vandel that have a history of inappropriate contact with students;

l.  Make a record of incidents involving harassment, abuse, or inappropriate contact involving employees like Vandel;

m. Remove violent and dangerous employees from their positions; and

n.  Report cases of sexual harassment and inappropriate contact between teachers and students to the GPSC.

227.

Defendants violated their own policies by failing to adequately train or supervise school employees to:

a.  Appropriately discipline Vandel;

b.  Investigate complaints raised by students, employees, and parents regarding sexual harassment, physical abuse, or inappropriate contact by Vandel and

104

the attendant bullying of Minor Jane Doe II resulting therefrom;

c.  Protect Minor Jane Doe II and other female students from grooming, sexual harassment, assault, or inappropriate contact by Vandel and the attendant bullying that resulted therefrom;

d.  Adequately supervise Vandel, despite knowledge that he posed a substantial risk of harm to others;

e.  Adequately supervise and monitor students, including Minor Jane Doe II;

f.  Know of the whereabouts of all employees and students, including Vandel and Minor Jane Doe II;

g.  Suspend, discipline, remove, or report Vandel, who had a history of inappropriate contact with minor female students;

h.  Properly notify parents/legal guardians when Vandel engaged in inappropriate conduct with a student;

i.  Institute reasonable corrective measures aimed at preventing Vandel, a known aggressor and harasser, from grooming, sexually harassing, and sexually assaulting minor female students, including Minor Jane Doe II;

j.  Warn students, parents/legal guardians, and other employees of Vandel's history of grooming, sexual harassment, and sexual assault of minor female students;

k.  Provide social services to Minor Jane Doe II following Vandel's sexual harassment and assault of her and the bullying that resulted therefrom;

l.  Make a record of incidents involving harassment, abuse, or inappropriate contact by Vandel;

m. Remove Vandel from his position; and

n.  Report cases of sexual harassment and inappropriate contact between Vandel and female students to the GPSC.

228.

Defendants' failure and refusal to act in accordance with their policy, training, and procedures were because the reports made against Vandel regarded his sexual harassment of minor female students.

229.

Upon information and belief, Defendants have/would have acted differently and followed their training, policy, and procedures when allegations of grooming, sexual harassment, and sexual assault have been made for sexual harassment of male students within FAST and FCS.

230.

Upon information and belief, Defendants have/would have conducted investigations in a manner that involved a more thorough inquiry and less shaming

of the victim, filed reports, and terminated employees accused of grooming, sexual

harassment, and sexual assault of male students.

231.

Defendants' actions in treating reports about female students being groomed,

sexually harassed, and sexually assaulted differently is a violation of Equal

Protection.

232.

Defendants' violation of Equal Protection meant that Vandel was not

investigated, despite multiple complaints; was not reported to the GPSC; and was

not terminated but remained employed in a position of power and authority, which

he used to groom, sexually harass, and sexually assault Minor Jane Doe II.

233.

As the direct and proximate cause of Defendants' violation of Equal

Protection, Minor Jane Doe II suffered physical, emotional, and psychological

injury.

234.

Plaintiffs are entitled to recover from Defendants all compensatory, special,

economic, consequential, general, and all other damages permissible under federal

law.

**Count VIII: Title IX Claim (20 U.S.C. § 1681(a)) – Deliberate Indifference to Vandel's History of Sexual Harassment**

**(Defendants FCS and FAST)**

235.

Plaintiffs adopt and incorporate herein by reference each and every allegation made in paragraphs 1–137 above as if fully set forth herein.

236.

Defendants FCS and FAST are Title IX funding recipients. Defendants FCS and FAST were responsible for ensuring compliance with Title IX of the Education Amendments Act of 1972 so that FAST received all per-pupil and other funding to which it was entitled.

237.

Minor Jane Doe II was subjected to grooming, sexual harassment, and sexual assault while enrolled in an education program or activity that receives Federal financial assistance.

238.

The violence that Minor Jane Doe II was subjected to at FAST by Vandel constituted "sexual harassment" within the meaning of Title IX.

239.

Vandel's harassment and assault on Minor Jane Doe II was motivated by his

sexual desire for Minor Jane Doe II.

240.

Prior to Vandel's sexual assault on Minor Jane Doe II, Defendants FCS, FAST, Founding Fourteen, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson, along with other teachers and staff at FAST, had actual knowledge of Vandel's inappropriate contact and sexual harassment of minor female students at other schools prior to his employment with FCS.

241.

Defendants FCS and FAST had actual knowledge of the threat that Vandel posed to students at FAST, including Minor Jane Doe II, through:

a.  Vandel's certification status with the GPSC;

b.  GPSC's investigations, findings of facts, case summary, and final decision regarding reports of Vandel's sexual harassment of minor female students; and

c.  Vandel's work history, which demonstrated repeated firings and removal from prior schools.

242.

Vandel's pervasive sexual harassment, physical abuse, and inappropriate contact toward Minor Jane Doe II damaged her equal access to an education.

243.

Defendants Looney, Loe, Rose, Gatewood, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson, employees of Defendants FCS, FAST, and Founding Fourteen, were the appropriate individuals to address and remedy the threat Vandel posed to students at FAST.

244.

FCS and FAST acted with deliberate indifference to the threat Vandel posed to the students at FAST, including Minor Jane Doe II, by:

a. Hiring Vandel to teach minor female middle school students, despite his years-long history of sexually harassing minor female middle school students;

b. Failing to protect students like Minor Jane Doe II from sexual harassment, physical abuse, or inappropriate contact;

c. Failing to adequately supervise Vandel, who they knew posed a substantial risk of harm to others;

d. Failing to adequately supervise and monitor students who had close contact with Vandel;

e. Failing to monitor and employ effective key control measures;

f. Failing to suspend, discipline, remove, or report employees like

Vandel, who had a history of inappropriate contact with minor female students;

g.  Failing to institute reasonable corrective measures aimed at preventing known aggressors and harassers like Vandel from grooming, sexually harassing, and sexually assaulting minor female students;

h.  Failing to provide social services to students like Minor Jane Doe II, who were sexually harassed and assaulted by Vandel;

i.  Failing to warn students, parents/legal guardians, and other employees of Vandel's history of inappropriate contact with students; and

j.  Failing to adequately train school employees on how to handle complaints of sexual harassment, physical abuse, or inappropriate contact.

These actions and inactions of Defendants FCS and FAST were clearly unreasonable.

245.

The deliberate indifference of Defendants FCS and FAST to Vandel's history of sexual violence subjected Minor Jane Doe II to Vandel's grooming, sexual harassment, and assault.

246.

Vandel's grooming, sexual harassment, and sexual assault of Minor Jane Doe II, and the bullying Minor Jane Doe II encountered as a result, was so severe, pervasive, and objectively offensive that it barred Minor Jane Doe II's access to educational opportunities and benefits.

247.

As a direct result of the deliberate indifference of Defendants FCS and FAST, Minor Jane Doe II has been excluded from participation in, and has been denied the benefit of, her education due to her sex.

248.

Defendants FCS and FAST are liable to Plaintiffs under the implied right of action to enforce Title IX for damages in such amount as will compensate Minor Jane Doe II for the educational opportunities and benefits she has lost and will lose; the physical and mental injuries Minor Jane Doe II has suffered and will suffer; and the medical and rehabilitation expenses for Minor Jane Doe II's care that Jane Doe I, John Doe, or Minor Jane Doe II have incurred or will incur as a result of the violation by Defendants FCS and FAST of Minor Jane Doe II's rights under Title IX.

249.

Defendants FCS and FAST are liable to Plaintiffs under the implied right of

action to enforce Title IX for reasonable attorneys' fees, including experts' fees, as part of the costs in this action.

**Count IX:   Title IX Claim (20 U.S.C. § 1681(a)) – Deliberate Indifference to Vandel's Sexual Harassment at FAST**

**(Defendants FCS and FAST)**

250.

Plaintiffs adopt and incorporate herein by reference each and every allegation made in paragraphs 1–137 above as if fully set forth herein.

251.

Defendants FCS and FAST are Title IX funding recipients. Defendants FCS and FAST were responsible for ensuring compliance with Title IX of the Education Amendments Act of 1972 so that FAST received all per-pupil and other funding to which it was entitled.

252.

Minor Jane Doe II was subjected to grooming, sexual harassment, and sexual assault while enrolled in an education program or activity that receives Federal financial assistance.

253.

The violence that Minor Jane Doe II was subjected to at FAST by Vandel

constituted "sexual harassment" within the meaning of Title IX.

254.

Vandel's harassment and assault on Minor Jane Doe II was motivated by his sexual desire for Minor Jane Doe II.

255.

Prior to Vandel's sexual assault on Minor Jane Doe II, Defendants FCS, FAST, Founding Fourteen, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson, along with other teachers and staff at FAST, had actual knowledge of Vandel's inappropriate contact with, and sexual harassment of, minor female students and female teachers at FAST.

256.

Defendants FCS and FAST had actual knowledge of the threat that Vandel posed to students at FAST, including Minor Jane Doe II, through multiple reports by FAST teachers and students, as well as Vandel's former teaching colleagues and students, of Vandel's grooming, sexual harassment, and sexual assault of minor female students and female teachers at FAST.

257.

Vandel's pervasive sexual harassment, physical abuse, and inappropriate contact toward Minor Jane Doe II damaged her equal access to an education.

258.

Defendants Looney, Loe, Rose, Gatewood, Higgins, Mahoney, Stinger, Beiner, Epstein, Akpan, and Erickson, employees of Defendants FCS, FAST, and Founding Fourteen, were the appropriate individuals to address and remedy the ongoing inappropriate contact and sexual harassment by Vandel towards students at FAST.

259.

Defendants FCS and FAST acted with deliberate indifference to multiple reports regarding sexual harassment, physical abuse, and inappropriate contact in its programs and activities by failing to:

    a. Appropriately discipline employees, including Vandel;

    b. Investigate complaints raised by students and employees regarding sexual harassment, physical abuse, or inappropriate contact by Vandel;

    c. Protect students like Minor Jane Doe II from sexual harassment, physical abuse, or inappropriate contact;

    d. Adequately supervise employees like Vandel that posed a substantial risk of harm to students at FAST;

    e. Adequately supervise, monitor, and provide social services support to

students like Minor Jane Doe II;

f.   Know of the whereabouts of all employees and students;

g.   Monitor and employ effective key control measures;

h.   Suspend, discipline, remove, or report employees like Vandel who had a history of inappropriate contact with minor female students;

i.   Properly notify parents/legal guardians whenever an employee engages in inappropriate conduct with a student;

j.   Institute reasonable corrective measures aimed at preventing known aggressors and harassers like Vandel from grooming, sexually harassing, and sexually assaulting minor female students;

k.   Warn students, parents/legal guardians, and other employees of employees like Vandel that have a history of inappropriate contact with students;

l.   Adequately train school employees on how to handle complaints of sexual harassment, physical abuse, or inappropriate contact;

m.  Make a record of incidents involving harassment, abuse, or inappropriate contact involving employees like Vandel;

n.   Remove violent and dangerous employees, like Vandel, from their positions; and

o. Report cases of sexual harassment and inappropriate contact between teachers and students to the GPSC.

These actions and inactions of FCS and FAST were clearly unreasonable.

260.

The deliberate indifference of Defendants FCS and FAST to previous reports of Vandel's sexual violence subjected Minor Jane Doe II to Vandel's grooming, sexual harassment, and assault.

261.

