## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ABO PHARMACEUTICALS,<br><br>        Plaintiff,<br><br>v.<br><br>BENNETT INTERNATIONAL TRANSPORT, LLC, FEDERAL EXPRESS CORPORATION, FEDEX EXPRESS, and XYZ CORPORATION(s),<br><br>        Defendants. | Civil Action File No.: _____ |

## COMPLAINT

COMES NOW Plaintiff, ABO Pharmaceuticals ("**ABO**"), by and through the undersigned counsel, and hereby submits its Complaint against Defendants Bennett International Transport, LLC ("**Bennett**"), Federal Express Corporation and FedEx Express (collectively referred to as "**FedEx**") as follows:

## PARTIES

1.      Plaintiff ABO Pharmaceuticals is a California corporation with its main office in the State of California. ABO was the owner of the subject cargo at all times relevant to this Complaint.

2.     Upon information and belief, Defendant Bennett International Transport, LLC ("Bennett") is a limited liability company incorporated under the laws of Georgia, with its principal place of business in Henry County, Georgia. Bennett is now and at all times relevant was an entity engaged in business as a carrier, customs broker, indirect carrier or freight forwarder for hire in Henry County, Georgia.

3.     Upon information and belief, Defendant Federal Express Corporation is a corporation incorporated under the laws of Delaware, with its principal place of business in Tennessee. Federal Express Corporation is now and at all times relevant was an entity engaged in business as a carrier for hire in Mexico and the United States of America, including Henry County, Georgia. Plaintiff is informed and believes and on the basis of that information and belief alleges that Federal Express Corporation operates multiple daily routes to and from this Judicial District.

4.     Upon information and belief, Defendant FedEx Express is a corporation incorporated under the laws of Delaware, with its principal place of business in Tennessee. FedEx Express is now and at all times relevant was an entity engaged in business as a carrier for hire in Mexico and the United States of America, including Henry County, Georgia. Plaintiff is informed and believes and on the basis of that

information and belief alleges that FedEx Express operates multiple daily routes to and from this Judicial District.

5.      Upon information and belief, Bennett arranged for the loading, delivery and transshipment of the subject cargo for purposes of its carriage by air.

6.      Upon information and belief, Federal Express Corporation and FedEx Express performed the carriage by air of the subject cargo.

7.      XYZ Corporation(s) are unknown corporations, business entities, or other persons, named by Plaintiff in an abundance of caution, as involved in the transportation of and damage of the subject cargo, should the proper entity be mistakenly identified, or in the event either of a change in ownership since that time, unknown to the Plaintiff.

## JURISDICTION AND VENUE

8.      Plaintiff's cargo damage claims are governed by the Convention for the Unification of Certain Rules for International Carriage, done at Montreal on May 28, 1999 ("Montreal Convention"), ICAO Doc. No. 9740 (entered into force on November 4, 2003, reprinted in S. Treaty Doc. No. 106–45). *See* 1999 WL 33292734. Thus, the Court has subject-matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331.

9.    In the alternative, Plaintiff's cargo damage claims are governed by The Carmack Amendment to the Interstate Commerce Act. *See* 49 U.S.C. § 14706(a)(1). Thus, the Court has subject-matter jurisdiction over Plaintiff's claims under 49 U.S.C. § 14706(d)(1).

10.    The Court has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. §1367(a).

11.    Venue is proper in this Court pursuant to Article 33 of the Montreal Convention in that Bennett is domiciled and has its principal place of business in this Judicial District. In addition, venue is proper pursuant to 28 U.S.C. §1391(b)(1) because Bennett resides in this Judicial District within the meaning of 28 U.S.C. §1391(c)(2) district.

12.    In addition, venue is proper pursuant to 28 U.S.C. §1391(b)(1) because FedEx resides in this Judicial District within the meaning of 28 U.S.C. §1391(c)(2).

13.    In the alternative, venue is proper forum because this is the judicial district through which Bennett operates as this is where Bennett is domiciled and has its principal place of business in this Judicial District. *See* 49 U.S.C. § 14706(d)(1).

