# Exhibit A

**MANAGEMENT SERVICES AGREEMENT**

Between

**ANNISTON ASSISTED LIVING, LLC**
As Operator,

and

**PHOENIX SENIOR LIVING LLC**
As Manager

<u>**MANAGEMENT SERVICES AGREEMENT**</u>

This **MANAGEMENT SERVICES AGREEMENT** (the "**Agreement**") is entered into as of this 27th day of May, 2021 (the "**Execution Date**"), and having the property management services and those related duties and obligations commencing on a mutually agreed upon date not later than sixty (60) days following the Execution Date (the "**Commencement Date**"), by and between **ANNISTON ASSISTED LIVING, LLC**, a Delaware limited liability company ("**Operator**"), and **PHOENIX SENIOR LIVING LLC**, a Georgia limited liability company ("**Manager**"). Operator and Manager may be referred to herein individually as a "**Party**" and collectively as the "**Parties**."

**W I T N E S S E T H:**

**WHEREAS**, 4425 Greenbriar Dear, LLC, a Delaware limited liability company ("**Landlord**"), holds the fee title interest to that certain senior living community currently consisting of thirty two (32) assisted living units and twenty four memory care units, commonly known as Autumn Cove Assisted Living and being located at 4425 Greenbriar Dear Road, Anniston, Alabama 36207 (the "**Facility**");

**WHEREAS**, Landlord and Operator have entered into a lease agreement with respect to the Facility whereby Operator will operate the facility as an assisted living community for seniors (the "**Lease**");

**WHEREAS,** Manager is experienced in the management of senior living facilities, including, independent living, assisted living and memory care facilities; and

**WHEREAS,** effective as of the Commencement Date, Operator wishes to engage Manager, and Manager wishes to provide services to Operator during the Term of this Agreement relating to the management of the Facility as a senior living community.

**NOW, THEREFORE,** the Parties hereto, intending to be legally bound, in consideration of the mutual provisions and covenants herein contained, agree as follows:

1.     **DEFINITIONS.**

**1.01** <u>Definitions</u>. The following terms shall have the meanings set forth below when capitalized herein:

"Administrator" shall mean such individual employed by Manager, at the expense of the Facility as an Operating Expense. The Administrator will be under the direct supervision of Manager, who is responsible for the daily operations of the Facility.

"Annual Budget" shall have the meaning set forth in Section 2.01(o).

"Available Beds" means the applicable number of beds in the Facility, unless otherwise agreed between Operator and Manager.

"Average Occupancy" means, for each continuous ninety (90) day period beginning on the first day of the calendar month next succeeding the Commencement Date (if the Commencement Date is not on the first day of a month), the average of Month Occupancy for each month within such ninety (90) day period. "Month Occupancy" means for each calendar month, the average of the number of residents included in each weekly census report for such calendar month, divided by the number of Available Beds.

"Books and Records" means all books and records of Manager pertaining to the Facility for the period after the Commencement Date, including customer referral lists, reports, plans, projections and advertising and marketing materials and financial and accounting books and records.

"Business Day" shall mean any day other than a Saturday, Sunday or legal holiday in the State of Georgia.

"Code" shall have the meaning set forth in Section 6.03.

"Commencement Date" is the date set out above in the caption. The duties and obligations of the Parties shall commence on the Commencement Date.

'Contracts" means all agreements between Manager and any other Person, written or oral, for the provision of goods or services to the Facility.

"Control" (including the correlative meanings of the terms "Controlling", "Controlled by", and "under common control with") as used with respect to Manager, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of Manager whether through the ownership of voting securities, by contract or otherwise.

"Covered Revenue" shall mean all Revenues booked, recognized or recorded in the period beginning on the Commencement Date and continuing through the Termination Date.

"CPI" shall mean the Consumer Price Index for all items for the United States as published by the United States Department of Labor, Bureau of Labor Statistics.

"Exclusion" shall have the meaning set forth in Section 5.03.

"Facility Employees" shall have the meaning set forth in Section 2.06(a).

"Fee Year" shall mean the calendar year.

"Fixed Asset Supplies" means supply items necessary for the operation of the Facility.

"GAAP" means generally accepted accounting principles in the United States.

"HIPAA" shall have the meaning set forth in Section 9.16.

"Improvements" shall mean all buildings, structures, and other improvements of every kind, including, without limitation, all roofs, plumbing systems, electric systems and HVAC systems, roadways, pavilions, alleyways, sidewalks, curbs, connecting tunnels, utility pipes, irrigation systems, conduits and lines (on site and off site), appurtenant to or presently situated at the Facility, and all columns and other support structures and any additions or subsequent modifications thereto.

"Insurance" shall mean the insurance on the Facility required by Operator or Landlord, including, pursuant to the Lease, and such other policies of insurance recommended by Manager.

"Interest" shall mean the lower of (i) the prime rate of interest as published in The Wall Street Journal or any successor thereto, plus three percent (3%) per annum or (ii) the highest interest rate permitted under applicable law not to exceed Ten Percent (10%) per annum.

"Inventories" means inventories as defined by GAAP and provisions in storerooms, medical supplies, mechanical supplies, stationery and other expenses, supplies and similar items.

"Landlord" has the meaning set forth in the Recitals.

"Lease" has the meaning set forth in the Recitals.

"Legal Requirements" means any (i) law, code, rule, ordinance or regulation applicable to Operator, Manager and/or the Facility or the operation thereof; (ii) any order of any governmental authority having jurisdiction over Operator, Manager and/or the Facility or the operation thereof; and (iii) any law, code, rule, regulation, bulletin, decision, ruling or opinion applicable to reimbursement by Medicare, Medicaid or any other governmental healthcare program for services or items rendered by the Facility.

"Lender" means any third-party lender or lenders, whether one or more in number, providing financing for the Facility made to Operator or other party in interest. The initial Lender is the Mortgagee (as defined below).

"Management Fees" means the fees described in Section 3.01.

"Manager" has the meaning set forth in the Recitals.

"Manager Default" shall have the meaning set forth in Section 4.02(a).

"Manager Intellectual Property" shall mean (1) all computer software developed and owned by Manager or any Manager affiliate; and (2) all manuals, instructions, policies, procedures and directives issued by Manager to its employees at the Facility regarding the procedures and techniques to be used in operation of the Facility.

"Mortgagee" means any third-party lender holding a mortgage securing any loan made to Landlord or Operator.

"NOI" means Revenues less Operating Expenses.

"Operating Account" has the meaning set forth in Section 2.01(j).

"Operating Expenses" means any or all, as the context requires, of the following: (i) all costs and expenses incurred in connection with the Operator, operation, management and maintenance of the Facility, including, without limitation, all administrative and general expenses, expenses relating to employment of employees at the Facility, and advertising and business promotion expenses; (ii) Management Fees; (iii) the cost of Inventories and Fixed Asset Supplies consumed in the operation of the Facility; (iv) costs and expenses for preparation of claims and billing submissions; (v) insurance and defense costs and claims; (vii) all real property and personal property taxes and assessments; (vi) those costs and expenses that are expressly identified as Operating Expenses in this Agreement or any Annual Budget; (vii) budgeted costs related to accounting software fees and Manager's server utilization fees; and (viii) any other noncapital costs and expenses incurred in connection with the Operator or operation of the Facility or as specifically provided for elsewhere in this Agreement or any Annual Budget. Operating Expenses shall not include any deductions for interest for property debt service or depreciation or amortization, income, franchise or similar taxes, or mortgage or rent payable from Operator to Landlord pursuant to the Lease, or costs relating to Landlord or Operator's ownership structure, nor shall Operating Expenses include costs incurred by Manager's or Operator's corporate offices, including salaries, other

staffing related costs, corporate overhead, and any other charges unless any such costs are used in the direct operations of the Facility and are approved in any Annual Budget.

"Operator" has the meaning set forth in the Recitals.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, trust or unincorporated organization, joint stock company or other similar organization, government or any political subdivision thereof, or any other legal entity.

"Proprietary Marks" shall mean all trademarks, trade names, symbols, logos, slogans, designs, insignia, emblems, devices, service marks and distinctive designs of buildings and signs, or combinations thereof, which are used to identify the Facility as Manager-related property. The term "Proprietary Marks" shall also include all trade names, trademarks, symbols, logos, designs, etc., which are used in connection with the operation of the Facility during the Term used to identify the Property as a Manager-related Property. The term "Proprietary Marks" shall include all present and future Proprietary Marks, whether they are now or hereafter owned by Manager or its affiliates, and whether or not they are registered under the laws of the United States or any other country. No signage shall be affixed to property without prior written consent of Operator representative of record. Proprietary Marks shall not include marks currently owned or used by Operator or Landlord, including but not limited to "Autumn Cove".

"Real Property" means the real property upon which the Facility is located and the Improvements.

"Receivables" means all billed and unbilled accounts receivable, trade receivables, work in progress, notes receivable and other receivables arising out of or related to the Facility.

