UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KEISHA DIXON, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE NO.: |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| CLAYTON COUNTY BOARD OF HEALTH, CLAYTON COUNTY, GEORGIA, and GEORGIA DEPARTMENT OF PUBLIC HEALTH, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.

Keisha Dixon ("Ms. Dixon" or "Plaintiff") brings this Complaint and Demand for Jury Trial against Clayton County Board of Health ("Clayton BOH"), Clayton County, Georgia ("Clayton County") and the Georgia Department of Public Health ("DPH") (collectively, the "Defendants"), for violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et. seq.* In support of her Complaint, Ms. Dixon alleges and states the following:

## **NATURE OF THE ACTION**

The Family and Medical Leave Act of 1993 was enacted to assist eligible employees with balancing their work and life demands by providing job-protected time off from work for limited, qualifying reasons.  Ms. Dixon was one such eligible employee who sought job-protected time off. Ms. Dixon committed to a career in public health, garnering an impressive employment record.  However, after taking approved FMLA to care for her son, Ms. Dixon was stripped of this federal protection and escorted out of Clayton BOH.

Ms. Dixon's son, an Army veteran suffering from PTSD, experienced a severe mental health crisis in early March 2021.  Ms. Dixon, as any mother would, immediately began to take approved time off to provide care to her son, using her accrued sick leave.  As her son's symptoms worsened, Ms. Dixon requested and was given approval for FMLA leave, ending on May 18, 2021.

On May 19, 2021, the day after she returned to work, Ms. Dixon attended a meeting with her supervisor Carla Heath. Heath immediately notified Ms. Dixon that her job with Clayton BOH was over.  Heath told Ms. Dixon that she could apply for a position that was a demotion in both title and compensation, however, there were no guarantees she (Ms. Dixon) would secure another job.   Heath pressured Ms. Dixon to decide if she could make ends meet making a salary less than half the salary she made prior to taking FMLA leave, assuming Ms. Dixon

would even be hired for a new job. Given the tremendous drop in salary, coupled with the uncertainty of being selected and the humiliation of being demoted and having to apply for a new job in the same organization, Ms. Dixon did not submit an application. On May 28, 2021, Ms. Dixon informed her supervisor that she was not financially able to apply for the demotion. Ms. Dixon reminded Heath that her leave had been approved and she only took the leave to care for her son. Nevertheless, Ms. Dixon was fired 21 days later. Even worse, Defendants refused to explain or give Ms. Dixon the reasons for her termination. Instead, Defendants obliquely noted that it was in the "best interests" of Clayton BOH for Ms. Dixon to be separated from her employment.

Consequently, Ms. Dixon brings an FMLA claim for Defendants' interference with and retaliation against her for exercising her right to take the job-protected leave which was crucial to care for her son who was suffering from severe documented PTSD.

## **JURISDICTION AND VENUE**

2.

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331. This action is authorized and instituted pursuant to 29 U.S.C. § 2617(a)(2), to secure protection of and redress the deprivation of Ms. Dixon's rights secured by 29

U.S.C. § 2601, *et seq.*, providing for relief from interference and retaliation from an employer for exercising and attempting to exercise her FMLA rights.

3.

Venue is proper in this Court under 28 U.S.C. § 1391(b) as all Defendants are located within the Northern District of Georgia, Atlanta Division, and the employment practices/unlawful conduct occurred within this District and Division.

**PARTIES**

4.

Ms. Dixon is a citizen of the United States, and is, and was at all times material, a resident of the state of Georgia, residing in Clayton County, Georgia. Ms. Dixon submits to the jurisdiction and venue of this Court.

5.

Defendant Clayton BOH is a public agency created by State law and is subject to the jurisdiction of this Court. Clayton BOH may be served by personal service upon Clayton County BOH's Chairman, Jeffrey Turner, at his office located at 112 Smith Street, Annex 1, Jonesboro, Georgia 30236.

6.

