**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| VETNOS, LLC, *Plaintiff*, | |
| v. | Civil Action No. _____ |
| SIDEPRIZE LLC d/b/a PRIZEPICKS, | **JURY TRIAL DEMANDED** |
| *Defendant*. | |

## COMPLAINT FOR PATENT INFRINGEMENT AND TRADE SECRET MISAPPROPRIATION

Plaintiff Vetnos, LLC ("Vetnos" or the "Company"), by and through its attorneys, hereby alleges for its patent infringement and trade secret misappropriation Complaint against Defendant SidePrize LLC, dba PrizePicks ("PrizePicks") as follows:

## INTRODUCTION

1.      This action arises from PrizePicks' deliberate and willful infringement and misappropriation of Vetnos' patent- and trade-secret-protected technology (the "Vetnos Technology"). After the failure of its initial product offering, PrizePicks chose to brazenly rip off the Vetnos Technology: "we liked your game so much, we decided to copy it," said PrizePicks' founder. To do so, PrizePicks willfully infringed Vetnos' patents and misappropriated Vetnos' trade secrets by hiring a

former employee of Vetnos' predecessor who was intimately familiar with the Vetnos Technology.

2.      By copying the Vetnos Technology, PrizePicks was able to launch a fixed-odds daily fantasy sports game and learn to effectively manage the risk associated with offering such a game without engaging in the significant trial, error, and loss that Vetnos' predecessor engaged in to develop the Vetnos Technology.

3.      Vetnos also recently discovered that, prior to joining PrizePicks, its former employee secretly sent confidential information concerning the Vetnos Technology to his personal email account in breach of his confidentiality obligations.

4.      Vetnos has repeatedly cautioned PrizePicks against relying on Vetnos' patent- and trade-secret-protected technology, but PrizePicks has ignored these warnings, instead bringing to market a product that depends on the Vetnos Technology. By doing so, PrizePicks has taken a reckless approach to Vetnos' intellectual property rights.

## NATURE OF THE CASE

**A.      Vetnos Was Founded to Create the Technology that Powers New Forms of Fantasy Sports Games**

5.      Over the past decade, fantasy sports games have surged in popularity, becoming a significant part of the global sports culture. In 2021, the global fantasy

sports market was valued at $24 billion and is estimated to reach a value of $78.5 billion by 2030.[1]

6.      The technology behind traditional fantasy sports games, however, suffers from a variety of limitations and drawbacks. Since its founding in 2014, Game Sports Network, Inc. ("GSN"), and its successor Vetnos (collectively, the "Companies"), have invested significant resources researching and developing a suite of technologies (the "Vetnos Technology") that address these drawbacks and that power entirely new forms of fantasy sports games.

7.      Because traditional fantasy sports games often span an entire season, fans must invest a significant amount of time managing their fantasy team to account for issues like player injuries, unfavorable matchups, etc. And even if fans are willing to make this time investment, they may still lose interest during a long season if their fantasy team falls behind or drops out of contention.

8.      Traditional fantasy sports games are also often based on a pari-mutuel format[2] where fans are pitted against each other, and the prize pool varies based on

---

[1] "Fantasy Sports Market," https://straitsresearch.com/report/fantasy-sports-market
[2] Pari-mutuel gaming formats pit participants against each other rather than against the game provider. In this format, all entry fees are pooled together, and the odds are determined by the total amount wagered on each outcome. The winnings are then distributed among the winners based on the proportion of their entry fees in the total pool, after deducting the game provider's commission.

the number of fans participating. However, because winnings vary based on the behavior of other players in the player pool, pari-mutuel formats introduce an additional factor of chance or risk, potentially discouraging fans from playing. Due to these and other factors, pari-mutuel formats may be less desirable to sports fans and/or may not be permitted in some jurisdictions, leaving sports fans with fewer options to exercise their skilled knowledge of sports teams and players.

9.    Through their work, the Companies firmly established themselves as innovators in the daily fantasy sports world, chiefly demonstrated by their development of the Vetnos Technology. Through extensive experimentation and research, the Companies developed technology that powers new games of skill that keep casual sports fans engaged through a long season, enable fans to participate with minimal time investment, and allow fantasy sports operators to provide competitive, fixed prizes with managed risk.

10.    The Companies have been innovating and practicing their innovations for nearly a decade. For example, GSN launched HotRoster, a daily fantasy sports game, in November of 2014 on the iOS App Store.

11.    The Vetnos Technology includes a system for providing daily fantasy sports games in which fans can test their sports knowledge and prediction skills and win prizes that are known, or "fixed," in advance. For example, with the Vetnos

Technology, a daily fantasy sports game may present a series of "matchups" to a fan, such as whether a particular athlete will score over or under a certain number of points in an upcoming game.

12.    A fixed prize may also be set based on the number of matchups (*e.g.*, over-under propositions) in the series that the fan can correctly predict. For example, if a fan successfully predicts the outcomes of four independent over-under matchups, then the fan may win a prize that is equal to ten times the price of their entry fee.[3]

13.    Through extensive experimentation and research, the Companies developed tools and technology for providing daily fantasy sports games that employ the fixed-odds structure described herein. The fixed-odds matchup format powered by the Vetnos Technology enables sports fans to exercise their sports knowledge and skill for transparent, unchanging prizes, allowing for fair and fun sports fan engagement. And because each fixed-odds matchup is untethered from the underlying sports season, fans can participate and start fresh on a daily basis with minimal time investment.

---

[3] Assuming the odds for each matchup is equivalent to a coin flip, the theoretical value of the game may be 16:1. Therefore, the prize for correctly predicting four independent over-under matchups could be set to a multiplier of the entry fee somewhere below 16.

14.     On information and belief, prior to the Companies' innovations, there were no fixed-odds daily fantasy sports games in the market. Rather, fantasy sports games were all burdened with a pari-mutuel format.

15.     This significant achievement is a testament to the expertise, tenacity, and entrepreneurial spirit of the Companies and their founders. Without the investment and risk-taking by the Companies, fantasy sports might still suffer from many of the drawbacks outlined in paragraphs 6 and 7 above.

16.     The Vetnos Technology has enabled new games and new prize structures, both within and without the daily fantasy sports category. Various organizations, including professional sports teams and leagues, have expressed interest in games made possible by the Vetnos Technology.

17.     The Vetnos Technology has also empowered various Tribal Nations. For example, various Tribal Nations have adopted a Vetnos sports-themed Class II gaming product relying on the Vetnos Technology. As Chicken Ranch Tribal Chairman Lloyd Mathieson said, "what really drew us to this app[] was the ability for Tribes to strengthen their sovereignty."[4] As President Terri Parton of the Wichita and Affiliated Tribes said, the Vetnos Technology "means more jobs and stronger

---

[4] "Tribal Nations Partner with Vetnos to Create First-Ever Class II Sports Gaming App, PlaySqor," (October 6, 2022), https://www.indiangaming.com/tribal-nations-partner-with-vetnos-to-create-first-ever-class-ii-sports-gaming-app-playsqor/

communities."[5] And as Treasurer Justin Barrett of the Eastern Shawnee Tribe of Oklahoma said, "We are not one of the larger Tribes, but we are strategic, forward-thinking, and progressive. When Tribes are able to expand and manage our gaming offerings properly, we can generate more revenue for the betterment of our people and our communities."[6]

18.    On information and belief, prior to the Companies' innovations, there were no Class II sports games available for Tribal Nations. The Vetnos Technology and the application thereof by Vetnos has solved a long-standing problem of creating Class II sports games available for Tribal Nations to adopt.

19.    Vetnos' transformative work developing the technology behind the daily fantasy sports world has been a powerful innovation that Vetnos has protected through various forms of intellectual property, including patents and trade secrets.

**B.    The Companies Secured Various Patents to Protect their Investment in Developing the Vetnos Technology**

20.    To protect the Companies' substantial investment of time and resources in developing the Vetnos Technology, the Companies sought and obtained patents

---

[5] *Id.*

[6] Vetnos News Release, "Tribal Nation Gaming Milestone: Three Tribes, Two States, and One Purpose" (October 5, 2022); *see also* https://www.nativeoklahoma.us/tribal-nation-gaming-milestone-three-tribes-two-states-and-one-purpose-bringing-a-first-of-its-kind-class-ii-sports-themed-app-to-the-market/

protecting certain inventions underlying the same. This lawsuit is based in part on three patents that claim priority to applications filed in 2014 and 2015 covering some of Vetnos' foundational intellectual property; namely: U.S. Patent Nos. 10,353,543 (the "'543 patent"), 11,157,147 (the "'147 patent"), and 11,579,754 (the "'754 patent") (collectively, the "Asserted Patents").

