UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MAYRA E. GARCIA CARRILLO,

    Plaintiff,

-vs-

EQUIFAX INFORMATION
SERVICES, LLC, and EXPERIAN
INFORMATION SOLUTIONS, INC.

    Defendants.

CASE NO.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, MAYRA GARCIA CARRILLO (hereinafter "Plaintiff"), by and through the undersigned counsel sues Defendant, EQUIFAX INFORMATION SERVICES, LLC (hereinafter "Equifax"), and EXPERIAN INFORMATION SOLUTIONS, INC. (hereinafter "Experian") (hereinafter collectively "Defendants") and in support thereof respectfully alleges violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

**PRELIMINARY STATEMENT**

1. This is an action for actual damages, statutory damages, punitive damages, costs, and attorney's fees brought pursuant to the FCRA.

2. Today in America there are three major consumer reporting agencies, Equifax Information Services, LLC, Trans Union LLC (hereinafter "Trans Union"), and Experian Information Solutions, Inc. (hereinafter collectively "CRAs").

3. Consumer reporting agencies that create consumer reports, like Equifax, Experian, and Trans Union are charged with using reasonable procedures designed to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities, particularly where a consumer makes a dispute about information reported.

4. When a consumer like Plaintiff disputes information through the agencies, those disputes are transmitted to the party furnishing the information. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

5. The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017).

## JURISDICTION, VENUE, AND PARTIES

6. Jurisdiction for this Court is conferred by 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

7. The Plaintiff is a natural person and resident of Maricopa County in the State of Arizona. She is a "consumer" as defined by 15 U.S.C. § 1681a(c).

8. Venue is proper in this District as Equifax's principal address is in this District, Equifax transacts business within this District, and most of the violations described in this Complaint occurred in this District.

9. Equifax is headquartered at 1550 Peachtree Street, N.W., Atlanta, GA, 30309.

10. Equifax disburses such consumer reports to third parties under contract for monetary compensation.

11. Experian is a corporation incorporated under the State of California, authorized to do business in the State of Georgia, through its registered agent, CT Corporation System, located at 289 South Culver Street, Lawrenceville, Georgia 30046.

12. Experian and Equifax are "consumer reporting agencies," as defined in 15 U.S.C § 1681(f). Experian and Equifax regularly engage in the business of assembling, evaluating and disbursing information concerning consumers for the purpose of furnishing consumer reports as defied in 15 U.S.C § 1681(d) to third parties.

13. Experian disburses such consumer reports to third parties under contract for monetary compensation.

## FACTUAL ALLEGATIONS

14. Upon information and belief, Equifax and Experian have reported Plaintiff as "deceased" on her consumer credit reports since 2020.

15. Plaintiff learned about the "deceased" reporting around January of 2023 when Plaintiff applied for an apartment and was denied due to the deceased remark on her Equifax consumer credit report.

16. Shortly thereafter, Plaintiff obtained a copy of her Equifax credit report and Experian credit report dated January 4, 2023. Upon review, Plaintiff observed her Equifax credit report was reporting her as deceased with a Date of Death of January 1, 2003. Upon review of her Experian credit report, Plaintiff became aware that they notated in the personal statements section that, "this consumer is deceased 01-02-2003".

17. During the time that Equifax and Experian were reporting Plaintiff as "deceased", both Defendants were also reporting active accounts with current payments, a newly opened account on June 15, 2022.

18. It is hard to understand how the Defendants could report an individual as both "deceased" at the same time as paying her obligations on time and opening a new account, as this clearly makes no sense and is *per se* inaccurate.

19. As a result of the major inaccuracy on her credit report, on January 6, 2023, Plaintiff mailed a detailed written dispute letter to the Defendants concerning the inaccurate reporting of her name, address, and the most erroneous a date of death. In her letter, Plaintiff explained that she is very much alive. Plaintiff included an image of her driver's license to confirm her identity and provided images from a utility bill as proof of her current address. Additionally, Plaintiff included images of her respective credit report with the inaccurate reporting listed on her file.

20. Plaintiff mailed her detailed dispute letter to Equifax via USPS Certified Mail 7022 0410 0002 8507 4783 and to Experian via USPS Certified Mail 7022 0410 0002 8507 4806.

