# EXHIBIT A

# State Court Record

**GEORGIA, FULTON COUNTY**

**DO NOT WRITE IN THIS SPACE**

**E-FILED**
23EV002837
5/11/2023 12:08 PM
Donald Talley, Clerk
Civil Division

**STATE COURT OF FULTON COUNTY**
Civil Division

**CIVIL ACTION FILE #:** _____

MAINSTREET SOUTHSIDE CENTER, LTD

900 Old Roswell Lakes Parkway #310

Roswell, GA  30076

Plaintiff's Name, Address, City, State, Zip Code

vs.

RIVERSIDE ABSTRACT, LLC

3839 Flatlands Avenue, #208

Brooklyn, NY   11234

Defendant's Name, Address, City, State, Zip Code

| TYPE OF SUIT | AMOUNT OF SUIT |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $ 750,000.00 |
| [X] CONTRACT | |
| [ ] NOTE | INTEREST $_____ |
| [ ] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $_____ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $ _____ |
| [ ] SPECIAL LIEN | |
| | ************ |
| [ ] NEW FILING | |
| [ ] RE-FILING:  PREVIOUS CASE NO. _____ | |

### SUMMONS

TO THE ABOVE NAMED-DEFENDANT:

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Gregory M. Taube, Esq.

Address: Nelson Mullins Riley & Scarborough LLP, 201 17th St, #1700

City, State, Zip Code: Atlanta, GA 30363          Phone No.: 404-322-6000

An answer to this complaint, which is herewith served upon you, must be filed within thirty (30) days after service, not counting the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSES MAY BE MADE & JURY TRIAL DEMANDED,** via electronic filing or, if desired, at the e-filing public access terminal in the Self-Help Center  at 185 Central Ave., S.W., Ground Floor, Room TG300,  Atlanta, GA 30303.

Donald Talley, Chief Clerk (electronic signature)

_____

*SERVICE INFORMATION:*

Served, this _____ day of _____, 20_____.     _____

DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:

We, the jury, find for _____

_____

This _____ day of _____, 20_____.     _____ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

**E-FILED**
23EV002837
5/11/2023 10:19 AM
Donald Talley, Clerk
Civil Division

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| MAINSTREET SOUTHSIDE CENTER, LTD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: |
| v. | ) | |
| | ) | |
| RIVERSIDE ABSTRACT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### COMPLAINT

Plaintiff Mainstreet Southside Center, Ltd. ("**Seller**") hereby files its Complaint and shows the Court as follows:

### THE PARTIES

1.

Seller is a Florida limited partnership and is registered to do business with its registered office located at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, Georgia.

2.

Defendant Riverside Abstract, LLC ("**Escrow Agent**") is a New York limited liability company and may be served with process at 3839 Flatlands Avenue, Suite 208, Brooklyn, New York 11234.

### JURISDICTION AND VENUE

3.

The Court has subject matter jurisdiction over this matter pursuant to O.C.G.A. §§ 15-6-8(1) and 9-10-93. Venue is proper in this Court.

4.

All parties have consented to personal jurisdiction by virtue of a forum selection clause in the Agreement (as defined below).

## STATEMENT OF FACTS

5.

On August 18, 2022, Seller and BNH Associates, LLC ("**Buyer**") entered into that certain Purchase and Sale Agreement (the "**Agreement**") for certain property located at 6000 Feldwood Road, Atlanta, Georgia. A copy of the Agreement is attached hereto as **Exhibit A**.

6.

Escrow Agent acknowledged and agreed to terms of the Agreement.

7.

Pursuant to Section 3.2 of the Agreement, Buyer has deposited $750,000 (the "**Deposit**") with Riverside Abstract LLC ("**Escrow Agent**").

8.

The Deposit has become non-refundable because the Agreement was not terminated on or prior to the Due Diligence Expiration Date, as permitted pursuant to Section 5.3 of the Agreement.

9.

Although the Agreement originally required a closing on November 3, 2022, Buyer exercised its right to extend the closing deadline to December 19, 2022 (the "**Closing Date**").

10.

On December 14, 2022, Buyer advised Seller that Buyer was not going to close on the Closing Date. Thereafter, Buyer had no further communication with Seller or with the Closing Agent (as defined in the Agreement) on or before the Closing Date.

2

11.

Seller was ready, willing, and able to close on the Closing Date.

12.

Section 11.2 of the Agreement provides as follows regarding a "Buyer Default":

In the event that Buyer shall have failed in any material respect on the Closing Date to have performed any of the covenants and agreements contained in this Agreement which are to be performed by Buyer on or before the Closing Date ("Buyer Default"), Seller shall be entitled to terminate this Agreement, whereupon Escrow Agent shall disburse the Deposit to Seller as liquidated damages, in lieu of all other remedies available to Seller at law or in equity for such default, and, except as expressly set forth herein, neither party shall have any further liability or obligation to the other hereunder. Seller and Buyer agree that the damages resulting to Seller as a result of such default by Buyer as of the Effective Date are difficult or impossible to ascertain and the liquidated damages set forth in the preceding sentence constitute Buyer's and Seller's reasonable estimate of such damages.

13.

Buyer has defaulted under the Agreement by failing to close on or before December 19, 2022.

14.

By letter dated December 20, 2022, Seller notified Buyer and Escrow Agent of the Buyer's default. A copy of this correspondence is attached hereto as **Exhibit B**.

15.

With respect to the Escrow Agent's responsibilities under the Agreement, Section 3.2 provides in pertinent part that "Escrow Agent shall hold the Deposit until the final determination of the rights of Buyer and Seller in an appropriate proceeding."

3

16.

On January 18, 2023, Seller filed a complaint against Buyer in this Court in Civil Action No. 23EV000394, alleging that Seller is entitled to recover the Deposit due to Buyer's default under the Agreement.

17.

On April 12, 2023, this Court entered default judgment in favor of Seller and against Buyer in the amount of $750,000. A copy of the default judgment is attached hereto as **Exhibit C** (the "**Judgment**").

18.

Section 3.2 of the Agreement requires the Escrow Agent to release the Deposit to Seller because this Court has finally determined the rights of Buyer and Seller and entered the Judgment in favor of Seller.

19.

On April 21, 2023, Seller provided Escrow Agent with a copy of the Judgment and demanded that Escrow Agent wire the Deposit to Seller.

20.

Instead of wiring the Deposit to Seller, Escrow delayed more than a week before sending an email to Buyer and Buyer's counsel with instructions to notify Escrow Agent by no later than April 28, 2023, whether there was an objection to Escrow Agent wiring the Deposit to Seller.

21.

Having received no indication of any objection by Buyer, Seller's counsel sent an email to Escrow Agent on May 1, 2023, demanding that Escrow Agent wire the Deposit to Seller without further delay.

22.

On May 4, 2023, Seller's counsel received an email from Escrow Agent claiming that Escrow Agent had received an objection from JOSMIC 1, LLC ("**JOSMIC**") and further claiming that JOSMIC "has (1) provided evidence that the escrow funds belong to it under an assignment agreement entered into with BHN Associates on July 25, 2022; and (2) has claimed that the PSA terminated prior to the conclusion of the due diligence period entitling JOSMIC 1 LLC to recover in full the escrow funds." According to Escrow Agent, it is "exploring JOSMIC 1 LLC's claims and will retain possession of the escrow funds until a determination with regard to the claims have been made."

23.

On May 5, 2023, Seller's counsel sent an email to Escrow Agent, through counsel that Escrow Agent identified in the May 4 email, to make sure that Escrow Agent is aware the Agreement cannot possibly have been assigned to JOSMIC because Section 12.1 of the Agreement required prior notice to the Seller and such notice was never given. In addition, Seller's counsel stated as follows: "Given there cannot possibly be any evidence that the escrow funds belong to JOSMIC 1 LLC, Riverside Abstract has no reasonable basis for withholding release of the escrow funds to Seller and Riverside Abstract must wire the funds to Seller without further delay. Please let me know by Monday whether Riverside Abstract will be wiring the funds, and if not, please explain why not."

24.

Despite these indisputable facts, Escrow agent has neither wired the Deposit to Seller nor otherwise communicated with Seller since May 4.

## COUNT ONE: BREACH OF ESCROW AGREEMENT

25.

Seller hereby incorporates by reference the allegations contained in the preceding Paragraphs of the Complaint as if each such allegation was fully set forth herein.

26.

Escrow Agent agreed to maintain and disburse the Deposit in accordance with the terms and conditions of the Agreement (the "**Escrow Agreement**").

27.

As more fully set forth above, Seller had the right to terminate the Agreement due to Buyer's failure to close by the Closing Date.

28.

Escrow Agent is required to disburse the Deposit to Seller as liquidated damages for Buyer's default in failing to close by the Closing Date.

29.

Escrow Agent's failure to disburse the Deposit to Seller constitutes a breach of the Escrow Agreement.

30.

Escrow Agent's actions and omissions have been grossly negligent or willful.

31.

As the natural and probable consequences of Escrow Agent's breach of the Escrow Agreement, Seller has suffered damages in an amount to be determined at trial.

32.

Escrow agent has acted in bad faith, has been stubbornly litigious, and has caused Seller unnecessary trouble and expense, as described above such that Seller is entitled to recover expenses of litigation under O.C.G.A. § 13-6-11.

WHEREFORE, Seller respectfully prays for the following relief:

(a)     That Judgment be entered in favor Seller;

(b)     That Seller be awarded damages against Escrow Agent in an amount to be determined at trial;

(c)     That Seller be awarded attorney's fees and other expenses of litigation for the filing and prosecution of this action pursuant to O.C.G.A. § 13-6-11; and

(d)     That Seller have such other and further relief as this Court deems just and proper.

Respectfully submitted this 11th day of May, 2023.

*/s/ Gregory M. Taube*
Gregory M. Taube
Georgia Bar No. 699166

*Attorney for Plaintiff*

NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, N.W., Suite 1700
Atlanta, GA 30363
(404) 322-6000 (Phone)
(404) 322-6050 (Fax)
greg.taube@nelsonmullins.com

# Exhibit A

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "**Agreement**") is entered into as of the 18th day of August, 2022 (the "**Effective Date**") by and between MAINSTREET SOUTHSIDE CENTER, LTD., a Florida limited partnership ("**Seller**"), and BHN ASSOCIATES LLC ("**Buyer**"), and RIVERSIDE ABSTRACT LLC ("**Escrow Agent**").

## RECITALS

WHEREAS, Seller desires to sell to Buyer certain improved real property located at 6000 Feldwood Road, Atlanta, Georgia, along with certain related personal and intangible property; and

WHEREAS, Buyer desires to purchase from Seller the Property (as defined below) in accordance with the terms and conditions hereinafter set forth.

## ARTICLE 1
## Purchase and Sale Agreement

1.1     ***Agreement to Purchase and Sell***.  In consideration of the mutual undertakings and covenants of the parties set forth in this Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Seller agrees to sell the Property to Buyer and Buyer agrees to buy the Property from Seller on and subject to the terms and conditions contained in this Agreement.

## ARTICLE 2
## The Property

2.1     ***Description of the Property***.  The "**Property**" consists of the following:

(a)     ***Land***.  Seller's fee interest in and to all of that certain tract of land situated at 6000 Feldwood Road, Atlanta, Georgia, and legally described on <u>Exhibit A</u> attached hereto, together with all of Seller's right, title and interest in and to the rights, privileges and easements appurtenant to such land (collectively, the "**Land**").

(b)     ***Improvements***.  The buildings, together with all other improvements and structures now situated on the Land (collectively, the "**Improvements**").

(c)     ***Rights; Appurtenances***.  All right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; and the appurtenances and all the estate and rights of Seller in and to the Land and Improvements (together with the Land and Improvements, collectively, the "**Premises**"), including (i) streets, easements, reciprocal easement agreements, covenants, privileges, rights-of-way and vehicle parking rights used in

1

connection with the Premises; (ii) any strips or gores of land between any portion of the Land and abutting or adjacent properties; (iii) all air rights, development rights, mineral rights, water rights, water stock, sewer rights and irrigation rights, if any, running with, allocated to, or otherwise pertaining to the Land, (iv) all rights of ingress and egress to the Premises, and (v) all other rights appurtenant to or connected with the beneficial use or enjoyment of the Property.

(d)     ***Personal Property***.  All of Seller's right, title and interest in and to the following (specifically excluding any property owned by Tenant under any Lease (as hereinafter defined)) (the "**Personal Property**"): (i) mechanical systems, fittings, fixtures, machinery and equipment comprising a part of or attached to or located upon the Improvements; (ii) maintenance supplies, equipment and tools, and other tangible personal property of every kind and character, if any, but only to the extent owned by Seller and used in connection with, and located in or on, the Improvements; and (iii) signs situated on or at the Land or Improvements.

(e)     ***Lease***.  All of Seller's right, title and interest in and to that certain lease with Bank of America, National Association ("Tenant") dated June 11, 2015, as amended by that certain First Amendment to Lease Agreement dated April 8, 2021 (the "**Lease**"), together with all rents and other sums due thereunder.

(f)     ***Contracts***.  Subject to the terms of Section 5.4 hereof, all of Seller's right, title and interest in and to all third party service contract rights related to the Land, Improvements, Personal Property or the  Lease that will remain in existence after Closing (as hereinafter defined), to the extent assignable at no cost to Seller and without the consent of third parties, a list of which is attached hereto as Exhibit B (collectively, the "**Contracts**").

