# EXHIBIT A

# MEMBERSHIP INTERESTS PURCHASE AGREEMENT

by and between

## WASATCH MENS GROUP, LLC

and

## WASATCH GROUP HOLDINGS, LLC

**Dated November 15th, 2022**

THIS DOCUMENT, IN ITS PRESENT FORM OR AS IT MAY BE HEREAFTER REVISED BY ANY PARTY, WILL NOT BECOME A BINDING AGREEMENT OF THE PARTIES UNLESS AND UNTIL, WITH ALL SCHEDULES AND EXHIBITS ATTACHED, IT HAS BEEN EXECUTED BY ALL PARTIES AND COMPLETE EXECUTED COPIES HAVE BEEN DELIVERED.   THE EFFECT OF THIS LEGEND MAY NOT BE CHANGED BY ANY ACTION OF THE PARTIES.

## MEMBERSHIP INTERESTS PURCHASE AGREEMENT

This **MEMBERSHIP INTERESTS PURCHASE AGREEMENT** (this "**Agreement**"), is made and entered into as of November 14th, 2022 (the "**Effective Date**" or "**Closing Date**"), by and between **WASATCH MENS GROUP, LLC**, a Utah limited liability company (the "**Buyer**"), and **WASATCH GROUP HOLDINGS, LLC,** a Utah limited liability company ("**Seller**"). Buyer and Seller are sometimes referred to herein as a "**Party**" or, collectively, the "**Parties**."

### RECITALS

**WHEREAS**, as of the Effective Date, Seller is the record and beneficial owner of one-hundred percent (100%) of the Membership Interests (the "**Purchased Interests**"), in the following third-party entities (individually the "**Company**" or jointly "**Companies**"):

1. Wasatch Medical Group LLC; a Utah limited liability company
2. Peach Tree Med LLC; a Georgia limited liability company
3. Valley Side Med LLC; a Texas limited liability company
4. North Ridge Med LLC; a California limited liability company
5. Maple Grove Med, LLC; a Maryland limited liability company
6. Hidden Creek Med LLC; a Connecticut limited liability company
7. Boise Medical Clinic, LLC; an Idaho limited liability company
8. Green Valley Med LLC; a Massachusetts limited liability company
9. Oak Valley Services, LLC; a North Carolina limited liability company
10. Edge Brook Med, LLC; an Illinois limited liability company
11. Pine Brook Med LLC; an Ohio limited liability company
12. Pine Ridge Med, LLC; an Ohio limited liability company
13. Park Side Med LLC; an Ohio limited liability company
14. South Valley Med LLC; a Texas limited liability company
15. Monument Med, LLC; a Maryland limited liability company
16. Ridge Side Med LLC; a Colorado limited liability company
17. Valley View Med, LLC; an Iowa limited liability company
18. Maple Ridge Services LLC; a Michigan limited liability company
19. North Brook Med LLC; a Texas limited liability company
20. Silver Leaf Med LLC; a Texas limited liability company
21. Pine Grove Med LLC; an Indiana limited liability company
22. Oakridge Med, LLC; a Missouri limited liability company
23. South Lake Med LLC; an Arkansas limited liability company
24. Oak View Med, LLC; a Kentucky limited liability company
25. River Ridge Med LLC; a Tennessee limited liability company
26. Park Lake Med, LLC; a Wisconsin limited liability company
27. Valley Park Med LLC; a Minnesota limited liability company
28. Hillside Med LLC; a Tennessee limited liability company

29. Spring View Med LLC; a Louisiana limited liability company

30. City Side Med LLC; a New York limited liability company

31. Bridge Side Med LLC; a Virginia limited liability company

32. Park Ridge Med LLC; a Oklahoma limited liability company

33. Brook Side Med, LLC; a Nebraska limited liability company

34. Oak Hills Med LLC; a Pennsylvania limited liability company

35. Maple Valley Med LLC; a Pennsylvania limited liability company

36. Green Valley Med LLC; a Massachusetts limited liability company

37. Pine Lake Services, LLC; a North Carolina limited liability company

38. Oak Park Med LLC; a Virginia limited liability company

39. Coast Side Med LLC; a California limited liability company

40. Crest Side Med LLC; a Texas limited liability company

41. Ocean Side Med LLC; a California limited liability company (DBA Ocean View?)

42. Camelback Medical Clinic LLC; a Utah limited liability company; foreign registration in Arizona

43. Bay Side Med LLC; a Washington limited liability company

44. Pine View Med LLC; Missouri limited liability company

45. South Bay Medical Clinic LLC; a Florida limited liability company;

46. Hidden Creek Med, LLC; a Connecticut limited liability company

which entities are engaged in the business of providing erectile dysfunction solutions services (the "**Business**");

