UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
GEORGIA ATLANTA DIVISION

| | |
|---|---|
| ELIZABETH HILTON )<br>)<br>    Plaintiff,          )<br>)<br>v.                            )<br>)<br>CITY OF MARIETTA, and   )<br>DAN FLYNN, in his individual )<br>capacity.                )<br>)<br>    Defendants.       )| Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Elizabeth Hilton ("Plaintiff") brings this Complaint against Defendant City of Marietta ("Defendant" or "the City"), and Defendant Dan Flynn, former Chief of Police of the Marietta Police Department, alleging as follows:

## INTRODUCTION

1. Plaintiff Elizabeth Hilton always wanted to be a police officer. At the age of 22, she started her career in law enforcement as a police officer with the City of Marietta's police department. However, she soon learned that female officers at Marietta Police Department were marginalized, and those who stood up

against abuses were ridiculed and mistreated. After witnessing two other officers fall victim to mental illness, she suffered her own mental health crisis and sought help. Yet, instead of allowing to her to get the help she needed to continue serving the people of Marietta, the department terminated her for the pretextual reason that she was not forthcoming about her mental health situation while ignoring the dishonesty of similarly situated male officers.

2. Plaintiff asserts claims for unlawful discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADAAA"), and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. She seeks back pay and lost economic benefits of employment, reinstatement or front pay, compensatory and punitive damages, reasonable attorney's fees, costs of litigation, and any other relief that this Court deems just.

## PARTIES

3. Plaintiff is a resident of DeKalb County in the State of Georgia, a citizen of the United States of America, and is subject to the jurisdiction of this Court.

4. Plaintiff is an "employee" as defined by the ADAAA.

5. Plaintiff is a "qualified individual with a disability" as that term is used and defined by the ADAAA.

6. The City of Marietta is a municipal corporation organized under the laws of the state of Georgia and is subject to actions of this kind.

7. The City of Marietta is an "employer" within the meaning of the ADAAA, 42 U.S.C. § 12111(5).

8. At all times relevant and material to this Complaint, Defendant Flynn was the Chief of Police for the Marietta Police Department.

## JURISDICTION AND VENUE

9. Plaintiff's claims present federal questions over which this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) and 42 U.S.C. § 2000e-5(f)(3) because the parties reside and/or conduct business within this district, and the unlawful employment practices giving rise to the claims occurred in this district.

11. Plaintiff exhausted all administrative remedies in this matter.

12. This action has been timely commenced.

## FACTUAL ALLEGATIONS

13. The Marietta Police Department ("MPD") is an unincorporated division of the City of Marietta.

14. On December 3, 2020, Ms. Hilton was informed that she would be

hired as a police officer for MPD.

15.    Ms. Hilton was 22 years old at the time she was hired.

16.    During a welcome interview with the Chief of Police, Defendant Dan Flynn, Ms. Hilton asked Defendant Flynn if there was any advice that he could share with her as she embarked on a new career. He smiled and said: "Well, as an attractive woman in a predominantly male workplace, chances are there will be some form of sexual harassment. My advice: don't be a bitch. We take harassment seriously but there is no reason not to be nice about it and try to handle it on your own first."

17.    Ms. Hilton began working as a police officer for MPD on or about December 14, 2020.

18.    As a police recruit, she attended the North Central Georgia Law Enforcement Academy to satisfy state-mandated certification requirements.

19.    During the pre-academy phase of trainings, recruits like Ms. Hilton were required to go to the gym every morning. Ms. Hilton and another female wore yoga pants to the gym, which prompted a complaint by a Lieutenant that they were "dressed inappropriately." Sergeant Figueroa told Ms. Hilton and another female police recruit that they were not allowed to wear gym clothes anywhere but to and from the gym to avoid further complaints. He admitted that

the only reason the Lieutenant complained was because they were "attractive females. If you were ugly or a male he wouldn't have said a word. You should take it as a compliment." This rule, however, did not apply to men.

20. On another occasion later in her employment (on August 26, 2021), Sergeant Figueroa told Ms. Hilton that she and another female officer who went on a vacation to the trip "owed [him] drunk pics." He later complained when Plaintiff did not send him any "drunk pics."

