IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ASCOT INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action File No.: |
| | ) | 1:22-cv-04064 |
| WESLEY KENSINGTON PARTNERS I, | ) | |
| LLC; WESLEY KENSINGTON | ) | |
| PARTNERS II, LLC; WESLEY KENSINGTON | ) | |
| PARTNERS, LLC; AVILA REAL ESTATE, | ) | |
| LLC; ADRIANNE HARDY, as | ) | |
| ADMINISTRATOR OF THE ESTATE OF | ) | |
| MICHAEL LAMAR WRIGHT and as PARENT | ) | |
| OF MINORS A.W.; and CLEATONYA | ) | |
| BRITTION as CONSERVATOR OF | ) | |
| MINOR M.W., | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Ascot Insurance Company ("Ascot"), Plaintiff in the above-styled action, hereby files this Amended Complaint for Declaratory Judgment, showing the Court as follows:

## PRELIMINARY STATEMENT

This action is brought pursuant to 28 U.S.C. § 2201, 28 U.S.C. § 2202, and Rule 57 of the FEDERAL RULES OF CIVIL PROCEDURE, seeking declaratory judgment as to the rights and other legal obligations of the interested parties identified herein

regarding issues of actual controversy. Ascot seeks a judgment declaring that it does not owe liability insurance coverage to Wesley Kensington Partners I, LLC or Wesley Kensington Partners II, LLC (collectively "WKP I & II") under policy no.: DSXS2010001763-01 (the "Policy") (a certified copy of the Policy is attached hereto as **Exhibit 1**) for the claims alleged and damages sought by the Estate of Michael Lamar Wright (the "Wright Estate") against WKP I & II ("Underlying Claims"), because WKP I & II breached their duties of notification and cooperation under the Policy.

## AMENDED PRELIMINARY STATEMENT

After this Complaint for Declaratory Judgment was originally filed, on October 19, 2022, a lawsuit arising out of the same facts as the Underlying Claims was filed on behalf of Mr. Wright's surviving minor children in the State Court of DeKalb County, State of Georgia by Defendant Adrianne Hardy, as Parent of Minors A.W., and Cleatonya Brittion, as Conservator of Minor M.W., Civil Action File No. 22A04071 (the "Underlying Lawsuit") (a true and correct copy of the Complaint in the Underlying Lawsuit is attached as **Exhibit 2**). Named as Defendants in the Lawsuit are Wesley Kensington Partners, LLC; Avila Real Estate, LLC; and Elisha Wright. Both Wesley Kensington Partners, LLC ("WKP LLC") and Avila Real Estate, LLC ("Avila") are allegedly affiliated with WKP I & II, but neither are

2

named insureds under the Policy. (Elisha Wright has no connection to WKP I & II and no interest in this lawsuit.) The purposes of this Amended Complaint are (1) to address the existence and significance of the Underlying Lawsuit; (2) seek a declaratory judgment of what rights, if any, WKP LLC and Avila have under the Policy; and (3) to add as parties to this Action the relevant parties to the Underlying Lawsuit, specifically WKP LLC; Avila; and Cleatonya Brittion, as Conservator of Minor M.W.[1]

## **JURISDICTION**

1.

Ascot brings this action for declaratory judgment pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202 for a declaration of the rights and other legal relations of the interested parties identified herein regarding issues of actual controversy.

2.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship between the parties and that the matter in controversy exceeds the sum or value of $75,000.

---

[1] The caption has been amended to include these new defendants, and to modify the role of Adrianne Hardy as Administrator of the Estate of Michael Lamar Wright and as Parent of Minors A.W.

3.

There is an actual case and controversy concerning Ascot's coverage obligations, if any, for the claims and damages alleged in the Underlying Claims and the Underlying Lawsuit such that this Court may declare rights and obligations of the parties under 28 U.S.C. § 2201 and Rule 57 of the FEDERAL RULES OF CIVIL PROCEDURE.

4.

The issues in controversy in this action should be determined under the laws of the State of Georgia as the Policy at issue was contracted for, delivered in, and understood by the parties thereto to be controlled by the laws of the State of Georgia. Further, the incident giving rise to the Underlying Claims occurred in the State of Georgia and the Underlying Lawsuit is pending in the State of Georgia.

5.

This Court has personal jurisdiction over all Defendants.

## **VENUE**

6.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because at least one of the Defendants resides in this judicial district and the events giving rise to the Underlying Claims and this Complaint occurred in this judicial district.

## **PARTIES**

7.

The Plaintiff, Ascot, is a foreign insurance company incorporated in the State of Colorado with its principal place of business located at 55 West 46th Street, Floor 26, New York, NY 10036. Ascot is authorized to transact business in the State of Georgia.

8.

Based on best information and belief, Defendants WKP I & II are limited liability companies located and operating in Fulton County, Georgia. The WKP I & II entities have principal places of business located at 1010 Huntcliff, Suite 2315, Atlanta, Georgia 30350. Upon information and belief, all members of the WKP I & II entities are citizens of Georgia. WKP I & II may be served through their registered agent, Michael P. Kornheiser, 6400 Powers Ferry Road, Suite 150, Atlanta, Georgia 30339.

9.

WKP LLC is a Georgia Limited Liability Company with its principal place of business at 1010 Huntcliff, Suite 2315, Atlanta, Georgia 30350. WKP LLC may be served through its registered agent, Michael P. Kornheiser, 6400 Powers Ferry Road,

Suite 150, Atlanta, Georgia 30339. Upon information and belief, all members of WKP LLC are citizens of Georgia.

10.

Avila is a Georgia Limited Liability Company with its principal place of business at 1010 Huntcliff, Suite 2315, Atlanta, Georgia 30350. Avila may be served through its registered agent, Michael P. Kornheiser, 6400 Powers Ferry Road, Suite 150, Atlanta, Georgia 30339. Upon information and belief, all members of Avila are citizens of Georgia.

11.

Defendant Adrianne Hardy, as the Administrator of the Estate of Michael Lamar Wright and as Parent of Minors A.W., is deemed to be a citizen of the state in which the deceased was a citizen at the time of his death. At the time of his death, Michael Lamar Wright was a resident of Decatur, DeKalb County, Georgia. Ms. Hardy is the parent of two of Mr. Wright's minor children.

12.

Cleatonya Brittion is a citizen of the State of Georgia. According to the Complaint filed in the Underlying Lawsuit, Ms. Brittion was appointed as conservator for one of Mr. Wright's minor children by the DeKalb County, Georgia, Probate Court.

13.

Each Defendant has been joined in this declaratory judgment action in order to involve all individuals or entities who have an interest in the outcome of the coverage issues to be decided in this declaratory judgment action.

## FACTUAL ALLEGATIONS

### THE UNDERLYING CLAIM

14.

On or about December 14, 2020, Michael Lamar Wright was allegedly fatally shot on the premises of the Wesley Kensington apartment complex located at 100 Wesley Kensington Circle, Lithonia, Georgia 30038.

15.

Based on the allegations set forth in the Wright Estate's September 12, 2022, Settlement Demand, it appeared that the Wright Estate claimed that WKP I & II are the at fault parties in failing to exercise ordinary care in inspecting and keeping its premises in a safe condition and, therefore, are liable for the death of Michael Lamar Wright.

16.

The Underlying Lawsuit filed on behalf of Mr. Wright's surviving children sets forth allegations consistent with those in the Settlement Demand, but names

WKP LLC and Avila as the allegedly culpable defendants. WKP I & II are not named as defendants in the Underlying Lawsuit.

17.

Based on best information and belief, a defense is currently being provided to WKP LLC and/or Avila by Ohio Security Insurance Company, their primary insurance carrier. However, Ohio Security has reserved its rights to pay its policy limits and, potentially, withdraw its defense at any time. Should Ohio Security withdraw the defense based on an exhaustion of its policy limits, the duty to defend would pass to Ascot as the excess insurance carrier, assuming there is coverage, which is contested by Ascot through this action, and assuming that WKP LLC and/or Avila is/are insureds under the Policy, which is also contested by Ascot in this action.

### THE POLICY

18.

Ascot issued the Policy to WKP I & II, including in pertinent part commercial excess liability coverage, effective October 1, 2020, to October 1, 2021. WKP I & II are the only named insureds under the policy. Neither WKP LLC nor Avila are named insureds.

19.

The **Commercial Excess Liability Coverage Form** of the Policy provides, in pertinent part:

## SECTION I – COVERAGES

### 1. Insuring Agreement

**a.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "injury or damage" to which insurance provided under this Coverage Part applies. We will have the right and duty to defend the insured against any suit seeking damages for such "injury or damage" when the applicable limits of "controlling underlying insurance" have been exhausted in accordance with the provisions of such "controlling underlying insurance".

\* \* \*

20.

**Section IV – Definitions** of the Policy provides, in pertinent part:

1. "Controlling underlying insurance" means any policy of insurance or self-insurance listed in the Declarations under the Schedule of "controlling underlying insurance".

