# Exhibit B

IN THE SUPERIOR COURT OF COWETA COUNTY
STATE OF GEORGIA

⚖ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
COWETA COUNTY, GEORGIA

**SUV2022001394**

**JUN 02, 2023 04:42 PM**

Niki Sewell

Niki Sewell, Clerk
Coweta Superior Court

KEVIN T. WATKINS,                       )
                                        )
    Plaintiff,                       )
                                        )
    v.                               )        CIVIL ACTION FILE
                                        )
CTCA   PHYSICIANS   GROUP   OF          )        NO. SUV2022001394
GEORGIA, LLC f/k/a CTCA PHYSICIANS      )
GROUP OF GEORGIA, INC. f/k/a CANCER     )
TREATMENT   CENTERS   OF   AMERICA      )
PROFESSIONAL    CORPORATION    OF       )
GEORGIA, P.C.,                          )
                                        )
    Defendant.                       )

---

## AMENDED COMPLAINT

COMES NOW, KEVIN T. WATKINS, Plaintiff in the above-styled civil action (hereinafter referred to as "Plaintiff"), and files this, his *Amended Complaint* against CTCA PHYSICIANS GROUP OF GEORGIA, LLC f/k/a CTCA PHYSICIAN GROUP OF GEORGIA, INC., f/k/a CANCER TREATMENT CENTERS OF AMERICA PROFESSIONAL CORPORATION OF GEORGIA, P.C., Defendant in the above-styled civil action (hereinafter referred to as the "Defendant"), and respectfully shows this Honorable Court as follows.  The Plaintiff and Defendant will collectively be referred to as the "parties."

### STATEMENT OF JURISDICTION & VENUE

1.

Plaintiff is a resident of Georgia.

2.

Defendant is a Georgia limited liability company. Defendant may be served through its counsel of record.

3.

Jurisdiction is appropriate in this Court.

4.

Venue is appropriate in this Court because Defendant is a resident of Coweta County, Georgia.

## STATEMENT OF FACTS & CLAIMS

5.

Plaintiff is a white male.

6.

Plaintiff is a highly skilled and experienced surgical oncologist.

7.

Plaintiff began working with Defendant as a surgical oncologist in or around August 2014.

8.

In or around October 2015, Plaintiff was appointed the surgery lead on designing and implementing the Enhanced Recovery Pathway at Defendant's Southeastern Regional Medical Center.

9.

In or around November 2015, Plaintiff was appointed Vice Chief of Surgery at Defendant's Southeastern Regional Medical Center.

10.

In or around January 2016, the Enhanced Recovery Pathway program Plaintiff created was implemented throughout Defendant's organization nationwide.

11.

In or around November 2016, Plaintiff was appointed Chief of Surgery at Defendant' Southeastern Regional Medical Center.

12.

In or around June 2016, Plaintiff was named Atlanta Magazine's Top Doctor.

13.

In or around November 2017, Gary Bernstein became Defendant's new Chief of Surgery.

14.

In late 2019, Jonathan Watkins was appointed the president and CEO of Defendant's Southeastern Regional Medical Center.

15.

In or around April 2020, Jonathan Watkins pressured Bernstein to step down as Chief of Surgery.

16.

In or around April 2020, Bernstein was replaced by Anita Johnson as Chief of Surgery by Jonathan Watkins.

17.

In or around March 2022, Jonathan Watkins interviewed Dr. Chukwuemeka Obiora (a black male) for an additional surgical oncology position.

18.

Plaintiff and surgical oncologist Katherine Poruk (a white female) were sufficiently handling the existing surgical oncology patients without the need of an additional surgical oncologist.

19.

In or around April 2022, Defendant hired Chukwuemeka Obiora (a black male) as a surgical oncologist.

20.

The surgical oncologists typically work as a team to handle patients within the same employer.

21.

Plaintiff was not involved in the hiring of Obiora, nor was Plaintiff given any notice that Obiora would be joining the surgical oncology team at Defendant, prior to Obiora's first day.

22.

Plaintiff is more qualified than Obiora as a surgical oncologist.

23.

Jonathan Watkins sent out an email to one of Defendant's internal listservs which stated that Obiora was an expert in multiple areas of surgical oncology.

24.

Jonathan Watkins' email is false because Obiora did not have adequate experience to claim surgical oncology expertise in all these areas.

25.

Jonathan Watkins' email had the effect of having multiple patients, which would be assigned to Plaintiff, to now be assigned to Obiora.

26.

Defendant replaced various other white surgeons with black, or non-white, surgeons since Jonathan Watkins' arrival at Southeastern Regional Medical Center.

27.

Obiora's surgeries were excessively long and had poor outcomes.

28.

Plaintiff raised Obiora's surgical judgment and poor outcomes as a concern to Defendant.

29.

Anita Johnson made an unofficial list of operating room staff, circulating nurses, and scrub techs that were permitted, and not permitted, to work in Obiora's operating room.

30.

Anita Johnson's unofficial list of staff that were not permitted to work in Obiora's operating room were all white.

31.

This was done to protect Obiora.

32.

In or around July 2022, Defendant hired Dr. Hixon (a black male) general surgeon to assist Obiora on his cases.

33.

Hixon was not permitted to assist Plaintiff or Poruk.

34.

Anita Johnson repeatedly praised Obiora's surgical skills in front of staff and other surgeons.

35.

Anita Johnson interfered with Plaintiff's ability to schedule his patient's surgery in the usual manner, delaying his patient's care in favor of non-white physicians.

36.

On August 19, 2022, Anita Johnson made a change to Plaintiff's call schedule responsibilities which forced Plaintiff to be on call all the time.

37.

Defendant abruptly terminated Plaintiff on August 19, 2022.

38.

Following his termination, Plaintiff applied for several different positions.

39.

Defendant published false and defamatory statements about the Plaintiff to his potential new employers.

40.

These false and defamatory statements were made about Plaintiff's trade, office, and profession, and in reference to his reputation in general.

41.

