**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| STEPHEN GEARHART, individually and on behalf of all others similarly situated, | Civil Action No. _____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| PORSCHE CARS NORTH AMERICA, INC.; and DR. ING H.C.F. PORSCHE AG, | |
| Defendants. | |

## I.     INTRODUCTION[1]

1.     Approximately two months ago, on April 27, 2023, the National

Highway Traffic Administration ("NHTSA") informed ARC Automotive, Inc.

_____

[1] Plaintiff informs the Court of the ongoing multi-district litigation *In re ARC Airbag Inflators Products Liability Litigation*, MDL No. 2051, centralized in the Northern District of Georgia. Plaintiffs filed their Consolidated Class Action Complaint (ECF 94, 94-1, 94-2) in the MDL on June 28, 2023, and Plaintiffs are filing individual transferor complaints against various defendants in their home states pursuant to Plaintiffs' Notice of Filing Plan (ECF 93) filed in the MDL. This complaint is one of those transferor complaints, which will be transferred to the Northern District of Atlanta for centralized pre-trial proceedings in the MDL per the December 15, 2022 order of the Judicial Panel of Multidistrict Litigation (ECF 1).

*Footnote continued on next page.*

("ARC") that NHTSA had "tentatively concluded that *a defect related to motor vehicle safety exists* in the frontal driver and passenger air bag inflators under investigation that were produced before installation of borescopes on all toroidal inflator manufacturing lines in January 2018 (emphasis added).[2] NHTSA demanded that ARC recall the defective inflators ("Defective Inflators") and "issue a Part 573 Recall Report addressing the safety defect."[3] NHTSA noted that ARC's 67 million Defective Inflators are contained in the driver and passenger frontal airbag modules of vehicles manufactured by at least 12 major vehicle manufacturers.[4] Most of these vehicles likely are on the road today, and tens of millions of people are at risk of serious injury or death. The vehicles affected by the inflator defect ("Inflator Defect") are the Class Vehicles in this case, and the owners and lessees of those vehicles are Plaintiff and Class Members.

2.     NHTSA described the defect as the presence of loose weld "slag" or "flash" in the interior of the Defective Inflators.[5] This loose piece of metal flash can

---

[2] Letter from S. Ridella, Director, Office of Defects Investigation, NHTSA, to S. Gold, Vice President – Product Integrity, ARC (Apr. 27, 2023), attached as Exhibit A.

[3] *Id*.

[4] *Id*. at 1-2.

[5] *Id*. at 2. Within the industry the material at the seam of two parts joined by friction welding is commonly referred to as "flash," which is the term Plaintiffs use herein instead of "slag." *See* "Whiteboard Wednesday: Friction Welding Flash,"

*Footnote continued on next page.*

become dislodged during a crash and block the Defective Inflators' single ventilation port. As NHTSA found, "ARC's inflator design is such that during a triggered deployment, the stored gas, excited by the propellant, has a single path through the exit orifice to exit the inflator and fill the air bag cushion."[6] If a piece of loose weld flash blocks the ventilation exit port during deployment, the large volume of gas trying to travel from the inflator to the air bag cushion over-pressurizes the metal inflator, which causes a rupture that can result in "metal [inflator] fragments being forcefully propelled into the passenger compartment."[7]

3.     NHTSA concluded that the Defective Inflators "pose an unreasonable risk of death or injury," and that "[a]n airbag inflator that ruptures when deploying in a vehicle is plainly defective."[8] Confirming the obvious, NHTSA determined that "[a]irbag inflators that project metal fragments into vehicle occupants, rather than properly inflating the attached air bag, create an unreasonable risk of death and injury."[9]

---

Manufacturing Technology, Inc., available at
https://blog.mtiwelding.com/whiteboard-wednesday-friction-welding-flash.
[6] *Id.* at 2. *Id.* at 2.
[7] *Id.*
[8] *Id.* at 4-5.
[9] *Id.* at 5.

*Footnote continued on next page.*

4.     ARC rejected NHTSA's demand.[10] Instead of recalling the Defective Inflators, ARC "strongly" disagreed with NHTSA. ARC attacked NHTSA's authority, mischaracterized the statements in NHTSA's detailed six-page letter as "not based on any objective technical or engineering conclusion," despite acknowledging that NHTSA had been investigating the issue for years, and called the defect in its inflators "hypothetical" even though it had caused numerous documented ruptures, injuries, and fatalities.[11]

5.     This indifference to the safety of millions of motorists stands in stark contrast to ARC's portrayal of itself as a responsible company focused on safety, as expected of a manufacturer of airbag inflators. On its official website, ARC promises that "safety" and "integrity" are its core values. In its May 11, 2023 response letter to NHTSA, ARC repeatedly made similar claims; for example, "The safety of the motoring public is a cornerstone of our business." This is demonstrably untrue. Not only did ARC defy NHTSA and refuse to recall its Defective Inflators, but it failed to even notify consumers of the dangers they face or take any other action to protect the driving public.

---

[10] Letter from S. Gold, Vice President – Product Integrity, ARC, to S. Ridella, Director, Office of Defects Investigation, NHTSA (May 11, 2023), attached as Exhibit B.
[11] *Id*. at 1.

6.    NHTSA's conclusions followed a nearly eight-year investigation. During that time, there have been at least 10 known ruptures of the Defective Inflators in vehicles, including seven driver inflators and three passenger inflators. Two of those ruptures resulted in driver fatalities. Additionally, numerous Defective Inflators ruptured during ARC's internal testing. These ruptures led to recalls of a fraction of the Class Vehicles with the defect. Those recalls are inadequate in scope because tens of millions of vehicles with the Defective Inflators still have not been recalled. Between 2017 and 2022, for example, BMW, Ford, GM, and Volkswagen (defined *infra*) collectively recalled fewer than 6,400 vehicles equipped with airbags containing Defective Inflators.

7.    On or about May 10, 2023, after NHTSA issued its April 27, 2023, letter, GM initiated a broader, yet still inadequate, recall of 994,000 of GM's "2014-2017 model year Buick Enclave, Chevrolet Traverse, and GMC Acadia vehicles." Contrary to NHTSA's findings that there is a design defect, GM said it was recalling these vehicles because of "a supplier manufacturing defect [that] may result in rupture during deployment." Nonetheless, GM agreed that "[a]n inflator rupture may cause metal fragments to pass through the airbag and into the vehicle interior, which

may result in injury or death to vehicle occupants."[12]

8.      On information and belief, ARC worked with others to conceal the Defective Inflators for years. It had help from the "Airbag Module Suppliers" (defined *infra*) and the Porsche Defendants (defined *infra*). The Airbag Module Suppliers and the Porsche Defendants have long known that ARC inflators are defective. The Porsche Defendants designate the specifications for the airbag inflators in their vehicles, which forbid structural failure and state that the inflators "shall not fail."

9.      Both the Airbag Module Suppliers and the Porsche Defendants develop design specifications for the ARC inflators and require that ARC conduct testing and evaluations as part of the Production Part Approval Process ("PPAP"), which is the process that documents ARC's conformance to the Porsche Defendants' specifications. The Airbag Module Suppliers and the Porsche Defendants also require testing of the ARC inflators and, if the inflator does not meet the specifications, the Airbag Module Suppliers and the Porsche Defendants must grant an exception before the product is installed and sold. If there is an inflator failure,

---

[12] General Motors, LLC Part 573 Safety Recall Report, submitted May 10, 2023, NHTSA Recall No. 23V-334, Manufacturer Recall No. N232404980, available at https://static.nhtsa.gov/odi/rcl/2023/RCLRPT-23V334-3594.PDF (last accessed June 13, 2023).

whether during testing or in the field, the Airbag Module Suppliers and the Porsche Defendants review all the previous design, process, and testing documents to determine the root cause of the failure.

10.     Inflators and airbag modules are manufactured in groups that are known as "lots." Prior to installing a lot of inflators or airbag modules, the Porsche Defendants require that ARC perform Lot Acceptance Testing ("LAT") on both inflators and airbag modules and that they be notified of any inflator ruptures. The Porsche Defendants also run their own tests on the airbag modules.[13] The Airbag Module Suppliers and the Porsche Defendants were made aware of multiple LAT failures where the inflator ruptured during testing, as confirmed in several of the recalls. The Airbag Module Suppliers and the Porsche Defendants were also made aware of ARC inflator ruptures in the field. Even though they knew about the defect, the Porsche Defendants still chose to sell tens of millions of vehicles with Defective Inflators to Plaintiff and the Class Members.

11.     The Vehicle Manufacturers have taken a lot-based recall approach to date. In a lot-based recall, the Vehicle Manufacturers identify the lot of a failed

---

[13] *See, e.g.*, https://static.nhtsa.gov/odi/inv/2016/INRL-EA16003-87413P.pdf (Ford requires ARC to "conduct Lot Acceptance Testing, Conformance of Production, or other production part testing to ensure conformance to design and performance requirements and/or quality control standards prior to shipping the components.").

inflator and then issue a recall notice for this finite population of inflators. An Automaker "assumes" the defect was caused by a lot-specific manufacturing error rather than by a fleet-wide design defect and then waits until the next failure takes place before it issues further recalls.[14] The Porsche Defendants did not recall any of their vehicles with ARC Defective Inflators.

12.    NHTSA's correspondence confirms that ARC was regularly in touch with the Automaker and Module Suppliers throughout NHTSA's investigation of the Defective Inflators. Defendants continued to profit from the sale, service, and use of the Defective Inflators, while the Class bore the safety risk and related economic loss.

13.    On May 31, 2023, NHTSA issued a Special Order to ARC (1) outlining its investigative efforts and ARC's refusal to issue a recall, (2) requiring ARC to file answers to questions under oath, and (3) requiring ARC to produce certain

---

[14] Several automakers in this case took a similar lot-based recall approach early in the *In re Takata Airbag Products Liability Litigation*, MDL No. 2599. Eventually all the Automaker defendants in that case were required to recall all vehicles with the defective inflators because NHTSA found it was a dangerous design defect that affected all vehicles with the inflators. Not coincidentally, the defective Takata inflators – like the ARC inflators here – sometimes exploded and spewed sharp metal fragments into the faces and necks of drivers and passengers when their air bags deployed in a crash.

*Footnote continued on next page.*

documents by June 14, 2023.[15] NHTSA's Special Order seeks information that ARC has yet to provide NHTSA or its customers, including whether ARC contends that its airbag inflators are expected to occasionally experience a field rupture, the estimated number and frequency of field ruptures ARC expects to occur, and whether ARC has notified its customers that its inflators are expected to occasionally experience field ruptures.

14.   On June 14, 2023, ARC responded to NHTSA's Special Order under oath.[16] Among other things, ARC admitted that it "designs its inflators, manufacturing processes, and quality controls to operate within the manufacturing and performance parameters specified by its customers," *i.e.*, the Automaker and Airbag Module Suppliers. ARC admitted that it did not have any expectation that the inflators at issue "would occasionally experience a field rupture."

15.   ARC also admitted that it has not taken any measures to notify its customers or consumers of the danger related to their inflators outside of the processes already embodied by the Advance Product Quality Process ("APQP"). ARC also confirmed that its customers participate in the design of the inflators and

---

[15] Special Order Directed to ARC, *In re: EA 16-003 Air Bag Inflator Rupture* (NHTSA May 31, 2023), attached as Exhibit C.
[16] ARC's Written Response to May 31, 2023 Special Order, *In re: EA 16-003 Air Bag Inflator Rupture* (NHTSA June 14, 2023), attached as Exhibit D.

validation of the inflators in a process known as the Design Failure Mode and Effects Analysis ("DFMEA"). ARC confirmed that these customers required ARC to meet their own "specifications and quality requirements." The DFMEA includes a Process Failure Mode and Effects Analysis ("PFMEA"), "which evaluates each process step" and ultimately subscribes a Risk Priority Number ("RPN") to the relevant failure modes. ARC's customers have the right to review or audit each of these processes and make their own determination of whether the inflators are satisfactory.

16.    ARC also confirmed that for ruptures that occur during testing, ARC notified the Airbag Module Suppliers and vice versa. ARC further confirmed that it was not able to estimate the number of field ruptures it expects to occur at this time.

17.    NHTSA specifically asked ARC to state the number of inflators that it had rejected due to "weld flash." ARC confirmed that, as late as 2016, it was not checking for weld flash issues with a borescope and, therefore, it does not know how many inflators were rejected for this reason. ARC did provide the numbers to NHTSA for weld flash rejections from August 2017 to May 31, 2023, but that information was stored on a drive and submitted as confidential. Therefore, the Class does not yet have that information.

18.    These answers confirm that the defect in ARC inflators is one of design, not a one-off manufacturing defect and, just as ARC, that Class Members would not

reasonably expect the defect to occur. They also confirm that the Porsche Defendants and Airbag Module Suppliers were aware of the relevant rupture rate involved in the design process with ARC, such that they have responsibility for the defects alleged herein.

19.   Plaintiff seeks to accomplish what ARC and the Porsche Defendants refuse to do, even when confronted by NHTSA. Plaintiff seeks to remove the dangerous Defective Inflators off the road and install airbags with demonstrably safe inflators in the Class Vehicles, enjoin Defendants from further jeopardizing the lives of tens of millions of Class Members, and compensate Plaintiff and Class Members for the economic damage they have incurred from buying cars with defective safety systems.

20.   The Class is a nationwide class that includes "all consumers in the United States who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC between 2001 and 2018."[17] The Class does not include: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such

---

[17] At this early stage and without the benefit of discovery, Plaintiff cannot determine with certainty each vehicle by make, model, and model year equipped with the Defective Inflators but have included those about which they are reasonably confident. Plaintiff may amend their pleadings to add vehicles if they are identified in the discovery process.

persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class Counsel; and (e) any person who timely and properly excludes himself or herself from the Class.

21.     In addition, Plaintiff brings claims under Florida law. The Florida Subclass consists of "all consumers in Florida who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC between 2001 and 2018." The Florida Subclass does not include: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class Counsel; and (e) any person who timely and properly excludes himself or herself from the Class.

22.     Consistent with Federal Rule of Civil Procedure 23(c)(5), which sanctions the creation of subclasses "[w]hen appropriate," Plaintiff reserves the right to modify the Class and the Florida Subclass as discovery progresses and at the class certification stage.

23.     As NHTSA explained, instead of protecting Class Members during a

crash, the Defective Inflators may explode, sending shrapnel into the passenger compartment and injuring or killing occupants. Class Members were not aware of the defect when they purchased or leased their Class Vehicles. Therefore, they overpaid for their Class Vehicles. The Defective Inflators also significantly diminished, and will continue to diminish, the value of the Class Vehicles. Worse yet, Class Members now face Hobson's choice: continue to drive their Class Vehicles and face the risk of catastrophic injury or replace the airbag modules containing Defective Inflators out of their own pockets.

24.     Plaintiff, on behalf of himself and all others similarly situated, asserts nationwide and state claims and seeks all available damages, penalties, and punitive damages for Defendants' egregious conduct. Plaintiff also seeks declaratory and injunctive relief, including a Court order directing Defendants to expeditiously repair the Class Vehicles with demonstrably safe airbags.

