# Exhibit E

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3

4   DR. MAHENDRA AMIN,              )
                                    )
5              Plaintiff,           )
         v.                         )   CIVIL ACTION
6                                   )   FILE NO. 1:23-MI-00022
                                    )
7   NBCUNIVERSAL MEDIA, LLC, ET     )
    AL,                             )
8                                   )
               Defendants.          )
9   _____)

10

11

    --------------------------------------------------------
12

         BEFORE THE HONORABLE JUSTIN S. ANAND
13            TRANSCRIPT OF PROCEEDINGS
                 MARCH 31, 2023
14  --------------------------------------------------------

15

16

17

18

19       Proceedings recorded by mechanical stenography
          and computer-aided transcript produced by
20

21        JANA B. COLTER, FAPR, RDR, CRR, CRC
             Realtime Systems Administrator
22            Official Court Reporter
                2394 U.S. Courthouse
23            75 Ted Turner Drive, SW
              Atlanta, Georgia  30303
24               (404) 215-1456

25
```

```
 1   APPEARANCES:

 2   For the Plaintiff:        STACEY EVANS
                               SCOTT GRUBMAN
 3                             AMBLE JOHNSON
                               Attorneys at Law
 4
     For the Defendant:        AMANDA LEVINE
 5                             CYNTHIA COUNTS
                               Attorneys at Law
 6
     For the Movant:           CLARE NORINS
 7                             ELORA MUKHERJEE
                               Attorneys at Law
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
 1      (Atlanta, Fulton County, Georgia, March 31, 2023, via Zoom
 2  Videoconferencing.)

 3                              —  —  —
 4                       P R O C E E D I N G S
 5                              —  —  —

