# EXHIBIT E

Fulton County Superior Court
***EFILED***MH
Date: 5/15/2023 2:17 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| PAUL HAARER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action File No.:** |
| | ) | **2023-CV-378125** |
| VINEYARD CAPITAL PARTNERS, L.L.C. | ) | |
| and PINNACLE FUNERAL SERVICE, L.L.C., | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

---

### DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS

Defendants Vineyard Capital Partners, L.L.C. and Pinnacle Funeral Service, L.L.C., by and through undersigned counsel, hereby make this limited appearance to move this Court for an Order compelling arbitration of all claims asserted in Plaintiff's Complaint and dismissing same.

In support of this Motion, Defendants rely on the authority and arguments set forth in their corresponding Memorandum of Law filed contemporaneously herewith.

Respectfully submitted this 8th day of May, 2023.

**JACKSON LEWIS P.C.**

*/s/ Adriana R. Midence*
Adriana R. Midence
Georgia Bar No.: 142298
Robert W. Capobianco
Georgia Bar No.: 106102
Kathryn M. White
Georgia Bar No.: 528556
171 17th Street NW, Suite 1200
Atlanta, Georgia 30363
T: (404) 525-8200
F: (404) 525-1173
robert.capobianco@jacksonlewis.com
adriana.midence@jacksonlewis.com
kathryn.white@jacksonlewis.com

**ATTORNEYS FOR DEFENDANTS**

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **PAUL HAARER,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **Civil Action File No.:** |
| | **)** | **2023-CV-378125** |
| **VINEYARD CAPITAL PARTNERS, L.L.C.** | **)** | |
| **and PINNACLE FUNERAL SERVICE, L.L.C.,** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |
| | **)** | |

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on May 8, 2023, I filed the foregoing **DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS** with the Court's e-filing system which will generate electronic service to all counsel of record, properly addressed as follows:

Richard L. Robbins
Catherine C. Sullivan
Michael D. Forrest
rrobbins@robbinsfirm.com
csullivan@robbinsfirm.com
mforrest@robbinsfirm.com

*Attorneys for Plaintiff*


/s/ Adriana R. Midence
Adriana R. Midence

Fulton County Superior Court
***EFILED***MH
Date: 5/15/2023 2:17 PM
Cathelene Robinson, Clerk

**IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA**

|  |  |  |
|---|---|---|
| PAUL HAARER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action File No.:** |
| | ) | **2023-CV-378125** |
| VINEYARD CAPITAL PARTNERS, L.L.C. | ) | |
| and PINNACLE FUNERAL SERVICE, L.L.C., | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND DISMISS

Plaintiff Paul Haarer ("Plaintiff") filed this action against his alleged former joint employers, Vineyard Capital Partners, LLC ("Vineyard") and Pinnacle Funeral Service, LLC ("Pinnacle") (collectively "Defendants"). All of Plaintiff's claims, however, are subject to binding arbitration. Accordingly, this Court should compel Plaintiff's claims to arbitration and dismiss Plaintiff's Complaint.

## I.   STATEMENT OF FACTS

### A.   The Parties.

Vineyard is a private equity investment company providing growth capital to its business partners. Pinnacle, a wholly owned subsidiary of Vineyard, is a funeral home acquisition and management company. Plaintiff alleges that Vineyard exercises extensive control and influence over Pinnacle and serves as Pinnacle's "alter ego." (Compl. ¶ 12.)

On June 1, 2014, Defendants hired Plaintiff to serve as Pinnacle's Managing Member. In assuming the role, Plaintiff executed an Employment Agreement and alleges he became jointly employed by Vineyard and Pinnacle. (*See* Ex. 1.) Plaintiff agreed to (i) faithfully serve the interests

of Pinnacle; (ii) use his best efforts to promote the success of Pinnacle and Vineyard; (iii) obey all

instructions given to him by Vineyard; and (iv) perform all services competently, thoroughly, and

professionally, among a variety of other things. (*See* Ex. 1 at Section 2.) Pinnacle also agreed to

pay Plaintiff's base salary and Vineyard agreed to pay him a 15% bonus based on distributions

made from Pinnacle to Vineyard. (*Id.* at Section 3.)

      B.     **<u>Plaintiff Agrees to Arbitration.</u>**

On January 16, 2015, Plaintiff became a member of Vineyard upon executing a Joinder

Agreement ("2015 Joinder Agreement"). Per the 2015 Joinder Agreement, Plaintiff "bec[a]me a

party in all respects to the Operating Agreement. . . and agree[d] that [he was] bound by all

obligations and duties of Members of the Company under the Operating Agreement." (Ex. 2.) The

Operating Agreement referred to therein contained both merger and binding arbitration provisions

but was amended on June 6, 2016 ("2016 Operating Agreement").  (Ex. 3.) Similarly, the 2016

Operating Agreement also contains a binding arbitration provision, remains operative, and

provides in relevant part:

> **Any Dispute** that cannot be resolved by the Disputing Parties **shall be resolved solely by binding arbitration in Tallahassee, Florida**, in accordance with the then prevailing rules of the Association, as modified by the provisions of this Article XII, **in lieu of judicial proceedings**. Any arbitration hereunder shall be commenced by Dispute Notice from one Disputing Party to the other, and must be commenced no later than the date when any judicial action upon the same matter would be barred by any applicable statute of limitations. The Members specifically acknowledge and agree that this Agreement and the businesses to be conducted by the Company all evidence transactions "involving commerce" under the Federal Arbitration Act, 9 U.S.C. § 1-14, and hereby waive and relinquish any right to claim otherwise.

(Ex. 3 at Section 12.1 at 25) (emphasis added). Therefore, as a member of Vineyard, Plaintiff

agreed to arbitrate.

**C.**   **Plaintiff's Claims Fall Within the Scope of the Arbitration Provision.**

The 2016 Operating Agreement defines "Dispute" broadly to "include **any controversy or claim** between; (i) any Member (or Assignee) and the Managers, (ii) **any Member (or Assignee) and the Company**, or (iii) any Manager and the Company, **arising under or in connection with this Agreement**." (Ex. 3 at Section 1.1(u) at 3) (emphasis added). The arbitration provision further contains a delegation clause instructing that "[t]he **Arbitrators shall have sole and absolute discretion to ascertain the number and nature of separate claims which comprise the Dispute**." (*Id.* at Section 12.7 at 26) (emphasis added). Plaintiff's claims constitute a "Dispute" and, therefore, are arbitrable.[1]

Because Plaintiff's claims are arbitrable, Defendants' counsel contacted Plaintiff's counsel, cited the mandatory arbitration provision, and asked for Plaintiff to consent to arbitration. Plaintiff refuses to arbitrate his claims.

**II.**   **THIS COURT SHOULD COMPEL ARBITRATION**

**A.**   **The FAA Requires Enforcement of Arbitration Provisions.**

The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"), codifies a strong federal policy favoring arbitration. Section 2 of the FAA states:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be **valid, irrevocable, and enforceable**, save upon such grounds as exist at law or in equity for the revocation of any contract.

---

[1] As described in more detail below, it is of no legal consequence that Pinnacle is not a signatory to the 2016 Operating Agreement for several reasons. First, Pinnacle consents to arbitration. Moreover, Plaintiff's claims against Pinnacle rely on his contractual terms with Vineyard, which allows Pinnacle to enforce the arbitration provision against Plaintiff even as a non-signatory. Finally, Plaintiff alleges that Defendants were his joint employer and engaged in concerted action, which also allows Pinnacle to enforce the arbitration provision against Plaintiff.

9 U.S.C. § 2 (emphasis added); *Lomax v. Woodmen of the World Life Ins. Society*, 228 F. Supp. 2d 1360, 1362-1363 (N.D. Ga. 2002) (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *see also Ivax v. B. Braun of America*, 286 F.3d 1309, 1315 (11th Cir. 2002); *Moses H. Cone Memorial Hospital v. Mercury Constr.*, 460 U.S. 1, 24-25 (1983) (agreeing that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration").

The FAA applies in state and federal courts to all arbitration provisions in contracts involving interstate commerce. "The Supreme Court has interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce' -- words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Caley v. Gulfstream Aero. Corp.*, 428 F.3d 1359, 1370 (11th Cir. 2005) (quoting *First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 874 (11th Cir. 2005)). The Supreme Court has also clarified that Congress' Commerce Clause power "may be exercised in individual cases without showing any specific effect upon interstate commerce if in the aggregate the economic activity in question would represent a general practice . . . subject to federal control." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56-57 (2003) (internal quotations omitted).

As an initial matter, the parties expressly agreed that they conduct business involving commerce under the FAA. (Ex. 3 at Section 12.1.)  *Webb v. Doordash, Inc.*, 451 F. Supp. 3d 1360, 1366 (N.D. Ga. 2020) (compelling arbitration when the "arbitration agreement provision expressly provide[d] that '[t]his arbitration agreement is governed by the Federal Arbitration Act'" and the defendant's business touched on interstate commerce).  Moreover, Pinnacle and Vineyard engage in interstate commerce; more specifically, as supported by the 2016 Operating Agreement, Vineyard engages in interstate commerce by providing capital to businesses throughout the

country, including Pinnacle, which engages in interstate commerce by acquiring funeral homes throughout the country. *Maddox v. United States Healthcare-Adams, LLC*, 350 F. Supp. 2d 968, 974 (M.D. Ala. 2004) ("Therefore, if an organization engages in business across state lines, has any portion of its assets generated as a result of any activity across state lines, or engages in any business that may be regulated by the Congress pursuant to powers granted in the *Commerce Clause*, then FAA jurisdiction is the appropriate mechanism for settling a dispute where a valid arbitration agreement has been executed."); *Lipscomb v. Payroll Mgmt.*, 23 Fla. L. Weekly Fed. D 295 (U.S. N.D. Fla. 2012) ("Here, although the plaintiff's individual work and contacts may have been limited to Florida, PMI's overall employment practices constitute activity involving commerce. Thus, the FAA's interstate commerce requirement is satisfied.").  Accordingly, the FAA applies and requires enforcement of Plaintiff's arbitration provision.

## B.   This Court's Review is Limited.

The provisions of the FAA are mandatory; if a valid arbitration agreement exists, "[b]y its terms, the Act leaves no place for the exercise of discretion of a . . . court, but instead mandates that . . . courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). Therefore, the only questions for courts to decide on a motion to compel arbitration are: "(1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." *Shotts v. OP Winter Haven, Inc.*, 86 So. 3d 456, 464 (Fla. 2011) (quoting *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999)).[2]

---

[2] Defendants cite Florida law because the 2016 Operating Agreement states that it "shall be governed by the internal law, not the law of conflicts, of the State of Florida, and specifically the Act." (Ex. 3 at Section 2.1 at 7.) *See Salinas v. Atlanta Gas Light Co.*, 347 Ga. App. 480, 482-83,

1.      **A Valid Agreement Exists.**

To constitute a valid contract, Florida law requires proof of offer, acceptance, and consideration. *SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197, 1200 (Fla. Dist. Ct. App. 2012). In the State of Florida, "one is bound by his contract . . . [u]nless [he] can show facts and circumstances to demonstrate that he was prevented from reading the contract, or that he was induced by statements of the other party to refrain from reading the contract." *Allied Van Lines, Inc. v. Bratton*, 351 So. 2d 344, 347-48 (Fla. 1977). To that end, "[n]o party to a written contract in [Florida] can defend against its enforcement on the sole ground that he signed it without reading it." *Id.* Importantly, arbitration agreements are presumed valid. *Krol v. FCA US, LLC*, 273 So. 3d 198, 202 (Fla. 5th DCA 2019); *Arrasola v. MGP Motor Holdings, LLC*, 172 So. 3d 508, 513 (Fla. 3d DCA 2015). Similarly, Florida courts "favor [arbitration] provisions, and will try to resolve an ambiguity in an arbitration provision in favor of arbitration." *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013); *Lennar Homes v. Wilkinsky*, 353 So. 3d 654, 656 (Fla. Dist. Ct. App. 2023); *Davis v. Bank of Am., Nat'l Ass'n*, 348 So. 3d 663, 667 (Fla. Dist. Ct. App. 2022); *Fed. Vending, Inc. v. Steak & Ale of Fla., Inc.*, 687 So. 1366, 1368 (Fla. 4th DCA 1997).

In consideration for Vineyard offering membership to Plaintiff, Plaintiff agreed to the terms of the 2015 Joinder Agreement and the Operating Agreement in effect at that time, which included an arbitration provision. Plaintiff remained a party to the 2015 Joinder Agreement when the then-existing Operating Agreement was amended by the 2016 Operating Agreement, which contains the relevant arbitration provision and governs the parties' relationship.  Plaintiff never objected to

---

819 S.E.2d 903, 906 (2018) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (III) (2009)) ("As for the governing law, the relevant arbitration agreement provides that '[t]he Federal Arbitration Act ("FAA") . . . will govern the arbitrability of all Disputes.' Nevertheless, nothing in the FAA 'purports to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them.'").

the 2016 Operating Agreement; to the contrary, he reaped all the benefits of membership and willfully assented to the terms. Accordingly, the 2016 Operating Agreement is valid. *Massa v. Michael Ridard Hosp. LLC*, 306 So. 3d 1106, 1109 (Fla. Dist. Ct. App. 2020) ("'Nonsignatories have been held to be bound to arbitration agreements under the theories of (1) incorporate by reference; (2) assumption; (3) agency; (4) veil piercing/alter ago; and (5) estoppel.' *Liberty Comms., Inc. v. MCI Telecomms. Corp.*, 733 So. 2d 571, 574 (Fla. 5th DCA 1999 (citations omitted)."); *Hall v. Animals*, No. 5:09-cv-474-Oc-10GRJ, 2010 U.S. Dist. LEXIS 159377, at *8 (M.D. Fla. July 30, 2010).

## 2. An Arbitrable Issue Exists.

"Determining whether an arbitrable issue exists requires the court to examine the plain language of the parties' arbitration agreement." *Bailey v. Women's Pelvic Health, LLC*, 309 So. 3d 698, 701 (Fla. 1st DCA 2020) (citations omitted). Importantly, "[c]ontracts with arbitration clauses create a presumption of arbitrability." *Id.* (citations omitted); *see also SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197, 1199 (Fla. Dist. Ct. App. 2012) ("Florida public policy favors arbitration and all doubts as to the scope of an arbitration agreement should be resolved in favor of arbitration."). The 2016 Operating Agreement states, "**[a]ny Dispute** that cannot be resolved by the Disputing Parties **shall be resolved solely by binding arbitration in Tallahassee, Florida**, in accordance with the then prevailing rules of the Association. . . **in lieu of judicial proceedings**." (Ex. 3 at Section 12.1 at 25) (emphasis added). This language is broad and not tailored to specific types of claims. Indeed, a "Dispute" is defined as "**any claim or controversy between**; (i) any Member (or Assignee) and the Managers; (ii) **any Member** (or Assignee) **and the Company**; or (iii) any Manager and the Company, arising under or in connection with this Agreement." (*Id.* at Section 1.1(u)) (emphasis added). Moreover, "[t]he Arbitrators shall have **sole and absolute**

**discretion** to ascertain the number and nature of separate claims which comprise the Dispute." (*Id.* at Section 12.7 at 26) (emphasis added).

