# EXHIBIT G

Fulton County Superior Court
***EFILED***KJ
Date: 6/20/2023 5:14 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| PAUL HAARER, | |
| *Plaintiff,* | CIVIL ACTION FILE |
| v. | NO.: 2023CV378125 |
| VINEYARD CAPITAL PARTNERS, L.L.C. and PINNACLE FUNERAL SERVICE, LLC, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS

Plaintiff Paul Haarer ("Plaintiff") submits his Response (the "Response") in Opposition to Defendants Vineyard Capital Partners, L.L.C.'s ("Vineyard") and Pinnacle Funeral Service, LLC's ("Pinnacle," Pinnacle and Vineyard, collectively, the "Defendants") Motion to Compel Arbitration and Dismiss and Memorandum of Law in Support (the "Motion").

### I.  Introduction.

In an attempt to inconvenience and dissuade Plaintiff from pursuing his legitimate claims against Defendants in this Court, Defendants ask the Court to agree with their incorrect and overbroad reading of an arbitration provision that appears in Vineyard's Operating Agreement. Defendants ask the Court to require all of Plaintiff's claims to be arbitrated, even though none of those claims are ones "arising under" or are "in connection with" the Operating Agreement, as required by the express language of the arbitration provision.

Relevant to this Response, Plaintiff filed a First Amended Complaint ("Amended Complaint") to add claims under the Age Discrimination in Employment Act ("ADEA"). Plaintiff had to wait to add these claims until 60 days after submitting charges to the Equal Employment

Opportunity Commission ("EEOC") pursuant to law.[1]   Under no circumstances are such discrimination claims subject to the Operating Agreement's arbitration provision.

The Amended Complaint also makes crystal clear that *none* of Plaintiff's claims "arise under" or are "connected with" the Operating Agreement.  Instead, Plaintiff's Amended Complaint brings three sets of claims.  <u>First</u>, Plaintiff brings claims relating to the 15% equity Plaintiff is owed in Pinnacle as part of his compensation as the former Pinnacle CEO.  His employment with Pinnacle was governed by an employment agreement that did *not* contain an arbitration provision. The Pinnacle employment agreement was a completely separate agreement from Vineyard's Operating Agreement.  <u>Second</u>, Plaintiff brings claims relating to a repurchase agreement, under which Vineyard was to repurchase Plaintiff's outstanding Vineyard shares.  This, again, was a standalone agreement that did not arise under or relate to the Operating Agreement either.  <u>Third</u>, as mentioned, Plaintiff brings claims relating to age discrimination he faced as a Pinnacle employee.  The ADEA claims have no connection with Vineyard's Operating Agreement.  In sum, neither the Operating Agreement nor its terms are mentioned or relied upon anywhere in the original or the Amended Complaint, other than to clarify that none of Plaintiff's claims rely on such Operating Agreement.  The caselaw is clear that in such circumstances, there can be no legitimate argument that the claims "arise under" or are "connected with" the Operating Agreement, meaning its arbitration provision is wholly inapplicable.

The only reason Defendants can even attempt to argue that Plaintiff is bound by the Operating Agreement, and thus its arbitration provision, is because Vineyard is, in essence, holding Plaintiff hostage by refusing to buy his membership units back under a standalone agreement.

---

[1] Though Defendants' Motion relates to the original Complaint, before adding such ADEA claims, Plaintiff was required to wait 60 days after submitting its EEOC charges pursuant to 29 U.S.C. § 626(d)(1).

Vineyard members are only bound to the Operating Agreement via the membership units that they hold in Vineyard.  Plaintiff tried to sell his remaining units by accepting Vineyard's offer to repurchase his remaining shares, but Vineyard has reneged on its offer to repurchase them. Vineyard cannot simultaneously demand that Plaintiff comply with Vineyard's Operating Agreement's arbitration provision and refuse to allow him to give up his membership in Vineyard. For all these reasons, the Court should deny the Motion in its entirety.

## II.   Relevant Facts.

### A.   Plaintiff Signs the 2014 Employment Agreement and Becomes Pinnacle's CEO.

When he was hired by Pinnacle as its CEO, Plaintiff executed an employment agreement with Defendants (the "2014 Employment Agreement").  (Am. Compl. ¶ 22).  Between 2014 and May of 2022, the 2014 Employment Agreement was consistently renewed by Plaintiff and Defendants after its initial expiration.  (*Id.* ¶ 30).  It has since expired.  (*See id.* ¶¶ 53, 56).

