# EXHIBIT H

Fulton County Superior Court
***EFILED***AC
Date: 6/20/2023 5:07 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

PAUL HAARER,

     *Plaintiff,*

v.

VINEYARD CAPITAL PARTNERS,
L.L.C. and PINNACLE FUNERAL
SERVICE, LLC,

     *Defendants.*

Civil Action File

No: 2023CV378125

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT FOR DAMAGES

Pursuant to O.C.G.A. § 9-11-15(a), Plaintiff Paul Haarer ("Haarer" or "Plaintiff") files this First Amended Complaint against Defendants Pinnacle Funeral Service, LLC ("Pinnacle") and Vineyard Capital Partners, L.L.C. ("Vineyard"; Vineyard and Pinnacle each a "Defendant" and collectively, "Defendants"), alleging as follows:

### I.    INTRODUCTION AND SUMMARY OF CLAIMS

As first detailed in Plaintiff's Original Complaint, this case involves the bad-faith failure of Defendants to live up to their contractual and legal obligations to Plaintiff, despite Plaintiff's successful tenure as Pinnacle's Chief Operating Officer ("CEO"). With Plaintiff at its helm for almost the past decade, Pinnacle grew dramatically in size and profitability, to Defendants' considerable benefit. To encourage Plaintiff's efforts to grow Pinnacle—and, consequently, to substantially

enrich Vineyard, Pinnacle's parent company—Defendants granted Plaintiff a fifteen percent (15%) equity stake in Pinnacle in approximately 2014.   Between 2015 and 2022, Defendants continually represented to Plaintiff not only the existence of his equity in Pinnacle, but they also made payments to him in accordance with specific equity valuations Defendants repeatedly provided to him.

Notwithstanding Plaintiff's successful run as Pinnacle's CEO, Vineyard and/or Pinnacle's management became increasingly hostile towards him.   The relationship deteriorated to such a degree that, in approximately May of 2022, Vineyard unilaterally reduced Plaintiff's compensation by roughly 70%.

Shortly thereafter, in approximately July 2022, Vineyard sent an email to its investors, including Plaintiff, offering to buy back Vineyard membership units ("Units") for a fixed price (the "Repurchase Offer"), so long as acceptance of the Repurchase Offer was made by September 30, 2022.   In compliance with the Repurchase Offer and without reservation, Plaintiff accepted Vineyard's Repurchase Offer on or about September 28, 2022, with respect to all of his remaining Units (the "Repurchase Agreement").

However, rather than honor its contractual obligations triggered by Plaintiff's timely acceptance of the Repurchase Offer, Vineyard then reneged on its offer to purchase Plaintiff's Units.   Adding insult to injury, Defendants fired Plaintiff on September 30, 2022, allegedly for accepting the Repurchase Offer.

However, repeated ageist comments directed at Plaintiff—who at all relevant times was well over 40 years old—by Vineyard's management, coupled with Defendants' unwarranted decision to renege on the Repurchase Agreement—show that Defendants terminated his employment because of discriminatory animus based on his age.  Such comments included, as a non-exhaustive example, a statement to Plaintiff by a Vineyard manager that the business acquisitions that Plaintiff was primarily concerned with from 2020 onward were "for the younger kids," or words to that effect.  Additionally, Plaintiff was immediately replaced as Pinnacle's CEO by a person who was younger than 40 years old, further showing that Defendants willfully terminated Plaintiff because of his age.

Following Plaintiff's termination, Defendants have refused to acknowledge his 15% equity stake in Pinnacle, and Vineyard has continued to refuse to honor the terms of the Repurchase Agreement.  Plaintiff has also suffered substantial lost pay since he was discriminatorily terminated.

Plaintiff asserts claims for breaches of contract, unjust enrichment, promissory estoppel, *quantum meruit*, and fraudulent misrepresentations.  Plaintiff seeks compensatory damages, punitive damages pursuant to O.C.G.A. § 51-12-5.1, interest, and attorneys' fees and costs pursuant to O.C.G.A. § 13-6-11.

In addition, Plaintiff now asserts claims for discriminatory termination and retaliation pursuant to the Age Discrimination in Employment Act of 1967,

29 U.S.C. §§ 621 *et seq.* (the "ADEA").  Plaintiff seeks a declaratory judgment, an award of back pay and front pay, liquidated damages, and attorneys' fees and costs on his ADEA claims.

## II.   THE PARTIES

### 1.

Plaintiff Paul Haarer is an individual resident of Fulton County, Georgia, and resides at 545 Williston Way, Alpharetta, Georgia 30005.  At all times relevant to this First Amended Complaint, Plaintiff was over 40 years old.

### 2.

At all relevant times, Plaintiff was an "employee" of Vineyard and Pinnacle within the meaning of the ADEA.

### 3.

Defendant Pinnacle Funeral Service, LLC is a Georgia limited liability company with its Principal Office Address at 7742 Spalding Drive #353, Norcross, Georgia 30092.  Pinnacle may be served by service on its registered agent, C T Corporation System, at 289 South Culver Street, Lawrenceville, Georgia 30046.

### 4.

Defendant Vineyard Capital Partners, L.L.C. is a Florida limited liability company with its principal address listed as 3320 Thomasville Rd, Suite 200 Tallahassee, FL 32308.  Vineyard may be served by service on its registered agent,

Tamra Crews, at 190 Ryan Lane, Covington, Georgia 30014.

5.

On information and belief, Vineyard also employs individuals who work for it from locations in Fulton County, Georgia. As non-exhaustive examples, and on information and belief:

- Vineyard's Human Resources Manager, Rebecca Sekowski, works for Vineyard out of her Fulton County home located at 5345 Hillgate Crossing, Alpharetta, Georgia 30005;

- Todd Reich, who works on business development for Vineyard, works for Vineyard out of his Fulton County home located at 1218 Defoor Court NW, Atlanta, Georgia 30318; and

- Jeff Boutwell, Vineyard's Founder and Managing Partner, regularly works for Vineyard out of his condo in Fulton County located at 1010 Peachtree Street NE, Atlanta, Georgia 30309.

6.

At all relevant times, Vineyard and Pinnacle were each an "employer" within the meaning of the ADEA.

7.

At all relevant times, Defendants employed Plaintiff, singly and/or jointly, for the purposes of the ADEA.

### III.   JURISDICTION AND VENUE

8.

Jurisdiction and venue are proper in this Court with respect to Pinnacle pursuant to O.C.G.A. §§ 14-11-1108(b) and 14-2-510(b) because its Principal Office Address is in Fulton County, Georgia.

9.

Jurisdiction and venue are proper in this Court with respect to Vineyard pursuant to O.C.G.A. §§ 9-10-91, 14-11-1108, and 14-2-510(b) because: (a) Vineyard has offices in Fulton County, where the contracts in dispute were made or were to be performed, and where Vineyard transacts substantial business; and (b) Vineyard transacts substantial business in Fulton County, Georgia, where a substantial portion of the tortious conduct complained of herein occurred.

10.

The Court has concurrent jurisdiction over Plaintiff's federal ADEA claims.

### IV.   ADMINISTRATIVE EXHAUSTION

11.

On March 28, 2023, Plaintiff filed Charges of Discrimination against Pinnacle and Vineyard with the Equal Employment Opportunity Commission (Charge Nos. 410-2023-05738 and 410-2023-05739, respectively), in which he asserted a claim for discriminatory termination under the ADEA.

12.

Plaintiff filed his Charges of Discrimination within 180 days following his termination, which occurred on September 30, 2022.

13.

More than 60 days having elapsed since Plaintiff filed his Charges of Discrimination with respect to his age discrimination claim, and thus Plaintiff has exhausted his administrative remedies for the purposes of the ADEA pursuant to 29 U.S.C. § 626(d)(1).

14.

This Court has jurisdiction over Plaintiff's ADEA retaliation claim because it could reasonably be expected to grow out of his Charges of Discrimination.

## V.    <u>FACTUAL ALLEGATIONS</u>

**A.    Mr. Haarer Served as CEO for Pinnacle for Many Years, Creating Significant Shareholder Value.**

15.

Vineyard is a private equity investment company that advertises itself as providing growth capital to businesses with which it partners.

16.

On information and belief and according to its website, Vineyard manages more than $230 million in assets.

17.

On the "News" section of its website, Vineyard repeatedly highlights its numerous awards as one of the top private equity firms in Atlanta, at least as far back as 2017.  A highlighted copy of such section is attached hereto as **Exhibit A.**

18.

Jeff Boutwell is Vineyard's Founder and Managing Partner.  His father, Ken Boutwell, is Vineyard's Managing Partner of Investor Relations.

19.

On or about June 1, 2014, Defendants hired Plaintiff to be the CEO of Pinnacle, one of Vineyard's portfolio companies.

20.

Pinnacle is a funeral home acquisition and management firm.

21.

Vineyard was and remains the parent company of Pinnacle.  It also acts as its agent and alter ego, steering everything from growth strategies, bank financing, certain hiring and firing decisions, and tax filings.

22.

When he was hired by Pinnacle, Plaintiff executed an employment agreement with Pinnacle (the "2014 Employment Agreement").   The 2014 Employment Agreement is attached hereto as **Exhibit B.**

23.

