**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| CHARLEY THURBER, and KIA THURBER, | ) ) ) | |
| PLAINTIFFS, | ) ) | Civil Action No.: |
| V. | ) ) | _____ |
| ZETROZ SYSTEMS LLC, and GEORGE K. LEWIS, JR., | ) ) ) | **JURY TRIAL DEMANDED** |
| DEFENDANTS. | ) ) ) | |

## <u>COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES</u>

Plaintiffs Charley Thurber and Kia Thurber (collectively "Plaintiffs"), by and through the undersigned attorney, bring this action against Defendants ZetrOz Systems LLC ("ZetrOz") and George K. Lewis, Jr. (collectively "Defendants") for failure to pay Plaintiffs at a rate of one-and-one-half their regular rate of pay for all hours worked in excess of 40 hours per week.  Additionally, Plaintiffs assert state law claims of breach of contract, quantum meruit pursuant to O.C.G.A. § 9-2-7, tortious interference with business relations, unjust enrichment, misrepresentation pursuant to O.C.G.A. § 51-6-2, negligent misrepresentation pursuant to O.C.G.A. § 23-2-52, defamation, slander per se pursuant to O.C.G.A. § 51-5-4, and attorneys'

fees.  Plaintiffs seek injunctive relief and damages against all Defendants based upon these violations.

## PARTIES

1.      At all relevant times, Plaintiffs were residents of the state of Georgia and submit themselves to the jurisdiction of the Court.

2.      Defendant ZetrOz is a LLC with its principal place of business located at 56 Quarry Road, Trumbull, Connecticut 06611.

3.      Defendant ZetrOz may be served with process through its Registered Agent, George K. Lewis, 158 Pinewood Trail, Trumbull, Connecticut, 00611, if formal service of process is not waived.

4.      Defendant George K. Lewis, Jr. may be served with process at 158 Pinewood Trail, Trumbull, Connecticut, 00611, if formal service of process is not waived.

5.      At all relevant times, Defendant ZetrOz has been, and continues to be, an "employer" engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. § 201 *et seq.*

6.      At all relevant times, Defendant ZetrOz has been, and continues to be, an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. § 203(s)(1)(A) because it "has employees engaged

in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person."

7.　At all relevant times, Defendant ZetrOz has had an annual gross volume of sales or business done in excess of $500,000.

8.　At all relevant times, Defendant ZetrOz has had two or more "employees engaged in commerce" as defined by 29 U.S.C. § 203(s)(1)(A).

9.　At all relevant times Defendant ZetrOz was an "employer" of Plaintiffs as that term is defined by 29 U.S.C. § 203(d).

10.　Defendant ZetrOz is governed by and subject to 29 U.S.C. § 206 and 29 U.S.C. § 207.

11.　Defendant George K. Lewis, Jr. owns and operates ZetrOz.  Defendant George K. Lewis, Jr. acts directly or indirectly on behalf of ZetrOz and exercises day-to-day control over the operations and pay practices of ZetrOz.  Defendant George K. Lewis, Jr. is an employer within the meaning of the FLSA.

## JURISDICTION AND VENUE

12.　This Court has federal question jurisdiction over Plaintiffs' FLSA claim pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.   Complete diversity exists because Plaintiffs are citizens of Georgia and Defendants are not citizens of Georgia.

14.     Pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 2000e-5(f)(3) and Local Rule 3.1(B)(3), venue is proper because the unlawful employment practices giving rise to the Plaintiffs' claims occurred in this judicial district and division.

15.     This Court has personal jurisdiction over Defendants for the following reasons:

   a.  Defendants, either directly or through agents, have transacted business within the State of Georgia, committed tortious acts within the State, or otherwise have sufficient minimum contacts with the State and have purposefully availed themselves of the privilege of conducting activities within the State, thus invoking the benefits and protections of its laws.

   b.  Alternatively, the Defendants have consented to this Court's jurisdiction by their actions, behavior, or specific agreement.

c. In the case of any corporate defendant, they are incorporated in, have principal place of business in, or are otherwise doing business in the State of Georgia.

d. Further, the exercise of jurisdiction over the Defendants complies with the Due Process Clause of the United States Constitution as the Defendants have sufficient minimum contacts with the State of Georgia such that maintenance of this suit does not offend traditional notions of fair play and substantial justice.

