# EXHIBIT  B

# LOAN AGREEMENT

for a loan in the principal amount of

**$2,300,000.00**

MADE BY AND BETWEEN

**2604 CAMBLETON ROAD PARTNERS, LLC,**
A Georgia limited liability company,

as Borrower,

AND

**JOSEPH HARKER and BRIAN PEOPLES,**

Individually, collectively, jointly and severally, as Guarantor

AND

**SPECIALTY CREDIT HOLDINGS, LLC,**
A Delaware limited liability company,

as Lender

**Dated: July __, 2017**

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "**Loan Agreement**") is and entered into as of July __, 2017 (the "**Effective Date**") by and among **SPECIALTY CREDIT HOLDINGS, LLC**, a Delaware limited liability company, (together with its successors and/or assigns, "Lender"), and **2604 CAMBLETON ROAD PARTNERS LLC, a Georgia limited liability company** ("**Borrower**"), **JOSEPH HARKER** ("**Harker**"), and **BRIAN PEOPLES** ("**Peoples**" and together with Harker, individually, collectively, jointly and severally, "**Guarantor**").

W I T N E S S E T H:

RECITALS

A.  **WHEREAS**, Borrower is or will become the fee simple owner of certain real property and improvements thereon located at 2604 Campbellton Road, Fulton County, Georgia, commonly known as the "Enclave @ Campbellton" consisting of approximately 35 Units (as defined herein), undivided rights in common areas and related amenities all as more specifically described in Schedule A, annexed hereto and made a part hereof (together with all improvements now or hereafter located thereon, collectively, the "**Property**"); and

B.  **WHEREAS**, Borrower has requested that Lender make a commercial loan in the principal amount of **TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00)** (the "**Loan**") for purposes of refinancing existing debt secured by the Property, rehabilitation, capital expenditures, funding various Reserves (as defined herein), closing fees, costs and charges; and

C.  **WHEREAS**, Guarantor is in Control (as defined herein) of Borrower and as a result thereof, will substantially benefit from the Loan; and

D.  **WHEREAS**, Lender is willing to make the Loan to Borrower on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, for valuable consideration and in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND RULES OF CONSTRUCTION

***Section 1.01***          ***Definitions.***

Except as otherwise defined herein, the following terms, as used herein, shall have the following meanings:

"Affiliate" - Means, with respect to a specified Person, group of Persons any other Person that, directly and/or indirectly, through one or more intermediaries, Controls or is Controlled by

1

and/or is under common Control with such Person, including, without limitation, Borrower, any Guarantor and any Person or entity owned or Controlled by, which owns or Controls, or is under common Control with, any combination of the Borrower and/or Guarantor.

"Alexandria Loan Borrower" – Means, any Asset Owner Party which owns the Asset with respect to the Alexandria Loan, is the maker of the promissory note and borrower under the Alexandria Loan and related Cross-Collateral Loan Documents evidenced thereby.

"Alexandria Loan" – Means that certain Cross-Collateral Loan and the Cross-Collateral Loan Documents by and among the Alexandria Loan Borrower and Lender.

"Austin Circle Loan" – Means that certain Cross-Collateral Loan evidenced by that certain Loan Agreement and Promissory Note, each being dated June 7, 2017, in the principal amount of $3,925,000.00, by and among 3859 Austin Circle Associates, LP, a Georgia limited partnership, and Lender.

"Applicable Interest Rate" – Means during the Term and subject to Section 2.06, a variable rate of interest equal to one (1) month LIBOR plus 8.500% per annum, it being expressly understood and agreed that all interest under the Loan shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.

"Asset Owner Parties" – As defined in the Exclusivity Agreement.

"Asset" or "Assets" – As defined in the Exclusivity Agreement.

"Asset Minimum Release Price" – Subject to the terms and conditions contained in Section 2.12, the minimum release price to be received by Lender (or by any Affiliate of Lender) under the Loan and/or any Cross-Collateral Loan as consideration for releasing any Asset under a Cross-Collateral Loan from the Obligations under this Agreement and the other applicable Loan Documents, all as more specifically described in Exhibit H annexed hereto and made a part hereof.

"Assignment of Contracts" – Means that certain Assignment of Contracts, Licenses, Rights and Permits, dated as of the Effective Date and executed by Borrower.

"Bankruptcy Action" shall mean with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code or any other Federal, state, local or foreign bankruptcy or insolvency law; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other Federal, state, local or foreign bankruptcy or insolvency law or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other Federal, state, local or foreign bankruptcy or insolvency law; (d) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Project; or (e) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due or to take action in furtherance of any of the foregoing.

"<u>Bankruptcy Code</u>" shall mean Title 11 of the United States Code, 11 U.S.C. § 101, et seq., as the same may be amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights or any other Federal or state bankruptcy or insolvency law.

"<u>Book Entry System</u>" – As defined in <u>Section 4.11</u> hereof.

"<u>Budget</u>" – Means, subject to Lender's written approval, the budget prepared and ratified by Borrower regarding any and all capital expenditures to be made with respect to the Project through the Completion Date, including, without limitation, the proposed use of funds in the CapEx Reserve and payment of any and all fees, costs and expenses related thereto, a true and accurate copy of which is annexed hereto as <u>Exhibit B</u>.

"<u>Business Day</u>" – Any day other than a Saturday, Sunday or other day on which the New York Stock Exchange and/or commercial banks located in New York, New York are authorized and/or required by Law to close. If the date of payment and/or performance under the Loan Documents falls on any day other than a Business Day, then such obligation of payment and/or performance shall occur and be deemed to be due on the immediately following Business Day with interest accruing through the date thereof.

"<u>CapEx Reserve</u>" As defined in <u>Section 2.04</u> hereof.

 "<u>Code</u>" - The Internal Revenue Code of 1986, as the same may be amended from time to time.

"<u>Collateral</u>" – The Project, together with any and all other real property and/or personal property (including general intangibles, if any) from Borrower, Guarantor and/or any other Person which secures, whether in whole and/or in part, the Obligations under the Loan Documents, including, without limitation, the Pledged Collateral (as defined under the Pledge Agreement) and Assigned Rights and Documents (as defined in the Assignment of Contracts), any Assets under the Cross-Collateral Loan Documents and any and all funds in the Reserves, all as may be replaced, substituted and/or included, from time to time.

"<u>Completion Date</u>" – Means, the date that is eighteen (18) months from the Effective Date whereupon any and all Improvements with respect to the Project shall be completed and final, non-appealable permits and certificates of occupancy and other approvals are issued by the applicable Governmental Authorities with respect to the Project, as may be required by Law <u>provided that</u>, in no event shall the Completion Date be later than eighteen (18) calendar months from the Effective Date

"<u>Completion Guaranty</u>" – Means that certain Completion Guaranty, dated as of even date as the Loan Agreement, executed by Guarantor.

"<u>Consent Fee</u>" – Means in addition to any other amounts payable by Borrower (including, without limitation, debt service), an annual fee payable to Lender equal to 0.20% of the Loan Amount payable monthly commencing on the Effective Date and thereafter, on the date each debt service payment is due and payable under the Note, computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.   Any unpaid

portion of the Consent Fee shall be added to the then unpaid principal balance of the Loan. The Consent Fee paid on the Effective Date shall not be pro-rated.

"Control" - As such term is used with respect to any Person and/or entity, including the correlative meanings of the terms "controlled by" and "under common control with", shall mean the possession, directly and/or indirectly, of the power to direct and/or cause the direction of the management policies of such Person and/or entity, whether through the ownership of voting securities, by contract and/or otherwise. "Controlled" and "Controlling" shall have correlative meanings.

"Cross-Collateral Loan" – Means, any loan(s) or other financing arrangement(s) now or hereafter entered into between Lender (or any Affiliate of Lender), Guarantor and/or any Asset Owner Parties (together with any Affiliate thereof) with respect to any Asset, including, without limitation, the Austin Circle Loan and Alexandria Loan, made pursuant to the Exclusivity Agreement.

"Cross-Collateral Loan Documents" – Any and all documents, agreements and instruments evidencing and/or securing a Cross-Collateral Loan, all as amended, restated, renewed and/or modified, from time to time.

"Debt" – Means at any given time, the aggregate unpaid and outstanding amounts due and owing under the Loan and/or any Cross-Collateral Loan at any given time, including, without limitation, unpaid principal, accrued and unpaid interest thereon (whether at the Applicable Interest Rate and/or the Default Rate), any Usage Fee, Consent Fee, Origination Fee, any Extension Fee, any Make-Whole Amount, any Commitment Fee (as such term is defined in the Exclusivity Agreement), Lender's fees, costs and expenses (including attorneys' fees and costs of collection), protective advances made by Lender for the care and preservation of the Collateral as may be permitted pursuant to the terms of the Security Instrument, and such other amounts as may be due and owing to Lender under the Note, this Loan Agreement and/or any of the other Loan Documents, it being expressly acknowledged and agreed by the parties hereto that the "Debt" constitutes "indebtedness" for U.S. federal income tax purposes and neither Borrower nor Lender shall take any action and/or tax return filing position contrary to this characterization.

"Default" - Any event and/or circumstance which with the giving of notice and/or the passage of time and/or both would become an Event of Default.

 "Default Rate" – Means a rate equal to the lesser of (i) eighteen percent (18.0%) per annum; or (ii) the maximum allowable rate under New York law.

"Determination Date" - Means the first day of the Interest Period for which the applicable Interest Rate is being determined.

"Disbursement" or "Disbursements" – Means, from time to time pursuant to the Budget and the terms and conditions of this Loan Agreement, disbursements made to or on behalf of Borrower from the CapEx Reserve.

"Dollars" and "$" - Lawful money of the United States of America.

"Event of Default" - Has the meaning given to such term in the Security Instrument and in Section 5.01 hereof.

"Exclusivity Agreement" – Means that certain Amended and Restated Exclusivity Agreement, dated of even date herewith between the Asset Owner Parties (including any Affiliates thereof) and Lender, same as may be amended, restated, modified and/or renewed, from time to time.

"Extended Maturity Date" - Means, as applicable and subject to satisfaction of the conditions precedent under Section 4.1 of the Note: (i) 5:00 PM (EST) on the thirty (30) month anniversary of the Effective Date if the first Extension Option is timely exercised, and (ii) 5:00 PM (EST) on the thirty-six (36) month anniversary of the Effective Date if the second Extension Option is timely exercised.

"Extension Fee" - Means each fee payable from Borrower to Lender under Section 4.1 of the Note in connection with each Extension Option in an amount equal to: (i) one and one-half percent (1.50%) of the then unpaid principal balance of the Loan in connection with the first Extension Option, and (ii) two percent (2.00%) of the then unpaid principal balance of the Loan in connection with the second Extension Option.

"Extension Option" - Means each of Borrower's two (2) options to extend the Initial Maturity Date in accordance with Section 4.1 of the Note for no greater than two (2), consecutive six (6) month periods of time.

"Extension Option Notice" - Means the written notice from Borrower to Lender requesting an Extension Option in accordance with Section 4.1 of the Note, in substantially the same form annexed hereto as Exhibit E.

"Extended Term" - Means the period of time from the Initial Maturity Date through and including the applicable Extended Maturity Date.

"FATCA" – As defined in Section 4.12 hereof.

"Financial Statements" - Statements of the assets, liabilities (direct and/or contingent), income, expenses and cash flow of Borrower and, as applicable, Guarantor, prepared in accordance with sound accounting principles consistently applied and/or tax based accounting in the United States of America as in effect from time to time and consistently applied, and/or any other financial statements as may be requested by Lender, from time to time.

"Governmental Authorities" - The United States, State of Georgia, State of New York, any State where the Project and/or any Asset is located and any political subdivision, agency, department, commission, board, bureau and/or instrumentality of either of them, including any local authorities, any public and/or quasi-public authority, which exercises (or may exercise) any jurisdiction over Borrower, Guarantor and/or all and/or any portion of the Project.

"Hazardous Substances" - Has the meaning as defined in the Security Instrument and the Indemnity and includes, without limitation, gasoline, petroleum, asbestos containing materials, explosives, radioactive materials or any hazardous or toxic material, substance or waste which is defined by those or similar terms or is regulated as such under any Law of any Governmental Authorities having jurisdiction over the Project or any portion thereof or its use, including: (i) any "hazardous substance" defined as such in (or for purposes of) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.A. § 9601(14) as may be amended from time to time, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (ii) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (iii) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (iv) any petroleum, including crude oil or any fraction thereof; (v) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (vi) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; and (vii) any other toxic substance or contaminant that is subject to any other Law or other past or present requirement of any Governmental Authorities. Any reference above to a Law includes the same as it may be amended from time to time, including the judicial interpretation thereof.

"Improvements" – Has the meaning as defined in the Security Instrument and in addition, includes, without limitation, any and all construction, rehabilitation, renovation, capital improvements, work and expenditures (including such expenditures made or to be made using funds from the CapEx Reserve), development (including horizontal and vertical development), hard costs and soft costs, rehabilitation, refurbishing, replacement and/or completion of any and all improvements made or to be made to any portion of the Project, including, without limitation, all work to be performed pursuant to the Budget, and obtaining any and all permits, approvals and licenses (including, without limitation, zoning and variance approvals), certificates of occupancy, utilities, roads, sidewalks and matters of ingress and egress, all as may be necessary or incidental to the operation of the Project.

"Indemnity" - Means that certain Environmental Compliance and Indemnity Agreement dated as of the Effective Date from Borrower and Guarantor.

"Initial Maturity Date" - Means 5:00 PM (EST) on June 30, 2019.

"Initial Term"– Means the period of time from the Effective Date through and including the Initial Maturity Date.

"Insurance Requirements" – Means the insurance requirements of Lender as determined by Lender in its sole discretion, including, without limitation, those insurance requirements pursuant to the Security Instrument, this Loan Agreement and the other Loan Documents, including, without limitation, the insurance requirements described in Exhibit F annexed hereto and made a part hereof.

"Intercreditor Agreement" – Means that certain Intercreditor Agreement dated July __, 2017 by and between Lender, as senior lender, and Mezzanine Lender, as subordinate lender.

"Interest Period" – Means, in connection with the calculation of interest accrued with respect to any specified date on which a payment is due, the period commencing on the first (1st) day of

the prior calendar month and ending on the last day of such month after such prior calendar month; provided, however, the initial Interest Period shall be the period commencing on the Effective Date and ending on July 31, 2017.

"Interest Reserve" – As defined in Section 2.04.

"Guarantor" – As defined in the preamble of this Loan Agreement.

"Guaranty" – Means, that certain Limited Guaranty Agreement and Completion Guaranty dated as of the Effective Date executed by Guarantor.

"Law" or "Laws" - Any federal, state and/or local law, statute, rule, regulation, ordinance, order, decree, directive, requirement, code, notice of violation and/or rule of common law, now and/or hereafter in effect as it relates to any Person, the Collateral, any Asset under a Cross-Collateral Loan or any matters described in the Loan Documents, in each case as amended, and/or any judicial and/or administrative interpretation thereof by any Governmental Authorities and/or otherwise, including any judicial and/or administrative order, determination, consent decree and/or judgment. As used herein, "Law" includes "Environmental Laws" as such term is defined in the Indemnity.

"Lender Counsel" – Mahadeva, PLLC.

"LIBOR" - Means, with respect to each Interest Period, the rate determined by Lender to be (i) the per annum rate for deposits in U.S. Dollars in the London interbank market for a period equal to the applicable Interest Period, on Reuters screen page LIBOR01 (or any successor thereto) as of 11:00 a.m., London time, on the day that is two (2) London Business Days prior to that respective Interest Period's Determination Date (rounded upwards, if necessary, to the nearest 1/100 of 1%); (ii) if such rate does not appear on said on Reuters screen page LIBOR01, the arithmetic mean (rounded as aforesaid) of the offered quotations of rates obtained by Lender from the Reference Banks for deposits in U.S. dollars for a period equal to the applicable Interest Period to prime banks in the London interbank market as of approximately 11:00 a.m., London time, on the day that is two (2) London business days prior to that Determination Date and in an amount that is representative for a single transaction in the relevant market at the relevant time; or (iii) if fewer than two (2) Reference Banks provide Lender with such quotations, the rate per annum which Lender determines to be the arithmetic mean (rounded as aforesaid) of the offered quotations of rates which major banks in New York, New York selected by Lender are quoting at approximately 11:00 a.m., New York City time, on the Determination Date for loans in U.S. dollars to leading European banks for a period equal to the applicable Interest Period in amounts of not less than U.S. $1,000,000.00. Notwithstanding anything to the contrary herein, during the Term, LIBOR shall never be below 1.22%. Lender's determination of LIBOR shall be binding and conclusive on Borrower absent manifest error. LIBOR may or may not be the lowest rate based upon the market for U.S. Dollar deposits in the London Interbank Eurodollar Market at which Lender prices loans on the date which LIBOR is determined by Lender as set forth above.

"Loan" - As defined in Recital B.

"Loan Amount" – Means the principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00), it being expressly understood by

Borrower that the Loan Amount excludes additional sums which may be added to the unpaid principal balance of the Loan pursuant to the terms of the Loan Documents, from time to time.

"Loan Documents" - This Loan Agreement, the Note, Security Instrument, the Limited Guaranty, Completion Guaranty, Security Agreement, Environmental Indemnity Agreement, Collateral Pledge Agreement (if any), Assignment of Licenses and Permits, Assignment and Subordination of Management Agreement, Exclusivity Agreement, UCC financing statements and any subordination agreement with respect to the Subordinated Debt, together with any and all other documents and agreements which evidence and/or secure the Loan, all of which are given to Lender by Borrower, Guarantor and/or such other Person in connection with the Loan, all as amended, restated, renewed and/or modified from time to time.

"Loan Servicer" - Means Grandbridge Real Estate Capital, LLC, having an address at 200 South College Street, Suite 2100, Charlotte, North Carolina 28202.

"Make-Whole Amount" – As defined in Section 2.10 of this Loan Agreement.

"Make-Whole Period" – The period of time from the Effective Date through 5 p.m. (EST) on the six (6) month anniversary of the Effective Date.

"Mandatory Payment" – The sum of $3,500,000.00 paid by Borrower to Lender or Loan Servicer (as determined by Lender in its sole discretion) in accordance with Section 2.06.  For the avoidance of doubt, the "Mandatory Payment" required to be made by Borrower and its Affiliates under the Cross-Collateral Loan Documents shall not exceed in the aggregate the sum of $3,500,000.

"Material Adverse Change", "material adverse change" or "material adverse effect" – Means, if in Lender's sole judgment, the business prospects, operations and/or financial condition of Borrower, Guarantor and/or any Asset Owner Parties obligated under a Cross-Collateral Loan and/or their respective property(ies) has changed in any manner which could materially impair the value of the Collateral, prevent timely repayment of the Loan, any Cross-Collateral Loan and/or otherwise prevent, hinder or delay the timely performance of any material Obligations of Borrower, Guarantor and/or any Asset Owner Parties under the Loan Documents and/or Cross-Collateral Loan Documents, respectively.

"Maturity Date" - Means, as applicable and as the context requires, the Initial Maturity Date and/or the Extended Maturity Date.

"Mezzanine Lender" – Means Good Steward Capital Management, Inc.,  an Arizona corporation, its permitted successors or assigns.

"Mezzanine Loan" – Means, the $5,000,000.00 loan from Good Steward Capital Management, Inc., an Arizona corporation, to Borrower and the other Asset Owner Parties made pursuant to that certain Mezzanine Promissory Note dated as of July __, 2017 by Borrower and the other Asset Owner Parties and in favor of Mezzanine Lender.

"Mezzanine Loan Documents" – Means all documents evidencing or securing the Mezzanine Loan, including, without limitation, that certain Mezzanine Promissory Note, that certain

Mezzanine Loan Agreement, guaranties or endorsements of such Note and Loan Agreement by third parties in favor of Mezzanine Lender, and all instruments or documents affecting or purporting to affect collateral securing the foregoing Note and Loan Agreement, including, without limitation, those certain Senior Mezzanine Pledge and Security Agreements dated as of July __, 2017 by the Asset Owner Parties and in favor of Mezzanine Lender.

"Net Insurance/Condemnation Proceeds" – An amount equal to any cash payments and/or proceeds received by Borrower (or any Person affiliated with Borrower) and related to the Collateral (a) under any casualty, business interruption and/or "key man" insurance policies in respect of any covered loss thereunder, or (b) as a result of the taking of any assets of Borrower by any Person, entity and/or Governmental Authorities pursuant to the power of eminent domain, condemnation and/or otherwise, and/or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (a) any actual and reasonable costs incurred by Borrower in connection with the adjustment and/or settlement of any claims of Borrower in respect thereof, and (b) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(b) of this definition, excluding income and/or gains.

"Note" – Means the promissory note dated as of the Effective Date executed by Borrower in favor of Lender in the Loan Amount as more specifically described therein, all in substantially the same form annexed hereto and made a part hereof as Exhibit D.

"Obligations" – Means those obligations of payment and performance of Borrower, Guarantor, any Asset Owner Parties and/or any other Person under the Loan Documents and/or Cross-Collateral Loan Documents, respectively, and is meant to be used in the broadest sense possible and includes, without limitation, the prompt and complete payment when due (whether at the stated Maturity Date, by acceleration and/or otherwise) of the Debt then due and owing under the Loan Documents and/or Cross-Collateral Loan Documents (including all extensions, modifications, renewals, replacements and guarantees thereof), and the due and punctual payment, observance and performance by Borrower, Guarantor, Asset Owner Parties and/or any other Person obligated under the Loan Documents and/or Cross-Collateral Loan Documents, respectively, of each and every one of their respective covenants, agreements, representations and warranties thereunder and their respective liabilities thereunder, arising out of and/or in connection with the Loan Documents and/or Cross-Collateral Loan Documents, and/or otherwise with respect to the transactions contemplated hereby and/or thereby.

"OFAC" – As defined in Section 4.04 hereof.

"Organizational Documents" – Means, collectively, any and all documents and agreements related to and/or concerning Borrower's existence, formation, governance and organization, including, without limitation, articles of organization, and certificates of good standing, operating agreements, partnership agreements, bylaws and any and all amendments and modifications thereto.

"Origination Fee" – Shall mean a fee in the amount of $143,750.00 (equal to six and one-quarter percent (6.25%) of the Loan Amount), which fee is deemed fully earned by Lender as of the Effective Date and paid to Lender as follows: (i) $69,000.00 (equal to three percent (3.00%) of the Loan Amount) shall be paid to Lender on the Effective Date; and (ii) $74,750.00 (equal to three and one-quarter percent (3.25%) of the Loan Amount) shall be paid to Lender upon the

earlier to occur of (a) the Maturity Date (subject to any Extension Option being granted); (b) acceleration of the Debt (whether such acceleration is voluntary and/or involuntary); or (c) a prepayment and/or repayment of the unpaid principal amount of the Loan in accordance with Section 2.10 hereof.  At all relevant times until received by Lender, the unpaid portion of the Origination Fee described in clause (ii) hereof shall be secured by the Loan Documents and shall not be subject to any Applicable Interest Rate charge.

"Patriot Act" - The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001, as amended from time to time.

"Permitted Encumbrances" – As defined in Exhibit "B" of the Security Instrument.

 "Person" – Means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, partnership, institution, trust, association, estate, Governmental Authorities and/or any other entity (whether foreign and/or domestic).

"Pledge Agreement" – that certain Collateral Pledge Agreement, if any, executed by all or any equity owners of Borrower.

"Project" – The collective reference to (i) the Property, together with all buildings, structures and improvements located or to be located thereon, including the Improvements, (ii) all rights, privileges, easements and hereditaments relating or appertaining thereto, and (iii) all personal property, fixtures and equipment required or beneficial for the operation thereof.

"Property" – As defined in the Recitals of this Loan Agreement.

"Remedy" – As defined in Section 7.13 hereof.

"Reference Banks" - Mean four (4) major banks in the London interbank market selected by Lender.

"Requisition" - A written statement by or on behalf of Borrower, in form approved by Lender in substantially the same form annexed hereto as Exhibit G or pursuant to a standard AIA form approved in form and substance reasonably acceptable to Lender and Borrower containing such terms and information acceptable to Lender, setting forth the amount of funds in the CapEx Reserve to be advanced in each instance in accordance with the Budget and with such other information and documentation as may be required by Lender in its sole discretion.

"Reserve" or "Reserves" – Means the T&I Reserve, Interest Reserve, and CapEx Reserve, together with any and all other reserves as may be established by Borrower at Lender's direction, from time to time.

"Security Instrument" – Any mortgage, deed of trust, security deed and/or deed to secure debt given by Borrower and/or other Person to secure the Obligations under the Loan and Loan Documents.

"Special Purpose Entity" – As defined in <u>Section 4.20</u>.

"Subordinated Debt" – Means any indebtedness owed by Borrower to any party whether secured or unsecured and which has or will execute a subordination agreement in favor of Lender.

"T&I Reserve" – As defined in <u>Section 2.04</u>.

"Term" – Means, as applicable and as the context requires, the Initial Term and/or the Extended Term.

"Title Insurer" – Means, Adams and Reese, LLP, as issuing agent for Old Republic National Title Insurance Company, as issuer of the title and loan policy insuring the Security Instrument under File No. 026716.Campbellton.

"To the best of Borrower's knowledge" and "To the best of Borrower's and Guarantor's knowledge" –Means the actual knowledge of Borrower or Guarantor (as the context requires) as of the date hereof, with no duty of investigation and/or inquiry, which duty has been disclaimer.

"Treasury Rate" – Means, as of the date of any repayment and/or prepayment of the Loan, the yield to maturity as of such date of the United States Treasury securities with a constant maturity (as complied and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two (2) Business Days prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such date to the last day of the Make-Whole Period; <u>provided</u>, <u>however</u>, that if the period from such date to the last day of the Make-Whole Period is less than one year, the weekly average yield on actually traded United States Treasury Securities adjusted to a constant maturity of one year will be used.

"Unit" – Means, any condominium unit or townhouse located at the Property whether for sale, lease or otherwise.

"Unit Release Price" – The net sum of $85,000.00 to be received by Lender in connection with any sale, refinance or other monetization of a Unit after deducting customary closing fees, charges and costs, all as shall be approved by Lender pursuant to final settlement or closing statement.

"Usage Fee" – Means in addition to any other amounts payable by Borrower (including, without limitation, debt service), an annual fee payable to Lender equal to 0.2000% of the Loan Amount payable monthly commencing on the Effective Date and thereafter, on the date each debt service payment is due and payable under the Note, computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.   Any unpaid portion of the Usage Fee shall be added to the then unpaid principal balance of the Loan.  The Usage Fee paid on the Effective Date shall not be pro-rated.

"Withholding Taxes" – As defined in <u>Section 4.11</u> hereof.

**Section 1.02.  _Rules of Construction._**  Except as expressly provided otherwise, when used in this Loan Agreement (i) "or" is not exclusive, (ii) "hereunder," "herein," "hereof" and the like refer to this Loan Agreement as a whole, (iii) "Article," "Section," "Schedule" and "Exhibit" refer to Articles, Sections, Schedules and Exhibits of this Loan Agreement, (iv) terms defined in the singular shall have a correlative meaning when used in the plural and vice versa, (v) a reference to a Law includes any amendment, modification and/or supplement to, and/or replacement of, such Law and (vi) a reference to a document shall mean such document as the same may be amended, modified and/or supplemented from time to time in accordance with its terms.  The cover page and the Exhibits and Schedules annexed hereto are incorporated as a part of this Loan Agreement with the same effect as if set forth in the body hereof.  Any table of contents and all captions and headings herein are for convenience only and shall not affect the interpretation and/or construction hereof.

**Section 1.03.  _Incorporation of Recitals and Exhibits._**  The foregoing preambles and all other recitals set forth herein are made a part hereof by this reference. All Schedules and Exhibits annexed to this Loan Agreement are incorporated in this Loan Agreement and expressly made a part hereof by this reference.

**ARTICLE II**
**THE LOAN**

**Section 2.01.  _Agreement to Lend and Borrow._**  From time to time in accordance with the terms and conditions of this Loan Agreement, Disbursements shall be made to or on behalf of Borrower from the Reserves in accordance with the terms and conditions of this Loan Agreement.  Pursuant to Borrower's request, on the Effective Date, a portion of the Origination Fee, in an amount equal to $69,000.00 (or 3% of the total Loan Amount) shall be paid to Lender utilizing a portion of the Loan Amount.  From and after the Effective Date, Lender will disburse to or on behalf of Borrower, and Borrower will accept from Lender, Disbursements from the CapEx Reserve pursuant to a Requisition approved by Lender and in accordance with the Budget as follows:

**(a)**       Disbursements from the CapEx Reserve shall be disbursed to or on behalf of Borrower, from time to time (or as otherwise directed by Borrower in writing) pursuant to Article III hereof; and

**(b)**       A signed Requisition by Borrower for each Disbursement from the CapEx Reserve pursuant to Article III hereof; and

**(c)**       Each Requisition shall be certified by Borrower and shall be accompanied with a reconciliation of the Budget which shall describe in detail, amounts paid by Borrower through the date of such Requisition (together with each applicable payee), a summary of any Improvements constructed prior to the date of the pending Requisition and a summary of any remaining Improvements to be completed at the Project prior to the Completion Date in accordance with the Budget and Plans, together with the anticipated time frame to complete such remaining Improvements and an updated Budget with respect to Improvements to be completed (which updated Budget shall be subject to the written consent and approval of Lender), all in such form and substance  acceptable to Lender.

**Section 2.02.   *No Reborrowing*.**  Any amount borrowed and repaid hereunder in respect of the Loan may not be re-borrowed.  Notwithstanding anything herein to the contrary, Lender shall not be obligated to make any additional advances or disbursements to Borrower in excess of the Loan Amount.

**Section 2.03.   *Cross-Collateralization*.**  Subject to Section 2.12, it is the intention of the parties to this Loan Agreement that until the Debt under the Loan and all Cross-Collateral Loans is paid in full, the Collateral and the Obligations hereunder shall be and is cross-collateralized with the Assets and any and all obligations of the respective Asset Owner Parties under the Cross-Collateral Loans any and all Cross-Collateral Loan Documents.  To the extent any election of remedies under any applicable Law applies to the matters described in the Loan Documents, the Cross-Collateral Loan Documents and/or the Collateral, Borrower, Guarantor and each Affiliate thereof hereby and forever waive such election of remedies to the fullest extent as may be permitted pursuant to applicable Law.  Accordingly, Borrower, Guarantor and any Affiliate of the foregoing expressly acknowledge, consent and agree to execute and deliver to Lender, from time to time, any and all documents, agreements and instruments as may be reasonably required by Lender (or any Affiliate of Lender) to effect and carry out the intents and purposes of this Section 2.03.

**Section 2.04.   *Establishment of Reserves*.**

**(a)    *CapEx Reserve*.**  On the Effective Date, Borrower shall establish with Lender or Loan Servicer (as determined by Lender), a capital expenditure reserve in the amount of ONE MILLION FIFTY SIX THOUSAND AND NO/100 DOLLARS ($1,056,000.00) using a portion of the Loan Amount (the "**CapEx Reserve**").  Funds in the CapEx Reserve shall only be used by Borrower for purposes of completing Improvements to the Project in accordance with the Budget.  Funds in the CapEx Reserve shall be disbursed to Borrower, from time to time, pursuant to each Requisition as may be approved by Lender subject to satisfaction of the conditions precedent set forth in Article III.  From time to time after the Effective Date and in strict accordance with the Budget, and further provided that (i) no Event of Default exists and is continuing beyond any applicable notice, grace and/or cure period; (ii) Lender is satisfied that the use of funds in connection with prior Disbursements from the CapEx Reserve have been used by Borrower to construct Improvements to the Project in accordance with the applicable prior Requisition therefor, and (iii) Borrower has provided an executed contract with a third party service provider in form and substance that is approved reasonably by Lender for all work related to the pending Requisition for Disbursement, Borrower may then elect to draw upon such portion of remaining funds in the CapEx Reserve to complete Improvements.  Disbursements from the CapEx Reserve may be made by Lender directly to any Person other than Borrower (including, any contractor, vendor or subcontractor) as determined by Lender in its sole discretion.

**(b)    *Interest Reserve*.**  On the Effective Date, Borrower shall establish with Lender or Loan Servicer (as determined by Lender), an interest reserve in the amount of ONE HUNDRED SEVENTY THOUSAND NINE HUNDRED FORTY FIVE AND 57/100 DOLLARS ($170,945.57) using a portion of the Loan Amount (the "**Interest Reserve**").  Borrower may utilize funds from the Interest Reserve to make debt service payments in accordance with Section 3 of the Note.

**(c)**      ***T&I Reserve***. On the Effective Date, Borrower shall establish with Lender or Loan Servicer (as determined by Lender), a tax and insurance reserve (the "**T&I Reserve**") for all real property taxes and insurance for the Project.  Borrower may elect to pre-pay all amounts otherwise due and payable into the T&I Reserve for the immediately following twelve (12) month period after the Effective Date (with sufficient evidence submitted to and approved by Lender in writing in connection therewith).  If Borrower does not pre-pay annual taxes and insurance in accordance with the immediately preceding sentence, then during the Term hereof, on the date each debt service payment is due under the Note, Borrower shall deposit into the T&I Reserve an amount equal to one-twelfth $(1/12^{th})$ of the annual real property taxes and assessments for the Project plus an amount equal to one-twelfth $(1/12^{th})$ of the annual insurance premiums payable for the Project. Lender shall estimate the amount of such contributions to the T&I Reserve based upon historical tax bills provided by Borrower, all in such form and substance reasonably acceptable to Lender.

**(d)**      ***General***.  If required by Lender (or Loan Servicer), Borrower agrees to execute an escrow agreement between Lender, Borrower and Loan Servicer regarding the Reserves and funds contained therein. At all relevant times and so long as any portion of the Debt remains due and owing, any and all funds in the Reserves shall constitute cash collateral and security for Borrower's Obligations.  Notwithstanding anything to the contrary in any Loan Documents, upon the occurrence of an Event of Default which continues beyond any and all applicable notice, cure and/or grace periods, Lender shall be entitled to sweep (or direct Loan Servicer to sweep) any and all funds in all or any Reserves and apply such funds against the Debt (or any portion thereof) in any order of priority as determined by Lender in its sole and absolute discretion.

**Section 2.05.   Interest on Loan.**  Borrower expressly acknowledges, consents and agrees that from and after the Effective Date, interest shall accrue on the entire Loan Amount of $2,300,000.00 at the Applicable Interest Rate (or as applicable, the Default Rate) until paid in full.

**Section 2.06.  Mandatory Payment, Increased Applicable Interest Rate.** If (A) less than $1,000,000.00 of the Mandatory Payment is not deposited with Lender or Loan Servicer on or prior to the six (6) month anniversary of the Effective Date, the Applicable Interest Rate under the Loan and each Cross-Collateral Loan shall increase by an additional 2.00% per annum on the six (6) month anniversary of the Effective Date and interest shall accrue at such increased rate until the Debt under the Loan and each Cross-Collateral Loans is indefeasibly paid in full; and (B) an amount greater than $1,000,000.00 of the Mandatory Payment (but less than the entire amount of the Mandatory Payment) is deposited with Lender or Loan Servicer on or prior to the six (6) month anniversary of the Effective Date, then the Applicable Interest Rate shall increase by an additional 1.00% per annum under the Loan and each Cross-Collateral Loan on the six (6) month anniversary of the Effective Date and interest shall accrue at such increased rate until the Debt under the Loan and each Cross-Collateral Loan is indefeasibly paid in full. Notwithstanding anything herein to the contrary, if the entire Mandatory Payment is deposited with Lender or Loan Servicer on or prior to the six (6) month anniversary of the Effective Date, then there will be no increase to the Applicable Interest Rate under the provisions of this Section 2.06.  The Mandatory Payment is subject to the Make-Whole Amount if Lender desires, in its sole and absolute discretion, to apply the Mandatory Payment to partial repayment of the Debt. Notwithstanding any other provision contained herein to the contrary, while Borrower is

obligated to make the Mandatory Payment as contemplated herein, Lender's sole remedy in the event of delay by Borrower in making the Mandatory Payment or in the event the Mandatory Payment is not made is as set forth in this Section 2.06.  Furthermore, subject to the other provisions of this Section 2.06, the foregoing increases in the Applicable Interest Rate shall apply automatically and without need of notice or action on the part of Lender.  Also notwithstanding any other provision contained herein to the contrary, (x) in the event the Mandatory Payment is made in full but after any of the foregoing provisions of this Section 2.06 have come into effect with respect to causing the Applicable Interest Rate to increase, then the Applicable Interest Rate shall be reduced but only by ONE HALF (1/2) of the per annum increase which occurred based on this Section 2.06 (from and after the date on which the Mandatory Payment is received by Lender) and only if the entire Mandatory Payment has been received by Lender, (y) so long as no interest or fees (including, without limitation, attorney's fees incurred by Lender) are then due or payable to Lender from Borrower, Lender agrees the Mandatory Payment shall be applied to reduce the principal balance of the Alexandria Loan, and (z) the foregoing increases in the Applicable Interest Rate shall not be due or payable to Lender monthly or any other periodic basis, but due and payable upon the earlier to occur of (I) an Event of Default, or (II) sale of the Project.

**Section 2.07.  _Voluntary Prepayments_**.  At any time after the Effective Date, subject to Section 2.10 and 2.11 below, Borrower may repay and/or prepay the Debt as allocated to this Borrower in full (but not in part except only in case of a partial release of a Unit from the lien of the Security Instrument pursuant to <u>Section 2.11</u>) ), <u>provided that</u>, if such prepayment in full is made during the Make-Whole Period, then such prepayment and/or repayment shall be accompanied by payment of the Make-Whole Amount and any unpaid portion of the Origination Fee.  Any amount paid by any Person on account of the Loan in excess of monthly debt service and monthly payment of the Usage Fee and Consent Fee shall be deemed to constitute a "prepayment" or "repayment" for purposes of this Loan Agreement.  Any prepayment or repayment hereunder shall be made upon not less than three (3) Business Days' prior written notice to Lender.  After the expiration of the Make-Whole Period and upon not less than three (3) Business Days' prior written notice to Lender, Borrower may, from time to time, repay or prepay the unpaid principal balance of the Loan in whole or in part without payment of the Make-Whole Amount.  Any such voluntary prepayment shall be applied as specified in <u>Section 2.09</u> and shall be made together with all amounts owing in accordance with <u>Section 2.10</u>.

**Section 2.08.  _Mandatory Prepayments; Insurance Condemnation Proceeds_**.  No later than the first Business Day following the date of receipt of Borrower (or any Affiliate thereof, as loss payee) of any Net Insurance/Condemnation Proceeds which are in whole or in part, and/or which are in connection with any single claim and/or aggregate of related claims, equal to and/or greater than $250,000.00, then Borrower shall pay such  Net Insurance/Condemnation Proceeds to Lender and (i) Lender may apply such amounts against the Debt in accordance with <u>Section 2.09</u> hereof, or (ii) provided no Event of Default exists, Lender may elect (but shall not be obligated) to release all and/or any portion thereof to Borrower in Lender's sole and reasonable discretion for purposes of repair, replacement and/or restoration of such portion of the Project related to such Net Insurance/Condemnation Proceeds pursuant to an approved budget (in which case any excess Net Insurance/Condemnation Proceeds not used by Borrower shall be returned to Lender).  Provided no Event of Default exists, if Net Insurance/Condemnation Proceeds which are in whole or in part, and/or which are in connection with any single claim or aggregate of claims, is less than (but not equal to) $250,000.00, then such amount of Net

Insurance/Condemnation Proceeds shall be remitted to Lender and Lender shall release such Insurance/Condemnation Proceeds to Borrower for the sole and exclusive purpose of repair, replacement and/or restoration of such portion of the Project related to such Net Insurance/Condemnation Proceeds subject to Lender's prior written approval of a budget and any Net Insurance/Condemnation Proceeds not used by Borrower in connection with such repair, replacement and/or restoration shall be remitted to Lender.

**Section 2.09.** *__Application of Prepayments__*.   Provided no Event of Default exists and is continuing hereunder, any prepayment or repayment hereunder shall be applied as follows:

> (i) first, to the payment of all fees, costs and expenses (including Lender's and each Lender's attorneys' fees), any unpaid portion of the Origination Fee (if applicable), any unpaid Usage Fee, any unpaid Consent Fee, any Extension Fee (if applicable) and any Commitment Fee (as defined in the Exclusivity Agreement and if applicable) to the full extent thereof;

> (ii) second, to the payment of any accrued and unpaid interest at the Default Rate (if applicable);

> (iii) third, to the payment of any accrued and unpaid interest at the Applicable Interest Rate;

> (iv) fourth, to the payment of the Make-Whole Amount (if applicable); and

> (v) fifth, to the payment of the outstanding principal balance of the Loan.

After any prepayment of the unpaid principal balance due and owing under the Loan, interest shall accrue at the Applicable Interest Rate (or, if applicable, the Default Rate) on the reduced unpaid principal after such prepayment and/or repayment.  With respect to any prepayment, the Lender shall determine the amounts to be allocated hereunder.  Determinations by Lender shall be deemed conclusive absent manifest error.  Notwithstanding anything herein to the contrary, upon an Event of Default which exists beyond any applicable notice, grace and/or cure periods, any payments received by Lender (whether voluntary and/or involuntary) from any Person on account of the Debt may be applied by Lender against any portion of the Debt (or against any portion of the debt under any Cross-Collateral Loan Documents if such Event of Default exists and is continuing) then due and owing and in any order of priority, all as determined by Lender in its sole and absolute discretion.

**Section 2.10.** *__General Provisions Regarding Payments and Performance__*.

**(a)** *General*.  All payments by Borrower of any amounts due and owing under the Debt shall be made in United States Dollars in same day funds, without recoupment, setoff, counterclaim and/or other defense free of any restriction and/or condition, and delivered to Lender and/or Loan Servicer no later than 5:00 p.m. (New York City time) on the date due to Lender after the expiration of all applicable notice, grace and/or cure provisions; funds received after that time on such due date shall be deemed to have been paid by Borrower on the next

Business Day at Lender's election.  If the due date for payment and/or performance of any Obligations of Borrower falls on any day other than a Business Day, then the due date for such payment and/or performance by Borrower shall be deemed to be due on the immediately following Business Day.

(b)        *Required Payments*.  Any and all payments in respect of the unpaid principal balance due and owing under the Loan shall be accompanied by payment of accrued interest on such unpaid principal amount being repaid or prepaid plus the Make-Whole Amount payable in connection therewith (if applicable) and any unpaid portion of the Origination Fee (if applicable).

(c)        *Make-Whole Amount*.  If, at any time during the Make-Whole Period, Borrower or any other Person on Borrower's behalf and/or account, whether voluntarily or involuntarily, repays or prepays, in full or in part (including, without limitation, in connection with payment of the Unit Release Price), for any reason (including, without limitation, any voluntary, involuntary and/or mandatory prepayment under the Loan Documents), any amount of the then outstanding principal balance under the Loan, and/or if the Debt is accelerated or otherwise becomes due (whether voluntarily or involuntarily), then Borrower expressly acknowledges, consents and agrees that it shall pay to Lender, in addition to such amount of the unpaid principal balance of the Debt being so repaid or prepaid, deemed repaid or prepaid, or accelerated or then due, an additional "make-whole" amount (the "**Make-Whole Amount**") equal to (as calculated on the date such prepayment or repayment is actually received by Lender utilizing the Applicable Interest Rate) the present value of the amount of interest Lender would have received on the principal amount of the Loan that is being repaid or prepaid calculated from the date of such repayment or prepayment (or acceleration, as the case may be) through the last day of the Make-Whole Period computed on the basis of actual days elapsed over a year of 360 days using a discount rate equal to the then prevailing U.S. Treasury Rate as of the date of such repayment or prepayment (or acceleration, as the case may be) plus 100 basis points. Borrower expressly acknowledges, consents and agrees that the Make-Whole Amount is a reasonable cost and charge payable by the Borrower in exchange for any repayment or prepayment of the Debt in accordance with the terms hereof and calculation thereof shall, at all relevant times, be based upon the then unpaid principal balance of the Loan.  Notwithstanding anything to the contrary in the Loan Documents, no Make-Whole Amount is due as to any funds received by Lender due to a casualty or condemnation event if Lender elects, in its sole and absolute discretion, to apply any such funds from either event or events to prepayment of principal of the Debt prior to expiration of the Make-Whole Period.  Borrower may prepay the Debt in whole or in part without payment of the Make-Whole Amount at any time after expiration of the Make-Whole Period. Notwithstanding any other provision contained herein to the contrary, no Make-Whole Amount or other prepayment premium shall be due or payable with respect to the Mandatory Payment if the Mandatory Payment is received by Lender on or after the sixth (6th) month anniversary of the Effective Date; otherwise, the Make-Whole Amount is due and payable with respect to the Mandatory Payment (if received by Lender).  By way of example but not limitation, if all or any portion of the Mandatory Payment is received by Lender on the third (3rd) month anniversary of the Effective Date, then the Make-Whole Amount shall be due with respect to the actual amount of the Mandatory Payment received by Lender.

**Section 2.11   Release of Units**. From time to time until the Debt under the Loan and all Cross-Collateral Loans is paid in full and provided that no Event of Default exists and is continuing

hereunder, Lender agrees to release a Unit from the lien of the Security Instrument subject to: (i) receipt of the Unit Release Price; (ii) an affidavit from Borrower declaring that the Unit being partially released is being sold to a *bona fide* third party purchaser pursuant to an arm's length negotiation and sale, that such purchaser is not related to Borrower, any Guarantor or any Affiliate thereof; (iii) true and accurate copies of all fully executed sale documents for such Unit sought to be partially released; and (iv) Lender shall have reasonably approved the HUD-1 or similar settlement or closing statement with respect to the Unit sought to be released. Notwithstanding the foregoing, until all Units are sold, all net funds due Borrower from the sale of Units after payment of the Unit Release Price to Lender and costs of closing payable by Borrower with respect to the sale of a Unit to a bona fide third party shall be paid to Lender or Loan Servicer (as directed by Lender in its sole and absolute discretion) for deposit in the CapEx Reserve for the Property, and upon repayment of the Loan in full and all of the Cross-Collateral Loans, any balance in such reserve shall be returned to Borrower. Notwithstanding any other provision contained herein to the contrary, in the event (i) the Loan is paid in full but not all Units have been released by Lender, and (ii) there is no default or Event of Default under any Cross-Collateral Loan, Borrower shall be entitled to a release of the CapEx Reserve proceeds (Borrower noting that at Loan payoff, amounts held as cash collateral for the Loan are typically applied to the Asset Minimum Release Price by Lender); provided that, Lender shall not be obligated to cancel or subordinate its Security Instrument unless and until the full Asset Minimum Release Price is paid to Lender; however, Lender shall continue to release Units upon sale to bona fide third party purchasers (if accompanied by the documentation required above) and no Unit Release Price is required to be paid at the time of such release of such Unit.

**Section 2.12  Asset Minimum Release Price.**      Notwithstanding anything in the Loan Documents or in any Cross-Collateral Loan Documents to the contrary, except as set forth in Section 2.11, so long as any portion of the Debt under this Loan and/or any Cross-Collateral Loan remains outstanding, there shall be no release of all or any portion of the Collateral consisting of the Project and any Asset under any Cross-Collateral Loan Documents unless Borrower pays to Lender the applicable Asset Minimum Release Price for the Project described in Exhibit H annexed hereto and made a part hereof. Borrower shall provide Lender with ten (10) days prior written notice of its intent to pay the applicable Asset Minimum Release Price. Upon payment to Lender of the Asset Minimum Release Price with respect to the Project, Borrower, Pledgors (as defined in the Loan Agreement and if applicable) Guarantors and the Project shall be released from all liens and obligations under the Loan Documents. Funds received pursuant to this Section 2.12 shall be applied by Lender pursuant to Section 2.09(i) through (iv) and provided no Event of Default (as such terms is defined in the Cross-Collateral Loan Documents) exists and is continuing, then to the principal balances of any outstanding Cross-Collateral Loans on a prorata (by loan size) basis.

## ARTICLE III
## CONDITIONS PRECEDENT

**Section 3.01.  _Conditions Precedent to Closing._**  Lender shall not be obligated to make any Disbursement on the Effective Date until the following conditions shall have been satisfied in Lender's sole discretion:

(a)     There shall exist no Default and/or Event of Default (and if the Alexandria Loan has been made, there shall be no default or event of default under the Cross-Collateral Loan Documents evidencing or securing the Alexandria Loan);

(b)     The representations and warranties of Borrower (and, as applicable, Guarantor) made to Lender and each Lender herein, in the other Loan Documents and in any other document, certificate and/or statement executed and/or delivered to Lender in connection with the Loan, shall be true and correct in all material respects on and as of the date of any Disbursement with the same effect as if made on such date;

(c)     The Project and any portion thereof shall not have been materially injured and/or damaged by fire and/or other casualty unless Lender shall have received insurance proceeds sufficient in the judgment of Lender to effect the satisfactory restoration of the Project and to permit completion of any Improvements thereon; and

(d)     Lender shall have received each of the following:

1.     Origination Fee.  A portion of the Origination Fee in the sum of $69,000.00 shall be paid to Lender on the Effective Date; and

2.     Budget.  The Budget annexed hereto as Exhibit B, ratified by Borrower as true and correct in all respects by its signature to this Loan Agreement subject to Lender's approval; and

3.     Executed Loan Documents.  This Loan Agreement and each of the other Loan Documents duly executed by the parties thereto and where applicable, duly acknowledged and in proper form for recording and/or filing, as the case may be, and all necessary or desirable recordings and filings shall have been duly made; and

4.     Financial Statements.  Current Financial Statements and such other financial data (including, without limitation, current financial statements of Guarantor) as reasonably required by Lender have been provided to Lender, which Financial Statements shall be deemed by Borrower as true and correct in all respects by its signature to this Loan Agreement); and

5.     Certificates of Insurance.  Certificates of insurance evidencing the coverages of insurance required by the Loan Documents, evidence of the payment of the premiums therefor, with all relevant policies properly naming Lender as "Mortgagee/Grantee/Beneficiary and/or Loss Payee," as may be required by Lender in its sole discretion; and

6.     Hazardous Substances Report/Certification.  At Lender's option, detailed report and certification, in form and substance reasonably acceptable to Lender, by a properly qualified engineer reasonably acceptable to Lender, which shall include, inter alia, a certification that such engineer has obtained and examined the list of prior owners, tenants and other users of the Project, and has made an on-site physical examination of the Project, and a visual observation of the surrounding

areas, and has found no evidence of past and/or present Hazardous Substances, activities and/or the presence of Hazardous Substances; and

7. <u>Title Policy</u>.   One or more paid title insurance policy or policies, marked commitment(s) and/or pro forma title policy or policies, in an amount not less than the Loan Amount in such form as reasonably approved by Lender and Lender Counsel, issued by the Title Insurer for purposes of insuring the Security Instrument as a valid first lien, deed of trust and security interest in, to and under Borrower's interest in the Project, free and clear of all defects and encumbrances except those previously received and approved by Lender and Lender Counsel in writing, and shall contain:

(i)      full coverage against mechanics' liens (filed and inchoate),

(ii)     a reference to the survey, together with any updates thereto endorsed to Lender (but such title policy shall contain no survey exceptions except those theretofore approved by Lender and Lender Counsel), and

(iii)    such endorsements as Lender and Lender Counsel may reasonably require that are permitted to be issued in the State where the Collateral is located; and

8. <u>Survey</u>.  A current survey of the Project certified to Lender showing:

(i)      the location of the perimeter of the Project by courses and distances (including, without limitation, any subdivision which occurred with respect to the Project (or any portion thereof)),

(ii)     all easements, rights-of-way, and utility lines referred to in the title policy required by this Loan Agreement and/or which actually service and/or cross the Project,

(iii)    the lines of the streets abutting the Project and the width thereof, and any established building and setback lines,

(iv)     encroachments and the extent thereof upon the Project,

(v)      the Improvements to the extent constructed, and the relationship of the Improvements by distances to the perimeter of the Project, established building, setback and street lines, and

(vi)     if the Project is described as being on a filed map or plat, a legend relating the survey to said map or plat; and

9. <u>Organizational Documents</u>.  If Borrower, any member, general partner, manager and/or member thereof is a limited liability company, partnership and/or corporation, current copies of the following documents with respect to each such Person (unless otherwise indicated):

(i)      a good-standing certificate from the jurisdiction of its formation and, as to Borrower, from its state of its formation;

(ii)     a resolution, certified by members of Borrower authorizing the consummation of the transactions contemplated hereby and the execution, delivery and performance of the Loan Documents to be executed, delivered and/or performed by said company, all in such form and substance acceptable to Lender, and

(iii)    a certificate as to the incumbency of the officers executing any of the documents required hereby and if Borrower, any general partner, manager and/or  member thereof is a partnership, venture, limited liability company, corporation and/or trust:

        (a)     such Person's organizational agreement(s) and all amendments and attachments thereto, certified by a general partner, venturer, member, president and/or trustee to be true, accurate and complete,

        (b)     certificates filed or as may be  required to be filed by such Person in the jurisdiction of its formation, and

        (c)     any consents by partners, venturers, members, trustees, shareholders, directors, officers and/or beneficiaries as may be required for the consummation of the transactions contemplated hereby; and

10.     <u>Property Management Agreement</u>.  A fully executed agreement with a third-party property management company that is approved by Lender.  Such agreement shall be subject to review and approval by Lender and shall be subordinated to the Loan Documents pursuant to an agreement between Lender, property manager and Borrower.

11.     <u>Post-Closing Agreement under Austin Circle Loan</u>. All obligations under that certain Post-Closing Agreement, dated June 7, 2017, between the 3859 Austin Circle Associates, LP, a Georgia limited partnership and Lender have been satisfied.

12.     <u>Requisition</u>.  A Requisition and if requested by Lender in writing, the items required in the definition of "Requisition" as set forth in <u>Section 1.01</u> above; provided, however, that no Requisition shall be required for Borrower to receive the Disbursement on the Effective Date provided that all other conditions

21

precedent to such Disbursement as more fully described in this Loan Agreement have been met; and

13.  <u>Chattel Searches</u>.   UCC searches against Borrower, Guarantor and/or other owner(s) of the Project and advice from the Title Insurer to the effect that searches of proper public records disclose no leases of personalty and/or financing statements filed and/or recorded against the Project, Borrower and/or other owner of any of the Project; and

14.  <u>Contracts</u>.  Copy of any and all contracts with third parties to perform any work in connection with any Improvements; and

15.  <u>Lien Waivers or Subordinations</u>.  Lien waivers and/or subordination agreements pursuant to applicable Law from any Person who has performed any work at the Project prior to the Effective Date, all in such form and substance acceptable to Lender; and

16.  <u>Zoning</u>.  Evidence acceptable to Lender that Borrower's intended use for the Project is in compliance with any and all applicable Laws related to zoning as may be administered by any Person having jurisdiction over the Project and Borrower, together with a satisfactory opinion (if required by Lender in writing) regarding zoning matters for the intended use of the Project in form and substance acceptable to Lender; and

17.  <u>Equity Injection Requirement</u>.  Lender shall have received satisfactory evidence from Borrower (or such Affiliate thereof acceptable to Lender) in form and substance acceptable to Lender that not less than $400,000.00 (the "Equity Injection") has been injected or invested into or for the benefit of the Collateral for purposes of completing the Improvements in accordance with the Budget (and in no event later than the applicable Completion Date).

**(b)**  <u>Leases</u>.  Intentionally Omitted.

**(c)**  <u>Documents for Lender</u>. Borrower and Guarantor shall provide any and all executed documents, agreement, contracts, licenses, permits and approvals as may be required by Lender and any Governmental Authorities, including, without limitation, constructions contracts (including a guaranteed maximum price contract with a general contractor).

**(d)**  <u>General Release</u>.  Upon Borrower's acceptance of the initial Disbursement made on the Effective Date, Borrower and Guarantor expressly release and discharge Lender and each of their respective members, managers, officers, directors, employees, consultants, Lender Counsel and each Affiliate thereof, from and against any and all claims, causes of action and liabilities relating to the Loan which occurred, arose and/or accrued arising prior to the Effective Date.

**Section 3.02.**  **_Conditions to Disbursements After the Effective Date_**.  Lender's obligation to make any Disbursements after the Effective Date shall be subject to the satisfaction of the following conditions:

**(a)**     The applicable conditions of <u>Section 3.01</u> shall have been and remain satisfied as of the date of each Disbursement;

**(b)**     There shall exist no Default or Event of Default and Borrower and Guarantor shall be in compliance with all terms, provisions and conditions contained in the Loan Documents;

**(c)**     The representations and warranties made to Lender in the Loan Documents and in any other document, certificate or statement executed or delivered to Lender in connection with the Loan shall be true and correct in all material respects on and as of the date of each Disbursement with the same effect as if made on such date;

**(d)**     If required by Lender in its sole discretion, or as may be reasonably required by Title Insurer, Lender shall have received a written continuation report of or endorsement to the title policy insuring the Security Instrument to the date of each Disbursement, in such form to be reasonably approved by Lender and Lender Counsel and in accordance with Georgia title insurance procedural requirements, conforming to the pending disbursement requirements as more fully set forth in <u>Exhibit A</u> annexed hereto and made a part hereof setting forth no additional exceptions except those approved by Lender and Lender Counsel in writing (each a "**<u>Title Update</u>**");

**(e)**     Lien waivers, releases and/or subordination agreements as may be reasonably required by Lender or pursuant to applicable Law from any and all applicable contractors, subcontractors, materialmen, laborers and suppliers who have performed work and/or supplied labor and/or materials at the Project;

**(f)**     Lender (or Lender's consultant) shall be satisfied that all conditions precedent to making any Disbursement under <u>Section 3.01</u> and this <u>Section 3.02</u> have been satisfied; and

**(g)**     Borrower shall be in material compliance with the Budget; and

**(h)**     Lender shall have received a fully executed form of Requisition in substantially the same form annexed hereto as <u>Exhibit G</u> in conjunction with a standard AIA form G702 703 of draw request (or an alternative form acceptable to Lender), together with corresponding invoices as evidence of and in support of each Disbursement as may be reasonably requested by Lender, together with such other documentation and information as may be required herein and such other information Lender may require at the time (including, without limitation, true and accurate copies of any invoices from any subcontractors rendering or performing work at the Project.

**(i)**     Borrower shall have provided a copy of a fully executed contract covering all work and materials related to such Disbursement.

**Section 3.03.   <u>Conditions to Final Disbursement.</u>**   Lender has no obligation to make the final Disbursement from the CapEx Reserve, unless Lender has received the following:

(a)     Compliance with the terms of <u>Sections 3.01</u> and <u>3.02</u>, respectively;

**(e)**     Final and unconditional certificates of occupancy have been obtained from any Governmental Authorities with respect to completion of the Improvements;

**(f)**     All apartment units at the Project are available for immediate occupancy;

**(g)**     Final lien waivers from any and all Persons who have provided work with respect to the Improvements have been obtained;

**(h)**     Such other information as may be reasonably requested by Lender; and

**(i)**     A general release and discharge from Borrower and Guarantor in favor of Lender.

**Section 3.04.   _Procedure and Timing of Disbursements_**.  Provided that a proper Requisition as required by this Loan Agreement is delivered to Lender and has been approved by Lender, upon not less than ten (10) days' notice, funds in the CapEx Reserve may be disbursed to Borrower, as work is actually completed and/or as a reimbursement for expenses actually incurred in accordance with the Budget.  All Disbursements to Borrower are to be made at such place or by such means as Lender may designate, from time to time.  Borrower may not make more than one (1) Requisition in any single calendar month without Lender's written consent.  Subject to unforeseeable delays, Lender shall use commercially reasonable efforts to fund (or cause to fund) each Disbursement from the CapEx Reserve within ten (10) Business Days after receipt of each Requisition.

**Section 3.05.   _Completion Date_**.     Notwithstanding anything to the contrary in this Loan Agreement, the following shall be completed to the satisfaction of Agent on or prior to the Completion Date: (i) the completion of all applicable Improvements to be constructed upon the Project, all in accordance with the Budget, in compliance with applicable Law (including, without limitation, zoning laws and applicable administrative ordinance and code requirements), in a good workmanlike manner, free and clear of defects, and free and clear of liens (inchoate or otherwise) or claims for liens for material supplied or labor or services performed in connection therewith; (ii) Lender has received acceptable evidence that all applicable approvals from any Governmental Authorities relating to the Project and completion of Improvements thereon have been obtained and, to the extent not already in place, that permanent certificates of occupancy with respect to all such Improvements on the Project have been issued by the applicable Governmental Authorities as may be required by Law.

**ARTICLE IV**
**REPRESENTATIONS AND, WARRANTIES**

As of the Effective Date, Borrower (and as applicable, Guarantor) represent and warrant to Lender as follows:

**Section 4.01.   _Due Formation, Power and Authority_.**     If Borrower, any general partner, manager and/or member thereof is a corporation, partnership, joint venture, limited liability company and/or trust, each such Person is duly organized, validly existing and in good standing under the Laws of the respective jurisdiction of its formation and has full power and authority to consummate the transactions contemplated hereby and to execute, deliver and perform under the terms and conditions of this Loan Agreement and the other Loan Documents to which such

Person is a party. The execution, issuance and delivery of this Loan Agreement, the Note and the other Loan Documents by Borrower is within Borrower's company powers and has been duly authorized by all necessary company action, this Loan Agreement, the Note and the other Loan Documents to which it is a party is valid, binding and enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar Laws affecting creditors' rights generally, and Borrower is not in violation of any applicable Law and/or the terms of Borrower's Organizational Documents and by entering into the Loan Documents and transactions contemplated thereby will not result in the breach of and will not constitute an event of default under any indenture or other agreement by which it and/or any of its property is or may be bound.

**Section 4.02.    _Legally Enforceable Agreements._**  The Loan Documents to which Borrower and Guarantor are parties are the legal, valid and binding obligation of Borrower and/or Guarantor, enforceable against Borrower and/or Guarantor in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency and other similar Laws affecting creditors' rights generally.

**Section 4.03.    _Financial and Other Reporting Obligations._**

**(a)**     All Financial Statements which have been heretofore delivered to Lender are true, correct and current in all material respects and fairly present the respective financial conditions of the subjects thereof as of the respective dates thereof; no material adverse change has occurred in the financial conditions reflected in such Financial Statements since the respective dates thereof and no borrowings (other than from Lender) which might give rise to a lien and/or claim against the Project and/or proceeds of the Loan have been made by Borrower, Guarantor and/or others since the dates thereof, other than as previously disclosed to Lender.

**(j)**     Subject to <u>Section 4.03(c)</u> below, and provided no Event of Default exists and is continuing, Borrower shall provide to Lender true and accurate copies of any and all current Financial Statements and such other reports in Borrower's possession regarding the condition of the Project (including, without limitation, surveys, environmental conditions, feasibility studies, zoning reports, development agreements and appraisals) within five (5) days after written request by Lender.  Borrower agrees to provide such other documents and reports to Lender as may be requested by Lender, from time to time, within ten (10) days after Borrower's receipt of Lender's written request.

**(k)**     Until the Debt is paid in full, on the fifteenth (15th) day of each month, Borrower shall provide monthly written reports to Lender during the Term, which shall include, without limitation, current Financial Statements and operating information for Borrower and the Project covering the immediately preceding month, together with a year-to-date total and a copy of a sufficiently detailed rent roll as of the last day of the preceding month where such rent roll shall include a summary of any units that are not in rent-ready condition.  In addition, each monthly written update shall detail any and all capital expenditures made by Borrower with respect to the Project. Further, during the Term, Borrower shall provide to Lender any and all other documents and/or reports as may be requested by Lender within ten (10) days.  Lender may disclose such financial and other information to

Lender's consultants, attorneys and other third party professionals handling the matters related to the Loan.

**Section 4.04.**   _**Compliance with Laws; Payment of Taxes.**_

**(a)**   To the best of Borrower's and Guarantor's knowledge, Borrower and Guarantor are in compliance with, and the transactions contemplated hereby and the other Loan Documents do not and will not violate any provision of, and/or require any filing, registration, consent and/or approval under any Law presently in effect having applicability to Borrower and/or Guarantor other than those which will be obtained or available for Closing upon the payment of any fees required therefor (ex. Building permit);

**(b)**   To the best of Borrower's and Guarantor's knowledge, Borrower and Guarantor have filed all necessary tax returns (or extensions as applicable) (federal, state and local) required to be filed and have paid all taxes, assessments and governmental charges and levies due and payable (including those in respect of the Project), including interest and penalties;

**(c)**   To the best of Borrower's and Guarantor's knowledge, Borrower holds, permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any and all Governmental Authorities necessary for and/or incidental to the conduct of its business and is in compliance with all Laws relating thereto to the extent customary in the jurisdiction where the Project is located;

**(d)**   To the best of Borrower's and Guarantor's knowledge, Borrower has received no notice that it is not in compliance with federal, state, local, and/or foreign applicable statutes, rules, regulations, and orders including, without limitation, those relating to environmental protection, occupational safety and health, and equal employment practices;

**(l)**   To the best of Borrower's knowledge, Borrower is not in violation of and/or in default under any material agreement to which it is a party and/or by which its assets is or may be subject to and/or bound;

**(m)**   To the best of Borrower's and Guarantor's knowledge, Borrower has ensured that no Person who owns a controlling, managing and/or majority interest in, and/or otherwise controls Borrower (whether directly and/or indirectly), is and/or shall be (i) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("**OFAC**"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, executive order and/or regulation, or (ii) a Person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation and/or any other similar executive orders;

**(n)**   To the best of Borrower's and Guarantor's knowledge, Borrower and Guarantor are in compliance, in all material respects, with all applicable Bank Secrecy Act and anti-money laundering laws and regulations;

(o)     To the best of Borrower's and Guarantor's knowledge, Borrower and Guarantor are in compliance, in all material respects, with the Patriot Act; and

(p)     To the best of Borrower's and Guarantor's knowledge, Borrower and Guarantor are not subject to regulation under the Investment Company Act of 1940 and/or any Law limiting its ability to incur indebtedness for money borrowed as contemplated hereby and Borrower is not engaged in the business of extending credit for the purpose of purchasing and/or carrying margin stock and Borrower shall not use any part of the proceeds of the Loan hereunder to purchase and/or carry any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System and/or to extend credit to others for the purpose of purchasing and/or carrying any margin stock;

**Section 4.05.** **Litigation.**     There are no actions, suits and/or proceedings pending, or to Borrower's knowledge threatened against and/or affecting Borrower and Guarantor, and/or against all or any portion of the Project, the validity and enforceability of the Security Instrument and the priority of the liens thereof at Law, in equity and before and by any Governmental Authorities; and (ii) actions, suits and/or proceedings which have been disclosed to Lender in writing are fully covered by Borrower's and/or Guarantor's insurance and would, if adversely determined, not substantially impair the ability of Borrower and/or Guarantor to pay, when due, any amounts which may become payable under the Loan Documents; and to Borrower's and Guarantor's knowledge, neither Borrower nor Guarantor is in default with respect to any order, writ, injunction, decree and/or demand of any court and/or Governmental Authorities.

**Section 4.06.** **No Conflicts or Defaults.**     The consummation of the transactions contemplated hereby and the performance hereof and of the other Loan Documents have not resulted and will not result in any breach of, and/or constitute an Event of Default and/or a default under, any mortgage, deed of trust, lease, bank loan and/or credit agreement, corporate charter, by-laws, partnership agreement, operating agreement and/or other instrument to which Borrower and/or Guarantor is a party and/or by which either of them is or may be bound and/or affected.

**Section 4.07.** **Solvency.**     Borrower and Guarantor are solvent and upon consummation of the transactions contemplated by this Loan Agreement, the other Loan Documents and any other related documents, will be solvent.

**Section 4.08.** **Organizational Documents; Control of Borrower.**     Borrower will not terminate and/or alter its existence.   Subject to Lender's prior written consent, certified copies of any subsequent amendments to any Organizational Documents of Borrower will be provided to Lender no later than five (5) days after the date on which such amendments become effective. At all relevant times until the Debt is paid in full, Borrower shall be Controlled by Guarantor, who shall have sole co-management and Control (whether such management and Control is direct or indirect) over the affairs and business of Borrower.

**Section 4.09.** **Insurance.**     Borrower has in force, and has paid the premiums in respect of, all of the insurance required by the Security Instrument with respect to the Project. Borrower expressly acknowledges and agrees that proof of insurance shall be delivered to and approved by Lender prior to making any Disbursement to Borrower on the Effective Date.   Until the Debt is paid in full, Borrower, at its sole cost and expense, will keep the Project insured for the mutual benefit of

27

Borrower and Lender in accordance with the Insurance Requirements (same as may be amended, modified and/or supplemented from time to time). Within thirty (30) days after evidence of such insurance has been provided to Lender (such evidence to constitute a condition precedent to making any Disbursement to Borrower on the Effective Date), Borrower shall deliver to Lender certified copies of all insurance policies evidencing such insurance. Until the Debt is paid in full, from time to time Borrower shall furnish Lender with any and all renewal and/or replacement policies, but in no event later than ten (10) days prior to expiration of such policy(ies) previously accepted and approved by Lender. Notwithstanding anything in the Loan Documents to the contrary, Borrower shall not be authorized to cancel and/or replace any policies previously approved and accepted by Lender prior to the expiration thereof without the express, prior, written consent of Lender, provided that, Lender shall have first approved any subsequent replacement policy. Borrower shall reimburse Lender for all of Lender's (or Lender's insurance consultant's) costs and expenses incurred in causing the compliance with the terms and provisions of Lender's Insurance Requirements, including, but not limited to obtaining and reviewing any and all renewal insurance policies and/or replacement insurance policies. If the Borrower fails to furnish such certified copies of insurance policies, Lender may procure, but shall not be obligated to procure, such insurance and pay the insurance premium, and Borrower agrees to reimburse Lender for the cost of such insurance promptly on demand if not obtained by Borrower. Lender, in its sole discretion, may authorize its insurance consultant to act on its behalf in connection with obtaining, reviewing and ensuring compliance of any and all insurance policies in accordance with Lender's Insurance Requirements at any time. Notwithstanding anything herein to the contrary, Lender may agree to different amounts of Insurance Requirements in its sole discretion.

All original certificates of insurance shall be emailed and mailed to Lender at the address in accordance with the notice provisions of this Loan Agreement.

**Section 4.10.** *Registered Obligations.*

**(a)** To the best of Borrower's knowledge, Borrower represents, warrants and covenants that, as of the Effective Date and until Borrower's Obligations have been fully satisfied and performed, such Obligations under the Loan Documents have been, are and shall remain in registered form within the meaning of Section 5f.103-1(c) of the United States Treasury Regulations, as well as Sections163(f), 871(h)(2) and 881(c)(2) of the Code and any related regulations (and any successor provisions), and that either and/or both of the following are true: (i) the Obligations as to the Debt and any stated interest upon the indebtedness evidenced by the Note are registered with Borrower and/or its lender and transfer of such Obligations may be effected only by surrendering the instruments evidencing such Obligations and either the reissuance by Borrower of the instruments to the new holders thereof and/or the issuance by Borrower of new instruments to the new holders; or (ii) the Debt (including without limitation the right to principal and any stated interest) may be transferred only through a system maintained by Borrower and/or Lender whereby ownership of an interest in the indebtedness is reflected in a record of ownership ("**Book Entry System**"), and the Debt has been transferred through Borrower's Book Entry System evidencing that Lender (or its successors in interest) are entitled to receive such payments of principal and stated interest. Notwithstanding anything to the contrary herein, the rights of Lender hereunder may be transferred to any Person upon prior written notice to Borrower. Notwithstanding anything herein to the contrary, the Obligations under the Loan Documents shall not be transferred by Borrower or by any other Person obligated

28

hereunder without the express written consent of Lender.  Notwithstanding anything herein to the contrary, Lender may transfer and/or assign, all or any portion of their rights and obligations under the Note, and Lender may transfer and/or assign all or any portion of the Loan Documents, to any Person with notice to Borrower.  The notice to Borrower described in the immediately preceding sentence may be from any Person (including any transferee of the Loan Documents).

**(b)**      Subject to the immediately following sentence, all payments made by Borrower owing under the Debt and Obligations shall be made free and clear of and without deduction for any present and/or future taxes, levies, imposts, deductions, charges, and/or withholdings, and all liabilities with respect thereto, excluding taxes imposed on and/or measured by the net income of Lender and their respective members and/or partners (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings, and liabilities being hereinafter referred to collectively as "**Withholding Taxes**").  If Lender shall fail to provide Borrower with a Form W-9 prior to the initial disbursement pursuant to <u>Section 3.01</u> showing that Lender is a U.S. Person, (i) Borrower shall make deductions of Withholding Taxes as required by Law from all payments required to be made to Lender, and (ii) Borrower shall timely pay the full amount deducted to the relevant tax authority and/or other authority in accordance with applicable Law.

**Section 4.11.   *FATCA*.**   Borrower covenants that it has obligated its owners to the effect that such owners will indemnify Borrower and hold Borrower harmless for any costs and/or expenses arising from any withholding and/or other taxes (including interest and penalties) imposed on Borrower under the Foreign Account Tax Compliance Act ("**FATCA**"), and in all events Borrower shall use best efforts to cause each of its owners to bear the amount of taxes (and other costs and expenses, including interest and penalties) reasonably determined by such Borrower to be caused by such owner's status and/or failure to comply with information requirements under FATCA.

**Section 4.12.   *Accuracy of Information; Full Disclosure*.**   To Borrower's knowledge neither this Loan Agreement nor any documents, financial statements, reports, notices, schedules, certificates, statements and/or other writings furnished by and/or on behalf of Borrower and/or Guarantor to Lender in connection with the negotiation of this Loan Agreement and/or other Loan Documents and/or the consummation of the transactions contemplated hereby, and/or required herein and/or by the other Loan Documents to be furnished by and/or on behalf of Borrower and/or Guarantor contains any untrue and/or misleading statement of a material fact and/or omits a material fact necessary to make the statements herein and/or therein not materially misleading, there is no material fact known to Borrower which Borrower has not disclosed to Lender in writing which materially affects adversely nor, so far as Borrower can now foresee, will materially affect adversely any of the Project and/or the business affairs and/or financial condition of Borrower and/or Guarantor, and/or the ability of Borrower and/or Guarantor to perform under this Loan Agreement and the other Loan Documents, with evidence of the assignment including its recording information if the lien is transferred.

**Section 4.13.   *Flood Zone*.**   The Project and any Improvements thereon is not located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards and, if so located, adequate flood insurance is in full force and effect with respect to the Project.

**Section 4.14.   *Utility Services.***   All utility services necessary for the construction of the Improvements and the operation thereof for their intended purposes are available at the boundaries of the Project, including, without limitation, water supply, storm and sanitary sewer, electric power and telephone facilities.

**Section 4.15.   *Creation of Liens; Lien Priority.***   As of the Effective Date, other than the Permitted Encumbrances, Borrower and Guarantor have entered into no other contract and/or arrangement of any kind, the performance of which by the other party thereto would give rise to a lien and/or encumbrance on all and/or any portion of the Project prior to the lien and security interest of the Security Instrument except for their respective arrangements with Lender and Lender.  Borrower has not created, incurred, assumed and/or permitted to exist any lien, pledge, security interest, mortgage and/or other encumbrance upon any of its respective property and/or assets except in favor of Lender and except as otherwise specifically permitted pursuant to the provisions of the documents executed in connection with the Loan.  On the Effective Date, Lender shall have senior secured, first priority lien and security interest in the Project described in SCHEDULE A annexed hereto and made a part hereof, subject to the Permitted Encumbrances.

**Section 4.16.   *Construction Prior to Closing.***  Borrower has advised the Title Insurer in writing prior to the issuance of the title policy insuring the Security Instrument whether or not any survey, soils-testing, site-development, excavation and/or other work related to construction of the Improvements was begun and/or done before such Security Instrument was recorded.

**Section 4.17.   *Other Indebtedness.***   As of the Effective Date, there is no outstanding indebtedness of Borrower to any of its officers, directors, partners, members, managers, shareholders and/or Affiliates other than the Subordinated Debt which shall be subordinated to the prior final and indefeasible payment in full of the Loan.

**Section 4.18.   *Borrower as Single-Purpose Entity.***  As of the Effective Date, Borrower is, and at all relevant times until the Debt due and owing under the Loan Documents is paid in full shall remain a single-purpose, bankruptcy-remote, limited liability company organized and in existence under the Laws of the State of Georgia whose sole asset is and shall be the Project and whose members and owners (both direct and indirect) are identified in the organizational chart of Borrower annexed hereto and made a part hereof as Exhibit C.

**Section 4.19.   *Real Estate as Sole Investment*.**   The Borrower is not involved in owning, holding and/or trading securities (whether stocks, bonds, bank debt and/or otherwise), and the Borrower is designed to hold solely real estate interests.

**Section 4.20.   *Special Purpose Entity Provisions*.**   Notwithstanding anything in its Organizational Documents to the contrary, subject to Section 2.03, Borrower agrees that so long as the Loan is outstanding, it shall maintain (or cause to maintain) itself as a Special Purpose Entity.  As used herein, "**Special Purpose Entity**" shall mean a limited liability company that, since the date of its formation and at all times on and after the date thereof, has complied with and shall at all times comply with the following requirements unless it has received either prior consent to do otherwise from Lender, in each case:

**(a)**     has not engaged and shall not engage in any business unrelated to the acquisition, development, ownership, management and/or operation of the Project and has not owned and shall not own any real property other than the Project;

**(b)**     does not have, shall not have and at no time had any assets other than the Project and personal property necessary and/or incidental to its ownership and operation of the Project;

**(c)**     has not engaged in, sought, consented and/or permitted to and shall not engage in, seek, consent to and/or permit (A) any dissolution, winding up, liquidation, consolidation and/or merger, or (B) any sale and/or other transfer of all and/or substantially all of its assets and/or any sale of assets outside the ordinary course of its business, except as permitted by the Loan Documents;

**(d)**     shall not cause, consent to and/or permit any amendment of its Organizational Documents with respect to the matters set forth in this definition;

**(e)**     has not and shall not (and, if such entity is (a) a limited liability company, has and shall have a limited liability agreement or an operating agreement, as applicable, (b) a limited partnership, has a limited partnership agreement, or (c) a corporation, has a certificate of incorporation or articles that, in each case, provide that such entity shall not) (1) dissolve, merge, liquidate, consolidate; (2) sell all or substantially all of its assets; or (3) amend its Organizational Documents with respect to the matters set forth in this definition without the consent of Lender;

**(f)**     has at all times been and shall at all times intend to remain solvent and has paid and shall pay its debts and liabilities (including, a fairly-allocated portion of any personnel and overhead expenses that it shares with any Affiliate) from its assets as the same shall become due, and has maintained and shall intend to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

**(g)**     has not failed and shall not fail to correct any known misunderstanding regarding the separate identity of such entity and has not identified and shall not identify itself as a division of any other Person;

**(h)**     has maintained and shall maintain its bank accounts, books of account, books and records separate from those of any other Person and, to the extent that it is required to file tax returns under applicable Law, has filed and shall file its own tax returns, except to the extent that it is required by Law to file consolidated tax returns;

**(i)**     has maintained and shall maintain its own records, books, resolutions and agreements;

**(j)**     has not commingled and shall not commingle its funds and/or assets with those of any other Person, has not participated and shall not participate in any cash management system with any other Person;

**(k)**     has held and shall hold its assets in its own name;

**(l)**     has conducted and shall conduct its business in its name and/or in a name franchised and/or licensed to it by an entity other than an Affiliate of itself and/or of Borrower, except for

business conducted on behalf of itself by another Person under a business management services agreement that is on commercially-reasonable terms, so long as the manager, and/or equivalent thereof, under such business management services agreement holds itself out as an Lender of Borrower;

**(m)**     (i) has maintained and shall maintain its financial statements, accounting records and other entity documents separate from those of any other Person; (ii) has shown and shall show, in its financial statements, its asset and liabilities separate and apart from those of any other Person; and (iii) has not permitted and shall not permit its assets to be listed as assets on the financial statement of any of its Affiliates except as required by GAAP; provided, however, that any such consolidated financial statement contains a note indicating that the Special Purpose Entity's separate assets and credit are not available to pay the debts of such Affiliate and that the Special Purpose Entity's liabilities do not  constitute obligations of the consolidated entity;

**(n)**     has paid and shall pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets, and has maintained and shall maintain a sufficient number of employees in light of its contemplated business operations;

**(o)**     has not incurred any indebtedness other than (i) the Debt, (ii) unsecured trade payables and operational debt not evidenced by a note, and (iii) indebtedness incurred in the financing of equipment and other personal property used on the Project;

**(p)**     shall have no indebtedness other than (i) the Loan, (ii) liabilities incurred in the ordinary course of business relating to the ownership and operation of the Project and the routine administration of Borrower, in amounts not to exceed three percent (3%) of the amount of the Loan, which liabilities are not more than ninety (90) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances, (iii) such other liabilities that are permitted pursuant to the Organizational Documents, (iv) indebtedness incurred under Section 2.03, and (v) the Subordinated Debt.

**(q)**     has not assumed, guaranteed and/or become obligated and shall not assume and/or guarantee and/or become obligated for the debts of any other Person, has not held out and shall not hold out its credit as being available to satisfy the obligations of any other Person and/or has not pledged and shall not pledge its assets for the benefit of any other Person, in each case except as permitted pursuant to the Organizational Documents as required under Section 2.03;

**(r)**     has not acquired and shall not acquire obligations and/or securities of its partners, members, shareholders, any other owner and/or Affiliate;

**(s)**     has allocated and shall allocate fairly and reasonably any overhead expenses that are shared with any of its Affiliates, constituents, principals, and/or any guarantors of any of their respective obligations, and/or any Affiliate of any of the foregoing, including, but not limited to, paying for shared office space and for services performed by any employee of an Affiliate;

**(t)**     shall maintain and use separate stationery, invoices and checks bearing its name and not bearing the name of any other entity unless such entity is clearly designated as being the Special Purpose Entity's agent;

**(u)**     has not pledged and shall not pledge its assets to and/or for the benefit of any other Person;

**(v)**     has held itself out and identified itself and shall hold itself out and identify itself as a separate and distinct entity under its own name and/or in a name franchised and/or licensed to it by an entity other than an Affiliate of Borrower and not as a division and/or part of any other Person;

**(w)**     has maintained and shall maintain its assets in such a manner that it shall not be costly and/or difficult to segregate, ascertain and/or identify its individual assets from those of any other Person;

**(x)**     has not made and shall not make loans to any Person and has not held and shall not hold evidence of indebtedness issued by any other Person and/or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of and/or subject to common ownership with such entity);

**(y)**     other than capital contributions and distributions permitted under the terms of its organizational documents, has not entered into and/or been a party to, and shall not enter into and/or be a party to, any transaction with any of its partners, members, shareholders and/or Affiliates except in the ordinary course of its business and on terms which are commercially reasonable terms comparable to those of an arm's-length transaction with an unrelated third party;

**(z)**     has not had and shall not have any obligation to, and has not indemnified and shall not indemnify its partners, officers, directors and/or members, as the case may be, in each case unless such an obligation and/or indemnification is fully subordinated to the Debt and shall not constitute a claim against it in the event that its cash flow or any income derived from the Project is insufficient to pay the Debt;

**(aa)**     has not had and shall not have any of its obligations guaranteed by any Affiliate except as provided by the Loan Documents except as permitted by Section 2.03;

**(bb)**     has not formed, acquired and/or held and shall not form, acquire and/or hold any subsidiary, without the prior consent of Lender in its sole discretion;

**(cc)**     has complied and shall comply with all of the material terms and provisions contained in its organizational documents;

**(dd)**     has conducted and shall conduct its business so that each of the assumptions made about it and each of the facts stated about it in that certain insolvency opinion provided by Borrowers' counsel are true, provided that an insolvency opinion is required by Lender hereunder;

**(ee)**     has not permitted and shall not permit any Affiliate and/or constituent party independent access to its bank accounts, other than the manager of the Project in connection with its duties as property manager thereof;

**(ff)** is, has always been and shall continue to be duly formed, validly existing, and in good standing in the state of its incorporation and/or formation and in all other jurisdictions where it is qualified to do business;

**(gg)** has paid all taxes which it owes and is not currently involved in any dispute with any taxing authority;

**(hh)** is not now, nor has ever been, party to any lawsuit, arbitration, summons, and/or legal proceeding that resulted in a judgment against it that has not been paid in full;

**(ii)** has no judgments and/or liens of any nature against it except for tax liens not yet due and the Permitted Exceptions (as such term is defined in the Security Instrument); and

**(jj)** has no material contingent and/or actual obligations not related to the Project.

**ARTICLE V**
**COVENANTS OF BORROWER**

Borrower covenants and agrees with Lender that it will promptly:

**Section 5.01.   *Compliance with Laws; Payment of Taxes*.**  Comply with all Laws applicable to Borrower and its respective right, title and interest in the Project, and/or any part thereof, such compliance to include, without limitation, paying before the same become delinquent all taxes, assessments and governmental charges imposed on it and/or the Project, and/or any part thereof, unless the same is being contested by Borrower in good faith by appropriate proceedings and with adequate reserves, if required, and promptly furnish Lender with reports of any official searches made by Governmental Authorities and any claims of violations thereof.

**Section 5.02.   *Compliance with Security Instrument*.**  Borrower and Guarantor (as applicable) shall comply with the provisions of the Security Instrument to which they are a party.

**Section 5.03.   *Continuing Accuracy of Representations and Warranties*.**   Cause all of the representations and warranties made to Lender herein and in the other Loan Documents to be continuously true and correct in all material respects.

**Section 5.04.   *Covenants, Restrictions and Easements*.**  Comply with all restrictions, covenants and easements affecting the Project and/or the Improvements and cause the satisfaction of all conditions hereof.

**Section 5.05.   *Inspection and Cooperation*.**

**(a)** Permit Lender and its representatives to enter upon the Project upon advance, written notice and during normal business hours to inspect the Improvements and all materials to be used in the construction, rehabilitation and/or renovation thereof and examine all detailed plans and shop drawings which are and/or may be kept at the Project; cooperate and cause any third parties working on behalf of Borrower and/or any general contractor to cooperate with Lender to enable it to perform its functions hereunder; at the time of each inspection by Lender.  For the avoidance

of doubt, Lender and its representatives shall have authority to enter upon the Project to inspect ongoing work involving the Improvements during normal business hours with prior advance notice in connection with Borrower's request for any Requisition.

**(b)** Until the Debt is paid in full, permit Lender and its representatives upon reasonable prior notice to enter upon the Project on a monthly basis and/or at such other reasonable times as may be determined by Lender to inspect the Improvements, the Project and all materials used in the construction, rehabilitation and/or renovation thereof, and provided no Event of Default exists and is continuing after any applicable notice, grace and/or cure period, shall be at the expense of the party requesting such inspections.

**Section 5.06.** ___**Payment of Costs**___.   Borrower shall pay all costs and expenses required for completion of the Improvements and the satisfaction of the conditions hereof in a timely manner, including, without limitation:

**(a)** all document and stamp taxes, recording and filing expenses and fees and commissions lawfully due to brokers in connection with the transactions contemplated hereby, unless otherwise agreed in writing to be paid by any other Person and/or entity, and

**(b)** any taxes, insurance premiums, liens, security interests and/or other claims and/or charges against the Project and/or Improvements.

**Section 5.07.** ___**Brokers**___.  Borrower hereby indemnifies and holds harmless Lender against claims of brokers arising by reason of the execution hereof and/or the consummation of the transactions contemplated hereby, unless caused by Lender's intentional acts.

**Section 5.08.** ___**Perform Under Loan Documents**___.   Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all costs, fees and expenses to the extent required under the Loan Documents executed and delivered by, and/or applicable to, Borrower.

**Section 5.09.** ___**Certain Materials to be Submitted**___.  Upon request, deliver to Lender copies of all contracts, bills of sale, statements receipted vouchers and/or agreements under which Borrower (or the Guarantor) claims title to any materials, fixtures and/or articles incorporated in the Improvements and/or subject to the lien of the Security Instrument, and/or under which it has incurred costs for which it is entitled to a disbursement of proceeds of the Loan, and deliver to Lender such other data and/or documents in connection with the Improvements as Lender may from time to time reasonably request.

**Section 5.10.** ___**Correction of Defects**___.  Upon demand of Lender, correct any material defects (including, without limitation, structural) in the Improvements.

**Section 5.11.** ___**Security of Site**___.  Employ suitable means to protect from theft and/or vandalism all portions of the Project.

**Section 5.12.** ___**Use of Loan Proceeds**___.   To use the proceeds of the Loan for purposes of refinancing the Project, complete various capital expenditures at the Project, fund Reserves in

accordance with the Budget and payment of certain closing fees, costs, and expenses related thereto.

**Section 5.13.   _Use of Third Party Property Manager._**   No third party property manager shall be hired with respect to the Property without Lender's prior written consent and subordination of such manager's management contract with respect to same.

**Section 5.13.   _No Additional Indebtedness_.**   Borrower shall incur no other indebtedness, other than reasonable, unsecured trade payables with respect to Borrower's business of rehabilitating townhome units at the Project and selling them to third parties.

**ARTICLE VI**
**EVENT OF DEFAULT; REMEDIES**

**Section 6.01.   _Event of Default._**   If any one of the following events (individually, an "**Event of Default**" and collectively, "**Events of Default**") shall occur and be continuing only after (unless such time is lengthened below) Borrower continues in default under any of the terms, covenants and/or conditions (i) for five (5) days after Borrower receives written notice from Lender in the case of any default which can be cured by the payment of a sum of money; or (ii) for fifteen (15) days after Borrower receives written notice from Lender in the case of any other default, if Borrower provides to Lender satisfactory proof that Borrower is diligently working to cure such non-monetary default, Borrower shall have an additional fifteen (15) days to cure such non-monetary default:

**(a)**      if any portion of the Debt is not paid when due;

**(b)**      if Borrower fails to pay when due any installment of any assessment against all and/or any portion of the Project for local improvements heretofore and/or hereafter laid, which assessment is and/or may become payable in annual and/or periodic installments and is and/or may become a lien on all and/or any portion of the Project;

**(c)**      if any Federal tax lien is filed against Borrower, Guarantor and/or against all and/or any portion of the Project, provided that, the Person against which such Federal tax lien was filed has used commercially reasonable efforts to discharge same within the first ten (10) days after the date such declaration of default by Lender and same is not actually discharged of record within thirty (30) days after the date such declaration of default by Lender;

**(d)**      if without Lender's consent any part of the Project, and/or any interest therein and/or any interest in Borrower, whether directly and/or indirectly, is in any manner further encumbered, sold, transferred, assigned, hypothecated and/or conveyed, or, if any Improvement and/or the Equipment (as such terms are defined in the Security Instrument and except, however, for normal replacement, wear and tear of the Equipment) is removed, demolished and/or materially altered Notwithstanding the above, this provision shall not limit a transfer of a non-controlling interest in Borrower or any Affiliate thereof, whether directly or indirectly;

36

(e)    if any of the insurance policies as may be required by the Loan Documents are not kept in full force and effect;

(f)    if any of the insurance policies as may be required by the Loan Documents fail to include Lender as additional insured and first loss payee thereunder;

(g)    if, without Lender's consent, any Leases (as such term is defined in the Security Instrument) are made, canceled and/or materially modified except in the ordinary course of Borrower's business;

(h)    if Borrower and/or Guarantor shall be in default beyond applicable notice and grace periods under any of the Loan Documents and/or if any Asset Owner Parties shall be in default beyond applicable notice and grace periods under any Cross-Collateral Loan Documents, whether in whole and/or in part;

(i)    if any material representation and/or warranty of Borrower and/or Guarantor in any of the Loan Documents is false and/or misleading in any material respect;

(j)    if Borrower, Guarantor and/or any Asset Owner Parties makes a voluntary assignment for the benefit of creditors;

(k)    if a court of competent jurisdiction enters a decree and/or order for relief with respect to Borrower, Guarantor and/or any Asset Owner Parties obligated under any Cross-Collateral Loan Documents (and/or any general partner, manager or other Person in Control of any of the foregoing) under Title 11 of the United States Code as now constituted and/or hereafter amended and/or under any other applicable Federal and/or state bankruptcy Law or other similar Law, and/or if such court enters a decree and/or order appointing a receiver, liquidator, assignee, trustee, sequestrator (or similar official) of Borrower, Guarantor and/or any Asset Owner Parties obligated under any Cross-Collateral Loan Documents (and/or any general partner, manager or other Person in Control of any of the foregoing) and/or of any substantial part of their respective properties or any Assets, and/or if such court decrees and/or orders the winding up and/or liquidation of the affairs of Borrower, Guarantor and/or any Asset Owner Parties obligated under any Cross-Collateral Loan Documents (and/or any general partner, manager or other Person in Control of any of the foregoing) and such decree and/or order is not dismissed with prejudice within forty-five (45) days after filing;

(l)    if Borrower, Guarantor and/or any Asset Owner Parties obligated under any Cross-Collateral Loan Documents (and/or any general partner, manager or other Person in Control of any of the foregoing) files a voluntary petition and/or files an answer and/or consent seeking relief under Title 11 of the United States Code as now constituted and/or hereafter amended, and/or under any other applicable Federal or state bankruptcy Law or other similar Law, and/or if Borrower, Guarantor and/or any Asset Owner Parties obligated under any Cross-Collateral Loan Documents (and/or any general partner, manager or other Person in Control of any of the foregoing) (consents to the institution of proceedings thereunder and/or to the filing of any such petition and/or to the appointment of and/or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of Borrower, Guarantor and/or any Asset Owner

Parties obligated under any Cross-Collateral Loan Documents (and/or any general partner, manager or other Person in Control of any of the foregoing)  and/or of any substantial part of their respective properties or any Assets;

**(m)**   if an involuntary petition is filed against and/or consented to by Borrower, Guarantor and/or any Asset Owner Parties obligated under any Cross-Collateral Loan Documents (and/or any general partner, manager or other Person in Control of any of the foregoing) and same is not dismissed with prejudice within forty-five (45) days after filing;

**(n)**   Intentionally Omitted;

**(o)**   excluding installment contract payments under which Borrower is not otherwise in default, if all and/or any portion of the Project becomes subject: (i) to any tax lien, other than a lien for local real estate taxes and assessments not due and payable, or (ii) to any lis pendens, notice of pendency, stop order, judgment, notice of intention to file mechanic's and/or materialman's lien and/or similar interest, mechanic's lien, materialman's lien and/or other lien, and the same have not been discharged, with prejudice, bonded or insured over to Lender's satisfaction within forty-five (45) days after Borrower has notice thereof;

**(p)**   if a writ of execution and/or attachment and/or any similar process shall be issued and/or levied against all and/or any part of and/or interest in any portion of the Project any portion of the Project and/or any judgment involving monetary damages shall be entered against Borrower and/or Guarantor which shall become a lien on Borrower's and/or Guarantor's respective interest in the Project and same is not bonded in an amount satisfactory to Lender or removed within forty-five (45) days;

**(q)**   if Borrower and/or Guarantor shall have entered into any financing and/or shall have consented to the placing of any lien, mortgage, deed to secure debt and/or other encumbrance,  upon all and/or any portion of the Project and/or against any other Collateral granted to Lender;

**(r)**   the dissolution and/or the sale, assignment, hypothecation, gift and/or other transfer of all and/or substantially all of the assets of Borrower and/or Guarantor;

**(s)**   any failure of Borrower and/or Guarantor to adhere to any Law that results in a material adverse effect upon the Project;

**(t)**   if Borrower, without Lender's written consent, guarantees, assumes, endorses and/or otherwise in any way becomes, directly and/or indirectly, responsible and/or liable for any other debts and/or obligations, including, without limitation, the debts and/or obligations of any Person, excluding debts of Borrower in connection with the operation of the Project or as contemplated by Section 2.03;

**(u)**   sale, transfer, encumbrance, conveyance and/or assignment of all and/or any portion of the Project, whether directly and/or indirectly, except in accordance with the provisions of the Security Instrument or this Agreement;

38

**(v)**      except as otherwise expressly stated in the Loan Agreement, any change in the Organizational Documents of Borrower occurs, and/or if any change to the organizational chart of Borrower as described in <u>Exhibit C</u> occurs without the Lender's prior written consent;

**(w)**      the death and/or incapacity of Guarantor, <u>provided</u> <u>that</u>, if in the event of the death or incapacity of Harker or Peoples, within forty-five (45) days after such, death and/or incapacity of Guarantor, a replacement guarantor (or guarantors) satisfactory to Lender in its sole discretion does not execute one and/or more replacement guaranties (in form and content satisfactory to Lender in its sole discretion);

**(x)**      if, at any time Guarantor fails to Control the business affairs of Borrower;

**(y)**      if, at any time Mezzanine Lender commences or gives written notice of any Equity Collateral Enforcement Action (defined in the Intercreditor Agreement); or

**(z)**      if, at any time, Borrower and/or Guarantor removes the existing property manager from management of the Property or utilizes any other property management company without first obtaining written consent to do so from Lender, which consent will not be unreasonably withheld or delayed.

**Section 6.02.   _Remedies._**   Upon the occurrence of an Event of Default, Lender may, by written notice to the Borrower:(A) declare the entire Debt under the Loan Documents to be immediately due and payable, whereupon the outstanding Loan Amount, together with any and all accrued and unpaid interest at the Applicable Interest Rate (same as may be increased pursuant to <u>Section 2.06</u> hereof) and other amounts under the Loan Documents; and/or (B) declare the entire Debt under any Cross-Collateral Loan Documents shall become and be immediately due and payable without presentment, demand, protest and/or further notice of any kind, all of which are hereby expressly waived by Borrower and Guarantor.  Upon the occurrence of an Event of Default which continues beyond any applicable notice, grace and/or cure periods, any all cash and/or payments thereafter received by Lender in connection with the Loan or any Cross-Collateral Loan (whether such payments are voluntary and/or involuntary) shall be applied against the unpaid Debt under the Loan Documents and/or any Cross-Collateral Loan Documents in any order of priority as determined by Lender in its sole and absolute discretion.  In addition to any other remedies available to Lender under the Loan Documents and/or Cross-Collateral Loan Documents, Lender may elect to enforce all and/or any of its rights and remedies, in any order of priority as may be determined by Lender in its sole and absolute discretion, against Borrower, Guarantor, any Asset Owner Parties and/or any other Person obligated under the Loan Documents and/or Cross-Collateral Loan Documents, respectively.

**Section 6.03.   _Late Charge; Default Rate._**   If any payment of interest or fees is not paid on the date when same is due and payable other than the payment due on the Maturity Date, Borrower agrees to pay a late payment charge equal to five percent (5%) of the delinquent amount, which amount shall be added to the unpaid principal balance of the Loan ("**Late Charge**").  The Late Charge will be assessed if any payment (other than principal) hereunder or under the Loan Agreement is not paid within five (5) days after the date such payment is due and is for purposes of defraying the expense, fees and costs incurred by Lender in handling and processing

delinquent payments. Borrower agrees the Late Charge is reasonable.  In addition to Late Charge which may be due hereunder, if this Note is declared immediately due and payable by Lender pursuant to the provisions of this Loan Agreement and/or under any of the other Loan Documents, and/or if the Note is not paid in full on the Maturity Date, Borrower shall thereafter pay interest from the date of such declaration until the Debt hereunder is paid in full at a rate equal to the Default Rate.

**Section 6.04.   _No Cross-Default with Alexandria Loan_**.  Notwithstanding anything contained herein to the contrary, the parties expressly acknowledge, consent and agree that a default or event of default under the documents, agreements and instruments evidencing the Alexandria Loan shall not be an Event of Default under this Agreement. Conversely, an Event of Default under the Loan Documents shall not constitute an event of default under the documents, agreements and instruments evidencing the Alexandria Loan.   Nothing in this Section 6.04 is intended to affect the cross-collateralization of the Asset securing the Alexandria Loan with the Loan or any other Cross-Collateral Loan.

## ARTICLE VII
## GENERAL CONDITIONS AND PROVISIONS

**Section 7.01.   _Advance Not Waiver_.**  Any advance or Disbursement by Lender of any proceeds from the Loan hereunder made prior to and/or without the fulfillment by Borrower of all of the conditions precedent thereto shall not constitute a waiver by Lender and Lender of such requirement with respect to withholding any future Disbursement of proceeds from the Loan.

**Section 7.02.   _No Third-Party Beneficiaries_.**  This Loan Agreement is solely for the benefit of the Lender, Lender, Borrower, Guarantor and any other Person obligated under the Loan.  All conditions of the obligations of Lender to make Disbursements on behalf of any Lender hereunder are imposed solely and exclusively for the benefit of the Lender and each Lender and may be freely waived and/or modified in whole and/or in part by Lender, at any time if, in its sole discretion, it deems it advisable to do so, and no Person other than Borrower (provided, however, that all conditions have been satisfied) shall have standing to require Lender or any Lender to make any Disbursements and/or to be a beneficiary of this Loan Agreement and/or any Disbursements to be made hereunder.

**Section 7.03.   _Authorization to Make Direct Disbursements_.**   Borrower hereby irrevocably authorizes Lender upon advanced written notice to Borrower, to disburse (provided such authorization is made in writing) funds from the CapEx Reserve directly to the general contractor, any subcontractor and/or other Persons and/or entities to pay for completion of the Improvements.

**Section 7.04.   _Concerning Irrevocable Authorizations_.**   Any and all Disbursements made at any time pursuant to the irrevocable authorizations granted by Section 7.03 shall require no further direction, authorization and/or request for disbursement from Borrower other than advanced written notice to Borrower of Lender's determination to make said Disbursement.  Any and all such disbursements shall be added to the outstanding principal balance evidenced by the Note and shall be secured by the Security Instrument.  The aforesaid authorizations shall (i) not prevent Borrower from paying the contractors and other Persons, from paying the interest, and/or from satisfying the conditions and obligations referred to in Section 7.03, out of its own funds,

(ii) in no event be construed so as to relieve Borrower and/or others from their obligations to pay such contractors and/or other Person, to pay interest as and when due under the Note, and/or to satisfy such conditions and obligations, and (iii) in no event obligate Lender to disburse proceeds of the Loan for any such purposes.

**Section 7.05.   *Ratification of Requisition by Acceptance of Disbursement.*** Borrower agrees that, by its acceptance of any Disbursement hereunder, it shall be bound in all respects by the Requisition submitted on its behalf in connection therewith with the same force and effect as if Borrower had itself executed and submitted the Requisition and whether or not the Requisition is executed or submitted by an authorized Person. Each Requisition submitted to Lender by Borrower, and the receipt of the funds requested thereby, shall constitute an affirmation that the representations and warranties contained herein and in the other Loan Documents remain true and correct in all material respects as of the respective dates of such Requisitions unless Borrower discloses to Lender the extent to which such representation or warranty is no longer materially true.

**Section 7.06.   *Documentation, Etc. Satisfactory.*** All documentation and proceedings deemed by Lender and Lender Counsel to be reasonably necessary and/or required in connection herewith and the documents relating hereto shall be subject to the prior approval of, and satisfactory to, both of them as to form and substance. Approval of such documents shall not be unreasonably withheld. In addition, the Persons and/or parties responsible for the execution and delivery of, and signatories to, all of such documentation, shall be acceptable to, and subject to the approval of, Lender and Lender and Lender Counsel. Lender Counsel shall receive copies, certified if requested by either of them, of all documents which they may require in connection with the transactions contemplated hereby.

**Section 7.07.   *Further Assurances*.** Borrower and Guarantor shall, at their sole cost and expense:

**(a)**     furnish to Lender all instruments, documents, boundary surveys, footing and/or foundation surveys, certificates, plans and specifications, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents and/or which are requested by Lender in connection therewith;

**(b)**     execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary and/or desirable, to evidence, preserve and/or protect the collateral at any time securing and/or intended to secure the obligations of Borrower under the Loan Documents, as Lender may require; and

**(c)**     do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Loan Agreement and the other Loan Documents, as Lender shall require from time to time.

**Section 7.08.   *Notices.*** Except as expressly provided otherwise, all notices, demands, consents, approvals and statements required and/or permitted hereunder shall be in writing and shall be deemed to have been sufficiently given and/or served for all purposes when presented personally, by delivery to a nationally recognized overnight courier service or by electronic mail, if to

Borrower, Guarantor and/or Lender, at their respective addresses stated below, and/or at such other address of which a party shall have notified the party giving such notice in writing in accordance with the foregoing requirements, with a copy to each of the following:

If to Lender:
Specialty Credit Holdings, LLC
Two Greenwich Plaza, 1st Floor
Greenwich, Connecticut 06830
Attn: Andrew Scott
E-mail: ascott@silverpointcapital.com

With a copy to:
Mahadeva, PLLC
80 Business Park Drive, Suite 201
Armonk, New York 10504
Attention: Prassana Mahadeva
E-Mail: pmahadeva@mahadevalaw.com

If to Borrower and Guarantor:

c/o ARIAM Partners, LLC
1020 Powers Place
Alpharetta, GA 30009
Attention: Joe Harker
E-mail: jharker@ariampartners.com

With a copy to:
Polsinelli PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
Attention: Douglas Noren
E-mail: DNoren@Polsinelli.com

***Section 7.09. Entire Agreement; Amendments and Waivers.*** This Loan Agreement and the other Loan Documents contain the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior oral and/or written agreements and/or statements relating to such subject matter. None of the terms and provisions hereof and/or of the other Loan Documents may be changed, waived, discharged and/or terminated, nor may any material departure from the provisions hereof and/or thereof be consented to, except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, termination and/or consent is sought. Any such waiver and/or consent shall be effective only in the specific instance and for the specific purpose for which given. Without limiting the foregoing, acceptance by Lender of any sum required to be paid pursuant hereto and/or any other Loan Document after its due date, and/or in an amount less than the sum then due, shall not constitute a waiver by Lender of its right to require prompt payment when due of all other such sums and/or to declare a default and/or to exercise such other rights provided herein and/or in the other Loan Documents for such late and/or reduced payment.

**Section 7.10.   *Setoff.***   Borrower agrees that, in addition to (and without limitation of) any right of setoff, bankers' lien and/or counterclaim Lender may otherwise have, Lender shall, during an existence of an Event of Default, be entitled, at its option, to offset balances (general, special, time, demand, provisional and/or final) held by it for the account of Borrower at any of Lender's offices against any amount payable by Borrower to Lender hereunder and/or under any other Loan Document which is not paid when due (regardless of whether such balances are then due to such Borrower), in which case it shall promptly notify such Borrower thereof; provided that Lender's failure to give such notice shall not affect the validity thereof.  Payments by Borrower hereunder and/or under the other Loan Documents shall be made without setoff and/or counterclaim.

**Section 7.11.   *Successors and Assigns.***   Except as herein provided, this Loan Agreement shall be binding upon and inure to the benefit of Borrower, Lender and each Lender and their respective heirs, personal representatives, successors and assigns.   Notwithstanding the foregoing, Borrower, without the prior written consent of Lender in each instance, may not assign, transfer and/or set over to another, in whole and/or in part, all and/or any part of its benefits, rights, duties and obligations hereunder, including, but not limited to, performance of and compliance with conditions hereof and the right to receive the proceeds of current and/or future Disbursements.

**Section 7.12.   *Severability.***   The provisions hereof are intended to be severable.  Any provisions hereof, and/or the application thereof to any Person, entity and/or circumstance, which, for any reason, in whole and/or in part, is prohibited and/or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition and/or unenforceability without invalidating the remaining provisions hereof (or the remaining portions of such provision) and/or the application thereof to any other Person, entity and/or circumstance, and any such prohibition and/or unenforceability in any jurisdiction shall not invalidate and/or render unenforceable such provision (or portion thereof) and/or the application thereof to any Person, entity and/or circumstance in any other jurisdiction.

**Section 7.13.   *Non-Waiver; Remedies Cumulative.***    No failure and/or delay on Lender's part in exercising any right, remedy, power and/or privilege (hereinafter in this Section, each a "**Remedy**") hereunder and/or under any of the other Loan Documents shall operate as a waiver of any such Remedy and/or shall be deemed to constitute Lender's acquiescence in any default by Borrower, and/or by Guarantor under any of said documents.  A waiver by Lender of any Remedy hereunder and/or under any of the other Loan Documents on any one occasion shall not be construed as a bar to any other and/or future exercise thereof and/or of any other Remedy.  The Remedies provided in said documents are cumulative, may be exercised singly and/or concurrently and are not exclusive of any Remedies provided therein and/or by Law.

**Section 7.14.   *Certain Waivers.***         Borrower and Guarantor hereby irrevocably and unconditionally waive (i) promptness and diligence; (ii) notice of any actions taken by Lender hereunder and/or under any other Loan Document and/or any other agreement and/or instrument relating thereto except to the extent otherwise required in the Loan Documents, (iii) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of Borrower's (or Guarantor's) respective obligations hereunder and under the other Loan Documents, the omission of and/or delay in which, but for the provisions of this Section 7.14, might constitute grounds for relieving Borrower and/or Guarantor of any of their respective

obligations hereunder and/or under the other Loan Documents, (iv) any requirement that Lender exhaust any right and/or take any action against Borrower, Guarantor and/or any other Person and/or entity and/or against any Collateral for the Loan in any specific order of priority, (v) any right and/or claim of right to cause a marshalling of Borrower's and/or Guarantor's assets; and (vi) all rights of subrogation and/or contribution, whether arising by contract and/or operation of Law and/or otherwise by reason of payment by Borrower (or Guarantor and/or any other Person and/or entity for and/or on behalf of Borrower) pursuant hereto and/or to the other Loan Documents.

**Section 7.15.   *Expenses*.**   The Loan shall be made without cost to Lender.  Borrower covenants and agrees to pay all out-of-pocket costs, expenses and charges (including, without limitation, all fees and charges of engineers, appraisers, Lender and reasonable fees of Lender Counsel) incurred by Lender in connection with (i) the preparation for and consummation of the transactions contemplated hereby and/or for the performance hereof and of the other Loan Documents, and for any services which may be required in addition to those normally and reasonably contemplated hereby, and (ii) the enforcement hereof and/or of any and/or all of the other Loan Documents in the Event of Default.  If Borrower fails to pay within ten (10) days after demand any costs, charges and/or expense required to be paid by it as aforesaid, and Lender pays such costs, charges and/or expenses, Borrower shall reimburse Lender on demand for the amounts so paid, together with interest thereon at the "Default Rate" (as said quoted term is defined in the Note) if, in fact, there exists an uncured Event of Default at that time.   The obligations of Borrower and Guarantor under this <u>Section 7.15</u> shall survive the repayment of all amounts due under and/or in connection with any of the Loan Documents and the termination of the Loan.

**Section 7.16.   *Counterparts*.**    This Loan Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any party hereto may execute this Loan Agreement by signing any such counterpart.

**Section 7.17.   *Transfers of Interests in Loan*.**    Borrower and Guarantor recognize that Lender may sell and transfer interests in the Loan, the Note, this Loan Agreement and in the other Loan Documents to one or more participants and/or assignees and that all documentation, Financial Statements, appraisals and other data, and/or copies thereof, relevant to Borrower, Guarantor and/or the Loan, and to any Disbursements hereunder, may be exhibited to and retained by any such participant and/or assignee and/or prospective participant and/or assignee for its files, and Lender shall cause the participants or assignees to be bound to maintain the privacy and confidentiality of the files and personal information of Borrower and Guarantors.

**Section 7.18.   *Business and Operations*.**    Borrower will continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Project.  Borrower will qualify to do business and will remain in good standing under the Laws of all jurisdictions required by Law as and to the extent the same are required for the ownership, maintenance, management and operation of the Project.  Borrower shall at all times during the term of the Loan, continue to own all of its Personalty (as such term is defined in the Security Instrument") which are reasonably necessary to operate the Project in the manner required hereunder and in the manner in which they are currently operated.

**Section 7.19.  _Governing Law; Jurisdiction._**    Except with respect to the Laws of any jurisdiction regarding the perfection and enforcement of liens and security interests in any Collateral located in such jurisdiction, this Loan Agreement and the rights and obligations of the parties hereunder shall in all respects be governed by, and construed and enforced in accordance with, the Laws of the State of New York (without giving effect to principles of conflicts and/or choice of Law).  Borrower hereby irrevocably submits to the non-exclusive jurisdiction of any State and/or Federal court sitting in New York County, New York over any suit, action and/or proceeding arising out of and/or relating to this Loan Agreement, and Borrower and Guarantor hereby agree and consent that, in addition to any methods of service of process provided for under applicable Law, all service of process in any such suit, action and/or proceeding in any State and/or Federal court sitting in or near New York County, New York (or such other county in the State of New York) may be made by certified and/or registered mail, return receipt requested, directed to Borrower at the address indicated on the cover page hereof, and service so made shall be complete five (5) days after the same shall have been so mailed.

**Section 7.20.  _No Oral Agreements._**    THIS WRITTEN LOAN AGREEMENT AND THE LOAN DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS AND/OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES, AND THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**Section 7.21.  _Representation by Independent Counsel._**    Borrower and Guarantor expressly acknowledge, confirm and agree that each have been represented by independent counsel of their own choosing and that Borrower and Guarantor is fully familiar with this Loan Agreement, Note, the Loan the other Loan Documents and the transactions, terms and conditions contained and contemplated therein.

**Section 7.22.  _Patriot Act Notice_.**    Lender hereby notifies Borrower and Guarantor that, pursuant to the requirements of the Patriot Act, Lender is required to obtain, verify and record information that identifies the Borrower and Guarantor, which information includes the name and address of Borrower and Guarantor and other information that will allow Lender to identify Borrower and Guarantor in accordance with the Patriot Act.  Borrower and Guarantor (together with any Person affiliated with and/or having an ownership interest therein) shall provide such information and take such actions as are reasonably requested by Lender in order to assist Lender in maintaining compliance with the Patriot Act.

**Section 7.23.  _Bankruptcy_.**

**(a)**    In entering into the Loan and execution of the Loan Documents, Borrower and Guarantor hereby stipulate, acknowledge and agree that Lender agreed to the provisions as set forth herein in exchange for the promises, representations, acknowledgments and warranties of Borrower and Guarantor as contained herein and in the other Loan Documents and that Lender would not have agreed to provide the Loan and enter into the Loan Documents but for such promises, representations, acknowledgments, agreements, and warranties, all of which have been accepted by Lender in good faith, the breach of which by Borrower and/or Guarantor, in any way, at any time, now and/or in the future, would admittedly and confessedly constitute cause for dismissal of any such bankruptcy petition pursuant to 11 U.S.C. § 1112(b).

**(b)**      As additional consideration for Lender agreeing to the provisions as set forth herein and in the other Loan Documents, Borrower and Guarantor agree that in the event a bankruptcy petition under any Chapter of the Bankruptcy Code (11 U.S.C. §101, et seq.) is filed by and/or against Borrower (or by and/or against any member and/or manager of Borrower and/or against any Person having a direct and/or indirect ownership and/or equity interest in Borrower) and/or by and/or against Guarantor, at any time after the execution hereof, Lender shall be entitled to seek the immediate entry of an order from the appropriate bankruptcy court granting Lender complete relief from the automatic stay imposed by §362 of the Bankruptcy Code (11 U.S.C. §362) to exercise its foreclosure and other rights with respect to the Loan (whether such rights are judicial and/or non-judicial), including, but not limited to, exercising a power of sale under any Security Instrument, obtaining a foreclosure judgment and foreclosure sale, upon the filing with the appropriate court of a motion for relief from the automatic stay with a copy of this Loan Agreement attached thereto.  Borrower and Guarantor specifically agree (i) that upon filing a motion for relief from the automatic stay, Lender shall be entitled to relief from the stay without the necessity of an evidentiary hearing and without the necessity and/or requirement of Lender to establish and/or prove the value of any property, the lack of adequate protection of its interest in all and/or any portion of the Project, and/or the lack of equity in all and/or any portion of the Project; (ii) that the lifting of the automatic stay hereunder by the appropriate bankruptcy court shall be deemed to be "for cause" pursuant to §362(d)(1) of the Bankruptcy Code (11 U.S.C. §362(d)(1)); and (iii) that Borrower and Guarantor will not directly and/or indirectly oppose and/or otherwise defend against Lender's efforts to gain relief from the automatic stay.  This provision is not intended to preclude Borrower (and/or any member and/or manager of Borrower and/or any Person having a direct and/or indirect ownership and/or equity interest in Borrower and/or Guarantor) from filing for protection under any Chapter of the Bankruptcy Code.  The remedies prescribed in this Section 7.23 are not exclusive and shall not limit Lender's rights under the Loan Documents and/or under any Law.

**(c)**      Borrower and Guarantor have advised Lender and hereby stipulate as follows:  (i) other than the Permitted Encumbrances or as acknowledge by Lender, that Borrower has no unsecured creditors and/or junior lienholders, and any Proceeding (as hereinafter defined) would essentially be a two-party dispute between Lender and Borrower; and (ii) an effective plan of reorganization would not be feasible for Borrower to achieve in any Proceeding.

**(d)**      Borrower and Guarantor are sophisticated owners, investors and operators of real estate similar to the Project, have been represented by their own independent counsel of their choosing in negotiating and entering into this Loan Agreement and the other Loan Documents, and agreeing to the waivers set forth in this Section 7.23(a), and all of the above terms and conditions have been freely bargained for and are all supported by reasonable and adequate consideration and the provisions herein are material inducements for Lender entering into the Loan, and the Loan Documents.

For the purposes of this Section 7.23, a "Proceeding" shall mean:  (a) any voluntary and/or involuntary case, action and/or proceeding before any court and/or other governmental authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up and/or relief of debtors, and/or (b) any general assignment for the benefit of

creditors, composition, marshaling of assets for creditors, and/or other, similar arrangement in respect of its creditors, generally and/or any substantial portion of its creditor; undertaken under U.S. Federal, state, and/or foreign Law, including the Bankruptcy Code.  The provisions of this Section 7.23 shall survive the expiration and/or earlier termination of this Note.

**Section 7.24.    *Conflict.*    In** the event any provision and/or term contained in this Loan Agreement conflicts with any provision and/or term contained in any other Loan Document, such term and/or provision contained in this Loan Agreement shall prevail.

**Section 7.25.    *Time of the Essence*.**    Borrower and Guarantor agree that time is of the essence under this Loan Agreement and the Note.

**IN  WITNESS  WHEREOF**, the parties have executed and delivered this Loan Agreement as of the day and year first above written, the execution hereof by Borrower constituting (a) a certification by the Borrower that the representations and warranties made in Article IV are true and correct as of the date hereof.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK; SIGNATURES ON IMMEDIATELY FOLLOWING PAGES]**

## SIGNATURE PAGE TO LOAN AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be executed as of the date first set forth above.

### BORROWER:

**2604 Cambleton Road Partners, LLC**
**A Georgia limited liability company**

By: _____,
A _____
Its _____ MANAGING MEMBER

By: _____

STATE OF Georgia        )
                        : ss.:
COUNTY OF Fulton        )

On this 12 day of July in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared Joseph Harker, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and in my presence executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

_____
Notary Public

PATRICIA VANHOOZER
MY COMMISSION EXPIRES
MAR 18 20__
FULTON CO., GEORGIA
NOTARY PUBLIC

48

## SIGNATURE PAGE TO LOAN AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be executed as of the date first set forth above.

**JOSEPH HARKER**

**By:** _____

**STATE OF** Georgia )
                     : ss.:
**COUNTY OF** Fulton )

On this _12_ day of _July_ in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _Joseph Harker_, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and in my presence executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

_____
Notary Public

49

## SIGNATURE PAGE TO LOAN AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be executed as of the date first set forth above.

**BRIAN PEOPLES**

**By:** _____

**STATE OF** Georgia                    )
                                       : ss.:
**COUNTY OF** Fulton                    )

On this 12 day of July in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _Brian Peoples_, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and in my presence executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

_Patricia Vanhooser_
Notary Public

## SIGNATURE PAGE TO LOAN AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be executed as of the date first set forth above.

LENDER:

SPECIALTY CREDIT HOLDINGS, LLC,
a Delaware limited liability company

By: _____ Michael A. Gatto
Name:
Title:   Its Authorized Signatory

STATE OF CONNECTICUT      )
                          : ss.:
COUNTY OF FAIRFIELD       )

On this 14 day of JULY in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _____Michael A. Gatto_____, Authorized Signatory of Specialty Credit Holdings, LLC, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and in my presence executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

_____
Notary Public



LISA ORLANDO
Notary Public of Connecticut
My Commission Expires 06/30/2022

51

**SCHEDULE A**

<u>Legal Description of Property</u>

<u>Multiple units 2604 Campbellton Rd.</u>

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

All that tract or parcel of land lying and being in Land Lot 199 of the 14th District, Fulton County, Georgia, being Units A-1, A-3, A-4, A-5, A-6, A-7, B-1, B-2, C-1, C-2, C-3, C-4, C-5, C-7, D-1, D-2, D-3, D-4, E-1, E-2, E-3, F-1, F-2, F-3, F-5, F-6, F-7, G-3, G-4, G-7, H-1, H-2, H-3, H-4, H-5 of the 2406 Campbellton Road Subdivision, as per plat recorded in Plat Book 392, Page 19, Fulton County, Georgia Records, which plat is incorporated herein and made a part of this description.

Together with the Declaration of Covenants, Conditions and Restrictions for Campbellton Village Townhomes, as recorded in Deed Book 44374, Page 59, aforesaid records.

Together with the Declaration of Easement recorded in Deed Book 43608, Page 527, aforesaid records.

**EXHIBIT A**
Pending Disbursements Clause


Pending disbursement of the full proceeds of the Loan secured by the Security Instrument, the loan policy of insurance issued by Title Company (the "Policy") insures only to the extent of the amount actually disbursed plus interest accrued thereon but increases up to the face amount of the Policy as disbursements are made in good faith and without knowledge of any defects in, or encumbrances prior to, the lien of the insured mortgage or deed of trust other than exceptions on Schedule B of the Policy not insured against thereunder.

Title shall be continued down to the date of each disbursement and the Title Company shall furnish to the insured thereunder, a continuation report which shall note (1) the new effective date and amount of the Policy, (2) all assessments, taxes, liens, encumbrances, leases, mortgages, easements and other items including survey variations, encroachments and setback violations then affecting the insured premises which have been filed of record or discovered by the Company since the original date of the Policy regardless of whether they affect the lien of the insured mortgage or deed of trust, (3) which of the aforesaid items have been filed or recorded since the date of the last preceding continuation report, and (4) which said items are intended to be added as exceptions to the coverage of the Policy as to (a) all amounts secured by the insured mortgage or deed of trust and (b) only amounts secured by the insured mortgage or deed of trust advanced on or after the new effective date of the Policy.

In addition, each continuation search will notify the insured of any liens which have been discharged by bonding, court deposit or any other means other than full payment.

**EXHIBIT B**

<u>Budget</u>
(to be supplemented with such supporting documentation, invoices and other information as may
be requested and/or required by Lender, from time to time)

## EXHIBIT C - SCHEDULE OF VALUES

| D | Exterior | | | | | |
|---|---|---|---|---|---|---|
| 1 | Windows | | | | $ | 53,000 |
| 2 | Fascia Repair and Paint | | | | $ | 20,000 |
| 3 | Brick Repair | | | | $ | 10,000 |
| 5 | Door Replacement | | 19 | $ | 225 $ | 4,275 |
| 6 | Sidewalk repair | | | | $ | 6,500 |
| E | Unit Repairs 35 units | Turn Units | Renovation | | | |
| 14 | Permits | | | | $ | 15,000 |
| 15 | Demo | | | | $ | 44,000 |
| 17 | Cabinets Labor | | | | $ | 18,000 |
| 20 | Interior Paint (P & O) | | | | $ | 35,000 |
| 22 | Drywall labor | | | | $ | 120,000 |
| 23 | Drywall / Plaster Materials | | | | $ | 120,000 |
| 24 | Interior Finish labor | | | | $ | 45,000 |
| 25 | Interior Finish Materials | | | | $ | 65,000 |
| 26 | Tile Floor Prep | | | | $ | 16,000 |
| 27 | Tub Refinish | | | | $ | 16,000 |
| 28 | Finish Plumb Labor / Install parts | | | | $ | 73,225 |
| 30 | Finish Electrical labor | | | | $ | 75,500 |
| 32 | Flooring | | | | $ | 105,000 |
| 33 | Finish HVAC Labor / Trim Parts | | | | $ | 88,000 |
| 35 | Hardware Labor | | | | $ | 15,000 |
| 37 | Appliance | | | | $ | 105,000 |
| 38 | Final Clean | | | | $ | 6,500 |
| E | **Total Interior Units Price** | | | | $ | **1,056,000** |

**EXHIBIT C**

<u>Organizational Chart of Borrower</u>



Enclave at Campbellton
Organizational Structure

35 Condominium Units
Atlanta, Georgia

2604 CAMBLETON Road Partners, LLC

Yuen-Tsaparas Holdings, Inc.
By Panagiotis Tsaparas
100% ownership

(Company Interest 55%)

JSS Realty Holdings, Inc.
By Joseph Harker
100% ownership

(Company Interest 15%)

Peoples Commercial Funding, LLC
By Brian Peoples
100% ownership

(Company Interest 15%)

Alberto Storelli

(Company Interest 15%)

**EXHIBIT E**

**Form of Extension Option Notice**

[BORROWER Letterhead]/[Date]

Specialty Credit Holdings, LLC
c/o Silver Point Capital, L.P.
Two Greenwich Plaza, 1st Floor
Greenwich, Connecticut 06830
Attn: Andrew Scott

> Re:   Loan Agreement in the principal amount of $2,300,000.00, dated on or about July __, 2017 (the "Loan Agreement")

Dear Sirs:

Reference is made to the Loan Agreement and except as otherwise used herein, all capitalized terms herein shall have the same meaning as defined in the Loan Agreement. This letter constitutes the Extension Option Notice under Section 4.1 of the Note. Specifically, Borrower requests that the applicable Maturity Date under the Note be extended pursuant to the terms thereof. Borrower acknowledges and agrees that on the Extended Maturity Date, the Debt shall become immediately due, owing and paid to Lender.

During the Extended Term, Borrower and Guarantor agree to comply with every one of their respective obligations under the Loan Documents. Borrower and Guarantor represent and warrant to Lender as of the date set forth above and again on the applicable Maturity Date, as follows:

> i.   No Event of Default exists and is continuing under the Loan Documents beyond any applicable notice, grace and/or cure period;

> ii.   On or prior to the applicable Maturity Date, each of the conditions precedent to Extended Term described in Section 4.1 of the Note shall be satisfied subject to Lender's sole discretion;

> iii.   Borrower and Guarantor restate and reaffirm each and every one of their respective Obligations under the Loan Documents as if they were all fully set forth herein;

> iv.   Borrower and Guarantor expressly acknowledge, consent and agree that Lender and its respective members, managers, employees, directors, partners, contractors, consultants, attorneys, parents, subsidiaries, servicers, successors and/or assigns, and Loan Servicer (collectively, the

12

"Lender Parties"), have performed each and every one of their respective obligations under the Loan Documents; and

v. Borrower and Guarantor, together with each of their respective members, managers, employees, directors, contractors, consultants, attorneys, parents, subsidiaries, servicers, executors, heirs, hereditors, conservators and successors and/or assigns, hereby release and discharge Lender, and each of the Lender Parties, with prejudice, from any and all claims, causes of action, liabilities and damages arising out of and/or related to the Loan and the Loan Documents.

By our signatures below, it is the intent of the Borrower and Guarantor to be expressly bound by the terms, representations, warranties, covenants and release and discharge contained in this Extension Option Notice.

**2604 Cambleton Road Partners, LLC,**
**A Georgia limited liability company**

By: _____,
      A _____
      Its

      By: _____

**JOSEPH HARKER**

By: _____

**BRIAN PEOPLES**

By: _____

13

**EXHIBIT F**

**Insurance Requirements**

| **Property Insurance** | **Requirements** |
|---|---|
| Named Insured | Entity Owning Property |
| Insurance Company's AM Best Rating | AX or better |
| Term of Coverage | 12 Months |
| Evidence of Commercial Property Insurance | Coverage must be shown on Acord Form 28(10/03) Signed by an Authorized Agent |
| Certificate Holder – Mortgagee/Loss Payee | , its successors and/or assigns, as their interests may appear Two Greenwich Plaza, 1st Floor Greenwich, CT 06830 Attention: Andrew Scott |
| Lender's Interest | Lender's Loss payable Provisions (ISO 12030702), and/or similar wording, to be completed, made part of the policy and attached to evidence of property insurance. |
| Cancellation Notice | Minimum 30 Days-Wording as shown on Acord 28 (10/03) or policy langua |
| Real & Personal Property including Boiler and Machinery | Limit Full Replacement Cost, or other such amount as approved by Lender |
| Deductible | Maximum of $10,000. Higher maximum may be required. |
| Business Income/Loss of Rents | 100% Gross Rents and/or Income with 12 months' limit of indemnity with 6 |
| Perils Insured | Special Cause of Loss Form (All Risk) including Wind/Hail and Named Stor Full Terrorism (TRIA); and if applicable, Flood & Earthquake Ordinance or Law |
| Valuation | Replacement Cost |
| Coinsurance | None – Agreed Amount |
| Waiver of Subrogation | To be included |
| Ordinance & Law     Section A – Ordinance of Law | Building Limit |

EXHIBIT F

| | |
|---|---|
| Section B – Demolition Cost | 15% of Building Limit |
| Section C – Increased Cost of Construction | 15% of Building Limit |
| Builder's Risk | If applicable, completed value form 100% values to be insured. Loss of Rents/Business Interruption – 100% Value Occupancy Clause must be included |
| Annual Premium | Invoice to be included with confirmation that premium has been paid in in full or paid at closing. |

**General Liability/Umbrella Liability Insurance**

| | |
|---|---|
| Insurance Company's AM Best Rating | AX |
| Named Insured | Entity Owning Property |
| Certificate of Insurance | Acord Form 25S – Signed by an Authorized Agent |
| Term of Coverage | 12 Months |
| Certificate Holder/Additional Insured - Additional Insured Endorsement To be made part of the policy and attached to the Evidence of Insurance | , its successors and/or assigns, as their interests may appear Two Greenwich Plaza, 1st Floor Greenwich, CT 06830 Attention: Andrew Scott |
| Cancellation Notice | Minimum 30 days – In the cancellation section, strike the words "endeavor to" and "but failure to do so shall impose no obligation and/or liability of any kind upon the insurer, its agents and/or representatives" OR, wording in the "Description of Operations" stating: " Certificate Holder will receive 30 Days written notice of cancellation except 10 days for non-payment of premium." |
| Limit of Liability – General Liability Insurance | $1,000,000 per occurrence/$2,000,000 General Aggregate |
| Deductible or Retention | None |
| Annual Premium | Invoice must be included with confirmation that premium has been paid in full or financed. If financed, payment schedule to be attached. |

**Umbrella (Excess Liability) Insurance**

| | |
|---|---|
| Limit of Liability | $5,000,000 Minimum. Higher limits may be required |
| Certificate Holder/Additional Insured | Two Greenwich Plaza, 1st Floor Greenwich, CT 06830 Attention: Andrew Scott |
| Cancellation Notice | 30 days minimum notice of cancellation Invoice to be included with confirmation that premium |

1

Annual Premium | has been paid in full or paid at closing.

**Workers Compensation Insurance** | Statutory Benefits

Employers Liability | $500,000/$500,000/$500,000

Certificate of Insurance | Accord Form 25S – Signed by an Authorized Agent

Annual Premium | Invoice to be included with confirmation that premium
Has been paid in full and/or financed. If financed, payment schedule to be attach

**Additional Coverage** | As needed

## EXHIBIT G

## Form of Requisition

## REQUISITION REQUEST FORM

**ASSET NAME:**      Enclave @ Campbellton

**PROPERTY ADDRESS:**      _____

_____

_____

**BORROWER NAME:**      **PHONE NUMBER:**_____

**E-MAIL:**_____

**Borrower Wiring Instructions**:

**Bank:**
**Bank Address:**
**ABA:**
**Acct. No.:**
**Ref:**

**SPECIFY NATURE OF WORK TO BE PERFORMED**:

**ESTIMATED COMPLETION DATE**: _____

**ESTIMATED BUDGET**

**All line items described above shall be supported by itemized invoices, true and accurate copies of which are annexed as Exhibit "A"**

I certify that the information contained herein is true and correct to the best of my knowledge, information and belief.

Dated: _____ __, 20__

                    **2604 Cambleton Road Partners, LLC,**
                    **A Georgia limited liability company**

**By:** _____,
                    **A** _____
                    **Its**

                    **By:** _____

_Below this line for internal use only_

---

APPROVED BY:

**Date:** _____

**ASSET MANAGER:** _____    **PHONE NUMBER:** _____
                                         **E-MAIL:** _____
**Deal
Code:** _____

**Exhibit "A" to Requisition Form**

**Invoices**

## EXHIBIT H

### Schedule of Asset Release Price

| Property | Loan Allocation | Release Price |
|---|---|---|
| Enclave @ Campbellton | $2,300,000 | $2,875,000 |

Control Number : 16009227

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

### CERTIFIED COPY

  I, Brian P. Kemp, the Secretary of State of the State of Georgia, do hereby certify under the seal of my office that the attached documents are true and correct copies of documents filed with the Corporations Division of the Office of the Secretary of State of Georgia under the name of

### 2604 Cambleton Road Partners, LLC

#### a Domestic Limited Liability Company

  This certificate is issued pursuant to Title 14 of the Official Code of Georgia Annotated and is prima-facie evidence of the existence or nonexistence of the facts stated herein.

| | |
|---|---|
| Docket Number | : 12567425 |
| Date Inc/Auth/Filed | : 02/01/2016 |
| Jurisdiction | : Georgia |
| Print Date | : 06/28/2017 |
| Form Number | : 215 |



Brian P. Kemp
Secretary of State

**ARTICLES OF ORGANIZATION**

*Electronically Filed*
Secretary of State
Filing Date: 2/1/2016 1:51:55 PM

## BUSINESS INFORMATION

| | |
|---|---|
| **CONTROL NUMBER** | 16009227 |
| **BUSINESS NAME** | 2604 Cambleton Road Partners, LLC |
| **BUSINESS TYPE** | Domestic Limited Liability Company |
| **EFFECTIVE DATE** | 02/01/2016 |

## PRINCIPAL OFFICE ADDRESS

| | |
|---|---|
| **ADDRESS** | 6080 Foxberry Lane, Roswell, GA, 30075, USA |

## REGISTERED AGENT'S NAME AND ADDRESS

| **NAME** | **ADDRESS** |
|---|---|
| brian d. Peoples | 2215 westwind drive, Fulton, roswell, GA, 30075, USA |

## ORGANIZER(S)

| **NAME** | **TITLE** | **ADDRESS** |
|---|---|---|
| brian donald peoples | ORGANIZER | 6080 foxberry lane, roswell, GA, 30075, USA |

## OPTIONAL PROVISIONS

N/A

## AUTHORIZER INFORMATION

| | |
|---|---|
| **AUTHORIZER SIGNATURE** | Brian D. Peoples |
| **AUTHORIZER TITLE** | Organizer |

Control Number : 16009227

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

### CERTIFICATE OF EXISTENCE

I, Brian P. Kemp, the Secretary of State of the State of Georgia, do hereby certify under the seal of my office that

**2604 Cambleton Road Partners, LLC**

**a Domestic Limited Liability Company**

was formed in the jurisdiction stated below or was authorized to transact business in Georgia on the below date. Said entity is in compliance with the applicable filing and annual registration provisions of Title 14 of the Official Code of Georgia Annotated and has not filed articles of dissolution, certificate of cancellation or any other similar document with the office of the Secretary of State.

This certificate relates only to the legal existence of the above-named entity as of the date issued. It does not certify whether or not a notice of intent to dissolve, an application for withdrawal, a statement of commencement of winding up or any other similar document has been filed or is pending with the Secretary of State.

This certificate is issued pursuant to Title 14 of the Official Code of Georgia Annotated and is prima-facie evidence that said entity is in existence or is authorized to transact business in this state.

Docket Number         : 14735511
Date Inc/Auth/Filed   : 02/01/2016
Jurisdiction          : Georgia
Print Date            : 06/28/2017
Form Number           : 211



Brian P. Kemp
Secretary of State

# PROMISSORY NOTE

$2,300,000.00

July __, 2017
EIN:

FOR VALUE RECEIVED, **2604 CAMBLETON ROAD PARTNERS, LLC, a Georgia limited liability company**, having a principal place of business at 1020 Powers Place, Alpharetta, Georgia 30009 ("**Borrower**") promises to pay to, **SPECIALTY CREDIT HOLDINGS, LLC,** a Delaware limited liability company, having an office located at c/o Silver Point Capital, L.P., Two Greenwich Plaza, 1st Floor, Greenwich, Connecticut 06830 (together with its successors and/or assigns, the "**Lender**"), the principal sum of **TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00)** plus such other amounts as may become due and owing under this Note and the Loan Agreement from time to time, pursuant to the terms hereof.

1.     **DEFINED TERMS**.  Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the Loan Agreement.  The following capitalized terms used in this Note shall have the following meanings:

"**Loan Agreement**" means the Loan Agreement dated as of the Effective Date between Borrower, Guarantor and Lender.

"**Note**" means this promissory note.

"**Other Security Documents**" means, collectively, all documents and agreements other than this Note, the Loan Agreement, the Security Instrument, Security Agreement, Assignment of Rents, Guaranty, Pledge Agreement and Exclusivity Agreement whether now and/or hereafter executed by Borrower, Guarantor and/or any other Person in connection with the Loan, which wholly and/or partially secures, evidences, relates to, and/or guarantees payment of the Debt evidenced by this Note and the Other Security Documents.

2.     **FULLY ADVANCED LOAN; INTEREST**.  Borrower expressly acknowledges and agrees that on the Effective Date and until all amounts hereunder are paid in full, interest on the unpaid Loan Amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00) shall accrue at the Applicable Interest Rate (or, as applicable, the Default Rate) and shall be repaid pursuant to the terms hereof. Borrower expressly acknowledges and agrees that the CapEx Reserve portion of the Loan Amount shall be released in accordance with the terms of the Loan Agreement. Borrower is a sophisticated investor and therefore understand, and expressly acknowledges and agrees that a "balloon" payment of any and all amounts due and owing in respect of the Debt shall be paid to Lender upon the earlier to occur of an Event of Default which continues beyond any applicable notice, grace and/or cure periods and/or on the Maturity Date. All interest at the Applicable Interest Rate (or as the case may be,

the Default Rate) shall be computed on the basis of a 360 day year for the actual number of actual days elapsed in the period during which it accrues.

      **3.**     **PAYMENTS**.  The unpaid amount of the Debt shall be paid, from time to time, in accordance with the terms of this Note and the other Loan Documents.   From and after the Effective Date Borrower may use funds in the Interest Reserve to pay such portion of monthly debt service then due and owing under this Note at the Applicable Interest Rate (but only to the extent sufficient funds exist therein) and the balance of such monthly debt service payment then due and owing shall paid by Borrower.   On the Effective Date, Borrower shall pre-pay interest at the Applicable Interest Rate through July 31, 2017.  Thereafter, commencing on September 1, 2017 and continuing thereafter on the first (1st) day of each and every month during the Term hereof, Borrower shall make monthly interest-only payments to Lender at the Applicable Interest Rate (provided that, no Event of Default exists and is continuing, in which case, interest shall accrue at the Default Rate). On the earlier to occur of : (i) the applicable Maturity Date; or (ii) an acceleration of the Loan as  a result of an Event of Default which continues beyond any applicable notice, grace and/or cure period, the entire unpaid Loan Amount, all accrued and unpaid interest (at the Applicable Interest Rate and Default Rate (if any)), late charges, unpaid Make-Whole Amount, and deferred portion of the Origination Fee, unpaid Usage Fees and Consent Fees, together with any and all other amounts as may then be due and owing under the Loan Documents (including, without limitation, legal fees and costs), shall become immediately due and acknowledge and agree that the amounts described in immediately preceding clauses (i) and (ii) shall constitute a balloon payment. Except as otherwise stated in writing by Lender, any and all payments under this Note and the other Loan Documents shall be paid by Borrower and delivered to Loan Servicer.

      **3.1**   **Additional Payments**.   In addition to each debt service payment hereunder, Borrower shall pay a monthly Usage Fee and Consent Fee and such additional amounts as may be necessary to fund the T&I Reserve and Interest Reserve and CapEx Reserve in accordance with the terms of the Loan Agreement.  Such additional payments shall be made to Lender or Loan Servicer, as the case may be.  On the Effective Date, Borrower shall pay the Usage Fee and Consent Fee due for the month in which closing occurs.

      **3.2**   **General**.  Monthly payments of debt service, plus the Usage Fee and Consent Fee shall be paid from the Interest Reserve provided sufficient funds exist therein.  If at any time during the Term, insufficient funds exist in the Interest Reserve to pay any portion of any payment when same is due and payable as required under this Section 3, then Borrower shall remain obligated to pay such unpaid amounts.  For the avoidance of doubt, and notwithstanding Borrower's express authorizations to Lender and/or Loan Servicer with respect to using funds from the Interest Reserve to make payments hereunder (but only to the extent sufficient funds exist therein), at all relevant times during the Term and until the Debt is indefeasibly paid in full, Borrower shall remain primarily obligated to make any and all payments under this Note and the other Loan Documents when same is due and payable (subject to any applicable grace periods). Borrower expressly acknowledges, consents and agrees that the failure by Borrower to make all and/or any portion of any payment under this Note when same is due and payable (subject to expiration of any applicable grace period), and/or Borrower's failure to pay any other sum of money under this Note and/or under any of the other Loan Documents when same is due and

payable (subject to expiration of any applicable grace periods) shall constitute an Event of Default. All accrued and unpaid interest shall be compounded monthly upon the earlier to occur of the following: (i) an Event of Default which continues beyond any applicable notice, grace and/or cure period; (ii) acceleration of the Borrower's Obligations under the Loan; or (iii) the Maturity Date. All payments under this Note and the other Loan Documents shall be made in lawful currency of the United States of America, in immediately available and good funds and without any defense, set-off, counterclaim, rescission, recoupment and/or deduction of any kind. Provided that no Event of Default exists and is continuing, all payments, as and when received by Lender (or Loan Servicer), shall be applied in such order of priority accordance with Section 2.09 of the Loan Agreement.

      **4.**    **MATURITY DATE**.    Subject to any Extension Option being successfully exercised by the Borrower in accordance with Section 4.1 hereof, the Debt shall be due and payable in full on the earlier to occur of an Event of Default which continues beyond any and all applicable notice, cure and/or grace periods or the Maturity Date. Borrower expressly acknowledges and agrees that a balloon payment of all unpaid principal, interest and other fees, costs, charges and expenses under this Note and the other Loan Documents shall become due and payable to Lender on the earlier to occur of an Event of Default which continues beyond any and all applicable notice, cure and/or grace periods or the Maturity Date.

      **4.1**    **Extension Option**. As provided herein, Borrower may exercise each Extension Option by satisfying each of the following conditions precedent:

      **a)**    Lender has received the executed Extension Option Notice applicable to the Note evidencing the Debt not less than fifteen (15) days prior to the Initial Maturity Date if exercising the first Extension Option and no later than fifteen (15) days prior to expiration of the first Extended Term if exercising the second Extension Option;

      **b)**    No Default and/or Event of Default exists and is continuing under any of the Loan Documents or under any of the Cross-Collateral Loan Documents;

      **c)**    Borrower and Guarantor consent that Lender, Loan Servicer and any other Person acting on their behalf have performed each and every one of their respective obligations under the Loan Documents and Borrower and Guarantor unconditionally release and discharge Lender, Loan Servicer and their respective officers, employees, directors, managers, partners, affiliates, subsidiaries, parents, agent, consultants and attorneys from any and all claims and liabilities in such form of written release acceptable to Lender;

      **d)**    The applicable Extension Fee is paid to and received by Lender in connection with each Extension Option;

      **e)**    The loan-to-value ratio (expressed as a percentage, based upon all

amounts then due and owing under the Loan plus the "as is" value of the Collateral, all as calculated and determined by Lender in its sole discretion) is no greater than seventy percent (70%) in connection with the first Extension Option and sixty-five percent (65%) in connection with the second Extension Option, respectively.

   **f)** A minimum annualized net operating income for the Project (calculated as the annualized, immediately trailing three (3) month period divided by the Loan Amount) is not less than eleven and one-half percent (11.50%).

   **g)** Any and all accrued and unpaid interest, any applicable Make-Whole Amount, unpaid Origination Fee, Consent Fee and Usage Fees are paid current; and

   **h)** All townhomes at the Project are in rent-ready condition, available for immediate occupancy.

   **i)** Asset Owner Parties or Affliates have deposited the Mandatory Payment with Silver Point or Silver Point's loan servicer.

   Borrower and Guarantor agree to execute all documents as may be reasonably required by Lender including payment of Lender's reasonable fees, costs and expenses (including legal fees). Borrower and Guarantor agree and acknowledge that Lender reserves the right to include additional conditions precedent to granting any extension of the Initial Maturity Date.

  5. **PREPAYMENT.**  Subject to <u>Section 2.07</u> of the Loan Agreement, Borrower may prepay the Debt in whole <u>only</u>, provided that, if such prepayment is made during the Make-Whole Period, then such prepayment shall be accompanied by the Make-Whole Amount and any unpaid portion of the Origination Fee.  After the expiration of the Make-Whole Period, Borrower may prepay the Debt in whole or in part without payment of the Make-Whole Amount.

  6. **RIGHT OF SET-OFF**.  Borrower acknowledges and agrees that Lender has a right of set-off on any deposits of sums now or hereafter held by or on behalf of Borrower. Borrower grants Lender a first prior lien on and a security interest in all deposits, credits, and/or other property of Borrower now, and/or at any time hereafter, delivered to and/or left in the possession of Lender.

  7. **BUSINESS DAYS**. If any payment due hereunder falls on any day other than a Business Day, such payment shall be payable on the immediately following Business Day, with interest accruing thereon until the date of payment thereof.

  8. **JOINT AND SEVERAL LIABILITY**.  If more than one party executes this Note, the obligations and liabilities of each of them will be joint and several and the term

"Borrower" will include each and all of them.  All covenants, representations and warranties referencing "Borrower" hereby applies to each of parties executing this Note individually though liability is joint and several for breach of any such covenant, representation and/or warranty.

9.      **GOVERNING LAW; JURISDICTION**.   This Note, and the rights and obligations of Lender and Borrower hereunder, shall be governed by the procedural and substantive Laws of the State of New York, without regard to its principles of conflicts and/or choice of Laws.  Borrower hereby consents to non-exclusive the jurisdiction in personam of the State and Federal Courts located in the State of New York, in any legal proceeding instituted against Borrower to enforce any rights of Lender under this Note and Borrower and Lender hereby waive any right to a trial by jury in any such legal proceeding and each agrees that venue in or near New York County, New York is not inconvenient.

10.      **DISBURSEMENTS**.  Borrower hereby agrees to pay on demand, and authorizes Lender to charge any account maintained with Lender by Borrower (if any) with, the cost of any out of pocket expenses and/or Disbursements Lender incurs in connection with this Note.

11.      **WAIVER**.    Borrower does hereby waive diligence, presentment, demand, extension of time for payment, notice of dishonor, protest, and all other notices whatsoever, and agrees that Lender may, from time to time, extend and/or renew this Note for any period (whether and/or not longer than the original period of this Note) and grant any releases, compromises, extensions, renewals, and/or indulgences with respect to this Note, all without notice to and/or consent of Borrower and without affecting the obligations of Borrower and/or Guarantor hereunder.  It is expressly agreed by Borrower that such waiver is reasonable under the circumstances.

12.      **INDEMNIFICATION**.  Borrower hereby agrees to indemnify, defend and hold Lender (together with each of Lender's officers, directors, members, managers, employees, attorneys (both in-house and outside attorneys), agents, contractors, and Loan Servicer) harmless from any and all costs, damages, losses, expenses, and fees (including, without limitation, attorneys' fees and expenses) incurred and/or suffered by Lender in connection with any third party claim arising from this Note, the Loan Documents and/or the transactions contemplated hereby.

13.      **NO WAIVER BY LENDER**.  No delay and/or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right and/or of any other right under this Note, the Loan Agreement, the Security Instrument and/or any of the other Loan Documents and/or Other Security Documents.  A waiver on any one occasion shall not be construed as a waiver of any such right and/or remedy on any future occasion.

14.      **AUTHORITY**.  Borrower represent that Borrower has the power, authority and legal right to execute and deliver this Note.

15.      **COMPLETE AGREEMENT**.  None of the provisions of this Note may be waived, changed, and/or terminated orally and/or otherwise, except by a writing duly executed by Borrower and Lender.  This Note and the other Loan Documents set forth the entire

understanding between Borrower and Lender relating to the subject matter hereof and supersede all prior agreements and understandings, whether oral and/or written, relating thereto.

16.     **USURY**.  This Note is subject to the express condition that at no time shall Borrower be obligated and/or required to pay interest on the unpaid Loan Amount at a rate which could subject Lender to either civil and/or criminal liability as a result of being in excess of the maximum rate which Borrower is permitted by Law to contract and/or agree to pay.  If by the terms of this Note, Borrower is at any time required and/or obligated to pay interest on the principal balance at a rate in excess of such maximum rate, the rate of interest under this Note shall be deemed to be immediately reduced to such maximum rate and interest payable hereunder shall be computed at such maximum rate and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the Loan Amount.

17.     **SECURITY**.  This Note is secured by, among other things, the Project.

18.     **WAIVER OF JURY TRIAL.  BORROWER AND LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT AND/OR COUNTERCLAIM ARISING IN CONNECTION WITH, OUT OF AND/OR OTHERWISE RELATING TO THIS NOTE, THE SECURITY INSTRUMENT AND/OR ANY OTHER SECURITY DOCUMENT AND/ INSTRUMENT NOW AND/OR HEREAFTER EXECUTED AND DELIVERED IN CONNECTION THEREWITH AND/OR THE LOAN SECURED BY THE SECURITY INSTRUMENT.**

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK; SIGNATURES ON IMMEDIATELY FOLLOWING PAGES]**

## SIGNATURE PAGE TO PROMISSORY NOTE

IN WITNESS WHEREOF, Borrower has duly executed, and/or caused the execution of, this Note as of the day and year first above written.

BORROWER:

**2604 CAMBLETON ROAD PARTNERS, LLC,**
**A Georgia limited liability company**

By: _____

A _____,
Its _MANAGING MEMBER_

By: _____
Name: _JOSEPH HARVER_
Title: _MANAGING MEMBER_

STATE OF _Georgia_          )
                           : ss.:
COUNTY OF _Fulton_          )

On this _12_ day of _July_ in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _Joseph Harver_, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and in my presence executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

_Patricia VanHooger_
Notary Public

PATRICIA VANHOOTER
MY COMMISSION EXPIRES
MAR 18 20_19_
FULTON CO. GEORGIA
NOTARY PUBLIC

STATE OF GEORGIA

COUNTY OF Fulton

**Commitment No.: 026716 Cambleton**

<u>OWNER'S AFFIDAVIT</u>

The undersigned is a Managing Member of 2604 Cambleton Road Partners, LLC (the "Owner"), and as such, the undersigned is authorized to make this Affidavit and has knowledge of the facts set forth below.

With respect to the Property described below, the undersigned hereby represents, to the best of his knowledge and belief and without any special or additional investigation, the following:

1. That the Owner is the owner in fee simple of the real property described in <u>Exhibit "A"</u> attached hereto and by this reference made a part hereof (the "Property"), subject to the Permitted Exceptions (defined below).

2. That except as set forth in <u>Exhibit "B"</u> (the "<u>Permitted Exceptions</u>") attached hereto and by this reference made a part hereof, there are no unpaid or unsatisfied security deeds, mortgages, claims of lien, utility bills, special assessments for sewerage or streets or ad valorem taxes which constitute or could constitute a lien against the Property or any part thereof, nor has the Owner received any notice of a lien claim or filing, except any lien for which an escrow of funds is being made pursuant to the settlement statement associated with the loan transaction associated with the transaction associated with this Owner's Affidavit.

3. That Owner knows of no pending petition for paving or other street improvements and no notice of any proposed paving nor of any pending ordinance or assessment for any street improvement has been furnished to the Owner.

4. Other than as reflected on the Permitted Exceptions, there is no outstanding indebtedness for equipment, appliances or other fixtures attached to the Property.

5. That except for the Permitted Exceptions and the unrecorded leases, Owner is in exclusive possession of the Property and knows of no one claiming under any unrecorded deed or instrument of any nature, or claiming any interest in the Property whatsoever.

6. That there are no disputes with adjoining landowners or others concerning the location of the lines, corners or boundaries of the Property and except as would be set forth in a current and accurate survey of the Property, the improvements on the Property are within the limits of the Property.

7. That no improvements or repairs have been made to said Property at the instance of Owner during the ninety-five (95) days immediately preceding the date hereof for which full payment has not been made, or for which provisions for payment have not been made

59010613.2

or which will not be paid or escrowed for at the time of closing, except for the following Contractors, Subcontractors and Materialmen:

| |
|---|
| RELIABLE   PROPERTY   SOLUTIONS |
| |
| |
| |
| |
| |
| |

8.   That there are no pending suits, judgments, bankruptcies or executions against the Owner, nor any liens for past due taxes or assessments, that could affect title to said Property or constitute a lien thereon which is prior to a security deed of even date herewith to SPECIALTY CREDIT HOLDINGS, LLC, a Delaware limited liability company (herein "Lender").

9.   That there are no brokers or other person under any listing agreement or other agreement with the Owner for the management, sale or lease of all or any portion of the Property which would entitle such broker or other person to a lien or claim of lien pursuant to O.C.G.A. § 44-14-600, *et seq.*

10.   That, except as shown on the closing or settlement statement for the transaction associated with this affidavit, all water bills and sewer bills and all other utility bills applicable to the Property that are currently due and payable have been paid in full.

11.   That this affidavit is given with knowledge that it will be relied upon by Lender and by Old Republic National Title Insurance Company.

### SIGNATURE PAGE TO THE OWNER'S AFFIDAVIT

By: _____

Name: Joseph Harker, individually

Sworn to and subscribed before me
this __12__ day of July, 2017.

_Patricia Vanhoozer_
Notary Public

(Seal)

My Commission Expires: __3.18.19__

(NOTARIAL SEAL)

59010613.2

Exhibit A

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

All that tract or parcel of land lying and being in Land Lot 199 of the 14th District, Fulton County, Georgia, being Units A-1, A-3, A-4, A-5, A-6, A-7, B-1, B-2, C-1, C-2, C-3, C-4, C-5, C-7, D-1, D-2, D-3, D-4, E-1, E-2, E-3, F-1, F-2, F-3, F-5, F-6, F-7, G-3, G-4, G-7, H-1, H-2, H-3, H-4, H-5 of the 2406 Campbellton Road Subdivision, as per plat recorded in Plat Book 392, Page 19, Fulton County, Georgia Records, which plat is incorporated herein and made a part of this description.

Together with the Declaration of Covenants, Conditions and Restrictions for Campbellton Village Townhomes, as recorded in Deed Book 44374, Page 59, aforesaid records.

Together with the Declaration of Easement recorded in Deed Book 43608, Page 527, aforesaid records.

Exhibit B

# PERMITTED EXCEPTIONS

1.     Taxes for the year 2017 and subsequent years, not yet due and payable.

2.     Declaration of Covenants, Conditions, and Restrictions for Campbellton Village Townhomes, by Hovis Management Group, LLC, dated January 16, 2007, recorded January 31, 2007 in Book 44374, Page 59, Fulton County, Georgia Records, as affected by the Consent to Subdivision and Filing of New Plat and Declaration of Covenants, Conditions, and Restrictions for Campbellton Village Townhomes by Omni National Bank, dated December 31, 2007, recorded January 29, 2008 in Book 46270, Page 571, aforesaid records.

3.     Consent to Subdivision and Filing of New Plat by Hovis Management Group, LLC, et al., dated September 26, 2006, recorded October 5, 2006 in Book 43608, Page 530, aforesaid records.

4.     Declaration of Easement between Hovis Management Group, LLC, dated September 3, 2005, recorded October 5, 2006 in Book 43608, Page 527, aforesaid records.

5.     Right of Easement in favor of Southern Bell Telephone and Telegraph Company, dated June 12, 1980, recorded September 19, 1980 in Book 7648, Page 167, aforesaid records.

6.     Georgia Power Company Right of Way Easement from Jack W. Helms, et al., dated December 12, 1965, recorded January 27, 1966 in Book 4544, Page 470, aforesaid records.

7.     Easement in favor of Georgia Power Company, dated April 12, 1991, recorded in Book 4685, Page 168, aforesaid records.

8.     Easements, right-of-ways, boundary lines and improvements as shown on Plat recorded at Plat Book 392, Page 19, aforesaid records.

## SURVEY AFFIDAVIT

PROPERTY: 2604 Campbellton Road, Atlanta, Georgia

Personally appeared the undersigned, who, being duly sworn according to law, deposes and says on oath as follows:

1. 2604 Cambleton Road Partners, LLC, a Georgia limited liability company is the owner ("Owner") of the property ("Property") described in Exhibit "A" attached hereto and shown on that certain Plat from R.F. M. Consulting, LLC dated as of April 28, 2016 and recorded in the real property records maintained by the Clerk of the Superior Court for Fulton County, Georgia at Plat Book 392-19,  and as of the date of this Affidavit I have knowledge of the facts stated herein.

2. I am the managing member of Owner and have examined the Survey.  Based on that examination and personal knowledge, it is an accurate depiction of the Property and reveals all improvements located thereon and as of today's date:

   a. No structural changes have been made to any of the buildings or other improvements shown on the Survey, and no additional structures or improvements have been placed or exist on the Property which are not shown on the Survey, including, but not limited to, driveways or other paving, poles, utilities, fences, walls, sheds or other outbuildings;

   b. There have been no improvements or additions to improvements built on adjoining land which might encroach onto or over the Property;

   c. The Owner has not granted any rights or privileges to any other party to use, cross over, or cross under any portion of the Property, other than those rights and /or privileges which the Owner has disclosed to Old Republic Title Company or its agent;

   d. Neither the Owner nor the undersigned are aware of any boundary line disputes with respect to any of the boundary lines of the Property, and no portion of the Property has been taken or deed given for widening of any road or street abutting the Property; and

   e. The curb cuts and access points to Campbellton Road have not been altered or changed.

[CONTINUED ON THE FOLLOWING PAGE]

This Affidavit is made for the purpose of inducing Old Republic Title Company to issue its Loan Policy of Title Insurance free and clear of any exceptions as to survey matters not shown on the attached Survey of the Property.  I understand that Old Republic Title Company or its Agent will rely on the statements in this Affidavit for the purpose of issuing a loan policy of title insurance.

SWORN to and SUBSCRIBED before me this
12 day of July, 2017.

Notary Public

[NOTARIAL SEAL]

By: Joseph Harker

[SIGNATURE PAGE TO SURVEY AFFIDAVIT]

Exhibit "A"

392-19

**NOTES:**

THIS SURVEY WAS PREPARED IN CONFORMITY WITH THE TECHNICAL STANDARDS FOR PROPERTY SURVEYS IN GEORGIA AS SET FORTH IN CHAPTER 180-7 OF THE RULES OF THE GEORGIA BOARD OF REGISTRATION FOR PROFESSIONAL ENGINEERS AND LAND SURVEYORS AND AS SET FORTH IN THE GEORGIA PLAT ACT O.C.G.A. 15-6-67, AUTHORITY O.C.G.A. SECS. 15-6-67, 43-15-4, 43-15-6, 43-15-19, 43-15-22.

THE FIELD DATA UPON WHICH THIS PLAT IS BASED WAS OBTAINED USING A GPT-3005W TOTAL STATION, AND HAS A LINEAR PRECISION RATIO OF ONE FOOT IN 57,134 FEET AND AN ANGULAR ERROR OF 05 SECONDS PER ANGLE AND WAS NOT ADJUSTED.

THIS PLAT HAS BEEN CHECKED FOR MATHEMATICAL ACCURACY AND CLOSES WITHIN ONE FOOT IN 335,364 FEET.

TOTAL AREA = 99,570 SQUARE FEET OR 2.29 ACRES.

PROPERTY MAY OR MAY NOT BE SUBJECT TO PROTECTIVE OR RESTRICTIVE COVENANTS AS PER FINAL PLAT AND CITY/COUNTY ORDINANCES INCLUDING ALL EASEMENTS AND RIGHTS OF WAY.

THIS SURVEY WAS PREPARED WITHOUT THE BENEFIT OF A TITLE SEARCH, THERE MAY BE BURDENS, EASEMENTS, RESTRICTS AND OR RIGHTS OF WAYS NOT SHOWN OR REFERENCED THAT A CURRENT TITLE REPORT WOULD REVEAL.

THE LOCATION OF UNDERGROUND UTILITIES WERE NOT LOCATED FOR THIS SURVEY. UTILITIES SHOWN ARE BASED UPON VISIBLE AND PHYSICAL EVIDENCE. THERE MAY BE UTILITIES ON OR CROSSING THIS PROPERTY THAT ARE NOT SHOWN. CALL THE UTILITIES PROTECTION CENTER (# 811) BEFORE ANY EXCAVATIONS ARE BEGUN TO ENSURE AND VERIFY THE CORRECT LOCATION AND DEPTH OF ALL UTILITIES.

**REFERENCES:**
DEED BOOK 45284, PAGE 16
DEED BOOK 46067, PAGE 637

**INDIVIDUAL UNIT DIMENSIONS**
A-1 - A-3 = 16.35' x 33.00'
A-4 - A-7 = 16.00' x 33.00'
B-1 - B-4 = 16.10' x 33.00'
B-5 - B-11 = 16.28' x 33.00'
B-12 - B-15 = 16.00'x 33.00'
C-1 - C-3 = 16.23' x 33.00'
D-1 - D-2 = 15.80' x 33.00'
D-3 - D-5 = 16.23' x 33.00'
D-6 - D-7 = 15.75' x 33.00'
D-8 - D-14 = 16.29' x 33.00'
D-15 - D-16 = 16.02' x 33.00'
D-17 - D-19 = 16.10' x 33.00'
D-20 - D-21 = 15.90' x 33.00'



**TABLE FOR POINT OF BEGINNING TO INDIVIDUAL UNITS FROM NORTHWESTERN PROPERTY CORNER LABELED P.O.B.**

| UNIT | BEARING | DISTANCE |
|------|---------|----------|
| A-1 | S67°1'20.6"W | 148.19 |
| A-2 | S64°08'50"W | 133.66 |
| A-3 | S60°21'43"W | 119.60 |
| A-4 | S55°35'46"W | 106.21 |
| A-5 | S50°35'40"W | 92.11 |
| A-6 | S42°56'18"W | 81.03 |
| A-7 | S33°05'57"W | 71.82 |
| B-1 | S26°32'28"W | 132.25 |
| B-2 | S24°02'51"W | 147.17 |
| B-3 | S22°00'57"W | 162.30 |
| B-4 | S20°11'57"W | 177.61 |
| C-1 | S19°36'01"W | 193.72 |
| C-2 | S18°20'05"W | 209.38 |
| C-3 | S17°14'46"W | 225.13 |
| C-4 | S16°10'00"W | 240.95 |
| C-5 | S15°28'14"W | 256.03 |
| C-6 | S14°44'17"W | 272.76 |
| C-7 | S14°05'11"W | 288.73 |
| D-1 | S13°02'26"W | 304.31 |
| D-2 | S12°32'41"W | 320.14 |
| D-3 | S12°05'44"W | 336.00 |
| D-4 | S11°41'12"W | 351.88 |
| E-1 | S16°19'29"W | 373.91 |
| E-2 | S15°46'44"W | 389.73 |
| E-3 | S15°16'33"W | 405.59 |
| F-1 | S25°01'55"W | 441.79 |
| F-2 | S25°57'27"W | 427.63 |
| F-3 | S26°41'37"W | 412.11 |
| F-4 | S27°46'44"W | 397.77 |
| F-5 | S28°56'41"W | 383.57 |
| F-6 | S30°22'21"W | 371.16 |
| F-7 | S31°46'05"W | 357.80 |
| G-1 | S32°56'51"W | 343.06 |
| G-2 | S34°31'27"W | 329.66 |
| G-3 | S36°13'58"W | 316.53 |
| G-4 | S38°05'15"W | 303.70 |
| G-5 | S40°06'12"W | 291.22 |
| G-6 | S42°17'48"W | 279.13 |
| G-7 | S44°41'06"W | 267.49 |
| H-1 | S47°35'35"W | 258.34 |
| H-2 | S51°07'38"W | 248.02 |
| H-3 | S53°03'25"W | 236.41 |
| H-4 | S56°20'23"W | 227.31 |
| H-5 | S59°53'01"W | 219.02 |
| H-6 | S63°54'24"W | 213.79 |
| H-7 | S67°52'56"W | 207.52 |

● = DESIGNATES POINT OF BEGINNING AT INDIVIDUAL UNITS

**NOTE:**
PARTY WALLS BETWEEN UNITS ARE INDISCERNIBLE AND HAVE BEEN DIVIDED PROPORTIONALLY.

**R.F.M. CONSULTING, LLC**
707 WHITLOCK AVENUE
BUILDING A-37
MARIETTA, GA 30064
(770) 757-3977
EMAIL: RFMCON@BELLSOUTH.NET

GRAPHIC SCALE: 1 (Inch) = 50(feet)

**SURVEY OF**
**# 2604 CAMPBELLTON ROAD**
**LOCATED IN**
LAND LOT 199, 14th DISTRICT
FULTON COUNTY, GEORGIA
FIELD DATE: 12-04-2015
PLAT DATE: 04-28-2016
SCALE: 1" (INCH) = 50' (FEET)

## CERTIFICATE OF NO INDEBTEDNESS

### 2604 CAMBLETON ROAD PARTNERS LLC

We, the undersigned, being the duly acting Managing Member of 2604 Cambleton Road Partners LLC, a Georgia limited liability company (the "Company"), do hereby certify in such capacity that except for trade payables incurred in the ordinary course of business, the Company has no indebtedness.

IN WITNESS WHEREOF, this Certificate of No Indebtedness has been executed as of the __ day of July, 2017.

_____
Joseph Harker

_____
Brian Peoples

_____
Alberto Storelli

# ASSIGNMENT OF CONTRACTS, LICENSES, RIGHTS AND PERMITS

**THIS ASSIGNMENT OF CONTRACTS, LICENSES, RIGHTS AND PERMITS** (this "Assignment"), is made, executed and entered into as of July __, 2017 by **2604 CAMBLETON ROAD PARTNERS, LLC,** a Georgia limited liability company ("Assignor"), in favor of **SPECIALTY CREDIT HOLDINGS, LLC**, a Delaware limited liability company and its successors and assigns ( "Assignee").

## RECITALS

A.     Contemporaneously herewith, Assignor is making a loan to and at the request of Assignee in the principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00) (the "Loan").

B.     The Loan is evidenced by, among other things, that certain Loan Agreement, dated of even date herewith, by and among Assignor, certain guarantors named therein and Assignee (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "Loan Agreement").

C.     The Loan is secured by, among other things, the Project (as defined in the Loan Agreement) and certain real property located in Fulton County, Georgia, commonly known as 2604 Campbellton Road, Atlanta, Fulton County, Georgia 30311, as more particularly described in that certain Deed to Secure Debt, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of even date herewith, executed by Assignor and delivered to Assignee (as amended, restated, modified and/or renewed, from time to time, the "Security Instrument") and in Exhibit A annexed hereto and made a part hereof.

D.     As a condition to making the Loan, Assignor has agreed to execute and deliver this Assignment to Assignee.

NOW, THEREFORE, in consideration of the recitals set forth above and incorporated herein, to secure the Loan and for other good and valuable consideration, Assignor agrees as follows:

## AGREEMENTS

1.     Capitalized Terms.  Except as otherwise defined herein, all capitalized terms in this Agreement shall have the same meaning as defined in the Loan Agreement.

2.     Material Inducement.  Assignee hereby expressly acknowledges, consents and agrees that the execution and delivery of this Agreement in favor of Assignee is a material inducement for Assignee to make the Loan and without execution and delivery of this Agreement by Assignor, Assignee would not make the Loan.

3.     Grant, Transfer and Assignment of Assigned Rights and Documents.  Assignor hereby grants, transfers and assigns to Assignee, all of Assignor's right, title and interest (whether now or hereafter acquired by Assignor) in, to and under each of the following related to all or any portion of the Property and the Improvements to be constructed thereon (all as may be updated, amended, modified, restated and/or renewed, from time to time, collectively, the "Assigned Rights and Documents"):

1

    a.    any and all licenses, permits (including building permits), surveys, plans (including architectural plans) specifications, sketches and drawings; and

    b.    any and all approvals from any Person (including any Governmental Authorities) having jurisdiction over Assignor and/or all or any portion of the Property; and

    c.    any and all plats, maps, zoning reports, density reports, engineering plans and reports, development agreements, developer rights, declarant rights and any and all other documents, reports, studies, assessments and/or agreements (including any of the foregoing related to utilities, roadways and/or matters of ingress and/or egress); and

    d.    any and all contracts and rights thereunder (including, without limitation, any subcontracts, contracts with any general contractor, third parties, materialmen, service contracts and/or agreements related to any portion of the Property renovation/ rehabilitation work and/or completion of the Improvements) and estimates for work to be performed by any Person; and

    e.    any and all guarantees, warranties and other undertakings covering the quality and/or performance of the workmanship performed at the Property (including construction and completion of the Improvements); and

    f.    any and all guarantees, warranties and other undertakings covering the quality of materials supplied or used by any Person at the Property and construction and completion of the Improvements; and

    g.    any and all licenses, authorizations and/or permits issued by any Governmental Authorities having jurisdiction over Assignor and/or the Property; and

    h.    any and all trade names, trademarks and logos used in connection with the Property (including "Enclave @ Campbellton" and any similar name); and

    i.    any and all easements, covenants running with the land and rights-of-way appurtenant to or for the benefit of all or any portion of the Property (whether previously in existence, now existing or hereafter existing); all crops growing or to be grown on the Property (including all such crops following severance from the Property); all air rights; all mineral rights (including subsurface rights); all standing timber upon the Property (including all such timber following severance from the Property); all development rights; all tax credits (or other similar credits related thereto); any and all air rights related to all or any portion of the Property (whether or not appurtenant to the Property) and shares of stock or tax credits or other credits pertaining to such air or air rights; all water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Property) and any tax or other credits related thereto; all sewer rights and any tax or other credits related thereto;  all utilities; any and all oil, gas, and other hydrocarbon substances and rights thereto in, on, under, or upon the Property; and any other matters as may be required by any Governmental Authorities or pursuant to applicable Law, and the completion thereof and any and all documents and agreements related to any of the foregoing.

This Assignment is given for the purpose of securing the performance and discharge of Assignor's Obligations under the Loan, the Cross-Collateral Loans, the Loan Documents and the Cross-Collateral Loan Documents and Assignor's repayment of the Debt and all indebtedness evidenced by the Cross-Collateral Loan Documents.

4. <u>Performance Under Assigned Rights and Documents</u>. Assignor agrees to faithfully abide by, perform and discharge, each and every one of its respective obligations, covenants, conditions and agreements in connection with the Assigned Rights and Documents to be performed and discharged by Assignor in accordance with the terms thereof, and Assignor agrees to enforce the performance and discharge by any Person which may be a counterparty to such Assigned Rights and Documents (each such Person, a "<u>Counterparty</u>").

5. <u>Event of Default</u>. In addition to any Event of Default under the other Loan Documents, Assignor agrees that the occurrence of any of the following shall constitute an Event of Default under the Loan Documents:

a. Failure of Assignor for a period of thirty (30) days after written notice from Assignee, to observe or perform any covenant or condition contained in this Assignment; provided that if any such failure is susceptible of cure and cannot reasonably be cured within said thirty (30) day period, then Assignor shall have an additional thirty (30) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as such Assignor commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such resulting thirty (30) day period from the date of Assignee's notice; and

b. Any representation, warranty or covenant made by Assignor herein which is not true and correct in any material respect as of the date hereof and said representation or warranty cannot be cured within ten (10) days after written notice from Assignee; provided that if any such failure is susceptible of cure and cannot reasonably be cured within said ten (10) day period, then Assignor shall have an additional ten (10) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as such Assignor commences such cure within the initial ten (10) day period and diligently and in good faith pursues such cure to completion within such resulting twenty (20) day period from the date of Assignee's notice.

6. <u>Remedies</u>. Upon the occurrence of an Event of Default hereunder, Assignee shall have all rights granted to Assignee under the Loan Documents, and Assignee shall have the right (but not the obligation) to correct any such Event of Default in such manner and to such extent as Assignee may deem necessary (in its sole discretion) to protect the security hereof, including specifically, without limitation, the right to appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Assignee, and also the right to perform and discharge each and every obligation, covenant, condition and agreement of Assignor under the Assigned Rights and Documents and, in exercising any such powers, to pay any and all necessary costs and expenses, employ counsel of Assignee's choosing and incur and pay attorneys' fees and expenses, the costs and expenses of which shall be added to the Debt. Notwithstanding anything herein to the contrary, Assignee shall not be obligated to undertake, perform or discharge (whether in whole or in part), nor does it hereby undertake to perform or discharge (whether in whole or in part), any obligation, duty or liability under any of the Assigned Rights and Documents or by reason of this Assignment.

3

a. At any time after the occurrence of an Event of Default, Assignee may, in its sole discretion and without notice to Assignor and without regard to the adequacy of security for the Debt hereby secured, either in person or by its agent, and with or without bringing any action or proceeding, or by seeking the appointment of a receiver by a court of competent jurisdiction at any time hereafter, to enforce for its own benefit the Assigned Rights and Documents (or all or any part of them). The exercise of any rights or remedies under this Assignment shall not be deemed to cure or waive any Event of Default under any of the other Loan Documents, or waive, modify or affect any notice of default under any of the Loan Documents, or invalidate any act done pursuant to such notice.

b. That Assignor expressly consents and agrees that Assignee may issue written notice to any Counterparty describing the occurrence of an Event of Default ("Counterparty Notice"), and Assignor hereby expressly acknowledges, confirms and agrees that Counterparty is hereby expressly authorized by Assignor to perform for the benefit of Assignee and in accordance with the terms and conditions of such Assigned Rights and Documents to which such Counterparty is a party, and such Counterparty is hereby expressly authorized to rely upon the Counterparty Notice. Assignor specifically agrees to indemnify and hold harmless Counterparty in connection with their reliance upon a Counterparty Notice and the discharge and performance of such Counterparty's obligations under the relevant Assigned Rights and Documents.

c. That in the exercise of the rights, remedies and/or powers in this Assignment granted to Assignee, no liability shall be asserted or enforced against Assignee, all such liability being hereby expressly waived and released by Assignor and each and every member, manager, employee and Person affiliated therewith. Assignor hereby agrees to indemnify and hold harmless Assignee, and each of Assignee's respective officers, directors, employees, attorneys and agents (collectively, the "Assignee Parties"), from and against any and all liability, damage, expense, cost, claims, loss and/or damage which Assignee and/or any of the Assignee Parties may incur by reason of any act or omission by any Person under all or any portion of the Assigned Rights and Documents. Should Assignee and/or any of the Assigned Parties incur any liability, expense, cost, loss and/or damage (i) under any of the Assigned Rights and Documents for which it is to be indemnified by Assignor hereunder, or (ii) by reason of the exercise of Assignee's rights, remedies and/or powers hereunder (including, but not limited to, the exercise of the rights granted to Assignee under Section 6(b) hereof), the amount thereof, including costs, expenses and attorneys' fees shall be secured hereby and by the Security Instrument and all other Loan Documents and shall be due and payable upon demand by Assignee and shall bear interest at the Default Rate.

7. Assignment. This Assignment shall not be assigned by Assignor without the prior written consent of Assignee. Assignee may assign this Assignment to any Person and all representations, warranties, covenants, powers and rights herein contained shall be binding upon, and shall inure to the benefit of the legal representatives, successors and assigns thereof.

8. Representations, Warranties and Covenants.

a. Assignor represents and warrants to Assignee that: (1) Assignor has not previously assigned, sold, pledged, transferred, mortgaged, hypothecated or otherwise encumbered all or any portion of the Assigned Rights and Documents or any right, title or interest therein, to any Person; (2) all requisite approvals from any Person as may be required by applicable Law, corporate action by Assignor or as otherwise required have

4

been obtained by Assignor in connection with entering into this Agreement; (3) as of the Effective Date, Assignor is not in default under any of the Assigned Rights and Documents; (4) Assignor has not performed any act which might prevent Assignor from performing its undertakings hereunder or which might prevent Assignee from operating under or enforcing any of the terms and conditions hereof or which would limit Assignee in such operation or enforcement; (5) Assignor has not received notice of default from any Person (including any Counterparty) in connection with any of the Assigned Rights and Documents and to the best of its actual knowledge, no Counterparty has received notice of default under any of the Assigned Rights and Documents to which it is a party except as otherwise disclosed in writing to Assignee prior to the Effective Date; and

      b.    Assignor covenants that: (1) Assignor shall not assign, sell, pledge, transfer, mortgage, hypothecate or otherwise encumber its interests in all or any portion of the Assigned Rights and Documents to any Person without the prior written consent of Assignee; and (2) no amendments to any of the Assigned Rights and Documents will be made without the prior written consent of Assignee.

    9.    <u>Notices</u>.    (a)    Except as expressly provided otherwise in the Loan Agreement, all notices, demands, consents, approvals and statements required and/or permitted hereunder shall be in writing and shall be deemed to have been sufficiently given and/or served for all purposes when presented personally, by  delivery to a nationally recognized overnight courier service [or, in the alternative by electronic mail (with confirmation of delivery) and one (1) day after delivery to a nationally recognized overnight courier service providing evidence of the date of delivery] providing evidence of the date of delivery, if to Assignor and/or Assignee, at their respective addresses stated below, and/or at such other address of which a party shall have notified the party giving such notice in writing in accordance with the foregoing requirements, with a copy to each of the following:

          <u>If to Assignee</u>:
          Specialty Credit Holdings, LLC
          Two Greenwich Plaza, 1st Floor
          Greenwich, Connecticut 06830
          Attn:  Andrew Scott
          E-mail:  ascott@silverpointcapital.com

          <u>With a copy to</u>:
          Mahadeva, PLLC
          80 Business Park Drive, Suite 201
          Armonk, New York 10504
          Attention: Prassana Mahadeva
          E-Mail:  pmahadeva@mahadevalaw.com

          <u>If to Assignor</u>:
          ARIAM Partners, LLC
          1020 Powers Place
          Alpharetta, GA 30009
          Attention: Joe Harker
          E-mail:  jharker@ariampartners.com

          <u>With a copy to</u>:

> Polsinelli PC
> 150 N. Riverside Plaza, Suite 3000
> Chicago, IL 60606
> Attention: Douglas Noren
> E-mail: DNoren@Polsinelli.com

(b)     The parties acknowledge that all notices, demands, consents, approvals and statements required and/or permitted hereunder must be delivered to their respective counsel or else the notices, demands, consents, approvals and statements required and/or permitted hereunder shall be deemed undelivered.

(c)     The parties agree that the terms and conditions stated in this <u>Section 9</u> shall survive closing.

10.     <u>Incorporation by Reference</u>.  Any provision in the Loan Agreement that pertains to this Assignment shall be deemed to be incorporated herein as if such provision were fully set forth in this Assignment.  In the event of any conflict between the terms of this Assignment and the terms of the Loan Agreement, the terms of the Loan Agreement shall prevail.  A provision in this Assignment shall not be deemed to be inconsistent with the Loan Agreement by reason of the fact that no provision in the Loan Agreement covers such provision in this Assignment.

11.     <u>Collateral</u>.  This Assignment is made for collateral purposes only and the duties and obligations of Assignor under this Assignment shall terminate when the Debt due and payable to Assignee under the Loan Documents is paid in full and all Obligations of Assignor under the Loan Documents are performed and discharged.

12.     <u>Governing Law</u>.   This Assignment shall be governed by, and construed in accordance with, the laws of the State of New York. Assignor and Assignee intend and believe that each provision in this Assignment comports with all applicable local, state or federal laws and judicial decisions.   However, if any provision or provisions, or if any portion of any provision or provisions, in this Assignment is found by a court of law to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision or public policy, and if such court should declare such portion, provision or provisions of this Assignment to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent both of Assignor and Assignee that such  portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Assignment shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein and that the rights, obligations and interests of each Assignor and Assignee under the remainder of this Assignment shall continue in full force and effect.

13.     <u>Miscellaneous</u>.   It is expressly intended, understood and agreed that this Assignment and the other Loan Documents are made and entered into for the sole protection and benefit of Assignor, and Assignee, and their respective successors and assigns (but in the case of assigns of Assignor, only to the extent permitted hereunder); that no other person or persons shall have any right at any time to action hereon or rights to the proceeds of the Loan evidenced and secured by the Loan Documents; that proceeds from the Loan do not constitute a trust fund for the benefit of any third party or Person; that no third party or Person shall under any circumstances be entitled to any equitable lien on any such undisbursed proceeds from the Loan

(if any) at any time; and that Assignee shall have a lien upon and right to direct application of any such undisbursed proceeds from the Loan, if any, as provided in the Loan Documents.

[remainder of page intentionally left blank; signatures on immediately following page]

## SIGNATURE PAGE TO ASSIGNMENT OF LICENSES, RIGHTS AND PERMITS

**IN WITNESS WHEREOF**, Assignor has caused the execution of and delivered this Assignment as of the date first written above.

**ASSIGNOR:**

**2604 CAMBLETON ROAD PARTNERS, LLC**
A Georgia limited liability company

By: _____

A _____,

Its _____

By: _____
Name: JOSEPH HARKER
Title: MANAGING MEMBER

STATE OF _Georgia_ )
) ss.:
COUNTY OF _Fulton_ )

On this 12th day of June *July* in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _Joseph Harker_, the _Mg Member_ of _2604 Cambleton Road Partners LLC_, a _GA LLC_, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument before me and executed the same in his capacity as stated above, and that by his signature on the instrument, the individual and/or the person on behalf of which the individual acted, executed the instrument.

_Patricia Vanhoozer_
Notary Public

*[Notary seal: PATRICIA VANHOOZER, MY COMMISSION EXPIRES MAR 18 20__, FULTON CO. GEORGIA, NOTARY PUBLIC]*

8

**EXHIBIT A**
**Legal Description**

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

All that tract or parcel of land lying and being in Land Lot 199 of the 14th District, Fulton County, Georgia, being Units A-1, A-3, A-4, A-5, A-6, A-7, B-1, B-2, C-1, C-2, C-3, C-4, C-5, C-7, D-1, D-2, D-3, D-4, E-1, E-2, E-3, F-1, F-2, F-3, F-5, F-6, F-7, G-3, G-4, G-7, H-1, H-2, H-3, H-4, H-5 of the 2406 Campbellton Road Subdivision, as per plat recorded in Plat Book 392, Page 19, Fulton County, Georgia Records, which plat is incorporated herein and made a part of this description.

Together with the Declaration of Covenants, Conditions and Restrictions for Campbellton Village Townhomes, as recorded in Deed Book 44374, Page 59, aforesaid records.

Together with the Declaration of Easement recorded in Deed Book 43608, Page 527, aforesaid records.

## UNCONDITIONAL GUARANTY OF COMPLETION

**THIS UNCONDITIONAL GUARANTY OF COMPLETION** (this **"Guaranty"**) is made this _____ day of July, 2017 by **JOSEPH HARKER** ("Harker"), and **BRIAN PEOPLES** ("Peoples" and together with Harker, individually, collectively, jointly and severally, "**Guarantor**") in favor of **SPECIALTY CREDIT HOLDINGS, LLC**, a Delaware limited liability company, (together with its successors and/or assigns, "**Lender**").

## RECITALS

**WHEREAS**, contemporaneously herewith, Lender is making a commercial real estate loan to 2604 CAMBLETON ROAD PARTNERS, LLC, a Georgia limited liability company ("**Borrower**"), in the principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00) (the "**Loan**");

**WHEREAS**, the Loan is evidenced by, among other things, a certain Loan Agreement, dated of even date herewith, by and among Borrower, Guarantor and Lender, in the principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00) (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "**Loan Agreement**");

**WHEREAS**, the Loan is further evidenced by a certain Promissory Note, dated of even date herewith, made and executed by Borrower in favor of Lender, in the principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00) (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "**Note**"); and

**WHEREAS**, Guarantor has a Controlling (as defined in the Loan Agreement) interest and direct or indirect ownership interest in Borrower and will therefore substantially benefit from the Loan; and

**WHEREAS**, Lender requires that Guarantor execute and deliver this Guaranty as a condition precedent to making the Loan.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Guarantor irrevocably and unconditionally agrees as follows:

1.      **Definitions**.  Except as otherwise stated herein, all capitalized terms shall have the same meaning as defined in the Loan Agreement.  For purposes of this Guaranty:

1.1      "**Guaranteed Obligations**" shall mean: (a) the timely completion of the Improvements to be made to the Project, all of which shall be completed no later than the Completion Date and in accordance with the Loan Agreement and Budget;  and (b) the full and

1

timely payment and discharge of any and all costs, expenses and liabilities for, or in connection with the completion of the Improvements when same may become due and payable, and the full and timely payment and discharge of any and all claims, liens, charges and/or demands for labor, materials, and services used for, or in connection with, the completion of the Improvements which, if left unpaid, may become claims, liens, charges and/or demands on all or any portion of the Project.

   1.2  "**Event of Default**" shall include each of the following:

     (a)  A Default or an Event of Default as defined under the Loan Agreement, the Note, the Security Instrument or any of the other Loan Documents;

     (b)  Guarantor's failure to perform any of the Guaranteed Obligations under this Guaranty after the expiration of all applicable notice and cure periods in accordance with the Loan Agreement; and

     (c)  Receipt by Lender of notification from Guarantor that Guarantor does not intend to be liable for the Guaranteed Obligations or that Guarantor contests the validity or enforceability of this Guaranty.

   2.  **Unlimited Guaranty**.

   2.1  **Unlimited Continuing Guaranty and Suretyship Obligation**. Guarantor guarantees to Lender and becomes a surety to Lender for each of the Guaranteed Obligations. The liability of Guarantor hereunder is unlimited. **THIS GUARANTY IS A CONTINUING GUARANTY AND SURETYSHIP AGREEMENT AND SHALL CONTINUE IN FORCE UNTIL ALL GUARANTEED OBLIGATIONS HAVE BEEN COMPLETED, PAID AND SATISFIED IN FULL AND FREE OF ALL LIENS, CHARGES, DEMANDS AND/OR CLAIMS OF ANY KIND, TYPE OR NATURE AS DETERMINED BY LENDER IN ITS SOLE DISCRETION. ALL DISBURSEMENTS OF THE LOAN AMOUNT PLUS ANY ADDITIONAL ADVANCES OR AMOUNTS AS MAY BE PERMITTED UNDER THE LOAN DOCUMENTS MADE TO OR ON BEHALF OF BORROWER, AND ANY BORROWINGS OF BORROWER FROM LENDER IN CONNECTION WITH THE PERFORMANCE AND COMPLETION OF THE GUARANTEED OBLIGATIONS SHALL CONSTITUTE ONE SINGLE OBLIGATION GUARANTEED BY GUARANTOR PURSUANT TO THE TERMS HEREOF.**

   2.2  **Exercise of Rights**.  Guarantor expressly understands and agrees that (a) at any time following an Event of Default Lender may proceed against Guarantor and/or against all or any portion of the Collateral or other security for this Guaranty in such order, priority and manner as Lender shall determine in its sole discretion; (b) Guarantor's liability under this Guaranty is not limited to the value or proceeds realized by Lender from a sale or other liquidation of any Collateral for this Guaranty; (c) Lender may, at any time following an Event of Default, proceed against any and all assets of Guarantor securing this Guaranty to complete or cause to be completed, the Guaranteed Obligations; and (d) to the extent any Collateral for this

Completion Guaranty

Guaranty secures any other Obligations of Guarantor under the Loan Documents, Lender may apply such Collateral and proceeds thereof to the performance and completion of the Guaranteed Obligations and/or such other Obligations under the Loan Documents in such order, priority and manner as Lender shall determine in its sole discretion.  Guarantor expressly acknowledges and agrees that it may be impossible to measure precisely the damages to Lender resulting from a breach of its covenant to complete or to cause the completion of the Guaranteed Obligations and that such a breach may not have an adequate remedy at law in respect of such breach.  Nothing contained herein shall prejudice Lender's rights to assert any and all claims for damages incurred as a result of an Event of Default and Lender may, before, during, or after any termination or cancellation of the Loan Agreement and Obligations thereunder, hold Guarantor liable for all losses and damages sustained and expenses incurred by reason of Borrower or Guarantor failing to design, develop, construct and complete the Improvements in accordance with the Loan Agreement, this Guaranty, or any of the other Loan Documents, including, without limitation, the cost of such completion.

3. **Scope and Duration of Liability**.

3.1 **Primary Liability**.

(a) The Guaranteed Obligations are primary, absolute, independent, irrevocable and unconditional.  This Guaranty is an agreement of suretyship as well as of guaranty and, upon the occurrence of an Event of Default, Lender may proceed directly against Guarantor without being required to proceed first against Borrower or any other person or entity, or against any Collateral or other security for the Guaranteed Obligations, and without first resorting to or exhausting any other security or Collateral, or any other remedy or remedies to enforce the payment or collection of the said liabilities and without first having recourse under any of the other Loan Documents or any of the Project, the Security Instrument or any other Loan Documents provided to Lender in connection with the Loan through foreclosure proceedings, non-judicial foreclosure or otherwise; provided, however, that nothing herein contained shall prevent Lender from pursuing its rights and remedies under any of the other Loan Documents.

(b) The Guaranteed Obligations shall not be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Borrower or its estate in bankruptcy resulting from the operation of any present or future provision of the Federal Bankruptcy Code or other similar statute, or from the decision of any court; or any insolvency, reorganization, arrangement, readjustment, composition, liquidation, or similar proceeding relating to Borrower or its properties or creditors; or any presently existing or hereafter enacted or made law, rule, ordinance, code, regulation, judicial decision or administrative decision of any type or nature, including, without limitation, any law, rule, ordinance, code, regulation, judicial decision or administrative decision which limits or impairs Borrower's ability to perform its Obligations pursuant to the Loan Documents.

3

(c)      Any acknowledgement, new promises, or payments of any nature by Borrower with respect to the Guaranteed Obligations shall be deemed to be made as agent of Guarantor for the purposes hereof.

3.2      **Duration**.  Provided no Event of Default has occurred, and there exists no event which with the passage of time, delivery of notice or both would constitute an Event of Default, Lender shall provide Guarantor with a written release from the terms and conditions of this Guaranty upon the earlier of the release and discharge of the Security Instrument upon repayment of the Debt evidenced by the Note and Loan Agreement; or the completion of the Improvements and confirmation that all of the Guaranteed Obligations have been fully, finally and irrevocably paid, complied with and performed, free of all liens, charges, demands and claims of any kind, type or nature, as evidenced by, among other things, the following in form and substance reasonably satisfactory to Lender: (i) a certification of completion by Borrower (and any other Person as may be required by Governmental Authorities having jurisdiction over Borrower and/or the Project), which states that the Improvements  have been completed in a good and workmanlike manner and in compliance with all applicable Laws, (ii) the issuance by the appropriate Governmental Authorities of all applicable permits, licenses and approvals necessary for the use, occupancy, operation and maintenance of the Improvements, including but not limited to a certificate of occupancy and/or certificates of completion from any Governmental Authorities having jurisdiction over Borrower and/or the Project,  (iii) final lien waivers and general releases for labor and materials supplied and work performed by any Person (including, without limitation from any contractors and all subcontractors, the architect, engineer or any Person who is a laborer, mechanic, materialman, merchant or trader for work performed, materials furnished or services provided) in connection with the design, development, completion and construction of the Improvements, all in such form and content satisfactory to Lender in its sole discretion; (iv) written acceptance of the construction as complete by Borrower (same as may be approved by Lender); and (v) an updated title search of the Project at Borrower's cost and expense showing that no mechanic's liens, charges, demands or notices (or any intention of any Person in connection with any of the foregoing) have been or may be placed on all or any portion of the Project.

If at any time a payment or payments by any Person on account of the Guaranteed Obligations, or any part thereof, are subsequently invalidated, declared to be fraudulent or preferential, set aside or are required to be repaid to a trustee, receiver, conservator, liquidator or any other Person under any bankruptcy act (or other insolvency Law), state or federal Law, common law or equitable cause, then to the extent of such payment or payments, the Guaranteed Obligations intended to be satisfied hereunder shall be reinstated, revived and continued in full force and effect as if such payment or payments had not been made.  For the avoidance of doubt, this Guaranty shall remain in full, force and effect without regard to a change in any management and/or Control in Borrower.

3.2      **Remedies**.  Upon the occurrence of an Event of Default, Guarantor shall, upon Lender's demand (a) immediately pay, comply with and perform such of the Guaranteed Obligations as Lender shall direct and required by the Guaranty, irrespective of whether the Guaranteed Obligations directed by Lender to be paid, complied with and performed by

4

Guarantor are those which gave rise to the Event of Default, and (b) complete or cause the completion of the Improvements in accordance with the Loan Agreement pursuant to the Budget.

4. **Unconditional Enforceability**.   The Guaranteed Obligations shall be unconditional and irrevocable, irrespective of:

(a) the genuineness, validity or enforceability of any of the Loan Documents;

(b) any alteration, amendment or modification of the Budget except as otherwise expressly permitted under the Loan Agreement, or schedule of Disbursement of proceeds from the Loan in connection with any Requisition, or any of the provisions of the Loan Agreement or any of the other Loan Documents or any extension of time for performance required thereby;

(c) any limitation of liability of Borrower or any other person or entity contained in the Loan Documents (including, without limitation, that certain Limited Guaranty);

(d) the release of Borrower or any other Person from performance or observance of the Obligations contained in any of the Loan Documents by operation of Law or otherwise, whether made with or without notice to Guarantor;

(e) the existence of any Collateral or other security given to secure the Obligations under the Loan Documents;

(f) any material change in Borrower's financial condition and/or operations;

(g) the impossibility or illegality of performance on the part of Borrower of its Obligations under the Loan Documents;

(h) any defense that may arise by reason of the incapacity or lack of authority of Borrower, any other guarantor or other Person, or the failure of Lender to file or enforce a claim against the estate of Borrower or Guarantor in any bankruptcy or other proceedings; or

(i) any other circumstances, occurrences or conditions, whether similar or dissimilar to any of the foregoing, which might otherwise constitute a legal or equitable defense, discharge or release of any guarantor under the Loan Documents or surety.

Completion Guaranty

5.     **Borrower's Performance under the Loan Documents**.   Guarantor hereby unconditionally, absolutely, and irrevocably guarantees to Lender that Borrower: (a) will maintain and preserve the enforceability of the Loan Documents as the same may be modified, supplemented, extended, renewed or restated from time to time, (b) will not take or fail to take action of any kind wherein the taking of such action and/or the failure to take such action might be the basis for a claim that Guarantor has any defense of its Guaranteed Obligations hereunder, and (c) will not change, alter, modify or deviate from the Budget (except as otherwise permitted in the Loan Agreement) without Lender's prior written consent.

6.     **Release/Modification/Information**.   Lender may, at any time and from time to time, with or without consideration, release or discharge Guarantor, Borrower or any one or more other guarantors or other Persons of, or sureties for, any or all of the Guaranteed Obligations, agree to the substitution, exchange or release of all or any part of the Collateral securing the Guaranteed Obligations, obtain or receive any additional collateral or suretyship obligations securing Borrower's performance under the Loan Agreement or other Loan Documents, and/or modify, amend, increase, extend, renew or supplement any of the Guaranteed Obligations or the Loan Agreement or other Loan Documents, all without notice to or further consent from Guarantor.  Except as may be expressly agreed to by Lender in writing, none of the foregoing actions shall in any way affect or diminish the liability of Guarantor under this Guaranty.  Lender has no obligation or commitment of any kind to inform or advise Guarantor of any information, occurrences or events regarding Borrower or Borrower's financial condition, operations, loan status or Collateral position, including, without limitation, any material adverse change in such financial condition, operations, loan status or Collateral position.   Guarantor acknowledges that Guarantor shall be solely responsible for keeping informed as to any of the foregoing matters.

7.     **Subrogation**.  Guarantor hereby agrees that:

7.1     **Subordination**.   Any and all rights of subrogation that Guarantor may have against Borrower or against all or any portion of the Collateral or other security for Borrower's performance and completion of the Guaranteed Obligations, and any and all rights of contribution, indemnity and/or substitution that Guarantor may have against Borrower or any other guarantor or surety, shall be junior and subordinate to any rights that Lender may have against Borrower, to all right, title and interest that Lender may have in any such Collateral or security for Borrower's performance and completion of the Guaranteed Obligations, and to any right Lender may have against such other guarantor or surety.  Lender may use, sell or dispose of any item of Collateral or security for Borrower's performance and completion of the Guaranteed Obligations as it deems fit without regard to any subrogation rights Guarantor may have, and upon any such disposition or sale of such Collateral or security any rights of subrogation that Guarantor may have with respect to such Collateral or security shall terminate.

7.2     **Limitations**.   Until the Guaranteed Obligations shall have been fully, finally and irrevocably paid, complied with and performed free of all liens and claims of any nature in accordance with Section 3 herein, Guarantor shall not take, or permit to be taken, any action to exercise (a) any right of subrogation against any Collateral or security for Borrower's performance and completion of the Guaranteed Obligations, (b) any right of contribution that

6

Completion Guaranty

Guarantor may have against Borrower, or any other guarantor or surety of the Guaranteed Obligations, (c) any right to enforce any remedy which Lender now has or may hereafter have against Borrower or (d) any benefit of, and any right to participate in, any Collateral or other security now or hereafter held by Lender.  If any amount shall be paid to Guarantor on account of such subrogation or contribution rights at any time when all Guaranteed Obligations shall not have been fully, finally and irrevocably paid, complied with and performed free of all liens and claims of any nature in accordance with <u>Section 3</u> herein, such amount shall be held in trust for Lender and shall forthwith be paid over to Lender to be credited and applied on account of Borrower's Obligations under the Loan Documents.

 

8.     **<u>Subordination of Other Obligations</u>**.   Provided no Event of Default has occurred, Guarantor may advance funds to Borrower or accept funds from Borrower on account of any indebtedness of Borrower, now owed or hereafter incurred, to Guarantor with Lender's prior written consent, which consent may be withheld in Lender's sole and absolute discretion; Notwithstanding the aforesaid, any approved advance of any sums to Borrower from Guarantor, together with all indebtedness of Borrower now owed or hereafter incurred to Guarantor, are shall be unconditionally subordinated in payment, performance and all other respects to Lender's rights and remedies under this Guaranty and the Loan Documents. If Guarantor collects any such sums or indebtedness from Borrower at any time when an Event of Default exists, or when there exists any event which with the passage of time, delivery of notice or both would constitute an Event of Default, or when it is reasonably foreseeable that the payment of such sums to Guarantor will render Borrower financially unable to perform any of Borrower's subsequent Obligations under the Loan Agreement or other Loan Documents, such collected funds shall be deemed collected and received by Guarantor in trust for Lender and shall be paid upon demand to Lender for application, when received, on account of Borrower's Obligations under the Loan Documents.

9.     **<u>Representations</u>**.   Each party which constitutes Guarantor represents and warrants to Lender with respect to himself or itself only that:

9.1     **<u>Authority and Consents</u>**.  Guarantor has the power, authority and legal right to enter into, execute and deliver this Guaranty and all actions, approvals and consents of any party necessary for Guarantor to validly execute and deliver this Guaranty have been obtained.

9.2     **<u>No Violation</u>**.  The execution, delivery and performance by Guarantor of this Guaranty will not conflict with, violate or constitute a default under any indenture, note, mortgage, loan, credit agreement, instrument or any other document to which Guarantor is a party or by which Guarantor is bound or affected, or any judgment or order of any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, nor will such execution, delivery and performance constitute a default upon the passage of time or the giving of notice or both.

Completion Guaranty

9.3   **Enforceability**.  This Guaranty is a legal, valid and binding obligation of Guarantor and is fully enforceable against Guarantor in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws or equitable principles relating to or affecting the rights of creditors generally.

9.4   **No Default Under Other Obligations**.  To the best of its knowledge, Guarantor is not in default in the performance or observance of any of its obligations, covenants or conditions contained in any indenture or other agreement creating, evidencing or securing any indebtedness or obligation or pursuant to which any such indebtedness or obligations are issued.

9.5   **Governmental Consents**.  No consent, approval or authorization of or designation, declaration or filing with any Governmental Authorities on the part of Guarantor is required in connection with the execution, delivery or performance by Guarantor of this Guaranty or the consummation of the transactions contemplated thereby.

9.6   **Review of Loan Documents**.  Guarantor has examined the Loan Documents to Guarantor's full and completed satisfaction, and is fully and completely satisfied with the level and completeness of examination and review of all of the Loan Documents.

9.7   **Benefit**.  Guarantor has a direct financial interest in and Control of Borrower and will benefit directly from the execution of the Loan Documents and the performance and completion of the Guaranteed Obligations.

9.8   **Independent Review**.  Guarantor has executed this Guaranty after conducting its own independent review and analysis of the financial condition and operations of Borrower, and Guarantor has not relied upon any representation, statement or information of or from Lender and/or any Affiliate thereof in connection with the same.

9.9   **Accuracy of Representations**.  No representation or warranty by Guarantor contained herein or in any certificate or other document furnished by Guarantor pursuant hereto or in connection herewith fails to contain any statement of material fact necessary to make such representation or warranty not materially or intentionally misleading in light of the circumstances under which it was made.  There is no fact, to the best knowledge of Guarantor, that Guarantor has not disclosed to Lender and/or any Affiliate thereof, which materially or adversely affects, or is likely to materially or adversely affect Guarantor's financial condition or Lender's decision to provide the Loan to Borrower.

10.   **Notices**.  All notices shall be given in the manner provided in the Loan Agreement with respect to Lender and with respect to Guarantor, as follows:

If to Lender:
Specialty Credit Holdings, LLC
Two Greenwich Plaza, 1st Floor
Greenwich, Connecticut 06830
Attn:  Andrew Scott
E-mail:  ascott@silverpointcapital.com

Completion Guaranty

With a copy to:
Mahadeva, PLLC
80 Business Park Drive, Suite 201
Armonk, New York 10504
Attention: Prassana Mahadeva
E-Mail:  pmahadeva@mahadevalaw.com


If to Guarantor:
c/o ARIAM Partners, LLC
1020 Powers Place
Alpharetta, GA 30009
Attention: Joe Harker
E-mail:  jharker@ariampartners.com

With a copy to:
Polsinelli PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
Attention: Douglas Noren
E-mail: DNoren@Polsinelli.com


      11.    **Cumulative Remedies**.  The rights, remedies, powers and privileges provided to Lender herein or in any of the Loan Documents shall not be deemed exclusive, but shall be cumulative and shall be in addition to any other rights, remedies, powers and privileges of Lender at law or in equity.

      12.    **Waivers**.  Guarantor hereby fully, finally, unconditionally and irrevocably waives the following:

      12.1    **Notices**.  Notice of acceptance of this Guaranty by Lender; presentment for payment, notice of nonpayment or demand, demand, protest, notice of protest and notice of dishonor or default to any party including Borrower and Guarantor; notice of any change in Borrower's financial condition, operations, loan status or Collateral position; and all other notices to which Guarantor may be entitled but which may legally be waived.

      12.2    **Forbearance**.  Any rights Guarantor may have by reason of any forbearance, modification or extension which Lender may grant or to which Lender and Borrower may agree with respect to the Loan Agreement or any of the other Loan Documents.

      12.3    **Demand**.  Demand for payment as a condition of liability under this Guaranty.

9

Completion Guaranty

12.4   **Disability**.  Any disability of Borrower or defense available to Borrower, including absence or cessation of Borrower's liability, for any reason whatsoever.

12.5   **Defenses**.  Any defense or circumstance which might otherwise constitute a legal or equitable discharge of a guarantor or surety, including, without limitation, any obligation of Lender to proceed against Borrower prior to exercising its rights against Guarantor hereunder.

12.6   **Possession/Marshalling**.  Any demand for possession of any Collateral and any and all rights to subrogation or realization on any of Borrower's property, including any right to require or participate in the marshalling of Borrower's assets.

12.7   **Limitations on Actions**.  All benefits under any present or future laws exempting any property, real or personal, or any part of any proceeds thereof, from attachment, levy or sale under execution, or providing for any stay of execution to be issued on any judgment recovered under any of the Loan Documents or in any replevin or foreclosure proceedings, or otherwise providing for any valuation, appraisal or exemption.

12.8   **Bond**.  Any requirement for bonds, security or sureties required by statute, court rule or otherwise.

12.9   **Expenses**.  All rights to claim or recover attorney's fees and costs in the event that Guarantor is successful in any action to remove, suspend or prevent the enforcement of a judgment entered by confession.

12.10   **Imperfections**.  Any and all errors, defects and imperfections in any action by Lender in replevin, foreclosure or other court process or in connection with any other action related to any of the Loan Documents or the transactions contemplated therein.

13.   **Delay or Omission Not Waiver**.  Neither the failure nor any delay on the part of Lender to exercise any right, remedy, power or privilege under the Loan Agreement or any of the other Loan Documents upon the occurrence of any Event of Default or otherwise shall operate as a waiver thereof or impair any such right, remedy, power or privilege.  No waiver of any Event of Default shall affect any later Event of Default or shall impair any rights of Lender.  No single, partial or full exercise of any rights, remedies, powers and privileges by the Lender shall preclude further or other exercise thereof.  No course of dealing between Lender and Borrower or Guarantor shall operate as, or be deemed to constitute, a waiver of Lender's rights under the Loan Agreement or any of the other Loan Documents or affect the duties or Obligations of Borrower or Guarantor.

14.   **Binding Effect; Successors and Assigns**.  This Guaranty and all rights and powers granted hereby will bind and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

10

Completion Guaranty

15. **Construction**.  For purposes of this Guaranty, the singular shall be deemed to include the plural and the neuter shall be deemed to include the masculine and feminine as the context may require.

16. **Severability**.  The provisions of this Guaranty and all other Loan Documents are deemed to be severable, and the invalidity or unenforceability of any provision shall not affect or impair the remaining provisions which shall continue in full force and effect.

17. **Governing Law**.  This Guaranty shall be governed and construed in accordance with the laws of the State of New York without regard to conflict of law principles.

18. **Joint and Several Liability**.  All of the Guaranteed Obligations of Guarantor hereunder are joint and several with those of any other Guarantor or other Person or of any surety for all or any part of the Guaranteed Obligations.  If there is more than one Guarantor under this Guaranty, all agreements, conditions, covenants and provisions hereof shall be the joint and several obligation of each Guarantor.

19. **Counterparts**.  This Guaranty may be executed in any number of counterparts, all of which when taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Guaranty by signing any such counterpart.

20. **Submission to Jurisdiction**.  Guarantor hereby consents to the exclusive jurisdiction of any state or federal court located within the State of New York, and irrevocably agrees that, subject to Lender's election, all actions or proceedings relating to the Loan Documents or the transactions contemplated hereunder shall be litigated in such courts, and Guarantor waives any objection which Guarantor may have based on lack of personal jurisdiction, improper venue or forum non conveniens to the conduct of any proceeding in any such court and consents that any such service of process be made by mail or messenger directed to Guarantor at the address set forth in Section 11 hereof.  Nothing contained in this Section 21 shall affect the right of Lender to serve legal process in any other manner permitted by law or affect the right of Lender to bring any action or proceeding against Guarantor or Guarantor's property in the courts of any other jurisdiction.

21. **JURY TRIAL WAIVER**.  **GUARANTOR AND LENDER, BY ITS ACCEPTANCE HEREOF, WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER ANY OF THE LOAN DOCUMENTS OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF BORROWER, GUARANTOR OR LENDER WITH RESPECT TO ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  GUARANTOR AND LENDER AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THE LOAN DOCUMENTS MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF GUARANTOR AND LENDER TO THE WAIVER OF THEIR**

11

Completion Guaranty

**RIGHT TO TRIAL BY JURY. THE UNDERSIGNED ACKNOWLEDGES THAT HE/SHE HAS HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS SECTION ON BEHALF OF GUARANTOR, THAT HE/SHE FULLY UNDERSTANDS ITS TERMS, CONTENTS AND EFFECT, AND THAT HE/SHE VOLUNTARILY AND KNOWINGLY AGREES TO THE TERMS OF THIS SECTION ON BEHALF OF GUARANTOR.**

[Remainder of Page Left Intentionally Blank]

[Signatures on Immediately Following Page]

12

## SIGNATURE PAGE TO COMPLETION GUARANTY

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

JOSEPH HARKER

By: _____

STATE OF Georgia      )
                          : ss.:
COUNTY OF Fulton      )

On this 12 day of July in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared Joseph Harker, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

_____
Notary Public

PATRICIA VANHOOZER
MY COMMISSION EXPIRES
MAR 18 2019
FULTON CO., GEORGIA
NOTARY PUBLIC

13

Completion Guaranty

**SIGNATURE PAGE TO COMPLETION
GUARANTY**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

**BRIAN PEOPLES**

**By:** _[signature]_

**STATE OF** _Georgia_ )

                       : ss.:

**COUNTY OF** _Fulton_ )

On this _12_ day of _June_ in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _Brian Peoples_, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

_[signature]_
Notary Public

_[Notary seal: PATRICIA VANHOOZER, MY COMMISSION EXPIRES MAR 18 20__, FULTON CO., GEORGIA, NOTARY PUBLIC]_

14

Completion Guaranty

**WHEN RECORDED, RETURN TO:**

Mahadeva, PLLC
80 Business Park Drive, Suite 201
Armonk, New York 10504

---

*(ABOVE SPACE FOR RECORDER'S USE)*

**DEED TO SECURE DEBT, ASSIGNMENT OF RENTS AND LEASES,
SECURITY AGREEMENT AND FIXTURE FILING**

by

**2604 CAMBLETON ROAD PARTNERS, LLC,**
a Georgia limited liability company,
as Grantor,

to and in favor of

**SPECIALTY CREDIT HOLDINGS, LLC,**
a Delaware limited liability company,
as Grantee

## DEED TO SECURE DEBT, ASSIGNMENT OF RENTS AND LEASES, SECURITY AGREEMENT AND FIXTURE FILING

This Deed to Secure Debt, Assignment of Rents and Leases, Security Agreement and Fixture Filing (as amended from time to time, this "Deed to Secure Debt ") secures future advances and is a Financing Statement covering fixtures to be filed in the real property records pursuant to § 11-9-502(c) of the Official Code of Georgia Annotated ("O.C.G.A.").

This is a "Short-term note secured by real estate" as defined in § 48-6-60 of the O.C.G.A. and therefore intangible recording tax is not due.

This Deed to Secure Debt, dated as of July __, 2017, is given by **2604 CAMBLETON ROAD PARTNERS, LLC, a Georgia limited liability company** having a principal place of business and mailing address at  1020 Powers Place, Alpharetta, Georgia 30009, as Grantor ("Grantor"), to **SPECIALTY CREDIT HOLDINGS, LLC**, a Delaware limited liability company (together with its successors and assigns collectively referred to herein as "Grantee"), having an address at Two Greenwich Plaza, First Floor, Greenwich, Connecticut 06380.

Except as otherwise expressly stated or defined herein, all capitalized terms used in this Deed to Secure Debt shall have the same meaning as defined in that certain Loan Agreement, dated as of even date herewith, between Grantor as Borrower and JOSEPH HARKER and BRIAN PEOPLES, as Guarantors and Grantee, as Lender (as amended, restated the "Loan Agreement"). (Wherever used herein, the terms "Grantor" and "Grantee" include all the parties to this instrument and the heirs, legal representative and assigns of individuals, and the successors and assigns of corporations, limited liability companies and partnerships.)

### WITNESSETH:

**THAT FOR AND IN CONSIDERATION** of the loan to Grantor by Grantee resulting in the indebtedness which is hereinafter more particularly described, and in order to secure that loan and payment of the Note evidencing the same, Grantor hereby GRANTS, BARGAINS, CONVEYS, TRANSFERS, ASSIGNS AND SELLS the Property (as defined herein), to Grantee, its heirs, successors and assigns in fee simple forever, and Grantor does hereby bind itself, its heirs, successors and assigns to WARRANT AND FOREVER DEFEND (i) the title to the Property unto Grantee and its heirs, successors and assigns, subject only to Permitted Exceptions (as defined herein) and (ii) the validity and priority of the security title passed pursuant to this Deed to Secure Debt, subject only to Permitted Exceptions, in each case against the claims of all Persons whomsoever. The Property is situated in Fulton County, State Georgia, and is described as follows:

### *SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF*

Commonly known as "Enclave @ Campbellton" located at 2604 Campbellton Road, Atlanta, Fulton County, Georgia consisting of approximately 35 fee simple townhomes, undivided rights in

common areas and related amenities in Fulton County, State of Georgia, all as more specifically described on Exhibit A annexed hereto and made a part hereof.

**TO HAVE AND TO HOLD** the same, together with the tenements, hereditaments and appurtenances thereto belonging, and the reversion or reversions, remainder and remainders, and the rents, issues and profits thereof, unto the Grantee, in fee simple.

**TOGETHER WITH** all right, title and interest of Grantor, if any, in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Property (as defined herein) to the center line thereof.

**TOGETHER WITH** all of Grantor's right, title and interest in and to any and all machinery, apparatus, equipment, fittings, fixtures, appliances, and articles of personal property of every kind and nature whatsoever, now or hereafter located in or upon the Property (as defined herein) or any part thereof, and used or useable in connection with any present or future operation of said Property and the improvements located thereon and now owned or hereafter acquired by Grantor. It is expressly understood that this Deed to Secure Debt is a deed passing legal title pursuant to the laws of the State of Georgia governing deeds to secure debt and is not a mortgage under those provisions of the existing laws of the State of Georgia (O.C.G.A § 44-14-60). This Deed to Secure Debt shall also constitute a security agreement granting a present and continuing security interest and security title in the portion of the Property (as defined herein) constituting personal property or fixtures, and a financing statement filed as a fixture filing under the Uniform Commercial Code of the State of Georgia and that Grantee shall, at Grantee's option, and without limiting all other rights of Grantee as contained herein, be entitled to exercise all rights and remedies as a secured creditor under the Uniform Commercial Code of the State of Georgia in the event of a default hereunder by Grantor. This Deed to Secure Debt is intended to be recorded in the real estate records of Fulton County, Georgia.

**TOGETHER WITH** any and all awards or payments (to be disbursed and applied as hereinafter provided), including interest thereon, and the right to receive the same, which may be made with respect to the Property (as defined herein) as a result of (a) the exercise of the right of eminent domain, (b) the alteration of the grade of any street, or (c) any other injury to or decrease in the value of the Property, to the extent of all amounts which may be secured by this Deed to Secure Debt at the date of receipt of any such award or payment, and of the attorneys' fees, costs and disbursements incurred by Grantee in connection with the collection of such award or payment. Grantor agrees to execute and deliver, from time to time, such further instruments as may be requested by Grantee to confirm such assignment to Grantee of any such award or payment.

**AND** the Grantor covenants with the Grantee that the Grantor owns said Property (as defined herein) unencumbered and in fee simple subject to the matters set forth on Exhibit B attached hereto (collectively, the "Permitted Exceptions"); that the Grantor has good right and lawful authority to convey said Property as aforesaid; that the Grantor will make such further assurances to perfect the fee simple title to said Property in the Grantee as may be required; that the Grantor hereby fully warrants the title to said Property, and subject to the Permitted Exceptions and will defend the same against the lawful claims of all persons whomsoever.

**PROVIDED ALWAYS**, that Grantor shall pay unto said Grantee under the terms of that certain Promissory Note, dated as of even date herewith, executed and given by Grantor to Grantee

in the aggregate principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00) bearing interest, default interest, prepayment fees and payable as therein provided, including any and all renewals, modifications, advances and expenses incident to the collection of the indebtedness secured by the Deed to Secure Debt) (the "Note") and shall perform, pay, comply with and abide by each and every one of the agreements, stipulations, conditions, covenants and other Obligations contained in the Loan Agreement, the Note, and this Deed to Secure Debt, including without, limitation the obligation to pay all Cross-Collateral Loans (defined in the Loan Agreement).

**AND** the Grantor hereby further covenants and agrees to pay promptly when due the principal and interest and other sums of money provided for in the Note, the Loan Agreement and this Deed to Secure Debt, or either; to pay all and singular the taxes, assessments, levies, liabilities, obligations, and encumbrances of every nature on said Property (as defined herein); to affirmatively permit, commit or suffer no waste, impairment or deterioration of said Property or the improvements thereon at any time (subject to expected wear and tear); to comply with, or cause to be complied with, all applicable statutes, ordinances and requirements of any Governmental Authorities having jurisdiction over Grantor and/or the Property and the Improvements thereon; to pay all costs, charges, and expenses, including attorneys' fees, costs and expenses of collection, and title searches, all as may be reasonably incurred or paid by the Grantee because of the failure of the Grantor to promptly and fully comply with the agreements, stipulations, conditions, covenants and other Obligations under the Note, the Loan Agreement and this Deed to Secure Debt, or either; to perform, comply with and abide by each and every one of the agreements, stipulations, conditions, covenants and other Obligations as set forth in the Note, the Loan Agreement and this Deed to Secure Debt, or either. In the event the Grantor fails to pay when due any tax, assessment, insurance premium or other sum of money payable under the Note, the Loan Agreement and/or this Deed to Secure Debt after the expiration of all applicable notice and cure periods thereunder (if any), the Grantee may (but shall not be obligated) pay the same, without waiving or affecting the option to foreclose or any other right or remedy hereunder or under the other Loan Documents, and all such payments shall bear interest from date thereof at the highest lawful rate.

**IF** any sum of money herein referred to is not promptly paid on the date the same becomes due after all applicable notice and cure periods, or if each and every of the agreements, stipulations, conditions, covenants or other Obligations of the Note, the Loan Agreement and this Deed to Secure Debt, or either, are not fully performed, paid when due or complied with and abided by after all applicable notice and cure periods, then the entire Debt described in the Note, the Loan Agreement and this Deed to Secure Debt, or the entire unpaid balance under the Loan, shall forthwith or thereafter, at the option of the Grantee, become and be immediately due and payable notwithstanding anything contrary in the Note, the Loan Agreement, this Deed to Secure Debt or the other Loan Documents.  Failure by the Grantee to exercise any of the rights or options herein provided shall not constitute a waiver of any rights or options available to the Deed to Secure Debt under the Note, the Loan Agreement, this Deed to Secure Debt, under the other Loan Documents or pursuant to applicable Law, whether accrued or thereafter accruing.

1. GRANT.

      1.1 The Property.  For the purpose of securing payment and performance of the Secured Obligations (as defined in Paragraph 2 below), Grantor has hereby irrevocably and unconditionally GIVEN, GRANTED, BARGAINED, SOLD, CONVEYED, TRANSFERRED,

WARRANTED, PLEDGED and ASSIGNED, and does hereby GIVE, GRANT, BARGAIN, SELL, TRANSFER, WARRANT, PLEDGE, ASSIGN and CONVEY to Grantee, WITH POWER OF SALE, its heirs, successors and assigns, the Property, to HAVE AND TO HOLD all of the Property (as defined below) for the use and benefit of Grantee, its heirs, successors and assigns in fee simple forever, and Grantor does hereby bind itself, its heirs, successors and assigns to WARRANT AND FOREVER DEFEND (i) title to the Property unto Grantee and its heirs, successors and assigns, subject only to Permitted Exceptions (as defined herein) and (ii) the validity and priority of the liens of this Deed to Secure Debt, subject only to the Permitted Exceptions, in each case against the claims of all Persons whomsoever. If Grantor shall pay and perform or cause to be paid and performed all of the Debt and Obligations in accordance with the terms of the Loan Documents (including, without limitation, the Cross-Collateral Loan Documents (defined in the Loan Agreement)), on or before the date same are to be performed and discharged, then the liens, security interests, estates, and rights granted by the Loan Documents and Cross-Collateral Loan Documents may be canceled of record at the request and cost of Grantor, which cost Grantor hereby agrees to pay, otherwise same shall remain in full force and effect; provided, however, that if, at any time, there shall be any Event of Default, then Grantee shall be entitled to the exercise the remedies set forth in this Deed to Secure Debt. The "Property" is described and defined as follows (and includes all Personalty and Improvements (all as further defined herein)):

(a)   The real property located in the County of Fulton, State of Georgia consisting of an approximately 35 fee simple townhomes located at 2604 Campbellton Road, Atlanta, Georgia, together with undivided rights in common areas and amenities all as more fully described in Exhibit A hereto (collectively, the "Land");

(b)   All buildings, structures, improvements, capital improvements, renovations, rehabilitation work, fixtures and appurtenances now or hereafter placed or constructed upon all or any portion of the Land, all apparatus and equipment now or hereafter attached or annexed in any manner to all or any portion of the Land or any building (whether fully constructed or partially constructed) on all or any portion of the Land, including all pumping plants, engines, pipes, ditches and flumes, all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment, HVAC and heating systems, rights-of-way, and any and all improvements made to all or any portion of the Land and any existing or future structures thereon using proceeds from the Loan or from any other source, it being expressly understood and agreed that "Improvements" (as defined herein) is intended to be used in the broadest sense possible and means to include (without limitation) any and all development work (including the obtaining of any and all permits, licenses, variances, zoning matters and/or approvals from any Person) made to all or any portion of the Land which is or may be required by any Person having jurisdiction over Grantor and/or the Property (or any part thereof), the obtaining of any matters or the making of any improvements regarding or related to Grantor's intended use of the Property (or any part thereof) (collectively, the "Improvements");

(c) All easements and rights of way appurtenant to all or any portion of the Land; all development rights, credits and air and mineral rights; all water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Land) and shares of stock pertaining to such water or water rights, ownership of which affect all or any portion of the Land;

(d)  All existing and future leases, subleases, subtenancies, licenses, usufructs, occupancy agreements and concessions relating to the use and enjoyment of all or any portion of the Land and/or the Improvements, and any and all guaranties and other agreements relating to or made in connection with any of the foregoing (collectively, the "Leases");

(e)  Any and all proceeds in the future, including all claims to and demands for them, of the voluntary or involuntary conversion of all or any portion of the Land, Improvements, or the other property described above into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies, whether or not such policies are required by Grantee, and all condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or the other property described above or any part of them; and

(f)  All proceeds of, additions and accretions to, substitutions and replacements for, and changes in any of the property described in subparagraphs (a) through (f) hereof.

To have and to hold the Property, the Rents and Personalty (as such terms are defined herein) to the use, benefit and behoove of Grantee forever, in fee simple, subject to the terms, provisions and conditions herein set forth.

2.  THE SECURED OBLIGATIONS.

2.1  Purpose of Securing.  This Deed to Secure Debt is intended to constitute not only a Deed to Secure Debt for purposes of Georgia law but also a fixture filing financing statement for purposes of the Uniform Commercial Code of the State of Georgia and is made to secure the following described Secured Obligations (as defined herein).  Grantor makes the grant, bargain, sale, conveyance, transfer and assignment set forth in Paragraph 1, makes the irrevocable and absolute assignment set forth in Paragraph 3, and grants the security interest set forth in Paragraph 4 and elsewhere in this Deed to Secure Debt, all for the purpose of securing the following (collectively defined herein as the "Secured Obligations") in any order of priority that Grantee may choose:

(a)  Payment of all present and future debts, obligations and liabilities of Grantor to Grantee in connection with the Loan arising under the Loan Agreement and Note, each being in the aggregate principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00) executed by Grantor, as Borrower in favor of Grantee, as Lender (the Note and Loan Agreement as amended, restated and/or modified from time to time, individually, a "Debt Instrument" and collectively, the "Debt Instruments"), including, without limitation, any and all unpaid principal, accrued and unpaid interest at the Applicable Interest Rate, accrued and unpaid interest at the Default Rate, any unpaid Make-Whole Amount, unpaid Usage Fee, any Extension Fee, any unpaid portion of the Origination Fee, advances (including protective advances) plus any and all other amounts which may be due and owing under the Loan Documents, from time to time, all such amounts being expressly understood and agreed by Grantor as constituting the Debt which

shall be due and payable, in full, on the Initial Maturity Date of **JUNE 30, 2019**, subject to two (2), consecutive, six (6) month extensions thereof, provided that, those certain conditions to each Extension Option are met in accordance with Section 4.1 of the Note;

(b)     This Deed to Secure Debt also secures payment of all other Obligations of Grantor under the Loan Documents, including, without limitation, any Obligations now existing or which may hereafter arise if the Debt Instruments are extended, renewed, modified and/or amended pursuant to any written agreement between Grantor and Grantee, and all Obligations of Grantor under any subsequent agreement(s) or instrument(s) which restate, amend, modify and/or supersede the Debt Instruments whether in whole or in part; and

(c)     Payment and performance of all Obligations of Grantor under this Deed to Secure Debt, including, but not limited to, any advances (including protective advances) made by Grantee or any transferee of Grantee for the purpose of paying any taxes related to the Property (or any part thereof) or premiums on insurance for the Property (or any part thereof) or to repair, maintain, preserve, protect and/or improve all or any portion of the Property (whether or not Grantor is, at that time, the owner of the Property); and

(d)     Payment and performance of any and all Obligations of the Grantor, Guarantor, any Asset Owner Parties (defined in the Loan Agreement) and/or any other Person under the Cross-Collateral Loan Documents and any and all other obligations which Grantor or any Affiliate of Grantor owes to Grantee (or any of its affiliates) from time to time pursuant to a Cross Collateral Loan such obligations being expressly agreed to be secured by this Deed to Secure Debt.

This Deed to Secure Debt does not secure any obligations arising under any environmental agreements or any indemnities (including, without limitation, the Indemnity) or other obligations related to Hazardous Substances or any similar Law relating to the Property or environmental matters or under any obligation which expressly states that it is unsecured, whether contained in the Loan Documents or in any other document, agreement or instrument. Unless specifically described in subparagraph (a) above or otherwise agreed in writing, "Secured Obligations" shall not include any debts, obligations or liabilities which are or may hereafter be "consumer credit" subject to the disclosure requirements of the Federal Truth in Lending law or any regulation promulgated thereunder.

2.2 Terms of Secured Obligations.  Any Person who may have or acquires an interest in all or any part of the Property shall be deemed to have notice of, and will be bound by, the terms of the Debt Instruments described in Paragraph 2.1(a), the other Loan Documents and each other agreement or instrument made or entered into in connection with each of the Secured Obligations. These terms include any provisions in the Debt Instruments which permit borrowing and/or repayment, or which provide that the interest rate on one or more of the Secured Obligations may vary from time to time.

2.3     Future Advances.  This Deed to Secure Debt also secures future advances (including protective advances), if any, made by Grantee to Grantor or made by Grantee on Grantor's behalf for the benefit of all or any portion of the Property.

3. ASSIGNMENT OF RENTS.

        3.1 Assignment. Grantor hereby irrevocably, absolutely, presently and unconditionally assigns to Grantee the Rents, and confers upon Grantee the right to collect such Rents with or without taking possession of all or any portion of the Property. This assignment is, and is intended to be, an unconditional, absolute and present assignment from Grantor to Grantee of all of Grantor's right, title and interest in and to any contracts to purchase or purchase and sale agreements regarding all or any portion of the Property, and the Rents and not an assignment in the nature of a pledge of the Rents or the mere grant of a security interest therein. Such assignment to Grantee shall not be construed to bind Grantee to the performance of any of the covenants, conditions or provisions contained in any such agreement or otherwise impose any obligation upon Grantee. Grantee shall have no responsibility on account of this assignment for the control, care, maintenance, management or repair of the Property, for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property.

        3.2 Grant of License. Notwithstanding the provisions of Paragraph 3.1, Grantee, hereby confers upon Grantor a license (the "License") to collect and retain the Rents, so long as no Event of Default (as defined in Paragraph 6.2) shall exist. If an Event of Default has occurred Grantee, shall have the right, which it may choose to exercise in its sole discretion, to terminate this License without further notice to or demand upon Grantor, and without regard to the adequacy of the security for the Secured Obligations. Grantor agrees to collect and hold all Rents in trust for Grantee and to use the Rents for the payment of the cost of operating and maintaining the Property and for the payment of the Secured Obligations before using any portion of the Rents for any other purpose, all in accordance with the Budget.

4. GRANT OF SECURITY INTEREST.

        4.1 Grant of Security Interest. Grantor hereby unconditionally grants to Grantee a security interest in, and pledges and assigns to Grantee, all of Grantor's right, title and interest now or hereafter acquired in and to all of the following described personal property (but only to the extent owned and assignable by Grantor) (collectively, the "Personalty"):

        (a) All tangible personal property of every kind and description, whether stored on all or any portion the Property or elsewhere, including, without limitation, all goods, materials, supplies, tools, books, records, chattels, furniture, fixtures, equipment, and machinery, and which in all cases is (i) used or useful or acquired in connection with the making of any Improvements undertaken on all or any portion of the Property or the maintenance of the Property, or (ii) affixed or installed, or to be affixed or installed, in any manner on all or any portion of the Property (collectively, the "Equipment");

        (b) All water, mineral, air and rights related thereto (whether riparian, subsurface, appropriative, or otherwise, and whether or not appurtenant to all or any portion of the Property) and shares of stock pertaining to such water, mineral, air and/or rights related thereto, the ownership of which affect the Property (or any portion thereof); and all development plans and specifications, construction plans and specifications, architectural and engineering plans, such other specifications and drawings, and as-built drawings which arise from or relate to the Land or the Improvements;

(c)   All general intangibles and rights relating to the Property, including, without limitation, all permits, licenses and claims to or demands for the voluntary or involuntary conversion of any portion of the Land, Improvements, or other portions of the Property into cash or liquidated claims, proceeds of all present and future fire, hazard or casualty insurance policies, whether or not such policies are required by Grantee, and all condemnation awards or payments now or later to be made by any Governmental Authorities or other public body or decree or by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Land, Improvements, or other Property or any part of any of the foregoing;

(d)   Any and all funds in each Reserve until such time the Debt is paid in full; and

(e)   All substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data.

4.2 <u>Fixture Filing</u>.   Without in any manner limiting the generality of any of the other provisions of this Deed to Secure Debt: (a) some portions on the goods described or to which reference is made herein are or are to become fixtures on the Property described or to which reference is made herein or on <u>Exhibit A</u> attached to this Security Instrument; (b) this Security Instrument is to be filed of record in the real estate records as a financing statement and shall constitute a "<u>fixture filing</u>" for purposes of the UCC in effect in the State of Georgia; and (c) Grantor is the record owner of the real estate or interests in the real estate constituting the Property hereunder.   Grantor hereby consents to Grantee filing and recording financing statements (and continuations thereof) with the appropriate filing and recording offices in order to perfect (and maintain the perfection of) the security interests granted herein.   Information concerning the security interest herein granted may be obtained at the addresses set forth on the first page hereof.   The addresses of the Secured Party (Grantee) and of the Debtor (Grantor) are set forth on the first page hereof.   In that regard, the following information is provided:

<u>Name of Debtor</u>: 2604 Cambleton Road Partners, LLC

<u>Type of Organization</u>: domestic limited liability company

<u>State</u>: Georgia

4.3 <u>No Obligation of Grantee</u>.   The assignment and security interest herein granted shall not be deemed or construed to constitute Grantee as being in possession of the Property, obligate Grantee to lease the Property or attempt to do the same, or to take any action, incur any expense or perform or discharge any obligation, duty or liability whatsoever.

5. <u>RIGHTS AND DUTIES OF THE PARTIES</u>.

5.1 <u>Representations and Warranties</u>.   Grantor represents and warrants that except as identified in that certain title commitment issued by Adams and Reese LLP, as issuing agent for Old

Republic National Title Insurance Company, (the "Title Commitment"),  (i) Grantor lawfully owns the Property comprised of, among other things, the Land and Improvements, has good and marketable title to the Property and has full power, lawful right and authority to convey the same in fee simple and to grant Grantee a perfected first lien and security interest in the Property by virtue of this Deed to Secure Debt, and (ii) except with respect to Permitted Exceptions identified in Exhibit B annexed hereto, the Property is free and clear of all liens, encumbrances, restrictions, and security interests of every kind and/or nature except for those permitted encumbrances which Grantee has previously approved, as set out in Exhibit B attached hereto and incorporated herein by reference, which are referred to as "Permitted Exceptions" in this Deed to Secure Debt.

      5.2 Taxes, Assessments, Liens, Encumbrances and Other Impositions.  Grantor shall pay (or cause to be paid) when due (i) any and all property taxes, assessments, water, sewer, utility and other rents, rates and charges, including all levies, excises, taxes, license fees, permit fees, impact fees, connection fees, and other fees and charges, whether general or special, ordinary or extraordinary, foreseen or unforeseen, that may be assessed, levied or imposed upon all or any portion of the Property, or otherwise arising with respect to the occupancy, use, possession or disposition thereof, whether or not the failure to pay the same might result in the creation of a lien upon all or any portion of the Property; (ii) all franchise, excise and other taxes, fees and charges assessed, levied or imposed with respect to Grantor's right to do business in the State of Georgia and the political subdivisions or any Governmental Authorities thereof, (iii) all taxes and fees (except for Grantee's state and federal income taxes) that may be levied by the United States of America or any Governmental Authorities, state or political subdivision thereof, upon Grantee or Grantor in connection with or upon the Loan Documents, or the Debt or its payment, or collection, or any combination thereof (including all documentary stamp taxes and intangible taxes plus any penalties and interest charged for the late payment of any such taxes); and (iv) all lawful claims and demands of contractors, subcontractors, mechanics, laborers, materialmen and other lienors which, if unpaid, might result in the creation of a lien upon the Collateral, it being expressly understood and agreed by Grantor that all sums payable under this Paragraph 5.2 are defined as "Impositions".  With respect to state and local real and tangible personal property taxes, Grantor will pay same and provide Grantee with true and accurate copies of the receipts for each such payment without demand at least thirty (30) days prior to the date each of such taxes will become delinquent.  Nothing contained in this Paragraph shall prohibit Grantor from paying Impositions (or any part thereof) in installments where such method of payment is permitted by Law provided that true and accurate copies of any such agreements to pay Impositions (or any part thereof) in installments shall be provided to Grantee within ten (10) days after execution by all parties thereto.  With respect to all other Impositions, Grantor will furnish Grantee with proof of such payment upon demand.  Grantor shall be obligated to immediately discharge any lien or other encumbrance on all or any portion of the Property which Grantee has not consented to in writing (or to which Grantor has not appropriately bonded or provided other acceptable security in such amounts reasonably acceptable to Grantee or in accordance with applicable Law), and shall also pay when due each obligation secured by or reducible to a lien, charge or encumbrance which now or hereafter encumbers all or part of the Property, whether the lien, charge or encumbrance is or would be senior or subordinate to this Deed to Secure Debt.

      (a)   Contests.   Grantor may contest, by any and all appropriate administrative, trial or appellate proceedings, or any combination thereof, and in Grantee's name, if required by law, the amount, validity, enforceability or application of any Imposition that Grantor is required to pay or perform to any person or entity other than

Grantee by any provision of this Deed to Secure Debt or the other Loan Documents if and only for so long as: (i) Grantor notifies Grantee in writing of its intent to contest the Imposition; (ii) such contest suspends the collection or enforcement of the item(s) contested; (iii) no part of the Collateral will be subject to loss, sale or forfeiture before final determination of any such contest; (iv) neither Grantor nor Grantee will be subject to any criminal liability; (v) Grantor furnishes such security as may be required by law in connection with each such contest; (vi) the value, usefulness and marketability of the Collateral will not be adversely impaired by any such contest; (vii) Grantor otherwise continues to pay and perform, as the case may be, the Debt and Grantor's obligations under this Deed to Secure Debt; (viii) Grantor otherwise is not in default under any provision of the Loan Documents; (ix) each such contest is continuously prosecuted diligently to final determination; (x) Grantor pays or causes to be paid, and defends, indemnifies and holds Grantee harmless of and from any and all losses, judgments, decrees and costs (including all attorneys' fees) incurred in connection with each such contest; (xi) Grantor, promptly following final determination of each such contest, fully pays and discharges all amounts that may be levied, assessed, charged, imposed or otherwise determined to be payable, together with all penalties, fines, interests, costs and expenses, and otherwise complies with such final determination, at Grantor's sole cost and expense; and (xii) such liens are not filed against the Property pursuant to applicable Law in which event such liens must be discharged or deferred to bond pursuant to this Deed to Secure Debt before Grantor contests such liens. So long as Grantor complies with the foregoing and Grantee is promptly reimbursed for all costs and expenses incurred, Grantee will cooperate with Grantor in connection with any such contest.

5.3 <u>Damages and Insurance and Condemnation Proceeds</u>.

(a)   Grantor hereby absolutely and irrevocably assigns to Grantee, and authorizes the payor to pay to Grantee, the following claims, causes of action, awards, payments and rights to payment (collectively, the "<u>Claims</u>"):

(i)   all awards of damages and all other compensation payable directly or indirectly because of a condemnation, proposed condemnation or taking for public or private use which affects all or part of the Property or any interest in it;

(ii)   all other awards, claims and causes of action, arising out of any breach of warranty or misrepresentation affecting all or any part of the Property, or for damage or injury to, or defect in, or decrease in value of all or part of the Property or any interest in it;

(iii)   all proceeds of any insurance policies payable because of loss sustained to all or part of the Property, whether or not such insurance policies are required by Grantee; and

(iv)   All interest which may accrue on any of the foregoing.

(b) Grantor shall immediately notify Grantee in writing if:

(i) any damage occurs or any injury or loss is sustained to all or part of the Property, or any action or proceeding relating to any such damage, injury or loss is commenced; or

(ii) any offer is made, or any action or proceeding is commenced, which relates to any actual or proposed condemnation or taking of all or part of the Property.

If Grantee chooses to do so, it may in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on breach of warranty or misrepresentation, or for damage or injury to, defect in, or decrease in value of all or part of the Property, and it may make any compromise or settlement of the action or proceeding.  Grantee, if it so chooses, may participate in any action or proceeding relating to condemnation or taking of all or part of the Property, and may join Grantor in adjusting any loss covered by insurance.

(c)  All proceeds of the Claims assigned to Grantee under this Paragraph shall be paid to Grantee in accordance with Section 2.08 of the Loan Agreement.  In each instance where the proceeds from any single Claim or aggregate of Claims is equal to or greater than $250,000.00, then in accordance with Section 2.08 of the Loan Agreement, Grantee may apply those proceeds first toward reimbursement of all of Grantee's costs and expenses of recovering such Net Insurance/Condemnation Proceeds, including attorneys' fees and Grantor further authorizes Grantee, at Grantee's option and in Grantee's sole discretion, and regardless of whether there is any impairment of the Property, (i) to apply the balance of such proceeds, or any portion of them, to pay or prepay some or all of the Secured Obligations in such order or proportion as Grantee may determine in accordance with the Loan Agreement, or (ii) to hold the balance of such Net Insurance/Condemnation Proceeds, or any portion thereof, in a segregated account to be used for the cost of reconstruction, repair or alteration of the Property, or (iii) to release the balance of such Net Insurance/Condemnation Proceeds, or any portion thereof, to Grantor provided that, no Event of Default exists, Grantee has approved in its sole discretion, a budget for the reconstruction, repair or alteration of the Property ("Restoration Budget") and any Net Insurance/Condemnation Proceeds not used by Grantor for such reconstruction, repair or alteration of the Property shall be immediately returned to Grantee.  In each instance where the Net Insurance/Condemnation Proceeds from any single Claim or aggregate of Claims is less than (but not equal to) $250,000.00, then in accordance with Section 2.08 of the Loan Agreement and provided that no Event of Default exists, such proceeds shall be remitted to Grantee and thereafter released to Grantor for purposes of reconstruction, repair or alteration of the Property related to the Net Insurance/Condemnation Proceeds derived from or related to such Claims subject to Grantee's approval of a Restoration Budget, in which case, any such Net Insurance/Condemnation Proceeds not used by Grantor for such reconstruction, repair or alteration of the Property shall be immediately returned to Grantee.  If any Net Insurance/Condemnation Proceeds are released to Grantor, Grantee shall not be obligated to see to, approve or supervise the proper application of such Net Insurance/Condemnation Proceeds.  If the Net Insurance/Condemnation Proceeds are held by Grantee to be used to reimburse Grantor for the costs of construction and repair of the Property, the Property shall be restored to the equivalent of its original condition, or such other condition as Grantee may approve in writing.  Grantee may, at Grantee's option, condition disbursement of all or any portion of such Net Insurance/Condemnation Proceeds on Grantee's approval of such plans

and specifications prepared by an architect satisfactory to Grantee, contractor's cost estimates, architect's certificates, waivers of liens, sworn statements of mechanics and materialmen, and such other evidence of costs, percentage of completion of construction, application of payments, and satisfaction of liens as Grantee may reasonably require.

(d)    In the event of damage or destruction to the buildings or Improvements now or hereafter situated on the Property, all insurance money paid to Grantee on account of such damage or destruction, less the actual costs, fees and expenses, if any, incurred in connection with adjustment of the loss, may, in Grantee's sole and absolute discretion, be released by Grantee pursuant to a Restoration Budget to be applied to payment (to the extent of actual restoration performed) of the cost of restoring, repair, replacing or rebuilding the Property substantially to its value immediately prior to such damage or destruction (the "Restoration"), including the cost of temporary repairs. Insurance proceeds released for Restoration shall be disbursed, from time to time, as such Restoration progresses subject to the following conditions:

(i)    Grantor is not then in Default under and no Default or Event of Default then exists with respect to any of the terms, covenants and conditions under the Loan Agreement, Note or this Deed to Secure Debt (or under any of the other Loan Documents); and

(ii)    The cost of Restoration is less than 50% of the insurable value of the building or buildings prior to such damage or destruction;

(iii)    Grantee shall first be given satisfactory proof that by the expenditure of such proceeds, the Property will be fully restored, free and clear of all liens and encumbrances, or, if such proceeds are insufficient to restore or rebuild the Property, Grantor shall either (1) deposit promptly with Grantee funds which, together with such proceeds, shall be sufficient to complete Restoration, or (2) provide other assurance satisfactory to Grantee (as determined by Grantee in its sole discretion) that Restoration will be completed; and

(iv)    In the event Grantor shall fail either to pursue Restoration diligently to completion or to complete Restoration within such period of time as determined by Grantee in its discretion, Grantee, at its option, may complete Restoration for or on behalf of Grantor and for such purpose may do all necessary acts in connection therewith or incidental thereto.

In the event any of the said conditions are not or cannot be satisfied, then Grantee may, in its sole and absolute discretion, apply such proceeds to payment of the Debt secured by this Deed to Secure Debt in any order of priority as determined by Grantee.  Notwithstanding anything to the contrary, under no circumstances shall Grantee become personally liable for the fulfillment of the terms, covenants and conditions contained in any of the Leases of the Property with respect to the matters referred to in this paragraph or be obligated to take any action to restore or repair all or any portion of the Property.  Grantee shall not be obligated to see to the proper application of any funds released hereunder, nor shall any amount so released or used be deemed a payment on account of the Debt secured by this Deed to Secure Debt.

Upon (i) completion of all the Restoration in a good workmanlike manner and substantially in accordance with the Restoration Budget and the plans and specifications therefor approved by Grantee and (ii) receipt by Grantee of satisfactory evidence that the Restoration has been completed and paid for in full (or, if any part of such Restoration has not been paid for, adequate security for such payment shall exist in form satisfactory to Grantee) (together with the issuance of any certificates and approvals as may be required by any Governmental Authorities having jurisdiction over the Property and Grantor), any balance of the insurance proceeds at the time held by Grantee shall be paid to Grantor or its designee provided Grantor is not then in Default under and no Event of Default then exists with respect to any of the terms or provisions of the Loan Agreement, the Note or the other Loan Documents.

If, while any insurance proceeds (including Net Insurance/Condemnation Proceeds) are being held by Grantee to reimburse Grantor for the cost of Restoration of all or any portion of the Property, Grantee shall be or become entitled to, and shall, accelerate the Debt secured by the Deed to Secure Debt upon the terms and conditions set forth in the Note, Grantee shall be entitled to apply all such proceeds then held by it in reduction of the Debt by this Deed to Secure Debt in any order of priority as determined by Grantee in its sole discretion secured and any excess held by it in excess of payment in full of the Debt secured by the Deed to Secure Debt (if any) shall be returned to Grantor or any party entitled thereto.

5.4 <u>Insurance</u>. At Grantee's request, Grantor shall provide Grantee with a counterpart original of any policy, together with a certificate of insurance setting forth the coverage, the limits of liability, the carrier, the policy number and the expiration date. Each such policy of insurance shall be in accordance with the Insurance Requirements and in form and content reasonably satisfactory to Grantor and Grantee pursuant to such Insurance Requirements, and shall be written only by companies approved by Grantee. In addition, each policy of hazard insurance shall include a Form 438BFU or equivalent loss payable endorsement in favor of Grantee except as otherwise may be agreed upon between Grantee and Grantor, in writing.

(a) <u>Hazard and Property Insurance</u>. Except as otherwise agreed to between Grantor and Grantee in writing, from time to time, Grantor will obtain and keep in full force (i) "All Risk" type property insurance to include as a minimum the perils of fire and extended coverage, vandalism, water damage, collapse, earthquake, and law and ordinance (demolition and increased cost of construction) coverage in an amount equal to 100% of the full insurable value of the Improvements (i.e., total cost less value of land and non-destructibles such as foundations, underground utilities, etc.); and (ii) personal property insurance as required by Grantee in an amount equal to 100% of the full insurable replacement value of the Personalty; and (iii) business income insurance in an amount equal to (y) annual net income plus continuing normal operating expenses, or (z) one year's rental value including, but not limited to rental income from all Leases or sub-leases which are assigned to Grantee; and (iv) flood insurance in the maximum amount available unless Grantee is furnished a surveyor's certificate indicating that the improvements are not located inside the special flood hazard Boundary Map or in Flood Insurance Rate Map (FIRM) Zones A, AE, A1-A30, AH, A), A99, VE, V1-V30 OR M).

(b) <u>Liability Insurance</u>. Except as otherwise agreed to between Grantor and Grantee in writing, from time to time, Grantor will obtain and keep in full force a "Broad

Form Comprehensive General Liability" insurance coverage for both Grantor and any contractor performing services to the Property in the coverage amounts required by the Insurance Requirements.

The policy or policies of insurance shall be in compliance with the Insurance Requirements and (i) contain a standard Grantee/mortgagee clause in favor of Grantee naming Grantee as a Grantee and additional insured  and including a lender's loss payee clause in such policy, as applicable, and (ii) be evidenced by original policies or certified copies of policies deposited with Grantee, as Grantee may elect, to be held by Grantee until the Debt shall have been fully paid and discharged. Grantor shall endeavor to require the insurer to include a provision that the policy or policies not be terminable or modified without thirty (30) days' prior written notice to Grantee. Grantor shall furnish Grantee satisfactory evidence of payment of all premiums required and similar evidence of renewal or replacement coverage not later than thirty (30) days prior to the date any coverage will expire.

Except as expressly agreed to between Grantor and Grantee, each insurance policy or endorsement required herein shall be written by an insurer having a rating not less than "AX" Best's Rating according to the most current edition of Best's Key Rating Guide as determined at the time of the initial policy and at all times during the term hereof.  All policies shall indicate that notices related to such insurance shall be sent to Grantee at:

> Specialty Credit Holdings, LLC
> Two Greenwich Plaza, 1st Floor
> Greenwich, Connecticut 06830
> Attn:  Andrew Scott

If any loss occurs having a material adverse effect upon with respect to the Property, Grantee is hereby appointed attorney-in-fact for Grantor to make proof of loss if Grantor fails to make the same in a commercially reasonable time, and in such event to give a receipt for any proceeds collected under such policies.  Grantor will promptly give written notice to Grantee of any loss or damage to the Property having a material adverse effect thereon, and will not adjust or settle any such loss without Grantee's prior written consent, which consent shall not be unreasonably withheld or delayed.  Upon any Default or Event of Default by Grantor under this Deed to Secure Debt, all right, title and interest of Grantor in and to all such insurance policies then in force, including any and all unearned premiums and existing claims, will inure to Grantee, which, at its option, and as attorney-in-fact for Grantor, may then make, settle and give binding acquittances for claims under all such policies, and may assign and transfer such policies or cancel or surrender them, applying any unearned premium in such manner as Grantee may elect.  The foregoing appointment of Grantee as attorney-in-fact for Grantor is coupled with an interest, and is irrevocable.  Notwithstanding the occurrence of any casualty or the availability of any insurance proceeds, Grantor will pay the Debt in the manner required by the Loan Documents.

5.5 <u>Maintenance, Preservation and Repair of Property</u>.

(a)  <u>Maintenance and Repairs</u>.  Grantor, at its sole cost, shall keep the Property in good condition (subject to reasonable and customary wear and tear) and shall make any and all repairs, renewals, replacements, servicing and reconstruction that are necessary to maintain the Property in good order, condition and repair.  Grantor shall not

commit or allow waste of all or any portion of the Property. Grantor shall not remove or demolish all or any portion of the Property or any part of it, or alter, restore or add to the Property, or initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except (i) as contemplated by the Loan Agreement; (ii) ordinary repairs or alterations anticipated for a Property of this nature; or (iii) except as contemplated by (i) and (ii), with Grantee's express prior written consent in each instance not to be unreasonably withheld. Grantor shall establish (and set aside in segregated deposits with Loan Servicer or such other Person as may be reasonably required by Grantee) funds in each Reserve and in such amounts acceptable to Grantee for Improvements, construction and/or for replacements, repairs and capital expenditures in accordance with the provisions of the Budget and in accordance with the Loan Agreement.

(b) <u>Reconstruction</u>. If all or a portion of the Property becomes damaged or destroyed, Grantor shall promptly and completely repair and/or restore the Property in a good and workmanlike manner in accordance with sound building practices. Immediately following the occurrence of any casualty or other loss, Grantor promptly will undertake all restoration required or desirable and will pursue it diligently to completion. Grantor shall (i) not strip, waste, remove or demolish any portion of the Property (except as contemplated by the Loan Agreement or as otherwise expected in regularly ordinary maintenance for a Property of this nature, nor affirmatively permit any such action; (ii) promptly comply with all applicable Laws of any kind affecting the Property or requiring any alterations or Improvements to be made thereon, and (iii) not commit or affirmatively permit any act upon the Property in violation of any applicable law, subject to Grantor's right to contest the same in good faith to conclusion as may be provided herein. If any public agency or authority requires or commences any proceedings for the demolition or removal, or both, of any improvements or portions thereof comprising the Property due to non-compliance with health, safety, fire or building codes, then, unless Grantor undertakes within the permitted time to contest such action in the manner as may be provided herein and pursues such contest to a successful conclusion, such action will constitute an Event of Default under this Deed to Secure Debt. Grantor will not, without Grantee's prior written consent, (i) make any material alterations, additions or Improvements to all or any portion of the Property; (ii) make any material change in the general nature of the use or occupancy of the Property; (iii) institute, join or acquiesce in any action to change the existing zoning or land use classification of all or any portion of the Property, or (iv) grant easements or licenses affecting the use or operation of all or any portion of the Property. Grantee and any Person authorized by Grantee may enter the Property at all reasonable times with advanced prior written notice for inspections or for any other lawful purpose. If Grantor fails to comply with the requirements of this Paragraph, resulting in an impairment in the value of the Property as determined by Grantee, then Grantee, without waiving the option to foreclose, may take any or all measures that Grantee reasonably deems necessary or desirable for the maintenance, repair, care, preservation and/or protection of the Property, and any expenses reasonably incurred by Grantee in so doing shall be added to the unpaid principal balance of the Loan and become part of the Debt secured hereby, and shall, at the option of Grantee, become immediately due and payable by acceleration, and shall bear interest at the Default Rate. Notwithstanding anything herein to the contrary, Grantee shall have no obligation to care for or maintain the Property, or, having taken some measures therefor, to continue same or take other measures.

(c)   Grantor shall not commit or expressly allow any act or omission upon or use of all or any portion of the Property which would violate any applicable law or order of any Governmental Authorities, whether now existing or which later may be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting all or any portion of the Property.  Grantor shall not bring or keep any article on the Property or cause or expressly allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Grantor on the Property or any part of it under this Deed to Secure Debt.

(d)   Grantor shall perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value.

5.6   Releases, Extensions, Modifications and Additional Security.  Without affecting the personal liability of any Person, including Grantor (or Guarantor, for the payment of the Secured Obligations) or the lien of this Deed to Secure Debt on all or any portion of the Property for the unpaid amount of the Secured Obligations, Grantee may from time to time and without notice:

(a)   release any Person liable for payment of any Secured Obligation;

(b)   extend the time for payment, or otherwise alter the terms of payment, of any Secured Obligations or any part thereof;

(c)   accept additional real or personal property of any kind as security for any Secured Obligations, whether evidenced by deeds to secure debt, security deeds, deeds of trust, mortgages, security agreements or any other instruments of security;

(d) substitute or release any Collateral securing the Secured Obligations;

(e)   consent to the making of any map of the Property or any part of it; or

(f)   release the Property (or any part of it from the lien of this Deed to Secure Debt).

5.7   Satisfaction and Cancellation.  If and when Grantor has paid and performed all of the Secured Obligations in full, Grantee will provide to Grantor, or at Grantee's option, file a satisfaction and cancellation of this Deed to Secure Debt and termination statements for filed financing statements or reconvey the Property to the Grantor.  Grantor shall be responsible for the recordation of such cancellation and satisfaction and the payment of any recording and filing costs. Upon the recording of such cancellation and satisfaction and the filing of such termination statements, the absolute assignments set forth in Paragraph 3 shall automatically terminate and become null and void.

5.8   Compensation and Reimbursement of Costs and Expenses.

(a)   Grantor agrees to pay fees in the maximum amounts provided or permitted by law, or fees as may be charged by Grantee when the law provides no maximum limit, for any services that Grantee or Loan Servicer may render in connection with this Deed to Secure Debt, including Grantee's or Loan Servicer's providing a statement of the Secured

Obligations.  Grantor shall also pay or reimburse all of Grantee's and Loan Servicer's out of pocket fees, costs and expenses which may be incurred in rendering any such services.

(b)  Grantor further agrees to pay or reimburse Grantee for all fees, costs, expenses and other advances (including protective advances) which may be incurred or made by Grantee to protect and/or preserve all or any portion of the Property or to enforce any terms of this Deed to Secure Debt, including the exercise of any rights or remedies afforded to Grantee hereunder, whether any lawsuit is filed or not, or in defending any action or proceeding arising under or relating to this Deed to Secure Debt, including reasonable attorneys' fees and other legal costs, costs of any sale of the Property and any cost of evidence of title (including, without limitation, foreclosure searches).

(c)  Grantor shall pay all obligations arising under this Paragraph within ten (10) days upon demand by Grantee.  Each such obligation shall be added to the then unpaid principal balance of the Loan, and shall constitute part of the Secured Obligations, and shall bear interest from the date the obligation arises at the rate provided in any instrument or agreement evidencing the Secured Obligations.  If more than one rate of interest is applicable to the Secured Obligations, the highest rate shall be used for purposes hereof.

5.9 Exculpation and Indemnification.

(a)  Grantee shall not be directly or indirectly liable to Grantor or any other Person as a consequence of any of the following:

(i)  Grantee's exercise of or failure to exercise any rights, remedies or powers granted to it in this Deed to Secure Debt or in any of the other Loan Documents;

(ii)  Grantee's failure or refusal to perform or discharge any obligation or liability of Grantor under any agreement related to the Property or under this Deed to Secure Debt;

(iii)  Grantee's failure to produce Rents and/or Rents (as defined herein) from the Property or to perform any of the obligations of the lessor under any of the Leases;

(iv)  any waste committed by lessees of the Property or any other parties, or any dangerous or defective condition of the Property; or

(v)  any loss sustained by Grantor or any third party resulting from any act or omission of Grantee in operating or managing the Property upon exercise of the rights or remedies afforded Grantee under this Deed to Secure Debt unless the loss is caused by the willful misconduct and bad faith of Grantee.

Grantor hereby expressly waives and releases all liability of the types described above, and agrees that no such liability shall be asserted against or imposed upon Grantee.  As used herein, "Rents" means all "Rents" applicable to all or any portion of the Property (as defined in Paragraph 6.3(f) hereof) including, without limitation, any revenues, royalties, income,

issues, proceeds, bonus monies, profits, security and other types of deposits (after Borrower acquires title thereto) and other benefits paid or payable by parties to the Leases and/or other contracts (other than Grantor) for using, leasing, licensing, possessing, operating from, residing in or otherwise enjoying all or any portion of the Property.

(b)   Grantor agrees to indemnify and hold harmless Grantee and each of Grantee's successors, assigns, employees, managers, directors, officers, partners, affiliates, agents and attorneys from and against any and all losses, damages, liabilities, claims, causes of action, judgments, court costs, reasonable attorneys' fees and other legal expenses, cost of evidence of title, cost of evidence of value, and other costs and expenses which Grantee may suffer or incur in performing any act required or permitted by this Deed to Secure Debt or by Law or because of any failure of Grantor to perform any of the Secured Obligations.  This agreement by Grantor to indemnify Grantee shall survive the release and cancellation of any or all of the Secured Obligations and the full release or any partial release of this Deed to Secure Debt but shall automatically terminate after expiration of any and all applicable statutes of limitation under applicable Law.

5.10 <u>Defense and Notice of Claims and Actions</u>.  At Grantor's sole expense, Grantor shall protect, preserve and defend the Property and all portions thereof, and title to and right of possession of the Property and all portions thereof, and the security of this Deed to Secure Debt and the rights and powers of Grantee created under it, against any and all adverse claims.  Grantor shall give Grantee prompt notice in writing if any claim is asserted or threatened which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

5.11   <u>Reporting Obligations</u>.   Grantor shall provide to Grantee (i) Financial Statements and reports in accordance with <u>Section 4.03</u> of the Loan Agreement.

5.12   <u>No Mortgagee-in-Possession</u>.   Grantor hereby confirms and agrees that notwithstanding any provisions contained in this Deed to Secure Debt or in the other Loan Documents, Grantor retains sole control of the operation and maintenance of the Property, subject to the Obligations of Grantor under the Loan Agreement and the other Loan Documents, and Grantee is not and shall not be deemed to be a mortgagee-in-possession.

6.  <u>ACCELERATING TRANSFERS, DEFAULT AND REMEDIES</u>.

6.1 <u>Accelerating Transfers</u>

(a)   "Accelerating Transfer" means, except as otherwise expressly permitted under the Loan Documents or as otherwise incurred by Grantor in the ordinary course of Grantor's business in connection with the sale or lease of any portion of the Property as expressly permitted pursuant to the terms of the Loan Agreement, any sale, contract to sell, lease, conveyance, encumbrance or other transfer, whether voluntary, involuntary, by operation of law or otherwise, of all or any portion of the Property or any interest therein.  If Grantor is a corporation, "Accelerating Transfer" also means any transfer of the voting power of Grantor.   If Grantor is a partnership, "Accelerating Transfer" also means withdrawal or removal of any general partner, dissolution of the partnership under applicable law, or any transfer of any of partnership interests of Grantor. If Grantor is a limited liability

company, "Accelerating Transfer" also means a breach under <u>Section 4.08</u> of the Loan Agreement.

(b)  Except as otherwise expressly permitted pursuant to the Loan Agreement, Grantor agrees that it shall not make any Accelerating Transfer unless and until the proposed transfer is preceded by Grantee's express written consent to the particular transaction and transferee.  Except as otherwise expressly permitted pursuant to the Loan Agreement, Grantee may withhold such consent in its sole discretion.  Subject to the provisions in the Loan Agreement, if any Accelerating Transfer occurs, Grantee in its sole discretion may declare all of the Secured Obligations to be immediately due and payable, and Grantee a may exercise any rights and remedies provided under this Deed to Secure Debt.

6.2  <u>Events of Default</u>.  In addition to any "Event of Default" occurring under the Note or the Loan Agreement, the occurrence of any one or more of the following events, at the option of Grantee, shall constitute an event of default (together with any Event of Default under the Note and/or the Loan Agreement, an "<u>Event of Default</u>") under this Deed to Secure Debt subject to expiration of any and all applicable, notice, grace and/or cure periods under the applicable Loan Documents:

(a)  An Event of Default under any of the other Loan Documents or under any other mortgage, instrument or document evidencing, securing or guaranteeing payment of the Debt, in whole or in part, or otherwise executed and delivered in connection with the Loan Documents or the Loan evidenced and secured thereby;

(b)  if the Grantor shall default under any provision under this Deed to Secure Debt;

(c)  if any portion of the Property becomes subject: (i) to any tax lien, other than a lien for local real estate taxes and assessments not due and payable, or (ii) to any lis pendens, notice of pendency, stop order, judgment, notice of intention to file mechanic's or materialman's lien, mechanic's, materialman's or other lien, and the same have not been (i) discharged, with prejudice, within sixty (60) days of filing thereof or (ii) bonded or insured over by Grantor, within thirty (30) days of filing thereof, at its sole cost and expenses, in an amount and on terms and conditions satisfactory to Grantee within its sole discretion;

(d)  if, except in accordance with the terms and provisions of the Deed to Secure Debt and applicable Law, Grantor shall have entered into any secondary financing secured by the Property or shall have consented to the placing of any lien, mortgage, Deed to Secure Debt or other encumbrance upon any of the Collateral granted to Grantee without prior written consent of Grantee;

(e)  any failure of Grantor to adhere in any material respect to any applicable Laws that govern the Property and such failure continues for thirty (30) days notice to Grantor;

(f)  if Grantor, without Grantee's written consent, guarantees, assumes, endorses or otherwise in any way becomes, directly or indirectly, responsible or liable for any other debts or obligations, including, without limitation, the debts or obligations of any

Person, except for such debts incurred by Grantor in connection with the renovation and operation of the Property;

        (g)     the sale, transfer, encumbrance (excluding Notice of Commencements to be recorded against title as may be permitted under applicable Law), conveyance or assignment of all or any portion of the Property, directly or indirectly, except in accordance with the provisions of this Deed to Secure Debt and the other Loan Documents; or

        (h)     As described in the Loan Agreement.

      6.3 <u>Remedies</u>. At any time after the occurrence of an Event of Default, Grantee may, at Grantee's election and by or through a trustee or otherwise, be entitled to exercise any and all of the rights and remedies described below (provided such are permitted by applicable Law), as well as any other rights and remedies authorized by Law, including, without limitation, such remedies described in <u>Paragraph 7.18</u>. All of such rights and remedies hereunder shall be cumulative, and the exercise of any one or more of them shall not constitute an election of remedies.

        (a)     Grantee may accelerate and declare any or all of the Secured Obligations to be due and payable immediately, without notice of default, notice of acceleration or intention to accelerate, presentment or demand for payment, protest, notice of protest, notice of nonpayment or dishonor, or notices or demands of any kind or character (all of which are hereby waived by Grantor).

        (b)     As a matter of right without regard to the adequacy of the security or the solvency of any Person liable for the Secured Obligations, Grantee shall be entitled, upon application to a court of competent jurisdiction, to the immediate appointment of a receiver for all or any part of the Property and all Rents and/or Rents, whether such receivership may be incidental to a proposed sale of the Property or otherwise, and Grantor hereby consents to the appointment of such a receiver and agrees that such receiver shall have all of the rights and powers granted to Grantee herein. In addition, to the extent permitted by law, and with or without the appointment of a receiver, or an application therefor, Grantee may (a) enter upon, and take possession of (and Grantor shall surrender actual possession of), the Property or any part thereof, without notice to Grantor and without bringing any legal action or proceeding, or, if necessary by force, legal proceedings, ejectment or otherwise, and (b) remove and exclude Grantor and its agents (including Grantor's property manager) and any of their employees therefrom and (c) and/or do any and all other things which it may in its sole discretion consider necessary and appropriate to protect the security of this Deed to Secure Debt. The appointment of such receiver shall be a matter of strict right to Grantee, regardless of the adequacy of security or of the solvency of any party obligated for payment of the Debt. All fees, expenses and compensation incurred pursuant to any such receivership shall be secured by the lien of this Deed to Secure Debt until paid. The receiver, personally or through agents, may exclude Grantor wholly from the Property and have, hold, use, operate, manage and control the Property and may, in the name of Grantor, exercise all of Grantor's rights and powers to maintain, construct, operate, restore, insure and keep insured the Property in such manner as such receiver deems appropriate. Such other things may include: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers or Grantee under, this Deed to Secure Debt; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien

which in Grantee's sole judgment is or may be senior in priority to this Deed to Secure Debt, such judgment of Grantee to be conclusive as among the parties to this Deed to Secure Debt; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under this Deed to Secure Debt; otherwise caring for and protecting any and all of the Property; and/or employing counsel, accountants, contractors and other appropriate Persons to assist Grantee.  Grantee may take any of the actions permitted hereunder either with or without giving notice to any Person.  Grantor agrees to deliver to Grantee, all books and records pertaining to the Property, including computer-readable memory and any computer hardware or software necessary to access or process such memory, as may be requested by Grantee in order to enable Grantee to exercise its rights under this Paragraph.

(c)  If an Event of Default shall have occurred and be continuing hereunder, Grantee may (i) sell all or any part of the Property at public auction to the last and highest bidder for cash (free of any equity of redemption, homestead, dower, courtesy or other exemption, all of which are expressly waived by Grantor) at such time and place and upon such terms and conditions as may be required by applicable law or rule of court and after having complied with the Georgia law applicable to power of sale foreclosures provided in Title 44 of Chapter 14 of the O.C.G.A. (a "Power of Sale Foreclosure"); (ii) elect to foreclose this Deed to Secure Debt pursuant to a judicial foreclosure action; or (iii) take such other action at law, equity or by contract for the enforcement of this Deed to Secure Debt and realization on the security herein or elsewhere provided for, as the law may allow. In any action or proceeding to foreclose this Deed to Secure Debt or to collect the sums secured hereby, Grantee may proceed therein to final judgment and execution for the entire unpaid balance of the Secured Obligations, together with all future advances and any other sums due by Grantor in accordance with the provisions of this Deed to Secure Debt, together with interest from the date of default at the Default Rate and all expenses of sale and of all proceedings in connection therewith, including attorneys' fees. The unpaid balance of any judgment shall bear interest at the greater of (i) the statutory rate provided for judgments, or (ii) the Default Rate.

If the Secured Obligations are not paid in full when the same shall become due, whether by acceleration or otherwise, Grantee, at its option and without notice, may sell the Property or any part of the Property at public sale or public sales before the door of the courthouse of the county in which the Property or any part of the Property is situated, to the highest bidder for cash, in order to pay the Secured Obligations and all expenses of the sale and of all proceedings in connection therewith, including attorney's fees actually incurred after advertising the time, place and terms of sale once a week for four (4) weeks immediately preceding such sale (but without regard to the number of days) in a newspaper in which Sheriff's sales are advertised in said county.  At any such public sale or public sales, Grantee may execute and deliver to the purchaser a conveyance of the Property or any part of the Property in fee simple, with full warranties of title, and to this end, Grantor hereby constitutes and appoints Grantee the agent and attorney-in-fact of Grantor to make such sale and conveyance, and thereby to divest Grantor of all right, title or equity that Grantor may have in and to the Property and to vest the same in the purchaser or purchasers at such sale or sales, and all the acts and doings of said agent and attorney-in-fact are hereby ratified and confirmed and any recitals in said conveyance or conveyances as to facts essential to a valid sale shall be binding upon Grantor. The aforesaid power of sale and agency hereby granted are coupled with an interest and are irrevocable by death or otherwise, and are granted as cumulative of the other remedies provided hereby or by law for collection of the Secured Obligations and shall not be exhausted by one exercise thereof but may be exercised until full payment of all of the Secured Obligations.  In the event of any sale under this Security Deed by virtue of the exercise of the powers herein granted, or

pursuant to any order in any judicial proceeding or otherwise, the Property may be sold as an entirety or in separate parcels and in such manner or order as Grantee in its sole discretion may elect, and if Grantee so elects, Grantee may sell the personal property covered by this Security Deed at one or more separate sales in any manner permitted by the Uniform Commercial Code of the State of Georgia, and one or more exercises of the powers herein granted shall not extinguish nor exhaust such powers, until the entire Property is sold or the Secured Obligations are paid in full. Accordingly, Grantee shall be entitled, but not obligated, to hold multiple sales of portions of the Property until the entirety of the Property is sold pursuant to this section. If the Secured Obligations are now or hereafter further secured by any chattel mortgages, pledges, contracts of guaranty, assignments of lease or other security instruments, Grantee may at its option exhaust the remedies granted under any of said security instruments either concurrently or independently, and in such order as Grantee may determine.  Upon any foreclosure sale, Grantee may bid for and purchase the Property and shall be entitled to apply all or any part of the Secured Indebtedness as a credit to the purchase price.

(d)   Grantee shall have the right from time to time to sue Grantor for any sums (whether interest, principal or any installments thereof, taxes, penalties, or any other sums required to be paid under the terms of this Deed to Secure Debt, as the same become due), without regard to whether or not any of the other Secured Obligations shall be due, and without prejudice to the right Grantee thereafter to enforce any appropriate remedy against Grantor, including an action of foreclosure, an action for specific performance or any other action, for an Event of Default or Events of Default existing at the time such earlier action was commenced.

(e)   Grantee shall have the right to terminate the License with or without notice to or demand upon Grantor, and without regard to the adequacy of the security for the Secured Obligations and thereafter the License (as defined in Paragraph 3.2 hereof) shall be automatically and immediately revoked and terminated. Grantee may pursue any remedy available under applicable Law.   Grantor hereby irrevocably authorizes and directs the tenants under any and all Leases (if any) to pay all Rents to Grantee instead of to Grantor, upon receipt of written notice from Grantee, without the necessity of any inquiry of Grantor and without the necessity of determining the existence or non-existence of an Event of Default. Grantor hereby appoints Grantee as attorney-in-fact with full power of substitution, which appointment shall take effect upon the occurrence of an Event of Default and is coupled with an interest and is irrevocable prior to the full and final payment and performance of the Secured Obligations, in Grantor's name for the benefit of Grantee: (a) to endorse all checks and other instruments received in payment of Rents and to deposit the same in any account selected by Grantee; (b) to give receipts and releases in relation thereto; (c) to institute, prosecute and/or settle actions for the recovery of Rents; (d) to modify the terms of any Leases including terms relating to the Rents payable thereunder; (e) to cancel any contract to purchase or purchase and sale agreement with respect to the Property; and (f) to do all other acts and things with respect to the Rents which Grantee may deem necessary or desirable to protect the security for the Obligations.

(f)   Grantor has, pursuant to Paragraph 8.7, assigned to Grantee all Rents under each of the Leases covering all or any portion of the Property. Grantee,  may, at any time, and without notice, either in person, by agent, or by receiver to be appointed by a court, enter and take possession of the Property or any part thereof, and in its own name, sue for or otherwise collect the Rents. Grantee may (in its sole discretion), upon the occurrence of an

Event of Default, deliver a rent demand to Grantor ("Rent Demand") or deliver a notice of enforcement to all or any of the lessees. Grantor agrees that any Rent Demand sent by Grantee may be sent to Grantor pursuant to the notice provisions set forth in Paragraph 7.12. Grantor shall, within ten (10) days after its receipt of a Rent Demand, deliver to Grantee such Rents as are described in the Rent Demand. All Rents collected by Grantee, shall be applied as provided in Paragraph 8.7, provided, however, that if the costs, expenses, and attorneys' fees shall exceed the amount of Rents collected, the excess shall be added to the Debt, shall bear interest at the Default Rate, and shall be immediately due and payable. The entrance upon and possession of the Property, the collection of Rents, and the application thereof as set forth above shall not cure or waive any Event of Default or notice of default, if any, hereunder nor invalidate any action pursuant to such notice. Failure or discontinuance by Grantee, at any time or from time to time, to collect said Rents shall not in any manner impair the subsequent enforcement by Grantee, of the right, power, and authority herein conferred upon it. Nothing contained herein, nor the exercise of any right, power, or authority herein granted to Grantee shall be, or shall be construed to be, an affirmation by it of any tenancy, lease, or option, nor an assumption of liability under, nor the subordination of, the lien or charge of this Deed to Secure Debt, to any such tenancy, lease, or option, nor an election of judicial relief, if any such relief is requested or obtained as to Leases or Rents, with respect to the Property or any collateral given by Grantor to Grantee. In addition, from time to time, Grantee may elect, and notice hereby is given to each lessee of such right, to subordinate the lien of this Deed to Secure Debt to any Lease by unilaterally executing and recording an instrument of subordination, and upon such election, the lien of this Deed to Secure Debt shall be subordinate to the Lease identified in such instrument of subordination; provided, however, in each instance, such subordination will not affect or be applicable to (and will expressly exclude any) lien, charge, encumbrance, security interest, claim, easement, restriction, option, covenant, and other rights, titles, interests, or estates of any nature regarding all or any portion of the Property to the extent that the same may have arisen or intervened during the period between recordation of this Deed to Secure Debt and the execution of the Lease identified in such instrument of subordination.

(g)   Upon obtaining possession of the Property or upon the appointment of a receiver, Grantee or the receiver, as the case may be, may, at its sole option, (a) make all necessary or proper repairs and additions to or upon the Property, (b) operate, maintain, control, make secure and preserve the Property, and (c) complete the construction of any unfinished Improvements on the Property and, in connection therewith, continue any and all outstanding contracts for the erection and completion of such Improvements and make and enter into any further contracts which may be necessary, either in their or its own name or in the name of Grantor (the costs of completing such Improvements shall be expenses secured by this Deed to Secure Debt and shall accrue interest as provided in any instrument or agreement evidencing the Secured Obligations and if more than one rate of interest is applicable to the Secured Obligations, the highest rate shall be used for purposes hereof). Grantee or such receiver shall be under no liability for, or by reason of, any such taking of possession, entry, holding, removal, maintaining, operation or management, except for gross negligence or willful misconduct.  The exercise of the remedies provided in this Paragraph shall not cure or waive any Event of Default, and the enforcement of such remedies, once commenced, shall continue for so long as Grantee shall elect, notwithstanding the fact that the exercise of such remedies may have, for a time, cured the original Event of Default.

(h) Grantee at its election, may proceed under the Uniform Commercial Code as to all or any part of the Personalty and/or any security granted to Grantee hereunder or under any Pledge Agreement or the other Loan Documents and in conjunction therewith may exercise all of the rights, remedies and powers of a secured creditor under the Uniform Commercial Code. Upon the occurrence of any Event of Default, Grantor shall assemble all of the accessories and make the same available within the Improvements. Any notification required by the Uniform Commercial Code shall be deemed reasonably and properly given if sent in accordance with the Notice provisions of this Deed to Secure Debt at least ten (10) days before any sale or other disposition of the Personalty and/or any Collateral granted under any Pledge Agreement. Disposition of the Personalty and/or any Collateral granted under any Pledge Agreement shall be deemed commercially reasonable if made pursuant to a public sale advertised at least twice in a newspaper of general circulation in the community where the Property is located. Disposition of the Personalty and/or any Collateral granted under any Pledge Agreement shall be deemed commercially reasonable if made pursuant to a private sale if sent in accordance with the Notice provisions of this Deed to Secure Debt at least ten (10) days before any private sale or other disposition thereof. It shall be deemed commercially reasonable for the Grantee to dispose of the Personalty and/or any Collateral granted under any Pledge Agreement without giving any warranties as to the Personalty and/or any Collateral granted under any Pledge Agreement and specifically disclaiming all disposition warranties. Alternatively, Grantee may choose to dispose of some or all of the Property, in any combination consisting of both Personalty and the Land, in accordance with the law and procedures applicable to real property, as permitted by Article 9 of the Uniform Commercial Code. Grantor agrees that such a sale of Personalty together with the Land constitutes a commercially reasonable sale of the Personalty.

(i) Grantee shall have the right from time to time to protect, exercise and enforce any legal or equitable remedy against Grantor provided under the Debt Instrument or any documents or agreements executed or delivered in connection therewith or by applicable laws.

(j) Grantee may, within its sole discretion, replace the manager of Grantor with an entity or individual selected by Grantee. Grantee may replace the property manager of the Property at its sole discretion.

6.4 <u>Application of Sale Proceeds and Rents</u>.

(a) Grantee, shall apply the proceeds of any sale of the Property in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs, fees and expenses of the sale, including costs of evidence of title in connection with the sale and legal fees and costs; and, second, to pay all other Secured Obligations in any order and proportions as Grantee in its sole discretion may choose until paid in full. The remainder, if any, shall be remitted to the Person or Persons entitled thereto.

(b) Grantee shall apply any and all Rents collected by it, and any and all sums in the following manner: first, to pay the portion of the Secured Obligations attributable to the costs and expenses of operation or collection (or both of them) that may be incurred by Grantee or any receiver; and, second, to pay all other Secured Obligations in any order and proportions as Grantee in its sole discretion may choose until paid in full. The remainder, if any, shall be remitted

to the Person or Persons entitled thereto.  Grantee shall not have any liability for any funds which it does not actually receive.

### 6.5  Waivers and Agreements Regarding Remedies.

To the full extent subject to applicable law Grantor may do so, Grantor hereby:

(a)  agrees that, subject to applicable law, it will not at any time plead, claim or take advantage of any laws now or hereafter in force providing for any appraisement, valuation, stay, extension or redemption, and waives and releases all rights of redemption, valuation, appraisement, stay of execution, reinstatement, extension and notice of election to accelerate the Secured Obligations;

(b)  waives all rights, legal and equitable, it may now or hereafter have, to require a marshalling of the assets of Grantor, including the Property, or to a sale in the inverse order of alienation in the event of a foreclosure of the Property, and agrees not to assert any right under any law pertaining to the marshalling of assets, the sale in inverse order of alienation, the exemption of homestead, the administration of estates of decedents, or other matters whatsoever to defeat, reduce or affect the right of Grantee under the terms of this Deed to Secure Debt to a sale of the Property without any prior or different resort for collection, or the right of Grantee to the payment of the Secured Obligations out of the proceeds of sale of the Property in preference to every other claimant whatsoever and each successor and assign of Grantor, including any holder of a lien subordinate to this Deed to Secure Debt, by acceptance of its interest or lien agrees that it shall be bound by the above waivers, as if it had given the waivers itself; and

(c)  waives any right to bring or utilize any defense, counterclaim or setoff, other than a mandatory counterclaim or one which denies the existence or sufficiency of the facts upon which any foreclosure action is grounded.  If any defense, counterclaim or setoff, other than one permitted by the preceding clause, is timely raised in a foreclosure action, such defense, counterclaim or setoff shall be dismissed.  If such defense, counterclaim or setoff is based on a Claims which could be tried in an action for money damages, such Claims may be brought in a separate action for money damages shall not be deemed to afford any grounds for staying the foreclosure action.

6.6    WAIVER OF GRANTOR'S RIGHTS.  BY EXECUTION OF THIS DEED TO SECURE DEBT, GRANTOR EXPRESSLY: (A) ACKNOWLEDGES THE RIGHT OF GRANTEE TO ACCELERATE THE DEBT EVIDENCED BY THE LOAN AGREEMENT AND NOTE AND ANY OTHER DEBT WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE (IF ANY) AS IS SPECIFICALLY REQUIRED TO BE GIVEN UNDER THE PROVISIONS OF THIS DEED TO SECURE DEBT OR PURSUANT TO APPLICABLE LAW; (B) WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE CONSTITUTION OF THE UNITED STATES (INCLUDING, WITHOUT LIMITATION, THE FIFTH AND FOURTEENTH AMENDMENTS THEREOF), THE VARIOUS PROVISIONS OF THE CONSTITUTIONS OF THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW, (1) TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY GRANTEE, OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO GRANTEE, OR PROVIDED TO GRANTEE, EXCEPT SUCH NOTICE (IF ANY) AS IS SPECIFICALLY REQUIRED TO BE GIVEN UNDER

THE PROVISIONS OF THIS DEED TO SECURE DEBT AND (2) CONCERNING THE APPLICATION, RIGHTS OR BENEFITS OF ANY STATUTE OF LIMITATION OR ANY MORATORIUM, REINSTATEMENT, MARSHALING, FORBEARANCE, APPRAISEMENT, VALUATION, STAY, EXTENSION, HOMESTEAD, EXEMPTION OR REDEMPTION LAWS; AND (C) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION AND THAT THIS DEED TO SECURE DEBT IS VALID AND ENFORCEABLE BY GRANTEE, ON BEHALF OF BENEFICIARY AGAINST GRANTOR IN ACCORDANCE WITH ALL THE TERMS AND CONDITIONS HEREOF.

Grantor Initials _____

7.      MISCELLANEOUS PROVISIONS

7.1 No Waiver or Cure.

(a)   Each waiver by Grantee must be in writing, and no waiver shall be construed as a continuing waiver.  No waiver shall be implied from any delay or failure Grantee to take action on account of any default of Grantor.  Consent by Grantee to any act or omission by Grantor shall not be construed as consent to any other or subsequent act or omission or to waive the requirement for Grantee's consent to be obtained in any future or other instance.

(b)   If any of the events described below occurs, that event alone shall not cure or waive any breach, Event of Default or notice of default under this Deed to Secure Debt or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed); or impair the security of this Deed to Secure Debt; or prejudice the Grantee or any receiver in the exercise of any right or remedy afforded any of them under this Deed to Secure Debt; or be construed as an affirmation by Grantee of any tenancy, lease or option, or a subordination of the lien of this Deed to Secure Debt:

(i)   Grantee, its agents or a receiver takes possession of all or any part of the Property;

(ii)   Grantee collects and applies Rents, either with or without taking possession of all or any part of the Property;

(iii)   Grantee receives and applies to any Secured Obligation proceeds of any Property, including any proceeds of insurance policies, condemnation awards, or other claims, property or rights assigned to Grantee under this Deed to Secure Debt;

(iv)   Grantee makes a site visit, observes the Property and/or conducts tests thereon;

(v)   Grantee receives any sums under this Deed to Secure Debt or any proceeds of any Collateral held for any of the Secured Obligations, and applies them to one or more Secured Obligations; or

(vi)   Grantee or any receiver performs any act which it is empowered or authorized to perform under this Deed to Secure Debt or invokes any right or remedy provided under this Deed to Secure Debt.

7.2 <u>Powers</u>.   Grantee may take any of the actions permitted under <u>Paragraph 6.3(b)</u> regardless of the adequacy of the security for the Secured Obligations, or whether any or all of the Secured Obligations have been declared to be immediately due and payable, or whether notice of default and election to sell has been given under this Deed to Secure Debt.

7.3 <u>No Broker</u>.   No Person acting on behalf of the Grantor is or will be entitled to any commission or brokers or finder's fees in connection with the transactions contemplated by this Deed to Secure Debt.

7.4 <u>Merger</u>.   No merger shall occur as a result of Grantee's acquiring any other estate in or any other lien on the Property unless Grantee consents to a merger in writing.

7.5 <u>Joint and Several Liabilities</u>.   If Grantor consists of more than one Person, each shall be jointly and severally liable for the faithful performance of all of Grantor's Obligations under this Deed to Secure Debt.

7.6 <u>Applicable Law</u>.   THE PROVISIONS OF THIS DEED TO SECURE DEBT REGARDING THE CREATION, PERFECTION AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS HEREIN GRANTED SHALL BE GOVERNED BY, AND BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED. ALL OTHER PROVISIONS OF THIS SECURITY INSTRUMENT, ANY CLAIM OR CONTROVERSY ARISING OUT OF THE SUBJECT MATTER HEREOF WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE, AND THE RIGHTS AND OBLIGATIONS OF GRANTOR AND GRANTEE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF, WITHOUT REGARD TO CHOICE OF LAW RULES, TO THE EXTENT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND FURTHER, NOTWITHSTANDING THE FOREGOING, WITH RESPECT TO ANY PERSONAL PROPERTY INCLUDED IN THE "PROPERTY", THE CREATION OF THE SECURITY INTEREST THEREIN SHALL BE GOVERNED BY THE UNIFORM COMMERCIAL CODE IN EFFECT IN THE STATE OF NEW YORK FROM TIME TO TIME AND THE PERFECTION, THE EFFECT OF PERFECTION OR NON-PERFECTION AND PRIORITY OF SUCH SECURITY INTEREST SHALL BE GOVERNED IN ACCORDANCE WITH THE MANDATORY CHOICE OF LAW RULES SET FORTH IN THE UNIFORM COMMERCIAL CODE IN EFFECT IN THE STATE OF NEW YORK FROM TIME TO TIME.

7.7 <u>Successors in Interest</u>.  The terms, covenants and conditions of this Deed to Secure Debt shall be binding upon and inure to the benefit of the heirs, successors and assigns of the parties.  However, this Paragraph does not waive the provisions of <u>Paragraph 6.1</u>.

7.8 <u>Declarant's Rights</u>.  Grantor understands, acknowledges and agrees that in the event Grantor creates or acquires any rights as declarant (or title of similar effect) under a declaration of covenants, conditions, restrictions or easements (or any or all of the foregoing), such rights shall immediately upon their creation become Collateral for the Debt secured by this Deed to Secure Debt by virtue of <u>Paragraph 1.1</u> above (subject however, to any interests of any third parties under such declaration(s)).  Furthermore, Grantee's acceptance of such Collateral in no way obligates Grantee to subordinate its security title to the Property to any such declaration and Grantee shall have, upon foreclosure, if any, the full right and authority to cause termination of any such declaration by operation of Law.  Grantor further understands that it shall be Grantee's sole option, upon foreclosure, if any, to permit any such declaration to survive foreclosure with Grantee becoming (or not becoming, at Grantee's sole option) declarant upon foreclosure (assuming Grantee becomes owner of the Property at foreclosure).  Upon Grantee's ownership of such rights and subject to any interests of any third parties thereunder (if any), Grantee shall be fully entitled to transfer and convey such rights to any third party which Grantee may from time to time determine, in its sole discretion.

7.9 <u>Interpretation</u>.  Whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender.  The captions of the paragraphs or sections of this Deed to Secure Debt are for convenience only and do not define or limit any terms or provisions.  The word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to."  The word "obligations" or "Obligations" is used in its broadest and most comprehensive sense, and includes the defined term "Obligations" under the Loan Agreement and any and all primary, secondary, direct, indirect, fixed and contingent obligations.  It further includes all principal, interest, prepayment charges, late charges, loan fees and any other fees and charges accruing or assessed at any time, as well as all obligations to perform acts or satisfy conditions.  No listing of specific instances, items or matters in any way limits the scope or generality of any language of this Deed to Secure Debt.  The Exhibits to this Deed to Secure Debt are hereby incorporated in this Deed to Secure Debt.

7.10 <u>Estoppel Letters</u>.  As and when, from time to time, requested by Grantee or Grantor, and within ten (10) days after any such request, Grantee or Grantor (as the case may be) will execute and deliver to or at the direction of Grantee or Grantor, such estoppel letters certifying such matters relating to this Deed to Secure Debt or the Loan Documents, or both, as may be reasonably be required.

7.11 <u>Severability</u>.  If any provision of this Deed to Secure Debt should be held unenforceable or void, that provision shall be deemed severable from the remaining provisions and in no way affect the validity of this Deed to Secure Debt except that if such provision relates to the payment of any monetary sum, then Grantee may, at its option, declare all Secured Obligations immediately due and payable.

7.12 <u>Notices</u>.  Grantor hereby requests that a copy of notice of default and notice of sale be mailed to it at the address set forth below.  That address is also the mailing address of

Grantor as debtor under the Uniform Commercial Code.  Grantee's address given below is the address for Grantee as secured party under the Uniform Commercial Code.

Addresses for Notices to Grantor:       c/o ARIAM Partners, LLC
                                         1020 Powers Place
                                         Alpharetta, GA 30009
                                         Attention: Joe Harker
                                         E-mail:  jharker@ariampartners.com

     With a copy to:                     Polsinelli PC
                                         150 N. Riverside Plaza, Suite 3000
                                         Chicago, IL 60606
                                         Attention: Douglas Noren
                                         E-mail: DNoren@Polsinelli.com

Address for Notices to Grantee:          Specialty Credit Holdings, LLC
                                         Two Greenwich Plaza, 1st Floor
                                         Greenwich, Connecticut 06830
                                         Attention: Andrew Scott
                                         E-mail:  ascott@silverpointcapital.com

     With a copy to:                     Mahadeva, PLLC
                                         80 Business Park Drive, Suite 201
                                         Armonk, New York 10504
                                         Attn:  Prassana Mahadeva
                                         E-mail:  pmahadeva@mahadevalaw.com

      7.13 _Grantor as Tenant Holding Over_.  In the event of a foreclosure sale of the Property, Grantor shall be deemed a tenant holding over and shall forthwith deliver possession to Grantee or any purchaser or purchasers at such sale (or to any designee of Grantee) or be summarily dispossessed according to provisions of any Law of the State of Georgia applicable to tenants holding over.

      7.14   _Secured Fees_.  This Deed to Secure Debt secures the unpaid amount of the Debt at any given time, including without limitation, any unpaid Usage Fee, Make-Whole Amount, Origination Fee, Extension Fee and any unpaid portions thereof.

      7.15   _Time of the Essence_.  Time is of the essence with respect to each and every covenant, agreement, and obligation of Grantor under this Deed to Secure Debt and the other Loan Documents, and any and all other instruments now or hereafter evidencing, securing or otherwise relating to the Loan.

      7.16   _Hazardous Substances_.  Grantor covenants and agrees with Grantee that, throughout the term of the Note:  (a) the Property shall be operated and maintained by or on behalf of Grantor in compliance with all applicable Laws that govern the Property; (b) Grantor shall maintain or procure all necessary and applicable permits, licenses, and certificates required by federal, state, and local laws throughout the Loan Term; (c) all hazardous or toxic substances, within

the definition of any applicable statute or regulation, which may be used by any person for any purpose upon the Property, shall be used or stored thereon only in a safe and approved manner, in accordance with all industrial standards and all laws, regulations and requirements for such storage promulgated by any applicable governmental agency or authority; (d) other than as described in (c) above, Property will not be used for the purpose of storing such substances; and (e) other than as described in (c) above, no such storage or use will otherwise be allowed on the Property (whether through Leases with tenants who might store or use hazardous substances or otherwise) which will cause, or which will increase the likelihood of causing, the release of such hazardous or toxic substances onto the Property.  Grantor shall immediately notify Grantee of any failure to comply under this Paragraph or receipt of any notice of violation or third party complaint.  Grantor hereby agrees to indemnify and save and hold Grantee harmless of and from all claims, damages, loss, liabilities, penalties, fines, remedial action requirements, and enforcement actions, along with the costs and attorneys' fees incurred by Grantee in defending Grantor's use, generation, transportation, and disposal, release, or threatened release of hazardous substances, including without limitation, asbestos-containing materials or damage whatsoever incurred by Grantee arising out of or by reason of any violation of any applicable statute or regulation for the protection of the environment which occurs upon the Property from and after the date hereof which has a material adverse effect upon the Property, or by reason of the imposition of any governmental lien for the recovery of environmental clean-up costs expended by reason of such violation, including without limitation any lien arising pursuant to any so-called "Super Fund" or "Super Lien" legislation.  The indemnification provided for in this section shall not apply to losses which arise by reason of the gross negligence or willful misconduct of Grantee.  A default under this Paragraph shall constitute an Event of Default under this Deed to Secure Debt provided that prior to an Event of Default being declared, Grantor is provided written notice of said default, Grantor immediately undertakes commercially reasonable efforts to cure such Event of Default and such Event of Default is actually cured to Grantor's sole satisfaction within and forty-five (45) days. It is expressly acknowledged by Grantor that this indemnification shall survive any foreclosure of the lien and security interest of this Deed to Secure Debt or the discharge of this Deed to Secure Debt and shall inure to the benefit of Grantee, its successors and assigns.  Notwithstanding the provisions of this Deed to Secure Debt to the contrary, the indemnification obligations of Indemnitor hereunder shall terminate one (1) year after the full and complete payment by Grantor of the Debt evidenced and secured by the Loan Documents provided that contemporaneously at the time of such payment in full of the Debt, Grantor furnishes to the Grantee an updated environmental report in form and substance, and from a qualified environmental consultant reasonably acceptable to Grantee, which updated environmental report discloses, as of the date of such repayment of the Debt in full, there are no actual or threatened  (A) non-compliance with or violation of applicable Environmental Laws (or permits issued pursuant to Environmental Laws) in connection with the Property or operations thereon, (B) environmental liens encumbering the Property, (C) administrative processes or proceedings or judicial proceedings  by any Governmental Authorities in any way connected with any matter addressed in this Agreement or in the Indemnity; or (D) presence or Release of Hazardous Substances in, on, above, or under the Property that has not been fully remediated in accordance with all applicable Environmental Laws.

     7.17    <u>Environmental Assessments</u>.  If an Event of Default by Grantor shall have occurred and be continuing beyond any cure period applicable thereto, Grantee may, at its election, obtain an environmental assessments of the Property prepared by a geohydrologist, an independent engineer, or other qualified consultant or expert approved by Grantee evaluating or confirming (i) whether any hazardous substances are present in the soil or water at the Property and (ii) whether the use and operation of the Property comply with all applicable environmental laws relating to air

quality, environmental control, release of oil, hazardous materials, hazardous wastes and hazardous substances, and any and all other applicable environmental laws. Environmental assessments may include detailed visual inspections of the Property including, without limitation, any and all storage areas, storage tanks, drains, dry wells, and leaching areas, and the taking of soil samples, surface water samples, and ground water samples, as well as such other investigations or analyses as are necessary or appropriate for a complete determination of the compliance of the Property and the use and operation thereof with all applicable environmental laws. All such environmental assessments shall be at the sole cost and expense of Grantor. In the event it is determined that additional tests and/or remediation are necessary as a result of the aforesaid assessments, or in the event such additional testing or remediation is recommended by the aforesaid assessments, the Grantor agrees to immediately perform the tests or undertake the remediation as recommended.

7.18    WAIVER OF JURY TRIAL. BY ACCEPTANCE HEREOF, GRANTOR AGREES THAT NEITHER GRANTOR, NOR ANY OF THEM OR LEGAL   REPRESENTATIVE OF GRANTOR (ALL OF WHOM ARE HEREINAFTER REFERRED TO AS THE "PARTIES") SHALL SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM, OR ANY OTHER LITIGATION PROCEDURE BASED UPON OR ARISING OUT OF THIS DEED TO SECURE DEBT OR ANY INSTRUMENT EVIDENCING, SECURING, OR RELATING TO THE DEBT AND OTHER OBLIGATIONS EVIDENCED HEREBY, ANY RELATED AGREEMENT OR INSTRUMENT, ANY OTHER COLLATERAL FOR THE DEBT EVIDENCED HEREBY OR THE DEALINGS OR THE RELATIONSHIP BETWEEN OR AMONG THE PARTIES, OR ANY OF THEM. NONE OF THE PARTIES WILL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS NOT BEEN WAIVED. THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY NEGOTIATED BY THE PARTIES WITH GRANTEE, AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. GRANTEE HAS IN NO WAY AGREED WITH OR REPRESENTED TO THE PARTIES THAT THE PROVISIONS OF THIS PARAGRAPH WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

8.    STATE SPECIFIC PROVISIONS – GEORGIA

**IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE TERMS AND PROVISIONS OF THIS SECTION 8 AND THE TERMS AND PROVISIONS OF THE OTHER SECTIONS, PARAGRAPHS AND ARTICLES OF THIS DEED TO SECURE DEBT, THE TERMS AND PROVISIONS OF THIS SECTION 8 SHALL GOVERN AND CONTROL.**

8.1    Financing Statement. This Deed to Secure Debt is a Financing Statement covering fixtures to be filed in the real property records pursuant to Uniform Commercial Code (O.C.G.A. § 11-9-502 *et seq.*).

8.2    Future Advances. It is the intention of the parties hereto that this Deed to Secure Debt is made and executed to comply with the provisions of the O.C.G.A. § 11-9-201, *et seq.*

8.3    Commercial Transaction.    The interest of Grantee under this Deed to Secure Debt and liability and obligation of Grantor for the payment of the Secured Obligations arise from a "commercial transaction" within the meaning of Official Code of Georgia Annotated § 44-14-260

(1).   Accordingly, pursuant to O.C.G.A. § 44-14-263, Grantor waives any and all rights which Grantor may have to notice prior to seizure by Grantee of any interest in personal property of Grantor which constitutes part of the Property, whether such seizure is by writ of possession or otherwise.

      8.4   <u>Non-Residential Status of Premises.</u>   Grantor represents and warrants to Grantee that neither all of the Property nor any part thereof is to be used as a dwelling place by Grantor at the time this Deed to Secure Debt is entered into and, accordingly, the notice requirements of O.C.G.A. § 44-14-162.2 shall not be applicable to any exercise of the power of sale contained in this Security Deed.

      8.5   <u>Perpetual Term.</u>   Pursuant to O.C.G.A. § 44-14-80, the parties to this Deed to Secure Debt intend to establish and do hereby establish a perpetual or indefinite security interest in the Property.

      8.6   <u>Attorneys' Fees.</u>   In all events where Grantor may be obligated to pay all reasonable costs, expenses and attorneys' fees incurred by Grantee in connection with the Loan Documents, "reasonable attorneys' fees" or other words of similar import shall in all events mean reasonable attorneys' fees actually incurred, without the application of the statutory presumption established by the O.C.G.A. § 13-1-11.

9.   <u>CROSS-COLLATERAL LOAN.</u>   In addition to this Deed to Secure Debt securing all Obligations of Grantor, it is the intention of Grantor that this Deed to Secure Debt shall also secure any and all obligations of any Affiliate of Grantor and/or Guarantor under any Cross-Collateral Loan pursuant to the terms of the Loan Agreement.

[Remainder of Page Left Intentionally Blank; Signatures on Immediately Following Page]

## SIGNATURE PAGE TO DEED TO SECURE DEBT

IN WITNESS WHEREOF, the undersigned have duly executed and delivered this Deed to Secure Debt under seal as of the date first above written.

Signed, sealed and delivered in the Presence of:

_Alice Childress_
Unofficial Witness

_Patricia Vanhoozer_
Notary Public

[NOTARY SEAL]

GRANTOR:

2604 CAMBLETON ROAD PARTNERS, LLC
a Georgia limited liability company

By: _____ [SEAL]

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

All that tract or parcel of land lying and being in Land Lot 199 of the 14th District, Fulton County, Georgia, being Units A-1, A-3, A-4, A-5, A-6, A-7, B-1, B-2, C-1, C-2, C-3, C-4, C-5, C-7, D-1, D-2, D-3, D-4, E-1, E-2, E-3, F-1, F-2, F-3, F-5, F-6, F-7, G-3, G-4, G-7, H-1, H-2, H-3, H-4, H-5 of the 2406 Campbellton Road Subdivision, as per plat recorded in Plat Book 392, Page 19, Fulton County, Georgia Records, which plat is incorporated herein and made a part of this description.

Together with the Declaration of Covenants, Conditions and Restrictions for Campbellton Village Townhomes, as recorded in Deed Book 44374, Page 59, aforesaid records.

Together with the Declaration of Easement recorded in Deed Book 43608, Page 527, aforesaid records.

## PERMITTED EXCEPTIONS

1. Taxes for the year 2017 and subsequent years, not yet due and payable.

2. Declaration of Covenants, Conditions, and Restrictions for Campbellton Village Townhomes, by Hovis Management Group, LLC, dated January 16, 2007, recorded January 31, 2007 in Book 44374, Page 59, Fulton County, Georgia Records, as affected by the Consent to Subdivision and Filing of New Plat and Declaration of Covenants, Conditions, and Restrictions for Campbellton Village Townhomes by Omni National Bank, dated December 31, 2007, recorded January 29, 2008 in Book 46270, Page 571, aforesaid records.

3. Consent to Subdivision and Filing of New Plat by Hovis Management Group, LLC, et al., dated September 26, 2006, recorded October 5, 2006 in Book 43608, Page 530, aforesaid records.

4. Declaration of Easement between Hovis Management Group, LLC, dated September 3, 2005, recorded October 5, 2006 in Book 43608, Page 527, aforesaid records.

5. Right of Easement in favor of Southern Bell Telephone and Telegraph Company, dated June 12, 1980, recorded September 19, 1980 in Book 7648, Page 167, aforesaid records.

6. Georgia Power Company Right of Way Easement from Jack W. Helms, et al., dated December 12, 1965, recorded January 27, 1966 in Book 4544, Page 470, aforesaid records.

7. Easement in favor of Georgia Power Company, dated April 12, 1991, recorded in Book 4685, Page 168, aforesaid records.

8. Easements, right-of-ways, boundary lines and improvements as shown on Plat recorded at Plat Book 392, Page 19, aforesaid records.

<u>**ENVIRONMENTAL COMPLIANCE AND INDEMNIFICATION AGREEMENT**</u>

**THIS ENVIRONMENTAL COMPLIANCE AND INDEMNIFICATION AGREEMENT** (this "<u>Agreement</u>"), is made, executed and entered into as of July ___, 2017 by **2604 CAMBLETON ROAD PARTNERS, LLC,** a Georgia limited liability company ("<u>Borrower</u>"), **JOSEPH HARKER** ("Harker"), and **BRIAN PEOPLES** ("Peoples" and together with Borrower and Harker, individually, collectively, jointly and severally, each individually an "<u>Indemnitor</u>", and collectively, jointly and severally an "<u>Indemnitors</u>"), in favor of **SPECIALTY CREDIT HOLDINGS, LLC,** a Delaware liability (together with its successors and/or assigns sometimes referred to herein as "<u>Lender</u>" or "<u>Indemnitee</u>").

<u>R E C I T A L S</u>:

A.      Lender has agreed to make a commercial construction loan (the "<u>Loan</u>") to Borrower in the aggregate principal amount of **TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00)** evidenced by, among other things, a certain Loan Agreement as of even date herewith executed by Indemnitors, as defined below, in favor of Indemnitee (as amended, restated, modified and/or renewed, from time to time, the "<u>Loan Agreement</u>") and a certain Promissory Note, dated as of even date herewith, in the principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00), executed by Borrower in favor of Indemnitee (collectively, as amended, restated, modified and/or renewed, from time to time, the "<u>Note</u>").

B.      The Loan is secured by, among other things, the Project (as defined herein) more particularly described in the Loan Agreement and that certain Deed to Secure Debt, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of even date herewith, executed by Borrower and delivered to Indemnitee (as amended, restated, modified and/or renewed, from time to time, the "<u>Security Instrument</u>").

C.      Lender is unwilling to make the Loan unless Indemnitors agree to provide the indemnification, representations, warranties, covenants and other matters described in this Agreement for the benefit of the Indemnified Parties (as defined herein).

NOW, THEREFORE, in order to induce the Indemnitee to make the Loan and for other good and valuable consideration, the Indemnitors hereby covenant and agree with the Indemnitee as follows:

<u>AGREEMENT</u>

1.      **Defined Terms**.  Except as otherwise stated herein, all capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning as defined in the Loan Agreement.  The following capitalized terms as used in this Agreement shall have the following meanings:

1.1      "<u>**Environmental Laws**</u>" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous

1

Substances, and/or relating to liability for or costs of other actual or threatened danger to human health or the environment. The term "Environmental Laws" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues governing the use, ownership or operation of the Project: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; the Oil Pollution Act of 1990; and the River and Harbors Appropriation Act, and those relating to lead based paint. The term "Environmental Laws" also includes, but is not limited to, any present and future federal, state and local laws, statutes ordinances, rules, regulations, permits or authorizations and the like, as well as common law, that: (a) conditions transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Project; (b) requires notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Project to any Governmental Authority or other Person, whether or not in connection with any transfer of title to or interest in such property; (c) imposes conditions or requirements in connection with permits or other authorization for lawful activity; (d) relates to nuisance, trespass or other causes of action related to the Project; or (e) relates to wrongful death, personal injury, or property or other damage in connection with any physical condition or use of the Project.

      1.3    **"Environmental Permits"** mean all permits, licenses, approvals, authorizations, consents or registrations required by any applicable Environmental Laws in connection with the ownership, use and/or operation of the Project for the storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances.

      1.4    **"Hazardous Substances"** includes, but is not limited to, (i) any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including, but not limited to, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, mold, radioactive materials, flammables and explosives, but excluding substances of kinds and in amounts ordinarily and customarily used or stored in properties similar to the Project for the purposes of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Laws, and (ii) mold, mycotoxins, microbial matter, and/or airborne pathogens (naturally occurring or otherwise) which pose an imminent threat to human health or the environment or adversely affect the Project.

2

1.5     "**Indemnified Parties**" includes Indemnitee, any Affiliate and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved with the servicing and administration of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, Persons who may hold or acquire or will have held a full or partial interest in the Loan, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, members, employees, agents, attorneys, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, but not limited to, any other Person who holds or acquires, or will have held, a participation or other full or partial interest in the Loan or the Project, whether during the term of the Loan or as a part of, or following, a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Indemnitee's assets and business).

1.6     "**Losses**" includes any losses, damages, costs, fees, expenses, claims, suits, judgments, awards, liabilities (including, but not limited to, strict liabilities), obligations, debts, diminutions in value, fines, penalties, charges, costs of Remediation, as defined in Section 1.8 (whether or not performed voluntarily), amounts paid in settlement, foreseeable and unforeseeable consequential damages, litigation costs, attorneys' fees, engineers' fees, environmental consultants' fees, and investigation costs (including, but not limited to, costs for sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), of whatever kind or nature, and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

1.7     "**Release**" with respect to any Hazardous Substance includes, but is not limited to, any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing (including the abandonment or discharging of barrels, containers or other closed receptacles containing Hazardous Substances) into the environment or other movement of Hazardous Substances.

1.8     "**Remediation**" includes, but is not limited to, any response, remedial, removal, or corrective action; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance; any actions to prevent, cure or mitigate any Release of any Hazardous Substance; any action to comply with any Environmental Laws or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, or laboratory or other analysis, or evaluation relating to any Hazardous Substances or to anything referred to herein.

2.   **Environmental Representations and Warranties**.   Except as otherwise disclosed to Indemnitee by Indemnitors in connection with the origination of the Loan, or as set forth in any environmental report delivered to Lender, to Indemnitors' knowledge, (A) there are no Hazardous Substances or underground storage tanks in, on, or under the Project, except those that are both (i) in compliance with all Environmental Laws and with Environmental Permits issued pursuant thereto and (ii) fully disclosed to Indemnitee in writing; (B) there are no past, present or threatened Releases of Hazardous Substances in, on, under or from the Project which have not been fully remediated in accordance with Environmental Law; (C) there is no past or present non-compliance with Environmental Laws, or with Environmental Permits issued pursuant thereto, in connection with the Project which has not been fully remediated in accordance with Environmental Laws; (D) Indemnitors do not know of, and have not received, any written or oral notice or other communication from any Person (including, but not limited to, any Governmental Authorities) relating to the threat of any Release of Hazardous Substances migrating to the Project; (E) no Indemnitor knows of, nor has received, any written or oral notice or other communication from any Person (including, but not limited to, any Governmental Authorities) relating to Hazardous Substances or Remediation thereof, of possible liability of any Person pursuant to any Environmental Law, any other environmental conditions in connection with the Project, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; (G) each Indemnitor has truthfully and fully delivered to Indemnitee, in writing, any and all information relating to conditions in, on, under or from the Project that is known to such Indemnitor and all information that is contained in the files and records of such Indemnitor, including, but not limited to, any reports relating to Hazardous Substances in, on, under or from the Project and/or to the environmental condition of the Project; and (H) no Mold (as defined below) is present in the indoor air of the Project (if applicable) at concentrations exceeding ambient air levels and no visible Mold is present on any building materials or surfaces at the Project for which any Governmental Authorities recommend or require removal thereof by remediation professionals, and Indemnitors are not aware of any conditions at the Project that are likely to result in the presence of Mold in the indoor air at concentrations that exceed ambient air levels or on building materials or surfaces that would require such removal.   As used in this Agreement, the term "**Mold**" means fungi that reproduces through the release of spores or the splitting of cells or other means, including, but not limited to, mold, mildew, fungi, fungal spores, fragments and metabolites such as mycotoxins and microbial organic compounds.

4

3.    **Environmental Covenants**. Each Indemnitor covenants and agrees that: (A) all uses and operations on or of the Project, whether by Indemnitors or any other Person, shall be in compliance with all Environmental Laws and Environmental Permits issued pursuant thereto; (B) there shall be no Releases of Hazardous Substances in, on, under or from the Project, except those that are both (i) in compliance with all Environmental Laws and with Environmental Permits issued pursuant thereto and (ii) fully disclosed to Indemnitee in writing; (C) there shall be no Hazardous Substances in, on, or under the Project, except those that are both (i) in compliance with all Environmental Laws and with Environmental Permits issued pursuant thereto and (ii) fully disclosed to Indemnitee in writing; (D) Indemnitors shall keep the Project free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Indemnitors or any other Person (the "**Environmental Liens**"); (E) Indemnitors shall, at their sole cost and expense, fully and expeditiously cooperate in all activities pursuant to <u>Section 5</u> of this Agreement, including, but not limited to, providing all relevant information and making knowledgeable Persons available for interviews; (F) Indemnitors shall, at their sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Project, by an environmental consultant approved by Indemnitee pursuant to any written request of Indemnitee (including, but not limited to, sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), and share with Indemnitee the reports and other results thereof, and Indemnitee and the other Indemnified Parties shall be entitled to rely on such reports and other results thereof; (G) Indemnitors shall, at their sole cost and expense, comply with all written requests of Indemnitee to (i) effectuate Remediation or obtain a no further action letter for any condition (including, but not limited to, a Release of any Hazardous Substances) in, on, under or from the Project, in full compliance of Environmental Laws or reasonably required by Indemnitee based upon recommendations and observations of an independent environmental consultant approved by Indemnitee, (ii) comply with any Environmental Laws, (iii) comply with any directive from any Governmental Authorities, and (iv) take any other action necessary or appropriate for protection of human health or the environment; (H) Indemnitors shall not do, and shall use commercially reasonable efforts to not allow any tenant or other user of the Project to do, any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any Person (whether on or off the Project), impairs or may impair the value of the Project, is contrary to any requirement of any insurer, constitutes a public or private nuisance, constitutes waste, or violates any covenant, condition, agreement or easement applicable to the Project; (I) Indemnitors shall use best efforts to enforce the applicable provisions of the Leases (as defined in the Security Instrument) in order to prevent tenants or other users of the Project from taking any action that violates any applicable Environmental Laws, impairs or may impair the value of the Project, constitutes a public or private nuisance, constitutes waste or violates any covenant, condition, agreement or easement applicable to the Project; and (J) Indemnitors shall promptly notify Indemnitee in writing of (i) any presence or Release or threatened Release of Hazardous Substances in, on, under, from or migrating towards the Project, (ii) any non-compliance with any Environmental Laws related in any way to the Project, (iii) any actual or potential imposition of an Environmental Liens, (iv) any required or proposed Remediation of environmental conditions relating to the Project, and/or (v) any written or oral notice or other communication of which any Indemnitor becomes aware from any source whatsoever (including, but not limited to, any Governmental Authorities) relating in any way to Hazardous Substances or Remediation

thereof, possible liability of any Person pursuant to any Environmental Laws, other environmental conditions in connection with the Project, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Agreement.

4.   **Indemnified Rights/Cooperation and Access**.   In the event the Indemnified Parties have reason to believe that an environmental hazard exists on the Project that does not, in the sole discretion of the Indemnified Parties, (i) endanger any tenants or other occupants of the Project or their guests or the general public or (ii) materially and adversely affect the value of the Project, upon notice from the Indemnitee, Indemnitors shall, at Indemnitors' sole cost and expense, promptly cause an engineer or consultant satisfactory to the Indemnified Parties to conduct an environmental assessment or audit (the scope of which shall be determined in the sole and absolute discretion of the Indemnified Parties) and take any samples of soil, groundwater or other water, air, or building materials or any other invasive testing requested by Indemnitee and promptly deliver to Indemnitee the results of any such assessment, audit, sampling or other testing; *provided, however*, if such results are not delivered to the Indemnitee within ten (10) days or if the Indemnified Parties have reason to believe that an environmental hazard exists on the Project that, in the sole judgment of the Indemnified Parties, endangers any Tenant or other occupant of the Project or their guests or the general public or may materially and adversely affect the value of the Project, upon notice to Borrower, the Indemnified Parties and any other Person designated by the Indemnified Parties, including, but not limited to, any receiver, any representative of any Governmental Authorities, and/or any environmental consultant, shall have the right, but not the obligation, to enter upon the Project at all reasonable times to assess any and all aspects of the environmental condition of the Project and its use, including, but not limited to, conducting any environmental assessment or audit (the scope of which shall be determined in the sole and absolute discretion of the Indemnified Parties) and taking samples of soil, groundwater or other water, air, or building materials, and reasonably conducting other invasive testing.  Indemnitors shall cooperate with and provide the Indemnified Parties and any such Person designated by the Indemnified Parties with access to the Project.

5.   **Indemnification**.   Each Indemnitor covenants and agrees, at its sole cost and expense, to protect, defend, indemnify, release and hold the Indemnified Parties harmless from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any presence of any Hazardous Substances in, on, above, or under the Project; (b) any past, present or threatened Release of Hazardous Substances in, on, above, under or from the Project; (c) any activity by any Indemnitor, any Person affiliated with any Indemnitor, and/or any tenant or other occupant or user of the Project in connection with any actual, proposed or threatened use, treatment, storage, holding, existence, disposition or other Release, generation, production, manufacturing, processing, refining, control, management, abatement, removal, handling, transfer or transportation to or from the Project of any Hazardous Substances at any time located in, under, on or above the Project; (d) any activity by any Indemnitor, any Person affiliated with any Indemnitor, and/or any tenant or occupant or other user of the Project in connection with any actual or proposed Remediation of any Hazardous Substances at any time located in, under, on or above the Project, whether or not such Remediation is voluntary or pursuant to court or administrative order, including, but not limited to, any removal, remedial or corrective action; (e) any past, present or threatened non-compliance or violation of any

6

Environmental Laws (or permits issued pursuant to any Environmental Law) in connection with the Project or operations thereon, including, but not limited to, any failure by any Indemnitor, any Person affiliated with any Indemnitor, and/or any tenant or occupant or other user of the Project to comply with any order of any Governmental Authorities in connection with any Environmental Laws; (f) the imposition, recording or filing, or the threatened imposition, recording or filing, of any Environmental Lien encumbering the Project; (g) any administrative processes or proceedings or judicial proceedings in any way connected with any matter addressed in this Agreement; (h) any past, present or threatened injury to, destruction of or loss of natural resources in any way connected with the Project, including, but not limited to, costs to investigate and assess such injury, destruction or loss; (i) any acts of any Indemnitor, any Person affiliated with any Indemnitor, and/or any tenant or occupant or other user of the Project in arranging for the disposal or treatment, or arranging with a transporter for transport for the disposal or treatment, of the Hazardous Substances at any facility or incineration vessel containing such or similar Hazardous Substances; (j) any acts of any Indemnitor, any Person affiliated with any Indemnitor, and/or any tenant or occupant or other user of the Project in accepting any Hazardous Substances for transport to disposal or treatment facilities, incineration vessels or sites from which there is a Release, or a threatened Release of any Hazardous Substance which causes the incurrence of costs for Remediation; (k) any personal injury, wrongful death, or property or other damage arising under any statutory or common law or tort law theory, including, but not limited to, damages assessed for private or public nuisance or for the conducting of an abnormally dangerous activity on or near the Project in each case relating to Hazardous Materials at the Project; and (l) any misrepresentation or inaccuracy in any representation or warranty or material breach or failure to perform any covenants or other obligations pursuant to this Agreement; provided, however, that the Environmental Indemnity shall not include any loss, damage, cost, expense or liability (1) arising from a Hazardous Substance which first exists on the Project following the date on which the Lender (or its nominee) takes title to the Project, whether by foreclosure of the Security Instrument, by a deed-in-lieu thereof or otherwise, or possession thereof (whichever is later) and the existence of such Hazardous Substance was not caused (whether actual or proximate) by any act or omission of Indemnitors, or (2) to the extent arising from the gross negligence or willful misconduct of the Lender or its agent.

6.     **Duty to Defend and Attorneys and Other Fees and Expenses**.  Upon written request by any Indemnified Party, Indemnitors shall defend any action or inquiry commenced in respect of the presence or alleged presence of any Hazardous Substances located in, on or near the Project (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties.  Notwithstanding the foregoing, any Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of the Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding, providing that no compromise or settlement shall be entered without Indemnitors' consent, which consent shall not be unreasonably withheld.  Upon demand, Indemnitors shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of the reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

7

7. **Unimpaired Liability**. The liability of Indemnitors under this Agreement shall in no way be limited or impaired by, and each Indemnitor hereby consents to and agrees to be bound by, any amendment or modification of the provisions of the Note, the Loan Agreement, the Security Instrument or any other Loan Documents to or with Indemnitee by Borrower or any Person who succeeds Borrower, Guarantor or any Person as owner of the Project. In addition, the liability of Indemnitors under this Agreement shall in no way be limited or impaired by: (a) any extensions of time for performance required by the Note, the Loan Agreement, the Security Instrument or any of the other Loan Documents; (b) any sale or transfer of all or part of the Project; (c) any exculpatory provision in the Loan Documents limiting Indemnitee's recourse to the Project or to any other security for the Note, or limiting Indemnitee's rights to a deficiency judgment against any Indemnitor; (d) the accuracy or inaccuracy of the representations and warranties made by Indemnitors herein and by Borrower and/or Guarantor under the Note, the Loan Agreement, the Security Instrument or any of the other Loan Documents or herein; (e) the release of any Indemnitor or any other Person from performance or observance of any of the agreements, covenants, terms or conditions contained in any of the other Loan Documents by operation of Law, Indemnitee's voluntary act, or otherwise; (f) the release or substitution in whole or in part of any security for the Note; or (g) Indemnitee's failure to record the Security Instrument or file any UCC financing statements (or Indemnitee's improper recording or filing of any thereof) or to otherwise perfect, protect, secure or insure any security interest or lien given as security for the Note; and, in any or all of the foregoing cases, whether with or without notice to any Indemnitor and with or without consideration.

8. **Enforcement**. Indemnified Parties may enforce the obligations of each Indemnitor without first resorting to, or exhausting any security or Collateral under, or without first having recourse pursuant to, the Note, the Loan Agreement, the Security Instrument, or any other Loan Documents or any of the Project, through foreclosure proceedings or otherwise; *provided, however*, that nothing herein shall inhibit or prevent Indemnitee from suing on the Note, foreclosing, or exercising any power of sale under, the Security Instrument, or exercising any other rights and remedies thereunder. This Agreement is not Collateral or security for the Obligations of Borrower pursuant to the Loan Agreement, unless Indemnitee expressly elects in writing to make this Agreement additional Collateral or security for the Obligations of Borrower pursuant to the Loan Agreement, which Indemnitee is entitled to do in its sole and absolute discretion. It is not necessary for an Event of Default to have occurred pursuant to and as defined in the Security Instrument or the Loan Agreement for the Indemnified Parties to exercise their rights pursuant to this Agreement. Notwithstanding any provision in any of the other Loan Documents to the contrary, the obligations of each Indemnitor pursuant to this Agreement are exceptions to any non-recourse or exculpation provision in the Limited Guaranty and any other Loan Documents and each Indemnitor expressly acknowledges and agrees that it is fully and personally liable on a joint and several basis for such obligations hereunder, and such liability is not limited to the original or amortized principal balance of the Loan or the value of the Project.

9.     **Survival**.  Notwithstanding anything herein to the contrary, the obligations and liabilities of Indemnitors under this Agreement shall survive indefinitely the following: (i) payment of the Debt, (ii) any termination, satisfaction, assignment, entry of a judgment of foreclosure, (iii) exercise of any power of sale, and/or (iii) delivery of a deed in lieu of foreclosure of the Security Instrument; provided, however, that the indemnification obligations of Indemnitors under this Agreement shall terminate one (1) year after the full and complete payment by Borrower of the Debt evidenced and secured by the Loan Documents provided that contemporaneously at the time of such payment in full of the Debt, Indemnitors furnish to Lender an updated environmental report in form and substance, and from a qualified environmental consultant reasonably acceptable to Lender, which updated environmental report discloses, as of the date of such repayment of the Debt in full, there are no actual or threatened (A) non-compliance with or violation of applicable Environmental Laws (or permits issued pursuant to Environmental Laws) in connection with the Project or operations thereon, (B) environmental liens encumbering the Project, (C) administrative processes or proceedings or judicial proceedings by any Governmental Authorities in any way connected with any matter addressed in this Agreement or the Deed to Secure Debt; or (D) presence or Release of Hazardous Substances in, on, above, or under the Project that has not been fully remediated in accordance with all applicable Environmental Laws.

10.     **Interest**.  Any amounts payable to any Indemnified Parties under this Agreement shall become immediately due and payable on demand and, if not paid within five (5) days of such demand therefor, shall bear interest at the Default Rate.

11.     **Waivers**.  (a)  Each Indemnitor hereby waives and relinquishes: (i) any right or claim of right to cause a marshaling of such Indemnitor's assets or to cause Indemnitee or other Indemnified Parties to proceed against any of the security for the Loan before proceeding under this Agreement against such Indemnitor; (ii) all rights and remedies accorded by Legal Requirements to indemnitors or guarantors, except any rights of subrogation which any Indemnitor may have, provided that the indemnity provided for hereunder shall neither be contingent upon the existence of any such rights of subrogation nor subject to any claims or defenses whatsoever which may be asserted in connection with the enforcement or attempted enforcement of such subrogation rights, including, without limitation, any claim that such subrogation rights were abrogated by any acts of Indemnitee or other Indemnified Parties; (iii) the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against or by Indemnitee or other Indemnified Parties; (iv) notice of acceptance hereof and of any action taken or omitted in reliance hereon; (v) presentment for payment, demand of payment, protest or notice of nonpayment or failure to perform or observe, or other proof, or notice or demand; and (vi) all homestead exemption rights against the obligations hereunder and the benefits of any statutes of limitations or repose.  Notwithstanding anything to the contrary contained herein, each Indemnitor hereby agrees to postpone the exercise of any rights of subrogation with respect to any collateral securing the Loan until the Loan shall have been paid in full.

**(b)      EACH INDEMNITOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT,**

9

**TORT OR OTHERWISE, RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF ANY INDEMNIFIED PARTY IN CONNECTION THEREWITH.**

12.    **Subrogation**.    Each Indemnitor hereby agrees to take any and all actions, including institution of legal action against third parties, necessary or appropriate to obtain reimbursement, payment or compensation from such Persons responsible for the presence of any Hazardous Substances at, in, on, under or near the Project or otherwise obligated by law to bear the cost.  The Indemnified Parties shall be and hereby are subrogated to all of Indemnitors' rights now or hereafter in such claims.

13.    **Indemnitors' Representations and Warranties**.    Each Indemnitor represents and warrants with respect to himself or itself only that:

13.1    It has the full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (ii) the execution, delivery and performance of this Agreement by such Indemnitor has been duly and validly authorized, and (iii) all requisite action has been taken by such Indemnitor to make this Agreement valid and binding upon such Indemnitor, enforceable in accordance with its terms;

13.2    Its execution of, and compliance with, this Agreement is in the ordinary course of business of such Indemnitor and will not result in the breach of any term or provision of the charter, by-laws, partnership, operating or trust agreement, or other governing instrument of such Indemnitor or result in the breach of any term or provision of, or conflict with or constitute a default under, or result in the acceleration of any obligation under, any agreement, indenture or loan or credit agreement or other instrument to which such Indemnitor or the Project is subject, or result in the violation of any law, rule, regulation, order, judgment or decree to which such Indemnitor or the Project is subject;

13.3    To the best of such Indemnitor's knowledge, there is no action, suit, proceeding or investigation pending or threatened against it which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of such Indemnitor, or in any material impairment of the right or ability of such Indemnitor to carry on its business substantially as now conducted, or in any material liability on the part of such Indemnitor, or which would draw into question the validity of this Agreement or of any action taken or to be taken in connection with the obligations of such Indemnitor contemplated herein, or which would be likely to impair materially the ability of such Indemnitor to perform under the terms of this Agreement;

13.4    It has not received written notice that the Project is subject to any Environmental Liens, or judicial or administrative notice, action, or inquiry, investigation or claim, relating to Hazardous Substances.

13.5    It does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

10

13.6    To the best of such Indemnitor's knowledge, no approval, authorization, order, license or consent of, or registration or filing with, any Governmental Authorities or other Person, and no approval, authorization or consent of any other Person is required in connection with this Agreement; and

13.7    This Agreement constitutes a valid, legal and binding obligation of such Indemnitor, enforceable against it in accordance with the terms hereof.

14.    **No Waiver**.  No delay by any Indemnified Party in exercising any right, power or privilege under this Agreement shall operate as a waiver of any such privilege, power or right.

15.    **Notice of Legal Actions**.  Each party hereto shall, within five (5) Business Days of receipt thereof, give written notice to the other party hereto of (a) any notice, advice or other communication from any Governmental Authorities or any source whatsoever with respect to Hazardous Substances on, from or affecting the Project, and (b) any legal action brought against such party or related to the Project, with respect to which Indemnitors may have liability under this Agreement.  Such notice shall comply with the provisions of <u>Section 19</u> hereof.

16.    **Examination of Books and Records**.  The Indemnified Parties and their accountants and other representatives shall have the right to examine the records, books, and management and other papers of any Indemnitor which reflect upon its financial condition, at the Project or at the office regularly maintained by such Indemnitor where the books and records are located.  The Indemnified Parties and their accountants and other representatives shall have the right to make copies and extracts from the foregoing records and other papers.  In addition, at reasonable times and upon notice (which may be given verbally), the Indemnified Parties and their accountants and other representatives shall have the right to examine and audit the books and records of each Indemnitor pertaining to the income, expenses and operation of the Project during reasonable business hours at the office of such Indemnitor where the books and records are located.

17.    **Transfer of Loan**.  (a)  Subject to the Loan Agreement, Indemnitee may, at any time, sell, transfer, pledge or assign its rights under the Note, the Loan Agreement, the Security Instrument, this Agreement and the other Loan Documents to any Person, and any or all servicing rights with respect thereto, or grant participations therein.  In connection with any such transfer, Indemnitee may forward to each prospective transferee, all documents and information which Indemnitee now has or may hereafter acquire relating to each Indemnitor and the Project, whether furnished by such Indemnitor, any other guarantor or otherwise, as Indemnitee determines necessary or desirable.  Each Indemnitor agrees to cooperate with Indemnitee in connection with any transfer made pursuant to this <u>Section 17</u>, including, without limitation, the delivery of an estoppel certificate required in accordance with the Loan Agreement and such other documents as may be reasonably requested by Indemnitee.  Indemnitors shall also furnish, and each Indemnitor hereby consents to Indemnitee furnishing to such prospective transferees, any and all information concerning the financial condition of such the Indemnitor and any Guarantor and any and all information concerning the Project as may be requested by Indemnitee, any prospective transferee in connection with any sale, transfer or participation interest.

11

(b)     Upon any transfer or proposed transfer contemplated above and in the other Loan Documents, at Indemnitee's request, Indemnitor shall provide an estoppel certificate to any prospective transferee in such form, substance and detail as Indemnitee, such prospective transferee may require.

18.     **Taxes**.  Each Indemnitor has filed, and shall, throughout the Term, file all federal, state, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it.  No Indemnitor has knowledge of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

19.     **Notices**.  Except as expressly provided otherwise, all notices, demands, consents, approvals and statements required and/or permitted hereunder shall be in writing and shall be deemed to have been sufficiently given and/or served for all purposes when presented personally, by  delivery to a nationally recognized overnight courier service [or, in the alternative by electronic mail (with confirmation of delivery) and one (1) day after delivery to a nationally recognized overnight courier service providing evidence of the date of delivery] providing evidence of the date of delivery, if to Indemnitors and/or any Indemnified Parties, at their respective addresses stated below, and/or at such other address of which a party shall have notified the party giving such notice in writing in accordance with the foregoing requirements, with a copy to each of the following:

> If to any Indemnified Parties:
> Specialty Credit Holdings, LLC
> Two Greenwich Plaza, 1st Floor
> Greenwich, Connecticut 06830
> Attn:  Andrew Scott
> E-mail:  ascott@silverpointcapital.com
>
> With a copy to:
> Mahadeva, PLLC
> 80 Business Park Drive, Suite 201
> Armonk, New York 10504
> Attention: Prassana Mahadeva
> E-Mail:  pmahadeva@mahadevalaw.com
>
> If to Indemnitors:
> ARIAM Partners, LLC
> 1020 Powers Place
> Alpharetta, GA 30009
> Attention: Joe Harker
> E-mail: jharker@ariampartners.com
>
> With a copy to:
> Polsinelli PC
> 150 N. Riverside Plaza, Suite 3000

12

Chicago, IL 60606
Attention: Douglas Noren
E-mail: DNoren@Polsinelli.com

(b)     The parties acknowledge that all notices, demands, consents, approvals and statements required and/or permitted hereunder must be delivered to their respective counsel or else the notices, demands, consents, approvals and statements required and/or permitted hereunder shall be deemed undelivered.

(c)     The parties agree that the terms and conditions stated in this <u>Section 19</u> shall survive closing.

20.     **Duplicate Originals; Counterparts**.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement.  The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

21.     **No Oral Change**.  This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Indemnitors or any Indemnified Party, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

22.     **Headings, Etc**.  The headings and captions of various sections of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

23.     **Number and Gender/Successors and Assigns**.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Person or Persons referred to may require.  Without limiting the effect of specific references in any provision of this Agreement, the term "<u>Indemnitor</u>" shall be deemed to refer to each and every Person comprising an Indemnitor from time to time, as the sense of a particular provision may require, and to include the heirs, executors, administrators, legal representatives, successors and assigns of such Indemnitor, all of whom shall be bound by the provisions of this Agreement, provided that no obligation of any Indemnitor may be assigned except with the written consent of Indemnitee.  Each reference herein to Indemnitee shall be deemed to include its successors and assigns.  This Agreement shall inure to the benefit of the Indemnified Parties and their respective successors, permitted assigns, heirs and legal representatives forever.  The Indemnified Parties shall have the right to assign or transfer their rights under this Agreement in connection with any assignment of the Loan and the Loan Documents.  Pursuant to the terms of the Loan Agreement, any assignee or transferee of any Indemnified Party shall be entitled to all the benefits afforded to any Indemnified Party under this Agreement.  No Indemnitor shall have the right to assign or transfer its rights or obligations under this Agreement without the prior

13

written consent of Indemnitee, and any attempted assignment without such consent shall be null and void.

24.    **Release of Liability**.  Any one or more parties liable upon or in respect of this Agreement may be released without affecting the liability of any party not so released.

25.    **Rights Cumulative**.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies which Indemnitee has under the Note, the Security Instrument, the Loan Agreement or the other Loan Documents or would otherwise have at law or in equity.

26.    **Inapplicable Provisions**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Laws effective during the term of this Agreement, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement, and the remaining provision of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement, unless such continued effectiveness of this Agreement, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein

27.    **Governing Law**.  (a) This Agreement shall be governed in accordance with the terms and provisions of <u>Section 7.19</u> of the Loan Agreement.

(b) WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A "**PROCEEDING**"), EACH INDEMNITOR IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE CITY OF NEW YORK, COUNTY OF NEW YORK AND STATE OF NEW YORK, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.  NOTHING IN THIS AGREEMENT SHALL PRECLUDE INDEMNITEE FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION.   EACH INDEMNITOR FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY NEW YORK STATE OR UNITED STATES COURT SITTING IN THE CITY OF NEW YORK AND COUNTY OF NEW YORK MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO ANY INDEMNITOR AT THE ADDRESS INDICATED IN THIS AGREEMENT, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF ANY INDEMNITOR SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

28.    **Miscellaneous**.  (a)  Wherever pursuant to this Agreement: (i) Indemnitee (or any other Indemnified Party) exercises any right given to it to approve or disapprove any matter; (ii) any arrangement or term is to be satisfactory to Indemnitee (or any other Indemnified Party); or

14

(iii) any other decision or determination is to be made by Indemnitee (or any other Indemnified Party), the decision of Indemnitee (or such other Indemnified Party) to approve or disapprove such matter, all decisions that arrangements or terms are satisfactory to Indemnitee (or such other Indemnified Party) or not satisfactory and all other decisions and determinations made by Indemnitee (or such other Indemnified Party), shall be in the sole and absolute discretion of Indemnitee (or such other Indemnified Party) and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b)     Wherever pursuant to this Agreement it is provided that Indemnitors pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of Indemnitee.

29.     **Joint and Several Liability.**   The obligations and liabilities of Indemnitors hereunder shall be joint and several.

(signatures begin on the following page; remainder of this page left intentionally blank)

## SIGNATURE PAGE TO ENVIRONMENTAL COMPLIANCE AND INDEMNIFICATION AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

**2604 CAMBLETON ROAD PARTNERS, LLC**
A Georgia limited liability company

By: _____

A _____ ,

Its _____

By: _____

Name: JOSEPH HARKER

Title: MANAGING MEMBER

**STATE OF** Georgia          )
                              : ss.:
**COUNTY OF** Fulton          )

On this 12th day of July in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared Joseph Harker , personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

Patricia VanHooser

[Notary seal: PATRICIA VANHOOZER  MY COMMISSION EXPIRES  MAR 18 2019  FULTON CO. GEORGIA  NOTARY PUBLIC]

16

## SIGNATURE PAGE TO ENVIRONMENTAL COMPLIANCE AND INDEMNIFICATION AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

JOSEPH HARKER

By: _____

**STATE OF** Georgia )
: ss.:
**COUNTY OF** Fulton )

On this 12th day of July in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared Joseph Harker, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

_Patricia Vanhoozer_

PATRICIA VANHOOZER
MY COMMISSION EXPIRES
MAR
18
20_19
FULTON CO., GEORGIA
NOTARY PUBLIC

17

## SIGNATURE PAGE TO ENVIRONMENTAL COMPLIANCE AND INDEMNIFICATION AGREEMENT

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

BRIAN PEOPLES

By: _Brian Peoples_

STATE OF _Georgia_                    )
                                      : ss.:
COUNTY OF _Fulton_                    )

On this _12th_ day of _July_ in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _Brian Peoples_, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

_Patricia VanHoo_

18

# SECURITY AGREEMENT

This Security Agreement (as the same may be amended, restated or otherwise modified, this "Agreement") is made as of the _____ day of July, 2017 by **2604 CAMBLETON ROAD PARTNERS, LLC**, a Georgia limited liability company ("Grantor"), in favor of **SPECIALTY CREDIT HOLDINGS, LLC**, a Delaware limited liability company (together with its successors and/or assigns "Lender").

R E C I T A L S:

A.     Contemporaneously herewith, Lender is making a loan to and at the request of Grantor in the principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00) (the "Loan");

B.     The Loan is evidenced by, among other things, that certain Loan Agreement, dated of even date herewith, by and among Grantor, certain guarantors named therein and Lender (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "Loan Agreement");

C.     The Loan is secured by, among other things, the Project (as defined in the Loan Agreement) and the real property more particularly described in that certain Deed to Secure Debt, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of even date herewith, executed by Grantor and delivered to Lender (as amended, restated, modified and/or renewed, from time to time, the "Security Instrument").

D.     Lender is unwilling to make the Loan unless Grantor agrees to grant Lender the security interest in the Collateral (as defined in Section 2 hereof).

NOW, THEREFORE, in order to induce the Lender to make the Loan and for other good and valuable consideration, the Indemnitors hereby covenant and agree with the Lender as follows:

AGREEMENT

**1.**     **Defined Terms**.  Except as otherwise stated herein, all capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning as defined in the Loan Agreement.

**2.**     **Grant of Security Interest**.   For purposes of securing the payment and performance of any and all Obligations of the Grantor under the Loan Documents and any and all Obligations of the Grantor, Guarantor, any Asset Owner Parties and/or any other Person under the Cross-Collateral Loan Documents, Grantor hereby grants to Lender all of Grantor's right, title and interest in, and a continuing security interest in, and unconditionally pledges and assigns to Lender the following described property, assets and rights of Grantor, consisting of any and all corporate and business assets, properties and rights of the Grantor wherever located, whether now owned or hereafter acquired or arising, and all proceeds, products, and accessions thereof (collectively, the "**Collateral**"):

1

a.   any and all Rents (as defined in the Security Instrument), cash, cash equivalents, money (including contract rights and/or rights to the payment of money, including Cash Proceeds), accounts and accounts receivable (including trade receivables) and deposit accounts (including any deposit accounts from which Grantor may from time to time authorize Lender or Loan Servicer to debit payments due on the Obligations); and

b.   the Reserves and any and all funds therein; and

c.   furniture, machinery, equipment, fixtures, goods, materials, supplies, tools chattel paper (whether tangible or electronic); and

d.   commercial tort claims and proceeds therefrom, insurance claims and proceeds therefrom, proceeds from all present and future fire, hazard or casualty insurance policies (including Net Insurance/Condemnation Proceeds) (whether or not such policies are required by Lender as part of the Insurance Requirements) and all condemnation awards or payments now or later to be made by any Governmental Authorities, any other Person or by decree by any court of competent jurisdiction for any such taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in all or any portion of the Project and Improvements thereon; and

e.   any and Assigned Rights and Documents (as defined in the Assignment of Contracts); and

f.   any general intangibles (including payment intangibles and intellectual property) and rights relating thereto, including, without limitation, all trade names, marks, all permits, licenses and claims to or demands for the voluntary or involuntary conversion of any of the Project, or other property into cash or liquidated claims; and

g.   instruments (including promissory notes), investment property (including all securities), inventory, deposit accounts wherever located, letters of credit rights; and

h.   any and all tangible personal property of every kind and description, whether or not stored at the Project (or any portion thereof) or elsewhere, which in all cases is:

     (i)   used or useful or acquired in connection with any construction of Improvements undertaken on any portion of the Project or in connection with the maintenance of the Project and any Improvements thereon; and/or

2

        (ii)     affixed or installed, or to be affixed or installed, in any manner on any portion of the Project; and

    i.   any and all substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing described property in <u>Subsection 2(a) through (h)</u>; and

    j.   any and all books, records and files to any of the foregoing described Collateral in <u>Subsection 2(a) through (h)</u>, including, without limitation, computer readable memory and data and any computer software and/or hardware necessary to access and process such memory and data; and

    k.   all other assets of Grantor, together with any and all proceeds and products of any of the foregoing described property in <u>Subsection 2(a) through (h)</u>, it being expressly understood and agreed that the Collateral described in this Agreement shall have the same meaning as defined and/or used under the UCC.

    **3.**     **<u>Authorization to File Financing Statements</u>**.  Grantor hereby irrevocably authorizes Lender at any time and from time to time to file in any filing office in any UCC jurisdiction any financing statements and amendments thereto that (a) indicate and/or describe the Collateral (including, without limitation, filing an executed copy of this Agreement) as follows: (i) as all assets of the Grantor or words of similar effect, regardless of whether any particular asset included in the Collateral falls within the scope of the UCC of the State (as defined below) or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by the UCC of the State or such jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Grantor is an organization, the type of organization and any organization identification number issued to the Grantor and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. The Grantor agrees to furnish any such information to Lender promptly upon the Lender's request.  As used herein, "<u>State</u>" means the State of Georgia and/or such other State, as applicable.

    **4.**     **<u>Other Actions</u>**. Further to insure the attachment, perfection and first priority of, and the ability of Lender to enforce the security interest in the Collateral, the Grantor agrees, in each case at the Grantor's expense, to take the following actions with respect to the following Collateral and without limitation on the Grantor's other obligations contained in this Agreement:

    a.   <u>Promissory Notes and Tangible Chattel Paper</u>. If the Grantor shall at any time hold or acquire any promissory notes or tangible chattel paper, the Grantor shall forthwith endorse, assign and deliver the same to Lender, accompanied by such instruments of transfer or assignment duly executed in blank as Lender may from time to time specify.

    b.   <u>Collateral in the Possession of a Bailee</u>. If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify Lender thereof and, at the Lender's request and option, shall promptly obtain an acknowledgement from

3

the bailee, in form and substance satisfactory to Lender, that the bailee holds such Collateral for the benefit of Lender and such bailee's agreement to comply, without further consent of the Grantor, at any time with instructions of Lender as to such Collateral. Lender agrees with the Grantor that Lender shall not give any such instructions unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the Grantor with respect to the bailee.

c.  Electronic Chattel Paper. If the Grantor at any time holds or acquires an interest in any electronic chattel paper, the Grantor shall promptly notify Lender thereof and, at the request and option of Lender, shall take such action as Lender may request to vest in Lender control, under the UCC, of such electronic chattel paper. Lender agrees with the Grantor that Lender will arrange, pursuant to procedures satisfactory to Lender amid so long as such procedures will not result in the Lender's loss of control, for the Grantor to make alterations to the electronic chattel paper permitted under the UCC for a party in control to make without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the Grantor with respect to such electronic chattel paper.

d.  Letter-of-Credit Rights. If the Grantor is at any time a beneficiary under a letter of credit now or hereafter, the Grantor shall promptly notify Lender thereof and, at the request and option of Lender, the Grantor shall, pursuant to an agreement in form and substance satisfactory to Lender, either (i) arrange for the issuer and any confirmer or other nominated person of such letter of credit to consent to an assignment to Lender of the proceeds of the letter of credit or (ii) arrange for Lender to become the transferee beneficiary of the letter of credit, with Lender agreeing, in each case, that the proceeds of the letter to credit are to be applied as provided in the Loan Agreement.

e.  Commercial Tort Claims. If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall immediately notify Lender in a writing signed by the Grantor of the particulars thereof and grant to Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to Lender.

f.  Other Actions as to any and all Collateral. The Grantor further agrees, upon request of Lender and at Lender's option, to take any and all other actions necessary for the attachment, perfection and first priority under applicable Law of, and the ability of Lender to enforce, the  security interest in any and all of the Collateral, including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC, to the extent, if any, that the Grantor's signature thereon is required therefor, (ii) causing Lender's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or

priority of, or ability of Lender to enforce, Lender's security interest in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Lender to enforce, the security interest in such Collateral, (iv) obtaining governmental and other third party waivers, consents and approvals in form and substance satisfactory to Lender, including, without limitation, any consent of any licensor, lessor or other person obligated on Collateral, (v) obtaining waivers from mortgagees and landlords in form and substance satisfactory to Lender and (vi) taking all actions under any earlier versions of the UCC or under any other Law, determined by Lender to be applicable in any relevant UCC or other jurisdiction, including any foreign jurisdiction.

5.     **Relation to Other Loan Documents**. The provisions of this Agreement supplement the provisions of the Security Instrument granted by the Grantor to Lender, with respect to the Collateral described herein, and which secures the payment or performance of any of the Obligations under the Loan Documents and Cross-Collateral Loan Documents. Nothing contained in the Security Instrument or other similar instrument, including any real estate mortgage, deed of trust, deed to secure debt or similar instrument, shall derogate from any of the rights or remedies of Lender hereunder with respect to the Collateral described herein.   In addition to the provisions of this Agreement being so read and construed with any such mortgage or deed to secure debt, the provisions of this Agreement shall be read and construed with the other Loan Documents.

6.     **Representations and Warranties Concerning Grantor's Legal Status**. The Grantor represents and warrants to Lender as follows: (a) it is a Georgia limited liability company which is duly organized, validly existing and in good standing under the Laws of the State of Georgia and is validly existing and in good standing in all states in which the Grantor is doing business; (b) it is also duly qualified as a foreign corporation and is in good standing in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition; (c) it has full power and authority to own its properties, assets, the Project and the Collateral, and to transact the businesses in which it is presently engaged or presently proposes to engage; (d) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of the Grantor; and (e) this Agreement constitutes, and any instrument or agreement required hereunder to be given by the Grantor to Lender when delivered will constitute, the legal, valid and binding obligation of the Grantor, enforceable against the Grantor in accordance with their respective terms.

7.     **Covenants Concerning Grantor's Legal Status**. The Grantor covenants to and with Lender as of the Effective Date, the following: (a) there is no pending or threatened litigation, claim for infringement, proceeding or investigation by any Governmental Authorities or any other person known to the Grantor against or otherwise affecting the Grantor or any of its assets or its officers, directors or agents in their capacities as such, nor does the Grantor know of any ground for any such litigation, infringement claims, proceedings or investigations; (b) no contract or organizational document prohibits any term or condition of this Agreement; (c) the execution and delivery of this Agreement will not violate any Law or agreement governing the

Grantor or to which the Grantor is a party; and (d) all information and statements furnished in connection with the Loan Documents, and any other documents related to this secured transaction, are true and correct, and contain no false or misleading statement.

**8.**          **Representations and Warranties Concerning Collateral**. The Grantor further represents and warrants to Lender the following, as of the date of this Agreement (a) Grantor is the owner of the Collateral, free from any right or claim of any person or any adverse lien, security interest or other encumbrance, except for the security interest created by this Agreement and other liens, (b) none of the Collateral constitutes, or is the proceeds of, "farm products" as defined in the UCC of the State, (c) none of the account debtors or other persons obligated on any of the Collateral are Governmental Authorities covered by the Federal Assignment of Claims Act or similar federal, state or local statute or rule in respect of such Collateral, (d) the Grantor holds no commercial tort claim, and (e) the Grantor has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of Hazardous Substances (as defined in the Indemnity), (f) all other information set forth in this Agreement pertaining to the Collateral is true, accurate and complete, and (g) there has been no change in any of such information since the date on which the Loan Agreement, the Note or this Agreement was signed by the Grantor.

**9.**          **Covenants Concerning Collateral**. The Grantor further covenants with Lender as follows:

a.   the Collateral will be kept at the Project listed on SCHEDULE II attached hereto or at Grantor's place of business in the State of Georgia and the Grantor will not remove the Collateral from any location except in the ordinary course of Grantor's business, without providing at least thirty (30) days prior written notice to Lender; and

b.   the Grantor is (or will be) the owner of the Collateral, free and clear from any right or claim of any other Person or any lien, security interest or other encumbrance, and the Grantor shall defend the same against all claims and demands of all Persons at any time claiming the same or any interests therein adverse to Lender; and

c.   without the express prior written consent of Lender, the Grantor shall not pledge, grant, transfer, assign, convey, hypothecate, mortgage or create, or suffer to exist any right of any Person in or claim by any Person to all or any portion of the Collateral, or any security interest, lien or other encumbrance in all or any portion of the Collateral in favor of any Person; and

d.   Grantor will keep the Collateral in good order and repair (subject to expected ordinary wear and tear) and will not use the same in violation of Law or any policy of insurance thereon; and

e.   the Grantor will permit Lender, or its designee, to inspect the Collateral at any reasonable time, wherever located, upon advanced written notice to Grantor, and during normal business hours; and

f.   the Grantor will pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement; and

g.   the Grantor will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of Hazardous Substances (as defined in the Indemnity); and

h.   the Grantor will not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except as follows: (i) otherwise provided pursuant to the terms of the Loan Documents; (ii) in the ordinary course of Grantor's business and (ii) so long as no Event of Default has occurred and is continuing, sales or other dispositions of obsolete items of equipment consistent with past practices.

**10.**      **Insurance**.   Grantor, prior to conducting any business other than paying or performing its other obligations under the Loan, shall:  (a) maintain with financially sound and reputable insurers, insurance with coverage and limits as may be required by Law and of such character and amounts as are usually maintained by companies engaged in like business, including without limitation liability insurance; (b) furnish to Lender upon the execution of this Agreement and at the beginning of each fiscal year, copies of policies and a statement of the insurance coverage; and (c) maintain the Insurance Requirements.  Lender shall be named a loss payee under such policies to the extent of its interest.  Such insurance shall be in such minimum amounts that the Grantor will not be deemed a co-insurer under applicable insurance laws, regulations and policies. Except as otherwise expressly provided in the Insurance Requirements, the policies shall provide that no cancellation shall occur without thirty (30) days prior written notice to Lender.  Grantor shall provide Lender with notice that such policies have been renewed and are paid in accordance with the terms of such policies at least fifteen (15) days prior to the date of expiration. Grantor will at least annually and upon any change, or more often upon the occurrence of an Event of Default, upon request of Lender, furnish to Lender a schedule of all insurance carried by Grantor, setting forth in detail the amount and type of such insurance.  The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral described in this Agreement shall, (i) so long as no Event of Default has occurred and is continuing and the amount of such proceeds of casualty insurance is less than $50,000.00, then with the written consent of Lender, such amounts less than $50,000.00 be disbursed to the Grantor for direct application by the Grantor solely to the repair or replacement of such portion of the Collateral described in this Agreement so damaged or destroyed and (ii) in all other circumstances, be held by Lender or Loan Servicer as cash collateral for the Obligations. Lender may, at its sole option, disburse from time to time all or any part of such proceeds so held as cash collateral, upon such terms and conditions as Lender may reasonably prescribe, for direct

application by the Grantor solely to the repair or replacement of the Grantor's property so damaged or destroyed, or Lender may apply all or any part of such proceeds to the Obligations.

11.     **Collateral Protection Expenses; Preservation of Collateral**.

    a.   <u>Expenses Incurred</u>. Upon an Event of Default which continues beyond any applicable cure period, Lender may, in its sole discretion, discharge taxes, liens, charges and/or other encumbrances at any time levied or placed upon all or any portion of the Collateral, make repairs thereto and pay any necessary filing fees or insurance premiums, it being expressly understood and agreed by Grantor that any such sums expended by Lender shall be added to the unpaid principal balance of the Loan and such amounts so advanced by Lender shall accrue at the Default Rate. The Grantor agrees to reimburse Lender on demand for all expenditures so made. Notwithstanding anything herein to the contrary, Lender shall have no obligation to make any such expenditures or advances, nor shall the making thereof be construed as a waiver or cure of any Event of Default.

    b.   <u>Lender's Obligations and Duties</u>. Notwithstanding anything herein to the contrary, Grantor shall remain primarily obligated and liable under each contract or agreement included in the Collateral (including, without limitation, under any of the Assigned Rights (as defined in the Assignment of Contracts)) to be observed, paid and/or performed by the Grantor thereunder. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, Lender shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by Lender of any payment or the exercise by Lender of any rights and/or remedies relating to any of the Collateral, nor shall Lender be obligated in any manner to perform any of the obligations of the Grantor under or pursuant to any such contract or agreement, or to make any inquiry as to the nature or sufficiency of any payment received by Lender in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to Lender or to which Lender may be entitled at any time or times. Lender's sole duty with respect to the custody, safe keeping and physical preservation of any Collateral in Lender's actual, physical possession and control, under any applicable Law, under the UCC or otherwise, shall be to deal with such Collateral in the same manner as Lender deals with similar property for its own account.

12.     **Securities and Deposits**. Lender may, at its option at any time following and during the continuance of an Event of Default, transfer to itself or any designee, assignee or nominee, any securities constituting Collateral, receive any income thereon and hold such income as additional Collateral or apply it to the Obligations in any order of priority as determined by Lender in its sole discretion. At any time following and during the continuance of an Event of Default, Lender may demand, sue for, collect, or make any settlement or compromise with any Person which it deems reasonable with respect to all or any portion of the

Collateral.  Regardless of the adequacy of Collateral or any other security for the Obligations, any deposits or other sums at any time credited by or due from Lender to the Grantor may at any time be applied to or set off against any of the Obligations then due and owing.

**13.**       **Notification to Account Debtors and Other Persons Obligated on Collateral.** If an Event of Default shall have occurred and be continuing, then at the request and option of Lender, Grantor shall notify account debtors and other Persons obligated to Grantor under or in connection with any Collateral, the first-priority lien and security interest of Lender therein and that payment shall be directed and be made directly to Lender (or to such other Person expressly designated by Lender as its agent therefor,) and Lender may, without further or additional notice or demand to Grantor, so notify the applicable account debtors and other Persons obligated under or in connection with the Collateral.  After the making of such request or the giving of any such notification, any proceeds of collection derived from the Collateral and received by the Grantor, shall be held by Grantor, as trustee for Lender, without commingling the same with other funds of the Grantor and shall turn the same over to Lender in the identical form received from such Person, together with any necessary endorsements or assignments. Lender shall apply the proceeds derived from all or any portion of the Collateral to the Obligations in such order of priority as determined by Lender in its sole discretion.  Any proceeds received by Lender derived from all or any portion of the Collateral in excess in payment in full of the Debt shall be returned to Grantor.

**14.**       **Power of Attorney.**

a.   Appointment and Powers of Lender. The Grantor hereby irrevocably constitutes and appoints Lender (and any officer or Lender thereof), with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Grantor or in Lender's own name, for purposes of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or useful to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives said attorneys the power and right, on behalf of the Grantor, without notice to or assent by the Grantor, to do the following: Such power of attorney shall be held in escrow by Lender's Counsel and shall have the right to release such document only upon an occurrence and continuance of an Event of Default once applicable grace and or cure periods have expired and written notice to Grantor.  Upon payment and performance in full of the Obligations, this power shall be automatically revoked and rescinded.

b.   Actions by Lender. Upon the occurrence and during the continuance of an Event of Default once any applicable grace and/or cure periods have expired, generally to sell, transfer, pledge, make any agreement with respect to or otherwise dispose of or deal with any of the Collateral in such manner as is consistent with the UCC and as if fully and completely as though Lender was the absolute owner thereof for all purposes, and to do, at the Grantor's expense, at any time, or from time to time, all acts and things which Lender deems necessary or useful to protect, preserve or realize upon the Collateral and security interest therein, in order to

effect the intent of this Agreement, (A) the filing and prosecuting of registration and transfer applications with the appropriate federal, state or local agencies or authorities with respect to trademarks, copyrights and patentable inventions and processes, (B) upon written notice to the Grantor, the exercise of voting rights with respect to voting securities, which rights may be exercised, if Lender so elects, with a view to causing the liquidation of assets of the issuer of any such securities, and (C) the execution, delivery and recording, in connection with any sale or other disposition of any Collateral, of the endorsements, assignments or other instruments of conveyance or transfer with respect to such Collateral.

c.  <u>Financing Statements</u>.  To file such financing statements with respect hereto, with or without the Grantor's signature, or a photocopy of this Agreement in substitution for a financing statement, as Lender may deem appropriate and to execute in the Grantor's name such financing statements and amendments thereto and continuation statements which may require the Grantor's signature.

d.  <u>Ratification by Grantor</u>.  To the extent permitted by Law, the Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and is irrevocable.    All rights hereunder afforded to Lender, however, shall automatically terminate upon satisfaction the Note.

e.  <u>No Duty</u>. The powers conferred on Lender hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Lender shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Grantor for any act or failure to act, except for Lender's own willful misconduct.

**15.**    **Event of Default**.  An Event of Default shall occur hereunder if (i) an Event of Default shall occur and continue beyond any applicable cure period under any of the other Loan Documents; (ii)  if Grantor fails to perform or observe any covenant or agreement contained in this Agreement or in any other of the Loan Documents, and such failure remains un-remedied for thirty (30) days after Lender gives written notice thereof to Grantor and Grantor fails to cure same within said cure period; (iii) if any material representation, warranty or statement made in or pursuant to this Agreement shall be false or erroneous; or (iv) if there shall occur any sale, lease, transfer, assignment, encumbrance, or other disposition of all or any portion of the Collateral without Lender's prior written consent or as expressly permitted under the Loan Agreement.

**16.**    **Rights and Remedies Upon Event of Default**. Upon the occurrence of an Event of Default which continues beyond any and all applicable notice, grace and/or cure periods, Lender may, at its election and in addition to any other rights and remedies afforded Lender under the other Loan Documents and applicable Law, and without further demand or notice of any kind, do any one or more of the following:

a. Declare all of the Obligations to Lender to be immediately due and payable, whereupon the entire amount of the Debt shall be due and owing to Lender;

b. Terminate any commitment to make any additional advances under the Loan; and/or

c. In any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, Lender shall have the rights and remedies of a secured party under the UCC and any other applicable Law and such additional rights and remedies as may be provided to a secured party of collateral of the kind and type as the Collateral, including, without limitation, the right to take possession of the Collateral, and for that purpose Lender may enter upon the Project or wherever the Collateral may be situated and remove the Collateral (or any portion of the Collateral) therefrom. Lender may in its discretion require the Grantor to assemble all or any part of the Collateral at such location or locations within the jurisdiction of the Grantor's principal office or at such other locations as Lender may designate. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type custom sold on a recognized market, Lender shall give to the Grantor at least at ten (10) days prior written notice of the time and place of any public or private sale of Collateral or any other intended disposition is to be made. The Grantor hereby acknowledges that ten (10) days prior written notice of such sale or sales shall be reasonable notice. In addition, the Grantor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Lender's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of all or any portion of the Collateral and to exercise its rights and remedies with respect thereto. Lender may also have a receiver appointed to take charge of all or any portion of the Collateral and to exercise all rights of Lender under this Agreement.

The rights and remedies of Lender described in this <u>Section 16</u> are in addition to (and not in limitation of), any other right, power, privilege, or remedy, either in law, in equity, or otherwise, to which Lender may be entitled. No failure or delay on the part of Lender in exercising any right, power, or remedy will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right hereunder. The remedies in this Agreement are in addition to, not in limitation of, any other right, power, privilege, or remedy, either in law, in equity, or otherwise, to which Lender may be entitled. All Lender's rights and remedies, whether evidenced by this Agreement or by any other agreement, instrument or document shall be cumulative and may be exercised singularly or concurrently.

**17.     Standards for Exercising Rights and Remedies**. To the extent that applicable Law imposes duties on Lender to exercise remedies in a commercially reasonable manner, the Grantor acknowledges and agrees that it is not commercially unreasonable for Lender (a) to fail to incur expenses reasonably deemed significant by Lender to prepare all or any portion of the Collateral for disposition or sale, or otherwise not complete raw material or work in process or progress into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to the Collateral (or any portion thereof) to be disposed of, or to obtain or, if not required by applicable Law, to fail to obtain approvals and/or consents for the

11

collection or disposition of Collateral to be collected or disposed of from any Governmental Authorities or from any Person, (c) to fail to exercise collection remedies against account debtors or other Persons who may be obligated under Collateral, or to fail to remove any liens, charges or encumbrances on or any adverse claims against all or any portion of the Collateral, (d) to exercise collection remedies against account debtors and other Persons obligated under the Collateral, whether directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of the Collateral (and such portions thereof) through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as the Grantor, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (k) to purchase insurance or credit enhancements to insure Lender against risk of loss, collection or disposition of Collateral or to provide to Lender a guaranteed return from the collection or disposition of Collateral, or (1) to the extent deemed appropriate by Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Lender in the collection or disposition of any of the Collateral. The Grantor acknowledges that the purpose of this <u>Section 17</u> is to provide non-exhaustive indications of what actions or omissions by Lender would fulfill Lender's duties under the UCC of the State or any other relevant jurisdiction in Lender's exercise of remedies against the Collateral and that other actions or omissions by Lender shall not be deemed to fail to fulfill such duties solely on account of not being indicated in this <u>Section 17</u>. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any rights to the Grantor or to impose any duties on Lender that would not have been granted or imposed by this Agreement or by applicable Law in the absence of this Section.

**18.**      **No Waiver.** Lender shall not be deemed to have waived any of its rights and remedies in respect of the Obligations or the Collateral unless such waiver shall be in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All rights and remedies of Lender with respect to the Obligations or the Collateral (or any portion thereof), whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as Lender deems expedient.

**19.**      **Suretyship Waivers by Grantor.** The Grantor waives demand, notice, protest, and notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. With respect to both the Obligations and the Collateral, the Grantor assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such

manner and at such time or times as Lender may deem advisable. Lender shall have no duty as to the collection or protection of the Collateral or any income therefrom, the preservation of rights against prior parties, or the preservation of any rights pertaining thereto. The Grantor further waives any and all other suretyship defenses.

20.     **Marshalling.** Lender shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, the Grantor hereby agrees that it will not invoke any Law relating to the marshalling of collateral which might cause delay in or impede the enforcement of Lender's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Grantor hereby irrevocably waives the benefits of all such Laws.

21.     **Proceeds of Dispositions; Expenses.** The Grantor shall pay to Lender on demand any and all expenses, including attorneys' fees and disbursements, incurred or paid by Lender in protecting, preserving or enforcing any and all rights and remedies under or in respect of any of the Obligations or any of the Collateral. After deducting all of said expenses, the residue of any proceeds of collection or sale or other disposition of Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as Lender may determine in its sole discretion, proper allowance and provision being made for any Obligations not then due. Upon the final payment and satisfaction in full of all of the Obligations and after making any payments required by the UCC of the State, any excess shall be returned to the Grantor. In the absence of final payment and satisfaction in full of all of the Obligations, the Grantor shall remain liable for any deficiency.

22.     **Overdue Amounts**. Until paid, all amounts due and payable by the Grantor hereunder shall be a debt secured by the Collateral and shall bear, whether before or after judgment, interest at the Default Rate (as that term is defined in the Note).

23.     **Governing Law; Consent to Jurisdiction.** The provisions of this Agreement and the respective rights and duties of Grantor and Lender hereunder shall be governed by and construed in accordance with New York Law.  Grantor hereby irrevocably submits to the non-exclusive jurisdiction of any State or Federal court sitting in New York County, New York, over any action or proceeding arising out of or relating to this Agreement, or any document related to the Obligations, and Grantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court.  The Grantor hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient court.

24.     **Waiver of Jury Trial**. GRANTOR AND LENDER EACH WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER

SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN LENDER AND GRANTOR ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT, THE LOAN AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

       **25.**    **Notices.** (a)  Except as expressly provided otherwise, all notices, demands, consents, approvals and statements required and/or permitted hereunder shall be in writing and shall be deemed to have been sufficiently given and/or served for all purposes when presented personally, by delivery to a nationally recognized overnight courier service [or, in the alternative by electronic mail (with confirmation of delivery) and one (1) day after delivery to a nationally recognized overnight courier service providing evidence of the date of delivery] providing evidence of the date of delivery, if to Grantor and/or Lender, at their respective addresses stated below, and/or at such other address of which a party shall have notified the party giving such notice in writing in accordance with the foregoing requirements, with a copy to each of the following:

                    If to Lender:
                    Specialty Credit Holdings, LLC
                    Two Greenwich Plaza, 1st Floor
                    Greenwich, Connecticut 06830
                    Attn:  Andrew Scott
                    E-mail:  ascott@silverpointcapital.com

                    With a copy to:
                    Mahadeva, PLLC
                    80 Business Park Drive, Suite 201
                    Armonk, New York 10504
                    Attention: Prassana Mahadeva
                    E-Mail:  pmahadeva@mahadevalaw.com

                    If to Grantor:
                    ARIAM Partners, LLC
                    1020 Powers Place
                    Alpharetta, GA 30009
                    Attention: Joe Harker
                    E-mail:  jharker@ariampartners.com

                    With a copy to:
                    Polsinelli PC
                    150 N. Riverside Plaza, Suite 3000
                    Chicago, IL 60606
                    Attention: Douglas Noren
                    E-mail: DNoren@Polsinelli.com

(b)    The parties acknowledge that all notices, demands, consents, approvals and statements required and/or permitted hereunder must be delivered to their respective counsel or else the notices, demands, consents, approvals and statements required and/or permitted hereunder shall be deemed undelivered.

(a)    The parties agree that the terms and conditions stated in this <u>Section 25</u> shall survive closing.

26.    **Miscellaneous.** The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof. This Agreement and all rights and obligations hereunder shall be binding upon the Grantor and its successors and assigns, and shall inure to the benefit of Lender and their respective successors and assigns. If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be enforceable as if such invalid, illegal or unenforceable term had not been included herein. The Grantor acknowledges receipt of a copy of this Agreement.

[Signature on Immediately Following Page]

## SIGNATURE PAGE TO SECURITY AGREEMENT

IN WITNESS WHEREOF, intending to be legally bound, the Grantor has caused this Agreement to be duly executed as of the date first above written.

### GRANTOR:

**2604 CAMBLETON ROAD PARTNERS, LLC**
A Georgia limited liability company

By: _____

A _____,

Its _____

By: _____
Name: _JOSEPH HANKA_
Title: _MANAGING MEMBER_

16

SCHEDULE II
Location of Collateral

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

All that tract or parcel of land lying and being in Land Lot 199 of the 14th District, Fulton County, Georgia, being Units A-1, A-3, A-4, A-5, A-6, A-7, B-1, B-2, C-1, C-2, C-3, C-4, C-5, C-7, D-1, D-2, D-3, D-4, E-1, E-2, E-3, F-1, F-2, F-3, F-5, F-6, F-7, G-3, G-4, G-7, H-1, H-2, H-3, H-4, H-5 of the 2406 Campbellton Road Subdivision, as per plat recorded in Plat Book 392, Page 19, Fulton County, Georgia Records, which plat is incorporated herein and made a part of this description.

Together with the Declaration of Covenants, Conditions and Restrictions for Campbellton Village Townhomes, as recorded in Deed Book 44374, Page 59, aforesaid records.

Together with the Declaration of Easement recorded in Deed Book 43608, Page 527, aforesaid records.

## LIMITED GUARANTY AGREEMENT

**THIS LIMITED GUARANTY AGREEMENT** (this "**Guaranty**") is made as of the ___ day of July, 2017 by, **JOSEPH HARKER** ("**Harker**") and **BRIAN PEOPLES** ("**Peoples**" and together with Harker, individually, collectively, jointly and severally, "**Guarantor**") in favor of **SPECIALTY CREDIT HOLDINGS, LLC**, a Delaware limited liability company, (together with its successors and/or assigns, "**Lender**").

## R E C I T A L S :

**WHEREAS**, contemporaneously herewith, Lender is making a commercial real estate loan to **2604 Cambleton Road Partners, LLC**, a Georgia limited liability company ("**Borrower**"), in the principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00) (the "**Loan**"); and

**WHEREAS**, the Loan is evidenced by, among other things, a certain Loan Agreement, dated of even date herewith, by and among Borrower, Guarantor and Lender, in the principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00) (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "**Loan Agreement**"); and

**WHEREAS**, the Loan is further evidenced by a certain Promissory Note, dated of even date herewith, made and executed by Borrower in favor of Lender, in the principal amount of TWO MILLION THREE HUNDRED THOUSAND AND 00/100 DOLLARS ($2,300,000.00) (together with all extensions, renewals, modifications, substitutions and amendments thereof, the "**Note**"); and

**WHEREAS**, Guarantor has a Controlling (as defined in the Loan Agreement) interest and direct or indirect ownership interest in Borrower and will therefore substantially benefit from the Loan; and

**WHEREAS**, Lender requires that Guarantor execute and deliver this Guaranty as a condition precedent to making the Loan.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, and in order to induce Lender to make the Loan to Borrower, Guarantor hereby represents, warrants and covenants as follows:

1.    <u>Capitalized Terms; Authorization and Enforceability of Loan Documents</u>. Except as otherwise defined herein, all capitalized terms in this Guaranty shall have the same meaning as defined in the Loan Agreement. Guarantor acknowledges and agrees that it holds a Controlling or ownership interest (whether direct or indirect) in Borrower and that the Loan Documents have been duly authorized and executed by Borrower and are the legal, valid and binding instruments, enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other legal or equitable principles now or hereafter in effect generally affecting creditors' rights and remedies.

2.    <u>Obligations Guaranteed</u>.    (A)    Guarantor hereby unconditionally

Limited Guaranty

guarantees any and all Obligations of Borrower under the Loan Documents which are owed at any time to Lender thereunder for any loss, damage, cost, expense, liability, claim and/or any other obligation incurred by Borrower to Lender (including attorneys' fees and costs) plus the payment of all Enforcement Costs (as defined herein) arising from or related to the following:

(i)     fraud or material misrepresentation by or on behalf of Borrower or Guarantor (or any of their agents or representatives) in connection with the Loan;

(ii)     the gross negligence or willful misconduct of Borrower or Guarantor (or any of their agents or representatives) in connection with the Loan;

(iii)     the breach of any representation, warranty, covenant or indemnification provision under the Americans with Disability Act, the Indemnity and/or in the Security Instrument concerning any and all Laws related to environmental matters, hazardous substances and/or asbestos, in addition to any indemnification of Lender with respect thereto;

(iv)     the filing of any mechanic, contractor, materialmen or other similar lien by any Person on or against all or any portion of the Project which remain unsatisfied;

(v)     misappropriation of proceeds from the Loan by Borrower, Guarantor or any Affiliate thereof (or by any agent, employee or representative thereof), failure to use proceeds from the Loan to pay charges for labor, materials and/or other charges which create liens (or may create liens) on all or any portion of the Project, the misappropriation of any rents and/or other such other income or proceeds derived from all or any portion of the Collateral (including, without limitation, insurance or condemnation proceeds or awards by Borrower or any Affiliate (or by any agent, employee or representative thereof); and/or the failure to apply or pay over any tenant security deposits or other refundable deposits in accordance with the terms of applicable Leases (as defined in the Security Instrument), if any;

(vi)     following the occurrence of an Event of Default, Borrower (including Borrower in its capacity as a debtor or debtor in possession in any Proceeding) fails either to apply rents or other income derived from the Collateral, whether collected before or after such Event of Default, to the ordinary, customary, and necessary expenses of operating the Project in accordance with the Budget and/or upon Lender's written demand to deliver such Rents or other income derived from the Collateral to Lender;

(vii)     material physical waste is committed on the Project by the Borrower or by any Person under Borrower's Control;

(viii)     Borrower fails to maintain insurance or to pay taxes or assessments prior to delinquency, or other liens or claims that could create a lien upon or affecting all or any portion of the Project; provided that such obligation by Borrower to pay such taxes or insurance premiums shall be limited and Guarantors shall have no liability hereunder to the extent Borrower has escrowed funds with Lender for the payment of such costs and Lender has not made such funds available for the payment thereof; or

2

(ix)     following an Event of Default, Borrower fails to deliver to Lender after written request therefor, any security deposits, books and records relating to the Project.

(B)     Guarantor hereby unconditionally guarantees the immediate payment and performance of all of Borrower's Obligations under the Loan Documents and payment of the entire unpaid amount of the Debt as may be then due and owing thereunder (including, without limitation, the unpaid principal balance of the Loan, any and all accrued and unpaid interest thereon at the Applicable Interest Rate, Default Rate or both, late charges, any Make-Whole Amount, Consent Fee, Usage Fee, Break-Up Fee (as defined in the Exclusivity Agreement), Extension Fee, Usage Fee and any unpaid or deferred portion of the Origination Fee, together with any and all other amounts (including legal fees and costs), plus the payment of all Enforcement Costs, upon the occurrence of any of the following events:

(i)     If Borrower and/or Guarantor shall (A) commence or acquiesce to a case under any applicable bankruptcy, insolvency, creditors rights or other similar law now or hereafter in effect, whether such case is voluntarily or involuntarily (collectively, the "**Insolvency Laws**") or (B) makes any assignment for the benefit of creditors under any Insolvency Laws and such case has not been dismissed, with prejudice within forty-five (45) days after same has been filed; or

(ii)     If all or any portion of the Project becomes the subject of, or an asset in, any action under any applicable Insolvency Laws (whether voluntary or involuntary) and such case has not been dismissed within forty-five (45) days after same has been filed; or

(iii)     So long as any portion of the Debt remains unpaid, if a change to the Organizational Documents of Borrower or Borrower's organizational chart as described as an exhibit to the Loan Agreement occurs without Lender's written consent, except with respect to any transfer of a non-controlling direct or indirect interest in Borrower; or

(iv)     if Harker or Peoples fails to maintain any direct or indirect ownership and Controlling interest in Borrower; or

(v)     If Borrower, Guarantor or any Affiliate thereof has, in bad faith, contested or in any material way interfered with, either directly or indirectly, any foreclosure action, appointment of a receiver, UCC sale or similar attempt by Lender to realize upon the Project following an Event of Default; or

(vi)     If Borrower fails to maintain the Special Purpose Entity requirements in any material respect pursuant to the terms of the Loan Agreement or if a transfer of all or any portion of the Project or any interest of Guarantors in Borrower occurs without Lender's written consent.

(C)     So long as none of the events described in Subsection 2(A) or (B) have

3

occurred or then exist, Guarantor's liability under this Guaranty shall be limited to the principal amount of **ONE MILLION ONE HUNDRED FIFTY THOUSAND 00/100 DOLLARS ($1,150,000.00),** plus any and all accrued and unpaid interest, fees (including, without limitation, any Consent Fee, Usage Fee, Make-Whole Amount, unpaid portion of the Origination Fee, Extension Fee and any Break-Up Fee (as defined in the Exclusivity Agreement), as applicable) charges, costs and any and all Enforcement Costs (as defined herein).

(D)  Notwithstanding anything in this Guaranty to the contrary, so long as any portion of the Debt remains due and owing, any actual or purported termination, discharge and/or cancellation of this Guaranty and Guarantor's Obligations hereunder (whether in whole or in part) shall be deemed null, void and of no further force and effect, and this Guaranty and all of Guarantor's Obligations hereunder shall be deemed to continue and be effective and immediately reinstated upon any of the events occurring under Subsection 2(A) and/or Subsection 2(B), respectively, it being expressly understood and agreed by Guarantor that: (i) upon the occurrence of any of the events described in Subsection 2(A), Guarantor shall be liable to Lender for any loss, damage, cost, expense, liability, claim and/or any other obligation incurred by Lender (including attorneys' fees and costs) plus the payment of all Enforcement Costs; and (ii) upon any of the events occurring under Subsection 2(B),  Guarantor shall be liable to Lender for all Obligations of Borrower under the Loan Documents, including, without limitation, the entire Debt plus Enforcement Costs.

(E)  As used herein, **"Enforcement Costs"** means any and all fees, costs and/or expenses that may be paid or incurred by Lender in connection with or related to the collection and/or enforcement of all or any portion of the Guarantor's Obligations hereunder and/or the exercise and/or enforcement of any one or more of any other rights, powers, privileges, remedies and/or interests of Lender under the Loan Documents or hereunder, including, without limitation, attorneys' fees and consultants, irrespective of the manner or success of any such collection, exercise and/or enforcement, and whether or not such expenses constitute part of the Borrower's Obligations.

3.  Unconditional Guaranty. This Guaranty is an absolute, unconditional, present and continuing guaranty of payment and performance and not of collection and is in no way conditioned or contingent upon any attempt to enforce Lender's rights against Borrower or to collect from the Borrower or upon any other condition or contingency; accordingly, Lender shall have the right to proceed against Guarantor immediately upon any Event of Default without taking any prior action or proceeding to enforce the Loan Documents or any of them or for the liquidation or foreclosure of any security you may at any time hold pursuant thereto.  Guarantor hereby waives and releases any claim (within the meaning of 11 U.S.C. § 101) which Guarantor may have against Borrower arising from a payment made by Guarantor under this Guaranty and agrees not to assert or take advantage of any subrogation rights of Guarantor or any right of Guarantor to proceed against Borrower for reimbursement.  It is expressly understood that the waivers and agreements of Guarantor constitute additional and cumulative benefits given to Lender for its security and as an inducement for its extension of credit to Borrower.  Lender may at any time and from time to time take any and/or all actions and enforce all rights and remedies available to it hereunder or under applicable Law to collect from Guarantor any amounts then due and payable hereunder by Guarantor and/or to cause Guarantor to fulfill his, her or its Obligations hereunder.  Lender may at any time and from time to time take any and/or all actions

4

and enforce all rights and remedies available to it hereunder or under applicable law to collect from Guarantor any amounts then due and payable hereunder by Guarantor and/or to cause Guarantor to fulfill his, her or its Obligations hereunder.

4.    <u>Liability Unimpaired</u>.  Guarantor's liability hereunder shall in no way be limited or impaired by, and Guarantor hereby consents to and agrees to be bound by, any amendment or modification of the provisions of any of the Loan Documents or any other instrument made to or with Lender by Borrower or Guarantor, or any Person who succeeds Borrower as owner of all or part of the Project prior to foreclosure of the Security Instrument or exercise of any power of sale contained therein.  In addition, Guarantor's liability hereunder shall in no way be limited or impaired by (i) any extensions of time for performance required by any of said documents, (ii) any sale, assignment or foreclosure (whether judicial or non-judicial) of the Note or Security Instrument or any sale or transfer of all or part of the Project or such other Collateral covered by the Security Instrument, (iii) any exculpatory provision in any of said instruments limiting Lender's recourse to the Project or to any other security, collateral or Collateral (or any portion thereof), or limiting Lender's rights to a deficiency judgment against Borrower (or any other Person), (iv) the release of Borrower or any other Person from payment and/or performance or observance of any of the agreements, covenants, terms or conditions contained in any of said instruments by operation of Law or otherwise, (v) the release or , in whole or in part, of any security, collateral or Collateral for the Loan or any Cross-Collateral Loan, (vi) Lender's failure to record the Security Instrument or file any UCC financing statements (or Lender's improper recording or filing of any of the foregoing) or to otherwise perfect, protect, secure or insure any security interest or lien given as security for the Loan, (vii) the invalidity, irregularity or unenforceability, in whole or in part, of any of the Loan Documents, this Guaranty or any other instrument or agreement executed or delivered to Lender in connection with the Loan; (viii) the inaccuracy of any of the representations and/or warranties (or a breach of any covenants or negative covenants) made by Borrower in the Security Instrument or the other Loan Documents, or (ix) any other action or circumstance whatsoever that constitutes, or might be construed to constitute, a legal or equitable discharge or defense (except full payment and satisfaction) of or by Borrower with respect to its Obligations under any of the Loan Documents or of Guarantor under this Guaranty; and, in any such case, whether with or without notice to Guarantor and with or without consideration.

5.    <u>Preservation of Loan Documents</u>.  Until such time the Debt is paid in full, Guarantor will cause Borrower to maintain and preserve the enforceability and validity of the Loan Documents as the same may be modified and will not permit Borrower or any other Person on Borrower's behalf to take or to fail to take any actions of any kind which might be the basis for a claim that Guarantor has a defense to Guarantor's Obligations hereunder.

6.    <u>Security</u>.  As security for any and all of the Obligations of the Guarantor under this Guaranty now existing or hereafter arising hereunder or otherwise, the Guarantor hereby grants to Lender a lien upon and a security interest in any and all cash flow, moneys or other property (i.e., goods and merchandise, as well as any and all documents relative thereto; funds, securities, choses in action and any and all other forms of property whether real, personal or mixed, and any right, title or interest of the Guarantor therein or thereto), and the proceeds thereof, which have been, or may hereafter be, deposited or delivered to Lender (or with any third party acting on Lender's behalf) by or for the account or credit of the Guarantor whether for

Limited Guaranty

safekeeping, custody, pledge, deposit, transmission, collection or otherwise.  All remittances and property shall be deemed delivered to Lender as soon as put in transit to Lender by mail or carrier.

7.     Indemnification; Payments; Certain Waivers.   Guarantor (i) waives any right or claim of right to cause a marshalling of Borrower's assets or to cause Lender to proceed against any of the security for the Loan or for the Obligations guaranteed hereby before proceeding against Guarantor, (ii) agrees that any payments required to be made by Guarantor hereunder shall become due on demand in accordance with the terms of this Guaranty and without presentment to Borrower, demand for payment or protest or notice of non-payment or protest, and (iii) except as hereinafter provided, expressly waives and relinquishes all rights and remedies accorded by applicable law to guarantors.  Without limiting the generality of the foregoing, Guarantor hereby waives all rights (x) to participate in any claim or remedy Lender may now or hereafter have against Borrower or in any Collateral which Lender now has or any additional collateral Lender may hereafter acquire for the Obligations guaranteed hereby and (y) except as provided below, to contribution, indemnification, set-off, exoneration or reimbursement, whether from Borrower, Guarantor, or any other Person now or hereafter primarily or secondarily liable for any of Borrower's Obligations to Lender, and whether arising by contract or operation of law or otherwise by reason of Guarantor's execution, delivery or performance of this Guaranty.  Guarantor does not waive and hereby retains all rights of subrogation, contribution, indemnification, set-off or reimbursement against Borrower or any other Guarantor that Guarantor may have (the "**Undersigned's Rights**"); provided however that (i) this Guaranty shall neither be contingent upon the existence of the Undersigned's Rights nor subject to any claims or defenses whatsoever which may be asserted in connection with the enforcement or attempted enforcement of the Undersigned's Rights including, without limitation, any claim that the Undersigned's Rights were abrogated by Lender's acts and/or omissions, and (ii) until the Loan shall have been indefeasibly paid in full, Guarantor hereby postpones and subordinates (A) the exercise of any and all of the Undersigned's Rights and Lender's rights against Guarantor under this Guaranty or against Borrower under any of the Loan Documents, and (B) any of the Undersigned's Rights to any Collateral securing the Loan.

8.     Reinstatement.   This Guaranty shall continue to be effective, or be reinstated automatically, as the case may be, if at any time payment, in whole or in part, of any of the Obligations guaranteed hereby is rescinded or otherwise must be restored or returned by Lender (whether as a preference, fraudulent conveyance or otherwise) upon or in connection with the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower, Guarantor or any other Person, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower, Guarantor or any other Person or for a substantial part of Borrower's, Guarantor's or any of such other Person's property, as the case may be, or otherwise, all as though such payment had not been made.  Guarantor further agrees that in the event any such payment is rescinded or must be restored or returned, all costs and expenses (including, without limitation, legal fees and expenses) incurred by or on behalf of Lender in defending or enforcing such continuance or reinstatement, as the case may be, shall constitute Enforcement Costs, the payment of which is guaranteed by Guarantor pursuant to Section 2 above and covered by Guarantor's indemnity pursuant to Section 7 above.

9.     Litigation, Compliance with Judgments.  Guarantor represents and

6

Limited Guaranty

warrants that there are no actions, suits or proceedings pending or threatened against or affecting Guarantor, at Law, in equity or before or by any Governmental Authorities which would have a material effect on such Guarantor's ability to perform its Obligations hereunder and Guarantor is not in default with respect to any order, writ, injunction, decree or demand of any court or Governmental Authorities.

10. <u>Authorization and Enforceability; No Conflicts</u>. Guarantor has the full power and authority to enter into and perform its Obligations under this Guaranty and this Guaranty is a legal, valid and binding instrument, enforceable against Guarantor in accordance with its terms. Guarantor represents and warrants that the consummation of the transactions contemplated hereby and the performance of this Guaranty and the other Loan Documents to which such Guarantor is a party have not resulted and will not result in any breach of, or constitute a default under, any mortgage, deed of trust, lease, bank loan or credit agreement, corporate charter, by-laws, partnership agreement or other instrument to which Guarantor is a party or by which Guarantor may be bound or affected.

11. <u>Compliance with Laws</u>. Guarantor represents and warrants that it is in compliance with, and the transactions contemplated by the Loan Documents and this Guaranty do not and will not violate any provision of any applicable Law presently in effect having applicability to Guarantor, and agrees that Guarantor will comply promptly with all Laws now or hereafter in effect having applicability to Guarantor.

12. <u>Accuracy of Information; Full Disclosure</u>. Guarantor represents and warrants that neither this Guaranty nor any documents, financial statements, reports, notices, schedules, certificates, statements or other writings furnished by or on behalf of Guarantor to Lender (or Affiliate thereof) in connection with the negotiation of the Loan Documents or the consummation of the transactions contemplated thereby, or required herein or by the other Loan Documents to be furnished by or on behalf of Guarantor, contains any untrue or misleading statement of a material fact; there is no fact which Guarantor has not disclosed to Lender (or any Affiliate thereof) in writing which materially affects adversely all or any portion of the Project covered by the Security Instrument or the business affairs or financial condition of Guarantor, or the ability of Guarantor to perform this Guaranty and the other Loan Documents to which Guarantor is a party.

13. <u>Share Transfer Restriction</u>. If Guarantor is a partnership, corporation or limited liability company, so long as any portion of the Debt remains unpaid, no transfer of any shares of or ownership interests in Guarantor (or by any Person in any other entity which may be directly or indirectly controlled by Guarantor) in Borrower may be made without the express written consent of Lender.

14. <u>Non-Waiver Remedies Cumulative</u>. No failure or delay on Lender's part in exercising any right, power, remedy, action or privilege under any of the Loan Documents, this Guaranty or any other documents shall operate as a waiver of any such right, power, remedy, action or privilege and shall not be deemed to constitute Lender's acquiescence in any Default or Event of Default by Borrower or Guarantor under any of the Loan Documents. A waiver by Lender of any right, power, remedy, action or privilege under any of the Loan Documents, this Guaranty or any other documents made to or with Lender in connection with the Loan on any

7

Limited Guaranty

one occasion shall not be construed as a bar to any right, power, remedy, action or privilege which Lender otherwise would have on any future occasion. Any right, power, remedy, action or privilege provided in said documents are cumulative, may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by Law.

15.   <u>Transfers of Interests in Loan</u>.   Guarantor acknowledges that Lender may, in its sole discretion, sell, assign or transfer one or more interests in the Loan, this Guaranty and the other Loan Documents to one or more participants, purchasers and/or assignees and agrees in connection therewith, all Loan Documents and other documentation, financial statements, appraisals and other data, or copies thereof as may be relevant to Borrower, Guarantor, any other Person obligated under the Loan Documents, and/or all or any portion of the Project, may be provided to and retained by any such participant, purchaser or assignee.

16.   <u>Separate Indemnity</u>.   Guarantor acknowledges and agrees that Lender's rights (and Guarantor's Obligations) under this Guaranty shall be in addition to all of Lender's rights (and all of Guarantor's Obligations) under the Indemnity and/or under any other indemnity provision, clause and/or agreement executed and delivered to Lender by Borrower and/or Guarantor in connection with the Loan, and payments by Guarantor under this Guaranty shall not reduce any of Guarantor's Obligations and liabilities under any such indemnity provision, clause and/or agreement.

17.   <u>Severability</u>.   Any provision of this Guaranty, or the application thereof to any Person or circumstance, which, for any reason, in whole or in part, is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Guaranty (or the remaining portions of such provision) or the application thereof to any other Person or circumstance, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision (or portion thereof) or the application thereof to any Person or circumstance in any other jurisdiction.

18.   <u>Entire Agreement; Amendments</u>.   This Guaranty contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior oral or written agreements or statements relating to such subject matter, and none of the terms and provisions hereof may be waived, amended or terminated except by a written instrument signed by the Person against whom enforcement of the waiver, amendment or termination is sought.

19.   <u>Successors and Assigns</u>.   This Guaranty shall be binding upon and shall inure to the benefit of Lender and Guarantor and their respective heirs, personal representatives, successors and assigns.   Subject to the terms of the Loan Agreement, this Guaranty may be assigned by Lender with respect to all or any portion of the Obligations guaranteed hereby, and when so assigned Guarantor shall be liable under this Guaranty to the assignee(s) of the portion(s) of the Obligations guaranteed hereby so assigned without in any manner affecting the liability of Guarantor hereunder to Lender with respect to any portion of the Obligations guaranteed hereby retained by Lender.

20.   <u>WAIVER OF TRIAL BY JURY</u>.   GUARANTOR, AND BY ITS ACCEPTANCE HEREOF AND LENDER, EACH HEREBY AGREES NOT TO ELECT A

8

Limited Guaranty

TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. GUARANTOR, AND LENDER ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.

21. ADDITIONAL WAIVERS IN THE EVENT OF ENFORCEMENT. GUARANTOR HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS GUARANTY, ANY AND EVERY RIGHT GUARANTOR MAY HAVE TO (I) INJUNCTIVE RELIEF, (II) INTERPOSE ANY COUNTERCLAIM THEREIN (OTHER THAN COMPULSORY COUNTERCLAIMS), AND (III) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING.

22. Governing Law; Submission to Jurisdiction. This Guaranty and the rights and obligations of the parties hereunder shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of New York (without giving effect to New York's principles of conflicts of law). Guarantor hereby irrevocably submits to the nonexclusive jurisdiction of any New York State or Federal court sitting in the County and City of New York over any suit, action or proceeding arising out of or relating to this Guaranty, and Guarantor hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any New York State or Federal court sitting in the County and City of New York may be made by certified or registered mail, return receipt requested, directed to the Guarantor at the address indicated below, and service so made shall be complete five (5) days after the same shall have been so mailed.

23. Paragraph Headings. Any paragraph headings and captions in this Guaranty are for convenience only and shall not affect the interpretation or construction hereof.

24. Liability Unaffected by Release. Any other Person liable upon or in respect of any Obligation hereby guaranteed may be released without affecting the liability of Guarantor hereunder.

25. Joint and Several Obligations. If more than one Person comprises Guarantor, then each such Person's Obligations and liability under this Guaranty shall be joint and several.

26. Notices. Notices shall be given in the manner provided in the Loan Agreement with respect to Lender and with respect to Guarantor, as follows:

If to Lender:

9

Limited Guaranty

Specialty Credit Holdings, LLC
Two Greenwich Plaza, 1st Floor
Greenwich, Connecticut 06830
Attn:  Andrew Scott
E-mail:  ascott@silverpointcapital.com

With a copy to:
Mahadeva, PLLC
80 Business Park Drive, Suite 201
Armonk, New York 10504
Attention: Prassana Mahadeva
E-Mail:  pmahadeva@mahadevalaw.com

If to Guarantor:
c/o ARIAM Partners, LLC
1020 Powers Place
Alpharetta, GA 30009
Attention: Joe Harker
E-mail:  jharker@ariampartners.com

With a copy to:
Polsinelli PC
150 N. Riverside Plaza, Suite 3000
Chicago, IL 60606
Attention: Douglas Noren
E-mail: DNoren@Polsinelli.com

     27.    <u>Principles of Construction</u>.  All references to sections, paragraphs, schedules and exhibits are to sections, schedules and exhibits in or to this Guaranty unless otherwise specified.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Guaranty shall refer to this Guaranty as a whole and not to any particular provision of this Guaranty.  The recitals to this Guaranty shall be deemed a part hereof and all exhibits and schedules attached hereto, if any, are incorporated herein by reference for all purposes.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined and "including" means including without limitation.  Whenever the context requires, each gender shall include all other genders.

     28.    <u>Counterparts</u>. This Guaranty may be executed in any number of counterparts, each of which shall be an original and all of which shall constitute together but one and the same agreement.

Limited Guaranty

## SIGNATURE PAGE TO LIMITED GUARANTY

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

**JOSEPH HARKER**

**By:** _____

**STATE OF** Georgia )

                           : ss.:

**COUNTY OF** Fulton )

On this 12 day of July in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared Joseph Harker, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

_____
Notary Public

11

## SIGNATURE PAGE TO LIMITED GUARANTY

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above.

**BRIAN PEOPLES**

**By:** _____

**STATE OF** Georgia          )
                              : ss.:
**COUNTY OF** Fulton          )

On this 12 day of July in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared Brian Peoples, personally known to me and/or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual and/or the person in behalf of which the individual acted, executed the instrument.

_____
Notary Public

12

Limited Guaranty