Fulton County Superior Court
***EFILED***LW
Date: 5/25/2023 12:17 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **GAIN SERVICING LLC** | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action File No. _____  2023CV380689 |
| v. | § | |
| | § | |
| **ACCELERATED CARE CENTER, LLC** | § | |
| | § | |
| Defendant. | § | |

### ORIGINAL COMPLAINT

**COMES NOW**, Plaintiff, Gain Servicing LLC ("Gain"), to file this Original Complaint against Defendant, Accelerated Care Center, LLC ("Accelerated"), and in support would show as follows:

### I.    PARTIES

1.    Gain is a limited liability company organized and existing under the laws of Georgia, with its principal place of business located at 3424 Peachtree Rd. NW, Suite C-100, Atlanta, Georgia 30326.

2.    Accelerated is a limited liability company organized and existing under the laws of the state of Missouri, with its principal place of business located at 12152 Tesson Ferry Road, St. Louis, Missouri 63128.

### II.    JURISDICTION AND VENUE

3.    This suit arises out of a Services Agreement ("Agreement") executed by and between Gain and Accelerated on May 14, 2020, as amended by Amendment No. 1 on June 9, 2020, and Amendment No. 2 on July 1, 2020, in which Accelerated retained Gain to provide certain

1



services as outlined in the Agreement. A true and correct copy of the Agreement and its Amendments is attached hereto as **Exhibit A** and is incorporated fully herein by reference. Further, Gain and Accelerated expressly agreed that the Agreement "shall be governed by the laws of the State of Georgia without regard to the conflicts of law principles thereof." (Ex. A at § 15.10.)

4.     Pursuant to Ga. Const. art. VI, § 4, ¶ I and O.C.G.A. § 15-6-8, this Court has subject-matter jurisdiction over this suit.

5.     Pursuant to O.C.G.A. §§ 9-10-91(1) and 9-10-94, Accelerated, having transacted business within the State of Georgia, is subject to the jurisdiction of this Court and may be served with process at its principal place of business.

6.     Pursuant to O.C.G.A. § 9-10-93, venue is proper in the Superior Court of Fulton County, Georgia because a substantial part of the business that gives rise to this suit between Gain and Accelerated was transacted in Fulton County, Georgia. Gain is a resident of Fulton County, Georgia; Gain provided the services required under the Agreement in Fulton County Georgia; the Agreement required certain notices and information to be sent to Gain in Fulton County, Georgia; and Gain retained certain proceeds for services rendered in Fulton County, Georgia.

## III.    FACUTAL BACKGROUND

7.     Gain is an Atlanta-based limited liability company that provides management software, tracking, accounts receivable collection, and reporting services for healthcare providers related to the acceptance of Letters of Protections ("LOP") as a payment method for uninsured and underinsured patients.

8.     As part of providing these services, Gain and the particular healthcare provider requesting services will enter into a services agreement that outlines all pertinent obligations, rights, and remedies attributed to each respective party to the agreement.

2

4856-5327-0110.5

9.     On or about May 14, 2020, Gain entered into such an Agreement with Accelerated, whereby each party expressly agreed to be bound by its terms. (*See generally* Ex. A.)

10.     Pursuant to the Agreement, Gain was to provide certain tracking and collection services with respect to specific accounts receivable for medical charges owed to Accelerated by certain patients who have suffered personal injury ("Serviced Accounts Receivable"). (*See* Ex. A at §§ 2.1, 2.7.) Accelerated was to then send Gain all proposed Serviced Accounts Receivables, whereby gain would group, evaluate, and accept certain Serviced Accounts Receivables ("Accepted A/R Batch"). (*See* Ex. A at § 2.3.) To acknowledge the Accepted A/R Batch, Gain would then send Accelerated a listing as to whether each Serviced Accounts Receivable was accepted or declined, within thirty (30) days of receiving the proposed Serviced Accounts Receivables ("Accepted Accounts Sheet"). (*See* Ex. A at § 2.4.)

11.     For each patient invoice attributed to an accepted Serviced Accounts Receivable, Gain would pay Accelerated a certain percentage of the gross invoice ("Advance Rate"). (*See* Ex. A at § 6.1.) In consideration of the services provided under the Agreement, Gain was to receive an amount equal to 185% of the Advance Rate for all Serviced Accounts Receivable ("Initial Return"). (*See* Ex. A at Amendment No. 1 § 6.5.)

12.     Importantly, and at issue in this suit, Sections 6.7 and 6.8 of the Agreement provide threshold guarantees that Accelerated expressly agreed to abide by.

13.     Section 6.7 of the Agreement provides that:

If, eighteen (18) months after the acceptance of the Accepted A/R Batch by sending the Accepted Accounts Sheet, Gain has not collected Net Proceeds attributable to all Serviced Accounts Receivable equal to at least 110% of the Advance Rate for all Serviced Accounts Receivable in the Accepted A/R Batch, then Provider agrees to (1) pay to Gain within 5 business days the amount required to ensure that Gain receives at least 110% of the Advance Rate for all Serviced Accounts Receivable in the Accepted A/R Batch; or (2) assign to Gain

3

additional assets acceptable to Gain. For the avoidance of doubt, whether to accept additional assets in lieu of cash shall be solely at Gain's discretion.

14.     Section 6.8 of the Agreement provides that:

If, twenty-four (24) months after the acceptance of an Accepted A/R Batch by sending the Accepted Accounts Sheet, Gain has not collected Net Proceeds attributable to all Serviced Accounts Receivable equal to the Advance Rate plus the Initial Return for all Serviced Accounts Receivable in the Accepted A/R Batch, then Provider agrees to (1) pay to Gain within 5 business days the amount required to ensure that Gain receives at least the Advance Rate plus the Initial Return for all Serviced Accounts Receivable in the Accepted A/R Batch; or (2) assign to Gain additional assets acceptable to Gain. For the avoidance of doubt, whether to accept additional assets in lieu of cash shall be solely at Gain's discretion.

15.     In short, under the Agreement, Accelerated promised to ensure that Gain recouped at least 110% of the Advanced Rate it paid to Accelerated for each Accepted A/R Batch within eighteen months of its acceptance. Further, at twenty-four months from the date of acceptance, Accelerated promised to ensure that Gain would recoup at least the Advanced Rate plus the Initial Return (185% of the Advance Rate). If these thresholds were not met, Accelerated promised to pay any shortfall within 5 business days of the relevant anniversary of the acceptance of an Accepted A/R Batch.

16.     On January 16, 2023, Gain sent Accelerated a formal demand for payment related to certain Accepted A/R Batches that failed to meet the required threshold amounts, as required by Sections 6.7 and 6.8 of the Agreement. A true and correct copy of the demand letter is attached hereto as **Exhibit B** and is incorporated fully herein by reference. As of the date of the demand letter, Accelerated's threshold shortfall was $1,048,704.12. (*See* Ex. B.)

17.     On February 22, 2023, and again on March 21, 2023, after payment had not been received, Gain sent subsequent notices to Accelerated of its breach and made additional demands for payment. True and correct copies of these notices are attached hereto as **Exhibit C** and are incorporated fully herein by reference. Despite being notified of its breach of the

4

Agreement, Accelerated has not made any such payments to date. Therefore, pursuant to Section 13.4 of the Agreement, Accelerated is and continues to be in default of the Agreement.[1]

18.     Upon an event of default not cured within 30 days of its occurrence, Section 14.1 of the Agreement provides Gain with certain remedies: (*See* Ex. A at § 14.1.)

    (a)     Gain may, at Gain's option, declare immediately due and payable without the need for further demand on the Provider liquidated damages in an amount equal to the Initial Return for all outstanding Serviced Accounts Receivable plus 14% of the gross invoice amount for all outstanding Serviced Accounts Receivable plus direct expenses for all outstanding Serviced Accounts Receivable;

    (b)     Provider assigns to Gain All Serviced Accounts Receivable, all proceeds of any Serviced Accounts Receivable, and Provider's security interests in all Serviced Accounts Receivable and all proceeds of any Serviced Accounts Receivable. This Agreement shall be deemed to be a security agreement for such purposes.

    (c)     Gain May offset all outstanding advances and any other amount owed by Provider to Gain against any (i) balances and deposits of Provider held by Gain, or (ii) any amount to or for the credit or the account of Provider.

19.     As such, under the unambiguous terms of the Agreement, Gain has declared liquidated damages, as specified in Section 14.1 of the Agreement, as immediately due and payable, and has been assigned all Serviced Accounts Receivables, all proceeds of any Serviced Accounts Receivables, and security interests in all Serviced Accounts Receivables and all proceeds of any Serviced Accounts Receivables held by Accelerated.

20.     To date, Accelerated has failed and refused to remit any payment as required under the obligations of the Agreement, giving rise to this action to enforce Gain's rights under said Agreement. As of the date of this Complaint, at least $4,626,205.58 is immediately due and payable by Accelerated.

