burden on you. You may be restricted by local building owner or city specifications requiring adherence to a pre-established style or format. Franchisor will allow for these local and city variances.

5.5    **Internet Advertising.**

We maintain a website that provides information about the System, the products and services offered by franchisees and we will have sole discretion and control over it. We also have the sole right to create interior pages on our website(s) that contain information about your business and other franchised and company owned locations. All Franchisees are given access to post on the interior web pages for their location within the Franchisor's guidelines.

You may not establish a presence on, or market using, the Internet without our prior written consent. If we disagree with the content of your Franchisee's Page, our determinations will control. We retain the sole right to advertise or use the Marks on the Internet. We retain ownership of your Facebook, Facebook groups and communities, Google, Yahoo, Bing, Yelp, and any other online business profile pages. We will establish your internet presence and add the franchisee as administrator, however, franchisee must immediately provide all login and password credentials to franchisor if they are changed. We may require you to provide content for our Internet marketing pages. We may require you to provide content for our Internet marketing pages. Should your internet presence become inactive or fails to comply with system standards, Franchisor may assume control of all internet activities for your club. You must comply with our intranet and Internet usage rules, style guide, and requirements. We retain the sole right to approve any linking to, or other use of, the Workout Anytime Internet site. You must also establish or maintain a landing/splash page, online business profile or other presence on the Internet through any internet or social networking site in connection with the operation of your Club, including but not limited to Facebook, LinkedIn, MySpace, Plaxo, Twitter, Instagram, Snapchat, YouTube or any other social media platforms that may be required by Franchisor that uses any variation of the Marks or references the System. We must also approve your use of linking and framing between web pages and all other websites.

5.6    **Social Media.**  You may not engage in advertising or the promotion of your Club using social media programs that offer deeply discounted membership fees, such as, but not limited to such programs as Groupon, Living Social, Scout Mob or other similar programs without the express written consent of Workout Anytime, which consent shall be at our sole discretion.

## SECTION 6 - RECORDS - LATE PAYMENT CHARGE

6.1    You must prepare on a current basis complete and accurate records concerning all financial, marketing and other aspects of the business conducted under this Agreement. You must maintain an accounting system which accurately reflects all operational aspects of the Club including uniform reports as may be required by Workout Anytime. Your records shall include tax returns, monthly reports, statements of Gross Revenue (to be prepared each month for the prior month) and profit and loss statements and balance sheets (to be prepared at least annually by a Certified Public Accountant). All financial data with respect to your business that is required will be for Franchisor's own use, will be kept confidential, and will not be made available to other franchisees, prospective franchisees, or other third parties except to the extent that Workout Anytime decides, or is required to make a "Financial Performance Representation" under the franchise disclosure laws. The records

- 8 –

required under this Sub-section pertain only to your operation of the Club. Workout Anytime has no right to inspect or copy the records of any unrelated business activity you may have.

6.2     To encourage prompt payment and to cover the costs and expenses involved in handling and processing payments, you will also pay, upon demand, a late payment fee equal to the greater of; (i) one and one-half percent (1 1/2%) per month on all payments due to Workout Anytime for the period said payments are due and unpaid; or (ii) the highest rate of interest permitted by law. Each failure to pay Royalty Fees, National Brand Development Fees, Technology Fees, and other fees or amounts payable to Workout Anytime when due is a material breach of this Agreement.

6.3     Upon our written request you will make available the following records and unlimited real-time access to your computer system:  An accurate set of books reflecting your Gross Revenues; all tapes and readout totals of cash registers or other point of sale devices; sales slips; order records of transactions with concessionaires and vendors; federal, state and city tax returns; banking records; accounts receivable; and such other records as may be needed for an effective audit of your gross sales. All such books and records shall be retained for a period of at least three (3) years after the end of each calendar year to which they relate, or if we have begun an audit, for such longer period as may be required to complete such audit.  All such books and records shall be subject to inspection and audit by us at all reasonable times.

6.4     We will have the right to have an auditor of our choice make a special audit of all your books and records, wherever located, pertaining to your Gross Revenue. If your actual Gross Revenues exceed the figures you have submitted to us previously by more than two percent (2%) in any calendar year, then you will pay for the cost of the audit, otherwise the cost of such audit shall be borne by us; and (ii) if such Gross Revenues shall be understated by four percent (4%) or more in any calendar year, or if the Gross Revenue is understated on three (3) or more occasions during the Initial Term, we will have the option to terminate this Franchise Agreement pursuant to the terms of Section 17.  You will promptly pay to us any deficiency in which is established by any audit including any applicable late fees or penalties.

6.5     You acknowledge and agree that the restrictions imposed above are reasonable and necessary to protect the goodwill associated with the System and the Marks, as well as our reputation and image, and are for the protection of us, you, and all other franchisees that own and operate a Workout Anytime Club.

## SECTION 7 - SERVICES AND ASSISTANCE PROVIDED BY THE FRANCHISOR

7.1     The Initial Franchise Fee and Royalty Fees are paid for the License which includes the use of the Marks and the System, owner's training, and for certain services rendered by Workout Anytime.

7.2     Workout Anytime will offer you initial and continuing services as we deem necessary or advisable in furthering the business of your Club, and the business of the System as a whole, in connection with protecting the Marks and goodwill of Workout Anytime. Failure of Franchisor to provide any service whether specifically described herein, either initially or continuing, will not excuse you from paying the Initial Franchise Fee or the fees set forth in Section 4 herein.

7.3     Initial and continuing services provided by Workout Anytime are:

- 9 —

A. Equipment orders will be placed through our affiliate, Commercial Fitness Products, Inc. with our assistance and guidance. We will help the franchisee determine the proper amount of time between equipment orders, equipment delivery, and their set-up to ensure the proper opening of your Club.

B. Designation of your Territory.

C. Furnishing you with specifications or guidelines for all initial and replacement equipment, inventory and supplies required for the operation of your Club.

D. Providing you or your designated manager (the "Manager") and up to one (1) other person with an initial training program. You and your Manager must attend and satisfactorily complete the initial training program prior to opening the Club. The initial training program will be conducted approximately nine (9) to twelve (12) weeks prior to the opening of your Club.

Franchisee must attend to conclusion, all required pre-opening training, which will not be waived under any circumstances. You will be responsible for travel and living expenses incurred by you or any of your employees who participate in the training program. The initial training and orientation program will be held at our headquarters or at another location that we designate and will include a minimum of thirty (30) hours of training time. Training will consist of a discussion of the System, equipment uses, administrative procedures, hiring/training employees, customer service, marketing, sales, accounting, support procedures and instructions on quality standards and practical experience in the operation of a Workout Anytime health club facility. You will likewise receive on-site training by a Workout Anytime trained individual.

E. Assistance with respect to pre-opening, opening activities and/or on-going operations or training will be available as requested by Franchise owner. On-site training assistance during opening week is optional, pending availability of Workout Anytime representatives, with you bearing the costs associated with our representative being on-site at your request.

F. Formulation of marketing plans, advertising and promotional programs and materials.

G. Providing a service number and the Workout Anytime email platform available for your on-going inquiries and consultations with Workout Anytime representatives.

H. The development of new products and service methods for the successful operation of the System as deemed beneficial at the sole discretion of Workout Anytime.  You will be informed of any new product or service methods and adopt same within a reasonable specified period of such notification.

I. We will loan you or provide you with access to the electronic version of one (1) copy of the Manual containing mandatory and suggested specifications, standards, operating procedures and rules prescribed from time to time by Workout Anytime.

J. We will make commercially reasonable efforts to negotiate favorable prices and terms with major suppliers and allow you to utilize such centralized purchasing system.

- 10 –

K.  Workout Anytime may conduct visits by our field representatives from time to time. These visits, as determined necessary by Workout Anytime, will be within the sole discretion and at the sole expense of Workout Anytime.  Notwithstanding the forgoing, within six (6) months after you open your Club, we will send a representative to visit and inspect your Club and will thereafter provide to you a written report with respect to same.

L.  We may delegate certain of our obligations as set forth in this Section 7 to an Area Representative or contractor in certain geographic regions.

### SECTION 8 - LOCATION OF HEALTH CLUB FACILITY; CONSTRUCTION AND OPENING FOR BUSINESS; LEASE OR MORTGAGE

8.1   The Development Agreement will designate a site selection area in which you will locate the Club. If no location is specified in Exhibit "L" at the time you sign the Franchise Agreement, you, at your own cost and expense, will be solely responsible for locating and designating a location and for constructing and equipping the Club at the location in accordance with the System within six (6) months of the date of this Agreement. The location you choose to operate your Club must be approved by Workout Anytime. Because of our interest in the location, Workout Anytime may request, information regarding the cost of acquisition, development and construction. Any location inspection will be made solely at the option of Workout Anytime and will not be deemed to impose either any responsibility on Workout Anytime for the construction of the health club facility, or any warranty or representation of any kind, express or implied, as to its fitness or suitability. Upon its designation, the approved location will be the location specified in Exhibit "L".

8.2   You acknowledge that the location of the Club is a crucial factor in the Club's potential for success and Franchisor may reject any location, in its sole discretion. Franchisor makes no representations or warranties with respect to the availability of appropriate locations, or the suitability or potential of locations, which it may approve.

8.3   Workout Anytime will assist you in analyzing a proposed location for your Club. There are general methods used by Workout Anytime to assist you in your selection of a location for your Club. Workout Anytime assists in the location selection by ascertaining population density and proximity of the proposed location to any other Workout Anytime location(s). Workout Anytime does not hold itself out as a real estate expert and does not undertake to advise as to the suitability of any location. Our approval of a proposed location merely reflects that the proposed location generally meets our criteria for the development of a Club.

8.4   You must secure a location for your Club by purchase or lease which meets our approval within one hundred eighty (180) days of the execution of this Agreement. You agree to construct (or renovate), equip and open the Club at your expense in a good, workmanlike manner on or within twelve (12) months from this Agreement date, unless otherwise agreed between you and us in writing. The construction (or renovation) will conform to all applicable requirements of local authorities and will be in accordance with the standards and general specifications of the System. You must use an architect approved by Franchisor to prepare plans for the construction of the Club. You must submit your construction plans to us for our review.

8.5   You may not open your Club until  all construction has been satisfactorily completed, your Managers and all employees have been trained, the Club is ready for opening in all other respects

– 11 –

(including signage, inventory, fixtures and equipment), the Initial Franchise Fee has been paid in full, all State and local requirements to operate a health club facility have been satisfied, Certificates of Insurance have been furnished in accordance with Section 13, you are in compliance with all terms of this Agreement including those set forth in Section 11, all items contained in an opening checklist have been completed to Franchisor's satisfaction, and you have met your Pre-Sale Membership obligations. You acknowledge that your opening for business prior to completely satisfying all the above conditions will cause irreparable damage to Franchisor's goodwill and reputation.

8.6     If you lease the health club facility:

A.   You and your Landlord must enter into our Lease Addendum, attached hereto as Exhibit M.

B.   You will install the maximum sized signage allowed by either your lease or local government. All signs, advertising, logos or other forms or insignia pertaining to the System are to be removed from the premises demised under the lease in the event that neither you nor Workout Anytime, or its designee, is the tenant under the lease upon termination of the Agreement. Workout Anytime must approve the proposed sign, including color, font and dimensions prior to proceeding to construction of sign.

C.   You must utilize the services of our approved real estate broker to assist in your site search and to ensure the site meets Workout Anytime criteria. You will not be charged by our approved vendor for this service as such commissions are regularly absorbed by the Landlord. Should you not wish to utilize approved vendor you will be charged a fee of One Thousand Five Hundred ($1,500.00) Dollars for the costs associated with our site approval and lease review.

D.   You may not expand the Club or lease additional adjoining space to the club without the express written consent of Franchisor, which consent shall be at Franchisor's sole discretion.

### SECTION 9 - MAINTENANCE AND UPGRADING THE CLUB

9.1     Subject to the terms of this Section, and particularly Sub-section 9.2 below, you will at all times comply with all reasonable Workout Anytime standards, specifications, processes, procedures, requirements and instructions regarding your Club's physical facilities (the "Premises"), including the layout of furnishings, fixtures, and equipment, as are set forth in the Manual or in accordance with System Standards.

9.2     You will repaint the interior of the Premises a minimum of every three (3) years (or, as needed upon inspection by Workout Anytime in compliance with its reasonable standards), and remodel or upgrade the Club and all fitness equipment in the Club at your cost in accordance with our reasonable standards every five (5) years and at the time of renewal of this Agreement. You will also pay the cost of adding equipment or altering the Club for services and/or new equipment you choose to add, or that you are required to add, pursuant to Sub-section 11. **(YOU ACKNOWLEDGE THAT AN ADDITIONAL INVESTMENT WILL BE REQUIRED PURSUANT TO THIS SUB-SECTION.)**

9.3     You must modify, upgrade or update your computer system at any time that we require you to do so at your sole expense.

9.4    You will maintain your Club and any parking areas in good and safe condition   If you fail to maintain your Club in a condition that satisfied our reasonable requirements, we may, upon not less than three (3) days' written notice to you, order or accomplish the cleaning of the Premises, and you will be responsible for paying to us all costs we incur by doing so.

## SECTION 10 - CONFIDENTIAL OPERATIONS MANUAL

10.1    We will provide you with a copy or grant you access to the electronic version of the Workout Anytime Confidential Operations Manual (the "Manual"). The Manual will remain the sole property of Workout Anytime. You agree to immediately return the Manual to Workout Anytime at the expiration or termination of this Agreement.

10.2    You will treat the contents of the Manual as confidential and will not copy or otherwise reproduce, in whole or in part, or in any way make the contents of the Manual available to any person other than those persons employed by you to whom disclosure is necessary to enable you to operate the Club.

10.3    Workout Anytime may amend, revise and enhance the Manual and other instructional material (including its website) at any time in its sole discretion.

10.4    You agree to operate the Club in accordance with the Manual and Franchisor's website, and to be responsible for assuring compliance with the standards, specifications, requirements and instructions set forth in the Manual and Franchisor's website.

10.5    The contents of the Franchise resource section of the Workout Anytime website is deemed to be part of the Manual.

10.6    Franchisee acknowledges that because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor specifically reserves the right and privilege, at its discretion and as it may deem in the best interests of the System, to vary standards for any franchisee based upon the peculiarities, particularities and circumstances of a specific site (i.e., landlord requirements, business potential, population of trade area, existing business practices,  or any condition which Franchisor deems to be of importance to the successful operation of such franchisee's franchised business).  Franchisee shall not be entitled to require the Franchisor to grant to it a like or similar variation which Franchisor may offer or permit to another franchisee.

## SECTION 11 – FRANCHISEE'S DUTIES AND OBLIGATIONS

11.1    Consistent with the terms of this Agreement, you will diligently develop the business of your Club and use your best efforts to market and promote its core services and products.

11.2    Subject to the terms of this Agreement, including Sub-sections 9.2 and 10.4, during the Term you will comply with all present and future standards, specifications, processes, procedures, requirements and instructions regarding the operation of the Club as set forth in the Manual. In furtherance of such, you must comply with the following requirements:

- 13 –

A. A complete set of exercise equipment must be initially ordered only through Workout Anytime or another approved supplier, as may appear in the Manual, or as supplemented in the owner's section of Franchisor's website.

B. You must conduct pre-opening sales ("Pre-Sales") for your Club in accordance with our standards and Manual.

C. You or your Manager must devote its full time and best efforts to the management and operation of the Club.

D. You and your Manager must attend and satisfactorily complete the Workout Anytime initial training program. Attendance by you or your operating manager (if any) is compulsory and must be satisfactorily completed at least two (2) weeks prior to the opening of your Club.

E. Any additional service or product introduced into the System by Workout Anytime must be offered for sale on a continuing basis at your Club at the time and in the manner required by Workout Anytime.

F. You may only offer services and products for sale at your Club that have been approved by Workout Anytime in the Manual or otherwise in writing.  Workout Anytime reserves the right, in its sole discretion, to disallow any service or product that you have requested permission to offer.

G. Only signs, advertising and promotional material, services, equipment, supplies, uniforms, furnishings, color/design scheme and fixtures that meet Workout Anytime standards and specifications can be used at your Club or in the promotion or marketing of your Club.

H. All equipment, signs, products, supplies and other items necessary to add new services or products must be acquired, installed and utilized at Franchise Owner's expense within sixty (60) days of notice from us.

I. Your Club, and everything located at and within your Club, must be maintained in a safe and presentable condition and in compliance with the highest standards of cleanliness, including restrooms and showers, changing rooms and utility closets. The Club must be adequately lighted and operated in a clean and wholesome manner consistent with Workout Anytime requirements as such may be established and modified from time to time. The flooring must be new or in good condition. Appropriate window treatments must be installed to allow for the comfort and privacy of your members. All maintenance, repairs and replacements requested by Workout Anytime must be promptly made.  All consultants and employees of the Club must be clean and neat in appearance and must always wear Workout Anytime approved uniforms.

J. No alterations of the Club which materially affect the image of the Club may be made except at Franchisor's request or approval, and any alterations must conform to specifications and requirements established or approved by Franchisor in its sole discretion.

K. The Club and its business must comply with all applicable State and local laws, ordinances, rules, codes, regulations and other requirements.

- 14 –

L. Advertising materials provided to you by Workout Anytime for your use may be used only in the manner intended to promote the business. Any advertising materials which you create must first be submitted to us for approval prior to your use of same.

M. The Club must be open for business twenty-four (24) hours every day during the License Term, except days the Club is closed for repairs pursuant to Section 15.

N. The employees, the equipment and supplies, inventory and other items on hand at your Club must always be sufficient in quality and number to efficiently meet the current and anticipated volume of your business.

O. All debts and taxes arising from the Club and its business, except those duly contested in a bona fide dispute, must be paid when due including debts payable to your landlord, lender/financer, third party vendors, and both Workout Anytime and our affiliates.

P. All necessary and appropriate measures must be taken to avoid an unsatisfactory sanitation or health rating by or from any governmental agency or authority. Conditions or practices disapproved by any such agency or authority must be promptly corrected.

Q. All your dealings and transactions with Workout Anytime members, customers, suppliers and other franchisees are to be performed fairly and honestly. You will not permit a non-member access to either your or another franchisee's Workout Anytime Club unless on an introductory or trial basis, and then only for a maximum of thirty (30) days. You will not solicit or entice another franchisee's employee or members originating at their Club to terminate their employment or membership to have such employee or member become associated with your franchised location.

R. You must allow Workout Anytime reasonable space at your point of sale counter or another reasonable location inside the Club for a franchise recruitment advertisement. You are also responsible for the restocking and upkeep of that display, should one be used. Workout Anytime will be responsible for the cost of producing the advertisements.

S. You are solely responsible for recruiting new customers to the Club through advertising, marketing and business networking.

T. You are responsible for keeping up to date on competitors. This includes an awareness of competitors' pricing, promotional offers, advertising and services. You are responsible for taking direct action, as appropriate, and as authorized by Franchisor, to respond to a competitors' activities.

U. You must provide training to your employees in a fashion like that which you and your Manager received from Franchisor's representatives.

V. In accordance with your State's Health Club Act requirements (if any such law or its equivalent exists for your geographic area or jurisdiction), you are responsible for arranging for obtaining all health club certifications and licensing prior to opening.

W. If they indicate a desire to do so, you must permit members of any other Workout Anytime franchised location the use of your Club. You understand and agree that all Workout Anytime

- 15 –

members, regardless of their originating membership location, are an integral component of the Workout Anytime System. As such, they are to be treated with the same courtesy and respect you regularly extend to a member originating from your Club. This membership reciprocity includes access to tanning, massages, etc., if the member has purchased a membership that includes premium services at their originating Workout Anytime club. You must permit those members to utilize such premium features at your Club to promote a positive experience for both you and the member. Your failure to comply with Franchisor's reciprocity policy as stated in this Section is a material breach of this Agreement.

X. You must supply us with a copy of the lease governing your Club premises and ensure that Workout Anytime is included as a party to be notified in any instance, as well as our being able to exercise an option to take possession of the facility upon your default or termination should we, in our sole discretion, wish to do so. Such option will be secured by your submission to your landlord of Exhibit "M" attached hereto.

Y. You agree to never transfer members of your Club to any other Workout Anytime club without the express written permission of both the member and Workout Anytime. During or after the termination or expiration of this Agreement, you will never transfer, or attempt to transfer, any individual's membership to any club that is not a part of the System.

Z. You will immediately notify us of any legal action or proceeding by an individual or agency against you relating to your Club.

AA. You acknowledge that when we may be required to perform any service for you, we may use third parties, including affiliates of ours, to perform those services.

BB. Upon the reasonable request of the Franchisor, the Franchisee will present to its members such evaluation forms as are periodically prescribed by Franchisor and shall participate or request its members to participate in any marketing surveys performed by or on behalf of Franchisor.

CC. If the Franchisee is an entity other than a single individual, then you must supply us with copies of the organizational documents including information concerning all members, shareholders or partners as we may require.

DD. Once an individual joins your Club, and for so long as his/her membership remains in effect that person's membership fees are paid solely to you. Accordingly, except for personal training fees which might be purchased at a non-originating franchised location, only you are to receive fees associated with such individual's Workout Anytime membership regardless of the degree such member uses another franchised location.

EE. **Minimum Pre-Sale Membership Requirement**. If you have not sold at least Five Hundred (500) Charter Memberships by the date your Club is open for business, we have the right to send up to two (2) representatives of Franchisor to your Club for up to ten (10) days to provide sales and other training to you and your staff. You must pay our then-current training fee, currently Five Hundred Dollars ($500) per day per trainer, plus the expenses of travel and room and board of the trainers.

- 16 –

FF.     **Minimum Monthly Gross Revenue Requirement**.  Beginning in the twelfth (12th) month after the opening of your Club, you must generate a minimum of monthly Gross Revenue of Thirty-Five Thousand Dollars ($35,000) (the "Minimum Monthly Gross Revenue Requirement").  In the event that you fail to attain the Minimum Monthly Gross Revenue Requirement for 2 consecutive months, we have the right to impose any one or all of the following requirements until your Monthly Gross Revenues equal or exceed the Minimum Monthly Gross Revenue Requirement: (i) we may increase your required local advertising requirement by up to 200%; and/or (ii) we may require you and/or your designated manager to attend additional training at Franchisor's headquarters or at another location that Franchisor designates, and you will be required to pay our then-current training fee.  The Minimum Monthly Gross Revenue Requirement is not intended, nor may it be construed to be a Financial Performance Representation.

GG.     **Personal Guarantee.**  All owners of ten (10%) equity in the Franchisee must sign a Personal Guarantee and Non-Competition Agreement in a form we require.

11.3    In prescribing standards, specifications, processes, procedures, requirements or instructions under Sub-section 11.2 or any other provision of this Agreement, Workout Anytime will assist in general market research and provide guidance in determining the prices charged by you for services or products of any kind. Workout Anytime will not have control over the day-to-day operations of the Club. Unless otherwise provided for herein, you are expected to establish your own prices as to all products or services other than both individual/family and corporate membership rates or costs and the Rate Guaranty Fee, which you understand and agree are to be established solely by Workout Anytime, from time to time, as it may determine in its sole discretion.

11.4    Workout Anytime and our representatives or designated contractors will have the right to enter, inspect and photograph your Club at any time (it being understood by the parties that the facility is a club operating twenty-four (24) hours a day, seven (7) days a week), and our representatives will have the right to discuss with you or other people you may designate all matters that may pertain to compliance with this Agreement and with Workout Anytime standards, specifications, requirements, instructions and procedures. You will in all respects cooperate with Franchisor's rights under this Sub-section provided that our exercise of these rights will not unreasonably interfere with the conduct of your business.

11.5    You agree during the Term and for three (3) years after the expiration and termination of this Agreement that you will supply to Workout Anytime your home address and telephone number(s) which Workout Anytime may include in its Disclosure Document.

11.6    If you are an individual, you or your Manager trained in the Workout Anytime system must directly supervise the franchised business. If you are a corporation or other entity, or if you have in Franchisor's sole judgment, insufficient experience in a business like a Workout Anytime franchise or experience in business management in general, then you must nominate an operating partner or Manager having the required experience who will have direct responsibility for all operations of the Club. Any change in the operating partner or Manager will be subject to the approval of Workout Anytime. The operating partner will be the correspondent referred to in Sub-section 20.9 below.

11.7    <u>**Attendance at Annual Convention.**</u>     Franchisor may hold an annual conference (the "Convention") at a location we select.  We will determine the topics and agenda for the Convention

- 17 –

to serve the purpose among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and our personnel regarding business operations, and recognizing franchisees for their achievements. Franchisee or Franchisee's representative must attend the Convention and to pay our then-current registration fee. If we charge a registration fee for the Annual Convention, you must pay the fee regardless of whether you attend. All expenses, including Franchisee's and Franchisee's employees' transportation to and from the Annual Convention, and lodging, meals, and salaries during the Annual Convention, are the responsibility of Franchisee.

11.8 **Ownership of Member Information and Data.** Franchisee acknowledges and agrees that Franchisor is the owner of all information concerning the members of the Club and that Franchisee may not disclose, sell or encumber such information or data to any person or entity during the Term or following the termination, expiration, or non-renewal of this Agreement.

11.9 **Employee Matters.** You are solely responsible for the day-to-day operation of your Franchised Business and its employees. You will be solely responsible for recruiting and hiring the persons you employ to operate the Franchised Business. You are responsible for their training, wages, taxes, benefits, safety, schedules, work conditions, assignments, discipline and termination. At no point will you or your employees be deemed to be employees of Workout Anytime Franchising Systems, LLC.

   A. Franchisee shall obtain from each of its personnel an acknowledgement signed by such personnel that such individual understands, acknowledges, and agrees that he or she is an employee of Franchisee and not Franchisor and that such individual shall look solely to Franchisee for his or her compensation and for all other matters related to their relationship with Franchisee.

   B. Franchisee shall post a notice on an employee bulletin board clearly visible to employees at the Franchised Business notifying all employees of their employer and clearly stating that neither Franchisor nor its affiliates are an employer of the employees.

   C. Franchisee's employees are not Franchisor's agents or employees and Franchisor is not a joint employer of these individuals. Franchisee is solely responsible for performing all administrative functions of the Franchised Business, including payroll and providing worker's compensation insurance. Franchisee acknowledges that it is not economically dependent on Franchisor and that Franchisor does not provide facilities, equipment or house or transport Franchisee's employees or provide to Franchisee employees tools or materials required for Franchisee's employees to perform services for Franchisee.

## SECTION 12 - PURCHASE OF EQUIPMENT, INVENTORY AND SUPPLIES

12.1 You must purchase all exercise equipment through Workout Anytime or an approved supplier/vendor as shall be listed in the Manual which we provide to you, or through the franchise resource section of our website. Commercial Fitness Products, Inc. is currently the sole approved vendor of approved fitness equipment. You must furnish all items, including apparel, which bear the marks, only from our approved supplier.

- 18 -

**ALTHOUGH APPROVED BY US, WE AND OUR AFFILIATES MAKE NO WARRANTY AND EXPRESSLY DISCLAIM ALL WARRANTIES, INCLUDING WARRANTIES OR MERCHANTABILITY AND FITNESS FOR ANY PURPOSE, WITH RESPECT TO FIXTURES, FURNITURE, EQUIPMENT (INCLUDING, WITHOUT LIMITATION, ALL EXERCISE EQUIPMENT), SUPPLIES OR OTHER APPROVED ITEMS.**

12.2    The standards and specifications for other equipment, supplies and other products recommended by Workout Anytime may be found in the Manual or at the franchise resource section of the Workout Anytime website.

12.3    You may not purchase other items from any other non-approved supplier/source unless approved by Franchisor.

12.4    Workout Anytime may review at any time the quality of the equipment, products and other supplies anticipated to be purchased for your club to ensure that quality standards of the System are met. Any deficiencies as to either quality or quantity must be addressed and corrected within that reasonable period which Workout Anytime may designate.

## SECTION 13 - INSURANCE AND INDEMNIFICATION

13.1    **Insurance.**  Upon commencement of the License Term, you will purchase, and maintain in full force, at all times, during the Term of this agreement, an insurance policy with those limits equal to or greater than those outlined below. Franchisor shall have the discretion during the Term to change the required insurance coverages.  Copies of all insurance policies must be provided to Workout Anytime prior to the opening of your Club and within thirty (30) days of such policies' renewal date:

A.  General Liability - $2,000,000 per occurrence/$4,000,000 aggregate;

B.  Sexual Abuse and Molestation - $1,000,000 per occurrence/$1,000,000 aggregate;

C.  Employee Related Practices Insurance (EPLI) - $1,000,000 per occurrence/ $1,000,000 aggregate;

D.  Workers' Compensation – based on state requirements;

E.  Surety Bonds – based on state requirements

F.  Such additional insurance as may be required by the terms of any lease or mortgage for the Club.

13.2    All policies of insurance required under this Section will be with insurers qualified to do business and in good standing in the State where your Club is located and will be in a form reasonably satisfactory to Franchisor. Prior to opening for business, you will furnish to Franchisor certificates issued by each of your insurers indicating that all premiums due have been paid, that all required insurance is in full force and effect and that the insurance will not be terminated or changed without at least thirty (30) days' prior written notice from the insurer to both yourself and Franchisor. New

- 19 –

certificates evidencing renewal of insurance will be furnished at least thirty (30) days prior to the date of expiration of each policy. Within five (5) days of any request by Franchisor you will deliver to us a copy of all insurance policies for our examination and confirmation.

13.3    If you fail to obtain or maintain adequate insurance as set forth herein then Franchisor may, at its election and sole discretion, obtain insurance for and in your name and its name. Within five (5) days of any written request by Franchisor you will pay all costs and premiums incurred by Franchisor in obtaining such insurance, plus an administrative fee equal to ten (10%) percent of such insurance premium.

13.4    **Indemnification.**   Franchisee hereby agrees, during and after the term of this Agreement, to indemnify and hold harmless Franchisor and its affiliates, and their respective owners, directors, officers, members, managers, employees, agents, successors and assigns (the "Indemnified Parties") against, and to reimburse any one or more of the Indemnified Parties for, any and all liabilities, losses, suits, claims, demands, costs, fines and actions (the "Claims") of any kind or nature whatsoever directly or indirectly arising out of Franchisee's breach of this Agreement or the operation of the Franchised Business, unless (and then only to the extent that) the Claims are determined to be caused solely by Franchisor's intentional misconduct in a final, unappealable ruling issued by a court with competent jurisdiction or arbitrator.   For the purposes of this indemnification, "claims" includes all obligations, damages (actual, consequential, or otherwise), and the cost that any Indemnified Party reasonably incurs in defending any claim against it, including, without limitation, reasonable accountants', arbitrators', attorneys' and expert witness' fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration, or alternative dispute resolution, regardless of whether litigation, arbitration, or alternative dispute resolution is commenced.   Each Indemnified Party may defend any claim against it at Franchisee's expense and agree to settlements or take other remedial, corrective or other actions.   This indemnity will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.   Any Indemnified Party need not seek recovery from any insurer or other third party, or otherwise mitigate its losses and expenses, in order to maintain and recover fully a claim against Franchisee under this section. Franchisee agrees that a failure to pursue a recovery or mitigate a loss will not reduce or alter the amounts that an Indemnified Party may recover from Franchisee under this section.

13.5    Franchisor shall not be responsible or otherwise liable for any injury, loss, or damage suffered by any person or property directly or indirectly arising out of Franchisee's operation of the Franchised Business.   Franchisor will have no liability for Franchisee's obligations to pay third parties, including any landlords or product vendors.

## SECTION 14 - TRADEMARKS AND TRADE SECRETS

14.1    You recognize and acknowledge Franchisor's exclusive ownership and right to its current and future Marks and in all related practices, procedures, methods and devices. All goodwill now or in the future associated with or relating to the Marks will accrue directly and exclusively to the benefit and is the property solely of Workout Anytime. Nothing contained in this Agreement will be construed to entitle you any right, title or interest in the Marks, or the goodwill now or in the future associated with them, other than the rights and license expressly granted in this Agreement.

14.2    You represent, warrant and agree that you will not:

- 20 –

    A.   Directly or indirectly contest or aid in contesting, either during or following termination of this Agreement, the validity or ownership of the Marks;

    B.   Take any action in derogation of Franchisor's claimed rights whether now existing or later obtained;

    C.   Include the Marks in either your corporate, limited liability company, or partnership name, or in any internet domain name; or,

    D.   Utilize the Marks in any advertising or promotion that has not otherwise first been approved, in writing, by Workout Anytime.

14.3    You agree to use only Franchisor's existing or future Marks, and related practices, systems, procedures and methods for the promotion and operation of the Club, and only in accordance with the written procedures established by Workout Anytime.

14.4    You will cause the Workout Anytime Marks to be reproduced exactly and accurately.

14.5    Except for the registration of a "d/b/a" or a fictitious name certificate for the operation of the Club, YOU WILL <u>NOT</u> REGISTER OR ATTEMPT TO REGISTER THE MARKS IN YOUR OWN NAME. You may not use the Marks as any part of your entity name. The use or registration of the name "Workout Anytime" in any form or fashion other than what may otherwise be permitted herein will be deemed a material breach of this Agreement.

14.6    You will immediately inform Franchisor of any suspected, known or threatened infringement, piracy or challenge to the Marks, Trade Secrets, methods and procedures used in the System. You will assist and cooperate with Franchisor in acting, at Franchisor's sole expense, as Franchisor deems appropriate to protect the System. Franchisor will indemnify, hold you harmless, and will reimburse you for your liability and reasonable costs for defending the Marks.

14.7    Only the principals of the franchise entity, and that manager employed by the franchisee to operate the health club facility, may utilize the Workout Anytime email platform.

14.8    Immediately upon the expiration or sooner termination of this Agreement, you will:

    A.   Cease and forever abstain from using any of the Marks including, but not limited to, the de-imaging and de-branding of the Premises;

    B.   Take all actions necessary to cancel any d/b/a/ or fictitious name registration containing any of the Marks; and,

    C.   Furnish Workout Anytime with evidence reasonably satisfactory to Workout Anytime of compliance with the foregoing obligations within thirty (30) days after any expiration or sooner termination.

14.9    You acknowledge that you took no part in creating or developing, have no prior knowledge of, and have no rights or claims in, or to, any element of the System. You agree that all materials loaned

- 21 –

or licensed or made available to you will be kept confidential by you and will remain the property of Workout Anytime.

14.10   Except as specifically disclosed in the Disclosure Document, Workout Anytime represents and warrants to the best of its knowledge that the Marks do not violate or infringe upon any rights of others.

14.11   You agree that any use or variant of the Marks which you may develop or originate which, in turn, may be approved and adopted by Workout Anytime becomes the sole and exclusive property of Workout Anytime.  You affirmatively waive all rights of whatever form or nature, arising under either common law or both state or federal law(s), and assign to Workout Anytime all prospective rights and interests in any intellectual property which utilizes either the present Marks themselves or any subsequent Marks which Workout Anytime may use, regardless of their originating source.

## SECTION 15 – LOSS, CONDEMNATION AND CASUALTY

15.1   You will promptly advise Franchisor upon your receipt of a notice of default or termination of your Club's lease or mortgage, or equipment lease, or security agreement related to any purchase of equipment, and will promptly provide Franchisor a copy of the notice. You will also give Franchisor notice of any proposed taking of your Club, or any of your equipment, or any portion thereof through the exercise of the power of eminent domain, foreclosure, or any dispossessory action, at the earliest possible time. If the Club or a substantial part thereof is to be taken, the Club may be relocated within the area specified in Exhibit "L" or elsewhere with Franchisor's written approval in accordance with our relocation procedures. If you open a Club at another location in accordance with Franchisor's standards and general specifications within one (1) year of the closing of the old Club, the new Club will be deemed to be the Club licensed under the Agreement. If a condemnation, lease termination or mortgage default takes place and a new Club does not, for any reason, (other than those specified in Section 8) become the Club as provided in this Sub-section, then the License will terminate upon notice by Franchisor.

15.2   If the Club is damaged, you will expeditiously repair the damage.  If the damage requires closing the Club you will immediately notify Workout Anytime in writing, and will:

A.   Relocate the Club as provided in Sub-section 15.1; or,

B.   Repair or rebuild the Club in accordance with Franchisor's then existing standards and general specifications and reopen the Club for continuous business operations as soon as practicable (but, in any event, within twelve (12) months after closing the Club), giving Franchisor thirty (30) days' advance written notice of the date of reopening.

If the Club is not (or, in the opinion of Franchisor, cannot be) reopened in accordance with this Section, or relocated pursuant to Sub-section 15.1, the License will terminate upon written notice to you.

The Term will not be extended by any interruption in the Club's operations, except for an act of God that results in the Club being closed not less than sixty (60) days nor more than one hundred eighty (180) days. You must apply for any extension within thirty (30) days following the reopening

- 22 –

of the Club. Except as provided in Sub-section 4.3, no event during the Term will excuse you from paying Royalty Fees or other fees as provided for in this Agreement.

### SECTION 16 - RESTRICTIONS ON COMPETITION

16.1    During the term of this Agreement, or any extensions or renewals and for a period of two (2) years following the expiration, termination, assignment or transfer of this Agreement or the franchise, you will not directly or indirectly, through corporations, partnerships, limited liability companies, trusts, associations, joint ventures or other unincorporated businesses, perform any services for, engage to acquire, be an employee of, have any financial, beneficial or equity interest in, or have any interest based on profits or revenues of, any business that engages in or offers franchises for businesses that engage in or operate gymnasiums, fitness, personal training, or workout facilities, except for other health club facilities franchised by Workout Anytime or its affiliates, at the premises of the Club, or within twenty-five (25) miles of any Workout Anytime health club facility.

16.2    Nothing in this Section will prevent any active officer of yours or member of your family, either individually or collectively, from owning not more than five percent (5%) of the stock of any company, which is subject to the reporting requirements of Section 10 or Sub-section 13 (D) of the Securities and Exchange Act of 1934.

16.3    You will not at any time, during the term of this Agreement or any extensions or renewals and for a period of two (2) years following their expiration, termination, assignment or transfer, divert or solicit any member or former member of your Club or another Workout Anytime club to another workout or fitness facility other than a to a Workout Anytime club.

16.4    If any court having jurisdiction to determine the validity or enforceability of this Section determines that, strictly applied, it would by invalid or unenforceable, the scope of prohibited activities or the time or geographical provisions of this Section will be deemed modified to the extent necessary (but only to that extent) so that such restrictions as modified will be valid and enforceable.

16.5    You acknowledge that as a Workout Anytime franchisee you will have access to Workout Anytime Trade Secrets and confidential information and practices and therefore be in a unique position to use the special knowledge you will have gained while a franchisee. You acknowledge that a breach of the covenants contained in this Section will be deemed to threaten immediate and substantial irreparable injury to Workout Anytime. Accordingly, you agree that Workout Anytime will have the right, without prior notice to you, to obtain immediate injunctive relief without limiting any other rights or remedies.

16.6    If you are a legal entity, all officers, directors, stockholders, partners, members, trustees, beneficiaries and/or principals of you, the franchisee, and any persons controlled by, controlling or under common control with you must execute the Non-Competition, Non-Solicitation and Confidentiality Agreement attached hereto as Exhibit "C".

16.7    You agree that the scope of the timetables and prohibitions set forth above are reasonable and necessary to protect us and the System (including other franchisees of the System). You agree that the above referenced prohibitions are permissively broad to prevent you from taking information, materials and training which Workout Anytime is providing to you on an ongoing basis and using them to either compete with us or preempt or otherwise restrict our ability to enter new markets.

16.8    Franchisee acknowledges and confirms that the scope of the activities prohibited in this Section 16, as well as length of the term and geographical restrictions contained in this Section 16, are necessary to protect Franchisor's legitimate business interests and are fair and reasonable and not the result of overreaching, duress or coercion of any kind.

16.9    If Franchisee is an individual, Franchisee further acknowledges and confirms that his or her full, uninhibited and faithful observance of each of the covenants contained in this Section 16 will not cause any undue hardship, financial or otherwise, and that enforcement of each of the covenants contained in this Section 16  will not impair his or her ability to obtain employment commensurate with his or her abilities and on terms fully acceptable to him or her or otherwise to obtain income required for the comfortable support of himself or herself and his or her family, and the satisfaction of the needs of his or her creditors.

16.10   Franchisee acknowledges and confirms that its special knowledge of the Franchisor's systems and business (and anyone acquiring such knowledge through Franchisee) is such as would cause Franchisor and its franchisees severe injury and loss if he or she (or anyone acquiring such knowledge through Franchisee) were to use such knowledge to the benefit of a competitor or were to compete with Franchisor or any of its franchisees.

16.11   If any court shall hold that the time or territory or any other provision stated in this Section 16 constitutes an unreasonable restriction upon Franchisee, Franchisee agrees that the provisions of this Franchise Agreement shall not be rendered void but shall apply as to time and territory or to such other extent as such court may judicially determine or indicate constitutes a reasonable restriction under the circumstances involved.

16.12   Franchisor, in its discretion, may reduce the scope of any covenants set forth in this Section 16. Any such reduction is effective immediately upon Franchisor's delivery of notice. Franchisee shall comply immediately with any covenant as so modified. Such modified covenant is fully enforceable to the extent permitted by applicable law.

## SECTION 17 - TERMINATION

17.1    **Termination by You.**

If you are in compliance with this Agreement and Franchisor materially breaches this Agreement and fails to cure the breach within sixty (60) days after a written notice of the breach is delivered to Franchisor by you, you may terminate this Agreement, effective ten (10) days after delivery to Franchisor of a notice of termination. There are no other provisions in this Agreement that grant you the right to terminate this Agreement, and such termination may only be accomplished as provided for herein, or by agreement of the parties.

Should you terminate this Agreement in compliance with this Sub-section, you are required to comply with the post-termination procedures as set forth in Sub-section 17.7.

17.2    **Termination by Franchisor Without Notice.**

The Agreement will immediately terminate without notice (or in the event notice is required by law, immediately upon the giving of such notice or at the earliest time thereafter permitted by applicable law) in the event that:

A. No site has been designated and accepted pursuant to Sub-Section 8.1;

B. A permanent or temporary receiver or trustee for the Club or all or substantially all of your property is appointed by any court, or any such appointment is consented to or not opposed through legal action by you, or you make a general assignment for the benefit of your creditors, or you make a written statement to the effect that you are unable to pay your debts as they become due, or a levy or execution is made on the License, or an attachment or lien remains on your health club facility;

C. You lose possession or the right of possession of all or a significant part of the Club through condemnation, casualty, lease termination, mortgage foreclosure, equipment lease, or purchase foreclosure, and the Club is not relocated or reopened as provided in Section 15;

D. You contest in any court or preceding the validity of, or Workout Anytime ownership of, any of the Marks;

E. A material breach of Section 11.2(W) or 18 (i.e. Transfer and Assignment) occurs; or,

F. You are a corporation or limited liability company and any action is taken which purports to merge, consolidate, dissolve or liquidate you without Franchisor's prior written consent.

17.3    **Termination With Notice and Without Opportunity to Cure.**  Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

A. If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or take part in any criminal misconduct or other misconduct that negatively impacts the Licensed Marks or the operation of the Franchised Business;

B. If Franchisee or Franchisee's Principal Owners commit any fraud or misrepresentation in the operation of the Franchised Business;

C. If Franchisee or Franchisee's Principal Owners make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to any financial misrepresentation;

D. If Franchisee fails to complete the Initial Training;

E. If Franchisee directly or indirectly files suit or makes any other formal legal claim against any of Franchisor's approved vendors;

- 25 –

F.  If Franchisor sends Franchisee more than 2 notices to cure pursuant to Sections 17.4, 17.5 or 17.6 hereof in any 12-month period, regardless of whether the breaches have been cured;

G.  If Franchisee or Franchisee's principals materially violate any provision hereof pertaining to the Licensed Marks or Confidential Information or misuse the Licensed Marks or Confidential Information;

H.  If Franchisee violates the in-term restrictive covenant contained in Section 15;

I.  If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within 30 days;

J.  If Franchisee or any of Franchisee's principals become insolvent;

K.  If Franchisee voluntarily or otherwise abandons the Franchised Business. The term "abandon" includes any conduct which indicates a desire or intent to discontinue the Franchised Business in accordance with the terms of this Agreement and will apply if Franchisee fails to operate the Franchised Business for a period of three (3) or more consecutive business days without Franchisor's prior written approval;

L.  Franchisee fails to maintain insurance or to repay Franchisor for insurance paid by it, or otherwise fail to adhere to the requirements of Section 13;

M.  Franchisee fails, within thirty (30) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business;

N.  Any government action is taken against Franchisee that results in any obligation upon Franchisor which in Franchisor's sole judgment is uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation; or

O.  If Franchisee commits any fraud, criminal acts or other misconduct or makes any misrepresentation or omission to Franchisor relating to any other agreement with Franchisor or Franchisor's affiliates; or

P.  If Franchisee fails to commence operations of the Franchised Business by the required opening date, as described in Section 8.4 of this Agreement.

17.4  **Termination Upon Notice and 5 Days' Opportunity to Cure.**  If Franchisee fails to pay as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's major suppliers or vendors, Franchisor may terminate this Agreement upon after the expiration of five (5) days following notice to cure.

17.5  **Termination Upon Notice and 15 Days' Opportunity to Cure.** Franchisor has the right to terminate this Agreement if any of the following defaults remain uncured after expiration of the 15-day cure period:

A. If any audit reveals that Franchisee has understated Franchisee's royalty or advertising payments by more than 2%, or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any 12-month period;

B. If Franchisee fails to personally, or through an approved manager, supervise the day-to-day operation of the Franchised Business or fails to employ enough qualified, competent personnel as Franchisor requires from time to time;

C. If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual; or

D. Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

17.6 **Termination With Notice and 30 Day Opportunity to Cure.** Franchisor has the right to terminate this Agreement after notice and expiration of a 30-day cure period if Franchisee fails to perform or comply with any one or more of the terms or conditions of this Agreement which are not specifically enumerated in Sections 17.2, 17.3, 17.4, or 17.5 of this Agreement, or any ancillary agreements between Franchisee and Franchisor or any agreement between Franchisee and any of Franchisor's affiliates.

17.7 **Effect of Termination.**

Should this Agreement expire or be terminated by any party and for any reason, all rights and obligations between you and Franchisor under this Agreement will terminate, except for Sub-sections 10.1 and, 10.2, Section 14 and 16, and Sub-section 17.7. In an instance of expiration or termination, you will cease to be a licensed participant in the System, and you will:

A. Promptly pay Franchisor all amounts owing by you based on operations of the Club through the date of termination plus interest at the rate of eighteen percent (18%) per annum;

B. Immediately discontinue the use of all Marks, signs, structures, forms of advertising, telephone listings and service, the Manual, and all materials and products of any kind which are identified or associated with the System and return all materials and products to Franchisor and, at our request, assign your Club's telephone number to Franchisor;

C. Make no representation nor state that you are in any way approved, endorsed or licensed by Workout Anytime, or associated or identified with Workout Anytime or the System in any manner;

D. Immediately take all steps necessary to amend or terminate any registration or filing of any d/b/a or fictitious name or any other registration or filing containing the Marks to delete the Marks and all references to anything associated with the System;

E. Provide Franchisor the option to purchase required by Section 18.8;

F. Comply with the provisions of Sub-sections 15.7 and 16.1; and

- 27 –

G.  Forfeit all rights to receive membership fees and other revenue through the monthly draft from the credit card processor as of the date of termination or expiration of this Agreement.

17.8    If, within thirty (30) days after termination of this Agreement by Workout Anytime, you fail to remove all displays of the Marks from the Premises which are identified or associated with the System, Workout Anytime may enter the Premises to effect removal. In this event, Workout Anytime will not be charged with trespass nor be accountable or required to pay for any displays or materials which it might remove from your facility.

17.9    If, within thirty (30) days after termination you have not taken all steps necessary to amend or terminate any registration or filing of any fictitious name or any other registration or filing containing the Marks, you hereby irrevocably appoint Workout Anytime as your true and lawful attorney-in-fact for you, and permit Workout Anytime, in your name, place and stead and on your behalf, to take action as may be necessary to amend or terminate all registrations and filings, this appointment being coupled with an interest to enable Workout Anytime to protect the System.

17.10   Franchisor shall have the right to seek its lost future profits in the event of the termination of the Franchise Agreement by Franchisee in violation of this Agreement.  Franchisee acknowledges that its failure to operate the Club for the full term of this Agreement will deprive Franchisor of the benefit of the bargain including loss of revenue and goodwill of the franchise system in Franchisee's market area.

17.11   Franchisor's Right to Withhold Services or Products.  During any period of uncured default by Franchisee, Franchisor shall have the right to withhold or discontinue providing all services to Franchisee.

17.12   Franchisor's Option to Purchase of Business and Inventory. On the expiration or termination of this Agreement for any reason, we will have the right, but not the obligation, exercisable by written notice delivered to you at any time contemporaneously with or after delivery of a notice of termination under this Agreement, or within thirty (30) days after the date of expiration, to purchase all or part of your physical assets used in the Club except your personal assets. There will be no compensation for goodwill, and the purchase price for such assets will be equal to their fair market value less such goodwill. If you and we cannot agree on the purchase price for the assets that we desire to purchase within ten (10) days following our exercise of this option to purchase, an independent appraiser we designate will determine the fair market value, and you and we will share equally the cost of the appraiser. Such appraiser's decision will be final and binding with no appeal therefrom. The closing of the purchase will take place at a location, and on a date, we choose, and will be completed in accordance with all applicable bulk sales laws. At closing, you will deliver to us a bill of sale for the assets, in a form acceptable to us. We will be entitled to set off against the purchase price any amounts you then owe us or any affiliate of ours, and to pay out of the purchase price any of your unpaid creditors.

17.13   Alignment Deficiency Fee.  In lieu of Franchisor's exercise of its right to declare the Franchisee in default or to terminate Franchisee for cause, without waiver of any rights afforded to Franchisor herein, Franchisee may impose the Alignment Deficiency Fee described in Section 4.9 herein.

- 28 –

## SECTION 18 – TRANSFER AND ASSIGNMENT

18.1    **General.**

Except with respect to your mortgage company or institutional lender (if any), none of your rights under this Agreement may be the subject of any pledge, lien, levy, attachment, or security agreement, or assigned or otherwise purportedly transferred through execution, foreclosure, or like action. None of your rights or obligations under this Agreement are assignable or transferable, without Franchisor's prior written consent, which will not be unreasonably withheld or delayed, and compliance in all other respects with the terms of this Section.

With and after each valid assignment of this Agreement pursuant to this Section, the assignee or assignees will have deemed to be you, the Franchisee, under this Agreement and will be bound and liable for all existing and future obligations of the Franchisee. No stockholder in any corporation, and no member of any limited liability corporation, which becomes a franchisee will have any rights as an individual under this Agreement because of his, her or its stock ownership or membership interest, and the name of such entity will not include any of the Marks.

18.2    This Agreement, and your rights and obligations arising under it, are personal to you only.  As used herein, the word "transfer" means the sale, lease, assignment, gift, mortgage, or transfer because of your death, bankruptcy, share exchange, or transfer by operation of law or otherwise, either directly or indirectly, voluntarily or involuntarily.  If you are a corporation or limited liability company, such includes a transfer, as defined above, of a fifty (50%) percent or more interest in your entity.  A transfer cannot occur unless the following conditions are first satisfied, and you have paid a non-refundable Transfer Fee to Franchisor at the time you apply for consent to transfer the franchise:

A.   As of the date of Franchisee's request for consent and as of the effective date of the Transfer there shall be no default in the performance or observance of any of the Franchisee's obligations under this Agreement or any other agreement between the Franchisee and the Franchisor or any affiliate or supplier thereof, and if the Franchisee intends to transfer its right to possession of the premises, that the Franchisee has obtained the consent of all necessary parties to the assignment of any licenses, and the lease or sublease, to the proposed transferee;

B.   As of the date of the Franchisee's request for consent and as of the effective date of Transfer, the Franchisee shall have settled all outstanding accounts with Workout Anytime, its affiliates, all taxing authorities, and any third-party vendors;

C.   The proposed transferee is approved as a prospective franchisee, the sale price is appropriate, and Workout Anytime is paid a Transfer Fee in the amount of fifty (50%) percent of the then-current Initial Franchise Fee, unless the transferee is a corporation of which you are the majority stockholder, or said transfer is to either Workout Anytime itself or to an entity in which you own a fifty (50%) percent or more interest;

D.   The proposed transferee will execute our then current form of Franchise Agreement, and the proposed transferee will execute an Acknowledgement of Receipt of a then current copy of our Franchise Disclosure Document;

– 29 –

E.   The proposed transferee will pay for, attend and satisfactorily complete the training program for new franchisees unless;

1.   The transferee is a current franchisee in good standing in the System; or,
2.   The transferee is and has been a manager for a period of one (1) year or more of a Workout Anytime Club in good standing.

F.   The individual proposed transferee, or the stockholders, partners, members, trustees or beneficiaries of a proposed corporate, partnership, limited liability company, or trust transferee, will each execute a personal guarantee, jointly and severally guaranteeing the performance of the proposed transferee's obligation;

G.   The proposed transferee will have demonstrated to Franchisor that it has in all respects satisfied our standards applicable to new franchisees regarding experience, personal and financial reputation and stability, willingness and ability to devote his or her full time and best efforts to the operation of the franchised business, and any other conditions as Franchisor may reasonably apply in evaluating new franchisees. You must provide Franchisor all information about the proposed transferee as it may reasonably require. Because of the confidential information available to a franchisee, no assignment to a competitor or to any person or entity owning an interest in a competitive business of Workout Anytime will be permitted at any time;

H.   The parties to the proposed transaction will have entered into a binding agreement (a "Purchase Offer") subject only to the rights of Franchisor. You will furnish a copy of the binding agreement to us.  You will advise each prospective transferee of this provision and other terms under this Agreement;

I.   You will sign a written agreement in a form satisfactory to us in which you agree to comply with and satisfy all post-term obligations set forth in this Agreement:

J.   The Franchisee shall have delivered to the Franchisor, in a form satisfactory to the Franchisor, a complete release of the Franchisor, its directors and officers, members and managers, and their affiliates and the directors and officers, members and managers thereof from all obligations of any such persons under this Agreement;

K.   The proposed transferee agrees in writing to perform such maintenance, remodeling or re-equipping of the Club as we determine necessary to correct any then deficiencies to such club as we, in our sole discretion, deem necessary; and

L.   You agree that we may release to the prospective transferee all information we have with respect to your operation of the subject Club.

M.   The proposed transferee must not be engaged in a competitive business.

N.   The purchase price and terms of the proposed transfer are not so burdensome to the prospective transferee as to impair or materially threaten the transferee's ability to perform under the Franchise Agreement.

The refusal of Franchisor to consent to the proposed Transfer based upon the noncompliance with any of the foregoing conditions shall not be deemed to be an unreasonable withholding of consent.

- 30 —

The Franchisor's consent to a Transfer shall not operate to release the Franchisee from any liability under this Franchise Agreement.

18.3    If you are an individual and you desire to transfer your rights under this Agreement to a corporation, partnership, limited liability company, or trust which you will newly form and of which you will be a majority shareholder, partner, member, trustee, beneficiary and/or an executive officer, you may do so only if:

    A.   You execute a Personal Guarantee;

    B.   You continue to devote your full time and best efforts to manage the day-to-day operations of the franchised business unless you have an operational partner or Manager approved by Franchisor;

    C.   The corporation's, partnership's, limited liability company's or trust's activities be confined exclusively to the operation of the Franchised Business;

    D.   The corporation, partnership, trust and all officers sign an agreement with Workout Anytime assuming jointly and severally all your obligations under this Agreement; and,

    E.   It is expressly understood that the assumption of your obligation by any corporation, partnership, limited liability company, or trust does not limit your personal obligations under this Agreement, and that you and the corporation, partnership, limited liability company, or trust will be jointly and severally liable.

18.4    Any attempt by you to transfer any of your rights or interest under this Agreement or the License, without having received Franchisor's prior written consent will be void and will constitute a material breach of this Agreement.

18.5    You do not have the right to grant a sub-franchise.

18.6    **Death or Permanent Incapacity of Franchisee.**

Upon the death or permanent incapacity of the Franchisee or a controlling owner of the Franchisee, if such person has at the time of such death or permanent incapacity a spouse or any adult children surviving, the following shall apply:

    A.   if the surviving spouse and/or adult child desire and are, in the reasonable opinion of the Franchisor, capable of carrying on the Franchised Business, the said spouse and/or adult child shall have the right to continue to operate the Franchised Business provided that they shall directly covenant and agree with the Franchisor to be bound by the terms and conditions of this Agreement and any other agreements made between the Franchisor and the Franchisee;

    B.   if the surviving spouse and/or an adult child do not desire or are not, in the reasonable opinion of the Franchisor, capable of carrying on the Franchised Business, or cannot devote their full time and attention to the Franchised Business or if the Franchisee does not have a spouse or adult child surviving, the Franchisor shall have the right, such right to be exercised by the Franchisor giving written notice to the Franchisee or to Franchisee's estate within sixty (60) days of the date of Franchisee's death or death of the controlling owner of the Franchisee or

the date upon which the Franchisee's or controlling owner's permanent incapacity arises, to purchase all or any part of the assets of the Franchisee used in the operation of the Franchised Business for a purchase price equal to the "asset value" of the Franchisee's assets less all proper business liabilities assumed by the Franchisor as of the date said purchase is completed. To satisfy the aforesaid purchase price, the Franchisor shall pay the difference between the "asset value" and the amount of the liabilities assumed by it, on the date of the completion of the purchase by way of cash or certified check.

The Franchisee or any controlling owner shall be deemed to have a "permanent disability" if the usual participation of the Franchisee or any controlling owner in the Franchised Business is significantly curtailed for a cumulative period of ninety (90) days in any six (6) month period during the term of this Agreement, including renewals, due to physical and/or intellectual incapacity as determined by a medical provider or as evidenced by the appointment of a guardian, custodian, or trustee.

18.7    **Transfer or Assignment by Franchisor.**  The Franchisor shall have the right to transfer this Agreement to any person or legal entity without prior notice to, or consent of the Franchisee. Specifically, and without limitation of the foregoing, the Franchisee agrees that the Franchisor may sell its assets, its interest in the Trademarks or the System to a third party; may offer its securities privately or publicly; may merge, acquire other entities or be acquired by another entity directly or indirectly; may undertake a refinancing, recapitalization, leveraged buyout, or other economic or financial restructuring; and with regard to any or all of the above sales, assignments and dispositions, the Franchisee expressly and specifically waives any claims, demands, or damages against the Franchisor arising from or related to the transfer and from any and all future liability under any of the terms, covenants, or conditions, express or implied, contained in this Agreement, which have been assigned.  In the event of a transfer of this Agreement by the Franchisor, the Franchisor shall be freed and relieved of any and all liability under this Agreement.  The Franchisee agrees to look solely to the assignee for performance of the Franchisor's obligations hereunder that have been assigned.  Nothing contained in this Agreement shall require the Franchisor to continue any business operating under the System or to offer any services or products, whether or not bearing the Trademarks, to the Franchisee if the Franchisor assigns its rights in this Agreement in accordance with the provisions of this paragraph.

18.8    **Franchisor's Right of First Refusal.**  Without in any way derogating from the Franchisor's right to reject a proposed Transfer in accordance with this Agreement, if at any time during the Initial Term or any renewal of this Agreement, the Franchisee obtains a bona fide offer (the "Offer") to acquire the whole or any part of its interest in the Franchised Business which the Franchisee wishes to accept, the Franchisee shall promptly give written notice thereof to the Franchisor together with a true copy of the Offer.  Upon receipt of such notice and Offer, the Franchisor shall have the option of purchasing the property forming the subject matter thereof upon the same terms and conditions as those set out in the Offer except that:

A.    there shall be deducted from the purchase price the amount of any commission, fee or transfer fee that would have otherwise been payable to the Franchisor, any broker or agent or other intermediary in connection with the Transfer;

B.    the Franchisor shall have the right to substitute cash for any other form of consideration specified in the Offer and to pay in full the entire purchase price at the time of closing.

- 32 –

The Franchisor may exercise the option at any time within thirty (30) days after receipt of the said notice by giving written notice to the Franchisee.  If the Franchisor declines to exercise such option and if such Transfer is approved by the Franchisor in accordance with this Agreement, the Franchisee shall be at liberty to complete the Transfer to such third party transferee in accordance with the Offer, provided that, notwithstanding the terms of the Offer, such transaction must be completed within thirty (30) days of the date on which Franchisor notifies the Franchisee of its approval of such transaction.  If the transaction is not completed within thirty (30) days, the foregoing provisions of this right of first refusal shall apply again in respect of the proposed Transfer and so on from time to time.

## SECTION 19 - MISCELLANEOUS

19.1.   **Relationship of Parties.**

You neither have nor will you exercise any authority, express, implied or apparent, to act on behalf of or as an agent of Franchisor or any of its affiliates or subsidiaries, for any purpose, and will take no action which is intended to create an apparent employer-employee or agency relationship between you and Franchisor. You are, and will remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Club and its business and for all claims and demands based on damages or destruction of property or based on injury, illness or death of any person or persons, directly or indirectly arising from the operation of the Club. Franchisor will neither have, nor exercise the right to, the control of the day-to-day managerial operations of the Club.

19.2.   **No Conflict with Other Agreements.**

You represent that you are not a party to or subject to any agreements that might conflict with the terms of this Agreement and agree not to enter any conflicting agreements during the Term.

19.3.   **Cost of Enforcement.**

If either party institutes or prevails entirely or in part in any action at law or in equity against the other party based entirely or in part on the terms of this Agreement, the prevailing party will be entitled to recover from the losing party, in addition to any judgment, reasonable attorney's fees, court costs and all the prevailing party's expenses about any action at law.

19.4.   **No Waiver.**

No waiver by Franchisor of any breach by Franchisee, nor any delay or failure by Franchisor to enforce any provision of this Agreement, may be deemed to be a waiver of any other or subsequent breach or to be deemed an estoppel to enforce Franchisor's rights with respect to that or any other subsequent breach.  Franchisor will not waive or impair any right, or option this Agreement reserves (including Franchisor's right to demand exact compliance with every term, condition, and covenant or to declare any breach to be a default and to terminate this Agreement before its term expires) because of any custom or practice at variance with this Agreement's terms; Franchisor's alleged failure, refusal, or neglect to exercise any right under this Agreement or to insist on the other's compliance with this Agreement, including any System Standard; Franchisor's waiver of or failure to exercise any right, power, or option, whether of the same, similar, or different nature, with other Franchised Businesses; the existence of franchise agreements for other franchisees that contain

- 33 –

provisions different from those contained in this Agreement; or Franchisor's acceptance of any payments due from Franchisee after any breach of this Agreement.

19.5.   **Entire Agreement; Amendments.**

This Agreement, with any related agreements and all Exhibits, constitutes the entire understanding and agreement between you and Franchisor and supersedes all prior understandings, whether oral or written, pertaining to either this Agreement, the System or your Club. You acknowledge and agree that no claims, representations or warranty of earnings, sales, profits or success of your Workout Anytime Club have been made to you other than those set out in Item 19 of the franchise disclosure document.  No interpretation, change, termination or waiver of any provision of this Agreement, and no consent or approval under this Agreement, will be effective or binding upon you or Franchisor unless in writing signed by you and Franchisor, except that a waiver needs to be signed only by the party waiving. Nothing in this Agreement or in any related agreement, however, is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you.

19.6.   **Severability.**

If any term or provision of this Agreement or the application thereof to any person, property or circumstances will to any extent be invalid or unenforceable, the remainder of this Agreement will be unaffected and will remain in full force and effect and each term and provision will be valid and enforced as fully permitted by law.

19.7.   **Governing Law.**

All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. Sections 1 et seq.).  Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.) or other federal law, this Agreement, the franchise, and all claims arising from the relationship between Franchisor and Franchisee (and/or any of our affiliates) and Franchisee will be governed by the laws of the State of Georgia, without regard to its conflicts of laws rule.  Should however, the restrictive Covenants set forth in Section 16 and Exhibit C attached hereto herein be deemed unenforceable under Georgia law, the law of the state in which the Franchised Business is located, shall be applied solely to the interpretation and enforcement of those covenants. This Agreement will become a valid and enforceable contract when we accept it and sign it in Atlanta, Georgia.  Franchisee and Franchisor expressly agree that this Agreement has been made in the State of Georgia, that substantially all performance of the obligations hereunder has been and will be rendered in the State of Georgia, and that there is a regular stream of business activity between Franchisee and franchisor from and into the State of Georgia.  The Covenant Not to Compete in Section 16 and Exhibit C attached hereto of this Agreement shall be interpreted in accordance with the laws of the state in which the Franchisee is located.

19.8.   **Arbitration.**

Except as qualified below, any dispute between Franchisee and Franchisor or any of their respective affiliates, officers, directors, employees, agents (including area representatives) or owners arising out of, in connection with or in relation to this Agreement, the parties' relationship or Franchisee's Franchised Business must be submitted to binding arbitration under the authority of the Federal

– 34 –

Arbitration Act without reference to any state arbitration statutes and must be determined by arbitration administered by the American Arbitration Association pursuant to its then-current commercial arbitration rules and procedures. The arbitration shall take place in the city where Franchisor's headquarters are located at the time of the commencement of the arbitration action. The arbitration shall be heard by one (1) arbitrator who has at least ten (10) years of experience in franchise law. The arbitrator must follow the law and not disregard the terms of this Agreement.

Any arbitration must be on an individual basis and the parties and the arbitrator will have no authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claim or any other proceeding involving third parties. In the event a court determines that this limitation on joinder of or class certification of claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts.

A judgment may be entered upon the arbitration award by any state or federal court in the state where Franchisor maintains its headquarters or the state where Franchisee's Franchised Business is located. The decision of the arbitrator will be final and binding on all parties to the dispute; however, the arbitrator may not under any circumstances: (1) stay the effectiveness of any award pending termination of this Agreement; (2) assess punitive or exemplary damages; (3) make any award which extends, modifies, or suspends any lawful term of this Agreement or any reasonable standard of business performance set by Franchisor.

Notwithstanding the foregoing, the parties agree that the following claims will not be subject to arbitration: (1) any action for declaratory or equitable relief, specific performance, other relief in the nature of equity to enjoin any harm or threat of harm to such party's tangible or intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder; (2) any action in ejectment or for possession of any interest in real or personal property; or (3) any action by Franchisor to collect any sums due to it.

19.9.   **Venue.**

Nothing contained in this Agreement will prevent Franchisor or Franchisee from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard such party's interests. In the event of any litigation arising out of this Agreement or based upon the relationship between the parties, venue for any such litigation shall be any court of general jurisdiction in Fulton County, Georgia or the United States District Court for the Northern District of Georgia, Atlanta Division. Franchisee hereby accepts and submits to, generally and unconditionally, for itself and with respect to its property, the jurisdiction of any such courts in any such action or proceeding and hereby waives, to the greatest extent permitted by applicable law defenses based on jurisdiction, venue, or forum non conveniens. The provisions of this Section 19.9 shall be self-executing and shall remain in full force and effect after the termination or expiration of this Agreement. Franchisee acknowledges that this Agreement has been entered into in the State of Georgia, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Atlanta, Georgia, including but not limited to assistance, support and the development of the System.

- 35 –

19.10.  **Cross-Default.**

In the event that Franchisee (or its affiliate) directly or indirectly acquires the right and franchise to operate another or other Workout Anytime franchised Clubs, any default by Franchisee (or its affiliate) in the performance or observance of any of the terms and conditions under any one agreement governing the aforesaid right and franchise shall be deemed to be an event of default under all other agreements pursuant to which Franchisee (or its affiliate) directly or indirectly owns or operates such Workout Anytime franchised business or businesses.

19.11.  **Notices.**

All notices and other communications provided for in this Agreement must be in writing and will be delivered in person or mailed by certified mail, or by Federal Express or U.S. Express Mail for overnight delivery if to you, at your address or, if to Workout Anytime at our address, Attention: Steven C. Strickland, with a copy to Joseph J. Gottlieb, Esq., 284 North Main Street, Alpharetta, Georgia 30009. Workout Anytime or you may change, by providing notice thereof in writing, the address to which future notices will be sent. Notices delivered in person will be deemed given when delivered and mailed notices will be deemed given three (3) days after mailing if by certified or other receipted mail, or one (1) day after mailing if by Federal Express or U.S. Express Mail. If you are a corporation, some other legal entity, or more than one (1) individual, then you will authorize one (1) natural person as correspondent with authority to bind you.

19.12.  **No Set Off by Franchisee.**

Franchisee agrees that it will not, on grounds of the alleged nonperformance by Franchisor of its obligations hereunder, withhold payment of any royalty or other amounts due to Franchisor or its affiliates, whether on account of goods purchased by Franchisee or otherwise.

19.13.  **Certain References.**

References to weeks and months mean calendar weeks and calendar months. References to persons mean legal entities as well as natural persons.  Whenever the pronouns "he" or "his" are used herein, such refers to the masculine, feminine and neutral genders, and the singular and plural. Except as otherwise specifically set forth in this Agreement, this Agreement will inure to the benefit of and be binding on you and Workout Anytime, our respective heirs, executors, administrators, personal representatives, successors and assigns.

19.14.  **Patriot Act.**

You represent and warrant to us that (i) You are not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation, named by any Executive Order or the United States Treasury Department as a "terrorist", "Specially Designated National and Blocked Person", or other banned or blocked person, group, or nation (collectively, "Banned Persons") pursuant to any anti-terrorism law; (ii) You are not engaged in this Franchise Agreement, or instigating or facilitating the execution of this Agreement, directly or indirectly on behalf of any Banned Person; (iii) You currently do not appear, and throughout the Franchise Term neither you nor any officer, director, shareholder, partner, member or other owner shall appear on any list of Banned Persons; (iv) no anti-terrorism law prohibits you from doing business with the Franchisee; (v) the Franchisee, its

– 36 –

officers, directors, or principal shareholders, partner, member, or other owner of the Franchisee shall not, during the Franchise Term, violate any anti-terrorism laws; and (vi) Franchisee, its officers, directors, principal shareholders, partners or members shall not, during the Franchise Term do business with any party, individual, or entity that has violated or will violate any anti-terrorism laws. For purposes of this Agreement, "anti-terrorism laws" shall mean Executive Order 13224 and related regulations promulgated and enforced by the Office of Foreign Assets Control, the Money Laundering Control Act, the United States Patriot Act, or any similar law, order, rule or regulation enacted in the future. Franchisee hereby agrees to defend, indemnify, protect, and hold harmless Franchisor from and against all claims, damages, losses, risks, liabilities, fines, penalties, expenses (including attorneys' fees) and costs arising from or related to a breach of the foregoing representations and warranties. The foregoing indemnity obligations of Franchisee shall survive the termination or expiration of this Agreement.

19.15. **Other Franchises.**

You acknowledge that other Workout Anytime franchisees have or will be granted franchises at various times and in different situations, and further acknowledge that the provisions of such franchises may vary substantially from those contained in this Agreement. You also acknowledge that because complete and detailed uniformity under varying circumstances may not be practical, there may be variations we grant to other of our Workout Anytime clubs (whether franchised or which our affiliates operate), and you will not be entitled to require us to grant similar variations or privileges to you.

19.16. **Release of Prior Claims.**

By executing this Franchise Agreement, Franchisee, and each successor of Franchisee under this Franchise Agreement forever releases and discharges Franchisor and its affiliates, its designees, franchise sales brokers, if any, or other agents, and their respective officers, directors, representatives, employees and agents, from any and all claims of any kind, in law or in equity, which may exist as of the date of this Franchise Agreement relating to, in connection with, or arising under this Agreement or any other agreement between the parties, or relating in any other way to the conduct of Franchisor, its affiliates, its designees, franchise sales brokers, if any, or other agents, and their respective officers, directors, representatives, employees and agents prior to the date of this Agreement, including any and all claims, whether presently known or unknown, suspected or unsuspected, arising under the franchise, business opportunity, securities, antitrust or other laws of the United States, any state or locality.

19.17. **Modification of the System.**

**FROM TIME TO TIME AFTER THE DATE OF THIS FRANCHISE AGREEMENT. FRANCHISOR MAY CHANGE OR MODIFY THE SYSTEM (INCLUDING THE TYPES OF GOODS AND SERVICES OFFERED BY THE FRANCHISED BUSINESS). FRANCHISEE SHALL ACCEPT, AND IS BOUND BY, ANY SUCH CHANGES IN THE SYSTEM AS IF THEY WERE PART OF THIS ORIGINAL FRANCHISE AGREEMENT AT THE TIME OF ITS EXECUTION. FRANCHISEE WILL MAKE SUCH EXPENDITURES AND SUCH CHANGES OR MODIFICATIONS TO COMPLY WITH THE CHANGES OR MODIFICATIONS OF THE SYSTEM AS FRANCHISOR MAY REASONABLY REQUIRE.**

– 37 –

19.18.   **Acknowledgement.**

YOU ACKNOWLEDGE THAT YOU HAVE CONDUCTED AN INDEPENDENT INVESTIGATION OF THE WORKOUT ANYTIME SYSTEM AND RECOGNIZE THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT INVOLVES BUSINESS RISK AND WILL BE LARGELY DEPENDENT UPON THE ABILITY OF YOU AS AN INDEPENDENT BUSINESS PERSON. WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC EXPRESSLY DISCLAIMS THE MAKING OF, AND YOU ACKNOWLEDGE THAT YOU HAVE NOT RECEIVED, ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT;

YOU ACKNOWLEDGE YOU HAVE RECEIVED A COPY OF THE COMPLETE WORKOUT ANYTIME FRANCHISE AGREEMENT AT LEAST SEVEN (7) DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED. YOU FURTHER ACKNOWLEDGE THAT YOU RECEIVED THE DISCLOSURE DOCUMENT REQUIRED BY THE FEDERAL TRADE COMMISSION TITLED "FRANCHISE DISCLOSURE DOCUMENT" AT LEAST FOURTEEN (14) DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED;

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND THIS AGREEMENT, AND THAT WORKOUT ANYTIME HAS ACCORDED YOU AMPLE TIME AND OPPORTUNITY AND HAS ENCOURAGED YOU TO CONSULT WITH ADVISORS, COUNSELORS, AND BOTH LEGAL AND FINANCIAL PROFESSIONALS OF YOUR OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT;

YOU ACKNOWLEDGE THAT OTHER WORKOUT ANYTIME FRANCHISEES HAVE OR WILL BE GRANTED FRANCHISES AT VARIOUS TIMES AND IN DIFFERENT SITUATIONS, AND FURTHER ACKNOWLEDGE THAT THE PROVISIONS OF SUCH FRANCHISES MAY VARY SUBSTANTIALLY FROM THOSE CONTAINED IN THIS AGREEMENT.  YOU ALSO ACKNOWLEDGE THAT BECAUSE COMPLETE AND DETAILED UNIFORMITY UNDER VARYING CIRCUMSTANCES MAY NOT BE PRACTICAL, THERE MAY BE VARIATIONS WE GRANT TO OTHER OF OUR WORKOUT ANYTIME CLUBS (WHETHER FRANCHISED OR OPERATED BY OUR AFFILIATES), AND YOU WILL NOT BE ENTITLED TO REQUIRE US TO GRANT SIMILAR VARIATIONS OR PRIVILEGES TO YOU;

YOU ACKNOWLEDGE THAT THE SUCCESS OF FRANCHISEE IN OWNING AND OPERATING THE CLUB IS SPECULATIVE AND WILL DEPEND ON MANY FACTORS INCLUDING, TO A LARGE EXTENT, THE FRANCHISEE'S INDEPENDENT BUSINESS ABILITY. NO REPRESENTATIONS OR PROMISES, EXPRESS OR IMPLIED, HAVE BEEN MADE BY FRANCHISOR OR ANY EMPLOYEE, BROKER OR REPRESENTATIVE OF FRANCHISOR, TO INDUCE FRANCHISEE TO ENTER INTO THIS FRANCHISE AGREEMENT OR ANY RELATED AGREEMENT EXCEPT AS SPECIFICALLY INCLUDED IN THIS FRANCHISE AGREEMENT OR SUCH

- 38 –

**RELATED AGREEMENTS. NO EMPLOYEE, OFFICER, DIRECTOR, BROKER OR REPRESENTATIVE IS AUTHORIZED TO DO OTHERWISE;**

**IN ALL OF ITS DEALINGS WITH FRANCHISOR, ITS EMPLOYEES, BROKERS (IF ANY), AND OTHER REPRESENTATIVES, EACH HAVE ACTED ONLY IN A REPRESENTATIVE CAPACITY AND NOT IN AN INDIVIDUAL CAPACITY. THIS FRANCHISE AGREEMENT, AND ALL BUSINESS DEALINGS BETWEEN FRANCHISEE AND SUCH INDIVIDUALS AS A RESULT OF THIS FRANCHISE AGREEMENT, ARE SOLELY BETWEEN FRANCHISEE AND FRANCHISOR;**

**FRANCHISOR MAKES NO WARRANTY AS TO FRANCHISEE'S ABILITY TO OPERATE THE FRANCHISED BUSINESS IN THE JURISDICTION IN WHICH THE FRANCHISED BUSINESS IS TO BE OPERATED. IT IS INCUMBENT UPON FRANCHISEE TO SEEK OR OBTAIN ADVICE OF COUNSEL SPECIFICALLY WITH RESPECT TO THIS ISSUE. IN THE EVENT THAT LEGISLATION ENACTED BY, OR REGULATION OF, ANY GOVERNMENTAL BODY PREVENTS FRANCHISEE FROM OPERATING THE FRANCHISED BUSINESS, FRANCHISOR SHALL NOT BE LIABLE FOR DAMAGES NOR BE REQUIRED TO INDEMNIFY FRANCHISEE IN ANY MANNER WHATSOEVER OR TO RETURN ANY MONIES RECEIVED FROM FRANCHISEE.**

This entire Agreement, including corrections, changes and all attachments and addendums, will only be binding upon Workout Anytime when executed or initialed by a member, director or officer of Workout Anytime.

**You and Workout Anytime, intending to be legally bound, have duly executed, sealed and delivered this Agreement in duplicate.**

FRANCHISEE: (For an Entity)                          FRANCHISEE: (For an Individual)

  WOA Athens AL, LLC./ John Greff

_____                     _____
(Please print name and type of entity)              (Please print name)

*[signature]*

_____                     _____
By: (Signature of person signing for entity)        By: (Signature)

Manager

_____                     _____
Title: (Title of person signing)                    Date:
    11/27/2019

_____
Date:

**(SIGNATURES CONTINUED ON FOLLOWING PAGE)**

– 39 –

FRANCHISOR:  WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC

*Steven C Strickland*

By:  Steven C. Strickland, Its CEO

11/27/2019

Date:

- 40 –

EXHIBIT B **- PERSONAL GUARANTEE**

## PERSONAL GUARANTEE

11/27/2019

THIS GUARANTEE is made this _____ of _____, 201____, by the undersigned ("Guarantor"), for the benefit of WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC ("Franchisor").

## RECITALS

John Greff

A. _____ is the Franchisee ("Franchisee") of that certain Franchise Agreement (the "Franchise Agreement") with Franchisor dated <u>11/27/2019</u>_____, 201____; and,

B.      As a condition to entering into the Franchise Agreement, Franchisor requires that Guarantor guarantee the full performance of the obligations of Franchisee under the Franchise Agreement; and,

C.      Guarantor will receive substantial benefit from the Franchise Agreement and desires that Franchisee enter into the Franchise Agreement with the Franchisor;

**NOW, THEREFORE,** in consideration of the execution of the Franchise Agreement by Franchisee and its acceptance by Franchisor, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor covenants and agrees as follows:

## AGREEMENT

1.      **Guarantee.** Guarantor hereby absolutely and unconditionally guarantees (a) the full and faithful performance of all of the covenants, conditions, agreements and undertakings of Franchisee to be kept and performed by Franchisee under the Franchise Agreement including, but not limited to, the monthly payment(s) when due, and other sums payable by Franchisee to Franchisor under the Franchise Agreement, and (b) the payment of all damages owing to Franchisor by Franchisee after the termination of the Franchise Agreement or the exercise by Franchisor of any other right or remedy of Franchisor following a default by Franchisee under the Franchise Agreement (collectively the "Obligations"). Guarantor understands and agrees that this Guarantee is unconditional and continuing and is a guarantee of payment and performance and not of collection.

2.      **Independent Obligation.** The liability of Guarantor hereunder is independent of the obligation of the Franchisee or any other person or entity a separate action or separate actions against Guarantor until after Franchisee has failed to comply with all cure periods allowed. The release of, or cancellation by, any signer of a similar instrument shall not act to release or otherwise affect the liability of Guarantor hereunder.

3.      **Modification to Franchise Agreement.** Guarantor's obligations under this Guarantee of Franchise Agreement shall not be extinguished, discharged, diminished or reduced in any way by any modification or amendment of the Franchise Agreement including, but not limited to, any modification of payment dates or amounts, or any subsequent assignment of the Franchise Agreement made with or without the consent of Franchisor. Guarantor hereby waives any right to approve any modification or amendment of the Franchise Agreement.

4.      **Obligations of Guarantor Upon Default by Franchisee.** Should Franchisee shall fail to pay when due any other monetary sum or charge, or any portion thereof, accrued or due pursuant to the

- 1 -

terms of the Franchise Agreement within any allotted cure period, then, upon written notice to Guarantor by Franchisor, Guarantor shall pay to Franchisor all such amounts as may be due and owing from Franchisee to Franchisor by reason of Franchisee's failure to perform.

5.  **Remedies.** If Guarantor fails to perform any obligation under this Guarantee, then in addition to all other remedies provided at law or in equity, from time to time and without first requiring performance on the part of Franchisee, and without being required to exhaust or proceed against any or all security held by Franchisor for the performance of Franchisee under the Franchise Agreement, Franchisor may enforce its rights to require performance by Guarantor of any or all of the obligations on the part of Guarantor to be performed under this Guarantee by action at law or in equity, or both.

6.  **No Waiver.** No failure on the part of Franchisor to pursue any remedy under this Guarantee or under the Franchise Agreement shall constitute a waiver on the part of Franchisor of its right to pursue such remedy based on a subsequent default.

7.  **Waiver of Exoneration.** Guarantor waives any right to require Franchisor to (a) proceed against Franchisee, (b) proceed against or exhaust any security held from Franchisee, or (c) pursue any other right or remedy available to Franchisor. Guarantor further waives any defense it may acquire because of Franchisor's election of any remedy against Guarantor or Franchisee, or both.

8.  **Waiver of Subrogation.** Until the obligations of Franchisee under the Franchise Agreement have been performed in full, Guarantor shall have no right of subrogation against Franchisee, and Guarantor hereby expressly waives any right to enforce any remedy which Franchisor now has or may hereafter acquire against Franchisee. Guarantor hereby waives the benefit of, and any right to participate in, any security now or hereafter held by Franchisor for the performance of the obligations of Franchisee under the Franchise Agreement.

9.  **Waiver of Presentments.** Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guarantee and waives all notices of the existence, creation, or incurring of new or additional obligations.

10.  **Other Guarantor Waivers.** Without limiting the generality of the preceding paragraphs, Guarantor hereby waives all rights and defenses to:

(a)  All rights it may have now or in the future to require or demand that Franchisor pursue any right or remedy Franchisor may have against Franchisee or any other third party;

(b)  Any defense arising as a result of Guarantor's election of the application of Section 1111(b)(2) of the Bankruptcy Code or based on any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code;

(c)  Any defense as a surety arising under applicable law;

(d)  Any duty or obligation of Franchisor to disclose to Guarantor any facts Franchisor may now or hereafter know about Franchisee, regardless of whether Franchisor has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or has reason to believe that such facts are unknown to Guarantor or has a reasonable opportunity to communicate such facts to guarantor, it being understood and agreed that guarantor is fully

- 2 –

responsible for being and keeping informed of the financial condition of Franchisee and of any and all circumstances bearing on the risk of nonperformance of any Obligation; and,

(e)     Any defense based upon an election of remedies by Franchisor, including any election which destroys or impairs any right of subrogation, reimbursement of contribution which Guarantor may have, or any rights or benefits under any provisions of Georgia law in any way qualifying, conditioning or limiting the obligations of Guarantor based on any steps or procedures that Franchisor should take before proceeding against Guarantor.

11.     **Bankruptcy.** This Guarantee will continue unchanged by any bankruptcy, reorganization or insolvency of Franchisee, or any successor or assignee thereof, or by any disaffirmance or abandonment by a trustee of Franchisee. Notwithstanding any modification, discharge or extension of the indebtedness or any amendment, modification, stay or cure of Franchisor's rights which may occur in any bankruptcy or reorganization case or proceeding concerning Franchisee whether permanent or temporary, and whether assented to by Franchisor, Guarantor hereby agrees that it shall be obligated hereunder to pay and perform the Obligations in accordance with the terms of the Franchise Agreement and the terms of this Guarantee. Guarantor understands and acknowledges that by virtue of this Guarantee, Guarantor has specifically assumed all risks of a bankruptcy or reorganization case or proceeding with respect to Franchisee.

12.     **Assignment of Franchise Agreement.** As used herein, the term "Franchisor" shall include any successor, assignee or transferee of Franchisor. Guarantor agrees that Franchisor may, without notice to Guarantor, assign the Franchise Agreement and this Guarantee in whole or in part and that no such assignment or transfer of the Franchise Agreement and/or this Guarantee shall operate to extinguish or diminish the liability of Guarantor under this Guarantee.

13.     **Obligations of Guarantor Are Primary.** Guarantor agrees that the liability of Guarantor under this Guarantee shall be primary and that in any cause or right of action which shall accrue to Franchisor under this Guarantee, Franchisor may, at its sole option, proceed against Guarantor without having commenced any action, or having obtained any judgment, against Franchisee. If Franchisor has any enforceable right against Franchisee upon termination of the Franchise Agreement, Franchisor shall be entitled to enforce those rights against Guarantor without giving prior notice to Franchisee or Guarantor, and without making any demand on either of them.

14.     **Interest.** Any sum required to be paid by Guarantor to Franchisor pursuant to the terms of this Guarantee shall bear interest at the lower of seven percent (7%) or the highest rate then allowed by law, from the date due until paid in full.

15.     **Attorneys' Fees.** Guarantor agrees to pay Franchisor's reasonable attorneys' fees and all costs and other expenses incurred in any collection or attempted collection, or in any negotiations relative to the obligations hereby guaranteed or incurred enforcing this Guarantee against the Guarantor. In addition, in the event of any dispute between the parties arising under this Guarantee, or the breach of any covenant or condition under this Guarantee, then the prevailing party shall be entitled to have and recover from the party not so prevailing the attorneys' fees and costs incurred by the prevailing party, whether such fees and costs are incurred in taking any action under this Guarantee, or in any judicial proceeding (including appellate proceeding). "Prevailing party" for the purposes of this Paragraph 15 shall include, without limitation, the party who receives from the other party the sums allegedly due, performance of the covenants allegedly breached, consideration substantially equal to that which was demanded, or substantially the relief or consideration sought in any judicial proceeding whether or not such proceeding is prosecuted to final

- 3 -

judgment, or a party who dismisses a judicial action in return for substantially the performance or relief sought or the payment of the sums allegedly due.

16. **Time of the Essence.** Time is of the essence with respect to the performance of every provision of this Guarantee.

17. **Governing Law.** This Guarantee shall be construed and interpreted in accordance with the laws of the State of Georgia.

18. **Captions.** The captions and paragraph numbers appearing in this Guarantee are inserted only as a matter of convenience and are not to be used to interpret this Guarantee.

19. **Examination of Franchise Agreement.** Guarantor acknowledges that he/she has (a) received a copy of the Franchise Agreement, (b) read and understood the terms and provisions of the Franchise Agreement including, but not limited to, the covenants, conditions, agreements and undertakings of Franchisee to be kept and performed by Franchisee under the Franchise Agreement, and (c) read and understood the obligation of Guarantor under this Guarantee, including the legal effect of such obligations and has been advised by legal counsel respecting such obligations.

20. **Binding to Successors.** Guarantor shall not assign any of its obligations hereunder by operation of law or otherwise, and any attempted assignment shall, at Franchisor's sole option, be void. Subject to the foregoing, the obligations of Guarantor under this Guarantee shall be binding on Guarantor's successors.

**IN WITNESS WHEREOF,** Guarantor has executed this Guarantee as of the date first hereinabove set forth.

**GUARANTORS:**

11/27/2019
_____     Date: _____

_____     Date: _____

_____     Date: _____

_____     Date: _____

- 4 –

EXHIBIT C **- NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Non-Competition and Non-Solicitation Agreement ("Agreement") is entered into by and between Workout Anytime Franchising Systems, LLC ("Franchisor") and _____ ("Obligor"), and becomes effective on the Effective Date of the Franchise Agreement once counter-signed by Franchisor. THIS AGREEMENT IS MADE SUBJECT TO ANY PROVISIONS OF ANY EXHIBIT "G" ATTACHED TO THE DISCLOSURE DOCUMENT PURSUANT TO WHICH THIS NON-COMPETITION AND NON-SOLICITATION AGREEMENT WAS PRESENTED TO AND SIGNED BY OBLIGOR AND WHICH SPECIFICALLY AND EXPRESSLY RELATE TO THE STATE OF FRANCHISEE'S RESIDENCY.

*John Greff*

### W I T N E S S E T H:

**WHEREAS,** Obligor is either (1) the "Franchisee" named in the Franchise Agreement ("Franchise Agreement") that is being executed in conjunction with this Agreement, and/or (2) an equity owner of the legal entity that is named as the Franchisee in the Franchise Agreement ("Obligor" shall for all purposes under this Agreement mean and refer to the entity (if Franchisee is an entity), all equity owners of such entity, and all managers and/or primary operators of Franchisee's Workout Anytime franchised health club facility (the "Club");

**WHEREAS,** Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchise and franchisees from unfair competition by an existing or former franchisee that has had special, intimate knowledge of Franchisor's methods and trade secrets and confidential information for the operation of a Workout Anytime Club;

**WHEREAS,** Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee that transfers (without Franchisor's permission) the goodwill associated with Franchisor's proprietary and protected marks and business practices to a business that competes with Workout Anytime franchisees;

**WHEREAS,** Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee that is able to take advantage of the knowledge and experience gained in running a Workout Anytime Club, and use such knowledge and experience in operating a new competing business without having to continue to pay royalties and other fees for such information, thereby placing other franchisees at a competitive disadvantage;

**WHEREAS,** Obligor acknowledges that Franchisor has a legitimate business interest in re-franchising the formerly protected territory of a former franchisee, and Franchisor would suffer irreparable damage absent this Agreement because it would be unable to attract new franchisees to the area served by its former franchisee;

**WHEREAS,** Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee who (1) diverts business and customers from a current or former Workout Anytime Club to a competitor of Franchisor, or (2) induces or attempts to induce an employee of any Workout Anytime Club to discontinue their employment with the Club;

– 1 –

**WHEREAS,** Obligor acknowledges that Franchisor requires the execution of this Agreement as an ancillary requirement to Franchisor's simultaneous grant of a franchise to Obligor or a legal entity of which Obligor is an equity owner.

**NOW, THEREFORE,** in express acknowledgement and recognition of the importance of the foregoing recitals, the parties agree as follows:

1.      **Consideration in Exchange for Obligor's Covenants.**   Obligor hereby expressly acknowledges and confirms that all of the valuable benefits, advantages and opportunities enjoyed by Obligor immediately upon (and solely as a result of) Obligor's (or as applicable, Obligor's legal entity) becoming a franchisee under the Franchise Agreement, and the additional protection provided by this Agreement being signed by all other new franchisees, serve as valuable and adequate consideration received in simultaneous exchange for all of Obligor's promises and covenants made in this Agreement.

2.      **Obligor's In-Term Non-Competition and Non-Solicitation Covenants.**  During the term of the Franchise Agreement, and without geographic limits, Obligor shall not directly or indirectly (such as through corporations or other entities controlled by the Obligor or by or through or in conjunction with any other individual person or persons including, but not limited to, Obligor's spouse (if any) and employees):

       a.      divert or attempt to divert any business or customer of any Club to any competitor or do anything injurious or prejudicial to the goodwill associated with Franchisor's Marks, methods, the Workout Anytime Franchise System, or Franchisor's business practices; and,

       b.      persuade, entice, or attempt to persuade or entice, any employee of any Workout Anytime Club to discontinue their employment with such Club; and,

       c.      own, maintain, engage in, be associated with, be employed by, advise, assist, invest in, be landlord to, franchise, or have any interest in any health club, gymnasium, or fitness center business which is the same or substantially like or competitive with any Workout Anytime Club; and,

       d.      use, communicate, disseminate, provide access, or divulge to anyone at any time any confidential information or trade secrets of Franchisor, or at any time copy, duplicate, record or otherwise reproduce any confidential information or trade secrets of Franchisor, including without limitation those materials contained within the secure password protected Franchise resource section of Franchisor's website, except as expressly permitted in the Franchise Agreement.

3.      **Obligor's Post-Term Non-Competition and Non-Solicitation Covenants.**

       a.      For purposes of this Section 3, the word "Conclusion" means the termination, assignment or transfer and/or expiration of the Franchise Agreement corresponding to this Agreement, regardless of whether such termination/expiration occurs prior to, or at the end of, such Franchise Agreement's term (the "Term").

       b.      Upon the Conclusion of the Term and for the stated time thereafter and geographic restriction set forth below, Obligor shall not, directly or indirectly:

(i)      for a two (2) year period following the Conclusion of the Term and without geographic limitation, divert or attempt to divert any business or customer of any health club facility to any competitor, or do anything injurious or prejudicial to the goodwill associated with Franchisor's Marks, methods or the Workout Anytime Franchise System; and,

(ii)      for a two (2) year period following the Conclusion of the Term within twenty-five (25) miles of the location of the franchisee's former Club, own, maintain, engage in, be associated with, be employed by, advise, assist, invest in or have any interest in any business that engages in or offers franchises for businesses that engage in or operate gymnasiums, fitness, or workout facilities which is the same as, or substantially like or competitive with any Workout Anytime Club; and,

(iii)      for a two (2) year period following the Conclusion of the Term and without geographic limitation, persuade, entice or attempt to persuade or entice any employee of any Workout Anytime Club to discontinue their employment with such Club.

c.      Upon the Conclusion of the Term, Obligor shall not, at any time, directly or indirectly:

(i)      communicate, disseminate, provide access, reveal or divulge to anyone, in whole or in part, any of Franchisor's confidential information or trade secrets; and,

(ii)      use, copy, duplicate, record or otherwise reproduce at any time any of Franchisor's confidential information or trade secrets; and,

(iii)      use in any manner whatsoever any of the Marks, the methods, Franchisor's Operations Manuals, any of the materials contained within the secure password protected Franchise resource section of Franchisor's website, or any other proprietary or intellectual property rights of Franchisor and the Workout Anytime Franchise system.

d.      Upon the Conclusion of the Term, Obligor shall immediately return to Franchisor all Operations Manuals, all training materials, all of Franchisor's proprietary software and printed matters, all website materials, all other confidential information and trade secrets, and all of Franchisor's advertising and promotional signs and related items.

4.      **Severability.**  It is the parties desire and intention that the covenants contained in this Agreement shall be construed as agreements severable and independent from each other, except that any violation of Section 2 of this Agreement shall constitute a material breach and default of the Franchise Agreement and cause for immediate termination of the Franchise Agreement without opportunity to cure. It is also the intention of the parties that if any Section of this Agreement is deemed by a court of competent jurisdiction to be invalid or unenforceable, then the maximum legally allowable restriction permitted by applicable law shall control and bind Obligor.

5.      **Enforcement Costs.**  Obligor agrees to pay to Franchisor all the costs and expenses (including reasonable attorneys' fees) incurred by Franchisor in connection with its enforcement of this Agreement.

- 3 –

6.      **Counter-Parts, Entire Agreement, Amendments.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall be one and the same instrument. The parties may execute such counterparts via fax, or electronically via PDF. This Agreement, together with the Franchise Agreement, contains the entire agreement of the parties pertaining to the subject matter hereof and no prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the parties not set forth herein shall be of any force and effect. Any modifications to this Agreement must be accomplished by a written agreement signed by both parties.

7.      **Injunction.** Obligor recognizes and agrees that the injury that Franchisor and certain of its franchisees will suffer in the event of Obligor's breach of any covenant contained in this Agreement cannot be compensated by monetary damages alone, and Obligor therefore agrees that in the event of a breach or threatened breach by Obligor of this Agreement, Franchisor (and its affiliates, successors and assigns), in addition to and not in limitation of, any other rights, remedies, or damages available to Franchisor (and/or its affiliates, successors, and assigns) at law, in equity, under this Agreement or otherwise, shall be entitled to seek an injunction from any court of competent jurisdiction in order to prevent or restrain any such breach by Obligor or by Obligor's agents, representatives, employees, partners, co-owners, or any and all other persons directly or indirectly acting for or with him/her/it.

8.      **Choice of Law, Venue and Jurisdiction.**  This Agreement shall be construed and governed under and in accordance with the laws of the State in which the Franchised Business is located. Exclusive venue and jurisdiction of any suit arising under this Agreement shall lie within the federal or state courts within the State of Georgia, except to the extent that the laws of the State where the Club is located requires for the Franchise Agreement and this Agreement to be enforceable against the Obligor or Obligor's legal entity that venue and jurisdiction lie in such State.

**AGREED TO AND ACCEPTED BY OBLIGOR:**

Signature:  _____

Print your name:  John Greff
_____

Print Title (if applicable):  Manager
_____

Date of Signature:  11/27/2019
_____

*If the "Franchisee" named in the Franchise Agreement is an entity (e.g., corporation, limited liability company, partnership, trust, etc.), or if there is more than one (1) equity owner of "Franchisee", or if "Franchisee" consists of more than one (1) person, or if someone other than "Franchisee" or an equity owner of an entity "Franchisee" will serve said "Franchisee" as a manager or primary operator, complete and sign the additional OBLIGOR SIGNATURES below for the entity, for each equity owner of the entity, for each person included as part of "Franchisee", or for each manager or primary operator, or alternatively submit separate signed originals of this Agreement for the entity and for each of said persons.

**(ADDITIONAL SIGNATURE CONTINUED ON FOLLOWING PAGE)**

**ADDITIONAL OBLIGOR SIGNATURES:**

Signature: _____

Print your name: _____

Print Title (if applicable): _____

Date of Signature: _____


Signature: _____

Print your name: _____

Print Title (if applicable): _____

Date of Signature: _____


WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC:

Signature of Signing Officer: *Steven C Strickland*

Printed Name of Signing Officer: Steven C. Strickland, CEO

11/27/2019

*Date of Counter Signature: _____

(*Effective Date of Agreement)

- 5 –

WOAT FDD 2019v5

360 —

John Greff —

Houston, TX.

**EXHIBIT A**

**FRANCHISE AGREEMENT**

AD = mak

Location = Houston, TX

Fee = 19,500

Date = 01-11-18.

WOATFDD041017v1



# Bank of America      Online Banking

---

**WOAT Operating: Account Activity Transaction Details**

---

| | |
|---|---|
| **Post date:** | 01/11/2018 |
| **Amount:** | 19,500.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 180111 TIME:0508 ET TRN:2018011100140953 SEQ:5530300010ES/000416 ORIG:JOHN H GREFF OR JENNIFER ID:786878970 SND BK: JPMORGAN CHASE BANK, NA ID:021000021 PMT DET:DCD O F 18/01/10 REF: JOHN GREFF, TEXAS |
| **Merchant name:** | JOHN H GREFF OR JENNIFER |
| **Transaction category:** | Uncategorized: Pending |

Jerry Lucas - Broker

JG

**Workout Anytime Franchising Systems, LLC**

**FRANCHISE AGREEMENT**

This Franchise Agreement (this "Agreement") is entered into between Workout Anytime Franchising Systems, LLC, a Georgia Limited Liability Company ("Workout Anytime", "Franchisor", "us" or "we"), whose principal address is 2325 Lakeview Parkway, Suite 200, Alpharetta, Georgia, 30009, and John Greff_____, a _____ ——Individual———————————— ("Franchisee" or "you")

## LET ALL PARTIES KNOW

Workout Anytime owns a unique system for opening and operating a twenty-four (24) hour health and fitness facility   for the general public through a uniform system which has high standards of service, uses quality equipment, and operates under the business format created and developed by Workout Anytime Franchising Systems, LLC known as the Workout Anytime Franchise System (the "System");

The distinguishing characteristics of the System include the name Workout Anytime, workable and functional interior and exterior designs, confidential operating procedures, standards and specifications for equipment, services, products, and both management and marketing programs. All distinguishing characteristics may be changed, improved, and further developed by Workout Anytime. They are known as "Trade Secrets" and are designated by and identified with the marks described in this Agreement;

Workout Anytime identifies itself by means of certain trade names, service marks, logos, emblems, and indicia of origin, including the Federal registered trademarks "Workout Anytime" and "24/7 Get Fit", and the common law rights associated with "Workout Anytime 24/7", along with other trade names and service marks which are now, or may be in the future, designated by Workout Anytime in writing for use with the System (the "Marks");

Workout Anytime continues to use, develop and control the use of the Marks to identify for the public the source of services and products marketed under the System, and which represent the System's high standards of quality, cleanliness, appearance and service;

You recognize the benefits to be derived from being identified with the System. You also recognize the value of the Marks and the continued uniformity of image to you, Workout Anytime, and other franchisees of Workout Anytime. You understand the importance to the System of Workout Anytime's high and uniform standards of quality, cleanliness, appearance and service, and further recognize the necessity of opening and operating your Workout Anytime health club facility in conformity within the System;

You recognize that to enhance the value of the System and goodwill associated with it, the Agreement places detailed obligations on you, including adherence to Workout Anytime's reasonable present and future requirements regarding the types of services offered, advertising, physical facilities, operational techniques, and related matters; and,

You wish to be assisted, trained, and franchised to operate a health club facility pursuant to the provisions, and at the location within the territory specified in, this Agreement (the "Territory"). You have also had an adequate opportunity to be thoroughly advised of the terms and conditions of this Agreement by counsel or an advisor of your own choosing.

- 1 -

WOATFDD042017v1

**THEREFORE**, you and us, intending to be legally bound and in consideration of mutual agreements, covenants and promises contained in this Agreement, agree as follows:

## SECTION 1 - GRANT OF LICENSE

1.1     Subject to the limitations contained in this Agreement, Workout Anytime grants to you, during the Term (as defined below) the rights and license (the "License") to:

    A.    Operate a health club facility that uses the System (the "Club") upon the terms and conditions of this Agreement, in one (1) single territorial area and at one (1) location as described in Exhibit "L" (the "Territory");

    B.    Use the Marks at the Club and to utilize the System; and,

    C.    Offer and market at the Club related services and products (optional) that have been approved by Workout Anytime.

1.2     During the Term, Workout Anytime will not use or license any of the Marks licensed to you in connection with the operation of any other health club facility within your Territory described in Exhibit "L".  We or our affiliates have the right to grant other franchises or licenses and to operate company or affiliate owned fitness centers within private establishments located within the Territory, if access to those centers is limited to employees of the business, or transient guests of the business.

## SECTION 2 - FRANCHISE TERM AND RENEWAL

This Agreement and the franchise granted will continue for a period of fifteen (15) years. This fifteen (15) year period will begin on the date this Agreement is executed by Workout Anytime and is subject to prior termination in accordance with the provisions of this Agreement (the "Initial Term"). Upon expiration of the Initial Term you will have the option to renew your Franchise License for a single successive period of five (5) years (the "Renewal Term" and collectively with the Initial Term, the "Term" or a "Term").

Workout Anytime may refuse to renew this Agreement if you have:

    A.    Failed to remedy any material breach of this Agreement as specified by Workout Anytime in a written notice to you and such failure to remedy remains outstanding thirty (30) days prior to the end of the Initial Term or any Renewal Term; or,

    B.    Committed two (2) or more material breaches of this Agreement of a substantial nature in the preceding twenty-four (24) months prior to the end of the then-current Term.

Workout Anytime may also refuse to renew this Agreement if you are not current in payment obligations to Workout Anytime and our subsidiaries and affiliates at the end of the then-current Term following receipt of written notice by Franchisor of such delinquency in payment.

You will execute a Renewal Franchise Agreement and all other agreements in the form then being used by Workout Anytime in granting new franchises and pay a renewal fee of Two Thousand Five Hundred ($2,500.00) Dollars (the "Renewal Fee"), these agreements may

WOATFDD042017v1

include an increase in continuing monthly fees and other obligations. There will not be, however, another Initial Franchise Fee charged in the renewal of the Franchise Agreement. Failure by you to execute agreements within thirty (30) days after their delivery to you will be deemed an election by you to not to renew your franchise.

As additional conditions to renewal, you will:

      C.     Make capital expenditures as may be reasonably required to renovate and modernize your Club, including the replacement of equipment, to reflect the then-current image of the company; and

      D.     Complete any additional education or training programs that the Franchisor may then require for franchisees upon renewal.

      E.     You must provide Franchisor with not less than six (6) months prior written notice of your desire to renew.  Franchisee will notify you within thirty (30) days of its receipt of your notice, if you have met Franchisor's requirements to renew for an additional five (5) year term.

## SECTION 3 - INITIAL FRANCHISE FEE

3.1     Upon the execution of this Agreement, you will pay Workout Anytime an Initial Franchise Fee of Twenty-Nine Thousand Five Hundred ($29,500.00) Dollars (the "Initial Franchise Fee").

          $19,500 - Houston, TX - New Area

3.2     If we agree to sell you more than one (1) Club, the Initial Franchise Fees for the additional Clubs, if purchased at the time you enter into our Development Agreement and initial Franchise Agreement are as follows: For a 2-pack: (i) $29,500 for the first club; and (ii) $19,500 for the second Club.  For a 3-pack: (i) $29,500 for the first Club; (ii) $19,500 for the second Club; and (iii) $14,500 for the third Club.  The Clubs must be developed in accordance with the Development Schedule set forth in the Development Agreement.

If you elect not to purchase additional discounted clubs for the term of this current FDD version, future purchases of franchises will be at the then-current FDD version discount.

3.3     The Initial Franchise Fee is non-refundable under any conditions.

3.4     The amounts referred to above do not include any applicable Federal, State or Local Taxes which may be payable to the appropriate taxing authorities. (A State and Local Use Tax is applicable in some States of the purchase price of your equipment).

## SECTION 4 - CONTINUING FEES

4.1     Continuing Monthly Royalty Fee. On or before the tenth (10th) day of each month, commencing when you begin the pre-sale of memberships, you will pay the following continuing monthly royalty fee (the "Royalty Fee"):

      1.     During the first five (5) years of the Initial Term, you will pay a monthly Royalty Fee of Four Hundred Ninety-Nine ($499.00) Dollars.  During the sixth (6th) through tenth (10th) years of the Initial Term, you will pay a monthly Royalty Fee of Five Hundred Forty-Nine ($549.00) Dollars.  During the eleventh (11th) through the fifteenth (15th) years of the Initial Term you will pay a monthly Royalty Fee of Five Hundred

- 3 -

Ninety-Nine ($599.00) Dollars.  During the first renewal term, if applicable, you will pay a monthly Royalty Fee of Six Hundred Forty-Nine ($649.00) Dollars.

2. In addition to the amounts required to be paid pursuant to Section 4.1 1, you will pay a monthly Royalty Fee equal to four (4%) percent of your Gross Revenues.

3. "Gross Revenues" includes all revenue you generate from all business conducted at your Club, including but not limited to membership fees, personal training fees, tanning bed fees, massages, and the sale and delivery of any other services, products, merchandise, and tangible property of any nature whatsoever, whether in cash or for credit, from sources paying at the club, outside the club or online and whether collected or uncollected.  "Gross Revenue" does not include the amount of any applicable sales tax imposed by federal, state, municipal, or other governmental authority if such taxes are stated separately when the customer is charged and you pay such amounts as and when due to the appropriate taxing authority. Also, excluded from Gross Revenues is the amount of any documented refunds, charge backs, credits, and allowances given to customers in good faith and only in accordance with our operating procedures.  All barter and exchange transactions for which you furnish services or products in exchange for goods or services to be provided by the vendor, supplier, or customer will be valued at the full retail value of the memberships bartered in exchange for the goods or services provided to you.  Gross Revenues also includes the proceeds of any business interruption insurance paid to you. Gross Revenue also includes any payments you receive from vendors.

4.2 By the tenth (10th) day of each month you will pay a monthly National Brand Development Fee equal to one (1%) percent of your monthly Gross Revenues. Payment of the National Brand Development Fee will commence when you begin the pre-sale of memberships to your Club.  We reserve the right to increase the monthly National Brand Development Fee to a maximum of two (2%) percent upon thirty (30) days advance written notice.  Such monies will be utilized for the design and development of advertising, both local and national advertising costs, public relations, trade shows and conventions, and those other costs associated with both developing and promoting the System and the Workout Anytime brand.

4.3 Notwithstanding any designation by you as to what your continuing Monthly Royalty Fee is comprised of or how it has been calculated, we have the sole discretion to apply such payment(s) made by you towards any of your indebtedness for Monthly Processing Fees, advertising and promotional contributions, purchases, interests, collection costs or any other indebtedness.

4.4 You will pay a monthly Technology Fee of Three Hundred Ninety-Five ($395.00) Dollars by the tenth (10th) day of each month to compensate us for our expenses of developing and managing the franchisor's website, the franchisee's specific web page which links from the franchisor's website, as well as your Club's email platform (including up to five [5] discrete email addresses) and other technology we determine important in the operation of your Club.  Payment of the Technology Fee shall commence when you begin the pre-sale of memberships for your Club.

4.5 You hereby authorize the Franchisor's approved third party vendor (presently being ABC Financial Services, Inc.) to deduct from any monies it collects on your behalf the amount of all fees you are obligated to pay us and/or our affiliates on the due date of such fee(s).  All Gross Revenue derived from the sale of all products and services at

your Franchised Club must be processed through Franchisor's approved third party payment processor. You also authorize said vendor to supply us with any information it may have dealing with the operation of your Club and account.  To effectuate the terms of this Section, and to ensure the proper and timely remittance of all fees due the Franchisor under this Agreement, you hereby irrevocably constitute and appoint Workout Anytime your true and lawful attorney-in-fact to permit our review and, as may become necessary, our amendment of your account with that third-party vendor employed to collect your monthly membership monies.  This power of attorney is irrevocable and coupled with an interest and shall survive the termination of your franchise.

4.6     As security for all monetary and other obligations of Franchisee to Franchisor or its affiliates as set forth in this Agreement, Franchisee grants to Franchisor a first priority security interest in all assets of Franchisee in the Club, including entire club membership database for current and former members, Franchisee's monthly recurring draft, all furniture, fixtures, machinery, equipment, inventory and all other property (tangible or intangible), now owned or later acquired by Franchisee used in connection with the franchised health club business and wherever located as well as all contractual and related rights of Franchisee under this Franchise Agreement and all other agreements between the parties. Franchisee agrees to execute such financing statements, continuation statements, notices of lien, assignments or other documents as may be required to perfect and maintain Franchisor's security interest described in this paragraph, and authorize us to file in the public records of the county in which your Club may be located one (1) or more financing statements (i.e., UCC-1 financing statement) to evidence this security interest. Franchisor may, in its discretion, enter a subordination agreement, in form and substance satisfactory to it, whereby it will subordinate its security interest to: (a) the security interest of a reputable institutional lender relating to a loan to Franchisee for reasonable working capital purposes; (b) the purchase money security interest of an approved equipment vendor for any equipment purchased or leased by Franchisee and used in the operation of the Franchised Business; and (c) the purchase money security interest of a supplier of approved products sold at the Club. Franchisee shall pay all filing fees and costs for perfecting Franchisor's security interest.

4.7     Each month, within ten (10) days of a written request by us, you will supply a financial statement to us of the previous month's membership activities, including the number of new members, renewing members, cancelled members and current active enrollment as well as the amount of sales generated from the Club as a consequence of any of your actions in any regard or aspect, including, but not limited to, membership sales revenue, personal training revenue, and revenue associated with the sale of merchandise and other products, including supplements, food and liquids/beverages. We may also contact you by telephone or e-mail to collect this information.

4.8     Subject to your receipt of business interruption insurance payments, if you are unable to operate the Club due to damage or loss to the Club caused or created by a casualty, act of God, condemnation, or other condition over which you have no control, then the Royalty Fee will be waived for a period no greater than six (6) months commencing with the month in which such damage or loss occurs.

## SECTION 5 - ADVERTISING AND PROMOTION

5.1     You will spend a minimum of Four Thousand ($4,000.00) Dollars per month to advertise and promote the opening of your Club at your own expense within sixty (60) days of the opening of your Club to the public.  Thereafter, you will spend a minimum of Two

WOATFDD042017v1

Thousand ($2,000.00) Dollars per month on advertising, marketing and otherwise promoting your Club (the "Local Advertising Expenditure"). Workout Anytime will offer recommendations as to the type, manner, and time frame to maximize the benefit of your advertising. Workout Anytime has the right to require you to pay the Local Advertising Expenditure directly to it and if so required, Workout Anytime will make such expenditures as it deems reasonably necessary to promote your Club within your territory. You must submit proof of your expenditures for Local Advertising to Workout Anytime upon request.

5.2    Workout Anytime will make available to you advertising and promotional materials for the Club which are used by Workout Anytime, its affiliates and other franchisees of the System. You will receive a sample of each type of advertising and promotion material the Franchisor may create at no charge via web download, or other means of transmission we deem appropriate. If you want additional copies you must pay duplication or printing costs. You may develop advertising materials for your own use, at your own cost, subject to Workout Anytime's written approval, which we will provide within ten (10) days of your submission of the proposed materials. If we have not approved the use of the materials within ten (10) days, they are deemed not approved. Workout Anytime reserves the right to reject or stop your advertising if it is deemed inappropriate or not in keeping with the standards and quality of the brand.

5.3    Workout Anytime has the right to approve the media in which you propose to advertise. You must submit to us in advance, any proposal describing the media in which you propose to advertise, providing sufficient detail to permit us to evaluate it.  We will have ten (10) days to approve or disapprove the use of our materials in the media you propose.  If we have not approved the use of the materials within ten (10) days, they are deemed not approved.

5.4    You will install and, during the term of this Agreement will maintain an outdoor sign in a prominent location in accordance with Workout Anytime sign specifications, or as approved in writing by Workout Anytime, unless prohibited from doing so by applicable laws and regulations. You will use your best efforts to obtain any permit or variance required to allow the installation and maintenance of an outdoor sign meeting Workout Anytime specifications so long as it does not impose any undue economic burden on you. You may be restricted by local building owner or city specifications requiring adherence to a pre-established style or format.  Workout Anytime will allow for these local and city variances.

5.5    Internet Advertising.   We have established several Internet Site Pages, Internet advertising Landing Pages, and Business Profile Pages for the System.  We will develop sites and landing pages with specific parts that you are able to customize with Franchisor approval. Franchisor shall have complete control of your online presence and changes may be made as we deem appropriate, for your Club.  You are restricted from establishing a presence on, or marketing using, the Internet without our consent.  We retain the sole right to advertise or use the Marks on the Internet.  We retain ownership of your Google, Yahoo, Bing, Yelp, Facebook, Twitter, LinkedIn, Instagram and any other online business profile pages. We may require you to provide content for our Internet marketing pages.  You must comply with our intranet and Internet usage rules, style guide, and requirements.  We retain the sole right to approve any linking to, or other use of, the Workout Anytime Internet site. You must also establish or maintain a landing/splash page, online business profile or other presence on the Internet through any Internet or social networking site, including but not limited to Facebook, LinkedIn, MySpace, Plaxo, Twitter, Instagram, Pinterest or YouTube, that uses any variation of the

Marks or references the System.  We must also approve your use of linking and framing between web pages and all other websites.    Your social media presence shall be in accordance with Workout Anytime's Social Media Policy as it may be modified or amended from time to time.

5.6     <u>Social Media</u>.  You may not engage in advertising or the promotion of your Club using social media programs that offer deeply discounted membership fees, such as, but not limited to such programs as Groupon, Living Social, Scout Mob or other similar programs without the express written consent of Workout Anytime, which consent shall be at our sole discretion.

## SECTION 6 - RECORDS - LATE PAYMENT CHARGE

6.1     You must prepare on a current basis complete and accurate records concerning all financial, marketing and other aspects of the business conducted under this Agreement. You must maintain an accounting system which accurately reflects all operational aspects of the Club including uniform reports as may be required by Workout Anytime. Your records shall include tax returns, monthly reports, statements of Gross Revenue (to be prepared each month for the prior month) and profit and loss statements and balance sheets (to be prepared at least annually by a Certified Public Accountant). All financial data with respect to your business that is required will be for Workout Anytime's own use, will be kept confidential, and will not be made available to other franchisees, prospective franchisees, or other third parties except to the extent that Workout Anytime decides, or is required to make a "Financial Performance Representation" under the franchise disclosure laws. The records required under this Sub-section pertain only to your operation of the Club. Workout Anytime has no right to inspect or copy the records of any unrelated business activity you may have.

6.2     To encourage prompt payment and to cover the costs and expenses involved in handling and processing payments, you will also pay, upon demand, a late payment charge equal to the greater of; (i) one and one-half percent (1 1/2%) per month on all payments due to Workout Anytime for the period said payments are due and unpaid; or (ii) the highest rate of interest permitted by law. Each failure to pay Royalty Fees, National Brand Development Fees, Technology Fees, and other fees or amounts payable to Workout Anytime when due is a material breach of this Agreement.

6.3      Upon our written request you will make available the following records:  An accurate set of books reflecting your Gross Revenues; all tapes and readout totals of cash registers or other point of sale devices; sales slips; order records of transactions with concessionaires and vendors; federal, state and city tax returns; banking records; accounts receivable; and such other records as may be needed for an effective audit of your gross sales. All such books and records shall be retained for a period of at least three (3) years after the end of each calendar year to which they relate, or if we have begun an audit, for such longer period as may be required to complete such audit.  All such books and records shall be subject to inspection and audit by us at all reasonable times.

6.4     We will have the right to have an auditor of our choice make a special audit of all your books and records, wherever located, pertaining to your Gross Revenue.  If your actual Gross Revenues exceed the figures you've submitted to us previously by more than two percent (2%) in any calendar year, then you will pay for the cost of such audit, otherwise

- 7 -

the cost of such audit shall be borne by us; and (ii) if such Gross Revenues shall be understated by four percent (4%) or more in any calendar year, or if the Gross Revenue is understated on three (3) or more occasions during the Initial Term, we will have the option to terminate this Franchise Agreement pursuant to the terms of Section 17.   You will promptly pay to us any deficiency in which is established by any audit including any applicable late fees or penalties.

6.5     You acknowledge and agree that the restrictions imposed above are reasonable and necessary to  protect the goodwill associated with the System and the Marks, as well as our reputation and image, and are for the protection of us, you, and all other franchisees that own and operate a Workout Anytime Club.

## SECTION 7 - SERVICES AND ASSISTANCE PROVIDED BY THE FRANCHISOR

7.1     The Initial Franchise Fee and Royalty Fees are paid for the License which includes the use of the Marks and the System, owner's training, and for certain services rendered by Workout Anytime.

7.2     Workout Anytime will offer you initial and continuing services as Workout Anytime deems necessary or advisable in furthering the business of your Club, and the business of the System as a whole, in connection with protecting the Marks and goodwill of Workout Anytime. Failure of Workout Anytime to provide any service whether specifically described herein, either initially or continuing, will not excuse you from paying the Initial Franchise Fee or the fees set forth in Section 4 herein.

7.3     Initial and continuing services provided by Workout Anytime are:

A.     Equipment orders will be placed through our affiliate, Commercial Fitness Products, Inc. with our assistance and guidance. We will help the franchisee determine the proper amount of time between equipment orders, equipment delivery, and their set-up to ensure the proper opening of your Club.

B.     Designation of your exclusive Territory.

C.     Furnishing you with specifications or guidelines for all initial and replacement equipment, inventory and supplies required for the operation of your Club.

D.     Providing you or your designated manager (the "Manager") and up to one (1) other person with an initial training program. You and your Manager must attend and satisfactorily complete the initial training program prior to opening the Club. The initial training program will be conducted approximately nine (9) to twelve (12) weeks prior to the opening of your Club.

Franchisee must attend to conclusion, all required pre-opening training, which will not be waived under any circumstances. You will be responsible for travel and living expenses incurred by you or any of your employees who participate in the training program. The initial training and orientation program will be held at our headquarters or at another location that we designate and will include a minimum of thirty (30) hours of training time. Training will consist of a discussion of the System, equipment use, administrative procedures, hiring/training employees, customer service, marketing, sales, accounting, support procedures and

instructions on quality standards and practical experience in the operation of a Workout Anytime health club facility. You will likewise receive on-site training by a Workout Anytime trained individual.

E.  Assistance with respect to pre-opening, opening activities and/or on-going operations or training will be available as requested by Franchise owner. On-site training assistance during opening week is optional, pending availability of Workout Anytime representatives, with you bearing the costs associated with our representative being on-site at your request.

F.  Formulation of marketing plans, advertising and promotional programs and materials.

G.  Providing a service number and the Workout Anytime email platform available for your on-going inquiries and consultations with Workout Anytime representatives.

H.  The development of new products and service methods for the successful operation of the System as deemed beneficial at the sole discretion of Workout Anytime.  You will be informed of any new product or service methods and adopt same within a reasonable specified period of such notification.

I.  We will loan you, or provide you with access to the electronic version of one (1) copy of the Manual (defined below) containing mandatory and suggested specifications, standards, operating procedures and rules prescribed from time to time by Workout Anytime.

J.  We will make commercially reasonable efforts to negotiate favorable prices and terms with major suppliers and allow you to utilize such centralized purchasing system.

K.  Workout Anytime may conduct visits by our field representatives from time to time. These visits, as determined necessary by Workout Anytime, will be within the sole discretion and at the sole expense of Workout Anytime.  Notwithstanding the forgoing, within six (6) months after you open your Club, we will send a representative to visit and inspect your Club, and will thereafter provide to you a written report with respect to same.

L.  We may delegate certain of our obligations as set forth in this Section 7 to an Area Representative or contractor in certain geographic regions.

### SECTION 8 - LOCATION OF HEALTH CLUB FACILITY; CONSTRUCTION AND OPENING FOR BUSINESS; LEASE OR MORTGAGE

8.1  The Development Agreement will designate a site selection area in which you will locate the Club.  If no location is specified in Exhibit "L" at the time you sign the Franchise Agreement, you, at your own cost and expense, will be solely responsible for locating and designating a location and for constructing and equipping the Club at the location in accordance with the System within six (6) months of the date of this Agreement. The location you choose to operate your Club must be approved by Workout Anytime. Because of our interest in the location, Workout Anytime may request, information regarding the cost of acquisition, development and construction. Any location inspection

- 9 -

will be made solely at the option of Workout Anytime and will not be deemed to impose either any responsibility on Workout Anytime for the construction of the health club facility, or any warranty or representation of any kind, express or implied, as to its fitness or suitability. Upon its designation, the approved location will be the location specified in Exhibit "L".

8.2    You and Workout Anytime acknowledge that the location of the Club is a crucial factor in the Club's potential for success and Workout Anytime may reject any location, in our sole discretion, but we will not unreasonably withhold our consent to any location. Workout Anytime makes no representations or warranties with respect to the availability of appropriate locations, or the suitability or potential of locations, which it may approve.

8.3    Workout Anytime will assist you in analyzing a location for your Club. There are general methods used by Workout Anytime to assist you in your selection of a location for your Club. Workout Anytime assists in the location selection by ascertaining population density and proximity of the proposed location to any other Workout Anytime location(s). Workout Anytime does not hold itself out as a real estate expert and does not undertake to advise as to the suitability of any location. Our approval of a proposed location merely reflects our belief that the proposed location appears to be suitable for the development of a Club.

8.4    You must secure a location for your Club by purchase or lease which meets our approval within one hundred eighty (180) days of the execution of this Agreement. You agree to construct (or renovate), equip and open the health club facility at your expense in a good, workmanlike manner on or within twelve (12) months from this Agreement date, unless otherwise agreed between you and us in writing. The construction (or renovation) will conform to all applicable requirements of local authorities and will be in accordance with the standards and general specifications of the System. You must use Franchisor's approved architect to prepare plans for the construction of the Club.   You must submit your construction plans to us for our review.

8.5    You may not open your Club until  all construction has been satisfactorily completed, your Managers and all employees have been trained, the Club is ready for opening in all other respects (including signage, inventory, fixtures and equipment), the Initial Franchise Fee has been paid in full, all State and local requirements to operate a health club facility have been satisfied, Certificates of Insurance have been furnished in accordance with Section 13, you are in compliance with all terms of this Agreement including those set forth in Section 11, all items contained in an opening checklist have been completed to Workout Anytime's satisfaction, and you have met your Pre-Sale Membership obligations. You acknowledge that your opening for business prior to completely satisfying all the above conditions will cause irreparable damage to Workout Anytime's goodwill and reputation.

8.6    If you lease the health club facility:

    A.    You and your Landlord must enter into our Lease Addendum, attached hereto as Exhibit M.

    B.    You will install the maximum sized signage allowed by either your lease or local government. All signs, advertising, logos or other forms or insignia pertaining to the System are to be removed from the premises demised under the lease in the event that neither you nor Workout Anytime, or its designee, is the tenant under

- 10 -

the lease upon termination of the Agreement. Workout Anytime must approve the proposed sign, including color, font and dimensions prior to proceeding to construction of sign.

C.   You must utilize the services of our preferred vendor, Horizon Properties, to assist in your site search and lease negotiation and to ensure the site meets Workout Anytime criteria. You will not be charged by Horizon Properties for this service as such commissions are regularly absorbed by the Landlord. Should you not wish to utilize Horizon Properties, however, you will be charged a fee of One Thousand Five Hundred ($1,500.00) Dollars for the costs associated with our site approval and lease review.

D.   You may not expand the Club or lease additional adjoining space to the club without the express written consent of Franchisor, which consent shall be at Franchisor's sole discretion.

## SECTION 9 - MAINTENANCE AND UPGRADING THE CLUB

9.1   Subject to the terms of this Section, and particularly Sub-section 9.2 below, you will always comply with all reasonable Workout Anytime standards, specifications, processes, procedures, requirements and instructions regarding your Club's physical facilities (the "Premises"), including the layout of furnishings, fixtures, and equipment, as are set forth in the Manual or in accordance with System Standards.

9.2   You will repaint the interior of the Premises a minimum of every three (3) years (or, as needed upon inspection by Workout Anytime in compliance with its reasonable standards), and remodel or upgrade the Club and all fitness equipment in the Club at your cost in accordance with our reasonable standards every five (5) years and at the time of renewal of this Agreement. You will also pay the cost of adding equipment or altering the Club for services and/or new equipment you choose to add, or that you are required to add, pursuant to Sub-section 11. **(YOU AFFIRMATIVELY ACKNOWLEDGE THAT AN ADDITIONAL INVESTMENT WILL BE REQUIRED PURSUANT TO THIS SUB-SECTION.)**

9.3   At any time during the Term, Workout Anytime reserves the right to require that you include as an option in your contract with your members a provision calling for the collection of a yearly one (1) time "Club Enhancement Fee" of Twenty-Five ($25.00) Dollars. This fee may be charged and collected in a single instance from all your Club's members at any time or designated month you specify.  Within thirty (30) days of said monies' collection you will inform Workout Anytime of the total amount collected and specify in writing how you propose such monies be expended, be it on additional or upgraded equipment or improvements on the Premises of your facility. Workout Anytime will then either approve your proposal, or make suggestions as to an alternative that such monies might best improve your facility for use by your members within ten (10) days of your submission of same.

9.4   You must include in your membership contract a provision requiring your members to pay an annual "rate guarantee fee" of Twenty-Nine ($29.00) Dollars. This fee may be collected from your Club's members at the time of the signing of their initial contract, or within sixty (60) days of signing, and then annually thereafter as the membership contract is renewed.  Workout Anytime encourages you to utilize these monies in furthering the

- 11 -

goals and objectives of your Club by improving your Club's equipment, signage, flooring, painting, etc.

9.5     You will maintain your Club and any parking areas in good and safe condition   If you fail to maintain your Club in a condition that satisfied our reasonable requirements, we may, upon not less than three (3) days' written notice to you, order or accomplish the cleaning of the Premises, and you will be responsible for paying to us all costs we incur by doing so.

## SECTION 10 - CONFIDENTIAL OPERATIONS MANUAL

10.1    We will provide you with a copy or grant you access to the electronic version of the Workout Anytime Confidential Operations Manual (the "Manual"). The Manual will remain the sole property of Workout Anytime. You agree to immediately return the Manual to Workout Anytime at the expiration or termination of this Agreement.

10.2    You will treat the contents of the Manual as confidential and will not copy or otherwise reproduce, in whole or in part, or in any way make the contents of the Manual available to any person other than those persons employed by you to whom disclosure is necessary to enable you to operate the Club.

10.3    Workout Anytime may amend, revise and enhance the Manual and other instructional material (including its website) at any time in its sole discretion.

10.4    You agree to operate the Club in accordance with the Manual and Franchisor's website, and to be responsible for assuring compliance with the standards, specifications, requirements and instructions set forth in the Manual and Franchisor's website.

10.5    The contents of the Franchise resource section of the Workout Anytime website is deemed to be part of the Manual.

10.6    Franchisee acknowledges that because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor specifically reserves the right and privilege, at its discretion and as it may deem in the best interests of the System, to vary standards for any franchisee based upon the peculiarities, particularities and circumstances of a specific site (i.e., landlord requirements, business potential, population of trade area, existing business practices,  or any condition which Franchisor deems to be of importance to the successful operation of such franchisee's franchised business).  Franchisee shall not be entitled to require the Franchisor to grant to it a like or similar variation which Franchisor may offer or permit to another franchisee.

## SECTION 11 - FRANCHISEE'S DUTIES AND OBLIGATIONS

11.1    Consistent with the terms of this Agreement, you will diligently develop the business of your Club and use your best efforts to market and promote its core services and products.

11.2    Subject to the terms of this Agreement, including Sub-sections 9.2 and 10.4, during the Term you will comply with all present and future reasonable standards, specifications, processes, procedures, requirements and instructions regarding the operation of the

- 12 -

Club as set forth in the Manual. In furtherance of such, you must comply with the following requirements:

A.    A complete set of exercise equipment must be initially ordered only through Workout Anytime or another approved supplier, as may appear in the Manual, or as supplemented in the owner's section of Workout Anytime's website.

B     You must conduct pre-opening sales ("Pre-Sales") for your Club in accordance with our standards and Manual.

C.    You or your Manager must devote its full time and best efforts to the management and operation of the Club.

D.    You and your Manager must attend and satisfactorily complete the Workout Anytime initial training program. Attendance by you or your operating manager (if any) is compulsory and must be satisfactorily completed at least two (2) weeks prior to the opening of your Club.

E.    Any additional service or product introduced into the System by Workout Anytime must be offered for sale on a continuing basis at your Club at the time and in the manner required by Workout Anytime.

F.    You may only offer services and products for sale at your Club that has been approved by Workout Anytime in the Manual or otherwise in writing.   Workout Anytime reserves the right, in its sole discretion, to disallow any service or product that you have requested permission to offer.

G.    Only signs, advertising and promotional material, services, equipment, supplies, uniforms, furnishings, color/design scheme and fixtures that meet Workout Anytime standards and specifications can be used at your Club or in the promotion or marketing of your Club.

H.    All equipment, signs, products, supplies and other items necessary to add new services or products must be acquired, installed and utilized at Franchise Owner's expense within sixty (60) days of notice from us.

I.    Your Club, and everything located at and within your Club, must be maintained in a safe and presentable condition and in compliance with the highest standards of cleanliness, including restrooms and showers, changing rooms and utility closets. The Club must be adequately lighted and operated in a clean and wholesome manner consistent with Workout Anytime requirements as such may be established and modified from time to time. The flooring must be new or in good condition. Appropriate window treatments must be installed to allow for the comfort and privacy of your members. All maintenance, repairs and replacements requested by Workout Anytime must be promptly made.   All consultants and employees of the Club must be clean and neat in appearance and must always wear approved apparel and/or uniforms.

J.    No alterations of the Club which materially affect the image of the Club may be made except at Workout Anytime's request or approval, and any alterations must conform to specifications and requirements established or approved by Workout Anytime in its sole discretion.

- 13 -

K.  The Club and its business must comply with all applicable State and local laws, ordinances, rules, codes, regulations and other requirements.

L.  Advertising materials provided to you by Workout Anytime for your use may be used only in the manner intended to promote the business.  Any advertising materials which you might create must first be submitted to us for approval prior to your use of same.

M.  The Club must be open for business twenty-four (24) hours every day during the License Term, except days the Club is closed for repairs pursuant to Section 15.

N.  The employees, the equipment and supplies, inventory and other items on hand at your Club must always be sufficient in quality and number to efficiently meet the current and anticipated volume of your business.

O.  All debts and taxes arising from the Club and its business, except those duly contested in a bona fide dispute, must be paid when due including debts payable to your landlord, lender/financer, third party vendors, and both Workout Anytime and our affiliates.

P.  All necessary and appropriate measures must be taken to avoid an unsatisfactory sanitation or health rating by or from any governmental agency or authority. Conditions or practices disapproved by any such agency or authority must be promptly corrected.

Q.  All your dealings and transactions with Workout Anytime members, customers, suppliers and other franchisees are to be performed fairly and honestly. You will not permit a non-member access to either your or another franchisee's Workout Anytime health club facility unless such is on an introductory or trial basis, and then only for a maximum of thirty (30) days. You will not persuade or entice another franchisee's employee or members originating at their Club to terminate their employment or membership to have such employee or member become associated with your franchised location.

R.  You are obligated to allow Workout Anytime reasonable space at your point of sale counter or another reasonable location inside the Club for a franchise recruitment advertisement. You are also responsible for the restocking and upkeep of that display, should one be used. Workout Anytime will be responsible for the cost of producing the advertisements.

S.  You are solely responsible for recruiting new customers to their Club through advertising, marketing and business networking.

T.  You are responsible for keeping up to date on competitors. This includes an awareness of competitors' pricing, promotional offers, advertising and services. You are responsible for taking direct action, as appropriate, and as authorized by Franchisor, to respond to a competitors' activities.

U.  You must provide training to your employees in a fashion like that which you and your Manager received from Workout Anytime's representatives.

V.  In accordance with your State's Health Club Act requirements (if any such law or

its equivalent exists for your geographic area or jurisdiction), you are responsible for arranging for obtaining all health club certifications and licensing prior to opening.

W.   **If they indicate a desire to do so, you** <u>**must**</u> **permit members of any other Workout Anytime franchised location the use of your Club.** You understand and agree that all Workout Anytime members, regardless of their originating membership location, are an integral component of the Workout Anytime System. As such, they are to be treated with the same courtesy and respect you regularly extend to a member originating from your Club. This membership reciprocity includes access to tanning, personal training, massages, etc., if the member has purchased a membership that includes premium services at their originating Workout Anytime club. You must permit those members to utilize such premium features at your Club to promote a positive experience for both you and the member. **Your failure to comply with Franchisor's reciprocity policy as stated in this Section is a material breach of this Agreement.**

X.   You must supply us with a copy of the lease governing your Club premises, and ensure that Workout Anytime is included as a party to be notified in any instance, as well as our being able to exercise an option to take possession of the facility upon your default or termination should we, in our sole discretion, wish to do so. **Such option will be secured by your submission to your landlord of Exhibit "M" attached hereto.**

Y.   You agree to never transfer members of your Club to any other Workout Anytime club without the express written permission of both the member and Workout Anytime.  During or after the termination or expiration of this Agreement, you will never transfer, or attempt to transfer, any individual's membership to any club that is not a part of the System.

Z.   You will immediately notify us of any legal action or proceeding by an individual or agency against you relating to your Club.

AA.  You acknowledge that when we may be required to perform any service for you, we may use third parties, including affiliates of ours, to perform those services.

BB.  Upon the reasonable request of the Franchisor, the Franchisee will present to its members such evaluation forms as are periodically prescribed by Franchisor and shall participate or request its members to participate in any marketing surveys performed by or on behalf of Franchisor.

CC.  If the Franchisee is an entity other than a single individual, then you must supply us with copies of the corporate Articles of Incorporation and Certificate of Existence, partnership or joint venture agreement, company Articles of Organization if the entity is a limited liability company, or any other document attesting to the legal form of the Franchisee.

DD.  Once an individual joins your Club, and for so long as his/her membership remains in effect that person's membership fees are paid solely to you.  Accordingly, except for personal training fees which might be purchased at a non-originating franchised location, only you are to receive fees associated with such individual's Workout Anytime membership regardless of the degree such member uses another franchised location.

- 15 -

11.3 In prescribing standards, specifications, processes, procedures, requirements or instructions under Sub-section 11.2 or any other provision of this Agreement, Workout Anytime will assist in general market research and provide guidance in determining the prices charged by you for services or products of any kind. Workout Anytime will not have control over the day-to-day operations of the Club. Unless otherwise provided for herein, you are expected to establish your own prices as to all products or services **other than** both individual/family and corporate membership rates or costs which you understand and agree are to be established solely by Workout Anytime, from time to time, as it may determine in its sole discretion.

11.4 Workout Anytime and our representatives or designated contractors will have the right to enter, inspect and photograph your Club at any time (it being understood by the parties that the facility is a club operating twenty-four (24) hours a day, seven (7) days a week), and our representatives will have the right to discuss with you or other people you may designate all matters that may pertain to compliance with this Agreement and with Workout Anytime standards, specifications, requirements, instructions and procedures. You will in all respects cooperate with Workout Anytime's rights under this Sub-section provided that our exercise of these rights will not unreasonably interfere with the conduct of your business.

11.5 You agree during the Term and for three (3) years after the expiration and termination of this Agreement that you will supply to Workout Anytime your home address and telephone number(s) which Workout Anytime may include in its Disclosure Document.

11.6 If you are an individual, you or your Manager trained in the Workout Anytime system must directly supervise the franchised business. If you are a corporation or other entity, or if you have in Workout Anytime's sole judgment, insufficient experience in a business like a Workout Anytime franchise or experience in business management in general, then you will nominate an operating partner or Manager having the required experience who will have direct responsibility for all operations of the Club. Any change in the operating partner or Manager will be subject to the approval of Workout Anytime. The operating partner will be the correspondent referred to in Sub-section 20.9 below.

11.7 **Attendance at Annual Convention.**   Franchisor may hold an annual conference (the "Convention") at a location we select.   We will determine the topics and agenda for the Convention to serve the purpose among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and our personnel regarding business operations, and recognizing franchisees for their achievements.   Franchisee or Franchisee's representative must attend the Convention and to pay our then-current registration fee.  If we charge a registration fee for the Annual Convention, you must pay the fee regardless of whether you attend.   All expenses, including Franchisee's and Franchisee's employees' transportation to and from the Annual Convention, and lodging, meals, and salaries during the Annual Convention, are the responsibility of Franchisee.

11.8 **Ownership of Member Information and Data.**  Franchisee acknowledges and agrees that Franchisor is the owner of all information concerning the members of the Club and that Franchisee may not disclose, sell or encumber such information or data to any person or entity during the Term or following the termination, expiration, or non-renewal of this Agreement.

11.9 **Employee Matters.**   You are solely responsible for the day-to-day operation of your Franchised Business and its employees.  You will be solely responsible for recruiting and

- 16 -

hiring the persons you employ to operate the Franchised Business. You are responsible for their training, wages, taxes, benefits, safety, schedules, work conditions, assignments, discipline and termination. At no point will you or your employees be deemed to be employees of Workout Anytime Franchising Systems, LLC.

(a)     Franchisee shall obtain from each of its personnel an acknowledgement signed by such personnel that such individual understands, acknowledges, and agrees that he or she is an employee of Franchisee and not Franchisor and that such individual shall look solely to Franchisee for his or her compensation and for all other matters related to their relationship with Franchisee.

(b)     Franchisee shall post a notice on an employee bulletin board clearly visible to employees at the Franchised Business notifying all employees of their employer and clearly stating that neither Franchisor nor its affiliates are an employer of the employees.

(c)     Franchisee's employees are not Franchisor's agents or employees and Franchisor is not a joint employer of these individuals. Franchisee is solely responsible for performing all administrative functions of the Franchised Business, including payroll and providing worker's compensation insurance. Franchisee acknowledges that it is not economically dependent on Franchisor and that Franchisor does not provide facilities, equipment or house or transport Franchisee's employees or provide to Franchisee employees tools or materials required for Franchisee's employees to perform services for Franchisee.


## SECTION 12 - PURCHASE OF EQUIPMENT, INVENTORY AND SUPPLIES

12.1   You must purchase all exercise equipment through Workout Anytime or an approved supplier/vendor as shall be listed in the Manual which we provide to you, or through the franchise resource section of our website. Commercial Fitness Products, Inc. is currently the sole approved vendor of approved fitness equipment.   You must furnish all items, including apparel, which bear the marks, only from our approved supplier.

**ALTHOUGH APPROVED BY US, WE AND OUR AFFILIATES MAKE NO WARRANTY AND EXPRESSLY DISCLAIM ALL WARRANTIES, INCLUDING WARRANTIES OR MERCHANTABILITY AND FITNESS FOR ANY PURPOSE, WITH RESPECT TO FIXTURES, FURNITURE, EQUIPMENT (INCLUDING, WITHOUT LIMITATION, ALL EXERCISE EQUIPMENT), SUPPLIES OR OTHER APPROVED ITEMS.**

12.2   The standards and specifications for other equipment, supplies and other products recommended by Workout Anytime may be found in the Manual or at the franchise resource section of the Workout Anytime website.

12.3   You may not purchase other items from any other non-approved supplier/source unless approved by Workout Anytime Franchising Systems, LLC.

12.4   Workout Anytime may review at any time the quality of the equipment, products and other supplies anticipated to be purchased for your club to ensure that quality standards of the System are met.    Any deficiencies as to either quality or quantity must be addressed and corrected within that reasonable period which Workout Anytime may designate.

WOATFDD042017v1

## SECTION 13 - INSURANCE AND INDEMNIFICATION

13.1    Upon commencement of the License Term, you will purchase, and maintain in full force, at all times, during the Term of this agreement, an insurance policy with those limits equal to or greater than those outlined below. Copies of all insurance policies must be provided to Workout Anytime prior to the opening of your Club and within thirty (30) days of such policies' renewal date:

    A.    Workers' Compensation insurance in amounts prescribed by law;

    B.    Fire and lightning, extended coverage, theft, vandalism and malicious mischief, flood (if the health club facility is in a designated flood hazard area), and sprinkler leakage insurance on your health club facility;

    C.    Comprehensive general liability insurance and product liability insurance coverage in such amounts and upon such terms as may from time to time be customary for retail businesses located in your Territory, but not less than $2,000,000, insuring both you and Workout Anytime against all claims, suits, obligations, liabilities and damage, including attorney's fees, based upon or arising out of actual or alleged personal injuries or property damage relating to the use or condition of the health club facility; and, name Workout Anytime Franchising Systems, LLC as an additional insured.

    D.    Such additional insurance as may be required by the terms of any lease or mortgage for the Club.

13.2    All policies of insurance required under this Section will be with insurers qualified to do business and in good standing in the State where your Club is located, and will be in a form reasonably satisfactory to Workout Anytime. Prior to opening for business, you will furnish to Workout Anytime certificates issued by each of your insurers indicating that all premiums due have been paid, that all required insurance is in full force and effect and that the insurance will not be terminated or changed without at least thirty (30) days' prior written notice from the insurer to both yourself and Workout Anytime Franchising Systems, LLC. New certificates evidencing renewal of insurance will be furnished at least thirty (30) days prior to the date of expiration of each policy. Within five (5) days of any request by Workout Anytime you will deliver a copy of all insurance policies to Workout Anytime for its examination and confirmation.

13.3    If you fail to obtain or maintain adequate insurance as set forth herein then Workout Anytime may, at its election and sole discretion, obtain insurance for and in your name and its name. Within five (5) days of any written request by Workout Anytime you will pay all costs and premiums incurred by Workout Anytime in obtaining such insurance, plus an administrative fee equal to ten (10%) percent of such insurance premium's cost to Workout Anytime.

13.4    You will indemnify, defend and hold Workout Anytime harmless against all claims, demands, losses, damages (including punitive damages), costs, suits, judgments, penalties, expenses (including reasonable attorneys' fees and amounts paid in settlement or compromise) and liabilities of any kind, whether or not ultimately determined to be meritorious, including damages suffered by you or any of your property or property interests (collectively, "Damages"), arising directly or indirectly out of, or in

- 18 -

connection with, the construction, operation, maintenance or occupancy of your Club, except to the extent that such liabilities arise from the gross negligence or willful acts or purposeful omissions of Workout Anytime.

13.5   All fixtures, equipment, signs, merchandise, supplies and other property on or about your Club will be at your sole risk and hazard, and if they are destroyed or damaged in any way, no part of the loss or damage shall be paid by Workout Anytime except to the extent caused by Workout Anytime's gross negligence or willful acts.

## SECTION 14 - TRADEMARKS AND TRADE SECRETS

14.1   You recognize and acknowledge Workout Anytime's exclusive ownership and right to Workout Anytime's current and future Marks and in all related practices, procedures, methods and devices. All goodwill now or in the future associated with or relating to the Marks will accrue directly and exclusively to the benefit and is the property solely of Workout Anytime. Nothing contained in this Agreement will be construed to entitle you any right, title or interest in the Marks, or the goodwill now or in the future associated with them, other than the rights and license expressly granted in this Agreement.

14.2   You represent, warrant and agree that you will not:

A.   Directly or indirectly contest or aid in contesting, either during or following termination of this Agreement, the validity or ownership of the Marks;

B.   Take any action in derogation of Workout Anytime claimed rights whether now existing or later obtained;

C.   Include the Marks in either your corporate, limited liability company, or partnership name, or in any internet domain name; or,

D.   Utilize the Marks in any advertising or promotion that has not otherwise first been approved, in writing, by Workout Anytime.

14.3   You agree to use only Workout Anytime existing or future Marks, and related practices, systems, procedures and methods for the promotion and operation of the Club, and only in accordance with the written procedures established by Workout Anytime.

14.4   You will cause Workout Anytime Marks to be reproduced exactly and accurately.

14.5   Except for the registration of a "d/b/a" or a fictitious name certificate for the operation of the Club, **YOU WILL <u>NOT</u> REGISTER OR ATTEMPT TO REGISTER THE MARKS IN YOUR OWN NAME.**   You may not use the Marks as any part of your entity name.   The use or registration of the name "Workout Anytime" in any form or fashion other than what may otherwise be permitted herein will be deemed a material breach of this Agreement.

14.6   You will immediately inform Workout Anytime of any suspected, known or threatened infringement, piracy or challenge to the Marks, Trade Secrets, methods and procedures used in the System. You will assist and cooperate with Workout Anytime in acting, at Workout Anytime's sole expense, as Workout Anytime deems appropriate to protect the System. Workout Anytime will indemnify, hold you harmless, and will reimburse you for your liability and reasonable costs for defending the Marks.

- 19 -

14.7 Only the principals of the franchise entity, and that manager employed by the franchisee to operate the health club facility, may utilize the Workout Anytime email platform.

14.8 Immediately upon the expiration or sooner termination of this Agreement, you will:

    A. Cease and forever abstain from using any of the Marks including, but not limited to, the de-imaging and de-branding of the Premises;

    B. Take all actions necessary to cancel any d/b/a/ or fictitious name registration containing any of the Marks; and,

    C. Furnish Workout Anytime with evidence reasonably satisfactory to Workout Anytime of compliance with the foregoing obligations within thirty (30) days after any expiration or sooner termination.

14.9 You acknowledge that you took no part in creating or developing, have no prior knowledge of, and have no rights or claims in, or to, any element of the System. You agree that all materials loaned or licensed or made available to you will be kept confidential by you and will remain the property of Workout Anytime.

14.10 Except as specifically disclosed in the Disclosure Document, Workout Anytime represents and warrants to the best of Workout Anytime's knowledge that the Marks do not violate or infringe upon any rights of others.

14.11 You agree that any use or variant of the Marks which you may develop or originate which, in turn, may be approved and adopted by Workout Anytime becomes the sole and exclusive property of Workout Anytime. You affirmatively waive all rights of whatever form or nature, arising under either common law or both state or federal law(s), and assign to Workout Anytime all prospective rights and interests in any intellectual property which utilizes either the present Marks themselves or any subsequent Marks which Workout Anytime may use, regardless of their originating source.

## SECTION 15 – LOSS, CONDEMNATION AND CASUALTY

15.1 You will promptly advise Workout Anytime upon your receipt of a notice of default or termination of your Club's lease or mortgage, or equipment lease or security agreement related to any purchase of equipment, and will promptly provide Workout Anytime a copy of the notice. You will also give Workout Anytime notice of any proposed taking of your Club, or any of your equipment, or any portion thereof through the exercise of the power of eminent domain, foreclosure, or any dispossessory action, at the earliest possible time. If the Club or a substantial part thereof is to be taken, the Club may be relocated within the area specified in Exhibit "L" or elsewhere with Workout Anytime's written approval in accordance with our relocation procedures. If you open a Club at another location in accordance with Workout Anytime's standards and general specifications within one (1) year of the closing of the old Club, the new Club will be deemed to be the Club licensed under the Agreement. If a condemnation, lease termination or mortgage default takes place and a new Club does not, for any reason, (other than those specified in Section 8) become the Club as provided in this Sub-section, then the License will terminate upon notice by Workout Anytime.

15.2    If the Club is damaged, you will expeditiously repair the damage.  If the damage requires closing the Club you will immediately notify Workout Anytime in writing, and will:

      A.    Relocate the Club as provided in Sub-section 15.1; or,

      B.    Repair or rebuild the Club in accordance with Workout Anytime's then existing standards and general specifications, and reopen the Club for continuous business operations as soon as practicable (but, in any event, within twelve (12) months after closing the Club), giving Workout Anytime thirty (30) days' advance written notice of the date of reopening.

            If the Club is not (or, in the opinion of Workout Anytime, cannot be) reopened in accordance with this Section, or relocated pursuant to Sub-section 15.1, the License will terminate upon written notice to you.

15.3    The Term will not be extended by any interruption in the Club's operations, except for an act of God that results in the Club being closed not less than sixty (60) days nor more than one hundred eighty (180) days. You must apply for any extension within thirty (30) days following the reopening of the Club. Except as provided in Sub-section 4.3, no event during the Term will excuse you from paying Royalty Fees or other fees as provided for in this Agreement.

15.4    In the event you receive a bona fide offer for the purchase of your Club, or any of its equipment or other assets, then in such event you will give Workout Anytime written notice of this offer.  The notice must set forth the name of the proposed transferee, and all other terms and conditions of the proposed transfer.  On receipt of the notice, Workout Anytime shall have the exclusive right and option during a period of sixty (60) days from the date of said notice, to purchase from the franchisee the assets proposed to be sold under the same terms and conditions contained in such bona fide offer to purchase.

## SECTION 16 - RESTRICTIONS ON COMPETITION

16.1    During the term of this Agreement, or any extensions or renewals and for a period of two (2) years following their expiration, termination, assignment or transfer, you will not directly or indirectly, through corporations, partnerships, limited liability companies, trusts, associations, joint ventures or other unincorporated businesses, perform any services for, engage to acquire, be an employee of, have any financial, beneficial or equity interest in, or have any interest based on profits or revenues of, any business that engages in or offers franchises for businesses that engage in or operate gymnasiums, fitness, personal training, or workout facilities, except for other health club facilities franchised by Workout Anytime or its affiliates, at the premises of the Club, or within twenty-five (25) miles of any Workout Anytime health club facility.

16.2    Nothing in this Section will prevent any active officer of yours or member of your family, either individually or collectively, from owning not more than five percent (5%) of the stock of any company, which is subject to the reporting requirements of Section 10 or Sub-section 13 (D) of the Securities and Exchange Act of 1934.

16.3    You will not at any time, during the term of this Agreement or any extensions or renewals and for a period of two (2) years following their expiration, termination, assignment or transfer, divert or solicit any member or former member of your Club or another Workout Anytime club to another workout or fitness facility other than a to a Workout Anytime

club.

16.4    You will not at any time solicit, employ, or otherwise attempt to employ or interfere with the employment relationship of any person who is either employed by Workout Anytime, or employed by any other Workout Anytime franchisee.

16.5    If any court having jurisdiction to determine the validity or enforceability of this Section determines that, strictly applied, it would by invalid or unenforceable, the scope of prohibited activities or the time or geographical provisions of this Section will be deemed modified to the extent necessary (but only to that extent) so that such restrictions as modified will be valid and enforceable.

16.6    You acknowledge that as a Workout Anytime franchisee you will have access to Workout Anytime Trade Secrets and confidential information and practices and therefore be in a unique position to use the special knowledge you will have gained while a franchisee. You acknowledge that a breach of the covenants contained in this Section will be deemed to threaten immediate and substantial irreparable injury to Workout Anytime. Accordingly, you agree that Workout Anytime will have the right, without prior notice to you, to obtain immediate injunctive relief without limiting any other rights or remedies.

16.7    If you are a legal entity, all officers, directors, stockholders, partners, members, trustees, beneficiaries and/or principals of you, the franchisee, and any persons controlled by, controlling or under common control with you must execute the Non-Competition, Non-Solicitation and Confidentiality Agreement attached hereto as Exhibit C.

16.8    You agree that the scope of the timetables and prohibitions set forth above are reasonable and necessary to protect us and the System (including other franchisees of the System). You agree that the above referenced prohibitions are permissively broad to prevent you from taking information, materials and training which Workout Anytime is providing to you on an ongoing basis and using them to either compete with us, or preempt or otherwise restrict our ability to enter new markets.

16.9    Franchisee acknowledges and confirms that the scope of the activities prohibited in this Section 16, as well as length of the term and geographical restrictions contained in this Section 16, are necessary to protect Franchisor's legitimate business interests and are fair and reasonable and not the result of overreaching, duress or coercion of any kind.

16.10   If Franchisee is an individual, Franchisee further acknowledges and confirms that his or her full, uninhibited and faithful observance of each of the covenants contained in this Section 16 will not cause any undue hardship, financial or otherwise, and that enforcement of each of the covenants contained in this Section 16 will not impair his or her ability to obtain employment commensurate with his or her abilities and on terms fully acceptable to him or her or otherwise to obtain income required for the comfortable support of himself or herself and his or her family, and the satisfaction of the needs of his or her creditors.

16.11   Franchisee acknowledges and confirms that its special knowledge of the Franchisor's systems and business (and anyone acquiring such knowledge through Franchisee) is such as would cause Franchisor and its franchisees severe injury and loss if he or she (or anyone acquiring such knowledge through Franchisee) were to use such knowledge to the benefit of a competitor or were to compete with Franchisor or any of its franchisees.

- 22 -

16.12  If any court shall hold that the time or territory or any other provision stated in this Section 16 constitutes an unreasonable restriction upon Franchisee, Franchisee agrees that the provisions of this Franchise Agreement shall not be rendered void, but shall apply as to time and territory or to such other extent as such court may judicially determine or indicate constitutes a reasonable restriction under the circumstances involved.

16.13  Franchisor, in its discretion, may reduce the scope of any covenants set forth in this Section 16. Any such reduction is effective immediately upon Franchisor's delivery of notice. Franchisee shall comply immediately with any covenant as so modified. Such modified covenant is fully enforceable to the extent permitted by applicable law.

## SECTION 17 - TERMINATION

17.1  **Termination by You.**

If you are in compliance with this Agreement and Workout Anytime materially breaches this Agreement and fails to cure the breach within sixty (60) days after a written notice of the breach is delivered to Workout Anytime by you, you may terminate this Agreement, effective ten (10) days after delivery to Workout Anytime of a notice of termination. There are no other provisions in this Agreement that grant you the right to terminate this Agreement, and such termination may only be accomplished as provided for herein, or by agreement of the parties.

Should you terminate this Agreement in compliance with this Sub-section, you are required to comply with the post-termination procedures as set forth in Sub-section 17.7.

17.2  **Termination by Workout Anytime Without Notice.**

The Agreement will immediately terminate without notice (or in the event notice is required by law, immediately upon the giving of such notice or at the earliest time thereafter permitted by applicable law) in the event that:

A.  No site has been designated and accepted pursuant to Sub-Section 8.1;

B.  A permanent or temporary receiver or trustee for the Club or all or substantially all of your property is appointed by any court, or any such appointment is consented to or not opposed through legal action by you, or you make a general assignment for the benefit of your creditors, or you make a written statement to the effect that you are unable to pay your debts as they become due, or a levy or execution is made on the License, or an attachment or lien remains on your health club facility;

C.  You lose possession or the right of possession of all or a significant part of the Club through condemnation, casualty, lease termination, mortgage foreclosure, equipment lease or purchase foreclosure, and the Club is not relocated or reopened as provided in Section 15;

D.  You contest in any court or preceding the validity of, or Workout Anytime ownership of, any of the Marks;

E.  A material breach of Section 11.2(W) or 18 (i.e. Transfer and Assignment) occurs;

WOATFDD042017v1

- 23 -

or,

F.     You are a corporation or limited liability company and any action is taken which purports to merge, consolidate, dissolve or liquidate you without Workout Anytime prior written consent.

**17.3    Termination With Notice and Without Opportunity to Cure.** Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

A.     If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or take part in any criminal misconduct or other misconduct that negatively impacts the Licensed Marks or the operation of the Franchised Business;

B.     If Franchisee or Franchisee's Principal Owners commit any fraud or misrepresentation in the operation of the Franchised Business;

C.     If Franchisee or Franchisee's Principal Owners make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to any financial misrepresentation;

D.     If Franchisee fails to complete the Initial Training;

E.     If Franchisee directly or indirectly files suit or makes any other formal legal claim against any of Franchisor's approved vendors;

F.     If Franchisor sends Franchisee more than 2 notices to cure pursuant to Sections 17.4, 17.5 or 17.6 hereof in any 12-month period, regardless of whether the breaches have been cured;

G.     If Franchisee or Franchisee's principals materially violate any provision hereof pertaining to the Licensed Marks or Confidential Information or misuse the Licensed Marks or Confidential Information;

H.     If Franchisee violates the in-term restrictive covenant contained in Section 15;

I.     If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within 30 days;

J.     If Franchisee or any of Franchisee's principals become insolvent;

K.     If Franchisee voluntarily or otherwise abandons the Franchised Business. The term "abandon" includes any conduct which indicates a desire or intent to discontinue the Franchised Business in accordance with the terms of this Agreement and will apply if Franchisee fails to operate the Franchised Business for a period of three (3) or more consecutive business days without Franchisor's prior written approval;

L.     Franchisee fails to maintain insurance or to repay Franchisor for insurance paid by it, or otherwise fail to adhere to the requirements of Section 13;

M.   Franchisee fails, within thirty (30) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business;

N.   Any government action is taken against Franchisee that results in any obligation upon Franchisor which in Franchisor's sole judgment is uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation; or

O.   If Franchisee commits any fraud, criminal acts or other misconduct or makes any misrepresentation or omission to Franchisor relating to any other agreement with Franchisor or Franchisor's affiliates.

17.4   **Termination Upon Notice and 5 Days' Opportunity to Cure.**  If Franchisee fails to pay as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's major suppliers or vendors, Franchisor may terminate this Agreement upon after the expiration of five (5) days following notice to cure.

17.5   **Termination Upon Notice and 15 Days' Opportunity to Cure.** Franchisor has the right to terminate this Agreement if any of the following defaults remain uncured after expiration of the 15-day cure period:

A.   If any audit reveals that Franchisee has understated Franchisee's royalty or advertising payments by more than 2%, or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any 12-month period;

B.   If Franchisee fails to commence operations of the Franchised Business by the required opening date, as described in Section 8.4 of this Agreement;

C.   If Franchisee fails to personally, or through an approved manager, supervise the day-to-day operation of the Franchised Business or fails to employ enough qualified, competent personnel as Franchisor requires from time to time;

D.   If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual; or

E.   Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

17.6   **Termination With Notice and 30 Day Opportunity to Cure.** Franchisor has the right to terminate this Agreement after notice and expiration of a 30-day cure period if Franchisee fails to perform or comply with any one or more of the terms or conditions of this Agreement which are not specifically enumerated in Sections 17.2, 17.3, 17.4, or 17.5 of this Agreement, or any ancillary agreements between Franchisee and Franchisor or any agreement between Franchisee and any of Franchisor's affiliates.

17.7   **Effect of Termination.**

Should this Agreement expire or be terminated by any party and for any reason, all rights and obligations between you and Workout Anytime under this Agreement will terminate, except for Sub-sections 10.1 and, 10.2, Section 14 and 16, and Sub-section 17.7. In an instance of expiration or termination, you will cease to be a licensed participant in the System, and you will:

- 25 -

A.   Promptly pay Workout Anytime all amounts owing by you based on operations of the Club through the date of termination plus interest at the rate of eighteen percent (18%) per annum;

B.   Immediately discontinue the use of all Marks, signs, structures, forms of advertising, telephone listings and service, the Manual, and all materials and products of any kind which are identified or associated with the System and return all materials and products to Workout Anytime and, at our request, assign your Club's telephone number to Workout Anytime;

C.   Make no representation nor state that you are in any way approved, endorsed or licensed by Workout Anytime, or associated or identified with Workout Anytime or the System in any manner;

D.   Immediately take all steps necessary to amend or terminate any registration or filing of any d/b/a or fictitious name or any other registration or filing containing the Marks to delete the Marks and all references to anything associated with the System;

E.   Provide Workout Anytime the option to purchase required by Section 18.8;

F.   Comply with the provisions of Sub-sections 15.7 and 16.1; and

G.   Forfeit all rights to receive membership fees and other revenue through the monthly draft from the credit card processor as of the date of termination or expiration of this Agreement.

17.8   If, within thirty (30) days after termination of this Agreement by Workout Anytime, you fail to remove all displays of the Marks from the Premises which are identified or associated with the System, Workout Anytime may enter the Premises to effect removal. In this event, Workout Anytime will not be charged with trespass nor be accountable or required to pay for any displays or materials which it might remove from your facility.

17.9   If, within thirty (30) days after termination you have not taken all steps necessary to amend or terminate any registration or filing of any fictitious name or any other registration or filing containing the Marks, you hereby irrevocably appoint Workout Anytime as your true and lawful attorney-in-fact for you, and permit Workout Anytime, in your name, place and stead and on your behalf, to take action as may be necessary to amend or terminate all registrations and filings, this appointment being coupled with an interest to enable Workout Anytime to protect the System.

17.10  **Nonwaiver.**  Franchisor's delay in exercising or failing to exercise any right or remedy under this Agreement or Franchisor's acceptance of any late or partial payment due hereunder will not constitute a waiver of Franchisor's rights against Franchisee.

17.11  **Franchisor's Right to Withhold Services or Products.**  During any period of uncured default by Franchisee, Franchisor shall have the right to withhold or discontinue providing all services to Franchisee.

17.12  Franchisor's **Option to Purchase of Business and Inventory**. On the expiration or termination of this Agreement for any reason, we will have the right, but not the obligation, exercisable by written notice delivered to you at any time contemporaneously

- 26 -

with or after delivery of a notice of termination under this Agreement, or within thirty (30) days after the date of expiration, to purchase all or part of your physical assets used in the Club except your personal assets. There will be no compensation for goodwill, and the purchase price for such assets will be equal to their fair market value less such goodwill. If you and we cannot agree on the purchase price for the assets that we desire to purchase within ten (10) days following our exercise of this option to purchase, an independent appraiser we designate will determine the fair market value, and you and we will share equally the cost of the appraiser. Such appraiser's decision will be final and binding with no appeal therefrom. The closing of the purchase will take place at a location, and on a date, we choose, and will be completed in accordance with all applicable bulk sales laws. At closing, you will deliver to us a bill of sale for the assets, in a form acceptable to us. We will be entitled to set off against the purchase price any amounts you then owe us or any affiliate of ours, and to pay out of the purchase price any of your unpaid creditors.

17.13 **Alignment Deficiency Fee.**   In the event of default of its obligations under this Agreement by Franchisee, at Franchisor's sole discretion, and without waiver of any of Franchisor's rights under this Agreement, in lieu of the termination of this Agreement, Franchisor may impose a fee (the "Alignment Deficiency Fee") in an amount up to One Thousand Five Hundred ($1,500) Dollars per event of default.  Franchisee must pay the Alignment Deficiency Fee within three (3) days of Franchisor's demand.

## SECTION 18 – TRANSFER AND ASSIGNMENT

18.1 **General.**

Except with respect to your mortgage company or institutional lender (if any), none of your rights under this Agreement may be the subject of any pledge, lien, levy, attachment, or security agreement, or assigned or otherwise purportedly transferred through execution, foreclosure, or like action. None of your rights or obligations under this Agreement are assignable or transferable, without Workout Anytime's prior written consent, which will not be unreasonably withheld or delayed, and compliance in all other respects with the terms of this Section.

With and after each valid assignment of this Agreement pursuant to this Section, the assignee or assignees will have deemed to be you, the Franchisee, under this Agreement and will be bound and liable for all existing and future obligations of the Franchisee. No stockholder in any corporation, and no member of any limited liability corporation, which becomes a franchisee will have any rights as an individual under this Agreement because of his, her or its stock ownership or membership interest, and the name of such entity will not include any of the Marks.

18.2 This Agreement, and your rights and obligations arising under it, are personal to you only.   As used herein, the word "transfer" means the sale, lease, assignment, gift, mortgage, or transfer because of your death, bankruptcy, share exchange, or transfer by operation of law or otherwise, either directly or indirectly, voluntarily or involuntarily.  If you are a corporation or limited liability company, such includes a transfer, as defined above, of a fifty (50%) percent or more interest in your entity.  A transfer cannot occur unless the following conditions are first satisfied:

A.    There will be no material default in the performance or observance of any of your obligations under this Agreement or any other agreement with Workout

WOATFDD042017v1

Anytime, and you recognize that the provisions of Section 16.1 *et seq.* will apply after the transfer or assignment has been approved and transacted;

B.  You have settled all outstanding accounts with Workout Anytime, its affiliates, all taxing authorities, and any third-party vendors;

C.  The proposed transferee is approved as a prospective franchisee, the sale price is appropriate, and Workout Anytime is paid a Transfer Fee in the amount of fifty (50%) percent of the then-current Initial Franchise Fee, unless the transferee is a corporation of which you are the majority stockholder, or said transfer is to either Workout Anytime itself or to an entity in which you own a fifty (50%) percent or more interest;

D.  The proposed transferee will execute our then current form of Franchise Agreement, and the proposed transferee will execute an Acknowledgement of Receipt of a then current copy of our Franchise Disclosure Document;

E.  The proposed transferee will pay for, attend and satisfactorily complete the training program for new franchisees unless;

    1.  The transferee is a current franchisee in good standing in the System; or,

    2.  The transferee is and has been a manager for a period of one (1) year or more of a Workout Anytime health club facility in good standing.

F.  The individual proposed transferee, or the stockholders, partners, members, trustees or beneficiaries of a proposed corporate, partnership, limited liability company, or trust transferee, will each execute a personal guarantee, jointly and severally guaranteeing the performance of the proposed transferee's obligation;

G.  The proposed transferee will have demonstrated to Workout Anytime that it has in all respects satisfied our standards applicable to new franchisees regarding experience, personal and financial reputation and stability, willingness and ability to devote his or her full time and best efforts to the operation of the franchised business, and any other conditions as Workout Anytime may reasonably apply in evaluating new franchisees. Workout Anytime must be provided all information about the proposed transferee as we may reasonably require. Because of the confidential information available to a franchisee, no assignment to a competitor or to any person or entity owning an interest in a competitive business of Workout Anytime will be permitted at any time;

H.  The parties to the proposed transaction will have entered into a binding agreement (a "Purchase Offer") subject only to the rights of Workout Anytime. Workout Anytime will be furnished a copy of this binding agreement. You will advise each prospective transferee of this provision and other terms under this Agreement;

I.  You will sign a written agreement in a form satisfactory to us in which you agree to comply with and satisfy all post-term obligations set forth in this Agreement, and likewise agree to release both us and our affiliates from any claims which you may have against us, and from any further obligations which we may have to you;

- 28 -

J.    The proposed transferee agrees in writing to perform such maintenance, remodeling or re-equipping of the Club as we determine necessary to correct any then deficiencies to such club as we, in our sole discretion, deem necessary; and

K.    You agree that we may release to the prospective transferee all information we have with respect to your operation of the subject Club.

L.    The proposed transferee must not be engaged in a competitive business.

M.    The purchase price and terms of the proposed transfer are not so burdensome to the prospective transferee as to impair or materially threaten the transferee's ability to perform under the Franchise Agreement.

You acknowledge and agree that the above listed conditions are both reasonable and necessary to protect the goodwill associated with the Workout Anytime System and Marks, and are for the protection of us, you, and all existing and prospective franchisees that now own, or may own, a Workout Anytime Club.

18.3    If you are an individual and you desire to transfer your rights under this Agreement to a corporation,   partnership, limited liability company, or trust which you will newly form and of which you will be a majority shareholder, partner, member, trustee, beneficiary and/or an executive officer, you may do so only if:

A.    Your name remains on the Personal Guaranty;

B.    You continue to devote your full time and best efforts to manage the day-to-day operations of the franchised business unless you have an operational partner or Manager approved by Workout Anytime;

C.    The corporation's, partnership's, limited liability company's or trust's activities be confined exclusively to operate the franchised business;

D.    The corporation, partnership, trust and all officers sign an agreement with Workout Anytime assuming jointly and severally all your obligations under this Agreement; and,

E.    It is expressly understood that the assumption of your obligation by any corporation, partnership, limited liability company, or trust does not limit your personal obligations under this Agreement, and that you and the corporation, partnership, limited liability company, or trust will be jointly and severally liable.

18.4    Upon the death of an individual Franchisee, the rights granted by this Agreement may pass (without payment of any Transfer Fee) to the next of kin or legatees of the Franchisee, provided that your legal representative(s) will, within sixty (60) calendar days of your death, apply in writing to Workout Anytime for the right to transfer to the next of kin or legatee your rights under this Agreement. Workout Anytime will not unreasonably withhold its permission so long as the proposed transferee(s) meets each of the requirements set forth in Sub-section 18.2 without regard to Sub-section 18.2(C). Should such proposed transferee(s) not meet said requirements, then the kin or legatee will be required to sell the respective interests of the Franchisee within one hundred twenty (120) days of being notified of their not complying with Workout Anytime's requirements, and the provisions of Section 18.8 *et seq.* will also apply.

- 29 -

18.5    Any attempt by you to transfer any of your rights or interest under this Agreement or the License, without having received Workout Anytime's prior written consent will be void and will constitute a material breach of this Agreement. However, if you die and your personal representative does not desire to sell the health club facility, and if under controlling local law your interest in the health club facility, and both the License and this Agreement are distributable to heirs or legatees who are members of his or her immediate family and who would otherwise qualify as assignees, then such attempted assignment by operation of law or will not be deemed a violation of the Agreement provided such heirs or legatees accept the conditions imposed on otherwise permitted assignees.

18.6    You do not have the right to grant a sub-franchise.

18.7    Workout Anytime may assign its rights under this Agreement as it sees fit at any time without notice to you.

18.8    If at any time from the date of this Franchise Agreement through the expiration of the Term or the earlier termination of this Franchise Agreement: (i) any person who owns at least a ten percent (10%) ownership or voting interest in Franchisee (or in any entity with an ownership interest in Franchisee) receives an at-arm's-length written offer from an independent third party to purchase any portion or all of such person's interest (the portion or all of such person's interest hereinafter referred to as the "Interest," and such offer later referred to as the "Interest Offer"); or (ii) if the Franchisee receives an at-arm's-length written offer from an independent third party to purchase any portion or all of Franchisee's interests under this Franchise Agreement or, outside the ordinary course of business, a material part or all of the assets used in the franchised business (such assets subject to the offer later referred to as the "Assets", and such type of offer later referred to as the "Asset Offer"), then Franchisee shall ensure that such person receiving the Interest Offer (the "Offeror") shall, if he or she desires to accept such offer, first offers to sell to the Franchisor the Interest or the Assets for the consideration and on the terms and conditions set forth in such third party's written offer. The Offeror's offer (the "Offer") shall be made by written notice to the Franchisor setting forth the name and address of the prospective purchaser, the price and terms of the Offer, a franchise application completed by the prospective purchaser, and any other information that Franchisor may reasonably request to evaluate the Offer, including any purchase and sale and related agreements proposed to be executed or executed by Franchisee or the third party. Franchisor shall then have the first option to purchase the Interest or the Assets by accepting the Offer within thirty (30) days after its receipt of the Offer and required information.

A.    If the Franchisor gives notice of acceptance of the Offer, then the Offeror shall sell the Interest or the Assets to the Franchisor, and the Franchisor shall purchase the Interest or the Assets from the Offeror, for the consideration and upon the terms and conditions set forth in the Offer, less any broker's commission not due if Franchisor exercises its right of first refusal but due and payable by the Offeror upon the sale to the prospective purchaser. Franchisor's creditworthiness shall be deemed at least equal to the creditworthiness of any proposed purchaser. If the Franchisor is a public company at such time having shares traded on a national securities exchange, the Offeror must accept the then-current value of Franchisor's registered shares in lieu of cash or other consideration.

B.    If an independent third party's written offer (and the Offeror's corresponding offer

- 30 -

to the Franchisor) provides for the purchaser's payment of a unique consideration which is of such a nature that it cannot reasonably be duplicated by the Franchisor, then the Franchisor may, in its notice of exercise, substitute cash or stock in an amount determined by mutual agreement of the Offeror and Franchisor within forty-five (45) days after the Offer is made or, failing such agreement, by an independent appraiser selected by Franchisor in its sole discretion.

C.    If the proposed sale includes assets of the Offeror not related to the operation of the franchised business, then the Franchisor may, at its option, elect to purchase only the assets related to the operation of the franchised business and an equitable purchase price shall be determined in the reasonable discretion of the Franchisor and allocated to each asset included in the proposed sale.

D.    Unless otherwise agreed by the Offeror and Franchisor, the closing of the purchase of the Interest or the Assets shall be held at a location designated by Franchisor on no later than the sixtieth (60th) day after the Offer is delivered to the Franchisor, provided that the closing of any such purchase for which a cash or stock consideration is determined in accordance with Sub-section 18.8(B) or 18.8(C) above shall be held on the fifteenth (15th) day after such cash or stock consideration is finally determined. At any such closing, the Offeror shall deliver to the Franchisor an assignment and other documents reasonably requested by Franchisor representing a transfer of ownership of the Interest or the Assets free and clear of all liens, claims, pledges, options, restrictions, charges and encumbrances, in proper form for transfer and with evidence of payment of all applicable transfer taxes by the Offeror. Franchisor shall simultaneously therewith make payment of any cash consideration for the Interest or Assets by a cashier's check, or payment by the issuance of Franchisor's registered shares, after set off against the amount due to the Offeror for all amounts the Franchisee owes Franchisor, if any. The remaining terms and conditions of such purchase and sale shall be set forth in the Offer.

E.    If the Franchisor does not accept the Offer as provided above, the Offeror shall be free, for a period of sixty (60) days after Franchisor has elected not to exercise its option, to sell the Interest or the Assets to the independent third party for the consideration and upon the terms and conditions specified in such third party's written offer, subject to full compliance with all terms and conditions of transfer required under this Franchise Agreement. It shall be a condition precedent to any sale of the Assets or the Interest to an independent third party that there is delivered to such third party an acknowledgment that the Assets or the Interest purchased by such third party is and shall be subject to the terms and conditions of this Franchise Agreement and that such third party agrees to be bound by the terms of this Franchise Agreement with respect to transferring the Assets or the Interest in the same manner as the Offeror. If the Offeror does not sell the Assets or the Interest or the Assets as provided above within the aforesaid sixty (60) day period, then any transfer by him or her of the Interest or the Assets shall again be subject to the restrictions set forth in this Franchise Agreement.

F.    In the event a proposed transferee is the spouse, son, or daughter of the Offeror, Franchisor shall not have any right of first refusal; provided, however, that all such transferees shall be subject to all the restrictions on transfer of ownership imposed on the Offeror under this Franchise Agreement.

- 31 -

## SECTION 19 - MISCELLANEOUS

19.1   **Relationship of Parties.**

You neither have nor will you exercise any authority, express, implied or apparent, to act on behalf of or as an agent of Workout Anytime or any of its affiliates or subsidiaries, for any purpose, and will take no action which is intended to create an apparent employer-employee or agency relationship between you and Workout Anytime. You are, and will remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Club and its business and for all claims and demands based on damages or destruction of property or based on injury, illness or death of any person or persons, directly or indirectly arising from the operation of the Club. Workout Anytime will neither have, nor exercise the right to, the control of the day-to-day managerial operations of the Club.

19.2   **No Conflict with Other Agreements.**

You represent that you are not a party to or subject to any agreements that might conflict with the terms of this Agreement and agree not to enter any conflicting agreements during the Term.

19.3   **Cost of Enforcement**

If either party institutes or prevails entirely or in part in any action at law or in equity against the other party based entirely or in part on the terms of this Agreement, the prevailing party will be entitled to recover from the losing party, in addition to any judgment, reasonable attorney's fees, court costs and all the prevailing party's expenses about any action at law

19.4    **No Waiver.**

No failure, forbearance, neglect or delay of any kind on the part of Workout Anytime in connection with the enforcement or exercise of any rights under this Agreement will affect or diminish Workout Anytime right to strictly enforce and take full benefit of each provision of this Agreement at any time, whether at law for damages, in equity for injunctive relief or specific performance, or otherwise. No custom, usage or practice with regard to this Agreement by you or Workout Anytime other franchisees will preclude the strict enforcement of this Agreement in accordance with its literal terms. No waiver by Workout Anytime of performance of any provision of this Agreement will constitute or be implied as a waiver of Workout Anytime right to enforce that provision at any future time.

19.5   **Entire Agreement; Amendments.**

This Agreement, with any related agreements and all Exhibits, constitutes the entire understanding and agreement between you and Workout Anytime and supersedes all prior understandings, whether oral or written, pertaining to either this Agreement, the System or your Club. You acknowledge and agree that no claims, representations or warranty of earnings, sales, profits or success of your Workout Anytime health club franchise have been made to you other than those set out in Item 19 of the franchise disclosure document.  No interpretation, change, termination or waiver of any provision of this Agreement, and no consent or approval under this Agreement, will be effective or

- 32 -

binding upon you or Workout Anytime unless in writing signed by you and Workout Anytime, except that a waiver needs to be signed only by the party waiving. Nothing in this Agreement or in any related agreement, however, is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you.

19.6    **Severability.**

If any term or provision of this Agreement or the application thereof to any person, property or circumstances will to any extent be invalid or unenforceable, the remainder of this Agreement will be unaffected and will remain in full force and effect and each term and provision will be valid and enforced as fully permitted by law. Should this prove impractical in the sole discretion of Workout Anytime, then Workout Anytime will have the option of terminating this Agreement upon written notice to you.

19.7    **Governing Law.**

All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. Sections 1 et seq.).  Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.) or other federal law, this Agreement, the franchise, and all claims arising from the relationship between Franchisor and Franchisee (and/or any of our affiliates) and Franchisee will be governed by the laws of the State of Georgia, without regard to its conflicts of laws rule.  Should however, the restrictive Covenants set forth in Section 16 and Exhibit C attached hereto herein be deemed unenforceable under Georgia law, the law of the state in which the Franchised Business is located, shall be applied solely to the interpretation and enforcement of those covenants. This Agreement will become a valid and enforceable contract when we accept it and sign it in Atlanta, Georgia. Franchisee and Franchisor expressly agree that this Agreement has been made in the State of Georgia, that substantially all performance of the obligations hereunder has been and will be rendered in the State of Georgia, and that there is a regular stream of business activity between Franchisee and franchisor from and into the State of Georgia. The Covenant Not to Compete in Section 16 and Exhibit C attached hereto of this Agreement shall be interpreted in accordance with the laws of the state in which the Franchisee is located.

19.8    **Arbitration.**

Except as specifically otherwise provided in this Agreement, and in the event, that you or Workout Anytime seek injunctive relief under this Agreement, each of us agree that all disputes between us, and any claims by either of us that cannot be amicably settled, will be determined solely and exclusively by arbitration in accordance with the then existing rules of the American Arbitration Association in Atlanta, Georgia subject to the following:

A.    A single arbitrator will be selected by the American Arbitration Association upon application of either you or Workout Anytime. Arbitration proceedings will be conducted in accordance with the rules then prevailing of the American Arbitration Association at its Atlanta, Georgia office. Judgment upon an award of the majority of the arbitrators will be binding, and will be entered in a court of competent jurisdiction;

B.    Nothing herein contained will bar the right of you or Workout Anytime to obtain injunctive relief against threatened conduct that would violate this

Agreement and cause loss or damages.

19.9   **Venue.**

Nothing contained in this Agreement will prevent Franchisor or Franchisee from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard such party's interests. In the event of any litigation arising out of this Agreement or based upon the relationship between the parties, venue for any such litigation shall be any court of general jurisdiction in Fulton County, Georgia or the United States District Court for the Northern District of Georgia, Atlanta Division. Franchisee hereby accepts and submits to, generally and unconditionally, for itself and with respect to its property, the jurisdiction of any such courts in any such action or proceeding and hereby waives, to the greatest extent permitted by applicable law defenses based on jurisdiction, venue, or forum non conveniens.  The provisions of this Section 19.9 shall be self-executing and shall remain in full force and effect after the termination or expiration of this Agreement.  Franchisee acknowledges that this Agreement has been entered into in the State of Georgia, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Atlanta, Georgia, including but not limited to assistance, support and the development of the System.

19.10   **Notices.**

All notices and other communications provided for in this Agreement must be in writing and will be delivered in person or mailed by certified mail, or by Federal Express or U.S. Express Mail for overnight delivery if to you, at your address or, if to Workout Anytime at our address, Attention: Steven C. Strickland, with a copy to Joseph J. Gottlieb, Esq., 1117 Perimeter Center West, Suite W400, Atlanta, Georgia 30338. Workout Anytime or you may change, by providing notice thereof in writing, the address to which future notices will be sent. Notices delivered in person will be deemed given when delivered and mailed notices will be deemed given three (3) days after mailing if by certified or other receipted mail, or one (1) day after mailing if by Federal Express or U.S. Express Mail. If you are a corporation, some other legal entity, or more than one (1) individual, then you will authorize one (1) natural person as correspondent with authority to bind you.

19.11   **Certain References.**

References to weeks and months mean calendar weeks and calendar months. References to persons mean legal entities as well as natural persons.  Whenever the pronouns "he" or "his" are used herein, such refers to the masculine, feminine and neutral genders, and the singular and plural. Except as otherwise specifically set forth in this Agreement, this Agreement will inure to the benefit of and be binding on you and Workout Anytime, our respective heirs, executors, administrators, personal representatives, successors and assigns.

19.12   **Patriot Act.**

You represent and warrant to us that (i) You are not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation, named by any Executive Order or the United States Treasury Department as a "terrorist", "Specially Designated National and Blocked Person", or other banned or blocked person, group, or nation (collectively, "Banned Persons") pursuant to any anti-terrorism law; (ii) You are not engaged in this

- 34 -

Franchise Agreement, or instigating or facilitating the execution of this Agreement, directly or indirectly on behalf of any Banned Person; (iii) You currently do not appear, and throughout the Franchise Term neither you nor any officer, director, shareholder, partner, member or other owner shall appear on any list of Banned Persons; (iv) no anti-terrorism law prohibits you from doing business with the Franchisee; (v) the Franchisee, its officers, directors, or principal shareholders, partner, member, or other owner of the Franchisee shall not, during the Franchise Term, violate any anti-terrorism laws; and (vi) Franchisee, its officers, directors, principal shareholders, partners or members shall not, during the Franchise Term do business with any party, individual, or entity that has violated or will violate any anti-terrorism laws.  For purposes of this Agreement, "anti-terrorism laws" shall mean Executive Order 13224 and related regulations promulgated and enforced by the Office of Foreign Assets Control, the Money Laundering Control Act, the United States Patriot Act, or any similar law, order, rule or regulation enacted in the future.  Franchisee hereby agrees to defend, indemnify, protect, and hold harmless Franchisor from and against all claims, damages, losses, risks, liabilities, fines, penalties, expenses (including attorneys' fees) and costs arising from or related to a breach of the foregoing representations and warranties.  The foregoing indemnity obligations of Franchisee shall survive the termination or expiration of this Agreement.

19.13   **Other Franchises.**

You acknowledge that other Workout Anytime franchisees have or will be granted franchises at various times and in different situations, and further acknowledge that the provisions of such franchises may vary substantially from those contained in this Agreement. You also acknowledge that because complete and detailed uniformity under varying circumstances may not be practical, there may be variations we grant to other of our Workout Anytime clubs (whether franchised or which our affiliates operate), and you will not be entitled to require us to grant similar variations or privileges to you.

19.14   **Release of Prior Claims.**

By executing this Franchise Agreement, Franchisee, and each successor of Franchisee under this Franchise Agreement forever releases and discharges Franchisor and its affiliates, its designees, franchise sales brokers, if any, or other agents, and their respective officers, directors, representatives, employees and agents, from any and all claims of any kind, in law or in equity, which may exist as of the date of this Franchise Agreement relating to, in connection with, or arising under this Agreement or any other agreement between the parties, or relating in any other way to the conduct of Franchisor, its affiliates, its designees, franchise sales brokers, if any, or other agents, and their respective officers, directors, representatives, employees and agents prior to the date of this Agreement, including any and all claims, whether presently known or unknown, suspected or unsuspected, arising under the franchise, business opportunity, securities, antitrust or other laws of the United States, any state or locality.

19.15.   **Modification of the System.**

**FROM TIME TO TIME AFTER THE DATE OF THIS FRANCHISE AGREEMENT. FRANCHISOR MAY CHANGE OR MODIFY THE SYSTEM (INCLUDING THE TYPES OF GOODS AND SERVICES OFFERED BY THE FRANCHISED BUSINESS). FRANCHISEE SHALL ACCEPT, AND IS BOUND BY, ANY SUCH CHANGES IN THE SYSTEM AS IF THEY WERE PART OF THIS ORIGINAL FRANCHISE AGREEMENT AT THE TIME OF ITS EXECUTION. FRANCHISEE WILL MAKE SUCH EXPENDITURES AND SUCH CHANGES OR MODIFICATIONS TO COMPLY WITH**

**THE CHANGES OR MODIFICATIONS OF THE SYSTEM AS FRANCHISOR MAY REASONABLY REQUIRE.**

19.16 **Acknowledgement.**

YOU ACKNOWLEDGE THAT YOU HAVE CONDUCTED AN INDEPENDENT INVESTIGATION OF THE WORKOUT ANYTIME SYSTEM AND RECOGNIZE THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT INVOLVES BUSINESS RISK AND WILL BE LARGELY DEPENDENT UPON THE ABILITY OF YOU AS AN INDEPENDENT BUSINESS PERSON. WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC EXPRESSLY DISCLAIMS THE MAKING OF, AND YOU ACKNOWLEDGE THAT YOU HAVE NOT RECEIVED, ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT;

YOU ACKNOWLEDGE YOU HAVE RECEIVED A COPY OF THE COMPLETE WORKOUT ANYTIME FRANCHISE AGREEMENT AT LEAST SEVEN (7) DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED. YOU FURTHER ACKNOWLEDGE THAT YOU RECEIVED THE DISCLOSURE DOCUMENT REQUIRED BY THE FEDERAL TRADE COMMISSION TITLED "FRANCHISE DISCLOSURE DOCUMENT" AT LEAST FOURTEEN (14) DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED;

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND THIS AGREEMENT, AND THAT WORKOUT ANYTIME HAS ACCORDED YOU AMPLE TIME AND OPPORTUNITY AND HAS ENCOURAGED YOU TO CONSULT WITH ADVISORS, COUNSELORS, AND BOTH LEGAL AND FINANCIAL PROFESSIONALS OF YOUR OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT;

YOU ACKNOWLEDGE THAT OTHER WORKOUT ANYTIME FRANCHISEES HAVE OR WILL BE GRANTED FRANCHISES AT VARIOUS TIMES AND IN DIFFERENT SITUATIONS, AND FURTHER ACKNOWLEDGE THAT THE PROVISIONS OF SUCH FRANCHISES MAY VARY SUBSTANTIALLY FROM THOSE CONTAINED IN THIS AGREEMENT.  YOU ALSO ACKNOWLEDGE THAT BECAUSE COMPLETE AND DETAILED UNIFORMITY UNDER VARYING CIRCUMSTANCES MAY NOT BE PRACTICAL, THERE MAY BE VARIATIONS WE GRANT TO OTHER OF OUR WORKOUT ANYTIME CLUBS (WHETHER FRANCHISED OR OPERATED BY OUR AFFILIATES), AND YOU WILL NOT BE ENTITLED TO REQUIRE US TO GRANT SIMILAR VARIATIONS OR PRIVILEGES TO YOU;

YOU ACKNOWLEDGE THAT THE SUCCESS OF FRANCHISEE IN OWNING AND OPERATING THE CLUB IS SPECULATIVE AND WILL DEPEND ON MANY FACTORS INCLUDING, TO A LARGE EXTENT, THE FRANCHISEE'S INDEPENDENT BUSINESS ABILITY. NO REPRESENTATIONS OR PROMISES, EXPRESS OR IMPLIED, HAVE BEEN MADE BY FRANCHISOR OR ANY EMPLOYEE, BROKER OR REPRESENTATIVE OF FRANCHISOR, TO INDUCE FRANCHISEE TO ENTER INTO THIS FRANCHISE AGREEMENT OR ANY RELATED AGREEMENT EXCEPT AS SPECIFICALLY INCLUDED IN THIS FRANCHISE AGREEMENT OR SUCH RELATED AGREEMENTS. NO EMPLOYEE, OFFICER, DIRECTOR, BROKER OR REPRESENTATIVE IS AUTHORIZED TO DO OTHERWISE;

- 36 -

**IN ALL OF ITS DEALINGS WITH FRANCHISOR, ITS EMPLOYEES, BROKERS (IF ANY), AND OTHER REPRESENTATIVES, EACH HAVE ACTED ONLY IN A REPRESENTATIVE CAPACITY AND NOT IN AN INDIVIDUAL CAPACITY. THIS FRANCHISE AGREEMENT, AND ALL BUSINESS DEALINGS BETWEEN FRANCHISEE AND SUCH INDIVIDUALS AS A RESULT OF THIS FRANCHISE AGREEMENT, ARE SOLELY BETWEEN FRANCHISEE AND FRANCHISOR;**

**FRANCHISOR MAKES NO WARRANTY AS TO FRANCHISEE'S ABILITY TO OPERATE THE FRANCHISED BUSINESS IN THE JURISDICTION IN WHICH THE FRANCHISED BUSINESS IS TO BE OPERATED. IT IS INCUMBENT UPON FRANCHISEE TO SEEK OR OBTAIN ADVICE OF COUNSEL SPECIFICALLY WITH RESPECT TO THIS ISSUE. IN THE EVENT THAT LEGISLATION ENACTED BY, OR REGULATION OF, ANY GOVERNMENTAL BODY PREVENTS FRANCHISEE FROM OPERATING THE FRANCHISED BUSINESS, FRANCHISOR SHALL NOT BE LIABLE FOR DAMAGES NOR BE REQUIRED TO INDEMNIFY FRANCHISEE IN ANY MANNER WHATSOEVER OR TO RETURN ANY MONIES RECEIVED FROM FRANCHISEE.**

This entire Agreement, including corrections, changes and all attachments and addendums, will only be binding upon Workout Anytime when executed or initialed by a member, director or officer of Workout Anytime.

**You and Workout Anytime, intending to be legally bound, have duly executed, sealed and delivered this Agreement in duplicate.**


FRANCHISEE: (For an Entity)                    FRANCHISEE: (For an Individual)

                                               John Greff
_____                    _____
(Please print name and type of entity)         (Please print name)


_____                    _____
By: (Signature of person signing for entity)   By: (Signature)

                                               01/09/2018
_____                    _____
Title: (Title of person signing)               Date:


_____
Date:

FRANCHISOR:  WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC

*Steven C. Strickland*
_____
By:  Steven C. Strickland, Its CEO

01/10/18          01-11-18  GA
_____
Date:

- 37 -

**EXHIBIT B**

**PERSONAL GUARANTY**

## PERSONAL GUARANTY

**THIS GUARANTY** is made this _____ of _____ 12/26/17 _____, 201____, by the undersigned ("Guarantor"), for the benefit of WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC ("Franchisor").

### RECITALS

A. _____John Greff_____ is the Franchisee ("Franchisee") of that certain FRANCHISE AGREEMENT (the "FRANCHISE AGREEMENT") with Franchisor dated ____12/26/17_____, 201____; and,

B. As a condition to entering into the FRANCHISE AGREEMENT, Franchisor requires that Guarantor guarantee the full performance of the obligations of Franchisee under the FRANCHISE AGREEMENT; and,

C. Guarantor will receive substantial benefit from the FRANCHISE AGREEMENT and desires that Franchisee enter into the FRANCHISE AGREEMENT with the Franchisor;

**NOW, THEREFORE**, in consideration of the execution of the FRANCHISE AGREEMENT by Franchisee and its acceptance by Franchisor, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor covenants and agrees as follows:

### AGREEMENT

1. **Guarantee.** Guarantor hereby absolutely and unconditionally guarantees (a) the full and faithful performance of all of the covenants, conditions, agreements and undertakings of Franchisee to be kept and performed by Franchisee under the FRANCHISE AGREEMENT including, but not limited to, the monthly payment(s) when due, and other sums payable by Franchisee to Franchisor under the FRANCHISE AGREEMENT, and (b) the payment of all damages owing to Franchisor by Franchisee after the termination of the FRANCHISE AGREEMENT or the exercise by Franchisor of any other right or remedy of Franchisor following a default by Franchisee under the FRANCHISE AGREEMENT (collectively the "Obligations"). Guarantor understands and agrees that this Guaranty is unconditional and continuing and is a guaranty of payment and performance and not of collection.

2. **Independent Obligation.** The liability of Guarantor hereunder is independent of the obligation of the Franchisee or any other person or entity a separate action or separate actions against Guarantor until after Franchisee has failed to comply with all cure periods allowed. The release of, or cancellation by, any signer of a similar instrument shall not act to release or otherwise affect the liability of Guarantor hereunder.

3. **Modification to FRANCHISE AGREEMENT.** Guarantor's obligations under this Guaranty of FRANCHISE AGREEMENT shall not be extinguished, discharged, diminished or reduced in any way by any modification or amendment of the FRANCHISE AGREEMENT including, but not limited to, any modification of payment dates or amounts, or any subsequent assignment of the FRANCHISE AGREEMENT made with or without the consent of Franchisor. Guarantor hereby waives any right to approve any modification or amendment of the FRANCHISE AGREEMENT.

4. **Obligations of Guarantor Upon Default by Franchisee.** Should Franchisee shall fail to pay when due any other monetary sum or charge, or any portion thereof, accrued or

- 1 -

WOATFDD042017v1

due pursuant to the terms of the FRANCHISE AGREEMENT within any allotted cure period, then, upon written notice to Guarantor by Franchisor, Guarantor shall pay to Franchisor all such amounts as may be due and owing from Franchisee to Franchisor by reason of Franchisee's failure to perform.

5. **Remedies.** If Guarantor fails to perform any obligation under this Guaranty, then in addition to all other remedies provided at law or in equity, from time to time and without first requiring performance on the part of Franchisee, and without being required to exhaust or proceed against any or all security held by Franchisor for the performance of Franchisee under the FRANCHISE AGREEMENT, Franchisor may enforce its rights to require performance by Guarantor of any or all of the obligations on the part of Guarantor to be performed under this Guaranty by action at law or in equity, or both.

6. **No Waiver.** No failure on the part of Franchisor to pursue any remedy under this Guaranty or under the FRANCHISE AGREEMENT shall constitute a waiver on the part of Franchisor of its right to pursue such remedy based on a subsequent default.

7. **Waiver of Exoneration.** Guarantor waives any right to require Franchisor to (a) proceed against Franchisee, (b) proceed against or exhaust any security held from Franchisee, or (c) pursue any other right or remedy available to Franchisor. Guarantor further waives any defense it may acquire because of Franchisor's election of any remedy against Guarantor or Franchisee, or both.

8. **Waiver of Subrogation.** Until the obligations of Franchisee under the FRANCHISE AGREEMENT have been performed in full, Guarantor shall have no right of subrogation against Franchisee, and Guarantor hereby expressly waives any right to enforce any remedy which Franchisor now has or may hereafter acquire against Franchisee. Guarantor hereby waives the benefit of, and any right to participate in, any security now or hereafter held by Franchisor for the performance of the obligations of Franchisee under the FRANCHISE AGREEMENT.

9. **Waiver of Presentments.** Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty and waives all notices of the existence, creation, or incurring of new or additional obligations.

10. **Other Guarantor Waivers.** Without limiting the generality of the preceding paragraphs, Guarantor hereby waives all rights and defenses to:

(a) All rights it may have now or in the future to require or demand that Franchisor pursue any right or remedy Franchisor may have against Franchisee or any other third party;

(b) Any defense arising as a result of Guarantor's election of the application of Section 1111(b)(2) of the Bankruptcy Code or based on any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code;

(c) Any defense as a surety arising under applicable law;

(d) Any duty or obligation of Franchisor to disclose to Guarantor any facts Franchisor may now or hereafter know about Franchisee, regardless or whether Franchisor has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or has reason to believe that such facts are unknown to Guarantor or has a reasonable opportunity to communicate such facts to guarantor, it being understood and agreed that

- 2 -

guarantor is fully responsible for being and keeping informed of the financial condition of Franchisee and of any and all circumstances bearing on the risk of nonperformance of any Obligation; and,

(e)      Any defense based upon an election of remedies by Franchisor, including any election which destroys or impairs any right of subrogation, reimbursement of contribution which Guarantor may have, or any rights or benefits under any provisions of Georgia law in any way qualifying, conditioning or limiting the obligations of Guarantor based on any steps or procedures that Franchisor should take before proceeding against Guarantor.

11.     **Bankruptcy.** This Guaranty will continue unchanged by any bankruptcy, reorganization or insolvency of Franchisee, or any successor or assignee thereof, or by any disaffirmance or abandonment by a trustee of Franchisee. Notwithstanding any modification, discharge or extension of the indebtedness or any amendment, modification, stay or cure of Franchisor's rights which may occur in any bankruptcy or reorganization case or proceeding concerning Franchisee whether permanent or temporary, and whether assented to by Franchisor, Guarantor hereby agrees that it shall be obligated hereunder to pay and perform the Obligations in accordance with the terms of the FRANCHISE AGREEMENT and the terms of this Guaranty. Guarantor understands and acknowledges that by virtue of this Guaranty, Guarantor has specifically assumed all risks of a bankruptcy or reorganization case or proceeding with respect to Franchisee.

12.     **Assignment of FRANCHISE AGREEMENT.** As used herein, the term "Franchisor" shall include any successor, assignee or transferee of Franchisor. Guarantor agrees that Franchisor may, without notice to Guarantor, assign the FRANCHISE AGREEMENT and this Guaranty in whole or in part and that no such assignment or transfer of the FRANCHISE AGREEMENT and/or this Guaranty shall operate to extinguish or diminish the liability of Guarantor under this Guaranty.

13.     **Obligations of Guarantor Are Primary.** Guarantor agrees that the liability of Guarantor under this Guaranty shall be primary and that in any cause or right of action which shall accrue to Franchisor under this Guaranty, Franchisor may, at its sole option, proceed against Guarantor without having commenced any action, or having obtained any judgment, against Franchisee. If Franchisor has any enforceable right against Franchisee upon termination of the FRANCHISE AGREEMENT, Franchisor shall be entitled to enforce those rights against Guarantor without giving prior notice to Franchisee or Guarantor, and without making any demand on either of them.

14.     **Interest.** Any sum required to be paid by Guarantor to Franchisor pursuant to the terms of this Guaranty shall bear interest at the lower of seven percent (7%) or the highest rate then allowed by law, from the date due until paid in full.

15.     **Attorneys' Fees.** Guarantor agrees to pay Franchisor's reasonable attorneys' fees and all costs and other expenses incurred in any collection or attempted collection, or in any negotiations relative to the obligations hereby guaranteed, or incurred enforcing this Guaranty against the Guarantor. In addition, in the event of any dispute between the parties arising under this Guaranty, or the breach of any covenant or condition under this Guaranty, then the prevailing party shall be entitled to have and recover from the party not so prevailing the attorneys' fees and costs incurred by the prevailing party, whether such fees and costs are incurred in taking any action under this Guaranty, or in any judicial proceeding (including appellate proceeding). "Prevailing party" for the purposes of this Paragraph 15 shall include, without limitation, the party who receives from the other party the sums allegedly due,

- 3 -

performance of the covenants allegedly breached, consideration substantially equal to that which was demanded, or substantially the relief or consideration sought in any judicial proceeding whether or not such proceeding is prosecuted to final judgment, or a party who dismisses a judicial action in return for substantially the performance or relief sought or the payment of the sums allegedly due.

16.  **Time of the Essence.** Time is of the essence with respect to the performance of every provision of this Guaranty.

17.  **Governing Law.** This Guaranty shall be construed and interpreted in accordance with the laws of the State of Georgia.

18.  **Captions.** The captions and paragraph numbers appearing in this Guaranty are inserted only as a matter of convenience and are not to be used to interpret this Guaranty.

19.  **Examination of FRANCHISE AGREEMENT.** Guarantor acknowledges that he/she has (a) received a copy of the FRANCHISE AGREEMENT, (b) read and understood the terms and provisions of the FRANCHISE AGREEMENT including, but not limited to, the covenants, conditions, agreements and undertakings of Franchisee to be kept and performed by Franchisee under the FRANCHISE AGREEMENT, and (c) read and understood the obligation of Guarantor under this Guaranty, including the legal effect of such obligations and has been advised by legal counsel respecting such obligations.

20.  **Binding to Successors.** Guarantor shall not assign any of its obligations hereunder by operation of law or otherwise, and any attempted assignment shall, at Franchisor's sole option, be void. Subject to the foregoing, the obligations of Guarantor under this Guaranty shall be binding on Guarantor's successors.

**IN WITNESS WHEREOF,** Guarantor has executed this Guaranty as of the date first hereinabove set forth.

**GUARANTORS:**

_____     12/26/17
                              Date: _____

_____     Date: _____

_____     Date: _____

_____     Date: _____

**EXHIBIT C**

**NON-COMPETITION AND**

**NON-SOLICITATION AGREEMENT**

WOATFDD042017v1

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Non-Competition and Non-Solicitation Agreement ("Agreement") is entered into by and between Workout Anytime Franchising Systems, LLC ("Franchisor") and ___John Greff___ ("Obligor"), and becomes effective on the Effective Date of the Franchise Agreement once counter-signed by Franchisor. THIS AGREEMENT IS MADE SUBJECT TO ANY PROVISIONS OF ANY EXHIBIT "G" ATTACHED TO THE DISCLOSURE DOCUMENT PURSUANT TO WHICH THIS NON-COMPETITION AND NON-SOLICITATION AGREEMENT WAS PRESENTED TO AND SIGNED BY OBLIGOR AND WHICH SPECIFICALLY AND EXPRESSLY RELATE TO THE STATE OF FRANCHISEE'S RESIDENCY.

### W I T N E S S E T H :

WHEREAS, Obligor is either (1) the "Franchisee" named in the Franchise Agreement ("Franchise Agreement") that is being executed in conjunction with this Agreement, and/or (2) an equity owner of the legal entity that is named as the Franchisee in the Franchise Agreement ("Obligor" shall for all purposes under this Agreement mean and refer to the entity (if Franchisee is an entity), all equity owners of such entity, and all managers and/or primary operators of Franchisee's Workout Anytime franchised health club facility (the "Club");

WHEREAS, Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchise and franchisees from unfair competition by an existing or former franchisee that has had special, intimate knowledge of Franchisor's methods and trade secrets and confidential information for the operation of a Workout Anytime Club;

WHEREAS, Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee that transfers (without Franchisor's permission) the goodwill associated with Franchisor's proprietary and protected marks and business practices to a business that competes with Workout Anytime franchisees;

WHEREAS, Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee that is able to take advantage of the knowledge and experience gained in running a Workout Anytime Club, and use such knowledge and experience in operating a new competing business without having to continue to pay royalties and other fees for such information, thereby placing other franchisees at a competitive disadvantage;

WHEREAS, Obligor acknowledges that Franchisor has a legitimate business interest in re-franchising the formerly protected territory of a former franchisee, and Franchisor would suffer irreparable damage absent this Agreement because it would be unable to attract new franchisees to the area served by its former franchisee;

WHEREAS, Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee who (1) diverts business and customers from a current or former Workout Anytime Club to a competitor of Franchisor, or (2) induces or attempts to induce an employee of any Workout Anytime Club to discontinue their employment with the Club;

WHEREAS, Obligor acknowledges that Franchisor requires the execution of this

- 6 -

Agreement as an ancillary requirement to Franchisor's simultaneous grant of a franchise to Obligor or a legal entity of which Obligor is an equity owner.

**NOW, THEREFORE**, in express acknowledgement and recognition of the importance of the foregoing recitals, the parties agree as follows:

1.    **Consideration in Exchange for Obligor's Covenants.**   Obligor hereby expressly acknowledges and confirms that all of the valuable benefits, advantages and opportunities enjoyed by Obligor immediately upon (and solely as a result of) Obligor's (or as applicable, Obligor's legal entity) becoming a franchisee under the Franchise Agreement, and the additional protection provided by this Agreement being signed by all other new franchisees, serve as valuable and adequate consideration received in simultaneous exchange for all of Obligor's promises and covenants made in this Agreement.

2.    **Obligor's In-Term Non-Competition and Non-Solicitation Covenants**.  During the term of the Franchise Agreement, and without geographic limits, Obligor shall not directly or indirectly (such as through corporations or other entities controlled by the Obligor or by or through or in conjunction with any other individual person or persons including, but not limited to, Obligor's spouse (if any) and employees):

a.    divert or attempt to divert any business or customer of any Club to any competitor or do anything injurious or prejudicial to the goodwill associated with Franchisor's Marks, methods, the Workout Anytime Franchise System, or Franchisor's business practices; and,

b.    persuade, entice, or attempt to persuade or entice, any employee of any Workout Anytime Club to discontinue their employment with such Club; and,

c.    own, maintain, engage in, be associated with, be employed by, advise, assist, invest in, be landlord to, franchise, or have any interest in any business which is the same or substantially like or competitive with any Workout Anytime Club; and,

d.    use, communicate, disseminate, provide access, or divulge to anyone at any time any confidential information or trade secrets of Franchisor, or at any time copy, duplicate, record or otherwise reproduce any confidential information or trade secrets of Franchisor, including without limitation those materials contained within the secure password protected Franchise resource section of Franchisor's website, except as expressly permitted in the Franchise Agreement.

3.    **Obligor's Post-Term Non-Competition and Non-Solicitation Covenants**.

a.    For purposes of this Section 3, the word "Conclusion" means the termination, assignment or transfer and/or expiration of the Franchise Agreement corresponding to this Agreement, regardless of whether such termination/expiration occurs prior to, or at the end of, such Franchise Agreement's term (the "Term").

b.    Upon the Conclusion of the Term and for the stated time thereafter and geographic restriction set forth below, Obligor shall not, directly or indirectly:

(i)    for a two (2) year period following the Conclusion of the Term and without geographic limitation, divert or attempt to divert any business or

- 7 -

customer of any health club facility to any competitor, or do anything injurious or prejudicial to the goodwill associated with Franchisor's Marks, methods or the Workout Anytime Franchise System; and,

(ii)    for a two (2) year period following the Conclusion of the Term within twenty-five (25) miles of the location of the franchisee's former Club, own, maintain, engage in, be associated with, be employed by, advise, assist, invest in or have any interest in any business that engages in or offers franchises for businesses that engage in or operate gymnasiums, fitness, or workout facilities which is the same as, or substantially like or competitive with any Workout Anytime Club; and,

(iii)   for a two (2) year period following the Conclusion of the Term and without geographic limitation, persuade, entice or attempt to persuade or entice any employee of any Workout Anytime Club to discontinue their employment with such Club.

c.    Upon the Conclusion of the Term, Obligor shall not, at any time, directly or indirectly:

(i)    communicate, disseminate, provide access, reveal or divulge to anyone, in whole or in part, any of Franchisor's confidential information or trade secrets; and,

(ii)    use, copy, duplicate, record or otherwise reproduce at any time any of Franchisor's confidential information or trade secrets; and,

(iii)   use in any manner whatsoever any of the Marks, the methods, Franchisor's Operations Manuals, any of the materials contained within the secure password protected Franchise resource section of Franchisor's website, or any other proprietary or intellectual property rights of Franchisor and the Workout Anytime Franchise system.

d.    Upon the Conclusion of the Term, Obligor shall immediately return to Franchisor all Operations Manuals, all training materials, all of Franchisor's proprietary software and printed matters, all website materials, all other confidential information and trade secrets, and all of Franchisor's advertising and promotional signs and related items.

4.    **Severability**. It is the parties desire and intention that the covenants contained in this Agreement shall be construed as agreements severable and independent from each other, except that any violation of Section 2 of this Agreement shall constitute a material breach and default of the Franchise Agreement and cause for immediate termination of the Franchise Agreement without opportunity to cure. It is also the intention of the parties that if any Section of this Agreement is deemed by a court of competent jurisdiction to be invalid or unenforceable, then the maximum legally allowable restriction permitted by applicable law shall control and bind Obligor.

5.    **Enforcement Costs**.  Obligor agrees to pay to Franchisor all the costs and expenses (including reasonable attorneys' fees) incurred by Franchisor in connection with its enforcement of this Agreement.

- 8 -

WOATFDD042017v1

6.      **Counter-Parts, Entire Agreement, Amendments.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall be one and the same instrument. The parties may execute such counterparts via fax, or electronically via PDF. This Agreement, together with the Franchise Agreement, contains the entire agreement of the parties pertaining to the subject matter hereof and no prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the parties not set forth herein shall be of any force and effect. Any modifications to this Agreement must be accomplished by a written agreement signed by both parties.

7.      **Injunction.** Obligor recognizes and agrees that the injury that Franchisor and certain of its franchisees will suffer in the event of Obligor's breach of any covenant contained in this Agreement cannot be compensated by monetary damages alone, and Obligor therefore agrees that in the event of a breach or threatened breach by Obligor of this Agreement, Franchisor (and its affiliates, successors and assigns), in addition to and not in limitation of, any other rights, remedies, or damages available to Franchisor (and/or its affiliates, successors, and assigns) at law, in equity, under this Agreement or otherwise, shall be entitled to seek an injunction from any court of competent jurisdiction in order to prevent or restrain any such breach by Obligor or by Obligor's agents, representatives, employees, partners, co-owners, or any and all other persons directly or indirectly acting for or with him/her/it.

8.      **Choice of Law, Venue and Jurisdiction.**  This Agreement shall be construed and governed under and in accordance with the laws of the State in which the Franchised Business is located.   Exclusive venue and jurisdiction of any suit arising under this Agreement shall lie within the federal or state courts within the State of Georgia, except to the extent that the laws of the State where the Club is located requires for the Franchise Agreement and this Agreement to be enforceable against the Obligor or Obligor's legal entity that venue and jurisdiction lie in such State.

**AGREED TO AND ACCEPTED BY OBLIGOR:**

Signature: _____

John Greff

Print your name: _____

Print Title (if applicable): _____

12/26/17

Date of Signature: _____

*If the "Franchisee" named in the Franchise Agreement is an entity (e.g., corporation, limited liability company, partnership, trust, etc.), or if there is more than one (1) equity owner of "Franchisee", or if "Franchisee" consists of more than one (1) person, or if someone other than "Franchisee" or an equity owner of an entity "Franchisee" will serve said "Franchisee" as a manager or primary operator, complete and sign the additional OBLIGOR SIGNATURES below for the entity, for each equity owner of the entity, for each person included as part of "Franchisee", or for each manager or primary operator, or alternatively submit separate signed originals of this Agreement for the entity and for each of said persons.

**ADDITIONAL OBLIGOR SIGNATURES:**

- 9 -

WOATFDD042017v1

Signature: _____

Print your name: _____

Print Title (if applicable): _____

Date of Signature: _____


Signature: _____

Print your name: _____

Print Title (if applicable): _____

Date of Signature: _____


WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC:

Signature of Signing Officer: _____*Steven C Strickland*_____

Printed Name of Signing Officer: Steven C. Strickland, CEO

*Date of Counter Signature: __01/18/18__ 01-11-18
(*Effective Date of Agreement)

- 10 -

EXHIBIT "F"

PERSONAL DATA

FDD042017v1

XXXXXXXX
FDD044816v1

## I. PERSONAL DATA DISCLOSURE

This information will be kept strictly confidential. Please provide all available information. Should certain information not be available at this time, such as your new health club facility telephone number, please provide it immediately upon its availability, but no later than your scheduled facility opening date.

Your Name ___John Greff___

Home Address ___22803 Tomball PKWY___

City/State/Zip Code ___Tomball TX 77375___

SSN ___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___ - _____ - _____

Home Phone _____    Work Phone _____

Cell Phone ___(281) 387-4141___

E-mail Address ___johngreff8@gmail.com___

Workout Anytime Phone _____

Workout Anytime Fax _____

Facility's Address _____

City/State/Zip Code _____

Signed: ___John Greff___    Date: ___1/10/2018___

FDD042017V1

XXXFBDOAX516v1

## II. FRANCHISEE OWNERSHIP INFORMATION FORM

1.    FULL NAME(S) OF FRANCHISEE [If this franchise is owned by a legal entity, only insert the name of the legal entity; if this franchise is owned by one or more individuals, only insert the name(s) of such individual(s):

Entity Name: _____

Individual Owner(s): _____ _____

_____

_____

2.    THE FRANCHISE WILL BE OWNED BY (Check which one applies):

_____ SOLE PROPRIETOR          Fed. Tax I.D. # _____

_____ PARTNERSHIP              Fed. Tax I.D. # _____

_____ CORPORATION             Fed. Tax I.D. # _____

_____ LIMITED LIABILITY COMPANY    Fed. Tax I.D. # _____

_____ OTHER BUSINESS ENTITY      Fed. Tax I.D. # _____
(Please explain on a separate piece of paper)

3.    NAMES OF ALL OWNERS, PARTNERS, SHAREHOLDERS OR MEMBERS AND PERCENTAGE OF OWNERSHIP INTEREST: (Please use separate sheet if necessary)

NAME: _____          % OF OWNERSHIP:
_____
SOCIAL SECURITY NUMBER:
_____

NAME: _____          % OF OWNERSHIP:
_____
SOCIAL SECURITY NUMBER:
_____

NAME: _____          % OF OWNERSHIP:
_____
SOCIAL SECURITY NUMBER:
_____

4.   LIST OF DIRECTORS, MANAGERS OR GENERAL PARTNERS: (Please use separate sheet if necessary)

NAME: _____

SOCIAL SECURITY NUMBER: _____

NAME: _____

SOCIAL SECURITY NUMBER: _____

NAME: _____

SOCIAL SECURITY NUMBER: _____

NAME: _____

SOCIAL SECURITY NUMBER: _____

5.   LIST OF OFFICERS: (Please use separate sheet if necessary)

NAME: _____     TITLE: _____

SOCIAL SECURITY NUMBER:
_____

NAME: _____     TITLE: _____

SOCIAL SECURITY NUMBER:
_____

NAME: _____     TITLE: _____

SOCIAL SECURITY NUMBER:
_____

NAME: _____     TITLE: _____

SOCIAL SECURITY NUMBER:
_____

6.    DESIGNATED CONTACT PERSON:

NAME: _____          TITLE: _____

ADDRESS:        _____

                _____

PHONE: _____     E-MAIL: _____

FA380

WOATCHATTS, LLC

(Jeff Landis,
Troy Bage,
Boston Landis)

**EXHIBIT A**

**FRANCHISE AGREEMENT**

Date = 05-02-18
Fee = 19,500.
AD = Parker
Location = Dayton, TN

WOATFDD041017v1

**Bank of America** 〉〉〉            **Online Banking**

**WOAT Operating: Account Activity Transaction Details**

| | |
|---|---|
| **Post date:** | 05/02/2018 |
| **Amount:** | 19,500.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 180502 TIME:1455 ET TRN:2018050200345958 SEQ:0611210250115572/012399 ORIG:WOATCHATT 3 LLC ID:1600053852 SND BK:ATLANTIC CAPITAL BANK, NA ID:061121025 PMT DET:RE: FRANCHI SE FEE - JEFF LONDIS |
| **Merchant name:** | WOATCHATT 3 LLC |
| **Transaction category:** | Uncategorized: Pending |

*FA-380.*

**Workout Anytime Franchising Systems, LLC**

**FRANCHISE AGREEMENT**

This Franchise Agreement (this "Agreement") is entered into between Workout Anytime Franchising Systems, LLC, a Georgia Limited Liability Company ("Workout Anytime", "Franchisor", "us" or "we"), whose principal address is 2325 Lakeview Parkway, Suite 200, Alpharetta, Georgia, 30009, and ___Woatchatt5, LLC_____, a _____ _____ ("Franchisee" or "you").

## LET ALL PARTIES KNOW

Workout Anytime owns a unique system for opening and operating a twenty-four (24) hour health and fitness facility   for the general public through a uniform system which has high standards of service, uses quality equipment, and operates under the business format created and developed by Workout Anytime Franchising Systems, LLC known as the Workout Anytime Franchise System (the "System");

The distinguishing characteristics of the System include the name Workout Anytime, workable and functional interior and exterior designs, confidential operating procedures, standards and specifications for equipment, services, products, and both management and marketing programs. All distinguishing characteristics may be changed, improved, and further developed by Workout Anytime. They are known as "Trade Secrets" and are designated by and identified with the marks described in this Agreement;

Workout Anytime identifies itself by means of certain trade names, service marks, logos, emblems, and indicia of origin, including the Federal registered trademarks "Workout Anytime" and "24/7 Get Fit", and the common law rights associated with "Workout Anytime 24/7", along with other trade names and service marks which are now, or may be in the future, designated by Workout Anytime in writing for use with the System (the "Marks");

Workout Anytime continues to use, develop and control the use of the Marks to identify for the public the source of services and products marketed under the System, and which represent the System's high standards of quality, cleanliness, appearance and service;

You recognize the benefits to be derived from being identified with the System. You also recognize the value of the Marks and the continued uniformity of image to you, Workout Anytime, and other franchisees of Workout Anytime. You understand the importance to the System of Workout Anytime's high and uniform standards of quality, cleanliness, appearance and service, and further recognize the necessity of opening and operating your Workout Anytime health club facility in conformity within the System;

You recognize that to enhance the value of the System and goodwill associated with it, the Agreement places detailed obligations on you, including adherence to Workout Anytime's reasonable present and future requirements regarding the types of services offered, advertising, physical facilities, operational techniques, and related matters; and,

You wish to be assisted, trained, and franchised to operate a health club facility pursuant to the provisions, and at the location within the territory specified in, this Agreement (the "Territory"). You have also had an adequate opportunity to be thoroughly advised of the terms and conditions of this Agreement by counsel or an advisor of your own choosing.

- 1 -

**THEREFORE**, you and us, intending to be legally bound and in consideration of mutual agreements, covenants and promises contained in this Agreement, agree as follows:

## SECTION 1 - GRANT OF LICENSE

1.1     Subject to the limitations contained in this Agreement, Workout Anytime grants to you, during the Term (as defined below) the rights and license (the "License") to:

   A.     Operate a health club facility that uses the System (the "Club") upon the terms and conditions of this Agreement, in one (1) single territorial area and at one (1) location as described in Exhibit "L" (the "Territory");

   B.     Use the Marks at the Club and to utilize the System; and,

   C.     Offer and market at the Club related services and products (optional) that have been approved by Workout Anytime.

1.2     During the Term, Workout Anytime will not use or license any of the Marks licensed to you in connection with the operation of any other health club facility within your Territory described in Exhibit "L". We or our affiliates have the right to grant other franchises or licenses and to operate company or affiliate owned fitness centers within private establishments located within the Territory, if access to those centers is limited to employees of the business, or transient guests of the business.

## SECTION 2 - FRANCHISE TERM AND RENEWAL

This Agreement and the franchise granted will continue for a period of fifteen (15) years. This fifteen (15) year period will begin on the date this Agreement is executed by Workout Anytime and is subject to prior termination in accordance with the provisions of this Agreement (the "Initial Term"). Upon expiration of the Initial Term you will have the option to renew your Franchise License for a single successive period of five (5) years (the "Renewal Term" and collectively with the Initial Term, the "Term" or a "Term").

Workout Anytime may refuse to renew this Agreement if you have:

   A.     Failed to remedy any material breach of this Agreement as specified by Workout Anytime in a written notice to you and such failure to remedy remains outstanding thirty (30) days prior to the end of the Initial Term or any Renewal Term; or,

   B.     Committed two (2) or more material breaches of this Agreement of a substantial nature in the preceding twenty-four (24) months prior to the end of the then-current Term.

Workout Anytime may also refuse to renew this Agreement if you are not current in payment obligations to Workout Anytime and our subsidiaries and affiliates at the end of the then-current Term following receipt of written notice by Franchisor of such delinquency in payment.

You will execute a Renewal Franchise Agreement and all other agreements in the form then being used by Workout Anytime in granting new franchises and pay a renewal fee of Two Thousand Five Hundred ($2,500.00) Dollars (the "Renewal Fee"), these agreements may

include an increase in continuing monthly fees and other obligations. There will not be, however, another Initial Franchise Fee charged in the renewal of the Franchise Agreement. Failure by you to execute agreements within thirty (30) days after their delivery to you will be deemed an election by you to not to renew your franchise.

As additional conditions to renewal, you will:

> C.     Make capital expenditures as may be reasonably required to renovate and modernize your Club, including the replacement of equipment, to reflect the then-current image of the company; and

> D.     Complete any additional education or training programs that the Franchisor may then require for franchisees upon renewal.

> E.     You must provide Franchisor with not less than six (6) months prior written notice of your desire to renew.  Franchisee will notify you within thirty (30) days of its receipt of your notice, if you have met Franchisor's requirements to renew for an additional five (5) year term.

## SECTION 3 - INITIAL FRANCHISE FEE

3.1     Upon the execution of this Agreement, you will pay Workout Anytime an Initial Franchise Fee of Twenty-Nine Thousand Five Hundred ($29,500.00) Dollars (the "Initial Franchise Fee").   Fee = $19,500          *Jff Jordan*

3.2     If we agree to sell you more than one (1) Club, the Initial Franchise Fees for the additional Clubs, if purchased at the time you enter into our Development Agreement and initial Franchise Agreement are as follows: For a 2-pack: (i) $29,500 for the first club; and (ii) $19,500 for the second Club.  For a 3-pack: (i) $29,500 for the first Club; (ii) $19,500 for the second Club; and (iii) $14,500 for the third Club.  The Clubs must be developed in accordance with the Development Schedule set forth in the Development Agreement.

If you elect not to purchase additional discounted clubs for the term of this current FDD version, future purchases of franchises will be at the then-current FDD version discount.

3.3     The Initial Franchise Fee is non-refundable under any conditions.

3.4     The amounts referred to above do not include any applicable Federal, State or Local Taxes which may be payable to the appropriate taxing authorities. (A State and Local Use Tax is applicable in some States of the purchase price of your equipment).

## SECTION 4 - CONTINUING FEES

4.1     Continuing Monthly Royalty Fee. On or before the tenth (10th) day of each month, commencing when you begin the pre-sale of memberships, you will pay the following continuing monthly royalty fee (the "Royalty Fee"):

> 1.     During the first five (5) years of the Initial Term, you will pay a monthly Royalty Fee of Four Hundred Ninety-Nine ($499.00) Dollars.  During the sixth (6th) through tenth (10th) years of the Initial Term, you will pay a monthly Royalty Fee of Five Hundred Forty-Nine ($549.00) Dollars.  During the eleventh (11th) through the fifteenth (15th) years of the Initial Term you will pay a monthly Royalty Fee of Five Hundred

- 3 -

Ninety-Nine ($599.00) Dollars.  During the first renewal term, if applicable, you will pay a monthly Royalty Fee of Six Hundred Forty-Nine ($649.00) Dollars.

      2.     In addition to the amounts required to be paid pursuant to Section 4.1 1, you will pay a monthly Royalty Fee equal to four (4%) percent of your Gross Revenues.

      3.     "Gross Revenues" includes all revenue you generate from all business conducted at your Club, including but not limited to membership fees, personal training fees, tanning bed fees, massages, and the sale and delivery of any other services, products, merchandise, and tangible property of any nature whatsoever, whether in cash or for credit, from sources paying at the club, outside the club or online and whether collected or uncollected.  "Gross Revenue" does not include the amount of any applicable sales tax imposed by federal, state, municipal, or other governmental authority if such taxes are stated separately when the customer is charged and you pay such amounts as and when due to the appropriate taxing authority.  Also, excluded from Gross Revenues is the amount of any documented refunds, charge backs, credits, and allowances given to customers in good faith and only in accordance with our operating procedures.  All barter and exchange transactions for which you furnish services or products in exchange for goods or services to be provided by the vendor, supplier, or customer will be valued at the full retail value of the memberships bartered in exchange for the goods or services provided to you.  Gross Revenues also includes the proceeds of any business interruption insurance paid to you. Gross Revenue also includes any payments you receive from vendors.

4.2     By the tenth (10th) day of each month you will pay a monthly National Brand Development Fee equal to one (1%) percent of your monthly Gross Revenues. Payment of the National Brand Development Fee will commence when you begin the pre-sale of memberships to your Club.  We reserve the right to increase the monthly National Brand Development Fee to a maximum of two (2%) percent upon thirty (30) days advance written notice.   Such monies will be utilized for the design and development of advertising, both local and national advertising costs, public relations, trade shows and conventions, and those other costs associated with both developing and promoting the System and the Workout Anytime brand.

4.3     Notwithstanding any designation by you as to what your continuing Monthly Royalty Fee is comprised of or how it has been calculated, we have the sole discretion to apply such payment(s) made by you towards any of your indebtedness for Monthly Processing Fees, advertising and promotional contributions, purchases, interests, collection costs or any other indebtedness.

4.4     You will pay a monthly Technology Fee of Three Hundred Ninety-Five ($395.00) Dollars by the tenth (10th) day of each month to compensate us for our expenses of developing and managing the franchisor's website, the franchisee's specific web page which links from the franchisor's website, as well as your Club's email platform (including up to five [5] discrete email addresses) and other technology we determine important in the operation of your Club.  Payment of the Technology Fee shall commence when you begin the pre-sale of memberships for your Club.

4.5     You hereby authorize the Franchisor's approved third party vendor (presently being ABC Financial Services, Inc.) to deduct from any monies it collects on your behalf the amount of all fees you are obligated to pay us and/or our affiliates on the due date of such fee(s). All Gross Revenue derived from the sale of all products and services at

- 4 -

your Franchised Club must be processed through Franchisor's approved third party payment processor. You also authorize said vendor to supply us with any information it may have dealing with the operation of your Club and account.  To effectuate the terms of this Section, and to ensure the proper and timely remittance of all fees due the Franchisor under this Agreement, you hereby irrevocably constitute and appoint Workout Anytime your true and lawful attorney-in-fact to permit our review and, as may become necessary, our amendment of your account with that third-party vendor employed to collect your monthly membership monies.  This power of attorney is irrevocable and coupled with an interest and shall survive the termination of your franchise.

4.6    As security for all monetary and other obligations of Franchisee to Franchisor or its affiliates as set forth in this Agreement, Franchisee grants to Franchisor a first priority security interest in all assets of Franchisee in the Club, including entire club membership database for current and former members, Franchisee's monthly recurring draft, all furniture, fixtures, machinery, equipment, inventory and all other property (tangible or intangible), now owned or later acquired by Franchisee used in connection with the franchised health club business and wherever located as well as all contractual and related rights of Franchisee under this Franchise Agreement and all other agreements between the parties. Franchisee agrees to execute such financing statements, continuation statements, notices of lien, assignments or other documents as may be required to perfect and maintain Franchisor's security interest described in this paragraph, and authorize us to file in the public records of the county in which your Club may be located one (1) or more financing statements (i.e., UCC-1 financing statement) to evidence this security interest. Franchisor may, in its discretion, enter a subordination agreement, in form and substance satisfactory to it, whereby it will subordinate its security interest to: (a) the security interest of a reputable institutional lender relating to a loan to Franchisee for reasonable working capital purposes; (b) the purchase money security interest of an approved equipment vendor for any equipment purchased or leased by Franchisee and used in the operation of the Franchised Business; and (c) the purchase money security interest of a supplier of approved products sold at the Club. Franchisee shall pay all filing fees and costs for perfecting Franchisor's security interest.

4.7    Each month, within ten (10) days of a written request by us, you will supply a financial statement to us of the previous month's membership activities, including the number of new members, renewing members, cancelled members and current active enrollment as well as the amount of sales generated from the Club as a consequence of any of your actions in any regard or aspect, including, but not limited to, membership sales revenue, personal training revenue, and revenue associated with the sale of merchandise and other products, including supplements, food and liquids/beverages. We may also contact you by telephone or e-mail to collect this information.

4.8    Subject to your receipt of business interruption insurance payments, if you are unable to operate the Club due to damage or loss to the Club caused or created by a casualty, act of God, condemnation, or other condition over which you have no control, then the Royalty Fee will be waived for a period no greater than six (6) months commencing with the month in which such damage or loss occurs.

## SECTION 5 - ADVERTISING AND PROMOTION

5.1    You will spend a minimum of Four Thousand ($4,000.00) Dollars per month to advertise and promote the opening of your Club at your own expense within sixty (60) days of the opening of your Club to the public.  Thereafter, you will spend a minimum of Two

- 5 -

Thousand ($2,000.00) Dollars per month on advertising, marketing and otherwise promoting your Club (the "Local Advertising Expenditure"). Workout Anytime will offer recommendations as to the type, manner, and time frame to maximize the benefit of your advertising. Workout Anytime has the right to require you to pay the Local Advertising Expenditure directly to it and if so required, Workout Anytime will make such expenditures as it deems reasonably necessary to promote your Club within your territory. You must submit proof of your expenditures for Local Advertising to Workout Anytime upon request.

5.2    Workout Anytime will make available to you advertising and promotional materials for the Club which are used by Workout Anytime, its affiliates and other franchisees of the System. You will receive a sample of each type of advertising and promotion material the Franchisor may create at no charge via web download, or other means of transmission we deem appropriate. If you want additional copies you must pay duplication or printing costs. You may develop advertising materials for your own use, at your own cost, subject to Workout Anytime's written approval, which we will provide within ten (10) days of your submission of the proposed materials.  If we have not approved the use of the materials within ten (10) days, they are deemed not approved. Workout Anytime reserves the right to reject or stop your advertising if it is deemed inappropriate or not in keeping with the standards and quality of the brand.

5.3    Workout Anytime has the right to approve the media in which you propose to advertise. You must submit to us in advance, any proposal describing the media in which you propose to advertise, providing sufficient detail to permit us to evaluate it.  We will have ten (10) days to approve or disapprove the use of our materials in the media you propose.  If we have not approved the use of the materials within ten (10) days, they are deemed not approved.

5.4    You will install and, during the term of this Agreement will maintain an outdoor sign in a prominent location in accordance with Workout Anytime sign specifications, or as approved in writing by Workout Anytime, unless prohibited from doing so by applicable laws and regulations. You will use your best efforts to obtain any permit or variance required to allow the installation and maintenance of an outdoor sign meeting Workout Anytime specifications so long as it does not impose any undue economic burden on you. You may be restricted by local building owner or city specifications requiring adherence to a pre-established style or format.  Workout Anytime will allow for these local and city variances.

5.5    <u>Internet Advertising</u>.  We have established several Internet Site Pages, Internet advertising Landing Pages, and Business Profile Pages for the System.  We will develop sites and landing pages with specific parts that you are able to customize with Franchisor approval. Franchisor shall have complete control of your online presence and changes may be made as we deem appropriate, for your Club.  You are restricted from establishing a presence on, or marketing using, the Internet without our consent.  We retain the sole right to advertise or use the Marks on the Internet.  We retain ownership of your Google, Yahoo, Bing, Yelp, Facebook, Twitter, LinkedIn, Instagram and any other online business profile pages. We may require you to provide content for our Internet marketing pages.  You must comply with our intranet and Internet usage rules, style guide, and requirements.  We retain the sole right to approve any linking to, or other use of, the Workout Anytime Internet site.  You must also establish or maintain a landing/splash page, online business profile or other presence on the Internet through any Internet or social networking site, including but not limited to Facebook, LinkedIn, MySpace, Plaxo, Twitter, Instagram, Pinterest or YouTube, that uses any variation of the

- 6 -

Marks or references the System. We must also approve your use of linking and framing between web pages and all other websites. Your social media presence shall be in accordance with Workout Anytime's Social Media Policy as it may be modified or amended from time to time.

5.6     <u>Social Media</u>.  You may not engage in advertising or the promotion of your Club using social media programs that offer deeply discounted membership fees, such as, but not limited to such programs as Groupon, Living Social, Scout Mob or other similar programs without the express written consent of Workout Anytime, which consent shall be at our sole discretion.

## SECTION 6 - RECORDS - LATE PAYMENT CHARGE

6.1     You must prepare on a current basis complete and accurate records concerning all financial, marketing and other aspects of the business conducted under this Agreement. You must maintain an accounting system which accurately reflects all operational aspects of the Club including uniform reports as may be required by Workout Anytime. Your records shall include tax returns, monthly reports, statements of Gross Revenue (to be prepared each month for the prior month) and profit and loss statements and balance sheets (to be prepared at least annually by a Certified Public Accountant). All financial data with respect to your business that is required will be for Workout Anytime's own use, will be kept confidential, and will not be made available to other franchisees, prospective franchisees, or other third parties except to the extent that Workout Anytime decides, or is required to make a "Financial Performance Representation" under the franchise disclosure laws. The records required under this Sub-section pertain only to your operation of the Club. Workout Anytime has no right to inspect or copy the records of any unrelated business activity you may have.

6.2     To encourage prompt payment and to cover the costs and expenses involved in handling and processing payments, you will also pay, upon demand, a late payment charge equal to the greater of; (i) one and one-half percent (1 1/2%) per month on all payments due to Workout Anytime for the period said payments are due and unpaid; or (ii) the highest rate of interest permitted by law. Each failure to pay Royalty Fees, National Brand Development Fees, Technology Fees, and other fees or amounts payable to Workout Anytime when due is a material breach of this Agreement.

6.3      Upon our written request you will make available the following records: An accurate set of books reflecting your Gross Revenues; all tapes and readout totals of cash registers or other point of sale devices; sales slips; order records of transactions with concessionaires and vendors; federal, state and city tax returns; banking records; accounts receivable; and such other records as may be needed for an effective audit of your gross sales. All such books and records shall be retained for a period of at least three (3) years after the end of each calendar year to which they relate, or if we have begun an audit, for such longer period as may be required to complete such audit. All such books and records shall be subject to inspection and audit by us at all reasonable times.

6.4     We will have the right to have an auditor of our choice make a special audit of all your books and records, wherever located, pertaining to your Gross Revenue. If your actual Gross Revenues exceed the figures you've submitted to us previously by more than two percent (2%) in any calendar year, then you will pay for the cost of such audit, otherwise

- 7 -

the cost of such audit shall be borne by us; and (ii) if such Gross Revenues shall be understated by four percent (4%) or more in any calendar year, or if the Gross Revenue is understated on three (3) or more occasions during the Initial Term, we will have the option to terminate this Franchise Agreement pursuant to the terms of Section 17.  You will promptly pay to us any deficiency in which is established by any audit including any applicable late fees or penalties.

6.5     You acknowledge and agree that the restrictions imposed above are reasonable and necessary to  protect the goodwill associated with the System and the Marks, as well as our reputation and image, and are for the protection of us, you, and all other franchisees that own and operate a Workout Anytime Club.

## SECTION 7 - SERVICES AND ASSISTANCE PROVIDED BY THE FRANCHISOR

7.1     The Initial Franchise Fee and Royalty Fees are paid for the License which includes the use of the Marks and the System, owner's training, and for certain services rendered by Workout Anytime.

7.2     Workout Anytime will offer you initial and continuing services as Workout Anytime deems necessary or advisable in furthering the business of your Club, and the business of the System as a whole, in connection with protecting the Marks and goodwill of Workout Anytime. Failure of Workout Anytime to provide any service whether specifically described herein, either initially or continuing, will not excuse you from paying the Initial Franchise Fee or the fees set forth in Section 4 herein.

7.3     Initial and continuing services provided by Workout Anytime are:

A.     Equipment orders will be placed through our affiliate, Commercial Fitness Products, Inc. with our assistance and guidance. We will help the franchisee determine the proper amount of time between equipment orders, equipment delivery, and their set-up to ensure the proper opening of your Club.

B.     Designation of your exclusive Territory.

C.     Furnishing you with specifications or guidelines for all initial and replacement equipment, inventory and supplies required for the operation of your Club.

D.     Providing you or your designated manager (the "Manager") and up to one (1) other person with an initial training program. You and your Manager must attend and satisfactorily complete the initial training program prior to opening the Club. The initial training program will be conducted approximately nine (9) to twelve (12) weeks prior to the opening of your Club.

Franchisee must attend to conclusion, all required pre-opening training, which will not be waived under any circumstances. You will be responsible for travel and living expenses incurred by you or any of your employees who participate in the training program. The initial training and orientation program will be held at our headquarters or at another location that we designate and will include a minimum of thirty (30) hours of training time. Training will consist of a discussion of the System, equipment use, administrative procedures, hiring/training employees, customer service, marketing, sales, accounting, support procedures and

instructions on quality standards and practical experience in the operation of a Workout Anytime health club facility. You will likewise receive on-site training by a Workout Anytime trained individual.

E.      Assistance with respect to pre-opening, opening activities and/or on-going operations or training will be available as requested by Franchise owner. On-site training assistance during opening week is optional, pending availability of Workout Anytime representatives, with you bearing the costs associated with our representative being on-site at your request.

F.      Formulation of marketing plans, advertising and promotional programs and materials.

G.      Providing a service number and the Workout Anytime email platform available for your on-going inquiries and consultations with Workout Anytime representatives.

H.      The development of new products and service methods for the successful operation of the System as deemed beneficial at the sole discretion of Workout Anytime.  You will be informed of any new product or service methods and adopt same within a reasonable specified period of such notification.

I.      We will loan you, or provide you with access to the electronic version of one (1) copy of the Manual (defined below) containing mandatory and suggested specifications, standards, operating procedures and rules prescribed from time to time by Workout Anytime.

J.      We will make commercially reasonable efforts to negotiate favorable prices and terms with major suppliers and allow you to utilize such centralized purchasing system.

K.      Workout Anytime may conduct visits by our field representatives from time to time. These visits, as determined necessary by Workout Anytime, will be within the sole discretion and at the sole expense of Workout Anytime.  Notwithstanding the forgoing, within six (6) months after you open your Club, we will send a representative to visit and inspect your Club, and will thereafter provide to you a written report with respect to same.

L.      We may delegate certain of our obligations as set forth in this Section 7 to an Area Representative or contractor in certain geographic regions.


### SECTION 8 - LOCATION OF HEALTH CLUB FACILITY; CONSTRUCTION AND OPENING FOR BUSINESS; LEASE OR MORTGAGE

8.1     The Development Agreement will designate a site selection area in which you will locate the Club.  If no location is specified in Exhibit "L" at the time you sign the Franchise Agreement, you, at your own cost and expense, will be solely responsible for locating and designating a location and for constructing and equipping the Club at the location in accordance with the System within six (6) months of the date of this Agreement. The location you choose to operate your Club must be approved by Workout Anytime. Because of our interest in the location, Workout Anytime may request, information regarding the cost of acquisition, development and construction. Any location inspection

WOATFDD042017v1

will be made solely at the option of Workout Anytime and will not be deemed to impose either any responsibility on Workout Anytime for the construction of the health club facility, or any warranty or representation of any kind, express or implied, as to its fitness or suitability. Upon its designation, the approved location will be the location specified in Exhibit "L".

8.2     You and Workout Anytime acknowledge that the location of the Club is a crucial factor in the Club's potential for success and Workout Anytime may reject any location, in our sole discretion, but we will not unreasonably withhold our consent to any location. Workout Anytime makes no representations or warranties with respect to the availability of appropriate locations, or the suitability or potential of locations, which it may approve.

8.3     Workout Anytime will assist you in analyzing a location for your Club. There are general methods used by Workout Anytime to assist you in your selection of a location for your Club. Workout Anytime assists in the location selection by ascertaining population density and proximity of the proposed location to any other Workout Anytime location(s). Workout Anytime does not hold itself out as a real estate expert and does not undertake to advise as to the suitability of any location. Our approval of a proposed location merely reflects our belief that the proposed location appears to be suitable for the development of a Club.

8.4     You must secure a location for your Club by purchase or lease which meets our approval within one hundred eighty (180) days of the execution of this Agreement. You agree to construct (or renovate), equip and open the health club facility at your expense in a good, workmanlike manner on or within twelve (12) months from this Agreement date, unless otherwise agreed between you and us in writing. The construction (or renovation) will conform to all applicable requirements of local authorities and will be in accordance with the standards and general specifications of the System. You must use Franchisor's approved architect to prepare plans for the construction of the Club.   You must submit your construction plans to us for our review.

8.5     You may not open your Club until  all construction has been satisfactorily completed, your Managers and all employees have been trained, the Club is ready for opening in all other respects (including signage, inventory, fixtures and equipment), the Initial Franchise Fee has been paid in full, all State and local requirements to operate a health club facility have been satisfied, Certificates of Insurance have been furnished in accordance with Section 13, you are in compliance with all terms of this Agreement including those set forth in Section 11, all items contained in an opening checklist have been completed to Workout Anytime's satisfaction, and you have met your Pre-Sale Membership obligations. You acknowledge that your opening for business prior to completely satisfying all the above conditions will cause irreparable damage to Workout Anytime's goodwill and reputation.

8.6     If you lease the health club facility:

A.     You and your Landlord must enter into our Lease Addendum, attached hereto as Exhibit M.

B.     You will install the maximum sized signage allowed by either your lease or local government. All signs, advertising, logos or other forms or insignia pertaining to the System are to be removed from the premises demised under the lease in the event that neither you nor Workout Anytime, or its designee, is the tenant under

- 10 -

the lease upon termination of the Agreement. Workout Anytime must approve the proposed sign, including color, font and dimensions prior to proceeding to construction of sign.

C.      You must utilize the services of our preferred vendor, Horizon Properties, to assist in your site search and lease negotiation and to ensure the site meets Workout Anytime criteria. You will not be charged by Horizon Properties for this service as such commissions are regularly absorbed by the Landlord. Should you not wish to utilize Horizon Properties, however, you will be charged a fee of One Thousand Five Hundred ($1,500.00) Dollars for the costs associated with our site approval and lease review.

D.      You may not expand the Club or lease additional adjoining space to the club without the express written consent of Franchisor, which consent shall be at Franchisor's sole discretion.


## SECTION 9 - MAINTENANCE AND UPGRADING THE CLUB

9.1     Subject to the terms of this Section, and particularly Sub-section 9.2 below, you will always comply with all reasonable Workout Anytime standards, specifications, processes, procedures, requirements and instructions regarding your Club's physical facilities (the "Premises"), including the layout of furnishings, fixtures, and equipment, as are set forth in the Manual or in accordance with System Standards.

9.2     You will repaint the interior of the Premises a minimum of every three (3) years (or, as needed upon inspection by Workout Anytime in compliance with its reasonable standards), and remodel or upgrade the Club and all fitness equipment in the Club at your cost in accordance with our reasonable standards every five (5) years and at the time of renewal of this Agreement. You will also pay the cost of adding equipment or altering the Club for services and/or new equipment you choose to add, or that you are required to add, pursuant to Sub-section 11. **(YOU AFFIRMATIVELY ACKNOWLEDGE THAT AN ADDITIONAL INVESTMENT WILL BE REQUIRED PURSUANT TO THIS SUB-SECTION.)**

9.3     At any time during the Term, Workout Anytime reserves the right to require that you include as an option in your contract with your members a provision calling for the collection of a yearly one (1) time "Club Enhancement Fee" of Twenty-Five ($25.00) Dollars. This fee may be charged and collected in a single instance from all your Club's members at any time or designated month you specify. Within thirty (30) days of said monies' collection you will inform Workout Anytime of the total amount collected and specify in writing how you propose such monies be expended, be it on additional or upgraded equipment or improvements on the Premises of your facility. Workout Anytime will then either approve your proposal, or make suggestions as to an alternative that such monies might best improve your facility for use by your members within ten (10) days of your submission of same.

9.4     You must include in your membership contract a provision requiring your members to pay an annual "rate guarantee fee" of Twenty-Nine ($29.00) Dollars. This fee may be collected from your Club's members at the time of the signing of their initial contract, or within sixty (60) days of signing, and then annually thereafter as the membership contract is renewed.  Workout Anytime encourages you to utilize these monies in furthering the

goals and objectives of your Club by improving your Club's equipment, signage, flooring, painting, etc.

9.5     You will maintain your Club and any parking areas in good and safe condition   If you fail to maintain your Club in a condition that satisfied our reasonable requirements, we may, upon not less than three (3) days' written notice to you, order or accomplish the cleaning of the Premises, and you will be responsible for paying to us all costs we incur by doing so.

## SECTION 10 - CONFIDENTIAL OPERATIONS MANUAL

10.1    We will provide you with a copy or grant you access to the electronic version of the Workout Anytime Confidential Operations Manual (the "Manual"). The Manual will remain the sole property of Workout Anytime. You agree to immediately return the Manual to Workout Anytime at the expiration or termination of this Agreement.

10.2    You will treat the contents of the Manual as confidential and will not copy or otherwise reproduce, in whole or in part, or in any way make the contents of the Manual available to any person other than those persons employed by you to whom disclosure is necessary to enable you to operate the Club.

10.3    Workout Anytime may amend, revise and enhance the Manual and other instructional material (including its website) at any time in its sole discretion.

10.4    You agree to operate the Club in accordance with the Manual and Franchisor's website, and to be responsible for assuring compliance with the standards, specifications, requirements and instructions set forth in the Manual and Franchisor's website.

10.5    The contents of the Franchise resource section of the Workout Anytime website is deemed to be part of the Manual.

10.6    Franchisee acknowledges that because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor specifically reserves the right and privilege, at its discretion and as it may deem in the best interests of the System, to vary standards for any franchisee based upon the peculiarities, particularities and circumstances of a specific site (i.e., landlord requirements, business potential, population of trade area, existing business practices,  or any condition which Franchisor deems to be of importance to the successful operation of such franchisee's franchised business).  Franchisee shall not be entitled to require the Franchisor to grant to it a like or similar variation which Franchisor may offer or permit to another franchisee.

## SECTION 11 - FRANCHISEE'S DUTIES AND OBLIGATIONS

11.1    Consistent with the terms of this Agreement, you will diligently develop the business of your Club and use your best efforts to market and promote its core services and products.

11.2    Subject to the terms of this Agreement, including Sub-sections 9.2 and 10.4, during the Term you will comply with all present and future reasonable standards, specifications, processes, procedures, requirements and instructions regarding the operation of the

- 12 -

Club as set forth in the Manual. In furtherance of such, you must comply with the following requirements:

A.      A complete set of exercise equipment must be initially ordered only through Workout Anytime or another approved supplier, as may appear in the Manual, or as supplemented in the owner's section of Workout Anytime's website.

B       You must conduct pre-opening sales ("Pre-Sales") for your Club in accordance with our standards and Manual.

C.      You or your Manager must devote its full time and best efforts to the management and operation of the Club.

D.      You and your Manager must attend and satisfactorily complete the Workout Anytime initial training program. Attendance by you or your operating manager (if any) is compulsory and must be satisfactorily completed at least two (2) weeks prior to the opening of your Club.

E.      Any additional service or product introduced into the System by Workout Anytime must be offered for sale on a continuing basis at your Club at the time and in the manner required by Workout Anytime.

F.      You may only offer services and products for sale at your Club that has been approved by Workout Anytime in the Manual or otherwise in writing.   Workout Anytime reserves the right, in its sole discretion, to disallow any service or product that you have requested permission to offer.

G.      Only signs, advertising and promotional material, services, equipment, supplies, uniforms, furnishings, color/design scheme and fixtures that meet Workout Anytime standards and specifications can be used at your Club or in the promotion or marketing of your Club.

H.      All equipment, signs, products, supplies and other items necessary to add new services or products must be acquired, installed and utilized at Franchise Owner's expense within sixty (60) days of notice from us.

I.      Your Club, and everything located at and within your Club, must be maintained in a safe and presentable condition and in compliance with the highest standards of cleanliness, including restrooms and showers, changing rooms and utility closets. The Club must be adequately lighted and operated in a clean and wholesome manner consistent with Workout Anytime requirements as such may be established and modified from time to time. The flooring must be new or in good condition. Appropriate window treatments must be installed to allow for the comfort and privacy of your members. All maintenance, repairs and replacements requested by Workout Anytime must be promptly made.  All consultants and employees of the Club must be clean and neat in appearance and must always wear approved apparel and/or uniforms.

J.      No alterations of the Club which materially affect the image of the Club may be made except at Workout Anytime's request or approval, and any alterations must conform to specifications and requirements established or approved by Workout Anytime in its sole discretion.

K.    The Club and its business must comply with all applicable State and local laws, ordinances, rules, codes, regulations and other requirements.

L.    Advertising materials provided to you by Workout Anytime for your use may be used only in the manner intended to promote the business.  Any advertising materials which you might create must first be submitted to us for approval prior to your use of same.

M.    The Club must be open for business twenty-four (24) hours every day during the License Term, except days the Club is closed for repairs pursuant to Section 15.

N.    The employees, the equipment and supplies, inventory and other items on hand at your Club must always be sufficient in quality and number to efficiently meet the current and anticipated volume of your business.

O.    All debts and taxes arising from the Club and its business, except those duly contested in a bona fide dispute, must be paid when due including debts payable to your landlord, lender/financer, third party vendors, and both Workout Anytime and our affiliates.

P.    All necessary and appropriate measures must be taken to avoid an unsatisfactory sanitation or health rating by or from any governmental agency or authority. Conditions or practices disapproved by any such agency or authority must be promptly corrected.

Q.    All your dealings and transactions with Workout Anytime members, customers, suppliers and other franchisees are to be performed fairly and honestly. You will not permit a non-member access to either your or another franchisee's Workout Anytime health club facility unless such is on an introductory or trial basis, and then only for a maximum of thirty (30) days. You will not persuade or entice another franchisee's employee or members originating at their Club to terminate their employment or membership to have such employee or member become associated with your franchised location.

R.    You are obligated to allow Workout Anytime reasonable space at your point of sale counter or another reasonable location inside the Club for a franchise recruitment advertisement. You are also responsible for the restocking and upkeep of that display, should one be used. Workout Anytime will be responsible for the cost of producing the advertisements.

S.    You are solely responsible for recruiting new customers to their Club through advertising, marketing and business networking.

T.    You are responsible for keeping up to date on competitors. This includes an awareness of competitors' pricing, promotional offers, advertising and services. You are responsible for taking direct action, as appropriate, and as authorized by Franchisor, to respond to a competitors' activities.

U.    You must provide training to your employees in a fashion like that which you and your Manager received from Workout Anytime's representatives.

V.    In accordance with your State's Health Club Act requirements (if any such law or

- 14 -

its equivalent exists for your geographic area or jurisdiction), you are responsible for arranging for obtaining all health club certifications and licensing prior to opening.

W.    **If they indicate a desire to do so, you <u>must</u> permit members of any other Workout Anytime franchised location the use of your Club.** You understand and agree that all Workout Anytime members, regardless of their originating membership location, are an integral component of the Workout Anytime System.  As such, they are to be treated with the same courtesy and respect you regularly extend to a member originating from your Club. This membership reciprocity includes access to tanning, personal training, massages, etc., if the member has purchased a membership that includes premium services at their originating Workout Anytime club.  You must permit those members to utilize such premium features at your Club to promote a positive experience for both you and the member. **Your failure to comply with Franchisor's reciprocity policy as stated in this Section is a material breach of this Agreement.**

X.    You must supply us with a copy of the lease governing your Club premises, and ensure that Workout Anytime is included as a party to be notified in any instance, as well as our being able to exercise an option to take possession of the facility upon your default or termination should we, in our sole discretion, wish to do so. **Such option will be secured by your submission to your landlord of Exhibit "M" attached hereto.**

Y.    You agree to never transfer members of your Club to any other Workout Anytime club without the express written permission of both the member and Workout Anytime.   During or after the termination or expiration of this Agreement, you will never transfer, or attempt to transfer, any individual's membership to any club that is not a part of the System.

Z.    You will immediately notify us of any legal action or proceeding by an individual or agency against you relating to your Club.

AA.   You acknowledge that when we may be required to perform any service for you, we may use third parties, including affiliates of ours, to perform those services.

BB.   Upon the reasonable request of the Franchisor, the Franchisee will present to its members such evaluation forms as are periodically prescribed by Franchisor and shall participate or request its members to participate in any marketing surveys performed by or on behalf of Franchisor.

CC.   If the Franchisee is an entity other than a single individual, then you must supply us with copies of the corporate Articles of Incorporation and Certificate of Existence, partnership or joint venture agreement, company Articles of Organization if the entity is a limited liability company, or any other document attesting to the legal form of the Franchisee.

DD.   Once an individual joins your Club, and for so long as his/her membership remains in effect that person's membership fees are paid solely to you. Accordingly, except for personal training fees which might be purchased at a non-originating franchised location, only you are to receive fees associated with such individual's Workout Anytime membership regardless of the degree such member uses another franchised location.

11.3    In prescribing standards, specifications, processes, procedures, requirements or instructions under Sub-section 11.2 or any other provision of this Agreement, Workout Anytime will assist in general market research and provide guidance in determining the prices charged by you for services or products of any kind. Workout Anytime will not have control over the day-to-day operations of the Club. Unless otherwise provided for herein, you are expected to establish your own prices as to all products or services <u>other than</u> both individual/family and corporate membership rates or costs which you understand and agree are to be established solely by Workout Anytime, from time to time, as it may determine in its sole discretion.

11.4    Workout Anytime and our representatives or designated contractors will have the right to enter, inspect and photograph your Club at any time (it being understood by the parties that the facility is a club operating twenty-four (24) hours a day, seven (7) days a week), and our representatives will have the right to discuss with you or other people you may designate all matters that may pertain to compliance with this Agreement and with Workout Anytime standards, specifications, requirements, instructions and procedures. You will in all respects cooperate with Workout Anytime's rights under this Sub-section provided that our exercise of these rights will not unreasonably interfere with the conduct of your business.

11.5    You agree during the Term and for three (3) years after the expiration and termination of this Agreement that you will supply to Workout Anytime your home address and telephone number(s) which Workout Anytime may include in its Disclosure Document.

11.6    If you are an individual, you or your Manager trained in the Workout Anytime system must directly supervise the franchised business. If you are a corporation or other entity, or if you have in Workout Anytime's sole judgment, insufficient experience in a business like a Workout Anytime franchise or experience in business management in general, then you will nominate an operating partner or Manager having the required experience who will have direct responsibility for all operations of the Club. Any change in the operating partner or Manager will be subject to the approval of Workout Anytime. The operating partner will be the correspondent referred to in Sub-section 20.9 below.

11.7    **Attendance at Annual Convention.** Franchisor may hold an annual conference (the "Convention") at a location we select. We will determine the topics and agenda for the Convention to serve the purpose among other things, of updating franchisees on new developments affecting franchisees, exchanging information between franchisees and our personnel regarding business operations, and recognizing franchisees for their achievements. Franchisee or Franchisee's representative must attend the Convention and to pay our then-current registration fee. If we charge a registration fee for the Annual Convention, you must pay the fee regardless of whether you attend. All expenses, including Franchisee's and Franchisee's employees' transportation to and from the Annual Convention, and lodging, meals, and salaries during the Annual Convention, are the responsibility of Franchisee.

11.8    **Ownership of Member Information and Data.** Franchisee acknowledges and agrees that Franchisor is the owner of all information concerning the members of the Club and that Franchisee may not disclose, sell or encumber such information or data to any person or entity during the Term or following the termination, expiration, or non-renewal of this Agreement.

11.9    **Employee Matters.** You are solely responsible for the day-to-day operation of your Franchised Business and its employees. You will be solely responsible for recruiting and

WOATFDD042017v1

hiring the persons you employ to operate the Franchised Business.  You are responsible for their training, wages, taxes, benefits, safety, schedules, work conditions, assignments, discipline and termination.  At no point will you or your employees be deemed to be employees of Workout Anytime Franchising Systems, LLC.

(a)     Franchisee shall obtain from each of its personnel an acknowledgement signed by such personnel that such individual understands, acknowledges, and agrees that he or she is an employee of Franchisee and not Franchisor and that such individual shall look solely to Franchisee for his or her compensation and for all other matters related to their relationship with Franchisee.

(b)     Franchisee shall post a notice on an employee bulletin board clearly visible to employees at the Franchised Business notifying all employees of their employer and clearly stating that neither Franchisor nor its affiliates are an employer of the employees.

(c)     Franchisee's employees are not Franchisor's agents or employees and Franchisor is not a joint employer of these individuals.  Franchisee is solely responsible for performing all administrative functions of the Franchised Business, including payroll and providing worker's compensation insurance.  Franchisee acknowledges that it is not economically dependent on Franchisor and that Franchisor does not provide facilities, equipment or house or transport Franchisee's employees or provide to Franchisee employees tools or materials required for Franchisee's employees to perform services for Franchisee.

## SECTION 12 - PURCHASE OF EQUIPMENT, INVENTORY AND SUPPLIES

12.1    You must purchase all exercise equipment through Workout Anytime or an approved supplier/vendor as shall be listed in the Manual which we provide to you, or through the franchise resource section of our website. Commercial Fitness Products, Inc. is currently the sole approved vendor of approved fitness equipment.    You must furnish all items, including apparel, which bear the marks, only from our approved supplier.

**ALTHOUGH APPROVED BY US, WE AND OUR AFFILIATES MAKE NO WARRANTY AND EXPRESSLY DISCLAIM ALL WARRANTIES, INCLUDING WARRANTIES OR MERCHANTABILITY AND FITNESS FOR ANY PURPOSE, WITH RESPECT TO FIXTURES, FURNITURE, EQUIPMENT (INCLUDING, WITHOUT LIMITATION, ALL EXERCISE EQUIPMENT), SUPPLIES OR OTHER APPROVED ITEMS.**

12.2    The standards and specifications for other equipment, supplies and other products recommended by Workout Anytime may be found in the Manual or at the franchise resource section of the Workout Anytime website.

12.3    You may not purchase other items from any other non-approved supplier/source unless approved by Workout Anytime Franchising Systems, LLC.

12.4    Workout Anytime may review at any time the quality of the equipment, products and other supplies anticipated to be purchased for your club to ensure that quality standards of the System are met.    Any deficiencies as to either quality or quantity must be addressed and corrected within that reasonable period which Workout Anytime may designate.

- 17 -

## SECTION 13 - INSURANCE AND INDEMNIFICATION

13.1    Upon commencement of the License Term, you will purchase, and maintain in full force, at all times, during the Term of this agreement, an insurance policy with those limits equal to or greater than those outlined below. Copies of all insurance policies must be provided to Workout Anytime prior to the opening of your Club and within thirty (30) days of such policies' renewal date:

      A.     Workers' Compensation insurance in amounts prescribed by law;

      B.     Fire and lightning, extended coverage, theft, vandalism and malicious mischief, flood (if the health club facility is in a designated flood hazard area), and sprinkler leakage insurance on your health club facility;

      C.     Comprehensive general liability insurance and product liability insurance coverage in such amounts and upon such terms as may from time to time be customary for retail businesses located in your Territory, but not less than $2,000,000, insuring both you and Workout Anytime against all claims, suits, obligations, liabilities and damage, including attorney's fees, based upon or arising out of actual or alleged personal injuries or property damage relating to the use or condition of the health club facility; and, name Workout Anytime Franchising Systems, LLC as an additional insured.

      D.     Such additional insurance as may be required by the terms of any lease or mortgage for the Club.

13.2    All policies of insurance required under this Section will be with insurers qualified to do business and in good standing in the State where your Club is located, and will be in a form reasonably satisfactory to Workout Anytime. Prior to opening for business, you will furnish to Workout Anytime certificates issued by each of your insurers indicating that all premiums due have been paid, that all required insurance is in full force and effect and that the insurance will not be terminated or changed without at least thirty (30) days' prior written notice from the insurer to both yourself and Workout Anytime Franchising Systems, LLC. New certificates evidencing renewal of insurance will be furnished at least thirty (30) days prior to the date of expiration of each policy. Within five (5) days of any request by Workout Anytime you will deliver a copy of all insurance policies to Workout Anytime for its examination and confirmation.

13.3    If you fail to obtain or maintain adequate insurance as set forth herein then Workout Anytime may, at its election and sole discretion, obtain insurance for and in your name and its name. Within five (5) days of any written request by Workout Anytime you will pay all costs and premiums incurred by Workout Anytime in obtaining such insurance, plus an administrative fee equal to ten (10%) percent of such insurance premium's cost to Workout Anytime.

13.4    You will indemnify, defend and hold Workout Anytime harmless against all claims, demands, losses, damages (including punitive damages), costs, suits, judgments, penalties, expenses (including reasonable attorneys' fees and amounts paid in settlement or compromise) and liabilities of any kind, whether or not ultimately determined to be meritorious, including damages suffered by you or any of your property or property interests (collectively, "Damages"), arising directly or indirectly out of, or in

- 18 -

connection with, the construction, operation, maintenance or occupancy of your Club, except to the extent that such liabilities arise from the gross negligence or willful acts or purposeful omissions of Workout Anytime.

13.5   All fixtures, equipment, signs, merchandise, supplies and other property on or about your Club will be at your sole risk and hazard, and if they are destroyed or damaged in any way, no part of the loss or damage shall be paid by Workout Anytime except to the extent caused by Workout Anytime's gross negligence or willful acts.

## SECTION 14 - TRADEMARKS AND TRADE SECRETS

14.1   You recognize and acknowledge Workout Anytime's exclusive ownership and right to Workout Anytime's current and future Marks and in all related practices, procedures, methods and devices. All goodwill now or in the future associated with or relating to the Marks will accrue directly and exclusively to the benefit and is the property solely of Workout Anytime. Nothing contained in this Agreement will be construed to entitle you any right, title or interest in the Marks, or the goodwill now or in the future associated with them, other than the rights and license expressly granted in this Agreement.

14.2   You represent, warrant and agree that you will not:

A.   Directly or indirectly contest or aid in contesting, either during or following termination of this Agreement, the validity or ownership of the Marks;

B.   Take any action in derogation of Workout Anytime claimed rights whether now existing or later obtained;

C.   Include the Marks in either your corporate, limited liability company, or partnership name, or in any internet domain name; or,

D.   Utilize the Marks in any advertising or promotion that has not otherwise first been approved, in writing, by Workout Anytime.

14.3   You agree to use only Workout Anytime existing or future Marks, and related practices, systems, procedures and methods for the promotion and operation of the Club, and only in accordance with the written procedures established by Workout Anytime.

14.4   You will cause Workout Anytime Marks to be reproduced exactly and accurately.

14.5   Except for the registration of a "d/b/a" or a fictitious name certificate for the operation of the Club, **YOU WILL NOT REGISTER OR ATTEMPT TO REGISTER THE MARKS IN YOUR OWN NAME.** You may not use the Marks as any part of your entity name. The use or registration of the name "Workout Anytime" in any form or fashion other than what may otherwise be permitted herein will be deemed a material breach of this Agreement.

14.6   You will immediately inform Workout Anytime of any suspected, known or threatened infringement, piracy or challenge to the Marks, Trade Secrets, methods and procedures used in the System. You will assist and cooperate with Workout Anytime in acting, at Workout Anytime's sole expense, as Workout Anytime deems appropriate to protect the System. Workout Anytime will indemnify, hold you harmless, and will reimburse you for your liability and reasonable costs for defending the Marks.

- 19 -

14.7   Only the principals of the franchise entity, and that manager employed by the franchisee to operate the health club facility, may utilize the Workout Anytime email platform.

14.8   Immediately upon the expiration or sooner termination of this Agreement, you will:

A.   Cease and forever abstain from using any of the Marks including, but not limited to, the de-imaging and de-branding of the Premises;

B.   Take all actions necessary to cancel any d/b/a/ or fictitious name registration containing any of the Marks; and,

C.   Furnish Workout Anytime with evidence reasonably satisfactory to Workout Anytime of compliance with the foregoing obligations within thirty (30) days after any expiration or sooner termination.

14.9   You acknowledge that you took no part in creating or developing, have no prior knowledge of, and have no rights or claims in, or to, any element of the System. You agree that all materials loaned or licensed or made available to you will be kept confidential by you and will remain the property of Workout Anytime.

14.10   Except as specifically disclosed in the Disclosure Document, Workout Anytime represents and warrants to the best of Workout Anytime's knowledge that the Marks do not violate or infringe upon any rights of others.

14.11   You agree that any use or variant of the Marks which you may develop or originate which, in turn, may be approved and adopted by Workout Anytime becomes the sole and exclusive property of Workout Anytime.  You affirmatively waive all rights of whatever form or nature, arising under either common law or both state or federal law(s), and assign to Workout Anytime all prospective rights and interests in any intellectual property which utilizes either the present Marks themselves or any subsequent Marks which Workout Anytime may use, regardless of their originating source.

## SECTION 15 – LOSS, CONDEMNATION AND CASUALTY

15.1   You will promptly advise Workout Anytime upon your receipt of a notice of default or termination of your Club's lease or mortgage, or equipment lease or security agreement related to any purchase of equipment, and will promptly provide Workout Anytime a copy of the notice. You will also give Workout Anytime notice of any proposed taking of your Club, or any of your equipment, or any portion thereof through the exercise of the power of eminent domain, foreclosure, or any dispossessory action, at the earliest possible time. If the Club or a substantial part thereof is to be taken, the Club may be relocated within the area specified in Exhibit "L" or elsewhere with Workout Anytime's written approval in accordance with our relocation procedures. If you open a Club at another location in accordance with Workout Anytime's standards and general specifications within one (1) year of the closing of the old Club, the new Club will be deemed to be the Club licensed under the Agreement. If a condemnation, lease termination or mortgage default takes place and a new Club does not, for any reason, (other than those specified in Section 8) become the Club as provided in this Sub-section, then the License will terminate upon notice by Workout Anytime.

15.2    If the Club is damaged, you will expeditiously repair the damage.  If the damage requires closing the Club you will immediately notify Workout Anytime in writing, and will:

    A.    Relocate the Club as provided in Sub-section 15.1; or,

    B.    Repair or rebuild the Club in accordance with Workout Anytime's then existing standards and general specifications, and reopen the Club for continuous business operations as soon as practicable (but, in any event, within twelve (12) months after closing the Club), giving Workout Anytime thirty (30) days' advance written notice of the date of reopening.

       If the Club is not (or, in the opinion of Workout Anytime, cannot be) reopened in accordance with this Section, or relocated pursuant to Sub-section 15.1, the License will terminate upon written notice to you.

15.3    The Term will not be extended by any interruption in the Club's operations, except for an act of God that results in the Club being closed not less than sixty (60) days nor more than one hundred eighty (180) days. You must apply for any extension within thirty (30) days following the reopening of the Club. Except as provided in Sub-section 4.3, no event during the Term will excuse you from paying Royalty Fees or other fees as provided for in this Agreement.

15.4    In the event you receive a bona fide offer for the purchase of your Club, or any of its equipment or other assets, then in such event you will give Workout Anytime written notice of this offer.  The notice must set forth the name of the proposed transferee, and all other terms and conditions of the proposed transfer.  On receipt of the notice, Workout Anytime shall have the exclusive right and option during a period of sixty (60) days from the date of said notice, to purchase from the franchisee the assets proposed to be sold under the same terms and conditions contained in such bona fide offer to purchase.

## SECTION 16 - RESTRICTIONS ON COMPETITION

16.1    During the term of this Agreement, or any extensions or renewals and for a period of two (2) years following their expiration, termination, assignment or transfer, you will not directly or indirectly, through corporations, partnerships, limited liability companies, trusts, associations, joint ventures or other unincorporated businesses, perform any services for, engage to acquire, be an employee of, have any financial, beneficial or equity interest in, or have any interest based on profits or revenues of, any business that engages in or offers franchises for businesses that engage in or operate gymnasiums, fitness, personal training, or workout facilities, except for other health club facilities franchised by Workout Anytime or its affiliates, at the premises of the Club, or within twenty-five (25) miles of any Workout Anytime health club facility.

16.2    Nothing in this Section will prevent any active officer of yours or member of your family, either individually or collectively, from owning not more than five percent (5%) of the stock of any company, which is subject to the reporting requirements of Section 10 or Sub-section 13 (D) of the Securities and Exchange Act of 1934.

16.3    You will not at any time, during the term of this Agreement or any extensions or renewals and for a period of two (2) years following their expiration, termination, assignment or transfer, divert or solicit any member or former member of your Club or another Workout Anytime club to another workout or fitness facility other than a to a Workout Anytime

- 21 -

club.

16.4    You will not at any time solicit, employ, or otherwise attempt to employ or interfere with the employment relationship of any person who is either employed by Workout Anytime, or employed by any other Workout Anytime franchisee.

16.5    If any court having jurisdiction to determine the validity or enforceability of this Section determines that, strictly applied, it would by invalid or unenforceable, the scope of prohibited activities or the time or geographical provisions of this Section will be deemed modified to the extent necessary (but only to that extent) so that such restrictions as modified will be valid and enforceable.

16.6    You acknowledge that as a Workout Anytime franchisee you will have access to Workout Anytime Trade Secrets and confidential information and practices and therefore be in a unique position to use the special knowledge you will have gained while a franchisee. You acknowledge that a breach of the covenants contained in this Section will be deemed to threaten immediate and substantial irreparable injury to Workout Anytime. Accordingly, you agree that Workout Anytime will have the right, without prior notice to you, to obtain immediate injunctive relief without limiting any other rights or remedies.

16.7    If you are a legal entity, all officers, directors, stockholders, partners, members, trustees, beneficiaries and/or principals of you, the franchisee, and any persons controlled by, controlling or under common control with you must execute the Non-Competition, Non-Solicitation and Confidentiality Agreement attached hereto as Exhibit C.

16.8    You agree that the scope of the timetables and prohibitions set forth above are reasonable and necessary to protect us and the System (including other franchisees of the System). You agree that the above referenced prohibitions are permissively broad to prevent you from taking information, materials and training which Workout Anytime is providing to you on an ongoing basis and using them to either compete with us, or preempt or otherwise restrict our ability to enter new markets.

16.9    Franchisee acknowledges and confirms that the scope of the activities prohibited in this Section 16, as well as length of the term and geographical restrictions contained in this Section 16, are necessary to protect Franchisor's legitimate business interests and are fair and reasonable and not the result of overreaching, duress or coercion of any kind.

16.10   If Franchisee is an individual, Franchisee further acknowledges and confirms that his or her full, uninhibited and faithful observance of each of the covenants contained in this Section 16 will not cause any undue hardship, financial or otherwise, and that enforcement of each of the covenants contained in this Section 16 will not impair his or her ability to obtain employment commensurate with his or her abilities and on terms fully acceptable to him or her or otherwise to obtain income required for the comfortable support of himself or herself and his or her family, and the satisfaction of the needs of his or her creditors.

16.11   Franchisee acknowledges and confirms that its special knowledge of the Franchisor's systems and business (and anyone acquiring such knowledge through Franchisee) is such as would cause Franchisor and its franchisees severe injury and loss if he or she (or anyone acquiring such knowledge through Franchisee) were to use such knowledge to the benefit of a competitor or were to compete with Franchisor or any of its franchisees.

- 22 -

16.12 If any court shall hold that the time or territory or any other provision stated in this Section 16 constitutes an unreasonable restriction upon Franchisee, Franchisee agrees that the provisions of this Franchise Agreement shall not be rendered void, but shall apply as to time and territory or to such other extent as such court may judicially determine or indicate constitutes a reasonable restriction under the circumstances involved.

16.13 Franchisor, in its discretion, may reduce the scope of any covenants set forth in this Section 16. Any such reduction is effective immediately upon Franchisor's delivery of notice. Franchisee shall comply immediately with any covenant as so modified. Such modified covenant is fully enforceable to the extent permitted by applicable law.

## SECTION 17 - TERMINATION

17.1   **Termination by You.**

If you are in compliance with this Agreement and Workout Anytime materially breaches this Agreement and fails to cure the breach within sixty (60) days after a written notice of the breach is delivered to Workout Anytime by you, you may terminate this Agreement, effective ten (10) days after delivery to Workout Anytime of a notice of termination. There are no other provisions in this Agreement that grant you the right to terminate this Agreement, and such termination may only be accomplished as provided for herein, or by agreement of the parties.

Should you terminate this Agreement in compliance with this Sub-section, you are required to comply with the post-termination procedures as set forth in Sub-section 17.7.

17.2   **Termination by Workout Anytime Without Notice.**

The Agreement will immediately terminate without notice (or in the event notice is required by law, immediately upon the giving of such notice or at the earliest time thereafter permitted by applicable law) in the event that:

A.     No site has been designated and accepted pursuant to Sub-Section 8.1;

B.     A permanent or temporary receiver or trustee for the Club or all or substantially all of your property is appointed by any court, or any such appointment is consented to or not opposed through legal action by you, or you make a general assignment for the benefit of your creditors, or you make a written statement to the effect that you are unable to pay your debts as they become due, or a levy or execution is made on the License, or an attachment or lien remains on your health club facility;

C.     You lose possession or the right of possession of all or a significant part of the Club through condemnation, casualty, lease termination, mortgage foreclosure, equipment lease or purchase foreclosure, and the Club is not relocated or reopened as provided in Section 15;

D.     You contest in any court or preceding the validity of, or Workout Anytime ownership of, any of the Marks;

E.     A material breach of Section 11.2(W) or 18 (i.e. Transfer and Assignment) occurs;

or,

F.     You are a corporation or limited liability company and any action is taken which purports to merge, consolidate, dissolve or liquidate you without Workout Anytime prior written consent.

17.3   **Termination With Notice and Without Opportunity to Cure.** Franchisor has the right to terminate this Agreement upon notice without providing Franchisee an opportunity to cure for any of the following breaches or defaults:

A.     If Franchisee or Franchisee's principals are convicted of or plead guilty or no contest to a felony or take part in any criminal misconduct or other misconduct that negatively impacts the Licensed Marks or the operation of the Franchised Business;

B.     If Franchisee or Franchisee's Principal Owners commit any fraud or misrepresentation in the operation of the Franchised Business;

C.     If Franchisee or Franchisee's Principal Owners make any misrepresentation or omission in connection with Franchisee's franchise application, including but not limited to any financial misrepresentation;

D.     If Franchisee fails to complete the Initial Training;

E.     If Franchisee directly or indirectly files suit or makes any other formal legal claim against any of Franchisor's approved vendors;

F.     If Franchisor sends Franchisee more than 2 notices to cure pursuant to Sections 17.4, 17.5 or 17.6 hereof in any 12-month period, regardless of whether the breaches have been cured;

G.     If Franchisee or Franchisee's principals materially violate any provision hereof pertaining to the Licensed Marks or Confidential Information or misuse the Licensed Marks or Confidential Information;

H.     If Franchisee violates the in-term restrictive covenant contained in Section 15;

I.     If a levy of writ of attachment or execution or any other lien is placed against Franchisee or any of Franchisee's principals or any of their assets which is not released or bonded against within 30 days;

J.     If Franchisee or any of Franchisee's principals become insolvent;

K.     If Franchisee voluntarily or otherwise abandons the Franchised Business. The term "abandon" includes any conduct which indicates a desire or intent to discontinue the Franchised Business in accordance with the terms of this Agreement and will apply if Franchisee fails to operate the Franchised Business for a period of three (3) or more consecutive business days without Franchisor's prior written approval;

L.     Franchisee fails to maintain insurance or to repay Franchisor for insurance paid by it, or otherwise fail to adhere to the requirements of Section 13;

- 24 -

M.    Franchisee fails, within thirty (30) calendar days after notification of non-compliance by federal, state or local government authorities to comply with any law or regulation applicable to the Franchised Business;

N.    Any government action is taken against Franchisee that results in any obligation upon Franchisor which in Franchisor's sole judgment is uneconomical, not in the best interests of Franchisor, or would result in Franchisor having an unintended relationship or obligation; or

O.    If Franchisee commits any fraud, criminal acts or other misconduct or makes any misrepresentation or omission to Franchisor relating to any other agreement with Franchisor or Franchisor's affiliates.

17.4    **Termination Upon Notice and 5 Days' Opportunity to Cure.**  If Franchisee fails to pay as and when due any sums owed to Franchisor, any of Franchisor's affiliates, or any of Franchisor's major suppliers or vendors, Franchisor may terminate this Agreement upon after the expiration of five (5) days following notice to cure.

17.5    **Termination Upon Notice and 15 Days' Opportunity to Cure.** Franchisor has the right to terminate this Agreement if any of the following defaults remain uncured after expiration of the 15-day cure period:

A.    If any audit reveals that Franchisee has understated Franchisee's royalty or advertising payments by more than 2%, or if Franchisee has failed to submit timely reports and/or remittances for any two (2) reporting periods within any 12-month period;

B.    If Franchisee fails to commence operations of the Franchised Business by the required opening date, as described in Section 8.4 of this Agreement;

C.    If Franchisee fails to personally, or through an approved manager, supervise the day-to-day operation of the Franchised Business or fails to employ enough qualified, competent personnel as Franchisor requires from time to time;

D.    If Franchisee fails to maintain the strict quality controls reasonably required by this Agreement and/or the Operations Manual; or

E.    Franchisee fails to procure or maintain any licenses, certifications, or permits necessary for the operation of the Franchised Business.

17.6    **Termination With Notice and 30 Day Opportunity to Cure.** Franchisor has the right to terminate this Agreement after notice and expiration of a 30-day cure period if Franchisee fails to perform or comply with any one or more of the terms or conditions of this Agreement which are not specifically enumerated in Sections 17.2, 17.3, 17.4, or 17.5 of this Agreement, or any ancillary agreements between Franchisee and Franchisor or any agreement between Franchisee and any of Franchisor's affiliates.

17.7    **Effect of Termination.**

Should this Agreement expire or be terminated by any party and for any reason, all rights and obligations between you and Workout Anytime under this Agreement will terminate, except for Sub-sections 10.1 and, 10.2, Section 14 and 16, and Sub-section 17.7. In an instance of expiration or termination, you will cease to be a licensed participant in the System, and you will:

A.  Promptly pay Workout Anytime all amounts owing by you based on operations of the Club through the date of termination plus interest at the rate of eighteen percent (18%) per annum;

B.  Immediately discontinue the use of all Marks, signs, structures, forms of advertising, telephone listings and service, the Manual, and all materials and products of any kind which are identified or associated with the System and return all materials and products to Workout Anytime and, at our request, assign your Club's telephone number to Workout Anytime;

C.  Make no representation nor state that you are in any way approved, endorsed or licensed by Workout Anytime, or associated or identified with Workout Anytime or the System in any manner;

D.  Immediately take all steps necessary to amend or terminate any registration or filing of any d/b/a or fictitious name or any other registration or filing containing the Marks to delete the Marks and all references to anything associated with the System;

E.  Provide Workout Anytime the option to purchase required by Section 18.8;

F.  Comply with the provisions of Sub-sections 15.7 and 16.1; and

G.  Forfeit all rights to receive membership fees and other revenue through the monthly draft from the credit card processor as of the date of termination or expiration of this Agreement.

17.8    If, within thirty (30) days after termination of this Agreement by Workout Anytime, you fail to remove all displays of the Marks from the Premises which are identified or associated with the System, Workout Anytime may enter the Premises to effect removal. In this event, Workout Anytime will not be charged with trespass nor be accountable or required to pay for any displays or materials which it might remove from your facility.

17.9    If, within thirty (30) days after termination you have not taken all steps necessary to amend or terminate any registration or filing of any fictitious name or any other registration or filing containing the Marks, you hereby irrevocably appoint Workout Anytime as your true and lawful attorney-in-fact for you, and permit Workout Anytime, in your name, place and stead and on your behalf, to take action as may be necessary to amend or terminate all registrations and filings, this appointment being coupled with an interest to enable Workout Anytime to protect the System.

17.10   **Nonwaiver.**  Franchisor's delay in exercising or failing to exercise any right or remedy under this Agreement or Franchisor's acceptance of any late or partial payment due hereunder will not constitute a waiver of Franchisor's rights against Franchisee.

17.11   **Franchisor's Right to Withhold Services or Products.**  During any period of uncured default by Franchisee, Franchisor shall have the right to withhold or discontinue providing all services to Franchisee.

17.12   Franchisor's **Option to Purchase of Business and Inventory**. On the expiration or termination of this Agreement for any reason, we will have the right, but not the obligation, exercisable by written notice delivered to you at any time contemporaneously

- 26 -

with or after delivery of a notice of termination under this Agreement, or within thirty (30) days after the date of expiration, to purchase all or part of your physical assets used in the Club except your personal assets. There will be no compensation for goodwill, and the purchase price for such assets will be equal to their fair market value less such goodwill. If you and we cannot agree on the purchase price for the assets that we desire to purchase within ten (10) days following our exercise of this option to purchase, an independent appraiser we designate will determine the fair market value, and you and we will share equally the cost of the appraiser. Such appraiser's decision will be final and binding with no appeal therefrom. The closing of the purchase will take place at a location, and on a date, we choose, and will be completed in accordance with all applicable bulk sales laws. At closing, you will deliver to us a bill of sale for the assets, in a form acceptable to us. We will be entitled to set off against the purchase price any amounts you then owe us or any affiliate of ours, and to pay out of the purchase price any of your unpaid creditors.

17.13 **Alignment Deficiency Fee.**   In the event of default of its obligations under this Agreement by Franchisee, at Franchisor's sole discretion, and without waiver of any of Franchisor's rights under this Agreement, in lieu of the termination of this Agreement, Franchisor may impose a fee (the "Alignment Deficiency Fee") in an amount up to One Thousand Five Hundred ($1,500) Dollars per event of default.  Franchisee must pay the Alignment Deficiency Fee within three (3) days of Franchisor's demand.

## SECTION 18 – TRANSFER AND ASSIGNMENT

18.1    **General.**

Except with respect to your mortgage company or institutional lender (if any), none of your rights under this Agreement may be the subject of any pledge, lien, levy, attachment, or security agreement, or assigned or otherwise purportedly transferred through execution, foreclosure, or like action. None of your rights or obligations under this Agreement are assignable or transferable, without Workout Anytime's prior written consent, which will not be unreasonably withheld or delayed, and compliance in all other respects with the terms of this Section.

With and after each valid assignment of this Agreement pursuant to this Section, the assignee or assignees will have deemed to be you, the Franchisee, under this Agreement and will be bound and liable for all existing and future obligations of the Franchisee. No stockholder in any corporation, and no member of any limited liability corporation, which becomes a franchisee will have any rights as an individual under this Agreement because of his, her or its stock ownership or membership interest, and the name of such entity will not include any of the Marks.

18.2    This Agreement, and your rights and obligations arising under it, are personal to you only.   As used herein, the word "transfer" means the sale, lease, assignment, gift, mortgage, or transfer because of your death, bankruptcy, share exchange, or transfer by operation of law or otherwise, either directly or indirectly, voluntarily or involuntarily.   If you are a corporation or limited liability company, such includes a transfer, as defined above, of a fifty (50%) percent or more interest in your entity.   A transfer cannot occur unless the following conditions are first satisfied:

A.    There will be no material default in the performance or observance of any of your obligations under this Agreement or any other agreement with Workout

Anytime, and you recognize that the provisions of Section 16.1 *et seq.* will apply after the transfer or assignment has been approved and transacted;

B.  You have settled all outstanding accounts with Workout Anytime, its affiliates, all taxing authorities, and any third-party vendors;

C.  The proposed transferee is approved as a prospective franchisee, the sale price is appropriate, and Workout Anytime is paid a Transfer Fee in the amount of fifty (50%) percent of the then-current Initial Franchise Fee, unless the transferee is a corporation of which you are the majority stockholder, or said transfer is to either Workout Anytime itself or to an entity in which you own a fifty (50%) percent or more interest;

D.  The proposed transferee will execute our then current form of Franchise Agreement, and the proposed transferee will execute an Acknowledgement of Receipt of a then current copy of our Franchise Disclosure Document;

E.  The proposed transferee will pay for, attend and satisfactorily complete the training program for new franchisees unless;

    1.  The transferee is a current franchisee in good standing in the System; or,

    2.  The transferee is and has been a manager for a period of one (1) year or more of a Workout Anytime health club facility in good standing.

F.  The individual proposed transferee, or the stockholders, partners, members, trustees or beneficiaries of a proposed corporate, partnership, limited liability company, or trust transferee, will each execute a personal guarantee, jointly and severally guaranteeing the performance of the proposed transferee's obligation;

G.  The proposed transferee will have demonstrated to Workout Anytime that it has in all respects satisfied our standards applicable to new franchisees regarding experience, personal and financial reputation and stability, willingness and ability to devote his or her full time and best efforts to the operation of the franchised business, and any other conditions as Workout Anytime may reasonably apply in evaluating new franchisees. Workout Anytime must be provided all information about the proposed transferee as we may reasonably require. Because of the confidential information available to a franchisee, no assignment to a competitor or to any person or entity owning an interest in a competitive business of Workout Anytime will be permitted at any time;

H.  The parties to the proposed transaction will have entered into a binding agreement (a "Purchase Offer") subject only to the rights of Workout Anytime. Workout Anytime will be furnished a copy of this binding agreement.  You will advise each prospective transferee of this provision and other terms under this Agreement;

I.  You will sign a written agreement in a form satisfactory to us in which you agree to comply with and satisfy all post-term obligations set forth in this Agreement, and likewise agree to release both us and our affiliates from any claims which you may have against us, and from any further obligations which we may have to you;

- 28 -

J.  The proposed transferee agrees in writing to perform such maintenance, remodeling or re-equipping of the Club as we determine necessary to correct any then deficiencies to such club as we, in our sole discretion, deem necessary; and

K.  You agree that we may release to the prospective transferee all information we have with respect to your operation of the subject Club.

L.  The proposed transferee must not be engaged in a competitive business.

M.  The purchase price and terms of the proposed transfer are not so burdensome to the prospective transferee as to impair or materially threaten the transferee's ability to perform under the Franchise Agreement.

You acknowledge and agree that the above listed conditions are both reasonable and necessary to protect the goodwill associated with the Workout Anytime System and Marks, and are for the protection of us, you, and all existing and prospective franchisees that now own, or may own, a Workout Anytime Club.

18.3   If you are an individual and you desire to transfer your rights under this Agreement to a corporation,   partnership, limited liability company, or trust which you will newly form and of which you will be a majority shareholder, partner, member, trustee, beneficiary and/or an executive officer, you may do so only if:

A.  Your name remains on the Personal Guaranty;

B.  You continue to devote your full time and best efforts to manage the day-to-day operations of the franchised business unless you have an operational partner or Manager approved by Workout Anytime;

C.  The corporation's, partnership's, limited liability company's or trust's activities be confined exclusively to operate the franchised business;

D.  The corporation, partnership, trust and all officers sign an agreement with Workout Anytime assuming jointly and severally all your obligations under this Agreement; and,

E.  It is expressly understood that the assumption of your obligation by any corporation, partnership, limited liability company, or trust does not limit your personal obligations under this Agreement, and that you and the corporation, partnership, limited liability company, or trust will be jointly and severally liable.

18.4   Upon the death of an individual Franchisee, the rights granted by this Agreement may pass (without payment of any Transfer Fee) to the next of kin or legatees of the Franchisee, provided that your legal representative(s) will, within sixty (60) calendar days of your death, apply in writing to Workout Anytime for the right to transfer to the next of kin or legatee your rights under this Agreement. Workout Anytime will not unreasonably withhold its permission so long as the proposed transferee(s) meets each of the requirements set forth in Sub-section 18.2 without regard to Sub-section 18.2(C). Should such proposed transferee(s) not meet said requirements, then the kin or legatee will be required to sell the respective interests of the Franchisee within one hundred twenty (120) days of being notified of their not complying with Workout Anytime's requirements, and the provisions of Section 18.8 *et seq.* will also apply.

WOATFDD042017v1

18.5    Any attempt by you to transfer any of your rights or interest under this Agreement or the License, without having received Workout Anytime's prior written consent will be void and will constitute a material breach of this Agreement. However, if you die and your personal representative does not desire to sell the health club facility, and if under controlling local law your interest in the health club facility, and both the License and this Agreement are distributable to heirs or legatees who are members of his or her immediate family and who would otherwise qualify as assignees, then such attempted assignment by operation of law or will not be deemed a violation of the Agreement provided such heirs or legatees accept the conditions imposed on otherwise permitted assignees.

18.6    You do not have the right to grant a sub-franchise.

18.7    Workout Anytime may assign its rights under this Agreement as it sees fit at any time without notice to you.

18.8    If at any time from the date of this Franchise Agreement through the expiration of the Term or the earlier termination of this Franchise Agreement: (i) any person who owns at least a ten percent (10%) ownership or voting interest in Franchisee (or in any entity with an ownership interest in Franchisee) receives an at-arm's-length written offer from an independent third party to purchase any portion or all of such person's interest (the portion or all of such person's interest hereinafter referred to as the "Interest," and such offer later referred to as the "Interest Offer"); or (ii) if the Franchisee receives an at-arm's-length written offer from an independent third party to purchase any portion or all of Franchisee's interests under this Franchise Agreement or, outside the ordinary course of business, a material part or all of the assets used in the franchised business (such assets subject to the offer later referred to as the "Assets", and such type of offer later referred to as the "Asset Offer"), then Franchisee shall ensure that such person receiving the Interest Offer (the "Offeror") shall, if he or she desires to accept such offer, first offers to sell to the Franchisor the Interest or the Assets for the consideration and on the terms and conditions set forth in such third party's written offer. The Offeror's offer (the "Offer") shall be made by written notice to the Franchisor setting forth the name and address of the prospective purchaser, the price and terms of the Offer, a franchise application completed by the prospective purchaser, and any other information that Franchisor may reasonably request to evaluate the Offer, including any purchase and sale and related agreements proposed to be executed or executed by Franchisee or the third party. Franchisor shall then have the first option to purchase the Interest or the Assets by accepting the Offer within thirty (30) days after its receipt of the Offer and required information.

A.    If the Franchisor gives notice of acceptance of the Offer, then the Offeror shall sell the Interest or the Assets to the Franchisor, and the Franchisor shall purchase the Interest or the Assets from the Offeror, for the consideration and upon the terms and conditions set forth in the Offer, less any broker's commission not due if Franchisor exercises its right of first refusal but due and payable by the Offeror upon the sale to the prospective purchaser. Franchisor's creditworthiness shall be deemed at least equal to the creditworthiness of any proposed purchaser. If the Franchisor is a public company at such time having shares traded on a national securities exchange, the Offeror must accept the then-current value of Franchisor's registered shares in lieu of cash or other consideration.

B.    If an independent third party's written offer (and the Offeror's corresponding offer

- 30 -

to the Franchisor) provides for the purchaser's payment of a unique consideration which is of such a nature that it cannot reasonably be duplicated by the Franchisor, then the Franchisor may, in its notice of exercise, substitute cash or stock in an amount determined by mutual agreement of the Offeror and Franchisor within forty-five (45) days after the Offer is made or, failing such agreement, by an independent appraiser selected by Franchisor in its sole discretion.

C.    If the proposed sale includes assets of the Offeror not related to the operation of the franchised business, then the Franchisor may, at its option, elect to purchase only the assets related to the operation of the franchised business and an equitable purchase price shall be determined in the reasonable discretion of the Franchisor and allocated to each asset included in the proposed sale.

D.    Unless otherwise agreed by the Offeror and Franchisor, the closing of the purchase of the Interest or the Assets shall be held at a location designated by Franchisor on no later than the sixtieth (60th) day after the Offer is delivered to the Franchisor, provided that the closing of any such purchase for which a cash or stock consideration is determined in accordance with Sub-section 18.8(B) or 18.8(C) above shall be held on the fifteenth (15th) day after such cash or stock consideration is finally determined. At any such closing, the Offeror shall deliver to the Franchisor an assignment and other documents reasonably requested by Franchisor representing a transfer of ownership of the Interest or the Assets free and clear of all liens, claims, pledges, options, restrictions, charges and encumbrances, in proper form for transfer and with evidence of payment of all applicable transfer taxes by the Offeror. Franchisor shall simultaneously therewith make payment of any cash consideration for the Interest or Assets by a cashier's check, or payment by the issuance of Franchisor's registered shares, after set off against the amount due to the Offeror for all amounts the Franchisee owes Franchisor, if any. The remaining terms and conditions of such purchase and sale shall be set forth in the Offer.

E.    If the Franchisor does not accept the Offer as provided above, the Offeror shall be free, for a period of sixty (60) days after Franchisor has elected not to exercise its option, to sell the Interest or the Assets to the independent third party for the consideration and upon the terms and conditions specified in such third party's written offer, subject to full compliance with all terms and conditions of transfer required under this Franchise Agreement. It shall be a condition precedent to any sale of the Assets or the Interest to an independent third party that there is delivered to such third party an acknowledgment that the Assets or the Interest purchased by such third party is and shall be subject to the terms and conditions of this Franchise Agreement and that such third party agrees to be bound by the terms of this Franchise Agreement with respect to transferring the Assets or the Interest in the same manner as the Offeror. If the Offeror does not sell the Assets or the Interest or the Assets as provided above within the aforesaid sixty (60) day period, then any transfer by him or her of the Interest or the Assets shall again be subject to the restrictions set forth in this Franchise Agreement.

F.    In the event a proposed transferee is the spouse, son, or daughter of the Offeror, Franchisor shall not have any right of first refusal; provided, however, that all such transferees shall be subject to all the restrictions on transfer of ownership imposed on the Offeror under this Franchise Agreement.

WOATFDD042017v1

## SECTION 19 - MISCELLANEOUS

19.1    **Relationship of Parties.**

You neither have nor will you exercise any authority, express, implied or apparent, to act on behalf of or as an agent of Workout Anytime or any of its affiliates or subsidiaries, for any purpose, and will take no action which is intended to create an apparent employer-employee or agency relationship between you and Workout Anytime. You are, and will remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Club and its business and for all claims and demands based on damages or destruction of property or based on injury, illness or death of any person or persons, directly or indirectly arising from the operation of the Club. Workout Anytime will neither have, nor exercise the right to, the control of the day-to-day managerial operations of the Club.

19.2    **No Conflict with Other Agreements.**

You represent that you are not a party to or subject to any agreements that might conflict with the terms of this Agreement and agree not to enter any conflicting agreements during the Term.

19.3    **Cost of Enforcement**

If either party institutes or prevails entirely or in part in any action at law or in equity against the other party based entirely or in part on the terms of this Agreement, the prevailing party will be entitled to recover from the losing party, in addition to any judgment, reasonable attorney's fees, court costs and all the prevailing party's expenses about any action at law

19.4    **No Waiver.**

No failure, forbearance, neglect or delay of any kind on the part of Workout Anytime in connection with the enforcement or exercise of any rights under this Agreement will affect or diminish Workout Anytime right to strictly enforce and take full benefit of each provision of this Agreement at any time, whether at law for damages, in equity for injunctive relief or specific performance, or otherwise. No custom, usage or practice with regard to this Agreement by you or Workout Anytime other franchisees will preclude the strict enforcement of this Agreement in accordance with its literal terms. No waiver by Workout Anytime of performance of any provision of this Agreement will constitute or be implied as a waiver of Workout Anytime right to enforce that provision at any future time.

19.5    **Entire Agreement; Amendments.**

This Agreement, with any related agreements and all Exhibits, constitutes the entire understanding and agreement between you and Workout Anytime and supersedes all prior understandings, whether oral or written, pertaining to either this Agreement, the System or your Club. You acknowledge and agree that no claims, representations or warranty of earnings, sales, profits or success of your Workout Anytime health club franchise have been made to you other than those set out in Item 19 of the franchise disclosure document.  No interpretation, change, termination or waiver of any provision of this Agreement, and no consent or approval under this Agreement, will be effective or

- 32 -

binding upon you or Workout Anytime unless in writing signed by you and Workout Anytime, except that a waiver needs to be signed only by the party waiving. Nothing in this Agreement or in any related agreement, however, is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you.

19.6    **Severability.**

If any term or provision of this Agreement or the application thereof to any person, property or circumstances will to any extent be invalid or unenforceable, the remainder of this Agreement will be unaffected and will remain in full force and effect and each term and provision will be valid and enforced as fully permitted by law. Should this prove impractical in the sole discretion of Workout Anytime, then Workout Anytime will have the option of terminating this Agreement upon written notice to you.

19.7    **Governing Law.**

All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. Sections 1 et seq.).  Except to the extent governed by the Federal Arbitration Act, the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 et seq.) or other federal law, this Agreement, the franchise, and all claims arising from the relationship between Franchisor and Franchisee (and/or any of our affiliates) and Franchisee will be governed by the laws of the State of Georgia, without regard to its conflicts of laws rule.  Should however, the restrictive Covenants set forth in Section 16 and Exhibit C attached hereto herein be deemed unenforceable under Georgia law, the law of the state in which the Franchised Business is located, shall be applied solely to the interpretation and enforcement of those covenants. This Agreement will become a valid and enforceable contract when we accept it and sign it in Atlanta, Georgia. Franchisee and Franchisor expressly agree that this Agreement has been made in the State of Georgia, that substantially all performance of the obligations hereunder has been and will be rendered in the State of Georgia, and that there is a regular stream of business activity between Franchisee and franchisor from and into the State of Georgia. The Covenant Not to Compete in Section 16 and Exhibit C attached hereto of this Agreement shall be interpreted in accordance with the laws of the state in which the Franchisee is located.

19.8    **Arbitration.**

Except as specifically otherwise provided in this Agreement, and in the event, that you or Workout Anytime seek injunctive relief under this Agreement, each of us agree that all disputes between us, and any claims by either of us that cannot be amicably settled, will be determined solely and exclusively by arbitration in accordance with the then existing rules of the American Arbitration Association in Atlanta, Georgia subject to the following:

A.    A single arbitrator will be selected by the American Arbitration Association upon application of either you or Workout Anytime. Arbitration proceedings will be conducted in accordance with the rules then prevailing of the American Arbitration Association at its Atlanta, Georgia office. Judgment upon an award of the majority of the arbitrators will be binding, and will be entered in a court of competent jurisdiction;

B.    Nothing herein contained will bar the right of you or Workout Anytime to obtain injunctive relief against threatened conduct that would violate this

WOATFDD042017v1

Agreement and cause loss or damages.

19.9   **Venue.**

Nothing contained in this Agreement will prevent Franchisor or Franchisee from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard such party's interests. In the event of any litigation arising out of this Agreement or based upon the relationship between the parties, venue for any such litigation shall be any court of general jurisdiction in Fulton County, Georgia or the United States District Court for the Northern District of Georgia, Atlanta Division. Franchisee hereby accepts and submits to, generally and unconditionally, for itself and with respect to its property, the jurisdiction of any such courts in any such action or proceeding and hereby waives, to the greatest extent permitted by applicable law defenses based on jurisdiction, venue, or forum non conveniens.  The provisions of this Section 19.9 shall be self-executing and shall remain in full force and effect after the termination or expiration of this Agreement.  Franchisee acknowledges that this Agreement has been entered into in the State of Georgia, and that Franchisee is to receive valuable and continuing services emanating from Franchisor's headquarters in Atlanta, Georgia, including but not limited to assistance, support and the development of the System.

19.10   **Notices.**

All notices and other communications provided for in this Agreement must be in writing and will be delivered in person or mailed by certified mail, or by Federal Express or U.S. Express Mail for overnight delivery if to you, at your address or, if to Workout Anytime at our address, Attention: Steven C. Strickland, with a copy to Joseph J. Gottlieb, Esq., 1117 Perimeter Center West, Suite W400, Atlanta, Georgia 30338. Workout Anytime or you may change, by providing notice thereof in writing, the address to which future notices will be sent. Notices delivered in person will be deemed given when delivered and mailed notices will be deemed given three (3) days after mailing if by certified or other receipted mail, or one (1) day after mailing if by Federal Express or U.S. Express Mail. If you are a corporation, some other legal entity, or more than one (1) individual, then you will authorize one (1) natural person as correspondent with authority to bind you.

19.11   **Certain References.**

References to weeks and months mean calendar weeks and calendar months. References to persons mean legal entities as well as natural persons.  Whenever the pronouns "he" or "his" are used herein, such refers to the masculine, feminine and neutral genders, and the singular and plural. Except as otherwise specifically set forth in this Agreement, this Agreement will inure to the benefit of and be binding on you and Workout Anytime, our respective heirs, executors, administrators, personal representatives, successors and assigns.

19.12   **Patriot Act.**

You represent and warrant to us that (i) You are not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation, named by any Executive Order or the United States Treasury Department as a "terrorist", "Specially Designated National and Blocked Person", or other banned or blocked person, group, or nation (collectively, "Banned Persons") pursuant to any anti-terrorism law; (ii) You are not engaged in this

Franchise Agreement, or instigating or facilitating the execution of this Agreement, directly or indirectly on behalf of any Banned Person; (iii) You currently do not appear, and throughout the Franchise Term neither you nor any officer, director, shareholder, partner, member or other owner shall appear on any list of Banned Persons; (iv) no anti-terrorism law prohibits you from doing business with the Franchisee; (v) the Franchisee, its officers, directors, or principal shareholders, partner, member, or other owner of the Franchisee shall not, during the Franchise Term, violate any anti-terrorism laws; and (vi) Franchisee, its officers, directors, principal shareholders, partners or members shall not, during the Franchise Term do business with any party, individual, or entity that has violated or will violate any anti-terrorism laws.  For purposes of this Agreement, "anti-terrorism laws" shall mean Executive Order 13224 and related regulations promulgated and enforced by the Office of Foreign Assets Control, the Money Laundering Control Act, the United States Patriot Act, or any similar law, order, rule or regulation enacted in the future.  Franchisee hereby agrees to defend, indemnify, protect, and hold harmless Franchisor from and against all claims, damages, losses, risks, liabilities, fines, penalties, expenses (including attorneys' fees) and costs arising from or related to a breach of the foregoing representations and warranties.  The foregoing indemnity obligations of Franchisee shall survive the termination or expiration of this Agreement.

**19.13   Other Franchises.**

You acknowledge that other Workout Anytime franchisees have or will be granted franchises at various times and in different situations, and further acknowledge that the provisions of such franchises may vary substantially from those contained in this Agreement. You also acknowledge that because complete and detailed uniformity under varying circumstances may not be practical, there may be variations we grant to other of our Workout Anytime clubs (whether franchised or which our affiliates operate), and you will not be entitled to require us to grant similar variations or privileges to you.

**19.14   Release of Prior Claims.**

By executing this Franchise Agreement, Franchisee, and each successor of Franchisee under this Franchise Agreement forever releases and discharges Franchisor and its affiliates, its designees, franchise sales brokers, if any, or other agents, and their respective officers, directors, representatives, employees and agents, from any and all claims of any kind, in law or in equity, which may exist as of the date of this Franchise Agreement relating to, in connection with, or arising under this Agreement or any other agreement between the parties, or relating in any other way to the conduct of Franchisor, its affiliates, its designees, franchise sales brokers, if any, or other agents, and their respective officers, directors, representatives, employees and agents prior to the date of this Agreement, including any and all claims, whether presently known or unknown, suspected or unsuspected, arising under the franchise, business opportunity, securities, antitrust or other laws of the United States, any state or locality.

**19.15.   Modification of the System.**

FROM TIME TO TIME AFTER THE DATE OF THIS FRANCHISE AGREEMENT. FRANCHISOR MAY CHANGE OR MODIFY THE SYSTEM (INCLUDING THE TYPES OF GOODS AND SERVICES OFFERED BY THE FRANCHISED BUSINESS). FRANCHISEE SHALL ACCEPT, AND IS BOUND BY, ANY SUCH CHANGES IN THE SYSTEM AS IF THEY WERE PART OF THIS ORIGINAL FRANCHISE AGREEMENT AT THE TIME OF ITS EXECUTION. FRANCHISEE WILL MAKE SUCH EXPENDITURES AND SUCH CHANGES OR MODIFICATIONS TO COMPLY WITH

- 35 -

THE CHANGES OR MODIFICATIONS OF THE SYSTEM AS FRANCHISOR MAY REASONABLY REQUIRE.

19.16   **Acknowledgement.**

YOU ACKNOWLEDGE THAT YOU HAVE CONDUCTED AN INDEPENDENT INVESTIGATION OF THE WORKOUT ANYTIME SYSTEM AND RECOGNIZE THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT INVOLVES BUSINESS RISK AND WILL BE LARGELY DEPENDENT UPON THE ABILITY OF YOU AS AN INDEPENDENT BUSINESS PERSON. WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC EXPRESSLY DISCLAIMS THE MAKING OF, AND YOU ACKNOWLEDGE THAT YOU HAVE NOT RECEIVED, ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT;

YOU ACKNOWLEDGE YOU HAVE RECEIVED A COPY OF THE COMPLETE WORKOUT ANYTIME FRANCHISE AGREEMENT AT LEAST SEVEN (7) DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED. YOU FURTHER ACKNOWLEDGE THAT YOU RECEIVED THE DISCLOSURE DOCUMENT REQUIRED BY THE FEDERAL TRADE COMMISSION TITLED "FRANCHISE DISCLOSURE DOCUMENT" AT LEAST FOURTEEN (14) DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED;

YOU ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND THIS AGREEMENT, AND THAT WORKOUT ANYTIME HAS ACCORDED YOU AMPLE TIME AND OPPORTUNITY AND HAS ENCOURAGED YOU TO CONSULT WITH ADVISORS, COUNSELORS, AND BOTH LEGAL AND FINANCIAL PROFESSIONALS OF YOUR OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT;

YOU ACKNOWLEDGE THAT OTHER WORKOUT ANYTIME FRANCHISEES HAVE OR WILL BE GRANTED FRANCHISES AT VARIOUS TIMES AND IN DIFFERENT SITUATIONS, AND FURTHER ACKNOWLEDGE THAT THE PROVISIONS OF SUCH FRANCHISES MAY VARY SUBSTANTIALLY FROM THOSE CONTAINED IN THIS AGREEMENT.  YOU ALSO ACKNOWLEDGE THAT BECAUSE COMPLETE AND DETAILED UNIFORMITY UNDER VARYING CIRCUMSTANCES MAY NOT BE PRACTICAL, THERE MAY BE VARIATIONS WE GRANT TO OTHER OF OUR WORKOUT ANYTIME CLUBS (WHETHER FRANCHISED OR OPERATED BY OUR AFFILIATES), AND YOU WILL NOT BE ENTITLED TO REQUIRE US TO GRANT SIMILAR VARIATIONS OR PRIVILEGES TO YOU;

YOU ACKNOWLEDGE THAT THE SUCCESS OF FRANCHISEE IN OWNING AND OPERATING THE CLUB IS SPECULATIVE AND WILL DEPEND ON MANY FACTORS INCLUDING, TO A LARGE EXTENT, THE FRANCHISEE'S INDEPENDENT BUSINESS ABILITY. NO REPRESENTATIONS OR PROMISES, EXPRESS OR IMPLIED, HAVE BEEN MADE BY FRANCHISOR OR ANY EMPLOYEE, BROKER OR REPRESENTATIVE OF FRANCHISOR, TO INDUCE FRANCHISEE TO ENTER INTO THIS FRANCHISE AGREEMENT OR ANY RELATED AGREEMENT EXCEPT AS SPECIFICALLY INCLUDED IN THIS FRANCHISE AGREEMENT OR SUCH RELATED AGREEMENTS.   NO   EMPLOYEE,   OFFICER,   DIRECTOR,   BROKER   OR REPRESENTATIVE IS AUTHORIZED TO DO OTHERWISE;

IN ALL OF ITS DEALINGS WITH FRANCHISOR, ITS EMPLOYEES, BROKERS (IF ANY), AND OTHER REPRESENTATIVES, EACH HAVE ACTED ONLY IN A REPRESENTATIVE CAPACITY AND NOT IN AN INDIVIDUAL CAPACITY. THIS FRANCHISE AGREEMENT, AND ALL BUSINESS DEALINGS BETWEEN FRANCHISEE AND SUCH INDIVIDUALS AS A RESULT OF THIS FRANCHISE AGREEMENT, ARE SOLELY BETWEEN FRANCHISEE AND FRANCHISOR;

FRANCHISOR MAKES NO WARRANTY AS TO FRANCHISEE'S ABILITY TO OPERATE THE FRANCHISED BUSINESS IN THE JURISDICTION IN WHICH THE FRANCHISED BUSINESS IS TO BE OPERATED. IT IS INCUMBENT UPON FRANCHISEE TO SEEK OR OBTAIN ADVICE OF COUNSEL SPECIFICALLY WITH RESPECT TO THIS ISSUE. IN THE EVENT THAT LEGISLATION ENACTED BY, OR REGULATION OF, ANY GOVERNMENTAL BODY PREVENTS FRANCHISEE FROM OPERATING THE FRANCHISED BUSINESS, FRANCHISOR SHALL NOT BE LIABLE FOR DAMAGES NOR BE REQUIRED TO INDEMNIFY FRANCHISEE IN ANY MANNER WHATSOEVER OR TO RETURN ANY MONIES RECEIVED FROM FRANCHISEE.

This entire Agreement, including corrections, changes and all attachments and addendums, will only be binding upon Workout Anytime when executed or initialed by a member, director or officer of Workout Anytime.

**You and Workout Anytime, intending to be legally bound, have duly executed, sealed and delivered this Agreement in duplicate.**

FRANCHISEE: (For an Entity)                    FRANCHISEE: (For an Individual)

Woatchatt5, LLC

_____               _____
(Please print name and type of entity)         (Please print name)

*Jeff Landis*

_____               _____
By: (Signature of person signing for entity)    By: (Signature)

Manager

_____               _____
Title: (Title of person signing)                Date:

5/1/2018

_____
Date:

FRANCHISOR:  WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC

*Steven C. Strickland*

_____
By:  Steven C. Strickland, Its CEO

05/01/18

_____
Date:

- 37 -

# EXHIBIT B

## PERSONAL GUARANTY

## PERSONAL GUARANTY

**THIS GUARANTY** is made this _____ of _____5/1/2018_____, 201____, by the undersigned ("Guarantor"), for the benefit of WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC ("Franchisor").

### RECITALS

A. ___Jeff Londis, Troy Bage, Boston Londis___ is the Franchisee ("Franchisee") of that certain FRANCHISE AGREEMENT (the "FRANCHISE AGREEMENT") with Franchisor dated _____5/1/2018_____, 201____; and,

B.    As a condition to entering into the FRANCHISE AGREEMENT, Franchisor requires that Guarantor guarantee the full performance of the obligations of Franchisee under the FRANCHISE AGREEMENT; and,

C.    Guarantor will receive substantial benefit from the FRANCHISE AGREEMENT and desires that Franchisee enter into the FRANCHISE AGREEMENT with the Franchisor;

**NOW, THEREFORE**, in consideration of the execution of the FRANCHISE AGREEMENT by Franchisee and its acceptance by Franchisor, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor covenants and agrees as follows:

### AGREEMENT

1.    **Guarantee.** Guarantor hereby absolutely and unconditionally guarantees (a) the full and faithful performance of all of the covenants, conditions, agreements and undertakings of Franchisee to be kept and performed by Franchisee under the FRANCHISE AGREEMENT including, but not limited to, the monthly payment(s) when due, and other sums payable by Franchisee to Franchisor under the FRANCHISE AGREEMENT, and (b) the payment of all damages owing to Franchisor by Franchisee after the termination of the FRANCHISE AGREEMENT or the exercise by Franchisor of any other right or remedy of Franchisor following a default by Franchisee under the FRANCHISE AGREEMENT (collectively the "Obligations"). Guarantor understands and agrees that this Guaranty is unconditional and continuing and is a guaranty of payment and performance and not of collection.

2.    **Independent Obligation.** The liability of Guarantor hereunder is independent of the obligation of the Franchisee or any other person or entity a separate action or separate actions against Guarantor until after Franchisee has failed to comply with all cure periods allowed. The release of, or cancellation by, any signer of a similar instrument shall not act to release or otherwise affect the liability of Guarantor hereunder.

3.    **Modification to FRANCHISE AGREEMENT.** Guarantor's obligations under this Guaranty of FRANCHISE AGREEMENT shall not be extinguished, discharged, diminished or reduced in any way by any modification or amendment of the FRANCHISE AGREEMENT including, but not limited to, any modification of payment dates or amounts, or any subsequent assignment of the FRANCHISE AGREEMENT made with or without the consent of Franchisor. Guarantor hereby waives any right to approve any modification or amendment of the FRANCHISE AGREEMENT.

4.    **Obligations of Guarantor Upon Default by Franchisee.** Should Franchisee shall fail to pay when due any other monetary sum or charge, or any portion thereof, accrued or

- 1 -

due pursuant to the terms of the FRANCHISE AGREEMENT within any allotted cure period, then, upon written notice to Guarantor by Franchisor, Guarantor shall pay to Franchisor all such amounts as may be due and owing from Franchisee to Franchisor by reason of Franchisee's failure to perform.

5.      **Remedies.** If Guarantor fails to perform any obligation under this Guaranty, then in addition to all other remedies provided at law or in equity, from time to time and without first requiring performance on the part of Franchisee, and without being required to exhaust or proceed against any or all security held by Franchisor for the performance of Franchisee under the FRANCHISE AGREEMENT, Franchisor may enforce its rights to require performance by Guarantor of any or all of the obligations on the part of Guarantor to be performed under this Guaranty by action at law or in equity, or both.

6.      **No Waiver.** No failure on the part of Franchisor to pursue any remedy under this Guaranty or under the FRANCHISE AGREEMENT shall constitute a waiver on the part of Franchisor of its right to pursue such remedy based on a subsequent default.

7.      **Waiver of Exoneration.** Guarantor waives any right to require Franchisor to (a) proceed against Franchisee, (b) proceed against or exhaust any security held from Franchisee, or (c) pursue any other right or remedy available to Franchisor. Guarantor further waives any defense it may acquire because of Franchisor's election of any remedy against Guarantor or Franchisee, or both.

8.      **Waiver of Subrogation.** Until the obligations of Franchisee under the FRANCHISE AGREEMENT have been performed in full, Guarantor shall have no right of subrogation against Franchisee, and Guarantor hereby expressly waives any right to enforce any remedy which Franchisor now has or may hereafter acquire against Franchisee. Guarantor hereby waives the benefit of, and any right to participate in, any security now or hereafter held by Franchisor for the performance of the obligations of Franchisee under the FRANCHISE AGREEMENT.

9.      **Waiver of Presentments.** Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this Guaranty and waives all notices of the existence, creation, or incurring of new or additional obligations.

10.     **Other Guarantor Waivers.** Without limiting the generality of the preceding paragraphs, Guarantor hereby waives all rights and defenses to:

(a)     All rights it may have now or in the future to require or demand that Franchisor pursue any right or remedy Franchisor may have against Franchisee or any other third party;

(b)     Any defense arising as a result of Guarantor's election of the application of Section 1111(b)(2) of the Bankruptcy Code or based on any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code;

(c)     Any defense as a surety arising under applicable law;

(d)     Any duty or obligation of Franchisor to disclose to Guarantor any facts Franchisor may now or hereafter know about Franchisee, regardless of whether Franchisor has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or has reason to believe that such facts are unknown to Guarantor or has a reasonable opportunity to communicate such facts to guarantor, it being understood and agreed that

WOATFDD042017v1

guarantor is fully responsible for being and keeping informed of the financial condition of Franchisee and of any and all circumstances bearing on the risk of nonperformance of any Obligation; and,

(e)     Any defense based upon an election of remedies by Franchisor, including any election which destroys or impairs any right of subrogation, reimbursement of contribution which Guarantor may have, or any rights or benefits under any provisions of Georgia law in any way qualifying, conditioning or limiting the obligations of Guarantor based on any steps or procedures that Franchisor should take before proceeding against Guarantor.

11.     **Bankruptcy.** This Guaranty will continue unchanged by any bankruptcy, reorganization or insolvency of Franchisee, or any successor or assignee thereof, or by any disaffirmance or abandonment by a trustee of Franchisee. Notwithstanding any modification, discharge or extension of the indebtedness or any amendment, modification, stay or cure of Franchisor's rights which may occur in any bankruptcy or reorganization case or proceeding concerning Franchisee whether permanent or temporary, and whether assented to by Franchisor, Guarantor hereby agrees that it shall be obligated hereunder to pay and perform the Obligations in accordance with the terms of the FRANCHISE AGREEMENT and the terms of this Guaranty. Guarantor understands and acknowledges that by virtue of this Guaranty, Guarantor has specifically assumed all risks of a bankruptcy or reorganization case or proceeding with respect to Franchisee.

12.     **Assignment of FRANCHISE AGREEMENT.** As used herein, the term "Franchisor" shall include any successor, assignee or transferee of Franchisor. Guarantor agrees that Franchisor may, without notice to Guarantor, assign the FRANCHISE AGREEMENT and this Guaranty in whole or in part and that no such assignment or transfer of the FRANCHISE AGREEMENT and/or this Guaranty shall operate to extinguish or diminish the liability of Guarantor under this Guaranty.

13.     **Obligations of Guarantor Are Primary.** Guarantor agrees that the liability of Guarantor under this Guaranty shall be primary and that in any cause or right of action which shall accrue to Franchisor under this Guaranty, Franchisor may, at its sole option, proceed against Guarantor without having commenced any action, or having obtained any judgment, against Franchisee. If Franchisor has any enforceable right against Franchisee upon termination of the FRANCHISE AGREEMENT, Franchisor shall be entitled to enforce those rights against Guarantor without giving prior notice to Franchisee or Guarantor, and without making any demand on either of them.

14.     **Interest.** Any sum required to be paid by Guarantor to Franchisor pursuant to the terms of this Guaranty shall bear interest at the lower of seven percent (7%) or the highest rate then allowed by law, from the date due until paid in full.

15.     **Attorneys' Fees.** Guarantor agrees to pay Franchisor's reasonable attorneys' fees and all costs and other expenses incurred in any collection or attempted collection, or in any negotiations relative to the obligations hereby guaranteed, or incurred enforcing this Guaranty against the Guarantor. In addition, in the event of any dispute between the parties arising under this Guaranty, or the breach of any covenant or condition under this Guaranty, then the prevailing party shall be entitled to have and recover from the party not so prevailing the attorneys' fees and costs incurred by the prevailing party, whether such fees and costs are incurred in taking any action under this Guaranty, or in any judicial proceeding (including appellate proceeding). "Prevailing party" for the purposes of this Paragraph 15 shall include, without limitation, the party who receives from the other party the sums allegedly due,

- 3 -

performance of the covenants allegedly breached, consideration substantially equal to that which was demanded, or substantially the relief or consideration sought in any judicial proceeding whether or not such proceeding is prosecuted to final judgment, or a party who dismisses a judicial action in return for substantially the performance or relief sought or the payment of the sums allegedly due.

16.    **Time of the Essence.** Time is of the essence with respect to the performance of every provision of this Guaranty.

17.    **Governing Law.** This Guaranty shall be construed and interpreted in accordance with the laws of the State of Georgia.

18.    **Captions.** The captions and paragraph numbers appearing in this Guaranty are inserted only as a matter of convenience and are not to be used to interpret this Guaranty.

19.    **Examination of FRANCHISE AGREEMENT.** Guarantor acknowledges that he/she has (a) received a copy of the FRANCHISE AGREEMENT, (b) read and understood the terms and provisions of the FRANCHISE AGREEMENT including, but not limited to, the covenants, conditions, agreements and undertakings of Franchisee to be kept and performed by Franchisee under the FRANCHISE AGREEMENT, and (c) read and understood the obligation of Guarantor under this Guaranty, including the legal effect of such obligations and has been advised by legal counsel respecting such obligations.

20.    **Binding to Successors.** Guarantor shall not assign any of its obligations hereunder by operation of law or otherwise, and any attempted assignment shall, at Franchisor's sole option, be void. Subject to the foregoing, the obligations of Guarantor under this Guaranty shall be binding on Guarantor's successors.

**IN WITNESS WHEREOF,** Guarantor has executed this Guaranty as of the date first hereinabove set forth.

**GUARANTORS:**

Jeff Londis
_____    Date: 5/1/2018 _____

Troy Bage
_____    Date: 5/1/18 _____

Boston Londis
_____    Date: 5/1/2018 _____

_____    Date: _____

WOATFDD042017v1

- 4 -

**EXHIBIT C**

**NON-COMPETITION AND**

**NON-SOLICITATION AGREEMENT**

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Non-Competition and Non-Solicitation Agreement ("Agreement") is entered into by and between Workout Anytime Franchising Systems, LLC ("Franchisor") and <u>Jeff Londis, Troy Bage, Boston Londis</u> ("Obligor"), and becomes effective on the Effective Date of the Franchise Agreement once counter-signed by Franchisor. THIS AGREEMENT IS MADE SUBJECT TO ANY PROVISIONS OF ANY EXHIBIT "G" ATTACHED TO THE DISCLOSURE DOCUMENT PURSUANT TO WHICH THIS NON-COMPETITION AND NON-SOLICITATION AGREEMENT WAS PRESENTED TO AND SIGNED BY OBLIGOR AND WHICH SPECIFICALLY AND EXPRESSLY RELATE TO THE STATE OF FRANCHISEE'S RESIDENCY.

### W I T N E S S E T H:

**WHEREAS**, Obligor is either (1) the "Franchisee" named in the Franchise Agreement ("Franchise Agreement") that is being executed in conjunction with this Agreement, and/or (2) an equity owner of the legal entity that is named as the Franchisee in the Franchise Agreement ("Obligor" shall for all purposes under this Agreement mean and refer to the entity (if Franchisee is an entity), all equity owners of such entity, and all managers and/or primary operators of Franchisee's Workout Anytime franchised health club facility (the "Club");

**WHEREAS**, Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchise and franchisees from unfair competition by an existing or former franchisee that has had special, intimate knowledge of Franchisor's methods and trade secrets and confidential information for the operation of a Workout Anytime Club;

**WHEREAS**, Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee that transfers (without Franchisor's permission) the goodwill associated with Franchisor's proprietary and protected marks and business practices to a business that competes with Workout Anytime franchisees;

**WHEREAS**, Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee that is able to take advantage of the knowledge and experience gained in running a Workout Anytime Club, and use such knowledge and experience in operating a new competing business without having to continue to pay royalties and other fees for such information, thereby placing other franchisees at a competitive disadvantage;

**WHEREAS**, Obligor acknowledges that Franchisor has a legitimate business interest in re-franchising the formerly protected territory of a former franchisee, and Franchisor would suffer irreparable damage absent this Agreement because it would be unable to attract new franchisees to the area served by its former franchisee;

**WHEREAS**, Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchises and franchisees from unfair competition by an existing or former franchisee who (1) diverts business and customers from a current or former Workout Anytime Club to a competitor of Franchisor, or (2) induces or attempts to induce an employee of any Workout Anytime Club to discontinue their employment with the Club;

**WHEREAS**, Obligor acknowledges that Franchisor requires the execution of this

- 6 -

Agreement as an ancillary requirement to Franchisor's simultaneous grant of a franchise to Obligor or a legal entity of which Obligor is an equity owner.

**NOW, THEREFORE,** in express acknowledgement and recognition of the importance of the foregoing recitals, the parties agree as follows:

1.     **Consideration in Exchange for Obligor's Covenants**.     Obligor hereby expressly acknowledges and confirms that all of the valuable benefits, advantages and opportunities enjoyed by Obligor immediately upon (and solely as a result of) Obligor's (or as applicable, Obligor's legal entity) becoming a franchisee under the Franchise Agreement, and the additional protection provided by this Agreement being signed by all other new franchisees, serve as valuable and adequate consideration received in simultaneous exchange for all of Obligor's promises and covenants made in this Agreement.

2.     **Obligor's In-Term Non-Competition and Non-Solicitation Covenants**.  During the term of the Franchise Agreement, and without geographic limits, Obligor shall not directly or indirectly (such as through corporations or other entities controlled by the Obligor or by or through or in conjunction with any other individual person or persons including, but not limited to, Obligor's spouse (if any) and employees):

a.     divert or attempt to divert any business or customer of any Club to any competitor or do anything injurious or prejudicial to the goodwill associated with Franchisor's Marks, methods, the Workout Anytime Franchise System, or Franchisor's business practices; and,

b.     persuade, entice, or attempt to persuade or entice, any employee of any Workout Anytime Club to discontinue their employment with such Club; and,

c.     own, maintain, engage in, be associated with, be employed by, advise, assist, invest in, be landlord to, franchise, or have any interest in any business which is the same or substantially like or competitive with any Workout Anytime Club; and,

d.     use, communicate, disseminate, provide access, or divulge to anyone at any time any confidential information or trade secrets of Franchisor, or at any time copy, duplicate, record or otherwise reproduce any confidential information or trade secrets of Franchisor, including without limitation those materials contained within the secure password protected Franchise resource section of Franchisor's website, except as expressly permitted in the Franchise Agreement.

3.     **Obligor's Post-Term Non-Competition and Non-Solicitation Covenants**.

a.     For purposes of this Section 3, the word "Conclusion" means the termination, assignment or transfer and/or expiration of the Franchise Agreement corresponding to this Agreement, regardless of whether such termination/expiration occurs prior to, or at the end of, such Franchise Agreement's term (the "Term").

b.     Upon the Conclusion of the Term and for the stated time thereafter and geographic restriction set forth below, Obligor shall not, directly or indirectly:

(i)     for a two (2) year period following the Conclusion of the Term and without geographic limitation, divert or attempt to divert any business or

-7-

customer of any health club facility to any competitor, or do anything injurious or prejudicial to the goodwill associated with Franchisor's Marks, methods or the Workout Anytime Franchise System; and,

(ii)    for a two (2) year period following the Conclusion of the Term within twenty-five (25) miles of the location of the franchisee's former Club, own, maintain, engage in, be associated with, be employed by, advise, assist, invest in or have any interest in any business that engages in or offers franchises for businesses that engage in or operate gymnasiums, fitness, or workout facilities which is the same as, or substantially like or competitive with any Workout Anytime Club; and,

(iii)    for a two (2) year period following the Conclusion of the Term and without geographic limitation, persuade, entice or attempt to persuade or entice any employee of any Workout Anytime Club to discontinue their employment with such Club.

c.    Upon the Conclusion of the Term, Obligor shall not, at any time, directly or indirectly:

(i)    communicate, disseminate, provide access, reveal or divulge to anyone, in whole or in part, any of Franchisor's confidential information or trade secrets; and,

(ii)    use, copy, duplicate, record or otherwise reproduce at any time any of Franchisor's confidential information or trade secrets; and,

(iii)    use in any manner whatsoever any of the Marks, the methods, Franchisor's Operations Manuals, any of the materials contained within the secure password protected Franchise resource section of Franchisor's website, or any other proprietary or intellectual property rights of Franchisor and the Workout Anytime Franchise system.

d.    Upon the Conclusion of the Term, Obligor shall immediately return to Franchisor all Operations Manuals, all training materials, all of Franchisor's proprietary software and printed matters, all website materials, all other confidential information and trade secrets, and all of Franchisor's advertising and promotional signs and related items.

4.    **Severability.** It is the parties desire and intention that the covenants contained in this Agreement shall be construed as agreements severable and independent from each other, except that any violation of Section 2 of this Agreement shall constitute a material breach and default of the Franchise Agreement and cause for immediate termination of the Franchise Agreement without opportunity to cure. It is also the intention of the parties that if any Section of this Agreement is deemed by a court of competent jurisdiction to be invalid or unenforceable, then the maximum legally allowable restriction permitted by applicable law shall control and bind Obligor.

5.    **Enforcement Costs.** Obligor agrees to pay to Franchisor all the costs and expenses (including reasonable attorneys' fees) incurred by Franchisor in connection with its enforcement of this Agreement.

- 8 -

6.      **Counter-Parts, Entire Agreement, Amendments**.   This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall be one and the same instrument. The parties may execute such counterparts via fax, or electronically via PDF. This Agreement, together with the Franchise Agreement, contains the entire agreement of the parties pertaining to the subject matter hereof and no prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the parties not set forth herein shall be of any force and effect. Any modifications to this Agreement must be accomplished by a written agreement signed by both parties.

7.      **Injunction**. Obligor recognizes and agrees that the injury that Franchisor and certain of its franchisees will suffer in the event of Obligor's breach of any covenant contained in this Agreement cannot be compensated by monetary damages alone, and Obligor therefore agrees that in the event of a breach or threatened breach by Obligor of this Agreement, Franchisor (and its affiliates, successors and assigns), in addition to and not in limitation of, any other rights, remedies, or damages available to Franchisor (and/or its affiliates, successors, and assigns) at law, in equity, under this Agreement or otherwise, shall be entitled to seek an injunction from any court of competent jurisdiction in order to prevent or restrain any such breach by Obligor or by Obligor's agents, representatives, employees, partners, co-owners, or any and all other persons directly or indirectly acting for or with him/her/it.

8.      **Choice of Law, Venue and Jurisdiction**.   This Agreement shall be construed and governed under and in accordance with the laws of the State in which the Franchised Business is located.   Exclusive venue and jurisdiction of any suit arising under this Agreement shall lie within the federal or state courts within the State of Georgia, except to the extent that the laws of the State where the Club is located requires for the Franchise Agreement and this Agreement to be enforceable against the Obligor or Obligor's legal entity that venue and jurisdiction lie in such State.

**AGREED TO AND ACCEPTED BY OBLIGOR:**

Signature: _Jeff Londis_____

Print your name: _____Jeff Londis_____

Print Title (if applicable): ____Manager_____

Date of Signature: _____5/1/2018_____

*If the "Franchisee" named in the Franchise Agreement is an entity (e.g., corporation, limited liability company, partnership, trust, etc.), or if there is more than one (1) equity owner of "Franchisee", or if "Franchisee" consists of more than one (1) person, or if someone other than "Franchisee" or an equity owner of an entity "Franchisee" will serve said "Franchisee" as a manager or primary operator, complete and sign the additional OBLIGOR SIGNATURES below for the entity, for each equity owner of the entity, for each person included as part of "Franchisee", or for each manager or primary operator, or alternatively submit separate signed originals of this Agreement for the entity and for each of said persons.

**ADDITIONAL OBLIGOR SIGNATURES:**

- 9 -

Signature: _____

Print your name: _____
Troy Bage

Print Title (if applicable): _____

Date of Signature: _____
5/1/18

Signature: _____

Print your name: _____
Boston Londis

Print Title (if applicable): _____

Date of Signature: _____
5/1/2018

WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC:

Signature of Signing Officer: _____

Printed Name of Signing Officer: Steven C. Strickland, CEO

*Date of Counter Signature: _____
(*Effective Date of Agreement)
05/01/18

- 10 -

# EXHIBIT "F"

# PERSONAL DATA

FDD042017v1

XXXXXXXXXX
FDD042017v1

## I. PERSONAL DATA DISCLOSURE

This information will be kept strictly confidential. Please provide all available information. Should certain information not be available at this time, such as your new health club facility telephone number, please provide it immediately upon its availability, but no later than your scheduled facility opening date.

Your Name    Jeff Londis

Home Address    1430 Baugh Springs Road

City/State/Zip Code    McDonald/TN/37353

SSN    214869257

Home Phone    (423) 413-8350          Work Phone    (423) 413-8350

Cell Phone    (423)413-8350

E-mail Address    jlondis@me.com

Workout Anytime Phone    (423) 413-8350

Workout Anytime Fax    (423)413-8350

Facility's Address    1430 Baugh Springs Road

City/State/Zip Code    McDonald/TN/37353

Signed:    jeff londis          Date:    May1, 2018

## II. FRANCHISEE OWNERSHIP INFORMATION FORM

1.      FULL NAME(S) OF FRANCHISEE [If this franchise is owned by a legal entity, only insert the name of the legal entity; if this franchise is owned by one or more individuals, only insert the name(s) of such individual(s):

Entity Name: _____Woatchatt5, LLC_____

Individual Owner(s): _____Jeff Londis_____

_____Boston Londis_____

_____Troy Bage_____

2.      THE FRANCHISE WILL BE OWNED BY (Check which one applies):

__✓__ SOLE PROPRIETOR          Fed. Tax I.D. # __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_____

_____ PARTNERSHIP                Fed. Tax I.D. # _____

_____ CORPORATION               Fed. Tax I.D. # _____

_____ LIMITED LIABILITY COMPANY  Fed. Tax I.D. # _____

_____ OTHER BUSINESS ENTITY      Fed. Tax I.D. # _____
(Please explain on a separate piece of paper)

3.      NAMES OF ALL OWNERS, PARTNERS, SHAREHOLDERS OR MEMBERS AND PERCENTAGE OF OWNERSHIP INTEREST: (Please use separate sheet if necessary)

NAME: _____Jeff Londis_____          % OF OWNERSHIP: 50_____

SOCIAL SECURITY NUMBER: _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_____

NAME: _____Boston Londis_____          % OF OWNERSHIP: 10_____

SOCIAL SECURITY NUMBER: _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_____

NAME: _____Troy Bage_____          % OF OWNERSHIP: 40_____

SOCIAL SECURITY NUMBER: _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_____

FDD042017V1

4.   LIST OF DIRECTORS, MANAGERS OR GENERAL PARTNERS: (Please use separate sheet if necessary)

NAME: Jeff Londis
_____

SOCIAL SECURITY NUMBER: 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
_____

NAME: Troy bage
_____

SOCIAL SECURITY NUMBER: 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
_____

NAME: Boston Londis
_____

SOCIAL SECURITY NUMBER: 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
_____

NAME: _____

SOCIAL SECURITY NUMBER: _____

5.   LIST OF OFFICERS: (Please use separate sheet if necessary)

NAME: Jeff Londis                          TITLE: Manager
_____            _____

SOCIAL SECURITY NUMBER:
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
_____

NAME: Boston Londis                        TITLE: Manager
_____            _____

SOCIAL SECURITY NUMBER:
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
_____

NAME: Troy Bage                            TITLE: Manager
_____            _____

SOCIAL SECURITY NUMBER:
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
_____

NAME: _____      TITLE: _____

SOCIAL SECURITY NUMBER:
_____

FDD042017V1

XXXXXXXXXX1

6.    DESIGNATED CONTACT PERSON:

NAME: Jeff Londis                          TITLE: Manager

ADDRESS: 1430 Baugh Springs Road

McDonald, TN 37353

PHONE: 423 413-8350        E-MAIL: jlondis@me.com

# EXHIBIT "F"

# PERSONAL DATA

FDD042017v1

XXXXXXXXXX
FDD042017v1

## I. PERSONAL DATA DISCLOSURE

This information will be kept strictly confidential. Please provide all available information. Should certain information not be available at this time, such as your new health club facility telephone number, please provide it immediately upon its availability, but no later than your scheduled facility opening date.

Your Name    Troy Bage

Home Address    825 Oak St

City/State/Zip Code    Chattanooga, TN 37403

SSN    220722032

Home Phone    410-627-7533         Work Phone    410-627-7533

Cell Phone    410-627-7533

E-mail Address    tdbage@gmail.com

Workout Anytime Phone

Workout Anytime Fax

Facility's Address

City/State/Zip Code

Signed:    Troy Bage         Date:    5/1/18

## II. FRANCHISEE OWNERSHIP INFORMATION FORM

1.    FULL NAME(S) OF FRANCHISEE [If this franchise is owned by a legal entity, only insert the name of the legal entity; if this franchise is owned by one or more individuals, only insert the name(s) of such individual(s):

Entity Name: _____

Individual Owner(s):   _____ _____

_____

_____

2.    THE FRANCHISE WILL BE OWNED BY (Check which one applies):

_____ SOLE PROPRIETOR                    Fed. Tax I.D. # _____

_____ PARTNERSHIP                         Fed. Tax I.D. # _____

_____ CORPORATION                         Fed. Tax I.D. # _____

_____ LIMITED LIABILITY COMPANY           Fed. Tax I.D. # _____

_____ OTHER BUSINESS ENTITY               Fed. Tax I.D. # _____
(Please explain on a separate piece of paper)

3.    NAMES OF ALL OWNERS, PARTNERS, SHAREHOLDERS OR MEMBERS AND PERCENTAGE OF OWNERSHIP INTEREST: (Please use separate sheet if necessary)

NAME: _____             % OF OWNERSHIP:

SOCIAL SECURITY NUMBER:                   _____

_____

                Troy Bage
NAME: _____  % OF OWNERSHIP:
                                          40
SOCIAL SECURITY NUMBER:                   _____
        220722032
_____

NAME: _____             % OF OWNERSHIP:

SOCIAL SECURITY NUMBER:                   _____

_____

4.    LIST OF DIRECTORS, MANAGERS OR GENERAL PARTNERS: (Please use separate sheet if necessary)

NAME: _____

SOCIAL SECURITY NUMBER: _____

NAME: _____

SOCIAL SECURITY NUMBER: _____

NAME: _____

SOCIAL SECURITY NUMBER: _____

NAME: _____

SOCIAL SECURITY NUMBER: _____

5.    LIST OF OFFICERS: (Please use separate sheet if necessary)

NAME: _____    TITLE: _____

SOCIAL SECURITY NUMBER:
_____

NAME: _____    TITLE: _____

SOCIAL SECURITY NUMBER:
_____

NAME: _____    TITLE: _____

SOCIAL SECURITY NUMBER:
_____

NAME: _____    TITLE: _____

SOCIAL SECURITY NUMBER:
_____

6.    DESIGNATED CONTACT PERSON:

NAME: _____        TITLE: _____

ADDRESS: _____

_____

PHONE: _____    E-MAIL: _____



EXHIBIT "F"

PERSONAL DATA

FDD042017v1

XXXXXXXXXv1

## I. PERSONAL DATA DISCLOSURE

This information will be kept strictly confidential. Please provide all available information. Should certain information not be available at this time, such as your new health club facility telephone number, please provide it immediately upon its availability, but no later than your scheduled facility opening date.

Your Name    Boston Londis

Home Address    1430 Baugh Springs Rd.

City/State/Zip Code    McDonald, TN 37353

SSN    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

Home Phone    423-413-3878      Work Phone    423-413-3878

Cell Phone    423-413-3878

E-mail Address    bostonlondis@gmail.com

Workout Anytime Phone    423-413-3878

Workout Anytime Fax    423-413-3878

Facility's Address    Rhea Towne Place shopping center
200 Able Drive

City/State/Zip Code    Dayton TN, 37320

Signed:    Boston Londis      Date:    05/01/2018

FDD042017V1

XXXFDD0000X515v1

## II. FRANCHISEE OWNERSHIP INFORMATION FORM

1.    FULL NAME(S) OF FRANCHISEE [If this franchise is owned by a legal entity, only insert the name of the legal entity; if this franchise is owned by one or more individuals, only insert the name(s) of such individual(s):

Entity Name:  Woatchatt5, LLC

Individual Owner(s):  Jeff Londis

Troy Bage

Boston Londis

2.    THE FRANCHISE WILL BE OWNED BY (Check which one applies):

✓ SOLE PROPRIETOR                Fed. Tax I.D. # 11111111111

✓ PARTNERSHIP                     Fed. Tax I.D. # 11111111111

✓ CORPORATION                     Fed. Tax I.D. # 11111111111

✓ LIMITED LIABILITY COMPANY       Fed. Tax I.D. # 11111111111

✓ OTHER BUSINESS ENTITY           Fed. Tax I.D. # 11111111111
(Please explain on a separate piece of paper)

3.    NAMES OF ALL OWNERS, PARTNERS, SHAREHOLDERS OR MEMBERS AND PERCENTAGE OF OWNERSHIP INTEREST: (Please use separate sheet if necessary)

NAME: Jeff Londis                         % OF OWNERSHIP: 50

SOCIAL SECURITY NUMBER: 111111111

NAME: Troy Bage                           % OF OWNERSHIP: 40

SOCIAL SECURITY NUMBER: 111111111

NAME: Boston Londis                       % OF OWNERSHIP: 10

SOCIAL SECURITY NUMBER: 412756379

4.   LIST OF DIRECTORS, MANAGERS OR GENERAL PARTNERS: (Please use separate sheet if necessary)

NAME: Boston Londis
_____

SOCIAL SECURITY NUMBER: 412756379
_____

NAME: Jeff Londis
_____

SOCIAL SECURITY NUMBER: 1111111111
_____

NAME: Troy Bage
_____

SOCIAL SECURITY NUMBER: 11111111111
_____

NAME: None
_____

SOCIAL SECURITY NUMBER: 111111111111
_____

5.   LIST OF OFFICERS: (Please use separate sheet if necessary)

NAME: Jeff Londis                    TITLE: Owner
_____          _____

SOCIAL SECURITY NUMBER:
111111111111
_____

NAME: Troy Bage                      TITLE: Owner
_____          _____

SOCIAL SECURITY NUMBER:
_____

NAME: Boston Londis                  TITLE: Owner
_____          _____

SOCIAL SECURITY NUMBER:
412756379
_____

NAME: None                           TITLE: None
_____          _____

SOCIAL SECURITY NUMBER:
1111111111
_____

FDD042017V1

XXXXXXXXXXX1

6.     DESIGNATED CONTACT PERSON:

NAME: Jeff Landis                        TITLE: Owner
_____                _____

ADDRESS: 1430 Baugh Springs Rd.
_____

McDonald, TN 37353
_____

PHONE: 423-413-8350          E-MAIL: jlondis@me.com
_____      _____



*2017 - Franchise Inf...*

**SignNow**    2017 - Franchise Inf...    ⚙   💾 DONE

*SignNow –*
*4-27-18.*



# WORKOUT ⚡ ANYTIME™
### FRANCHISING SYSTEMS, LLC

## Franchise Agreement Information

**Date:** 04/27/18

**Area Developer:** Greg Parker

**Best Contact**   **Phone:** 865-604-8262   **E-mail:** gparker@workoutanytime.com

**Franchise Purchased as:** [ ] Individual   [✓] Legal Entity

**Name of Individual or Legal Entity:** Woatchatt5 LLC

**Full Address:** 1430 Baugh Springs Rd. Mcdonnel TN 37353

**If Entity, Organized in State of:** TN

**If Entity, Qualified to do Business in State:** TN

*Jeff Londis*

**Franchisee Contact Phone:** 423-413-8350

**Franchisee E-Mail:** jlondis@me.com

**Franchise Owner #2** Troy Bage

**Address:** 1430 Baugh Springs Rd. Mcdonnel TN 37353

**Owner #2 Phone:** 410-527-7533

**Owner #2 E-Mail:** Tdbage@gmail.com

**Franchise Owner #3** Boston Londis

**Address:** 1430 Baugh Springs Rd. Mcdonnel TN 37353

**Owner #3 Phone:** 423-413-3878

**Owner #3 E-Mail:** bostonlondis@gmail.com

**Franchise Owner #4** Owner #4 Name

**Address:** Owner #4 Address

**Owner #4 Phone:** Owner #4 Phone

**Owner #4 E-Mail:** Owner #4 E-mail

**# of Franchises Purchasing** 1

| | | |
|---|---|---|
| **Franchise Fee #1** | [ ] | $ 29,500.00 |
| **Franchise Fee #2** | [ ] | $ 24,500.00 |
| **Franchise Fee #3** | [ ] | $ 19,500.00 |
| **Franchise Fee #4** | [ ] | $ 19,500.00 |
| **Franchise Fee #5** | [✓] | $ 19,500.00 |
| **Pricing Variance & Reason:** | | Pricing Variance & Reason |

**Territory**   **State:** TN   **City:** Dayton

**State Rider Needed for:**

| | | |
|---|---|---|
| [ ] Hawaii | [ ] New York |
| [ ] Illinois | [ ] North Dakota |
| [ ] Indiana | [ ] Rhode Island |
| [ ] Maryland | [ ] Virginia |



**Owner Application Attached:**    @Jeff Londis.pdf

**Signature of AD Completing Form:**    *Greg Panken*

FDD Receipt Page                    FDD Receipt Page

Edit & Sign
- My Signature
- Text
- Today's Date
- My Check

# FRANCHISE APPLICATION

**WORKOUT ANYTIME**
FRANCHISING SYSTEMS, LLC

Each owner, partner, member and shareholder associated with the purchase of the franchise must complete a Franchise Application.

**What first prompted you to inquire about the Workout Anytime Franchise Ownership opportunity?**
☐ Television ad   ☐ Newspaper (classified section)   ☐ Newspaper (full-page ad)   ☐ Internet site   ☐ Direct Mail   ☐ Referred by friend

## SECTION 1: CONTACT INFORMATION

| FIRST NAME | MIDDLE NAME | LAST NAME |
|---|---|---|
| Jeff | James | Lordis |

ADDRESS: 1430 Baugh Springs Road

| CITY | STATE | ZIP CODE |
|---|---|---|
| McDonald | TN | 37353 |

| SOCIAL SECURITY # | DATE OF BIRTH* | E-MAIL |
|---|---|---|
| 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 | 4/10/1961 | JLordis@Me.Com |

*Social Security Number and Date of Birth must belong to the franchise applicant.

| HOME | CELL PHONE | WORK PHONE |
|---|---|---|
| | 423 413-8350 | |

Are you married? ☑ Yes ☐ No - if Yes, spouse's name _____
Will you have other owners/partners? ☑ Yes ☐ No ☐ I don't know - if Yes, partner's name  Tray Sage
What state would you like to open a store in?  TN

## SECTION 2: EMPLOYMENT   Are you:  ☑ Self-employed  or  ☐ Employed   (If so, please complete the information below)

| NAME OF COMPANY / EMPLOYER | | POSITION | TYPE OF BUSINESS |
|---|---|---|---|
| Are you: ☐ Unemployed  or  ☐ Retired | | (If so, please check box and skip to Section 3) | |

## SECTION 3: FINANCIAL INFORMATION

| | | |
|---|---|---|
| Total Liquid Assets available (e.g. cash, stocks, bonds, mutual funds) | A $ _____ .00 | ($150,000 CASH AVAILABLE REQUIRED FOR EACH UNIT) |
| Total Tangible Assets (e.g. house, car, business, etc.) | + B $ _____ .00 | |
| Total Assets | C $ _____ .00 | (Add A to B) |
| Total Liabilities | - D $ _____ .00 | |
| Total Net Worth: Total Assets minus Total Liabilities | E $ _____ .00 | (Subtract D from C) |
| | ($300,000 NET WORTH REQUIRED FOR EACH UNIT) | |

## SECTION 4: PERSONAL INFORMATION

1. Have you ever filed for bankruptcy protection? If yes, identify discharge date _____   ☐ Yes ☑ No
2. Have you ever been convicted of a felony? _____   ☐ Yes ☑ No
3. Are you or anyone in your immediate family a partner or owner (partial or otherwise) of a health club? ...   ☑ Yes ☐ No
If yes, list name of business and family relationship:  Workout Anytime
4. Are you or anyone in your immediate family employed by a health club? _____   ☐ Yes ☑ No
if yes, list name of employer and family relationship: _____
5. Are you or anyone in your immediate family currently under any form of non-competition agreement that limits your right to operate
any business? If yes, list name of other business and family relationship  Workout Anytime   ☑ Yes ☐ No
6. Do you own a shopping center and are you interested in opening a Workout Anytime health club in that center?   ☐ Yes ☑ No

## SECTION 5: OTHER

1. Are you a U.S. Citizen? _____   ☑ Yes ☐ No
if no what country? _____
2. I have enough income to maintain my current lifestyle without spending funds allocated for development of my Workout Anytime
franchise(s) until opening _____   ☑ Yes ☐ No
3. I understand that if financing is required to open my Workout Anytime it is my sole responsibility to obtain the financing   ☑ Yes ☐ No

## SECTION 6: SIGNATURE

I understand that the acceptance of this Franchise Application by Workout Anytime or any of its affiliates (collectively "Workout Anytime") does not constitute the grant of a franchise. I understand that Workout Anytime grants franchises only by executing written franchise agreements. By signing below I authorize Workout Anytime and its assigns to start an investigative consumer report (including information as to my character, general reputation, personal characteristics and mode of living) and credit investigation based on the information voluntarily provided by me and warrants that all information provided is true and accurate. I understand and I have a right to request that Workout Anytime make a complete and accurate disclosure of the nature and extent of such investigation. Workout Anytime may obtain any credit report in connection with this applicant. This is my authorization to credit reporting agencies, bank(s), creditors and suppliers to release to Workout Anytime and to Workout Anytime to release to such parties, all information requested regarding my depository, loan or other credit information including, without limitation, financial information, in the normal credit evaluation process. I release my bank(s), creditors, suppliers and Workout Anytime from all liability with respect to the release of any such requested information. Authorization is granted to use photo or this permit of my signature to obtain information. If I am requesting that Workout Anytime make a credit determination based on my creditworthiness combined with any co-applicants, I authorize Workout Anytime to discuss any derogatory credit items with such co-applicants. I understand that Workout Anytime will rely on the information that I provide in this Application. I understand that Workout Anytime may, at any time, require that I sign an updated application or provide updated information. I acknowledge that I have read, and hereby agree to be bound by the Confidentiality and Non-Disclosure provisions which appear on the reverse side of this Application.

| DATE | PRINT NAME (FIRST, MIDDLE INITIAL, LAST) | SIGNATURE IN INK |
|---|---|---|
| 4/1/2018 | Jeff Lordis | |

## Confidentiality and Non-Disclosure

The individual who has signed the application on the reverse hereof ("Applicant") has applied to become a franchisee of Workout Anytime Franchising Systems, LLC ("Workout Anytime") and, in connection with the application process, may become privy to certain information regarding the business of Workout Anytime and its affiliates and its franchisees which Workout Anytime classifies and protects as confidential and proprietary (the "Information"). Workout Anytime is willing to divulge such information (as and to the extent it deems appropriate in connection with the Applicant's application) only if the Applicant agrees to protect the confidentiality of such Information. In consideration of the disclosure of Information, Applicant agrees to the following terms and conditions:

1. **Confidentiality.** Applicant on behalf of itself and its affiliates, employees, officers and directors, agrees to maintain as confidential all Information disclosed to it. Applicant shall not, directly or indirectly, disclose any such Information to any third party without Workout Anytime prior written consent, nor shall Applicant use any Information for its own benefit (except for the purpose of the discussions contemplated by this Agreement) or for the benefit of any third party. The dissemination of information by Applicant within its own organization shall be limited to those employees and consultants whose duties justify the need to know such Information.

2. **Return of Information.** Applicant shall return to Workout Anytime within ten (10) days of written request therefore, all Information, together with any and all copies thereof.

3. **No Rights in Information.** Neither this Agreement nor the disclosure of Information shall be deemed, by implication or otherwise, to vest in Applicant any rights in the Information or any other trade secrets or property of Workout Anytime.

4. **Breach.** Any breach of any provision hereof will be theft of Workout Anytime trade secrets, and will cause irreparable harm and damage to Workout Anytime. Workout Anytime shall be entitled to enjoin any actual or threatened violation of any of the provisions in this Agreement. In addition to injunctive relief, Workout Anytime may recover damages from Applicant for any loss caused by any violation of the provisions of this Agreement (including violations by third parties to whom Applicant discloses Information). In any action brought to enforce any of the provisions of this Agreement, Workout Anytime shall be entitled to reasonable attorney's fee and costs.

5. **Law.** This Agreement is made under, and shall be construed and enforced in accordance with, the laws of the State of Georgia. The parties agree that the exclusive venue for disputes between them shall be in the Superior Court of Dekalb County, Georgia, or the United States District Court for the Northern District of Georgia, Atlanta Division, and the parties each waive any objection they may have to the personal jurisdiction of, or venue in, such courts.

6. **Severability.** Any provision hereof which may prove unenforceable under any law or by any court shall not affect the validity of any other provision hereof.

*Return this application to:*

Workout Anytime Franchising Systems, LLC

2325 Lakeview Parkway, Suite 200, Alpharetta, GA 30009

Attn: Franchise Sales Dept.

PHONE: 770-403-7203      FAX. 866-284-2872

www.WorkoutAnytime.com



## Personal Profile



**Personal Information:**

**First Name:** Troy

**Last Name:** Bage

**Gender:**

**Address:** 825 Oak St

**How many years at this address?:** 4

**City:** Chattanooga

**Country:** USA

**State / Province:** Tennessee

**Zip / Postal Code:** 37403

**Birth Date:** ******

**Home Phone:**

**Home Phone Extension:**

**Best Time To Contact:**

**Home Ownership:** Own

**Email:** Tdbage@gmail.com

**Alternate Email Address:**

**Marital Status:** Married

**Spouse Name:**

**How did you hear about us?:** Current franchise owner

**How long have you wanted to operate your own franchise?:**

**Can you devote your full time to the business?:** No

**Are there any other franchise opportunities that you are looking into?:**

**Employment:**

**Present Employer:** Ivy Rehab

**Percent of Company you own:** 1

**Title:** COO

**Date Started:** 10/16/2017

**Address:**

City: White Plains

Country: USA

State / Province: New York

Zip / Postal Code:

Business Phone:

May we call you at work ?: No

Hours Per Week:

Salary (ex. $ 100,000.00/year): 0.00

Brief description of your responsibilities:

Have you previously ever been self-employed?:

Have you ever signed a contract or non-competitor agreement that might limit or disqualify you from owning/operating a franchise?:

Have you ever owned, operated or worked with any firm that provides products or services similar to ours?:

**Finance:**

How would you finance your franchise?:

Will you have a partner?: Yes

How long can you support yourself and your family without making withdrawls from your business (in years)?:

Income from present occupation ($): 0.00

Spouse/Other Income ($): 0.00

If other income, explain:

**Specified Data:**

Would this business be your sole source of income?: No

Approximate Your Total Assets ($): 0.00

Your Total Liabilities ($): 0.00

Your Net Worth ($): 0.00

**If qualified, when would you be ready to start your Franchise Business?:**

**Do you intend to run this business yourself?:** No

**If not, who will be responsible for the daily operation of your business?:**

**Have you ever been convicted of a felony?:** No

**Do you have any contingent liabilities for guarantees, endorsements, leases etc.?:**

**Have you or any company you have owned or managed ever gone through bankruptcy or compromised a debt?:**

**Are you now, or have you ever been party to any lawsuit - either as defendant or plaintiff?:** No

**Have you ever been convicted?:**

**Other Comments:**

**How does your spouse and family feel about your being in business for yourself?:**

**Other facts you want us to know:**

**Prospect Summary:**

**Personal / Personality Style:**

**Lead's Background/Business Overview:**

**Goals and Aspirations :**

**Franchise Cons (Disadvantages to us in prospect's mind):**

**Reason For Time Frame Choice:**

**Franchise Pros
(Advantages to us in
prospect's mind):**

**Other Information:**

# Personal Profile



**Personal Information:**

| | |
|---|---|
| **First Name:** Boston | **Last Name:** Londis |
| **Gender:** Male | |
| **Address:** 1430 Baugh Springs Rd. | |
| **How many years at this address?:** 2 | **City:** Mcdonald |
| **Country:** USA | **State / Province:** Tennessee |
| **Zip / Postal Code:** 37353 | **Birth Date:** ****** |
| **Home Phone:** (423) 413-3878 | **Home Phone Extension:** |
| **Best Time To Contact:** Anytime | **Home Ownership:** Own |
| **Email:** bostonlondis@gmail.com | **Alternate Email Address:** |
| **Marital Status:** | **Spouse Name:** |
| **How did you hear about us?:** Friends/Family | |
| **How long have you wanted to operate your own franchise?:** 1 yr | **Can you devote your full time to the business?:** Yes |
| **Are there any other franchise opportunities that you are looking into?:** No | |

**Employment:**

| | |
|---|---|
| **Present Employer:** White Oak Enterprises | **Percent of Company you own:** 10 |
| **Title:** Development Associate | **Date Started:** 07/03/2017 |
| **Address:** 1430 Baugh Springs Rd. | |

**City:** Mcdonald

**Country:** USA

**State / Province:** Tennessee

**Zip / Postal Code:** 37353

**Business Phone:** (423) 413-3878

**May we call you at work ?:** Yes

**Hours Per Week:** 31-40

**Salary (ex. $ 100,000.00/year):** 65,000.00

**Brief description of your responsibilities:** All finance/accounting for 4 WOAT gyms, real estate development

**Have you previously ever been self-employed?:** No

**Have you ever signed a contract or non-competitor agreement that might limit or disqualify you from owning/operating a franchise?:** No

**Have you ever owned, operated or worked with any firm that provides products or services similar to ours?:** No

## Finance:

**How would you finance your franchise?:** 75%-80% loan and 20%-25% equity.

**Will you have a partner?:** Yes

**How long can you support yourself and your family without making withdrawls from your business (in years)?:** 5

**Income from present occupation ($):** 65,000.00

**Spouse/Other Income ($):** 0.00

**If other income, explain:**

## Specified Data:

**Would this business be your sole source of income?:** No

**Approximate Your Total Assets ($):** 0.00

**Your Total Liabilities ($):** 0.00

**Your Net Worth ($):** 0.00

**If qualified, when would you be ready to start your Franchise Business?:** ASAP

**Do you intend to run this business yourself?:** No

**If not, who will be responsible for the daily operation of your business?:** Ted Brisebois, Jeff Londis, Individual gym managers, myself when needed

**Have you ever been convicted of a felony?:** No

**Do you have any contingent liabilities for guarantees, endorsements, leases etc.?:** No

**Have you or any company you have owned or managed ever gone through bankruptcy or compromised a debt?:** No

**Are you now, or have you ever been party to any lawsuit - either as defendant or plaintiff?:** No

**Have you ever been convicted?:** No

**Other Comments:**

**How does your spouse and family feel about your being in business for yourself?:** Excited

**Other facts you want us to know:**

**Prospect Summary:**

**Personal / Personality Style:**

**Lead's Background/Business Overview:**

**Goals and Aspirations :**

**Franchise Cons (Disadvantages to us in prospect's mind):**

**Reason For Time Frame Choice:**

**Franchise Pros
(Advantages to us in
prospect's mind):**

**Other Information:**

**RECEIPT**

THIS DISCLOSURE DOCUMENT SUMMARIZES CERTAIN PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THE DISCLOSURE DOCUMENT AND ALL AGREEMENTS CAREFULLY.

If Workout Anytime Franchising Systems, LLC offers you a franchise, it must provide this Disclosure Document to you fourteen (14) calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. See Exhibit "G" to this Disclosure Document to determine whether your State requires delivery of these materials sooner than the referenced fourteen (14) calendar day period. New York requires that you receive this Franchise Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

If Workout Anytime Franchising Systems, LLC does not deliver this Disclosure Document on time, or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and, if applicable, to your State agency on Exhibit "E" to this Disclosure Document.

The name, principal business address, and telephone number of each "franchise seller" offering the franchise are as follows: Randy Trotter and Steven C. Strickland, 2325 Lakeview Parkway, Suite 200, Alpharetta, GA 30009; (770) 809-1401; and

The Issuance Date of this Disclosure Document is April 20, 2017.

See Exhibit "E" for our registered agents authorized to receive service of process.

I received on the date appearing adjacent to my signature below a Franchise Disclosure Document of Workout Anytime Franchise Corporation dated April 20, 2017 which included the Exhibits (Exhibits "A" through "M") listed below

A. Franchise Agreement
B. Personal Guaranty
C. Non-Competition and Non-Solicitation Agreement
D. Area Development Agreement
E. State Administrations and Agents for Service of Process
F. Personal Data Disclosure and Franchisee Ownership Information Form
G. State Specific Addendum (as applicable)
H. Financial Statements
I. Operation's Manual
J. List of Franchisees
K. Terminated Franchises
L. Territory Description
M. Lease Amendment
N. Receipts

WOATPDS042017v1

Date FDD Received:

_4/9/2018_____ , 201__    _[signature]_____
Date                                            Prospective Franchisee

                                                _Jeff Landis_____
                                                Printed Name

WGATFDD043817v1

RECEIPT

THIS DISCLOSURE DOCUMENT SUMMARIZES CERTAIN PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THE DISCLOSURE DOCUMENT AND ALL AGREEMENTS CAREFULLY.

If Workout Anytime Franchising Systems, LLC offers you a franchise, it must provide this Disclosure Document to you fourteen (14) calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. See Exhibit "G" to this Disclosure Document to determine whether your State requires delivery of these materials sooner than the referenced fourteen (14) calendar day period. New York requires that you receive this Franchise Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

If Workout Anytime Franchising Systems, LLC does not deliver this Disclosure Document on time, or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and, if applicable, to your State agency on Exhibit "E" to this Disclosure Document.

The name, principal business address, and telephone number of each "franchise seller" offering the franchise are as follows: Randy Trotter and Steven C. Strickland, 2325 Lakeview Parkway, Suite 200, Alpharetta, GA 30009; (770) 809-1401; and

The Issuance Date of this Disclosure Document is April 20, 2017.

See Exhibit "E" for our registered agents authorized to receive service of process.

I received on the date appearing adjacent to my signature below a Franchise Disclosure Document of Workout Anytime Franchise Corporation dated April 20  2017 which included the Exhibits (Exhibits "A" through "M") listed below:
A.  Franchise Agreement
B.  Personal Guaranty
C.  Non-Competition and Non-Solicitation Agreement
D.  Area Development Agreement
E.  State Administrators and Agents for Service of Process
F.  Personal Data Disclosure and Franchisee Ownership Information Form
G.  State Specific Addendum (as applicable)
H.  Financial Statements
I.  Operation's Manual
J.  List of Franchisees
K.  Terminated Franchises
L.  Territory Description
M.  Lease Amendment
N.  Receipts

WOATFDD04-2017v1

Date FDD Received:

4 - 9 - 18 _____ , 201 8
Date

_____
Prospective Franchisee

Boston Landis
Printed Name

WOATFDD043917v1

**RECEIPT**

THIS DISCLOSURE DOCUMENT SUMMARIZES CERTAIN PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THE DISCLOSURE DOCUMENT AND ALL AGREEMENTS CAREFULLY.

If Workout Anytime Franchising Systems, LLC offers you a franchise, it must provide this Disclosure Document to you fourteen (14) calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. See Exhibit "G" to this Disclosure Document to determine whether your State requires delivery of these materials sooner than the referenced fourteen (14) calendar day period. New York requires that you receive this Franchise Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

If Workout Anytime Franchising Systems, LLC does not deliver this Disclosure Document on time, or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and, if applicable, to your State agency on Exhibit "E" to this Disclosure Document.

The name, principal business address, and telephone number of each "franchise seller" offering the franchise are as follows: Randy Trotter and Steven C. Strickland, 2325 Lakeview Parkway, Suite 200, Alpharetta, GA 30009; (770) 809-1401; and

The Issuance Date of this Disclosure Document is April 20, 2017.

See Exhibit "E" for our registered agents authorized to receive service of process.

I received on the date appearing adjacent to my signature below a Franchise Disclosure Document of Workout Anytime Franchise Corporation dated April 20, 2017 which included the Exhibits (Exhibits "A" through "M") listed below:
A. Franchise Agreement
B. Personal Guaranty
C. Non-Competition and Non-Solicitation Agreement
D. Area Development Agreement
E. State Administrators and Agents for Service of Process
F. Personal Data Disclosure and Franchisee Ownership Information Form
G. State Specific Addendum (as applicable)
H. Financial Statements
I. Operation's Manual
J. List of Franchisees
K. Terminated Franchises
L. Territory Description
M. Lease Amendment
N. Receipts

WOATFDD042017v1

Date FDD Received:

_____April 9th_____, 201_8_   _Troy Bage_
Date                              Prospective Franchisee

                                  Troy Bage
                                  Printed Name

WOATFDD042017v1



# FRANCHISE AGREEMENT

WOA Lafayette GA, LLC / John H Greff

---

Franchisee
**09/01/2020**

---

Effective Date
Workout Anytime Lafayette  (Georgia)

---

Franchised Location

05/20

QB\62388385.6

# TABLE OF CONTENTS

**Page**

SECTION 1 - GRANT OF LICENSE ........................................................................................ 2

SECTION 2 - TERM ........................................................................................................... 2

SECTION 3 - INITIAL FRANCHISE FEE ............................................................................ 3

SECTION 4 - CONTINUING FEES ..................................................................................... 4

SECTION 5 - ADVERTISING AND PROMOTION ............................................................ 6

SECTION 6 - RECORDS ..................................................................................................... 7

SECTION 7 - SERVICES AND ASSISTANCE PROVIDED BY THE FRANCHISOR ........... 8

SECTION 8 - LOCATION OF THE CLUB, CONSTRUCTION AND OPENING FOR
             BUSINESS, LEASE OR MORTGAGE ...................................................... 9

SECTION 9 - MAINTENANCE AND UPGRADING THE CLUB ......................................... 11

SECTION 10 - BRIDGE LMS PLATFORM ........................................................................ 11

SECTION 11 – FRANCHISEE'S DUTIES AND OBLIGATIONS ........................................ 12

SECTION 12 - PURCHASE OF EQUIPMENT, INVENTORY AND SUPPLIES ................... 15

SECTION 13 - INSURANCE, INDEMNIFICATION AND RELEASE .................................. 15

SECTION 14 - TRADEMARKS ......................................................................................... 17

SECTION 15 – LOSS, CONDEMNATION AND CASUALTY .............................................. 17

SECTION 16 - COVENANTS ............................................................................................. 18

SECTION 17 - TERMINATION ......................................................................................... 20

SECTION 18 – TRANSFER AND ASSIGNMENT .............................................................. 23

SECTION 19 - MISCELLANEOUS .................................................................................... 26

SECTION 20 -- DISPUTE RESOLUTION .......................................................................... 29

SECTION 21 -- ACKNOWLEDGEMENTS ......................................................................... 30

EXHIBIT A -- FRANCHISE INFORMATION
EXHIBIT B -- GUARANTEE AND ASSUMPTION OF OBLIGATIONS

05/20

QB\62388385.6

**Workout Anytime Franchising Systems, LLC**

**FRANCHISE AGREEMENT**

This Franchise Agreement  ("Agreement") is entered into as of 09/01/2020
("Effective Date") by and between Workout Anytime Franchising Systems, LLC, a Georgia limited liability company ("Franchisor," "us" or "we"), whose principal address is 2325 Lakeview Parkway, Suite 200, Alpharetta, Georgia, 30009, and __WOA Lafayette GA, LLC.__ , a limited liability company ("Franchisee," "you" or "your") whose principal address is 130 Rainbow Drive, Unit 3042 Livingston, TX 77399

**RECITALS**

We own a proprietary system for developing, opening and operating 24 hour health and fitness facilities for the general public through a uniform system which has high standards of service, uses quality equipment, and operates under the business format created and developed by us known as the Workout Anytime Franchise System ("System").

The distinguishing characteristics of the System include, but are not limited to, the name and mark "Workout Anytime," workable and functional interior and exterior designs, confidential operating procedures, standards and specifications for equipment, services, products, and both management and marketing programs. All distinguishing characteristics may be changed, improved, and further developed by us.

The System is identified by certain trade names, service marks, logos, emblems, and indicia of origin, including "Workout Anytime" and "24/7 Get Fit," "Workout Anytime 24/7" and  other trade names and service marks which are now, or may be in the future, designated by us for use with the System ("Marks").

We continue to use, develop and control the use of the Marks to identify to the public the source of services and products marketed under the System, and which represent the System's high standards of quality, cleanliness, appearance and service.

You recognize the benefits to be derived from being identified with the System. You also recognize the value of the Marks and the continued uniformity of image to you, us and other franchisees. You understand the importance to the System of our high and uniform standards of quality, cleanliness, appearance and service, and further recognize the necessity of opening and operating your Workout Anytime health club facility ("Club" or "Franchised Business") in conformity within the System.

You recognize that to enhance the value of the System and the goodwill associated with it, this Agreement places detailed obligations on you, including adherence to our present and future requirements regarding the types of services offered, advertising, physical facilities, operational techniques, and related matters.

You wish to be assisted, trained, and franchised to operate the Franchised Business pursuant to this Agreement at a specific location within the geographic territory specified in this Agreement.

**NOW THEREFORE,** the parties agree as follows:

05/20

## SECTION 1 - GRANT OF LICENSE

**1.1**    <u>Grant</u>.   Subject to the terms and conditions of this Agreement, we grant to you the right, and you undertake the obligation, to use the Marks and the System to continuously operate the Franchised Business Agreement to be located in the geographic area described in attached Exhibit A ("Territory") and at the specific location identified on the cover page and in Exhibit A ("Franchised Location") and to offer and market at the Club approved related services and products that we have approved during the term of this Agreement.   (If we have not accepted a site for the Club as of the Effective Date, we will identify the Franchised Location on the cover page and in Exhibit A following site acceptance.)

**1.2**    <u>Limited Exclusivity</u>.   Provided you are in compliance with this Agreement, during the Term, we will not operate, or license others to operate, a health club facility operated under the Marks in the Territory. Notwithstanding this grant of limited exclusivity, we may:

**A.**    Grant other franchises or licenses for, and operate company or affiliate-owned, health and fitness businesses operated in private establishments located in the Territory, if access to those businesses is limited to employees of the business or transient guests of the business.

**B.**    Establish, and license others to establish, Workout Anytime businesses at any location outside the Territory, notwithstanding their proximity to the Territory or the actual or threatened impact on the Franchised Business.

**C.**    Own and operate health and fitness businesses under different trademarks at any location inside or outside of the Territory, or grant others the right to own and operate health and fitness businesses under different trademarks at any locations inside or outside of the Territory.

**D.**    Sell and distribute, directly or indirectly, or license others to sell and distribute, directly or indirectly, any products, services or merchandise from any location or to any purchaser (including members of your Franchised Club), through any channel or method of distribution (including, but not limited to, sales made by or through mail order and/or on the Internet) and retain all revenues from those sales, so long as those sales are not conducted from a Workout Anytime business operated at a location inside the Territory.

**E.**    Purchase, be purchased by, merge or combine with, businesses that directly compete with Workout Anytime business.

**F.**    Own, operate and franchise clubs offering the same or similar services under the Marks in non-traditional venues such as airports, train stations, military bases, educational facilities, hospitals, health care facilities and casinos.

**G.**    Engage in any other activities not expressly prohibited by this Agreement.

## SECTION 2 - TERM

**2.1**    <u>Initial Term</u>.   The term of this Agreement ("Term") begins on the Effective Date and expires at midnight on the day preceding the 10th anniversary of the date the Club first opened for business unless terminated earlier as provided in this Agreement.   (We may complete and forward to you a notice to memorialize the date the Club first opened for business.)

**2.2**    <u>Successor Franchise</u>.   When the Term ends, you will have the option to obtain an unlimited number of successor franchise terms of 5 years each, unless prior to the end of the preceding term, we have

05/20

announced a decision to stop franchising the Workout Anytime concept or we decide to withdraw the Workout Anytime concept from the geographic market in which the Club is located. You must give us written notice of your desire to exercise your option not more than 12 months and not less than 6 months before the end of the prior term. We may require you to satisfy any or all of the following as a condition of exercising your option for the next successor franchise term:

**A.** You must execute the standard form of Workout Anytime franchise agreement that we are then offering to new franchisees (or the standard form that we most recently offered, if we are not then offering franchises) ("Successor Franchise Agreement"). The terms of the Successor Franchise Agreement may be substantially different from the terms of this Agreement. We will modify the Successor Franchise Agreement to delete terms inapplicable to that successor term (such as opening deadlines).

**B.** During the prior term, you have substantially complied with this Agreement and the System.

**C.** Neither you nor your affiliates may be in default under this Agreement or any other agreements between you or your affiliates and us or our affiliates; you and your affiliates must not be in default beyond the applicable cure period under any real estate lease, equipment lease or financing instrument relating to the Club; and you must not be in default beyond the applicable cure period with any vendor or supplier to the Club.

**D.** You have the right to continue operating at the Franchised Location for the full term of the Successor Franchise Agreement.

**E.** You renovate and modernize the Club to reflect the then-current operating specifications and image of the System.

**F.** You and all guarantors under this Agreement must sign a general release, in a form we prescribe, of any and all claims against us, our affiliates and our and their past, present and future officers, directors, members, managers, shareholders and employees.

**G.** You and those of your employees designated by us must successfully complete (as determined by us in our sole discretion) any additional training courses that we then require.

**H.** You pay us a Renewal Fee of $2,500.

## SECTION 3 - INITIAL FRANCHISE FEE

**3.1** Unless the Franchised Club is being developed pursuant to a Development Agreement, no later than the date you sign this Agreement, you must pay us an initial franchise fee in the amount of $35,000 ("Initial Franchise Fee"). You acknowledge and agree that the Initial Franchise Fee is fully earned by us when paid and is not refundable. If any taxes, fees or assessments are imposed on us by reason of our acting as franchisor or licensing the Marks, you must reimburse us the amount of those taxes, fees or assessments within 30 days after receipt of an invoice from us.

**3.2** If the Franchised Club is being developed pursuant to a Development Agreement, no additional Initial Franchise Fee need be paid if the Franchised Club is the first Franchised Club developed under the Development Agreement. For all additional Franchised Clubs developed under the Development Agreement, the balance of the Initial Franchise Fee to be paid pursuant to this Agreement is $10,000. The balance of the Initial Franchise Fee to be paid pursuant to this Agreement (if any) is listed in Exhibit A.

3

05/20

WOA Lafayette Transfer Fee - $8750 to be paid by Seller/ John Greff was given variance to transfer fee

## SECTION 4 - CONTINUING FEES

**4.1**     <u>**Continuing Monthly Royalty Fee.**</u>

       **A.**     On or before the 10th day of each calendar month, commencing when you begin the pre-sale of memberships and continuing for the Term, you will pay a continuing monthly royalty fee ("Royalty Fee") equal to 6% of your Gross Revenues during the prior calendar month.

       **B.**     "Gross Revenues" includes all revenue you generate from all business conducted at or in connection with your Club, including but not limited to membership fees, "Rate Guaranty" or comparable fees; personal training fees, tanning bed fees, massages, and the sale and delivery of any other services, products, merchandise, and tangible property of any nature whatsoever, whether in cash or for credit, from sources paying at the club, outside the club or online and whether collected or uncollected. "Gross Revenues" does not include the amount of any applicable sales tax imposed by federal, state, municipal, or other governmental authority if such taxes are stated separately when the customer is charged, and you pay such amounts as and when due to the appropriate taxing authority. Also excluded from Gross Revenues is the amount of any documented refunds, charge backs, credits, and allowances given to customers in good faith and only in accordance with our operating procedures. All barter and exchange transactions for which you furnish services or products in exchange for goods or services to be provided by the vendor, supplier, or customer will be valued at the full retail value of the memberships bartered in exchange for the goods or services provided to you. Gross Revenues also includes the proceeds of any business interruption insurance paid to you. Gross Revenue also includes any payments you receive from vendors.

       **C.**     Subject to your receipt of business interruption insurance payments, if you are unable to operate the Club due to damage or loss to the Club caused or created by a casualty, act of God, condemnation, or other condition over which you have no control, then the additional monthly Royalty Fee will be waived for a period no greater than 6 months commencing with the month in which the damage or loss occurs.

**4.2**     <u>**National Brand Development Fund.**</u>   By the 10th day of each calendar month, you will pay a monthly National Brand Development Fee equal to 1% of your monthly Gross Revenues. Payment of the National Brand Development Fee will commence when you begin the pre-sale of memberships. We reserve the right to increase the monthly National Brand Development Fee to a maximum of 2% of Gross Revenues following 30 days' written notice. Those monies will be utilized for the design and development of advertising, both local and national advertising costs, public relations, trade shows and conventions, and those other costs associated with both developing and promoting the System and the Workout Anytime brand.

**4.3**     <u>**Technology Package and Software License Fee**</u>. By the 10th day of each calendar month, you will pay a monthly fee for the Technology Package of $595 to compensate us for our expenses in developing and managing the Workout Anytime website, your specific web page which links from the Workout Anytime website, as well as your Club's email platform (including up to 5 discrete email addresses) and other technology we determine important in the operation of your Club. Payment of the fee for the Technology Package will commence when you begin the pre-sale of memberships. We periodically may increase the fee for the Technology Package. You also must install certain software (including virus protection) on your computer system as we periodically determine from approved suppliers and pay any necessary software license fees.

**4.4**     <u>**Payment Processing Vendor and Fees.**</u> You authorize our approved third-party vendor to deduct from any monies it collects on your behalf the amount of all fees you are obligated to pay us and/or our

4

05/20

affiliates on the due date of those fees. All Gross Revenues derived from the sale of all products and services at the Club must be processed through our approved third-party payment processor. You also authorize the vendor to supply us with any information it may have relating to the operation of your Club and account. To effectuate the terms of this Section, and to ensure the proper and timely remittance of all fees due us under this Agreement, you irrevocably appoint Workout Anytime as your true and lawful attorney-in-fact to permit our review and, as may become necessary, our amendment of your account with the third-party vendor employed to collect your monthly membership monies. This power of attorney will survive the termination of this Agreement.

**4.5     Financial Statements.**  By the 10th day of each calendar month, you will supply a financial statement to us of the previous month's membership activities, including the number of new members, renewing members, cancelled members and current active enrollment, as well as the amount of all revenues from the Club, including membership sales revenue, personal training revenue, and revenue associated with the sale of merchandise and other products, including supplements, food and liquids/beverages. We may also contact you by telephone or Email to collect this information.

**4.6     Computer System Corruption Fee.**  If you fail to maintain computer virus protection software in accordance with our requirements and the Platform on any computer you use to access our computer network, and any virus, malware or similar issues are transmitted to our computer network as a result of your failure, you will pay to us a fee in the amount of the fees charged by outside vendors and verifiable internal expenses in relation to the issue per occurrence.

**4.7     Alignment Deficiency Fee.**  If you are in default under this Agreement, at our discretion, and without waiver of any of our rights under this Agreement, in lieu of termination of this Agreement, we may impose a fee ("Alignment Deficiency Fee") in an amount up to $1,500 per event of default.  You must pay the Alignment Deficiency Fee within 3 days of our demand.

**4.8     Interest and Late Fee.**  If any payments by you due to us are not received in full by the due date, in addition to paying the amount owed, you must pay to us interest on the amount owed from the due date until paid at the lesser of the maximum rate permitted for indebtedness of this nature in the state in which the Club is located or 18% per annum.  In addition, a late fee of $100 may be assessed at our discretion on all payments by you due to us and not received by us by the due date.  Payment of a late fee and/or interest by you on past due obligations is in addition to all other remedies and rights available to us pursuant to this Agreement or under applicable law.

**4.9     Training Cancellation Fees.**  If you cancel either the classroom training scheduled to take place at our headquarters or training facility or the onsite training and health club opening scheduled at your Club's site, you must pay to us a $200.00 cancellation fee for each scheduled attendee.  If you cancel on site or during set up, training and health club opening any time after confirmation of scheduled dates, you must pay to us a $1,500.00 cancellation fee.  In addition to the foregoing training cancellation fees, you must also reimburse us for the costs incurred by us to rebook travel and hotel accommodations for the subsequently scheduled on-site training and health club opening activities.

**4.10     Inspection Fee.** Pursuant to Sections 11.2 and 14.3, we, or an assigned site inspector, have the right to appear unannounced at our sole discretion, to inspect the general operation and maintenance of your Club, and your use of the Marks. You will pay to us $125 per quarter to cover our costs associated with such inspections.

**4.11     Partial Payments.**  No payment by you of a lesser amount than due will be treated as anything other than a partial payment on account, regardless of whether you include an endorsement, statement or

05/20

accompanying letter to the effect that payment of the lesser amount constitutes full payment. We have sole discretion to apply any payments by you to any past due indebtedness and we have the right to accept payment from any other entity as payment by you without that entity being substituted for you.

## SECTION 5 - ADVERTISING AND PROMOTION

**5.1** **Local Advertising Expenditure**.

      **A.** Commencing when you begin the pre-sale of memberships and continuing for the Term, you will spend at least $2,000 each calendar month on advertising, marketing and otherwise promoting the Club ("Local Advertising Expenditure"). We periodically may offer recommendations as to the type, manner and time frame to maximize the benefit of your advertising. We have the right to require you to pay the Local Advertising Expenditure directly to us and, if so required, we will make such expenditures as we deem appropriate to promote the Club. You must submit proof of your expenditures for Local Advertising to Workout Anytime upon request.

      **B.** We periodically may make available to you advertising and promotional materials for the Club which are used by us, our affiliates and other franchisees of the System. If so, we may provide you a sample of each type of advertising and promotional material at no charge via a web download, or other means of transmission we deem appropriate. If you want additional copies you must pay duplication or printing costs.

      **C.** You must submit to us in writing for our prior acceptance all sales promotion materials and advertising that have not been prepared, or previously accepted, by us and identify the proposed media in which you propose to place the advertising. If our written consent to the material and its proposed placement is not received within 10 days after the date that we received the material, the material may not be used. In no event will your advertising or marketing materials contain any statement or material that, in our sole discretion, may be considered: **(i)** in bad taste or offensive to the public or to any group of persons; **(ii)** defamatory of any person or an attack on any competitor; **(iii)** to infringe upon the use, without permission, of any other persons' trade name, trademark, service mark or identification; **(iv)** inconsistent with the public image of the System or the Marks; or **(v)** not in accordance with any federal or state law. We reserve the right to require you to discontinue the use of any advertising or marketing materials.

**5.2** **Exterior Signage.** You will install and maintain an outdoor sign in a prominent location in accordance with our sign specifications, or as we otherwise approve in writing, unless you are prohibited from doing so by applicable laws and regulations. You will use your best efforts to obtain any permit or variance required to allow the installation and maintenance of an outdoor sign meeting our specifications.

**5.3** **Social Media.** You agree not to promote, offer or sell any products or services relating to the Club through, or use any of the Marks in, any form of electronic communications, including Internet web sites, social networking sites, applications or other future technological avenues that enable users to create and share content or to participate in social networking (collectively, "Social Media"), without our prior written consent, which we may withhold for any or no reason. You must, at all times, comply with our Social Media policy, as modified periodically. You expressly acknowledge and agree that your use of any Social Media relating to the Club is subject to our prior written approval. You may not establish an independent site or page on any Social Media. If we authorize you to have and/or design a site or a page on any Social Media for the Club, your site and page may only be accessed from our site or page, and we may prohibit links between your site or page and any other site. You acknowledge that any use of Social Media by you with respect to the Club constitutes advertising and promotion subject to this Section 5, and you agree to comply with any additional policies and standards we issue from time to time with respect to Social Media.

05/20

You acknowledge that any copyright in your sites or pages on any Social Media will be deemed to be owned by us, and you agree to sign any documents that we reasonably deem necessary to affirm our ownership of the copyright. If necessary, you must ensure cooperation with us by any web site service provider or web site hosting company with which you do business. You represent that you have or will have the lawful right to use any proprietary materials of others that appear on your sites or pages on Social Media. We periodically may provide to you content for your sites and pages on Social Media, including copy, news stories and photographs. We must consent to any changes to your sites and pages on Social Media.

## SECTION 6 - RECORDS

**6.1     Recordkeeping.** In connection with the Club, you must prepare on a current basis complete and accurate records concerning all financial, marketing and other aspects of the business conducted under this Agreement. You must maintain an accounting system which accurately reflects all operational aspects of the Club including uniform reports as may be required by us. Your records must include tax returns, monthly reports, statements of Gross Revenues (to be prepared each month for the prior calendar month) and profit and loss statements and balance sheets. You must preserve all of your books and records in electronic form for at least 3 years from the date of preparation, or longer as required by government regulations, and make them available to us within 5 days after our written request.

**6.2     Audit Rights.** During and after the Term, we have the right to inspect, copy and audit your books and records, your federal, state and local tax returns and any other forms, reports, information or data that we may reasonably designate, including unlimited real time access to your computer system. We will provide you 10 days' written notice before conducting an in-person financial examination or audit. We (or our designees) may conduct the examination or audit at our offices or those of a third party, in which case we may require you to send us your records. If the examination or audit reveals an understatement of Gross Revenues, you must immediately pay to us all amounts owed, plus interest (and a late fee at our discretion) as provided in Section 4.8. If an inspection or audit is made necessary by your failure to provide reports or supporting records as required under this Agreement, or to provide those reports or records on a timely basis, or if the audit or inspection reveals an understatement of Gross Revenues of greater than 2% for the audit period, you must reimburse us for the full cost of the inspection or audit, including travel, lodging, meals and wages of our representatives and the reasonable charges of any attorneys or independent accountants we use for the inspection or audit and, upon our request, you must thereafter provide us with periodic audited financial statements. The remedies set forth in this Section are in addition to any other remedies and rights available to us under this Agreement or applicable law.

**6.3     Ownership of Data.** You agree that all data that you collect from members or others in connection with the Club, including member lists, is deemed to be owned by us. You have the right to use the member data while this Agreement or a Successor Franchise Agreement is in effect, but only in accordance with any privacy policy that we may establish from time to time.

**6.4     Data Protection.** You agree and undertake that you will:

      **A.**     Comply with the provisions of all applicable laws, regulations and best practices relating to privacy and data protection ("Data Protection Laws") in the use and processing of any personal data, including customer contact information (such as name, telephone numbers, e-mail and postal addresses), and transactional information collected by you from customers and prospective customers of the Franchised Business ("Customer Personal Data").

05/20

**B.** Refrain from otherwise modifying, amending or altering the contents of the Customer Personal Data or disclosing or permitting the disclosure of any of the Customer Personal Data to any third party unless required by applicable law or specifically authorized in writing by us.

**C.** Implement and maintain throughout the Term appropriate technical and organizational measures to protect Customer Personal Data against an unauthorized or unlawful processing, access or use and/or accidental loss, destruction, damage, alteration or disclosure ("Data Breach").

**D.** Promptly notify us in writing if you suspect there has been a Data Breach, in which event you will do all such acts and things (at your own expense) as we may require in order to remedy or mitigate the effects of the Data Breach.

**E.** Promptly notify us of any complaint, communication or request relating to the Applicable Data Protection Laws.

## SECTION 7 - SERVICES AND ASSISTANCE PROVIDED BY THE FRANCHISOR

**7.1** **Generally.** We will offer you initial and continuing services as we deem necessary or advisable in furthering the business of the Club, and the business of the System as a whole. We have the right to delegate to others the performance of any of our duties under this Agreement.

**7.2** **Specific Services.** During the Term, we intend to provide you, as we deem appropriate, initial and continuing services including the following:

**A.** Providing assistance and guidance with respect to equipment orders which will be placed through our affiliate. We will help you determine the proper amount of time between equipment orders, equipment delivery and their set-up to ensure the proper opening of the Club.

**B.** Furnishing you with specifications or guidelines for all initial and replacement equipment, inventory and supplies required for the operation of the Club.

**C.** Providing you or your designated manager ("Manager") and up to one other person with our initial training program. You and your Manager must attend and satisfactorily complete the initial training program prior to opening the Club. The initial training program will be conducted approximately 9 to 12 weeks prior to the opening of the Club. You will be responsible for travel and living expenses incurred by you or any of your employees who participate in the initial training program. The initial training program will be held at our headquarters or at another location that we designate. Additional employees who desire to attend the initial training program may do so, subject to space availability and your payment of a training fee as determined by us.

**D.** Providing assistance with respect to pre-opening, opening activities and/or on-going operations or training will be available as requested by you as we deem appropriate in light of your needs and the availability of our personnel. If we provide on-site training assistance during opening week you will bear the travel, living and other expenses associated with our representative being on-site.

**E.** Formulating marketing plans, advertising and promotional programs and materials.

**F.** Maintaining a website which we control that provides information about the System and the products and services offered by franchisees. We also have the sole right to create interior pages on our

05/20

website(s) that contain information about your business and other franchised and company owned locations. You will have access to post on the interior web pages for your Club provided you adhere to our guidelines.

      **G.**     Providing consultation and responding to inquiries regarding your operations through communications platforms such as telephone, Email or other methods of communication as we periodically determine.

      **H.**     Developing new products and service methods for the operation of the System as we deem appropriate. We will advise you of any new product or service methods and you must adopt the new product or service methods within a reasonable period as specified by us.

      **I.**     Loaning you one copy, or provide you with access to the electronic version, of the Bridge LMS Platform which contains mandatory and suggested specifications, standards, operating procedures and rules we periodically prescribe.

      **J.**     Making commercially reasonable efforts to negotiate favorable prices and terms with major suppliers and allow you to utilize such centralized purchasing system.

      **K.**     Periodically conducting visits by our representatives and designees to the Club at any time. These visits will be made at our expense, as we determine necessary or appropriate and we intend to provide you a written report following each visit. We intend to conduct the first visit within 6 months after the Club opens. Our representatives have the right to discuss with you or your designees all matters that may pertain to compliance with this Agreement and with our standards, specifications, requirements, instructions and procedures.

      **L.**     Assisting in general market research and providing guidance in determining the prices charged by you for services or products at your Club.

**SECTION 8 - LOCATION OF THE CLUB, CONSTRUCTION AND OPENING FOR BUSINESS, LEASE OR MORTGAGE**

**8.1**    **Your Responsibility.**  Within 180 days after the Effective Date, you must obtain our site acceptance of the Franchised Location. If we have not accepted a site within this time period, we may terminate this Agreement pursuant to Section 17. You assume all cost, liability and expense for locating, obtaining and developing a site for the Club. You may not make any binding commitments to purchase or lease a site until we have accepted the site in writing.

**8.2**    **Site Selection Assistance.**  We may, but are not required to, provide you with the following site selection assistance:  **(a)** our site selection guidelines and, as you may request, a reasonable amount of consultation with respect thereto; and **(b)** that on-site evaluation as we may deem advisable (subject to the availability of our personnel) as part of our evaluation of your request for site acceptance, provided that, if we provide this assistance at your request, you must reimburse us for all travel, living and other expenses incurred by our representatives in connection with our on-site evaluation. Notwithstanding the foregoing, we have no obligation to conduct any on-site evaluations of locations you propose.

**8.3**    **Site Information and Evaluation.**  For each proposed site, you must submit to us a site review report consisting of financial pro forma, a description of the site, photographs, demographic information, site characteristics (including access and egress points and the amount of road traffic), other fitness facilities in the area, and any other information that we may require, including, but not limited to, a letter of intent or other evidence satisfactory to us, which confirms your favorable prospects for obtaining the site. In

9

addition, we may require a site analysis prepared by a third party vendor at your expense. We reserve the right to designate the third party vendor used to prepare the site analysis and the right to conduct an on-site evaluation of the proposed site before deciding whether to accept the site.

8.4     **Site Acceptance.**

      **A.**     Within 60 days after our receipt of a complete (as determined by us) site review report, we will review that information, evaluate the proposed site and advise you in writing whether we have accepted the site; however, we have no obligation to review any site review report if you and/or your affiliates are not in full compliance with all agreements with us and/or our affiliates. If we do not respond within that time period, we will be deemed to have rejected the site. Our acceptance or rejection of a site may be subject to reasonable conditions we determine in our sole discretion.

      **B.**     You acknowledge that, in order to preserve and enhance the reputation and goodwill of the System, all Workout Anytime businesses and the goodwill of the Marks, all Workout Anytime businesses must be properly developed, operated and maintained. Accordingly, you agree that we may refuse to accept a site unless you demonstrate sufficient financial capabilities, in our sole judgment, applying standards consistent with criteria that we use to establish operations in other comparable market areas, to properly develop, operate and maintain the Club. To that end, you must provide us with those financial statements and other information regarding you and the development and operation of the proposed Club, including, without limitation, investment and financing plans for the proposed Club, as we may require.

      **C.     Our acceptance of a site does not constitute a representation or warranty of any kind, express or implied, of the site's suitability for a Workout Anytime business or any other purpose. Our acceptance indicates only that we believe that the site meets our then-current site selection criteria. Applying criteria that have appeared effective with other sites might not accurately reflect the potential for all sites, and demographic and/or other factors included in or excluded from our criteria could change, altering the potential of a site. The uncertainty and instability of these criteria are beyond our control, and we are not responsible if a site we accept fails to meet your expectations. Your submission of a proposed site for our acceptance is based on your own independent investigation of the site's suitability for a Workout Anytime business.**

8.5     **Lease.** If you lease the Franchised Location:

      **A.**     Your landlord and you must enter into then-current form of Lease Addendum.

      **B.**     You will install the maximum sized signage allowed by either your lease or local law. Workout Anytime must approve the proposed sign, including color, font and dimensions prior to construction of the sign.

      **C.**     If we have an approved real estate broker in your area, you must utilize the services of that broker to assist in your site search and to ensure the site meets our criteria. You will not be charged for the services of the approved real estate broker if paid by your landlord. If your landlord does not pay that cost or if you do not use our approved real estate broker, you must pay us $1,500 for the costs associated with site acceptance and lease review.

8.6     **Construction.**     You assume all cost, liability and expense for developing, constructing and equipping the Club and opening the Club within 12 months after the Effective Date. You must ensure that your proposed plans for the Club ("Plans") comply with all applicable ordinances, building codes and permit requirements, lease requirements and restrictions and the Americans with Disabilities Act. You

05/20

must use only registered architects, engineers and professional and licensed contractors, each of whom must be approved by us. You must submit the Plans to us and revise the Plans as we require. Once we consent to the Plans, neither you nor your contractor may change them unless you again obtain our consent. You may not submit the Plans to your local government agency or begin site preparation or construction before we have notified you, in writing, that we have consented to the Plans. You may not commence construction until you have obtained all required permits and licenses.

**8.7** **Opening.** We will not authorize the opening of the Club unless all of the following conditions have been met: your Managers and all employees have been trained; the Club is ready for opening in all other respects and is in compliance with all System standards (including signage, inventory, fixtures and equipment); the Initial Franchise Fee has been paid in full; all state and local requirements to operate a health club facility have been satisfied; the required certificates of insurance have been furnished to us; you are in compliance with all terms of this Agreement; all items contained in our then-current opening checklist have been completed to our satisfaction; and you have met your pre-sale membership obligations.

### SECTION 9 - MAINTENANCE AND UPGRADING THE CLUB

**9.1** **Compliance with Standards.** In recognition of the mutual benefits that come from maintaining the System's reputation for quality, you will at all times comply with all System standards, specifications, processes, procedures, requirements and instructions regarding the Franchised Location, including the layout of furnishings, fixtures, and equipment, as are set forth in the Platform or in accordance with System standards.

**9.2** **Maintenance.** You must maintain the interior and exterior of the Club and all fixtures, furnishings, signs and equipment in first-class condition and in the highest degree of cleanliness, orderliness, sanitation and repair in accordance with the requirements of the System and the Platform and the lease for the Franchised Location, including repainting the Club at least every 3 years. The Club must be adequately lighted and meet all brand standards, including exterior window graphics, interior graphics and location identifiers within the Club. Expenditures in connection with signage and equipment are considered a maintenance expenditure (whether for repair or replacement) under this Section rather than a remodeling expenditure under Section 9.3. There is no limitation on the amount that you may be required to spend for repairs and maintenance. You may not make any alteration, addition, replacement or improvement in, or to, the Franchised Location without our prior written consent.

**9.3** **Remodeling.** In addition to ordinary maintenance and upkeep, we have the right to require you to undertake structural changes, remodeling and renovations and other modifications to the Club and all fitness equipment to conform to the design, color schemes and presentation of the Marks that we are then requiring of new Workout Anytime businesses.

**9.4** **Computer System.** You must, at your expense, modify, upgrade or update your computer system at any time that we require you to do so at your sole expense.

### SECTION 10 - BRIDGE LMS PLATFORM

**10.1** **Provided on Loan.** As provided in Section 7.2.I, we will furnish you one copy of, or provide electronic access to, the Bridge LMS Platform ("Platform") on loan. (As used in this Agreement, the term "Platform" also includes the FranConnect HUB of library resources and all written and electronic correspondence from us regarding the System, other publications, materials, drawings, memoranda, videotapes, CDs, DVDs, audio tapes, and electronic media that we from time to time may provide to you.)

11

05/20

The Platform contains mandatory specifications, standards, policies and procedures prescribed from time to time by us for Workout Anytime businesses. You will operate the Club in accordance with the Platform.

**10.2    Modifications.** The Platform may be modified by us from time to time to: **(a)** reflect changes in the System, including, without limitation, changes in specifications, standards, policies and procedures of Workout Anytime businesses; **(b)** specify brands, types and/or models of equipment which must be used by you in the operation of the Club; and **(c)** specify changes in the décor, format, image, products, services and operations of a Workout Anytime business prescribed by us. You must accept and use all such changes and make those expenditures as required to implement those changes. If a dispute about the contents of the Platform occurs, the master copy maintained by us at our principal office will be controlling.

**10.3    Confidential Nature.** You will treat the contents of the Platform as confidential and will not copy or otherwise reproduce, in whole or in part, or in any way make the contents of the Platform available to any person other than those persons employed by you to whom disclosure is necessary to enable you to operate the Club.

**10.4    Variations.** Since complete uniformity under varying conditions may not be possible or practical, we reserve the right, at our discretion, to vary standards for any Workout Anytime business based upon the peculiarities, particularities and circumstances of that Workout Anytime business.

## SECTION 11 – FRANCHISEE'S DUTIES AND OBLIGATIONS

**11.1    Best Efforts.** You will diligently develop the business of the Club and use your best efforts to market and promote the Club's core services and products.

**11.2    Operational Requirements.** During the Term you will comply with all present and future standards, specifications, processes, procedures, requirements and instructions regarding the operation of the Club as set forth in the Platform or otherwise in writing, including, but not limited to, the following requirements:

      **A.**     A complete set of exercise equipment must be initially ordered from us or an approved supplier and all additional equipment must be ordered from us or an approved supplier.

      **B.**     You must conduct pre-opening sales for your Club in accordance with our standards and the Platform. If you have not sold at least 500 charter memberships by the date your Club opens for business, we have the right to send up to 2 representatives to the Club for up to 10 days to provide sales and other training to you and your staff. You must pay our then-current training fee, plus travel, living and other expenses of our representatives.

      **C.**     You or your Manager must devote full time and best efforts to the management and operation of the Club.

      **D.**     You may only offer services and products for sale at the Club that have been approved by us. We reserve the right, in our sole discretion, to disallow any service or product that you have requested permission to offer. Any additional service or product we introduce into the System must be offered on a continuing basis at the Club at the time and in the manner required by us. All equipment, signs, products, supplies and other items necessary to add new services or products must be acquired, installed and utilized at your expense following 60 days' notice from us.

**E.**     Only signs, advertising and promotional material, services, equipment, supplies, uniforms, furnishings, flooring, color/design scheme and fixtures that meet our standards and specifications can be used at the Club or in the promotion or marketing of the Club.

**F.**     All consultants and employees of the Club must be clean and neat in appearance and must always wear Workout Anytime brand approved attire.

**G.**     The Club and its operations must comply with all applicable state and local laws, ordinances, rules, codes, regulations and other requirements.

**H.**     The Club must be open for business 24 hours every day during the Term, except for permitted closures, and the Club must be staffed at least for those hours we periodically specify.

**I.**     The employees, equipment and supplies, inventory and other items on hand at the Club must always be sufficient in quality and number to efficiently meet the current and anticipated volume of business.

**J.**     You must maintain the Club and all fixtures, furnishings, signs, fitness equipment and all other components of the Club in the highest degree of cleanliness and sanitation in accordance with the requirements of the System. All necessary and appropriate measures must be taken to avoid an unsatisfactory sanitation or health rating by or from any governmental agency or authority. Conditions or practices disapproved by any such agency or authority must be promptly corrected.

**K.**     All of your dealings and transactions with members, customers, suppliers and other franchisees must be performed fairly and honestly. You will not permit a non-member access to your Club, except on an introductory or trial basis and then only for a maximum of 30 days. You will not solicit or entice another franchisee's member to terminate its membership to have the member become associated with your Club.

**L.**     You must provide a reasonable space at your point of sale counter or another reasonable location inside the Club for a franchise recruitment advertisement which you agree to restock with materials we provide.

**M.**     You are solely responsible for recruiting new customers to your Club through advertising, marketing and business networking. Once an individual joins your Club, that person's membership fees are paid solely to you regardless of whether the member uses another Workout Anytime club. No membership may be transferred without our prior written consent, which we may grant or withhold in our discretion.

**N.**     You will establish prices for all products and services at the Club other than individual/family and corporate membership rates and the Rate Guaranty Fee, which you understand and agree are to be periodically established solely by us in our sole discretion.

**O.**     You must permit members of any other Workout Anytime club to use of your Club and treat them with the same courtesy and respect you regularly extend to a member originating from your Club. This membership reciprocity includes access to tanning, massages and premium services, if the member has purchased a membership that includes premium services at their originating Workout Anytime club. You must permit those members to utilize such premium features at your Club to promote a positive experience for both you and the member.

05/20

QB\62388385.6

**P.**     You are responsible for keeping up to date on competitors. This includes an awareness of competitors' pricing, promotional offers, advertising and services.

**Q.**     You must provide training to your employees as we require.

**R.**     In accordance with applicable law, you are responsible for obtaining all health club certifications and licensing prior to opening.

**S.**     You may not transfer members of your Club to any other Workout Anytime club without the express written permission of the member and us.

**T.**     You will immediately notify us of any legal action or proceeding by an individual or agency against you relating to your Club.

**U.**     Following our request, you will present to members of your Club those evaluation forms we periodically prescribe and participate or request your members to participate in any marketing surveys performed by us or on our behalf.

**V.**     Beginning in the 12th month after the Club opens for business, you must generate a minimum of monthly Gross Revenue of $35,000 ("Minimum Monthly Gross Revenue Requirement"). If you fail to attain the Minimum Monthly Gross Revenue Requirement for 2 consecutive months, we have the right to impose any one or all of the following requirements until your monthly Gross Revenues equal or exceed the Minimum Monthly Gross Revenue Requirement: **(i)** we may increase your required local advertising requirement by up to 200%; and/or **(ii)** we may require that your Manager and/or you attend additional training at our headquarters or at another location that we designate and you will be required to pay our then-current training fee.

**W.**     You will fully cooperate with inspections and visits by our representatives and designees conducted at the Club.

**X.**     During the Term and for 3 years after the expiration and termination of the Term, you will ensure that you have provided us your current home address and telephone numbers.

**11.3     Management of the Club.**  If you are an individual, you or your Manager who has successfully completed our training program must directly supervise the Club. If you are a business entity or if you have, in our judgment, insufficient experience in a similar business or in business management generally, then you must nominate an operating partner or Manager having the required experience who will have direct responsibility for all operations of the Club. Any change in the operating partner or Manager will be subject to our approval.

**11.4     Attendance at Annual Convention.**   If we conduct a franchise convention, you or your representative must attend at your cost.  If we charge a registration fee for the convention, you must pay the fee regardless of whether you attend.

**11.5     Employee Matters.**  You will be solely responsible for: **(a)** hiring, training and supervising efficient, competent and courteous employees of good character for the operation of the Franchised Business; **(b)** the terms of their employment and compensation; and **(c)** the proper training of the employees in the operation of the Club.  You will obtain from each of your personnel a signed acknowledgement that such individual understands, acknowledges, and agrees that he or she is an employee of yours and not ours and that such individual will look solely to you for his or her compensation and for all other matters related

14

05/20

to their relationship with you.  You will post a notice on an employee bulletin board clearly visible to employees at the Club notifying all employees of their employer and clearly stating that neither we nor our affiliates are their employer.

## SECTION 12 - PURCHASE OF EQUIPMENT, INVENTORY AND SUPPLIES

**12.1      Sourcing.**  We have the right to require that all equipment, inventory, flooring, supplies and all other items that you purchase for use, sale or resale in the Club:  **(a)** meet specifications that we establish from time to time; **(b)** be purchased only from suppliers to whom we have consented (which may include us and/or our affiliates); and/or **(c)** be purchased only from a single source or from a limited number of designated sources (which may include us and/or our affiliates).   To the extent that we establish specifications, require our consent to suppliers or designate specific suppliers for particular items, we will publish our requirements in the Platform or otherwise in writing.  We may create purchasing restrictions to control the quality and selection, and ensure the consistency, of equipment, inventory, supplies and other merchandise; to consolidate System purchases to reduce costs or ensure availability of products; or for other valid business reasons.  **Although approved by us, we and our affiliates make no warranty and expressly disclaim all warranties, including warranties of merchantability or fitness for any purpose, with respect to equipment (including, without limitation, all exercise equipment), inventory, supplies or other approved items.**

**12.2      Approved Suppliers.**  If you would like to purchase equipment, inventory or supplies that you are not required to purchase from us or a designated supplier, from a supplier to whom we have not consented, you must submit a written request for consent.  We have the right to inspect the proposed supplier's facilities and test samples of the proposed products.  You agree to pay to us a reasonable fee, not to exceed the actual cost of the inspection and testing the proposed product or evaluating the proposed supplier, including personnel and travel costs, whether or not the product or supplier is accepted.  We have the right to grant, deny or revoke consent to products, services and suppliers in our sole discretion.  We will notify you of our decision as soon as practicable following our evaluation.  We reserve the right to reinspect the facilities and products of any accepted supplier and revoke acceptance upon the supplier's failure to meet any of our then-current criteria.

**12.3      Rebates**.  We and our affiliates may earn income on your purchase and lease of equipment, inventory, products and/or supplies.  If we or our affiliates receive any rebates, commissions or other payments from third-party suppliers based on your purchases or leases from them, we may retain the rebates, commissions or other payments.  You agree that we are entitled to such income and consideration.

## SECTION 13 - INSURANCE, INDEMNIFICATION AND RELEASE

**13.1      Insurance.**  You must maintain in full force and effect that insurance which you determine to be necessary, which must include at least the types of insurance and the minimum policy limits specified in the Platform or otherwise in writing.  Each insurance policy must be written by an insurance company that maintains an "A+" or better rating by the latest edition of Best's Insurance Rating Service (or another rating service designated by us).  The insurance policy or policies must be in effect when you take possession of the Franchised Location.  The insurance policy or policies must protect you, us and our respective past, present and future officers, directors, managers, members, owners, employees, representatives, consultants, attorneys and agents.  We and any entity with an insurable interest designated by us must be named as additional insureds in the policy or policies (statutory policies excepted).  Each policy must include a waiver of subrogation in our favor.  We may require additional types of coverage or increase the required minimum amount of coverage upon reasonable notice.  Your obligation to obtain coverage is not limited in any way by insurance that we maintain.  You must provide us with certificates of insurance evidencing the required

15

coverage and proof of payment therefor no later than the date you sign this Agreement. The evidence of insurance must include a statement by the insurer that the policy or policies will not be canceled or materially altered without at least 30 days' prior written notice to us. If you fail to obtain and maintain insurance coverage as required by this Agreement, we have the right, but not the obligation, to obtain the required insurance on your behalf and to charge you for the cost of the insurance, plus a reasonable fee for our services in procuring the insurance.

**13.2    Indemnification.** You agree to defend, indemnify, and hold harmless us and our past, present and future affiliates, officers, directors, managers, members, shareholders, agents, attorneys, consultants, and employees against any claims, losses, costs, expenses, liabilities and damages (collectively, "Claims") arising directly or indirectly from, as a result of, or in connection with the Club, as well as the costs of defending against those Claims (including, but not limited to, reasonable attorneys' fees, costs of investigation, settlement costs and interest). You promptly will give us written notice of any litigation, proceeding, or dispute filed or instituted against you that could directly or indirectly affect us or any of the other indemnitees under this Section and, upon request, you will furnish us with copies of any documents from those matters as we may request.

With respect to any threatened or actual litigation, proceeding, or dispute that could directly or indirectly affect us or any of the other indemnitees under this Section, we will have the right, but not the obligation, to:  **(a)** choose counsel; **(b)** direct and control the handling of the matter; and/or **(c)** settle any claim against the indemnitees. Our exercise of these rights does not affect your obligation to indemnify and hold us harmless in accordance with this Section. This Section will survive the expiration or termination of this Agreement, and applies to Claims even if they exceed the limits of your insurance coverage.

**13.3    General Release.** You (on behalf of yourself and your parent, subsidiaries and affiliates) (collectively, "Releasors") freely and without any influence forever release and covenant not to sue us, our parent, subsidiaries and affiliates and their and our respective past and present officers, directors, shareholders, members, managers, agents and employees, in their corporate and individual capacities, with respect to any and all claims, demands, liabilities and causes of action of whatever kind or nature, whether known or unknown, vested or contingent, suspected or unsuspected (collectively, "demands"), that any Releasor now owns, has or claims to have or holds, or may in the future own or hold, or at any prior time owned, held, had or claimed to have, based on, arising out of or relating to, in whole or in part any fact, event, conduct or omission occurring on or before the Effective Date, including, without limitation, demands arising under federal, state and local laws, rules and ordinances and demands arising out of, or relating to this Agreement and all other agreements between any Releasor and us or our parent, subsidiaries or affiliates, the sale of any franchise to any Releasor, the development and operation of the Club and the development and operation of all other Workout Anytime businesses operated by any Releasor that are franchised by us. Releasors expressly agree that fair consideration has been given by us for this release, and they fully understand that this is a negotiated, complete and final release of all demands.

Notwithstanding the foregoing, claims arising from representations in our Franchise Disclosure Document, or its exhibits or amendments, are expressly excluded from this release.

16

QB\62388385.6

## SECTION 14 - TRADEMARKS

**14.1    Limited Right to Use.**  Your right to use the Marks applies only to the Club operated at the Franchised Location as expressly provided in this Agreement.  We will provide you guidelines for the use of the Marks.  Both during and after the Term, you agree not to directly or indirectly contest or aid in contesting the validity of our rights and/or our affiliates' rights in the Marks or take any action detrimental to our rights in the Marks.

**14.2    Acknowledgments.**  You acknowledge that:  **(a)** the Marks are valid and serve to identify our products, services and Workout Anytime businesses; **(b)** your use of the Marks under this Agreement does not give you any ownership interest in them; and **(c)** all goodwill associated with the Marks inures exclusively to our benefit and is our property.  Upon the expiration or termination of the Term, no monetary amount will be attributable to goodwill associated with your activities as a franchisee under this Agreement.

**14.3    Specific Restrictions on Use.**  You agree:  **(a)** to use only the Marks that we designate, and only in the manner we authorize; **(b)** to use the Marks only for the operation of Club at the Franchised Location and in authorized advertising for the Club; **(c)** to operate and advertise the Club only under the name "Workout Anytime" without prefix or suffix; **(d)** to display the Marks in the Club, at the Franchised Location, and on brochures and other printed materials, employee uniforms and vehicles only in the manner that we authorize; **(e)** not to use the Marks or any names confusingly similar to the Marks as part of your entity or legal name; **(f)** to permit our representatives to inspect your operations to verify that you are properly using the Marks; **(g)** to use the Marks to promote and to offer for sale only the products and services that we have authorized, and not use any of the Marks in association with any other products, materials or services; **(h)** not to use or permit the use of the Marks or any names confusingly similar to the Marks as part of any Internet domain name or e-mail address or in the operation of any Internet web site without our prior written consent; **(i)** not to use the Marks to incur any obligation or indebtedness on our behalf; and **(j)** to ensure that the Marks bear the "®", "™", or "SM" symbol, as we prescribe from time to time.

**14.4    Changes to the Marks**.  We have the absolute right to change, discontinue, or substitute for any of the Marks and to adopt new Marks for use with the System without any liability for any impact to the System.  You agree to implement any such change at your own expense, regardless of the reason for the change, within the time that we reasonably specify.

**14.5    Third-Party Challenges.**  You agree to notify us promptly of any unauthorized use of the Marks that you suspect or of which you have knowledge.  You also agree to inform us promptly of any challenge by any person or entity to the validity of, our ownership of, or our right to license others to use, any of the Marks.  You acknowledge and agree that we have the right, but not the obligation, to initiate, direct and control any litigation or administrative proceeding relating to the Marks, including, but not limited to, any settlement.  You agree to sign all documents and render any other assistance we may deem necessary to the defense or prosecution of any such proceeding.

## SECTION 15 – LOSS, CONDEMNATION AND CASUALTY

**15.1    Loss.**  You will promptly advise us following your receipt of a notice of default or termination of your Club's lease, mortgage, equipment lease or security agreement related to the purchase of equipment and provide us a copy of the notice. You will also promptly give us notice of any proposed taking of your Club, or any of your equipment, or any portion thereof through the exercise of the power of eminent domain, foreclosure, or any dispossessory action. If the Club or a substantial part thereof is to be taken, the Club may be relocated within the Territory or elsewhere following our written approval in accordance with our

05/20

relocation procedures. If you open a Club at another location within one year of the closing of the old Club, the new Club will be deemed to be the Club licensed under the Agreement. If a condemnation, lease termination or mortgage default takes place and a new Club does not open within on year, this Agreement will terminate following notice from us.

**15.2    Damage to the Club.** If the Club is damaged, you will expeditiously repair the damage. If the damage requires that the Club be closed, you will immediately notify us in writing, and will: **(a)** relocate the Club as provided in Section 15.1; or **(b)** repair or rebuild the Club in accordance with our then-existing standards and general specifications and reopen the Club as soon as practicable (but, in any event, within 12 months after the closing of the Club) and give us 30 days' advance written notice of the reopening. If the Club is not (or, in our opinion, cannot be) reopened in accordance with this Section, or relocated pursuant to Section 15.1, this Agreement will terminate following notice from us. The Term will not be extended by any interruption in the Club's operations, except for an act of God that results in the Club being closed not less than 60 days nor more than 180 days.

### SECTION 16 - COVENANTS

**16.1    Confidential Information.** During and after the Term, you may not communicate, divulge or use for any purpose other than the development and/or operation of the Club any confidential information, knowledge, trade secrets or know-how which may be communicated to you or which you may learn by virtue of this Agreement or the operation of the Club. You may divulge confidential information only to your professional advisers, your employees who must have access to the information to develop or operate the Club, your contractors and your landlord, provided that you obtain our prior consent. All information, knowledge and know-how relating to us, our business plans or the System are deemed confidential for purposes of this Agreement, except information that you can demonstrate came to your attention by lawful means prior to our disclosure, or that is or becomes a part of the public domain other than through you. At our request, you will require your employees, and any other person or entity to whom you wish to disclose any confidential information to sign agreements providing that they will maintain the confidentiality of the disclosed information. The agreements, which may be provided by us, must be in a form satisfactory to us and must identify us as a third-party beneficiary with the independent right to enforce the agreements.

**16.2    Restrictions During Term.** You acknowledge and agree that: **(i)** pursuant to this Agreement, you will have access to valuable trade secrets, specialized training and confidential information from us and our affiliates regarding the development, operation, management, purchasing, sales and marketing methods and techniques of the System; **(ii)** the System and the opportunities, associations and experience established by us and acquired by you under this Agreement are of substantial and material value; **(iii)** in developing the System, we and our affiliates have made and continue to make substantial investments of time, technical and commercial research, and money; **(iv)** we would be unable to adequately protect the System and its trade secrets and confidential information against unauthorized use or disclosure and would be unable to adequately encourage a free exchange of ideas and information among Workout Anytime businesses if franchisees were permitted to hold interests in competitive businesses; and **(v)** restrictions on your right to hold interests in, or perform services for, competitive businesses will not hinder your activities. Accordingly, you agree that, during the Term, you will not, without our prior written consent, either directly or indirectly through any other person or entity:

      **A.**     Divert or attempt to divert any business or customer, or potential business or customer, of any Workout Anytime business to any Competitive Business (as defined in Section 16.2.D).

      **B.**     Own, manage, engage in, advise, make loans to, be employed by, assist or have any interest in any Competitive Business.

18

05/20

      **C.**     During the Term, there is no geographical limitation on these restrictions.

      **D.**     As used in this Agreement, the term "Competitive Business" means any business that engages in or operates gymnasiums or workout facilities or offers fitness instruction or personal training.

**16.3**   **Restrictions After Termination, Expiration or Transfer.**  In light of your acknowledgments and agreements as set forth in Section 16.2, you agree as follows:

      **A.**     For a period of 2 years following the expiration, termination or transfer of this Agreement, you covenant and agree that you will not own, manage, engage in, advise, make loans to, be employed by, assist or have any interest in any Competitive Business that is (or is intended to be) located at or within 25 miles of the Franchised Location or within 25 miles of any other Workout Anytime business.

      **B.**     For a period of 2 years following the expiration or termination of this Agreement or a transfer, you further covenant and agree that you will not, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person, firm, partnership, corporation, or other entity, sell, assign, lease or transfer the Franchised Location to any person, firm, partnership, corporation, or other entity which you know, or have reason to know, intends to operate a Competitive Business at the Franchised Location.  You, by the terms of any conveyance selling, assigning, leasing or transferring your interest in the Franchised Location, must include restrictive covenants as are necessary to ensure that a Competitive Business that would violate this Section is not operated at the Franchised Location for this 2-year period, and you must take all steps necessary to ensure that these restrictive covenants become a matter of public record.

**16.4**   **Modification.**  We have the right, in our sole discretion, to reduce the scope of any covenant in this Section 16 effective immediately upon your receipt of written notice, and you agree that you will comply with any covenant as so modified, which will be fully enforceable notwithstanding the provisions of Section 19.3.  If any part of these restrictions is found to be unreasonable in time or distance, each month of time or mile of distance may be deemed a separate unit so that the time or distance may be reduced by appropriate order of the court to that deemed reasonable.  If, at any time during the 2-year period following expiration, termination or transfer of this Agreement, you fail to comply with your obligations under this Section, that period of noncompliance will not be credited toward your satisfaction of the 2-year obligation.  Following the resolution of any dispute regarding the enforceability of this Section that is resolved in our favor, the 2-year period (or such other period as may be deemed reasonable by the court) will run from the date of the resolution.

**16.5**   **Applicability.**  If you are a business entity, all officers, directors, stockholders, partners, members, trustees, beneficiaries and/or principals of you, the franchisee, and any persons controlled by, controlling or under common control with you must execute our standard form of Non-Competition, Non-Solicitation and Confidentiality Agreement.  This Section 16 does not prohibit you, any Principal Owner or any guarantor under this Agreement from having:  **(a)** interests in any other franchise-related agreement with us or our affiliates that remains in effect; or **(b)** ownership of less than 5% of the outstanding equity securities of any publicly-held corporation, as defined in the Securities and Exchange Act of 1934.

05/20

## SECTION 17 - TERMINATION

**17.1    Termination by You.**  If you are in compliance with this Agreement and we materially breach this Agreement and fail to substantially cure the breach within 60 days after a written notice of the breach is delivered to us by you, you may terminate this Agreement, effective 10 days after delivery to us of a notice of termination.  If you terminate this Agreement in accordance with this Section, you must comply with the post-termination procedures set forth in Section 17.5.

**17.2    Termination Following Notice.**  In addition to the grounds for termination stated elsewhere in this Agreement, we may terminate this Agreement, and the rights granted by this Agreement, by written notice to you, without giving you an opportunity to cure, upon the occurrence of any of the following events:

      **A.**    You or your Manager fail to complete our initial training program.

      **B.**    You fail to open the Club for business by the required opening date, unless we, in our sole discretion, extend this period to address unforeseen construction delays that are not within your control.

      **C.**    You or any Principal Owner (as defined in Section 18.3) becomes insolvent or makes a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by you or such a petition is filed against and not opposed by you; if you are adjudicated a bankrupt or insolvent; if a bill in equity or other proceeding for the appointment of a receiver or other custodian for you or your business or assets is filed and consented to by you; or if a receiver or other custodian (permanent or temporary) of your assets or property, or any part thereof, is appointed by any court of competent jurisdiction.

      **D.**    You or any Principal Owner has made a material misrepresentation or omission in your application for the rights granted by this Agreement or is convicted of or pleads no contest to a felony or other crime or offense that may adversely affect the goodwill associated with the Marks.

      **E.**    There is a material breach of any obligation under Section 16.

      **F.**    We discover that you made a material misrepresentation or omitted a material fact in the information that you furnished to us in connection with our decision to enter into this Agreement.

      **G.**    You knowingly falsify any report required to be furnished to us or make any material misrepresentation in your dealings with us or fail to disclose any material facts to us.

      **H.**    You, any Principal Owner, any guarantor under this Agreement or any of your managers, members, officers or directors is convicted of, or pleads no contest to, a crime that we reasonably believe is likely to harm the reputation of the System or our goodwill.

      **I.**    Any Transfer that requires our prior written consent occurs without your having obtained that prior written consent.

      **J.**    You, any Principal Owner or any other entity that is a Workout Anytime franchisee and in which you or any Principal Owner have a direct or indirect ownership interest remain in default beyond the applicable cure period under: **(i)** any other agreement with us or our affiliates; **(ii)** any real estate lease, equipment lease or financing instrument relating to the Club; or **(iii)** any agreement with any vendor or supplier to the Club; provided that if the default is not by you, you are given written notice of the default and 10 days to cure the default.

05/20

**K.**     You refuse to permit, or try to hinder, an examination or audit of your books and records or inspection of the Club or Franchised Location as permitted by this Agreement.

**L.**     Any condition exists with respect to the Club that, in our reasonable judgment, seriously jeopardizes public health or safety.

**M.**     During any 12-month period, you fail to operate the Club for 3 or more consecutive days or 5 total days unless we determine, in our sole discretion, that the failure was beyond your control.

**N.**     Any Principal Owner fails or refuses to sign the Guarantee.

**O.**     An entity that is not a party to this Agreement is operating the Club without our prior written consent.

**17.3    Termination Following Expiration of Cure Period.**

**A.**     Except for those items listed in Sections 17.2, 17.3.B and 17.3.C, you will have 30 days after written notice of default from us within which to remedy the default and provide evidence of that remedy to us. If any default is not cured within that time, this Agreement will terminate without further notice to you effective immediately upon expiration of that time, unless we notify you otherwise in writing. Notwithstanding the foregoing, if the default cannot be corrected within 30 days, you will have that additional time to correct the default as we believe to be reasonably required (not to exceed 90 days) provided that you begin taking the actions necessary to correct the default during the 30-day cure period and diligently and in good faith pursue those actions to completion. You will be in default under this Section 17.3.A for any failure to materially comply with any of the requirements imposed by this Agreement or otherwise in writing, or to carry out the terms of this Agreement in good faith.

**B.**     Notwithstanding the provisions of Section 17.3.A, if you fail to pay any monies owed to us or our affiliates when those monies become due and payable and you fail to pay those monies within 5 days after receiving written notice of default, this Agreement will terminate effective immediately upon expiration of that time, unless we notify you otherwise in writing.

**C.**     If you have received 2 or more notices of default under this Agreement within the previous 12 months, we will be entitled to send you a notice of termination upon your next default under this Agreement in that 12-month period without providing you an opportunity to remedy that default.

**17.4    Statutory Limitations.**  If any valid, applicable law or regulation of a competent governmental authority with jurisdiction over this Agreement requires a notice or cure period prior to termination longer than set forth in this Agreement, this Agreement will be deemed amended to conform to the minimum notice or cure period required by the applicable law or regulation.

**17.5    Effect of Termination.**  Upon termination or expiration of this Agreement, unless we direct you otherwise:

**A.**     All rights granted to you under this Agreement will immediately terminate and you must immediately cease to operate the Club.

**B.**     You must promptly pay all sums owing to us, our affiliates and your suppliers and you forfeit all rights to receive membership fees and other revenue through the monthly draft from the credit card processor.

21

05/20

**C.**     You and all persons and entities subject to the restrictions contained in Section 16 will continue to abide by those restrictions and will not, directly or indirectly, take any action that violates those restrictions.

**D.**     You must immediately cease to use, by advertising or in any other manner, the Marks and all other distinctive forms, slogans, signs, symbols, web sites, domain names, email addresses, and devices associated with the System. Within 15 days, you must promptly take those actions as may be necessary to cancel any assumed name registration or equivalent registration, and any domain name registration that contains any Marks.

**E.**     You must make modifications or alterations to the Franchised Location and the Club immediately upon termination or expiration of this Agreement as necessary to prevent the operation of any business in violation of Section 16 and any specific additional changes we reasonably request for that purpose. Upon our request, you must return to us, at our cost, any signage that we specify.

**F.**     You must immediately deliver to us all hard copies, and delete all electronic copies, of the Platform and all training materials, marketing materials, records, files, instructions, and correspondence in your possession or control that contain confidential information. You also must deliver to us all hard copies, and delete all electronic copies, of customer information and customer lists that you have compiled and uninstall any software that we have provided.

**G.**     The limited exclusive rights granted to you in the Territory will terminate, and we will have the right to operate, and license others to operate, Workout Anytime businesses anywhere in the Territory.

**17.6   <u>Lost Revenue Damages</u>.**

**A.**     If we terminate this Agreement because of your breach or if you terminate this Agreement without cause, you and we agree that it would be difficult, if not impossible, to determine the amount of damages that we would suffer due to the loss or interruption of the revenue stream we otherwise would have derived from your continued payment of the Royalty Fee and the Brand Fund Development Fee through the remainder of the term of this Agreement. Therefore, you and we agree that a reasonable estimate of such damages, less any cost savings we might have experienced, ("Lost Revenue Damages") is an amount equal to the net present value of the Royalty Fee and the Brand Fund Development Fee that would have been paid had this Agreement not been terminated, from the date of termination to the scheduled expiration of the Term ("Measurement Period").

**B.**     For the purposes of this Section, Lost Revenue Damages will be calculated as follows: **(1)** the aggregate of the Royalty Fee and the Brand Fund Development Fee percentages multiplied by the average monthly Gross Revenue of your Club during the 12 full calendar months immediately preceding the termination date (or, if as of the effective date of termination, your Club has not been operating for at least 12 full calendar months, we will use the average monthly Gross Revenues of all Workout Anytime businesses operating during that 12 month period); **(2)** multiplied by the number of calendar months in the Measurement Period.

**C.**     You agree to pay us Lost Revenue Damages, as damages and not as a penalty, as calculated in accordance with this Section, within 15 days after the effective date of termination, or on any later date that we determine. You and we agree that the calculation described in this Section is a calculation only of the Lost Revenue Damages and that nothing will preclude or limit us from proving and recovering any other damages caused by your breach of this Agreement.

05/20

QB\62388385.6

**17.7    Option to Purchase Your Business and Inventory.** On the expiration or termination of this Agreement for any reason, we will have the right, but not the obligation, exercisable by written notice delivered to you within 30 days after the date of expiration, to purchase all or part of the physical assets used in the Club, except your personal assets. There will be no compensation for goodwill, and the purchase price for the assets will be equal to their fair market value less such goodwill. If you and we cannot agree on the purchase price for the assets that we desire to purchase within 10 days following our exercise of this option to purchase, an independent appraiser we designate will determine the fair market value, and you and we will share equally the cost of the appraiser. The appraiser's decision will be final and binding with no right to appeal. The closing of the purchase will take place at a location, and on a date, we choose, and will be completed in accordance with all applicable bulk sales laws. At closing, you will deliver to us a bill of sale for the assets, in a form acceptable to us. We will be entitled to set off against the purchase price any amounts you then owe us or any affiliate of ours, and to pay out of the purchase price any of your unpaid creditors.

## SECTION 18 – TRANSFER AND ASSIGNMENT

**18.1    Transfers By Us.** We have the unrestricted right to transfer or assign ownership interests in us and all or any part of our interest in this Agreement to any person or legal entity without your consent.  You agree that we will have no liability after the effective date of transfer or assignment for the performance of, or any failure to perform, any obligations transferred.  We also have the right to delegate to others the performance of any of our duties under this Agreement.

**18.2    Your Governing Documents.**

    **A.**    If you are (or Transfer your interests in this Agreement to) a business entity, during the Term, your (or the transferee's) governing documents must provide that your (or its) activities are limited exclusively to the development of Workout Anytime businesses and that no Transfer (as defined in Section 18.4.A.) of an ownership interest may be made except in accordance with Section 18.4.  Any stock or other ownership certificates that you issue must bear a conspicuous printed legend to that effect.

    **B.**    You represent that you have furnished us with a list of all holders of a direct or indirect equity interests in you and their respective percentage interests, as well as copies of your governing documents (and any amendments thereto) and any other corporate documents, books or records that we may request, and that all such information is current as of the date on which you sign this Agreement.  Your direct and indirect owners and their respective equity interests as of the Effective Date are identified in Exhibit A.  You must promptly update this information as changes occur.

**18.3    Guarantees.** All holders of direct or indirect equity interests in you of 10% or more ("Principal Owners") must jointly and severally guarantee your payment and performance under this Agreement and must bind themselves to the terms of this Agreement pursuant to the Guarantee and Assumption of Obligations attached as Exhibit B ("Guarantee").  Notwithstanding the foregoing, we reserve the right, in our sole discretion, to waive the requirement that some or all of the Principal Owners execute the Guarantee and/or to limit the scope of the Guarantee.  We reserve the right to require that any guarantor provide personal financial statements to us from time to time.

    You acknowledge that, unless otherwise agreed to in writing by us, it is our intent to have individuals (and not corporations, limited liability companies or other business entities) execute the Guarantee.  Accordingly, if any Principal Owner is not an individual, we will have the right to have the Guarantee executed by individuals who have only an indirect ownership interest in you.  (By way of

23

05/20

example, if a Principal Owner is a corporation, we have the right to require that the Guarantee be executed by individuals who have an ownership interest in that corporation.)

If you, any guarantor or any parent, subsidiary or affiliate of yours holds any interest in other businesses that are franchised by us, at our request, the party who owns that interest will execute, concurrently with this Agreement, a form of cross-guarantee to us for the payment of all obligations for those businesses, unless waived in writing by us in our sole discretion. For purposes of this Agreement, an affiliate of yours is any company controlled, directly or indirectly, by you or your parent or subsidiary.

**18.4    Transfers by You.**

  **A.**  **Definition of Transfer.** For purposes of this Agreement, a "Transfer" by you means any sale, assignment, transfer, conveyance, merger, give away, pledge, mortgage or other encumbrance, either voluntarily or by operation of law (such as through divorce or bankruptcy proceedings) of: **(i)** any interest in this Agreement; **(ii)** if you are a business entity, any direct or indirect ownership interests in you; or **(iii)** substantially all of your assets pertaining to your operations under this Agreement.

  **B.**  **No Transfer Without Our Consent.** You acknowledge that this Agreement is personal to you and we have selected you as a developer based on our reliance on your (and your direct and indirect owners') character, skill, aptitude and business and financial capacity. Neither you nor any of your direct or indirect owners may undertake any Transfer or permit any Transfer to occur without obtaining our prior written consent. The decision as to whether to consent to a Transfer will be made in the exercise of our business judgment, but our consent will not be unreasonably withheld. We have the right to communicate with and counsel you, your direct and indirect owners and the proposed transferee on any aspect of a proposed Transfer. You agree to provide any information and documentation relating to the proposed Transfer that we reasonably require, including, but not limited to, a copy of the proposed offer. Unless otherwise agreed, we do not waive any claims against the transferring party if we consent to a Transfer.

Except as otherwise provided in this Section 18.4, if you or your direct or indirect owners propose to undertake a Transfer, the following conditions apply (unless waived by us):

  **(1)** You and your direct and indirect owners must:

    **(a)** Be in compliance with all obligations to us under this Agreement and any other agreements you have with us, our affiliates, any lenders that have provided financing to you and your major suppliers as of the date of the request for our consent to the Transfer.

    **(b)** Pay to us a Transfer fee in the amount of 50% of the then-current initial franchise fee charged to new franchisees to reimburse us for our reasonable costs and expenses incurred in reviewing and documenting the Transfer, including legal and accounting fees.

    **(c)** Advise us in writing of any proposed Transfer, submit (or cause the proposed transferee to submit) a franchise application for the proposed transferee, submit a copy of all contracts and all other agreements or proposals and submit all other information requested by us relating to the proposed Transfer.

  **(2)** The proposed transferee (and, if the proposed transferee is a business entity, all persons that have any direct or indirect ownership interest in the proposed transferee as we may require) must demonstrate to our satisfaction extensive experience in high quality operations of a character and complexity similar to a Workout Anytime business; must meet the managerial, operational, experience,

quality, character and business standards for a developer promulgated by us from time to time; must possess a good character, business reputation and credit rating; must have an organization whose management culture is compatible with our management culture; and must have adequate financial resources and working capital to meet the development obligations under this Agreement. If the proposed transferee is an existing Workout Anytime business franchisee, the transferee and its direct and indirect owners must not be in default under their agreements with us and must have substantially complied with our operating standards.

(3) An assignment agreement and/or any other agreements that we require to reflect the Transfer must be signed by the transferor and the proposed transferee. In addition, we may require, at our option, that amendments to this Agreement and/or our then-current standard form of franchise agreement (for a term ending on the expiration of the Initial Term) be signed.

(4) You, your Principal Owners, all of your guarantors under this Agreement and the transferee must execute a general release, in a form prescribed by us, of all claims against us, our affiliates and our and their past, present and future affiliates, officers, directors, members, managers, shareholders, agents and employees. You, your Principal Owners and your guarantors under this Agreement will remain liable to us for all obligations arising before the effective date of the Transfer.

(5) The price and other proposed terms of the Transfer must not, in our reasonable business judgment, have the effect of negatively impacting the prospect for the future viability of the Franchised Business.

(6) If the transferee is a business entity, those persons or entities designated by us, which may include, but are not limited to, those with a direct or indirect ownership interest of 10% or more in the transferee, must execute our then-current form of Guarantee.

(7) The proposed transferee and those of its employees that we designate must complete all training course we require and pay our then-current training fee.

(8) Each of your affiliates that have entered into a franchise agreement with us must, as of the date of the request for our consent to the Transfer, be in compliance with all obligations to us under those agreements and with all obligations under any agreement with any lenders that have provided financing pursuant to an arrangement with us.

C.   **Transfer upon Death or Permanent Incapacity.** If the Transfer is a transfer of direct or indirect ownership interests in you following the death or permanent incapacity (as reasonably determined by us) of a person that has a direct or indirect ownership interest in you, that person's executor, administrator or personal representative must apply to us in writing within 3 months after the death or declaration of permanent incapacity for consent to Transfer the person's interest. The Transfer will be subject to the provisions of this Section 18.4, as applicable. In the case of Transfer by bequest or by intestate succession, if the heirs or beneficiaries are unable to meet the conditions of this Section 18.4, the executor may Transfer the decedent's interest to another successor that we have accepted, subject to all of the terms and conditions for Transfers contained in this Agreement. If an interest is not disposed of under this Section 18.4.C. within 6 months after the date of death or appointment of a personal representative, we may terminate this Agreement without opportunity to cure.

D.   **Transfer for Convenience of Ownership.** If you are an individual or a partnership, we will consent to the Transfer of this Agreement to a business entity that you form for the convenience of ownership, provided that: **(i)** the entity has and will have no business other than the operation of Workout

05/20

Anytime businesses; **(ii)** you comply with the requirements in Sections 18.2 and the provisions of Section 18.4.B., as applicable; and **(c)** the owners hold equity interests in the new entity in the same proportion shown on Exhibit A.

   **E.**   **Right of First Refusal.** We have the right, exercisable within 30 days after receipt of the notice (and information) specified in Section 18.4.B, to send written notice to you that we intend to purchase the interest or assets proposed to be transferred. We may assign our right of first refusal to someone else either before or after we exercise it. However, our right of first refusal will not apply with regard to Transfers to the spouse, son or daughter of a direct or indirect owner in you (including Transfers to a spouse, son or daughter as a result of death or permanent incapacity as described in Section 18.4.C), provided that the transferees meet all criteria required of new franchisees.

   If the Transfer is proposed to be made pursuant to a sale, we or our designee may purchase the interest proposed to be transferred on the same economic terms and conditions offered by the third-party. Closing on our purchase must occur within 60 days after the date of our notice to the seller electing to purchase the interest (or, if the parties cannot agree on the cash equivalent, as provided in the next sentence, within 60 days after the appraiser's determination). If we cannot reasonably be expected to furnish the same consideration as the third-party, we may substitute the reasonable equivalent in cash. If the parties cannot agree within 30 days on the reasonable equivalent in cash, we and you will each select a professionally certified appraiser and the two selected appraisers will select a third professionally certified appraiser to determine the fair market value of the interest proposed to be transferred. The third appraiser will appraise the fair market value of the interest proposed to be transferred and the value set by the third appraiser will be conclusive. The appraisers' fees and costs will be borne equally by us and you. Any material change in the terms of the offer from a third party after we have elected not to purchase the seller's interest will constitute a new offer subject to the same right of first refusal as the third party's initial offer.

   If a Transfer is proposed to be made by gift, we and you will each select a professionally certified appraiser and the two selected appraisers will select a third professionally certified appraiser to determine the fair market value of the interest proposed to be transferred. The third appraiser will appraise the fair market value of the interest proposed to be transferred and the value set by the third appraiser will be conclusive. We may purchase the interest at the fair market value determined by the appraiser. Closing on the purchase will occur within 30 days after our notice to the transferor of the appraiser's determination of fair market value. The appraisers' fees and costs will be borne equally by us and you.

   At any point, we may decline to exercise our right of first refusal. The decision by us and/or our designee to decline to exercise our right of first refusal will not constitute our consent to the proposed Transfer or a waiver of any other provision of this Section 18.4 with respect to the proposed Transfer. If we elect not to exercise our rights under this Section, the transferor may not complete the Transfer until he has complied with this Section 18.4. Closing of the Transfer must occur within 60 days of our election (or that longer period as applicable law may require); otherwise, the third-party's offer will be treated as a new offer subject to our right of first refusal. The Transfer is conditional upon our determination that the Transfer was completed on terms substantially the same as those offered to us. You must provide to us copies of all fully-executed agreements and any other information we request relating to the Transfer.

**SECTION 19 - MISCELLANEOUS**

**19.1**   **Relationship of Parties.** This Agreement does not create a fiduciary or other special relationship or make you or us an agent, legal representative, joint venturer, joint employer, partner, employee or servant of each other for any purpose. You are not authorized to make any contract, agreement, warranty or representation on our behalf, or to create any obligation, express or implied, on our behalf. During the

26

Term, you agree to hold yourself out to the public as an independent contractor operating the Club under license from us, and you agree to exhibit a notice to that effect (the location and content of which we reserve the right to specify) in a conspicuous place at the Club.

**19.2    Consents and Waivers.**  Whenever our prior written approval, acceptance or consent is required under this Agreement, you agree to make a timely written request to us for our consent.  Our approval, acceptance or consent must be in writing and signed by an authorized officer or manager to be effective. We make no warranties or guarantees upon which you may rely by providing any waiver, approval, consent or suggestion to you in connection with this Agreement and assume no liability or obligation to you therefor, or by reason of any neglect, delay, or denial of any request therefor.  We will not, by virtue of any waivers, approvals, consents, advice or services provided to you, assume responsibility or liability to you or to any third parties to which we would not otherwise be subject.

No delay or failure to exercise any right under this Agreement or to insist upon your strict compliance with any obligation or condition, and no custom or practice that differs from the terms of this Agreement, will constitute a waiver of our right to exercise the contractual right or demand your strict compliance with the terms of this Agreement.  Our waiver of any particular default does not affect or impair our rights with respect to any subsequent default you may commit.  Our waiver of a default by another franchisee does not affect or impair our right to demand your strict compliance with the terms of this Agreement.  Our acceptance of any payments due from you does not waive any prior defaults.

**19.3    Entire Agreement.**  Each element of this Agreement is essential and material.  This Agreement, the Platform, the documents referred to in this Agreement and the attachments to this Agreement constitute the entire agreement between you and us with respect to the Franchised Business at the Franchised Location and supersede all prior negotiations, representations, correspondence and agreements concerning the same subject matter.  Except for our Franchise Disclosure Document and your Development Agreement (if applicable), there are no other representations, inducements, promises, agreements, arrangements, or undertakings, oral or written, between the parties relating to the matters covered by this Agreement other than those set forth in this Agreement and in the attachments.  No obligations or duties that contradict or are inconsistent with the express terms of this Agreement may be implied into this Agreement.  Except as expressly set forth in this Agreement, no amendment, change or variance from this Agreement will be binding on either party unless mutually agreed to by the parties and executed in writing.

**19.4    Severability and Construction.**  Each provision of this Agreement is severable from the others. If, for any reason, any provision is determined by a court to be invalid, the invalidity will not impair the operation of the remaining provisions of this Agreement.  The latter will continue to be given full force and effect and bind us and you; the invalid provision(s) will be deemed not to be a part of this Agreement. Each provision of this Agreement that, expressly, or by reasonable implication, is to be performed, in whole or in part, after the expiration, termination or Transfer of this Agreement will survive expiration, termination or Transfer.  This Agreement will not be interpreted in favor of or against any party based on a party's sophistication or based on the party that drafted this Agreement.  Except as expressly otherwise provided, nothing in this Agreement is intended, or will be deemed, to confer any rights or remedies upon any person or legal entity other than you and us.

**19.5    Our Discretion.**  Whenever we have a right and/or the discretion to take or withhold an action, or to grant or decline to grant you a right to take or withhold an action, except as otherwise expressly and specifically provided in this Agreement, we may make that decision or exercise our right and/or discretion on the basis of our judgment of what is in the best interests of the System.  Our judgment of what is in the best interests of the System, at the time our decision is made or our right or discretion is exercised, can be made without regard to whether:  **(a)** other reasonable alternative decisions or actions, or even arguably

preferable alternative decisions or actions, could have been made by us; **(b)** our decision or the action taken promotes our financial or other individual interest; **(c)** our decision or the action taken applies differently to you and one or more other franchisees or our company-owned or affiliate-owned operations; or **(d)** our decision or the action taken is adverse to your interests. We will have no liability to you for any such decision or action. We and you intend that the exercise of our right or discretion will not be subject to limitation or review. If applicable law implies a covenant of good faith and fair dealing in this Agreement, we and you agree that such covenant will not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement and that this Agreement grants us the right to make decisions, take actions and/or refrain from taking actions not inconsistent with your rights and obligations under this Agreement.

**19.6**   **Notices.**   Notices related to this Agreement will be effective upon receipt (or first rejection) and may be given by any of the following delivery methods:  **(a)** certified or registered mail; **(b)** U.S. Priority Mail or national commercial delivery service (e.g., UPS, Federal Express); or **(c)** email (if receipt is verified within 24 hours of transmission). Either party can change its notice address by informing the other party. Notices sent will be sent to the addresses listed on the first page of this Agreement, however, we also may send notices addressed to you at the Franchised Location.   A copy of notices to us will also be sent to Andrew Beilfuss, Esq., Quarles & Brady, 411 East Wisconsin Avenue, Suite 2400, Milwaukee, WI 53202-4426.

**19.7**   **Miscellaneous.**   All references to gender and number will be construed to include such other gender and number as the context may require. All captions in this Agreement are intended solely for the convenience of the parties and none will be deemed to affect the meaning or construction of any provision of this Agreement. This Agreement may be executed in counterparts, and each copy so executed and delivered will be deemed an original. This Agreement may be signed using electronic signatures, and those signatures will have full legal force and effect. Time is of the essence of this Agreement for each provision in which time is a factor.

**19.8**   **Injunctive Relief.**   You recognize that your failure to comply with the terms of this Agreement, including, but not limited to, the failure to fully comply with the restrictions contained in Section 16 or the failure to comply with all post-termination obligations, is likely to cause irreparable harm to us, our affiliates and the System. Therefore, you agree that, in the event of a breach or threatened breach of any of the terms of this Agreement by you, we will be entitled to declaratory and injunctive relief (both preliminary and permanent) restraining that breach and/or to specific performance without showing or proving actual damages and without posting any bond or security.

**19.9**   **Control During Crisis Situation.**   If an event occurs at the Club that has or reasonably may cause harm or injury to customers, guests or employees (*i.e.*, slip and fall injuries, natural disasters, robberies, shootings, Data Breach, etc.) or may damage the Marks, the System or our reputation (collectively "Crisis Situation"), you must: **(a)** immediately contact appropriate emergency care providers to assist it in curing the harm or injury; and **(b)** immediately inform us by telephone of the Crisis Situation. You must refrain from making any internal or external announcements (*i.e.*, no communication with the news media) regarding the Crisis Situation (unless otherwise directed by us or public health officials).

To the extent we deem appropriate, in our sole and absolute discretion, we or our designee may control the manner in which the Crisis Situation is handled by the parties, including, without limitation, conducting all communication with the news media, providing care for injured persons and/or temporarily closing the Club. The parties acknowledge that, in directing the management of any Crisis Situation, we or our designee may engage the services of attorneys, experts, doctors, testing laboratories, public relations firms and those other professionals as we deem appropriate. You and your employees must cooperate fully

05/20

with us or our designee in our efforts and activities in this regard and will be bound by all further Crisis Situation procedures developed by us from to time hereafter. The indemnification under Section 13.2 will include all losses and expenses that may result from the exercise by us or our designee of the management rights granted in this Section 19.9.

**19.10    Compliance with U.S. Laws.** You acknowledge that under applicable U.S. law, including, without limitation, Executive Order 13224, signed on September 23, 2001 ("Order"), we are prohibited from engaging in any transaction with any person engaged in, or with a person aiding any person engaged in, acts of terrorism, as defined in the Order. Accordingly, you represent and warrant to us that, as of the date of this Agreement, neither you nor any person holding any ownership interest in you, controlled by you, or under common control with you is designated under the Order as a person with whom business may not be transacted by us, and that you: **(a)** do not, and hereafter will not, engage in any terrorist activity; **(b)** are not affiliated with and do not support any individual or entity engaged in, contemplating, or supporting terrorist activity; and **(c)** are not acquiring the rights granted under this Agreement with the intent to generate funds to channel to any individual or entity engaged in, contemplating, or supporting terrorist activity, or to otherwise support or further any terrorist activity.

## SECTION 20 -- DISPUTE RESOLUTION

**20.1    Choice of Law.** Except as provided in this Section 20.1, this Agreement and the relationship between the parties is governed by and will be construed in accordance with the laws of the state of Georgia. Notwithstanding the foregoing: **(a)** the covenants in Section 16 will be governed by the laws of the state in which the Franchised Business is located; and **(b)** nothing in this Section is intended, or will be deemed, to make any Georgia law regulating the offer or sale of franchises or the franchise relationship applicable to this Agreement if that law would not otherwise be applicable.

**20.2    Arbitration.** Except as qualified below, any dispute between the parties or any of their respective affiliates, officers, directors, employees, agents or owners arising out of, in connection with or in relation to this Agreement, the parties' relationship or the Club must be submitted to binding arbitration under the authority of the Federal Arbitration Act without reference to any state arbitration statutes and must be determined by arbitration administered by the American Arbitration Association ("AAA") pursuant to its then-current commercial arbitration rules and procedures. The arbitration will take place in the city where our headquarters are located at the time the demand for arbitration is filed. The arbitration will be heard by a single arbitrator who has at least 10 years of experience in franchise law. The arbitrator must follow the law and not disregard the terms of this Agreement.

Any arbitration must be on an individual basis and the parties and the arbitrator will have no authority or power to proceed with any claim as a class action or otherwise to join or consolidate any claim with any other claim or any other proceeding involving third parties. In the event a court determines that this limitation on joinder of or class certification of claims is unenforceable, then this entire commitment to arbitrate will become null and void and the parties must submit all claims to the jurisdiction of the courts.

The decision of the arbitrator will be final and binding on all parties to the dispute; however, either party may appeal the award to the AAA and the arbitrator may not under any circumstances: **(a)** stay the effectiveness of any award pending termination of this Agreement; **(b)** assess punitive or exemplary damages; **(c)** make any award which extends, modifies, or suspends any lawful term of this Agreement or any reasonable standard of business performance set by us.

Notwithstanding the foregoing, the parties agree that the following claims will not be subject to arbitration: **(i)** any action for declaratory or equitable relief, specific performance, other relief in the nature

29                                                                                              05/20

of equity to enjoin any harm or threat of harm to such party's tangible or intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder; **(ii)** any action in ejectment or for possession of any interest in real or personal property; or **(iii)** any action by us to collect any sums due to us.

**20.3    Choice of Forum.**  The parties agree, for any action not subject to arbitration, you must file any suit against us only in the federal or state court having jurisdiction where our principal offices are located at the time suit is filed.  We may file suit in the federal or state court located in the jurisdiction where our principal offices are located at the time suit is filed or in the jurisdiction where you reside or do business or where the Club is or was located or where the claim arose.  You consent to the personal jurisdiction of those courts over you and to venue in those courts.

**20.4    Limitation of Actions.**  Any legal action or proceeding (including a proceeding related to the offer and sale of a franchise to you) brought or instituted with respect to any dispute arising from or related to this Agreement or with respect to any breach of the terms of this Agreement must be brought or instituted within a period of 2 years after the initial occurrence of any act or omission that is the basis of the legal action or proceeding, regardless of when discovered.  The preceding limitation period does not apply:  **(a)** with respect to payments owed by one party to the other; **(b)** if prohibited by applicable law; or **(c)** if applicable law provides for a shorter limitations period.

**20.5    Mutual Waiver of Jury Trial.  Each of us irrevocably waives trial by jury in any action not subject to arbitration.**

**20.6    Mutual Waiver of Punitive Damages.**  Each of us waives any right to or claim of punitive, exemplary, multiple or consequential damages against the other in litigation and agrees to be limited to the recovery of actual damages sustained.

**20.7    Remedies Not Exclusive.**  Except as provided in Sections 20.1 through 20.6, no right or remedy that the parties have under this Agreement is exclusive of any other right or remedy under this Agreement or under applicable law.

**20.8    Reimbursement of Costs and Expenses.**  If either party brings an action to enforce this Agreement, the party prevailing in that proceeding will be entitled to reimbursement of costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants' and expert witness fees, the cost of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses, whether incurred prior to, in preparation for, or in contemplation of the filing of, the proceeding. If we utilize legal counsel (including in-house counsel employed by us) in connection with any failure by you to comply with this Agreement, you must reimburse us for any of the above-listed costs and expenses incurred by us.  In any judicial proceeding, the amount of these costs and expenses will be determined by the court and not by a jury.

**20.9    Rights of Parties are Cumulative.**  The parties' rights under this Agreement are cumulative and the exercise or enforcement of any right or remedy under this Agreement will not preclude the exercise or enforcement by a party of any other right or remedy under this Agreement that it is entitled by law or this Agreement to exercise or enforce.

## SECTION 21 -- ACKNOWLEDGEMENTS

You represent, acknowledge and warrant to us (and you agree that these representations, acknowledgments and warranties will survive termination of this Agreement) that:

05/20

**21.1** This Agreement involves significant legal and business rights and risks. We do not guarantee your success. You have read this Agreement in its entirety, conducted an independent investigation of the business contemplated by this Agreement, have been thoroughly advised with regard to the terms and conditions of this Agreement by legal counsel or other advisors of your choosing, recognize that the nature of the business conducted by Workout Anytime businesses may change over time and have had ample opportunity to investigate all representations made by or on behalf of us. The prospect for success of the business undertaken by you is speculative and depends to a material extent upon your personal commitment, capability and direct involvement in the day-to-day management of the business.

**21.2** We expressly disclaim the making of, and you acknowledge that you have not received, any warranty or guaranty, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement. We do not, by virtue of any approvals or advice provided to you, assume responsibility or liability to you or any third-party to which we would otherwise not be subject.

**21.3** We have entered, and will continue to enter, into agreements with other franchisees. The manner in which we enforce our rights and the franchisees' obligations under any of those other agreements will not affect our ability to enforce our rights or your obligations under this Agreement.

**21.4** The Initial Franchise Fee is not refundable for any reason.

**21.5** We may change or modify the System, from time to time, including the Platform, and you will be required to make such expenditures as those changes or modifications in the System may require.

**21.6** Nothing in this Agreement prohibits us or our affiliates from: **(a)** operating or licensing others to operate Workout Anytime businesses at any location other than in the Territory during the Term; **(b)** operating or licensing others to operate health club facilities, other than Workout Anytime businesses, at any location; **(c)** utilizing the System or any part of the System in any manner other than operation by us or our affiliates of a Workout Anytime business in the Territory; **(d)** developing and owning other franchise systems for the same or similar products and services using trade names and trademarks other than the Marks; and/or **(e)** purchasing, being purchased by, merging or combining with, businesses that directly compete with Workout Anytime businesses.

**21.7** You have not received from us or our affiliates or anyone acting on our behalf, any representation of your potential sales, expenses, income, profit or loss.

**21.8** You have not received from us or our affiliates or anyone acting on our behalf, any representations other than those contained in our Franchise Disclosure Document provided to you as inducements to enter this Agreement.

**21.9** Although this Agreement contains provisions requiring you to operate the Club in compliance with the System: **(a)** we and our affiliates do not have actual or apparent authority to control the day-to-day conduct and operation of your business or employment decisions; **(b)** neither you nor we intend for us or our affiliates to incur any liability in connection with or arising from any aspect of the System or your use of the System, whether or not in accordance with the requirements of the Platform; and **(c)** you are the sole employer of your employees and you and we are not joint employers.

**21.10** You will be solely responsible for: **(a)** hiring, training and supervising efficient, competent and courteous employees of good character for the operation of the Franchised Business; **(b)** the terms of their

05/20

employment and compensation; and **(c)** the proper training of the employees in the operation of the Franchised Business.

**21.11** Your execution of this Agreement does not and will not conflict or interfere, directly or indirectly, intentionally or otherwise, with the terms of any other agreement with any third party to which you, any of your owners or any affiliate of yours is a party, including, but not limited to, any noncompetition provision.

**21.12** You have received our Franchise Disclosure Document at least 14 days prior to your signing this Agreement or payment of any monies to us, or earlier if required by applicable law.

**IN WITNESS WHEREOF**, the parties have executed this Agreement by their duly authorized representatives.

**FRANCHISEE:**
WOA Lafayette GA, LLC.

By: _____

Print Name: John H Greff

Title: Manager

Date: 08/31/2020

**FRANCHISOR:  WORKOUT ANYTIME FRANCHISING SYSTEMS, LLC**

By: *Steven C Strickland*

Print Name: Steve Strickland

Title: CEO

Date: 09/01/2020

32                                                                    05/20

## EXHIBIT A

### FRANCHISE INFORMATION

1.  **Territory:** n/a

2.  **Franchised Location:** Workout Anytime Lafayette 106 Pearl Drive, Ste 108, Lafayette, GA 30728

3.  **Balance of the Initial Franchise Fee Paid:** Transfer Fee of $8750 paid by Seller/ John Greff received variance of total

4.  **Ownership:** The following is a list of all holders of a direct or indirect equity interest in you and their respective percentage interests:

| Name | Address | Percentage Ownership Interest |
|---|---|---|
| John H Greff | 130 Rainbow Dr Suite 304 | 100 |
|  |  |  |
|  |  |  |
|  |  |  |

05/20

QB\62388385.6

**EXHIBIT B**

**GUARANTEE AND ASSUMPTION OF OBLIGATIONS**

In consideration of, and as an inducement to, the execution of the foregoing Franchise Agreement dated as of 09/01/2020                   ("Agreement") by and between Workout Anytime Franchising Systems, LLC ("Franchisor") and John H. Greff                                   ("Franchisee"), the undersigned (collectively, "Guarantors") hereby personally and unconditionally agree as follows:

1.      **Guarantee and Assumption of Franchisee's Obligations.**   Guarantors hereby: **(A)** guarantee to Franchisor and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement or at law or in equity, that Franchisee and any assignee of Franchisee's interest under the Agreement will: **(i)** punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement and **(ii)** punctually pay all other monies owed to Franchisor and/or its affiliates; **(B)** agree to be personally bound by each and every provision in the Agreement, including, without limitation, the provisions of Section 13.2 and Section 16; and **(C)** agree to be personally liable for the breach of each and every provision in the Agreement.

2.      **General Release.**  Each Guarantor (if an individual, on behalf of him/herself and his/her heirs, representatives, successors and assigns, and if a business entity, on behalf of itself and its parent, subsidiaries and affiliates) (collectively, "Releasors"), freely and without any influence, forever releases and covenants not to sue Franchisor, its parent, subsidiaries and affiliates and their respective past and present officers, directors, managers, members, shareholders, agents and employees, in their corporate and individual capacities, with respect to any and all claims, demands, liabilities and causes of action of whatever kind or nature, whether known or unknown, vested or contingent, suspected or unsuspected (collectively, "claims"), that any Releasor now owns, has or claims to have or holds, or may in the future own or hold, or at any prior time owned, held, had or claimed to have, based on, arising out of or relating to, in whole or in part, any fact, event, conduct or omissions occurring on or before the date of this Guarantee, including, without limitation, claims arising under federal, state and local laws, rules and ordinances and claims arising out of, or relating to this Guarantee, the Agreement and all other agreements between any Releasor and Franchisor or its parent, subsidiaries or affiliates, the sale of any franchise to any Releasor, the development and operation of the Franchised Business and the development and operation of all other businesses operated by any Releasor that are franchised by Franchisor.  Releasors expressly agree that fair consideration has been given by Franchisor for this release, and they fully understand that this is a negotiated, complete and final release of all claims.

3.      **General Terms and Conditions.**  The following general terms and conditions will apply to this Guarantee:

A.      Each of the undersigned waives:  **(i)** acceptance and notice of acceptance by Franchisor of the foregoing undertakings; **(ii)** notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; **(iii)** protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; **(iv)** any right he/she/it may have to require that an action be brought against Franchisee or any other person as a condition of liability; **(v)** all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the execution of and performance under this Guarantee by the undersigned; **(vi)** any law or statute which requires that Franchisor make demand upon, assert claims against or collect from Franchisee or any others, foreclose any security interest, sell collateral,

05/20

QB\62388385.6

exhaust any remedies or take any other action against Franchisee or any others prior to making any demand upon, collecting from or taking any action against the undersigned with respect to this Guarantee; **(vii)** any and all other notices and legal or equitable defenses to which he may be entitled; and **(viii) any and all right to have any legal action under this Guarantee decided by a jury.**

**B.** Each of the undersigned consents and agrees that: **(i)** his/her/its direct and immediate liability under this Guarantee will be joint and several; **(ii)** he/she/it will render any payment or performance required under the Agreement if Franchisee fails or refuses punctually to do so; **(iii)** such liability will not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; **(iv)** such liability will not be diminished, relieved or otherwise affected by any amendment of the Agreement, any extension of time, credit or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which will in any way modify or amend this Guarantee, which will be continuing and irrevocable during the term of the Agreement and for so long thereafter as there are monies or obligations owing from Franchisee to Franchisor or its affiliates under the Agreement; and **(v)** monies received from any source by Franchisor for application toward payment of the obligations under the Agreement and under this Guarantee may be applied in any manner or order deemed appropriate by Franchisor. In addition: **(a)** each Guarantor acknowledges that the obligations under this Guarantee will continue to remain in force and effect unless Franchisor in its sole discretion, in writing, releases him/her/it from this Guarantee; and **(b)** following any Transfer, the obligations of each Guarantor under this Guarantee will continue to remain in force and effect unless Franchisor in its sole discretion, in writing, releases the Guarantor from this Guarantee. Notwithstanding the provisions of the previous sentence, unless prohibited by applicable law, the obligations contained in Sections 16.3 of the Agreement will remain in force and effect for a period of 2 years after any such release by Franchisor.  A release by Franchisor of any Guarantor will not affect the obligations of any other Guarantor.

**C.** If Franchisor brings a legal action to enforce this Guarantee, the prevailing party in that proceeding will be entitled to reimbursement of its costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants' and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, whether incurred prior to, in preparation for or in contemplation of the filing of any such proceeding.  In any judicial proceeding, these costs and expenses will be determined by the court and not by a jury.

**D.** If Franchisor utilizes legal counsel (including in-house counsel employed by Franchisor or its affiliates) in connection with any failure by the undersigned to comply with this Guarantee, the undersigned will reimburse Franchisor for any of the above-listed costs and expenses incurred by it.

**E.** This Guarantee will inure to the benefit of and be binding upon the parties and their respective heirs, legal representatives, successors and assigns.  Franchisor's interests in and rights under this Guarantee are freely assignable, in whole or in part, by Franchisor.  Any assignment will not release the undersigned from this Guarantee.

**G.** Section 20 of the Agreement is incorporated by reference into this Guarantee and all capitalized terms that are not defined in this Guarantee will have the meaning given them in the Agreement.

2

05/20

QB\62388385.6

**IN WITNESS WHEREOF**, each of the undersigned has hereunto affixed his signature.

**GUARANTORS:**

Date: 08/31/2020

_____

Print Name: John H Greff

Address: 130 Rainbow Dr Suite 304

Date: _____

_____

Print Name: _____

Address: _____

3

05/20

QB\62388385.6

EXHIBIT "B"

NON-COMPETITION AND NON-SOLICITATION AND CONFIDENTIALITY AGREEMENT

QB\62401456.10

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This Non-Competition and Non-Solicitation Agreement ("Agreement") is entered into as of _____ 09/01/2020 ("Effective Date") by and between Workout Anytime Franchising Systems, LLC ("Franchisor") and John H. Greff _____ ("Obligor").

### RECITALS

Obligor is an owner of the legal entity identified in Exhibit A that is a party to the Franchise Agreement identified in Exhibit 1 or a manager and/or primary operator of Franchisee's Workout Anytime franchised health club facility ("Club").

Obligor acknowledges that Franchisor has a legitimate business interest in protecting its franchise and franchisees from unfair competition by an existing or former franchisee who: **(1)** has had special, intimate knowledge of Franchisor's methods and trade secrets and confidential information for the operation of a Workout Anytime Club; **(2)** is able to take advantage of the knowledge and experience gained in running a Workout Anytime Club, and use such knowledge and experience in operating a new competing business without having to continue to pay royalties and other fees for such information, thereby placing other franchisees at a competitive disadvantage; or **(3)** diverts business and customers from a current or former Workout Anytime Club to a competitor of Franchisor

Obligor acknowledges that Franchisor has a legitimate business interest in re-franchising the territory of a former franchisee and Franchisor would suffer irreparable damage absent this Agreement because it would be unable to attract new franchisees to the area served by its former franchisee.

Obligor acknowledges that Franchisor requires the execution of this Agreement as an ancillary requirement to Franchisor's simultaneous grant of a franchise to Franchisee.

**NOW, THEREFORE,** the parties agree as follows:

**1.** **Consideration in Exchange for Obligor's Covenants.** Obligor acknowledges and confirms that Franchisor's willingness to execute and perform under the Franchise Agreement is expressly conditioned on execution of this Agreement by Obligor and that serves as valuable and adequate consideration received in exchange for Obligor's promises and covenants made in this Agreement.

**2.** **Obligor's In-Term Non-Competition and Non-Solicitation Covenants.** During the term of the Franchise Agreement, and without geographic limits, Obligor will not directly or indirectly (such as through corporations or other entities controlled by the Obligor or by or through or in conjunction with any other individual person or persons including, but not limited to, Obligor's spouse (if any) and employees) undertake any of the following:

**a.** Divert or attempt to divert any business or customer of any Club to any competitor or do anything injurious or prejudicial to the goodwill associated with Franchisor's Marks, methods, the Workout Anytime Franchise System, or Franchisor's business practices.

**b.** Own, maintain, engage in, be associated with, be employed by, advise, assist, invest in, be landlord to, franchise, or have any interest in any health club, gymnasium, or fitness center business which is the same or substantially like or competitive with any Workout Anytime Club,

**c.** Use, communicate, disseminate, provide access, or divulge to anyone at any time any confidential information or trade secrets of Franchisor, or at any time copy, duplicate, record or otherwise

reproduce any confidential information or trade secrets of Franchisor, including without limitation those materials contained within the secure password protected Franchise resource section of Franchisor's website, except as expressly permitted in the Franchise Agreement.

**3.      Obligor's Post-Term Non-Competition and Non-Solicitation Covenants.**  For purposes of this Section 3, the word "Conclusion" means the termination, assignment or transfer and/or expiration of the Franchise Agreement corresponding to this Agreement, regardless of whether such termination/expiration occurs prior to, or at the end of, such Franchise Agreement's term (the "Term").

    a.      Upon the Conclusion of the Term, Obligor will not:

        (i)      Directly or indirectly, for a 2 year period following the Conclusion of the Term, and without geographic limitation, divert or attempt to divert any business or customer of any health club facility to any competitor, or do anything injurious or prejudicial to the goodwill associated with Franchisor's Marks, methods or the Workout Anytime Franchise System.

        (ii)      For a 2 year period following the Conclusion of the Term within 25 miles of the location of the Club, own, maintain, engage in, be associated with, be employed by, advise, assist, invest in or have any interest in any business that engages in or offers franchises for businesses that engage in or operate gymnasiums, fitness, or workout facilities which is the same as, or substantially like or competitive with any Workout Anytime Club.

    b.      Upon the Conclusion of the Term, Obligor will not, at any time, directly or indirectly:  **(i)** communicate, disseminate, provide access, reveal or divulge to anyone, in whole or in part, any of Franchisor's confidential information or trade secrets; **(ii)** use, copy, duplicate, record or otherwise reproduce at any time any of Franchisor's confidential information or trade secrets; and **(iii)** use in any manner whatsoever any of the Marks, the methods, Franchisor's Operations Manuals, any of the materials contained within the secure password protected Franchise resource section of Franchisor's website, or any other proprietary or intellectual property rights of Franchisor and the Workout Anytime Franchise system.

    c.      Upon the Conclusion of the Term, Obligor will immediately return to Franchisor all Operations Manuals, all training materials, all of Franchisor's proprietary software and printed matters, all website materials, all other confidential information and trade secrets, and all of Franchisor's advertising and promotional signs and related items.

**4.      Severability.**  The covenants contained in this Agreement will be construed as agreements severable and independent from each other, except that any violation of Section 2 will constitute a material breach and default of the Franchise Agreement and cause for immediate termination of the Franchise Agreement without opportunity to cure.  If any Section of this Agreement is deemed by a court of competent jurisdiction to be invalid or unenforceable, then the maximum legally allowable restriction permitted by applicable law will control and bind Obligor.

**5.      Enforcement Costs.**  Obligor agrees to pay Franchisor all the costs and expenses (including reasonable attorneys' fees) incurred by Franchisor in connection with its enforcement of this Agreement.

**6.      Counterparts, Entire Agreement, Amendments.**  This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original, and all of which together will be one and the same instrument. The parties may execute such counterparts via fax, or electronically via PDF. This Agreement, together with the Franchise Agreement, contains the entire agreement of the parties pertaining to the subject matter hereof and no prior or contemporaneous representations, inducements, promises, or agreements, oral or otherwise, between the parties not set forth herein will be of any force and

effect. Any modifications to this Agreement must be accomplished by a written agreement signed by both parties.

7.     **Injunction.** Obligor recognizes and agrees that the injury that Franchisor and certain of its franchisees will suffer in the event of Obligor's breach of any covenant contained in this Agreement cannot be compensated by monetary damages alone, and Obligor therefore agrees that in the event of a breach or threatened breach by Obligor of this Agreement, Franchisor (and its affiliates, successors and assigns), in addition to and not in limitation of, any other rights, remedies, or damages available to Franchisor (and/or its affiliates, successors, and assigns) at law, in equity, under this Agreement or otherwise, will be entitled to seek an injunction from any court of competent jurisdiction in order to prevent or restrain any such breach by Obligor or by Obligor's agents, representatives, employees, partners, co-owners, or any and all other persons directly or indirectly acting for or with him/her/it.

8.     **Choice of Law, Venue and Jurisdiction.**  This Agreement will be construed and governed under and in accordance with the laws of the State in which the Club is located.  Obligor must file any suit against Franchisor only in the federal or state court having jurisdiction where Franchisor's principal offices are located at the time suit is filed.  Franchisor may file suit in the federal or state court located in the jurisdiction where its principal offices are located at the time suit is filed or in the jurisdiction where Obligor resides or does business or where the Club is or was located or where the claim arose.  Obligor consents to the personal jurisdiction of those courts over you and to venue in those courts.

    **IN WITNESS WHEREOF**, the parties have executed this Agreement as of the Effective Date by their duly authorized representatives.

**OBLIGOR:**                                    **WORKOUT ANYTIME FRANCHISE SYSTEMS, LLC**

Signature: _____     By:_ *Steven  C  Strickland*
Print your name: John H Greff             Title: _____Manager_____

Print Title (if applicable): Owner _____

Signature: _____

Print your name: _____

Print Title (if applicable): _____

Signature: _____

Print your name: _____

Print Title (if applicable): _____

Date of Signature: _____

QB\62940301.2                                    05/20



**ADDENDUM TO FRANCHISE**           [1] **AGREEMENT**

THIS ADDENDUM ("Addendum") is made and entered into on  August 28th        , 20 20 , by and

between  Workout Anytime Franchising Systems, LLC.                         (" Franchisor        "),

located at 2325 LAKEVIEW PARKWAY, SUITE 200  ALPHARETTA, GA  30009                  , and

 John Greff/ WOA Lafayette GA, LLC. /Greff Family Holdings               (" Franchisee        "),

located at 130 Rainbow Drive, Unit 3042 Livington, TX  77399                       .

Franchisor          and  Franchisee         entered  into  a  Franchise          Agreement  on
 August 31st         , 20 20 , (such Agreement, together with any amendments, the " Franchise
Agreement").  Franchisee          is applying for financing(s) from a lender in which funding is provided
with the assistance of the U. S. Small Business Administration ("SBA").  SBA requires the execution of this
Addendum as a condition for obtaining SBA-assisted financing.

In consideration of the mutual promises below and for good and valuable consideration, the receipt and
sufficiency of which the parties acknowledge the parties agree that notwithstanding any other terms in
the  Franchise          Agreement or any other document  Franchisor        requires Franchisee
to sign:

### CHANGE OF OWNERSHIP

- If Franchisee          is proposing to transfer a partial interest in Franchisee          and
  Franchisor          has an option to purchase or a right of first refusal with respect to that
  partial interest, Franchisor          may exercise such option or right only if the proposed
  transferee  is  not  a  current  owner  or  family  member  of  a  current  owner  of
  Franchisee         . If the Franchisee        's consent is required for any transfer (full or
  partial), Franchisor          will not unreasonably withhold such consent.  In the event of an
  approved transfer of the (Enter type of)     interest or any portion thereof, the transferor
  will not be liable for the actions of the transferee Franchisee        .

### FORCED SALE OF ASSETS

- If Franchisor          has the option to purchase the business personal assets upon default or
  termination of the Franchise          Agreement and the parties are unable to agree on the
  value of the assets, the value will be determined by an appraiser chosen by both parties.  If
  the Franchisee         owns the real estate where the franchisee          location is
  operating, Franchisee          will not be required to sell the real estate upon default or
  termination, but Franchisee          may be required to lease the real estate for the
  remainder of the (enter type of)     term (excluding additional renewals) for fair market
  value.

---

[1] While relationships established under license, jobber, dealer and similar agreements are not generally described
as "franchise" relationships, if such relationships meet the Federal Trade Commission's (FTC's) definition of a
franchise (see 16 CFR § 436), they are treated by SBA as franchise relationships for franchise affiliation
determinations per 13 CFR § 121.301(f)(5).

**COVENANTS**

- If the __Franchisee__ owns the real estate where the __franchisee__ location is operating, __Franchisor__ has not and will not during the term of the __Franchise__ Agreement record against the real estate any restrictions on the use of the property, including any restrictive covenants, branding covenants or environmental use restrictions. If any such restrictions are currently recorded against the __Franchisee__'s real estate, they must be removed in order for the __Franchisee__ to obtain SBA-assisted financing.

**EMPLOYMENT**

- __Franchisor__ will not directly control (hire, fire or schedule) __Franchisee__'s employees. For temporary personnel franchises, the temporary employees will be employed by the __Franchisee__ not the __Franchisor__.

As to the referenced __Franchise__ Agreement, this Addendum automatically terminates when SBA no longer has any interest in any SBA-assisted financing provided to the __Franchisee__.

Except as amended by this Addendum, the __Franchise__ Agreement remains in full force and effect according to its terms.

__Franchisor__ and __Franchisee__ acknowledge that submission of false information to SBA, or the withholding of material information from SBA, can result in criminal prosecution under 18 U.S.C. 1001 and other provisions, including liability for treble damages under the False Claims Act, 31 U.S.C. §§ 3729 - 3733.

**Authorized Representative of FRANCHISOR** :

By: _Steven C Strickland_

Print Name: Steve Strickland

Title: CEO

**Authorized Representative of FRANCHISEE** :

By: _____

Print Name: John Greff

Title: Manager

**Note to Parties**: This Addendum only addresses "affiliation" between the __Franchisor__ and __Franchisee__. Additionally, the applicant __Franchisee__ and the __franchise__ system must meet all SBA eligibility requirements.

## CONDITIONAL CONSENT TO TRANSFER OF FRANCHISE AGREEMENT
### (Existing Franchisee to New Franchisee)

**THIS CONDITIONAL CONSENT** ("**Agreement**") is made as of the date set forth in Exhibit 1 ("**Effective Date**") by and among Workout Anytime Franchising Systems, LLC ("**Franchisor**"), the party identified in Exhibit 1 who currently is a party to the Franchise Agreement ("**Transferor**"), Franchisee's existing guarantors who are identified in Exhibit 1 ("**Existing Guarantors**"), the party identified in Exhibit 1 who will become the Franchisee under to the Franchise Agreement ("**Transferee**") and the other parties identified in Exhibit 1 who will be owners of Transferee ("**Additional Owners**").  (Transferor, Existing Guarantors, Transferee and Additional Owners will be collectively referred to as "**Franchisee Parties**.")

### RECITALS

Pursuant to the Workout Anytime Franchise Agreement identified in Exhibit 1 ("**Franchise Agreement**"), Franchisor granted Transferor the right to operate the Club.

Pursuant to a Personal Guarantee, Existing Guarantors guaranteed Transferor's obligation under the Franchise Agreement

In accordance with the terms of the Franchise Agreement, Transferor has requested Franchisor's written consent to the transfer of the Franchise Agreement to Transferee ("**Proposed Transfer**").

Franchisor is willing to consent to the Proposed Transfer, subject to the execution of, and compliance with, this Agreement by Franchisee Parties.

**NOW, THEREFORE**, the parties agree as follows:

**1.** **Transfer.**   Transferor hereby transfers to Transferee all of Transferor's right, title and interest in the Franchise Agreement.  Transferee hereby assumes and agrees to perform all duties of Transferor under the Franchise Agreement, including, without limitation, payment of all monies owed, or that become owed, to Franchisor and its affiliates.  Transferor and Existing Guarantors will remain liable to Franchisor for all amounts and obligations owed to Franchisor and its affiliates under the Franchise Agreement up to and including the Effective Date.  Transferee will be liable to Franchisor for all amounts and obligations owed to Franchisor and its affiliates under the Franchise Agreement from and after the Effective Date.

**2.** **Representations.**   Franchisee Parties represent and warrant the following to Franchisor and acknowledge that Franchisor will rely on these representations:

**A.** Transferee's governing documents provide that Transferee's activities are limited exclusively to the development and operation of Clubs.

**B.** Franchisee Parties have delivered to Franchisor a true and complete copy of Transferee's governing documents.

**3.** **Conditions Precedent.** Franchisee Parties acknowledge and agree that the following conditions precedent must be satisfied before Franchisor will sign this Agreement:

**A.** Transferor may not be in default under the Franchise Agreement or any

QB\63224995.1

other agreement between Transferor or Transferor's affiliates and Franchisor, any Franchisor affiliate, Transferor's landlord or any supplier.

   **B.**  If Transferee or an affiliate of Transferee is a franchisee of Franchisor, neither Transferee nor an affiliate may be in default under any agreement with Franchisor, any Franchisor affiliate, any landlord or any supplier.

   **C.**  If requested by Franchisor, Additional Owners will take, and successfully complete, that training required by Franchisor.

   **D.**  Transferor and Transferee have paid Franchisor the transfer fee listed in Exhibit 1.

   **E.**  Each person and entity who holds a direct or indirect interest of 10% or more in Transferee must execute the Personal Guarantee in the form attached hereto as Exhibit 2.

   **4.**  **Consent by Franchisor.** Subject to the terms and conditions of this Agreement, Franchisor hereby: **(A)** consents to the Proposed Transfer; **(B)** waives its right of first refusal under Section 18.8 of the Franchise Agreement with respect to the Proposed Transfer, provided that Franchisor will not, as a result of its waiver of its right of first refusal in connection with the Proposed Transfers, be deemed to have waived its rights under Section 18.8 of the Franchise Agreement with respect to any future transfer; and **(C)** reserves the right to require that Franchisee Parties sign the current form of franchise agreement for an initial term ending on the expiration date of the current term of the Franchise Agreement. Franchisor's consent to, and waiver of its right of first refusal with respect to, the Proposed Transfer will, at Franchisor's election, be null and void if Franchisee Parties fail to comply with any term, condition or provision set forth in this Agreement.

   **5.**  **General Release.** In order to induce Franchisor to consent to the Proposed Transfer, Franchisee Parties, each on behalf of himself/herself/itself, and as applicable, each of his/her/its present and past affiliates and his/her/its present and past owners, investors, guarantors, shareholders, members, directors, officers, employees, contractors, agents, and legal representatives, and the predecessors, successors, heirs, executors, administrators, and assigns of the foregoing in their corporate and individual capacities (collectively, **"Releasors"**), freely and without any influence, forever release and covenant not to sue Franchisor, and its past, present, and future direct or indirect parent organizations, subsidiaries, divisions, affiliated entities and its and their shareholders, contractors, agents, legal representatives, owners, members, partners, officers, directors, trustees, administrators, fiduciaries, employment benefit plans and/or pension plans or funds, executors, attorneys, employees, insurers, reinsurers, and/or agents and their successors and assigns, individually and in their official capacities (collectively, **"Releasees"**), from any and all claims, demands, liabilities and causes of action of whatever kind or nature, whether known or unknown, vested or contingent, suspected or unsuspected (collectively "**claims**"), that any Releasor now owns, has or claims to have or holds, or may in the future own or hold, or at any prior time owned, held, had or claimed to have, based on, arising out of or relating to, in whole or in part any fact, event, conduct or omission occurring on or before the Effective Date, including, without limitation, claims arising under federal, state and local laws, rules and ordinances, claims for contribution, indemnity and/or subrogation and claims arising out of or relating to the Franchise Agreement and/or any or any other agreement between any Releasee and any Releasor ("**Related Agreement**"), the sale of franchises by any Releasee to any Releasor, the development and operation of a Club by any Releasor and/or Releasees' performance of their obligations under the Franchise Agreement and/or any Related Agreement. Franchisee Parties (on behalf of Releasors)

2                            05/20

agree that fair consideration has been given by Franchisor for this release and fully understands that this is a negotiated, complete and final release of all of Releasors' claims.

The following applies only if the Club is located in California or if any Releasor is domiciled in California: Franchisee Parties (on behalf of Releasors) also expressly agrees that, with respect to this release, any and all rights granted under Section 1542 of the California Civil Code are expressly waived. That Section reads as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

**6.      No Waiver.** Franchisee Parties recognize and agree that Franchisor's conditional consent to the Proposed Transfer: **(A)** does not constitute a waiver of any claims Franchisor may have against Franchisee Parties; **(B)** will not be deemed a waiver of Franchisor's continuing right to give or withhold consent to any future transfers; and **(C)** will not be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of the Franchise Agreement.

**7.      Notices.** The notice provision of the Franchise Agreement is incorporated by reference into this Agreement.  Transferee's address for notices is set forth in Exhibit 1.

**8.      Entire Agreement.** This Agreement, the documents referred to herein and the attachments hereto constitute the entire, full and complete agreement to which Franchisor is a party concerning its conditional consent to the Proposed Transfer and supersede any and all prior or contemporaneous negotiations, discussions, understandings or agreements to which Franchisor is a party concerning the Proposed Transfer. There are no other representations, inducements, promises, agreements, arrangements, or undertakings, oral or written, to which Franchisor is a party relating to the Proposed Transfer other than those set forth in this Agreement, the documents referred to herein and the attachments hereto. No obligations or duties that contradict or are inconsistent with the express terms of this Agreement may be implied into this Agreement. Except as expressly set forth herein, no amendment, change or variance from this Agreement will be binding on either party unless mutually agreed to by the parties and executed in writing.

**9.      Miscellaneous.** All capitalized terms not defined in this Agreement have the meaning given to them in the Franchise Agreement. All captions in this Agreement are intended solely for the convenience of the parties and are not deemed to affect the meaning or construction of any provision of this Agreement. This Agreement may be executed in counterparts, and each copy so executed and delivered will be deemed to be an original. This Agreement may be signed using electronic or facsimile signatures, and such signatures will have full legal force and effect.

[SIGNATURES ARE ON THE NEXT PAGE]

**IN WITNESS WHEREOF**, the parties have duly executed, sealed and delivered this Agreement as of the Effective Date.

**FRANCHISOR:**
**WORKOUT ANYTIME FRANCHISE SYSTEMS, LLC**

By: *Steven C Strickland*

Name: _____
　　　 Steve Strickland

Title: _____
　　　 CEO

**TRANSFEROR:**
Rogue Wave Wellness, LLC.

_____

By: _____

Name: _____
　　　 Bill Cesak

Title: _____
　　　 Manager

**TRANSFEREE:** WOA Lafayette GA, LLC.

_____

By: _____

Name: _____
　　　 John H. Greff

Title: _____
　　　 Manager

**EXHIBIT 1**
**FRANCHISE INFORMATION**

1. **Effective Date:** 09.01.2020 _____

2. **Transferor:** Bill Cesak/ Rogue Wave Wellness, LLC. _____

3. **Existing Guarantors:** Bill Cesak _____

4. **Transferee:** John H. Greff/ WOA Lafayette GA, LLC. _____

5. **Additional Owners:** none _____

6. **Date of Franchise Agreement:** 08.31.2020 _____

7. **Club Location:** WOA Lafayette / 106 Pearl Drive, Ste 108  Lafayette, GA 30728

8. **Ownership of Transferee:**  The following is a list of all holders of a direct or indirect interest in Transferee and their respective percentage interests:

| Name | Address | Percentage Ownership Interest |
|------|---------|-------------------------------|
| John Greff | 130 Rainbow Dr suite 3042 | 100% |
| | Livingston TX 77399 | |
| | | |
| | | |
| | | |

9. **Transfer Fee:** $8750.00 Transfer Fee paid by Seller _____

10. **Transferee's Notice Address:** 130 Rainbow Dr Suite 3042, Livingston TX 77399

05/20

## EXHIBIT 2
## PERSONAL GUARANTEE

In consideration of, and as an inducement to, Workout Anytime Franchising Systems, LLC's ("**Franchisor**") conditional consent to the proposed transfer of the Franchise Agreement (as detailed in the foregoing Conditional Consent to Transfer), each of the undersigned ("**Guarantor**"), who own a direct or indirect interest of at least 10% in Transferee, hereby personally and unconditionally agrees as follows:

1.      **Guarantee and Assumption of Franchisee's Obligations.**   Each of the undersigned hereby:  **(A)** guarantee to Franchisor and its successors and assigns, for the term of the Franchise Agreement and thereafter as provided in the Franchise Agreement or at law or in equity, that Franchisee and any assignee of Franchisee's interest under the Franchise Agreement will: **(1)** punctually pay and perform each and every undertaking, agreement and covenant set forth in the Franchise Agreement and **(2)** punctually pay all other monies owed to Franchisor and/or its affiliates; **(B)** agree to be personally bound by each and every provision in the Franchise Agreement; and **(C)** agree to be personally liable for the breach of each and every provision in the Franchise Agreement ("**Obligations**").

2.      **General Terms and Conditions.**  The following general terms and conditions will apply to this Guarantee:

A.      Each of the undersigned waives:  **(1)** acceptance and notice of acceptance by Franchisor of the foregoing undertakings; **(2)** notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed; **(3)** protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; **(4)** any right he/she/it may have to require that an action be brought against Franchisee or any other person as a condition of liability; **(5)** all rights to payments and claims for reimbursement or subrogation which any of the undersigned may have against Franchisee arising as a result of the execution of and performance under this Guarantee by the undersigned; **(6)** any law or statute which requires that Franchisor make demand upon, assert claims against or collect from Franchisee or any others, foreclose any security interest, sell collateral, exhaust any remedies or take any other action against Franchisee or any others prior to making any demand upon, collecting from or taking any action against the undersigned with respect to this Guarantee; **(7)** any and all other notices and legal or equitable defenses to which he may be entitled; and **(8) any and all right to have any legal action under this Guarantee decided by a jury.**

B.      Each of the undersigned consents and agrees that:  **(1)** his/her/its direct and immediate liability under this Guarantee will be joint and several; **(2)** he/she/it will render any payment or performance required under the Franchise Agreement if Franchisee fails or refuses punctually to do so; **(3)** such liability will not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; **(4)** such liability will not be diminished, relieved or otherwise affected by any amendment of the Franchise Agreement, any extension of time, credit or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person including, without limitation, the acceptance of any partial payment or performance or the compromise or release of any claims, none of which will in any way modify or amend this Guarantee, which will be continuing and irrevocable during the term of the Franchise Agreement and for so long thereafter as there are monies or obligations owing from Franchisee to Franchisor or its affiliates under the Franchise Agreement; and **(5)** monies received from any source by Franchisor for application toward payment of the obligations under the Franchise Agreement and under this Guarantee may be applied in any manner or order deemed

2                                    05/20

appropriate by Franchisor. In addition: **(a)** each Guarantor acknowledges that the obligations under this Guarantee will continue to remain in force and effect unless Franchisor in its sole discretion, in writing, releases him/her/it from this Guarantee; and **(b)** following any transfer, the obligations of each Guarantor under this Guarantee will continue to remain in force and effect unless Franchisor in its sole discretion, in writing, releases the Guarantor from this Guarantee. Notwithstanding the provisions of the previous sentence, unless prohibited by applicable law, the post-termination noncompetition obligations contained in the Franchise Agreement will remain in force and effect for a period of 2 years after any such release by Franchisor. A release by Franchisor of any Guarantor will not affect the obligations of any other Guarantor.

        **C.**    If Franchisor brings a legal action to enforce this Guarantee, the prevailing party in that proceeding will be entitled to reimbursement of its costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants' and expert witness fees, cost of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses, whether incurred prior to, in preparation for or in contemplation of the filing of any such proceeding. In any judicial proceeding, these costs and expenses will be determined by the court and not by a jury.

        **D.**    If Franchisor utilizes legal counsel (including in-house counsel employed by Franchisor or its affiliates) in connection with any failure by the undersigned to comply with this Guarantee, the undersigned will reimburse Franchisor for any of the above-listed costs and expenses incurred by it.

        **E.**    This Guarantee will inure to the benefit of and be binding upon the parties and their respective heirs, legal representatives, successors and assigns. Franchisor's interests in and rights under this Guarantee are freely assignable, in whole or in part, by Franchisor. Any assignment will not release the undersigned from this Guarantee.

        **G.**    The dispute resolution provisions of the Franchise Agreement are incorporated by reference into this Guarantee and all capitalized terms that are not defined in this Guarantee will have the meaning given them in the Franchise Agreement.

    **3.**    **Other Guarantor Waivers.** Without limiting the generality of the preceding paragraphs, each of the undersigned hereby waives all rights and defenses to:

        **A.**    Any defense arising as a result of Guarantor's election of the application of Section 1111(b)(2) of the Bankruptcy Code or based on any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code.

        **B.**    Any duty or obligation of Franchisor to disclose to Guarantor any facts Franchisor may now or hereafter know about Franchisee, regardless or whether Franchisor has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or has reason to believe that such facts are unknown to Guarantor or has a reasonable opportunity to communicate such facts to guarantor, it being understood and agreed that Guarantor is fully responsible for being and keeping informed of the financial condition of Franchisee and of any and all circumstances bearing on the risk of nonperformance of any Obligation.

        **C.**    Any defense based upon an election of remedies by Franchisor, including any election which destroys or impairs any right of subrogation, reimbursement of contribution which Guarantor may have, or any rights or benefits under any provisions of applicable law in any

way qualifying, conditioning or limiting the obligations of Guarantor based on any steps or procedures that Franchisor should take before proceeding against Guarantor.

**4.** **Bankruptcy.** This Guarantee will continue unchanged by any bankruptcy, reorganization or insolvency of Franchisee, or any successor or assignee, or by any disaffirmance or abandonment by a trustee of Franchisee. Notwithstanding any modification, discharge or extension of the indebtedness or any amendment, modification, stay or cure of Franchisor's rights which may occur in any bankruptcy or reorganization case or proceeding concerning Franchisee whether permanent or temporary, and whether assented to by Franchisor, each of the undersigned hereby agrees that he/she/it will be obligated hereunder to pay and perform the Obligations in accordance with the terms of the Franchise Agreement and the terms of this Guarantee. Each of the undersigned understands and acknowledges that by virtue of this Guarantee, each of the undersigned has specifically assumed all risks of a bankruptcy or reorganization case or proceeding with respect to Franchisee.

**5.** **Examination of Franchise Agreement.** Each of the undersigned acknowledges that he/she/it has: **(A)** received a copy of the Franchise Agreement; **(B)** read and understood the terms and provisions of the Franchise Agreement including, but not limited to, the covenants, conditions, agreements and undertakings of Franchisee to be kept and performed by Franchisee under the Franchise Agreement; and **(C)** read and understood the obligations of each Guarantor under this Guarantee, including the legal effect of those obligations and has been advised by legal counsel with respect to those obligations.

**IN WITNESS WHEREOF**, each of the undersigned has hereunto affixed his signature.

**GUARANTORS:**

Date: 08/31/2020

John H. Greff

Print Name:

Address: 130 Rainbow Dr Suite 3042, Livingston TX

Date:

Print Name:

Address:

**EXHIBIT "E"**

**PERSONAL DATA DISCLOSURE AND FRANCHISEE OWNERSHIP INFORMATION FORM**

## I. PERSONAL DATA DISCLOSURE

This information will be kept strictly confidential. Please provide all available information. Should certain information not be available at this time, such as your new health club facility telephone number, please provide it immediately upon its availability, but no later than your scheduled facility opening date.

Your Name  John Greff

Home Address    130 Rainbow Dr unit 3042

City/State/Zip Code    Livingston TX 77399

SSN  402717192

Home Phone                                    Work Phone

Cell Phone   4232772335

E-mail Address   john.greff@workoutanytime.com

Workout Anytime Phone       4232772335

Workout Anytime Fax

Facility's Address        Shoppes of Pearl Crest, 106 Pearl Drive, Suite 108

City/State/Zip Code    Lafayette, GA  30728

Signed:              JL LM              Date: 08/31/2020

## II. FRANCHISEE OWNERSHIP INFORMATION FORM

1.   FULL NAME(S) OF FRANCHISEE [If this franchise is owned by a legal entity, only insert the name of the legal entity; if this franchise is owned by one or more individuals, only insert the name(s) of such individual(s):

Entity Name: _____ WOA LaFayette GA LLC _____

Individual Owner(s):  _____ John Greff _____

_____

_____

2.   THE FRANCHISE WILL BE OWNED BY (Check which one applies):

_____ SOLE PROPRIETOR               Fed. Tax I.D. # _____

_____ PARTNERSHIP                   Fed. Tax I.D. # _____

_____ CORPORATION                   Fed. Tax I.D. # _____

X _____ LIMITED LIABILITY COMPANY   Fed. Tax I.D. # 85-2252407

_____ OTHER BUSINESS ENTITY         Fed. Tax I.D. # _____
(Please explain on a separate piece of paper)

3.   NAMES OF ALL OWNERS, PARTNERS, SHAREHOLDERS OR MEMBERS AND PERCENTAGE OF OWNERSHIP INTEREST: (Please use separate sheet if necessary)

NAME: John Greff _____         % OF OWNERSHIP: 100 _____

SOCIAL SECURITY NUMBER:
402717192 _____

                                      % OF OWNERSHIP: _____
NAME: _____

SOCIAL SECURITY NUMBER:
_____

                                      % OF OWNERSHIP: _____

NAME: _____

SOCIAL SECURITY NUMBER:
_____

2

4.   LIST OF DIRECTORS, MANAGERS OR GENERAL PARTNERS: (Please use separate sheet if necessary)

NAME: John Greff

SOCIAL SECURITY NUMBER: 402717192

NAME: _____

SOCIAL SECURITY NUMBER: _____

NAME: _____

SOCIAL SECURITY NUMBER: _____

NAME: _____

SOCIAL SECURITY NUMBER: _____

5.   LIST OF OFFICERS: (Please use separate sheet if necessary)

NAME: _____          TITLE: _____

SOCIAL SECURITY NUMBER:
_____

NAME: _____          TITLE: _____

SOCIAL SECURITY NUMBER:
_____

NAME: _____          TITLE: _____

SOCIAL SECURITY NUMBER:
_____

NAME: _____          TITLE: _____

SOCIAL SECURITY NUMBER:
_____

2

6.    DESIGNATED CONTACT PERSON:

NAME: John Greff                              TITLE: Owner

ADDRESS: 130 Rainbow Dr Suite 3042
_____ Livingston TX 77399

PHONE: 4232772335              E-MAIL: john.greff@workoutanytime.com

3

9/17/2020                    Bank of America | Online Banking | Accounts | Account Details | Account Activity

**Bank of America** 🦅                                          Online Banking

---

**WOAT Operating: Account Activity Transaction Details**

---

|  |  |
|---|---|
| **Post date:** | 09/16/2020 |
| **Amount:** | 8,750.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 200916 TIME:0801 ET TRN:2020091600305698 SEQ:W000000216158/000004 ORIG:TENNESSEE BAR FOUNDATION ID:131954042 SND BK: SIMMONS BANK ID:082900432 |
| **Merchant name:** ? | TENNESSEE BAR FOUNDATION |
| **Transaction category:** | Uncategorized: Pending |



## Franchise Fee Wiring Instructions

**Bank Name:**      Bank of America

**ABA:**            026009593

**Account Name:**   Workout Anytime Franchising Systems, LLC

**Acct Number:**    003286017142

**Reference:**      1)  Franchisee Name – (as listed on your Franchise Agreement)
                    2)  State or Territory

I, as the Franchisee, acknowledge receipt of these wiring instructions and further
state that I will wire the full franchise fee due with this agreement within the next 2
business days.

_____
Signature

Transfer Fee of $8750 to be paid by Seller/ Buyer received variance on
transfer fee

02.02.2017

## RECEIPT

This Disclosure Document Summarizes Certain Provisions Of The Franchise Agreement And Other Information In Plain Language. Read The Disclosure Document And All Agreements Carefully.

If Workout Anytime Franchising Systems, LLC offers you a franchise, it must provide this Disclosure Document to you fourteen (14) calendar days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale. See Exhibit "G" to this Disclosure Document to determine whether your State requires delivery of these materials sooner than the referenced fourteen (14) calendar day period. New York requires that you receive this Franchise Disclosure Document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

If Workout Anytime Franchising Systems, LLC does not deliver this Disclosure Document on time, or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and, if applicable, to your State agency on Exhibit "E" to this Disclosure Document.

The name, principal business address, and telephone number of each "franchise seller" offering the franchise are as follows: Randy Trotter and Steven C. Strickland, 2325 Lakeview Parkway, Suite 200, Alpharetta, GA 30009;                    (770)                              809-1401;                              and

The Issuance Date of this Disclosure Document is July 26, 2019.

See Exhibit "E" for our registered agents authorized to receive service of process.

I received on the date appearing adjacent to my signature below a Franchise Disclosure Document 26of Workout Anytime Franchise Corporation dated July __, 2019 which included the Exhibits (Exhibits "A" through "M") listed below:

A. Franchise Agreement
B. Personal Guarantee
C. Non-Competition and Non-Solicitation Agreement
D. Area Development Agreement
E. State Administrators and Agents for Service of Process
F. Personal Data Disclosure and Franchisee Ownership Information Form
G. State Specific Addendum (as applicable)
H. Financial Statements
I. Operation's Manual
J. List of Franchisees
K. Terminated Franchises
L. Territory Description
M. Lease Amendment
N. Receipts

Date FDD Received:
07/26/2020 _____, 201__
Date

Prospective Franchisee – If an Entity all Members or Shareholders Must sign
John Greff
Printed Name

WOAT FDD 2019v1