# EXHIBIT B

E-FILED IN OFFICE - KMG
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
23-C-04107-S1
6/14/2023 3:10 PM
TIANA P. GARNER, CLERK

### IN THE STATE COURT OF GWINNETT COUNTY

### STATE OF GEORGIA

## CAROLYN COLEMAN

### c/o SKAAR & FEAGLE, LLP

2374 Main Street, Suite B, Tucker, GA 30084

PLAINTIFF

CIVIL ACTION NUMBER: 23-C-04107-S1

VS.

## WELLS FARGO BANK, N.A.

### c/o Corporation Service Company

2 Sun Court, Suite 400, Peachtree Corners, GA 30092

DEFENDANT

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

SKAAR & FEAGLE, LLP
2374 Main Street, Suite B
Tucker, GA 30084

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This **14th** day of **June**, 20**23**.

Tiana P. Garner
Clerk of State Court

By_____
**Deputy Clerk**

**INSTRUCTIONS:** Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

E-FILED IN OFFICE - KMG
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-04107-S1**
**6/14/2023 3:10 PM**
TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| CAROLYN COLEMAN, | : |
| Plaintiff, | : |
| | : Civil Action No.    23-C-04107-S1 |
| v. | : |
| | : _____ |
| WELLS FARGO BANK, N.A., | : |
| | : **JURY TRIAL DEMANDED** |
| Defendant. | : |

## COMPLAINT FOR DAMAGES

### INTRODUCTION

1. Plaintiff, Carolyn Coleman (hereinafter "Coleman" or "Plaintiff") brings this action against Wells Fargo Bank, N.A. ("Wells Fargo") for violating the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693 *et seq.* ("EFTA") and the Fair Credit Billing Act, 15 U.S.C. § 1666 ("FCBA").

2. In addition, Plaintiff brings supplemental State law claims against Wells Fargo for violations of Article 4A of the Uniform Commercial Code, as enacted by the State of Georgia, conversion, Georgia's Fair Business Practices Act, Georgia's Unfair and Deceptive Practices Towards the Elderly Act, breach of fiduciary duty, breach of legal duty, and negligence, for Wells Fargo's conduct in refusing to return funds taken from Plaintiff's account with actual knowledge that such funds were converted from Plaintiff's account without authorization.

## JURISDICTION, VENUE AND PARTIES

3.   Plaintiff, Carolyn Coleman, is a natural person over sixty (60) years of age who resides in Georgia and is entitled to bring this action here.

4.   Wells Fargo is a bank chartered under the laws of the United States with its principal office located at 101 N. Phillips Ave., Sioux Falls, SD 57104.

5.   Wells Fargo is a nationwide provider of banking and financial services and markets its services throughout the country, including the State of Georgia.

6.   Wells Fargo continually and systematically transacts business within this District, including multiple branch locations and ATMs.

7.   Because it is a national bank, Wells Fargo's branch locations are treated as if they were the "main office" of Wells Fargo. 12 U.S.C. § 36(f)(2).

8.   Wells Fargo is subject to the jurisdiction and venue of this court.

9.   Wells Fargo may be served by personal service upon its registered agent in Gwinnett County, Georgia, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

## FACTS COMMON TO ALL CAUSES

10.   Wells Fargo is a national banking association and a "financial institution" as that term is defined by EFTA. *See* 15 U.S.C § 1693a(9).

11.   Wells Fargo is also a "creditor" as term is defined by the Truth in Lending Act ("TILA") of which the FCBA is a subpart. *See* 15 U.S.C. § 1602(g).

12.   Ms. Coleman maintained a Wells Fargo Crown Classic Banking Account ("Bank Account") that is the subject of this lawsuit and meets the definition of "Account" as that term is defined by EFTA. *See* 15 U.S.C. § 1693a(2).

13.   Ms. Coleman also maintained a Wells Fargo Signature Visa card ("Card Account") that is the subject of this lawsuit and meets the definition of "credit card" and "open end credit plan" as those terms are defined by TILA. *See* 15 U.S.C. §§ 1602(j) & (l).

14.   Ms. Coleman uses both the Bank Account and Card Account to pay the bills and personal expenses of herself and her family.

15.   Ms. Coleman had her Wells Fargo online account ("Online Account") hacked by fraudsters pretending to be from Best Buy's Geek Squad[1], which permitted access by the fraudsters to her Bank Account, Credit Account, and Zelle[2].

16.   After hacking into the Online Account, the fraudsters engaged in a series of unauthorized transactions, all part of the same scheme to defraud Ms. Coleman and steal her money.

17.   The fraudsters created two cash advances from the Card Account to the Bank Account in the amounts of $2,000.00 and $15,000.00, respectively, in order to fund her Bank Account.

---

[1] Best Buy's Geek Squad is a third-party technical support provider.
[2] Zelle is an e-payment platform run by Early Warning Signs which is an entity owned by several of the nation's largest banks, including Wells Fargo.

18.   While still hacked into Ms. Coleman's Online Account, the fraudsters then instigated both a $1,000 transfer via Zelle and a $15,000 wire transfer to a Bank of America account belonging to a person by the name of Zheng Yu, someone wholly unknown to Ms. Coleman.

19.   Ms. Coleman became aware that something with her online account may be amiss, so the next day, on October 7, 2022, Ms. Coleman went in-person to a Wells Fargo branch location to speak with a banker.

20.   The banker looked at Ms. Coleman's accounts and informed her that her fears were justified as a fraud was committed against her.

21.   The banker filed at least two claims for Ms. Coleman: one included the cash advances and Zelle transaction and one for the wire transfer.

22.   The banker was not at all surprised about the fraud and informed Ms. Coleman that he had seen similar fraudulent schemes perpetrated against Wells Fargo's customers in the recent past, allegedly involving fraudsters posing as the Geek Squad.

23.   Wells Fargo was well aware that such scams were happening to its customers but had failed to warn or inform Ms. Coleman to be on the lookout for such activity.

