## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| NECHOL GARTRELL,<br><br>Plaintiff,<br><br>v.<br><br>EQUIFAX INFORMATION SERVICES, LLC,<br><br>Defendant. | **Case No.:**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**1. FCRA, 15 USC § 1681,** *et seq.* |

Plaintiff Nechol Gartrell ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.,* against Defendant Equifax Information Services, LLC ("Equifax" or "Defendant").

### I.  INTRODUCTION

1.  Plaintiff's Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.,* by Defendant. Plaintiff contends the Defendant failed to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports, and consequently reported inaccurate information about Plaintiff. "Consumer reports" under 15 U.S.C. § 1681a(d) include both credit file disclosures obtained directly by

1

Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

## II.  JURISDICTION AND VENUE

2.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

3.      Venue in the Northern District of Georgia is proper pursuant to 28 U.S.C. § 1391 because Defendant regularly transacts business within this District, is otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## III.  PARTIES

4.      Plaintiff incorporates herein by reference all the above paragraphs of this Complaint as though fully set forth at length herein.

5.      Plaintiff is a natural person who resides in Decatur, Georgia.

6.      Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

7.      Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Equifax is regularly engaged in the

2

business of assembling, evaluating, and disbursing information concerning consumers in the form of "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, GA 30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

8.     During all times pertinent to this Complaint, Defendant was authorized to conduct business in the State of Georgia and conducted business in the State of Georgia on a routine and systematic basis.

9.     Defendant regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Defendant regularly furnishes consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and is therefore a "consumer reporting agency" ("CRA") as defined by 15 U.S.C. § 1681a(f) of the FCRA.

10.    During all times pertinent to this Complaint, Defendant acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

11.   Any violations by Defendant were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violation.

## IV.   FACTUAL BACKGROUND

12.   Plaintiff incorporates herein by reference all the above paragraphs of this Complaint as though fully set forth at length herein.

13.   The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

14.   Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

15.   The FCRA is intended to ensure CRAs exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because CRAs have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

16.   Defendant, one of the three major consumer reporting agencies (at times referred to collectively as "the CRAs," and individually as a "CRA") in the

4

United States, regularly publishes and distributes credit information about Plaintiff and other consumers through the sale of consumer reports (i.e., credit reports).

17.    Defendant's consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

18.    Defendant obtains consumer information from various sources. Some consumer information is sent directly to Defendant, and other information must be independently gathered by Defendant, or acquired from third party providers, vendors or repositories, such as computerized reporting services like PACER or Lexis-Nexis.

19.    Defendant also obtains information from other CRAs (who commonly share information).

20.    Defendant regularly seeks out and procures consumer bankruptcy filing and discharge information on a daily basis, with the intention of including it in the consumer reports Defendant sells to third parties for a profit.

21.    The diligence Defendant exercises in uncovering and recording consumer bankruptcy filings is not replicated in Defendant's subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

22.    Defendant's unreasonable policies, procedures, and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

23.    Defendant knows the information it reports about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in its own files.

24.    The vast majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendant) to make lending decisions.

25.    The information Defendant includes in a consumer report contributes to a consumer's overall creditworthiness and determines his or her FICO Scores.

26.     FICO Scores are calculated using information contained in Defendant's consumer reports.

27.     FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of the consumer's creditworthiness.

28.     FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

a. "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower the consumer's FICO Score will be.

b. The "amount of debt" a consumer owes has a major impact on his or her credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that the consumer's "amount

of debt" is higher than it actually is, which will undoubtedly impact the consumer's credit score.

29.    Lenders also consider a consumer's debt-to-income ratio ("DTI") based on the total amount of debt reported by Defendant in consumer reports.

30.    DTI compares the total amount a consumer owes to the total amount a consumer earns.

31.    Defendant regularly provides information that allows lenders to calculate the "total amount of debt" a consumer owes based on the total debt reported by Defendant.

