IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| O.L., by and through her mother, V.L., and V.L., | ) ) ) | |
|     Plaintiffs, | ) ) | CIVIL ACTION FILE NO: |
| v. | ) ) | _____ |
| COBB COUNTY SCHOOL DISTRICT, ALVIN THOMAS, NAKIA COTTON, and JESSICA COLEMAN, | ) ) ) ) ) | |
|     Defendants. | ) | **JURY TRIAL REQUESTED** |

## **COMPLAINT**

COME NOW Plaintiffs O.L.,[1] by and through her mother, V.L., and V.L., in her own capacity as Plaintiff, and bring this civil action against Defendants.

## PARTIES

### 1.

Plaintiff O.L. is a minor child who has autism, speech and language impairment, motor impairment, and significant medical injury caused by medication prescribed to her by a pediatrician.  Due to her disabilities, O.L cannot

---

[1] This compliant sets forth causes of action under the American with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), Section 1983, the equal protection clause of the Fourteenth Amendment to the United States Constitution, and the Individuals with Disabilities Education Act ("IDEA").  Pursuant to the IDEA, Plaintiffs' due process hearing request (which involves one cause of action set forth herein) "shall remain confidential." 20 U.S.C. § 1415(b)(7)(a).  Thus, Plaintiffs' initials are used to maintain their confidentiality.

work, perform daily living skills such as completely dressing and undressing herself, eat appropriately, safely care for herself, communicate typically, manage finances, manage healthcare, or perform many other major life activities as defined by the Americans with Disabilities Act ("ADA").

2.

Plaintiff V.L. is the mother of O.L. and since March 2020, she began exercising her rights under the ADA, Section 504, and IDEA to advocate for O.L. to be free from discrimination based solely upon disability and to receive necessary and appropriate accommodations and services to be provided access to education.

3.

Defendant Cobb County School District ("CCSD") is a public corporate body and political subdivision operating in Cobb County, Georgia under the Constitution and laws of the State of Georgia and has the capacity to be sued. CCSD is a public entity as defined in 42 U.S.C. § 12131(1) and is a recipient of federal financial assistance.

4.

At the time of the incidents set forth herein and at the time of the due process hearing pursuant to the IDEA, Defendant Alvin Thomas was the principal of Tapp Middle School and an employee of CCSD.  Mr. Thomas is being sued in his individual capacity.

5.

At the time of the incidents set forth herein and at the time of the due process hearing pursuant to the IDEA, Defendant Nakia Cotton was CCSD's Supervisor for Alternative Services, including Section 504, Homebased Programs, and Hospital Homebound.  Cotton's direct supervisor was Defendant Coleman, and Cotton is being sued in her individual capacity.

6.

At the time of the incidents set forth herein and at the time of the due process hearing pursuant to the IDEA, Defendant Jessica Coleman was CCSD's Director of Special Education Compliance and Section 504 Coordinator overseeing IDEA and Section 504 compliance for all schools in CCSD.  Coleman is being sued in her individual capacity.

## JURISDICTION AND VENUE

7.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 20 U.S.C. § 1415)(i)(2)(A).

8.

Venue is proper because the Defendants are located or reside in the Northern District of Georgia, Atlanta Division, and the events giving rise to the claims occurred in the Northern District of Georgia, Atlanta Division.

<u>COUNT I</u>

<u>CCSD'S UNLAWFUL DISCRIMINATION OF O.L.</u>

<u>IN VIOLATION OF THE ADA AND SECTION 504</u>

9.

Plaintiff O.L. seeks recovery from CCSD of the damages caused her due to CCSD's intentional discrimination against her based solely upon disability in violation of Section 504 and the ADA.

10.

During the 2019-2020 school year, O.L. attended Tapp Middle School in CCSD in the 7th grade and had a Section 504 plan in place due to her attention deficit hyperactivity disorder ("ADHD"), yet her teachers reported in O.L.'s Section 504 plan that O.L. was not eating at school, would draw under the table, did not ask questions, did not collaborate with other students, and shied away from participation.

11.

At school, as CCSD knew, O.L. was a withdrawn child who did not give eye contact, dis not talk to her peers, whispered to her teachers, sat by herself in her technology club, and displayed odd routines and rituals, yet CCSD never evaluated O.L. pursuant to Section 504 as is required.

12.

During O.L.'s 7th grade school year at Tapp Middle School, students were bullying O.L. due to her disabilities, making O.L. sad, frightened to attend school due to the bullying, and sick at school when she did attend.

13.

As recommended to V.L., O.L.'s mother took O.L. to her pediatrician in March 2020 to obtain counseling and support for the bullying O.L. was experiencing, and V.L. also reported the bullying to CCSD school officials, yet CCSD never addressed the bullying.

14.

Despite O.L.'s young age and slight frame, O.L.'s pediatrician prescribed 50 milligrams of Seroquel and 50 milligrams of Zoloft when he had already placed O.L. on two asthma inhalers (Albuterol and Arnuity Ellipta), Vyvanse for ADHD, and Clonidine for sleep (due to the effects of the inhalers and Vyvanse).

15.

O.L. suffered a severe, devastating medical reaction to the Seroquel and Zoloft prescribed, and she lost her ability to feed herself, talk, dress herself, stay continent, write, play the violin, do schoolwork independently, tolerate sensory input (such as noise, lights, touch, etc.) to a significant level, and basically regressed in every area of adaptive and cognitive functioning.

16.

The negative effects of the medication prescribed to O.L. were catastrophic, causing O.L. to go from an A/B student who coded (programmed computers) and played the violin to an adaptive functioning level of a toddler.

17.

On March 27, 2020, V.L. informed in writing all of O.L.'s CCSD Tapp Middle School teachers and the school counselor and school 504 coordinator, Ms. Manning, that O.L. had been placed on medication and after this, O.L. had a very bad reaction causing O.L. not to be able to complete basic skills like taking a shower, toileting, speaking, and feeding and dressing herself and that O.L. would probably have to be placed on homebound services.

18.

Despite the direct written notice to CCSD concerning O.L.'s drastic change in functioning and despite the fact O.L. had a Section 504 plan in place with CCSD at the time, CCSD did nothing to evaluate O.L. and address her Section 504 accommodations so that O.L. could have non-discriminatory access to education.

19.

Due to the severe reaction O.L. had to the medication prescribed, including confusion, O.L. would wander around, sometimes leaving her home, and on one occasion when O.L. left home and was in the street, V.L. called 911 and O.L. was

taken to Ridgeview Hospital, where another patient violently physically attacked O.L., making O.L.'s functioning worsen.

20.

From March 2020 forward, O.L.'s mother continued to try to talk in person to Ms. Manning, CCSD's counselor and 504 school chair, and when V.L. finally was able to meet with Ms. Manning, V.L. informed the counselor/504 coordinator that O.L. was not speaking or functioning, and she was making a "direct parent referral" for special education. The counselor stated O.L.'s 504 plan had to be updated in a 504 meeting first, which was held on August 5, 2020.

21.

At the August 5, 2020 Section 504 and special education referral meeting, O.L.'s mother explained that once O.L. was given the medication, she stopped speaking, eating, and writing; could not do much, had fine motor issues, and, while O.L. had sensory sensitivities prior to the medication, they were much worse after the medication. V.L. gave CCSD staff examples of how O.L. was sensitive to loud noise, sound, and touch and how it was "more heightened" after being prescribed the medication.

22.

Without any evaluation and with full knowledge the medication prescribed to O.L. caused severe regression in adaptive, cognitive, and behavioral functioning,

CCSD admitted it went into the Section 504 meeting looking at only an emotional behavioral disorder ("EBD"). Later, CCSD admitted more than once that the medication reaction O.L. suffered was a medical condition very negatively impacting her functioning and needs.

23.

From August 3, 2020, CCSD conducted three Section 504 meetings for O.L. and V.L. attended all three, yet never once did CCSD disclose, much less offer, in-home services, board certified behavior analyst ("BCBA") supports and services, speech or occupational therapy, communication supports, assistive technology ("AT"), or numerous other reasonable accommodations so O.L. could access an education. Instead, O.L.'s mother and siblings had to educate her.

24.

Instead of offering reasonable, necessary accommodations, CCSD recommended O.L. not access any education until hospital homebound services could be approved, but V.L. explained the doctors attempting to figure out what had happened to O.L. recommended O.L. stay on a regular schedule and continue to be exposed to language, education, and cognitive stimulation.

25.

At the 504 meetings, O.L.'s mother was rigorously advocating for O.L. to have modified assignments and other reasonable accommodations, informing CCSD that O.L. could only perform self-care tasks with stand by assistance and could not do the computer virtual assignments without tremendous help.

26.

The next Section 504 meeting for O.L. was conducted on August 12, 2020. At that meeting, CCSD was  again refusing to even consider reasonable accommodations and was pressuring V.L. to just have O.L. not attend school until hospital homebound might be provided.

27.

Because CCSD was not providing sufficient accommodations to O.L. so she could access education, because CCSD was violating the few accommodations it placed in O.L.'s Section 504 plan, because CCSD was preparing educational records for O.L. which contained inaccurate information, and because CCSD staff were intimidating and harassing V.L. due to her advocacy, V.L. retained an educational advocate who attended the third Section 504 meeting conducted on October 12, 2020.

28.

Prior to the October 12, 2020 Section 504 meeting, V.L. obtained private occupational therapy ("OT") and speech and language speech therapy ("ST") evaluations privately, as this had been recommended by O.L.'s doctor.

29.

On September 22, 2020, the very day V.L. received  the private OT and ST evaluation reports, she forwarded them to CCSD staff for consideration and use.

30.

