## IN THE OFFICE OF STATE ADMINISTRATIVE HEARINGS
## STATE OF GEORGIA

| | |
|---|---|
| O.L., by and through V.L., and V.L., | |
| **Petitioners,** | |
| v. | Docket No.:  2203340 |
| | 2203340-OSAH-DOE-SE-33-Woodard |
| COBB COUNTY SCHOOL DISTRICT, | |
| **Respondent.** | |

### PETITIONERS' POSTHEARING BRIEF

COME NOW Petitioners and file their Posthearing Brief.

I.    **FINDINGS OF FACT AND EVIDENCE OF RECORD**

**1.** Petitioners O.L. and her mother are residents of Cobb County, and at the time of the hearing, O.L. was 15 years old.  Transcript Vol. I ("T1"), p. 40. During the 2019-2020 school year, O.L. attended the Cobb County School District ("CCSD") in 7th grade at Tapp Middle School.  *Id.*

**2.**  O.L. was a very sweet, intelligent, shy student who had very few friends and who liked to work by herself most of the time.   *Id.* at p. 41.   O.L. was highly interested in computer programming and technology and made As and Bs in her coursework.  *Id.* at pp. 41, 53-54.  She had a Section 504 plan in place.  Petitioners' Exhibit 1 (P-1), pp. 19-22.

**3.** Unfortunately, during 7th grade, O.L was being bullied at Tapp Middle School. T1, pp. 41-42, 44-46.  O.L. started becoming sad because of the bullying and started missing her school bus.  *Id.* at pp. 45-46.  The third time this occurred and O.L.'s mother took O.L. to school, O.L. was terrified to go into the school building and almost threw up, so her mother checked her out of school and took her to the pediatrician.  *Id.* at p. 46. O.L. told the doctor that adults and children at school were making her sad.  *Id.* Based upon this, the pediatrician said O.L. was depressed and put her on 50 milligrams of Seroquel and 50 milligrams of Zoloft.  *Id.* at pp. 46-47.  The doctor

1

had already placed O.L. on two asthma inhalers (Albuterol and Arnuity Ellipta), Vyvanse for ADHD, and Clonidine for sleep.  *Id*. at pp. 46-47.

**4.** Within minutes of O.L. taking the new medications, she reacted to them very negatively, speaking in a robotic voice and saying she did not know who she was.  *Id*. at p. 47.  O.L.'s doctor, however, told her mother that O.L. needed to continue on the medication, which made O.L.'s functioning much worse.  *Id.* at pp. 47-49.  With the medication, O.L. was confused and could not do things for herself, including bathing and feeding herself.  *Id.*  The reaction was so severe,  O.L.'s mother took O.L. to the emergency room ("ER"), and there O.L. was taken off the Seroquel and Zoloft after being on it for 7 day  *Id.*   On March 27, 2020, O.L.'s mother informed all of O.L.'s teachers and the school counselor/504 coordinator (Ms. Manning) in writing that O.L. had been put on medication and stopped speaking, eating, and moving around and was incoherent.  *Id.* at pp. 52-54; P-33, pp. 365-373; T3, p. 1165.  O.L.'s mother informed O.L.'s teachers and the CCSD counselor that O.L. would likely have to be placed on homebound because at that time they were working on O.L. doing very basic skills like taking a shower, toileting, and feeding and dressing herself.  P-33, pp. 365-373.

**5.** Despite this drastic change in functioning and the fact O.L. had a 504 plan and despite the child find obligation of the Individual with Disabilities Education Act ("IDEA"), CCSD did nothing at the time in response to O.L. presenting with severe disabilities impacting her education.  T1, pp. 53-54, 58-61.

**6.** Due to her confusion after the medication, O.L. would elope from her home and her mother would have to call 911.  *Id.* at p. 55. On the third elopement, O.L. left home and walked into the street, was taken to the ER, and was admitted at Ridgeview Hospital.  *Id.* at pp. 55-56.  At Ridgeview, O.L. was physically attacked up by a teenager, making O.L.'s functioning worse.  *Id.*

**7.** O.L.'s mother kept the school counselor/504 coordinator (Ms. Manning) informed and continued to try to talk to her, and when she finally got to talk to her, O.L.'s mother informed the counselor that O.L. was not speaking or functioning, and she was making a "direct parent referral" for special education. *Id.* at pp. 58-59. The counselor stated O.L.'s 504 plan had to be updated in a 504 meeting, which was held on August 5, 2020. *Id.* at 59-61; T3, p. 870. On August 5, 2020, O.L.'s mother gave written parental consent for evaluation ("PCE") of O.L. for evaluation under the IDEA. P-2, pp. 32-33. Despite the significant change in functioning and O.L.'s needs, CCSD did not start evaluating O.L. right after the direct referral and consent for evaluation but instead required O.L.'s mother to attend 504 meetings. T3, pp. 869-872. At the August 5, 2020 meeting, O.L.'s mother explained that once O.L. was given the medication, she stopped speaking, eating, and writing and could not do much. T5, p. 1803. She told CCSD staff about the fine motor issues and how while O.L. had sensory sensitivities prior to the medication, they were much worse after the medication. *Id.* at pp. 1803-1804. She told CCSD staff that prior to the medication, O.L. was a very shy child, liked to work by herself, and liked to do things in a certain way and after the medication, all "became more pronounced." *Id.* at p. 1804. She gave examples of how O.L. was sensitive to loud noise, sound, and touch and how it was "more heightened" after being prescribed the medication. *Id.*

**8.** According to CCSD, at the August 5, 2020 direct parent referral meeting, going into conducting an evaluation of O.L., CCSD was looking at "emotional behavior disorder" ("EBD") eligibility based on "anxiety, the depression and inability to engage in the learning environment." T3, pp. 1165-1167. While not discussed with O.L.'s mother, from the beginning, CCSD was focused on an "emotionally based" disability. T3, pp. 1170-1171; T5, p. 1803. O.L.'s ER

records provided with March/April 2020 dates, however, reflected the symptoms of adverse medication reaction.  P-33, p. 427.

**9.** After O.L.'s reaction to the medication, the following school year (2020-2021), CCSD had three 504 meetings which O.L.'s mother attended.  T3, p. 871.  O.L. was at home with many educational needs, but CCSD did not offer any services to O.L., despite her severe regression in functioning and inability to do schoolwork.  *Id.* at pp. 871-872; T4, pp. 1285-1286.  At the 504 meeting held on October 12, 2020, O.L.'s mother informed CCSD that O.L. could perform at that time simple self-care tasks with stand by assistance.  P-1, p. 31.  CCSD was also informed by a professional assisting O.L.'s mother at that meeting that O.L. scored in the 1st percentile on a recent private speech therapy ("ST") evaluation and could only perform curriculum at the pre-kindergarten with low cognitive functioning level.  *Id.* at p. 29.  CCSD was not providing O.L. any specialized instruction, so O.L.'s mother wanted O.L. to at least have access to the curriculum and the structure of a full day of school even if O.L. could not do the work, so it was placed in O.L.'s 504 plan that O.L. did not have to complete any CTLS (CCSD's online program) assignments.  *Id.* at p. 30.; T3, pp. 876-878; T5, p. 1816.  Instead, her mother only had to login for attendance.  P-1, p. 30; T3, p. 876.  O.L.'s mother logged in for O.L. all the time and would try to get printed worksheets and help O.L. with them.  T3, pp. 877-878.

**10.** CCSD was aware since March 2020 that O.L. had significant speech, language, and motor impairments after O.L.'s medication reaction.  *See, e.g.*, P-33, pp. 365-373; P-1, p. 29.  All anyone had to do was observe O.L. to see she was stimming, avoiding social engagement, avoiding eye contact, engaging in repetitive activities and stereotyped movements, having sensory issues, and toe walking – all consistent with a child with autism.  T2, pp. 780, 796-798, 803-804; P-36, videos numbered 110618, 130738, WA000, WA0024; P-23, p. 243.  *See also* 34

C.F.R. § 300.8(c)(1)(i) ("Autism means a developmental disability significantly affecting verbal and nonverbal communications and social interaction … that adversely affects a child's educational performance.  Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or changes in daily routines, and unusual responses to sensory experiences.").  The private occupational therapist ("OT") who evaluated O.L. in September 2020 noted that O.L. did not "make any eye contact" and did not speak.  T-4, p. 63. The private BCBA, licensed counselor, and former CCSD educator noted O.L. to have significant sensory deficits.  T1, pp. 147-148.

**11.** O.L.'s mother gave CCSD all medical and other records regarding O.L. as soon as she received them.  T2, pp. 420-421, 434.  A Children's HealthCare of Atlanta ("CHOA") medical record July 24, 2020, O.L.'s medical diagnoses at that time were cognitive and behavioral changes, sleeping difficulties, positive for antinuclear antibody – primary, and speech disturbance, unspecified type.  P-3, p. 58.

**12.** On September 22, 2020, O.L.'s mother received and provided immediately to CCSD private ST and OT evaluations.  P-4, pp. 60-66; T3, pp. 886-888.  She also sent the evaluation reports to CCSD's 504 chair (Ms. Cotton), Ms. Ford (a special education administrator), and Ms. Manning (counselor/504 coordinator).  *Id.* The private ST diagnosed O.L. with a "receptive-expressive language disorder" and recommended ST twice a week at 30 minutes each session with 6-month goals for O.L. to identify and label objects in pictures, identify and label actions in pictures, identify objects by function, and attend to an activity for 10 minutes.  P-4, pp. 61-62.  The private OT recommended the following 3-month objectives during 1 hour a week of therapy: O.L. will engage in a 4-station sensory motor obstacle course with good attention for 10 minutes, engage in an age appropriate task for 5 minutes, button and unbutton large buttons, perform

simple independent adaptive living skills such as wiping surfaces or vacuuming, understand and demonstrate rules for a simple turn-taking game and 6-month objectives for O.L. to use good visual motor and fine motor skills to complete bilateral integration activities and dress herself with standby assistance. *Id.* at p. 65. The private OT also had a goal for O.L.'s family to understand O.L.'s sensory needs to assist her in maintain an appropriate level of arousal. *Id.* at p. 66. Beginning in September 2020, O.L.'s mother provided the recommended ST and OT (including later recommended physical therapy ("PT"), requiring one hour drive time each way. P-22, pp. 206-239; P-35, p. 584; T3, p. 887. By January 2021, O.L. was engaging in fine and gross motor activities (i.e., swinging, completing simple puzzles, placing pegs in pegboard, stacking blocks, taking turns with therapist, working on sitting balance, working on walking without toe walking, and placing straws into a small opening. *Id.* at pp. 233, 235, 238.

