# Exhibit A

 **SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
Suite 500, Marquis 1
245 Peachtree Ctr. Avenue
Atlanta, GA 30303-9913

Date: August 31, 2022

Cornelius Deandre Battle
112 Sandlewood Drive
Apt. 112
Morrow, GA 30260

## Notice of Decision – Unfavorable

You will receive this document in both a standard print and large print version. You will receive them separately.

I carefully reviewed the facts of your case and made the enclosed decision. Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal, you or your representative must ask in writing that the Appeals Council review my decision. The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter. The form is available at https://www.ssa.gov/forms/ha-520.html. Please put the Social Security number shown above on any appeal you file. You may call (800) 772-1213 with questions.

Please send your request to:

> **Appeals Council**
> **5107 Leesburg Pike**
> **Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice. The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

See Next Page

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case. You should send your written statement **with your appeal**. Sending your written statement with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case. It will consider all of my decision, even the parts with which you agree. Review can make any part of my decision more or less favorable or unfavorable to you. The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do. If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal. If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final. A final decision can be changed only under special circumstances. You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision. If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all. If you disagree with my decision, you should file an appeal within 60 days.

See Next Page

Cornelius Deandre Battle                                                        Page 3 of 3

**Need More Help?**

1. Visit www.ssa.gov for fast, simple, and secure online service.
2. Call us at 1-800-772-1213, weekdays from 8:00 am to 7:00 pm.  If you are deaf or hard of hearing, call TTY 1-800-325-0778.  Please mention this notice and decision when you call.
3. You may also call your local office at (866)931-9946.

> Social Security
> 401 W. Peachtree St. NW
> Suite 2860, Floor 28
> Atlanta, GA 30308-9972

**How are we doing?** Go to www.ssa.gov/feedback to tell us.

> Christine Guard
> Administrative Law Judge

Enclosures:
Decision Rationale
Form HA-L39 (Exhibit List)

cc:     Kathleen Flynn
        315 W. Ponce De Leon
        Avenue, Suite 940
        Decatur, GA 30030

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

| | |
|---|---|
| **IN THE CASE OF** | **CLAIM FOR** |
| Cornelius Deandre Battle | Supplemental Security Income |
| (Claimant) | |
| (Wage Earner) | |

## JURISDICTION AND PROCEDURAL HISTORY

This case is before the undersigned Administrative Law Judge on remand from the Appeals Council pursuant to a remand from the United States District Court for the Northern District of Georgia.

This case has been the subject of multiple remands and numerous subsequent claims (Exhibits 20D-22D) have been filed.  As a result, undersigned confirmed with claimant's representative that claimant alleges disability since November 21, 2008 (Exhibit 50B).

The procedural history of this case is as follows; however, this history will omit recitation of subsequently filed applications.  The evidence from any subsequent applications have been consolidated into this file and considered in reaching this decision.  On December 1, 2008, claimant protectively filed a claim for supplemental security income alleging disability beginning November 21, 2008 (Exhibit 1D).  The claim was denied initially on June 3, 2009, and upon reconsideration on May 5, 2010. Thereafter, the claimant filed a timely written request for hearing on June 3, 2010 (20 CFR 416.1429 et seq.). The claimant appeared and testified at a hearing held on September 28, 2010. William W. Porter, an impartial vocational expert, appeared at the hearing.  The claimant was represented by Kathleen Flynn, an attorney.

On November 12, 2010, Administrative Law Judge Hughes issued a decision finding that claimant was disabled beginning on November 21, 2008 and that his disability ended on March 29, 2010 (Exhibit 4A).

Claimant asked the Appeals Council to review that decision.  On May 18, 2011, the Appeals Council vacated the hearing decision and remanded the case to the Administrative Law Judge for the resolution of several issues (Exhibit 5A).  Those issues included explanation of whether and when claimant's condition medically improved, evaluation of the "B" criteria using the special technique, consideration of the opinions of Drs. Reddy and Robinson along with the state agency medical consultants, discussion of the rationale for the limitations assessed in residual functional capacity, discussion of claimant's credibility, and further consideration of whether claimant had past relevant work (Exhibit 5A).  The Appeals Council directed that the claimant be offered an opportunity for a new hearing (Exhibit 5A).

See Next Page

A hearing was held on November 10, 2011 at which the claimant appeared and testified at a
hearing.  Michael C Dorsey appeared as the impartial vocational expert. Claimant continued to
be represented by Ms. Flynn, but Hadiyah Mayers, an attorney, appeared on claimant's behalf at
the hearing.   On April 18, 2012, Administrative Law Judge Hughes again issued a partially
favorable decision in claimant's case finding claimant was disabled beginning on November 21,
2008 and that his disability ended on March 29, 2010.  On August 9, 2013, the Appeals Council
denied claimant's request for review (Exhibit 8A).

Thereafter, claimant filed an action in the district court.  The district court reversed and
remanded the case to the Commissioner for further proceedings consistent with its order (Exhibit
6A).  The district court found that the Administrative Law Judge's decision that claimant had
medical improvement such that he was no longer disabled was not supported by substantial
evidence (Exhibit 6A).  Additionally, the district court also found issues with the treatment of Dr.
Allen's opinion (Exhibit 6A/18).  The Administrative Law Judge's decision did not credit Dr.
Allen's conclusions that claimant was likely to have difficulty carrying out tasks, including being
punctual without reminders, as a result of his memory problems because he failed to articulate
his reasons for disregarding this portion of Dr. Allen's opinion (Exhibit 6A/18).  The district
court also took issue with the Administrative Law Judge's treatment of the non-examining
medical consultant, Dr. Carter (Exhibit 6A/18-20).  The court found that the Administrative Law
Judge did not compare the findings of Dr. Carter to the information from other medical sources
to show medical improvement of claimant (Exhibit 6A/19).  The court also noted that a non-
examining source's opinion is not on its own substantial evidence, but rather the weight the
opinion is given depends on its consistency with other evidence (Exhibit 6A/19).

On May 26, 2015, the Appeals Council affirmed the decision of Administrative Law Judge
Hughes which found that the claimant was disabled from November 21, 2008, through March
28, 2010 (Exhibit 7A). The Appeals Council vacated the Administrative Law Judge's decision
only with respect to the issue of disability as of March 29, 2010, and again remanded the case to
an Administrative Law Judge for further proceedings in accordance with the district court's
remand (Exhibit 7A). Because the case had previously been remanded to the same
Administrative Law Judge, the Appeals Council directed that the case be assigned to another
Administrative Law Judge and claimant be offered the opportunity for a hearing (Exhibit 7A).

The claimant appeared and testified at a hearing held on January 12, 2016. Amy Meacham, an
impartial vocational expert, also appeared and testified at the hearing.  Ms. Flynn continued to
represent claimant at this time, but La'Quierra Harris, an attorney, appeared on claimant's behalf
at the hearing (Exhibit 15A). On May 4, 2016, Administrative Law Judge Dula issued an
unfavorable decision in this case finding that claimant had not been disabled since March 29,
2010 (Exhibit 15A).  Claimant sought review by the Appeals Council (Exhibit 16A).  By order
dated September 15, 2017, the Appeals Council remanded the decision again finding that the
decision did not apply the medical improvement standard, failed to properly address the opinion
of Dr. Allen, failed to adequately explain claimant's functioning, and did not explain the off-task
limitation (Exhibit 16A).  As a result, the Appeals Council directed that evidence be obtained
from a medical expert and offer the claimant an opportunity for another hearing (Exhibit 16A).

Following this remand, Administrative Law Judge Dula held a hearing on April 10, 2019 at which claimant appeared and testified (Exhibit 13A). Tonetta Watson-Coleman, an impartial vocational expert, also appeared telephonically at the hearing. The claimant continued to be represented by Ms. Flynn, but Francine McQueen, an attorney, appeared on claimant's behalf at the hearing. On September 17, 2019, Administrative Law Judge Dule issued an unfavorable decision in claimant's case finding that he was not disabled as of March 29, 2010 (Exhibit 13A).

On September 5, 2020, the Appeals Council remanded this case again (Exhibit 14A). Because the Appeals Council directed a new Administrative Law Judge be assigned to the claimant, undersigned held a new hearing on August 13, 2021. The hearing was held by telephone due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic. All participants attended the hearing by telephone. The claimant agreed to appear by telephone before the hearing and confirmed such agreement at the start of the hearing. (Exhibits 44B; 47B; Hearing Testimony). The claimant continues to be represented by Ms. Flynn, and her associate, Erica Dempsey, also an attorney, appeared at the hearing on the claimant's behalf. (Exhibit 48B; Hearing Testimony). Also appearing and testifying were Michael A. Lace, an impartial medical expert, and Matthew L. McClanahan, an impartial vocational expert.

In its most recent remand, the Appeals Council explained that it remanded the case because the September 17, 2019 decision did not comply with the prior remand order (Exhibit 14A). The Appeals Council explained that the district had remanded the claim because the finding of medical improvement was not supported by substantial evidence (Exhibit 14A). The district court also expressed concern about the reliance upon the opinion of consultative examiner Dawn Allen, Ph.D. in finding that the claimant could maintain concentration, persistence, or pace for an eight-hour workday beginning on March 29, 2010 despite her opinion also reflecting that the claimant was likely to have difficulty carrying out tasks, including being punctual, without reminders due to memory problems (Exhibit 14A). The Administrative Law Judges did not adequately explain their reliance in part and rejection in part of that opinion (Exhibit 14A). The Appeals Council directed undersigned to further address the claimant's mental status functioning with the assistance of a medical expert and obtain a consultative examination regarding the claimant's mental status functioning (Exhibit 14A). Secondly, the Appeals Council found that the hearing decision did not adequately evaluate claimant's work activity (Exhibit 14A). Specifically, the Administrative Law Judge found the claimant worked at the level of substantial gainful activity in 2012, based solely upon the reported earnings of $42,831.16, despite the claimant's denial that he worked in 2012 (Exhibit 14A). As a result, the Appeals Council directed further development and resolution of this conflict (Exhibit 14A). Finally, the Appeals Council found that additional evaluation of claimant's physical impairments was warranted (Exhibit 14A). In this regard, the decision found that the decision addressed claimant's having a seizure disorder but did not address whether the impairment was severe, or the additional evidence provided with the subsequent application (Exhibit 14A). The decision also did not address claimant's other impairments (Exhibit 14A).

The Appeals Council specifically ordered on remand that undersigned:
- Obtain additional evidence concerning the claimant's physical impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 416.912).

- Obtain evidence from a medical expert to clarify the nature and severity of, and functional limitations resulting from, the claimant's impairments (20 CFR 416.913a(b)(2)).
- Develop the claimant's work history and evaluate whether the claimant had earnings from work activity in 2012.
- Further address the opinion of Dr. Allen (Exhibit 21F) in compliance with the district court's remand order (see Exhibit 6A).
- Further evaluate whether the claimant's seizure disorder is a severe impairment.
- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (SSR 96-8p).  In doing so, evaluate the treating and non-treating source opinions in accordance with the provisions of 20 CFR 416.927 and explain the weight given to such opinion evidence.
- Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (SSR 83-14).

The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 416.1435 (a)).  Although there is a 5-day letter in the record (Exhibit 31E), development has been completed and no additional records were available from Grady Memorial Hospital (Exhibit 46F).  During the decision process, it was discovered that some documents that were required to be included, such as from subsequent applications, district court proceedings, etc., were not in the file.  As a result, all exhibits were added to the file and proffered to the claimant's representative, and proffering was confirmed by phone.  (Exhibits 33E-34E).

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  In this instance, claimant was found to be disabled from November 21, 2008 through March 28, 2010 by decision of an Administrative Law Judge and affirmed by the decision of the Appeals Council.  The issued presented in this decision is whether the claimant's disability has ended under section 1614(a)(3)(A) of the Social Security Act.

After reviewing all of the evidence of record, the undersigned Administrative Law Judge finds that the claimant's disability ended on March 29, 2010, and that the claimant has not become disabled again since that date.

## APPLICABLE LAW

To determine if the claimant continues to be disabled, the undersigned must follow a seven-step evaluation process (20 CFR 416.994).

See Next Page

At step one, the undersigned must determine whether the claimant has an impairment or combination of impairments which meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CRF 416.920(d), 416.925 and 416.926).  If the claimant does, his disability continues (20 CFR 416.994(b)(5)(i)).

At step two, the undersigned must determine whether medical improvement has occurred (20 CFR 416.994(b)(5)(ii)).  Medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs and/or laboratory findings (20 CFR 416.994(b)(1)(i)).  If medical improvement has occurred, the analysis proceeds to the third step.  If not, the analysis proceeds to the fourth step.

At step three, the undersigned must determine whether medical improvement is related to the ability to work (20 CFR 416.994(b)(5)(iii)).  Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities (20 CFR 416.994(b)(1)(iii)).  If it does, the analysis proceeds to the fifth step.

At step four, the undersigned must determine if an exception to medical improvement applies (20 CFR 416.994(b)(5)(iv)).  There are two groups of exceptions (20 CFR 416.994(b)(3) and (b)(4)).  If one of the first group exceptions applies, the analysis proceeds to the next step.  If one of the second group exceptions applies, the claimant's disability ends.  If none apply, the claimant's disability continues.

At step five, the undersigned must determine whether all the claimant's current impairments in combination are severe (20 CFR 416.994(b)(5)(v)).  If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant is no longer disabled.  If they do, the analysis proceeds to the next step.

At step six, the undersigned must assess the claimant's residual functional capacity based on the current impairments and determine if he can perform past relevant work (20 CFR 416.994(b)(5)(vi)).  If the claimant has the capacity to perform past relevant work, his disability has ended.  If not, the analysis proceeds to the last step.

At the last step, the undersigned must determine whether other work exists that the claimant can perform, given his residual functional capacity and considering his age, education, and past work experience (20 CFR 416.994(b)(5)(vii)).  If the claimant can perform other work, he is no longer disabled.  If the claimant cannot perform other work, his disability continues.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience.

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

After careful consideration of the entire record, the undersigned makes the following findings:

See Next Page

**1.    The most recent favorable medical decision finding that the claimant was disabled is the decision dated April 18, 2012 from the Administrative Law Judge.  The Appeals Council decision dated May 26, 2015 formally affirmed the finding of disability.  The decision dated April 18, 2012 and subsequent Appeals Council affirmance dated May 26, 2015 will be called the "final administrative decisions."**

As discussed in the earlier procedural decision in this case, this case has been the subject of multiple remands.   On November 12, 2010, Administrative Law Judge Hughes issued a decision finding that claimant was disabled beginning on November 21, 2008 and that his disability ended on March 29, 2010 (Exhibit 4A).  However, that decision was vacated by the Appeals Council on May 18, 2011 (Exhibit 5A).  Following a hearing on November 10, 2011, Administrative Law Judge Hughes again entered a partially favorable decision finding that claimant was disabled beginning on November 21, 2008 and that his disability ended on March 29, 2010.  Administrative Law Judge Hughes issued that decision on April 18, 2012.  Following that decision, the Appeals Council denied review (Exhibit 8A), and claimant proceeded to district court. The district court reversed and remanded the case to the Commissioner (Exhibit 6A).  Finally, on May 26, 2015, the Appeals Council affirmed the decision of Administrative Law Judge Hughes which found that the claimant was disabled from November 21, 2008, through March 28, 2010 and vacated the decision only with respect to the period beginning March 29, 2010 (Exhibit 7A).  As a result, the final administrative decisions constitute the starting point for this evaluation.

**2.    At the time of the final administrative decisions, the claimant had the following medically determinable impairments: adjustment disorder with depressed mood; cognitive disorder, not otherwise specified, borderline intellectual functioning, history of gunshot wounds to the head, and seizure disorder.  These impairments were found to result in the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 416.967(b). Specifically, the claimant was not able to climb ropes/ladders/scaffolds; could perform frequent fingering and reaching with his non-dominant left arm; was unable to work at exposed heights or near dangerous machinery; could not drive; he could perform only simple tasks, defined as 1-2 step tasks; he could perform only low stress jobs, defined as few changes in the workplace and occasional simple decision-making; he could have only occasional superficial contacts with co-workers and the general public; and he was unable to maintain focus, concentration, or pace for up to 1/3 of the 8-hour workday.**

The decision of Administrative Law Judge Hughes issued on April 18, 2012 set forth claimant's severe impairments as: adjustment disorder with depressed mood; cognitive disorder, not otherwise specified, borderline intellectual functioning, history of gunshot wounds to the head, and seizure disorder.  These impairments had more than a minimal effect on claimant's ability to perform work.  The decision also provided that claimant had the ability to perform light work with the additional limitations listed above.

**3.    The medical evidence establishes that, since March 29, 2010, the claimant has had the following medically determinable impairments: sequelae of a gunshot wound to the head resulting in traumatic brain injury and seizure disorder; cognitive disorder not otherwise specified/major neurocognitive disorder; adjustment disorder with depressed mood; major**

**depressive disorder; borderline intellectual functioning; and posttraumatic stress disorder. These are the claimant's current impairments.**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

An impairment is found to be non-severe when medical evidence establishes only a slight abnormality, or a combination of slight abnormalities, which would have no more than a minimal effect on an individual's ability to perform basic work activities. (20 CFR 404.1521, 416.920(c), and 416.921 and SSR 85-28)  Further, to be considered a severe impairment, it must last or be expected to last at a "severe" level for a continuous period of 12 months or be expected to result in death. (20 CFR 404.1509 and 416.909)  The claimant's records also show diagnoses of various conditions, including:  insomnia; HIV; a history of an ACL repair; radial artery injury repair; minor left hemi-motor syndrome; blurry vision; and a history of a right orbital fracture with anosmia.

With respect to claimant's complaints of insomnia, the evidence shows that his insomnia is well managed with medication and that claimant had no significant side effect complaints related to his medication (Exhibits 16F, 39F).  There is no indication in the medical records that claimant's reported insomnia would have more than a minimal effect on his ability to perform basic work activities

Claimant has been diagnosed with HIV/AIDS.  The medical evidence shows that claimant is on medication for his HIV, and his viral load is undetectable (Exhibit 35F).  Claimant consistently reports doing well with respect to this condition (Exhibits 35F, 36F, 39F, 41F, 43F).  As the records show no complications as a result of his HIV diagnosis, compliance with medication, and ongoing control as a result, the medical evidence indicates that claimant HIV status would have no more than a minimal effect on his ability to perform basic work activities. As a result, the impairment is nonsevere.

