**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**SILICON HOLDING B.V.,**

      **Plaintiff,**

**v.**

**BRAND INDUSTRIAL SERVICES, INC.,**
**BRANDSAFWAY, LLC, and**
**INDUSTRIAL SPECIALISTS, LLC**

      **Defendants.**

_____/

**Case No:**

| **DEMAND FOR JURY TRIAL** |
| --- |

## <u>COMPLAINT FOR WILLFUL PATENT INFRINGEMENT</u>

Plaintiff, SILICON Holding B.V. ("Plaintiff" or "SILICON"), by and through undersigned counsel, for its Complaint against Defendants Brand Industrial Services, Inc., ("Brand Industrial"), BrandSafway, LLC ("BrandSafway") and Industrial Specialists, LLC ("Industrial Specialists") (collectively "Defendants"), alleges the following:

## <u>NATURE OF THE ACTION</u>

1.     Plaintiff brings this action alleging patent infringement of four (4) U.S. patents pursuant to the Patent Act, 35 U.S.C. § 101, *et seq.* relating to Defendants' unlawful conduct in connection with the unlawful manufacture, use, offer to sell,

and sale of certain refractory anchor assemblies and related components used in industrial welding operations (the "Accused Product"). The "Patents-in-Suit" are U.S. Patent No. 10,190,314 (the "'314 Patent"), U.S. Patent No. 10,961,712 (the "'712 Patent"), U.S. Patent No. 11,428,007 (the "'007 Patent"), and U.S. Design Patent No. D947,009 (the "'009 Design Patent").

## THE PARTIES

2.    Plaintiff, SILICON Holding B.V. ("Plaintiff" or "SILICON"), is a company organized under the laws of the Netherlands with its headquarters at Monsterseweg 2, 2291 PB Wateringen, in the Netherlands.

3.    SILICON is a metal fabrication company, designing and manufacturing a wide range of specialized heat-resistant products, including ferrules and refractory anchors, for use in the petrochemical, cement, incineration, steel, and power industries.

4.    On information and belief, Defendant Brand Industrial Services, Inc. ("Brand Industrial") is a Delaware corporation with its global headquarters at 600 Galleria Parkway SE, Suite 1100, Atlanta, GA 30339 and a registered address at 180 Cherokee Street NE, Marietta, GA 30060. Exhibit 22.

5.    On information and belief, Defendant BrandSafway, LLC ("Brand Safway") is a Delaware limited liability company with a principal office address at

600 Galleria Parkway SE, Suite 1100, Atlanta, GA 30339 and a registered address at 289 S Culver St, Lawrenceville, GA, 30046-4805. Exhibit 15.

6.    On information and belief, Defendant BrandSafway is a "member" and "manager" of Defendant Industrial Specialists. Exhibit 16; Exhibit 17; Exhibit 18.

7.    On information and belief, up until around 2017, Defendant BrandSafway was known as Brand Energy Solutions, LLC

8.    On information and belief, Defendant Industrial Specialists is a Delaware limited liability company with a principal office address at 600 Galleria Parkway SE, Suite 1100, Atlanta, GA 30339 and a registered address at 106 Colony Park Drive Ste. 800-B, Cumming, GA, 30040-2794. Exhibit 16; *see also* Exhibit 19; Exhibit 20.

9.    On information and belief, Defendant Industrial Specialists also has a physical presence in Texas and in Louisiana.

10.    On information and belief, up until around 2010, Defendant Industrial Specialists was formerly known as Brand Industrial Solutions, LLC.

## JURISDICTION AND VENUE

11.    This action arises under the patent laws of the United States. 35 U.S.C 101 *et seq*. Accordingly, this Court has exclusive subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a) and (b).

12.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims asserted or that may be asserted that are so related to claims within the original jurisdiction of this action that they form part of the same case or controversy under Article III of the United States Constitution.

13.    This Court has *in personam* jurisdiction over Defendant Brand Industrial because Defendant Brand Industrial is registered to do business in this state, has its global headquarters in this District, and has and continues to commit acts of infringement and induces acts of infringement by others in this District, thereby deriving substantial revenue from products and/or services provided to individuals and businesses in this District.

14.    This Court has *in personam* jurisdiction over Defendant BrandSafway because Defendant BrandSafway is registered to do business in this state, has a principal office address in this District, and has and continues to commit acts of infringement and induces acts of infringement by others in this District, thereby deriving substantial revenue from products and/or services provided to individuals and businesses in this District.

15.    This Court has *in personam* jurisdiction over Defendant Industrial Specialists because Defendant Industrial Specialists is registered to do business in this state, has a principal office address in this District, and has and continues to

commit acts of infringement and induces acts of infringement by others in this District, thereby deriving substantial revenue from products and/or services provided to individuals and businesses in this District.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because it is where a substantial part of the events giving rise to the claims occurred, including but not limited to Defendants' acts of infringement. Alternatively, venue is proper in this district under 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this District. Venue is proper under 28 U.S.C § 1400 because each Defendant has committed acts of infringement in this District and has a regular and established place of business in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### *The '314 Patent*

17.     SILICON, as owner of U.S Patent No. 10,190,314 (the "'314 Patent"), holds all title to, interest in, and has standing to sue for infringement—including past infringement of the '314 Patent, entitled "An Anchoring Assembly For Anchoring A Liner Of A Cured Lining Material, A Ferrule Suitable For Use With The Anchoring Assembly, An Anchoring Mounting Assembly Further Comprising A Ferrule Holder And The Use Of The Anchoring Assembly," which issued on January 29, 2019.

18.    A true and correct copy of the '314 Patent is attached hereto as <u>Exhibit 1</u>. SILICON's ownership of the '314 Patent is confirmed via <u>Exhibit 5</u>.

19.    The '314 Patent has three named inventors: (1) Jerome Michael Garot; (2) Danielle Francesca Garot; and (3) Wouter Garot.

20.    The '314 Patent issued from Application No. 14/823,314 filed on August 11, 2015.

21.    The '314 Patent generally relates to an anchoring assembly for anchoring a liner of a cured lining material applied in liquid form to a metal object provided with the anchoring assembly, and more specifically relates to an anchoring assembly for anchoring concrete linings.

22.    The '314 Patent describes certain drawbacks with prior art anchoring assemblies, including that, prior to the '314 Patent's priority date, it was time consuming to mount an anchoring assembly on the metal object, a process that included, *inter alia*, welding the elongated mounting pin to the metal object, and, subsequently, screwing the nut having the spaced anchor fins, on top of the elongated mounting pin, at its second end. An alternate and similarly time consuming method was to hand weld hex metal to the metal object before the lining material was to be applied.

23.    The '314 Patent thus discloses a method of mounting anchoring assemblies to a metal object for anchoring a liner of a cured lining material arranged to be applied in liquid form to the metal object in a faster, less time consuming manner compared to known methods. The '314 Patent further discloses an anchoring assembly which is arranged to be mounted to the metal object in a faster, less time consuming manner compared to known anchoring assemblies.

