## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ASHLEY BUTLER, | **Case No.:** |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| EXPERIAN INFORMATION SOLUTIONS, INC.; and TRANS UNION LLC, | 1. **FCRA, 15 U.S.C. § 1681,** *et seq.* |
| Defendants. | |

Plaintiff Ashley Butler ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.,* against Defendants Experian Information Solutions, Inc. ("Experian") and Trans Union LLC ("Trans Union") (referenced collectively as "Defendants").

## I.    INTRODUCTION

1.    Plaintiff's Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.,* by Defendants. Plaintiff contends Defendants failed to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports. "Consumer reports" under 15 U.S.C. § 1681a(d) include both credit file disclosures obtained directly by

1

Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

2.      Plaintiff's Complaint also alleges that Defendants violated 15 U.S.C. § 1681, *et seq.,* by failing to reasonably investigate Plaintiff's consumer disputes, which each resulted in Defendants' reporting inaccurate information about Plaintiff.

## II.      <u>JURISDICTION AND VENUE</u>

3.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

4.      Venue in the Northern District of Georgia is proper pursuant to 28 U.S.C. § 1391 because Defendants regularly transact business within this District or are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## III.      <u>PARTIES</u>

5.      Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

6.      Plaintiff is a natural person who resides in Atlanta, Georgia, County of Fulton.

7.    Plaintiff is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

8.    Defendant Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f).  On information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Experian's principal place of business is located at 475 Anton Boulevard, Costa Mesa, California 92626.

9.    Defendant Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). On information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661 and can be served through its registered agent Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703.

10.    Defendants regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Defendants

3

regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. §1681a(f) of the FCRA.

11.    During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Georgia and conducted business in the State of Georgia on a routine and systematic basis.

12.    During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

13.    Any violations by Defendants were not in good faith, were knowing, negligent, willful, and/or intentional.

14.    Defendants did not maintain procedures reasonably adapted to avoid any such violations.

## IV.    FACTUAL BACKGROUND

15.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

16.    The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting

4

methods undermine the public confidence, which is essential to the continual functioning of the banking system.

17.    Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

18.    The FCRA is intended to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

19.    Experian, Trans Union, and Equifax, the three major consumer reporting agencies (at times referred to collectively as "CRAs" and individually as a "CRA") in the United States, regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports.

20.    Defendants regularly obtain consumer bankruptcy information to include in consumer reports.

21.    Defendants' consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes

the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

22.     Defendants obtain consumer information from various sources. Some consumer information is sent directly to the CRAs by furnishers, and other information is independently gathered by the CRAs from third party providers, vendors or repositories, like computerized reporting services like PACER and Lexis-Nexis.

23.     Defendants regularly seek out and procure public record information, including consumer bankruptcy filing and discharge information, with the intention of including this bankruptcy information on the consumer reports they sell to third parties such as lenders.

24.     The diligence Defendants exercise in uncovering and recording consumer bankruptcy filings is not replicated in their subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

25.     Defendants' unreasonable policies, procedures and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

26.     Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in their own files.

27.     The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendants) to make lending decisions.

28.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in the consumer's consumer report, which is based on the amount of reported debt, payment history, and dates of delinquencies contained in the Defendants' consumer reports.

29.     The information Defendants include in a consumer report contributes to the consumer's overall creditworthiness and determines his or her FICO Scores.

30.     FICO Scores are calculated using information contained in Defendants' consumer reports.

31. FICO and other third-party algorithms use variables or "attributes" derived from the consumer's consumer report to calculate a "credit score," which is a direct reflection of the consumer's creditworthiness.

32. FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

    a. "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower the consumer's FICO Score will be.

    b. The "amount of debt" a consumer owes has a major impact on his or her credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that the consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact the consumer's credit score.

33.    Lenders also consider a consumer's debt-to-income ratio ("DTI") before deciding to extend credit or approve financing terms.

34.    DTI compares the total amount a consumer owes to the total amount the consumer earns.

35.    A consumer's income, however, is not included in his or her consumer report; only his or her amount of debt is.

36.    The higher the amount of reported debt that the consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for the consumer to obtain credit and favorable credit terms (e.g., higher interest and lower credit limits).

