**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| LIFE VAC, LLC, | ) | |
| | ) | CIVIL ACTION FILE NO.: |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| vs. | ) | |
| | ) | |
| | ) | |
| PETER HEIMLICH, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW, Plaintiff Life Vac LLC ("LifeVac"), by and through its undersigned counsel, and files this Complaint against Defendant Peter Heimlich, and shows the Court as follows:

## NATURE OF THE ACTION

1.      LifeVac is a company with a single-minded mission: to prevent choking deaths where other anti-choking protocols, like back blows and abdominal thrusts, have failed. Since its establishment in 2013, LifeVac has designed, developed, and sold a high-quality airway clearance device bearing the same name, LifeVac.

2.      Each LifeVac device has two components: a mask to fit over the mouth of the choking victim and a hand-operated, accordion bellows that connects to the mask. A one-way valve in the bellows allows air to travel out of the mask but not

into it, preventing airflow that could push the object deeper into the victim's airway. When the bellows is extended, negative pressure pulls on obstructions, mimicking the effect of a cough that would push air out of the lungs.

3.       In October 2014, Plaintiff listed the first LifeVac device for sale, which became a bestseller on Plaintiff's website, www.lifevac.net, and on third-party e-commerce platforms.

4.       LifeVac is not a replacement for the standard anti-choking protocols of back blows and abdominal thrusts recommended by major medical associations. LifeVac's marketing and training materials make clear that the device should be used only *after* these standardized protocols have failed.

5.       Since the launch of LifeVac, individuals have reported to LifeVac over 1,000 lives saved by the use of the device.

6.       Beginning in 2014, a number of schools and fire departments elected to stock the device as part of their emergency preparedness. It was at this point that LifeVac became the target of what became a years-long campaign to harass, malign, and defame LifeVac and its products by Defendant Peter Heimlich. Heimlich—a blogger who admits he has no scientific or medical training—has repeatedly attempted to make a name for himself as a purported armchair investigative reporter with a focus in the medical field. Peter Heimlich's claim to fame is that he is the son

and critic of Dr. Henry Heimlich—the widely credited inventor of the Heimlich maneuver.

7.      As early as 2016, to bolster his bona fides as a purported medical watchdog, Heimlich called for investigations into the LifeVac device after two Brooklyn public schools purchased the device to have on hand in case of a choking emergency. Despite the continued purchase of LifeVac by fire departments in the area, Heimlich's campaign aimed at the Brooklyn schools caused the schools to suspend new purchases of LifeVac.

8.      Since then, Heimlich's campaign has escalated. While in the beginning, Heimlich's attacks on LifeVac centered around "questions" he raised about the device, which were in fact defamatory statements concealed as questions and intended to stoke unfounded fears in those who might purchase the LifeVac device, his more recent attacks have devolved into increasingly outlandish tactics. These include falsely accusing LifeVac users—users who have no relationship to LifeVac other than having used the device to successfully save their own child's life—as being paid mouthpieces for the company.  Similarly, Heimlich mischaracterized a successful intervention with LifeVac that saved a child when he submitted an adverse effects claim to the FDA about the incident—a complaint that the child's

own mother has called false. Indeed, she claims that the lifesaving effects of the LifeVac device are the only reason that her son is still alive today.

9.     Now when LifeVac introduces the device to a new school, retirement home, or group of emergency responders, Heimlich can be counted on to send emails, often through fake email accounts and other anonymous methods, to potential customers to steer them away from the device. Heimlich's campaign of harassment must stop. Heimlich's efforts to build his personal brand at the expense of LifeVac have crossed the line to an unlawful disruption of LifeVac's business.

## THE PARTIES

10.     Plaintiff LifeVac, LLC, is a New York-based limited liability company with its principal place of business in Nesconset, New York.

11.     Defendant Peter Heimlich is domiciled in Georgia and resides at 3630 River Hollow Run, Peachtree Corners, 30096, Gwinnett County, Georgia. Heimlich blogs on the websites medfraud.info and the-sidebar.com.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum value of $75,000 and is between citizens of different States.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Plaintiff's claims occurred within this judicial district.

14.     This Court has personal jurisdiction over the Defendant because he resides and is domiciled in the state of Georgia.

## FACTUAL ALLEGATIONS

### I.     The LifeVac Device

15.     Choking is the fourth leading cause of accidental death worldwide. At least one child chokes to death every five days in the United States, and thousands more are hospitalized with choking-related injuries. In addition to children, the elderly and people with certain diseases and disabilities are more likely to die from choking. As a frontline treatment for a choking victim, the American Red Cross first recommends five back blows followed by five abdominal thrusts—also known as the Heimlich maneuver.

