IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ASCOT INSURANCE COMPANY | ) |
| | ) |
|     Petitioner, | ) |
| | ) |
| v. | ) Civil Action Number: |
| | ) |
| THE PARTNERSHIP INC., TPI | ) |
| MANAGEMENT SERVICES, LLC, | ) |
| HOUSING ENTERPRISE INSURANCE | ) |
| COMPANY, INC., THE HANOVER | ) |
| INSURANCE COMPANY, ELSA FLORES | ) |
| DIAZ, and EDWIN MEDRANO CACERES | ) |
| | ) |
|     Respondents. | |

## PETITION FOR DECLARATORY JUDGMENT

COMES NOW Ascot Insurance Company ("Ascot"), by and through its undersigned counsel of record, and brings this action for declaratory judgment against Respondents The Partnership, Inc., TPI Management Services, LLC, Housing Enterprise Insurance Company, Inc., The Hanover Insurance Company, Elsa Flores Diaz, and Edwin Medrano Caceres, alleging as follows:

## PARTIES

### 1.

Ascot is a foreign corporation formed under the laws of the State of Colorado with its principal place of business located in Parker, Colorado. It is authorized to transact business in the State of Georgia.

2.

The Partnership Inc. is a foreign corporation formed under the laws of the State of Florida with its principal place of business located in Plymouth, Minnesota. It may be served with process via its registered agent, URS Agents Inc., at 3675 Crestwood Parkway, Ste. 350, Duluth, Gwinnett County, Georgia 30096.

3.

TPI Management Services LLC is a foreign limited liability corporation formed under the laws of the State of Florida with its principal place of business located in Riviera Beach, Florida.  It may be served with process via its registered agent, URS Agents Inc., at 3675 Crestwood Parkway, Ste. 350, Duluth, Gwinnett County, Georgia 30096.   The sole member of TPI is The Partnership, Inc., a corporation formed under the laws of the State of Florida with its principal place of business in Minnesota.

4.

Housing Enterprise Insurance Company, Inc. is a foreign corporation formed under the laws of the State of Vermont with its principal place of business located in Cheshire, Connecticut.  It may be served with process via its registered agent, Registered Agent Solutions, Inc., 900 Old Roswell Lakes Parkway, Ste. 310, Roswell, Fulton County, Georgia 30076.

5.

The Hanover Insurance Company is a foreign corporation formed under the laws of the State of New Hampshire with its principal place of business located in Worcester, Massachusetts.  It may be served with process via its registered agent, CT Corporation System, 289 S. Culver Street, Lawrenceville, Gwinnett County, Georgia 30046.

6.

Elsa Flores Diaz is a natural person and is a citizen of the State of Georgia. She may be served with process at her last known address, 2929 Panthersville Road, Apartment U24, Decatur, DeKalb County, Georgia 30034.

7.

Edwin Medrano Caceres is a natural person and is a citizen of the State of Georgia.   He may be served with process at his last known address, 2929 Panthersville Road, Apartment U24, Decatur, DeKalb County, Georgia 30034.

**JURISDICTION**

8.

The Court has jurisdiction over this action pursuant to 28 United States Code Section 1332 because Petitioner is a citizen of a different state than all Respondents.

9.

This amount in controversy, exclusive of interest and costs, exceeds Seventy-Five Thousand Dollars ($75,000.00) because the relief sought by Respondents for

injuries arising from the incident that is the subject matter of this action exceeds $75,000.00.

10.

The Court further has jurisdiction pursuant to 28 U.S.C. § 2201, in that Ascot is seeking a declaration from this Court regarding the parties' rights and obligations with respect to Ascot Commercial Excess Liability Policy No. DSXS2010002206-01 issued to Respondents The Partnership Inc. and TPI Management Services LLC. (A certified copy of the Policy is attached hereto as Exhibit A).

11.

Respondents contest Ascot's position in regard to the parties' rights and obligations under said Policy, and, therefore, a true and actual controversy exists between the parties. Thus, the Court is vested, pursuant to 28 U.S.C. § 2201, with the power to declare the rights and obligations of the parties hereto, and to provide such other relief as may be necessary.

**VENUE**

12.

Venue is laid in this District pursuant to 28 U.S.C. § 1391 by virtue of the fact that one or more Respondents reside in this Court's jurisdiction, and the at-issue loss occurred in this Court's jurisdiction.

## FACTS

13.

At all relevant times, Respondent The Partnership owned a multi-family housing complex located on 2800 Martin Luther King Drive, Atlanta, Georgia 30311 (hereinafter "the Complex").

14.

On July 22, 2021, Respondents Diaz and Caceres, along with the minor children (collectively "the Diaz Family"), were residents of the Complex.

15.

On July 22, 2021, the unit occupied by the Diaz Family was subject to an armed burglary ("the Incident").

16.

The Partnership notified their primary commercial general liability insurance carrier, Respondent Housing Enterprise Insurance Company, about the Incident on or about September 10, 2021.

17.

The Partnership notified their professional liability insurance carrier, Respondent The Hanover Insurance Company, about the Incident prior to December 2, 2021.

18.

The Diaz Family filed suit against The Partnership in the Northern District of Georgia, *Elsa Flores Diaz and Edwin Medrano Caceres, for themselves and on behalf of their minor children E.M.F, V.M.F., B.M.F., and H.M.F. vs The Partnership, Inc.*; civil action file number 1:21-cv-03661-ELR, on September 2, 2021 ("the Underlying Suit").

19.

The Partnership was served with process in the Underlying Suit on September 8, 2021.

20.

Policy limits demands were served on Respondents Housing Enterprise and The Hanover in December 2021.

21.

Ascot was not made aware of the Underlying Suit or demands in 2021.

22.

Ascot received first notice of the Incident, demands, and the Underlying Suit on May 15, 2023.

23.

In addition to damages associated with the armed burglary, the Diaz Family claims a pattern of racial discrimination by The Partnership during their residency at

the Complex.

24.

The Diaz Family also seeks recovery of punitive damages against The Partnership.

25.

