**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| JAN-PRO FRANCHISING | ) | |
| INTERNATIONAL, INC., | ) | |
| a/k/a Jan-Pro Franchising, Inc. | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | FILE NO. _____ |
| v. | ) | |
| | ) | **JURY DEMAND** |
| SERVICETITAN, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff Jan-Pro Franchising International, Inc., a/k/a Jan-Pro Franchising, Inc. ("***Jan-Pro***" or "***Plaintiff***") hereby states its complaint against Defendant ServiceTitan, Inc. ("***Defendant***" or "***ServiceTitan***").

## Introduction

1.

This is a diversity action for breach of contract and breach of implied warranties arising from a failed custom software development project. ServiceTitan and its predecessor-in-interest contracted to develop a custom franchise management software platform to serve as Jan-Pro's core operating system for its three-tier franchise business. This development project was to cost $730,000 and be

completed in approximately one year.  Three and a half years of development later, and despite millions of dollars paid to ServiceTitan and its predecessor, ServiceTitan has utterly failed to deliver a product that is even remotely usable.  As of the filing of this Complaint, there is no operational or commercially viable product, likely never will be, and Jan-Pro has nothing of value to show for its substantial investment of time and resources.  Instead, Jan-Pro has to use its outdated technology platforms to run its entire franchising operations and seek out new developers to start from scratch on a franchise management system that should have been operational since late 2020.

2.

ServiceTitan has failed to deliver a commercially viable product, has breached several contractual obligations and warranties, and failed to cure those breaches. Further, ServiceTitan has indicated it does not intend to honor certain of its contractual obligations, including its obligations to maintain and keep the software platform fully functional were it ever to become operational.  Jan-Pro has been damaged as a result in an amount currently exceeding $4 million consisting of over $2 million paid directly to ServiceTitan, as well as substantial fees paid to third-party vendors used to help service the project and internal expenses related to the project. In addition, Jan-Pro expects to incur substantial expenses to obtain a suitable

replacement for the failed software platform.  Jan-Pro is entitled to recover its actual monetary damages and cover damages, and is also entitled to an award of its costs and post-judgment interest.

3.

ServiceTitan's uncured breaches also entitle Jan-Pro to ownership and a physical copy of the current source code for the franchise management system, all at no cost.  The software, however, is useless and of no value to Jan-Pro.  Hence, Jan-Pro does not want it, and the only thing that can put Jan-Pro in the same position as if ServiceTitan had performed the contract is a substantial damages award.

**Parties, Jurisdiction and Venue**

4.

Plaintiff Jan-Pro International Franchising, Inc., a/k/a Jan-Pro Franchising, Inc. ("***Jan-Pro***") is a Massachusetts corporation that is headquartered and maintains its principal place of business in Fulton County, Georgia, at 2520 Northwinds Parkway, Suite 375, Alpharetta, Georgia 30009.

5.

Defendant ServiceTitan, Inc. is a Delaware corporation that is headquartered and maintains its principal place of business in California, and registered to do business in Georgia.  (Exhibit 1.)  ServiceTitan has a registered agent in Gwinnett

3

County, Georgia, and may be served with process through this registered agent, Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.  (Id.)

6.

ServiceTitan is the successor-in-interest to Servant Systems, Inc. ("*SSI*"), a Michigan corporation.  As detailed below, ServiceTitan was assigned the software development contract at issue and replaced SSI as the contracting party obligated to Jan-Pro and responsible for delivering the software platform.

7.

This Court has jurisdiction over the parties and this action.

8.

The Court has personal jurisdiction over Defendant ServiceTitan because it has consented to lawsuits against it in Georgia courts by registering to do business in Georgia.  *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. --, 143 S. Ct. 2028 (June 27, 2023); *Cooper Tire & Rubber Co. v. McCall*, 863 S.E. 2d 81 (Ga. 2021).

9.

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states, *see* 28 U.S.C. § 1332(c), and the amount in controversy exceeds $75,000.

