# EXHIBIT 2

# SERVICES AND LICENSE AGREEMENT

This SERVICES AND LICENSE AGREEMENT ("Agreement') is entered into by and between JAN-PRO Franchising, Inc., a Georgia corporation, having its principal place of business at 2520 Northwinds Parkway, Suite 375, Alpharetta, GA 30009 ("JAN-PRO") and SERVANT SYSTEMS INCORPORATED, a Michigan corporation, having its principal place of business at P.O. Box 7087, Ann Arbor, Michigan 48107-7087 ("SSI"), effective __10/31__, 2019 (the "Effective Date").

## RECITALS

JAN-PRO is a commercial cleaning company using the franchising business model including regional master franchises and unit franchises. JAN-PRO contracts with third parties, such as SSI, for the purpose of developing software systems for use by master franchisees in the operation of their businesses. JAN-PRO contemplates contracting with SSI to develop and/or license one or more software applications and/or to enhance and improve one or more existing software programs owned by JAN-PRO. The parties are entering into this Agreement for the purpose of defining the framework terms within which JAN-PRO will license SSI's Servantia SmartWare® software application as well as the framework terms within which SSI will perform software development services for JAN-PRO, on a project basis.

**NOW, THEREFORE**, the parties agree as follows:

For good and valuable consideration, the mutual covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows in regards to the development of a Franchise Management System (FMS) for JAN-PRO including the licensing of SSI's Servantia SmartWare® to be utilized by SSI as the basis of FMS.

1. Definition of "Servantia SmartWare®"

For the purposes of this Agreement, the term "Servantia SmartWare®" shall include the franchise management software for mobile services companies developed, sold and supported by SSI.

Servantia SmartWare® includes the cloud-based franchise software used primarily by franchisees to run their daily operations and Servantia Lead Management, in addition to any future enhancements to these specific products (Servantia SmartWare® and SmartWare Lead Management collectively, "SmartWare"). As of the Effective Date Servantia SmartWare® and Servantia Lead Management are hosted on the Microsoft Azure cloud environment and it is expected the FMS will be hosted in the same environment, but this environment may change upon mutual agreement of the parties.

As part of this Agreement, SSI will include the provisioning on Azure of the cloud hosting environment required for FMS users including JAN-PRO and JAN-PRO master franchisees, including bi-location of the application and database with hot failover capabilities, and various performance and monitoring tools, and interfaces to third parties. For the production environment,

JAN-PRO master franchisees will be hosted in an independent Azure environment, including one Azure SQL database. All JAN-PRO franchisees will be tenants in that one database.

JAN-PRO or JAN-PRO master franchisees shall separately pay for third party applications selected by them to which FMS may interface directly or indirectly through JAN-PRO systems including, but not limited to, client-side mapping, sever-side mapping, accounting software (e.g., Intuit® QuickBooks® or QuickBooks® Online), consolidation and business intelligence reporting (e.g., Qvinci®), voice-over-internet protocol (VOIP) vendor(s), credit card processors, customer satisfaction surveys, consumer website(s), call centers, and similar third party applications.

2. Software Development Services.

From time to time while this Agreement is in effect, JAN-PRO may contract with SSI to perform software development services. The terms of each such project shall be confirmed in a mutually agreed Statement of Work ("SOW") which will describe the software development services to be performed by SSI, the functional specifications for the software to be developed ("specifications"), SSI's charges for those services, licensing fees to be incurred, and other project terms that are not set forth in this Agreement. The terms of this Agreement shall apply to each SOW. In case of any conflict between this Agreement and the SOW for any project, the terms of the SOW shall control.

