**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

JESSICA TILLSON,

                              Plaintiff,

vs.

EQUIFAX INFORMATION
SERVICES, LLC,

                              Defendant.

CASE NO.:

**<u>JURY TRIAL</u>**
**<u>DEMANDED</u>**

## <u>COMPLAINT</u>

Jessica Tillson, ("Plaintiff"), a living, breathing consumer, brings this Complaint against Equifax Information Services, LLC ("Equifax") and states as follows:

## <u>INTRODUCTION</u>

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks,

the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time they sell their credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     Defendant Equifax is a CRA as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f).

5.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested

parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

7.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

8.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to*

*obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

9.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

10.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." See 15 U.S.C. § 1681(a)(4).

11.    This action seeks actual, statutory, and punitive damages, costs and attorneys' fees for Plaintiff against Defendant for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.,* as described herein.

## THE PARTIES

12.    Plaintiff Jessica Tillson ("Plaintiff") is a natural person who resides in the State of Rhode Island, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

13.    Defendant Equifax Information Services, LLC ("Equifax") is a limited liability company that resides in the State of Georgia and in the Northern District.

14.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

16.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

17.   Plaintiff mailed multiple written disputes regarding inaccurate information in his Equifax credit report to Equifax located in Fulton County; Atlanta, Georgia.

18.   Defendant Equifax received Plaintiff's multiple written disputes in Fulton County; Atlanta, Georgia.

19.   Upon receipt of Plaintiff's disputes, Defendant Equifax forwarded such disputes to furnishers via Automated Consumer Dispute Verification electronic forms. Upon completion of its investigations furnishers responded to Defendant Equifax's electronic communications, which originated from Atlanta, Georgia, by sending its results electronically to Defendant Equifax in Fulton County; Atlanta, Georgia

20.   Defendant Equifax then processed the dispute results from furnishers at its National Consumer Assistance Center in Atlanta, Georgia, and mailed Plaintiff its final dispute results from Atlanta, Georgia.

## FACTS

### The Credit Bureau Defendant's Practices Concerning the Sale of Credit Reports on the "Deceased"

21.   Defendant Equifax sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

22.   Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant Equifax, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

23.   Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

24.   Defendant Equifax routinely places a "deceased" notation or marking on credit reports when they are advised by any of their many data furnishing sources (such as banks and debt collectors) that a given consumer is deceased.

25.   Defendant Equifax's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

26.   Defendant Equifax does not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

27.   Defendant Equifax does not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

28.   Defendant Equifax does not independently verify with any source or furnisher that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

29.   In some cases, in order to assure accuracy, Defendant Equifax may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant Equifax does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

30.    Defendant Equifax regularly receives the "Death Master File" from the Social Security Administration, including weekly and/or monthly updates, listing by social security number those consumers that the government believes to be deceased. But Defendant Equifax does not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

31.    Defendant Equifax will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

32.    Defendant Equifax does not employ any procedures at all to assure that a consumer with a "deceased" mark on their report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

33.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant Equifax does not employ any procedures to assure that a consumer with a "deceased" mark on their report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

34. Even in instances where the purportedly deceased consumer communicates directly with Defendant Equifax, Defendant Equifax does not employ any procedures to assure that a consumer with a "deceased" mark on their report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

35. Once a "deceased" mark is placed upon a consumer's report, Defendant Equifax will not calculate and will not provide a credit score for that consumer.

36. Upon Defendant Equifax's reports with a "deceased" mark sold to third parties, Defendant Equifax never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

37. Defendant Equifax knows that third party credit issuers require a credit score in order to process a given credit application.

38. Defendant Equifax knows that consumers without credit scores are unable to secure any credit from most credit issuers.

39. Defendant Equifax knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

40. Defendant Equifax has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit

specifically because they are reporting them as "deceased" and without a credit score.

41.   Defendant Equifax has received and documented many disputes from consumers complaining that their credit reports had them erroneously marked as "deceased."

42.   Defendant Equifax knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" code, even when said consumers (and their dates of birth and social security numbers) are not on the Death Master File and are, in fact, alive.

43.   Nevertheless, Defendant Equifax does not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is, in fact, deceased.

