## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| **ALLIED WORLD SURPLUS LINES INSURANCE COMPANY** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) ) | **Case No.:** |
| **GEORGIA CRYOSERVICES, INC.; XYTEX CORPORATION; XYTEX CRYO INTERNATIONAL LTD; J. TODD SPRADLIN; MARY HARTLEY; L.S.E; K.E.; S.L.H.; A.H; M.R.H.; S.J.H.; L.S.: A.M.C.; A.D.H.J.; A.D.A.; G.G.; S.K.; E.K.; J.M.R.; J.R.R.; L.S.F.; K.L.K.; M.J.S.; M.J.P.; M.M.H.; R.D.; and P.J.H.** | ) ) ) ) ) | |

### ALLIED WORLD SURPLUS LINES INSURANCE COMPANY'S COMPLAINT FOR DECLARATORY JUDGMENT

Allied World Surplus Lines Insurance Company ("Allied World"), for its

Complaint for Declaratory Judgment, alleges on knowledge, information, and

belief as follows:

### NATURE OF THE ACTION

1.      Allied World asserts this Complaint to obtain a judicial determination

and declaration pursuant to 28 U.S.C. § 2201 *et. seq.*, as to the parties' rights and

obligations under the claims-made and reported Miscellaneous Medical Facilities Professional and General Liability Policy No. 0308-2107 (the "Policy"), issued by Allied World to Georgia Cryoservices, Inc. ("Georgia Cryo") and its affiliated entities for the **Policy Period** of March 9, 2020 to March 9, 2021 (the "Policy" or the "2020-2021 Policy").[1]  A true and correct copy of the Policy (without the application) is attached as Exhibit A.

2.     In particular, Allied World seeks a judicial determination that there is no coverage under the Policy for various claims asserted against **Insureds**, which arise from the **Insureds'** alleged wrongful conduct in connection with the screening, marketing, and sale of semen from a semen donor ("Donor 3116"), because the **Claim** was not first made and reported under the Policy and thus does not fall within the scope of the Policy's coverage.

3.     A real, immediate, and justiciable controversy exists between the parties relating to their respective rights, duties, and obligations under the Policy and will continue to exist until such time as it is resolved by this Court.

---

[1] All terms in bold print appear in bold print in the Policy and are defined therein.

## PARTIES

4.      Plaintiff Allied World is a corporation organized and existing under the laws of the State of Arkansas with its principal place of business located in New York, New York.  Therefore, Allied World is a citizen of Arkansas and New York.

5.      Defendant Georgia Cryoservices, Inc. (*i.e.,* Georgia Cryo) is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Georgia, and accordingly is a citizen of Georgia. Georgia Cryo is the **Named Insured** under the Policy and is the holding company for Xytex Corporation and Xytex Cryo International LTD.

6.      Defendant Xytex Corporation ("Xytex Corporation") is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Georgia, and accordingly is a citizen of Georgia.  Xytex Corporation is an **Insured Entity** under the Policy.

7.      Defendant Xytex Cryo International LTD ("Xytex International") is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Georgia, and accordingly is a citizen of Georgia. Xytex International is an **Insured Entity** under the Policy.

3

8.     Defendant J. Todd Spradlin is a citizen of the State of Georgia and the medical director of Xytex Corporation.

9.     Defendant Mary Hartley is a citizen of the State of Georgia and an employee of Xytex Corporation.

10.     Defendants A.D.A. and G.G. reside in Gatineau, Quebec, Canada and have one child, A.A.G., who was conceived as a result of their purchase of Donor 3116 semen from Defendant Xytex Corporation.  They are citizens of Canada.[2] They have sued one or more **Insureds** under the Policy in Georgia and are named as defendants in this action to the extent that they claim any rights under the Policy.  Allied World will agree to dismiss them without prejudice if they agree to be bound by the outcome of this action.

11.     Defendants S.K. and E.K. reside in Edmonton, Alberta and have one child, L.K., who was conceived as a result of their purchase of Donor 3116 semen from Defendant Xytex Corporation.  They are citizens of Canada.  They have sued one or more **Insureds** under the Policy in Georgia and are named as defendants in this action to the extent that they claim any rights under the Policy.  Allied World

---

[2] For parties referred to with initials, those individuals filed suit in Georgia state court using those initials.

