## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| HYDRO SYSTEMS, INC, a California company, | **Case No. _____** |
| Plaintiff, | |
| v. | **JURY DEMAND** |
| FACTORY AUTOMATION SYSTEMS, INC, a Georgia company, | |
| Defendant. | |

Plaintiff Hydro Systems, Inc. ("Hydro Systems" or "Plaintiff") respectfully alleges the following claims against Defendant Factory Automation Systems, Inc. ("FAS" or "Defendant").

### <u>INTRODUCTION</u>

1.      This is a diversity action for breach of contract, breach of warranties and covenants, unjust enrichment, negligent misrepresentation, and attorneys' fees, all arising from FAS's failure to produce and deliver properly functioning robotic automation systems as promised, for use in the production of high-end bathtubs in Hydro Systems's McDonough manufacturing facility.

1

2.      In August, 2021, Hydro Systems agreed to pay over one million dollars for these robots, and FAS represented to Hydro Systems that the robots would be completed and functioning within 28 weeks of order. Hydro Systems has made substantial investments of time and resources in reliance that FAS would deliver robots that could function as promised. Almost two years later, Hydro Systems has paid almost one million dollars to FAS, and has incurred substantial expenses and other costs as part of the process, but has FAS failed to deliver robots that function as promised.

3.      Instead, more than 40 weeks after Hydro Systems's order and down payment, FAS delivered robots that did not meet the basic specifications FAS committed to provide and could not perform the functions for which they were purchased.

4.      Now, almost two years later, and despite hundreds of hours of FAS's tinkering and reprogramming and changes in design and process, the robots *still* do not meet the basic specifications FAS committed to provide and *still* cannot perform the functions for which they were purchased.

5.      Throughout this time, Hydro Systems has consistently and clearly articulated and reiterated one simple demand: that FAS fulfill its representation that the robots "will process tubs to a more consistent finish in less time than manual labor."

6.      Throughout this time, Hydro Systems has repeatedly and consistently notified FAS that the robots it delivered are not acceptable.

7.      Hydro Systems has suffered millions of dollars in damages including, but not limited to, over $900,000.00 already paid to FAS for nonconforming, defective, and deficient robots; costs of testing, 3D scanning, and other expenses FAS required Hydro Systems to incur in the process of producing the robots; lost production; lost sales; wasted materials; increased labor costs; lost time and productivity of Hydro Systems employees; lost profits; costs of cover; and attorneys' fees.

8.      In addition, Hydro Systems expects to incur substantial expenses to obtain suitable replacements for the failed robots.

9.      Hydro Systems is entitled to recover its monetary damages and cover damages, and is also entitled to an award of its costs and post-judgment interest.

## PARTIES, JURISDICTION, AND VENUE

10. Hydro Systems is a California corporation with its principal place of business in Valencia, California. Hydro Systems is authorized to do business in Georgia.

11. Factory Automation Systems is a Georgia corporation, with its principal office address at 5139 Southridge Parkway, Atlanta, GA, 30349. Factory Automation Systems has a registered agent in Clayton County, Georgia, and may be served with process through its agent, Edward Bonnell, at 5139 Southridge Parkway, Atlanta, GA, 30349.

12. This Court has personal jurisdiction over FAS because it is a Georgia corporation.

13. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States.

14. Venue is properly based in this district pursuant to 28 U.S.C. § 1391(b) because FAS is a Georgia corporation based in this judicial district, and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## ALLEGATIONS OF FACT

**A.    Hydro Systems Agrees to Purchase Robots From FAS**

15.    Hydro Systems is a family-owned business founded by Alan Steinhardt in Valencia, California in 1978.  Hydro Systems designs and manufactures a full line of custom, high-end bathtubs that can be found in homes and hotels around the world.

16.    In 2018, after 40 years in business, Hydro Systems added a new manufacturing facility in McDonough, Georgia, in part to facilitate servicing its customers nationwide from both sides of the country while reducing its carbon footprint.

17.    In May, 2021, Hydro Systems began to consider robotic automation for some of its manufacturing processes in the Georgia facility.

18.    Through its research and consideration of automation systems, Hydro Systems became aware of FAS.

19.    FAS states on its website, at www.factoryautomation.com, that "Factory Automation Systems is a full-service systems integrator that provides turnkey automation solutions to manufacturing companies across the U.S."

20.     After researching FAS and viewing video of an FAS robot sanding a competitor's bathtubs, Hydro Systems contacted FAS and invited salespersons from FAS to tour Hydro Systems's Georgia facility.

21.     On or about June 20, 2021, FAS salesperson Don Gee and, on information and belief, at least one other person from FAS, toured Hydro Systems's Georgia facility with Hydro Systems principals Kevin Steinhardt and Ken Steinhardt (the "June 2021 Facility Visit").

22.     During the June 2021 Facility Visit, Don Gee observed Hydro Systems's processes for producing bathtubs, including the sanding processes and polishing processes.

23.     During the June 2021 Facility Visit, FAS discussed Hydro Systems's needs for sanding and polishing automation, and FAS's capabilities and offerings.

24.     During the June 2021 Facility Visit, FAS watched Hydro Systems's processes for manually sanding and polishing tubs, and asked questions and received answers concerning the sandpaper grits and polishing compounds used in these processes.

25.     During the June 21, 2021 Facility Visit, FAS observed that Hydro Systems's process for manufacturing tubs included painting the raw, newly-molded tubs with gel coat, waiting for the gel coat to dry and harden into a rough coating

sometimes referenced as "orange peel" because of its texture (the "Orange Peel Gel Coat"), and then sanding off the Orange Peel Gel Coat.

26.    During the June 2021 Facility Visit, FAS salesperson Don Gee told Hydro Systems that the FAS robotic sanding and polishing systems would allow Hydro Systems to turn the lights off and go home while the robots work through the night.

