IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KEEDRA JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. _____ |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| CITY OF STONECREST, GA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff **Keedra Jackson** ("Plaintiff" or "Ms. Jackson") brings this employment discrimination action for relief and damages against Defendant **City of Stonecrest, GA** ("Defendant" or "Stonecrest"), based on the following allegations and causes of action:

## NATURE OF THE ACTION

1.      The claims in this case arise under Title VII of the Civil Rights Act of 1964 ("Title VII"), *as amended*, 42 U.S.C.A. § 2000e *et seq*., 42 U.S.C.A. § 1983, and the Georgia Whistleblower Act (O.C.G.A. § 45-1-4). Ms. Jackson, a former

zoning and development official in Stonecrest, Georgia, alleges under Title VII that her gender was at least a motivating factor in the city's decision to terminate her while male municipal employees were treated more leniently for more egregious misconduct. She further alleges that her termination was in retaliation for her filing of a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Ms. Jackson brings a mixed motive sex discrimination claim under the Equal Protection Clause of the Fourteenth Amendment based on Stonecrest's failure to promote her to the position of Director of Planning & Zoning in 2022. Ms. Jackson asserts that her termination was also a reprisal for her reporting of potential corrupt influence of a municipal official, which constitutes a violation of the Georgia Whistleblower Act.

2.     Ms. Jackson seeks back pay, front pay, and lost benefits, including the cost of health insurance; compensatory damages for mental anguish and emotional distress; punitive damages to the extent allowed by law; and her attorneys' fees and costs of litigation.

## THE PARTIES

3.    Ms. Jackson is a resident of Fairburn, Georgia, and during the time of the events alleged in this Complaint, was employed by Stonecrest's municipal government.

4.    Stonecrest is a municipality located in DeKalb County that is incorporated under the laws of the State of Georgia.

## PERSONAL JURISDICTION

5.    Pursuant to O.C.G.A. § 9-11-4(e)(5), Stonecrest may be served with process upon the chairman of the City Council, the Mayor, the City Manager, or an agent authorized by appointment to receive service of process.

6.    Service may be effectuated on the aforementioned officials at Stonecrest's City Hall address, 3120 Stonecrest Blvd., Suite 190, Stonecrest, GA 30038.

## SUBJECT-MATTER JURISDICTION AND VENUE

7.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343.

8.     This Court is entitled to exercise supplemental jurisdiction of the state law claim Plaintiff asserts, pursuant to 28 U.S.C.A. § 1367.

9.     Venue is proper in this Court under 28 U.S.C.A. § 1391(b)(1)-(2), as Defendant resides in and conducts business in this judicial district and division.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.    On February 9, 2023, Ms. Jackson filed a charge with the EEOC against Stonecrest, alleging sex discrimination under Title VII, and a subsequent amended charge was submitted on or about April 11, 2023. *See* Ex. A. Her right-to-sue letter was issued on June 21, 2023, and her Title VII claims are timely brought prior to the statutory deadline of 90 days. *See* Ex. B.

## FACTUAL ALLEGATIONS

### Municipal governing structure

11.    Stonecrest is a municipality of approximately 50,000 residents that is one of Georgia's newest cities, having been established through referendum in November 2016.

12.     Stonecrest touts itself as a hub of artistic and cultural attractions, "spectacular shopping," and "unique outdoor experiences" such as the interactive theme park called SeaQuest Stonecrest ("SeaQuest").[1]

13.     The City is governed by a council-manager system of government consisting of a City Council elected from five single-member districts and an appointed City Manager. The City Council acts as the policymaking authority for the formulation of municipal laws and regulations.

14.     Pursuant to legislation enacted in 2021 by the Georgia Legislature, the Council possesses the sole power to appoint the following municipal positions: city attorney, city clerk, finance director, and tax collector.

