# Exhibit A

 **SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
Suite 500, Marquis 1
245 Peachtree Ctr. Ave
Atlanta, GA 30303-9913

Date: December 21, 2022

Deborah Suk Jetter
2528 Sparta Drive
Morrow, GA 30260

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision.  Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision.  The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter.  The form is available at https://www.ssa.gov/forms/ha-520.html.  Please write the Social Security number associated with this case on any appeal you file.  You may call (800) 772-1213 with questions.

Please send your request to:

> **Appeals Council**
> **5107 Leesburg Pike**
> **Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice.  The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP2 (03-2010)

Deborah Suk Jetter (BNC#: 21PD600J49995)                    Page 3 of 3

**If You Have Any Questions**

1.  Visit www.ssa.gov for fast, simple, and secure online service.
2.  Call us at **1-800-772-1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1-800-325-0778**. Please mention this notice and decision when you call.
3.  You may also call your local office at (866) 331-2215.


                              Social Security
                              6665 Park Place
                              Morrow, GA 30260-2349


**How are we doing?** Go to www.ssa.gov/feedback to tell us.


                              Brendan F. Flanagan
                              Administrative Law Judge


Enclosures:
Decision Rationale


cc:     Kathleen Flynn
        315 W. Ponce De Leon
        Avenue, Suite 940
        Decatur, GA 30030


                                                        Form HA-L76-OP2 (03-2010)

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

<u>**IN THE CASE OF**</u>                                    <u>**CLAIM FOR**</u>

Deborah Suk Jetter                                  Supplemental Security Income
(Claimant)
                                                    21PD600J49995
                                                    (Beneficiary Notice Control Number)
(Wage Earner)                                       *Social Security Number removed for your protection*

<u>**JURISDICTION AND PROCEDURAL HISTORY**</u>

On June 17, 2020, the claimant filed an application for supplemental security income, alleging disability beginning October 3, 2019.  The claim was denied initially on May 28, 2021, and upon reconsideration on October 27, 2021.  Thereafter, the claimant filed a written request for hearing received on November 11, 2021 (20 CFR 416.1429 *et seq.*).  On April 7, 2022, the undersigned held a telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic.  All participants attended the hearing by telephone. The claimant agreed to appear by telephone at the start of the hearing.  The claimant is represented by Kathleen Flynn, an attorney.  Rena Serkin, an impartial vocational expert, also appeared at the hearing.

The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 416.1435(a)).

<u>**ISSUES**</u>

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act.  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since June 17, 2020, the date the application was filed.

See Next Page

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975).  If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)).  An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965).  If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, she is not disabled.  If the claimant is not able to do other work and meets the duration requirement, she is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912 and 416.960(c)).

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant has not engaged in substantial gainful activity since June 17, 2020, the application date (20 CFR 416.971 *et seq*.).**

The claimant worked after the application date, but this work activity did not rise to the level of substantial gainful activity.  During the hearing, the claimant stated that she drives for Door Dash and has done so approximately one and one-half years. On days that she works, she works a whole day and is usually paid $50 for the day.   However, she did not state how many days in a week/month that she works . The claimant stated that for two months, she helped a friend with their business by posting pictures online and was paid $50 a month.  She also stated that she helped people move, but that it did not last long, and she did not report receiving any income.

Although she reported earning $50 per day from Door Dash and $50 for two months from the friend who she helped post pictures online, a review of her earning record does not reflect income from Door Dash or any other employer since 2014 (Exhibits C8D and C1D).

Nevertheless, given the amount of income and infrequency of work, even if she worked full-time daily, the claimant's earnings will not have risen to the level of "substantial gainful activity" as defined in 20 CFR § 416.974.

See Next Page

Accordingly, the claimant has not engaged in substantial gainful activity since allegedly becoming disabled.

**2.   The claimant has the following severe impairments: Degenerative Disc Disease, Asthma/COPD, Right Knee Pain, Obesity, Bipolar Disorder, Generalized Anxiety Disorder and Post-traumatic Stress Disorder (PTSD) (20 CFR 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

The claimant also has the impairments consisting of hypothyroidism, uterine leiomyoma, anemia, headaches and right hand pain that have been determined to be non-severe.

