# Exhibit A

 **SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
2nd Floor
10155 Eagle Drive
Covington, GA 30014-3804

Date: June 22, 2022

Kimberly A Thompson
3539 Robins Landing
Apt 9
Decatur, GA 30032

## Notice of Decision – Partially Favorable

I carefully reviewed the facts of your case and made the enclosed partially favorable decision. Please read this notice and my decision.

Another office will process my decision and decide if you meet the non-disability requirements for Supplemental Security Income payments. That office may ask you for more information. If you do not hear anything within 60 days of the date of this notice, please contact your local office. The contact information for your local office is at the end of this notice.

**If You Disagree With My Decision**

If you disagree with my decision, you or your representative may submit written exceptions to the Appeals Council. "Written exceptions" are your statements explaining why you disagree with my decision. Please put the Social Security number shown above on any written exceptions you send.

Please send your written exceptions to:

> **Appeals Council**
> **5107 Leesburg Pike**
> **Falls Church, VA  22041-3255**

If you need help, you may file in person at any Social Security or hearing office.

**Time Limit To File Written Exceptions (30 Days)**

You must file your written exceptions with the Appeals Council **within 30 days** of the date you get this notice. The Appeals Council assumes that you got this notice within 5 days after the date of the notice unless you show that you did not get it within the 5-day period.

Form HA-L76-OP1 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**


See Next Page

If you need more time to file your written exceptions, you must file a written request with the Appeals Council. You must file the request for an extension within 30 days of the date you get this notice. If you request more than 30 days, you must explain why you need the extra time. The Appeals Council will decide whether to grant your request for more than a 30-day extension.

## How Written Exceptions Work

The Appeals Council will consider your entire case. It will consider all of my decision, even the parts with which you agree. The Appeals Council's action may be more or less favorable or unfavorable to you. The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N).

The Appeals Council may:

- Find that there is no reason to change my decision,
- Dismiss your case,
- Return your case to me or another administrative law judge for a new decision, or
- Issue its own decision.

The Appeals Council will send you a notice telling you what it decides to do. If the Appeals Council does not change my decision, my decision will become the final decision after remand. Any future claim you file will not change a final decision on this claim if the facts and issues are the same.

## The Appeals Council May Review My Decision On Its Own

The Appeals Council may review my decision even if you do not file written exceptions. They may decide to review my decision within 60 days after the date of the decision. The Appeals Council will mail you a notice of review if they decide to review my decision.

## Filing An Action In Federal District Court

If you do not file written exceptions and the Appeals Council does not review my decision on its own, my decision will become final on the 61st day following the date of this notice. After my decision becomes final, you will have 60 days to file a new civil action in Federal district court. You will lose the right to a court review if you do not file a civil action during the 60-day period starting with the day my decision becomes final. However, you can ask the Appeals Council to give you more time to file a civil action. The Appeals Council will grant your request for more time only if you can show a good reason for needing more time. We will not send you any more notices about your right to file in Federal district court.

## New Application

You have the right to file a new application at any time, but filing a new application is not the same as filing exceptions to my decision or filing a civil action in Federal court. If you disagree

Form HA-L76-OP1 (03-2010)

See Next Page

Kimberly A Thompson                                        Page 3 of 3

with my decision and you file a new application instead of filing written exceptions or appealing to Federal court, you might lose some benefits or not qualify for benefits at all. My decision could also be used to deny a new application for benefits if the facts and issues are the same. If you think my decision is wrong, you should file your exceptions within 30 days or file a new civil action between the 61st and 121st days after the date of this notice.

**If You Have Any Questions**

We invite you to visit our website located at www.socialsecurity.gov to find answers to general questions about social security. You may also call (800) 772-1213 with questions. If you are deaf or hard of hearing, please use our TTY number (800) 325-0778.

If you have any other questions, please call, write, or visit any Social Security office. Please have this notice and decision with you. The telephone number of the local office that serves your area is (877)626-9909. Its address is:

>       Social Security
>       3554 Covington Hwy
>       Decatur, GA 30032-9803


>               Kristen Glover
>               Administrative Law Judge


Enclosures:
Form HA-L21 (Fee Agreement Denial)
Decision Rationale
Form HA-L39 (Exhibit List)


cc:     Kathleen Flynn
        315 W. Ponce De Leon
        Avenue, Suite 940
        Decatur, GA 30030

Form HA-L76-OP1 (03-2010)

# SOCIAL SECURITY ADMINISTRATION
## Office of Hearings Operations

## ORDER OF ADMINISTRATIVE LAW JUDGE

### IN THE CASE OF

### CLAIM FOR

Kimberly A Thompson
(Claimant)

Widow's Insurance Benefits (Disability) and
Supplemental Security Income

Chris Wesley Thompson
(Wage Earner)

(Social Security Number)

I do not approve the fee agreement between you and your representative because:

> You appointed more than one representative from a law firm, or other business; all
> representatives did not sign a single fee agreement; and the representative(s) who did
> not sign the fee agreement, did not waive charging and collecting a fee. (Exhibits 12B,
> 13B, and 29B)

## HOW TO ASK US TO REVIEW THE FEE AGREEMENT DETERMINATION

You or your representative can ask us to review the determination on the fee agreement. If you
decide to ask us for a review, write us within 15 days from the day you get this order. Tell us that
you disagree and give your reasons. Send your request to this address:

> Social Security Administration
> Office of the Regional Chief Judge
> Suite 20T10
> 61 Forsyth Street SW
> Atlanta, GA 30303-8819

Your representative also has 15 days to write us if he or she does not agree with the
determination on the fee agreement.

You should include the social security number(s) shown on this order on any papers you send us.

## AUTHORIZING A REPRESENTATIVE'S FEE UNDER THE FEE PETITION PROCESS

If neither you nor your representative requests review, your representative must file a fee petition
if he or she wants to charge and collect a fee. Form SSA-1560 (Petition to Obtain Approval of a
Fee for Representing a Claimant before the Social Security Administration) can be used by your

See Next Page

Form HA-L21 (03-2007)

Kimberly A Thompson                                        Page 2 of 2

representative for this purpose.

/s/ *Kristen Glover*
_____
Kristen Glover
Administrative Law Judge

June 22, 2022
_____
Date

Form HA-L21 (03-2007)

## SOCIAL SECURITY ADMINISTRATION
### Office of Hearings Operations

### DECISION

**IN THE CASE OF**

**CLAIM FOR**

Kimberly A Thompson
(Claimant)

Widow's Insurance Benefits (Disability) and
Supplemental Security Income

Chris Wesley Thompson
(Wage Earner)

(Social Security Number)

## JURISDICTION AND PROCEDURAL HISTORY

This case is before the undersigned Administrative Law Judge on remand from the Appeals Council pursuant to a remand from the United States District Court for the Northern District of Georgia Atlanta Division.

