# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ELIZABETH A. GAINES | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION FILE NO. |
| v. | : | _____ |
| | : | |
| | : | |
| CHEROKEE COUNTY SCHOOL DISTRICT | : | |
| | : | |
| | : | |
| Defendant | : | |
| _____ | : | |

## COMPLAINT

Plaintiff Elizabeth A. Gaines ("Plaintiff" or "Gaines") files her Complaint against Defendant Cherokee County School District (d/b/a Cherokee County Schools) (the "District").

## NATURE OF THE ACTION

1.

This is an action for discrimination and retaliation under the Age Discrimination in Employment Act of 1967, as amended, 29 U. S. C. § 621, *et al.* ( (ADEA).

**PARTIES**

2.

Plaintiff Elizabeth A. Gaines is a U.S. citizen and resident of Cherokee County in the State of Georgia.

3.

Defendant Cherokee County School District is a school district operating under the laws of Georgia with its principal address at 1205 Bluffs Parkway, Canton, Georgia 30114.  The School District is subject to an action under the ADEA, and can be served with summons and complaint at the above address upon its Superintendent, Dr. Brian V. Hightower.

**JURISDICTION AND VENUE**

4.

The claims brought in this lawsuit present federal questions and jurisdiction in this court is proper under 28 U.S.C. § 1331.

5.

Venue of this suit is proper in the Northern District of Georgia, Atlanta Division under 28 U.S.C. § 1391 and 29 U.S. Code § 626(c). Defendant's principal office address is in this division, so it resides and operates within

this division. The alleged unlawful acts against Plaintiff also occurred in this judicial district and division.

6.

Plaintiff filed an Inquiry alleging age discrimination and retaliation against the School District with the Equal Employment Opportunity Commission on October 14, 2021. She later perfected a charge based on that inquiry with the EEOC on January 30, 2022. The EEOC signed a Notice of Right to Sue on or about May 23, 2023.

**FACTUAL ALLEGATIONS**

7.

On August 1, 2002**,** the School District hired Elizabeth Gaines to work as a Social Studies teacher at Dean Rusk Middle School. While the Mill Creek Middle School was being built, she continued to teach Middle School Social Studies but at the Little River Elementary School temporary site. Since 2009 or so, she has taught Social Studies at Mill Creek Middle School. Until she retired, the District renewed her contract each year. She had an exemplary teaching record, and in 2010, she was named "Teacher of the Year" at Mill Creek Middle School.

8.

At the time of the discriminatory and retaliatory acts alleged in this Complaint, Gaines was 65.

9.

During the discriminatory and retaliatory events, Gaines was the primary caregiver of her sister, who suffered from physical disabilities.

10.

On March 27, 2018, the District named Matthew May the new Principal of Mill Creek Middle School.

11.

May preferred younger teachers and staff. He used job assignments and teaching loads to get rid of teachers and staff members, including those who were older.

12.

Historically, all principals that Gaines had worked for proposed teaching assignments for the next academic year in February and March so that teachers would have time to transfer if they wanted.

13.

But May did not disclose the proposed teaching assignments for Mill Creek Middle School, including those for Seventh Grade Social Studies teachers like Gaines, until around May 15-17, 2021.

14.

May assigned Gaines two "on-level" classes and two remedial classes, but not one advanced class.

15.

Most, if not all, students in remedial classes are due special services and accommodations that require extra time and documentation, adding to the teacher load.

16.

For example, many students in remedial classes speak English as a Second language and are classified as "ESOL." English as a second language includes all students who do not speak English, including Spanish, French, Vietnamese, German, Russian, and numerous African dialects from tribes such as Bantu, Igbo, Hausa, and others.

17.

Due to disabilities or behavioral issues, many students in remedial or on-level classes are provided with services according to an Individualized

Education Program (IEP). An IEP is a legally binding contract to provide specific services to aid students in being successful and leveling the playing field.

18.

RTI Response to Intervention (RTI) services and support are given to students who struggle academically in math, science, social studies, and language arts due to gaps in education and executive functioning.

19.

Section 504 of the Rehabilitation Act provides guaranteed assistance for students with medical conditions such as ADD, ADHD, Asthma, food allergies, and other disabilities. Section 504 plans provide students with disabilities reasonable accommodations by giving them necessary services, materials, or technology, and changing their learning environment.

20.

Even "on-level" classes have many students requiring special services and accommodations that require extra time and documentation, also adding to the teacher load.

21.

