# EXHIBIT 8

## (Renee Dahring Preliminary Report)

Renee Dahring, MSN, APRN, CNP, CCHP, FAANP<br>
3110 Evelyn Street<br>
Roseville, Minnesota  55113

I. **Introduction**

Plaintiff counsel has retained me as an expert on correctional health and nursing to render opinions regarding the nursing care of Quennel Warren, while she was in custody at the Clayton County Jail on September 7-12, 2021.

II. **Statement of expertise and qualifications**

I am an advanced practice registered nurse (APRN) and board-certified Family Nurse Practitioner in Minnesota. I received my BSN from North Dakota State University in 1989 and my MSN from the University of Minnesota in 2000.  I have been a registered nurse (RN) for 35 years and a family nurse practitioner for 23 years.  As an NP I have 22 years of experience in providing care for individuals in correctional settings.  My experience includes approximately 4 years providing primary care in the Minnesota prison system and over 18 years providing services to male and female detainees in both urban and rural jails in Minnesota. For two years I was the lead nurse practitioner and Director of Clinical Services for the two Adult Facilities and the two Juvenile Correctional Facilities in Ramsey County in St. Paul Minnesota. I currently conduct clinic hours for inmates in Hennepin County, Minnesota on behalf of Centurion. I am certified as a correctional health professional (CCHP).  I have been a regular speaker for the last 10 years at the Minnesota Sheriffs Association annual state conference for correctional nurses and other healthcare providers and have spoken at several national correctional conferences.  I attend the National Commission on Correctional Healthcare (NCCHC) national conference on correctional health care yearly and I serve on their Nurse Advisory Council.   I also am an instructor in the school of nursing at the University of Minnesota - Twin Cities and Metropolitan State University in St. Paul. I am a Fellow of the American Association of Nurse Practitioners (AANP). These experiences form the basis of my knowledge regarding standards of care that I believe are relevant to the issues in this case.

III. **Compensation**

I am being compensated for my review of all medical records, phone discussions, report writing, preparation for depositions and court testimony at $225.00/hr.   Any transportation, mailings, or copying at a rate of $50.00/hr. Deposition or expert witness testimony at trial at a rate of $350.00/hr with a four (4) hour testimony minimum. Travel time for deposition or court testimony is $50/hr portal to portal.

IV. **Depositions and Testimony at Trial during the past 4 years**

Depositions:
 Bowles v Bourbon County, Kentucky, et al, Eastern District of Kentucky, Central Division at
    Lexington 3:16-CV-00069-GFVT, plaintiff
 Rowland v Franklin County, Kentucky, et al Eastern District of Kentucky, Central Division at
    Frankfort 3:18-CV-33-GFVT, plaintiff
 Reece v Shelby County, Eastern District of Kentucky, Central Division at
    Frankfort 5:17-cv-00434-KKC, plaintiff

Lacy vs. Anderson, et al., Western District of Wisconsin, 20-cv-1014-JDP, defense

Phillips, et al. vs. Perkinson, et al.  United States District Court Eastern District of North Carolina Western Division, no. 5:21-ct-3099-m. Plaintiff

Sosa v CFG Health Systems, et. al. United States District Court District of New Jersey, no 2:20-cv-00777-CCC-MF. Defense

Trial:

Michael Derby and Janice Derby v Columbia County, Jeffrey Dickerson, John Does 1-10, Chris Hoover, Justin Hecht, Columbia Community Mental Health, Karen Fortlander, Unity Center for Behavioral Health, State of Oregon for the county of Multinomah, 19CV17239, plaintiff

**V.     Materials provided but not reviewed in forming these preliminary opinions**

911 Call For Service by Q. Warren

Bodycam of Responding Officer dated 9/7/2021

911 Call for Service by Clayton County Jail dated 9/9/2021

Warren Audio Telephone Call from CCJ dated 9/7/2019

Warren Audio Telephone Call from CCJ dated 9/9/2019

Barnes Audio Interview by Internal Affairs dated 10/20/2021

K. Johnson Audio Interview by Internal Affairs dated 10/20/2021

A. Fraser Audio Interview by Internal Affairs dated 10/20/2021

Eagles Landing Diabetes

Southside Medical Center

 United Physician's Group

Trinity Services Group Meal Records

CCPD Incident Report No. 21050864

CCPD Incident Report No. 21050868

Housing Unit Log

**VI.    Materials reviewed in forming these preliminary opinions.**

Quennel Warren's Detention and Medical Records from:

> CorrectHealth
> Suicide Watch list from Clayton County
> Clayton County EMS
> Grady Hospital

 Suicide Watch Log for Q. Warren

Clayton County Request for Proposal (Healthcare Services)

CorrectHealth Initial Health Services Contract

Inmate Classification History for Q. Warren

Correctional Nursing Scope and Standards of Practice

**VII.** **Chronology**

September 7, 2021

Ms. Warren is admitted into the Clayton County Jail at approximately 3:50pm.

