# EXHIBIT 14

## (Howard Krone, M.D. Preliminary Report)

# Howard B. Krone, M.D.
Fellow American Academy of Orthopaedic Surgeons
3025 Maple Drive, Suite 2
Atlanta, Georgia 30205

June 1, 2023

Nina Butler
Injury Claims Solutions
2045 Rockbridge Rd, S.W.
Stone Mountain, Georgia 30087
E-mail: ics@injuryclaimssolutions.com

RE:   Warren, Quennel
Date of Incident:  September 9, 2021

Dear Ms. Butler:

Ms. Warren called 911 after being locked out of her apartment by her boyfriend. Prior to this she had a long history of being a type I diabetic on various injectable diabetic medications. Even with these and with monitoring, it was difficult to control her blood sugars. She had been detained on other occasions at Clayton County jail where there was a specific medical history of her prior type I diabetes and varying blood glucose tests. Eventually she was admitted to Clayton County jail on September 7, 2021. On the medical intake completed by nurse Letitia Smith, it was noted that Ms. Warren's current medications were Humalog, Humulin R, and that she had a history of diabetes. Her blood sugar on admission was 140. Ms. Warren was noted as not having any thoughts or plans of harming herself or suggested any self-injurious behavior. She also did not appear to be under the influence of or withdrawing from drugs or alcohol. A detailed physical was performed by nurse Katherine Calderon stating that everything was within normal limits.

She was housed in Housing Unit #3 Section 5. Apparently on the date of the incident she was noted to let go from bars on the second floor. She then fell backwards. After the fall one of the inmate workers stated that, "You could tell she was in pain at that point…..I just remember her hollering." After the fall a Ms. Johnson reported that Ms. Warren "was mostly screaming in pain, and I called for a paramedic a few times." A jailer, A. Fraser, reported that, "As she fell down her feet touched the floor first, but I believe that she of course landed on it incorrectly which caused her to get an injury on the right side of her body. She fell on I believe it was her right leg and her right arm. She was crying out loud until the paramedic got there."

Nurse Marvet Wint evaluated her and stated she was "alert and making crying sounds without a tear. Under the skin assessment it was noted that neither bruising, scratches nor swelling noted on inmate's body." Under the musculoskeletal and extremities examination it was noted that she was able to move her lower extremities without pain. Nurse Wint stated that the inmate stated that "her foot hurt and that passive range of motion was achieved without a wince and no edema was noted." Finally, under the other section it was noted that, "Inmate stated after ROM that her right back hurt. No

**WARREN, QUENNEL**
**Page 2 of 4**

impairment was noted. The skin was intact. There was no edema or variation in color or no scratches seen." It stated that the "<u>Inmate was able to stand without grimace</u>."

Based off of these examinations, nurse Wint decided "to admit to infirmary on suicide watch and x-ray right side leg and foot and initiate pain met and refer to mental health for evaluation and treatment." Finally nurse Wint's clinical impression was that she was a "suicide attempt." There were no records that an x-ray was performed or that pain management was administered or that Ms. Warren was given any insulin treatment or special diet meals.

When Ms. Warren was placed on suicide watch nurse Pricilla Madu-Sterling entered a note in Ms. Warren's chart identifying that she was "crying with complaints of severe pain." Nurse Amber Reed made a notation of "broke leg." Ms. Warren was then evaluated by Dr. Klopton, and it was ordered that she be transferred to a hospital for evaluation of right leg fracture.

When the Clayton County EMS arrived at the jail, Ms. Warren was complaining of right ankle and right lower back pain, and the paramedics noted that her "right leg appears to be shorter than the left leg with possible hip fracture."

She was then admitted to the Grady Hospital emergency room where her initial complaints were pain to her right hip, right thigh, right leg and abdomen. She also reported "numbness and tingling in the bilateral lower extremities." They also noted that upon admission her right ankle had been splinted while on a backboard with a cervical collar in place. It was here that x-rays were taken of her right ankle, right foot, right tibia and fibula, right knee and right femur, and she was noted to have a type III pilon fracture with associated lateral malleolar fracture as well as fractures of the right superior and inferior pubic rami. A later fracture of her ankle was taken which noted a minimally displaced distal tibia fracture extending to the tibial plafond and lateral malleolus fracture. In addition, asymmetry of the ankle mortis was noted consistent with underlying ligamentous injury.

Following this a CT scan to her chest, abdomen and pelvis with contrast were noted which demonstrated a burst fracture of the L1 vertebral body with at least 30% anterior height loss and 4 mm of retropulsion in the canal. In addition, there was very slight height loss of T4, T5 and T7 bodies. It also noted nondisplaced fracture of the right L5 pedicle and transverse process fracture with associated zone 2 right sacral fracture with fracture extension to the right sacroiliac joint and associated fractures of the right superior and inferior pubic rami with small right pelvic side wall hematoma.

