**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **DENNIS W. GILREATH, SUSAN A. GILREATH, AND GREG GILREATH**<br><br>    **Plaintiffs,**<br><br>**vs.**<br><br>**BOLEMAN CONTRACTORS, LLC, TIMOTHY M. BOLEMAN, PHILIP BOLEMAN, JOSEPH L. NAYLOR, ELEMENT RESTORATION GROUP, LLC, TESA, LLC, BLUSKY HOLDINGS LLC, TIMOTHY BROCK BOLEMAN, ADELYN BOLEMAN, JENNIFER BROCK BOLEMAN, AND JENNIFER BROCK BOLEMAN AND TIMOTHY M. BOLEMAN, IN THEIR CAPACITIES AS CO-TRUSTEES OF THE JENNIFER BROCK BOLEMAN REVOCABLE LIVING TRUST.**<br><br>    **Defendants.** | **CIVIL ACTION FILE**<br><br>**NO. _____**<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

COME NOW Dennis and Susan Gilreath and their son, Greg Gilreath, (collectively, the "Plaintiffs"), and file their Complaint against Defendants, respectfully showing the following:

<u>Introduction</u>

This is a civil action brought by a retired California couple and their son against a builder that fraudulently induced them to pay them hundreds of thousands of dollars and then left them high and dry. Fourteen months after signing contracts with the Plaintiffs,

the company shut its doors, before the first hammer was even swung on homes that were supposed to have been completed within eight months. The evidence strongly suggests that the now defunct builder diverted Plaintiffs' money to other projects or used it on personal matters, in violation of Georgia law.

Plaintiffs recently discovered that the builder's chief executive officer ("CEO"), Tim Boleman, transferred the title of his house out of his name in the fall of 2021, presumably concerned about liabilities. Around the same time, Plaintiffs now know, the CEO admitted to another customer that he was having financial hardship, which was not long after he had signed the contract at issue in this case. In May of 2022, Plaintiffs discovered that the builder had failed to pay several subcontractors on their project despite having taken in over $200,000 from the Plaintiffs.

Plaintiffs realized something may be amiss in the spring of 2022. To find out what was going on since they were thousands of miles away, they scheduled a meeting between their Georgia-based CPA and the CEO to go over invoices and the status of the project. When the CPA showed up, the CEO canceled the meeting, told the CPA to tell Plaintiffs to sue him, and terminated the permits. Shortly thereafter, the builder's CEO's son and daughter-in-law bought a house with $50,000 in cash as a down payment, the CEO's brother started another construction company, and the CEO announced he was retired. Plaintiffs never received a penny back from their deposits or an explanation for where all of their money went. It is not yet clear whether the builder closed its office shortly before or shortly after the canceled meeting.

What is clear is that while the builder was busy spending Plaintiffs' money, Dennis Gilreath suffered a stroke and declining health. As shown below, the builder's officers and agents knowingly made repeated misrepresentations to get Plaintiffs to keep writing

checks. Defendants' fraud, malfeasance and exploitation of elders have caused the Plaintiffs

substantial damage, financially, emotionally, and physically.

<u>The Parties</u>

1.

Dennis W. Gilreath ("Dennis") and Susan A. Gilreath ("Suzanne") (collectively, the

"Gilreaths") are citizens of the State of California, residing at 408 Lake View Court, Oakley,

California 94561.

2.

Greg Gilreath ("Greg" or the "Son") is the adult son of the Gilreaths and is a citizen

of the State of California, residing at 404 Lake View Court, Oakley, California 9461.

3.

Defendant Boleman Contractors, LLC (the "Boleman Contractors" or the "Defunct

LLC") is a limited liability company formed in the State of Georgia, whose principal place of

business, according to the Secretary of State, is 322 Oak Street, Suite 1, Gainesville, GA

30501. Service upon the Defunct LLC may be effectuated by serving its registered agent,

Tim Boleman, at the registered office, 322 Oak Street, Suite 1, Gainesville, GA 30501, or as

otherwise authorized by law.

4.

Defendant Timothy M. Boleman ("T. Boleman" or "Tim Boleman") is a citizen of

Georgia who, upon information and belief, currently resides at 3678 Old Ivey Lane,

Gainesville, GA 30506. T. Boleman may be served at his residence or as otherwise

authorized by law.

5.

Defendant Philip Boleman ("P. Boleman") is a citizen of Georgia who, upon information and belief, currently resides at 1185 Overland Park Drive, Braselton, GA 30517.  P. Boleman may be served by personal service at this residence or as otherwise authorized by law.

6.

Defendant Joseph L. Naylor ("Naylor") is a citizen of Georgia who, upon information and belief, currently resides at 40 Ridgemere Trace, Sandy Springs, Georgia. Naylor may be served by personal service at this residence or as otherwise authorized by law.

7.

Defendant Element Restoration Group, LLC ("Element") is a Georgia limited liability company with a principal place of business at 993 Cleburne Parkway, Suite F, Hiram, Georgia 30141.  Element may be served by serving its registered agent, Tim Boleman, at Element's registered office, which is also at 993 Cleburne Parkway, Suite F, Hiram, Georgia 30141, or as otherwise allowed by law.

8.

Defendant Blusky Holdings LLC ("Blusky") is a Georgia limited liability company with its principal place of business and registered office at T. Boleman's residence, 3678 Old Ivey Lane, Gainesville, GA 30506.  Blusky may be served by serving its registered agent, T. Boleman, at the registered office or as otherwise authorized by law.

9.

Defendant Tesa, LLC ("Tesa") is a Georgia limited liability company that was organized June 1, 2022 with a principal place of business and registered office at the same

address as P. Boleman's residence.  Tesa may be served by serving its registered agent, Phil Boleman, at Tesa's registered office or as otherwise allowed by law.

10.

Defendant Timothy Brock Boleman ("TB Boleman" or "T. Boleman's Son") is a citizen of Georgia who, upon information and belief, currently resides at 2626 Limestone Creek, Gainesville, GA 30501. TB Bolman may be served by personal service at this residence or as otherwise authorized by law.

11.

Defendant Adelyn Bargeron Boleman ("A. Boleman") is a citizen of Georgia who, upon information and belief, currently resides at 2626 Limestone Creek, Gainesville, GA 30501. A. Boleman may be served by personal service at this residence or as otherwise authorized by law.

12.

Defendant Jennifer Brock Boleman ("J. Boleman") is a citizen of Georgia who, upon information and belief, currently resides at 3678 Old Ivey Lane, Gainesville, GA 30506.  J. Boleman may be served at this residence or as otherwise authorized by law.

