# Exhibit A



**SOCIAL SECURITY ADMINISTRATION**



Office of Hearings Operations
Suite 200
550 Government Street
Mobile, AL 36602-9910

Date: March 01, 2023


Daniel Timothy Duncan
1328 Peachtree St NE
Atlanta, GA 30309

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision.  Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision.  The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter.  The form is available at https://www.ssa.gov/forms/ha-520.html.  Please write the Social Security number associated with this case on any appeal you file.  You may call (800) 772-1213 with questions.

Please send your request to:

> **Appeals Council**
> **5107 Leesburg Pike**
> **Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice.  The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Daniel Timothy Duncan (BNC#: 21KO632F47025)                    Page 2 of 3

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

 The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP2 (03-2010)

See Next Page

Daniel Timothy Duncan (BNC#: 21KO632F47025)                    Page 3 of 3

**If You Have Any Questions**

1. Visit www.ssa.gov for fast, simple, and secure online service.
2. Call us at **1-800-772-1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1-800-325-0778**. Please mention this notice and decision when you call.
3. You may also call your local office at (866) 931-9946.

SOCIAL SECURITY
STE 2860 FLR 28
401 W PEACHTREE ST NW
ATLANTA, GA 30308-9972

**How are we doing?** Go to www.ssa.gov/feedback to tell us.

Tracy S Guice
Administrative Law Judge

Enclosures:
Decision Rationale

cc:    Kathleen Marie Flynn
       KATHLEEN M FLYNN LLC
       315 W PONCE DE LEON AV
       SUITE 940
       DECATUR, GA 30030

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

**IN THE CASE OF**             **CLAIM FOR**

Daniel Timothy Duncan            Supplemental Security Income
(Claimant)

                                        21KO632F47025

(Wage Earner)                (Beneficiary Notice Control Number)
                                   *Social Security Number removed for your protection*

## JURISDICTION AND PROCEDURAL HISTORY

On December 27, 2019, the claimant filed an application for supplemental security income, alleging disability beginning July 1, 2018. The claim was denied initially on February 8, 2021, and upon reconsideration on September 8, 2021. Thereafter, the claimant filed a written request for hearing received on October 4, 2021 (20 CFR 416.1429 *et seq.*). On June 28, 2022, the undersigned held a telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic. All participants attended the hearing by telephone. The claimant agreed to appear by telephone before the hearing (Exhibit B11E), and confirmed such agreement at the start of the hearing. The claimant is represented by Kathleen Marie Flynn, an attorney. Rebecca Williams, an impartial vocational expert (Exhibit B13E), also appeared at the hearing.

The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 416.1435(a)). The representative submitted Exhibit B15F at the hearing, and the undersigned has admitted this record into evidence.

The claimant amended the alleged onset date to the protective filing date of December 27, 2019. (Hearing Testimony).

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since December 27, 2019, the date the application was filed.

## **APPLICABLE LAW**

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained

basis despite limitations from his impairments.  In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965).  If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, he is not disabled.  If the claimant is not able to do other work and meets the duration requirement, he is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912 and 416.960(c)).

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant has not engaged in substantial gainful activity since December 27, 2019, the application date (20 CFR 416.971 *et seq.*).**

**2.   The claimant has the following severe impairments: lumbar spondylosis; left shoulder non-displaced fracture of the greater tuberosity, subacute; left knee degenerative joint disease; diabetes mellitus; hypertension; obesity; post-traumatic stress disorder (PTSD); and bipolar disorder (20 CFR 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

The claimant received treatment for hyperlipidemia throughout the relevant period, and was prescribed medication to help manage this condition. (Exhibit B4F; B8F; B9F; B10F; B11F; B12F; B13F; B14F; B15F). However, this impairment appears to be controlled with medication. The claimant does not report any significant symptomology associated with this condition, and has not experienced any exacerbations of cardiovascular issues requiring specialist or emergency

care. Therefore, there is no evidence that the claimant has experienced more than minimal functional limitations associated with this condition for the required durational period. Thus, this impairment is not severe. To the extent that any cardiac symptomology is reported during the relevant period, the undersigned has considered this symptomology in conjunction with the claimant's severe impairment of hypertension.

The undersigned has considered the aforementioned impairment singly and in combination and determines that the overall evidence of record fails to prove that it has placed more than a minimal limitation on the claimant's ability to perform work-related activities for the required durational period. As a result, it is not a not severe impairment. (20 CFR 416.909 and 416.920(c)). Although the aforementioned impairment is not severe, under 20 CFR 416.923, the undersigned must consider the combined effect of all the claimant's impairments on his ability to function without regard to whether any such impairment, if considered separately, would be of sufficient severity. The undersigned has done so and, although the aforementioned impairment is not severe, the limitations in the residual functional capacity in Finding 4 below consider any functional limitations resulting from the claimant's nonsevere impairments or the combination thereof.

Any other diagnosis, ailment, or condition not specifically setout herein is both not severe and acute in nature or otherwise quickly resolved and is not expected to lead to any work restrictions that satisfy the required durational period.

**3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

To meet listing 1.15, the claimant's musculoskeletal disorder, such as lumbar spondylosis must be documented by neuro-anatomic (radicular) distribution of one or more of the following symptoms consistent with compromise of the affected nerve root(s): pain, paresthesia, or muscle fatigue; AND radicular distribution of neurological signs present during physical examination or on a diagnostic test and evidenced by muscle weakness; and sign(s) of nerve root irritation, tension, or compression, consistent with compromise of the affected nerve root; and sensory changes evidenced by decreased sensation or sensory nerve deficit on electrodiagnostic testing; or decreased deep tendon reflexes; AND findings on imaging consistent with compromise of a nerve root(s) in the cervical or lumbosacral spine; AND impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:  a documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; or an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.

