IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ASP GLOBAL, LLC | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No. |
| | ) | |
| v. | ) | _____ |
| | ) | |
| SMART GLOVE INTERNATIONAL PTE. LTD., a Singaporean company, | ) ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW Plaintiff ASP Global, LLC ("Plaintiff" or "ASP"), by and through its undersigned counsel, and hereby files this Complaint against Defendant SMART GLOVE INTERNATIONAL PTE. LTD. ("Smart Glove" or "Defendant"), a Singaporean company, (together with Plaintiff, the "Parties"), respectfully showing this Court as follows:

## PARTIES

1. Plaintiff ASP is a limited liability corporation organized and existing under the laws of the State of Georgia, having its headquarters and principal place of business in Austell, Georgia. For purposes of assessing jurisdiction, Plaintiff is a citizen of the State of Georgia.

1

2. Defendant Smart Glove is a Singaporean company organized and existing under the laws of Singapore, having its headquarters and principal place of business in Singapore. For purposes of assessing jurisdiction, Defendant is a citizen of a foreign country.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because complete diversity exists between the parties and the amount at issue exceeds $75,000.

4. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district, the contracts between the parties contemplate the purchase and supply of products in this judicial district, the communications between the parties were focused on, emanated from and/or sent to this district, and the products at issue were shipped to this district and, to the extent they are still held, are held in this district.

## STATEMENT OF FACTS

5. On or around February 10, 2021, ASP ordered 8 containers (26,800 cases) of Smart Glove GEN-X Nitrile Examination Gloves (the "Gloves") from Smart Glove for the aggregate purchase price of $3,430,400.00, all of which was

paid in full by ASP. The invoices from these orders (PO Nos. 1005047-M, 1005048-M, 1005049-M, 1005050-M, 1005052-M, 1005055-M, 1005059-M, 1005060-M) are attached in composite **Exhibit A.**

6. Smart Glove's shipment for PO No. 1005047-M arrived in Austell, Georgia on or about June 21, 2021.

7. Smart Glove's shipment for PO No. 1005052-M arrived in Austell, Georgia on or about June 28, 2021.

8. Smart Glove's shipment for PO No. 1005048-M and PO No. 1005050-M arrived in Austell, Georgia on or about July 14, 2021.

9. Smart Glove's shipment for PO No. 1005049-M arrived in Austell, Georgia on or about July 15, 2021.

10. Smart Glove's shipment for PO Nos. 1005059-M and 1005060-M arrived in Austell, Georgia on or about July 27, 2021.

11. In addition, ASP paid $435,500 towards two additional orders of gloves (the "Extra Orders"), which were never delivered to ASP.

12. As part of the Extra Orders, ASP paid $44,586.50 in return freight, detention and demurrage and made a demand for reimbursement of same from Smart Glove on August 31, 2022.

13. Ms. Eliana Koh, a Smart Glove customer service agent, agreed that Smart Glove would review the invoices to finalize the costs of the detention/demurrage charges. To date, ASP has not received a refund for these costs.

14. After the Gloves that were sent arrived, Smart Glove sent certificates of release ("COR") for the Gloves purchased by ASP. Therein, Smart Glove inaccurately represented that the Gloves had been "verified to comply with good manufacturing practice" and "device master record requirements." It was further inaccurately represented that the Gloves were within certain "Acceptance Quality Levels" ("AQL") for watertight test, critical barrier defects, visual defects, and critical visual defects.

15. Based on these representations, among other things, between July 2021 and February 2022, ASP sold 11,600 cases of the Gloves to its customers, leaving 15,200 cases of gloves in inventory.

16. In February 2022, ASP began receiving complaints from customers regarding the quality of the Gloves.

17. ASP's quality staff conducted an investigation of the alleged defects by testing samples from various lot numbers. ASP's investigation revealed that the Gloves were significantly defective, out of contract specifications, and not suitable for their intended use. Among other things, the Gloves: (1) failed to meet the 1.5

AQL for critical barrier defects, despite the claims in Smart Glove's COR; (2) were poorly packed; (3) contained holes, tears, and foreign material (including debris/dirt); and (4) exhibited poor beading at cuff, missing cuff, and tearing while donning.

