# Exhibit A-1

*Expert Declaration of David B. Lett*

**EXPERT DECLARATION OF DAVID B. LETT**
**RE PATENTABILITY OF UNITED STATES PATENT NO. 8,160,980**

**Table of Contents**

I.    INTRODUCTION.................................................................................1

II.   LEGAL STANDARD FOR PATENT ELIGIBILITY ...............................1

  A.   Patent Eligibility ...........................................................................1

    1.   Step One under *Alice* ...............................................................3

    2.   Step Two under *Alice*...............................................................4

III.  THE '980 PATENT ...........................................................................6

  A.   Overview and Prosecution of the '980 Patent ................................6

    1.   The Claims of the '980 Patent ...................................................6

    2.   The Specification/Written Description of the '980 Patent .............8

    3.   The Prosecution History of the '980 Patent................................16

  B.   Eligibility Analysis of the '980 Patent..........................................17

    1.   *Alice* Step One ........................................................................19

    2.   *Alice* Step Two.......................................................................21

IV.   CONCLUSION................................................................................23

## I.    INTRODUCTION

1.    I have been retained by DigiMedia Tech, LLC ("DigiMedia" or "Patent Owner") as a technical expert for the purposes of evaluating the patentability of certain patents under Section 101 of the Patent Act.

2.    Information about my education and experience is provided in my CV, which is attached as Exhibit A to this Declaration.

3.    I am being compensated for my time working on this matter at my customary hourly rate for consulting work of this nature.  I have no personal stake nor interest in the outcome of the present proceeding or in either party to this proceeding.

4.    In forming my opinions stated in this declaration, I reviewed and am familiar with U.S. Patent No. 8,160,980 ("the '980 Patent") and its prosecution history.  A complete list of the materials I have been provided and reviewed in preparing this Declaration is set forth in Exhibit B to this Declaration.

## II.    LEGAL STANDARD FOR PATENT ELIGIBILITY

### A. Patent Eligibility

I am informed that Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor…"  35 U.S.C. § 101.

I understand the Supreme Court has expanded on this language by

identifying three types of subject matter that are *not* patent-eligible: "Laws of nature, natural phenomena, and abstract ideas." *Alice Corp. Pty. Ltd. v. CLS Bank. Int'l*, 573 U.S. 208, 216 (2014). The ultimate purpose for these exemptions is to ensure that a patent does not monopolize the basic building blocks for other inventions. *Id.* However, the Supreme Court cautioned the courts and the parties to "tread carefully in construing the exclusionary principle lest it swallow all of patent law." *Id.* at 217. All inventions contain or use some form of the laws of nature, natural phenomena and abstract ideas; "[t]hus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id.* Ultimately, the Supreme Court developed a two-part test to determine if a patent is eligible. *Id.* at 216–19.

I also understand that issued patents are presumed to be valid, enforceable, and directed to patent-eligible subject matter. I understand further that this presumption can only be overcome by clear and convincing evidence. I understand this presumption derives from the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting prior art references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents. *See, e.g., Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed. Cir. 1984); *see also Microsoft v. i4i*

*Ltd. P'ship*, 564 U.S. 91, 108-111 (2011).

### 1. Step One under *Alice*

I have been informed that the first step of the *Alice* patent-eligibility analysis looks at the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *CardioNet, LLC*, 955 F.3d at 1367 (quoting *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016)). I understand that a court is to look at the patent claims, the specification, and the prosecution history of the patent. *Id.* at 1372–73. Claims that purport to improve the functioning of a computer itself or to improve an existing technology process are not abstract ideas even if an abstract idea is underlying the claims. *Id.* at 1368. "It is not enough merely to identify a patent-ineligible concept underlying the claim; [the court] must determine whether the patent-ineligible concept is what the claim is 'directed to.'" *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1048 (Fed. Cir. 2016). In essence, do the claims attempt to monopolize the entirety of the ineligible concept? *See id.*; *CardioNet, LLC*, 955 F.3d at 1368.

I understand the Supreme Court has held that, in analyzing patent eligibility under Section 101, the patent claims "***must be considered as a whole***" and it is "inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis." *Diamond v. Diehr*, 450 U.S. 175,

188 (1981).  The Federal Circuit has repeatedly echoed this sentiment and held that, to steer clear of the Supreme Court's admonition not to "dissect the claims," claims must be "considered in their entirety to ascertain whether their character as a whole is directed to" an abstract idea.  *McRO, Inc.*, 837 F.3d at 1312.

In *Alice* step one, the court "cannot simply ask whether the claims ***involve*** a patent-ineligible concept, because essentially every routinely patent-eligible claim involving physical products and actions involves a law of nature and/or natural phenomenon."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016).  Rather, defendants must compare the claims from their cited cases ***as a whole*** to the asserted claims of the challenged patents ***as a whole***.  Only if a court finds that the claims in their entirety are directed to an abstract idea, may the court then move to step two.  *Alice*, 573 U.S. at 217.

## 2.  Step Two under *Alice*

I am informed that step two of the *Alice* inquiry involves "determin[ing] whether the additional elements [aside from the abstract idea] 'transform the nature of the claim' into a patent-eligible application."  *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78 (2012)).  This entails looking at the claim elements both individually and "as an ordered combination."  *Id*. at 209.  Even a claim directed to a patent-ineligible concept may be patentable if it includes "unconventional steps" that "confine[] the claims to a

particular, useful application of the principle." *Mayo*, 566 U.S. at 84.