As a direct result of the deliberate indifference of Defendants FCS and FAST, Minor Jane Doe II lost all confidence with regard to her safety at FAST and has suffered, and will continue to suffer, injuries as a result.

262.

Vandel's grooming, sexual harassment, and sexual assault of Minor Jane Doe II, and the bullying Minor Jane Doe II encountered as a result, was so severe, pervasive, and objectively offensive that it barred Minor Jane Doe II's access to educational opportunities and benefits.

263.

As a direct result of the deliberate indifference of Defendants FCS and FAST, Minor Jane Doe II has been excluded from participation in, and has been

denied the benefit of, her education due to her sex.

264.

Defendants FCS and FAST are liable to Plaintiffs under the implied right of action to enforce Title IX for damages in such amount as will compensate Minor Jane Doe II for the educational opportunities and benefits she has lost and will lose; the physical and mental injuries Minor Jane Doe II has suffered and will suffer; and the medical and rehabilitation expenses for Minor Jane Doe II's care that Jane Doe I, John Doe, or Minor Jane Doe II have incurred or will incur as a result of the violation by Defendants FCS and FAST of Minor Jane Doe II's rights under Title IX.

265.

Defendants FCS and FAST are liable to Plaintiffs under the implied right of action to enforce Title IX for reasonable attorneys' fees, including experts' fees, as part of the costs in this action.

### Count X: Title IX Claim (20 U.S.C. § 1681(a)) – Deliberate Indifference to the Sexual Harassment and Assault of Minor Jane Doe II

### (Defendants FCS and FAST)

266.

Plaintiffs adopt and incorporate herein by reference each and every

allegation made in paragraphs 1–137 above as if fully set forth herein.

267.

Defendants FCS and FAST are Title IX funding recipients. Defendants FCS and FAST were responsible for ensuring compliance with Title IX of the Education Amendments Act of 1972 so that FAST received all per-pupil and other funding to which it was entitled.

268.

Minor Jane Doe II was subjected to grooming, sexual harassment, and sexual assault while enrolled in an education program or activity that receives Federal financial assistance.

269.

The violence that Minor Jane Doe II was subjected to at FAST by Vandel constituted "sexual harassment" within the meaning of Title IX.

270.

Vandel's harassment and assault on Minor Jane Doe II was motivated by his sexual desire for Minor Jane Doe II.

271.

Defendants FCS, FAST, Founding Fourteen, Beiner, and Epstein obtained further knowledge of the grooming, sexual harassment, and assault of Minor Jane

Doe II after Teacher 22 and Minor Jane Doe II reported Vandel's inappropriate conduct. Defendants FCS, FAST, Founding Fourteen, Beiner, and Epstein obtained additional knowledge of the grooming, sexual harassment, and assault of Minor Jane Doe II after Vandel was arrested and the police contacted FAST.

<div align="center">272.</div>

Vandel's pervasive sexual harassment, physical abuse, and inappropriate contact toward Minor Jane Doe II damaged her equal access to an education.

<div align="center">273.</div>

Defendants FCS and FAST acted with deliberate indifference to the knowledge that Vandel had groomed, sexually harassed, and sexually assaulted Minor Jane Doe II when Defendant (Principal) Beiner and Defendant (Vice Principal) Epstein, after learning of Vandel's inappropriate conduct regarding Minor Jane Doe II, downplayed Vandel's inappropriate conduct; chastised, blamed, and demeaned Minor Jane Doe II with regard to her story; stopped her from sharing a full account; and commented that her uniform pants were "too tight."

<div align="center">274.</div>

Defendants' conduct was so severe, pervasive, and objectively offensive that it barred Minor Jane Doe II's access to educational opportunities and benefits, in at

least the following ways: the traumatic mishandling of Minor Jane Doe II's

reporting of Vandel's sexually inappropriate conduct; the accusatory and blame-

shifting comments made by Defendant (Principal) Beiner and/or Defendant (Vice

Principal) Epstein to Minor Jane Doe II; the refusal to remove Vandel from Minor

Jane Doe II's classroom; requiring Minor Jane Doe II to face her molester on a

daily basis if she wished to continue her education at FAST; forcing Minor Jane

Doe II to be subjected to daily grooming efforts along with bullying from other

students; and Defendants' failure to provide social services support to Minor Jane

Doe II despite repeated reports of Vandel's sexually inappropriate conduct and the

attendant bullying of Minor Jane Doe II by her peers.

275.

       As a direct result of the deliberate indifference of Defendants FCS and

FAST, Minor Jane Doe II and her parents were re-traumatized when they later

learned that Vandel began grooming a friend, Student 9, immediately upon Minor

Jane Doe II's withdrawal from FAST, and shortly thereafter, forcibly raped

Student 9 by inserting his penis in her vagina, causing her to bleed.

276.

       As a direct result of the deliberate indifference of Defendants FCS and

FAST, Minor Jane Doe II has been excluded from participation in, and has been

denied the benefit of, her education due to her sex.

<p style="text-align:center">277.</p>

Defendants FCS and FAST are liable to Plaintiffs under the implied right of action to enforce Title IX for damages in such amount as will compensate Minor Jane Doe II for the educational opportunities and benefits she has lost and will lose; the physical and mental injuries Minor Jane Doe II has suffered and will suffer; and the medical and rehabilitation expenses for Minor Jane Doe II's care that Jane Doe I, John Doe, or Minor Jane Doe II have incurred or will incur as a result of the violation by Defendants FCS and FAST of Minor Jane Doe II's rights under Title IX.

<p style="text-align:center">278.</p>

Defendants FCS and FAST are liable to Plaintiffs under the implied right of action to enforce Title IX for reasonable attorneys' fees, including experts' fees, as part of the costs in this action.

<p style="text-align:center"><strong><u>DEMAND FOR JURY TRIAL</u></strong></p>

Plaintiffs demand a jury trial with respect to all issues so triable as a matter of right.

<p style="text-align:center"><strong><u>PRAYER FOR RELIEF</u></strong></p>

WHEREFORE, Plaintiffs Minor Jane Doe II, and Jane Doe I and John Doe,

<p style="text-align:center">122</p>

as Parents, Natural Guardians and Next Friends of Minor Jane Doe II, respectfully pray for the following relief:

(a)     That the Court declare Defendants' actions, policies, and practices complained of herein violated the rights of Minor Jane Doe II as secured by 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a);

(b)     Judgment in Plaintiffs' favor against Defendants that includes all damages allowed by law, including but not limited to the following:

    i.   Damages in such amount as will fully compensate Minor Jane Doe II for the educational opportunities and benefits she has lost and will continue to lose, for injury, for pain and suffering, and for the costs she has incurred and may incur as a direct and proximate result of Defendants' violations of her constitutionally-protected rights and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a);

    ii.  Damages in such amount as will fully compensate Jane Doe I and John Doe for the expenses they have incurred and will incur on behalf of and for the care of Minor Jane Doe II as a direct and proximate result of Defendant's violations of

Minor Jane Doe II's constitutionally-protected rights and

Title IX of the Education Amendments of 1972, 20 U.S.C. §

1681(a); and

iii. Damages in such amount as will fully compensate Minor

Jane Doe II for the injuries she has suffered as a direct and

proximate result of Defendants' violations of her

constitutionally-protected rights under Title IX, including

but not limited to damages for personal injuries; past,

present and future pain and suffering; past, present and

future medical expenses; mental anguish; lost wages and

future loss of wages; loss of the capacity for the enjoyment

of life; incidental expenses and consequential damages to be

proven at trial;

(c) All costs of this action, including reasonable attorneys' fees and

experts' fees; and

(d) Such other relief as this Honorable Court may deem just and proper.

**MOORE HALL, LLC**

*/s/ Michael J. Moore*
MICHAEL J. MOORE
Georgia Bar No. 520109

AIMEE J. HALL
Georgia Bar No. 318048
3630 Peachtree Road NE, Suite 1025
Atlanta, Georgia 30326
(404) 882-2960
mjmoore@moorehall.com
ajhall@moorehall.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH L.R. 5.1 C

I HEREBY CERTIFY that the foregoing document was prepared in Times

New Roman, 14-point font, as approved by Local Rule 5.1 C.

*/s/ Michael J. Moore*
MICHAEL J. MOORE

*Attorney for Plaintiffs*

# EXHIBIT A

**FIRST AMENDED AND RESTATED BYLAWS OF
FOUNDING FOURTEEN, INC.**

## ARTICLE 1
### NAME

    1.1    Name.  The name of the corporation shall be **Founding Fourteen, Inc.** hereinafter referred to as the "Corporation."

## ARTICLE 2
### ORGANIZATION

2.1 Purpose.  The Corporation was established as a non-profit corporation under the laws of the State of Georgia and is organized exclusively for educational and charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future Federal tax law (the "Code"). The express purpose of the Corporation is to organize and operate a charter school.

2.2 Dissolution.  In the event of the dissolution of the Corporation, the Board of Directors ("Board") shall, after paying or making provision for the payment of all of the liabilities of the Corporation, dispose of all of the remaining assets of the Corporation, exclusively for the purposes of the Corporation in such manner, or to such organization or organizations organized and operated exclusively for charitable, educational, religious or scientific purposes, as shall at the time qualify as an exempt organization or organizations under Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provisions of any future United States Internal Revenue Law), as the Board shall determine.  Any of such assets not so disposed of shall be disposed of by the court having proper jurisdiction in the county where the principal office of the Corporation is then located, exclusively for such purposes or to such organization or organizations, as said court shall determine, which are organized and operated exclusively for such purposes.

## ARTICLE 3
### GOVERNING BOARD

    3.1  Number  and  Qualification. The Governing Board Members shall serve as the Governing Board of the Corporation. The Governing Board shall consist of between seven (7) and eleven (11) members. Members shall be natural persons who are 18 years of age or older. . Between the time of incorporation and the time the charter petition is submitted, the Board may recruit additional members.

    3.2    Appointment  and  Term  of  Office. The initial Governing Board shall serve staggered, initial terms and be divided into thirds. The first group of Members' terms shall end on the date of the annual meeting held in the 2017 calendar year. The second group of members' terms shall end on the date of the annual meeting held in the 2018 calendar year. The third group of Members' terms shall end on the date of the annual meeting held in the 2019

calendar year.

Thereafter, the Board's nominating committee, known as the Committee on Members, shall present a slate of potential Members and officers for election by the Governing Board. This slate shall be presented at the annual meeting of the Board. Members shall be elected for a term of three (3) years, unless the Member is sooner removed by or as a result of the earliest to occur of: (1) operation of law; (2) an order or decree of any court of competent jurisdiction; (3) voluntary resignation, or (4) removal by a two-thirds majority of the Governing Board, as further described in Section 3.5. A Member may serve up to two (2) consecutive terms. An individual who has served up to two (2) consecutive terms as Member will not be eligible for another term until one (1) year has passed following the last day of the individual's preceding term as Member. However, if the board member's term expires, the member shall continue to serve until the governance board has elected and qualified a successor.

3.3     Vacancy. Any vacancy occurring in the Governing Board and any position to be filled by reason of an increase in the number of Members may be filled, upon recommendation of a qualified candidate by the Governance Committee, by two-thirds (2/3) vote of the seated Members. A Member elected to fill the vacancy shall be elected for the unexpired term of his/her predecessor in office.

If the Board members remaining in office constitute less than a quorum, they shall fill the vacancy by the affirmative vote of a majority of all the board members remaining in the office as soon as practicable and shall have the authority to govern the school on an emergency basis in the interim.