## FACTUAL BACKGROUND

### A.    Carriage by air.

14.    On or about June 15, 2021, the cargo in question left the manufacturer's

facility in Mexico City for carriage by air to John F. Kennedy Airport in New York City for onward shipment to Johannesburg, South Africa.

15.     The cargo contained Human Plasma Fractional Paste (**"Fractional Paste" or "cargo"**) which is used to create various pharmaceuticals and other life-saving treatments related to injury, congenital defects, and immunological disorders.

16.     The shelf life of the Fractional Paste is 3 years from the date of manufacture if it is stored at -25 degrees Celsius. The cargo would not have expired until September 2023 if properly stored at the correct temperature.

17.     The Fractional Paste (totaling 2,440.28 KG) was stored in small units of plastic bags. The plastic bags were placed inside individual U-line fiber drums (**"Drums"**) that were then stacked and placed into 4 pallets. Each pallet was packed with 18 blocks of dry ice (totaling between 80.95 and 84.70 KG), covered with shrink wrap material and insulated with a thermal blanket cover. The total weight of the Fractional Paste with dry ice was approximately 3,400 KG.

18.     The Fractional Paste was packaged pursuant to the standard operating procedures and logistic protocols of the manufacturer, GenBio S.A. de C.V. (**"GenBio"**).

19.     ABO hired indirect carrier, Bennett, to handle the international transportation of the Fractional Paste from the manufacturer of the Fractional Paste,

GenBio, in Mexico City, Mexico to the buyer of the Fractional Paste, National Bioproducts Institute (**"NBI"**), in Johannesburg, South Africa.

20.     ABO hired Bennett because it represented that it was experienced in "Cold Chain Solutions" and that it had prior and long-term extensive experience handling plasma/pharmaceutical intermediates.

21.     Bennett retained a contracting carrier, Able Freight Services, LLC (**"Able"**), to package and transport the Fractional Paste from the GenBio loading dock in Chalco de Díaz Covarrubias, near Mexico City, Mexico, so that it could be tendered to FedEx in Toluca, Mexico for air transportation to JFK Airport, Queens, New York.

22.     Bennett retained a contracting carrier, FedEx, to transport the Fractional Paste from Mexico City, Mexico (Toluca) to New York City, New York utilizing FedEx "International Priority Freight" service. The Fractional Paste was supposed to be delivered within 24 hours after FedEx's receipt of the cargo.  The transportation time from Mexico City to New York City actually took five days.

23.     Bennett retained a contracting carrier and broker, Contract Freighters, Inc. **("CFI"),** to accept the Fractional Paste at the JFK Airport in New York City, repackage the Fractional Paste with additional dry ice, and release the Fractional Paste to board its flight to Johannesburg, South Africa.

24.    At all times mentioned in this Complaint, Able, FedEx and CFI were agents of Bennett who acted within the scope of their retention by Bennett, and/or vice versa, or were otherwise engaged in a joint venture.

25.    Specifically, the acts and omissions of Able, FedEx and CFI are deemed to be also those of Bennett as the contracting carrier.

26.    Prior to the international transportation, ABO made a special declaration of the value of the Fractional Paste to Bennett. Bennett had actual knowledge of the Fractional Paste's value prior to receiving possession of the cargo as ABO purchased "spoilage insurance" with an insured value of $820,147.36.

27.    Prior to the international transportation, ABO made a special declaration of the value of the Fractional Paste to FedEx.

28.    Prior to the international transportation, ABO informed Bennett the Fractional Paste had to remain at a temperature below 25 degrees Celsius at all times during the transportation. Bennett charged ABO additional monies due to the temperature requirement of the cargo during transportation.

29.    Prior to the international transportation, ABO provided Bennett with a copy of GenBio's Proforma commercial invoice that states, "TEMPERATURE TO BE MANAGED -25ºC or below."

30.    Prior to the international transportation, Bennett informed FedEx the

Fractional Paste had to remain at a temperature below 25 degrees Celsius at all times during the transportation. FedEx charged ABO additional monies due to the temperature requirement of the cargo during transportation.