"Revenues" shall mean, for the applicable period of time, but without duplication, all gross revenues and receipts of every kind derived by or for the benefit of Operator, Manager or their affiliates from operating or causing the operation of the Facility and all departments and parts thereof, determined in accordance with GAAP for each accounting period (with the exception of any pass-through fees), including, but not limited to: income from both cash and credit transactions (after reasonable deductions for rent concessions or rebates given, paid or returned in ordinary course of obtaining Revenues, bad debt allowance, discounts for prompt or cash payments, refunds and credit card payment fees) from rental or subleasing of every kind; community fees; monthly occupancy fees; healthcare fees and ancillary service fees received pursuant to various agreements with residents of the Facility; license, lease and concession fees and rentals, off premises catering, if any, and parking; income from vending machines; proceeds, if any, from business interruption (but only to the extent it reimburses Operator for lost income and not for additional or other expenses) or other loss of income insurance; club membership fees; income from food and beverage and catering sales; wholesale and retail sales of merchandise (other than proceeds from the sale of furnishings, fixtures and equipment no longer necessary to the operation of the Facility); and service charges, to the extent not distributed to Facility Employees as gratuities; all determined in accordance with GAAP; provided, however, that Revenues shall not include the following:

(i)      Management Fees or reimbursements paid by Operator to Manager pursuant to this Agreement;

(ii)     gross receipts of revenue generated by lessees, sublessees, licensees or concessionaires;

(iii)    gratuities to Facility Employees;

5

(iv)      federal, state or municipal excise, sales, occupancy, use or similar taxes collected directly from residents or guests of the Facility or included as part of the sales price of any goods or services;

(v)      proceeds of any insurance policy (except for business interruption or loss of income insurance as provided above) or condemnation or other taking;

(vi)      any proceeds from any sale of the Facility or any other capital transaction;

(vii) proceeds of any financing or refinancing of any debt encumbering the Facility or any portion thereof;

(viii) proceeds from the disposition of furnishings, fixtures and equipment or any capital asset no longer necessary for the operation of the Facility;

(ix) interest received or accrued with respect to amounts deposited in any operating or reserve accounts of the Facility;

(x) security deposits until such time as the same are applied to current fees due for services rendered for the Facility;

(xi) awards of damages, settlement proceeds and other payments received by Operator in respect of any litigation other than litigation to collect fees due for services rendered from the Facility or otherwise compensating Operator or Landlord for lost revenue; and

(xii) payments under any policy of title insurance.

Any community fees or deposits or other amounts that are refunded to a resident shall be credited against Revenues during the month in which such refunds are made, if previously included in Revenues. Notwithstanding any GAAP accounting treatment requirement, for the express purpose of calculating Management Fees due and payable, any and all non-refundable community fees and non-refundable security deposits earned when residents move into the Facility shall be deemed earned in the month received (or reflected as a reduction in fees in the month refunded, if applicable) and included in the definition of Revenues contained in this paragraph.

"Term" shall have the meaning set forth in Section 4.01.

"Termination Date" means the date this Agreement terminates or expires per the terms hereof.

## 2.      RIGHTS AND RESPONSIBILITIES.

2.1      **Duties and Responsibilities of Manager.** Operator hereby appoints Manager as the sole and exclusive manager of the Facility and grants Manager all the authority necessary to carry out, in a manner that is consistent with applicable industry standards and consistent with the objectives and obligations set forth in this Agreement, the management of the Facility on behalf of the Operator. Manager and Operator are not partners or joint-venturers and it is agreed that Manager is acting solely as the agent of Operator in performing services or acquiring assets or supplies as provided hereunder. Operator shall honor, as its own, all contracts, agreements, and commitments entered into by Manager

6

with respect to the management and operation of the Facility. Manager shall not be required to make monetary expenditures on Operator's behalf to the extent that the Operating Account does not contain sufficient funds to cover such expenditures and shall be promptly reimbursed for any expenditures Manager may make or incur on Operator's behalf. As the exclusive manager of the Facility, Manager shall perform the following, but only with respect to the Facility and subject to the rights and responsibilities of the Operator:

(a)      Manage all aspects of the Facility in a professional, competent and business-like manner;

(b)      Recruit, hire, train and supervise Facility Employees, with no such personnel being employed by Operator;

(c)      Manage the available cash flow of the Facility, including, without limitation, (i) timely billing of all residents and or other third-party payors for all services or items provided by the Facility, (ii) timely payment of all Operating Expenses from available cash flow;

(d)      Prepare, keep and provide Operator with access during regular business hours to all contracts, Books and Records, documents, policies and other information necessary for the lawful operation and sound financial management of the Facility;

(e)      As an Operating Expense and in accordance with the Annual Budget, purchase and keep the Facility furnished with all necessary furnishings, Fixed Asset Supplies, equipment and Inventories and services from third parties; provided, however, that no material (defined as more than the lesser of (i) 5% of each budgeted Operating Expense line item at the Facility or (ii) Five Thousand and NO/100 Dollars ($5,000.00)) non-budgeted expenditure for any such item shall be made without Operator's prior written approval, which approval shall not be unreasonably withheld or delayed, except expenditures reasonably necessary in the opinion of Manager to maintain services to residents and patients as a matter of life safety; Anything exceeding such amount requires Operator's prior written approval with detailed listing of needs. No furniture, furnishings, art, or textiles shall be purchased without prior written consent of Operator representative of record.

(f)      Provide a qualified full-time Administrator at the Facility who will assume general operational responsibility for such Facility (whose expense shall be an Operating Expense); provide notice including a summary of such person's prior experience to Operator in advance of any change in the Administrator, provided that Operator shall have the right to review any person hired by Manager for such administrator position and to consult with Manager regarding such hiring, recruit, hire, train, promote, direct and terminate the employment of all other personnel necessary to maintain and operate the Facility; establish performance standards, salary and compensation scales, promotion policies, fringe benefit arrangements, and other personnel policies and guidelines, all in accordance with the Annual Budget; provided, however, that no material non-budgeted personnel expense shall be incurred without Operator's prior written approval; provide management support to the Administrator; and provide such other supervision, management and financing direction as may be required for the Administrator efficiently to perform his or her duties and responsibilities;

(g)      As an Operating Expense, comply with Manager's accounting and reporting obligations as set out in this Agreement;

(h)      As an Operating Expense, prepare and file in a timely manner in accordance with applicable regulations, all necessary statistical reports (specifically including, but not limited to, payroll, sales, use and occupancy tax reports and returns) and data to meet all local, state and federal regulatory

requirements; provided, however, that nothing contained herein shall be deemed or construed to require Manager to prepare or file Operator's local, state or federal income tax returns or schedules thereto;

(i)  Process all insurance claims for the Facility; provided, however, that nothing contained herein shall be deemed or construed to require Manager to prepare or file residents' insurance claims;

(j)  Collect the Revenues; deposit all such funds received by Manager for or on behalf of Operator in a Operator designated bank account ("**Operating Account**") established by Operator for such purpose, as to which Manager shall have the right to deposit and withdraw funds, pay out of such funds all Operating Expenses, its compensation and any other sums due it from Operator, and all other sums properly payable pursuant to any of the provisions hereof (all expenditures authorized hereby being considered Operating Expenses to be paid from Operator's funds received by Manager); and hold, remit or expend the balance of such funds, if any, as Operator may direct provided, further, that funds may not be withdrawn by Operator if the aggregate minimum cash balance required by Section 2.02(d) hereof would be impaired thereby;

(k)  As an Operating Expense and in accordance with the Annual Budget, engage or utilize counsel satisfactory to Operator, defend any legal proceedings or claims relating to operation of the Facility, and cause such legal proceedings to be instituted as may be necessary to enforce payment of charges or compliance with other terms of admission agreements, or to dispossess residents and patients involving setoffs of damage claims; provided, however, that no material non-budgeted legal expense shall be incurred without Operator's prior written approval;

(l)  As an Operating Expense and in accordance with the Annual Budget, develop, implement, manage and supervise marketing and public relations programs for the Facility as follows: provided, however, that such programs shall be subject to Operator's prior written approval:

(i)  develop a marketing plan, encompassing an advertising plan, advertising, marketing, public relations, and networking;

(ii)  develop and design marketing and advertising materials;

(iii)  construct appropriate signage on the Facility property pursuant to any local governmental requirements;

(iv)  prospect database management; and

(v)  conduct surveys of residents and their families regarding selection of the Facility.

(m)  As an Operating Expense: (i) file and pay all taxes, including but not limited to real and personal property taxes (as applicable), and assessments (other than income, franchise and similar taxes) on the Facility; (ii) pay all premiums for insurance on the Facility; and (iii) pay such reserves as Operator may direct;

(n)  As an Operating Expense, prepare and deliver to Operator the following statements for the Facility prepared in accordance with GAAP and applied consistently from period to period (which shall be certified by an officer of Manager as being true and accurate in all material respects) by the fifteenth (15th) Business Day of each calendar month during the Term:

(i)  Balance sheet and income statement (in Microsoft Excel format);

(ii)      Trial balance with 3 columns (balance forward, net debits/credit, and ending balance in Microsoft Excel format);

(iii)      Rent roll;

(iv)      Report of daily census for the month;

(v)      Marketing report;

(vi)      Twelve month rolling cash flow projection;

(vii)      Detail of Management Fee calculations;

(viii)      Capital expenditure reconciliation to the approved capital budget in the Annual Budget;

(ix)      Disclosure of any material communications with regulatory agencies and state surveys;

(x)      Equity intercompany reconciliation, if applicable;

(xi)      Most recent sales tax filings with the monthly reporting submittals to help validate to our tax department that you are current with filings;

(xii)      Reasonably cooperate with and assist Operator in satisfying any requirements of Lender providing financing for the Facility; and

(xiii)      Any other information relating to the Facility reasonably requested by Operator.