Defendant Clayton County is a political subdivision of the State of Georgia and is subject to the jurisdiction of this Court. To avoid the costs of service, Clayton County has agreed to waive service. Clayton County may otherwise be

served by personal service upon the Clayton County Board of Commissioners' Chairman, Jeffrey Turner, at his office located at 112 Smith Street, Annex 1, Jonesboro, Georgia 30236.

7.

DPH is a public agency and is subject to the jurisdiction of this Court.  DPH functions through numerous divisions, sections, programs and offices, and collaborates with Georgia's 159 county health departments and 18 public health districts statewide. DPH may be served by personal service upon its designee pursuant to O.C.G.A. § 50-21-35, and General Counsel, Jeffrey Rickman, at West Tower, Suite 1902, 200 Piedmont Avenue S.E., Atlanta, Georgia 30334.

8.

At all times relevant to this Complaint, Ms. Dixon was an employee of the Clayton BOH as defined in 29 U.S.C. § 2611(2).

9.

At all times relevant to this Complaint, Ms. Dixon was an employee of Clayton County as defined in 29 U.S.C. § 2611(2).

10.

At all times relevant to this Complaint, Ms. Dixon was an employee of DPH as defined in 29 U.S.C. § 2611(a)(2).

11.

At all times relevant to this Complaint, Ms. Dixon worked for Defendants at a location where Defendants employed 50 or more employees within a 75-mile radius.

## STATEMENT OF FACTS

12.

Ms. Dixon began her career in public health in December 2006.  Ms. Dixon excelled in her roles and was promoted to Administrative Operations Assistant for DPH before ultimately working as Chief of Staff to the DPH Commissioner until April 2019.

13.

On April 1, 2019, Ms. Dixon was transferred from working as the chief of staff to director of administrative operations in Jonesboro, Georgia.  Ms. Dixon's title was subsequently changed to special projects coordinator as a result of an internal reorganization in February 2020.  As special projects coordinator, Ms. Dixon's supervisor was Carla Heath, then-Director of Administration/Operations for Clayton Health.  Heath's current title is Director of Business Operations.

14.

In Jonesboro, a major component of Ms. Dixon's job duties as special projects coordinator became the oversight, management, and facilitation of the "Return to Battlecreek Project" ("Battlecreek").

15.

Specifically, Battlecreek involved the renovation and integration of a new state-of-the-art facility located at 1117 Battlecreek Road, Jonesboro, Georgia.

16.

From June 2019 to December 2020, the entire facility at 1117 Battlecreek Road was under construction. In December 2019, staff began moving into the administrative portion(s) of the facility from another location.

17.

As Battlecreek progressed, Ms. Dixon met with Heath on several occasions to discuss her (Ms. Dixon's) continuing role in Jonesboro after Battlecreek concluded. For example, on November 25, 2020, the two discussed roles Ms. Dixon could fill including replacing the Program Manager, Jennifer Beane, if she retired, in conjunction with absorbing another vacant position, the Healthier Generations Project ("HGP") Coordinator, which reported to the Program Manager. Ms. Dixon believed when Battlecreek ended she would be moved into

other positions and/or absorb other positions commensurate with her salary.

18.

Through the end of 2020, Ms. Dixon and Heath discussed varied options for Ms. Dixon post Battlecreek completion. There was no question that Ms. Dixon's job with Clayton BOH would continue after Battlecreek ended. Said another way, at no time did Defendants ever tell, advise, inform, or suggest to Ms. Dixon that the conclusion of the Battlecreek project would impact her continued employment.

19.

On or about March 1, 2021, Ms. Dixon's son, a U.S. Army veteran, experienced a mental health crisis, brought about by his diagnosed PTSD.

20.

Ms. Dixon advised Health of her son's situation and she began to use her accrued sick leave to care for her son. Unfortunately, her son's health deteriorated as his mental health episodes escalated. Ms. Dixon was petrified to leave her son alone and she submitted documentation for FMLA leave to provide continued care for him.

21.