## C.   The Companies Developed, Employed, and Protected Trade Secret Methods of Operating a Fixed-Odds Daily Fantasy Sports Game

21.   In developing, offering, and running a fixed-odds daily fantasy sports game, the Companies, including GSN, also developed certain confidential, proprietary methods (the "Trade Secrets").

22.   In a fixed-odds daily fantasy sports game, a significant challenge for the game provider is the task of selecting the daily matchups that the provider offers players. The fixed-odds format of the game means that the provider must produce matchups (1) in which the two outcomes that a player can select have an equal probability of occurring (*i.e.*, a "coin flip" or 50/50 odds) and (2) that are attractive to players so that a sufficient number of players select each side of the matchup. In the event the game provider produces a matchup that is not equally probable or that fails to generate a sufficient number of entries on either side, then the provider

assumes the risk that prize payments associated with this matchup might be disproportionate to the entry fees paid by players.

23.   In addition to producing appropriate matchups, the provider of a fixed-odds daily fantasy sports game can manage risk in other ways, including by actively managing the number and type of matchups that it offers players at any time.

24.   For example, for a series of four matchups, GSN generally offered prizes of ten times the player's entry fee (*i.e.*, 10:1 odds) versus a theoretical probability of correctly selecting four 50/50 matchups of 16:1. This margin allowed GSN to make a profit while insulating GSN from risk.

25.   Players prefer the highest possible prizes. Therefore, in a marketplace of competing providers of fixed-odds daily fantasy sports, the provider able to offer higher prizes at the same level of risk will have a competitive advantage.

26.   A game provider with better risk management methodology will be able to offer higher prizes, eventually approaching the theoretical probability limit.

27.   GSN expended substantial time, labor, and resources to develop the Trade Secrets. The Trade Secrets have significant value, are not publicly known or readily ascertainable by proper means, and are maintained as confidential and proprietary information.

28.     The Trade Secrets include: (a) methods, strategies, and know-how for managing risk associated with providing fixed-odds daily fantasy sports games, including choice volume, risk correlation, risk concertation, sustained P&L stability, and card republication; (b) techniques for producing daily 50/50 matchups, including data sources, data translation, and formulas and algorithms used to analyze player data; (c) marketing strategies for fixed-odds daily fantasy sports games; and (d) customer data, including the identities, habits, preferences, and purchase history of GSN customers.

29.     The Trade Secrets derive independent economic value and would be valuable to competitors, such as PrizePicks, because they demonstrate various proofs of concept, speed research, and development efforts, and provide a roadmap for a developer of a competing fixed-odds daily fantasy sports game.

30.     GSN took various measures to protect the secrecy of the Trade Secrets. For example, and without limitation, GSN had written policies and procedures governing their information technology and the security of confidential information, including the Trade Secrets. The Trade Secrets were only available to specific GSN personnel with a business need to know the information. GSN's computer systems on which some of the Trade Secrets were stored could be accessed only by authorized individuals with log-in credentials.

31.    GSN personnel who were provided access to the Trade Secrets were subject to confidentiality obligations with respect to the use or disclosure of GSN confidential information, including the Trade Secrets. Employees are also required to adhere to strict rules and policies pertaining to the confidentiality of the Trade Secrets. Employees are prohibited from disclosing or providing information regarding the Trade Secrets to an outside third party or entity.

32.    As a small startup, Vetnos' patents, trade secrets, and other proprietary information were among the Companies' most valuable business assets and enabled the Companies to attract investors who could help the Companies bring the Vetnos Technology to market.

**D.    PrizePicks Was Intimately Aware of Vetnos' Foundational Work on Daily Fantasy Sports Technology and Copied the Same Without Requesting a Patent License**

33.    In October of 2018, PrizePicks announced that they had also released a system for daily fantasy sports that was based on a fixed-odds format (the "PrizePicks product").[7]

---

[7] "Introducing PrizePicks, The Most Simple, Fast and Fun Daily Fantasy Sports Game to Hit the US Market," (October 4, 2018), https://markets.businessinsider.com/news/stocks/introducing-prizepicks-the-most-simple-fast-and-fun-daily-fantasy-sports-game-to-hit-the-us-market-1027589878

34.     The PrizePicks product uses the patent- and trade-secret-protected Vetnos Technology that the Companies developed. By copying the Vetnos Technology, PrizePicks was able to avoid the effort, investment, and risk undertaken by the Companies and obtain a head start in terms of time and money spent developing a product.

35.     Upon information and belief, prior to the release of the PrizePicks product, PrizePicks had not previously developed a system with a fixed-odds format for daily fantasy sports.

36.     Instead, PrizePicks (then d/b/a SidePrize LLC) was initially focused solely on facilitating side bets between parties in season-long, pari-mutuel fantasy sports games. As explained by CEO Adam Wexler, "[w]e're taking an existing offline behavior online and removing as much friction as possible in the process. Currently, friends are talking smack and challenging each other over text, email[,] phone calls[,] or in person leading up to their scheduled weekly match-up. They may agree to it, but it is often a very unofficial agreement. Then Monday night rolls around and the losers are in no hurry to pay the winners. At the end of the day, the reason SidePrize is needed is because winners possess the burden of collecting

money from the losers," and "SidePrize is building an entire business around this specific niche."[8]

37.     However, due to fundamental problems with the SidePrize offering, PrizePicks pivoted to using the Vetnos Technology ("'The problem with SidePrize was that I may want to challenge you, but you may not want to challenge me. So we had all these outstanding proposals,' explains CEO Wexler. 'What that led me to thinking was that the ideal format was a fantasy sports game against the house.'").[9]

38.     At least as early as July of 2018, PrizePicks demonstrated direct knowledge of, and a keen interest in, the pioneering, patented, and proprietary technology developed by the Companies. In or around July of 2018, Steven Kerstein, a former GSN employee consulting for PrizePicks, asked Dan Orlow, the co-founder of both GSN and Vetnos, if he would speak with PrizePicks' CEO Adam Wexler about the Vetnos Technology.

---

[8] "Startup Seeks to Monetize the Fantasy Sports Side Challenge," (June 20, 2015), https://www.forbes.com/sites/darrenheitner/2015/06/20/startup-seeks-to-monetize-the-fantasy-sports-side-challenge/

[9] "Insightpool Founder Adam Wexler Is Back to Make Fantasy Sports Easier, Faster, and    More    Profitable    Than    Ever,"    (October    24,    2018), https://hypepotamus.com/companies/prizepicks/

39.     As a co-inventor of each of the patents filed on the Vetnos Technology, Orlow is intimately familiar with the technology that powers daily fantasy sports games.

40.     On a telephone call in or around July of 2018 between Orlow and Wexler, Wexler told Orlow that he was impressed by the Vetnos Technology, but demonstrated a cavalier approach to the intellectual property rights of the Companies. Specifically, as noted in paragraph 1 above, after explaining his interest in the Vetnos Technology, Wexler told Orlow that, because "we liked your game so much, we decided to copy it."

41.     Orlow cautioned Wexler against doing so and indicated that the Vetnos Technology and the games it powered were the subject of several patent applications, but Wexler was undeterred.

42.     Orlow reiterated this warning to Wexler when they met in person in December of 2021 at the SBC Summit in New Jersey, where Orlow again notified Wexler that, by incorporating the Vetnos Technology, PrizePicks was infringing Vetnos' patents.

43.    In an effort to avoid litigation, Vetnos continued to warn PrizePicks that the PrizePicks infringed Vetnos' patents in various meetings, phone calls, and letters to no avail.[10]

44.    Despite these warnings, Wexler and PrizePicks have continued to knowingly and willfully infringe Vetnos' patents by intentionally copying and incorporating the patent-protected Vetnos Technology into the PrizePicks product.

45.    Kerstein began consulting for PrizePicks at least as early as July of 2018. Prior to consulting for PrizePicks, Kerstein worked for GSN, handling risk-management techniques specific to the Vetnos Technology.

46.    In October of 2018, PrizePicks hired Kerstein on a part-time basis to serve as PrizePicks' "Risk Management Advisor."[11] Kerstein's consulting role for PrizePicks and subsequent hire was significant, because Kerstein's job at GSN was both to help identify matchups appropriate for GSN's fixed-odds gaming technology and to ensure the profitability of these matchups.