21. On January 16, 2023, Plaintiff received a dispute response from Equifax stating, "the documents you provided were illegible", and requesting proof of identity from Plaintiff.

22. Due to such response, on January 27, 2023, Plaintiff obtained a copy of her Equifax and observed Equifax was no longer reporting her "deceased".

23. On January 27, 2023, Plaintiff attempted to obtain a copy of her Experian credit report, however she received a message stating, "A condition exits that prevents Experian from being able to accept your request at this time."

24. On February 22, 2023, Plaintiff was successful in obtaining her Experian credit report, and upon review, the deceased notation in the Personal Statements section was no longer listed.

25. During the relevant time period, Plaintiff was denied the ability to obtain housing.

26. The Defendants had good reason to know that Plaintiff was not "deceased" such as Plaintiff making payments for her open line of credit during the relevant time period.

27. Despite this, the Defendants willingly chose to continue to report that Plaintiff was "deceased" despite knowing she was alive.

28. As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

   a. Monies lost by attempting to fix her credit;

   b. Loss of time attempting to cure the errors;

   c. Mental anguish, added stress, aggravation, embarrassment, sleepless nights, and other related impairments to the enjoyment of life; Plaintiff is being physically affected by Equifax's actions;

   d. Reduction in credit score; and

   e. Inability to obtain housing.

## COUNT I
## Violation of the Fair Credit Reporting Act
## as to Defendant, Equifax Information Services, LLC

29. Plaintiff realleges and reincorporates paragraphs one (1) through twenty-eight (28) as if fully stated herein.

30. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure the maximum possible accuracy in the preparation of the credit report and credit files it published and maintains concerning the Plaintiff.

31. Despite Equifax believing that Plaintiff was dead, it published her credit report (containing the "customer deceased") to furnishers.

32. Moreover, while reporting Plaintiff as deceased, Equifax also was reporting that Plaintiff opened a new account with Atlantic Capital Bank on June 15, 2022, and it sold Plaintiff's credit report to Capital One on November 29, 2022, while reporting Plaintiff as deceased.

33. The FCRA requires that Equifax must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

34. The FCRA requires that Equifax must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C.

§§ 1681e(a) & 1681b. Equifax, despite having access to the Social Security Death Index, refuses to cross-check individuals for accuracy of deceased reporting.

35. Equifax places a "deceased" notation or marking on reports when it is advised from any of their many data furnishing sources that a given consumer is deceased.

36. Equifax does not request or require a death certificate or any other proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

37. Equifax does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

38. Even in instances where other data on the face of the consumer's report indicates that she is not deceased, Equifax employs no procedures which assure that a consumer with a "deceased" mark on her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

39. Once a "deceased" mark is placed upon a consumer's report, Equifax will not calculate and will not provide a credit score for that consumer.

40. Equifax has received and documented thousands of disputes from consumers complaining that Equifax's credit reports have them erroneously marked as "deceased."

41. Nevertheless, Equifax employs no procedures which assure that a consumer marked as "deceased" on Equifax's reports is, in fact, deceased.

42. Equifax has no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source.

43. Nor does Equifax employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

44. For years after a consumer's actual death, Equifax will continue to sell for profit credit reports about that consumer.

45. Equifax will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to Equifax – meaning that nobody is continuing to buy those reports.

46. Equifax charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

47. Equifax profits from the sale of reports on the deceased.

48. Equifax has in their credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

49. Equifax knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

50. Equifax warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

51. Equifax has no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

52. Indeed, Equifax sells reports of the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

53. For consumers who are deceased, there exists no permissible purpose under the FCRA for Equifax to ever sell their credit reports, absent a court order.

54. Equifax knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

55. At all times pertinent hereto, Equifax was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Equifax herein.

56. At all times pertinent hereto, the conduct of Equifax, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and grossly negligent disregard for federal law and the rights of Plaintiff herein. Equifax's conduct, action and inaction were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 USC § 1681n. In the alternative, it was negligent entitling Plaintiff to recover actual damages under 15 USC § 1681o. Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 USC § 1681n and/or § 1681o.