(g)     ***Intangible Property***.  To the extent assignable without cost to Seller or the consent of third parties, all of Seller's right, title and interest in and to (i) all consents, authorizations, entitlements, variances or waivers, licenses, permits, certificates of occupancy and other approvals issued by any state, federal or local authority relating to the use, maintenance or operation of the Premises or the fixtures, machinery or equipment included in this sale, (ii) all warranties or guaranties, if any, applicable to the Premises, (iii) plans, specifications, architectural and engineering drawings, prints, surveys, soil and substrata studies relating to the Premises in Seller's possession, whether or not stored, managed or contained on computer software or hardware, (iv) all operating manuals and books, data and records regarding the Premises and its component systems in Seller's possession, (v) all air rights, development rights and approvals, and (vi) all guarantees, trademarks, trade names, names, logos, copyrights, websites and other intangible property (the "**Intangible Property**"), if any, owned by Seller and relating solely to the Land, the Improvements or the Personal Property, including the name "Southside Center" and any variations thereof.

## ARTICLE 3
### Purchase Price; Deposit; Adjustments

3.1     ***Purchase Price***.  The purchase price (the "**Purchase Price**") for the Property is Twenty-Six Million Dollars ($26,000,000.00), subject to adjustment as set forth in this Agreement.  The Purchase Price (other than the Deposit, which will be credited as described in

2

Section 3.2, and plus or minus prorations and adjustments to be made pursuant to and in accordance with this Agreement) will be payable by wire transfer of immediately available federal funds at the Closing. No portion of the Purchase Price is allocated to either the Personal Property or the Intangible Property.

3.2     **_Deposit_**.   Within two (2) Business Days after the Effective Date, Buyer will deposit with the Escrow Agent the sum of Seven Hundred Fifty Thousand Dollars ($750,000.00) (the "**Deposit**") to secure Buyer's obligations under this Agreement.  If this Agreement is not terminated on or prior to the Due Diligence Expiration Date, as permitted pursuant to Section 5.3 hereof, the Deposit shall thereafter be non-refundable except as otherwise expressly set forth in this Agreement.  Buyer's failure to timely deposit any amount required pursuant to this Section shall be deemed a default under this Agreement entitling Seller immediately and without notice to exercise its remedies for a Buyer default as set forth in this Agreement.  The Escrow Agent will maintain and disburse the Deposit pursuant to the terms and conditions of this Agreement. If Closing occurs in accordance with this Agreement, the Deposit (and all interest earned thereon) shall be applied against the Purchase Price, as hereinafter provided.  If this Agreement is terminated, or if either party fails to perform any of its agreements hereunder, the Deposit shall be disposed of in the manner hereinafter provided.  If any dispute arises under this Agreement with respect to the disposition of the Deposit or the entitlement of any party to the Deposit or the obligations of Escrow Agent with respect thereto, Escrow Agent shall not be required to determine the resolution of any such dispute and shall not be obligated to make any delivery of the Deposit; but in such event, Escrow Agent shall hold the Deposit until receipt by Escrow Agent of an authorization in writing signed by Buyer and Seller directing the disposition of same, or in the absence of such authorization, Escrow Agent shall hold the Deposit until the final determination of the rights of Buyer and Seller in an appropriate proceeding.  If such written authorization is not given, or if proceedings for such determination are not promptly commenced and diligently continued to a resolution, Escrow Agent may bring an appropriate action or proceeding for leave to deposit said monies in a court of competent jurisdiction in the State of Georgia pending such determination and to submit such resolution of such dispute to such court by action of interpleader. Buyer and Seller hereby consent to the jurisdiction of such court in connection with any such dispute. Escrow Agent shall not be responsible hereunder for any acts or omissions unless willfully done or done in a grossly negligent or willfully misconduct manner, and upon delivery of the Deposit in accordance with the terms of this Agreement, Escrow Agent shall have no further liability to the parties hereunder or in connection herewith.  Seller and Buyer hereby jointly and severally agree to indemnify and hold Escrow Agent harmless from and against any and all loss, costs or damages arising under this Agreement or in connection herewith (except such loss, costs or damages as shall result from the gross negligence or willful misconduct of Escrow Agent).

3.3     **_Prorations of Taxes_**.   All real and personal property taxes attributable to the Property are paid by the Tenant are therefore there is no proration of such taxes hereunder.

3.4     **_Utilities_**.   All charges for water, electricity, sewer rental, gas, telephone and all other utilities ("**Operating Expenses**") and all common area maintenance charges billed to Tenant ("**CAM Charges**") are paid by the Tenant and therefore there is no proration of Operating Expenses or CAM Charges hereunder.

3

3.5     ***Other Income and Expenses***.  Rent and all other income and ordinary operating expenses for or pertaining to the Property will be prorated as of the Closing Date in accordance with customary practice in commercial real estate transactions in Fulton County in the State of Georgia.

3.6     ***Insurance.***   There shall be no proration of Seller's insurance premiums or assignment of Seller's insurance policies (except for any assignment of claims to the extent required by Article 9 hereof).

3.7     ***Adjustment Payments; Estimates***.  The net amount of all adjustments to be made under this Article 3 will be paid on the Closing Date in immediately available funds as a proration of the Purchase Price.  All post-closing adjustments will be made in immediately available funds.  All apportionments and prorations made hereunder shall be made based on the number of days of ownership of the Property in the period applicable to the apportionment, with Buyer entitled to income and responsible for expenses for the Closing Date; *provided, however,* in the event Seller does not receive the Purchase Price by receipt of wired funds by or on the Closing Date, all prorations shall be made as of the following Business Day.  Prorations of annual payments will be made based on the number of days of ownership in the applicable annual period.  In the event, on the Closing Date, the precise figures necessary for any of the foregoing adjustments are not capable of determination, then, except to the extent otherwise provided in this Agreement, those adjustments will be made on the basis of good faith estimates using currently available information, and final adjustments shall be made within three (3) months after the Closing Date to the extent precise figures are determined or become available. The terms of this Section 3.10 shall survive Closing.

3.8     ***Lease Costs and Expenses***.  All unpaid tenant improvement costs or allowances, free rent periods or rental abatements, concessions and other inducements and all brokerage commissions relating to the Lease, and any amounts owing in connection with the Lease shall be the obligation of Seller and shall be paid at the Closing with evidence of payment delivered to Buyer at the Closing or Buyer shall receive a credit against the Purchase Price for any such amount(s) not paid. ***Closing Costs***.  At the Closing, (a) Seller shall pay and be responsible for (i) the recording charges for any instrument which release or discharges any lien as required by Article 5 hereto, (ii) all state, county and local transfer taxes and fees payable upon the deed transferring Property to Buyer, (iii) one-half of the fees of the Escrow Agent, (iv) Seller's counsel's fees and expenses, (v) the commissions due Broker pursuant to Section 9.1, and (vi) the cost of the Title Policy, excluding any endorsements requested by Buyer to the Title Policy; and (b) Buyer shall pay and be responsible for (i) all recording charges other than as are the expressly responsibility of Seller pursuant to the terms of this Section, (ii) all costs and fees for title examination, title insurance and other title company charges (other than as provided in (a)(vi) above), the survey of the Property and all of Buyer's due diligence studies and investigations, (iii) one-half of the fees of the Escrow Agent, and (iv) Buyer's counsel's fees and expenses.  Seller and Buyer shall each pay all other expenses, charges or costs for which sellers and buyers, respectively, are customarily responsible in commercial real estate transactions in State of Georgia.

4820-1493-8874 v.6 124051/00124

3.10   ***Closing Statement***.  Seller will prepare a draft closing statement or will provide the Escrow Agent and Buyer with sufficient information to prepare a draft closing statement at the Closing.

## ARTICLE 4
## Representations, Warranties, Covenants and Agreements

4.1   ***Seller's Representations and Warranties***.  Seller makes only the representations and warranties to Buyer which are set forth below and elsewhere in this Agreement, provided that Buyer acknowledges and agrees that, subject to the terms of this Agreement, each of such representations and warranties is and may be expressly qualified by any information set forth in this Agreement or any disclosures expressly made by Seller to Buyer in writing prior to the Due Diligence Expiration Date and may be modified or updated in accordance with the terms of this Agreement.  Buyer acknowledges (a) that, other than as specifically set forth below in this Section 4.1 or elsewhere in this Agreement, Buyer has entered into this Agreement with the intention of making and relying upon its own investigation of the physical, environmental, economic and legal condition of the Property, and (b) that, other than as specifically set forth below in this Section 4.1 or elsewhere in this Agreement, Seller is not making and has not at any time made any representation or warranty of any kind or nature, either oral or written, directly or indirectly, expressed, implied, statutory or otherwise, with respect to the Property, including, without limitation, representations or warranties as to habitability, merchantability, fitness for a particular purpose, title, zoning, tax consequences, latent or patent physical or environmental condition, health or safety matters, utilities, operating history or projections, valuation, projections, the applicability of any laws, rules or regulations or compliance therewith.  Without in any way limiting the foregoing, except as expressly set forth in this Section 4.1 or elsewhere in this Agreement, Seller makes no representation or warranties as to any previous or present generation, storage, disposal or existence of any oil, petroleum products, or other hazardous materials, as defined under applicable Environmental Laws (collectively, "**Hazardous Materials**") in, on, under or about the Property.  Buyer specifically waives any private right of action provided under applicable Environmental Laws to recover or be reimbursed for any liabilities, costs, fees or expenses from Seller.  Buyer agrees to accept complete responsibility for the allocation of any response costs under any applicable Environmental Laws.  The agreements and waiver set forth in this Section shall survive the Closing and the recording of the Deed (as hereinafter defined).  As used herein, the term "**Environmental Law**" means any law, statute, ordinance, rule, regulation, order or determination of any governmental authority or agency affecting the Property and pertaining to health or the environment including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1982 ("**CERCLA**"), the Resource Conservation and Recovery Act of 1986 ("**RCRA**"), and any and all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees of the United States, the State of Georgia or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Property, the Property or the use of the Property, relating to pollution, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or Hazardous Materials into, or the presence thereof in, the environment (including, without limitation, ambient air, surface water, ground water or land or soil), as any or all of the same may be amended from time to time.

5

Based upon Buyer's familiarity with the Property, Buyer's due diligence relating to the Property and Buyer's experience and knowledge as to the market in which the Property is situated and as to investment in and operation of real estate in the nature of the Property and commercial real estate in general, Buyer shall purchase the Property on the Closing Date in its "AS IS, WHERE IS AND WITH ALL FAULTS" condition, without any representation or warranty whatsoever, as aforesaid, except as set forth in this Section 4.1 or elsewhere in this Agreement, and Buyer fully assumes the risk that adverse latent or patent physical, structural, environmental, economic or legal conditions may not have been revealed by Buyer's investigations. Seller and Buyer acknowledge that the Purchase Price to be paid to Seller for the Property has taken into account that the Property is being sold subject to the foregoing provisions of this Section 4.1.

THE CLOSING OF THE PURCHASE OF THE PROPERTY BY BUYER HEREUNDER SHALL BE CONCLUSIVE EVIDENCE THAT: (A) BUYER HAS FULLY AND COMPLETELY INSPECTED (OR HAS CAUSED TO BE FULLY AND COMPLETELY INSPECTED) THE PROPERTY; (B) BUYER ACCEPTS THE PROPERTY AS BEING IN GOOD AND SATISFACTORY CONDITION AND SUITABLE FOR BUYER'S PURPOSES; AND (C) THE PROPERTY FULLY COMPLIES WITH SELLER'S COVENANTS AND OBLIGATIONS HEREUNDER, EXCEPT FOR ANY BREACH OF REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN THIS SECTION 4.1 OR ELSEWHERE IN THIS AGREEMENT.

Except for claims for a breach of the representations and warranties of Seller provided in this Section 4.1 or elsewhere in this Agreement, Buyer for itself and on behalf of each of its successors and assigns (collectively, the "**Releasors**") by this general release of known and unknown claims (this "**Release**") hereby irrevocably and unconditionally release and forever discharges Seller, its affiliates, and the managers, members, partners, directors, officers, shareholders, owners, employees, and agents of each (collectively, the "**Releasees**"), and each of them, which and who shall constitute intended third party beneficiaries hereof, from and against any and all claims of any kind or nature whatsoever, **WHETHER KNOWN OR UNKNOWN**, suspected or unsuspected, fixed or contingent, liquidated or unliquidated which any of the Releasors now have, own, hold or claim to have had, owned or held, against any of the Releasees arising from, based upon or related to, whether directly or indirectly, any facts, matters, circumstances, conditions or defects (whether patent or latent) of all or any kinds, related to, arising from, or based upon, whether directly or indirectly, the Property, including without limitation (i) the physical condition, quality and state of repair of the Property conveyed; (ii) any latent or patent defect affecting the Property conveyed; (iii) the presence of Hazardous Materials in, on, about or under the Land or which have migrated from adjacent lands to the Land or from the Land to adjacent lands; and (iv) any claims arising out of alleged construction defects. The foregoing Release shall be effective as of the Closing, and shall survive Closing.