**WHEREAS**, prior to the Closing Date, Andrew Rinehart distributed, transferred, assigned, sold and otherwise conveyed all of his right, title, and interest in the Purchased Interests to Seller pursuant to an Assignment Agreement attached hereto as Exhibit A (the "Seller Assignment");

**WHEREAS**, Seller wishes to sell to Buyer, and Buyer wishes to purchase and redeem from Seller, the Purchased Interests, subject to the terms and conditions set forth herein (the "**Transaction**" and together with all transactions contemplated in this Agreement and the Ancillary Documents, collectively, the "**Transactions**"); and

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

**I.**

## DEFINITIONS

Unless otherwise defined herein, capitalized terms used in this Agreement shall have the meanings ascribed to them in **Appendix A** attached hereto.

**II.**

## PURCHASE AND SALE

**II.1. Purchase and Sale; Closing**.  On the terms and subject to the conditions set forth in this Agreement, Seller hereby sells, transfers, assigns, conveys, and delivers to the Buyer, and Buyer purchases and redeems from Seller, the Purchased Interests, for the consideration set forth in Section 2.02.  The consummation of the Transactions shall take place on the Closing Date through the exchange of electronic or facsimile signatures and payment of funds (the "**Closing**"), and the Closing and enforceability of this Agreement shall become effective only upon receipt by Seller of Buyer Closing Date Deliverables and upon receipt by Buyer of Seller Closing Date Deliverables.  The Closing shall be effective as of 11:59 p.m. ("**Effective Time**") on the Effective Date (the "**Closing Date**").

**II.2. Purchase Price**.  The aggregate purchase price for the Purchased Interests shall be ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, which is comprised of the Initial Purchase Price and the Deferred Purchase Price (collectively, the "**Purchase Price**").  The Parties agree to allocate the Purchase Price for Tax purposes as provided on Schedule 2.02.

(a)     Initial Purchase Price.   The Initial Purchase price for the Purchased Interests shall be ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (the "**Initial Purchase Price**").  The Initial Purchase Price shall be payable by the Buyer by wire transfer of immediately available funds to Seller's account as designated on Schedule 2.02(a) (the "**Seller Account**").

(b)     Deferred Purchase Price.   In addition to the Initial Purchase Price, and as consideration in connection with the sale, purchase, and redemption of the Purchased Interests the Buyer shall pay a total of ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (the "**Deferred Purchase Price**") to the Seller Account in thirty-six (36) equal monthly installments, each in the amount of ▬▬▬▬▬▬▬▬▬▬▬▬, payable to Seller on or before the 15th day of each month, commencing the month after close.  For the avoidance of doubt, the Deferred Purchase Price shall not accrue any interest and may be prepaid without penalty, in the Buyer's sole discretion.  Payment and performance of the Deferred Purchase Price is personally guaranteed by Robert Duncan (the "Guarantor").  Buyer agrees to have merchant account, cash, checks and finance funding deposited in to sellers account from the Peach Tree Med, LLC (Atlanta) in to sellers bank account to fulfill the sellers note, even if the amount exceeds the ▬▬▬▬per month. Any excess will be applied to the outstanding note amount. If the amount deposited drops below ▬▬▬▬ the seller may elect to have another or an additional clinic added.

(c)     Revenue and Expense Transition.   The Parties agree that Seller shall retain all revenue from the Companies, and Seller shall continue to pay Company expenses, up to and including November 26th, 2022, while the buyer applies for merchant accounts. Subsequently, commencing on November 27th, 2022, Buyer shall retain all Company

revenue and shall pay all Company expenses.   The Closing Date shall remain as stated herein.