21. Upon completion of her certification with the Academy, Ms. Hilton entered MPD's Field Training Program on or about March 19, 2021.

22. In anticipation of the Field Training Program, in which recruits are tased as part of training, Ms. Hilton submitted a medical note communicating that she suffered from Temporomandibular Joint Disorder.

23. Ms. Hilton's medical note indicated that a taser could cause permanent damage to her joints and requested that she not be tased as a reasonable accommodation.

24. Ms. Hilton's request was rejected, and she was informed being tased was a "rite of passage."

25. She was tased that same day.

26. Ms. Hilton was initially directed to report to Officer Dylan Conklin,

a Field Training Officer ("FTO").

27. FTO Conklin refused to train Ms. Hilton or otherwise interact with her. He frequently laughed and ridiculed Ms. Hilton.

28. FTO Conklin took steps to set Ms. Hilton up for failure.

29. In late April 2021, while working an arrest with another FTO, Ryan Lukaszewics, Ms. Hilton observed FTO Lukaszewics use excessive force by using a chokehold on a handcuffed suspect.

30. Ms. Hilton reported the excessive use of force on or about May 1, 2021, to FTO Conklin.

31. Ms. Hilton was suspended for the remainder of the day without pay.

32. On May 2, 2021, Ms. Hilton reported the excessive use of force to the Training Unit.

33. Later that same day, Ms. Hilton was directed to report to FTO Lukaszewics despite her reports to FTO Conklin and to the Training Unit.

34. In May 2021, Ms. Hilton was informed that she had failed Phase 1 of training.

35. Ms. Hilton reiterated her concerns with FTO Conklin and FTO Lukaszewics and their impact on her training.

36. Ms. Hilton was reassigned to FTO Amelia Hines and completed

Phase I of the Field Training Program.

37. Plaintiff began Phase II of the Field Training Program in early June 2021.

38. For Phase II, Ms. Hilton was instructed to report to FTO Pedro Hernandez.

39. In late June 2021, FTO Hernandez ran a criminal background check on Ms. Hilton without authorization.

40. Plaintiff reported this policy violation to Sergeant Figueroa, but no investigation into FTO Hernandez's actions was conducted and no disciplinary action was issued.

41. Ms. Hilton completed the Field Training Program in late June 2021, at which point she was assigned to Defendant's Patrol Division.

42. During her initial four months with the Patrol Division, Ms. Hilton witnessed numerous instances of excessive force.

43. She also was employed during a time when two police officers at Marietta Police Department committed suicide.

44. During a briefing about one of the suicides, a Lieutenant told the command staff that it is "against policy to commit suicide."

45. Around mid-October 2021, Plaintiff began to experience symptoms

of Post-Traumatic Stress Disorder ("PTSD") and depression.

46. On December 4, 2021, Plaintiff suffered from a mental health episode in which she harmed herself and caused bruises on her neck and forehead.

47. The next day, Plaintiff attended a roll call where Sergeant Duncan loudly asked her in front of everyone: "what happened to you?" Plaintiff stated in a low voice that she hit her head on a door. Sergeant Duncan seemingly did not believe her and said repeatedly in a loud voice: "Are you good?" Ms. Hilton was embarrassed and felt herself starting to cry so she excused herself to the restroom, to which he said: "Yeah, good idea!"

48. In the restroom, Ms. Hilton was physically backed into a corner by her supervisors and coworkers and was questioned about her bruises.

49. In an effort not to divulge her private medical information, Ms. Hilton responded that she got into an altercation with a friend of her mother's.

50. Once Ms. Hilton was allowed to start her shift (1.5 hours late), she was made to go speak to another Sergeant (who was off duty) at her home about the incident. Ms. Hilton explained that she was embarrassed and wanted everyone to stop asking her about it.

51. On or about December 15, 2021, Ms. Hilton was informed by Lieutenant Bonito that she was now the subject of an Internal Affairs ("IA")

investigation surrounding the statements she made in the bathroom on December 5, 2021.

52. Ms. Hilton spoke with Lt. Bonito pursuant to the IA investigation the same day and told him the truth during the formal investigation about the bruises being the result of self-harm.