9

2.    "Controlling underlying insurer" means any insurer who provides any policy of insurance listed in the Declarations under the Schedule of "controlling underlying insurance".

* * *

5.    "Retained limit" means the available limits of "controlling underlying insurance" applicable to the claim.

6.    "Ultimate net loss" means the total sum, after reduction for recoveries, or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of:

a.    Settlements, judgments, binding arbitration; or

b.    Other binding alternate dispute resolution proceeding entered into with our consent.

"Ultimate net loss" includes defense expenses if the "controlling underlying insurance" specifies that limits are reduced by defense expenses.

* * *

21.

The Schedule of Underlying insurance in the Declarations of the Policy lists, in pertinent part:

10

General Liability

Company: Ohio Security Insurance Company

Policy Number: 61992051

Policy Period: 10/1/2020 - 10/1/2021

Limits of Insurance:

Each Occurrence: $1,000,000.00

Products-completed Operations Aggregate: $2,000,000.00

General Aggregate: $2,000,000.00

***

General Liability

Company: Ohio Security Insurance Company

Policy No.: 61908926

Policy Period: 10/1/2020 - 10/1/2021

Limited of Insurance:

Each Occurrence:  $1,000,000.00

* * *

22.

The Policy also includes the following conditions to coverage under the Policy, as amended in pertinent part by the **GEORGIA CHANGES** endorsement to the Policy:

**SECTION III – CONDITIONS**

The following conditions apply. In addition, the conditions applicable to any "controlling underlying insurance" are also applicable to the coverage provided under this insurance unless superseded by the following conditions.

\*\*\*

**3. Duties In The Event Of An Event, Claim Or Suit[2]**

 a. In the event of an "event", claim or suit, we or our representative must receive prompt notice of the "event". Include:

  (1) How, when and where the "event" occurred;

  (2) The insured's name and address; and

  (3) To the extent possible, the names and addresses of any injured persons and witnesses.

---

[2] As amended by the **GEORGIA CHANGES** endorsement (form CX 01 19 02 15).

12

The requirement for giving notice of a claim, if not satisfied by the insured within 30 days of the date of the "event", may be satisfied by an injured third party who, as the result of such "event", has a claim against the insured. However, in this event, notice of a claim given by an injured third party must be mailed to us.

***

**11. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

    **a.**    To join us as a party or otherwise bring us into a suit asking for damages from an insured; or

    **b.**    To sue us on this Coverage Part unless all of its terms have been fully complied with.

***

23.

Relevant to the Policy conditions above, the Policy provides the following definition of "Event":

13

## SECTION IV – DEFINITIONS

***

**3.** "Event" means an occurrence, offense, accident, act, or other event, to which the applicable "controlling underlying insurance" applies.

***

**WKP I & II's Breaches of Duties and Conditions To Coverage Under the Policy**

24.

Michael Lamar Wright was fatally shot on December 14, 2020.

25.

Following the shooting, WKP I & II and/or WKP LLC and/or Avila (collectively, the "Alleged Insureds") notified their "controlling underlying insurer" Ohio Security Insurance Company – owned by Liberty Mutual Insurance Company – of the "event" on or about December 20, 2020.

26.

The "controlling underlying insurance," Ohio Security Insurance Company policy no. 61908926 and policy no. 61992051, applies to the subject shooting event occurring on or about December 20, 2020.

27.

Despite notifying its "controlling underlying insurer," the Alleged Insureds failed to promptly notify Ascot of the "event."

28.

The Alleged Insureds did not notify Ascot of the "event" until July 12, 2022, more than eighteen months after the fatal shooting. Specifically, prior to July 12, 2022, the Alleged Insureds never provided Ascot information as to how, when, or where the accident or "occurrence" took place, the names and addresses of any injured persons or witnesses, or the nature or location of any injury or damage arising out of the accident or "occurrence."

29.

On September 12, 2022, the Wright Estate issued a settlement demand to Ascot, demanding that Ascot pay its full policy limits under the Policy to resolve the Wright Estate's claims for damages arising from the December 14, 2020 shooting.

30.

On or about September 15, 2022, Defendant Hardy, as Administrator of the Wright Estate, and in consideration for the sum of $1,000,000.00, executed a Limited Release, pursuant to O.C.G.A. § 33-24-41.1, fully releasing WKP I & II's "controlling underlying insurer" with regard to policy no.: 61908926, from all

liability for any of the Wright Estate's claims based on the death of Michael Lamar Wright, and providing a limited release to WKP I & II from any and all of the Wright Estate's claims relating to the death of Michael Lamar Wright, except to the extent other insurance is available which covers the Wright Estate's claim or claims against WKP I & II.

31.

The Wright Estate's settlement demand asserts that if Ascot does not pay the demand in full, and should judgment be rendered in favor the Wright Estate, that the Wright Estate intends to seek bad faith penalty damages against Ascot.

**THE UNDERLYING LAWSUIT**

32.

On October 19, 2022, Defendant Hardy[3] and Defendant Britton filed the Underlying Lawsuit on behalf of Mr. Wright's surviving minor children, naming WKP LLC and Avila as Defendants. WKP I & II were not named as Defendants.

33.

The Underlying Lawsuit is based on the same factual predicate as the Wright Estate's Settlement Demand.

---

[3] Adrianne Hardy was named "as Parent of Minors A.W." rather than as Administrator of the Wright Estate.

16

34.

Ohio Security Insurance Company, the issuer of the "controlling underlying insurance," has agreed to defend WKP LLC and Avila pursuant to its policy no. 61992051, under a reservation of rights, but explicitly asserted a right to pay its policy limit and withdraw its defense.

## CLAIM FOR DECLARATORY RELIEF

35.

Ascot incorporates by reference the allegations set forth in paragraphs 1-34 above.

36.

An actual controversy now exists between Ascot and the Alleged Insureds with respect to whether the Policy provides coverage for the Wright Estate's and the surviving minor childrens' claims and damages asserted against the Alleged Insureds, arising out of the December 14, 2020, shooting and death of Michael Lamar Wright.

37.

Further, Ascot is currently faced with a demand to make payment for the full limits of liability coverage under the Policy or face potential bad faith claims and damages.

38.

It is Ascot's belief that the Alleged Insureds have breached their duties and conditions to coverage under the Policy with respect to the Wright Estate's and the surviving minor childrens' claims, including breach of its duty to promptly notify Ascot of the shooting "event" giving rise to such claims.

39.

Based on the facts set forth above and the terms and conditions set forth in the Policy, Ascot seeks a declaration that the Alleged Insureds have breached their duties and conditions to notify Ascot of the "event" under the Policy and that, as a result, Ascot does not have any duty or obligation under the Policy to provide coverage to the Alleged Insureds for the claims and damages alleged and demanded by the Wright Estate and Mr. Wright's surviving minor children.

40.

Based on the facts set forth above and the terms and conditions set forth in the Policy, Ascot seeks a declaration that it does not owe the Alleged Insureds a defense with respect to the Wright Estate's claims, the Underlying Lawsuit, or any subsequent lawsuit asserting claims based upon the December 14, 2020, shooting death of Michael Lamar Wright.

41.

Based on the facts set forth above and the terms and conditions set forth in the Policy, Ascot seeks a declaration that it is not obligated under the Policy to indemnify the Alleged Insureds for any award of damages which may be entered against the Alleged Insureds based upon or arising out of the December 14, 2020, shooting death of Michael Lamar Wright.

42.

In addition, neither WKP LLC nor Avila are named insureds under the Policy. Ascot seeks a declaration as to what duty, if any, it owes to these two entities.

43.

A genuine dispute exists regarding the coverage issues set forth above and a declaratory judgement is necessary to clarify this uncertainty. Ascot has issued a reservation of rights to the Alleged Insureds and faces potential exposure to a bad faith penalty as a result of the Wright Estate's Settlement Demand. Accordingly, there is such immediacy of choice imposed upon Ascot at this time to justify an adjudication by declaratory judgment. *See Richmond v. Ga. Farm Bureau Mut. Ins. Co.*, 140 Ga. App. 215, 217 (1976).

44.

As set forth above, Ascot believes that the Alleged Insureds failed to promptly notify it of an "event," claim, or suit. Therefore, Ascot believes that the Alleged Insureds have breached their duties under the Policy and failed to satisfy conditions precedent to coverage under the Policy. Accordingly, Ascot seeks a declaration as to its obligations under the Policy with respect to the claims and damages asserted by the Wright Estate and Mr. Wright's surviving minor children as a result of the December 14, 2020 shooting death of Michael Lamar Wright, including, without limitation, the Underlying Lawsuit, and without such declaration Ascot faces exposure for indemnity for potential damages awarded against the Alleged Insureds and potential bad faith penalties with respect to the Wright Estate's Settlement Demand.