As a direct and proximate cause of these false and defamatory statements, these potential employers have either delayed hiring Plaintiff, or not hired Plaintiff at all.

### Count 1:  Breach of Contract

42.

On or about April 11, 2014, the parties entered into a written contract entitled *Employment Agreement* in which both parties would be required to perform certain duties.  The *Employment Agreement* is attached as Plaintiff's Exhibit A.  This document will be referred to in this complaint as the "Original Contract."

43.

On or about August 18, 2017, the parties executed the first written amendment to the *Employment Agreement* which is entitled *First Amendment to Amended and Restated Employment Agreement*, and it is attached as Plaintiff's Exhibit B.  This document will be referred to in this complaint as "Contract Amendment One."

44.

On or about April 8, 2022 (with an effective date of January 1, 2022), the parties executed the second written amendment to the *Employment Agreement* which is entitled *Second Amendment to Employment Agreement*, and it is attached as Plaintiff's Exhibit C. This document will be referred to in this complaint as "Contract Amendment Two."

45.

The Original Contract, Contract Amendment One, and Contract Amendment Two will be collectively referred to in this Complaint as the "Contract."

46.

Defendant agreed, in the Original Contract, that when Plaintiff was on call, that this call would "be shared equally with other surgical oncology staff physicians." Original Contract, § 5.1. Defendant agreed in Contract Amendment Two, that when Plaintiff was on general surgery call,

that these call days would "coincide[e] with surgical oncology days." Contract Amendment Two, § 9.9.

47.

Despite these limits to Plaintiff's call duties, Defendant breached these terms on the Contract and required Plaintiff to take call almost 24/7. When Plaintiff pointed this out to Defendant, Defendant retaliated against Plaintiff and abruptly terminated him, without cause, in violation of the terms of the Contract.

48.

If Defendant terminates Plaintiff without cause, the Contract requires "at least [ninety (90) days prior written notice] of intent to terminate," and requires Defendant "to pay [Plaintiff's] base salary . . . for . . . one hundred eighty (180) days from the date of the notice of termination." Original Contract, § 4.1; Contract Amendment One, § 1. Defendant may only "immediately terminate" Plaintiff "for cause." Original Contract, § 4.2.

49.

Despite these limits on how Plaintiff may be terminated, Defendant orally terminated Plaintiff on or about August 19, 2022.

50.

This abrupt, verbal termination is a breach of Contract which caused Plaintiff damages which are accruing.

51.

Defendant gave written notice of Plaintiff's termination on August 30, 2022.

52.

Defendant failed to pay the proper contracted amount of Plaintiff's base salary, between August 19, 2022 and August 30, 2022, which is $11,301.37.

53.

Defendant failed to pay the proper contracted amount of Plaintiff's base salary for 180 days following written notice of termination, which is $184,931.51.

54.

Defendant failed to pay the proper contracted amount of Plaintiff's call salary ($1,444.00/month) for the 90-day period following written termination, which is $4,332.00.

55.

Defendant made a payment to Plaintiff on August 30, 2022 in the net amount of $80,490.78, and on October 14, 2022, in the net amount of $1,009.67, which set off Plaintiff's damages.

56.

As a further result of Defendant's breach of contract, Plaintiff is entitled to additional damages; including all other unpaid compensation, unreimbursed expenses, incentive compensation, call compensation, 401K and HSA benefits, and medical coverage; which are owed prior to Defendant's written termination of the Plaintiff on August 30, 2022; and which are owed during the 90-day notice period after the written termination August 30, 2022; in an amount to be proven at trial.

57.

Furthermore, the 90-day notice period was specifically drafted for Plaintiff to be able to complete tasks which are material and standard for surgeons in this industry.

58.

As a result of Defendant's breach of contract, Plaintiff was unable to complete necessary tasks required for minimum patient care and continuity of care.

59.

It is standard practice in this industry for a transition period to occur, i.e. a notice period, where a surgeon continues to work, patient care can be addressed, notice can be given to a surgeon's patients, and surgeons can transition to a new position elsewhere.

60.

Due to Defendant's abrupt breach, and failure to follow a notice period, Plaintiff was unable to process a transition period for his patients and himself.

61.

Due to Defendant's abrupt breach, and failure to follow a notice period, Plaintiff was unable to process emails and other correspondence needed to process administrative needs for Plaintiff's unreimbursed expenses.

62.

Plaintiff was unable to issue correspondence needed to ensure Plaintiff could limit his exposure to malpractice liability and complaints on his license to the Georgia Composite Medical Board.

63.

Plaintiff was unable to secure access to data related to his credentialing with future employers, hospitals, providers, and payers; his continuing medical education material; his personal education presentations; and other personal documents.

64.

Because Defendant failed to abide by the notice period, Plaintiff suffered additional damages to his reputation, his malpractice insurability, his liability for future claims, his liability for complaints, and his ability to obtain a new position, in an amount to be proven at trial.

65.

Because Defendant failed to abide by the notice period, Plaintiff's reputation became subject to additional scrutiny by potential new employers.

66.

Plaintiff has suffered monetary damages which include unpaid compensation and benefits, consequential and special damages to Plaintiff's reputation in his profession and in the community, emotional damages and pain and suffering from the stress following abrupt termination and being cut off from Plaintiff's personal and professional items, tasks, and necessities. This amount will be proven at trial.

67.

Plaintiff specifically pleads that Defendant should be liable for interest on Plaintiff's damages which accrue from the time of Defendant's breach. O.C.G.A. § 13-6-13.

Count 2: Slander

68.

Plaintiff sought reemployment with other employers.

69.

Defendant made false and defamatory statements or charges against Plaintiff to Plaintiff's potential new employers in reference to Plaintiff's trade, office, and profession, calculating to injure him therein.

70.

Defendant made false and defamatory statements or charges against Plaintiff to Plaintiff's potential new employers in reference to Plaintiff's trade, office, and profession, with negligent or reckless disregard of the damages Plaintiff would suffer to his reputation and ability to gain reemployment.