## II.     PARTIES, JURISDICTION, AND VENUE

### A.     A.     The Plaintiff

25.     Plaintiff Stephen Gearhart resides in Fort Myers Beach, Florida. Plaintiff owns a 2017 Porsche Macan GTS, which he purchased used on or about December 11, 2019 for approximately $59,000 from Porsche Fort Myers in Fort Myers, Florida, an authorized Porsche dealership. Plaintiff's Porsche was covered

by a written warranty. Plaintiff purchased his Class Vehicle without knowledge of the Inflator Defect. Through his exposure to Porsche's advertisements, promotional materials and other public statements, Plaintiff was aware of Porsche's uniform and pervasive marketing message that its vehicles are safe and dependable, which was material to his decision to purchase the Class Vehicle. When Plaintiff acquired the Class Vehicle, he believed, based on Porsche's uniform and pervasive marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his Class Vehicle did Porsche disclose that it was not safe or dependable, or that it was equipped with an airbag containing a defective ARC inflator. Had Defendants disclosed their knowledge of the Inflator Defect, Plaintiff would have heard, seen, and been aware of it. Plaintiff had no way of knowing when he purchased his Class Vehicle that it contained airbags with defective ARC inflators and only recently learned of the presence of the Inflator Defect in his Class Vehicle in 2023, shortly before commencing his lawsuit. To Plaintiff's knowledge, the airbags with the defective ARC inflators in his Class Vehicle have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would have paid less to do so. Plaintiff Stephen

Gearhart would purchase a vehicle from Porsche in the future if Defendants' representations about the vehicle, including its safety and durability, were accurate.

**B.**     **B.     The Porsche Defendants**

26.     Defendant Dr. Ing. H.C. Porsche AG ("Porsche AG") is incorporated under the laws of Germany and maintains its principal place of business in Germany.

27.     Defendant Porsche Cars North America, Inc. ("Porsche America") is incorporated under the laws of Delaware and maintains its principal place of business at One Porsche Drive, Atlanta, GA. 30354. Porsche AG wholly owns Porsche America. Porsche AG and Porsche America are referred to collectively as the "Porsche Defendants." Porsche America is the importer and distributor of Porsche brand vehicles sold in the United States. Porsche vehicles sold in the United States contain Defective Inflators manufactured by ARC.

28.     At all times alleged herein, Porsche America was authorized to conduct and did engage in substantial business within each state and territory of the United States and supplied products within them, including the state of Georgia, such that it should anticipate being haled into Court there. On information and belief, Porsche America maintains contractual relationships with ARC and/or the Airbag Module Suppliers to purchase component parts with the intent they be installed and sold in Class Vehicles, including vehicles in Georgia sold through a network of dealerships

in Georgia and throughout the United States. Thus, Porsche America has afforded itself the protection of Georgia laws. Porsche America also committed the tortious acts alleged in this Complaint in whole or in part in the state of Georgia by virtue of manufacturing, marketing, distributing, and selling its vehicles in Georgia to Georgia consumers.

29.     Porsche America delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in all of the United States, purposefully avails itself of the laws of each state and territory of the United States and receives financial benefit and profits as a result of designing, manufacturing, testing, marketing, distributing, storing, and/or selling the Class Vehicles, either directly or through subsidiaries, within each state and territory of the United States. As such, the claims in this case arise out of or relate to Porsche America's contacts with Georgia.

30.     Therefore, jurisdiction is proper under the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States of America, and the Georgia Long Arm Statute, Ga. Code Ann. § 9-10-91 (West). This Court may exercise general and specific personal jurisdiction over Porsche America as its principal place of business is located in Georgia and the substantial business it conducts within the state.

31.     General jurisdiction is also appropriate over Porsche America in the courts of Pennsylvania, including the federal district courts in that state. Pursuant to 42 Pa. Cons. Stat. §§ 5301(a)(2)(i), and (b) (2019), any company registered to do business in the state of Pennsylvania has consented to jurisdiction in those courts over "any cause of action." Porsche America is registered to do business in the state of Pennsylvania pursuant to 15 Pa. Cons. Stat. § 411(a).

32.     General jurisdiction is likewise appropriate over Porsche America in the courts of Georgia, including the federal district courts in that state. *See Cooper Tire & Rubber Co. v. McCall*, 312 Ga. 422, 437 (2021). Under *Allstate Insurance Co. v. Klein*, 262 Ga. 599, 601 (1992), "Georgia courts may exercise general personal jurisdiction over any out-of-state corporation that is "authorized to do or transact business in this state at the time a claim or cause of action arises." Porsche America is registered to do business in the state of Georgia pursuant to Ga. Code § 14-2-1501 (2003). Porsche America can be served through its registered agent for service, C T Corporation System, 289 Culver St, Lawrenceville, Georgia 30046.

## C.     C.     Relevant Third Parties

### 1.     ARC

33.     ARC is a Delaware corporation, headquartered at 1729 Midpark Road, Suite 100, Knoxville, Tennessee 37921. It has manufacturing facilities in

Morgantown, Kentucky, and Hartsville, Tennessee, among others around the United States and the world. ARC manufactures a full complement of airbag inflators and related parts. ARC's factory in Knoxville, Tennessee, is one of the three American factories maintained by ARC. This factory assembles and tests ARC products for distribution around the country and Tennessee, including some of the Defective Inflators at issue in this case.

### 2.    The "Airbag Module Suppliers"

#### a.    Autoliv

34.    AUTOLIV, INC. is incorporated in Delaware and maintains its principal place of business in Sweden. AUTOLIV, INC., created, operates, and substantially controls AUTOLIV ASP, INC., which develops, designs, tests, markets, promotes, and distributes Autoliv-brand automotive component parts and passive safety systems, including the airbag modules at issue in this lawsuit, throughout the United States, including Tennessee. Although AUTOLIV, INC., is headquartered in Sweden, it is a publicly traded company listed on the New York Stock Exchange and publicly represents that its "corporate governance is subject primarily U.S. federal and state regulations . . ." This is the Company's "primary listing," meaning that it has chosen to subject itself to the corporate governance laws of the United States.

35.    AUTOLIV ASP, INC., was formed under the laws of Indiana and

maintains its principal places of business in Ogden, Utah, and Auburn Hills, Michigan. AUTOLIV ASP, INC., operates five manufacturing facilities in Utah. The Utah and Michigan facilities both design, manufacture, test, market, and sell airbag modules and components, including inflators and propellant. AUTOLIV ASP, INC., also operates two Autoliv Technical Centers in the United States that help develop, design, and test airbag modules and their components for various vehicle platforms. AUTOLIV, INC., and AUTOLIV ASP, INC., are collectively referred to as the "Autoliv."

### b.    Joyson

36.    Joyson Safety Systems ("Joyson") is incorporated under the laws of Delaware and maintains its principal place of business in Michigan and has offices in Sunnyvale, California. Joyson develops, designs, tests, markets, promotes, and manufactures airbag modules and inflators for, and distributes and sells them to, the The Porsche Defendants, including the airbag modules at issue in this lawsuit, throughout the United States, including Michigan and California. Joyson and its predecessor companies, including Key Safety Systems, Inc., have repeatedly used the Port of Savannah, Georgia, to transport and facilitate the distribution of its component parts including airbag inflators and airbag inflator modules.

### c.   Toyoda Gosei

37.   Toyoda Gosei North America, Inc., ("Toyoda Gosei") is incorporated under the laws of Michigan and has its principal place of business in Michigan. Toyoda Gosei incorporates ARC inflators into airbag modules for use in vehicles manufactured by one or more of the Porsche Defendants.

### d.   ZF

38.   ZF are ZF Active Safety and Electronics US LLC; ZF Passive Safety Systems US Inc.; ZF Automotive US Inc.; ZF TRW Automotive Holdings Corp.; and ZF Friedrichshafen AG. Plaintiff refers to these parties collectively as "ZF." Plaintiff refers to ZF Active Safety and Electronics US LLC, ZF Passive Safety Systems US Inc., ZF Automotive US Inc., ZF TRW Automotive Holdings Corp. as the "Domestic ZF Parties."

39.   ZF Active Safety and Electronics US LLC (referred to herein as "ZF Electronics USA") is a Delaware LLC headquartered in Michigan. It formerly operated under the name "TRW Automotive U.S. LLC." ZF Electronics USA designed, manufactured, and sold some airbag modules that incorporated ARC's Defective Inflators.

40.   ZF Passive Safety Systems US Inc. (referred to herein as "ZF Passive Safety USA") is a Delaware corporation headquartered in Michigan. It previously

operated under the name "TRW Vehicle Safety Systems, Inc." ZF Passive Safety USA worked closely with ZF Electronics USA to design the airbag modules that incorporate ARC's Defective Inflators. During the relevant period, it issued paychecks to the vast majority of the ZF engineers and technical specialists who were responsible for the core design of the relevant airbag modules, the adaptation of those modules to the various makes and models of the Class Vehicles, and the investigation of Defective Inflators.

41.     ZF Automotive US Inc. (referred to herein as "ZF Automotive USA") is a Delaware corporation headquartered in Michigan and the direct parent and 100% owner of ZF Passive Safety USA and ZF Active Safety and Electronics US LLC. It formerly operated under the name "TRW Automotive Inc." It shares responsibility with ZF Electronics USA for the design and manufacture of the airbag modules at issue in this case.

### 3.     Jurisdiction and Venue

42.     Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Defendants' home states, there are more than 100 putative Class Members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Also, this Court has supplemental

jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

43.    The Court has personal jurisdiction over the Plaintiff because submits to the jurisdiction of this Court.

44.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 (a)-(c). A substantial part of the events or omissions giving rise to these claims occurred in this District. The Porsche Defendants do substantial business in Georgia and within this District, and each maintains requisite minimum contacts with Georgia.  Furthermore, venue is proper in this District because, like many other class members, significant and material aspects of the transactions relating to Plaintiff's purchase and/or service of their Class Vehicles occurred within and were otherwise connected to this District. The Porsche Defendants are residents of this District under 28 U.S.C. 1391(c)(2) because they are subject to personal jurisdiction in this District.

## III.    FACTUAL ALLEGATIONS

### A.    ARC's History

45.    ARC has a long history of developing pyrotechnic propellants for use in rocket motors and airbag inflators, among other products. The company was formed in 1949 under the name Atlantic Research Corporation, with the aim of developing propellants for the U.S. Department of Defense.[18]

_____

[18] About Us, ARC, http://www.arcautomotive.com/about.html (last accessed June 28, 2023).

46.     ARC first supplied propellant for passenger-side airbag inflators in 1970 and developed its first hybrid passenger inflators as part of a joint venture with Allied Signal in 1993.[19] Today, ARC is a global manufacturer that produces a full complement of inflators for automotive airbag applications (driver, side, head, knee, seat, seatbelt, and curtain).

47.     ARC has factories all over the world, including in Knoxville, Morgantown, and Hartsville, Tennessee; Xi'an and Ningbo, China; and Skoplje, Macedonia.[20]

48.     Of the 67 million Defective Inflators at issue in this action, ARC designed and manufactured nearly all of them. Though ARC claims that Delphi (now owned by the Autoliv) manufactured 11 million of the Defective Inflators, the inflators manufactured by Delphi were likely manufactured to ARC's specifications and include a label identifying both ARC and Delphi as the manufacturers.[21]

### D.      The Airbag Supply Chain

49.     In the automotive industry, ARC is known as a "Tier 2 supplier,"

---

[19] *Id.*

[20] ARC's plant in Reynosa, Mexico, is in the process of shutting down.

[21] *See*, *e.g.*, https://www.ebay.com/itm/125918786116?epid=1022168909&hash=item1d51583 244%3Ag%3AymQAAOSwFZ1kU5nz&fits=Year%3A2006%7CModel%3ASierr a+1500%7CMake%3AGMC (last accessed June 12, 2023).

meaning it supplied the Defective Inflators, and other automotive components, to the Airbag Module Suppliers. The Airbag Module Suppliers are known as "Tier 1 suppliers" and include the Autoliv Joyson, Toyoda Gosei, TRW, and Hyundai Mobis. The Airbag Module Suppliers supplied completed airbag modules to the Porsche Defendants, *i.e.*, major auto manufacturers and distributors, who incorporated the modules into the completed Class Vehicles, which they manufactured, distributed, marketed, and sold.

50.    ARC, the Airbag Module Suppliers, and the Porsche Defendants shared information and worked together throughout the design, manufacturing, assembly and investigation process using the APQP process, in which the suppliers and customers communicate during every step of design and testing.[22] For example, the Porsche Defendants supply the Airbag Module Suppliers with end product specifications of airbag modules that will fit into the Porsche Defendants' vehicles as well as the ballistic and timing requirements the airbag inflators must meet.[23] These specifications consist of regulatory requirements and contractual performance requirements negotiated by the Porsche Defendants and Airbag Module Suppliers.

51.    After ARC develops the design for the inflator, it creates a DFMEA,

---

[22] *In re: EA16-003 Air Bag Inflator Rupture*, ARC's Written Response to May 31, 2023 Special Order, at 6.
[23] *Id.*

which evaluates the potential failure modes that could occur with the inflator, such as overpressurization caused by various issues, and the possible effects that could result from those failures, such as rupture.[24] The DFMEA is used to identify the possible problems that could arise with the design and to evaluate whether certain aspect should be redesigned to address the most severe failure effects.[25] The DFMEA ranks each failure effect by the level of severity should it occur, with 10 being the highest severity; the likelihood the failure will occur; and the ability of the design controls to detect the failure mode before it occurs.[26] These rankings are used to calculate a RPN that assesses the overall design risk. When the severity ranking is high and when the RPN is high, engineers must implement corrective actions to ensure the failure mode does not occur.[27] Once the DFMEA is completed, the supplier creates a PFMEA that uses the same criteria to evaluate each step in the process to identify issues that could arise during the manufacturing process and creates a Control Plan to minimize the chance of these manufacturing errors occurring.[28]

---

[24] *Id.*

[25] Potential Failure Model and Effects Analysis (FMEA), 4th ed. 2008, at PDF 24.

[26] *Id.* at PDF 21.

[27] *Id.* at PDF 66-67.

[28] *In re: EA16-003 Air Bag Inflator Rupture*, ARC's Written Response to May 31, 2023 Special Order, at 6.

52.     The DFMEA, PFMEA, and Control Plan are all reviewed by the Tier 1 suppliers and the Automaker customers as part of the PPAP, which requires that the supplier provide documents showing that the inflator was designed, manufactured, and tested to meet the Tier 1 and Automaker requirements, prior to its approval for production. During this process, the Tier 1 and Automaker participants review the RPN and inform the Tier 2 supplier if they believe the RPN is too high and requires a redesign to lower the risk.[29] ARC's response to NHTSA's Special Order confirms that the PPAP process was followed for the Defective Inflators.[30] Thus, the Defective Inflators' design and manufacture, including the use of friction welding without a process for inspecting the center support for weld flash, would have been reviewed by the Airbag Module Suppliers and the Porsche Defendants and approved prior to their production, purchase, and installation.

53.     When a safety or performance issue arises with an automotive part, like the airbag module assembly, or one of its components, like the inflator, the Airbag Module Suppliers and the Porsche Defendants have the right and obligation to examine design and validation testing for all relevant components. In fact, on information and belief, the Porsche Defendants have reserved this contractual right

---

[29] *Id.*

[30] *Id.*

for themselves when dealing with Tier 1 and Tier 2 suppliers.

54.     In NHTSA's April 2023 letter to ARC and ARC's response, it is clear that all Defendants in this action have been aware of and worked on the defect issues from the outset. For example, ARC admits that while the Porsche Defendants are not ARC's direct "customers"; in this instance, the Porsche Defendants have "worked directly with ARC during the course of NHTSA's investigation" into the failure of the Defective Inflators.

55.     Thus, at least by the time the ARC Defective Inflators began rupturing and NHTSA began investigating, the Porsche Defendants had examined, or should have examined, all design and manufacturing documentation related to ARC's inflators. The Porsche Defendants would have worked with both ARC and the Airbag Module Suppliers during these evaluations.