 6           THE COURT:  Hi.  Good morning.  This is Judge Anand.
 7      Can y'all hear me okay?
 8           MS. NORINS:  Yes, Judge.
 9           MS. EVANS:  Yes.
10           THE COURT:  Okay.  Great.  Well, good morning to
11  everybody and thanks to you-all for being available on
12  relatively short notice for this.
13           Let me begin by asking counsel to identify themselves
14  and state their appearances.  I'm really just interested in
15  those who are going to be speaking, so I guess starting with
16  counsel for the petitioner here, if y'all would state your
17  appearances and introduce yourselves for the record, that
18  would be helpful.
19           MS. NORINS:  Certainly, Your Honor.
20      I'm Clare Norins with the UGA School of Law's First
21  Amendment Clinic representing nonparty Betty Ndonga, along
22  with my co-counsel, Elora Mukherjee from the Columbia
23  Immigration Clinic.
24           THE COURT:  Very good.  Good morning to both of you.
25           MS. MUKHERJEE:  Good morning.
```

| | |
|---|---|
| 1 | THE COURT:  And then I guess counsel for defendant |
| 2 | here, for Dr. Amin. |
| 3 | MS. EVANS:  Your Honor -- |
| 4 | THE COURT:  Or, I guess, I'm sorry, he's the |
| 5 | plaintiff.  I'm sorry, Dr. Amin is plaintiff in this case, so |
| 6 | I'm sorry. |
| 7 | Ms. Evans; is that right? |
| 8 | MS. EVANS:  Yes, Your Honor.  Good morning. |
| 9 | Stacey Evans on behalf of Dr. Amin, who is a |
| 10 | plaintiff in the NBCUniversal case. |
| 11 | Also here with me is Amble Johnson from my firm and |
| 12 | also Scott Grubman, who is co-counsel is on the Zoom as well. |
| 13 | Good morning. |
| 14 | THE COURT:  Very good.  Good morning to all of you. |
| 15 | And then, I'm sorry, do we -- am I right that we also |
| 16 | have counsel for NBC; is that right? |
| 17 | MS. LEVINE:  It's Amanda Levine from Davis Wright |
| 18 | Tremaine, and we represent NBC.  And I'm on with my |
| 19 | co-counsel, Cynthia Counts, from FisherBroyles. |
| 20 | THE COURT:  Great.  Good morning to y'all as well. |
| 21 | I mean, I think that's everyone who is a party in the |
| 22 | case, if I'm not mistaken. |
| 23 | Is there anyone else, any other counsel here |
| 24 | appearing?  Okay. |
| 25 | All right.  Very good.  Well, I have reviewed both |

1  Ms. Ndonga's brief and also Dr. Amin's brief that we received

2  last night and I've reviewed all of that in detail and the

3  attachments.  But let me give y'all the opportunity as well to

4  make any additional points and also I may have some questions.

5  But you can be assured that I've read the material, so you

6  don't have to begin from scratch.

7          But I'll let you have a chance for each of you to

8  argue your positions and I do have a few questions here and

9  there probably.

10          So I guess let's just start with Ms. Norins on behalf

11  of the petitioner.

12          MS. NORINS:  Thank you, Judge.

13          So as earlier stated, I'm here seeking relief on

14  behalf of non-party Ms. Betty Ndonga.  Ms. Ndonga was

15  improperly served.  It appears maybe that service has now been

16  corrected.  We have not been able to confirm that with her,

17  but assuming that the affidavit submitted along with Amin's

18  papers last night is correct, she's now been personally served

19  with an unduly burdensome nonparty subpoena issued by

20  Mahendra Amin in his defamation suit against media company,

21  NBCUniversal.

22          Ms. Ndonga had --

23          THE COURT:  Let me ask you a quick question about

24  service.

25          MS. NORINS:  Okay.

1          THE COURT:  Because you said you haven't been able to
2     confirm the personal service.
3          But the original service, was that not on someone who
4     resided at her residence, which normally under Rule 4 would be
5     sufficient service?
6          MS. NORINS:  So the subpoena was handed to
7     Ms. Ndonga's mother, Lucy Ndonga on March 14th.  And in the
8     Northern District of Georgia, Rule 45 subpoenas are required
9     to be served by personal delivery to the deponent.  And so we
10    maintain that that initial attempted service was improper.
11         And then we immediately notified Amin's counsel of
12    that.  And now it appears that they have personally served
13    her.  But again, we haven't been able to confirm that --
14         THE COURT:  Okay.
15         MS. NORINS:  -- with Ms. Ngonda.
16         THE COURT:  Okay.  All right.  I'm sorry to pull you
17    away from that.
18         MS. NORINS:  No, no problem.
19         So separately, Ms. Ndonga has sued Mahendra Amin and
20    other defendants in a punitive class action titled *Oldaker v.*
21    *Giles* that is pending in front of Judge Sands in the Middle
22    District of Georgia.  And Judge Sands has issued a stayable
23    discovery order in that case.  So by seeking to depose
24    Plaintiff Ndonga, Defendant Amin is violating that stay.
25         With that background, there are ample grounds for

 1  quashing Amin's subpoena to Ms. Ndonga in its entirety.  The

 2  service issue has now presumably been cured, but there is the

 3  violation of the *Oldaker* discovery stay to contend with and we

 4  have moved separately in front of Judge Sands for an order to

 5  show cause why Amin should not be sanctioned for violating

 6  that stay order.

 7       And third, the nonparty subpoena to Ms. Ndonga is

 8  unduly burdensome, for a number of reasons.  It will require

 9  her to testify about sensitive and traumatic subject matter in

10  a case to which she is not a party and she had had nothing to

11  do with these statements that were made by NBCU that Amin is

12  challenging as defamatory.

13       Amin has no need for her testimony about what

14  procedures he performed on her as those are established by her

15  medical records.

16       And this will also set up Ms. Ndonga to be subjected

17  to a series of repetitive and duplicative depositions on the

18  same subject matter, then she will almost certainly be deposed

19  again in the *Oldaker* case, both by Amin and the other

20  defendants in that case.

21       We maintain that she has little to no relevant

22  information that would go to either the falsity of the alleged

23  defamatory statements or to state of mind by NBCU or actual

24  malice at the time they made these statements.

25       So for these reasons, we believe the subpoena is

1   unduly burdensome and would move to quash it in its entirety

2   under both Rule 45 and Rule 26.

3       THE COURT:  Let me ask:  As to relevance, Dr. Amin's

4   brief states that in the *Oldaker* case -- I'm sorry, in the

5   Universal Case, NBC has issued initial discovery or disclosure

6   statements listing the *Oldaker* plaintiffs as witnesses with

7   relevant information in the case that they would seek to use

8   in support of their claims or defenses in that case.

9       Would that not, if nothing else, by itself, entitle

10   Dr. Amin -- I mean, putting aside the stay and all those

11   issues, purely relevance, would the fact that your client is

12   identified as a witness to be used in support of Dr. Amin's

13   adversary in that other case, by itself, entitle Dr. Amin to

14   take her deposition, whether now or later.

15       I'm just sort of trying to set the stage.

16       MS. NORINS:  Sure.  I'd be happy to speak to that.

17   NBCU has identified the *Oldaker* plaintiffs as a group of

18   persons with relevant information.  Nowhere in their discovery

19   responses that have been shared with us are any of the

20   particular plaintiffs identified or any reason given for why

21   their particular testimony would be relevant.

22       Ms. Ndonga was not a source for it -- the published

23   statements by NBCU, she did not speak to them, she did not

24   provide information to them.  There is really no reason to

25   depose her about what NBCU knew at the time that they made

1  these broadcasts.  And I would maintain that by listing

2  *Oldaker* plaintiffs as a general category with no specific

3  showing of what Ms. Ndonga could testify to that would be

4  relevant, that does not satisfy relevancy.

5      THE COURT:  Okay.  All right.  I think those were my

6  questions for you.

7      I don't know if there is anything else you wanted to

8  add.  As the movant, I'll let you have rebuttal or allow you

9  to respond, but...

10     MS. NORINS:  So I would like to provide a little bit

11 of context about who Ms. Ndonga is, because I think that goes

12 to the undue burden that this subpoena places on her.

13     THE COURT:  Um-hmm.

14     MS. NORINS:  So Ms. Ndonga was brought here from

15 Kenya at the age of two years old and she has lived in the

16 United States her entire life.

17     Tragically, she suffers from very serious mental

18 health conditions, namely, schizoaffective disorder and

19 posttraumatic stress disorder and because of this, in May of

20 2019, an immigration judge in Atlanta adjudicated her mentally

21 incompetent.

22     It was after that adjudication of mental incompetency

23 that she was subjected to nonconsensual and invasive and

24 medically unindicated procedures at the hands of Amin while

25 she was involuntarily detained by ICE.  And Amin's treatment

1  of her caused her significant physical and emotional trauma.

2       And an evaluating doctor has adjudged that this

3  worsened her preexisting PTSD and also caused her to lose

4  grounds in terms of her coping with her mental illness.

5       And so this deposition is seeking to ask her to

6  answer oral questions, to be grilled in a room full of lawyers

7  where Amin, as a party, would have the right to be present

8  about these deeply traumatic events in a proceeding to which