All of Plaintiff's claims reflect a claim or controversy between a Member (Plaintiff) and the Company (Vineyard) arising under or in connection with the 2016 Operating Agreement.  With respect to Plaintiff's claims against Pinnacle:

> Under the doctrine of equitable estoppel. . . Florida courts have permitted a non-signatory defendant to enforce an arbitration clause against a signatory plaintiff either: (1) "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory," *Koechli v. BIP Int'l, Inc.*, 870 So. 2d 940, 944 (Fla. 1st DCA 2004) (citation omitted); or (2) when "there are allegations of concerted action by both a nonsignatory and one or more of the signatories to the contract." *Roman v. Atl. Constr. & Dev., Inc.*, 44. So. 3d 222, 224 (Fla. 4th DCA 2010) (citation omitted).

*Allscripts Healthcare Sols., Inc. v. Pain Clinic of Nw. Fla., Inc.*, 158 So. 3d 644, 646 (Fla. Dist. Ct. App. 2014).

As courts have explained, "[t]he idea behind the first exception is that a signatory plaintiff should not be allowed to sue to essentially enforce its rights under a contract and, at the same time, evade an arbitration agreement in the contract, simply by naming as defendants parties who were not signatories to the contract." *Id.* "The purpose of the doctrine is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from relying on the contract when it works to his advantage by establishing the claim, and repudiating it when it works to his disadvantage. . .." *Bailey v. ERG Enterprises, LP*, 705 F.3d 1311, 1320 (11th Cir. 2013) (citation omitted); *see also BDO Seidman, LLP v. Bee*, 970 So. 2d 869, 875 (Fla. 4th DCA 2007) ("A party may not rely on a contract to establish his claims while avoiding his obligation under the contract to arbitrate such claims."); *Giller v. Cafeteria of S. Beach Ltd., LLP*, 967 So. 2d 240, 242 (Fla. 3d DCA 2007) ("One cannot both take advantage of contract provisions to seek to impose liability on an individual

professional and at the same time avoid another contract term or provision for which it has no use.").

Plaintiff has pled *all* of his claims against Vineyard and all but one against Pinnacle. The nature of Plaintiff's claims against Pinnacle rely on his contractual terms with Vineyard, which allows Pinnacle to enforce the arbitration provision against Plaintiff even as a non-signatory. For example, Plaintiff alleges that Defendants agreed to buy back his Vineyard units but then reneged; Plaintiff's theory in this regard relies upon Section 4.1 of the 2016 Operating Agreement, which addresses the buying back of units by Vineyard, and this is the same contract that contains the arbitration provision. Counts VI and VII pertain to an alleged repurchase agreement under which *only* Plaintiff and Vineyard had obligations. This agreement contemplated the repurchase of *Vineyard* shares by and between *Vineyard* and its Members, and the purported contract did not otherwise mention or have anything to do with Pinnacle. In fact, Pinnacle had no authority to offer, bind, or otherwise contract Vineyard to sell or repurchase any of its own assets. Accordingly, the first prong of the equitable estoppel analysis prohibits Plaintiff from raising Count VII against Pinnacle outside of arbitration.

Moreover, Plaintiff alleges that Pinnacle is a closely held, wholly owned subsidiary of Vineyard, that Vineyard serves as the "alter ego" of Pinnacle, (Compl. ¶¶ 12-15), and that Pinnacle and Vineyard were his joint employers. (Ex. 1.) Plaintiff further alleges that Defendants engaged in concerted action; for example, Plaintiff alleges that he was not sufficiently compensated for his work at Pinnacle, and that Defendants either (a) breached Paragraph 3 of the Employment Agreement or (b) breached an amendment to Paragraph 3 of the Employment Agreement via an oral contract whereunder Plaintiff's compensation structure was reconsidered. Either interpretation necessarily impugns an obligation on Vineyard to issue the equivalent of bonuses to Plaintiff

following distributions that Vineyard received from Pinnacle's operations because Pinnacle did not have such authority.  All of this alleged concerted action by Defendants satisfies the second prong of the equitable estoppel analysis and compels arbitration of Plaintiff's claims.

### 3. Defendants Have Not Waived Arbitration.

Under Florida law, "a party may waive his or her right to arbitration by filing a lawsuit without seeking arbitration, by filing an answer to a pleading seeking affirmative relief without raising the right to arbitration, and by moving for summary judgment." *Green Tree Servicing, LLC v. McLeod*, 15 So. 3d 682, 687 (Fla. 2d DCA 2009) (internal citations omitted); *Davis*, 348 So. 3d at 668-69. No such waiver has occurred.

Because this case was filed in this Court, the Georgia Rules of Civil Procedure required Defendants to answer Plaintiff's Complaint and assert all compulsory counterclaims.  So, while Defendants are filing their Answer and Counterclaims contemporaneously with this Motion, they raised all defenses relating to their right to arbitration. Moreover, the parties have not engaged in any meaningful discovery, and Defendants have not moved for summary judgment, nor have they otherwise actively participated in litigating this matter. Therefore, Defendants have not waived arbitration.

## III.   THIS COURT SHOULD DISMISS PLAINTIFF'S COMPLAINT

In addition to compelling arbitration, this Court should dismiss Plaintiff's Complaint. *Lambert*, 544 F.3d at 1195 ("[T]he FAA requires a court to either stay or dismiss a lawsuit and to compel arbitration upon a showing that (a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims. . . fall within the scope of that agreement."). Both Georgia and Florida courts have dismissed complaints in this situation. *See Smith v. Adventure Air Sports Kennesaw, LLC*, 357 Ga. App. 1, 3-8, 849 S.E.2d 738,

742-46 (2020) (upholding trial court's order dismissing claims brought by one plaintiff and compelling same to arbitration); *Samaca, LLC v. Cellairis Franchise, Inc.*, 2019 Ga. Super. LEXIS 4, at *3-4 (Ga. Sup. Ct. Mar. 6, 2019) (Superior Court of Fulton County granted Defendants' Motion to Dismiss and Compel Arbitration; decision was unanimously affirmed by the Georgia Court of Appeals; Plaintiff's Motion for Reconsideration with the Court of Appeals was denied; and Plaintiff's Petition for Certiorari with the Supreme Court of Georgia was denied); *Wedemeyer v. Gulfstream Aero. Corp.*, 324 Ga. App. 47, 47, 749 S.E.2d 241, 242 (2013) (upholding trial court's order dismissing the case with prejudice and compelling the claims to arbitration); *Tag Dev. v. Punta Gorda Constr. Mgmt.*, 2021 Fla. Cir. LEXIS 11758, at *1-2 (granting third-party defendant's motion to dismiss and compelling arbitration); *Region Bank v. Patel*, 2010 Fla. Cir. LEXIS 6992, *1 (granting defendant's motion to dismiss and compel arbitration).

Moreover, the Eleventh Circuit has frequently affirmed cases where the district court compelled arbitration and dismissed the underlying case. *See, e.g., Pendergast v. Sprint Nextel Corp.*, 691 F.3d 1224, 1236 (11th Cir. 2012) (affirming district court's order dismissing complaint and compelling arbitration); *Samadi v. MBNA Bank, N.A.*, 178 Fed. Appx. 863, 866 (11th Cir. 2006); *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1379 (11th Cir. 2005); *Jackson v. Cintas Corp.*, 425 F.3d 1313 (11th Cir. 2005). Furthermore, district courts in this circuit and other circuit courts of appeals support dismissal of an action when compelling arbitration will leave no substantive claims pending before the district court. *See, e.g., De La Riva v. Suntrust Bank*, No. 21-24412-CIV-LENARD/LOUIS, 2022 U.S. Dist. LEXIS 154720, at *24-26 (S.D. Fla. Apr. 14, 2022); *Colon v. Wells Fargo Bank, N.A.*, Civil Action No. 1:14-CV-346-ODE, 2014 U.S. Dist. LEXIS 189220 at *4-6 (N.D. Ga. Sept. 16, 2014); *Dale v. Comcast Corp.*, 453 F. Supp. 2d 1367, 1368 (N.D. Ga. 2006) (dismissal appropriate "where all of the issues raised in the action must be

submitted to arbitration") (*reversed on other grounds*, 498 F.3d 1216); *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992). Accordingly, because Plaintiff's claims are arbitrable, this Court should dismiss this action.

## IV.   **CONCLUSION**

For the reasons stated above, Defendants request that the Court grant their Motion, compel arbitration, and dismiss Plaintiff's Complaint.

Respectfully submitted this 8th day of May, 2023.

**JACKSON LEWIS P.C.**

*/s/ Adriana R. Midence*
Adriana R. Midence
Georgia Bar No.: 142298
Robert W. Capobianco
Georgia Bar No.: 106102
Kathryn M. White
Georgia Bar No.: 528556
171 17th Street NW, Suite 1200
Atlanta, Georgia 30363
T: (404) 525-8200
F: (404) 525-1173
robert.capobianco@jacksonlewis.com
adriana.midence@jacksonlewis.com
kathryn.white@jacksonlewis.com

**ATTORNEYS FOR DEFENDANTS**

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

PAUL HAARER,                )
                            )
       Plaintiff,       )
                            )
v.                       )     Civil Action File No.:
                            )     2023-CV-378125
VINEYARD CAPITAL PARTNERS, L.L.C.  )
and PINNACLE FUNERAL SERVICE, L.L.C.,  )
                            )
       Defendants.    )
                            )

## **CERTIFICATE OF SERVICE**

I certify that, on May 8, 2023, I filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS** with the Court's e-filing system which will generate electronic service to all counsel of record, properly addressed as follows:

Richard L. Robbins
Catherine C. Sullivan
Michael D. Forrest
rrobbins@robbinsfirm.com
csullivan@robbinsfirm.com
mforrest@robbinsfirm.com

*Attorneys for Plaintiff*


/s/ *Adriana R. Midence*
Adriana R. Midence

# EXHIBIT 1

## EMPLOYMENT AGREEMENT
## MANAGING MEMBER – PINNACLE FUNERAL SERVICE, LLC
### Paul Haarer

This Agreement, dated effective as of June 1, 2014 between Pinnacle Funeral Service, LLC., a Georgia corporation ("Company") which is a subsidiary of Vineyard Financing, LLC, a Florida corporation ("Vineyard"), and Paul Haarer, a resident of Georgia ( "Haarer" or "Employee").

WHEREAS, the Company is a funeral home operator with multiple locations owned and a strategy to continue profitability growth through organically growing the revenues and reducing the expenses of the existing locations and by completing acquisitions and start-ups throughout the United States; and

WHEREAS, Haarer has funeral industry operational and acquisition experience and industry relationships; and

WHEREAS, the Company and Haarer are mutually desirous of entering into an employment agreement ("Agreement") whereby Haarer provides his experience and professional skills for the management of the Company upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the covenants, agreements, representations and payments set forth below, the parties agree as follows:

1.    **Term.**    The Company hereby agrees to employee Haarer for a two year term beginning on June 1, 2014 (the "term of this Agreement").   Haarer agrees to accept such employment and to perform the services specified herein, all upon the terms and conditions hereinafter stated.   Term may be extended by mutual agreement annually.

2.    **Duties.**  During the term of this Agreement, Haarer will actively, with all of his working time, serve as a Managing Member of the Company.

Specifically, Haarer will:

(a)    Along with Vineyard, set goals, targets and objectives of the Company;

(b)    Manage the Company to achieve these objectives;

(c)    Build and manage a corporate staff for the Company to assist Haarer in achieving these objectives;

(d)    Operate core business locations (currently Bass-Cauthen, Moody-Connolly, Parnick Jennings and Heritage of Griffin) to an EBITDA profit margin of 35% or better;

      (e)      Operate non-core businesses (currently Miller-Richards, Cox, Hall & Hall, and Coastal Camden) to as efficient an EBITDA profit margin as possible.

In addition, Haarer will

      (a)      Well and faithfully serve the interests of the Company;

      (b)      Obey all instructions given to him by Vineyard;

      (c)      Use his best efforts to promote the success of the Company and Vineyard;

      (d)      Perform all services in a competent, thorough and professional manner, and conduct his dealings, transactions and communications with others on behalf of the Company in accordance with the highest ethical and professional standards;

      (e)      Accurately keep and maintain all books of account as shall be reasonably required by the Company and Vineyard, and make all returns or reports as and when reasonably required by the Company and Vineyard; and

      (f)      Periodically report to Company and Vineyard concerning status of Company goals.

## 3.    **Compensation.**

The Company will pay Haarer annual compensation calculated as:

- **Base Salary:** $132,000 annually, paid in equal bi-monthly installments.
- **Bonuses:**    Distributions from the Company will be made to Vineyard as excess funds accumulate – whether from profitable operations or the sale of owned business locations. As those distributions are made to Vineyard, Haarer shall receive a 15% bonus for all distributions made to Vineyard.    So that if $100,000 is distributed from the Company, Haarer shall receive $15,000 and Vineyard shall receive $85,000.    This distribution shall be after the 10% preferred payment is made to any equity that Vineyard has invested in Company.    Vineyard's equity in Pinnacle as of this date is $1,698,920 (this is calculated as Vineyard's initial equity $2,943,317 less $1,244,400 allocated to the property lease in Griffin).

In addition:

- NewBridge Group will pay to Haarer 20% of any commissions received in which the Company is the purchaser in the transaction.
- Vineyard Financing will grant Haarer options to purchase 400 units annually of Vineyard Financing, LLC ownership at a fixed price of $145 per unit.    The first 400 are eligible to be purchased effective June 1, 2014.    These options shall remain in place for up to 5

years, as long as Haarer remains an employee of the Company.  Upon exercise of the
option, ownership shall be transferred immediately to Haarer and any distributions made
by Vineyard for those units shall be paid to Haarer.   The units shall have a restriction so
that they cannot be sold until one year after Haarer leaves employment with the
Company.

4.      **Benefits.**      Haarer will be entitled to receive Company benefits that are received by all
other Company employees including:

- Health Insurance of up to $400/month
- Cell phone reimbursement
- Parking fees in Atlanta office
- Fitness club membership in Atlanta office.
- Upon closing the Milwaukee transaction, Company shall fund an auto lease up to
  $300/month for Haarer to use when visiting Pinnacle owned locations.

5.      **Office Location:**      The Company shall be entitled to free usage of the office space
leased by NewBridge Group in Colony Square to serve as the home office of the Company.
Haarer shall have the flexibility to work remotely approximately 20% of the time.

6.      **Travel.**      All reasonable travel expenses related to managing owned firms or
exploring opportunities to purchase new firms will be paid or reimbursed by Company.
Expenses shall typically include airfare, hotels, rental cars, meals, and auto fuel.

7.      **Vacation.**      Haarer shall be entitled to four weeks vacation or personal time at full
salary, at a time to be mutually agreed by Company and Haarer.


8.      **Confidentiality.**

(a) **Confidential Information.**  As used in this paragraph, the term "Confidential
Information" shall mean and include: (i) the names and addresses of existing clients or leads of
the Company or NewBridge Group, (ii) other non-public information concerning existing clients
of the Company, Vineyard, or NewBridge Group, (iii) information concerning the Company's,
Vineyard's, or NewBridge Group's procedures, processes and practices; (iv) information
concerning the financial condition of the Company, Vineyard or NewBridge Group; (v)
information concerning the business and affairs of the Company, Vineyard or NewBridge Group;
(vi) information concerning the services Employee may render to Company pursuant to this
Agreement; (vii) all books of account; (viii) documents, vouchers and other books or papers
connected with the business and affairs of the Company, Vineyard or NewBridge Group or
clients of the Company, Vineyard or NewBridge Group.