### B.   The Equity Agreement.

Plaintiff's base salary as Pinnacle's CEO was relatively small given his position because a substantial portion of his compensation was tied to a 15% equity stake in Pinnacle to which Defendants and Plaintiff agreed (the "Equity Agreement").  (*Id.* ¶ 28).  Although the Equity Agreement was not expressly detailed in the 2014 Employment Agreement, it was documented repeatedly in conversations and emails from Defendants.  (*Id.* ¶ 37).  Further, Plaintiff received payments equivalent to his 15% stake in Pinnacle when Pinnacle issued equity realization payments to itself and Plaintiff.  (*Id.* ¶ 38).  The Amended Complaint includes many examples of Defendants recognizing Plaintiff's equity interest in Pinnacle.  (*See id.* ¶¶ 42–50).

These many acts and writings evidence the formation and continued existence of the Equity Agreement throughout Plaintiff's employment, as well as Defendants' continued acknowledgment

of the same.  (*Id.* ¶ 50).  Plaintiff, relying on Defendants' repeated and consistent representations concerning the Equity Agreement, worked tirelessly to grow Pinnacle.  (*Id.* ¶ 51).

### C.     Plaintiff Becomes a Member of Vineyard and Subject to its Operating Agreement.

Plaintiff joined Vineyard as a member on or about January 16, 2015, via a Joinder Agreement.  (Defendants' Memorandum of Law in Support ("Memo.") at Ex. 2).  Pursuant to the Joinder Agreement, Plaintiff became "a party in all respects to the [Vineyard] Operating Agreement."  (*Id.*).  The Operating Agreement contains an arbitration provision (the "Arbitration Provision"), which states the following:

> Any *Dispute* that cannot be resolved by the Disputing Parties shall be resolved solely by binding arbitration in Tallahassee, Florida, in accordance with the then prevailing rules of the Association, as modified by the provisions of this ARTICLE XII, in lieu of judicial proceedings. Any arbitration hereunder shall be commenced by Dispute Notice from one Disputing Party to the other, and must be commenced no later than the date when any judicial action upon the same matter would be barred by any applicable statute of limitations. The Members specifically acknowledge and agree that this Agreement and the businesses to be conducted by the Company all evidence transactions "involving commerce" under the Federal Arbitration Act, 9 U.S.C.A. §§ 1-14, and hereby waive and relinquish any right to claim otherwise.

(*Id.*, Ex. 3 § 12.1) (emphasis added)).

"Dispute" is defined as: "any controversy or claim between; (i) any Member (or Assignee) and the Managers, (ii) any Member (or Assignee) and the Company, or (iii) any Manager and the Company, *arising under or in connection with this Agreement*."  (*Id.* § 1.1(u)) (emphasis added)).

### D.     The Repurchase Offer and Plaintiff's Acceptance of the Same.

On July 27, 2022, Vineyard sent its investors, including Plaintiff, an Investor Report that included an express offer from Vineyard to repurchase Vineyard membership units ("Units") from investors, as well as a notice that Vineyard would accept new investment funds from investors. (Am. Compl. ¶ 60).  The Investor Report made no mention of the Operating Agreement or that

such agreement was triggered by the offer.  (*See id.* ¶¶ 60–61, Ex. I).  Instead, the Investor Report included an offer to buy back Units for a fixed price (the "Repurchase Offer"), stating: "**To provide investors with liquidity, we are offering to repurchase up to 10,000 equity units at the current value of \$[] per unit.  This offer expires September 30, 2022, so please contact us before then if you wish to sell any of your units.**"  (*Id.* ¶ 61, Ex. I (emphasis added)).

The Investor Report directed interested investors to contact Tamra Crews, Vineyard's Director of Treasury and Investor Relations, concerning the Repurchase Offer.  (*Id.* ¶ 62).  On September 28, 2022, two (2) days before the Repurchase Offer expired, Plaintiff formally accepted that offer via an email to Director Crews, in accordance with the directions provided by the Investor Report.  (*Id.* ¶ 63).  This acceptance created the "Repurchase Agreement."  (*Id.* ¶ 140).  In his September 28, 2022 email to Director Crews, Plaintiff specifically stated that he accepted the offer to sell all his remaining Vineyard Units at the proposed rate per Unit.  (*Id.* ¶ 64).