The 2014 Employment Agreement did not contain an arbitration provision, and it did not refer to or incorporate by reference the arbitration provisions of Vineyard's 2016 operating agreement (the "Operating Agreement") when it was initially executed or subsequently renewed by the Plaintiff and Defendants.

24.

Rather, the 2014 Employment Agreement expressly provided "that the Superior Court of Fulton County, Georgia shall be a proper venue for any disputes concerning this Agreement or any transactions between the parties relating to the performance of this Agreement or the parties' respective obligations to each other, and the parties stipulate and consent to the venue and jurisdiction of such Court for the resolution or determination of such disputes."

25.

Although Plaintiff was ostensibly an employee of Pinnacle, Vineyard dictated the terms of the 2014 Employment Agreement.  Further, Vineyard closely controlled Pinnacle and regularly dictated Plaintiff's goals as Pinnacle's CEO.

26.

In fact, Pinnacle did not have a Board of Directors throughout Plaintiff's employment.  Instead, Vineyard effectively functioned as Pinnacle's Board, providing direction and oversight of Pinnacle.

27.

In negotiating the 2014 Employment Agreement, Vineyard tied Plaintiff's compensation to Pinnacle's equity value.

28.

Plaintiff's base salary was relatively small given his position as CEO because a substantial portion of his compensation was tied to a 15% equity stake in Pinnacle that Vineyard offered him and Plaintiff accepted (the "Equity Agreement").

29.

The 2014 Employment Agreement additionally provided that Vineyard "will grant Haarer options to purchase 400 units annually of [Vineyard] ownership at a fixed price of $███ per unit." The first 400 units were eligible for purchase effective June 1, 2014.

30.

Between 2014 and May 2022, the Employment Agreement was consistently renewed by Plaintiff and Defendants after its initial expiration.

31.

At the time that Plaintiff began running Pinnacle, it was a break-even business. However, Plaintiff soon began closing and selling underperforming Pinnacle locations and replacing them by purchasing and building lucrative locations in Georgia and other states across the country. It is believed that Pinnacle represented

Vineyard's largest equity investment, and during Plaintiff's tenure as CEO, the value of the units increased from $██ to $██[1].

32.

Between 2014 and 2022, Pinnacle achieved unprecedented success. Its revenues increased by tens of millions of dollars, and it was named one of Georgia's Fast 40 by ACG Atlanta, meaning it was one of the top 40 fastest growing companies in 2022. By 2022, it had become a well-recognized, leading company in the funeral industry.

33.

In 2020, Vineyard wanted to spur Pinnacle's acquisition of new business locations, which was a core part of Pinnacle's success under Plaintiff.

34.

As a result, Vineyard's Managing Partner, Jeff Boutwell, told Plaintiff in 2020 that Vineyard and NewBridge Group, Inc. ("NewBridge," Vineyard's affiliate business development team) would pay substantial acquisition bonuses. In accordance with Mr. Boutwell's representations, Plaintiff received a business acquisition bonus after acquiring a Chicago entity.

---

[1] As with the Original Complaint, and out of an abundance of caution, Plaintiff is redacting certain potentially confidential business information for Defendants' benefit and intends to file and move to seal the unredacted version of this First Amended Complaint.

35.

Notwithstanding Plaintiff's success in acquiring business, both before and after Vineyard's 2020 directive to Plaintiff, Vineyard and/or Pinnacle managers made repeated comments evidencing age based discriminatory animus at least in connection with Plaintiff's ability to acquire business.

36.

As a non-exhaustive example, on or about October 8, 2021, Jeff Boutwell stated to Plaintiff that the acquisition role—which role was a core function of Plaintiff's role as Pinnacle's CEO—was "for the younger kids," or words to that effect.

**B.    Defendants Renege on the Equity Agreement and Substantially Reduce Plaintiff's Compensation.**

37.

Although the Equity Agreement was not expressly detailed in the 2014 Employment Agreement, it was documented repeatedly in conversations and emails from Defendants' managers.

38.

Further, Plaintiff received payments equivalent to his 15% stake in Pinnacle when Vineyard realized Pinnacle's equity through payouts to Plaintiff and others.

39.

Plaintiff reasonably relied on the Equity Agreement through the remainder of his employment with Defendants.

40.

The Equity Agreement was separate and apart from the Operating Agreement and did not contain any arbitration provision or otherwise reference the arbitration provisions in the Operating Agreement.

41.

Further, the Operating Agreement did not incorporate by reference the Equity Agreement or the Employment Agreement.

42.

As an example of Defendants documenting the Equity Agreement, on July 12, 2015, Vineyard's Managing Partner, Jeff Boutwell, sent Plaintiff a projected 5-year cashflow chart for Pinnacle, which detailed the "total equity" that he had in Pinnacle. A redacted and highlighted version of this communication is attached hereto as **Exhibit C.**

43.

Likewise, on September 1, 2015, Jeff Boutwell emailed Plaintiff, stating "[f]rom our conversation earlier I thought I'd run these numbers on your total compensation since you took over Pinnacle." Below that, he listed $▮▮▮▮ of

- 13 -

"value of 15% equity in Pinnacle." A redacted and highlighted version of this communication is attached hereto as **Exhibit D.**

44.

This understanding continued into 2016, when Jeff Boutwell again emailed Plaintiff, detailing the "15% accretion," "15% in value," and "equity value we believe you have in Pinnacle." A redacted and highlighted version of this communication is attached hereto as **Exhibit E.**

45.

Likewise, on March 13, 2017, Jeff Boutwell emailed, stating: "I talked to my father . . . there was $▇▇▇▇ of total accretive equity in Pinnacle. So I thought us recognizing $▇▇▇▇ of it now wasn't a big risk." A redacted and highlighted version of this communication is attached hereto as **Exhibit F.**

46.

Subsequently, one-third ($▇▇▇▇) of the Pinnacle equity would be paid out on March 27, 2017, 15% of which was paid to Plaintiff and eighty five (85) percent of which was paid to Vineyard.

47.

These payments were accounted for in the following month, as reflected in Vineyard's capital account excel spreadsheet, with a note in the April 2017 column by Vineyard's prior employee, Andrew Butler, stating, "Andrew Butler: Realization

of Equity Value Increase (85% Vineyard/15% Paul) -per Jeff [Boutwell] & Paul [Haarer]." A redacted and highlighted version of the relevant portion of this communication is attached hereto as **Exhibit G.**

48.

Years later, in 2021, the mutual understanding that Plaintiff held 15% equity in Pinnacle endured.

49.

As an example, Vineyard's Chief Operating Officer, Veronica Case, emailed Plaintiff on June 4, 2021, sending him a Pinnacle Valuation and Debt chart that showed "15% to Paul."  A redacted and highlighted version of this communication is attached hereto as **Exhibit H.**

50.

These many writings evidence the formation and continued existence of the Equity Agreement through Plaintiff's employment, as well as Defendants' continued acknowledgment of the same.

51.

Plaintiff, relying on Defendants' repeated and consistent representations concerning the Equity Agreement, worked tirelessly to grow Pinnacle.  For instance, as non-exhaustive examples, Plaintiff: made himself available 24/7 to staff in Georgia, South Carolina, and multiple locations across the Midwest; met with city

officials on behalf of Pinnacle; performed menial tasks such as replacing light bulbs at the various locations, building a fence, performing landscaping duties, and decorating; and even assisted with putting bodies in caskets to assist the funeral directors if nobody else could do so.

52.

Despite Vineyard's consistent acknowledgment of the Equity Agreement and Plaintiff's requests over the years, Vineyard refused to reduce the Equity Agreement to a formal written agreement.

53.

In fact, on May 27, 2022, Vineyard stated that it would not renew the 2014 Employment Agreement, which had previously been renewed after its initial expiration. Defendants also indicated that it would not sign an interim agreement that incorporated the material terms of the Equity Agreement.

54.

Eventually, Defendants tried to back out of the Equity Agreement altogether. For example, on or about May 27, 2022, Vineyard unilaterally decided that it would no longer pay Plaintiff any further equity realization payments, in violation of the Equity Agreement.

55.

Vineyard's decision not to renew the 2014 Employment Agreement came shortly after Jeff Boutwell told Plaintiff that business acquisitions, which were a core part of Plaintiff's role as Pinnacle's CEO, was "for the younger kids," or words to that effect.

56.

Further, Vineyard opted not to renew the 2014 Employment Agreement despite Plaintiff's proven track record growing Pinnacle throughout the relevant time period.

**C.  Vineyard Made a Formal Offer to Repurchase Units from Investors, including Mr. Haarer, which Mr. Haarer Timely Accepted Without Reservation.**

57.

While Plaintiff continued to build Pinnacle as its CEO, he also repeatedly exercised his option under the 2014 Employment Agreement to purchase up to 400 Units in Vineyard annually at a fixed price of $██.

58.

Between 2015 and 2019, Plaintiff acquired a total of 2,000 Units.

59.