16.    Defendants have caused harm to the Plaintiffs within the State of Georgia, and thus should reasonably anticipate being haled into court in Georgia.

17.    This Court's exercise of personal jurisdiction over the Defendants is also consistent with the Georgia long-arm statute, O.C.G.A. § 9-10-91.

## **FACTUAL ALLEGATIONS**

18.    Defendant ZetrOz develops a portfolio of wearable, drug free, non-invasive devices that deliver therapeutic ultrasound technology, a new treatment form to treat pain and enhance healing.

19.    One of Defendant ZetrOz's products is sam (Sustained Acoustic Medicine).  Sam is a wearable device that delivers low intensity, long duration,

ultrasound treatment for soft tissue injuries and chronic pain to reduce the need for pain medication and surgery.

20.     Defendant ZetrOz sells its products nationwide.

21.     Plaintiff Charley Thurber spent three years at the University of Tennessee where he graduated with a degree in sports management and a minor in business management and played NCAA Division I baseball.

22.     Plaintiff Charley Thurber was drafted by the New York Mets and had a seven-year professional baseball career that also included time with the Colorado Rockies.

23.     Plaintiff Kia Thurber graduated from East Tennessee State University where she received a business degree.  She played Division I soccer for four years.

24.     Plaintiffs Charley Thurber and Kia Thurber are married.

25.     In late 2016/2017, during Plaintiff Charley Thurber's professional baseball career, Plaintiffs began their employment with Defendant ZetrOz.

26.     During their employment with Defendant ZetrOz, Plaintiffs reported directly to Defendant Lewis.

27.     Plaintiffs were hired for the express purpose of capitalizing on Plaintiff Charley Thurber's baseball career in order to open the major league baseball and minor league baseball markets.

28.     However, once Defendants realized that Plaintiffs' contacts extended to other professional and college sports, they capitalized on Plaintiffs' sports careers and contacts, in order to enter those markets.

29.     Throughout their employment, Plaintiffs were responsible for a significant number of tasks including, but not limited to, the following: opening markets in professional and college sports by using their sports connections and contacts, opening markets in the military, establishing payor relations, selling sam products to their sports contacts, participating in bi-weekly zoom meetings with the sam sales team (the team responsible for product sales in non-athletic markets), arranging clinical research studies surrounding the use of sam technology, gathering customer feedback for Defendant ZetrOz to create new products such as a medicated sam gel patch in which Plaintiffs led a team of 100+ individuals for a clinical feedback mission, providing business advice to Defendant Lewis, providing quarterly updates to Defendant Lewis, providing initiative updates to Defendant Lewis, etc.

30.     Plaintiffs built Defendant ZetrOz's billing system by finding Defendant ZetrOz a biller and creating a process to achieve insurance coverage for Defendant ZetrOz.  Once established, this billing system consistently had over one million dollars in accounts receivable.

31.     Plaintiffs arranged for meetings with insurance payors for the sports and government markets and introduced Defendant Lewis to industry payors: OccuNet, Fairly Group, AG Administrators, BMI, Mutual of Omaha, TriCare, etc. Plaintiffs, on behalf of ZetrOz, spearheaded the efforts to arrange contracts with these payors.

32.     Plaintiffs created marketing emails that went to thousands of individuals in all business sectors (sports, orthopedics, work injury, government) each week and wrote marketing briefs that were used by Defendants nationwide.

33.     Plaintiffs were also responsible for finding and managing social media influencers, serving as product influencers, arranging speaking engagements, leading marketing efforts, and creating national marketing campaigns.

34.     Plaintiffs used their own Constant Contact account, a platform for digital and email marketing, to run weekly national marketing campaigns to their territory of athletics.

35.     Plaintiffs were required to set up and run the Instagram, Twitter, and LinkedIn accounts for "samrecover" and were required to provide 24/7 coverage of an online chat bot and the national corporate hotline.

36.     Defendants also required that Plaintiffs attend quarterly board meetings.

37.     Both Plaintiffs were named "Employee of the Year" in differing years.

38.     Defendants required that Plaintiffs sign independent contractor agreements.

39.     Those independent contractor agreements provided that Plaintiffs would be compensated through commission based on the number of devices sold.