---

[1] *See* Ex. A at §§ 13, 13.4 ("Any one or more of the following is an 'Event of Default.' . . . .Provider breaches or fails to satisfy when due any covenant, agreement, obligation, warranty, or representation in this agreement[.]")

4856-5327-0110.5

## IV.   CAUSE OF ACTION

### COUNT I
### (Breach of Contract)

21.    Gain re-alleges and incorporates by reference all the allegations in the preceding paragraphs as if fully set forth herein.

22.    Gain and Accelerated are parties to a valid and enforceable contract.

23.    Gain fully complied with its obligations under the contract.

24.    Accelerated's actions of failing to adhere to the threshold requirements under the contract caused an "Event of Default" which was not cured within 30 days, thereby affording Gain certain remedies under the contract. (*See* Ex. A at §§ 6.7, 6.8, 14.1.)

25.    Accelerated breached the contract by failing to pay amounts owed to Gain as a remedy for Accelerated's Event of Default, under the unambiguous language of the contract.

26.    As a direct and proximate result of Accelerated's breach, Gain has been and continues to be injured and has damages as a party to the contract.

## V.   ATTORNEYS' FEES

27.    Gain re-alleges and incorporates by reference all the allegations in the preceding paragraphs of its Complaint as if fully set forth herein.

28.    As a result of Accelerated's breach of contract, Gain had to engage the undersigned counsel to bring this litigation to enforce the contract. Pursuant to Section 10 of the Agreement, Accelerated is required to:

> Promptly pay Gain for all costs and expenses paid or incurred by Gain in connection with the enforcement of Gain's rights under this Agreement, including, without limitation: costs and expenses (including attorneys' and paralegals' fees and disbursements) paid or incurred to . . . enforce the provisions of this Agreement and any amendment[.]

6

4856-5327-0110.5

29.    Further, pursuant to O.C.G.A. § 13–6–11, because Accelerated has caused Gain unnecessary trouble and expense in enforcing its contractual rights, Gain is entitled to recover attorneys' fees.

## VI.    CONDITIONS PRECEDENT

30.    Gain re-alleges and incorporates by reference all the allegations in the preceding paragraphs as if fully set forth herein.

31.    All conditions precedent have been performed, have occurred, have been satisfied, or have otherwise been waived.

WHEREFORE, Gain respectfully requests judgment in its favor and against Accelerated as follow:

a)   awarding Gain actual and liquidated damages plus interest;

b)   awarding Gain attorneys' fees and costs of court, pursuant to the Agreement and O.C.G.A. § 13–6–11; and

c)   awarding Gain all such other and further relief, at law or in equity, general or special, to which it is entitled.

7

Dated: May 24, 2023

Respectfully submitted,

**FOLEY & LARDNER LLP**

By:   */s/ Dabney D. Ware*
      Dabney D. Ware
      Georgia Bar No. 737511
      dware@foley.com
      1 Independent Drive, Suite 1300
      Jacksonville, Florida 32202
      Phone: (904) 359-2000
      Fax: (904) 359-8700


      Geoffrey H. Bracken
      Texas Bar No. 02809750
      gbracken@foley.com
      Ronald L. Oran, Jr.
      Texas Bar No. 24072268
      roran@foley.com
      Eric B. Williams, II
      Texas Bar No. 24131767
      ebwilliams@foley.com
      1000 Louisiana Street, Suite 2000
      Houston, Texas 77002
      Phone: (713) 276-5500
      Fax: (713) 276-5555

*Geoffrey H. Bracken, Ronald L. Oran, Jr., and Eric B. Williams II pro hac forthcoming*


**ATTORNEY FOR PLAINTIFF, GAIN
SERVICING LLC**

8

4856-5327-0110.5

**EXHIBIT A**

<center>Services Agreement</center>

This Services Agreement (this "**Agreement**"), dated as of May 14, 2020 (the "**Effective Date**"), is by and between gain servicing LLC, a Georgia limited liability company ("**Gain**") and Accelerated Care Center, LLC, a Missouri limited liability company ("**Provider**").

WHEREAS, Provider is a provider of medical services and desires to retain Gain to provide certain services with respect to the tracking and collection of Provider's medical receivables, upon the terms and conditions hereinafter set forth, and Gain is willing to perform such services; and

WHEREAS, the obligors associated with such medical receivables are generally patients ("**Patients**") who have suffered personal injury and are represented by legal counsel ("**Counsel**") who are considering or who have initiated litigation ("**Proceeding**"), and who may have granted Provider a security interest in ("**Security Interest**"), and have given provider a letter of protection ("**Letter of Protection**") with respect to, the potential proceeds of such litigation;

THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties agree as follows:

1.     <u>Engagement</u>.  Provider hereby engages Gain as an independent contractor, and Gain hereby accepts such engagement, to perform Services as set forth herein.   Furthermore, Provider hereby authorizes Gain to act as Provider's agent and in Provider's name with respect to all Serviced Accounts Receivable (defined below).

2.     <u>Services</u>.

2.1     Gain shall provide certain tracking and collection services further described below with respect to specific accounts receivable for medical charges owed to Provider by Patients deemed acceptable by Gain (hereinafter "**Serviced Accounts Receivable**"). Provider shall provide to Gain certain information necessary to perform the services required hereunder with respect to each Serviced Accounts Receivable, which shall include:

(a)     A sheet in substantially the same form as attached hereto as **<u>Exhibit A</u>** evidencing, among other things, the name of the Patient, the date of service, the amount of the invoice due from the Patient to the Provider, and the invoice number utilized by Provider relative to each applicable Patient's invoice (hereinafter referred to as a "**Proposed Accounts Sheet**");

(b)     Documents sufficient to identify date of birth and SSN of the Patient;

(c)     the date of and summary information about the Patient's injury, including medical notes;

(d)     the address, phone number, and the name of the Counsel representing the Patient and if available, the names and email addresses of the specific attorneys, paralegals, and case managers;

   (e) copies of all documentation evidencing the creation of the Serviced Account Receivable and Provider's security interest (if any) in the Patient's recovery in the Proceeding; and

   (f) a copy of the Letter of Protection with respect to the Serviced Account Receivable signed by the Counsel and the Patient or other documentation acceptable to Gain.

  2.2 At or about the time of the Effective Date, Provider shall provide the information required by Section 2.1 with respect to each and every accounts receivable Provider desires to be serviced by Gain as a Serviced Accounts Receivable. During the term of this Agreement, Provider shall seek to have Gain provide Services (as defined below) pursuant to this Agreement in connection with any additional accounts receivable that Provider wishes to be serviced by a third party. Provider shall offer additional accounts receivable for servicing by providing Gain with (i) a Proposed Accounts Sheet and (ii) the information listed in Section 2.1 for those additional accounts receivable.

  2.3 Any accounts receivable listed in a Proposed Accounts Sheet shall only become a Serviced Accounts Receivable upon written notification of Gain's acceptance of such as a Serviced Accounts Receivable via an Accepted Accounts Sheet (defined below). For purposes herein, those accounts receivable accepted by Gain as Serviced Accounts Receivable shall be collectively referred to herein as an "**Accepted A/R Batch**."

  2.4 Within thirty (30) days of the receipt of a Proposed Accounts Sheet, Gain shall deliver to Provider a listing in substantially the same form as the attached **Exhibit B** of the accounts receivable that Gain accepts as Serviced Accounts Receivable and those that are not accepted (and not subject to this Agreement). This listing shall be referred to herein as the "**Accepted Accounts Sheet**." Those accounts receivable that are not accepted will be evidenced by a red highlight of such accounts receivable in the Accepted Accounts Sheet provided by Gain to Provider pursuant to this Section. All accounts receivable not so highlighted shall be deemed Serviced Accounts Receivable and subject to the terms of this Agreement. Provider agrees that it may only seek to have Services provided by a party other than Gain for accounts receivable that Gain did not accept as Accepted Accounts as evidenced an accepted accounts Sheet.

  2.5 Within ninety (90) days of Gain's receipt of the information required by Section 2.1, Gain may determine in its discretion that any Serviced Accounts Receivable is no longer acceptable and shall no longer be treated as a Serviced Accounts Receivable (and no longer part of an Accepted A/R Batch) for purposes of this Agreement if:

   (a) the Patient is (x) not represented by Counsel in the Proceeding or (y) deceased ;

   (b) the Patient or Counsel has notified Gain that they will not acknowledge and accept a Serviced Accounts Receivable and Gain's rights with respect to the servicing thereof;

   (c) the Proceeding is inactive and/or dismissed;

(d)     the Provider has not provided Gain adequate case notes;

(e)     the Provider has not provided Gain an accurate invoice that includes, without limitation, all necessary and documented PIP adjustments; or

(f)     there is inadequate liability insurance coverage as determined by Gain in its discretion.

Gain may provide notice under this Section 2.5 by indicating so in writing to Provider within the time frame required by this Section or by providing an updated Accepted Accounts Sheet evidencing a revised Accepted A/R Batch within the same time frame (such Accepted Accounts Sheet comporting with the format required by Section 2.4 to allow Provider to delineate those accounts receivable no longer acceptable by Gain).