24.   During the October 7, 2022 visit, the banker also discontinued her account/account number and provided a new account with a new number.

25.   Ms. Coleman did not hear anything from Wells Fargo for several days following the claims submitted by the in-person banker prompting her to call customer service.

26.   During the call with customer service, Ms. Coleman was informed that her
      claims had been denied by Defendant but was not told the reason for the denial
      or any details of Defendant's investigation into the matter.

27.   Ms. Coleman felt hopeless and dejected after the call wondering how could Wells
      Fargo deny her claim for fraud.

28.   Wells Fargo knew well that such fraud was taking place against its customers,
      the transactions at issue did not even make sense for her to have instigated, she
      has never before sent a payment order or otherwise attempted an online wire
      transfer, and she did not receive any benefit therefrom.

29.   Ms. Coleman then received a letter dated October 13, 2022 from Defendant which
      stated that the cash advances and Zelle transfer claims were denied because
      someone who had authority from Ms. Coleman had initiated the transactions.

30.   Ms. Coleman was further confused and felt even more hopeless and worried that
      she may never have the funds returned to her because Wells Fargo claimed that
      she was responsible for the fraud despite the fact that she did not initiate the
      transactions, nor had she authorized anyone to do so.

31.   Moreover, Wells Fargo had not accused her of fraud or being a part of any
      scheme, yet without explanation, somehow suggested that she engaged in
      transfers that drained her Bank Account, jeopardized her ability to pay her
      expenses, and vastly increased her Card Account payments with no benefit to
      her.

32. Ms. Coleman was frustrated, devastated and scared for her financial future since Defendant had essentially called her a liar and refused to return her money.

33. On October 28, 2022, out-of-blue, Ms. Coleman received a call from Defendant's representative, Holly Ott, who told her that they attempted to recall the $15,000.00 wire transfer but were only able to recover $5,000.00 of it.

34. The October 28, 2022 call itself was an admission that Defendant knew the transactions had been the result of fraud..

35. Instead of immediately returning the $15,000.00 that Defendant knew belonged to Ms. Coleman, Ms. Ott insisted during the October 28, 2022 call that Defendant would only return to her $5,000.00, but even to obtain that (1/3 of the amount stolen from her as a wire transfer), Ms. Coleman must sign a release and indemnity agreement, releasing Defendant from any further obligation for the fraud and from any claims that she may have against them and agreeing to indemnify the Defendant against claims by other third-parties.

36. Ms. Coleman wisely did not want to sign away her legal rights without forethought, so she said that she would have to call back after giving it some thought.

37. Undeterred, on November 2, 2022, a representative from Defendant called Ms. Coleman again, and this time, the representative threatened that if she did not sign away her legal rights and agree to indemnify Defendants within 5 days, the proffered deal would be void, and Defendant would return nothing to her.

- 6 -

38. Ms. Coleman ultimately did not sign the release as she did not even fully understand the terms and rightfully worried that she would never be made whole if she signed away her legal rights only to receive a fraction of what was stolen from her.

39. Shortly thereafter, Ms. Coleman sent a dispute letter to the address on the back of her credit card billing statement for addressing billing errors to dispute the cash advances.

40. On December 13, 2022, Defendant sent Ms. Coleman a response denying those claims without explanation or documentation as to why the claim was denied.

41. On December 15, 2022, Ms. Coleman's husband transferred $23,468.20 of his retirement funds into the Bank Account because the Colemans could not cover basic living expenses after the cash advances had maxed out the Card Account balance and the wire transfer had drained the Bank Account balance.

42. Ms. Coleman sent a letter dated December 19, 2022 responding to the December 13, 2022 denial, exercising her right to see the documentation that Defendant relied upon in its investigation.

43. Defendant blew off Ms. Coleman's December 19, 2022 letter and never provided her with the documentation that Defendant relied upon in its investigation.

44. By January 4, 2021, Ms. Coleman concluded that she could not trust Defendant to be an honest broker with her money or to treat her fairly and forthrightly, so she opened an account with another bank and wrote a check for $17,500 from the Bank Account to fund the new account.

45.    Unbeknownst to Ms. Coleman, the same day that Ms. Coleman had deposited a
       check in the amount of $17,500.00 into the new bank account, Defendant, without
       warning or notice to Ms. Coleman, reversed the cash advances.

46.    However, despite having finally having determined that the cash advances were
       fraudulent for reasons unexplained by Defendant, Defendant did not likewise
       refund the fraudulent wire transfer that was part of the same scheme and
       conducted in concert therewith during the same Online Account session.

47.    Of course, this caused the check to her new bank to be declined for insufficient
       funds.

48.    Again, the reversal of the cash advances was yet another admission that
       Defendant knew that the transactions were all part of a fraud.

49.    Worse, in reversing the cash advances, Defendant engaged in an unlawful setoff
       by taking money from her Wells Fargo deposit account, the Bank Account, to pay
       itself back for the cash advances from the Card Account, a Wells Fargo credit
       account, without refunding the Bank Account for the fraudulent wire transfer.

50.    On two occasions, Defendant made tacit admissions that the transactions of
       October 6, 2022 were fraud, and both times, only would correct it to benefit itself
       and to Ms. Coleman's detriment: 1) when it offered to refund only 1/3 of the
       money stolen from Ms. Coleman in exchange for a full release of all further
       liability and claims and agreement indemnify them from any and third-party
       claims; and 2) by paying itself back with Ms. Coleman's Bank Account money for
       the cash advances without refunding her Bank Account money back to her.

- 8 -

51.  Infuriated, dejected, stressed, and feeling hopeless, Ms. Coleman sent one last dispute to Defendant in February of 2023, seeking a reversal of the wire transfer.

52.  On February 23, 2023, Defendant sent Ms. Coleman a letter claiming that the fraudulent wire transfer was valid after already having admitted on two occasions, one just a month prior, that the transactions were the result of fraud.