32.    A consumer's income, however, is not included in his or her consumer report; only his or her amount of debt is.

33.    The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for the consumers to obtain credit, and the worse the credit terms will be (e.g., higher interest, lower credit limits).

34.    A consumer who has obtained a bankruptcy discharge and has a consumer report that is reporting outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account were accurately reporting as having a zero balance.

35.    Defendant is well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding, are discharged.

36.    However, Defendant also knows that it is rare for a pre-petition debt to be reaffirmed or successfully challenged in an adversary proceeding.

37.    Further, Defendant knows that if reaffirmation agreements or adversary proceedings exist, they will be explicitly identified on an individual consumer's bankruptcy docket sheet.

38.    Additionally, information indicating that a specific debt has not been discharged, but instead was reaffirmed or successfully challenged through an adversary proceeding, is retrieved from the same sources from which Defendant voluntarily obtained consumer bankruptcy case information.

39.    Defendant also receives information about account reaffirmations or other discharge exceptions directly from furnishers of account/tradeline information.

40.    However, Defendant regularly reports inaccurate information about consumers' debts after they receive a Discharge Order.

41.     Rather than follow reasonable procedures to assure maximum possible accuracy, as is required by the FCRA, Defendant frequently reports information regarding pre-bankruptcy debts based on incomplete or knowingly inaccurate information.

42.     Defendant regularly publishes consumer information that conflicts with the information provided by data furnishers, included in Defendant's credit files, contained in public records that Defendant regularly accesses, and/or sourced through Defendant's independent and voluntary efforts.

43.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendant for its inaccurate consumer reporting following a Chapter 7 discharge, including failure to report the discharge.

44.     Therefore, Defendant is on continued notice of its inadequate post-bankruptcy reporting procedures, which often produce inaccurate public record information, balances, and account and payment statuses.

### *Allegations Specific to the Credit Reporting of Plaintiff*

45.     Plaintiff filed for a "no asset" Chapter 7 Bankruptcy on or about April 13, 2022, in the United States Bankruptcy Court for the Northern District of Georgia, petition no. 22-52886-lrc.

10

46.    Plaintiff received an Order of Discharge on or about July 25, 2022.

47.    Thereafter, Plaintiff was not personally liable for her dischargeable debts and these debts have a $0 balance after the bankruptcy discharge.

48.    Defendant prepared one or more consumer reports concerning Plaintiff after she was discharged from Chapter 7 Bankruptcy.

49.    The allegations in this complaint against Defendant are based on the reporting by Defendant in Plaintiff's April 20, 2023, consumer disclosure obtained by Plaintiff.

50.    Defendant reported Plaintiff's credit history, including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the dates the accounts were opened, statuses, and the dates of the last status update.

51.    Defendant failed to report Plaintiff's consumer bankruptcy information in the Public Records section or in any individual tradelines of Plaintiff's consumer reports.

52.    Notably, the other CRAs, Experian and Trans Union, accurately reported Plaintiff's bankruptcy information in the Public Records sections of their respective reports, and in the individual tradelines of their respective reports.

53.    Upon information and belief, Defendant received notice of Plaintiff's bankruptcy discharge through its independent collection of Plaintiff's consumer information through vendors such as Lexis-Nexis, as well as from furnishers that provided data regarding the individual tradelines featured on Plaintiff's consumer reports.

54.    Defendant also obtains information from other CRAs (who commonly share information).

55.    Defendant is aware that CRAs are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and/or with a zero balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

56.    Defendant should have reported Plaintiff's bankruptcy filing and discharge information in the public records section of Plaintiff's consumer reports.

57.    Defendant should have reported all of Plaintiff's dischargeable, pre-petition debts as included in or discharged in Chapter 7 Bankruptcy, and/or with a zero balance, but did not.

58.    Defendant should not have reported any late payment history in the months after Plaintiff filed for bankruptcy.

59.     Defendant also should not have reported any "charge offs" after the bankruptcy discharge.

60.     Rather than accurately report the discharged debts, Defendant reported Plaintiff's accounts with numerous inaccuracies.