The private speech language pathologist diagnosed O.L. with a severe receptive and expressive language disorder, which replaced a prior incorrect diagnosis of selective mutism, and recommended Olivia receive ST twice a week.

31.

The private occupational therapist reported O.L. had motor and sensory impairment and recommended O.L. be provided OT, listing objectives for O.L. to button and unbutton clothes, participate in motor planning activities, maintain attention for 10 minutes, perform simple adaptive living skills such as wiping surfaces or vacuuming, take turns in games, and dress herself.  Parent training to help O.L. maintain a proper level of sensory arousal was also recommended.

32.

CCSD received the private OT and ST evaluation reports 20 days prior to the October 12, 2020 Section 504 meeting.

33.

At the October 12, 2020 Section 504 meeting, the educational advocate for O.L. and V.L. explained that due to O.L.'s medical needs, particularly her change in cognitive functioning due to the medication prescribed to her, O.L. required a modified instructional program, and she stated that O.L. required a comprehensive speech and language evaluation since the private evaluation showed O.L. was at the 1st percentile for language skills.

34.

At the October 2020 Section 504 meeting, CCSD would not even consider providing O.L. any specialized instruction, a home teacher, support services and accommodations, AT, and other reasonable accommodations, and given this, V.L. explained that O.L. should at least be provided access to the virtual curriculum and the structure of a full day of school even if O.L. could not do the work.

35.

On October 12, 2020, CCSD prepared a Section 504 plan for O.L. stating as an accommodation that O.L. did not have to complete any virtual schoolwork because she could not do so, and that if V.L. logged into the virtual sessions, O.L. would be counted present at school for attendance purposes.

36.

V.L. faithfully logged into each class for O.L. each and every school day pursuant to the Section 504 accommodation, and she continued to advocate for O.L. to receive comprehensive evaluation.

37.

At the October 2020 Section 504 meeting, CCSD listed as an accommodation that a hospital homebound form would be provided to V.L. for O.L. and once it was completed and returned, an eligibility meeting would be conducted for O.L. to receive education in the home.

38.

Throughout the time from March 2020 forward, V.L. was taking O.L. to doctors trying to figure out how to address the medication reaction.  The medical doctors were taking a medical approach and the mental health doctors were taking

a mental health approach, and all the records V.L. received, she forwarded to CCSD, as the diagnoses changed as evaluations were obtained by V.L.

39.

The most effective medical approach was the detoxification of O.L. from the medication prescribed to her, and the ineffective medical approach was the mental health providers continuing to prescribe all types of medications that did not work and some of which caused side effects.

40.

Because of CCSD staff not implementing the very few, insufficient, yet needed Section 504 accommodations for O.L. and because of staff harassing and intimidating her as she attempted to advocate for O.L. to be free from discrimination based solely upon her disability, O.L. reported her concerns to CCSD administration so she might be provided help having O.L.'s Section 504 plan implemented.

41.

After V.L. reported CCSD staff, CCSD personnel just became more unreasonable, more uncooperative, more harassing and intimidating, and they continued to refuse to implement O.L.'s 504 plan, with the full knowledge and approval of CCSD and its top administrators.  Cotton did not stop the retaliation.

42.

One example of the harassment and intimidation is that Defendant Thomas insisted V.L. not be allowed to send emails to O.L.'s teachers and that V.L. had to come into the school building to physically pick up assignments (not evaluations as he later asserted) instead of CCSD simply placing them online or emailing them to her, when Thomas knew that V.L. was having to provide full care to O.L., who was not able to access the school building due to her disabilities.

43.

The situation was so intimidating and impossible, V.L. asked Defendant Cotton why CCSD was acting the way it was with the harassment, intimidation, and lack of cooperation, and Defendant Cotton told V.L. on a speaker phone call with witnesses present that it was because V.L. went to the "county," meaning CCSD administration, with her concerns about the discrimination of O.L.

44.

Defendant Thomas also started sending V.L. threatening letters claiming O.L. was absent and truant and legal action would be taken against V.L.  Truancy charges can result in O.L. having court mandates and in V.L. being fined, required to do community service, or incarcerated.

45.

V.L. was very frightened and confused about the truancy threats, as she had been logging into the computer as set forth in O.L.'s 504 plan, so she tried to work it out with Thomas, but he refused to do so, forcing V.L. to track down and contact the CCSD staff over attendance who explained there were no absences for O.L.

46.

When Defendants' plan to file truancy charges against V.L. were prevented by V.L. expending much time and effort to undo the false absence claims, Defendants CCSD, Cotton, Thomas, and Coleman all were involved and agreed in December 2020 that O.L. would be dis-enrolled from school because she allegedly was not doing the class assignments, despite the fact V.L. had a Section 504 plan that did not require her to complete any schoolwork.

47.

When Defendants dis-enrolled O.L. from school, they did not tell V.L., who only learned when she tried to log O.L. into school and was blocked, which caused her to call Tapp Middle School administration about the denied access, at which time administration told V.L. that Defendant Cotton, who was acting under the direction of Coleman, had told the middle school staff to dis-enroll O.L.

48.

Defendants intentionally dis-enrolled O.L. from Tapp Middle School on December3 or  4, 2020, just days prior to a previously scheduled IDEA eligibility meeting for O.L. on December 7, 2020.  Defendants' actions totally excluded O.L. from any educational access.

49.

After CCSD and the individual Defendants dis-enrolled O.L. from Tapp Middle School, Defendants then alleged O.L. was not attending school (as Defendants had blocked V.L. from logging O.L. into classes in direct violation of O.L.'s 504 plan), and they then intentionally disenrolled O.L. from CCSD in December 2020, intentionally discriminating against O.L. based solely upon disability and intentionally not allowing O.L. any access at all to any education.

50.

Prior to dis-enrolling O.L. from Tapp Middle School and then CCSD, CCSD and Defendants Cotton and Coleman denied hospital homebound to O.L., claiming the hospital homebound form could only be completed by a psychiatrist because all of O.L.'s disabilities were mental health related when O.L.'s treating doctor stated clearly on the form that O.L.'s first diagnosis was "cognitive changes."

51.

With the hospital homebound form, O.L.'s doctor submitted a letter, explaining that O.L. was being followed by the doctor for "Cognitive and Behavioral changes of unknown etiology, Anxiety, Depression and Attention Deficit Disorder." The doctor recommended O.L. be placed on homebound "modified instruction based on her current cognitive level," explaining that O.L. was still undergoing further evaluation for her sudden cognitive and mental decline," but Defendants did not even contact the doctor but instead alleged, without medical evaluation, that all of O.L.'s disabilities were mental health based.

52.

As is the custom and practice of CCSD, Coleman, and Cotton, and without any medical evaluation by CCSD or discussion with O.L.'s doctor, in late November 2020, CCSD, Coleman, and Cotton denied homebound instruction to O.L., claiming only a psychiatrist could fill out the forms when in fact the Defendants were aware that it was only after medication had been prescribed to O.L. and she had a toxic reaction to that medication that O.L. lost her adaptive, academic, daily living, motor, cognitive, and behavior skills.  The form was not even needed, as Defendants knew, for CCSD could and should have provided O.L. services at home in her Section 504 plan.

53.

Defendants intentionally discriminated against O.L. based solely upon her disability by not allowing her access to education, not providing her reasonable and necessary accommodations, not implementing and intentionally violating the 504 plans it provided, and totally excluding O.L., a resident of Cobb County, Georgia, from any public school education based solely upon her disability.

54.

O.L. is entitled to all damages from CCSD allowed by law and determined appropriate by a jury for the intentional discrimination set forth above.

55.

As set forth above, solely because of O.L.'s disabilities, Defendants intentionally refused to provide O.L. reasonable accommodations so she could access public education, provided her disparate treatment because of her disabilities, were deliberately indifferent to O.L.'s needed accommodations, failed to timely evaluate O.L.'s disabilities, and totally excluded and isolated O.L. from any public school education at a time in O.L.'s life when she needed education the most.  The harm caused to O.L. by Defendants has been severe and irreparable.

56.

In further discrimination of O.L. based solely upon her disabilities, in March 2021, CCSD replaced O.L.'s Section 504 plan, while still dis-enrolling O.L. from education in Cobb County, with an Individualized Education Program ("IEP") that was intentionally inaccurately dated 1/21/2021.

57.

In further discrimination of O.L. based solely upon her disabilities, in March 2021, when CCSD replaced O.L.'s Section 504 plan that was not being implemented because CCSD had denied O.L. any access to education, Defendants insisted O.L. only receive 2 hours a week of education when non-disabled students receive 32.5 hours a week and when students receiving education in the home must receive 22.5 hours a week.  This was intentional discrimination and done after V.L. filed a State educational agency complaint against CCSD in late February 2021.

58.

In further discrimination of O.L. based solely upon her disabilities, despite CCSD being informed in March 2020 that O.L. had suffered motor, speech, and language impairment and in September 2020 received formal evaluation reports to that effect as well as O.L.'s need for therapy, CCSD did not even evaluate O.L.'s disabilities in those areas until February and March 2021.

59.

In further discrimination of O.L. based solely upon her disabilities, when Defendants replaced O.L.'s 504 plan with an IEP, they stated untruthfully evaluations that had been completed had not so as to deny O.L. needed OT and ST.

60.

In further discrimination of O.L. based solely upon her disabilities, CCSD refused to even evaluate O.L. for the much needed accommodation of AT evaluation, AT, and AT training until O.L. could actually access a CCSD public school building for her education.  It was only because of O.L.'s disabilities that CCSD denied this much needed and reasonable accommodation of AT to O.L.

61.