**13.** When the private ST diagnosed O.L.in September 2020 with a receptive and expressive language disorder, O.L's physician and a mental health nurse practitioner (Dr. Wise, Ph.D.) dropped the incorrect initial diagnosis of selective mutism, and O.L.'s mother notified CCSD's psychologist (Ms. McCullough), Ms. Ford, and entire team that the selective mutism diagnosis had been dropped and replaced with the correct diagnosis of a language disorder. T3, p. 891; P-33, p. 399. O.L. received private OT, ST, and PT subsequently for about a year, but when the group providing the services started having staffing issues, they had to be discontinued. T3, pp. 892-893. With no consistency in services, this confused O.L. *Id.*

**14.** In September 2020, O.L.'s mother retained Mr. Foley, a licensed counselor, BCBA and former CCSD teacher, to provide counseling and educational services to O.L. and parent training to O.L.'s mother (and O.L.'s siblings). T3, pp. 934-935. No one at CCSD, not even the school psychologist, ever once asked to speak to Mr. Foley. *Id.* at p. 935.

**15.** On September 16, 2022, CCSD had O.L. show up to an unfamiliar school, and on the porch of the school, while CCSD's psychologist said O.L. would have to go with her alone (O.L. did not even know this person), another unknown adult put a temperature device that looked like a gun to O.L.'s head, causing O.L. to exit and return to her mother's car.  T4, p. 138-139; T5, p. 1810; P-14, pp. 169-170.  That was about one to two minutes.  *Id.*  It was a very rainy day, and for about 10-15 minutes, CCSD's school psychologist stood outside the car trying to engage O.L. as O.L.'s mother held the umbrella and got soaked.  T5, p. 1811; T3, pp. 905-909.  That was CCSD's IDEA evaluation of O.L.  CCSD's psychologist did not give O.L.'s most recent (or any) teachers who knew here prior to the medication any forms, rating scales, or other documents for them to provide input on how O.L. functioned prior to O.L.'s medication reaction.  T4, pp. 1339-1341.  The school psychologist did not evaluate O.L.'s adaptive functioning, by admission.  *Id.* at p. 1341. It is undisputed CCSD's psychologist never tried to build rapport with O.L. as she had never met the child but yet the psychologist testified if she were going to evaluate a child with autism, she would first develop rapport.  *Id.* at p. 1342.  CCSD's psychologist did not observe O.L. in the home.   T3, pp. 909-910.   CCSD's psychologist stated in the recommendations section that "[i]t will be critical for adults to develop a trusting relationship with Olivia," yet she did not do so herself.  P-5, p. 74.

**16.** Without comprehensive or appropriate evaluation and without a multidisciplinary evaluation team assessing O.L., CCSD's psychologist recommended O.L. be considered for EBD eligibility. T-5, p. 73; T1, pp. 339-341.  CCSD's psychologist did not include the corrected diagnosis of "receptive-expressive language disorder" in her report but instead claimed  inaccurately that O.L. still carried the tentative diagnosis of "selective mutism." P-5, pp. 69, 70.  She also admitted she did not conduct any adaptive assessments of O.L. T4, p. 1319.

**17.** On October 12, 2020, CCSD conducted a third Section 504 meeting.  T3, 872.  Pursuant to Section 504, O.L. was given an accommodation that by her 504 team that she did not have to complete any 8th grade online assignments (as she could not do so) and all her mother had to do was log in for attendance purposes.  *Id.* at pp. 881, 876-878; P-1, p. 30.

**18.** On October 13, 2020, O.L.'s mother withdrew her authorization for CCSD to communicate with Potter's Behavioral Clinic, saying she should be a part of the communications and that she hoped they could all work together and coordinate O.L.'s educational and medical care both at home and at school.  P-33, p. 423.  O.L.'s mother because the school psychologist had told her O.L.'s nurse had said something she had not. T3, pp. 928-933; T5, p. 1800-1802.[1]  At the hearing, CCSD's psychologist claimed for the first time the nurse told her that medical testing had been completed and did not show an organic or medical reason for the loss of O.L.'s functioning and that it was their understanding at that time it was psychiatric in nature and claimed she told O.L.'s mother this.  O.L.'s mother testified the psychologist did not tell her that. T5, p. 1800.  Further, CCSD's psychologist did not put that in her report but instead stated an MRI and spinal tap yielded normal results and the organic cause that explains O.L.'s decline in functioning has not yet been identified.  P-5, p. 69.  Credibility of this witness is severely impaired.  The CCSD psychologist did not confer with medical providers, did not suggest medical evaluation, did not build rapport with O.L. prior to trying to evaluate her, did not comply

---

[1] CCSD's psychologist claimed that O.L.'s nurse (Dr. Wise) had allegedly agreed to a placement of O.L. at H.A.V.E.N (a psychoeducational placement where very violent children are placed) but the nurse had not said that, so O.L.'s mother revoked the *unilateral* communication consent. T3, pp. 928-933; T5, p. 1800-1802; *Doe v. DeKalb Cty. Sch. Dist.,* 145 F.3d 1441, 1443-1444, (11th Cir. 1998) (Pscyhoeducation programs (now called "GNETS") are for students with the most severe behavioral problems where children "are often aggressive," including biting, hitting, scratching, kicking, attacks with pencils and razors, restraints, and more.).  O.L.'s mother was agreeing/consenting to communications but she needed to be a part of those communications. *Id.*

with the law and ensure a "multidisciplinary evaluation team" evaluate O.L., and tellingly did not report that the prior, initial selective mutism diagnosis had been corrected for the diagnosis of "receptive-expressive language disorder." P-4, p. 61, P-33, p. 398-399.  If she disagreed with that diagnosis, she could have easily referred O.L. for a CCSD ST evaluation, which should have already been provided. Ga. Reg. § 160-4-7.04(4)(9); P-33, pp. 365-372; T4, p. 1292.

**19.** Upon direct request by O.L.'s mother, in October 2020, CCSD provided O.L.'s mother with hospital homebound ("HHB") forms for O.L.'s physician to complete.  P-6, pp. 109-113.  In its form, CCSD told the doctor in writing that CCSD only had to provide three hours of instruction per week and "[i]n no way can the limited Hospital/Homebound program substitute for the comprehensive nature of academic studies that the student would receive in school." *Id.* at p. 111. O.L.'s physician, who knew O.L. well and worked with O.L.'s medical team at CHOA, completed the HHB forms.  T3, pp. 900-901.  Dr. van Putten diagnosed O.L. with cognitive changes, ADHD, behavior changes of unknown etiology, anxiety disorder, and major depressive disorder in the HHB form dated 11/10/2020.  P-6, p. 112.  The doctor attached a letter explaining O.L. suffered cognitive and behavioral changes of unknown etiology, O.L. had been given multiple medications after she declined which had possibly made her condition worse, and she needed HHB due to her current cognitive level.  P-6, p. 113; P-7, p. 114.  CCSD, which was providing O.L. no educational services whatsoever, refused to provide O.L. HHB, saying Dr. van Putten was not qualified to complete the forms allegedly because the diagnoses were all mental health diagnoses.  T3, p. 901; P-33, p. 436.  O.L.'s cognitive and behavioral changes were of "unknown etiology" to O.L.'s doctors, CCSD had no medically evaluated O.L, CCSD had absolutely no idea what caused O.L.'s cognitive changes, and it had no basis for claiming they were just a mental health issue to deny O.L. educational services she so very much required.

**20.** On October 20, 2020, CCSD completed its psychological evaluation report of O.L. and provided it to O.L.'s mother on October 21, 2020, less than one business day prior to an IDEA scheduled eligibility meeting.  P-5, p. 74; R-108; R-109.  Due to necessary medical treatment, O.L.'s mother had to reschedule the meeting.  T3, pp. 959-960, 986. CCSD had never mentioned any deadlines until the following year after O.L.'s mother filed a state complaint and had retained legal counsel.  *Id.* at pp. 986-987.   CCSD never once told O.L's mother she was preventing CCSD from meeting its deadlines, as it later argued. *Id.*