With respect to claimant's left ACL tear, the records show it was repaired (Exhibit 30F).  The record contains no evidence of instability or treatment after the final administrative decision in this case.  The examinations in the records show 5/5 motor and normal range of motion (Exhibits 3F, 42F).  Claimant's gait is noted as normal (Exhibits 8F, 36F, 39F).  As a result, nothing in the medical evidence demonstrates that claimant's repair ACL tear would have more than a minimal effect on his ability to perform basic work activities. As a result, the impairment is nonsevere.

With respect to the radial artery injury, claimant presented to the emergency department with a tourniquet in place following punching a glass window on April 30, 2016 (Exhibit 34F).  It was determined that he injured his radial artery and had a complex laceration to his right forearm (Exhibit 34F).  The injuries were repaired, and he had "near complete" resolution of the numbness and tingling in his hand and had full sensation with 2-point discrimination in all fingers (Exhibit 34F).  At his first follow-up appointment on May 5, 2016, claimant had 3/5 strength in his right hand and reported only occasional numbness in the hand (Exhibit 34F).  At his next follow-up on May 14, 2016, claimant had 5/5 strength in his hand and wrist, his hand was warm, his ulnar pulse was palpable, and his motor and sensation were intact (Exhibit 34F).

His sutures were removed (Exhibit 34F). There is no indication that his injury lasted or was expected to last a severe level for a continuous 12-month period. In fact, it appears the injury resolved relatively quickly without complications. As a result, it appears this condition is nonsevere.

Claimant reported some difficulty in opening packages as a result of trouble tightly closing his hands in April 2009 (Exhibit 14F). At his April 2009 psychological testing, claimant was able to complete the Bender-Gestalt Visual Motor Test which required him to use a pencil and paper to reproduce 9 geometric figures (Exhibit 14F). Claimant was able to complete the test, claimant scored in the superior range, and he had no hand tremors (Exhibit 14F). A July 2009 doctor's visit showed a very subtle, minor left hemi-motor syndrome with drifting of the left upper extremity and some difficulty with fine motor movement of the left arm (Exhibit 16F, 2-3). In May 2016, claimant's left-hand strength was noted to be 5/5 (Exhibit 34F). Following recovery from his laceration noted above, claimant had 5/5 motor strength as noted above (Exhibit 34F). As a result, it does not appear that this condition would have more than a minimal effect on an individual's ability to perform basic work activities. As a result, the impairment is nonsevere.

Right orbital fracture and right sided anosmia following the gunshot wound there is no indication that claimant lacked the ability to smell from the left side and there is no indication that the right orbital fracture did not heal or resulted in more than a minimal effect on his ability to perform basic work activities. Claimant occasionally mentioned having blurry vision. In April 2009, claimant complained of blurry vision, but not diplopia (Exhibit 8F). Claimant could not tell Dr. Robinson when he last had an eye examination (Exhibit 8F). Claimant's uncorrected vision was 20/70 when using both eyes (Exhibit 8F). In late April 2009, claimant reported being able to perform his activities of daily living, watch TV, and spend time with friends without any expression of visual problems (Exhibit 14F). No visual disturbances were noted during his completion of psychological testing, and he was able to work at a consistent pace (Exhibit 14F). In his January 2010 function report claimant reported being able to read and able to read and watch TV well (Exhibit 8E). He was similarly able to complete testing in March 2010 (Exhibit 21F). In January 2020, claimant had an eye examination (Exhibit 39F). His vision was correctable to 20/20, and he was provided with a new prescription for eyeglasses (Exhibit 39F). He was given MARTA passes to obtain his eyeglasses prescription and a referral to the Lenscrafters One Sight Program (Exhibit 36F). Given the limited information available and the correctability of his eyesight, it appears that his blurry vision would have no more than a minimal effect on his ability to perform basic work activities. Therefore, these impairments are nonsevere.

The undersigned considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity.

The claimant also alleges shoulder issues. Other than a single emergency room visit, there is no indication of ongoing shoulder impairments. The objective evidence showed no fracture, well aligned joints, and no focal abnormality of the soft tissues (Exhibit 42F). To the extent claimant alleges a headache disorder, there is little information related to headaches in the medical evidence. Claimant did present to the emergency room in October 2014 regarding a headache (Exhibit 30F). He was given Motrin and discharged with a notation of possible migraine

(Exhibit 30F).  Claimant's medical evidence does not demonstrate the presence of a primary
headache disorder as contemplated in SSR 19-4p. Social Security Ruling 16-03p provides that
"an individual's statements of symptoms alone are not enough to establish the existence of a
physical or mental impairment or disability."  As a result, the undersigned finds these conditions
not medically determinable.

**4.   Since March 29, 2010, the claimant has not had an impairment or combination of
impairments which meets or medically equals the severity of an impairment listed in
20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).**

Considered individually and in combination, the claimant's current impairments have not met or
medically equaled a listing since March 29, 2010.  The severity of the claimant's physical
impairments, considered singly and in combination, does not meet or medically equal the criteria
of any impairment listed in Listings 11.02 or 11.18.

To meet Listing 11.02, the claimant must have a history generalized tonic-clonic seizures,
occurring at least once a month for at least 3 consecutive months despite adherence to prescribed
treatment; dyscognitive seizures, occurring at least once a week for at least 3 consecutive months
despite adherence to prescribed treatment; generalized tonic-clonic seizures, occurring at least
once every 2 months for at least 4 consecutive months despite adherence to prescribed treatment
with a marked limitation in  physical functioning, understanding, remembering, or applying
information, interacting with others, concentrating, persisting, or maintaining pace, or adapting
or managing oneself; or dyscognitive seizures, occurring at least once every 2 weeks for at least
3 consecutive months despite adherence to prescribed treatment with a marked limitation in
physical functioning, understanding, remembering, or applying information, interacting with
others, concentrating, persisting, or maintaining pace, or adapting or managing oneself.  The
medical evidence suggests fairly good control of claimant's seizures with medical compliance.
Nothing in the record suggests seizures of the frequency required by Listing 11.02.

With respect to Listing 11.18, the record does not establish that claimant has a disorganization of
motor function in two extremities that resulted in an extreme limitation in the ability to stand up
from a seated position, balance while standing or walking, or use the upper extremities,
persisting for at least 3 consecutive months after the injury. The evidence of record also fails to
show a marked limitation in physical functioning, and in one of the following areas of mental
functioning, persisting for at least 3 consecutive months after the injury: understanding,
remembering, or applying information; interacting with others; concentrating, persisting, or
maintaining pace; or adapting or managing oneself.

The severity of the claimant's mental impairments, considered singly and in combination, does
not meet or medically equal the criteria of listings 12.02, 12.04, 12.11, and 12.15.  In making this
finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To
satisfy the "paragraph B" criteria, the mental impairments must result in extreme limitation of
one, or marked limitation of two, of the four areas of mental functioning.  The four areas of
mental functioning are: understand, remember, or apply information; interact with others;
concentrate, persist, or maintain pace; and adapt or manage oneself.  An extreme limitation is an
inability to function in the area independently, appropriately, effectively, and on a sustained

See Next Page

basis.  A marked limitation is a seriously limited ability to function in the area independently, appropriately, effectively, and on a sustained basis.

Records show that the claimant suffered a gunshot wound to the head in November 2008. (Exhibits 4F/2; 7F/2).  As a result, he underwent a right frontal craniotomy, ICH evacuation, debridement, and duraplasty.  (Exhibit 1F/76).  Subsequent doctor visits starting in April 2009 show that the claimant complained of poor/slow reaction time after the accident, as well as poor memory and forgetfulness.  (Exhibit 8F).

Dr. David Rush, the initial consultative psychological examiner, evaluated the claimant in April 2009 (Exhibit 14F).  Claimant reported to Dr. Rush that he was able to attend to his activities of daily living independently, including bathing, grooming, and dressing (Exhibit 14F).  Claimant was able to prepare simple meals using a microwave and reported no difficulty resuming laundry and other household chores, despite his mother doing them for him (Exhibit 14F).  Claimant's mother, Ms. McKellar, told Dr. Rush that claimant needed reminding on occasion to perform some of activities of daily living as a result of his lack of interest in performing them, rather than forgetfulness (Exhibit 14F).  Claimant indicated stated that he had no driver's license and did not drive (Exhibit 14F).  Claimant told Dr. Rush that he enjoyed watching TV and listened to music in his spare time (Exhibit 14F).  The claimant reported having a large circle of friends, including a best friend, and enjoyed going to walks in the neighborhood (Exhibit 14F).  He had never received mental health care or been hospitalized for psychiatric reasons at that time (Exhibit 14F).  Claimant had a normal mood and affect with his mental status examination being grossly normal aside from "fair" recent and remote memory and "limited" insight, judgment, and decision-making abilities (Exhibit 14F).  It was noted that he put forth good effort during testing, with adequate attention and concentration though his functioning was most likely less than prior to the injury (Exhibit 14F).  He tested with a full-scale IQ score of 71, which is in the borderline range of intellectual functioning (Exhibit 14F).  However, he had average reading ability, borderline math ability, and tested with a standard score of 120 (90.88%ile) on the screening test for neuropsychological deficits, which was in the superior range (Exhibit 14F).  Ultimately, the claimant was diagnosed with cognitive disorder not otherwise specified, adjustment disorder with depressed mood, and borderline intellectual functioning.  (Exhibit 14F).

The most recent consultative psychological evaluation was performed in March 2010 by Dr. Dawn Allen (Exhibit 21F).  Claimant asserted at that time he was unable to cook, wash clothes, or manage finances without supervision due to his memory problems, but denied any assistance in completing his activities of daily living, despite a comment from his mother that she has to remind him to shower (Exhibit 21F).  Claimant told Dr. Allen that he forgets to lock the door and turn off the stove (Exhibit 21F).  The claimant reported that during a typical day, he eats and searches for job openings (Exhibit 21F).  Dr. Allen described the claimant as being friendly and cooperative (Exhibit 21F).  In addition, the claimant reported to Dr. Allen that he still communicates with the friends that were at the shooting (Exhibit 21F).  His mental status examination was notable for slow speech with poor articulation, borderline intellect, and slow mentation with no difficulty following directions (Exhibit 21F).  Of note, his mood was euthymic throughout the evaluation, with no signs of depression (Exhibit 21F).  His insight was deemed fair, but his remote memory was impaired, and he had some difficulties recalling information after a recent delay(Exhibit 21F).  The claimant tested with a full-scale IQ score of 72, which

represents a borderline range of intelligence (Exhibit 21F).  In spite of his IQ scores, Dr. Allen noted that there was no indication of a learning disorder (Exhibit 21F).  Dr. Allen found that claimant's reading and math scores were in the low range with his visual perceptual skills being mildly impaired (Exhibit 21F).  The records reflected the claimant possessed a GAF ("Global Assessment of Functioning") score of 64.  According to the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, a GAF of between 61 and 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally means the claimant is functioning well and has some meaningful interpersonal relationships.  Dr. Allen diagnosed the claimant with cognitive disorder.  (Exhibit 21F).

The Grady Memorial Hospital records dated July 1, 2015, revealed the claimant experienced poor concentration and memory loss, but he was oriented to name, place, situation (Exhibit 30F).  After the death of a loved one and upon discovering his HIV status, the claimant reported being depressed and presented to Grady for treatment.  However, a mental status examination from October 22, 2015 was entirely within normal limits.  (Exhibit 32F/8).  On June 22, 2018, a mental status examination showed his mood was sad, but his behavior and thought process was normal.  In addition, there was no evidence of suicidal ideation, delusions, or hallucinations, and his insight, judgment, and memory was described as fair.  The claimant was prescribed medications that included, but were not limited to Zoloft, Desyrel, and Valtrex.  (Exhibit 35F/12).  Subsequent months were similar regarding his mental status examination.  (Exhibit 35F/16-17, 21, 26).  Despite his history of depression and cognitive problems, the Grady records dated March 25, 2019, were relatively normal with the exception of his cognition, insight, and memory.  The claimant's behavior was appropriate, and his mood was euthymic with normal affect.  In addition, the claimant's thought process was concrete and goal directed with no suicidal or homicidal ideations.  However, his cognition was noted as impaired, his insight limited, and his memory poor.  (Exhibit 36F/7-10).  This is consistent with other follow up appointments, including June 24, 2019 and August 8 and 29, 2019, though it is noted that the claimant "shows functional improvement."  (Exhibit 39F/6-10, 18-20, 27-30).  A general review of the claimant's hospital treatment records indicate that he underwent therapy to improve his post-gunshot wound condition, particularly focused on memory and cognitive processes.  Additionally, there is a lengthy history surrounding the claimant's housing situation.  (Exhibit 39F).  At an appointment in January 2020, he presented with a brighter affect, stating he was no longer depressed and had his own apartment.  It was noted he was on time for the appointment, and his mental status examination continued to show impaired cognition and poor memory.  (Exhibit 39F/48-49).  Records indicate that he had returned to work in April 2020, but his mental status examination had no significant changes, and he was assessed with an anxious mood.  (Exhibit 39F/52, 54-56).  In May 2020 he reported he had to stop working because of his health due to the buses changing schedule and him having to walk 30 minutes to catch one, which was just "too much."  (Exhibit 39F/58).  Records from December 2020 indicate that the claimant was "doing fine, no problems to report" and was "taking his medications as directed."  (Exhibit 41F/4-9).

In understanding, remembering, or applying information, the claimant has moderate limitation.  Testing showed that claimant operated in the borderline range of intellectual functioning (Exhibits 14F, 21F).  However, claimant was able to complete his activities of daily living (Exhibit 14F, 21F).  At his examination with Dr. Rush, claimant reported being able to complete

his activities of daily living without reminders, albeit with prodding from his mother when he was disinterested (Exhibit 14F). The record reflects that claimant has been able to remember to take his medications as directed as evidence by his HIV viral load remaining undetectable. Although there were times where claimant did not take his seizure medication as directed. Dr. Allen did indicate that claimant had some difficulty with short term memory as well but could follow directions (Exhibit 21F). This is consistent with a moderate limitation in understanding, remembering, and applying information.

In interacting with others, the claimant has mild limitation. Claimant reported having a large group of friends (Exhibits 14F, 21F). Claimant was also able to relate information to his treating doctors and engage with the medical consultants who evaluated him. Claimant did, however, answer questions slowly, but accurately to Dr. Rush, and Dr. Allen noted slow speech and poor articulation (Exhibits 14F, 21F). This is consistent with a mild limitation in interacting with others.

These limitations are also consistent with the testimony of the medical expert, Dr. Lace, at the most recent hearing.

With regard to concentrating, persisting, or maintaining pace, the claimant has moderate limitation. Claimant demonstrated adequate attention in his psychological consultative examinations (Exhibits 14F, 21F). Claimant reported difficulty completing chores and activities of daily living, although at one time, his mother reported this motivational rather than memory driven (Exhibits 14F, 21F). Claimant was able to understand and persist sufficiently to maintain his food stamps and engage with program providers (Exhibit 39F). Both psychological consultative examiners reported that claimant answered questions slowly (Exhibits 14F, 21F). Claimant was also able to navigate public transit. Claimant is also able to read and watch TV. This is consistent with a moderate limitation in concentration, persistence, and pace.

As for adapting or managing oneself, the claimant has mild limitation. Claimant is able to ride public transit and engage with his friends and medical providers successfully. Claimant has been able to obtain housing but was kicked out of a program for smoking marijuana. This is consistent with a mild limitation in adapting and managing oneself.

Because the claimant's mental impairments do not cause at least one "extreme" limitation or two "marked" limitations, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life. The record supports a finding that he has significantly more than a minimal capacity to adapt to changes in the environment or to demands that are not already part of daily life, as the claimant only has -some deficits- in adapting to abrupt changes (Exhibit 21F).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the

sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning.  The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5.    Medical improvement occurred on March 29, 2010 (20 CFR 416.994(b)(1)(i)).**

The medical evidence supports a finding that, by March 29, 2010, there had been a decrease in medical severity of the impairments present at the time of the final administrative decisions.

Claimant had a sudden injury on November 21, 2008 during which he received a gunshot wound to the head (Exhibits 1F, 4F, 7F).  Claimant's head injury was extensive (Exhibits 1F, 7F).  Claimant was hospitalized for some time (Exhibit 1F).  Claimant underwent a frontal craniotomy and intercranial hemorrhage evacuation (Exhibit 8F).  The entrance wound was over the right eyebrow and the exit wound was through the right forehead (Exhibit 8F).  Physical and occupational therapy notes from December 2008 reflected that he was deconditioned and weak from his long hospital stay (Exhibit 1F).  However, claimant had no focal strength or motor deficits noted (Exhibit 1F).  His strength was symmetrical bilaterally (Exhibit 1F).  Claimant had physical and occupational therapy ordered five times per week on December 4, 2008 (Exhibit 1F).  Claimant was noted to be nonverbal at that time (Exhibit 1F).  Claimant could, however, understand commands and follow some commands (Exhibit 1F).  The therapist noted that claimant appeared unmotivated and had poor judgment at his December 4, 2008 assessment (Exhibit 1F).

Following the injury, claimant had to relearn many basic tasks as evidenced in the limited physical and occupational therapy records (Exhibit 1F).  Claimant also had to make substantial physical strength recovery as well as a consequence of his prolonged hospitalization and traumatic brain injury.  The medical evidence reflects a progression in claimant physical and mental abilities.

Claimant told Dr. Robinson in April 2009, that he had a poor or slow reaction time now, poor memory, and that he forgets easily (Exhibit 8F).  Claimant had no paresthesia and was able to ambulate without difficulty (Exhibit 8F).  Dr. Robinson noted that claimant's thought processes and content were normal, but claimant had some slowness with answering some questions (Exhibit 8F).  Claimant was able to answer all questions appropriately, however (Exhibit 8F).  Claimant was neurologically intact with no motor or sensory deficits noted (Exhibit 8F).  Claimant's gait and station were also normal (Exhibit 8F).  Dr. Robinson noted that claimant's physical examination was essentially normal (Exhibit 8F).  Claimant had normal range of motion throughout his body, normal pinch and grip strength, and 5/5 motor strength in his upper and lower extremities (Exhibit 8F).  Dr. Robinson also reported that claimant had been doing fine following his injury with the exception of having some poor memory and slowness in thinking (Exhibit 8F).