24.    The Patent Office issued the '314 Patent as shown in Exhibit 1, with eight (8) claims.

25.    Exemplary Independent Claim 1 of the '314 Patent is directed to:

An anchoring assembly comprising an elongated mounting pin and a ferrule provided at a first end of the elongated mounting pin,

wherein the elongated mounting pin is arranged to be mounted by a welding process at the first end to a metal object,

the anchoring assembly further comprising a plurality of spaced anchor fins connected to the elongated mounting pin at a second end and extending radially outwardly relative to the elongated mounting pin,

wherein the ferrule has an enclosed or partially enclosed cylindrical shape that is configured to contain mounting residue within the ferrule during the welding process,

the ferrule comprising a radially outwardly extending place holder part having a protrusion arranged thereon that is removably received within a ferrule holder during the welding process of the elongated mounting pin at the first end to the metal object,

the ferrule holder being removable after concluding the welding process.

26.    Representative portions of an exemplary anchoring assembly are depicted below, showing an elongated mounting pin (17), a ferrule (15), and a plurality of spaced anchor fins (2):



Exhibit 1, Figs. 1, 4.

27.    The '314 Patent is valid and enforceable.

### *The '712 Patent*

28.    SILICON, as owner of U.S Patent No. 10,961,712 (the "'712 Patent"), holds all title to, interest in, and has standing to sue for infringement—including past infringement of the '712 Patent, entitled "An Anchoring Assembly For Anchoring A Liner Of A Cured Lining Material, A Ferrule Suitable For Use With The

Anchoring Assembly, An Anchoring Mounting Assembly Further Comprising A Ferrule Holder And The Use Of The Anchoring Assembly," which issued on March 30, 2021.

29.     The '712 Patent is a continuation of the '314 Patent.

30.     A true and correct copy of the '712 Patent is attached hereto as Exhibit 2. SILICON's ownership of the '712 Patent is confirmed via Exhibit 5.

31.     The '712 Patent has the same three named inventors as the '314 Patent: (1) Jerome Michael Garot; (2) Danielle Francesca Garot; and (3) Wouter Garot.

32.     The '712 Patent issued from Application No. 16/221,869 filed on December 17, 2018.

33.     The '712 Patent generally relates to a portion of an anchoring assembly for anchoring a liner of a cured lining material applied in liquid form to a metal object provided with the anchoring assembly, and more specifically relates to the ferrule used in connection with an anchoring assembly for anchoring concrete linings.

34.     The welding process, which involves fusing two components, *e.g.*, fusing one end of the mounting pin to the metal object, naturally creates a pool of molten metal. The '712 Patent discloses a particularly configured ferrule, and related

anchor assembly, in order to collect and hold any welding residual, as well as provide a stabilizing mechanism for the operator, among other benefits.

35.    The '712 Patent describes certain drawbacks with prior art anchoring assemblies, including that, prior to the '712 Patent's priority date, it was time consuming to mount an anchoring assembly on the metal object, a process that included, *inter alia*, welding the elongated mounting pin to the metal object, and, subsequently, screwing the nut having the spaced anchor fins, on top of the elongated mounting pin, at its second end. An alternate and similarly time consuming method was to hand weld hex metal to the metal object before the lining material was to be applied.

36.    The '712 Patent thus discloses a method of mounting anchoring assemblies to a metal object for anchoring a liner of a cured lining material arranged to be applied in liquid form to the metal object in a faster, less time consuming manner compared to known methods. The '712 Patent further discloses an anchoring assembly which is arranged to be mounted to the metal object in a faster, less time consuming manner compared to known anchoring assemblies.

37.    For example, the '712 Patent's specification describes some of the benefits of the disclosed ferrule:

A ferrule is used to hold the mounting residue, i.e. welding residue, at his place during the mounting process, i.e. stud welding process. The

10

inventors noted that a ferrule comprising a radially outwardly extending place holder part is beneficial as this provides the possibility for holding the ferrule at his place during the mounting process and for removing the ferrule holder after the mounting process. Further, it provides for space at the other side of the anchoring assembly such that it is possible to mount anchoring assemblies in smaller spaces at the metal object.

The inventors noted that in such a case, the ferrule should comprise a radially outwardly extending place holder part arranged to be held by a ferrule holder during mounting of the elongated mounting pin, at the first end, to the metal object. Such a radially outwardly extending place holder has the beneficial effect that the ferrule holder is able to hold the ferrule, and align it with the rest of the anchoring assembly, during the mounting process. The rest of the anchoring assembly, for example the spaced anchor fins, may be held by a chuck such that the complete anchoring assembly is kept in its place during the mounting process.

Exhibit 1, 4:10-20, 4:30-42.

38.     The welding residue described above—which the ferrule of the '712

Patent is designed to hold—is depicted below:

 

<em>See also</em> Exhibit 26.

39.     The Patent Office issued the '712 Patent as shown in Exhibit 2, with

fifteen (15) claims.

40.    Exemplary Independent Claim 1 of the '712 Patent is directed to:

A ferrule configured for containing and/or holding mounting residue during a welding mounting process of an elongated mounting pin, the ferrule comprising:

an annulus having an inner and outer diameter and an arm having a first end that is directly connected to the outer diameter of the annulus and a second end that is spaced apart from both the first end of the arm and the outer diameter of the annulus, the arm having a raised rim extending away from an upper surface of the arm to which a female holder can removably engage for holding the arm, wherein

a first end of the annulus is configured to circumferentially engage and enclose or partially enclose a portion of the elongated mounted pin to contain and/or hold mounting residue during the welding mounting process therein, and

the arm is configured as a place holder part extending radially outwardly away from the outer diameter of the annulus and arranged to removably receive a ferrule holder part connected to the ferrule holder that stabilizes and secures the ferrule during a welding mounting process and is removable therefrom upon concluding the welding mounting process.

41.    Representative portions of an exemplary ferrule are depicted below:



Exhibit 1, Fig. 4.

42.    The '712 Patent is valid and enforceable.

### *The '007 Patent*

43.    SILICON, as owner of U.S Patent No. 11,428,007 (the "'007 Patent"), holds all title to, interest in, and has standing to sue for infringement—including past infringement of the '007 Patent, entitled "Anchoring Assembly For Anchoring A Liner Of A Cured Lining Material, A Ferrule Suitable For Use With The Anchoring Assembly, An Anchoring Mounting Assembly Further Comprising A Ferrule Holder And The Use Of The Anchoring Assembly," which issued on August 30, 2022.

44.    The '007 Patent is a continuation of the '712 Patent, which is itself a continuation of the '314 Patent.

45.    A true and correct copy of the '007 Patent is attached hereto as Exhibit 3. SILICON's ownership of the '007 Patent is confirmed via Exhibit 5.

46.    The '007 Patent has the same three named inventors as the '314 Patent and the '712 Patent: (1) Jerome Michael Garot; (2) Danielle Francesca Garot; and (3) Wouter Garot.

47.    The '007 Patent issued from Application No. 17/185,297 filed on February 25, 2021.

48.    The '007 Patent generally relates to a portion of an anchoring assembly for anchoring a liner of a cured lining material applied in liquid form to a metal object provided with the anchoring assembly, and more specifically relates to the ferrule used in connection with an anchoring assembly for anchoring concrete linings.

49.    The welding process, which involves fusing two components, *e.g.*, fusing one end of the mounting pin to the metal object, often creates unwanted molten steel/metal. The '007 Patent discloses a particularly configured ferrule, and related anchor assembly, in order to collect and hold any welding residual, among other benefits.