37.    A consumer who has obtained a bankruptcy discharge and has an account reporting with outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account were accurately reporting with a zero-dollar balance.

38.    Defendants are well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding, are discharged.

39.     However, Defendants also know that pre-petition debts are rarely reaffirmed or successfully challenged in an adversary proceeding.

40.     Further, Defendants know that if reaffirmation agreements or adversary proceedings (successful or not) exist, they will be explicitly identified on an individual consumer's bankruptcy docket sheet.

41.     Additionally, information indicating whether a specific debt was reaffirmed or successfully challenged through an adversary proceeding (rather than discharged) can be easily retrieved from the same sources from which Defendants independently obtains consumer bankruptcy case information.

42.     Defendants also receive information about account reaffirmations or other discharge exceptions directly from furnishers of account/tradeline information.

43.     Despite the availability of accurate consumer information, Defendants regularly report inaccurate information about accounts after consumers receive a Discharge Order.

44.     Defendants regularly publish consumer information that conflicts with information: provided by data furnishers to the Defendants, already included in their credit files, contained in public records that they regularly access, or sourced through their independent and voluntary efforts.

45.    Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by § 1681e(b).

46.    Defendants know the information they report about consumers' bankruptcies is often inconsistent with public records, information provided by furnishers, and data contained in Defendants' own files.

47.    Defendants also know that failing to report the effect of a discharge on consumer account tradelines, while reflecting a bankruptcy on a credit report, would reasonably be understood to declare to the world that that the consumer had been in bankruptcy but had not received a discharge of a particular account. This not only inaccurately reflects an outstanding debt, but also would reasonably suggest to a consumer and those reviewing the consumer's credit report that the consumer was guilty of a bad act for which he did not deserve a discharge of a particular debt.[1]

48.    Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendants for their inaccurate credit reporting following a Chapter 7 discharge.

---

[1] Indeed, a bankruptcy discharge is for the "honest but unfortunate debtor," *Grogan v. Garner*, 498 U.S. 279, 287 (1991), and will not be provided to someone who filed bankruptcy in bad faith, failed to report assets, fraudulently transferred assets, engaged in reprehensible pre-bankruptcy conduct such as fraud, defalcation or embezzlement, or caused willful and malicious injury. 11 U.S.C. §§ 727(a), 523(a).

11

49.     Thus, Defendants are on continued notice of their inadequate post-bankruptcy reporting procedures. More specifically, Defendants are on continued notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

*Allegations Specific to Credit Reporting of Plaintiff*

50.     Plaintiff filed a "no asset" Chapter 7 Bankruptcy on or about August 3, 2022, in the United States Bankruptcy Court for the Northern District of Georgia (Case No. 22-56018-bem).

51.     Plaintiff received an Order of Discharge on or about November 21, 2022.

52.     Thereafter, Plaintiff was not personally liable for any of her dischargeable debts. Upon entry of Plaintiff's Discharge Order, all of Plaintiff's dischargeable debts had zero-dollar balances.

53.     Defendants prepared one or more consumer reports concerning Plaintiff after Plaintiff was discharged from Chapter 7 Bankruptcy.

54.     The allegations in this complaint against Defendants are based on the reporting by Defendants in Plaintiff's March 17, 2023 consumer disclosure obtained by Plaintiff.

55.     Defendants obtained notice of Plaintiff's bankruptcy discharge through their routine, independent collection of consumer information from third party vendors such as Lexis-Nexis, as well as from furnishers that provide data regarding the individual tradelines reported by the CRAs in Plaintiff's consumer reports.

56.     In the Public Records section of Plaintiff's consumer reports, Defendants included the bankruptcy case number, court, filing date, and the fact that Plaintiff's bankruptcy had been discharged.

57.     Defendants also reported Plaintiff's credit history in individual "tradelines," including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the dates of the last status update.

58.     Defendants are aware that they are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and/or with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

59.     Defendants should have reported **all** of Plaintiff's dischargeable, pre-petition debt as included in or discharged in Chapter 7 Bankruptcy, and/or with a zero-dollar balance.