16.     Although these anti-choking protocols are safe and reliable, they are not 100% effective. The LifeVac device was created as a method of clearing the airway of a choking victim when other anti-choking protocols have failed. The sole mission of LifeVac is to prevent as many choking deaths as possible.

17.    LifeVac was founded by Arthur Lih, who was the former owner of a successful airfreight company. After Mr. Lih sold his freight company, and despite his own financial security, he was moved to create the LifeVac device after hearing the story of a mother who lost her young son after he choked to death on a grape that was lodged in his windpipe. In that case, the Heimlich maneuver had not worked. Mr. Lih wanted to create a device that would act as a backup to traditional anti-choking protocols so that no one would ever have to experience the pain of losing a child or other loved one to choking.

18.    The LifeVac device is made up of two components: a mask to fit over the mouth of the choking victim and an accordion bellows that connects to the mask. A one-way valve in the bellows allows air to travel out of the mask but not into it, preventing airflow that could push the object deeper into the victim's airway.

19.    The LifeVac device was first launched in October 2014. Shortly after launching, LifeVac sold 21 units to the fire department of Jericho, New York. Soon, 10 different fire departments on Long Island, where LifeVac is headquartered, had purchased devices.

20.    The demand for LifeVac was immediately apparent. Individuals and institutions who were responsible for at-risk populations saw in LifeVac an opportunity for additional safeguards against choking, knowing that the protocol of

back blows and abdominal thrusts might fail. Parents and schools with responsibility for children, nursing homes with responsibility for persons with various swallowing disorders, and first responders, such as firefighters, all saw the obvious benefit in having another tool at their disposal to help choking victims in their care.

21.    The LifeVac device is registered with the Food and Drug Administration as a Class II medical device like other portable suction devices.

22.    The FDA categorizes medical devices into three classes – Class I, II, or III. According to the FDA, the classification of medical devices is "based on their risks and the regulatory controls necessary to provide a reasonable assurance of safety and effectiveness." As a general rule, Class I devices pose the lowest risk to patients while Class III devices pose the highest risk.

23.    Approximately 47% of medical devices fall under the Class I category, which presents "minimal potential for harm to the user." Examples of the Class I category include elastic bandages and electric toothbrushes. The vast majority of Class I medical devices are exempt from the regulatory process.

24.    Class II devices pose a moderate risk to patients. Examples of Class II devices, in addition to portable suction devices like LifeVac include contact lenses and pregnancy tests. Class II devices are subject to what are referred to by the FDA

as general and special regulatory controls. Class II devices <u>do not</u> have to go through the separate regulatory process necessary for FDA "approval."

25.     Only a high risk, Class III devices which "support or sustain human life or is of substantial importance in preventing impairment of human health or presents a potential, unreasonable risk of illness or injury" are required to be approved by the FDA before reaching the market. Examples of Class III devices are pacemakers, defibrillators, and implanted prosthetics.

26.     The efficacy of the LifeVac device has been the subject of a number of peer-reviewed articles, including in the *International Journal of Clinical Skills* and *Fronters in Medicine*, the latter of which documented that the device saved the lives of 38 adult patients with oropharyngeal dysphagia, a disorder characterized by difficulty swallowing.

27.     Since the launch of the LifeVac there have been hundreds of stories of individuals saved by the simple, easy to use device. This includes even incidents caught on video, where LifeVac was used by police officers or good Samaritans to rescue children choking when other life-saving interventions failed. Some of the families of individuals saved by LifeVac have become outspoken advocates of the LifeVac device.

28.     For example, there is the story of Bill and Christine Florence of Lowell, Massachusetts. Their daughter Maggie O'Rourke, an ICU nurse, had purchased her parents a LifeVac device as a Christmas present in 2022. It was originally intended as a "gag" gift from Ms. O'Rourke to her parents, gently making fun of her own anxious nature. However, according to the Florences, that "gag" gift saved Mr. Florence's life only a day later when he choked on a piece of leftover turkey. Ms. Florence, herself a nurse practitioner, immediately called 911 and tried the Heimlich maneuver. When the Heimlich maneuver failed to dislodge the piece of turkey, she remembered her daughter's gift. She used the LifeVac device as directed and the turkey was cleared from Mr. Florence's airway. The Florences credit LifeVac with saving Mr. Florence's life when all other options had failed.

29.     The terrifying incident turned the Florences into proud advocates of the LifeVac device. They donated $5,000 worth of LifeVac devices to the public schools of Lowell.