The Diaz Family claims The Partnership refused to maintain a safe and secure premises, in that it failed to provide security guards, a closed security fence, working security cameras, or working lighting.

26.

At the time of the Incident, The Partnership and TPI Management Services LLC were insured by Ascot Insurance Company Commercial Excess Liability Policy No. DSXS2010002206-01 ("the Policy").

27..

In July 2023, the Diaz Family made a demand on the Policy.

28.

Ascot seeks a declaration that the Policy does not provide coverage to The Partnership and/or TPI for claims at issue in the Underlying Suit.

### CAUSES OF ACTION

1.  *The Policy does not provide coverage for claims at issue in the Underlying Suit because notice of the incident was not promptly provided to Ascot.*

29.

Ascot reincorporates the allegations contained in Paragraph 1 through 28 as if set forth verbatim herein.

30.

The Policy provides:

**GEORGIA CHANGES**

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A**. Paragraph **3.a.** of **Duties In The Event Of An Event, Claim Or Suit** Provisions of **Section III – Conditions** is replaced by the following:

**a.** In the event of an "event", claim or suit, we or our representative must receive prompt notice of the "event". Include:

    **(1)** How, when and where the "event" occurred;

    **(2)** The insureds name and address; and

    **(3)** To the extent possible, the names and addresses of any injured persons and witnesses.

The requirement for giving notice of a claim, if not satisfied by the insured within 30 days of the date of the "event", may be satisfied by an injured third party who, as the result of such "event", has a claim against the insured. However, in this event, notice of a claim given by an injured third party must be mailed to us.

31.

The Incident triggering the Underlying Suit occurred on July 22, 2021.

32.

The Underlying Suit was filed on September 2, 2021.

33.

Policy limits demands were served on The Partnership and/or The Hanover and Housing Enterprise in December 2021.

34.

Ascot did not receive notice of the Incident until May 2023.

35.

The nearly two-year delay in notifying Ascot of the Incident does not constitute prompt notice.

36.

Prompt notice is a condition precedent to coverage under the Policy.

37.

Because Ascot was not provided with prompt notice of the Incident or the Underlying Suit, the Policy does not provide coverage for any claims asserted in the Underlying Suit.

2. *The Policy does not provide coverage for claims asserted in the Underlying Suit because it did not receive notice thereof as soon as practicable.*

38.

Ascot reincorporates the allegations contained in Paragraph 1 through 37 as if

set forth verbatim herein.

39.

The Policy provides:

**b.** If a claim is made or suit is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or suit and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or suit as soon as practicable.

40.

The Underlying Suit was filed on September 2, 2021.

41.

Ascot did not receive notice of the Underlying Suit until May 2023.

42.

Notice of the Underlying Suit as soon as practicable was a condition precedent to coverage.

43.

The nearly two-year delay in notifying Ascot of the Underlying Suit does not constitute notice as soon as practicable.

44.

Because Ascot did not receive notice of the Underlying Suit as soon as

practicable as required by the Policy, the Policy does not provide coverage for claims at issue in the Underlying Suit.

3. *The Policy does not provide coverage for the Underlying Suit because Ascot did not receive immediate notice of demands, the claim, or the Underlying Suit.*

45.

Ascot reincorporates the allegations contained in Paragraph 1 through 44 as if set forth verbatim herein.

46.

The Policy provides:

**c.** You and any other insured involved must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the suit; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "injury or damage" to which this insurance may also apply.

47.

The Underlying Suit was filed on September 2, 2021.

48.

Policy limits demands were served on The Partnership and/or The Hanover and Housing Enterprise in December 2021.

49.

Ascot did not receive notice of the demands until May 2023.

50.

The nearly two-year delay in notifying Ascot of the Underlying Suit and demands does not constitute immediate notice.

51.

Immediate notice of a demand is a condition precedent to coverage under the Policy.

52.

Because Ascot was not provided with immediate notice of the demands, the Policy does not provide coverage for any claims asserted in the Underlying Suit.

## PRAYER FOR RELIEF

WHEREFORE, Ascot prays:

1. That process be issued as required by law, and Respondents be served with a copy of the Summons and Petition for Declaratory Judgment.

2. That the Court issue a declaration that Ascot is not obligated to provide a defense, coverage, and/or indemnity to The Partnership and/or TPI Management Services, LLC for any claims at issue in The Underlying Suit;

3. For such other and further relief as the Court deems just and proper.

Respectfully submitted, this 28th day of July, 2023.

COPELAND STAIR VALZ & LOVELL, LLP

By: _/s/ *Melissa L. Bailey*_____
MELISSA L. BAILEY
State Bar No.: 804341

*Attorneys for Ascot*

191 Peachtree Street NE
Suite 3600
Atlanta, Georgia 30303-1740
404-522-8220
………
P.O. Box 56887
Atlanta, Georgia 30343-0887

POLICY NUMBER:DSXS2010002206-01



**EXHIBIT A**

COMMERCIAL EXCESS LIABILITY
CX DS AIC 1 07 19

# COMMERCIAL EXCESS LIABILITY DECLARATIONS

| | |
|---|---|
| **Company Name:** | Ascot Insurance Company (Admitted) |
| **Producer Name:** | Risk Placement Services, Inc. |
| **Named Insured(s):** | The Partnership Inc. & TPI Management Services, LLC |
| **Mailing Address:** | 1002 Greene St #3<br>Augusta, GA 30901 |

| Policy Period | |
|---|---|
| **From:** 11/5/2020 | |
| **To:** 11/5/2021 | At 12:01 AM (Standard Time at your mailing address shown above) |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE TO PROVIDE YOU WITH THE INSURANCE AS STATED IN THIS POLICY.**

| Excess Policy – Limits Of Insurance | |
|---|---|
| **Each Occurrence Limit** | $5,000,000.00 |
| **Aggregate Limit** | $5,000,000.00 |
| **Product Completed Operations:** | $5,000,000.00 |

| Excess Policy – Premium | |
|---|---|
| **Premium (including premium subject to audit)** | **$10,905.00** |