4

10.

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and/or (d) because Defendant ServiceTitan is subject to the Court's personal jurisdiction and is deemed to reside in this District for venue purposes, and because Plaintiff Jan-Pro is deemed to reside in this District for venue purposes because it maintains its principal place of business here.

**Factual Background**

Jan-Pro, the Franchise Management System, and the Relevant Contract

11.

Jan-Pro operates a three-tiered franchise system for commercial cleaning and disinfecting services consisting of Jan-Pro at the top level, Regional Franchise Developers ("*RFDs*") at the second level, and Certified Business Owners ("*CBOs*") at the third level.  Jan-Pro is responsible for the overall franchise system, recruits RFDs, and provides the means and technology for the entire franchise system.  The RFDs sell franchise licenses to CBOs, provide training and other critical business functions and support, including the administrative, financial, scheduling and other business functions for the CBOs, obtain customers for them, and also invoice and collect franchise and other payments from the CBOs.  The CBOs are independent

franchisees who operate the commercial cleaning businesses, serving customers from a wide array of businesses fields.

12.

In 2018, Jan-Pro began a project to update and replace its technology programs used to coordinate and handle the operations of the businesses with a Franchise Management System ("***FMS***") that would serve as the franchise system's core operating platform. The FMS was to be a single platform combining the functionality of existing programs with additional desired functions and integrating seamlessly with other Jan-Pro systems, software programs, databases and customer portals.

13.

Jan-Pro developed a detailed plan for the FMS and issued an RFP to multiple technology providers, including ServiceTitan's predecessor SSI. Jan-Pro selected SSI to develop the FMS based on SSI's response and assurances it could customize its existing software platform to provide the three-tiered franchise management system Jan-Pro required.

14.

Jan-Pro and ServiceTitan's predecessor SSI executed a *Services and License Agreement* for the FMS platform development, effective October 31, 2019.  A true and correct copy of the *Services and License Agreement* is attached as Exhibit 2.

15.

On or about November 3, 2020, SSI sent a letter to Jan-Pro's Alpharetta, Georgia headquarters, informing Jan-Pro that ServiceTitan acquired substantially all of SSI's business operations, was taking over all of SSI's rights and obligations under the *Services and License Agreement*, and asking Jan-Pro to consent to the assignment of the *Services and License Agreement* from SSI to ServiceTitan and agree to certain amendments to the *Services and License Agreement* with ServiceTitan.  Jan-Pro and ServiceTitan consented to the assignment and agreed to the amendments.  A true and correct copy of the assignment/amendment letter and the amendment to the *Services and License Agreement* is attached as Exhibit 3.

16.

After numerous problems were encountered with the FMS development, Jan-Pro and Service Titan agreed, entered into and executed the *Second Amendment to Services and License Agreement*, effective November 5, 2021.  The purpose of this amendment to the agreement was to define the scope and terms of the Phase II

development of the FMS (which included ServiceTitan's fix of the numerous bugs in the software), and expressly ratified and confirmed all provisions of the original agreement and first amendment not modified by the second amendment.  A true and correct copy of the second amendment (excluding Exhibit B thereto[1]) is attached as Exhibit 4.

17.

As amended, the *Services and License Agreement* (Exhibits 2, 3 and 4) is referred to hereinafter as the "***Contract***."

18.

ServiceTitan and its predecessor-in-interest SSI are merchants of franchise management software because at all relevant times they both developed, marketed, sold, hosted and/or serviced software systems for franchise businesses and franchise management.

19.

At all relevant times, Jan-Pro relied on the skill and judgment of ServiceTitan and its predecessor-in-interest SSI to select and/or furnish a suitable software product for the FMS platform.

---

[1] Exhibit B is the scope of work for the Phase II development of the FMS, but is not attached to the Complaint given its length of 395 pages.

20.