This Agreement (termed Phase 1) for the development of the FMS shall be done via a series of SOWs, each defined, authorized, and completed in and of itself. As each SOW is nearing completion, JAN-PRO and SSI shall jointly develop the following SOW(s). At the completion of any SOW, JAN-PRO and SSI shall make all reasonable attempts to define and authorize any following SOW(s) within ten (10) business days of the completion of the prior SOW(s). Both parties acknowledge that the completion and implementation of Phase 1 of the FMS that conforms to and performs in accordance with the mutually agreed upon specifications of both parties for the Phase 1 deliverables is fundamental to this Agreement

JAN-PRO may also request SSI to perform software development services beyond the scope of the FMS or unrelated to the FMS. Any such services shall be defined and authorized via a mutually agreed SOW.

3. License and White Label Branding

SSI hereby grants to JAN-PRO for 96 months, starting from the Effective Date of this Agreement and continuing until the last day of the 96th full month after the Effective Date, (the "Term"), an exclusive license to the JAN-PRO version of SSI's SmartWare (as defined in Section 1), as developed under this Agreement, as the basis for FMS for use by JAN-PRO and JAN-PRO master franchisees. SSI shall not license the JAN-PRO version of SmartWare to any other party. JAN-PRO has the right to sublicense the JAN-PRO version of SmartWare to its Master Franchisees. Neither JAN-Pro, nor any JAN-PRO Master Franchisees have the right to sublicense any version of SmartWare to users outside the JAN-Pro franchise system.

FMS software shall be branded under JAN-PRO's unique naming, if requested, according to JAN-PRO's direction at no additional charge.

4. Term

This Agreement shall become effective when it is signed by both parties. It will remain in effect for an initial 96-month term.

JAN-PRO may terminate this Agreement, effective upon six (6) months prior written notice to SSI without incurring any damages of any kind, except as otherwise provided herein. SSI may terminate this Agreement, effective upon thirty (30) months prior written notice to JAN-PRO, only after completion of Phase 1 of the FMS, without incurring damages of any kind, except as otherwise provided herein. Unless specified in a notice of termination, any outstanding SOW shall remain in effect on the date of termination and the terms of this Agreement shall apply to that SOW until it has been fully performed by both parties.

If this Agreement is terminated by JAN-PRO without cause or by SSI for cause, JAN-PRO and the JAN-PRO master franchisees shall stop using the FMS as of the date the termination takes effect. If JAN-PRO terminates this Agreement for cause or if SSI terminates this Agreement without cause, (a) the license provided in Section 3 shall remain in effect and (b) JAN-PRO shall have the source code escrow rights specified in Section 12.

Discussion of an extension of this Agreement shall begin at least thirty-six (36) months prior to the expiration of this Agreement. The requirement for thirty (30) months prior written notice shall apply to the end of the term of the Agreement. If the Agreement is not explicitly terminated at the end of the 96-month term, the Agreement will be automatically renewed for an additional 96-month term. SSI shall be required to renew the Agreement if Jan-Pro is in good standing with this Agreement.

Should the parties agree to an extension of this Agreement, the License Fees shall continue to be determined by the terms defined in Section 7 of this Agreement.

5. Ownership of SmartWare

Nothing herein shall in any way transfer ownership or rights in SmartWare to JAN-PRO beyond those explicitly stated in this Agreement

6. Accounting

JAN-PRO will track usage of FMS by JAN-PRO master franchisees, collect the relevant monthly license fees from JAN-PRO master franchisees, and forward the specified license fees to SSI.

7. Master Franchisee License Fee(s) and Support

SSI shall not charge the JAN-PRO corporate office for their internal utilization of the FMS, for data provided to the JAN-PRO corporate office, or for FMS usage for training purposes.

SSI may charge for enhancements to FMS or SmartWare requested by JAN-PRO that are unique to JAN-PRO or which are not part of SmartWare.

The monthly license fee for JAN-PRO master franchisees' utilization of SmartWare as the basis for the FMS shall be as follows:

> $325 per month per master franchisee utilizing FMS in the production environment as of the tenth of each month

SSI shall have the right to increase the license fees charged for each master franchisee's utilization of SmartWare. Any increase in the license fee shall be instituted no sooner than January 2022, no more than once per 12-month period, and shall not exceed the increase in the nation-wide US Urban Consumer Price Index (CPI-U) since the Effective Date unless otherwise approved by JAN-PRO.