44.   Even consumers who dispute the erroneous "deceased" status on their Equifax credit report continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

45.   Defendant Equifax does not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing

source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

46.   Nor does Equifax employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

47.   For years after a consumer's actual death, Defendant Equifax will continue to sell credit reports about that consumer.

48.   Defendant Equifax will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them— meaning that no one is continuing to purchase reports about that consumer.

49.   Defendant Equifax charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

50.   Defendant Equifax profits from the sale of reports on deceased consumers.

51.   Defendant Equifax has in their credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

52.   Defendant Equifax know that truly deceased consumers do not apply for credit.

53.   Defendant Equifax knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant Equifax to be a common and major source of identity theft.

54.   Defendant Equifax knows that identity theft and credit fraud are serious and widespread problems in our society.

55.   Defendant Equifax warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

56.   Defendant Equifax has no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

57.   Defendant Equifax sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

58.   For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant Equifax to sell their credit reports, absent a court order.

59.   Defendant Equifax knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

## The Credit Bureaus' Method for Considering Consumer Credit Report Disputes

60.   The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

61.   The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by

consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

62.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."  It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

63.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

64.    Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

65.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

66.    These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

67.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

68.    The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

69.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Comenity Bank Denies Plaintiff Credit Due to Inaccurate Credit Reporting on August 3, 2021**

70.    On or about August 3, 2021, Plaintiff sought to obtain a Burlington credit card and submitted a credit application.

71.    Shortly thereafter, Comenity Bank denied Plaintiff's credit application based upon the contents of Plaintiff's credit.

72.   Plaintiff takes great pride in Plaintiff's good name and established credit rating and works hard to ensure that the bills are paid in full and on time each month. Plaintiff believes and understands that their credit record with creditors is good, so Plaintiff could not imagine how the application had been denied.

**Plaintiff Disputes to Equifax on September 2, 2021**

73.   On or about September 2, 2021, extremely shocked, surprised, and embarrassed at the inaccurate reporting, Plaintiff mailed a written dispute to Equifax, via certified mail, disputing the deceased reporting. Plaintiff requested an investigation into the disputed information, correct the reporting, and be sent a corrected disclosure.

**Equifax's Failure to Respond to Plaintiff's September 2, 2021 Dispute**

74.   Defendant did not respond to Plaintiff's dispute.

75.   Defendant did not indicate that Plaintiff's dispute was found to be frivolous or irrelevant.

76.   Defendant failed to conduct a reasonable reinvestigation of Plaintiff's dispute, or any reinvestigation whatsoever, to determine whether the disputed

information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

77.   Also, Defendant failed to provide the requested credit disclosure in violation of 15 U.S.C. § 1681g.

## Plaintiff Disputes to Equifax on December 18, 2021

78.   On or about December 18, 2021, extremely shocked, surprised, and embarrassed at the inaccurate reporting, Plaintiff mailed a written dispute to Equifax, via certified mail, disputing the deceased reporting. Plaintiff requested an investigation into the disputed information, correct the reporting, and be sent a corrected disclosure.

## Equifax's Response to Plaintiff's December 18, 2021 Dispute

79.   Defendant Equifax updated the reporting to undesignated, which is inaccurate and in violation of 15 U.S.C. § 1681i(a)(1)(A).

80.   In the last two years, Plaintiff has disputed the Defendants' reporting Plaintiff as deceased, causing credit denials, which will be further identified during discovery.

81.   At all times pertinent hereto, Defendant Equifax was acting by and through their agents, servants, and/or employees who were acting within the course

and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

82.   At all times pertinent hereto, the conduct of Defendant Equifax, as well as that of their agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

83.   As a result of the "deceased" annotations contained throughout Plaintiff's credit reports, Defendant Equifax made it practically impossible for Plaintiff to obtain credit.