4

will agree to dismiss them without prejudice if they agree to be bound by the outcome of this action.

12.     Defendants J.M.R. and J.R.R. reside in Tecumseh, Ontario and have one child, Z.J.R., who was conceived as a result of their purchase of Donor 3116 semen from Defendant Xytex Corporation. They are citizens of Canada.  They have sued one or more **Insureds** under the Policy in Georgia and are named as defendants in this action to the extent that they claim any rights under the Policy. Allied World will agree to dismiss them without prejudice if they agree to be bound by the outcome of this action.

13.     Defendants L.S.F. and K.L.K. reside in Hamilton, Ontario and have one child, O.K., who was conceived as a result of their purchase of Donor 3116 semen from Defendant Xytex Corporation. They are citizens of Canada.  They have sued one or more **Insureds** under the Policy in Georgia and are named as defendants in this action to the extent that they claim any rights under the Policy. Allied World will agree to dismiss them without prejudice if they agree to be bound by the outcome of this action.

14.     Defendants M.J.S. and M.J.P. reside in Newfoundland and have one child, H.M.S.P., who was conceived as a result of their purchase of Donor 3116 semen from Defendant Xytex Corporation. They are citizens of Canada.  They

have sued one or more **Insureds** under the Policy in Georgia and are named as defendants in this action to the extent that they claim any rights under the Policy. Allied World will agree to dismiss them without prejudice if they agree to be bound by the outcome of this action.

15.     Defendants M.M.H. and R.D. reside in Kelowna, British Colombia, and have one child, J.D., who was conceived as a result of their purchase of Donor 3116 semen from Defendant Xytex Corporation.  They are citizens of Canada. They have sued one or more **Insureds** under the Policy in Georgia and are named as defendants in this action to the extent that they claim any rights under the Policy.  Allied World will agree to dismiss them without prejudice if they agree to be bound by the outcome of this action.

16.     Defendant P.J.H. resides in Keswick, Ontario and has one child, S.A.H., who was conceived as a result of her purchase of Donor 3116 semen from Defendant Xytex Corporation.  Defendant P.J.H. is a citizen of Canada.  Defendant P.J.H. has sued one or more **Insureds** under the Policy in Georgia and  is named as a defendant in this action to the extent that she claims any rights under the Policy. Allied World will agree to dismiss Defendant P.J.H without prejudice if she agrees to be bound by the outcome of this action.

17.     Defendants L.S.E. and K.E. reside in Arizona and have one child, M.E., who was conceived as a result of their purchase of Donor 3116 semen from Defendant Xytex Corporation.  They are citizens of Arizona.  They have sued one or more **Insureds** under the Policy in Georgia and are named as defendants in this action to the extent that they claim any rights under the Policy.  Allied World will agree to dismiss them without prejudice if they agree to be bound by the outcome of this action.

18.     Defendants S.L.H. and A.H. reside in California and have embryos as a result of their purchase of Donor 3116 semen from Defendant Xytex Corporation.  They are citizens of California.  They have sued one or more **Insureds** under the Policy in Georgia and are named as defendants in this action to the extent that they claim any rights under the Policy.  Allied World will agree to dismiss them without prejudice if they agree to be bound by the outcome of this action.

19.     Defendants M.R.H. and S.J.H. reside in Nebraska and have an embryo as a result of their purchase of Donor 3116 semen from Defendant Xytex Corporation.  They are citizens of Nebraska.  They have sued one or more **Insureds** under the Policy in Georgia and are named as defendants in this action to the extent that they claim any rights under the Policy.  Allied World will agree to

dismiss them without prejudice if they agree to be bound by the outcome of this action.

20.     Defendants L.S. and A.M.C. reside in Massachusetts and have one child, E.A.C., who was conceived as a result of their purchase of Donor 3116 semen from Defendant Xytex Corporation.  They are citizens of Massachusetts. They have sued one or more **Insureds** under the Policy in Georgia and are named as defendants in this action to the extent that they claim any rights under the Policy.  Allied World will agree to dismiss them without prejudice if they agree to be bound by the outcome of this action.