27.    In August, 2021, FAS presented to Hydro Systems "Proposal 21-9571, Rev. 4," dated August 30, 2021 (the "FAS Proposal"). A true and correct copy of the FAS Proposal is attached as Exhibit A.

28.    The FAS Proposal specified at page 1: "These robot systems will process tubs to a more consistent finish in less time than manual labor."

29.    Hydro Systems agreed to purchase the robots described in the FAS Proposal.

30.    On or about August 31, 2021, Hydro Systems paid FAS a down payment of $348,000.00.

31.    On or about September 8, 2021, Hydro Systems sent samples of its tub finishes to Scott Seitz, project manager at FAS.

32.    The tub finish samples sent to FAS on or about September 8, 2021 included 1) a sample of Hydro Systems's raw tub material before initial sanding,

7

which was covered with hardened Orange Peel Gel Coat; 2) a sample of Hydro Systems's tub material after manual sanding; and 3) a sample of Hydro System's finished tub material after manual polishing.

33.     On or about September 29, 2021, at FAS's request, Hydro Systems made available to FAS a raw Daniela model tub, which FAS picked up from Hydro Systems's McDonough facility.

34.     By email dated October 15, 2021 (the "October 15, 2021 List"), six weeks after Hydro Systems had agreed to purchased two robots from FAS and had paid a down payment to FAS, Scott Seitz of FAS sent Hydro Systems a two-page list of "items we would like to cover in greater detail during our visit on Monday."

35.     The October 15, 2021 list contained detailed questions about Hydro Systems's existing processes for casting, coating, sanding, and polishing tubs.

36.     On or about October 18, 2021, Scott Seitz and Toby Robinson from FAS toured Hydro Systems's Georgia facility with Ken Steinhardt and Kevin Steinhardt. During this visit, Seitz and Robinson observed Hydro Systems's processes for casting, de-molding, preparing for Orange Peel Gel Coat, painting with Orange Peel Gel Coat, sanding off the Orange Peel Gel Coat, and polishing of Hydro Systems tubs.

37.     In or around January, 2022, FAS asked Hydro Systems to check for potential hazards of the dust created from sanding off the Orange Peel Gel Coat.

38.     Hydro Systems engaged a testing laboratory to test and report on potential hazards from dust created from sanding the Orange Peel Gel Coat.

39.     In April, 2022, Hydro Systems provided the results from the testing laboratory to FAS.

40.     By email dated May 11, 2022, FAS told Hydro Systems: "let me be clear, the combustibility of the sanding dust is NOT the reason this project has been delayed."

**B.    FAS Delays Producing the Robots and Fails to Test Them Properly**

41.     The FAS Proposal states, on page 4, that "During the design and engineering phases, the FAS project manager will work with Hydro Systems to establish the Factory Acceptance Test criteria. FAS will stage the system and test performance in our shop. Then during the FAT, the Hydro Systems team will have the opportunity to inspect the hardware and observe the system in operation."

42.     The FAS Proposal states, on page 7, that "[t]he system will be ready for FAT [Factory Acceptance Testing] in approximately 24 – 28 weeks after receipt of order and down payment."

43.     The time period of "24 – 28 weeks after" FAS's receipt of Hydro Systems's August 31, 2021 order and down payment would fall between February 15, 2022 – March 15, 2022.

44.     By February, 2022, more than 24 weeks after Hydro Systems paid the down payment to FAS, FAS had not given Hydro Systems a completion date for the robots, and Hydro Systems began inquiring about status.

45.     By email dated February 18, 2022, Kevin Steinhardt asked Scott Seitz: "What are we looking like for completion of the robots[?] I am trying to plan my trip to Georgia for [M]arch and I want to ensure I am there for the training[.]"

46.     In response, by email dated February 21, 2022, Scott Seitz told Kevin Steinhardt to "plan for two days the week of March 28th for us to jointly evaluate the sanding and polishing effectiveness at our office."

47.     Accordingly, Kevin Steinhardt, Vice President of Hydro Systems, who lives in California and works at Hydro Systems's Valencia, California facility, made plans to travel to Georgia to evaluate the robots at FAS during the week of March 28, 2022.

48.     In an email dated March 2, 2022, Scott Seitz informed Hydro Systems that "the fabricator of the robot risers for your Sanding/Buffing Cells has notified us that delivery will be delayed until April 14th due to material shortages. The risers

10

are required for setup of the robot cell before we can begin actual testing. This will delay a demonstration at our shop until sometime in April."

49.     On or about March 21, 2022, 29 weeks after Hydro Systems had paid its down payment to FAS, and before the sanding robot or the polishing robot had been tested or delivered to Hydro Systems, Hydro Systems paid FAS another $348,000.00.

50.     In April, 2022, FAS requested additional tubs for testing.

51.     In response, Hydro Systems sent FAS two raw tubs that had been painted with Orange Peel Gel Coat. These tubs were an Alamo model and a Marquis model.

52.     As of at least May 10, 2022, 36 weeks after Hydro Systems paid the down payment to FAS, FAS had not yet completed either robot.

53.     By email dated May 10, 2022, Hydro Systems asked FAS for an estimated time of delivery for the robots, stating that "they were due to be delivered in [M]arch and now its [M]ay with no end in sight."

54.     In response, by email dated May 11, 2022, Scott Seitz of FAS told Hydro Systems that "if we receive the requested [sample] unpolished tubs by May 16th and tub fixturing is resolved as detailed above, we can have a functioning robot polishing cell in near production-ready condition at our facility by the week of June

6th for your representative to see . . . The Sanding Cell can potentially be deployed in your facility approximately 30-days after the Polishing Cell is installed and operating."

55.    In response to this request, on or about May 16, 2022, Hydro Systems provided FAS two more sample tubs.  These tubs, an Alamo model and a Marquis model, had been coated with Orange Peel Gel Coat and then manually sanded up to 1000 grit at Hydro Systems's facility and were ready for polishing, but had not yet been polished.