15.     With respect to the hiring of the heads of city departments <u>outside of</u> the positions identified in ¶ 14, the City Manager exercises sole authority and responsibility, and therefore speaks with final policymaking authority with respect to matters relating to the appointment of the leadership of the aforementioned departments.[2]

---

[1] https://discoverdekalb.com/towns/stonecrest/

[2] https://www.stonecrestga.gov/form-of-government.aspx

16.   The elected Mayor of Stonecrest possesses no policymaking authority, and the duties of the position are limited to the following: serving as ceremonial head of the city; representing Stonecrest in interactions with federal, state, and local government entities; participating in council meetings without voting power; and nominating candidates for the positions of city manager, city attorney, finance director, and tax collector, subject to the approval of the Council.

17.   The Planning & Zoning Department reviews rezoning applications, land use plan amendments, special land use permits, and alterations or variances to the zoning code.

18.   The Planning and Zoning Department reports its recommendations to the Planning Commission, subject to ultimate approval or veto by the Council.

19.   On January 4, 2022, Ms. Jackson was hired as Senior Planner for Stonecrest. She reported directly to Jim Summerbell, who was the Director of Planning & Zoning at the time Ms. Jackson was hired.

20.   In her role as Senior Planner, Ms. Jackson was responsible for performing various planning and community development tasks, including the following duties: the processing of applications, building permits, and business

license requests; as well as monitoring of compliance with local zoning ordinances and codes.

**Ms. Jackson's involvement with SeaQuest and the aftermath**

21.    SeaQuest opened at Stonecrest Mall on or about November 9, 2021. Its promotional materials advertise SeaQuest as an "educational land and sea adventure" with interactive attractions and exhibits, including a live petting zoo for livestock and indoor animals.

22. Stonecrest Resorts is the real estate development company that owns SeaQuest at Stonecrest Mall, and it in turn is owned by Vaughn Irons.

23.    On or around February 21, 2022, early in her employment as Senior Planner, Ms. Jackson received a request by email from a SeaQuest employee, Jessica DeJong, seeking zoning approval for SeaQuest to add more non-aquatic animals to its indoor exhibits.

24.    As part of her due diligence in analyzing SeaQuest's request, Ms. Jackson discovered that the SeaQuest property had been operating in a zoning district that pursuant to local zoning regulations did not actually permit livestock

and/indoor animal displays.

25.     Ms. Jackson promptly informed DeJong of her findings and in the course of their email exchanges also referred to the underlying safety and health concerns that likely motivated the zoning code's prohibition of live animals at Stonecrest Mall.

26.     Ms. Jackson notified Stonecrest's City Manager at the time, Janice Allen-Jackson, and Alicia Thompson, an attorney for the Planning & Zoning Department, of the emerging issue around SeaQuest's zoning status.

27.     Despite Ms. Jackson's expressed reservations, in February 2022, Ms. Jackson was instructed by Allen-Jackson and Thompson to draft a text amendment[3]—a proposed change or revision in the text of the City's Zoning Ordinance—that would permit land animals and livestock in the space occupied by SeaQuest.

28.     On or about March 7, 2022, after several messages from DeJong inquiring about SeaQuest's status and whether the city had plans to address the zoning issue, Ms. Jackson responded with an update, stating: "We are now looking

---

[3] The SeaQuest text amendment that Ms. Jackson authored is listed on City Council Work Session agendas as TMOD-22-012 Animal Exhibition Ordinance.

at an ordinance to put in place," and "[t]he ordinance will be tailored to benefit your establishment."

29.    Soon after, Ms. Jackson presented the text amendment in a City Council work session, in which the Mayor of Stonecrest, Jazzmin Cobble ("Mayor Cobble"), was present.

30.    The City Council as well as Mayor Cobble instructed Ms. Jackson to make some modifications to the text amendment in an evident effort to strengthen SeaQuest's capacity to continue operating a petting zoo.

31.    For reasons unclear to Ms. Jackson, the text amendment process was delayed for another six months.

32.    During the spring and summer of 2022, there was media coverage of emerging opposition in some quarters to SeaQuest, including animal rights activists. The organization People for the Ethical Treatment of Animals ("PETA") submitted requests under Georgia's Open Records Act for municipal documents and records related to SeaQuest.