Clinic notes from the Good Shepherd Clinic shows the claimant has hypothyroidism.  She is prescribed Synthroid to control her thyroid levels and stated that it works (Exhibits C11F, C17F, C19F,  C20F, C21F and C25F).

The claimant reported a history of fibroids for seven years.  She has heavy menstrual cycles with blood clots, along with severe menstrual cramps.  A pelvic ultrasound revealed 18 weeks size uterus with multiple leiomyoma.  On a September 2021 examination shows that she reported pelvic pain and a pelvic mass was noted on examination.  However, on this date, her pain scale was 0/10 (Exhibit C16F, pp. 33,38, 39).  On a November 30, 2020, follow-up examination, clinic notes show that her diagnosis was officially intramural leiomyoma of uterus and the plan was to refer to care coordination, evaluate and treat within two weeks (Exhibit D-16F, p. 15). No pain on date of CE, April 2021 (Exhibit C19F, p. 3). However, there is no evidence of any further complaints or treatment relating to this impairment.

During the November 30, 2020, follow-up visit for intramural leiomyoma of the uterus, laboratory results revealed a mild iron deficiency.  The claimant was diagnosed with anemia and Dr. Curtis Champion's plan was to prescribe meds (Exhibit C16F, p. 15). However, there has been no medical report that finds other impairments are related to anemia.

Not long after the claimant was diagnosed with uterine fibroids, she reported right leg pain that occurs occasionally, radiates into the right foot and has associated symptoms of spasms.  The leg pain was  initially diagnosed a sleep-related cramps.  However, no leg pan symptoms were found on Dr. Al-Amin's consultative exam in April 2021 and there have been no additional reports of right leg pain (Exhibits C16F, pp. 17, 21/C19F).

The claimant complained of frequent and severe headaches once a month, associated with some vision changes and sensitivity to noise. She felt they are due to increasing family stress and reported that she has some pain relief from Goody Powder.  Topramax was prescribed  (Exhibit C17F, pp. 5).  She reported a slight headache on a visit in November 2021, and her Topomax was refilled ( Exhibit D25F, p. 2).  Again, the evidence does not show that the claimant continued to experience and report chronic headaches during examinations.

See Next Page

The claimant testified that she is right-hand dominant.  November 2021 clinic notes from a Good Shepherd Clini visit for refills shows the claimant started a job working in landscaping that requires a lot of repetitive motion.  She reported right wrist pain, and some relief with OTC ibuprofen and biofreeze. A referral to orthopedics was provided (Exhibit C25F, p. 2).

However, on an April 22, 2021, consultative examination, Dr. Jessie Al-Amin did not find any symptoms such as pain or limited range of motion of the right wrist, as Dr. Al-Amin observed the claimant pulling and pushing a drawer and opening and closing a door.  She turned on and off a wall light and turned a doorknob. The claimant stated that she can get dressed unassisted, which includes buttoning and unbuttoning her clothes and tying and untying her shoes.  She can also perform all household chores/activities of daily living and carry grocery bags.  In addition, Dr. Al-Amin noted the claimant wrote legibly and picked up coins with both hands. (Exhibit C19F, pp. 4, 5, 6).

Accordingly, there is no evidence of any significant complications and/or work-related limitations due to these conditions documented in the record, and in addition, there is no evidence these impairments are expected to last 12 months or longer.

Therefore, the undersigned concludes that these additional impairments do not have more than a minimal impact on the claimant's ability to perform work-related activities and are therefore "non-severe."

The undersigned considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity.