The claimant initially filed for Title XVI Supplemental Security Income benefits on November 8, 2012, alleging disability beginning November 1, 2010. This case was heard before ALJ Perkerson on May 14, 2015, and an unfavorable decision was issued on July 29, 2015. (Exhibit 4A) The claimant appealed this decision to the Appeals Council, who remanded the case back to the ALJ level in a remand order dated September 15, 2016. (Exhibit 5A)

While the claimant's Title XVI case was pending to be reheard by an Administrative Law Judge, the claimant filed a new application for Title II Widow's Insurance Benefits (Disability) based on her deceased spouse's record on May 5, 2017. As the claimant's new Title II application concerned the same issues regarding whether the claimant was disabled under the definition of the Social Security Act, the claimant's Title II application was escalated and associated with her pending Title XVI claim before the undersigned.

On July 3, 2017, the undersigned issued separate unfavorable Title II and Title XVI decisions. (Exhibits 6A, 11A) Thereafter, the claimant appealed to the US District Court for the Northern District of Georgia (Civil Action Number 1:18 – CV – 05502). The USDC reversed and remanded the decisions dated July 3, 2017, in a District Court Order dated August 5, 2020. (Exhibit 7A and 8A) Per the order of the USDC, the Appeals Council vacated the denial decision of the Commissioner of Social Security and remanded the case to the undersigned for further proceedings in a remand order dated July 26, 2021. (Exhibit 9A)

Due to the COVID-19 pandemic, the hearings in this case were held via telephone conference with all participants appearing via telephone. The claimant and her representative did not object to the hearings being held by telephone, and confirmed that they agreed to the hearings being held telephonically at the beginning of each hearing.

See Next Page

An initial hearing was held on March 2, 2022, and a supplemental hearing was held on May 31, 2022. The claimant was represented by Brynne Holt at the initial hearing via telephone. Vocational expert, Melissa Neel, also appeared and testified at the initial hearing via telephone conference. (Exhibit 22E)

Following the initial hearing held on March 2, 2022, the undersigned obtained a medical expert opinion via interrogatory in order to comply with the USDC remand order (*See* Exhibit 8A). The interrogatory response of Dr. Mahmood was entered into evidence (Exhibit 39F) and properly proffered to the claimant's representative (Exhibit 23E), who requested a supplemental hearing in order to question Dr. Mahmood (Exhibit 24E). This request for supplemental hearing was granted, and a supplemental hearing was held via telephone conference on May 31, 2022. The claimant appeared at the supplemental hearing via telephone and had no objection to the supplemental hearing being held via telephone conference. Brynne Holt served as the claimant's representative at the supplemental hearing via telephone conference. Medical expert, Dr. Mahmood, was present via telephone and gave testimony at the supplemental hearing. Vocational expert Wendy Klamm was also present at the supplemental hearing via telephone conference; however, no testimony was taken from Ms. Klamm during the supplemental hearing. (Exhibit 25E)

Although Brynne Holt served as the claimant's representative at both the initial and supplemental hearings, the claimant's main representative of record is Kathleen Flynn, an attorney.

The claimant is alleging disability since November 1, 2010.

The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the claimant's final scheduled hearing (20 CFR 404.935(a) and 416.1435(a)).

## ISSUES

The issue is whether the claimant is disabled under sections 216(i), 223(d), 202(e), and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Other issues are whether the claimant is the widow of the deceased worker, has attained the age of 50, is unmarried (unless one of the exceptions in 20 CFR 404.335(e) apply), and has a disability that began before the end of the prescribed period. The prescribed period ends with the month before the month in which the claimant attains age 60, or, if earlier, either 7 years after the worker's death or 7 years after the widow was last entitled to survivor's benefits, whichever is later. In this case, the claimant's prescribed period began on March 12, 2015, the date the wage earner died. Therefore, the claimant must establish that her disability began on or before March 31, 2022 in order to be entitled to a disabled widow's benefits.

See Next Page

After careful consideration of all the evidence, the Administrative Law Judge concludes that the claimant was not disabled prior to April 26, 2021, but became disabled on that date and has continued to be disabled through the date of this decision. The undersigned also finds that disability was established during the prescribed period for entitlement to disabled widow's benefits.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975). If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1522 and 416.922; Social Security Rulings (SSRs) 85-28, and 16-3p). If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

See Next Page

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)). An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 404.1520(f) and 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965). If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience. If the claimant is able to do other work, she is not disabled. If the claimant is not able to do other work and meets the duration requirement, she is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512, 404.1560(c), 416.912 and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.**

**2.   The prescribed period ended on March 31, 2022.**

**3.   The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

See Next Page

**4.  Since the alleged onset date of disability, November 1, 2010, the claimant has had the following severe impairments: history of migraines; diffuse idiopathic pulmonary neuroendocrine cell hyperplasia (DIPNECH); typical broncho pulmonary carcinoid status post wedge resection; obesity; coronary artery disease status post stent in the left diagonal artery; NSTEMI (20 CFR 404.1520(c) and 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

With respect to the claimant's allegations of depression, the medical evidence does not support a finding of a medically determinable severe impairment prior to the established onset date, and since the established onset date, the evidence reflects no more than mild limitations due to symptoms of depression.  As noted in the initial Disability Determination Explanation dated in February 2013, the claimant has alleged depression since her initial Title XVI application; however, the claimant reported that she was not depressed to the point that she needed treatment. The claimant reported that her depression was situational in nature and related to her physical limitations, with the claimant reporting that she would get down sometimes due to her physical conditions. The claimant's ADLs were noted to reflect that the claimant drove, shopped, prepared meals, handled money, and had the capacity to handle a bank account but noted she did not have a bank account to handle at that time. (*See* Exhibit 2A, page 4)

**5.  Since November 1, 2010, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

The claimant's representative has argued that the claimant's lung cancer would medically equal the listing for lung cancer. The issue of medical equivalence requires the opinion of a medical expert specific to the issue of medical equivalence for an Administrative Law Judge to find a claimant equals the requirements of a listing. (*See* Social Security Rulings 86-8 and 17-2p, and *HALLEX* I-2-6-70)