Each supported student requiring this extra support, no matter their issue or disability, requires data collection and extensive meetings, daily

notes, and monthly uploaded data to various sites to prove that the student's

needs/accommodations are being followed. This is time-consuming and

involves legal documentation of services.

21.

In contrast, advanced-level classes have very few, if any, students who

are due special services and accommodations that require extra time and

documentation.

23.

In prior years, Gaines was assigned a more balanced load of remedial,

on-level, and advanced classes.

24.

For example, for the 2020-21 academic year, Gaines was assigned one

on-level and three advanced classes.

25.

This teaching assignment resulted in a workload of approximately 45-

50 hours per week.

26.

The new schedule would have raised Gaines's teaching load to

approximately 70 to 75 hours a week.

27.

This disproportionally heavy teaching load was not only unusual, but an unrealistic level of work for any single teacher.

28.

In addition to the unrealistic teaching load, it makes it almost impossible for a teacher with this load to provide the required services and documentation for these students. The District and the teacher could face legal liability if the services are not provided, or the documentation is inadequate.

29.

In contrast to the class assignments provided to Gaines for the next school year, May assigned the other Seventh Grade Social Studies teachers, who were much younger, and less experienced, a significantly lighter teaching load of students needing special services.

30.

May assigned Pebble Pence, a much younger, former special education teacher, four advanced social studies classes, and no on-level or remedial classes.

31.

Pence was so surprised by the unequal work distribution that she later offered to May to adjust her teaching schedule to less the teaching load on Gaines.

32.

May refused her offer.

33.

May assigned Lisa Sorrano, a much younger teacher, three advanced classes, one on-level class, and no remedial classes.

34.

May assigned Bill Dillon, a much younger teacher, three advanced classes, one on-level class, and no remedial classes.

35.

Dillon actually had expressed a preference for teaching students with challenging or special needs.

36.

Since May only assigned two on-level class to the other Seventh Grade Social Studies teachers, this meant that May had assigned almost **all** students needing special remedial services to Gaines.

37.

Only twelve students in all four classes assigned to Gaines for the 2021-22 school year did not need special remedial services or documentation.

38.

While it should not matter, there is a higher status attached to teaching advanced classes, and a lower status attached to those who do not teach advanced classes, but primarily remedial ones.

39.

In fact, when the proposed schedule came out, several teachers asked Gaines, "What did you do," because the schedule appeared to be punitive.

40.

On Wednesday, May 17, 2021, Gaines emailed May requesting a meeting to discuss the proposed teaching assignments for 2021-22.

41.

May replied that he would not be available until Wednesday, May 19, 2021, and that Assistant Principal Stacy Krutz could also meet with them because she was involved in setting up the class schedules.

42.

On either May 18th or 19th, Gaines complained about the extreme amount of work assigned to her in this proposed schedule to Adrian Thompson, Ed.D., Director of Human Resources.

43.

She explained the work burden of serving this large a number of students requiring special services.

44.

She complained that May had taken this targeted adverse action because she was turning 65, and that he was trying to drive her into quitting.

45.

Thompson denied that the District ever forced older teachers or staff out, and stated that it violated policy to do so.

46.

In response, Gaines provided examples of other teachers whom May had also targeted due to their age or another protected status, including Linda Chapman, Maribelle Curbelo, and Linda Evans.

47.

Thompson offered to speak to May directly on her behalf, but Gaines asked to let her meet with him that week first, and she would report back to him.

48.

On or around May 20, 2021, Gaines met with Principal May and Assistant Principal, Krutz, to complain about receiving the dramatically uneven teaching loads.

49.

During the meeting, Gaines began by listing her contributions since being at Mill Creek Middle School.

50.

Gaines specifically asked May and Krutz if there had been any complaints by parents, peers, and students about me. They replied that there had not been.

51.

When Gaines asked why he had made this uneven schedule, May's only response was that he was "shaking things up."

52.

When Gaines specifically alleged age discrimination, Krutz replied that she did not even know that Gaines "was old."

53.

Kurtz asked Gaines what teaching assignments she hoped for.

54.

Gaines replied that she wanted a more even workload distribution, not just for herself, but for the students needing special support. She specifically suggested two remedial classes and two advanced classes so she could provide the special services and documentation required for those students.

55.

Gaines also replied that she would prefer at least one advanced class because she had just completed her specialist training on curriculum and instruction for Social Studies.

56.

But her main concern was that she did not believe any teacher could sustain that workload and provide students with the teaching and services they deserved (or were required by law to receive).