5:16pm: Medical intake is completed by MA Smith and reviewed and co-signed by RN Calderon at 5:24pm.  Ms. Warren was classified as a Type 2 diabetic.  At the time of the intake screening Ms. Warrens blood glucose reading is 140. Blood sugar goals for a Type 1 diabetic range from 70 to 130 before meals and less than 180 after meals.  She is noted to have diabetes and to be currently taking 2 types of insulin, Humalog and Humulin R and to have a past medical history of being hospitalized for 2 weeks for her diabetes. Her physical exam is documented as "WNL" which means "within normal limits".

6:00pm: RN Calderon enters an order from NP Wint for Ms. Warren to receive Novolin 70/30 10 units BID (twice daily) Novolin R sliding scale coverage BID and Accu checks (blood glucose readings) BID along with a 2800 calorie ADA diet with bedtime snack.

September 8, 2021

4:34am: Blood glucose reading is extremely high at 430 and Ms. Warren is administered 10 units of Novolin 70/30 insulin and 1 unit Novolin U-100 insulin by RN Bea.

3:52pm:  NP Sims admits Ms. Warren to the infirmary for dizziness, nausea and vomiting. His initial clinical impression is 1). DM (Diabetes) poor control 2). Dehydration 3). Nausea.  He orders a diabetic diet, vs twice a shift and blood sugar readings TID (three times a day) along with lab orders to check her urine for ketones, a complete blood count, a comprehensive metabolic panel, lipids and a hemoglobin A1c (average of blood sugar readings over the past 90 days. He orders an IV of 1 liter of normal saline to be given as a bolus (rapid administration) and then to be followed by an additional liter at a rate of 250ml/hr.  Insulin order for 10 units of 70/30 and 8 units of regular insulin is to be administered immediately and to repeat blood sugar check in 2 hours and notify him of results. An anti-nausea medication, ondansetron, is also ordered to be given twice a day. There is no documentation that the labs, the IV fluids or the repeat blood sugar check was completed as ordered.

10:13pm:  NP Eccleston notes on infirmary rounds that Ms. Warren is sleeping but awakens easily and denies pain but reports feeling weak and tired.  A detailed physical exam is noted which includes a gait evaluation and neurological tests. Her clinical impression is dehydration and diabetes and orders to continue the current therapy.

September 9, 2021

2:39am: Blood glucose reading is elevated at 206.  LPN Mann administers 1 unit of Novolin R U-100 insulin.

3:08am:  LPN Mann administers. 14 units of Novolin 70/30 insulin.

4:07am: LPN Mann documents a brief assessment which indicates Ms. Warren accepted her medications and meals.

7:50am: RN Reid marks the orders for urine, labs, blood glucose re-check and IV fluids as completed although there is no documentation these orders were ever carried out.

11:07am:  RN Reid enters a note in the flowsheet which includes no clinical information or assessment except for recording a regular diet and diagnosis of Type 2 diabetes.

11:54am: Ms. Warren is transferred back to general population per order from MD Clopton. No encounter or examination is noted. Orders for BID regular insulin coverage per protocol are entered.

Of note: At 4:07am and 12:13pm Ms. Warren's vital signs (blood pressure, pulse, temperature and O2 saturation readings are documented to be the exact same reading except for the respiratory rate.

2:02pm: RN Madu Sterling backdated note entered at 5:25pm indicates approximate time of fall to be 2:02pm and documents "inmate on floor crying and c/o pain to right leg". Transfered to infirmary.

2:07pm: Admitted to the infirmary per note from MH professional Thibodeaux after injury from fall.

2:45 to 6:15pm.  Placed on suicide watch and RN Reid notes and highlights on suicide watch form "broke leg".