X-rays of her pelvis confirmed acute fractures of the superior and inferior pubic ramus on the right with approximately 4 mm of lateral displacement.

They initially performed a closed reduction on her right ankle and placed her in a plaster coaptation splint.

**WARREN, QUENNEL**
Page 3 of 4

At 11:55 p.m. on September 9, 2021 orthopedist Dr. Armand Sharma noted an "unstable pelvis needs OR in AM." This was delayed due to her diabetic problems.

On September 13, 2021 she underwent her first surgery which included percutaneous fixation of the posterior pelvic ring, open reduction and internal fixation of the anterior pelvic ring, and finally a closed reduction and application of multiplane external fixator to the right pilon ankle fracture.

I then reviewed the postoperative x-rays which to me showed excellent reduction of the displaced pelvic fractures and pilon fractures.

Two days later on September 15 she started occupation therapy.

She underwent a second surgery on September 20, 2021 involving open reduction and internal fixation of the right pilon ankle fracture with fixation of the tibia and fibular as well as removal of the external fixator under anesthesia of the right ankle. I reviewed AP and lateral x-rays of the right distal tibia and ankle which show excellent reduction of the ankle mortis, fibular fracture, and pilon fracture.

She was discharged from Grady Hospital on September 21, 2021, 12 days after admission. She was ambulating with a TLSO back brace and rolling walker. She also had a boot on her right lower leg and foot.

On reviewing this case and the complaints and the physical findings in my opinion it should have been obvious that Ms. Warren had likely suffered broken bones after her fall to her right ankle, possibly foot, distal tibia, pelvis and lumbar spine. The severity of the ankle fracture in the two-storey fall directly on her right lower extremity would have produced immediate swelling in the right foot, right ankle and right distal tibia. She would also have complained of significant pain involving her lower abdomen where she had the pelvic fractures in the posterior aspect of the pelvis where she had the sacroiliac joint subluxation. She would have also complained of pain in the lower lumbar area where she had multiple compression fractures and would have had significant point tenderness if touched by an examiner in any of these areas where the fractures were present from the ankle to the distal tibia to the pelvis and the back. Weightbearing would have definitely made her ankle fractures worse since the pilon fracture is comminuted and extremely unstable. It could possibly have also caused more displacement of the pelvic fractures depending on how much weight she was made to bear. I do not think that it would have displaced the compression fractures. As far as range of motion testing passively, which involves an examiner moving an extremity through a range of motion she could not tolerate, that she will allow this and this would also risk displacing the ankle fracture even more.

On reviewing this, her fractures in the pelvis, ankle and distal tibia were operated on with excellent postoperative reduction at Grady.

I would hope and assume that they should go on to healing by 6 months postoperatively. Until that time, she would be on limited weightbearing of the right lower extremity using

**WARREN, QUENNEL**
**Page 4 of 4**

a roller for approximately 8 weeks and then progressive weightbearing on crutches or using a cane subsequently. She would have to use the back brace until approximately 6-8 weeks postoperatively. She will require extensive range of motion and strengthening exercises to the right lower extremity in physical therapy for approximately 3 months post discharge.

There is the possibility of her requiring future surgeries including possible removal of the hardware in the ankle needed to reduce her distal tibia and ankle fractures since some people develop pain in the skin overlying the hardware and subsequently need another operation to have this hardware removed. In addition, the hardware would have to be removed if she developed aggressive degenerative arthritis in the ankle joint which is quite a high probability in a pilon fracture and would require either an ankle replacement or an ankle fusion in the future to alleviate future pain. The hardware in the pelvic area should not need to be removed.

Obviously if future operations on the ankle are concerned, it would also involve a long period of rehabilitation.

I also want to address the injuries to her low back. The compression fracture was significant being over 30%, and there was evidence of retropulsion. It is most probable that she would continue to have some degree of pain in the low back from this injury. The lesser compression fractures at different levels might also cause some pain. At the time of her discharge from Grady she did not exhibit any obvious sensory or motor impairment due to the retropulsion, but over a period of time there is the possibility that this would occur as the disc degeneration at this level became worse. If it occurs here also she might require operative intervention perhaps including a spinal fusion.

I am board-certified by the American Orthopaedic Board of Surgery. I am a fellow of the American Academy of Orthopaedic Surgery. I am licensed to practice medicine in the states of Florida (license #153872) and Georgia (license #14192).

Sincerely,

DocuSigned by:
*H.B. Krone MD*
534E1451CB3B48C...
Howard B. Krone, M.D.

HBK:tlh