13.

 Defendants Jennifer Boleman and Timothy M. Boleman, in their capacities as Co-Trustees of the Jennifer Brock Boleman Revocable Living Trust ("Trustees of Jennifer's Revocable Trust"), are citizens of Georgia who, upon information and belief, currently reside at 3678 Old Ivey Lane, Gainesville, GA 30506.  J. Boleman and T. Boleman may be served in their capacities as Trustees at their residence or as otherwise authorized by law.

Jurisdiction and Venue

14.

Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because the citizenship of every Plaintiff differs from the citizenship of every Defendant and because the amount in controversy exceeds $75,000.

15.

Venue is proper in this district because it is the district in which all defendants reside, where the contract at issue was formed, where misrepresentations were made, and/or where real property involved in the dispute is located.

Facts and Background

16.

The Gilreaths purchased 4.6+ acres of land in Milton, Georgia in 2019 with the intention of building two homes and a workshop (a/k/a the "Barn") on the land.

17.

Following the purchase, the Gilreaths hired Earth's Products Demo, LLC ("Earth's Products") (owned by Ken Finlon) to remove debris on the land.

18.

The Gilreaths hired Rymac Construction ("Rymac") to serve as the general contractor.

19.

In early 2021, the Gilreaths decided to change contractors. Although Rymac's owner had impressive work experience, he had only received his general contractor license in 2019. Because their project was complex, the Gilreaths decided to hire a more experienced contractor.

## Pre-Contract Communications with Boleman

20.

In or around February 2021, the Gilreaths sent PDFs of its building plans and other information to Boleman Contractors to see if it wanted to submit an estimate of a bid to serve as general contractor for their project.

21.

Boleman Contractors indicated an interest in submitting a bid for the project and sent Dennis Gilreath its estimated charges for the project in February, 2021.

22.

After the Gilreaths received Boleman Contractor's bid, Dennis Gilreath had oral and/or written communications with Naylor concerning the bid.

23.

Upon information and belief, Naylor was the Marketing and Operations Manager for Boleman Contractors.

24.

On February 24, 2021, Naylor sent Dennis Gilreath ("Dennis") an email in which Naylor stated that "[w]e are prepared to do whatever we can to facilitate finalizing the permitting process and I have a call into Traci to set up a time to meet.  Our estimate includes our time to work with the city and municipalities to finish the permitting process."

25.

Naylor also asked in the February 24, 2021 email if the Gilreaths' architect was working on modifications that the City of Milton, through Rick Slay, had requested.

26.

Dennis responded to Naylor's email the same day, reminding Naylor that the Gilreaths did not have an architect. Dennis explained that the plans had been purchased and modified through an online company and that the Gilreaths were hoping Boleman Contractors could recommend a reasonable architect it could work with in the course of completing work to secure building permits, if Boleman Contractors was hired.

27.

Dennis also notified Naylor that he had asked Rymac to turn over to Boleman Contractors copies of all plans turned in to the City along with a status on the permits, which, upon information and belief, Rymac did shortly thereafter – before the contracts at issue in this litigation were signed.

28.

Before signing a contract, the Gilreaths told Boleman Contractors that they needed the project to be completed by the end of 2021 and asked Boleman Contractors if they would be able to meet this schedule, which it assured them it could.

29.

On or around February 25, 2021, Boleman Contractors sent its proposed contract for serving as general contractor to build the home for the Gilreaths.

30.

It also sent a separate, proposed contract for Greg's home.  The proposed contract for the barn, the third structure that was to be built, was not sent until later that year.

31.

On or around March 3, 2021, Rymac forwarded to Boleman Contractors various PDF files for Boleman's review prior to the March 12th meeting Boleman had scheduled with Dennis to go over the proposed contracts and the project.

32.

Thus, before the contracts were signed, Boleman Contractors had spoken to the City about the status of obtaining permits for the project and had received information from Dennis and from Rymac about the project.

<u>Execution of Contracts for Gilreaths' and Greg's New Homes and Site Visit</u>

<u>March 12-13. 2021</u>

33.

Dennis Gilreath and his son, Greg, traveled to Georgia for the March 12th meeting with Boleman Contractors. In attendance were Dennis, Greg, P. Boleman, Naylor and T. Boleman.  T. Boleman, however, was not present for the whole meeting as all other attendees were.

34.

During the meeting, Boleman Contractors' plan for proceeding with the project, logistics, and other items were discussed.

35.

A considerable amount of time was spent discussing the construction schedule and the need to have the project started within sixty days and completed by the end of the year.

36.

P. Boleman and Naylor assured Dennis and Greg Gilreath that, given the work already done by RYMAC with the City of Milton, the due date of completion by the end of

the year would be met.  They explained they would be breaking ground by the beginning of April and had the ability to get the project done by the end of November.

37.

Based on these assurances, Dennis and Greg signed the contracts and the required deposits were paid.

38.

 Pursuant to the contract for the construction of the Gilreaths' home located at 16660 Phillips Road, Milton, GA (the "16660 Home" or the "Gilreaths' Home"), the Gilreaths agreed to pay the listed contract sum of $932,595 (the "Gilreaths' Contract Sum").

39.

The contract for the Gilreath's Home provided that the Gilreath's Contract Sum would be adjusted upward or downward, based on final selectins for which Allowances were given pursuant to Section 4 of the Contract, without the need for Change Orders to be prepared.  Change Orders, if any, were governed by Section 5.5 of the Boleman Contractors' Terms and Conditions ("T&C") that were incorporated into the contract.

40.

The required deposit for the Gilreaths' Home, which Dennis paid at the March 12, 2021 meeting, was 10% of the Gilreaths' Contract Sum, or $93,259.20.

41.

Greg Gilreath signed the contract with Boleman Contractors for the construction of his house which was to be located at 16662 Phillips Road, Milton, Georgia ("Greg's Home" or the "16662 Home"). Greg agreed to pay $530,649.00 for the construction of his house ("Greg's Contract Sum"), which amount would be adjusted upward or downward, based on final selectins for which Allowances were given pursuant to Section 4 of Greg's Contract,

10

without the need for Change Orders to be prepared.  Change Orders, if any, were governed by Section 5.5 of T&C that were incorporated into the contract.

42.

The required deposit for Greg's Home, which was also paid at the March 12, 2021 meeting, was 10% of Greg's Contract Sum, or $53,064.90.

43.

Section 5.3 of the T&C is titled "Permits and Fees."  The first sentence of this section provides that Contractor (Boleman Contractors) will "obtain and pay the costs of all building permits."

44.