To meet listing 1.18, the claimant's left shoulder disorder and left knee disorder must be documented by chronic joint pain or stiffness; AND abnormal motion, instability, or immobility of the affected joint(s); AND anatomical abnormality of the affected joint(s) noted on physical examination (for example, subluxation, contracture, or bony or fibrous ankylosis); *or* imaging (for example, joint space narrowing, bony destruction, or ankylosis or arthrodesis of the affected joint); AND impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:  a documented medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; *or* an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; *or* an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.

The record does not document the medical need for a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands; or an inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, and a documented medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements. Thus, when combined with all the other factors that are not met in the aforementioned subsections, the record offers no support for the determination that the claimant would meet or equal one of the aforementioned musculoskeletal listings. All listings were analyzed.  No listing was met or equaled, whether the impairment was analyzed individually or in combination.  No examining or treating source has reported that the claimant has an impairment that meets or medically equals the criteria of a listed impairment. All musculoskeletal listings have been considered, though the musculoskeletal listings referenced in this analysis are the new listings that are effective as of April 2, 2021.

The claimant's history of left shoulder fracture also does not meet listing 1.23, the record must contain medical documentation of a nonunion or complex fracture of the shaft of the humerus, radius, or ulna under continuing surgical management directed toward restoration of functional use of the extremity; AND medical documentation of an inability to independently initiate, sustain, and complete work-related activities involving fine and gross movements that has lasted, or is expected to last, for a continuous period of at least 12 months. There is no evidence of the aforementioned requirements in the medical record.

Diabetes mellitus is considered under Medical Listing 9.00 for Endocrine Disorders, which specifically evaluates diabetes in regard to the medical listing in other body systems affected by the endocrine disorder (diabetes). However, under the directives of 9.00B.5., the claimant's diabetes has not resulted in any complications or end organ damage that would meet or equal any of the listings referenced under Medical Listing 9.00B.5.

See Next Page

Section 4.00H of the medical listings requires an evaluation of hypertension by reference to the specific body system affected when the undersigned considers its effects under the listings. The undersigned has considered the claimant's obesity and hypertension in determining whether the claimant has any medically determinable impairments that are severe, whether those impairments meet or equal any listing, and finally in determining the claimant's residual functional capacity. Despite the fact that no treating or examining medical source has specifically attributed additional or cumulative limitations based upon the claimant's obesity or hypertension, under the directives of 1.00Q, SSR 19-2p, and 4.00H, the undersigned has considered these limitations singly and in combination with his other impairments, as well as the effects on the claimant's other body systems, and has determined that these impairments have not resulted in any complications or end organ damage that would meet or equal any of the aforementioned listings.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.15.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has a moderate limitation. Though the claimant has continued to report symptomology associated with PTSD and bipolar disorder during the relevant period, his mental status examinations are routinely normal throughout the treatment records. In fact, his thought processes are described as linear and goal-directed during the relevant period. (Exhibit B5F; B6F; B7F; B8F; B11F; B12F; B13F; B14F). Furthermore, the claimant reports the ability to perform significant, multi-step activities of daily living. He can make simple meals such as sandwiches, use public transportation, pay bills, count change, and handle a savings account. His hobbies also include reading and playing cards or board games. (Exhibit B5E). Therefore, the undersigned determines the evidence of record establishes that the claimant's admitted activities and demonstrated abilities are significant and, while his mental impairments may impose some difficulties on his ability to understand, remember, or apply information, they are no more than moderate difficulties.

In interacting with others, the claimant has a moderate limitation. Though the claimant reports periods of anger and irritability, with one instance of mild agitation noted during a treatment appointment (Exhibit B11F), the treatment records routinely describe the claimant as calm and cooperative. His attitude toward the treatment provider is routinely described as comfortable. (Exhibit B5F; B6F; B7F; B8F; B11F; B12F; B13F; B14F). Furthermore, he is capable of going out into public regularly. He uses public transportation, shops in stores, goes to the park regularly, and routinely goes to a church to obtain meals. (Hearing Testimony; Exhibit B5E). Therefore, the undersigned determines that the evidence of record establishes that the claimant's demonstrated abilities are significant, and while his mental impairments may impose some difficulty on the claimant's ability to interact with others, these are no more than moderate difficulties.

See Next Page

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. Though the claimant reports issues with concentration, he is also capable of performing significant, multi-step activities of daily living. As noted above, he can make simple meals, pay bills, count change, and handle a savings account. His hobbies also include activities requiring concentration, such reading and playing cards or board games. (Exhibit B5E). None of the claimant's treatment providers have noted any significant issues with focus or attention. (Exhibit B5F; B6F; B7F; B8F; B11F; B12F; B13F; B14F). Therefore, the undersigned determines that the evidence of record establishes that the claimant's admitted activities and demonstrated abilities are significant, and while his mental impairments may impose some difficulties on his abilities to concentrate, persist, and maintain pace, they are no more than moderate difficulties.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant reports that he can handle his own personal care, though he sometimes needs reminders to care for his personal needs or take his medications. He also reported that he can go out alone. (Hearing Testimony; Exhibit B5E). Furthermore, as noted above, the claimant's mental status examinations are routinely normal even during exacerbations of his mental health symptomology. The claimant is routinely described as alert and oriented in the treatment records, and his insight and judgment are routinely described as good. (Exhibit B5F; B6F; B7F; B8F; B11F; B12F; B14F; B15F). Therefore, the undersigned determines that the evidence of record establishes that the claimant's admitted activities and demonstrated abilities are significant, and while his mental impairments may impose some difficulties on his abilities to adapt and manage himself, they are no more than moderate difficulties.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life. There is no evidence that the claimant has experienced an extended episode of decompensation since the alleged onset date, that a minimal increase in mental demands or change in the environment would cause him to decompensate, or that the claimant is unable to function outside of a highly supportive living arrangement due to his mental impairments.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning.  The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can lift and carry 10 pounds frequently and 20 pounds**