18.   On February 16, 2022, ASP sent an email to Mr. Zahier describing defects in the Gloves and requesting a Supplier Corrective Action Request ("SCAR") with a deadline of February 25, 2022. This email is attached as **Exhibit B**.

19.   Despite the clear one-week deadline, Smart Glove responded nearly three weeks late on March 14, 2022, whereby Smart Glove attached an investigation report admitting product defects, attached hereto as **Exhibit C**.

20.   Specifically, Smart Glove's investigation revealed holes, poor beading, discoloration, torn cuffs and other defects. (*See* Smart Glove Corrective Action/Preventitive Action Report (CAPAR) dated March 15, 2022, attached hereto as **Exhibit C**).  Among other things, Smart Glove's initial report explained that the tearing was "[d]ue to poor latex pick up which was caused by bubble formation in latex tank…Bubbles that stick on former that leads to poor latex pick up and causes thin spot on the gloves.  Gloves with thin spots tend tear easily." (*Id.*)

21. ASP also communicated findings from its internal investigation, including an Acceptance Quality Level ("AQL") evaluation demonstrating that the Gloves did not meet the performance criteria specified for this product ordered.

22. Notwithstanding its acknowledgement of these significant defects, Smart Glove failed to offer or provide any relief for their defective products.

23. On May 11, 2022, ASP sent another email alerting Smart Glove of its product deficiencies, noting that one of ASP's strategic customers refused any future orders from Smart Glove.

24. ASP has 15,200 cases of unusable gloves it has had to hold in inventory, purchased at a cost of $1,945,600.

25. Given the gloves did not pass the AQL inspection, ASP requested full reimbursement for the remaining 15,200 cases of the non-conforming gloves as no customer would accept the remaining Smart Glove gloves.

26. In response to this email, ASP and Smart Glove conducted a virtual meeting on June 2, 2022 at 9:00 AM (Malaysia time) with Sabrina Moore (ASP), Elina (Smart Glove), and Zhaqri (Smart Glove).

27. During this meeting, ASP and Smart Glove agreed that ASP would send to Smart Glove five unopened dispensers per lot number of gloves ("the lots") to further investigate the quality of Smart Glove's gloves.

28. ASP promptly arranged for the samples to be sent to Smart Glove for investigation, and these goods arrived at Smart Glove's location on July 14, 2022.

29. Throughout August, Smart Glove sent investigation reports for the lots, many of which confirmed the complained-of defects in the products. *See* **Exhibit D**.

30. For example, in SCAR-19-003, which ASP received from Zhaqri on August 4, 2022, Part B of the report shows that the gloves had "tear defect at cuff and dinger area" and that the "tear could be due to weak spots on glove." The root cause analysis also stated: "The weak spots at cuff part occurred due to poor hand former cleanliness, thus created poor latex pickup during dipping process resulting weak spot on the gloves." *See* **Exhibit E**.

31. Nevertheless, Smart Glove refused to pay damages, provide any refund or reimburse the money for the gloves that were not delivered.

32. On January 19, 2023, ASP's counsel sent a demand letter to Foo Khon Pu, a representative of Smart Glove, demanding reimbursement by January 24, 2023.

33. To date, ASP has not received reimbursement for any defective gloves, any damages or the money that was paid for gloves that were not delivered.

## COUNT ONE – BREACH OF CONTRACT

34. Plaintiff incorporates Paragraphs 1-33 as if fully set forth herein.

35. There is a valid and enforceable contract between ASP and Smart Glove.

36. ASP performed all duties and obligations imposed on it by paying the full value of the Gloves and incidental costs prior to shipment.

37. Defendant breached the contract by shipping defective, unusable products.

38. Defendant further breached by failing to provide two orders of goods and/or failing to provide a refund despite ASP's payment of $435,000 plus $44,586.50 of Smart Glove's shipping/demurrage charges.

39. The product ASP bargained for would have been worth far more to ASP than the purchase price and associated expenses had they been properly manufactured and timely delivered.