Thus, I understand that step two analyzes the elements of a claim individually and as an ordered combination to determine if the additional elements form an inventive concept that amounts in practice to more than a patent on the ineligible concept itself. *Id.*; *CardioNet, LLC*, 955 F.3d at 1367–69. An inventive concept is more than the application of the abstract idea using "well-understood, routine, and conventional activities." *Cellspin*, 927 F.3d at 1316. Allegations in a complaint, the patent, and the specifications can be used to determine if the claims are potentially inventive. *Id.* at 1317; *Aatrix Software, Inc.*, 882 F.3d at 1128. For example, "[a]n analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two." *BASCOM Global Internet Servs. v. AT&T Mobility*, 827 F.3d 1341, 1348 (Fed. Cir. 2016).

I am further informed that the patent's specification "need not expressly list all the reasons why [a] claimed structure is unconventional." *Cellspin*, 927 F.3d at 1317. In addition, "[c]laims need not articulate the advantages of the claimed combinations to be eligible." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020). For example, I understand that neither a claim's "compatibility with conventional communication systems" nor "the fact that the improvement is not defined by reference to 'physical' components" renders it abstract. *Id.* "An inventive concept can be found in the non-conventional and non-

generic arrangement of known, conventional pieces." *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Typically, whether a concept was inventive at the priority date of the patent involves significant fact questions. *Id.*; *Cellspin*, 927 F.3d at 1318.

## III.   THE '980 PATENT

### A. Overview and Prosecution of the '980 Patent

The claims of the '980 Patent are directed to technical solutions to the problems of (i) reducing the wait time between requesting common, everyday information and displaying such information to a user and (ii) intelligently generating suggested content for the user from the potentially extensive information based on a user profile.  The claimed invention consists of a new concept, function, and format of delivery that provides a level of ease in accessing common information that prior art systems could not provide, including by providing a proxy that handles the collection and parsing of data, a server that gathers usage data from the client, a data mining cluster that allows for user profiling and time, space and relevance analysis, and a set of channels which are periodically updated and upon which automatic suggestions are given based on the user profile.

#### 1.  The Claims of the '980 Patent

The '980 Patent consists of 13 issued claims, which are set forth below:

1. An information system based on time, space and relevance, said system comprising: a client that displays information in a user-friendly manner; a proxy that handles the collection and parsing of data; a server that gathers usage data from the client; data mining cluster that allows for user profiling and time, space and relevance analysis; a set of information channels, which are periodically updated, and upon which automatic suggestions are given based on a user profile.

2. The system according to claim 1, wherein the client is a thin client.

3. The system according to claim 1, wherein the proxy is divided between the client and the server.

4. The system according to claim 1, wherein the data handled by the proxy is in extensible markup language (XML) format.

5. An information system, said information system comprising: at least one client that displays information related to a plurality of information channels; a data mining cluster which performs user profiling and time, space and relevance analysis, wherein suggestions are provided to said at least one client based on a user profile and said time, space, and relevance analysis, and wherein said plurality of information channels are updated based on said suggestions.

6. The system, according to claim 5, wherein the at least one client is a thin client.

7. The system according to claim 5, wherein said at least one client comprises a proxy that collects and parses data.

8. The system according to claim 5, wherein said plurality of information channels are periodically updated.

9. The system according to claim 5, wherein said suggestions are automatically provided to said at least one client.

10. The system according to claim 7, wherein the data collected by the proxy is in extensible markup language (XML) format.

11. A client device for obtaining information based on time, space and

relevance analysis received from a data mining cluster, said device comprising: at least one user interface for entering data; a screen for displaying said information; an input/output unit for receiving said information and transmitting said data, wherein automatic suggestions are received, via said input/output unit, based on a user profile and said time, space, and relevance analysis.

12. The client device according to claim 11, wherein the client device is a thin client device.

13. The client device according to claim 11, further comprising a proxy for pre-fetching said information.

## 2. The Specification/Written Description of the '980 Patent

The specification of the '980 Patent describes the various components of these claims in sufficient detail for a person having ordinary skill in the art to understand, make, and use the claimed invention.

The written description of the '980 Patent provides an overview of the invention claimed in the '980 Patent:

The present invention is a new concept, function and format of delivery, and while some of its components are in the state of the art, no other system provides the level of ease in accessing common information that can be achieved in accordance with exemplary embodiments of the present invention.

YDreams [the original assignee] has been developing the concept for some time, but now expands it to the current invention considerably through the implementation of Time, Space and Relevant filtering, which is an exemplary aspect of this invention.

An exemplary embodiment of the present invention relates to a concept for an increased availability of information, relying on the ease of access and patterned display.

An exemplary embodiment of the present invention can expand the state of the art on information customization by integrating an

Declaration of David B. Lett – Page 8

automated process of empiric channel selection according to a user profile.

The system relies on a local client and a proxy, which can be fully located on the client itself, or rather on a separate server.

Basic data such as weather forecasts, temperature, news etc. can be displayed to the user. By the user's choice of display, a profile can be constructed which suggests to the user alternative channels that match the user's profile but not the user's current selection. ...