3.4     Powers. The property, affairs, and business of the Corporation shall be managed by the Governing Board, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not prohibited by statute, the Articles of Incorporation, or these bylaws.

3.5     Resignation or Removal. Any individual Member may resign at any time by delivering written notice to the Chair or Vice Chair of the Corporation. Unless otherwise specified in the notice, the resignation shall take effect upon receipt thereof by the officers, and the acceptance of the resignation shall not be necessary to make it effective; provided, however, that a Member who resigns may postpone the effectiveness of his resignation to a future date or to the occurrence of a future event specified in a written tender of resignation. A vacancy shall be deemed to exist at the time of such tender; and the Governing Board may then or thereafter elect or appoint a successor to take office when the resignation, by its terms, becomes effective. Any Member may be removed for cause by a two-thirds majority vote of the remaining Members then in office and present at any regular or special meeting of the Board. Among other things, an unexcused absence from two (2) consecutive regular meetings or missing more than three (3) regular meetings in any calendar year shall constitute cause for removal of a Member. Notwithstanding the previous sentence, the Chair is authorized to excuse any Director's absence from a regular or special meeting of the Board, provided that said Member provides notice of his/ her absence to the Chair at least twenty-four (24) hours in advance of the

meeting. In the event the Chair excuses a Director's absence, that absence shall not count as an unexcused absence for purposes of determining cause for removal of that Member as provided by this paragraph.

3.6     Conflicts of Interest.

3.6.1   Conflicts of Interest Policy. Each Board Member will sign a conflict of interest policy at the beginning of each school year affirming his or her unconflicted loyalty to the interest of Corporation.

3.6.2   Inquiry into Self-Dealing Transactions - In its consideration of any action, the Board and its committees shall first conduct appropriate inquiry to determine whether such action involves a Self-Dealing Transaction.   "Self Dealing Transaction" means any transaction having the School as one party and one or more of the following among the other proposed parties to the transaction:

(1)     Members, Officers, or employees of the Corporation or school management company, or blood or marital relations of any of them;

(2)     An entity in which a Member, Officer or employee of the Corporation or school management company, or blood or marital relation of any of them, holds a significant ownership or investment interest;

(3)     An entity which employs or otherwise compensates a Member, Officer or employee of the Corporation or school management company, or employs or compensates a blood or marital relation; and/or

(4)     Any entity which has, as a member of its Governing Board or trustees, a Member, Officer or employee of the Corporation or school management company, or a blood or marital relation of any of them.

3.6.3   Approval of Self-Dealing Transactions - A Self-Dealing Transaction, as defined above, shall be voidable at the sole election of the Corporation unless the following provisions are satisfied:

(1)     The Board shall hold one or more meeting(s) to discuss and vote on the transaction or arrangement resulting in the conflict of interest. An Interested Person may make a presentation to the Board, but after such presentation, shall leave the meeting(s) during the discussion of, and the vote on the conflict of interest transaction.

(2)     The Chair shall, if appropriate, appoint a disinterested person or committee to investigate alternatives to the proposed arrangement with reasonable efforts from a person or entity that would not give rise to a conflict of interest.

(3)     After exercising due diligence to determine whether the Corporation can arrange

an alternative transaction more favorable to the school with reasonable efforts, the Governing Board concludes that it is in the Corporation's best interests and is fair and reasonable to authorize the Self-Dealing Transaction

(4)     The Governing Board authorizes, approves, or ratifies the transaction by the affirmative vote of a majority of the disinterested Members, and with disclosure or knowledge of the material facts concerning the Self-Dealing Transaction.

Interested Members may be counted in determining the presence of a quorum at a meeting of the Governing Board (or a committee thereof) that authorizes, approves, or ratifies such contract or transaction.

Notwithstanding the above, no loan shall be made by the Corporation to any of its Members or officers, as provided further in Section 7.4 of these Bylaws.

3.7     Compensation of Members. Whether or not employed by the Corporation for other purposes, Members and members of any committee of the Governing Board shall serve in that capacity without compensation, but may be entitled to reimbursement for any reasonable expenses incurred in attending meetings. Any Member barred from receiving compensation under these provisions shall not be barred from serving the Corporation in any other capacity and receiving reasonable compensation for such other services.

3.8     Board Training. The members of the Governing Board will participate in annual training on their proper function as a charter school governing board, which shall be conducted by a qualified educational attorney or consultant.

### SECTION 4
### MEETINGS AND COMMITTEES OF THE GOVERNING BOARD

4.1     Timing and Notice. The Governing Board shall meet at least eight (8) times annually. Regular meetings of the board may be held without notice at such locations, dates and times as shall be determined by the Governing Board; provided, however, that all meetings shall be held in compliance with the Georgia Open Meetings Act. Special meetings of the board may be held upon actual notice to each Member or notice that is mailed or transmitted by facsimile or email, to each Member, at least two (2) days prior to the meeting. Notice of special meetings shall include the date, time, and place of the meeting. The order of business at all meetings shall be set by the Board Chair.

4.2     Annual Meeting. The annual meeting shall be held every April or May (the date, time, and place to be fixed by the Governing Board and notice given to all members, at least three (3) weeks in advance), for the purpose of electing officers, deciding upon a slate of members to present to the charter school parents/legal guardians for election, and for the transaction of such other business as may come before the meeting. Upon presentation of the slate as defined in section 3.2, the Governing Board shall elect the slate by a two-thirds (2/3) or greater majority. If a proposed slate fails to achieve the requisite vote, the Governing Board

may consider alternative slates as further proposed by the Committee on Members.

     4.3    Waiver of Notice. Whenever any notice of the meetings of the board is required to be given under law, the Articles of Incorporation, or these bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Attendance at a meeting by a person entitled to notice shall constitute a waiver of proper notice of such meeting, except where attendance is for the express purpose of objecting to the transaction of business because the meeting is not lawfully called or convened.

     4.4    Quorum and Voting. A majority of the Members in office shall be necessary and sufficient to constitute a quorum for the transaction of business. Any less number may: (1) set a time to adjourn, (2) adjourn, (3) recess, or (4) take measures to obtain a quorum. Each Member shall have one vote on each matter coming before the Governing Board. The act of a majority of the Members present and voting at a duly constituted meeting of the Governing Board shall be the act of the Board, except in the following circumstances, which shall require a two-thirds (2/3) or greater majority: (1) the selection of the school principal; (2) the approval of the school budget; (3) the selection and financing of the school facility; and (4) the removal of a Member.

     4.5    Participation by Alternative Means of Communication. Members and members of any committee of the Governing Board may participate in a meeting of the board or such committee by means of conference telephone or other communications mechanism provided that a quorum of the meeting is present in person in accordance with the Georgia Open Meetings Act. Participation by such means shall constitute presence in person at such meeting.

     4.6    Committees. A Board resolution shall appoint committees or task forces of the Board, except for the Standing Committees expressly provided for herein. Committees may be composed of Members or community members, or both, unless otherwise provided in these Bylaws. The Board may prescribe the need and/or the composition of such committees.

     4.7    Standing Committees. There shall have four standing committees: the Executive Committee, Development Committee, Finance Committee and Governance Committee. Each Standing Committee will have a charter that defines its respective roles and responsibilities. The Board may elect to name other Standing Committees as it deems appropriate.

     4.7.1   Executive Committee - The Board may delegate to the Executive Committee the full powers of the Board to act upon all matters pertaining to the welfare and management of the Corporation between regular meetings of the Board. The Executive Committee shall conduct the annul review of the Principal's performance in the prior fiscal year and recommend performance goals and compensation for the upcoming fiscal year, subject to final Board approval. The Executive Committee shall be chaired by the Chair and shall include as members the Officers of the Board and any additional Members nominated by the Chair and approved by the Board. Only Members may serve on this committee. The Executive Committee shall report to the next regular meeting of the Board any action taken by it during the interim between any regular meetings.

4.7.2   Development Committee - The Development Committee is responsible for preparing and approving an annual fundraising plan, coordinating Members' participation in all fundraising programs, assisting with development initiatives, and facilitating the continued cultivation of friends and patrons of the Corporation. The Development Committee is also charged with ensuring that accurate and secure giving records are maintained by the Corporation.

4.7.3   Finance Committee - The Finance Committee is responsible for seeking to maintain the financial viability of the Corporation. The Finance Committee shall approve the annual operating budget and present it to the Board for review and approval. The Finance Committee shall monitor the financial operations and report on the Corporation's financial status at each regular meeting of the Board. The Finance Committee shall review and approve the organization's fiscal policies and procedures and shall present recommend changes to the Board as appropriate. The Finance Committee shall recommend the selection of the independent auditing firm and oversee the auditing process and recommend approval of the annual audit to the Board.   The Finance Committee also will oversee the major business operating risks of the Corporation, along with any pending litigation, to ensure that all such risks are being identified and managed appropriately. The Finance Committee shall be chaired by the Treasurer of the Board.

4.7.4   Committee on Members - The Committee on Members is responsible for overseeing matters pertaining to the Corporation's Board, including membership and evaluation. The Committee on Members will nominate the Chair, Vice Chair, Secretary and Treasurer for election after consultation with the Chair. The Committee on Members shall establish criteria for the selection of new Members, evaluate such candidates, and make recommendations to the Board for new Members for Board approval at the annual meeting. The Committee on Members shall perform such other tasks related to the membership and performance of the Board as set forth more specifically in its charter.

4.7.5   Academics Committee – The Academic Committee is responsible for curriculum and other academic matters at the school. The Academic Committee shall review and recommend revisions to the curriculum as necessary and recommend educational strategies, establish criteria for evaluation of faculty and student performance, and establish and implement provisions for the regular assessment of the academic performance of the students population in accordance with the provisions of the charter.

4.8   Advisory Council. The Governing Board, a committee of the Board, or the chair may select and appoint individuals to serve on the school's Advisory Council. Such individuals are not required to be Members. The Advisory Council shall have no delegated or governance authority, but shall serve in a strictly advisory capacity to the Governing Board and its committees. Any members of the advisory group may be removed by the Board or by the appointing authority whenever in their judgment the best interests of the Corporation shall be served by such removal.

**SECTION 5**
**OFFICERS**

5.1     Number and Positions. The officers of the Corporation shall be the Chair, Vice-Chair, Secretary, and Treasurer. The officers of the Corporation shall be elected by the Governing Board, and shall report directly to the Governing Board. The Board may also elect one or more assistant secretaries, and assistant treasurers. The Board may elect such other officers and agents as it shall deem necessary, who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board. The selection of an officer shall not of itself create any contract rights in favor of the officer. Any two or more offices may be held by the same person, except the Chair may not also hold another office.

5.2     Term of Office and Qualifications. The officers of the Corporation shall serve at the pleasure of the Governing Board. Officers shall be nominated by the Committee on Members and elected by the Governing Board at its annual meeting, and shall hold office for three-year terms or until their successors are chosen and qualify, or until death, resignation, or removal.  In the case of absence or disability of an officer of the Corporation, or in any other case that the Governing Board may deem sufficient reason therefor, the Board may delegate for the time being any or all of the powers or duties of any officer to any other officer, Member, or any other person.

5.3     Resignation or Removal. Any officer may resign at any time by delivering written notice to the Governing Board of the Corporation. Unless the written notice specifies a later effective date, the resignation shall be effective when the notice is accepted by the Governing Board. Any officer may be removed by the Board, whenever in its judgment the best interests of the Corporation would be served thereby, by a two-thirds majority vote of the remaining Members then in office and present at any regular or special meeting of the Board. Any such removal will be without prejudice to the contract rights, if any, of the officer so removed.