31.     Prior to the international transportation, Bennett provided FedEx with a copy of GenBio's Packing List that states, "TEMPERATURE TO BE MANAGED -25ºC or below."

32.     Prior to the international transportation, FedEx confirmed it understood the temperature requirements of the Fractional Paste, that it would check the temperature at various touchpoints and that it would re-ice the Fractional Paste if needed.

33.     On June 14, 2021, Able created FedEx air waybills for the Fractional Paste for its transportation from Mexico City to New York City. The FedEx air waybill identified the "Customs Value" of the caste as $810,573.40. The FedEx air waybill also identified the cargo as "Plasma."

34.     Able provided the Drums to GenBio in Mexico City wherein GenBio palletized the Fractional Paste.

35.     Able then picked up the cargo from GenBio and brought it back to its warehouse in Mexico City on June 15, 2021.

36.     Able understood and informed FedEx about the need to maintain the

temperature of the Fractional Paste.

37.     Able transported the Fractional Paste to the Toluca airport in Mexico City on June 15, 2021 on or around 1:00 p.m. giving FedEx possession of the cargo at that time. Upon information and belief, the Fractional Paste passed customs at 6:34 p.m. on June 15, 2021.

38.     Before June 15, 2021, Bennett and Able were unaware FedEx required the dry ice to be contained within cartons before FedEx would transport the Fractional Paste.

39.     On June 15, 2021, FedEx expressed concerns regarding the evaporating dry ice from the pallets so Able repacked the Fractional Paste with additional dry ice. This caused the cargo to stay in Mexico for an additional time while Able re-built the pallets to contain the loose dry ice.

40.     The Fractional Paste did not leave the Toluca airport on June 15, 2021. Emails between Bennett, Able and FedEx confirm they understood the Fractional Paste needed to remain frozen with the use of dry ice to keep the Fractional Paste at the required temperature.

41.     On June 16, 2021 at 9:43 p.m., FedEx transported the Fractional Paste from the Toluca airport to its hub in Memphis, Tennessee via aircraft. The Fractional Paste arrived at FedEx's hub in Memphis, Tennessee on June 17, 2021 at 12:30 a.m.

42.     The Fractional Paste was subject to a foreseeable regulatory hold at customs in Memphis, Tennessee from 1:01 a.m. until 5:23 p.m. on June 17, 2021. During that time, on information and belief, Bennett never instructed FedEx to re-ice the Fractional Paste or to monitor the temperature.

43.     FedEx never checked the temperature of the Fractional Paste while it was stored in FedEx's facility in Memphis, Tennessee, even though FedEx agreed to do so prior to the international transportation.

44.     FedEx did not re-ice the Fractional Paste while it was stored in FedEx's facility in Memphis, Tennessee, even though FedEx agreed to do so prior to the international transportation.

45.     The Fractional Paste did not depart from Memphis to New York until June 18, 2021 at 3:11 a.m. despite being released from customs ten hours earlier, at 5:23 p.m. on June 17, 2021.

46.     Upon arrival in New York City on June 18, 2021 on or around 6:20 a.m., FedEx would not release the Fractional Paste to CFI, did not check the temperature of the Fractional Paste and did not re-ice the Fractional Paste despite its agreement to do so.

47.     FedEx also had no freezer storage facilities to store the Fractional Paste at the JFK airport.

48.     On June 18, 2021 at 3:36 p.m., Bennett informed FedEx the Fractional Paste needed to be released to be held in an offsite customs bonded warehouse for a flight the following week. Bennett also instructed FedEx to store the Fractional Paste in a freezer.

49.     On June 18, 2021 at 4:17 p.m., FedEx informed Bennett that it could not release the Fractional Paste to CFI because CFI did not provide the correct IE bond information.