(o)      Manager shall prepare and submit to Operator for Operator's approval at least sixty (60) days prior to the commencement of each calendar year, an annual plan and budget to cover all anticipated Revenues and Operating Expenses of the Facility for that calendar year, including capital improvements (the "**Annual Budget**"). Operator shall have thirty (30) business days to approve the Annual Budget by written notice. If the Operator does not approve the Annual Budget, the Operator and Manager agree to participate in telephone conferences or meet at the office of Manager to conduct negotiations in good faith and use commercially reasonable efforts to arrive at a mutually acceptable Annual Budget. During such negotiations, each Party agrees to apply reasonable expectations to projections of Operating Expenses and Revenues for the next calendar year.

Until the current calendar year Annual Budget is resolved, the prior calendar year Annual Budget shall apply for the current calendar year with respect to those line items that are subject to dispute, with Operating Expenses adjusted by increases in the CPI (as hereafter defined) from the prior calendar year; otherwise all budgeted items approved by Operator shall apply for such calendar year.

Except as expressly provided for in this Agreement and except for items relating to the health and safety of Facility residents or employees, otherwise herein, Manager shall not make expenditures for any item aggregating materially in excess of the amount budgeted (defined as more than the lesser of (i) 10% of each budgeted Operating Expense line item at the Facility or (ii) Ten Thousand and NO/100 Dollars ($10,000.00)) without Operator's prior written approval, which approval shall not be unreasonably withheld or delayed. The Annual Budget shall also include Manager's recommendations and suggestions

for the rental rates, ancillary service fees, and other costs and charges to the residents of the Facility (and, in such regard, Manager shall monitor rates in the applicable service areas, and assist Operator in obtaining approval of appropriate rates from governmental and third-party paying agencies); the salaries and fringe benefits of all Facility Employees; and major purchase contracts for supplies. Manager agrees to use its best efforts to maintain levels of rates and charges sufficient to assure the operation of the Facility in a first-class manner, and to provide for the payment of all costs of operation of the Facility, specifically including, but not limited to, the Management Fee. Manager shall, at all times, maintain full and complete documentation regarding all of its actions taken to fulfill its duties as manager of the Facility. All Books and Records and reports maintained or prepared by Manager for or in connection with the operation of the Facility shall be Operator's property. During the term hereof, Operator shall, at all reasonable times, and at its expense, have the right to inspect and audit such Books and Records and reports, and to inspect all parts of the Facility.

(p)     As an Operating Expense, prepare the following reports consistent with GAAP (which reports shall be certified by an officer of Manager as being true and accurate in all material respects) and management status reports of the Facility, to be submitted to Operator within ten days after the end of each calendar quarter.

(i)     All balance sheet reconcilements;

(ii)    Search for unrecorded liabilities;

(iii)   Signed Certification statement; and

(iv)    Manager will cooperate in providing other reports as reasonable and necessary which are requested by the Operator.

(q)     As an Operating Expense, prepare the following reports consistent with GAAP (which reports shall be certified by an officer of Manager as being true and accurate in all material respects) and management status reports of the Facility, to be submitted to Operator within seventy- five (75) days after the end of each calendar year, and each of which to be subject to an audit, at Operator's cost, by a firm of accountants selected by Operator, at Operator's expense (but not to be used in computing the Management Incentive Fee).

(i)     Balance sheet and income statement;

(ii)    Revenues, Operating Expenses, Excess Cash Flow and NOI;

(iii)   Calculations of Management Fee;

(iv)    Fixed asset additions;

(v)     Capital expense reconciliation to the capital budget in the Annual Budget;

(vi)    Communications with any regulatory agencies; and

(vii)   Manager will cooperate in providing other reports as reasonable and necessary which are requested by the Operator.

(r)     Provide performance standards and review procedures for the Administrator and obtain and maintain licenses and staff to deliver the appropriate care and services of all residents of the Facility;

10

(s)     Reasonably participate in and be responsible for any survey, inspection or site investigation conducted by a governmental, regulatory, certifying or accrediting entity with authority or jurisdiction over the Facility and provide notice to Operator immediately upon the earlier of the commencement of any such survey, inspection, or site investigation or a notice regarding such survey, inspection, or site investigation;

(t)     Notify Operator and provide copy to Operator within three (3) business days of receipt of any material communications from any governmental, regulatory, certifying, or accrediting entity, including but not limited to communications regarding survey deficiencies and remedies or penalties to be imposed;

(u)     Any other services related to the operation of the Facility as reasonably requested by Operator from time to time;

(v)     Access to property for Operator or Operator's designate (to include Operator's banker or family members) at Operator's request during normal business hours of 8am to 6pm with prior notice to Manager of at least 24 hours;

(w)     Obtain and keep in full force and effect in the name of Operator any and all licenses and permits necessary for the operation of the Facility. Manager shall not be required to use its own funds to pay any liabilities or obligations related to the operation of the Facility except to cover its own costs and expenses in providing corporate services;

(x)     Manager shall provide written notice to Operator in the event that there is any change in the ownership of Manager, whether direct or indirect, regardless of whether such change constitutes a change in Control. Change of Control of Manager shall constitute grounds for nullification of contract at Operator's discretion; and

(y)     Manager shall maintain and provide to Operator a complete copy of Manager's "Emergency Preparedness and Response Plan" or other documented crisis and/or disaster communication and management plan for the Facility, in form and substance required by applicable Legal Requirements, at the following times: (1) at the Commencement Date: (2) annually, at the same time as Manager submits its Annual Budget to Operator; (3) no later than ten (10) Business Days following its receipt of Operator's request for same; and (4) upon the expiration of the Term or earlier termination of this Agreement.

**2.2    Duties and Responsibilities of Operator.** Operator shall perform the following, subject to the rights and responsibilities of the Manager:

(a)     Execute applications or other relevant documentation for licenses, permits or other instruments necessary for operation of the Facility and provide such information and perform such acts relative to the operation of the Facility as are required by law, regulation or governmental agency in order to obtain and/or maintain any license, permit, instrument, certificate, certification or approval with respect to the proper operation of the Facility;

(b)     Reasonably cooperate with Manager in its responsibility to obtain and keep in full force and effect in the name of Operator any and all licenses and permits necessary for the operation of the Facility;

(c)     Reasonably cooperate and participate in upon notice and request any survey, inspection or site investigation conducted by a governmental, regulatory, certifying or accrediting entity with authority or jurisdiction over the Facility;

(d)     Ensure that the Operating Account has a minimum balance of at least $10,000 at all times for the Facility. Operator agrees to deposit an amount of money into the Operating Account that is sufficient to restore the minimum balance within five (5) Business Days of receiving written notice from Manager of the shortfall that includes a reasonable explanation accounting for the shortfall; and

(e)     Make deposits to the Operating Account promptly following written notice from Manager in the event the balance of the Operating Account shall at any time be insufficient to pay incurred or anticipated Operating Expenses. Such deposits shall be sufficient in amount to comply with the requirements of Section 2.02(d); and

(f)     Reasonably cooperate with Manager regarding purchase or replacement of furniture, art, or other related furnishings.

**2.3     Limitations on Authority of Manager.** Notwithstanding anything contained in this Agreement to the contrary and in addition to the various other provisions of this Agreement, Manager shall not, without the prior written consent of Operator, perform any of the following actions on behalf of Operator:

(a)     Borrow money or incur any indebtedness pursuant to the Annual Budget on behalf of Operator, except for trade payables incurred in the ordinary course of business;

(b)     Pledge or provide a security interest in any assets of Operator;

(c)     Sell, lease or otherwise dispose of any assets of Operator or the Facility, except for Fixed Asset Supplies and Inventories in the ordinary course of business;

(d)     Adjust or settle any claim under any insurance policy or litigation or other claim applicable to the Operator or the Facility;

(e)     Purchase furniture, art, or similar furnishings;

(f)     Enter into any contract or other agreement which will obligate Operator without the prior written consent of Operator except for contracts containing a thirty (30) day cancellation clause with no fee or penalty; or which contract or other agreement does not exceed Twenty Thousand and NO/100 Dollars ($20,000.00) in any calendar year;

(g)     Release, compromise, assign or transfer any claim, right or benefit of Operator, except in the ordinary course of managing and operating the Facility as provided herein; or

(h)     Confess a judgment on behalf of or against Operator.

**2.4     Limitation on Liabilities of Manager.** Operator and Manager acknowledge and agree that Manager will not assume or acquire (i) any liabilities or accounts payable associated with the operation of the Facility and arising or accruing in the period prior to the Commencement Date, (ii) any of the past or current state and federal licenses or certifications for operation of the Facility (if any); or (iii) any of the past or current provider numbers or provider agreements executed or maintained by Operator and/or the Facility for participation in Medicaid, Medicare or any other state or federal government

reimbursement program, or with any third party payor (if any), except for the personal care services program provider agreements. This Section shall survive termination or expiration of this Agreement for a period of ninety (90) days.

**2.5     Insurance.** Throughout the term of this Agreement, Manager shall procure and maintain (or Operator shall procure and maintain, at Operator's election), as an Operating Expense and with the prior written approval of Operator, the Insurance. Such Insurance shall be kept in force at all times during the Term, naming the Operator and Manager as the named insureds, and any other party in interest as an additional insured, and with any Mortgagee as an additional insured and loss payee/mortgagee (as required by such Mortgagee). Such insurance shall be of the type and in the amounts reasonably required to be maintained by the Operator and any Mortgagee. Insurance premiums shall be escrowed if required by any Mortgagee. The terms of insurance shall be stated in writing and may not be amended without the written approval of Operator. Certificates of insurance and copies of policies shall be supplied to Operator annually and each such policy shall provide for thirty (30) days' notice to Operator prior to termination or cancellation. Manager shall notify Operator immediately upon notice from any insurer of impending cancellation, non-renewal or reduction of coverage of its existing insurance policy. If any policy is terminated as a result of the nonpayment of the premium by Manager, Operator shall have the right to pay the premium. If any policy is terminated for a reason other than the nonpayment of the premium, Operator shall have the right to place coverage. All deductibles, legal settlements, and any other costs related to claims under the insurance policies required herein shall be an Operating Expense of the Facility. Operator may elect, in its sole discretion and upon thirty (30) days' written notice to Manager, to procure and maintain, as an Operating Expense, all Facility insurance policies required except for Manager's workers compensation and employers' liability insurance policies.