On April 27, 2021, Ms. Dixon received formal approval for her intermittent FMLA leave from March 4, 2021, through March 31, 2021, and continuous leave from April 1, 2021, through May 18, 2021 to care for her son whose condition

continued to devolve. Carmen King, then-Human Resources Director for Clayton Health, approved the FMLA leave.

22.

Around this time, Ms. Dixon also informed Heath and King that she would likely need intermittent FMLA leave in the future to take her son to medical appointments and, should her son have another mental health crisis, she may need continuous FMLA leave in the future to provide care for her son. Ms. Dixon notified them she would keep them informed of her son's continued health crisis and her attendant need for leave.

23.

On May 19, 2021, Ms. Dixon returned from her approved FMLA leave; the next day she was called into a meeting and informed that her job was over. Ms. Dixon was shocked considering that in November and December she had discussed other positions once Battlecreek ended.

24.

Ms. Dixon questioned Heath noting that her workload relating to Battlecreek had not diminished or otherwise been reduced prior to taking FMLA leave. Heath ignored Ms. Dixon stating that her (Ms. Dixon's) job was over but she *could* apply for HGP, which alone would be a significant demotion in pay and title.

25.

Ms. Dixon reminded Heath that they had already discussed the HGP position in 2020 as something Ms. Dixon would assume upon completion of Battlecreek. Heath ignored Ms. Dixon's questions advising her that, despite leading her to believe the position was reserved for her, they posted the position during Ms. Dixon's leave and scheduled it to close on May 17, 2021, the day before her leave was scheduled to end.  Obviously, Ms. Dixon would not have known about the posting or anything else related to the loss of her employment since she was on job- protected leave.

26.

Heath notified Dixon if she wanted to apply for the HGP Coordinator position, she could, however, Heath placed an arbitrary and tight deadline on Ms. Dixon's submission for the job.

27.

Ms. Dixon was very upset and confused. Heath's statements informed Ms Dixon that the "offer" to have Ms. Dixon apply for the HGP position was pretextual since the job was already closed.

28.

On May 24, 2021, Heath emailed Ms. Dixon the HGP Coordinator job - 7 days after the job closed- instructing Ms. Dixon, if she was interested, to submit

her application by the following day because that was when the program manager would purportedly be reviewing the applications already received.

29.

Heath's comments were all pretextual. In 2020 - and before Ms. Dixon took job protected leave and caused inconvenience in the office- Heath had undisputedly discussed options for Ms. Dixon's continued employment after Battlecreek ended. Suddenly, after Ms. Dixon left to care for her son, Defendants' raced to post the HGP position with a closure date before Ms. Dixon's leave was scheduled to end, even though the job had been vacant since November 2021.

30.

In 2021, after Ms. Dixon's leave but before her termination, Ms. Dixon's work on the Battlecreek project had not ended. In fact, open records reflect ongoing work performed on Battlecreek as of January 2023- work that was previously performed by Ms. Dixon.

31.

It was clear to Ms. Dixon that Defendants were forcing her out of her job by pressuring her to apply for HGP position as a new hire (*i.e.*, with no preference), with a drastic cut in pay, as apparent retaliation for having to take time off to care for her son, and due to the future leave she would likely require based on her son's condition.

32.

As Defendants were aware, Ms. Dixon could not make ends meet earning a salary less than half the salary she made before she took FMLA leave as she also cared for her son. Defendants were aware of this as the income level was discussed when options for open positions were discussed between Heath and Dixon prior to Ms. Dixon's approved leave.

33.

On May 28, 2021, Ms. Dixon informed Defendants that she was financially unable to apply for the demotion but that she wanted to stay with Clayton BOH. Ms. Dixon was fired 21 days later, and approximately one month after her return from FMLA.

34.

Defendants refused to give Ms. Dixon a reason for her termination when she was fired or in her termination documents, noting that it was in Clayton BOH's "best interest" to separate from Ms. Dixon, presumably because she had to care for her son.

35.

To date, the Battlecreek facility remains under construction, with large portions inside and outside the building closed to staff. As such, clinical staff remain at another facility located at 685 Forest Parkway, Forest Park, Georgia.

36.