47.    A PrizePicks press release described the advantages of the new fixed-odds gaming technology adopted from the Companies: "With PrizePicks,

---

[10] Meeting between Dan Orlow and Steven Kerstein in London in February of 2023; Letters from Vetnos to PrizePicks on 22 March 2023 and 8 May 2023.
[11] LinkedIn profile of Steven Kerstein, https://www.linkedin.com/in/stevenkerstein1991/

fantasy sports fans no longer have to play in competitions against peers with superior knowledge and resources. <u>Instead, they can test their prediction skills in a fixed-odds format. Since fans do not compete with each other, they have a higher likelihood of winning significant prizes.</u>" (emphasis added).[12]

48.    In February of 2023, Kerstein acknowledged the close relationship between the PrizePicks application and the Vetnos Technology, telling Orlow that "nobody knows more about the game than you do" (referring to the game made possible by the Vetnos Technology and copied by PrizePicks as the PrizePicks product).[13]

49.    Vetnos    has    repeatedly    cautioned    PrizePicks    regarding    the patent-protected status of the Vetnos Technology. In addition to the communications noted in paragraphs 35–40 above, the Companies provided notice to PrizePicks that the Vetnos Technology was patented in other ways. For example, Vetnos provides notice that its technology, and the games this technology powers, are protected by patents on its website and marketing materials. In addition, Kerstein was made aware

---

[12] "Introducing PrizePicks, The Most Simple, Fast and Fun Daily Fantasy Sports Game to Hit the US Market," (October 4, 2018), https://markets.businessinsider.com/news/stocks/introducing-prizepicks-the-most-simple-fast-and-fun-daily-fantasy-sports-game-to-hit-the-us-market-1027589878
[13] Meeting between Dan Orlow and Steven Kerstein in London in February of 2023.

that the Vetnos Technology was patent protected before switching to work for PrizePicks.

      **E.**     **Kerstein Violated GSN's Non-Disclosure Agreement by Exfiltrating Confidential Information**

50.      On or about September 18, 2015, GSN hired Kerstein.

51.      GSN policy was to require all incoming employees (including Kerstein) to execute a Non-Disclosure, Proprietary Information, Invention Assignment and Non-Solicitation Agreement (the "Non-Disclosure Agreement").

52.      The Non-Disclosure Agreement defines "Proprietary Information" as:

> any information, whether or not in writing, of a private, secret, or confidential nature concerning the Company's business, business relationships or financial affairs. By way of illustration, but not limitation, Proprietary Information shall be deemed to include any plan, method, data, know- how, research, information, procedure, development, invention, improvement, modification, discovery, process, work of authorship, documentation, formula, technique, product (currently existing, in development or planned), idea, concept, design, drawing, specification, technique, trade secret or intellectual property right whatsoever or any interest therein whether patentable or non-patentable, patents and applications therefor, trademarks and applications therefor or copyrights and applications therefor, personnel data, records, marketing techniques and materials, marketing and development plans, customer names and other information related to customers, including prospective customers and contacts at customers, price lists, pricing policies and supplier lists of the Company, which have or may come into my possession, or which I have learned, or to which I had or have access, or which I may discover or develop or have discovered or developed, as a result of my role as an employee of the Company. Proprietary Information also includes any information described above that the Company treats as proprietary or designates as Proprietary Information, whether or not owned or developed by the Company.

53.     As consideration for his employment with GSN, the Non-Disclosure

Agreement provided:

> (i) during my work for the Company and thereafter, I will hold in confidence
> and will not directly or indirectly reveal, report, publish, disclose, transfer or
> use any of the Proprietary Information for any purposes, except in the course
> of my work for the Company;

> (ii) I will not disclose to the Company or use on its behalf any information
> from any other source which I am required to keep confidential unless such
> information has become Proprietary Information because the Company
> acquired such information from the person to whom I owe this obligation, or
> by other means that does not violate the confidential nature of such
> information including it becoming public knowledge;

> (iii) I will hold in strict confidence and not disclose or use any Proprietary
> Information of any Related Parties at any time either during or after the term
> of my employment, without the express consent of the Company and the
> Related Party concerned; and

> (iv) At any time, should I have a question whether any matter within the scope
> of the above definition might nonetheless be disclosed, I shall consult my
> immediate supervisor or any person to whom the Company's Chief Executive
> Officer or majority or its Board of Directors shall delegate this responsibility
> and abide by such person's or persons' decision.

54.     When Kerstein was hired, GSN was still a small start-up company

devoting significant time and resources to the development of the Vetnos

Technology and associated know-how.

55.     Kerstein's duties for GSN included the task of selecting the daily

matchups that GSN would offer to players.

56.     Kerstein's duties for GSN also included improving risk management and expanding underwriting to include new sources of underwriting.

57.     On June 19, 2017, GSN informed Kerstein that he would be laid off.

58.     In the months prior to the end of his employment, Kerstein secretly sent confidential information owned by GSN to his personal email account. There was no legitimate business reason for Kerstein to send GSN confidential information to his personal email account. Kerstein sent the confidential GSN information to his personal email account for the purpose of maintaining access to the Trade Secrets after his employment with GSN and without GSN's knowledge or permission. Kerstein's exfiltration of the confidential GSN information was not known to GSN at the time.

59.     Kerstein's exfiltration of GSN confidential information was contrary to his contractual obligations to GSN and in breach of GSN policy.

60.     On information and belief, Kerstein exfiltrated GSN confidential information using other means, such as by copying and retaining other GSN files, data, or documents.

**F.     Kerstein Brought GSN Trade Secrets to PrizePicks**

61.      At least as early as 2018, Kerstein began consulting for PrizePicks on a part-time basis regarding risk management and other topics.

62.     On information and belief, Kerstein's work for PrizePicks would have required Kerstein to draw upon and use the confidential information and trade secrets owned by GSN.

63.     Upon information and belief, PrizePicks hired Kerstein into a full-time role in June of 2021. Kerstein's LinkedIn profile states that as of June of 2021, his role with PrizePicks was "Linesmaking and Risk Management."

64.     On information and belief, PrizePicks hired Kerstein with the intention of obtaining the Trade Secrets, including, without limitation, the techniques for effectively managing risk when operating the fixed-odds daily fantasy sports game developed by GSN.

65.     Upon information and belief, it was not until PrizePicks consulted with and hired Kerstein that it was able to effectively manage the risk associated with its fixed-odds daily fantasy sports game.

66.     On information and belief, PrizePicks knew or should have known that Kerstein possessed the Trade Secrets after his employment with GSN was terminated.

67.     PrizePicks knew or should have known that Kerstein owed GSN a duty of confidentiality with respect to the Trade Secrets.

68.     It is common in this industry for employees like Kerstein to be subject to post-employment restrictive covenants, including non-disclosure agreements.

69.     Despite PrizePicks' knowledge that Kerstein owed GSN a duty of confidentiality, PrizePicks nevertheless acquired and used the Trade Secrets through Kerstein.

70.     PrizePicks' game pays unusually high prizes to players. Prize amounts like the ones paid by PrizePicks would only be possible if PrizePicks were able to manage the risk associated with its fixed-odds daily fantasy sports offering with a high degree of sophistication enabled by the Trade Secrets. The Trade Secrets enable efficient risk management that would allow PrizePicks to offer high prize amounts without the risk of losing significant amounts of capital.

71.     On information and belief, PrizePicks is using the Trade Secrets, despite the fact that PrizePicks knew or should have known that the Trade Secrets were obtained by Kerstein in breach of his confidentiality obligations to GSN.

72.     PrizePicks' use of the Trade Secrets enables PrizePicks to offer higher prizes than would otherwise be possible. PrizePicks' use of the Trade Secrets allowed PrizePicks to avoid years of trial and error.

73.   PrizePicks' use of the Trade Secrets to offer higher prizes than would otherwise be possible also allowed PrizePicks to undercut competitors and potential competitors.

74.   PrizePicks' misappropriation of the Trade Secrets permitted PrizePicks to capture a significant share of the market for fixed-odds daily fantasy sports gaming, grow its user base, and generate, on information and belief, hundreds of millions of dollars of net revenue.

**G.   PrizePicks Refuses to Provide Assurances to Vetnos Regarding PrizePicks' Use of the Trade Secrets**

75.   In 2023, Vetnos learned for the first time that Kerstein sent confidential information belonging to GSN from his GSN email account to his personal email account in 2017.