WHEREFORE, Plaintiff, MAYRA GARCIA CARRILLO, respectfully requests that this Court award statutory, actual and punitive damages against Defendant, EQUIFAX INFORMATION SERVICES, LLC, to Plaintiff, award Plaintiff her attorney fees and the costs of this action pursuant to 15 U.S.C. § 1681n and/or § 1681o; and grant all such additional relief as the Court deems appropriate.

## COUNT II
### Violation of the Fair Credit Reporting Act
### as to Defendant, Experian Information Solutions, Inc.

57. Plaintiff realleges and reincorporates paragraphs one (1) through twenty-eight (28) as if fully stated herein.

58. Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure the maximum possible accuracy in the preparation of the credit report and credit files it published and maintains concerning the Plaintiff.

59. Despite Experian believing that Plaintiff was dead, it published her credit report (containing the "customer deceased") to furnishers.

60. Moreover, while reporting Plaintiff as deceased, Experian also was reporting that Plaintiff opened a new account with Atlantic Capital Bank on June 15,

2022, and it sold Plaintiff's credit report to several third parties, while reporting Plaintiff as deceased.

61. The FCRA requires that Experian must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

62. The FCRA requires that Experian must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b. Experian, despite having access to the Social Security Death Index, refuses to cross-check individuals for accuracy of deceased reporting.

63. Experian places a "deceased" notation or marking on reports when it is advised from any of their many data furnishing sources that a given consumer is deceased.

64. Experian does not request or require a death certificate or any other proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

65. Experian does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

66. Even in instances where other data on the face of the consumer's report indicates that she is not deceased, Experian employs no procedures which assure that a consumer with a "deceased" mark on her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

67. Once a "deceased" mark is placed upon a consumer's report, Experian will not calculate and will not provide a credit score for that consumer.

68. Experian has received and documented thousands of disputes from consumers complaining that Experian's credit reports have them erroneously marked as "deceased."

69. Nevertheless, Experian employs no procedures which assure that a consumer marked as "deceased" on Experian's reports is, in fact, deceased.

70. Experian has no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source.

71. Nor does Experian employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

72. For years after a consumer's actual death, Experian will continue to sell for profit credit reports about that consumer.

73. Experian will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to Experian – meaning that nobody is continuing to buy those reports.

74. Experian charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

75. Experian profits from the sale of reports on the deceased.

76. Experian has in their credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

77. Experian knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

78. Experian warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

79. Experian has no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased

or for the buyers of their reports which access the purportedly deceased consumer's information.

80. Indeed, Experian sells reports of the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

81. For consumers who are deceased, there exists no permissible purpose under the FCRA for Experian to ever sell their credit reports, absent a court order.

82. Experian knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

83. At all times pertinent hereto, Experian was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Equifax herein.

84. At all times pertinent hereto, the conduct of Experian, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and grossly negligent disregard for federal law and the rights of Plaintiff herein. Experian's

conduct, action and inaction were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 USC § 1681n. In the alternative, it was negligent entitling Plaintiff to recover actual damages under 15 USC § 1681o. Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 USC § 1681n and/or § 1681o.

WHEREFORE, Plaintiff, MAYRA GARCIA CARRILLO, respectfully requests that this Court award statutory, actual and punitive damages against Defendant, EXPERIAN INFORMATION SOLUTIONS, INC., to Plaintiff, award Plaintiff her attorney fees and the costs of this action pursuant to 15 U.S.C. § 1681n and/or § 1681o; and grant all such additional relief as the Court deems appropriate.

**DATED** this 20th day of June 2023.

Respectfully submitted,

**/s/Octavio Gomez**
Octavio "Tav" Gomez
Florida Bar #:0338620
Georgia Bar #: 617963
Pennsylvania #: 325066
The Consumer Lawyers PLLC
412 E. Madison St, Ste 916
Tampa, FL 33602

Cell: (813)299-8537
Facsimile: (844)951-3933
Primary Email:
Tav@theconsumerlawyers.com
Secondary Email:
Lisa@theconsumerlawyers.com
*Attorney for Plaintiff*