Subject to the foregoing, Seller hereby represents and warrants to Buyer that the following shall be true and correct as of the Effective Date and as of the Closing Date:

(a)    Organization and Authority.  This Agreement and the consummation of the transactions contemplated hereby have been duly authorized, executed and delivered by Seller and all consents required under Seller's organizational documents or by law have been obtained. All documents that are to be executed by Seller and delivered to Buyer on the Closing

6

Date have been, or on the Closing Date will be, duly executed, authorized and delivered by Seller. This Agreement and all such documents are, and on the Closing Date will be, legal, valid and binding obligations of Seller, enforceable in accordance with their terms and do not, and, at the time of the Closing Date will not, violate any provisions of any agreement or judicial or administrative order, writ, injunction or decree to which Seller is a party or to which Seller or the Property (or any portion thereof) is subject. Seller is duly formed, validly existing and in good standing under the laws of the jurisdiction of its organization, and has all requisite power and authority to own and operate its assets as they are presently owned and operated, to enter into this Agreement and all other agreements, instruments and documents herein provided to be executed or to be caused to be executed by Seller, and to carry out the transactions contemplated hereby. The person executing this Agreement on behalf of Seller is authorized to do so.

(b)  Consents.  The execution and delivery of this Agreement and the consummation of the transaction do not require any governmental or other consent, authorization, approval or registration under any law, statute, judgment, order, writ, injunction or decree which is binding upon the Seller and no consent of any third party is required in connection with the execution, delivery or performance by Seller of this Agreement or for its consummation of any transaction contemplated hereby.

(c)  Non-Contravention. The execution and delivery of this Agreement by Seller do not, and the performance of Seller's obligations hereunder will not, (i) violate any applicable law, regulation, judgment, decree or order, or (ii) result in the breach of, or constitute a default, under the organizational documents of Seller, any note or other evidence of indebtedness, any mortgage, deed of trust or indenture, or any lease or other agreement or instrument by which Seller or the Property is bound.

(d)  Litigation.  There are no existing legal actions, suits, arbitrations, governmental investigations or similar proceedings (including arbitration proceedings) pending or affecting the Property or against Seller, or to Seller's knowledge, threatened, that would affect the Property or any part thereof, or be against Seller, which if adversely determined, would materially and adversely affect Seller's ability to perform its obligations hereunder or to consummate the transactions contemplated by this Agreement or would adversely affect the Property or Seller.

(e)  Bankruptcy.  No bankruptcy, insolvency, reorganization, assignment for the benefit of creditors or similar action or proceeding, whether voluntary or involuntary, is pending, or, to Seller's knowledge, threatened, against Seller, and Seller is not insolvent.

(f)  Lease.  Except for the Lease, there are no leases, licenses or other occupancy agreements with Tenant, licensees or other occupants in effect which will affect the Property after Closing, and there are no tenants, subtenants, licensees, or other occupants or persons having any rights or asserting any claims for occupancy or possession of the Property, except Seller and Tenant, as tenant only under the Lease. To Seller's knowledge, (i) the Lease is in full force and effect, has not been modified, amended or extended and no renewal, extension options or options for additional space has been granted to Tenant, licensees of occupants except as set forth in the Lease documents provided by Seller to Buyer, (ii) Seller has not given to Tenant nor received from Tenant any written notice of default that remains uncured under the

7

Lease on the Effective Date or any written notice of termination of the Lease, (iii) Seller has provided Buyer with a full, correct and complete copy of the Lease, including all amendments, modifications and any guaranties thereto, prior to the execution of this Agreement by Buyer and Seller, (iv) no construction, alteration, decoration or other work remains to be performed under the Lease by the landlord thereunder, and all construction allowances or other sums to be paid to Tenant have been paid in full, (v) all brokerage commissions and other compensation and fees payable by reason of the Lease (including, without limitation, any renewals or expansions) have been or will be fully paid, (vi) Tenant is not entitled to any free rent periods or rental abatements, concessions and other inducements for any period subsequent to the Closing, and (vii) there is no security deposit under the Lease.

(g)   No Condemnation; Violations.   There are no pending or, to Seller's knowledge, threatened condemnation proceedings affecting the Property or actions or proceedings to change road patterns or grades which would affect ingress to or egress from the Property.   Seller has received no written notice (that remains uncured) from any government agency having jurisdiction over the Property of a violation of any building, fire, health or other law applicable to the Property, or any part thereof, or with respect to the presence of Hazardous Materials at the Property, during Seller's ownership of the Property and, the consummation of the transactions contemplated herein will not result in the violation of any law applicable to the Property.   Seller has received no written notice (that remains uncured) that there is any violation of any restriction, condition or agreement contained in any easement, restrictive covenant or any similar instrument or agreement affecting the Property or any portion thereof from any party thereto or beneficiary thereof.

(h)   Non-Foreign Person.   Seller is not a "foreign person," "foreign trust" or "foreign corporation" within the meaning of the United States Foreign Investment in Real Property Tax Act of 1980 and the Internal Revenue Code of 1986, as subsequently amended.

(i)   Employees.   There are no employees of Seller at the Property or any collective bargaining agreements, employee benefit plans or other employee agreements affecting the Property.   Any employees at the Property are employees of the manager, if any, of the Property, or of Tenant.

(j)   Agreements.   On the Closing Date, there will be no contract or agreement in effect for the leasing or management of the Property for or pursuant to which Buyer shall be bound (notwithstanding that there may be agreements pursuant to which Tenant may be bound).

(k)   Property Rights.   Seller has not transferred or conveyed (or agreed to transfer or convey) any air or development rights or any other rights appurtenant to the Property

(l)   Insurance.   Seller has received no written notice from any insurance company or board of fire underwriters requesting the performance of any work or alterations with respect to the Property that has not been performed or required an increase in insurance rates applicable to the Property as a result of work which has not been performed.   Seller has received no written notice of default or cancellation under any insurance policies covering the Property.

8

(m)   <u>Taxes</u>.  Seller has not commenced any tax reduction proceedings.

(n)   <u>No Options</u>.  No person or entity has any option, right of first refusal, right of first offer, right of reverter, reversionary interest, or other right with respect to the purchase or acquisition of the Property or any interest therein.

(o)   <u>OFAC</u>.  Neither Seller nor, to Seller's knowledge any of its direct or indirect equity owners or any of its or their respective employees, officers or directors, is a person, nation, group or entity,  or is controlled directly or indirectly by a person or entity, with whom U.S. persons or entities (each, a "**Prohibited Person**") are restricted from doing business under regulations of the Office of Foreign Asset Control of the Department of the Treasury ("**OFAC**") (including those named on OFAC's Specially Designated and Blocked Persons List) or under any similar statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism) or other similar governmental action.  Neither Seller (nor any person, group or entity which owns or controls Seller, directly or indirectly) has conducted or will conduct business or has engaged or will engage in any transaction or dealing with any Prohibited Person.

(p)   <u>AML/Patriot Act</u>.  Neither Seller nor any person or entity that, directly or indirectly, controls, is controlled by or under common control with Seller: (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Law; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.  For purposes of this Agreement, the term "Anti-Money Laundering Laws" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations.  Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

The representations and warranties of Seller set forth in this Section 4.1, as updated as of the Closing in accordance with the terms of this Agreement, shall survive Closing for a period of six (6) months (the "<u>Survival Period</u>").  Buyer shall have the right to bring an action against Seller for, and Seller shall indemnify Buyer and its Indemnitees against the costs and expenses resulting from, the breach of a representation or warranty hereunder, provided that Seller shall have no liability to Buyer for a breach of any representation or warranty unless written notice containing a description of the specific nature of such breach shall have been given by Buyer to Seller prior to the expiration

of said six (6) month period, nor shall Seller have any liability unless the amount of such claim or claims, individually or in the aggregate, exceeds $25,000.00; *provided, however,* any claim for a breach of a representation or warranty shall, except to the extent the same was caused by the willful breach by Seller of Seller's obligations pursuant to this Agreement, be limited to actual damages suffered by Buyer (specifically excluding consequential, punitive or indirect damages), and in no event shall Seller have any liability in excess of $1,000,000.00. In the event that Buyer discovers prior to the Due Diligence Expiration Date and has actual knowledge that a representation or warranty of Seller under this Section 4.1 is untrue or becomes untrue and Buyer does not elect to terminate this Agreement prior to the Due Diligence Expiration Date, such representation or warranty shall not be a condition to Closing. Anything contained herein to the contrary notwithstanding, to the extent any inaccuracy in a representation and warranty of Seller in this Agreement or any documents or instruments delivered by Seller at the Closing is expressly disclosed by Seller to Buyer in writing, other than if such inaccuracy was caused by the breach by Seller of Seller's obligations under this Agreement, and Buyer nevertheless consummates the Closing and the transactions contemplated by this Agreement, then such representation and warranty shall be deemed modified to reflect such inaccuracy. The reference to "Seller's knowledge" as used in this Section 4.1 shall be deemed to mean the actual knowledge of Joseph DiMario (the "**Designated Individuals**"), after due inquiry. Seller has caused the Designated Individuals to review the Seller's representations and warranties contained herein. Notwithstanding anything to the contrary contained herein, the designation of the Designated Individuals shall in no event expose the Designated Individuals to personal liability hereunder on account of a breach by Seller of any representation or warranty contained herein, all such liability residing only with Seller.

    4.2    ***Buyer's Representations and Warranties***. Buyer hereby represents and warrants to Seller as of the date of this Agreement as follows:

        (a)    Organization and Authority. This Agreement has been duly authorized, executed and delivered by Buyer and all consents required under Buyer's organizational documents or by law have been obtained. All documents that are to be executed by Buyer and delivered to Seller on the Closing Date have been, or on the Closing Date will be, duly executed, authorized and delivered by Buyer. This Agreement and all such documents are, and on the Closing Date will be, legal, valid and binding obligations of Buyer, enforceable in accordance with their terms and do not, and, at the time of the Closing Date will not, violate any provisions of any agreement or judicial or administrative order, writ, injunction or decree to which Buyer is a party or to which Buyer is subject. Buyer is duly formed, validly existing and in good standing under the laws of the jurisdiction of its organization, and has all requisite power and authority to enter into this Agreement and all other agreements, instruments and documents herein provided to be executed or to be caused to be executed by Buyer, and to carry out the transactions contemplated hereby. The person executing this Agreement on behalf of Seller is authorized to do so.

        (b)    Pending Actions. There are no existing legal actions, suits, arbitrations, governmental investigations or similar proceedings (including arbitration proceedings) pending or to the best of Buyer's knowledge, threatened against Buyer, which if adversely determined, would materially and adversely affect Buyer's ability to perform its obligations hereunder or to consummate the transactions contemplated by this Agreement, or would adversely affect Buyer.

(c)     OFAC.  Neither Buyer nor, to Buyer's knowledge any of its equity owners or any of its or their respective employees, officers or directors, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of OFAC (including those named on OFAC's Specially Designated and Blocked Persons List) or under any similar statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism) or other similar governmental action.

(d)     Anti-Money Laundering Laws.  Buyer has taken, and shall continue to take until the Closing, such measures as are required by applicable law to assure that the funds used to pay to Seller the Purchase Price are derived: (i) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

Buyer shall indemnify Seller against and hold Seller harmless from any and all loss, damage, liability or expense, including court costs and reasonable attorneys' fees, which Seller may reasonably and actually incur or sustain by reason of a breach by Buyer of a representation or warranty hereunder.  Buyer's obligations pursuant to this Section 4.3 shall survive the Closing for the Survival Period.

4.3     *Tenant Estoppels*.  Promptly after the Due Diligence Expiration Date, Seller shall request from the Tenant an estoppel certificate, reasonably acceptable to Buyer, in substantially the form of Exhibit C attached hereto ("**Tenant Estoppel**") to be delivered to Buyer within three (3) Business Days after Seller's receipt of same, but no later than 15 days of Closing.  The Tenant Estoppel shall be deemed reasonably acceptable to Buyer, if such Tenant Estoppel (i) is dated not more than thirty (30) days prior to the initial Closing Date, (ii) has all blanks completed or marked not applicable, as appropriate, (iii) does not indicate (1) any material discrepancy from the Property Information or the representations and warranties of Seller set forth herein, (2) any Lease amendment, assignment or subletting that was not previously provided by Seller to Buyer and which is not reasonably acceptable to Buyer, (iii) any default by Tenant, or (iv) any adverse claim or setoff rights against landlord, or landlord default.

4.4     *SNDA*.  Promptly after the Due Diligence Expiration Date, Seller shall request, and shall use commercially reasonable efforts to obtain, from Tenant a subordination, non-disturbance and attornment agreement ("**SNDA**") in such form as may be prescribed under the Lease.