**II.3. Closing Date Deliverables**.

(a)   Seller Closing Date Deliverables.   At Closing, Seller shall have delivered, or caused to be delivered, to the Buyer all of the following:

(i)   a Membership Interest Assignment Agreement in the form attached hereto as **Exhibit B**, duly executed by Seller selling, transferring, and assigning all of Seller's right, title, and interest to the Purchased Interests to the Buyer as of the Effective Date (the "**Assignment Agreement**"); and

(ii)   all other agreements, documents, instruments, or certificates required to be delivered by Seller at or prior to the Closing.

(b)   Buyer Closing Date Deliverables.   At Closing, the Buyer shall have delivered, or caused to be delivered to the Seller all of the following:

(i)   delivery of the Initial Purchase Price to the Seller Account; and

(ii)   duly executed Assignment Agreement.

**III.**

## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to the Buyer to enter into and perform its obligations under this Agreement, Seller represent and warrant to the Buyer, as of the Closing, as follows:

**III.1. Organization and Authority**. Each of the Companies are duly organized, and validly existing, under the laws of the state in which the Company was organized, and has the requisite power and authority to own, lease, operate its properties and assets, and to transfer the Purchased Interests to Buyer pursuant to the Seller Assignment as of the date and time thereof. The Seller Assignment validly transfers all right, title, and interest to the Purchased Interests to Buyer.  Seller has all requisite power and authority to execute and deliver this Agreement and each other Ancillary Document to which Seller is or will be a party and to perform his obligations hereunder and thereunder.  The execution, delivery, and performance by Seller of this Agreement, each other Ancillary Document to which Seller is or will be a party, and each of the Transactions, have been duly and validly authorized by Seller and no other act or proceeding on the part of Seller is necessary to authorize the execution, delivery, or performance of this Agreement or each other Ancillary Document to which Seller is or will be a party, or to otherwise consummate the Transactions.  This Agreement has been, and each other Ancillary Document to which Seller is or will be a party will be, duly and validly executed and delivered by Seller, and this Agreement constitutes, and each other Ancillary Document to

5

which such Seller is or will be a party, upon execution and delivery by Seller, will each constitute, in each case, assuming the due and valid authorization, execution, and delivery by the Buyer, a legal, valid, and binding obligation of Seller, enforceable against such Seller in accordance with their respective terms.

**III.2.Ownership of Purchased Interests; No Encumbrances**.  The Purchased Interests are all of the Equity Securities Seller owns, or owned, in the Companies.  Seller is the sole legal, beneficial, record, and equitable owner of the Purchased Interests.  The Purchased Interests have been duly authorized, are validly issued, are fully paid and nonassessable, and free and clear of all Encumbrances (with the exception of UCC filings from UGA).  None of the Purchased Interests are certificated.  Effective upon the Closing, the Buyer will own all of the outstanding membership interests in the Companies.  The Purchased Interests are not subject to, nor issued in violation of, any preemptive rights.  There are no outstanding, nor does Seller have any obligation to issue, any options, warrants, rights, calls, puts, performance shares, appreciation rights, restricted units, dividend equivalents, rights to subscribe, rights of first refusal, rights of first offer, conversion rights (including convertible notes or other similar convertible debt instruments) or other agreements or commitments to which Seller is a party providing for the issuance, disposition, or acquisition of any of the Equity Securities of the Company or any rights or interests exercisable therefor or related thereto.  Seller is not a party to any voting trusts, proxies, or any other Contract with respect to the voting of any Equity Securities of the Companies.

**III.3.Non-contravention**.  None of the execution, delivery, or performance by Seller of this Agreement or any Ancillary Documents to which Seller is or will be a party, and none of the Transactions, shall (a) to the Knowledge of Seller violate any Law to which Seller or any of its properties or assets is subject, (b) require any consent, notice, approval, or authorization under, or result in a right of acceleration, termination, payment, abandonment, modification, amendment, cancellation, or result in any breach, termination, or modification of, or constitute a default (or an event which would, with the passage of time or the giving of notice or both, constitute a default) under any Contract to which Seller, or to Seller's Knowledge, the Seller, is a party, or (c) result in the imposition of any Encumbrance upon the Purchased Interests or any of the Seller's assets.  To the Seller's Knowledge, the Seller is not required to give any notice to, make any registration or filing with, or obtain any authorization, consent, waiver, or approval of any Governmental Authority for the Parties to consummate the Transactions.