53. Ms. Hilton further shared that she was experiencing mental health issues and explained why she was nervous to share this information with other officers and supervisors. She further explained the circumstances of being questioned about the matter while being trapped in a bathroom.

54. Ms. Hilton explained that the self-harm incident was precipitated by instances of post-traumatic stress brought on by her experiences as a police officer.

55. Ms. Hilton informed Lieutenant Bonito about other symptoms, including trouble sleeping and eating.

56. Ms. Hilton was subsequently placed on administrative leave and informed that the purpose of the leave was to address her mental health. Lt. Bonito and Major Twaddell told Ms. Hilton that she needed to speak with a psychologist and made an appointment for her to meet with one the next day (December 16 at 2pm).

57. Ms. Hilton was further informed she would see a Defendant-designated therapist three to seven times and would then be transferred to another psychologist to have her fitness for duty evaluated.

58. Ms. Hilton was further informed that the police department would address any purported policy violations after she was cleared to return to work.

59. On December 16, 2021, Ms. Hilton attended her first counseling session at 2pm.

60. Two hours later, Lieutenant Bonito instructed her to report to him the following morning.

61. On December 17, 2021, Ms. Hilton met with Lieutenant Bonito.

62. In that meeting, Lieutenant Bonito indicated that he had spoken with the Chief (Defendant Flynn) and that if Ms. Hilton did not resign then she would be fired for lying, and things would be "very bad" for her.

63. Ms. Hilton explained that she did not want to resign, and that she had wanted to be a police officer her whole life. She shared that she just needed help.

64. Lieutenant Bonito further stated that Ms. Hilton's termination would be reported to the Peace Officer Standards and Training ("POST") Council, jeopardizing her future career in law enforcement.

65. Lieutenant Bonito assured Ms. Hilton that if she resigned that day, he

would not formalize any investigation against her that may be reported to POST. This was not truthful.

66. He then ordered Ms. Hilton to bring him all of her equipment and uniforms, empty her locks, and return her patrol car and vehicle equipment immediately.

67. When Ms. Hilton returned with her equipment, she pleaded with Lt. Bonito again. He insisted that she could only get another job as a police officer if she resigned. He then told her what to write in a resignation letter and she followed his instructions since she was left with no other choice.

68. Male officers violated the same dishonesty policy Ms. Hilton was alleged to have violated and were treated more favorably, including but not limited to, Officer Anthony Castillo.

## COUNT I

### FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADAAA
*(Against Defendant City of Marietta)*

69. Plaintiff incorporates by reference paragraphs 1 through 70 as set forth in this Complaint as though fully and completely set forth herein.

70. At all relevant times, Defendant has been subject to the requirements of Title I of the Americans with Disabilities Act as amended by the ADAAA.

71. At all times relevant, Plaintiff was an individual with a disability as

defined under the ADAAA, 42 U.S.C. § 12102(1), inasmuch as she had physical or mental impairment that substantially limited one or more major life activities, she had a record of such impairments, and she was regarded as a person with such impairments.

72. At all relevant times, Mr. Jones has been a qualified individual with a disability as that term is defined by 42 U.S.C. § 12111(8), and able to perform the essential functions of her job with or without a reasonable accommodation.

73. Defendant intentionally discriminated against Plaintiff by failing and refusing to accommodate her requests for reasonable accommodation.

74. Defendant's actions amount to a violation of 42 U.S.C. § 12112(a)-(b)(5)(A), which prohibits discrimination on the basis of disability in the form of not making reasonable accommodations for disabilities.

75. As a direct and proximate result of Defendant's intentional discrimination and failure and refusal to accommodate Plaintiff, she has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including social security, all in an amount to be established at trial.

76. Defendant's actions have caused and will continue to cause Plaintiff to suffer damages for emotional distress, mental anguish, loss of enjoyment of

life, and other non-pecuniary losses all in an amount to be established at trial.

77.  Defendant's actions were undertaken intentionally, willfully, and maliciously with respect to, or with reckless disregard for, Plaintiff's federally protected rights, and she is therefore entitled to punitive damages.

78.  Plaintiff is entitled to be reinstated to employment by Defendant, and, if reinstatement is not feasible, he is entitled to an award of damages for future lost wages and benefits of employment.