## **PRAYER FOR RELIEF**

WHEREFORE, Ascot respectfully requests that this Court:

a.     Issue a judgment declaring that the Alleged Insureds have breached their duty to promptly notify and provide information to Ascot of the "event" and that Ascot is, therefore, not obligated to defend, indemnify, or otherwise provide coverage to the Alleged Insureds for the claim and damages alleged by the Wright Estate or Mr. Wright's surviving minor children arising out of or related to the

shooting death of Michael Lamar Wright due to such breach of the Alleged Insureds' duties under the Policy, which are conditions precedent to coverage.

    b.    Issue a judgment declaring that WKP LLC and Avila are not entitled to coverage under the Policy for the additional reason that they are not insureds under the policy.

    c.    Grant such further and necessary relief as the Court deems just and proper pursuant to 28 U.S.C. § 2202.

    Respectfully submitted, this _22nd_ day of December 2022.

**STITES & HARBISON, PLLC**

_/s/ Derrick L. Bingham_
Derrick L. Bingham
Georgia Bar No. 141217
Julie R. Comer
Georgia Bar No.: 380547

_Attorneys for Plaintiff Ascot Insurance Company_

303 Peachtree Street, N.E.
Suite 2800
Atlanta, Georgia 30308
Telephone: 404-739-8888
DBingham@stites.com
JComer@stites.com

# EXHIBIT 1





Ascot Insurance Company
55 West 46th Street, 26th Floor
New York, NY 10036
T: +1 646 356 8101
ascotgroup.com

October 10, 2022

Re:     Certified Copy of Insurance Policy
        Writing Company:     Ascot Insurance Company
        Insured:             Wesley Kensington Partners I, LLC
                            Wesley Kensington Partners II, LLC
        Insured Mailing Address: 100 Wesley Kensington Cir.
                            Stonecrest, GA  30038
        Policy Number:       DSXS2010001763-01
        Policy Period:        From:   October 1, 2020
                            To:       October 1, 2021

Attached herewith is a copy of the above-captioned insurance policy.  The attached policy is certified as complete and accurate to the best of our knowledge.

Best regards,

Jeff Sipos,
General Counsel and Secretary

Enclosures

POLICY NUMBER:DSXS2010001763-01

COMMERCIAL EXCESS LIABILITY
CX DS AIC 1 07 19

# COMMERCIAL EXCESS LIABILITY DECLARATIONS

| | |
|---|---|
| **Company Name:** | Ascot Insurance Company (Admitted) |
| **Producer Name:** | All Risks, LTD. |
| **Named Insured(s):** | Wesley Kensington Partners I LLC; Wesley Kensington Partners II LLC |
| **Mailing Address:** | 100 Wesley Kensington Cir<br>Stonecrest, GA 30038 |
| **Policy Period** | |
| **From:** 10/1/2020 | |
| **To:** 10/1/2021 | At 12:01 AM (Standard Time at your mailing address shown above) |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE TO PROVIDE YOU WITH THE INSURANCE AS STATED IN THIS POLICY.**

| Excess Policy – Limits Of Insurance | |
|---|---|
| **Each Occurrence Limit** | $5,000,000.00 |
| **Aggregate Limit** | $5,000,000.00 |
| **Product Completed Operations:** | $5,000,000.00 |

| Excess Policy – Premium | | | |
|---|---|---|---|
| **Premium (including premium subject to audit)** | | | |
| **Audit Period (If Applicable)** | ☐ **Annually** | ☐ **Semiannually** | ☐ **Quarterly** ☐ **Monthly** |

| Endorsements Attached To The Excess Policy |
|---|
| CX DS AIC 1 07 19  Dec Page AIC |
| CX 00 01 04 13  COMMERCIAL EXCESS LIABILITY COVERAGE FORM |
| CX 01 19 02 15  GEORGIA CHANGES |
| CX 21 02 04 13  TOTAL POLLUTION EXCLUSION |
| CX 21 13 04 13  EXCLUSION - FUNGI OR BACTERIA |
| CX 21 16 04 13  EXCLUSION - SILICA OR SILICA-RELATED DUST |
| CX 21 19 04 13  EXCLUSION - EMPLOYMENT-RELATED PRACTICES |
| CX 21 17 04 13  Exclusion - Communicable Disease |
| CX 21 20 04 13  EXCLUSION - PROFESSIONAL SERVICES |
| IL N 001 09 03  FRAUD STATEMENT |
| IL N 159 01 08  GEORGIA UNINSURED MOTORISTS COVERAGE NOTICE ACKNOWLEDGMENT |
| IL P 001 01 04  U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS |
| IL 09 85 01 15  DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT |
| CX 90 07 07 19  Electronic Data - Cyber Exclusion |
| CX 90 09 07 19  Prior & Pending Litigation Exclusion |
| CX 90 08 07 19  Care, Custody or Control Exclusion |
| IL PN 10 01 01 19  NAIC Terrorism Selection / Rejection & Quote Disclosure |
| CX 90 03 07 19  Asbestos Exclusion |
| CX 90 02 07 19  Lead Exclusion |
| CX 90 01 07 19  Occupational Disease Exclusion |
| CX 90 15 07 19  Exclusion - Designated Construction Work |
| CX 90 16 07 19  Enhanced Coverage Endorsement |
| CX 21 30 01 15  CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| AIC SP 01 01 19  ASCOT SIGNATURE PAGE |

**SCHEDULE OF UNDERLYING:**

Hired And Non Owned Auto Liability

    Company: Ohio Security Insurance Company

    Policy Number: 61992051

    Policy Period: 10/1/2020 - 10/1/2021

    Limits of Insurance:

     Combined Single Limit:                $1,000,000.00

General Liability

    Company: Ohio Security Insurance Company

    Policy Number: 61992051

    Policy Period: 10/1/2020 - 10/1/2021

    Limits of Insurance:

Each Occurrence: $1,000,000.00

Products-completed Operations Aggregate: $2,000,000.00

General Aggregate: $2,000,000.00

Hired And Non Owned Auto Liability

Company: Ohio Security Insurance Company

Policy Number: 61908926

Policy Period: 10/1/2020 - 10/1/2021

Limits of Insurance:

Combined Single Limit: $1,000,000.00

General Liability

Company: Ohio Security Insurance Company1

Policy Number: 61908926

Policy Period: 10/1/2020 - 10/1/2021

Limits of Insurance:

Each Occurrence: $1,000,000.00

Products-completed Operations Aggregate: $2,000,000.00

General Aggregate: $2,000,000.00

# COMMERCIAL EXCESS LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance. The word "insured" means any person or organization qualifying as such under the "controlling underlying insurance".

Other words and phrases that appear in quotation marks in this Coverage Part have special meaning. Refer to Section **IV** – Definitions. Other words and phrases that are not defined under this Coverage Part but defined in the "controlling underlying insurance" will have the meaning described in the policy of "controlling underlying insurance".

The insurance provided under this Coverage Part will follow the same provisions, exclusions and limitations that are contained in the applicable "controlling underlying insurance", unless otherwise directed by this insurance. To the extent such provisions differ or conflict, the provisions of this Coverage Part will apply. However, the coverage provided under this Coverage Part will not be broader than that provided by the applicable "controlling underlying insurance".

There may be more than one "controlling underlying insurance" listed in the Declarations and provisions in those policies conflict, and which are not superseded by the provisions of this Coverage Part. In such a case, the provisions, exclusions and limitations of the "controlling underlying insurance" applicable to the particular "event" for which a claim is made or suit is brought will apply.

## SECTION I – COVERAGES

**1. Insuring Agreement**

**a.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "injury or damage" to which insurance provided under this Coverage Part applies.

We will have the right and duty to defend the insured against any suit seeking damages for such "injury or damage" when the applicable limits of "controlling underlying insurance" have been exhausted in accordance with the provisions of such "controlling underlying insurance".

When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other suit seeking damages for "injury or damage".

However, we will have no duty to defend the insured against any suit seeking damages for which insurance under this policy does not apply.

At our discretion, we may investigate any "event" that may involve this insurance and settle any resultant claim or suit, for which we have the duty to defend.

But:

**(1)** The amount we will pay for "ultimate net loss" is limited as described in Section **II** – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under this Coverage Part. However, if the policy of "controlling underlying insurance" specifies that limits are reduced by defense expenses, our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of defense expenses, judgments or settlements under this Coverage Part.

**b.** This insurance applies to "injury or damage" that is subject to an applicable "retained limit". If any other limit, such as, a sublimit, is specified in the "controlling underlying insurance", this insurance does not apply to "injury or damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "controlling underlying insurance".

**c.** If the "controlling underlying insurance" requires, for a particular claim, that the "injury or damage" occur during its policy period in order for that coverage to apply, then this insurance will only apply to that "injury or damage" if it occurs during the policy period of this Coverage Part. If the "controlling underlying insurance" requires that the "event" causing the particular "injury or damage" takes place during its policy period in order for that coverage to apply, then this insurance will apply to the claim only if the "event" causing that "injury or damage" takes place during the policy period of this Coverage Part.