71.

These false and defamatory statements or charges were made without privilege.

72.

Defendant uttered disparaging words to Plaintiff's potential new employers which produced special damages which flowed naturally therefrom.

73.

Defendant committed slander or oral defamation of the Plaintiff causing him damages, including special damages.

74.

As a direct and proximate cause of Defendant's slander and oral defamation, Plaintiff's employment applications have been rejected or delayed.

75.

As a direct and proximate cause of Defendant's slander and oral defamation, Plaintiff has not yet been able to secure re-employment, and has suffered immense damages, including financial losses, and emotional pain and suffering.

Count 3:  Libel

76.

Plaintiff sought reemployment with other employers.

77.

Defendant made published in writing, statements or charges against Plaintiff, to Plaintiff's potential new employers in reference to Plaintiff's trade, office, and profession, calculating to injure him therein.

78.

Defendant made published in writing, statements or charges against Plaintiff, to Plaintiff's potential new employers in reference to Plaintiff's trade, office, and profession, with negligent or reckless disregard of the damages Plaintiff would suffer to his reputation and ability to gain reemployment.

79.

These false and defamatory statements or charges were made without privilege.

80.

Defendant's charges against Plaintiff, to Plaintiff's potential new employers produced special damages which flowed naturally therefrom.

81.

Defendant committed libel of the Plaintiff causing him damages, including special damages.

82.

As a direct and proximate cause of Defendant's libel, Plaintiff's employment applications have been rejected or delayed.

83.

As a direct and proximate cause of Defendant's libel, Plaintiff has been unable to secure re-employment, and has suffered immense damages, including financial losses, and emotional pain and suffering.

Count 4:  Race Discrimination - 42 U.S.C. § 1981

84.

42 U.S.C. §1981 prohibits race discrimination in the make and enforcing of contracts.

85.

42 U.S.C. § 1981 prohibits racial discrimination against whites as well as nonwhites.

86.

Defendant took adverse action against Plaintiff because of Plaintiff's race (white).

87.

Plaintiff's race (white) was a motivating factor in Defendant's taking adverse action against the Plaintiff.

88.

Defendant preferred nonwhites over whites in employment, including work environment, support, scheduling, treatment, promotion, work assignments, benefits, decisions to terminate, and in statements or references to former employee's new potential employers.

89.

Defendant subjected Plaintiff to unwelcome conduct and conditions because of Defendant's preference for nonwhites.

90.

Such conduct and conditions created a hostile work environment and resulted in tangible employment action against the Plaintiff.

91.

Specifically, surgery, call, patient care conditions, schedule, and support were altered to prefer nonwhite surgeons.

92.

Eventually, Defendant terminated Plaintiff and made negative references to his future employers.

93.

As a direct and proximate cause, Plaintiff was terminated, forced out of his contractual notice period, and has been unable to secure re-employment, thereby suffering immense damages, including financial losses, reputation loss, and emotional pain and suffering.

94.

Accordingly, Defendant is liable to the Plaintiff for compensatory damages, including back pay, front pay, lost benefits, interest, and emotional pain and suffering.

95.

Defendant should be held liable for the Plaintiff's attorney's fees and costs of litigation, including expert fees, under 42 U.S.C. § 1988.

96.

Defendant's actions were done with malice or reckless indifference to Plaintiff's federally protected rights, and therefore Defendant is liable to the Plaintiff for punitive damages in an amount to punish Defendant, or deter Defendant and others like Defendant from committing such conduct in the future. 42 U.S.C. § 1981.

## PUNITIVE DAMAGES

## ADDITIONAL DAMAGES, INTEREST, ATTORNEY'S FEES & COSTS

97.

Plaintiff specifically pleads that Defendant has acted in bad faith, has been stubbornly litigious, and has caused Plaintiff unnecessary trouble and expenses. Accordingly, the Court or jury should order that Defendant pay, as part of Plaintiff's damages, expenses of litigation, including costs and attorney's fees. O.C.G.A. § 13-6-11.

98.

Plaintiff specifically pleads that Defendant has defended against Plaintiff's rightful demands, and that such defenses lacked substantial justification and were interposed for delay, and unnecessarily expanded the proceedings between the parties. O.C.G.A. § 9-15-14(b).

99.

The actions of Defendant show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences.

100.

Punitive damages should be awarded against Defendant in an amount sufficient to deter, penalize, and punish Defendant in light of the circumstances of this case, as provided in O.C.G.A. § 51-12-5.1.

WHEREFORE, Plaintiff requests that the Court:

a)  Enter a judgment against the Defendant, and in favor of the Plaintiff, for each Count;

b)  Order Plaintiff injunctive and equitable relief, specifically to restore Plaintiff to access to his email, and his personal and professional items, so that Plaintiff can complete tasks and necessities which are material and standard for the medical industry, and which were contemplated in the 90-day notice period in the Contract;

c)  Order Defendant to pay Plaintiff compensatory and monetary damages for his salary, unreimbursed expenses, on call pay, incentive compensation, benefits, and other compensation owed to Plaintiff under his Contract;

d)  Order that Defendant pay punitive damages in amount to deter, penalize, and punish.

e)  Order Defendant to pay Plaintiff consequential, nominal, compensatory, and special damages as against Defendant to compensate Plaintiff for his mental and emotional distress, anxiety, humiliation, loss of professional and personal reputation, opportunities, lack of access to his personal and professional items, increased liability for malpractice, trouble and expense of transferring over to a new employer, loss of enjoyment of life, in an amount to be determined by a jury;

f)  that Defendant be ordered to pay Plaintiff compensation, compensatory damages, front pay, back pay, lost benefits, lost retirement benefits, reasonable attorney fees, court costs, and expenses;

g)  That Plaintiff have a judgment entered his favor, and against Defendant for all damages allowed to him under law;

h)  That Plaintiff recover his attorney's fees, costs, and expenses of litigation as permissible under law.;

i)  That Plaintiff be granted a trial by jury on all issues so triable;

j)  That all costs of this action be case upon Defendant;

k)  That defendant be ordered to pay pre-judgment and post-judgment interest according to law; and

l)  Such other, further, and different relief as this Court deems just and proper.