### E.     ARC's Airbag Inflators

56.     Airbags are a critical safety feature in every car sold in the United States since 1999. They are required by law and prevent serious injury and death during accidents. To effectively shield passengers from impact with the vehicle interior, airbags must deploy quickly. Thus, airbag systems use a carefully and precisely controlled explosion to rapidly inflate the airbag cushion upon collision. The explosive charge is typically created by a chemical propellant. The airbag inflator is

a metal canister that houses the chemical propellant and controls its release. In a collision, the propellant generates gases to inflate the airbag cushion.

57.     The diagram below illustrates the basic components of the driver airbag system:



58.     ARC's Defective Inflators are found in both driver and passenger side airbags and are known as hybrid inflators. According to ARC, this technology uses compressed gas "augmented by limited amounts of pyrotechnic material."[31] Hybrid inflators combine the use of a propellant and a quantity of stored pressurized inert gas to inflate the airbag cushion. In a crash, the inflator ignitor starts the chemical propellant reaction to produce a portion of the gas while stored pressurized gas,

---

[31]Products, ARC, http://www.arcautomotive.com/products.html (last accessed June 5, 2023).

which expands due to the heat generated during the burning of the propellant, inflates the remainder of the cushion.

59.     ARC's Defective Inflators are all similarly "toroidal," or doughnut shaped, and structured for both driver and passenger side airbags. During the Class Period, ARC designated its driver hybrid toroidal inflators as CADH/DH-7 (single stage) and DCADH (dual stage). ARC designated its passenger inflators as PH7-90, PH7-120 (single stage) and PH7-120, DPH7 (dual stage). The following is an illustration of ARC's typical driver's side inflator for the DCADH model:[32]



60.     This design is substantially similar to a common ARC hybrid passenger side airbag inflator, the PH7 shown in the image below:[33]

---

[32] ARC, Products, Dual Level CADH Hybrid Inflator (last accessed Apr. 21, 2022).
[33] ARC, Products, Dual Level PH7 (120) Hybrid Inflator (last accessed Apr. 21, 2022).



Dual Level PH7 (120) Hybrid Inflator

61.    The following are actual images of an ARC hybrid driver inflator:



*Top: Top-down view of an ARC hybrid toroidal driver inflator.*

*Bottom: Cross sectional view of an ARC hybrid toroidal driver inflator.*

62.    The following photos show the back side of the driver inflator which is centrally located on the back of the airbag module assembly (the side facing away from the driver) for the 2013-2017 Chevrolet Traverse. The photo on the right shows that same inflator photo zoomed-in on the label that identifies it as an ARC DCADH-C inflator:[34]

---

[34] eBay, 2013-2014-2015-2016-2017 Chevrolet Traverse Driver Airbag (last accessed Apr. 21, 2022).

 

63.     Below are photos of an ARC hybrid front passenger inflator identified as an ARC PH7 used in the 2015-2017 Audi A3.[35] The photo shows the similarity to the driver side inflator used in the GM vehicle models cited above.





---

[35] Audi A3 Right Passenger Dash Bag, eBay.

64.     The inflators are attached to different airbag cushions, which are tailored to the size and shape needed for a driver or passenger module. For example, the image below is of the passenger side airbag in a 2015-2017 Audi A3 which was manufactured by Key Safety Systems (KSS), a predecessor of Joyson.[36]



65.     As noted, to function, an airbag needs the chemical propellant to create a controlled explosion. ARC has used ammonium nitrate as its propellant since at least 2001. Ammonium nitrate is a desirable propellant for an Automaker or part supplier because it affords a high percentage of gas in its combustion and is inexpensive. Ammonium nitrate is commonly used as a fertilizer and is well known for its use in making cheap explosives. Both NHTSA's own investigations, and a December 2015 version of ARC's Material Safety Data Sheet (MSDS) for its hybrid inflators, confirm as much.

66.     Because of its natural habit of changing shape and volume with

---

[36] *Id.*

temperature changes, ammonium nitrate is used in inflators only when it is precisely phase stabilized. Phase stabilized ammonium nitrate or "PSAN," suppresses volume changes that would otherwise occur with temperature cycling. In the face of an unexpected rise in pressure, such as a blocked ventilation exit orifice, PSAN burns exponentially faster than many other propellant chemicals.[37] PSAN's faster dynamic burning rate, or burning en masse, means that the gases can build up faster than the metal canister can handle if the ventilation exit orifices are inadequate or obstructed.

67.    Even though the causes of the ruptures were different in Takata's inflators, Takata's use of PSAN in its deadly airbag inflators focused the industry's attention on the potential for PSAN to be volatile. In 2019, ARC itself in a patent recognized that PSAN was "considered unacceptable" even in hermetically sealed hybrid inflators.[38] ARC, and the Porsche Defendants, were aware of PSAN's risks and the explosive force that results from the speed of combustion. Thus, they knew that ARC's airbag inflator housing needed to, at least, incorporate features that

---

[37] PSAN is considered overly risky and inappropriate by most in the scientific, research, safety, Automaker, and supplier manufacturing communities. Thus, most inflator manufacturers now use a variant of guanidine nitrate as the fuel in their propellant in frontal impact airbag designs. Guanidine nitrate has been proven over the last two decades to be a safe and durable propellant chemical. A small number of airbag propellant manufacturers have used ammonium nitrate due to cost savings.

[38] Patent US 2019/0218155 A1, Non-Ammonium Nitrate Based Generants, filed Jan. 17, 2019, publ. July 18, 2019, at 2.

33

mitigate against structural failure due to excessive pressure. Thus, the inflators must be designed with a sufficient number of ventilation exit orifices in correct locations such that they will not be blocked.

68.    Based on a review of recalls from 2000 to present involving inflator ruptures, whether in the manufacturing facilities or in the field, such ruptures are exceedingly rare in designs that do not contain ammonium nitrate in the propellant. The bottom line is that ARC designed its Defective Inflators using a highly explosive and unstable propellant that it knew was associated with dangerous ruptures under certain circumstances and required properly designed and engineered ventilation measures. Thus, ARC and the Porsche Defendants were aware and on notice that the inflators must be designed to withstand and avoid over pressurization of the inflator housing due to the presence of the propellant. This was a known mechanism of failure.

### F.    The Defect

69.    Against this background, all ARC's Defective Inflators had a serious design defect or defects: the presence of asymmetrical and unstable weld "flash" in the interior of the inflator housing combined with insufficient ventilation using a single exit orifice. This design is what causes the ruptures, as explained in detail below.

70.   The housing components of the ARC hybrid inflators consist of an upper pressure vessel, a lower pressure vessel, and a center support. Each piece of the DCADH inflator sections is illustrated below:



*Above: A side-view drawing of sections of the ARC hybrid DCADH inflator sections.*

71.   During assembly, ARC joins each of these three pieces of metal together. During the relevant period, ARC's design process specifications provided for these component parts to be joined using friction welding; a process carried out pursuant to the specific designs of ARC, the Porsche Defendants, and the Airbag Module Suppliers. Friction welding generates heat through mechanical friction between a moving component and a stationary one, while at the same time applying a lateral force (or pressure), called an "upset," to the parts. This displaces and ultimately fuses the material. Friction welding is a process carried out pursuant to a

specific design; "no operator skill is involved."[39]



*Above: Examples of friction welding techniques.*

72.    The ARC hybrid inflators utilize three separate friction welds. The order in which the welds are performed are different for the driver and passenger inflators. For the driver's inflator, in the CADH and DCADH, the first friction weld is between the upper pressure vessel and the center support. The second friction weld is between the center support and the lower pressure vessel. The third friction weld joins the lower and upper pressure vessels together. Friction welds two and three are

---

[39] Thompson Friction Welding, "A Practical Guide to Friction Welding," Sept. 26, 2004, at 30.

performed during the same operation. All relevant driver side inflators are substantially similar in their design and manufacturing, and all were defective when they left ARC's facilities.



**Left: Friction weld (1). Right: Friction welds (2) and (3).**

73.     For the passenger's inflators, in the PH7-90, PH7-120 (single stage) and PH7-120, DPH7 (dual stage), the first friction weld is between the lower pressure vessel and the center support. The second friction weld is between the center support and the upper pressure vessel. The third and final friction weld joins the lower and upper pressure vessels together. Friction welds two and three are performed during the same operation. All relevant passenger side inflators are substantially similar in their design and manufacturing, and all were defective when they left ARC's facilities.



*Left: Friction weld (1). Right: Friction welds (2) and (3).*

74.    "Slag" or "flash," the excess metal that that collects at the seam or joint of the two pieces being adjoined, is a natural byproduct of most welding methods, including friction welding. In ARC's Defective Inflators, flash is created at each of the seams between the joined parts, both on the exterior and interior of the airbag inflator.

75.    Controlled and consistent flash formation is a normal and expected byproduct of the friction welding process. In the illustrations below, the flash is uniform and materializes in a "ram's horn" shape (so named because it resembles a ram's horn). Such flash is uniform, symmetrical, and stable. That is, it does not contain odd or irregular shaped pieces. It does not have pieces hanging on by thin, unstable connections, and thus, will stay in place. In other words, it will not block ventilation exit orifices or otherwise interfere with airbag deployment, an inherently turbulent process.



*3D Model showing center tube to lower pressure vessel flash in "ram's horn shape."*

76.     Notably, friction welding is a design choice that ARC made. Not all toroidal airbag inflators are joined using friction. There are multiple types of welding, including, for example, laser welding, which does not produce flash. And friction welding – when the proper components are matched with proper machinery, specifications, and techniques – can also produce uniform flash in the "ram horn" shape discussed above. That, however, is not what ARC chose.

77.     ARC designed a process that generated asymmetrical, brittle, and sometimes excess weld flash along the internal seams of its friction welds. If certain parameters, such as part-to-part alignment, rotational speed, the force applied to the parts being welded, or the machine's balance, among other things, are out of specification during the friction welding process, such asymmetrical flash will collect at the joint of the parts being welded. ARC's friction welding process allowed

for the chance that asymmetrical and brittle weld flash could form at the seams of any inflator. Without designing a procedure to confirm no irregular flash had formed, which it did not implement until 2018, whether or not a vehicle's inflator contains such irregular flash is unpredictable and unknown.

78.    From the introduction of its hybrid inflators in 2000, through 2017, ARC did not physically check the quality of the interior friction welds, nor did it have any controls in place to identify asymmetrical flash occurring inside of the Defective Inflators. The pictures below show the asymmetrical weld flash collected in the interior of an ARC inflator at the union of the center support and upper pressure vessel. Unlike the weld flash in the illustrations above, the flash at this point in the inflator is not symmetrical or uniform.

*Actual Picture of Asymmetrical Internal Weld Flash*



*Flash on the inner diameter of the support tube of
an exemplar ARC Defective Inflator*



*Excess asymmetrical weld flash at the support tube inner diameter to
upper pressure vessel interface in field collected ARC hybrid inflators*



79.    When the asymmetrical weld flash is exposed to the gas flow through the gas ventilation exit port generated during the deployment, pieces of the flash in proximity of the exit port are at risk of dislodging. If the dislodged weld flash is large enough to block the gas exit port, the dislodged weld flash restricts gas exiting and will result in an increase of pressure in the inflator housing. As the internal pressure of the inflator increases due to the gas exit port restriction, the toroidal metal housing

expands, deforms, and changes shape from the toroid shape to more of a ball shape until it reaches the point of rupture.

80.    During a driver side rupture of an ARC hybrid inflator, the inflator housing expands due to the excessive internal pressure. This stretches the center support because it is welded to the top and bottom portions of the inflator housing. Eventually the center support violently fractures in line with the gas flow, and the center support and the upper pressure vessel are propelled towards the occupant.

81.    When the inflator housing ruptures, internal components of the inflator can be ejected as gas pressure ventilates into the passenger compartment, which can injure or kill the occupants. In addition to propelling internal inflator components toward the driver, the entire module assembly may also break free of the steering wheel and strike the driver which can cause injury or death.

82.    In its recall of one manufacturing lot of ARC passenger-side inflators, Ford noted that, "[p]reliminary analysis indicates that weld flash from the inflator canister welding process at the Tier 2 inflator supplier may obstruct the gas exhaust port."[40] If the ARC welding process incorporated into the design of the inflators allows weld flash, or pieces of weld debris, to block exhaust ports, the PSAN can exacerbate the over-pressurization and lead to an explosive rupture.

---

[40] Ford, Recall No. 17V529, Part 573 Safety Recall Report, Aug. 31, 2017.

83.    This is a design defect, which can allow undetected pieces of weld flash to obstruct the single, static exhaust port and cause the airbag inflator to explode.

84.    As noted, a reasonable alternative design was to select a welding method or type of machinery that produced stable and uniform weld flash. But ARC had other options as well. It could have incorporated more robust pressure relief valves into its design or included multiple exit ports to the inflator. A pressure relief mechanism would have mitigated the dangers of both PSAN-related over-pressurization and ruptures caused by a restricted gas exit port.

85.    ARC was aware that utilizing a pressure relief mechanism would mitigate the dangers of both PSAN-related over-pressurization and those ruptures caused by a restricted single gas exit port. According to a *New York Times* article, as part of its efforts to mitigate the known dangers associated with PSAN, in the early 2000s, ARC's competitor, TRW, incorporated a pressure relief valve in its PSAN-based inflators that allowed gas to escape should the inflator begin to over-pressurize.[41]

86.    In fact, ARC has designed inflators that do contain such a mechanism. In February 2013, for example, ARC filed a patent entitled, "Variable Orifice

---

[41] "A Cheaper Airbag, and Takata's Road to a Deadly Crisis," N.Y. Times, Aug. 26, 2016.

*Footnote continued on next page.*

Construction," that would allow the inflator to increase the size of the exit orifice when the internal gas pressure was rising.[42] Although the patent mentions that the flexible orifice size is needed because some propellants result in higher pressure than others, it does not mention the fact that the invention would also reduce the chance of a flash nugget blocking the orifice enough to cause a rupture.

87.     In December 2020, ARC implicitly acknowledged both that its current design allowed for weld flash to partially block the exit orifice and that its current design did not adequately ventilate excess gas when it filed a patent application entitled, "Airbag Inflator With Pressure Relief Valve and Increased Combustion Efficiency."[43]

88.     In the patent, ARC stated:

Some existing inflator assemblies utilize a center support structure that requires two simultaneous welds, which is problematic in respect of manufacturing <u>and also increases the potential for weld particles to exit the inflator upon deployment</u>. Existing designs have also been configured to fragment during deployment as a consequence, in the event of excessive pressure increase within the inflator due to some failure or external condition or the like, these existing inflator designs

---

[42] U.S. Patent 8,770,621 B1, Variable Orifice Construction, filed Feb. 26, 2013, pub. July 8, 2014.
[43] U.S. Patent 2022/0185224 A1, Airbag Inflator With Pressure Relief and Increased Combustion Efficiency, filed Dec. 11, 2020, pub. June 16, 2022, at 10 (emphasis added).

*Footnote continued on next page.*

can be potentially hazardous for vehicle occupants.[44]

89.     ARC continued, "[i]t would be desirable to provide an airbag inflator that reduces gaseous effluents with efficient combustion while incorporating additional safety features in respect of venting and unintended increased in internal pressure and weld particles."[45] ARC proposed a hybrid inflator design in which "[t]he multiple sub-chambers are connected to one another via control vents. A canister lid with vent holes encloses the energetics canister. A flow diverter is placed into the booster can retain the energetics cover to the energetics canister and to further direct and control pressure and flow before exiting the top vessel via a control orifice."[46]

90.     The inflator would also have flow diverters to "further direct and control pressure and flow before exiting the top vessel."[47] Finally, the inflator would have a pressure relief mechanism in the bottom portion of the inflator "in the event of excess internal pressure without any rupture of the inflator during a deployment event."[48] During manufacturing, ARC would conduct hydroburst tests to confirm that the pressure relief mechanism works in the case of an over pressurization.