9  she is not a party.

10       She has not put any of these issues by NBCUniversal

11  at issue.  And she wasn't a source for any of their

12  statements.  And so under the *Castleberry* case from the

13  Southern District of Georgia, 2019, this imposes a tremendous

14  burden on her to be asked to testify about this private

15  information.

16       And I understand there is a protective order in place

17  in the Amin case and that would protect this information from

18  being publicly disseminated, but it would not protect

19  Ms. Ndonga from being orally grilled in a room full of

20  lawyers, where again, Amin would have the right to be present.

21       And so I would like to point the Court to the

22  *Fappiano* case from the Second Circuit that we cited in our

23  briefing, because I think that's a very factually similar

24  case.  So in that case, a former criminal defendant sued for

25  malicious prosecution alleging that the NYPD had manufactured

1  evidence against him for a rape charge and he wanted to depose

2  the alleged victim of the sexual assault.  She was a nonparty.

3  But he argued she had relevant information as to how the

4  investigation was conducted.

5        And the Court denied that.  And the Court said,

6  quote, the woman's interest in maintaining her privacy and

7  preventing unwanted exposure to past trauma was sufficient

8  reason to quash the subpoena.

9        And we think that is very analogous here where

10  Ms. Ndonga is a nonparty in this proceeding.  She would be

11  asked to testify to events that are similar in gravity, in

12  effect, to a sexual assault and she should not have to do this

13  in this case.  She may have to do that in her case-in-chief,

14  where she had brought claims against Dr. Amin, but that is the

15  proper venue and forum for that deposition, not this case.

16        THE COURT:  All right.  Well, thank you very, very

17  much.

18        I guess I'll turn it over to Ms. Evans.

19        Before I do that, before I do that, let me -- I know

20  I intended -- I overlooked saying this at the outset.

21        Whenever we do Zoom conferences, it's my habit to

22  remind everyone that -- well, we do have a court reporter

23  that's taking this down, it would not be permissible for any

24  of the attendees or participants to be recording this

25  yourselves.  Of course we don't have to say that if you are

1  here in the Court, that's sort of obvious, and most of you

2  would have had to have given up your phones in the first

3  place.

4          But one odd effect of Zoom hearings is with everyone

5  in their own offices or sometimes even homes, you can be -- we

6  all have phones and you can be recording it informally.  And I

7  just want to remind everyone that that's not permitted.  We do

8  have a no cameras in the courtroom rule that applies in

9  federal court, that includes Zoom.

10         I mean, obviously, y'all have cameras on your

11 devices, that's not what I mean, but you can't be recording

12 this separately from the official way, which we do have a

13 court reporter present.

14         So sorry, I usually say that at the outset.  I

15 forgot.  But I'll say it now.

16         But with that, I'll turn it to Ms. Evans.

17         MS. EVANS:  Thank you, Your Honor, and good morning

18 again.

19         I'm going to start by addressing some of the

20 questions that you raised to the petitioner, because I think

21 bringing us back to the standard that the movant would have to

22 prove is most relevant here.  And that is on a motion to

23 quash, there is no ability to quash it if there is no undue

24 burden or if the subpoena seeks discoverable information,

25 which it certainly does.  And Your Honor picked up quickly on

1   the relevancy.

2          Yes, the plaintiffs in *Oldaker* along with every

3   detainee at ICDC is identified by the defendant in the NBCU

4   case as folks having relevant, discoverable information.  And

5   that only makes sense, because it's a defamation case.  And in

6   a defamation case, truth is always a defense, which means that

7   we, as plaintiff, as Dr. Amin's counsel, we have the burden to

8   prove that the statements were false.

9          That means no matter the malice, no matter who

10  repeated things to MSNBC, the underlying allegation here is

11  that Dr. Amin performed unnecessary, unconsented to procedures

12  and that he did so harshly, that he bruised folks, that he

13  lacked undue care.  For the first time here today, I'm hearing

14  his treatment be analogized to sexual assault, which is an

15  extreme allegation, and one that on its own should require

16  cross-examination.

17         But these witnesses, of which Ms. Ndonga is one, have

18  relevant information and there is absolutely no way around

19  that, Your Honor.  And it would cripple Dr. Amin with his

20  burden if he's not allowed to have access to the women that

21  made allegations.

22         Now, we've been very -- we have tried to ease the

23  burden as much as possible.  We are seeking to depose

24  detainees who we know have made allegations against Dr. Amin,

25  whether they are in the *Oldaker* case or there are some others

1  who have spoken out in other ways.  We are seeking to depose

2  those individuals.

3          I would also point out, Your Honor, that this is

4  something that has been known in the *NBCUniversal* case since

5  the very first time that the parties' counsel got together to

6  discuss discovery.  In our very first discovery conference,

7  and this is memorialized on the docket, in December of 2021,

8  both sides were talking about how there was going to be need

9  for significant third-party discovery, including from

10 detainees, who by the time we got to discovery, may be outside

11 the country.

12         Clearly, from the beginning, both sides have

13 identified detainees as having relevant information.  The fact

14 that they have a separate lawsuit does nothing to change that.

15 If that lawsuit, the *Oldaker* lawsuit did not exist, there

16 would be -- we wouldn't even be here.  I still -- I don't

17 think it raises any grounds to stop this subpoena, but

18 certainly, we wouldn't be here, and because it's relevant in

19 our case, that's enough.

20         I don't know and frankly don't care what's going on

21 in the *Oldaker* case.  That's not my case.  I'm not counsel of

22 record.  I know it's there.  I generally don't know the status

23 of it.  I don't keep up with it because I'm focused on the

24 defamation case.

25         I also want to point out, Your Honor, that in

1   addition to identifying these detainees, including the *Oldaker*

2   plaintiffs, as having relevant, discoverable information,

3   defendants have served extensive written discovery on

4   plaintiffs asking for every document exchanged in the *Oldaker*

5   case.  So they've brought that case to prominence in our case

6   and we disagree that everything about that case would possibly

7   be relevant, because it includes allegations against federal

8   agencies and has to do with COVID and other treatment of

9   detainees that aren't relevant in Dr. Amin's case.

10          But we do agree with MSNBC -- MSNBC is the publisher,

11  NBCUniversal, obviously, owns MSNBC, so they're the defendant,

12  but sometimes I slip into saying MSNBC, because that's who

13  we're talking about here.

14          But we agree with defendant in that case that

15  certainly, the allegations that the detainees made against

16  Dr. Amin are relevant and we also know, and this was in our --

17  in our papers, I believe, that there is a -- there is joint

18  defense and common interest agreements between counsel for the

19  *Oldaker* plaintiffs and NBCUniversal.

20          And indeed, they are in contact with each other, so

21  we would be committing malpractice, Your Honor, as Dr. Amin's

22  counsel, if we did not seek to depose these detainees, because

23  when -- when defendant ultimately files their summary judgment

24  motion, which we know will happen when discovery closes in our

25  case, they could very well attach declarations that they've

1  been able to get through cooperation with counsel.

2         And if we had not exercised our due diligence in

3  seeking to find out about that testimony beforehand, we would

4  be on our heels.  And the law just simply does not allow

5  one-sidedness like that.  We are entitled to probe these

6  statements that Mr. Ndonga has brought up here today that

7  there has been findings of trauma, that Dr. Amin worsened her

8  condition, that she did or didn't talk to reporters.  We are

9  entitled to know if she did or didn't talk to Dawn Wooten, who

10 is the person who started the media frenzy.  We don't have to

11 take Ms. Norins' word for it.  That's not how it works.

12         THE COURT:  Let me interrupt you for one sec here.  I

13 mean, assuming I were to agree with you on the issue of

14 relevance, and, I mean, you heard my question to Ms. Norins on

15 that, that suggested some understanding of your position with

16 regard to this being a witness identified by your adversary,

17 which essentially gives you the right in most cases to depose

18 them.  And that was a question that I posed to Mr. Norins.

19         But putting aside whether or not I agree with you on

20 the -- your ultimate right to at the end of the day depose

21 her, is there not a potential prejudice to that occurring

22 right now?

23         And the reason I'm asking that is there is a stay

24 issued by Judge Sands in the *Oldaker* case, principally on the

25 grounds of the potential interference with an ongoing