(b) **Generally.**  Employee acknowledges that, during the course of performing services
under this Agreement, Employee shall learn and obtain Confidential Information.

(c) **Non-Disclosure.**  Further, during the term of this Agreement and afterwards, Employee shall hold confidential, and shall not disclose or divulge to any third parties, any Confidential Information.  All such Confidential Information shall be treated by Employee in strict confidence and shall not be divulged by Employee to any person other than an official or employee of the Company.

(d) **Return of Confidential Information.**  Any and all Confidential Information shall be the property of the Company, whether paid for by the Company or not.  Upon request of the Company or on termination of this Agreement, as the case may be, Employee shall immediately return to and turn over to the Company any and all Confidential Information that is in documentary or electronic form, and all copies thereof; and shall further confirm in writing that Employee has not disclosed any such Confidential Information to any third parties.

(e) **Survival.**  The expiration or termination of this Agreement shall not affect the obligations contained in this **Paragraph 8,** which obligations shall continue to bind Employee after any such event.

(f) **Compelled Disclosure.**  In the event that Employee shall be legally required or compelled to disclose any information which he would otherwise be required to hold in confidence pursuant to this **Paragraph 8**, Employee shall be permitted to make such disclosure to the extent that Employee is legally required or compelled to do so, and shall not be deemed to be in breach of the restrictions contained in this **Paragraph 8** for such disclosure; provided, however, that Employee (i) shall make such disclosure only to the extent legally required or compelled, and shall not otherwise disclose such confidential information; and (ii) shall notify the Company well in advance of any such disclosure, so that the Company may intervene in any legal proceeding to quash any such subpoena or other compulsory process mandating such disclosure.

8.      **Non-Solicitation.**  Employee agrees that, for a period commencing on the date of this Agreement and ending two years after the date this Agreement is terminated or expires, Employee shall not in any manner persuade or attempt to persuade any current or former employee, current or former consultant, client, or potential client of the Company, Vineyard or NewBridge Group to discontinue or diminish that person's or that entity's relationship or potential relationship with or to any of these entities.    As used in this paragraph, the term "potential client" shall be defined as any business or individual that is listed in the NewBridge database and that Employee has spoken to during the term of this Agreement.  If a violation of this covenant occurs, Employee shall reimburse the Company for this lost income.

9.      **Defaults**.  Each of the following events or circumstances shall constitute an event of default by Employee under this Agreement, and shall entitle the Company to terminate this Agreement in accordance with **Paragraph 10** of this Agreement: (a) Employee disregards or fails to comply with any laws, ordinances, rules, regulations, or orders of any public body having jurisdiction; (b) Employee is arrested for any crime involving moral turpitude; (c) Employee becomes the subject of an investigation concerning violations of any criminal law or is indicted;

(d) Employee fails to comply with any provision of this Agreement; or (e) any representation or warranty of Employee contained in this Agreement proves to have been untrue or inaccurate.

10.     **Termination by Company.**  If Employee defaults in performance of any provision herein, the Company may terminate this Agreement without prejudice to any other remedies the Company may have.  Upon such termination for cause, the Company may order Employee to stop work under this Agreement, and shall owe Employee only for services and expenses properly incurred prior to the default.  Termination without cause by Company will provide Employee a severance of 3 months of existing Base Salary.  Any termination pursuant to this Agreement shall not affect any rights of the Company against Employee then existing or which may thereafter accrue.

11.     **Termination by Employee.**  The Company's failure to make payments defined in **Paragraph 3 and 4** of this Agreement, after Employee provides the Company written notice of such failure and further provides the Company ten calendar days after such notice to make such payment, shall constitute a default under this Agreement and shall entitle Employee to terminate this Agreement and be entitled to all compensation earned by him, including severance equal to 3 months existing Base Salary.

12.     **Compliance with Applicable Laws.**  Employee shall comply with all laws and ordinances, and the rules, regulations, or orders of all public authorities relating to the performance of the services to be provided pursuant to this Agreement, and shall obtain any and all permits and licenses legally required for the legal and proper performance of its duties under this Agreement.

13.     **Modification.**  This Agreement may not be amended or modified unless such an amendment or modification is placed in writing and signed by all parties to this Agreement.

14.     **Notices.**  Any and all notices, elections or demands permitted or required to be made under this Agreement shall be in writing (unless provided otherwise herein), signed by the parties giving such notice, and shall be delivered personally or sent by email:


If to Haarer:                    Mr. Paul Haarer
                                 TEL:          770-335-6420
                                 EMAIL:        Phaarer@bellsouth.net


If to Vineyard:                  Vineyard Financing, LLC
                                 c/o NewBridge Group, Inc.
                                 1175 Peachtree Street, NE
                                 Suite 1425
                                 Atlanta, Georgia  30361

|       |              |
|-------|--------------|
| ATTN: | Jeff Boutwell |
| TEL:  | 404-249-9582 |
| FAX:  | 888-317-2654 |

The date of personal delivery or the date of mailing, as the case may be, shall be the date of such notice, election, demand or statement.

15.   **Time is of the Essence.**  Time is of the essence in interpreting and performing all of the parties' obligations, covenants and agreements contained in this Agreement.

16.   **Entire Agreement.**  This Agreement contains the entire terms of the agreement between the parties regarding subject matter hereof, and any representation or promise not included or contained in this Agreement shall be of no force or effect.

17.   **Headings.**  The headings of the sections, paragraphs and other portions of this Agreement are for convenience of reference only, are not to be considered a part hereof and shall not limit or otherwise effect any of the terms hereof.

18.   **Binding Effect**.  This Agreement is a continuing obligation and, subject to the provisions of **Paragraph 8.**

19.   **Rights and Remedies Cumulative.**  The rights and remedies provided by this Agreement are cumulative of the rights and remedies granted by law or equity, and the use of any one right or remedy by either party shall not preclude or waive its right to use any or all other remedies.

20.   **No Waiver.**  No delay or failure on the part of the Company in the exercise of any right, power or privilege granted under this Agreement, or available at law or in equity, shall impair any such right, power or privilege or be construed as a waiver of any event of default or any acquiescence therein.  No single or partial exercise of any such right, power or privilege shall preclude the further exercise of such right, power or privilege.  The Company's waiver of any breach of any provision of this Agreement shall not constitute a continuing waiver or a waiver of any subsequent breach of the same or a different provision of this Agreement.

21.   **Governing Law.**  This Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of Georgia.

22.   **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall be deemed one and the same instrument.

23.   **Survival**.  All representations and warranties contained herein made by Employee in connection herewith shall survive the execution and delivery of this Agreement and the exercise by the Company of its rights and remedies under this Agreement.

24.   **Venue.**  The parties stipulate and agree that the Superior Court of Fulton County, Georgia shall be a proper venue for any disputes concerning this Agreement or any transactions between the parties relating to the performance of this Agreement or the parties' respective obligations to each other, and the parties stipulate and consent to the venue and jurisdiction of such Court for the resolution or determination of such disputes.

25.   **Indemnification.**   Company will indemnify Haarer against any and all claims by Foundation Partners Group related to his work with NewBridge and Pinnacle with regard to Haaer's existing non-compete agreement that expires May, 2015.

26.   **Replacement of Agreement.**   This agreement replaces the existing management agreement dated Nov. 13, 2013 between Haarer, Stoots, Boutwell and Vineyard Financing related to the management of Company.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

By: _____          6 - 11 - 14
Jeffrey K. Boutwell                                       Date
President
NewBridge Group, Inc.
"NewBridge"

By: _____          7/22/14
W. K. Boutwell                                          Date
Managing Member
Vineyard Financing, LLC
Parent of Pinnacle Funeral Service, LLC

_____              06/11/14
Paul Haarer                                             Date
Managing Member
Pinnacle Funeral Service, LLC
"Haarer"

# EXHIBIT 2

**Joinder Agreement**
**To**
**Operating Agreement of Vineyard Financing, L.L.C.**

[Issuance of Units]

THIS JOINDER AGREEMENT is executed as of the _16th_ day of _January_ 2015, by and between _Paul Haarer_ ("New Member") and VINEYARD FINANCING, L.L.C. (the "Company").

New Member on the date hereof has been issued units of Membership Interest of the Company in the amount stated below, as permitted under the Operating Agreement of the Company dated December 1, 2006 (as thereafter amended, the "Operating Agreement"). As a condition precedent to New Member becoming a Member of the Company, the Company is requiring New Member to execute a joinder agreement with the Company, whereupon New Member shall become a party in all respects to the Operating Agreement.

In consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and New Member agree that by execution of this Joinder Agreement, New Member hereby agrees to become a party to the Operating Agreement and agrees that he/she/it shall be bound by all obligations and duties of Members of the Company under the Operating Agreement. The Company acknowledges and agrees on behalf of itself and the existing Members of the Company that New Member, by execution of this Joinder Agreement, has become a Member of the Company entitled to all rights and privileges as a Member under the Operating Agreement.

New Member hereby covenants and warrants that he/she/it has acquired the units of Membership Interest of the Company solely for its own account for investment and not with a view to, or for resale in connection with, any distribution of such units within the meaning of applicable securities laws. New Member further acknowledges the arbitration provisions set forth in the Operating Agreement.

The parties hereto have executed this Joinder Agreement as of the day and year first written above.

NEW MEMBER:

_____
(Signature)
Print Name: _Paul Haarer_

Number of Units: _100_

VINEYARD FINACING, L.L.C.

By: _____
   Jeff Boutwell, Manager

# EXHIBIT 3

(Execution Copy)

**AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**VINEYARD CAPITAL PARTNERS, L.L.C.,**
a Florida Limited Liability Company.

**(Manager-Managed)**

**Dated as of:  June 6, 2016**

---

THE MEMBERSHIP INTERESTS DESCRIBED HEREIN HAVE NOT BEEN REGISTERED UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR REGISTERED OR QUALIFIED UNDER ANY APPLICABLE STATE SECURITIES LAWS ("STATE ACTS"), AND ARE RESTRICTED SECURITIES AS THAT TERM IS DEFINED IN RULE 144 UNDER THE SECURITIES ACT. SUCH MEMBERSHIP INTERESTS WERE ISSUED IN RELIANCE UPON ONE OR MORE EXEMPTIONS FROM REGISTRATION CONTAINED IN SECTIONS 3(b)(1), 4(a)(2) or 4(a)(5) OF THE SECURITIES ACT AND APPLICABLE EXEMPTIONS FROM REGISTRATION OR QUALIFICATION UNDER THE STATE ACTS. THE MEMBERSHIP INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED, EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER THE SECURITIES ACT AND THE STATE ACTS, OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND OR REGISTRATION OR QUALIFICATION UNDER THE STATE ACTS, OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED. ALL MEMBERSHIP INTERESTS OF THE COMPANY ARE GOVERNED BY THE TERMS OF THIS OPERATING AGREEMENT, INCLUDING THE ADDITIONAL TRANSFER RESTRICTIONS CONTAINED HEREIN AND MAY ONLY BE TRANSFERRED IN COMPLIANCE WITH THE TERMS OF THIS AGREEMENT. BASED UPON THE FOREGOING, EACH HOLDER OF A MEMBERSHIP INTEREST MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF AN INVESTMENT THEREIN FOR AN INDEFINITE PERIOD OF TIME.

## TABLE OF CONTENTS

ARTICLE I.         DEFINITIONS ................................................................................................ 1

    Section 1.1.      General Definitions ................................................................. 1
    Section 1.2.      General Interpretive Principles .............................................. 6

ARTICLE II.       FORMATION ................................................................................................. 7

    Section 2.1.      Organization and Governing Law .......................................... 7
    Section 2.2.      Additional Basic Information ................................................. 7
    Section 2.3.      Company Purpose ................................................................... 7
    Section 2.4.      Rights of Third Parties; Creditors Not Benefited ................. 7
    Section 2.5.      No State-Law Partnership ...................................................... 8

ARTICLE III.     RIGHTS AND DUTIES OF MEMBERS ...................................................... 8

    Section 3.1.      Representations and Warranties .............................................. 8
    Section 3.2.      Specific Limitations on Members Rights ............................... 8
    Section 3.3.      Termination of Membership ................................................... 9
    Section 3.4.      Deceased and Incompetent Members ..................................... 9
    Section 3.5.      Rights of Mere Assignees ...................................................... 9
    Section 3.6.      No Right to Withdraw Capital Contributions or Receive Distributions ............... 9
    Section 3.7.      Partition .................................................................................. 9
    Section 3.8.      New Members ........................................................................ 9

ARTICLE IV.     TRANSFER OF MEMBERSHIP INTERESTS ........................................... 9

    Section 4.1.      Ability to Sell Membership Interests ..................................... 9
    Section 4.2.      General Restrictions on Transferability ............................... 10
    Section 4.3.      Additional Conditions to Recognition of Transferee ........... 10
    Section 4.4.      Drag Along Rights ............................................................... 10
    Section 4.5.      Obligation to Sell Interest ................................................... 11
    Section 4.6.      Company Redemption Right ................................................ 11

ARTICLE V.      MANAGEMENT OF THE COMPANY ...................................................... 11

    Section 5.1.      Management Generally ......................................................... 11
    Section 5.2.      Tenure and Qualifications .................................................... 12
    Section 5.3.      Actions by the Managers ...................................................... 12
    Section 5.4.      Authority of the Managers ................................................... 12
    Section 5.5.      Reliance by Third Parties ..................................................... 14
    Section 5.6.      Duty of Loyalty ................................................................... 14
    Section 5.7.      Manager's Standard of Care ................................................ 15
    Section 5.8.      Transactions with a Manager and its Affiliates ................... 15
    Section 5.9.      Actions Requiring Member Consent .................................... 15
    Section 5.10.     Resignation .......................................................................... 16
    Section 5.11.     Removal ............................................................................... 16
    Section 5.12.     Management Succession ...................................................... 16

A WMO 3144373 v7
2936727-000001

ARTICLE VI.      CAPITALIZATION OF THE COMPANY ........................................ 16

Section 6.1.     Initial Capital Contributions of Members ................................................ 16
Section 6.2.     No Required Additional Capital Contributions .................................................. 16
Section 6.3.     Loans by Members .................................................................................. 16

ARTICLE VII.     ALLOCATIONS OF PROFITS AND LOSSES ................................. 16

Section 7.1.     Taxation as a Partnership ...................................................................... 16
Section 7.2.     Tax Matters Partner ................................................................................ 17
Section 7.3.     Capital Accounts ................................................................................... 17
Section 7.4.     Capital Account Treatment of Dispositions ........................................... 18
Section 7.5.     No Obligation to Restore Capital Account Deficit Balance .............................. 18
Section 7.6.     No Interest on Initial Capital Contributions or Retained Profits ........................ 18
Section 7.7.     Allocations of Profits and Losses .......................................................... 18
Section 7.8.     Additional Allocation Provisions ........................................................... 18

ARTICLE VIII.     DISTRIBUTIONS ...................................................................... 18

Section 8.1.     Interim Distributions ............................................................................. 18
Section 8.2.     Distribution of Assets on Dissolution .................................................... 18
Section 8.3.     No Right to Capital ............................................................................... 18
Section 8.4.     No Mandatory Tax Distributions; Reserves .......................................... 18