On September 30, 2022, Plaintiff emailed Director Crews and Jeff Boutwell, Vineyard's Founder and Managing Partner, providing them with the certificate numbers for his remaining Vineyard Units.  (*Id.* ¶ 65).  Plaintiff further asked for clarification about when he could expect payment for those Units.  (*Id.*).  Later that day, Jeff Boutwell responded to Plaintiff's September 30, 2022 email, stating that, "We received your request prior to Sept 30, as requested in the investor report.  I'll get back to first [sic] of next week on the redemption."  (*Id.* ¶ 66, Ex. J).

### E.    Plaintiff's Termination and This Lawsuit.

Despite Vineyard's express offer to repurchase Units and Plaintiff's express acceptance of the same, Vineyard not only refused to repurchase his Units, but fired him instead.  (*See id.* ¶¶ 67–69). Vineyard purportedly fired Plaintiff for accepting the Repurchase Offer, which Vineyard claimed would unsettle investors if they found out that Pinnacle's CEO wished to redeem all of his

remaining Vineyard Units.  (*Id.* ¶ 68).  Plaintiff strongly believes that this excuse for Plaintiff's termination was pretext, and that the real reason Plaintiff was fired was due to his age.  (*Id.* ¶ 82).  Over the years, Defendants repeatedly made comments regarding Plaintiff's age, indicating that his advancing years made him unsuitable for the job as Pinnacle's CEO.  (*See id.*).  Unsurprisingly, Defendants replaced Plaintiff with a much younger man after firing Plaintiff.  (*Id.* ¶ 77).

Since his termination, Defendants have not recognized his equity interest in Pinnacle under the Equity Agreement.  (*Id.* ¶¶ 73, 106).  Nor has Vineyard repurchased Plaintiff's Units in accordance with the Repurchase Agreement, despite demands that it do so.  (*Id.* ¶¶ 67, 144).  The refusal to repurchase Plaintiff's Units also means that, despite his attempt to relinquish his membership interest in Vineyard by selling his Units, Vineyard has forced him to remain a Vineyard member—and thus to be subject to the Operating Agreement's Arbitration Provision—by refusing to repurchase his Units.

For all these reasons, Plaintiff had no choice but to file this lawsuit.  The lawsuit consists of claims for: Breach of the Equity Agreement (against Defendants); Unjust Enrichment as to the Equity Agreement (against Defendants); Promissory Estoppel as to the Equity Agreement (against Defendants); Quantum Meruit as to the Equity Agreement (against Defendants); Fraudulent Misrepresentation as to the Equity Agreement (against Defendants); Breach of the Repurchase Agreement (against Vineyard); Fraudulent Misrepresentation as to the Repurchase Agreement (against Vineyard[2]); Discriminatory Termination in Violation of the ADEA (against Defendants); Retaliatory Assertion of Counterclaims in Violation of the ADEA (against Defendants); Punitive

---

[2] Though the original Complaint initially indicated that this claim was against Pinnacle and Vineyard, the Amended Complaint clarifies that Plaintiff brings this claim against Vineyard only. (*See* Am. Compl. ¶¶ 146–52).

Damages (against Defendants); and Expenses of Litigation Pursuant to O.C.G.A. § 13-6-11 (against Defendants).  (*Id.* ¶¶ 99–181).

On March 28, 2023, the same day that Plaintiff initiated this lawsuit, he also filed Charges of Discrimination against Defendants with the EEOC, alleging that Defendants violated the ADEA by terminating his employment because of his age.  (*Id.* ¶ 11).

On May 8, 2023, Defendants brought counterclaims for Breach of Contract and Implied Covenant of Good Faith and Fair Dealing; Money Had and Received; Breach of Fiduciary Duty; and Punitive Damages.  (*See* Answer and Counterclaims).  In essence, Defendants claim that Plaintiff violated the 2014 Employment Agreement by allegedly mismanaging Pinnacle and, as Pinnacle's Managing Member, breaching his fiduciary duty to Defendants by overpaying Pinnacle distributions for his own benefit.  (*Id.*).  On June 7, 2023, Plaintiff filed an Answer denying Defendants' allegations and asserting various affirmative defenses.  (*See* Answer to Defs.' Counterclaims).