When Vineyard offered to re-purchase Plaintiff's units in the past, Vineyard honored its offer when Plaintiff decided to accept and sell some of his units.  For

example, on March 30, 2020, Plaintiff was able to sell 400 of his Units, without restriction, after Vineyard had sent to investors, including Plaintiff, an offer to re-purchase Units.

60.

However, on July 27, 2022, two months after Vineyard substantially cut Plaintiff's compensation despite Pinnacle's continuing success, Vineyard sent its investors, including Plaintiff, an Investor Report that included an offer from Vineyard to re-purchase Units from investors, as well as a notice that Vineyard would accept $███████ in new investment funds from investors.

61.

Specifically, the Investor Report included the Repurchase Offer, stating:

> To provide investors with liquidity, we are offering to repurchase up to 10,000 equity units at the current value of $██ per unit.  This offer expires September 30, 2022, so please contact us before then if you wish to sell any of your units.

A redacted version of the relevant portion of the Repurchase Offer is attached hereto as **Exhibit I.**

62.

The Investor Report directed interested investors to contact Tamra Crews, Vineyard's Director of Treasury and Investor Relations, concerning the Repurchase Offer.

- 18 -

63.

On September 28, 2022, two (2) days before the Repurchase Offer expired, Plaintiff formally accepted that offer via an email to Director Crews, in accordance with the directions provided by the Investor Report.

64.

In his September 28, 2022 email to Director Crews, Plaintiff specifically stated that he accepted the offer to sell his remaining 1,600 Vineyard Units at the proposed rate of $███ per Unit.

65.

On September 30, 2022, Plaintiff emailed Director Crews and Jeff Boutwell, providing them with the certificate numbers for his 1,600 Units.  Plaintiff further asked for clarification about when he could expect payment for the redeemed Units.

66.

Later that day, Jeff Boutwell responded to Plaintiff's September 30, 2022 email, stating that, "We received your request prior to Sept 30, as requested in the investor report.  I'll get back to first [sic] of next week on the redemption."  Redacted and highlighted versions of these communications are attached hereto as **Exhibit J.**

**D.      Defendants Terminate Plaintiff's Employment on Pretextual Grounds.**

67.

Instead of honoring Plaintiff's tender of his Units, Vineyard reneged on the Repurchase Offer by subsequently refusing to pay Plaintiff for any of his Units.

68.

More specifically, on September 30, 2022, Vineyard fired Plaintiff on behalf of Pinnacle.  Plaintiff learned from Jeff Boutwell that Vineyard purportedly had decided to fire him because he had accepted the Repurchase Offer, which would allegedly unsettle other investors, had "created a lot of concern," and was "strange."

69.

Later that day, Jeff Boutwell sent correspondence to Plaintiff memorializing that "Vineyard Capital Partners, LLC has made the decision to terminate your employment with Pinnacle Funeral Service, LLC effective today. . . ."  A redacted copy of this letter is attached hereto as **Exhibit K.**

70.

Later, on information and belief, Vineyard and/or Pinnacle filed paperwork with the Georgia Department of Labor, which listed "insubordination" as the reason for Plaintiff's termination.

71.

In other words, Vineyard, as owner of Pinnacle and as its *de facto* Board, and Pinnacle terminated Plaintiff on the pretextual ground that his acceptance of Vineyard's own offer would not look good to other investors given his role as Pinnacle's CEO and/or his actions constituted insubordination.

72.

This is despite the fact that Vineyard made the Repurchase Offer unprovoked and voluntarily.

73.

To date, Vineyard has refused to repurchase Plaintiff's Units, nor have Defendants paid Plaintiff all he is owed in accordance with the Equity Agreement.

74.

In refusing to comply with their obligations under the Equity and Repurchase Agreements, Defendants have breached their duty of good faith and fair dealing.

75.

By refusing to honor their contractual obligations under the Equity and Repurchase Agreements, Defendants have acted in bad faith, been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense.

76.

Vineyard's false representations to Plaintiff concerning the Equity Agreement and Defendants false representations to Plaintiff concerning the Repurchase Agreements were made knowingly to induce him to act to his substantial detriment.

**E.    Defendants' Violations of the ADEA.**

77.

Shortly after Plaintiff's termination, Pinnacle and Vineyard replaced him with a younger person, Tony Kumming, who took over as Pinnacle's CEO and who was under 40 years old when he replaced Plaintiff.

78.

On information and belief, on or about October 18, 2022, Mr. Kumming attended a meeting concerning Vineyard's and/or Pinnacle's potential acquisition of Parrish and Underwood Funeral Homes and Cremations ("PUFHC"), which meeting was attended by, *inter alia*, Steven Jones, Pinnacle's Chief Operating Officer, as well as PUFHC Owner/Manager Chris Watson and two PUFHC employees.

79.

On information and belief, one purpose of this meeting was to discuss Plaintiff's recent termination as Pinnacle's CEO.

80.

On information and belief, at such meeting, someone who worked for

Plaintiffs stated during a discussion of Plaintiff's end as Pinnacle's CEO that Pinnacle was bringing in younger people who were willing to be more aggressive in acquiring properties, or words to that effect.

81.

On further information and belief, that sentiment was later echoed by Jeff Boutwell.

82.

The asserted reasons by Defendants for Plaintiff's termination were pretext, and the real motivation was Plaintiff's age, as demonstrated by, *inter alia*:

   a.   the repeated ageist comments by Vineyard and/or Pinnacle's management, including that the acquisition role stressed by Vineyard from 2020 onward was "for the younger kids," as well as the statements by Defendants noting Defendants' efforts to bring in younger people to spur acquisitions;

   b.   Vineyard's repeated emphasis that Pinnacle make new acquisitions, despite Plaintiff's success in growing Pinnacle through such acquisitions;

   c.   Jeff Boutwell's statement to Plaintiff that he purportedly was being fired because he had accepted Vineyard's Repurchase Offer, which was a contrived excuse for Defendants to fire

- 23 -

Plaintiff because of his age; and

d.   Defendants' contrary representation to the Georgia Department

of Labor that Plaintiff was fired for insubordination, which was

another contrived excuse for Defendants to fire Plaintiff because

of his age.

83.

Defendants willfully and/or intentionally terminated Plaintiff's employment

because of his age, in violation of his federally protected rights under the ADEA.

84.

On March 28, 2023, Plaintiff filed his Charges of Discrimination alleging that

Defendants discriminated against him by terminating his employment because of his

age, in violation of the ADEA.

85.

On May 8, 2023, Defendants filed their Answer to Plaintiff's Complaint,

which included Counterclaims brought by Defendants against Plaintiff based on his

alleged mismanagement of Pinnacle.

86.

Specifically, Defendants allege in Count I of their Counterclaims that Plaintiff

breached the 2014 Employment Agreement and the implied covenant of good faith

and fair dealing by authorizing distributions out of Pinnacle's savings, authorizing

excessive employee bonuses, committing Pinnacle to excessive capital expenditures, underreporting bad debt that Pinnacle was alleged to have, and refusing to adequately maintain various Pinnacle funeral homes.

87.

Defendants further allege in Count II of their Counterclaims that Plaintiff unjustly enriched himself at Defendants' expense by authorizing excessive distributions from Pinnacle to Vineyard.

88.

Defendants allege in Count III of their Counterclaims that Plaintiff breached his fiduciary duties to Pinnacle based on the foregoing alleged conduct.

89.

Defendants allege in Count IV of their Counterclaims that they are entitled to their attorneys' fees and costs under O.C.G.A. § 13-6-11 based on the conduct alleged in their Counterclaims.

90.

Finally, Defendants allege in Count V of their Counterclaims that Plaintiff's conduct as alleged in Defendants' Counterclaims entitles them to an award of punitive damages.

91.

Defendants' Counterclaims have no basis in law or fact because Plaintiff did not engage in any conduct that would constitute, or that could be reasonably construed as constituting, the alleged breach of his contractual or fiduciary obligations to Defendants.

92.

Defendants' baseless assertion of the Counterclaims would have dissuaded a reasonable person from engaging in protected activity under the ADEA.

93.

Defendants did not assert claims against Plaintiff based on the alleged misconduct in the six (6) month period between his termination and his filing of the EEOC Charges, despite their assertion that Plaintiff's alleged misconduct caused Defendants millions of dollars in damages.

94.

However, Defendants asserted their Counterclaims approximately five (5) weeks after Plaintiff filed his EEOC Charges against Defendants with the EEOC, which filings constituted protected activity for the purposes of the ADEA.

95.

Defendants intentionally retaliated against Plaintiff for engaging in protected activity by asserting the Counterclaims against him.

96.

In retaliating against Plaintiff, Defendants willfully and intentionally violated his federally protected rights under the ADEA.

97.

Plaintiff's ADEA claims are not arbitrable and are separate and apart from the Operating Agreement.

98.

Plaintiff does not assert any claims pursuant to or arising under the Operating Agreement.

## COUNT I
## Breach of Contract—Breach of the Equity Agreement
## (against Defendants)

99.

Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

100.

Under the Equity Agreement between Plaintiff and Defendants, Defendants promised to provide Plaintiff a 15% equity stake in Pinnacle in exchange for his work for Defendants as Pinnacle's CEO, including his work that was above-and-beyond the duties of a CEO, such as, but not limited to, performing menial tasks, and making himself available to staff 24/7.