40.     Through their sports connections and contacts, Plaintiffs grew Defendants business exponentially and made a name for Defendant ZetrOz in the sports market.

41.     For example, in 2020 Plaintiffs made approximately $180K in commission, in 2021 they made $360K in commission, and they were on pace to make close to $700K in commission in 2022 prior to their termination.

42.     Moreover, due to various clinical studies designed through ideas, data, and relationships of the Plaintiffs, and conducted in large part by the Plaintiffs' efforts, Defendants received millions of dollars in funding from the federal government to create new products, including from NASA, the National Institute of Health, and other federal agencies.

43.     For example, Defendants signed a five-year Healthcare Federal Supply Schedule Agreement to provide the US government healthcare institutes with its sam device and patches.   The $3.4 million dollar contract covers military bases and

hospitals, veteran healthcare hospitals, and employees of the FBI, CIA, DOL, postal service, and other US departments and agencies operating both in the United States and abroad.  The funding was received due to Defendants using references and data collected from clinical studies designed and run by Plaintiffs.

44.    Additionally, sam has been authorized by many health plans and insurance carriers in the United States including the United States Department of Defense (DOD) and the Veterans Administration again due in large part to the clinical studies designed and run by Plaintiffs and Plaintiffs' design and creation of Defendant ZetrOz's billing system.

45.    Defendant Lewis also spoke as a keynote speaker at the 2020 National Institutes of Health Pain Consortium Symposium and touted the results of one of the clinical studies designed and run by Plaintiffs.

46.    In essence, Plaintiffs grew Defendants' business by millions of dollars both by growing the entire sports market and by securing Defendants' many lucrative grant awards in federal funds through the clinical studies designed and run by Plaintiffs.

47.    Notwithstanding the unlawful independent contractor agreements Plaintiffs were required to sign, Plaintiffs were improperly classified as independent

contractors when they should have been classified as employees, entitling them to overtime protections under the FLSA.

48.    Defendants directly and indirectly controlled the employment relationship.

49.    The independent contractor agreements specifically stated that Plaintiffs were not allowed to sell competing products.

50.    Plaintiffs were required to attend bi-weekly sales meetings for full company sales strategy.

51.    Plaintiffs did not have prior experience working at a medical device company.

52.    Plaintiffs were told to upload all contacts into a customer relationship manger tool, HubSpot, where all Plaintiffs' conversations, ordering history, strategy, and client contact information was stored.  Defendants purposefully exploited Plaintiffs' inexperience and good faith by exercising control over the software and gaining access to Plaintiffs' client information.

53.    Plaintiffs attended and participated in board meetings.

54.    Plaintiffs each had a ZetrOz email address.

55.     Plaintiffs had their own business cards but those business cards only had the sam logo and ZetrOz email addresses on them.   In other words, those business cards were for the sole benefit of Defendants.

56.     Plaintiffs had nearly daily conversations with Defendant Lewis regarding business strategy.

57.     Plaintiffs had all expenses—which were significant—reimbursed by Defendant ZetrOz.

58.     Plaintiffs were consistently pictured and listed as part of Defendant ZetrOz's leadership team in marketing presentations and were required to represent the Company at events nationwide.

59.     Plaintiffs worked a significant number of hours for Defendant ZetrOz and did not have other employment while working at Defendant ZetrOz.

60.     Plaintiffs often worked over 40 hours in a week, especially during weeks in which Plaintiffs were required to travel to shows and other events.

61.     Plaintiffs shared exclusive opportunities to sponsor professional and college sports teams including private tradeshows formerly unknown by Defendants and exclusive speaking arrangements for Defendant Lewis to present.   Plaintiffs commonly developed methods to help Defendant Lewis achieve ways to present

educational symposiums and attend private facilities, dinners, and meetings with exclusive clientele.  These opportunities were for the sole benefit of Defendants.

62.     In May 2022, Plaintiff Charley Thurber attended 11 multi-day shows, including shows for NFL, NBA and ACC, etc. on behalf of Defendant ZetrOz which required that he work an extensive number of hours traveling, attending shows, and communicating with prospective and current customers.

63.     On at least two different occasions during Plaintiff's employment with Defendants, Defendants told Plaintiffs that they should be brought on as employees, not independent contractors.

64.     Specifically, on or around June 2019, Defendant offered Plaintiffs employment agreements for $30,000/year with a 7% commission rate.