2.6     Gain may at any time determine that a Serviced Accounts Receivable is no longer acceptable and shall no longer be treated as a Serviced Accounts Receivable (and no longer part of an Accepted A/R Batch) if Gain concludes in its discretion that: (i) any representation or warranty contained in Sections 7.1 and 7.2 shall be or have become untrue, (ii) the Provider has not provided Gain with an adequate Letter of Protection signed by both the attorney and patient or similar documentation acceptable to Gain; or (iii) Provider engages in fraud in relation to the information provided in connection with this Agreement or is grossly negligent in providing accurate information in connection with this Agreement. Provider acknowledges that immediately following notice to Provider with respect thereto, the management and collection of any such accounts receivable will be the responsibility of Provider and that such accounts receivable will no longer be subject to this Agreement. Gain may provide notice under this Section 2.6 by indicating so in writing to Provider or by providing an updated Accepted Accounts Sheet at any time evidencing a revised Accepted A/R Batch (such Accepted Accounts Sheet comporting with the format required by Section 2.4 to allow Provider to delineate those accounts receivable no longer acceptable by Gain).

2.7     The services to be provided by Gain with respect to any Serviced Accounts Receivable are as follows (the "**Services**"):

(a)     Keep a log of any outstanding Serviced Accounts Receivable;

(b)     On Provider's behalf and in Provider's name as its agent, use an email address utilizing Provider's domain name, a phone number utilizing a mutually agreeable phone system, and Provider's letterhead to communicate with Counsel to (i) keep reasonably informed about the status of the Proceedings and (ii) negotiate with Counsel any settlement or reduction of the medical charges owed to Provider relating to a Serviced Accounts Receivable;

(c)     In connection with a Serviced Accounts Receivable, receive payment from Counsel on behalf of Provider, and remit the proceeds after Initial Return, net of Gain's fees and expenses, to Provider;

3

(d)     Report to Provider each month the payments collected on any Serviced Accounts Receivable (by name and amount), the percent of invoice collected, the amounts reduced and/or other statistics as mutually agreed upon;

(e)     On Provider's behalf and in Provider's name as its agent, manage the transition when a Patient changes Counsel;

(f)     On Provider's behalf and in Provider's name as its agent, make filings to perfect Provider's liens securing repayment of the Serviced Accounts Receivable'; and

(g)     On Provider's behalf and in Provider's name as its agent, send Notices of Lien to Insurance companies as and when appropriate.

2.8     For the purposes of providing the Services, Provider hereby grants and endows Gain with full authority to act on Provider's behalf and bind Provider with respect to the provision of the Services.

3.     Gain's Obligations.

3.1     Gain is responsible for all employees of Gain and for the payment of their compensation, including, if applicable, withholding of income taxes, and the payment and withholding of social security and other payroll taxes, unemployment insurance, workers' compensation insurance payments and disability benefits.

3.2     Gain is not, and shall not be, responsible for the referral of patients to Provider or otherwise developing a greater number of patient referrals to Provider.  Gain has not guaranteed to Provider that the arrangements contemplated hereunder will guarantee any amount of income to Provider.  None of Gain's activities contemplated hereunder shall constitute obligations of Gain to generate patient flow or business to Provider, and there is absolutely no intent for Gain in any manner to be compensated to generate patients for Provider.

4.     Provider's Obligations.

4.1     Provider shall:

(a)     cooperate with Gain in all matters relating to the Services and appoint a Provider employee to serve as the primary contact with respect to this Agreement and who will have the authority to act on behalf of Provider with respect to matters pertaining to this Agreement;

(b)     provide an email address utilizing Provider's domain name, a phone number utilizing Provider's phone system, and Provider's letterhead each of which Gain is hereby authorized to use to perform the Services on Provider's behalf;

4

(c)    subject to Gain's approval, negotiate with Counsel any settlement or reduction of the medical charges owed to Provider relating to a Serviced Accounts Receivable;

(d)    provide such access to Provider's premises, and such office accommodation and other facilities as may reasonably be requested by Gain for the purposes of performing the Services;

(e)    respond within two (2) business days to any Gain request to provide direction, information, approvals, authorizations or decisions that are reasonably necessary for Gain to perform Services in accordance with the requirements of this Agreement;

(f)    provide such information as Gain may reasonably request in order to carry out the Services, in a timely manner, and ensure that it is complete and accurate in all material respects;

(g)    Provider will cause all funds, proceeds, credits, payments or other consideration distributed or paid with respect to any Serviced Accounts Receivable to be made directly to a controlled access bank (lockbox) account and/or lockbox P.O. Box address under the joint control of the parties (the "Lockbox").   Provider acknowledges and agrees that Gain may use the Provider email address account set up for Gain's use to inform any and all attorneys or law firms representing Patients, that any and all funds received on behalf of Patient and payable to the Patient/Provider by said attorney or law firm shall be forwarded to the lockbox P.O. Box.   In the event Provider receives direct payment for any Serviced Accounts Receivable, Provider shall, within two (2) business days, either (1) deposit such payment into the Lockbox or forward such payment to the lockbox P.O. Box along with a copy of any check or other documentation of the payment received.   Provider agrees that, if Provider breaches its obligations pursuant to this provision, any payment for a Serviced Accounts Receivable it receives will accrue interest beginning at the time of such breach at the maximum interest rate allowed by law, which interest rate should be at least eighteen percent per annum where allowed by law.

(h)    Provider shall supply Gain with a monthly report of (1) payments received by Provider for any Serviced Account Receivable and (2) the payment status of all Serviced Accounts Receivable as shown in Provider's accounting system.

4.2    If Gain's performance of its obligations under this Agreement is prevented or delayed by any act or omission of Provider or its agents, subcontractors, consultants or employees, Gain shall not be deemed in breach of its obligations under this Agreement or otherwise liable for any costs, charges or losses sustained or incurred by Provider, in each case, to the extent arising directly or indirectly from such prevention or delay.

5.    Term.  This Agreement shall commence as of the Effective Date and shall continue thereafter until terminated by Gain or Provider by written notice.  Gain may terminate this agreement at any time.  Provider may terminate this agreement only upon 90 days prior written notice, but any such termination shall not affect the parties' obligations with regard to any Accepted A/R Batch or Serviced Accounts Receivable.

6.    Fees and Expenses; Payment Terms.

6.1    The "**Advance Rate**" shall be 34% of the gross invoice amount of any Serviced Accounts Receivable.

6.2    Within fourteen (14) days of providing an Accepted Accounts Sheet, Gain shall pay the Provider the Advance Rate for all Serviced Accounts Receivable in an Accepted A/R Batch as evidenced by an Accepted Accounts Sheet.  For example, Gain will pay Provider $381,581.97 for the Accepted A/R Batch shown on the Accepted Accounts Sheet attached as Exhibit B.  Should Gain exercise its rights under Sections 2.5 or 2.6 of this Agreement by determining that a Serviced Accounts Receivable is no longer acceptable, Provider shall refund to Gain the Advance Rate for such Serviced Accounts Receivable deemed no longer acceptable. Such amount shall be refunded to Gain within ten (10) days of receipt by Provider of a revised Accepted Accounts Sheet delineating the Serviced Accounts Receivable that are no longer acceptable.  Gain Servicing hereby acknowledges that failure to abide by the obligations of this provision shall constitute an Event of Default (as defined below).  Gain Servicing agrees that, if after receiving its Initial Return, Gain Servicing breaches its obligations pursuant to this provision, any payment for a Serviced Accounts Receivable it receives will accrue interest beginning at the time of such breach at the maximum interest rate allowed by law, which interest rate should be at least eighteen percent per annum where allowed by law.

6.3    To ensure that Serviced Accounts Receivables are verified to the satisfaction of Gain, there shall be deducted from the initial Advance Amount paid to Provider, the sum of $57,237.30, representing 15% of the total Advance Amount for all Accounts Receivable (the "Withheld Sum").  The Withheld Sum shall be payable to the Provider 5 business days after the date that Gain receives case verifications satisfactory to Gain in its sole discretion. For example and for the avoidance of doubt, if Gain receives case verification on 90% of cases represented in the total Advance Amount, Gain would pay Provider an additional $19,079.10 which is;

$1,122,299.92 Accepted AR Batch x .34 = $381,581.97 of initial invoices

-$381,581.97 x .15 = $57,237.30 (Withheld Sum)

$324,344.68 sent to Provider upon signing of the agreement

$19,079.10 additional 5% of cases verified

Total sent to Provider assuming 90% of cases are verified = $343,423.78

6

6.4    "**Net Proceeds**" means revenue attributable to a Serviced Accounts Receivable minus any direct expenses that Gain must pay any third-party on account of that Serviced Account Receivable, including, but not limited to, filing fees and attorneys' fees.