53.  Defendant did not have a reasonable basis for believing that the wire transfer was authorized as Ms. Coleman had never initiated one in the past, never engaged in a good faith investigation which would have easily uncovered the error, and knowingly and willfully concluded that no error had occurred as such conclusion could not reasonably be drawn from the evidence available to it.

54.  Defendant ignored its obligations to investigate, to provide notice of Ms. Coleman's rights to documents, and failed to produce the documents when it was requested.

55.  Ms. Coleman was particularly susceptible to the harm caused by Defendant as she is a senior citizen on a fixed income which exacerbated the kind of stress and anxiety caused by the loss of the bulk of her savings and the inability to access funds that rightly belong to her.

56.  Defendant's actions were the direct and proximate cause of the harm sustained by Ms. Coleman.

57.  At all times pertinent hereto, the conduct of Defendant was intentional, willful, reckless, and in gross disregard for Ms. Coleman's rights and interests under State and Federal law.

58.    Defendant had ample opportunity to correct course and adhere to its legal

       obligations to Ms. Coleman with more than sufficient information to determine

       that the transfers were the result of fraud, yet Defendant refused repeatedly with

       reckless disregard for the personal and financial well-being of Ms. Coleman and

       the law.

59.    Ms. Coleman has complied with all conditions precedent to bringing this action.


## CAUSES OF ACTION

## COUNT ONE: FAIR CREDIT BILLING ACT

60.    Wells Fargo is a "creditor" as that term is defined by the FCBA as an amendment

       to TILA. *See* 15 U.S.C. § 1602.

61.    Ms. Coleman's Card Account was an "open end credit plan" as that term is

       defined by the FCBA as an amendment to TILA. *Id.*

62.    The FCBA provides that:

> (a) If a creditor, within sixty days after having transmitted to an
> obligor a statement of the obligor's account in connection with an
> extension of consumer credit, receives at the address disclosed
> under section 1637(b)(10) of this title a written notice . . . from the
> obligor in which the obligor—
> (1) sets forth or otherwise enables the creditor to identify the name
> and account number (if any) of the obligor,
> (2) indicates the obligor's belief that the statement contains a billing
> error and the amount of such billing error,
> (3) sets forth the reasons for the obligor's belief (to the extent
> applicable) that the statement contains a billing error,
> (A) not later than thirty days after the receipt of the notice, send a
> written acknowledgment thereof to the obligor, unless the action
> required in subparagraph (B) is taken within such thirty-day
> period, and

(B) not later than two complete billing cycles of the creditor (in no event later than ninety days) after receipt of the notice and prior to taking any action to collect the amount, or any part thereof, indicated by the obligor under paragraph (2) either –
(i) make appropriate corrections in the account of the obligor, including the crediting of any finance charges on amounts erroneously billed, and transmit to the obligor a notification of such corrections and the creditor's explanation of any change in the amount indicated by the obligor under paragraph (2) and, if any such change is made and the obligor so requests, copies of documentary evidence of the obligor's indebtedness; or
(ii) send a written explanation or clarification to the obligor, after having conducted an investigation, setting forth to the extent applicable the reasons why the creditor believes the account of the obligor was correctly shown in the statement and, upon request of the obligor, provide copies of documentary evidence of the obligor's indebtedness . . .

63.   Within sixty days of Defendant having transmitted to Ms. Coleman a statement

for the Card Account reflecting the fraudulent cash advances, Defendant

received a written notice from her that:

   a.  Set forth or otherwise enabled Defendant to identify the name and

       account number of the Card Account;

   b.  Indicated Ms. Coleman's belief that the statement contained a billing error

       and the amount of such error; and

   c.  Set forth the reasons Ms. Coleman believed that the statement contained

       the billing error.

64.   A "billing error" includes, "A reflection on a statement of an extension of credit

for which the obligor requests additional clarification including documentary

evidence thereof." *See* 15 U.S.C. § 1666(b)(2).

65.   Following Ms. Coleman's dispute, Defendant did not make appropriate

corrections in her account or submit a notification of such corrections in violation

of 15 U.S.C. § 1666(a)(3)(B)(i).

66.   Following Ms. Coleman's dispute, Defendant did not provide a written

explanation or clarification setting forth the applicable reasons why Defendant

believed that the fraudulent wire transfers were correctly shown in her

statements in violation of 15 U.S.C. § 1666(a)(3)(B)(ii).

67.   Following Ms. Coleman's request for documentary evidence as to why

Defendant had denied her claim, Defendant did not send any such documentary

evidence of Ms. Coleman's indebtedness for the fraudulent cash advances in

violation of 15 U.S.C. § 1666(a)(3)(B)(ii).

68.   It was extraordinarily clear with a modicum of investigation that the cash

advances were fraudulent and constituted a billing error as:

a.   The cash advances were large amounts of money wholly inconsistent with

Ms. Coleman's use of her accounts;

b.   The cash advances were used to fund a clearly fraudulent wire transfer

which occurred within a short amount of time of each other;

c.   Prior to sending the dispute pursuant to 15 U.S.C. § 1666(a), Ms. Coleman

had both in person and on the telephone disputed the entire fraudulent

scheme; and

d.   Defendant was aware of such fraudulent schemes at the time.

69.   Defendant took an action to offset Ms. Coleman's, a cardholder, indebtedness arising in connection with her consumer credit transactions under a relevant credit card plan against her funds held on deposit with Defendant, in violation of 15 U.S.C. § 1666h.

70.   Accordingly, Ms. Coleman is entitled to 1) her actual damages, 2) twice the amount of any finance charge in connection with the cash advances, a minimum of $500 up to a maximum of $5,000, or such higher amount as is appropriate due to Defendant's established pattern and practices of violating the FCBA, costs and a reasonable attorney's fee. *See* 15 U.S.C. § 1640(a).

## COUNT TWO: ELECTRONIC FUNDS TRANSFER ACT

71.   Defendant is a "financial institution" as that term is defined by the EFTA. *See* 15 U.S.C. § 1693a(9).

72.   Ms. Coleman's Crown Classic Banking Account ("Bank Account") that is the subject of this lawsuit was an "account" as defined by the EFTA. *See* 15 U.S.C. § 1693a(2).