### *Inaccuracies on Plaintiff's April 20, 2023 Consumer Report*

61.     As a preliminary matter, Defendant did not indicate that Plaintiff had filed for bankruptcy and received a discharge.

62.     The name, social security number, and address in Plaintiff's Chapter 7 petition match the information listed on her Equifax consumer report.

63.     Defendant failed to report Plaintiff's bankruptcy discharge even though Defendant had all the correct personal information for Plaintiff in its database which matched the personal information reported in Plaintiff's Chapter 7 petition (e.g., full name, social security number, address).

64.     Notably, non-parties Experian and Trans Union accurately reported Plaintiff's public record bankruptcy filing and discharge based on the same information.

65.     Additionally, upon information and belief, furnishers reported the Plaintiff's discharged/zero account balances, bankruptcy and discharge information to Defendant.

66.   Defendant knew or should have known that Plaintiff's bankruptcy was discharged.

67.   Defendant reported debts that were in fact discharged in bankruptcy and were therefore required to report these as discharged and/or with a zero balance. However, Defendant's failure to report Plaintiff's bankruptcy, filed in April 2022 and discharged in July 2022, in Plaintiff's consumer report contributed to the numerous inaccuracies listed in Plaintiff's consumer report.

68.   Upon information and belief, the following furnishers of information, among others, accurately reported to Defendant that Plaintiff's accounts were included in Plaintiff's bankruptcy discharge and/or had a zero balance after the bankruptcy filing/discharge, but Defendant rejected or revoked the data furnished to it and inaccurately overrode the reporting of the accounts.

69.   Consequently, on Plaintiff's consumer disclosure, Defendant inaccurately reported several of Plaintiff's discharged accounts with inaccurate statuses, outstanding balances and/or inaccurate payment histories.

70.   For example, on Plaintiff's consumer disclosure, Defendant inaccurately reported Plaintiff's discharged TBOM account, ending with ************5827 and opened in May 2018, with a status of "Charge-Off" and

with a notation that the "Charge Off Amount" was $565, when the account was discharged in bankruptcy and actually has a zero-dollar balance.

71.    As another example, Defendant also inaccurately reported Plaintiff's discharged Upgrade, Inc. account, ending with ****5425 and opened in August 2021, with a status of "Charge-Off" and with a notation that the "Charge Off Amount" was $3,005, when the account was discharged in bankruptcy and actually has a zero-dollar balance.

72.    As another example, Defendant also inaccurately reported Plaintiff's discharged United Auto Credit account, ending with ************0002 and opened in February 2018, with a status of "Charge-Off" and with an outstanding balance of $278, when the account was discharged in bankruptcy and actually has a zero-dollar balance.

73.    The status of "Charge-Off" in the consumer credit reporting industry means that a debt may still be owed, especially where, as here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline indicates there is a balance and/or past due balance owed on the account before or after the "charge-off."

74.    The national consumer reporting agencies specifically acknowledge that a "charge-off" generally means consumers are still legally responsible for paying the debt.

75.    According to Equifax, a charge-off means the lender has written the account off as a loss and the account is closed to future charges. The timeframe is generally between 120 and 180 days after a consumer becomes delinquent, and a charge-off does not mean that the consumer no longer owes the debt; the consumer is still legally obligated to pay the debt.

76.    In addition to the above-referenced accounts, the tradelines for Road Auto Finance, LLC (Account No. ***01), Georgia's Own Credit Union (Account No. ********84), World Finance Co (Account No. ****01) and The Bank of Missouri – Milestone (Account No. *************6576) each indicated an "UNAVAILABLE" account status. In total, Defendant reported seven (7) of Plaintiff's accounts inaccurately (collectively, the "Accounts") by failing to indicate that the Accounts were included/discharged in Chapter 7 Bankruptcy, and instead reported the Accounts with inaccurate statuses.