The statute of limitations has not run on this cause of action, as the discrimination has been and is ongoing and because Plaintiffs had to exhaust all administrative remedies under the IDEA, and to the extent Defendants assert otherwise, equitable tolling prevents such a defense.

<u>COUNT II</u>

<u>DEFENDANTS' INTENTIONAL RETALIATION, COERCION,</u>

<u>INTIMIDATION, THREATS, AND INTERFERENCE</u>

<u>IN VIOLATION OF THE ADA AND SECTION 504</u>

62.

Plaintiffs O.L. and V.L. seek recovery from all Defendants for the damages caused them due to Defendants' intentional retaliation against; coercion and intimidation of; and threats to O.L. and V.L. as well as Defendants' intentional interference with O.L. accessing education free from discrimination based solely upon disability and for V.L. advocating for O.L. to receive a non-discriminatory education and be allowed educational access and reasonable accommodations under Section 504 and the ADA and otherwise exercise and enjoy her rights under those statutes.

63.

Plaintiffs incorporate herein as set forth fully the factual assertions set forth in paragraphs 1-6, 12-18, 20-21, 23-37, 40-53, and 55-60.

64.

After O.L. suffered a severe, toxic reaction to medication prescribed her and became disabled in March 2020 cognitively, adaptively, motorically, and

behaviorally and in areas of speech and language, self-help skills, daily living skills, learning, communication, and other ways, because O.L., through her mother, attempted to exercise O.L.'s rights under the ADA and Section 504, Defendants intentionally denied O.L. reasonable accommodations, comprehensive evaluation under Section 504, access to education, access to instruction in the home, access to any public school education, her Section 504 accommodations, AT evaluation, AT, and AT instruction, and threatened her wrongfully with truancy, prepared intentionally false educational records, refused to provide V.L. all of her child's educational records, dis-enrolled her from school, dis-enrolled her from CCSD, and on March 16, 2021, deprived her of a non-discriminatory education saying CCSD would only provide O.L. 2 hours a week with only 3 educational objectives when school children receive 32.5 hours a week of educational programming and placement and over a hundred educational objectives in the same time frame.

65.

Defendants' retaliatory acts set forth above have caused and continue to cause O.L. severe harm and damage and have denied and continue to deny her an education, access to non-discriminatory education, any meaningful education, needed services and AT, proper and necessary evaluation, and to this date, Defendants continue to retaliate against O.L. by depriving her intentionally of any education, having not even enrolled O.L. back into CCSD after improperly and

unlawfully dis-enrolling O.L. from Tapp Middle School and using that to

unlawfully dis-enroll O.L. from CCSD.

66.

After O.L. suffered a severe, toxic reaction to medication prescribed her, as

set forth above, V.L. advocated and attempted to aid O.L. from March 2020

forward in exercising her rights under the ADA and Section 504 to be

comprehensively evaluated, to receive reasonable and necessary accommodations

so O.L. could access education, to receive timely evaluation in all areas of

disability, to receive any access to education, to receive printable assignments, to

receive services, to receive ST and OT, to receive education in the home since she

could not access a public school building, to receive AT evaluation and services, to

receive an appropriate Section 504 plan, to have O.L.'s 504 plan implemented, to

receive O.L.'s educational records, and to exercise and enjoy her rights under the

ADA and Section 504.

67.

Because V.L. took the actions set forth in paragraph 66 above in attempts to

aid O.L. to exercise and enjoy her rights under the ADA and Section 504,

Defendants, working together, intentionally retaliated against, coerced,

intimidated, threatened, and interfered with V.L. and her advocacy by denying

23

V.L. necessary communication with O.L.'s teachers, denying O.L. a non-discriminatory education, denying O.L. enrollment in school and CCSD, preventing O.L. from receiving any public school education, wrongfully threatening O.L. and V.L. with truancy charges, fabricating alleged absences, violating intentionally O.L.'s Section 504 plans, denying V.L. any assistance in educating O.L., denying O.L. home services, denying the application for homebound instruction V.L. submitted, treating V.L. and the advocate she retained with scorn and openly mocking them through the process, attacking V.L. and her character without cause, blaming V.L. for CCSD not providing O.L. a non-discriminatory education, refusing to consider the evaluations presented by V.L. to CCSD, refusing to comprehensively evaluate O.L., refusing to provide independent evaluations requested, forcing V.L. to have to educate O.L. 22.5 hours a week, and when V.L. filed a State complaint, preparing an educational plan that would only provide O.L. 2 hours a week of instruction, which is not sufficient under law to be counted as school attendance, and more.

68.

Because of the retaliation as set forth above by Defendants against V.L., V.L. has been caused health issues and fear, depression, and grave concerns for her child and herself; she has been prevented from advocating for her child to receive a non-discriminatory education and access; forced to pay for education for her child

and to teach her child 22.5 plus hours a week; forced to reduce her work load and therefore lose income to teach her child and provide her AT, evaluations, and services for O.L. to receive a non-discriminatory education, forced to obtain evaluations, programming, educational services, and materials, forced to retain an advocate and attorneys, forced to obtain herself parent training, forced to exhaust administrative remedies, and caused additional ongoing harm.

69.

Because of Defendants' intentional violation of the anti-retaliation provisions of the ADA and Section 504, Plaintiffs seek recovery for all the damages caused them by Defendants and as allowed by law in an amount to be determined by a jury.

70.

The statute of limitations has not run on this cause of action, as Defendants' retaliation has been and is ongoing and because Plaintiffs had to exhaust all administrative remedies under the IDEA, and to the extent Defendants assert otherwise, equitable tolling prevents such a defense.

## COUNT III

## DEFENDANTS' VIOLATION OF 42 U.S.C. § 1983 AND O.L.'S U.S. CONSTITUTIONAL RIGHT TO EQUAL PROTECTION UNDER THE LAW

71.

Plaintiffs incorporate the facts asserted in paragraphs 1-6, 15-18, 23-24, 26, 34-37, and 44-53 above as fully set forth herein.

72.

From March 2020 forward and ongoing, while acting under color of state law, custom, and usage and in concert, Defendants CCSD, Thomas, Coleman, and Cotton used their authority granted by state law to intentionally deprive O.L. her rights to equal access to public education by intentionally depriving her of needed and reasonable accommodations and modifications, failing to comprehensively evaluate her, refusing to implement CCSD's Section 504 plans for O.L., denying her education in the home, denying her any educational services and AT, denying her exercise of her Section 504 accommodations, knowingly wrongfully claiming O.L. was truant and threatening O.L. and V.L. with truancy charges, and when that unlawful, retaliatory plan did not work, violating O.L.'s Section 504 plan and dis-enrolling O.L. from school in December 2020 going forward, blocking her from any education or access to education since December 2020 forward, and then

claiming since she was not accessing her classes (because Defendants prohibited this), falsely alleging she was no longer attending CCSD and dis-enrolling her from CCSD from December 2020 forward.

73.

Defendants have acted and continue to act under color of state law, custom, and usage and in concert to wrongfully deprive O.L. her right to be enrolled in public education in violation her U.S. equal protection rights under the Fourteenth Amendment to the United States Constitution in violation of Section 1983. Defendants wrongfully removed O.L. from public school and refuse to themselves put O.L. back in public school, depriving her intentionally of a public education and access to a public education.

74.

Defendants have acted and continue to act under color of state law, custom, and usage and in concert to wrongfully deprive O.L. her right to equal access to schooling and a free public education because she is disabled and because she is among a disabled group who requires specialized educational services in the home.

75.

CCSD, Coleman, and Cotton, acting in concert and under color of state law, custom, practice, and usage, deny equal access to disabled students who require

education in the home, relegating them to 3-5 hours a week when non-disabled

students and disabled students who can access a brick and mortar school are

provided 32.5 hours a week of public education and placement.

76.

Defendants have acted and continue to act under color of state law, custom,

practice, and usage and in concert to deny O.L. any access, much less equal access,

to education, dis-enrolling her from school and not providing her a current

educational program despite the fact she is a resident of Cobb County, Georgia.

77.

In August 2019, Judge May of the United States District Court found CCSD

had denied a disabled child who required hospital homebound education a free

appropriate public education by only providing the child 5 hours a week of

education with one teacher, and when CCSD was asked why it did this, CCSD

responded through its attorney that in CCSD, 5 hours a week is a lot of hours for

disabled children being educated in the home.

78.

Pursuant to Defendants' custom, practice, and policy to deny equal access to

education to disabled students who have to be educated in the home and in

retaliation, CCSD relegated O.L. to only 2 hours a week of instruction.

79.

Defendants, acting under color of state law and pursuant to custom, practice, usage, and policy and in concert, denied O.L. equal protection of the law by denying O.L. any education in the home until March 16, 2021, and then by only stating it would provide O.L. 2 hours a week only if V.L. re-enrolled her when CCSD illegally dis-enrolled O.L.

80.

It is the practice, policy, usage, and custom of CCSD, Coleman, and Cotton, acting under color of state law and in concert, to deprive disabled children requiring hospital homebound instruction in the home to education by denying the application for hospital homebound services by claiming there is no medical necessity when that is a violation of State regulations, which is what Defendants did to O.L.

81.

It is the practice, policy, usage, and custom of CCSD, Coleman, and Cotton, acting under color of state law and in concert, to deprive disabled children requiring hospital homebound services education in the home by denying the application for hospital homebound services and then by dis-enrolling said students from public education, which is what Defendants did to O.L

82.

It is the practice, policy, usage, and custom of CCSD, Coleman, and Cotton, acting under color of state law and in concert, to deprive disabled children who require special education and services outside the school environment their rights under the ADA, Section 504, and the IDEA as a matter of course in order to not have to educate these children, as they did and continue to do to O.L.