**21.** On October 26, 2020, Dr. Hirt, a licensed psychologist not affiliated with DCSD, evaluated O.L. P-8, pp. 115-138.   Dr. Hirt correctly included in his report the diagnosis of receptive/language disorder by O.L.'s physician (and private speech therapist).  *Id.* at p. 116.  He also correctly reported that after receiving the medications of Zoloft and Seroquel, O.L. had an adverse reaction and stopped talking, could not open her mouth, and was catatonic. P-8, p. 117. Dr. Hirt reported lack of eye contact and social engagement and detailed past history of social deficits at school. *Id.* at p. 116.  He also reported O.L.'s prior sensory issues that increased after the medication reaction.  *Id.* at p. 117.  Dr. Hirt stated in his report he used a formal cognitive measure but it was overwhelming to O.L. and she could not participate in the IQ test he used.  *Id.* at p. 119.  Dr. Hirt used several other formal measures, reporting that O.L. was overwhelmed by them.  *Id.* at pp. 119-121.  Dr. Hirt, unlike CCSD's psychologist, administered an adaptive functioning assessment – the ABAS-III.  This assessment showed O.L.'s adaptive functioning to be severely impaired (less than 0.1 percentile).  *Id.* at p. 120.  Dr. Hirt stated that this was consistent with his observations.  *Id.* After O.L.'s severe reaction to the medication, O.L. was rated to have severe autism and sensory issues.  *Id.* at pp. 124, 128, 129.  Initially, Dr. Hirt gave O.L. a diagnosis of rule out for autism, saying more information was needed, and he

recommended ST and OT.  *Id.* at p. 129, 130. O.L.'s mother gave this report to CCSD, along with a letter he wrote dated December 4, 2021, explaining he was awaiting information that could result in a diagnosis of autism.  P-9, pp. 135. Dr. Hirt had asked O.L.'s 7th grade teachers who knew her complete a Gilliam Autism Rating Scale-Third Edition ("GARS-3") regarding O.L. The GARS-3 is retrospective, asking the individual to go back in time to assess the individual.  T2, p. 510.  It was important to know how O.L. functioned prior to the medication reaction she suffered later while she was in 7th grade.  T2, p. 531.  After Dr. Hirt's initial report, one CCSD teacher, Dr. Gilbert, who knew O.L very well in school and after school, completed the GARS-3, reporting significant social and social communication concerns (before O.L. was severely damaged from the medication) to include, *inter alia*, not initiating conversations with peers/others, paying little attention to what peers do, failing to imitate people in games or learning, not following others' gestures or cues to look at something, being indifferent to other persons' attention, showing minimal pleasure interacting with others, being uninterested with interacting with others, displaying little to no reciprocal social communication, using exceptionally precise speech, not trying to make friends, showing no interest in others, responding inappropriately to humor, and having difficulty understanding jokes, slang, teasing, being ridiculed, and what caused others to dislike her.  P-12, pp. 139-140; T3, pp. 919-920.  The CCSD teacher's rating of O.L. prior to the medication was that she was a child very likely to have autism.  T2, p. 534.  It was appropriate for the private psychologist to find out if O.L. had autism prior to the medication reaction in March 2020.  *Id.* at p. 535.[2]  On November 20, 2020, O.L.'s mother gave CCSD Dr. Hirt's report and 6 dates for an eligibility meeting.  P-33, p. 445.

---

[2] While CCSD provided without evaluation O.L. a 504 plan due to O.L.'s ADHD, CCSD's prior 504 plan stated that O.L.'s math teacher reported O.L. did not ask questions and did not collaborate with other students , her science teacher reported O.L. was quiet and shied away from

22. On December 4, 2020, only three days prior to the IDEA eligibility meeting for O.L. and only after O.L.'s mother had been advocating for O.L. to receive a proper, discriminatory free education, O.L.'s mother went to log O.L. onto the virtual classes as was an accommodation in O.L.'s 504 plan but someone, without notice, no longer allowed O.L.'s mother to log O.L. into the virtual program.  T3, pp. 878-879; P-10, p. 138.  The assistant principal told orally and in writing O.L.'s mother staff was told by the CCSD 504 coordinator (Ms. Cotton) to remove O.L. from the educational program and school. T3, p. 879; P-33, p. 457.  O.L.'s mother could not figure any of that out, so she sent an email, and it was confirmed they were told to do this, with the result of O.L. being removed from school.  *Id*. at pp. 879-880.  Prior to CCSD removing O.L. from school, CCSD had falsely claimed that O.L. was absent and threatened truancy charges against O.L. and her mother.  *Id.* at pp. 882-884.  After that was resolved, without notice, CCSD removed O.L. from school, and the result was that all of a sudden O.L.'s mother (a single parent with a full-time job and medical issues herself) had to educate O.L. 22.5 hours a week so there would not be real truancy charges.  *Id*. at p. 884; P-33, pp. 439-445; 20-2-690(c)(5).  O.L.'s mother researched a program through an educational advocacy group, tried it for 30 days, pays for it and uses it as part of O.L.'s education program.  T3, pp. 884-885.  O.L.'s siblings help with the program.  *Id.* She also engaged a licensed counselor (Mr. Foley) who is also a Board Certified Behavior Analyst ("BCBA") and former CCSD educator to help with programming and provide parent training and counseling.  *Id*. at p. 885-886.  The impact of CCSD's retaliatory actions was to deny O.L. access to education, place undue hardship upon the family at a time of

---

other students, her Spanish teacher reported O.L.'s weakness was not attention to task but instead was her not working with her peers more. P-1, pp. 19-20.

crisis, and deny O.L. and her mother their right to receive funding under the Georgia Special Needs Scholarship Act the following school year and thereafter. Ga. Reg. 160-5-1-.34(3)(a)(3).

**23.** At the hearing, CCSD's special education administrator Ms. Ford, when asked directly whether O.L. was removed from school due to attendance or for not doing her work, stated that whatever the policy is for taking attendance they can withdraw a student and that she did not know because she was not involved in that process of students being withdrawn due to a lack of attendance. T4,p. 1446.  She said she was told in an email O.L. was withdrawn due to a lack of attendance.  *Id.* at p. 1447.  When asked by the ALJ if it was a "ministerial function," Ford claimed it was.  *Id.* at p. 1439.  When asked if it was Ms. Cotton, director for CCSD over Section 504, who ordered or recommended to disenroll O.L. from school, Ford said she could not remember, saying there was a lot of communication about it. *Id.* at pp. 1440 -1441.  Then Ford testified that she was not aware of O.L.'s attendance or why she was withdrawn.  *Id.* at p. 1442. *Ms. Ford emailed O.L.'s mother on April 22, 2021, informing her that O.L. was withdrawn from school because she "was not accessing any of her classes.*" P-33, p. 559.  It was not because of any attendance issue, which O.L. did not have as her attendance report, which was withheld, proved.  P-18, p. 181; P-28, p. 281; P-34, pp. 576, 580-582; T5, pp. 1761-1762.  *See also*  P-10, p. 136 (no absences).  At the hearing, Ms. Coleman admitted that under O.L.'s 504 plan, O.L. was not required to do the assignments. T5, pp. 1763-1764.  Thus, it was not a ministerial decision to remove O.L. from school and any education due to her not completing assignments because a legal 504 accommodation plan prohibited this.

**24.** On December 7 and 15, 2020, CCSD conducted an eligibility meeting for O.L. pursuant to the IDEA.  From August 5, 2000 to December 15, 2000, CCSD only gave O.L. one evaluation, observing O.L. for only 10-15 minutes while she sat in a car.  T3, pp. 904-909; T5, p. 1811.

25. CCSD's IDEA eligibility report is replete with inaccurate information, from its wrong date to its assertion CCSD was providing O.L. 504 accommodations when CCSD had removed her from school to CCSD saying O.L. did not have motor or coordination needs.  P-14, pp. 148-176. Tellingly, CCSD misstated O.L.'s prior 504 accommodation (it had violated on December 4, 2020) by leaving out that O.L. did not have to complete assignments.  Id. at p. 151.  CCSD used old, undated teacher reports saying O.L. had no motor issues and could write well, stated a GARS-3 was an Autism Teacher Checklist (the GARS-3 was competed by a CCSD technology teacher), and not properly attributing much of the evaluation information to private testing, as CCSD knew it had to comprehensively evaluate O.L. and just did not bother to do so.  *See, e.g.,* *id.* at pp. 151, 152, 156 (CCSD did not disclose that IQ, visual motor integration, performance, academic achievement, adaptive behavior, and sensory processing deficits testing  was only done so privately.).  CCSD did note that O.L. had diagnoses of autism, cognitive and behavioral changes, severe receptive-expressive language disorder, ADHD, PTSD, ADHD, depression, and anxiety.  *Id.* at p. 149.  CCSD did show it was completely aware that O.L. could not complete virtual schoolwork at all.  *Id.* at p. 169.  In the report, CCSD reported that it did not come to a final decision regarding autism eligibility "because a comprehensive speech evaluation has not been completed."  *Id.* at pp. 172, 175. O.L.'s mother did not agree with CCSD not finding O.L. a child with autism but she gave formal consent for O.L. to be provided special education and related services.   *Id.*; P-15, p. 177 (O.L.'s mother stated CCSD did not properly or comprehensively evaluate O.L.), P-16, p. 178.

26. On the last day of the hearing, CCSD, through Jessica Coleman, claimed that CCSD could not find O.L. eligible as a child with autism because CCSD did not have a cognitive evaluation of O.L. or a speech and language evaluation of O.L. T5, p. 1672.  CCSD did not claim this in its

formal response to the hearing request, and CCSD's eligibility report did not state this, saying instead only a speech and language evaluation was needed for CCSD to determine autism eligibility.  Respondent CCSD's Response to Hearing Request, p. 5, ¶ 18; P-14, p. 175.    This completely new defense is also belied by Ms. Ford's testimony that the ST evaluation was needed to consider the autism eligibility, which could not be the case if it were true the cognitive evaluation was needed, as CCSD had not used one. T4, pp. 1460-1461.  To this day, CCSD has never evaluated O.L. for autism. T3, pp. 943-945.

**27.** After O.L.'s mother raised issues with CCSD's initial evaluation not being comprehensive or appropriate did CCSD say it would conduct an ST and OT evaluation, but it called them "reevaluations" and required O.L.'s mother sign a "reevaluation" PCE.  P-17, pp. 179-180 (the alleged purpose of the reevaluation was to if she continued to be a disabled child under the IDEA and to consider if she required related services as outlined in the current IEP team minutes. *Id.* at p. 179.  In CCSD, a student cannot receive ST unless that child has been found eligible as a child with a SLI despite ST being a related service.  T4, p. 1434; 20 U.S.C. § 1401(26).