Dr. Robinson's evaluation shows that claimant has recovered his motor strength and the majority of his fine motor skills.  However, Dr. Robinson's evaluation also showed ongoing issues with thinking and memory.

See Next Page

In April 2009, claimant saw Dr. Rush (Exhibit 14F). Claimant reported being able to complete his activities of daily living independently, including bathing, grooming, and dressing (Exhibit 14F). Claimant's mother indicated that claimant needed reminders to perform some of these tasks as a result of his lack of interest, rather than forgetfulness (Exhibit 14F). Claimant reported being to prepare simple meals using a microwave (Exhibit 14F). He also indicated that he was able to perform the household chores, including laundry, but his mother was doing those tasks for him since the accident (Exhibit 14F). Claimant and his mother reported concerns about his ability to manage his finances independently because of forgetfulness and distraction (Exhibit 14F). Claimant indicated that he enjoyed watching TV and listening to music, as well as having a large circle of friends (Exhibit 14F). Claimant also reported enjoying taking walks in the neighborhood (Exhibit 14F).

During his interview with Dr. Rush, claimant reported significant symptoms consistent with adjustment disorder with depressed mood including needing increased sleep, increased appetite, irritability, and loss of energy (Exhibit 14F). Claimant also reported symptoms consistent with cognitive disorder not otherwise specified including a disturbance in recalling previously learned information, short-term memory deficits such as misplacing items and repeating himself, and difficulty maintaining attention (Exhibit 14F). Claimant reported some motor difficulties such as with opening packages because he could not tightly close his hands (Exhibit 14F). Claimant's mother also reported that he had difficulty recalling the names of familiar people and that he worked at a slower pace (Exhibit 14F). Both claimant and his mother confirmed that he did not currently experience any violent outbursts like those he experienced immediately following his injury (Exhibit 14F). Claimant also denied having headaches in his report to Dr. Rush (Exhibit 14F/6).

Dr. Rush reported that claimant was alerted and oriented times four, had cooperative behavior, was under talkative, but had normal rate of speech and flow, and his mood and affect were normal (Exhibit 14F). Claimant's thought associations were tight, and the content was logical (Exhibit 14F). His recent and remote memory were fair, but his insight, judgment, and decisionmaking abilities were limited (Exhibit 14F). Claimant had adequate attention and concentration, but Dr. Rush believed that these were at a lesser level than prior to the injury (Exhibit 14F). Claimant also worked at a consistent pace (Exhibit 14F). Dr. Rush observed that claimant did not experience frustration during the testing and responded well to redirection (Exhibit 14F). Claimant had a full-scale IQ of 71 which placed him in the borderline range of intellectual functioning (Exhibit 14F). Claimant's reading score placed him in the average range of ability, but his mathematics score was in the borderline range (Exhibit 14F). Claimant completed the Bender-Gestalt Visual Motor Test which required him to use a pencil and paper to replicate 9 geometric figures to screen for neuropsychological deficit (Exhibit 14F). Claimant completed the test in 6 minutes and his score was in 90.88 percentile, which is in the superior range (Exhibit 14F). Claimant's attention in the task was good (Exhibit 14F). Dr. Rush indicated that claimant was currently functioning in the borderline range of intellectual functioning which was most likely consistent with his functioning prior to the accident (Exhibit 14F).

See Next Page

Dr. Rush opined that claimant would have minimal difficulty maintaining concentration and attention to tasks (Exhibit 14F).  He further opined that claimant would likely have difficulty remembering and following complex instructions, but not simple instructions (Exhibit 14F).  Dr. Rush indicated that claimant may have some difficulty interacting with coworkers, supervisors, and the public due to irritability and frustration (Exhibit 14F).  Dr. Rush also averred that claimant would not likely have difficulty adhering to a work schedule and meeting production norms (Exhibit 14F).  He further indicated that claimant would not likely decompensate under stressful conditions (Exhibit 14F).

Claimant had made significant progress, although he had not, and likely will not return to his pre-injury baseline.  The testing performed by Dr. Rush supports his conclusions that claimant had recovered some with the screening for neuropsychological deficit showing claimant was in the superior range, but his ongoing functioning lying in the borderline range intellectually.

In May 2009, claimant had a one-minute episode of grand mal seizure activity while riding in a car with his cousin (Exhibit 3F).  Claimant bit his tongue but did not experience incontinence (Exhibit 3F).  This was claimant's first seizure since the gunshot wound injury (Exhibit 3F).  Claimant had been prescribed Dilantin to control seizure activity, but he was not taking it (Exhibit 3F).  Claimant's motor skills and sensory perception were intact (Exhibit 3F).  Claimant was again prescribed Dilantin and discharged (Exhibit 3F).

At this point, claimant was not taking his prescribed medications.  As a result, seizure activity occurred.  However, once claimant began taking Keppra regularly there is little evidence of ongoing seizure episodes through the period ending March 29, 2010.  As a result, there is evidence that claimant's seizure activity had decreased and was well-controlled with medication.

On June 12, 2009, claimant's mother, Stephanie McKellar, submitted a disability report via the internet (Exhibit 5E).  Ms. McKellar stated that claimant seemed to just move a lot slower than before with doing things now (Exhibit 5E).  Ms. McKellar reported that claimant needed "a lot more time to get ready, shower, or groom himself" (Exhibit 5E).  Ms. McKellar also reported that claimant was "capable of doing many normal things around the house, but his presence of mind just is not sharp enough to survive without help" (Exhibit 5E).  Ms. McKellar indicated that claimant sometimes left the house without closing the door (Exhibit 5E).  Ms. McKellar stated that claimant refused to help with household chores (Exhibit 5E).  Ms. McKellar related that claimant had a disconnect between thoughts he might have and the ability to execute the action on those thoughts (Exhibit 5E).  Ms. McKellar related that claimant was forgetful at times, and that it was not safe for him to cook now because he might turn on the stove and forget he has it on  (Exhibit 5E).  Ms. McKellar also observed that if she asked claimant a question, it took more time for him to process the information and produce an answer (Exhibit 5E).  Ms. McKellar finally indicated that claimant had "a hard time with some of his natural physical reflexes" (Exhibit 5E).

This report from claimant's mother is contrary to the findings of all of the psychological examinations through March 29, 2010 and is largely contrary to her reports to Dr. Rush just over two months prior to her statement.  Ms. McKellar also appears to conflate claimant's refusal to undertake tasks or his willingness to let her undertake them for him with an inability of claimant

See Next Page

to perform his activities of daily living and household chores.  There is nothing in the medical record that would explain a significant decline in claimant's abilities between her report to Dr. Rush and this report two months later.

On July 14, 2009, Dr. Joseph Saba completed a neurological evaluation of claimant (Exhibit 16F).  Dr. Saba remarked that claimant "miraculously" has had no residual except seizures that started in May 2009 (Exhibit 16F/2).  Claimant indicated that he had been placed on Keppra for his seizures, and he complained of insomnia (Exhibit 16F/2).  Dr. Saba observed that claimant's motor examination showed a very subtle minor left hemimotor syndrome with drifting to the left of the upper extremity and some difficulty with fine motor movement of the left arm (Exhibit 16F/2).  Claimant's sensory examination was normal (Exhibit 16F/2).  Dr. Saba provided a new diagnosis of minor left hemimotor syndrome, insomnia, and minor depression (Exhibit 16F/2).  Dr. Saba provided seizure limitations including limitations on driving, until his seizures were controlled for a minimum of 6 months in compliance with Georgia law, no handling of bombs, explosives, or ammunition, nor working next to dangerous or moving machinery, no working in elevated places or in construction jobs, no activities where the claimant might hurt himself or others if he had a seizure, taking showers rather than baths, and no swimming alone (Exhibit 16F/3).  Dr. Saba provided claimant with a prescription for Doxepin for insomnia and recommended continuing Keppra, 750mg, b.i.d. (Exhibit 16F/3).

On August 19, 2009, claimant underwent an EEG (Exhibit 16F/4).  The results of the EEG were abnormal and showed focal slowing consistent with claimant's history of a gunshot wound (Exhibit 16F/4).  However, no definite epileptiform abnormalities were observed (Exhibit 16F/4).

Dr. Saba's report reflects that claimant had an extremely significant physical recovery which is consistent with the previous reports.  Claimant's neurological examination is significant for the addition of seizure precautions.

In Ms. McKellar's Third-Party Function Report dated January 25, 2010, she indicated that claimant's daily activities involved taking his medication, looking for employment online and cleaning up (Exhibit 6E/2).  Ms. McKellar reported that claimant had no problems in the area of personal care (Exhibit 6E/3).  Ms. McKellar stated that claimant will not take a bath without being told to and needed reminders to take his medication (Exhibit 6E/4).  According to his mother, claimant was able to make sandwiches, mow, clean his room, and take out the trash (Exhibit 6E/4).  Ms. McKellar did not report that claimant needed encouragement to do these chores and could not explain why claimant could not prepare his own meals (Exhibit 6E/4).  Ms. McKellar indicated that claimant could watch TV without difficulty (Exhibit 6E/6).  She also reported that claimant had a hard time completing tasks, following instructions, and understanding that he was not the same as he was before he was injured (Exhibit 6E/7).  Ms. McKellar stated that claimant could pay attention for 15 minutes and did not follow verbal instructions well (Exhibit 6E/7).  She also reported that claimant became irritated quickly when placed under stress and needed time to adjust to changes in routine (Exhibit 6E/8).  Finally, claimant's mother explained that claimant will not remember to lock the doors, turn off the iron or TV, and that he puts things down and does not remember where he put them (Exhibit 6E/9).

See Next Page

In his report from the same day (January 25, 2010), claimant indicated his daily activities involved waking up, taking his medication, eating, looking for jobs, and taking care of things around the house (Exhibit 8E/2).  Claimant indicated that his reactions were delayed and moving slower than he used to move (Exhibit 8E/3, 9).  Claimant also relayed that it takes him a while to get dressed and he avoids getting hot because he becomes dizzy (Exhibit 8E/3).  Claimant indicated that he sometimes needed reminders to take a bath and reminders to take his medication (Exhibit 8E/4).  Claimant reported being able to perform cleaning chores and do laundry weekly (Exhibit 8E/4).  Claimant explained that he could watch TV and read well (Exhibit 8E/6).  Physically, claimant stated that he could lift 50 pounds, but bending made him dizzy and he could not stand long or walk far (Exhibit 8E/7).  Claimant related that he could walk ½ mile before needing to rest and could pay attention for about 30 minutes at a time (Exhibit 8E/7).  Claimant indicated that he could not follow instructions well (Exhibit 8E/7).  Claimant also reported difficulties with handling stress and needing "a minute" to adjust to changes in routine (Exhibit 8E/8).

Claimant's reports of his physical abilities reflect significant physical improvement from the time of his hospitalization and initial recovery period.  Claimant could in January 2010 by his own report lift 50 pounds and walk ½ mile before needing to rest.  As to mental improvement, claimant also reported improvement with his ability to pay attention rising in his own estimation to 30 minutes at a time.

On January 29, 2010, Dr. Reddy, claimant's primary care provider, indicated that claimant had normal fine and gross motor coordination, normal range of motion throughout, normal pinch and grip strength, and 5/5 motor strength in his upper and lower extremities (Exhibit 19F).  Dr. Reddy also indicated that claimant had a normal ability to get along with coworkers, supervisors, and the public, was competent to handle funds, and had normal ability to make simple-work related decisions (Exhibit 19F/5).  Dr. Reddy indicated that claimant was somewhat likely to decompensate or become unable to function under stress (Exhibit 19F/5).  Dr. Reddy indicated that claimant was forgetful, but had normal insight, judgment, and impulse control (Exhibit 19F/6).  Dr. Reddy opined that, on the basis of cognitive data and clinical observation, claimant had a normal ability to understand, remember, and carry out simple instructions (Exhibit 19F/6).  Dr. Reddy explained claimant's most recent mental status examination revealed that claimant had a normal orientation, appearance, and general behavior (Exhibit 19F/7).  Claimant had an abnormal affect and mood as a result of occasional agitation (Exhibit 19F/7).  Dr. Reddy also noted claimant's thought process was abnormal as a result of his slow response to questions (Exhibit 19F/7).

Dr. Reddy was claimant's primary care physician.  Dr. Reddy's opinion demonstrates significant mental improvement since the original injury.  Dr. Reddy's estimation showed that claimant had the ability to understand, remember, and carry out simple instructions.  However, Dr. Reddy still noted that claimant was forgetful.  Dr. Reddy did not explain what forgetful meant in his opinion.  He also appears to base his report of occasional agitation on the report of claimant or his mother, but he did not provide additional details.

On March 29, 2010, claimant underwent a consultative examination with Dr. Dawn Allen (Exhibit 21F).  Claimant reported to Dr. Allen that he was taking Keppra for seizures that began

shortly after the gunshot injury (Exhibit 21F). Claimant complained of headaches and olfactory and memory impairment (Exhibit 21F). A mental impairment questionnaire indicated claimant experienced occasional agitation and slow response to questions (Exhibit 21F).

Claimant reported to Dr. Allen that he was unable to cook, wash clothes, or manage finances without supervisions (Exhibit 21F). Claimant indicated that his memory problems result in safety issues including forgetting to lock doors and turn off the stove (Exhibit 21F). Claimant's mother confirmed those safety issues and indicated that she has to repeatedly tell him information (Exhibit 21F). Claimant denied having any difficulty completing his activities of daily living but indicated that his mother has to remind him to take a shower (Exhibit 21F). Claimant reported that, on a typical day, he eats and searches for a job (Exhibit 21F). Claimant's mother indicated that her son's mood and memory had changed significantly because before the injury he was energetic and on-the-go, while he is now quiet and does not speak much (Exhibit 21F). Claimant still interacts with friends (Exhibit 21F).

Dr. Allen observed that claimant was friendly and cooperative (Exhibit 21F). He was alert and oriented (Exhibit 21F). His affect was euthymic during the interview, but his speech was slow and poorly articulated (Exhibit 21F). Dr. Allen assessed claimant was in the borderline range of intellect based on the vocabulary used during the session (Exhibit 21F). Claimant had trouble performing numerical operations, but he was able to manipulate objects held in working memory (Exhibit 21F). Claimant did not show difficulty with following directions, but his mentation was slow (Exhibit 21F). Claimant had fair insight (Exhibit 21F). Dr. Allen reported that claimant's remote memory was impaired, and he had difficulty recalling information after recent delay (Exhibit 21F).

Testing demonstrated claimant's full-scale IQ score was 72, which was in the borderline range; however, his processing speed was in the average range (Exhibit 21F). Claimant's word reading and math computation were in the low range (Exhibit 21F). The Rey-Osterreith Complex figure indicated that claimant's visual perceptual skills indicated mild impairment in organizing details (Exhibit 21F).

As a result, Dr. Allen opined that claimant was able to understand simple and complex instructions, but he would likely have difficulty carrying out tasks including being punctual without reminders due to memory problems (Exhibit 21F). Dr. Allen indicated that claimant demonstrated an ability to maintain social relationships but experienced a decline in socialization (Exhibit 21F). Dr. Allen reported that claimant's history of seizures and memory impairment would present some deficits during situations that require critical thinking, additional comprehension, and abrupt changes in routine (Exhibit 21F).

Dr. Allen's opinion also reflects substantial medical improvement in claimant's condition from the time of the injury even with claimant's development of seizures while unmedicated following the initial injury. Her evaluation occurred approximately 10-months after claimant developed his seizure disorder and been treated with medication that stabilized the condition. At the time of her evaluation claimant had not needed further treatment by his neurologist. Claimant and his mother did not report ongoing seizure activity to Dr. Allen. Claimant was able to follow directions, and Dr. Allen provided no indication that claimant was not able to persist throughout

the evaluation and testing (Exhibit 21F). Claimant had already been able to persist and display adequate attention and concentration in testing with Dr. Rush a year prior (Exhibit 14F). Claimant displayed no apparent cognitive deterioration during this approximately time period, despite the development of seizure activity when off seizure medications. Consequently, claimant had stabilized and displayed stable medical improvement as of Dr. Allen's psychological evaluation. As discussed earlier, claimant had already had significant physical improvement since the initial injury and onset of disability. The weight of the opinions in this case are discussed later in this decision.

**6.   Since March 29, 2010, the impairments present at the time of the final administrative decisions decreased in medical severity to the point where the claimant has had the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except that the claimant should never climb ladders, ropes, or scaffolds, but may utilize a step or step stool to extend his reach no more than 3 additional feet; frequently climb ramps and stairs; occasionally balance as defined in the Selected Characteristics of Occupations companion publication to the Dictionary of Occupational Titles; occasionally be exposed to extreme heat; never be exposed to dangerous chemicals, open bodies of water, unprotected heights, or open, moving, mechanical parts and hazardous machinery; never operate a motorized vehicle; can concentrate sufficiently in 2-hour increments to perform simple, routine tasks requiring that the person is able to apply common sense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations; can tolerate a low level of work pressure defined as work not requiring multitasking, significant independent judgment, sharing of job tasks, or production rate pace; production rate pace is defined as work where the pace of one's work affects, or is affected by, the pace of other's work such as assembly line work.**

In making this residual functional capacity assessment, the undersigned did not consider the limiting effects of the impairments that developed after the final administrative decisions. At the time of the prior administrative decisions, claimant had severe impairments of adjustment disorder with depressed mood; cognitive disorder, not otherwise specified; borderline intellectual functioning; history of gunshot wounds to the head; and seizure disorder.

Consistent with the physical finding of Drs. Reddy, Robinson, and Saba finding claimant had largely recovered physically and being mindful of claimant's seizure history, claimant has been limited to performing medium work with additional safety limitations including claimant never climb ladders, ropes, or scaffolds, only occasionally balancing as defined in the Dictionary of Occupational Titles and its companion publications, never being exposed to dangerous chemicals, open bodies of water, unprotected heights, or open, moving, mechanical parts and hazardous machinery, and never operating a motorized vehicle. Given claimant's complaints about fatigue, which would potentially correlate to his seizure medication, but only finds subjective support in the medical evidence, claimant has been limited to only frequently climbing ramps and stairs. However, given the very good control of claimant's seizure disorder with medication, claimant's residual functional capacity permits him to use a step or step stool to extend his reach as provided. Given the relationship between certain mental health medications, seizure medications, and the possibility of claimant having a seizure as a result of becoming

overheated, claimant's residual functional capacity limits him to only occasionally being exposed to extreme heat.