50.    The Patent Office issued the '007 Patent as shown in Exhibit 3, with twenty (20) claims.

14

51.     Exemplary Independent Claim 1 of the '007 Patent is directed to:

A ferrule configured for containing and/or holding mounting residue during a welding mounting process of an elongated mounting pin, the ferrule comprising:

an annulus having an inner and outer diameter, the annulus is configured to fit around the elongated mounted pin during the welding mounting process; and

an arm having:

a first end that is directly connected to the outer diameter of the annulus and a second end that is spaced apart from and extends away from both the first end of the arm and the outer diameter of the annulus, and

a raised rim extending away from an upper surface of the arm to which a ferrule holder can removably engage for holding the arm.

52.     The '007 Patent is valid and enforceable.

### *The '009 Design Patent*

53.     SILICON, as owner of U.S Patent No. D947,009 (the "'009 Design Patent"), holds all title to, interest in, and has standing to sue for infringement—including past infringement of the '009 Patent, entitled "Ferrule," which issued on March 29, 2022.

54.     A true and correct copy of the '009 Design Patent is attached hereto as Exhibit 4. SILICON's ownership of the '009 Patent is confirmed via Exhibit 6.

55.     The '009 Design Patent has three named designers: (1) Jerome Michael Garot; (2) Danielle Francesca Garot; and (3) Wouter Garot.

15

56.    The '009 Design Patent is a continuation of the '712 Patent, which it itself a continuation of the '314 Patent.

57.    The '009 Design Patent issued from Application No. 29/743,335 filed on July 21, 2020.

58.    The '009 Design Patent claims "[t]he ornamental design for a ferrule, as shown and described."

59.    The '009 Design Patent includes eight figures. Fig. 2 is represented below:



<u>Exhibit 4</u>, Fig. 2.

60.    The '009 Design Patent is presumed valid and enforceable.

### *SILICON's Refractory Products and Services*

61.    Refractory anchors are critically important to performing high temperature industrial processes.

62.    SILICON specializes in the design, manufacture and installation of stainless steel anchoring products, primarily for use in the petrochemical, cement, steel, power, incineration industries where resistance to extremely high temperatures is a crucial requirement. SILICON also makes welding studs for the shipbuilding industry.

63.    By way of example, SILICON, through its family of affiliated companies, offers certain refractory anchoring systems as well as its Rapid Arc Welding ("RAW") technology for fixing refractory anchors, which SILICON markets to various industries including petrochemical, cement, power, incineration, and steel, to name a few.

64.    RAW is an innovative method of attaching refractory anchors inside high temperature vessels and furnaces. It is recognized industry-wide for its ability to optimize the quality, speed, and safety of the anchor installation process.

65.    RAW has solved many problems that conventional hand and stud welding have had for a long time. RAW is safe, user-friendly, very fast and it delivers welds of high quality. Due to RAW, SILICON has been able to provide its

17

customers with a highly cost-effective alternative to the older, more conventional methods of refractory anchor installation. Exhibit 26.

66.     By way of an example, a standard hand welding repair project that requires 20,000 anchors can be performed by a team of twenty hand welders in approximately eight days. However, with SILICON's RAW technology and a team of just ten RAW operators, SILICON can complete the same project in roughly two days. *See* Exhibit 26.

67.     To support each of these industries, SILICON has developed several series of refractory anchoring systems to support, *e.g.*, brick linings, concrete linings, dual linings, ceramic fiber linings, and metallic fibers. Exhibit 27.

68.     Additionally, SILICON produces proprietary RAW machines and equipment,  and engineers its own ferrules, chucks, ferrule plates and other RAW accessories to facilitate welding for any position and for many applications - in between pipes, on pipes or even in extremely tight spaces. *See* Exhibit 26.

69.     One such application of SILICON's RAW technology is shown below:



Exhibit 28

70.     Over the years, SILICON has invested heavily in research and development relating to its refractory anchor products and services. SILICON was motivated in large part to make these investments based on the benefits offered by the patent system—meaning that SILICON expected to be able to exclude others from practicing the Patents-in-Suit in order to recoup its research and development costs. *See, e.g.*, https://silicon.nu/patents.

71.     SILICON has never licensed any of the Patents-in-Suit to a competitor.

## DEFENDANTS' INFRINGING CONDUCT

### *Defendants' Pre-Suit Knowledge of the Patents-in-Suit*

72.     The Parties are direct competitors in the field of refractory anchors and related welding services.

73.    Additionally, Defendants are sophisticated entities in the sense that one of Defendants' related entities, BrandSafway Services, LLC, holds several U.S. patents and U.S. patent applications.

74.    On information and belief, at least since 2019, Defendants have been aware of SILICON's patent portfolio and monitor SILCION's patent filings and related activity.

75.    For example, on March 27, 2019, Silicon received a letter from a law firm representing the Defendants (the "March 27, 2019 Letter"), Exhibit 12, in which Defendants sought a "non-exclusive, non sublicensable, royalty-free patent license" to the '314 Patent, thereby acknowledging not only their knowledge of the '314 Patent, but also evidencing their knowledge that, absent a license, their conduct constituted infringement.

76.    The Parties exchanged correspondence thereafter, including a second letter from Defendants to Silicon, dated April 30, 2019, Exhibit 13, further evidencing Defendants' attention to Silicon's patents, including the '314 Patent.

77.    At no point did Silicon agree to grant Defendants the license they were seeking.

78.    On information and belief, Defendants continued to monitor SILICON's patent-related activity and were thus aware of following: (1) on or

around March 30, 2021, that the '712 Patent had issued, (2) on or around August 30, 2022, that the '007 Patent issued, and 3) on or around March 29, 2022, that the '009 Design Patent issued.

79.     For example, on September 8, 2022, Defendants sent a letter via FedEx addressed to counsel for SILICON, discussing SILICON's patent activity before the USPTO, and saying: "We'll be monitoring the Silicon [Patent] Application and Silicon's conduct in the marketplace." Exhibit 14, pg. 3.

80.     Accordingly, at least as early as of the aforementioned dates relating to each of the Patents-in-Suit, and as further explained below, Defendants' infringement of the Patents-in-Suit was willful.

### *Defendants' Refractory Anchors and Welding Services*

81.     Among other products and services, Defendants offer certain refractory services and welding solutions, during which Defendants use particular refractory anchors, and also separately offer those anchors for sale.

82.     For example, on its website, https://brandsafway.com/quik-x-refractory-anchoring-system, Exhibit 29, Defendant Brand Industrial advertises its BrandTech™ Precision Welding services (the "Accused Welding Service"):



> Quik-X™ & Quik-X PRO™
> **Refractory Anchoring System**
> Patented Quik-X uses 44% fewer welds, cuts
> installation time by 50%, and is designed for air
> grids and cyclones in FCCUs (fluid catalytic cracking
> units). Use Quik-X PRO when matching dissimilar
> metals and using various stud lengths and alloy
> types. Manufactured in the U.S. for faster delivery.
>
> BrandTech™ Precast Solutions
> Cut intricately detailed foam refractory forms in just
> hours, slashing costly downtime and shortening
> turnaround schedules by as much as 90%.
>
> BrandTech® Precision Welding*
> A computer-driven stud-welding technology,
> BrandTech uses 81% less labor, allowing two
> welders to do the work of 16 with a 0.5% error rate.
>
> BrandTech™ Power Distribution Unit*
> Manage power for multiple pieces of equipment on
> your turnarounds. Reduce cost and improve safety.
>
> BrandTech® Precision Layout™
> The first and only laser layout system for refractory
> anchors to reduce layout time by as much as 75%.