60.     Defendants failed to report **all** of Plaintiff's dischargeable, pre-petition debts as included in or discharged in Chapter 7 bankruptcy with a zero-dollar balance.

61.     Defendants inaccurately reported Plaintiff's Upstart Network, Inc. account (the "Upstart Account"), ending with ***4663 and opened in September, 2011, which pre-dated Plaintiff's bankruptcy filing.

62.     The Upstart Account was discharged on or about November 21, 2022. Therefore, the Upstart Account should have been reported as discharged in bankruptcy, and/or with a zero-dollar balance.

63.     However, Defendants inaccurately reported the discharged Upstart Account as having a balance of $2242, instead of a zero-dollar balance.

64.     Defendants did not indicate that the Upstart Account was discharged in bankruptcy, or report the Upstart Account with a zero balance, despite reporting Plaintiff's bankruptcy in the Public Records section of Plaintiff's consumer report and indicating that other pre-bankruptcy accounts were "Discharged/Included in Bankruptcy Chapter 7" and carried zero-dollar balances.

65.     Notably, the other national consumer reporting agency, Equifax, did not inaccurately report the Upstart Account like Defendants.

//

*Plaintiff's Disputes*

66.    On or about March 20, 2023, Plaintiff sent certified letters to Experian and Trans Union disputing their inaccurate reporting of the Upstart Account.

67.    The letters specifically advised that Plaintiff was discharged from bankruptcy in November 2022, and that, consequently, all her debts were discharged, except for her non-dischargeable student loans.

68.    Upon information and belief, Experian and Trans Union received Plaintiff's dispute letters.

69.    On or about April 5, 2023, Trans Union responded to Plaintiff's dispute. Trans Union's dispute response, however, merely verified that Plaintiff's bankruptcy was reporting correctly in the public records section of Plaintiff's consumer report.

70.    Trans Union did not investigate Plaintiff's dispute concerning the Upstart Account, pursuant to its unreasonable procedures, despite possessing independent information that indicated the Upstart Account was discharged.

71.    On or about April 18, 2023, Experian responded to Plaintiff's dispute. Experian's dispute response, however, merely verified that the information it was already reporting was accurate.

72.    Experian and Trans Union each continued to inaccurately report Plaintiff's discharged Upstart Account as having a balance of $2,242.

73.    Experian did not investigate Plaintiff's dispute.

74.    Although Defendants could have verified that the Upstart Account was discharged through the same sources from which they receive consumer bankruptcy information, they neglected to do so.

75.    Rather than perform an investigation based on Plaintiff's dispute based on reasonably available public records and information known by it, Trans Union astoundingly verified its reporting concerning Plaintiff's bankruptcy, while simultaneously failing to note that the Upstart account was discharged by that very bankruptcy.

76.    Defendants' failure to report the Upstart Account accurately after receiving Plaintiff's disputes is particularly egregious because Defendants knew the information they reported was factually inaccurate and conflicted with information contained in their own records.

77.    Defendants inaccurately reported that Plaintiff owed a balance that Plaintiff did not actually owe.

78.    Defendants inaccurately reported the Upstart Account with a balance owed after the Upstart Account was discharged in Chapter 7 Bankruptcy and therefore had a zero-dollar balance.

79.    Defendants failed to indicate that the Upstart Account had a zero-dollar balance and/or was included/discharged in Chapter 7 Bankruptcy.

80.    Defendants' reporting of the Upstart Account is patently false/incorrect and therefore inaccurate.

81.    Defendants' reporting of the Upstart Account is materially misleading and therefore inaccurate.

82.    Plaintiff specifically notified Defendants that her pre-petition debts were discharged, but Defendants rejected this specific notice.

### *Plaintiff's Damages*

83.    Upon information and belief, had Defendants accurately reported the Upstart Account with a zero balance, Plaintiff's credit scores and/or DTI would have been better.

84.    Defendant's reporting of an additional $2,242 of debt which Plaintiff does not actually owe negatively increases DTI since the debt is substantially greater, but the income is unchanged.