30.     Similarly, in 2019 a Texas woman saved her 5-year-old son from choking on a lollipop with a LifeVac device after the anti-choking protocol of back blows and abdominal thrusts failed to dislodge the candy from her son's throat. She was so moved by the efficacy of the LifeVac device that she wanted to share her experience on Facebook. The post quickly caught fire and went viral within her own

parenting community and beyond. The story of the child's rescue with the LifeVac device prompted a local bank executive to donate LifeVac devices to the public schools of Cleburne, Texas.

31.     The success of the LifeVac device and the many incredible stories of lives saved have also attracted unwanted—and defamatory—attacks by Peter Heimlich who has been using the amazing LifeVac story as a means of drawing attention to himself and his blogs.

## II.     Peter Heimlich's Defamatory, Tortious, and Unlawful Campaign Against LifeVac

32.     Peter Heimlich carries a very famous last name. He is the son of Dr. Henry Heimlich, who developed the anti-choking technique that bears his name. The Heimlich maneuver is a simple, lifesaving protocol that utilizes abdominal thrusts to exert pressure on the diaphragm of a choking victim to dislodge a foreign object from his or her airway. The American Red Cross recommends that in choking emergencies, the Heimlich maneuver should follow an initial attempt to clear a victim's airway with back blows.

33.     Peter Heimlich, despite having no medical or scientific credentials himself, has fashioned himself as an investigative journalist uncovering purported "medical frauds." He runs medfraud.info website and a separate blog called the Sidebar.

34.     In the 2000s, Peter Heimlich gained some notoriety for exposing the more unsavory aspects of his father's career. Peter Heimlich has also questioned whether his father even "invented" the Heimlich maneuver. Indeed, in 2007 he told a reporter that his father never invented anything "but his own mythology."

35.     Peter Heimlich portrayed his father as a crank and a conman, who made unsubstantiated claims as a means to gain celebrity and money. If true, that impulse appears to run in the family.

36.     Regardless of the merit (or not) in Peter Heimlich's criticisms of his father, once there was nothing left to "uncover" in his father's career, Heimlich looked for a new target. He found LifeVac, a life-saving device that just so happened to be an anti-choking intervention, like his father's Heimlich maneuver.

37.     Shortly after the launch of the LifeVac, in late 2015, Heimlich wrote a six-page letter to the FDA to request a "review" of the LifeVac device. Heimlich falsely suggested to the FDA that LifeVac was required to have submitted a premarket notification (also known as a 510(k) submission) when registering the device. As the FDA correctly noted in its response to Heimlich, LifeVac was determined by the FDA to be exempt from the 510(k) process and had appropriately registered as a Class II device. Heimlich intended to publicize his attack on LifeVac by blogging about the FDA's response.

38.    Having failed with the FDA, Heimlich then reached out to fire departments specifically to request information about LifeVac for his "blog" as a self-described, purported "member of the news media." In a December 9, 2015 email, Heimlich asks a local fire department that had purchased LifeVac for "all records associated" with their purchase of LifeVac.

39.    Heimlich continued his unsuccessful blog "reporting" into early 2016. He called for investigations into LifeVac after two Brooklyn public schools purchased the device to have on-hand in case of a choking emergency. Without any evidence to support his claims that the LifeVac device was in any way unsuitable for its intended use, Heimlich wrote to city officials to question whether the device complied with guidelines for medical care or had been properly vetted by school administrators. The obvious aim of Heimlich's efforts was to suggest to schools that LifeVac was unsafe and ineffective, though he lacked any basis of his own to make such claims.

40.    Heimlich's campaign has escalated since 2016. At first, LifeVac and Mr. Lih were willing to consider legitimate concerns, if any, raised by Heimlich, as the safety of choking victims is the company's mission. But throughout the course of Heimlich's crusade against LifeVac, it has become clear that LifeVac has become

a personal obsession for Heimlich, unmoored from any authentic or supported criticisms of the device.

41.     In August 2018, Mr. Lih appeared on a local news segment of Good Morning Texas to discuss choking and the LifeVac device. Immediately after the segment aired, Heimlich submitted a complaint to the television network, prompting the network to request proof from LifeVac that the device was registered with the FDA—clearly evidencing that Heimlich had conveyed false information to the network.

42.     Heimlich has gone on to use even more extreme tactics. He has resorted to the use of misrepresentations and blatant falsehoods to disparage the LifeVac device in the marketplace, preventing entities from beginning or continuing a business relationship with LifeVac.

43.     As described above, in 2019 a mother's Facebook post went viral after she described how the LifeVac device saved her son from choking on a lollipop. Heimlich took the extraordinary step of contacting a local Texas paper to allege that LifeVac had paid the child's mother to falsely claim that the device had saved her son's life, a claim that she vehemently denied. She spread the word about LifeVac simply because she believes in the product and is grateful that her son is still here today.