| **Audit Period (If Applicable)** | ☐ **Annually** | ☐ **Semiannually** | ☐ **Quarterly** | ☐ **Monthly** |
|---|---|---|---|---|

| Endorsements Attached To The Excess Policy |
|---|
| CX DS AIC 1 07 19  Dec Page AIC |
| CX 00 01 04 13  COMMERCIAL EXCESS LIABILITY COVERAGE FORM |
| CX 01 19 02 15  GEORGIA CHANGES |
| CX 21 02 04 13  TOTAL POLLUTION EXCLUSION |
| CX 21 13 04 13  EXCLUSION - FUNGI OR BACTERIA |
| CX 21 16 04 13  EXCLUSION - SILICA OR SILICA-RELATED DUST |
| CX 21 19 04 13  EXCLUSION - EMPLOYMENT-RELATED PRACTICES |
| CX 21 17 04 13  Exclusion - Communicable Disease |
| CX 21 20 04 13  EXCLUSION - PROFESSIONAL SERVICES |
| IL N 001 09 03  FRAUD STATEMENT |
| IL N 159 01 08  GEORGIA UNINSURED MOTORISTS COVERAGE NOTICE ACKNOWLEDGMENT |
| IL P 001 01 04  U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS |
| IL 09 85 01 15  DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT |
| CX 90 07 07 19  Electronic Data - Cyber Exclusion |
| CX 90 09 07 19  Prior & Pending Litigation Exclusion |
| CX 90 08 07 19  Care, Custody or Control Exclusion |
| IL PN 10 01 01 19  NAIC Terrorism Selection / Rejection & Quote Disclosure |
| CX 90 03 07 19  Asbestos Exclusion |
| CX 90 02 07 19  Lead Exclusion |
| CX 90 01 07 19  Occupational Disease Exclusion |
| CX 90 15 07 19  Exclusion - Designated Construction Work |
| CX 90 16 07 19  Enhanced Coverage Endorsement |
| CX 21 30 01 15  CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| AIC SP 01 01 19  ASCOT SIGNATURE PAGE |

**SCHEDULE OF UNDERLYING:**
General Liability

Company: HAI International

Policy Number: TBD

Policy Period: 10/29/2020 - 10/29/2021

Limits of Insurance:

Each Occurrence:                              $1,000,000.00

Products-completed Operations Aggregate:     $2,000,000.00

General Aggregate:                           $2,000,000.00

Type:                                    Hired And Non Owned Auto Liability

Combined Single Limit:                   $1,000,000

COMMERCIAL EXCESS LIABILITY
CX 00 01 04 13

# COMMERCIAL EXCESS LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance. The word "insured" means any person or organization qualifying as such under the "controlling underlying insurance".

Other words and phrases that appear in quotation marks in this Coverage Part have special meaning. Refer to Section **IV** – Definitions. Other words and phrases that are not defined under this Coverage Part but defined in the "controlling underlying insurance" will have the meaning described in the policy of "controlling underlying insurance".

The insurance provided under this Coverage Part will follow the same provisions, exclusions and limitations that are contained in the applicable "controlling underlying insurance", unless otherwise directed by this insurance. To the extent such provisions differ or conflict, the provisions of this Coverage Part will apply. However, the coverage provided under this Coverage Part will not be broader than that provided by the applicable "controlling underlying insurance".

There may be more than one "controlling underlying insurance" listed in the Declarations and provisions in those policies conflict, and which are not superseded by the provisions of this Coverage Part. In such a case, the provisions, exclusions and limitations of the "controlling underlying insurance" applicable to the particular "event" for which a claim is made or suit is brought will apply.

## SECTION I – COVERAGES

**1. Insuring Agreement**

    **a.** We will pay on behalf of the insured the "ultimate net loss" in excess of the "retained limit" because of "injury or damage" to which insurance provided under this Coverage Part applies.

    We will have the right and duty to defend the insured against any suit seeking damages for such "injury or damage" when the applicable limits of "controlling underlying insurance" have been exhausted in accordance with the provisions of such "controlling underlying insurance".

When we have no duty to defend, we will have the right to defend, or to participate in the defense of, the insured against any other suit seeking damages for "injury or damage".

However, we will have no duty to defend the insured against any suit seeking damages for which insurance under this policy does not apply.

At our discretion, we may investigate any "event" that may involve this insurance and settle any resultant claim or suit, for which we have the duty to defend.

But:

    **(1)** The amount we will pay for "ultimate net loss" is limited as described in Section **II** – Limits Of Insurance; and

    **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under this Coverage Part. However, if the policy of "controlling underlying insurance" specifies that limits are reduced by defense expenses, our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of defense expenses, judgments or settlements under this Coverage Part.

    **b.** This insurance applies to "injury or damage" that is subject to an applicable "retained limit". If any other limit, such as, a sublimit, is specified in the "controlling underlying insurance", this insurance does not apply to "injury or damage" arising out of that exposure unless that limit is specified in the Declarations under the Schedule of "controlling underlying insurance".

    **c.** If the "controlling underlying insurance" requires, for a particular claim, that the "injury or damage" occur during its policy period in order for that coverage to apply, then this insurance will only apply to that "injury or damage" if it occurs during the policy period of this Coverage Part. If the "controlling underlying insurance" requires that the "event" causing the particular "injury or damage" takes place during its policy period in order for that coverage to apply, then this insurance will apply to the claim only if the "event" causing that "injury or damage" takes place during the policy period of this Coverage Part.

© Insurance Services Office, Inc., 2012

d. Any additional insured under any policy of "controlling underlying insurance" will automatically be an additional insured under this insurance. If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance required by the contract, less any amounts payable by any "controlling underlying insurance".

Additional insured coverage provided by this insurance will not be broader than coverage provided by the "controlling underlying insurance".

**2. Exclusions**

The following exclusions, and any other exclusions added by endorsement, apply to this Coverage Part. In addition, the exclusions applicable to any "controlling underlying insurance" apply to this insurance unless superseded by the following exclusions, or superseded by any other exclusions added by endorsement to this Coverage Part.