ServiceTitan's predecessor-in-interest SSI knew and/or had reason to know the particular purpose for which the FMS platform was required by Jan-Pro and that Jan-Pro was relying on SSI's skill and judgment to select and/or furnish a suitable software product for the FMS platform at the time of contracting and throughout the FMS development project.  Further, ServiceTitan knew and/or had reason to know the particular purpose for which the FMS platform was required by Jan-Pro and that Jan-Pro was relying on ServiceTitan's skill and judgment to select and/or furnish a suitable software product for the FMS platform at the time of the assignment and amendments of the original contract and throughout the remainder of the FMS development project.

Relevant Contract Provisions

21.

The Contract requires ServiceTitan (and its predecessor-in-interest) to develop the FMS platform and license the customized version of the software to Jan-Pro.  (Ex. 2 at §§ 2-3.)

22.

Among other obligations, the Contract requires ServiceTitan (and its predecessor-in-interest) to host, maintain, provide technical support for the FMS,

and provide security updates.  (Ex. 2 at §§1, 7 & Ex. C thereto; Ex. 3 at § 1.) ServiceTitan is also contractually required to keep the FMS platform "… fully functional in accordance with the terms of the [Services and License] Agreement." (Ex. 2 at § 1.)

23.

Pursuant to the express terms of the Contract, a party may terminate the Contract for an uncured material breach.  Specifically, Section 17 provides:

17. <u>Default and Termination</u>

If either party (a) commits a material breach or a material default in the performance or observance of its obligations under this Agreement and (b) such a breach or default continues for a period of 90 days after the delivery by the other Party of written notice reasonably detailing such breach or default, then (c) the non-breaching or non-defaulting Party shall have the right to terminate the Agreement, with immediate effect, by giving written notice to the breaching or defaulting Party.

A material breach of this Agreement includes, but is not limited to, the examples of breaches provided in Exhibit A, Material Breaches.

(Ex. 2 at § 17.)

24.

The Contract explicitly provides examples of "material breaches", which include, but are not limited to:

1. FMS functionality returns substantially incorrect results such that multiple master franchisees are unable to perform the functions necessary to support successful business operations.

10

2. FMS functionality is unreliable.  Multiple master franchisees are each having multiple significant errors per day when running the software.

3. FMS performance and availability is not meeting standards defined in Exhibit C, Service Level Agreement.

(Ex. 2 at Ex. A.)

25.

The Contract also requires ServiceTitan to deliver a commercially viable product fit for its intended use.  Specifically, Section 1 of the first amendment provides in relevant part:

> … If ServiceTitan does not deliver a commercially viable product fit for its intended use, then such event, if not cured within 30 days after written notice (or if cure is not commercially reasonable within 30 days, a longer period of time as agreed between the parties not to exceed 90 days), will be deemed a termination of the [Services and License] Agreement by ServiceTitan prior to the end of the term in accordance with Section 4, requiring transfer and assignment to [Jan-Pro] of a copy of then the current working source code of the FMS product in its entirety without cost.

(Ex. 3 at § 1.)

26.

The Contract also provides the following express warranty from ServiceTitan:

> FMS will conform to and perform according to the functional requirements, features and specifications described in or otherwise attached to this Agreement.

(Ex. 2 at § 16.)

27.

The second amendment of the Contract identifies specific bugs and other items and functions which ServiceTitan is required to fix or otherwise correct or develop for the FMS.  (*See* Ex. 4 at § 2.)

28.

The Contract requires ServiceTitan to provide the FMS source code free of charge to Jan-Pro if ServiceTitan (a) materially breaches the Contract; (b) fails to fulfill its obligations to maintain the FMS; or (c) terminates the Contract without cause.  (Ex. 2 at §§ 4, 12 & 17; Ex. 3 at § 3.)

29.

The Contract's choice of law provision provides it shall be governed by and construed under Michigan law.  (Ex. 2 at § 22.)

<u>Problems with the FMS Development<br>and ServiceTitan's Uncured Contract Breaches</u>

30.

The FMS platform was to cost $730,000 to develop and be completed and ready by the end of 2020.