JAN-PRO shall invoice or draft JAN-PRO master franchisees for monthly license fees due to SSI on a monthly basis. Gross payment of fees to SSI will be paid in arrears monthly, net 15 days from date of invoice or draft.

As part of the master franchisee license fee, SSI shall provide JAN-PRO with the following:
- Level 3 FMS Support. Level 3 support is the uppermost level of support in a technical support model accountable for resolving the most difficult problems. It is also known as back-end support, tier III support, high-end support and many other titles. The title denotes expert level support for troubleshooting. This includes running SQL update queries to update incorrect data. Most Level 3 support issues can be documented, and stories created for the normal sprint planning coordinated between SSI and JAN-PRO.
- Level 4 FMS Support. Level 4 support is for those issues which are time critical and may require a production fix to FMS to support key franchisee operations prior to the next planned FMS release.
- Microsoft Azure monitoring, maintenance and performance tuning including Azure SQL, app servers and VMs.
- Timely response to Microsoft Azure problems such as Microsoft Regional Data Center unavailability, automated or manual switchover to an alternative Microsoft Regional Data Center, and Azure SQL failures.

JAN-Pro will provide Level 1 and Level 2 support, as provided in Section 10.

8. Software Development Fees

SSI shall charge JAN-PRO for the development of Phase 1 of the FMS for the various positions at the rates specified in the following table:

| Position | SSI Standard Rate per Hour | JAN-PRO Phase 1 Rate per Hour | Examples of Staff with Position |
|---|---|---|---|
| Project Management | $150 | $125 | Len Chockley, Bruce Franson |
| Developers | $125 | $100 | Ben Carpenter, Dave Flanagan, Julian Rodriguez |
| Interns | $50 | $40 | |
| DevOps | $115 | $90 | Anthony Hernandez |
| Senior QA/Analyst | $100 | $80 | Karlena Felan |
| QA Testing | $80 | $65 | Glenna Schleusener, Wendy Carter |

Each SOW may specify the dates on which SSI may invoice JAN-PRO or the dates on which payments are due for its work under that SOW. Unless otherwise specified in a SOW, (a) all SSI invoices for work performed shall be invoiced monthly during the term of the SOW, or upon completion of the SOW, whichever comes first, and (b) SSI invoices will be payable on net 15-day terms.

SSI acknowledges that having staff with the appropriate skills is key to the successful development and completion of the FMS. If staff other than the above examples are assigned to the FMS, SSI is responsible to ensure that these staff have the needed skills.

The scope of work for Phase 1 FMS features in this Agreement is that defined by the following two (2) documents attached to this Agreement and included by reference:
- JAN-PRO Project Plan in the document "Jan-Pro_FeatureAvailabilityAndDevelopmentPhase_20191025.pdf", dated October 25, 2019
- JAN-PRO Specifications in the document "Jan-ProCoreSystemSpecificationV1_3_WithSSI_ResponsesAndComments_20190628.pdf", version date June 28, 2019

The scope of work for Phase 1 for the development life cycle includes:
- Site visits to master franchisees
- Design and development of the FMS
- development of data migration tools from the two existing applications (MasterView, LodeStar) to FMS
- performing data migrations for FMS Alpha franchisee site tests
- parallel testing of FMS with an existing application at a master franchisee for each of the two existing applications (MasterView, LodeStar)
- FMS alpha test site support
- Training of JAN-PRO staff to perform data migrations to FMS from each of the two existing applications (MasterView, LodeStar)
- Provision of generic SmartWare documentation that JAN-PRO can use as the basis of FMS User Guides

- FMS beta site support for master franchisees from initial FMS install until the time of FMS General Availability for each of the two existing applications (MasterView, LodeStar).
- a methodology for upgrading FMS to new versions. Planned version upgrades will normally take place in the evenings after business hours in the contiguous U.S.
- three (3) months of FMS maintenance and bug fixes post-General Availability

This scope of work is included within the maximum charge for Phase 1 FMS, as provided below.