84.   As a standard practice, Defendant Equifax does not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the furnisher despite numerous court decisions admonishing this practice. See Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3d Cir. 1997) ("The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); Apodaca v. Discover Fin. Servs., 417 F. Supp. 2d 1220, 1230–31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only

superficial inquiries once the consumer has notified it that information is disputed); Gorman v. Experian Info. Sols., Inc., 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

85.     Consistent with their standard policies and procedures, Defendant Equifax automatically generated their "investigation" results once the aforementioned furnishers provided their responses to Plaintiff's disputes, verifying that Plaintiff was deceased, and no employee from any of the credit bureaus took any additional steps to review Plaintiff's documentation, information, or the Social Security Administration's ("SSA") Death Master File, which Defendant purchases from the SSA, after the furnishers provided their responses to Plaintiff's disputes.

86.     Instead, Defendant Equifax blindly accepted the aforementioned furnishers' incomplete version of the facts and continued to report the inaccurate, derogatory information on Plaintiff's credit reports, namely, that he is deceased.

87.     Defendant Equifax continues the practice of parroting the response from furnishers even though they have been repeatedly sued for failing to conduct reasonable investigations as required by the FCRA.

88.     Defendant Equifax do not intend to modify their dispute-processing procedures because doing so would drastically increase their operating expenses.

89.    Instead, Defendant Equifax intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendant Equifax's violations of the FCRA are willful.

90.    At all times pertinent hereto, Defendant Equifax was acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

91.    At all times pertinent hereto, the conduct of Defendant Equifax, as well as that of their agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

92.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-86 as if fully stated herein.

93.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure

maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

94.   On multiple occasions, Defendant Equifax prepared patently false consumer reports concerning Plaintiff.

95.   Despite actual and implied knowledge that Plaintiff is not dead, Defendant Equifax readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

96.   Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintain concerning Plaintiff.

97.   As a result of Defendant Equifax's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his/her1 credit; being chilled from seeking credit opportunities; the expenditure of time and money disputing and trying to correct the blatantly inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, fear of financial difficulty, and the inability to obtain credit for important life purchases.

98.   Defendant Equifax's conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

99.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.


**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendant Equifax)**

100. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-96 as if fully stated herein.

101. The FCRA mandates that Defendant Equifax conduct an investigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. See 15 U.S.C. § 1681i(a)(1). The Act impose a 30-day time limitation for the completion of such an investigation. Id.

102.  The FCRA provides that if Defendant Equifax conduct an investigation of disputed information and confirm that the information is in fact inaccurate, or are unable to verify the accuracy of the disputed information, they are required to delete that item of information from the consumer's file. See 15 U.S.C. § 1681i(a)(5)(A).

103. On multiple occasions during 2020 and 2021, Plaintiff sent written disputes to Defendant Equifax, pleading with them to comply with their statutory reinvestigation obligations and correct and/or delete specific items in his/her1 credit files that are patently inaccurate, misleading, and highly damaging to him and his ability to obtain credit, namely, references to him being "deceased."

104. Either Defendant Equifax conducted no investigation of Plaintiff's disputes, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit files, namely, the deceased notations.

105. Defendant Equifax violated 15 U.S.C. § 1681i on multiple occasions by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff;

and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files.

106. As a result of Defendant Equifax's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from his credit; being chilled from seeking credit opportunities; the expenditure of time and money disputing and trying to correct the blatantly inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, fear of financial difficulty, and the inability to obtain credit for important life purchases.

107. Defendant Equifax's conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

108.  Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681g**
**Failure to Provide Disclosures to Plaintiff**

109. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-99 as if fully stated herein.

110.  Defendants violated 15 U.S.C. § 1681g by failing to provide Plaintiff's credit disclosure after each request.

111. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from Plaintiff's credit; detriment to Plaintiff's credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment.

112.  Defendants' conduct, action, and inaction was willful, rendering them each separately liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

113.  Plaintiff is entitled to recover attorney's fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

a)   Determining that Defendant negligently and/or willfully violated the FCRA;

b)   Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)   Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and

d)   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

114.   Plaintiff demands a trial by jury.

Dated:      August 2, 2023

> */s/ Joseph P. McClelland*
> Joseph P. McClelland
> LAW FIRM OF JOSEPH P.
> MCCLELLAND, LLC
> Georgia Bar No: 483407
> 545 N. McDonough Street, Suite 210
> Decatur, GA 30030
> Telephone: (770) 775-0938
> Fax: (470) 468-0070
> Email: joseph@jacksonlaws.com
> *ATTORNEY FOR PLAINTIFF*