21.     Defendant A.D.H.J. resides in the United Kingdom and has one child, J.M.J., who was conceived as a result of the purchase of Donor 3116 semen from Defendant Xytex Corporation.  A.D.H.J is a citizen of the United Kingdom.  She has sued one or more **Insureds** under the Policy and is named as a defendant in this action to the extent that she claims any rights under the Policy.  Allied World will agree to dismiss her without prejudice if she agrees to be bound by the outcome of this action.

## JURISDICTION AND VENUE

22.     This is an action for declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of

Civil Procedure, for the purpose of determining a question of actual controversy between the parties as described more fully below.

23.     This action currently is ripe for adjudication.

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiff and defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.  A substantial part of the events giving rise to the claims at issue occurred in this District, and Georgia Cryo, Xytex Corporation, and Xytex International maintain their principal place of business in this District.

## **FACTUAL ALLEGATIONS**

**A.     The Policy**

26.     Insuring Agreement I.A. of the Policy, as amended by Endorsement No. 2, provides, in relevant part:

> The **Insurer** will pay on behalf of the **Insured**, **Loss** and **Defense Expenses** in excess of the Deductible stated in Item 4(a) of the Declarations and subject to the Limits of Liability set forth in Item 3(a) of the Declarations, which the **Insured** becomes legally obligated to pay as a result of a **Claim** alleging a **Medical Incident**, provided always that:

1.     such **Medical Incident** takes place on or after the **Retroactive Date** stated in Item 5(a) of the Declarations and before the end of the **Policy Period**;

2.     such **Claim** is first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period;

3.     notice of such **Claim** is given to the **Insurer** in accordance with Section IV.B. of this Policy; and

4.     such **Medical Incident** takes place in the **Coverage Territory**.

Policy, Insuring Agreement I.A., as amended by Endorsement No. 2.

27.     **Policy Period** means the "period from the Inception Date stated in Item 2(a) of the Declarations [March 9, 2020] to the earlier of the Expiration Date stated in Item 2(b) of the Declarations [March 9, 2021] or the cancellation date." Policy, Section II.H.

28.     **Insured** is defined in the Policy to include any **Insured Entity**. Policy, Section II.R.

29.     **Insured Entity** is defined to include the **Named Insured**, any **Subsidiaries**, and entities listed in Endorsement No. 4. Policy, Section II.S., as amended by Endorsement Nos. 4 and 7.

30.     Georgia Cryo is the **Named Insured** under the Policy.  Policy, Declarations, Item 1.

31.     Xytex Corporation and Xytex International each constitute an **Insured Entity**.  Policy, Endorsement No. 4.

32.     **Insured** includes an **Insured Person**.  Policy, Section II.R. **Insured Person**, in turn, is defined to include, in relevant part:

1.  any **Employee** of an **Insured Entity**, but only while acting within the scope of his/her duties as such; [and]

. . .

6. any of the **Insured Entities'** medical directors, administrators, department heads or chiefs of staff, who are not **Employees**, while acting within the scope of their duties as such; provided, however, that such person shall not be an **Insured Person** for **Claims** arising out of direct **Patient** care rendered or allegedly failed to be rendered by him/her[.]

Policy, Section II.T.

33.     Dr. Spradlin was Chief Medical and Laboratory Director at Xytex Corporation, and Ms. Hartley was a Xytex Corporation employee. Thus, Dr. Spradlin and Ms. Hartley are **Insureds**.

34.     **Medical Professional Incident** means, in relevant part:

1.     an actual or alleged act, error or omission in the **Insured's** rendering of or failure to render **Healthcare Professional Services** to the **Insured's Patients** that results in **Medical Professional Injury**; . . . [or]

4.     any actual or alleged act, error or omission in connection with the **Insured's** performance of quality assurance activities . . . .

11

Policy, Section III.W.