56.    Prior to, on, or about May 18, 2022, Hydro Systems provided FAS with the tub fixturing components it had requested for testing.

57.    By email dated June 3, 2022, FAS notified Hydro Systems to "plan for the Polishing Cell Factory Acceptance Test (FAT) at our facility next Thursday, June 9th @ 10 AM."

58.    Also in the June 3, 2022 email from FAS to Hydro Systems, project manager Scott Seitz stated that "in my absence next week Brian Hiltz will be taking care of the project management responsibilities."

59.    Accordingly, Kevin Steinhardt traveled from California to Georgia to observe and participate in the June 9, 2022 Factory Acceptance Testing.

60.     During Kevin Steinhardt's June 9, 2022 attendance at FAS for the attempted Factory Acceptance Testing for the polishing robot, the polishing spindle fell off the robot and onto the floor while the robot was operating.

61.     During Kevin Steinhardt's June 9, 2022 attendance at FAS for the attempted Factory Acceptance Testing for the polishing robot, the robot faulted, and on information and belief, this was caused by a cycle stop, which then caused the polishing tool to rub against the tub.

62.     During Kevin Steinhardt's June 9, 2022 attendance at FAS for the attempted Factory Acceptance Testing of the polishing robot at FAS, after the spindle fell off and the polishing tool rubbed against the tub and the polishing robot faulted, FAS assured Kevin Steinhardt that they would address these issues and get them fixed.

63.     Because the polishing robot malfunctioned and did not function properly during Kevin Steinhardt's June 9, 2022 attendance at FAS for the attempted Factory Acceptance Testing, Hydro Systems regarded the polishing robot as incomplete and unfinished.

64.     Nevertheless, on or about June 15, 2022, in reliance on FAS's assurances that it would correct the defects and deficiencies of the polishing robot

13

and deliver a properly functioning sanding robot, Hydro Systems paid FAS an additional $232,000.00.

65.     FAS did not invite Hydro Systems to any other testing procedure or attempted FAT process on the polishing robot after Kevin Steinhardt's June 9, 2022 attendance at FAS for the attempted Factory Acceptance Testing or before FAS delivered the polishing robot to Hydro Systems.

66.     On or about June 20, 2022, FAS delivered the polishing robot, but not the sanding robot, to Hydro Systems's Georgia facility.

67.     Meanwhile, as of this time – June 20, 2022, more than 40 weeks after Hydro Systems's down payment to FAS – the sanding robot had not been tested or delivered at all.

68.     FAS did not invite Hydro Systems to any testing procedure or attempted FAT process on the sanding robot before delivering the sanding robot to Hydro Systems.

69.     On or about July 11, 2022, 45 weeks after Hydro Systems had paid the down payment to FAS – after FAS had represented to Hydro Systems that both robots would be installed and functioning within 24-28 weeks after down payment – FAS delivered the sanding robot to Hydro Systems's facility.

**C.     Even Once Delivered, the Robots Were Incomplete and Could Not Function as Promised**

70.     After FAS delivered and installed the polishing robot at Hydro Systems's Georgia facility, on or about June 20, 2022, the polishing robot performed poorly at best.

71.     Specifically, for example, even though Hydro Systems had provided FAS with polishing compound for testing purposes while FAS was building the polishing robot, the polishing robot FAS delivered on or about June 20, 2022 could not properly dispense polishing compound from the robot's dispenser to the polishing pad.

72.     FAS attempted to solve this issue by diluting the polishing compound.

73.     Diluting the polishing compound did not solve the issues and did not make the polishing robot function properly.

74.     After the polishing compound was diluted in an attempt to make the polishing robot function, the polishing robot still was not able to remove scratches from the tubs and did not polish the tubs to high gloss finish.

75.     In addition, the polishing robot was burning compound onto the tub it was supposed to be polishing.

76.     In addition, the polishing robot was not able to polish out sanding marks and scratches that a human polisher would be able to sand out manually.

77.     FAS could not make the polishing robot function properly during initial installation at Hydro Systems's Georgia facility, on or about June 20, 2022.

78.     In fact, the only two FAS people on site at Hydro Systems to assist with installing and running the polishing robot were, on information and belief, interns, and these FAS representatives did not appear to understand the robot.

79.     The FAS representatives suggested various potential solutions, including asking Hydro Systems personnel to go to auto part stores to purchase different buffing pads.

80.     Hydro Systems personnel did go to auto part stores to purchase the buffing pads suggested by FAS personnel, but these buffing pads did not improve the performance of the polishing robot.

81.     In addition, when FAS delivered and installed the polishing robot at Hydro Systems's Georgia facility, on or about June 20, 2022, the polishing robot was not fully programmed.

82.     The FAS Proposal states, on page 1, that "our scope of work and pricing is based on programming twelve unique tub models."

83.     The FAS Proposal states, on page 6, that "FAS will program twelve designated tub models for both sanding and polishing."

16

84.    When FAS delivered the polishing robot to Hydro Systems, on or about June 20, 2022, it had not been programmed to polish twelve models.

85.    When FAS delivered the polishing robot to Hydro Systems, on or about June 20, 2022, it had only been programmed to polish three models.

86.    When FAS delivered the polishing robot to Hydro Systems, on or about June 20, 2022, even the three models for which it had been programmed functioned poorly and required Hydro Systems personnel to manually re-do the polishing work for every tub.

87.    After FAS delivered the polishing robot to Hydro Systems, on or about June 20, 2022, all of the models previously programmed had to be reprogrammed because of poor programming.