33.    On or around September 12, 2022, Ms. Jackson was instructed by the City Attorney to escalate the adoption of the text amendment by putting it on the

Planning Commission's agenda and noticing the Planning Meeting in the community newspaper.

34.    Yet another four and a half months passed in which the Planning Commission and the City Council took no action regarding final adoption of the text amendment. The amendment was finally placed on the Council's agenda for its session the third week in January 2023.

35.    On or about January 17, 2023, PETA representatives sent a letter to Mayor Cobble and the City Council urging the Council to reject the proposed text amendment granting SeaQuest authority to allow indoor animal exhibits.

36.    In late January 2023, a metro Atlanta area television media outlet, Atlanta News First ("ANF"), acquired the contents of the February 2022 email exchange between Ms. Jackson and DeLong.

37.    On or around January 23, 2023, the Council heard debate and public input on the text amendment, and chose to table consideration of the amendment to its next session.

38.    After the City Council meeting, ANF investigative reporter Rachel Polanksy questioned Mayor Cobble about the March 7, 2022 email that Ms.

Jackson had written to DeJong. Mayor Cobble replied:

> "Ma'am, I'm Jazzmin Cobble. I'm the mayor of the city of Stonecrest.
> I'm not Keedra Jackson. I can only speak for the city of Stonecrest on
> behalf of the legislative body…I'm sorry, on behalf of the executive
> body, with the support of our legislative body, and the codes are
> written to make sure that we regulate use within the city of Stonecrest.
> She's a staff member here, yes ma'am, and absolutely I will look into
> what you had mentioned, and I definitely will address it."[4]

Polansky also sought to question Ms. Jackson about the text amendment
after the conclusion of the Council meeting, but Ms. Jackson did not provide any
response beyond stating, "I have no comment at this time."

39.    At the time of the media scrutiny of the text amendment, Mayor
Cobble would have been well aware of the nearly yearlong internal
communications among city officials regarding the text amendment, including her
own efforts in Council work sessions to strengthen the amendment to favor
SeaQuest's interests. Mayor Cobble would have fully understood that Ms.
Jackson's drafting of the amendment was at the direction of elected city officials,
two successive City Managers, and municipal legal staff.

40.    In the aftermath of the council meeting, Ms. Jackson was not

---

[4] https://www.atlantanewsfirst.com/2023/02/01/reporter-ordered-out-stonecrest-city-hall-after-asking-tough-questions/

admonished for her interaction with ANF's reporter, which was witnessed by city staffers and consisted of nothing more extensive than a "No comment."

41.    On or about January 25, 2023, Ms. Jackson was alerted by an employee of DeKalb County government that Stonecrest should look into whether SeaQuest's owner Vaughn Irons was facing legal issues that might preclude him from performing development activity in Stonecrest.

42.    Ms. Jackson immediately conducted internet searches that revealed that Irons had been under an ongoing investigation by the DeKalb County Ethics Board for alleged improprieties.

43.    The impetus for the investigation was that while serving as Chairman of the Dekalb County Development Authority a decade earlier, Irons simultaneously operated a for-profit economic development firm; Irons' firm received a $972,000 contract from the DeKalb County Commission, despite provisions in the DeKalb Ethics Code that prohibited county officials from profiting from financial transactions with the county.

44.    On or about December 15, 2022, the DeKalb County Board of Ethics had issued a finding that Irons knowingly violated the ethics code and in late January 2023, was in the process of issuing a formal reprimand of Irons and

banning him from engaging in contracting with DeKalb County.

45.    On January 25, Ms. Jackson informed City Manager Gia Scruggs, who had succeeded Janice Allen-Jackson, of the information she received, and Scruggs agreed to brief Mayor Cobble.