**3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

As discussed below, the medical evidence does not contain the objective signs, symptoms, or findings, or the degree of functional limitations necessary for the claimant's impairments, considered singly or in combination, to meet or equal the severity of any sub-section of the above-mentioned listings or any other section contained in Appendix 1.  In reaching this conclusion, the Administrative Law Judge has considered the opinions of the state agency medical consultants who evaluated the issue at the administrative review process and reached the same conclusion (20 CFR § 416.927(f)).  The Administrative Law Judge also notes no treating or examining medical source has stated the claimant has an impairment or combination of impairments that meets or equals the criteria of any listed impairment.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked

limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

During a February 2021 PCP clinic visit at the Southside Medical Center, the claimant completed a PHQ-9 and scored 12, indicative of moderate depression (Exhibit C16F, p. 5). In addition, during September 13, 2021, and October 28, 2021, ED visits, the claimant stated that she has bipolar disorder, but had not been taking medications as prescribed due to not being able to afford them. In the emergency department (ED) on both dates, the claimant denied barriers to learning, and suicidal ideations. As a result, she was assessed as low risk with no intervention needed (Exhibit C24F, pp. 54, 66, 139).

January 2021 progress notes from visits at the Clayton Center-Psychiatric shows the claimant has been diagnosed with bipolar disorder and PTSF for years. She stated that current medications and past therapy did work and requested Abilify, as she had taken it in the past and it seemed to work. The MSE was within normal limits. Psychiatrist Dr. Ramesh Amin diagnosed the claimant with bipolar disorder and PTSD for children six years and younger. Dr. Amin started Abilify and continued her other medications; Remeron, Trileptal and Seroquel (Exhibit C15F, pp. 1, 3, 4, 6). During her evaluation with Dr. Al-Amin, as discussed below, the claimant stated that all her medications work, which included Trileptal and Risperidone, the medications she was taking at the time (Exhibit C19F).

During his April 2021 evaluation, psychiatrist Dr. Al-Amin noted the claimant reported that she has a learning disorder and that she quit school in the ninth grade. However, she did not report any history of special education, and Dr. Al-Amin noted the claimant is able to read and write (Exhibit C19F). There is no evidence in the medical evidence of record during the period in question that shows the claimant experienced any difficulties with a learning disorder. As stated during testimony, he helps a friend put pictures online and drives for Door Dash. Neither Dr. Al-Amin or any other treating professional commented on the claimant's cognitive limitations, and she does not have a diagnosis of a learning disability since the application date.

In understanding, remembering or applying information, the claimant has a moderate limitation. As stated above, Neither Dr. Al-Amin or any other treating professional commented on the claimant's cognitive limitations, and she does not have a diagnosis of a learning disability since the application date. She can read and write, and understand at least simple instructions, as she is a driver for Door Dash, where she is required to find addresses and routes using a GPS system. She also must deliver the correct packages to the correct receivers, which shows the ability to understand, remember and apply information. However, giving the claimant the benefit of the doubt, the undersigned has determined the claimant experiences moderate limitations in this domain of functioning, and can apply commonsense understanding to carry out simple instructions at a reasoning level of one and two.

In interacting with others, the claimant has a moderate limitation. The claimant reported difficulty getting along with her father, with whom she lives. The claimant also has a legal history as she served time with the Georgia Department of Corrections (Exhibits C5F and C6F). However, since the application date, the evidence does not show that the claimant experienced difficulty getting along with others or her healthcare professionals, as she was cooperative with

examinations and treatment recommendations.  However, again giving the claimant the benefit of the doubt, the undesigned has determined the claimant has moderate limitations in this area of functioning and is limited to no more than occasional interaction with the public, crowds, coworkers and supervisors.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation.  The claimant reported that she likes to keep busy and does several activities, for which she is paid.  She helps a friend upload pictures online for three hours at time. She does land scaping, and drives for Door Dash, both of which require concentration, persistence and pace. The claimant rarely reported fatigue or difficulties with concentration, and always reported that her medications were effective.  Nevertheless, the undersigned has determined the claimant can concentrate and persist in two-hour segments and cannot perform fast paced high production demands.