*Evaluating Medical Equivalence – Medical Judgment Required*

For an impairment to be found to be equivalent in severity to a listed impairment, the set of symptoms, signs and laboratory findings in the medical evidence supporting a claim must be compared with and found to be equivalent in terms of medical severity and duration to, the set of symptoms, signs and laboratory findings specified for a listed impairment. When the individual's impairment is not listed, the set for the most closely analogous listed impairment is used. [] Any decision as to whether an individual's impairment or impairments are medically equivalent of a listed impairment must be based on medical evidence demonstrated by medically acceptable clinical and laboratory diagnostic techniques, *including consideration of a medical judgment about medical equivalence furnished by one or more physicians designated by the Secretary.* The Disability Determination Services physician's documented medical judgment as to the

See Next Page

equivalency meets this regulatory requirement. (Social Security Ruling 86-8, *emphasis added*)

Although the adjudicator is responsible for the ultimate determination on finding medical equivalence, the adjudicator must base their decision about whether the individual's impairment(s) medically equals a listing on the preponderance of the evidence in the record, and to demonstrate the required support of a finding that an individual is disabled based on medical equivalence at step 3, the record must contain one of the following:

1. A prior administrative medical finding from a MC or PC from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or
2. ME evidence, which may include testimony or written responses to interrogatories, obtained at the hearing level supporting the medical equivalence finding, or
3. A report from the Ac's medical support staff supporting the medical equivalence finding.

(*See* Social Security Ruling 17-2p Policy Interpretation, *Evidentiary requirements)*

*HALLEX* 1-2-6-70, Section D further clarifies how the Administrative Law Judge uses opinion evidence in determining whether an individual's impairment(s) medically equals an impairment: An Administrative Law Judge will consider opinions about medical equivalence from a physical or psychologist *designated by the Commissioner* whenever a claimant is not engaging in substantial gainful activity and has a severe impairment(s) that does not "meet" the requirements of a listing.

Medical equivalence exists when:

- Signs, symptoms, and laboratory findings are not identical to those specified in a listed impairment, but are of equivalent severity;
- Signs, symptoms and laboratory findings are equivalent in severity to those of the most closely analogous listed impairment; or
- The combination of signs, symptoms, and laboratory findings are equivalent in severity to the criteria of a listed impairment.

An Administrative Law Judge must obtain ME testimony *specific to the issue of medical equivalence* if they intend to find the claimant equals the requirements of a listing. When questioning an ME about medical equivalence, the Administrative Law Judge will:

- Ask the ME to describe the claimant's medical impairment(s);
- Obtain testimony about which listing in the Listing of Impairments is the most appropriate for comparison with the claimant's impairment(s) and why;
- When applicable, ask the ME whether the claimant's impairment(s) meet the duration requirement; and
- Request an opinion from the ME about whether the claimant had or has an impairment(s) that medically equals the criteria of the listing and the reasons for the opinion.

(*See HALLEX* 1-2-6-70, Section D, Opinion on Medical Equivalence)

The undersigned notes that this case is on remand from the USDC due to error in the previous decision not obtaining a medical expert regarding whether the claimant's lung cancer medically equaled Listing 13.14. It was noted in the USDC decision that while the Administrative Law

See Next Page

Judge did have the benefit of two State agency MCs, those MC reports were prepared in 2013, which was prior to the claimant's 2015 lung cancer diagnosis. As such, the State agency MC opinions of record did not contain any assessment with regards to the claimant's medical equivalency. (Exhibit 8A) Therefore, the USDC sent the claimant's case back for further proceedings with respect to the claimant's medical equivalency in the listings.

In complying with the USDC remand order, the undersigned obtained the opinion of a medical expert (ME), designated as an ME by the Commissioner per *HALLEX* 1-2-6-70, Section D, to determine medical equivalency in this case.

After the initial hearing, the medical records in this case along with a medical integratory questionnaire were sent to medical expert Dr. Tallat Mahmood, an ME in Oncology. (Exhibit 39F) After reviewing the medical records, Dr. Mahmood wrote that the evidence documented "no impairments are supported from an oncology prospective. [The claimant] has carcinoid of the lung but does not have any symptoms related to this and her last CT scan showed no evidence of [the] disease." (Exhibit 39F, page 11) In question 7, it was asked whether any of the claimant's impairments established by the medical evidence, combined or separately, meet or equal any impairment described in the Listing of Impairments. Dr. Mahmood responded "no" to this question and specified that listing 13.14 was considered, but the claimant's condition(s) did not meet or medically equal the listing as the claimant "has neither non-small cell ca. or small cell (oat cell) ca." and that 7.08 was also considered, but the claimant did not meet or medically equal this listing as "this requires 3 hospitalizations in 12 months which [the claimant] did not have." (Exhibit 39F, page 12)

The undersigned finds the interrogatory response of Dr. Mahmood to be supported and consistent with the evidence of record as discussed further in this decision below. Based on the ME opinion, the undersigned finds that the claimant's impairments does not meet or medically equal any impairment in the Listing of Impairments.

Furthermore, the undersigned notes that the claimant's representative did request a supplemental hearing in order to question Dr. Mahmood regarding their expert opinion in this case. The undersigned notes that during the supplemental hearing, which was on May 31, 2022, more than two months after Dr. Mahmood reviewed the file and completed her interrogatory response, Dr. Mahmood was unable to respond to many questions due to lack of memory of the case and the fact that Dr. Mahmood did not have the case file in front of her at the time of the supplemental hearing; however, Dr. Mahmood did testify generally with respect to possible side effects of various conditions, which was considered by the undersigned. The fact that Dr. Mahmood was unable to recall specific facts of a case file reviewed more than two months previously and which they were not thereafter provided with does not diminish the supportability of Dr. Mahmood's expert opinion within the interrogatory response, which was based on contemporaneous review of the case file in March 2022. As such, the interrogatory response of Dr. Mahmood is allocated significant weight and the claimant's impairments do not meet or medically equal any impairment in the Listing of Impairments.

The claimant's heart condition was considered against listing 4.04 for ischemic heart disease; however, there is no evidence of symptoms due to myocardial ischemia, as described in 4.00E3

See Next Page

4.00E7, while on regimen of prescribed treatment, with one of the following: A) sign-or symptom-limited exercise tolerance test demonstrating at least one manifestation at a workload equivalent to 5METs or less; OR B) three separative ischemic episodes, each requiring revascularization or not amenable to revascularization within a consecutive 12-month period; OR C) coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance would present a significant risk to the individual, with *both* angiographic evidence and resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily activities.

Obesity is not a listed impairment; however, the functional limitations caused by the MDI of obesity, either alone or in combination with another impairment(s), may medically equal a listing (*See* 84 FR 22924 and SSR 19-2p) Obesity may have an adverse impact upon co-existing impairments. For example, obesity may affect the cardiovascular and respiratory systems, making it harder for the chest and lungs to expand and imposing a greater burden upon the heart. Someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone. In addition, obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour day, five-day week or equivalent schedule. These considerations have been taken into account in reaching the conclusions herein at the second through fifth steps of the sequential disability evaluation process, even though no treating or examining medical source has specifically attributed additional or cumulative limitations to the claimant's obesity.