57.

She also expressed that this workload could lead to students not receiving complete services or documentation, to their detriment. But this could also lead to legal liability.

58.

After the meeting, Gaines sent May and Kurtz an email, once again, requesting a more even distribution of the teaching load.

59.

Neither May, nor Kurtz, ever replied.

60.

Around May 21-23, Gaines spoke to Thompson and stated she had no hope they would change her class assignments.

61.

Even though he was the Director of HR, Thompson failed to follow the District's Harassment Policy at that time, which required him or a designee to help Gaines put her age discrimination complaint in writing so that it could be investigated.

62.

The District did not investigate Gaines' age discrimination complaint before she filed an EEOC Char

63.

The 2020-21 school year ended on or about May 28, 2021.

64.

On or around July 20, 2021, May communicated the final schedule for the 2021-22 school year.

65.

Instead of lessening the teaching load, just two months after her age discrimination complaints, May retaliated against Gaines by assigned her around twelve students more to teach digitally simultaneously with one of her remedial classes. This added even more in-class students with remedial, ESOL, Special Education, and 504 plans to her teaching load.

66.

May did not assign any other Seventh Grade Social Studies teacher a live online class, much less one of students needing special support.

67.

This additional workload increased Gaines's teaching load to approximately 80 hours a week.

68.

Gaines could not reach Thompson, so she contacted Kerri Martin, Executive Director of the Administrative Leadership for Elementary Schools.

69.

Martin had Mark Merges, Executive Director of Administrative Leadership Office of School Operations, who was May's supervisor, call Gaines back.

70.

She explained the situation to Merges, including examples of the pattern of May targeting other older teachers.

71.

Merges agreed that it appeared that the teaching load assignment to her was "insane."

72.

Merges stated that he would investigate further and speak to May.

73.

But Merges never responded to Gaines.

74.

Gaines complained to Thompson that May had retaliated against her for complaining of age discrimination by further increasing her teaching load.

75.

Thompson replied that she needed to accept that May could give her any teaching schedule he wanted. This was alarming because, as Director of HR, Thompson should have known that May could not discriminate based on age. Instead, Thompson allowed May the discretion to discriminate in teaching assignments.

76.

Instead of investigating or stopping age discrimination, Thompson suggested that Gaines write May a letter expressing her "angry feelings," and then mail it or burn it.

77.

Since no one would take action to end May's discriminatory treatment, Gaines asked Thompson if she could immediately retire.

78.

Thompson threatened Gaines by stating that if she retired early, just as the academic year she had contracted for started, the District would void her teacher certification.

79.

Instead, Thompson stated that she must stay at least through the end of September 2021 to give the school time to hire a replacement.

80.

She agreed to do so, and notified May by phone call and email of her
intent to retire on September 30, 2021.

81.

Gaines had no other choice but to retire, which is what May intended.

82.

In the previous two academic years, May had visited her classroom two
or three times, but never while teaching. After she complained of age
discrimination and retaliation, he began to monitor her classroom on almost
a daily basis (including while she was teaching), asking her questions in a
snide and condescending manner.

83.

Just as she had communicated to May, Kurtz, Thompson, and Merges,
performing her job to standard with this uneven and heavy teaching load
proved virtually impossible.

84.

Not only was this workload not sustainable, but Gaines believed that
she was subjecting herself and the District to legal liability because she could
not service and document the services performed for those students requiring
that level of service and documentation.

85.

After she brought an EEOC Charge, Gaines contacted Thompson's replacement as Director of Human Resources, Rick Beaulieu, to ask for help receiving references so she could perform substitute teaching for the Cobb County School District. Beaulieu never responded.

86.

Beaulieu's refusal to respond led to Gaines losing out on one assignment due to this retaliation.

87.

After this, Gaines contacted the District's Chief Operating Officer, Deborah Murdock. She instructed Beaulieu and May to provide the references.

88.

Besides discriminating based on age, May also uses class assignments to drive African-American teachers from Mill Creek, which has a predominantly white student population.

## COUNT ONE
## DISCRIMINATION UNDER THE ADEA

### 90.

At the time of the actions leading to her constructive discharge, Gaines was 65 years old.

### 91.

To force Gaines to retire or transfer, May assigned her a disproportionally and excessively heavy teaching load that no teacher could reasonably sustain. This teaching load was not only unusual, but an unrealistic level of work for any single teacher.