3:52pm: NP Wint documents Ms. Warren was brought to medical after "a suicide attempt by jumping from 2nd floor in housing unit".  She also documents that Ms. Warren is "crying without a tear" and her "complaints were rapidly changing as the assessment progressed" and that she observed "no bruising or swelling on inmates body".  Her physical exam indicates no abnormalities, and that Ms. Warren was able to move her lower extremities without pain and that PROM (passive range of motion) which means that the examiner moved her extremities was "achieved without a wince".  NP Wint's Notes go on to state that Ms. Warren complained of back pain and that she was able to stand "without grimace".  She is admitted to the infirmary on a suicide watch and a mental health consult is ordered along with X-rays of her "right side, leg and foot" along with pain management and continuing current medications. There is no record that any of these orders being carried out by the healthcare staff.

4:54pm:  MD Clopton is contacted; a right distal fracture is noted by RN Madu and a transport form is initiated.

5:25pm: A note by RN Madu Sterling notes that Ms. Warren had been transferred to medical after her injury and was observed to be crying and complaining of severe pain and was evaluated by MD Clopton and ordered to be sent to the hospital for "evaluation of right leg fracture".

5:49pm: Clayton County EMS is notified.

6:28pm: Clayton County EMS arrives on scene and documents they found the patient was on a back board and with C spine precautions and she complained of right ankle and right lower back pain. EMS noted the patient's right leg appeared shorter which raised suspicion of a hip fracture. EMS administered a powerful pain medication (Fentanyl) intravenously prior to transport.

6:51pm: RN Madu Sterling offsite referral notes Ms. Warren was transported to Southern Regional Hospital for her right distal leg fracture.

7:00pm: Ms. Warren arrives at Grady Hospital Emergency Department and is diagnosed with pelvic, ankle and lumbar spine fractures. Her labs were abnormal and indicated her to be in diabetic ketoacidosis (DKA).  She was admitted to the surgical intensive care unit (SICU) started on an insulin drip and once her DKA was stabilized underwent surgical repair of her fractures and was discharged on September 21st, 2021.

VIII.     **Summary findings**

Ms. Warren had previous admissions to the jail in which she was documented to have Type 1 diabetes. Type 1 diabetes is a condition in which an individual does not make any insulin and requires insulin injections 4-5 times a day in order to live.  If persons with this type of diabetes do not receive insulin injections or adequate amounts of insulin based on their food intake they will go into diabetic ketoacidosis (DKA) within less than 24 hours.  DKA is a life-threatening situation which requires immediate hospitalization to correct. Upon admission, Ms. Warren was incorrectly categorized as having Type 2 diabetes, despite records at the jail indicating she was a Type 1 diabetic and had previously required multiple insulin injections a day. Ms. Warren's intake also contained information consistent with a Type 1 diabetic, such as use of insulin only, an onset of diabetes at an early age, normal weight, and a history of hospitalizations for diabetes, which competent nurses and providers would expected to recognize. Failure to do so falls below the standard of care.

The day following Ms. Warrens admission to the Clayton County Jail she is clearly exhibiting signs of diabetic crisis which is characterized by hyperglycemia and a high risk of impending diabetic ketoacidosis.  Diabetic ketoacidosis symptoms include: a blood glucose reading higher than 250, nausea and vomiting, abdominal pain, weakness, dehydration, and a "fruity" breath odor.  When Ms. Warren's blood glucose reading was over 400 in the early morning hours, she was administered insulin, no call was made to the provider, no steps were taken to rule out DKA and she was never rechecked.  This does not meet the standard of care.  Considering the rapid onset of DKA and that DKA is an emergency, Ms. Warren should have received an evaluation with consideration of a transfer to the hospital.

Later the same day Ms. Warren was clearly exhibiting the alarming symptoms of DKA, which is a medical emergency, when she was admitted to the infirmary by NP Sims.  NP Sims does a partial evaluation, orders lab tests and a recheck which never occurred but were later marked as "complete" by RN Reid.  NP Sims orders IV fluids, of which there is no documentation was ever completed, prior to establishing an actual diagnosis. The initiation of a treatment prior to determining an accurate diagnosis is below the standard of care. The failure of a nurse to follow orders or notify the provider as to why the orders were not carried out, is a deficient practice.

Provider notes look to be boilerplate and not individualized to the patient. The notes all lack a meaningful history, and the physical exam is a checklist that appears to be pre-populated.  In fact, Ms. Warren's vital signs are documented to be exactly the same on two separate occasions, except for respiratory rate, which is not credible and calls into question the validity of the documentation.

Ms. Warren is discharged from the infirmary to general population by MD Clopton without receiving an evaluation or an inquiry into lab results or even a current blood sugar. This falls below the standard of care for discharge from an infirmary level of care.