Section 5.1 of the T&C is titled "Project Commencement and Delays." The first sentence in this section states that "Contractor shall start and diligently pursue all work through to completion."

45.

Section 5.5 of the T&C governs "Change Orders."  This section provides the circumstances in which a change order is necessary.  A Change Order could be needed, for example, if the homeowner makes changes.  A Change Order could also be needed if there are latent defects or conditions on the site that are unknown to Contractor prior to commencement of work.  When that happens, Contractor is obligated by the contract to notify the homeowner at which time the Contractor may prepare an estimate of the anticipate increase in costs to complete the project. Acceptance of an estimate of an anticipated increase in costs to complete the project, Section 5.5 of the T&C provides, "shall be memorialized in a Change Order."

11

46.

Section 5.5 of the T&C states in its last paragraph that "[e]xtra work and change orders become part of the Contract once the Order is prepared in writing and signed by the parties prior to the commencement of any work covered by the new Order.  The Change Order shall describe the scope of the extra work or change, the cost to be added or subtracted for the contract, and the effect the Change Order will have on the schedule of progress payments.  Failure to have written authorization shall not be deemed fatal to the collection of the extra work."

47.

Upon information and belief, Boleman Contractors had visited the Gilreaths' property at 16660 and 16662 Phillips Road prior to signing contracts with the Gilreaths' and Greg.

48.

Dennis and Greg met with T. Boleman, P. Boleman, and Naylor on site of their property the day after the contract was signed, on March 13, 2021.

49.

At the March 13, 2021 site visit, Boleman Contractors, T. Boleman, P. Boleman and Naylor again assured Dennis and Greg that they would commence work diligently to get the permits and that they felt confident they could complete construction within eight months.

50.

Based on Boleman Contractor's, T. Boleman's, P. Bolman's, and Naylor's assurances, the Gilreaths commenced work on moving their family to Georgia, getting their house ready to sell and moving belongings into storage.

51.

Dennis was over sixty-five years of age at the time he signed the contracts.  Suzanne turned sixty-five in August of 2021.

Delays, Delays, Delays

While Boleman Contractors Divert Monies to Themselves or Other Projects

52.

 Despite its assurances, Boleman Contractors did not start and pursue the contract obligations with diligence, as the contracts with the Gilreaths and Greg (collectively, the "Gilreath Family") required.

53.

Upon information and belief, Boleman Contractors and its officers and agents knew at the time of the March 12th meeting that breaking ground by April 1, 2021 was impossible given the need for an architect and the work that the City of Milton was requiring. Nonetheless, they made this false representation because the contract did not have a "damages for delay" provision, as the CEO later pointed out, and they wanted to induce Plaintiffs to sign the contracts and give over $140,000 in deposits, since they needed money.

54.

The delays and lack of diligence continued.

55.

In July 2021, the City of Milton advised that the building permits could be issued within fifteen days if certain conditions were met.

56.

Due to a series of continued delays, however, the building permits were not issued until on or around December 28, 2021, more than nine months after the contracts were signed.

57.

Upon information and belief, the building permits could have been issued much sooner had Boleman Contractors acted with the diligence that the contracts required.

58.

Upon information and belief, Boleman Contractors did not act with the requisite diligence because it was experiencing financial hardship and spending Plaintiffs' monies elsewhere.

59.

Upon information and belief and unbeknownst to Plaintiffs, Boleman Contractors and its officers and agents knew that it would take much longer to break ground than they said it would but made the knowingly false assurances anyway, because they thought it would give them time to use the money elsewhere before money was needed in construction on the Plaintiffs' project.

60.

Plaintiffs learned only recently that T. Boleman told one of its other customers in the late summer or fall of 2021, not long after the contracts at issue were signed, that he was having "financial hardship." This conversation reportedly occurred when T. Boleman explained why he was asking that customer for a $75,000 advance.

14

61.

Upon information and belief, financial hardship of the now Defunct LLC and of T. Boleman caused Boleman Contractors not to diligently pursue work on the Gilreath project and motivated them to use the Gilreaths' money for things other than on the Gilreaths' project.

62.

Boleman Contractors' financial problems caused it, for example, not to pay All Purpose Wells for work it had done in the spring or summer of 2021, which led All Purpose Wells to put a lien on the Gilreaths' property in September 2021.

63.

The Gilreaths were unaware that a lien had been placed on their property until a lien search was fun in 2023.  They were surprised to learn that All Purpose Wells had put a lien on the property since the Gilreaths had sent Boleman Contractors a check for $26,312, the full amount of the well work, in August of 2021 pursuant to Naylor's instruction.

64.

Naylor had told them to make the check payable to Boleman Contractors, which they did. Boleman Contractors cashed the check in August 2021, before the lien was placed.

65.

T. Boleman admitted in April 2022 that the Gilreaths should not have been asked to send in a check to pay the well subcontractor's invoice since the well drilling was an allowance in the contract and allowances were supposed to be worked out at the end, when adjustments upward or downward on allowances were made.

15

66.

As T. Boleman also later admitted, deposit monies are supposed to be used to cash flow the projects.

67.

By September 2021, when the lien was placed on their property, the Gilreaths had written checks to Boleman Contractors for over $186,000.

68.

Since Boleman Contractors did not timely pay All Purpose before the lien was placed on the Gilreaths' property September 2, 2021, it is reasonable to conclude that Boleman Contractors had spent all of the money the Gilreaths had given them elsewhere than on the Gilreaths' project, in violation of Georgia law.

69.

Further, given that T. Boleman went to another customer in the late summer or fall of 2021, professing financial hardship, it is reasonable to conclude that Boleman Contractors had squandered the Gilreaths' deposits by September 2, 2021, when the All Purpose lien was put on the Gilreaths' property.

70.

Upon information and belief, Boleman Contractors' financial problems caused it to delay work on the Gilreaths' project and to include charges on invoices sent to the Gilreaths to collect money, when money was not due.

71.

Naylor sent an invoice in October 2021 for purported progress payments.

16

72.

Suzanne wrote Naylor and Boleman Contractors asking them to break out the charges on her and Dennis's house from charges for Greg's house.  She also inquired about when the deposit monies were to be applied and about status since the builder included a monthly supervision charge on its October invoice for the first time.

73.

Naylor sent revised invoices dated November 29, 2021, in which he broke out the charges for maintenance/supervision/profit and overhead between the house for Dennis and Suzanne and the house for Greg.

74.

Not having heard that the permits had been issued despite the November invoices, Suzanne called the City of Milton in December 2021 to find out what the status of the permits was. Suzanne was told that they were ready but had not been paid for.

75.