**occasionally. The claimant can sit for a total of 6 hours during an 8-hour workday, and stand and walk for a total of 4 hours during an 8-hour workday. The claimant can occasionally use the left upper extremity and the left lower extremity to push and pull. The claimant can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but is precluded from climbing ladders, ropes, or scaffolds. The claimant can frequently reach with the left upper extremity. For walking to and from the workstation, the claimant requires the use of a cane. The claimant is precluded from concentrated exposure to extreme heat and cold, as well as work around unprotected heights. The claimant can perform simple, routine, repetitive tasks with occasional workplace changes. The claimant can engage in occasional interaction with the general public and coworkers. The claimant can sustain concentration and attention for two-hour periods with customary breaks.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

The claimant reports that he is unable to work due to pain in his back, left shoulder, and left knee, as well as persistent symptomology associated with diabetes mellitus and hypertension. In addition to these physical impairments, the claimant also reports significant mental health issues associated with post-traumatic stress disorder (PTSD) and bipolar disorder. (Hearing Testimony; Exhibit B1E; B4E; B5E). The claimant testified that he injured his hip and shoulder after falling form an electric scooter, and was treated with pain medication and exercises. He used a cane following this injury, though this assistive device was not prescribed. The claimant testified that he still uses a cane, and stated he is still unable to raise his shoulder. The clamant also reported pain associated with a bulging disc in his back that radiates to his legs. He also testified that he continues to have elevated blood sugar despite taking medication for diabetes mellitus, and reported that his blood pressure is still slightly high despite treatment for this condition. The claimant testified that his impairments prevent him from walking, sitting, or standing for long periods and limits the amount he can carry. In addition to his physical impairments, the claimant

also reports ongoing mental health issues. Though he testified that he takes medication that lessens his symptoms, he testified that he still experiences symptoms such as a buzzing in his ears and auditory hallucinations. He reports that he has issues with anger control, anxiety, and mood swings, and has problems with his memory. (Hearing Testimony).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The record documents a history of treatment for the aforementioned impairments. (Exhibit B1F; B2F; B3F; B4F; B5F; B6F; B7F). The claimant presented for treatment in December 2019, a few days before the filing of the instant application, for refills on his prescription medication and to discuss laboratory findings. The claimant's A1c levels were elevated at 7.7 and his blood glucose was high at 217. His blood pressure was also elevated at this appointment. The claimant reported bitemporal headaches, increased urination, buzzing in his left ear, and dizziness. The claimant was prescribed medication for diabetes mellitus and hypertension at that time. The claimant also reported pain in his left shoulder at that time, and was prescribed medication to help manage this pain. (Exhibit B4F; B5F; B6F; B7F). The claimant continued to report sharp pain and decreased range of motion into the relevant period, but records from January 2020 note that his prescribed medication was helping with the pain. The claimant also reported sharp back pain with intermittent tingling in the legs, as well as ongoing issues with diabetes mellitus and hypertension. During the objective physical examination, however, the claimant had no edema in his extremities, and he was ambulating normally. The claimant was continued on his medication for hypertension, and his medication for diabetes was increased. The claimant was prescribed an additional medication for his shoulder pain. (Exhibit B5F; B6F).

The claimant continued to report sharp, throbbing pain in his left shoulder in February 2020. (Exhibit B4F). An MRI of the left shoulder revealed a non-displaced fracture of the greater tuberosity, subacute. The rotator cuff, long head of the biceps tendon, and glenoid labrum were intact. (Exhibit B4F/3; B5F/33; B6F/49; B7F/48). The claimant continued to report back pain to his primary care provider in February 2020 with episodic lower extremity pain, left greater than the right. The claimant reported at times his pain was so severe he was unable to stand straight, and he had a tendency to lean. The claimant reported that he typically used a cane, but it was broken at the time of this appointment. He also noted that he drags his right foot at times. However, the claimant reported that his prescribed medication had been helpful. During the objective physical examination, the claimant's right dorsiflexion strength was 4-5 vs. give way weakness, and tenderness was noted. However, the claimant's strength was 5/5 in all other areas, and the claimant ambulated with a normal gait. His back had normal curvature. The claimant was scheduled for imaging to further evaluate his back pain, and was continued on his prescribed medication. The claimant again followed up with his primary care provider at the end of February, reporting continued shoulder pain, ongoing symptomology associated with diabetes and hypertension, itching in his left ankle and foot, and a 'clicking sound' when walking, particularly when stepping on the right foot. The claimant was prescribed a cream for the itching,

and continued on his current medication regimen for his other impairments. (Exhibit B5F; B6F; B7F).