40. Defendant has further breached by breaching the covenant of good faith and fair dealing associated with the agreement with Plaintiff.

41. As a direct and proximate result of Defendant's breaches, Plaintiff has suffered direct and consequential damages in an amount to be demonstrated at trial.

## COUNT TWO – BREACH OF WARRANTY

42. Plaintiff reincorporates Paragraphs 1-41 as if fully set forth herein.

43. ASP purchased products from Smart Glove, who is a merchant with respect to gloves. Indeed, Smart Glove markets itself as having specialized knowledge about the glove industry, stating on their website they are "armed with a wealth of experience and expertise in glove manufacturing . . . .":

### ABOUT THE COMPANY

Founded in 1995, Smart Glove is one of Malaysia's leading innovative glove manufacturers recognized on a global front. Armed with a wealth of experience and expertise in glove manufacturing, Smart Glove provides a diverse range of specialty gloves. Robust operating history of over 20 years, Smart Glove is committed to producing specialty gloves with different specifications to cater to the needs of our customers from various industries, but not limited to medical, food, dental, cleanroom and others.

(Available at Smartglove.com.my)

44. Defendant's products were defectively designed and/or manufactured, making them unfit for their ordinary purpose as patient examination gloves and unmerchantable. Specifically, the Gloves had critical defects including holes, tears, foreign materials, poor beading at cuff, missing cuff, dirt/debris, poor packing, and tearing while donning.

45. The defects at issue existed when Defendant delivered the Gloves to ASP and make the Gloves unmerchantable and out of warranty.

46. As a direct and proximate result of Defendant's breaches, Plaintiff has suffered direct and consequential damages in an amount to be demonstrated at trial.

## **COUNT THREE – UNJUST ENRICHMENT**

(Pled in the alternative)

47. Plaintiff incorporates paragraphs 1-46 as if fully set forth herein.

48. Plaintiff paid Defendant more than $3,865,900.00 for the Gloves but has not received the Gloves in the condition ordered or, in some cases, at all.

49. By retaining Plaintiff's money without supplying conforming Gloves, Defendant has obtained a windfall in at least the amount of the payment, plus the time value of the money that was paid.

50. Defendant's financial windfall is the result of their improper and inequitable conduct.

51. In the event the Parties are deemed not to have a controlling contract, it would be inequitable and unjust for Defendant to be permitted to retain any of Plaintiff's payments or the time value of money Defendant has received from holding Plaintiff's payments.

52. As such, Plaintiff is entitled to recover for Defendant's unjust enrichment in an amount to be demonstrated at trial.

## COUNT FOUR – ATTORNEY'S FEES

53. Plaintiff restates and incorporates the allegations of Paragraphs 1 through 52 as if fully set forth herein.

54. Defendant's actions have been in bad faith, have manifest stubborn litigiousness, and have caused Plaintiff unnecessary trouble and expense, so as to justify an award to Plaintiff of its costs of litigation, including reasonable attorney's fees and expenses under O.C.G.A. § 13-6-11.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendant, and that Plaintiff be awarded:

A. Judgment in its favor on all appropriate counts of this Complaint;

B. All allowable compensatory, consequential, incidental, and other damages arising from Defendant's breach in an amount to be determined at trial;

C. All costs incurred in this action;

D. Attorney's fees and expenses pursuant to O.C.G.A. § 13-6-11;

E. Pre- and post-judgment interest on the liquidated amount of pursuant to O.C.G.A. §§ 7-4-15 and 13-6-13 and post-judgment interest according to law; and

F. Such other further relief as the Court deems necessary and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands trial by jury for all causes of action, claims, or issues in this action which are triable as a matter of right by a jury.

Respectfully submitted this 18th day of August, 2023.

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.**

*/s/ Steven G. Hall*
Steven G. Hall
Georgia Bar No. 319308
Jordana K. Oppenheim
Georgia Bar No. 825750
3414 Peachtree Road, NE, Ste 1500
Atlanta, GA 30326
404.577.6000 (Telephone)
404.221.6501 (Facsimile)
shall@bakerdonelson.com
joppenheim@bakerdonelson.com

*Counsel for Plaintiff*