The system is a quality of life solution developed in view of residential housing complexes, for supplying information based on time, space and relevance therein. The system is made up of several interdependent subsystems, the client and the supporting infrastructure. The client includes a user-friendly interface and a proxy. The user interface is based in a touch screen placed inside the home to provide quick and easy access to a range of services including the information listed in the former paragraph, and also other functions such as digital photo frame. The proxy pre-fetches information for rapid access. The information provided to the user is based on the user's location and profile. Information is based in channels catalogued in a directory with levels of information and related-location. The usage of the system determines the suggestion of new services to the user.

The supporting infrastructure involves a database collecting information related to the users' usage of the system, a web portal for system administration, and a statistics analyzer to study the information and perform channel suggestions for each user. Additionally, the server can also pre-fetch client information, allowing thin clients with reduced processing power to be used within the proposed system. The database allows analysis of users' usage and to perform profiles leading to suggesting information channels that best fit their profiles.

A portal for system administration is also included allowing the addition, modification or removal of services to/from the system, along with system related parameters, emergency contacts, and location-based events relevant to the user.

'980 Patent, 1:44 – 2:58.

The written description of the '980 Patent provides a detailed description of

the claimed "*proxy*" element of the invention:

> The *proxy* module requests extensible markup language (XML)-based services and converts the provided information to the system format. This allows for seamless integration of different content providers for different information channels. The *proxy* also registers users' preferences, performs updates of the application and sends statistics to the database. In case of thin clients, the content can be pre-fetched into a server module, named a Content Server, and afterwards requested by the thin client.

> The content within the *proxy* is time, location and user tagged. Information in the information channel is time tagged; the last information retrieved is the most relevant for the moment. When applied, the *proxy* is also able to fetch information within an information channel related to the client location. Configuration files are used to select the correct parameters to select relevant information within the XML-based service.

> Besides XML-based information, the system is also able to fetch and navigate within maps to visualize location based content. The location-based content appears through the usage of a collection of layers that the user can select based in his or her interests.

> The system also incorporates automatic updates to seamlessly integrate new functionalities during the course of the system life cycle. Periodically, the *proxy* checks the web administration portal for updates and system-related information according to the functionalities integrated within the system.

> Statistics are collected within the user interface and sent to the *proxy*. By this tiered process, the system guarantees that statistical information is not lost due to network failure.

> The *proxy* also integrates contacts, to-do lists and calendar functionalities.

For different processing loads, the *proxy* may reside entirely on the client, or run partially on a server.

The client has a hierarchical way to access information through different depths of information also reflected in Catalogue Directory stored within the Web Administration Portal. In the first information level, the user can find, for example access to information, services, SOS and Maintenance functionalities. SOS allows for fast access to emergency contacts, and maintenance allows for system customization, namely related location, approval of system services suggestions, themes customization, user identification and screensaver parameters.

Location based information is customized through introduction of the user's location-based reference, namely a landline phone number, a zip code or selection of district, municipality and parish. Moreover, when the screensaver is customized, the system automatically updates media content that will be shown, through the usage of personalized media content service. Upon user's approval of new information channels to be added to the client, the interface is automatically updated to incorporate the suggestions.

For statistical usage, each interaction between the user and the interface is reported to the *proxy* as an event.

The architecture of the user also uses XML to seamlessly configure the interface and supply relevant information within the interface. This allows for a fast modification of the interface when messages within the platform need to be accommodated.

The Database stores statistics (active/inactive clients, services unavailability, errors, etc).

The database stores users' registrations.

The Web Administration Portal enables addition, modification and removal of new services to be fetched by the *proxy* and incorporated within the user's interface.

By default, a set of services is integrated within the interface. Afterwards, based in the user's usage of the system further suggestions are performed by the system to the client and submitted for his or her

Declaration of David B. Lett – Page 11

approval.

Emergency contacts and relevant events are also inserted within the Web Administration Portal in order to be fetched by the ***proxy*** and shown within the user interface.

Administration statistics are also visualized within the web administration portal.

In the Web Administration Portal, along with the addition, modification and removal of services, the administrator is also able to catalogue each service in a directory, named Catalogue Directory, with levels of information, information related time, user's reference and location-related information. The Catalogue Directory is used within the Statistics Analyzer to suggest the information channels that best fit the user's profile.

Events performed by the user and stored within the database are analyzed. After analysis, new service suggestions for each user are made and stored within the database for future ***proxy*** retrieval.

'980 Patent, 2:59 - 4:12 (emphasis added).

The written description of the '980 Patent also provides a detailed

description of the claimed "***data mining cluster***" element of the invention:

The process by which the user profile is built and suggestions are made is hereinafter described:

The organization of information in each information channel ("channel") shall be executed based on Interaction Time in each information level. Most used items shall be displayed in greater focus, causing the remaining items to be in lesser focus.

E.g., if Economy News are the most accessed in the News Channel then such item will appear in greater focus than the Neighborhood News, as well as the remainder.

The update of the channel disposition shall be done by a content server when the application is updated.

In the Intelligent Suggestions Channel there are suggestions of content according to the user's profile. The user's profile is defined based on every click of the user in the channels.

The Intelligent Suggestions Channel is defined by the following process:

1—Previous Information Cataloguing

All information related to the user, channels and associated hyperlinks is categorized in a hierarchical way.