5.4     Vacancy. A vacancy in any office because of death, resignation, removal, disqualification or otherwise, may be filled by the Governing Board for the unexpired portion of the term. In the event of such a vacancy, the vacancy may be filled temporarily by appointment by the chair until such time as the Governing Board shall determine.

5.5     Chair.  The Chair shall preside at meetings of the Governing Board; shall make reports to the Board; shall have the general powers and duties of management usually vested in the office of the chief executive and chair of a corporation; and shall have such other rights, duties, and powers as are authorized by the Governing Board.

5.6     Vice-Chair. The Vice-Chair shall, in the absence of the chair, perform the duties and exercise the powers of the Chair, or such of them as may be so delegated, and shall have such other rights, duties, and powers as are authorized by the Governing Board from time to

time.

5.7    Secretary. The Secretary, or an assistant secretary, shall attend all meetings of the Governing Board and shall record the minutes of all proceedings, including all votes, in a book or database to be kept for that purpose, and shall perform like duties for the standing committees when required. The Secretary shall give, or cause to be given, such notice as is required of all meetings of the Governing Board and shall perform such other duties as may be prescribed by law, the Articles of Incorporation, these bylaws, or the Governing Board.

5.8    Assistant Secretaries. If the Governing Board elects to fill the position, the assistant secretary (or any of the assistant secretaries in order of their seniority) shall, in the absence or disability of the secretary, perform the duties and exercise the powers of the secretary, and shall perform such other duties as the Governing Board shall prescribe.

5.9    Treasurer. Except as the Board may otherwise determine, the Treasurer shall ensure or cause to be ensured that a true and accurate accounting of the financial transactions of the Corporation is made and that such accounting is presented to  and  made  available to  the Board. These records will include cash, outstanding advances, investments, accounts receivable and other assets, accounts payable, and fund balances (net assets). The Treasurer shall also meet regularly with the appropriate designee to ensure oversight and budget compliance and perform such other duties as may be prescribed by the Board. The Board shall utilize its best efforts to ensure that the Treasurer is a Georgia certified public accountant. With the support of the Board's Finance Committee, the Treasurer shall be required to make routine reports to the Board related to the financial condition of the Corporation.

5.10    Assistant Treasurers. If the Governing Board elects to fill the position, the assistant treasurer (or any of the assistant treasurers in the order of their seniority) shall in the absence or disability of the Treasurer, perform the duties and exercise the powers of the treasurer, and perform such other duties as the Board shall prescribe.

5.11    School Principal. The school principal shall manage daily operations of the school; shall hire and supervise instructional and support staff; shall ensure that the charter contract goals are met; shall report at least quarterly to the Governing Board on charter compliance and progress toward meeting goals; shall serve as an ex-officio, non-voting member of the Board and assist the Board chair with scheduling and setting agendas for Governing Board meetings; shall facilitate and implement policies duly adopted by the Governing Board; shall act as liaison between the school, the charter sponsor and the state department of education; and shall perform such other duties as the Governing Board shall prescribe.

## SECTION 6
## BOOKS AND RECORDS

6.1    Records. The Corporation shall keep correct and complete books and records and records of its accounts and transactions, and minutes of the proceedings of its Governing Board and any executive or other committee when exercising any of the powers of the

Governing Board.

6.2 <u>Form</u>. The books and records of the Corporation shall be in written form, electronic form, or in any other form which can be converted within a reasonable time into written form for visual inspection.

## <u>SECTION 7</u>
## <u>FISCAL MATTERS</u>

7.1 <u>Deposits</u>. The Treasurer shall select banks, trust companies, or other depositories in which the funds of the Corporation not otherwise employed shall, from time to time, be deposited to the credit of the Corporation. The Treasurer shall report said selections to the chair and the Governing Board.

7.2 <u>Checks</u>. All checks or demands for money and notes of the Corporation shall be signed by the Treasurer or other such person or persons as the Governing Board may from time to time designate.

7.3 <u>Fiscal Years</u>. The Governing Board shall have the power to fix, and from time to time to change, the fiscal year of the Corporation. Unless otherwise fixed by the Board, the fiscal year shall commence on July 1 and shall terminate on the following June 30.

7.4 <u>Loans to Members and Officers Prohibited</u>. No loans shall be made by the Corporation to any of its Members or officers. Any Member or officer who assents to or participates in the making of any such loan shall be liable to the Corporation for the amount of such loan, including reasonable interest until it is repaid.

7.5 <u>Contracts</u>. The Governing Board may authorize any officer or officers, agent or agents of the Corporation, in addition to the officers so authorized by these bylaws, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation. Such authority may be general or confined to specific instances. Unless so authorized, no officer, agent, or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable pecuniarily for any purpose or in any amount.

7.6 <u>Partnerships and Joint Ventures</u>. The Governing Board may authorize any officer or officers, agent or agents of the Corporation to enter into any partnerships or joint ventures that the Board determines will advance the purposes and goals of the Corporation as described in the Articles of Incorporation or standing policies of the Board.

7.7 <u>Gifts and Contributions</u>. The Governing Board or, by delegation, any officer, may accept on behalf of the Corporation any contribution, gift, or bequest for the general purpose or for any special purpose of the Corporation.

7.8 <u>Endowments</u>. Any endowments for the general purposes or for any special

purpose of the Corporation shall be approved by the Governing Board.

## SECTION 8
## INDEMNIFICATION

8.1. <u>Indemnification</u>.  The Corporation shall indemnify to the fullest extent permitted by law each of its officers, Directors, whether or not then in office (and his executor, administrator and/or heirs) as well as the executor, administrator and heirs of any of them against all reasonable expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and necessarily incurred by him in connection with any threatened, pending or completed action, suit, proceeding or arbitration, whether civil or criminal, administrative or investigative (including any appeal thereof), to which he is or is threatened to be made a party because he is or was a Director, officer, employee or agent of this Corporation, or such other corporation, partnership, joint venture, trust or other enterprise.  He shall have no right to reimbursement, however, in relation to matters as to which he has been adjudged liable to the Corporation for gross negligence or willful misconduct in the performance of his duties to the Corporation.  The foregoing right of indemnification shall be in addition to and not exclusive of all other rights to which such Director, officer, employee or agent may be entitled.

8.2 <u>Insurance</u>.  The Corporation may purchase and maintain insurance on behalf of any person who is or was a Director, officer, employee or agent of the Corporation against any liability asserted against him and incurred by him in any such capacity or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions of this Section.

## SECTION 9
## AMENDMENTS

The Articles of Incorporation and these bylaws may be amended by the affirmative vote of a two- thirds majority of the Members then in office at any meeting of the Governing Board, provided that the Members shall be provided with at least two (2) days prior notice that an amendment will be brought to a vote, which notice shall include a draft of the proposed amendment, and that no such amendment shall authorize the Governing Board or the officers of the Corporation to conduct the affairs of the Corporation in any manner or for any purpose contrary to the provisions of Section 501(c)(3) of the Code.

## SECTION 10
## MISCELLANEOUS

10.1 <u>Policies and Procedures</u>.  Any action by the Board establishing policy or methods of procedure – administrative, business, academic or otherwise – not contained in these Bylaws shall be known as Policies of the Board.

Policies and Procedures of the Board may be adopted by the Board or may be amended or repealed, in whole or in part, at any meeting of the Board in accordance with the laws of the State of Georgia.


ADOPTED this 14th day of September, 2017, I certify that the foregoing First Amended and Restated Bylaws of Founding Fourteen, Inc. were approved and adopted by and on behalf of the Corporation by its Board of Directors on September 14th, 2017, and are currently in effect.

By:     _____
        MIKE FINLEY
        BOARD CHAIR

# EXHIBIT B

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

This Charter for Fulton Academy of Science and Technology ("Charter") is entered into by and between Founding Fourteen, Inc. ("Petitioner"), the Fulton County Board of Education ("Local Board") and the State Board of Education ("State Board") (collectively referred to as "the parties").

**WHEREAS,** the Petitioner submitted a petition to the Local Board proposing to establish a start-up charter school pursuant to O.C.G.A. § 20-2-2060 *et seq.*, the Charter Schools Act of 1998 ("Charter Schools Act"), and the Local Board approved the petition;

**WHEREAS,** the State Board finds that the petition complies with the provisions of the Charter Schools Act and the rules, regulations, policies, and procedures promulgated in accordance with O.C.G.A. § 20-2-2063 and further finds that the petition is in the public interest; and

**WHEREAS,** pursuant to O.C.G.A. § 20-2-2064.1, the State Board grants this Charter to permit Petitioner to operate Fulton Academy of Science and Technology ("the Charter School") in accordance with the terms and conditions of this Charter.

**NOW THEREFORE,** in consideration of the promises, mutual agreements, and covenants contained herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Definitions.** The terms below will be interpreted in accordance with the following definitions, unless and until federal or state law, or State Board of Education rules or regulations, or the state accountability system, is amended otherwise.

    a. **College and Career Ready Performance Index ("CCRPI"):** A comprehensive school improvement, accountability, and communication platform for all educational stakeholders that will promote college and career readiness for all Georgia public school students.

    b. **Elementary and Secondary Education Act as Amended ("ESEA as Amended"):** The federal education statute, originally passed by the U.S. Congress in 1965, that defines the role of the federal government in public education and authorizes many of the major federal education programs, including Title I. This Act was reauthorized by Congress in 2015 as the Every Student Succeeds Act ("ESSA").

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

    c. **Education Service Provider ("ESP"):**  A for-profit or non-profit organization that contracts with new or existing charter schools to provide services including, but not limited, to curriculum design, professional development, student assessments, financial and operational management, facilities management, and human resources management. An ESP may include Education Management Organizations ("EMOs"), Charter Management Organizations ("CMOs"), Education Service Organizations ("ESOs"), and others.

    d. **Georgia Department of Education ("GaDOE" or "Department"):** The Georgia Department of Education is the state agency charged with the fiscal and administrative management of certain aspects of K–12 public education, including the implementation of federal and state mandates. Such management is subject to supervision and oversight by the State Board of Education.

    e. **Georgia Milestones Assessment System ("Georgia Milestones"):** The Georgia Milestones Assessment System is a state-required assessment system to measure student acquisition of the knowledge and skills set forth in the state standards. Georgia Milestones is a consistent testing program that will be administered across grades three through twelve in the content areas of Reading, English/Language Arts, Mathematics, Science, Social Studies, and Writing.

    f. **Local Educational Agency ("LEA"):** A Local Educational Agency is the public authority legally constituted by the state as an administrative agency to provide control of and direction for kindergarten through Grade 12 public education institutions.

    g. **Material term or provision:**  A material term or provision is an important or substantial aspect in this Charter.  A change to a material term or provision may alter the rights, obligations, interests, or relations of the parties.

    h. **State Board of Education ("SBOE" or "State Board"):** The State Board of Education is the constitutional authority that defines education policy for public K–12 education agencies in Georgia.

2. **Charter Term.** This Charter is for Petitioner to operate the Charter School for a five-year term beginning on July 1, 2021 and expiring on June 30, 2026.

3. **Grade Range and Enrollment.** The Charter School shall serve grades K-8. The Charter School's total enrollment shall not exceed 720 students during the term of the Charter. If the

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

Charter School seeks to exceed the enrollment of 720 students, it must seek an amendment to this Charter, to be agreed upon by each of the parties to this Charter.   Any adjustments exceeding the Charter School's annual enrollment projections outlined in the petition, up to the number of students identified in this section, must be formally approved by the Local Board, which agrees to fund any additions above the annual projections for which it approves for the remainder of this Charter.