50.     On June 19, 2021 at 12:46 a.m., Bennett contacted FedEx regarding its failure to keep the Fractional Paste at the correct temperature. Bennett opined FedEx dropped the ball by failing to release the Fractional Paste to CFI to implement a warehouse transfer. Bennett also informed FedEx it should be prepared for a possible $800,000 claim if the Fractional Paste was ruined due to inadequate temperature regulation.

51.     Upon information and belief, FedEx stored the Fractional Paste in a non-refrigerated warehouse in New York from June 18th until June 21st, 2021. Upon information and belief, the Fractional Paste was not re-packaged with dry ice during this three-day period despite FedEx's agreement to check the temperature at various touch points and re-ice the Fractional Paste, if necessary.

52.     Upon information and belief, CFI eventually obtained possession of the

Fractional Paste and re-packed the cargo with dry ice on June 21, 2021 at 9:51 a.m.

53.     On June 24, 2021, the Fractional Paste was shipped to London, Great Britain on British Airways Flight BA182/24/ BA1057/2. The Fractional Paste then left London on British Airways Flight BA1057/2, arriving in Johannesburg on June 27, 2021 at 7:48 a.m. Both air waybills identified the requirement to keep the Fractional Paste below the set temperature of -25 degrees Celsius.

54.     On June 28, 2021, the Fractional Paste was rejected by the buyer/consignee, NBI, because it exceeded the maximum temperature making it useless for its intended purpose as a raw material for manufacturing intravenous gamma globulin ("IVIG") and albumin per the relevant pharmacopoeia.

55.     On June 28, 2021, ABO placed Bennett on notice of NBI's rejection of the Fractional Paste due to the temperature issues causing a total loss of the cargo.

56.     On June 30, 2021, ABO through Bennett placed FedEx on notice of NBI's rejection of the Fractional Paste due to the temperature issues causing a total loss of the cargo.

57.     On June 30, 2021, Bennett submitted an invoice to ABO in the amount of $79,986.00 for the cargo's voyage. On August 26, 2021, ABO paid the invoice in its entirety.

**B.      The cargo's temperature regulation.**

58.      The Fractional Paste was specifically booked with Bennett as a temperature-controlled shipment. The price charged by Bennett was based on the temperature-maintenance requirements. The temperature of the Fractional Paste was required to stay below -25 degrees Celsius during storage and at no time exceed -5 degrees.

59.      The temperature of the Fractional Paste was constantly monitored and reported per Temptale temperature monitors.

60.      Bennett agreed to maintain the temperature of the Fractional Paste during the transportation from Mexico City to South Africa. Bennett and its agents utterly failed to maintain the required temperature.

61.      FedEx agreed to check the temperature of the Fractional Paste at various touchpoints and re-ice the Fractional Paste, if necessary. FedEx never checked the Fractional Paste's temperature, nor did it ever re-ice the Fractional Paste while it was in FedEx's possession.

62.      The temperature of all four pallets of the Fractional Paste exceeded -5 degrees Celsius on June 18, 2021 (between 2:11 p.m. to 3:44 p.m.) while the cargo was in New York City. The temperature of all four pallets remained above -5 decrees Celsius until some time on June 23, 2021.

63.     All four pallets of the Fractional Paste reached a temperature above -20 degrees Celsius on June 17, 2021 and remained above -20 degrees Celsius until approximately June 24, 2021.

64.     The European Pharmacopoeia (Ph. Eur.) is the primary source of official quality standards for medicines and their ingredients in Europe. Ph. Eur. standards provide a scientific basis for the quality control of a product throughout its life cycle, supporting the pharmaceutical industry and healthcare systems.

65.     Compliance with the Ph. Eur. is required by the South African Health Products Regulatory Authority.

66.     NBI is required to comply with the Ph. Eur. standards as it operates within the jurisdiction of the South African Health Products Regulatory Authority.

67.     NBI's final product dossiers required compliance with the Ph. Eur.

68.     NBI relied upon Ph. Eur. 0853 to identify the standards for transporting the Fractional Paste. The standard states the Fractional Paste is considered suitable if the temperature never exceeds -5 Celsius.