**2.6     Facility Employees; Proprietary Interest.** All persons employed in the operation of the Facility ("**Facility Employees**") shall be employees of the Manager or a contracted professional employment organization. Using the Revenues (supplemented, if necessary, by Operator's funds), Manager shall make disbursements and deposits for all compensation and other amounts payable with respect to Facility Employees, specifically including, but not limited to, unemployment insurance, social security, benefits, workers' compensation, and other charges imposed by a governmental authority or provided for in a union agreement. All payroll and payroll administration costs and fees, specifically including, but not limited to, those enumerated above, of the Facility Employees are Operating Expenses to be reimbursed by Operator to the Manager, as applicable from Revenues (supplemented, if necessary, by Operator's funds). Any payment by Operator to Manager for the Facility Employees shall be in addition to all Management Fees payable under this Agreement. Except as otherwise provided herein, all home office payroll costs and overhead expenses for employees of Manager are corporate administrative costs to be borne by Manager without reimbursement.

**2.7     Loans.** Manager shall operate the Facility in all material respects in compliance with operational covenants in any mortgage, loan agreement, or other loan documents of any Lender ("**Loan Documents**") provided Manager has been provided copies of any such Loan Documents. Notwithstanding anything in this Agreement to the contrary, an Event of Default by Manager under this Agreement by Manager shall not be deemed to have occurred based on this Section 2.07 unless (i) Manager has received written notification of the alleged failure of compliance under the Loan Documents, (ii) Manager has not cured the alleged failure of compliance under the Loan Documents within the applicable cure period thereunder, as such cure period is extended by the Lender, and (iii) the Lender shall not have waived the breach with respect to such alleged failure of compliance. Manager agrees that it shall, if required by the Lender, subordinate Manager's rights under this Agreement to the lien and operation of the Loan Documents on the Facility consistent with what is required of Operator or Landlord or their affiliates by such Lender. Subject to the foregoing, Manager agrees to execute such

reasonable documentation of subordination as may be mutually and reasonably agreed upon between the Parties.

**3.     COMPENSATION TO MANAGER.** In consideration of Manager's performance of the services required under this Agreement, Manager shall be compensated as follows:

**3.1     Management Fee.** For all management and administrative services provided by Manager hereunder after the Commencement Date, and including, without limitation, in connection with services related to start-up of the Facility from the Commencement Date and prior to resident move-in and receipt of Revenues, if applicable, Operator shall pay to Manager a management fee equal to the greater of: (i) five percent (5.0%) of Revenues, or (ii) Seven thousand five hundred and no/100 dollars ($7,500.00) (the "**Management Fee**"). Management Fees are payable monthly in advance on the first (1st) day of each month based on the Revenue that Manager expects to be collected for such month, determined on the basis of the in-place residency agreements, and shall be adjusted retroactively within twenty (20) days after the end of each month based on the issuance of monthly statements of actual Revenue for such month. Payments of Management Fee shall be without deduction for setoff or counterclaim. If Operator fails to make payment of Management Fee or other amounts when due hereunder, and if the failure to pay continues for five (5) Business Days after written notice thereof, the amount owed to Manager shall accrue interest at the rate of Interest from and after the date on which such payment was originally due until such payment is made.

**3.2     Priority of Payments.** So long as no Manager Default hereunder has occurred and is continuing, any fees or other amounts due to Manager hereunder, including, without limitation, the Management Fee, shall be paid by Operator to Manager prior to, and in priority to, any loan payments, mortgages or rents due under agreement.

**3.3     Manager Option Purchase.** So long as no Manager Default hereunder has occurred Landlord and Operator hereby grant, and Manager shall have, an option to acquire and purchase the Facility, including, without limitation, the underlying land and all improvements, together with the entire operations, all in accordance with the terms set forth in the Purchase Option attached hereto as **EXHIBIT B**, and which is hereby incorporated herein by reference.

**4.     TERM AND TERMINATION.**

**4.1     Term.** This Agreement shall become effective as of the Commencement Date. The initial term of this Agreement shall begin on the Commencement Date and, unless earlier terminated as provided herein, shall continue for a period of two (2) years thereafter (the "**Initial Term**"); provided the Term may be extended by mutual agreement of the parties for two (2) periods of two (2) years each (each, an "**Extended Term**" and together with the Initial Term, being the "**Term**"). Notwithstanding the foregoing, in the event the Purchase Option described in Section 3.03 above is not exercised during the Option Period, then Operator shall have the right to thereafter terminate this Agreement upon sixty (60) days written notice to Manager.

**4.2     Termination.**

(a)     Operator shall have the right to terminate this Agreement, without paying any fee or penalty, when and if one of the following events occur (hereinafter collectively referred to as "**Manager Default**"), after which Operator shall have the right - but not the obligation - to declare a termination of this Agreement in accordance with the termination protocols set forth below:

(i)     Appointment of a receiver or trustee to manage the assets of Manager;

14

(ii)    Assignment for the benefit of creditors of the assets of Manager;

(iii)    A reduction in licensed capacity, prohibition on new admissions, suspension of any operating license, or termination, revocation, or non-renewal of any license, if not corrected within five (5) Business Days, or longer as may be required to reinstate or otherwise make effect any license;

(iv)    Manager's gross negligence or willful misconduct;

(v)    Any voluntary act of bankruptcy by Manager, or any involuntary proceeding commenced against Manager and not dismissed within sixty (60) days of the commencement thereof; and/or

(vi)    Manager's breach of any provisions of this Agreement, where such breach has not been cured within thirty (30) days after the giving of written notice of the breach or such longer period as agreed to by Operator and as may reasonably be required to diligently effect such cure, specifying the nature of the breach, and complying with all provisions regarding mediation set forth herein.

(b)    Manager shall have the right to terminate this Agreement if and when one of the following events occur, after which Manager shall have the right, but not the obligation, to declare a termination of this Agreement in accordance with the termination protocols set forth below:

(i)    appointment of a receiver or trustee to manage the assets of Operator;

(ii)    assignment for the benefit of creditors of the assets of Operator, except Manager shall agree to enter into any agreements which may be required on behalf of the Mortgagee in order for Operator to obtain financing;

(iii)    any voluntary act of bankruptcy by Operator, or any involuntary proceeding commenced against Operator and not dismissed within sixty days of the commencement thereof ;

(iv)    failure by Operator to pay Manager in accordance with Article 3 hereof within ten (10) calendar days after such amount becomes due;

(v)    failure by Operator to make any deposit to the Operating Account in order to comply with its obligations under Section 2.02 within five (5) Business Days after a request in writing made by Manager;

(vi)    any governmental license or authorization for the operation of the Facility is at any time suspended, terminated or revoked for a reason other than any act or omission of Manager and such suspension, termination or revocation shall continue unstayed and in effect for a period of thirty (30) consecutive days; and

(vii)    Operator' s breach of any material term, where such breach has not been cured within thirty (30) days after the giving of written notice of the breach or such longer period as may reasonably be required to diligently effect such cure, specifying the nature of the breach, and complying with all provisions regarding mediation set forth herein.

15

(c)     If at any time Operator or an affiliate of Operator sells the Facility to a third party who is not an affiliate of Operator, Operator shall have the option to terminate this Agreement immediately upon written notice to Manager.

**4.3     Effect of Termination.** Upon termination of this Agreement for Default (and irrespective of which Party terminates this Agreement), all of the following shall apply:

(a)     Manager shall turn over to Operator a complete set of keys and Books and Records pertaining to the Facility within three (3) Business Days after the termination has become effective;

(b)     Each Party shall make information related to this Agreement and the Facility available to the requesting Party for tax and other reporting purposes; and

(c)     All sums due Manager hereunder, whether pertaining to expenses, unreimbursed expenses or the Management Fees shall be due and payable by Operator to Manager within ten (10) calendar days after the Termination Date.

## 5.     REPRESENTATIONS AND WARRANTIES OF OPERATOR.

As a material inducement for Manager to enter into this Agreement and to consummate the transactions contemplated hereby, Operator hereby makes the following representations and warranties as of the Commencement Date, each of which is relied upon by Manager regardless of any investigation made or information obtained by Manager:

**5.1     Due Organization.** Operator is a limited liability company duly organized and validly existing under the laws of the State of Delaware.

**5.2     Approval of Agreement.** The execution, delivery and performance of this Agreement: (i) has been duly approved by all requisite corporate action on the part of Operator and such actions are within the corporate powers, authority and legal right of Operator; (ii) does not violate or conflict with the organizational documents of Operator, or any material contract to which Operator is a party, or any applicable law or governmental regulation. This Agreement (and each agreement referenced herein) constitutes the legal, valid, and binding obligation of Operator, enforceable against such Party in accordance with their respective terms.