After Ms. Dixon's termination Defendants continued their retaliatory efforts. During her candidacy for employment with another state agency Ms. Dixon learned that Defendants listed her dismissal as a termination; the job was then rescinded. If Ms. Dixon's position was intended to be temporary Defendants would have no reason to classify her separation as a termination rendering her ineligible for rehire.

37.

Defendants' unlawful termination caused Ms. Dixon to suffer monetary damages, which she still faces today.

## COUNT I
## FMLA RETALIATION

38.

Ms. Dixon realleges and incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

39.

The actions of Defendants alleged herein, including firing Ms. Dixon for exercising and attempting to exercise her right to FMLA leave, were motivated by an impermissible retaliatory or discriminatory animus such that those actions constitute a violation of 29 U.S.C. § 2615(a)(2).

40.

Defendants' conduct was willful; Defendants intended to deprive Ms. Dixon of her rights under the FMLA.

41.

As a result of its violation of 29 U.S.C. § 2615(a)(2) as alleged herein, Defendants are liable to Ms. Dixon for all wages, salary, employment benefits and other compensation denied her by Defendants, actual monetary losses sustained by Ms. Dixon as a direct result of Defendants' violation, plus interest, liquidated damages, employment, and reinstatement.

## COUNT II
## FMLA INTERFERENCE

42.

Ms. Dixon realleges and incorporates by reference paragraphs 1 through 41 as if fully set forth herein.

43.

Defendants' termination and failure to return Ms. Dixon to the same position she held before her FMLA leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions, constitutes a violation of 29 U.S.C. § 2615(a)(1) for interference with Ms. Dixon's FMLA rights.

44.

Defendants' conduct was willful, and Defendants intended to deprive Ms.

Dixon of her rights under the FMLA.

45.

As a result of its violations of 29 U.S.C. § 2615(a)(1) as alleged herein, Defendants are liable to Ms. Dixon for all wages, salary, employment benefits and other compensation denied to her by Defendants, actual monetary losses sustained by Ms. Dixon as a direct result of Defendants' violation, plus interest, liquidated damages, employment, and reinstatement.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Dixon demands the following relief:

(a) Adjudicate and declare that Defendants violated Ms. Dixon's rights under the FMLA;

(b) An award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Ms. Dixon for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, and other benefits of employment;

(c) Additional liquidated damages in the amount of the above-requested award, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii);

(d) Equitable relief in the form of back pay, reinstatement, or in the event that reinstatement to the same position is not practicable, front pay, as the court deems appropriate, pursuant to 29 U.S.C. § 2617(a)(1)(B), and

classification of Ms. Dixon by Defendants as eligible for rehire; and

  (e) Attorney's fees, including expert witness fees, and costs of this action, pursuant to 29 U.S.C. § 2617(a)(3);

  (f) Such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Ms. Dixon demands a jury by trial on the matters alleged herein.

Respectfully submitted this 19th day of June, 2023.

            **WORTH JARRELL LLC**

            /s/ *Stephen S. Revis*
            Kimberly A. Worth
            Georgia Bar No. 500790
            kworth@worthjarrell.com
            Stephen S. Revis
            Georgia Bar No. 650249
            srevis@worthjarrell.com

            *Attorneys for Plaintiff*

Five Concourse Parkway
Suite 3200
Atlanta, Georgia 30328
Telephone: (404) 760-6016

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies that the foregoing has been prepared in Times New Roman (14 point) font, as required by the Court in Local Rule 5.l (B).

Respectfully submitted this 19th day of June, 2023.

                                      **WORTH JARRELL LLC**

                                      /s/ *Stephen S. Revis*
                                      Kimberly A. Worth
                                      Georgia Bar No. 500790
                                      kworth@worthjarrell.com
                                      Stephen S. Revis
                                      Georgia Bar No. 650249
                                      srevis@worthjarrell.com

                                      *Attorneys for Plaintiff*

Five Concourse Parkway
Suite 3200
Atlanta, Georgia 30328
Telephone: (404) 760-6016