76.   Based on the similarity between the GSN product offering and the PrizePicks offering, the unusually high prizes offered by PrizePicks, PrizePicks' employment of Kerstein, and Kerstein's secret exfiltration of GSN confidential information, Vetnos became concerned that PrizePicks may have misappropriated the Trade Secrets.

77.   On March 22, 2023, Vetnos' counsel sent a letter to Wexler regarding Vetnos' concern that PrizePicks may have misappropriated the Trade Secrets. This March 22, 2023 letter demanded that PrizePicks investigate the potential

misappropriation of the Trade Secrets, take certain remedial steps, and provide certain information to Vetnos.

78.     On April 19, 2023, counsel for PrizePicks responded to the March 22, 2023 letter. However, PrizePicks did not deny that PrizePicks obtained and used confidential GSN information from Kerstein. PrizePicks failed to adequately respond to the demands of the Vetnos' March 22, 2023 letter. This failure heightened Vetnos' concern that PrizePicks obtained and used the Trade Secrets without authorization.

79.     On May 9, 2023, Vetnos' counsel sent another letter to PrizePicks' counsel seeking the information and certifications demanded in the March 22, 2023 letter.

80.     On May 19, 2023, counsel for PrizePicks sent another incomplete and unsatisfactory response to Vetnos' counsel. The May 19, 2023 letter from PrizePicks' counsel again failed to provide substantive responses to Vetnos' requests. Notably, again, the May 19, 2023 letter does not deny that PrizePicks obtained and used confidential GSN information through its employment of Kerstein.

**H.     Vetnos Is the Successor in Interest to GSN and Owns the Trade Secrets**

81.     On August 9, 2017, GSN was renamed to Avaago, Inc. ("Avaago").

82.    On December 17, 2017, Avaago, though its appointed Chapter 7 Bankruptcy Trustee, entered into an Asset Purchase Agreement with Mako Capital, LLC ("Mako") for the sale of Avaago's "Acquired Assets" free and clear of all liens, claims, and encumbrances. The "Acquired Assets" included, in part, "all of [Avaago's] tangibles and/or intellectual property of any kind or nature . . ." and "all other assets used by [Avaago] in the business known as 'Game Sports Network, Inc.'"

83.    On February 22, 2018, the United States Bankruptcy Court for the Southern District of New York entered an order authorizing the sale of Avaago's assets and intellectual property, including the Trade Secrets, to Mako.

84.    On March 9, 2018, Mako and Avaago, through Avaago's Chapter 7 Bankruptcy Trustee, executed a Bill of Sale for the sale, assignment, transfer, conveyance, and delivery of Avaago's Assigned Assets.

85.    On November 14, 2018, Mako and Vetnos executed an Assignment and Assumption Agreement, which granted, transferred, assigned, conveyed, and delivered to Vetnos all of Mako's assets, including the Trade Secrets.

86.    Vetnos currently owns all of the Trade Secrets.

## I. Vetnos Brings This Action to Protect the Company's New Fantasy Sports Games Technology and Ensure its Innovations are Respected

87.     PrizePicks copied Vetnos' intellectual property and has continued to use Vetnos' patented inventions, trade secrets, and proprietary information without permission.

88.     Vetnos therefore brings this lawsuit to protect the fantasy sports game systems and technology it innovated, invested in, patented, and protected via trade secrets, and to ensure that its intellectual property is respected.

## PARTIES

89.     Vetnos LLC ("Vetnos") is a limited liability company organized and existing under the laws of Delaware having its principal place of business at 369 Lexington Avenue, Suite 208, New York, NY 10017. Vetnos LLC is the owner by assignments of the patents in this litigation.[14]

90.     Upon information and belief, SidePrize is a limited liability company doing business as PrizePicks organized and existing under the laws of Georgia, with

---

[14] Assignment records showing the chain of title for each patent are attached herein as Exhibit 1.

its principal place of business at 3423 Piedmont Road, Suite 445, Atlanta, GA

30305[15] and/or at 1230 Peachtree Street NE, Atlanta, GA 30309.[16]

91.     Upon information and belief, PrizePicks developed and commercializes

the PrizePicks product, which is offered for download on the PrizePicks website and

mobile application platforms like the Google Play Store and the iOS App Store.

## JURISDICTION AND VENUE

92.     This action arises under the laws of the United States, 35 U.S.C. § 1 et.

seq and 18 U.S.C. § 1836. This Court has jurisdiction over the subject matter of this

action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

93.     This Court has supplemental jurisdiction over the claims brought under

state law pursuant to 28 U.S.C. § 1367(a) because they are part of the same case or

controversy as the claim brough under the Defend Trade Secrets Act (18 U.S.C.

§ 1836).

94.     This Court has personal jurisdiction over PrizePicks consistent with due

process because, on information and belief, SidePrize (doing business as PrizePicks)

is a limited liability company organized and existing under the laws of the state of

---

[15] "Locations," https://www.linkedin.com/company/prize-picks/about/

[16] Georgia Secretary of State, Corporations Division (May 22, 2023), https://ecorp.sos.ga.gov/businesssearch/BusinessInformation?businessId=2022371&businessType=Domestic%20Limited%20Liability%20Company&fromSearch=True

Georgia and residing in Atlanta, Georgia. Furthermore, on information and belief, PrizePicks regularly conducts business in this District and has committed acts of patent infringement, has induced acts of patent infringement by others in this District, and/or has contributed to patent infringement by others in this District, the state of Georgia, and throughout the United States.

95.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b) because, on information and belief, PrizePicks resides and has a regular and established place of business in this District. Furthermore, on information and belief, PrizePicks regularly conducts business and has committed acts of patent infringement, has induced acts of patent infringement by others in this District, and/or has contributed to patent infringement by others in this District, the state of Georgia, and throughout the United States.

## COUNT I – INFRINGEMENT OF THE '543 PATENT

96.     Vetnos incorporates each of the above paragraphs as though fully set forth herein.

97.     The '543 patent is titled "Method and system for presenting and operating a skill-based activity." The '543 patent names Daniel Orlow, James Morrison, David Manpearl, Kenneth White, and Benjamin Scott Stahlhood II as inventors. The '543 patent claims priority to a provisional patent application filed on

September 8, 2014 and a provisional patent filed on January 22, 2015. The '543 patent issued on July 16, 2019 and is assigned to Vetnos. A true and correct copy of the '543 patent is attached herein as Exhibit 3.

98.   Upon information and belief, PrizePicks has directly infringed and continues to directly infringe one or more claims of the '543 patent, either literally or under the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing the PrizePicks product in the United States and in this District without authority, in violation of 35 U.S.C. § 271(a).

99.   Upon information and belief, the use of the PrizePicks product infringes one or more of the claims of the '543 patent. PrizePicks has induced infringement and continues to induce infringement of one or more of the claims of the '543 patent, either literally or under the doctrine of equivalents, by encouraging others, including, but not limited to, partnering game operators and web hosting services, to use the PrizePicks product in the United States and in this District in a manner that would directly infringe the '543 patent. PrizePicks has intentionally encouraged and will continue to intentionally encourage acts of direct infringement by others, including, but not limited to, partnering game operators and web hosting services, with knowledge of the '543 patent and with knowledge that their acts are encouraging infringement, in violation of 35 U.S.C. § 271(b).

100.   The PrizePicks product satisfies each and every element of one or more claims of the '543 patent. PrizePicks' actions with respect to the PrizePicks product have infringed, induced infringement, or contributorily infringed at least claims 1–6 and 15–18 of the '543 patent.