## ARTICLE 5
## Access, Inspection, Due Diligence and Property Materials

5.1     ***Access and Inspections; Title and Survey***.  Access.  Buyer shall have the right, subject to the remainder of this Section 5.1, to enter the Property from the date hereof until the earlier of the Closing Date or any earlier termination of this Agreement to evaluate the Property for its purchase in accordance with the terms of this Agreement, provided Buyer shall: (i) in all events give at least twenty-four (24) hours' advance notice to Seller (which notice may be by

email) so that Seller may in its discretion have a representative designated by Seller present during each visit to the Property and in no event shall Buyer be permitted to visit the Property without a Seller representative present (if so required by Seller); (ii) not contact or otherwise communicate with any person using, occupying or providing service at the Property (except the property manager), including without limitation, any tenant under any of the Lease, and the right of access herein granted is specifically subject to the rights of Tenant under the Lease, provided however, Seller will cooperate with Buyer in scheduling interviews with the Tenant under the Lease provided that Seller shall have the right to be present at such interviews; and (iii) not unreasonably interfere with the use or operation of the Property.  If Buyer desires access to any space occupied by a Tenant, Seller shall seek to arrange such entry, but any access to space occupied pursuant to a Lease shall be subject to and limited by the terms of the applicable Lease. Any such access shall be limited to normal business hours and Buyer shall cooperate with any reasonable request by Seller in connection with the timing of any such access.  Through the Closing Date, Seller agrees to cooperate in all reasonable respects with Buyer and agrees to make available to Buyer and its agents (and to the Title Company and any surveyor), via electronic means or dropbox access, all of the books, files and records relating to the operation, management, maintenance and repair of the Property that are in the possession or under the reasonable control of Seller, including the items set forth on Exhibit I that are in the possession or under the reasonable control of Seller.  Notwithstanding the foregoing, no invasive, intrusive or destructive testing or soil investigations shall be performed without the prior written approval of Seller, which such approval may be granted or withheld by Seller in its sole discretion, provided that a Phase I Environmental Audit shall not be deemed to be an intrusive inspection requiring Seller's approval.  While on the Property, Buyer will comply and will cause any of its representatives, consultants, agents or employees to comply with all applicable governmental laws and regulations.  Buyer shall restore any damage to the Property or any adjacent property caused by such actions to the same condition as existed prior to Buyer's action and indemnify, defend and save Seller and, as the case may be, its partners, trustees, shareholders, directors, members, managers, officers, employees and agents harmless of and from any and all claims and/or liabilities which Seller or its partners, trustees, shareholders, directors, members, managers, officers, employees or agents may suffer or be subject by reason of or in any manner relating to such inspections and other activities; provided, however, that Buyer shall not be responsible for (i) any damage caused by the gross negligence or willful misconduct of Seller or tenant, or (ii) any preexisting condition or latent defect at the Property.  Buyer specifically acknowledges and agrees not to utilize any such access for, or to otherwise engage in, any marketing of all or any part of the Property prior to the Closing.  In the event Buyer discovers a preexisting condition at the Property, Buyer hereby covenants that it shall not disclose such condition to any person or governmental authority except (i) as may be required by law or regulation, and (ii) to communicate with governmental authorities in order to have them (1) conduct a records check as part of Buyer's Phase I Environmental Audit, and (2) confirm whether, according to the existing records of the city/town, the Property is in compliance with applicable zoning ordinances and building codes.   Prior to conducting any invasive testing, Buyer shall furnish (or caused to be furnished) to Seller a certificate naming Seller (and its property manager and lender) as additional insureds on Buyer's or its agent's commercial general liability insurance policy with a company having a rating of A:IX, which such commercial general liability insurance coverage shall be in an amount of at least Two Million Dollars per occurrence ($2,000,000).   Buyer or its agent shall also maintain workers

compensation insurance in an amount required by law, together with employers liability, with a waiver of subrogation endorsement by the insurance carrier with respect to Seller.  Buyer agrees to maintain or cause to be maintained such coverages for so long as this Agreement remains in effect.

      (b)    <u>Satisfaction of Due Diligence</u>.  Buyer acknowledges that Buyer will conduct prior to the Due Diligence Expiration Date, such investigations of the Property, including but not limited to, the environmental conditions thereof, as Buyer deems necessary or desirable to satisfy itself as to the condition of the Property and the existence or nonexistence or curative action to be taken with respect to any hazardous or toxic substances on or discharged from the Property and, except as provided expressly in this Agreement, will rely solely upon the same and not upon any information provided by or on behalf of Seller or its agents or employees with respect thereto.  Buyer will assume the risk that adverse environmental conditions may not have been revealed by Buyer's investigations, and Buyer, upon Closing, except as provided expressly in this Agreement, shall be deemed to have waived and released Seller (and its divisions, subsidiaries, members, managers, partners and affiliated companies and its and their employees, officers, shareholders, directors, agents, representatives, and professional consultants and its and their respective successors and assigns) from and against any and all claims, demands, causes of action (including causes of action in tort), losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees) of any and every kind or character, known or unknown, which Buyer might have asserted or alleged against Seller (and its divisions, subsidiaries, members, managers, partners and affiliated companies and its and their employees, officers, shareholders, directors, agents, representatives, and professional consultants and its and their respective successors and assigns) at any time by reason of or arising out of any environmental condition or the Property.  All investigations made by Buyer will be at Buyer's sole cost and expense and will be performed in accordance with this Agreement.  <u>Reports</u>. Buyer will promptly provide Seller with a copy of any report, draft report or evaluation ("**Reports**") which indicates the presence of Hazardous Materials on the Property or the violation of any applicable law.  Buyer agrees to keep confidential and not to disclose the results or the contents of any Reports, except as required to be disclosed by law or regulation and except as may be disclosed to Buyer's representatives as provided in this Agreement.   In the event Buyer terminates this Agreement for any reason other than a Seller Default, Buyer shall, upon the request of Seller and reimbursement by Seller for the cost therefor, promptly deliver to Seller copies of any third party reports prepared for Buyer in connection with Buyer's investigation of the Property without warranty or representation of any kind as to the completeness or accuracy of the Reports or any other matter relating thereto, and Seller shall have no right to rely on any Report without the written consent of the party preparing same (and in any event Buyer shall have no obligation or liability resulting from such reliance).***Due Diligence Materials***.  Seller has made available to Buyer (which has been made available on an information website or other on-line site), non-proprietary materials, data and other information, if any, in the possession of Seller which relate exclusively to the Property, including the items set forth in <u>Exhibit I</u> that are in the possession or under the reasonable control of Seller (the "**Due Diligence Materials**").  In no event shall Seller be required to prepare or obtain any information, report, document, survey, study, report or other item for Buyer.  Buyer acknowledges and agrees that, except as expressly provided in this Agreement, Seller makes no representation or warranty as to the accuracy or completeness of the Due Diligence Materials or any other materials delivered by Seller in connection herewith.

13

5.3     *__Due Diligence Period__*.  Buyer shall have the period of time commencing on the Effective Date and continuing through September 19, 2022 (the "**Due Diligence Expiration Date**") to notify Seller (which notice may be by email to Seller's counsel) that (i) Buyer has determined to proceed with the acquisition of the Property, and in the event of such notice the Due Diligence Expiration Date will be deemed to have occurred as of the date of such notice, and the Deposit shall be non-refundable except as otherwise expressly set forth in this Agreement; or (ii) Buyer elects (in its sole discretion, for any reason or no reason) not to proceed with the transaction described herein, whereupon the Escrow Agent shall return the Deposit to Buyer immediately, and this Agreement shall be null and void without recourse to either party hereto and, except as expressly set forth herein, neither party shall have any further liability or obligation to the other hereunder.  If Buyer fails to give either of such notices prior to the Due Diligence Expiration Date, Buyer shall be automatically deemed to have elected not to proceed with the transaction described herein, whereupon the Escrow Agent shall automatically return the Deposit to Buyer immediately, and this Agreement shall be null and void without recourse to either party hereto and, except as expressly set forth herein, neither party shall have any further liability or obligation to the other hereunder.

5.4     *__Contracts to be Terminated__*.  Prior to the Due Diligence Expiration Date, Buyer shall notify Seller which Contracts Buyer wants to assume, and Seller will deliver notices of termination at Closing terminating all other Contracts.  Seller's existing property management and leasing agreement and any Contracts which Buyer does not expressly elect to assume (or which may not be assumed by Buyer) shall be terminated as of Closing and Buyer shall have no liability therefor.  At Closing, Seller shall assign to Buyer, and Buyer shall assume, all other Contracts.

5.5     *__Title and Survey Review__*.

(a)     *__Title and Survey__*.  Within 5 days of the Effective Date, Buyer, at Buyer's sole cost and expense, shall order and obtain, a current ALTA commitment for an ALTA Owner's Policy of Title Insurance (the "Commitment") issued through a nationally recognized title insurance company (the "Title Company"), together with copies of all documents identified in the Commitment. Buyer, at Buyers option and at Buyer's expense, may obtain a survey of the Property (the "Survey").  The Survey shall be certified to Buyer, the title insurance company, and any lender of Buyer (such Commitment, documents and survey, collectively, the "Title Evidence").  The Title Evidence shall name Buyer as the party to be insured thereunder and commit to insure Buyer with indefeasible, good and marketable title.  Any endorsements to the Commitment requested by Buyer shall be paid for by Buyer unless curative to a title objection which Seller elects to cure (or is required to cure) as provided for below.  Seller shall, prior to the Closing Date, satisfy all of the title requirements shown in the Commitment so that there will be no exception for delinquent taxes, occupancy, mechanic's liens or any other title defect in the final title policy, unless any such defect is expressly waived in writing by Buyer or is deemed to be waived in accordance with this Agreement.

(b)     *__Title and Survey Objections__*.  Within 15 days of Buyer obtaining the Commitment, Buyer shall have the right to notify Seller of any written objections ("**Title Objections**") to any matter included on the Title Evidence, provided, however, that Buyer shall have no right to object to any of the matters set forth within subsections (a) through (d) of the

14

definition of Permitted Encumbrances. Buyer's failure to notify Seller of any Title Objections with respect to any particular matter within such time period will constitute a waiver of Title Objections with respect to a particular matter. As used herein, the term "**Permitted Encumbrance**" shall mean (a) the standard printed exclusions from coverage contained in the ALTA form of owner's title policy; (b) all matters, whether or not of record, that arise out of the actions of Buyer or its agents, representatives or contractors, other than those customarily deleted upon delivery to Title Company of a survey certified to the Title Company and an "owners" or "gap" affidavit; (c) the lien of real estate taxes, water, sewer, and other public charges not yet due and payable; (d) all other matters of record affecting title to the Property as to which Buyer has actual knowledge.

 5.6 *Seller's Cure of Title Objections.* Within 10 days after receipt of Buyer's Title Objections, Seller shall notify Buyer whether or not it elects to attempt to cure any Title Objections raised by Buyer. In the event Seller fails to timely respond to Buyer's Title Objections, Seller shall be deemed to have elected not to attempt to cure such Title Objections. If Seller elects, or is deemed to have elected, not to attempt to cure any title objections raised by Buyer, then Buyer shall, within 5 days thereafter elect to either (a) terminate this Agreement and receive a refund of the Deposit in accordance with this Agreement (and in such event, except as expressly set forth herein, neither party shall have any further liability or obligation to the other hereunder), or (b) proceed to close without any reduction in the Purchase Price and in such event any such Title Objections shall be deemed Permitted Encumbrances. In the event Buyer fails to timely respond to Seller's notice, Buyer shall be deemed to have elected clause (b). Notwithstanding the foregoing, with respect to Voluntary Liens (as hereinafter defined), Seller shall remove or cure the same by payment of funds from Closing. Seller shall have the right, in its sole discretion, to extend the Closing Date for a period of up to thirty (30) days to permit Seller to cure any Title Objections which it elects to attempt to cure other than Voluntary Liens, which Seller shall be obligated to cure not later than at Closing. In addition, Seller shall remove any encumbrances or exceptions to title which are voluntarily created by, through or under Seller after the date of the Due Diligence Expiration Date. If the Title Objections which Seller has agreed to cure are not cured prior to Closing (as the same may be extended as provided herein), Buyer will have the option as its sole and exclusive remedies to terminate this Agreement and receive a refund of the Deposit in accordance with this Agreement and Seller shall reimburse Buyer for reasonable title and survey charges and attorney fees (and in such event, except as expressly set forth herein, neither party shall have any further liability or obligation to the other hereunder), or (y) proceed to close with a reduction in the Purchase Price. If Buyer elects the latter, any uncured Title Objections shall be deemed Permitted Encumbrances. As used herein, the term "**Voluntary Liens**" shall mean (i) liens and other encumbrances that Seller has knowingly and intentionally suffered or allowed to be placed on the Property, including any mortgage, deed of trust or other security instrument encumbering the Property or any portion thereof, (2) judgments against Seller or the Property, or other defects or objections to title caused by Seller (3) federal, state and municipal tax liens, (4) mechanics' or materialmens' liens against Seller or the Property constituting a lien thereon, (5) any liens or encumbrances which can be satisfied by the payment of a readily ascertainable sum, (6) any encumbrance or exceptions to title created by, through or under Seller after the Effective Date. In no event shall Seller be required to bring suit to clear any claimed title or survey defects other than in respect of Voluntary Liens and Title Objections which it elects to attempt to cure.