**III.4.Contracts and Commitments**.  Seller discloses, and Buyer acknowledges, that the Companies have executed and entered into certain Contracts, including the leases and advertising backpay executed and agreed upon by the Companies, (collectively, the "**Seller Committed Contracts**"), which Seller Committed Contracts the Companies remain obligated.  Certain other third-parties, including but not limited to advertisers, media, or other third-parties might claim certain amounts owed by the Companies which buyer is responsible for.

**III.5.Legal Proceedings**.  Seller discloses, and Buyer acknowledges, that certain actions and legal processing are pending and/or threatened against the Company or Companies.  Buyer

acknowledges that consummation of this Transaction involves inherit risks, including but not limited to assuming liability for the pending and/or threatened legal proceedings against the Companies, as well as having to defend such claims.

**III.6.Brokers.**   No Person is entitled to any brokerage, finder's, or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Seller.

**III.7.Seller Transition Assistance.**  Seller agrees to assist Buyer in the transition of the Purchased Interests in the following manners:

(a)   Seller agrees to sublease any clinic locations plus the corporate office lease in Murray Utah to Buyer for leases that expire on or after February 1, 2023.  For leases expiring before February 1, 2023, Seller will assist in transitioning the lease and personal guarantees to Buyer and/or closing the clinics upon completion of servicing of patients of the Company.  Buyer agrees to pay the entire amount owed on any leases associated with the company.  The security deposits will be returned to the seller.

(b)   Seller agrees to assist Buyer in introductions to Utah ABC station and any other applicable advertising outlets.

(c)   Seller agrees to 60 days of part time consulting and assistance.

(d)   Seller to retain ownership of computers with personal information on them plus furniture from Andrew Rinehart's personal office plus in the lobby of the corporate office space located at 310 E. 4500 S. Suite 570 Murray UT.

**IV.**

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

As a material inducement to Seller to enter into and perform his obligations under this Agreement, the Buyer represents and warrants to Seller, as of the Closing, as follows:

**IV.1.Authority.**  The Buyer has full power and authority to enter into this Agreement and the Ancillary Documents to which the Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the Transactions.  The execution and delivery by the Buyer of this Agreement and any Ancillary Document to which the Buyer is a party, the performance by the Buyer of its obligations hereunder, and thereunder and the consummation by the Buyer of the Transactions have been duly authorized by all requisite action on the part of the Buyer. This Agreement has been duly executed and delivered by the Buyer, and (assuming due authorization, execution, and delivery by Seller) constitutes a legal, valid, and binding obligation of the Buyer enforceable against the Buyer in accordance with its terms.

**IV.2.Actions**.  There are no Actions or Governmental Orders pending, or to the Buyer's Knowledge, threatened against or affecting the Buyer, which would reasonably be expected to prevent, materially delay, or materially impede the Buyer's ability to consummate the Transactions.

**IV.3.Broker**.  No Person is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Buyer.

**IV.4.No Other Representations**.  No representation or warranty by the Buyer in this Agreement or any certificate or other document furnished or to be furnished to Seller pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**IV.5.Legal Proceedings**.  Seller discloses, and Buyer acknowledges, that certain actions and legal processing are pending and/or threatened against the Company or Companies.  Buyer acknowledges that consummation of this Transaction involves inherit risks, including but not limited to assuming liability for the pending and/or threatened legal proceedings against the Companies, as well as having to defend such claims.

**IV.6.Buyer Assumption of Liabilities.**  At the Closing, the Buyer will assume and agree to pay, perform and discharge all obligations of the Companies, and, to the extent herein, to indemnify Seller against and hold it harmless from, all obligations and liabilities of the Seller and the Companies, relating to the Companies of any nature or kind, known or unknown, fixed, accrued, absolute or contingent, which arise, accrue or are incurred before or after the Closing Date, relating to or based upon the past, present or future business or operation of the Companies as heretofore, currently or hereafter conducted (the "Seller Assumed Liabilities" attached hereto as **Exhibit C** (non-exhaustive list), including but not limited to:

(a)      all liabilities and obligations of the Companies under the Contracts or Leases of the Companies,

(b)      advertising back pay liability related to advertisers in all markets of the Companies, including continuing to pay the agreed upon back pay payment plans.