## COUNT II

**DISABILITY DISCRIMINATION IN VIOLATION OF THE ADAAA**
*(Against Defendant City of Marietta)*

79.  Plaintiff incorporates by paragraphs 1 through 70 set forth in this Complaint as though fully and completely set forth herein.

80.  At all relevant times, Defendant has been subject to the requirements of Title I of the Americans with Disabilities Act as amended by the ADAAA.

81.  At all times relevant, Plaintiff was an individual with a disability as defined by the ADAAA, 42 U.S.C. § 12102(1), inasmuch as she had mental and physical impairments that substantially limited one or more major life activities, she had a record of such impairments, and she was regarded as a person with such impairments.

82.  At all relevant times, Plaintiff was a qualified individual with a

disability as that term is defined by 42 U.S.C. § 12111(8), and she was able to perform the essential functions of her job with or without a reasonable accommodation.

83. Defendant intentionally discriminated against Plaintiff by subjecting her to adverse employment actions including, but not limited to, the denial of a requested reasonable accommodation and the termination of her employment, because of her disabilities.

84. Defendant City of Marietta violated Plaintiff's rights under the ADAAA, 42 U.S.C. § 12112, by discriminating against her on the basis of her disabilities.

85. As a direct and proximate result of Defendant's intentional discrimination, Plaintiff has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job related benefits, including social security, all in an amount to be established at trial.

86. Defendant's actions have caused and will continue to cause Plaintiff to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, all in an amount to be established at trial.

87. Defendant's actions were undertaken intentionally, willfully, and

maliciously with respect to, or with reckless disregard for, Plaintiff's federally protected rights, and she is therefore entitled to punitive damages.

88. Plaintiff is entitled to be reinstated to employment by Defendant, and, if reinstatement is not feasible, she is entitled to an award of damages for future lost wages and benefits of employment.

## COUNT III

**SEX DISCRIMINATION IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT**
**(Actionable under 42 U.S.C. 1983)**
*(Against all Defendants)*

89. Plaintiff incorporates paragraphs 1 through 70 of the Complaint.

90. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution entitles Plaintiff to equal protection under the laws.

91. Defendants violated Plaintiff's rights to equal protection by, among other things, knowingly and intentionally terminating her employment and altering the terms and conditions of her employment on the basis of her sex, which adversely affected her compensation, and otherwise discriminating against her because of her sex.

92. Defendants' conduct constitutes unlawful sex discrimination based on sex in violation of the Equal Protection Clause of the Fourteenth Amendment

to the United States Constitution.

93. Defendants undertook all of the unlawful conduct giving rise to Plaintiff's claims while acting under color of state and local law.

94. The unlawful conduct of Defendants violated clearly established law.

95. As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages including lost wages and other benefits of employment, emotional distress, inconvenience, humiliation, damage to her career, and other indignities.

96. Defendants undertook their unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages against Defendant Flynn.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demand a **TRIAL BY JURY** and that the following relief be granted:

a. A declaratory judgment that Defendants violated the Equal Protection Clause and that Defendant City of Marietta violated the ADA;

b. Full back pay and all fringe and pension benefits, including but not limited to bonuses, raises, vacation time, paid time off, and the like, which Plaintiff would have received but for the unlawful discrimination perpetrated by

Defendants, with prejudgment interest;

  c. Compensatory damages in an amount to be determined by a jury for Plaintiff's emotional distress,

  d. Punitive damages in an amount to be determined by a jury;

  e. Reasonable attorney's fees and expenses of litigation;

  f. Prejudgment interest at the rate allowed by law;

  h. Injunctive relief prohibiting Defendant from further unlawful conduct of the type described herein; and

  i. Any other relief this Court deems proper and just.

Respectfully submitted this 28th day of June, 2023.

        BEAL SUTHERLAND BERLIN & BROWN

        <u>*s/Rachel Berlin Benjamin*</u>
        Rachel Berlin Benjamin
        Georgia Bar No. 707419
        rachel@beal.law
        Brian J. Sutherland
        Georgia Bar No. 105408
        brian@beal.law
        945 East Paces Ferry Road
        Suite 2000
        Atlanta, Georgia 30326

        *Attorney for Plaintiff*