 © Insurance Services Office, Inc., 2012

**d.** Any additional insured under any policy of "controlling underlying insurance" will automatically be an additional insured under this insurance. If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance required by the contract, less any amounts payable by any "controlling underlying insurance".

Additional insured coverage provided by this insurance will not be broader than coverage provided by the "controlling underlying insurance".

## 2. Exclusions

The following exclusions, and any other exclusions added by endorsement, apply to this Coverage Part. In addition, the exclusions applicable to any "controlling underlying insurance" apply to this insurance unless superseded by the following exclusions, or superseded by any other exclusions added by endorsement to this Coverage Part.

Insurance provided under this Coverage Part does not apply to:

### a. Medical Payments

Medical payments coverage or expenses that are provided without regard to fault, whether or not provided by the applicable "controlling underlying insurance".

### b. Auto

Any loss, cost or expense payable under or resulting from any of the following auto coverages:

**(1)** First-party physical damage coverage;

**(2)** No-fault coverage;

**(3)** Personal injury protection or auto medical payments coverage; or

**(4)** Uninsured or underinsured motorists coverage.

### c. Pollution

**(1)** "Injury or damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, pollutants.

This exclusion does not apply to the extent that valid "controlling underlying insurance" for the pollution liability risks described above exists or would have existed but for the exhaustion of underlying limits for "injury or damage".

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

## SECTION II – LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations, and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or suits brought, or number of vehicles involved;

**c.** Persons or organizations making claims or bringing suits; or

**d.** Limits available under any "controlling underlying insurance".

**2.** The Limits of Insurance of this Coverage Part will apply as follows:

**a.** This insurance only applies in excess of the "retained limit".

**b.** The Aggregate Limit is the most we will pay for the sum of all "ultimate net loss", for all "injury or damage" covered under this Coverage Part.

However, this Aggregate Limit only applies to "injury or damage" that is subject to an aggregate limit of insurance under the "controlling underlying insurance".

**c.** Subject to Paragraph **2.b.** above, the Each Occurrence Limit is the most we will pay for the sum of all "ultimate net loss" under this insurance because of all "injury or damage" arising out of any one "event".

**d.** If the Limits of Insurance of the "controlling underlying insurance" are reduced by defense expenses by the terms of that policy, any payments for defense expenses we make will reduce our applicable Limits of Insurance in the same manner.

© Insurance Services Office, Inc., 2012

**3.** If any "controlling underlying insurance" has a policy period that is different from the policy period of this Coverage Part then, for the purposes of this insurance, the "retained limit" will only be reduced or exhausted by payments made for "injury or damage" covered under this insurance.

The Aggregate Limit of this Coverage Part applies separately to each consecutive annual period of this Coverage Part and to any remaining period of this Coverage Part of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION III – CONDITIONS

The following conditions apply. In addition, the conditions applicable to any "controlling underlying insurance" are also applicable to the coverage provided under this insurance unless superseded by the following conditions.

**1. Appeals**

If the "controlling underlying insurer" or insured elects not to appeal a judgment in excess of the amount of the "retained limit", we may do so at our own expense. We will also pay for taxable court costs, pre- and postjudgment interest and disbursements associated with such appeal. In no event will this provision increase our liability beyond the applicable Limits of Insurance described in Section **II** – Limits Of Insurance.

**2. Bankruptcy**

**a. Bankruptcy Of Insured**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**b. Bankruptcy Of Controlling Underlying Insurer**

Bankruptcy or insolvency of the "controlling underlying insurer" will not relieve us of our obligations under this Coverage Part.

However, insurance provided under this Coverage Part will not replace any "controlling underlying insurance" in the event of bankruptcy or insolvency of the "controlling underlying insurer". The insurance provided under this Coverage Part will apply as if the "controlling underlying insurance" were in full effect and recoverable.

**3. Duties In The Event Of An Event, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "event", regardless of the amount, which may result in a claim under this insurance. To the extent possible, notice should include:

**(1)** How, when and where the "event" took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any "injury or damage" arising out of the "event".

**b.** If a claim is made or suit is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or suit and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or suit as soon as practicable.

**c.** You and any other insured involved must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the suit; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "injury or damage" to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**4. First Named Insured Duties**

The first Named Insured is the person or organization first named in the Declarations and is responsible for the payment of all premiums. The first Named Insured will act on behalf of all other Named Insureds for giving and receiving of notice of cancellation or the receipt of any return premium that may become payable.

At our request, the first Named Insured will furnish us, as soon as practicable, with a complete copy of any "controlling underlying insurance" and any subsequently issued endorsements or policies which may in any way affect the insurance provided under this Coverage Part.

**5. Cancellation**

**a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**b.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**c.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**d.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**6. Changes**

This Coverage Part contains all the agreements between you and us concerning the insurance afforded. The first Named Insured is authorized by all other insureds to make changes in the terms of this Coverage Part with our consent. This Coverage Part's terms can be amended or waived only by endorsement.

**7. Maintenance Of/Changes To Controlling Underlying Insurance**

Any "controlling underlying insurance" must be maintained in full effect without reduction of coverage or limits except for the reduction of aggregate limits in accordance with the provisions of such "controlling underlying insurance" that results from "injury or damage" to which this insurance applies.

Such exhaustion or reduction is not a failure to maintain "controlling underlying insurance". Failure to maintain "controlling underlying insurance" will not invalidate insurance provided under this Coverage Part, but insurance provided under this Coverage Part will apply as if the "controlling underlying insurance" were in full effect.

The first Named Insured must notify us in writing, as soon as practicable, if any "controlling underlying insurance" is cancelled, not renewed, replaced or otherwise terminated, or if the limits or scope of coverage of any "controlling underlying insurance" is changed.

**8. Other Insurance**

**a.** This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

When this insurance is excess, if no other insurer defends, we may undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**b.** When this insurance is excess over other insurance, we will pay only our share of the "ultimate net loss" that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of the insurance provided under this Coverage Part; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

**9. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** If this policy is auditable, the premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period, we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit premium is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

 © Insurance Services Office, Inc., 2012 **CX 00 01 04 13**

**10. Loss Payable**

Liability under this Coverage Part does not apply to a given claim unless and until:

**a.** The insured or insured's "controlling underlying insurer" has become obligated to pay the "retained limit"; and

**b.** The obligation of the insured to pay the "ultimate net loss" in excess of the "retained limit" has been determined by a final settlement or judgment or written agreement among the insured, claimant, "controlling underlying insurer" (or a representative of one or more of these) and us.

**11. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a suit asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured, "controlling underlying insurer" and the claimant or the claimant's legal representative.

**12. Transfer Of Defense**

**a. Defense Transferred To Us**

When the limits of "controlling underlying insurance" have been exhausted, in accordance with the provisions of "controlling underlying insurance", we may elect to have the defense transferred to us. We will cooperate in the transfer of control to us of any outstanding claims or suits seeking damages to which this insurance applies and which would have been covered by the "controlling underlying insurance" had the applicable limit not been exhausted.

**b. Defense Transferred By Us**

When our limits of insurance have been exhausted our duty to provide a defense will cease.

We will cooperate in the transfer of control of defense to any insurer specifically written as excess over this Coverage Part of any outstanding claims or suits seeking damages to which this insurance applies and which would have been covered by the "controlling underlying insurance" had the applicable limit not been exhausted.

In the event that there is no insurance written as excess over this Coverage Part, we will cooperate in the transfer of control to the insured and its designated representative.

**13. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION IV – DEFINITIONS**

The definitions applicable to any "controlling underlying insurance" also apply to this insurance. In addition, the following definitions apply.

**1.** "Controlling underlying insurance" means any policy of insurance or self-insurance listed in the Declarations under the Schedule of "controlling underlying insurance".

**2.** "Controlling underlying insurer" means any insurer who provides any policy of insurance listed in the Declarations under the Schedule of "controlling underlying insurance".

**3.** "Event" means an occurrence, offense, accident, act, or other event, to which the applicable "controlling underlying insurance" applies.

**4.** "Injury or damage" means any injury or damage, covered in the applicable "controlling underlying insurance" arising from an "event".

**5.** "Retained limit" means the available limits of "controlling underlying insurance" applicable to the claim.

**6.** "Ultimate net loss" means the total sum, after reduction for recoveries, or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of:

**a.** Settlements, judgments, binding arbitration; or

**b.** Other binding alternate dispute resolution proceeding entered into with our consent.

"Ultimate net loss" includes defense expenses if the "controlling underlying insurance" specifies that limits are reduced by defense expenses.

© Insurance Services Office, Inc., 2012

COMMERCIAL EXCESS LIABILITY
CX 01 19 02 15

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# GEORGIA CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** Paragraph **3.a.** of **Duties In The Event Of An Event, Claim Or Suit** Provisions of **Section III – Conditions** is replaced by the following:

**a.** In the event of an "event", claim or suit, we or our representative must receive prompt notice of the "event". Include:

**(1)** How, when and where the "event" occurred;

**(2)** The insured's name and address; and

**(3)** To the extent possible, the names and addresses of any injured persons and witnesses.

The requirement for giving notice of a claim, if not satisfied by the insured within 30 days of the date of the "event", may be satisfied by an injured third party who, as the result of such "event", has a claim against the insured. However, in this event, notice of a claim given by an injured third party must be mailed to us.