Respectfully submitted this 31st day of May, 2023.

LAWSON, BECK & SANDLIN, LLC

Holly Hance Maestas
Attorney for Plaintiff
Georgia State Bar No. 153092

1125 Commerce Drive, Suite 300
Peachtree City, Georgia 30269
Telephone:     (770) 486-8949
Facsimile:      (770) 486-8950
Email: holly@lawsonandbeck.com

# Plaintiff's Exhibit A

*(to Amended Complaint)*

*FINAL DRAFT 04/11/14*

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("Agreement") is between CANCER TREATMENT CENTERS OF AMERICA PROFESSIONAL CORPORATION OF GEORGIA, P.C., a Georgia professional corporation ("PCG"), and KEVIN WATKINS, M.D., a New York resident ("Doctor").

PCG is providing certain services to or for the benefit of patients treating for cancer at Southeastern Regional Medical Center ("CTCA-SE" or "Hospital") located in Newnan, Georgia and desires to employ the services of a qualified physician to serve as surgical oncologist at the Hospital. Doctor has the professional training and experience to provide such services and to serve in such capacity, and is licensed to practice medicine in Georgia. The parties wish to establish an employment relationship as hereinafter provided.

In consideration of the mutual promises and agreements hereinafter set forth herein and for other good and valuable consideration, receipt of which is acknowledged, the parties agree as follows:

1. Incorporation of Recitals. The recitals set forth above are incorporated by reference and are made an integral part of this Agreement.

2. Effective Date. This Agreement is entered into and is effective and binding as of August 18, 2014 the "Effective Date" of the Agreement.

3. Term and Termination. This Agreement shall remain in full force and effect until August 17, 2017 unless terminated as provided in section 4 hereof.

4. Termination.

4.1 At any time either party may terminate this Agreement without cause by giving the other party at least one hundred and twenty (120) calendar days' prior written notice of intent to terminate. In the event Doctor attempts to terminate this Agreement with less than one hundred twenty (120) days' notice or ceases performance or fails to provide the full amount of required notice, Doctor shall pay PCG as liquidated damages in an amount equal to all incentive and bonus compensation paid to Doctor in the twelve (12) months prior to termination. In the event that PCG terminates this Agreement pursuant to this Section 4.1, PCG shall continue to pay Doctor's base salary at the rate as described in Section 9.1 below for a period of one hundred eighty (180) days from the date of the notice of termination so long as Doctor continues to work fulltime for PCG hereunder for a period designated by PCG's Administrator (which period shall not exceed one hundred twenty (120) days from the date of termination notice); if Doctor does not continue to work fulltime for PCG during the time period requested by PCG's Administrator, PCG's obligation to make salary installment payments shall terminate on the last day on which Doctor works fulltime for PCG hereunder.

4.2 PCG shall have the right to immediately terminate this Agreement for cause including, without limitation, for any one of the following reasons:

4.2.1 Material Breach of a provision of this Agreement that is not cured after written notice;

4.2.2 Reasonable proof of Professional misconduct of Doctor as determined by PCG or by medical staff of Hospital that is not cured after written notice;

1

## FINAL DRAFT 04/11/14

4.2.3   Finding of guilty for a felony or a crime involving moral turpitude committed by Doctor;

4.2.4   Repeated acts of professional negligence by Doctor determined by a prospective QA process that are not cured after adequate written notice of initial acts;

4.2.5   Failure of the Doctor to meet any of the standards imposed by the section entitled "Physician Requirements" that are not cured after adequate written notice; or

4.2.6   Doctor's repeated neglect of duty or violation of the Hospital's policies, bylaws or rules or regulations that is not cured after written notice of initial acts.

4.3 In addition, this Agreement shall automatically terminate if Doctor dies or loses Doctor's license to practice medicine in Georgia.

5. Employment Agreement.   PCG hereby agrees to employ Doctor and Doctor agrees to be employed by PCG as a surgical oncologist on the terms and subject to the conditions set forth in this Agreement.   Doctor agrees to serve PCG and to perform those duties related to PCG as may be assigned from time to time by PCG including the following  (collectively, the "Services").

5.1 Doctor hereby agrees to be on call to provide prompt medical care for surgical oncology issues. This will be shared equally with other surgical oncology staff physicians.

5.2 Doctor shall provide quality surgical oncology services with respect to PCG programs as directed by PCG.

5.3 When requested by PCG, Doctor shall be responsible for the following as they relate to surgical oncology:

5.3.1. Provide specialty medical management for inpatients and outpatients;

5.3.2   On-going in-service training of clinical and technical staff when deemed necessary;

5.3.3   Participation in clinical research and clinical research design;

5.3.4   Preparation of treatment protocols;

5.3.5   Development of disease orientated treatment to include front-line as well as secondary treatment of either a standard or investigatory nature;

5.3.6   Participation in responding to insurance reimbursement issues;

5.3.7   Creation and maintenance of necessary department medical charts, records and billing forms; and

5.3.8   Preparation of reports for publication including peer review journals.

5.4 Doctor shall provide such other services as reasonably requested by PCG's Administrator.

2

*FINAL DRAFT 04/11/14*

6. <u>Scope</u>. Doctor shall work full time for PCG and shall devote as much time, skill, labor and attention to the affairs and activities of PCG as PCG shall reasonably require to serve the best interests of PCG and the Hospital's inpatients, outpatients and office-based patients, but in no event fewer than forty-five (45) hours per week at the Hospital.

7. <u>Professional Accountability</u>. In order to maintain internal quality control and to reduce morbidity and mortality and to improve patient care, Doctor agrees to be subject to and to participate in peer review activities established by the rules, regulations and bylaws of the medical staff the Hospital.