---

[44] *Id.* (emphasis added).

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

91.    Further, ARC knew about the defect and the potential for inflator ruptures but failed to implement meaningful manufacturing process changes and effective quality control systems until 2018. In 2018, ARC implemented manufacturing process changes, including a borescope system to visually inspect 100 percent of the upper vessel to support tube friction welds prior to sale. Implementing this quality control measure sooner was a preventable means to stop Defective Inflators from reaching and endangering tens of millions of consumers.

92.    This is not the first time that ARC has been accused of improper/defective welding. During the infamous Takata recalls, the bankrupt successor entity to Takata Corporation, Reorganized TK Holdings Trust, sued ARC, alleging that ARC provided Takata's U.S. subsidiary, TK Holdings, Inc., with defective side airbag inflators which caused TK Holdings' customer (General Motors) to issue a recall on its vehicles manufactured during the period the defective inflators were supplied by ARC. TK Holdings, Inc. alleged, *inter alia*, damages arising from breach of contract.[49]

93.    As alleged by TK Holdings, Inc., "ARC's inflators failed due to improper/defective welding."[50] As aptly stated by TK Holdings, Inc., "[t]he inflators

---

[49] *Reorganized TK Holdings Trust v. ARC Auto., Inc*., Bankr. D. Del., No. 1:19ap50266, Complaint, June 24, 2019.
[50] *Id*.

provided by ARC were not reasonably fit for their intended, anticipated, or reasonably foreseeable use." Accordingly, the defective inflators suffered from the additional issue of poor process control.

### G.   NHTSA Concludes That ARC Inflators Are Defective

#### 1.   Preliminary Evaluation and Engineering Analysis

94.   In July 2015, NHTSA's Office of Defects Investigation ("ODI") opened a Preliminary Evaluation (PE15-027) into 490,000 ARC driver side hybrid airbag inflators manufactured between 2001 and 2004, based on the two ruptures it was aware of. In the opening resume, NHTSA stated the inflators "may rupture during frontal air bag deployment resulting in metal fragments being propelled into the passenger compartment." NHTSA opened the investigation because, in December 2014, it received notice of a rupture that occurred in 2009 involving a 2002 model year Chrysler Town & Country, as well as notice in June 2015 of a rupture in a 2004 model year Kia Optima. When NHTSA realized that both inflators were ARC hybrid inflators, it opened the investigation.[51]

95.   After requesting and receiving some information on design, manufacturing, and quality control processes covering the relevant inflators, NHTSA issued several standing general orders ("SGO" or "SGOs"), including SGO

---

[51] NHTSA, Investigation PE15-027, ODI Opening Resume, July 13, 2015.

2015-01, SGO 2015-01A, SGO-2015-02, and SGO 2015-02A. These SGOs were directed not only at ARC but also the Porsche Defendants – and required each entity to timely report information about field ruptures upon notice.

96.     In March 2016, NHTSA met with ARC at its Knoxville, Tennessee headquarters, a representative of the Hyundai-Kia, and the relevant Tier 1 supplier. On information and belief, as is custom in the industry, Hyundai-Kia, the relevant Tier 1 supplier, and ARC communicated prior to meeting with NHTSA.

97.     NHTSA, ARC, each of the Airbag Module Suppliers, and the Porsche Defendants responsible for the vehicles affected by this issue (inflators manufactured between 2001 and 2004) continued meeting to determine how to evaluate the propensity for the Defective Inflators to fail. The result was a program whereby ARC, the Porsche Defendants, and the relevant Airbag Module Suppliers collected and tested Defective Inflators from the field.

98.     Because the initial round of testing did not include a sufficient number of inflators, the Defendants expanded the collection efforts. The Defendants and NHTSA decided that the appropriate number of airbags to test was 459 inflators of each type. This would be a total of 918 inflators, 459 single-level CADH and 459 dual-level CADH. The Porsche Defendants supplied VIN numbers for the vehicles at issue and agreed to a testing process. Roughly, the process went as follows: the

Porsche Defendants located the relevant inflators and shipped them to ARC's lab in Knoxville, Tennessee, for testing. ARC inspected and x-rayed each inflator, deployed them in test tanks, and recorded any ruptures. ARC shared this data with both NHTSA and the Porsche Defendants.

99.     Ultimately, by May 2018, ARC's testing was complete, and it claimed that none of the inflators ruptured.

100.    While this process was underway, in August 2016, NHTSA upgraded the Preliminary Evaluation to an Engineering Analysis (EA16-003), which is a more in-depth, detailed investigation. During its Preliminary Evaluation, NHTSA learned that GM and Hyundai also used airbag modules that contain ARC hybrid driver inflators.[52] NHTSA upgraded and expanded the investigation to all ARC inflators installed in U.S. vehicles after learning about a fatal rupture in a 2009 Hyundai Elantra that occurred in Canada in July 2016.

101.    In its "ODI Resume" (a technical form completed as part of the NHTSA investigation process) announcing the Engineering Analysis, NHTSA noted the inflators involved in the three known field incidents had ruptured in "substantially the same manner" and were "assembled using substantially the same manufacturing

_____

[52] NHTSA, Investigation EA16-003, ODI Opening Resume, Aug. 4, 2016.

*Footnote continued on next page.*

process."[53] NHTSA's stated focus was to determine how many ARC driver inflators were in vehicles in the United States and to collect more ARC inflators from the field to test and evaluate them to determine a root cause.[54]

102.   When NHTSA opened EA16-003, it issued a series of information request letters to Tier 1 suppliers that utilized ARC's hybrid toroidal inflators, and the Porsche Defendants. The letters focused on information for front airbag modules using hybrid toroidal shaped ARC inflators. In NHTSA's information request to ARC, NHTSA stated, "[t]o assist us at this stage of the investigation, we are requesting certain information concerning all toroidal shaped frontal air bag inflators manufactured by ARC that were subsequently supplied to a Tier 1 or other air bag system manufacturer, for incorporation into their completed air bag modules…from the start of production (SOP) up to the date of this letter."[55]

103.   NHTSA has not publicly released most of the documents filed in the EA16-003 investigation. It has posted the letters it sent to the Porsche Defendants, Tier 1 Suppliers, and ARC on its website, but not the companies' responses.

104.   At some point in 2016, NHTSA further learned that some of the LAT for ARC's inflators involved poor welds on passenger hybrid 7 (PH7) inflators.

---

[53] *Id.*
[54] *Id.*
[55] NHTSA, EA16-003, Ltr. to ARC, Aug. 9, 2016.

NHTSA accordingly sought information about this issue from ARC under SGO 2016-01. ARC met with NHTSA to address this issue as well.

105.    In October 2016, NHTSA published a letter it sent to ARC chastising the company for failing to respond to its requests. This strongly worded letter puts the lie to ARC's claims in its May 2023 letter that it has completely cooperated with NHTSA. The letter from NHTSA states, in part:

106.    Furthermore, beyond ARC's lax response to compulsory process, ARC's attitude and approach to NHTSA's investigation remains troubling. Since this investigation was opened, ARC has on more than one occasion questioned the necessity of providing certain information, failed to provide documents in a readable format, appeared nonchalant in its approach to developing a testing plan or protocol, and has advocated for the closure of the investigation without possessing or providing a full understanding of the root cause for at least one of the underlying inflator ruptures.

107.    Additionally, a number of incidents involving ARC's product have been brought to NHTSA's attention by vehicle manufacturers and other suppliers. These incidents range from testing failures to recalls and raise serious questions regarding the quality and integrity of ARC's air bag inflators. While vehicle manufacturers and other suppliers have voluntarily notified NHTSA of these and other incidents

without the need for a formal request, ARC has failed to take any steps to notify NHTSA of these incidents, or their potential relationship to the incidents under investigation. After NHTSA learned of one of these incidents earlier this year, NHTSA contacted ARC and indicated that the company needed to provide this type of information to NHTSA proactively. Instead of noting the serious nature of these incidents and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised NHTSA staff for indicating otherwise.

108.   Compounding ARC's failure to inform NHTSA of these matters, ARC has also failed to comply with Standing General Order 2015-02A, issued in the underlying Preliminary Evaluation, which requires ARC to file a report within five days of receiving notification of an inflator field rupture. On July 8, 2016, a fatal rupture occurred in Newfoundland, Canada. NHTSA was notified of this incident on by both Transport Canada and by Hyundai. Although ARC was clearly notified of the incident, as demonstrated by ARC's attendance at an inspection of the vehicle that occurred on July 26, 2016, ARC has failed to provide any report to NHTSA regarding that incident. As noted by the Standing General Order, failure to comply with that obligation calls for the imposition of daily civil penalties.

109.   ARC's   response   to   NHTSA's   investigation   to   date   does   not

demonstrate the behavior that NHTSA expects of manufacturers, much less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues. ARC has been given every consideration, yet has failed to respond in kind…[56]

110.   In April 2017, NHTSA once again sought further information from ARC, this time through a special order with 56 requests for information directed at all of the inflators ARC had ever produced.

111.   Shortly after NHTSA issued these requests, ARC, the Porsche Defendants, NHTSA, and Airbag Module Suppliers formed what they term the "Collaboration Team" or the "ARC Joint Task Force." The purpose was ostensibly to investigate the ruptures of ARC's Defective Inflators. Ultimately, the Collaboration Team presented its findings to NHTSA.

112.   Although publicly available documents do not make it clear, it is apparent that the Collaboration Team determined that ARC's welding design was faulty. ARC admits that, following this presentation to NHTSA, it "implemented changes to the weld schedules of the existing IFW friction welders and implemented

---

[56] NHTSA, EA16-003, Ltr. to ARC, Re: ARC's Response to EA16-003, Oct. 4, 2016, at 3 (emphasis added).

an automated borescope inspection system." It also "invested in capital improvements through the acquisition of state-of-the-art Izumi friction welders." ARC agrees that these were "corrective actions." These changes are confirmed by documents included in the EA16-003 document request, which state that ARC implemented equipment and process improvements on all toroidal inflator assembly lines on January 31, 2018.

113.   In August 2020, NHTSA requested additional information specifically regarding the PH7 toroidal shaped hybrid front passenger airbag inflator "to facilitate its investigation of the potential risk of deployment-related field rupture."[57] Regarding the PH7 inflator, NHTSA focused on a time frame "defined by a) a starting point of June 1, 2014, the inflator build date of a confirmed field event, and b) the end point of January 31, 2018, the implementation date of equipment and process improvements by ARC on all toroidal inflator assembly lines."[58] NHTSA sent similar letters requesting information about the PH7 passenger hybrid inflator to vehicle manufacturers Volkswagen, BMW, Fiat Chrysler, GM, Toyota, Kia, and Hyundai.

114.   In April 2021, NHTSA posted a memorandum to the public file for

_____

[57] NHTSA, EA16-003, Ltr. to ARC Automotive, Inc., Aug. 18, 2020.
[58] *Id.*

EA16-003 stating that it was reviewing ARC's responses to redact all personally identifiable information and that these types of responses "are usually complex, contain large volumes of documents, and require additional time for review and redaction."[59] NHTSA asserted that, "[t]he public version of the response will be posted to this investigation file when available." The response has yet to be publicly posted.

115.   On August 31, 2022, NHTSA called a meeting that included ARC, the Porsche Defendants, and all of the Airbag Module Suppliers. At the meeting, NHTSA revisited the history of the investigation and indicated that it would issue further information requests. It issued those requests in December 2022 and sought information about ARC's process changes, as well as the "accept/reject quantities" from the time that ARC started using borescopes to check its interior welds. ARC responded to NHTSA in February of 2023. The "accept/reject" rates are not yet public.

116.   On April 25, 2023, NHTSA met with GM to inspect a 2017 Chevrolet Traverse in which the driver inflator ruptured during a crash. Two days later, on April 27, 2023, NHTSA issued a letter to ARC requesting that it recall all 67 million of its

---

[59] NHTSA, EA16-003, Memo. Re: Response to Information Request, Apr. 13, 2021.

Defective Inflators. In this letter NHTSA:

> tentatively concluded that a defect related to motor vehicle safety exists
> in the frontal driver and passenger airbag inflators under investigation
> that were produced before installation of borescopes on all toroidal
> inflator manufacturing lines in January 2018 ("subsequent
> inflators"). . .

NHTSA demanded that ARC issue a Part 573 Recall report to address the defect.

117.   NHTSA confirmed that through January 2018, ARC supplied 67 million of the Defective Inflators to six Tier 1 airbag system manufacturers. Of the 67 million, 11 million were manufactured by Delphi (now owned by Autoliv) under a license from ARC. The Defective Inflators have been installed in cars manufactured by at least 12 vehicle manufacturers.

118.   NHTSA confirmed what is outlined above – and in the original complaints transferred to this Court – that ARC's friction welding generates weld slag or flash. If that slag or flash breaks loose during deployment it will follow the air flow through the sole exit port. Because there is only a single exit port in ARC inflators, pieces of flash may (and sometimes do) block the exit port. This leads to a rupture of the airbag inflator and sends shrapnel into the vehicles and towards passengers.

119.   NHTSA noted (as discussed *infra*) that, to date, the Automakers have addressed the Defective Inflators only by issuing recalls limited to the lots associated

with a failed airbag inflator. Despite all of this information and ARC's own claims of cooperation, NHTSA noted that ARC had not determined there was a defect or that a recall is necessary.

120.  NHTSA explained that a defect is a motor vehicle or motor vehicle equipment that exposes the public to an "unreasonable risk of death or injury in an accident . . ." 49 U.S.C. § 30102(8). NHTSA concluded that a "defect that occurs in an essential component of a piece of motor vehicle equipment, such as in this matter involving a frontal air bag inflator, presents an unreasonable risk to safety." Stating the obvious, NHTSA determined that an "airbag inflator that ruptures when deploying in a vehicle is plainly defective." NHTSA also found that the number of ruptures and/or field events at issue were not "de minimis." Those events are discussed below in further detail.

## 2.  Early Injuries, Deaths, and Piecemeal Recalls

121.  There have been at least 10 known ruptures of ARC's Defective Inflators in vehicles, including seven driver inflators and three passenger inflators. Two of those ruptures resulted in driver fatality. Additionally, two passenger inflators ruptured during LAT at ARC's factory. Five of the ruptures resulted in significantly limited recalls of other vehicles that contained other inflators only from that lot. The most recent rupture resulted in a larger-in-scope recall by GM but was still isolated

to one inflator variant. On information and belief, there have been multiple other inflator ruptures, either in the field or in testing, that have not been publicized.

122.   The Defective Inflators themselves were manufactured at various ARC factories and include both dual-stage (which has a two-stage deployment based on the severity of the crash) and single-stage (which deploys at the same rate no matter the crash severity) inflators. They all, however, share common defects. For example, all the components were joined with friction welding that used the same or substantially similar parameters that produces asymmetrical flash on the interior seams of the inflator compartment. In fact, there are documented field and LAT ruptures on inflators produced from multiple manufacturing facilities, *infra*. Moreover, all the inflators have a single exit port, and none were designed with an adequate pressure relief mechanism as discussed above in ¶¶ 278-302 to prevent a rupture. All contained PSAN in their secondary propellant, posing a risk of an exponential increase in pressure and, consequently, the risk of a rupture. These facts strongly suggest a systemic design defect in the inflators rather than a manufacturing defect occurring at one location, for one lot, for a short period of time, due to a non-conforming assembly process.