```
1   investigation, governmental investigation, including potential
2   criminal investigation, that stay, that order perhaps doesn't
3   literally apply to this subpoena, that's not for me to say one
4   way or the other, but of course it's under the caption of the
5   Oldaker case, not the defamation case.
6           But as a practical matter, allowing this to go
7   forward now, would it not defeat the purposes of that stay and
8   allow for what Judge Sands found for the interest of justice
9   And the integrity of these governmental investigations,
10  important public interest concerns to be defeated by allowing
11  a deposition now of essentially, as I understand it, likely to
12  be the same exact subject matter that he's determined cannot
13  go forward now in that case.  And I guess that's part one of a
14  lengthy question.
15          The other part would be:  Wouldn't it, therefore,
16  since you have a discovery period, as I understand it that
17  goes through July, is there not good reason to say even if I
18  were to agree you're, in general, entitled to take this
19  deposition at some point, there's no magic to that happening
20  right now and let's at least hold off on this and, you know,
21  maybe closer to that point, there will be movement on the stay
22  or there will be some other reason why the concerns no longer
23  apply, but at least they do now.  And why shouldn't that be a
24  reason to at least stay this at this time?
25          MS. EVANS:  Your Honor --
```

1          THE COURT:  So that's a lot to unpack, I guess, but
2    that's my major concern as to your position.
3          MS. EVANS:  Thank you, Your Honor.  And the short
4    answer is no, there's absolutely no reason to stay because of
5    anything in the Middle District or otherwise.
6          First of all, just stepping back, and I know we filed
7    our papers late, and I apologize for that.  We were responding
8    in realtime and a lot going on, so we do apologize for it
9    coming over so late, so you may not have been able to focus in
10   on this, but there is no stay of the *Oldaker* case.
11         THE COURT:  No.  And I'm sorry.  I mean, if I said
12   that, I misspoke.  No, I understand that.  But there is a stay
13   of discovery in the *Oldaker* case, which is really what we're
14   talking about.
15         MS. EVANS:  Yes, your Honor, there is a stay of
16   discovery, but only because there are dispositive motions
17   pending, not because -- there's no discovery stay because of
18   any criminal or other ongoing investigations.  There was
19   originally a stay of the whole case because of that, but that
20   was lifted.  And so the stay that exists on discovery in the
21   *Oldaker* case now is just like the stay that we had temporarily
22   in the *NBCUniversal* case or you would have in any civil case,
23   where when you have a dispositive motion pending, typically,
24   discovery stops until you find out if you're going to need it
25   or not, so that's one.

1          But two, and this is -- this is perhaps the most

2    important part is that early on in the *NBCUniversal* case, the

3    defendant there suggested that we stay discovery in our case

4    not because of dispositive motions or anything of that, but

5    because of ongoing congressional and criminal investigation.

6          And the magistrate judge in the Southern District of

7    Georgia issued an order, and it's Document 43 on our -- on our

8    docket there, and I can provide for you, denied that and said,

9    no, we're not going to put discovery in this case on hold.

10          And you have experience, as well as my co-counsel,

11   Scott Grubman, in knowing that -- and one of the reasons that

12   we argued that this shouldn't happen is sometimes you don't

13   know when investigations are over.  The government doesn't

14   always tell you we're done.  And so we could be sitting here

15   forever if we were doing that.

16          But for context, and Ms. Norins talked about some

17   context with her client, I want to make sure that the Judge is

18   aware, because -- because of the media coverage and the media

19   has the largest microphone here, there may be some

20   misconceptions about Dr. Amin.

21          I want to step back and say while there has been

22   ongoing criminal investigations because of the media frenzy,

23   Dr. Amin has not been charged with anything.  Dr. Amin has

24   been investigated by the Medical Board of Georgia since this

25   media frenzy.  He still has his license to practice medicine.

20

1   He still has admission privileges at his hospital.

2          So there is -- Dr. Amin, we believe in the end, will

3   be fully exonerated in the -- and not only in the justice

4   system but in the court of public opinion, and that's why our

5   defamation case is so important.

6          But no, Your Honor, there is no reason to stay

7   discovery in any way in this case, whether it's third parties

8   or otherwise, because of anything going on in the Middle

9   District of Georgia.

10         It also would be unfair because it would prejudice

11  Dr. Amin in being able to comply with his obligations under

12  the scheduling order in his case where a judge ahs already

13  said, no, we are not going to put discovery in this case on

14  hold because of any outside investigations and doing that

15  knowing that there was significant third-party discovery that

16  was going to be sought by detainees by both sides in the

17  *NBCUniversal* case.

18         To your point about timing in our case, generally

19  because the discovery period goes through July 31, we have the

20  burden on all of our elements because we're the plaintiffs and

21  that's how the law works.  We have the burden on falsity, we

22  have the burden on malice, which is a very high burden, which

23  we won't get into today, but I believe shouldn't exist, but

24  that's neither here nor there.

25         But knowing that, getting more information on how

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  bad, how absolutely bad these allegations were and how false

2  they were and whether MSNBC should have known that, where they

3  should have had reason to doubt what Ms. Wooten was saying,

4  whether they should have had reason to doubt what they were

5  relying on in other reporting.  All of that is relevant, but

6  the first things starts with what these detainees did or did

7  not say.

8        And there's a lot we believe that Dawn Wooten said

9  they said, they didn't say.  And finding that out before we

10 get to depositions of producers and on-air personalities of

11 MSNBC is important.  And that's why we've staged the discovery

12 as we have.  And it would burden Dr. Amin if we have to, for

13 scheduling purposes, talk to the on-air personalities, talk to

14 the producers, talk to the researchers before we know what

15 these detainees actually said to anyone.

16       And again, we don't have to take Ms. Norins' word for

17 who they talked to or what they might have said, because we

18 believe that the whistleblower -- the whistleblower is

19 completely not credible, that -- and it's already been her

20 allegation that there were mass hysterectomies has already

21 been largely discredited, because there were two, and no one's

22 been able to say otherwise.

23       But none of her allegations about the gynecological

24 treatment of the detainees at the Irwin County Detention

25 Center were based on firsthand accounts.  And we're entitled

1  to know how did she come up with this.  Who did -- who did she

2  actually talk to.  And we don't have to take her word for it.

3       We need to be able to talk to these detainees that we

4  know have allegedly made allegations against Dr. Amin and say

5  you talk to Ms. Wooten?

6       Did you talk to the press?

7       Did you tell anyone?

8       We're entitled to probe that and we are -- we need to

9  do that before we get to the parties.

10       Also, and this is in Judge Wood's order, largely

11  denying NBCUniversal's motion for judgment on the pleadings,

12  part of our malice investigation here is finding out what

13  these women were offered, what were they told, how did they --

14  how did these individuals who, according to evidence that we

15  have from other third parties, never talked to the transport

16  officer, for example, the woman that was with them in the

17  investigation -- in the exam room every single time and saw

18  the informed consent, saw the proper treatment by Dr. Amin.

19       Did any of these detainees ever say anything to that

20  woman that was always there?

21       We know the answer is no, but we are entitled to ask

22  them and probe and expose how much of a hit job this was

23  against Dr. Amin.

24       And again, I feel so strongly about this and

25  Ms. Norins went in and provided some context for her -- her

1   client here.  Dr. Amin is the same.  Dr. Amin came to this

2   country with nothing.  He was born and raised in India and had

3   a medical degree, but came here and sold newspapers in

4   New York.

5          Finally, worked his way up to be able to get a

6   medical license and he's practiced medicine in Georgia for

7   over 35 years, often being the only OB/GYN in a very

8   underserved area of Southeast Georgia.

9          As part of that practice, he did treat detainees at

10  Irwin County Detention Center.  And then in September of 2020,

11  found himself in the media -- in the middle of a media frenzy

12  alleging him of going on a sterilization campaign and

13  performing mass hysterectomies.

14         Again, that's -- that's how this all started.  That's

15  what got the media excited.  And it has been largely

16  discredited, because again, only two, two hysterectomies, both

17  of which have now been reviewed by independent OB/GYNs and

18  found to have been proper.

19         So now what we have -- now what we have, Your Honor,

20  is an alleged whistleblower, Dawn Wooten, who talked to

21  unnamed detainees that we are entitled to find out falling

22  back on alleged unnecessary procedures that were performed

23  harshly, that were performed without uninformed consent.  That

24  is the underlying truth or falsity in our defamation case.

25         And the only way we can get to those underlying

1   statements is to talk to these detainees.  And I'm sorry that

2   there's another case going on.  But that's not my problem.

3          And, in fact, the judge in our case has already said

4   that's not his problem.  Judge Cheesbro is our magistrate,

5   Judge Wood, she -- no one has stepped on or suggested that the

6   magistrate judge's order in that regard is improper.  They

7   know about the *Oldaker* case, they know about congressional

8   investigations, they know about criminal investigations, and

9   they said our case marches on.

10          I would also mention briefly that the idea that there

11  might be a second deposition or some undue burden on

12  Ms. Ndonga here is speculation at this point.  There's

13  dispositive motions in that case.  She may very well never get

14  to discovery.  So we can't sit around and wait on this

15  hypothetical situation.

16          And I would say, and I'm not counsel of record, so --

17  and Mr. Grubman, and he's not even the main counsel in that

18  case, there's insurance counsel for Dr. Amin in the *Oldaker*

19  case, so I'm not binding him, but I would suggest that any

20  potential burden for a second deposition only comes into play

21  if they get to discovery.

22          And if they do, I feel certain that counsel could

23  work together to see if there is any ability to limit the

24  areas of examination to not reexamine perhaps what we go into

25  for Dr. Amin in this case, but that's a hypothetical.  There

1  is no undue burden at this point for her -- for Ms. Ndonga to

2  come forward and answer questions on cross-examination.

3          I mean, just because the person who speaks first, and

4  in this case, the loudest, because they got some media

5  attention behind them, they might sound truthful until there's

6  cross-examination.  I think there is even a Bible verse that

7  says we but we all know that's true.  That's what defamations

8  cases are about.

9          THE COURT:  Let me ask you, and in a way, I'm sort of

10  repeating the question I had before in a different way.

11          But, you know, even what you just said about the

12  hypothetical and your hope or prediction, although you don't

13  represent him in that case, but that if it were to come to

14  pass that there was a need to depose Ms. Ndonga in the *Oldaker*

15  case, that something could be worked out so that there

16  wouldn't be duplication, et cetera.

17          Again, given that -- I mean, we have four more months

18  before discovery closes in your case.  I mean, would it not --

19  calling at least something of a time out here and holding off

20  on this, at least for the time being, would it not increase

21  the chance that we could know the answer on that?

22          I mean, I don't know when these *Oldaker*'s motions are

23  going to be resolved.  I don't know when this federal

24  investigation is going to be resolved.

25          But if we were to stay this for a period of time and

1  perhaps in a few months, before the expiration of discovery

2  here, we'd know the answer to these things and a deposition

3  could be done with -- cooperatively, as you just described,

4  that isn't duplicative, that would, it seems to me, satisfy or

5  be consistent with the concerns of Rule 1 to not -- to limit

6  burdens and expense and make litigation as efficient for the

7  parties and as least burdensome as possible.

8        Going forward now, it just strikes me when we have

9  four more months to potentially work with here eliminates that

10  possibility with -- I'm struggling to see the marginal benefit

11  or what is achieved by getting this done next Tuesday.

12        Does that make sense as a question?

13        MS. EVANS:  I understand your question, Your Honor.

14        And as to next Tuesday, I want -- I want to move

15  forward.  We've been trying to get this discovery for a year.

16  And certainly we paused while there was a temporary stay

17  during the motion for judgment on the pleadings.

18        But then we immediately, diligently picked back up

19  the effort to get this deposition, so we've been waiting for a

20  while.  And again, I would go back that with all due respect

21  to this Court, the Southern District of Georgia where our case

22  is pending has heard these arguments about the potential

23  merits of staying and holding and they said no and --

24        THE COURT:  Well, was that with respect specifically

25  to a deposition of a party in the *Oldaker* case that was

1   subject to a discovery stay or was it more a discussion about

2   staying discovery altogether as a general matter?

3        MS. EVANS:  It was -- no, this was -- the defendant

4   in our case moved to stay discovery for two reasons, they had

5   a dispositive motion and then they also said because of all of

6   these ongoing congressional investigations and the *Oldaker*

7   case specifically.

8        And reading from that order, which again denied that

9   request, the Court notes that defendant highlights the stay of

10  discovery in a related case in the Middle District of Georgia,

11  *Oldaker v. Giles*, as justification for a stay until the

12  conclusion of government investigations.

13       Plaintiff argues the *Oldaker* stay has no bearing on

14  this case, which -- which we do here, and that the outcomes

15  are different.  There's so much going on in *Oldaker* than are

16  going on in here.

17       And then here's -- here's the final -- the final

18  statement from the Judge:  Indeed, defendant has not shown

19  discovery should be stayed until all government investigations

20  are concluded.  Defendants' generalized concerns about how

21  government investigations might impede discovery in this case

22  are not enough.

23       And it's an extreme, undue burden on Dr. Amin, who

24  again, has had his life upended.  Talk about trauma.  He has

25  the right to move forward in his defamation case.  He's gotten