ARTICLE IX.     RIGHTS OF MANAGERS AND OTHER INDEMNIFIED PERSONS ............ 19

Section 9.1.     Liability of the Managers and Other Indemnified Persons ................................ 19
Section 9.2.     Other Matters Concerning the Managers ................................................ 19
Section 9.3.     Indemnification Provisions ................................................................... 20

ARTICLE X.     DISSOLUTION AND WINDING-UP OF THE COMPANY ........................... 21

Section 10.1.     Dissolution ........................................................................................... 21
Section 10.2.     Winding-Up .......................................................................................... 21
Section 10.3.     Termination of Existence ...................................................................... 21

ARTICLE XI.     MEMBER RESTRICTIVE COVENANTS ....................................... 22

Section 11.1.     Restrictive Covenants ........................................................................... 22
Section 11.2.     Breach of Restrictive Covenants ........................................................... 23
Section 11.3.     Redemption Right and Terms of Breach of Restrictive Covenants ..................... 24
Section 11.4.     Interpretation of Restrictive Covenants and Acknowledgement of ........................
        Irreparable Harm .................................................................................. 24
Section 11.5.     Severability .......................................................................................... 24
Section 11.6.     Survival of Representations, Warranties, Covenants and Obligations ............... 24

ARTICLE XII.     ARBITRATION OF DISPUTES ................................................... 25

Section 12.1.     Binding Arbitration ............................................................................... 25
Section 12.2.     Selection of Arbitrators ......................................................................... 25
Section 12.3.     Decision of Arbitrators ......................................................................... 25

-iii-

Section 12.4.    Available Discovery ...................................................................... 25
Section 12.5.    Identification of Claims .................................................................. 25
Section 12.6.    Delivery of Final Proposals ............................................................ 25
Section 12.7.    Resolution of Claims ...................................................................... 26
Section 12.8.    Arbitration Costs ............................................................................ 26
Section 12.9.    Entry of Judgment .......................................................................... 26
Section 12.10.   Vacation or Modification ................................................................ 26
Section 12.11.   Equitable Relief .............................................................................. 26

ARTICLE XIII.     MISCELLANEOUS PROVISIONS ................................................ 26

Section 13.1.    Notices ............................................................................................ 26
Section 13.2.    Binding Effect ................................................................................. 27
Section 13.3.    Severability ..................................................................................... 27
Section 13.4.    Identification ................................................................................... 27
Section 13.5.    Amendments to Agreement ............................................................ 27
Section 13.6.    Entire Agreement ............................................................................ 27
Section 13.7.    Further Assurances ......................................................................... 27
Section 13.8.    Authority ......................................................................................... 27
Section 13.9.    Execution in Counterparts; Facsimile and Electronic Signatures ...... 27
Section 13.10.   Captions .......................................................................................... 28
Section 13.11.   Execution of Additional Instruments ............................................. 28
Section 13.12.   Power of Attorney .......................................................................... 28

A WMO 3144373 v7
2936727-000001

**Amended and Restated Operating Agreement**

**of**

**Vineyard Capital Partners, L.L.C.**,

a Florida limited liability company.

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") of **Vineyard Capital Partners, L.L.C.**, a Florida limited liability company (the "Company") organized pursuant to the Act, is entered into and shall be effective as of the 6th day of June, 2016 (the "Effective Date"), by and among the Company and its Members (defined below), and shall be binding on all current Members of the Company, as well as any and all other future Members of the Company (by execution of a written agreement to be bound by the terms of this Agreement).

**W I T N E S S E T H:**

WHEREAS, the Company was initially formed as a limited liability company under the laws of the State of Florida on the 15th day of May, 2002 under the name of "Vineyard Properties, L.L.C." by the filing of the Articles of Organization with the Secretary of State of Florida. On October 31, 2003, the Company formally changed its name to "Vineyard Financing, L.L.C." by amending its Articles of Organization. Thereafter, on June 16, 2015, the company further amended its Articles of Organization to change its name to "Vineyard Capital Partners, L.L.C.";

WHEREAS, the Company and its Members previously entered into that certain Limited Liability Company Operating Agreement of Vineyard Financing, L.L.C., dated December 1, 2006, as amended by that certain Amendment to Operating of Vineyard Financing, L.L.C., dated April 25, 2007, for the management of the affairs and business of the Company (the "Prior Operating Agreement");

WHEREAS, Section 11.02 of the Prior Operating Agreement provides that those Members holding at least a two-thirds majority (66 $^2/_3$) of the Membership Interests in the Company shall have the power and authority to amend such agreement;

WHEREAS, the parties to this Agreement desire to make amended and restated changes to the terms and provisions of the Prior Operating Agreement to be effective as of the Effective Date, as set forth herein below, such that the Managers, the Members and the Company intend for this Agreement to supersede and fully replace the Prior Operating Agreement.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants expressed below, and other valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto, intending to be legally bound, hereby certify and agree as follows:

**ARTICLE I.**
**DEFINITIONS**

**Section 1.1.**    ***General Definitions.*** For purposes of this Agreement, unless the context clearly indicates otherwise, the following terms have the meanings set forth below:

(a)    *"Act"* means the Florida Limited Liability Company Act as set forth in Fla Stat. Ann. § 605.0101, *et seq.*, as amended from time to time.

A WMO 3144373 v7
2936727-000001

(b)     *"Agreement"* means this Operating Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as the context requires, and shall have the same meaning as the term "Operating Agreement" as such term is used in the Act.

(c)     *"Arbitrator"* means a Person selected in accordance with Section 8 of this Agreement to resolve a Dispute.

(d)     *"Articles of Organization"* means the articles of organization for the Company, filed with the Florida Secretary of State on May 15, 2002, as the same may be amended from time to time.

(e)     *"Assignee"* means a Person who is a transferee of an interest in the Company under a transaction consented to by the Manager(s) or otherwise under this Agreement, but who is not specifically admitted as a Member.

(f)     *"Assignment"* means any voluntary or involuntary transaction, proceeding or action which affects any right, title or interest in or to all or any portion of a Member's Units, including, without limitation, the death, Disability, or Event of Bankruptcy of a Member, and any purported transfer of a Units pursuant to a decree of divorce or an agreement of separation of a Member and such Member's spouse.

(g)     *"Association"* means the American Arbitration Association and, in the event that the American Arbitration Association ceases to exist or to provide rules concerning commercial arbitration, any comparable or successor Person selected by the Manager(s).

(h)     *"Authorized Person"* means and includes any Person who has been authorized to take any specified actions under this Agreement or through a written designation of the Manager(s).

(i)     *"Capital Account"* means, with respect to a Member, the bookkeeping account determined and maintained by the Company in the manner set forth in Section 6.2 hereof.

(j)     *"Capital Contribution"* means, as of any date, with respect to any Member, the aggregate amount of cash, cash equivalents, promissory obligations or the Fair Market Value of other property which such Member contributes or is deemed to have contributed to the Company pursuant to Article V (net of liabilities assumed by the Company from such Member and liabilities to which any such contributed property is subject) as of the date in question.

(k)     *"Certificate of Dissolution"* means a certificate of dissolution for the Company, as contemplated by Section 605.0707 of the Act, and executed by one (1) or more Authorized Persons.

(l)     *"Claim"* means and includes all claims, demands, actions, suits, or proceedings (civil, criminal, administrative, or investigative).

(m)     *"Code"* means the United States Internal Revenue Code of 1986, as amended.

(n)     *"Company"* means Vineyard Capital Partners, L.L.C., a limited liability company formed under the laws of the State of Florida, and any successor limited liability company.

(o)     *"Company Asset Manager"* means NewBridge Group, Inc., a Georgia corporation ("NewBridge Group"), and NewBridge Investment Management, Inc., a Florida corporation

("NewBridge Investment" and together with NewBridge Group is collectively referred to herein as "NewBridge").

(p)      *"Company Buyback Option"* shall have the meaning specified in Section 4.1 below.

(q)      *"Company Purpose"* shall have the meaning specified in Section 2.3 below.

(r)      *"Contributing Member"* shall have the meaning specified in Section 5.2(b) below.

(s)      *"Date of Formation"* means May 15, 2002.

(t)      *"Disability"* means, with respect to Member, the determination of a court of competent jurisdiction that such Person is incompetent to manage his, her, or its person or property.

(u)      *"Dispute"* means and include any controversy or claim between; (i) any Member (or Assignee) and the Managers, (ii) any Member (or Assignee) and the Company, or (iii) any Manager and the Company, arising under or in connection with this Agreement.

(v)      *"Dispute Notice"* means a Notice given by the Managers to a Member (or Assignee) or the Company, or by a Member (or Assignee) to the Managers, as applicable, in order to resolve a Dispute in accordance with this Agreement.

(w)      *"Disputing Party"* means and includes the Managers, the Company, or any Member or Assignee who has given or received a Dispute Notice, as applicable.

(x)      *"Distribution"* means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise based on the number of Units held by a Member; provided, that, none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Membership Interest, (b) any recapitalization or exchange of securities of the Company, (c) any subdivision (by split or otherwise) or any combination (by reverse split or otherwise) of any outstanding Membership Interest or (d) any fees or remuneration paid to any Member in such Member's capacity as an employee, officer, consultant or other provider of services to the Company.

(y)      *"Effective Date"* shall have the meaning set forth in the introductory paragraph above.

(z)      *"Event of Bankruptcy"* means the occurrence with respect to a Member of any one or more of the events described in Section 605.0602 of the Act.

(aa)      *"Fair Market Value"* of any asset at any time means the fair market value of the asset in question, as determined in the good faith judgment of the Managers.

(bb)      *"Hearing Date"* means the date set by the Arbitrators to hear an arbitration under Section VIII of this Agreement with respect to a Dispute.

(cc)      *"Indemnified Person"* means and includes (i) the Managers; (ii) a former Manager; and (iii) any other Person who is accorded such status by the Managers, which may include,

without limitation, Members, former Members, and any Person who is or was serving at the request of the Managers in any capacity in connection with the business or affairs of the Company.

(dd)     *"Indemnity Claim"* means and includes any and all Claims in which any Indemnified Person may be involved, or threatened to be involved, as a party or otherwise, by reason of (i) such Person's present or former status as an Indemnified Person or (ii) any action taken or omitted in any such capacity.

(ee)     *"Indemnity Expense"* means and includes any and all loss, claims, damages, liabilities, expenses, judgments, fines, settlements, and other amounts, including, without limitation, attorneys' fees and paralegal charges, arising from any and all Indemnity Claims.

(ff)     *"Initial Capital Contributions"* shall have the meaning specified in Section 5.1 below.

(gg)     *"Majority Interest"* shall mean the number of issued and outstanding Units owned by the Members which, taken together, exceed fifty percent (50%) of the aggregate of all of the Units of all Members.

(hh)     *"Majority Vote"* means the vote of one or more Members of the Company, whose Units, when taken together, exceeds fifty percent (50%) of the aggregate total of all Units issued and outstanding to all the Members.

(ii)     *"Majority Written Consent"* means a written consent to the taking or omission of any action required or permitted to be taken by Members under this Agreement which is signed by or on behalf of  Members entitled to grant or withhold consent with respect to such action whose Units represent a Majority Vote of all the Members.

(jj)     *"Management Transition Committee"* means an advisory committee to the Company, which shall be composed of five (5) committee members, all of whom shall be appointed by the Majority Vote or Majority Written Consent of the Members, following the death, Disability, resignation or removal of both the Initial Managers.

(kk)     *"Manager(s)"* shall have the meaning specified in Article IV below.

(ll)     *"Member"* means each of the initial Members, as well as any other Person who may be admitted as a New Member, but such term shall not apply to a mere Assignee.

(mm)    *"Membership Interest"* means a Member's equity interest in the Company, measured in Units, and shall include a Member's right to information of the Company as provided under the Act, as modified by this Agreement, and the right to participate in the management of the Company, but only to the extent provided under the Act, as modified by this Agreement.

(nn)     *"Memorandum"* means the Company's Confidential Private Placement Memorandum, to be dated as of June 6, 2016.

(oo)     *"New Member"* means any Person who is not a current Member of the Company as of the Effective Date hereof and who has been or will be subsequent admitted as a Member of the Company.

-4-

(pp)    *"Notice"* means a writing or electronic communication containing the information required by any provision hereof to be communicated to a Person, which shall be sufficiently delivered and shall constitute sufficient Notice for purposes of any provision hereof if (i) sent by registered or certified mail, return receipt requested, to any Person at the last known address of such Person, on the third (3rd) business day following the deposit thereof with the United States Postal Service, with sufficient postage affixed; (ii) transmitted by hand delivery or air courier, when actually received at the address of such Person; (iii) transmitted by telecopy or other form of facsimile transmission, upon acknowledgment of receipt thereof in writing by telecopy or otherwise; or (iv) transmitted by email, the time and date of transmittal of such email, if such email is sent prior to 5:00 P.M. (eastern time) on any regular business day not a Federal holiday, and 9:00 A.M. (eastern time) on the next regular business day not a Federal holiday, if such email is sent after such time.

(qq)    *"Offering"* means the private placement offering of Units by the Company to investors, whether pursuant to the Memorandum or otherwise.

(rr)    *"Organization"* means and includes all organizations (whether created by the laws of Florida or of another state or foreign country) including, without limitation, general partnerships, joint ventures, limited partnerships, limited liability companies, corporations, trusts, business trusts, estates, custodianships, and other associations.

(ss)    *"Percentage Interest"* means, with respect to a Member, the Units then-currently held by a Member *divided by* the total issued and outstanding Units held by all Members (as adjusted from time to time in accordance herewith).

(tt)    *"Person"* means and includes all Organizations, all natural persons, and all trustees, personal representatives, fiduciaries or other individuals performing in any similar capacity.

(uu)    *"Personal Representative"* means, as to a natural Person, the executor, administrator, guardian, conservator or other legal representative thereof and, as to an Organization, the legal representative or successor thereof.

(vv)    *"Profits"* or *"Losses"* means for each taxable year of the Company or other relevant period an amount equal to the Company's net taxable income or loss for such period, as determined for federal income tax purposes (including separately stated items) in accordance with the accounting method and rules used by the Company and in accordance with Section 703 of the Code, with the following adjustments:

(i)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses (pursuant to this definition) shall be added to such taxable income or loss; and

(ii)    any expenditure of the Company that is described in Section 705(a)(2)(B) of the Code, or which is treated as such pursuant to the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses (pursuant to this definition) shall be subtracted from such taxable income or loss.

(ww)    *"Property"* means any property, real or personal, tangible or intangible, and any legal or equitable interest in property of any type or in any form, including cash and cash equivalents but excluding services and promises to perform services in the future.

(xx)    *"Reserves"* shall have the meaning specified in <u>Section 8.4</u> below.

-5-

(yy) *"Restricted Period"* shall have the meaning specified in <u>Section 11.1(a)</u> below.

(zz) *"Subsidiary(ies)"* shall mean any Person of which 50% or more of the outstanding equity interests having general voting power under ordinary circumstances to elect a majority of the governing body of such a Person, irrespective of whether or not at the time equity interest of any other class or classes shall have or might have voting power by reason of the happening of any contingency, is at the time, directly or indirectly, or indirectly owned by one or more Persons by those Persons and one or more Subsidiaries, or by one or more other Subsidiaries.