Now, Defendants' Motion seeks to force Plaintiff to litigate this case via arbitration in Florida.  (*See generally* Mot.).  This is despite the fact that *none* of Plaintiff's claims, nor Defendants' counterclaims, arise under or are connected with the Operating Agreement, which is the only agreement at issue that contains an arbitration provision.  The Motion is a clear attempt to force Plaintiff to arbitrate in a forum that Defendants know is inconvenient for Plaintiff and, thereby, discourage him from pursuing his legitimate claims against Defendants.  Because, *inter alia*, neither the allegations in Plaintiff's original nor those in the Amended Complaint rely on the Operating Agreement, Plaintiff's claims at issue are not covered by the Operating Agreement's Arbitration Provision.  (*See* Compl. and Am. Compl.).  As a result, this Court should deny the Motion and allow this case to proceed in this Court.

### III.    Argument and Citations to Authority.

### A.    General Law Regarding Arbitration.

"Under both Georgia and federal law, [a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Yates v. CACV of Colorado*, *LLC*, 303 Ga. App. 425, 430 (2010); *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999) ("[N]o party may be forced to submit a dispute to arbitration that the party did not intend and agree to arbitrate.").  The U.S. Supreme Court has held that, in determining whether a party agreed to submit to arbitration falling under the purview of the Federal Arbitration Act, there must be "clear and unmistakable" evidence that the party agreed to do so.  *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–49 (1995).  The threshold question of whether parties to a contract agreed to arbitrate a dispute is normally a matter for a court, rather than an arbitrator, to decide.  *Panhandle Fire Prot., Inc. v. Batson Cook Co.*, 288 Ga. App. 194, 197 (2007); *see also First Options of Chicago*, 514 U.S. at 944–947.

### B.    The Parties Did Not Agree to Arbitrate Plaintiff's Claims.

As an initial matter, Plaintiff does not contest Defendants' assertion that the Operating Agreement is governed by the Federal Arbitration Act (the "FAA").  And because the Operating Agreement states that Florida law shall govern "interpretation" of the Operating Agreement, including its Arbitration Provision, Plaintiff, like Defendants, cites to Florida law for the purpose of interpreting the arbitration provision only.  (Memo Ex. 3 at § 2.1); *DIRECTV, Inc. v. Imburgia*, 577 U.S. 47, 54 (2015) (discussing the FAA and noting that "the interpretation of a contract is ordinarily a matter of state law to which we defer"); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) (In FAA context, "interpretation of an arbitration agreement is generally a matter of state law"); *First Options of Chicago*, 514 U.S. at 944–49 ("When deciding whether

the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."); *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009) ("'[S]tate law' . . . is applicable to determine which contracts are binding" and enforceable under the FAA.); *Am. Exp. Fin. Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 940 (11th Cir. 1997) (same as *First Options*); *Salinas v. Atlanta Gas Light Co.*, 347 Ga. App. 480, 482–83 (2018) ("As for the governing law," while the FAA may apply to the arbitration provision and arbitration itself, "nothing in the FAA 'purports to alter background principles of state contract law regarding the scope of agreements.").[3]

Here, the parties to this lawsuit did not agree to arbitrate the claims at issue in this case because Plaintiff's claims do not fall within the meaning of an arbitrable "Dispute" in the Operating Agreement's Arbitration Provision. The Arbitration Provision is clear that Plaintiff's claims are not "Disputes" requiring arbitration. "Disputes" requiring arbitration under the Operating Agreement are defined as "any controversy or claim between; (i) any Member (or Assignee) and the Managers, (ii) any Member (or Assignee) and [Vineyard], or (iii) any Manager and [Vineyard], *arising under or in connection with [the Operating Agreement]*." (Memo., Ex. 3 § 1.1(u)) (emphasis added)). According to the seminal Florida case on interpreting similar arbitration provision language, "not every dispute that arises between contracting parties should be subject to arbitration." *Seifert*, 750 So. 2d at 638. "[T]he mere fact that the dispute would not have arisen but for the existence of the contract and consequent relationship between the parties is insufficient by itself to transform a dispute into one 'arising out of or relating to' the agreement." *Id.* If "the factual allegations in the complaint do not rely on the contract" containing the arbitration

---

[3] By referring to Florida law, Plaintiff in no way concedes that he is bringing a claim in this case under or connected with the Operating Agreement or that the claims should be arbitrated in Florida.

provision," the claims are not encompassed by such provision. *Id.* at 641 (stating that, even where an arbitration provision is broad, a "dispute does not create [the necessary] 'significant relationship' to the contract [containing the arbitration provision if] none of the allegations in the complaint refer to or mention" such agreement).