101.

The Equity Agreement imposed upon Defendants a duty of good faith and fair dealing.

102.

Plaintiff fully performed his contractual obligations under the Equity Agreement.

103.

Defendants promised Plaintiff the 15% equity stake in Pinnacle, in exchange for which he accepted his role as Pinnacle's CEO and performed valuable services for Defendants.

104.

Plaintiff and Defendants each mutually assented to the material terms of the Equity Agreement.

105.

Plaintiff relied upon Defendants' compensation promises in accepting his position as Pinnacle's CEO and performing valuable services for Defendants.

106.

In breach of the Equity Agreement, Defendants have refused to acknowledge Plaintiff's 15% equity stake in Pinnacle since at least 2022, despite Plaintiff's entitlement to the same.

107.

As a result of Defendants' breach of the Equity Agreement, Plaintiff has been damaged and Defendants are liable to Plaintiff for breach of contract in an amount at least equivalent to his 15% equity stake in Pinnacle, plus interest and attorneys' fees and costs.

## COUNT II
### (PLED IN THE ALTERNATIVE)
### Unjust Enrichment—Equity Agreement
### (against Defendants)

108.

Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

109.

In the alternative, Defendants are liable to Plaintiff for unjust enrichment in the full amount owed to him, equivalent to the value of the 15% equity stake in Pinnacle that Defendants promised him, plus interest and attorneys' fees and costs.

110.

Defendants promised Plaintiff that he would be compensated for the valuable services that he provided as Pinnacle's CEO by, in addition to paying him a relatively low base salary, granting him a 15% equity stake in Pinnacle.

111.

Defendants requested that Plaintiff perform valuable services for their benefit, and knowingly accepted such services, with the full knowledge that Plaintiff performed such services because of Defendants' promise to grant him a 15% equity stake in Pinnacle.

112.

In reliance on Defendants' representations that he was to receive, and had received, a 15% equity stake in Pinnacle, Plaintiff performed valuable services for Defendants and thereby conferred a benefit upon Defendants.

113.

Injustice and unjust enrichment can only be avoided by enforcing Defendants' promise to pay Plaintiff the full compensation owed to him.

114.

Defendants are liable to Plaintiff for unjust enrichment in the full amount owed to him, which is at least equivalent to the 15% equity stake in Pinnacle promised to him, plus interest and attorneys' fees and costs.

## COUNT III
## (PLED IN THE ALTERNATIVE)
### Promissory Estoppel—Equity Agreement
### (against Defendants)

### 115.

Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

### 116.

In the alternative, Defendants are liable to Plaintiff for promissory estoppel pursuant O.C.G.A. § 13-3-44 in the full amount owed to him equivalent to the value of the 15% equity stake in Pinnacle that Defendants promised him, plus interest and attorneys' fees and costs.

### 117.

Defendants promised Plaintiff that he would be compensated for the valuable services that he provided as Pinnacle's CEO by, in addition to paying him a relatively low base salary, granting him a 15% equity stake in Pinnacle.

### 118.

Defendants should have reasonably expected Plaintiff to rely on their promise to grant him the 15% equity stake in Pinnacle that was owed and promised.

119.

In reliance on the representation by Defendants that he would be granted the 15% equity stake in Pinnacle owed and promised, Plaintiff accepted his position as Pinnacle's CEO and performed valuable services for Defendants.

120.

Plaintiff relied on Defendants' promise to his detriment by performing valuable services for Defendants instead of pursuing other opportunities.

121.

Injustice can only be avoided by enforcing Defendants' promise to pay Plaintiff the full compensation owed to him.

122.

Defendants are liable to Plaintiff for promissory estoppel pursuant to O.C.G.A. § 13-3-44 in the full amount owed to him, which is at least equivalent to the 15% equity stake in Pinnacle promised to him, plus interest and attorneys' fees and costs.

**COUNT IV**
**(PLED IN THE ALTERNATIVE)**
**Quantum Meruit—Equity Agreement**
**<u>(against Defendants)</u>**

123.

Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

124.

In the alternative, Defendants are liable to Plaintiff for *quantum meruit* in the full amount owed to him equivalent to the value of the 15% equity stake in Pinnacle that Defendants promised him, plus interest and attorneys' fees and costs.

125.

In reliance on the representation by Defendants that he would be granted the 15% equity stake in Pinnacle owed and promised, Plaintiff accepted his position as Pinnacle's CEO and performed valuable services for Defendants.

126.

The services Plaintiff performed for Defendants were done at the request of Defendants and/or were knowingly accepted by Defendants.

127.

Defendants' acceptance of Plaintiff's services without payment to him of the value of the 15% equity stake in Pinnacle that he was promised would be unjust.

128.

At the time that Plaintiff performed services for Defendants, he expected to receive all compensation owed and promised.

129.

At the time that Plaintiff performed services for Defendants, Defendants knew he expected them to pay all compensation owed and promised.

130.

Defendants are liable to Plaintiff for *quantum meruit* in the full amount owed to him, which is at least equivalent to the 15% equity stake in Pinnacle promised to him, plus interest and attorneys' fees and costs.

## COUNT V
## Fraudulent Misrepresentation—Equity Agreement
## (against Defendants)

131.

Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

132.

Defendants falsely, as detailed above, represented to Plaintiff that he would receive 15% equity in Pinnacle.

133.

Defendants' representations to Plaintiff, as detailed above, concerning his 15% equity in Pinnacle were knowingly false at the time they were made and were intended to deceive Plaintiff.

134.

Defendants made the false representations to Plaintiff concerning the 15% equity in Pinnacle to induce him to continue to provide valuable services to Defendants as Pinnacle's CEO.

135.

Plaintiff reasonably relied on Defendants' false representations concerning the 15% equity in Pinnacle in continuing his work for Defendants and repeatedly renewing the 2014 Employment Agreement, as Defendants repeatedly represented in both actions and words that Plaintiff had such equity.

136.

As a direct and proximate result of Defendants' false misrepresentations to Plaintiff concerning his 15% equity in Pinnacle, Plaintiff has been substantially harmed.

137.

Plaintiff is entitled to recover from Defendants damages equal to at least the harm caused by their fraudulent misrepresentations, punitive damages, interest, and attorneys' fees and costs.

## COUNT VI
### Breach of Contract—Breach of the Repurchase Agreement
### (against Vineyard)

138.

Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

139.

Under the Repurchase Offer extended to Plaintiff by Vineyard, Vineyard offered to repurchase from Plaintiff 1,600 Units at a price of $██ per Unit.

140.

Plaintiff timely accepted the Repurchase Offer without reservation, thereby creating the Repurchase Agreement between him and Vineyard.

141.

The Repurchase Agreement imposed upon Vineyard a duty of good faith and fair dealing.

142.

Vineyard, as the master of the Repurchase Offer, assented to its terms.

143.

Plaintiff assented to the terms of the Repurchase Offer by timely accepting the same without reservation.

144.

In breach of the Repurchase Agreement, Vineyard has refused to repurchase Plaintiff's 1,600 Units at the agreed upon price of $██ per Unit.

145.

As a result of Vineyard's breach of the Repurchase Agreement, Plaintiff has been damaged and Vineyard is liable to Plaintiff for breach of contract in the amount of at least $564,800, plus interest and attorneys' fees and costs.

## COUNT VII
## Fraudulent Misrepresentation—Repurchase Agreement
## (against Vineyard)

146.

Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

147.

Vineyard falsely represented to Plaintiff that it would repurchase his Units at a fixed price of $█ per Unit.

148.

Vineyard's representations to Plaintiff concerning the Repurchase Offer were knowingly false at the time they were made and were intended to deceive Plaintiff.

149.

Vineyard made the false representations to Plaintiff concerning the Repurchase Offer to induce him to accept that Offer, which Vineyard then used as pretext for terminating him.

150.

Plaintiff reasonably relied on Vineyard's false representations concerning the Repurchase Agreement in deciding to accept that Offer.

151.

As a direct and proximate result of Vineyard's false misrepresentations to Plaintiff concerning the Repurchase Offer, Plaintiff has been substantially harmed.

152.

Plaintiff is entitled to recover from Vineyard damages at least equal to the harm caused by its fraudulent misrepresentations, punitive damages, interest, and attorneys' fees and costs.

**COUNT VIII**
**Discriminatory Termination in Violation of the ADEA**
**(against Defendants)**

153.

Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

154.

At all relevant times, Vineyard and Pinnacle were Plaintiff's "employer," singly and/or jointly, within the meaning of the ADEA, 29 U.S.C. § 630(b).

155.

At all relevant times, Plaintiff was Defendants' "employee" within the meaning of the ADEA, 29 U.S.C. § 630(f).

156.

At all relevant times, the ADEA governed Defendants and protected Plaintiff.

157.

At all relevant times, Plaintiff was more than 40 years old, and thus was a member of a protected class for the purposes of the ADEA.

158.

At all relevant times, Plaintiff was qualified for his role as Pinnacle's CEO.

159.

Defendants terminated Plaintiff's employment because of his age on or about September 30, 2022.

160.