65.     On or around November 2021, just weeks before Plaintiffs' second child arrived, Defendant Lewis expressed verbally a fear of having improperly classified Plaintiffs as independent contractors considering the significant travel expenses they were having to reimburse.

66.     In December 2021 Plaintiffs had their second baby.

67.     In February 2022, just weeks after Plaintiffs' second child was born, Defendant Lewis submitted a proposal for Plaintiff Charley Thurber to be Director of Sports Medicine for Defendant ZetrOz making $30,000 annually.

68.     Defendant Lewis threatened that Plaintiffs would be "run over" if the agreement was not accepted.

69.     Plaintiffs experienced a high degree of stress during these negotiations.

70.     Defendants no longer wanted to honor the independent contractor agreements because they felt that Plaintiffs—who had grown Defendants' business exponentially—were going to make too much money in commission.

71.     Defendants did not want to compensate Plaintiffs commission for the tremendous growth the Company was experiencing because of the Plaintiffs' efforts despite the fact that the commission was substantially less than the value of the benefit conferred.

72.     Therefore, Defendants presented Plaintiffs with employment agreements, however, the employment agreements presented to Plaintiffs contained extremely unfavorable compensation terms and restrictive covenants, so Plaintiffs did not sign those agreements.

73.     Defendants were trying to turn Plaintiffs into employees, compensate them less, and also prevent them from competing with Defendants.

74.     Although the employment agreements contained extremely unfavorable compensation terms, Defendants continued to pressure Plaintiffs into

14

signing those agreements yet showed no interest in altering the compensation terms or the unreasonable restrictive covenants contained in the agreements.

75.    In April 2022, Plaintiff Kia Thurber was hospitalized for serious medical conditions resulting from the birth of her baby and the stress she endured due to her job and lack of maternity leave.  She was hospitalized numerous times in the months that followed.

76.    Although Plaintiff Kia Thurber was forced to go on an extended leave of absence, she was expected to make a full recovery and continue working.

77.    Plaintiff Charley Thurber continued to work and increase business while keeping his personal lives private.

78.    It was an extremely emotional time for Plaintiffs as Plaintiff Charley Thurber had to care for both of his children while his wife was dealing with an extended medical emergency related to the birth of her second child.

79.    Defendants used this extremely trying time for Plaintiffs to their advantage.

80.    For example, Defendants began interviewing prospective employees.

81.    Additionally, Plaintiff Charley Thurber was persuaded to share his Constant Contact account login with Defendants because Defendants claimed to want to "help" Plaintiffs manage during their health emergency.

82.     Instead, Defendants used that time to lock Plaintiffs out of the account that had all the marketing material, strategy, and contacts, and put that material in the hands of their new sales team.

83.     In addition, Defendants took control of Plaintiffs' Hub Sports account, which contained all of Plaintiffs' sports contacts, and locked Plaintiffs out of this account.

84.     On or about July 10, 2022, Defendant Lewis informed the Plaintiffs that he was terminating their contracts stating that he could not be liable for Plaintiff Kia Thurber and that he had a new sales team that would be managing Plaintiffs' accounts in professional and college sports.

85.     Defendant Lewis also informed Plaintiff Charley Thurber that he had spent the last six months recruiting a sales team and that Plaintiffs' accounts would be assigned to that team.

86.     The individuals on the sales team were hired as employees—not independent contractors—and were divided into specific regions in order to cover the national market that Plaintiffs had created.

87.     The sales team also used the contacts, order history, and strategy that Plaintiffs had created.

88.     For the next thirty days, Plaintiff Charley Thurber continued to submit orders to Defendant ZetrOz for fulfillment, in good faith.

89.     The independent contractor agreements provided the following, "In the event of termination, T&T Medical agrees to complete the full processing of all submitted & pending third party billed orders.  In return, ZetrOz agrees to pay commission for all orders submitted from T&T Medical's accounts and territories *regardless of the amount of time elapsed after termination*."  (emphasis added).

90.     Defendants owe Plaintiffs approximately $207,508.60 in unpaid commissions for devices sold both during the time that Plaintiffs were employed by Defendants and after.

91.     Defendants continue to benefit from Plaintiffs' name and efforts as Defendants have continued to fill orders that come in from the Plaintiffs' old ZetrOz email addresses.