6.5    In consideration of the Services provided hereunder, Gain shall retain from Net Proceeds collected by Gain with respect to any Accepted A/R Batch, an amount equal to 150% of the Advance Rate for all Serviced Accounts Receivable in an Accepted A/R Batch (the "**Initial Return**").

6.6    With respect to Net Proceeds collected by Gain after and in excess of the Initial Return, Gain may retain an amount equal to 100% of those excess Net Proceeds collected in a given calendar month on all Serviced Accounts Receivable in an Accepted A/R Batch as a fee for the services provided hereunder (the "**Secondary Return**"). The remainder of any Net Proceeds collected after payment of the Initial Return shall be paid to Provider on the tenth (10th) calendar day of each month following the month in which such amounts are collected by Gain. For example and for the avoidance of doubt, if in the calendar month of January Gain collects $10,000.00 in Net Proceeds in excess of the Initial Return for all Serviced Accounts Receivable in an Accepted A/R Batch, Gain shall pay to Provider $0.00 on or before February 10th of the same calendar year.

6.7    If, eighteen (18) months after the acceptance of the Accepted A/R Batch by sending the Accepted Accounts Sheet, Gain has not collected Net Proceeds attributable to all Serviced Accounts Receivable equal to at least 110% of the Advance Rate for all Serviced Accounts Receivable in the Accepted A/R Batch, then Provider agrees to (1) pay to Gain within 5 business days the amount required to ensure that Gain receives at least 110% of the Advance Rate for all Serviced Accounts Receivable in the Accepted A/R Batch; or (2) assign to Gain additional assets acceptable to Gain. For the avoidance of doubt, whether to accept additional assets in lieu of cash shall be solely at Gain's discretion.

6.8    If, twenty-four (24) months after the acceptance of an Accepted A/R Batch by sending the Accepted Accounts Sheet, Gain has not collected Net Proceeds attributable to all Serviced Accounts Receivable equal to the Advance Rate plus the Initial Return for all Serviced Accounts Receivable in the Accepted A/R Batch, then Provider agrees to (1) pay to Gain within 5 business days the amount required to ensure that Gain receives at least the Advance Rate plus the Initial Return for all Serviced Accounts Receivable in the Accepted A/R Batch; or (2) assign to Gain additional assets acceptable to Gain. For the avoidance of doubt, whether to accept additional assets in lieu of cash shall be solely at Gain's discretion.

6.9    Provider hereby agrees to defend Gain against any claim or proceeding brought to contest any Serviced Accounts Receivable and to promptly pay all costs and expenses paid or incurred by Gain in connection with any such claim or proceeding, including, but not limited to, attorneys' and paralegals' fees.

6.10    Provider shall contemporaneously execute the Limited Guaranty Agreement attached hereto as **Exhibit C**.

7

6.11    Provider shall be responsible for all sales, use and excise taxes, and any other similar taxes, duties and charges of any kind imposed by any federal, state or local governmental entity on any amounts payable by Provider hereunder; *provided, that*, in no event shall Provider pay or be responsible for any taxes imposed on, or with respect to, Gain's income, revenues, gross receipts, personnel or real or personal property or other assets.    Gain shall be entitled to offset any such amounts from Serviced Accounts Receivable collected prior to remittance to Provider.

7.    Representations and Warranties.

7.1    Each party represents and warrants to the other party that:

(a)    it is duly organized, validly existing and in good standing as a corporation or other entity as represented herein under the laws and regulations of its jurisdiction of incorporation, organization or chartering;

(b)    it has the full right, power and authority to enter into this Agreement, to grant the rights and licenses granted hereunder and to perform its obligations hereunder;

(c)    it performs, and will continue to perform, its respective duties and obligations in a non-discriminatory manner without regard to race, gender, color, national origin, sexual orientation, or disability;

(d)    it is, and will continue to be, in compliance with all applicable healthcare laws including, but not limited to, any legal requirements relating to kickbacks, fee-splitting, physician self-referrals, advertising, marketing, promotional activities, and fraud and abuse in the healthcare industry;

(e)    the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action of the party; and

(f)    when executed and delivered by such party, this Agreement will constitute the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

7.2    Provider represents and warrants to Gain on the date hereof and on the date of any request to accounts receivable after the date hereof, that: (i) the balance due by the Patient to the Provider for any Serviced Accounts Receivable is as set forth in the information provided Gain pursuant to Section 2.1 herein with respect thereto, (ii) Provider is the owner of, and has valid title to, the Serviced Accounts Receivable, free and clear of all liens and encumbrances; (iii) all obligations represented by the Serviced Accounts Receivable result from the provision by Provider or any employee, agent or other affiliate thereof of bona fide medical services at reasonable and customary rates, as incurred in compliance with all applicable laws, regulations, and guidance; (iv) there are no claims pending or threatened against Provider (including claims off set-off) relating to the services giving rise to the Serviced Accounts Receivable; (v) none of the Serviced Accounts

8

Receivables are subject to any Medicare, Medicaid, or other governmental reimbursement program, nor are any of the Financed Accounts Receivables subject to any capitation arrangement, fee schedule, discount formula, cost-reimbursement or other adjustment or limitation to the Provider's usual charge; and (vi) there exist no disputes with regard to the validity or collectability of the Serviced Accounts Receivable.

7.3    If at any time, Provider becomes aware of facts or circumstances rendering the representations or warranties set forth in Section 7.2 untrue or inaccurate, Provider shall provide prompt notice to Gain advising with reasonable particularity of such facts and circumstances.

7.4    EXCEPT FOR THE EXPRESS WARRANTIES IN THIS AGREEMENT, (A) EACH PARTY HEREBY DISCLAIMS ALL WARRANTIES, EITHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE UNDER THIS AGREEMENT, AND (B) GAIN SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT.

8.    LIMITATION OF LIABILITY.

8.1    IN NO EVENT WILL GAIN BE LIABLE TO PROVIDER OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE OR PROFIT OR LOSS OF DATA OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.2    IN NO EVENT WILL GAIN'S LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE AGGREGATE AMOUNTS PAID OR PAYABLE TO GAIN PURSUANT TO THIS AGREEMENT.

9.    Confidentiality.  Provider agrees not to disclose the terms of this Agreement to any third party other than its representatives, except as required by applicable law or order of a court of competent jurisdiction.   In the event the Provider receives any subpoena or other request for any information regarding the terms of this Agreement and/or the business relationship between the parties (hereinafter a "Request"), within three (3) business days of receipt thereof, the Provider shall provide Gain with any documentation regarding the Request.   Further, the Provider specifically agrees to timely object (including filing a Motion for Protective Order, Notice of Objection, etc.) through counsel to any such Request. *For the avoidance of doubt, the Provider shall not disclose any information regarding the terms of this Agreement unless so ordered by a court with appropriate confidentiality protections in place mandating that such information only be utilized for purposes of the underlying lawsuit and not be disclosed to any other third parties.  To the extent a Court orders the production of such information without*

9

*confidentiality protections in place, the Provider agrees to exercise any and all applicable appellate rights to ensure that such protective measures are put in place.*

10.   Costs and Expenses. Provider agrees to promptly pay Gain for all costs and expenses paid or incurred by Gain in connection with the enforcement of Gain's rights under this Agreement, including, without limitation: costs and expenses (including attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of Gain's fee hereunder, enforce Gain's security interests and liens, sell or otherwise realize upon its rights hereunder, and otherwise enforce the provisions of this Agreement and any amendment, supplement, modification, extension, or restatement of this Agreement, or to defend any claims made against Gain arising out of the transactions contemplated herein (including, without limitation, preparations for and consultations concerning any such matters). In the event of litigation related to this Agreement, if a court determines that one party has breached the terms of this Agreement, then the non-prevailing party will reimburse the prevailing party for reasonable costs and expenses (including attorneys' fees and expenses) incurred in connection with such litigation.

11.   Information. To the extent related to the Serviced Accounts Receivable, Gain and is agents shall have the right to inspect Provider's books and records at such reasonable times as Gain may designate, and to make and take away copies of such books and records.

12.   Further Assurances. Provider shall promptly cure any defects in the execution and delivery of this Agreement and immediately execute and deliver to Gain all such other and further instruments consistent with this Agreement as may be reasonably required by Gain from time to time in order to satisfy or comply with the covenants and agreements of Gain made in this Agreement.