73.   The EFTA provides that when a consumer becomes aware that an error has occurred with their deposit account or "bank account," the consumer may, within sixty days of the banking statement containing the error, dispute it to their financial institution.

74.  A timely EFTA dispute from a consumer then requires the financial institution to conduct an investigation of the dispute and provide timely notifications.

75.  More specifically, after a consumer dispute, "the financial institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." 15 U.S.C. § 1693f(a).

76.  Further, if an error is determined to have occurred, the financial institution shall, within one business day, correct the error and credit any interest charged. 15 U.S.C. § 1693f(b).

77.  If the financial institution determines that no error occurred, it must deliver or mail the explanation to the consumer within 3 business days after the conclusion of the investigation. 15 U.S.C. 1693f(d).

78.  However, the consumer is not left simply to rely upon the financial institution's word that no error occurred. Upon request, the financial institution must "promptly deliver or mail to the consumer reproductions *of all documents which the financial institution relied on to conclude that such error did not occur*" and "shall include notice of the right to request reproductions with the explanation of its findings." (*italic* added) 15 U.S.C. § 1693f(d).

79.  "[A]n unauthorized electronic fund transfer" constitutes an error. 15 U.S.C. § 1693f(f).

80.   If a violation has occurred, the consumer is entitled to treble damages where the

financial institution:

> . . . (a) did not make a good faith investigation of the alleged
> error, or (b) did not have a reasonable basis for believing
> that the consumer's account was not in error; or
> (2) the financial institution knowingly and willfully
> concluded that the consumer's account was not in error
> when such conclusion could not have been drawn from the
> evidence available to the financial institution at the time of
> its investigation.

81.   The fraudulent transfer from her Bank Account using Zelle in the amount of

$1,000 wasan "unauthorized electronic funds transfers" as defined by the EFTA.

*See* 15 U.S.C. § 1693a(12).

82.   The EFTA requires that if, within 60 days of transmitting a banking statement to

a consumer, a financial institution receives oral or written notification that:

> "(1) sets forth or otherwise enables the financial institution to
> identify the name and account number of the consumer;
> (2) indicates the consumer's belief that documentation, or, in
> the case of notification pursuant to 1693d(b) of this title, the
> consumer's account, contains an error and the amount of
> such error; and
> (3) sets forth the reasons for the consumer's belief (where
> applicable) that an error has occurred,"
>
> the financial institution shall do the following: 1) "investigate
> the alleged error," 2) determine whether an error has
> occurred, and 3) "report or mail the results of such
> investigation and determination to the consumer within ten
> business days."

83.   Ms. Coleman notified Defendant in-person on the next day as the fraudulent

transfer occurred.

84.   Ms. Coleman continued to notify Defendant of the error within the sixty-days following the fraudulent transfer, both before and after it appeared on a statement, on multiple occasions through various mediums.

85.   Ms. Coleman's notification to Defendant of the fraudulent transfer clearly identified her name and account number, indicated her belief that her Bank Account contained an error, and set forth the reasons for her belief as to how and when the error occurred.

86.   Despite Ms. Coleman adequately notifying Defendant pursuant to EFTA of the unauthorized electronic funds transfer that occurred on October 6, 2022, Defendant failed to adequately investigate the fraudulent transfer, to reasonably determine that an error on Ms. Coleman's Bank Account had occurred, and to report findings of a reasonable investigation to Ms. Coleman in violation of 15 U.S.C. § 1693f(a).

87.   If a financial institution determines that an error has occurred, "it shall promptly . . . correct the error" within one business day. 15 U.S.C. § 1693f(b).

88.   A sufficiently reasonable investigation by Defendant of the unauthorized electronic funds transfer in the form of the fraudulent transfer would have resulted in a correction of what was clearly an error; accordingly, Defendant's failure to correct the error was in violation of 15 U.S.C. § 1693f(b).

89.   Even when a financial institution determines that an error did not occur, the financial institution is still obligated to "upon request of the consumer promptly deliver or mail the consumer to the consumer reproductions of all documents

which financial institution relied on to conclude that such error did not occur."
15 U.S.C. § 1693f(d).

90.     Further, if a financial institution determines that no error occurred, in notifying
the consumer of such, the "financial institution shall include notice of the right to
request reproductions with the explanation of its findings. *Id.*

91.     Defendant did not provide any notice of Ms. Coleman's rights to have access to
all of the documents and evidence that Defendant used in making its
determination with respect to the dispute of the $1,000 unauthorized Zelle
transfer, in violation of the EFTA.

92.     The letter Defendant sent on October 13, 2022 instructed that Ms. Coleman could
call if she "would like to get copies of the documents we used to make our
decision . . ." thereby acknowledging that Ms. Coleman had a right to receive the
documents it used in its determination.

93.     Ms. Coleman sought to obtain whatever documents or evidence Defendant relied
upon to make the determination that the fraudulent transfer was somehow not
the result of fraud or otherwise in error.

94.     Despite Ms. Coleman requesting the documents or evidence Defendant used to
determine that the fraudulent transfer was not in error, Defendant has failed to
provide the documents upon which it relied in violation of 15 U.S.C. § 1693f(d).

95.     Defendant's violations of the EFTA entitle Ms. Coleman to her actual damages,
statutory damages, costs of this action, and reasonable attorney fees. 15 U.S.C.
1693m(a).

96.    Moreover, if a financial institution does not make a good faith investigation of an alleged error, did not have a reasonable basis for believing that the consumer's account was not in error, or the financial institution knowingly and willfully concluded the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available, the consumer shall be entitled to treble the plaintiff's actual damages. 15 U.S.C. § 1693f(e).