77.    Upon information and belief, Lexis-Nexis furnished information to all three CRAs, including Defendant, that indicated Plaintiff had filed for bankruptcy

and received a discharge, but Defendant rejected or otherwise failed to report the data it received.

78.   Upon information and belief, some or all of the data furnishers of the foregoing tradelines provided information to all three CRAs, including Defendant, that indicated their corresponding accounts had been discharged in bankruptcy, but Defendant rejected or otherwise overrode the data it received.

79.   In addition, public records reflecting Plaintiff's bankruptcy filing and subsequent discharge are readily available to Defendant through multiple sources such as PACER, but Defendant failed to review those sources or knowingly rejected them.

80.   In any event, Defendant knew or had reason to know that it reported information contradicted by notices received from third parties.

81.   Defendant failed to indicate that any of the Accounts had a zero-dollar balance and/or were discharged in Chapter 7 Bankruptcy.

82.   Defendant also erroneously reported that three of the Accounts were charged off after the discharge and/or carried outstanding balances.

83.   Notably, Experian and Trans Union, the two other national CRAs, reported Plaintiff's accounts accurately on consumer reports produced after Plaintiff's discharge.

84.    Defendant's reporting of the Accounts is patently inaccurate.

85.    If not patently inaccurate, Defendant's reporting of the Accounts is materially misleading.

## *Plaintiff's Damages*

86.    After her discharge, Plaintiff applied for credit cards with several entities, including Exxon Mobil and World Finance, and was denied for each due to the erroneous reporting by Defendant.

87.    Plaintiff also applied for a Capital One credit card and was approved at less favorable terms and a lower credit limit than Plaintiff would have obtained had Defendant reported accurately.

88.    Defendant's inaccurate reporting was published to various potential creditors by Defendant during the process of Plaintiff's credit applications.

89.    Plaintiff's consumer credit file and consumer reports were also reviewed by numerous other entities after the discharge of her bankruptcy; those entities viewed the erroneous information published by Defendant.

90.    As a direct result of Defendant's inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

91.     Defendant's inaccurate reporting is especially damaging to Plaintiff, who has worked hard to repair her credit in order to become a first-time homeowner. However, Plaintiff has been chilled from applying for mortgages due to Defendant's inaccurate reporting.

92.     As a direct result of Defendant's inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred.

93.     Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, reputational damage, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

## V.     COUNT I
## Violations of the FCRA, 15 U.S.C. § 1681e(b)

94.     Plaintiff incorporates herein by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

95.     The FCRA requires CRAs, like Defendant, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

96.     Defendant negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of

credit information pertaining to pre-bankruptcy debts after a consumer receives a Discharge Order.

97.   Defendant received notice of Plaintiff's bankruptcy and discharge through public records, independent collection of consumer information directly obtained by Defendant through sources of consumer information such as Lexis Nexis, Defendant's own files, and information provided by data furnishers, yet Defendant rejected that information.

98.   Defendant's unreasonable policies and procedures cause it to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

99.   Defendant's unreasonable policies and procedures cause it to regularly report consumer information without verifying its accuracy.

100.  Defendant's unreasonable policies, procedures and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

101.  Defendant knows the information it reports about consumers' bankruptcies is often inconsistent with public records and its own files, including other furnishers that report to Defendant that the consumer's bankruptcy has been discharged.

102.   In this case, the inaccurately reported debts pertain to accounts Defendant knew pre-dated Plaintiff's Chapter 7 Bankruptcy and were included and discharged by Plaintiff's bankruptcy discharge.

103.   Defendant's failure to maintain and employ reasonable procedures to assure the maximum accuracy of consumers' post-bankruptcy accounts is particularly egregious because the Defendant regularly and voluntarily searches for consumer bankruptcy information to include in credit files.

104.   Defendant knew or should have known it is obligated, by the FCRA, to maintain and employ reasonable procedures to assure it reports maximally accurate consumer credit information.