83.

Defendants have irreparably and severely harmed O.L., causing her life long and extensive damages, for which O.L. has a right to recover her damages as determined appropriate by a jury.

84.

The statute of limitations has not run on this cause of action, as Defendants' denial of O.L.'s right to equal protection under the laws has been and is ongoing and because Plaintiffs had to exhaust all administrative remedies under the IDEA, and to the extent Defendants assert otherwise, equitable tolling prevents such a defense.

## COUNT IV

## APPEAL OF ADMINISTRATIVE FINAL DECISION

### 85.

Plaintiffs incorporate the facts asserted in paragraphs 1-6, 12-18, 20-21, 28-31, 73-75, 78, and 82 as if fully set forth herein.

### 86.

In March 2020, V.L. notified all of O.L.'s CCSD Tapp Middle School teachers and the school counselor and Section 504 supervisor that after taking prescribed medication, O.L. had a significant adverse reaction and could not talk, feed or dress herself, toilet properly, or perform other very basic self-help skills.

### 87.

V.L. continued to inform the school counselor, who was the 504 supervisor for the school, of O.L.'s inability to function and continued to ask to talk to the counselor/504 supervisor.  Finally, when V.L. was able to meet with the counselor/504 supervisor on August 3, 2020, because CCSD had taken no action to evaluate O.L., V.L. made what is called a "direct referral" to special education for comprehensive evaluation, IDEA eligibility, and an Individualized Education Program ("IEP").

88.

Despite being informed in September 2020 that O.L. had formally been diagnosed with an expressive and receptive language disability and motor impairment and required ST and OT to make progress, CCSD ignored the evaluations provided to CCSD from V.L. and refused to evaluate O.L. for ST and OT.

89.

At the hearing, CCSD witnesses admitted that in CCSD, the school district does not evaluate speech, language, or motor impairment unless the child is first diagnosed with a disability and found eligible under the IDEA, thus directly and intentionally violating the IDEA by refusing to evaluate the child initially in every area of suspected disability.

90.

CCSD's policy, practice, and custom of not evaluating students in the areas of speech, language, and motor impairments causes significant delay in the student being provided necessary related services under the IDEA and results in an improper IEP, as is both the case for O.L.

91.

Despite CCSD knowing that O.L. had lost her ability to talk after taking the medication prescribed, and despite the fact CCSD knew however that O.L. could use a tablet to navigate to preferred activities, such as listening to music, CCSD refused to evaluate O.L. for AT and specifically an augmentative and alternative communication ("AAC") device so she could communicate.

92.

CCSD informed V.L. it would only provide O.L. an AT evaluation, which is required in order for O.L. to receive an AT device and training on that device, when O.L. could attend a brick and mortar school.

93.

After V.L. signed CCSD's evaluation consent form provided to her on August 5, 2020, the only evaluation, if it can even be called that, as it is wholly inappropriate, that CCSD used for IDEA eligibility and identifying O.L.'s disabilities  was a 10 minute attempt by the school psychologist standing in the rain while V.L. covered the psychologist with an umbrella wherein the psychologist made a few demands on O.L., who did not even know the psychologist and was sitting in a car, after being frightened and intimidated by the psychologist.

94.

The school psychologist refused to build rapport with O.L. prior to evaluation and refused to even observe her or talk to any of O.L.'s medical doctors, yet the psychologist recommended anyone trying to work with O.L. must build rapport and she testified that O.L. showed symptoms of a child with traumatic brain injury or some type of neurological event.  The psychologist also never recommended medical evaluation despite such being a service under the IDEA.

95.

Despite O.L. presenting as a child with autism that had severely worsened after the medication and without comprehensive evaluation, on December 15, 2020, CCSD found O.L. eligible under the IDEA as a child with EBD and other health impairment ("OHI").  CCSD provided the wrong date on the eligibility formal record, dating it December 7, 2020.

96.

CCSD's misdated eligibility report, which was not provided by December 6, 2021, when it should have been provided by law, noted that O.L. had autism and a severe expressive and receptive language disability, yet CCSD never evaluated O.L. for these areas of known disability as of December 15, 2020, and it never evaluated her for autism.

97.

Despite CCSD knowing that O.L. could no longer dress herself, use a fork and spoon, feed herself without making a mess, brush her hair, button and unbutton clothes, brush her teeth, hold a pencil to write, and had other motor impairment, in its eligibility report, CCSD denied, without any evaluation and in direct contravention of the findings of a private therapist and every professional seeing O.L., that O.L. had no motor needs.

98.

CCSD never told V.L. CCSD had deadlines to meet to find O.L. eligible and provide her with an IEP until February 2021 after V.L. filed a formal complaint against CCSD, and even then, CCSD stated it could meet yet once again in March 2021, when the IEP had to be provided by law on or before January 15, 2021.

99.

CCSD stopped the IEP meeting conducted on January 21, 2021 and did not prepare an IEP for O.L. until March 16, 2021, but yet CCSD dated the IEP January 21, 2021.

100.

O.L.'s mother requested an independent educational evaluation ("IEE"), explaining that CCSD's evaluation was not proper or comprehensive, and CCSD refused to use the independent evaluator selected, claiming falsely that he had not "been responsive" when in fact he had.  CCSD also claimed he was not on its list of approved evaluators, but the law does not require such, and that same evaluator had conducted an IEE for a CCSD student just the prior month and had conducted over 10 IEEs for CCSD students in the past.

101.

When V.L. requested an IEE for ST, CCSD also denied the evaluator selected by V.L., claiming she too was not on the list, yet she had just conducted an IEE for a CCSD student and she did not have to be on the list.  CCSD illegally and unlawfully refused to allow V.L. to select independent evaluators and obtain IEEs.

102.

When CCSD finally conducted OT and ST evaluations, if they can be called that, the ST did not provide, as the record proves, O.L. with an AAC device and O.L. did not have an AAC device, yet the administrative law judge ("ALJ") found the ST did provide O.L. with an AAC device.

103.

In CCSD's misdated IEP, CCSD claimed CCSD's OT and ST evaluations had not been completed and thus could not be considered but in fact they had, and the evaluations showed O.L. could not put on her shoes and take them off independently, could not put on her coat independently, and could not zip and unzip, button and unbutton, manage a belt buckle, open a cup, open packages, clean her own face and more.  It was also disclosed O.L. could not speak even when trying to do so.  Significant sensory issues were reported as well and CCSD knew all this prior to preparing its IEP (and even before finding O.L. eligible).

104.

CCSD conducted an IEP meeting on March 16, 2021 when V.L. said she could not attend on that date but could attend a meeting days later, but CCSD did not provide V.L. a meeting a few days later, and it refused to discuss with her her serious concerns about eligibility.

105.

Pursuant to CCSD's March 16, 2021 IEP for O.L., once CCSD found a teacher and that teacher scheduled when she could come to O.L.'s home, until August 1, 2021, CCSD would only provide O.L. alleged instruction on 3 behavior objectives with no therapy and no adaptive living skills, no AT use, no daily living

skills, no verbal communication, and more being unaddressed.  All in all, CCSD's IEP called for O.L. to receive no more than **22 hours of education over 4.5 months** on only 3 objectives when regular education students and disabled students who do not require education in the home receive **32.5 hours a week** of education and educational placement.  CCSD's IEP was an annual IEP, providing in the written document only 2 hours a week to O.L. for 40 weeks.

106.

CCSD's annual, misdated IEP, at the very most, would have provided O.L. **over an entire year only 80 hours of instruction** while non-disabled students and disabled students who do not have to be educated in the home due to their disabilities would receive that in less than 3 weeks.

107.

For O.L to receive a free appropriate public education ("FAPE"), she required proper identification as a child with speech and language impairment and autism as well a motor and social need, an intensive educational program based upon proper and comprehensive evaluation including adaptive functioning, autism, speech and language impairment, motor disability,  and other areas, AT and AT training, parent training, proper, meaningful transition objectives, OT, and ST.  All of these are provided for under the IDEA when a child with disabilities needs them

to receive a FAPE, and O.L. did, but CCSD did not provide them to O.L. but instead dis-enrolled her from CCSD and later attempted to relegate her to only 2 hours of instruction a week.

108.

Prior to the March 16, 2021 IEP meeting, V.L. provided CCSD with a comprehensive neuropsychological evaluation report setting forth the private evaluation of O.L. by Dr. Kimie Ono, a well-trained and educated expert in neuropsychology and education of disabled students.  Dr. Ono reported O.L. talked and communicated non-verbally and participated in a few activities, and Dr. Ono conducted, as did a prior private psychologist, an adaptive functioning evaluation, something CCSD never did.

109.

Dr. Ono recommended the school system provide O.L. ST, OT, physical therapy, AT, homebound instruction, errorless learning, positive reinforcement, social skills intervention, structure, and a strong program addressing adaptive functioning, yet CCSD did not consider this evaluation report, talk to Dr. Ono, or invite Dr. Ono to the IEP meeting.

110.

Only after the March 16, 2021 IEP meeting did CCSD, through Ms. Ford, reach out to V.L. on April 14, 2021 saying that if O.L. was going to access the 2 hours a week, then V.L. herself had to go and re-register and re-enroll O.L. back into Tapp Middle School and CCSD and prove O.L. was a resident when in fact V.L. never removed and never dis-enrolled O.L.: CCSD did.

111.

On April 14, 2021, CCSD, through Ms. Ford, said CCSD's OT and ST the truth was that both evaluations had been completed and dispersed prior to the March 16, 2021 IEP meeting.

112.