**28.**   On January 8, 2020, CCSD received a medical letter stating O.L. had autism, significant sensory integration dysfunction, poor coordination and concentration skills, and safety concerns and asked CCSD to consider this when developing O.L.'s IEP.  P-20, p. 184.

**29.** O.L.'s mother, being required by CCSD to educate her child, had a private BCBA evaluate O.L. for ABA educational and behavioral services, and a report ("Key Autism Report") was issued on January 18, 2021 and provided to CCSD.  P-21, pp. 185-203, P-24, p. 251; T3, pp. 957-959.  A formal skills assessment, the Assessment of Functional Living Skills ("AFLS") was administered. P-21, pp. 185-203.   This evaluation was very thorough in evaluating O.L.'s educational needs and designing educational programming to mere O.L.'s needs based upon

disability and her unique needs based upon her disabilities and resulted in 46 skill acquisition and parent training goals and 3 behavioral goals being recommended.  *Id.* The BCBA also recommended O.L. receive 25 hours of direct instruction 1:1 a week, 4 hours a week of BCBA oversight, 1 hour a week of parent training, 1 hours a week of case planning, and 10 hours per period of updated assessment.  *Id.* at p. 203.  The recommendations in the Key Autism report were appropriate and necessary for O.L., who needed all the goals due to her significant adaptive and language skills deficits. T2, pp. 467-470, 473-475 (O.L. required intensive educational programming due to her very low level of functioning.).  O.L. also required ST, OT, PT, and AT, all of which are very important for O.L. *Id.* at pp. 471-473.

**30.**  On January 21, 2021, an IEP meeting for O.L. was held by CCSD, and O.L.'s mother attended the chaotic, rowdy meeting where CCSD staff would roll their eyes when O.L.'s mother started to speak.  T3, pp. 948-949.  Instead of moving forward, CCSD (Ms. Ford) stopped the IEP meeting.  *Id.*

**31.**  On February 4, 2021, Dr. Lyon obtained and provided to many CCSD staff members O.L.'s private therapy records. P-22, pp. 206-239; T3, p. 894.   These records showed O.L. was participating in occupational therapy (she did not have an AAC device in ST at that time, so it was not very effective).  T2, p. 804, T3, pp. 895, 897-899; P-22, p. 233.  O.L.'s mother observed herself what was reported in the private OT notes that in early January 2021, O.L. engaged in age-appropriate tasks for five minutes, followed simple directions, completed several fine motor activities, stacked blocks, completed simple puzzles, and placed pegs in a peg board.  *Id.   See also* P-22, pp. 238-239 (The therapist noted great improvement with participation again, saying that while O.L. was conducting very low level motor skills (age 3), she was engaging in them and doing them.). The private therapist also provided parent training to O.L.'s mother regarding

O.L.'s sensory needs, and O.L.'s mother implemented all the suggestions to help O.L. function better.  T3, pp. 895-898.  CCSD had this report prior to it preparing an IEP for O.L.

**32.** On February 11, 2021, Dr. Ono, a neuropsychologist at CHOA, conducted a Comprehensive Neuropsychologist Evaluation to O.L. to assist with educational planning, and O.L.'s mother provided the report to CCSD as soon as she received it on March 9, 2021.  P-23, pp. 240-249; P-33, p. 539.  Dr. Ono, a pediatric neuropsychologist at CHOA and adjunct professor at Emory University conducting research, evaluated O.L. and observed O.L. to be a child with low functioning autism, consistent with Dr. Hirt's conclusion that she was a child with high functioning autism prior to the medication. T2, pp. 438-446, 463; P-23, pp. 240-249.  Dr. Ono found no reason to dispute Dr. Hirt's diagnosis of autism for O.L. T2, p. 456.  It is important to properly identify a child with low functioning autism because there are assessments they need and programming required, "one of them being applied behavior analysis ["ABA"] which is critical to be able to change behaviors to be able to learn." T2, pp. 463-464; T1, pp. 355, 360. For O.L., it was very important for her to be identified as a child with low functioning autism. T2,  p. 464.  Dr. Ono agreed with Dr. Hirt that O.L. had "significant sensory integration dysfunction issues," which "goes hand in hand with her autism diagnosis" and her speech and language disability.  *Id.* at p. 465.  Dr. Ono agreed with the Key Autism report that O.L. required 25 hours a week of direct ABA services, along with ST, OT, PT, AT, BCBA supervision, and parent training.  *Id.* at pp. 467-468.  Dr. Ono agreed with the goals recommended in the Key Autism report as well.  *Id.* at pp. 468-469.  In her report, Dr. Ono recommended O.L. receive special education and related services in her IEP as a child with autism and OHI.  P-23,p. 245. She further recommended O.L.'s IEP provide O.L.ST, OT, PT, AT evaluation and AT, HHB, errorless learning (ABA), social skills instruction, and adaptive skills instruction and supports,

and when she could return to a school setting, small group instruction and a paraprofessional. *Id.* at pp. 245-247. The report noted that O.L. had been diagnosed with encephalopathy. P-23, p. 245. At the time Dr. Ono saw O.L. in February 2021, O.L. needed a lot of services and access to those services. T2,p. 538. Due to O.L.'s severe regression, the more services she received, the better. *Id.* at p. 538. CCSD never called Dr. Ono or asked her to attend an IEP meeting even though she attends IEP meetings. T2, pp. 456-457.

**33.** On March 2, 2021, CCSD completed its OT evaluation of O.L. P-24, pp. 250-256. The CCSD OT report notes O.L. has diagnoses of autism, language disorder, ADHD, catatonia of autism, ADHD, PTSD, mild depression, sensory integration dysfunction, and asthma. *Id.* at p. 250. The school CCSD OT came by the home to observe O.L., but she was in bed asleep due to medication changes, and the evaluator said she would not come back. T3, pp. 952-954. Only because O.L.'s mother requested and arranged for the CCSD OT to observe O.L. in private OT, did the CCSD OT do so very briefly one time. P-24, p. 251; T3, pp. 954-955; T4, p. 1513. The report was completed prior to the March 16, 2021 CCSD IEP meeting. P-24, p. 256; T3, pp. 254-955. The OT reported O.L. did not demonstrate bilateral skills, and needed help putting on a coat, putting on her shoes, pulling up her clothes after toileting, and cleaning her face and she is fully dependent regarding buttoning, unbuttoning, zipping, unzipping, tying shoes, managing a belt buckle, drinking from an open cup, and opening packages. P-24, p. 254. The OT reported O.L. could open the cover of a tablet, touch the screen, and use her finger to touch the YouTube icon to watch a video. *Id.* at p. 255. Mild sensory issues were reported prior to March/April 2022 and severe ones after March/April 2020. *Id.* CCSD's OT who evaluated O.L. did not testify at the hearing. Ms. Osborne did, but she had not reviewed but a few records and had never met O.L. or her mother. T4, p. 1490. It was admitted that O.L. did participate with her

private OT and perform preschool motor activities.  *Id.* at p. 1497.  Ms. Osborne stated she had

seen students lose skills due to TBI or a neurological event.  *Id.* at p. 1498.  She also admitted

that if a child lost skills like O.L., it would be appropriate for an OT to work with the child at age

13.7 to button clothes, zip, and tie shoes.  *Id.* at pp. 1507-1508.  In CCSD, an OT evaluation is

not provided to any student until after eligibility and an IEP is provided.  *Id.* at pp. 1510-1511.

**34.**  On March 12, 2021, CCSD completed a ST evaluation report of O.L. prior to the March 16,

2021 IEP meeting. P-25, pp. 257-261; T3, pp. 955-956.  The report noted (it appears for the first

time) the medical record from CHOA showing O.L. had a "Positive ANA (antinuclear

antibody)" result.  The CCSD ST was not provided the addendum of Dr. Hirt's report, so she was

confused and did not know a CCSD teacher had reported O.L. had significant autism symptoms

prior to her medication reaction.  P-25, p. 258.  The CCSD ST observed O.L. for about 10-15

minutes (the first brief visit O.L. was in bed), at most.  *Id.* at p. 261.  In the ST report, the

therapist stated she presented O.L. with a tablet with a newly added AAC system. *Id.* at p. 260.

At the hearing, the CCSD ST contradicted her report and stated "we" presented O.L. with an

AAC device from her private therapist, and O.L. was not successful with that.  T4, p. 1375.  This

is not true at all.  O.L. did not have an AAC device at that time and did not get one until

November 2021. T5, p. 1805; P-30, p. 283. What O.L. had was her older sister's standard

Android tablet that had no AAC programs or communication icons or pictures on it.  T5, p. 1805.

O.L. used it to go to YouTube to listen to her favorite violin music (prior to the medicine, O.L.

played the violin).  *Id.* at pp. 1805-1806; T1, p. 328.  In her report, CCSD's OT confirmed this.

P-24, p. 255.  CCSD's ST testified that based on her evaluation, she did not find O.L. would

benefit from an AAC device, claiming O.L. could not access anything. T4, p. 1383.  Again, this

is false.  As stated above, O.L. could access a tablet to listen to her favorite violinist, the ST did

not even evaluate O.L. for use of an AAC device, and she claimed incorrectly under oath that O.L. had an AAC device when she did not.[3]  CCSD's ST also claimed it would have impacted her understanding if she had known O.L. had encephalopathy, but she did, as she later admitted. T4, pp. 1381-1383; P-25, p. 259.[4]  The ST reported O.L. engaged in a formal language assessment but could only point with an open hand, so her scores were minimal (the ST did not provide the scores).   P-25, p. 261.   The ST stated O.L. "presents with a functional communication disorder." *Id.* CCSD had been informed of this in March 2020.  The ST said O.L. would have recommended SLI eligibility to the team and ST for O.L. T4, p. 1384.  In CCSD, a disabled student cannot receive ST unless the child has an SLI eligibility. *Id.* at pp. 1434-1435. Before CCSD would provide O.L. any ST, CCSD and its ST required that O.L. be found eligible under the IDEA, then go through what it calls the "reevaluation" process, and then be found eligible as a child with an SLI. T4, pp. 1433-1434; P-33, pp. 543-544.  The ST claimed Ms. Cohen, an expert in the area of SLI with 42 years of experience across settings, misused screening tools, made recommendations outside her practice area, and reported only so many items (CCSD's ST did not even report O.L.'s score on the PPVT-5, as required).  The ST lost credibility once again when on cross she admitted that it is her ethical obligation to report Ms. Cohen if she truly thought Ms. Cohen had acted improperly but she had never done so. *Id.* at pp.