With respect to the mental residual functional capacity, first and foremost, the residual functional capacity in this case limits claimant's exposure to hazards as detailed in the discussion of physical limitations above.  In addressing claimant's abilities to understand, remember, and apply information, claimant has been limited to performing simple, routine tasks that required him to be able to apply common sense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations.  This limitation is consistent with Dr. Rush's opinion that claimant would likely have difficulty remembering and following complex instructions, but not simple instructions (Exhibit 14F).  This limitation is also consistent with Dr. Allen's opinion that claimant would be able to understand simple and complex instructions (Exhibit 21F).  Additionally, these limitations also address Dr. Allen's concerns about deficits that claimant's seizure history and memory impairment providing difficulties in critical thinking, additional comprehension, and abrupt changes in routine (Exhibit 21F).  These limitations are also consistent with Dr. Reddy's opinion that, despite his forgetfulness, claimant had a normal ability to understand, remember, and carry out simple instructions (Exhibit 19F/6).  Finally, these limitations are consistent with Dr. Reddy's indication that claimant could make simple, work-related decisions (Exhibit 19F/5).

With respect specifically to claimant's limitations in the area of concentration, persistence, and pace, although Dr. Rush opined that claimant would have minimal difficulty maintaining concentration and attention to tasks (Exhibit 14F), claimant's residual functional capacity provides for his periods of concentration to be limited to 2-hour increments with the tasks being simple and routine as further defined above.  In addressing persistence and pace, along with any limitations that might be coincident as a result of his mild impairment in the ability to adapt or manage himself, the tasks claimant can complete are to require a low level of work pressure defined as work not requiring multitasking, significant independent judgment, sharing of job tasks, or production rate pace.  These limitations are consistent with the claimant is not likely to decompensate under stressful conditions (Exhibit 14F).  These limitations also address Dr. Allen's concerns related to additional comprehension and abrupt changes in routine by making sure his work environment does not require multitasking or the use of significant independent judgment.  These limitations should also address the concerns expressed by Dr. Reddy that claimant was somewhat likely to decompensate or become unable to function under stress (Exhibit 19F/5), which appear to be consistent with the concerns more thoroughly explained by Dr. Allen.

Given claimant's ability to maintain a circle of friends and relate to others based on his own report, no limitations have been included on interaction with others.  This is not inconsistent with Dr. Rush's indication of possible difficulty interacting with coworkers, supervisors, and the public due to irritability and frustration (Exhibit 14F).  The lack of limitations is fully consistent with Dr. Allen's indication that claimant demonstrated an ability to maintain social relationships but experienced a decline in socialization (Exhibit 21F).  Dr. Rush's indication of the possibility of interaction difficulties appears to be based on claimant's self-report, as opposed to observation, and is also phrased speculatively with the use of the word "may."  Dr. Reddy,

claimant's primary care provider also indicated that claimant had a normal ability to get along with coworkers, supervisors, and the public (Exhibit 19F/5).  Overall, the medical evidence of record reflects that claimant is able to maintain relationships with others and to shop on occasion and attend medical appointments without social interaction issues.

**7.    The claimant's medical improvement is related to the ability to work because it has resulted in an increase in the claimant's residual functional capacity (20 CFR 416.994(b)(2)(iv)(B)).**

Based on the impairments present at the time of the final administrative decisions, the residual functional capacity the claimant has had since March 29, 2010 is less restrictive than the one the claimant had at the time of the final administrative decisions.

At the time of the final administrative decisions, claimant could only perform light work and had significant limitations on the use of his left arm that included a limitation to only frequently fingering and reaching.  As of March 29, 2010, claimant's strength and motor skills were within normal limits and there were no longer fingering or reaching limitations with the left upper extremity.  Additionally, as discussed above, claimant was able to perform medium as opposed to light work as of March 29, 2010.

While claimant had additional hazard limitations as a result of the need to protect claimant if seizure activity occurred, claimant's mental residual functional capacity had also increased as of March 29, 2010.  At the time of the final administrative decisions, claimant could perform only simple tasks, defined as 1-2 step tasks, only low stress jobs having few changes in the workplace and occasional simple decision-making, and could have only occasional superficial contacts with co-workers and the general public.  Further, he was unable to maintain focus, concentration, or pace for up to 1/3 of the 8-hour workday.  As of March 29, 2010, claimant had the ability to concentrate sufficiently in 2-hour increments to perform simple, routine tasks requiring that the person is able to apply common sense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations.  This is substantially less restrictive than the previous residual functional capacity.  Additionally, while the residual functional capacity as of March 29, 2010 based on the impairments in the final administrative decisions still limited claimant's work stress, claimant no longer had restrictions in interacting with others in the workplace.

**8.    Since March 29, 2010, the claimant has continued to have a severe impairment or combination of impairments (20 CFR 416.994(b)(5)(v)).**

The claimant's impairments of sequelae of a gunshot wound to the head resulting in traumatic brain injury and seizure disorder; cognitive disorder not otherwise specified/major neurocognitive disorder; adjustment disorder with depressed mood; major depressive disorder; borderline intellectual functioning; posttraumatic stress disorder.  The above impairments have been determined by medically acceptable evidence including signs, symptoms, and laboratory findings.  From the evidence discussed hereunder, the undersigned finds that these impairments constitute more than slight abnormalities and have had more than a minimal effect on the claimant's ability to perform basic work activities for a continuous period of 12 months.

See Next Page

Claimant's nonsevere impairments are detailed in Finding 3 above.

**9.    Since March 29, 2010, based on the current impairments, the claimant has had the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except that the claimant should never climb ladders, ropes, or scaffolds, but may utilize a step or step stool to extend his reach no more than 3 additional feet; frequently climb ramps and stairs; occasionally balance as defined in the Selected Characteristics of Occupations companion publication to the Dictionary of Occupational Titles; occasionally be exposed to extreme heat; never be exposed to dangerous chemicals, open bodies of water, unprotected heights, or open, moving, mechanical parts and hazardous situations; never operate a motorized vehicle; can concentrate sufficiently in 2-hour increments to perform simple, routine tasks requiring that the person is able to apply common sense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations; can tolerate a low level of work pressure defined as work not requiring multitasking, significant independent judgment, sharing of job tasks, or production rate pace; production rate pace is defined as work where the pace of one's work affects, or is affected by, the pace of other's work such as assembly line work.**

As required by SSR 96-8p, the residual functional capacity has been assessed based on all the evidence with consideration of the limitations and restrictions imposed by the combined effects of all the claimant's medically determinable impairments.

In making this assessment, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929.  The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 416.927.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the consistency of the statements based on a consideration of the entire case record.

On June 12, 2009, claimant's mother, Stephanie McKellar, submitted a disability report via the internet (Exhibit 5E).  Ms. McKellar stated that claimant seemed to just move a lot slower than before with doing things now (Exhibit 5E).  Ms. McKellar reported that claimant needed "a lot more time to get ready, shower, or groom himself" (Exhibit 5E).  Ms. McKellar also reported

that claimant was "capable of doing many normal things around the house sometimes, but his presence of mind just is not sharp enough to survive without help" (Exhibit 5E). Ms. McKellar indicated that claimant sometimes left the house without closing the door (Exhibit 5E). Ms. McKellar stated that claimant refused to help with household chores (Exhibit 5E). Ms. McKellar related that claimant had a disconnect between thoughts he might have and the ability to execute the action on those thoughts (Exhibit 5E). Ms. McKellar related that claimant was forgetful at times, and that it was not safe for him to cook now because he might turn on the stove and forget he has it on  (Exhibit 5E). Ms. McKellar also observed that if she asked claimant a question, it took more time for him to process the information and produce an answer (Exhibit 5E). Ms. McKellar finally indicated that claimant had "a hard time with some of his natural physical reflexes" (Exhibit 5E).

In Ms. McKellar's Third-Party Function Report dated January 25, 2010, she indicated that claimant's daily activities involved taking his medication, looking for employment online and cleaning up (Exhibit 6E/2). Ms. McKellar reported that claimant had no problems in the area of personal care (Exhibit 6E/3). Ms. McKellar stated that claimant will not take a bath without being told to and needed reminders to take his medication (Exhibit 6E/4). According to his mother, claimant was able to make sandwiches, mow, clean his room, and take out the trash (Exhibit 6E/4). Ms. McKellar did not report that claimant needed encouragement to do these chores and could not explain why claimant could not prepare his own meals (Exhibit 6E/4). Ms. McKellar indicated that claimant could watch TV without difficulty (Exhibit 6E/6). She also reported that claimant had a hard time completing tasks, following instructions, and understanding that he was not the same as he was before he was injured (Exhibit 6E/7). Ms. McKellar stated that claimant could pay attention for 15 minutes and did not follow verbal instructions well (Exhibit 6E/7). She also reported that claimant became irritated quickly when placed under stress and needed time to adjust to changes in routine (Exhibit 6E/8). Finally, claimant's mother explained that claimant will not remember to lock the doors, turn off the iron or TV, and that he puts things down and does not remember where he put them (Exhibit 6E/9).

In his report from the same day (January 25, 2010), claimant indicated his daily activities involved waking up, taking his medication, eating, looking for jobs, and taking care of things around the house (Exhibit 8E/2). Claimant indicated that his reactions were delayed and moving slower than he used to move (Exhibit 8E/3, 9). Claimant also relayed that it takes him a while to get dressed and he avoids getting hot because he becomes dizzy (Exhibit 8E/3). Claimant indicated that he sometimes needed reminders to take a bath and reminders to take his medication (Exhibit 8E/4). Claimant reported being able to perform cleaning chores and do laundry weekly (Exhibit 8E/4). Claimant explained that he could watch TV and read well (Exhibit 8E/6). Physically, claimant stated that he could lift 50 pounds, but bending made him dizzy and he could not stand long or walk far (Exhibit 8E/7). Claimant related that he could walk ½ mile before needing to rest 10 to 20 minutes and could pay attention for about 30 minutes at a time (Exhibit 8E/7). Claimant indicated that he could not follow instructions well (Exhibit 8E/7). Claimant also reported difficulties with handling stress and needing "a minute" to adjust to changes in routine (Exhibit 8E/8).

On June 3, 2010, claimant prepared another function report (Exhibit 11E). However, a portion of that report reads as though someone else filled it out (Exhibit 11E/1). The reported indicated

that claimant had moderate numbness in the hand and arms and that claimant had occasional difficulty using arms due to severe arm weakness (Exhibit 11E/1). The report also explained that claimant now had seizures, but they are controlled with medication (Exhibit 11E/1). The report indicated that claimant had severe headaches several times a month (Exhibit 11E/1). The reported stated that claimant had memory loss making it difficult to complete a task and causing claimant to repeat things over and over resulting in difficulty holding conversations or train of thought (Exhibit 11E/1). The report also indicated that claimant become aggravated easily and had uncontrolled mood swings (Exhibit 11E/1). Finally, the reporter asserted that claimant's "mind is not sharp enough to survive without help" (Exhibit 11E/1).

A later section of Exhibit 11E appears to have been completed by claimant. In that portion, claimant indicated that he lacked the energy to take a bath or shower and he had to be reminded to take a shower change my clothes (Exhibit 11E/4). Claimant reported that he needs to do things slowly and had to take a break when walking due to fatigue (Exhibit 11E/4). Claimant also reported feeling dizzy when he stood for a long period of time (Exhibit 11E/4). Claimant complained of right knee pain when climbing stairs (Exhibit 11E/4). Claimant reported feeling anxiety, concern that he might forget the stove is on and start a fire that prevents him from cooking, and the inability to complete a task resulting in him not performing any household chores (Exhibit 11E/4). Claimant also indicated that he lacked the strength to lift or carry heavy objects (Exhibit 11E/4). Lastly, he reported that he does not go grocery shopping or do odd jobs around the house (Exhibit 11E/4).

At his first hearing on September 28, 2010, the claimant testified that he completed the 11th grade and had attended some of 12th grade. He discussed his earnings and testified that he had been terminated from a job just after starting for failing a drug test and had been fired from a furniture delivery job for being late. The claimant testified that he washed his own clothes and helped his mother with grocery shopping. (Exhibit 20B/14). He reported that he could not work due to slowness and not being able to lift as much as he used to be able to lift. The claimant reported that he moved more slowly now. He reported being more forgetful since he was shot, and that he needed to be reminded 2 to 3 times about a task he is told to do. The claimant reported forgetting to turn off the stove but was not able to indicate forgetting other things. He indicated he could pay attention to a 30-minute TV show, but not to a longer show or movie because he would lose interest. The claimant indicated that it would take him 10 to20 minutes to go back and be able to pay attention again. He testified that his left shoulder pops out, but that he had not seen a doctor for it, and that this condition had begun a long time ago and if he moved it backward, it would pop out. The claimant reported that he could lift 20 pounds with each of his arms. He indicated that he still had headaches weekly, twice per week, that cause him to lay down and sleep for 10 to 20 minutes. However, claimant did not take medication for his headaches. He reported that Keppra caused him to awaken in the middle of his sleep, on average he slept 8 hours, but was awake for 10 to 20 minutes. The claimant also indicated he had depression but had not been treated for it due to monetary issues. He stated that he became irritable and became angry easily, and that this was new since he was shot. Loud talking and asking him things over and over again caused him to snap from time to time.

At the November 10, 2011 hearing the claimant testified that he completed the 11th grade. (Exhibit 19B). He described his work history from 2004-2005 and 2007 and testified he had

performed no other work and received no other income at that time.  The claimant noted that he had not received benefits because of his incarceration following the first hearing; however, the violation of probation had been resolved at the time of the second hearing.  He indicated that he was taking Keppra and had been doing so since the shooting.  The claimant indicated that despite taking medication, he still had seizures "once every couple months."  (Exhibit 19B/14).  He indicated that he had stopped using marijuana and alcohol after he was shot.  The claimant still lived with his mother at the time of the hearing and had done so since 2008 with his brother and sister.  He completed or helped out with the chores of doing dishes and taking out the trash.  The claimant stated that his medication made him irritable and prone to cussing and snapping.  (Exhibit 19B/16).  He would become irritable if people asked him the same questions repeatedly.  The claimant reported that he had trouble sleeping as a result of the medication, but also reported sleeping 7-8 hours per night.  He indicated that he had been in a wheelchair for a couple of weeks after he was released from the hospital, but then began walking on his own.  The claimant related that he had trouble paying attention for a long period of time and indicated that he would become distracted thinking about something else.  He indicated that he could pay attention for a 30-minute TV show, but not a longer program or movie.  The claimant testified that he did not cook because he might forget to turn something off or burn something.  He continued that he did not do laundry because he would forget to take the clothes out and mix the wrong colors together.  The claimant reported that he had never had a driver's license.  At the time of the hearing, his last seizure had been two months prior.  (Exhibit 19B/20).  The claimant feels he was sleeping after the seizure and did not remember anything until he awakens from it.  He napped for 30 minutes to an hour following a seizure.  Once he awakens from his nap, he is generally back to normal.  During his last seizure, the claimant noted that he bit his lip.  The claimant also indicated that he had right knee surgery in 2005 and complained about trouble with his left shoulder's range of motion.  He was not under medical care for either orthopedic condition at the time of the hearing.  The claimant indicated that he could lift 20 pounds with his left arm and 50 pounds with his right.  He reported that cold made his knee hurt more and if he made certain motions with his knee it would begin to hurt.  The claimant testified that he could stand for 10-15 minutes.  He could sit for 10 minutes before he became irritable and had to get up.  The claimant reported having one seizure in jail.

The claimant's mother, Ms. Stephanie McKellar, testified at the November 2011 hearing as well (Exhibit 19B).  (Exhibit 19B/25).  She described the claimant as forgetful, needing to be told thing repeatedly, and indicated that he lost things when he set them down and repeated himself frequently.  The claimant was able to interact well with his family, except his sister who he had a hard time with sometimes.  Ms. McKellar indicated that she did not let him cook much- only microwave things.  She also reported having to remind him to take out the trash and clean his room.  She did not let him cook more because "he could forget" and leave the stove on if she was not there.  (Exhibit 19B/26).  Ms. McKellar reported that the claimant had very substantial limitations when he first came home from the hospital.  After his first month at home, he had his feeding tube removed and started to recover and become stronger.  In early 2009, claimant would still be a little wobbly when he first stood up and was slow until he got stronger.  In 2010, Ms. McKellar testified that claimant was doing better, gaining weight, and still forgetful.  Ms. McKellar reported that claimant has remained forgetful.

See Next Page

At his hearing on January 12, 2016, claimant reported that he was homeless and had been staying with friends and family since his mother passed away. The claimant had not taken his medication the day of the hearing because he did not have the money to buy his medication. He had not had his medication in 2 weeks, and he had a seizure 10 days prior to the hearing. The claimant sees spots and his speech slurs before the seizure. He had a seizure about a month prior to the seizure 10 days before the hearing. The claimant indicated that stress was a trigger for his seizures. He reported sleeping 8 hours per night but taking 1-2 hours to go to sleep. The claimant indicated that drawing is a hobby, and he drew about 1 hour per day. He testified that he can use a computer, but he loses focus after 30 minutes. He indicated that he does not use public transportation because he gets lost. The claimant reported that he could walk about a block before his knee begins to hurt and he needs to rest for about 10 minutes. He again indicated that he could lift and carry about 20 pounds. The claimant noted being able to shop for groceries and personal items by himself. He reported when he is agitated, he will lash out at the person he is mad at. The claimant also reported needed glasses, but not having the money to get new ones. He indicated that he still attended Grady for medical care, and that he had not looked for work in a year.

On April 10, 2019, another hearing was held in claimant's case. The claimant testified that he had lost some weight as a result of his HIV status. He indicated that he was now living with a roommate at Making a Way house but had previously lived on the streets for one year and with his mother before that. The claimant reported last having a full-time job in 2004. He indicated that he was unable to load and unload trucks anymore and that his condition prevented him from doing other work. The claimant indicated that he was laid off of his job in 2004 because he did not have transportation and was late too many times. He took the bus to the hearing but had to go to the train station and walk the rest of the way to the hearing office. The claimant indicated that he was not able to work because his pace was too slow, and he could not remember things. At that hearing, the claimant reported having two seizures per month over the prior two months and once a month prior to that. He reported his vision becomes blurred and then he wakes up to be told he had a seizure. The claimant reported being tired following his seizure and needing to sleep for about an hour to recover. He reported stress and becoming mad or arguing as well as getting too hot made his seizures come on. Three weeks prior to the hearing, the claimant bit his tongue during a seizure. He indicated that he needed to write things down so that he did not forget them. The claimant indicated that he needed reminders for chores and hygiene. He reported issues keeping up with appointments and that he could not sit in one area for a long time. The claimant indicated that he could not stay focused on a task for 30 minutes. He testified that he has headaches twice per week and that they last until he gets medication or about 30 minutes, and that light causes some of his headaches. The claimant reported that his daily activities consist of taking his medications, handling his appointments, watching TV, and trying to sleep. He indicated that he sleeps 7 to 8 hours per night, but that his sleep is broken at 5 hours. The claimant indicates that he does not sleep during the day. He testified that he had no issues socializing with the people he lives with or with grocery shopping. The claimant did report that his medications made him drowsy or sleepy.