*BrandTech Precision Welding and the BrandTech Power Distribution Unit meet all UL (Underwriters Laboratories), CSA (Canadian Standards Association), ABSA (Alberta Boilers Safety Association) and CE (European Union) standards.

Exhibit 30; *see also* Exhibit 37.

83.     Defendant Industrial Specialists also advertises the Accused Welding

Service on *its* website, at https://indspec.com/products-and-services/refractory-

services/, Exhibit 31, and at https://indspec.com/products-and-services/brandtech-

precision-welding-automated-welding-solutions/, Exhibit 32, and in its promotional

materials. *See, e.g.*, Exhibit 30; Exhibit 33; Exhibit 34.

84.     On information and belief, the Accused Welding Service offered on

each of Defendants' respective websites is one and the same and evidences

Defendants' behavior as a single business enterprise for purposes of offering the

Accused Welding Service. Additionally, on information and belief, the Accused

Welding Service was previously offered under the name 'Rapid Fusion Welding,' said name further supporting Defendants' willful copying of SILICON's technology.

85.    Specifically, on information and belief, Defendant Brand Industrial offers the Accused Welding Service through one of three entities. For most U.S. based work, including in this District, Defendant Brand Industrial offers the Accused Welding Service through Defendant Industrial Specialists:



Exhibit 35.

86.    The Accused Welding Service is a "computer-driven stud-welding technology" in which a welding gun is used to weld the elongated mounting pin of a refractory anchor to a desired metal object, as is depicted in the above image.

87.    On information and belief, in providing the Accused Welding Service, Defendants use one or more of the following refractory anchors: (1) Quik-X™; (2)

Alternate Variation Quik-X™; (3) Half Quik-X™; (4) K-Bar; and (5) Quik-X Pro™

(collectively the "Accused Refractory Anchors"):



Exhibit 34, pg. 11.

 

Exhibit 36; *see also* https://brandsafway.com/quik-x-refractory-anchoring-system (Promotional Video) at 1:01 to 1:26.

88.   For example, Defendants' promotional materials refer to the Accused Refractory Anchors being "combined with BrandTech® Precision Welding". *E.g.*, Exhibit 36.

89.   As can be seen from the images above, each Accused Refractory Anchor comprises an elongated mounting pin which is configured to be welded to a metal object. Additionally, extending outwardly from the mounting pin of each Accused Refractory Anchor are at least two spaced apart anchor fins.

90.   In addition to using the Accused Refractory Anchors in combination with the Accused Welding Services, Defendants separately offer to sell the Accused Refractory Anchors, which are subsequently used by Defendants' customers and end-users in a variety of welding techniques applications. *E.g.*, Exhibit 34, pg. 12 (describing various "Anchor Applications"); *id.*, pgs. 13-16.

91.   For example, on or around October 2021, SILICON caused approximately forty units of Accused Refractory Anchors (of the K-Bar variety) to be purchased from Defendant Industrial Specialists and delivered to Atlanta, GA, in this district. Exhibit 11 at Ex. E; *see also id.* at Ex. F (Quik-X variety).

92.   The below images taken from Defendants' Refractory Anchor Catalog appear to show an Accused Refractory Anchor having been welded using a ferrule, and demonstrate Defendants encouraging the use of ferrules:



Exhibit 36; *see also* Exhibit 34, pgs. 12-16 (depicting "typical ferrule design).

93.   On information and belief, in performing the Accused Welding Services, Defendants use ferrules, one for each Accused Refractory Anchor, as demonstrated in Defendants' promotional materials, in order to contain any welding residue.

94.   Specifically, on information and belief, in performing the Accused Welding Services, and for customers who purchase the Accused Refractory Anchors, Defendants use and/or make available to customers a particular kind of ferrule (the "Accused Ferrule"), as shown below:



Exhibit 11 at Ex. D.

95.     Additionally, as shown below, Defendants offer to sell the Accused Ferrule as a stand-alone product. *See* Exhibit 11, ¶¶ 10-22.

   

Exhibit 11 at Ex. D.

96.     On information and belief, Defendants encourage the use of the Accused Ferrules, including whilst performing the Accused Welding Services. *See, e.g.*, Exhibit 11, ¶ 12 (citing *id.* at Ex. A) ("Do you consider using our StudWelding equipment…? this is important so we know if you need ferrules as well.").

97.    As explained below, Defendants' conduct relating to various combinations of each of the Accused Welding Services, the Accused Refractory Anchors, and the Accused Ferrules infringe each of the Patents-in-Suit.

### *Defendants Act as a Single Business Enterprise*

98.    On information and belief, Defendants operate as a single business enterprise for purposes of advertising and selling the Accused Welding Services, the Accused Refractory Anchors, and the Accused Ferrules.

99.    For example, on information and belief, Defendant Brand Industrial is the parent company of Defendant Industrial Specialists and identifies Defendant Industrial Specialists as being "by BrandSafway." *E.g.*, Exhibit 31; Exhibit 32; *see also* Exhibit 27 ("Industrial Specialists, a BrandSafway company").

100.   As another example, a 2021 Texas Franchise Tax Public Information Report for Defendant Industrial Specialists, LLC identifies Defendant BrandSafway as the "parent corporation." Exhibit 21, pg. 9.

101.   As another example, Defendant Industrial Specialists' home page, www.indspec.com, links back to Defendant Brand Industrial's website on several occasions, including with respect to the following links: "Media," "Privacy Policy," "Terms of Use," and "Privacy Policy Shield."

102.   As another example, Defendant Industrial Specialists' home page, www.indspec.com, says "© 2023 Brand Industrial Services, all rights reserved," referring to Defendant Brand Industrial.

103.   As yet another example, each of the icons below, which appear at the bottom of Defendant Industrial Specialists' home page, relating to Facebook and LinkedIn, respectively, redirect users to the respective Facebook or LinkedIn page for Defendant Brand Industrial:



104.   As yet another example, both of the Defendants offer the Accused Welding Services on their respective websites using the same promotional literature. On information and belief, Defendants do not compete for potential customers, but rather funnel potential customers into a single channel for purposes of offering the Accused Welding Services, thus blurring any distinction between them in the eyes of their customers.

105.   As yet another example, all three Defendants list the same "primary office address" on the Georgia Secretary of State website: 600 Galleria Pkwy SE, Suite 1100, Atlanta, GA 30339.

106.   As yet another example, Defendants have overlapping executives working out of their Atlanta, GA headquarters including, for example, Mr. Robert D. Heath, whose April 27, 2023 electronic signature appears on the 2023 Annual Report filed with the Secretary of State for the State of Florida for ***all three Defendants***, in which Mr. Heath confirms that all three Defendants share the same "current principal place of business" and "current mailing address" in Atlanta, GA. *Compare* Exhibit 23, *with* Exhibit 24, *with* Exhibit 25.