17

85.     The false increased debt also negatively impacts the 30% of credit score which is based on the debt owed divided by credit limits, which impacts post-discharge consumers even more than those who have not filed bankruptcy.

86.     The inaccurate reporting by Defendants suggests to creditors that Plaintiff is guilty of a bad act and was not deserving of receiving a discharge of the Upstart Account.

87.     After Plaintiff's bankruptcy discharge, Plaintiff applied for credit with Capital One and Credit One and was approved at less than favorable rates and lower credit limits due to the inaccurate reporting of the Upstart Account by Defendant.

88.     Defendants' inaccurate reporting of the Upstart Account, along with additional information belonging to Plaintiff, was published to multiple creditors by Defendants during the process of Plaintiff's credit applications.

89.     As a direct result of Defendants' inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

90.     Plaintiff sustained actual monetary damages from the expense of the certified mailing of Plaintiff's disputes to Defendants.

91.     As a direct result of Defendant's inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred.

18

92.     Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, humiliation, stress, anger, frustration, shock, embarrassment, reputational harm, violation of privacy, and anxiety.

93.     Defendants' conduct exacerbated Plaintiff's frustration during the already stressful post-bankruptcy period by hindering Plaintiff's ability to rebuild her credit.

## V.     COUNT I
## Violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681e(b), 1681(i)

94.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

95.     The FCRA requires CRAs, like Defendants, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

96.     In this case, Defendants negligently and willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of Plaintiff's credit information after Plaintiff received a Discharge Order.

97.     Defendants independently sought information about Plaintiff's bankruptcy filing and discharge and voluntarily reported it in Plaintiff's consumer reports.

98.     When Defendants procured and published Plaintiff's bankruptcy information, they had an obligation to ensure they followed reasonable procedures to report the bankruptcy discharge and its effect(s) with maximal accuracy.

99.     These obligations are well established by the plain language of the FCRA, promulgated by the Federal Trade Commission, detailed in case law, and evidenced in prior cases involving Defendants from which they are on notice of their unreasonable procedures concerning the reporting of discharged debts.

100.   Defendants knew or should have known that the effect of a Discharge Order in a no asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding.

101.   Defendants knew or should have known of their obligations under the FCRA, especially pertaining to reporting discharged debt with a zero-dollar balance.

102.   Additionally, Defendants possess or could easily obtain substantial written materials that detail CRAs' duties and obligations under the FCRA, including those that apply when a consumer files for Chapter 7 Bankruptcy.

20

103.   Defendants know that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

104.   Yet Defendants inaccurately reported Plaintiff's Upstart Account, which pre-dated Plaintiff's Chapter 7 Bankruptcy, with statuses other than "discharged in bankruptcy" and balances greater than zero.

105.   Despite knowledge of these legal obligations, Defendants willfully and consciously breached their duties under the FCRA. Accordingly, Defendants deprived Plaintiff of her rights under the FCRA.

106.   Defendants had actual knowledge of Plaintiff's bankruptcy and Discharge Order, as evidenced by the information they published in Plaintiff's consumer reports, including the bankruptcy case number, court, date of filing and date of discharge.

107.   Individual furnishers of account information also notified Defendants of Plaintiff's bankruptcy, as evidenced by tradelines in Plaintiff's consumer reports that are labeled "discharged in bankruptcy" with zero-dollar balances.

108.   Yet in this case, Defendants reported the Upstart Account, which pre-dated Plaintiff's bankruptcy, with a balance owed after Plaintiff's discharge (instead of a zero-dollar balance).

109.   Defendants violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information included in Plaintiff's credit file and consumer reports, and by also failing to report accurate information when Defendants knew or should have known the information they were reporting is inaccurate, or otherwise contradicted by information known by Defendants, reported to Defendants, or reasonably available to Defendants.

110.   Even after Plaintiff notified Defendants of the inaccurate information they included in Plaintiff's credit file, Defendants continued to inaccurately report the Upstart Account with an outstanding balance.