44.     Whenever Mr. Lih introduces the LifeVac device to a new school, retirement home, or group of emergency responders, Heimlich can be counted on to send emails to potential customers to scare them away from the devices. Since the Texas newspaper reported on Heimlich's baseless accusation of paid testimonials, however, Heimlich has begun to anonymize his attacks on LifeVac. Heimlich's prior and sustained course of conduct, as well as the content of these emails themselves, strongly suggests that Peter Heimlich is the anonymous writer.

45.     In September 2021, a representative of the emergency medical services of Central Dupage Hospital (CDH) in Winfield, Illinois, which is affiliated with Northwestern Medicine, reached out to LifeVac to inquire about purchasing and implementing the devices in their program.

46.     By February 2022, members of the CDHEMS began carrying LifeVac devices. A post on the agency's Facebook page indicated that the LifeVac device had been introduced to CDHEMS by a member of the Wheaton, Illinois Fire Department who had saved his own daughter from using the LifeVac device when she aspirated on peanut butter pretzels. Back blows and abdominal thrusts failed to clear the obstruction.

47.     On March 7, 2022, Dr. Steve Graham, the CDHEMS Medical Director, and Justin Williams, the CDHEMS System Coordinator, received an email bearing

the subject line "Question re: your agency's implementation of controversial 'anti choking' devices". Like with Heimlich's other letters and emails following the publication of a successful LifeVac story, the email to CDHEMS raised several "questions" regarding the safety of the LifeVac device. The email questioned whether a provider using the LifeVac device during an emergency that "results in a poor outcome" would be shielded from liability by the Illinois Good Samartian Act, which limits the tort liability of individuals who may harm another individual in the process of trying to provide medical aid. Heimlich's "questions" were thinly veiled disparagements of the LifeVac device, intended to instill fear in decisionmakers who were considering adopting (or who had adopted) the LifeVac device. Like Heimlich's other requests to LifeVac purchasers, such as fire departments, the email asked "how many of the devices were purchased by CDHEMS, the total cost, and what employee approved the purchase?"

48.     Mr. Williams responded to the anonymous email and informed the sender that CDHEMS "would be more than happy to discuss our processes and reviews." He also asked for the sender's name and contact information.

49.     In response, the anonymous sender—Heimlich—refused to provide his name, simply stating that "several colleagues" were involved with the investigation

of the LifeVac device. On this email, the sender copied Ashley Thoele, the chief of the emergency medical services division at the Illinois Department of Public Health.

50.    That same day, as a result of the email exchange described above, LifeVac devices were ordered to be removed from all CDHEMS vehicles. The next day, March 8, 2023, all CDHEMS departments confirmed that the LifeVac devices had been removed from EMS vehicles.

51.    On February 19, 2022, the county commissioners of Switzerland County, Indiana received an anonymous email, also believed to be from Heimlich, with content similar, and often identical, to the email sent to the CDHEMS representatives. This time, through the use of the email address "Indy EMS <indy.911.ems@gmail.com>" and the "Indy EMS" signoff,  Heimlich appears to have impersonated an actual medical doctor board certified in Emergency Medical Services who operates the domain IndyEMS.com and uses an email different from "Indy EMS <indy.911.ems@gmail.com>".

52.    The anonymous emailer references a March 16, 2021 post on the Facebook page of the Switzerland County Emergency Management Agency that announced the provision of 47 LifeVac devices to certain county entities, including the Switzerland County High School, Switzerland County Middle School, and the Switzerland County YMCA.

53.    The email states that the sender is "concerned that the use of these devices may put lives at risk and create liability risk for users of the devices." Just as in the email to CDHEMS, the email was sent after a social media post announcing the adoption of the LifeVac device and questioned whether users of the device would be shielded from liability by the Indiana Good Samaritan Law.

54.    In addition to these anonymous emails, it appears that Heimlich has submitted a false claim to the FDA's MedWatch program regarding an alleged malfunction of the LifeVac device.

55.    It was reported to LifeVac on June 17, 2022, that a 9-year-old boy had been saved by a LifeVac device after he choked on a lollipop. The boy's mother submitted the following report to LifeVac: "Sucker broke due to the suction of the LifeVac and dislodged it into pieces allowing it to come up and out of his airway. It would not have come out if it hadn't didn't broken as it was too big and too far down in his airway. I tried back thrusts and the Heimlich maneuver multiple times, and nothing worked. He turned blue and started to go limp on me. I ran him to the couch and laid him down as my daughter opened the LifeVac and immediately placed it over his face and began pulling. The device absolutely saved his life. If I hadn't had this device, I don't think my son would be here today. Thank you, guys, so much

again from the bottom of my heart." This report was posted to LifeVac's website on July 12, 2022.