Insurance provided under this Coverage Part does not apply to:

**a. Medical Payments**

Medical payments coverage or expenses that are provided without regard to fault, whether or not provided by the applicable "controlling underlying insurance".

**b. Auto**

Any loss, cost or expense payable under or resulting from any of the following auto coverages:

**(1)** First-party physical damage coverage;

**(2)** No-fault coverage;

**(3)** Personal injury protection or auto medical payments coverage; or

**(4)** Uninsured or underinsured motorists coverage.

**c. Pollution**

**(1)** "Injury or damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, pollutants.

This exclusion does not apply to the extent that valid "controlling underlying insurance" for the pollution liability risks described above exists or would have existed but for the exhaustion of underlying limits for "injury or damage".

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**SECTION II – LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations, and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or suits brought, or number of vehicles involved;

**c.** Persons or organizations making claims or bringing suits; or

**d.** Limits available under any "controlling underlying insurance".

**2.** The Limits of Insurance of this Coverage Part will apply as follows:

**a.** This insurance only applies in excess of the "retained limit".

**b.** The Aggregate Limit is the most we will pay for the sum of all "ultimate net loss", for all "injury or damage" covered under this Coverage Part.

However, this Aggregate Limit only applies to "injury or damage" that is subject to an aggregate limit of insurance under the "controlling underlying insurance".

**c.** Subject to Paragraph **2.b.** above, the Each Occurrence Limit is the most we will pay for the sum of all "ultimate net loss" under this insurance because of all "injury or damage" arising out of any one "event".

**d.** If the Limits of Insurance of the "controlling underlying insurance" are reduced by defense expenses by the terms of that policy, any payments for defense expenses we make will reduce our applicable Limits of Insurance in the same manner.

 © Insurance Services Office, Inc., 2012

**3.** If any "controlling underlying insurance" has a policy period that is different from the policy period of this Coverage Part then, for the purposes of this insurance, the "retained limit" will only be reduced or exhausted by payments made for "injury or damage" covered under this insurance.

The Aggregate Limit of this Coverage Part applies separately to each consecutive annual period of this Coverage Part and to any remaining period of this Coverage Part of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION III – CONDITIONS**

The following conditions apply. In addition, the conditions applicable to any "controlling underlying insurance" are also applicable to the coverage provided under this insurance unless superseded by the following conditions.

**1. Appeals**

If the "controlling underlying insurer" or insured elects not to appeal a judgment in excess of the amount of the "retained limit", we may do so at our own expense. We will also pay for taxable court costs, pre- and postjudgment interest and disbursements associated with such appeal. In no event will this provision increase our liability beyond the applicable Limits of Insurance described in Section **II** – Limits Of Insurance.

**2. Bankruptcy**

   **a. Bankruptcy Of Insured**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

   **b. Bankruptcy Of Controlling Underlying Insurer**

   Bankruptcy or insolvency of the "controlling underlying insurer" will not relieve us of our obligations under this Coverage Part.

However, insurance provided under this Coverage Part will not replace any "controlling underlying insurance" in the event of bankruptcy or insolvency of the "controlling underlying insurer". The insurance provided under this Coverage Part will apply as if the "controlling underlying insurance" were in full effect and recoverable.

**3. Duties In The Event Of An Event, Claim Or Suit**

   **a.** You must see to it that we are notified as soon as practicable of an "event", regardless of the amount, which may result in a claim under this insurance. To the extent possible, notice should include:

   **(1)** How, when and where the "event" took place;

   **(2)** The names and addresses of any injured persons and witnesses; and

   **(3)** The nature and location of any "injury or damage" arising out of the "event".

   **b.** If a claim is made or suit is brought against any insured, you must:

   **(1)** Immediately record the specifics of the claim or suit and the date received; and

   **(2)** Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or suit as soon as practicable.

   **c.** You and any other insured involved must:

   **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

   **(2)** Authorize us to obtain records and other information;

   **(3)** Cooperate with us in the investigation or settlement of the claim or defense against the suit; and

   **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of "injury or damage" to which this insurance may also apply.

   **d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**4. First Named Insured Duties**

   The first Named Insured is the person or organization first named in the Declarations and is responsible for the payment of all premiums. The first Named Insured will act on behalf of all other Named Insureds for giving and receiving of notice of cancellation or the receipt of any return premium that may become payable.

At our request, the first Named Insured will furnish us, as soon as practicable, with a complete copy of any "controlling underlying insurance" and any subsequently issued endorsements or policies which may in any way affect the insurance provided under this Coverage Part.

**5. Cancellation**

**a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**b.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

**(1)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

**(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**c.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**d.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**e.** If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**6. Changes**

This Coverage Part contains all the agreements between you and us concerning the insurance afforded. The first Named Insured is authorized by all other insureds to make changes in the terms of this Coverage Part with our consent. This Coverage Part's terms can be amended or waived only by endorsement.

**7. Maintenance Of/Changes To Controlling Underlying Insurance**

Any "controlling underlying insurance" must be maintained in full effect without reduction of coverage or limits except for the reduction of aggregate limits in accordance with the provisions of such "controlling underlying insurance" that results from "injury or damage" to which this insurance applies.

Such exhaustion or reduction is not a failure to maintain "controlling underlying insurance". Failure to maintain "controlling underlying insurance" will not invalidate insurance provided under this Coverage Part, but insurance provided under this Coverage Part will apply as if the "controlling underlying insurance" were in full effect.

The first Named Insured must notify us in writing, as soon as practicable, if any "controlling underlying insurance" is cancelled, not renewed, replaced or otherwise terminated, or if the limits or scope of coverage of any "controlling underlying insurance" is changed.

**8. Other Insurance**

**a.** This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

When this insurance is excess, if no other insurer defends, we may undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**b.** When this insurance is excess over other insurance, we will pay only our share of the "ultimate net loss" that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of the insurance provided under this Coverage Part; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

**9. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** If this policy is auditable, the premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period, we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit premium is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

© Insurance Services Office, Inc., 2012
CX 00 01 04 13

**10. Loss Payable**

Liability under this Coverage Part does not apply to a given claim unless and until:

**a.** The insured or insured's "controlling underlying insurer" has become obligated to pay the "retained limit"; and

**b.** The obligation of the insured to pay the "ultimate net loss" in excess of the "retained limit" has been determined by a final settlement or judgment or written agreement among the insured, claimant, "controlling underlying insurer" (or a representative of one or more of these) and us.