31.

Significant problems arose during the initial test run of the FMS platform in October 2020, with numerous other problems encountered in later test runs and

attempted platform rollouts in 2021 and 2022.

32.

Jan-Pro attempted to work with ServiceTitan to address the various problems with the FMS development. The parties agreed on a list of 300 bugs and action items (the "*300 List*") to correct and complete the FMS platform, pushing the completion date to September 2022. The 300 List also led to the second amendment to the Contract.

33.

ServiceTitan did not meet the extended September 2022 completion date and many of ServiceTitan's attempted "fixes" caused more bugs and further deterioration of the FMS platform.

34.

As of the filing date of this Complaint, ServiceTitan has not provided a commercially viable product, and the FMS platform is not reliable, functioning or operable.

35.

The FMS software cannot carry out critical and necessary business functions, is unreliable and unstable, and returns incorrect results and data. For example, the FMS cannot invoice customers or handle financial and accounting data. Among

other problems, the FMS shows customer and franchisee invoices as sent when they never were, shows other invoices as unpaid when they were paid months before, does not provide correct dates or addresses for invoicing, does not calculate or account for payments accurately, and the data in the FMS is not accurate and does not match Jan-Pro's QuickBooks data despite purportedly being designed to interface with Jan-Pro's financial software and database.

36.

As a result, neither Jan-Pro nor any of its RFDs or CBOs are using the FMS platform, and instead must rely on the older systems the FMS was intended to update and replace nearly three years ago.

### Jan-Pro's Notice of Breach to ServiceTitan, Efforts to Resolve the Dispute, and Termination of the Contract

37.

By letter dated October 11, 2022, Jan-Pro gave ServiceTitan the required notice of ServiceTitan's material breaches of the Contract and request for cure. Jan-Pro also made suggestions for reaching a business solution for the parties to move forward to a viable FMS software platform. A true and correct copy of the notice letter is attached as Exhibit 5.

38.

The parties then met in-person in November 2022, where they identified

approximately 150 new necessary bug fixes and changes and ServiceTitan promised to provide a written proposal to fix and complete the FMS platform.

39.

Instead of providing the promised proposal for curing its breaches, in mid-December 2022 ServiceTitan indicated it would not stand behind the FMS platform, sought to avoid its obligations to complete the software development and avoid its obligations to host and maintain the software once it was completed.  ServiceTitan also sought to have Jan-Pro pay for another year of software development services to fix the existing problems with the FMS and transition it to a third-party developer, and sought to have Jan-Pro pay an additional $350,000 for the transfer of the FMS source code.

40.

Jan-Pro promptly rejected ServiceTitan's proposal, the parties agreed to stop all work on the FMS platform project as of December 26, 2022, and Jan-Pro subsequently informed ServiceTitan in mid-January 2023 that Jan-Pro did not want the FMS software source code because it did not appear the software could be fixed. Subsequent efforts by Jan-Pro to resolve this dispute were unsuccessful.

41.

By letter dated July 25, 2023, Jan-Pro gave ServiceTitan notice of the Contract

termination.  Specifically, Jan-Pro gave notice that ServiceTitan terminated the Contract prior to the end of the term because ServiceTitan did not cure its material breaches of the Contract within the applicable time period.  Alternatively – and to the extent ServiceTitan disputed its failure to timely cure automatically terminated the Contract – Jan-Pro also gave written notice of the Contract's termination, effective immediately, pursuant to Section 17 of the Contract.  A true and correct copy of the Contract termination notice is attached as <u>Exhibit 6</u>.

<u>Damage and Injury to Jan-Pro</u>

42.

Jan-Pro has incurred expenses related to the unsuccessful FMS platform project exceeding $4 million to date.  This includes over $2.1 million Jan-Pro paid directly to ServiceTitan and its predecessor-in-interest SSI.

43.