Work to be performed by JAN-PRO and not included in this Phase 1 FMS scope of work includes:
- user acceptance testing of the FMS
- performing the data migrations for FMS beta sites
- rollout, including test and live data migrations and coordination with master franchisees, of FMS to master franchisee sites post-General Availability
- training of master franchisees
- training materials and user guides for master franchisees
- Level 1 and Level 2 support of master franchisees

The maximum charge for the sum of all software development work under all SOWs within Phase 1 of development of FMS shall be $730,000. Travel expenses such as transportation and per diem costs shall not be included in this maximum charge and will only be incurred with permission of JAN-PRO. License fees for SmartWare shall not be included in this maximum charge.

Each SOW, whether for Phase 1 of FMS or otherwise, shall have a not-to-exceed amount unless otherwise stated in the SOW.

9. Provisioning of Hosted Environment for FMS

SSI shall separately charge JAN-PRO for the provisioning of FMS hosting on Microsoft Azure and server-side mapping on Microsoft Azure. SSI charges to JAN-PRO for Microsoft platforms shall be at a 5% discount from Microsoft standard prices. SSI shall charge JAN-PRO for other third-party run-time licenses, performance and monitoring tools, and other operations tools at cost, whether licensed independently or on a shared cost basis.

JAN-PRO shall have ownership rights of the Azure account at Microsoft used for the FMS production environment. SSI shall be the reseller of the Azure account as long as the Agreement remains in effect unless both parties mutually agree to a change.

10. FMS Enhancements, Support and Project Management

SSI agrees to make all features of SmartWare, including new features developed during the term of this Agreement, available for integration into and testing within FMS when approved by JAN-PRO within a SOW. New features of SmartWare may also be developed on a "shared" basis across clients of SmartWare, including the FMS, when all clients will benefit, when approved by JAN-PRO within a SOW. JAN-PRO will not be charged for any features that it has not approved under a SOW.

JAN-PRO shall provide Level 1 and Level 2 FMS support to JAN-PRO master franchisees. A general definition of Level 1 and Level 2 support is as follows:
- Level 1 Support: These specialists solve basic user issues and have a general understanding of the product and services. They gather user information, analyze symptoms and determine the basic problem(s). They solve about 80 percent of user problems, including such issues as:
    - Problems with usernames and passwords
    - Virus and other security issues
    - Verification of hardware, software and Internet setup including user permissions
    - Menu navigation and finding the correct screens and reports for the user
- Level 2 Support: These specialists have more experience and knowledge and can assist Level 1 specialists with basic technical problems. They investigate the issues raised and check for known solutions to complex issues. They will also document issues and attempt to duplicate the problem, including the data and sequence of steps, required for Level 3 support to quickly duplicate the problem. They also, when possible, identify data problems that require correction by Level 3 support.

JAN-PRO shall provide a project manager to oversee and manage the project including, but not limited to, development of JAN-PRO specifications as they differ from the current features of SmartWare, interaction with JAN-PRO corporate staff and JAN-PRO master franchisees, interaction with SSI staff, the schedule and migration of JAN-PRO franchisee offices from the current software to FMS, and training/initial FMS support.

### 11. Trade Secrets of JAN-PRO

JAN-PRO shall identify the components of SmartWare that are separable from the core product (e.g., screens, reports, call scripts) that are customized for JAN-PRO which it considers a confidential Trade Secret of JAN-PRO.

A component which is a confidential Trade Secret of JAN-PRO are those meeting the following criteria:

a) JAN-PRO identifies the component as a confidential Trade Secret;
b) The component is not currently available in the marketplace; and
c) The component does not become available in the marketplace.

SSI agrees to exclude such confidential Trade Secrets in any product made available to its other clients. JAN-PRO has identified the expected confidential Trade Secrets as of the Effective Date of this Agreement in Exhibit B to this Agreement, which Exhibit may be updated from time to time by mutual agreement of the parties. The parties shall attempt to identify any such confidential Trade Secrets when developing specifications for the custom development work. In any case, at least once a year JAN-PRO shall identify any confidential Trade Secrets which are part of the custom development done under this Agreement.