35. **Healthcare Professional Services** are

services performed by an **Insured** in the treatment or care of any person, including:

1. medical, dental, nursing, psychiatric, osteopathic, chiropractic, dental, x-ray or other professional care or services;
2. the furnishing or dispensing of medications, drugs, blood, blood products, or medical or surgical supplies, equipment or appliances in connection with such services described in Paragraph 1, above;
3. the furnishing of food or beverages in connection with such services described in Paragraph 1, above;
4. the providing of counseling or social services in connection with such services described in Paragraph 1, above;
5. the handling or treatment of dead bodies, including autopsies, organ donation, harvesting, or other procedures.

Policy, Section II.P.

36. A **Patient** is "any person or human body seeking, registered or admitted to receive **Healthcare Professional Services** from an **Insured**, before during or after registration for such services, and whether on an inpatient, outpatient or emergency basis." Policy, Section II.FF.

37. **Medical Professional Injury** means "injury, including death, to others that results from acts or omissions in the providing of or failure to provide **Healthcare Professional Services** by or for an **Insured**. Policy, Section II.AA.

12

38.     A **Claim** is defined as "a judicial proceeding or other written demand seeking monetary damages otherwise covered by this Policy."  Policy, Section II.F.

39.     A **Claim** "shall be deemed first made when any **Insured** first receives notice of the **Claim**."  *Id.*  In addition, all **Related Claims**, whenever made, "shall be deemed to be a single **Claim** and shall be deemed to have been first made on the earliest of the following dates:

1.  the date on which the earliest **Claim** within such **Related Claims** was received by an **Insured**; or

2.  the date on which written notice was first given to the **Insurer** of an act, error, omission or **Occurrence** which subsequently gave rise to any of the **Related Claims**, regardless of the number and identity of claimants, the number and identity of **Insureds** involved, or the number and timing of the **Related Claims**, and even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period**.

Policy, Section IV.C.

40.     **Related Claims** are:

all **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, events or involved individuals or the same or related series of facts, circumstances, situations, transactions, events or involved individuals, whether related logically, causally or in any other way.

Policy, Section II.M.

13

41.     With respect to Insuring Agreement I.A., Professional Liability, the Policy has a $1 million each **Claim** and $3 million Aggregate Limit of Liability, inclusive of **Claim Expenses**, and subject to a $4 million Maximum Aggregate Limit of Liability for all Insuring Agreements.  The Policy also has a $250,000 each and every **Claim** deductible.

**B.     The Client Demands**

42.     The **Insureds** sold semen from Donor 3116 to various clients, who used the semen to fertilize eggs to create embryos, and who produced offspring from the fertilized embryos.

43.     In or around December 2018, one or more **Insureds** received notifications of two different genetic conditions that manifested in offspring of Donor 3116.

44.     After the **Insureds** received these notifications, they notified clients who had purchased semen from Donor 3116.

45.     After receiving notifications from the **Insureds** regarding the genetic conditions involving Donor 3116 offspring, numerous customers who had purchased semen from Donor 3116 responded, soliciting further information and demanding compensation (the "Client Demands").

46.     On February 9, 2019, a customer who had purchased Donor 3116

semen sent the following correspondence to Xytex Corporation:

> Thank you for your response regarding donor 3116. I understand that
> it is not normal business hours, but I had a few remaining questions.
>
> Obviously, our main concern is that our daughter has not inherited a
> chromosomal abnormality, but as you said there are no immediate
> answers or solutions, and we will patiently await the results.
>
> In the meantime, I would like to know ahead of time our course of
> action in the event that his results are positive.
>
> 1) Will Xytex cover expenses of testing for our daughter to determine
> if she has inherited this abnormality?
> 2) What happens to the remaining vial of sperm we have stored?
> 3) Will we be reimbursed for said vial in order to purchase sperm
> from another donor? -- Of course ideally we wanted the same paternal
> line for our children, but as this is seeming to be a dwindling
> possibility, we wanted to know the next steps because we planned to
> do another IUI in August/September of this year.
>
> Thank you for your continued help in relieving some of our concerns
> and stress.