88.    The polishing robot continued to function poorly or not at all.

89.    In addition, the polishing robot does not function as specified in the FAS Proposal.

90.    The FAS Proposal states, at page 1: "The polishing process will use two buffing compounds."

91.    The polishing robot does not use two buffing compounds.

92.     The polishing robot is not capable of achieving the high gloss finish Hydro Systems showed to FAS during the June 2021 Facility Visit and on subsequent samples and demonstrations shown to FAS.

93.     The polishing robot leaves scratches that must be removed manually.

94.     By email dated July 5, 2022, Hydro Systems informed FAS that "the tubs are all coming out with scratches on them. The scratches are in a specific pattern and clearly coming from the robot . . . It is clear to me that these tubs were not closely inspected when you tested them at your place . . . when inspected closely all the scratches can be seen. We are now stuck doing R&D instead of producing product."

95.     Meanwhile, at this point, on or around July 5, 2022, more than 40 weeks after Hydro Systems had made its down payment to FAS, the sanding robot had not been delivered to Hydro Systems.

96.     When FAS finally delivered and installed the sanding robot at Hydro Systems, on or about July 11, 2022, the sanding robot was incomplete and performed poorly at best.

97.     The FAS Proposal states, on page 2, that "The system will include an automatic sandpaper exchange system to accommodate three grits of sandpaper."

98.     The sanding robot that FAS delivered to Hydro Systems on or about July 11, 2022 did not have an automatic sandpaper exchange.

99.    Instead, every hour, a person would need to manually change out the sandpaper in the sanding robot.

100.   The FAS Proposal contains a list of "Deliverables" to be expected from FAS.

101.   At page 3 of the FAS Proposal, under "Deliverables; Sanding Cell Components; Robot End-of-Arm Tool," the list of deliverables includes "Vacuum hose to connect sander to Hydro Systems-supplied vacuum collection system."

102.   When FAS delivered the sanding robot to Hydro Systems, on or about July 11, 2022, it did not have a vacuum hose to connect to a vacuum collection system.

103.   FAS has never added a vacuum hose to the sanding robot.

104.   As of the filing of this Complaint, the sanding robot still does not have a vacuum hose to connect to a vacuum collection system.

105.    By email dated July 26, 2022 (the "July 26, 2022 Deficiencies Email"), Hydro Systems informed FAS that "The [FAS Proposal] calls for the programming of twelve unique tub models. To date, 5 models have been programmed."

106.   In the July 26, 2022 Deficiencies Email, Hydro Systems informed FAS that "we need to have an Operator change sanding discs between each unit, not

allowing us to run fully automated or overnight. This results in us having to shut down the robot hourly to exchange sandpaper."

107.    In the July 26, 2022 Deficiencies Email, Hydro Systems informed FAS that "Robot was to use less time than manual labor. At 25mm/sec, this doesn't represent less time than we currently use. Per Cody, we can adjust upwards incrementally, but doing so makes the robot less precise and can lead to faults."

108.    In the July 26, 2022 Deficiencies Email, Hydro Systems informed FAS that "[t]he system will include an automated sandpaper exchange system. To date, we do not have this."

109.    In the July 26, 2022 Deficiencies Email, Hydro Systems informed FAS that "A further fault from today was that the SandingBot dropped the bumper that is used to reference the tubs. The robot attempted to reference the tub without the bumper, so we hit the E-Stop. As of now, we are locked up again."

110.    In the July 26, 2022 Deficiencies Email, Hydro Systems informed FAS that "we are a long way from operating in an efficient manner, and in a way that was represented in [The FAS Proposal]. Please do not consider the robots to have passed Site Acceptance at this time until FAS can correct the above issues."

**D.     FAS Demands Additional Payment for Programming Already Included in its Proposal Price**

111.   As of August 9, 2022, almost a full year after Hydro Systems paid the down payment to FAS, FAS had programmed only five models into the sanding robot and the polishing robot.

112.   Moreover, even the five models FAS had programmed into the sanding robot and the polishing robot failed to function properly.

113.   By letter dated August 9, 2022 (the "August 9, 2022 Letter"), Hydro Systems notified FAS that "to date, [FAS] has failed to provide an acceptable robotic system for sanding and polishing our bathtubs as proposed."

114.   The August 9, 2022 Letter detailed many shortcomings of the robots.

115.   The August 9, 2022 Letter stated that "we have to change sanding discs manually between sanding passes every hour.  This forces us to have an operator standing-by at all times which substantially reduces the return on investment by increasing our labor costs, as opposed to reducing labor."

116.   The August 9, 2022 Letter also stated that "[t]he robot systems were to provide a more consistent finish in less time than our manual process.  To date, the finish is less consistent, and forcing us to do much rework[.]"

117.   The August 9, 2022 Letter also stated that "[t]o date, we have only 5 models programmed when FAS committed to 12 models."

21

118.   The August 9, 2022 Letter also stated that "it is clear that the SandingBot lacks the necessary torque to do the work necessary to achieve a quality finish."

119.   The August 9, 2022 Letter also stated that "[t]he PolishingBot, as programmed, will not even remove 1500 grit scratches. These scratches are being removed manually in our Detailing department. By comparison, an employee using a manual polishing buffer can remove 1000 grit scratches with minimal effort. This deems the investment in the PolishBot completely worthless."

120.   In its conclusion, the August 9, 2022 Letter stated that "Hydro Systems has spent over $40,000 in rework costs, not to mention lost profits during the so-called start-up phase of the robots."

121.   By email dated August 15, 2022, Jim Pursley, the president of FAS, wrote Hydro Systems concerning the unfinished programming and other concerns Hydro Systems had raised about completion and functioning of the robots.

122.   The August 15, 2022 email from FAS to Hydro Systems discussed Hydro Systems's concerns with the robots and, as condition precedent to addressing these concerns, requested additional payment from Hydro Systems beyond the price agreed in the FAS Proposal.