46.    On January 25 or January 26, Ms. Jackson conducted some additional research using her municipal work computer on Irons' potential ties to current government officials in Stonecrest and discovered through publicly available sources that Irons had been a donor to Mayor Cobble's last campaign and that then-Councilwoman Cobble was quoted in the Atlanta Journal Constitution in November 2021 expressing support for SeaQuest's opening at Stonecrest Mall.

47.    Ms. Jackson's municipal work computer and the contents of her search results were readily accessible to city officials.

48.    On January 27, 2023, Ms. Jackson was informed by City Manager Scruggs that she was being suspended for five (5) days for "making statements to the public" without authorization, and for the March 7, 2022 email, which according to Scruggs, caused negative ramifications for the city. Ms. Jackson was ordered to surrender her city laptop and her keys to city property and directed to

stay away from City Hall during her suspension.

49.     On January 31, 2023, Ms. Jackson sent a letter to Councilwoman Tara Graves describing the events leading to the public controversy over the text amendment, as well as Ms. Jackson's concerns that Irons might have improper influence over Mayor Cobble, and that the suspension might be reprisal for Ms. Jackson's digging into Irons' history.

50.     On its newscast on or about February 1, 2023, ANF ran a lengthy investigative report about SeaQuest's ties to the prior Mayor of Stonecrest, Jason Lary, who was convicted and imprisoned based on federal charges of stealing COVID pandemic relief funds, as well as the correspondence between Ms. Jackson and Stonecrest regarding the drafting of a zoning amendment. *Supra,* n.4. The report portrayed the amendment as an act of political favoritism.

51.     The online posting of the ANF story contained a quote from Mayor Cobble that the contents of Ms. Jackson's email exchanges "were unfortunate…solely attributable to the individual making them and in no way reflect the views of the Mayor and the City Council," followed by boilerplate verbiage about Stonecrest's commitment to progressive policies.

14

52.     Despite the effort to depict Ms. Jackson as the driving force behind the text amendment, Mayor Cobble undoubtedly knew the claims in the statement Stonecrest issued in her name were fundamentally inaccurate and misleading: at all times, Ms. Jackson's conduct was at the direction and instigation of various city officials ranging from Mayor Cobble to council members to the prior City Manager and City Attorney.

53.     Ms. Jackson's suspension was extended in order for the city to conduct additional investigation.

54.     On February 9, 2023, Ms. Jackson filed her first EEOC charge against Stonecrest, alleging sex discrimination based partly on the fact that one male municipal official had received a shorter suspension over allegations of sexual harassment and had been permitted to retain his computer and keys, as well as broader allegations of sex-based disparate treatment.

55.     On March 9, 2023, Ms. Jackson was notified in a letter from Scruggs of the City's decision to terminate Ms. Jackson's employment for "… conduct that interferes with the operations of the City, brings discredit to the City, or is offensive to the publi[c]."

56.     At the time of Ms. Jackson's termination, Stonecrest had already been provided notice of Ms. Jackson's EEOC charge. In addition, when she was informed of the disciplinary action against her on January 27, 2023, Ms. Jackson had orally told Scuggs that she believed the terms of her suspension were more onerous than disciplinary action taken against male employees facing allegations of misconduct.

57.     The grounds for Ms. Jackson's termination, based on the rationale initially provided for her suspension, appeared to be related to her role in drafting a zoning amendment that she was ordered to create by city officials and that had support from elected officials including Mayor Cobble and members of the City Council.

58.     To the extent the language in her correspondence with a SeaQuest employee had been portrayed by one media outlet as some act of preferential treatment for the development entity, the decision-maker regarding Ms. Jackson's termination, City Manager Scruggs, and Mayor Cobble would have been fully aware that the text amendment had been ordered by higher-level officials.

59.     Even if Stonecrest concluded that Ms. Jackson's phrasing of the

rationale for the text amendment was not artful or had caused some political damage, the city's termination of Ms. Jackson stands in sharp contrast with its more lenient treatment of male municipal employees whose rank was comparable to or higher than Ms. Jackson's and who faced findings of more egregious behavior but received discipline notably less severe than termination.