As for adapting or managing oneself, the claimant has experienced a moderate limitation.  As discussed above, the claimant reported that she likes to stay busy and has several ways to earn income.  She drove for Door Dash for a couple of years and with her other income-producing activities, there is no evidence that shows she was unable to perform work-related and activities of daily living and no evidence that she required emergency room or inpatient mental health treatment due to her mental impairments. Nevertheless, the undersigned has determined the claimant experienced moderate limitations in this domain of functioning and is limited to no more than occasional changes in the work setting.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.  As to the "C" criteria of Listing 12.04, the evidence does not reveal the claimant has a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation on her ability to perform basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, or that she has experienced repeated episodes of decompensation, has a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or changes in the environment has been predicted to cause her to decompensate, or that she has a current history of one or more years' inability to function outside a highly supportive living arrangement.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning.  The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR**

**416.967(b) except the claimant can sit, stand, and walk six hours each in an eight-hour workday and perform unlimited pushing and pulling within the limits for lifting and carrying.  She can perform frequent climbing ramps and stairs; limited to occasional climbing ladders, ropes and scaffolds and frequent stooping, kneeling, crouching and crawling.  The claimant must avoid extreme cold and avoid concentrated exposure to atmospheric conditions such as fumes, odors, dust, and gases and have no exposure to hazards, such as moving mechanical parts and unprotected heights.  The claimant can apply commonsense understanding to carry out simple instructions at a reasoning level of one and two and can concentrate and persist in two-hour segments.  Socially, the claimant is limited to no more than occasional interaction with the public, crowds, coworkers and supervisors.  Adaptation is limited to no more than occasional changes in the work setting and she cannot perform fast paced high production demands.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

The claimant alleged when she filed this application for supplemental security income that her ability to work was limited due to bipolar disorder, anxiety, COPD, asthma, right knee injury, lower back pain and learning disability (Exhibit C3E). During testimony, the claimant stated that she could not work a sedentary job because of hand, memory and right knee going out.  She can lift only 10 pounds and cannot walk or stand longer than 15 minutes. She stays at the home of her mother and various friends and has a tendency to lash out. Crowd noise causes anxiety; she has frequent panic attacks and loses her ability to concentrate.  She has nightmares, anxiety and asthma and uses an inhaler approximately twice a month.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of

these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because in spite of her back and knee pain, she helps people move, performs landscaping and drives for Door Dash, where she may be required to deliver heavy items and not just restaurant food.  The medical evidence as a whole does not show that the claimant has physical limitations due to back and/or knee pain, or due to asthma, and although Dr. Al-Amin referenced lumbar x-rays that revealed degenerative disc disease, his examination did not reveal any symptoms of back or knee pain, such as tenderness to palpation or reduced range of motion.  The claimant reported to Dr. Ramesh Amin that she reported are cleaning and cooking, and as noted by Dr. Al-Amin, she is able to perform activities of daily living that include shopping (Exhibit C22F, p. 38)

The claimant receives primary care treatment from several physicians at the Southside Medical Center.  She reported back pain and lumbar spine x-rays from December 2020 show mild disc space narrowing at L5-S1, mild facet arthropathy at L4-L5 and L5-S1 (Exhibit C14F, p. 10). On October 26, 2021, when the claimant presented to the ED with breathing problems, she also complained of right-sided superior back pain due to strenuous exercise from the day before.  However, the strenuous exercise was later reported as moving logs.  In spite of her pain and reported activities, the examination revealed no deformity and normal range of motion and the cervical back also had normal range of motion and supple neck.  Although diagnosed with musculoskeletal back pain, she was discharged without receiving treatment for back pain.  Subsequent evidence from a November 29,2021 visit at the Good Shephard Clinic shows that the claimant also does landscaping work (Exhibit C24F, p. 74, 76, 81, 138/ C25F, p. 2).

The evidence shows that the claimant's asthma symptoms were relatively stable during the period in question.  During a November 30, 2020, visit, the claimant's asthma was diagnosed as having mild-to-moderate symptoms and stable.  She is noted to use an Albuterol HFA inhaler, topical steroid inhaler prn montelukast, prn prednisone, etc. The claimant also received medical care from the Good Shepherd Clinic and May 2021 clinic notes show that she presented with cough, shortness of breath and body aches.  She was diagnosed with sinusitis  and prescribed doxycycline and Tessalon Perles and prednisone (Exhibit C21F, p. 3).