**6.    After careful consideration of the entire record, the undersigned finds that since November 1, 2010, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: no climbing with respect to ropes, ladders, or scaffolds; occasional climbing with respect to ramps and stairs; occasional crawling; occasional balancing, stooping, kneeling, and crouching; frequent exposure to extreme temperatures and workplace hazards such as moving machinery and unprotected heights; occasional exposure to humidity and to dust, fumes, gases, and other pulmonary irritants; no more than moderate noise intensity level, with "moderate noise" as described/defined within the Selected Characteristics of Occupations (SCO).**

In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p. The undersigned has also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

See Next Page

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned considered other evidence in the record to determine if the claimant's symptoms limited the ability to do work-related activities.

The claimant is alleging disability since November 2010 due primarily to her physical impairments. At the initial hearing, the claimant's representative noted that the claimant has several severe impairments, including a lung cancer that medically equals the listing for lung cancer. The claimant's representative also argued that, since the alleged onset date, the claimant had NSTEMI (two times), migraine headaches, sleep apnea, type II diabetes, hypertension, obesity, and depression. Based on the combination of these impairments, the claimant's representative argued that the claimant would have a reduced range of sedentary exertional ability to work and would be unable to complete a competitive 40-hour workweek. The claimant testified that she is currently receiving chemotherapy treatment for her lung cancer in the form of monthly injections. The claimant testified that she began her lung cancer treatment in 2016 and her medication was changed last year as her blood markers continued to go up. The claimant testified that she has been on a new chemotherapy medication for the past year, but it is similar to the prior medication in that that the treatment is a monthly injection with similar side effects of nausea and vomiting.

With respect to the claimant's diabetes, the claimant described how her blood sugars are not controlled and her blood sugars can spike due to eating or drinking the wrong thing. The claimant noted that her blood sugars should be around 100, but they can easily spike to 200 and when this happens, she can feel extremely exhausted or extremely thirsty and hyperactive. The claimant further testified that her blood pressure is not controlled, and when her blood pressure gets too high, her head will hurt, and she will feel tired and anxious. The claimant testified that she was diagnosed with a pulmonary embolism, and she has had lower extremity swelling due to blood clots. The claimant testified that she must elevate her legs at waist level to elevate the lower extremity swelling. With regards to the claimant's migraines, the claimant described how the pain will start with a drumming in her head and worsen to the point of a heavy pounding pain. Loud noises or smells will trigger the claimant's headaches. The claimant currently takes Cymbalta for her depression and, so far, she has no attacks or violent bouts of rage, but if people or situations agitate her and exacerbate her depressive symptoms.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported for the reasons explained in this decision and the medical evidence of record supports no more than a reduced range of light level work throughout the entire period at issue.

See Next Page

The claimant has numerous chronic conditions that are stable with compliance of treatment. The claimant has a long history of migraine headaches that predates the alleged onset date. Emory records from 2007 document that the claimant was educated on things that commonly trigger migraine headaches, including stress, certain foods, alcohol, eye strain, and sleep. The claimant was advised to track her headaches and the things that trigger them and try to avoid those factors that tend to trigger her headaches. Otherwise, the claimant was not placed on any restrictions. (Exhibit 1F) The claimant continued to present to the ER sporadically with complaints of headaches. Physical examinations were otherwise normal. (Exhibit 3F)

In February 2010, the claimant presented to the ER with complaints chest pain. Cardiac PET study with pharmacologic stress revealed no scintigrapic evidence of ischemia, and left ventricular EF was 57% with normal segmental wall motion and thickening. (Exhibit 4F, page 62) The claimant continued to have episodes of chest pain, and in March 2011, the claimant was diagnosed with coronary atherosclerotic heart disease with plaque erosion and thrombus formation. A drug-eluting stent was placed on the D1 branch artery, which went well and the claimant was thereafter started on a regimen of aspirin, Plavix, statin and beta blocker. (Exhibit 5F, page 27 – 28) Follow-up exams document that the claimant was reporting that she was doing well, and physical examinations were within normal limits. (Exhibit 5F, page 87 – 96) The claimant did have an episode of chest pain in June 2011 that were not relieved with her nitroglycerin. The claimant went to the ER, where testing revealed no abnormalities. Ultimately the chest pain resolved on its own, and the claimant was discharged with instructions to continue with her medications as prescribed. (Exhibit 6F, page 10 – 11) The records throughout 2011 and 2012 reflect stable angina. (Exhibit 7F, 9F)

Medical records from 2013 continue to document routine treatment for the claimant's chronic conditions. The claimant went in for a routine physical examination, and there was no evidence of upper or lower extremity edema. Heart sound was regular. Peripheral pulses +2. The claimant was noted to be followed by neurology for her history of migraine headaches and followed by cardiology for her coronary atherosclerotic heart disease. The claimant was noted to have Type 2 diabetes, controlled with metformin; however, labs were sent to test her hemoglobin A1c, albumin, and creatine ratio with a urine test. The claimant was to follow-up in 6 months regarding her diabetes. (Exhibit 12F, page 25)

Treatment notes in September 2013 reflect that the claimant was reporting feeling fatigued related to her OSA, but otherwise all systems reviewed were negative. The claimant was noted to have severe OSA, but the claimant was not using CPAP secondary to reports of being intolerant to the device. Physical examination revealed the claimant to be obese, middle aged woman, not in any acute distress. The claimant's blood pressure was 119/86, heart RRR, and gait WNL. (Exhibit 13F, page 2) The claimant was to reimplement therapy for her moderate-to-severe OSA with an autoPAP device and follow-up in four weeks. (Exhibit 13F, page 4; Exhibit 15F, page 30)

In April 2013, CT showed multiple lung nodules in both lungs. No further testing or treatment was recommended at that time. The claimant was recommended to follow up in 6 months. (Exhibit 16F, page 3 – 4) Repeat CT in August 2014 showed stable bilateral pulmonary nodules and scattered areas of mosaic attenuation, possibly diffuse idiopathic pulmonary endocrine cell

See Next Page

hyperplasia (DIPNECH). The claimant was advised to have a follow-up CT in February 2015 to confirm 2-year stability. (Exhibit 17F, page 2; Exhibit 18F, page 15)