### 92.

Even under a normal regular teaching load, May usually worked 45-50 hours per week. Under this new teaching load, Gaines must work at least 75-80 hours per week.

### 93.

In contrast, the three other younger Seventh Grade Social Studies teachers were assigned almost entirely advanced classes with nearly no students requiring remedial services or documentation.

### 94.

This teaching load would only require about 40-45 hours per week.

95.

This change in teaching load (almost doubling the work hours) is a significant and material change in the terms and conditions of Gaines's employment.

96.

In addition, not assigning Gaines any advanced classes, and assigning her the only remedial classes, caused a loss of status.

97.

May took this action because he wanted to replace Gaines with a younger teacher.

98.

May replaced Gaines with a significantly younger teacher, Cade Curtis, who had never been asked to return to any school he had worked for. Upon information and belief, Plaintiff believes Curtis has had a substandard job performance.

99.

The teaching load was indeed unsustainable and unworkable. Gaines could not perform all the services and documentation her students required. As expected, she had to work at least 75 to 80 hours per week.

100.

Due to this adverse action of assigning her this teaching load, and increasing it further after she complained of discrimination, May forced to retire on September 30, 2021.

101.

The reasonable person in Gaines's position would have felt compelled to retire.

102.

Because she retired early, her monthly retirement benefits payment for the rest of her life will be less than it would have been had she retired later.

103.

Although Gaines has retirement health insurance benefits, this does not include the dental, vision, and life insurance she would have had as an active employee.

104.

Besides the financial impact, these discriminatory acts caused Gaines emotional distress.

105.

As a result of Defendant's discriminatory acts, Plaintiff is entitled to recover the relief requested below.

## COUNT TWO
## RETALIATION UNDER THE ADEA

### 106.

Plaintiff engaged in protected activity under the ADEA when she complained of age discrimination in the assignment of her teaching load to May, Kurtz, and Thompson.

### 107.

Rather than respond to her age discrimination complaint, and reduce her teaching load, May increased her teaching load further by adding more students needing services, whom she would simultaneously teach online.

### 108.

A reasonable employee would have found the further increase in teaching load after her discrimination complaint to be materially adverse, meaning it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

### 109.

Due to this further adverse action of assigning her even more of a teaching load after her age discrimination complaint, Gaines was forced to retire on September 30, 2021.

110.

The reasonable person in Gaines's position would have felt compelled to retire.

111.

When Gaines notified Thompson of her intent to retire, he warned her that this could affect her teaching record if she did not wait until the District could hire a replacement.

112.

To keep her teaching certificate without blemish, Gaines put off early retirement until September 30, 2021.

113.

Gaines also engaged in protected activity when complaining of age discrimination and retaliation to Merges.

114.

Gaines also engaged in protected activity under the ADEA when she filed an EEOC Inquiry and Charge.

115.

Defendant further retaliated against Gaines when its Director of Human Resources refused to assist her in obtaining references for substitute teaching applications for Cobb County.

116.

His refusal resulted in Gaines losing a substitute teaching opportunity.

117.

The retaliatory acts caused Gaines to suffer emotional distress.

118.

As a result of Defendant's retaliatory acts, Plaintiff is entitled to recover the relief requested below.

WHEREFORE, Plaintiff prays:

a.      That Summons issue requiring Defendant to answer the Complaint within the time provided by law;

b.      That Plaintiff be awarded a declaratory judgment that Defendant violated the ADEA;

c.      That Plaintiff recover from Defendant back pay and benefits with pre-judgment interest;

d.      That Plaintiff recover compensatory damages against Defendant in an amount to be determined by a jury;

e.      That Plaintiff recover liquidated damage against Defendant in an amount equal to any amount awarded for back pay and benefits;

f.      That the Court order Defendant to reinstate Plaintiff, or in lieu of

reinstatement, pay her front pay and benefits;

g.      That Plaintiff recover attorney's fees and costs of litigation under the

ADEA and any other applicable federal law;

h.      That the Court award Plaintiff any other or further relief as it deems

necessary and proper, or equitable and just.


**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS**


    Respectfully submitted this 11th day of August, 2023.

                T. Robert Reid, LLC

                <u>s/ Tilden Robert Reid, II</u>
                T. Robert Reid
                Ga. Bar No. 600138

                1030 Woodstock Road
                Suite 3112
                Roswell, Georgia  30075
                Telephone (678) 743-1064
                Facsimile (404) 549-4136
                robreidattorney@gmail.com

                Attorney for Plaintiff