Around 2:07pm Ms. Warren is injured when she falls from a height of at least 2 stories, and she is brought to the medical unit.  No vital signs, pain management, supportive nursing care or evaluation is performed for almost 2 hours.

NP Wint astonishingly documents at 3:52pm a completely normal exam including remarks about the absence of bruising or swelling and goes on to repeatedly use unprofessional language and unscientific measures such as the presence of tears as a means of evaluation of Ms. Warren's injuries.  NP Wint indicates Ms. Warren is able to bear weight which is completely inconsistent with the injuries she is later documented to have sustained. Asking a person who has just fallen from such a great height to stand is cruel and dangerous. A fall from a height of 2 stories is an emergency and in my experience has always resulted in serious injuries such as fractures, spinal and heard injuries and even death. NP Wint was not only callous and indifferent to Ms. Warren's pain and serious injury, but she also fails to take into account diabetes as a complicating factor.

Approximately 3 hours after her fall MD Clopton ordered Ms. Warren to be transferred to the local emergency department for evaluation of a fracture. EMS was notified almost 4 hours after Ms. Warren is injured. Upon arrival EMS readily appreciates visually that Ms. Warren has a likely pelvic fracture, a leg fracture and was in extreme pain. Upon arrival at the hospital MS. Warren was in fact found to be suffering from multiple serious fractures of the pelvis, spine and leg as well as being in DKA. She was admitted to an intensive care unit and after her DKA was treated she undergoes surgery.  The failure of NP Wint to appreciate such obvious injuries is grossly incompetent.

IX. **Conclusions and opinions**

Ms. Warren did not receive adequate care for her diabetes or her progression to DKA, and was subsequently allowed to develop DKA despite the healthcare team having knowledge available of her Type 1 diabetes diagnosis in her chart from previous admissions. In my experience Type 1 diabetics are extremely knowledgeable about their disease and would verbally inform caregivers of their condition as they know the serious and life-threatening consequences of inadequate treatment. The healthcare staff failed to appreciate the obvious indications of her Type 1 diabetes and risk of life-threatening DKA, which should be common knowledge to nurses and providers.  Care was inadequate and foreseeable complications occurred due to the lack of proper care.

After her fall, Ms. Warren was ignored and allowed to suffer despite injuries that were obvious and would have been apparent to even a lay person.  Ms. Warren had a complicating factor of

diabetes which elevated the seriousness of her injury yet was never addressed. The response to her serious injuries was unnecessarily slow, the staff displayed a shocking lack of concern in the period immediately after her fall.

The overall lack of accurate and consistent documentation, the failure to carry out orders, and poor communication among the healthcare team falls far below the standard of care.

For purposes of satisfying Georgia Medical Opinion requirements, my current findings include but are not limited to:
1) RN Calderon's inaccurate recording of Ms. Warren's diabetes diagnosis fell below the standard of care.
2) RN Bea's failure to conduct a proper assessment and notify a provider of a dangerously high blood sugar falls below the standard of care.
3) NP Sims failed to do a complete assessment when Ms. Warren was admitted to the infirmary with signs of a diabetic crisis, which falls below the standard of care.
4) NP Eccleston, RNs Mann and Reid all failed to execute and/or follow up on current orders in the system for Ms. Warren which does not meet the standard of care.
5) RN Reid falsely marked orders complete without carrying out those orders, this falls below the standard of care.
6) RN Madu Sterling's failure to provide immediate nursing interventions, carry out prescribed orders, or escalate to a higher level of care when Ms. Warren was admitted to the infirmary falls below the standard of care.
7) NP Wint's delay in providing appropriate treatment and evaluation, her conduct and attitude which was reflected in her unprofessional documentation of Ms. Warren's injuries falls below the standard of care.
8) NP Wint's failure to immediately transfer Ms. Warren to a higher level of care to treat her serious physical injuries falls below the standard of care.
9) RN Reid's failure to execute orders for pain management, X-rays, and continued insulin falls below the standard of care.
10) RN Reid failed to provide any nursing interventions after noting Ms. Warren's "broken leg" which falls below the standard of care.
11) RN Reid failed in her duty to seek a higher level of care for Ms. Warren's serious injury falls below the standard of care.

I hold all my opinions stated above to a reasonable degree of nursing and medical certainty. My opinions are based on the documents I have reviewed, and I reserve the right to change my opinions if additional information or documents are provided to me.

_____            __May 9, 2023_
Renee Dahring, MSN, APRN, CNP, CCHP, FAANP                    Date