As a result, Suzanne overnighted checks for the permits to Boleman Contractors. The checks were made payable to the City of Milton.

76.

With the Gilreaths' checks in hand, Naylor picked up the building permits for the Gilreaths' House, Greg's House, and the Barn on December 28, 2021, nine and a half months after the contracts for the Gilreaths' House and for Greg's House were signed.

77.

After the permits were issued, the Gilreaths had a conference call from California with Boleman Contractors to discuss the upcoming schedule. P. Boleman and Naylor were on the call (the "Fast Track Call").

17

78.

During the First Track Call, Boleman Contractors, P. Boleman, and Naylor assured the Gilreaths that their project had been put on a "fast-track" and that it would be completed by August 1, 2022.

79.

During January 2022, after the permits were issued, the Gilreaths paid over $70,000 in additional payments to Boleman Contractors in reliance on the representations in the Fast Track Call.

80.

Dennis sent Check 139 for $16,104 pursuant to an invoice for progress payments at Naylor's request on or around January 12, 2022.

81.

Dennis sent in Check #138 for $16,104 on or around January 16, 2022 for the deposit for the Barn that was to be constructed on the property along with the two houses.

82.

On or around February 11, 2022, Dennis then sent in check 141 for $5,860 at Naylor's request for a progress payment on the Barn.

83.

On March 30, 2022, Dennis sent in two checks, one for $27,750 and one for $13,202 pursuant to invoices Naylor and T. Boleman sent that, upon information and belief, T. Boleman had worked on with Naylor.

84.

Dennis understood from conversations with Naylor and the invoices that these two checks were for supposed progress/maintenance and supervision payments that Naylor and

18

Boleman Contractors claimed were due and for grading work done on the property by Earth Products.

85.

When Boleman Contractors sent the invoices in March 2022 for grading work, it reported on the invoice in the "completed" column that 100% of the grading and sitework had been done.

86.

Since Dennis was 3000 miles away, he did not know until talking to the owner of Earth Products that at the time Boleman Contractors reported that 100% of the sitework had been "completed", the foundations had not been poured and more sitework was required.

87.

Dennis accordingly asked Naylor to adjust the sitework category percentage to 75% to reflect the actual percentage completed, which Naylor and Boleman Contractors did.

88.

At the time of the additional payments in 2022, the Gilreaths were completely unaware of Boleman Contractors and T. Bolman's financial problems, that Boleman Contractors had not paid All Purpose Well, that Boleman had not in fact fast tracked the project, and that Boleman had been delaying work.

89.

Similarly, at the time of these additional payments, the Gilreaths had believed Naylor, P. Boleman and Boleman Contractors' explanations for why things had taken so long to get the permits, which excuses included but are not necessarily limited to: (1) the architect and the engineer not providing them information or revised plans on time;

(2) a gas shortage preventing them from getting to the City;

(3) the City supposedly not responding to them;

(4) the City taking too long to review and provide comments on submissions; and

(5) medical issues preventing them from getting to the City for follow up.

90.

At the time these payments were made, the Gilreaths had no knowledge of Boleman Contractors and T. Boleman's financial hardship or that they, with the knowledge and participation of P. Boleman and Naylor upon information and belief, had diverted their monies to other projects or to line their own pockets, instead of paying for work for the Gilreaths' project.

91.

Despite having received over $240,000 in payments, Plaintiffs discovered in or around April 2022 that Boleman Contractors had not even put an office onsite to oversee construction and had not had temporary power set up on the Gilreaths' property.

92.

Despite the lack of progress, Boleman Contractors had demanded payment for monthly supervision / progress payments.

93.

Plaintiffs discovered recently that Earth's Products grading work in the January to March 2022 time frame took longer to complete because Boleman Contractors failed to address tree removal issues and issues relating to erosion detention ponds.

94.

Upon information and belief, Mr. Finlon had numerous conversations with Boleman Contractors about their need to follow up with the City of Milton about these issues.

95.

Because Boleman Contractors failed to discharge its responsibilities, Ken Finlon set up numerous meetings with the City on site, hired an engineer, and paid fees to handle the issues the City required regarding trees and ponds. As a result, the City agreed to the deletion of one of the erosion ponds and the downsizing of the second pond and ultimately allowed the grading work to continue.

96.

Boleman Contractors, upon information and belief, never came to the site while Finlon was dealing with the City to solve the detention pond and tree issues, except one time when another engineer that Boleman Contractors had not paid would not respond to inquiries.

97.

Upon information and belief, T. Boleman took over generating invoices to the Gilreaths directly in late March 2022; Naylor had been the person tasked to send invoices to the Gilreaths originally.

98.

On or around April 20, 2022, T. Boleman recreated invoices from 2021, adding in a supposed Change Order for the first time that had never been discussed, submitted or approved as the contract required.

99.

Among other things, the Change Order that was added after work was supposedly done purported to charge for things the Gilreaths believe Boleman Contractors did not have the right to charge under the contract.

100.

For example, T. Boleman, all of a sudden, added a charge for $15,000 for work done acquiring the permits, which work Boleman Contractors had previously told the Gilreaths was already included in the contract price quoted.

101.

Similarly, T. Boleman, all of a sudden and after the fact, tried to add work done by the architect which was done outside the contract, so that Boleman Contractors could add 10% of the architect's cost to the company's profit and overhead.  Long before, however, Naylor had told the Gilreaths that their work in coordinating the architect was a service they provided that they did not charge for.

102.

The Change Order noted that the well work had been completed, but failed to account for the overpayment the Gilreaths had been charged by not including the whole check in the amounts previously paid in the Change Order, which omission resulted in a higher balance allegedly being due than if the previously paid amount had correctly listed the amounts the Gilreaths paid (even assuming the Change Order was then somehow allowed).

103.

T. Boleman's invoices also listed a different amount for the monthly maintenance/supervision/profit and overhead payments than Naylor's prior invoices had

22

listed.  And T. Boleman listed the monthly payments as being due over ten months, not six as Naylor's invoices dated November 29, 2021 had listed.  Moreover, ten months is longer than the eight-month period during which Boleman Contractors had assured they would complete the project within originally.  A ten month build timeline was also inconsistent with the earlier representation that the project had been fast-tracked.

104.

Because they had questions about invoices and the status of the project, the Gilreaths asked T. Boleman to meet with their Georgia Certified Public Accountant ("CPA").  T. Boleman agreed to meet with the CPA on May 2, 2022.

105.

When the CPA showed up for the May 2 meeting, the office door was locked, and Carey, the man who had been introduced as the Head Superintendent, told the CPA that T. Boleman was not coming to the meeting.