The claimant presented to his primary care provider again in March 2020 for refills on his medication, and the only acute issue noted at that time was a toothache. The claimant was continued on his prescribed medication regimen. (Exhibit B5F; B6F; B7F). The claimant presented for another follow up in June 2020. The claimant continued to report dizziness, headaches, and increased urination associated with diabetes and hypertension, as well as ongoing issues with shoulder pain. The claimant's blood pressure was elevated during this treatment appointment. During the physical examination, a callus was noted on the medial plantar forefoot, and sensation was decreased in the right lateral heel. Monofilament wire test was abnormal as well, though sensation was normal in all other areas. The claimant reported that he felt a 'pull' in the right lower quadrant of his abdomen. However, the claimant was in no acute distress, and was ambulating normally. The claimant was continued on his prescribed medication for diabetes and hypertension, and a referral to orthopedics was pending. (Exhibit B6F; B7F). The claimant presented to his primary care provider again in October 2020 requesting a refill on all his medications, and reporting worsening pain in his left knee and back with radiating pain into the right leg. During the objective examination, the claimant again felt a 'pull' in the right lower quadrant of her abdomen. Tenderness was noted, but straight leg raise was negative. Examination of the knee was benign, with full range of motion and negative McMurray's and Lachman's. No edema, warmth, or crepitus was noted. The claimant ambulated with a normal gait and station. The claimant was continued on his prescribed medication for diabetes mellitus and hypertension, and was again prescribed medication for pain. He was also given stretches and home exercises to perform to improve his musculoskeletal pain, and was advised to use an over-the-counter knee brace. The claimant's medication for diabetes mellitus was increased later in October. (Exhibit B8F).

Records from November 2020 note ongoing pain in the claimant's back and knee, as well as issues with urinary frequency. The claimant continued to ambulate with a cane, but was in no acute distress. The claimant's medication for diabetes mellitus were again adjusted, and the claimant was continued on his prescribed medications for his other severe impairments. The claimant followed up with his primary care provider in December 2020. During this objective examination, a thickened nail was noted on the right great toe, and monofilament wire test was abnormal in the bilateral heels. The claimant ambulated with a limp. However, he had normal muscle tone and normal movement of all extremities. The claimant's diabetes was described as uncontrolled, but he was improving control of his hypertension. He was prescribed medications to manage his headaches, and continued to be prescribed medication for his musculoskeletal pain. (Exhibit B8F). A new medication was added for diabetes mellitus in February 2021, and the claimant was restarted on his previous regimen for hypertension. (Exhibit B9F; B10F; B11F; B12F). Increased urinary frequency was noted during this period, and the claimant was referred to urology. The claimant also reported ongoing severe back pain with episodic lower extremity pain. He continued to use a cane to ambulate, and he ambulated with an irregular gait upon examination. (Exhibit B11F; B12F). An MRI was re-ordered for further assessment of the claimant's back pain. This imaging was performed in March 2021, and revealed L4-5 spondylosis, with no significant canal or foraminal stenosis. (Exhibit B9F/35; B10F/35; B11F/24; B12F/40; B13F/29). Primary care records from March note that the claimant's blood

See Next Page

sugars were in the high range, and his blood pressure was described as being under fair control. During the objective examination, there was tenderness and muscle spasm in the CVA. However, the claimant ambulated normally at that time. (Exhibit B11F; B12F; B13F).

The claimant continued to report chronic lower back pain in April 2021, with episodic lower extremity pain. He stated that he continued to use a cane to walk lengthy distances, though he was able to walk short distances and transfer from a bed to a chair without a cane. The claimant was referred for physical therapy. During an appointment in May, the claimant reported ongoing back pain with some hip pain. The claimant reported that he had not yet participated in physical therapy at that time. During the objective examination, tenderness was noted in the left low lumbar area and left PSIC. Straight leg raise was positive on the left. However, the strength in his lower extremities was 5/5, and he ambulated with a normal gait. The claimant was again referred to physical therapy, and it was recommended that the claimant be placed on a muscle relaxant. Records from May also note an increase in the claimant's medication for diabetes mellitus. The claimant began physical therapy in May 2021, and limited range of motion was noted during the objective examination. Strength was 4/5 on the right, and the claimant demonstrated with an antalgic gait pattern. He ambulated with a single point cane. Overall, the claimant was described as demonstrating gross weakens sot his left lower extremity with poor neuromuscular coordination and core stabilization. The claimant was provided information regarding a home exercise program, and advised to follow up in a month. (Exhibit B12F; B13F). Physical therapy records from July note a slight decrease in symptoms. The claimant continued to report tenderness in the lower back on the left side and ankle, periodical leg numbness, and stated that he continued to use a cane when in the community. Limited range of motion was still noted in the lumbar spine, but his bilateral lower extremity strength and sensation were within normal limits. The claimant was described as responding well to their exercises, though there was some fatigue noted. The claimant reported no increase of pain with muscular activation, decreased symptoms with nerve glides, and decreased back tightness after certain exercises. (Exhibit B12F; B13F; B14F).

The claimant continued to seek treatment for his severe impairments into 2022. Records from January note that the claimant had been off his medications, and he had experienced an increase in back pain since stopping his medications. No headaches, fatigue, or palpitations were reported. The claimant was restarted on his current medications, and a physical therapy appointment was scheduled. Physical therapy records from the end of January note improving back pain. The claimant reported that his pain was more in his buttocks, glutes, and left knee. He continued to ambulate with a single point cane. The claimant reported poor compliance with his home exercise program, and the records note continued hip and lower extremity pain and weakness. Though the claimant reported some soreness after the session, there was no increase in pain. During a primary care appointment in February 2022, the claimant reported some nausea when eating, as well as some sleeping issues. He reported that he missed his medications sometimes. The claimant also continued to report some lower back pain. During the objective examination, the claimant had a thickened nail with proximal groove in the right big toe, had limited range of motion, and ambulated with a limp and cane. However, sensation was grossly intact, and there was no tremor noted. The claimant had normal strength and tone. He was continued on his prescribed medications. The claimant presented for a follow up in March 2022, stating that he forgot to get refills on his medication at the previous appointment. The claimant

continued to ambulate with a cane. His medication for diabetes mellitus was adjusted, and he
was continued on his medication for hypertension. (Exhibit B14F).