The user have access to several categories or associated category hierarchy. Geography is a good example. E.g. a user in "Lisbon", shall implicitly be under "Portugal", which on its hand is under "Europe".

The categorization of the channels and associated hyperlinks can be exemplified again by the News Channel. The user can click on "News" and then click on one of the sub-level, which for example can include "Economics" and "International".

Categorization shall also employ time variables, such as the day of the week on which the click occurred (1-7), if it is a working day, weekend or holiday. It will also employ the date on which the click took place, decomposing the date in the categories "year", "month", "day", "hour" and "minute".

2—User Profile Definition

The user profile is obtained resorting to **Data Mining Clustering Techniques** applied to the interaction records and their categories. **Clustering** is the partitioning of a data set into subsets (**clusters**), so that the data in each subset is similar within a parameterized distance. Each **cluster** that is obtained shall stand for a user profile.

As an example, consider a list of records from 3 users whose identifiers (ID) are 174, 175 and 176. The first record in FIG. 4 is from user 175 and was recorded at Jan. 1, 2007 at 10:12 in the path "News"→"Economics"→"Microeconomics". This hierarchy is represented by the columns "Pag. Level 1"=1="News", "Pag. Level 2"=2="Economics", and "Pag. Level 3"=1="Microeconomics".

The geographic location of the user is represented in a hierarchical way by "User Space 1"="Africa", "User Space 2"="Angola", "User Space 3"="Luanda". When possible, the information in the channel the user accessed is also geographically categorized; in this example it is done by "Content Space 1"="Africa", "Content Space 2"="Angola", "Content Space 3"="Luanda".

3—Intelligent Suggestions Channel

After defining the **Cluster** (profile) to which the user belongs, the channels to be suggested to the user are determined by analysis of all the "Pag. Level" categories and Interaction Time.

For each channel path in the **cluster** a sequence of probabilities is defined in regard to the user being likely to go full depth on a path or not. This allows for a prediction of the probability of the user following a determined hyperlink.

The set of paths for final hyperlinks in a **cluster** can be represented via a hypergraph. Each **cluster** record being a hyperedge of the hypergraph. A hypergraph H=(V,E) is a set of vertexes V and a set of hyperedges E, representing a graph extension in which each edge can connect to more than two vertexes.

For example, if {p1="News", p2="Economics", p3 "Microeconomics"} is a record in the **cluster**, then the hypergraph will include the hyperedge which connects p1 to p2 and p3. Next, a determined weight will be linked to each hyperedge, calculated from the Page Levels probability, and weighted with Interaction Time.

Finally, to determine the suggestion to be submitted to the user, first the **cluster** to which the user belongs is identified and then the hyperlink (hyperedge) with the greatest relevance (weight) is suggested. If this hyperlink was already one of the most visited by the user, then the next most relevant hyperlink is selected until it is not one of the most relevant to the user.

Suppose that the bold records in FIG. 4 form a **cluster**. In order to determine the weights, we first calculate the probability of each hyperedge in the **cluster** and then multiply it by the average of its interaction times, as presented in FIG. 5.

The hyperedge with higher weight is the suggestion to the user.

In this example, the hyperlink suggested to the user is 2-3-1.

The specific element that determines geo-referenced information may vary from provider to provider. For instance, a good implementation can be achieved through zone codes in some areas. The method by which location is provided can vary.

The exemplary embodiments of the present invention, including the processes described above, can be written as computer programs and can be implemented in general-use digital computers that execute the programs using a computer readable recording medium and other types of transmission media. Examples of the computer readable recording medium include magnetic storage media (e.g., ROM, floppy disks, hard disks, etc.), and optical recording media (e.g., CD-ROMs, or DVDs). Other types of transmission media can include carrier waves (e.g., transmission through the Internet).

The foregoing embodiments are merely exemplary and are not to be construed as limiting the present invention.  The present teaching can be readily applied to other types of apparatuses.

'980 Patent, 4:13 - 5:59 (emphasis added).

Figure 4 of the '980 patent, described in the passage above, shows:

| Year | Month | Day | Hour | Minutes | UserId | Pag. Level 1 | Pag. Level 2 | Pag. Level 3 | Interaction Time | User Space 1 | User Space 2 | User Space 3 | Content Space 1 | Content Space 2 | Content Space 3 |
|------|-------|-----|------|---------|--------|------|------|------|------|------|------|------|------|------|------|
| 2007 | 1 | 1 | 10 | 12 | 175 | 1 | 2 | 1 | 1 | Africa | Angola | Luanda | Africa | Angola | Luanda |
| 2007 | 1 | 1 | 15 | 10 | 176 | 1 | 2 | 3 | 2 | Europe | England | London | Europe | England | London |
| 2007 | 1 | 2 | 16 | 0 | 174 | 2 | 0 | 1 | 1 | Europe | Portugal | Lisbon | Europe | Portugal | Lisbon |
| 2007 | 3 | 10 | 11 | 5 | 176 | 2 | 3 | 0 | 1 | Europe | England | London | | | |
| 2007 | 3 | 10 | 16 | 50 | 174 | 2 | 3 | 1 | 3 | Europe | Portugal | Lisbon | Europe | Portugal | Lisbon |
| 2007 | 2 | 15 | 20 | 41 | 175 | 2 | 3 | 1 | 2 | Africa | Angola | Luanda | | | |
| 2007 | 3 | 10 | 12 | 15 | 176 | 2 | 3 | 1 | 2 | Europe | Portugal | Lisbon | Europe | England | London |
| 2007 | 4 | 5 | 13 | 10 | 175 | 2 | 3 | 3 | 3 | Europe | Portugal | Porto | | | |
| 2007 | 4 | 10 | 12 | 0 | 176 | 2 | 3 | 3 | 1 | Europe | Portugal | Lisbon | | | |
| 2007 | 3 | 10 | 17 | 45 | 174 | 2 | 3 | 4 | 2 | Europe | Portugal | Lisbon | Europe | Portugal | Lisbon |
| 2007 | 3 | 10 | 17 | 20 | 174 | 2 | 3 | 5 | 3 | Europe | Portugal | Lisbon | | | |
| 2007 | 4 | 5 | 13 | 12 | 175 | 3 | 3 | 2 | 1 | Europe | England | London | Europe | England | London |