4. **Mission Statement.** The mission of the Charter School is to provide an education based on design thinking and problem-solving with an emphasis on science, technology, engineering, and mathematics (STEM) to K-8 children in the Fulton County community. The Charter School's goal is to prepare children in a way that provides them a foundation to be creative innovators and problem solvers so they are prepared for success and leadership in our rapidly changing world. With the diverse demographics of our existing community serving as the background theme for academics, children will develop the foundations for learning and thinking that prepares them for success in post-secondary education and careers.

5. **Essential or Innovative Features.**   The Charter School will offer the following essential or innovative features during the charter term:
   - Incorporating Design Thinking into all facets and subject areas;

   - Adding one class hour each week for a "Genius" hour;

   - Creating a capstone project for 8th grade students; and

   - Teaching Coding and Computer Science to all grades.

6. **Maximum Flexibility Allowed by Law.** In exchange for the Charter School's agreement to meet or exceed the performance-based goals and measurable objectives set forth in Section 8 below, the State Board shall grant the maximum flexibility allowed by law to the Charter School. Pursuant to O.C.G.A. § 20-2-2065(a), the Charter School shall be entitled to the maximum flexibility allowed by law from the provisions of Title 20 of the Official Code of Georgia Annotated and from any state or local rule, regulation, policy, or procedure established by the Local Board, the State Board, or the Department. Notwithstanding this maximum flexibility, the Charter School shall comply with the terms of this Charter, the Charter Schools Act, including the provisions set forth in Section 16 below, and any rules, regulations, policies, or procedures established by the State Board or the Department, consistent with the Charter Schools Act.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

7.   **Accreditation.** If the Charter School serves grades 8-12, the Charter School shall maintain accreditation from an approved accrediting agency identified in O.C.G.A. §§ 20-3-519(6)(A)(i) or 20-3-519(6)(A)(ii).

8.   **Performance-based Goals and Measurable Objectives.** In exchange for the flexibility granted in Section 6 above, the Charter School agrees to meet or exceed the performance-based goals and measurable objectives that are designed to result in improvement of student achievement as set forth by the State Board and Local Board in **Appendix A,** which is incorporated in and attached to this Charter.

9.   **Assessment and Accountability.** Notwithstanding Sections 6 and 8 above, the Charter School is subject to all accountability and assessment requirements set forth within Title 20 of the Official Code of Georgia Annotated, including, but not limited to, the accountability provisions of O.C.G.A. §§ 20-14-30 through 41, and any corresponding rules and regulations. The Charter School is further subject to all federal accountability requirements under the Elementary and Secondary Education Act, subject to any amendment, waiver, or reauthorization thereof.

10.  **Annual Report.** The Charter School shall submit an annual report by November 1 of each year to the Georgia Department of Education.  The annual report shall comply with all requirements set forth in O.C.G.A. § 20-2-2067.1(c), including, but not limited to, an indication of the Charter School's progress towards the goals and objectives stated in Section 8 above and all state-mandated assessment and accountability scores from the previous year, if available. The Charter School shall post the annual report on the school's website and make copies available to the community.

11.  **Open Enrollment and Admissions.** The Charter School shall comply with the open enrollment and admissions provisions set forth in O.C.G.A. § 20-2-2066. Enrollment shall be open to any student in accordance with the following criteria:

   a. **Attendance Zone.** The attendance zone for the Charter School shall be the Fulton County School District.

   b. **Application.** To be eligible for enrollment at the Charter School, students residing in the attendance zone must submit a timely application to the Charter School in accordance with the deadline set by the Charter School. The Charter School may use applications only for the purpose of verifying the student's residence within the school's attendance zone and grade level and to obtain information to establish weights in an enrollment lottery, if applicable. The Charter School may not use

CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY

admissions criteria or applications that would not otherwise be used at a traditional public school, including, but not limited to, requests for letters of recommendation, essays, resumes, or information regarding a student's school or community activities, grades, test scores, attendance record, or disciplinary history. The Charter School may gather other relevant information from students after enrollment is determined.

c. **Annual Enrollment.** The Charter School must offer at least one annual enrollment opportunity for each grade level served for which space is available.

d. **Random Lottery.** If the number of timely applicants received by the Charter School exceeds the approved enrollment or capacity of a program, class, grade level, or building, the Charter School shall ensure that such applicants have an equal chance of being admitted through a random selection process in accordance with O.C.G.A. § 20-2-2066(a)(1)(A), except for educationally disadvantaged students who may be provided an increased chance of admission through a weighted lottery. The Charter School shall not conduct more than one lottery, per grade, per admissions cycle.

e. **Statutory Enrollment Priorities.** In accordance with O.C.G.A. § 20-2-2066(a)(1)(A), the Charter School shall give enrollment priority to the following categories of applicants and in the following priority:

   i. A sibling of a student enrolled in the Charter School; and
   ii. A student whose parent or guardian is a member of the Governing Board of the Charter School or is a full-time teacher, professional, or other employee at the Charter School.

f. **Weighted Lottery.** In accordance with O.C.G.A. § 20-2-2066(a)(1)(A), the Charter School may utilize a weighted lottery to provide an increased chance of admission to educationally disadvantaged students, as defined by State Board Rule.

12. **Withdrawal without Penalty.** The Charter School shall comply with the provisions of O.C.G.A. § 20-2-2066(d) for withdrawing students. The Charter School agrees that a student may withdraw without penalty from the Charter School at any time and enroll in another public school in the local school system in which such student resides.

13. **State and Federally Mandated Educational Services.**

a. **Students with Disabilities.** The Charter School shall comply with all federal special education laws and regulations, including Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act, and the Individuals with

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

Disabilities Education Act. Special education teachers must have a bachelor's degree and must either be certified in special education or hold a special education license in Georgia.

b. **English Language Learners.** The Charter School shall comply with all applicable federal and state laws and regulations relating to the provision of educational services to English Language Learners.

c. **Remediation.** The Charter School shall provide remediation in required cases pursuant to State Board of Education Rule 160-4-5-.01 and ESEA as amended, subject to any amendment, waiver, or reauthorization thereof.

14. **Governance Structure.**

a. **Governing Board.** The Charter School shall utilize an autonomous governing body in the form of a Governing Board, which shall operate in accordance with its bylaws and **Appendix B** (Locally Approved Charter School Partners Roles and Responsibilities Chart) of this Charter and which shall be responsible for complying with and carrying out the provisions of this Charter, including compliance with all applicable law. Appendix B is incorporated in and attached to this Charter.

b. **Function.** It shall be the function of the Governing Board to uphold the Charter School's mission and vision, to set policy for the Charter School, to work collaboratively with school officials to ensure the Charter School complies with the performance goals enumerated in Appendix A, to ensure effective organizational planning, and to ensure financial stability of the Charter School.

c. **Autonomy.** The Governing Board shall exercise substantive control over such areas as policy, personnel decisions, financial decisions, curriculum and instruction, resource allocation, school improvement goals, and school operations, which are listed by way of example and not by limitation.

d. **Annual Training.** The Governing Board shall receive initial training and annual training thereafter. Pursuant to O.C.G.A § 20-2-2072 and relevant State Board Rule 160-4-9.06, the training shall include, but not be limited to, best practices on school governance, the constitutional and statutory requirements relating to public records and meetings, and the requirements of applicable statutes and rules and regulations.

CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY

e. **Public Meetings.** The Governing Board and its meetings, including emergency meetings, are subject to and shall comply with the Open and Public Meetings Act, O.C.G.A. § 50-14-1 *et seq.,* and any subsequent amendment thereof. The Governing Board shall conduct regular meetings consistent with principles of transparency and avoidance of actual or apparent conflicts of interest in the governance of the Charter School.

f. **Public Records.** The Governing Board is subject to and shall comply with the Georgia Open Records Act, O.C.G.A. § 50-18-70 *et seq.*, and any subsequent amendment thereof. The Governing Board shall maintain its adopted policies, budgets, meeting agendas, and minutes, and shall make such documents available for public inspection. The Charter School shall make the minutes of all Governing Board meetings available on its website within ten (10) business days after Governing Board approval and for the duration of the Charter.

g. **Conflicts of Interest.** The Governing Board shall establish a formal policy to prevent and disclose conflicts of interest. Members of the Governing Board and all individuals employed at the Charter School shall abide by such conflicts of interest policy.  Upon request, the Charter School shall provide conflict of interest forms to the Local Board or Department demonstrating that Governing Board members are in compliance with the conflicts of interest policy.

h. **Public Status.** Petitioner assures that the Charter School shall be a public, nonsectarian, nonreligious, nonprofit school organized and operated under the laws of the State of Georgia. Petitioner further assures that the Charter School shall not be home based.

i. **Board Compensation.** Petitioner shall not compensate members of the Charter School's Governing Board in excess of reasonable expenses incurred in connection with actual attendance at board meetings or with performance of duties associated therewith.

15. **Fiscal Control.**

a. **Financial Reporting Requirements.** The Charter School shall follow the financial requirements of the Charter Schools Section of the Department's Financial Management for Georgia Local Units of Administration Manual. The Charter School shall submit all information required by the State Accounting Office for inclusion in the State of Georgia Comprehensive Annual Financial Report.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

   b. **Annual Audit.** The Charter School shall have an annual financial audit.

      i. The financial audit shall be conducted by an independent certified public accountant licensed in the State of Georgia. The Charter School will submit its annual financial audit to the State of Georgia by November 1st each year.

      ii. A separate audit shall not be required for a school if the Charter School is included in the local school system audit conducted pursuant to O.C.G.A. § 50-6-6, but the Charter School will submit the system's audit to the State of Georgia by November 1st each year.

   c. **Base Per-Pupil Funding.** The base per-pupil funding amount is the school system's good-faith estimate for the charter term. Based on this estimate, the Local Board shall fund the Charter School at no less than a per-pupil base rate of $8,719.00, provided that the amount of revenue received by the local district is equal to the amount of state and local revenue upon which the approved school budget is based.

   d. **Chief Financial Officer.** The Charter School shall designate a Chief Financial Officer, who shall possess the following minimum qualifications:

      i. A baccalaureate or higher degree in business, accounting, or finance from an accredited college or university and a minimum of four (4) years' experience in a field related to business or finance; or

      ii. Documented experience of ten (10) or more years in the field of business and financial management.

   e. **Federal Funding and Monitoring Requirements.** The Charter School shall comply with all federal eligibility and monitoring requirements related to the application for and receipt of federal funds.

   f. **Insurance.** The Charter School shall obtain adequate insurance coverage and shall maintain such coverage throughout the Charter term in accordance with the laws of the State of Georgia. The Charter School shall obtain a Certificate of Insurance which shall name the Local Board and the State Board as additional insureds.

   g. **Surplus Funds.** Any surplus funds remaining at the close of each fiscal year will be used to enhance the Charter School's academic program. Under no circumstances shall

CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY

any surplus be distributed to the Charter School's employee(s), Governing Board member(s), educational service provider, or educational management organization. Nothing in this section shall be construed to prevent the Charter School from setting aside surplus funds in a reserve account or budgeting and awarding performance bonuses as part of their annual operating expenses.

h.   **Responsibility for Debts.** The Charter School is solely responsible for all debts incurred by the Charter School and its Governing Board. Except as agreed hereto, the Local Board and the State Board shall not be contractually bound to the Charter School or to any third party with whom the Charter School has a contract or from whom the Charter School has purchased goods or services.