69.     The Fractional Paste reached a temperature of above exceeded -5 degrees Celsius on June 18, 2021 while the cargo was in New York City, making it immediately unsuitable for use at that time.

70.     Due to Bennett's failure to ensure the Fractional Paste remained at the

correct temperature, ABO could not sell the Fractional Paste because it was rejected by NBI when it reached Johannesburg, South Africa.

71.     Due to FedEx's failure to check the temperature of the Fractional Paste and re-ice if necessary, ABO could not sell the Fractional Paste because it was rejected by NBI when it reached Johannesburg, South Africa.

### C.     Insurance coverage.

72.     Bennett advertised it provided spoilage insurance in its communications with ABO.

73.     ABO requested Bennett procure spoilage insurance that would cover any damages that occurred to the Fractional Paste during its transport to South Africa.

74.     Bennett represented to ABO that it purchased spoilage insurance that would cover any damages that occurred to the Fractional Paste during its transport to South Africa.

75.     Bennett charged $4,200 for the spoilage insurance issued to ABO.

76.     ABO relied upon Bennett's representation that the spoilage insurance would cover any damages that that occurred to the Fractional Paste during its transport to South Africa.

77.     RLI Corp. **("RLI")** issued a Certificate of Insurance No. 950910 dated

July 15, 2021 under RLI Marine Policy No. CAR0100371 for Bennett International Transport LLC, covering the Fractional Paste. The certificate of insurance indicated the Fractional Paste had an insured value of USD $820,147.36. The spoilage insurance obtained through Bennett covered transportation of the Fractional Paste from Mexico City to Queens, New York.

78.     Bennett acted as an insurance broker during its actions in procuring spoilage insurance on behalf of ABO from RLI.

79.     ABO tendered a claim to RLI due to the insurance it obtained directly from Bennett. RLI denied ABO's claim because of Bennett's actions and omissions.

**D.     Damages.**

80.     As a result of Bennett's failures, ABO lost $810,000 (the invoice value it paid for the Fractional Paste); storage and transportation costs, and related expenses; disposal fees and investigation-related costs, among others.

81.     As a result of FedEx's failures, ABO lost $810,000 (the invoice value it paid for the Fractional Paste); storage and transportation costs, and related expenses; disposal fees and investigation-related costs, among others.

82.     ABO declared a value of $810,000 of the Fractional Paste when it retained Bennett to transport the Fractional Paste from Mexico City, Mexico to Johannesburg, South Africa.

83.     Bennett declared a value of $810,000 of the Fractional Paste when it retained FedEx to transport the Fractional Paste from Mexico City, Mexico to New York City, New York.

84.     On or about June 30, 2021, ABO submitted a written complaint with Bennett within 14 days of NBI's receipt of the Fractional Paste.

85.     On or about June 30, 2021, ABO through Bennett submitted a written complaint with FedEx within 14 days of NBI's receipt of the Fractional Paste.

86.     ABO submitted a written demand to Bennett on March 20, 2023. To date, Bennett has not made any attempts to resolve the matter, thereby necessitating this Court's involvement.

87.     Plaintiff believes Defendants are acting in bad faith and in contravention with the Montreal Convention's goals of encouraging, and facilitating, informal, expeditious and cost-effective resolution of claims in general and Article 20 (6) of the Montreal Convention in particular.

**E.      Carriage by land.**

88.     In the alternative, if the Court finds the Fractional Paste was damaged during land carriage, Bennett was the carrier paid to transport the Fractional Paste from Mexico to South Africa.

89.     In the alternative, if the Court finds the Fractional Paste was damaged

during land carriage, FedEx was the carrier paid to transport the Fractional Paste from Mexico to South Africa.

90.    Bennett bound itself to transport the Fractional Paste by accepting responsibility for ensuring the delivery of the cargo.

91.    FedEx bound itself to transport the Fractional Paste by accepting responsibility for ensuring the delivery of the cargo.

92.    Bennett received the Fractional Paste in good condition from GenBio in Mexico City.

93.    Bennett's agent, Able, packaged and re-packaged the Fractional Paste while it was stored in Mexico City. Any damage caused by improperly packaging the Fractional Paste was caused by Able.