**5.3     Exclusion.** Operator represents and warrants to Manager that neither Operator nor any of its owners, officers, directors, managers, or employees are excluded from participation in any federal health care programs, as defined under 42 U.S.C. 1320a-7b(f), or any form of state Medicaid program (each, an **"Exclusion"),** and to Operator's knowledge, there are no pending or threatened governmental investigations that may lead to such Exclusion. Operator agrees to notify Manager of the commencement of any such Exclusion or investigation within seven (7) Business Days of Operator's first learning of it. Manager shall have the right to terminate this Agreement upon learning of any investigation which may result, with reasonable probability, in Operator's Exclusion, after giving Operator not less than sixty (60) days prior written notice of such election. Operator agrees to notify Manager of the status of any such investigation. In the event of Operator's Exclusion, Manager shall have the right to terminate this Agreement effective as of the earlier to occur of the following: (i) sixty (60) days after notice from Manager of such termination or (ii) the date on which Operator shall enter into an agreement with a replacement Manager. In the event Manager shall give notice to Operator following Operator's Exclusion under this Section 5.03, Operator agrees to use its best efforts in good faith to enter into an agreement with a replacement Manager as soon as possible following Manager's notice. Operator agrees to

indemnify Manager and save it harmless from any penalty, loss, cost or damage Manager may incur as a result of Operator's Exclusion.

**6.** **REPRESENTATIONS AND WARRANTIES OF MANAGER.** Manager hereby represents and warrants to Operator as follows:

**6.1** **Organization.** Manager is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Georgia.

**6.2** **Authorization; No Violation of Laws or Agreements.** Manager has full power and authority, and has taken all requisite corporate action, to enter into and perform under this Agreement and all other agreements and documents contemplated by or related to this Agreement to which Manager is a party. Nothing in the articles of organization or operating agreement of Manager, as amended, or any other agreement, instrument, decree, proceeding, law or regulation (except as specifically referred to in or contemplated by this Agreement) by or to which Manager is bound or subject would prohibit or inhibit Manager from consummating this Agreement on the terms and conditions herein contained. Upon execution and delivery, this Agreement and any agreement or document to be executed by Manager pursuant hereto shall constitute a legal, valid and binding obligation of Manager in accordance with its terms.

**6.3** **Eligible Independent Contractor.** Manager is and shall at all times be an "eligible independent contractor" as defined in Section 856(d)(9) of the Internal Revenue Code of 1986, as amended from time to time (the **"Code"**), and Manager will and shall cause the Facility to be operated in such a manner so that it qualifies as a "qualified health care facility" within the meaning of Section 856(e)(6)(D) of the Code at all times. In the event that Operator reasonably concludes that the terms of this Agreement will have any effect as to cause rents under any lease to fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Internal Revenue Code, Manager hereby agrees to enter into an amendment to this Agreement as proposed by Operator modifying such terms in such a way as to cause rent under any such lease to so qualify as "rent from real property" in the reasonable opinion of Operator and its counsel; provided however, no such modifications shall affect the amount of Management Fees or the practical realization of the rights and benefits of the Manager hereunder.

**6.4** **Exclusion.** Manager represents and warrants to Operator that neither Manager nor any of its owners, officers, directors, managers, or employees have incurred an Exclusion, and to Manager's knowledge, there are no pending or threatened governmental investigations that may lead to such Exclusion. Manager agrees to notify Operator of the commencement of any such Exclusion or investigation within seven (7) business days of Manager's first learning of it. Operator shall have the right to terminate this Agreement upon learning of any such investigation which may result, with reasonable probability, in Manager's Exclusion, after giving Manager not less than sixty (60) days prior written notice of such election. Manager agrees to notify Operator of the status of any such investigation. In the event of Manager's Exclusion, Operator shall have the right to terminate this Agreement effective as of the earlier to occur of the following: (i) sixty (60) days after notice from Operator of such termination or (ii) the date on which Operator shall enter into an agreement with a replacement Manager. In the event Operator shall give notice to Manager following Manager's Exclusion under this Section 6.04, Operator agrees to use its best efforts in good faith to enter into an agreement with a replacement Manager as soon as possible following Operator's notice. Manager agrees to indemnify Operator and save it harmless from any penalty, loss, cost or damage Operator may incur as a result of Manager's Exclusion.

**7.** **INDEMNIFICATION.**

**7.1** **Indemnification by Operator.** Subject to the limitations set forth in this Article 7, Operator agrees to indemnify, save, pay, insure, defend and hold harmless Manager, its employees, owners, officers and contractors from and after the Commencement Date against and with respect to any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including interest, penalties, and reasonable attorneys' fees and expenses, costs of litigation and costs of investigation (but not including any adjustments or credits expressly provided for in this Agreement):

(a) resulting from any breach of a representation or warranty contained in Article 5 of this Agreement;

(b) resulting from gross negligence or willful misconduct of Operator in exercising its duties and responsibilities hereunder;

(c) Operator's uncured breach of this Agreement, provided such breach is curable by Operator but is not cured by Operator within the applicable time frames set forth for such cure in this Agreement;

(d) arising out of or resulting from the ownership, operation, use or control of the Facility at any time during the Term of this Agreement, including without limitation, any and all liabilities which relate to events occurring during the Term of this Agreement, except for those caused by or arising out of the willful act or omission of Manager and except to the extent subject to Manager's indemnity of Operator provided in Section 7.02 below.

**7.2** **Indemnification by Manager.** Subject to the limitations set forth in this Article 7, Manager hereby agrees to indemnify, save, pay, insure, defend and hold harmless Operator at all times from and after the Commencement Date against and with respect to any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries, and deficiencies, including interest, penalties, and reasonable attorneys' fees and expenses, costs of litigation and costs of investigation (but not including any adjustments or credits expressly provided for in this Agreement):

(a) resulting from any breach of a representation or warranty contained in Article 6 of this Agreement;

(b) resulting from gross negligence or willful misconduct of Manager in exercising its duties and responsibilities hereunder; or

(c) Manager's uncured breach of this Agreement, provided such breach is curable by Manager but is not cured by Manager within the applicable time frames set forth for such cure in this Agreement.

**8.** **INTELLECTUAL PROPERTY LICENSE TO USE MARKS; RESTRICTIVE COVENANTS.**

**8.1** **Intellectual Property.** All Manager Intellectual Property and all Proprietary Marks shall at all times be the exclusive property and proprietary to Manager or its affiliates. During the Term, Manager shall be entitled to take all reasonable steps to ensure that the Manager Intellectual Property remains confidential and Operator will take all steps necessary to protect the confidentiality of the Manager Intellectual Property. Upon termination of this Agreement, Manager shall be entitled to remove

all Manager Intellectual Property and Proprietary Marks from the Facility without compensation to Operator.

**8.2**    **Proprietary Marks.** The Parties agree that during the Term, the Facility shall be known as "**Autumn Cove**" community or facility, with such additional identification as may be necessary and agreed to by Operator and Manager to provide identification of "**Phoenix**" or its affiliated branded communities. Operator shall not, without prior written consent of Manager, install any additional Proprietary Marks on interior or exterior of building.

**8.3**    **Ownership of Proprietary Marks.** The Proprietary Marks shall in all events remain the exclusive property of Manager or its affiliate, and nothing contained herein shall confer on Operator the right to use the Proprietary Marks other than as provided herein. Upon termination of this Agreement, any use of or right to use the Proprietary Marks by Operator shall cease. The right to use such Proprietary Marks belongs exclusively to Manager, and the use thereof inures to the benefit of Manager whether or not the same are registered and regardless of the source of the same. Operator shall not, without prior written consent of Manager install any signage with Proprietary Marks on interior or exterior of building.

**8.4**    **License to Use Marks.** To the extent applicable, Manager hereby grants to Operator a non-exclusive, non-assignable, limited and restricted right and license (**"License"**) to use the words and names "**The Phoenix**" and "**The Retreat**" or "**The Bungalows**" solely as part of the name of the Facility during the Term. This License shall not give Operator any ownership, apart from this License to use of any of the above marks and that all goodwill arising from Operator's use of the marks shall inure solely to the benefit of Manager or its affiliates. This License shall terminate upon termination or expiration of this Agreement.

**8.5**    **Non-Solicitation.** During the Term and for a period of eighteen (18) months after its termination, unless Manager consents, none of Operator or its affiliates shall, directly or indirectly, as an individual or on behalf of a firm, corporation, partnership or other legal entity, (i) solicit for employment or endeavor in any way to entice or lure away from employment from Manager or hire or offer to hire any of Manager's employee, officer, director or agent, (ii) take any action that would interfere with, diminish or impair the valuable relationships that Manager or its affiliates has with third party payors, referral sources, residents, patients, customers or health care facilities, or (iii) solicit Manager's residents, patients, referral sources or customers for itself or other entities. Notwithstanding the foregoing, nothing shall prevent Operator, in the event this Agreement is terminated for any reason, from soliciting: (i) employees that work for the Manager at the Facility to continue working at the location of the Facility; and/or (ii) residents that reside at the Facility to continue to reside at the Facility.

**8.6**    **Breach of Covenant.** Manager and/or its affiliates shall be entitled, in case of any breach of the covenants of this Section 8 by Operator or others claiming through it, to obtain injunctive relief, without the necessity of posting bond or other security, and to any other right or remedy available at law or in equity.

**9.**    **MISCELLANEOUS.**

**9.1**    **No Third-Party Beneficiaries.** Any provision hereof to the contrary notwithstanding, nothing in this Agreement is intended, nor shall it be deemed, to confer upon any Person other than the Parties hereto and their respective successors and assigns any rights or remedies under or by reason of this Agreement.