101.   For example, claim 1 of the '543 patent is representative and recites:[17]

A system for presenting a skill-based game, the system comprising:

a non-transitory storage medium storing machine readable code;

at least one activity server system comprising a processor configured to execute the machine-readable code and to communicate over a wide area network with a plurality of presentation computing devices, each distinct one of the presentation computing devices associated with a distinct one of a plurality of users, and to receive information from the plurality of presentation computing devices; and

a device storage system coupled to the activity server system storing (i) information concerning the plurality of users, each user identifiable by a user account, and (ii) event data pertinent to a set of events and participants in the set of events;

wherein, the machine-readable code, when executed by the activity server system, causes performance of computer processes comprising:

separately responsive to communications initiated from each of the presentation computing devices, serving, over the wide area network, to the presentation devices, a set of matchups of participants along with associated fixed-payout odds based on winning user matchup selections, so

---

[17] *See also* claim charts attached herein as Exhibit 2.

as to cause the presentation devices to display the set of matchups to the users with the associated fixed payout odds, so as to offer separately through each of the presentation devices an opportunity to play the skill based game;

receiving, separately, from the presentation devices, over the wide area network, user roster data characterizing, with respect to the matchups, a set of user-selected winners;

updating the event data pertinent to participants in the actual events; and

using the updated data to calculate and assign payouts to the users based on both the set of user-selected winners and the fixed payout odds, wherein determination of whether a given user is a winner or loser is based solely upon the given user's selections and not on those of other users:

wherein the machine-readable code, when executed by the activity server system, causes performance of computer processes further comprising:

receiving by the activity server system schedule information about a plurality of games from an information source containing the schedule information;

determining by the activity server system athletes expected to compete in the plurality of games by accessing player information from an information source containing the player information;

ranking by the activity server system the athletes using historical fantasy point performance values for the athletes based at least upon calculated expected fantasy point

performance values to be scored by the athletes in a next game; and

causing display by the activity server system in a graphical user interface identities of the athletes according to their expected fantasy point performance values wherein the graphical user interface allows a matchmaker to select players to assign to a matchup.

102.    PrizePicks is a "daily fantasy sports game" that enables "sports fans [to] test their prediction skills in a fixed-odds format."[18] The PrizePicks product is a system that uses a server to communicate with presentation computing devices, such as computers and smartphones, over the internet using web-based or app-based interfaces, such as the PrizePicks website and mobile application platforms like the Google Play Store and the iOS App Store.

103.    PrizePicks receives information from the presentation computing devices of numerous users throughout the U.S. and Canada. *See* PrizePicks Press Release ("'With the launch of PrizePicks on mobile, we're providing tens of millions of domestic fantasy players with an easy way to raise the stakes,' said CEO Adam Wexler, who sits on the FSTA Board of Directors and Co-Chairs the Research Committee. 'Sports fans everywhere can now conveniently submit their daily picks

---

[18] PrizePicks Press Release, "PrizePicks Is Daily Fantasy Sports, Simplified, Now Available on Mobile," (Oct. 23, 2018), https://www.globenewswire.com/news-release/2018/10/23/1625283/0/en/PrizePicks-Is-Daily-Fantasy-Sports-Simplified-Now-Available-On-Mobile.html

right from their smartphone — which research shows is where most DFS fans spend their time.'"). *See also* "PrizePicks – Where You Can Play" ("PrizePicks' Daily Fantasy Sports (DFS) contests are widely available across the U.S. and Canada.")[19].

104.   PrizePicks stores user data on a device storage system that is secured by a two-factor authentication process "to protect[] member privacy and security."[20] PrizePicks also stores and presents event data pertinent to events and participants.

105.   PrizePicks matchups are delivered over the internet, displayed on the computing devices of end users, and are associated with fixed-payout odds: "[t]he fixed-odds format gives fans greater chances of winning exponentially more than their entry."[21] PrizePicks Press Release. *See also* "PrizePicks - How to Play" ("You'll be able to see your exact potential payouts when you type in your entry amount, so you can make adjustments based on that information.").[22] As an example, the "PrizePicks – Payouts" page indicates that the payouts for PrizePicks Power

---

[19] "PrizePicks – Where You Can Play,"
https://www.prizepicks.com/resources/states-where-you-can-play-prizepicks
[20]   "PrizePicks – What Makes PrizePicks Legit?" (August 23, 2022),
https://www.prizepicks.com/resources/what-makes-prizepicks-legit
[21] PrizePicks Press Release, "PrizePicks Is Daily Fantasy Sports, Simplified, Now Available on Mobile," (October 23, 2018), https://www.globenewswire.com/news-release/2018/10/23/1625283/0/en/PrizePicks-Is-Daily-Fantasy-Sports-Simplified-Now-Available-On-Mobile.html
[22] "PrizePicks – How to Play," (May 18, 2023),
https://www.prizepicks.com/resources/how-to-play-prizepicks

Plays include: a "4-Pick Power Play," a "3-Pick Power Play," and a "2-Pick Power Play."[23]

106.   PrizePicks roster data is the selection of sets of players from which users predict over-unders: PrizePicks "curates a board of players to select from on a daily basis. Sports fans pick two, three or four players from the list, and then predict if each player will go over or under their projected fantasy score." PrizePicks Press Release. *See also* "PrizePicks – How to Play."

107.   To identify winners and calculate payouts, PrizePicks updates the event data for each user selection. *See* "PrizePicks - How to Play" ("Once you've picked 2–6 stats, more or less, flex or power, and your entry amount, you're done! It's that easy. Now you can just submit your entry and sweat the results in real-time…. You can also just check the app on occasion, because most stats will be live scored in real-time.").

108.   PrizePicks uses a "fixed-odds format" that "gives fans greater chances of winning exponentially more than their entry." PrizePicks Press Release. PrizePicks' "standard payouts" provide a payout multiplier based on how many

---

[23] "PrizePicks – Payouts," (November 17, 2022), https://www.prizepicks.com/resources/prizepicks-payouts

picks are correct in an entry, as opposed to the picks of other users. *See* "PrizePicks – Payouts."

109.   PrizePicks receives and accesses schedule information about games and player information about the players expected to compete in these games. *See* "PrizePicks – How to Play."

110.   PrizePicks uses historical fantasy point performance values to rank athletes, and it allows users to view these values. *See* "PrizePicks – How to Play" ("If you need some extra help, you can click the three lines next to a player's projection to pull up their stats from their last 5 games, as well as their average during that span.") These values are used to calculate expected fantasy point performance values to be scored by the athletes in their next game. In addition, PrizePicks' rankable "Lines" indicate that PrizePicks has tools for ranking, on the server size, players based on expected fantasy point performance (*i.e.*, the "Line"). *See*, *e.g.*, Rotowire PrizePicks Projections.[24]

111.   PrizePicks' infringement of the '543 patent has been willful. As discussed above, PrizePicks intentionally made and used the PrizePicks product knowing that it used the same fixed-odds gaming technology as Vetnos'

---

[24] Rotowire, "PrizePicks Projections," https://www.rotowire.com/daily/prize-picks.php

patent-protected technology and hired an employee with specialized skills to support the execution of Vetnos' patent-protected technology. PrizePicks has continued to use the invention claimed in the '543 patent in deliberate disregard for Vetnos' patent rights.

112.   Vetnos has suffered damages as a result of PrizePicks' infringement of the '543 patent. Vetnos is entitled to an award of compensatory damages, including reasonable royalties and/or lost profits, for PrizePicks' infringement of the '543 patent.

113.   PrizePicks has engaged in egregious infringement behavior with respect to the '543 patent warranting an award of enhanced damages pursuant to 35 U.S.C. § 284.

114.   PrizePicks' conduct with respect to the '543 patent makes this case stand out from others and warrants an award of attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT II – INFRINGEMENT OF THE '147 PATENT

115.   Vetnos incorporates each of the above paragraphs as though fully set forth herein.

116.   The '147 patent is titled "Method and system for presenting and operating a skill-based activity." The '147 patent names Daniel Orlow, James

Morrison, David Manpearl, Kenneth White, and Benjamin Scott Stahlhood II as inventors. The '147 patent is a continuation of the patent application now issued as the '543 patent. The '147 patent issued on October 26, 2021 and is assigned to Vetnos. A true and correct copy of the '147 patent is attached herein as Exhibit 4.

117.   Upon information and belief, PrizePicks has directly infringed and continues to directly infringe one or more claims of the '147 patent, either literally or under the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing the PrizePicks product in the United States and in this District without authority, in violation of 35 U.S.C. § 271(a).

118.   Upon information and belief, the use of the PrizePicks product infringes one or more of the claims of the '147 patent. PrizePicks has induced infringement and continues to induce infringement of one or more of the claims of the '147 patent, either literally or under the doctrine of equivalents, by encouraging others, including, but not limited to, partnering game operators and hosting services, to use the PrizePicks product in the United States and in this District in a manner that would directly infringe the '147 patent. PrizePicks has intentionally encouraged and will continue to intentionally encourage acts of direct infringement by others, including, but not limited to, partnering game operators and hosting services, with knowledge

of the '147 patent and with knowledge that their acts are encouraging infringement, in violation of 35 U.S.C. § 271(b).

119.   The PrizePicks product satisfies each and every element of one or more claims of the '147 patent. PrizePicks' actions with respect to the PrizePicks product have infringed, induced infringement, or contributorily infringed at least claims 1–6 and 12–18 of the '147 patent.