15

5.7     Notwithstanding anything to the contrary contained herein, if, subsequent to Due Diligence Expiration Date and prior to Closing, Buyer notifies Seller that an update to Buyer's title commitment or the survey indicates the existence of a recorded encumbrance, encroachment, defect or other recorded matter affecting title to the Property, that was recorded or arose after the effective date of Buyer's title commitment or survey, as applicable, and of which Buyer did not have notice until after the Due Diligence Expiration Date and which is objectionable to Buyer, other than the Permitted Encumbrances and any Voluntary Liens (each a "**Subsequent Defect**" and together the "**Subsequent Defects**"), Seller will use such efforts and will expend such amount as it may, in its sole but reasonable judgment, deem appropriate to remove or cure such Subsequent Defect prior to Closing (except for Voluntary Liens, which Seller shall be obligated to cure).   Seller will have no obligation, however, to cure any Subsequent Defect (other than Voluntary Liens, which Seller shall continue to be obligated to cure).  If Seller is unable to so remove or cure all Subsequent Defects prior to Closing, Seller shall give notice to Buyer prior to the Closing Date, extend the Closing Date for a period of no more than thirty (30) days. If Seller does not or is unable to so remove or cure all Subsequent Defects prior to Closing (as may be extended pursuant to the preceding sentence), Buyer may (a) waive all such uncured Subsequent Defects and accept such title as Seller is able to convey as of Closing with a reduction in the Purchase Price (in which case, such Subsequent Defects will be Permitted Encumbrances); or (b) terminate this Agreement, whereupon the Escrow Agent will return the Deposit to Buyer and all parties will be relieved of any further obligations hereunder, except for those obligations which expressly survive any termination hereof and have Seller reimburse Buyer for reasonable title and survey charges and attorney fees.

5.8     ***Required State of Title***.  At the Closing, Seller shall convey by limited warranty deed to Buyer (or to Buyer's permitted nominee) Seller's right, title and interest in and to the Land and the Improvements free and clear of any and all liens and other encumbrances, except for the Permitted Encumbrances.

## ARTICLE 6
## Conditions to Seller's and Buyer's Performance

6.1     ***Conditions to Seller's Obligations***.  The obligations of Seller to consummate the transaction contemplated by this Agreement are, in addition to the other terms and conditions of this Agreement, subject to the following (any one or more of which may be waived in whole or in part by Seller at its discretion):

(a)     The representations and warranties made by Buyer in this Agreement being true and correct in all material respects on and as of the Closing Date with the same force and effect as though such representations and warranties had been made as of the Closing Date (except as the same may be modified or updated in accordance with the terms of this Agreement), and Buyer shall deliver a certificate to such effect at Closing; and

(b)     Buyer having paid the Purchase Price, as adjusted and prorated hereunder, and having executed and delivered to Seller all of the documents required of Buyer hereunder.

6.2     ***Conditions to Buyer's Obligations***.  The obligations of Buyer to consummate the transaction contemplated by this Agreement are, in addition to the other terms and conditions of

16

this Agreement, subject to the following (any one or more of which may be waived in whole or in part by Buyer at its discretion):

(a)     The representations and warranties made by Seller in this Agreement being true and correct in all material respects when made and on and as of the Closing Date with the same force and effect as though such representations and warranties had been made as of the Closing Date (except as the same may be modified or updated in accordance with the terms of this Agreement, and Seller shall deliver a certificate to such effect at Closing; and

(b)     Seller having performed in all material respects all covenants, agreements and obligations required by this Agreement to be performed by Seller on or prior to the Closing Date.

(c)     Seller having executed and delivered to Buyer all of the documents required of Seller hereunder (including, without limitation, the items listed in Section 7.2).

(d)     Seller shall have delivered possession of, and title to, the Property, subject only to the Permitted Encumbrances.

(e)     Seller shall have obtained and delivered to Buyer the Tenant Estoppel that is reasonably acceptable to Buyer and otherwise as required and in accordance with Section 4.3, and Buyer shall have received the SNDA in accordance with Section 4.4.

(f)     No order or injunction of any court or administrative agency of competent jurisdiction nor any statute, rule, regulation or executive order in effect as of the Closing which restrains or prohibits the transfer of the Property in accordance with the terms of this Agreement.

(g)     No action, suit or other proceeding shall be pending which shall have been brought by any person or entity (other than the parties hereto, and their affiliates, or someone acting on their behalf) to restrain, prohibit or change in any material respect the purchase and sale of the Property in accordance with the terms of this Agreement.

## ARTICLE 7
## Closing

7.1     ***Escrow Closing***.  Provided all conditions to closing contained in this Agreement have been satisfied (or deemed satisfied) or waived in writing, the transaction contemplated by this Agreement shall close (the "**Closing**") through an escrow with the Escrow Agent on November 3, 2022 (as the same may be extended in accordance with the terms of this Agreement, the "**Closing Date**"), as more particularly set forth in this Article 7; *provided, however*, Buyer shall have the right to reschedule the Closing Date to December 19, 2022, provided (i) Buyer shall provide Seller with notice of such extension not later than 3 Business Days prior to the originally scheduled Closing Date, which notice may be solely by email to Seller's counsel, and (ii) time shall be of the essence with respect to Buyer's obligation to close on the rescheduled Closing Date.

7.2     ***Seller's Closing Deliveries***.   At Closing, Seller shall deliver or cause to be executed and delivered to the Escrow Agent each of the following items:

17

(a)     Warranty Deed in the form of <u>Exhibit D</u> attached hereto (the "**Deed**");

(b)     Bill of Sale in the form of <u>Exhibit E</u> attached hereto;

(c)     Assignment and Assumption of Lease in the form of <u>Exhibit F</u> attached hereto (the "**Assignment and Assumption of Lease**");

(d)     Notice to Tenant advising Tenant of the transfer of title to the Property to Buyer;

(e)     Assignment and Assumption of Contracts in the form of <u>Exhibit G</u> attached hereto (the "**Assignment and Assumption of Contracts**");

(f)     General Assignment transferring the Intangible Property to Buyer;

(g)     Certificate of Non-Foreign Status in the form of <u>Exhibit H</u> attached hereto;

(h)     Settlement statement showing all of the payments, adjustments and prorations provided for in this Agreement and otherwise agreed upon by Seller and Buyer (the "**Settlement Statement**");

(i)     Customary form of affidavit for the benefit of the Title Company, which will include certifying (i) to the absence of claims which would give rise to mechanics' and materialmen's liens; and (ii) that Seller and the Tenant under the Lease then in effect are the only parties in possession of the Land or Improvements;

(j)     A certificate and affidavit as to whether (A) Seller is a resident of the State of Georgia (as defined in O.C.G.A. § 48-7-128(a), or (B) Seller is deemed to be a resident of the State of Georgia pursuant to O.C.G.A. § 48-7-128, or (C) the sale of the Property by Seller is otherwise exempt from the withholding requirements of O.C.G.A. § 48-7-I 28.

(k)     The certificate regarding Seller's representations and warranties contemplated by Section 6.2(a);

(l)     Copies of notices of termination of such Contracts that Buyer did not elect to assume in accordance with Section 5.4;

(m)     To the extent not previously delivered, the original of the Tenant Estoppel and the SNDA;

(n)     Such evidence as may be reasonably and customarily required by the Title Company with respect to the authority of the person(s) executing the documents required to be executed by Seller on behalf of Seller;

(o)     All other instruments and documents reasonably required to effectuate this Agreement and the transactions contemplated thereby.

18

7.3   ***Buyer's Closing Deliveries***.   At Closing, Buyer shall deliver or cause to be executed and delivered to the Escrow Agent each of the following items

      (a)    The balance of the Purchase Price, as adjusted and prorated hereunder;

      (b)    The Assignment and Assumption of Lease;

      (c)    The Assignment and Assumption of Contracts;

      (d)    The Settlement Statement

      (d)    Such evidence as may be reasonably and customarily required by the Title Company with respect to the authority of the person(s) executing the documents required to be executed by Buyer on behalf of Buyer; and

      (e)    All other instruments and documents reasonably required to effectuate this Agreement and the transactions contemplated thereby.

7.4   ***Delivery of Deposit***.   On the Closing Date the Escrow Agent will deliver or cause to be delivered the Deposit pursuant to the terms of this Agreement.

## ARTICLE 8
## Seller's Interim Operating Covenants

8.1   ***Operations.***   Seller shall continue to operate, manage, maintain and repair the Property through the Closing Date in the ordinary course of Seller's business and substantially in accordance with Seller's present practice, including performing its obligations under the Lease and Contracts, subject to ordinary wear and tear and further subject to Article 9 of this Agreement. Seller shall not apply for or consent to any zoning change or approval, change in road patters, change to the ingress to or egress from the Property, variance, subdivision, lot line adjustment or similar change with respect to the Property.

8.2   ***Maintain Insurance***.   Seller shall maintain until the Closing Date fire and extended coverage insurance, and casualty insurance, on the Property which is at least equivalent in all material respects to the insurance policies covering the Land and the Improvements as of the Effective Date.

8.3   ***Personal Property***.   Seller shall not transfer or remove any Personal Property from the Improvements after the Effective Date except for repair or replacement thereof.  Any items of Personal Property replaced after the Effective Date shall be promptly installed prior to Closing and shall be of substantially similar quality to the item of Personal Property being replaced.

8.4   ***Service Contracts***.   Between the Effective Date and the Closing, Seller shall not enter into any new maintenance, service or supply contracts or equipment lease with respect to the Property which shall be not terminable upon thirty (30) days' notice without cost to Buyer.

19

8.5   ***Taxes.***  Seller shall not commence, withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Property for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Buyer.

8.6   ***Leases***.  Between the Effective Date and the Closing, Seller shall not modify, amend or terminate the Lease, apply any security deposits held by Seller under the Lease, or enter into any new lease.

8.7   ***Notices***.  Seller shall deliver to Buyer, promptly after receipt by Seller, a copy of (i) all current written default and other material notices to or from Tenant; and (ii) all written notices of any violations issued to Seller by any governmental authority with respect to the Property and any other material notices received from any governmental authority with respect to the Property.  Seller shall promptly notify Buyer if Seller receives notice or knowledge of any information that would result in a misrepresentation by Seller under this Agreement.

8.8   ***Liens and Encumbrances***.  Seller shall not place any mortgage or any other encumbrance, easement, covenant, condition, right-of-way or restriction on the Property, or modify or amend any existing easement, covenant, condition, right-of-way, restriction, or other encumbrance affecting the Property, or voluntarily take any action that materially and adversely affects title to the Property as same exists on the Effective Date

8.9   ***Taxes.***  Seller shall not commence, withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Property for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Buyer.

## ARTICLE 9
## Casualty and Condemnation

9.1   ***Damage***.  If, prior to the Closing, all or any portion of the Property is damaged by fire or any other cause whatsoever, Seller shall promptly give Buyer written notice of such damage.

(a)   Minor Damage.  If the damage is not Material (as defined below), then Buyer shall at Closing receive (i)  a credit in the amount of the deductible plus all insurance proceeds received by Seller as a result of such loss, or an assignment of Seller's rights to such insurance proceeds, plus (ii) a credit in the amount of such damage not covered by insurance proceeds, and this Agreement shall continue in full force and effect with no reduction in the Purchase Price, and Seller shall have no further liability or obligation to repair such damage or to replace the Property.  Regardless of the size of the loss, for any damage not repaired or that will not be repaired prior to Closing, Seller shall not agree to any insurance settlement without Buyer's prior written consent, not to be unreasonably withheld, conditioned or delayed.

(b)   Major Damage.  If (a) the cost for repairing such damage is greater than One Million Dollars ($1,000,000.00) (as determined by Seller's independent insurer), (b) such damage will entitle Tenant to terminate the Lease or abate its rent in whole or in part for any

period beyond that covered by Seller's rent loss insurance applicable to such casualty, or (iii) access to the Property is materially affected (such casualties, "Material"), then Buyer shall have the option, exercisable by written notice delivered to Seller within fifteen (15) Business Days after Seller's notice of damage to Buyer, which notice from Seller shall be accompanied by the written estimate of the cost for repair, either to (i) receive the amount of the deductible plus all insurance proceeds received by Seller as a result of such loss, or an assignment of Seller's rights to such insurance proceeds, plus a credit in the amount of such damage not covered by insurance proceeds, and this Agreement shall continue in full force and effect with no reduction in the Purchase Price, and Seller shall have no further liability or obligation to repair such damage or to replace the Property; or (ii) terminate this Agreement. If necessary, the Closing Date shall be extended to give the parties the full fifteen (15) Business Day period to make such election and to obtain insurance settlement agreements with Seller's insurers. If Buyer elects to terminate this Agreement, Buyer shall give written notice to Seller thereof within such fifteen (15) Business Day period, the Deposit shall be immediately returned to Buyer, and thereafter neither party will have any further rights or obligations hereunder, except for any obligations that expressly survive termination. If Buyer fails to notify Seller within such fifteen (15) Business Day period of Buyer's intention to terminate this Agreement, then Buyer shall be deemed to have elected option (i).