(c)      all service obligations of the Companies to patients that signed up for or commenced treatments with a Company on or before the Closing Date, including arranging for technician travel to understaffed markets as needed,

(d)      accounts payable and accrued liabilities,

(e)      all liabilities past, present or future of the company or companies

8

(f)     all obligations with respect to employees, former employees, contractors, former contractors and any other person or business claiming monies or damages from the Companies, and

(g)     all liabilities under state or federal law, known or unknown.

(h)     all chargebacks that may come in for any patient at any time, which include credit card, cash, check and financing chargebacks.

(i)     buyer acknowledges that the tax return presented was preliminary and may not be the final version.


**IV.7.Separate Payroll Bank Account.**   Upon closing the Buyer agrees to place not less than seven hundred thousand dollars ($700,000) into a separate bank account, that seller may use for lease and technician (not medical provider) payroll payments.   Seller to make lease payments out of this fund on December 1st 2021 for the paused (no advertising running) clinics only, buyer to pay the leases for the remaining clinics.   Thereafter, Seller to contribute half of the remaining funds towards each of the 2 payrolls on December 9th 2022 and December 23rd 2022, with the buyer contributing the remainder.   Seller may also use these funds for other business related expenses.

**IV.8.Additional Buyer Obligations.**   At the Closing, the Buyer agrees to the following additional items:

(a)     Buyer agrees to set up, activate and utilize two (2) new merchant accounts for each Company,

(b)     Buyer agrees to set up and/or assume ownership and control of the ADP payroll accounts for payroll processing,

(c)     Buyer agrees within 48 hours of close to change the ownership of each entity to buyers name, removing the seller from all entity registration records with each state.

(d)     Buyer to give seller full access to all entity bank accounts and allow seller to transfer funds in order to satisfy payroll, leases or other company expenses.

(e)     Buyer agrees to remove Seller's name, image, and likeness on all television, radio, and print ads on or before December 23, 2022.

(f)     Buyer to give seller full access to all entity bank accounts and allow seller to transfer funds in order to satisfy payroll, leases or other company expenses.

9

(g)     Buyer agrees to not withdraw any amount of money from the clinic bank accounts without authorization from the seller, up until March 1st, 2023.

(h)     Buyer will service all payroll until all patients are fully serviced, even in clinics that are not running advertisements or producing revenue

(i)     Buyer assumes all responsibility for advertising backpay

(j)     Buyer will pay the lease payments on all locations until leases are fully satisfied

(k)     Buyer will be given ownership of the clinic bank accounts, all with a 0 balance. No company monies will be transferred at the time of sale.

V.

## OTHER AGREEMENTS

**V.1.Intellectual Property Matters**.  Seller hereby acknowledges and agrees that, upon closing, Seller does not have any right, title, or interest in the any Intellectual Property of the Company, or its Affiliates.  To the extent that Seller has any right, title, or interest in the Intellectual Property of the Company, or any of its Affiliates, each such Person hereby assigns to the Buyer, and its Affiliates (as applicable), all such Person's right, title, and interest in and to any and all of such Intellectual Property.  To the extent Seller has assigned to the Buyer, or its Affiliates all of such Person's right, title, and interest in any Intellectual Property prior to the Closing Date, then by the foregoing, each such Person hereby confirms having assigned, transferred, conveyed, and delivered to the Buyer, and its Affiliates (as applicable), effective as of the date of the first assignment, all of such Person's right, title, and interest in and to such Intellectual Property.    Seller further acknowledges and agrees that all original works of authorship which are made by Seller (solely or jointly with others) within the scope of and during the period of his or its relationship with the Company is "work made for hire," as that term is defined in Section 101 of the Copyright Act of 1976.

### V.2.Tax Matters.

(a)     Allocation of Company Income and Loss.  The Parties hereby agree that the Company shall allocate all items of Company income, gain, loss, deduction, or credit attributable to the Purchased Interests for the taxable year of the Closing based on a closing of the Company's books as of the Closing Date.