**B.** Paragraph **5.a.** of the **Cancellation** Provisions of **Section III – Conditions** is replaced by the following:

**a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation stating a future date on which the policy is to be cancelled, subject to the following:

**(1)** If only the interest of the first Named Insured is affected, the effective date of cancellation will be either the date we receive notice from the first Named Insured or the date specified in the notice, whichever is later. However, upon receiving a written notice of cancellation from the first Named Insured, we may waive the requirement that the notice state the future date of cancellation, by confirming the date and time of cancellation in writing to the first Named Insured.

**(2)** If by statute, regulation or contract this policy may not be cancelled unless notice is given to a governmental agency, mortgagee or other third party, we will mail or deliver at least 10 days' notice to the first Named Insured and the third party as soon as practicable after receiving the first Named Insured's request for cancellation.

Our notice will state the effective date of cancellation, which will be the later of the following:

**(a)** 10 days from the date of mailing or delivering our notice; or

**(b)** The effective date of cancellation stated in the first Named Insured's notice to us.

**C.** Paragraph **5.e.** of the **Cancellation** Provisions of **Section III – Conditions** is replaced by the following:

**e. Premium Refund**

**(1)** If this policy is cancelled, we will send the first Named Insured any premium refund due.

**(2)** If we cancel, the refund will be pro rata, except as provided in **(3)** below.

**(3)** If the cancellation results from failure of the first Named Insured to pay, when due, any premium to us or any amount, when due, under a premium finance agreement, then the refund may be less than pro rata. Calculation of the return premium at less than pro rata represents a penalty charged on unearned premium.

**(4)** If the first Named Insured cancels, the refund may be less than pro rata.

**(5)** The cancellation will be effective even if we have not made or offered a refund.

© Insurance Services Office, Inc., 2014

**D.** The following is added to Paragraph **5. Cancellation** of **Section III – Conditions** and supersedes any other provisions to the contrary:

If we decide to:

**1.** Cancel or nonrenew this policy; or

**2.** Increase current policy premium by more than 15% (other than any increase due to change in risk, exposure or experience modification or resulting from an audit of auditable coverages); or

**3.** Change any policy provision which would limit or restrict coverage;

then:

We will mail or deliver notice of our action (including the dollar amount of any increase in renewal premium of more than 15%) to the first Named Insured and lienholder, if any, at the last mailing address known to us. Except as applicable as described in Paragraph **E.** below, we will mail or deliver notice at least:

    **a.** 10 days before the effective date of cancellation if this policy has been in effect less than 60 days or if we cancel for nonpayment of premium; or

    **b.** 45 days before the effective date of cancellation if this policy has been in effect 60 or more days and we cancel for a reason other than nonpayment of premium; or

    **c.** 45 days before the expiration date of this policy if we decide to nonrenew, increase the premium or limit or restrict coverage.

**E.** With respect to a policy that is written to permit an audit, the following is added to Paragraph **5. Cancellation** of **Section III – Conditions:**

If you fail to submit to or allow an audit for the current or most recently expired term, we may cancel this policy subject to the following:

**1.** We will make two documented efforts to send you and your agent notification of potential cancellation. After the second notice has been sent, we have the right to cancel this policy by mailing or delivering a written notice of cancellation to the first Named Insured at least 10 days before the effective date of cancellation, but not within 20 days of the first documented effort.

**2.** If we cancel this policy based on your failure to submit to or allow an audit, we will send the written notice of cancellation to the first Named Insured at the last known mailing address by certified mail or statutory overnight delivery with return receipt requested.

**F.** Paragraph **5.f.** of the **Cancellation** Provisions of **Section III – Conditions** is replaced by the following:

If notice is mailed, a receipt provided by, or such other evidence of mailing as prescribed or accepted by, the U.S. Postal Service shall be sufficient proof of notice.

 © Insurance Services Office, Inc., 2014 **CX 01 19 02 15**

COMMERCIAL EXCESS LIABILITY
CX 21 02 04 13

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

Exclusion **c.** under Paragraph **2. Exclusions** of **Section I – Coverages** is replaced by the following:

Insurance provided under this Coverage Part does not apply to:

**2. Exclusions**

**c. Pollution**

**(1)** "Injury or damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time; or

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, pollutants.

© Insurance Services Office, Inc., 2012

COMMERCIAL EXCESS LIABILITY
CX 21 13 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – FUNGI OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**Fungi Or Bacteria**

**a.** "Injury or damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such "injury or damage".

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following definition is added to the **Definitions** section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi.

COMMERCIAL EXCESS LIABILITY
CX 21 16 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – SILICA OR SILICA-RELATED DUST

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**Silica Or Silica-related Dust**

**a.** "Injury or damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following definitions are added to the **Definitions** section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

 © Insurance Services Office, Inc., 2012

COMMERCIAL EXCESS LIABILITY
CX 21 17 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – COMMUNICABLE DISEASE

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**Communicable Disease**

"Injury or damage" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**b.** Testing for a communicable disease;

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

© Insurance Services Office, Inc., 2012

COMMERCIAL EXCESS LIABILITY
CX 21 19 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – EMPLOYMENT-RELATED PRACTICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to "injury or damage" to:

**a.** A person arising out of any:

**(1)** Refusal to employ that person;

**(2)** Termination of that person's employment; or

**(3)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**b.** The spouse, child, parent, brother or sister of that person as a consequence of "injury or damage" to that person at whom any of the employment-related practices described in Paragraph **(1), (2)** or **(3)** above is directed.

This exclusion applies whether the injury-causing event described in Paragraph **(1), (2)** or **(3)** above occurs before employment, during employment or after employment of that person.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

CX 21 19 04 13 © Insurance Services Office, Inc., 2012 Page 1 of 1

COMMERCIAL EXCESS LIABILITY
CX 21 20 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to "injury or damage" due to the rendering of or failure to render any professional service. This includes but is not limited to:

**a.** Legal, accounting or advertising services;

**b.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings or specifications;

**c.** Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;

**d.** Engineering services, including related supervisory or inspection services;

**e.** Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

**f.** Any health or therapeutic service treatment, advice or instruction;

**g.** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement, or personal grooming or therapy;

**h.** Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardiovascular fitness, bodybuilding or physical training programs;

**i.** Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**j.** Body piercing services;

**k.** Services in the practice of pharmacy;

**l.** Law enforcement or firefighting services; and

**m.** Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "event" which caused the "injury or damage" involved the rendering of or failure to render any professional service.

© Insurance Services Office, Inc., 2012

**POLICYWRITING SUPPORT FORMS**
**INSTRUCTIONAL SUPPLEMENT**
**INTERLINE**


**INSTRUCTIONS FOR USE OF FRAUD STATEMENT**
**IL N 001 09 03**

---

At the option of the insurer, the following fraud warning statement, or a substantially similar statement, may be included with every application and claim form in all states that do not have a specific fraud warning statement.


Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.


Insurers may either incorporate the text of the fraud warning statement directly into the text of the application or claim form or attach **IL N 001.**

---

© Insurance Services Office, Inc., 2004

**POLICYWRITING SUPPORT FORMS**
**INSTRUCTIONAL SUPPLEMENT**
**INTERLINE**

**INSTRUCTIONS FOR USE OF GEORGIA UNINSURED MOTORISTS COVERAGE NOTICE ACKNOWLEDGMENT**
**IL N 159 01 08**

| General Instructions |
| --- |
| Ga. Comp. R. & Regs. 120-2-28-.06 requires, in general, that for any new or renewal policy of insurance that includes uninsured motorists coverage as defined in GA. CODE ANN. Section 33-7-11, notice must be provided with respect to such coverage. Ga. Comp. R. & Regs. 120-2-28-.06 also includes requirements related to signed confirmations. For the related notice requirements pertaining to Uninsured Motorists Coverage, refer to:<br><br>**A.** Rule **14.A.** Uninsured Motorists Coverage of the Georgia Personal Vehicle Manual Exception Pages.<br><br>**B.** Rule **97.** Uninsured Motorists Insurance in Division One – Automobile of the Commercial Lines Manual.<br><br>For the notice requirements applicable to Excess Uninsured Motorists Coverage, refer to:<br><br>**A.** Rule **A1.** Excess Uninsured Motorists Coverage of the Georgia Personal Umbrella Liability Policy Program Manual Exception Pages.<br><br>**B.** Rule **31.** Uninsured Motorists Insurance in Division Thirteen – Commercial Liability Umbrella of the Commercial Lines Manual.<br><br>Use **IL N 159,** Georgia Uninsured Motorists Coverage Notice Acknowledgment. |