8. <u>Quality Assessment and Improvement</u>. Doctor shall cooperate with the development and implementation of a quality assessment and improvement system and shall actively participate in QA&I programs including, but not limited to, periodic review of policies and procedures relating to patient care as well as any other quality assessment involvement deemed appropriate by PCG or by the officers of the Hospital.

9. <u>Compensation and Benefits</u>. So long as Doctor has not breached any provision of this Agreement and so long as this Agreement remains in effect, during the term of this Agreement:

9.1 PCG shall pay Doctor for services at a rate of Three Hundred Seventy-Five Thousand Dollars ($375,000) per year, payment to be made in twenty-six (26) equal installments per year (every other week), but only as Doctor actually provided services in accordance herewith (PCG shall deduct FICA, withholding taxes and other amounts as required by law);

9.2 PCG shall pay Doctor incentive compensation (from which PCG shall deduct FICA, withholding taxes and other amounts as required by law) at the end of each calendar month in the amount of thirty-seven percent (37%) of the CMS-allowable charges for Doctor's professional services rendered during such calendar month; provided, however, in the event that Doctor remains continuously employed by PCG through July 31, 2015, the amount of such incentive compensation shall not be less than Seventy-Five Thousand Dollars ($75,000); and further provided that Doctor must remain current with Medical Record documentation measured in terms of Medical Record delinquency as defined by the CTCA-SE Medical Staff Bylaws and Rules and Regulations. Each episode of Medical Record Delinquency will result in a deduction of Five Hundred Dollars ($500) from the bonus each month that Doctor remains delinquent;

9.3 Upon receipt of original documentation, PCG shall reimburse Doctor for Doctor's actual expenditures an amount not to exceed Five Thousand Dollars ($5,000) per year for Doctor's attendance at professional meetings, for the purchase of professional texts and professional journals for Doctor's use, for Doctor's continuing medical education, professional dues, licensing fees, DEA certification, computer and resource materials for CME, and subscriptions previously approved by PCG;

9.4 PCG shall provide Doctor the health, dental, disability and life insurance programs provided by PCG to its similarly situated physician employees, and will provide the opportunity for Doctor to add Doctor's family to these benefits at Doctor's cost consistent with the plan then in existence;

9.5 Doctor shall be eligible to participate in such 401(k) and similar plan(s) as may then be provided by PCG to its similarly situated physician employees, in accordance with the terms thereof;

3

*FINAL DRAFT 04/11/14*

9.6 Upon receipt of appropriate documentation, PCG shall reimburse Doctor for Doctor's actual expenditures for reasonable expenses not to exceed Twenty Thousand Dollars ($20,000) incurred in relocating Doctor's household belongings to the Newnan area;

9.7 PCG shall provide Doctor with six months of housing allowance of $2,000 a month; and

9.8 Upon execution of this Agreement, PCG shall make a loan to Doctor (the "Loan") in the principal amount of Fifty Thousand Dollars ($50,000), which Loan shall bear interest at five percent (5%) on amounts outstanding from time to time. Doctor shall repay the Loan by permitting PCG to offset the incentive compensation described in Section 9.2 above from and after the time that Doctor has actually received Seventy-Five Thousand Dollars ($75,000); provided, however, all amounts owed on the loan shall be repayable immediately in the event that Doctor terminates this Agreement pursuant to Section 4.1 above; and provided further that, in the event that PCG terminates this Agreement pursuant to Section 4.1 above, any amount of the Loan remaining outstanding on the date of such termination shall be forgiven. In addition, Doctor shall have the right to prepay the Loan at any time.

10. Billing.   PCG shall have the exclusive right to bill, collect and retain in its own name the professional service fees for any and all professional services provided by Doctor at CTCA-SE or to PCG patients and other services assigned by PCG. Doctor agrees that Doctor shall not submit any invoices for any of Doctor's professional services to any patient or third-party payor.

11. Time Off.   Doctor, after consultation with and approved by PCG, may schedule thirty-one (31) weekdays off per year, of which six (6) are the Federal holidays, twenty (20) are for vacation, and five (5) are for continuing medical education ("CME"). Vacation and CME days do not roll over into the following year.

12. Personnel Policies.   Doctor shall be subject to the CTCA-SE's personnel policies except to the extent to which such policies are contrary to the provisions of this Agreement.

13. Regulation.

13.1 Doctor shall comply with all applicable provisions of law and other rules and regulations of any and all governmental authorities relating to licensure and regulation of physicians.

13.2 Doctor shall cooperate in conducting Services in accordance with the standards and recommendations of the Joint Commission ("TJC"), the American College of Surgeons ("ACS"), the Georgia Department of Public Health and the bylaws, policies, rules and regulations of the Hospital.

13.3 Doctor shall assist in attaining and maintaining all relevant licensures, TJC accreditation and ACS approval for programs operated at the Hospital.

14. Physician Requirements.

14.1 Doctor agrees that Doctor shall at all times relevant hereto be licensed to practice medicine in Georgia.

14.2 Doctor shall complete all medical charts within ten (10) working days from an inpatient's discharge date and within four (4) days of any significant diagnosis, treatment, test, observation, history or order for any patient of Doctor, whichever is earlier.

## FINAL DRAFT 04/11/14

14.3 Continuation of this Agreement shall be contingent upon Doctor's continuing satisfaction of the requirements of this section entitled "Physician Requirements".

14.4 Doctor shall strictly abide by the Principles of Medical Ethics of the American Medical Association.

15. <u>Non-exclusivity</u>.  Patients treated under this Agreement are and shall remain patients of PCG.  PCG may determine which patients or clients shall or shall not be treated or served by Doctor and may arrange for other physicians or entities to provide medical services to patients already treated by Doctor when so requested by the patient or when believed by PCG to be in the best interest of the patient.