123.   Little is publicly known about the ten field ruptures. News reports have largely reported only on the information provided by NHTSA in the few

investigation documents it made public. News reports about the two fatal incidents do not include information about the drivers or their locations.

124.   The following is what is known about each rupture and recall thus far:

### a.   The 2009 "Dutton Rupture"

125.   In January 2009, in Ashtabula County Ohio, an ARC DCADH ruptured in a 2002 Chrysler Town and Country minivan severely injuring Lois Dutton.[60] According to Ms. Dutton, "[i]t broke my jaw in three places. Collapsed a lung." The inflator was a dual-stage hybrid inflator manufactured at ARC's Knoxville, Tennessee, facility.[61] It even sent shrapnel through her chest and out of her back. Ms. Dutton spent three months in a medically induced coma after the incident and faced hundreds of thousands of dollars in medical bills.

126.   The Dutton ARC rupture was attributed to a "single isolated event" and no actions were taken. This occurrence and write-off as a "single isolated event" is very similar to what occurred in the Takata recall with what is known as Event Zero. Event Zero was the first field rupture of a Takata PSAN PSDI inflator, and instead of performing a thorough investigation, Takata and Honda wrote it off as an "anomaly" and only took any action when additional field ruptures took place three

---

[60] NHTSA, Investigation PE15-027, ODI Opening Resume, July 13, 2015.
[61] *Id.*

years later.

### b.      The 2014 Kia Optima Rupture

127.   On April 8, 2014, the ARC driver inflator in a 2004 Kia Optima ruptured during a frontal impact crash in New Mexico.[62] The driver suffered serious injuries. The inflator was a single-stage inflator made at ARC's Knoxville, Tennessee, facility.[63] The driver sued Kia Corp. and Kia America, Inc., under their previous names, and the lawsuit was settled quickly. Kia did not issue a recall. In its investigation, NHTSA indicated that this inflator was placed in a Delphi Automotive Systems Corp. airbag module. Delphi was acquired by Autoliv in 2009.

### c.      The 2016 Hyundai Elantra Rupture

128.   On July 8, 2016, the driver of a 2009 Hyundai Elantra was killed in Canada when an ARC driver inflator exploded during a crash.[64] This inflator was a single-stage inflator made in ARC's China facility.[65] Hyundai later recalled 2,022 MY 2009 Elantra vehicles in Canada, but did not issue a recall in the United States.[66] This recall was performed to collect parts for Transport Canada defect investigation

---

[62] *Chavez v. Kia Motors Corp.*, D.N.M., No. 1:15-cv-00462, First Amended Complaint, June 25, 2015.
[63] NHTSA, Investigation PE15-027, ODI Closing Resume, Aug. 25, 2016.
[64] "1st Recorded Canadian Fatality from Airbag Inflator Rupture Under Investigation," CBC News, Aug. 4, 2016.
[65] NHTSA, Investigation EA16-003, ODI Opening Resume, Aug. 4, 2016.
[66] Transport Canada, Recall No. 2018-173, Apr. 11, 2018.

3280-38-10 in an effort to aid in the analysis by Hyundai and Transport Canada. The recovery program ended on February 5, 2020, with a note stating: "No safety defect has been identified with these vehicles and this action is not being conducted under the requirements of the Motor Vehicle Safety Act."

### d.     The 2017 BMW Lot Qualification Rupture and Recall

129.   On February 8, 2017, a Tier 1 supplier, Key Safety Systems notified BMW that an ARC DPH-7 passenger hybrid inflator intended for BMW ruptured during a quality check or LAT at an ARC facility on January 29, 2017.[67] The DPH-7 inflator was manufactured at ARC's Reynosa, Mexico, facility.[68] On March 21, 2017, BMW issued Recall 17V-189 for 36 vehicles equipped with ARC DPH-7 passenger front inflators.

130.   The DPH-7 uses the same friction welding process as both the CADH and DCADH. According to the Part 573 Safety Recall Report:

> Depending on the circumstances, impaired gas flow could create excessive internal pressure, which could result in the body of the inflator rupturing upon deployment. Metal fragments could pass through the air bag cushion material, which may result in injury or death to vehicle occupants.

131.   This recall, however, fails to include all BMW vehicles with Defective

---

[67] BMW, Recall No. 17V189, Part 573 Safety Recall Report, Mar. 21, 2017.
[68] NHTSA, Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.

Inflators, depriving consumers of notice and a remedy, and it fails to compensate all consumers, even the ones included in the recall, for the diminished value of their vehicles.

### e.  The 2017 Ford Lot Rupture and Recall

132.   On July 31, 2017, Ford was notified that an ARC PH7-120 dual-stage passenger inflator had ruptured during LAT at ARC's facility.[69] Ford's airbag module was assembled by Takata Corporation, which was subsequently acquired by Key Safety System and later incorporated into Joyson Safety System. According to ARC's presentation to NHTSA, the PH7 inflators were manufactured in four of its facilities: Knoxville, Macedonia, China, and Mexico.[70]

133.   On August 31, 2017, Ford issued Recall 17V-529 for 650 F-150 and Mustang vehicles equipped with ARC's PH7-120 dual stage passenger inflator which uses the same friction welding process as the DPH-7, CADH and DCADH. According to the Part 573 Safety Recall Report:

> July 31, 2017, The Tier 1 airbag module supplier notified Ford of an abnormal deployment of a passenger Airbag (PAB) inflator during a Lot Acceptance Test (LAT) conducted at the supplier's engineering facility. The inflator ruptured during full output at +65 Celsius.

---

[69] Ford, Recall No. 17V529, Part 573 Safety Recall Report, Aug. 31, 2017.
[70] NHTSA, Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.

134.   During August of 2017, the concerns outlined in the Part 573 Safety Recall Report were reviewed by Ford's Critical Concern Review Group ("CCRG") and its preliminary analysis indicates that weld flash from the inflator canister welding process at the Tier 2 inflator supplier may obstruct the gas exhaust port. LAT frequency was increased, and a Design of Experiments was initiated to further evaluate potential factors.

135.   This recall, however, fails to include all Ford vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all consumers, even the ones included in the recall, for the diminished value of their vehicles.

### f.   The 2017 Chevy Malibu Rupture and Recall

136.   On September 22, 2017, an ARC driver inflator ruptured in a 2011 Chevrolet Malibu during a crash in Pennsylvania.[71] GM recalled 1,145 model year 2010-2011 Chevrolet Malibu vehicles built with inflators from the same lot as the inflator that ruptured (Recall 19V019). GM did not specify the type of inflator but stated that it was manufactured in Mexico.[72] According to ARC's submission to

---

[71] *McQuaide v. Gen'l Motors LLC*, Pa., Allegheny Co. Ct. Com. Pleas, No. GD-18-007744, Third Amended Complaint, Jan. 29, 2019.

[72] Gen'l Motors, Recall No. 19V019, Part 573 Safety Recall Report, Jan. 31, 2019.

*Footnote continued on next page.*

NHTSA, the driver inflator that is manufactured at ARC's Mexico facility is a CADH (*i.e.*, ADH-C).[73] The airbag module was manufactured by TRW Automotive Holdings Corp., which has since been acquired by ZF Friedrichshafen AG to form what is commonly referred to as ZF-TRW.

137. According to NHTSA, an ARC passenger hybrid inflator manufactured on June 1, 2014, ruptured in the field. NHTSA did not specify the make, model, and model year vehicle or the date of rupture.[74]

138. This recall, however, fails to include all GM vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all consumers, even the ones included in the recall, for the diminished value of their vehicles.

g.    **The 2021 Chevy Traverse Rupture and Recall**

139. On August 15, 2021, a driver in Calumet, Michigan, was killed due to a rupture of the ARC driver hybrid inflator in her 2015 Chevrolet Traverse. The victim, who was driving with two of her children as passengers, collided with an oncoming vehicle that crossed into her lane, and her airbag deployed. According to

---

[73] NHTSA, Investigation PE15-027, ARC Response to Information Request, Attachment: ARC Automotive 2015 Presentation, July 17, 2015, at PDF 10.
[74] *See, e.g.,* NHTSA, Investigation EA16-003, Investigation Response Ltr. to Volkswagen Group of Am., Inc., Sept. 14, 2020.

the police investigation:

> [i]t appeared that the driver's side airbag malfunctioned causing it to detach from the steering column and sent metal fragments into the driver's compartment of the vehicle. The igniter for the front driver's side airbag was found on the passenger side dashboard. There was also metal shrapnel on the driver's side dash, in the instrument cluster and markings on the driver's side roof which appeared to come from the driver's side airbag.[75]

140.   The police investigation report noted that the autopsy of the victim found parts of the metal airbag inflator lodged in her neck. The other passengers in the victim's vehicle, including an unbelted right front passenger and occupants in the second and third row seats, survived the crash.

141.   GM sent a contract field investigator to examine the vehicle on September 8, 2021, and, on September 14, 2021, another GM field investigator accompanied by the police investigator performed x-rays on the metal shards that were removed during the autopsy. Further inspection of the vehicle and airbag pieces were examined by counsel representing the victim's family, GM, ARC, and Toyoda Gosei (the Tier 1 supplier to GM) on October 27, 2021. The investigation report includes a photograph of the ruptured inflator, which is unrecognizable as an inflator due to the extent of the damage, as depicted below:

---

[75] Houghton Co. Sheriff's Off., Incident Report, Aug. 15, 2021.



142.   GM subsequently issued a recall of 552 model year 2008-2017 Buick Enclave vehicles and 2013-2017 Chevrolet Traverse vehicles (Recall 21V782).[76] As with its previous recall, GM recalled only inflators made from the same lot as the ruptured inflator that were used either as original equipment or replacement inflators. GM did not specify the type, stage, or manufacturing location for the inflator.

143.   This recall, however, fails to include all GM vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all consumers, even the ones included in the recall, for the diminished value of their vehicles.

### h.    The Second 2021 Chevy Traverse Rupture and Recall

144.   On October 13, 2021, NHTSA confirmed that, just south of Lexington,

---

[76] Gen. Motors, Recall No. 21V782, Part 573 Safety Recall Report, Oct. 7, 2021.

Kentucky, there was another rupture of an ARC hybrid driver inflator involving a second 2015 Chevrolet Traverse.[77] Based on this incident GM issued Recall 22V-246 on April 14, 2022, for 2,687 vehicles including:

      a.      2015 Buick Enclaves (542)

      b.      2015 Chevrolet Traverses (1183)

      c.      2015 GMC Arcadias (962)

145.   The chronology listed in the Recall 22V-246 Part 573 report states:[78]

On November 9, 2021, GM received a claim letter from an attorney representing the owner of a 2015 model year Chevrolet Traverse that was involved in a crash. On February 18, 2022, the claimant alleged that the front-driver airbag inflator in the vehicle ruptured during the crash.

GM was provided an opportunity to inspect the vehicle on March 23, 2022. GM determined, at that inspection, that the front driver airbag inflator in the subject vehicle ruptured during the crash deployment.

On April 7, 2022, GM's Safety and Field Action Decision Authority decided to conduct a safety recall on all front driver airbag modules containing an inflator from the same manufacturing lot as the inflator under investigation. GM is continuing to investigate this incident. GM's investigation has not identified another rupture allegation involving the vehicles in this recall population.

146.   This recall, however, fails to include all GM vehicles with Defective

---

[77] *Second driver killed by airbag inflator from Tennessee's ARC*, Autoblog, Oct. 14, 2021, https://www.autoblog.com/2021/10/14/arc-airbag-inflator-death-gm-nhtsa-investigation/ (last accessed July 20, 2022).

[78] GM, Recall No. 22V246, Part 573 Safety Recall Report, Apr. 14, 2022.

Inflators, depriving consumers of notice and a remedy, and it fails to compensate all consumers, even the ones included in the recall, for the diminished value of their vehicles.

### i.    The 2021 Audi A3 Rupture and Recall

147.   On December 18, 2021, the ARC passenger hybrid inflator in a 2016 Audi A3 ruptured during a crash in California, causing severe laceration injuries to the front seat passenger. An individual personal injury case was filed and remains pending.[79] In July 2022, VW recalled 1,216 vehicles, noting that although it had not yet determined a root cause, it was only recalling inflators from the same "suspect batch."[80] According to photos of an exemplar airbag installed in the 2015-2017 Audi A3, the passenger inflators are ARC PH7 hybrid inflators manufactured in Macedonia.[81]

148.   This recall, however, fails to include all Audi vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all consumers, even the ones included in the recall, for the diminished value of their vehicles.

---

[79] *Barbone v. Khijniak*, Cal., Orange County Super. Ct., No. 30-2022-01254070-CU-PA-CJC, Apr. 8, 2022.

[80] VW, Recall No. 22V543 Part 573 Safety Recall Report, July 27, 2022.

[81] eBay, Audi A3 Right Passenger Dash Bag SRS Inflator Stk 21262 (last accessed Mar. 3, 2022).

### j.    The 2023 GM Rupture and Recall

149.   On March 22, 2023, a driver side inflator in a 2017 Chevrolet Traverse ruptured in Michigan. This module was produced by Toyoda Gosei. On May 10, 2023, GM instituted a recall (NHTSA No. 23V334), stating that it:

> decided that a defect which relates to motor vehicle safety exists in certain 2014-2017 model year Buick Enclave, Chevrolet Traverse, and GMC Acadia vehicles. In these vehicles, the front-driver airbag inflator may contain a supplier manufacturing defect that may result in inflator rupture during deployment.
>
> Description of the Safety Risk: An inflator rupture may cause metal fragments to pass through the airbag and into the vehicle interior, which may result in injury or death to vehicle occupants.
>
> Description of Remedy Program: Dealers will replace the front-driver airbag module.[82]

150.   GM concluded that the "MC" variant inflator in these vehicles may rupture and "cause metal fragments to pass through the airbag and into the vehicle interior, which may result in injury or death to vehicle occupants." GM committed that once the parts are available, its dealers will replace the Defective Inflators in the front driver side but specified that only "MC" variant inflators were included. This recall included 994,000 vehicles.

151.   This recall, however, fails to include all GM vehicles with Defective Inflators, depriving consumers of notice and a remedy, and it fails to compensate all

---

[82] GM, Recall No. 22V334, Product Safety Recall Report, May 10, 2023.

consumers, even the ones included in the recall, for the diminished value of their vehicles.

### k.    International Events

152.   In addition to the previously discussed July 2016 driver side air bag inflator rupture in a 2009 Hyundai Elantra in Canada, on October 16, 2017, a passenger side airbag ruptured in a 2015 Volkswagen Golf in Turkey. Joyson produced the airbag module, which also contained a Defective inflator manufactured in ARC's Knoxville, Tennessee facility.