```
 1  past a dispositive motion.  A federal judge has said you have
 2  stated a claim to move forward on discovery in proving falsity
 3  on 27 statements that all go to how these detainees claimed
 4  that they were treated or not treated.
 5        He should not have to wait, and four months seems
 6  like a long time, we're also talking about summer, I would go
 7  back to Your Honor, we are entitled to take discovery in the
 8  order that will allow us to most efficiently prosecute our
 9  case on behalf of Dr. Amin, and that includes talking to
10  detainees first, having that wealth of information before we
11  go and talk to the party defendants.
12        And so putting off -- it's not just putting off one
13  deposition that's sort of an on-the-side issue, if it were, I
14  might agree with you.  But that's not what this is.  This is
15  the underpinning of the entire case, what these detainees
16  said.
17        And we mentioned this in your briefing, but this is
18  not the only motion to quash that we're apparently going to
19  have to contend with.  There's been a filing frenzy in
20  district courts.  And I suspect there will be more, because we
21  are attempting to serve.
22        We are getting met with extreme efforts to evade
23  service, which professionally is very frustrating, given all
24  the lawyers that you can see on this screen and how in touch
25  the defendant in our case is with the counsel that is on
```

 1  record here.  But that's neither here nor there.

 2         Dr. Amin is the plaintiff.  He's survived a

 3  dispositive motion.  The judge in his court has said his

 4  discovery should be able to move forward.  It's clearly

 5  relevant, according to all of the parties in the case.  There

 6  is no undue burden on Ms. Ndonga at this point.  There may be

 7  an argument for a later day, but that's not for us to decide

 8  here.

 9         And there's absolutely no reason that this valid,

10  appropriately served subpoena should not be able to move

11  forward unfettered.

12         THE COURT:  All right.  All right.  Well, I

13  appreciate all of that.

14         Let me turn to -- you know, I don't know if counsel

15  for NBC has a position here.  This is not really directly your

16  fight, but you're a party to the case, so you have the right

17  to be heard, if you wish to, but I'll turn it to you at this

18  time.

19         MS. LEVINE:  Yes, sir.  Thank you, Your Honor.

20         Just two points, without getting into the merits of

21  our defamation claim, which I don't think are relevant here.

22         Ms. Evans has said that we're in constant contact

23  with the *Oldaker*'s plaintiffs' counsel, and that we have a

24  joint defense agreement.  That's incorrect.  We have had

25  limited conversations with plaintiffs' counsel about

1   procedural issues in the *Oldaker* case, like what the status of

2   the case is.  We don't have a joint defense agreement with

3   them.

4           And the second point that kind of goes to that,

5   another reason that we would ask that the deposition not go

6   forward next week, and as Your Honor was suggesting go forward

7   later in the discovery period is that we haven't been able to

8   obtain the documents from the *Oldaker* case.  The first time we

9   were able to see the second amended complaint was this week

10  when Ms. Ndonga's counsel filed it in connection with her

11  motion to quash.

12          We would ask that we have an opportunity to review

13  the documents before the deposition goes forward.  The

14  documents on the Pacer docket can't be accessed by nonparties

15  to the case, so we've been asking Dr. Amin to provide them,

16  he's refused, until this week has provided a couple of

17  documents, but not everything that we would want to see before

18  the deposition went forward.

19          THE COURT:  Okay.  All right.

20          All right.  Well, let me turn it back to Ms. Norins,

21  if you have any final words as the movant, you're entitled to

22  rebut, so let me -- let me turn it back to you.

23          MS. NORINS:  Thank you, Judge.

24          So let's just be clear about what remains at issue in

25  Amin's defamation case.  There are 27 remaining statements, 23

1  of which pertain to hysterectomies, neither Ms. Ndonga nor any

2  of our other *Oldaker* plaintiffs had a hysterectomy performed

3  by Amin.  That's established by the medical records.

4          So we're only really talking about four statements

5  that could possibly be relevant in terms of what our client

6  could testify to.

7          Also, as I understand Ms. Evans' position, she wants

8  to depose as many of Amin's patients as she can before she

9  actually deposes the people at NBCU and the folks they

10 actually talked to.  I think that's the reverse order of what

11 makes sense.

12         The defamation claims that are still live pertain to

13 the whistleblower complaint, Dawn Wooten's interview with

14 MSNBC and apparently some conversations with lawyers who were

15 representing women at the detention facility, so let's start

16 by deposing those people and asking them who they spoke to.

17 And if they say they've spoke to any of our *Oldaker*

18 plaintiffs, then maybe we come back and discuss this further,

19 but it just seems like they're proceeding in the opposite

20 order of what makes sense.

21         I also want to point out that we have offered

22 declarations from our plaintiffs in lieu of deposition, and

23 not just one declaration.  We offered we would do an initial

24 declaration in response to questions from both NBCU Amin, and

25 that we would even do a second follow-up deposition if they

1  had additional questions.

2        We have no obligation to cooperate with them in this

3  case.  We are nonparties.  But we offered two declarations

4  from each of our plaintiffs that they're interested in.  And

5  that was simply not enough for them.  We offered them two

6  bites at the apple, and they want to reserve the right for a

7  third bite at the apple to depose our plaintiffs after getting

8  two declarations from them.  And that's just not reasonable.

9  And so that's why we are here for this motion to quash because

10  we've tried to accommodate them and they just simply will not

11  take a reasonable position on it.

12        THE COURT:  Let me ask you on that, I mean,

13  mechanically, what do you mean by declarations?  I mean,

14  because -- I mean, are you -- do you mean answering written

15  questions or do you mean -- I mean, because how do you know

16  what Ms. Evans is going to ask so that you know what would be

17  the declaration?  Does that make sense?

18        MS. NORINS:  Yes.  So we offered that, you know,

19  Amin's counsel and NBC's counsel could send us their questions

20  that they have for our plaintiffs and if they reasonably

21  relate to any of the challenged statements at issue, we would

22  provide written responses in the form of a declaration.  And

23  then, if they had further follow-up questions, based on that

24  initial declaration, we offered we would do a second

25  declaration.

1    And that would provide them with presumably the

2  information that they're seeking and that was simply not

3  acceptable to them, because they wanted to reserve the right

4  to still depose our plaintiffs after having, you know, two

5  chances to ask them questions.

6         THE COURT:  So --

7         MS. EVANS:  Your Honor.

8         THE COURT:  Let me just make sure that I understand

9  it.  So your offer would be to -- would be instead of a

10 deposition, an oral deposition, that you would answer two

11 rounds of written questions essentially.

12        MS. NORINS:  Well, that was our offer to them in an

13 effort to avoid the motion practice that we're now having to

14 engage in.  Obviously, reserving our rights, I mean, we still

15 maintain that these women that we represent were not the

16 source of any of the statements that NBCU made in their

17 broadcast, so we don't think that they have any relevance, and

18 if -- if so, it's very, very marginal.

19        But we didn't want to be filing motions to quash in

20 multiple jurisdictions, we -- you know, we were willing to

21 cooperate, within reason, and just couldn't get to that point.

22        So, you know, it -- I appreciate that you're saying

23 that maybe the deposition wouldn't need to go forward now, it

24 could wait and see what happens with the stay in *Oldaker*.

25        At any point where our plaintiffs might be deposed,

1  we maintain that it should not be through oral questioning,

2  that it should be through written answers -- or written

3  questions and written responses.

4          THE COURT:  Even if the stay in *Oldaker* -- even if

5  the stay in *Oldaker* is over, your clients who filed lawsuits

6  against Dr. Amin would take the position they don't need to be

7  deposed?

8          MS. NORINS:  Well, I think unless we could work out

9  some sort of consolidated deposition for both cases.

10          THE COURT:  Okay.

11          MS. NORINS:  Yeah.  I mean, we don't want them to

12  have to go through it twice.

13          THE COURT:  Okay.  All right.  I heard someone piping

14  up.  Ms. Evans, was that you?  I will let you -- I may allow

15  Ms. Norins to respond, because that's sort of my obligation to

16  her as the movant.

17          But if you want to say something, I'll let you.

18          MS. EVANS:  Understood.  Yes, Your Honor.  And thank

19  you.

20          I just briefly wanted to respond about the statements

21  about the cooperation, because it's a complete

22  misrepresentation of the record.  I have bent over backwards

23  attempting to make this as convenient as possible on these

24  third parties.  And that started over a year ago.

25          And then well before we got to the point we got to

1  now, because of the subpoenas that we ultimately had to issue,

2  I had been talking extensively with them.  I originally asked

3  for just their cooperation in setting depositions.  They posed

4  the possibility of deposition by written questions.  And when

5  I looked into that process, it was so clunky and burdensome,

6  it wasn't going to save anybody any time or effort.

7          And so I suggested, I suggested that we provide a

8  list of questions that we wanted answers to and that counsel

9  assist their clients in preparing a declaration that would

10  answer those questions.

11          But because that's putting -- that's giving up a lot

12  of right to have probing follow-up questions and

13  cross-examination, I said I would have to reserve the right to

14  depose if the answers were not fulsome, if they were evasive,

15  and I was told absolutely not.  All I would be able to have

16  from them was a second declaration, which if I didn't find the

17  first declaration sufficient, why would I think that a second

18  one would be?

19          And then, Your Honor, I'm going to be honest, and not

20  all of this was attached to the papers, because given that

21  service is -- I think everybody agrees is perfected at this

22  point, it's not really relevant, but there have been two

23  declarations shared with us in this case that are perjurous,

24  they just are.

25          And so at this point, given how prone it seems these

1  witnesses are to just writing whatever is convenient for them

2  in a declaration, how little they seem to value signing on the

3  line that says they're under penalty of perjury, I cannot in

4  good conscience allow -- I can't agree to accept any

5  declaration in lieu of probing deposition testimony.  And

6  that's only been heightened today by Ms. Norins' honestly out

7  of left field allegation of what Dr. Amin did in his treatment

8  of Ms. Ndonga is akin to sexual assault.  I simply, as an

9  advocate, cannot do that.

10       And I also just wanted to respond briefly to

11  Ms. Levine who said that they're waiting on documents.  Those

12  are being produced this week, that -- that -- and if we need

13  to postpone the deposition for a week or something like that,

14  that's fine.  I just cannot agree that we're going to put our

15  case on hold where a judge has said we shouldn't have to for

16  another case.

17       And they are in communications, that's been written

18  in written responses to interrogatories that they've had

19  conversations with Ms. Norins, Ms. Norins and other counsel,

20  perhaps, that are covered by the common interest and joint

21  defense privileges.  That's their words, not mine.

22       THE COURT:  All right.

23       MS. NORINS:  Your Honor, can I just --

24       THE COURT:  Ms. Norins, yes, yes, yes.  You may.

25       MS. NORINS:  Your Honor, can I just respond?