(aaa) *"Super Majority Vote"* means the vote of one or more Members of the Company, whose Units, when taken together, exceeds sixty-six and two-thirds percent (66 $^2/_3$%) of the aggregate total of all Units issued and outstanding to all the Members.

(bbb) *"Super Majority Written Consent"* means a written consent to the taking or omission of any action required or permitted to be taken by Members under this Agreement which is signed by or on behalf of  Members entitled to grant or withhold consent with respect to such action whose Units represent a Super Majority Vote of all the Members.

(ccc) *"Transfer"* or *"transfer"* shall mean any sale, assignment, exchange, gift, bequest, pledge, security interest, encumbrance, or other alienation or disposition whatsoever of all or a portion of a Member's Units, including any distribution by an executor, administrator, or trustee.

(ddd) *"Transferee"* shall mean any Person who buys, receives or otherwise obtains for consideration or gratuitously all or any portion of a Member's Units pursuant to and in accordance with the terms of this Agreement.

(eee) *"Transferor"* or *"Transferring Member"* shall mean a Member who desires to sell, assign, pledge, hypothecate or otherwise transfer for consideration or gratuitously all or any portion of such Member's Units pursuant to and in accordance with the terms of this Agreement.

(fff) *"Treasury Regulations"* means a regulation issued by the United States Department of the Treasury and relating to a matter arising under the Code.

(ggg) *"Units."* A Member's Membership Interest in the Company is represented by "Units", which shall represent a Member's (i) allocation of Profits or Losses as and when made under this Agreement; (ii) the right to receive Distributions as and when the Manager(s) determine(s) to make the same under this Agreement; and (iii) the specific rights granted to the Members under the Act, to the extent that this Agreement does not condition or withhold such rights.  Each Unit shall entitle the holding Member to one (1) vote on all matters which require or which are submitted to the Members for approval. With the consent of the Manager(s) (which consent shall not be unreasonably withheld), a Unit may be subdivided by percentage.

(hhh) *"Waivable Provisions of the Act"* means those provisions of the Act <u>not</u> made expressly non-waivable under the Act.

**Section 1.2.**    ***General Interpretive Principles.*** For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires: (a) the terms defined in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender; (b) accounting terms not otherwise defined herein have the meanings given to them in the United States in accordance with generally accepted accounting principles; and (c) the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and

-6-

not to any particular provision; and the term "include" or "including" shall mean without limitation by reason of enumeration.

## ARTICLE II.
## FORMATION

**Section 2.1.**   *Organization and Governing Law.*   The Company has been organized as a Florida limited liability company by the execution and filing of the Articles of Organization on May 15, 2002 with the Secretary of the State of Florida.  All questions concerning the construction, validity, and interpretation of this Agreement, and the performance of the obligations imposed by this Agreement, shall be governed by the internal law, not the law of conflicts, of the State of Florida, and specifically the Act.  The provisions of this Agreement shall govern over all provisions of the Act which would apply but for (and inconsistently with) this Agreement.

**Section 2.2.**   *Additional Basic Information.*   The following details currently apply to the Company:

(a)   The name of the Company is "**Vineyard Capital Partners, L.L.C.**" The Company's Manager(s) in its sole discretion may change the name of the Company at any time and from time to time.  Notification of any such change shall be given to all Members.  All business of the Company shall be conducted under its name or under such other trade name(s) as may be approved by the Manager(s).

(b)   The Company shall have a duration from the Date of Formation until it shall be dissolved and its affairs wound up in accordance with the Act and this Agreement.

(c)   The names and addresses of the current Members of the Company shall be those Persons reflected in the current books and records of the Company maintained by the Managers, as of the Effective Date, which books and records shall be amended from time-to-time by the Manager(s) to reflect any additional Members to the Company or the withdrawal or redemption of any current Members.

(d)   The principal office of the Company shall be initially located at 3431 Cedar Lane Drive, Tallahassee, Florida 32312-1207, but may be changed by the Manager(s) from time to time as the needs of the Company require.

**Section 2.3.**   *Company Purpose.*   The Company is organized for the purposes of generating income on capital and realizing capital appreciation by allocating its assets between and among a portfolio of investments that includes owning, developing, renting, managing and investing in funeral home real estate properties and investing in and lending money to funeral homes businesses and operators, as well as other investments and engaging in all other activities, undertakings and transactions the Managers may deem necessary or advisable in connection therewith (collectively, the "Company Purpose").The Managers, on behalf of the Company, shall have the right to exercise all other powers necessary to or reasonably connected with the Company Purpose which may be legally exercised by limited liability companies under the Act.

**Section 2.4.**   *Rights of Third Parties; Creditors Not Benefited.* This Agreement is entered into by and among the Members for the exclusive benefit of the Company, its Members, Manager(s), and their respective successors and permitted assigns.  Nothing in this Agreement, express or implied, is intended or is to be construed to give to any creditor of the Company or any creditor of the Members or any other Person whatsoever, other than Members and the Company, any legal or equitable right, remedy or claim under or with respect to this Agreement or any of its covenants, conditions or provisions, and such

-7-

provisions are and shall be held to be for the sole and exclusive benefit of the Members and the Company. Without limiting the generality of the foregoing, no creditor shall be entitled to require a Member to solicit or accept any loan or additional capital contribution for the Company or to enforce any right which the Company may have against such Member, whether arising under this Agreement or otherwise.

**Section 2.5.**   *No State-Law Partnership.*   The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member, Manager or officer of the Company shall be a partner or joint venturer of any other Member, Manager or officer, for any purposes other than as set forth in the next sentence of this Section 2.5.  Notwithstanding the foregoing, the Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

## ARTICLE III.
## RIGHTS AND DUTIES OF MEMBERS

**Section 3.1.**   *Representations and Warranties.*   Each Member hereby represents and warrants to the Company, to the Manager(s), and each other Member that: (a) the Member is acquiring its, his, or her Units in the Company for the Member's own account as an investment and without an intent to sell, transfer, or distribute the Units; and (b) the Member acknowledges that the Units have not been registered under the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, as amended (the "Securities Act"), in reliance on the exemptions from registration provided by Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder, or any applicable state securities laws, and may not be resold or transferred by the Member (i) without appropriate registration or the availability of an exemption from such requirements and (ii) without strictly conforming to the requirements of this Agreement.

**Section 3.2.**   *Specific Limitations on Members Rights*.   In addition to the limitations, requirements, and other provisions of this Agreement, and to the applicable provisions of the Act, each Member, and every Unit, shall be taken and held subject to the following:

(a)    no Member (who is not also a Manager) shall have the right to participate in the management of the Company, or have any authority to bind the Company in any manner, except as otherwise specifically provided herein, or as may be expressly delegated in writing to the Member by the Manager(s);

(b)    no Member shall have the right to vote on any matters except as otherwise specifically provided herein, or unless a specific provision of the Act otherwise requires, which such provision may not be amended or modified by the terms of this Agreement;

(c)    no Member may make any voluntary Assignment of all or any portion of a such Member's Units without the express, advance written approval of the Managers, and any attempted or purported voluntary Assignment, without the approval of the Managers, shall be null, void and of no effect;

(d)    no Member shall have any right to withdraw from the Company, except with the written approval of the Manager(s), and then on such terms as the Manager(s) may agree in its sole and absolute discretion;

(e)    no Member shall have the right to voluntarily dissolve the Company; and

A WMO 3144373 v7
2936727-000001

(f)    each Member hereby knowingly and voluntarily modifies, alters, waives, and relinquishes all Waivable Provisions of the Act, to the extent the same are not expressly provided for under this Agreement.

**Section 3.3.    *Termination of Membership*.** The occurrence of any event which terminates the continued membership of any Member shall not cause the Company to be dissolved or its affairs to be wound up.

**Section 3.4.    *Deceased and Incompetent Members*.** If a Member who is an individual dies or has a Disability, that Member's Personal Representative may exercise all of the Member's rights under this Agreement for the purpose of settling the affected Member's estate or administering the affected Member's property. If a Member is an Organization, and is dissolved or terminated, the power of the affected Member under this Agreement may be exercised by its Personal Representative. Each Personal Representative shall have the authority to consummate, on behalf of the Member, the Transfer of such Member's Units pursuant to ARTICLE IV or as otherwise contemplated by this Agreement.

**Section 3.5.    *Rights of Mere Assignees*.** An Assignee shall have only the rights to allocations of Profits or Losses and any Distributions relating to the assigned interest. None of the other rights of a Member under the Act or this Agreement shall belong to any Assignee.  In the case of any amendment to this Agreement where the approval of the Members is sought, no approval or consent by any Assignees shall be necessary, and such approval shall be determined by Members holding, in the aggregate, more than 50% of the Percentage Interests then held by Members alone.

**Section 3.6.    *No Right to Withdraw Capital Contributions or Receive Distributions*.**  Except as otherwise provided elsewhere in this Agreement, no Member shall be entitled to withdraw any amount out of such Member's Capital Account or receive any Distribution from the Company, without the approval of the Manager(s).

**Section 3.7.    *Partition*.**  A Member shall not, directly or indirectly, take any action to require partition of the Company or any of its assets or cause the sale of any Company assets.  Each Member for such Member, such Member's Personal Representatives, successors, and assigns irrevocably waives any and all right to maintain any action for partition or to compel the sale of his, her or its Units or of the Company's assets except as provided in this Agreement.

**Section 3.8.    *New Members*.**  Upon the written approval or consent of the Managers to be exercised at the Managers' sole discretion, New Members may be admitted to the Company as of the beginning of each month. Each New Member will be required to execute a joinder agreement pursuant to which he or it becomes bound by the terms of this Agreement, as well as any other documents to be determined by the Managers in their sole discretion.  Admission of a new Member shall not be cause for dissolution of the Company.

**ARTICLE IV.**
**TRANSFER OF MEMBERSHIP INTERESTS**

**Section 4.1.    *Ability to Sell Membership Interests*.**  Subject to any statutory restrictions to the contrary and any other provision contained in this Agreement, including, but not limited to, Rule 144 and Rule 502(d) under the Securities Act, the Company intends to provide as much liquidity as possible to its Members, and will, at the Managers' sole discretion, periodically offer to repurchase a certain limited number of Units from the Members from time-to-time (each, a "**Company Buyback Option**").  In the event the Company provides notice to the Members of a Company Buyback Option, each Member shall have the option, but not the requirement, to resell all or a portion of his, her or its Units to the Company

A WMO 3144373 v7
2936727-000001

on a pro-rata basis along with each other Member of the Company that desires to resell his, her or its Units to the Company pursuant to the Company Buyback Option. The closing of any Transfer of Units pursuant to this Section 4.1 shall be on such terms as determined by the Managers.

Section 4.2.     *General Restrictions on Transferability.* Except as otherwise specifically provided herein, no Member shall have the right to Transfer all or any portion of such Member's Units without the approval of the Manager(s). Each Member hereby acknowledges the reasonableness of the restrictions on Transfer of all or any portion of his, her or its Units imposed by this Agreement in view of the Company purposes and the relationship of the Members. Any purported Transfer of any Unit not in accordance with this Agreement shall be null and void and of no effect. Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

Section 4.3.     *Additional Conditions to Recognition of Transferee.*

(a)     If a Transferring Member transfers his, her or its Units to a Person who is not already a Member in accordance with the terms of this Agreement, as a condition to recognizing one or more of the effectiveness and binding nature of such Transfer, the Manger(s) may require the Transferring Member and the proposed successor-in-interest to execute, acknowledge and deliver to the Company such instruments of Transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which such Manager(s) may deem reasonably necessary or desirable to accomplish any one or more of the following:

(i)     constitute such successor-in-interest as an Member;

(ii)     confirm that the proposed successor-in-interest to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this Agreement, as the same may have been further amended;

(iii)     preserve the Company after the completion of such Transfer under the laws of each jurisdiction in which the Company is qualified, organized or does business;

(iv)     maintain the status of the Company as partnership for federal tax purposes; and

(v)     assure compliance with any applicable state and federal laws, including securities laws and regulations.

(b)     Any Transfer of any Units and admission of a Member in compliance with this Section 4.3 shall be deemed effective as of the last day of the calendar month in which the appropriate consent thereto was given in accordance with this Section 4.3. Each Member hereby acknowledges and agrees that a Transferring Member shall indemnify the Company, its Manager(s) and the other Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any Transfer or purported Transfer in violation of this Section 4.3.

Section 4.4.     *Drag Along Rights.* If one or more Members holding at least a Majority Interest (the "Majority Owner(s)") proposes to Transfer in a bona fide transaction Units representing, in the aggregate, a majority of the total issued and outstanding Units of the Company to any Person who is not already a Member, and if such unrelated Person is willing to purchase all of such Units, then such Majority Owner(s) may, at least ten (10) days prior to the closing of the sale, give notice to the other Members (specifying the identity of the prospective purchaser, the proposed purchase price, the scheduled

-10-

date of the closing, and all other relevant material information), and the other Members shall also sell, simultaneously with the sale by the Majority Owner(s), all of their Units in the Company to the third party purchaser on the same terms and conditions as the Majority Owner(s), and as equitably adjusted to take into account Percentage Interests of the Members and Capital Account balances.

Section 4.5.    *Obligation to Sell Interest.*  Upon the occurrence of any Triggering Event listed below, the Member to which any of the specified events applies or his personal representative (the "Triggering Member"), as the case may be, shall immediately inform and provide notice to the Managers of the Triggering Event.  The Company shall have the option to purchase any or all of the Triggering Member's Units within fifteen (15) days after the Managers' receipt of the notice of such Triggering Event.  The purchase price for a Triggering Member's Units shall be based on the most recently calculated Offering Price for Units in the Company, as set forth in the Memorandum, which number shall be determined by the Managers in their sole and absolute discretion.  For purposes of this Section 4.5, a "Triggering Event" shall mean any of the following:

> (a)    the death or dissolution of Member;

> (b)    the occurrence of an Event of Bankruptcy with respect to such Member;

> (c)    if the Member is an individual, the divorce of such Member from his or her spouse, if such spouse thereby becomes the owner of or entitled to any part of the Membership Interest of the Member (in which event only the Membership Interest to which the spouse becomes entitled shall be subject to the option and obligations to purchase as provided in this Section 4.5); or

> (d)    any other involuntary Transfer, or any assertion of any other claim of primary title to the Membership Interest of such Member by any third party with whom such Membership Interest has been pledged or otherwise encumbered or who has any claim against the assets of a Member.

Such Triggering Member (or such Triggering Member's Personal Representative) hereby appoints the Managers as his, her or its true and lawful attorney-in-fact to take any and all actions, including, without limitation, signing all contracts, instruments, certificates, transfer forms, and all other documents, necessary or convenient, to effect transfer of such Membership Interest pursuant to this Section 4.5.

Section 4.6.    *Company Redemption Right.*  Notwithstanding any other provision contained herein to the contrary, the Company shall have the right, at the Managers' sole discretion, to redeem all or any portion of any Member's Units at any time upon thirty (30) days' prior written notice to the applicable Member(s) (the "Company Redemption Right").  In the event the Managers exercise the Company Redemption Right, the purchase price to be paid by the Company for the Member's(s') Units to be redeemed shall be based on the most recently calculated Offering Price for Units in the Company, as set forth in the Memorandum, which number shall be determined by the Managers in their sole and absolute discretion.  The purchase and sale of a Member's Units pursuant to the Company Redemption Right shall take place no later than forty-five (45) days from the date such Member receives written notice of the Company's intention to exercise the Company Redemption Right.