Although Plaintiff is a member of, and asserts claims against, Vineyard, those claims neither arise under nor are connected with Vineyard's Operating Agreement such that the Arbitration Provision would be triggered. More specifically, Plaintiff's claims center around the Equity Agreement, the Repurchase Agreement, age discrimination, and retaliation under the ADEA. They have nothing to do with the Operating Agreement, and neither the original nor the Amended Complaint rely on the Operating Agreement or its terms. Below is analysis of each type of claim Plaintiff has brought and why such claims do not fall into the Arbitration Provision's scope.

### i.        Pinnacle Cannot Enforce the Arbitration Agreement.

First, Pinnacle cannot enforce the Arbitration Provision because, as explained in detail below, the Arbitration Provision does not apply to any of Plaintiff's claims. Even if it did, Pinnacle is not a party to the Operating Agreement that contains such provision and thus cannot enforce it. The FAA does not "alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)." *Arthur Andersen LLP,* 556 U.S. at 630. Under both Florida and Georgia law, Pinnacle cannot enforce the operating agreement. In Georgia, only "the party who has the right to complain about the contract being broken" can bring a claim to enforce the contract. *Norton v. Budget Rent A Car Sys., Inc.*, 307 Ga. App. 501, 502 (2010). Here, Pinnacle is not a party to the Operating Agreement and thus cannot seek to enforce it. Similarly, in Florida,

> "Non-parties to a contract containing an arbitration clause cannot compel parties to
> a contract to arbitrate unless it is determined that they are a third party beneficiary
> to the contract." . . . "A third party is an intended beneficiary, and thus able to sue
> on a contract, only if the parties to the contract intended to primarily and directly
> benefit the third party.". . . "[I]n order to find the requisite intent, it must be shown
> that *both* contracting parties intended to benefit the third party. It is insufficient to
> show that only one party unilaterally intended to benefit the third party." . . .
> "Florida law looks to 'nature or terms of a contract' to find the parties' clear or
> manifest intent that it 'be for the benefit of a third party.'". . . Furthermore, Florida
> law holds that "the language used in a contract is the best evidence of the intent and
> meaning of the parties."

*Fla. Power & Light Co. v. Rd. Rock, Inc.*, 920 So. 2d 201, 203 (Fla. Dist. Ct. App. 2006); *see also*

*Berger v. Welsh*, 326 Ga. App. 290, 294 (2014) ("Under any arguably applicable law, to enforce a

contract, a third-party beneficiary must be the intended, not incidental, beneficiary."). Further,

just because a contracting entity wholly owns a non-contracting entity does mean that the non-

contracting entity is a beneficiary of the contract at issue. *Fla. Power & Light Co.*, 920 So. 2d

at 203. Here, there is no indication in the Operating Agreement that it is meant to benefit Pinnacle,

even if Vineyard owns Pinnacle. Pinnacle is mentioned nowhere in the Operating Agreement, nor

does the Operating Agreement provide that entities owned by, or related to, Vineyard may invoke

the Arbitration Provision. (*See generally* Memo., Ex. 3).

Additionally, Defendants' argument that Plaintiff is relying on the Operating Agreement's

terms in asserting claims against Pinnacle (Memo. at 8) such that Pinnacle can enforce the

Arbitration Provision has no merit. It may be true that a non-party to a contract containing an

arbitration provision can enforce such provision where a plaintiff's claims link the non-party to

the contract and the plaintiff's claims depend on such contract. However, the very case Defendants

cite states:

> [R]eliance on the contract in this context requires that "a party must actually depend
> on the underlying contract to assert its claims." . . . Thus, for this exception to apply,
> "the claim ... must, at a minimum, raise some issue the resolution of which requires
> reference to or construction of some portion of the contract itself."

*Allscripts Healthcare Sols., Inc. v. Pain Clinic of Nw. Fla., Inc.*, 158 So. 3d 644, 647 (Fla. Dist. Ct. App. 2014).   As already explained, none of Plaintiff's claims rely on the Operating Agreement's terms, and the Amended Complaint makes no reference to the Operating Agreement or its terms in support of his claims.