Defendants' violations of the ADEA, to wit, their discriminatory termination of Plaintiffs' employment, were intentional and willful.

161.

As a result of Defendants' violations of the ADEA, Plaintiff has suffered lost pay and benefits.

162.

As a result of Defendants' intentional and willful violations of the ADEA, Plaintiff is entitled to recover at least his lost pay and benefits, an award of front pay, liquidated damages, and his attorneys' fees and costs.

## COUNT IX
## Retaliatory Assertion of Counterclaims in Violation of the ADEA
## (against Defendants)

163.

Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

164.

At all relevant times, Vineyard and Pinnacle were "employer[s]," singly and/or jointly, within the meaning of the ADEA, 29 U.S.C. § 630(b).

165.

At all relevant times, the ADEA governed Defendants and protected Plaintiff.

166.

Plaintiff engaged in protected activity under the ADEA by filing his EEOC Charges against Defendants.

167.

Defendants did not file claims against Plaintiff on the basis of his alleged breaches of contract and fiduciary duties until shortly after he filed his Charges of

Discrimination with the EEOC.

168.

Defendants asserted the Counterclaims against Plaintiff in retaliation for engaging in protected conduct under the ADEA, to wit, filing Charges of Discrimination.

169.

Defendants' Counterclaims have no reasonable basis in law or fact.

170.

Defendants' violations of the ADEA, to wit, their retaliatory assertion of the Counterclaims, were intentional and willful.

171.

Defendants' assertion of the baseless Counterclaims would have dissuaded a reasonable person from engaging in protected activity under the ADEA.

172.

As a result of Defendants' intentional and willful violations of the ADEA, Plaintiff is entitled to at least declaratory relief and his attorneys' fees and costs.

## COUNT X
## Punitive Damages
## (against Defendants)

173.

Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

174.

Defendants have acted in bad faith and with a callous disregard for Plaintiff's rights.

175.

Defendants' actions constitute willful misconduct, malice, oppression, and that entire want of care which shows a conscious indifference to the consequences.

176.

By performing the foregoing acts, Defendants acted with the intent to injure Plaintiff, and with malice, oppression, and/or fraud.

177.

Thus, Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined by the enlightened conscience of a jury at trial.

## COUNT XI
## Expenses of Litigation Pursuant to O.C.G.A. § 13-6-11
## (against Defendants)

178.

Plaintiff realleges and incorporates by reference the above paragraphs as if fully set forth herein.

179.

Defendants have acted in bad faith, including, but not limited to, their breaches of the Equity Agreement (Defendants) and Repurchase Agreement (Vineyard), by never intending to honor them at the outset, by taking baseless positions, and by later refusing to provide Plaintiff compensation and payments to which he is entitled, despite Plaintiff's demands and attempts to avoid litigation.

180.

By at least engaging in the above activity, Defendants have acted in bad faith, have been stubbornly litigious, and have caused him unnecessary trouble and expense.  Defendants forced the litigation by failing to negotiate or having their counsel even provide a written response to Plaintiff's demand letter after promising to do so.

181.

Pursuant to O.C.G.A. § 13-6-11, Plaintiff is entitled to his expenses of litigation, including attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands a TRIAL BY JURY and prays for judgment in his favor and the following relief against Defendants, jointly and/or severally:

a.   A declaratory judgment that Defendants violations of the ADEA as described herein were unlawful;

b.   Compensatory damages in an amount to be proven at trial, including but not limited to:

   i.   With respect to the Repurchase Agreement, such compensatory damages shall be determined by a jury but are not less than $564,800;

   ii.   With respect to the Equity Agreement, such compensatory damages shall be determined by a jury but are not less than $6,000,000;

c.   Punitive damages in an amount to be determined at trial but not less than **TWO MILLION DOLLARS** ($2,000,000);

d.   An award of lost compensation and benefits on Plaintiff's ADEA age discrimination claim;

e.   Liquidated damages on Plaintiff's ADEA age discrimination claim;

f.   Pre-judgment and post-judgment interest at the applicable rates;

g.     Plaintiff's attorneys' fees and expenses of litigation; and

h.     All such other relief as this Court may deem just and proper.

Respectfully submitted this 20th day of June 2023.

*/s/ Richard L. Robbins*
Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com
Catherine C. Sullivan
Georgia Bar No. 957620
csullivan@robbinsfirm.com
Michael D. Forrest
Georgia Bar No. 974300
mforrest@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3255

*Counsel for Plaintiff*

# EXHIBIT A



| ABOUT | OPERATING PARTNERS | INVESTORS | LEADERSHIP | NEWS | CONTACT |

## NEWS

### 2022 Top 20 Private Equity Ranking
March 22, 2022

Vineyard Capital Partners is pleased to announce that Atlanta Business Chronicle has once again named us one of the top 20 private equity firms in Atlanta—for the sixth year. Vineyard manages $230 million in assets which are invested with proven businesses and talented management teams.  Assets have doubled in size over the past few years, as its partners […]

READ MORE ›

### Investment in Funeral Home Operator
January 5, 2022

Vineyard made a significant investment this week in a multi-location funeral home operator based in the New England.  The company currently owns six locations and has plans to acquire other funeral businesses in the region to meet the need of retiring funeral home owners selling their businesses.     Vineyard is one of the nation's […]

READ MORE ›

### Vineyard invests in new Dental Services Organization
December 21, 2021

Vineyard Capital initiated investment in a new Dental Service Organization this week with the name Infinite Dental, LLC.   The company's founding coincided with the acquisition of two dental practices in north Georgia.    Sam Kim, Vineyard's dental operating partner, will lead operational and growth strategy for the businesses.   Infinite Dental plans to continue its […]

READ MORE ›

### Top 20 Private Equity Ranking
May 9, 2021

Atlanta Business Chronicle recognized Vineyard Capital Partners recently on its list of top Atlanta private equity firms.  With $155 million in assets under management, Vineyard was founded in 2003 with a focus on supporting the growth of proven entrepreneurs and management teams.    "It's an honor for our team to be recognized", commented Jeff Boutwell, […]

READ MORE ›

### 2020 – Another busy year for Vineyard's partners

March 31, 2021

Vineyard's invested operating partners acquired a combined 15 businesses in 2020, for a combined $40 million in value.    While we had a couple operating partners that experienced significant challenges during the pandemic and related isolation requirements, the overwhelming majority of our invested businesses performed well and even found opportunities to improve their service and […]

**READ MORE ›**

### Record year of Investments

January 15, 2020

Vineyard Capital and its operating partners had a record year in 2019, with each of its four major partners expanding through acquisitions and achieving individual records for revenues and profits earned.  Combined, Vineyard's partners acquired 18 new business locations, bringing the combined total to 85 separate businesses invested in through Vineyard's platform. Earlier in 2019, […]

**READ MORE ›**

### Completion of Equity Issuance

June 24, 2019

Vineyard Capital Partners completed an equity issuance this month which will expand its limited partner investors to just over 100 members.    Management projects that total assets under management should exceed $200M in the next year as the funds are invested with operating partners. Jeff Boutwell, managing partner commented, "We're grateful to have such a […]

**READ MORE ›**

### Expansion of Acquisition Funding Program

June 22, 2019

Vineyard Capital recently expanded its commitment to its Operating Partners by issuing new equity units and bringing in significant additional investments funds.  The company welcomed approximately 15 new investors and also received additional funds from approximately 40 of its current investors.  With these available funds, Vineyard has committed approximately $75M in new acquisition funding to its […]

**READ MORE ›**

### Completion of Residential Development in north Atlanta

May 31, 2019

Vineyard Capital is pleased to announce the completion of its partnership with Georgia Land Development Partners.  The $3M+ project created 40 home sites on approximately 20 acres of land near the Windermere Country Club. Andrew Butler, portfolio manager at Vineyard, commented "The project was a little more challenging than expected, however, I think everyone is […]

**READ MORE ›**

### Partnership to Redevelop North Atlanta Office Property

February 27, 2019

Vineyard Capital Partners, LLC has completed a transaction to become the majority equity partner in a 200,000 square foot commercial real estate redevelopment project.  The partnership and project will be managed by and co-owned with Cone Commercial Real Estate, an experienced Atlanta based firm.    The approximate $25 million project will include renovating the properties, […]

**READ MORE ›**

### Atlanta Business Chronicle recognizes Vineyard Capital as a top 20 Private Equity Group

January 12, 2019

Vineyard Capital Partners, LLC was notified this week that it had been recognized again as one of the Top 20 Private Equity Groups in Atlanta for 2018/2019.  Vineyard's assets have increased to $140 million in the last several years and investors have realized a 10 year average return of approximately 16% annually.  "Vineyard's […]

**READ MORE ›**

### Partnership to Develop 40 Home Sites in North Georgia.

January 4, 2018

Vineyard Capital Partners, LLC partnered this month with Georgia Land Development Partners, LLC to develop 20 acres of land in to 40 home sites.   The development is located adjacent to the Windermere Country Club and is expected to be completed in late 2018.