92.     Although the Plaintiffs continued to, in good faith, submit orders to Defendant ZetrOz from college and professional sports teams following Defendants termination of their contracts, Defendants were purposefully unresponsive to Plaintiffs' clients, did not ship orders on time, or provide updates, in order to purposefully harm the Plaintiffs' reputation with the sports teams (their clients).

93.     When Defendants failed to respond to Plaintiffs or process Plaintiffs' orders for an entire month, Plaintiffs began submitting orders through a third-party distributor, Client Care RX.

94.     Client Care RX used an individual Dena Malin, President of Claims Pro, to bill insurance claims.

95.     Ms. Malin, on behalf of her Company, Claims Pro, worked with Client Care RX for approximately 15 years.

96.     Upon information and belief, following Defendants termination of Plaintiffs, Defendants hired Ms. Malin as an employee of Defendant ZetrOz as she has a ZetrOz email address, and her signature block states that she is "Billing Administrator."  Since Ms. Malin's hire at ZetrOz, she has not billed a majority of the Plaintiffs' orders that were submitted through Client Care RX, thereby purposefully harming the Plaintiffs' reputation with their clients.

97.     Upon information and belief, Defendants told Ms. Malin not to bill Plaintiffs' orders.

98.     Ms. Malin has access to the entire list of claims submitted through the Plaintiffs (using Client Care RX as the distributor).

99.     Ms. Malin's sharing of these claims with Defendants violates the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

100.   Additionally, upon information and belief, Defendant Lewis is directing Ms. Malin to charge Plaintiffs' clients exorbitant fees for Plaintiffs' submitted orders that have already been paid for by insurance agreements.   For example, insurance has already paid approximately $3,000 for these devices yet Ms. Malin and Defendants are requesting a credit card payment totaling $8,500 from Plaintiffs' clients, thereby purposefully harming the Plaintiffs' reputation with their clients.

101.   Claims Pro's has failed to submit orders to insurance which has prevented the shipment of orders placed by Plaintiffs through Client Care RX, has purposefully failed to provide the standard bi-weekly status updates required for insurance carriers to execute payment, and has misrepresented to Plaintiffs' clients that colleges are not allowing sam devices to be paid through insurance.

102.   Plaintiffs' clients have also submitted faulty or damaged units to Defendants to be replaced yet these units are not replaced, thereby purposefully harming the Plaintiffs' reputation with their clients.

103.   Defendants have threatened to cut off Client Care RX's supply if they continue to work with Plaintiffs.

104.   Defendants also stopped providing their full product line to Client Care RX, including the wireless sam unit, in order to prevent the Plaintiffs from selling this device to their clients.

105.   Defendants have also defamed the Plaintiffs by stating they have acted wrongly, by describing Plaintiffs as "unstable" to clients, and by telling clients that Plaintiffs are misrepresenting themselves as distributors.

106.   For example, on or about November 10, 2022, Defendant George Lewis sent the Assistant Athletic Trainer for the Green Bay Packers, an email that stated, among other things, the following: "**<u>Importantly:</u>** Thurber Medical . . . Charley Thurber . . . <u>ARE NOT</u> distributors or representatives of sam products.  We have been made aware by other teams in the league that they have been misrepresenting themselves."

## COUNT I
## WILLFUL FAILURE TO PAY MINIMUM WAGE
## IN VIOLATION OF THE FLSA
### (Against all Defendants – For Damages)

107.   Plaintiffs incorporates by reference all preceding paragraphs of the Complaint.

108.   Plaintiffs assert this count pursuant to 29 U.S.C. § 216(b).

109.   At all relevant times, Defendant ZetrOz was an employer engaged in commerce and/or the production of goods for commerce pursuant to 29 U.S.C. §§ 203(b), 203(s)(1).

110.   At all relevant times, Defendants employed Plaintiffs, and Plaintiffs were Defendants' employees, pursuant to 29 U.S.C. §§ 203(e), 203(g).

111.   At all relevant times, Defendant ZetrOz has had an annual gross volume of sales or business done in excess of $500,000.

112.   The FLSA requires covered employers like Defendants to pay employees like Plaintiffs at a rate of one-and-one-half their regular rate of pay for all hours worked in excess of 40 hours per week.  *See* 29 U.S.C. § 207.