13.   Events of Default. Any one or more of the following is an "Event of Default."

13.1   Provider files or has filed against it any Insolvency Proceedings;

13.2   Provider becomes insolvent or is generally not paying its debts as they become due or is left with unreasonably small capital;

13.3   Any involuntary lien, garnishment, encumbrance, or attachments to the Serviced Accounts Receivables;

13.4   Provider breaches or fails to satisfy when due any covenant, agreement, obligation, warranty, or representation in this agreement;

13.5   Provider is in default under any document, instrument, or agreement evidencing any debt, obligation, or liability in favor of Gain, its affiliates, or vendors regardless of whether the debt, obligation, or liability is direct or indirect, primary or secondary, or fixed or contingent;

13.6   An event of default occurs under any guaranty or obligation of Provider to a third party, or any material provision of any guaranty given by Provider to a third party is not valid or enforceable and Provider or is repudiated or terminated;

10

<u>confidentiality protections in place, the Provider agrees to exercise any and all available appellate rights to ensure that such protective measures are put in place.</u>

10. <u>Costs and Expenses</u>. Provider agrees to promptly pay Gain for all costs and expenses paid or incurred by Gain in connection with the enforcement of Gain's rights under this Agreement, including, without limitation, costs and expenses (including attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of Gain's fee hereunder, enforce Gain's security interests and liens, sell or otherwise realize upon its rights hereunder, and otherwise enforce the provisions of this Agreement and any amendment, supplement, modification, extension, or restatement of this Agreement, or to defend any claim made against Gain arising out of the transactions contemplated herein (including, without limitation, preparations for and consultations concerning any such matters). In the event of litigation related to this Agreement, if a court determines that one party has breached the terms of this Agreement, then the non-prevailing party will reimburse the prevailing party for reasonable costs and expenses (including attorneys' fees and expenses) incurred in connection with such litigation.

11. <u>Information</u>. To the extent related to the Serviced Accounts Receivable, Gain and its agents shall have the right to inspect Provider's books and records at such reasonable times as Gain may designate, and to make and take away copies of such books and records.

12. <u>Further Assurances</u>. Provider shall promptly cure any defects in the execution and delivery of this Agreement and immediately execute and deliver to Gain all such other and further instruments consistent with this Agreement as may be reasonably required by Gain from time to time in order to satisfy or comply with the covenants and agreements of Gain made in this Agreement.

13. <u>Events of Default</u>. Any one or more of the following is an "Event of Default:"

13.1 Provider files or has filed against it any Insolvency Proceedings;

13.2 Provider becomes insolvent or is generally not paying its debts as they become due or is left with unreasonably small capital;

13.3 Any involuntary lien, garnishment, encumbrance, or attachments to the Serviced Accounts Receivables;

13.4 Provider breaches or fails to satisfy when due any covenant, agreement, obligation, warranty, or representation in this agreement;

13.5 Provider is in default under any document, instrument, or agreement evidencing any debt, obligation, or liability in favor of Gain, its affiliates, or vendors regardless of whether the debt, obligation, or liability is direct or indirect, primary or secondary, or fixed or contingent;

13.6 An event of default occurs under any guaranty or obligation of Provider to a third party, or any material provision of any guaranty given by Provider to a third party is not valid or enforceable and Provider or is repudiated or terminated.

13.7    A default or event of default occurs under any agreement between Provider and any creditor of Provider;

13.8    Any creditor that has signed a subordination agreement with Gain breaches any terms of such subordination agreement; or

13.9    A material impairment in the perfection or priority of the Gain's Security Interest; (ii) a material adverse change in the business, operations, or conditions (financial or otherwise) of the Provider occurs; or (iii) a material impairment of the prospect of repayment of any portion of the advances occurs.

14.    Remedies. Unless otherwise specifically provided for herein to the contrary, no right or remedy conferred upon or reserved to Gain or Provider under this agreement is intended to be exclusive of any other right or remedy, and every right and remedy shall be cumulative and in addition to every other right or remedy granted hereunder or now or hereafter existing under any applicable law.  Every right and remedy granted by this agreement or by applicable law to Gain or Provider may be exercised from time to time and as often as may be deemed expedient by Gain and Provider unless contrary to the express provisions of this agreement.  In addition to any right or remedy allowed for under this agreement, any other agreement between Gain and Provider, applicable law or equity, a breach of this agreement shall be deemed grounds for termination of any other agreement between Gain and Provider.

14.1    Remedies Upon Default. Upon any Event of Default not cured within 30 days of its occurrence:

(a)    Gain may, at Gain's option, declare immediately due and payable without the need for further demand on the Provider liquidated damages in an amount equal to the Initial Return for all outstanding Serviced Accounts Receivable plus 14% of the gross invoice amount for all outstanding Serviced Accounts Receivable plus the direct expenses for all outstanding Serviced Accounts Receivable;

(b)    Provider assigns to Gain all Serviced Accounts Receivable, all proceeds of any Serviced Accounts Receivable, and Provider's security interests in all Serviced Accounts Receivable and all proceeds of any Serviced Accounts Receivable. This Agreement shall be deemed to be a security agreement for such purposes.

(c)    Gain may offset all outstanding advances and any other amount owed by Provider to Gain against any (i) balances and deposits of Provider held by Gain, or (ii) any amount held by Gain owing to or for the credit or the account of Provider.

15.    Miscellaneous.

15.1    Each party shall, upon the reasonable request, and at the sole cost and expense, of the other party, execute such documents and perform such acts as may be necessary to give full effect to the terms of this Agreement.

15.2    The relationship between the parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership,

joint venture or other form of joint enterprise, employment or fiduciary relationship between the parties, and neither party shall have authority to contract for or bind the other party in any manner whatsoever.

15.3   For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

15.4   This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

15.5   Provider may not assign, transfer or delegate any or all of its rights or obligations under this Agreement without the prior written consent of Gain.  Gain may assign its rights hereunder without the necessity of Provider's consent.  Any attempted assignment, transfer or other conveyance in violation of the foregoing shall be null and void. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

15.6   This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

15.7   The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

15.8   This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

15.9   If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in a

mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

15.10   This Agreement shall be governed by the laws of the State of Georgia without regard to the conflicts of law principles thereof.

15.11   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

GAIN SERVICING LLC

By _____

Name: Reid Zeising

Title: CEO

Accelerated Care Center, LLC

By _____

Name: _____

Title: _____

**EXHIBIT A**

**PROPOSED ACCOUNTS SHEET**

**Batch No. 1**

**TOTAL VALUE OF PROPOSED INVOICES:**          **$**

| Patient Name | Date of Service | Invoice Amount | Invoice No. |
|---|---|---|---|
| Jon Doe | 9/20/18 | $ | 000123 |
| Jane Doe | 9/21/18 | $ | 000124 |
| Jeff Doe | 9/22/18 | $ | 000125 |