97.    It was extraordinarily clear with a modicum of investigation that the transfer was fraudulent and constituted an unauthorized electronic funds transfer based upon:

a)   The day following the fraudulent transfers, Ms. Coleman notified Defendant in person of the fraudulent activity which would be highly incongruent with the actions of one who intentionally initiated a transfer or authorized one;

b)   Ms. Coleman well documented the fraudulent transactions that preceded the fraudulent transfer such that it would have simply taken a brief review of Defendant's records to determine that Ms. Coleman had not initiated the transaction;

c)   Defendant has never indicated in any way that it believes or suspects that Ms. Coleman was somehow a co-conspirator or involved in fraud herself;

d)   The fraudulent transactions are not at all in line with Ms. Coleman's usual and customary banking history; and

e)   Defendant's lack of explanation as to what happened to the funds following the fraudulent transfer.

98.    Defendant i) did not provisionally reverse the fraudulent transactions; ii) did not

make a good faith investigation of the error; iii) did not have a reasonable basis

for believing that the Account was not in error; and iv) knowingly and willfully

concluded that the Account was not in error when such conclusion could not

reasonably have been drawn from the evidence available to Defendant.

99.    Ms. Coleman is entitled to treble the amount of damages determined under 15

U.S.C. § 1693m(a)(1).  15 U.S.C. § 1693f(e).

## COUNT THREE: ARTICLE 4A, UNIFORM COMMERCIAL CODE

100.   Article 4A of the Uniform Commercial Code governs all electronic funds

transfers that are not covered by the Electronic Funds Transfer Act. OCGA §§ 11-

4A-104 & 108.

101.   Under Article 4A, "[a] payment order received by the receiving bank is the

authorized order of the person identified as sender if that person authorized the

order or is otherwise bound by it under the law of agency." OCGA § 11-4A-

202(a).

102.   Plaintiff did not authorize the fraudulent transfer order.

103.   The fraudster who initiated the transfer order lacked any authority, actual or

apparent, to act as agent of Plaintiff.

104.   Defendant did not act pursuant to any agreed security procedure.

105.   In the alternative, any such procedure was not a commercially reasonable

method of providing security against unauthorized payment orders.

106.   Defendant did not accept the payment order in good faith.

107.   Defendant was on notice that a fraudster was attempting to access Plaintiff's account and facilitated the transfer anyway.

108.   Plaintiff notified Defendant of the unauthorized transfer the following day after such transfer, and Plaintiff continued frequent disputes and correspondence both within 90 days and afterwards.

109.   Plaintiff is entitled to a full and complete refund of the unauthorized transfer and interest on the refundable amount calculated from the date the bank received payment to the date of the refund. *See* OCGA § 11-4A-204.

110.   Defendant represented to Ms. Coleman that it believed the transfer was authorized when it, in fact, knew the transfer was not authorized.

111.   Defendant continuously and systematically refused to refund Ms. Coleman despite having actual knowledge that Ms. Coleman did not authorize the transfer and was entitled to a refund.

112.   Defendant is aware that fraudulent schemes, such as the one perpetrated against Ms. Coleman, yet refuses refunds for unauthorized transfers until its customers retain counsel or contact a regulatory authority.

113.   Defendant has acted in bad faith, been stubbornly litigious, and caused Plaintiff unnecessary trouble and expense. Accordingly, Plaintiff is entitled to the expenses of litigation, including reasonable attorney fees pursuant to OCGA § 13-6-11.

## COUNT FOUR: CONVERSION.

114.   In Georgia, "The owner of personalty is entitled to its possession. Any deprivation of such possession is a tort for which an action lies." O.C.G.A. § 51-10-1.

115.   "Conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." (quotation marks omitted) *Maryland Cas. Ins. Co. v. Welchel*, 257 Ga. 259, 261 (1987) *citing Southern Express Co. v. Sinclair*, 130 Ga. 372, 373.' *Wood v Frank Graham Co.*, 91 Ga.App. 621, 622 (1955). Any distinct act of dominion wrongfully asserted over another's property in denial of his right, or inconsistent with it, is a conversion. It is unnecessary to show that the defendant applied it to his own use, if he exercised dominion over it in defiance of the owner's right, or in a manner inconsistent with it. It is in law a conversion whether it be for his own or any other's use. (cit)" (quotations omitted) *Id.*

116.   "It is immaterial that such dominion was exercised in good faith, for 'Whoever meddles with another's property, whether as principal or agent, does so at his peril, and it makes no difference that in doing so he acts in good faith. (cit)" *Id.*

117.   "In order to establish a claim for conversion, the complaining party must show: (1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other

party to return the property." *Trey Inman & Associates, P.C. v. Bank of Am., N.A.,* 306 Ga.App. 451, 457 (2010) *citing Internal Medicine Alliance v. Budell,* 20 Ga.App. 231, 239 (2008).

118. Ms. Coleman had title to the funds in her Bank Account; Defendant wrongfully exercised dominion and took actual possession and control of Ms. Coleman's funds by sending them to Bank of America via a fraudulently initiated transfer; Defendant knew that such transfer was not authorized by Ms. Coleman; Ms. Coleman has demanded the return of the funds in her Bank Account on multiple occasions; Defendant knew that Ms. Coleman was entitled to her funds, and Defendant steadfastly refused to return the funds to her Bank Account. Accordingly, Defendant is liable to Ms. Coleman for the conversion of her funds that were in her Bank Account.

119. For the tort of conversion, Defendant is liable to Ms. Coleman for the funds it took from her plus her actual, general, special, direct, and consequential damages in an amount to be determined by a jury. O.C.G.A. § 51-12-1.

120. Defendant had repeated contacts with Ms. Coleman about the theft which provided several separate and distinct opportunities for the bank to return the stolen funds.

121. Defendnat forces its customers who are victims of crime to affirmatively take the action to sue them in order to recover obviously stolen funds that were clearly and demonstratively unauthorized by any reasonable person.