105.   Defendant knew or should have known it is obligated, by the FCRA, to update consumer reports and individual tradelines after receiving notice of a Chapter 7 Bankruptcy Discharge.

106.   Defendant knew or should have known that the effect of a Discharge Order in a no-asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding.

107.   CRAs' obligations are established by the plain language of the FCRA, promulgated by the Federal Trade Commission, supported by well-established case law, and demonstrated in prior cases involving the Defendant.

108.   Therefore, Defendant had ample notice of its obligations under the FCRA and its continued use of unreasonable procedures.

109.   If Defendant contends it did not have sufficient notice, Defendant must justify its own failure to review and/or locate the substantial written materials that detail CRAs' duties and obligations under the FCRA, including where consumers file for Chapter 7 Bankruptcy.

110.   Defendant regularly conducts voluntary public records searches with the intention of including bankruptcy information on the consumer reports it sells to other parties for a profit.

111.   In this case, Defendant knew or should have known about Plaintiff's bankruptcy filing and discharge and failed to include that information in Plaintiff's consumer disclosure and in consumer reports published to third parties.

112.   When Defendant received notice of Plaintiff's bankruptcy information, it had an obligation to ensure it reported Plaintiff's discharge and its effects with maximal accuracy.

113.   Unfortunately, Defendant willfully and consciously breached its duties as a CRA and deprived Plaintiff of her right to a fair and accurate consumer report.

114.   Despite knowledge of its legal obligations, Defendant violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to ensure maximum possible accuracy of Plaintiff's consumer disclosure/consumer report.

115.   Defendant knows that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date.

116.   Yet, in this case, Defendant reported numerous accounts that pre-dated Plaintiff's bankruptcy with an improper account status and/or erroneous late payment history after Plaintiff's discharge.

117.   Defendant knew or should have known the information it reported about Plaintiff's accounts was inaccurate.

118.   Defendant violated 15 U.S.C. § 1681e(b) by failing to report accurate information when Defendant knew or should have known the information Defendant is reporting is inaccurate, and/or otherwise contradicted by information known by Defendant, reported to Defendant, and/or reasonably available to Defendant.

119.   Defendant's violations of 15 U.S.C. § 1681e(b) were willful.

23

120.   Alternatively, Defendant's violations of 15 U.S.C. § 1681e(b) were negligent.

121.   Defendant's   inaccurate   reporting   damaged   Plaintiff's creditworthiness.

122.   Plaintiff suffers actual damages, including the above-referenced economic damages, a decreased credit score, loss of credit opportunities, and other financial harm caused by Defendant inaccurately reporting balances for debts that were discharged in bankruptcy, and otherwise failing to report that the debts were discharged in bankruptcy.

123.   Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, loss of sleep, stress, anger, frustration, shock, embarrassment, and anxiety.

124.   Defendant is a direct and proximate cause of Plaintiff's damages.

125.   Defendant is a substantial factor in Plaintiff's damages.

126.   Therefore, Defendant is liable for actual and statutory damages, punitive damages, attorneys' fees, and costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

//

## VI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendant for the following:

(a)     Declaratory judgment that Defendant violated the FCRA, 15 U.S.C. § 1681e(b);

(b)     An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

(c)     An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

(d)     An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2);

(e)     An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

(f)     Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## VII.   <u>JURY DEMAND</u>

Plaintiff hereby demands a jury trial on all issues so triable.

//

RESPECTFULLY SUBMITTED this 24th day of July 2023.

By: */s/ Jenna Dakroub*
Jenna Dakroub, GA #385021
CONSUMER ATTORNEYS
260 Peachtree Street NW, Suite 2200
Atlanta, GA 30303
T: (602) 807-1525
F: (718) 715-1750
E: jdakroub@consumerattorneys.com

CONSUMER ATTORNEYS
8245 N. 85th Way
Scottsdale, AZ 85258
*Attorney for Plaintiff,*
*Nechol Gartrell*