V.L. responded that she would gladly attend the eligibility meeting, but CCSD claimed V.L. never replied, yet evidence admitted into the administrative record proves she did.  CCSD claimed it was going forward with the meeting but admitted at the hearing it never did.

113.

Defendants intentionally did not evaluate O.L. in the areas of suspected disability of language impairment, motor impairment, sensory dysfunction thereby

excluding O.L. from eligibility as a child with a language impairment and autism,
and then they wrote in the December 15, 2020 eligibility report and told V.L. at
that meeting that for CCSD to consider eligibility for autism, CCSD would have to
provide O.L. a speech evaluation.

114.

In its misdated eligibility report, CCSD wrote:  Parent and Teacher ratings
suggest O[.L.] is demonstrating many behaviors consistent with her diagnosis of
Autism.  However, the committee [actually just CCSD] did not come to a final
decision regarding eligibility in this category because a comprehensive speech
evaluation had not been completed."

115.

CCSD did not comprehensively evaluate O.L., did not try to evaluate her for
autism, claimed it only needed to conduct a speech and language evaluation to
consider an autism eligibility , did not consider its finalized ST evaluation at the
March 16, 2021 IEP meeting, and then claimed in mid-April 2021, a year after
V.L. first reported O.L.'s disabilities due to her medication reaction, it needed to
hold a "re-evaluation" meeting to discuss more evaluations it had never provided
to begin with or since.  CCSD refused to provide another eligibility meeting or an

IEP meeting to consider the ST and OT evaluations that the IDEA mandated

CCSD consider in preparing the March 16, 2021 IEP.

116.

Defendants CCSD, Coleman, and Cotton orchestrated the entire process

once Cotton and Coleman became involved including denying reasonable

accommodations to O.L., dis-enrolling O.L. from school in violation of her Section

504 plan days before the IDEA eligibility meeting, relegating O.L. to a mere 2

hours of instruction a week (something never heard of before or since for a child

with O.L.'s disabilities and needs), changing the re-eligibility meeting to a re-

evaluation meeting at which time CCSD was going to claim it needed more

evaluations, continuing the stall, not evaluating O.L. for ST and OT timely,

refusing an AT evaluation to O.L. until she could access a brick and mortar school,

and all the other violations of O.L.'s rights and applicable laws as set forth above.

117.

CCSD wrongfully denied V.L.'s request for Ms. Mindy Cohen to

independently evaluate O.L., so V.L. had to pay for it, and she had to provide an

AT evaluation and AT.  Ms. Cohen built a rapport with O.L. and used positive

reinforcement with O.L., who talked to Ms. Cohen using her communication

device.  CCSD never did any of this and never even attempted to do any of this.

118.

On August 2, 2021, O.L. and V.L. requested an administrative due process hearing pursuant to the IDEA.

119.

On September 15, 2022, CCSD filed an answer to the hearing request and prior written notice signed by Coleman, at which time CCSD claimed, *inter alia,* O.L. was "unenrolled in December 2020 due to lack of attendance" and that CCSD considered all private evaluations.

120.

Despite V.L. requesting all of O.L.'s educational records as early as January 7, 2021 and multiple times thereafter, CCSD refused to provide V.L. all of her child's records and required V.L. pay legal counsel to try to obtain them, and even then, CCSD continued to withhold records, including the IEP signature page still not provided.

121.

On August 11, 2022, when CCSD finally provided after multiple requests by V.L. and multiple more requests by Plaintiffs' counsel, *inter alia,* O.L.'s attendance records, the records were not even complete yet they showed that after

March 20, 2020, O.L. had no absences from school despite CCSD asserting in its filed answer to the hearing request that it dis-enrolled O.L. from school due to absences.

122.

The administrative law judge ("ALJ") entered an order setting the hearing and limiting the time for each party, with Plaintiffs having the burden of proof and burden of going first with their case, to only 18 hours of presentation, including cross-examination, with the ALJ maintaining time records.  The ALJ also ordered all motions to be filed on or before August 19, 2022.

123.

The limitation of time to Plaintiffs of only 18 hours prevented Plaintiffs from their statutory right to a fair hearing, and CCSD's counsel continued to make multiple, often speaking objections, intentionally eating away at Plaintiffs' time to present evidence.

124.

During the third day of the hearing, Plaintiffs' counsel raised the issue again of constant talking objections from CCSD's counsel, eating away at Plaintiffs' limited time and stated, "I won't have cross left.  So I'm scared, quite frankly," and the ALJ laughed and replied, "It's true."

44

125.

During the fourth day of the hearing, Plaintiffs' counsel informed the ALJ again that CCSD's attorneys were constantly objecting for the reason to use up Plaintiffs' limited time and this was causing Plaintiffs' counsel to have to rush constantly instead of being thorough, that it was a very big concern, and that she was having to minimize cross examination and give up cross examination to ensure rebuttal time.  The ALJ stated he might consider allowing some rebuttal if all Plaintiffs' time was used, but by then, the damage was done, and might does not mean he would.

124.

There was no reason given and no valid or legal reason for the ALJ to limit Plaintiffs' presentation of evidence, including objections from CCSD attorneys, to 18 hours, and this violated Plaintiffs' IDEA rights to a fair hearing and to present evidence and call witnesses.

125.

During the hearing, it was noted by Plaintiffs' counsel and a paralegal that the ALJ would stop his timer when CCSD's attorneys were looking for a document or asking for a moment to talk to each other but that the ALJ did not do this for Plaintiffs.

126.

On August 5, 2022, Plaintiffs served CCSD custodian of records with a very limited subpoena for O.L.'s educational records never provided.  In violation of the ALJ's order and OSAH rules, CCSD purposely waited until August 22, 2022, less than 5 business days prior to the hearing at that time, to untimely file a motion to quash.

127.

On the first day of the re-scheduled hearing, September 12, 2022, the ALJ stated he had granted CCSD's motion to quash and denied Plaintiffs' motion to quash CCSD's subpoena seeking hundreds of pages of irrelevant documents.  The ALJ stated he had entered said order on August 23, 2022 regarding the motions to quash when in fact one motion was not even filed until August 24, 2022.  The ALJ then stated it was just a draft but was file stamped and not served upon the parties and he scratched out the file stamp and wrote a different date.

128.

Plaintiffs had a right to obtain all of O.L.'s educational records well in advance of the hearing pursuant to the IDEA and federal regulations implementing the IDEA, and this is a critical parental right pursuant to the IDEA.  Because CCSD refused to provide all of O.L.'s education records and because the ALJ

quashed in full Plaintiffs' subpoena upon the CCSD custodian of records, Plaintiffs were deprived their right to obtain all of O.L.'s educational records to fully prepare for the hearing, address CCSD's false claims, and use relevant evidence.

129.

The ALJ refused to allow Plaintiffs to call a CCSD board member who was privy to and very concerned with Defendants dis-enrolling O.L. from school and other issues with O.L. not being educated.  The sole reason he could not be called is because he was a board member, which is not valid legal ground at all for him being exempt from testifying and this directly violated Plaintiffs' IDEA right to compel the attendance of witnesses.

130.

When Plaintiffs' counsel raised the issue that CCSD was seeking in a trial subpoena totally irrelevant documents and their untimely subpoena should be quashed, the ALJ replied that he agreed and that if CCSD tried to introduce the subpoenaed documents, counsel could make a relevance objection or hearsay objection, ignoring they should not have been subpoenaed in the first place.

131.

As is the standard practice for CCSD's attorneys, they serve, without notice to opposing counsel, subpoenas upon many private providers, in this case 16, and

they send letters to those served telling the providers that if they provide counsel the documents in advance of the hearing, they may not have to attend each day for 5 days.  CCSD's attorneys have been informed more than once this is not allowed by law, for there is no discovery in administrative cases in Georgia and it is improper to serve subpoenas and not provide the other party notice and time to object.  CCSD's attorneys, however, did this once again, without even letting Plaintiffs know it had served the subpoenas and had sought the documents in advance of a hearing.  CCSD did in fact obtain confidential records involving O.L. without any notice to Plaintiffs or their counsel, and the ALJ refused to address that issue, depriving Plaintiffs of a fair hearing as CCSD was provided discovery with is prohibited and Plaintiffs were not.

132.

Throughout the hearing, the ALJ allowed CCSD witnesses to introduce, over objection, hearsay and to testify, again over objection, to facts not known to the witness, including what happened and what was said at meetings the witness never attended as well as what third persons were thinking at the meeting or when they read a document and why they took actions they did.

133.

At the end of the hearing, the ALJ told the court reporter to be sure to provide him with the transcripts before providing them to the parties so he could go over them to ensure no corrections were needed.

134.

Something happened to the transcripts and at least one does not appear to correctly state what the ALJ stated and one may add the swearing in of a CCSD witness, which was not heard by several at the hearing, including counsel for CCSD.

135.

Volume Fourt of the Transcripts, dated September 15, 2022 and provided to the parties' attorneys by the ALJ's staff in October 2020, starts on page 1247 and ends on page 1450, despite the fact it references that direct of a CCSD witness began on page 1558.  At the least, the testimony of the last witness, Defendant Coleman, was not included in the transcript.

136.

In late December 2022, a revised fourth transcript was provided to the parties' counsel by the ALJ's staff.  V.L., her legal counsel, those observing the

hearing at the time, and a paralegal all noted that the 4th transcript as revised does not appear accurate.

137.

At the end of the fourth day of the hearing, CCSD called Defendant Coleman to testify although Coleman has never met O.L., never evaluated her, never provided her any services, never asked V.L. to provide any videos of O.L. at home learning, using her AAC device, learning, etc., never attended one meeting for O.L., and never talked to one private provider to or evaluator of O.L.