---

[3] CCSD's ST testified that to evaluate a child for an AAC device, she would come out several days to evaluate the child, bring out several devices and try different things regarding use of an AAC device, and then send a "loaner" AAC device home to see if it might work after practice on it. T4, pp. 1357-1358.  However, she did none of this with O.L.  However, when O.L. was privately provided a trial device and given a full private AT evaluation for use of an AAC device, O.L. became very successful with that device.  P-30, pp. 283-288 (O.L. learned quickly how to communicate messages with her AAC device, and she used it to communicate socially and to convey medical information, request food, ask questions, communicate safety information, relate past events, and talk about the future.).

[4] The ST said it would have also helped her understanding if she had known if O.L. had aphasia, but she did not evaluate O.L. for that or refer her for evaluation of that.  T4, pp. 1381-1382; P-24, pp. 257-261.

1388-1389.   The ST stated in her report that O.L. "is nonverbal and not able to participate in conversation at this time." P-25, p. 261.   That was false as well.   CCSD's ST had Dr. Ono's report in which Dr. Ono reported that even in a new hospital setting, O.L. *appropriately* said "stop" a few times.   P-23, pp. 243-245; P-25, p. 258.[5]   CCSD's ST never saw O.L. prior to testing and brought nothing to try to reinforce O.L.   T4, pp. 1395-1396.   CCSD's ST claimed O.L. would have to be found eligible under the IDEA as a child with an SLI before she could start receiving services, but she admitted on direct, ST is also a related service.   T4, pp. 1388, 1399.   CCSD's ST did not ask to talk to the neurologist, psychologist, counselor or any other outside provider and asked to but then did not speak to O.L.'s private ST.   T4, pp. 1403-1404. CCSD's admitted O.L. learning to talk and to have a way to communicate is critical. T4, p. 1407. CCSD's ST evaluation was not appropriate or comprehensive.   T1, pp. 342-345.

**35.** After the January 21, 2021 IEP meeting that CCSD stopped, CCSD sent dates of 2/21, 2/22, 2/23, or 3/16 to conduct an IEP meeting (there was clearly no sense of urgency by CCSD here). P-33, p. 542.   All the while, O.L.'s mother kept communicating to CCSD that she wanted eligibility to be addressed so a proper IEP could be provided to O.L.T3, pp. 960-961.   For example, on March 9, 2021, O.L.'s mother sent an email submitting Dr. Ono's report, saying she was willing to meet to develop an IEP for O.L. but she wanted to review eligibility first.   P-33, p. 539.   She asked when CCSD could meet with her to discuss eligibility, saying she could then meet for an IEP on March 18 or 19.   *Id.*

---

[5] CCSD's ST testified she did not recommend that O.L.'s mother see about getting a functional MRI for O.L., but in an email she sent to O.L.'s mother, she stated: "[A] Functional MRI would provide information on which parts of the brain are working and activating under stimulus conditions. … This could provide direction as to how to present material to [O.L.] so she can process it as efficiently as possible. You can ask the neurology team or even the neuropsychologist if they think so like that would be helpful." P-33, pp. 514-515.

**36.**  At the time of the March 16, 2021 IEP meeting, CCSD had completed its ST and OT evaluations and reports, but it did not invite the evaluators to the IEP meeting and did not discuss the completed, most current CCSD evaluations.  T4, pp. 1432, 1471; R-23, p. 112.  CCSD would not even consider providing O.L. ST in her IEP unless she was found eligible as a child with SLI, and OT was not considered either.  T4, p. 1433.  Ms. Ford did not know as of March 16, 2021 what O.L.'s tolerance level was for receiving education and related services in the home, claiming she had no access to O.L. despite the fact she never sought any and it was O.L.'s mother who was asking for CCSD educators to come to her home and come back to observe more.  T4, pp. 1468-1467.  CCSD stated that as of March 16, 2021, O.L. was "non-verbal and unresponsive" and thus "unable to participate in educational activities." The information that CCSD had at that time disproves this statement.  CCSD had the neuropsychological evaluation in which O.L. appropriately told another individual to stop twice and where she communicated appropriately at times nonverbally.  CCSD also had the private OT records where O.L. was working with the private OT, taking turns, and completing motor tasks, albeit at a low level. Even for CCSD's ST, who was unknown to O.L., she participated in a formal assessment, PPVT-5, but due to motor impairment, she received a minimal score. After the medication reaction, O.L. had lost all toileting skills but had re-learned to toilet again and do this mostly by herself, and she had re-learned how to remove her coat, take her shoes off, scoop with a spoon, drink with a lidded cup or straw, and use an iPad or Android device to locate and listen to her favorite violin music.  P-24, pp. 251-256.  For O.L., these were critical educational goals for O.L. at the time.  T2, pp. 468-469.  CCSD knew this and it knew, despite it failing to evaluate O.L.'s adaptive functioning, O.L. had significant needs in re-learning adaptive skills.  *See, e.g.,* P-8, pp. 120-121; P-21, p.188 (Based on the AFLS, the private BCBA to first evaluate O.L.

recommended a significant number of critical self-help/adaptive functioning/living goals for O.L. along with many communication, language, social, and other goals, and CCSD had this at the time it prepared its IEP but it did not consider it or any of the other information O.L.'s mother had provided).  P-21, pp. 189-203.  CCSD had long had the private ST and OT evaluation reports recommending with just two hours a week 11 three to six-month goals.  P-4, pp. 62, 65-66.  By the time CCSD prepared its IEP, it had three adults (a psychologist, OT, and ST) spend less than a total of one hour with O.L. *See above citations*.  CCSD had, *inter alia*, the AFLS results, the BCBA's recommendation of numerous critical objectives for O.L., Dr. Ono's evaluation report and recommendations, the private ST and OT evaluation reports, CCSD's ST and OT evaluations, and CCSD ignored all that information and only provided O.L. with 3 "behavioral" objectives in an annual IEP, and none of those objectives involved O.L. being taught daily living skills, social skills, how to communicate with an AAC device, and more.  P-27, p. 270.  CCSD's objectives were not measurable due to vagueness and were too limited – 1) O.L. will remain in appropriate range [unstated] of staff member throughout completion of instructional task [how long – 10 seconds, a minute], 2) O.L. will respond by eye gaze or motor movement to some prompt or directive [doing what, she already looked when her name was mentioned], and 3) O.L. will increase engagement to academic task by engaging with the materials 2 out of 4 trials.  *Id.*; T2, pp. 603-604; T1, pp. 380-381.  In private OT, O.L. had mastered the above, and CCSD knew this.  CCSD claimed that its 3 objectives  met O.L.'s "global academic needs." P-27, at p. 278; P-22, pp. 233-234, 238-239.   That is blatantly false, and CCSD knew this.  Just in the area of communication alone O.L. required 20 objectives.  T1, pp. 381-382. CCSD improperly limited extended school year services in its IEP to 6 hours for the entire summer.  P-27, p. 272; T2, pp. 274-275, 724-728; T1, pp. 211-212.   In its IEP, FCSD falsely claimed O.L. had no

communication needs and falsely claimed an ST evaluation was in progress when it had been completed. P-27, p. 273; T2, p. 605; T1, p. 385. CCSD stated in its IEP it would not evaluate O.L. for AT until she was participating in an "educational setting." P-27, p. 273; T1, pp. 385-386. CCSD would not consider AT or PT for O.L. until she attended a brick and mortar school. T3, p. 899-900. Three objectives with 2 hours a week with a special education teacher in the home was not designed to result in meaningful progress or meet O.L.'s needs. T2, pp. 604, 724-725, 728; T1, p. 388. In addition, CCSD's plan of only 2 hours a week did not provide O.L. the consistency, routine, repetition, and pairing she required. *Id.* at pp. 614, 729-732; T1, pp. 212-213, 384. O.L. required more intensive services, AT, OT, ST, BCBA oversight. T1, p. 213. 392. O.L. required intensive ST alone, along with a coordination with OT, ABA, parent training, sibling training, counselors to have a meaningful program. T1, p. 392. When the services would be provided are not stated in CCSD's IEP. *Id.* at p. 658. CCSD's IEP stated it 2 hours a week of services would begin on 1/21/2021 but the IEP meeting was canceled that day by CCSD and the IEP was not prepared until 3/16/2021. P-27, p. 278. In its IEP, CCSD stated it would re-assess O.L.'s needs once O.L. started "consistently receiving services," with no explanation of what that meant. *Id.* CCSD recommended in the IEP to review data and progress to see if changes were needed to the time of homebound instruction in August 2021. *Id.* That meant, from March 16, 2021 (once a teacher was found and some scheduling was in place) to August 1, 2021, with limited services and even more limited ESY, CCSD would only provide O.L. over 4. 5 months a mere 22 hours of special education on 3 objectives with no related services. *Id.*; R-169, p. 805.

**37.** CCSD's IEP, without proper evaluation, with only 2 hours a week of service from a teacher, 3 objectives, no OT, AT, ST, PT, ABA was not designed to result in O.L. making meaningful progress. T2, pp. 478-482, 581, 587-588, 598-591. Building rapport is just one objective, and

O.L. required many more, and just to build rapport, more than 2 hours a week was required. *Id.* at pp. 598-601. Two hours a week of instruction is unheard of. *Id.* at pp. 801-802. O.L. needed autism and SLI eligibilities, AAC/AT evaluation, proper transition objectives. *Id.* O.L. required parent training as well to receive a FAPE. T1, pp. 361-362.