At his most recent hearing, the claimant alleges that he is not able to hold down a full-time job because he cannot get to work on time due to not setting an alarm and oversleeping, does not learn quickly, cannot do things quickly, and has issues lifting and unloading items that are too

heavy.  He states that he can lift 25 to 30 pounds due to a left shoulder issue where it pops out and he has to pop it back in if he lifts more than that.  The claimant alleges this has been a problem for 5 to 6 years, and that he is right hand dominant.  He states that he normal has seizures 1 to 2 times per month despite taking his Keppra, and that he lives alone.  The claimant alleges that he feels dizzy initially and then someone will tell him he had a seizure, and then it takes him 30 minutes to an hour to feel normal again.  He states that sometimes he bites his tongue.  The claimant alleges that Grady Memorial Hospital pays for his seizure medication (Keppra) as well as his HIV medications (Descovy and Tivocay), and that he takes them as he should with no side effects.  He states that he takes Trazodone for his mental health, and this medication does make him sleepy.  The claimant alleges that his memory comes and goes, and he forgets things throughout the day.  He states that he typically stays at his house and will sit down somewhere to try and find a place to make some money, either a job or someone to help him, and that he will listen to music.  The claimant alleges that if he has a ride, he will occasionally go to the center to look for jobs, and that he is looking for something slow-paced, such as a labor place.  He states that he used to go to church every Sunday but has not been in a couple of years because his church is not in the same area, and he cannot walk there anymore and does not have a ride.  The claimant alleges that he has friends and family that check on him and he sees them every month or so.  He states that he is able to clean his dishes and keeps his house clean but does not drive and has never had a driver's license.  The claimant alleges that he does not sleep well with or without the Trazodone, and only sleeps about 5-6 hours.  He states that he cannot stand more than about an hour, and that he can sit less than 30 minutes because he gets agitated and does not like to sit for long times looking at things.  The claimant alleges that he can walk less than a mile due to the heat or getting dizzy, and that this is the same even when it is cooler outside.  He states that he wears glasses and has no vision issues with them on. (Hearing Testimony).

The medical evidence shows that claimant had a sudden injury on November 21, 2008 during which he received a gunshot wound to the head (Exhibits 1F, 4F, 7F).  Claimant's head injury was extensive (Exhibits 1F, 7F).  Claimant was hospitalized for some time (Exhibit 1F).  Claimant underwent a frontal craniotomy and intercranial hemorrhage evacuation (Exhibit 8F).  The entrance wound was over the right eyebrow and the exit wound was through the right forehead (Exhibit 8F).  Physical and occupational therapy notes from December 2008 reflected that he was deconditioned and weak from his long hospital stay (Exhibit 1F).  However, claimant had no focal strength or motor deficits noted (Exhibit 1F).  His strength was symmetrical bilaterally (Exhibit 1F).  Claimant had physical and occupational therapy ordered five times per week on December 4, 2008 (Exhibit 1F).  Claimant was noted to be nonverbal at that time (Exhibit 1F).  Claimant could, however, understand commands and follow some commands (Exhibit 1F).  The therapist noted that claimant appeared unmotivated and had poor judgment at his December 4, 2008 assessment (Exhibit 1F).

Claimant told Dr. Robinson in April 2009, that he had a poor or slow reaction time now, poor memory, and that he forgets easily (Exhibit 8F).  Claimant had no paresthesia and was able to ambulate without difficulty (Exhibit 8F).  Dr. Robinson noted that claimant's thought processes and content were normal, but claimant had some slowness with answering some questions (Exhibit 8F).  Claimant was able to answer all questions appropriately, however (Exhibit 8F).  Claimant was neurologically intact with no motor or sensory deficits noted (Exhibit 8F).

See Next Page

Claimant's gait and station were also normal (Exhibit 8F). Dr. Robinson noted that claimant's physical examination was essentially normal (Exhibit 8F). Claimant had normal range of motion throughout his body, normal pinch and grip strength, and 5/5 motor strength in his upper and lower extremities (Exhibit 8F). Dr. Robinson also reported that claimant had been doing fine following his injury with the exception of having some poor memory and slowness in thinking (Exhibit 8F).

In April 2009, claimant saw Dr. Rush (Exhibit 14F). Claimant reported being able to complete his activities of daily living independently, including bathing, grooming, and dressing (Exhibit 14F). Claimant's mother indicated that claimant needed reminders to perform some of these tasks as a result of his lack of interest, rather than forgetfulness (Exhibit 14F). Claimant reported being to prepare simple meals using a microwave (Exhibit 14F). He also indicated that he was able to perform the household chores, including laundry, but his mother was doing those tasks for him since the accident (Exhibit 14F). Claimant and his mother reported concerns about his ability to manage his finances independently because of forgetfulness and distraction (Exhibit 14F). Claimant indicated that he enjoyed watching TV and listening to music, as well as having a large circle of friends (Exhibit 14F). Claimant also reported enjoying taking walks in the neighborhood (Exhibit 14F).

During his interview with Dr. Rush, claimant reported significant symptoms consistent with adjustment disorder with depressed mood including needing increased sleep, increased appetite, irritability, and loss of energy (Exhibit 14F). Claimant also reported symptoms consistent with cognitive disorder not otherwise specified including a disturbance in recalling previously learned information, short-term memory deficits such as misplacing items and repeating himself, and difficulty maintaining attention (Exhibit 14F). Claimant reported some motor difficulties such as with opening packages because he could not tightly close his hands (Exhibit 14F). Claimant's mother also reported that he had difficulty recalling the names of familiar people and that he worked at a slower pace (Exhibit 14F). Both claimant and his mother confirmed that he did not currently experience any violent outbursts like those he experienced immediately following his injury (Exhibit 14F). Claimant also denied having headaches in his report to Dr. Rush (Exhibit 14F/6).

Dr. Rush reported that claimant was alerted and oriented times four, had cooperative behavior, was under talkative, but had normal rate of speech and flow, and his mood and affect were normal (Exhibit 14F). Claimant's thought associations were tight, and the content was logical (Exhibit 14F). His recent and remote memory were fair, but his insight, judgment, and decisionmaking abilities were limited (Exhibit 14F). Claimant had adequate attention and concentration, but Dr. Rush believed that these were at a lesser level than prior to the injury (Exhibit 14F). Claimant also worked at a consistent pace (Exhibit 14F). Dr. Rush observed that claimant did not experience frustration during the testing and responded well to redirection (Exhibit 14F). Claimant had a full-scale IQ of 71 which placed him in the borderline range of intellectual functioning (Exhibit 14F). Claimant's reading score placed him in the average range of ability, but his mathematics score was in the borderline range (Exhibit 14F). Claimant completed the Bender-Gestalt Visual Motor Test which required him to use a pencil and paper to replicate 9 geometric figures to screen for neuropsychological deficit (Exhibit 14F). Claimant completed the test in 6 minutes and his score was in in 90.88 percentile, which is in the superior

See Next Page

range (Exhibit 14F).  Claimant's attention in the task was good (Exhibit 14F).  Dr. Rush indicated that claimant was currently functioning in the borderline range of intellectual functioning which was most likely consistent with his functioning prior to the accident (Exhibit 14F).

Dr. Rush opined that claimant would have minimal difficulty maintaining concentration and attention to tasks (Exhibit 14F).  He further opined that claimant would likely have difficulty remembering and following complex instructions, but not simple instructions (Exhibit 14F).  Dr. Rush indicated that claimant may have some difficulty interacting with coworkers, supervisors, and the public due to irritability and frustration (Exhibit 14F).  Dr. Rush also averred that claimant would not likely have difficulty adhering to a work schedule and meeting production norms (Exhibit 14F). He further indicated that claimant would not likely decompensate under stressful conditions (Exhibit 14F).

In May 2009, claimant had a one-minute episode of grand mal seizure activity while riding in a car with his cousin (Exhibits 3F, 9F).  Claimant bit his tongue but did not experience incontinence (Exhibit 3F).  This was claimant's first seizure since the gunshot wound injury (Exhibit 3F).  Claimant had been prescribed Dilantin to control seizure activity, but he was not taking it (Exhibit 3F).  Claimant's motor skills and sensory perception were intact (Exhibit 3F).  Claimant was again prescribed Dilantin and discharged (Exhibit 3F).

On July 14, 2009, Dr. Joseph Saba completed a neurological evaluation of claimant (Exhibit 16F).  Dr. Saba remarked that claimant "miraculously" has had no residual except seizures that started in May 2009 (Exhibit 16F/2).  Claimant indicated that he had been placed on Keppra for his seizures, and he complained of insomnia (Exhibit 16F/2).  Dr. Saba observed that claimant's motor examination showed a very subtle minor left hemimotor syndrome with drifting to the left of the upper extremity and some difficulty with fine motor movement of the left arm (Exhibit 16F/2).  Claimant's sensory examination was normal (Exhibit 16F/2).  Dr. Saba provided a new diagnosis of minor left hemimotor syndrome, insomnia, and minor depression (Exhibit 16F/2).  Dr. Saba provided seizure limitations including limitations on driving, until his seizures were controlled for a minimum of 6 months in compliance with Georgia law, no handling of bombs, explosives, or ammunition, nor working next to dangerous or moving machinery, no working in elevated places or in construction jobs, no activities where the claimant might hurt himself or others if he had a seizure, taking showers rather than baths, and no swimming alone (Exhibit 16F/3).  Dr. Saba provided claimant with a prescription for Doxepin for insomnia and recommended continuing Keppra, 750mg, b.i.d. (Exhibit 16F/3).

On August 19, 2009, claimant underwent an EEG (Exhibit 16F/4).  The results of the EEG were abnormal and showed focal slowing consistent with claimant's history of a gunshot wound (Exhibit 16F/4).  However, no definite epileptiform abnormalities were observed (Exhibit 16F/4).

Claimant was seen at South Fulton Medical Center on December 14, 2009 with the complaint of a seizure and a prescription for a 10-day supply of his Keppra dose (Exhibit 33F/12).  Claimant presented via EMS as a result of a witnessed seizure (Exhibit 33F/16).  Claimant reported dizziness, but he was awake, alert, and oriented (Exhibit 33F/17).

See Next Page

On January 29, 2010, Dr. Reddy, claimant's primary care provider, indicated that claimant had normal fine and gross motor coordination, normal range of motion throughout, normal pinch and grip strength, and 5/5 motor strength in his upper and lower extremities (Exhibit 19F; Exhibits 15F).  Dr. Reddy also indicated that claimant had a normal ability to get along with coworkers, supervisors, and the public, was competent to handle funds, and had normal ability to make simple-work related decisions (Exhibit 19F/5).  Dr. Reddy indicated that claimant was somewhat likely to decompensate or become unable to function under stress (Exhibit 19F/5).  Dr. Reddy indicated that claimant was forgetful, but had normal insight, judgment, and impulse control (Exhibit 19F/6).  Dr. Reddy opined that, on the basis of cognitive data and clinical observation, claimant had a normal ability to understand, remember, and carry out simple instructions (Exhibit 19F/6).  Dr. Reddy explained claimant's most recent mental status examination revealed that claimant had a normal orientation, appearance, and general behavior (Exhibit 19F/7).  Claimant had an abnormal affect and mood as a result of occasional agitation (Exhibit 19F/7).  Dr. Reddy also noted claimant's thought process was abnormal as a result of his slow response to questions (Exhibit 19F/7).

On March 29, 2010, claimant underwent a consultative examination with Dr. Dawn Allen (Exhibit 21F).  Claimant reported to Dr. Allen that he was taking Keppra for seizures that began shortly after the gunshot injury (Exhibit 21F).  Claimant complained of headaches and olfactory and memory impairment (Exhibit 21F).  A mental impairment questionnaire indicated claimant experienced occasional agitation and slow response to questions (Exhibit 21F).

Claimant reported to Dr. Allen that he was unable to cook, wash clothes, or manage finances without supervisions (Exhibit 21F).  Claimant indicated that his memory problems result in safety issues including forgetting to lock doors and turn off the stove (Exhibit 21F).  Claimant's mother confirmed those safety issues and indicated that she has to repeatedly tell him information (Exhibit 21F).  Claimant denied having any difficulty completing his activities of daily living but indicated that his mother has to remind him to take a shower (Exhibit 21F).  Claimant reported that, on a typical day, he eats and searches for a job (Exhibit 21F).  Claimant's mother indicated that her son's mood and memory had changed significantly because before the injury he was energetic and on-the-go, while he is now quiet and does not speak much (Exhibit 21F).  Claimant still interacts with friends (Exhibit 21F).

Dr. Allen observed that claimant was friendly and cooperative (Exhibit 21F).  He was alert and oriented (Exhibit 21F).  His affect was euthymic during the interview, but his speech was slow and poorly articulated (Exhibit 21F).  Dr. Allen assessed claimant was in the borderline range of intellect based on the vocabulary used during the session (Exhibit 21F).  Claimant had trouble performing numerical operations, but he was able to manipulate objects held in working memory (Exhibit 21F).  Claimant did not show difficulty with following directions, but his mentation was slow (Exhibit 21F).  Claimant had fair insight (Exhibit 21F).  Dr. Allen reported that claimant's remote memory was impaired, and he had difficulty recalling information after recent delay (Exhibit 21F).

Testing demonstrated claimant's full-scale IQ score was 72, which was in the borderline range; however, his processing speed was in the average range (Exhibit 21F).  Claimant's word reading

and math computation were in the low range (Exhibit 21F).  The Rey-Osterreith Complex figure indicated that claimant's visual perceptual skills indicated mild impairment in organizing details (Exhibit 21F).

As a result, Dr. Allen opined that claimant was able to understand simple and complex instructions, but he would likely have difficulty carrying out tasks including being punctual without reminders due to memory problems (Exhibit 21F).  Dr. Allen indicated that claimant demonstrated an ability to maintain social relationships but experienced a decline in socialization (Exhibit 21F).  Dr. Allen reported that claimant's history of seizures and memory impairment would present some deficits during situations that require critical thinking, additional comprehension, and abrupt changes in routine (Exhibit 21F).

In August 2010, claimant's seizure disorder was noted to be stable on Keppra, 500 mg, b.i.d. (Exhibit 25F/2).

In April 2011, claimant was seen at Grady for medication refills and with complaints of a headache (Exhibit 26F/19).  At his April 2011 visit, claimant reported that his last seizure was in December 2010 (Exhibit 26F/35).  Claimant indicated that his headache was intermittent in the right temporal sinus region (Exhibit 26F/19).  His headache began that day and caused photophobia, but not nausea (Exhibit 26F/19).  Claimant's musculoskeletal examination was normal and he was given a Keppra dose in the emergency room because he was out along with a prescription and follow-up appointment with neurology (Exhibit 26F/23).  On May 1, 2011, claimant was again seen at Grady's emergency room for a medication refill (Exhibit 26F/23-25).  Claimant had no other complaints (Exhibit 26F/25).  On May 20, 2011, claimant reported for primary care and indicated that he had a tonic clonic seizure around 1 month prior (Exhibit 26F/31).  Claimant alleged that he lost consciousness for 30 minutes and had a post-ictal phase that resulted in his visiting the emergency room where he received a medication refill (Exhibit 26F/31).  Claimant had run out of medication prior to the seizure (Exhibit 26F/31).  Prior to that seizure from running out of medication, claimant had been seizure free for around 1 year (Exhibit 26F/33).  Claimant was educated on the importance of keeping his appointments so that he did not run out of medication (Exhibit 26F/33).

In July 2012, claimant reported to Southside Medical Center for medication refill (Exhibit 29F/1-3).  Claimant had no psychiatric symptoms, and his memory was noted to be normal (Exhibit 29F/3).  His Keppra was refilled (Exhibit 29F/3).  In October 2012, he returned again and complained of insomnia along with needing his medication refilled (Exhibit 29F/6).  His Keppra was refilled, and he was instructed on sleep hygiene (Exhibit 29F/7).  Claimant was seen again in February 2013and July 2013 (Exhibit 29F).  His Keppra was refilled (Exhibit 29F).

Claimant was seen at Atlanta Medical Center on December 21, 2012 with the complaint of a seizure (Exhibit 33F/14).  Claimant presented by EMS after he was with friends and had a seizure (Exhibit 33F/20).  He was not post-ictal (Exhibit 33F/33).  He was given a loading dose of Keppra and Ativan and discharged home (Exhibit 33F/33-34).  Claimant told EMS that his last seizure was over a month prior (Exhibit 33F/42).

See Next Page

On October 2, 2014, Claimant presented to the emergency room with complaints of headache (Exhibit 30F/15). At that time, he complained of blurry vision during his headache that improved when the headache improved (Exhibit 30F/15). Claimant also indicated that he had nausea and vomiting with the headache (Exhibit 30F/15). Claimant's headache resolved with Motrin (Exhibit 30F/15). This headache was noted to possibly be a migraine (Exhibit 30F/16).

On October 30, 2014, claimant presented to Grady after he left his prescription on the bus (Exhibit 30F/18). Claimant indicated his last seizure was one month prior (Exhibit 30F/18). Claimant was given a new prescription (Exhibit 30F/19).

In July 2015, claimant presented for a new patient visit at Grady's neurology clinic (Exhibit 30F/20). Claimant indicated that he sees white spots in his eyes before he blanks out, starts to shake, and stops responding (Exhibit 30F/20). When he wakes up, he is tired with a headache (Exhibit 30F/20). Claimant indicated that his symptoms resolve after 30 minutes (Exhibit 30F/20). Claimant indicated that stress, missing medications, and not eating triggers his seizures (Exhibit 30F/20). Claimant indicated his last seizure was 1 year prior (Exhibit 30F/20). At that appointment, claimant had been out of Keppra for 2 weeks (Exhibit 30F/20). Claimant had no other complaints at that visit (Exhibit 30F/21). Claimant was alert and oriented, had normal attention and fund of knowledge, but poor attention and memory loss (Exhibit 30F/21). Claimant had normal coordination, gait, and station (Exhibit 30F/21-22). Claimant's Keppra was refilled (Exhibit 30F/23).