107.   As yet another example, SILICON caused the purchase of several items from Defendants, including samples of the Accused Ferrules and the Accused Refractory Anchors. Exhibit 11 at Exs. D-F. The relevant communications involved a Mr. Eduardo Almeida, who used an @brandsafway.com email address (as opposed to other of Defendant Industrial Specialists' employees who use an @indspec.com email address). Exhibit 11, ¶¶ 7-10, 16. Yet, the return address on the packages containing said infringing samples identified "Industrial Specialists" as the sender. *Id*. at Exs. D-F.

108.   In sum, more than just having centralized control and a mutual purpose, the legal distinction between Defendants—as separate legal entities—has been blurred such that treating them separately for purposes of patent infringement would

lead to inequity and injustice and demonstrates an attempt by Defendants to circumvent the Patent Act.

109.   Accordingly, in light of the aforementioned evidence of common ownership, overlapping executives, sharing of employees, and evidence that both Defendants are involved in offering the same accused products and services, SILICON alleges that Defendant Brand Industrial and/or Defendant BrandSafway directs and controls Defendant Industrial Specialists' conduct relating to the Accused Welding Services, Accused Refractory Anchors, and Accused Ferrules, such that Defendants form a joint enterprise or single business enterprise pursuant to *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) and its progeny. *See also Travel Sentry, Inc. v. Tropp*¸ 877 F.3d 1370, 1378 (Fed. Cir. 2017) (citing to *Akamai* and stating that one actor may be liable for direct infringement of a method claim if it directed or controlled another entity to perform certain steps).

110.   In light of Defendants' thinly-veiled attempt to present themselves as separate legal entities relating to their joint conduct, and the resulting blurring of the two entities' legal distinction, it would be an injustice to allow either Defendants to escape liability for the others' conduct as it relates to patent infringement.

### Defendants Infringe the Patents-in-Suit

111.   Defendants have infringed and continue to infringe the claims of the '314 Patent, including at least Claim 1, by making, using, selling, and/or offering to sell the Accused Welding Services, in the United States, without authorization including in combination with the Accused Refractory Anchors and/or the Accused Ferrules. Attached hereto as Exhibit 7 is a claim chart demonstrating how the Accused Welding Services, in combination with the Accused Refractory Anchors and the Accused Ferrules infringe Claim 1of the '314 Patent.

112.   Defendants have infringed and continue to infringe the claims of the '712 Patent, including at least Claim, 1 by making, using, selling, and/or offering to sell the Accused Welding Services, in the United States, without authorization including in combination with the Accused Refractory Anchors and/or the Accused Ferrules. Attached hereto as Exhibit 8 is a claim chart demonstrating how the Accused Ferrules infringe Claim 1of the '712 Patent.

113.   Defendants have infringed and continue to infringe the claims of the '007 Patent, including at least Claim 1 by making, using, selling, and/or offering to sell the Accused Welding Services in the United States, without authorization, including in combination with the Accused Refractory Anchors and/or the Accused

Ferrules. Attached hereto as <u>Exhibit 9</u> is a claim chart demonstrating how the Accused Ferrules infringe Claim 1of the '007 Patent.

114.   Defendants have infringed and continue to infringe the '009 Design Patent by making, using, selling, and/or offering to sell ferrules that infringe the '009 Design Patent. Attached hereto as <u>Exhibit 10</u> is a table demonstrating the striking similarity between the '009 Design Patent and the Accused Ferrules.

115.   By way of example, on or around October 2021, SILICON caused over fifty units of the Accused Ferrules to be purchased from Defendants and shipped to Atlanta, GA, in this District. <u>Exhibit 11 at Ex. D</u>.

116.   On information and belief, SILICON has lost sales and has been otherwise harmed as a result of Defendants' infringement of the Patents-in-Suit.

**<u>COUNT I – WILLFUL DIRECT PATENT INFRINGEMENT –</u>**
**<u>U.S. PATENT NO. 10,190,314</u>**
*All Defendants*
(35 U.S.C. § 271(a))

117.   Plaintiff incorporates and realleges paragraphs 1 through 116 of this Complaint.

118.   Defendants have infringed and continue to directly infringe upon one or more claims of the '314 Patent, either literally or under the Doctrine of Equivalents, by making, using, selling and/or offering to sell the Accused Refractory Anchors in combination with the Accused Ferrules, including as it relates to the

33

Accused Welding Services, within the United States in violation of 35 U.S.C. § 271(a).

119.   On information and belief, Defendant Brand Industrial and Defendant Industrial Specialists offer to sell and actually sell, whereas Defendant BrandSafway is liable for direct infringement by virtue of operating as a single enterprise with Defendant Brand Industrial and Defendant Industrial Specialists.

120.   On information and belief, Defendants have had knowledge of the '314 Patent at least since March 27, 2019, by virtue of Defendants' letter to SILICON seeking a license to practice the '314 Patent, evidencing Defendants' sophistication and its monitoring of SILICON's patent-related activities. Exhibit 12.

121.   Accordingly, Defendants had knowledge and/or were willfully blind with respect to the '314 Patent.

122.   Defendants have willfully infringed and continue to willfully infringe the '314 Patent. Despite their knowledge of the '314 Patent, Defendants have infringed and continue to infringe in complete and reckless disregard of SILICON's patent rights.

123.   Upon information and belief, Defendants have gained revenues by virtue of their infringement of the '314 Patent.

124.   SILICON has sustained damages as a direct and proximate result of Defendants' infringement in an amount to be proven at trial, but not less than a reasonable royalty.

125.   SILICON will suffer, and is suffering, irreparable harm from Defendants' infringement of the '314 Patent.

126.   SILICON has no adequate remedy at law and is entitled to an injunction against Defendants' continuing infringement of the '314 Patent.

127.   Defendants' infringement of the '314 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

**<u>COUNT II – INDIRECT PATENT INFRINGEMENT –</u>**
**<u>U.S. PATENT NO. 10,190,314</u>**
*All Defendants*
(35 U.S.C. § 271(b), (c))

128.   SILICON incorporates and realleges paragraphs 1 through 127 of this Complaint.

129.   Defendants have indirectly infringed and continue to indirectly infringe upon one or more claims of the '314 Patent by actively inducing others to practice the '314 Patent.

130.   For example, Defendants offer to sell and sell the Accused Refractory Anchors in combination with the Accused Ferrules, intending for those components

to then be used as intended by Defendants' customers and end-users to directly infringe the '314 Patent.

131.  As another example, by virtue of the parent/subsidiary relationship described above, Defendant Brand Industrial induces Defendant Industrial Specialists to directly infringe, by encouraging Defendant Industrial Specialists to both offer and perform the Accused Welding Services, as well as encouraging Defendant Industrial Specialists to offer to sell and sell the Accused Refractory Anchors in combination with the Accused Ferrules as described above.

132.  As another example, by virtue of the parent/subsidiary relationship described above, Defendant BrandSafway induces Defendant Industrial Specialists and/or Defendant Brand Industrial to directly infringe, by encouraging those Defendants to both offer and perform the Accused Welding Services, as well as encouraging those Defendants to offer to sell and sell the Accused Refractory Anchors in combination with the Accused Ferrules as described above, knowing that this conduct infringes a valid U.S. patent.