111.   Defendants' inaccurate reporting was particularly egregious because they have the ability to independently confirm that the Upstart Account was discharged by reviewing their own records or accessing readily available public records.

112.   In around 2009, Defendants implemented their own automated software "bankruptcy scrub" following the settlement agreement in *White v. Experian Info. Sols.*, Inc., No. SACV 05-1070 DOC (MLGx), (C.D. Cal. 2008).

113.   Defendants' bankruptcy scrub software identifies pre-petition accounts and makes assumptions about which accounts were discharged through the Chapter 7, even when the furnisher does not update the accounts as discharged.

114.   In other words, Defendants' automated bankruptcy scrubs assume Defendants' notice of a Chapter 7 discharge is in fact notice that a consumer's pre-petition accounts may be reporting inaccurately, and Defendants will overide data reported by a furnisher according to Defendants' assumptions and algorithms.

115.   However, Defendants have intentionally chosen to disregard knowingly inaccurate open balances and payment obligations of certain types of pre-bankruptcy accounts in Defendants' software programming of their automated "bankruptcy scrubs" they have been employing for well over a decade.

116.   Defendants also failed to follow reasonable procedures, as 15 U.S.C. § 1681e(b) requires, by failing to verify that the Upstart Account was discharged following Plaintiff's dispute, which information is reasonably available from the same sources Defendants procure consumer bankruptcy information.

117.   Defendants' violations of 15 U.S.C. § 1681e(b) were willful.

118.   Alternatively, Defendants' violations of 15 U.S.C. § 1681e(b) were negligent.

119.   When a consumer disputes the accuracy or completeness of information included in a CRA's credit file, the FCRA requires the agency to either conduct a reasonable reinvestigation into the disputed information **or** delete the disputed

information from the consumer's credit file within thirty (30) days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

120.   When conducting its reinvestigation of disputed information in a consumer report, the consumer reporting agency is required to "review and consider all relevant information submitted by the consumer."

121.   Thus, in addition to violating the FCRA by failing to follow reasonable procedures as 15 U.S.C. § 1681e(b) requires, Defendants also violated the FCRA by failing to perform a reasonable reinvestigation of the disputed Upstart Account even after Plaintiff notified them of the inaccurate information in Plaintiff's credit file.

122.   Defendants Experian and Trans Union's violations of 15 U.S.C. § 1681i include, but are not limited to the following:

(a)   Failing to reasonably reinvestigate the inaccurate information Plaintiff disputed.

(b)   Failing to consider all relevant information while investigating Plaintiff's dispute.

123.   Instead of reasonably reinvestigating Plaintiff's dispute, Defendants did not appropriately respond to Plaintiff's dispute and continued to report the discharged Upstart Account with an outstanding balance after Plaintiff's bankruptcy discharge.

124.   Defendants' inaccurate reporting damaged Plaintiff's creditworthiness.

125.   Plaintiff suffers actual damages, including a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendants inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

126.   Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

127.   Defendants are direct and proximate causes of Plaintiff's damages.

128.   Defendants are substantial factors in Plaintiff's damages.

129.   Defendants' acts, as described above, were done willfully and knowingly; or, alternatively were committed negligently.

130.   Therefore, Defendants are individually liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq.*

## VI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants for the following:

(a)   Declaratory judgment that Defendants violated the FCRA, 15 U.S.C. § 1681e(b) and § 1681i;

(b)   An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

(c)   An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

(d)   An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2);

(e)   An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

(f)   Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## VII.  <u>JURY DEMAND</u>

Plaintiff hereby demands jury trial on all issues so triable.

//

RESPECTFULLY SUBMITTED this 27th day of July 2023.

**CONSUMER ATTORNEYS**
By: */s/Jenna Dakroub*
Jenna Dakroub (SBN: 385021)
260 Peachtree Street NW, Suite 2200
Atlanta, GA 30303
T: (602) 807-1525
F: (718) 715-1750
E: jdakroub@consumerattorneys.com

**CONSUMER ATTORNEYS**
8245 N. 85th Way
Scottsdale, AZ 85258

*Attorneys for Plaintiff*
*Ashley Butler*