56.    The following day, an anonymous adverse event report was submitted to the FDA's MedWatch program, which is the FDA's medical product safety reporting program for health professionals, patients, and consumers. The report falsely stated that it was submitted by the "Patient," described the type of event as a "Serious Injury," and provided the following misleading and incomplete description of the June 17, 2022 choking event described above: "SUCKER BROKE DUE TO THE SUCTION OF THE LIFEVAC AND DISLODGED IT INTO PIECES" IF THE DEVICE SHATTERED A LOLLIPOP INTO PIECES, THAT COULD POSE THE RISK OF SERIOUS COMPLICATIONS."

57.    The mother of the 9-year-old boy who experienced the choking incident has disclaimed that she or her child—the actual patient—ever submitted an adverse event report to the FDA. The mother has stated that any claims that the LifeVac device caused a serious injury to her son is categorically false.

58.    The anonymity of the adverse effect report prevented LifeVac from verifying that the reporter was Heimlich; however, his attempts to conceal his identity are consistent with an improper pattern of fraudulent representations,

including his knowingly false claim that LifeVac paid a mother to claim that the device had saved her son's life and his appropriation of the "Indy EMS" identity.

59.     On July 28, 2022, the FDA forwarded the adverse effect report to LifeVac. The July 28, 2022 letter requests that LifeVac review the event report to determine whether a formal Medical Device Report is required.

60.     Upon information and belief, Heimlich has continued to disparage LifeVac through other anonymous internet accounts, including, for example, the Twitter (now "X") handle, ACD_Skeptic. "ACD" is a reference to anti-choking device.

61.     For example, on May 5, 2023, ACD_Skeptic falsely claimed that the LifeVac device was implicated in a choking death. ACD_Skeptic wrote, "first wrongful death lawsuit in which a so-called 'anti-choking' device was used," linking to another post and article about a woman who died from choking at an assisted living facility. ACD_Skeptic followed with an immediate tweet in the same thread by saying the "wrongful death lawsuit was filed just weeks after" a media segment featuring LifeVac aired, implying that the media outlet had promoted a dangerous device.

62.     But as the news article about the incident discloses, and contrary to Heimlich's suggestion, LifeVac was in no way implicated in the victim's wrongful

death. Rather, the victim had been left negligently unattended for an hour after suffering a choking episode. Later, long after the victim had already died, a firefighter "had to use a LifeVac, a device that can dislodge items obstructing a person's breathing, several times to remove food from [the victim's] airway."

63.     The wrongful death lawsuit that was filed also did not allege that LifeVac contributed to the victim's death. Instead, the complaint explains that LifeVac was used after first responders arrived on the scene and the victim already had no pulse. Emergency personnel removed "a substantial amount of brown substance and large chunks of food" using the LifeVac device. "The Emergency Personnel continued to use the LifeVac device multiple times; each bringing up large chunks of food each time." ACD_Skeptic even linked to the complaint, demonstrating that ACD_Skeptic knew their statements suggesting that LifeVac contributed to the victim's death were false.

64.     Contrary to ACD_Skeptic's accusation, LifeVac was used successfully to dislodge food, and was in no way involved in the victim's wrongful death. To Heimlich, however, the better story for his narrative was to defame LifeVac by suggesting the device was the cause of the death.

## FIRST CAUSE OF ACTION
### Defamation Per Se
### (under New York law)

65.    Plaintiff incorporates all the preceding paragraphs of this complaint as if fully set forth herein.

66.    The Defendant made false and defamatory statements as set forth herein to unprivileged third-parties including but not limited to the FDA.

67.    The defamatory statements were made in connection with an adverse event report filed on July 13, 2022 with the FDA's Medwatch program.

68.    The report referenced a June 17, 2022 incident previously reported to LifeVac regarding a 9-year-old boy had been saved by a LifeVac device after he choked on a lollipop.

69.    Upon information and belief, on July 13, 2023, Heimlich submitted an adverse event report to the FDA's MedWatch program. The report stated falsely that the report was submitted by the "Patient" and that the type of event was a "Serious Injury." The report falsely alleged that "IF THE DEVICE SHATTERED A LOLLIPOP INTO PIECES, THAT COULD POSE THE RISK OF SERIOUS COMPLICATIONS."