**11. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a suit asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured, "controlling underlying insurer" and the claimant or the claimant's legal representative.

**12. Transfer Of Defense**

**a. Defense Transferred To Us**

When the limits of "controlling underlying insurance" have been exhausted, in accordance with the provisions of "controlling underlying insurance", we may elect to have the defense transferred to us. We will cooperate in the transfer of control to us of any outstanding claims or suits seeking damages to which this insurance applies and which would have been covered by the "controlling underlying insurance" had the applicable limit not been exhausted.

**b. Defense Transferred By Us**

When our limits of insurance have been exhausted our duty to provide a defense will cease.

We will cooperate in the transfer of control of defense to any insurer specifically written as excess over this Coverage Part of any outstanding claims or suits seeking damages to which this insurance applies and which would have been covered by the "controlling underlying insurance" had the applicable limit not been exhausted.

In the event that there is no insurance written as excess over this Coverage Part, we will cooperate in the transfer of control to the insured and its designated representative.

**13. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION IV – DEFINITIONS**

The definitions applicable to any "controlling underlying insurance" also apply to this insurance. In addition, the following definitions apply.

**1.** "Controlling underlying insurance" means any policy of insurance or self-insurance listed in the Declarations under the Schedule of "controlling underlying insurance".

**2.** "Controlling underlying insurer" means any insurer who provides any policy of insurance listed in the Declarations under the Schedule of "controlling underlying insurance".

**3.** "Event" means an occurrence, offense, accident, act, or other event, to which the applicable "controlling underlying insurance" applies.

**4.** "Injury or damage" means any injury or damage, covered in the applicable "controlling underlying insurance" arising from an "event".

**5.** "Retained limit" means the available limits of "controlling underlying insurance" applicable to the claim.

**6.** "Ultimate net loss" means the total sum, after reduction for recoveries, or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of:

**a.** Settlements, judgments, binding arbitration; or

**b.** Other binding alternate dispute resolution proceeding entered into with our consent.

"Ultimate net loss" includes defense expenses if the "controlling underlying insurance" specifies that limits are reduced by defense expenses.

 © Insurance Services Office, Inc., 2012

COMMERCIAL EXCESS LIABILITY
CX 01 19 02 15

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# GEORGIA CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** Paragraph **3.a.** of **Duties In The Event Of An Event, Claim Or Suit** Provisions of **Section III – Conditions** is replaced by the following:

  **a.** In the event of an "event", claim or suit, we or our representative must receive prompt notice of the "event". Include:

  **(1)** How, when and where the "event" occurred;

  **(2)** The insured's name and address; and

  **(3)** To the extent possible, the names and addresses of any injured persons and witnesses.

  The requirement for giving notice of a claim, if not satisfied by the insured within 30 days of the date of the "event", may be satisfied by an injured third party who, as the result of such "event", has a claim against the insured. However, in this event, notice of a claim given by an injured third party must be mailed to us.

**B.** Paragraph **5.a.** of the **Cancellation** Provisions of **Section III – Conditions** is replaced by the following:

  **a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation stating a future date on which the policy is to be cancelled, subject to the following:

  **(1)** If only the interest of the first Named Insured is affected, the effective date of cancellation will be either the date we receive notice from the first Named Insured or the date specified in the notice, whichever is later. However, upon receiving a written notice of cancellation from the first Named Insured, we may waive the requirement that the notice state the future date of cancellation, by confirming the date and time of cancellation in writing to the first Named Insured.

  **(2)** If by statute, regulation or contract this policy may not be cancelled unless notice is given to a governmental agency, mortgagee or other third party, we will mail or deliver at least 10 days' notice to the first Named Insured and the third party as soon as practicable after receiving the first Named Insured's request for cancellation.

  Our notice will state the effective date of cancellation, which will be the later of the following:

  **(a)** 10 days from the date of mailing or delivering our notice; or

  **(b)** The effective date of cancellation stated in the first Named Insured's notice to us.

**C.** Paragraph **5.e.** of the **Cancellation** Provisions of **Section III – Conditions** is replaced by the following:

  **e. Premium Refund**

  **(1)** If this policy is cancelled, we will send the first Named Insured any premium refund due.

  **(2)** If we cancel, the refund will be pro rata, except as provided in **(3)** below.

  **(3)** If the cancellation results from failure of the first Named Insured to pay, when due, any premium to us or any amount, when due, under a premium finance agreement, then the refund may be less than pro rata. Calculation of the return premium at less than pro rata represents a penalty charged on unearned premium.

  **(4)** If the first Named Insured cancels, the refund may be less than pro rata.

  **(5)** The cancellation will be effective even if we have not made or offered a refund.

**D.** The following is added to Paragraph **5. Cancellation** of **Section III – Conditions** and supersedes any other provisions to the contrary:

If we decide to:

**1.** Cancel or nonrenew this policy; or

**2.** Increase current policy premium by more than 15% (other than any increase due to change in risk, exposure or experience modification or resulting from an audit of auditable coverages); or

**3.** Change any policy provision which would limit or restrict coverage;

then:

We will mail or deliver notice of our action (including the dollar amount of any increase in renewal premium of more than 15%) to the first Named Insured and lienholder, if any, at the last mailing address known to us. Except as applicable as described in Paragraph **E.** below, we will mail or deliver notice at least:

    **a.** 10 days before the effective date of cancellation if this policy has been in effect less than 60 days or if we cancel for nonpayment of premium; or

    **b.** 45 days before the effective date of cancellation if this policy has been in effect 60 or more days and we cancel for a reason other than nonpayment of premium; or

    **c.** 45 days before the expiration date of this policy if we decide to nonrenew, increase the premium or limit or restrict coverage.