Jan-Pro is also incurring additional expenses, and will incur future expenses, to cover for ServiceTitan's breaches of the Contract and failure to provide a commercially viable software platform.  Jan-Pro is working to get a replacement software provider who can create a suitable substitute for the failed FMS platform, and will incur substantial external and internal expenses to obtain a functioning FMS platform.

16

44.

Jan-Pro has suffered damages, and continues to suffer damages, as a direct and proximate result of ServiceTitan's material breaches of the Contract and failure to cure its breaches.

**<u>Claims for Relief</u>**

**COUNT I**
**BREACH OF CONTRACT**

45.

Jan-Pro hereby incorporates and realleges the assertions in Paragraph 1 to 44 above as if fully set forth herein.

46.

Jan-Pro and ServiceTitan's predecessor-in-interest SSI entered into the *Services and License Agreement* (Ex. 2).

47.

Jan-Pro and ServiceTitan entered into the assignment of, and amendment to, the *Services and License Agreement* (Ex. 3), whereby ServiceTitan was assigned the contract, replaced its predecessor-in-interest SSI, and assumed all of the rights and obligations of SSI, as modified by the amendment.

48.

Jan-Pro and ServiceTitan entered into the *Second Amendment to Services and License Agreement* (Ex. 4).

49.

The Contract, as amended, (Exhibits 2, 3 and 4), is a valid, binding and enforceable agreement between Jan-Pro and ServiceTitan.

50.

Jan-Pro fulfilled its obligations under the Contract.

51.

ServiceTitan has materially breached the Contract in several ways.

52.

First, ServiceTitan has materially breached the Contract by failing to deliver a commercially viable product fit for its intended use.  (*See* Ex. 3 at § 1.)

53.

Second, ServiceTitan has materially breached the Contract because the FMS returns substantially incorrect results that prevents Jan-Pro master franchisees from performing functions necessary to support successful business operations, such as invoicing, other financial functions, and scheduling.  (*See* Ex. 2 at Ex A, ¶ 1; *see also* Ex. 2 at § 17.)

54.

Third, ServiceTitan has materially breached the Contract because the FMS functionality is unreliable.  (*See* Ex. 2 at Ex A, ¶ 2; *see also* Ex. 2 at § 17.)  For example, the FMS is not stable enough to be used, and when the FMS was live it did not return accurate data from Jan-Pro's databases or other software and numerous significant errors were encountered daily.

55.

Fourth, ServiceTitan has materially breached the Contract because the FMS performance and availability does not meet the required Contract standards.  (*See* Ex. 2 at Ex A, ¶ 3 & Ex. C; *see also* Ex. 2 at § 17.)  ServiceTitan breached at least the *Technical Support and Software Maintenance* Priority Level 2 standards, which applies to severe loss of service of the FMS where operation could continue in restricted fashion and requires ServiceTitan to "… remedy the defects and/or provide a workaround within 2 working days." (Ex. 2 at C, § 3.ii).  For example, ServiceTitan did not remedy or provide workarounds within the required time for the following Priority Level 2 category issues:

- Customer payments – amounts did not auto-populate which prevented the user from being able to process receipts against an invoice, this was caused by a faulty previously implemented production fix;

- Unit Franchise surcharge incorrect date range availability – incorrect allowable dates set which prevented the users from being able to enter miscellaneous deductions related to the current open period for the Unit Franchisees;

- Overpayments / Credit memos – in wrong QuickBooks connector section, therefore the credits were going to the incorrect QuickBooks account; and

- Invoicing – mid-month price increases caused existing services to be automatically cancelled instead of creating a new invoice for the price adjustment.

56.

Fifth, ServiceTitan has materially breached the Contract because it has failed to keep the FMS fully functional, in that the platform has never been fully functional and is not stable enough to be used in a live environment. (*See* Ex. 3 at § 1.)

57.