SSI will enhance the SmartWare core code with the additions for JAN-PRO and have one code base for all its clients. Other clients would have access to those features and conversely JAN-PRO would have access to the improvements made at SSI's initiative without having to pay for the development under a SOW, unless agreed to by JAN-PRO.

The SmartWare data model, including any enhancements or improvements to that data model made by SSI while developing the JAN-PRO version of SmartWare shall not be considered a confidential Trade Secret of JAN-PRO and shall remain property of SSI.

For the avoidance of doubt, however, nothing in this Agreement shall restrict SSI from developing any functionality for any client or for its clients generally, provided that it does so "from scratch" and without reference to or use of custom development done for JAN-PRO, and does not violate a confidential Trade Secret of JAN-PRO.

12. Source Code Escrow

SSI agrees to place the FMS source code, FMS documentation, and instructions for building and releasing FMS in escrow upon request of JAN-PRO. This may be done via three party depositor agreements and three-party beneficiary agreements or equivalent as approved by JAN-PRO. SSI also agrees to provide sufficient instructions and cooperation for a verification process to allow the FMS to be built and released.

SSI shall identify the FMS source code that is unique to JAN-PRO as described in Section 11, is not part of SmartWare available to other SSI clients, and which will not be used for the development of software applications for commercial cleaning companies other than JAN-PRO without express written permission from JAN-PRO. This FMS source code shall be separated in the source code control system to distinguish it from source code that is part of SmartWare Core.

JAN-PRO agrees to pay any fees to third parties used for FMS escrow and verification.

SSI agrees to update the escrow deposit as necessary to maintain a copy that is compatible with the version used by JAN-PRO and provide the needed materials as included in any approved SOWs, which shall not be counted in the maximum fees for Phase 1 of the FMS as defined in section 8, Software Development Fees. Said materials shall be provided at least annually or more frequently upon written request of JAN-PRO.

SSI hereby grants to JAN-PRO a contingent license to receive the complete FMS source code, including the FMS custom code and all SmartWare Core code utilized for the FMS, directly or from the escrow agent and to use the source code to support its use of the FMS if SSI:

> 1) whether directly or through a successor or affiliate, ceases to be in the software business,
>
> 2) fails to fulfill its obligations to maintain the FMS as provided in this Agreement,
>
> 3) becomes insolvent or admits insolvency,

4) files a petition for protection under the U.S. Bankruptcy Code, or an involuntary petition is filed against it and is not dismissed within 60 Business Days,

5) SSI terminates this Agreement under Section 4.

If JAN-PRO receives FMS source code under this section, (a) the license rights and limitations stated in Section 3 shall remain in effect, and (b) JAN-PRO shall be granted a right to use the source code to support FMS for the JAN-PRO corporate office and JAN-PRO Master Franchisees, but ownership and all other rights to SmartWare shall remain with SSI.

### 13. Trademarks and Copyrights

All trademarks and copyrights are the property of their respective owners. "Servantia SmartWare®" is a registered trademark of SSI.

### 14. Publicity

SSI shall not refer to the existence of this Agreement in any press release, advertising or materials distributed to prospective customers, without the prior written consent of JAN-PRO, which shall not be unreasonably withheld.

### 15. Assignment

JAN-PRO may assign this Agreement to any subsidiary or affiliate under control of Lynx Franchising ("Lynx"), or to a third party as part of the sale of all or part of its business (including the sale of one or more franchisor companies currently owned by Lynx), or pursuant to any merger, consolidation or other reorganization, without SSI's consent, upon written notice to SSI. SSI shall not assign this Agreement without JAN-PRO's prior written consent, which shall not be unreasonably withheld. An assignee of either party, if authorized hereunder, shall have all of the rights and obligations of the assigning party set forth in this Agreement.