47.     On February 11, 2019, a customer who had purchased Donor 3116

semen, sent the following e-mail to Xytex Corporation:

> Thank you for this letter, which of course is very worrying.
>
> I have a set of frozen eggs from this sperm which were frozen two
> years ago.
>
> I have forwarded a copy on to my physician urgently (Geoffrey Trew
> of 92 Harley Street) but in the meantime, can you please confirm

15

whether Xytex will be covering to cost (should I chose to do so) of undergoing treatment for me to harvest eggs again with a new donor?

The cost is, from memory approximately between $5,000 and $10,000.

48.    On February 18, 2019, two clients who had purchased Donor 3116

semen wrote the following e-mail to Xytex Corporation:

I am writing with reference to your last two correspondence to us dated February 8th and 11th 2019, relating to donor 3116 and the discovered 1.33 Mb micro duplication within the short arm of chromosome 17 at band p12. I have attached the letters (emails) sent to me, for your information.

Firstly, I'd like to communicate my absolute horror and distress with regards to this new information, even more os (sic) the manor (sic) in which this was communicated to us. Trying to et (sic) pregnant is such a sensitive emotive endeavor, I would sincerely have hoped for a personally address letter (email). Your expression of 'any inconvenience' we may have suffered really does not come close to the our [sic] actual devastation.

We purchased three vials of 3116 from Xytex. We had IUI and IVF with this donor and as a result have 2 embryos that are still in storage. As a result of your findings we now have to think about disposing of them.

Your letter states that you will offer clients a chance to choice [sic] a new donor and test the embryos from donor 3116. I cannot ascertain enough just how much this discovery and the way it has been communicated to us has been devastating. The thought of going through the last two weeks again is something we just cannot do.

Our journey trying to get pregnant is now over, this is more than an 'INCONVENIENCE'. We have entered into a contract with you honestly but feel somewhat let down by the way this has been

16

conducted and communicated. It feels as though we are being kept at arms length and we do not have the physical and mental strength and indeed confidence to try again with another donor.

We spent $2745.00 with you for donor 3116. We had nearly 2 years of fertility treatment in the region of $12000. This does not include the days off work, the traveling to and from the clinic, as well as the pressure of fertility treatment and not withstanding the stress of the last few weeks.

We do not wish for new sperm. We would like the money back we spent and we may seek advice on the total that we have spent.

49.    On February 19, 2019, one customer sent the following e-mail to

Xytex Corporation:

We used 3116 donor sperm and we got baby last year and this year, too.  I choose healthy sperm so I did not imagine this is happening like this high risk disease donor had.

I have a question. how many does his baby born and how many % was CMT ?

can you disclosure [sic] his family was no CMT patient for sure ? your company have testing screens but what is the reason why you does not have CMT is not including on your test even if this DNA might have high risk in the future?

I will ask the doctor about this test but can you cover this test cost? Also we want to know what kind of option you have , if our babies is positive result.  because we already used his sperm and now they are here.

50.    On February 20, 2019, a Xytex customer sent the following e-

mail to Xytex Corporation:

17

I have a 5 months old baby from the donor 3116. I am very upset and I do not understand why the donor was not tested at the time.

How come he is being tested now; Is it because there are cases of children born with the disease?

What are my options for testing.

I want more information about the disease and the possibility to know the severity of the mutation with the test.

I would like to receive the donor family history.

Shouldn't we have been informed that there was an investigation happening?

I still have two units at the fertility clinic and I will not be using them now and I just renewed for another year of storage. I will like to be refunded for the cost of the two units as well as the year of storage.

I have to say that I am extremely upset and I find it to be negligent that the donor was not tested. This situation is troubling for parents who are desperate to have kids and we choose to put our trust in the company.

51.    On February 22, 2019, a Xytex customer sent an e-mail stating,

"Thank you for the update. I would like a refund for the 3 samples that I purchased

from Xytex last year. Please let me know who best to speak to in respect of this."

**C.    The Canadian Actions**

52.    In September 2020, seven lawsuits (the "Canadian Actions") were

filed against **Insured Entity** Outreach Health Services, Inc. ("Outreach") by

18

individuals who purchased semen from Donor 3116 and took delivery of the semen in Canada (the "Canadian Plaintiffs").

53.    The Canadian Plaintiffs generally assert that the **Insureds** made numerous misrepresentations regarding the background of Donor 3116, including with respect to the fact that he had a genetic abnormality, as well as with regard to his education and employment history.