123.   Specifically, the August 15, 2022 email from FAS to Hydro Systems stated, in relevant part: "You have requested . . . programming of 7 more tubs . . . We will allow for 120 man-hours to optimize the cells and/or program tubs. The price for this is $24,000."

124.   Throughout August, 2022, FAS continued to refuse to program the remaining models included in the FAS Proposal.

125.   By email dated August 30, 2022, as part of an exchange concerning the robots' deficiencies and defects, Hydro Systems asked FAS: "I don't see any mention of programming and optimizing the 12 models per contract[,] was that an oversight or is your final offer only 5 models?"

126.   In response, by email dated August 30, 2022, FAS stated: "Since those tub programs are not integral to resolving performance issues, I am not prepared to make any agreement at this time."

127.   FAS continued in its refusal to program the remaining models promised in the FAS Proposal.

128.   At some point in September, 2022, FAS resumed work on programming the remaining models included in the FAS Proposal.

129.  Even after FAS resumed its work on programming the remaining models included in the FAS Proposal, FAS did not complete the programming included in the FAS Proposal until the spring of 2023.

130.  Even after FAS deemed completed the programming included in the FAS Proposal, the sanding robot and the polishing robot still could not and cannot process tubs to a more consistent finish in less time than manual labor.

131.  Even after FAS deemed completed the programming included in the FAS Proposal, the sanding robot and the polishing robot still did not and does not meet the basic specifications FAS committed to provide and could not and cannot perform the functions for which they were purchased.

132.  In November, 2022, the sanding robot malfunctioned in a manner that caused some of its components to smash into the tub it was sanding and break the tub.

133.  FAS addressed this malfunction by taking components from the polishing robot and installing them into the sanding robot.

134.  As a result, the polishing robot was idle and unusable for a month while awaiting parts to replace those FAS had removed from it in order to make the sanding robot function.

24

### E.     To Date, the Robots Do Not Function as Promised

135.   Throughout the first seven months of 2023, Hydro Systems permitted FAS to continue adjusting, testing, and reprogramming the robots on Hydro Systems's production floor, often during production time.

136.   FAS's continuing work on the robots and the frequent faults of the robots have interfered with Hydro Systems's production and has taken the attention of Hydro Systems's personnel away from other responsibilities.

137.   In reliance on FAS's assurances that it could bring the robots into conformity with the description promised in the FAS Proposal, Hydro Systems adjusted its labor force such that Hydro Systems currently does not have the staffing to keep up with its production demands by processing tubs manually without automation.

138.   In July, 2023, FAS ceased working to bring the robots into conformity with the description promised in the FAS Proposal.

139.   The robots still do not conform to the description promised in the FAS Proposal.

140.   Due to FAS's failure to deliver robots that conform to the description promised in the FAS Proposal, Hydro Systems has been forced to make efforts and

to spend resources in good faith and without unreasonable delay to purchase and/or contract to purchase robots in substitution for those due from FAS.

141.   Hydro Systems will incur substantial external and internal expenses to contract with an automation company who can create a suitable substitute for the failed FAS robots.

142.   Hydro Systems is incurring additional expenses, and will incur future expenses, to cover for FAS's failure to provide robots that conform to the description promised in the FAS Proposal.

143.   Hydro Systems is incurring additional expenses, and will incur future expenses, in working to mitigate its damages by attempting to get the robots to function properly without assistance from FAS.

144.   The robots continue to fault frequently.

145.   The robots cannot process tubs to a more consistent finish in less time than manual labor.

146.   The robots take substantially longer than manual labor to process tubs.

147.   Tubs processed by the robots require substantial manual cleanup to reach an acceptable and consistent finish.

148.   The robots' nonconformities have substantially impaired their value to Hydro Systems.

149.   Hydro Systems has suffered damages, and continues to suffer damages, as a direct and proximate result of FAS's material breaches of its contract and FAS's failure to cure its breaches.

## COUNT 1
### Breach of Contract

150.   Hydro Systems reincorporates the allegations of paragraphs 1 through 149 as if restated herein.

151.   As set forth above, Hydro Systems and FAS entered into a contract to purchase sanding and polishing robots from FAS.

152.   The sanding robot and the polishing robot are "goods" pursuant to Article 2 of the Georgia Commercial Code.

153.   The contract specified that the robots would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

154.   The robots do not sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

155.   The contract specified that the sanding robot would have a vacuum hose to connect the sander to a vacuum collection system.

156.   The sanding robot does not have a vacuum hose to connect the sander to a vacuum collection system.

27

157.   The contract specified that the polishing process would use two buffing compounds.

158.   The polishing robot does not use two buffing compounds.

159.   FAS has breached its obligations under the contract.

160.   FAS's breaches are material and go to the central purpose of the agreement between the parties.

161.   Despite repeated notice, opportunity, and requests by Hydro Systems for FAS to cure its breaches, FAS has refused to do so.

162.   Hydro Systems has substantially performed its obligations under the agreement.

163.   Hydro Systems has paid consideration to FAS pursuant to the contract.

164.   Hydro Systems has suffered and continues to suffer direct, actual, and other damages as a direct and proximate result of FAS's breaches of contract.

165.   Damages Hydro Systems has suffered due to FAS's breaches of contract include, but are not limited to: funds paid to FAS for nonconforming, defective, and deficient robots; costs of testing, 3D scanning, and other expenses FAS required Hydro Systems to incur in the process of producing the robots; lost production; lost sales; wasted materials; increased labor costs; lost time and

productivity of Hydro Systems employees; lost profits; costs of cover; and attorneys' fees.

166.   Hydro Systems is entitled to recover damages pursuant to O.C.G.A. §§ 11-2-711, 11-2-712, 11-2-714, 11-2-715, 11-2-717, and any other applicable authority, in an amount to be determined at trial.