60.     Ray White, the male Director of Planning & Zoning and Ms. Jackson's immediate supervisor, was given a three-day suspension after allegations were substantiated that he sexually harassed a subordinate.

61.     DeAllous Smith, the city's male Director of Communications and Technology, was determined to have engaged in bullying conduct toward a subordinate but received a two-week suspension.

62.     Ms. Jackson's termination from a visible, prominent role in Stonecrest's city government has caused her significant reputational damage, in addition to emotional distress, mental anguish, and humiliation.

63.     The loss of Ms. Jackson's role in Stonecrest has impaired her capacity to obtain employment comparable in income and scope to her position as Deputy Director of Planning and Zoning, the job she held at the time of her termination.

Upon information and belief, at least one municipal entity that extended her an offer withdrew the job after contact with Stonecrest officials.

**Stonecrest's discriminatory failure to hire/promote Ms. Jackson in 2022**

64.    On or about March 1, 2022, after Jim Summerhill's departure, Ms. Jackson was named the Acting Director of Planning & Zoning. She also continued to perform the duties of Senior Planner.

65.    As Acting Director of Planning & Zoning, Ms. Jackson implemented a range of successful initiatives, including the creation of the Pre-Development Review Team, a campaign to expedite the process of updating delinquent business license reviews, and an updating of the zoning application process.

66.    Ms. Jackson sought to be appointed as the full-fledged Director of Zoning and Planning, which would have elevated her pay significantly and positioned her for major career opportunities beyond Stonecrest.

67.    In or around July 2022, the City selected a male, Raymond White, as the new Director of the Planning & Zoning Department.

68.    White's credentials were at best comparable to Ms. Jackson's, and he

lacked her track record of familiarity with the Planning and Zoning Department.

69.    Ms. Jackson was told by multiple Stonecrest employees that the Mayor Pro Tem, a male council member, had expressed his view to the City Manager that the Director of Planning and Zoning should be a man and had advocated for White's appointment, partly based on the sexist stereotype that the role involves regular engagement with business owners and that a male might be a more natural leadership fit.

70.    Ms. Jackson was named Deputy Director of Planning and Zoning and also resumed the responsibilities she held as Senior Planner.

71.    The failure to appoint Ms. Jackson as Director of Planning and Zoning was consistent with Stonecrest's pattern of naming men to its highest-level positions: during Ms. Jackson's tenure, ten of the twelve senior leadership positions were held by men. The presence of a predominantly female city council, and women in the positions of Mayor and City Manager, has not affected Stonecrest's formula of placing its highest-paid and most influential administrative positions disproportionately in the hands of men.

## COUNT I

### SEX DISCRIMINATION
**(termination in violation of the motivating factor provision of Title VII, 42 U.S.C.A. § 2000e-2(m))**

72.     Plaintiff Jackson incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

73.     Stonecrest engaged in unlawful discriminatory conduct when it terminated Ms. Jackson for conduct that was authorized by higher-level officials and that did not reflect a serious disciplinary infraction, while male counterparts accused of more egregious behavior faced only temporary suspensions and were permitted to remain in their positions.

74.     Stonecrest's substantially more lenient treatment toward male officials is an arbitrary and inconsistent exercise of its disciplinary authority to the detriment of a female official and reflects discriminatory conduct that is at least partly motivated by her gender, even if other factors also motivated Stonecrest's actions.

75.     As a result of Stonecrest's discriminatory conduct, Ms. Jackson has suffered monetary damages, including but not limited to back pay and front pay;

loss of future benefits; and noneconomic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT II

### GEORGIA WHISTLEBLOWER ACT
### (O.C.G.A. § 45-1-4)

76.     Plaintiff Jackson incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

77.     Georgia's whistleblower statute (O.C.G.A. § 45-1-4) prohibits public employers from retaliating against public employees who report a violation of, or noncompliance with, a regulation, rule, or law to a supervisor or governmental agency.