On September 13, 2021, the claimant presented to the ED with shortness of breath and wheezing.  She was also tachypneic and tachycardic; however, a chest x-ray revealed no acute process.  Treatment notes show that ED treatment, which included Proventil nebulizer and Atrovent, kept the claimant hemodynamically stable throughout the entire ED visit without objective evidence for acute process requiring urgent intervention or hospitalization.  She was given a diagnosis of exacerbation of asthma, unspecified asthma severity and was deemed stable for discharge with a prescription for prednisone.  However, the claimant left against medical advice (AMA) before she was formally discharged (Exhibit C24F, pp. 12, 13).

On January 21, 2021 she reported that she stays active and does chores.  The records note that her "lawyer advised not to work since she has applied for disability."  At the hearing, the

claimant explained that she asked her disability lawyer "how do I make a living," and someone gave her the above response.

She returned to the ED on October 26, 2021, with shortness of breath and stated that her symptoms were similar to her previous asthma exacerbation of a few months ago. She also stated that her nebulizer treatment and inhaler were not working. Although she admitted to smoking tobacco and methamphetamines, she reported mild chest tightness that she normally has with exacerbations. She denied productive coughs.  The pulmonary examination revealed diffuse expiratory wheezing, however, imaging studies reveled no evidence of acute pulmonary embolism, acute aortic disease and no acute chest findings.  She was again stable for discharge after receiving ED treatment, and no overnight stay or inpatient treatment was required (Exhibit C24F, p. 74, 79, 81).  Also noted that on his April 2021 examination, Dr. Al-Amin noted that there was no wheezing appreciated on examination (Exhibit C19F).  Also noted is that the claimant reported that she does landscaping, but there are no reports of asthma exacerbations due to exposure to the outside and/or grass.

The undersigned also notes the claimant is obese as she stands 62 inches tall with her weight ranging from 151 to 190 pounds; thus, having had a body index as high as 34.7 based on her maximum weight of 190 pounds, which meets the clinical definition obesity (Exhibits C16F, C24F, C19F and C24F).  The Administrative Law Judge has considered the claimant's obesity in accordance with SSR 19-2p and has determined it does not have a significant impact on her other body systems or that it significantly affects her ability with ambulation, mobility or manipulation. Also, the progress notes and reports from treating and examining medical sources do not contain any references to problems or exacerbations of any body system as a result of obesity.

Dr. Jessie Al-Amin performed a consultative examination on April 22, 2021, and noted the claimant's allegations of COPD, asthma, right knee injury and lower back pain.  Dr. Al-Amin also reviewed a November 2020 spirometry report that suggested moderate obstructions and December 2020 lumbar spine x-rays that showed mild degenerative disc disease.  He noted that her tach is controlled with medication and that she takes medication for asthma and COPD. . Her lungs were clear to auscultation with no wheezing, rhonchi or rales noted (Exhibit C19F).

The claimant reported right knee pain following right knee surgery due to an ACL repair at age 18.  She reported chronic right knee pain rated 10/10 with stiffness.  She had also stated that she has had physical therapy and injections (Exhibit C19F).

In addition, the claimant complained of low back pain for many years, with stiffness.  However, she stated that Ibuprofen relieves the pain.  In addition, she reported to Dr. Al-Amin that she can walk two hours; sit for 60 minutes; stand for 60 minutes; lift 20 pounds and climb a flight of steps.  The physical examination revealed no signs or symptoms of any musculoskeletal impairment, as there was no tenderness, reduced range of motion or swelling.  The claimant was unable to perform a tandem walk; however, she is noted to stand erect without assistance; has a normal posture and has a normal gait and does not use an assistive device for ambulation.  Dr. Al-Amin noted the claimant had no difficulty rising from a sitting to standing position; can bend

over while sitting and had no difficulty getting on the examination table.  He also noted there were no involuntary movements (Exhibit C19F).