In September 2015, the claimant underwent a surgical lung biopsy, which did reveal a carcinoid tumor in the right middle lobe. As of October 2015, the plan was for no treatment at that time and repeat CT scan in one year. (Exhibit 19F, page 101) The claimant reported that she had ceased smoking in July 2015 and was having "a little bit of coughing" but no hemoptysis or chest pain. Physical examination reported that the claimant was alert and oriented. Blood pressure was 124/80. The claimant's surgical wounds were well-healed. There was no pedal edema, clubbing, or cyanosis. (Exhibit 19F, page 102)

In August 2016, the claimant transferred her treatment to Grady due to insurance reasons. The claimant's chronic conditions were documented and noted to be stable on medication management. Review of systems revealed no shortness of breath or cough, no chest pain, no palpitation, no leg swelling, no joint pain, and no joint stiffness. (Exhibit 20F, page 6 – 9) In December 2016, the claimant was diagnosed with metastatic disease related to carcinoid with elevated chromogranin level. The claimant was started on octreotide injections as treatment, which the claimant is noted to have tolerated well. (Exhibit 23F, page 15)

Repeat CT taken in March 2017 showed that there were numerous pulmonary nodules consistent with DIPNECH with background diffuse air trapping typical of this condition; however, no aggressive osseous lesions were noted. (Exhibit 23F, page 24) The claimant's chromogranin level continued to be elevated, so the claimant was continued on the octreotide injections as treatment. The claimant reported having flushing and night sweats as side effects of the treatment. (Exhibit 23F, page 34)

In May 2018, the claimant was found to have a submassive PE in the LMWH found via echo. It was noted that the claimant would need to be placed on an anticoagulant within her price range and she would need to follow-up with a pulmonary hypertensive group. (Exhibit 26F, page 2) The claimant was placed on warfarin for her DVT/PE. (Exhibit 27F, page 4) Physical examinations thereafter are normal, with the claimant exhibiting normal 5/5 strength in the bilateral upper and lower extremities, and sensory intact to all modalities in all extremities. (Exhibit 27F, page 14)

The updated records during the period since the claimant turned age-55 continue to document the claimant's medication management for her chronic conditions. The claimant was continuing to take her anticoagulation therapy and there is no documentation of any complaints or symptoms. (Exhibit 29F) The claimant's polycystic kidney disease continues to be stable as seen on the most recent CT as well as confirmed in the serum creatinine labs. (Exhibit 32F; Exhibit 36F) There are intermittent references to the claimant's depression in the record, but no ongoing treatment other than medication management through her PCPs and psychiatric examinations are normal throughout. (Exhibit 32F, page 1, 82; Exhibit 34F, page 1 – 2)

As for the claimant's lung carcinoid, the treatment notes from July 2019 through May 2021 conflict with the claimant's testimony regarding the progression of her condition and her treatment. On 7/15/2019, the claimant's chromogranin levels were noted to have increased, but

See Next Page

the claimant was asymptomatic without radiographic progression. The plan was to continue with octreotide. (Exhibit 36F, page 5) On 1/16/2020, the claimant's chromogranin levels had decreased despite the claimant having not had any therapy since October 2019 due to a hospitalization. Follow-up on 4/16/2020 documented that the claimant continued to have "no symptoms of carcinoid" and the claimant reported to her doctor that she felt well. The claimant's chromogranin levels did increase, but this was attributed to the claimant's cessation in her octreotide therapy. On 7/9/2020, the claimant again reported no symptoms at all and her imaging studies showed "essentially stable disease." On 11/12/2020 the claimant reported no symptoms. The claimant reported feeling well, and denied any pain, nausea, vomiting, or diarrhea. The claimant was on Lenreotide and tolerating it well. (Exhibit 36F, page 6)

With regards to the claimant's testimony regarding her hypertension/blood pressure, the evidence of record reflects that the claimant's blood pressure is controlled with medication. During the relevant period at issue, the claimant's blood pressure is routinely measured in a normal range, and the treatment notes reflect that her blood pressure is "at goal" and the claimant is continued on her treatment of medication management. (Exhibit 18F, page 4) The claimant's diabetes is also documented to be stable with medication management, and there is no evidence of the significant blood sugar variances described by the claimant during the relevant period at issue. (Exhibit 20F, page 6) The only time that the claimant's diabetes was not controlled was when there was noncompliance on the part of the claimant, specifically where the claimant was drinking high sugar energy drinks that were interfering with her blood sugar control. (Exhibit 21F, page 6)

The claimant's testimony regarding her side effects of her treatment for her lung carcinoid is not supported by the overall evidence of record. The claimant testified that she was receiving chemotherapy injections once a month; however, the records reflect that the was receiving octreotide injections, which is man-made hormone that to control the growth of some tumors and is not chemotherapy. This aside, this therapy can cause side effects, but the side effects of severe nausea and vomiting, as testified to by the claimant are not reflected in the medical records. The claimant reported having some issues with "flushing and night sweats" with the injections. (Exhibit 23F, page 34) There is no evidence of the severe side effects as described by the claimant at the hearing. As for the claimant's testimony regarding the need to elevate the lower extremities, there is no evidence of any lower extremity swelling of blood clotting that would necessitate the elevation of the lower extremities as described by the claimant.

As for the medical opinions of record, the State agency medical consultant opinions of record dated in the 2013, reflected in the Disability Determination Explanation of record are allocated significant weight inasmuch as these nonexamining medical consultant opinions were based on review of the medical records available at that time. (Exhibit 14F) The restrictions assessed therein were supported by the lack of significant limitations documenting in the objective medical evidence within the treatment records, and the claimant's reported complaints within those records were not commensurate with her allegations of disability at that time. (Exhibit 2A) At the time that the State agency issued their initial determination, the claimant's depression was not a medically determinable impairment as the claimant had not sought any treatment, thus this conclusion was supported at that time and is given weight to the extent that this was consistent with the record at that time. Since the time of the State agency determination, the claimant has

See Next Page

received medication management for reports of depression and was recently referred for the mental health program at Grady; however, there is no evidence of anything more than mild limitations due to depressive symptoms in evidence prior to the established onset date and there is no evidence of a severe mental impairment prior to the established onset date.

The opinion of Dr. Mahmood obtained via interrogatory is also allocated significant weight and reflects the most recent review of the medical evidence of record. (Exhibit 39F) As previously discussed, the claimant's representative did request a supplemental hearing in order to question Dr. Mahmood regarding their expert opinion in this case. The undersigned notes that during the supplemental hearing, which was on May 31, 2022, more than two months after Dr. Mahmood reviewed the file and completed her interrogatory response, Dr. Mahmood was unable to respond to many questions due to lack of memory of the case and the fact that Dr. Mahmood did not have the case file in front of her at the time of the supplemental hearing, nor was Dr. Mahmood provided with the case file prior to the hearing in which to refresh their memory of the case; however, Dr. Mahmood did testify generally with respect to possible side effects of various conditions, which was considered by the undersigned. The fact that Dr. Mahmood was unable to recall specific facts of a case file reviewed more than two months previously and which they were not thereafter provided with does not diminish the supportability of Dr. Mahmood's expert opinion within the interrogatory response, which was based on contemporaneous review of the case file in March 2022. As such, the interrogatory response of Dr. Mahmood is allocated significant weight and the claimant's impairments do not meet or medically equal any impairment in the Listing of Impairments.