106.

The CPA insisted that Carey call T. Boleman. T. Boleman finally picked up the call and told the CPA he was not coming and that he could tell the Gilreaths to sue him.

107.

The same day, T. Boleman sent Dennis an email saying he was terminating the permits and was sorry things didn't work out.

108.

Boleman Contractors never paid Earth Products for the work it did.

109.

Boleman Contractors left an invoice for its subcontractor, Gaskins Surveying Company, Inc. ("Gaskins"), unpaid as well, even though Boleman Contractors said it had to

23

be paid despite questions about Gaskins' work.  Plaintiffs are unsure when Gaskins completed the work that it billed for.

110.

Below is a picture of the only structure found on the property when this picture was taken, between May 1 and May 4, 2022:



111.

Upon information and belief, Boleman Contractors is now defunct, having closed its doors either shortly before or shortly after its CEO canceled the meeting with the Gilreaths' CPA.

Suspicious Transactions in June 2022

112.

In June 2022, T. Boleman's Son and A. Boleman bought a house in Gainesville, where his father lives.  According to records found in the GSCCA database, they obtained a

mortgage for $50,000 less than the price of the house, suggesting they used $50,000 in cash as a down payment.

113.

On June 1, 2022, P. Boleman formed Tesa, LLC, a construction company based out of his house.

114.

T. Boleman's LinkedIn profile shows that he supposedly retired in June 2022.

115.

On June 1, 2022, Boleman Contractors filed an amendment to a motion to dismiss they had filed in a lawsuit pending in the State Court of Hall County in Civil Action No. 2022-SV-276N.  In the amendment, Boleman Contractors contended that the suit should be dismissed because the plaintiff, Efren Pena, had contracted with a different company, Element Restoration Group, LLC ("Element"), not Boleman Contractors as Pena apparently had thought.

T. Boleman's Many Companies and Other Litigation Troubles

116.

Element is a construction company T. Boleman formed in 2014, for which he is also the registered agent.

117.

Boleman Builders LLC is a name that T. Boleman has also used when doing construction work.  A brief filed by Christine Panella and Carson Panella in the Superior Court of Hall County in Civil Action No. 2022CV1571J shows on page 1 that Boleman Contractors terminated its contract with the Panellas on May 2, 2022 (the same day it terminated the Gilreath permits) and then filed a lien on the Panella house on May 5, 2022

25

by an entity purporting to be Boleman Builders, LLC, though no such LLC exists according

to the Secretary of State entity.

118.

Invoices sent by Naylor to the Gilreaths used the name Boleman Builders.

119.

2021 and 2022 appear not to be the first times that T. Boleman encountered

litigation problems.

120.

In 2007, T. Boleman's house was foreclosed.

121.

In 2009, a company named Boleman Construction LLC, that T. Boleman formed,

was sued as was a company called Boleman Properties LLC.

122.

Suits were also filed against T. Boleman in 2009 and 2017 and against Tim doing

business as Chestatee Builders in 2006. Chestatee Builders, LLC, another company T.

Boleman had formed, had been dissolved by the Secretary of State in 2005.

123.

Boleman Construction Company, LLC was dissolved in 2015.

124.

In July 2022, Boleman Contractors was sued by Parks Lumber & Supply in Civil

Action File No. 2022CV001292.

125.

On August 1, 2022, T. Boleman changed the registered agent of Blusky Holdings,

LLC, another company he formed, from his wife to himself. The registered office and the

26

principal office of Blusky Holdings, LLC is at their residence.  The change of registered

agents at this time suggests that T. Boleman assumed he would get sued and did not want

his wife to be the one served.  The change also suggests that he had done something that

would cause Blusky to be exposed to liability as a result of his recent business dealings such

as absconding with the Gilreaths' money and transferring it to a Blusky account.

126.

Upon information and belief, T. Boleman has formed and done business as many

different companies.  Further, he has, upon information and belief, commingled monies

between various entities, such as between Boleman Contractors and Element and/or

Blusky, and/or has treated each as the alter ego of the other.

T. Boleman Hid Assets in the Midst of Financial Hardship and Disgruntled Customers

127.

Boleman Contractors' troubles apparently resulted in many dissatisfied clients in

2021 and 2022.

128.

Boleman Contractors is a defendant or defendant-in-counterclaim in at least five

cases filed in Hall Superior Court in 2021 and 2022.

129.

On August 26, 2021, Raymond Edward Kelley ("Mr. Kelley") filed a counterclaim

against Boleman Contractors in Civil Action File No. 2021CV1271J (the "Kelley

Counterclaim").  The Kelley Counterclaim avers in paragraph 11 that Mr. Kelley notified

Boleman Contractors that it was in default of its responsibilities and obligations pursuant

to a contract he had with them by letter dated April 16, 2021 (the "Kelly Default Letter").

130.

Given the proximity in time of the Kelly Default Letter and the signing of the

contract with the Gilreaths, it is reasonable to conclude that Boleman Contractors, T.

Boleman, P. Boleman and Naylor knew at the time the Gilreaths contract was signed that

Mr. Kelley was dissatisfied with them and would be making a claim against them.

131.

In December 2021, another Boleman customer, Mr. Anderson, filed a complaint that

is not available online.  The Brief in Support of Summary Judgment in the Anderson Case

(the "Anderson Brief") that is available online does not state the date the breaches occur.

Nonetheless, because suit was filed and an opportunity to repair was given pre-suit

according to the Anderson Brief, it is reasonable to conclude that Boleman Contractors, T.

Boleman, P. Boleman, and Naylor were aware of the dispute with the Anderson family in

2021.

132.

According to page four of the Anderson brief:

Plaintiffs paid Defendant $87,733.00, which was the exact amount invoiced

by Defendant.  (See Defendant's Response to Plaintiffs Interrogatory No. 8(a)-(b);

RFA 54-55 being filed contemporaneously herewith). Defendant never intended to

finish the construction project outlined in the Agreement and has not returned any

of the money Plaintiffs paid it. (RFA 62-63).

133.

On page 1 of the Anderson Brief, the Andersons noted that Boleman Contractors

"quit after Plaintiffs complained about the quality of the work performed."

28

134.

As explained previously, Boleman Contractors terminated the permit on the Gilreaths' permit after the Gilreaths scheduled a meeting with T. Boleman and their CPA to go over questions they had on their contracts and to find out about the status of their project. Thus, apparently, this was not the first time Boleman Contractors terminated a project in response to customer complaints.

135.

Boleman Contractors, upon information and belief, was having trouble on the Anderson project or was had Anderson asking it questions during 2021.