The claimant continued to report some back and shoulder pain during an appointment in July
2022, and stated that his blood glucose levels had been elevated. The claimant was in no acute
distress during the objective examination ,and was ambulating normally. The claimant reported
that he uses a cane to help with walking, but does not always need it. His blood pressure was at
goal, but his medications for diabetes was adjusted. The claimant was scheduled for a follow up
appointment with physical therapy. Physical therapy records from September 2022 note that the
claimant still gets twinges in his back and mobility was still difficult. His legs were feeling good
with weakness. Though the claimant reported that his pain could increase to 7 out of 10 on the
pain scale, at the time of the appointment it was 2 out of 10. Gower sign was noted with return
from lumbar flexion, and limited range extension and rotation were noted. Right hip weakness
was approximately 4+/5, but strength was 5/5 in all other major muscle groups. Nerve irritation
was noted throughout the sciatic distribution. Overall, the claimant was described as improving,
though he still had flexion bias and weakness in the hip. After the session, the claimant reported
fatigue but no increase in pain. He was provided a home exercise program and advised to follow
up as needed. The claimant presented to his primary care provider in November 2022 for refills.
During this appointment, the claimant reported right foot pain with no change to the skin or
swelling. The claimant reported that he had been taking his medications consistently 'most days'.
During the objective examination, the claimant ambulated with a cane. However, his right foot
examination was within normal limits with no lesions, wounds, or edema noted. Overall, the
claimant's numbers with regard to his diabetes were improving, but they remained higher than
goal, and he was stared on insulin. He was continued on his other medications, and was advised
to continue with physical therapy. Though the claimant continued to report foot pain in January
2023, he only had minimal callous to his feet. (Exhibit B15F).

The record also routinely notes that the claimant's weight is in the obese range. Social Security
Ruling 19-2p requires that the undersigned consider the effect obesity has on the claimant's
ability to perform routine movement and necessary physical activity within the work
environment. The combined effects of obesity with another impairment may be greater than the
effects of each of the impairments considered separately. Therefore, the undersigned has
considered all-work related physical limitations, whether due to the claimant's obesity, other
impairments, or a combination of impairments.

The records outlined above note reports of pain in the shoulder, back, and lower extremities
during the relevant period. Imaging of the left shoulder revealed a non-displaced fracture of the
greater tuberosity, though the rotator cuff, long head of the biceps tendon, and glenoid labrum
were intact. (Exhibit B4F; B5F; B6F). Imaging of the back noted L4-L5 spondylosis, though
there was no evidence of significant canal or foraminal stenosis. (Exhibit B9F; B10F; B11F;
B12F; B13F). The claimant ambulated with an abnormal gait or with a cane at some
appointments. However, the claimant admitted that he could ambulate some distance without a
cane, and many treatment records describe him as ambulating normally. While decreased range
of motion was noted in the claimant's shoulder in early 2020, more recent records have not noted
any significant deficits in this area on objective examination. Indeed, while the claimant at times
showed some limited strength in his lower extremities on examination, his strength was full in all

other areas. Furthermore, the claimant has been treated conservatively with medication management and physical therapy for these impairments. (Exhibit B4F; B5F; B6F; B7F; B8F; B9F; B10F; B11F; B12F; B13F; B14F; B15F). The claimant exhibited improvement with physical therapy (Exhibit B12F; B13F; B14F; B15F). The claimant has also received treatment for diabetes mellitus and hypertension throughout the relevant period, and has reported some symptomology associated with these conditions such as dizziness, headaches, and increased urination. However, physical examination findings have been largely normal, with only occasional notations of calluses or decreased sensation in the claimant's feet. (Exhibit B5f; B6F; B7F; b8F; B9F; B10F; B11F; B12F; B13F; B15F).

The evidence outlined above supports the determination that the claimant could perform a range of work at the light exertional level. The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. Furthermore, the claimant can stand and walk for a total of 4 hours during an 8-hour workday, though the claimant would require the use of a cane for walking to and from the workstation. Despite the claimant's reported injuries, physical examination findings have noted minimal limitations in strength and range of motion throughout the relevant period, supporting the determination that the claimant can occasionally use the left upper extremity and the left lower extremity to push or pull. The claimant is also capable of frequently reaching with the left upper extremity. Though the claimant can never climb ladders, ropes, or scaffolds, he is capable of occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs. To address the combined effects of the claimant's severe impairments, he would be precluded from concentrated exposure to extreme heat and cold, and could perform no work around unprotected heights.

The claimant also has a history of treatment for mental health symptomology. During an appointment in January 2020, the claimant reported a buzzing in his ears and difficulty to focus. He reported that he was fired for his previous job for arguing with another employee, and had found it difficult to find a job since that time. However, during the objective examination he was calm and cooperative, and his attitude toward the examiner was comfortable. He described his mood as 'better', and his state of consciousness was described as alert. He had a full range of affect, and his thought process was linear and goal-directed. The claimant's auditory hallucinations had decreased, and his insight and judgment were described as good. His medications were continued, and he was advised to follow up with this treatment provider in 4 weeks. The claimant was continued on his medication regimen in February 2020, and the claimant reported that his medication was working. He reported that he was sleeping 'a lot', and was less irritated. The claimant's mental status examination remained largely normal, and continued improvement was noted in the treatment records. The claimant continued to have normal findings on objective examination during a follow up in March 2020. (Exhibit B5F; B6F; B7F). The claimant reported that he was doing well during an appointment in July 2020, though he reported irritability and auditory hallucinations. The claimant described his mood fluctuating, but the rest of his mental status examination remained largely unchanged. The claimant was continued on his current medications, and was advised to follow up in 3 months unless treatment was needed sooner. (Exhibit B7F).