Figure 4

Figure 5 of the '980 patent, described in the passage above, shows:

| Pag. Level 1 | Pag. Level 2 | Pag. Level 3 | Probability | average interaction time | Weight |
|---|---|---|---|---|---|
| 2 | 3 | 0 | 10% | 1 | 10% |
| 2 | 3 | 1 | 30% | 2.33 | 70% |
| 3 | 3 | 2 | 1% | 1 | 1% |
| 2 | 3 | 3 | 20% | 2 | 40% |
| 2 | 3 | 4 | 10% | 2 | 20% |
| 2 | 3 | 5 | 10% | 3 | 30% |

Figure 5

### 3.  The Prosecution History of the '980 Patent

The application that became the '980 Patent was filed on July 11, 2008.  It claimed priority to a provisional patent application number 60/929,833, which was filed on July 13, 2007.

On June 21, 2011, the patent examiner initially rejected some of the claims in the application for lack of novelty under 35 U.S.C. § 102; the examiner objected to the remaining claims as being dependent on one or more of the rejected claims but stated that the remaining claims "would be allowable if rewritten [to] include all of the limitations of the base claim and any intervening claims."  *See* '980 Patent's Prosecution History, pp. 49, 54.  The examiner specifically found that the "prior art presently of record neither anticipated nor renders obvious" the limitations required by the objected-to claims.  *See id.* at 54.

On August 31, 2011, the patentee submitted amendments to the claims addressing the examiner's Office Action.  *See* '980 Pros. History, pp. 39-45.  Among other things, these amendments specifically added the data mining cluster

element (described at length in the specification) to each of the independent claims. *Id.* at 40-42.

In response, on December 12, 2011, the examiner issued a Notice of Allowance of the amended claims, which were then issued on April 17, 2012. Thus, the examiner confirmed that the amended and issued claims were not anticipated nor rendered obvious by the prior art of record.

**B. Eligibility Analysis of the '980 Patent**

It is my opinion that the claims of the '980 Patent are directed to patent-eligible subject matter. My opinion is based on my training and experience in the relevant art. I have reviewed the Memorandum Opinion and Order issued by United States District Court Judge John G. Koeltl of the Southern District of New York concerning the '980 Patent, and I respectfully disagree with his analysis, as set forth below.

Specifically, the claims of the '980 Patent are directed to technical solutions to the technical problems of both (i) reducing the wait time between requesting common, everyday information and displaying such information to a user and (ii) intelligently generating suggested content for the user from the potentially extensive information based on a user profile. The claimed invention consists of a new concept, function, and format of delivery that provides a level of ease in accessing common information that prior art systems could not provide, including

by providing a proxy that handles the collection and parsing of data, a server that gathers usage data from the client, a data mining cluster that allows for user profiling and time, space and relevance analysis, and a set of channels which are periodically updated and upon which automatic suggestions are given based on the user profile.

For example, the system of independent claim 1 provides a technical solution to the technical problem of quickly and efficiently providing common information to users.  In one embodiment the "system relies on a local client and a proxy, which can be fully located on the client itself, or rather on a separate server. Basic data such as weather forecasts, temperature, news etc. can be displayed to the user.  By the user's choice of display, a profile can be constructed which suggests to the user alternative channels that match the user's profile but not the user's current selection" ('980 Patent 1:60-67).

The combination of functional components and limitations set forth in the asserted claims constitute patent-eligible subject matter, are not directed to an abstract idea, law of nature, or natural phenomenon, and contain one or more technical, inventive concepts for accomplishing the goal of quickly and efficiently providing common information to users without unnecessary delay, and providing suggested additional information based on a user's profile, as set forth below. Moreover, the combination of functional components and limitations set forth in

the asserted claims of the '980 Patent was not well-understood, routine, or conventional at the time of the invention.

### 1. *Alice* Step One

It is my opinion that, looking at the claims of the '980 Patent in their entirety, the character of these claims as a whole is not directed to excluded subject matter, such as an abstract idea. While the claims might be dissected to identify individual abstract ideas within them, I understand that such dissection is improper. Here, the claims are directed to an improvement in the functioning of prior art computer systems that uses a proxy and a data mining cluster, both of which are specifically described in detail in the '980 Patent's written description. Moreover, it is my expert opinion that, even if, for the sake of argument, the claims are considered to involve patent-ineligible concepts like abstract ideas, the claims as a whole do not attempt to monopolize the entirety of any patent ineligible concept.