16. **Compliance with Other Laws, Rules, and Regulations.** The Charter School shall operate in accordance with the United States Constitution, the Constitution of the State of Georgia, and all applicable federal, state, and local laws that may not be waived pursuant to O.C.G.A. § 20-2-2065, including, but not limited to:

a.   **Civil Rights, Insurance, Health, Safety, and Conflicting Interests.** The Charter School shall operate in accordance with all applicable federal, state, and local rules, regulations, court orders, and statutes relating to civil rights; insurance; the protection of the physical health and safety of students, employees, and visitors; conflicting interest transactions; and the prevention of unlawful conduct.

b.   **Asbestos Remediation.** The Charter School shall comply with the terms of any applicable asbestos remediation plan.

c.   **Unlawful Conduct.** The Charter School shall be subject to all laws relating to unlawful conduct in or near a public school.

d.   **Student Conduct and Discipline.** The Charter School shall maintain and implement a written policy regarding student discipline, which policy shall be consistent with due process.

e.   **State Board of Education Rules.** The Charter School shall operate in accordance with all State Board of Education Rules promulgated in accordance with the Administrative Procedure Act during the term herein that are not subject to any waiver granted in Section 6 above.

CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY

f. **Prohibition on Discrimination.** The Charter School shall not discriminate against students on the basis of disability, race, creed, color, gender, national origin, religion, ancestry, marital status, academic ability, the need for special educational services, or any other characteristic protected by local, state, or federal law.

g. **Reporting Requirements.** The Charter School shall be subject to all reporting requirements of O.C.G.A. §§ 20-2-160, 20-2-161(e), 20-2-320, and 20-2-740.

h. **Tuition.** The Charter School shall not charge tuition or fees to its students except as may be authorized for local boards pursuant to O.C.G.A. § 20-2-133.

i. **Brief Period of Quiet Reflection.** The Charter School shall comply with O.C.G.A. § 20-2-1050, which requires a brief period of quiet reflection.

j. **Individual Graduation Plans.** The Charter school shall comply with O.C.G.A. § 20-2-327 related to Individual Graduation Plans.

k. **Family Educational Rights and Privacy Act.** The Charter School is subject to all provisions of the Federal Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g. In the event the Charter School closes, it shall transmit all official student records in the manner prescribed by the State Board or the Georgia Department of Education.

l. **Records Retention.**  The Charter School shall be responsible for maintaining and retaining its records, including student records, employee records, and all corporate records related to the Charter School's operations in accordance with Georgia Law, State Board Rule, and this Charter.  In the event that the Charter School closes, it shall provide for the maintenance, retrieval, and transmittal of all records in the manner prescribed by the State Board or the Department.  Neither the Department nor the State Board shall be required to assume possession of the Charter School records.

m. **QBE Formula Earnings.** The Charter School acknowledges that criteria used to calculate Quality Basic Education ("QBE") funding may not be waived.

17. **Education Service Providers.**

a. If the Charter School does not contract with an Education Service Provider at the time of execution of this Charter but later elects to contract with an Education Service

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

Provider, such decision will require a charter amendment prior to execution of an agreement with an Education Service Provider.

b.  If the Charter School contracts with an Education Service Provider, the Charter School shall notify the Local Board and the State Board before agreeing to any material changes or amendments to the contract with the Education Service Provider. The Charter School shall provide notice to the Local Board and State Board at least thirty (30) days prior to signing the revised contract. The notice shall include a copy of the proposed changes and/or amendments to the contract between the Charter School and the Education Service Provider. If any changes to the contract between the Charter School and Education Service Provider result in material changes to this Charter, the Charter School shall seek an amendment to this Charter.

18. **Compliance with the Rules, Practices, Policies, and Procedures of the Department.** The Charter School shall operate in accordance with the rules, practices, policies, and procedures established by the State Board and the Department.

19. **Employment Matters.** Individuals employed at the Charter School shall not be considered employees of the State Board or the Department.

a.  **Background Checks.** The Charter School shall continue to utilize background check procedures and shall ensure that all prospective employees or any individual that will have substantial contact with students undergo a fingerprinting and background check prior to beginning work at the Charter School or having contact with students.

b.  **Teachers' Retirement System.** All qualified teachers at the Charter School shall be members of the Teachers Retirement System of Georgia ("TRS") and subject to its requirements. The Charter School is responsible for making arrangements with TRS and making monthly contributions for its teachers in accordance with state requirements.

c.  **Teacher and Leader Evaluation.** The Charter School shall continue to implement the Teacher Keys Effectiveness System ("TKES") and Leader Keys effectiveness System ("LKES") in accordance with O.C.G.A. §20-2-210(b)(1) and State Board Rule 160-5-1-.37. The Charter School shall have at least two individuals credentialed in using TKES. If the most senior Charter School leader must be evaluated using LKES because he or she performs the duties of a principal as defined by State Board Rule 160-5-1-.37, a member of the Governing Board, who is credentialed in using LKES, shall serve as his or her evaluator.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

20. **Record Inspection.** Subject to state and federal laws, the Local Board, the State Board, the Department and their agents, and the State Auditor's office shall have the right to examine and copy all records, reports, documents, and files relating to any activity, program, or student of the Charter School.

21. **Facilities.**

   a. **Approval of Site and/or Facility.** The Charter School shall maintain proper approval for all sites and/or facilities and obtain proper approval for all new sites and/or facilities, prior to commencing any new construction, and prior to student occupation of any new facilities. The Charter School shall contact the Georgia Department of Education's Facilities Services Division regarding the following:

   i. **Site Approval.** The Charter School shall maintain site approval by the Facilities Services Division and obtain site approval for any new sites through the Facilities Services Division's process. Once a new site approval has been granted, the Charter School will be issued an additional site code. The Charter School shall not commit to any certificate of lease or ownership, commence any construction, nor allow student occupation prior to site approval of any new sites and/or facilities.

   ii. **Architectural Review.** The Charter School shall submit to and receive approval from the Facilities Services Division of all architectural plans for any new facility that will house any part of the Charter School during the Charter term. The Charter School shall not commit to any certificate of lease or ownership, commence any construction, nor allow student occupation prior to architectural review of the new facility.

   iii. **School Code Approval.** After securing both site approval and architectural review approval a new school code shall be obtained for the new site and/or facility. A locally approved Charter School shall contact their school system's facilities department and make a request for a school code. The Charter School shall properly obtain a school code prior to occupancy of the new site and/or facility.

   b. Prior to opening any new Charter School site and/or facility, and prior to students occupying any new facility, the Charter School shall obtain and submit the following documents to the Department:

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

      i. **Documentation of Ownership or Lease Agreement.** The Charter School shall obtain documentation of ownership or the lease agreement for the new facility that will house all or part of the Charter School.

      ii. **Certificate of Occupancy.** The Charter School shall obtain a Certificate of Occupancy for the facility in which all or part of Charter School shall be located.

      iii. **Emergency Safety Plan.** The Charter School shall prepare a safety plan in accordance with O.C.G.A. § 20-2-1185. This plan shall be submitted to the local emergency management agency and local law enforcement agency for approval.

22. **Transportation.** To the extent the Charter School offers a transportation program for its students, the Charter School shall ensure that the program complies with all applicable laws governing transportation of students.

23. **Food Services.** To the extent the Charter School offers a food service program, the Charter School shall ensure that the program complies with all applicable laws governing food service for students.

24. **Termination of Charter.**

    a. **Termination Grounds.** The Charter School may be terminated based on any of the following grounds:

      i. The Charter School's failure to timely implement the interventions set forth or approved by the Department;

      ii. The Charter School's failure to adhere to any material term of this Charter, including but not limited to, failure to achieve the performance goals set forth in Section 8 above and **Appendix A**;

      iii. The Charter School's failure to comply with any recommendation or direction of the State Board with respect to O.C.G.A. § 20-14-41;

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

    iv.   The Charter School's failure to meet generally accepted standards of fiscal management;

    v.   The Charter School's violation of applicable federal, state, local laws, court orders, or federal or state rules or regulations;

    vi.   The existence of competent substantial evidence that the continued operation of the Charter School would be contrary to the best interests of the students or the community;

    vii.   The Charter School's failure to comply with any provision of the Charter Schools Act;

    viii.   The existence of conditions that place the health, safety, or welfare of students or staff of the Charter School in danger; or

    ix.   The Charter School's failure to disclose material information regarding violations or potential violations of any material term of this Charter or applicable federal, state, or local laws, court orders, or federal or state rules or regulations;

    x.   The Local Board's failure to meet the principles and standards of charter school authorizing on the Local Board's annual evaluation for two consecutive years as required by O.C.G.A. § 20-2-2063.3 and the accompanying State Board Rule(s).

b.   **Requests for Termination.**  The termination of this Charter may be requested by a majority of the parents or guardians of the students enrolled in the Charter School, a majority of the faculty and instructional staff employed at the Charter School, the Local Board, or the State Board following the procedures identified in O.C.G.A. § 20-2-2068 and the accompanying State Board Rule(s).

c.   **Breach of Charter.**  In the event the Charter School fails to comply with any material provision of this Charter, the Department shall notify the Charter School by (1) certified mail, postage prepaid, return receipt requested, (2) a nationally recognized overnight courier, or (3) electronic mail with a confirmation copy sent by first class mail to the chairperson of the Governing Board.  The nature and outcome of the breach shall be recorded in a memo and placed in the Charter School's file maintained by the Department.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

d.   **Termination Procedures.** The parties acknowledge and agree the procedure for terminating this Charter will follow the procedures outlined in State Board Rule 160-4-9-.06(4)(e).

e.   **Distribution of Funds and Assets.** In the event the Charter School ceases operation for any reason, the Charter School and its Governing Board will be responsible for concluding the business and affairs of the Charter School and will cooperate with the Local Board and State Board to the extent necessary to provide an orderly return of the students to their local school. Any public surplus remaining at the time the Charter School ceases operation shall be remitted to the Local Board or State Board, whichever is appropriate, within 30 days of ceasing operations. Any furniture and equipment purchased with public funds shall be delivered to the Local Board or State Board, whichever is appropriate, within 30 days of ceasing operations. Neither the Local Board nor the State Board shall be responsible for the Charter School's unpaid debts in the event the Charter School does not have sufficient funds to pay all of its debts at the time it ceases operation. The date by which public surplus funds, furniture, and equipment shall be remitted to the Local Board or State Board under this Section may be extended for a reasonable period of time as determined by the Local Board or State Board; provided that, within thirty (30) days of the Charter School ceasing operations, the Governing Board makes a written request for an extension of time that describes the basis for the request.

25. **Pre-Opening Suspension.** In the event the Charter School fails to comply with any material provision set forth in this Charter that requires compliance prior to the opening of any new site and/or facility for the Charter School, the opening may be suspended until a time after all requirements have been fulfilled by the Charter School as determined by the Local Board and Department. Suspension will prohibit the extension of the Charter term set forth above in Section 2.

26. **Renewal, Non-Renewal, and Probationary Term.**

a.   **Renewal.** The Charter may be renewed by agreement of the parties following the procedures set forth in the Charter Schools Act and accompanying State Board Rule(s).

b.   **Non-Renewal.** Any grounds for termination stated in Section 24(a) above also may be grounds for non-renewal. In addition, the State Board or Local Board may elect

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

not to renew the Charter if the petition for renewal does not comply with the Charter Schools Act and the rules, regulations, policies, and procedures promulgated in accordance with the Charter Schools Act or if the State Board or Local Board deems that the Charter School is no longer in the public interest.

c. **Probationary Term.** In the event the Charter School fails to comply with any provision of this Charter, the Local Board may elect to grant a renewal for a probationary term, pending approval by the State Board of Education, within which term the Charter School must come into compliance satisfactory to the State Board and Local Board.