94.    FedEx received the Fractional Paste in good condition from Able in Mexico City.

95.    During the land carriage, the Fractional Paste was damaged while in Bennett's, Bennett's agent's or FedEx's possession.

96.    During that land carriage, the Fractional Paste was stored at a FedEx warehouse in New York City when the Fractional Paste exceeded a temperature of -5 degrees Celsius thereby making the Fractional Paste unusable.

97.    Bennett's failure to ensure the temperature of the Fractional Paste

during the land carriage caused ABO to suffer damages in the declared amount of $810,000.00, which was the market value of the cargo.

98.   FedEx's failure to check the temperature of the Fractional Paste during the land carriage, and to re-ice the Fractional Paste if necessary, caused ABO to suffer damages in the declared amount of $810,000.00, which was the market value of the cargo.

99.   Bennett's actions in advertising, procuring and selling spoilage insurance from RLI on ABO's behalf was that of an insurance broker.

100.   Bennett's advertising, procuring and selling spoilage insurance to ABO is unrelated to ABO's claim against Bennett for the damage to the Fractional Paste caused during carriage.

101.   Bennett represented to ABO that the spoilage insurance would cover any damage to the Fractional Paste that incurred during its carriage to South Africa.

102.   ABO relied upon Bennett's representation regarding the coverage of the spoilage insurance causing ABO to purchase the spoilage insurance through Bennett.

103.   Bennett purchased spoilage insurance from RLI on ABO's behalf.

104.   ABO tendered a claim to RLI after the Fractional Paste was damaged during the carriage to South Africa.

105.   RLI denied ABO's claim for the damage to the Fractional Paste due to Bennett's failure to properly package the Fractional Paste and for its failure to properly maintain and monitor the temperature of the Fractional Paste.

106.   ABO did not receive any benefits from the spoilage insurance obtained from Bennett due to Bennett's actions and omissions.

107.   ABO has been damaged due to its inability to recover any insurance coverage for the damage caused to the Fractional Paste.

108.   ABO has been damaged due to Bennett's failure to issue a refund in the amount of $79,986.00, the amount ABO paid for the cargo's voyage.

### FIRST CAUSE OF ACTION
### (Air Carrier Liability Pursuant To Montreal Convention: Cargo Damage)
### (All Defendants)

109.   Plaintiff reasserts and re-alleges Paragraphs 1 through 108 as though fully set forth hereto.

110.   The Fractional Paste was delivered for carriage by air in good condition.

111.   Bennett and/or its agents failed to properly package the Fractional Paste before and during its transportation.

112.   Bennett, Bennett's agents and FedEx failed to properly maintain and monitor the temperature of the Fractional Paste before and during its transportation.

113.   The Fractional Paste was damaged during carriage by air, thereby resulting in a loss in an amount to be proven at trial.

114.   Bennett is responsible for the actions and omissions of its agents.

115.   A timely written complaint was made with Defendants within the meaning of Article 31 of the Montreal Convention.

## SECOND CAUSE OF ACTION
**(Carrier Liability Pursuant to the Carmack Amendment)**
**(All Defendants)**

116.   Plaintiff reasserts and re-alleges Paragraphs 1 through 115 as though fully set forth hereto.

117.   The Fractional Paste was delivered for carriage by land in good condition.

118.   Bennett and/or its agents failed to properly package the Fractional Paste before and during its transportation.

119.   Bennett, Bennett's agents and FedEx failed to properly maintain and monitor the temperature of the Fractional Paste before and during its transportation.

120.   The Fractional Paste was damaged while stored in a warehouse, thereby resulting in a loss in an amount to be proven at trial.

121.   Bennett is responsible for the actions and omissions of its agents.

## THIRD CAUSE OF ACTION
### (Breach of Contract: Insurance)
### (Against Bennett only)

122.   Plaintiff reasserts and re-alleges Paragraphs 1 through 122 as though fully set forth hereto.

123.   Bennett represented it could obtain spoilage insurance that would cover any damage to the Fractional Paste caused during its transportation.