**9.2**    **Binding Effect; Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, including any representative appointed to administer or liquidate their respective estates in any way whatsoever.

**9.3**    **Assignment.** Neither of the Parties hereto may assign any of its rights or obligations hereunder without the prior written consent of the other party hereto, which consent shall not be wrongfully withheld, conditioned or delayed, except this Agreement may be assigned to either a Lender at the Operator's request or to a buyer as part of a Facility sale.

**9.4**    **Subordination.** This Agreement shall be subordinate to any Loan Documents, mortgage, deed of trust, master lease, or ground lease affecting the Facility. Manager shall promptly within fifteen (15) days enter into agreements reasonably requested by any holder of any mortgage or deed of trust or the lessor under any master lease or ground lease evidencing such subordination.

**9.5**    **Entire Agreement; Modification.** This Agreement, together with the exhibits and schedules hereto, constitutes the entire agreement between the Parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous communications, agreements and understandings with respect to the subject matter hereof, express or implied, oral or written, all of which are merged herein.

**9.6**    **Costs and Disputes.** Except as expressly provided herein, each Party hereto shall bear its own costs, including counsel fees and accounting fees, incurred in connection with the negotiation, preparation and execution of this Agreement, and all matters incident thereto. Any dispute arising out of this Agreement shall be heard by non-jury suit in any state or federal court sitting in Fulton County, Georgia, and the Parties consent to such venue.

BY SIGNING THIS CONTRACT, THE PARTIES UNCONDITIONALLY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL FOR THE RESOLUTION OF ALL DISPUTES. EACH PARTY HERETO HEREBY ACKNOWLEDGES THEY HAVE EXECUTED THE AFOREMENTIONED WAIVER OF JURY TRIAL KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY.

**9.7**    **Interpretation.** The Parties hereto acknowledge and agree that this Agreement has been negotiated at arm's length and between parties equally sophisticated and knowledgeable in the matters dealt with in this Agreement, and that each Party has been advised by counsel of its choosing with respect hereto. Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the Party that has drafted it is not applicable and is hereby waived. The terms of this Agreement shall be interpreted in a reasonable manner in order to affect the intent of the Parties as set forth herein.

**9.8**    **Severability.** All provisions of this Agreement shall be considered severable and if for any reason any such portion of this Agreement is held to be invalid, contrary to, or in conflict with any applicable present or future law or regulation in a final, unappealable ruling issued by any court, agency or tribunal with competent jurisdiction, that ruling shall not impair the operation of, or have any other effect upon, such other portions of this Agreement as may remain otherwise intelligible, which shall continue to be given full force and effect and binding upon the Parties hereto, although any portion held to be invalid shall be deemed not to be part of this Agreement.

**9.9**     <u>Waiver of Obligations.</u> Neither Party shall be deemed to have waived or impaired any right, power, or option reserved by this Agreement (including, without limitation, its right to demand exact compliance with every term, condition and covenant herein) by virtue of (i) any custom of the Parties at variance with the terms hereof; (ii) any failure by such Party to demand strict compliance with this Agreement; or (iii) any waiver, forbearance, delay, failure or omission to exercise any right, power or option. No failure, refusal or neglect to exercise any right under this Agreement or to insist upon full compliance by the other Parties hereto with their obligations hereunder shall constitute a waiver of any provision of this Agreement.

**9.10**     <u>Counterparts and Execution.</u> This Agreement may be executed in multiple counterparts, each of which shall be deemed an original Agreement for all purposes, and all of which when taken together shall constitute one Agreement among each of the Parties hereto, notwithstanding that all of the Parties are not signatories to the original or the same counterpart.

**9.11**     <u>Rights and Remedies Cumulative.</u> The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any Party shall not preclude or waive its right to use any or all other remedies. Such rights and remedies are given in addition to any other rights the Parties may have by law, statute, ordinance, or otherwise.

**9.12**     <u>Notices.</u> Any notice called for hereunder shall be in writing and shall be deemed properly given if sent both by e-mail and one of the following methods of delivery: (i) certified mail, return receipt requested, (ii) personal delivery, or (iii) dispatch by any form of private or governmental express mail or delivery service providing receipted delivery, to the following addresses or to such other address as either Party may designate by notice in accordance with this Section:

If to Operator:           Anniston Assisted Living, LLC
c/o: Wayfinder Holdings, LLC
10554 Ocean Highway
Pawleys Island, SC 29585
Attn: Alfred H. Abernethy, III
chip.abernethy@nai-lachicotte.com

With Copy To:

A. Harvey Abernethy, Jr.
abernethy.h@gmail.com

If to Manager:          Phoenix Senior Living LLC
10933 Crabapple Road
Roswell, GA 30075
Attn: Scott Miles
scott.miles@phoenixsrliving.com

Notice shall be deemed given on the earlier of (i) actual receipt by the receiving Party, (ii) the date shown on a facsimile transmission confirmation, (iii) the date reflected on a signed delivery receipt, or (iv) two (2) Business Days following tender of delivery or dispatch by express mail or delivery service.

**9.13**     <u>Survival.</u> All representations, warranties, indemnifications, covenants and undertakings set forth herein shall survive the Commencement Date and shall remain binding on the Parties hereto.

**9.14**   <u>Approval of Operator; Agreement of Parties.</u> Unless otherwise specifically provided, (i) any approval to be given by Operator hereunder must be in writing to be effective and may be granted or withheld in Operator's sole and absolute discretion, and (ii) any matter to be agreed to by the Parties must be in writing to be effective and the decision whether or not to enter into such agreement will be in the Parties' sole and absolute discretion.

**9.15**   <u>Governing Law.</u> All issues relating to this Agreement and its formation, performance and enforcement shall be governed by and construed in accordance with the substantive laws of the State of Georgia without reference to the rules governing conflict of laws.

**9.16**   <u>HIPAA Compliance.</u> The Parties agree that the services provided under this Agreement will comply in all material respects with all federal and state-mandated regulations, rules, or orders applicable to the services provided herein, including but not limited to regulations promulgated under Title II, Subtitle F of the Health Insurance Portability and Accountability Act (Public Law 104-91) **("HIPAA").** If and to the extent that Operator ever becomes a "Covered Entity" as defined by HIPAA, then Manager agrees to adopt the obligations of a "Business Associate" as defined by **HIPAA**. The Parties agree to sign the form of Business Associate Addendum added at **EXHIBIT A** attached hereto, but only with the intention that the obligations under the Business Associate Addendum will apply if and to the extent Operator is deemed to be a "Covered Entity" for purposes of HIPAA.

**[Remainder of page intentionally left blank. Signature page follows.]**

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the Commencement Date.

**OPERATOR:**

**ANNISTON SENIOR LIVING, LLC,** a Delaware limited liability company

By: _____

Name: _____

Its: _____

**MANAGER:**

**PHOENIX SENIOR LIVING LLC,** a Georgia limited liability company

By: _____

Jesse Marinko, Chief Executive Officer

[Signature Page to Autumn Cove Management Services Agreement]

## EXHIBIT A

## HIPAA BUSINESS ASSOCIATE ADDENDUM

This Business Associate Addendum (the "Addendum") is entered into by and between **PHOENIX SENIOR LIVING LLC**, a Georgia limited liability company ("**Business Associate**") and **ANNISTON SENIOR LIVING, LLC**, a Delaware limited liability company ("**Covered Entity**"). Business Associate and Covered Entity may be referred to herein individually as a "**Party**" and collectively as the "**Parties**." The effective date of this Addendum is the Commencement Date of the Management Services Agreement.

### WITNESSETH:

WHEREAS, the Parties to the Management Services Agreement and this Addendum acknowledge that the entity referred to herein as the Covered Entity may not qualify as a "covered entity" as that term is defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). The Parties are entering into this Addendum with the intent that this Addendum will become effective, and the terms herein will become obligatory on the Parties, only if and to the extent that the Covered Entity becomes a "covered entity" under HIPAA.

In that respect, this Addendum supplements any current or future service agreement(s) entered into between Business Associate and Covered Entity. Pursuant to the Management Services Agreement, Business Associate may perform functions or activities on behalf of Covered Entity involving the use and/or disclosure of Protected Health Information received from, or created or received by, Business Associate on behalf of Covered Entity. To the extent Business Associate is functioning as a business associate to Covered Entity, Business Associate and Covered Entity agree to the following terms and conditions to ensure compliance with the Privacy and Security Rules of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA Privacy and Security Rules") (45 C.F.R. Parts 160 and 164); and

WHEREAS, the Health Information Technology for Economic and Clinical Health ("HITECH") Act of the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, modified the HIPAA Privacy and Security Rules (hereinafter, all references to the "HIPAA Privacy and Security Rules" include all amendments thereto set forth in the HITECH Act and any accompanying regulations); and

THEREFORE, in consideration of the Parties' continuing obligations under the Management Services Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to the provisions of this Addendum.

Except as otherwise defined herein, any and all capitalized terms in this Addendum shall have the definitions set forth in the HIPAA Privacy and Security Rules. In the event of an inconsistency between the provisions of this Addendum and mandatory provisions of the HIPAA Privacy and Security Rules, as amended, the HIPAA Privacy and Security Rules in effect at the time shall control. Where provisions of this Addendum are different than those mandated by the HIPAA Privacy and Security Rules, but are nonetheless permitted by the HIPAA Privacy and Security Rules, the provisions of this Addendum shall control.