120.   For example, claim 1 of the '147 patent is representative and recites:[25]

A system for presenting a skill-based game, the system comprising:

a non-transitory storage medium storing machine readable code;

at least one activity server system comprising a processor configured to execute the machine readable code and to communicate over a wide area network with a plurality of presentation computing devices, each distinct one of the presentation computing devices associated with a distinct one of a plurality of users, and to receive information from the plurality of presentation computing devices; and

a device storage system coupled to the activity server system storing (i) information concerning a plurality of users, each user identifiable by a user account, and (ii) event data pertinent to a set of events and participants in the set of events;

wherein, the machine-readable code, when executed by the activity server system, causes performance of computer processes comprising:

---

[25] *See also* claim charts attached herein as Exhibit 2.

separately responsive to communications initiated from each of the presentation computing devices, serving over the wide area network, to the presentation devices, a set of matchups of participants along with associated fixed-payout odds based on winning user matchup selections, so as to cause the presentation devices to display the set of matchups to the users with the associated fixed payout odds, so as to offer separately through each of the presentation devices an opportunity to play the skill based game, by selecting matchups, wherein the skill based game on the presentation device of any given user is displayed with fixed-payout odds associated with the number of matchups selected by the given user for the game;

receiving, separately, from the presentation devices, over the wide area network, user roster data characterizing, with respect to the matchups, a set of user-selected winners;

updating the event data pertinent to participants in the actual events; and

using the updated data to calculate and assign payoffs to the users based on both the set of user-selected winners and the fixed payoff odds, wherein determination of whether a given user is a winner or loser is based solely upon the given user's selections and not on those of other users:

wherein the machine-readable code, when executed by the activity server system, causes performance of computer processes further comprising:

receiving by the activity server system schedule information about a plurality of games from an information source containing the schedule information;

determining by the activity server system athletes expected to compete in the plurality of games by accessing player information from an information source containing the player information;

ranking by the activity server system the athletes using historical fantasy point performance values for the athletes based at least upon calculated expected fantasy point performance values to be scored by the athletes in a next game; and

causing display by the activity server system in a graphical user interface identities of the athletes according to their expected fantasy point performance values wherein the graphical user interface allows a match maker to select players to assign to a matchup.

121.   PrizePicks is a "daily fantasy sports game" that enables "sports fans [to] test their prediction skills in a fixed-odds format."[26] The PrizePicks product is a system that uses a server to communicate with presentation computing devices, such as computers and smartphones, over the internet using web-based or app-based interfaces, such as the PrizePicks website and mobile application platforms like the Google Play Store and the iOS App Store.

122.   PrizePicks receives information from the presentation computing devices of numerous users throughout the U.S. and Canada. *See* PrizePicks Press

---

[26] PrizePicks Press Release, "PrizePicks Is Daily Fantasy Sports, Simplified, Now Available on Mobile," (October 23, 2018), https://www.globenewswire.com/news-release/2018/10/23/1625283/0/en/PrizePicks-Is-Daily-Fantasy-Sports-Simplified-Now-Available-On-Mobile.html

Release ("'With the launch of PrizePicks on mobile, we're providing tens of millions of domestic fantasy players with an easy way to raise the stakes,' said CEO Adam Wexler, who sits on the FSTA Board of Directors and Co-Chairs the Research Committee. 'Sports fans everywhere can now conveniently submit their daily picks right from their smartphone — which research shows is where most DFS fans spend their time.'"). *See also* "PrizePicks – Where You Can Play" ("PrizePicks' Daily Fantasy Sports (DFS) contests are widely available across the U.S. and Canada.").[27]

123.   PrizePicks stores user data on a device storage system that is secured by a two-factor authentication process "to protect[] member privacy and security."[28] PrizePicks also stores and presents event data pertinent to events and participants.

124.   PrizePicks matchups are delivered over the internet, displayed on the computing devices of end users, and are associated with fixed-payout odds: "[t]he fixed-odds format gives fans greater chances of winning exponentially more than their entry."[29] PrizePicks Press Release. *See also* "PrizePicks - How to Play"

---

[27] "PrizePicks – Where You Can Play,"
https://www.prizepicks.com/resources/states-where-you-can-play-prizepicks
[28] "PrizePicks – What Makes PrizePicks Legit?" (August 23, 2022),
https://www.prizepicks.com/resources/what-makes-prizepicks-legit
[29] PrizePicks Press Release, "PrizePicks Is Daily Fantasy Sports, Simplified, Now Available on Mobile," (October 23, 2018), https://www.globenewswire.com/news-release/2018/10/23/1625283/0/en/PrizePicks-Is-Daily-Fantasy-Sports-Simplified-Now-Available-On-Mobile.html

("You'll be able to see your exact potential payouts when you type in your entry amount, so you can make adjustments based on that information.").[30] As an example, the "PrizePicks – Payouts" page indicates that the payouts for PrizePicks Power Plays include: a "4-Pick Power Play," a "3-Pick Power Play," and a "2-Pick Power Play."[31]

125.   PrizePicks roster data is the selection of sets of players from which users predict over-unders: PrizePicks "curates a board of players to select from on a daily basis. Sports fans pick two, three or four players from the list, and then predict if each player will go over or under their projected fantasy score." PrizePicks Press Release. *See also* "PrizePicks – How to Play."

126.   To identify winners and calculate payouts, PrizePicks updates the event data for each user selection. *See* "PrizePicks - How to Play" ("Once you've picked 2–6 stats, more or less, flex or power, and your entry amount, you're done! It's that easy. Now you can just submit your entry and sweat the results in real-time…. You can also just check the app on occasion, because most stats will be live scored in real-time.").

---

[30] "PrizePicks – How to Play," (May 18, 2023),
https://www.prizepicks.com/resources/how-to-play-prizepicks
[31] "PrizePicks – Payouts,"(November 17, 2022),
https://www.prizepicks.com/resources/prizepicks-payouts

127.   PrizePicks uses a "fixed-odds format" that "gives fans greater chances of winning exponentially more than their entry." PrizePicks Press Release. PrizePicks' "standard payouts" provide a payout multiplier based on how many picks are correct in an entry, as opposed to the picks of other users. *See* "PrizePicks – Payouts."

128.   PrizePicks receives and accesses schedule information about games and player information about the players expected to compete in these games. *See* "PrizePicks – How to Play."

129.   PrizePicks uses historical fantasy point performance values to rank athletes, and it allows users to view these values. *See* "PrizePicks – How to Play" ("If you need some extra help, you can click the three lines next to a player's projection to pull up their stats from their last 5 games, as well as their average during that span.") These values are used to calculate expected fantasy point performance values to be scored by the athletes in their next game. In addition, PrizePicks' rankable "Lines" indicate that PrizePicks has tools for ranking, on the server size, players based on expected fantasy point performance (*i.e.*, the "Line"). *See*, *e.g.*, Rotowire PrizePicks Projections.[32]

---

[32]   Rotowire, "PrizePicks Projections," https://www.rotowire.com/daily/prize-picks.php

130.   PrizePicks' infringement of the '147 patent has been willful. As discussed above, PrizePicks intentionally made and used the PrizePicks product system knowing that it used the same fixed-odds gaming technology as Vetnos' patent-protected technology and hired an employee with specialized skills to support the execution of Vetnos' patent-protected technology. PrizePicks has continued to use the invention claimed in the '147 in deliberate disregard for Vetnos' patent rights.

131.   Vetnos has suffered damages as a result of PrizePicks' infringement of the '147 patent. Vetnos is entitled to an award of compensatory damages, including reasonable royalties and/or lost profits, for PrizePicks' infringement of the '147 patent.

132.   PrizePicks has engaged in egregious infringement behavior with respect to the '147 patent warranting an award of enhanced damages pursuant to 35 U.S.C. § 284.

133.   PrizePicks' conduct with respect to the '147 patent makes this case stand out from others and warrants an award of attorneys' fees pursuant to 35 U.S.C. § 285.

## COUNT III – INFRINGEMENT OF THE '754 PATENT

134.   Vetnos incorporates each of the above paragraphs as though fully set forth herein.

135.   The '754 patent is titled "Method and system for presenting and operating a skill-based activity." The '754 patent names Daniel Orlow, James Morrison, David Manpearl, Kenneth White, and Benjamin Scott Stahlhood II as inventors. The '754 patent is a continuation of the patent application now issued as the '147 patent. The '754 patent issued on February 14, 2023 and is assigned to Vetnos. A true and correct copy of the '754 patent is attached herein as Exhibit 5.