9.2     <u>Condemnation and Eminent Domain</u>.    In the event that any condemnation proceedings are instituted, or notice of intent to condemn is given, with respect to all or any portion of the Land and/or the Improvements, Seller shall promptly notify Buyer thereof. If the condemnation will not result in a Material and Adverse Effect (as hereinafter defined) on the Property, Buyer shall consummate the purchase of the Property without reduction of the Purchase Price, and the right to collect any condemnation award or compensation for such condemnation shall be assigned by Seller to Buyer at Closing. For the purposes of this Section, "Material and Adverse Effect" shall mean a condemnation (i) for which the *pro tanto* award is in excess of Five Hundred Thousand Dollars ($500,000.00), (ii) which would result in the Property being left with parking spaces below what is required to be provided under the Lease , (iii) which would result in the Property being left with parking spaces below the minimum parking requirements set forth in the REA or otherwise required by law or regulation, (vi) which results or will result in Tenant having a right of termination of the Lease or abatement of its rent in whole or in part (which right is not waived), (vi) takes any portion of a building, or (vii) which would reduce access to the Property or adversely affect Buyer's ability to operate the property as a first-class office building. If the condemnation will result in a Material and Adverse Effect on the Property, Buyer may thereupon elect, within fifteen (15) Business Days of notice thereof, either to (a) accept an assignment of any condemnation award or compensation for such condemnation from Seller at Closing whereupon this Agreement shall continue in full force and effect with no reduction in the Purchase Price, and Seller shall have no further liability or obligation to repair such damage or to replace the Property; or (b) terminate this Agreement. If necessary, the Closing Date shall be extended to give the parties the full fifteen (15) Business Day period to make such election. If Buyer elects to terminate this Agreement, Buyer shall give written notice to Seller thereof within such fifteen (15) Business Day period, the Deposit shall be immediately returned to Buyer, and thereafter neither party will have any further rights or obligations hereunder, except for any obligations that expressly survive termination. If Buyer fails to notify Seller within such fifteen (15) Business Day period of Buyer's intention to

21

terminate this Agreement, then Buyer shall be deemed to have elected option (a) and Buyer and Seller shall proceed to Closing in accordance with the terms and conditions of this Agreement.

## ARTICLE 10
### Brokerage Commissions

10.1    ***Representations and Indemnity***.  Seller and Buyer each mutually represent and warrant to the other that they have not dealt with, and are not obligated to pay, any fees or commissions to any broker in connection with the transaction contemplated by this Agreement other than Cushman and Wakefield (the "**Broker**").  The Broker shall be compensated by Seller pursuant to a separate written agreement.  Seller hereby agrees to indemnify, defend and hold Buyer and its subsidiaries, members, managers, partners and affiliated companies and its and their employees, officers, shareholders, and directors and its and their respective successors and assigns (collectively, the "**Indemnitees**") harmless from and against all liabilities, costs, damages and expenses (including reasonable attorneys' fees) arising from any claims for brokerage or finder's fees, commissions or other similar fees (including any fees owing to Broker) in connection with the transaction covered by this Agreement insofar as such claims shall be based upon alleged arrangements or agreements made by Seller or on Seller's behalf. Buyer hereby agrees to indemnify, defend and hold Seller and its Indemnitees harmless from and against all liabilities, costs, damages and expenses (including reasonable attorneys' fees) arising from any claims for brokerage or finders' fees, commissions or other similar fees (other than any fees owing to Broker) in connection with the transaction covered by this Agreement insofar as such claims shall be based upon alleged arrangements or agreements made by Buyer or on Buyer's behalf.   The covenants and agreements contained in this Article shall survive the termination of this Agreement or the Closing of the transaction contemplated hereunder.

## ARTICLE 11
### Default, Termination and Remedies; Failed Condition

11.1    ***Seller Default***.  In the event that  Seller shall have failed in any material respect on the Closing Date to have performed any of the covenants and agreements contained in this Agreement which are to be performed by Seller on or before the Closing Date ("**Seller Default**"), then Buyer shall have the right to either (a) terminate this Agreement, whereupon Escrow Agent shall release the Deposit to Buyer and Seller shall reimburse Buyer for its out of pocket costs not to exceed $50,000.00, and except as expressly set forth herein, neither party shall have any further liability or obligation to the other hereunder, or (b) take any and all legal and/or equitable actions necessary to compel Seller's specific performance hereunder and to consummate the transaction contemplated by this Agreement in accordance with the provisions of this Agreement, provided that any such action must be commenced and prosecuted diligently within ninety (90) days following the Closing Date.  Buyer's failure to pursue the remedy set forth in clause (b) in the time and manner set forth above shall be deemed a waiver of such remedy.  In no event shall Seller be liable to Buyer for any consequential or punitive damages based upon any breach of this Agreement, including, without limitation, breaches of representation or warranty.

4820-1493-8874 v.6 124051/00124

11.2    ***Buyer Default***.  In the event that  Buyer shall have failed in any material respect on the Closing Date to have performed any of the covenants and agreements contained in this Agreement which are to be performed by Buyer on or before the Closing Date ("**Buyer Default**"), Seller shall be entitled to terminate this Agreement, whereupon Escrow Agent shall disburse the Deposit to Seller as liquidated damages, in lieu of all other remedies available to Seller at law or in equity for such default, and, except as expressly set forth herein, neither party shall have any further liability or obligation to the other hereunder.  Seller and Buyer agree that the damages resulting to Seller as a result of such default by Buyer as of the Effective Date are difficult or impossible to ascertain and the liquidated damages set forth in the preceding sentence constitute Buyer's and Seller's reasonable estimate of such damages.  In no event shall Buyer be liable to Seller for any consequential or punitive damages based upon any breach of this Agreement, including, without limitation, breaches of representation or warranty.

11.3    ***Failure of a Condition***.  Notwithstanding anything contained herein to the contrary, either party shall have the right to waive the unsatisfied condition or conditions by written notice to the other party and Escrow Agent in which event the Closing Date shall be the date that is five (5) Business Days after the delivery of the waiver notice.  It is understood and agreed that the failure of any condition shall not constitute a default, breach of a covenant, or other failure to perform by Seller or Buyer, as applicable, unless such failed condition was caused by such party's willful and intentional actions (or failure to act) in violation of its covenants set forth herein.

## ARTICLE 12
## Miscellaneous

12.1    ***Assignment.***  Buyer may not assign any of Buyer's rights or assign or delegate any of Buyer's obligations under this Agreement to any party that is not an affiliate of Buyer or the principals of Buyer without first obtaining the prior written consent of Seller, which consent may be withheld by Seller in Seller's sole discretion.  No such assignment shall be effective and, if applicable, Seller's consent shall not be effective until and unless (i) Buyer has provided Seller with notice of the identity of the assignee at least five (5) days prior to the Closing Date, (ii) such assignee has expressly assumed in writing all obligations of the Buyer under this Agreement and further acknowledged and agreed in writing to be bound by all of the provisions of this Agreement as if the assignee had originally executed this Agreement as buyer and (iii) if applicable, Seller's consent has been obtained.  Notwithstanding any such assignment, the original named Buyer hereunder shall not be released, and shall remain liable for, all obligations of the Buyer under this Agreement prior to the Closing.  Buyer shall be solely liable for all additional realty transfer tax, if any, resulting from an assignment of this Agreement.

12.2    ***Notices.***  Any communication, notice or demand of any kind whatsoever which either party may be required or may desire to give to or serve upon the other shall be in writing and delivered by personal service (including express or courier service) providing receipt for delivery, or by registered or certified mail, postage prepaid, return receipt requested, or by electronic transmission via a .pdf file, addressed to such party at the address set forth below.  Any such communication, notice or demand shall be deemed to have been duly given or served on the date personally served or delivery is refused, if by personal service, or three (3) days after

being placed in the U.S. mail, if mailed, or upon receipt of a confirmation notice before 5:00 p.m. Eastern Time, if by electronic transmission.  Any party may change its address for notice by written notice given to the other in the manner provided in this Section.  Notice by either party under this Agreement may be given by counsel to such party.

| | |
|---|---|
| ***As to Seller:*** | Mainstreet Southside Center, Ltd. LP |
| | 2101 W. Commercial Blvd., #1200 |
| | Fort Lauderdale, FL 33309 |
| | Attn: Tamar Jacobs |
| | tjacobs@mainstreetcapital.com |
| | |
| ***With a copy to:*** | Nelson Mullins Broad and Cassel |
| | 1905 NW Corporate Blvd, Suite 310 |
| | Boca Raton, FL  33431 |
| | Attn:  James Wheeler, Esq. |
| | jim.wheeler@nelsonmullins.com |
| | |
| ***As to Buyer:*** | BHN Associates LLC |
| | 240 Adar Court |
| | Monsey, New York 10952 |
| | Attn:  Mordy Wider |
| | Email: mordy@bhnassociates.com |
| | |
| ***With a copy to:*** | Reiss Sheppe LLP |
| | 425 Madison, 19th Floor |
| | New York, New York 10017 |
| | Attn:  Stephen Friedman |
| | Email: sfriedman@reisssheppe.com |
| | |
| ***As to Escrow Agent:*** | Riverside Abstract LLC |
| | 3839 Flatlands Avenue, Suite 208 |
| | Brooklyn, New York 11234 |
| | Attention: Azi Mindick |
| | E-Mail: amindick@rsabstract.com |

12.3     ***Interpretation.***  Words of any gender used in this Agreement shall be held and construed to include any other gender, and words of a singular number shall be held to include the plural and vice versa, unless the context requires otherwise.

12.4     ***Captions.***  The captions used in connection with the Articles of this Agreement are for convenience only and shall not be deemed to extend, limit or otherwise define or construe the meaning of the language of this Agreement.

12.5     ***No Third-Party Beneficiaries.***  Nothing in this Agreement, express or implied, is intended to confer upon any person, other than the parties hereto and their respective successors

4820-1493-8874 v.6 124051/00124

and assigns, any rights or remedies under or by reason of this Agreement.

12.6     ***Amendments.***   This Agreement may be amended only by a written instrument executed by Seller and Buyer (or Buyer's permitted assignee).

12.7     ***Integration.***   This Agreement (including the schedules and exhibits) embodies the entire agreement between Seller and Buyer with respect to the transactions contemplated in this Agreement, and there have been and are no covenants, agreements, representations, warranties or restrictions between Seller and Buyer with regard thereto other than those set forth or provided for in this Agreement.

12.8     ***Choice of Law; Venue; Jurisdiction.***   This Agreement shall be construed under and in accordance with the laws of the State where the Property is located.  For the purposes of any suit, action or proceeding involving this Agreement, the parties hereby expressly submit to the jurisdiction of all federal and state courts sitting in the State of Georgia and consent that any order, process, notice of motion or other application to or by any such court or a judge thereof may be served within or without such court's jurisdiction by registered mail or by personal service, provided that a reasonable time for appearance is allowed, and the parties agree that such courts shall have exclusive jurisdiction over any such suit, action or proceeding commenced by either or both of said parties.  In furtherance of such agreement, the parties agree upon the request of the other to discontinue (or agree to the discontinuance of) any such suit, action or proceeding pending in any other jurisdiction.  Each party hereby irrevocably waives any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any federal or state court sitting in the State of Georgia and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

12.9     ***Jury Waiver.***   In recognition of the benefits of having any disputes with respect to this Agreement resolved by an experienced and expert person, Seller and Buyer hereby agree that any suit, action or proceeding, whether claim or counterclaim, brought or instituted by any party in connection with this Agreement or any event, transaction or occurrence arising out of or in any way connected with this Agreement or the Property, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury.  ACCORDINGLY, EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER PARTY IN CONNECTION WITH ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE RELATIONSHIP OF SELLER AND BUYER HEREUNDER, BUYER'S OWNERSHIP OR USE OF THE PROPERTY, AND/OR ANY CLAIMS OF INJURY OR DAMAGE.

12.10    ***Counterparts.***   This Agreement may be executed in two (2) or more counterparts, each of which shall be an original but such counterparts together shall constitute one and the same instrument notwithstanding that both Buyer and Seller are not signatory to the same counterpart.  Signatures to this Agreement transmitted by electronic mail in PDF format shall be valid and effective to bind the party so signing.

25

12.11  ***Business Day.***  "Business Day" means any day on which business is generally transacted by banks in the State of Georgia.  In the event any date hereunder (including the Closing Date) falls on a Saturday, Sunday or legal holiday, the date applicable shall be the next Business Day.

12.12  ***Intentionally Omitted***.

12.13  ***Use of Proceeds to Clear Title.***  To enable Seller to make conveyance as herein provided, Seller may, at the time of Closing, use the Purchase Price or any portion thereof to clear the title of any or all encumbrances or interests, provided that provision reasonably satisfactory to Buyer's attorney is made for prompt recording of all instruments so procured in accordance with conveyancing practice in the jurisdiction in which the Property is located.

12.14  ***Submission not an Offer or Option.***  The submission of this Agreement or a summary of some or all of its provisions for examination or negotiation by Buyer or Seller does not constitute an offer by Seller or Buyer to enter into an agreement to sell or purchase the Property, and neither party shall be bound to the other with respect to any such purchase and sale until a definitive agreement satisfactory to Buyer and Seller in their sole discretion is executed and delivered by both Seller and Buyer.

12.15  ***No Rule of Construction.***  Seller and Buyer have each been represented by counsel in the negotiations and preparation of this Agreement; therefore, this Agreement will be deemed to be drafted by both Seller and Buyer, and no rule of construction will be invoked respecting the authorship of this Agreement.

12.16  ***No Memorandum.***  Buyer and Seller agree not to record this Agreement or any memorandum hereof.