(b)     Cooperation.  The Parties shall provide each other with such cooperation and information as such Person may reasonably request of another Person in filing any Tax Return pursuant to this Section 5.04 or in connection with any audit, proceeding, or Action in respect of Taxes of the Company.  The Parties shall retain all Tax Returns, schedules and work papers, records, and other documents in its possession relating to Tax

matters of the Company for any Taxable period beginning before the Closing Date until the expiration of the statute of limitations of the Taxable periods to which such Tax Returns and other documents relate, without regard to extensions except to the extent notified by the other Party in writing of such extensions for the respective Tax periods. Prior to transferring, destroying, or discarding any Tax Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of the Company for any Taxable period beginning before the Closing Date, the Parties (as the case may be) shall provide the other Party with reasonable written notice and offer the other Party the opportunity to take custody of such materials.

**V.3.Buyer Release**.   Buyer, for itself, its heirs, executors, trustees, successor trustees, beneficiaries, subsidiaries, successors, lien holders, representatives, administrators, agents, principals, affiliates, assigns, attorneys, insurers, firms, corporations, officers, directors, partners, shareholders, members, managers, and employees, upon the Closing, hereby fully release, acquit and forever discharge Seller, its heirs, executors, trustees, successor trustees, beneficiaries, subsidiaries, successors, lien holders, representatives, administrators, agents, principals, affiliates, assigns, attorneys, insurers, firms, corporations, officers, directors, partners, shareholders, members, managers, and employees of and from any and all Actions or Losses, of every kind and nature whatsoever, which may presently exist in law or in equity, in the nature of an administrative proceeding or otherwise, for or by reason of any event, transaction, matter, or cause whatsoever which either Party, their heirs, executors, trustees, successor trustees, beneficiaries, subsidiaries, successors, lien holders, representatives, administrators, agents, principals, affiliates, assigns, attorneys, insurers, firms, corporations, officers, directors, partners, shareholders, members, managers, and employees may now have or may hereafter acquire in connection with the Purchase Interests or such Person's previous relationship with Seller, its Affiliates, whether at this time known or suspected, or unknown or unsuspected, anticipated or unanticipated, direct or indirect, fixed or contingent, or which may hereafter arise or become known, provided, however, that no release granted pursuant to this Section shall apply to the extent (a) it relates to a breach of this Agreement or any of the Ancillary Documents or any representation and warranty or covenant set forth herein or therein or (b) arises from or is related to any action or omission that was concealed from the aggrieved Person or a result of fraud or material misrepresentation.

**V.4.Non-disparagement**.   Each Party hereby agrees not at any time make, publish, or communicate to any Person or in any public forum any disparaging remarks, comments, or statements concerning the other Party, the Company, or any of their Affiliates or Representatives now or in the future.   For the avoidance of doubt, nothing contained in this Section shall be construed to prohibit any Party from making any statement to the extent required by Law.

**V.5.Further Assurances**.   Following the Closing, each of the Parties shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such

11

further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transactions.

VI.

## INDEMNIFICATION

### VI.1.General Indemnification Obligation.

(a) Subject to the limitations contained herein, Buyer (on behalf of himself and on behalf of the Companies), shall indemnify and hold harmless Seller, each of its respective Representatives and Affiliates (each a "**Seller Indemnified Party**") from and against any and all Losses sustained by any of such Persons based upon, arising out of, or otherwise in respect of any:

(i) inaccuracies in or any breach of any representation or warranty of Seller contained in this Agreement or any Ancillary Documents (including any Schedule or Exhibit attached hereto or thereto), as of the Closing Date;

(ii) any breach of any covenant or agreement of Seller contained in this Agreement or any Ancillary Document (including any Schedule or Exhibit attached hereto or thereto); and

(iii) the amount of all Taxes allocable to Seller or any imputed underpayment (as described in Section 6225 of the Code) imposed on the Seller and allocable to Seller or attributable to the Purchased Interests during Taxable years, or portions thereof, during any time when Seller owned the Purchased Interests (the "**Seller Ownership Period**"), or any other Tax assessment imposed on the Seller under any similar provision of state or local Law and allocable to Seller or attributable to the Purchased Interests during the Seller Ownership Period.