© Insurance Services Office, Inc., 2008

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

 © ISO Properties, Inc., 2004

POLICY NUMBER: DSXS2010001763-01

IL 09 85 01 15

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| |
|---|
| **SCHEDULE – PART I** |
| **Terrorism Premium (Certified Acts)**  ▮ |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):** |
| |
| **Additional information, if any, concerning the terrorism premium:** |
| |
| **SCHEDULE – PART II** |
| **Federal share of terrorism losses      80%      Year: 2020** |
| (Refer to Paragraph **B.** in this endorsement.) |
| **Federal share of terrorism losses      80%      Year: 2021** |
| (Refer to Paragraph **B.** in this endorsement.) |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

 © Insurance Services Office, Inc., 2015 IL 09 85 01 15

COMMERCIAL EXCESS
CX 90 07 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ELECTRONIC DATA CYBER EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**j. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability:**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

CX 90 07 07 19



POLICY NUMBER:        EFFECTIVE 12:01 A.M._____        COMMERCIAL EXCESS
CX 90 09 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRIOR AND PENDING LITIGATION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

       Insurance provided under this Coverage Part does not apply to:

       **f. Prior and Pending Litigation Exclusion**

       **a.**    Any "claim", "suit", administrative or regulatory proceeding or investigation, or licensing proceeding filed or commenced against "you" on or prior to the Prior Or Pending Litigation Date shown in the Declarations; or

       **b.**    The same or substantially the same "wrongful act", "interrelated wrongful act", fact or circumstance alleged in or underlying such "claim" or proceeding.

CX 90 09 07 19



COMMERCIAL EXCESS
CX 90 08 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CARE, CUSTODY OR CONTROL EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**i. Damage to Property in Care, Custody or Control:**

Damages arising out of:

Personal property in the care, custody or control of the insured.

CX 90 08 07 19



# POLICYHOLDER DISCLOSURE NOTICE OF <u>TERRORISM INSURANCE COVERAGE</u>

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED

**Acceptance or Rejection of Terrorism Insurance Coverage**

| |
|---|
| □ I hereby elect to purchase terrorism coverage for a prospective premium of $_____. |
| □ I hereby decline to purchase terrorism coverage for certified acts of terrorism. I understand that I will have no coverage for losses resulting from certified acts of terrorism. |

_____
Policyholder/Applicant's Signature                   Insurance Company

_____
Print Name                                   Policy Number

_____
Date

COMMERCIAL EXCESS
CX 90 03 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# <u>TOTAL ASBESTOS EXCLUSION</u>

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**I. Asbestos Or Asbestos-Related Dust**

(1) "Ultimate net loss," "injury or damage," or any other damages arising or resulting from, in whole or in part, the actual, alleged, threatened or suspected inhalation of, or ingestion of, asbestos or asbestos-related dust particles.

(2) Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of or in any way responding to or assessing the effects of asbestos or asbestos dust.

**B.** The following definitions are added to Section IV – Definitions:

7. "Asbestos" means naturally occurring hydrated fibrous mineral silicates that possess a unique crystalline structure and are incombustible in air, including chrysotile, amosite, crocidolite, tremolite, anthophylite, acinolite, and any material which contains "asbestos".

8. "Asbestos-related dust," means a mixture or combination of "asbestos" and other dust or particles.



COMMERCIAL EXCESS
CX 90 02 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LEAD LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**m. Lead Liability**

(1) "Ultimate net loss," "injury or damage," or any other damages arising or resulting from, in whole or in part, the ingestion, inhalation or absorption of lead in any form;

(2) Actual or alleged damage of any kind arising out of any form of lead;

(3) Any loss, cost or expense arising out of any:

    a. Request, demand or order that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of lead; or

    b. Claim or "suit" by or on behalf of any governmental authority or any claimant for damages, statutory penalties, abatement or any form of injunctive relief resulting from testing for, monitoring, cleaning-up, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of lead.



COMMERCIAL EXCESS
CX 90 01 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# <u>OCCUPATIONAL DISEASE EXCLUSION</u>

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

> Insurance provided under this Coverage Part does not apply to:

> **n. Occupational Disease**

> (1) "Ultimate net loss," "injury or damage," or any other damages arising or resulting from, in whole or in part, "Occupational Disease".

**B.** The following definitions are added to Section IV – Definitions:

> 9. "Occupational Disease" means injury by disease arising out of and in the course of employment.

CX 90 01 07 19



POLICY NUMBER:                                    **COMMERCIAL EXCESS LIABILITY**
                                                              **CX 90 15 07 19**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – DESIGNATED CONSTRUCTION WORK

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

### SCHEDULE

| Description Of Your Work: |
|---|
| All "injury or damage" included in the products-completed construction or renovation work performed in the following states: CO, NY, SC, and WA. |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

The following is added to Paragraph **2. Exclusions** of
**Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to or include hazards arising out of your work shown in the Schedule.

          © Includes copyrighted material of the Insurance Services Office, Inc.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# <u>ENHANCED COVERAGE ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

I.      **SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS**

The following is a summary of Limits of Insurance or Liability and/or additional coverages provided by this endorsement. This endorsement is subject to the provisions of the policy to which it is attached.

| | |
|---|---|
| Crisis Management | $50,000 |
| Donation Assurance | $25,000 |
| Emergency Real Estate Consulting Fee | $50,000 |
| Temporary Meeting Space Reimbursement | $50,000 |
| Theft of Workplace Materials from Personal Areas | $ 2,500 |
| Workplace Violence Counseling | $50,000 |

II.     **CONDITIONS**

      **A.**      **Applicability of Coverage**

      Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable. All other terms and conditions of this policy or coverage part to which this endorsement is attached remain unchanged.

      **B.**      **Limits of Liability or Limits of Insurance**

      **1.**      When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limit of Limits of Liability or Limits of Insurance will apply. In no instance will multiple limits apply to coverages which may be duplicated within this policy,

      Additionally, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum Limits of Liability or Limit of Insurance under all such coverage parts or policies combined shall not exceed the highest applicable Limits of Liability or Limit of Insurance under any one coverage part or policy.



COMMERCIAL EXCESS
CX 90 16 07 19

    **2.** Limits of Liability or Limits of Insurance identified in Clause 1. above are not excess of, but are in addition to the applicable Limits of Insurance stated in the Declarations.

**C.** **Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

## III. ADDITIONAL COVERAGES

**A.** **Crisis Management Emergency Response Expenses**

    **1.** We will reimburse you for reasonable "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis" to which this insurance applies. The amount of such reimbursement is limited as described in Section II, B-Limits of Liability or Limits of Insurance. No other obligation or liability to pay sums or perform acts or services is covered.

    **2.** We will reimburse only those reasonable "crisis management emergency response expenses" which are incurred during the policy period as shown in the Declarations of the policy to which this coverage is attached and reported to us within six months of the date the "crisis" was initiated.

    The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

**B.** **Donation Assurance**

We will reimburse you for reasonable "failed donation claim(s)". The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

With respect to any "failed donation claim", it is further agreed as follows:

    **1.** the donor must never have been in bankruptcy, nor have filed for bankruptcy/ reorganization prior to the time said pledge was made to you;

    **2.** for non-cash donations, payment by us of a "failed donation claim" shall be based on the fair market value of said non-cash donation at the time of the "failed donation claim";

    **3.** in the case of unemployment/incapacitation of a natural person donor and as a condition of payment of the "failed donation claim";

      **(a)** neither the natural person donor nor you shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date and;

      **(b)** the donor shall be unemployed for at least 60 days prior to us making payment;

    **4.** no coverage shall be afforded for a written pledge of funds or other measurable tangible property to you dated prior to the policy period;

CX 90 16 07 19      Includes Copyrighted material of ISO, Inc. with its permission.



COMMERCIAL EXCESS
CX 90 16 07 19

    **5.**   a donation amount which is to be collected by you over more than a 12-month period shall be deemed a single donation.

**C.**    **Emergency Real Estate Consulting Fee**

We will reimburse you any reasonable realtor's fee or real estate consultant's fee necessitated by your need to relocate due to the "unforeseeable destruction" of your principal location listed on the Declarations page during the policy period. The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

**D.**    **Temporary Meeting Space Reimbursement**

We will reimburse you for reasonable rental of meeting space which is necessitated by the temporary unavailability of your primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period. Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy. The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

**E.**    **Theft of Work Materials from Personal Areas**

We will reimburse any insured 50% of their personal or business property policy's deductible for any theft involving "work materials" that are stolen from the "insured's personal area" during the policy period, provided that that the theft is covered by other insurance. No reimbursement is applicable under this coverage for thefts for which no other insurance policy provides a settlement. The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

**F.**    **Workplace Violence Counseling**

In the event that an incidence of "workplace violence" occurs at any of your premises during the policy period, we will reimburse you for reasonable expenses incurred for the emotional counseling of your employees, during the policy period. The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

**A.**    **Definitions**

    **A.**    "Crisis" means the public announcement that an "incident" occurred on your premises or at an event sponsored by you.