16. <u>Professional Liability Insurance</u>.  Except as otherwise provided herein, PCG shall provide and maintain professional liability insurance through CTCA's self-insured program covering Doctor for services rendered to PCG's patients at CTCA-SE in the amount required by the medical staff regulations of CTCA-SE.  Such coverage is currently accounted on an "occurrence" basis; in the event that coverage becomes "claims made", PCG shall provide "tail" insurance for Doctor for acts committed in the scope of employment hereunder.  Such insurance shall expressly NOT include any prior acts coverage and will NOT include any coverage for acts or omissions relating to patients other than PCG's patients. As a condition precedent to PCG's obligations under this Section 16, Doctor shall provide PCG's Administrator with evidence of "tail" insurance covering Doctor's prior acts.

17. <u>Confidentiality and Access to Medical Information</u>.

17.1 Doctor acknowledges that PCG has certain non-public confidential business information, including but not limited to non-public information and information designated by PCG to be kept confidential; treatment information; including procedures, processes and protocols relating to complementary medicine, and other things that differentiate PCG's business and treatment styles; business strategies and other strategies and plans regarding sales, advertising, and marketing; financial data such as revenues and earnings figures, pricing information, schedules of charges and rates; scientific data, research results and information about research projects; as well as personnel files and other non-public personnel information ("Confidential Information") which Doctor has acquired and will continue to receive access to in the course of Doctor's employment with PCG. Doctor recognizes and agrees that this information is proprietary, highly sensitive and valuable. During Doctor's employment with PCG and thereafter, Doctor will maintain all Confidential Information that comes into Doctor's possession as confidential and as the property of PCG, and such Confidential Information shall not be disclosed by Doctor nor used by Doctor in any way, except (during Doctor's employment with PCG) as required by Doctor's duties to, and for the benefit of, PCG.  Confidential Information does not include information that is generally available to the public through no violation of confidentiality obligations by Doctor or anyone else.

17.2 Doctor shall not disclose any patient information in the possession of PCG or the Hospital (no matter what form or format it is in) including that concerning test results, diagnosis or treatment of any patient to anyone other than appropriate members of the medical staff or appropriate medical audit committees of the relevant Hospital without prior written consent from the patient or his/her authorized representative except as part of the treatment of patient by a health care provider.

17.3 Doctor will not remove any Confidential Information from PCG's premises except as Doctor's duties shall require and as authorized by PCG, and upon any termination of

5

## FINAL DRAFT 04/11/14

Doctor's employment, Doctor will immediately turn over all Confidential Information to Doctor's supervisor or other designee of PCG, and Doctor shall retain no copies (either paper, digital, or electronic) thereof.

17.4 Any patient information as well as the medical records of patients provided service hereunder shall at all times remain the property of PCG or the Hospital and shall be treated as confidential. Access to and release of such medical records or any information contained therein (no matter what form or format it is in) shall be in accordance with the Hospital's policies. Doctor shall not disclose any information relating to operations of PCG or the Hospital to persons other than appropriate PCG members without prior written consent of PCG or of the Hospital.

17.5 During and after this Agreement, Doctor agrees to assist PCG to obtain access to any and all medical records relating to patients treated by Doctor during the term of this Agreement.

## 18. Intellectual Property Ownership.

18.1 Purpose. PCG recognizes that the value of PCG and Hospital to patients goes beyond the physical surroundings of Hospital and the comfort and care that can be offered as individuals. PCG stakes its business on collaborating with the best minds in medicine and providing innovative, progressive therapies, many of which are developed by its physicians. As such, PCG realizes Doctor might conceive some ideas or create new treatments or protocols in Doctor's practice. To look after Doctor, Hospital's patients and the investments of PCG and its affiliates, PCG asks that Doctor assign those innovations to PCG so that it can explore the best possible means of protecting them.

18.2 Description. In furtherance of the joint mission of PCG, Hospital and their respective employees to provide innovative, advanced and effective therapies and overall compassionate and excellent integrative patient care, PCG invites and encourages Doctor to create inventions, improvements, ideas, concepts, know-how, designs, models, research, clinical innovations, protocols and other clinical-related intellectual property, proposals, procedures, strategies, methodologies and techniques, and other intellectual property, materials, information and data and related documentation. All such items created, conceived or developed by Doctor, alone or together with other PCG or Hospital employees or contractors, during the term of Doctor's employment or other relationship with PCG (whether prior to, on or after the Effective Date) are considered "Work." "Work" does not include, however, and this Agreement does not apply to, any invention developed by Doctor (i) entirely on Doctor's own time and (ii) without the use of any equipment, supplies, facilities or trade secret information of PCG or Hospital or any of their affiliates, unless such invention (a) relates to the business of PCG, Hospital or any of their affiliates or their respective actual or demonstrably anticipated research or development or (b) results from any work performed by Doctor for PCG.

18.3 Ownership of Work. To permit PCG, Hospital and their affiliates to consolidate, enhance and protect the Work of their various employees in the interest of supporting the collective mission, vision and values thereof, (i) Doctor understands and agrees that, to the extent permitted by law, the Work shall be deemed a "work made for hire" of PCG, (ii) Doctor hereby irrevocably assigns and transfers to PCG, effective with respect to each item of Work as of the date of its creation, any and all rights, title and interest Doctor may have or may acquire in and to the Work (including any Work not deemed, for whatever reason, to have been created as a work made for hire), in any and all media, languages, territories and jurisdictions throughout the world, now known or hereafter devised, including any and all

6

*FINAL DRAFT 04/11/14*

intellectual property rights in the Work, and the right to prosecute and recover damages for all past, present and future infringements and other violations of the Work, and (iii) Doctor hereby irrevocably waives and assigns to PCG any and all so-called moral rights or "droit moral" Doctor may have in or with respect to any Work (e.g., rights of attribution and preventing others from modifying the Work). Nothing contained in this Agreement will, however, require PCG to exercise or exploit any of its rights in or to the Work.

18.4   Notifying PCG of Work.   To enable PCG to identify and utilize Work created by its employees, during the term of Doctor's relationship with PCG, Doctor agrees to maintain current and accurate records of all Work. Upon the termination of Doctor's relationship with PCG for any reason, and/or at any time upon PCG's reasonable request, Doctor agrees to promptly (i) disclose to PCG all Work; (ii) deliver to PCG all documentation and other tangible materials that in any way embody, comprise, incorporate, or reflect the Work, and (iii) confirm in writing to PCG that Doctor has fully complied with these requirements.