### l.    Recall Summary

153.   The following chart summarizes the lot-based recalls, which cover only 1.2 million of the 67 million affected vehicles.

| Recall | Date | Manufacturer | Affected Vehicles | Population |
|---|---|---|---|---|
| 17V-189 | 03/21/2017 | BMW | 2017 BMW X5 sDrive35i, X5 xDrive35i, X5 xDrive50i 2017 BMW X5 xDrive 35d 2017 BMW X5 xDrive40e | 36 |
| 17V-529 | 08/31/2017 | Ford | 2017 Ford F150 2017 Ford Mustang | 650 |
| 19V-019 | 01/31/2019 | General Motors | 2010-2011 Chevrolet Malibu | 1,145 |
| 21V-782 | 10/21/2021 | General Motors | 2008-2017 Buick Enclave 2013-2017 Chevrolet Traverse | 552 |
| 22V-246 | 04/14/2022 | General Motors | 2015 Buick Enclave 2015 Chevrolet Traverse | 2,687 |
| 22V-543 | 07/27/2022 | Volkswagen | 2016 Audi TT Roadster 2016 Audi TT Coupe 2016 Audi S3 Sedan 2016 Audi R8 Coupe 2016 Audi A3 Sedan 2016 Audi A3 e-tron 2016 Audi A3 Cabriolet 2016 Volkswagen Golf Sportwagen 2016 Volkswagen Golf R 2016 Volkswagen Golf GTI 2016 Volkswagen Golf A7 2016 Volkswagen E Golf | 1,216 |
| 23V334 | 5/10/23 | General Motors | 2014-2017 Buick Enclave 2014-2017 Chevrolet Traverse | 994,000 |

| Recall | Date | Manufacturer | Affected Vehicles | Population |
|--------|------|--------------|-------------------|------------|
|        |      |              | 2014-2017 GMC Acadia | |
|        |      |              | **Total Recall Population** | **1,286,000** |

154.   As evidenced above, the ARC hybrid inflators that have ruptured thus far vary in type, stage, and location of manufacture. Despite knowledge of the Defective Inflators and the growing number of ruptures, ARC has not recalled their demonstrably unsafe Defective Inflators, the Airbag Module Suppliers did not recall their air bag modules containing the Defective Inflators, and the Porsche Defendants did not recall all their vehicles fitted with the Defective Inflators. As stated above, the Porsche Defendants have not issued any recalls following actual ruptures, a pattern that follows the devastating Takata airbag inflator recalls that went on for many years and needlessly endangered vehicle occupants and resulted in injuries and deaths. Instead of proactively taking steps to ensure their vehicles are safe as they are duty bound to do, the Porsche Defendants' response has been reactive and wholly inadequate.

155.   As of May 31, 2023, there has been limited public disclosure of the data requested by NHTSA from the Porsche Defendants or ARC. The original requests for information surrounding the ARC inflator ruptures are dated August 4, 2016. The most recent documents provided to the public on the NHTSA website are dated from December 2022 and only include requests for additional information.

72

156.   According to a memo dated April 13, 2021, NHTSA states:

The manufacturer's response to the Office of Defect Investigation (ODI)'s information request for this investigation is being reviewed and redacted to remove all personally identifiable information (PII) as required by federal law. These responses are usually complex, contain a large volume of documents, and require additional time for review and redaction. The public version of the response will be posted to this investigation file when available. While ODI's investigation is ongoing, we recommend that you periodically review this investigation file for additional documents and updates.

157.   Over two years have passed since NHTSA claimed the public version of the documents would be made available and as of May 31, 2023, only 100 documents have been made public, most of which are NHTSA's requests, in stark contrast to ARC's representation that they turned over 2 tera-bytes of material during the investigation.

158.   There are only two approaches available: (1) Recall all ARC hybrid toroidal inflators OR (2) wait until another field rupture takes place and recall the inflators of the same lot. The Porsche Defendants' "Wait and See" approach places drivers and passengers of vehicles that utilize an ARC hybrid toroidal inflator at risk. The two drivers of the 2015 Chevrolet Traverses involved in the August and October 2021 accidents were the latest guinea pigs used to identify two defective lots of ARC inflators and they will not be the last unless all ARC Defective Inflators are recalled.

159.   In fact, in the October 4, 2016, letter from NHTSA to ARC's Chief

73

Executive Officer, ARC's position on the seriousness of the matter was called out quite clearly by Michael Brown, Acting Director Offices of Defect Investigation:[83]

> ARC's response to [NHTSA's] investigation to date does not demonstrate the behavior that NHTSA expects of manufacturers, much less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues.

160.   The Class Vehicles are not safe to drive. Due to Defendants' failures, Plaintiff and Class Members are left with poor options: to be without the use of a vehicle; purchase, lease, or rent a new vehicle until Defendants first issue and then complete the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time. These are all, obviously, entirely unacceptable alternatives.

## H.   The Class Vehicles

161.   Attached as Exhibit E is a table that identifies, to the best of Plaintiff's knowledge, and without the benefit of discovery, the Class Vehicles equipped with ARC's Defective Inflators by make, model, and model year.

## I.   Defendants' Concealment of the Defect

162.   Like ordinary consumers, Plaintiff reasonably believed when purchasing his Class Vehicles that the vehicle was equipped with safe airbags that did not have a dangerous propensity to shoot shrapnel into their faces, necks, torsos,

---

[83] NHTSA, EA16-003, Ltr. to ARC, Aug. 9, 2016.

and limbs or those of other vehicle occupants. Accordingly, the ordinary reasonable consumer would have considered the Inflator Defect to constitute an important and material part of deciding whether to spend money to purchase or lease a Class Vehicle.

163.   Defendants were aware that consumers did not expect their airbags to be defective and had readily available means to convey that information to Plaintiff and the Class—including through on-vehicle labeling, stickers, and placards, through owner manuals, brochures, and pamphlets, through advertising for the Class Vehicles, and through full and complete disclosure by way of recalls. Plaintiff and the Class were exposed to such types of informational materials prior to purchasing or leasing their Class Vehicles, at the time of purchase or lease (through interactions with the Porsche Defendants' sales employees and other agents), and/or every day they sat in their Class Vehicles. Indeed, Defendants had one obvious location to convey a warning about an airbag defect, on the steering wheel itself, an item the driver cannot help but see before ever driving the car.

164.   Defendants nonetheless chose not to warn about or disclose the defect at any point in time. The Defendants' concealment succeeded because each entity in the chain between ARC and the Porsche Defendants remained silent about the defect—resulting in the public, prospective purchasers and lessees, automobile

dealerships, automobile retailers, and automotive repair and service facilities remaining unaware of the Inflator Defect, which successfully prevented any warning to Plaintiff and the Class. The foreseeable and intended effect of the Defendants' concerted silence was that they all continued to profit from the manufacture, marketing, sale, service, and use of the Defective Inflators and Class Vehicles equipped with those inflators—with consumers bearing all the safety risks and suffering economic losses as a result.

165.   Defendants intended to mislead and in fact misled reasonable consumers—including Plaintiff and the Class—through their concealment of the Inflator Defect. Defendants did so with the intent to generate and increase sales of the Class Vehicles, thereby increasing Defendants' relative share of the automotive components and automobile markets.

## J.   Economic Injury to the Class

166.   The Class Vehicles were worth less than the prices the Class Members paid for them. Neither the market nor any reasonable consumer would ignore the material danger involving an airbag shooting metal shrapnel into the driver and passengers when assessing the value of an automobile and whether to purchase or lease it. Consequently, Plaintiff paid more for their Class Vehicles than they otherwise would have because of the Inflator Defect, or they purchased vehicles that

they otherwise would not have purchased.

167.   By concealing the Inflator Defect, Defendants distorted and misrepresented the true value of every Class Vehicle. Every Plaintiff and Class member received a Class Vehicle with different characteristics and of different and substantially lesser value than they reasonably believed they were receiving. Accordingly, Plaintiff and the Class did not realize the benefit of their bargain in purchasing and leasing the Class Vehicles, and their expectations as ordinary reasonable consumers were not met.

168.   For these reasons, every Class Vehicle was worth less than what Plaintiff and Class Members paid for them.

## IV.   Tolling of the Statute of Limitations

169.   Plaintiff and the Class had no knowledge of the misconduct and concealment alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until August 2020 when the NHTSA expanded its Engineering Analysis to include "toroidal shaped hybrid air bag inflators, both passenger and driver side" and requested additional information from ARC specifically regarding the PH7 toroidal shaped hybrid front passenger airbag inflator "to facilitate its investigation of the potential risk of deployment-related field rupture."

170.   Plaintiff and Class Members are consumers who purchased or leased Class Vehicles. No information in the public domain was available to the Plaintiff and the members of the Class prior to August 2020 that revealed sufficient information to suggest that Defendants were involved in the misconduct or concealment alleged herein. Therefore, the statute of limitations did not begin to run because Plaintiff and the Class did not and could not discover their claims.

171.   In the alternative, the statute of limitations did not begin to run because the Defendants fraudulently concealed the Defective Inflators until at the earliest, August 2020. On information and belief, ARC and the Defendants have known of the defects in their airbags since at least 2015. Defendants knew of the defects well before the Plaintiff and many of the Class Members purchased the Class Vehicles, and have concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the Airbag Defect.

172.   Plaintiff and the Class had no means of obtaining any facts or information concerning any aspect of ARC's dealings with the Airbag Module Suppliers and the Porsche Defendants, much less the fact that they had engaged in the misconduct and concealment alleged herein. For these reasons, the statute of limitations as to Plaintiff's and the Class's claims did not begin to run and has been tolled with respect to the claims that Plaintiff and Class Members have alleged in

this Complaint.

## V.    Class Action Allegations

173.   Unless otherwise stated, the term "Class" refers jointly and severally to the Class and to the Florida Subclass. Excluded from the Class are: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class counsel, and (e) any person who timely and properly excludes himself or herself from the Class.

### A.    Nationwide Class

174.   Pursuant to Federal Rule of Civil Procedure ("Rules") 23(a), 23(b)(2), and 23(b)(3), Plaintiff bring this action on behalf of a proposed Class defined as follows: "All consumers in the United States who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC between 2001 and 2018."[84]

---

[84] At this early stage and without the benefit of discovery, Plaintiff cannot determine with certainty each vehicle by make, model, and model year equipped with the Defective Inflators but have included those about which they are reasonably confident. Plaintiff may amend their pleadings to add vehicles if they are identified in the discovery process.

### K.    State Subclasses

175.    In addition and/or alternatively, the named Plaintiff in this and the other transferred actions referenced herein bring a separate state subclass under the laws of their respective states. The State Subclasses consist of: "All consumers in their state of residence who purchased, currently own, lease, or leased a Class Vehicle that contains a driver or passenger side inflator manufactured by ARC between 2001 and 2018." The State Subclasses do not include: (a) each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such persons; (b) the Court, the Court's immediate family, and the Court staff; (c) any person who asserts a personal injury or wrongful death claim caused by the Defective Inflator; (d) Class counsel, and (e) any person who timely and properly excludes himself or herself from the Class.

176.    Consistent with Fed. R. Civ. P. 23(c)(5) which sanctions the creation of subclasses "[w]hen appropriate," Plaintiff reserve their right to modify the Class and the State Subclasses as discovery progresses and at the class certification stage.

### L.    Numerosity (Fed. R. Civ. P. 23(a)(1))

177.    The members the proposed Class(es) are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Although the precise number of Class Members is unknown to

Plaintiff, on information and belief, the Class would easily number in the millions. Millions of Class Vehicles spanning nearly 20 model years potentially contain Defective Inflators. The Class and/or classes are thus comprised of numerous, geographically dispersed members who cannot be practicably joined.

178.   The true size of the Class and/or Classes are ascertainable through the Porsche Defendants' business records and by other means.

### M.   Typicality (Fed. R. Civ. P. 23(a)(3))

179.   Plaintiff's claims are typical of other Class Members' claims because Plaintiff and the Class and/or State Subclasses all purchased or leased a Class Vehicle containing Defective Inflators. All received less than the full value Class Vehicles due to the Inflator Defect and the Porsche Defendants' representations and/or Defendants' omissions. Class Members, like Plaintiff, would not have purchased the Class Vehicles or paid as much had Defendants not misrepresented the safety of the Class Vehicles or concealed and omitted to disclose the Inflator Defect, which was unknown to Plaintiff and Class Members. And Plaintiff and Class Members were exposed to the same or substantially similar misrepresentations and to the same omissions—namely, concealment of the Inflator Defect. In short, the claims all arise from a single course of conduct and each Class member would individually make similar legal and factual arguments to establish Defendants' liability.

180.   There are no defenses available that are unique to the Plaintiff.

**N.    Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) & 23(b)(3))**

181.   Plaintiff and the Class are united by a community of interest in obtaining appropriate remedies, including injunctive relief, repair, or replacement of the Class Vehicles or Defective Inflators, restitution, damages, and other available relief designed to redress Defendants' wrongful conduct. This action involves questions of law and fact that are common to the Class(es) that are susceptible to common answers and that predominate over any individual questions specific to any Class Members. These include:

    d.    Whether the ARC airbag inflators are defective;

    e.    Whether the Class Vehicles are equipped with Defective Inflators;

    f.    Whether Defective Inflators in the Class Vehicles pose an unreasonable safety risk or are otherwise material to reasonable consumers;

    g.    Whether an ordinary reasonable consumer would have purchased or leased a Class Vehicle had he or she known of the Defective Inflators;

    h.    Whether an ordinary reasonable consumer would have paid less

money to purchase or lease a Class Vehicle had he or she known of the Defective Inflators;

i.  Whether the Class and Subclass members were denied the benefit of their bargain as a result of the undisclosed defect;

j.  Whether Defendants had actual or constructive knowledge of the defect;

k.  When Defendants first had actual or constructive knowledge of the defect;

l.  Whether Defendants had a duty to disclose the Defective Inflators before or at the time Plaintiff and the Class(es) purchased or leased their respective Class Vehicles;

m.  Whether Defendants had and have an ongoing duty to disclose the defect;

n.  Whether Defendants breached their express and implied warranties for the Class Vehicles and Defective Inflators;

o.  Whether Defendants violated governing laws prohibiting unfair and deceptive trade practices and other similar consumer protection laws of Plaintiff's and the Class Members' respective jurisdictions;

p.     Whether Defendants breached other duties or violated other applicable laws by their representations and/or by their omissions, including concealment of the Defective Inflators;

q.     Whether Defendants breached their obligations to provide timely repairs for the Class Vehicles;

r.     Whether Defendants should be declared legally and financially responsible for notifying the Class and Subclass members of the true and complete nature and extent of the Defective Inflators;

s.     Whether Defendants should be declared legally and financially responsible for notifying Class and Subclass Members of their right to reimbursement from Defendants for the costs incurred in diagnosing, repairing, and replacing the Defective Inflators in the Class Vehicles;

t.     Whether and to what extent Defendants are obligated to pay actual and consequential damages to the Class and Subclass Members as a result of the Defective Inflators;

u.     Whether Defendants fraudulently concealed the Defective Inflators;

v.     Whether Defendants misconduct was knowing and willful;

w.  Whether Defendants should be obligated to pay punitive damages in connection with the claims brought in this action, and if so, the amount of those damages;

x.  Whether Defendants were unjustly enriched by receiving Plaintiff's and the Class Members' money for the Class Vehicles;

y.  Whether Defendants should be ordered to disgorge all or part of the monies received from Plaintiff and the Class in exchange for the Class Vehicles;

z.  Whether Plaintiff and the Class are entitled to damages, injunctive relief, restitution, or other relief sought in this Complaint; and

aa.  The amounts to which Plaintiff and the Class are entitled.

182.  The factual and legal issues identified above (a) remain common to the Class, (b) arise from a common course of conduct and systemic policy decisions made by Defendants, (c) predominate in number and importance over questions that may not be common to the class, and (d) preclude neither class-wide calculation of damages nor the methodological determination of how such damages should be allocated among Class Members.