```
 1              THE COURT:  Yes, you may.

 2              MS. NORINS:  So this issue about the declarations, I

 3    mean, there is nothing perjurous about them, and I would

 4    challenge Ms. Evans to produce evidence of what she thinks is

 5    perjury.

 6              So one of those declarations is from the mother of

 7    Ms. Ndonga, so not a person who would be providing a

 8    declaration about Amin's treatment, but anyway, I take issue

 9    with that accusation, because it's unfounded.  And actually, I

10    would move to have that stricken from the record if it's not

11    going to be supported by evidence, because that's slandering

12    our plaintiff, our clients.

13              And as to, you know, whether you analogize what Amin

14    did to sexual assault or not, that's not what's at issue in

15    this case.  You know, what's at issue is what MSNBC said on

16    their broadcast and none of our plaintiffs were interviewed or

17    provided information for that and so until you come back to us

18    and say here's someone who says they interviewed Ms. Ndonga

19    and here's what she said, I don't see how her testimony is

20    relevant.

21              THE COURT:  All right.

22              MS. LEVINE:  Judge, I was just going to hop in with

23    NBC's position on the declarations, just to the -- oh, I think

24    my computer might have frozen.

25              THE COURT:  I can hear you.
```

1          MS. LEVINE:  Okay.  Great.  So just to hop in with

2    NBC's position on that, we would be okay with going forward

3    with written declaration depositions or written question

4    depositions, but for the reasons I said earlier, we would ask

5    that that occur later in the discovery period.

6          THE COURT:  Right.  Let me at this point reflect.

7    I'm going to ask y'all to stay put.  I'm going to personally

8    go offline for just a few minutes while I collect my thoughts

9    and reflect on everything that was well argued here, which I

10   very much appreciate.

11         And I want to look at one or two more things, so I

12   will return and retake the bench shortly with, I anticipate,

13   some feedback and reactions and I'll ask y'all to just stay

14   tuned for just a -- for just a few minutes.

15         Okay?

16         MS. NORINS:  Thank you, Your Honor.

17         THE COURT:  All right.

18         (Whereupon, a recess was taken.)

19         THE COURT:  Hi, I'm back.  Are you-all there?

20         Great.  It looks like all of the parties' interests

21   are all there.  Is anyone not there as far as y'all can tell

22   that needs to be present?

23         Okay.  Good.

24         All right.  Well, thank y'all for waiting for a

25   minute.  I appreciate all of your arguments here today and

 1  your written arguments, which have been extremely helpful, and

 2  well done on all sides.

 3         Here's where I am.  You know, we start with Rule 45,

 4  which provides that, first of all, in this case -- neither of

 5  these cases are pending in this district, the motion to quash,

 6  the subpoena is to be complied with, or the compliance was

 7  sought in this district, it was required to be brought here,

 8  and that's why we're here.

 9         And so I am in somewhat of the awkward position that

10  Rule 45 sometimes puts us in of dealing with discovery issues

11  in a case that's not mine and not in this district at all, and

12  actually also interrelates to a second case that's also not in

13  this district and not mine.  But that's -- that's the nature

14  of the interplay of these rules with regard to complex

15  litigation like this, so that sometimes does happen.

16         I want to make a comment first about service,

17  although it sounds like that likely is not an issue anymore,

18  but Ms. Norins has said that they haven't been able to confirm

19  that personal service or hand delivery occurred on the 29th,

20  and so just to make sure that that issue is covered, I

21  wouldn't be inclined to find an issue with service regardless.

22         My understanding is that the original service was

23  made to Ms. Ndonga's mother, who is a person who resides at

24  the same residence, her usual place of abode, it was

25  personally served on her.  That would generally comply and be

1   considered to be personal service under Rule 4.

2          Rule 45 speaks more generally of being delivered to

3   the person, delivering a copy to the named person, but the

4   cases aren't all that precise.  But I have a hard time

5   believing that it wouldn't comply with that, to engage in a

6   method that complies with personal service on a person as in

7   Rule 4.  Rule 4, in the end, is much more formal and it

8   involves much more significant legal rights and issues, that's

9   how you bring someone to court as a defendant in a case where

10  their legal rights and in many cases financial jeopardy is

11  directly at issue by suing them, and so I just tend to believe

12  that personally serving someone in a way that complies with

13  Rule 4 is sufficient to deliver a copy to the named person

14  that is referred to in Rule 45.

15         In fact, there is substantial case law, and just it

16  speaks to the case law, which we don't really have to get

17  into, but in many cases, the courts are finding more informal

18  methods that would be short as to satisfying Rule 4, are still

19  sufficient to serve somebody under Rule 45, at least with

20  regard to a subpoena duces tecum, I think there is a

21  distinction sometimes drawn with a deposition subpoena, which

22  is more of a big deal.

23         But if anything, in other words, the law is starting

24  to move to the view that if there is a difference between the

25  methods of service of Rule 4 and Rule 45, Rule 45 is less

1  onerous than what's required under Rule 4, so this service has

2  satisfied Rule 4, which I understand occurred with service on

3  the mother at their same place of residence would satisfy,

4  then I think that that would end the inquiry on that issue,

5  and of course it would be moot if personal service was made

6  anyway, which it sounds like it was.

7        It's also relevant, of course, that there's a dispute

8  and that Ms. Ndonga is actually aware and has had no

9  limitation in getting counsel and filing this motion

10 negotiating with the other side, so the purposes of service

11 are, of course, met here, even if I know there was an

12 allegation or a challenge to the technicalities of it.  I

13 think it's relevant that she's been actually aware as well.

14 Okay.  So let's move on from service.

15        I believe Ms. Ngonda has raised an issue of

16 relevance.  Now, relevance is not strictly speaking or

17 expressly a ground for which a court under Rule 45 can quash a

18 subpoena, although I do think that in many cases, in most

19 cases, and I think this is one, relevance is necessarily a

20 part of the undue burden inquiry, so -- but it isn't expressly

21 listed under Rule 45(d)(3), as one of the grounds for which a

22 subpoena can be quashed.

23        I do, though, think it comes into the analysis under

24 what's an undue burden, because you're trying to assess -- I

25 mean, all subpoenas create burdens, especially deposition

1  subpoenas, and I think this one because of its subject matter

2  and other circumstances that were identified by Ms. Norins,

3  apart from it perhaps creating more than the average amount of

4  burden and trying to assess what's undue burden, necessarily

5  part of the balancing involves the relevance subject matter

6  materiality to the need for the deposition.

7        So I really can't say at this point, I don't know, I

8  don't have enough to know, exactly how relevant or if at the

9  end of the day it really is relevant, but -- and I think

10  there's some reason to question whether the deposition of

11  Ms. Ndonga in the defamation case is likely to be of central

12  or core relevance.

13        The person is not identified by name in any of the

14  challenge statements, to my understanding, and she represents,

15  through Ms. Norins, that she was not interviewed, not a

16  source, didn't have contact with NBC in that regard.  She's

17  not alleged to have undergone a hysterectomy, which is the

18  subject of the majority, although not all of the challenged

19  statements.

20        So, you know, at the end of the day, I can't find

21  it's established that it's likely to be of core relevance,

22  but, you know, a key fact in the case, I don't -- I don't know

23  one way or the other, but I think I can find that that's

24  likely at that point, but I don't have that in front of me.

25        On the other hand, I do think Dr. Amin is entitled to

1  take the deposition if by virtue of nothing else NBC has

2  identified Ms. Ndonga as a witness they intend to rely on with

3  knowledge of the case.

4       I mean, the whole purpose of Rule 26(1) is for the

5  parties to identify their -- their potential witnesses before

6  discovery even starts so that the other side can get the

7  discovery, including deposing those witnesses to know what

8  they have to say, so there's no surprise or ambush at trial.

9  That's the entire purpose of Rule 26(1).

10      And I think Ms. Evans is right that having been told

11  that these folks are witnesses for NBC in their defense, she'd

12  be hard pressed not to depose them to see what they have,

13  because if she doesn't do that and then they file summary

14  judgment declarations or testify at trial, shame on her for

15  not having taken the steps necessary to get that discovery.

16      So a Rule 26(1) disclosure identifying Ms. Ndonga as

17  a witness, a potential witness, is I think enough to entitle

18  Dr. Amin to seek the deposition or to take the deposition at

19  some point.

20      You know, now the question then becomes this

21  deposition is scheduled for I think Tuesday or Wednesday, and

22  is that something -- is the timing of it something that is at

23  issue here.

24      So, I mean, I'm not going to quash the subpoena,

25  because I don't think there is legal deficiency in the