### ARTICLE V.
### MANAGEMENT OF THE COMPANY

Section 5.1.    *Management Generally.*  The power to make all decisions with regard to the management of the Company, unless otherwise specified, shall be vested exclusively in the Manager(s). The Manager(s) shall have all rights and powers under this Agreement, and under the Act, to do all things

A WMO 3144373 v7
2936727-000001

which are necessary or convenient to carry out the business and purposes of the Company. Unless authorized to do so by this Agreement or by the Manager(s), no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable peculiarly for any purpose.

**Section 5.2.**    *Tenure and Qualifications.*    The Company shall initially have two (2) Managers, who shall be **Jeffrey K. Boutwell** and **Ken Boutwell** (the "Initial Managers"). Each of the Initial Managers shall hold office until such Initial Manager's death, Disability, resignation pursuant to Section 5.10 or removal pursuant to Section 5.11 below. Upon an Initial Manager's death, Disability, resignation or removal, a successor Manager for such Initial Manager shall be appointed pursuant to Section 5.11 below. Managers need not be Members, individuals or residents of, or organized or incorporated under, the State of Florida.

**Section 5.3.**    *Actions by the Managers.*    All actions to be taken by the Managers under this agreement shall require the unanimous vote or consent of the Managers. In the event that there is not unanimous consent between the Managers, then the action or decision shall be determined by a Majority Vote or Majority Written Consent of the Members.

**Section 5.4.**    *Authority of the Managers.*    Except as otherwise expressly provided in this Agreement, the Managers shall have full, exclusive and complete discretion in the management of the Company and the power on behalf and in the name of the Company to take any action on behalf of the Company hereunder, to carry out any and all of the purposes of the Company set forth in Section 2.3, and to perform all acts and enter into and perform all contracts and other undertakings which it may deem necessary or advisable or incidental thereto, including, without limitation, the power to:

(a)    enter into, revise, amend or terminate any management agreement or other contract with the Company Asset Manager, or any successor party thereto, for the purpose of investing and managing certain of the assets of the Company;

(b)    acquire by purchase, lease, or otherwise, any real or personal property, tangible or intangible;

(c)    construct, operate, maintain, finance, and improve, and own, sell, convey, assign, mortgage, or lease any real estate and any personal property of the Company;

(d)    allocate the assets of the Company among various investments, to be selected in the sole and exclusive discretion of the Managers or the Company Asset Manager, in such proportions, utilizing such investment strategies and techniques, and in such number as shall be determined by the Managers or the Company Asset Manager;

(e)    open, maintain and close bank accounts and draw checks or other orders for the payment of moneys;

(f)    lend, with or without security, any of the funds or properties of the Company and, from time to time without limit as to amount, borrow or raise funds and secure the payment of obligations of the Company by mortgage upon, or pledge or hypothecation of, all or any part of the property of the Company;

(g)    do any and all acts on behalf of the Company, and exercise all rights of the Company, with respect to its interest in any person, firm, corporation, limited liability company, partnership or other entity, including without limitation the voting of Securities, participation in

-12-

arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters;

(h)    organize one or more corporations, limited liability companies, partnerships or any other entity to hold record title, as nominee for the Company, any assets of the Company;

(i)    act for and on behalf of the Company, and authorize any officer, employee or other agent of the Company to act in all matters incidental to the foregoing;

(j)    represent the Company and to make decisions affecting tax treatment of the Company;

(k)    exercise their discretion to waive for any Member any provision of this Agreement which imposes a requirement on a Member, whether it be for making an investment, withdrawing capital or otherwise, if and so long as such waiver does not adversely affect the rights of any other Member;

(l)    sell, dispose, trade, or exchange Company assets in the ordinary course of the Company's business;

(m)    enter into agreements and contracts and to give receipts, releases, and discharges;

(n)    purchase liability and other insurance to protect the Company's properties and business;

(o)    borrow money for and on behalf of the Company and, in connection therewith, execute and deliver instruments in furtherance thereof, including, but not limited to, notes, mortgages, assignments of rents, and security agreements;

(p)    execute or modify leases with respect to any part or all of the assets of the Company;

(q)    prepay, in whole or in part, refinance, amend, modify, or extend any mortgages or deeds of trust that may affect any asset of the Company and, in connection therewith, execute for and on behalf of the Company any extensions, renewals, or modifications of such mortgages or deeds of trust;

(r)    execute any and all other instruments and documents that may be necessary or in the Managers' opinion desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company;

(s)    make any and all expenditures that the Managers, in their discretion, deem necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities hereunder, including, without limitation, all legal, accounting, and other related expenses incurred in connection with the organization, financing, and operation of the Company;

(t)    make Distributions to Members;

(u)    enter into any kind of activity necessary to, in connection with, or incidental to the accomplishment of the purposes of the Company;

-13-

(v)     invest and reinvest Company Reserves in short-term instruments or money market funds;

(w)     enter into any contract or other arrangement with a Member or an Affiliate of a Member;

(x)     determine the value of each Unit based on market value of assets owned by the Company;

(y)     maintain for the conduct of Company affairs one or more offices and in connection therewith rent or acquire office space, engage personnel, whether part-time or full-time, and do such other acts as the Managers may deem necessary or advisable in connection with the maintenance and administration of such office or offices;

(z)     admit New Members to the Company or issue additional Units to one or more existing Members and the terms thereof; and

(aa)    engage attorneys, independent accountants, other investment advisers, management companies or such other persons as the Managers may deem necessary or advisable.

**Section 5.5.     *Reliance by Third Parties.***  Any lender, title company, purchaser, seller, co-tenant, or any other Person dealing with the Company may rely upon a certificate executed by any Manager as to (i) the existence or nonexistence of any fact or facts which constitute conditions precedent to acts by the Company that are related in any way to the business and affairs of the Company; (ii) the Persons who are authorized to execute and deliver any instrument or document of or on behalf of the Company; (iii) any act or failure to act by the Company; and (iv) any other matters related in any way to the Company or its assets and business.

**Section 5.6.     *Duty of Loyalty.***  It is intended that the Company's business and purpose be limited to that stated in Section 2.3 hereof. The Members acknowledge and agree that the pursuit of any business opportunity by any Manager outside of the Company's purpose shall not be deemed to be a Company opportunity, that engaging in any such outside activities are not competitive with the Company, and do not violate any duty of loyalty to the Company under the Act or at common law.  In furtherance thereof, it is expressly acknowledged that the Managers may and do have other business interests and may engage in other business activities in addition to those relating to the Company.  Neither the Company nor the Members shall have any right, by virtue of the formation or operation of the Company or this Agreement, to share or participate in such other investments or activities of the Manager or the income or proceeds derived therefrom.  The Managers shall incur no liability to the Company or to the Members as a result of engaging in any other business or venture.  The Managers may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including the ownership, operation, management, and syndication of businesses in the same line of business as the Company.  To the fullest extent permitted by the Act, the Members hereby waive, release and relinquish any claim that they have or may have against the Managers under any "partnership opportunity" doctrine, "corporate opportunity" doctrine, "limited liability company" doctrine, or any other legal or equitable principal of law arising with respect to or in connection with the pursuit of any such business opportunity by the Managers.  The Managers shall not be obligated to present any particular opportunity to the Company, even if such opportunity is of a character which, if presented to the Company, could be taken by the Company, and the Managers shall have the right to take for its own account or to recommend to others any such particular opportunity.  No decision or action taken by the Managers in reliance on the provisions of this Agreement shall be subject to review or challenge in any way or in any forum on the basis that it involved any breach of a duty of loyalty or similar fiduciary obligation.

-14-

Section 5.7. *Manager's Standard of Care*. The Managers' duty of care in the discharge of their duties for the Company is limited to refraining from engaging in conduct which a reasonable person would view as being opposed to the best interests of the Company. In discharging its duties, a Manager shall be fully protected in relying in good faith upon the records required to be maintained by the Company and upon such information, opinions, reports or statements by any of the Company's, Members, or agents, or by any other Person, as to matters the Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence or amount of assets from which Distributions to Members might properly be paid. The Managers shall devote only such time to the Company as they, in their sole discretion, shall deem to be necessary to manage and supervise the Company business.

Section 5.8. *Transactions with a Manager and its Affiliates*. The Company is authorized to enter into transactions, contracts, agreements, or arrangements with a Manager and its affiliates to the fullest extent permitted by the Act. A Manager and its affiliates shall be fully authorized to make loans to the Company on such terms as the Managers shall determine to be reasonable, and with such security as the Managers shall determine. If a Manager makes a loan to the Company, the Managers may require that the Company pay to the Manager all or any portion of the outstanding principal and interest due under the loan before making any Distributions or other payments to the Members.

Section 5.9. *Actions Requiring Member Consent*. Notwithstanding anything to the contrary contained in this Agreement, the Managers shall not undertake any of the following actions without first obtaining the Majority Vote or Majority Written Consent of the Members:

(a)     do any action in contravention of this Agreement;

(b)     possess Property of the Company or any of its Subsidiaries, or assign rights in specific Property of the Company or any of its subsidiaries, for other than Company purposes;

(c)     the conversion, merger, or consolidation of the Company with or into another Organization;

(d)     file a voluntary petition or otherwise initiate proceedings (i) to have the Company or any of its Subsidiaries adjudicated insolvent or, (ii) seeking an order for relief of the Company or any of its Subsidiaries as debtor under the United States Bankruptcy Code (11 U.S.C. § 101, *et seq*., as amended); file any petition seeking any composition, reorganization, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy laws or any other present or future applicable federal, state or other statute or law relative to bankruptcy, insolvency, or other relief for debtors with respect to the Company or any of its Subsidiaries; or seek the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of the Company or any of its Subsidiaries or of all or any substantial part of its Property, or make any general assignment for the benefit of creditors of the Company or any of its Subsidiaries, or admit in writing the inability of the Company or any of its Subsidiaries to pay its debts generally as they become due, or declare or effect a moratorium on the Company's or any of its Subsidiaries' debt or take any action in furtherance of any proscribed action; or

(e)     the dissolution, liquidation and winding up of the business of the Company pursuant to ARTICLE X.

-15-

**Section 5.10.     *Resignation.*** A Manager may resign as a Manager of the Company by delivering its written resignation to the Company at the Company's principal office.  Said resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the happening of some other event.

**Section 5.11.     *Removal.*** At a meeting called expressly for that purpose, a Manager may be removed by a Majority Vote of the Members in the event such Manager is adjudged guilty by a court of competent jurisdiction for any crime involving a felony, theft, embezzlement or moral turpitude, or if such Manager is adjudicated incompetent by a court of competent jurisdiction.  The removal of a Manager who is also a Member shall not affect such Manager's rights as a Member and shall not constitute a withdrawal of a Member.

**Section 5.12.     *Management Succession.*** Any vacancy occurring for any reason in the number of Managers of the Company may be filled by approval of the remaining Initial Manager then in office.  In the event, that there are no remaining Initial Managers, the Management Transition Committee shall appoint a successor Manager to fill any such vacancy.  Any successor Manager elected to fill a vacancy shall hold office until such Manager's death, Disability, resignation pursuant to <u>Section 5.10</u>, removal pursuant to <u>Section 5.11</u> or removal by a Super Majority Vote or Super Majority Written Consent of the Members.

**ARTICLE VI.**
**CAPITALIZATION OF THE COMPANY**

**Section 6.1.     *Initial Capital Contributions of Members.*** As of the Effective Date, each current Member has contributed cash to the Company in the form of a Capital Contribution in the amounts set forth in the books and records of the Company maintained by the Managers (the "<u>Initial Capital Contributions</u>").  Upon the request of a Member, the Managers shall provide a detailed report showing such Member's individual Initial Capital Contribution, number of Units owned, current Capital Account balance and current individual Percentage Interest in the Company.

**Section 6.2.     *No Required Additional Capital Contributions.*** Other than the Initial Capital Contributions, no Member shall be required to make any additional Capital Contributions to the Company.

**Section 6.3.     *Loans by Members*.** Upon the approval of the terms thereof by the Managers, any Member may make a secured or unsecured loan to the Company upon commercially reasonable terms. Loans by a Member to the Company shall not be considered Capital Contributions and the outstanding principal of which, as well as any accrued interest thereon, shall be paid prior to a Distributions to the Members by the Company pursuant to ARTICLE VIII below.

**ARTICLE VII.**
**ALLOCATIONS OF PROFITS AND LOSSES**

**Section 7.1.     *Taxation as a Partnership.*** The Members intend that the Company shall be taxed as a partnership for federal and state income tax purposes, and not as an association taxable as a corporation. The Managers shall cause the Company to file a federal income tax return and all other tax returns required to be filed by the Company for each Fiscal Year or part thereof, and shall provide to each Person who at any time during the Fiscal Year was a Member an annual statement (including a copy of Schedule K-1 to Internal Revenue Service Form 1065) indicating such Member's share of the Company's income, loss, gain, expense and other items relevant for federal income tax purposes.

-16-

        **Section 7.2.    *Tax Matters Partner.*** Live Oak Capital, LLC is hereby designated as the "Tax Matters Partner" of the Company. The Tax Matters Partner shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code. Any Member who is designated the Tax Matters Partner shall inform each other Member of all significant matters that may come to attention of the Tax Matters Partner in such capacity as Tax Matters Partner and shall forward to each other Member copies of all significant written communications received in that capacity. Any Member who is designated the Tax Matters Partner may not take any action contemplated by Sections 6222 through 6232 of the Code without the consent of the Managers, but this sentence does not authorize the Tax Matters Partner to take any action left to the determination of an individual partner under Sections 6222 through 6232 of the Code.

        **Section 7.3.    *Capital Accounts.*** A separate Capital Account shall be maintained for each Member in accordance with Section 1.704-1(b)(2)(iv) of the Regulations, and, to the extent not inconsistent therewith, to which the following provisions apply:

        (a)    To each Member's Capital Account there shall be credited: (i) the amount of money contributed by such Member to the Company (including liabilities of the Company assumed by such Member as provided in Section 1.704-1(b)(2)(iv)(c) of the Regulations); (ii) the Fair Market Value of any property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Profits and items of income and gain that are specially allocated.

        (b)    To each Member's Capital Account there shall be debited: (i) the amount of money distributed to such Member by the Company (including liabilities of such Member assumed by the Company as provided in Section 1.704-1(b)(2)(iv)(c) of the Regulations) other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the Fair Market Value of property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Losses or items of loss or deduction that are specifically allocated.

        (c)    In determining the amount of any liability, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Regulations.

        (d)    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-l(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations. If the Tax Matters Partner determines that it would be prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Member) are computed in order to comply with such Regulations, then such modification shall be made, provided that it is not likely to have a material effect on the amounts distributable to any Member upon the dissolution of the Company. The Tax Matters Partner also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Member and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-l(b)(2)(iv)(g) of the Regulations and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.

A WMO 3144373 v7
2936727-000001

**Section 7.4.** *Capital Account Treatment of Dispositions.* If a Member acquires all or part of the Membership Interest of another Member by Assignment, the Capital Account of the acquiring Member shall be credited and the Capital Account of the disposing Member shall be debited in an amount equal to that amount of the total Capital Account of the disposing Member which is proportionate to the Membership Interest involved in the Assignment.