Finally, Defendants argue that because Plaintiff asserted that Vineyard is an alter ego of Pinnacle, Pinnacle can seek to enforce Vineyard's Operating Agreement. (Mot. at 8); (Am. Compl. ¶ 21).  First, Plaintiff does not claim that Pinnacle acts as Vineyard's alter ego, but vice versa, and Vineyard should not be allowed to benefit from its abuse of the corporate form where nothing in the Operating Agreement indicated that its application would extend to unnamed third parties such as Pinnacle.  Second, the alter-ego argument fails because such argument does not apply where a plaintiff did not rely on the contract containing the arbitration provision in asserting his claims. *Allscripts Healthcare Sols., Inc.*, 158 So. 3d at 647 (noting in deciphering an arbitration provision and enforcement by a non-party that "[b]ecause [plaintiff's] claims do not arise out of the [agreement containing arbitration provision], [cases about the alter-ego theory] are inapposite."). Again, as explained in further detail below, Plaintiff does not bring any claims arising under or connected with the Operating Agreement, and neither the original nor Amended Complaint relies whatsoever on the same.  Thus, the alter-ego theory does not allow Pinnacle to enforce the arbitration provision.

### ii.       The Arbitration Provision Does Not Encompass the Equity Agreement Claims.

The Equity Agreement claims do not "arise under" the Operating Agreement, nor are they "connected with" it.  "To 'arise out of' an agreement to arbitrate, a claim must have a direct relationship to a contract's terms and provisions or 'relate to' the subject contract." *Club Mediterranee, S.A. v. Fitzpatrick*, 162 So. 3d 251, 253 (Fla. Dist. Ct. App. 2015) (internal citations

– 12 –

and quotations omitted).  In a case cited by the Florida District Court of Appeals, the Eleventh Circuit clarified: "The term 'arising out of' is broad, but it is not all encompassing. In construing that same term to determine whether a dispute arises out of a contract, we have explained that the focus is on 'whether the tort or breach in question was an immediate, foreseeable result of the performance of contractual duties.'" *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011).  Where "factual allegations of the complaint" "do not rely in any respect on the . . . agreement" containing an arbitration provision, the claims do not "arise out of" such agreement. *Club Mediterranee, S.A.*, 162 So. 3d at 253.

Here, Defendants' breach of the Equity Agreement was by no means an "immediate, foreseeable result of the performance of" contractual duties under the Operating Agreement.  The Equity Agreement was between Plaintiff and Defendants regarding his employment with Pinnacle and resultant compensation.  It is in an agreement that Plaintiff would receive 15% equity in Pinnacle in connection with his employment.  In fact, Defendants characterize Plaintiff's Equity Agreement claims as relating to the Pinnacle 2014 Employment Agreement, not the Operating Agreement.  (Memo. at 9 ("Defendants either (a) breached Paragraph 3 of the [2014] Employment Agreement or (b) breached an amendment to Paragraph 3 of the [2014] Employment Agreement via an oral contract whereunder Plaintiff's compensation structure was reconsidered.")).  The 2014 Employment Agreement, though expired, did not contain an arbitration provision.  (Memo. Ex. 1, § 24).  On the other hand, the Operating Agreement is by and among Vineyard and its members regarding the operation of Vineyard and the rights and duties of its managers and members.  Defendants' failure to recognize Plaintiff's 15% equity interest in Pinnacle has nothing to do with contractual duties in the Operating Agreement.  Likewise, none of the allegations in the original or Amended Complaint rely on, or even mention, the Operating Agreement.  Thus, the Equity

– 13 –

Agreement claims do not "arise under" the Operating Agreement.

Likewise, the Equity Agreement claims are not "connected with" the Operating Agreement. The phrase "'[c]onnected with' also connotes the necessity of some direct connection; if it did not, the term would be meaningless." *Doe*, 657 F.3d at 1219. Again, there is no direct connection between the Operating Agreement and the Equity Agreement. The Equity Agreement arose out of Plaintiff's employment with Pinnacle and had nothing to do with Plaintiff's status as a member of Vineyard.

Finally, where a party "could have engaged in . . . [the alleged] conduct even in the absence of any contractual . . . relationship with [the other]," then related claims do not "arise out of" and are not "connected with" the contract containing the arbitration provision. *Doe*, 657 F.3d at 1219. Here, Defendants could have breached their obligation under the Equity Agreement in the absence of the Operating Agreement. Plaintiff's membership in Vineyard was a completely separate transaction from the Equity Agreement. Thus, the Operating Agreement's Arbitration Provision does not require the Equity Agreement claims to be arbitrated.