**READ MORE ›**

### Partnership with Regional Dental Group

November 15, 2017

Vineyard Capital Partners, LLC is happy to announce its recent partnership with Bela Dentistry, LLC.    Vineyard will provide expansion capital to fund acquisitions and start-ups of dental practice locations throughout the Southeastern United States.   With approximately 8 current locations, the funding partnership is designed to fund Bela's expansion to as many as 50 locations […]

**READ MORE ›**

### Atlanta Business Chronicle Awards Vineyard Capital Partners, LLC as Top 100 Fastest Growing Privately Held Companies in Atlanta

April 28, 2017

Vineyard Capital Partners, LLC was recognized recently as one of the top 100 private companies in Atlanta.    The Pacesetter recognition is awarded to Atlanta based companies with minimum 50% revenue growth over the prior three years.  With 90% revenue growth from 2014 – 2016, Vineyard ranked #69 overall.

**READ MORE ›**

### Partnership with Residential Mortgage Servicing

April 1, 2017

Vineyard Capital Partners, LLC is pleased to announce a partnership with an experienced management team that specializes in residential mortgage servicing. The partnership will acquire a large portfolio of delinquent mortgages or foreclosed properties and then work with each property to find reasonable solutions.   In some cases the mortgage and payment amounts may be reduced  to encourage the owners […]

**READ MORE ›**

### Top 20 Private Equity Group – Atlanta Business Chronicle

March 24, 2017

Vineyard Capital Partners, LLC was notified this week that it had been recognized as one of the Top 20 Private Equity Groups in Atlanta.   The fund has doubled in size in the last few years to now include more than $100 million in assets under management. Jeff Boutwell, Managing Partner, commented "Vineyard's growth is a direct result […]

**READ MORE ›**

### Second Recognition by Inc 5000 Magazine

September 6, 2016

In 2016, for the second year in a row, Vineyard Capital Partners, LLC was listed in Inc. Magazine on their annual list of fastest growing companies in the US.   Vineyard ranked as #863 on the list of 5,000 top businesses with a 3-year revenue growth of 461%.    Vineyard's unique model of investing with talented and experienced […]

**READ MORE ›**

### Expansion into Hospitality Industry

March 6, 2016

Vineyard Capital Partners, LLC invested recently with an operating partner to be majority owner of two hotels located in Indiana and Illinois.   The hotels will both undergo relatively significant renovations to improve guest experience and to more modernize the facilities.    Jeff Boutwell, Managing Partner, added "We're very excited about teaming up with our operating partner […]

**READ MORE ›**

### Vineyard Capital Partners, LLC Recognized in Inc. 5000 with Three-Year Sales Growth of 320%

August 20, 2015

Vineyard Capital Partners, a leading financier to the funeral industry, recognized as one of the fastest growing private companies in America.

**READ MORE ›**

## Vineyard Expands Funeral Industry Partnerships

July 30, 2014

July, 2013,  In the past year, Vineyard added three new funeral home operating partners that is assisting with funding for acquisitions.     Jeff Boutwell, Managing Partner, commented "We're excited to continue to expand our relationships in the funeral industry as we work with company's and individuals that are growing through acquisitions.   We truly believe we have partnered with some the most experienced and […]

**READ MORE ›**

# EXHIBIT B

**EMPLOYMENT AGREEMENT**
**MANAGING MEMBER – PINNACLE FUNERAL SERVICE, LLC**
**Paul Haarer**

This Agreement, dated effective as of June 1, 2014 between Pinnacle Funeral Service, LLC., a Georgia corporation ("Company") which is a subsidiary of Vineyard Financing, LLC, a Florida corporation ("Vineyard"), and Paul Haarer, a resident of Georgia ( "Haarer" or "Employee").

> WHEREAS, the Company is a funeral home operator with multiple locations owned and a strategy to continue profitability growth through organically growing the revenues and reducing the expenses of the existing locations and by completing acquisitions and start-ups throughout the United States; and

> WHEREAS, Haarer has funeral industry operational and acquisition experience and industry relationships; and

> WHEREAS, the Company and Haarer are mutually desirous of entering into an employment agreement ("Agreement") whereby Haarer provides his experience and professional skills for the management of the Company upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the covenants, agreements, representations and payments set forth below, the parties agree as follows:

1.    **Term.**    The Company hereby agrees to employee Haarer for a two year term beginning on June 1, 2014 (the "term of this Agreement").   Haarer agrees to accept such employment and to perform the services specified herein, all upon the terms and conditions hereinafter stated.   Term may be extended by mutual agreement annually.

2.    **Duties.**  During the term of this Agreement, Haarer will actively, with all of his working time, serve as a Managing Member of the Company.

Specifically, Haarer will:

> (a)    Along with Vineyard, set goals, targets and objectives of the Company;

> (b)    Manage the Company to achieve these objectives;

> (c)    Build and manage a corporate staff for the Company to assist Haarer in achieving these objectives;

> (d)    Operate core business locations (currently Bass-Cauthen, Moody-Connolly, Parnick Jennings and Heritage of Griffin) to an EBITDA profit margin of 35% or better;

(e)     Operate non-core businesses (currently Miller-Richards, Cox, Hall & Hall, and Coastal Camden) to as efficient an EBITDA profit margin as possible.

In addition, Haarer will

(a)     Well and faithfully serve the interests of the Company;

(b)     Obey all instructions given to him by Vineyard;

(c)     Use his best efforts to promote the success of the Company and Vineyard;

(d)     Perform all services in a competent, thorough and professional manner, and conduct his dealings, transactions and communications with others on behalf of the Company in accordance with the highest ethical and professional standards;

(e)     Accurately keep and maintain all books of account as shall be reasonably required by the Company and Vineyard, and make all returns or reports as and when reasonably required by the Company and Vineyard; and

(f)     Periodically report to Company and Vineyard concerning status of Company goals.

## 3.     **Compensation.**
The Company will pay Haarer annual compensation calculated as:

- **Base Salary:** $132,000 annually, paid in equal bi-monthly installments.
- **Bonuses:**     Distributions from the Company will be made to Vineyard as excess funds accumulate – whether from profitable operations or the sale of owned business locations. As those distributions are made to Vineyard, Haarer shall receive a 15% bonus for all distributions made to Vineyard.   So that if $100,000 is distributed from the Company, Haarer shall receive $15,000 and Vineyard shall receive $85,000.   This distribution shall be after the 10% preferred payment is made to any equity that Vineyard has invested in Company.   Vineyard's equity in Pinnacle as of this date is $1,698,920 (this is calculated as Vineyard's initial equity $2,943,317 less $1,244,400 allocated to the property lease in Griffin).

In addition:
- NewBridge Group will pay to Haarer 20% of any commissions received in which the Company is the purchaser in the transaction.
- Vineyard Financing will grant Haarer options to purchase 400 units annually of Vineyard Financing, LLC ownership at a fixed price of $145 per unit.   The first 400 are eligible to be purchased effective June 1, 2014.   These options shall remain in place for up to 5

years, as long as Haarer remains an employee of the Company. Upon exercise of the option, ownership shall be transferred immediately to Haarer and any distributions made by Vineyard for those units shall be paid to Haarer. The units shall have a restriction so that they cannot be sold until one year after Haarer leaves employment with the Company.

4.  **Benefits.**     Haarer will be entitled to receive Company benefits that are received by all other Company employees including:

- Health Insurance of up to $400/month
- Cell phone reimbursement
- Parking fees in Atlanta office
- Fitness club membership in Atlanta office.
- Upon closing the Milwaukee transaction, Company shall fund an auto lease up to $300/month for Haarer to use when visiting Pinnacle owned locations.

5.  **Office Location:**     The Company shall be entitled to free usage of the office space leased by NewBridge Group in Colony Square to serve as the home office of the Company. Haarer shall have the flexibility to work remotely approximately 20% of the time.

6.  **Travel.**     All reasonable travel expenses related to managing owned firms or exploring opportunities to purchase new firms will be paid or reimbursed by Company. Expenses shall typically include airfare, hotels, rental cars, meals, and auto fuel.

7.  **Vacation.**     Haarer shall be entitled to four weeks vacation or personal time at full salary, at a time to be mutually agreed by Company and Haarer.

8.  **Confidentiality.**

(a) **Confidential Information.** As used in this paragraph, the term "Confidential Information" shall mean and include: (i) the names and addresses of existing clients or leads of the Company or NewBridge Group, (ii) other non-public information concerning existing clients of the Company, Vineyard, or NewBridge Group, (iii) information concerning the Company's, Vineyard's, or NewBridge Group's procedures, processes and practices; (iv) information concerning the financial condition of the Company, Vineyard or NewBridge Group; (v) information concerning the business and affairs of the Company, Vineyard or NewBridge Group; (vi) information concerning the services Employee may render to Company pursuant to this Agreement; (vii) all books of account; (viii) documents, vouchers and other books or papers connected with the business and affairs of the Company, Vineyard or NewBridge Group or clients of the Company, Vineyard or NewBridge Group.

(b) **Generally.** Employee acknowledges that, during the course of performing services under this Agreement, Employee shall learn and obtain Confidential Information.

(c) **Non-Disclosure.**  Further, during the term of this Agreement and afterwards, Employee shall hold confidential, and shall not disclose or divulge to any third parties, any Confidential Information.  All such Confidential Information shall be treated by Employee in strict confidence and shall not be divulged by Employee to any person other than an official or employee of the Company.