113.   Plaintiffs' employment does not fall under any of the exemptions to the maximum hour requirements of the FLSA.  *See* 29 U.S.C. § 213.

114.   Plaintiffs worked more than 40 hours per week for Defendants most weeks.

115.   At all relevant times, Defendants did not properly compensate Plaintiffs for all hours worked in excess of 40 in a workweek, as required by the FLSA.

116.   At all relevant times, Defendants knew that Plaintiffs worked overtime without proper compensation, and willfully and intentionally engaged in a widespread policy or practice of failing and refusing to pay Plaintiffs at a rate of one-

and-one-half their regular rate of pay for all hours worked in excess of 40 hours per week.  *See* 29 U.S.C. § 255.

117.   Defendants were familiar with the requirements of the FLSA. Defendants' violations were willful because they knew or showed reckless disregard for the matter of whether their conduct was prohibited by the FLSA.

118.   Defendants' willful failure and refusal to pay Plaintiffs overtime pay violates the FLSA.  *See* 29 U.S.C. § 207.

119.   As a direct and proximate result of these unlawful practices, Plaintiffs suffered and continue to suffer wage loss and are therefore entitled to recover overtime pay for up to three years prior to the filing of their claims, liquidated damages, pre-and post- judgment interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

**COUNT II**
**QUANTUM MERUIT**
**VIOLATION OF O.C.G.A. § 9-2-7**
**(Against all Defendants – For Damages)**

120.   Plaintiffs incorporate by reference all preceding paragraphs of the Complaint.

121.   The "Independent Contractor's Agreement" signed by Plaintiffs is null and void as it violates the FLSA.

122.   Plaintiffs performed services of value in good faith to Defendants for which Plaintiffs have not been fully paid, and Defendants have taken undue advantage of Plaintiffs' situation, contrary to law and good conscience.

123.   Defendants knowingly and voluntarily accepted and retained this benefit and value.

124.   Defendants have provided inadequate reimbursement, payment, or other consideration for the substantial benefit and value they received from Plaintiffs.  As such, Plaintiffs have conferred a benefit on Defendants for which Defendants equitably should compensate Plaintiffs.  Defendants have been unjustly enriched and payment is due from Defendants to Plaintiffs in equity and good conscience.

125.   Under these circumstances, it would be inequitable, unfair, and unjust for Defendants to retain this benefit.

**COUNT III**
**UNJUST ENRICHMENT**
**(Against all Defendants – For Damages)**

126.   Plaintiffs incorporate by reference all preceding paragraphs of the Complaint.

127.   The "Independent Contractor's Agreement" signed by Plaintiffs is null and void as it violates the FLSA.

128.   Plaintiffs performed services of value in good faith to Defendants for which Plaintiffs have not been fully paid, and Defendants have taken undue advantage of Plaintiffs' situation, contrary to law and good conscience.  As a direct result, and as evidenced by tremendous company growth, Defendants obtained a substantial benefit and value.

129.   Defendants knowingly and voluntarily accepted and retained this benefit and value.

130.   Defendants have provided inadequate reimbursement, payment, or other consideration for the substantial benefit and value they received from Plaintiffs.  As such, Plaintiffs have conferred a benefit on Defendants for which Defendants equitably should compensate Plaintiffs.  Defendants have been unjustly enriched in violation of the fundamental principles of justice, equity, and good conscience.

131.   Under these circumstances, it would be inequitable, unfair, and unjust for Defendants to retain this benefit.

**COUNT IV**
**BREACH OF CONTRACT**
**(Against all Defendants – For Damages)**

132.   Plaintiffs incorporate by reference all preceding paragraphs of the Complaint.

133.   Pursuant to Rule 8 of the Federal Rules of Civil Procedure, this count is pleaded in the alternative to Count II and III.

134.   To the extent the Independent Contractor Agreement was a valid and enforceable contract, at least in part, Plaintiffs satisfied all conditions precedent, and fully performed their obligations under that agreement.

135.   Without justification or excuse, Defendants breached the agreement by failing to pay all commission due.

136.   Plaintiffs are entitled to damages.

137.   Defendants' material breaches of the agreement have also forced Plaintiffs to retain outside counsel to bring this action and therefore Plaintiffs seek reimbursement of their reasonable attorney's fees, costs and expenses.