## EXHIBIT B

## ACCEPTED ACCOUNTS SHEET

### Batch No. 1

| Patient | DOB | Last DOS Law Firm Name | Total Bills |
|---------|-----|------------------------|-------------|
| Aaron Gray | 7/20/78 | 3/11/20 Goldblatt & Singer | $8,516.00 |
| Ali Alshodud | 6/10/70 | 3/18/20 Frankel, Rubin, Klein, Siegel, Payne & Pudlowski, P.C. | $825.00 |
| Amber Banda | 6/22/60 | 3/30/20 Hoffman & Gelfman | $825.00 |
| Amber Stillman | 3/7/01 | 4/2/20 Schultz & Myers | $5,275.00 |
| Amel Krupic | 12/18/83 | 4/1/20 Drafahl Law Firm | $5,825.00 |
| Angela Bryan | 8/11/72 | 4/10/20 Cantor Injury Law | $1,848.49 |
| Angela Minger | 7/21/73 | 4/6/20 Goldenhersh & Goldenhersh | $825.00 |
| Anthony Bramlett | 8/21/84 | 3/30/20 Bajric & Ramic | $825.00 |
| Antoine Robinson | 10/20/60 | 4/10/20 Goldblatt & Singer | $6,167.28 |
| Antonia Reglin | 3/31/78 | 4/11/20 Caffey Law Firm | $1,200.00 |
| Ashlee Barkeloo | 6/4/94 | 3/18/20 Bodenheimer Personal Injury Law Firm, P.A. | $1,065.00 |
| Camille Bramlett | 11/8/05 | 3/30/20 Bajric & Ramic | $825.00 |
| Christine Adams | 5/18/81 | 4/22/20 Goldblatt & Singer | $375.00 |
| Christine Miskovic | 3/28/78 | 3/18/20 The Bruning Law Firm | $375.00 |
| Christopher Linker | 12/18/81 | 2/10/20 Goldblatt & Singer | $1,215.00 |
| David Sorenson | 7/20/78 | 4/8/20 Law Offices of Justin Mason | $2,406.94 |
| Deborah Edney | 1/8/64 | 3/23/20 Goldblatt & Singer | $11,036.00 |
| Derrin Steinwagner | 8/7/86 | 3/16/20 Storment Law Office | $4,025.00 |
| Dianna Fehrenbach | 1/24/72 | 2/14/20 The Bruning Law Firm | $400.00 |
| Elmedina Kekic | 3/23/97 | 2/25/20 Cantor Injury Law | $8,589.34 |
| Elvis Besong | 7/3/88 | 3/18/20 Klenofsky Law Firm | $3,600.00 |
| Eric Moore | 8/21/70 | 4/10/20 Goldblatt & Singer | $1,965.77 |
| Felizza Salija | 8/18/74 | 3/8/20 Kolker Law Firm | $6,650.00 |
| Ferisa Duratovic | 8/24/88 | 2/21/20 Goldblatt & Singer | $7,698.00 |
| Gregory Flanders | 7/16/63 | 3/13/20 The Bradley Law Firm | $9,808.00 |
| Gustavo Pflugmacher | 2/5/65 | 4/2/20 Goldblatt & Singer | $1,325.00 |
| Hasan Skokic | 11/21/81 | 1/15/20 Bajric & Ramic | $375.00 |
| James Avery | 7/27/71 | 3/20/20 Schultz & Myers | $465,386.45 |
| James Oldani | | 3/30/20 Halvorson Klote | $825.00 |
| James Povolish | 1/29/75 | 4/10/20 Schultz & Myers | $18,607.00 |
| Jamie Pegg | 7/27/78 | 3/18/20 Allen Injury Law | $375.00 |
| Jennifer Buzzetta | 12/30/77 | 3/16/20 Law Office of Lenny Kagan | $1,625.00 |
| Jennifer Copeland | 6/8/72 | 3/30/20 Meehan Law, LLC | $4,375.00 |
| John Stanley | | 2/8/19 The Wilbern Law Firm | $1,185.00 |
| Joniva Davis | 8/11/89 | 4/6/20 Goldblatt & Singer | $1,625.00 |
| Juanita Dixon | 8/21/63 | 3/5/20 Drafahl Law Firm | $15,766.00 |
| Kate Fairchild | 6/13/34 | 2/18/20 Meyerkord & Meyerkord | $10,873.86 |
| Katie Deselm | 9/20/85 | 3/23/20 Law Office of Steve Slough | $39,023.41 |
| Kia Freiberger | 3/8/64 | 4/10/20 Drafahl Law Firm | $324,801.49 |
| Kyle Paul | 8/24/94 | 4/10/20 Charpentier Law | $400.00 |
| Lavonne Bluett | 9/13/71 | 3/16/20 Goldblatt & Singer | $1,625.00 |
| Leila Anderson | 7/28/02 | 3/30/20 Bajric & Ramic | $3,748.00 |
| Lisa Reid | 6/7/68 | 3/4/20 The Injury Counsel | $8,516.00 |
| Marilyn Murphy | 10/4/65 | 3/30/20 Goldblatt & Singer | $825.00 |
| Maureen McCorthy | 4/28/56 | 4/10/20 Goldblatt & Singer | $1,200.00 |
| Michael Blackwell | 8/11/01 | 4/6/20 Kirkendall Dwyer | $825.00 |
| Michael Parrinello | 4/8/82 | 3/30/20 Goldblatt & Singer | $825.00 |
| Mohamed Al-Haidari | 8/20/87 | 3/13/20 Dashtaki Law Firm | $3,600.00 |
| Nancy Banda | 10/27/56 | 3/30/20 Hoffman & Gelfman | $825.00 |
| Nicole Tiemann | 6/24/83 | 12/27/20 Pedroli & Gauthier | $49,032.89 |
| Pam Babcock | 6/8/82 | 3/18/20 Goldblatt & Singer | $5,375.00 |
| Peggy Hope | 1/24/50 | 4/2/20 Burger Law Firm | $7,325.00 |
| Phyllis Gryb | 8/3/62 | 3/16/20 Goldblatt & Singer | $6,671.00 |
| Ralph Altmann | 7/6/81 | 4/6/20 The Injury Counsel | $3,700.00 |
| Reginald Allen | 9/9/82 | 4/2/20 Schultz & Myers | $4,558.00 |
| Richard Dixon | 11/16/56 | 3/30/20 Goldblatt & Singer | $825.00 |
| Robert Laut | 2/12/84 | 4/8/20 Schultz & Myers | $9,008.00 |
| Robynn Smith | 8/13/91 | 4/2/20 O'Leary, Shelton, Corrigan, Peterson, Dalton & Quillin LLC | $8,891.00 |
| Roderick Edwards | 8/31/90 | 3/30/20 Goldblatt & Singer | $725.00 |
| Shauna Barton | 11/11/82 | 4/10/20 Goldblatt & Singer | $2,900.00 |
| Tambra Biondo | 3/18/87 | 3/18/20 O'Leary, Shelton, Corrigan, Peterson, Dalton & Quillin LLC | $4,633.00 |
| Thomas Nofles | 8/1/35 | 4/2/20 Goldblatt & Singer | $375.00 |
| Tiarra Thomas | 6/13/89 | 3/16/20 Goldenhersh & Goldenhersh | $825.00 |
| Tracey Gillan | 5/27/70 | 2/21/20 The Bradley Law Firm | $15,533.00 |
| **Total** | | | **$1,122,299.02** |

15

**EXHIBIT C**

**LIMITED GUARANTY AGREEMENT**

This LIMITED GUARANTY AGREEMENT dated as of _May    15_, 2020 (this "**Limited Guaranty**"), is executed by _____ (the "**Guarantors**") and gain servicing LLC ("**Gain**") in connection with the Services Agreement to which this Limited Guaranty is an exhibit.

NOW THEREFORE, in consideration of the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantors covenant and agree as follows:

**ARTICLE I**

**DEFINITIONS**

1.      Capitalized terms used but not defined in this Agreement shall have the respective meanings assigned to them in the Services Agreement.

**ARTICLE II**

**COVENANTS**

2.      For value received, subject to the limitations described herein, Guarantors hereby irrevocably guarantee, jointly and severally, to Gain the prompt and complete payment when due of the potential future payment obligations of the Provider pursuant to the Services Agreement to the extent they become payable.

3.      This Limited Guaranty is a continuing guaranty and one of payment and not of collection and Gain shall not be required to exhaust any right or remedy or take any action against the Provider or any other person or entity or any collateral before enforcing this Limited Guaranty against any Guarantor.

4.      Each Guarantor hereby waives notice of acceptance of this Limited Guaranty and waives diligence, presentment, demand for payment, protest, notice of dishonor or non-payment of any such obligation or liability, suit or the taking of other action by Gain against, and any other notice to, any Guarantor or others.

5.      Gain may at any time and from time to time without notice to or consent of any Guarantor and without impairing or releasing the obligations of any Guarantor hereunder (1) take or fail to take any action of any kind in respect of any security for any obligation or liability of the Provider or other Persons to Gain, (2) exercise or refrain from exercising any rights against the Provider or others, (3) compromise or subordinate any obligation or liability of the Provider or other Persons to Gain including any security therefor and (4) amend, modify, supplement and grant waivers under the Services Agreement and any other agreement related thereto. Except as

16

EXHIBIT C

LIMITED GUARANTY AGREEMENT

This LIMITED GUARANTY AGREEMENT dated as of _____, 2020 (this "Limited Guaranty"), is executed by _____ (the "Guarantor") and Gain servicing LLC ("Gain") in connection with the Services Agreement to which this Limited Guaranty is an exhibit.

NOW THEREFORE, in consideration of the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantors covenant and agree as follows:

ARTICLE I

DEFINITIONS

1. Capitalized terms used but not defined in this Agreement shall have the respective meanings assigned to them in the Services Agreement.

ARTICLE II

COVENANTS

2. For value received, subject to the limitations described below, Guarantor hereby irrevocably guarantees, jointly and severally, to Gain, the prompt and complete payment when due of the potential future payment obligations of the Provider pursuant to the Services Agreement to the extent they become payable.

3. This Limited Guaranty is an unlimited guaranty and one of payment and not of collection and Gain shall not be required to exhaust any right or remedy or take any action against the Provider or any other person or entity or any collateral before enforcing this Limited Guaranty against any Guarantor.

4. Each Guarantor hereby waives notice of acceptance of this Limited Guaranty and waives diligence, presentment, demand for payment, protest, notice of dishonor or nonpayment of any such obligation or liability, suit or the taking of other action by Gain against, and any other notice to any Guarantor or others.

5. Gain may at any time and from time to time without notice to or consent of any Guarantor and without impairing or releasing the obligations of any Guarantor hereunder (1) take or fail to take any action of any kind in respect of any security for any obligation or liability of the Provider or other Persons to Gain, (2) exercise or refrain from exercising any rights against the Provider or others, (3) compromise or subordinate any obligation or liability of the Provider or other Persons to Gain, including any security therefor, and (4) amend, modify, supplement and grant waivers under the Services Agreement and any other agreement, related thereto. Except as

otherwise provided herein, any other guaranty and suretyship defenses are hereby waived by Guarantors.

6.      Each Guarantor agrees that his obligations under this Limited Guaranty shall not be released, diminished, impaired, or adversely affected by the insolvency, bankruptcy, liquidation, disability or dissolution of either Provider or any other Person.