122.    These repeated and systemic failures and inadequacy in procedures and employee training demonstrate aggravating circumstances in which Defendnat has conducted itself in reckless disregard for the personal or financial well-being of Ms. Coleman, Ms. Coleman is entitled to additional damages to deter Defendant from repeating the trespass and to compensate her for her wounded feelings in an amount to be determined by a jury. O.C.G.A. § 51-12-5.

123.    Defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, and the entire want of care which would raise the presumption of conscious indifference to Ms. Coleman's consequences; accordingly, Defendant is liable for punitive damages in an amount to be determined by a jury. O.C.G.A. § 51-12-5.1.

124.    Defendant is further liable to Ms. Coleman for her expenses, including the costs of this action and reasonable attorney fees. O.C.G.A. § 51-12-7.

125.    Defendant represented to Ms. Coleman that it believed the transfer was authorized when it, in fact, knew the transfer was not authorized as explained to her by Defendant's employee at a branch location.

126.    Defendant continuously and systematically refused to refund Ms. Coleman despite having actual knowledge that Ms. Coleman did not authorize the transfer and was entitled to a refund.

127.    Defendant is aware of fraudulent schemes, such as the one perpetrated against Ms. Coleman, yet it refuses refunds for unauthorized transfers until its customers retain counsel or contact a regulatory authority.

- 23 -

128.    Defendnat has acted in bad faith, has been stubbornly litigious and caused the
        plaintiff unnecessary trouble and expense; accordingly, Ms. Coleman is entitled
        to recover her expenses of litigation, including reasonable attorney fees. O.C.G.A.
        § 13-6-11.

## COUNT FIVE: VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT

129.    Defendant has engaged in actions that constitute unfair and deceptive acts or
        practices in the conduct of consumer transactions and consumer acts and
        practices in trade or commerce, in violation of OCGA § 10-1-393.

130.    Following two fraudulent cash advances from Ms. Coleman's Card Account and
        a fraudulent wire transfer from Ms. Coleman's Bank Account, Defendant
        obstructed her every step of the way, refusing to return money to her that
        rightfully belonged to her.

131.    The fraudulent cash advances and fraudulent wire transfer did not occur in a
        vacuum and were not individual isolated events; each was part of a broader
        scheme to defraud Ms. Coleman.

132.    Defendant has admitted to Ms. Coleman that it was aware of this, or similar
        schemes perpetrated against its customers, yet Defendant insisted that the
        transactions were initiated by Ms. Coleman despite all evidence being to the
        contrary.

133.     Defendant had a legal obligation, including without limitation under Article 4A of the Uniform Commercial Code, to return Ms. Coleman's money to her in full for the unauthorized transfer order.

134.     Instead of returning the money Defendant knew was fraudulently taken from Ms. Coleman, Defendant attempted to coerce Ms. Coleman into accepting a mere 1/3 of the amount Defendant owed back to Ms. Coleman in exchange for releasing Defendant from any further liability to her and even agreeing to indemnify Defendant from other potential claims of third parties.

135.     When Ms. Coleman refused to forfeit her rights to Defendant, Defendant then refused to take any further action or to give her the money back that rightfully belonged to her.

136.     Further, Defendant acted maliciously by reversing the cash advances which effectively took money from Ms. Coleman's Bank Account to pay itself back for money fraudulently borrowed from it by Mr. Coleman but refusing to return funds stolen from the Bank Account which Defendant knew was part of the same concurrent fraudulent scheme.

137.     Defendant's actions were both deceptive and unfair.

138.     Defendant's actions were systematic and intentional.

139.     Defendant's actions resulted in direct economic harm as well as worry, anxiety, irritability, strained marital relations, loss of sleep, humiliation, and frustration.

140.   Accordingly, Ms. Coleman is entitled to her actual, general, treble, and

exemplary damages from Defendant's intentional violations, costs, and

reasonable attorney's fee. OCGA § 10-1-399.

## COUNT SIX: VIOLATIONS OF GEORGIA'S UNFAIR AND DECEPTIVE

## PRACTICES TOWARDS THE ELDERLY

1.   OCGA § 10-1-851 provides:

> When any person who is found to have conducted business
> in violation of Article 15, 17, or 21 of this chapter is found to
> have committed said violation against elder or disabled
> persons, in addition to any civil penalty otherwise set for or
> imposed, the court may impose an additional civil penalty
> not to exceed $10,000.00 for each violation.

2.   Article 15 of Chapter 10 of the Official Code of Georgia Annotated includes the Fair

Business Practices Act.

3.   UDPTEA defines "Elder person" as follows: "a person who is 60 years of age or

older." OCGA § 10-1-850(2).

4.   Ms. Coleman is both disabled and has been at all relevant times over the 60 years of

age.

5.   Ms. Coleman's status as disabled and an elder person was known to Wells Fargo at

the time of the fraudulent transactions.

6.   As a result of Wells Fargo's actions, Ms. Coleman is entitled to an award of 1) actual

damages, including without limitation general and emotional distress damages, 2)

punitive damages, 3) statutory damages of up to $10,000.00 per each violation, as well as 4) an award of costs and attorney fees.

## COUNT SEVEN: BREACH OF FIDUCIARY DUTY

141. "Private duties may arise from statute or from relations created by contract, express or implied. The violation of a private duty, accompanied by damage, shall give a right of action." O.C.G.A. § 51-1-8; *see also Northwest Plaza v. Northeast Enterprises*, 305 Ga.App. 182, 191-192 (2010).

142. "[W]hile a tort action cannot be based on the breach of a contractual duty only, it can be based on conduct which, in addition to breaching a duty imposed by contract, also breaches a duty imposed by law." *Wimpy v. Martin*, 356 Ga.App. 55, 56 (2020).

143. The elements for a breach of fiduciary duty consist of "(1) the existence of a fiduciary duty, (2) breach of that duty; and (3) damage proximately caused by the breach." (citations omitted) *Id.*

144. Ms. Coleman's agreement with Defendant that governs the Bank Account ("Agreement") states in relevant part, "You'll exercise ordinary care to determine whether a funds transfer from your account was either not authorized or inaccurate. You must notify us if a funds transfer from your account wasn't authorized or is inaccurate. Notify us within 14 days after we notify you that the instruction or order was accepted or your account was debited or credited for the funds transfer, whichever is earlier, to be entitled to a refund from us."