138.

At the hearing, Defendant Coleman admitted she attends hearings, provides affidavits, responds to complaints, and each and every time, it is her job to find CCSD complied with the IDEA and she so does.  This bias was totally discounted by the ALJ, as well as the fact Coleman did not and does not even know O.L.

139.

At the hearing, when Defendant Coleman took the stand, the ALJ, according to the fourth transcript, as revised, apologized to Ms. Coleman simply because she had been sitting while CCSD's attorney tried to discontinue the hearing early that day and then said, "Oh well.  I think you know the drill."

50

140.

The transcript as revised then purports to state the ALJ swore Defendant Coleman in as a witness, but CCSD's attorney stated she did not hear that, asking the ALJ if he wished her to swear the witness, and Plaintiff , Plaintiffs' counsel, and a paralegal did not hear the alleged swearing in, and it was in the paralegal's notes that it did not happen.

141.

At the hearing, the ALJ stated Defendant Coleman basically was the most knowledgeable and experienced witness regarding special education than anyone in the State, that he did not find limiting her expertise even possible, and that he did not even know how to restrict Coleman's expertise.

142.

In the final decision, the ALJ cited to Coleman's testimony throughout, even to statements of the law, and during the hearing the ALJ allowed Coleman to testify, over objection, regarding facts that she had no personal knowledge for the purpose of asserting facts.

143.

Under the IDEA, Plaintiffs are entitled to receive a verbatim record of the hearing, and they do not find they have been provided this.

144.

Under the IDEA, Plaintiffs had a legal right to an open the hearing, yet the ALJ stated that only 2 family friends attending the hearing was "hitting about the limit of where [he] wanted to go," indicating he did not want the hearing opened to more than 2 individuals at a time, which is a violation of Plaintiffs rights to have individuals witness the hearing.

145.

 Despite there being many issues and witnesses, the ALJ limited the parties' post hearing briefs to 40 pages.

146.

The ALJ entered two orders extending his time to issue a final decision and did not issue a final decision until May 8, 2023, almost 4 months after submission of closing briefs when the IDEA requires a decision be entered within 75 days of a hearing request, unless a party requests otherwise.

147.

Despite the ALJ's untimely final decision being 81 pages in length, it contained inaccurate statements of fact, is blatantly biased to CCSD, omits the testimony and evidence presented by O.L. and V.L., relies on hearsay and other impermissible evidence, discounts the testimony of unbiased third party experts who actually knew and worked with O.L., discounted the bias and lack of knowledge of O.L. of CCSD's employee witnesses, and contained clearly erroneous legal conclusions.

148.

The ALJ asserted that what Coleman interpreted an email to mean well after it was sent to someone else was what the District at the time concluded the email meant, and the ALJ allowed Coleman to testify what the law is and what is required under the law.  The ALJ cites in his final decision much of Coleman's testimony, which is not a finding of fact, and as well, the testimony is not accurate, such as Coleman testifying that it was not until June 2020 when V.L. notified CCSD of O.L.'s new disabilities when multiple emails prove it was May 2020 notice was given.  The ALJ cited to Coleman testifying O.L was dis-enrolled from middle school because "she had not been accessing services." First, no services were being provided to her and second, CCSD admitted in its answer  it was

allegedly because O.L. was not attending school.  Earlier, and at the time, CCSD admitted it was because O.L. was not completing her assignments that CCSD dis-enrolled her despite the fact her Section 504 plan allowed this accommodation.

149.

Asserted factual findings in the final decision are not findings but simply a statement of what someone testified, with no mention that other evidence proved that testimony was not accurate.

150.

Coleman testified, according to the ALJ, that daily living skills are not educational goals, but under the law, when a disabled child lacks basic self help skills such as toileting, dressing, feeding, and communication skills, formal education begins at that point, and such skills are undeniably educational goals for that child and are routinely placed in the child's IEP to be taught and mastered.

151.

Coleman claimed that an expert, Mr. Foley, who was a certified teacher in CCSD and who is currently a licensed counselor and a BCBA, had some personnel issues while in CCSD, and the ALJ found that relevant when in fact Mr. Foley reduced his hours to obtain further education and licensure, and if there were truly any personnel issues, it would have been Mr. Foley advocating for disabled

students in CCSD and voicing his concerns about the disabled students not being provided a FAPE, which is statutorily protected speech.

152.

The ALJ's final decision is so erroneous, it is impossible to state all the inaccurate findings of fact and conclusions of law, but the ALJ, in entering his final decision, ignored the substantial evidence of record and committed clear error when he found CCSD provided O.L. a FAPE procedurally and substantively, as it did not.

153.

The ALJ found that no documents referenced autism prior to eligibility, but in fact a private psychological evaluation provided to CCSD staff did, and CCSD's eligibility report itself stated the child was diagnosed with autism and that her parent and a CCSD teacher found she exhibited symptoms of a child with autism.

154.

The ALJ ignored that CCSD wanted to not provide any educational access to O.L. and just wait until she might have been provided hospital homebound services, which would have meant O.L. was provided no access to education for a long time, especially since CCSD denied hospital homebound services.

155.

The ALJ found V.L.'s statutorily protected expression to CCSD staff that O.L.'s Section 504 plan not being implemented was "complaining."

156.

The ALJ ignored the evidence that O.L. made steady, meaningful progress in private OT from when she first started, ignoring the evidence that CCSD was well aware in May 2020 O.L. had lost motor skills and that in September 2020 an OT evaluation showing O.L. required OT was provided to CCSD but that CCSD did not assess O.L. for OT and provide an OT evaluation report until March 2, 2021 and refused to consider it in an IEP meeting, which it never did to this day.

157.

The ALJ allowed the school psychologist to provide hearsay, over objection, to allegedly what a nurse told her when in fact the nurse denied ever having that conversation and instead stated the school psychologist thought O.L. should be placed at H.A.V.E.N., a GNETS program.  The ALJ ignored this is why V.L. said CCSD staff could talk to anyone serving O.L. as long as she was involved so as to prevent contradictory statements and false claims of what someone allegedly said.

158.

The ALJ erred in finding that cognitive and behavioral changes of unknown etiology is a mental health issue for O.L. when the undisputed evidence is that those changes occurred in reaction to prescription medications.

159.

The IDEA mandates that school systems consider all private evaluations obtained and provided by parents, yet the ALJ ignored the undeniable fact CCSD did not do this, for it had evaluations in September and November 2020 that stated O.L. required ST and OT and had autism and it did not evaluate for those disabilities.

160.

The ALJ erred by not finding the denial of O.L.'s educational records when requested each time and prior to the hearing was a serious procedural violation of the IDEA amounting to a denial of FAPE and a denial of a fair hearing and by not allowing Plaintiffs to subpoena O.L.'s own records when in fact she had a right to them under law.

161.

The ALJ ignored the law that CCSD could not find O.L. eligible as a child with autism or OHI due to its non-comprehensive evaluation in violation of the IDEA and the Georgia Department of Education ("GaDOE") rules.

162.

CCSD's school psychologist, who spent about 10 minutes outside a car in the rain allegedly evaluating O.L. without building a rapport with O.L., admitted she and CCSD never conducted any adaptive functioning of O.L., which was critical given her loss of adaptive functioning skills after the medication reaction, and which was mandated by GaDOE rules to find her eligible under OHI.

163.

The ALJ erred in finding OHI a correct IDEA eligibility and finding CCSD conducted an appropriate, comprehensive evaluation when CCSD did not, as admitted, conduct an adaptive functioning evaluation, which was required for O.L. and which the GaDOE mandates for a finding of OHI eligibility.

164.

The ALJ erred in finding EBD a correct IDEA eligibility and finding CCSD conducted an appropriate, comprehensive evaluation when CCSD violated the

GaDOE standards and rules by not providing and documenting the provision of "comprehensive prior extension of services … to include counseling,, modifications of the regular program or alternate placement available to all children, and data based progress monitoring of the results of the interventions and a "report of behavioral observations over a significant period of time."

165.

If CCSD had complied with the law and observed O.L. over an extended time, it would have noted without question she was a child with autism, and it would have noted she could use and benefit from ST, OT, and AT as well as continued access to cognitive concepts, language, structure, and social interaction, and the ALJ erred when it ignored this evidence.

166.

Pursuant to the IDEA, FAPE is defined by statute to include special education and related services that meet the standard of the State educational agency, which CCSD failed to do, as it did not comprehensively evaluate O.L. in every area of disability, it did not initially evaluate O.L. for speech and language eligibility and services, it did not evaluate O.L. for autism and still never has, and it did not comply with GaDOE mandates regarding assessing for disabilities of OHI, EBD, speech and language impairment, or OHI.

167.

The ALJ erred in ignoring the overwhelming evidence that CCSD did not properly, comprehensively evaluate O.L. within the IDEA and the GaDOE standards.

168.

The ALJ erred in finding O.L.'s IDEA team agreed to eventually conduct a cognitive assessment, as this was not discussed, was not in the minutes of CCSD's eligibility report, was not claimed in CCSD's answer to the hearing request, and was refuted by the evidence presented by CCSD that all it needed to do for autism eligibility, which was not true, was conduct a comprehensive speech and language evaluation.

169.

The ALJ erred in concluding that CCSD did not deny O.L.'s and V.L.'s rights to an IEE with Dr. Montgomery and in excluding from evidence the fact that CCSD also excluded O.L. and V.L. from obtaining an independent evaluation with Ms. Cohen, making again false claims regarding the independent evaluator selected by V.L.

170.