**38.** On April 14, 2021, Ms. Ford sent an email to O.L.'s mother, saying if O.L. was going to access the 2 hours a week in CCSD's IEP, O.L. had to be reenrolled at Tapp. P-33, p. 560. O.L.'s mother replied on April 20, 2021 stating she never withdrew O.L. from Tapp and she never withdrew O.L. from special education. *Id.* at p. 559. Ms. Ford responded, saying O.L. was withdraw on December 4, 2020 because she "was not accessing any of her classes." *Id.* She also stated CCSD's OT and ST evaluations were "complete for us to address in a re-evaluation meeting." *Id.* In truth, they had been complete prior to the March 2020 IEP meeting. O.L.'s mother responded that she was confused, asking why was Ms. Ford trying to convene a meeting for reevaluation, adding that she would gladly attend an eligibility meeting. *Id.* On April 27, 2021, Ms. Ford sent an email to O.L.'s mother claiming incorrectly she had not responded to a March 2, 2021 email when O.L.'s mother had responded to the April email. *Id.* at pp. 557, 558. In her April 27, 2021 email, Ms. Ford did not say it was to be an eligibility or IEP meeting, despite O.L.'s mother saying she would gladly attend an eligibility meeting. *Id* at p. 557, 558. Ms. Ford claimed the meeting would go forward, but testified it never did. *Id.*; T4, p. 1421. At the hearing, Ms. Ford claimed that the "speech evaluation was used to meet the assessment for consideration of autism eligibility and so with that speech evaluation we are to go go back to an

eligibility -- a reevaluation meeting where that information is entered along with the other evaluation information that is using a reevaluation document it is not an IEP." T4, p. 1433.[6]

**39.** O.L. requires extensive compensatory education to make up for CCSD not providing O.L. a FAPE for years, to include extensive ST with at least 2 additional years added onto age 22 with updated AAC/AT evaluations and devices and 4 years total of compensatory education would be appropriate. T1, pp. 214-217, 395-397. When ready, O.L. should receive BCBA support to access a small school. *Id.* at p. 217.

**40.** CCSD provided its IEP for O.L. to her mother, and O.L.'s mother responded in writing her concerns to Jessica Coleman and others. P-33, pp. 547-552. Ms. Coleman stated she would get back to O.L.'s mother but she never did so. *Id.* at p. 546; T1, p. 312.

**41.** O.L.'s mother requested an independent educational evaluation ("IEE") with Dr. Montgomery in December 2020. P-15, p. 177. O.L.'s mother asked Ms. Coleman to assist with obtaining the IEE, but Ms. Coleman did not respond. T1, pp. 312-313. The IEE was never provided and CCSD did not request a hearing. P-33, pp. 487 (the IEE provider responded to CCSD with the information requested), 532-533.

---

[6] Ms. Ford has no credibility at all, as other CCSD witnesses but there is not sufficient pages to cover all the issues. CCSD's ST sent her ST report to O.L.'s mother and stated she hoped she could read it prior to the eligibility meeting. P-33, p. 545. Ms. Ford, however, later claimed it was a "reevaluation meeting." When O.L.'s mother could not understand this but said she would go to an eligibility meeting, Ms. Ford did not say it was an eligibility meeting. The purpose of a reevaluation meeting is to determine if a reevaluation of the child is warranted or whether the child's parent or teacher requests a reevaluation. 20 U.S.C. § 1414(a)(2)(A)(ii). By having a reevaluation meeting, CCSD's well overdue OT and ST evaluations would not result in any services being added to the IEP or O.L. given an SLI eligibility, as the meeting was not an IEP or eligibility meeting, which the school ST said was required. It is only now understandable, since Ms. Coleman claimed the last day of the hearing that O.L. could not be found to have an autism eligibility without cognitive evaluation, that CCSD was going to have a reevaluation meeting and say cognitive testing was needed. This is an abuse of the entire IDEA process.

**42.** After O.L.'s mother informed CCSD it could talk to any private provider/evaluator with her involved in the communication, CCSD never asked to speak to even one provider or evaluator, including Dr. Hirt.  T3, pp. 932-934.  CCSD also never asked O.L.'s mother to consent to even one medical evaluation.  T3, p. 935.  CCSD never conducted even one medical evaluation and never said it needed any medical information or medical evaluations (other than the ST's suggestion of the functional MRI).  *Id*. at pp. 935-936.

**43.** After Key Autism had staffing issues, O.L.'s mother engaged Core Therapy to evaluate O.L. and provide her direct ABA services along with parent training.  T3, pp. 981-982.  As of the hearing, O.L. was receiving ABA directly from 8:30 to 2:30 each weekday.  *Id.* at p. 982. Rapport was built very rapidly with the ABA therapist, and by September 1, 2022, O.L. engaged in social conversation with her therapist for almost 16 minutes.  *Id.* at p. 983-984.  O.L. receives additional home educational programming with her mother or a retired special education teacher. *Id.* at p. 985.  With a private AT/ACC evaluation and device; private parent/sibling training; private counseling and BCBA supports; proper private evaluations; private ABA, ST, OT, and PT, educational programming, and more, O.L. is talking, interacting socially, making choices, using her device to communicate, attending, learning skills, watching educational videos and listening to audio books, and making progress, and this is exactly what she needed and still needs.  P-36 (videos numbered 113727 (this video shows O.L. and her sister using O.L.'s AAC device; O.L.'s sister wants O.L. to pick food, but O.L. is not interested and instead picks hobbies, saying violin, goes to that icon, then goes to an album cover of her favorite violinist where the cover shows her in the snow, O.L. says "she's freezing," then her sister goes back to food, and O.L. says "not that one."); WA0001; 113300; 120638 (O.L. is with her sister deciding what to order from KFC, and while conversing with her sister, she is heard to say wings, fries, yes and

seen to points to side items and when someone comes in the room, she gets up to go to that person, saying, "oh, where have you been?"); P-38; T1, pp. 322 (O.L.'s privately provided AAC device now talks for her and she communicated to Ms. Cohen "conversation stop" and "stop talking to speech therapist [O.L.]"); 344-345; P-30, pp. 286, 287 (O.L. learned quickly how to communicate with her AAC device, and by December 2021, she used it to engage in social communication (which she could not do without it), communicate medical information, request food, ask questions, communicate safety information, talk about past events, and talk about the future.). The current BCBA recommendation for ABA is for O.L. to be provided 30 hours a week of direct services.  T2, p. 705.

**44.** After CCSD removed O.L. from CCSD without notice in violation of her 504 plan and refused and continues to refuse to provide O.L. a FAPE free from discrimination based solely upon disability, O.L.'s mother has had to incur costs to provide education to O.L.  T2, pp.775- P-35, pp. 584-616.  The total for transportation and other costs, such as evaluations and parent training and co-pays, was $5,567.45 as of the date of the hearing.  At the hearing, CCSD objected to costs incurred from O.L.'s mother engaging an advocate for parent training/educational consultation so she could attempt to be involved in the decision making process for O.L.   Parent training, however, is a related service under the IDEA and a reimbursable expenditure.  20 U.S.C. § 1401(26)(A) (A related service is any service that is required to assist a child with a disability to benefit for special education.); 34 C.F.R. § 300.34(c)(8) ("Parent counseling and training means assisting parents in understanding the special needs of their child," including providing parents information about child development and helping parents acquire the skills needed to allow them to support implementation of their children's IEP.). *See also* P-1, p. 29 (the consultant provided developmental information and

educational information about O.L.), P-33, p. 405 (O.L.'s mother informed CCSD she had to retain an advocate/educational consultant to assist her in understanding O.L.'s needs and be informed in the educational process for O.L.).

**45.** The private providers recommended and or used the AFLS to assess O.L.'s educational needs and prepare educational goals.  T2, p. 243; T2, pp. 525, 701, 748; P-21, pp. 188-189; P-32, p. 350. CCSD never evaluated O.L.'s adaptive functioning skills, even to this date.  Record.

**46.** Out of CCSD's 7 CCSD employees who testified, only 2 had ever met O.L., and those two for less than 1 hour total collectively.  T3, pp. 1457 (Ford – special education administrator), 1507 (Osborne - OT), 1285-1286 (Rauscher - O.L.'s 8th grade teacher who never met O.L. and who testified that O.L.'s mother had been telling CCSD O.L. could not do the academic work); T5, pp. 1611, 1630 (Rice – CCSD psychologist), 1739 (Coleman – Director of Special Education and Compliance – Coleman said she had never met O.L. and had never asked to meet O.L. and claimed she did not need to).

## II.   <u>CONCLUSIONS OF LAW</u>

### A.  <u>The IDEA and Provision of FAPE Procedurally and Substantively</u>

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).  The IDEA is also intended "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B).  In determining whether a disabled child has been provided a FAPE, the courts first analyze whether the local educational agency ("LEA") complied with the IDEA procedural requirements, and if so, it then determines if the IEP developed was calculated for the

child to receive meaningful educational benefit.  *Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206-207 (1982).   The administrative record proves by more than a preponderance of the evidence that CCSD procedurally and substantively denied O.L. a FAPE and continues to do so.

### B.  CCSD Denied O.L. a FAPE Procedurally

"[T]he importance Congress attached to these procedural safeguards cannot be gainsaid." *Rowley*, 458 U.S. at 205.  *See also JSK v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1565 (11th Cir. 1991) (The IDEA "provides important procedural rights.").  IDEA procedural rights include, *inter alia,* the right to access educational records, receive prior written notice, obtain an independent educational evaluation unless the LEA requests a hearing, and provision of a fair due process hearing,  20 U.S.C. § 1415(b) and (d)(2).  Procedural violations of the IDEA may result in a denial of FAPE when they 1) impede the child's right to a FAPE, 2) significantly impede the parents' opportunity to participate in the decision-making process, or 3) cause a deprivation of educational benefits.  20 U.S.C. § 1415(f)(3)(E)(ii).