In September 2015, claimant had a mental status examination done which was within normal limits (Exhibit 32F/8-13).

In February 2016, claimant presented to emergency at Grady for a Keppra refill (Exhibit 34F/4). Claimant had been out of medication for 3 months as a result of lack of funds and transportation (Exhibit 34F/4). Claimant indicated that his last seizure was 4 months prior (Exhibit 34F/4).

On December 2, 2017, claimant was seen in the Grady emergency room as a result of a witnessed seizure and with complaints of shoulder pain (Exhibit 34F/26). Claimant indicated that he had been out of Keppra "for a minute" (Exhibit 34F/36). Claimant had a seizure in the morning and was seen in the afternoon (Exhibit 34F/37). Claimant had shaking of his arms, foamed at the mouth, his eyes rolled back, but did not bite his tongue (Exhibit 34F/37). Claimant indicated that it lasted 5 to 10 minutes, and he was confused afterward with a headache (Exhibit 34F/37). Claimant reported that he had not taken his Keppra in months because he ran out of medication and that his last seizure was "years ago" (Exhibit 34F/37). Claimant had limited range of motion in his left shoulder secondary to pain (Exhibit 34F/38). His X-ray was normal (Exhibit 34F/41). Claimant was given a loading dose of Keppra, and he was given a prescription (Exhibit 34F/41).

In May 2018, claimant was seen as a result of a new diagnosis of HIV (Exhibit 34F/43). Claimant indicated that he did not fill all of his prescriptions, but he did fill his Keppra prescription (Exhibit 34F/43). Claimant underwent genotyping and had a follow-up visit on June 6, 2018 (Exhibit 35F/2). He was started on antiretroviral drugs (Exhibit 35F/4). He was restarted on Keppra (Exhibit 35F/6). On June 8, 2018, claimant denied any history of mental

illness or treatment (Exhibit 35F/8).  His mental status examination reflected normal behavior, slowed speech, dysthymic mood with a mood congruent affect, cognition was grossly intact, insight, judgment, and memory were all fair (Exhibit 35F/12).  Claimant was diagnosed with major depressive disorder (Exhibit 35F/12).  On June 22, 2018, claimant presented with depressed mood and stress due to being homeless and having to go from house to house (Exhibit 35F/14).  His behavior and speech were normal, but his mood was sad with congruent affect (Exhibit 35F/16).  His though process was normal, cognition was intact, and his insight, judgment, and memory were fair (Exhibit 35F/17).

On July 3, 2018, claimant saw Nurse Practitioner Van Liew (Exhibit 35F/18).  She diagnosed claimant with major depressive disorder and major neurocognitive disorder sure to traumatic brain injury sequelae (Exhibit 35F/18).  Claimant reported being depressed and not sleeping, as he is sleeping outside (Exhibit 35F/18). Claimant lacked income and adequate food (Exhibit 35F/19).  Claimant reported that he "always worked but started getting sick last year" and lost his work and apartment (Exhibit 35F/19).  Claimant was unfamiliar with the community resources that were available (Exhibit 35F/19).  Claimant indicated that he had some memory problems, and his concentration was not good (Exhibit 35F/19).  Claimant's mental status examination reflected that claimant had appropriate behavior and normal speech, but his mood was depressed with a blunted affect (Exhibit 35F/21).  Claimant's cognition was grossly intact, and his judgment, insight, and memory were all fair (Exhibit 35F/21).  Claimant was started on sertraline and trazodone (Exhibit 35F/22).

In February 2019, claimant presented to his infectious disease visit and indicated that he thought he had a seizure a few weeks prior (Exhibit 35F/3).  Claimant indicated that he had been taking his medications as directed (Exhibit 35F/3).  As a result, his Keppra dosage was increased to 750 mg, b.i.d. (Exhibit 36F/6).

Claimant saw Nurse Van Liew again on March 25, 2019 (Exhibit 36F/7).  Claimant had not been seen at her office since July 2018 (Exhibit 36F/7).  Claimant denied any current symptoms of depression, but indicated he was not sleeping well (Exhibit 36F/8).  Claimant was continued on sertraline and restarted on trazodone (Exhibit 36F/8).  Claimant was smiling, had poverty of thought, was dressed neatly, and was polite (Exhibit 36F/8).  His mental status examination reflected that his behavior was appropriate, mood was euthymic with normal range affect, and his thought process was concrete (Exhibit 36F/10).  Claimant had impaired cognition, limited insight, fair judgment, and poor memory (Exhibit 36F/10).

On June 24, 2019, claimant presented to Nurse Van Liew tearful as a result of the loss of a friend and relative within a few weeks of each other (Exhibit 39F/6).  Claimant had all of his medications except Keppra which he would be able to get before he left (Exhibit 39F/7).  Claimant presented with appropriate behavior, depressed mood, his affect was increased in intensity, his thought process was goal directed and concrete, his cognition was impaired as a result of his injury, his memory was poor with limited insight and fair judgment (Exhibit 39F/9).

On August 8, 2019 claimant presented to Nurse Van Liew indicating that he was anxious about being homeless, but his depression had lessened since the death of his friend (Exhibit 39F/18).  On August 29, 2019, claimant saw her again (Exhibit 39F/28).  Claimant's mental status

examination reflected his behavior was appropriate, his speech was spontaneous, mood was euthymic, his affect and thought processes were normal, his cognition was impaired and memory poor, but his judgment and insight were fair (Exhibit 39F/28-29). Claimant was continued on his medications (Exhibit 39F/29).

Claimant saw Nurse Van Liew again on February 3, 2020 (Exhibit 39F/48). Claimant had a brighter affect than in previous visits, and he reported no longer being depressed as a result of having stable housing (Exhibit 39F/48). Claimant reported taking Trazodone to sleep as a result of recurrent nightmares and having trouble dealing with the deaths of his mother, aunt, and best friend in rapid succession (Exhibit 39F/49). Claimant was no longer taking sertraline (Exhibit 39F/49). Claimant's mental status examination reflected appropriate behavior, normal speech, anxious mood, mood congruent affect, with goal directed thought, impaired cognition as a result of head trauma, poor memory, and fair judgment and insight (Exhibit 39F/50).

In accordance with the Appeals Council directive, Dr. Michael Lace, a medical expert, appeared at the hearing to offer clarification on the claimant's impairments. His qualifications are in the record, and as he specializes in behavioral medicine, he was questioned primarily regarding the claimant's mental impairments. (Exhibit 45F). It is noted that there is no board certification present in Psychology, this expert has never examined or treated the claimant, and had reviewed the medical evidence in this case prior to the hearing, but testified that he had not discussed the merits of this case with anyone. The claimant's representative had no objections to Dr. Lace serving as a Medical Expert in this case. (Hearing Testimony).

Dr. Lace indicated that the claimant had the following medically determinable mental impairments: major neurocognitive disorder, major depressive disorder, and borderline intellectual functioning. While Dr. Lace acknowledged that a Clinical Nurse Specialist at Grady Memorial Hospital opined marked limitations in three domains (Exhibit 38F/5), he noted that this was inconsistent with the remainder of the claimant's record, which would support mild to moderate limitations (Exhibits 14F, 21F). Dr. Lace noted that throughout the record, the claimant's mental status examinations are variable, and that even in Exhibit 38F the claimant was noted as having good to fair ability in the areas of understanding and memory and his social adjustments, despite marked limitations in the first domain, which displayed internal inconsistency. (Exhibit 38F/3, 5). It was further noted that the claimant's Global Assessment of Functioning score in the record was a 64, indicating no more than moderate limitations due to mental impairments, and that his full-scale IQ was borderline, but that in his professional opinion, no listing had been met or equaled.

Dr. Lace opined that the claimant had the following limitations in the B criteria: moderate limitations in understanding, remembering, and carrying out instructions as well as concentrating, persisting, and keeping pace, and mild limitations in his social interactions and ability to adapt to normal workplace stressors. These are consistent with the findings in the earlier sections of this decision. He further opined that the claimant would be limited at all times to simple, routine work that was not fast-paced, production line type work. Regarding other medical opinions in the record, Dr. Lace indicated that Dr. Robinson (Exhibit 8F) noted there was nothing abnormal aside from slow processing speeds at time. Dr. Lace agreed with this assessment, noting that the claimant should perhaps have daily quotas at most versus supervisors

needing to look over his shoulder.  Additionally, while Dr. Lace reached a different conclusion than Dr. Rush (Exhibit 14F), he stated that later records suggest greater concentration ability than was opined by that expert, even by the Nurse Specialist in Exhibit 38F, despite that document's internal inconsistencies.  Finally, Dr. Lace testified that he saw no variance between his opinion and that of Dr. Allen (Exhibit 21F), opining that the claimant was able to understand simple instructions and reporting there was no evidence in the record of absenteeism or being habitually late.  Dr. Lace noted that the severity he had opined of mild and moderate limitations existed throughout the record.

The claimant's representative had the opportunity to question Dr. Lace regarding the contradictory notations in Exhibit 38F.  Dr. Lace stated that there may have been a misunderstanding of the meaning of mild, moderate, marked, and extreme, but the notations between fair to having no focus at all is not supported by the record so perhaps there was a misunderstanding of the "fair" definition as well.  The representative noted that the claimant had been seen 7 times in 2 years at Grady Memorial Hospital, and that during every mental status examination the claimant was noted to have poor memory and cognition as well as other symptoms.  Dr. Lace said this was his understanding as well, but that poor can mean a lot of things and is not necessarily correlated to the claimant's ability to function in life, and that moderate limitations would cover the cognitive challenges present in the record.  Dr. Lace further noted that there was not much specificity as to the challenges present in the record.  For instance, the claimant is able to eat and go to appointments, so poor is not specifically defined.  The representative pointed out the claimant's homelessness and situational stress, as well as his concentration issues with being punctual.  Dr. Lace stated that he understood the claimant's situation from his review of the record, and that tardiness was possible but there was not enough data in the record to support a finding that it would occur regularly or even a couple of times per month.  Finally, he remarked that in his professional opinion, if a person is able to remember or to set reminders as would be necessary to take medications, then that person should be able to remember to set reminders and alarms for work.  (Hearing Testimony).

After considering the evidence of record, the undersigned finds that the claimant's current medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the objective medical and other evidence for the reasons explained in this decision.  Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.

Considering all of claimant's current impairments, consistent with the physical finding of Drs. Reddy, Robinson, and Saba finding claimant had largely recovered physically and being mindful of claimant's seizure history, claimant has been limited to performing medium work with additional safety limitations including claimant never climb ladders, ropes, or scaffolds, only occasionally balancing as defined in the Dictionary of Occupational Titles and its companion publications, never being exposed to dangerous chemicals, open bodies of water, unprotected heights, or open, moving, mechanical parts and hazardous machinery, and never operating a motorized vehicle.  Given claimant's complaints about fatigue, which would potentially correlate to his seizure medication, but only finds subjective support in the medical evidence, claimant has

been limited to only frequently climbing ramps and stairs. However, given the very good control of claimant's seizure disorder with medication, claimant's residual functional capacity permits him to use a step or step stool to extend his reach as provided. Given the relationship between certain mental health medications, seizure medications, and the possibility of claimant having a seizure as a result of becoming overheated, claimant's residual functional capacity limits him to only occasionally being exposed to extreme heat. Several of claimant's physical allegations are not supported by the record as discussed earlier in this decision (shoulder pain/knee pain).

With respect to the mental residual functional capacity, first and foremost, the residual functional capacity in this case limits claimant's exposure to hazards as detailed in the discussion of physical limitations above. In addressing claimant's abilities to understand, remember, and apply information, claimant has been limited to performing simple, routine tasks that required him to be able to apply common sense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations. This limitation is consistent with Dr. Rush's opinion that claimant would likely have difficulty remembering and following complex instructions, but not simple instructions (Exhibit 14F). This limitation is also consistent with Dr. Allen's opinion that claimant would be able to understand simple and complex instructions (Exhibit 21F). Additionally, these limitations also address Dr. Allen's concerns about deficits that claimant's seizure history and memory impairment providing difficulties in critical thinking, additional comprehension, and abrupt changes in routine (Exhibit 21F). These limitations are also consistent with Dr. Reddy's opinion that, despite his forgetfulness, claimant had a normal ability to understand, remember, and carry out simple instructions (Exhibit 19F/6). Finally, these limitations are consistent with Dr. Reddy's indication that claimant could make simple, work-related decisions (Exhibit 19F/5). This is also consistent with the opinion of Dr. Lace, the medical expert.

With respect specifically to claimant's limitations in the area of concentration, persistence, and pace, although Dr. Rush opined that claimant would have minimal difficulty maintaining concentration and attention to tasks (Exhibit 14F), claimant's residual functional capacity provides for his periods of concentration to be limited to 2-hour increments with the tasks being simple and routine as further defined above. In addressing persistence and pace, along with any limitations that might be coincident as a result of his mild impairment in the ability to adapt or manage himself, the tasks claimant can complete are to require a low level of work pressure defined as work not requiring multitasking, significant independent judgment, sharing of job tasks, or production rate pace. These limitations are consistent with the claimant is not likely to decompensate under stressful conditions (Exhibit 14F). These limitations also address Dr. Allen's concerns related to additional comprehension and abrupt changes in routine by making sure his work environment does not require multitasking or the use of significant independent judgment. These limitations should also address the concerns expressed by Dr. Reddy that claimant was somewhat likely to decompensate or become unable to function under stress (Exhibit 19F/5), which appear to be consistent with the concerns more thoroughly explained by Dr. Allen. Finally, given Dr. Robinson's opinion that claimant should perhaps have daily quotas at most, rather than having supervisors needing to look over his shoulder, undersigned has limited claimant to no production rate work in the residual functional capacity. This is also consistent with the opinion of Dr. Lace.

See Next Page

Given claimant's ability to maintain a circle of friends and relate to others based on his own report, no limitations have been included on interaction with others. This is not inconsistent with Dr. Rush's indication of possible difficulty interacting with coworkers, supervisors, and the public due to irritability and frustration (Exhibit 14F). The lack of limitations is fully consistent with Dr. Allen's indication that claimant demonstrated an ability to maintain social relationships but experienced a decline in socialization (Exhibit 21F). Dr. Rush's indication of the possibility of interaction difficulties appears to be based on claimant's self-report, as opposed to observation, and is also phrased speculatively with the use of the word "may." Dr. Reddy, claimant's primary care provider also indicated that claimant had a normal ability to get along with coworkers, supervisors, and the public (Exhibit 19F/5). Overall, the medical evidence of record reflects that claimant is able to maintain relationships with others and to shop on occasion and attend medical appointments without social interaction issues.

As for the opinion evidence in this case, because Dr. Lace, the nonexamining medical expert called at the most recent hearing, had the opportunity to review the entire record prior to the hearing, is an expert in the area of mental health, and is familiar with the requirements of the Commissioner and this Agency when assessing disability, his opinions, which are consistent with and highly supported by the record as a whole, are given the greatest weight by the undersigned of the psychological opinions in this case. Undersigned explains below, that his opinion does not conflict with the opinion of Dr. Reddy, who treated claimant. His opinion are not inconsistent with the opinions of the other examining or treating providers except Nurse Van Liew. Further, his discussion of Dr. Allen's opinion that claimant would have difficulty being punctual without reminders due to memory problems is persuasive in light of the fully developed record. First, claimant has, despite his challenges with intermittent homelessness, been largely able to control his seizures and take his seizure medication as required. This is true when living with his mother, who provided reminders, and when living on his own. The times when claimant was without medication were largely due to transportation issues or monetary issues. This establishes that claimant does have the ability to remember to do necessary tasks on his own or with whatever reminders he is able to generate on his own. Additionally, since his initial diagnosis with HIV/AIDS, claimant has been able to routinely remember to take his ARV therapy to reduce his viral load to an undetectable level. Failing to take those medications as prescribed would result in changes in those test results which the record reflects are monitored by his infectious disease specialist. Claimant has also managed to navigate two programs to secure housing. It does appear that claimant has, at times, not displayed the best judgment which resulted in him becoming homeless again as he violated the program rules. Claimant has been able to navigate social work services at Grady as well. These data points support Dr. Lace's opinion and undermine the weight of Dr. Allen's opinion. Of course, Dr. Allen did not have the fully developed record available to her when she rendered her opinion. Also worthy of note, claimant has been able to maintain his medical stability at a time when he experienced greater mental health challenges with deaths of 2 family members and a close friend. This also supports Dr. Lace's evaluation of Dr. Allen's opinion.

The opinion of the nonexamining state agency psychological expert Douglas Robbins, Ph.D. is given little weight (Exhibit 11A). Dr. Robbins found that there was insufficient evidence to support the presence of a neurocognitive disorder or depressive related disorder (Exhibit 11A).

This is wholly inconsistent with the medical evidence in the fully developed file.  The opinion of state agency nonexamining physical medical consultant James Lewis, M.D., is given little weight (Exhibit 11A).  Dr. Lewis opined that claimant had no exertional limitations, but could only occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and would need to avoid all exposure to hazards (Exhibit 11A).  A limitation to medium work is more appropriate given claimant's seizure disorder, albeit well-controlled with medication.  Claimant has reported fatigue as well, and Dr. Saba suggested seizure precautions that counsel against claimant performing construction work.  There is no explanation for limiting claimant to occasional climbing of ramps and stairs accompanying Dr. Lewis' opinion.  As explained earlier, the medical evidence supports limiting claimant to frequently climbing ramps and stairs based on his complaints of fatigue that may correlate with medication side effects.  Dr. Lewis' opinion as to hazards has been included, although worded more thoroughly, in the residual functional capacity of this case.