133.  As another example, for all customers (or potential customers) who initially contact one of the Defendants but are subsequently redirected to the other Defendant, as a result of the blurred legal distinction between the Defendants (as discussed above), the Defendant who was initially contacted induces infringement

36

of the '314 Patent by encouraging the other Defendant to offer to sell or sell the Accused Ferrule, in combination with the Accused Refractory Anchors, or to perform the Accused Welding Services using the Accused Ferrules, in combination with the Accused Refractory Anchors, as described above.

134.   On information and belief, Defendants know that their intentional conduct has resulted (and will continue to result) in direct infringement of the '314 Patent by others, including customers and end users.

135.   By advertising, making, using, selling, and offering to sell the Accused Refractory Anchors in combination with the Accused Ferrules to others, Defendants have knowingly and intentionally aided, abetted, and induced others to directly infringe the '314 Patent.

136.   Defendants' pre-suit knowledge of the '314 Patent, as well as their familiarity with SILICON as a competitor, and their knowledge that SILICON's products are protected by the '314 Patent, evidences that Defendants knew that others' conduct (including the other Defendant, customers, and end-users) constituted infringement of a valid patent.

137.   Defendants' infringing activities violates 35 U.S.C. § 271(b), either literally or else under the doctrine of equivalents.

138.   Additionally,   Defendants   conduct   constitutes   contributory infringement of the '314 Patent.

139.   For example, the Accused Refractory Anchors in combination with the Accused Ferrules comprise a material part of the invention of the '314 Patent. Additionally, Defendants know that the Accused Refractory Anchors in combination with the Accused Ferrules are especially made and adapted for use in practicing the '314 Patent. Moreover, the Accused Refractory Anchors in combination with the Accused Ferrules do not have a substantial non-infringing use.

140.   Accordingly, Defendants' offers to sell and its actual sales of the Accused Refractory Anchors in combination with the Accused Ferrules violates 35 U.S.C. § 271(c), either literally or else under the doctrine of equivalents.

141.   SILICON has sustained damages as a direct and proximate result of Defendants' indirect infringement of the '314 Patent in an amount to be proven at trial, but not less than a reasonable royalty.

142.   SILICON will suffer and is suffering irreparable harm from Defendants' continued indirect infringement of the '314 Patent. Moreover, SILICON has no adequate remedy at law and is entitled to an injunction against Defendants' continuing infringement of the '314 Patent.

143.   Defendants' indirect infringement of the '314 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

### COUNT III – WILLFUL DIRECT PATENT INFRINGEMENT – U.S. PATENT NO. 10,961,712
*All Defendants*
(35 U.S.C. § 271(a))

144.   Plaintiff incorporates and realleges paragraphs 1 through 143 of this Complaint.

145.   Defendants have infringed and continue to directly infringe upon one or more claims of the '712 Patent, either literally or under the Doctrine of Equivalents, by making, using, selling and/or offering to sell the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, including as it relates to the Accused Welding Services, within the United States in violation of 35 U.S.C. § 271(a).

146.   On information and belief, Defendant Brand Industrial and Defendant Industrial Specialists offer to sell and actually sell, whereas Defendant BrandSafway is liable for direct infringement by virtue of operating as a single enterprise with Defendant Brand Industrial and Defendant Industrial Specialists.

147.   On information and belief, Defendants have had knowledge of the '712 Patent at least since on or around March 30, 2021, when the '712 Patent issued, by virtue of Defendants' letters to SILICON seeking a license to practice the '314

Patent, evidencing Defendants' sophistication and its on-going monitoring of SILICON's patent-related activities. Exhibit 12; Exhibit 13; Exhibit 14.

148.   Accordingly, Defendants had knowledge and/or were willfully blind with respect to the '712 Patent.

149.   Defendants have willfully infringed and continue to willfully infringe the '712 Patent. Despite their knowledge of the '712 Patent, Defendants have infringed and continue to infringe in complete and reckless disregard of SILICON's patent rights.

150.   Upon information and belief, Defendants have gained revenues by virtue of their infringement of the '712 Patent.

151.   SILICON has sustained damages as a direct and proximate result of Defendants' infringement in an amount to be proven at trial, but not less than a reasonable royalty.

152.   SILICON will suffer, and is suffering, irreparable harm from Defendants' infringement of the '712 Patent.

153.   SILICON has no adequate remedy at law and is entitled to an injunction against Defendants' continuing infringement of the '712 Patent.

154.   Defendants' infringement of the '712 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT IV – INDIRECT PATENT INFRINGEMENT – U.S. PATENT NO. 10,961,712
*All Defendants*
(35 U.S.C. § 271(b), (c))

155.   SILICON incorporates and realleges paragraphs 1 through 154 of this Complaint.

156.   Defendants have indirectly infringed and continue to indirectly infringe upon one or more claims of the '712 Patent by actively inducing others to practice the '712 Patent.

157.   For example, Defendants offer to sell and sell the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, intending for those components to then be used as intended  by Defendants' customers and end-users to directly infringe the '712 Patent.

158.   As another example, by virtue of the parent/subsidiary relationship described above, Defendant Brand Industrial induces Defendant Industrial Specialists to directly infringe, by encouraging Defendant Industrial Specialists to both offer and perform the Accused Welding Service, as well as encouraging Defendant Industrial Specialists to offer to sell and sell the Accused Ferrule, alone or in combination with the Accused Refractory Anchors, as described above.

159.   As another example, by virtue of the parent/subsidiary relationship described above, Defendant BrandSafway induces Defendant Industrial Specialists

and/or Defendant Brand Industrial to directly infringe, by encouraging those Defendants to both offer and perform the Accused Welding Services, as well as encouraging those Defendants to offer to sell and sell the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, as described above, knowing that this conduct infringes a valid U.S. patent.

160.   As another example, for all customers (or potential customers) who initially contact one of the Defendants but are subsequently redirected to the other Defendant, as a result of the blurred legal distinction between the Defendants (as discussed above), the Defendant who was initially contacted induces infringement of the '712 Patent by encouraging the other Defendant to offer to sell or sell the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, or to perform the Accused Welding Services using the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, as described above.

161.   On information and belief, Defendants know that their intentional conduct has resulted (and will continue to result) in direct infringement of the '712 Patent by others, including customers and end users.

162.   By advertising, making, using, selling, and offering to sell the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, to others,

Defendants have knowingly and intentionally aided, abetted, and induced others to directly infringe the '712 Patent.

163.   Defendants' pre-suit knowledge of the '712 Patent, as well as their familiarity with SILICON as a competitor, and their knowledge that SILICON's products are protected by the '712 Patent, evidences that Defendants knew that others' conduct (including the other Defendant, customers, and end-users) constituted infringement of a valid patent.

164.   Defendants' infringing activities violates 35 U.S.C. § 271(b), either literally or else under the doctrine of equivalents.

165.   Additionally, Defendants conduct constitutes contributory infringement of the '712 Patent.

166.   For example, the Accused Ferrules, either alone or in combination with the Accused Refractory Anchors, comprises a material part of at least Claim 1 of the '712 Patent. Additionally, Defendants know that the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, are especially made and adapted for use in practicing the '712 Patent. Moreover, the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, do not have a substantial non-infringing use.

43

167.   Accordingly, Defendants' offers to sell and its actual sales of the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, violates 35 U.S.C. § 271(c), either literally or else under the doctrine of equivalents.