70.    Upon information and belief, on May 5, 2023, Heimlich falsely claimed on Twitter (now X) that LifeVac contributed to a wrongful death. Using the

anonymous handle, ACD_Skeptic, Heimlich wrote that the "first wrongful death lawsuit in which a so-called 'anti-choking' device was used" was filed in Michigan. Heimlich also linked in the same thread to recent public media about LifeVac, and linked to the complaint itself.

71.     Defendant's statements were defamatory, tending to expose LifeVac to public hatred, contempt, ridicule, and disgrace. The Defendant's defamatory statements also tend to discredit LifeVac in the conduct of its business. In particular, Defendant's statements were reasonably understood by third parties to mean that LifeVac had produced a defective and unsafe product and was implicated in a wrongful death.

72.     The Defendant made the statements with knowledge of their falsity, with reckless disregard as to their truth or falsity, or with negligence.

73.     The Defendant made the statement with the intent and import that the statements were assertions of fact not opinion.

74.     The Defendant knew such statements disparaged LifeVac and its business, and intended to cause LifeVac pecuniary harm.

75.     The Defendant's defamatory statements were a substantial factor in causing harm to LifeVac.

76.     The Defendant made his defamatory statements with fraud, oppression, actual malice, malicious intent, and with the intent to cause the foregoing and other harm to LifeVac and its business. Accordingly, LifeVac is entitled to, and should be awarded, punitive damages against the Defendant.

77.     Defendant made his defamatory statements anonymously to hide his identity, continuing a pattern of misrepresentations to conceal that Defendant is the individual waging a harmful, defamatory campaign against LifeVac.

78.     The harm of Defendant's defamatory statement was suffered in New York, the domicile of LifeVac.

**SECOND CAUSE OF ACTION**
**Trade Libel**
**(under New York law)**

79.     Plaintiff incorporates all the preceding paragraphs of this complaint as if fully set forth herein.

80.     The Defendant made false and defamatory statements as set forth herein to unprivileged third-parties regarding its product, the LifeVac device referenced throughout this Complaint.

81.     The Defendant made the statements with knowledge of their falsity, with reckless disregard as to their truth or falsity, or with negligence.

82.     The Defendant made the statement with the intent and import that the statements were assertions of fact not opinion.

83.     The Defendant knew such statements disparaged the LifeVac device.

84.     The defamatory statements were made in connection with an adverse event report filed on July 13, 2022 with the FDA's Medwatch program.

85.     Upon information and belief, on July 13, 2023, Heimlich submitted an adverse event report to the FDA's MedWatch program. The report stated falsely that the report was submitted by the "Patient" and that the type of event was a "Serious Injury." The report falsely alleged that "IF THE DEVICE SHATTERED A LOLLIPOP INTO PIECES, THAT COULD POSE THE RISK OF SERIOUS COMPLICATIONS."

86.     Upon information and belief, on May 5, 2023, Heimlich falsely claimed on Twitter (now X) that LifeVac contributed to a wrongful death. Using the anonymous handle, ACD_Skeptic, Heimlich wrote that the "first wrongful death lawsuit in which a so-called 'anti-choking' device was used" was filed in Michigan. Heimlich also linked in the same thread to recent public media about LifeVac, and linked to the complaint itself.

87.     Defendant's statements were defamatory, tending to expose LifeVac and the LifeVac device to public hatred, contempt, ridicule, and disgrace. The

Defendant's defamatory statements also tend to discredit LifeVac in the conduct of its business. In particular, Defendant's statements were reasonably understood by third parties to mean that LifeVac had produced a defective and unsafe product and was implicated in a wrongful death.

88.   The Defendant made the statements with knowledge of their falsity, with reckless disregard as to their truth or falsity, or with negligence.

89.   The Defendant made the statement with the intent and import that the statements were assertions of fact not opinion.

90.   The Defendant knew such statements disparaged LifeVac and its business, and intended to cause LifeVac pecuniary harm.

91.   The Defendant's defamatory statements were a substantial factor in causing harm to LifeVac.

92.   The Defendant made his defamatory statements with fraud, oppression, actual malice, malicious intent, and with the intent to cause the foregoing and other harm to LifeVac and its business. Accordingly, LifeVac is entitled to, and should be awarded, punitive damages against the Defendant.

93.   Defendant made his defamatory statements anonymously to hide his identity, continuing a pattern of misrepresentations to conceal that Defendant is the individual waging a harmful, defamatory campaign against LifeVac.

25

94.     The harm of Defendant's defamatory statement was suffered in New York, the domicile of LifeVac.

## THIRD CAUSE OF ACTION
### Tortious Interference with Prospective Business Relations

95.     Plaintiff incorporates all the preceding paragraphs of this complaint as if fully set forth herein.

96.     Defendant maliciously and with the intent to harm LifeVac interfered with the business relationship between LifeVac and CDHEMS.