**E.** With respect to a policy that is written to permit an audit, the following is added to Paragraph **5. Cancellation** of **Section III – Conditions:**

If you fail to submit to or allow an audit for the current or most recently expired term, we may cancel this policy subject to the following:

**1.** We will make two documented efforts to send you and your agent notification of potential cancellation. After the second notice has been sent, we have the right to cancel this policy by mailing or delivering a written notice of cancellation to the first Named Insured at least 10 days before the effective date of cancellation, but not within 20 days of the first documented effort.

**2.** If we cancel this policy based on your failure to submit to or allow an audit, we will send the written notice of cancellation to the first Named Insured at the last known mailing address by certified mail or statutory overnight delivery with return receipt requested.

**F.** Paragraph **5.f.** of the **Cancellation** Provisions of **Section III – Conditions** is replaced by the following:

If notice is mailed, a receipt provided by, or such other evidence of mailing as prescribed or accepted by, the U.S. Postal Service shall be sufficient proof of notice.

© Insurance Services Office, Inc., 2014

COMMERCIAL EXCESS LIABILITY
CX 21 02 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

Exclusion **c.** under Paragraph **2. Exclusions** of **Section I – Coverages** is replaced by the following:

Insurance provided under this Coverage Part does not apply to:

**2. Exclusions**

   **c. Pollution**

     **(1)** "Injury or damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time; or

     **(2)** Any loss, cost or expense arising out of any:

       **(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

       **(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, pollutants.

© Insurance Services Office, Inc., 2012

COMMERCIAL EXCESS LIABILITY
CX 21 13 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – FUNGI OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**Fungi Or Bacteria**

**a.** "Injury or damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such "injury or damage".

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following definition is added to the **Definitions** section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi.

© Insurance Services Office, Inc., 2012

COMMERCIAL EXCESS LIABILITY
CX 21 16 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – SILICA OR SILICA-RELATED DUST

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**Silica Or Silica-related Dust**

**a.** "Injury or damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

**b.** Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following definitions are added to the **Definitions** section:

**1.** "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

**2.** "Silica-related dust" means a mixture or combination of silica and other dust or particles.

  © Insurance Services Office, Inc., 2012

COMMERCIAL EXCESS LIABILITY
CX 21 19 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – EMPLOYMENT-RELATED PRACTICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to "injury or damage" to:

**a.** A person arising out of any:

**(1)** Refusal to employ that person;

**(2)** Termination of that person's employment; or

**(3)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**b.** The spouse, child, parent, brother or sister of that person as a consequence of "injury or damage" to that person at whom any of the employment-related practices described in Paragraph **(1), (2)** or **(3)** above is directed.

This exclusion applies whether the injury-causing event described in Paragraph **(1), (2)** or **(3)** above occurs before employment, during employment or after employment of that person.

This exclusion applies whether the insured may be liable as an employer or in any other capacity, and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

© Insurance Services Office, Inc., 2012

COMMERCIAL EXCESS LIABILITY
CX 21 17 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – COMMUNICABLE DISEASE

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**Communicable Disease**

"Injury or damage" arising out of the actual or alleged transmission of a communicable disease.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others that may be infected with and spread a communicable disease;

**b.** Testing for a communicable disease;

**c.** Failure to prevent the spread of the disease; or

**d.** Failure to report the disease to authorities.

COMMERCIAL EXCESS LIABILITY
CX 21 20 04 13

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to "injury or damage" due to the rendering of or failure to render any professional service. This includes but is not limited to:

**a.** Legal, accounting or advertising services;

**b.** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings or specifications;

**c.** Inspection, supervision, quality control, architectural or engineering activities done by or for you on a project on which you serve as construction manager;

**d.** Engineering services, including related supervisory or inspection services;

**e.** Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

**f.** Any health or therapeutic service treatment, advice or instruction;

**g.** Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement, or personal grooming or therapy;

**h.** Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardiovascular fitness, bodybuilding or physical training programs;

**i.** Optometry or optical or hearing aid services including the prescribing, preparation, fitting, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;

**j.** Body piercing services;

**k.** Services in the practice of pharmacy;

**l.** Law enforcement or firefighting services; and

**m.** Handling, embalming, disposal, burial, cremation or disinterment of dead bodies.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "event" which caused the "injury or damage" involved the rendering of or failure to render any professional service.

**POLICYWRITING SUPPORT FORMS
INSTRUCTIONAL SUPPLEMENT
INTERLINE**

**INSTRUCTIONS FOR USE OF FRAUD STATEMENT**
**IL N 001 09 03**

At the option of the insurer, the following fraud warning statement, or a substantially similar statement, may be included with every application and claim form in all states that do not have a specific fraud warning statement.

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

Insurers may either incorporate the text of the fraud warning statement directly into the text of the application or claim form or attach **IL N 001.**

**POLICYWRITING SUPPORT FORMS**
**INSTRUCTIONAL SUPPLEMENT**
**INTERLINE**

**INSTRUCTIONS FOR USE OF GEORGIA UNINSURED MOTORISTS COVERAGE NOTICE ACKNOWLEDGMENT**
**IL N 159 01 08**

| General Instructions |
|---|
| Ga. Comp. R. & Regs. 120-2-28-.06 requires, in general, that for any new or renewal policy of insurance that includes uninsured motorists coverage as defined in GA. CODE ANN. Section 33-7-11, notice must be provided with respect to such coverage. Ga. Comp. R. & Regs. 120-2-28-.06 also includes requirements related to signed confirmations. For the related notice requirements pertaining to Uninsured Motorists Coverage, refer to:<br><br>**A.**   Rule **14.A.** Uninsured Motorists Coverage of the Georgia Personal Vehicle Manual Exception Pages.<br><br>**B.**   Rule **97.** Uninsured Motorists Insurance in Division One – Automobile of the Commercial Lines Manual.<br><br>For the notice requirements applicable to Excess Uninsured Motorists Coverage, refer to:<br><br>**A.**   Rule **A1.** Excess Uninsured Motorists Coverage of the Georgia Personal Umbrella Liability Policy Program Manual Exception Pages.<br><br>**B.**   Rule **31.** Uninsured Motorists Insurance in Division Thirteen – Commercial Liability Umbrella of the Commercial Lines Manual.<br><br>Use **IL N 159,** Georgia Uninsured Motorists Coverage Notice Acknowledgment. |