Sixth, ServiceTitan has materially breached the Contract because it breached its express warranty that the FMS will conform to and perform according to the functional requirements, features and specifications described in the Contract. (*See* Ex. 2 at § 16.) This includes ServiceTitan's failures to provide the required bug fixes and functionalities set forth in the second amendment to the Contract. For example:

20

- Item ID 16649 – the ability to combine addresses, which ServiceTitan could never develop;

- Item ID 16780 – Franchisee renewal reports, which has never worked and returns incorrect data;

- Item ID 17980 – Unit franchisee surcharge amount reports, which has never worked, shows incorrect results, and ignores the specified selection criteria;

- Item ID 18263 – Business Activity Report data extract, which never returned accurate data, forcing Jan-Pro to develop its own internal system;

- Item ID 18274 – Customer prices increases reports, which never worked and could not be used;

- Item ID 18279 – Migration MasterView Data, which never fully worked and returned incorrect data, forcing Jan-Pro to undertake substantial manual data manipulation and correct the errors post-migration; and

- Item ID 18417 – Regular Service and Special Service dashboard, which was never developed to the required specifications.

ServiceTitan also failed to fix the numerous bugs in the software, and created additional bugs with its attempted fixes.

58.

Seventh, ServiceTitan has unequivocally declared its intent not to host, support, maintain, and/or keep the FMS software fully functional even if it were to become a viable and operational platform, constituting anticipatory breach of ServiceTitan's obligations under the Contract. (*See* Ex. 2 at §§ 1, 7; Ex. 3 at § 1.)

59.

Jan-Pro provided ServiceTitan the required notice of breach, but ServiceTitan failed to cure its breaches within the contractually required time.  (*See* Ex. 5; *see also* Ex. 2 at § 17; Ex. 3 at § 1.)

60.

ServiceTitan's failure to cure its material breach of the Contract by failing to deliver a commercially viable product fit for its intended use within 30 (or 90) days of October 11, 2022 constitutes a termination of the Contract by ServiceTitan prior to the end of the term effective as of January 9, 2023.  (*See* Ex. 3 at § 1; Ex. 6.) Alternatively, the Contract terminated due to ServiceTitan's failure to cure its material breaches within 90 days of October 11, 2022, with such termination effective no later than July 25, 2023.  (*See* Ex. 2 at § 17; Ex. 5; Ex. 6.)

61.

Jan-Pro has suffered injury and damages as a direct, natural and proximate result of Defendant's material breaches of the Contract.  Jan-Pro's damages currently exceed $4 million for external and internal expenses for the FMS project, and such damages will include additional significant expenses to obtain a suitable replacement for the FMS platform from one or more third parties.  Jan-Pro is entitled to recover monetary damages in an amount to be determined at trial.

62.

Jan-Pro is also entitled to recover its costs and post-judgment interest.

## COUNT II
## BREACH OF THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

63.

Jan-Pro hereby incorporates and realleges the assertions in Paragraph 1 to 44 as if fully set forth herein.

64.

ServiceTitan and/or its predecessor-in-interest to the Contract knew or had reason to know the particular purpose for which the FMS platform was required by Jan-Pro and that Jan-Pro was relying on their skill or judgment to select or furnish a suitable software product for the FMS platform at the time of contracting and at the

time the *Services and License Agreement* was assigned to ServiceTitan and at the
times it was amended.

65.

The Contract does not exclude or modify the implied warranty that the FMS
software shall be fit for Jan-Pro's particular purpose.

66.

Accordingly, the Contract includes an implied warranty that the FMS software
shall be fit for Jan-Pro's particular purpose.  (M.C.L. § 440.2315; *accord* O.C.G.A.
§ 11-2-315.)

67.

ServiceTitan breached the implied warranty of fitness for a particular purpose
because the FMS software does not meet Jan-Pro's required purposes for the
software.  For example, the FMS software is not operable, reliable or functional,
cannot perform various business critical operations like invoicing and scheduling,
cannot return accurate data or otherwise accurately integrate financial and other data
from Jan-Pro's other software programs and databases, and cannot be used to run
the day-to-day business operations of Jan-Pro or its RFDs or CBOs.  Further, the
FMS software includes terminology and functions that have no relation to Jan-Pro

or its business, and instead are for one or more unrelated customers of ServiceTitan and/or its predecessor-in-interest.