### 16. Warranties

SSI represents that (i) all of the services to be performed by it hereunder will be rendered using sound, professional practices and in a competent and professional manner by knowledgeable, trained, and qualified personnel, (ii) it has the right, power and authority to execute, deliver and perform this Agreement and (iii) SmartWare does not violate or infringe any copyright or patent, constitute a libel, defamation or an invasion of the rights of privacy or publicity of, or otherwise violate or infringe any other rights whatsoever of, any person or entity. SSI shall use commercially reasonable efforts to conduct its business in compliance with all applicable laws, rules and regulations. FMS will conform to and perform according to the functional requirements, features and specifications described in or otherwise attached to this Agreement.

JAN-PRO represents that it has the right, power and authority to execute, deliver and perform this Agreement.

### 17. Default and Termination

If either Party (a) commits a material breach or a material default in the performance or observance of any of its obligations under this Agreement and (b) such a breach or default continues for a period of 90 days after delivery by the other Party of written notice reasonably detailing such breach or default, then (c) the non-breaching or non-defaulting Party shall have the right to terminate this Agreement, with immediate effect, by giving written notice to the breaching or defaulting Party.

A material breach of this Agreement includes, but is not limited to, the examples of breaches provided in Exhibit A, Material Breaches.

### 18. Confidentiality

During the course of the parties' business relationship, each party will have access to information and materials that are proprietary and confidential to the other party. "Confidential Information" includes without limitation, software source code, software development plans, business development plans, financial information, technical information, and any other information that by its nature a reasonable person would consider to be confidential or that a party identifies in writing as confidential at the time of its disclosure or within a reasonable period of time after its disclosure. Confidential Information does not include information that is in the public domain at the time of its disclosure or that enters the public domain after its disclosure without the violation of this non-disclosure covenant by the non-disclosing party, information that the non-disclosing party acquires or develops after its disclosure by the other party, without violation of this Agreement or information that the non-disclosing party is required to disclose by law or court order (provided that the disclosing party is given a reasonable opportunity to protect or restrict the disclosure of such information prior to its disclosure to a third party).

The recipient of Confidential Information shall use Confidential Information solely for the purposes of this Agreement and any SOW issued pursuant to this Agreement. The recipient may disclose the Confidential Information of the other party to the recipient's employees and contractors only to the extent that those persons need to know that Confidential Information in order to do their work for the recipient. The recipient shall not disclose Confidential Information of the disclosing party to any third party, without the prior written consent of the disclosing party.

### 19. Non-Solicitation

Each party agrees that, without the prior written consent of the other party, it shall refrain during the term of this Agreement and for one (1) year thereafter from, directly or indirectly, soliciting, hiring, seeking to hire from the other party of any of the other party's employee(s)/contractor(s). This prohibition does not extend to any placement resulting from a general advertisement.

### 20. No Partnership or Joint Venture

This does not constitute a partnership between or joint venture by the parties or constitute any party the agent of the other. No party shall hold itself out contrary to the terms of this Section and no party shall become liable by any representation, act or omission of the other contrary to these

provisions. This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any such party whether referred to herein or not.

21. Indemnification

Each of the parties agrees to indemnify, defend and hold the other party harmless (including the other party's parent, subsidiaries, affiliates, directors, officers, employees, agents, contractors, licensees and franchisees) from and against all claims, damages, suits, actions, administrative proceedings, costs or expenses, including attorneys' fees, of whatever nature, to the extent such liability arises from, or relates to, any act, omission or negligence of the indemnifying party, or its contractors, agents, or employees relating to services performed pursuant to, or as a result of, this Agreement or any other matter arising from the business relationship created by this Agreement. For the avoidance of doubt, JAN-Pro will not be responsible for damages that are caused by or result from the improper acts of its Master Franchisees or unit franchisees. The obligations stated within this paragraph shall survive termination or expiration of this Agreement.