54.    The Canadian Plaintiffs allege that Donor 3116 was presented as having an advanced educational degree and as being employed as a cytogeneticist, neither of which was true.  They assert that, in reality, Donor 3116 had no advanced degrees and worked as a lab technician.  Further, the Canadian Plaintiffs assert that the **Insureds** failed to test for and failed to disclose that Donor 3116 had genetic abnormalities, including but not limited to Charcot Marie Tooth Disease ("CMT1"), despite Donor 3116's hallmark presentations for CMT1 that were present and obvious when he became a donor.

55.    The Canadian Plaintiffs further allege that the **Insureds** continued to market and sell semen from Donor 3116 after learning of his genetic abnormalities, for profit purposes.  In addition, after learning of the genetic issues, the **Insureds** purportedly failed to disclose information regarding Donor 3116 to individuals who had purchased his semen.

56.     Each of the Canadian Actions asserts the following causes of action: Wrongful Birth; Failure to Investigate; Fraud; Negligent Misrepresentation; Negligence; Defective Product; Breach of Warranty ; Battery; Specific Performance; and Claim for Punitive and Aggravated Damages.

57.     For the Prayer for Relief in each lawsuit, the respective plaintiff/plaintiffs seek $370,000 in general damages; $3 million in special damages; $1 million in punitive, aggravated and/or exemplary damages; pre- and post-judgment interest; and costs ("on a substantial indemnity scale, plus HST where applicable").

58.     The Canadian Actions have been stayed based on Outreach's insolvency proceeding in Canada.

**D.     The Georgia Actions**

59.     On February 3, 2021, the Canadian Plaintiffs filed suit in Georgia state court in the lawsuit captioned, *A.D.A., et al. v. Xytex Corp., et al.*, Case No. 2021CV345360 (Ga. Sup. Ct.) (the "Canadian Plaintiff Georgia Action").  A true and correct copy of the complaint in the Canadian Plaintiff Georgia Action, with exhibits, is attached as Exhibit B.

60.     On the same day, a group of United States and United Kingdom purchasers of Donor 3116 semen filed the separate lawsuit in Georgia state court

20

captioned, *L.S.E., et al. v. Xytex Corp., et al.*, Case No. 2021CV345363 (Ga. Sup. Ct.) (the "U.S./U.K. Plaintiff Georgia Action" and, with the Canadian Plaintiff Georgia Action, the "Georgia Actions").  A true and correct copy of the complaint in the U.S./U.K. Plaintiff Georgia Action, with exhibits, is attached as Exhibit C.

61.     The Georgia Actions each assert the following causes of action against all defendants:  Intentional Misrepresentation – Fraud; Negligent Misrepresentation; Product Liability/Strict Liability; Products Liability/ Negligence; Breach of Express Warranty; Breach of Implied Warranty; Breach of Contract; Negligence; Violation of Georgia Fair Business Practices Act; Specific Performance; False Advertising; Promissory Estoppel; and Unjust Enrichment. Plaintiffs seek as relief: pain and suffering damages; financial losses; establishment of a medical monitoring fund; injunctive relief; punitive damages; and attorneys' fees and costs.

**The Canadian Plaintiff Georgia Action**

62.     Plaintiffs in the Canadian Plaintiff Georgia Action are the same plaintiffs who filed the Canadian Actions against **Insured Entity** Outreach. Plaintiffs all purchased Donor 3116 semen and have had children using that semen.

63.     The complaint names as defendants Xytex Corporation and Xytex International, and **Insureds** Dr.  Spradlin and Ms. Hartley. The complaint also

21

names numerous "Doe" defendants. The complaint asserts that Xytex International promoted and sold semen through its subsidiary, Xytex Corporation, for the purposes of artificial insemination. Defendants Dr. Spradlin and Ms. Hartley are alleged to have been employees, agents, owners and/or directors who were associated with the Atlanta, Georgia office of Xytex Corporation.