## COUNT 2
## Breach of Covenant of Good Faith and Fair Dealing

167.   Hydro Systems reincorporates the allegations of paragraphs 1 through 166 as if restated herein.

168.   As set forth above, Hydro Systems and FAS entered into a contract to purchase sanding and polishing robots from FAS.

169.   The sanding robot and the polishing robot are "goods" pursuant to Article 2 of the Georgia Commercial Code.

170.   The contract specified that the robots would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

171.   The robots do not sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

172.   The contract specified that the sanding robot would have a vacuum hose to connect the sander to a vacuum collection system.

173.   The sanding robot does not have a vacuum hose to connect the sander to a vacuum collection system.

174.   The contract specified that the polishing process would use two buffing compounds.

175.   The polishing robot does not use two buffing compounds.

176.   FAS has failed to perform in compliance with the spirit and the letter of its contract.

177.   FAS has failed to complete its obligations under the contract within a reasonable time.

178.   Under Georgia law, FAS has obligations of good faith and fair dealing in its performance of its contract with Hydro Systems.

179.   FAS has breached its obligations of good faith and fair dealing in its performance of its contract with Hydro Systems.

180.   FAS has materially breached its obligations under the contract.

181.   FAS's breach of its contractual obligations to Hydro Systems also constitute breach of FAS's obligations of good faith and fair dealing.

182.   Hydro Systems has suffered and continues to suffer direct, actual, and other damages as a direct and proximate result of FAS's breach of its obligations of good faith and fair dealing.

183.   Damages Hydro Systems has suffered due to FAS's breaches of contract include, but are not limited to: funds paid to FAS for nonconforming, defective, and deficient robots; costs of testing, 3D scanning, and other expenses FAS required Hydro Systems to incur in the process of producing the robots; lost production; lost sales; wasted materials; increased labor costs; lost time and productivity of Hydro Systems employees; lost profits; costs of cover; and attorneys' fees.

184.   Hydro Systems is entitled to recover damages pursuant to O.C.G.A. §§ 11-2-711, 11-2-712, 11-2-714, 11-2-715, 11-2-717, and any other applicable authority, in an amount to be determined at trial.

## COUNT 3
### Breach of Warranty to Repair or Replace

185.   Hydro Systems reincorporates the allegations of paragraphs 1 through 184 as if restated herein.

186.   The FAS Proposal states, at pages 9 and 12, that FAS will provide a warranty to repair or replace defective work.

187.   FAS provided Hydro Systems with an express written warranty to repair or replace defects of the sanding robot and/or the polishing robot.

188.   The contract specified that the robots would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

31

189.   The robots are defective in that they do not sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

190.   The sanding robot is defective in that it does not have a vacuum hose to connect the sander to a vacuum collection system.

191.   The polishing robot is defective in that it does not use two buffing compounds.

192.   Both robots are defective in that they fault frequently, costing Hydro Systems significant production time from stoppages and time, labor, and attention from Hydro Systems personnel to address the faults .

193.   Both robots are defective in that the tubs they sand and polish emerge unfinished and incomplete and require Hydro Systems to spend significant time and manual labor to finish and complete the tubs.

194.   FAS repeatedly assured Hydro Systems that the defects of the sanding robot and the polishing robot would be fixed.

195.   FAS has had more than ample and reasonable time and opportunity to repair or replace the sanding robot and the polishing robot.

196.   FAS has failed to repair defects in the sanding robot and the polishing robot within a reasonable time.

197.   FAS has failed to repair defects of the sanding robot and the polishing robot within within a reasonable number of attempts.

198.   The robots are not fit for the purposes intended and fail to meet the requirements for which they were purchased.

199.   Because of their defects, the robots have zero value.

200.   FAS's warranty to repair or replace defects of the robots has failed of its essential purpose.

201.   Hydro Systems has suffered and continues to suffer direct, actual, and other damages as a direct and proximate result of FAS's breach of its warranty to repair or replace defects of the robots.

202.   Damages Hydro Systems has suffered due to FAS's breaches of its warranty to repair or replace include, but are not limited to: funds paid to FAS for nonconforming, defective, and deficient robots; costs of testing, 3D scanning, and other expenses FAS required Hydro Systems to incur in the process of producing the robots; lost production; lost sales; wasted materials; increased labor costs; lost time and productivity of Hydro Systems employees; lost profits; costs of cover; and attorneys' fees.

203.   Hydro Systems is entitled to recover at least all funds paid to FAS for the purchase price of the defective robots funds and for the costs of testing, 3D

scanning, and other expenses FAS required Hydro Systems to incur in the process of producing the robots.

204.   Hydro Systems is entitled to recover damages incurred as a result of FAS's breach of its warranty to repair or replace the defective robots, pursuant to O.C.G.A. §§ 11-2-711, 11-2-712, 11-2-714, 11-2-715, 11-2-717, and any other applicable authority, in an amount to be determined at trial.

**COUNT 4**
**Breach of Express Warranty**
**(O.C.G.A. § 11-2-313)**

205.   Hydro Systems reincorporates the allegations of paragraphs 1 through 204 as if restated herein.

206.   The sanding robot and the polishing robot are "goods" pursuant to Article 2 of the Georgia Commercial Code.

207.   As set forth above, FAS represented to Hydro Systems, in the FAS Proposal, that the robots would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

208.   FAS's representation to Hydro Systems that the robots would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor was an affirmation of fact or promise made by the seller to the buyer which related to the goods and became part of the basis of the bargain.

34

209.   FAS's representation to Hydro Systems that the robots would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor created an express warranty that the robots and their function would conform to the affirmation or promise.

210.   FAS's representation to Hydro Systems that the robots would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor was a description of the goods that was made part of the basis of the bargain.

211.   FAS's representation to Hydro Systems that the robots would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor created an express warranty that the robots and their function would conform to the description of the goods.