78.     Ms. Jackson, a public employee, engaged in protected activity under the Georgia Whistleblower Act when in late January and early February 2023, she raised objections around the propriety of Stonecrest's relationship with SeaQuest's owner Vaughn Irons, as well as the possibility that Stonecrest's Mayor Jazzmin Cobble was improperly influenced by Irons, to the City Manager and an elected member of the city council.

79.     An exertion of improper influence through campaign contributions would have potentially violated the zoning laws, rules, and/or regulations that governed the City of Stonecrest, as well as federal laws regarding public corruption.

80.     Ms. Jackson was subjected to retaliation in that she was immediately suspended within two days of her disclosure to the City Manager of her concerns about the city's continuing involvement with SeaQuest, and terminated within approximately five weeks of her disclosure of potential improper influence on Mayor Cobble by SeaQuest's owner.

81.     As a direct and proximate result of the City's violation of the Georgia Whistleblower Act, Ms. Jackson has suffered monetary damages, including but not limited to back pay and front pay; loss of future benefits; and noneconomic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT III

### SEX DISCRIMINATION
**(failure to promote or hire in violation of the Equal Protection Clause of the Fourteenth Amendment, pursuant to 42 U.S.C.A. § 1983)**

82.    Plaintiff Jackson incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

83.    Ms. Jackson sought to be appointed to the position of Stonecrest's Director of Planning and Zoning, a position she held successfully for four months on an interim basis.

84.    The position Ms. Jackson sought was filled by a male whose credentials were no better than comparable to hers, and based on information provided her by contacts within city government, the decision was at least partly motivated by pressure from certain municipal officials to place a male in the role of Director of Planning and Zoning.

85.    As a result of Stonecrest's discriminatory conduct, Ms. Jackson has suffered monetary damages, including but not limited to back pay and front pay, and the loss of future benefits.

## **COUNT IV**

### **RETALIATION**
### **(retaliatory termination in Title VII, 42 U.S.C.A. § 2000e-3(a))**

86.    Plaintiff Jackson incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

87.     Ms. Jackson engaged in protected activity under the retaliation provision of Title VII in that she complained verbally to the City Manager that she was subjected to harsher discipline than males, and filed a charge of discrimination with the EEOC.

88.     Within approximately six weeks of her verbal complaint of discrimination, and one month of filing her charge, and in retaliation for filing the charge, Ms. Jackson was terminated from her position as Deputy Director of Planning and Zoning.

89.     As a result of Stonecrest's retaliatory conduct, Ms. Jackson has suffered monetary damages, including but not limited to back pay and front pay; loss of future benefits; and noneconomic damages including emotional distress, humiliation, embarrassment, and mental anguish.

## PRAYER FOR RELIEF

**WHEREFORE**, based on the above-stated claims, Plaintiff demands a trial by jury and that the following relief be granted:

A. Back pay, front pay, and lost benefits;

B. Compensatory damages to the extent allowed by law;

C.  Punitive damages;

D.  Attorneys' fees and costs of litigation;

E.  Pre-judgment and post-judgment interest at the highest lawful rate; and

F.  Such other equitable and monetary relief as the Court deems just and proper.

Respectfully submitted the 7th day of August, 2023.

**HKM Employment Attorneys LLP**

*s/Artur Davis*
Artur Davis[5]
ASB-3672-D56A
2024 3rd Ave. North, Suite 307
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com

*s/Kendra Livingston*
Kendra Livingston
GA Bar No. 791806
3344 Peachtree Road NE, Suite 800
Office # 35
Atlanta, GA 30326
Direct: 678-446-3016
klivingston@hkm.com

---

[5]Artur Davis will promptly file for admission *pro hac vice* as an attorney of record in this action. Mr. Davis is licensed in the state of Alabama and the District of Columbia.

Attorneys for Plaintiff Keedra Jackson