Dr. Al-Amin diagnosed the claimant's impairments as history of asthma/COPD, history of right knee surgery with chronic right knee pain, history of lower back pain and lumbar spine x-ray report demonstrating degenerative disc disease.  In addition, he opined the claimant may lift as tolerated and handle objects without difficulty.  However, he opined the claimant may have difficulty with prolonged sitting and that prolonged standing or walking may be problematic (Exhibit C19F).  This vague limit is accounted for in the residual functional capacity herein.

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

In reaching the above-stated residual functional capacity, the undersigned recognizes that the state agency medical consultants who evaluated the evidence of record concluded the claimant is capable of performing work at the light exertional level and capable of performing the mental demands of work-like activities (Exhibits C3A and C6A).  These opinions are persuasive, as they are consistent with and supported by the totality of the evidence that shows the claimant's back pain and asthma did not result in restricted activities, as she worked as a mover and a landscaper. The postural limitations in Exhibit C6A are more consistent and persuasive with the overall record than the limits in Exhibit C4A.  In addition, she noted that her medications for all impairments were working, although she stated that she likes to stay busy, she did not demonstrate any signs or symptoms of uncontrolled bipolar disorder.

Furthermore, the claimant's work of helping people move and delivering food shows good capabilities which are not entirely consistent with her claim of disability; and her lawyer's advice not to work, if it was followed, could diminish the persuasiveness of her claim.

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the evidence of the claimant's activities that are not disrupted by her asthma/COPD, right knee pain, lumbar spine impairment and obesity.

**5.    The claimant is capable of performing past relevant work as a hand packer, DOT 559.687-074, SVP2, light exertion.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).**

The vocational expert testified that an individual with the above-stated residual functional capacity could perform the above-listed job of hand packer.  Therefore, the undersigned has determined the claimant is able to perform her past relevant work as a hand packer.

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as generally performed.

See Next Page

In addition to past relevant work, there are other jobs that exist in significant numbers in the national economy that the claimant also can perform, considering the claimant's age, education, work experience, and residual functional capacity (20 CFR 416.969 and 416.969a). Therefore, the Administrative Law Judge makes the following alternative findings for step five of the sequential evaluation process.

The claimant was born on February 18, 1984 and was 36 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963). The claimant has a limited education (20 CFR 416.964). Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.17. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as a small product assembler, DOT 706.684-074, SVP2, light exertion, 8,400 jobs and marker, DOT 209.587-034, SVP2, light exertion, 286,000 jobs in the national economy.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the *Dictionary of Occupational Titles*.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

See Next Page

Deborah Suk Jetter (BNC#: 21PD600J49995)                    Page 13 of 13

**6.   The claimant has not been under a disability, as defined in the Social Security Act, since June 17, 2020, the date the application was filed (20 CFR 416.920(f)).**

<u>**DECISION**</u>

Based on the application for supplemental security income filed on June 17, 2020, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ ***Brendan F. Flanagan***
_____
Brendan F. Flanagan
Administrative Law Judge

December 21, 2022
_____
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | C1A | ALJ Hearing Decision | | 2019-10-02 | 24 |
| Y13 | C2A | AC Denial | | 2020-05-11 | 7 |
| Y13 | C5A | Disability Determination Transmittal | | 2021-10-14 | 1 |
| Y13 | C3A | Disability Determination Explanation | | 2021-05-28 | 12 |
| Y13 | C4A | Disability Determination Transmittal | | 2021-05-28 | 1 |
| Y13 | C6A | Disability Determination Explanation | | 2021-10-14 | 24 |
| Y13 | C7A | Decision of U.S. District Court | | 2021-12-20 | 2 |
| Y13 | C8A | Decision of U.S. District Court | | 2021-12-20 | 1 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | C1B | SSA-1696 - Claimant's Appointment of a Representative | | 2020-06-17 | 4 |
| Y13 | C2B | Fee Agreement for Representation before SSA | | 2020-06-30 | 1 |
| Y13 | C3B | Misc Jurisdictional Documents/Notices | | 2020-06-30 | 7 |
| Y13 | C4B | T16 Notice of Disapproved Claim | | 2021-05-28 | 5 |
| Y13 | C5B | T16 Notice of Disapproved Claim | | 2021-05-28 | 5 |
| Y13 | C6B | Misc Jurisdictional Documents/Notices | | 2021-06-07 | 3 |
| Y13 | C7B | T16 Disability Reconsideration Notice | | 2021-10-27 | 6 |
| Y13 | C8B | Misc Jurisdictional Documents/Notices | | 2021-11-15 | 3 |