With respect to the discharge lifting restrictions following the claimant's 2014 resection of her lung nodules, the limitation to return to activities "as tolerated" with "no lifting greater than 20 pounds times three to four weeks" and "no driving if taking narcotics" is allocated weight inasmuch as these restrictions reflect temporary restrictions following the claimant's surgery and do not reflect the physician's opinion regarding the claimant's permanent restrictions (or restrictions that would last more than 12 months) due to the claimant's conditions. (Exhibit 19F, page 3) That being said, the claimant's residual functional capacity exertional capacity limitation to light does fall within the parameters of the no lifting of greater than 20 pounds noted in this recovery period.

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by objective medical evidence contained in the claimant's file. Although the undersigned considered the allegations in the light most favorable to the claimant, her claim of disability is not supported by the record prior to turning age-55.

**7. Since November 1, 2010, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

According to the testimony of the vocational expert at the hearing, the claimant has past relevant work as a cleaner (DOT# 323.687-014; Light; SVP-2). As required by SSR 82-62, this work was substantial gainful activity, was performed long enough for the claimant to achieve average performance, and was performed within the relevant period. Although the vocational expert testified at the initial hearing that a person with the same residual functional capacity as that of

See Next Page

the claimant's would be capable of performing their past relevant work as a cleaner, the undersigned notes that in the previous Administrative Law Judge decision in which a similar residual functional capacity (reduced range of light) was posed to a vocational expert was given, the vocational expert opined that an individual would be unable to perform past relevant work as a janitorial cleaner. (*See* Exhibit 11A, page 18) The undersigned notes that this discrepancy is explained in that the vocational expert in the previous decision categorized the claimant's past relevant work as a "janitorial cleaner," which is a medium level job, whereas the current vocational expert categorized the claimant's past relevant work as merely "cleaner" at a light level. In both instances, the claimant's past work would have been unskilled with no transferable skills.

In giving the claimant the full benefit of the doubt, and in deference of the fact that while the claimant's past relevant work was performed within the relevant time period for purposes of her original application, with the time that has passed since due to appeals and remands, the claimant's past relevant work is no longer within the past 15 years for recency purposes, the undersigned will find that the claimant could not perform her past relevant work since her alleged onset date and proceed with the sequential evaluation. Accordingly, the claimant is unable to perform past relevant work as actually or generally performed.

**8.    Prior to the established disability onset date, the claimant was an individual closely approaching advanced age.  On April 26, 2021, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).**

The claimant was a younger individual, age-44, on the alleged onset date and turned age-50 on April 26, 2016[1], placing the claimant in the "individual closely approaching advanced age" category.  On April 26, 2021, the claimant changed age categories again to an "individual of advanced age."  Although the claimant was a "younger individual" age category for portion of the period at issue, for the purposes of simplicity the undersigned will consider the claimant as an individual of "closely approaching advanced age" for the entire period prior to the established onset date.  This finding does not adversely affect the claimant or otherwise alter the outcome of this decision.

**9.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).**

**10.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).**

**11.  Prior to April 26, 2021, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).**

---

[1] The claimant's date of birth is April 27, 1966. According to 20CFR 404.2(c)(4) and 416.120(c)(4), an individual attains a given age on the first moment of the day preceding the anniversary of his birth corresponding to such age. As such, the claimant switched age categories on April 26, 2016 and April 26, 2021, respectively.

See Next Page

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

Prior to April 26, 2021, if the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.13. However, the claimant's ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations. To determine the extent to which these limitations eroded the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.

The vocational expert testified that given all of these factors the individual would have been able to perform the requirements of representative occupations such as the following:

a. Cashier: Dictionary of Occupational Titles # 211.462-010; Light (SVP-2) Unskilled; 530,000 positions in the national economy
b. Sales Attendant: Dictionary of Occupational Titles # 299.677-010; Light (SVP-2) Unskilled; 250,000 positions in the national economy
c. Marker: Dictionary of Occupational Titles # 209.587-034; Light (SVP-2) Unskilled; 130,000 positions in the national economy

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, prior to the established onset date of disability, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. Prior to April 26, 2021, a finding of "not disabled" is therefore appropriate under the framework of the above-cited rule in the Medical-Vocational Guidelines.

**12. Beginning on April 26, 2021, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).**

See Next Page

Beginning on the date the claimant's age category changed, considering the claimant's age, education, and work experience, a finding of "disabled" is reached by direct application of Medical-Vocational Rule 202.04.

**13. The claimant was not disabled prior to April 26, 2021, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

**DECISION**

Based on the application for disabled widow's benefits filed on May 5, 2017, the claimant has been disabled under sections 202(e) and 223(d) of the Social Security Act beginning on April 26, 2021.

Based on the application for supplemental security income protectively filed on November 8, 2012, the claimant has been disabled under section 1614(a)(3)(A) of the Social Security Act beginning on April 26, 2021.

The component of the Social Security Administration responsible for authorizing supplemental security income will advise the claimant regarding the nondisability requirements for these payments, and if eligible, the amount and the months for which payment will be made.

/s/ *Kristen Glover*

Kristen Glover
Administrative Law Judge

June 22, 2022
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component No. | Description | Received | Dates | Pages |
|---|---|---|---|---|
| HO 1A | Disability Determination Transmittal | | 02/21/2013 | 1 |
| HO 2A | Disability Determination Explanation | | 02/21/2013 | 9 |
| HO 3A | Disability Determination Transmittal | | 12/19/2013 | 1 |
| HO 4A | ALJ Hearing Decision | | 07/29/2015 | 20 |
| HO 5A | AC Order | | 09/15/2016 | 4 |
| HO 6A | ALJ Decision - Prior | | 07/03/2017 | 21 |
| HO 7A | Decision of U.S. District Court | | 07/15/2020 | 28 |
| HO 8A | Decision of U.S. District Court | | 08/05/2020 | 2 |
| HO 9A | AC Order | | 07/26/2021 | 5 |
| HO 10A | Decision of U.S. District Court | | 07/29/2021 | 376 |
| HO 11A | ALJ Hearing Decision | | | 21 |