136.

Around the same time, Suzanne had written Boleman Contractors asking for information about the status of the permits and about how the deposits they had paid were to be applied. Suzanne wrote with questions in October 2021.

137.

Shortly thereafter, as a result of mounting financial issues and/or concern over liabilities, T. Boleman attempted to evade creditors by transferring title to his house from himself to his wife on November 1, 2021 via quitclaim deed.

138.

A portion of the quitclaim deed T. Boleman signed to get the house out of his name is depicted below:

After Recording, Please Return to:
Russell Hodges, Esq.
520 Pirkle Ferry Road, Ste C
Cumming, GA 30040

FILING FEES: $25.00
PT61: 069-2021-011077       TRANSFER TAX: $0.00
RECORDED BY: MB
CLERK: Charles Baker, C.S.C       Hall County, GA

### QUIT CLAIM DEED
**Prepared without Benefit of Title Search**

STATE OF GEORGIA
COUNTY OF HALL

This indenture, made this 2nd day of November 2021, between **Timothy M. Boleman** and **Jennifer B. Boleman**, as party of the first part, hereinafter called Grantor, and **Jennifer B. Boleman**, as party of the second part, hereinafter called Grantee. (the words "Grantor" and "Grantee" to include their respective heirs, successors and assigns where the context requires or permits).

Witnesseth that, the said party of the first part, for and in consideration of the sum of ten dollars and other good and valuable consideration in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, and conveyed, and by these presents does grant, bargain, sell and convey unto the said party of the second part, their heirs and assigns the following property:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 152 OF THE 10th LAND DISTRICT, HALL COUNTY, GEORGIA, BEING ALL OF LOT 22, OLD IVY SUBDIVISION, AS SHOWN ON REVISED SUBDIVISION PLAT RECORDED IN PLAT SLIDE 759, PAGES 163A AND 164A, HALL COUNTY, GEORGIA PLAT RECORDS, WHICH SAID PLAT IS HEREBY INCORPORATED BY REFERENCE AND MADE A PART OF THIS DESCRIPTION.
LESS AND EXCEPT THAT PORTION OF LOT 22, OLD IVY SUBDIVISION IDENTIFIED AS TRACT 1A, CONTAINING 0.18 ACRES AS DEPICTED IN PLAT BOOK 876, PAGE 498, AS DESCRIBED IN THAT WARRANTY DEED TO KRIS S. WHEELER AND LORI WHEELER, RECORDED IN DEED BOOK 8273, PAGE 381, OF THE HALL COUNTY, GEORGIA DEED RECORDS

Parcel ID- 296-066;  Property designated as – 3678 Old Ivy Lane, Gainesville, GA 30506

This conveyance is made subject to all zoning ordinances, easements and restrictions of record affecting said bargained premises.

To have and to hold the said bargained premises, together with all and singular the rights, members, and appurtenances thereof, to the same belonging, or in anywise appertaining, to the only

139.

J. Boleman transferred the house at 3678 Old Ivey Lane to a revocable trust for which they serve as Trustees on or around December 21, 2021.

140.

The screenshot below comes from a record filed in the GSCCA database:

| PT-61 (Rev. 2/18) | To be filed in **HALL COUNTY** | | PT-61 069-2022-000106 | |
|---|---|---|---|---|
| **SECTION A – SELLER'S INFORMATION** (Do not use agent's information) | | | **SECTION C – TAX COMPUTATION** | |
| SELLER'S BUSINESS / ORGANIZATION / OTHER NAME | | | **Exempt Code**<br>If no exempt code enter NONE | **Deed of Gift** |
| Jennifer Brock Boleman | | | | |
| MAILING ADDRESS (STREET & NUMBER) | | | 1. Actual Value of consideration received by seller<br>Complete Line 1A if actual value unknown | $0.00 |
| 3678 Old Ivy Lane | | | | |
| CITY, STATE / PROVINCE / REGION, ZIP CODE, COUNTRY | DATE OF SALE | | 1A. Estimated fair market value of Real and<br>Personal property | $0.00 |
| Gainesville, GA 30506 USA | 12/21/2021 | | | |
| **SECTION B – BUYER'S INFORMATION** (Do not use agent's information) | | | 2. Fair market value of Personal Property only | $0.00 |
| BUYERS'S BUSINESS / ORGANIZATION / OTHER NAME | | | 3. Amount of liens and encumbrances<br>not removed by transfer | $0.00 |
| Jennifer Brock Boleman & Timothy Mark Boleman CoTrustees ...* | | | | |
| MAILING ADDRESS (Must use buyer's address for tax billing & notice purposes) | | | 4. Net Taxable Value<br>(Line 1 or 1A less Lines 2 and 3) | $0.00 |
| 3678 Old Ivy Lane | | | | |
| CITY, STATE / PROVINCE / REGION, ZIP CODE, COUNTRY | Check Buyers Intended Use<br>( ) Residential  ( ) Commercial<br>( ) Agricultural ( ) Industrial | | 5. TAX DUE at .10 per $100 or fraction thereof<br>(Minimum $1.00) | $0.00 |
| Gainesville, GA 30506 USA | | | | |
| **SECTION D – PROPERTY INFORMATION** (Location of Property (Street, Route, Hwy, etc)) | | | | |
| HOUSE NUMBER & EXTENSION (ex 265A) | PRE-DIRECTION, STREET NAME AND TYPE, POST DIRECTION | | | SUITE NUMBER |
| COUNTY | CITY (IF APPLICABLE) | | MAP & PARCEL NUMBER | ACCOUNT NUMBER |
| HALL | | | 10152 000070 | |
| TAX DISTRICT | GMD | LAND DISTRICT | ACRES | LAND LOT | SUB LOT & BLOCK |
| **SECTION E – RECORDING INFORMATION** (Official Use Only) | | | | |
| DATE | DEED BOOK | DEED PAGE | PLAT BOOK | PLAT PAGE |
| | 9035 | 232 | | |

141.

By the time of the house transfers, T. Boleman and Boleman Contractors were experiencing financial hardship and the Gilreaths had been asking questions about delays and charges on invoices.  In addition, by such time, Plaintiffs have reason to believe T. Boleman and Boleman Contractors had squandered the monies Plaintiffs had paid.

<u>Additional Information on Plaintiff's Damages</u>

142.

In reliance on Boleman Contractors and on Naylor, P. Boleman and T. Boleman representations, Plaintiffs sent over $270,000 to Boleman Contractors in 2021 and 2022.

143.