The claimant reported some increased paranoia and auditory and visual hallucinations in October 2020. However, during the objective examination he remained cooperative and calm, and was

comfortable with the examiner. He was alert, his thought process was liner and goal-directed, and his insight and judgment were good. The claimant's medication regimen was adjusted for better management of his symptomology, and he was advised to follow up in a week or two. During a follow up later in October, the claimant did not report much change in his symptomology, and his medication was adjusted again. The claimant continued to report hallucinations in November 2020. However, his mood was euthymic, and the rest of his mental status examination was largely normal. The claimant's medications were again adjusted, and he was described as tolerating his new regimen well. By December, the claimant was described as doing okay, and he described his mood as euthymic. His mental status examination noted normal findings, and his mental health diagnoses were escribed as stable. The claimant was continued on his current medication regimen.  (Exhibit B8F). During an appointment in February 2021, the claimant reported that he was doing okay, though he continued to experience auditory hallucinations. His mental status examination remained normal, and his medication was increased. (Exhibit B11F; B12F). Records from March 2021 note that the claimant was doing 'pretty good', with decreased auditory hallucinations and increased sleep. His mental status examination remained largely normal, and he was continued on his medication regimen. (Exhibit B11F; B12F; B13F).

The claimant was off his medications for several months at the end of 2021, and restarted his medications in January 2022. The claimant reported lethargy and auditory hallucinations, as well as depression and low motivation. While his mood was low during the objective examination, he remained calm and cooperative, and was comfortable with the examiner. He was described as alert, had a full range of affect, and his thought process was linear and goal-directed. His insight and judgement were good. By February, the claimant reported that he was okay with sporadic sleep and issues with nausea. However, his mental status examination remained largely normal. The claimant reported that he was still sleeping a lot in March 2022, but reported that he was overall doing well despite some residual irritability. The claimant's mental status examination was largely normal. His medication was increased, and he was advised to follow up in 4 weeks. During an appointment in August 2022, the claimant reported that his sleep was ok, but he was still experiencing irritability and anger. However, his condition was described as stable overall, and his mental status examination was largely normal. The claimant was continued on his medication regimen, and indicated that he was interested in therapy.  (Exhibit B14F).

Though the claimant has reported some exacerbations in his mental health symptomology throughout the relevant period, improvement is noted in the claimant's symptomology when complaint with his prescribed medication. Furthermore, his mental status examinations are routinely normal. The claimant was described as calm and cooperative, had a linear and logical thought process, and had good judgment and insight throughout the relevant period. (Exhibit B5F; B6F; B7F; B8F; B11F; B12F; B13F; B14F). The claimant has also reported the ability to care for his personal needs, is capable of using public transportation, routinely goes in public, and reads and plays board games in his spare time. (Hearing Testimony; Exhibit B5E). Therefore, the overall evidence supports the determination that the claimant is capable of performing simple, routine, repetitive tasks with occasional workplace changes. Furthermore, he can engage in occasional interaction with the general public and coworkers, and can sustain concentration and attention for two-hour periods with customary breaks.

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources. The undersigned has fully considered the medical opinions and prior administrative medical findings.  Upon initial review, the state agency did not find any severe physical impairments. (Exhibit B1A). The undersigned does not find this opinion to be persuasive. The state agency was unable to support their findings with updated evidence, and this conclusion is inconsistent with the record as a whole. Though the claimant has experienced improvement in his condition with treatment and exhibits significant abilities during objective physical examinations, the claimant has received routine treatment for musculoskeletal pain, diabetes mellitus, and hypertension throughout the relevant period. These impairments have resulted in symptomology that have placed more than minimal functional limitations on the claimant. Therefore, the undersigned cannot find the opinion that the claimant has no severe physical impairments to be persuasive.

Upon reconsideration, the state agency opined that the claimant had severe physical impairments that have limited him to work at a light exertional level. They further opined that the claimant could occasionally climb ladders, ropes, and scaffolds, could occasionally stoop and crouch ,and could frequently balance, kneel, crawl, and climb ramps and stairs. The state agency further opined that the claimant could frequently reach in front of, laterally, and overhead with the left upper extremity. (Exhibit B5A). The undersigned also does not find this opinion to be persuasive. Though supported with more updated evidence, this opinion is also not entirely consistent with the record as a whole. The determination that the claimant could lift and carry the 20 pounds occasionally and 10 pounds frequently required for work at a light exertional level is consistent with the many normal physical examination findings in the record. However, the claimant has continued to report symptomology associated with his severe impairments that would limit him to 4 hours of standing and walking in a workday, would require him to use a cane to walk to and from the workstation, and would require additional postural, manipulative, and environmental limitations that were not contemplated by the state agency when they rendered their opinion. As this opinion is not consistent with the record as a whole, the undersigned does not find it to be persuasive.