Importantly, the patent examiner did not identify any patent eligibility issues during the prosecution of the '980 Patent. Instead, the examiner merely required that the claims be rewritten to include certain elements from certain proposed claims and noted that the prior art of record "neither anticipated nor rendered obvious" those elements. The patentee satisfied the examiner by amending the claims to include the data mining cluster element in all independent claims. The patent issued with no issues whatsoever raised about the eligibility of the claims

under Section 101.

Judge Koeltl's Order held the asserted claims of the '980 Patent are directed to "manipulating data and displaying it to a user."  Order, p.15.  In support of that conclusion, the Order cited introductory portions of the specification dealing with what the "present invention" "relates to" and certain advantages described in the same introductory portion of the specification.  *Id.*  The Order went on to assert that the '980 Patent "does not articulate any specific technological improvement."

I respectfully disagree with the Court's Order in this regard.  The claims of the '980 Patent all specifically require a data mining cluster, a claim element that was added to all the independent claims in response to the examiner's office action and that the examiner found was not anticipated or rendered obvious by the prior art of record.  This data mining cluster is described at length in the patent, and for example in claim 1 allows for user profiling and time, space and relevance analysis.  By implementing the data mining cluster as specifically described in the patent, the claims of the '980 Patent do, in fact, articulate a specific technological improvement in the provision of information to a user.  This is a technical solution to a technical problem, and the patent is not merely a "do-it-on-a-computer" patent.

As a result, it is my opinion that the claims, considered as a whole and in light of the specification and file history, are not directed to an abstract idea, but rather are directed to a specific sequence of steps and specifically identified and

described components that improve the functionality of a specific type of computer system.  Thus, it is my opinion that the claims of the '980 Patent satisfy *Alice* step one and are not directed to any excluded subject matter.

### 2. *Alice* Step Two

Even if the claims of the '980 Patent could be considered to be directed to patent-ineligible subject matter, it is my opinion that the claims would nonetheless remain patentable because analyzing the elements of the claims individually *and* as an ordered combination shows that the claims form an inventive concept that amounts in practice to more than a patent on any ineligible concept itself. Specifically, the inventive concept embodied in the '980 Patent's claims is more than the mere application of an abstract idea using well-understood, routine, and conventional activities.

The file history of the '980 Patent proves this point.  The examiner expressly found that the elements added to the originally rejected claims were not anticipated or rendered obvious by the prior art of record.  In my opinion, if claim elements are not anticipated or rendered obvious by the prior art, they cannot be well-understood, routine, or conventional.

Moreover, the examiner's determination that the claims as amended and issued were patentable indicates that the claims included unconventional steps.  It is my opinion that the claims as a whole do, in fact, include unconventional steps

in an ordered combination that confine the claims to a particular, useful application of any potentially ineligible concept, and improve prior computer technology. Further, even if the claims of the '980 Patent are considered to include known, conventional elements, reading the claims as a whole and read in light of the specification and file history, the claims involve the non-conventional and non-generic arrangement of known conventional elements.

Judge Koeltl's Order asserts that the patent does not explain how the claimed improvements to a user's experience are a product of any particular technological innovation. Order at 22. Again, I must respectfully disagree with the Court's Order. First, I understand that the accused infringer must establish patent ineligibility by clear and convincing evidence, and it appears the Court did not apply that burden of proof in its analysis. Second, the '980 Patent does, in fact, explain to a skilled artisan how the claimed invention accomplishes the benefits to the user experience. This description can be found in the specification's description of the claimed data mining cluster and proxy elements outlined above. The Order appears to have been confused by the fact that the ***programs*** implementing the claimed invention can be run on general purpose computers. However, computer ***programs*** constitute the embodiments of the claimed invention, not the general purpose computer components on which the embodying programs run. *See* '980 Patent 5:45-49.

Declaration of David B. Lett – Page 22

For the foregoing reasons, it is my opinion that the claims of the '980 Patent satisfy step two of the *Alice* analytical framework for determining patent eligibility, and form an inventive concept that amounts in practice to more than a patent on any ineligible concept itself.

## IV.   CONCLUSION

It is my opinion that the claims of the '980 Patent claim  patent-eligible subject matter under 35 U.S.C. § 101 and the Supreme Court's *Alice* decision.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements made of my own knowledge are true and correct and that all statements made on information and belief are believed to be true and correct.


Dated:  May 4, 2022

David B. Lett

## **EXHIBIT A**

Curriculum Vitae of David Lett

# David Lett   mobile/text (770) 335-8119   david.lett@charter.net   www.linkedin.com/in/David-Lett

## Expert Witness, CTO
Technology industry veteran with electronics/software/hardware/video/audio/data expertise.
IoT | Consumer Electronics | Telecommunications | Cable | Satellite | Broadband