27. **Temporary Extension.** At the discretion of the Local Board and State Board, a Charter may be extended for a grace period not exceeding sixty (60) days. A temporary extension must be in writing and mutually agreed upon by the parties to this Charter.

28. **Amendments to the Charter.** Any term of this Charter may be amended in writing upon the approval of the Local Board, the State Board, and a majority of the Governing Board of the Charter School. Any proposed amendment shall be made in accordance with State Board Rule 160-4-9-.06 *et seq.*

29. **Mandatory Training.** The State Board reserves the right to require the Charter School to attend any training related to the responsibilities of a Charter School.

30. **Indemnification.**

a. The Petitioner and the Charter School agree to indemnify, defend and hold harmless the Local Board, the School District, the Department, and the State Board, their officials, officers, employees, agents, volunteers, and assigns (all of whom hereinafter may collectively be referred to as "Indemnitees"), from any and all claims, demands, suits, actions, legal or administrative proceedings, losses, liabilities, costs, interest, and damages of every kind and description, including any attorneys' fees and/or litigation and investigative expenses, for bodily injury, personal injury, (including, but not limited to, the Charter School's employees), patent, copyright, or infringement on any intellectual property rights, or loss or destruction of property (including loss of use, damage or destruction of Indemnitee owned property) to the extent that any such claim or suit was caused by, arose out of, or contributed to, in whole or in part, by reason of any act, omission, professional error, fault, mistake, or negligence whether active, passive or imputed, of the Charter School or Petitioner, their employees, agents,

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

representatives, or subcontractors, their employees, agents, or representatives in connection with or incidental to their performance of this Charter regardless of whether such liability, claim, damage, loss, cost or expense is caused in part by an Indemnitee.

b. The Charter School and Petitioner shall be excused from their indemnification obligations above: (a) If the claims, demands, suits, actions, proceedings, losses, liabilities arise solely and exclusively out of the negligence of the Indemnitee seeking indemnification; or (b) If the Indemnitee fails to (i) provide written notice of the third party claim or suit within a reasonable time, (ii) cooperate with reasonable requests of the Charter School or Petitioner related to the indemnification; or (iii) assist the Charter School or Petitioner with the defense of such claim or suit.

c. The Charter School's and Petitioner's obligations to indemnify any Indemnitee shall survive the completion, expiration, or termination of this Agreement for any reason.

31. **Non-Agency.** The parties expressly acknowledge and agree that the Charter School is not acting as the agent of the Local Board, the State Board, or the Department except as required by law or this Charter. The Charter School acknowledges that it is without authority to, and will not, extend the faith and credit of the Local Board, the State Board, or the Department to any third party.

32. **Delegation.** The parties acknowledge and agree that the functions and powers of each party may be exercised only by each party and may not be delegated to a third party without written agreement by the parties.

33. **Application of Amended Law.** This Charter is subject to applicable federal and state laws, rules, regulations, and state accountability requirements. Any amendments to laws, rules, regulations, or state accountability requirements cited herein will result in the correlative and immediate modification of this Agreement without the necessity for executing a written amendment.

34. **Headings.** Section headings are for convenient reference only and are not part of the Charter or in any way to enlarge or limit any Section's contents.

35. **Non-Waiver.** No waiver of any breach of this Charter shall be held as waiver of any other or subsequent breach.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

36. **Severability.** If any provision of this Charter is determined to be unenforceable or invalid for any reason, the remainder of the Charter shall remain in full force and effect.

37. **Contradicting or Conflicting Provisions.** If any provision of the Charter is determined to contradict or conflict with any other provision of the Charter, the contradiction or conflict shall be resolved in favor of the broad flexibility guaranteed pursuant to O.C.G.A. § 20-2-2065 *et seq.*

38. **Governing Law and Venue.** This Charter shall be governed by, subject to, and construed under the laws of the State of Georgia. Any action brought by one party to this Charter against another party shall be brought in the Superior Court of Fulton County.

39. **Multi-Year Contracts Beyond Charter Term.** The Charter School shall not enter into a multi-year contract that extends beyond the length of the charter term for the acquisition of goods, materials, services, or supplies unless such contract contains the following provisions:

    a. The contract shall terminate absolutely and without further obligation on the part of the Charter School at the close of the fiscal year in which the charter term concludes and at the close of each succeeding charter term for which the contract may be renewed;

    b. The contract may be renewed only by a positive action taken by the Charter School; and

    c. The contract shall state the total payment obligation of the Charter School for the original contract term and each renewal shall state the total payment obligation that may be incurred in each subsequent charter term, if renewed.

    This section shall not apply to multi-year contracts to lease or purchase facilities, vehicles, or capital equipment.

40. **Entire Agreement.** This Charter sets forth the entire agreement among the Petitioner, the Local Board, and the State Board with respect to the subject matter of this Charter. All prior contracts, representations, statements, negotiations, understandings, and undertakings between the Petitioner, the Local Board, and the State Board are superseded by this Charter. The petition submitted to the Local Board and the State Board serves only as the formal application for the Charter School and does not constitute a contract between the Local Board, the State Board, and the Petitioner.

**CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY**

41. **Counterparts.**  The Parties agree that this Agreement may be executed in one or more counterparts which, when taken together, shall constitute one Agreement.  All faxed or scanned and emailed counterpart signature copies of this Agreement shall be as effective and binding as original signatures.


_____          _____

Chairperson,                                                                     (Date)
GEORGIA STATE BOARD OF EDUCATION


_____          _____

Authorized Representative,                                                (Date)
 FOUNDING FOURTEEN, INC.


_____          _____

Board President,                                                              (Date)
FULTON COUNTY BOARD OF EDUCATION

## 5 Year Renewal Appendix A – Charter Accountability and Consequences

### ACCOUNTABILITY REQUIREMENTS

The Local Board and State Board shall hold the Charter School accountable for the full performance of the performance framework standards listed below.  In the event that data are not available to make a determination regarding one of the goals below, the Department and the Local Board shall use the remaining goals to decide if the school has met its accountability requirements.

The Charter School will receive a report on its performance on each of the standards below from the Georgia Department of Education as they become available. The report will include any interventions or consequences that need to be implemented by the Charter School.

*Note: Accountability for the last year of the charter contract term will occur during the first year of a renewal charter, if granted.*

I. **ACADEMIC PERFORMANCE STANDARDS**
   **Goal 1:** During each year of its charter contract term the Charter School shall meet at least one of the following performance standards.

   **First Look – School Performance Gap Closure.** The primary academic outcome Georgia seeks from its local charter schools is that they *increase their College and Career Readiness Performance Index (CCRPI) score each year until they reach 100.* The performance standards that measure CCRPI progress include growth in CCRPI itself and in its two major academic components, Content Mastery and Progress Score. The Department's "First Look" at annual charter school performance is to see if the school has met the standard for any of the following three CCRPI gap-closing measures.

   a. Increase its CCRPI score by at least 4% of the gap between 100 and the school's previous year CCRPI score in each grade band served (elementary, middle, and/or high school);

      **OR**

   b. Increase its CCRPI Content Mastery score by at least 10% of the gap between 100 and its previous year CCRPI Content Mastery score in each grade band served (elementary, middle, and/or high school);

      **OR**

   c. Increase its CCRPI Progress score by at least 10% of the gap between 100 and its previous year CCRPI Progress score in each grade band served (elementary, middle, and/or high school).

**APPENDIX A – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)**

**Second Look – School-District Comparisons.**  If a charter school does not achieve at least one of the "First Look" School Performance Gap Closure standards, consideration will be given for achieving one of the "Second Look" School-District Comparison standards. The secondary academic outcome Georgia seeks from its local charter schools is that **they *do better than the district schools to which their students would otherwise be zoned.*** Performance standards include whether the charter school exceeds the CCRPI score (CCRPI, Content Mastery, or Progress) of their authorizing district or of the average of the three district schools to which a majority of the charter school's students would otherwise be zoned ("majority comparison schools").

    a.  Exceed the CCRPI score of the authorizing school district or of the district majority comparison schools;

        **OR**

    b.  Exceed the CCRPI Content Mastery scores of the authorizing school district or the district majority comparison schools;

        **OR**

    c.  Exceed the CCRPI Progress scores of the authorizing school district or of the district majority comparison schools.

**Goal 2:** During each year of its charter contract term, the school will perform at the level required to stay off the list of Targeted Support and Improvement (TSI) and Comprehensive Support and Improvement (CSI) schools published annually by GaDOE.

## II.  SCHOOL CLIMATE PERFORMANCE STANDARDS

**Goal 3:** The Charter School shall achieve and maintain a School Climate Star Rating of 4 or more stars during its Charter term.

## III.  FINANCIAL PERFORMANCE STANDARDS

**Goal 4:** During each year of its charter contract term, the Charter School shall achieve all six of the following financial performance standards.

    a.  Not be in default of loan or bond covenant(s) and not be delinquent with debt services payment;

        **AND**

    b.  Achieve a Liquidity Ratio that is greater than 0 and less than one as measured by (current assets less current liabilities) divided by total expenses;

APPENDIX A – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)

**AND**

c. Achieve a Current Ratio (Working Capital Ratio) that is greater than 1.0 and one-year trend is positive;

**AND**

d. Possess a Debt to Asset Ratio that is less than 95 percent;

**AND**

e. Unrestricted Days Cash (Total Expenses/365) is greater than 45 days and the one-year trend is positive;

**AND**

f. Achieve a sustainability ratio indicating at least a 45-day reserve as measured  by unrestricted assets divided by average monthly expenses;

**AND**

g. The Charter School received and submitted to GaDOE by November 1 an annual independent audit with an opinion of the auditor regarding the accuracy of the Charter School's accounting records, financial position, change in financial position, compliance with rules of various governing entities, including GAGAS (Generally Accepted Government Auditing Standards, i.e. the "Yellow Book") or, for those schools not yet converted to GAGAS, compliance with GAAP (Generally Accepted Accounting Principles) that includes:
   - An unmodified audit opinion;
   - An audit devoid of significant findings and conditions, material weaknesses, or significant internal control weaknesses;
   - An audit that does not include a going concern disclosure in the notes or an explanatory paragraph; and
   - No other adverse statement indicating noncompliance with applicable laws, rules, regulations, and provisions of the charter contract relating to financial management and oversight.

## IV.   GOVERNANCE PERFORMANCE STANDARDS

**Goal 5:** During each year of its charter contract term, the Charter School shall achieve all six of the following governance performance standards.

a. All Governing Board members complied with all applicable open governance requirements, including the Georgia Open Meetings Act and the Georgia Open Records Act;

**AND**

b. All Governing Board members attended all required training, including all training required for any new Governing Board members;

**AND**

c. The Board met a minimum of seven (7) times;

**AND**

d. The Charter School's leadership and Governing Board successfully implemented the Teacher and Leader Keys Effectiveness System as verified by GaDOE;

**AND**

e. All Governing Board members acted in accordance with the *Standards for Effective Governance of a Georgia Non-Profit School Governing Board*;

**AND**

f. The Board reflects the sociodemographic diversity of the community it serves;

**AND**

g. All governing board members have a current background check during each academic year of the charter contract.