124.   ABO agreed to purchase spoilage insurance through Bennett to cover any damage to the Fractional Paste caused during its transportation.

125.   Plaintiff paid Bennett a monetary amount to obtain spoilage insurance on its behalf.

126.   Bennett was obligated to arrange for adequate spoilage insurance coverage in the event of damage to the Fractional Paste.

127.   Bennett was aware the temperature of ABO's cargo needed to be strictly monitored and maintained when it obtained spoilage insurance on ABO's behalf.

128.   It was foreseeable that the Fractional Paste was at significant risk of being spoiled if Bennett failed to comply with the temperature requirements of transporting it.

129.   Bennett was aware the market value of ABO's cargo was $810,000 at

the time it purchased spoilage insurance on ABO's behalf.

130.    Bennett obtained spoilage insurance from RLI that contained a declared value of $810,000.00.

131.    ABO tendered an insurance claim to RLI after the Fractional Paste was damaged.

132.    RLI denied ABO's claim due to Bennett's actions or omissions in strictly monitoring and maintaining the temperature of the Fractional Paste.

133.    Bennett failed to obtain spoilage insurance that would cover the damage to the Fractional Paste despite its obligation to do so.

134.    Bennett's actions and omissions prevented ABO from recovering the declared value from the spoilage insurance issued by RLI.

135.    Bennett's acts and/or omissions proximately resulted in damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**
**(Against Bennett only)**

136.    Plaintiff reasserts and re-alleges Paragraphs 1 through 135 as though fully set forth hereto.

137.    Bennett represented to ABO that spoilage insurance would cover damages incurred during the transportation of the Fractional Paste.

138.   ABO relied upon Bennett's representation since Bennett represented that it was experienced in "Cold Chain Solutions."

139.   ABO agreed to purchase spoilage insurance through Bennett to cover any damage to the Fractional Paste caused during its transportation.

140.   ABO paid Bennett a monetary amount to obtain spoilage insurance on its behalf.

141.   Bennett was obligated to arrange for adequate spoilage insurance coverage in the event of damage to the Fractional Paste.

142.   Bennett obtained spoilage insurance from RLI that contained a declared value of $810,000.00.

143.   ABO tendered an insurance claim to RLI after the Fractional Paste was damaged.

144.   RLI denied ABO's claim due to Bennett's actions or omissions in strictly monitoring and maintaining the temperature of the Fractional Paste.

145.   Bennett failed to obtain spoilage insurance that would cover the damage to the Fractional Paste despite its obligation to do so.

146.   Bennett's actions and omissions prevented ABO from recovering the declared value from the spoilage insurance issued by RLI.

147.   Bennett's acts and/or omissions proximately resulted in damages in an

amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Negligence)
### (Against Bennett only)

148.   Plaintiff reasserts and re-alleges Paragraphs 1 through 147 as though fully set forth hereto.

149.   ABO agreed to purchase spoilage insurance through Bennett to cover any damage to the Fractional Paste caused during its transportation.

150.   ABO paid Bennett a monetary amount to obtain spoilage insurance on its behalf.

151.   Bennett was obligated to arrange for adequate spoilage insurance coverage in the event of damage to the Fractional Paste.

152.   Bennett was aware the temperature of ABO's cargo needed to be strictly monitored and maintained when it obtained spoilage insurance on ABO's behalf.

153.   It was foreseeable that the Fractional Paste was at significant risk of being spoiled if Bennett failed to comply with the temperature requirements of transporting it.

154.   Bennett obtained spoilage insurance from RLI that contained a declared value of $810,000.00.

155.   ABO tendered an insurance claim to RLI after the Fractional Paste was damaged.

156.   RLI denied ABO's claim due to Bennett's actions or omissions in strictly monitoring and maintaining the temperature of the Fractional Paste.

157.   Bennett's failure in in strictly monitoring and maintaining the temperature of the Fractional Paste caused RLI to deny ABO's claim.