### I.   PERMITTED USES AND DISCLOSURES BY BUSINESS ASSOCIATE

A.    Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the Management

Services Agreement, provided that such use or disclosure would not violate the HIPAA Privacy and Security Rules if done by Covered Entity.

B.      Business Associate may use Protected Health Information in its possession for its proper management and administration and to fulfill any present or future legal responsibilities of Business Associate, provided that such uses are permitted under state and federal confidentiality laws.

C.      Business Associate may disclose Protected Health Information in its possession to third parties for the purposes of its proper management and administration or to fulfill any present or future legal responsibilities of Business Associate, provided that:

1.      the disclosures are required by law; or

2.      Business Associate obtains reasonable assurances from the third parties to whom the Protected Health Information is disclosed that the information will remain confidential and be used or further disclosed only as required by law or for the purpose for which it was disclosed to the third party, and that such third parties will notify Business Associate of any instances of which they are aware in which the confidentiality of the information has been breached.

D.      Until such time as the Secretary issues regulations pursuant to the HITECH Act specifying what constitutes "minimum necessary" for purposes of the HIPAA Privacy and Security Rules, Business Associate shall, to the extent practicable, access, use, and request only Protected Health Information that is contained in a limited data set (as defined in 45 C.F.R. § 164.514(e)(2)), unless Business Associate requires certain direct identifiers in order to accomplish the intended purpose of the access, use, or request, in which event Business Associate may access, use, or request only the minimum necessary amount of Protected Health Information to accomplish the intended purpose of the access, use, or request. The Parties shall collaborate in determining what quantum of information constitutes the "minimum necessary" amount for Business Associate to accomplish its intended purposes.

## II.    **OBLIGATIONS AND ACTIVITIES OF BUSINESS ASSOCIATE**

A.      Business Associate agrees not to use or further disclose Protected Health Information other than as permitted or required by this Addendum or the Management Services Agreement or as required by law.

B.      Business Associate agrees to use appropriate safeguards and to comply, where applicable, with 45 C.F.R. Part 164, Subpart C with respect to Electronic Protected Health Information, to prevent use or disclosure of Protected Health Information other than as provided for by this Addendum. Specifically, Business Associate will:

1.      implement the administrative, physical, and technical safeguards set forth in 45 C.F.R. §§ 164.308, 164.310, and 164.312 that reasonably and appropriately protect the confidentiality, integrity, and availability of any Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity, and, in accordance with 45 C.F.R. § 164.316, implement and maintain reasonable and appropriate policies and procedures to enable it to comply with the requirements outlined in 45 C.F.R. §§ 164.308, 164.310, and 164.312; and

2.      report to Covered Entity any Security Incident that does not rise to the level of a Breach of Unsecured Protected Health Information ("Breach"), and any use or disclosure of Protected Health Information that is not provided for by this Addendum but that does not rise to the level of a Breach, of which Business Associate becomes aware. The report shall be made as soon as practical, and

in any event within ten (10) days of Business Associate's discovery of the Security Incident or the impermissible use or disclosure. A Security Incident shall be treated as discovered by Business Associate as of the first day on which such Security Incident is known to Business Associate or, through the exercise of reasonable diligence, would have been known to Business Associate.

C.      Business Associate shall require each subcontractor that creates, receives, maintains, or transmits Protected Health Information on its behalf to enter into a business associate agreement containing the same restrictions on access, use, and disclosure of Protected Health Information as those applicable to Business Associate under this Addendum. Furthermore, to the extent that Business Associate provides Electronic Protected Health Information to a subcontractor, Business Associate shall require such subcontractor to comply with all applicable provisions of 45 C.F.R. Part 164, Subpart C.

D.      Business Associate agrees to comply with any requests for restrictions on certain disclosures of Protected Health Information to which Covered Entity has agreed in accordance with 45 C.F.R. § 164.522 of which Business Associate has been notified by Covered Entity.

E.      If Business Associate maintains a designated record set on behalf of Covered Entity, at the request of Covered Entity and in a reasonable time and manner, Business Associate agrees to make available Protected Health Information required for Covered Entity to respond to an individual's request for access to his or her Protected Health Information in accordance with 45 C.F.R. § 164.524. If Business Associate maintains Protected Health Information in an electronic designated record set, it agrees to make such Protected Health Information available electronically to Covered Entity or, upon Covered Entity's specific request, to the applicable individual or to a person or entity specifically designated by such individual, upon such individual's request.

F.      If Business Associate maintains a designated record set on behalf of Covered Entity, at the request of Covered Entity and in a reasonable time and manner, Business Associate agrees to make available Protected Health Information required for amendment by Covered Entity in accordance with the requirements of 45 C.F.R. § 164.526.

G.      Business Associate agrees to document any disclosures of Protected Health Information, and to make Protected Health Information available for purposes of accounting of disclosures, as required by 45 C.F.R. § 164.528.

H.      If Business Associate is to carry out one or more of Covered Entity's obligations under 45 C.F.R. Part 164, Subpart E, Business Associate shall comply with the requirements of Subpart E that apply to Covered Entity in the performance of such obligation(s).

I.      Business Associate agrees that it will make its internal practices, books, and records relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity, available to the Secretary, in a time and manner designated by the Secretary, to enable the Secretary to determine Business Associate's or Covered Entity's compliance with the HIPAA Privacy and Security Rules. Business Associate also shall cooperate with the Secretary and, upon the Secretary's request, pursuant to 45 C.F.R. § 160.310, shall disclose Protected Health Information to the Secretary to enable the Secretary to investigate and review Business Associate's or Covered Entity's compliance with the HIPAA Privacy and Security Rules.

J.      Unless expressly authorized in the Management Services Agreement, Business Associate shall not:

1.      use Protected Health Information for marketing or fundraising;

2.      use Protected Health Information to create a limited data set or to de-identify the information;

3.      use Protected Health Information to provide data aggregation services relating to the health care operations of Covered Entity; or

4.      use or disclose Protected Health Information in exchange for remuneration of any kind, whether directly or indirectly, financial or non-financial, other than such remuneration as Business Associate receives from Covered Entity in exchange for Business Associate's provision of the services specified in the Management Services Agreement.

## III.   BUSINESS ASSOCIATE'S MITIGATION AND BREACH NOTIFICATION OBLIGATIONS

A.      Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this Addendum.

B.      Following the discovery of a Breach, Business Associate shall notify Covered Entity of such Breach without unreasonable delay and in no case later than ten (10) calendar days after discovery of the Breach, and shall assist in Covered Entity's breach analysis process, including risk assessment, if requested. A Breach shall be treated as discovered by Business Associate as of the first day on which such Breach is known to Business Associate or, through the exercise of reasonable diligence, would have been known to Business Associate. The Breach notification shall be provided to Covered Entity in the manner specified in 45 C.F.R. § 164.410(c) and shall include the information set forth therein to the extent known. If, following the Breach notification, Business Associate learns additional details about the Breach, Business Associate shall notify Covered Entity promptly as such information becomes available. Covered Entity shall determine whether Business Associate or Covered Entity will be responsible for providing notification of any Breach to affected individuals, the media, the Secretary, and/or any other Parties required to be notified under the HIPAA Privacy and Security Rules or other applicable law. If the Breach is caused by Business Associate, and if Covered Entity determines that Business Associate will be responsible for providing such notification, Business Associate may not carry out notification until Covered Entity approves the proposed notices in writing.

C.      Notwithstanding the provisions of Section III.B., above, if a law enforcement official states to Business Associate that notification of a Breach would impede a criminal investigation or cause damage to national security, then:

1.      if the statement is in writing and specifies the time for which a delay is required, Business Associate shall delay such notification for the time period specified by the official; or

2.      if the statement is made orally, Business Associate shall document the statement, including the identity of the official making it, and delay such notification for no longer than thirty (30) days from the date of the oral statement unless the official submits a written statement during that time.

Following the period of time specified by the official, Business Associate shall promptly deliver a copy of the official's statement to Covered Entity.

## IV.   OBLIGATIONS OF COVERED ENTITY

A.    Upon request of Business Associate, Covered Entity shall provide Business Associate with the notice of privacy practices that Covered Entity produces in accordance with 45 C.F.R. § 164.520.

B.    Covered Entity shall provide Business Associate with any changes in, or revocation of, permission by an individual to use or disclose Protected Health Information, if such changes could reasonably be expected to affect Business Associate's permitted or required uses and disclosures.

C.    Covered Entity shall notify Business Associate of any restriction on the use or disclosure of Protected Health Information to which Covered Entity has agreed in accordance with 45 C.F.R. § 164.522, and Covered Entity shall inform Business Associate of the termination of any such restriction, and the effect that such termination shall have, if any, upon Business Associate's use and disclosure of such Protected Health Information.

## V.    TERM AND TERMINATION

A.    <u>Term</u>. The Term of this Addendum shall be effective as of the effective date of the Management Services Agreement and shall terminate upon later of the following events: (i) in accordance with Section V.C., when all of the Protected Health Information provided by Covered Entity to Business Associate or created or received by Business Associate on behalf of Covered Entity is returned to Covered Entity or destroyed (and a certificate of destruction is provided) or, if such return or destruction is infeasible, when protections are extended to such information; or (ii) upon the expiration or termination of the Management Services Agreement.