136.   Upon information and belief, PrizePicks has directly infringed and continues to directly infringe one or more claims of the '754 patent, either literally or under the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing the PrizePicks product in the United States and in this District without authority, in violation of 35 U.S.C. § 271(a).

137.   Upon information and belief, the use of the PrizePicks product infringes one or more of the claims of the '754 patent. PrizePicks has induced infringement and continues to induce infringement of one or more of the claims of the '754 patent, either literally or under the doctrine of equivalents, by encouraging others, including, but not limited to, partnering game operators and web hosting services, to use the

PrizePicks product in the United States and in this District in a manner that would directly infringe the '754 patent. PrizePicks has intentionally encouraged and will continue to intentionally encourage acts of direct infringement by others, including, but not limited to, partnering game operators and web hosting services, with knowledge of the '754 patent and with knowledge that their acts are encouraging infringement, in violation of 35 U.S.C. § 271(b).

138.   The PrizePicks product satisfies each and every element of one or more claims of the '754 patent. PrizePicks' actions with respect to the PrizePicks product have infringed, induced infringement, or contributorily infringed at least claims 1–6 and 12–18 of the '754 patent.

139.   For example, claim 1 of the '754 patent is representative and recites:[33]

A system for presenting a skill-based game, the system comprising:

> a non-transitory storage medium storing machine readable code;
>
> at least one activity server system comprising a processor configured to execute the machine readable code and to communicate over a wide area network with a plurality of presentation computing devices, each distinct one of the presentation computing devices associated with a distinct one of a plurality of users, and to receive information from the plurality of presentation computing devices; and
>
> a device storage system coupled to the activity server system storing (i) information concerning a plurality of users, each user

---

[33] *See also* claim charts attached herein as Exhibit 2.

identifiable by a user account, and (ii) event data pertinent to a set of scheduled events and a pool of participants in the set of scheduled events;

wherein, the machine-readable code, when executed by the activity server system, causes performance of computer processes comprising:

separately responsive to communications initiated from each of the presentation computing devices, serving, over the wide area network, to the presentation devices, a set of matchups, wherein each matchup offers, to a given user, an opportunity to make a choice selected from the group consisting of (i) a first set of participants, from among a plurality of sets of participants in the pool of participants, projected by the given user to achieve a first fantasy score superior to a second fantasy score of a second set of participants and (ii) a projection by the given user that a third fantasy score of a third set of participants will be over, or under, a projected fantasy score of the third set of participants projected by the activity server system, along with associated fixed-payout odds based on winning criteria, so as to cause each of the presentation devices to display the set of matchups and the associated fixed payout odds on a corresponding graphical user interface;

receiving, separately, from each of the presentation devices, over the wide area network, user roster data characterizing a set of user-selected winners with respect to selected matchups;

updating the event data pertinent to participants in the scheduled events; and

using the updated data to calculate and assign payoffs to the users based on both the set of user-selected winners and the fixed payoff odds, wherein determination of whether a given user is a winner or loser is based solely

upon the given user's selections and not on those of other users:

wherein the machine-readable code, when executed by the activity server system, causes performance of computer processes further comprising:

receiving, by the activity server system, schedule information about a plurality of games from an information source containing the schedule information;

determining, by the activity server system, participants expected to compete in the plurality of games by accessing player information from an information source containing the player information;

evaluating, by the activity server system, using an automated process based upon statistical analysis and historical fantasy point performance values, for each of the participants, in the pool of participants, to determine statistically expected fantasy point performance values to be scored by the participants in a next game; and

causing display, by the activity server system, on the corresponding graphical user interface, of each participant in the set of matchups, wherein the corresponding graphical user interface allows the given user to make the choice.

140.   PrizePicks is a "daily fantasy sports game" that enables "sports fans [to] test their prediction skills in a fixed-odds format."[34] The PrizePicks product is a

---

[34] PrizePicks Press Release, "PrizePicks Is Daily Fantasy Sports, Simplified, Now Available on Mobile," (October 23, 2018), https://www.globenewswire.com/news-release/2018/10/23/1625283/0/en/PrizePicks-Is-Daily-Fantasy-Sports-Simplified-Now-Available-On-Mobile.html

system that uses a server to communicate with presentation computing devices, such as computers and smartphones, over the internet using web-based or app-based interfaces, such as the PrizePicks website and mobile application platforms like the Google Play Store and the iOS App Store.

141.   PrizePicks receives information from the presentation computing devices of numerous users throughout the U.S. and Canada. *See* PrizePicks Press Release ("'With the launch of PrizePicks on mobile, we're providing tens of millions of domestic fantasy players with an easy way to raise the stakes,' said CEO Adam Wexler, who sits on the FSTA Board of Directors and Co-Chairs the Research Committee. 'Sports fans everywhere can now conveniently submit their daily picks right from their smartphone — which research shows is where most DFS fans spend their time.'"). *See also* "PrizePicks – Where You Can Play" ("PrizePicks' Daily Fantasy Sports (DFS) contests are widely available across the U.S. and Canada.").[35]

142.   PrizePicks stores user data on a device storage system that is secured by a two-factor authentication process "to protect[] member privacy and security."[36] PrizePicks also stores and presents event data pertinent to events and participants.

---

[35] "PrizePicks – Where You Can Play,"
https://www.prizepicks.com/resources/states-where-you-can-play-prizepicks
[36] "PrizePicks – What Makes PrizePicks Legit?" (August 23, 2022),
https://www.prizepicks.com/resources/what-makes-prizepicks-legit

143.   PrizePicks matchups are delivered over the internet in response to communications initiated by the computing devices of end users. PrizePicks "curates a board of players to select from on a daily basis. Sports fans pick two, three or four players from the list, and then predict if each player will go over or under their projected fantasy scores." PrizePicks Press Release.

144.   PrizePicks enables users to select pools of participants: "Sports fans pick two, three, or four players from the list, and then predict if each player will go over or under their projected fantasy score." PrizePicks Press Release. *See also* "PrizePicks – How to Play."

145.   PrizePicks enables users to select, via a graphical user interface, over-unders for athletes: "Pick more or less on each of the squares in your entry. Get them right and you win BIG. It's that easy." "PrizePicks - How to Play." *See also* PrizePicks Press Release ("Sports fans pick two, three or four players from the list, and then predict if each player will go over or under their projected fantasy score.").

146.   PrizePicks utilizes a fixed-odds format: "[t]he fixed-odds format gives fans greater chances of winning exponentially more than their entry." PrizePicks Press Release. *See also* "PrizePicks - How to Play" ("You'll be able to see your exact potential payouts when you type in your entry amount, so you can make adjustments based on that information."). As an example, the "PrizePicks – Payouts" page

indicates that the payouts for PrizePicks Power Plays include: a "4-Pick Power Play," a "3-Pick Power Play," and a "2-Pick Power Play."[37]

147.   PrizePicks roster data is the selection of sets of players from which users predict over-unders: PrizePicks "curates a board of players to select from on a daily basis. Sports fans pick two, three or four players from the list, and then predict if each player will go over or under their projected fantasy score." PrizePicks Press Release. *See also* "PrizePicks – How to Play."

148.   To identify winners and calculate payouts, PrizePicks updates the event data for each user selection. *See* "PrizePicks - How to Play" ("Once you've picked 2–6 stats, more or less, flex or power, and your entry amount, you're done! It's that easy. Now you can just submit your entry and sweat the results in real-time…. You can also just check the app on occasion, because most stats will be live scored in real-time.").

149.   PrizePicks uses a "fixed-odds format" that "gives fans greater chances of winning exponentially more than their entry." PrizePicks Press Release. PrizePicks' "standard payouts" provide a payout multiplier based on how many

---

[37] "PrizePicks – Payouts," (November 17, 2022), https://www.prizepicks.com/resources/prizepicks-payouts

picks are correct in an entry, as opposed to the picks of other users. *See* "PrizePicks – Payouts."

150.   PrizePicks receives and accesses schedule information about games and player information about the players expected to compete in these games. *See* "PrizePicks – How to Play."

151.   PrizePicks uses historical fantasy point performance values to rank athletes, and it allows users to view these values. *See* "PrizePicks – How to Play" ("If you need some extra help, you can click the three lines next to a player's projection to pull up their stats from their last 5 games, as well as their average during that span.") These values are used to calculate expected fantasy point performance values to be scored by the athletes in their next game.