12.17  ***Confidentiality.***  Each party agrees, prior to Closing, to maintain in confidence, and not to disclose to any third party, the existence of this Agreement, the information contained in this Agreement or pertaining to the sale contemplated hereby and the information and data furnished or made available by Seller to Buyer, its agents and representatives in connection with Buyer's investigation of the Property and the transactions contemplated by the Agreement; provided, however, that each party, its agents and representatives may disclose such information and data (a) to such party's accountants, attorneys, prospective lenders, capital sources, accountants, partners, investors, consultants and other advisors in connection with the transactions contemplated by this Agreement (collectively, "**Representatives**") to the extent that such Representatives reasonably need to know (in Buyer's or Seller's reasonable discretion) such information and data in order to assist, and perform services on behalf of Buyer or Seller; (b) to the extent required by any applicable statute, law, regulation, governmental authority or court order; (c) in connection with any securities filings, registration statements or similar filings undertaken by Buyer; and (d) in connection with any litigation that may arise between the parties in connection with the transactions contemplated by this Agreement.  Neither Buyer nor Seller shall disclose, advertise or permit the advertising of the fact or terms of the sale contemplated herein prior to Closing, and each party agrees to use best efforts to prevent public disclosure of the transaction that is the subject of this Agreement, other than as expressly provided herein. Neither Buyer nor Seller shall issue any press releases with respect to the transaction

26

contemplated in this Agreement, whether prior or subsequent to Closing, other than a statement of the fact of the sale of the Property, without the approval of the other party, which approval may be withheld in such other party's sole and absolute discretion. The provisions of this Section shall supersede the terms of that certain Confidentiality Agreement signed by Buyer with respect to the Property and shall survive the termination of this Agreement.

12.18 ***Attorneys' Fees and Costs.*** In the event either party is required to resort to litigation to enforce its rights under this Agreement, the prevailing party in such litigation will be entitled to collect from the other party all reasonable costs, expenses and attorneys' fees incurred in connection with such action.

12.19 ***Severability***. In the event that any one or more of the provisions contained in this Agreement (except the provisions relating to Seller's obligations to convey the Property and Buyer's obligation to pay the Purchase Price, the invalidity of either of which shall cause this Agreement to be null and void) are held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had not been contained herein; *provided*, *however*, that the parties hereto shall endeavor in good faith to rewrite the affected provision to make it (a) valid, and (b) consistent with the intent of the original provision.

12.20 ***Section 1031 Exchange.*** Buyer and Seller agree that, at either party's election, this transaction shall be structured as an exchange of like-kind properties under Section 1031 of the Internal Revenue Code and the regulations and proposed regulations thereunder. The party so electing shall be known as the "**Electing Party**", and the other party shall be known as the "**Non-Electing Party**". The parties agree that if either party wishes to make such election, it must notify the other party thereof at least ten (10) Business Days prior to the Closing Date. If the Electing Party so elects, the Non-Electing Party shall cooperate with the Electing Party regarding the Section 1031 exchange; it being understood, however, that the Non-Electing Party shall not be required to take title to any other property as part of the Section 1031 exchange, incur any expenses or alter the Closing Date. The Electing Party shall in all events be responsible for all costs and expenses related to the Section 1031 exchange and shall indemnify, defend and hold harmless the Non-Electing Party from and against any and all liability, claims, damages and expenses (but excluding any attorneys' fees and expenses incurred by the Non-Electing Party in connection with its review of the documents reasonably necessary to effect the Electing Party's exchange) actually incurred by the Non-Electing Party and arising out of such Section 1031 exchange.

12.21 ***Limitation of Liability.*** No shareholders, partners or members of Seller and Buyer, nor any of their or their respective managers, officers, directors, agents, employees, heirs, successors or assigns shall have any personal liability of any kind or nature for or by reason of any matter or thing whatsoever under, in connection with, arising out of or in any way related to this Agreement and the transactions contemplated herein, and Seller and Buyer hereby each waives for itself and anyone who may claim by, through or under Seller or Buyer, respectively, any and all rights to sue or recover on account of any such alleged personal liability.

4820-1493-8874 v.6 124051/00124

12.22 ***Membership Interest Sale Structure***.  At Seller's or Buyer's request, the purchase and sale transaction contemplated herein will be structured as a conveyance of the Property to a newly formed Georgia or Delaware limited liability company formed by Buyer ("**Newco**") having Seller as its sole member, upon which Buyer will purchase the entire membership interest in Newco for the Purchase Price and otherwise on the same terms and conditions as are set forth herein, pursuant to an assignment of membership interests in form to be reasonably agreed upon by the parties prior to the Closing Date.  The transaction shall be completed in compliance with all applicable laws.

*[Remainder of Page Intentionally Left Blank]*

4820-1493-8874 v.6 124051/00124

IN WITNESS WHEREOF, the parties have executed this instrument as of the day and year first set forth above.

SELLER:

**MAINSTREET SOUTHSIDE CENTER, LTD.,**
a Florida limited partnership

By:  Mainstreet Southside Center, Inc.,
a Florida corporation, its general partner

By: _Patricia C Kilgallon_
Patricia C. Kilgallon, President


BUYER:

**BHN ASSOCIATES LLC**

By: _____
Name: _____
Its: _____


Acknowledged and Agreed:

**RIVERSIDE ABSTRACT LLC**

By: _____
Name: _____
Title: _____

27

IN WITNESS WHEREOF, the parties have executed this instrument as of the day and year first set forth above.

SELLER:

**MAINSTREET SOUTHSIDE CENTER, LTD.,**
a Florida limited partnership

By: Mainstreet Southside Center, Inc.,
a Florida corporation, its general partner

By: _____
       Patricia C. Kilgallon, President

BUYER:

**BHN ASSOCIATES LLC**

By: _____
Name: _____
Its: _____

Acknowledged and Agreed:

**RIVERSIDE ABSTRACT LLC**

By: _____
Name: _____
Title: _____

27

Schedule of Exhibits and Schedules:

| | | |
|---|---|---|
| Exhibit A | – | Legal Description |
| Exhibit B | – | List of Contracts |
| Exhibit C | – | Form of Tenant Estoppel Certificate |
| Exhibit D | – | Form of Limited Warranty Deed |
| Exhibit E | – | Form of Bill of Sale |
| Exhibit F | – | Form of Assignment and Assumption of Lease |
| Exhibit G | – | Form of Assignment and Assumption of Contracts |
| Exhibit H | – | Certificate of Non-Foreign Status |

4820-1493-8874 v.6 124051/00124

## Exhibit A

## Legal Description

All that tract or parcel of land being in Land Lot 82 of the 9th District of Fulton County, Georgia and being more particularly described as follows:

BEGINNING at the intersection formed by the easterly right of way of Feldwood Road (60 foot right of way) and the northerly right of way of Royal South Parkway (110 foot right of way) and running thence north 02 degrees 08 minutes 11 seconds east (formerly a record bearing of north 02 degrees 08 minutes 37 seconds east) along the easterly right of way of Feldwood Road (60 foot right of way) a distance of 1369.15 feet to an iron pin found at the southwest corner of land now or formerly owned by Irene Carpenter (Deed Book 6004, page 470); running thence south 88 degrees 08 minutes 19 seconds east and departing the easterly right of way of Feldwood Road along the South line of said Carpenter property a distance of 742.13 feet (formerly a record distance of 742.47 feet) to an axle found at the northwest corner of land now or formerly owned by Shell Oil Company, running thence south 02 degrees 17 minutes 01 seconds west along the west line of said Shell Oil Company property and also the west line of land now or formerly owned by Fred R. Millsaps a distance of 1369.80 feet to a point on the northerly right of way of Royal South Parkway (110 foot right of way); running thence north 88 degrees 05 minutes 25 seconds west along the northerly right of way of Royal South Parkway (110 foot right of way) a distance of 738.74 feet (formerly a record distance of 739.12 feet) to the easterly right of way Feldwood Road (60 foot right of way) and the POINT OF BEGINNING said property containing 23.27789 acres or 1,013,985 sq. ft.

All as shown on ALTA/ACSM Land Title Survey prepared by Preston Land Surveyors under seal of Abb W. Preston, Georgia Registered Land Surveyor No. 1799, for Bock & Clark's National Surveyors Network, and titled the Dana Portfolio Project, Southside Center, 6000 Feldwood Road, College Park, GA, Network Project No. 20020888-4, dated January 3, 2003, last revised January 21, 2003.

LESS & EXCEPT:

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 82, 9th District, Fulton County, Georgia and being more particularly described as follows:

Commence at the intersection of the northern right-of-way line of Royal South Parkway (110 ft. R/W) and the eastern right-of-way line of Feldwood Drive (variable R/W), thence northerly along said eastern right-of-way line 1319.15 feet to an iron pin set and the POINT OF BEGINNING; thence continuing along said eastern right-of-way line North 00° 37' 16" East a distance of 50.00 feet to a 5/8" rebar found at the intersection of said eastern right-of-way line and the land lot line common to Land Lots 82 and 104; thence leaving said eastern right-of-way line and along said common land lot line South 89° 39' 34" East a distance of 742.11 feet to an axle found; thence leaving said common land lot line South 00° 45' 46" West a distance of 50.00 feet to an iron pin set; thence North 89° 39' 34" West a distance of 741.98 feet to an iron pin set on the eastern right-of-way line of said Feldwood Drive and the POINT OF BEGINNING, said tract containing 0.8517 acres as shown on Boundary Survey for Lynn Alley Company, dated May 1, 2003, last revised April 6, 2004, prepared by Travis Pruitt and Associates, Inc. and bearing the seal of Christopher W. Hodge, GRLS No. 2941.

A-1

**Exhibit B**

**List of Contracts**

NONE.

**Exhibit C**

**<u>Form of Tenant Estoppel Letter</u>**

Re:    Lease at _____ (the "Property")

Ladies and Gentlemen:

The undersigned ("<u>Tenant</u>") hereby acknowledges the following information with respect to the premises leased by Tenant at the Property, under the lease (the "<u>Lease</u>") described in item 2 below:

      1.    Name and mailing address of Tenant:

         Bank of America, National Association

         _____

         _____

         _____

         Attn:

      2.    The Lease, as identified below, is in full force and effect and, except as set forth below, the Lease has not been amended, altered, supplemented, or otherwise modified:

         Date of Lease:
         Amendments:
         Landlord:

If the Lease has been amended, all references to the "Lease" in this Estoppel Certificate shall mean the Lease, as so amended.

      3.    The current rentable area of the premises demised under the Lease is approximately _____ square feet.

      4.    Landlord currently holds no security deposit and no advance rental, and Tenant has no other claims for deposits or advance rental.

      5.    Rentals have commenced to accrue under the Lease and Tenant is currently paying a monthly Base Rent of _____. Tenant is currently paying monthly operating expense and tax charges of _____.

      6.    Rentals accruing under the Lease have been paid through. Subject to any audit currently underway as noted hereunder or any future audits, to Tenant's knowledge, there are no offsets or credits against rentals payable by Tenant under the Lease nor are there any defenses or counterclaims against rental payable by Tenant under the Lease.  No rental payable under the Lease is in arrears or has been prepaid more than thirty (30) days in advance.

      7.    Intentionally Omitted.

8.      The expiration of the term of the Lease is _____.

9.      There are no renewals or extension options with respect to the Lease, except as set forth in Section 2.2.

10.     There are no expansion or first refusal rights with respect to additional space except as set forth in Article 36.

11.     Tenant has accepted possession of the premises demised under the Lease, and Landlord has completed or provided in all respects all improvements required to be furnished by Landlord under the Lease. Subject to any audit currently underway or any future audits, to Tenant's knowledge, Landlord is not in default in the performance of any of Landlord's obligations under the Lease.

12.     There are no purchase options under the Lease or other agreements giving Tenant any rights or options to purchase the real property and/or improvements, or a part thereof, affecting the space covered by the Lease.

It is understood that this letter is being given in contemplation of a sale and/or financing of the Property, and it is intended that this letter may be relied upon by any purchaser of such property or any lender providing financing in connection therewith, and their respective successors and assigns.   Notwithstanding the foregoing, nothing contained herein shall be deemed to constitute a waiver of any of Tenant's rights under the Lease, including, but not limited to, any right to audit, or a modification or amendment of the Lease.   If there are any conflicts between the terms of this Estoppel Certificate and the Lease, the terms of the Lease will prevail.

TENANT NAME:

Bank of America, National Association

By:       _____
Name:   _____
Title:    _____
Date:    _____

**Exhibit D**
**Form of Limited Warranty Deed**

**Return after recording to**:

[_____]
[_____]
[_____]

[_____] **County, Georgia Parcel Identification No.:** [_____]

### LIMITED WARRANTY DEED

**THIS LIMITED WARRANTY DEED** is made this [_____] day of [_____], 20[_____], by [_____], a [_____] ("**Grantor**"), in favor of [_____], a [_____] ("**Grantee**"). The words "Grantor" and "Grantee" include their respective heirs, successors, legal representatives and assigns where the context requires or permits.

### WITNESSETH:

THAT GRANTOR, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) in hand paid and other good and valuable consideration, the receipt and sufficiency whereof are hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does hereby grant, bargain, sell, alien, convey and confirm unto the said Grantee all of Grantor's interest in that certain real property located in [_____] County, Georgia, being further described on **Exhibit "A"** attached hereto and made a part hereof (the "**Land**"), together with all improvements located thereon, if any, and all easements and appurtenances thereon or appertaining to the Land (collectively, the "**Property**"), subject to and without warranty as to those certain matters set forth and described on **Exhibit "B"** attached hereto and incorporated herein by this reference (collectively, the "Permitted Exceptions").