(b) The Buyer, subject to the limitations contained herein, shall indemnify and hold harmless Seller and his Representatives and Affiliates ("**Seller Indemnified Party**") from and against any and all Losses actually sustained by Seller based upon, arising out of, or otherwise in respect of any:

(i) inaccuracies in or any breach of any representation or warranty of the Seller contained in this Agreement or any Ancillary Documents to which the Buyer is a party (including any Schedule or Exhibit attached hereto or thereto), as of the Closing Date; and

(ii) any breach of any covenant or agreement of the Buyer contained in this Agreement or any Ancillary Document to which the Buyer is a party (including any Schedule or Exhibit attached hereto or thereto).

12

**VI.2.Survival**. The representations and warranties of Buyer and the Seller contained in this Agreement or any Ancillary Document, and the right of Seller to seek indemnification as a result of any breach of or inaccuracy in any representation or warranty, shall survive until the date that is sixty-months (60) months after the Closing Date (the "**Expiration Date**"); provided, however, that:

(a)     The representations and warranties contained in Sections 3.01 (Organization and Authority); 3.02 (Ownership of Purchased Interests; No Encumbrances); 3.05 (Taxes); 3.07 (Brokers); 4.01 (Authority); and 4.03 (Brokers) (collectively, the "**Fundamental Representations**") shall survive until the date that is seventy-two (72) months after the Closing Date;

(b)     all of the covenants and agreements of Buyer and the Seller contained in this Agreement shall survive after the Closing and be enforceable in accordance with their terms until fully performed; and

(c)     any Liability Claim pending on any Expiration Date for which a Claims Notice has been given in accordance with Section 6.03 on or before such Expiration Date may continue to be asserted and indemnified against until finally resolved.

**VI.3.Notice and Opportunity to Defend**.

(a)     As soon as is reasonably practicable after a Seller Indemnified Party becomes aware of any claim that may result in a Loss (a "**Liability Claim**"), such Person (the "**Indemnified Party**") shall give notice thereof (a "**Claims Notice**") to the Party that is obligated to indemnify the Indemnified Party with respect to such claim (the "**Indemnifying Party**").     A Claims Notice shall describe the Liability Claim in reasonable detail, and shall indicate the amount (estimated, if necessary and to the extent feasible) of the Loss that has been or may be suffered by the Indemnified Party. No delay in or failure to give a Claims Notice by the Indemnified Party to the Indemnifying Party pursuant to this Section 6.03(a) shall adversely affect any of the other rights or remedies which the Indemnified Party has under this Agreement, or alter or relieve the Indemnifying Party of its obligation to indemnify the Indemnified Party to the extent that such delay or failure has not materially prejudiced the Indemnifying Party.

(b)     To the extent that any Liability Claim relates to a third-party proceeding, the Indemnifying Party may elect, by providing written notice to the Indemnified Party within thirty (30) days of receipt of a Claims Notice from the Indemnified Party of the commencement or assertion of any Liability Claim in respect of which indemnity may be sought hereunder, to assume and conduct the defense of such Liability Claim in accordance with the limits set forth in this Agreement with counsel selected by the Indemnifying Party and reasonably acceptable to the Indemnified Party.     If the Indemnifying Party does not assume the defense of a Liability Claim in accordance with this Section 6.03(b), the Indemnified Party may continue to defend the Liability Claim.

13

If the Indemnifying Party has assumed the defense of a Liability Claim as provided in this Section 6.03(b), and (i) the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Liability Claim, or (ii) a settlement of, or adverse judgment with respect to the Liability Claim may be expected to have a material adverse effect on, or is likely to establish a precedential custom or practice materially adverse to the continuing business or Tax position of the Indemnified Party, the Indemnified Party may assume its own defense, and the Indemnifying Party shall be liable for all reasonable costs or expenses (including reasonable attorneys' fees) paid or incurred in connection therewith. Without limiting the foregoing, the Indemnifying Party or the Indemnified Party, as the case may be, shall have the right to participate in (but not control), at its own expense, the defense of any Liability Claim which the other is defending as provided in this Agreement.