    **B.**    "Crisis management emergency response expenses" mean those expenses incurred for services provided by a "crisis management firm". However, "crisis management emergency response expenses" shall not include compensation, fees, benefits, overhead, charges or expenses of any insured or any of your employees, nor shall "crisis management emergency response expenses" include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance.

    **C.**    "Crisis management firm" means any service provider you hire that is acceptable to us. Our consent will not be unreasonably withheld.



**D.** "Domestic Partner", whenever used in this endorsement, means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by you.

**E.** "Failed donation claim", whenever used in this endorsement, will mean written notice to you during the Policy Period of:

1. the bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable tangible property to you;

2. the unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable tangible property to the Insured.

**F.** "Incident" means an accident or other event resulting in death or serious bodily injury to three or more persons. "Incident" shall also mean the accidental discharge of pollutants.

**G.** "Injury", whenever used in this endorsement, means any physical damage to the body caused by violence, fracture or an accident that results in physical damage or hurt.

**H.** "Insured's personal area" means any residence or automobile owned or rented by any insured.

**I.** "Serious bodily injury" means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

**J.** "Unforeseeable Destruction", whenever used in this endorsement, means damage resulting from a "Certified Act of Terrorism", fire, crash or collapse which renders all of your primary office completely unusable.

**K.** "Work materials" means any equipment that is used by the insured solely in the course of the insured's business; inclusive of stores of data and client records.

**L.** "Workplace violence", whenever used in this endorsement, means any intentional use of or threat to use deadly force by any natural person, with intent to cause harm and that results in bodily "injury" or death of a member of the Insured or any other natural person while on your premises.





Underwritten by: **Ascot Insurance Company**

Administrative Office: 55 West 46th Street, 26th Floor • New York, New York • 10036
1-646-356-8101 • A Stock Company

In Witness Whereof, the Company has caused this policy to be executed and attested.

_Yvonne Costello_
_____

_____
Chief Executive Officer

COMMERCIAL EXCESS LIABILITY
CX 21 30 01 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** Any endorsement addressing acts of terrorism (however defined) in any "controlling underlying insurance" does not apply to this excess insurance. The following provisions addressing acts of terrorism apply with respect to this excess insurance:

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for "injury or damage" that is otherwise excluded under this Coverage Part.

# EXHIBIT 2

No. 22A04071 _____

STATE COURT OF DEKALB COUNTY
GEORGIA, DEKALB COUNTY

Date Summons Issued and Filed
10/19/2022

SUMMONS

/s/ Monica Gay
_____
Deputy Clerk

Adrianne Hardy as Parent of minors A.W. and Cleatonya Britton as Conservator

Deposit Paid $ _____

of Minor M.W.
_____
(Plaintiff's name and address)

[ ]   **ANSWER**

**vs.**

[ ]   **JURY**

WESLEY KENSINGTON PARTNERS LLC, AVILA REAL

ESTATE LLC, ELISHA WRIGHT, AND JOHN DOES 1-3,
_____

_____
(Defendant's name and address)

Avila Real Estate LLC., Michael P. Kornheiser, 6400 Powers Ferry Road, Ste 150,
**TO THE ABOVE-NAMED DEFENDANT:** Atlanta, GA 30339

You are hereby summoned and required to file with the Clerk of State Court, Suite 230, 2nd Floor, Administrative Tower, DeKalb County Courthouse, 556 N. McDonough Street, Decatur, Georgia 30030 and serve upon the plaintiff's attorney, to wit:

Daphne DUplessis Saddler- John Foy & Associates
_____
(Name)

3343 Peachtree Rd. NE, Suite 350, Atlanta, GA
_____
(Address)

404-400-4000                                   575602
_____                         _____
(Phone Number)                         (Georgia Bar No.)

an **ANSWER** to the complaint which is herewith served upon you, within thirty (30) days after service upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. (Plus cost of this action.)

_____          _____

Defendant's Attorney                                      Third Party Attorney

_____          _____

_____          _____

Address                                                      Address

_____          _____

Phone No.          Georgia Bar No.                Phone No.                Georgia Bar No.

**TYPE OF SUIT**

☐ Account           ☐ Personal Injury          Principal        $ _____
☐ Contract          ☐ Medical Malpractice
☐ Note               ☐ Legal Malpractice        Interest          $ _____
☐ Trover             ☐ Product Liability
                         ☐ Other                       Atty Fees       $ _____

☐ Transferred From _____

**(Attach BLUE to Original and WHITE to Service Copy of complaint)**

STATE COURT OF
STATE COURT OF DEKALB COUNTY, GA.
DEKALB COUNTY, GA.
10/19/2022 4:02 PM
E-FILED
BY: Monica Gay

No. 22A04071

Date Summons Issued and Filed

/s/ Monica Gay

Deputy Clerk

Deposit Paid $ 10/19/2022

[] **ANSWER**

[] **JURY**

## STATE COURT OF DEKALB COUNTY
### GEORGIA, DEKALB COUNTY

### SUMMONS

Adrianne Hardy as Parent of minors A.W. and Cleatonya Britton as Conservator of Minor M.W.

(Plaintiff's name and address)

**vs.**

WESLEY KENSINGTON PARTNERS LLC, AVILA REAL ESTATE LLC, ELISHA WRIGHT, AND JOHN DOES 1-3,

(Defendant's name and address)

Wesley Kensington Partners LLC., Michael P. Kornheiser, 6400 Powers Ferry Road, Ste 150,
**TO THE ABOVE-NAMED DEFENDANT:** Atlanta, GA 30339

You are hereby summoned and required to file with the Clerk of State Court, Suite 230, 2ⁿᵈ Floor, Administrative Tower, DeKalb County Courthouse, 556 N. McDonough Street, Decatur, Georgia 30030 and serve upon the plaintiff's attorney, to wit:

Daphne DUplessis Saddler- John Foy & Associates

(Name)

3343 Peachtree Rd. NE, Suite 350, Atlanta, GA

(Address)

404-400-4000                    575602

(Phone Number)                (Georgia Bar No.)

an **ANSWER** to the complaint which is herewith served upon you, within thirty (30) days after service upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. (Plus cost of this action.)

_____

Defendant's Attorney                                    Third Party Attorney

_____

Address                                                      Address

Phone No.        Georgia Bar No.                    Phone No.        Georgia Bar No.

### TYPE OF SUIT

☐ Account            ☐ Personal Injury          Principal      $ _____
☐ Contract           ☐ Medical Malpractice
☐ Note               ☐ Legal Malpractice        Interest       $ _____
☐ Trover             ☐ Product Liability
                     ☐ Other                    Atty Fees      $ _____

☐ Transferred From _____

**(Attach BLUE to Original and WHITE to Service Copy of complaint)**

STATE COURT OF
DEKALB COUNTY, GA.
10/19/2022 4:02 PM
E-FILED
BY: Monica Gay

IN THE STATE COURT OF DEKALB COUNTY
STATE OF GEORGIA

ADRIANNE HARDY AS PARENT OF
MINORS A.W. AND CLEATONYA
BRITTION AS CONSERVATOR OF MINOR
M.W.,

                    Plaintiffs,

v.

WESLEY KENSINGTON PARTNERS LLC,
AVILA REAL ESTATE LLC, ELISHA
WRIGHT, AND JOHN DOES 1-3,

                    Defendants.

CIVIL ACTION
FILE NO.: 22A04071

## COMPLAINT FOR DAMAGES
## AND DEMAND FOR TRIAL BY JURY

COMES NOW, Plaintiffs ADRIANNE HARDY AS PARENT OF MINORS A.W. and CLEATONYA BRITTION AS CONSERVATOR OF MINOR M.W., file this Complaint for Damages and Demand for Trial by Jury as follows:

### PARTIES AND JURISDICTION

1.

Michael Lamar Wright (the "deceased") was killed on December 14, 2020.

2.

The deceased has three (3) minor children: ███████████, ███████████, and ███████████.

3.

Plaintiff, ADRIANNE HARDY AS PARENT OF MINORS A.W., is the mother of ███████████ and ███████████.

STATE COURT OF
DEKALB COUNTY, GA.
10/19/2022 4:02 PM
E-FILED
BY: Monica Gay

4.

Plaintiff, CLEATONYA BRITTION AS CONSERVATOR OF MINOR M.W., was appointed Conservator in the Dekalb County Probate Court on August 4, 2022, for ████████ ████████.

5.

Defendant WESLEY KENSINGTON PARTNERS, LLC, is a domestic limited liability company authorized to do business in the State of Georgia and is subject to the jurisdiction and venue of this Court after service upon its registered agent Michael Kornheiser, 6400 Powers Ferry Road, Suite 150, Atlanta, GA 30339.

6.

Defendant AVILA REAL ESTATE, LLC is a domestic limited liability company authorized to do business in the State of Georgia and is subject to the jurisdiction and venue of this Court after service upon its registered agent Michael Kornheiser, 6400 Powers Ferry Road, Suite 150, Atlanta, GA 30339.

7.