18.5   Further Documentation.   Doctor also agrees that, upon PCG's request, Doctor will promptly execute and deliver to PCG any and all further assignments, patent applications, and/or such other documents as PCG may deem necessary to vest in PCG any of its rights in the Work and/or protect any Work.

18.6   IP Warranties.   Doctor hereby represents and warrants that: (i) except as expressly authorized by PCG in each instance, the Work (excluding any materials provided by PCG to Doctor) does not and will not use or disclose any trade secrets, confidential information or other proprietary information of any individual or entity, including without limitation any works developed by Doctor for any individual or entity other than PCG; (ii) Doctor will not challenge PCG's or any of its affiliates' rights in any Work or infringe or otherwise violate any such rights; and (iii) neither the Work, nor the exploitation and/or use by PCG and/or any of its affiliates of any Work (excluding any materials provided by PCG to Doctor), in any manner or media throughout the world, will, to Doctor's knowledge, in any way infringe or otherwise violate any intellectual property, privacy or other rights of any individual or entity.

18.7   IP Indemnification.   Doctor agrees to reimburse and indemnify PCG, its affiliates (including without limitation Hospital and CTCA) and their respective licensors, and the officers, directors, members, managers, employees, agents, and representatives of PCG and its affiliates and their respective licensors (collectively, the "PCG Indemnitees"), and hold such PCG Indemnitees harmless against, any and all actions, damages, losses, expenses, claims, demands, costs and liabilities of any nature whatsoever (including reasonable attorneys' fees and court costs), incurred by any such PCG Indemnitees in connection with or arising out of any claim by a third party that any Work, or the use thereof, infringes or otherwise violates any intellectual property, privacy, or other rights of any individual or entity.

19.   Equitable Remedies.   Doctor recognizes that any breach by Doctor of the terms and conditions of the section above entitled "Confidentiality and Access to Medical Information" will cause PCG or the Hospital losses, which are not fully compensable by monetary damages. Therefore, PCG and the Hospital shall be entitled to institute and prosecute proceedings in any court of competent jurisdiction to enjoin any such breach, or threatened breach, and, in addition thereto, to obtain damages or enforce strict performance by Doctor of the provisions of such sections or to obtain any combination of such remedies as PCG or the Hospital shall elect. The prevailing party in any such action shall be entitled to reasonable attorneys' fees incurred in connection with any proceedings to enforce this Agreement.

*FINAL DRAFT 04/11/14*

20. Representation of Doctor. DOCTOR HEREBY REPRESENTS AND WARRANTS THAT (i) DOCTOR WILL NOT USE OR NEED TO USE ANY CONFIDENTIAL, PROPRIETARY OR TRADE SECRET INFORMATION FROM ANY FORMER EMPLOYER IN PERFORMING DOCTOR'S DUTIES FOR PCG OR CTCA, AND (ii) DOCTOR IS NOT CURRENTLY SUBJECT TO ANY AGREEMENT OR ARRANGEMENT THAT WOULD PROHIBIT OR RESTRICT DOCTOR FROM ENTERING INTO THIS AGREEMENT OR PERFORMING SERVICES HEREUNDER. DOCTOR ACKNOWLEDGES THAT PCG IS RELYING ON THE ACCURACY OF SUCH REPRESENTATION AS A CONDITION PRECEDENT TO ENTERING INTO THIS AGREEMENT.

21. Applicable Law. This Agreement shall be governed by and construed under the laws of Georgia.

22. Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

23. Notice. Any notice, election, request, demand, designation, consent, agreement or communication given or required to be given under this Agreement shall be in writing and signed by or on behalf of the party giving it, shall be personally delivered to the Doctor or the Administrator of PCG, as applicable, or sent by U.S. certified mail, or by Express Mail or similar private overnight delivery service addressed to the party at their last known address.

24. Assignment. PCG may assign this agreement to an affiliate on written notice to Doctor, so long as such affiliate is a physician practice that provides medical services in Georgia.

25. Integration. This Agreement constitutes the entire Agreement between the parties and contains all agreements between the parties with respect to the subject matter hereof. This Agreement supersedes all other agreements, either in writing or oral between the parties hereto with respect to the same or similar subject matter.

The parties execute this Agreement as of the Effective Date.

CANCER TREATMENT CENTERS
OF AMERICA PROFESSIONAL
CORPORATION OF GEORGIA, P.C.

By:
Its: Administrator

KEVIN WATKINS, M.D.

8

# Plaintiff's Exhibit B

*(to Amended Complaint)*

## FIRST AMENDMENT TO AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This FIRST AMENDMENT TO EMPLOYMENT AGREEMENT ("First Amendment"), between Cancer Treatment Centers of America Professional Corporation of Georgia, P.C., a Georgia professional corporation ("PCG") and **Kevin Watkins, M.D.**, a resident of Georgia ("Doctor"), is effective as of the 18th day of August, 2017 (the "Effective Date").

BACKGROUND:

    a.   PCG and Doctor entered into an Employment Agreement effective August 18, 2014 (the "Agreement").

    b.   PCG and Doctor wish to amend the terms of the Agreement as set forth below.

In consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the PCG and Doctor agree as follows:

1.   Incorporation of Background.  The Background set forth above is incorporated by reference and made an integral part of this First Amendment.

2.   Extension of Term and Change in Notice of Termination.  The Term of the Agreement is hereby extended to expire August 17, 2018 unless earlier terminated pursuant to the Agreement, as amended hereby.  Unless either party shall give at least 90 days prior notice, the Agreement shall automatically extend for successive one (1) year terms unless terminated in accordance with Section 4 of the Agreement; provided however, for each one year term beginning on or after August 17, 2018, either party may terminate the Agreement upon ninety (90) days prior written notice.  The procedures and effect of any such termination shall remain unchanged; only the notice period shall change for terms beginning on or after August 17, 2018.