**O.    Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**

183.   Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the Class Members. Plaintiff commits to protecting the interests of the Class(es) without exercising personal interest or otherwise acting in a manner inconsistent with the best interests of the Class(es) generally. Plaintiff has retained attorneys with exceptional experience in complex litigation, including extensive class action experience and experience in handling consumer protection cases and product liability cases, including automobile defect claims. The firms and lead counsel for the firms retained by Plaintiff also have substantial trial experience, individually and collectively. Plaintiff and his attorneys will responsibly, ethically, and vigorously advocate on behalf of the Class(es) and Plaintiff's counsel have ample resources to do so.

**P.    Ascertainability**

184.   The Defective Inflators manufactured by ARC are identifiable, discrete physical products that remain essentially unchanged when incorporated into a Class Vehicle. As a result, the Defective Inflators follow a traceable physical chain of distribution from ARC to the Airbag Module Suppliers to the Porsche Defendants to automobile dealerships and retailers and then to Plaintiff and the Class.

185.   Defective Inflators that are incorporated into the assembly contain

markings identifying ARC as the manufacturer on a small label on the component. Defective Inflators can therefore be physically traced through the supply chain.

186.    The identities of Class Members are ascertainable from various sources including Defendants' production and distribution records, Polk automotive data, vehicle ownership records, government ownership records, or via simple notice by publication.

**Q.    Superiority**

187.    The proposed class action is superior to the other means available to the Class to obtain relief. The damages suffered by individual Class Members are relatively small compared to the burden and expense of individual litigation of the claims described here against Defendants so that making the class whole in the absence of a class action is unlikely and impracticable.

188.    This means Class Members have relatively less interest in individually controlling the prosecution of separate actions and it cannot be said that the interests of individuals pursuing individual cases in conducting separate lawsuits is so strong as to call for denial of a class action. Without class certification, the prosecution of separate consumer actions by individual Class Members would be impracticable and financially difficult and, therefore, unlikely.

189.    Denial of class treatment runs the risk of establishing incompatible

standards of conduct for Defendants, discouraging the prosecution of meritorious but small claims, and it may result in adjudications which would be dispositive of the interests of other Class Members who are not parties to the adjudication, or otherwise substantially impair the ability of Class Members (and Defendants) to protect their rights and interests.

190.   Defendants have no facially plausible interest in defending against separate, geographically dispersed claims and, in fact, that would be more burdensome to Defendants than defending against all potential claims in a single forum and proceeding. Likewise, the judicial system has no interest in burdening numerous courts when the claims of this highly cohesive class can be fairly and efficiently concentrated and managed by this Court. Individualized actions would run the risk of creating inconsistent or contradictory judgments arising from the same set of facts and would increase the likely delay and expense to all parties involved and to the courts, including this Court. By proceeding as a class action, the claims at issue can be managed efficiently through economies of scale.

191.   Additionally, the claims are manageable, each Subclass claim is governed by one state's law and those laws are consonant with one another. Defendants' misconduct impacts all Class Members, whose losses are capable of calculation on a class-wide or subclass-wide basis.

192.   Ultimately, the class action procedure is superior to other methods of adjudicating the Plaintiff and Class Members' claims. This is precisely why class actions exist—class treatment facilitates the fair, uniform and efficient adjudication of claims, as it would here, and it promotes judicial economy while avoiding the undue financial, administrative and procedural burdens that necessarily would result from a multiplicity of individual actions.

## VI.   REALLEGATION AND INCORPORATION BY REFERENCE

193.   Plaintiff realleges and incorporates by reference each of the preceding paragraphs and allegations of this Complaint, including the Introduction, all Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the Claims for Relief asserted on behalf of the Nationwide Class and the State Subclasses in Volume II of the Complaint.

## VII.   CLAIMS ASSERTED ON BEHALF OF THE NATIONWIDE CLASS

### A.   Nationwide Count 1: Fraud by Omission and Concealment Against All Defendants.

403.   Plaintiff realleges and incorporates by reference all allegations in Volume 1 of the Consolidated Class Action Complaint above as though fully set forth herein.

404.   Plaintiff brings this count under Florida law, individually and on behalf of the other members of the Nationwide Class against Defendants.

405.   Alternatively, Plaintiff brings this claim on behalf of themselves and the Nationwide Class under the common law of fraudulent concealment, as there are no true conflicts among the states' laws of fraudulent concealment.

406.   For purposes of this count, members of the Nationwide Class shall be referred to as "Class Members."

407.   Defendants are liable for both fraudulent concealment and non-disclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

408.   Defendants owed Plaintiff and Class Members a duty to disclose all the material facts concerning the Defective Inflators in the Class Vehicles because:

a.     Given Defendants' role in the design, manufacture, testing, and sale of Class Vehicles and Defective Inflators, and their experience and knowledge as experts and long-time veterans of the automotive industry, they, along with ARC and the Airbag Module Suppliers, possessed exclusive access to and were in a superior position to know the true facts about the Defective Inflators;

b.     Given ARC's design, development, testing and manufacture of the Defective Inflators and its experience and knowledge as experts and long-time veterans of the automotive industry, it, along with the Defendants and the Airbag Module Suppliers, possessed exclusive

access to and was in a superior position to know the true facts about the Defective Inflators;

c.     Given the Airbag Module Suppliers' role in the design, manufacture, and testing of the airbag modules with the Defective Inflators installed in them, and their experience and knowledge as experts and long-time veterans of the automotive industry, they, along with ARC and the Defendants, possessed exclusive access to and were in a superior position to know the true facts about the Defective Inflators;

d.     Defendants knew that the Inflator Defect gave rise to serious safety concerns for the consumers who purchased and leased the Class Vehicles;

e.     The Inflator Defect poses a severe risk of harm in that, among other things, the metal shrapnel can puncture and stab the occupants, causing severe and potentially fatal injuries;

f.     Defendants knew about and investigated the Inflator Defect, but then did not notify consumers about it, disclose the Inflator Defect to NHTSA, or further launch a comprehensive recall for all Class Vehicles, which individually and together deprived Plaintiff of an opportunity that otherwise could have led them to discover the truth

about the Inflator Defect in their Class Vehicles; and

g.   The Defendants made, helped to make, or conspired to make incomplete representations about the safety and reliability of the Class Vehicles and their airbags, while purposefully withholding material facts about a known safety defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, the Defendants had the duty to disclose the whole truth.

409.   In breach of their duties, Defendants failed to disclose the Inflator Defect and that the Class Vehicles' airbags were not safe and reliable to Plaintiff and Class Members in connection with the sale of the Class Vehicles.

410.   The Inflator Defect within the Class Vehicles is material to the sale of the Class Vehicles because a reasonable person would find it important in purchasing, leasing, or retaining a new or used motor vehicle and because it directly impacts the value of the Class Vehicles purchased or leased by Plaintiff and Class Members.

411.   Defendants intended for Plaintiff and Class Members to rely on their omissions and concealment—which they did by purchasing and leasing the Class Vehicles at the prices they paid believing that their vehicles would not have an

Inflator Defect that would affect the quality, reliability, and safety of the Class Vehicles and their airbags.

412.   Plaintiff's and Class Members' reliance was reasonable because a reasonable consumer would not have expected that the Class Vehicles contained a safety defect that poses such a serious risk. They had no way of learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Class Members did not, and could not, unravel Defendants' deception on their own.

413.   Defendants actively concealed and suppressed these material facts, in whole or in part, to maintain a market for the Class Vehicles and the Defective Inflators installed in them, to protect profits, and to avoid costly recalls that would expose them to liability for those expenses and harm the commercial reputations of Defendants and their products. They did so at the expense of the Plaintiff and Class Members.

414.   If Defendants had fully and adequately disclosed the Inflator Defect to consumers, Plaintiff and Class Members would have seen such a disclosure.

415.   Through their omissions and concealment with respect to the Inflator Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and Class Members to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise

would have paid.

416.   Had Plaintiff and the Class Members known of the Inflator Defect within the Class Vehicles, they would not have purchased the Class Vehicles or would have paid less for them.

417.   As a direct and proximate result of Defendants' omissions and concealment, Plaintiff and other Class Members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Inflator Defect had been disclosed to them. Accordingly, Defendants are liable to Plaintiff and Class Members for their damages in an amount to be proven at trial.

418.   Defendants acted maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the Plaintiff's and Class Members' rights and well-being; and to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages, as permitted by law, in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

### R.    Nationwide Count 2: Unjust Enrichment Against the Defendants.

419.   Plaintiff realleges and incorporates by reference all allegations in Volume 1 of the Consolidated Class Action Complaint above as though fully set forth herein.

420.   Plaintiff brings this count under Florida law, individually and on behalf

of the other members of the Nationwide Class against the Defendants.

421.   For purposes of this count, members of the Nationwide Class shall be referred to as "Class Members."

422.   When they purchased and leased the Class Vehicles, Plaintiff and Class Members conferred tangible and material economic benefits upon the Defendants, who readily accepted and retained these benefits.

423.   Plaintiff and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Inflator Defect at the time of purchase or lease. Therefore, the Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiff and Class Members.

424.   The Defendants appreciated these economic benefits. These benefits were the expected result of the Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Inflator Defect, yet they failed to disclose this knowledge and misled the Plaintiff and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

425.   It would be unjust, inequitable, and unconscionable for the Defendants to retain these benefits, including because they were procured as a result of their

wrongful conduct alleged above.

426.   Plaintiff and Class Members are entitled to restitution of the benefits the Defendants unjustly retained and/or any amounts necessary to return Plaintiff and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

427.   Plaintiff pleads this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiff's claims for damages enters judgment on them in favor of the Defendants, Plaintiff will have no adequate legal remedy.

## VIII.  CLAIMS ASSERTED ON BEHALF OF THE FLORIDA SUBCLASS

### A. Florida Count 1: Breach of Express Warranty (Fla. Stat. §§ 672.313 and 680.21) Against the Defendants.

428.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

429.   The Florida Plaintiff brings this count under Florida law, individually and on behalf of the other members of the Florida Subclasses against the Defendants. Plaintiffs who purchased or leased their Class Vehicles in states with materially similar laws may represent Subclasses under this count.

430.   For purposes of this count, members of the Florida Subclass shall be referred to as "Class Members."

431.   The Class Vehicles are "goods" under Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

432.   The Defendants are "merchants," "sellers," and "lessors," of the Class Vehicles under Cal. Com. Code §§ 672.104(1) and 680.1031(3)(k), § 672.103(1)(d), and § 680.1031(1)(p), respectively.

433.   Plaintiff and Class Members who purchased and leased the Class Vehicles in Florida are "buyers" and "lessees" under Fla. Stat. §§ 672.103(1)(a) and 680.1031(1)(n).

434.   The Defendants issued an express written warranty for each defective Class Vehicle they sold, including that:

a.   The Class Vehicles would be free of defects in materials and workmanship at the time of sale; and

b.   The Class Vehicles were safe and reliable, and their airbags would function properly in the event of a crash.

435.   The warranties listed above formed the basis of the bargain with regard to Plaintiff's and Class Members' purchase and lease of the Class Vehicles.

436.   The Defendants knowingly breached their warranty for the Class Vehicles because:

a.   The airbag inflators have latent defects which have a dangerous

97

propensity to cause the inflators to rupture and eject metal shrapnel, subjecting Plaintiff and Class Members to the risk of loss and injury; and

b.    The Defendants denied, concealed, and misrepresented the Inflator Defect, in the process refusing to pay for or provide in a reasonably timely fashion the needed repairs and replacements for Plaintiff and Class Members.

437.   The Defendants knew or should have known that the warranties were false and/or misleading. Specifically, the Defendants were aware of the Inflator Defect in the Class Vehicles, which made the vehicles inherently defective and dangerous at the time that they were sold and leased to Plaintiff and Class Members.

438.   Plaintiff and Class Members were exposed to the Defendants' misrepresentations, and they had no way of discerning that the Defendants' representations were false and misleading or otherwise learning the material facts that the Defendants had concealed or failed to disclose. Accordingly, Plaintiff and Class Members reasonably relied on the Defendants' express warranties when purchasing or leasing their Class Vehicles.

439.   Plaintiff and Class Members timely provided the Defendants notice of the issues raised in this count and this Complaint and an opportunity to cure, as

alleged in the paragraphs addressing Defendants' notice, above.

440. Alternatively, Plaintiff and Class Members were excused from providing the Defendants with notice and an opportunity to cure the breach, because it would have been futile. As alleged above, the Defendants knew about the Defective Inflators for years; however, to date, the Defendants have not instituted a recall or any other repair program with respect to all of the Class Vehicles, or even acknowledged that the Inflator Defect exists in all of the Class Vehicles. Therefore, they have refused to recall or repair defective vehicles. Moreover, to the extent the Defendants have issued recalls, those recalls are inadequate because, *inter alia*: (a) they are belated because the Defendants knew about the Defective Inflators for years and did nothing to recall or remedy the serious safety defect; (b) with tens of millions of vehicles impacted in existing and potential future recalls, as a result of the Defendants' concealment of the Inflator Defect, the recalls cannot be implemented effectively due to supply constraints and resulting delays; (c) the recalls are incomplete, and apply to only a subset of the Class Vehicles.

441. As a direct and proximate result of the Defendants' breach of their express warranties, the Class Vehicles were and are defective and the Inflator Defect was not remedied. Therefore, Plaintiff and Class Members have been damaged, in an amount to be proven at trial, through their overpayment at the time of purchase

or lease for the Class Vehicles with an undisclosed safety defect that would not be remedied.

**B. Florida Count 2: Breach of Implied Warranty of Merchantability (Fla. Stat. §§ 672.314 and 680.212) Against the Defendants.**

442.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

443.   The Florida Plaintiff brings this count under Florida law, individually and on behalf of the other members of the Florida Subclasses against the Defendants. Plaintiffs who purchased or leased their Class Vehicles in states with materially similar laws may represent Subclasses under this count.

444.   For purposes of this count, members of the Florida Subclass shall be referred to as "Class Members."

445.   The Class Vehicles are "goods" under Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

446.   The Defendants are "merchants," "sellers," and "lessors," of the Class Vehicles under Cal. Com. Code §§ 672.104(1) and 680.1031(3)(k), § 672.103(1)(d), and § 680.1031(1)(p), respectively.

447.   Plaintiff and Class Members who purchased and leased the Class Vehicles in Florida are "buyers" and "lessees" under Fla. Stat. §§ 672.103(1)(a) and 680.1031(1)(n).

448.   Florida law conferred an implied warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which they were to be used pursuant to Fla. Stat. §§ 672.314 and 680.212.

449.   The Class Vehicles are not merchantable, and as such the Defendants breached their implied warranties, because at the time of sale and all times thereafter:

   a.   The Class Vehicles would not pass without objection in the automotive trade given the Inflator Defect;

   b.   The Inflator Defect renders the Class Vehicles unsafe to drive and unfit for ordinary purposes;

   c.   The Class Vehicles and the airbags therein were inadequately labeled as safe and reliable, and the labeling failed to disclose the Inflator Defect; and

   d.   The Class Vehicles do not conform to their labeling, which represents that the vehicles are safe and suitable for their intended use.

450.   Plaintiff and Class Members timely provided the Defendants notice of the issues raised in this count and this Complaint and an opportunity to cure, as alleged in the paragraphs addressing Defendants' notice, above.