```
 1   deposition itself.  But the question that I'm struggling with
 2   is whether there's at least grounds to modify it in terms of
 3   timing.  Because I do think that there is substantial issues,
 4   ultimately, I think undue burden with requiring Ms. Ndonga to
 5   sit for a deposition at this time.
 6        For numerous reasons, given the sort of complex
 7   procedural intricacies in the -- of these various cases.  I
 8   mean, there is a stay of discovery in the Oldaker case, not a
 9   stay of the case, that's true, a stay of discovery, all
10   discovery.
11        I disagree, at least from my reading of Judge Sands'
12   order with Ms. Evans's take on it that it was motivated or a
13   reflection of simply the fact that there is pending
14   dispositive motions and it's -- in other words, what one might
15   think of as a standard stay because of a pending 12(b)(6) or
16   12(c) motion, that's not what he said in that order.
17        The order talks expressly about the fact that this
18   is -- there's an ongoing federal investigation, or multiple
19   investigations, including criminal investigations and it could
20   prejudice or disrupt, interfere with that investigation or
21   those investigations for discovery to be going forward at this
22   time with regard to the Oldaker plaintiffs.  That was the
23   reasoning for the stay, I believe.  That's how I read it.  And
24   as far as I understand, that's not been lifted.  So, you know,
25   I don't know what the status of anything is, but that has not
```

45

1   yet been lifted at this time.

2         And so that raises two concerns in my mind.  One, I

3   have a district judge who's made a finding that for the

4   interest of justice and the integrity of a governmental

5   investigation, that this discovery needs to be stayed.

6         Now, it's not literally discovery in the defamation

7   case, because the order obviously has the caption of just the

8   *Oldaker* case, and it doesn't -- Judge Sands isn't presiding

9   over the defamation case, so I don't know that one could say

10  that that stay literally but de jure regulates the defamation

11  case, I don't think it does.

12        But as a practical matter, allowing a deposition of

13  Ms. Ndonga at this time would completely defeat the purpose

14  and countermand the concerns that motivated that stay, which

15  again, were not just for convenience and efficiency of the

16  parties because there's pending motions, it was because of a

17  much more serious and public interest concerns because of an

18  investigation.

19        And it's quite awkward for me, sitting here, to

20  ignore that and to say that I'm going to allow something to go

21  through that will defeat a District Judge's stay order in

22  another -- in another district, although in another case one

23  that would de facto completely countermand that stay, at least

24  at this time.

25        So and as it relates to Ms. Ndonga's personal

```
 1  prejudice and burden to her, I think there's similar reasons
 2  to allow this deposition to go forward right now, given the
 3  stay of the Oldaker case, potentially subjects her to quite
 4  prejudicial circumstances where -- and, you know, even if it
 5  weren't for her health concerns and the privacy of the subject
 6  matter, it would potentially expose her to multiple
 7  depositions over the same subject matter separated by, you
 8  know, many weeks or months, allowing counsel -- I mean, and
 9  I'm not necessarily suggesting this is the intention, but it
10  would effectively allow Dr. Amin's counsel -- and I know
11  there's different counsel, so -- but still, it would allow
12  Dr. Amin's counsel to have the benefit of following up months
13  later and formulate questions and tread it -- or ask -- have
14  months and months to figure out how to ask things a different
15  way or follow-up or fix things in the earlier deposition.
16          I mean, all the things that lawyers would love to be
17  able to do, to depose their opponent and then study that
18  transcript for months and months and then get another chance,
19  I think that that is unfair and prejudicial.
20          Again, and I'm not suggesting that's a tactical
21  choice here, I am sympathetic to Ms. Evans' statement, this is
22  a witness identified by my opponent, I have no choice but to
23  depose this person.  There's two cases, that is what it is,
24  that's not my doing.  And I'm not even counsel in that case.
25          So I'm not saying that's intentional, I'm just saying
```

1  that, as a practical matter, inevitably, that's the risk and

2  prejudice and result that would -- that I think, Ms. Ndonga

3  could be faced with here.

4          And it's unnecessary, I think, because the deposition

5  is what -- we're four months away from the close of discovery

6  in the NBC case.  And I think there's more than enough time to

7  stay this and still have time left in the discovery period.

8          What I'm contemplating here is a stay of 60 days, a

9  stay of 60 days, and that I also would, as Rule 45 permits me

10 to do, Rule 45(f), transfer this order modifying the subpoena,

11 so I'm denying quashing it, but I'm modifying it, with a stay

12 of at least 60 days and transferring the order for enforcement

13 purposes to the Southern District, the court with -- the forum

14 court over jurisdiction over the NBC case, the defamation

15 case.

16         And the forum court can overrule this, modify this,

17 extend this.  I think ultimately, it is really best for the

18 forum court, Judge Wood or the magistrate judge there to be in

19 the best position to assess whether or not and to what extent

20 they find it warranted to continue this, if the *Oldaker* stay

21 is still going on, or to overrule it.

22         And all of that is -- it is their case management

23 order, this is their schedule, it's already awkward having two

24 different overlapping cases in two different districts, and to

25 add a third, the Northern District of Georgia, imposing yet

1  different and potentially inconsistent schedules would really

2  start to have too many cooks in the kitchen here.

3       So I think it's warranted to stay this, not to quash

4  it.  I think Dr. Amin is entitled to take the deposition, you

5  know, at some point.  I don't think there is a necessity of

6  that happening now, and the balance of concerns and factors

7  weigh in favor of staying it at this time.

8       Without knowing what will be the case in 60 days,

9  whether these federal investigations will still be going on or

10  whether that really is of a concern to the Southern District

11 or whether there are other concerns or other reasons to

12 continue this or not continue this, I think 60 days is a

13 placeholder at this time that would still allow two more

14 months in the discovery period, if that gets extended, which

15 is not for me to say, and I think that gives sufficient time

16 for Dr. Amin to do everything that he needs to do in

17 discovery.

18      I'm not -- I mean, I understand Ms. Evans's concern

19 that you want to take the discovery in a particular order and

20 you have tactical reasons for doing that, which generally

21 speaking is -- I mean, everyone has the right to, in general,

22 try to take the discovery along the lines and, you know, on

23 the schedule that you're intending to.

24      But I really haven't heard enough to say that that's

25 substantial prejudice.  Again, I can't even say that this is

1  going to be at the end of the day of core central relevance

2  here, given the fact that there are no alleged hysterectomies,

3  and for other reasons, but so -- but in any event, the stay of

4  60 days would still allow half of the remaining discovery

5  period still available.

6       At that point, I think you-all need to get with the

7  judges down there to see if there's any application for this

8  to be continued, which very well might require them to extend

9  discovery, and whether they'll do that, whether they find that

10  to be warranted, whether that's something that is -- they're

11  in a far better position to decide what's necessary, what is

12  appropriate, what the facts are and what they're willing to

13  do.  This is their schedule that I want -- I'm sensitive to

14  not wanting to impose on or impose external modifications on

15  too much.

16       The general refusal to stay discovery in that case on

17  the grounds of these pending investigations, I just don't

18  know -- I think there this is a distinction that could be

19  drawn that I could see to saying discovery is not stayed

20  altogether as a general matter, but yet, we're talking about

21  at least plaintiff in that other case, where there's a

22  specific order, that allowing that sort of discovery of that

23  plaintiff and the other plaintiffs would interfere with

24  federal investigations, I don't -- I just don't know that that

25  was what the Southern District order was intending to find,