**Section 7.5.** *No Obligation to Restore Capital Account Deficit Balance.* Except as required by law, a Member shall not be required to restore a deficit balance in such Member's Capital Account.

**Section 7.6.** *No Interest on Initial Capital Contributions or Retained Profits.* The Members shall not be entitled to interest on their respective Capital Contributions, and on any Profits retained by the Company.

**Section 7.7.** *Allocations of Profits and Losses.* Except as otherwise required by provisions of the Code and Regulations, the Profits or Losses of the Company shall be allocated among the Members in accordance with their Percentage Interests.

**Section 7.8.** *Additional Allocation Provisions.* The Managers, in consultation with the accountants for the Company, are authorized to make additional, future provision for allocations of Profits and Losses, consistent with the Code and Treasury Regulations, to be effective at any time on or after the Effective Date hereof, if the Company shall incur debt in connection with its business activities.

## ARTICLE VIII.
## DISTRIBUTIONS

**Section 8.1.** *Interim Distributions.* The Company shall make interim Distributions, whether regularly or specially, at such times and in such amounts as determined by the Managers, based on the Percentage Interest of each Member, and subject to the amount of the Company's Profits and any Reserves established by the Managers.

**Section 8.2.** *Distribution of Assets on Dissolution.* Upon the dissolution and winding up of the Company in accordance with ARTICLE X below, the Company's Property shall be liquidated and sold, and any Profits or Losses of the Company, and each item of income, gain, loss, deduction or credit entering into the computation thereof, and each item of income, gain, loss, deduction or credit which the Members are required to take into account separately under the provisions of the Code or Regulations, shall be allocated among the Members in accordance with Section 7.7. After such allocations, the liquidation proceeds shall be distributed: (a) first, to creditors, including, without limitation, Members who are creditors, to the extent permitted by law, in satisfaction of the Company's liabilities; (b) second, to the setting up of any Reserves which the Managers may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company or of the Members or of the Managers arising out of or in connection with the Company; (c) third, to the Members to discharge their positive capital accounts, after giving effect to the tax allocations set forth in Section 7.7, and (d) fourth, the balance to the Members in accordance with their respective Percentage Interests.

**Section 8.3.** *No Right to Capital.* No Member has a right to Distributions or to be repaid its capital except as provided in this Agreement.

**Section 8.4.** *No Mandatory Tax Distributions; Reserves.* Because the Company shall be taxed as a partnership for federal and state tax purposes, each Member hereby acknowledges that any Profits of the Company for each fiscal year shall be allocated to him, her or it, and that he, she or it shall bear any and all tax liability (including, without limitation, federal and state tax liability) for such

A WMO 3144373 v7
2936727-000001

allocated Profits, whether or not the Company makes Distributions to the Members in respect of such fiscal year. The Members acknowledge that the Company shall have no obligation to make Distributions to Members in order for the Members to satisfy any such tax liabilities, and may first apply any Profits to satisfy the Company's commitments or to establish sufficient reserves as determined by the Managers to be necessary or appropriate for working capital and other anticipated costs and expenses of the Company's business or any of its Subsidiaries' respective businesses (hereinafter, "Reserves").

## ARTICLE IX.
## RIGHTS OF MANAGERS AND OTHER INDEMNIFIED PERSONS

**Section 9.1.** *Liability of the Managers and Other Indemnified Persons*.

(a)    Whenever this Agreement or any other agreement contemplated hereby provides that the Managers or any of their respective affiliates are permitted or required to make a decision (x) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Managers, or such affiliate(s), shall be entitled to consider only such interests and factors as it desires and shall have no duty or obligation to give any consideration to any interest of or other factors affecting the Company or any Members, or (y) in their "good faith" or under another express standard, the Managers, or such affiliate(s), shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement, any other agreement contemplated hereby or applicable law or in equity or otherwise.

(b)    Neither the Managers nor any other Indemnified Person shall be liable for monetary damages or otherwise to the Company or any Members for any act or failure to act (including breach of any duty of care or any duty of loyalty) unless it is established (the Person asserting such liability having the burden of proof) that such action or failure to act constituted an act or omission undertaken with deliberate intent to cause injury to the Company, constituted actual fraud, or was undertaken with reckless disregard for the best interests of the Company. No Indemnified Person shall have any liability to the Company, Members or any Assignee for any action permitted by this Agreement.

(c)    To the extent that, at law or in equity, an Indemnified Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any Members, any such Indemnified Person, including a Manager, acting under this Agreement shall not be liable to the Company or to any Member for such Indemnified Person's good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of an Indemnified Person otherwise existing in law or in equity, are agreed by the Members to replace such other duties and liabilities of such Indemnified Person.

**Section 9.2.** *Other Matters Concerning the Managers*.

(a)    The Managers may rely upon and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)    A Manager may consult with legal counsel (including, but not limited to, counsel who may be regular counsel to, or an employee of, the Company, a Manager, or any affiliate thereof), accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it and any opinion of any such Person as to matters that such Manager reasonably believes to be within such Person's professional or expert competence shall be full and complete authorization and

-19-

protection in respect to any action taken or suffered or omitted by the Managers hereunder in good faith and in accordance with such opinion.

**Section 9.3.**     ***Indemnification Provisions***.

(a)     To the fullest extent permitted by law, each Indemnified Person shall be indemnified and held harmless by the Company from and against any and all Indemnity Expenses arising from any and all Indemnity Claims unless, with respect to the matter at issue, it is established that the Indemnified Person's action or failure to act constituted an act or omission undertaken with deliberate intent to cause injury to the Company, constituted actual fraud upon, or was undertaken with reckless disregard for the best interests of the Company. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that the Indemnified Person acted in a manner contrary to that specified above.

(b)     To the fullest extent permitted by law, all Indemnity Expenses incurred by an Indemnified Person in defending any Indemnity Claim shall, from time to time, be advanced by the Company prior to the final disposition of such Claim, upon receipt by the Company of an undertaking by or on behalf of the Indemnified Person to repay such amount if it shall be determined that such Person is not entitled to be indemnified as authorized in this Section 9.3.

(c)     The advancement of expenses and indemnification provided by this Section 9.3 shall be in addition to any other rights to which an Indemnified Person may be entitled under any agreement, as a matter of law or otherwise, shall continue as to an Indemnified Person who has ceased to serve in such capacity, and shall inure to the benefit of the heirs, successors, assigns, personal representatives, and administrators of such Indemnified Person.

(d)     The Company may purchase and maintain insurance on behalf of the Managers and such other Indemnified Persons as the Managers shall determine against any liability that may be asserted against, or expense that may be incurred by, such Person in connection with the Company's activities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.

(e)     Any indemnification hereunder shall be satisfied solely out of any insurance obtained by the Company or the assets of the Company.  In no event may an Indemnified Person subject the Members, Assignees, Managers, or any of them to personal liability by reason of indemnification hereunder.

(f)     An Indemnified Person shall not be denied indemnification in whole or in part under this Section 9.3 because the Indemnified Person had an interest in the transaction with respect to which the indemnification applied, if the transaction was otherwise permitted by the terms of this Agreement. The indemnification provided in this Section 9.3 is for the benefit of the Indemnified Persons and their respective heirs, successors, assigns, executors, and administrators, and shall not be deemed to create any right to indemnification for the benefit of any other Persons.

(g)     The provisions of this Section 9.3 are not intended to be exclusive.  The Managers may cause the Company to enter into an indemnification agreement with any Indemnified Person, or to adopt policies covering any group of Indemnified Persons on such terms as the Managers may determine in their sole discretion.

A WMO 3144373 v7
2936727-000001

## ARTICLE X.
## DISSOLUTION AND WINDING-UP OF THE COMPANY

**Section 10.1.    *Dissolution.*** The Company shall be dissolved, and its affairs shall be wound up on the first to occur of the following: (i) the termination of the legal existence of the last remaining Member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining Member in the Company unless the business of the Company is continued in a manner permitted by this Agreement or the Act, (ii) the entry of a decree of judicial dissolution of the Company pursuant to Section 605.0703 of the Act, or (iii) upon the approval of the Managers with the Majority Vote or Majority Written Consent of the Members. Upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a Member of the Company, to the fullest extent permitted by law, the Personal Representative of such Member is hereby authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such Member in the Company, agree in writing (i) to continue the Company, and (ii) to the admission of the Personal Representative or its nominee or designee, as the case may be, as a substitute Member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member of the Company in the Company.

(a)      Notwithstanding any other provision of this Agreement, the bankruptcy of any one of the Members shall not cause such Member to cease to be a Member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

(b)      Notwithstanding any other provision of this Agreement, each Member waives any right it might have to agree in writing to dissolve the Company upon the bankruptcy of any Member, or the occurrence of an event that causes any Member to cease to be a Member of the Company.

**Section 10.2.    *Winding-Up.*** In the event of the dissolution of the Company, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 605.0709 of the Act. Upon dissolution, the remaining Members may preserve the Company business or Property as a going concern for a reasonable time, prosecute and defend actions and proceedings, settle and close the Company's business, dispose of and transfer property, discharge the Company's liabilities, distribute the assets of the Company pursuant to the Act and provisions of this Agreement, file articles of dissolution pursuant to the Act, dispose of known claims against the Company, publish notice of dissolution pursuant to the procedures in the Act concerning unknown claims, and perform all other acts necessary, appropriate and incidental to the winding up of the Company's affairs. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of its liabilities pursuant to the Act, so as to enable the Members to minimize the normal losses attendant upon any liquidation.

**Section 10.3.    *Termination of Existence.*** The Company shall terminate its existence when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have been distributed to the Members in the manner provided for in this Agreement, and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act, by the filing of a Certificate of Dissolution.

A WMO 3144373 v7
2936727-000001

## ARTICLE XI.
## MEMBER RESTRICTIVE COVENANTS

**Section 11.1.**    *Restrictive Covenants*. Except in the event of the Company's dissolution or bankruptcy, or unless the Company, any of its Members, or any other Person deriving title to the business of the Company or any of its goodwill, ceases to carry-on a like business to the Company (which in such event the obligations of the Members pursuant to subsections (a), (b) and (c) of this Section 11.1 shall terminate), and **in addition** to any other obligations, restrictions and covenants contained herein, all of the Members hereby covenant and agree as follows:

(a)    *Agreement Not to Compete*. So long as he, she or it is a Member of the Company such Member shall not, whether directly or indirectly, own more than ten percent (10%) of the outstanding equity in, participate in the management of, consult with, render services for, or in any manner engage in or represent any business that competes with the Company Purpose within 50 miles of any of the Company's invested locations.  Nor shall any Member make any other investment that is in competition with the Company Purpose or an opportunity of the Company within the United States, as such business exists or is in the process of being formed or acquired.

(b)    *Non-Solicitation of Customers, Clients, et. al.* So long as he, she or it is a Member of the Company and for a period of two (2) years following the Transfer of all of such Member's Units in the Company (the "Restricted Period"), such Member shall not, directly or indirectly, without the prior written consent of the Managers, contact, solicit, divert, appropriate, or call upon any customer, client, business partner, supplier, asset seller or asset manager of the Company or the Company Asset Manager, including any prospective customer, client, business partner, supplier, asset seller or asset manager of the Company or the Company Asset Manager with whom the Member has had Material Contact within the last twelve (12) months prior to the Assignment, if the intention or purpose of such activity is either to: (i) sell or engage in products or services substantially similar to those products or services being sold or provided by the Company to such current or prospective customer, client, business partner, supplier, asset seller or asset manager, or any customer, client, business partner, supplier, asset seller or asset manager that the Company previously provided products or rendered service to or received revenue of any kind within the preceding twelve (12) months; or (ii) otherwise encourage any such customer, client, supplier, asset seller or asset manager to discontinue, reduce, or adversely alter the amount of its business with the Company. Each Member acknowledges that due to such Member's relationship with the Company, the Member may from time-to-time obtain access to and information relating to the Company's customers, clients, business partners, suppliers, asset sellers or asset managers, and that it would be unfair and harmful to the Company if the Member took advantage of these relationships in a competitive business.

For purposes of this Section 11.1(b), "Material Contact" shall exist if the Member (a) had actual regular communication with such customer, client, business partner, supplier, asset seller or asset manager of the Company with respect to the Company's business, whether in person, by telephone, mail, e-mail or other correspondence; (b) received compensation as a result of a communication or interaction with such Person, relating to the Company's business; or (c) obtained Confidential Information (as defined below) with respect to such customer, client, business partner, supplier, asset seller or asset manager in the ordinary course of business as a result of the Member's association with the Company.

(c)    *Non- Piracy of Employees, Independent Contractors, Business Partners and Consultants*. At any time during the Restricted Period, such Member shall not, directly or indirectly: (i) solicit for employment, recruit or hire (or attempt to solicit, recruit or hire) or otherwise assist anyone in soliciting for employment, recruiting or hiring any employee, independent contractor, business partner or

-22-

consultant of the Company or the Company Asset Manager who was employed by or performed work for the Company or the Company Asset Manager within the last twelve (12) months and with whom the Member had Material Contact or (ii) otherwise encourage, solicit, or support any such employee, independent contractor or consultant to terminate his or her employment, contractual or business relationship with Company.

For purposes of this Section 11.1(c), "Material Contact" shall exist if the Member (a) supervised the Person or was supervised by the Person; or (b) if the Member worked with or interacted with the Person or Entity with regard to the Company Purpose.

(d)      *Duty Not-to-Disclose Trade Secrets and Confidential Information*. The Members acknowledge that, from time to time, they may receive information from or regarding the Company or its customers or clients in the nature of Trade Secrets (as defined below) or other confidential or proprietary business information, including, without limitation, periodic reports from management, files, records, policies, plans, documents, programs, concepts, referral source lists, client lists methods, techniques, devises, compilations, pricing information, financial data, financial plans, investment strategies or development data of the Company, or any other confidential information concerning the business, customers, clients, former or current employees, methods, operations, financing or services of the Company, the release of which may be damaging to the Company or Persons with which it does business (the "Confidential Information"). Each Member shall hold in strict confidence while they are a Member of the Company and for a period of five (5) years thereafter, any such information he, she or it receives regarding the Company or any of its customers, clients, business partners, suppliers, asset sellers or asset managers that is Confidential Information or, in the case of Trade Secrets, so long such information remains a Trade Secret, and may not disclose it to any Person other than another Member, except for disclosures: (i) compelled by law (but the Member must notify the Managers promptly of any request for that information, before disclosing it if practicable); (ii) of information that the Member also has received from a source independent of the Company that the Member reasonably believes was obtained without breach of any obligation of confidentiality; or (iii) to a Person already subject to an obligation of confidentiality to the Company or the affected customer or client, who or which demonstrates a compelling need to know such Confidential Information for the best interests of the Company or the affected customer or client. As used herein, the term "Trade Secret(s)" shall have the meaning set forth in the Florida Uniform Trade Secrets Act, Fla. Stat. Ann. § 688.002, *et seq.*, as amended, or as otherwise defined by Florida law.

(e)      *Non-Disparagement of Company*. At any time during the Restricted Period, such Member will not disparage, or cause to be disparaged through any other party, the Company, its Affiliates, Managers, Members, the Company Asset Manager, officers, agents or employees. For purposes of this section, "disparage" includes any communication, whether written or oral, in any form or media, that might be regarded by a reasonable recipient as disparaging or critical of the Company, including, but not limited to, negative references to the Company's or any of its Affiliates' services, corporate policy, Managers, Members, the Company Asset Manager, officers, agents and/or employees or such Persons' professionalism, ethics, honesty or personal integrity, or which would negatively affect the reputation or business of the Company, its Affiliates, Managers, Members, the Company Asset Manager, officers, employees or employees.

**Section 11.2.      *Breach of Restrictive Covenants***. In the event a Member breaches any of the covenants or restrictions contained in Section 11.1 above, the Company may immediately initiate legal proceedings or take some other action against the Member, without notice. Should the Company or a Member bring any litigation or action against the other to enforce or interpret the terms of this ARTICLE

-23-

XI or seek monetary damages hereunder, then the party prevailing in such action or litigation shall be entitled to reasonable attorneys' fees associated with such litigation or action.

**Section 11.3.** *Redemption Right and Terms of Breach of Restrictive Covenants.* At the Managers' sole discretion, any Member that breaches any of the covenants or restrictions contained in Section 11.1 above, may be required to sell such Member's Units to the Company upon thirty (30) days' written notice from the Company. If this option is elected by Managers, the purchase price to be paid for such Member's Units shall be based on the most recently calculated Offering Price for Units in the Company, as set forth in the Memorandum, which number shall be determined by the Managers in their sole and absolute discretion. The terms for this purchase may be any combination of cash or a promissory note from the Company that will amortize over five (5) years at an interest rate of the prime rate of interest (as reported by the *Wall Street Journal*) plus 3.00%, paid in monthly installments until paid in full.

**Section 11.4.** *Interpretation of Restrictive Covenants and Acknowledgement of Irreparable Harm.* The Members acknowledge and agree that the Company has developed its relationships with its customers, clients, business partners, suppliers, asset sellers, asset managers, employees, independent contractors and consultants and substantial goodwill over an extended period of time and at a substantial investment of time and money. The Company's business is based largely upon the personal and professional relationships developed by the Company, its Managers, the Company Asset Manager, its officers, employees, contractors and agents. The Members agree that most of these relationships have developed into permanent or near permanent relationships. As a result, it is agreed that the appropriate protections must be put in place to safeguard against the erosion of the foregoing relationships. Therefore, it is agreed that all of covenants contained in Section 11.1 above are reasonable in light thereof and shall be treated as covenants in connection with the sale of a business interest. It is further agreed that any breach, in whole or in part, of the covenants contained within Section 11.1 will result in immediate and irreparable harm and continuing damages to the Company and its business for which monetary damages may be inadequate, difficult to compute, or both. As such, the Company shall be entitled, if any such breach shall occur or be threatened or attempted, to a decree of specific performance and to a temporary and permanent injunction enjoining such breach, and to seek any and all other remedies to which the Company may be entitled, without posting bond or furnishing other security and without proving special damages or irreparable injury.

**Section 11.5.** *Severability.* If any provision of this ARTICLE XI is found by a court to be invalid or unenforceable for any reason, including, without limitation, the scope or the duration thereof, such provision shall be construed and/or reduced or reformulated by the court (or by the parties, if the court refuses to do so) in such a way as to make it valid and enforceable to the maximum extent possible. Any invalidity or unenforceability of any provision of this ARTICLE XI shall attach only to such provision and shall not affect or render invalid or unenforceable any other provisions of this ARTICLE XI, this Agreement or any other agreement or instrument.

**Section 11.6.** *Survival of Representations, Warranties, Covenants and Obligations.* Notwithstanding anything to the contrary expressed in this Agreement, the representations, warranties, covenants and obligations of the Members contained in this ARTICLE XI shall continue without regard to any termination or expiration of this Agreement.

A WMO 3144373 v7
2936727-000001

## ARTICLE XII.
## ARBITRATION OF DISPUTES

**Section 12.1.**   *Binding Arbitration*.   Any Dispute that cannot be resolved by the Disputing Parties shall be resolved solely by binding arbitration in Tallahassee, Florida, in accordance with the then prevailing rules of the Association, as modified by the provisions of this ARTICLE XII, in lieu of judicial proceedings.  Any arbitration hereunder shall be commenced by Dispute Notice from one Disputing Party to the other, and must be commenced no later than the date when any judicial action upon the same matter would be barred by any applicable statute of limitations.  The Members specifically acknowledge and agree that this Agreement and the businesses to be conducted by the Company all evidence transactions "involving commerce" under the Federal Arbitration Act, 9 U.S.C.A. §§ 1-14, and hereby waive and relinquish any right to claim otherwise.

**Section 12.2.**   *Selection of Arbitrators*.   Any arbitration hereunder shall be conducted by a panel of three (3) Arbitrators, selected as follows:

(a)    each Arbitrator must be an individual having no interest in the outcome of the Dispute, and no affiliation of business relationship with either of the Disputing Parties;

(b)    a Manager shall be entitled to select one of the Arbitrators;

(c)    a second Arbitrator shall be selected by the other Disputing Party; and

(d)    the third Arbitrator shall be selected by the Association.  If any Disputing Party fails to select its Arbitrator within ten (10) days after the Dispute Notice, then the Association, and not the Person or Persons who have failed to make such a selection, shall designate the remaining Arbitrator or Arbitrators.

**Section 12.3.**   *Decision of Arbitrators.*   All decisions of the arbitrators shall be made by the approval of at least two (2) of the three (3) Arbitrators.

**Section 12.4.**   *Available Discovery*.   Each Disputing Party to the arbitration shall have the right to request and obtain document production in accordance with the Federal Rules of Civil Procedure at any time within the first thirty (30) days after the date of the Dispute Notice, and the right, in accordance with such rules, to compel document production pursuant to any such request made within such time.  The Arbitrators shall have sole and absolute discretion to resolve all issues which may arise with respect to any such production requests and to determine whether additional discovery is necessary or appropriate.

**Section 12.5.**   *Identification of Claims*.   Any Dispute may be comprised of multiple, separate claims which, although generally related, involve separate and distinguishable issues of fact or law.  Each Disputing Party shall have the right, through notice to the Arbitrators and to the other Disputing Party given not later than ten (10) days before the Hearing Date, to identify the separate claims which that Disputing Party has determined to be part of the Dispute.  Claims may not be mutually inconsistent in the manner permitted in pleadings in civil litigation.

**Section 12.6.**   *Delivery of Final Proposals*.   Not less than three (3) business days before the Hearing Date, each Disputing Party shall submit to the Arbitrators and other Disputing Party its final proposal to resolve each claim.  A final proposal must state a sum certain for each claim involving payment of a liquidated sum, and must set forth a specific and detailed proposal for each claim that does not involve the payment of a liquidated sum.

-25-

**Section 12.7.** *Resolution of Claims*.  The Arbitrators shall have sole and absolute discretion to ascertain the number and nature of separate claims which comprise the Dispute.  The Arbitrators shall have the power, to combine claims which they determine to be indistinguishable as a matter of fact or law.  The Arbitrators shall resolve each claim by approving the final proposal of a particular Disputing Party with respect to such claim, and shall have no authority to compromise between the various final proposals with respect to any particular claim.

**Section 12.8.** *Arbitration Costs*.  The Disputing Party whose final proposal is approved shall be entitled to recover its costs incurred with respect to the arbitration of the claim related to such final proposal, and this amount shall be included in the Arbitrators' award.  If a Disputing Party prevails with respect to some claims and loses as to others, the Arbitrators shall allocate the costs of the arbitration among the claims.  If a Manager does not prevail with respect to any or all separate claims, the Company shall pay all costs or/and expenses in connection therewith unless it is determined that, with respect to the matter in dispute, the Manager's act or failure to act constituted an act or omission undertaken with deliberate intent to cause injury to the Company, constituted actual fraud by such Manager, or was undertaken with reckless disregard for the best interests of the Company, in which event such Manager shall pay such costs and expenses.

**Section 12.9.** *Entry of Judgment*.  At any time within one (1) year after the Arbitrators' award, any party to the arbitration may apply to the United States District Court for the Northern District of Florida, Tallahassee Division, or to the local state courts located in Leon County, State of Florida, for a judgment to be entered upon such award, and the court shall grant an order confirming the award unless the award is vacated, modified or corrected as described in Section 12.10 below.

**Section 12.10.** *Vacation or Modification*.  Any court of competent jurisdiction may make an order vacating the Arbitrators' award, upon the application of any Disputing Party made within ninety (90) days of the award, where (i) the award was procured by corruption, fraud or undue means; (ii) there was evident partiality or corruption by the Arbitrators; or (iii) the Arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the Dispute.  Any court of competent jurisdiction may make an order modifying or correcting the Arbitrators' award, upon the application of any Disputing Party made within ninety (90) days after the date of the award, where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing or property referred to in the award.

**Section 12.11.** *Equitable Relief*.   Anything in this ARTICLE XII to the contrary notwithstanding, the Managers shall have the right, without resorting to arbitration, to seek a restraining order, injunction or other equitable relief in connection with the enforcement of the restrictions on Assignment contained in this Agreement.  The Managers shall have the unrestricted right to seek such equitable relief in a court of competent jurisdiction in Leon County, State of Florida.  In such event, the court shall have the power only to grant such equitable relief as may be necessary to enforce the Assignment restrictions, and all other aspects of the Dispute shall be subject to the foregoing provisions of this ARTICLE XII.

### ARTICLE XIII.
### MISCELLANEOUS PROVISIONS

**Section 13.1.** *Notices*. Company statements, reports and income tax returns may be mailed to Members by regular first-class mail.  All other Notices under this Agreement shall be in writing, duly signed by the party giving the same, and shall be deemed given when delivered in accordance with Section 1.1(pp) herein.

**Section 13.2.    *Binding Effect*.** This Agreement shall be binding upon all the parties hereto, and their respective heirs, executors, administrators, successors and assigns. Subject to the restrictions on Assignment contained herein, this Agreement shall inure to the benefit of the respective heirs, executors, administrators, successors and assigns of the parties hereto.

**Section 13.3.    *Severability*.** If any provision of this Agreement, or the application thereof to any party or circumstance, shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to any Person or circumstance other than that which is determined to be invalid or unenforceable, shall not be affected thereby. Each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

**Section 13.4.    *Identification*.** Throughout this Agreement, wherever the context so permits, the masculine gender shall be deemed to include the feminine and vice-versa, and both shall be deemed to include the neuter and vice-versa, and the singular shall be deemed to include the plural and vice-versa.

**Section 13.5.    *Amendments to Agreement*.** The Managers may, without the consent or approval of any Member or Assignee, amend this Agreement at any time, and from time to time, for the purposes of (i) correcting any error, ambiguity, or omission; (ii) adding to the duties or obligations of, or surrendering any rights or powers granted to, the Managers; (iii) making any change that the Managers, in their sole discretion, determine (A) does not adversely affect the Members in any material respect, (B) is necessary or desirable to satisfy any requirements, conditions, or guidelines contained in any opinion, directive, order, ruling, or regulation of any federal, state, or other agency, or contained in any federal, state, or local statute or ordinance, or (C) is required to effect the intent of any of the provisions of this Agreement, or (D) is required to satisfy any requirements of the Code and of the Treasury Regulations with respect to the Company, or any requirements of federal or state securities laws, in which case such amendment shall, unless otherwise specified, have retroactive effect to the date of this Agreement. Additional amendments not covered by the preceding sentence may be proposed by the Managers, through Notice to the Members, and shall become effective upon the approval of a Majority Vote or the Majority Written Consent of the Members.

**Section 13.6.    *Entire Agreement*.** This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof.

**Section 13.7.    *Further Assurances*.** Each Member (and Assignee, if any) hereby agrees to execute and deliver such further documents and to cooperate in taking such further action as may be necessary or appropriate to effect this Agreement or any provision hereof.

**Section 13.8.    *Authority*.** Each Person executing this Agreement on behalf of another Person represents and warrants that he is authorized to do so, that such execution and the performance of this Agreement do not violate any agreement or restriction to which such party is subject and that this Agreement constitutes a legally binding obligation of such party.

**Section 13.9.    *Execution in Counterparts; Facsimile and Electronic Signatures*.** This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. Facsimile and electronic executions and deliveries shall have the full force and effect of original signatures.

A WMO 3144373 v7
2936727-000001

Section 13.10. *Captions*.  Titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and shall in no way define, limit, extend or describe the scope or intent of this Agreement or of any provision hereof.

Section 13.11. *Execution of Additional Instruments.*  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney, documents, and other instruments necessary to effectuate the purposes of this Agreement or comply with all applicable laws, rules or regulations.

Section 13.12. *Power of Attorney.*  Each Member hereby irrevocably makes, constitutes and appoints the Managers, with full power of substitution, so long as the Managers are acting in such a capacity (and any successor Manager(s) thereof so long as such Manager(s) is/are acting in such capacity), its true and lawful attorney, in such Member's name, place and stead (it is expressly understood and intended that the grant of such power of attorney is coupled with an interest) to make, execute, sign, acknowledge, swear and file with respect to the Company:

(a)     this Agreement and all amendments hereto, adopted in accordance with the terms hereof;

(b)     all documents which are necessary to effect the dissolution and termination of the Company;

(c)     all such other instruments, documents and certificates which may from time to time be required by the laws of the State of Florida or any other jurisdiction in which the Company shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement, continue and defend the valid existence of the Company; and

(d)     all instruments, documents and certificates which are necessary in connection with a reorganization which has been authorized in accordance with the terms of this Agreement.

(e)     all instruments, documents, and certificates which are necessary to transfer such Member's Units in accordance with the terms of this Agreement.

This power of attorney shall not be affected by and shall survive the bankruptcy, insolvency, death, incompetency, or dissolution of a Member and shall survive the delivery of any assignment by the Member of the whole or any portion of his or her Units. Each Member hereby releases the Managers from any liability or claim in connection with the exercise of the authority granted pursuant to this power of attorney, and in connection with any other action taken by the Managers pursuant to which such Managers purport to act as the attorney-in-fact for one or more Members, if the Managers believed in good faith that such action taken was consistent with the authority granted to it pursuant to this Section 13.12.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK. SIGNATURES APPEAR ON FOLLOWING PAGE.]

A WMO 3144373 v7
2936727-000001

IN WITNESS WHEREOF, this Amended and Restated Operating Agreement of Vineyard Capital Partners, L.L.C. has been adopted and executed, under seal, by the Managers of the Company and those Members holding at least a two-thirds majority (66 $^2/_3$) of the Membership Interests in the Company, as of the Effective Date set forth above.

**COMPANY**:

**VINEYARD CAPITAL PARTNERS, L.L.C.,**
a Florida limited liability company.

By: _____
      Print Name: Jeffrey K. Boutwell
      Title: Manager

By: _____
      Print Name: Ken Boutwell
      Title: Manager

                                    (COMPANY SEAL)

**MEMBERS**:

**LIVE OAK CAPITAL, LLC**, a
Florida limited liability company.

By: _____
      Print Name: Ken Boutwell
      Title: Manager

                                    (COMPANY SEAL)

(62% Membership Interest Holder)

Sign: _____ (SEAL)
         Jeffrey K. Boutwell, Individually.

(3% Membership Interest Holder)

Sign: _____ (SEAL)
         Jerry Gluesenkamp, Individually.

(7% Membership Interest Holder)

-29-