      **iii.**      **The Arbitration Provision Does Not Encompass the Repurchase Agreement Claims.**

Likewise, the Repurchase Agreement claims neither "arise under" nor are they "connected with" the Operating Agreement. The Repurchase Agreement was a new contract formed by Vineyard's offer to repurchase investors' shares for a certain price in July of 2022 and Plaintiff's acceptance of that offer. Defendants appear to argue that the Repurchase Agreement "arises under" and/or is "connected with" the Operating Agreement merely because Section 4.1 of the Operating Agreement allows Vineyard to repurchase members' units, and the Repurchase Agreement was an offer to repurchase units. (Memo. at 9). This argument is unavailing.

"[T]he mere fact that the [Repurchase Agreement claims] would not have arisen but for the

existence of the [Operating Agreement] and consequent relationship between [Vineyard and Plaintiff] is insufficient by itself to transform a dispute into one 'arising out of or relating to' the agreement." *Seifert*, 750 So. 2d at 638.  For a "claim to be considered 'arising out of or relating to' an agreement, it must, at a minimum, raise some issue the resolution of which requires *reference to or construction of some portion of the contract* itself."  *Id.* (emphasis added).  Here, again, neither the Operating Agreement nor its terms are mentioned in the Amended Complaint in relation to any claim, let alone the Repurchase Agreement claims.  Thus, such claims are not covered by the Arbitration Provision.  *Club Mediterranee, S.A.*, 162 So. 3d at 253.

Further, the breach of the Repurchase Agreement was not an "immediate, foreseeable result of the performance of contractual duties" of Vineyard or Plaintiff under the Operating Agreement. *Doe*, 657 F.3d at 1218–19.  Section 4.1 does not impose an *obligation* on Vineyard to repurchase shares, so there is no *duty* created by the Operating Agreement.  And Plaintiff does not claim that a duty arising under the Operating Agreement was breached.

Finally, the only reason that Plaintiff is arguably bound by the Operating Agreement is because Vineyard has refused to repurchase his remaining Units pursuant to the Repurchase Agreement.  If Vineyard had repurchased Plaintiff's remaining Units as offered (and accepted), Plaintiff would no longer be bound by the Operating Agreement because he would no longer be a member of Vineyard.  Vineyard should not be permitted to demand that Plaintiff comply with the Arbitration Provision to which he would not be bound if Vineyard had honored its own offer, as it was obligated to do.[4]

---

[4] To the extent that the Court concludes that it must, as a threshold matter, determine whether Vineyard was required to repurchase the Units, the Court (and not the arbitrator) must make that interpretation under Georgia law.  *See Bryan Cty. v. Yates Paving & Grading Co., Inc.*, 281 Ga. 361, 362–63 (2006).

### iv.    The Arbitration Provision Does Not Encompass the Age Discrimination Claims.

Plaintiff's age-discrimination claims are clearly not subject to the Arbitration Provision. The Amended Complaint now asserts claims under the ADEA for Discriminatory Termination and Retaliatory Assertion of Counterclaims.  Defendants filed their Motion before Plaintiff amended the Complaint to add age-discrimination claims, but if Defendants eventually argue that the discrimination claims are covered by the Arbitration Provision, any such argument would be meritless. *Saunders v. St. Cloud 192 Pet Doc Hosp., LLC*, 224 So. 3d 336, 339 (Fla. Dist. Ct. App. 2017) (arbitration of harassment claims not required even though employment agreement that contained a "zero tolerance policy regarding workplace harassment" included an arbitration provision).

Where discrimination claims "as pled in the complaint, do not allege that [a defendant's] conduct violated the [agreement containing the arbitration provision], nor are [the] claims based on the terms of [such agreement]", the plaintiff is not bound by the arbitration provision. *Navarro v. Varela*, 345 So. 3d 365, 368 (Fla. Dist. Ct. App. 2022).  Similarly, where a plaintiff's discrimination claims "do not require reference to or construction of the" agreement containing the arbitration provision, such provision is inapplicable to the claims. *Id*. at 368.  And, where a plaintiff "alleges [a defendant] violated [an act], which imposes legal duties on an employer regardless of the existence of a contract, and committed [discriminatory acts]," a contract's arbitration provision does not apply. *Id*.

Here, Plaintiff does not allege that Defendants' discriminatory acts violated the Operating Agreement, nor do those refer to, or turn on the interpretation or application of, the Operating Agreement's terms.  Rather, the discrimination claims are provided for, and governed solely by,

the ADEA, which imposes legal duties on Defendants regardless of the existence of any contract. Thus, because there can be no legitimate argument that Plaintiff's ADEA claims arise under, or are connected with, the Operating Agreement, those claims are not arbitrable.

### C. Even if the Court decides that Plaintiff's Claims Should Be Arbitrated, the Court should not Dismiss the Case.

Even if the Court decides that all of Plaintiff's claims should be sent to arbitration (they should not), dismissal of this case is not required.  In fact, if the Court decides that arbitration is necessary for all of the claims, Plaintiff hereby requests that the Court stay this case pending arbitration instead of dismissing it.  Under federal law, Section 3 of the Federal Arbitration Act (FAA) entitles litigants to a stay of any action that is "referable to arbitration under an agreement in writing." *Arthur Andersen LLP*, 556 U.S. at 625.  The same applies in Georgia.  *Krut v. Whitecap Hous. Grp., LLC*, 268 Ga. App. 436, 443 (2004) ("[T]he court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement (emphasis added)).  Thus, the Court should stay (not dismiss) this case if it refers all of the claims to arbitration.

Relatedly, if the Court finds that some of Plaintiff's claims require arbitration while others do not, Plaintiff requests that the claims not sent to arbitration remain pending in this court so that the case as to those remaining claims can proceed here.  *Krut*, 268 Ga. App. at 443 ("When faced with an action containing both arbitrable and nonarbitrable issues, the federal courts have allowed both to continue in bifurcated proceedings . . . Following the lead of the federal courts in applying the FAA, we conclude that the trial court was not required to stay proceedings apart [from the arbitrable claim.]").  And if Defendants argue that all of Plaintiff's claims should be arbitrated to avoid inefficiency or bifurcated proceedings, the Court should not take such arguments into

consideration. *Krut*, 268 Ga. App. at 443 (considerations of inefficiency, duplicative cases, and bifurcated cases not appropriate in determining arbitrability).

Finally, the cases Defendants cite do not require that this Court dismiss this lawsuit if the Court determines that the claims are arbitrable in whole or in part, and the cases certainly do not require that the Court dismiss this case with prejudice. *See, e.g.*, *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195–97 (11th Cir. 2008) ("[T]he FAA requires a court to either stay *or* dismiss a lawsuit"; "If the . . . [contract] covers these types of . . . disputes, however, the prosecution of [the party's] law suit should be *stayed* pending arbitration.") (emphasis added); *de la Riva v. Suntrust Bank*, No. 21-24412-CIV, 2022 WL 3681998, at *8 (S.D. Fla. Apr. 14, 2022) ("[W]hen all of the issues in the matter are subject to arbitration, the district court has discretion to dismiss" or stay a case); *Colon v. Wells Fargo Bank, N.A.*, No. 1:14-CV-346-ODE, 2014 WL 12360936, at *1 (N.D. Ga. Sept. 16, 2014) (dismissing case *without* prejudice). Thus, even if the Court finds that all of Plaintiff's claims are arbitrable (they are not), it should stay this case instead of dismissing it.

## IV.    Conclusion.

For the reasons stated above, Plaintiff respectfully requests that the Court deny Defendants' Motion in its entirety. Alternatively, if the Court finds that some but not all of Plaintiff's claims should be arbitrated, Plaintiff hereby requests that the Court stay the case as to the arbitrable claims and allow the remaining claims to move forward in this Court. If the Court finds that all of Plaintiff's claims should be arbitrated, Plaintiff requests that this case be stayed (not dismissed) pending arbitration.

Respectfully submitted, this 20th day of June 2023.

*/s/ Richard L. Robbins*
Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com

Catherine C. Sullivan
Georgia Bar No. 957620
csullivan@robbinsfirm.com
Michael D. Forrest
Georgia Bar No. 974300
mforrest@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3255

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS** using the Court's eFile system, which will automatically send electronic notice of such filing to all counsel of record.  I have also e-mailed a copy of the above to Defendants' counsel of record.

Respectfully submitted, this 20th day of June 2023.

*/s/ Richard L. Robbins*
Richard L. Robbins