(d) **Return of Confidential Information.**  Any and all Confidential Information shall be the property of the Company, whether paid for by the Company or not.  Upon request of the Company or on termination of this Agreement, as the case may be, Employee shall immediately return to and turn over to the Company any and all Confidential Information that is in documentary or electronic form, and all copies thereof; and shall further confirm in writing that Employee has not disclosed any such Confidential Information to any third parties.

(e) **Survival.**  The expiration or termination of this Agreement shall not affect the obligations contained in this **Paragraph 8,** which obligations shall continue to bind Employee after any such event.

(f) **Compelled Disclosure.**  In the event that Employee shall be legally required or compelled to disclose any information which he would otherwise be required to hold in confidence pursuant to this **Paragraph 8**, Employee shall be permitted to make such disclosure to the extent that Employee is legally required or compelled to do so, and shall not be deemed to be in breach of the restrictions contained in this **Paragraph 8** for such disclosure; provided, however, that Employee (i) shall make such disclosure only to the extent legally required or compelled, and shall not otherwise disclose such confidential information; and (ii) shall notify the Company well in advance of any such disclosure, so that the Company may intervene in any legal proceeding to quash any such subpoena or other compulsory process mandating such disclosure.

8.     **Non-Solicitation.**  Employee agrees that, for a period commencing on the date of this Agreement and ending two years after the date this Agreement is terminated or expires, Employee shall not in any manner persuade or attempt to persuade any current or former employee, current or former consultant, client, or potential client of the Company, Vineyard or NewBridge Group to discontinue or diminish that person's or that entity's relationship or potential relationship with or to any of these entities.    As used in this paragraph, the term "potential client" shall be defined as any business or individual that is listed in the NewBridge database and that Employee has spoken to during the term of this Agreement.  If a violation of this covenant occurs, Employee shall reimburse the Company for this lost income.

9.     **Defaults**.  Each of the following events or circumstances shall constitute an event of default by Employee under this Agreement, and shall entitle the Company to terminate this Agreement in accordance with **Paragraph 10** of this Agreement: (a) Employee disregards or fails to comply with any laws, ordinances, rules, regulations, or orders of any public body having jurisdiction; (b) Employee is arrested for any crime involving moral turpitude; (c) Employee becomes the subject of an investigation concerning violations of any criminal law or is indicted;

(d) Employee fails to comply with any provision of this Agreement; or (e) any representation or warranty of Employee contained in this Agreement proves to have been untrue or inaccurate.

10.     **Termination by Company.**  If Employee defaults in performance of any provision herein, the Company may terminate this Agreement without prejudice to any other remedies the Company may have.  Upon such termination for cause, the Company may order Employee to stop work under this Agreement, and shall owe Employee only for services and expenses properly incurred prior to the default.  Termination without cause by Company will provide Employee a severance of 3 months of existing Base Salary.  Any termination pursuant to this Agreement shall not affect any rights of the Company against Employee then existing or which may thereafter accrue.

11.     **Termination by Employee.**  The Company's failure to make payments defined in **Paragraph 3 and 4** of this Agreement, after Employee provides the Company written notice of such failure and further provides the Company ten calendar days after such notice to make such payment, shall constitute a default under this Agreement and shall entitle Employee to terminate this Agreement and be entitled to all compensation earned by him, including severance equal to 3 months existing Base Salary.

12.     **Compliance with Applicable Laws.**  Employee shall comply with all laws and ordinances, and the rules, regulations, or orders of all public authorities relating to the performance of the services to be provided pursuant to this Agreement, and shall obtain any and all permits and licenses legally required for the legal and proper performance of its duties under this Agreement.

13.     **Modification.**  This Agreement may not be amended or modified unless such an amendment or modification is placed in writing and signed by all parties to this Agreement.

14.     **Notices.**  Any and all notices, elections or demands permitted or required to be made under this Agreement shall be in writing (unless provided otherwise herein), signed by the parties giving such notice, and shall be delivered personally or sent by email:


If to Haarer:                          Mr. Paul Haarer
                                       TEL:          770-335-6420
                                       EMAIL:        Phaarer@bellsouth.net


If to Vineyard:                        Vineyard Financing, LLC
                                       c/o NewBridge Group, Inc.
                                       1175 Peachtree Street, NE
                                       Suite 1425
                                       Atlanta, Georgia  30361

ATTN:     Jeff Boutwell
TEL:      404-249-9582
FAX:      888-317-2654

The date of personal delivery or the date of mailing, as the case may be, shall be the date of such notice, election, demand or statement.

15.     **Time is of the Essence.**  Time is of the essence in interpreting and performing all of the parties' obligations, covenants and agreements contained in this Agreement.

16.     **Entire Agreement.**  This Agreement contains the entire terms of the agreement between the parties regarding subject matter hereof, and any representation or promise not included or contained in this Agreement shall be of no force or effect.

17.     **Headings.**  The headings of the sections, paragraphs and other portions of this Agreement are for convenience of reference only, are not to be considered a part hereof and shall not limit or otherwise effect any of the terms hereof.

18.     **Binding Effect**.  This Agreement is a continuing obligation and, subject to the provisions of **Paragraph 8.**

19.     **Rights and Remedies Cumulative.**  The rights and remedies provided by this Agreement are cumulative of the rights and remedies granted by law or equity, and the use of any one right or remedy by either party shall not preclude or waive its right to use any or all other remedies.

20.     **No Waiver.**  No delay or failure on the part of the Company in the exercise of any right, power or privilege granted under this Agreement, or available at law or in equity, shall impair any such right, power or privilege or be construed as a waiver of any event of default or any acquiescence therein.  No single or partial exercise of any such right, power or privilege shall preclude the further exercise of such right, power or privilege.  The Company's waiver of any breach of any provision of this Agreement shall not constitute a continuing waiver or a waiver of any subsequent breach of the same or a different provision of this Agreement.

21.     **Governing Law.**  This Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of Georgia.

22.     **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall be deemed one and the same instrument.

23.     **Survival**.  All representations and warranties contained herein made by Employee in connection herewith shall survive the execution and delivery of this Agreement and the exercise by the Company of its rights and remedies under this Agreement.

24.   **Venue.**  The parties stipulate and agree that the Superior Court of Fulton County, Georgia shall be a proper venue for any disputes concerning this Agreement or any transactions between the parties relating to the performance of this Agreement or the parties' respective obligations to each other, and the parties stipulate and consent to the venue and jurisdiction of such Court for the resolution or determination of such disputes.

25.   **Indemnification.**   Company will indemnify Haarer against any and all claims by Foundation Partners Group related to his work with NewBridge and Pinnacle with regard to Haaer's existing non-compete agreement that expires May, 2015.

26.   **Replacement of Agreement.**   This agreement replaces the existing management agreement dated Nov. 13, 2013 between Haarer, Stoots, Boutwell and Vineyard Financing related to the management of Company.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

By: _____           6 - 11 - 14
Jeffrey K. Boutwell                      Date
President
NewBridge Group, Inc.
"NewBridge"

By: _____           7/22/14
W. K. Boutwell                           Date
Managing Member
Vineyard Financing, LLC
Parent of Pinnacle Funeral Service, LLC

_____                06/11/14
Paul Haarer                              Date
Managing Member
Pinnacle Funeral Service, LLC
"Haarer"

# EXHIBIT C

**phaarer@live.com**

| | |
|---|---|
| **From:** | Jeff Boutwell <jeff@newbridgegroup.com> |
| **Sent:** | Sunday, July 12, 2015 2:31 PM |
| **To:** | Paul Haarer |
| **Subject:** | Pinnacle - 5 year summary proforma |
| **Attachments:** | Pinnacle - Summary - 5 years - 2015.xls |

See what you think about this.   We can meet about it tomorrow.

**Jeff Boutwell**
NewBridge Group
1175 Peachtree Street, NE
Suite 1425
Atlanta, GA 30361
404-249-9582 office
888-317-2654 fax
Keep up with who's buying, who's selling, succession planning, and financing strategies.
Click here to subscribe to our eNewsletter.



**NEWBRIDGE** GROUP

**Confidentiality Notice:** The information contained in this message may be privileged, confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or any employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

**PINNACLE FUNERAL SERVICE**
**Projected 5 year Summary Cash Flow**



**PAUL**



Paul's Annual Cash Flow

Paul's Equity

Total Equity - 15% of margin

# EXHIBIT D

**phaarer@live.com**

| | |
|---|---|
| **From:** | Jeff Boutwell <jeff@newbridgegroup.com> |
| **Sent:** | Tuesday, September 1, 2015 12:12 PM |
| **To:** | Paul Haarer |
| **Subject:** | compensation summary |

From our conversation earlier I thought I'd run these numbers on your total compensation since you took over Pinnacle. Let me know if you think I missed something.

value of 15% equity in Pinnacle appreciation since purchase

total equity

1

**Jeff Boutwell**
NewBridge Group
1175 Peachtree Street, NE
Suite 1425
Atlanta, GA 30361
404-249-9582 office
888-317-2654 fax
Keep up with who's buying, who's selling, succession planning, and financing strategies.
Click here to subscribe to our eNewsletter.



**Confidentiality Notice:** The information contained in this message may be privileged, confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or any employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

2

# EXHIBIT E

8/27/16

**RE: Renewal of Pinnacle Management Agreement**

Paul,

Sorry for the delay in getting responses back to you.    We can talk in person about these, but thought it'd be easier to give you a written response first.

Before responding directly to your specific requests, I want to thank you again for your strong leadership of Pinnacle. I really appreciate the way that you've taken charge and are leading Pinnacle to keep everything running smoothly and to continue to find ways to grow and improve.

Our hope for Pinnacle – which is what we've communicated to Vineyard's investors - is to continue aggressive growth for at least the next five years.  Accordingly, as Pinnacle's CEO, we want your compensation formula to provide significant compensation to you for achieving that growth in revenues and profits.  Because you took the CEO position at a time when Pinnacle was not yet very profitable, we understood you needed a base compensation.  Beyond that base, however, we want your compensation to be directly aligned with our investor's goals of growth in revenues and profits, meaning the more you make for the investors, the more you make personally.

So it's with that spirit of that full alignment in mind that I respond to each of your requests:



- It looks like you're annualized to make about $▮▮▮▮ compensation in 2016.

  ○ This doesn't include the approximate $▮▮▮ equity value we believe you have in Pinnacle.



3. Termination fee:

We could add that Pinnacle would pay you for 2/3 of the 15% accretion created if you leave or 100% of equity created if you stay until we find a replacement or merge or sell the company



9. Added bonuses for start-ups.
   We feel the incentives already in place for start-ups should be enough:

   - 15% of value created and cash flow to you

From the annualized 6 months P&L ending ████████ it appears the equity created in Pinnacle is about ████████ so you have about ████████ in equity built up.

Jeff

# EXHIBIT F

**phaarer@live.com**

| | |
|---|---|
| **From:** | Jeff Boutwell <jeff@newbridgegroup.com> |
| **Sent:** | Monday, March 13, 2017 2:30 PM |
| **To:** | Paul Haarer |
| **Subject:** | draw on accretion |

The draw you described below sounds good.  I talked to my father over the weekend to explain it to him and said I thought there was about ▮▮▮▮▮ of total accretive equity in Pinnacle.   So I thought us recognizing ▮▮▮▮▮ of it now wasn't a big risk.

*As previously discussed, towards the end of this month (let's target Monday the 27ᵗʰ) I plan to draw on the main capital account ▮▮▮▮▮ an amount of ▮▮▮▮▮ to get some equity out.  This will increase Pinnacle debt by ▮▮▮▮ and I will then make a distribution of ▮▮▮▮▮▮ back to Vineyard and ▮▮▮▮▮ (15%) to myself.*

**Jeff Boutwell**
NewBridge Group
1175 Peachtree Street, NE
Suite 1425
Atlanta, GA 30361
404-249-9582 office
888-317-2654 fax
Keep up with who's buying, who's selling, succession planning, and financing strategies.
Click here to subscribe to our eNewsletter.



**NEWBRIDGE** GROUP

**Confidentiality Notice:** The information contained in this message may be privileged, confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or any employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

# EXHIBIT G



Account Balances
  Main Capital Account
    Adjustments

2017
4
April

Andrew Butler:
Realization of Equity Value
Increase (85%
Vineyard/15% Paul) - per
Jeff & Paul

# EXHIBIT H

**From:** Veronica Case <veronica@vineyardcp.com>
**Sent:** Friday, June 4, 2021 9:00 AM
**To:** Paul Haarer <paul@pinnaclefunerals.com>
**Cc:** Jeff Boutwell <jeff@newbridgegroup.com>
**Subject:** Pinnacle Q1 21 Valuation

Good morning, Paul!

Attached is the Pinnacle valuation as of 3/31/21. ███████████████████████
███████████████████████████████████████████████████████████████████████

Please let us know if you have any comments.

Veronica Case, CPA
**Chief Operating Officer**
**Vineyard Capital Partners, LLC**
P. O. Box 79201
Atlanta, GA  30357

Office:   404.720.0804
Mobile:  404.512.5272

**Pinnacle Funeral Service**
Summary Valuation & Debt
3/31/2021



Pinnacle Equity

Equity post lease

Accretion
15% to Paul
85% to Vineyard
Accretion

# EXHIBIT I

**Paul Haarer**

| | |
|---|---|
| **From:** | Vineyard Capital Partners <jeff@newbridgegroup.com> |
| **Sent:** | Wednesday, July 27, 2022 9:53 AM |
| **To:** | Paul Haarer |
| **Subject:** | Vineyard Capital - June 30, 2022 Investor Report |



July 27, 2022

Dear Vineyard Investor,

Please follow this link to the **June 30, 2022 Report.**

We cover the following topics:

- Offer to re-purchase units from Investors

Please let us know if you have any questions.

**Jeff Boutwell**
Managing Member
jeff@vineyardcp.com

**Ken Boutwell**
Managing Member
ken@vineyardcp.com

**Veronica Case**
Chief Operating Officer
veronica@vineyardcp.com

NEWS   ABOUT   OPERATING
PARTNERS   INVESTORS   LEADERSHIP   CONTACT

Vineyard Capital Partners, LLC | 3320 Thomasville Rd, Suite 200, Tallahassee, FL 32308 |
www.newbridgegroup.com | info@newbridgegroup.com | Unsubscribe | Privacy Policy

## INVESTOR INFORMATION
### JUNE 2022



**Opportunity to Redeem**

To provide investors with liquidity, we are offering to repurchase up to ▮▮▮▮▮ equity units at the current value of $▮▮▮ per unit. This offer expires September 30, 2022, so please contact us before then if you wish to sell any of your units.

Please contact Tamra Crews at tamra@vineyardcp.com for documents necessary to facilitate either a sale of current units or purchase of new units under the offering.

# EXHIBIT J

**From:** Jeff Boutwell <jeff@newbridgegroup.com>
**Sent:** Friday, September 30, 2022 10:11 AM
**To:** Paul Haarer <paul@pinnaclefunerals.com>; Tamra Crews <tamra@vineyardcp.com>
**Subject:** RE: sale of VY units

Thanks Paul.   We received your request prior to Sept 30, as requested in the investor report.   I'll get back to first of next week on the redemption.

Jeff Boutwell
Managing Partner



4830 W. Kennedy Blvd.
Suite 600
Tampa, FL 33609
Cell: 404-316-3316
Web: www.newbridgegroup.com



**From:** Paul Haarer <paul@pinnaclefunerals.com>
**Sent:** Friday, September 30, 2022 10:05 AM
**To:** Tamra Crews <tamra@vineyardcp.com>; Jeff Boutwell <jeff@newbridgegroup.com>
**Subject:** RE: sale of VY units

Good morning Tamra and Jeff,

Below are my certificate numbers for my ▇▇▇ equity units:

▇▇▇

Please confirm whether I will receive payment today or Monday Oct 3rd, based on the June 30 2022 Investor Report allowing all investors liquidity to redeem units.

Please use the same bank account as my standard monthly distributions for the payment.  Thanks and have a great weekend.

Sincerely,
Paul Haarer
Cell 770-335-6420



7742 Spalding Dr., #353
Norcross, GA 30092
770-674-5908 Direct
888-758-0746 Fax
www.PinnacleFunerals.com

---

**From:** Paul Haarer
**Sent:** Wednesday, September 28, 2022 3:00 PM
**To:** tamra@vineyardcp.com
**Subject:** sale of VY units

Hi Tamra,

Per our discussion, I will sell my remaining ▓▓▓ Vineyard units at the redemption price of $▓▓ for a total of $▓▓▓▓▓. Please also add the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓. Please transfer the funds into the same account where I currently receive distributions.

Once I get the required form you discussed, I can provide the certificate numbers.

I know from the July report that the deadline is Friday so I wanted to let you know before that time. Thanks in advance.

Sincerely,
Paul Haarer
Cell 770-335-6420



7742 Spalding Dr., #353
Norcross, GA 30092
770-674-5908 Direct
888-758-0746 Fax
www.PinnacleFunerals.com

# EXHIBIT K



September 30, 2022

Mr. Paul Haarer

Re:  Termination of Employment

Paul,

Per our discussion earlier today, Vineyard Capital Partners, LLC has made the decision to terminate your employment with Pinnacle Funeral Service, LLC effective today, September 30, 2022.



Jeff Boutwell
Managing Member

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served the foregoing **FIRST AMENDED COMPLAINT FOR DAMAGES** with the Clerk of Court using the Court's e-file system, which will provide electronic notice of such filing to all counsel of record. I have also e-mailed the aforementioned document to Defendants' counsel of record.

Respectfully submitted, this 20th day of June 2023.

<u>*/s/ Richard L. Robbins*</u>
Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com
Catherine C. Sullivan
Georgia Bar No. 957620
csullivan@robbinsfirm.com
Michael D. Forrest
Georgia Bar No. 974300
mforrest@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3255

*Counsel for Plaintiff*