138.   The agreement provides, "Each party agrees to indemnify, defend, and hold harmless the other party from and against any loss, cost, or damage of any kind (including reasonable outside attorneys' fees) to the extent arising out of its breach of this Agreement, and/or its negligence or willful misconduct."

## COUNT V
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (Against all Defendants – For Damages and Injunctive Relief)

139.   Plaintiffs incorporate by reference all preceding paragraphs of the Complaint.

140.   Defendants' activities as set forth above constitute tortious interference with the business relations of Plaintiffs.

141.   Specifically, during Plaintiffs' employment with Defendants, despite the fact that they were classified as independent contracts, Defendants prevented Plaintiffs from selling competing products.

142.   Moreover, upon information and belief, Defendants requested access to Plaintiffs' Constant Contact and Hub Sports accounts in order to interfere improperly and without privilege with Plaintiffs' business relations and with its customers by inducing them to discontinue their relationship with Plaintiffs and to enter into a relationship with Defendants.

143.   Following Plaintiffs' termination from the Company, Defendants purposefully hired Dena Malin, President of Claims Pro, who had worked with Client Care RX for approximately 15 years, as an employee of ZetrOz, specifically, as Billing Administrator, so that she would not bill any of the Plaintiffs' orders submitted through Client Care RX, charge Plaintiffs' clients exorbitant fees for devices that had already been paid by insurance, fail to ship orders placed by Plaintiffs through Client Care RX, fail to replace faulty devices on orders submitted by Plaintiffs' clients, defame Plaintiffs to their clients, and force Client Care RX to

stop selling products submitted by Plaintiffs, thereby purposefully harming the Plaintiffs' reputation with their clients.

144.   Defendants took the aforementioned actions to harm Plaintiffs' reputation and so that Plaintiffs' clients would cease working with them.

145.   As a result of Defendants' interference with Plaintiffs' business relations, Plaintiffs have suffered monetary damages and have suffered substantial and irreparable injury and are threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

146.   By reason of the foregoing, Plaintiffs require injunctive relief.  Unless injunctive relief is granted, Plaintiffs will be irreparably harmed in a manner not fully compensable by money damages.  In addition, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT VI**
**MISREPRESENTATION**
**VIOLATION OF O.C.G.A. § 51-6-2**
**(Against all Defendants – For Damages)**

147.   Plaintiffs incorporate by reference all preceding paragraphs of the Complaint.

148.   Defendants misrepresented one or more material facts to Plaintiff.

149.   Plaintiff Charley Thurber was persuaded to share his Constant Contact account login with Defendants because Defendants claimed to want to "help" Plaintiffs manage during their health emergency.

150.   Instead, Defendants used that time to lock Plaintiffs out of the account that had all the marketing material, strategy, and contacts, and put that material in the hands of their new sales team.

151.   In addition, Defendants took control of Plaintiffs' Hub Sports account, which contained all of Plaintiffs' sports contacts, and locked Plaintiffs out of this account.

152.   On or about July 10, 2022, Defendant Lewis informed the Plaintiffs that he was terminating their contracts stating that he could not be liable for Plaintiff Kia Thurber and that he had a new sales team that would be managing Plaintiffs' accounts in professional and college sports.

153.   Defendants' misrepresentation was made either willfully or recklessly.

154.   Plaintiffs acted upon Defendants misrepresentation to their injury.  In justifiable reliance on Defendants' assurances, Plaintiffs lost client contact information and opportunities and have incurred lost profits.

## COUNT VII
## NEGLIGENT MISREPRESENTATION
## VIOLATION OF O.C.G.A. § 23-2-52
### (Against all Defendants – For Damages)

155.    Plaintiffs incorporate by reference all preceding paragraphs of the Complaint.

156.    Defendants misrepresented one or more material facts to Plaintiff.

157.    Plaintiff Charley Thurber was persuaded to share his Constant Contact account login with Defendants because Defendants claimed to want to "help" Plaintiffs manage during their health emergency.

158.    Instead, Defendants used that time to lock Plaintiffs out of the account that had all the marketing material, strategy, and contacts, and put that material in the hands of their new sales team.

159.    In addition, Defendants took control of Plaintiffs' Hub Sports account, which contained all of Plaintiffs' sports contacts, and locked Plaintiffs out of this account.

160.    On or about July 10, 2022, Defendant Lewis informed the Plaintiffs that he was terminating their contracts stating that he could not be liable for Plaintiff Kia Thurber and that he had a new sales team that would be managing Plaintiffs' accounts in professional and college sports.

161.   Plaintiffs acted upon Defendants misrepresentation to their injury.  In justifiable reliance on Defendants' assurances, Plaintiffs lost client contact information and opportunities and have incurred lost profits.

**COUNT VIII**
**DEFAMATION AND SLANDER PER SE**
**IN VIOLATION OF O.C.G.A. § 51-5-4**
**(Against all Defendants – For Damages)**

162.   Plaintiffs incorporates by reference all preceding paragraphs of the Complaint.

163.   Defendants have made defamatory remarks calculated to damage Plaintiffs and their business reputation.

164.   Defendants have defamed the Plaintiffs by stating they have acted wrongly, by describing Plaintiffs as "unstable" to clients, and by telling clients that Plaintiffs are misrepresenting themselves as distributors.

165.   For example, the Green Bay Packers and Los Angeles Rams told Plaintiffs following Plaintiffs' termination from Defendant ZetrOz that Defendants told them that the Plaintiffs are "unstable" and therefore not able to properly run their business and have been misrepresenting themselves as distributors of Defendant ZetrOz without authority, which is not true.

166.   On or about November 10, 2022, Defendant George Lewis sent the Assistant Athletic Trainer for the Green Bay Packers, an email that stated, among

other things, the following: "**Importantly:** Thurber Medical . . . Charley Thurber . . . ARE NOT distributors or representatives of sam products.  We have been made aware by other teams in the league that they have been misrepresenting themselves."

167.   In November 2022, Defendants also threatened to cut off the entire supply of a third-party distributor, Client Care RX, if they worked with Plaintiffs as Defendants told Client Care RX that Plaintiffs were misrepresenting that they had authority to sell Defendant ZetrOz's products.

168.   These statements have caused significant damage to Plaintiffs' trade, office, profession, occupation, and commercial reputation.

169.   These statements demonstrate willful misconduct, malice, wantonness, oppression and want of caring raising the presumption of conscious indifference to their actions, entitling Plaintiffs to punitive damages under O.C.G.A. § 51-12-5.1.

## COUNT IX
## ATTORNEYS' FEES
### (Against all Defendants – For Damages)

170.   Plaintiffs incorporate by reference all preceding paragraphs of the Complaint.

171.   Defendants have acted in bad faith, been stubbornly litigious and caused Plaintiffs unnecessary trouble and expense, and therefore, Plaintiffs are

entitled to recover their expenses of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11 or otherwise.

WHEREFORE, Plaintiffs demand a TRIAL BY JURY and the following relief:

(a)     A declaratory judgment that the Defendants' practices complained of herein are unlawful under the FLSA;

(b)     An injunction preventing Defendants from interfering with the business relations of Plaintiffs;

(c)     An award of special and general damages;

(d)     An award of back pay, including all lost pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

(e)     An award of compensatory damages for emotional pain and suffering in an amount to be determined by the enlightened conscience of a jury;

(f)     An award of unpaid wages at regular hourly rate, unpaid overtime compensation, and other compensation denied or lost to Plaintiffs by reason of Defendants' unlawful acts;

(g)     An award of front pay, including all lost future pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

(h)     An award of liquidated and punitive damages;

(i)     An award of pre-and post- judgment interest;

(j)     An award of costs and expenses of this action, including reasonable attorney's and expert fees; and

(k)     Such other relief as this Court deems just and proper.

Respectfully submitted, this 12th day of July, 2023.

_s/ Jackie Lee_
Jackie Lee
Georgia Bar No. 419196
jackie@leelawga.com
LEE LAW FIRM, LLC
695 Pylant Street N.E., Suite 105
Atlanta, Georgia 30306
Tel: (404) 301-8973

Bonnie Shira Levine
Georgia Bar No. 422055
bonnie@verselegal.com
VERSE LEGAL, LLC
135 Auburn Ave. N.E., Suite 204
Atlanta, Georgia 30303
Tel: (404) 910-3732

**COUNSEL FOR PLAINTIFF**