7.      Each Guarantor shall be entitled to assert, as a valid defense to payment by Guarantors hereunder, any valid defense available to the Provider to the same extent that any such defense could be successfully asserted by the Provider in any action with respect to amounts guaranteed hereunder; *provided, however,* that in no event shall any stay or discharge as the result of any bankruptcy, insolvency, reorganization, arrangement, composition, adjustment, dissolution, liquidation or other like proceeding relating to the Provider or any other Person give rise to a defense to payment or performance by Guarantors hereunder.

8.      Notwithstanding anything that may be expressed or implied herein or under any legal construct, no Person other than Guarantors shall have any obligation or liability arising out of or resulting from this Limited Guaranty.

9.      Guarantors agree to pay Gain all amounts that may be due without deduction or set-off, and each Guarantor confirms and agrees that, in making payments in respect of this Limited Guaranty, he will not offset any amount owed to him by the Provider.

10.      Each Guarantor agrees to reimburse Gain for all reasonable costs and expenses of Gain (including the reasonable fees and expenses of legal counsel) incurred in connection with any valid enforcement or collection proceeding against any of the Guarantors with respect to each Guarantor's obligations under this Limited Guaranty, including in connection with any bankruptcy, insolvency, receivership, foreclosure, winding up or liquidation proceedings, judicial or regulatory proceedings and workout, restructuring or other negotiations or proceedings (whether or not the workout, restructuring or transaction contemplated thereby is consummated).

## ARTICLE III

### MISCELLANEOUS PROVISIONS

11.      <u>Amendment and Modification.</u> Subject to applicable law, this Limited Guaranty may be amended, modified or supplemented only by written agreement of the parties.

12.      <u>Waiver of Compliance; Consents.</u> Except as otherwise provided in this Limited Guaranty, any failure of either of the parties to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver of such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent failure to comply therewith.

13.    <u>Assignment.</u> This Limited Guaranty and the rights, interests or obligations hereunder may be assigned by Gain, directly or indirectly, to any third party without the prior written consent of the other parties hereto.

14.    <u>Governing Law.</u> This Limited Guaranty shall be governed by and construed in accordance with the law of the State of Georgia as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies.

15.    <u>Counterparts.</u> This Limited Guaranty may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

16.    <u>Severability.</u> Any provision of this Limited Guaranty that is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

IN WITNESS WHEREOF, the parties hereto have executed this Limited Guaranty as of the date first above written.

GAIN SERVICING LLC

By _____

Name: Reid Zeising

Title: CEO


Accelerated Care Center, LLC

By _____

Name: Mary Yaakub

Title: owner

18

Amendment No. 1 Services Agreement

As of June 9, 2020 (the "**Effective Date**") gain servicing LLC ("**Gain Servicing**") and Accelerated Care Center, LLC ("**Provider**") agree to amend the May 14, 2020 Services Agreement[1] between them as follows only for purposes of Serviced Accounts Receivable that are accepted after the Effective Date hereof:

1.   Section 6.1 of the Services Agreement shall be replaced with the following:

6.1   The "**Advance Rate**" shall be 33% of the gross invoice amount of any Serviced Accounts Receivable.

2.   Section 6.5 of the Services Agreement shall be replaced with the following:

6.5   In consideration of the Services provided hereunder, Gain shall retain from Net Proceeds collected by Gain with respect to any Accepted A/R Batch, an amount equal to 185% of the Advance Rate for all Serviced Accounts Receivable in an Accepted A/R Batch (the "**Initial Return**").

3.   Section 6.6 of the Services Agreement shall be replaced with the following:

6.6   With respect to Net Proceeds collected by Gain after and in excess of the Initial Return, Gain may retain an amount equal to 60% of those excess Net Proceeds collected in a given calendar month on all Serviced Accounts Receivable in an Accepted A/R Batch as a fee for the services provided hereunder (the "**Secondary Return**"). The remainder of any Net Proceeds collected after payment of the Initial Return shall be paid to Provider on the tenth (10th) calendar day of each month following the month in which such amounts are collected by Gain. For example and for the avoidance of doubt, if in the calendar month of January Gain collects $10,000.00 in Net Proceeds in excess of the Initial Return for all Serviced Accounts Receivable in an Accepted A/R Batch, Gain shall pay to Provider $4,000 on or before February 10th of the same calendar year.

IN WITNESS WHEREOF, the parties have executed this amendment as of the Effective Date.

GAIN SERVICING LLC

By _____

Name: Reid Zeising

Title:   CEO

ACCELERATED CARE CENTER, LLC

By _____

Name: Mary Yadkee

Title:   owner

---

[1] All capitalized terms used herein but not defined shall have the meanings ascribed to them in the Services Agreement.

4815-7121-9391.1

## Amendment No. 2 Services Agreement

As of July 1, 2020 (the "**Effective Date**") gain servicing LLC ("**Gain Servicing**") and Accelerated Care Center, LLC ("**Provider**") agree to amend the May 14, 2020 Services Agreement[1] between them, which was previously as amended on June 9, 2020, as follows only for purposes of Serviced Accounts Receivable that are accepted after the Effective Date hereof:

1. Section 6.1 of the Services Agreement shall be replaced with the following:

6.1     The "**Advance Rate**" shall be 33% of the gross invoice amount of any Serviced Accounts Receivable unless authorized representatives of the parties agree to a different amount in writing.

IN WITNESS WHEREOF, the parties have executed this amendment as of the Effective Date.

GAIN SERVICING LLC

By

Name: Reid Zeising

Title: CEO

ACCELERATED CARE CENTER, LLC

By

Name: Mary Saakub

Title: owner

---

[1] All capitalized terms used herein but not defined shall have the meanings ascribed to them in the Services Agreement.





January 16, 2023

Via Email and US Mail

Accelerated Care Center, LLC
Mary Yaakub
12152 Tesson Ferry Road
St. Louis, MO 63128
mary@acceleratedcarestl.com

With a copy to:
Sheldon Korlin
Aegis Law
601 S. Lindbergh
Saint Louis, MO 63131
skorlin@aegislaw.com

Re:    Partial Advance Threshold Payment

Dear Mary and Sheldon:

As you are aware, Accelerated Care Center, LLC ("ACC") and Gain Servicing, LLC ("Gain") entered into a Services Agreement on May 14, 2020, as amended by the Amendment No 1. to the Services Agreement dated June 9, 2020 and the Amendment No. 2 to the Services Agreement dated July 1, 2020 (collectively the "Agreement").

Section 6.7 of the Agreement provides:

If, eighteen (18) months after the acceptance of the Accepted A/R Batch by sending the Accepted Accounts Sheet, Gain has not collected Net Proceeds attributable to all Serviced Accounts Receivable equal to at least 110% of the Advance Rate for all Serviced Accounts Receivable in the Accepted A/R Batch, then Provider agrees to (1) pay to Gain within 5 business days the amount required to ensure that Gain receives at least 110% of the Advance Rate for all Serviced Accounts Receivable in the Accepted A/R Batch; or (2) assign to Gain additional assets acceptable to Gain.  For the avoidance of doubt, whether to accept additional assets in lieu of cash shall be solely at Gain's discretion.

4279 Roswell Road | Suite 208-113 | Atlanta, Georgia 30342

Section 6.8 of the Agreement provides:

> If, twenty-four (24) months after the acceptance of an Accepted A/R Batch by sending the Accepted Accounts Sheet, Gain has not collected Net Proceeds attributable to all Serviced Accounts Receivable equal to the Advance Rate plus the Initial Return for all Serviced Accounts Receivable in the Accepted A/R Batch, then Provider agrees to (1) pay to Gain within 5 business days the amount required to ensure that Gain receives at least the Advance Rate plus the Initial Return for all Serviced Accounts Receivable in the Accepted A/R Batch; or (2) assign to Gain additional assets acceptable to Gain.  For the avoidance of doubt, whether to accept additional assets in lieu of cash shall be solely at Gain's direction.

At this time, the following batches have not achieved the required threshold:

| Batch Date | Amount Advanced | Current Threshold Due | Current Amount Collected | Current Threshold Shortfall |
|---|---|---|---|---|
| Section 6.8 | 150% Threshold | | | |
| 6/2020 | $67,407.44 | $101,111.16 | $84,579.76 | $16,531.40 |
| 7/2020 | $165,790.91 | $248,686.37 | $226,671.97 | $22,014.40 |
| 8/2020 | $117,293.23 | $175,939.85 | $127,397.49 | $48,542.36 |
| 9/2020 | $223,435.96 | $335,153.94 | $200,161.63 | $134,992.31 |
| 10/2020 | $40,505.23 | $60,757.85 | $58,018.63 | $2,739.22 |
| 11/2020 | $111,588.93 | $167,383.40 | $70,072.31 | $97,311.09 |
| 12/2020 | $87,454.98 | $131,182.47 | $96,278.99 | $34,903.48 |
| 1/2021 | $38,496.25 | $57,744.38 | $42,480.06 | $15,264.32 |
| JK 9/2020 | $93,186.61 | $139,779.92 | $94,142.30 | $45,637.62 |
| JK 10/2020 | $100,560.75 | $150,841.13 | $132,733.40 | $18,107.73 |
| JK 11/2020 | $120,164.77 | $180,247.16 | $82,239.72 | $98,007.44 |
| JK 12/2020 | $144,739.67 | $217,109.51 | $81,396.99 | $135,712.52 |
| JK 1/2021 | $48,691.72 | $73,037.58 | $27,770.55 | $45,267.03 |
| JK 2/2021 | $63,994.32 | $95,991.48 | $27,728.23 | $68,263.25 |
| JK 3/2021 | $72,713.66 | $109,070.49 | $19,596.66 | $89,473.83 |

| Batch Date | Amount Advanced | Current Threshold Due | Current Amount Collected | Current Threshold Shortfall |
|---|---|---|---|---|
| Section 6.7 | 110% Threshold | | | |
| 2/2021 | $3,505.62 | $3,856.18 | $2,093.11 | $1,763.07 |
| 3/2021 | $88,705.76 | $97,576.34 | $55,406.84 | $42,169.50 |
| 4/2021 | $4,253.70 | $4,679.07 | $3,241.41 | $1,437.66 |
| 6/021 | $4,633.19 | $5,096.51 | $250.00 | $4,846.51 |
| JK 6/2021 | $69,595.33 | $76,554.86 | $64,304.26 | $12,250.60 |
| JK 8/2021 | $181,971.50 | $200,168.65 | $86,699.83 | $113,468.82 |
| Total | | | | $1,048,704.12 |

Gain does not view Accelerated's arguments regarding COVID as excusing or otherwise waiving Accelerated's performance under Sections 6.7 and 6.8. Please consider this letter a formal demand to make the required payment of $1,048,704.12 via wire transfer within 5 business days of your receipt of this letter.  Our wire instructions are:

Wells Fargo Bank
420 Montgomery Street
San Francisco, CA 94104
415 396-2619

Wells Fargo Bank
ABA Number: 121000248
For Credit to: Cherokee Legal Holdings, LLC
Account Number: 9087026390

A failure to make the required payment will be considered an Event of Default under Section 13 of the Agreement.  We appreciate your attention to this important matter.

Sincerely,

Joel Schuessler
General Counsel

Page 1 of 3





**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW

1000 LOUISIANA STREET, SUITE
2000 HOUSTON, TX 77002-2099
713.276.5500 TEL
713.276.5555 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
713.276.5983
rornn@foley.com

February 22, 2023

**Via E-Mail and USPS**

Sheldon Korlin
Aegis Law
601 S. Linderbergh
Saint Louis, MO 63131
E-mail: _skorlin@aegislaw.com_

Re: Breach of Services Agreement between gain servicing LLC and Accelerated Care
Center, LLC

Mr. Korlin,

We are writing on behalf of our client, gain servicing LLC ("**Gain**"), with regards to the Services Agreement (the "**Agreement**") it entered into with your client, Accelerated Care Center, LLC ("**Accelerated**"). Gain has written both you and your client previously to inform you that your client is in breach of the Agreement. Specifically, under Section 6.7 of the Agreement, your client promised to ensure that Gain recouped at least 110% of the Advanced Rate[1] it paid to your client for each Accepted A/R Batch within eighteen months of its acceptance. At twenty-four months from the date of acceptance, Section 6.8 entitles Gain to recoup at least the Advanced Rate plus the Initial Return (150% of the Advance Rate). Any shortfall was to be paid within 5 business days of the relevant anniversary of the acceptance of an Accepted A/R Batch. Despite being notified of certain deficiencies, your client has not made any such payments to date. This constitutes an Event of Default under Section 13.4 of the Agreement, as you were notified on January 16, 2023.

Per Section 14.1 of the Agreement, "[u]pon any Event of Default not cured within 30 days of its occurrence," three things occur. First, Gain may declare "immediately due and payable without the need for further demand . . . an amount equal to the Initial Return for all outstanding Serviced Accounts Receivable plus 14% of the gross invoice amount for all outstanding Serviced Accounts Receivable plus the direct expenses for all outstanding Serviced Accounts Receivable." At this time, that amount would be at least $4,626,205.58. Second, Accelerated automatically "assigns to

---

[1] Undefined terms used herein have the definitions provided in the Services Agreement.

Page 2 of 3

Gain . . . Provider's security interests in all Serviced Accounts Receivable and all proceeds of any Serviced Accounts Receivable." Finally, "Gain may offset all outstanding advances and any other amount owed by Provider to Gain against any (i) balances and deposits of Provider held by Gain, or (ii) any amount held by Gain owing to or for the credit or the account of Provider."

Gain will agree to accept payment of the currently outstanding $999,084.49 in equal installments over the next six months in an effort to get this resolved —although we should note that there are additional Accepted A/R Batches that will reach the eighteen month and twenty-four month thresholds during that time period, which will have to be dealt with separately. If Accelerated will not agree to this payment plan, Gain will insist that the lockbox provisions of the Agreement (Section 4.1(g)) be followed going forward and it will notify counsel handling the underlying matters that all proceeds should be sent to Gain. Once Gain has recouped amounts owed to it, proceeds due to Accelerated, if any, will be paid to it by Gain as collections are received. Should relevant proceeds be received by Accelerated, you are hereby placed on notice that such proceeds are Gain's property and must be remitted to Gain within two business days per Section 4.1(g) of the Agreement.

We have reviewed your prior correspondence with Gain, and we wish to briefly address certain legal arguments you have made.

First, the Covid pandemic does not in any way excuse Accelerated's performance under Section 6.7. The parties are both sophisticated and specifically agreed to allocate amongst themselves the risk that monies would not be collected in a timely manner or at all on the underlying cases. Courts in both Georgia and Missouri have explicitly rejected claims, like yours, that COVID somehow makes it impossible for Accelerated to perform its obligations to pay money to Gain.

Second, any implied covenant of good faith and fair dealing cannot be used to rewrite the parties' agreement. Again, your client accepted the risk of untimely or insufficient collections from the underlying lawsuits related to its accounts receivable. Gain did not. It is neither fair nor good faith for Accelerated to now try to reallocate that risk.

Finally, your prior correspondence with Gain has asked for information regarding specific cases that Gain believes are not being handled appropriately or for which demand is being made. Such requests miss the point. Section 6.7 is not specific to any particular case. Either total recovery for an Accepted A/R Batch is at least 110% of the Advanced Rate[2] eighteen months after it is accepted or it is not. Gain is not alleging, nor is it required to allege, any fault by Accelerated. The parties reached an agreement that requires Accelerated to guarantee a certain minimum recovery for Gain and that recovery has not been received, so Accelerated must cover the shortfall.

---

[2] Terms not defined herein have the definitions provided in the Services Agreement.

Page 3 of 3

Gain very much prefers that the parties work together to ensure that everyone's contractual obligations are being met, but we will move on to enforcing our rights in court if necessary.

Regards,

*/s Ron Oran*

Ron Oran

Page **1** of **2**



**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW

1000 LOUISIANA STREET, SUITE
2000 HOUSTON, TX 77002-2099
713.276.5500 TEL
713.276.5555 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
713.276.5983
roron@foley.com

March 21, 2023

**<u>Via E-Mail and USPS</u>**

Sheldon Korlin
Aegis Law
601 S. Linderbergh
Saint Louis, MO 63131
E-mail: _skorlin@aegislaw.com_

Re: Breach of Services Agreement between gain servicing LLC and Accelerated Care Center, LLC

Mr. Korlin,

We are writing on behalf of our client, gain servicing LLC ("**Gain**"), in response to your March 7, 2023 letter inquiring as to how the $4,626,205.58 amount stated as due as a result of your client's default under the Services Agreement (the "**Agreement**") was calculated. That number was incorrect. As of March 8, 2023, the amount due to Gain is $2,362,741.71, which is composed of 1.5 times the amount of all outstanding serviced accounts receivable for Accelerated Care Center, LLC ("**Accelerated**") and JK Billing, plus 14%, per the terms of the Agreement. While it is certainly understandable that you would want to understand the basis for the mistaken amount used in my letter, your response appears mostly to be just a delay tactic. It does not respond at all to the substance of my letter or the offer to accept payments of the outstanding threshold amounts (now $1,180,344.15) in equal installments over six months as a cure for the current default. Your client should be in possession of all the information it needs to assess that offer.

With regards to your March 14, 2023 letter, we do represent Gain and you may send any response you have to me. Our clients are of course still free to communicate with one another if they so choose. The rest of your letter continues to ignore the terms of the Agreement. The Agreement clearly allocated the risk that cases may take longer to settle than expected in part to your client. Also, I assume the actions you caution me against taking are the same actions specifically allowed by the Agreement, as we have not mentioned any other actions.

Page 2 of 2

If you wish to accept the offer to cure your client's default, you should do so as soon as possible. Unfortunately, it appears to me that Accelerated is leaving Gain no option but to enforce its rights in Court.

Regards,

*/s Ron Oran*

Ron Oran