- 27 -

145.   The Agreement further states that Defendant will "investigate any reports of
       unauthorized activity on your account" for which Ms. Coleman relied upon that
       Defendant would in fact conduct an adequate investigation when an
       unauthorized fraudulent transfer took place on her Bank Account which should
       have resulted in a refund.

146.   The Agreement makes clear that Defendant is "responsible for exercising
       ordinary care."

147.   Defendant had a duty to exercise ordinary care in the maintenance of Ms.
       Coleman's Bank Account, the funds therein, and in investigating and crediting
       back funds that were stolen as the result of fraud; Defendant breached its duty to
       safeguard Ms. Coleman's funds or to refund them; and as a direct and proximate
       result caused Ms. Coleman to lose $15,000.00 and the resultant damages arising
       therefrom; accordingly, Defendant is liable to Ms. Coleman for a breach of
       fiduciary duty.

148.   For Defendant's breach of fiduciary duty to Ms. Coleman, Defendant is liable to
       Ms. Coleman for the funds it took from her plus her actual, general, special,
       direct, and consequential damages in an amount to be determined by a jury.
       O.C.G.A. § 51-12-1.

149.   Due to the aggravating circumstances in which Defendant has conducted itself in
       reckless disregard for the personal or financial well-being of Ms. Coleman, Ms.
       Coleman is entitled to additional damages to deter Defendant from repeating the

- 28 -

breach and to compensate her for her wounded feelings in an amount to be

determined by a jury. O.C.G.A. § 51-12-5.

150.    Defendant's actions showed willful misconduct, malice, fraud, wantonness,

oppression, and the entire want of care which would raise the presumption of

conscious indifference to Ms. Coleman's consequences; accordingly, Defendant is

liable for punitive damages in an amount to be determined by a jury. O.C.G.A. §

51-12-5.1.

151.    Defendant has acted in bad faith, has been stubbornly litigious and caused the

plaintiff unnecessary trouble and expense; accordingly, Ms. Coleman is entitled

to recover her expenses of litigation, including reasonable attorney fees. O.C.G.A.

§ 13-6-11.


### COUNT EIGHT: NEGLIGENCE

152.    In Georgia, the essential elements of negligence are:

> (1) A legal duty to conform to a standard of conduct raised
> by the law for the protection of others against unreasonable
> risks of harm; (2) a breach of this standard; (3) a legally
> attributable causal connection between the conduct and the
> resulting injury, and, (4) some loss or damage flowing to the
> plaintiff's legally protected interest as a result of the alleged
> breach of the legal duty.

*Heston v. Lilly*, 248 Ga.App. 856 (2001).

153.    Defendant had a legal duty to conduct itself in a manner that does not impose an

unreasonable risk of harm to Ms. Coleman from her money being stolen by

criminals; Defendant breached that legal duty when it allowed the money to be

stolen, failed to conduct an adequate investigation, failed to determine a blatant
error, and failed to credit the money back to her; Defendant is the legally
attributable cause of this happening to Ms. Coleman; and Ms. Coleman suffered
at least $15,000.00 in pecuniary damages alone.

154. Defendant's actions not only constitute negligence but gross negligence
expressing a conscious indifference to the consequences to Ms. Coleman and an
intentional disregard of her rights, knowingly and willfully disregarding them.
*See Trotter v. Summerour*, 273 Ga.App. 263 (2005)

155. Due to Defendant's gross negligence, Ms. Coleman is entitled to recover her
actual damages, general damages, punitive damages, and the expenses of
litigation, including reasonable attorney fees.

156. Defendant has acted in bad faith, has been stubbornly litigious and caused the
plaintiff unnecessary trouble and expense; accordingly, Ms. Coleman is entitled
to recover her expenses of litigation, including reasonable attorney fees. O.C.G.A.
§ 13-6-11.

## COUNT NINE: BREACH OF LEGAL DUTY

157. Georgia recognizes a right to recover damages due to a breach of an otherwise
unspecified legal duty, specifically: "When the law requires a person to perform
an act for the benefit of another or to refrain from doing an act which may injure
another, although no cause of action is given in express terms, the injured party

-30-

may recover for the breach of such legal duty if he suffers damages." O.C.G.A. § 51-1-6.

158.   Defendant breached its legal duty to prevent criminals from stealing Ms. Coleman's money from her Bank Account, to adequately investigate Ms. Coleman's claim of fraud, to provide required notices, to provide evidence and documents of its investigation, and to credit her Bank Account when the only possible conclusion from a good faith investigation was that the fraudulent transfer was not authorized by Ms. Coleman which has caused her to lose $15,000.00 and suffer other damages.

159.   Due to Defendant's breach of its legal duty to Ms. Coleman, notwithstanding any other provision of law, Ms. Coleman is entitled to recover her actual damages, general damages, punitive damages, and expenses of litigation including reasonable attorney fees.

160.   Defendant has acted in bad faith, has been stubbornly litigious and caused the plaintiff unnecessary trouble and expense; accordingly, Ms. Coleman is entitled to recover her expenses of litigation, including reasonable attorney fees. O.C.G.A. § 13-6-11.

## JURY TRIAL DEMAND

161.   Ms. Coleman demands trial by jury on all issues so triable.

## DOCUMENT PRESERVATION DEMAND

162.   Ms. Coleman hereby demands that Defendant take affirmative steps to preserve all documents, recordings, data, payment logs, emails, wire transfer logs, phone records, dialer records, electronically stored information, and other information or things that relate to Ms. Coleman, the allegations and events described herein, any third party associated with such, and any account or number or symbol relating to any of them. These materials are very likely relevant to the litigation of this action.

163.   If Defendant is aware of any third party who has possession, custody, or control of any such materials, Ms. Coleman demands Defendant request that such third party also take steps to preserve the requested materials. This demand shall not be deemed to narrow the scope of any independent document preservation duties.

WHEREFORE, Ms. Coleman respectfully prays the Court enter judgment in Ms. Coleman's favor and against Defendant, as follows:

   a)  That Ms. Coleman be awarded actual damages, including without limitation, the $15,000.00 that was stolen and not recredited to her Bank Account, plus her actual general damages;

   b)  That Ms. Coleman be awarded treble, exemplary, and punitive damages;

   c)  That Ms. Coleman be awarded her reasonable attorney fees;

   d)  That Ms. Coleman be awarded her costs and expenses in the litigation; and

e) That the Court grant Ms. Coleman any such further relief as is just and proper.

Respectfully submitted,

SKAAR & FEAGLE, LLP

By:    /s/ Cliff R. Dorsen
       Cliff R. Dorsen
       Georgia Bar No. 149254
       cdorsen@skaarandfeagle.com
       James M. Feagle
       Georgia Bar No. 256916
       jfeagle@skaarandfeagle.com
       Chelsea R. Feagle
       Georgia Bar No. 110863
       2374 Main Street, Suite B
       Tucker, GA 30084
       Telephone:    (404) 373-1970
       Facsimile:     (404) 601-1855

       Kris Skaar
       Georgia Bar No. 649610
       kskaar@skaarandfeagle.com
       Justin T. Holcombe
       Georgia Bar No. 552100
       jholcombe@skaarandfeagle.com
       133 Mirramont Lake Drive
       Woodstock, GA 30189
       Telephone:    (770) 427-5600
       Facsimile:     (404) 601-1855

       *Attorneys for Plaintiff*

E-FILED IN OFFICE - KMG
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-04107-S1**

6/14/2023 3:10 PM
TIANA P. GARNER, CLERK

## General Civil and Domestic Relations Case Filing Information Form

☐ Superior or ☒ State Court of  Gwinnett State Court_____  County

| For Clerk Use Only | |
|---|---|
| Date Filed _____ <br> **MM-DD-YYYY** | Case Number  23-C-04107-S1 <br> _____ |

| Plaintiff(s) | | | | | Defendant(s) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Coleman, Carolyn | | | | | Wells Fargo Bank, N.A. | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| | | | | | | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney**  Clifton Robert Dorsen_____   **State Bar Number** 149254_____   **Self-Represented** ☐

### Check one case type and one sub-type in the same box (if a sub-type applies):

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☒ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____        _____
**Case Number**                            **Case Number**

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Civil Action No. _____23 - C - 04107-S1_____

Date Filed _____6/14/23_____

Magistrate Court ☐
Superior Court ☐
State Court ☒
**Georgia, Gwinnett County**

Carolyn Coleman

**Plaintiff**

VS.

Wells Fargo Bank, N.A.

**Defendant**

**Attorney's Address**

Clibb Dorien
Skane + Feagle, LLP
2374 main Street, Suite B
Tucker, GA 30084

Name and Address of party to be served.

Wells Fargo Bank N.A
C/O Registered Agent profit:
Corporation Service Company
2 Sun Court Suite 400
Peachtree Corners, GA 30092

**Garnishee**

## Sheriff's Entry Of Service

**Personal** ☐

I have this day served the defendant _____ personally with a copy
of the within action and summons.

**Notorious** ☐

I have this day served the defendant _____ by leaving
a copy of the action and summons at his most notorious place of abode in this County.

Delivered same into hands of _____ described as follows
age, about _____ years; weight, about _____ pounds; height, about _____ feet and _____ inches; domiciled at
the residence of defendant.

**Corporation** ☒

Served the defendant _____Wells Fargo Bank, N.A_____ a corporation
by leaving a copy of the within action and summons with _____Alisha Smith_____
in charge of the office and place of doing business of said Corporation in this County.

**Tack & Mail** ☐

I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the
premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States
Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate
postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**Non Est** ☐

Diligent search made and defendant _____
not to be found in the jurisdiction of this Court.

This _____23_____ day of _____June_____, 20_23_.

W. Coberly    Sol352
**Deputy**

Sheriff Docket _____ Page _____

**Gwinnett County, Georgia**

WHITE: Clerk     CANARY: Plaintiff / Attorney     PINK: Defendant

SC-2 Rev.3.13

Civil Action No. _23-C-07107-S4_

Date Filed _4-14-23_

Magistrate Court ☐
Superior Court ☐
State Court ☐
Georgia, Gwinnett County

_Cassie Collins_

**Plaintiff**

VS.

_Wells Fargo Bank N.A_

**Defendant**

Attorney's Address

_Cliff Dorsten_
_Frenkel & Frenkel LLP_
_275 Main Street, Suite B_
_Tucker, GA 30084_

Name and Address of party to be served.

_Wells Fargo Bank N.A_
_its Registered Agent CT_
_Corporation Service Company_
_2 Sun Court, Suite 400_
_Peachtree Corners, GA 30092_

**Garnishee**

## Sheriff's Entry Of Service

**Personal** ☐
I have this day served the defendant _____ personally with a copy of the within action and summons.

**Notorious** ☐
I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place of abode in this County.

Delivered same into hands of _____ described as follows
age, about _____ years; weight, about _____ pounds; height, about _____ feet and _____ inches; domiciled at the residence of defendant.

**Corporation** ☑
Served the defendant _WELLS FARGO BANK, N.A_ a corporation
_Aisha Smith_
by leaving a copy of the within action and summons with _____
in charge of the office and place of doing business of said Corporation in this County.

**Tack & Mail** ☐
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**Non Est** ☐
Diligent search made and defendant _____
not to be found in the jurisdiction of this Court.

This _23_ day of _June_, 20_23_

_____
**Deputy**

Sheriff Docket_____ Page_____

_____
**Gwinnett County, Georgia**

WHITE: Clerk       CANARY: Plaintiff / Attorney       PINK: Defendant

SC-2 Rev.3.13