The ALJ erred in finding that CCSD's belated OT and ST evaluations were appropriate, as no rapport was attempted, no AAC device was presented, no reinforcement was used, and while O.L. was able to interact with others at that time, because of the brevity of the visit and lack of rapport, the evaluations were not conducted except for one limited attempt, and those scores were withheld because they allegedly were not valid.

171.

The ALJ erred in finding CCSD did not deny O.L. a proper evaluation by denying her an AT evaluation until she could access a brick and mortar school.

172,

The ALJ erred by ignoring the evidence that when V.L. herself provided O.L. an AT evaluation, AT, and AT training, O.L. was able to follow simple directions, had good focusing skills while working with her AAC device, maintained attention to a variety of tasks, had a desire to communicate, understood the power of communication, and learned quickly how to use her device to communicate medical information, request food, ask questions, socially interact with others, communicate safety information, tell about past events, and talk about the future.

173.

The ALJ erred in ignoring the fact CCSD did not consider the private BCBA adaptive skills/functional skills assessments provided to CCSD by V.L. as well as the suggestions contained therein that O.L. required an intensive home program focusing on all areas of education, including adaptive skills, communication skills, functional skills, engagement, turn taking, social skills, behavioral skills, physical skills, and academics.

174.

The ALJ erred in not considering the testimony of three independent BCBAs, all with educational backgrounds, and two with counseling licenses and in not considering the testimony of an independent ST with over 45 years of practice, especially considering these four experts had all provided educational services to and or evaluated O.L. over a period of time.

175.

The ALJ erred in only giving weight to the CCSD employees who testified, including ones who testified for CCSD for a living.  The ALJ ignored the overt bias of the witnesses and the fact that of the 7 CCSD employees who testified, only 2 had ever met O.L., and they for less than an hour, at best, total collectively.

176.

The ALJ  omitted from Dr. Ono's testimony that she stated O.L. could

receive 14 hours the first week and continue to progress in her hours up to 25 hours

a week of education (not counting therapies and other services she required).

177.

The ALJ erred in omitting from any consideration that every independent,

unbiased witness to testify made it clear CCSD's IEP with only 2 hours a week of

services was not designed to meet her needs, not designed to result in any progress,

and not designed based upon the information had at the time.

178.

The ALJ erred in finding CCSD refusing to evaluate O.L. for ST and OT

until CCSD first found O.L. eligible under the IDEA was not a failure to provide a

comprehensive initial evaluation in all areas of suspected disability, as the IDEA

requires, and was not a denial FAPE substantively and procedurally.

179.

The ALJ erred in allowing Coleman to testify regarding the only individuals

who knew about V.L.'s GaDOE complaint filed against CCSD in February 2021.

180.

The ALJ erred by blaming O.L. for CCSD not timely providing an IEP to O.L. and by ignoring the fact it was not until a State agency complaint was filed that CCSD ever mentioned to V.L. there were timelines involved.

181.

The ALJ erred in allowing into the record and considering the contradictory testimony of a CCSD employee who said in in just a few weeks CCSD was going to come back and alter the annual IEP it wrote on March 16, 2021 but dated for January 2021, as what is in the annual IEP for services is what the courts consider, and it did not state that, and to this very date, CCSD has not re-visited its woefully insufficient IEP.

182.

The ALJ erred in finding, it appears, CCSD stating in its IEP that ST and OT evaluations were ongoing at the time of the March 2021 IEP, as they had already been completed and provided and the IDEA mandates local educational agencies consider the most recent evaluation reports in preparing an IEP, which CCSD refused to do by claiming the completed evaluations were not completed.

183.

The ALJ erred in finding O.L. was not dis-enrolled from CCSD for educational purposes until after March 2021, for that contradicts the admissions by Coleman and others saying for O.L. to even be able to access a mere 2 hours a week of services in 3 objectives, she had to re-enroll in the CCSD and show she was still a resident in Cobb County.

184.

The ALJ erred in misstating the evidence and ignoring that Coleman admitted that in December 2020, CCSD dis-enrolled O.L. from middle school and then after that, because she was not (could not) attending school (as she was locked out of the system and completely excluded from education), in December 2020, CCSD dis-enrolled O.L. from the CCSD.

185.

The ALJ erred in finding CCSD's March 2021 IEP with 2 hours a week of education with no related services designed to meet O.L.'s educational needs based upon her unique disabilities and was reasonably calculated to result in meaningful educational benefit.

186.

The ALJ erred in finding CCSD's evaluation comprehensive by asserting CCSD acted appropriately at the time of its evaluation when in fact it had been provided private evaluations and diagnoses showing O.L. had severe language impairment, motor disabilities, sensory integration dysfunction, and autism but yet CCSD refused to evaluate or even attempt to evaluate for these disabilities.

187.

The ALJ erred by citing to two inapposite cases to assert it was fine for CCSD not to evaluate O.L. in the areas of ST, OT, sensory deficits, AT, and autism when CCSD was well aware during the time frame that O.L. had severe language impairment (could not talk after the medication reaction), had severe motor impairment (could not button, dress independently, write, feed herself with a fork and spoon, etc.), was very overly sensitive to light, sound, smells, touch, and other stimuli, and had autism as reported by her teacher and her mother and as found and diagnosed by a licensed psychologist.

188.

The ALJ erred when it found CCSD's school psychologist's "evaluation" of O.L. was appropriate when no rapport was established, when the psychologist frightened O.L. with a gun looking device and told O.L. her mother could not

come into a strange building with her, stood in the rain for about 10 minutes trying to place random demands on O.L., never observed her in the home, never communicated with the medical doctors providing treatment to O.L., did not conduct one adaptive behavior assessment, and more.

189.

The ALJ erred in ignoring that for the CCSD school psychologist to even recommend EBD, as she did, she knew CCSD had to provide O.L. prior services, had to take extensive data of progress monitoring, and provide O.L. "behavioral observations over a significant period of time," none of which CCSD did.

190.

The ALJ erred in finding CCSD's school psychologist's testimony valid regarding her claim that adaptive functioning did not need to be assessed, for the GaDOE mandates the local educational agency assess adaptive functioning before finding a child eligible under the IDEA as a child with OHI, and the result of that failure to conduct that evaluation, which the private evaluators did, was for CCSD to suggest an IEP with only 3 "behavioral" objectives over an entire year and no adaptive functioning objectives, which O.L. required and still requires to make meaningful progress and have her unique needs based upon her disability addressed.

191.

The ALJ erred in finding that CCSD intended to consider autism eligibility

when it conducted a comprehensive speech and language evaluation for many

reasons, including the fact CCSD did not conduct one, once CCSD conducted an

ST evaluation it did not consider it for eligibility and would not do so, after the

fact, CCSD claimed in April 2021 it would conduct not a re-eligibility meeting but

a "re-evaluation" meeting, and at the hearing, CCSD claimed it could not find O.L.

eligible under the IDEA because she could not participate in a cognitive

assessment, which the law does not require.

192.

The ALJ erred in finding the misrepresentations in CCSD's eligibility report

were either false or insignificant, as the report did state O.L. had no motor needs

when in fact she did and CCSD's March IEP did not address O.L.'s motor needs,

and misdating an eligibility report is of consequence, as is omitting important 504

accommodations not implemented by CCSD.

193.

The ALJ erred in finding it inconsequential that CCSD did not evaluate O.L.

for autism and did thus not identify her as a child with autism, for the experts in

autism who testified, all expressed how critical it was for proper evaluation and

identification of O.L. as a child with autism regardless of anything else so that she would be provided a proper IEP that addressed her educational (social, emotional, physical, developmental, adaptive, communication, academic, and other) needs. There is absolutely no research to support a 2 hour a week program with 3 objectives for a child with autism.

194.

The ALJ erred in finding CCSD did not have to evaluate O.L. in the area of autism and speech and language impairment and by citing an 8th circuit case that such comprehensive evaluation and proper identification will in many cases be substantively immaterial because the IEP will be tailored to the child's specific needs, as that is not accurate and in this case, that certainly did not happen and CCSD's IEP was not tailored to O.L.'s specific needs.

195.

The ALJ's conclusion of law that it was irrelevant that CCSD did not evaluate O.L. for autism and speech and language impairment timely and initially and did not properly identify her is directly contradicted by multiple cases and rulings by the 11th Circuit Court of Appeals, which has explained that it is a denial of FAPE not to evaluate a child with autism when it is suspected and that an IEP

which addresses the unique needs of a child cannot be developed if those working

with the child are not fully informed of the child's disabilities.

196.

The ALJ erred in ignoring CCSD's admissions that in the CCSD, disabled

children with speech and language impairments cannot receive any ST unless they

are found eligible as a child with speech and language impairment.

197.

The ALJ erred in concluding that it is unclear that the District had to get

additional assessment before finding O.L. eligible under the IDEA as a child with

autism.  CCSD informed V.L. orally and in writing in its eligibility report it had to

conduct a speech and language evaluation.

198.

The ALJ erred in ignoring that two CCSD's witnesses, the school

psychologist and Coleman, testified that for O.L. to be found eligible under the

IDEA as a child with autism she would have to be able to **participate** in a formal

cognitive assessment when the GaDOE only requires the evaluation to include a

formal assessment, whether the child can participate or not in it, which CCSD

never even attempted.

70

199.

The ALJ erred when he found V.L. withdrew O.L. from the District when in fact CCSD admitted it dis-enrolled her from CCSD and claimed V.L. would have to re-enroll her.

200.

The ALJ erred to find CCSD was attempting to set up additional evaluations in April 2021, for the evidence is that CCSD told O.L. in December 2020 that for O.L. to be found eligible as a child with autism, CCSD had to conduct a speech and language evaluation and when it did, not only did CCSD not consider it in preparing an IEP for O.L., it refused to provide O.L. an eligibility meeting despite V.L. writing that she would gladly attend an eligibility meeting.

201.

It was error for the ALJ to claim an IDEA eligibility category does not matter in the provision of FAPE, for CCSD witnesses testified that a child with a disability cannot be provided ST in CCSD unless found eligible as a child with speech and language impairment, and CCSD did not ever find O.L. eligible as a child with speech and language impairment, did not provide her an eligibility meeting regarding that, and did not provide her any ST, to this date.

202.

The ALJ's factual finding that V.L. "declined to have another eligibility meeting" is completely erroneous, as the testimony and documentary evidence proved she was asking for such a meeting repeatedly and said in writing she would gladly attend an eligibility meeting, and this was not disputed.

203.

It was error for the ALJ to find CCSD granted V.L.'s request for an IEE when in fact CCSD claimed the independent evaluator was not on its list when he did not have to be by law and that he had not responded to CCSD when in fact he had.

204.

It was error for the ALJ to conclude CCSD's March 2021 IEP was designed to provide O.L. a FAPE and to ignore the undisputed factual and expert testimony from those who had evaluated and or evaluated and worked with O.L for some time that 2 hours a week of education would not be sufficient for O.L to even bond and build rapport with the teacher, much less make progress, and that only 2 hours a week would not provide structure and could well result in making matters worse.

205.

The ALJ erred to the extent that the ALJ adopted CCSD's new, previously undisclosed argument that was refuted by CCSD's records and answer, that a child whose disabilities prevented her from participating in a formal cognitive assessment could not be found eligible as a child with autism.

206.

It was error for the ALJ to find that CCSD could just ignore private evaluations it selected to ignore and adopt prior diagnoses not based upon evaluation and not do its own evaluations.

207.

It was error for the ALJ to blame V.L. for CCSD not timely providing O.L. an IEP, much less an appropriate IEP designed to result in meaningful progress.

208.

The ALJ erred in finding 2 hours a week of instruction for a year was sufficient, for considering Ford's testimony that they planned to come back in two weeks when in fact the IEP called for no one to come back until August 2020 or perhaps much later.

209.

The ALJ erred in totally ignoring the extensive expert witness testimony by those who knew, worked with, and or evaluated O.L. that 2 hours a week would not result in O.L. making any progress with the teacher or program and would actually be counterproductive.

210.

The ALJ erred in considering anything other than the services provided in the annual IEP, for that is all V.L. had to access at the time, and the courts have repeatedly held that testimony cannot be added to explain away the services set forth in the IEP.

211.

The ALJ erred in concluding that CCSD's IEP with 2 hours of a teacher coming to the home who knows when but after her school day, providing O.L. no structure, not addressing O.L's social, communication, adaptive functioning, daily living, academic, self-help skills, use of an AT device, with just 3 objectives, was reasonably calculated to enable O.L. to make progress appropriate in light of her circumstances.

212.

The ALJ erred in ignoring the evidence that at the time of the development by CCSD of the IEP, CCSD had for approximately 6 weeks in its possession the private OT therapy notes for O.L., showing she was cooperative with her therapist, attentive, and tolerated therapy well usually; could complete simple puzzles, stack a tower of 10 blocks, dance to music, engage with her tablet, follow simple directions,  respond to her name, swing, complete several simple fine motor tasks, place pegs in a peg board, take turns with her therapist, and more.

213.

The ALJ erred by ignoring the evidence that O.L. had already mastered CCSD's three, simple, IEP, yearlong objectives before CCSD ever wrote its IEP.

214.

The ALJ erred in finding legally sufficient and appropriate CCSD's IEP with 2 hours a week of instruction and 3 objectives to stay in some unstated range of the teacher for some unknown about of time, respond by eye gaze or motor movement (nod), and engage in some unknown tasks for some unstated time.

215.

The ALJ erred by failing to consider the evidence that despite CCSD being

informed that by December 2021 O.L. could use her AAC device to communicate

and socially engage and despite CCSD being informed that O.L. could

communicate verbally, to this date, CCSD has not provided an IEP meeting to O.L.

despite the fact O.L.'s lawyer requested in writing on August 2, 2022 dates and

times for CCSD to conduct an IEP meeting for O.L. but CCSD never did so.

216.

The ALJ erred in finding the very limited private ST any indication that O.L.

could not make progress, as there were rotating STs, canceled ST by the STs, no

AT evaluation, no BCAB involved, and other issues.

217.

The ALJ erred in relying on a middle district court case where the child was

being provided 32.5 hours a week of education, unlike what CCSD proposed for

O.L.

218.

The ALJ erred in misstating the testimony of expert witnesses, as not one

recommended only 2 hours a week to begin and all stated that if less than 25 were

to be provided a week, then the IEP had to include the increase that would incur over time and not be left to some unknown time or never.  They also all stated that 2 hours a week was not in any way appropriate even to begin with.

219.

The ALJ erred in finding CCSD's refusal to provide O.L. with an AT evaluation until she was participating in an educational setting (defined by CCSD as attending a brick and mortar school) appropriate.

220.

The ALJ erred in finding that CCSD's failure to evaluate O.L. for physical therapy was without consequence because once she ran to her car when the information that CCSD had was that O.L. was toe walking and had balance and other issues.

221.

The ALJ erred when it ignored that CCSD stated it would consider a PT evaluation when and if O.L. could return to school because it was not worried about liability at home, et liability does not drive a disabled child's needs to walk appropriately and safely.

222.

The ALJ erred when it found that V.L. deprived CCSD of properly evaluating O.L. in all areas of suspected disability, meaning a physical therapy and AT evaluation.  Such a finding is without any merit, and the evidence was that V.L. asked CCSD for these evaluations more than once.

223.

The ALJ erred in finding O.L. declined the opportunity to remedy CCSD's failure to provide a physical therapy and AT evaluation to O.L. by not attending another re-evaluation meeting as the evidence was undisputed that CCSD refused to consider at the time those evaluations and the only once, learned only at the hearing, that CCSD said was then allegedly required was a cognitive assessment.

224.

The ALJ erred in not finding CCSD had to provide O.L. proper prior written notice, which CCSD did not do.

225.

The ALJ erred in finding Plaintiffs did not identify when O.L. should have been identified as a child with autism and when that should have occurred, as

Section 504 mandates, that when CCSD had to comprehensively evaluate O.L. to find her eligible under Section 504, which CCSD did not do.

226.

The ALJ erred in ignoring the evidence that when the private evaluator had O.L.'s first semester, 7th grade teacher, Dr. Gilbert, an educator most knowledgeable of O.L. complete autism rating scales, the teacher disclosed the following information known to CCSD:  O.L. was not initiating conversations with peers/others, she paid little attention to what peers did, O.L. failed to imitate people in games or learning, she did not follow others' gestures or cues to look at something, she was indifferent to other persons' attention, she showed minimal pleasure interacting with other and was uninterested with interacting with others, she displayed little to no reciprocal social communication, she used exceptionally precise speech, she did not try to make friend and showed no interest in others, she responded inappropriately to humor, having difficulty understanding jokes, slang, teasing, being ridiculed, and this all caused others to dislike her.

227.

The ALJ erred in ignoring the CCSD teacher's rating of O.L. prior to her medication reaction was that she was a child very likely to have autism, she

whispered to adults, did not engage with her peers, and would sit in middle school under the table and draw.

228.

The ALJ erred in ruling the IDEA statute of limitations had run on CCSD not finding O.L. eligible as a child with autism prior to her medication reaction because V.L. had not been informed of how V.L. functioned with peers and adults around her until September 2020, and she filed a hearing request in August 2021.

229.

To the extent, if he did, the ALJ found CCSD did not retaliate against V.L. and O.L. based solely on Coleman's claims it did not do so, the ALJ erred, as it had no jurisdiction to rule upon those claims.

230.

The ALJ erred in not providing a fair hearing to Plaintiffs as set forth above, preventing Plaintiffs from compelling the testimony of witnesses and obtaining O.L.'s educational records, limiting the hearing to unreasonable, unjustly enforced time limitations, allowing inadmissible evidence into the record, and as otherwise set forth above.

231.

The ALJ erred in ignoring CCSD's attorney's admission in open court that CCSD could not know if its evaluation was appropriate without all of O.L.'s medical records when in fact CCSD never requested them CCSD never provided medical evaluation to O.L.

232.

Attached hereto is a true and accurate copy of the posthearing brief filed by Plaintiffs in the administrative matter, setting forth in summary form due to page limitations the evidence in the record.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully pray for the following relief:

1) That the Court order Defendants to re-enroll O.L. back into CCSD and school and provide her with a non-discriminatory, non-retaliatory education and equal access to education;

2) That the Court order Defendants to undertake no further retaliatory acts whatsoever against O.L. and V.L.;

3) That the Court reverse the erroneous administrative final decision and grant O.L. appropriate compensatory education, V.L. reimbursement, and all other relief as authorized by 20 U.S.C. § 1415(i)(2)(C)(iii);

4) That Plaintiffs be granted their right to a jury trial against all Defendants on their ADA, Section 504, and Equal Protection/Section 1983 claims;

5) That Plaintiffs be awarded their attorney's fees and costs; and

6) That Plaintiffs be awarded all other relief appropriate.

This the 25th day of July 2023.

 /s/ Chris E. Vance
Chris E. Vance
Ga. Bar No. 724199
Counsel for Plaintiffs


**CHRIS E. VANCE, P.C.**
Suite 100, 2415 Oak Grove Valley Road
Atlanta, GA 30345
Tel:  (404) 320-6672
Fax: (404) 320-3412
chris@chrisvancepc.com