It was raised in the hearing request that CCSD failed to provide prior written notice ("PWN").  PWN is an important parental right that requires LEAs to inform parents of disabled children 1) an explanation of why the LEA took some action or refused or failed to take some action, 2) provide a description of other options that the IEP team considered and why they were rejected, 3) a description of the evaluation procedure, assessment, record, or report the LEA used as the basis for its action or inaction, and 4) the factors relevant to the LEA decision.  20 U.S.C. § 1415(b)(3), (c), (d)(2)(B).  It is required at the time of the LEAs action or refusal to act and if the LEA fails to do so, it is again required when a due process hearing request is sought by a parent.  20 U.S.C. § 1415(c)(2)(B)(i)(I). Failure to provide PWN will not always result in a

procedural violation amounting to a denial of a FAPE, but in this case, it undeniably did as it impeded O.L.'s right to a FAPE, caused educational deprivation, and denied O.L.'s mother her right to participate in the decision making process.  It also denied O.L. and her mother their important right to a fair due process hearing.  "Like an answer to a complaint, a response [which in this case mandated PWN be contained therein] "serves an important dual purpose: It gives notice of the issues in dispute and binds the answering party to a position." *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1199 (9th Cir. 2017).  "Failure to file a response [especially one containing PWN that has been withheld] puts the opposing party at a serious disadvantage in preparing for the hearing, as it must guess what defenses the opposing party will raise. The problem is particularly severe in IDEA cases because there is no discovery." *Id.* In its response, CCSD did not ever once allege it denied O.L. autism eligibility, much less that it did so because she could not take a formal cognitive evaluation, and it did not put that in its eligibility report.  Yet, at the hearing, on the last day, Ms. Coleman claimed that O.L. was not eligible as a child with autism because she cannot take a cognitive evaluation (and for other undisclosed reasons).  That is clearly not the law, it is discriminatory, and a violation of the IDEA child find mandate.  But in this case, it goes beyond that.  CCSD told O.L.'s mother and wrote in its eligibility report for O.L. that autism eligibility could not be considered due to there being no comprehensive speech and language evaluation.  It said it would conduct one. Then, at a hearing, more than two years later, CCSD came up with a new explanation not disclosed in its eligibility report, PWN, or its response requiring PWN.  That delayed the entire process of O.L. being properly identified and or the matter being resolved, and it has denied Petitioners their IDEA right to a fair due process hearing  Had CCSD disclosed as required this new argument/alleged explanation at the time (December 2020), it could have been addressed by simply asking the

GaDOE to weigh in on this and in other ways.  It could have also been addressed at the hearing level by Petitioners calling former CCSD school psychologists, former CCSD educators, a GaDOE representative, a former special education administrator, and or potentially others. CCSD, it could have been proven, has had many students with IDEA autism eligibilities when they could not take a formal cognitive assessment.  O.L.'s mother could not address this explanation then or two years later, as it had not been disclosed as the IDEA requires.

CCSD's refusal to consider O.L. a child with autism under the IDEA is a denial of FAPE procedurally and substantively.  Its new argument, even if it had been disclosed, that O.L. cannot be found eligible if cannot take a formal cognitive evaluation is also a procedural (and substantive) violation of FAPE.  CCSD only has to "utilize" a cognitive assessment; the autistic child does not have to be able to participate in CCSD's use of that assessment.  *See*  34 C.F.R. § 300.304(c)(1)(ii); Ga. Reg. § 160-4-7-.05 (Appendix (a)).  If it is not feasible to evaluate an area of functioning, such as cognitive functioning, then that does not have to be assessed (this is common sense).  20 U.S.C. § 1414(b)(3)(A)(ii).  What is much more critical is that LEAs evaluate children suspected of being disabled in all areas of suspected disability, assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient, and comprehensively evaluate children to identify all of the child's special education and related services need." 20 U.S.C. § 1414(b)(3)(B)(D); 34 C.F.R. § 300.303(c)(2)(4), (6).  CCSD may try to argue it does not matter if it properly identified O.L, but that is not so.  "Without evaluative information that [a disabled child] has autism spectrum disorder, it [i]s not possible for the IEP team to develop a plan reasonably calculated to provide [the child] with a meaningful educational benefit. N.*B. v. Hellgate Elem. Sch. Dist.*, 541 F.3d 1202, 1210 (9th Cir. 2008).  *See also* 34 C.F.R. § 300.8(c)(7) ("Multiple disabilities means

concomitant impairments …, the combination of which causes such severe educational needs that they cannot be accommodated in special education programs solely for one of the impairments.").

There are so many procedural violations regarding CCSD's failure to provide comprehensive, timely evaluation, but since this also results in a substantive violation, most will be covered in the next section.   However, CCSD's refusal to evaluate O.L.'s speech and language deficits and motor impairments until she had eligibility flies in the face of the IDEA evaluation requirements for a comprehensive evaluation in all areas of suspected disability. CCSD also violated GaDOE standards, resulting in a denial of a FAPE, when it did not use a "multidiscliplinary evaluation team." Pursuant to the GaDOE rules, evaluation of a child referred because of learning and/or behavior problems is the responsibility of a "multidisciplinary evaluation team." Ga. Reg. 160-4-70.04(4)(9).  *See also* 20 U.S.C § 1401(9) (FAPE means, inter alia, special education and related services provided that meet the standards of the State educational agency). CCSD admitted that going into the evaluation, it was looking at emotional behavioral issues and an EBD eligibility, yet it is undisputed that CCSD did not engage a multidisciplinary evaluation team.  For O.L., a multidisciplinary team would include a ST, OT, PT, AT evaluator, counselor, behavior specialist/BCBA, medical doctor (neurologist), and neuropsychologist, at the least.  This was critical for O.L., prior to the medication, she was a child with high functioning autism but after the medication reaction, she was a child with low functioning autism.  CCSD only wanted to consider the anxiety and depression one experiences when she loses functioning and has severe damage to her system from medication

There is no way CCSD could argue it provided O.L. a comprehensive evaluation by observing her for 10 minutes as she sat in the car or complied with the IDEA and GaDOE

evaluation requirements. *See, e.g.,* 20 U.S.C. § 1414(c)(1)(A)(iii) (As part of the initial evaluation, teacher and related service providers observations must be considered); C.F.R. § 300.305(a)(1)(iii) (same); Ga. Reg. 160-4-7-.04(5)(a)(3). CCSD did not assess O.L.'s speech/language disabilities or even try, her motor disabilities or even try, did not provide proper observation, and did not even conduct an adaptive functioning/behavior evaluation. Many evaluations may be completed with parent and others' input. CCSD failed to do this. The AFLS provided by three different BCBAs revealed, as the IDEA mandates, O.L.'s individual needs across many domains, but CCSD refused to consider any evaluations other than EBD based ones.

Withdrawing O.L. from school and refusing to provide AT and PT evaluations and AT unless she was in a school also violated O.L.'s procedural and substantive right to FAPE.

### C.  CCSD Denied O.L. a FAPE Substantively

A FAPE is "specialized education and related services" designed to meet the unique needs of a child with a disability and provided in conformity with the IDEA IEP provisions. *See* 20 U.S.C. § 1401(9), (29). Under the IDEA, each disabled child's IEP must include "academic and functional goals" "designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum and meet each of the child's other educational needs that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(i)(II). In *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S.Ct. 988, 1000 (2017), the Court held that the FAPE "standard is markedly more demanding than the 'merely more than *de minimis*' test." When advancing from grade level to grade level is not reasonable, the IEP must "be appropriately ambitious" and provide the child "the chance to meet challenging objectives." *Id.* "When all is said and done, a student offered an educational program providing

'merely more than *de minimis*' progress … can hardly be said to have been offered an education at all. … The IDEA demands more." *Id*. at p. 1001.

In this case, CCSD did not comply with the IDEA provisions mandating that the LEA "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent … to "assist in determining the content of the child's [IEP]." 20 U.S.C. § 1414(b)(2)(A)(ii).  Instead, CCSD had one school psychologist observe O.L. in the car for 10-15 minutes.  There is no way CCSD could provide a proper IEP to O.L. in this case because if failed to provide a comprehensive evaluation in violation of the IDEA. 20 U.S.C. § 1414(b)(3)(b); 34 C.F.R. § 300.304(c)(4); Ga. Reg. § 160-4-7-.04(4)(c)(2); 24 C.F.R. § 300.304(c)(6) (The evaluation must be "sufficiently comprehensive to identify all of the child's special education and related services needs …."); Ga. Reg. § 160-4-7-.04(4)(c)(7).

CCSD will, as it almost always does, claim it did the best with what it had, saying preparation of an IEP is a snapshot and is not retrospective, but that argument is inapplicable in this case for many reasons.  CCSD knew in March 2020 O.L. had a severe reaction to medication and lost her motor, adaptive functioning, and motor skills but did not evaluate them or even try. CCSD also did not request medical evaluation, it ignored the fact the "tentative" diagnosis of selective mutism had been replaced with a diagnosis in September 2020 of "receptive-expressive language disorder." CCSD did not even evaluate O.L.'s severe adaptive functioning disabilities. CCSD had in its possession an AFLS, and it uses the AFLS, but it did not use it with O.L, and it can be completed by interview and observation. Bottom line, at the time it prepared that March 16, 2021 IEP, CCSD knew O.L. was participating in OT, doing fine motor tasks, taking turns,

using an iPad/Android device independently, saying a few words, and communicating by non-verbal gestures and sounds.

CCSD ignored its child find obligations under the IDEA once it was put on notice in March 2020 that O.L. could not function.  Instead of complying with the IDEA (and Section 504), CCSD had a psychologist in September 2020 observe her in the car for about 10 to 15 minutes in the rain.  T5, 1811.  That is not a comprehensive or appropriate evaluation under any standard, and an IEP providing a FAPE cannot be prepared from such.  The IDEA also required CCSD consider private evaluations and information provided from O.L.'s mother, but CCSD ignored that information. In fact, it ignored its own most current ST and OT evaluations and O.L.'s developmental and functional needs in direct violation of the IDEA.  20 U.S.C. § 1414(b), (c), (d)(3)(A)(iii) (and (iv).

CCSD claims other private evaluators did not do much, but those evaluators were not receiving significant federal and state funding to comply with the IDEA and GaDOE requirements.  That ignores, however, the Key Autism evaluation with the AFLS and Dr. Ono's evaluation.  CCSD did not even try to build rapport or use reinforcements.

To this date, CCSD has not evaluated O.L. for autism or provided O.L.'s mother an eligibility meeting.  As the 11th Circuit has explained, the IDEA requirement that students must be evaluated in all areas of suspected disability "places upon school districts 'a continuing … obligation to identify and evaluate all students who are reasonably suspected of having a disability under the statutes.' *P.P ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009)." *Phyllene W. v. Huntsville City Bd. of Educ.*, 630 F.App'x 917 (11th Cir. 2015); *N.B. v. Hellgate Elem. Sch. Dist.*, 541 F.3d 1202,1209-1210 (9th Cir. 2008) (Once the LEA was made aware of a private diagnosis of autism, an evaluation for autism was required,

and without this evaluative information that the child possibly has autism, it is not possible for the IEP team to develop an educational plan reasonably calculated to provide the child with a meaningful education).

Even if CCSD had provided a comprehensive, appropriate evaluation to O.L. in compliance with the IDEA and GaDOE standards, which it did not, CCSD denied O.L. a FAPE substantively by failing to provide her an IEP designed to meet her needs based upon disability in its March 16, 2020 IEP. O.L. suffered severe regression of functioning after her reaction to the medication and after the physical assault, and she had needs, it is undisputed, in every area of functioning, from daily living, adaptive, motor, speech, social communication, academic, attention, joint attention, toileting, self-care, behavioral, and all other areas, yet CCSD provided O.L. a mere 3 "behavioral" objectives with 2 hours a week with a special education teacher and only 6 hours over the entire summer.[7]  That was and is not FAPE for O.L., as multiple experts testified.  With no multidisciplinary evaluation team brought in, no comprehensive evaluation, no behavior specialists involved, CCSD did not even know O.L.'s behavioral needs (elopement being the most important one).  When private experts in behavior and autism evaluated O.L, they all agreed she required much more than 3 objectives and much more than only 2 hours a week of services.  To be expected, at the hearing, CCSD attempted to alter what was written in its IEP, but he courts have consistently ruled that an LEA cannot try to alter what is written in the IEP when defending its written IEP.  *See, e.g., M.C. v. Antelope Valley Union High Sch. Dist*., 858 F.3d 1189, 1196 (9th Cir. 2017) (the IEP is a formal written offer); *Knable v. Bexley City Sch.*

---

[7] CCSD thrust O.L.'s education upon her mother when it removed O.L. from school, requiring O.L. be provided 22.5 hours a week of education and services.  CCSD stated in its HHB document that 3 hours of HHB a week is insufficient even for students not nearly as disabled with so many needs as O.L.  CCSD tried to claim it only provided 2 hours as it did not know what O.L. could endure, then Ford admitted she had no idea of this.  CCSD did not try to find this out, and it had a year to do so.  Yet, it knew O.L.'s mother was providing 22.5 hours a week.

*Dist.,* 238 F.3d 755 (6th Cir. 2000). The IEP said 2 hours a week with 3 objectives. This was O.L.'s annual IEP, and the IDEA mandates CCSD provide hear an annual IEP. It also said CCSD suggested the IEP be looked at in August 2021, approximately 4 months later with no meaningful education, structure, consistency. The IEP statement that the IEP would be considered when O.L. "consistently receiving services" has no meaning and was not explained.[8] The evidence was CCSD's plan was more harmful and had no educational benefit.

CCSD disenrolling O.L. from CCSD violated her rights to FAPE. O.L.'s mother did not remove O.L. from CCSD, she did not remove her from special education, and she did not waive any of her rights to a FAPE. O.L. had a right then and still does to receive a FPAE from CCSD. *See, e.g., James v. Upper Arlington City Sch.*, 228 F.3d 764, 768 (6th Cir. 2000) (Under the IDEA, "the obligation to deal with a child in need of services, and to prepare an IEP, derives from residence in the district, not from enrollment."); *Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1524 (9th Cir. 1994) (The court held the LEA's responsibility to provide a FAPE was to a disabled student residing in the LEA regardless if the child was being educated outside the LEA.); "To hold otherwise would allow the school district to slough off any response to its duty" to provide disabled students residing in the LEA an IEP until the children are enrolled. *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F.Supp.2d 1057, 1069 (D. N.J. 2011) "Given the lack of ambiguity in the statute, judicial inquiry ends here." *Id.* at p. 1070.

No doubt CCSD will argue, as it often does, that it is all the parent's fault that CCSD did not provide O.L. a FAPE, The affirmative duty to provide disabled children appropriate evaluation, identification, FAPE and IEP, however, is squarely upon LEAs, not parents. *See*

---

[8] Did that mean when the teacher came consistently, O.L. had to perform all of the 3 objectives or try, she had to engage each time on each objective, or if she got sick and missed an hour or two that would not be consistent?

*Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055 (9th Cir 2012) ("[P]articipating educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming parents."). *Id.* An LEA "'cannot abdicate its affirmative duties under the IDEA." *Id.* at 1056 (citing *N.B.*, 541 F.3d at 1209).

### D. <u>Appropriate Relief</u>

The evidence of record is O.L. is entitled to intensive, privately provided ABA, ST and OT services with PT and AT (and continued AT evaluations and AT devices as needed), ongoing private evaluations with updated proper IEPs and goals and objectives in a private placement. The evidence is that due to CCSD's failure at the time of the hearing to provide anything close to a FAPE to O.L. (or any education at all) based upon her disabilities, needs, and proper evaluation, O.L. is entitled to compensatory education as stated above for 2 – 4 years beyond the age of 22. Proper relief is also reimbursement to O.L's mother for all costs she has had to incur for providing O.L. evaluations, special education, and services. CCSD argued at the hearing O.L.'s mother did not seek compensatory education in her hearing request, but she did, seeking payment for private educational programming until O.L receives a high school diploma or her private providers and mother agree she does not need such intensive services. At the time, it was believed that Jacobs Ladder could meet O.L.'s needs but it was later learned that was not so (not that it might not be so later). At the time of the hearing request on August 2, 2021, which was more than a year ago, O.L.'s mother had no way to know this matter would not be resolved much earlier. She also had not received the advice of many experts engaged after the hearing request. All the IDEA requires is that parents seek the relief they know and is available to them at the time they request a hearing, and to do so does not bar them from seeking additional relief learned later. 20 U.S.C. § 1415(b)(7)(A)(IV). Moreover, courts are authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415 (i) (2) (B) (iii). The court's discretion in fashioning relief is "broad," "and equitable considerations are relevant in fashioning relief." *School Comm. of Burlington Sch. Committee v. Massachusetts Dept. of Educ.*, 471 U.S. 359, 369 (1985). *See also Diatta v. District of Columbia,* 319 F.Supp.2d 57, 64 (D.D.C. 2004) ("A court has broad discretion under the Act to fashion appropriate relief that meets the unique circumstances of the case. *See Burlington,* 471 U.S. at 369, 105 S.Ct. 1996.").

III.    <u>**CONCLUSION**</u>

A due process hearing was requested on August 2, 2021, almost a year and one half ago, and to this date, CCSD has not evaluated O.L. for autism, provided her the SLI and autism eligibility, provided O.L. a "multidisciplinary evaluation team" mandated by the GaDOE standards before EBD eligibility can be found, provided O.L a comprehensive evaluation in all areas of suspected disabilities, provided O.L's mother all of her child's educational records, provided O.L. an AT evaluation, much less AT, provided O.L. ST, OT, or PT, provided O.L. an updated IEP, provided O.L an annual IEP, and more.  In fact, CCSD has not even reenrolled O.L. after removing her from school.  There are no equities in favor of CCSD.  Before the Education Act for All Handicapped Children in 1975 was enacted, disabled children were excluded from school or otherwise not educated properly.  In this case, while CCSD provided O.L. eligibility, it has and does still exclude O.L. from an education, much less an appropriate one.  This has had a profound impact upon O.L.

Respectfully submitted this 20th day of January 2023.

*/s/ Chris E. Vance*
Chris E. Vance
Ga. Bar No. 724199

*Counsel for Petitioners*

**CHRIS E. VANCE, P.C.**
2415 Oak Grove Valley Road, N.E.
Suite 100
Atlanta, GA  30345
Telephone:  (404) 320-6672
Facsimile:  (404) 320-3412
Cell:  (404) 313-3800
E-mail:  chris@chrisvancepc.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served by hand deliver the Respondent through counsel with a copy of the foregoing **Petitioners' Posthearing Brief.**

This 20th day of January 2023.

/s/ Chris E. Vance
Chris E. Vance
Ga. Bar No. 724199

*Counsel for Petitioners*

**CHRIS E. VANCE, P.C.**
2415 Oak Grove Valley Road, N.E.
Suite 100
Atlanta, GA  30345
Telephone:  (404) 320-6672
Facsimile:  (404) 320-3412
Cell:  (404) 313-3800
E-mail:  chris@chrisvancepc.com