Terry Banks, M.D., a nonexamining state agency medical expert, opined that the claimant had no exertional limitations, and could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, never climb ladders, ropes, or scaffolds, and should avoid all exposure to hazards.  Additionally, it was opined that the claimant had frequent but not constant limitations in both near and far acuity. (Exhibit 17F).  His opinion is given little weight.  The medical evidence in the fully developed record does not support any limitations in stooping, kneeling, crouching, or crawling.  Claimant's limited objective evidence shows no severe physical impairment other than claimant's sequelae from the gunshot wound and seizure disorder.  Those impairments do not appear to impact claimant's ability to perform postural changes according to the medical evidence.  Frequently balancing is also not supported by the medical evidence given the need to continue seizure precautions, despite the good control afforded by his medications.  As a result, limiting claimant to occasionally balancing is better supported.  Dr. Banks' hazard limitations are consistent with the medical evidence and have been more specifically included in the residual functional capacity provided in this case.  His limitation to frequently climbing ramps and stairs has also been included in the residual functional capacity provided for the reasons stated earlier.  While Dr. Banks provided no exertional limitation, a limitation to medium work is more appropriate given claimant's seizure disorder, albeit well-controlled with medication.  Claimant has reported fatigue as well, and Dr. Saba suggested seizure precautions that counsel against claimant performing construction work.  Finally, the fully developed record demonstrates that claimant is able to see well with his glasses and has been able to read and watch TV throughout the time period under consideration without any reported issue.

Arthur Schiff, M.D., a nonexamining state agency medical expert, opined that the claimant was limited to medium work (Exhibit 20F).  Dr. Schiff further opined that claimant could frequently balance, stoop, kneel, crouch, crawl, reach and finger with his left arm, and climb ramps and stairs (Exhibit 20F).  He also found that claimant could never climb ladders, ropes, or scaffolds, and should avoid all exposure to hazards.  His opinion is given partial weight.  Dr. Schiff's limitation in the exertion level of work for claimant is consistent with all of the medical evidence of record as explained above, as is his opinion related to climbing ramps and stairs.  However, his opinion as to balancing frequently is not supported by the medical evidence given the need to continue seizure precautions, despite the good control afforded by his medications.  As a result, limiting claimant to occasionally balancing is better supported.  Dr. Schiff's hazard limitations

are consistent with the medical evidence and have been more specifically included in the residual functional capacity provided in this case. However, his opinion that claimant could only frequently stoop, kneel, crouch, crawl, reach and finger with his left arm are not supported by the fully developed record. Despite the findings of Dr. Saba of a minor hemimotor syndrome, there has been no severe impairment demonstrated. The consultative examination and other medical records continually show no fine motor impairment (also no impairment during the drawing portion of the psychological assessment by Dr. Rush) and 5/5 strength throughout demonstrating a substantial recovery. Further, despite his complaints of shoulder pain, the objective evidence was within normal limits. As a result, and given the lack of discussion as to the postural position changes and demonstration of normal left upper extremity strength, Dr. Schiff's limitations in those regards have not been incorporated into the final residual functional capacity in this case.

Dr. Catherine Blusiewicz, a nonexamining state agency psychological expert, opined that the claimant was moderately limited in the following domains: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and interacting appropriately with the general public. (Exhibit 12F). This results in mild limitations in activities of daily living, moderate limitations in social functioning and maintaining concentration persistence, and pace, and no episodes of decompensation. (Exhibit 13F). Dr. Blusiewicz opined that claimant retained the ability to remember simple instruction, but would have difficulty with detailed instructions and sustained concentration, persistence, and pace, although her would be able to maintain attention for 2-hour segments (Exhibit 12F/3). She further opined that claimant would not be comfortable with public interaction and would perform better in a job with limited demand for social interaction with the public and coworkers (Exhibit 12F/3). Dr. Blusiewicz noted that her opinions related to detailed instructions, concentration, persistence, pace and interaction were "not a substantial limitation" (Exhibit 12F/3). It is difficult to reconcile the limitations she provided in these areas with her statement that they are not substantial given the lack of explanation. A full review of the record, including subsequent records submitted after May 2009, indicates different limitations, with mild restrictions in social interactions and the ability to adapt under stress, as thoroughly discussed above. As a result, this opinion is afforded little weight by the undersigned. As detailed above, the opinion of Dr. Lace is more consistent with fully developed record.

Dr. Allen Carter, a nonexamining state agency psychological expert, opined in May 2010 that the claimant was moderately limited in the following domains: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and responding appropriately to changes in the work setting. (Exhibit 23F). This results in moderate limitations in activities of daily living and maintaining concentration, persistence, and pace, mild limitations in social functioning, and no episodes of decompensation likely

See Next Page

(Exhibit 22F).  Undersigned notes that there has been a change in the "B" criteria since the opinions were provided in this case.

Dr. Carter opined that claimant would have difficulty understanding complex tasks, but he retained the ability to understand simple tasks (Exhibit 23F/3).  He further opined that claimant would have difficulty sustaining concentration for complex tasks but could sustain concentration for simple tasks (Exhibit 23F/3).  Further, he indicated that claimant had a reduced ability to interact with large groups but could interact with supervisors and co-workers (Exhibit 23F/3).  Finally, claimant's ability to adapt to changes in work-like setting were reduced (Exhibit 23F/3).  Dr. Carter indicated that these last two items were "not a substantial loss" (Exhibit 23F/3).  Dr. Carter did not express his limitations in a vocationally relevant manner.  However, his opinion is given partial weight, but less weight than the opinion of Dr. Lace because Dr. Lace's opinion is more consistent with the fully developed record as discussed earlier in this decision.  Dr. Carter's limitations as to concentration and understanding have been incorporated into the residual functional capacity in this case, as claimant has been limited to performing simple, routine tasks as further defined in the residual functional capacity.  Dr. Carter has not explained the basis for his interaction limitations by relating it to the medical evidence, and the medical evidence does not support a limitation in the interactions with others.  Claimant is able to ride and navigate public transit (MARTA) and has maintained a significant group of friends as well as family relationships.  Finally, the medical evidence only indicates that claimant becomes irritated in certain situations.  There is nothing in the record supporting his contention beyond his self-report.

Frank Robinson, M.D., an examining doctor, opined that that claimant should perhaps have daily quotas at most, rather than having supervisors needing to look over his shoulder, undersigned has limited claimant to no production rate work in the residual functional capacity.  Dr. Robinson's opinion has been given partial weight, as it is not expressed in a vocationally relevant manner.

Joseph Saba, M.D., a treating doctor who saw claimant on two occasions, submitted a statement in July of 2009 regarding limitations resulting from the claimant's seizure activity (Exhibit 16F/3).  Dr. Saba provided seizure limitations including limitations on driving, until his seizures were controlled for a minimum of 6 months in compliance with Georgia law, no handling of bombs, explosives, or ammunition, nor working next to dangerous or moving machinery, no working in elevated places or in construction jobs, no activities where the claimant might hurt himself or others if he had a seizure, taking showers rather than baths, and no swimming alone (Exhibit 16F/3).  While the functional limitations appear to be a generalized list of seizure precautions instead of a list generated specifically for the claimant, the undersigned affords these limitations great weight as they are consistent with his seizure activity around that time and before he started medications.  In response, claimant has included the following vocationally relevant limitations, as opposed to the general limitations formulated by Dr. Saba, in the residual functional capacity: claimant can never climb ladders, ropes, or scaffolds, only occasionally balance as defined in the Selected Characteristics of Occupations companion publication to the Dictionary of Occupational Titles, never be exposed to dangerous chemicals, open bodies of water, unprotected heights, or open, moving, mechanical parts and hazardous machinery, and never operate a motorized vehicle.

See Next Page

Dr. David Rush, an examining source, completed a consultative examination of the claimant in April 2009 (Exhibit 14F).  Dr. Rush opined that claimant would have minimal difficulty maintaining concentration and attention to tasks (Exhibit 14F).  He further opined that claimant would likely have difficulty remembering and following complex instructions, but not simple instructions (Exhibit 14F).  Dr. Rush indicated that claimant may have some difficulty interacting with coworkers, supervisors, and the public due to irritability and frustration (Exhibit 14F).  Dr. Rush also averred that claimant would not likely have difficulty adhering to a work schedule and meeting production norms (Exhibit 14F). He further indicated that claimant would not likely decompensate under stressful conditions (Exhibit 14F).  This is largely consistent with the examination of Dr. Robinson that was made around the same time (Exhibit 8F).  Dr. Robinson noted that the claimant had been shot in the head in December 2008 but had been doing find since then with the exception of having some poor memory as well as some slowness in thinking.  With the exception of the interaction limitations, Dr. Rush's opinion is consistent with the overall record and the opinion of the medical expert, Dr. Lace.  Dr. Rush conducted extensive testing of the claimant, which supports his opinion, but his testing and observation do not show interaction limitations.  Dr. Rush appears to rely on claimant's self-report or lay person observation and report in reporting the possibility of interaction limitations occurring.  As a result, his opinion is given partial weight and is given slightly greater weight than the opinion of Dr. Allen because it appears greater testing was completed, but less weight than the opinion of Dr. Reddy who actually treated claimant.

On January 29, 2010, Dr. Reddy, claimant's primary care provider and a treating source, opined that claimant had a normal ability to get along with coworkers, supervisors, and the public, was competent to handle funds, and had normal ability to make simple-work related decisions (Exhibit 19F/5).  Dr. Reddy indicated that claimant was somewhat likely to decompensate or become unable to function under stress (Exhibit 19F/5).  Dr. Reddy indicated that claimant was forgetful, but had normal insight, judgment, and impulse control (Exhibit 19F/6).  Dr. Reddy opined that, on the basis of cognitive data and clinical observation, claimant had a normal ability to understand, remember, and carry out simple instructions (Exhibit 19F/6).  Dr. Reddy explained claimant's most recent mental status examination revealed that claimant had a normal orientation, appearance, and general behavior (Exhibit 19F/7).  Claimant had an abnormal affect and mood as a result of occasional agitation (Exhibit 19F/7).  Dr. Reddy also noted claimant's thought process was abnormal as a result of his slow response to questions (Exhibit 19F/7).  However, Dr. Reddy still noted that claimant was forgetful.  Dr. Reddy did not explain what forgetful meant in his opinion.  He also appears to base his report of occasional agitation on the report of claimant or his mother, but he did not provide additional details.Given Dr. Reddy's treating relationship with claimant and the support provided by the medical evidence in the record, Dr. Reddy's opinion is given greater weight than that of the psychological consultative examiners, Drs. Rush and Allen.  His opinion is given the greatest weight of the psychological opinions, except for the opinion of Dr. Lace, who was privy to the fully developed case.  The residual functional capacity in this case is not inconsistent with the residual functional capacity provided in this case and his opinion is addressed by limiting claimant to simple, routine tasks as defined specifically in the residual functional capacity limiting claimant to a GED reasoning level of 2.

See Next Page

On March 29, 2010, claimant underwent a consultative examination with Dr. Dawn Allen (Exhibit 21F). As a result, Dr. Allen, an examining source, opined that claimant was able to understand simple and complex instructions, but he would likely have difficulty carrying out tasks including being punctual without reminders due to memory problems (Exhibit 21F). Dr. Allen indicated that claimant demonstrated an ability to maintain social relationships but experienced a decline in socialization (Exhibit 21F). Dr. Allen reported that claimant's history of seizures and memory impairment would present some deficits during situations that require critical thinking, additional comprehension, and abrupt changes in routine (Exhibit 21F). Dr. Allen's opinion also reflects substantial medical improvement in claimant's condition from the time of the injury even with claimant's development of seizures while unmedicated following the initial injury. Her evaluation occurred approximately 10-months after claimant developed his seizure disorder and been treated with medication that stabilized the condition. At the time of her evaluation claimant had not needed further treatment by his neurologist. Claimant and his mother did not report ongoing seizure activity to Dr. Allen. Claimant was able to follow directions, and Dr. Allen provided no indication that claimant was not able to persist throughout the evaluation and testing (Exhibit 21F). Claimant had already been able to persist and display adequate attention and concentration in testing with Dr. Rush a year prior (Exhibit 14F). Claimant displayed no apparent cognitive deterioration during this approximately time period, despite the development of seizure activity when off seizure medications. Consequently, claimant had stabilized and displayed stable medical improvement as of Dr. Allen's psychological evaluation. Her opinion that claimant could understand simple and complex tasks is somewhat at odds with the opinion of Dr. Reddy that claimant could make simple work-related decisions and Dr. Rush that claimant would have difficulty remembering and following complex instructions. It is also inconsistent with the opinion of Dr. Lace in this regard. For that reason her opinion is given the least weight of the doctors providing psychological opinions. Her opinion as to the need for reminders and punctuality is speculative. There is nothing in the record that suggests claimant cannot set reminders to ensure he completes tasks. While claimant's mother did remind him and undertake household tasks for him, the evidence and claimant's admissions indicates that he was capable of undertaking them, but perhaps not motivated to do so. As discussed earlier, claimant has been able to live on his own, engage with social work, obtain food and needed documents for his social worker, and manage his medications successfully on his own. Consequently, that portion of her opinion is given little weight. However, her opinion as to the ability to maintain social relationships and as to deficits in situations requiring changes in routine and critical thinking are supported by her report and testing. These opinions are consistent with the evidence of record as well. Undersigned has addressed these opinions by including limitations to simple, routine tasks as defined in the residual functional capacity and limitations to low stress work as defined. Overall, her opinion is given partial weight for the reasons discussed.

As discussed above in the review of Dr. Lace's testimony, Lynn van Liew, an APRN, submitted a statement in April 2020. (Exhibit 38F). This opinion is afforded little weight by the undersigned. Despite this provider treating the claimant starting in 2018 and signing the statement on February 3, 2020, this case is being determined under the prior medical rules, and under those rules, APRNs are not acceptable medical sources, but rather other medical sources. Despite this, Nurse Van Liew opines that claimant has a good ability to interact with a supervisor

and maintain his personal appearance, and rates all other items asked as "fair." She noted claimant had an intermittent depressed mood, but then indicates that the claimant has marked limitations in understanding, remembering, and applying information, moderate difficulties in interaction with peers, and marked limitations in concentration, persistence, pace, and adaptation. This provider also indicates that he has marginal adjustment abilities as well. Such limitations are not supported by the limited medical treatment notes provided her treatment records as detailed earlier in this decision. Further, her opinion is not consistent with the opinions of others who examined and tested claimant, as discussed herein. The opinions of Drs. Reddy, Rush and Allen, and particularly Dr. Lace, are all better supported by their reports, records, or testimony and are more consistent with the overall record. Consequently, her opinions are given the least weight of all those providing psychological opinions, except the state agency consultants.

The claimant's mother, Ms. Stephanie McKellar, submitted function reports and provided hearing testimony. She also provides lay opinions when she is consulted during some of claimant's examinations. The undersigned carefully considered these lay witness statements pursuant to Social Security Ruling 16-3p. The undersigned has given these statements and testimony little weight. Since the witness is not medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or the frequency or intensity of unusual moods or mannerisms, the accuracy of the report is questionable. Additionally, the witness cannot be considered a disinterested third party witness whose report would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges. However, the undersigned notes that the information provided was greatly appreciated.

Of note, there are additional vocational analyses in the record. (Exhibits 3E; 9E). These documents are given little weight by the undersigned, especially when compared to the vocational expert at the hearing, as that expert is the only one who heard testimony and responded to the hypothetical posed by the undersigned.

In sum, the above residual functional capacity assessment is supported by the comprehensive objective evidence of the record, with full consideration of the claimant's subjective complaints and any contradictory opinions in the record.

**10.  The claimant has no past relevant work (20 CFR 416.965).  The claimant has not engaged in substantial gainful activity in the last fifteen (15) years.**

While claimant's statements indicate he had some past work, none of that work was performed at substantial gainful activity levels during the past 15 years. Claimant last had substantial gainful activity levels of work in 2004 when he earned $11,674.11 and in 2005 when he earned $14,920.20. The $42,831.16 reportedly earned by claimant in 2012 was not earned by him and fraud affidavit had been completed and filed with the Internal Revenue Service (Exhibit 11D). Claimant also testified that he did not earn those wages reported in 2012. Claimant did indicate that the earnings in 2014, 2017, and 2020 (although not certain of the total amount) were his (Current Hearing Testimony). Claimant testified that he had not had a full-time job since 2004 through 2005 (Current Hearing Testimony)

See Next Page

**11.  On March 29, 2010, the claimant was a younger individual age 18-49 (20 CFR 416.963).**

The claimant was born on March 14, 1985 and was 25 years of age on March 29, 2010.

**12.  The claimant has limited education (20 CFR 416.964).**

Claimant consistently related that he completed 11th grade and attended 12th grade but did not graduate from high school because he was unable to pass the graduation tests.

**13.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).**

**14.  Since March 29, 2010, considering the claimant's age, education, work experience, and residual functional capacity based on the current impairments, the claimant has been able to perform a significant number of jobs in the national economy (20 CFR 416.960(c) and 416.966).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

Since March 29, 2010, if the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.25.  However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.  To determine the extent of erosion of the unskilled medium occupational base caused by these limitations, the Administrative Law Judge asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity since March 29, 2010.  The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as an industrial cleaner, Dictionary of Occupational Titles # 381.687-018, which is medium work with a Specific Vocational Preparation of 2 and a GED Reasoning Level of 2, and for which there are 160,000 jobs in the national economy; hospital cleaner, Dictionary of Occupational Titles # 323.687-010, which is medium work with a Specific Vocational Preparation of 2 and a GED Reasoning Level of 2, and for which there are 177,000 jobs in the national economy; and dining room attendant, Dictionary of Occupational Titles # 311.677-018,

See Next Page

which is medium work with a Specific Vocational Preparation of 2 and a GED Reasoning Level of 2, for which there are 219,000 jobs in the national economy.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. With respect to the items not specifically addressed or broken into component parts, such as the item being climbed, in the Dictionary of Occupational Titles, the vocational expert based his testimony on job analyses, labor market studies, and his experience. Undersigned is satisfied with the vocational expert's explanation in this regard and accepts his testimony. Even if the jobs of industrial cleaner and hospital cleaner which have a climbing component were excluded, undersigned would find that the job of dining room attendant existed in significant numbers in the national economy.

Based on the testimony of the vocational expert, the undersigned concludes that since March 29, 2010, the claimant has been capable of making a successful adjustment to work that existed in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**15.  The claimant's disability ended on March 29, 2010, and the claimant has not become disabled again since that date (20 CFR 416.994(b)(5)(vii)).**

## <u>DECISION</u>

The claimant's disability under section 1614(a)(3)(A) of the Social Security Act ended on March 29, 2010, and the claimant has not become disabled again since that date.


/s/ *Christine Guard*
_____
Christine Guard
Administrative Law Judge

August 31, 2022
_____
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component No. | Description | Received | Dates | Pages |
|---|---|---|---|---|
| HO 1A | Disability Determination Transmittal - PF 12/16/2008 | | 12/23/2008 | 2 |
| HO 2A | Initial Disability Determination by State Agency, Title XVI | | 05/29/2009 | 1 |
| HO 3A | Reconsideration Disability Determination by State Agency, Title XVI | | 05/05/2010 | 1 |
| HO 4A | ALJ Hearing Decision | | 11/12/2010 | 19 |
| HO 5A | AC Order | | 05/18/2011 | 6 |
| HO 6A | Decision of U.S. District Court | | 03/24/2015 | 24 |
| HO 7A | AC Order | | 05/26/2015 | 4 |
| HO 8A | AC Denial | | | 1 |
| HO 9A | ALJ Hearing Decision | | 05/04/2016 | 19 |
| HO 10A | AC Order | | 09/15/2017 | 6 |
| HO 11A | T-16 Disability Determination Explanation-PRTDouglas Robins PhD//PRFC by James Lewis MD | | 03/02/2018 | 9 |
| HO 12A | Initial Disability Determination by State Agency, Title XVI | | 03/02/2018 | 1 |
| HO 13A | ALJ Hearing Decision | | 09/17/2019 | 24 |
| HO 14A | AC Order | | 09/05/2020 | 7 |
| HO 15A | ALJ Hearing Decision | | 04/29/2016 | 19 |
| HO 16A | AC Order | | 09/15/2017 | 6 |

## Jurisdictional Documents/Notices

| Component No. | Description | Received | Dates | Pages |
|---|---|---|---|---|
| HO 1B | Appointment of Representative | | 11/26/2008 | 1 |

HA-L39 (03-2007)

Cornelius Deandre Battle                                      Page 2 of 11

| HO 2B | Notice of Denial - Title XVI | 06/03/2009 | 4 |
| HO 3B | Notice of Reconsideration | 05/05/2010 | 4 |
| HO 4B | I501 Summary | 06/03/2010 | 1 |
| HO 5B | Appointment of Representative | 06/10/2010 | 1 |
| HO 6B | Representative Fee Agreement | 06/10/2010 | 1 |
| HO 7B | Waiver of Right to Representation | 06/21/2010 | 2 |
| HO 8B | Hearing Notice | 08/17/2010 | 24 |
| HO 9B | Notice Of Hearing Reminder | 09/14/2010 | 5 |
| HO 10B | Appointment of Representative | 09/27/2010 | 2 |
| HO 11B | Representative Fee Agreement | 09/28/2010 | 2 |
| HO 12B | Request for Review of Hearing Decision/Order | 12/23/2010 | 2 |
| HO 13B | Request for Hearing Acknowledgement Letter | 05/26/2011 | 7 |
| HO 14B | Hearing Notice | | 18 |
| HO 15B | Acknowledge Notice of Hearing | | 1 |
| HO 16B | Notice Of Hearing Reminder | | 6 |
| HO 17B | Request for Hearing Acknowledgement Letter | 06/17/2015 | 11 |
| HO 18B | Request for Review of Hearing Decision/Order | 06/15/2012 | 2 |
| HO 19B | Transcript of Oral Hearing | 11/10/2012 | 36 |
| HO 20B | Transcript of Oral Hearing | 09/28/2010 | 29 |
| HO 21B | Objection to Video Hearing | 06/22/2015 | 1 |
| HO 22B | Withdrawal/Revocation of Representation | 12/09/2015 | 2 |
| HO 23B | Claimant's Change of Address Notification | 12/21/2015 | 1 |
| HO 24B | Appointment of Representative | 01/12/2016 | 5 |

Cornelius Deandre Battle                                    Page 3 of 11

| | | | |
|---|---|---|---|
| HO 25B | Withdrawal of Laquierra Harris as Attorney of Record | 05/05/2017 | 3 |
| HO 26B | Claimant's Change of Address Notification | 05/21/2018 | 1 |
| HO 27B | Claimant's Change of Address Notification | 11/29/2018 | 2 |
| HO 28B | Hearing Notice | 12/05/2018 | 25 |
| HO 29B | Acknowledge Notice of Hearing | 12/11/2018 | 1 |
| HO 30B | Withdrawal/Revocation of Representation | 02/14/2017 | 1 |
| HO 31B | Appointment of Representative - FLYNN, KATHLEEN - ATTY | 04/05/2019 | 2 |
| HO 32B | Representative Fee Agreement - FLYNN, KATHLEEN - ATTY | 04/10/2019 | 2 |
| HO 33B | SSA-1696 - Claimant's Appointment of a Representative | 04/05/2019 | 2 |
| HO 34B | Fee Agreement for Representation before SSA | 04/05/2019 | 2 |
| HO 35B | Claimant's Change of Address Notification | 08/16/2019 | 2 |
| HO 36B | Claimant's Change of Address Notification | 08/16/2019 | 1 |
| HO 37B | Exceptions to Final Decisions | 10/07/2019 | 7 |
| HO 38B | Claimant's Change of Address Notification | 03/17/2020 | 1 |
| HO 39B | Request for Hearing Acknowledgement Letter | 01/08/2021 | 11 |
| HO 40B | Hearing Notice | 01/12/2021 | 25 |
| HO 41B | T16 Notice of Disapproved Claim | 03/06/2018 | 4 |
| HO 42B | Outgoing ODAR Correspondence | 12/19/2018 | 8 |
| HO 43B | SSA-1696-SUP2 - Representative's Withdrawal of Acceptance of Appointment | 05/05/2017 | 4 |

Cornelius Deandre Battle                                         Page 4 of 11

| HO 44B | Confirmed Phone Hearing | | 04/02/2021 | 1 |
|--------|------------|----|------------|---|
| HO 45B | Hearing Notice | | 05/06/2021 | 25 |
| HO 46B | Hearing Notice | | 06/30/2021 | 6 |
| HO 47B | Waive Advance Notice of Hearing | | 07/27/2021 | 1 |
| HO 48B | SSA-1696 - Claimant's Appointment of a Representative | | 08/12/2021 | 4 |
| HO 49B | Fee Agreement for Representation before SSA | | 08/12/2021 | 1 |
| HO 50B | Representative Correspondence | Subsequent to hearing | 12/03/2021 | 1 |
| HO 51B | Misc Jurisdictional Documents/Notices | Subsequent to hearing | 12/02/2010 | 5 |
| HO 52B | Notice of Award | Subsequent to hearing | 05/23/2012 | 2 |
| HO 53B | Misc Jurisdictional Documents/Notices | Subsequent to hearing | 10/31/2017 | 3 |

## Non-Disability Development

| Component No. | Description | Received | Dates | Pages |
|---------------|-------------|----------|-------|-------|
| HO 1D | Application for Supplemental Security Income Benefits | | 12/22/2008 | 7 |
| HO 2D | Detailed Earnings Query | | | 2 |
| HO 3D | DISCO DIB Insured Status Report | | | 2 |
| HO 4D | Certified Earnings Records | | | 2 |
| HO 5D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | | 8 |
| HO 6D | Certified Earnings Records | | 06/17/2015 | 2 |
| HO 7D | New Hire | | 06/19/2015 | 1 |
| HO 8D | DEQY | | 06/19/2015 | 6 |
| HO 9D | SEQY | | 06/19/2015 | 1 |
| HO 10D | WHAT - Work History Assistant Tool | | 01/08/2016 | 4 |
| HO 11D | Misc Non-Disability Development | Subsequent to hearing | 01/12/2016 | 2 |

Cornelius Deandre Battle                                      Page 5 of 11

| | | | | | |
|---|---|---|---|---|---|
| HO 12D | Detailed Earnings Query | | | 11/04/2017 | 2 |
| HO 13D | Summary Earnings Query | | | 11/04/2017 | 1 |
| HO 14D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | | 11/04/2017 | 1 |
| HO 15D | Certified Earnings Records | | | 11/04/2017 | 1 |
| HO 16D | WHAT | | | 03/17/2021 | 11 |
| HO 17D | Detailed Earnings Query | | | 03/17/2021 | 3 |
| HO 18D | Summary Earnings Query | | | 03/17/2021 | 1 |
| HO 19D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | | 03/17/2021 | 1 |
| HO 20D | Application for Supplemental Security Income Benefits | Subsequent to hearing | | 11/06/2017 | 6 |
| HO 21D | Application for Disability Insurance Benefits | Subsequent to hearing | | 11/17/2017 | 9 |
| HO 22D | Application for Supplemental Security Income Benefits | Subsequent to hearing | | 01/04/2018 | 10 |

### Disability Related Development

| Component No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|
| HO 1E | Disability Report - Adult | | | | 8 |
| HO 2E | Disability Report - Field Office | | R. ROBINSON, INTERVIEWER - DDS | to 12/23/2008 | 3 |
| HO 3E | Vocational Analysis | | AMY LAWRENCE, INTERVIEWER - DDS | to 05/27/2009 | 6 |
| HO 4E | Disability Report - Field Office | | A. CEESAY, INTERVIEWER - DDS | to 06/18/2009 | 3 |
| HO 5E | Disability Report - Appeals | | SOCIAL SECURITY - DDS | to 06/18/2009 | 7 |
| HO 6E | 3rd Party Function Report - Adult | | STEPHANIE MCKELLAR | | 9 |

| HO 7E | Work History Report | BATTLE, CORNELIUS DEANDRE | | 4 |
|---|---|---|---|---|
| HO 8E | Function Report - Adult | BATTLE, CORNELIUS DEANDRE | | 9 |
| HO 9E | Vocational Analysis | ASIA EILETS, INTERVIEWER - DDS | to 05/05/2010 | 6 |
| HO 10E | Disability Report - Field Office | SOCIAL SECURITY - DDS | to 06/14/2010 | 2 |
| HO 11E | Disability Report - Appeals | | | 6 |
| HO 12E | Report of Contact | SOCIAL SECURITY - DDS | to 07/06/2010 | 1 |
| HO 13E | Representative Brief | Kathleen M. Flynn, LLC | to 12/23/2010 | 5 |
| OAO 14E | Representative Brief | Kathleen M. Flynn | to 06/15/2012 | 4 |
| HO 15E | Post Office Returned Mail | | | 7 |
| HO 16E | Unsuccessful Development Attempt to Secure Non-Medical | Clayton County School Systems | 11/02/2015 to 11/02/2015 | 3 |
| HO 17E | Representative Correspondence | | 01/11/2016 to | 1 |
| HO 18E | Education Records - Non Medical | | 01/05/2016 to | 3 |
| HO 19E | Exceptions to ALJ Dec 04/29/16 | KATHLEEN FLYNN | to 05/26/2016 | 13 |
| HO 20E | Representative Brief | Kathleen Flynn | to 04/02/2019 | 2 |
| HO 21E | Resume of Vocational Expert | | | 5 |

Cornelius Deandre Battle                                        Page 7 of 11

| HO 22E | Medications | | BATTLE, CORNELIUS DEANDRE | to 01/01/2019 | 2 |
|---|---|---|---|---|---|
| HO 23E | Representative Brief | | FLYNN, KATHLEEN M. | to 04/08/2019 | 2 |
| HO 24E | Post Office Returned Mail | | | to 10/09/2019 | 27 |
| HO 25E | Representative Correspondence - Claimant's Current Telephone Number | | Kathleen Flynn | to 01/22/2021 | 1 |
| HO 26E | Five Day Letter | | Kathleen Flynn | to 03/15/2021 | 3 |
| HO 27E | Five Day Letter | | Katlheen Flynn | to 03/16/2021 | 3 |
| HO 28E | Exhibit List to Rep PH2E | | | | 5 |
| HO 29E | Resume of Vocational Expert | | Alison C. Crews | to 03/29/2021 | 1 |
| HO 30E | Resume of Vocational Expert | | Joyce Galloway Brumbaugh | to 04/16/2021 | 4 |
| HO 31E | Five Day letter | | | to 07/12/2021 | 3 |
| HO 32E | Resume of Vocational Expert | | Matthew L Mcclanahan | 08/09/2021 to | 4 |
| HO 33E | Proffer Correspondence | Subsequent to hearing | Y13 | to 01/11/2022 | 3 |
| HO 34E | Report of Contact | Subsequent to hearing | Y13 | to 01/11/2022 | 1 |

## Medical Records

| Component No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|

Cornelius Deandre Battle                                        Page 8 of 11

| | | | | |
|---|---|---|---|---|
| HO 1F | Medical Evidence of Record | GRADY HOSPITAL | 11/22/2008 to 11/23/2008 | 84 |
| HO 2F | Medical Evidence of Record | GRADY HOSPITAL | 02/04/2008 to 11/23/2008 | 54 |
| HO 3F | Medical Evidence of Record | MEDICAL CENTER OF CENTRAL GEORGIA | 11/21/2008 to 11/24/2008 | 11 |
| HO 4F | Medical Evidence of Record | CLAYTON CO FIRE DEPT/GRADY HOSPITAL | 11/21/2008 to 12/02/2008 | 52 |
| HO 5F | Medical Evidence of Record | STEPHEN ANDREWS | 11/21/2008 to 12/08/2008 | 112 |
| HO 6F | Progress notes w/Assessments | GRADY HOSPITAL | 11/21/2008 to 12/10/2008 | 171 |
| HO 7F | Medical Evidence of Record | GRADY MEMORIAL HOSPITAL | 11/18/2008 to 12/12/2008 | 58 |
| HO 8F | Consultative Examination Report | FRANK ELLIOTT ROBINSON MD | to 04/08/2009 | 7 |
| HO 9F | Medical Evidence of Record | MEDICAL CENTER OF CENTRAL GEORGIA | to 05/02/2009 | 12 |
| HO 10F | Medical Evidence of Record | MED CENTER OF CENTRAL GA | to 05/02/2009 | 3 |
| HO 11F | Emergency Department Records | MED CENTER OF CENTRAL GA | to 05/02/2009 | 45 |
| HO 12F | Mental RFC Assessment | CATHERINE BLUSIEWICZ, PH.D | to 05/27/2009 | 4 |
| HO 13F | Psychiatric Review Technique | CATHERINE BLUSIEWICZ, PH.D | to 05/27/2009 | 14 |

Cornelius Deandre Battle                                    Page 9 of 11

| | | | | |
|---|---|---|---|---|
| HO 14F | Consultative Examination Report | DAVID RUSH PHD | 05/02/2009 to 06/02/2009 | 6 |
| HO 15F | Medical Evidence of Record | RAMESH REDDY MD | to 06/26/2009 | 3 |
| HO 16F | CE Neurology | CENTER NEUROLOGY PC | to 08/19/2009 | 4 |
| HO 17F | Physical RFC Assessment | TERRY W. BANKS, MD, MPH | to 11/21/2009 | 8 |
| HO 18F | Medical Evidence of Record | S FULTON MEDICAL CENTER | to 12/14/2009 | 2 |
| HO 19F | Medical Evidence of Record | DR REDDY | 06/26/2009 to 01/29/2010 | 16 |
| HO 20F | Physical RFC Assessment | ARTHUR SCHIFF, MD | to 03/15/2010 | 8 |
| HO 21F | CE Psychology | DAWN M ALLEN PHD | to 03/29/2010 | 5 |
| HO 22F | Psychiatric Review Technique | ALLEN CARTER, PH.D | to 05/05/2010 | 14 |
| HO 23F | Mental RFC Assessment | ALLEN CARTER, PH.D | to 05/05/2010 | 4 |
| HO 24F | Medical Evidence of Record | CLAYTON COUNTY HEALTH DEPARTMENT | to 08/27/2010 | 1 |
| HO 25F | Medical Evidence of Record | SOUTHSIDE MEDICAL CENTER | 08/21/2010 to 08/21/2010 | 3 |
| HO 26F | Medical Evidence of Record | Grady Hospital | 01/01/2008 to 09/12/2011 | 48 |
| HO 27F | Memo - Additional Time Requested to Submit MER | Subsequent to hearing | to 12/08/2011 | 1 |

HA-L39 (03-2007)

| HO 28F | Medical Evidence of Record | Clayton County jail | 05/01/2007 to 12/08/2010 | 20 |
|---|---|---|---|---|
| HO 29F | Hospital Records | SOUTHSIDE MED CENTER | 07/05/2012 to 07/26/2013 | 23 |
| HO 30F | Hospital Records | GRADY MEMORIAL HOSPITAL | 09/12/2011 to 07/22/2015 | 24 |
| HO 31F | Hospital Records | Grady Memorial Hospital | 08/11/2015 to 08/12/2015 | 3 |
| HO 32F | Prison Records | Clayton County Jail | 07/15/2015 to 11/16/2015 | 50 |
| HO 33F | Hospital Records | Wellstar Atlanta Medical Center | 12/14/2009 to 03/06/2016 | 70 |
| HO 34F | Hospital Records | Grady Memorial Hospital | 02/22/2016 to 06/05/2018 | 48 |
| HO 35F | Progress Notes | Grady Memorial Hospital | 06/06/2018 to 12/04/2018 | 48 |
| HO 36F | Medical Evidence of Record | Grady Hospital | 02/26/2019 to 03/25/2019 | 13 |
| HO 37F | Medical Source - No MER Available | Grady Memorial Hospital | 03/25/2019 to 03/17/2020 | 4 |
| HO 38F | Medical Assessment of Ability to do Work-Related Activities (Mental) | Grady Memorial Hospital | to 04/27/2020 | 8 |
| HO 39F | Hospital Records | Grady Memorial Hospital | 04/22/2019 to 06/01/2020 | 59 |
| HO 40F | Hospital Records | Grady Memorial Hospital | 11/21/2008 to 11/18/2020 | 155 |
| HO 41F | Hospital Records | Grady Memorial Hospital | 11/20/2020 to 12/08/2020 | 9 |

Cornelius Deandre Battle                                    Page 11 of 11

| HO 42F | Hospital Records | GRADY MEMORIAL | 12/02/2017 to 01/12/2018 | 16 |
| HO 43F | Hospital Records | GRADY HOSPITAL | 12/04/2018 to 02/26/2019 | 10 |
| HO 44F | Hospital Records | Grady Memorial Hospital | 02/09/2021 to 03/10/2021 | 4 |
| HO 45F | Psychologist Professional Qualifications | Michael Lace, PsyD | | 6 |
| HO 46F | Medical Source - No MER Available | Grady Memorial Hospital | 03/11/2021 to 07/12/2021 | 6 |