168.   SILICON has sustained damages as a direct and proximate result of Defendants' indirect infringement of the '712 Patent in an amount to be proven at trial, but not less than a reasonable royalty.

169.   SILICON will suffer and is suffering irreparable harm from Defendants' continued indirect infringement of the '712 Patent. Moreover, SILICON has no adequate remedy at law and is entitled to an injunction against Defendants' continuing infringement of the '712 Patent.

170.   Defendants' indirect infringement of the '712 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

### COUNT V – WILLFUL DIRECT PATENT INFRINGEMENT – U.S. PATENT NO. 11,428,007
*All Defendants*
(35 U.S.C. § 271(a))

171.   SILICON incorporates and realleges paragraphs 1 through 170 of this Complaint.

172.   Defendants have infringed and continue to directly infringe upon one or more claims of the '007 Patent, either literally or under the Doctrine of Equivalents, by making, using, selling and/or offering to sell the Accused Ferrules,

alone or in combination with the Accused Refractory Anchors, including as it relates to the Accused Welding Services, within the United States in violation of 35 U.S.C. § 271(a).

173.   On information and belief, Defendant Brand Industrial and Defendant Industrial Specialists offer to sell and actually sell, whereas Defendant BrandSafway is liable for direct infringement by virtue of operating as a single enterprise with Defendant Brand Industrial and Defendant Industrial Specialists.

174.   On information and belief, Defendants have had knowledge of the '007 Patent at least since on or around August 30, 2022, when the '007 Patent issued, by virtue of Defendants' letter to SILICON seeking a license to practice the '314 Patent, evidencing Defendants' sophistication and its on-going monitoring of SILICON's patent-related activities. Exhibit 12; Exhibit 13; Exhibit 14.

175.   Accordingly, Defendants had knowledge and/or were willfully blind with respect to the '007 Patent.

176.   Defendants have willfully infringed and continue to willfully infringe the '007 Patent. Despite their knowledge of the '007 Patent, Defendants have infringed and continue to infringe in complete and reckless disregard of SILICON's patent rights.

177.   Upon information and belief, Defendants have gained revenues by virtue of their infringement of the '007 Patent.

178.   SILICON has sustained damages as a direct and proximate result of Defendants' infringement in an amount to be proven at trial, but not less than a reasonable royalty.

179.   SILICON will suffer, and is suffering, irreparable harm from Defendants' infringement of the '007 Patent.

180.   SILICON has no adequate remedy at law and is entitled to an injunction against Defendants' continuing infringement of the '007 Patent.

181.   Defendants' infringement of the '007 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

### COUNT VI – INDIRECT PATENT INFRINGEMENT – U.S. PATENT NO. 11,428,007
*All Defendants*
(35 U.S.C. § 271(b), (c))

182.   SILICON incorporates and realleges paragraphs 1 through 181 of this Complaint.

183.   Defendants have indirectly infringed and continue to indirectly infringe upon one or more claims of the '007 Patent by actively inducing others to practice the '007 Patent.

184.   For example, Defendants offer to sell and sell the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, intending for those components to then be used as intended  by Defendants' customers and end-users to directly infringe the '007 Patent.

185.   As another example, by virtue of the parent/subsidiary relationship described above, Defendant Brand Industrial induces Defendant Industrial Specialists to directly infringe, by encouraging Defendant Industrial Specialists to both offer and perform the Accused Welding Services, as well as encouraging Defendant Industrial Specialists to offer to sell and sell the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, as described above.

186.   As another example, by virtue of the parent/subsidiary relationship described above, Defendant BrandSafway induces Defendant Industrial Specialists and/or Defendant Brand Industrial to directly infringe, by encouraging those Defendants to both offer and perform the Accused Welding Services, as well as encouraging those Defendants to offer to sell and sell the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, as described above, knowing that this conduct infringes a valid U.S. patent.

187.   As another example, for all customers (or potential customers) who initially contact one of the Defendants but are subsequently redirected to the other

Defendant, as a result of the blurred legal distinction between the Defendants (as discussed above), the Defendant who was initially contacted induces infringement of the '007 Patent by encouraging the other Defendant to offer to sell or sell the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, or to perform the Accused Welding Services using the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, as described above.

188.   On information and belief, Defendants know that their intentional conduct has resulted (and will continue to result) in direct infringement of the '007 Patent by others, including customers and end users.

189.   By advertising, making, using, selling, and offering to sell the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, to others, Defendants have knowingly and intentionally aided, abetted, and induced others to directly infringe the '007 Patent.

190.   Defendants' pre-suit knowledge of the '007 Patent, as well as their familiarity with SILICON as a competitor, and their knowledge that SILICON's products are protected by the '007 Patent, evidences that Defendants knew that others' conduct (including the other Defendant, customers, and end-users) constituted infringement of a valid patent.

191.   Defendants' infringing activities violates 35 U.S.C. § 271(b), either literally or else under the doctrine of equivalents.

192.   Additionally, Defendants conduct constitutes contributory infringement of the '007 Patent.

193.   For example, the Accused Ferrules, either alone or in combination with the Accused Refractory Anchors, comprises a material part of at least Claim 1 of the '007 Patent. Additionally, Defendants know that the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, is especially made and adapted for use in practicing the '007 Patent. Moreover, the Accused Ferrules, alone or in combination with the Accused Refractory Anchors, does not have a substantial non-infringing use.

194.   Accordingly, Defendants' offers to sell and its actual sales of the Accused Ferrule, alone or in combination with the Accused Refractory Anchors, violates 35 U.S.C. § 271(c), either literally or else under the doctrine of equivalents.

195.   SILICON has sustained damages as a direct and proximate result of Defendants' indirect infringement of the '007 Patent in an amount to be proven at trial, but not less than a reasonable royalty.

196.   SILICON will suffer and is suffering irreparable harm from Defendants' continued indirect infringement of the '007 Patent. Moreover,

SILICON has no adequate remedy at law and is entitled to an injunction against Defendants' continuing infringement of the '007 Patent.

197.   Defendants' indirect infringement of the '007 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT VII – WILLFUL DIRECT PATENT INFRINGEMENT – U.S. PATENT NO. D947,009
*All Defendants*
(35 U.S.C. § 271(a))

198.   SILICON incorporates and realleges paragraphs 1 through 197 of this Complaint.

199.   The '009 Design Patent protects SILICION's unique and proprietary design for a ferrule.

200.   Defendants have infringed and continue to directly infringe upon the '009 Design Patent, either literally or under the doctrine of equivalents, by making, using, selling and/or offering to sell the Accused Ferrules, including as it relates to the Accused Welding Services, within the United States in violation of 35 U.S.C. § 271(a).

201.   On information and belief, Defendant Brand Industrial and Defendant Industrial Specialists offer to sell and actually sell, whereas Defendant BrandSafway is liable for direct infringement by virtue of operating as a single enterprise with Defendant Brand Industrial and Defendant Industrial Specialists.

50

202.   On information and belief, Defendants have had knowledge of the '009 Design Patent at least since on or around March 29, 2022, when the '009 Design Patent issued, by virtue of Defendants' letter to SILICON seeking a license to practice the '314 Patent, evidencing Defendants' sophistication and its on-going monitoring of SILICON's patent-related activities. Exhibit 12; Exhibit 13; Exhibit 14.

203.   Accordingly, Defendants had knowledge and/or were willfully blind with respect to the '009 Design Patent.

204.   Defendants have willfully infringed and continue to willfully infringe the '009 Design Patent. Despite their knowledge of the '009 Design Patent, Defendants have infringed and continue to infringe in complete and reckless disregard of SILICON's patent rights.

205.   Upon information and belief, Defendants have gained revenues by virtue of their infringement of the '009 Design Patent.

206.   SILICON has sustained damages as a direct and proximate result of Defendants' infringement in an amount to be proven at trial, but not less than a reasonable royalty.

207.  SILICON will suffer, and is suffering, irreparable harm from Defendants' infringement of the '009 Design Patent.

208.   SILICON has no adequate remedy at law and is entitled to an injunction against Defendants' continuing infringement of the '009 Design Patent.

209.   Defendants' infringement of the '009 Design Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

### COUNT VIII – INDIRECT PATENT INFRINGEMENT – U.S. PATENT NO. D947,009
*All Defendants*
(35 U.S.C. § 271(b), (c))

210.   SILICON incorporates and realleges paragraphs 1 through 209 of this Complaint.

211.   Defendants have indirectly infringed and continue to indirectly infringe upon the '009 Design Patent by actively inducing others, including one another, as well as Defendants' customers and end-users, to practice the '009 Design Patent.

212.   For example, Defendants offer to sell and sell the Accused Ferrules, intending for the Accused Ferrules to then be used as intended  by Defendants' customers and end-users to directly infringe the '009 Design Patent.

213.   As another example, by virtue of the parent/subsidiary relationship described above, Defendant Brand Industrial induces Defendant Industrial Specialists to directly infringe, by encouraging Defendant Industrial Specialists to both offer and perform the Accused Welding Services, wherein the Accused Ferrules are used, as well as encouraging Defendant Industrial Specialists to offer to sell and

sell the Accused Ferrules, as described above, which is then used as intended by the end-user or customer.

214.   As another example, by virtue of the parent/subsidiary relationship described above, Defendant BrandSafway induces Defendant Industrial Specialists and/or Defendant Brand Industrial to directly infringe, by encouraging those Defendants to both offer and perform the Accused Welding Services, wherein the Accused Ferrules are used, as well as encouraging those Defendants to offer to sell and sell the Accused Ferrules as described above, which is then used as intended by the end-user or customer, knowing that this conduct infringes a valid U.S. patent.

215.   As another example, for all customers (or potential customers) who initially contact one of the Defendants but are subsequently redirected to the other Defendant, as a result of the blurred legal distinction between the Defendants (as discussed above), the Defendant who was initially contacted induces infringement of the '009 Design Patent by encouraging the other Defendant to offer to sell or sell the Accused Ferrules, or to perform the Accused Welding Services using the Accused Ferrules, as described above.

216.   On information and belief, Defendants know that their intentional conduct has resulted (and will continue to result) in direct infringement of the '009 Design Patent by others, including customers and end users.

217.   By advertising, making, using, selling, and offering to sell the Accused Ferrules to others, Defendants have knowingly and intentionally aided, abetted, and induced others to directly infringe the '009 Design Patent.

218.   Defendants' pre-suit knowledge of the '009 Design Patent, as well as their familiarity with SILICON as a competitor, and their knowledge that SILICON's ferrules are protected by the '009 Design Patent, evidences that Defendants knew that others' conduct (including the other Defendant, customers, and end-users) constituted infringement of a valid patent.

219.   Defendants' infringing activities violate 35 U.S.C. § 271(b), either literally or else under the doctrine of equivalents.

220.   SILICON has sustained damages as a direct and proximate result of Defendants' indirect infringement of the '009 Design Patent in an amount to be proven at trial, but not less than a reasonable royalty.

221.   SILICON is entitled, pursuant to 35 U.S.C. § 289, to recover Defendants' total profit received from their acts of infringement relating to the '009 Design Patent.

222.   SILICON will suffer and is suffering irreparable harm from Defendants' continued indirect infringement of the '009 Design Patent. Moreover,

SILICON has no adequate remedy at law and is entitled to an injunction against Defendants' continuing infringement of the '009 Design Patent.

223.   Defendants' indirect infringement of the '009 Design Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

1.   Enter a judgment that the Patents-in-Suit are valid and enforceable;

2.   Enter judgment that all Defendants have directly infringed and continue to directly infringe the Patents-in-Suit in violation of 35. U.S.C. §§ 271(a) and 289;

3.   Enter judgment that all Defendants have indirectly infringed and continue to indirectly infringe the Patents-in-Suit in violation of 35. U.S.C. §§ 271(b) and (c);

4.   Enter judgment that all Defendants infringement of each of the Patents-in-Suit was willful;

5.   Enter a permanent injunction pursuant to 35 U.S.C. § 283 enjoining all Defendants, their agents, servants, employees, and attorneys and all those acting in concert or participation with any of the Defendants from making, using, advertising, importing, selling, and/or offering for sale that which infringes the Patents-in-Suit, including, but not limited to, the Accused Welding Services, the Accused Ferrules,

and/or the Accused Refractory Anchors, or colorable imitations thereof, or inducing others to do the same;

6.      Enter an Order impounding and calling for the destruction of any and all Accused Ferrules in the possession of any Defendant, and the molds from which the Accused Ferrules are made;

7.      Enter an Order declaring that Defendants hold in trust, as constructive trustees for the benefit of SILICON, their ill-gotten profits obtained from their distribution of products that infringe the Patents-in-Suit, and requiring Defendants to provide SILICON a full and complete accounting of all amounts due and owing to SILICON as a result of Defendants' infringing activities;

8.      Award to SILICON the full amount of damages sustained, including, but not limited to, any and all damage remedies available pursuant to the patent laws of the United States, 35 U.S.C. §§ 271, *et seq.*, which include but are not limited to provisional rights, lost profits, a reasonable royalty, infringers' profits, prejudgment interest, post judgment interest, and treble damages;

9.      Enter an Order that this is an exceptional case pursuant to 35 U.S.C. § 285;

10.    Enter an Order for Defendants to pay to SILICON both the costs of this action and the reasonable attorneys' fees incurred by it in prosecuting this action; and

11.    Grant to SILICON such other and additional relief as is just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury on all issues raised by the Complaint.

## RESERVATION OF RIGHTS

Plaintiff reserves the right, upon further investigation and discovery, to assert such claims against Defendants and other responsible parties as may be just and appropriate under the circumstances.

Respectfully submitted July 27, 2023.

*/s/ Jamie S. Gilmer*
Jamie S. Gilmer
GA Bar No. 909809
SHUMAKER, LOOP & KENDRICK, LLP
176 Croghan Spur Road
Suite 400
Charleston, SC 29407
Tel: (843) 996-1900
Fax: (843)996-1999
Email: jgilmer@shumaker.com

## **Local Rule 7.1(D) Certification of Compliance**

I hereby certify that the foregoing has been prepared with Times New Roman font, 14 point, one of the font and point selections approved by the Court in L.R. 5.1B, N.D. Ga.

This 27th day of July, 2023.

/s/ Jamie S. Gilmer
Jamie S. Gilmer
GA Bar No. 909809
jgilmer@shumaker.com