97.     Heimlich did so without privilege as he was a stranger to the relationship between LifeVac and CDHEMS.

98.     In September 2021, a representative of the emergency medical services of Central Dupage Hospital in Winfield, Illinois, which is affiliated with Northwestern Medicine, reached out to LifeVac to inquire about purchasing and implementing the devices in their program.

99.     By February 2022, members of the CDHEMS began carrying LifeVac devices. A post on the agency's Facebook page indicated that the LifeVac device had been introduced to CDHEMS by a member of the Wheaton, Illinois Fire Department who had saved his own daughter from using the LifeVac device when she aspirated on peanut butter pretzels and back blows and the Heimlich maneuver failed to clear the obstruction.

100.   On March 7, 2022, Dr. Steve Graham, the CDHEMS Medical Director, and Justin Williams, the CDHEMS System Coordinator, received an email bearing the subject line "Question re: your agency's implementation of controversial 'anti choking' devices". The email raised several questions regarding the safety of the LifeVac device and shared articles that were critical of the device. Additionally, the email questioned whether a provider using the LifeVac device during an emergency that "results in a poor outcome" would be shielded from liability by the Illinois Good Samartian Act, which limits the tort liability of individuals who may harm another individual in the process of trying to provide medical aid. The email also asked "how many of the devices were purchased by CDHEMS, the total cost, and what employee approved the purchase?"

101.   Mr. Williams responded to the anonymous email and informed the sender that CDHEMS "would be more than happy to discuss our processes and reviews." He also asked for the sender's name and contact information.

102.   In response, the anonymous sender refused to provide their name, simply stating that "several colleagues" were involved with the investigation of the LifeVac device. On this email, the sender copied Ashley Thoele, the chief of the emergency medical services division at the Illinois Department of Public Health.

103.   That same day, as a result of the email exchange described above, LifeVac devices were ordered to be removed from all CDHEMS vehicles. The next day, March 8, 2023, all CDHEMS departments confirmed that the LifeVac devices had been removed from EMS vehicles.

104.   Heimlich's conduct was dishonest and improper because he sent the email in question anonymously, preventing CDHEMS from investigating his past relationship with LifeVac.

105.   Heimlich acted with the intent to harm LifeVac.

106.   Absent Heimlich's interference, CDHEMS would have continued as a customer of LifeVac.

107.   Therefore, Heimlich's conduct proximately caused the cessation of the business relationship between CDHEMS and LifeVac, which caused injury to LifeVac.

## FOURTH CAUSE OF ACTION
### Violation of O.C.G.A. § 10-1-372
### Georgia Deceptive Trade Practices Act

108.   Plaintiff incorporates all the preceding paragraphs of this complaint as if fully set forth herein.

109.   In violation of the Georgia Deceptive Trade Practices Act, Defendant, in the course of his own business as a purported medical watchdog, disparaged the goods and business of LifeVac with false or misleading representations on at least four occasions.

110.   First, on February 19, 2022, Heimlich sent an anonymous email to county commissioners of Switzerland County, Indiana falsely stating that the use of LifeVac devices "may put lives at risk and create liability risk for users of the devices."

111.   Defendant made this false statement without any evidence that the use of a LifeVac device could be fatal to a choking victim or create liability risk for users of the device.

112.   Second, on March 7, 2022, Heimlich sent an anonymous email to the CDHEMS stating that there were "obvious health and safety concerns" related to the LifeVac device.

113.   Heimlich's presented the "health and safety concerns" as a statement of fact based on pure speculation and without any evidence of negative health or safety outcomes from the use of a LifeVac device.

114.   On March 8, 2022, CDHEMS removed all LifeVac devices from CDHEMS vehicles.

115.   Third, Heimlich has submitted a false claim to the FDA's MedWatch program regarding an alleged malfunction of the LifeVac device. Upon information and belief, on July 13, 2023, Heimlich submitted an adverse event report to the FDA's MedWatch program. The report stated falsely that the report was submitted

by the "Patient" and that the type of event was a "Serious Injury." The report falsely alleged that "IF THE DEVICE SHATTERED A LOLLIPOP INTO PIECES, THAT COULD POSE THE RISK OF SERIOUS COMPLICATIONS."

116.   Fourth, on May 5, 2023,  Heimlich falsely claimed on Twitter (now X) that LifeVac contributed to a wrongful death. Using the anonymous handle, ACD_Skeptic, Heimlich wrote that the "first wrongful death lawsuit in which a so-called 'anti-choking' device was used" was filed in Michigan. Heimlich also linked in the same thread to recent public media about LifeVac.

117.   Heimlich made these false statements with malice and with the intent to harm LifeVac.

118.   LifeVac suffered injuries as a direct result of Heimlich's false and disparaging statements, including but not limited to, the cessation of CDHEMS' business and use of the LifeVac device.

119.   Heimlich's past pattern of disparaging and false statements make it likely that he will continue to disparage LifeVac's goods and business, creating a likelihood of future harm.

## FIFTH CAUSE OF ACTION
### Violation of O.C.G.A. § 10-1-390
### Georgia Fair Business Practices Act

120.   Plaintiff incorporates all the preceding paragraphs of this complaint as if fully set forth herein.

121.   In violation of the Georgia Fair Business Practices Act, Defendant, in the course of his own business as a purported medical watchdog, disparaged the goods and business of LifeVac with false or misleading representations on at least four occasions.

122.   First, on February 19, 2022, Heimlich sent an anonymous email to county commissioners of Switzerland County, Indiana falsely stating that the use of LifeVac devices "may put lives at risk and create liability risk for users of the devices."

123.   Defendant made this false statement without any evidence that the use of a LifeVac device could be fatal to a choking victim.

124.   Second, on March 7, 2022, Heimlich sent an anonymous email to the CDHEMS stating that there were "obvious health and safety concerns" related to the LifeVac device.

125.   Heimlich's presented the "health and safety concerns" as a statement of fact based on pure speculation and without any evidence of negative health or safety outcomes from the use of a LifeVac device.

126.   On March 8, 2022, CDHEMS removed all LifeVac devices from CDHEMS vehicles.

127.   Third, Heimlich has submitted a false claim to the FDA's MedWatch program regarding an alleged malfunction of the LifeVac device. Upon information and belief, on July 13, 2023, Heimlich submitted an adverse event report to the FDA's MedWatch program. The report stated falsely that the report was submitted by the "Patient" and that the type of event was a "Serious Injury." The report falsely alleged that "IF THE DEVICE SHATTERED A LOLLIPOP INTO PIECES, THAT COULD POSE THE RISK OF SERIOUS COMPLICATIONS."

128.   Fourth, on May 5, 2023, Heimlich falsely claimed on Twitter (now X) that LifeVac contributed to a wrongful death. Using the anonymous handle, ACD_Skeptic, Heimlich wrote that the "first wrongful death lawsuit in which a so-called "anti-choking" device was used" was filed in Michigan. Heimlich also linked in the same thread to recent public media about LifeVac.

129.   Heimlich made these false statements with malice and with the intent to harm LifeVac.

130.   LifeVac suffered injuries as a direct result of Heimlich's false and disparaging statements, including but not limited to, the cessation of CDHEMS' business and use of the LifeVac device.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for damages and an entry of judgment against Defendant as follows:

a.   An award of compensatory and punitive damages for the tortious and unlawful conduct of the Defendant as set forth herein;

b.   Appropriate injunctive and declaratory relief, including but not limited to a restraining order preventing Heimlich from further disparaging LifeVac;

c.   An award of reasonable attorneys' fees, costs and expenses for this action;

d.   An award of pre- and post-judgment interest; and

e.   Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff requests a trial by jury.

Respectfully submitted this 28th day of July, 2023.

> */s/ Sean Keenan*
>
> CRUSER, MITCHELL, NOVITZ,
> SANCHEZ, GASTON & ZIMET, LLP
>
> Sean Keenan
> Georgia Bar No: 523871
> 275 Scientific Drive
> Peachtree Corners, GA 30092
> (t) +1 404 881 2622
> (f) +1 404 881 2630
> skeenan@cmlawfirm.com
>
> BOIES SCHILLER FLEXNER LLP
>
> Craig Wenner*
> Jeffrey P. Waldron*
> 55 Hudson Yards
> New York, NY 10001
> (t) +1 212 446 2300
> (f) +1 212 446 2380
> cwenner@bsfllp.com
> jwaldron@bsfllp.com
>
> *Attorneys for Plaintiff LifeVac LLC*
>
> * Application for admission
> forthcoming

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 5.1</u>

The undersigned attests that this document was prepared in Times New Roman, 14-point font that complies with this Court's Rules.

This 28th day of July, 2023.

> **Cruser, Mitchell, Novitz, Sanchez,**
> **Gaston & Zimet, LLP**
>
> *<u>/s/ Sean Keenan</u>*
> Sean Keenan
> Georgia Bar No. 523871