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")
# ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

© ISO Properties, Inc., 2004

POLICY NUMBER: DSXS2010002206-01

**IL 09 85 01 15**

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE**

| SCHEDULE – PART I |
|---|
| **Terrorism Premium (Certified Acts)**          $105.00 |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(ies):** |
| **Additional information, if any, concerning the terrorism premium:** |

| SCHEDULE – PART II |
|---|
| **Federal share of terrorism losses      80%      Year: 2020** |
| (Refer to Paragraph **B.** in this endorsement.) |
| **Federal share of terrorism losses      80%      Year: 2021** |
| (Refer to Paragraph **B.** in this endorsement.) |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part **II** of the Schedule of this endorsement or in the policy Declarations) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

© Insurance Services Office, Inc., 2015
**IL 09 85 01 15**

COMMERCIAL EXCESS
CX 90 07 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ELECTRONIC DATA CYBER EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**j. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability:**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

CX 90 07 07 19



POLICY NUMBER:                    EFFECTIVE 12:01 A.M._____        COMMERCIAL EXCESS
                                                                        CX 90 09 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PRIOR AND PENDING LITIGATION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

> Insurance provided under this Coverage Part does not apply to:
>
> **f. Prior and Pending Litigation Exclusion**
>
> **a.**   Any "claim", "suit", administrative or regulatory proceeding or investigation, or licensing proceeding filed or commenced against "you" on or prior to the Prior Or Pending Litigation Date shown in the Declarations; or
>
> **b.**   The same or substantially the same "wrongful act", "interrelated wrongful act", fact or circumstance alleged in or underlying such "claim" or proceeding.

CX 90 09 07 19



COMMERCIAL EXCESS
CX 90 08 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# <u>CARE, CUSTODY OR CONTROL EXCLUSION</u>

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**i. Damage to Property in Care, Custody or Control:**

Damages arising out of:

Personal property in the care, custody or control of the insured.

CX 90 08 07 19



POLICY NUMBER:                    EFFECTIVE 12:01 A.M._____                    INTERLINE
                                                                                     IL PN 10 01 01 19

# POLICYHOLDER DISCLOSURE NOTICE OF
# <u>TERRORISM INSURANCE COVERAGE</u>

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED

**Acceptance or Rejection of Terrorism Insurance Coverage**

| |
|---|
| □ I hereby elect to purchase terrorism coverage for a prospective premium of $_____. |
| □ I hereby decline to purchase terrorism coverage for certified acts of terrorism. I understand that I will have no coverage for losses resulting from certified acts of terrorism. |

_____
Policyholder/Applicant's Signature                    Insurance Company
_____

_____
Print Name                                            Policy Number
_____

_____
Date

COMMERCIAL EXCESS
CX 90 03 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# <u>TOTAL ASBESTOS EXCLUSION</u>

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**I. Asbestos Or Asbestos-Related Dust**

(1) "Ultimate net loss," "injury or damage," or any other damages arising or resulting from, in whole or in part, the actual, alleged, threatened or suspected inhalation of, or ingestion of, asbestos or asbestos-related dust particles.

(2) Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of or in any way responding to or assessing the effects of asbestos or asbestos dust.

**B.** The following definitions are added to Section IV – Definitions:

7. "Asbestos" means naturally occurring hydrated fibrous mineral silicates that possess a unique crystalline structure and are incombustible in air, including chrysotile, amosite, crocidolite, tremolite, anthophylite, acinolite, and any material which contains "asbestos".

8. "Asbestos-related dust," means a mixture or combination of "asbestos" and other dust or particles.



COMMERCIAL EXCESS
CX 90 02 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# <u>LEAD LIABILITY EXCLUSION</u>

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**m. Lead Liability**

(1) "Ultimate net loss," "injury or damage," or any other damages arising or resulting from, in whole or in part, the ingestion, inhalation or absorption of lead in any form;

(2) Actual or alleged damage of any kind arising out of any form of lead;

(3) Any loss, cost or expense arising out of any:

    a. Request, demand or order that any insured or others test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of lead; or

    b. Claim or "suit" by or on behalf of any governmental authority or any claimant for damages, statutory penalties, abatement or any form of injunctive relief resulting from testing for, monitoring, cleaning-up, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of lead.



COMMERCIAL EXCESS
CX 90 01 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OCCUPATIONAL DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2. Exclusions** of **Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does not apply to:

**n. Occupational Disease**

(1) "Ultimate net loss," "injury or damage," or any other damages arising or resulting from, in whole or in part, "Occupational Disease".

**B.** The following definitions are added to Section IV – Definitions:

9. "Occupational Disease" means injury by disease arising out of and in the course of employment.



POLICY NUMBER:                                          **COMMERCIAL EXCESS LIABILITY**
                                                              **CX 90 15 07 19**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – DESIGNATED CONSTRUCTION WORK

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**SCHEDULE**

| |
|---|
| **Description Of Your Work:**<br>All "injury or damage" included in the products-completed construction or renovation work performed in the following states: CO, NY, SC, and WA. |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |

The following is added to Paragraph **2. Exclusions** of
**Section I – Coverages:**

**2. Exclusions**

Insurance provided under this Coverage Part does
not apply to or include hazards arising out of your
work shown in the Schedule.

COMMERCIAL EXCESS
CX 90 16 07 19

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# <u>ENHANCED COVERAGE ENDORSEMENT</u>

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

I.　　**SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS**

The following is a summary of Limits of Insurance or Liability and/or additional coverages provided by this endorsement. This endorsement is subject to the provisions of the policy to which it is attached.

| | |
|---|---|
| Crisis Management | $50,000 |
| Donation Assurance | $25,000 |
| Emergency Real Estate Consulting Fee | $50,000 |
| Temporary Meeting Space Reimbursement | $50,000 |
| Theft of Workplace Materials from Personal Areas | $ 2,500 |
| Workplace Violence Counseling | $50,000 |

II.　　**CONDITIONS**

　　A.　　**Applicability of Coverage**

　　　　Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable. All other terms and conditions of this policy or coverage part to which this endorsement is attached remain unchanged.

　　B.　　**Limits of Liability or Limits of Insurance**

　　　　1.　　When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limit of Limits of Liability or Limits of Insurance will apply. In no instance will multiple limits apply to coverages which may be duplicated within this policy,

　　　　　　Additionally, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum Limits of Liability or Limit of Insurance under all such coverage parts or policies combined shall not exceed the highest applicable Limits of Liability or Limit of Insurance under any one coverage part or policy.

CX 90 16 07 19　　　　Includes Copyrighted material of ISO, Inc. with its permission.



2.   Limits of Liability or Limits of Insurance identified in Clause 1. above are not excess of, but are in addition to the applicable Limits of Insurance stated in the Declarations.

**C.   Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

**III.   ADDITIONAL COVERAGES**

**A.   Crisis Management Emergency Response Expenses**

1.   We will reimburse you for reasonable "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis" to which this insurance applies. The amount of such reimbursement is limited  as described in Section II, B-Limits of Liability or Limits of Insurance. No other obligation or liability to pay sums or perform acts or services is covered.

2.   We will reimburse only those reasonable "crisis management emergency response expenses" which are incurred during the policy period as shown in the Declarations of the policy to which this coverage is attached and reported to us within six months of the date the "crisis" was initiated.

The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

**B.   Donation Assurance**

We will reimburse you for reasonable "failed donation claim(s)". The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

With respect to any "failed donation claim", it is further agreed as follows:

1.   the donor must never have been in bankruptcy, nor have filed for bankruptcy/ reorganization prior to the time said pledge was made to you;

2.   for non-cash donations, payment by us of a "failed donation claim" shall be based on the fair market value of said non-cash donation at the time of the "failed donation claim";

3.   in the case of unemployment/incapacitation of a natural person donor and as a condition of payment of the "failed donation claim";

(a) neither the natural person donor nor you shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date and;

(b) the donor shall be unemployed for at least 60 days prior to us making payment;

4.   no coverage shall be afforded for a written pledge of funds or other measurable tangible property to you dated prior to the policy period;



**5.** a donation amount which is to be collected by you over more than a 12-month period shall be deemed a single donation.

**C.    Emergency Real Estate Consulting Fee**

We will reimburse you any reasonable realtor's fee or real estate consultant's fee necessitated by your need to relocate due to the "unforeseeable destruction" of your principal location listed on the Declarations page during the policy period. The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

**D.    Temporary Meeting Space Reimbursement**

We will reimburse you for reasonable rental of meeting space which is necessitated by the temporary unavailability of your primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period.  Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy. The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

**E.    Theft of Work Materials from Personal Areas**

We will reimburse any insured 50% of their personal or business property policy's deductible for any theft involving "work materials" that are stolen from the "insured's personal area" during the policy period, provided that that the theft is covered by other insurance. No reimbursement is applicable under this coverage for thefts for which no other insurance policy provides a settlement. The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

**F.    Workplace Violence Counseling**

In the event that an incidence of "workplace violence" occurs at any of your premises during the policy period, we will reimburse you for reasonable expenses incurred for the emotional counseling of your employees, during the policy period. The limit shown in the Schedule for this coverage will be the most we will reimburse per policy period for all Insureds combined. No deductible applies to this coverage.

**A.    Definitions**

**A.** "Crisis" means the public announcement that an "incident" occurred on your premises or at an event sponsored by you.

**B.** "Crisis management emergency response expenses" mean those expenses incurred for services provided by a "crisis management firm". However, "crisis management emergency response expenses" shall not include compensation, fees, benefits, overhead, charges or expenses of any insured or any of your employees, nor shall "crisis management emergency response expenses" include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance.

**C.** "Crisis management firm" means any service provider you hire that is acceptable to us. Our consent will not be unreasonably withheld.



**D.** "Domestic Partner", whenever used in this endorsement, means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by you.

**E.** "Failed donation claim", whenever used in this endorsement, will mean written notice to you during the Policy Period of:

1. the bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable tangible property to you;

2. the unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable tangible property to the Insured.

**F.** "Incident" means an accident or other event resulting in death or serious bodily injury to three or more persons. "Incident" shall also mean the accidental discharge of pollutants.

**G.** "Injury", whenever used in this endorsement, means any physical damage to the body caused by violence, fracture or an accident that results in physical damage or hurt.

**H.** "Insured's personal area" means any residence or automobile owned or rented by any insured.

**I.** "Serious bodily injury" means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

**J.** "Unforeseeable Destruction", whenever used in this endorsement, means damage resulting from a "Certified Act of Terrorism", fire, crash or collapse which renders all of your primary office completely unusable.

**K.** "Work materials" means any equipment that is used by the insured solely in the course of the insured's business; inclusive of stores of data and client records.

**L.** "Workplace violence", whenever used in this endorsement, means any intentional use of or threat to use deadly force by any natural person, with intent to cause harm and that results in bodily "injury" or death of a member of the Insured or any other natural person while on your premises.





Underwritten by: **Ascot Insurance Company**

Administrative Office: 55 West 46th Street, 26th Floor • New York, New York • 10036
1-646-356-8101 • A Stock Company

In Witness Whereof, the Company has caused this policy to be executed and attested.

Yvonne Costello
Corporate Secretary

Jonathan Zaffino
Chief Executive Officer

**COMMERCIAL EXCESS LIABILITY**
**CX 21 30 01 15**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE PART

**A.** Any endorsement addressing acts of terrorism (however defined) in any "controlling underlying insurance" does not apply to this excess insurance. The following provisions addressing acts of terrorism apply with respect to this excess insurance:

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.** The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for "injury or damage" that is otherwise excluded under this Coverage Part.