68.

Jan-Pro has suffered injury and damages as a direct, natural and proximate result of ServiceTitan's breach of the implied warranty of fitness for a particular purpose. Jan-Pro's damages currently exceed $4 million for external and internal expenses for the FMS project, and such damages will include additional significant expenses to obtain a suitable replacement for the FMS platform from one or more third parties. Jan-Pro is entitled to recover monetary damages in an amount to be determined at trial.

69.

Jan-Pro is entitled to recover its actual damages and cover damages for ServiceTitan's breach of the implied warranty of merchantability. Jan-Pro is also entitled to recover its legal costs and post-judgment interest.

**COUNT III**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

70.

Jan-Pro hereby incorporates and realleges the assertions in Paragraph 1 to 44 above as if fully set forth herein.

25

71.

ServiceTitan and its predecessor-in-interest to the Contract are merchants of software for franchise businesses and franchise management.

72.

The Contract does not exclude or modify the implied warranty that the FMS software shall be merchantable.

73.

Accordingly, the Contract includes an implied warranty that the FMS software shall be merchantable.  (M.C.L. § 440.2314; *accord* O.C.G.A. § 11-2-314.)

74.

ServiceTitan breached the implied warranty of merchantability because the FMS software does not pass without objection in the trade under the contract description, and because the FMS software is not fit for the ordinary purpose for which such software is used.  Instead, the FMS software is not operable, reliable or functional, cannot perform various business critical operations like invoicing and scheduling, cannot return accurate data or otherwise accurately integrate financial and other data from other software programs and databases, and cannot be used to run day-to-day business operations.

75.

Jan-Pro has suffered injury and damages as a direct, natural and proximate result of ServiceTitan's breach of the implied warranty of merchantability. Jan-Pro's damages currently exceed $4 million for external and internal expenses for the FMS project, and such damages will include additional significant expenses to obtain a suitable replacement for the FMS platform from one or more third parties. Jan-Pro is entitled to recover monetary damages in an amount to be determined at trial.

76.

Jan-Pro is entitled to recover its actual damages and cover damages for ServiceTitan's breach of the implied warranty of merchantability. Jan-Pro is also entitled to recover its legal costs and post-judgment interest.

## Prayer For Relief

WHEREFORE, Jan-Pro Franchising, Inc., demands a jury trial on all claims so triable and prays for judgment as follows:

(a)    The Court enter judgment that Defendant ServiceTitan, Inc.: (i) materially breached the Contract, failed to timely cure such breaches, and the Contract has terminated; (ii) breached the implied warranty of fitness for a particular purpose; and (iii) breached the implied warranty of merchantability.

(b)   On Jan-Pro's First, Second, and Third Claims for Relief, actual damages, cover damages, costs, and post-judgment interest.

(c)   All such other and further relief as this Court deems equitable, just and proper.


**<u>Demand for Jury Trial</u>**

Jan-Pro demands a trial by jury on all issues so triable.


Respectfully submitted this 1st day of August 2023.

*/s/ Damon J. Whitaker*
Damon J. Whitaker (Ga. Bar No. 752722)
**Bryan Cave Leighton Paisner LLP**
1201 West Peachtree Street NW, 14th Floor
Atlanta, Georgia 30309-3488
Telephone: (404) 572-6600
Facsimile: (404) 572-6999
damon.whitaker@bclplaw.com

**– Of Counsel –**
Steven M. Stimell (NY Bar No. 2177020)
(*Pro Hac Vice forthcoming*)
**Bryan Cave Leighton Paisner LLP**
1290 Avenue of the Americas
New York, New York 10104-3300
Telephone: (212) 541-2000
Facsimile: (212) 541-4630
smstimell@bclplaw.com

*Attorneys for Plaintiff Jan-Pro Franchising International, Inc.*

#60795008