22. Miscellaneous

If any term of this Agreement shall be found to be illegal, invalid or unenforceable by a court of competent jurisdiction, it is the intention of the parties that the remaining terms shall constitute their agreement with respect to the subject matter hereof, and all such remaining terms shall remain in full force and effect. This Agreement shall be binding on the parties and their respective successors and assigns. This Agreement shall be governed by and construed under the laws of the State of Michigan. This Agreement, together with those documents incorporated herein by reference, constitutes the entire agreement between the parties with respect to the subject matter hereof and shall not be modified, amended or terminated except by another agreement in writing executed by the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to take effect as of the date that it is signed by JAN-PRO (the "Effective Date").

**JAN-PRO Franchising, Inc.**  **Servant Systems Incorporated**

By: _/s/ Russ Reynolds_  By: _/s/ Donald A. DeSmith_

Russ Reynolds  Donald A. DeSmith
CEO  President

Date: _10/31/19_  Date: _10/31/2019_

# Exhibit A
# Material Breaches

Material breaches shall include, but are not limited to, the following cases:

1. FMS functionality returns substantially incorrect results such that multiple master franchisees are unable to perform the functions necessary to support successful business operations.

2. FMS functionality is unreliable. Multiple master franchisees are each having multiple significant errors per day when running the software.

3. FMS performance and availability is not meeting standards defined in Exhibit C, Service Level Agreement.

   JAN-PRO is responsible for allocating, or allowing SSI to allocate on its behalf, sufficient Azure resources to meet FMS performance and availability standards. This includes, but is not limited to, database performance levels, the number and size of API servers, and hot backup servers running in a different Microsoft Regional Data Center. JAN-PRO and SSI shall jointly determine the Azure resources required at different days of the week and times of the day to ensure sufficient performance.

4. Level 4 support problems submitted by JAN-PRO personnel to SSI are not addressed in a timely fashion.

   A level 4 support item which is preventing a master franchisee from running a key portion of their business must be addressed within one business day. A level 4 support item which makes it substantially difficult for a master franchisee to run their business must be addressed within one week. Addressing an issue may require a master franchisee to move to the Alpha / Beta testing group in order to receive the software update.

# Exhibit B
# JAN-PRO Trade Secrets

As described in Section 11 of this Agreement, JAN-PRO identifies the expected Trade Secrets of the customization of SmartWare (i.e., screens, reports, API's) done under this Agreement as of the Effective Date of this Agreement as follows:

- Estimate screen (EzBid)

- Unit Franchise screens

    a. New business multiplier concept
    b. Unit Franchise offer process
    c. Unit Franchise monthly statement process
    d. Unit Franchise package and note management process

- JAN-PRO reports (BAR, customer invoice, royalty, Unit statement and many others)

- JAN-PRO dashboard widgets

- Key API functions for the above whenever there is substantial JAN-PRO specific business logic

    a. Customer Portal
    b. Jan Hub

- Inspection App

- Proposal Template Library

- First Walkthrough page

# Exhibit C
# Service Level Agreement

FMS Performance

The standard for performance is 98% of API requests returning in 0.4 seconds or less. Performance of less than 90% of API requests returning in 0.4 seconds or less would constitute a material breach. This would exclude 3rd party API calls such as Google Maps or credit card processors. It would also exclude report API calls for FMS reports. It would also exclude performance during a nightly database maintenance window from 12 AM Eastern Time through 4 AM Eastern Time. During that time, the system will still be available, but the API requests response time would not be guaranteed.

When notified that FMS performance is not within this performance level, SSI will work with the Microsoft and other support personnel to cure the breach within 7 business days. If the impact upon Master Franchises is severe (below 70% of API calls responding within .4 seconds), SSI will devote all available resources to cure the breach.

FMS Availability

Standard for availability: During the hours of 6 AM to midnight Eastern Time, zero unscheduled downtime.

SSI infrastructure uses the Microsoft Azure Infrastructure and is supported by Microsoft. When notified that FMS availability is not within this availability level, SSI will work with Microsoft and other support personnel to cure the breach within 4 business hours. After 4 business hours, SSI will ensure that escalation procedures are in place and devote all available resources to cure the breach.

FMS Required Resources

Master franchisees are required to have a reliable high-speed Internet connection. Problems for master franchisees related to unreliable, low-speed, or satellite Internet connections shall not be deemed to be a breach.

Master franchisees are required to have at least a minimal workstation configuration for the FMS to perform well. This minimal configuration may be revised from time to time as new technology is made available. At Agreement initiation the minimal Microsoft Windows configuration (or comparable Apple Mac configuration) is the following:

- Microsoft Windows Professional operating system that is under Microsoft support e.g., Windows Professional 10
- Monitor with resolution of 1680 x 1050 or higher.
- 8 Gigabytes of Random-Access Memory (RAM)

Technical Support and Software Maintenance

1. Subject to the full payment of FMS License Fee and active Statements of Work for software maintenance and support, technical support shall be provided by telephone and e-mail to authorized individuals representing the organization. Technical support is available Monday to Friday (except public holidays) between the hours of 8.00 am – 5.30 pm Eastern Time. Priority Level 1 support will be provided via cell phone access to Vendor personnel from the hours of 6 am to 10 pm Monday to Saturday. Additional support will be provided by premium support access for Microsoft Azure on a 24x7 365 days per year basis.
2. The registered user of the Software licensed will receive from time-to-time notifications about Software upgrades including new versions, service packs, patches and instructions for applying the upgrades that are supplied by the Vendor during the period of maintenance cover.
3. Defects will be addressed in accordance with the assigned priority level.
    i. Priority Level 1: complete loss of all service of the Product and the situation is an emergency. The Vendor will acknowledge within 1 working hour from the time that the call was logged with the Vendor and shall remedy defects and/or provide a workaround within 1 working day of notification of the problem, with a permanent solution within an agreed timeframe.
    ii. Priority Level 2: severe loss of service of the Product however, operation can continue in a restricted fashion. The Vendor will acknowledge within 2 working hours from the time that the call was logged with the Vendor and shall remedy defects and/or provide a workaround within 2 working days.
    iii. Priority Level 3: a minor loss of service of the Product, the impact is an inconvenience. The Vendor will acknowledge 1 working day from the time that the call was logged with the Vendor and shall remedy defects in the release at the end of the next Agile Sprint to be started or within an agreed framework.
    iv. Priority Level 4: no loss of service of the Product; the result is a minor error or incorrect behavior. The Vendor will acknowledge within 1 working day from the time that the call was logged with the Vendor and the Vendor shall use its reasonable efforts to remedy defects and/or provide a workaround in the release at the end of the next Agile Sprint to be started or within an agreed framework.
4. Exclusions: If a problem is found to be caused by one or more of the following excluded factors then the Vendor may not provide support. The Vendor shall notify the Customer as soon as they become aware that a fault may be due to one of the following exclusions:
    i. Altered, damaged, or modified Products (save for those alterations or modifications made by the vendor
    ii. Products that are not at a supported release level or for which the Customer does not have a current support and maintenance contract;
    iii. Defects or errors caused by incorrect use of the Products or operator error;
    iv. Defects caused by failure to implement reasonable recommendations in

    respect of or solutions to defects provided by the Vendor;
   v. Products installed in a hardware or operating environment not supported by the Vendor.
   vi. Third party software not licensed through or supported by the Vendor;
   vii. Defects or errors caused by any fault or error in the equipment, programs, applications or products used in conjunction with the Products, or otherwise resulting from causes beyond the reasonable control of the Vendor.

5. Customer's Support Service Obligations: The Customer shall provide cooperation and assistance to the Vendor in the Vendor's efforts to provide support. Such cooperation and assistance shall include but not be limited to:
   i. The timely transmittal and release to the Vendor of appropriate and accurate documentation and information;
   ii. Make attempts to duplicate the problem in a test site and document the steps required to duplicate the problem;
   iii. Remote access to Customer's environment where the defect can be reproduced and traced.

GP:4843-8912-6315 v3