64.    Plaintiffs assert that they purchased Donor 3116 semen from Xytex Corporation, relying on numerous misrepresentations regarding Donor 3116's background. According to the complaint, the **Insureds** misrepresented Donor 3116 as having an advanced educational degree and as being employed as a cytogeneticist, neither of which was true. Plaintiffs state that, in reality, Donor 3116 had no advanced degrees and worked as a lab technician. Plaintiffs further assert that defendants failed to test for and failed to disclose that Donor 3116 had genetic abnormalities, including but not limited to CMT1, despite Donor 3116's hallmark presentations for CMT1 that were present and obvious at the time he became a donor.

65.    According to the complaint, on February 8, 2019, Dr. Spradlin, in his capacity as Chief Medical and Laboratory Director at Xytex Corporation, sent a letter to plaintiffs disclosing that Donor 3116 likely is a carrier of a chromosomal abnormality and that it was highly likely that the abnormality could be passed to

offspring. On February 11, 2019, Dr. Spradlin sent a second letter to plaintiffs confirming that Donor 3116 is a carrier of the genetic abnormality, which is associated with CMT1. Notwithstanding these disclosures, plaintiffs claim that defendants did not disclose all relevant information regarding Donor 3116 in a timely manner and further allege that defendants have a "pattern and practice" of withholding information from families who purchased semen, for reasons of defendants' financial gain. To that end, the complaint asserts that defendants in the lawsuit acted with malice and fraud in their dealings with plaintiffs regarding Donor 3116.

66.   The complaint alleges that plaintiffs' children born from Donor 3116's semen (seven in total) have been diagnosed with genetic abnormalities, including those associated with CMT1. Per the allegations in the complaint, two of the children have been tested and are positive for CMT1; two children have been tested and have the genetic mutation for CMT1; and it is unknown at this time if the remaining three children have any genetic abnormalities or disorders.

**The U.S./U.K. Georgia Action**

67.   Plaintiffs in the U.S./U.K Plaintiff Georgia Action all purchased semen from Donor 3116. Plaintiffs either have had children using the semen or have fertilized embryos using the semen.

68.     The complaint in the U.S./U.K. Plaintiff Georgia Action names the same defendants as the Canadian Plaintiff Georgia Action, and the factual allegations and claims asserted largely mirror those of the Canadian Plaintiff Georgia Action and the earlier Canadian Actions.

69.     The U.S./U.K. Plaintiff Georgia Action complaint asserts that plaintiffs' children born from Donor 3116's semen have been diagnosed with genetic abnormalities.  They allege that one of the children has been tested and is positive for CMT1, and the other two children have been tested and are positive for a genetic mutation associated with CMT1.

## REQUEST FOR COVERAGE FOR THE LAWSUITS UNDER THE POLICY

70.     On October 5, 2020, Allied World first received notice of circumstances regarding Donor 3116 and of the Canadian Actions filed against **Insured Entity** Outreach.

71.     On November 4, 2020, Allied World agreed to defend Outreach in the Canadian Actions, subject to a reservation of rights.  Allied World also requested that the **Insureds** provide additional information necessary for Allied World to complete its coverage investigation, including copies of any and all correspondence from the underlying plaintiffs and/or their counsel in connection with the circumstances at issue regarding Donor 3116.

24

72.     On February 16, 2021, the **Insureds** provided notice of the Georgia

Actions to Allied World and sought coverage under the Policy for the Georgia

Actions.

73.     On March 17, 2021, Allied World agreed to defend the **Insureds** in

the Georgia Actions, subject to a reservation of rights.  Allied World again

requested that the **Insureds** provide additional information necessary for Allied

World to complete its coverage investigation, including copies of any and all

correspondence from the underlying plaintiffs and/or their counsel in connection

with the circumstances at issue in the Canadian Actions and the Georgia Actions.

## COUNT I

### For a Declaration That There Is No Coverage Under the Policy Because the Claim Was First Made Before the Inception of the Policy

74.     Allied World realleges and incorporates by reference the foregoing

allegations in this Complaint.

75.     The Policy's insuring agreement requires that a **Claim** be first made

during the **Policy Period** of the Policy—that is, from March 9, 2020 to March 9,

2021.

76.     **Claim** is defined as "a judicial proceeding or other written demand

seeking monetary damages otherwise covered by this Policy."  Policy, Section II.F.

A **Claim** "shall be deemed first made when any **Insured** first receives notice of the

**Claim**." *Id.*

> 77.   **Related Claims** are:

> all **Claims** based on, arising out of, directly or indirectly resulting
> from, in consequence of, or in any way involving the same or related
> facts, circumstances, situations, transactions, events or involved
> individuals or the same or related series of facts, circumstances,
> situations, transactions, events or involved individuals, whether
> related logically, causally or in any other way.

Policy, Section II.M.

> 78.   All **Related Claims**, whenever made, "shall be deemed to be a single

**Claim** and shall be deemed to have been first made on the earliest of the following

dates:

> 1.   the date on which the earliest **Claim** within such **Related**
>      **Claims** was received by an **Insured**; or

> 2.   the date on which written notice was first given to the **Insurer**
>      of an act, error, omission or **Occurrence** which subsequently
>      gave rise to any of the **Related Claims**, regardless of the
>      number and identity of claimants, the number and identity of
>      **Insureds** involved, or the number and timing of the **Related**
>      **Claims**, and even if the **Related Claims** comprising such single
>      **Claim** were made in more than one **Policy Period**.

Policy, Section IV.C.

> 79.   The Client Demands sent to the **Insureds** in 2019, over a year before

the inception of the Policy on March 9, 2020, constitute **Claims** under the Policy

because they are written demands seeking monetary damages otherwise covered by the Policy.

80.   The Client Demands, the Canadian Actions, and the Georgia Actions are based on and arise out of the same or related facts, circumstances, situations, transactions and/or events regarding the genetic issues and other nondisclosures with respect to Donor 3116.

81.   The Client Demands, the Canadian Actions, and the Georgia Actions constitute **Related Claims** that are deemed a single **Claim** under the Policy, and the **Claim** is deemed made on the date on which the earliest **Claim** within such **Related Claims**—*i.e.,* the Client Demands—were received by an **Insured**, which was in February 2019 and over a  year before the inception of the Policy on March 9, 2020.

82.   No coverage is available under the Policy for the Client Demands, the Canadian Actions, or the Georgia Actions because they are **Claims** first made before the inception of the Policy.

**WHEREFORE**, Allied World respectfully requests the Court enter judgment in its favor and declare that Allied World has no duty to defend the **Insureds** against the Client Demands, the Canadian Actions, or the Georgia Actions, and, more specifically:

(A)    Enter judgment that there is no coverage for the Client Demands, the Canadian Actions, and the Georgia Actions because they are **Claims** first made before the inception of the Policy and, thus, Allied World has no duty to defend or indemnify the **Insureds** in the Client Demands, the Canadian Actions, or the Georgia Actions;

(B)    Award Allied World all other relief to which it may be entitled.

## <u>Reservation</u>

Other terms, conditions and limitations of the Policy may operate to bar or limit coverage for some or all of the amounts for which Defendants seek coverage. Allied World reserves the right to raise affirmatively other terms, conditions and limitations as defenses to coverage as appropriate, including the right to amend the Complaint.

Respectfully submitted this 2nd day of August 2023.

*/s/ Matthew A. Gass*
Johannes S. Kingma (GA Bar No. 421650)
Matthew A. Gass (GA Bar No. 360755)
Attorneys for Plaintiff Allied World Surplus Lines
Insurance Company
**Stites & Harbison, PLLC**
303 Peachtree Street, N.E., Suite 2800
Atlanta, GA 30308
Telephone: (404) 739-8800
Facsimile: (404) 739-8870
Emails: jkingma@stites.com
           mgass@stites.com

*/s/ Leland H. Jones IV*_____
Leland H. Jones IV (*pro hac vice* application being filed)
Kimberly Cereijo (*pro hac vice* application being filed)
**Attorneys for Plaintiff Allied World Surplus Lines**
**Insurance Company**
**Wiley Rein, LLP**
2500 M Street NW
Washington, D.C. 20036
Telephone: (202) 719-7000
Facsimile: (202) 719-7049
Emails: ljones@wiley.law
         Kcereijo@wiley.law