212.   The robots do not sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

213.   FAS has breached its express warranty that the robots would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

214.   FAS represented to Hydro Systems, in the FAS Proposal, that the that the sanding robot would have a vacuum hose to connect the sander to a vacuum

collection system, and that the polishing process would use two buffing coupounds.

215.   FAS's representations that the sanding robot would have a vacuum hose to connect the sander to a vacuum collection system and that the polishing process would use two buffing compounds were affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain.

216.   The sanding robot does not have a vacuum hose to connect the sander to a vacuum collection system and the polishing process does not use two buffing compounds.

217.   FAS has breached its express warranty that the sanding robot would have a vacuum hose to connect the sander to a vacuum collection system and that the polishing process would use two buffing compounds.

218.   Hydro Systems has suffered and continues to suffer direct, actual, and other damages as a direct and proximate result of FAS's breaches of express warranty.

219.   Damages Hydro Systems has suffered due to FAS's breaches of express warranty include, but are not limited to: funds paid to FAS for nonconforming, defective, and deficient robots; costs of testing, 3D scanning, and

other expenses FAS required Hydro Systems to incur in the process of producing the robots; lost production; lost sales; wasted materials; increased labor costs; lost time and productivity of Hydro Systems employees; lost profits; costs of cover; and attorneys' fees.

220.   Hydro Systems is entitled to recover damages pursuant to O.C.G.A. §§ 11-2-711, 11-2-712, 11-2-714, 11-2-715, 11-2-717, and any other applicable authority, in an amount to be determined at trial.

**COUNT 5**
**Failure of Limited Warranty**
**(O.C.G.A. §11-2-719)**

221.   Hydro Systems reincorporates the allegations of paragraphs 1 through 220 as if restated herein.

222.   Pursuant to O.C.G.A. §11-2-719, where circumstances cause an exclusive or limited remedy to fail of its essential purpose, other remedies may be had as provided in the Georgia Commercial Code.

223.   Under Georgia law, a limitation of remedies that leaves a buyer without any recourse against a seller is subject to deletion as being unconscionable.

224.   FAS has attempted to limit Hydro Systems's remedies such that Hydro Systems has no recourse to recover the damages caused by FAS's failure to

provide robots that can sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

225.   FAS has attempted to limit Hydro Systems's remedies such that Hydro Systems has no recourse to recover the damages caused by FAS's failure to provide a sanding robot that has a vacuum hose to connect the sander to a vacuum collection system.

226.   FAS has attempted to limit Hydro Systems's remedies such that Hydro Systems has no recourse to recover the damages caused by FAS's failure to provide a polishing process that uses two buffing compounds.

227.   Hydro Systems has suffered and continues to suffer direct, actual, and other damages as a direct and proximate result of FAS's failure to provide robots that conform to the description promised in the contract.

228.   Damages Hydro Systems has suffered due to FAS's failure to provide robots that conform to the description promised in the contract include, but are not limited to: funds paid to FAS for nonconforming, defective, and deficient robots; costs of testing, 3D scanning, and other expenses FAS required Hydro Systems to incur in the process of producing the robots; lost production; lost sales; wasted materials; increased labor costs; lost time and productivity of Hydro Systems employees; lost profits; costs of cover; and attorneys' fees.

38

229.   Hydro Systems is entitled to recover damages pursuant to O.C.G.A.

§§ 11-2-711, 11-2-712, 11-2-714, 11-2-715, 11-2-717, and any other applicable

authority, in an amount to be determined at trial.

## COUNT 6
### Rejection and/or Revocation of Acceptance
### (O.C.G.A. §§ 11-2-602 and 11-2-608)

230.   Hydro Systems reincorporates the allegations of paragraphs 1 through

229 as if restated herein.

231.   FAS represented to Hydro Systems, in the FAS Proposal, that the

robots Hydro Systems agreed to purchase would sand and polish Hydro Systems's

bathtubs to a more consistent finish in less time than manual labor.

232.   FAS has failed to provide robots that conform to the description

promised in the contract.

233.   FAS has delivered robots that do not conform to the description

promised in the contract. The robots FAS delivered are unreliable, operate slowly

and inconsistently, leave scratches and other defects that require significant manual

labor for correction, fault and cease operating frequently, and do not perform as

described and promised in the contract.

234.   FAS has breached the contract.

235.   Hydro Systems has informed FAS repeatedly both in person and in writing that the robots FAS delivered do not conform to the description promised in the contract and that the robots are unreliable, operate slowly and inconsistently, leave scratches and other defects that require significant manual labor for correction, fault and cease operating frequently, and do not perform as described and promised in the contract.

236.   Hydro Systems has informed FAS repeatedly both in person and in writing that the robots FAS delivered are not acceptable.

237.   FAS made assurances to Hydro Systems that it would and could cure the robots' nonconformities.

238.   Hydro Systems reasonably assumed, based on FAS's representations and assurances, that FAS would seasonably cure the robots' nonconformities.

239.   FAS has not seasonably cured the robots' nonconformities.

240.   Hydro Systems has not accepted the robots.

241.   Hydro Systems has rejected the robots.

242.   Hydro Systems has informed FAS repeatedly both in person and in writing that the transaction is still troublesome and must be watched.

243.   Hydro Systems has repeatedly and seasonably notified FAS of its breach.

244.   Hydro Systems has suffered and continues to suffer direct, actual, and other damages as a direct and proximate result of FAS's failure to provide robots that conform to the description promised in the contract.

245.   Damages Hydro Systems has suffered due to FAS's failure to provide robots that conform to the description promised in the contract include, but are not limited to: funds paid to FAS for nonconforming, defective, and deficient robots; costs of testing, 3D scanning, and other expenses FAS required Hydro Systems to incur in the process of producing the robots; lost production; lost sales; wasted materials; increased labor costs; lost time and productivity of Hydro Systems employees; lost profits; costs of cover; and attorneys' fees.

246.   Hydro Systems is entitled to recover damages pursuant to O.C.G.A. §§ 11-2-711, 11-2-712, 11-2-714, 11-2-715, 11-2-717, and any other applicable authority, in an amount to be determined at trial.

## COUNT 7
### Unjust Enrichment (in the alternative)

247.   Hydro Systems reincorporates the allegations of paragraphs 1 through 246 as if restated herein.

248.   Hydro Systems conferred a benefit on FAS, by paying FAS three payments totaling $928,000.00.

249.   Hydro Systems conferred a benefit on FAS by permitting FAS excessive time on Hydro Systems's production floor during production time while FAS conducted research and development and testing as part of its unsuccessful efforts to produce acceptable robots.

250.   Hydro Systems conferred benefits on FAS by providing FAS with large quantities of materials and many sample tubs while FAS made unsuccessful efforts to produce acceptable robots.

251.   FAS encouraged and induced Hydro Systems to confer these benefits on FAS, in part by promising it could produce robots that can sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

252.   FAS accepted the three payments totaling $928,000.00 from Hydro Systems, the excessive time on Hydro Systems's production floor, and the large quantities of materials and sample tubs, but FAS failed to deliver robots that function and perform as FAS promised they would.

253.   FAS's retention of the money paid to it is unjust, and equity requires FAS compensate Hydro Systems for the benefits conferred on FAS.

254.   Hydro Systems is entitled to recover damages from FAS in the amount of $928,000.00 plus interest.

255.   Hydro Systems is entitled to recover damages from FAS for the benefits Hydro Systems conferred to FAS by permitting research and development on Hydro Systems's production floor and by providing materials for FAS's use in its research and development, and for any and all other benefits it conferred to FAS, in an amount to be determined at trial.

## COUNT 8
### Negligent Misrepresentation

256.   Hydro Systems reincorporates the allegations of paragraphs 1 through 255 as if restated herein.

257.   FAS represented to Hydro Systems, in the FAS Proposal, that the robots Hydro Systems agreed to purchase would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

258.   FAS negligently provided false information to Hydro Systems when it represented to Hydro Systems that it could produce robots that would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

259.   Hydro Systems reasonably relied on FAS's representations that it could produce robots that would sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

260.   After more than a year of efforts, FAS has not been able to produce robots that can sand and polish Hydro Systems's bathtubs to a more consistent finish in less time than manual labor.

261.   Hydro Systems has suffered economic injury proximately caused by its reliance on FAS's false representations.

262.   The economic injury and damages Hydro Systems has suffered as a proximate result of its reliance on FAS's false representations include, but are not limited to: funds paid to FAS for nonconforming, defective, and deficient robots; costs of testing, 3D scanning, and other expenses FAS required Hydro Systems to incur in the process of producing the robots; lost production; lost sales; wasted materials; increased labor costs; lost time and productivity of Hydro Systems employees; lost profits; lost sales; costs of cover; lost time and opportunity to work with a vendor that can actually produce robots that perform as expected; and attorneys' fees.

263.   Pursuant to O.C.G.A. § 11-2-721, remedies available for material misrepresentation include all remedies available under Article 2 of the Georgia Commercial Code for nonfraudulent breach.

264.   Hydro Systems is entitled to recover damages pursuant to O.C.G.A. §§ 11-2-711, 11-2-712, 11-2-714, 11-2-715, 11-2-717, and any other applicable authority, in an amount to be determined at trial.

## COUNT 9
### Attorneys' Fees
### (Contractual and Statutory)

265.   Hydro Systems reincorporates the allegations of paragraphs 1 through 264 as if restated herein.

266.   The FAS proposal states, at page 12: "Attorneys' Fees - In the event any legal action is necessary to enforce or interpret the terms of this Contract, the prevailing party shall be entitled to reasonable attorneys' fees and costs, in addition to any other relief to which that party may be entitled. This provision shall be construed as applicable to the entire contract except for claims for which the right to attorneys' fees is established by statute."

267.   Hydro Systems has incurred substantial attorneys' fees to enforce and/or interpret the terms of the FAS Proposal.

268.   In addition, FAS has acted in bad faith, has been stubbornly litigious, or has caused Hydro Systems unnecessary trouble and expense.

269.   Hydro Systems is entitled to recover its attorneys' fees pursuant to contract and/or pursuant to O.C.G.A. §13-6-11.

**PRAYER FOR RELIEF**

WHEREFORE, Hydro Systems demands a jury trial on all claims so triable and prays for judgment as follows:

a.  Compensatory damages for funds Hydro Systems paid to FAS in the amount of at least $928,000.00 and costs of testing, 3D scanning, and other expenses FAS required Hydro Systems to incur in the process of producing the robots, and interest;

b.  An award of direct and/or actual damages in an amount to be determined at trial;

c.  An award of damages for lost production, lost sales, wasted materials, increased labor costs, lost time and productivity of Hydro Systems personnel, costs of cover, and all other damages to which Hydro Systems is entitled under applicable law, in an amount to be determined at trial;

d.  Judgment in Hydro Systems's favor for all claims;

e.  An award of Hydro Systems's reasonable attorney's fees and costs; and

f.  All such other and further relief as this Court deems equitable, just and proper.

Date: August 4, 2023.                              Respectfully submitted,

                                                   By: *s/ Jordana R. Sternberg*
                                                       Jordana R. Sternberg
                                                       (Ga. Bar No. 678440)
                                                       HILGERS GRABEN PLLC
                                                       1230 Peachtree Street, N.E.
                                                       19th Floor
                                                       Atlanta, Georgia 30309
                                                       Tel: 404-793-1763
                                                       Fax: 402-413-1880
                                                       jsternberg@hilgersgraben.com

                                                       *Counsel for Plaintiff*
                                                       *Hydro Systems, Inc.*