| Y13 | C9B | Outgoing ODAR Correspondence | | 2021-12-02 | 16 |
|---|---|---|---|---|---|
| Y13 | C10B | Outgoing ODAR Correspondence | | 2021-12-07 | 4 |
| Y13 | C11B | Request for Hearing Acknowledgement Letter | | 2021-12-07 | 15 |
| Y13 | C12B | Hearing Notice | | 2022-01-14 | 25 |
| Y13 | C13B | Notice Of Hearing Reminder | | 2022-03-10 | 6 |
| Y13 | C14B | SSA-1696 - Claimant's Appointment of a Representative | During hearing | 2022-03-29 | 4 |
| Y13 | C15B | Fee Agreement for Representation before SSA | During hearing | 2022-04-04 | 1 |

## **Non-Disability Development**

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | C1D | Application for Disability Insurance Benefits | | 2020-06-30 | 5 |
| Y13 | C2D | Application for Disability Insurance Benefits | | 2020-06-30 | 5 |
| Y13 | C3D | Application for Supplemental Security Income Benefits (Abbreviated) | | 2020-06-30 | 10 |
| Y13 | C4D | Application for Supplemental Security Income Benefits (Abbreviated) | | 2020-06-30 | 4 |
| Y13 | C5D | Application for Supplemental Security Income Benefits (Abbreviated) | | 2020-06-30 | 6 |
| Y13 | C6D | Detailed Earnings Query | | 2022-02-09 | 2 |
| Y13 | C7D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2022-02-09 | 1 |
| Y13 | C8D | Summary Earnings Query | | 2022-02-09 | 1 |
| Y13 | C9D | Certified Earnings Records | | 2022-02-09 | 2 |

| Y13 | C10D | Summary Earnings Query | 2022-03-30 | 1 |
| Y13 | C11D | Detailed Earnings Query | 2022-03-30 | 2 |
| Y13 | C12D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 2022-03-30 | 1 |
| Y13 | C13D | Certified Earnings Records | 2022-03-30 | 2 |
| Y13 | C14D | WHAT - Work History Assistant Tool | 2022-04-04 | 7 |

## Disability Related Development

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| Y13 | C1E | Work History Report | | Jetter, Deborah Suk | to 2015-02-06 | 14 |
| Y13 | C2E | Disability Report - Field Office | | Deborah Suk Jetter | to 2020-06-30 | 3 |
| Y13 | C3E | Disability Report - Adult | | Deborah Suk Jetter | to 2020-06-30 | 9 |
| Y13 | C4E | Disability Report - Adult | | Deborah Suk Jetter | to 2020-06-30 | 1 |
| Y13 | C5E | Disability Report - Adult | | Deborah Suk Jetter | to 2020-06-30 | 1 |
| Y13 | C6E | Disability Report - Field Office | | Deborah Suk Jetter | to 2021-06-07 | 2 |
| Y13 | C7E | Disability Report - Appeals | | Deborah Suk Jetter | to 2021-06-07 | 8 |
| Y13 | C8E | Disability Report - Field Office | | Deborah Suk Jetter | to 2021-11-15 | 2 |
| Y13 | C9E | Disability Report - Appeals | | Deborah Suk Jetter | to 2021-11-15 | 7 |
| Y13 | C11E | Representative Correspondence | | Kathleen Flynn | to 2022-03-07 | 2 |
| Y13 | C10E | Exhibit List to Rep PH2E | | | to 2022-02-09 | 5 |
| Y13 | C12E | Resume of Vocational Expert | | Rena Serkin | to 2022-04-05 | 2 |
| Y13 | C13E | Representative Correspondence | | Kathleen Flynn | to 2022-04-25 | 1 |
| Y13 | C14E | Representative Correspondence | | Kathleen Flynn | to 2022-06-01 | 1 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| Y13 | C1F | CE Orthopedic | | Debbie Brewer, Md | to 2010-07-14 | 9 |
| Y13 | C2F | Office Treatment Records | | Southern Regional Medical Center | 2011-05-03 to 2011-05-03 | 10 |
| Y13 | C3F | CE Orthopedic | | Oluropo Ayeni, Md | to 2015-10-08 | 10 |
| Y13 | C4F | CE Psychology | | Valerie Mcadams, Psyd | 2015-11-17 to 2015-11-17 | 7 |
| Y13 | C5F | Office Treatment Records | | Georgia Department Of Correction | 2018-07-05 to 2019-02-22 | 132 |
| Y13 | C6F | Office Treatment Records | | Ga Dept Of Corrections | 2018-08-01 to 2019-07-17 | 75 |
| Y13 | C7F | Office Treatment Records | | Clayton Behavior Health | 2019-06-11 to 2019-07-22 | 63 |
| Y13 | C8F | Office Treatment Records | | Southside Medical Center Inc | 2019-09-16 to 2020-03-05 | 51 |
| Y13 | C9F | Emergency Department Records | | Southern Regional Medical Center | to 2020-03-22 | 17 |
| Y13 | C10F | Hospital Records | | Piedmont Henry Hospital | 2019-05-29 to 2020-04-25 | 223 |
| Y13 | C11F | Office Treatment Records | | Good Shepherd Clinic | 2019-05-13 to 2020-07-14 | 18 |
| Y13 | C12F | Office Treatment Records | | Piedmont Henry Hospital | to 2020-11-24 | 11 |
| Y13 | C13F | Office Treatment Records | | Prime Healthcare Foundation Southern Regional   CE | to 2020-12-17 | 8 |

| | | | | | |
|---|---|---|---|---|---|
| Y13 | C14F | Office Treatment Records | Prime Healthcare Foundation Southern Regional  CE | to 2020-12-17 | 10 |
| Y13 | C15F | CE Psychiatry | Clayton Center-Psychiatric | to 2021-01-21 | 9 |
| Y13 | C16F | Office Treatment Records | Southside Medical Center | 2020-08-06 to 2021-02-26 | 46 |
| Y13 | C17F | Office Treatment Records | Good Shepherd Clinic | 2020-12-01 to 2021-03-02 | 13 |
| Y13 | C18F | Office Treatment Records | Southside Med Ctr | to 2021-03-26 | 12 |
| Y13 | C19F | CE Psychology | Jessie Louise Muse Al Amin Md - CE | to 2021-04-22 | 12 |
| Y13 | C20F | Office Treatment Records | Good Shepherd Clinic | 2021-03-03 to 2021-05-12 | 11 |
| Y13 | C21F | Office Treatment Records | Good Shepherd Clinic | 2021-05-12 to 2021-05-12 | 4 |
| Y13 | C22F | Progress Notes | Clayton Behavior Health | 2020-09-23 to 2021-05-17 | 48 |
| Y13 | C23F | Progress Notes | Clayton Ctr Behavioral Hlth | 2021-01-21 to 2021-05-17 | 30 |
| Y13 | C24F | Hospital Records | Piedmont Fayette Hospital | 2021-09-13 to 2021-10-26 | 157 |
| Y13 | C25F | Office Treatment Records | Good Shepherd Clinic | 2021-05-12 to 2021-11-29 | 8 |
| Y13 | C26F | Consultative Examination Report | Prime Healthcare Foundation Southern Regional  CE | to 2020-12-17 | 4 |
| Y13 | C27F | Office Treatment Records | Clayton Center Community Service Board | 2014-06-03 to 2022-04-12 | 138 |