## Jurisdictional Documents/Notices

| Component No. | Description | Received | Dates | Pages |
|---|---|---|---|---|
| HO 1B | SSA-1696 - Claimant's Appointment of a Representative-Kathleen Flynn | | 10/09/2012 | 1 |
| HO 2B | Social Security Information Notice | | 02/22/2013 | 4 |
| HO 3B | Request for Reconsideration | | 04/09/2013 | 1 |
| HO 4B | Fee Agreement for Representation before SSA | | 04/26/2013 | 1 |
| HO 5B | SSA-1696 - Claimant's Appointment of a Representative-Kathleen Flynn | | 04/26/2013 | 1 |

HA-L39 (03-2007)

Kimberly A Thompson                                    Page 2 of 8

| HO 6B | SSI Notice of Reconsideration | 12/19/2013 | 4 |
| HO 7B | Representative Correspondence | 01/03/2014 | 1 |
| HO 8B | Request for Hearing by ALJ | 01/04/2013 | 1 |
| HO 9B | Request for Hearing Acknowledgement Letter | 01/16/2014 | 4 |
| HO 10B | Hearing Notice | 01/05/2015 | 22 |
| HO 11B | Resume of Vocational Expert | | 7 |
| HO 12B | Fee Agreement for Representation before SSA | 05/14/2015 | 1 |
| HO 13B | SSA-1696 - Claimant's Appointment of a Representative-Kathleen Flnn/Sydney Jakes | 05/14/2015 | 1 |
| HO 14B | Request for Review of Hearing Decision/Order | 08/24/2015 | 1 |
| HO 15B | Acknowledgement of AC Remand Correspondence | 09/21/2016 | 6 |
| HO 16B | Objection to Video Hearing | 09/26/2016 | 1 |
| HO 17B | Objection to Video Hearing | 09/27/2016 | 1 |
| HO 18B | Notice of Hearing | 12/29/2016 | 14 |
| HO 19B | Request for Review of Hearing Decision/Order | 07/20/2017 | 1 |
| HO 20B | Request for Hearing Acknowledgement Letter | 07/27/2021 | 17 |
| HO 21B | Request for Hearing Acknowledgement Letter | 07/30/2021 | 9 |
| HO 22B | COVID Hearing Agreement Form | 08/12/2021 | 2 |
| HO 23B | Hearing Notice | 09/10/2021 | 14 |
| HO 24B | Hearing Notice | 09/14/2021 | 17 |
| HO 25B | Acknowledge Notice of Hearing | 09/21/2021 | 1 |
| HO 26B | Notice Of Hearing Reminder | 12/03/2021 | 8 |

Kimberly A Thompson                                              Page 3 of 8

| | | | | |
|---|---|---|---|---|
| HO 27B | SSA-1696-SUP2 - Representative's Withdrawal of Acceptance of Appointment-Remand Only | | 11/22/2021 | 3 |
| HO 28B | Hearing Notice | | 12/14/2021 | 20 |
| HO 29B | SSA-1696 - Claimant's Appointment of a Representative | | 03/02/2022 | 5 |
| HO 30B | Hearing Notice | | 05/17/2022 | 18 |
| HO 31B | Waive Advance Notice of Hearing | | 05/17/2022 | 3 |

### Non-Disability Development

| Component No. | Description | Received | Dates | Pages |
|---|---|---|---|---|
| HO 1D | Application for Supplemental Security Income Benefits | | 11/23/2021 | 9 |
| HO 2D | Certified Earnings Records | | 03/06/2014 | 5 |
| HO 3D | DEQY | | 04/30/2015 | 6 |
| HO 4D | SEQY | | 04/30/2015 | 1 |
| HO 5D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 04/30/2015 | 1 |
| HO 6D | Certified Earnings Records | | 04/30/2015 | 2 |
| HO 7D | Certified Earnings Records | | 11/17/2016 | 2 |
| HO 8D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 11/17/2016 | 1 |
| HO 9D | SEQY/DEQY | | 11/17/2016 | 3 |
| HO 10D | SEQY | | 03/15/2017 | 1 |
| HO 11D | DEQY | | 03/15/2017 | 3 |
| HO 12D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 03/15/2017 | 2 |
| HO 13D | Certified Earnings Records | | 03/15/2017 | 2 |

HA-L39 (03-2007)

Kimberly A Thompson

Page 4 of 8

| HO 14D | Summary Earnings Query | 02/23/2022 | 1 |
| HO 15D | Certified Earnings Records | 02/23/2022 | 4 |
| HO 16D | Detailed Earnings Query | 02/23/2022 | 6 |
| HO 17D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 02/23/2022 | 4 |
| HO 18D | Certified Earnings Records | 05/18/2022 | 3 |
| HO 19D | Detailed Earnings Query | 05/18/2022 | 3 |
| HO 20D | Summary Earnings Query | 05/18/2022 | 1 |
| HO 21D | New Hire, Quarter Wage, Unemployment Query (NDNH) | 05/18/2022 | 1 |

## Disability Related Development

| Component No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|
| HO 1E | Disability Report - Field Office | | FO | to 11/23/2012 | 3 |
| HO 2E | Function Report - Adult | | | to 12/07/2012 | 8 |
| HO 3E | Work History Report | | FO | to 12/07/2012 | 8 |
| HO 4E | Cardiac/Chest Pain Questionnaire | | FO | to 12/07/2012 | 3 |
| HO 5E | MENTAL IMPAIRMENT QUESTIONNAIRE | | FO | | 3 |
| HO 6E | Disability Report - Appeals | | FO | to 04/04/2013 | 8 |
| HO 7E | Function Report - Adult | | CLAIMANT | to 05/24/2013 | 8 |
| HO 8E | Cardiac/Chest Pain Questionnaire | | FO | to 05/24/2013 | 3 |

HA-L39 (03-2007)

Kimberly A Thompson                                    Page 5 of 8

| HO 9E | Recent Medical Treatment | | CLAIMANT | to 07/30/2013 | 2 |
|---|---|---|---|---|---|
| HO 10E | Claimant Correspondence | | CLAIMANT | to 11/14/2013 | 3 |
| HO 11E | Vocational Consultant Case Analysis | | DENEEN SNEED | to 12/19/2013 | 5 |
| HO 12E | Disability Report - Appeals | | FO | | 8 |
| HO 13E | Misc Disability Development and Documentation | | | | 1 |
| HO 14E | Representative Brief | | KATHLEEN FLYNN | to 08/20/2015 | 3 |
| HO 15E | Exhibit List to Representative | | ODAR-COVINGTON, GA | to 11/22/2016 | 13 |
| HO 16E | Resume of Vocational Expert | | RENA SERKIN | | 3 |
| HO 17E | Medications | | CLAIMANT | | 2 |
| HO 18E | Representative Brief | | KATHLEEN FLYNN | to 04/10/2017 | 1 |
| HO 19E | Brief for a Request for Review | | KATHLEEN FLYNN | to 07/19/2017 | 5 |
| HO 20E | Correspondence regarding efforts to obtain evidence | | KATHLEEN FLYNN | to 11/22/2021 | 3 |
| HO 21E | Correspondence regarding efforts to obtain evidence | | KATHLEEN FLYNN | to 02/02/2022 | 4 |
| HO 22E | Resume of Vocational Expert | | | | 2 |
| HO 23E | Proffer Correspondence | Subsequent to hearing | OHO-COVINGTON, GA | to 03/22/2022 | 2 |
| HO 24E | Response to Proffer Correspondence | Subsequent to hearing | BRYNNE HOLT | to 03/31/2022 | 3 |

Kimberly A Thompson

| | | | | | |
|---|---|---|---|---|---|
| HO 25E | Resume of Vocational Expert | | Klamm | to 05/17/2022 | 4 |

## Medical Records

| Component No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|
| HO 1F | Emergency Department Records | | EMORY HEALTHCARE | 05/22/2007 to 05/22/2007 | 45 |
| HO 2F | Emergency Department Records | | EMORY HEALTHCARE | to 07/19/2008 | 40 |
| HO 3F | Emergency Department Records | | EMORY HEALTHCARE | 09/15/2009 to 09/16/2009 | 51 |
| HO 4F | Inpatient Hospital Records | | EMORY HEALTHCARE | 02/22/2010 to 02/23/2010 | 123 |
| HO 5F | Inpatient Hospital Records | | EMORY HEALTHCARE | 03/23/2011 to 03/26/2011 | 221 |
| HO 6F | Emergency Department Records | | EMORY HEALTHCARE | to 06/28/2011 | 131 |
| HO 7F | Emergency Department Records | | EMORY HEALTHCARE | to 09/16/2011 | 57 |
| HO 8F | Emergency Department Records | | EMORY HEALTHCARE | to 01/18/2012 | 50 |
| HO 9F | Emergency Department Records | | EMORY HEALTHCARE | 03/07/2012 to 03/08/2012 | 183 |
| HO 10F | Outpatient Hospital Records | | EMORY HEALTHCARE | to 03/26/2012 | 17 |
| HO 11F | Outpatient Hospital Records | | EMORY HEALTHCARE | 01/28/2013 to 06/05/2013 | 15 |
| HO 12F | Outpatient Hospital Records | | EMORY HEALTHCARE | 09/15/2012 to 04/18/2013 | 41 |

Kimberly A Thompson                                        Page 7 of 8

| HO 13F | Outpatient Hospital Records | EMORY HEALTHCARE | 07/19/2012 to 09/26/2013 | 33 |
| HO 14F | Medical Consultant's Review of Physical RFC Assessment | ABRAHAM OYEWO, MD | to 12/19/2013 | 8 |
| HO 15F | Hospital Records | EMORY HEALTHCARE | 01/28/2013 to 08/27/2013 | 132 |
| HO 16F | Outpatient Hospital Records | EMORY HEALTHCARE | 04/01/2013 to 09/09/2013 | 38 |
| HO 17F | Radiology Report | EMORY HEALTHCARE | 08/18/2014 to 01/16/2015 | 3 |
| HO 18F | Outpatient Hospital Records | EMORY HEALTHCARE | 08/11/2014 to 01/09/2015 | 30 |
| HO 19F | Treatment notes covering the period | EMORY HEALTHCARE | 09/03/2015 to 04/14/2016 | 120 |
| HO 20F | Hospital Records | GRADY HOSPITAL | 08/22/2016 to 12/02/2016 | 44 |
| HO 21F | Office Treatment records | EMORY CLINIC | 10/16/2015 to 04/14/2016 | 10 |
| HO 22F | Office Treatment | EMORY CLINIC | 10/05/2011 to 09/05/2012 | 37 |
| HO 23F | Hospital Records | GRADY | 12/15/2016 to 03/17/2017 | 35 |
| HO 24F | Medical Source - No MER Available | EMORY HOSPITAL | 09/05/2016 to 03/23/2017 | 3 |
| HO 25F | Emergency Department Records | EMORY UNIVERSITY HOSPITAL | to 08/21/2017 | 61 |
| HO 26F | Inpatient Hospital Records | EMORY UNIVERSITY HOSPITAL | 05/03/2018 to 05/07/2018 | 67 |

HA-L39 (03-2007)

| | | | | | |
|---|---|---|---|---|---|
| HO 27F | Emergency Department Records | | EMORY UNIVERSITY HOSPITAL | 11/26/2018 to 11/27/2018 | 25 |
| HO 28F | Outpatient Hospital Records | | GRADY HOSPITAL | 08/26/2021 to 11/16/2021 | 44 |
| HO 29F | Outpatient Hospital Records | | GRADY HOSPITAL | 11/30/2021 to 12/29/2021 | 26 |
| HO 30F | Request for Medical Interrogatory | | OHO-COVINGTON, GA | to 02/24/2022 | 11 |
| HO 31F | Medical Expert Resume | | TALLAT MAHMOOD | to 02/24/2022 | 6 |
| HO 32F | Hospital Records | | GRADY HOSPITAL | 03/29/2018 to 02/07/2019 | 84 |
| HO 33F | Hospital Records | | GRADY HOSPITAL | 06/09/2017 to 11/11/2019 | 82 |
| HO 34F | Hospital Records | | GRADY HOSPITAL | 02/07/2019 to 07/09/2020 | 84 |
| HO 35F | Hospital Records | | GRADY HOSPITAL | 05/31/2017 to 08/12/2021 | 80 |
| HO 36F | Hospital Records | | GRADY HOSPITAL | 03/16/2017 to 10/06/2021 | 84 |
| HO 37F | Inpatient Hospital Records | | EMORY UNIVERSITY HOSPITAL | 05/03/2018 to 05/07/2018 | 55 |
| HO 38F | Emergency Department Records | | EMORY UNIVERSITY HOSPITAL | 11/26/2018 to 11/27/2018 | 43 |
| HO 39F | Response to Medical Interrogatory | Subsequent to hearing | DR. MAHMOOD | to 03/15/2022 | 13 |
| HO 40F | Emergency Department Records | Subsequent to hearing | EMORY UNIVERSITY HOSPITAL | 11/26/2018 to 11/27/2018 | 29 |

HA-L39 (03-2007)