In reliance on Boleman Contractors and on Naylor, P. Boleman and T. Boleman representations, the Gilreaths spent over $86,000 making preparations for their move to what they had hoped was their retirement dream homes.  This money included the cost for storage units in Georgia, shipping items, travel expenses, and the leasing of a temporary home in Georgia that they had planned to move into when their houses sold.

144.

Plaintiffs spent considerable time getting their houses ready to put on the market as well, in reliance on Boleman Contractors and on Naylor, P. Boleman and T. Boleman representations that the houses would be ready at first before the end of 2021 and then, after the permits were issued, by August 1, 2022.

145.

After Boleman Contractors terminated the permits, having taken over $270,000 of Plaintiffs' money, Plaintiffs' dreams of moving to Georgia were quashed.

146.

As a result of Boleman Contractors, T. Boleman, P. Boleman, and Naylor's malfeasance and taking of over $270,000 under false pretenses, Plaintiffs' houses have not been built.

147.

As a result of Boleman Contractors, T. Boleman, P. Boleman, and Naylor's malfeasance, Plaintiffs did not sell their California homes and have not moved to Georgia.

148.

As a result of Boleman Contractors, T. Boleman, P. Boleman, and Naylor's malfeasance, Plaintiffs have suffered substantial undue distress as well as monetary loss.

Additional Information on Fraudulent Statements

149.

Boleman Contractors, T. Boleman, P. Boleman, and Naylor fraudulently induced Plaintiffs to sign the contracts at issue by falsely representing to them that they were confident the houses and barn would be completed by the end of November 2021 and that they would be breaking ground by the beginning of April 2021, which representation they made before the contracts were signed, when the contracts were signed, and on March 13, 2021 at the site visit (the "Initial Misrepresentations").

150.

At the time these Initial Misrepresentations were made, Boleman Contractors and T Boleman were having financial problems, which Plaintiffs did not know, and Boleman Contractors, T. Boleman, P. Boleman, and Naylor were thus desperate for Plaintiffs' job to be secured so they could bring in much needed cash.

32

151.

At the time these Initial Misrepresentations were made Boleman Contractors, P.
Boleman, T. Boleman and Naylor knew they were false because they knew they had plans
to use Plaintiffs' monies on other projects or to address their own financial hardship. In
addition, upon information and belief, they knew that the work the City was requiring be
done and the time that new architectural plans and/or site revisions would necessitate
would have to take longer than the time table they told Plaintiffs.

152.

Upon information and belief, they knowingly made these false Initial
Misrepresentations to deceive Plaintiffs because they needed Plaintiffs' money.

153.

Plaintiffs justifiably relied on the Initial Representations because they had sent
information to Boleman Contractors about their plans and the status of the permits, had
Rymac send information, and knew Naylor had spoken to the City of Milton as well.

154.

In reliance on the pre-contract Initial Representations, Plaintiffs hired Boleman
Contractors, signed the contracts at issue, and paid ten percent deposits on the first two
contracts and thereafter began paying invoices.

155.

During their relationship, after the contracts were signed, Plaintiffs justifiably
relied on additional fraudulent statements by Boleman Contractors, T. Boleman, P.
Boleman and/or Naylor as to the reasons there were delays in obtaining the permits and
that money was due pursuant to invoices.

156.

In addition, Boleman Contractors and Naylor misrepresented that they had a company named Rochester Associates on board to help get the permitting process finished. This false representation was made in an email in April 2021.

157.

Upon information and belief, however, Rochester Associates was not engaged and a proposal for their services was never received.

158.

In addition, during the summer of 2021, Naylor told Dennis many times that he had plans to go to the City to address permit issues "the next day" but he did not.  Upon information and belief, Naylor repeatedly made excuses to buy time to cover up financial problems Boleman Contractors was having and that the real reason for delays was because they were putting their time and money into other projects.

159.

Knowing misrepresentations were also made during the Fast Track call as well as subsequently when Boleman Contractors, T. Boleman, P. Boleman and Naylor said that they had fast tracked the Gilreaths' project and that more progress had been made than had been.

160.

The Plaintiffs, being over 3000 miles, justifiably relied on the Fast Track and similar misrepresentations by sending in more money, taking steps to move to Georgia, and getting their home ready for sale.

161.

Boleman Contractors also made misrepresentations on invoices as to the status of what was completed or what charges were then due by misreporting the status of their work.

Count I: Fraudulent Inducement/Rescission (Against Boleman Contractors)

162.

The allegations of paragraphs 1 - 161 are incorporated herein by reference.

163.

.Defendants Boleman Contractors, T. Bolman, P. Boleman, and Naylor made knowing misrepresentations prior to the contracts being signed concerning when the project would be completed and when ground would be broken, knowing the schedule they assured Plaintiffs of would never be met and having no intention to perform, at the time the representations were made. They did so with the intent to deceive and to induce Plaintiffs into signing the contracts and paying substantial money in deposits.

164.

Plaintiffs justifiably relied upon the misrepresentations and were damaged as a result of such misrepresentations.

165.

As a result of the fraudulent inducement, the contracts at issue should be rescinded and all monies paid by Plaintiffs should be returned.

Count II: Breach of Contract, in the Alternative (Against Boleman Contrctors)

166.

The allegations of paragraphs 1 - 161 are incorporated herein by reference.

167.

In the event that the contracts at issue are not rescinded, Plaintiffs state a claim for breach of contract.

168.

Boleman Contractors had an express duty to start and diligently pursue all work through to completion.

169.

Boleman Contractors breached this duty, causing damage to Plaintiffs.

170.

In addition, Boleman Contractors had an implied duty of good faith and fair dealing under the contract not to bill Plaintiffs for amounts greater than as set forth in the contract or as allowed by the contract's T&C.

171.

By billing Plaintiffs for items for amounts greater than what the contracts allowed and for items on a supposed Change Order that was neither prepared in accordance with the T&C nor authorized by the contracts, Boleman Contractors breached duties in or under the contract, causing damages to Plaintiffs in an amount to be proven at trial.

Count III: Negligence Per Se

(Against Boleman Contractors, T. Boleman, P. Boleman and Naylor)

172.

The allegations of paragraphs 1 - 171 are incorporated herein by reference.

173.

According to regulations that apply to general contractors in the State of Georgia, Boleman Contractors had a duty not to use monies the Gilreaths paid in deposits on other clients' projects.

174.

Upon information and belief, Boleman Contractors did divert the Gilreaths' deposits for use on other projects, in whole or in part.

175.

Boleman Contractors' squandering of the Gilreaths' monies, with the knowledge and participation of T. Boleman, P. Boleman and Naylor, and their misrepresentations to Plaintiffs to induce them to write checks constitutes exploitation of an elder within the meaning of Georgia law pursuant to GA. Code 30-5-3.

176.

As a result, Boleman Contractors, T. Boleman, P. Boleman and Naylor are liable to the Gilreaths for negligence per se for an amount be proven at trial, which amount exceeds $75,000, the diversity jurisdiction threshold amount.

Count IV: Fraud (including Wire Fraud) (Against Boleman Contractors, T. Boleman, P. Boleman and Naylor)

177.

The allegations of paragraphs 1 - 176 are incorporated herein by reference.

178.

Boleman Contractors, by and through its officers and agents, T. Boleman, P. Boleman and Naylor made numerous material misrepresentations on which Plaintiffs reasonably relied throughout their relationship including but not limited to representations

37

concerning their ability to break ground quicky and complete the project within eight months, the reasons why there were delays, that their project had been fast-tracked, that charges reflected on their invoices were due based on their oversight work and/or based on completion, when such oversight had not been done and when the percentage completion represented had not actually occurred, and that they had Rochester Associates on board to handle the permitting.

179.

Said defendants schemed to defraud Plaintiffs as a result of these misrepresentations by means of false pretenses and did so knowingly and willfully participating in the scheme with intent to defraud and used interstate wire communications in furtherance of such fraud.

180.

Plaintiffs were damaged by such fraud.

181.

Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

Unjust Enrichment

182.

The allegations of paragraphs 1 - 181 are incorporated herein by reference.

183.

Upon information and belief, Defendants Element, Blusky, Tesa, TB Boleman, and Adeline Boleman  (collectively, the "Unjustly Enriched Defendants" ) have received monies from Boleman Contractors and T. Boleman that came from monies that were misappropriated and effectively stolen from Plaintiffs.

38

184.

As a result, the Unjustly Enriched Defendants have been conferred a benefit by the Plaintiffs that the Unjustly Enriched Defendants should return as a matter of equity.

185.

Additionally, Boleman Contractors has been unjustly enriched as a result of all monies paid to it and such money should be returned as a matter of equity.  Further, some of the money paid to Boleman Contractors, even if the contracts are not rescinded, was requested when the money was not due or when Boleman Contractors and not the Plaintiffs were obligated to pay for the items charged.

186.

At a minimum, all monies billed by Boleman Contractors outside the contract, meaning for things Boleman Contractors were not allowed to charge, resulted in unjust enrichment to Boleman Contractors, which monies Boleman Cntractors should return as a matter of equity even if the contracts are affirmed.

Money Had and Received

187.

The allegations of paragraphs 1 - 186 are incorporated herein by reference.

188.

Plaintiffs paid money to Boleman Contractors under compulsion, believing they had to as a result of its demands for payment when, it turns out, such monies were not due.

189.

All monies paid under the contract, if such contracts are affirmed, that were not in fact due by Plaintiff should be returned to Plaintiffs as money had and received.

## Fraudulent Conveyances

190.

The allegations of paragraphs 1 - 189 are incorporated herein by reference.

191.

Upon information and belief, each of the Unjustly Enriched Defendants received money or assets from Boleman Contractors and/or T. Boleman, P. Boleman and/or Naylor during the 2021-2022 time period.  Further,  Boleman Contractors made the transfer or payment with actual intent to defraud creditors or without reasonably equivalent value when it  was engaged in transactions for which Boleman Contractors' assets were unreasonably small in relation to the business or transaction and/or when Boleman Contractors intended to incur debts or reasonably should have believed debts it would incur were beyond its ability to pay them as they became due.

192.

Indeed, upon information and belief, Boleman Contractors told subcontractors around the time such transfers were made or shortly thereafter that they should look to Plaintiffs for payment of bills instead of to Boleman Contractors.

193.

As a result, all transfers made by Boleman Contractors and/or T. Boleman, P. Bolman and/or Naylor since March 12, 2021 should be set aside as voidable transfers and/or fraudulent conveyances, including but not limited to the transfer of the title of the house T. Boleman lives in first to J. Boleman and then to the Jennifer Brock Boleman Revocable Living Trust.

Alter Ego Liability

194.

The allegations of paragraphs 1 - 193 are incorporated herein by reference.

195.

Upon information and belief, T. Bolman did work as a contractor interchangeably through Boleman Contractors and Element during the 2021-2022 time frame.

196.

Upon information and belief, Element and Boleman Contractors commingled funds and shared the same officer(s), both having T. Boleman as its registered agent and/or Chief Executive Officer.

197.

Element is the alter ego for Boleman Contractors and is jointly and severally liable to Plaintiffs for Boleman Contractors' debts.

Attorney's Fees

198.

The allegations of paragraphs 1 – 197 are incorporated herein by reference.

199.

Defendants Boleman Contractors, T. Boleman, P. Boleman and Naylor have acted in bad faith, have been stubbornly litigious, and/or have put Plaintiffs to unnecessary trouble and expense.

200.

As a result, said Defendants are liable to Plaintiffs for statutory attorney's fees under OCGA 13-6-11.

201.

In addition, the contracts at issue, if affirmed, provide for the prevailing party to be reimbursed legal fees if it has to sue to enforce its contract.

202.

Plaintiffs should be awarded its attorney's fees either under the contract or under Georgia's statutory attorney's fees provision or both.

WHEREFORE, Plaintiffs respectfully pray that:

(a)   The contracts at issue be rescinded;

(b)   Alternatively, that Plaintiffs be awarded compensatory damages as allowed by law on their breach of contract claims;

(c)   Plaintiffs be awarded compensatory damages on its negligence per se count;

(d)   Plaintiffs be awarded compensatory and punitive damages on the fraud-based claims;

(e)   All monies that any defendant received through unjust enrichment or due to money had and received be equitably returned;

(f)   All voidable transfers and/or fraudulent conveyances be voided;

(g)   Alter egos of Boleman Contractors be held jointly and severally liable for its debts;

(h)   Plaintiffs be awarded pre- and post-judgment interest as allowed by law;

(i)   This Court order Defendants to pay all costs and fees of this action; and

(j)    For such other and further relief as is just and appropriate.

Respectfully submitted this 14th day of August, 2023.

_/s/ Lauren S. Antonino, Esq._
Georgia Bar No. 652408
Attorney for Plaintiffs
The Antonino Firm LLC
115 Strauss Lane
Atlanta, GA 30350
Telephone: (770) 408-1229 (direct)
Telephone: (404) 889-5209 (cell)
Fax: (470) 875-0194
Email: lauren@antoninofirm.com