Upon both initial review and reconsideration, the state agency psychological consultants opined that the claimant has a moderate limitation in concentrating, persisting, and maintaining pace, and mild limitations in all other areas of mental functioning. (Exhibit B1A; B5A). Upon initial review, the state agency opined that the claimant could carry out simple 2 to 3 step instructions. (Exhibit B1A). Upon reconsideration, the state agency opined that the claimant would be able to carry out simple and detailed instructions with some decrease in concentration and pace. (Exhibit B1A; B5A). The undersigned cannot find either of these opinions to be persuasive. The state agency was unable to support their opinion with the most updated evidence, which is now available to the undersigned at the hearing level. Furthermore, these opinions are not consistent with the claimant's continued treatment for mental health symptomology throughout the relevant period. Though the claimant's mental status examinations are routinely normal and improvement is noted with compliance with his medication regimen, the claimant's ongoing symptomology is more consistent with moderate limitations in all areas of mental functioning. These moderate limitations are also consistent with limiting the claimant to simple, routine, repetitive tasks with

occasional workplace changes and occasional interaction with the general public and coworkers. As the state agency consultants were unable to support their findings with the most updated evidence and their opinions are inconsistent with the record as a whole, the undersigned cannot find their opinions to be persuasive.

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the noted improvement in the claimant's symptomology with treatment, the many normal findings on objective examinations throughout the objective medical records, and the claimant's significant reported activities of daily living. The overall evidence supports the determination that the claimant could perform a range of work at the light exertional level. The claimant can lift and carry 20 pounds occasionally and 10 pounds frequently. Furthermore, the claimant can stand and walk for a total of 4 hours during an 8-hour workday, though the claimant would require the use of a cane for walking to and from the work station. Despite the claimant's reported injuries, physical examination findings have noted minimal limitations in strength and range of motion throughout the relevant period, supporting the determination that the claimant can occasionally use the left upper extremity and the left lower extremity to push or pull. The claimant is also capable of frequently reaching with the left upper extremity. Though the claimant can never climb ladders, ropes, or scaffolds, he is capable of occasionally balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs. To address the combined effects of the claimant's severe impairments, he would be precluded from concentrated exposure to extreme heat and cold, and could perform no work around unprotected heights. Despite his mental impairments, the claimant is capable of performing simple, routine, repetitive tasks with occasional workplace changes. Furthermore, he can engage in occasional interaction with the general public and coworkers, and can sustain concentration and attention for two-hour periods with customary breaks.

**5.    The claimant has no past relevant work (20 CFR 416.965).**

**6.    The claimant was born on May 14, 1980 and was 39 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).**

**7.    The claimant has at least a high school education (20 CFR 416.964).**

**8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).**

**9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant

See Next Page

cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.20. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as Bottling Line Attendant (DOT # 920.687-042; light; SVP 1; unskilled; 20,000 jobs in the national economy); Marker (DOT # 209.587-034; light; SVP 2; unskilled; 80,000 jobs in the national economy); and Router (DOT # 222.587-038; light; SVP 2; unskilled; 50,000 jobs in the national economy).

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. The vocational expert testified that there were no conflicts with the Dictionary of Occupational Titles with regard to the limitations on pushing and pulling, climbing, the use of a cane for walking to and from the workplace, or with social interaction. The vocational expert stated that the Dictionary of Occupational Titles did not differentiate between the left or right upper extremities, and the vocational expert found no conflicts with the limitations on the left upper extremity in the residual functional capacity and the jobs identified. The vocational expert explained that she reduced the job numbers because of the limitation of standing and walking for more than 4 hours total, and she testified that these jobs would not require standing or walking for more than 4 hours total, which is consistent with the residual functional capacity. The vocational expert further stated that the jobs of Marker and Router each had a GED reasoning level of 2, which was consistent for the residual functional capacity for simple, routine, repetitive tasks. The job of Bottling Line Attendant has a GED reasoning level of 1. The vocational expert stated that in providing this testimony, she relief on the Dictionary of Occupational Titles along with her knowledge, education, and training, as well as observations of the jobs as performed. The undersigned has considered this detailed testimony and accepts it pursuant to the requirements of SSR 00-4p.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

See Next Page

Daniel Timothy Duncan (BNC#: 21KO632F47025)                    Page 18 of 18

**10.  The claimant has not been under a disability, as defined in the Social Security Act, since December 27, 2019, the date the application was filed (20 CFR 416.920(g)).**

**<u>DECISION</u>**

Based on the application for supplemental security income filed on December 27, 2019, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.


/s/ *Tracy S Guice*
_____
Tracy S Guice
Administrative Law Judge

March 01, 2023
_____
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | B1A | Initial Disability Determination by State Agency, Title XVI | | 2021-02-08 | 16 |
| Y13 | B2A | Disability Determination Transmittal | | 2021-02-08 | 1 |
| Y13 | B3A | AC Decision | | 2011-04-18 | 9 |
| Y13 | B4A | Disability Determination Transmittal | | 2021-09-08 | 1 |
| Y13 | B5A | Reconsideration Disability Determination by State Agency, Title II | | 2021-09-08 | 9 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | B1B | SSA-1696 - Claimant's Appointment of a Representative | | 2019-12-27 | 1 |
| Y13 | B2B | Fee Agreement for Representation before SSA | | 2019-12-27 | 1 |
| Y13 | B3B | T16 Notice of Disapproved Claim | | 2021-02-19 | 6 |
| Y13 | B4B | Request for Reconsideration | | 2021-04-23 | 3 |
| Y13 | B5B | T16 Disability Reconsideration Notice | | 2021-09-08 | 3 |
| Y13 | B6B | Request for Hearing by ALJ | | 2021-10-06 | 3 |
| Y13 | B7B | Request for Hearing Acknowledgement Letter | | 2021-10-22 | 15 |
| Y13 | B8B | COVID Hearing Agreement Form | | 2021-11-17 | 18 |
| Y13 | B9B | Outgoing ODAR Correspondence | | 2021-11-17 | 4 |

| Y13 | B10B | Request for Hearing Acknowledgement Letter | | 2021-11-18 | 20 |
| X78 | B11B | Hearing Notice | | 2022-03-22 | 14 |
| X78 | B12B | Notice Of Hearing Reminder | | 2022-06-03 | 4 |
| X78 | B13B | SSA-1696 - Claimant's Appointment of a Representative - Kathleen Flynn & Erica Dempsey | | 2022-06-23 | 1 |
| X78 | B14B | Fee Agreement for Representation before SSA - Kathleen Flynn & Erica Dempsey | | 2022-06-23 | 1 |

## Non-Disability Development

| Component | No. | Description | Received | Dates | Pages |
| --- | --- | --- | --- | --- | --- |
| Y13 | B1D | Application for Supplemental Security Income Benefits (Abbreviated) | | 2019-12-27 | 11 |
| Y13 | B2D | WHAT - Work History Assistant Tool | | 2022-02-02 | 10 |
| Y13 | B3D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2022-02-02 | 1 |
| Y13 | B4D | Summary Earnings Query | | 2022-02-02 | 1 |
| Y13 | B5D | Detailed Earnings Query | | 2022-02-02 | 2 |
| Y13 | B6D | Certified Earnings Records | | 2022-02-02 | 2 |
| X78 | B7D | Certified Earnings Records | | 2022-06-24 | 2 |
| X78 | B8D | Detailed Earnings Query | | 2022-06-24 | 2 |
| X78 | B9D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2022-06-24 | 1 |
| X78 | B10D | Summary Earnings Query | | 2022-06-24 | 1 |

## Disability Related Development

| Component | No. | Description | Received | Source | Dates | Pages |
| --- | --- | --- | --- | --- | --- | --- |

| Y13 | B1E | Disability Report - Adult | | Claimant | to 2020-06-10 | 7 |
| Y13 | B2E | Disability Report - Field Office | | Claimant | to 2020-06-10 | 2 |
| Y13 | B3E | Work History Report | | Claimant | to 2020-06-10 | 8 |
| Y13 | B4E | Pain Questionnaire / Report | | Claimant | to 2020-07-10 | 4 |
| Y13 | B5E | Function Report - Adult | | Claimant | to 2020-07-10 | 9 |
| Y13 | B6E | Disability Report - Field Office | | Claimant | to 2021-04-23 | 2 |
| Y13 | B7E | Disability Report - Appeals | | Claimant | to 2021-04-23 | 6 |
| Y13 | B8E | Disability Report - Field Office | | Claimant | to 2021-10-06 | 2 |
| Y13 | B9E | Disability Report - Appeals | | Claimant | to 2021-10-06 | 7 |
| Y13 | B10E | Exhibit List to Rep PH2E | | Y13 | to 2022-02-02 | 11 |
| X78 | B11E | Report of Contact | | Oho | to 2022-03-16 | 1 |
| X78 | B12E | Correspondence regarding efforts to obtain evidence | | | | 2 |
| X78 | B13E | Resume of Vocational Expert | | Rebecca Williams | | 4 |
| X78 | B14E | Representative Correspondence | | Kathleen Flynn | to 2022-06-21 | 1 |

## Medical Records

| Component | No. | Description | Received | Source | Dates | Pages |
| --- | --- | --- | --- | --- | --- | --- |
| Y13 | B1F | Emergency Department Records | | Grady Hospital Records | 2002-10-08 to 2007-11-24 | 45 |
| Y13 | B2F | Progress Notes | | Northside Hospital Atlanta | 2007-10-25 to 2009-05-05 | 55 |
| Y13 | B3F | Emergency Department Records | | Grady Hospital Records | 2007-11-24 to 2009-08-31 | 8 |

| | | | | | |
|---|---|---|---|---|---|
| Y13 | B4F | Hospital Records | Northside Hospital Atlanta | 2007-11-25 to 2020-02-24 | 148 |
| Y13 | B5F | Office Treatment Records | Good Samaritan Helath Center Inc | 2004-01-10 to 2020-03-27 | 48 |
| Y13 | B6F | Office Treatment Records | Good Samaritan Helath Center Inc | 2007-11-24 to 2020-06-27 | 67 |
| Y13 | B7F | Progress Notes | Good Samaritan Health Center Inc | 2003-01-01 to 2020-07-03 | 64 |
| Y13 | B8F | Office Treatment Records | Good Samaritan Helath Center Inc | 2020-10-02 to 2020-12-18 | 43 |
| Y13 | B9F | Office Treatment Records | Northside Hospital Atlanta | 2021-02-12 to 2021-03-11 | 38 |
| Y13 | B10F | Office Treatment Records | Northside Hospital Atlanta | to 2021-03-11 | 44 |
| Y13 | B11F | Medical Evidence of Record | Good Samaritan Helath Center Inc | 2021-02-05 to 2021-03-12 | 26 |
| Y13 | B12F | Office Treatment Records | Good Samaritan Helath Center Inc | 2021-02-05 to 2021-07-10 | 42 |
| Y13 | B13F | Office Treatment Records | Good Samaritan Helath Center Inc | 2021-03-11 to 2021-07-26 | 32 |
| X78 | B14F | Office Treatment Records | Good Samaritan Health Center | 2021-07-10 to 2022-03-18 | 61 |
| X78 | B15F | Office Treatment Records | Good Samaritan Health Center | 2022-07-29 to 2023-01-07 | 46 |