- Patent litigation expert witness testimony, technical consulting, and expert reports for renowned patent law firms such as Fish & Richardson, King & Spalding, Banner & Witcoff, Kent & Risley, and Quinn Emanuel Urquhart & Sullivan.
- 28 U.S. Patents and more pending.  Served on corporate patent boards.
- Uniquely broad hardware/software/systems technical understanding.
- Award winning design and development including Best of Show, Technology Emmy, and Best of Innovations of over 100 million shipped products, responsible for $1.3B annual revenue.
- Industries: Consumer Electronics, Cable, Satellite, Internet of Things (IoT), Telematics, Television, Telecommunications, Video, Audio, Wireless, Broadband, OTT Video, IPTV, Security, Alarms, Payments
- Technical:  hardware design, software design, systems design, mechanical design, embedded systems, cloud computing, SaaS, fog computing, edge computing, high speed digital, C, Linux, mobile applications (IOS and Android), web applications (Java, JavaScript, HTML), firmware, user interfaces, UI/UX, video, audio, data, RF, DSP, communications, cybersecurity, encryption, error correction coding, real-time systems, cable, CATV, DOCSIS, broadband, satellite, satcom, IPTV, OTT video, video streaming, wireless, cellular, 3G, 4G, LTE, LTE-M, 5G, NB-IoT, Cat-M1, WiFi, 802.11ac, ZigBee, Z-Wave, Bluetooth, BLE, Internet of Things (IoT), Machine-to-Machine (M2M), Telematics, networks, consumer electronics, and telecommunications.

### EXPERIENCE

Jul. 2019 – present, **Chief Technology Officer (CTO), Telular**, an Ametek Company**,** Greater Atlanta Area
- Responsible for global engineering, corporate technical strategy, and technical representation.
- Telular is a technology leader in Industrial IoT (IIoT) recurring revenue solutions, combining wireless technologies, purpose-built hardware, and SaaS in the commercial telematics, security and home automation markets and sold under the SkyBitz and Telguard Brands.
- SaaS, Cellular, 3G, 4G, LTE, LTE-M, 5G, NB-IoT, Cat-M1, BLE, Satellite, cloud, distributed systems, Azure, Oracle Cloud, IoT, AI, ML, M2M, hardware, firmware, software, systems, architecture, mobile apps, web apps.

July 2017-present**,** **Expert Witness/CTO**, Independent Consultant
Technology, product development, organizational, & intellectual property consulting
- Intellectual property, patent assistance, and expert witness testimony
- Investor pitches

Dec. 2016 – June 2017, **Vice President of Engineering, Head of the Applications Development Center, Verifone**, Greater Atlanta Area ($2B revenue company).
- Transformed the 200+ global organization from 100% waterfall to Agile software development processes.
- Team included development, program management, and QA functions.
- Designed and developed secure and innovative payment terminal applications, mobile payment applications, and payment services
- Participated in corporate global architecture, product management, and engineering practice initiatives.

Aug. 2011 – Oct. 2016, **Vice President of Engineering, Head of the Atlanta R & D Center, EchoStar Technologies**, Greater Atlanta Area ($3B revenue, Engineering for Dish Network with a common controlling stockholder)
- Developed products for Dish Network and international customers including highest volume set-top boxes, H.265, HEVC, 3D, Satellite, MoCA, transcoding, Embedded C Linux applications, mobile applications (IOS and

1

Android), SaaS, and web applications (Javascript, HTML).  Provided product lifecycle support of contract manufacturers, test methodologies, customer service, QA, marketing, and sales.

- Intra-company entrepreneur that visualized, evangelized, developed the business model, and led the architecture and global development of a huge end-to-end secure IoT cloud/fog/edge Platform for the consumer security & smart home market and other adjacent markets.  Established the unique TV and mobile UI and MyLocal911 patented self-monitored security paradigm.  System architecture consisted of 32 cloud systems and 24 CPE products.  Systems included BSS/OSS, AWS cloud storage, 2-way video/audio streaming, authentication, provisioning, software download, command and control, customer service, online storefront, 911 emergency VoIP, logistics, CPE, and mobile applications.  Represented the platform at trade shows.
- Functioned as a general manager in roles and responsibilities including vision, operations, business results, product management, program management, complex projects and services, hardware/software/systems product development of video, Internet of Things (IoT), and mobile application products.
- **Winner of the prestigious Best of Show award at the 2013 CES for the Hopper** because of the Hopper Transfers functionality and mobile applications.
- **Won 2015 CSI award "Best smart home product, technology or service".**
- Established and evangelized the vision to be a center of excellence through business results, time to market, quality, innovation, team results, and continuous improvement.

Aug. 1990 – July 2011, **Vice President of Engineering, Cisco / Scientific Atlanta**, Greater Atlanta Area
  ($35B / $1.9B revenue companies respectively.  Cisco acquired Scientific Atlanta Feb. 2006)

- Intellectual property – served on the corporate patent board, provided patent assistance, and testified in patent litigation cases including as a 30(b)(6) witness representing the corporation.
- Responsible for the hardware/firmware/software/mechanical/systems/architecture/ASIC requirements design and development of several generations of high volume set top boxes and other products with extensive data communications and multimedia capabilities and advanced features including DOCSIS 1/2/3 and hybrid gateways, 802.11, IPTV, DVR, cable modems, ADSL, VDSL, DVB-T/C/S, bootloaders, factory diagnostics, application frameworks, Nagra, DRMs, conditional access, secure microprocessors, device management, Android, Adobe Flash, Linux, DVD play/record, MPEG-4, MPEG-2, H.264, NTSC, PAL, DAVIC, MoCA, high-performance CPUs, cablecards, network processors, HDMI, multiple video/audio display interfaces, 2D/3D graphics, multiple RF tuners, and full spectrum tuners.
- Products developed supported worldwide video, audio, power supply, and regulatory standards.
- Developed products manufactured in company factories, contract manufacturers (CMs), Original Design Manufacturers (ODMs), and Joint Design Manufacturers (JDMs).
- Developed processes and practices to ensure success in high quality, high volume, low cost, and fast time-to-market product development.
- Architected Video-On-Demand (VOD) systems.
- Architected robust software download system to ensure network disaster recovery to avoid truck rolls.  Received some of the **industries' first downloadable software patents and an electronic program guide patent**.  Developed the downloadable software system, enabling the applications software development business which evolved into a major corporate strategic business objective.
- Responsible for the total value proposition strategy internally in the organization through process design and externally facing customers to propose innovative solutions that add value and differentiate our offering.
- Established and managed department capex and opex budgets and manpower planning.
- Achieved unprecedented 3%/qtr product cost reductions for all products during the product lifecycle.
- Highly reliable products never had a field recall, which would have been disastrous to the business due to truck roll costs.
- Established software development department and software development practices including software processes, code reviews, networked version control and defect tracking, unit test teams, coding standards, and release processes.
- Reduced product development time to market for set top boxes from 14 months to 6 months through continuous process improvement

- Scaled organization from supporting $10M to $1.3B in sales
- Accounted for more than **70% of the revenues for Cisco's Service Provider Video Technology Group and for Scientific Atlanta Corporation**.
- Award winning design and development of over 100 million shipped products
- **Winner of Technology Emmy in 2012 for Pioneering Development of Multi-Room DVR.**
- **Winner of 2006 CES "Best of Innovations" award for DVR/DVD Recorder/Player.**
- **Winner of Motorola/EE Times Excellence in Innovation Award** in 1994.

Nov. 1985 - July 1990, **Hardware Engineering Manager / Senior Engineer, Wegener Communications, Inc.,** Greater Atlanta Area
- Managed product development of video, audio, and data satellite receivers, modulators, graphics display systems, DSP-based compandors, FSK and PSK satellite modems, multiplexers, forward error correction (FEC) codecs, RF upconverters and downconverters, and baseband analog and digital processing components. Disciplines managed included hardware, ASICs, FPGAs, RF, digital, microprocessors, analog, mechanical, and embedded software.
- Architected and designed forward error correction (FEC) coding systems, PSK modems, and analog control systems for RF modulators and PSK demodulators.

Mar. 1983 - June 1985 (while working at Scientific Atlanta), Assistant Professor, **DeVry Institute of Technology**, Greater Atlanta Area
- Taught evening school courses in microprocessor hardware/software and Electronics

June 1982 – Oct. 1985, **Scientific-Atlanta, Engineer II/Engineer I,** Greater Atlanta Area
- Designed software and hardware including addressable data transmitters, video sync suppression scramblers, transaction format converters, and data channel monitors for addressable Cable Television systems and Set Top Boxes.

**EDUCATION**
- MSEE course work in Electrical Engineering, Georgia Institute of Technology, Atlanta, Georgia
- BSEE, University of Tennessee, Knoxville, Tennessee, with High Honors.  Specialization in Computer Engineering. GPA:  3.53/4.00.
- Georgia Institute of Technology Scrum Leadership Certificate, Certified Scrum Master (CSM), Certified Scrum Product Owner (CSPO), Certified Large Scale Scrum (LeSS) Practitioner
- Many short courses in business and engineering including Mini MBA, Lean Methodologies, Java, Error Correction Coding, CyberSecurity, Encryption, Digital Signal Processing, Cloud Computing, Finance, Organizational Development, Project Management, Product Management, Just-In-Time Manufacturing, Total Quality Management, and Six Sigma.

**Representative Expert witness engagements:**

- 2019: Kent & Risley LLC, opined via expert declaration and consultation for a case resulting in a favorable client decision by the PTAB denying Unified Patents' IPR petition for SynchView's patent, avoiding a trial on Unified's petition for Inter Parties Review.

- 2019: Davis Polk & Wardwell LLC, case involving a confidential top global service provider and a top global consumer electronics company.  Prior art search for defendant to invalidate patents.

- 2019: Fish & Richardson P.C., Case involving confidential top global consumer electronics companies opined for plantiff on patent infringement.  The case was settled before trial.

- 2010:  Quinn Emanuel Urquhart & Sullivan LLP, Verizon vs. Cablevision, Opined for Cablevision, Depositions, Aaron Kaufman sent an email to Cisco management commenting that I was an outstanding expert witness.

- 2002: Kirkland & Ellis LLP, Gemstar vs. Scientific Atlanta, Depositions defending Scientific Atlanta.

- 1994-1996: King & Spalding LLP and Banner & Witcoff Ltd, Starsight vs. Scientific Atlanta, ITC trade secret case, Depositions and Trial testimony and 30(b)(6) witness representing the corporation.

## **EXHIBIT B**

MATERIALS REVIEWED

1. U.S. Patent No. 8,160,980, "Information System Based on Time, Space and Relevance" and its prosecution history

2. The Order entered on March 21, 2022, by United States District Judge John G. Koeltl, in the case styled *DigiMedia Tech, LLC v. ViacomCBS Inc., et al.,* Case No. 1:21-cv.01831-JGK, in the United States District Court for the Southern District of New York.