**Goal 6:** By the last year of its charter contract term, the Charter School shall implement all Essential or Innovative Features as defined in Section 5 of the charter in all material respects.

## V.   LEGAL COMPLIANCE PERFORMANCE STANDARDS

**Goal 7:**   During each year of its charter contract term, the Charter School shall implement all legal requirements included in federal and state law, rules, and regulations and in its Charter.

**Goal 8:** The Charter School shall not do anything which results in GaDOE or the authorizing district(s) placing the Charter School on probation more than two times in a single school year (July 1 to June 30).

**Goal 9:** The Charter School shall not do anything which results in GaDOE or the authorizing district(s) placing it on probation more than three times during its charter contract term.

**APPENDIX A – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)**

**ACCOUNTABILITY MONITORING AND REVIEW**

The Local Board and State Board shall hold the Charter School accountable for the full performance of the goals outlined in this Charter.

The Local Board of Education is responsible for the annual monitoring and review of the Charter School for full performance of this Charter.

The Georgia Department of Education will monitor and review the Charter School for full performance of this Charter.

The State Board shall hold the Local Board of Education accountable for effective authorizing practices in support of this Charter.

The Georgia Department of Education will monitor and review the Local Board of Education for effective authorizing practices.

**CONSEQUENCES**

Failure to meet the goals outlined in this Charter may result in consequences up to and including intervention, probation, termination, or recommendation for nonrenewal.

**APPENDIX B – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)**

**Introduction:** Locally-approved charter school non-profit governing boards must have decision-making authority in all areas, including personnel decisions, financial decisions and resource allocation, curriculum and instruction, establishing and monitoring the achievement of school improvement goals, and school operations. The columns in the chart below describe the authority that must be exercised by a charter school's governing board, management, and school district respectively. There are also columns provided for other common charter school partners (if applicable).

## Locally-Approved Charter School Partners Roles and Responsibilities Chart- Fulton Academy of Science and Technology

| Personnel Decisions | Charter School Nonprofit Governing Board | Charter School Management | Local School District* | Post-Secondary Education Partner(s) (if applicable) | Business Partner(s) (if applicable) | Community Partner(s) (if applicable) |
|---|---|---|---|---|---|---|
| Select, retain, transfer, promote, demote, and/or terminate the principal or school leader | ✓ | | | | | |
| Evaluate the principal or school leader (LKES) | ✓ | | | | | |
| Select, retain, transfer, promote, demote, and/or terminate faculty and all other staff | | ✓ | | | | |
| Evaluate the teachers (TKES) and all other staff | | ✓ | | | | |
| Determine whether teacher certification will be required | ✓ | ✓ | | | | |
| Plan professional development for staff | | ✓ | | | | |

| Financial Decisions and Resource Allocation | Charter School Nonprofit Governing Board | Charter School Management | Local School District* | Post-Secondary Education Partner(s) (if applicable) | Business Partner(s) (if applicable) | Community Partner(s) (if applicable) |
|---|---|---|---|---|---|---|
| Determine number and type of personnel positions budgeted, including qualifications, roles, and job descriptions | ✓ | ✓ | | | | |
| Establish compensation model including salary ranges, bonus or performance-based increases, supplements, and personal and professional leave, health, dental, disability, and other benefit plans offered (other than TRS, which is mandated) for all employees | ✓ | ✓ | | | | |
| Set budget priorities with funds received that are aligned with school improvement plan, including personnel, curriculum, supply, equipment, maintenance, operations, and all other costs | ✓ | ✓ | | | | |
| Ensure school receives all per-pupil and other funding to which it is entitled by agreement with the local district (its fiscal agent) | ✓ | ✓ | ✓ | | | |
| Raise additional funds through fundraising efforts | ✓ | ✓ | | | | |

**APPENDIX B – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)**

## Locally-Approved Charter School Partners Roles and Responsibilities Chart- Fulton Academy of Science and Technology

| | Charter School Nonprofit Governing Board | Charter School Management | Local School District* | Post-Secondary Education Partner(s) (if applicable) | Business Partner(s) (if applicable) | Community Partner(s) (if applicable) |
|---|---|---|---|---|---|---|
| Exercise discretion over expenditure for all state and local funds and, as permissible, federal funds | | ✓ | | | | |
| Final school budget approval | ✓ | | | | | |
| Establish financial policies and standard operating procedures | ✓ | | | | | |
| Maintain a reserve fund | ✓ | | | | | |
| Determine facility uses | ✓ | ✓ | | | | |
| Ensure sound fiscal management and monitor budget implementation | ✓ | ✓ | | | | |

| **Curriculum and Instruction** | Charter School Nonprofit Governing Board | Charter School Management | Local School District* | Post-Secondary Education Partner(s) (if applicable) | Business Partner(s) (if applicable) | Community Partner(s) (if applicable) |
|---|---|---|---|---|---|---|
| Recommend/Adopt instructional delivery model | ✓ | ✓ | | | | |
| Recommend/Adopt curriculum, including any changes in curriculum as needed to improve student achievement | ✓ | ✓ | | | | |
| Recommend/Adopt courses and programs to offer | ✓ | ✓ | | | | |
| Recommend/Adopt textbooks, technology, and instructional materials | ✓ | ✓ | | | | |
| Recommend/Establish additional graduation requirements | ✓ | ✓ | | | | |
| Recommend/Adopt course and credit requirements, including technology and physical education skill requirements | ✓ | ✓ | | | | |
| Recommend/Adopt seat time requirements | ✓ | ✓ | | | | |
| Recommend/Adopt opportunities for student acceleration/remediation | ✓ | ✓ | | | | |
| Create or modify Career Pathway curricula | ✓ | ✓ | | | | |
| Choose dual enrollment options | ✓ | ✓ | | | | |
| Choose credit recovery options | ✓ | ✓ | | | | |
| Utilize online learning platforms (e.g., Georgia Virtual School) | | ✓ | | | | |
| Establish additional mastery level requirements for performance | ✓ | ✓ | | | | |
| Select additional formative and/or summative assessments to determine student levels of mastery and growth | ✓ | ✓ | | | | |

| **Curriculum and Instruction (continued)** | Charter School Nonprofit Governing Board | Charter School Management | Local School District* | Post-Secondary Education Partner(s) (if applicable) | Business Partner(s) (if applicable) | Community Partner(s) (if applicable) |
|---|---|---|---|---|---|---|
| Establish delivery model, scheduling, staffing, and supplemental services for English Learner (EL), special education (SPED), gifted, and remedial programs | ✓ | ✓ | | | | |

**APPENDIX B – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)**

### Locally-Approved Charter School Partners Roles and Responsibilities Chart- Fulton Academy of Science and Technology

| | Charter School Nonprofit Governing Board | Charter School Management | Local School District* | Post-Secondary Education Partner(s) (if applicable) | Business Partner(s) (if applicable) | Community Partner(s) (if applicable) |
|---|---|---|---|---|---|---|
| Establish curriculum maps, pacing charts, and methods for monitoring the curriculum | | ✓ | | | | |
| Establish lesson plan requirements for teachers | | ✓ | | | | |
| Establish placement and promotion criteria | ✓ | ✓ | | | | |
| Set grading and reporting policies, plans, process, schedules, and formats | ✓ | ✓ | | | | |
| **Establishing and Monitoring the Achievement of School Improvement Goals** | **Charter School Nonprofit Governing Board** | **Charter School Management** | **Local School District*** | **Post-Secondary Education Partner(s) (if applicable)** | **Business Partner(s) (if applicable)** | **Community Partner(s) (if applicable)** |
| Complete self-assessment based on Georgia School Performance Standards | | ✓ | | | | |
| Develop actions, strategies, and interventions with faculty and staff (i.e., school improvement plan) | | ✓ | | | | |
| Set a timeline for implementing school improvement timeline | ✓ | ✓ | | | | |
| Set a budget for implementing school improvement timeline | ✓ | ✓ | | | | |
| Recommend/Approve school improvement plan and provide oversight of its implementation | ✓ | ✓ | | | | |
| Hold principal or school leader accountable for school improvement plan implementation and timeline | ✓ | | | | | |
| Hold faculty and staff accountable for school improvement plan implementation and timeline | | ✓ | | | | |
| Evaluate success of school improvement plan and recommend/make revisions as needed | ✓ | ✓ | | | | |
| Regularly communicate student and school performance data to all stakeholders | | ✓ | | | | |
| **School Operations** | **Charter School Nonprofit Governing Board** | **Charter School Management** | **Local School District*** | **Post-Secondary Education Partner(s) (if applicable)** | **Business Partner(s) (if applicable)** | **Community Partner(s) (if applicable)** |
| Provide input into school operations that are consistent with school improvement and charter goals, including establishing human resources policies, procedures, and | ✓ | ✓ | | | | |
| Establish work schedules of faculty and staff (e.g., hours per day, days per year, | | ✓ | | | | |
| Establish experience, training, and other matters related to substitute teachers | | ✓ | | | | |
| Recommend/Set school daily, weekly, and annual school calendar and class schedules, including length of school year, holidays, early release days, etc. | ✓ | ✓ | | | | |
| Recommend/Approve professional development vendors and resources | ✓ | ✓ | | | | |
| Manage day-to-day human resources | | ✓ | | | | |

**APPENDIX B** - Page **3** of **4**

**APPENDIX B – CHARTER FOR FULTON ACADEMY OF SCIENCE AND TECHNOLOGY (FAST)**

## Locally-Approved Charter School Partners Roles and Responsibilities Chart- Fulton Academy of Science and Technology

| | | | | | | |
|---|---|---|---|---|---|---|
| HR processing, including employment contracts and benefits administration | | ✓ | | | | |
| Recommend/Select co-curricular and extracurricular activities | ✓ | ✓ | | | | |
| Establish after-school and Saturday programs as needed | ✓ | ✓ | | | | |
| Set enrichment and/or advisory periods as needed | | ✓ | | | | |
| Establish field trips, including locations and date | | ✓ | | | | |
| Set class size and student-teacher ratios | ✓ | ✓ | | | | |
| Set staff-to-student ratios for non-class times (e.g., lunch, recess, specials, transitions) | ✓ | ✓ | | | | |
| Establish school partnerships for school growth | ✓ | ✓ | | | | |
| Develop communications strategies, including stakeholder surveys, parent involvement, volunteer support | ✓ | ✓ | | | | |
| Select/Approve vendors aligned with school needs | ✓ | ✓ | | | | |
| Manage transportation decisions, including authority to contract for transportation service | ✓ | ✓ | | | | |
| Select information systems (e.g., Student Information System, financial information systems) | ✓ | ✓ | | | | |
| Manage the facility or facilities that are owned and operated by the school system for use by the charter school | ✓ | ✓ | | | | |
| Approve/manage the food service agreement with a vendor or the school system | ✓ | ✓ | | | | |
| Establish school size | ✓ | ✓ | | | | |
| Establish school grade span different from typical primary, elementary, middle, and high public school models (e.g., 4-8, K-8, K-12) | ✓ | ✓ | | | | |
| Establish attendance policies | ✓ | ✓ | | | | |
| Establish student code of conduct and behavior policies, plans, processes, and formats | ✓ | ✓ | | | | |
| Adopt and implement a marketing plan that is inclusive in its recruitment and retention of all students | ✓ | ✓ | | | | |
| Ensure access to support to address the physical, social, financial, and emotional needs of students in the school | ✓ | ✓ | | | | |

*The LBOE retains its constitutional authority