158.   ABO was unable to recover the declared value from the spoilage insurance issued by RLI due to Bennett's actions or omissions in transporting the Fractional Paste.

159.   Bennett's acts and/or omissions proximately resulted in damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment: Insurance Policy)
### (Against Bennett only)

160.   Plaintiff reasserts and re-alleges Paragraphs 1 through 159 as though fully set forth hereto.

161.   ABO agreed to purchase spoilage insurance through Bennett to cover any damage to the Fractional Paste caused during its transportation.

162.   ABO paid Bennett a monetary amount to obtain spoilage insurance on its behalf.

163.   Bennett was obligated to arrange for adequate spoilage insurance coverage in the event of damage to the Fractional Paste.

164.   Bennett was aware the temperature of ABO's cargo needed to be strictly monitored and maintained when it obtained spoilage insurance on ABO's behalf.

165.   It was foreseeable that the Fractional Paste was at significant risk of being spoiled if Bennett failed to comply with the temperature requirements of transporting it.

166.   Bennett obtained spoilage insurance from RLI that contained a declared value of $810,000.00.

167.   ABO tendered an insurance claim to RLI after the Fractional Paste was damaged.

168.   Bennett's actions or omissions in strictly monitoring and maintaining the temperature of the Fractional Paste caused RLI to deny ABO's claim.

169.   Bennett's failure in in strictly monitoring and maintaining the temperature of the Fractional Paste caused RLI to deny ABO's claim.

170.   ABO was unable to recover the declared value from the spoilage insurance issued by RLI due to Bennett's actions or omissions in transporting the Fractional Paste.

171.   Bennett failed to obtain spoilage insurance that covered the damage suffered by the Fractional Paste during its transportation.

172.   Bennett's acts and/or omissions proximately resulted in damages in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**(Unjust Enrichment: Carrier)**
**(Against Bennett only)**

173.   Plaintiff reasserts and re-alleges Paragraphs 1 through 172 as though fully set forth hereto.

174.   ABO hired Bennett to handle the international transportation of the Fractional Paste from Mexico City, Mexico to Johannesburg, South Africa.

175.   ABO informed Bennett the Paste had to be maintained at a certain temperature during its transportation from Mexico City to South Africa.

176.   Bennett was aware the temperature of ABO's cargo needed to be strictly monitored and maintained when it agreed to transport the Paste.

177.   It was foreseeable that the Fractional Paste was at significant risk of being spoiled if Bennett failed to comply with the temperature requirements of transporting it.

178.   Bennett's actions or omissions in strictly monitoring and maintaining the temperature of the Paste caused the Paste to be unsuitable for use.

179.   Bennett's failure in in strictly monitoring and maintaining the temperature of the Fractional Paste caused ABO to suffer damages.

180.   Bennett failed to comply with the terms of the agreement with ABO thus breaching its agreement.

181.   Bennett submitted an invoice to ABO in the amount of $79,986.00 for the cargo's voyage. On August 26, 2021, ABO paid the invoice in its entirety.

182.   Bennett has been unjustly enriched by receiving the sum of $79,986.00 from ABO even thought if failed to satisfy the terms of the agreement between the parties.

183.   Bennett's acts and/or omissions proximately resulted in damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

Wherefore ABO prays for a judgment as follows:

1.      Judgment against Defendants in the amount to be proven at trial.

2.      Pre-judgement and post-judgment interest on such amount as allowed by Article 22 (b) of the Montreal Convention and in accordance with the Court's law;

3.      Costs of suit;

4.      Attorney fees per Article 22(6) of the Montreal Convention and in accordance with the Court's law; and

5.      Such other and further relief as the Court deems just and proper.

Respectfully submitted this 14th day of June, 2023.

**FRIED BONDER WHITE, LLC**

*/s/ Joseph A. White*
Joseph A. White
Georgia Bar No. 754315
jwhite@friedbonder.com
730 Peachtree Street, NE, Suite 600
Atlanta, Georgia 30308
Phone: (404) 995-8808
Facsimile: (404) 995-8899