B.    <u>Termination</u>. Upon either Party's knowledge of a material breach by the other Party of its obligations under this Addendum, the non-breaching Party shall, within twenty (20) days of that determination, notify the breaching Party, and the breaching Party shall have thirty (30) days from receipt of that notice to cure the breach or end the violation. If the breaching Party fails to take reasonable steps to effect such a cure within such time period, the non-breaching Party may terminate this Addendum and the Management Services Agreement without penalty.

Where either Party has knowledge of a material breach by the other Party and determines that cure is infeasible, prior notice of the breach is not required, and the non-breaching Party shall terminate the portion of the Management Services Agreement affected by the breach without penalty.

C.    <u>Effect of Termination</u>.

1.    Except as provided in paragraph 2 of this subsection C., upon termination of this Addendum, the Management Services Agreement or upon request of Covered Entity, whichever occurs first, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of subcontractors of Business Associate. Neither Business Associate nor its subcontractors shall retain copies of the Protected Health Information except as required by law.

2.    In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide within ten (10) days to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Health Information is infeasible, Business Associate, and its applicable subcontractors, shall extend the protections of this Addendum to such Protected Health Information and limit further uses and disclosures of such Protected Health Information

to those purposes that make the return or destruction infeasible, for so long as Business Associate and its applicable subcontractors maintain such Protected Health Information.

## VI.   **MISCELLANEOUS**

A.   <u>No Rights in Third Parties</u>. Except as expressly stated herein or in the HIPAA Privacy and Security Rules, the Parties to this Addendum do not intend to create any rights in any third parties.

B.   <u>Survival</u>. The obligations of Business Associate under Section V.C. of this Addendum shall survive the expiration, termination, or cancellation of this Addendum, the Management Services Agreement, and/or the business relationship of the Parties, and shall continue to bind Business Associate, its agents, employees, contractors, successors, and assigns as set forth herein. Furthermore, the Parties' indemnification obligations pursuant to Section VI.A. of this Addendum shall survive the expiration, termination, or cancellation of this Addendum, the Management Services Agreement, and/or the business relationship of the Parties, and shall continue to bind the Parties, their agents, employees, contractors, successors, and assigns as set forth herein.

C.   <u>Amendment</u>. The Parties agree that this Addendum will be amended automatically to conform to any changes in the HIPAA Privacy and Security Rules as are necessary for each of them to comply with the current requirements of the HIPAA Privacy and Security Rules and the Health Insurance Portability and Accountability Act, unless a particular statutory or regulatory provision requires that the terms of this Addendum be amended to reflect any such change. In those instances where an amendment to this Addendum is required by law, the Parties shall negotiate in good faith to amend the terms of this Addendum within sixty (60) days of the effective date of the law or final rule requiring the amendment. If, following such period of good faith negotiations, the Parties cannot agree upon an amendment to implement the requirements of said law or final rule, then either Party may terminate this Addendum and the Management Services Agreement upon ten (10) days written notice to the other Party. Except as provided above, this Addendum may be amended or modified only in a writing signed by the Parties.

D.   <u>Assignment</u>. Neither Party may assign its respective rights and obligations under this Addendum without the prior written consent of the other Party.

E.   <u>Independent Contractor</u>. None of the provisions of this Addendum are intended to create, nor will they be deemed to create, any relationship between the Parties other than that of independent Parties contracting with each other solely for the purposes of effecting the provisions of this Addendum and any other agreements between the Parties evidencing their business relationship. Nothing in this Addendum creates or is intended to create an agency relationship.

F.   <u>Governing Law</u>. To the extent this Addendum is not governed exclusively by the HIPAA Privacy and Security Rules or other provisions of federal statutory or regulatory law, it will be governed by and construed in accordance with the laws of the state in which Covered Entity has its principal place of business.

G.   <u>No Waiver</u>. No change, waiver, or discharge of any liability or obligation hereunder on any one or more occasions shall be deemed a waiver of performance of any continuing or other obligation, or shall prohibit enforcement of any obligation, on any other occasion.

H.   <u>Interpretation</u>. Any ambiguity of this Addendum shall be resolved in favor of a meaning that permits Covered Entity and Business Associate to comply with the HIPAA Privacy and Security Rules.

I.      Severability. In the event that any provision of this Addendum is held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of the provisions of this Addendum will remain in full force and effect.

J.      Notice. Any notification required in this Addendum shall be made in writing to the representative of the other Party who signed this Addendum or the person currently serving in that representative's position with the other Party.

K.      Certain Provisions Not Effective in Certain Circumstances. The provisions of this Addendum relating to the HIPAA Security Rule shall not apply to Business Associate if Business Associate does not receive, create, maintain, or transmit any Electronic Protected Health Information from or on behalf of Covered Entity.

L.      Entire Agreement. This Addendum constitutes the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written. In the event of any inconsistency between this Addendum and any other agreement between the Parties concerning the use and disclosure of Protected Health Information and the Parties' obligations with respect thereto, the terms of this Addendum shall control.

M.      Counterparts. This Addendum may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same Agreement.

[signatures begin on following page]

THE PARTIES EXECUTE THIS ADDENDUM WITH THE INTENT THAT THE TERMS HEREOF SHALL BECOME EFFECTIVE ONLY IF AND TO THE EXTENT THAT THE COVERED ENTITY HEREIN IS DEEMED TO BE A "COVERED ENTITY" AS DEFINED UNDER HIPAA.

**BUSINESS ASSOCIATE:**

**PHOENIX SENIOR LIVING LLC**, a Georgia limited liability company

By: _____

      Jesse Marinko, Chief Executive Officer


**COVERED ENTITY:**

**ANNISTON ASSISTED LIVING, LLC**, a Delaware limited liability company

By: _____
Name: _Chip Abernethy_____
Its: _Member_____

## EXHIBIT B

## PURCHASE OPTION

Section 1.    Define Terms. Capitalized terms contained in this **Exhibit B** and not otherwise defined have the meaning ascribed to them in the Management Services Agreement.

Section 2.    Purchase Option. Landlord and Operator, each to the extent applicable, hereby grant to Manager, the option (the "Purchase Option") to purchase the Facility, the land upon which the Facility is located consisting of approximately 7.5 acres, together with that certain contiguous raw land consisting of approximately 17.26 acres as more particularly described on those certain warranty deeds attached to this **Exhibit B** as Schedule 1-A and 1-B (all such land together with the Facility and related improvement located thereon being the "**Real Property**"), and any and all aspects of the business operations and assets of Landlord, Operator, and the Facility (the "**Business Operations**"; and together with the Real Property being the "**Property**"). The Purchase Option for the Property may be exercised for a period beginning on the Commencement Date and continuing until expiration upon the earlier of (i) fifteen (15) months following the Commencement Date, or (ii) the achievement by the Facility of NOI of Fifty-Five Thousand and No/100 dollars ($55,000.00) or more for a period to two (2) consecutive months (the "**Option Period**"). Manager must exercise the Purchase Option during the Option Period, by written notice in accordance with the terms of the Agreement (the "Purchase Option Notice"). Not later than thirty (30) days following delivery of the Purchase Option Notice the parties shall enter into a customary and mutually agreed upon purchase and sale and asset purchase agreement to affect the sale and conveyance of the Property free and clear of all liens and encumbrances (the "**PSA**"). The closing of the purchase and sale of the Property shall occur not later than seventy-five (75) days following execution of the PSA ("**Closing**").

Section 3.    Purchase Price. The purchase price (the "**Purchase Price**") for the Property will be payable in cash or by federal wire transfer, as determined by Manager, and shall in an amount equal to Eight Million Three Hundred Two Thousand and No/100 dollars ($8,302,000.00).

Section 4.    Closing/Due Diligence. At Closing, Landlord and Operator, each to the extent applicable, shall convey good and marketable title to the Property. The Property shall be conveyed on an "AS-IS, WHERE IS" basis excepting customary and agreed upon representations and warranties from Landlord and Operator, and their respective principals, with respect to the Property, all as to be further set forth in the PSA. As soon as practicable after Manager's election to purchase the Property, Landlord and Operator will provide Manager with customary due diligence for the purchase of the Real Property and Business Operations so that Manager may conduct due diligence on the Property for a period of not less than sixty (60) days following delivery of the Purchase Option Notice, during which time Manager may rescind its Purchase Option Notice for any reason or no reason and the purchase and sale as well as the Purchase Option shall be terminated and cancelled.  Notwithstanding anything to the contrary herein, while Landlord and Operator shall provide Manager with copies of any existing due diligence materials in its possession there shall be no requirement for Landlord or Operator to generate any studies, inspections, reports or other due diligence materials.

Section 5.    Seller Must Satisfy All Monetary Liens. Notwithstanding anything herein to the contrary, at or before Closing, Landlord and Operator covenant and agree (a) to cause to be released any mortgages, deeds of trust or deeds to secure debt which encumber the Property and (b) to cause to be cancelled and discharged, or otherwise cause Tenant's title insurance company to insure without exception as to (i) any mechanics' or contractors' liens which encumber the Property as of the date of Closing and which have been placed on the Property and (ii) any judgment liens which encumber the Property (the matters referenced in the foregoing clauses (a) and (b) are collectively referred to herein as the "Monetary Liens"). In the event Landlord fails to cure any such Monetary Lien at Closing, Manager, in addition to any other right and remedy allowed herein, at law or in equity, shall be entitled to pay such amount to the holder thereof as may be required to pay and cancel same, and to credit against the Purchase Price.

Section 6.    Closing Documents. At Closing, Landlord and Operator shall deliver to Manager all customary documents and agreements to convey good and marketable title to the Property free of any and all liens and encumbrances.