152.   PrizePicks' curated board displays, in a graphical user interface on a user's computing device, over-under matchups for players and allows users to indicate whether a player "will go over or under their projected fantasy score." PrizePicks Press Release. *See also* "PrizePicks - How to Play."

153.   PrizePicks' infringement of the '754 patent has been willful. As discussed above, PrizePicks intentionally made and used the PrizePicks product knowing that it used the same fixed-odds gaming technology as Vetnos' patent-protected technology and hired an employee with specialized skills to support

the execution of Vetnos' patent-protected technology. PrizePicks has continued to use the invention claimed in the '754 in deliberate disregard for Vetnos' patent rights.

154.   Vetnos has suffered damages as a result of PrizePicks' infringement of the '754 patent. Vetnos is entitled to an award of compensatory damages, including reasonable royalties and/or lost profits, for PrizePicks' infringement of the '754 patent.

155.   PrizePicks has engaged in egregious infringement behavior with respect to the '754 patent warranting an award of enhanced damages pursuant to 35 U.S.C. § 284.

156.   PrizePicks' conduct with respect to the '754 patent makes this case stand out from others and warrants an award of attorneys' fees pursuant to 35 U.S.C. § 285.

### COUNT IV - MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRET ACT 18 U.S.C. § 1836

157.   Vetnos incorporates each of the above paragraphs as though fully set forth herein.

158.   GSN developed, employed, and protected the Trade Secrets in connection with its fixed-odds daily fantasy sports gaming technology.

159.   The Trade Secrets constitute trade secrets under 18 U.S.C. § 1839(3).

160.   The Trade Secrets were and are used in interstate commerce.

161.   The Trade Secrets derive independent economic value by not being generally known or readily ascertainable through proper means.

162.   GSN took reasonable measures to keep the Trade Secrets secret.

163.   Vetnos is the successor in interest to GSN and the owner of the Trade Secrets.

164.   Vetnos continues to take reasonable measures to keep the Trade Secrets secret.

165.   PrizePicks misappropriated the Trade Secrets at least by (a) acquiring the Trade Secrets when it knew or had reason to believe that the Trade Secrets were acquired by improper means and (b) using the Trade Secrets when it knew or should have known that the Trade Secrets were derived from or through a person (Kerstein) who owed a duty to GSN and Vetnos to maintain the secrecy of the Trade Secrets.

166.   PrizePicks' misappropriation of the Trade Secrets was intentional, knowing, willful, and malicious.

167.   As a direct result of PrizePicks' misappropriation, Vetnos has been damaged and PrizePicks has been unjustly enriched.

168.   Vetnos has lost profits as a result of PrizePicks' misappropriation.

169.  PrizePicks has been unjustly enriched as a result of its misappropriation, at least by earning revenues fairly attributable to the Trade Secrets and by avoiding the costs of developing the Trade Secrets.

170.  Vetnos is entitled to recover from PrizePicks the damages it suffered, in an amount to be determined at trial. Vetnos is further entitled to recover from PrizePicks an award of exemplary damages and attorneys' fees.

171.  PrizePicks' conduct and continued misappropriation of the Trade Secrets has caused and will continue to cause irreparable harm and injury to Vetnos unless enjoined by the Court. Vetnos has no other adequate remedy at law for the irreparable harm it will continue to suffer as a result of PrizePicks' misappropriation.

## COUNT V - MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE GEORGIA TRADE SECRETS ACT O.C.G.A. § 10-1-760 *et seq.*

172.  Vetnos incorporates each of the above paragraphs as though fully set forth herein.

173.  GSN developed, employed, and protected the Trade Secrets in connection with its fixed-odds daily fantasy sports gaming technology.

174.  The Trade Secrets constitute trade secrets as defined by the Georgia Trade Secrets Act, O.C.G.A. § 10-1-761(4).

175.   The Trade Secrets derive substantial independent economic value by not being generally known to the public.

176.   GSN took reasonable measures to keep the Trade Secrets secret.

177.   Vetnos is the successor in interest to GSN and the owner of the Trade Secrets.

178.   Vetnos continues to take reasonable measures to keep the Trade Secrets secret.

179.   PrizePicks misappropriated the Trade Secrets at least by (a) acquiring the Trade Secrets when it knew or had reason to believe that the Trade Secrets were acquired by improper means and (b) using the Trade Secrets when it knew or should have known that the Trade Secrets were derived from or through a person (Kerstein) who owed a duty to GSN and Vetnos to maintain the secrecy of the Trade Secrets.

180.   PrizePicks' misappropriation of the Trade Secrets was intentional, knowing, willful, and malicious.

181.   As a direct result of PrizePicks' misappropriation, Vetnos has been damaged and PrizePicks has been unjustly enriched.

182.   Vetnos has lost profits as a result of PrizePicks' misappropriation.

183.   PrizePicks has been unjustly enriched as a result of its misappropriation, at least by earning revenues fairly attributable to the Trade Secrets and by avoiding the costs of developing the Trade Secrets.

184.   Vetnos is entitled to recover from PrizePicks the damages it suffered, in an amount to be determined at trial. Vetnos is further entitled to recover from PrizePicks an award of exemplary damages and attorneys' fees.

185.   PrizePicks' conduct and continued misappropriation of the Trade Secrets has caused and will continue to cause irreparable harm and injury to Vetnos unless enjoined by the Court. Vetnos has no other adequate remedy at law for the irreparable harm it will continue to suffer as a result of PrizePicks' misappropriation.

## **PRAYER FOR RELIEF**

WHEREFORE, Vetnos prays that this Court grant the following relief:

a.     A judgment that PrizePicks has infringed one or more claims of the Asserted Patents, induced infringement of one or more claims of the Asserted Patents, and/or contributorily infringed one or more claims of the Asserted Patents;

b.     A judgment that PrizePicks' infringement is willful;

c.     An award to Vetnos of monetary damages in an amount to be determined at trial for PrizePicks' infringement, including reasonable royalties and/or lost profits, together with interest, costs, expenses, and disbursements;

d.     An award to Vetnos of monetary damages in an amount to be determined at trial for PrizePicks' misappropriation of trade secrets, including lost profits and disgorgement of Vetnos' unjust enrichment;

e.     An award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C);

f.     An award of exemplary damages pursuant to GA Code § 10-1-763(b);

g.     A preliminary and permanent injunction order:

     a.   Prohibiting PrizePicks from using or disclosing the Trade Secrets for any purpose;

     b.   Requiring PrizePicks to return all copies of any files or documents containing the Trade Secrets or derivatives hereof to Vetnos;

     c.   Requiring PrizePicks to preserve all electronic records and metadata concerning the Trade Secrets;

     d.   Requiring PrizePicks to provide a full accounting of how any of the Trade Secrets have been used by PrizePicks and which PrizePicks employees have had access to the Trade Secrets;

h.     Pre-judgment and post-judgment interest on the damages assessed;

i.      An award to Vetnos of all other damages permitted by 35 U.S.C. § 284, including enhanced damages up to three times the amount of compensatory damages found;

j.      A declaration that this is an exceptional case and an award to Vetnos of its attorneys' fees, costs, and expenses, pursuant to 35 U.S.C. § 285; and

k.      Such other relief, both at law and in equity, to which Vetnos may be entitled and which this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Vetnos respectfully requests a trial by jury on all issues so triable in accordance with Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted, this 20 day of June, 2023.

GREENBERG TRAURIG, LLP

*/s/ Nigamnarayan Acharya*

| | |
|---|---|
| Nigamnarayan Acharya | Scott J. Bornstein (*pro hac* |
| Georgia Bar No. 001469 | forthcoming) |
| 3333 Piedmont Road NE, Ste. 2500 | One Vanderbilt Avenue |
| Atlanta, GA 30305 | New York, NY 10017 |
| Tel.: (678) 553-2357 | Tel.: (212) 801-2172 |
| acharyan@gtlaw.com | Scott.Bornstein@gtlaw.com |
| | |
| Gregory S. Bombard (*pro hac* | Kathryn E. Albanese (*pro hac* |
| forthcoming) | forthcoming) |
| One International Place, Ste. 2000 | One Vanderbilt Avenue |
| Boston, MA 02110 | New York, NY 10017 |
| Tel.: (617) 310-6027 | Tel.: (212) 801-6533 |
| Gregory.Bombard@gtlaw.com | Katie.Albanese@gtlaw.com |

*Attorneys for Plaintiff Vetnos, LLC*