TO HAVE AND TO HOLD the Property, subject to the Permitted Exceptions, with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in

D-1

anywise appertaining, to the only proper use, benefit and behoof of Grantee forever in FEE SIMPLE.

AND GRANTOR will forever warrant and forever defend the right and title to the Property unto Grantee, its heirs, successors, legal representatives and assigns, against the lawful claims of all persons claiming by, through or under Grantor (other than a claim arising out of the Permitted Exceptions), but not further or otherwise.

[NO FURTHER TEXT ON THIS PAGE]
[SIGNATURE ON THE FOLLOWING PAGE]

D-2

[SIGNATURE PAGE TO LIMITED WARRANTY DEED]

Executed under seal as of the day and year first set forth above.

Signed, sealed and delivered
in the presence of:

**GRANTOR:**

[_____],
a [_____]

_____
Print Name: _____
Unofficial Witness

By: _____
      Name: _____
      Title: _____

_____
Print Name: _____
Notary Public

[SEAL]

[AFFIX NOTARIAL STAMP OR SEAL]

My commission expires: _____

D-3

4820-1493-8874 v.6 124051/00124

**<u>EXHIBIT "A"</u>**

**<u>LEGAL DESCRIPTION OF THE LAND</u>**

Please see attached.

4820-1493-8874 v.6 124051/00124

**EXHIBIT "B"**

**PERMITTED EXCEPTIONS**

**Exhibit E**

**Form of Bill of Sale**
**Bill Of Sale**

_____ ("Seller"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby grants, bargains, sells, transfers and delivers to [_____], a [_____] ("Buyer"), all of Seller's right, title and interest in and to the following (specifically excluding any property owned by Tenant under any Lease (the "Personal Property"): (i) mechanical systems, fittings, fixtures, machinery and equipment comprising a part of or attached to or located upon the land or in the buildings located at 900 Broken Sound Parkway, Boca Raton, Florida (the "Property"); (ii) maintenance supplies, equipment and tools, and other tangible personal property of every kind and character, if any, but only to the extent owned by Seller and used in connection with, and located in or on, the Property; and (iii) signs situated on or at the Property, but specifically excluding from the Personal Property all property leased by Seller [as described on Exhibit A attached hereto], to have and to hold the Personal Property unto Buyer, its successors and assigns, forever.

Except as set forth above and in the Purchase and Sale Agreement by and between Seller and Buyer dated as of _____, 2021 (the "Purchase Agreement"), Seller grants, bargains, sells, transfers and delivers the Personal Property in its "AS IS" condition, WITH ALL FAULTS, IF ANY, and makes no representations or warranties, direct or indirect, oral or written, express or implied, as to title, encumbrances and liens, merchantability, condition or fitness for a particular purpose or any other warranty of any kind, all of which representations and warranties are expressly hereby disclaimed and denied. Notwithstanding the foregoing, Seller represents and warrants that it owns good and marketable title to the Personal Property, and that the Personal Property is free and clear of all liens and encumbrances and rights of third parties.

Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in the Purchase Agreement.

_[Remainder of Page Intentionally Blank]_

Executed under seal this _____ day of _____ 2021.

<u>SELLER</u>:

By:_____
Name:
Title:

E-2

<u>Exhibit A</u>
<u>to</u>
<u>Bill Of Sale</u>

<u>Excluded Personal Property Description</u>

[*To Be Confirmed*]

4820-1493-8874 v.6 124051/00124

**Exhibit F**

**Form of Assignment and Assumption of Lease**
Assignment And Assumption Of Interest In Lease

DATE: _____, 2021

ASSIGNOR: _____

ASSIGNEE: _____

RECITALS:

WHEREAS, Assignor and Assignee have entered into that certain Purchase and Sale Agreement dated as of _____, 2021 (the "Purchase Agreement"), wherein Assignor agreed to sell and Assignee agreed to buy that certain real property described on Exhibit "A" attached hereto and the improvements located thereon (the "Property");

WHEREAS, Assignee desires to assume and Assignor desires to assign to Assignee the Lease currently existing on the Property, which Lease are more particularly described on Exhibit "B" attached hereto and incorporated herein by this reference (the "Lease").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee agree as follows:

1.      Assignment.  Assignor conveys and assigns to Assignee all of Assignor's right, title and interest in and to the Lease, and all security deposits and advance payments thereunder, together with the right to receive any and all sums and proceeds arising out of said Lease, from and after the date hereof (the "Conveyance Date"), but reserving unto Assignor all uncollected rent attributable to the period prior to the Closing Date pursuant to the provisions of the Purchase Agreement.

2.      Assumption.  Assignee assumes and agrees to be bound by all of Assignor's liabilities and obligations pursuant to the Lease, if any, and agrees to perform and observe all of the covenants and conditions contained in the Lease, from and after the Conveyance Date.

3.      Indemnification.  Assignee further covenants and agrees to indemnify and hold harmless Assignor for, from and against any actions, suits, proceedings or claims, and all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection therewith, based upon or arising out of any breach or alleged breach of the Lease or out of any other facts connected with the Lease, occurring or alleged to have occurred from and after the Conveyance Date.  Assignor agrees to indemnify, defend and hold Assignee harmless for, from and against any and all actions, suits, proceedings or claims, and all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection therewith asserted against or incurred by Assignee in connection with the Lease or out of any other facts connected with the Lease occurring or alleged to have occurred prior to the Conveyance Date.

F-1

4.  <u>Binding Effect</u>.  This Assignment shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

5.  <u>Construction; Definitions</u>.  This Assignment shall be construed according to the laws of the State of Florida.  Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in the Purchase Agreement.

6.  <u>Counterparts</u>.  This Assignment may be executed in counterparts, which taken together shall constitute one original instrument.

7.  <u>Non-Recourse</u>.  Assignee agrees that the liability of Assignor under this Assignment shall be limited as provided in the Purchase Agreement and in this Assignment.

[Remainder of Page Intentionally Blank]

F-2

DATED as of the day and year first above written.

<u>ASSIGNOR</u>:

<u>ASSIGNEE</u>:                    [_____]

                                 Name: _____

                                 Title: _____

F-3

Exhibit A

Description

4820-1493-8874 v.6 124051/00124

Exhibit B

Lease

4820-1493-8874 v.6 124051/00124

**Exhibit G**

**Form of Assignment and Assumption of Contracts**
Assignment And Assumption Of Contracts

N/A

4820-1493-8874 v.6 124051/00124

**Exhibit H**

**Certificate of Non-Foreign Status**

Section 1445 of the Internal Revenue Code provides that a transferee (buyer) of a U.S. real property interest must withhold tax if the transferor (seller) is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by _____ ("Seller"), the undersigned hereby certifies the following on behalf of Seller.

1.      Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      Seller's U.S. employer identification number is _____; and

3.      Seller's office address is c/o _____.

Seller understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of Seller.

Dated: _____ ___, 2021

By:_____
Name:
Title:

H-1

# Exhibit B



## NELSON MULLINS

ATTORNEYS AND COUNSELORS AT LAW

1905 NW Corporate Boulevard  |  Suite 310
Boca Raton, FL 33431
T: 561.483.7000  F: 561.483.7321

nelsonmullins.com

James J. Wheeler, Esq.
T: (561) 343-6954
jim.wheeler@nelsonmullins.com

December 20, 2022

**VIA EMAIL**
BHN Associates LLC
Attn: Mordy Wider
Email: mordy@bhnassociates.com

Reiss Sheppe LLP
Attn: Stephen Friedman
Email: sfriedman@reisssheppe.com

RE: Purchase and Sale Agreement dated August 18, 2022 (the "**Agreement**"), by and between BHN ASSOCIATES LLC (the "**Buyer**"), and MAINSTREET SOUTHSIDE CENTER, LTD. (the "**Seller**") for the sale of that certain real property (the "**Property**") more particularly described in the Agreement

Dear Mr. Wider and Mr. Friedman:

As you know, this firm represents the Seller in connection with the above referenced Agreement. Pursuant to my conversation with Mr. Friedman on Wednesday, December 14, 2022 regarding the closing of the referenced transaction, Mr. Friedman advised me that Buyer was not going to close on the Closing Date. Accordingly, the Buyer never engaged in the closing process or engaged in any communication with the Closing Agent, and in fact the Buyer has failed to close on the Closing Date. The Seller was ready, willing and able to close on the Closing Date. Copies of the executed closing documents are attached.

In accordance with Section 11.2 of the Agreement, Seller hereby elects to terminate the Agreement, immediately, and by copy of this letter to the Escrow Agent, the Seller hereby makes demand upon the Escrow Agent to immediately release the Deposit (i.e. $750,000.00) to Seller as liquidated damages. Wire instructions are attached for that purpose. Due to such termination, Seller is hereby released and relieved of all obligations under the Agreement.

Sincerely yours,

NELSON MULLINS RILEY & SCARBOROUGH LLP

James J. Wheeler, Esq.

CC:    Seller via email
       Azi Mindick – Riverside Abstract LLC

4894-8076-4349 v.1 12405100137

Exhibit C

**E-FILED**
23EV000394
4/12/2023 4:04 PM
Donald Talley, Clerk
Civil Division

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

MAINSTREET SOUTHSIDE           )
CENTER, LTD,                   )
                               )
        Plaintiff,             )
                               )
                               )   CIVIL ACTION FILE
v.                             )   NO.: 23EV000394
                               )
BHN ASSOCIATES, LLC,           )
                               )
        Defendant.             )

## ORDER GRANTING DEFAULT JUDGMENT

Upon consideration of the Motion for Default Judgment submitted by Plaintiff Mainstreet Southside Center, Ltd. ("Mainstreet Southside"), the Court finds that: (1) Plaintiff has complied with the relevant provisions of the Georgia Code, the Civil Practice Act, and the Uniform State Court Rules (including attaching a Rule 15 Certificate); (2) Defendant has failed to file an Answer as required by O.C.G.A. § 9-11-12(a), and the time by which Defendant may open the default as a matter of right pursuant to O.C.G.A. § 9-11-55(a) has expired; and (3) the well-pleaded allegations of the Complaint, which have been admitted via Defendant's default, coupled with the exhibits to the Complaint and the Motion for Default Judgment, are sufficient to establish that Defendant is liable to Plaintiff in the amount set forth below. Accordingly, after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED that:

a) the request for entry of a default judgment is granted;

b) judgment is hereby entered in favor of Mainstreet Southside and against Defendant in the amount of $750,000.00; and

c) post-judgment interest on the amount above as allowed by law.

SO ORDERED, this _10th_ day of April, 2023.

_____
Honorable Eric A. Richardson
Judge, State Court of Fulton County

Prepared and presented by:

Gregory M. Taube
Georgia Bar No. 699166

NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, N.W., Suite 1700
Atlanta, Georgia 30363
(404) 322-6000 (Phone)
(404) 322-6050 (Fax)
greg.taube@nelsonmullins.com

_Attorney for Plaintiff_

2

**E-FILED**
23EV002837
5/11/2023 10:19 AM
Donald Talley, Clerk
Civil Division

## General Civil and Domestic Relations Case Filing Information Form

☐ Superior or ☒ State Court of _____FULTON_____ County

---

**For Clerk Use Only**

Date Filed _____

**MM-DD-YYYY**

Case Number _____

---

**Plaintiff(s)**

MAINSTREET SOUTHSIDE   CENTER, LTD

| Last | First | Middle I. | Suffix | Prefix |
|------|-------|-----------|--------|--------|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Defendant(s)**

RIVERSIDE ABSTRACT, LLC

| Last | First | Middle I. | Suffix | Prefix |
|------|-------|-----------|--------|--------|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** Gregory M. Taube, Esq.          **State Bar Number** 699166          Self-Represented ☐

---

### Check one case type and one sub-type in the same box (if a sub-type applies):

**General Civil Cases**

- ☐ **Automobile Tort**
- ☐ **Civil Appeal**
- ☐ **Contempt/Modification/Other Post-Judgment**
- ☒ **Contract**
- ☐ **Garnishment**
- ☐ **General Tort**
- ☐ **Habeas Corpus**
- ☐ **Injunction/Mandamus/Other Writ**
- ☐ **Landlord/Tenant**
- ☐ **Medical Malpractice Tort**
- ☐ **Product Liability Tort**
- ☐ **Real Property**
- ☐ **Restraining Petition**
- ☐ **Other General Civil**

**Domestic Relations Cases**

- ☐ **Adoption**
- ☐ **Contempt**
  - ☐ **Non-payment of child support, medical support, or alimony**
- ☐ **Dissolution/Divorce/Separate Maintenance/Alimony**
- ☐ **Family Violence Petition**
- ☐ **Modification**
  - ☐ **Custody/Parenting Time/Visitation**
- ☐ **Paternity/Legitimation**
- ☐ **Support – IV-D**
- ☐ **Support – Private (non-IV-D)**
- ☐ **Other Domestic Relations**

---

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____          _____
Case Number                          Case Number

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.