(c)    The Indemnifying Party, if it shall have assumed the defense of any Liability Claim as provided in this Agreement, shall not, without the prior written consent of the Indemnified Party, consent to a settlement of, or the entry of any judgment arising from, any such Liability Claim which (i) does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a complete release from all liability in respect of such Liability Claim, (ii) grants any injunctive or equitable relief, or (iii) may reasonably be expected to have a material adverse effect on, or is likely to establish a precedential custom or practice material adverse to, the continuing business or Tax position of the Indemnified Party. If a firm offer is made to settle a third-party Liability Claim which (x) does include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a complete release from all liability in respect of such liability claim, and (y) does not grant any injunctive or equitable relief, and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within fifteen (15) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such third-party Liability Claim. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such third-party Liability Claim, the Indemnifying Party may settle the third-party Liability Claim upon the terms set forth in such firm offer to settle such third-party Liability Claim.

**VI.4.Certain Limitations**.

(a)    For the purposes of the indemnification provisions set forth in this Article VI, any Losses shall be determined on a net basis after giving effect to any actual cash payments received by an Indemnified Party under insurance policies and other reimbursement arrangements with respect to such Losses, provided, that the amount of such insurance recovery shall be reduced by the amount of any increase in insurance premiums or similar direct costs resulting from making the claim giving rise to such recovery.

(b)     For the sole purpose of determining the amount of Losses (and not for determining whether or not any breaches of representations or warranties have occurred), the representations and warranties of a Party shall be determined without regarding to any materiality or other similar materiality qualification contained in or otherwise applicable to such representation or warranty (to the extent applicable).

**VI.5.Effect of Investigation**. The right to indemnification, payment, reimbursement, or other remedy based upon any breach of a representation, warranty, covenant or obligation of an Indemnifying Party will not be affected or deemed waived by reason of any investigation conducted or knowledge acquired (or capable of being acquired) at any time by or on behalf of any Indemnified Party, whether before, on, or after the Closing Date, with respect to the accuracy or inaccuracy of, or compliance with, such representation, warranty, covenant, or obligation.

**VII.**

### MISCELLANEOUS

**VII.1.Expenses**. Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the Transactions shall be paid by the Party incurring such costs and expenses.

**VII.2.Notices**. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 7.02):

**If to any Seller Party:**        Andrew Rinehart
                                   Email: andrew@andrewrinehart.us

**with a copy to**:                         The Law Office of Phillip M Rinehart
                                            285 N. Main Street #905
                                            Kaysville, UT 84037
                                            Attn: Phil Rinehart
                                            Email: phil@philrinehart.com

**If to the Buyer**:

                                            Robert Duncan
                                            E-mail:

**VII.3.Interpretation**.      For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive and shall be "and/or"; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.  Unless the context otherwise requires, references herein: (x) to Articles, Sections, Schedules, and Exhibits mean the Articles and Sections of, and Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.  The Schedules, and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**VII.4.Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**VII.5.Severability**.  If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.      Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**VII.6.Entire Agreement**.  This Agreement and the Ancillary Documents constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any

16

inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Appendices, Exhibits, Attachments, and Schedules the statements in the body of this Agreement will control.

**VII.7.Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  No Party may assign its rights or obligations hereunder without the prior written consent of the other Parties, which consent shall not be unreasonably withheld or delayed; provided, however, the Buyer may, without the prior written consent of Seller, assign all or any portion of its rights under this Agreement to one or more of its Affiliates.  Except with respect to the immediately preceding sentence, no assignment shall relieve the assigning Party of any of its obligations hereunder.

**VII.8.No Third-Party Beneficiaries**.  This Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**VII.9.Amendment and Modification; Waiver**.  This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party hereto.  No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving.  No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**VII.10.Governing Law**.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Utah without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Utah.

**VII.11.Specific Performance**.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**VII.12.Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail or other means of

electronic transmission (e.g., DocuSign) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

*{Signature Page to Membership Interest Purchase Agreement}*

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the Effective Date.

**SELLER**:    **WASATCH GROUP HOLDINGS, LLC**

By:  Andrew Rinehart, its sole Manager

**BUYER**:    **WASATCH MENS GROUP, LLC**

By:
Robert Duncan, its Manager

19