Defendant, ELISHA WRIGHT, is an individual whose last known address is 20 Ivy Circle, Covington, GA 30016.

8.

Defendant, John Doe 1, is an individual, entity, corporation, business, contractor, or subcontractor. The true name and capacity of John Doe 1 is currently unknown to Plaintiffs. Therefore, Plaintiffs sue John Doe 1 by a fictitious name. Plaintiffs will amend the Complaint to show the true name of John Doe1 when such has been ascertained.

9.

Defendant, John Doe 2, is an individual, entity, corporation, business, contractor, or subcontractor. The true name and capacity of John Doe 2 is currently unknown to Plaintiffs. Therefore, Plaintiffs sue John Doe 2 by a fictitious name. Plaintiffs will amend the Complaint to show the true name of John Doe 2 when such has been ascertained.

10.

Defendant, John Doe 3, is an individual, entity, corporation, business, contractor, or subcontractor. The true name and capacity of John Doe 3 is currently unknown to Plaintiffs. Therefore, Plaintiffs sue John Doe 3 by a fictitious name. Plaintiffs will amend the Complaint to show the true name of John Doe 3 when such has been ascertained.

11.

The incident giving rise to this lawsuit occurred at 100 Wesley Kensington Circle, Stonecrest, Georgia 30038, Dekalb County.

12.

Venue is proper pursuant to O.C.G.A. 14-2-510(b)(4).

13.

Personal and subject matter jurisdiction are proper in this Court.

**FACTS**

14.

Plaintiffs incorporate by reference paragraphs 1 through 13 above as if they were restated herein verbatim.

15.

On or about December 14, 2020, the deceased resided at Wesley Kensington Apartment Homes located at 100 Wesley Kensington Circle, Stonecrest, Georgia 30038, Dekalb County ("Property or Premises").

16.

On the afternoon of December 14, 2020, a red vehicle tailgated another vehicle through the unsecured entry gate of the property. The deceased was outside tending to his own affairs when the driver of the vehicle accosted the deceased and shot him dead. The shooter was later identified as Elisha Dewayne Wright.

17.

The entry gate will remain open for stretches of time allowing multiple vehicles to unlawfully enter the property.

18.

Defendants were notified of issues with the security gate prior to this incident.

19.

The deceased is survived by his three minor children.

20.

At all relevant times, the deceased had a right to be on the property.

21.

At all relevant times, the deceased exercised reasonable care for his safety.

22.

At all relevant times, the deceased did not instigate and was not the aggressor in the immediate events leading to his death.

23.

At all relevant times, Elisha Wright did not have a right to be on the property.

24.

At all relevant times, Elisha Wright was a trespasser on the property.

## NEGLIGENCE CLAIMS AGAINST
## WESLEY KENSINGTON PARTNERS, LLC and AVILA REAL ESTATE, LLC

25.

Plaintiffs incorporate by reference paragraphs 1 through 24 above as if they were restated herein verbatim.

26.

At all relevant times, Defendants owned or controlled the Premises and owed a legal duty pursuant to O.C.G.A. § 51-3-1, of reasonable care to invitees to inspect and keep the premises in a safe condition.

27.

At all relevant times, Defendants failed to exercise reasonable care to keep the Premises in a safe condition.

28.

At all relevant times, Defendants occupied, managed, maintained, or leased the Premises and owed a legal duty of ordinary care to keep the Premises in a safe condition.

29.

At all relevant times, Defendants breached its duty of ordinary care by failing to keep the premises in a safe condition.

30.

At all relevant times, Defendants failed to have proper security on the property, failed to have working security gates at all times, failed to have security personnel on the property, and failed to have measures in place to prevent and/or reduce criminal activity on the property.

31.

At all relevant times Defendants had actual knowledge of the dangerous condition that caused the deceased's death, to wit: criminal activity on the property and the areas immediately surrounding the property, and inadequate security on the property.

32.

At all relevant times Defendants had superior actual and/or constructive knowledge of the dangerous condition that caused the deceased's death, to wit: criminal activity on the property and the areas immediately surrounding the property, and inadequate security on the property.

33.

Defendants are responsible for the negligent acts and omissions of their employees pursuant to the theory of *respondeat superior*.

34.

As a direct and proximate result of the Defendants' negligence, the surviving children of the deceased suffered mental anguish and pain and suffering; loss of the care, protection, guidance, advice, training, and nurturing from the deceased; loss of love, society, and companionship from the deceased; loss of the deceased's expected earnings; and loss of the value of goods and services the deceased provided. Defendants are indebted to Plaintiffs for these losses.

35.

Defendants are indebted to Plaintiffs for all economic and non-economic damages allowed by Georgia law.

## ASSAULT AND BATTERY CLAIM AGAINST ELISHA WRIGHT

36.

Plaintiffs incorporate by reference paragraphs 1 through 24 above as if they were restated herein verbatim.

37.

At all relevant times, Defendant Elisha Wright was the driver of a red vehicle that entered the unsecured property.

38.

Defendant Elisha Wright accosted Michael Lamar Wright and shot him dead.

39.

As a direct and proximate result of the Defendant's acts, the surviving children of the deceased suffered mental anguish and pain and suffering; loss of the care, protection, guidance, advice, training, and nurturing from the deceased; loss of love, society, and companionship from the deceased; loss of the deceased's expected earnings; and loss of the value of goods and services the deceased provided.

40.

Defendant is liable for the death of the deceased and the losses to the deceased's heirs under Georgia tort law, pursuant to O.C.G.A. § 51-1-13.

41.

Pursuant to O.C.G.A. § 51-12-5.1, Defendant is liable for punitive damages based on his complete disregard and want of care for human life and his act of malice in taking the life of the deceased.

42.

Defendant is indebted to Plaintiffs for all economic and non-economic damages allowed by Georgia law.

**NEGLIGENCE CLAIMS AGAINST
JOHN DOES 1-3**

43.

Plaintiffs incorporate by reference paragraphs 1 through 24 above as if they were restated herein verbatim.

44.

Defendants occupied, managed, maintained, leased, and/or was contracted to provide management and/or security services on the Premises and owed a legal duty of ordinary care to keep the Premises in a safe condition.

45.

Defendants breached the duty of ordinary care by failing to properly manage and secure the property for the safety of residents.

46.

Defendants had a contractual duty to manage the property and keep the property in a safe condition.

47.

Defendants breached the contractual duty by failing to properly manage the property.

48.

Defendants had a contractual duty to provide security services on the property.

49.

Defendants breached the contractual obligations by failing to provide adequate security on the property.

50.

At all relevant times Defendants had actual knowledge of the dangerous condition that caused the deceased's death, to wit: criminal activity on the property and the areas immediately surrounding the property, and inadequate security on the property.

51.

At all relevant times Defendants had superior actual and/or constructive knowledge of the dangerous condition that caused the deceased's death, to wit: criminal activity on the property and the areas immediately surrounding the property, and inadequate security on the property.

52.

Defendants are responsible for the negligent acts and omissions of their employees pursuant to the theory of *respondeat superior*.

53.

As a direct and proximate result of the Defendants' negligence, the surviving children of the deceased suffered mental anguish and pain and suffering; loss of the care, protection, guidance, advice, training, and nurturing from the deceased; loss of love, society, and

companionship from the deceased; loss of the deceased's expected earnings; and loss of the value of goods and services the deceased provided. Defendants are indebted to Plaintiffs for these losses.

54.

Defendants are indebted to Plaintiffs for all economic and non-economic damages allowed by Georgia law.

**ATTORNEYS' FEES**

55.

All paragraphs herein are incorporated here as if restated verbatim.

56.

Defendants and their agents have been stubbornly litigious and have caused the Plaintiffs unnecessary trouble and expense for which Plaintiffs seek reasonable attorneys' fees and expenses as determined by a jury pursuant to O.C.G.A. § 13-6-11.

WHEREFORE, Plaintiff prays:

a.  That process issue according to law;

b.  That Defendants be served with a copy of Plaintiffs' Complaint for Damages and Demand for Trial by Jury and show cause why the prayers for relief requested by Plaintiffs herein should not be granted;

c.  That Plaintiffs be granted a **trial by jury** in this matter;

d.  That judgment be entered in favor of Plaintiffs against the Defendants for the wrongful death and losses arising our of the wrongful death of the deceased, an amount to be determined by the enlightened conscience of an impartial jury;

e.   That judgment be entered in favor of Plaintiffs against the Defendants;

f.   That Plaintiffs have such further relief as the Court may deem just and proper.

This 19th day of October 2022.

/s/ Daphne Duplessis Saddler
Daphne Duplessis Saddler
Georgia Bar No. 575602
Attorney for Plaintiff

John Foy & Associates, P.C.
3343 Peachtree Road, NE
Suite 350
Atlanta, GA 30326
Tel:  (404) 400-4000
Fax: (404) 873-4490

STATE COURT OF
DEKALB COUNTY, GA.
10/19/2022 4:02 PM
E-FILED
BY: Monica Gay