3.   Except as specifically modified and amended herein, all of the terms, provisions, requirements and specifications contained in the Agreement remain in full force and effect and the Agreement, as amended hereby, is ratified and confirmed.

IN WITNESS WHEREOF, the parties have caused this First Amendment to be executed by their duly authorized representatives, as of the date set forth above.

**Cancer Treatment Centers of America**
**Professional Corporation of Georgia, P.C.**

By: _____

Name: _____ ANNE MEISNER _____

Title: _____ CEO _____

By: _____

Name:  Kevin Watkins, M.D.

# Plaintiff's Exhibit C

*(to Amended Complaint)*

## SECOND AMENDMENT TO

## EMPLOYMENT AGREEMENT

This SECOND AMENDMENT TO THE EMPLOYMENT AGREEMENT (**"Second Amendment"**), between CTCA Physicians Group of Georgia, Inc., a Georgia corporation f/k/a Cancer Treatment Centers of America Professional Corporation of Georgia, P.C., a Georgia professional corporation (**"PG"**) and Kevin Watkins, M.D., a resident of Georgia (**"Doctor"**), is effective as of January 1, 2022 ("**Effective Date**").

**BACKGROUND:**

a.  PG and Doctor entered into an Employment Agreement effective August 18, 2014 and amended August 18, 2017 (collectively, the **"Agreement"**) whereby Doctor provides services to PG as a surgical oncologist.

b.  PG and Doctor agreed to a monthly payment of one thousand four hundred forty-four dollars ($1,444) to cover additional emergency general surgery call.

c.  PG and Doctor now wish to memorialize and amend the Agreement as set forth below in order to compensate Doctor for the call coverage provided.

In consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the PG and Doctor agree as follows:

1       Incorporation of Background.  The Background set forth above is incorporated by reference and made an integral part of this Second Amendment.

2       Section 9 – Compensation and Benefits.  A new Section 9.9 shall be added as follows:

*"In addition to providing surgical oncology call coverage as previously stipulated, Doctor shall provide emergency general surgery call coverage coinciding with surgical oncology call days. Doctor shall be paid One Thousand Four Hundred Forty-Four Dollars ($1,444) per month ($666.45 per pay period) for call coverage"*

3       Ratified and Confirmed.  Except as specifically modified and amended herein, all of the terms, provisions, requirements and specifications contained in the Agreement remain in full force and effect and the Agreement, as amended hereby, is ratified and confirmed.

(SIGNATURE PAGE FOLLOWS)

**IN WITNESS WHEREOF**, the parties have caused this Second Amendment to be executed by their duly authorized representatives, as of the date set forth above.

**CTCA PHYSICIANS GROUP OF GEORGIA, INC.,**
**F/K/A CANCER TREATMENT CENTERS OF**
**AMERICA PROFESSIONAL CORPORATION OF**
**GEORGIA, P.C.**

**DOCTOR:**

By: _____

*Electronically signed by: Jonathan E Weekes Date: Apr 8, 2022 08:41 CDT*

*Electronically signed by: Kevin T Watkins Date: Apr 8, 2022 11:10 EDT*

Name: _____

**KEVIN WATKINS, M.D.**

Title: _____

## IN THE SUPERIOR COURT OF COWETA COUNTY
## STATE OF GEORGIA

KEVIN T. WATKINS,                                )
                                                 )
    Plaintiff,                           )
                                                 )
    v.                                   )          CIVIL ACTION FILE
                                                 )
CTCA   PHYSICIANS   GROUP   OF                   )          NO. SUV2022001394
GEORGIA, LLC f/k/a CTCA PHYSICIANS               )
GROUP OF GEORGIA, INC. f/k/a CANCER              )
TREATMENT CENTERS OF AMERICA                     )
PROFESSIONAL   CORPORATION   OF                  )
GEORGIA, P.C.,                                   )
                                                 )
    Defendant.                           )

## **VERIFICATION**

Personally appeared KEVIN T. WATKINS who, after being duly sworn, states that the

facts alleged in the foregoing *Amended Complaint* are true and correct to the best of his knowledge,

belief and information.

_____
KEVIN T. WATKINS, Plaintiff

Sworn to and subscribed before me this
31st day of _May_____, 2023

_____
Notary Public

My commission expires:

_July 6, 2025_____

## IN THE SUPERIOR COURT OF COWETA COUNTY
## STATE OF GEORGIA

KEVIN T. WATKINS,                          )
                                           )
     Plaintiff,                           )
                                           )
     v.                                   )          CIVIL ACTION FILE
                                           )
CTCA   PHYSICIANS   GROUP   OF             )          NO. SUV2022001394
GEORGIA, LLC f/k/a CTCA PHYSICIANS         )
GROUP OF GEORGIA, INC. f/k/a CANCER        )
TREATMENT  CENTERS  OF  AMERICA            )
PROFESSIONAL   CORPORATION   OF            )
GEORGIA, P.C.,                             )

     Defendant.

### CERTIFICATE OF SERVICE

This is to certify that I have, this 2nd day of June , 2023, served a true and correct

copy of the within and foregoing **AMENDED COMPLAINT** upon all parties and/or counsel of

record by electronically filing the same via PeachCourt, which will automatically serve a copy of

the same to counsel of records as follows:

Victor Moldovan
Peter N. Hall
Laura E. Flint
HOLLAND KNIGHT
1180 West Peachtree Street, NW
Suite 1800, Regions Plaza
Atlanta, Georgia 30309
victor.moldovan @hklaw.com
peter.hall @hklaw.com
laura.flint@hklaw.com

LAWSON, BECK & SANDLIN, LLC

Holly Hance Maestas
Attorney for Plaintiff
Georgia State Bar No. 153092

1125 Commerce Drive, Suite 300
Peachtree City, Georgia 30269
Telephone:     (770) 486-8949
Facsimile:     (770) 486-8950
Email: holly@lawsonandbeck.com