451.   Alternatively, Plaintiff and Class Members were excused from providing the Defendants with notice and an opportunity to cure the breach because

it would have been futile. As alleged above, the Defendants have long known that the Class Vehicles contained the Defective Inflators, and that the Defective Inflators have caused airbags to malfunction in crashes involving the Class Vehicles; however, to date, the Defendants have not instituted a recall or any other repair program with respect to all of the Class Vehicles, or even acknowledged that the Inflator Defect exists in all of those Class Vehicles. Moreover, to the extent the Defendants have issued recalls, those recalls are inadequate because, inter alia: (a) they are belated because the Defendants knew about the Defective Inflators for years and did nothing to recall or remedy the serious safety defect; (b) with tens of millions of vehicles impacted in existing and potential future recalls, as a result of the Defendants' concealment of the Inflator Defect, the recalls cannot be implemented effectively due to supply constraints and resulting delays; (c) the recalls are incomplete, and apply to only a subset of the Class Vehicles.

452.   Plaintiff, individually and on behalf of Class Members, seeks all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

### C. <u>Florida Count 3: Violations of the Florida Deceptive & Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq*.) Against All Defendants.</u>

453.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

454.   The Florida Plaintiff brings this count under Florida law, individually and on behalf of the other members of the Florida Subclasses against the Defendants. Plaintiffs who purchased or leased their Class Vehicles in states with materially similar laws may represent Subclasses under this count.

455.   For purposes of this count, members of the Florida Subclass shall be referred to as "Class Members."

456.   Plaintiff and Class Members are "consumers" under Fla. Stat. § 501.203(7) because they purchased the Class Vehicles primarily for personal, family, or household use.

457.   Defendants were and are engaged in "trade or commerce" under the meaning of Fla. Stat. § 501.203(8).

458.   The Florida Unfair and Deceptive Trade Practices Act ("Florida UDTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

459.   Defendants' violations of the Florida UDTPA occurred repeatedly in their trade or practice—including the design, manufacture, distribution, marketing, sale, and lease of the Defective Inflators and the Class Vehicles.

460.   Defendants, through their agents, employees, and/or subsidiaries,

violated the Florida UDTPA by knowingly and intentionally misrepresenting, omitting, concealing, and/or failing to disclose material facts regarding the reliability, safety, and performance of the Class Vehicles and the Defective Inflators, as detailed above.

461.   Defendants had an ongoing duty to Plaintiff and Class Members to refrain from unfair or deceptive practices under the Florida UDTPA in the course of their business. Specifically, Defendants owed Plaintiff and Class Members a duty to disclose all the material facts concerning the Defective Inflators in the Class Vehicles because:

a.   Given ARC's design, development, testing and manufacture of the Defective Inflators and its experience and knowledge as experts and long-time veterans of the automotive industry, it, along with the Defendants and the Airbag Module Suppliers, possessed exclusive access to and was in a superior position to know the true facts about the Defective Inflators;

b.   Given the Airbag Module Suppliers' role in the design, manufacture, and testing of the airbag modules with the Defective Inflators installed in them, and their experience and knowledge as experts and long-time veterans of the automotive industry, they, along with ARC and the

Defendants, possessed exclusive access to and were in a superior position to know the true facts about the Defective Inflators;

c.   Given the Defendants' role in the design, manufacture, testing, and sale of Class Vehicles and Defective Inflators, and their experience and knowledge as experts and long-time veterans of the automotive industry, they, along with ARC and the Airbag Module Suppliers, possessed exclusive access to and were in a superior position to know the true facts about the Defective Inflators;

d.   Given the Inflator Defect's hidden and technical nature, Plaintiff and Class Members lack the sophisticated expertise in vehicle components and technology that would be necessary to discover the Inflator Defect on their own;

e.   Defendants knew that the Inflator Defect gave rise to serious safety concerns for the consumers who purchased and leased the Class Vehicles;

f.   The Inflator Defect poses a severe risk of harm in that, among other things, the metal shrapnel can puncture and stab the occupants, causing severe and potentially fatal injuries;

g.   Defendants knew about and investigated the Inflator Defect, but then

did not notify consumers about it or disclose the Inflator Defect to NHTSA, and the Defendants did not launch a comprehensive recall for all Class Vehicles, all of which individually and together deprived Plaintiff of an opportunity that otherwise could have led them to discover the truth about the Inflator Defect in their Class Vehicles; and

h.   The Defendants made, helped to make, or conspired to make incomplete representations about the safety and reliability of the Class Vehicles and their airbags, while purposefully withholding material facts about a known safety defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, the Defendants had the duty to disclose the whole truth.

462.   By misrepresenting the Class Vehicles as safe and reliable and the airbags installed in them as properly-functioning and free from defects, and/or by failing to disclose and actively concealing the dangers and risk posed by the Inflator Defect to both consumers and NHTSA, Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce, as prohibited by Fla. Stat. § 501.204(1).

463.   Defendants' unfair or deceptive acts or practices, including their

106

misrepresentations, concealments, omissions, and/or suppressions of material facts, were designed to mislead and had a tendency or capacity to mislead and create a false impression in consumers that the Class Vehicles had properly-functioning and reliable airbags. Indeed, those misrepresentations, concealments, omissions, and suppressions of material facts did in fact deceive reasonable consumers, including Plaintiff and Class Members, about the true safety and reliability of the Class Vehicles and/or the Defective Inflators installed in them, the quality of the Class Vehicles, and the true value of the Class Vehicles.

464.   Defendants intended for Plaintiff and Class Members to rely on their misrepresentations, omissions, and concealment—which they did by purchasing and leasing the Class Vehicles at the prices they paid believing that their vehicles would not have an Inflator Defect that would affect the quality, reliability, and safety of the Class Vehicles and their airbags.

465.   Defendants' misrepresentations, concealments, omissions, and suppressions of material facts regarding the Inflator Defect and true characteristics of the Class Vehicles were material to the decisions of Plaintiff and Class Members to purchase and lease those vehicles, as Defendants intended. Plaintiff and Class Members were exposed to those misrepresentations, concealments, omissions, and suppressions of material facts, and relied on Defendants' misrepresentations that the

Class Vehicles and their airbags were safe and reliable in deciding to purchase and lease the Class Vehicles.

466. Plaintiffs' and Class Members' reliance was reasonable, as they had no way of discerning that Defendants' representations were false and misleading, or otherwise learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Class Members did not, and could not, unravel Defendants' deception on their own.

467. Had they known the truth about the Inflator Defect, Plaintiff and Class Members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

468. As a direct and proximate result of Defendants' deceptive practices, Plaintiff and Class Members have sustained economic injury and loss—either by purchasing a vehicle they otherwise would not have purchased or paying more than they otherwise would have as a result of Defendants' actions and omissions alleged above—that first occurred at the time each Class Vehicle was purchased or leased.

469. Defendants' violations present a continuing risk to Plaintiff and Class Members, as well as to the general public, because the Class Vehicles remain unsafe due to the Defective Inflators therein. Defendants' unlawful acts and practices complained of herein affect the public interest.

470.    Pursuant to Fla. Stat. § 501.211, Plaintiff and Class Members seek an order enjoining the above unfair or deceptive acts or practices and awarding actual damages, treble damages, restitution, attorneys' fees, and any other just and proper relief available under the Florida UDTPA against Defendants.

### D. Florida Count 4: Fraud by Omission and Concealment Against Defendants.

471.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

472.    The Florida Plaintiff brings this count under Florida law, individually and on behalf of the other members of the Florida Subclasses against the Defendants. Plaintiffs who purchased or leased their Class Vehicles in states with materially similar laws may represent Subclasses under this count.

473.    For purposes of this count, members of the Florida Subclass shall be referred to as "Class Members."

474.    Defendants are liable for both fraudulent concealment and non-disclosure. *See, e.g.*, Restatement (Second) of Torts §§ 550-51 (1977).

475.    Defendants owed Plaintiff and Class Members a duty to disclose all the material facts concerning the Defective Inflators in the Class Vehicles because:

a.    Given the Defendants' role in the design, manufacture, testing, and sale of Class Vehicles and Defective Inflators, and their experience and

knowledge as experts and long-time veterans of the automotive industry, they, along with ARC and the Airbag Module Suppliers, possessed exclusive access to and were in a superior position to know the true facts about the Defective Inflators;

b.      Given ARC's design, development, testing and manufacture of the Defective Inflators and its experience and knowledge as experts and long-time veterans of the automotive industry, it, along with the Defendants and the Airbag Module Suppliers, possessed exclusive access to and was in a superior position to know the true facts about the Defective Inflators;

c.      Given the Airbag Module Suppliers' role in the design, manufacture, and testing of the airbag modules with the Defective Inflators installed in them, and their experience and knowledge as experts and long-time veterans of the automotive industry, they, along with ARC and the Defendants, possessed exclusive access to and were in a superior position to know the true facts about the Defective Inflators;

d.      Given the Inflator Defect's hidden and technical nature, Plaintiff and Class Members lack the sophisticated expertise in vehicle components and technology that would be necessary to discover the Inflator Defect

on their own;

e.   Defendants knew that the Inflator Defect gave rise to serious safety concerns for the consumers who purchased and leased the Class Vehicles;

f.   The Inflator Defect poses a severe risk of harm in that, among other things, the metal shrapnel can puncture and stab the occupants, causing severe and potentially fatal injuries;

g.   Defendants knew about and investigated the Inflator Defect, but then did not notify consumers about it, disclose the Inflator Defect to NHTSA, and the Defendants did not launch a comprehensive recall for all Class Vehicles, all of which individually and together deprived Plaintiff of an opportunity that otherwise could have led them to discover the truth about the Inflator Defect in their Class Vehicles; and

h.   The Defendants made, helped to make, or conspired to make incomplete representations about the safety and reliability of the Class Vehicles and their airbags, while purposefully withholding material facts about a known safety defect. Because they volunteered to provide information about the Class Vehicles that they marketed and offered for sale and lease to consumers, the Defendants had the duty to disclose the

whole truth.

476.   In breach of their duties, Defendants failed to disclose the Inflator Defect and that the Class Vehicles' airbags were not safe and reliable to Plaintiff and Class Members in connection with the sale of the Class Vehicles.

477.   The Inflator Defect within the Class Vehicles is material to the sale of the Class Vehicles because a reasonable person would find it important in purchasing, leasing, or retaining a new or used motor vehicle and because it directly impacts the value of the Class Vehicles purchased or leased by Plaintiff and Class Members.

478.   Defendants intended for Plaintiff and Class Members to rely on their omissions and concealment—which they did by purchasing and leasing the Class Vehicles at the prices they paid believing that their vehicles would not have an Inflator Defect that would affect the quality, reliability, and safety of the Class Vehicles and their airbags.

479.   Plaintiff's and Class Members' reliance was reasonable because a reasonable consumer would not have expected that the Class Vehicles contained a safety defect that poses such a serious risk. They had no way of learning the facts that Defendants had concealed or failed to disclose. Plaintiff and Class Members did not, and could not, unravel Defendants' deception on their own.

480.   Defendants actively concealed and suppressed these material facts, in whole or in part, to maintain a market for the Class Vehicles and the Defective Inflators installed in them, to protect profits, and to avoid costly recalls that would expose them to liability for those expenses and harm the commercial reputations of Defendants and their products. They did so at the expense of Plaintiff and Class Members.

481.   If Defendants had fully and adequately disclosed the Inflator Defect to consumers, Plaintiff and Class Members would have seen such a disclosure.

482.   Through their omissions and concealment with respect to the Inflator Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and Class Members to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

483.   Had Plaintiff and Class Members known of the Inflator Defect within the Class Vehicles, they would not have purchased the Class Vehicles or would have paid less for them.

484.   As a direct and proximate result of Defendants' omissions and concealment, Plaintiff and other Class Members either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Inflator Defect

had been disclosed to them. Accordingly, Defendants are liable to Plaintiff and Class Members for their damages in an amount to be proven at trial.

485.   Defendants acted maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the Plaintiff's and Class Members' rights and well-being; and to enrich themselves. Defendants' misconduct warrants an assessment of punitive damages, as permitted by law, in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

**E. Florida Count 5: Unjust Enrichment Against the Defendants.**

486.   Plaintiff realleges and incorporates by reference all allegations in Volume 1 of the Consolidated Class Action Complaint as though fully set forth herein.

487.   The Florida Plaintiff brings this count under Florida law, individually and on behalf of the other members of the Florida Subclasses against the Defendants. Plaintiffs who purchased or leased their Class Vehicles in states with materially similar laws may represent Subclasses under this count.

488.   For purposes of this count, members of the Florida Subclass shall be referred to as "Class Members."

489.   When they purchased and leased the Class Vehicles, Plaintiff and Class Members conferred tangible and material economic benefits upon the Defendants,

who readily accepted and retained these benefits.

490.   Plaintiff and Class Members would not have purchased or leased their Class Vehicles, or would have paid less for them, had they known of the Inflator Defect at the time of purchase or lease. Therefore, the Defendants profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiff and Class Members.

491.   The Defendants appreciated these economic benefits. These benefits were the expected result of the Defendants acting in their pecuniary interest at the expense of their customers. They knew of these benefits because they were aware of the Inflator Defect, yet they failed to disclose this knowledge and misled the Plaintiff and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

492.   It would be unjust, inequitable, and unconscionable for the Defendants to retain these benefits, including because they were procured as a result of their wrongful conduct alleged above.

493.   Plaintiff and Class Members are entitled to restitution of the benefits the Defendants unjustly retained and/or any amounts necessary to return Plaintiff and Class Members to the position they occupied prior to dealing with those Defendants, with such amounts to be determined at trial.

494.   Plaintiff pleads this claim separately as well as in the alternative to their claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiff's claims for damages enters judgment on them in favor of the Defendants, Plaintiff will have no adequate legal remedy.

## IX.   PRAYER FOR RELIEF

Plaintiff, on behalf of himself and all others similarly situated, request the Court to enter judgment in favor of Plaintiff and against the Defendants and grant the following relief:

A.   An order certifying the proposed Class and/or State Subclasses designating named Plaintiff as the named representative of the relevant classes and designating the undersigned as Class Counsel for all classes;

B.   A declaration that the airbags in Class Vehicles are defective;

C.   A declaration that the Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

D.   An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles;

E.   An award to Plaintiff and Class Members of compensatory, exemplary,

and statutory penalties, damages, including interest, in an amount to be proven at trial;

F.     An award to Plaintiff and Class Members for the return of the purchase price of the Class Vehicles, with interest from the time it was paid, the reimbursement of the reasonable expenses occasioned by the sale, and damages;

G.     A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket expenses and damages claims associated with the Defective Inflators in Plaintiff's and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Inflators;

H.     A declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class Members;

I.     An award of attorneys' fees and costs, as allowed by law;

J.     An award of pre-judgment and post-judgment interest, as provided by law;

K.     Leave to amend this Complaint to conform to the evidence produced at trial; and

    L.     Such other relief as may be appropriate under the circumstances.

## X.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: June 30, 2023        Respectfully Submitted,

**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C**.

By: */s/ H. Clay Barnett, III*
**H. CLAY BARNETT, III (GA Bar No. 174058)**
Thomas P. Willingham (GA Bar No. 235049)
Overlook II
2839 Paces Ferry Rd SE, Suite 400
Atlanta, GA 30339
T: 404-751-1162 / F: 334-954-7555
Clay.Barnett@BeasleyAllen.com
Tom.Willingham@beasleyallen.com

**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
W. Daniel "Dee" Miles, III (*pro hac vice forthcoming* )
Demet Basar (*pro hac vice forthcoming* )
J. Mitch Williams (*pro hac vice forthcoming*)
Dylan T. Martin (*pro hac vice forthcoming*)
272 Commerce Street
Montgomery, Alabama 36104
T: 334-269-2343 / F: 334-954-7555
Dee.Miles@Beasleyallen.com
Demet.Basar@Beasleyallen.com
Mitch.Williams@Beasleyallen.com
Dylan.Martin@beasleyallen.com

118