```
1   that that was -- I think it was refusal to stay discovery as a
2   general matter altogether, not -- in other words, without
3   prejudice to whether it may make sense to at least temporarily
4   stay specific depositions that go to the core of the concerns
5   raised by Judge Sands.
6           But at the end of the day, if the Southern District
7   wants this deposition or others to go forward, even though it
8   might effectively be de facto inconsistent with what
9   Judge Sands ordered, that's, I think, for them to decide.  I
10  don't -- as a, you know, third court coming in, the cook in
11  the kitchen problem, I'm not going to overrule Judge Sands in
12  that way at least de facto.
13          So to sum up where I'm coming out with here is under
14  Rule 45(3)(A), I do find there are grounds to modify, not
15  quash the subpoena on grounds of undue burden, that will -- I
16  think the grounds -- and I'll order this to be stayed for a
17  period of at least 60 days.
18          And then transfer this order to the Southern District
19  of Georgia, under the docket of the defamation case for them
20  to enforce, and like any other interlocutory order to
21  entertain appeals, obviously, as a magistrate judge order,
22  anyone can appeal this to the presiding district judge, but of
23  course they also can modify this as they see fit, including
24  extending it, if that's what the stay -- if that's what is
25  requested and they find it's warranted.
```

1          So that, I think, strikes the appropriate balance
2    among all these concerns and that will be my ruling.
3          I'm going to -- I'll issue a brief written order on
4    the docket, but I'm not likely to repeat all of this.  I mean,
5    just in the interest of efficiency and getting this moving,
6    I'll likely refer to and incorporate my comments here for more
7    reasoning and background, and so I'll consider all my comments
8    here since I came back from the break to be part of my order
9    and opinion here on this matter.
10          And I guess formally, that means granting in part and
11    denying in part the motion, and modifying the subpoena with
12    the stay.
13          Any questions or issues or anything else before we
14    go?
15          MR. GRUBMAN:  Your Honor.  This is Scott Grubman.
16    And I'm sorry, my camera is not working.
17          THE COURT:  That's okay.
18          MR. GRUBMAN:  So if -- if and -- it's -- I have to
19    talk to my colleague, but I assume with all due respect, we
20    are going to want to appeal this to a district court judge.
21    Should that -- will your order make clear that that appeal is
22    more properly done down in the Southern District as opposed to
23    here?
24          We would appreciate -- and, Your Honor, if it matters
25    to you --

1              THE COURT:  Um-hmm.

2              MR. GRUBMAN:  -- my suggestion would be that it does,

3    quite frankly, I think -- even though I respectfully disagree

4    with your 60 days, I do absolutely think that even though they

5    brought this motion in the right jurisdiction under Rule 45,

6    that it is appropriate for Judge Cheesbro and Judge Wood to

7    decide this.

8              I mean, with all due respect, there's a lot of talk

9    about stepping on Judge Sands' toes, but respectfully,

10   Your Honor, I do believe this order improperly steps on Judge

11   Wood and Judge Cheesbro's toes, and you're in a very bad

12   position, because either way, you're going to step on a

13   judge's toes that is from another district.

14             So to the extent your Honor would consider it, I

15   would ask that it -- you know, because I think what's probably

16   going to happen is Judge Cheesbro is going to get this order

17   and be like, well, what the heck do I do with this.  It's

18   probably a pretty unique situation.

19             THE COURT:  Yeah, these situations as far as I'm

20   concerned, and in terms of how the rule works here, but, I

21   mean, Rule 45(f) says that we can order -- transfer the order

22   to the court where the motion -- the issuing court may

23   transfer the order to the court where the motion was made,

24   the --

25             MR. GRUBMAN:  That very well might be.  Judge, to be

1  honest with you, I've just never dealt with that specific

2  subsection.

3          THE COURT:  Yes.

4          MR. GRUBMAN:  So that very well might be enough.

5          THE COURT:  Right.

6          MR. GRUBMAN:  The second question I have, Your Honor,

7  is more -- and this might be for your clerk.  I know this Zoom

8  is being recorded.  Is there a transcript?  And the reason I

9  ask is because, quite honestly, I believe Ms. Levine --

10 Levine -- I don't know exactly how you pronounced it has taken

11 positions in this statement, in this hearing as an officer of

12 the Court, that are -- that is inconsistent with positions

13 that NBC has taken in the Southern District, and quite

14 honestly, Your Honor, I would like to use that -- the

15 transcript of this hearing to consider proper motions practice

16 for then the Southern District, so if you can just tell us the

17 best way to get a transcript or have your -- I could ask your

18 clerk offline, and that would be great, assuming there's a

19 court -- I don't even know if there is a court reporter on

20 here.

21         THE COURT:  Yes.  There is a court reporter online at

22 this point.  And I think the best thing to do would be to

23 contact my deputy clerk, Ms. Evans, or my law clerk,

24 Ms. Jenkins.

25         MR. GRUBMAN:  Okay.  Thank you very much.

```
 1              THE COURT:  She can put you in touch with the court

 2    reporter to make any arrangements that are necessary.

 3              So with respect to the question of where to lodge an

 4    appeal.  I mean, I can't really give legal advice, of course.

 5              MR. GRUBMAN:  Right.

 6              THE COURT:  But the district judge here,

 7    Judge Boulee, is presiding over this particular motion, and so

 8    I think -- I can't -- I can't answer your question, whether it

 9    would more logically go to him --

10              MR. GRUBMAN:  Yes, Your Honor.

11              THE COURT:  -- or to the judges in the Southern

12    District.

13              MR. GRUBMAN:  Yes, Your Honor.  I understand.

14              THE COURT:  I mean, I tend to think now that I think

15    of it that an appeal of my ruling would logically go to my

16    superior, who is Judge Boulee.

17              And, I mean, to the extent the order then in the

18    future gets extended or modified, in the Southern District,

19    then that will be a different matter, but that the immediate

20    appeal would I think most logically -- or the rules would

21    provide that to go to my superior, Judge Boulee, who has the

22    authority over me here.  I think that that would probably be

23    the answer, the more I think about it.

24              MS. EVANS:  Your Honor, one question and appreciate

25    the discussion, and we will have to figure out that path.  I
```

1  think you're right, we'll see.  But the case docket shows

2  Judge May as the district court judge as opposed to

3  Judge Boulee.

4          THE COURT:  So I'm sorry.  I'm sorry.  I'm sorry.  I

5  took my reading glasses off and that was a bad idea.  So I

6  misread the initials.  You're right, Judge May.

7          MS. EVANS:  Okay.  I just wanted to make sure that

8  something hadn't changed.  Thank you, Your Honor.

9          MR. GRUBMAN:  Thank you, Judge.  Those are all the

10  questions I have.

11          THE COURT:  All right.  Anything else then before we

12  adjourn?

13          MS. NORINS:  No, Your Honor.  Thank you.

14          MS. EVANS:  Thank you, Your Honor.

15          THE COURT:  All right.  All right.  Thank you very

16  much, everyone.  I'm going to get this written order out as

17  soon as possible, but it will -- it's immediately effective

18  that the deposition as of next week is stayed, and -- but I'll

19  get the written order out as soon as possible.  I'll try to

20  get that out by the end of the day.

21          MS. EVANS:  Thank you, Your Honor.

22          THE COURT:  All right.  Thank you.

23          MS. LEVINE:  Thank you.

24          THE COURT:  Have a good weekend, everybody.

25

1          (Whereupon, the proceedings were adjourned at 11:35

2   a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    REPORTERS CERTIFICATE

2

3

4          I, Jana B. Colter, Official Court Reporter for the

5  United States District Court for the Northern District of

6  Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the

8  proceedings held via Zoom Videoconferencing on March 31, 2023,

9  in the matter of Dr. Mahendra Amin v. NBCUniversal Media, LLC,

10 Case No. 1:23-MI-00022; that said proceedings in connection

11 with the hearing were reduced to typewritten form by me; and

12 that the foregoing transcript (56 Pages) is a true and

13 accurate record of the proceedings.

14         This the 1st day of April, 2023.

15

16

17                         _____
                           /s/ Jana B. Colter, FAPR, RDR, CRR, CRC
18                              Official Court Reporter

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA