# EXHIBIT B-120

FILED IN OFFICE

NOV 1 0 2022

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

## IN THE FULTON COUNTY SUPERIOR COURT
## STATE OF GEORGIA

IN RE SUBPOENAS FROM MAY 2022    )    **Case No.**
SPECIAL PURPOSE GRAND JURY    )    **2022-EX-000024**

**SUBPOENAS ISSUED TO:**    Presidential Nominee Electors Mark Amick, Joseph Brannan, Brad Carver, Vikki Consiglio, John Downey, Carolyn Fish, Kay Godwin, Cathy Latham, David Shafer, Shawn Still, CB Yadav

### ELECTOR NOMINEES' OPPOSITION TO STATE'S MOTION TO DISQUALIFY COUNSEL

NOW COME the eleven above-referenced Republican elector nominees, by and through their counsel, and oppose the Fulton County District Attorney Office's ("FCDA") Motion to Disqualify Counsel, showing this Court as follows:

### INTRODUCTION

The presumption of innocence "lies at the foundation of the administration of our criminal law." *Coffin v. United States,* 156 U.S. 432, 453 (1895). In Georgia, an individual is presumed innocent until he or she is tried and convicted. *Vanderford v. Brand*, 126 Ga. 67 (1906); *see also* O.C.G.A. § 16-1-5 ("Every person is presumed innocent until proved guilty.")

Here, the eleven nominee electors have not been charged with any crime. They are not criminal defendants – they are presumptively innocent citizens. Indeed, the Special Purpose Grand Jury ("SPGJ"), which has no authority to indict but only to issue a report of recommendations to the FCDA, has not yet even issued its report as to whether and what charges it might recommend against anyone, including the nominee electors. And, if the actual law and the facts are presented to the SPGJ and are allowed to have any sway, the SPGJ will inevitably conclude that none of the nominee electors violated any statutes and cannot, therefore, ever be charged with any crimes. As set forth in the nominee

electors' Motion to Quash and Disqualify (attached hereto as **Exhibit A**), they cannot have and did not commit any crime as a matter of law and fact.

Despite these facts and the presumption of innocence that the nominee electors constitutionally enjoy, the FCDA has taken the unusual, perhaps unprecedented, step of trying to forcibly separate the nominee electors from their chosen counsel *at this preliminary investigatory stage* based entirely upon the FCDA's presumption of their guilt and its conjecture and speculation as to what issues might arise if a whole series of events that have not yet occurred and may never occur come to pass.

Specifically, the FCDA presumes as a fundamental underpinning of its Motion that some or all of the jointly represented nominee electors committed a crime and that some or all of them are, therefore, in a position to provide incriminating information against each other.

Speculation and conjecture, however, are insufficient bases for the FCDA to even have standing, much less to justify disqualification. *See, e.g., Lewis v. State*, 312 Ga. App. 275, 289–90 (2011) (overruling disqualification as an abuse of discretion when "the case for disqualification consist[ed] of one conjecture piled upon another" and the court was aware of no decision of any other court disqualifying counsel in a criminal matter on this basis); *see also Schaff v. State,* 304 Ga. App. 639, 642(1) (2010) (speculation cannot

2

support disqualification); *Life Care Centers of America v. Smith,* 298 Ga. App. 739, 745(3) (2019) (absence of evidence of wrongdoing by counsel, "[b]eyond conclusory allegations," does not justify disqualification); *Clough v. Richelo,* 274 Ga. App. 129, 135-136(1)(b) (2005) (mere speculation is no basis for disqualification). As importantly, the speculation and conjecture upon which the FCDA's Motion is based is not just unsubstantiated, it is simply wrong, and many of the necessary factual predicates necessary to the FCDA's analysis have not and may never occur.

In particular, none of the jointly represented clients committed any crime (and they are certainly constitutionally entitled to the presumption of innocence at this stage). Additionally, each jointly represented elector has repeatedly affirmed to their counsel that they did not engage in any criminal activity and that they have *no knowledge* of any of the other jointly represented nominee electors engaging *in any criminal act or activity*. So, even if one or more of the jointly represented nominee electors were to ███████████ provide truthful testimony to the SPGJ or in any other proceeding, that testimony would *not* be adverse to any other nominee elector who is currently in the joint representation. At worst, the testimony would be neutral, and, more likely, it would be exculpatory to the hypothetically indicted nominee elector(s).[1]

In making these incorrect foundational assumptions, the FCDA's Motion ignores the actual footing on which this investigation stands, which is quite different than the typical case that the FCDA investigates and prosecutes. In a typical case, a known crime has undisputedly been committed, but the facts of what occurred and who committed

---

[1] ████████████████████████████████████████████████████

3

which aspects of the crime are unknown.  The job of the investigators and the FCDA in such a case is to determine who committed the crime, often by offering immunity or plea deals to those who the investigation reveals were present or involved and can provide incriminating evidence.

Here, the FCDA is conducting an original investigation, meaning that it has *not* been established that any crime has occurred, and the jointly represented nominee electors vigorously reject the characterization of their conduct as in any way criminal as a matter of both law and fact.  *See* **Exhibit A**.  Additionally, unlike more typical cases, this investigation is not one in which the operative facts are unknown or unclear:  on advice of counsel, the Georgia Republican nominee presidential electors executed their provisional ballots on December 14, 2020 to preserve the State of Georgia's right to have presidential electoral ballots *if* the then-pending judicial challenge to the presidential election were successful.  There is no mystery here – the Republican nominee electors took these actions in public, as broadcast by the news media, and they made public, contemporaneous statements to the media and on social media as to exactly what they had done and exactly why they did so.  The dispute in this case is not about what the Republican nominee electors did or even why they did it,[2] but instead whether their undisputed actions constitute a crime.  They do not.

As previously established (*see* **Exhibit A**), the nominee electors' actions are not and cannot be criminal as a matter of both law and fact.  To the extent the FCDA persists in wrongly claiming otherwise, those legal matters will be fought out in the state and

---

[2] The FCDA's motion intimates, but does not outright say, that Mr. Shafer and perhaps others in the Georgia GOP leadership are differently situated than the other Republican nominee electors because they were supposedly privy to plans to which the others were not. These intimations are entirely baseless, as addressed in detail in Footnote 21.

perhaps federal courts. But the key dispute here, unlike in a more typical case, is not who committed what portion of a known crime – instead, it is whether the known, public actions of this group of nominee electors can possibly be considered a crime. And because of this different context, the FCDA's assumption that the jointly represented nominee electors can "flip" on each other or otherwise provide incriminating information as to any other jointly represented elector is simply inaccurate, as well as legally insufficient.

When the issues raised in the Motion are properly framed, the FCDA has no legitimate basis to seek disqualification of counsel for the jointly represented electors. Precedent from the Georgia courts and the U.S. Supreme Court establish that, under the facts of this case, there is no actual or potential conflict of interest, and certainly no disqualifying conflict.

The FCDA cites only *two* cases to support its disqualification demand, and *both* of those cases address disqualification from an attorney's post-indictment representation of a defendant in trial where Sixth Amendment. *See Heidt v. State,* 292 Ga. 343 (2013) (disqualifying attorney assisting lead counsel in defense from representing defendant at trial based on need to protect Sixth Amendment right to conflict-free counsel when attorney simultaneously represented witness who government called to provide incriminating testimony against defendant); *Edwards v. State*, 336 Ga. App. 595 (2016) (disqualifying attorney from represented defendant based on Sixth Amendment right to conflict-free counsel at trial when attorney had not properly obtained informed consent waiving the conflict from both the former client who was to testify at trial and the defendant). The FCDA has provided *no* Georgia case disqualifying counsel from representing multiple clients at the grand jury or pre-indictment stage, and counsel's research has revealed none – and this makes sense. At this preliminary stage, unlike post-

indictment and in a trial, the events necessary to even raise the possibility of a potentially disqualifying conflict of interest have not yet occurred and may never (and in this case, should never) occur. Additionally, at this stage, the judicial system's duty to protect a defendant's Sixth Amendment right to counsel has not yet been triggered.

Even when individuals have been indicted and are facing trial, however, Georgia courts and the U.S. Supreme Court, recognizing how disruptive and prejudicial interference with a person's choice of counsel is, have approached demands for disqualification, especially from opposing counsel, with great skepticism and caution and have generally refused to disqualify chosen counsel absent a substantial, actual, and substantiated conflict that has not been knowingly and intelligently waived. Nothing approaching such a disqualifying conflict exists, especially at this stage in the criminal investigatory process, and all of the jointly represented clients have knowingly and intelligently consented to the joint representation.[3] At this point, no disqualifying conflict exists, and each client (some with the advice of independent counsel) has executed a robust informed consent. For all of these reasons, and for the reasons set forth herein, the FCDA's Motion should be denied.

## ARGUMENT AND CITATION OF AUTHORITY

The right to counsel is "an important interest which requires that any curtailment of the client's right to counsel of choice be approached with *great caution.*" *Bernocchi v. Forcucci*, 279 Ga. 460, 462 (2) (2005); *see also Padgett v. Collins Mobile Home Sales,*

---

[3] Additionally, counsel has an ongoing obligation to assess conflicts of interest and potential conflicts of interest throughout the duration of their representation, and should facts and circumstances change or evolve that raise an actual or potential conflict, counsel has the obligation to raise that issue with their clients and ensure that conflict issue is appropriately addressed, through declining continuing or agreeing to additional future representation or by securing, if appropriate, additional informed consent.

*Inc.*, 357 Ga. App. 30, 32 (2020) (same); *Lewis*, 312 Ga. App. at 283 (same); *Blumenfeld v. Borenstein*, 247 Ga. 406, 408 (1981) (same).   Disqualification "has an immediate adverse effect on the client by separating him [or her] from counsel of his [or her] choice." *Bernocchi*, 279 Ga. at 462 (2); *see also Padgett*, 357 Ga. App. at 32 (same); *Lewis*, 312 Ga. App. at 283 (same); *Blumenfeld*, 247 Ga. at 408 (same).   When chosen counsel is disqualified, it works a "unique hardship" on the client whose lawyer has been disqualified though the loss of time and money in finding new counsel and "the benefit of its counsel's specialized knowledge of [the client's circumstances]." *Lewis*, 312 Ga. App. at 282 (citations omitted).[4]   "[L]awyers are not fungible, swapping one lawyer for another is not without great consequence, and the choice of a lawyer in some cases may, effectively, decide the outcome for the client." *Id.* at 280 n. 8.   For all of these reasons, disqualification of chosen counsel is an "*extraordinary remedy* and should be *granted sparingly*." *Bernocchi*, 279 Ga. at 462 (2) (emphasis added).[5]

Even when a case progresses to the indictment and/or trial stage, which this investigation has not and may never, the attorneys jointly representing multiple defendants in a criminal matter are presumed to have executed their ethical obligations with regard to conflicts of interest because they "[are] in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." *Burns v. State*, 274 Ga. App. 687, 689 (2005).   Courts must "cast a skeptical eye toward motions to disqualify counsel of choice because parties often move for disqualification of opposing counsel for tactical reasons." *Lewis*, 312 Ga. App. at 283

---

[4] Because of the hardships caused by disqualification, "motions to disqualify should be made with reasonable promptness after a party discovers the facts which lead to the motion." *Zelda Enterprises, LLP v. Guarino*, 343 Ga. App. 250, 253-54 (2017).

[5] *See also Padgett, supra; Lewis, supra ; Blumenfeld, supra.*

(citations omitted); *see also* Comment 15 to Ga. R. Profess. Conduct 1.7 ("Resolving questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation. . . . Where the conflict is such as clearly to call into question the fair or efficient administration of justice, opposing counsel may properly raise the question. *Such an objection should be viewed with caution, however, for it can be misused as a technique of harassment*.") (emphasis added).  Indeed, a lawyer does not have standing to file a motion to disqualify against their opposing counsel unless the moving lawyer can substantiate "a violation of the rules which is sufficiently severe to call in question the fair and efficient administration of justice." *Cohen v. Rogers*, 338 Ga. App. 156, 166 (2016) (quoting *Bernocchi*, 279 Ga. at 463 (2)) (vacating disqualification order because trial court applied the wrong standard to determine if counsel had a conflict of interest in simultaneously representing individual and two corporations)).

The party seeking to disqualify counsel has the burden to substantiate that the extraordinary remedy of disqualification is warranted.  *Lewis*, 312 Ga. App. at 283 (citations omitted).  To satisfy this burden, the moving party must establish an *actual* conflict or an *actual impropriety. See Blumenfeld*, 247 Ga. at 409-410 (mere appearance of impropriety not based on actual conflict insufficient ground for disqualification); *Georgia Trails & Rentals, Inc. v. Rogers*, 359 Ga. App. 207, 213-14 (2021), *reconsideration denied* (Mar. 30, 2021), *cert. denied* (Sept. 8, 2021) (same).[6]

---

[6] Some Georgia Court of Appeals cases suggest, as the FCDA has argued, that disqualification can also be based upon a "serious potential for conflict," *see, e.g., Edwards*, 336 Ga. App. at 599-60, although their ultimate decisions do not rely upon such potential conflict as the basis of their holdings.  The Court of Appeals has more recently noted that this position is inconsistent with the Georgia Supreme Court's pronouncement in *Blumenfeld.  In Georgia Trails*, the Court of Appeals noted as follows:

> The appellants *repeatedly refer to 'potential' conflicts in this circumstance, but our Supreme Court has held that absent an actual conflict of interest or actual impropriety, the trial court does not abuse its discretion in denying a motion to disqualify counsel.*

Even where a party has standing to move for disqualification and is able to satisfy their burden to prove an actual conflict or impropriety, such conflicts can generally be waived by the jointly represented clients through informed consent.[7] As counsel for the jointly represented nominee electors previously informed the Court and the FCDA, counsel has scrupulously followed the requirements of Rule 1.7 and the other applicable Georgia Rules of Professional Responsibility in disclosing all of the necessary information to the jointly represented clients in writing, ensuring that they understood that information, encouraging them to seek the review of independent counsel (which some

---

See *Blumenfeld v. Borenstein*, 247 Ga. 406, 409-410, 276 S.E.2d 607 (1981) (*mere appearance of impropriety not based on actual conduct is an insufficient ground for disqualification*). Likewise, as the appellees note, the father was included on the special verdict form for the allocation of fault. Consequently, there is no evidence of harm. See *Kamara v. Henson*, 340 Ga. App. 111, 116 (2), 796 S.E.2d 496 (2017) ("affirm[ing] the denial of [the appellant's] motion to disqualify Defense Counsel, because there is no actual conflict of interest or actual impropriety")

359 Ga. App. at 214. Additionally, this position is at odds with Rule 1.7(a), which recognizes that a disqualifying conflict only exists when there is a *"significant risk"* that the lawyer's own interests or the lawyer's duties to another client ... will materially and adversely affect the representation of the client," *see Lewis*, 312 Ga. App. at 289-90 (quoting Ga. R. Prof. Conduct 1.7) (emphasis in the original), and with Comment 2 to Rule 1.7, which provides as follows:

> Loyalty to a client is impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other competing responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. Paragraph (a) addresses such situations. *A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. Consideration should be given to whether the client wishes to accommodate the other interest involved.*

This Court need not resolve this potential discrepancy, however, because, as set forth herein, no serious potential for conflict exists in this investigation, particularly at this stage, and the eleven nominee electors have knowingly and intelligently waived any such conflicts.

7 Under Rule 1.7(c), a conflict is not waivable only when (1) it is prohibited by law or these rules; or (2) includes the assertion of a claim by one client against another client represented by the lawyer in the same or substantially related proceeding; or (3) involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients. None of these circumstances are present here. Waiver is not prohibited by the rules; indeed, it is contemplated by them. *See* Rule 1.7(b) and Comment 2. As discussed herein, no client has or can made any claim against another client. And nothing suggests, much less establishes, that counsel cannot provide adequate representation to all of the affected clients, particularly at this investigatory stage and under these specific facts.

did), and then make a informed, individual decision as to whether to continue in the joint representation. Each client individually insisted upon staying in the joint representation, and each executed a written informed consent memorializing this informed choice.

Under these facts, the FCDA lacks standing to bring its Motion. Even if it had standing, however, it has not met and cannot meet its burden to substantiate any disqualifying conflict of interest and has not provided any applicable authority that such conflicts could not be waived, especially at this pre-indictment, investigatory stage.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

Georgia law is clear that such improper assumptions and speculation fall well short of the showing necessary to justify the "extraordinary remedy" of disqualification, which the Georgia courts have repeatedly cautioned should be "granted sparingly."

## I.      The FCDA Lacks Standing to Move for Disqualification.

Under Rule 1.7(b), the onus of identifying and remediating any conflict in joint representation is on the lawyer(s) undertaking the representation because they are in the best position to do so. *Burns*, 274 Ga. App. at 689; Rule 1.7 cmt. 15. "For an attorney to have standing to raise the issue of an opposing lawyer having a conflict of interest in simultaneously representing multiple plaintiffs or defendants, *there must be a violation of the rules which is sufficiently severe to call in question the fair and efficient administration of justice*" and the party seeking disqualification "*must provide substantiation.*" *Bernocchi*, 279 Ga. at 463 (citations omitted) (emphasis added). An objection from opposing counsel "should be viewed with caution . . . for it can

be misused as a technique of harassment." *Id*. at 460; Ga. St. Bar R. 4-102(d):1.7, cmt. 15; *see also Lewis, supra*, at 283.[8]

Here, the FCDA has not alleged or substantiated any actual violation of the rules, and it necessarily has not met its threshold burden to substantiate a violation that is "sufficiently severe to call in question the fair and efficient administration of justice." *Bernocchi*, 279 Ga. at 463. Instead, the FCDA bases its Motion entirely on its speculation about the *possibility* of a future conflict arising out of a series of inaccurate and unsupported assumptions: (1) that criminal charges will ultimately be filed against any of the jointly represented elector nominees; (2) ███████████████████████████ ███████████████████████████████████████████████████ ████████████████████; (3) that current counsel would represent any or all jointly represented nominee elector at any future trial; (4) ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ and (5) that any potential conflicts that might arise in the future should automatically be presumed to be material, irreconcilable, and unwaivable now.[9]



Speculation and conjecture, however, are not the required substantiation, *Bernocchi, supra,* and they are insufficient bases for disqualification. *See, e.g., Lewis, supra; Schaff, supra; Life Care Centers of America, supra; Clough, supra.* As importantly, as established in greater detail herein, the speculation and conjecture upon which the FCDA Motion is based is not just unsubstantiated, it is simply wrong, and many of the events relied upon by the FCDA have not and may never occur.[10]

To have standing to even seek to disqualify a citizen's chosen counsel, thereby causing undue hardship and prejudice, including the loss of time, money, and the benefit of said counsel's specialized knowledge about the case, the FCDA was required under Georgia law to offer more than its own conclusory assertions and rely on more than its speculation and conjecture that a conflict may exist or arise in the future. The FCDA has failed to carry that burden, and it therefore lacks standing to bring this Motion.

## II.    Georgia and Federal Law Protect The Eleven Nominee Electors From Being Separated From Their Chosen Counsel.

In Section II.A. of its Motion, the FCDA argues that the Court has greater leeway to separate the nominee electors from their chosen counsel because the nominee electors' Sixth Amendment right to counsel has not yet been triggered. The cases cited by the FCDA in support of this position actually establish the opposite -- that individuals actually *have* a right to counsel at the grand jury investigative stage; the cited authority in no way support the proposition that clients can be separated from their chosen, privately engaged

---

[10] The FCDA also relies on its "heightened ethical duty" as "ministers of justice" as the impetus for bringing this motion. These heightened ethical duties, however, do not excuse the FCDA from the requirement that it must substantiate *"a violation of the rules which is sufficiently severe to call in question the fair and efficient administration of justice"* to have standing. If anything, their heightened ethical duties as ministers of justice should have led them to refrain from trying to strip 11 presumptively innocent citizens of their chosen counsel based solely on speculation and conjecture, which they should know is wholly insufficient under Georgia law, or as a tactic, which is improper under the Rules.

counsel at the grand jury stage of an investigation. Indeed, neither case involves an effort by the government to disqualify or involuntarily separate grand jury witnesses from their chosen counsel, and neither case relates to the disqualification analysis applied by Georgia courts in all cases in which a disqualifying conflict is alleged.

Specifically, in *United States v. Mandujano*, the Supreme Court explicitly noted that a witness called to the grand jury *was entitled to the assistance of counsel*, but that the witness could not insist that his counsel be permitted to go into the grand jury room with him pursuant to Fed. R. Crim. P 6(d). 425 U.S. 564, 581 (1976). In particular, the Supreme Court stated

> *Respondent was also informed that if he desired he could have the assistance of counsel, but that counsel could not be inside the grand jury room. That statement was plainly a correct recital of the law.* No criminal proceedings had been instituted against respondent, hence the Sixth Amendment right to counsel had not come into play. *Kirby v. Illinois*, 406 U.S. 682, 92 S. Ct. 1877, 32 L.Ed.2d 411 (1972). A witness 'before a grand jury cannot insist, as a matter of constitutional right, on being represented by his counsel . . . .' *In re Groban, supra*, 352 U.S., at 333, 77 S. Ct., at 513, 1 L.Ed.2d, at 380.[6] *Under settled principles the witness may not insist upon the presence of his attorney in the grand jury room*. Fed. Rule Crim. Proc. 6(d).")

*Id*. at 581 (emphasis added). Footnote 6 in that passage specifically clarifies that the right to counsel in this context is rooted in the Fifth Amendment, not the Sixth Amendment: "The right to counsel mandated by Miranda was fashioned to secure the suspect's Fifth Amendment privilege in a setting thought inherently coercive. The Sixth Amendment was not implicated." *Id*. at 581 n. 6. In short, *Mandujano* affirms the right to assistance of counsel at the grand jury stage of an investigation, it simply clarifies that the right is a

Fifth Amendment, not Sixth Amendment, right to counsel and that the right to assistance of counsel does not include having counsel present in the grand jury.[11]

The FCDA's reliance on the Eleventh Circuit's decision in *United States v. Gaddy* fares no better. In *Gaddy*, a witness voluntarily testified in the grand jury after being informed that his attorney was unavailable and after being advised by the prosecutor that he need not answer questions that would incriminate him *and that he had the right to consult with legal counsel before testifying.* The witness proceeded to testify, and the Eleventh Circuit held that he had, therefore, voluntarily waived any right to counsel he enjoyed. *United States v. Gaddy*, 894 F.2d 1307, 1314-15 (11th Cir. 1990).[12]

Here, the nominee electors have made no request to have their lawyers present in the grand jury, and the issue of their voluntary waiver of their right to counsel is obviously not at issue. To the extent any principles relevant to this matter can be distilled from *Mandujano* and *Gaddy*, it is that individuals called before the grand jury have a right to be represented by and consult with counsel outside the grand jury room, not the opposite. The FDCA "allowing" witnesses appearing before the SPGJ to consult with their counsel (or, in their view, to be represented by counsel at all) is not a mere courtesy; it is the witnesses' right.

---

[11] The citation by the Supreme Court to *In re Groban* further clarifies that the Court was addressing a grand jury witness's right to have their counsel present in the grand jury, as that was the very issue in *In re Groban*.

[12] The Eleventh Circuit mentions in *dicta* that "[t]his Court has not decided whether a constitutional right to counsel exists during the course of a grand jury proceeding," but noted that it had presumed without deciding the existence of such a right in *United States v. Olmeda*, 839 F.2d 1433, 1437 (11th Cir.1988). *Gaddy*, 894 F.2d at 1314–15. The *Gaddy* court also noted that the Supreme Court in *Mandujano* had stated that there was no Sixth Amendment right to counsel at that stage but that the witness in that case had been informed of his right to consult with counsel outside the grand jury. *Id.* The Eleventh Circuit did not address the Supreme Court's specific invocation of the right to counsel under the Fifth Amendment in Footnote 6 of *Mandujano*, either because it overlooked the same or because the existence of the constitutional right to counsel at the grand jury stage was not ultimately material to its holding that any right to counsel had been voluntarily waived.

More importantly, regardless of any constitutional guarantee to counsel the nominee electors have at this stage, they are certainly free to hire legal counsel for any purpose they deem necessary in any context, as they have done here. The issue presented here is not their right to counsel, but instead whether the FCDA has standing to attempt to strip them of their chosen counsel and whether, if so, it has met its heavy burden to overcome the presumption against disqualification of chosen counsel. Under clear Georgia law, the answer to both of those questions is no.

To answer these questions, Georgia courts look to the established body of Georgia law on what must be established before *any* individual in any context can be separated from their chosen, privately engaged counsel, which is in no way dependent upon or tethered to whether a constitutional right to counsel is implicated. Indeed, Georgia courts routinely recognize the right to retain chosen counsel even in *civil* cases, where the Fifth and Sixth Amendments will never be implicated, and the courts engage in the same rigorous analysis disfavoring disqualification of chosen counsel in those cases as well as in criminal cases. *See, e.g., Georgia Trails*, 359 Ga. App. at 213-14 (applying disqualification analysis in context of civil case, noting that disqualification is an "extraordinary remedy" that severely prejudices the client separated from his or her counsel and should only be "granted sparingly"); *Padgett*, 357 Ga. App. at 31-33 (same); *Zelda Enterprises, LLP v. Guarino*, 343 Ga. App. 250, 250-54 (2017) (same).[13]

---

[13] Such disqualifications in the criminal context are granted even more sparingly because "the consequences of an erroneous deprivation of the right to select counsel of choice in criminal prosecutions are severe. *Such an erroneous deprivation is a structural error*, one that affects 'the framework in which the trial proceeds,' and *it requires an appellate court to reverse any conviction that follows without any inquiry into harm or prejudice.*" *Lewis*, 312 Ga. App. at 283 (citations omitted) (emphasis added).

Thus, in *all* contexts where opposing counsel seeks the disqualification of their opponent's counsel, Georgia courts apply the same disqualification principles and analysis, which recognizes that the right to chosen counsel is an "important interest" and the "extraordinary remedy" of disqualification of chosen counsel must be approached with "great caution" and "granted sparingly." *See, e.g., Bernocchi*, 279 Ga. at 462 (2); *Padgett*, 357 Ga. App. at 32 (same); *Lewis*, 312 Ga. App. at 283 (same); *Blumenfeld,* 247 Ga. at 408 (same). The FCDA's suggestion that this Court can or should apply a more lenient analysis or has greater leeway to grant its motion based upon the FCDA's misinterpretation and misapplication of *Mandujano* and *Maddy* is contrary to well-established Georgia law, invites error, and should be rejected.

### III.   No Disqualifying Conflict Exists.

In assessing alleged conflicts of interests, courts are encouraged to resist "mechanically applying the rules for the disqualification of counsel" and instead to consider the "facts peculiar to each case in balancing the need to ensure ethical conduct on the part of lawyers appearing before the court and other social interests, which include the litigant's right to freely chosen counsel." *Georgia Trails*, 359 Ga. App. at 213. The particular facts in this case establish that no disqualifying conflict exists and that stripping the jointly represented nominee electors of their chosen counsel is unwarranted and prejudicial.

### A. When Unindicted Targets of a Criminal Investigation[14] Are Unified In Their Innocence and Their Potential Defenses to Any Future Charges Are Compatible and Synergistic, No Actual or Potential Conflict Exists.

As the Georgia courts have noted, in almost every case in which one lawyer represents co-defendants in a criminal proceeding, a conflict of interest is possible. *See, e.g., Burns*, 281 Ga. at 339-40. Both the United States Supreme Court and Georgia Supreme Court have affirmed, however, that multiple representation is permissible in the absence of an actual conflict of interest and that such joint representation can be a significant benefit when "a common defense . . . gives strength against a common attack." *Id.* at 339 (citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980) and quoting *Holloway v. State of Arkansas*, 435 U.S. 475 (1978)).

Where, as here, targets' defenses are "synergistic rather than antagonistic," *Shelnutt v. State*, 289 Ga. App. 528, 529-30 (2008), where there is no "finger-pointing" and the clients profess their collective innocence, *Taylor v. State*, 320 Ga. App. 596, 603 (2013) and *Burns*, 281 Ga. at 339, "representation by the same attorney [does] not give rise to *any* conflict of interest, *potential or actual*." *Shelnutt*, 289 Ga. App. at 530. *See also, e.g., Tolbert v. State*, 298 Ga. 147, 156-57 (2015) (noting that in many cases a common defense gives strength against a common attack and finding no conflict in joint representation of co-defendants at trial where their defenses were compatible); *Lamb v. State*, 267 Ga. 41, 42 (1996) (no conflict of interest in jointly represented co-defendants at trial because they presented a unified defense and did not incriminate each other); *Chandler v. State*, 255 Ga. App. 11, 13 (2002) (no actual conflict of interest in joint

---

[14] As the cases cited herein demonstrate, this same rule would apply even if the individuals were indicted co-defendants, a stage that has not been reached in this process as yet.

representation at trial of co-defendants because defenses were compatible); *Abernathy v. State,* 278 Ga. App. 574, 585 (2006) (no conflict in joint representation at trial co-defendants' defenses were not antagonistic).

The jointly represented nominee electors (and, presumably, all 16 of the Republican nominee electors) have made plain throughout this process that they are *all* innocent of wrongdoing, much less any criminal activity, and they have affirmed in writing that none of them are aware of *any* wrongdoing or criminal activity by *any* of the other nominee electors. Indeed, as set forth in some detail in their original Motion to Quash and Disqualify (**Exhibit A**), the actions taken by the Republican nominee electors are not and *cannot* be wrongful or criminal; instead, their actions were taken on advice of counsel, protected by both federal and state law, *see* **Exhibit A** at 10-18, and based on established precedent. *Id.* at 10-13. Indeed, executing dual provisional ballots to preserve rights during a judicial challenge to an election has been lauded as the proper and advisable action to take by Justice Stevens, Democrat Congresswoman Patsy Mink of Hawaii, and electoral college experts. *Id.* at 13-14. Viewed in this context, the continued suggestion that the nominee electors' actions were improper, much less criminal, is untethered to the facts and the law and is, candidly, absurd. Because they are united in their innocence, have no incriminating evidence to provide as to themselves or each other, and their defenses to any potential charges are compatible, not antagonistic, no actual or potential conflict exists. *See Shelnutt, supra; Taylor, supra; Burns, supra; Tolbert, supra; Lamb, supra; Chandler, supra; Abernathy, supra.*







But, because of the FCDA's inconsistent behavior with regard to the electors' status, the sudden (mis)labeling of them as targets, and the incorrect narratives it continues to promote about the events of December 14, 2020, *any* counsel representing the Republican nominee electors would be remiss in not addressing these serious factual and legal disconnects that could lead to the

FCDA wrongfully accusing these individuals of false statements or perjury simply for telling the actual truth instead of the "truth" the FCDA apparently wants to hear.

As importantly, the analysis as to conflicts of interest in joint representation in Georgia (and according to the U.S. Supreme Court) turns *not* on whether there are immaterial differences between the jointly represented clients' testimony or roles in the alleged criminal activity but instead on whether the jointly represented clients' defenses are aligned and synergistic. Here, each represented client is united with the other in their defense of innocence, and they have each affirmed that they have no incriminating information about themselves or any of the other jointly represented nominee electors. As a result, their putative defenses to any eventual charge(s) that could be filed are unified, aligned, and synergistic – none of the jointly represented nominee electors can or would have to "point fingers" at the other or otherwise incriminate each other to pursue their own defense ███████████████████████. These facts nullify the possibility of any actual or potential conflict of interest as a matter of law. *See Shelnutt, supra; Taylor, supra; Burns, supra; Tolbert, supra; Lamb, supra; Chandler, supra; Abernathy, supra.*

### C. The FCDA's Speculation About Possible Future Conflicts of Interest Is Insufficient As a Matter of Law to Justify Disqualification.

███████████████████████ the FCDA argues that *if*, after the conclusion of the SPFG investigation one or more of the jointly represented electors is indicted and *if* one of the jointly represented clients were immunized and *if* that immunized client were called to testify as witness against a non-immunized indicted client, this would create an unwaivable conflict of interest. Indeed, the Motion claims (without citation to supporting authority and contrary to established Georgia law) that the mere possibility of these potential events that have not yet occurred and may never

occur create an *actual unwaivable* conflict now.  But the long series of "ifs" in the FCDA's Motion and the many events that would each have to occur before any even potential conflict came to fruition belie this untenable assertion.

Only if this entire series of events and several others[15] were to occur would the potential conflict identified in the Motion even *possibly* become an actual conflict.  *See, e.g., Burns,* 274 Ga. App. at 690-91 (actual conflict requires more than a bare possibility that a conflict will develop and ripens only when it would require  counsel to slight one client in favor of the other).  At this stage, which is many steps back from this series of events that would all have to occur before even the specter of a conflict could arise, there is no actual conflict or actual impropriety permitting disqualification.  *See,* e.g., *Georgia Trails,* 359 Ga. App. at 214 (actual conflict or actual impropriety, not potential conflict, required for disqualification); Rule 1.7, Comment 2 (potential conflict does not preclude representation).

Even if all of these events eventually were to occur and current counsel were hired to represent any then-indicted nominee elector at trial, no actual disqualifying conflict would prevent this hypothetical future representation in which a former client would be called to testify if trial counsel would not have to use confidential information gained in the context of the former representation of the immunized witness to cross examine him or her. [16] *See, e.g., Perry v. State,* 314 Ga. App. 575, 580-82 (2012) (outlining factors to

---

[15] In addition to the series of events identified by the FCDA that would have to occur before any potential conflict arose, the indicted client would have to attempt to hire Pierson Law or the Debrow Firm to represent him or her in trial, counsel would have to agree to accept that representation, and the Georgia and/or federal courts would have to decline to dismiss the indictment pre-trial.

[16] In its Motion, the FCDA speculates that "the body of information -- including potentially incriminating information and information that could be used for impeachment or otherwise to the disadvantage of a former client – gained by Pierson and Debrow concerning each of their 11 clients . . . *is undoubtedly vast.*" FCDA Motion at 15 (emphasis added).  But this assertion is "purely conjectural, and conjecture is no reason

be considered in assessing conflict in the context of cross-examining former client); *Rescigno v. Vesali,* 306 Ga.App.610, 613(1) (2010) (fact that lawyer acquired general information from a former client, and now represents another client adverse to the former client, does not require disqualification in the absence of a reason to believe that confidential information acquired from the first client would be of use to the second). And, as the FCDA concedes, even if confidential information were involved, the current client and the former client can waive, could waive (and, here, have waived) this conflict through informed consent. *See, e.g., Edwards,* 336 Ga. App. at 599-60 (noting that to waive a conflict created by trial counsel's divided loyalties to her former and current clients requires the informed consent of both the current and former client, which trial counsel failed to obtain).[17]

At this point, however, none of the numerous factual predicates that would be required to occur before even the prospect of any conflict would loom have occurred, and many are unlikely to ever occur. The SPGJ has not issued its report, ███████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████, no charges have been

---

to deprive Lewis of his counsel of choice." *Lewis,* 312 Ga. App. at 288-89 (collecting cases holding that speculation is insufficient to support disqualification). Additionally, the assumption is simply wrong, as explained in greater detail herein.

[17] Like the *Heidt* decision discussed herein, the *Edwards* decision does not support the FCDA's request for disqualification, certainly not at this stage. Like *Heidt,* the *Edwards* court analyzed its disqualification decision in the context of the court's obligation to protect the defendant's Sixth Amendment right to conflict-free counsel at trial, a right that the FCDA admits is not implicated at this investigatory stage of the proceedings. *Edwards,* 336 Ga. App. at 600 n. 4. Additionally, the deficiency in *Edwards* was not the conflict of interest *per se* but the failure of the trial counsel to get a proper waiver from both his former client and the defendant he was representing in trial. *Id.* at 599-600. Indeed, even in its citation to *Edwards* in the Motion, the FCDA concedes that this potential conflict is waivable through informed consent is obtained from the current and former client. *See* FCDA Motion at 15. This process and information are exactly what the jointly represented nominee electors have received and gone through in this case in executing their informed consent to the continued joint representation.

brought, no counsel have been hired to represent any jointly represented client in any such hypothetical criminal prosecution, no decision to call any of the jointly represented clients to testify in any such putative trial can have been made, and so on. Only if all of these events happened would counsel and perhaps the eventual trial court need to assess whether an actual conflict has arisen and, if so, whether it can be and has been waived.

But the FCDA's uncertain and speculative parade of possibilities does not create any actual conflict or impropriety justifying disqualification. *See, e.g., Lewis*, 312 Ga. App. at 289–90 (overruling disqualification when "the case for disqualification consist[ed] of one conjecture piled upon another"); *Schaff,* 304 Ga. App. at 642(1) (speculation cannot support disqualification); *Life Care Centers of America,* 298 Ga. App. at 745(3) (conclusory allegations of wrongdoing by counsel does not justify disqualification); *Clough,* 274 Ga. App. at 135–136(1)(b) (mere speculation no basis for disqualification). And in the light of the fact that the jointly represented electors are unified in their innocence, cannot and will not provide any testimony adverse to each other in the SPGJ or any other context, and have synergistic, compatible defenses to any eventual possible criminal charge, such an actual conflict or impropriety is unlikely to ever erupt. But in that unlikely event, there is no reason (and the FCDA has articulated none) that such an issue cannot and should not be properly addressed by trial counsel and, if necessary, the trial judge at that time.

Even on this limited record, however, there is good reason to believe that these necessary predicates to the FCDA's theory of disqualification will not unfold in the manner theorized by the FCDA. The fundamental (but incorrect) assumptions that underpin the FCDA's entire motion are that some of the jointly represented nominee electors can make claims against each other, *see* FCDA Motion at 2, 11, 13; that they have

or can provide incriminating information about any of the other jointly represented clients, *see* FCDA Motion at 15; ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ As set forth herein, *all of these assumptions are incorrect*, and the FCDA has presented no evidence substantiating its incorrect speculation.  Georgia law does not permit the FCDA to strip the nominee electors of their chosen legal counsel, especially at the investigatory stage, simply because the FCDA wrongly speculates that a crime has been committed and/or that these jointly represented individuals can provide incriminating information about the other jointly represented clients as it relates to this (nonexistent) crime.  Not only is the FDCA's bare speculation legally insufficient, but it is also simply wrong.

For much of these same reasons, the FCDA's speculative assertion that counsel for the jointly represented nominee electors "cannot even advise any of their 11 clients about any deal that might be proposed by the District Attorney to secure their testimony ██████ ████████████████ without stepping directly into a mess of serious ethical concerns" is also wrong as a matter of law.  This assumption is based upon the FCDA's incorrect presumption of the nominee electors' guilt and the incorrect presumption that any of the jointly represented nominee electors have incriminating information to provide about any other jointly represented nominee elector. As established, these assumptions are unsubstantiated and incorrect.

The sole case relied upon by the FCDA in support of this argument, *Heidt v. State*, is inapposite for a number of reasons.  First, *Heidt* involved disqualification at the post-indictment, trial stage of a criminal prosecution where the operative facts informing the conflict analysis had occurred and were known.  Second, the disqualification held not to

26

be an abuse of discretion in *Heidt* was expressly based upon the Court's obligation to protect the defendant's Sixth Amendment right to conflict-free counsel at trial, *id.* at 346-47, a right that the FCDA concedes is not yet implicated in this pre-indictment investigation.  Third, under the facts in that case, the jointly represented clients had consented to the representation, but, unlike here, their interests and defenses were not, in fact, aligned: one client could incriminate the other, and she chose to do so by testifying against him at trial in exchange for her plea deal.  *Id.*[18]  Representing both clients under these specific circumstances would have run afoul of Rule 1.7(a)'s prohibition against simultaneous representation of clients who have claims against each other and otherwise rendered the attorney unable to adequately serve the interests of both client.  *Id.*

Other courts have recognized that under facts more aligned with the facts here, ██████████████████████ plea offers to some, but not all, of jointly represented clients do not create an actual conflict.  For example, there is no actual or potential conflict where one jointly represented client cannot provide incriminating testimony against another, *see, e.g., Shelnutt*, 289 Ga. App. at 529-30 (no actual or potential conflict when defenses are aligned and require no finger pointing or blame shifting); *Burns*, 281 Ga. at 339 (same). ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████   ████████
████████████████████████████████████████████████

---

[18] The Court of Appeals in *Heidt* also noted more than once that the attorney at issue was simply assisting the defendant's lead or main counsel in the defense.  As a result, the prejudice to the defendant was unlikely to be as significant as removing the defendant's counsel altogether.

████████████████████████████████████████████████████

████████████████████████████ *Perry*, 314 Ga. App. at 580-82 (2012) (outlining

factors to be considered in assessing conflict in the context of cross-examining former

client); *Rescigno*, 306 Ga. App. at 613(1) (no disqualification in the absence of a reason to

believe that confidential information acquired from former client would be of use to the

currently represented client).

And even if the FCDA were to indict some of the jointly represented clients and

make plea offers, such offers to jointly represented clients would not create an actual

disqualifying conflict unless and until such an offer is accepted *and* would require

incriminating testimony against the jointly represented client who was not offered or did

not accept a plea offer. *See, e.g., Abernathy,* 278 Ga. App. at 585 (no conflict when plea

offer was declined and co-defendants' defenses were not antagonistic).  Plea offers to

jointly represented indicted co-defendants also create no actual conflict of interest unless

it can be established that their joint counsel could not negotiate such plea offers for both

without prejudicing either. *Tolbert*, 298 Ga. at 153-54. And even where ████████ plea

offers *do* create an actual conflict of interest, that conflict can be waived by the jointly

represented clients' informed consent. *Abernathy*, 278 Ga. App. at 585.



In general, counsel

and the jointly represented clients believe that allowing the SPGJ and the public to hear

the truth about what occurred on December 14, 2020 -- that no crime occurred or could have occurred, that they were acting on advice of counsel and in conformity with established precedent, that their ballot was contingent and provisional, and that none of the Republican nominee electors did anything improper or illegal – would inure to the benefit, not detriment, of *all* of the Republican nominee electors.

### D.   The Additional Information Proffered in the Motion Does Not Establish An Actual or Potential Conflict.

In the Motion, the FCDA provides twelve additional "facts" that it has "developed" that it claims are "material to demonstrating a conflict of interest" in the joint representation. *See* FCDA Motion at 7-10.  Other than the bare recitation of these alleged facts, however, the Motion makes no attempt to explain how or why these facts could or do create any actual or potential conflict in the joint representation, which is the FCDA's burden to provide.  And, for the same reasons set forth above, these alleged "facts" simply cannot and do not implicate any conflict of interest, much less a disqualifying and/or unwaivable one.

#### 1.   *Incorrect allegations by the FCDA.*

Several of the twelve statements are simply incorrect.  For example, Ms. Debrow and Ms. Pierson's law firms were not hired by the Georgia Republican Party (Statement No. 1); they were hired individually by every jointly represented client.  The Georgia Republican Party has agreed to pay for the services of Ms. Debrow and Ms. Pierson's law firms to individually represent these clients.  But, as addressed in greater detail herein, as demonstrated by the engagement letters specifically addressing these matters, and as is completely typical when a third party agrees to pay for the legal fees and services for various individuals involved in an investigation or litigation, the Georgia GOP serves merely as the payor.  It has no substantive or other rights to any information or influence in the representation, nor has the Georgia GOP or its officers attempted to interfere or influence the legal representation in any way, and the FDCA has not argued that it has.

Contrary to the affidavit, Shawn Still was not the Secretary of the Georgia Republican Party on December 14, 2020 (Statement No. 3). In fact, Shawn Still has never been the Secretary of the Georgia Republican Party.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ As explained in greater detail in the nominee electors Motion to Quash and Disqualify (**Exhibit A**), because of the judicial challenge pending in Fulton County Superior Court challenging the 2020 presidential election results and, therefore, challenging which slate of electors for the electoral college were the correct ones, the certificates provisionally signed by the jointly represented electors were no falser than the ones signed by the Democratic elector nominees on that same day. The validity of *both* electoral slates was contingent upon the as-then-undecided outcome of the pending judicial challenge.

In other words, because the very issue that would be decided in the judicial challenge was *which* presidential electoral ballot were the valid one, the filing of that challenge rendered *both* the Republican and Democrat electoral ballots executed on December 14, 2020 *contingent* – contingent upon the outcome of the Fulton County judicial challenge, just like the ballots executed by both parties in 1960 in Hawaii when a judicial challenge was pending there. Had the judicial challenge been successful, a fact that was not and could not be known on December 14, 2020 and an issue that was never decided by the courts on the merits, then the Republican electoral ballot would have been the correct one to be counted by Congress on January 6, 2021, and the Democratic electoral ballot would have been rendered invalid. As explained in greater detail in the Motion to Quash and Disqualify, this is not and cannot be the law. Instead, both federal and state law protect the actions taken by both the Republican and Democrat nominee

electors on December 14, 2020 to preserve the rights of both sets of electors until the outcome was judicially determined or until the matter was sent to Congress on January 6, 2021 for its adjudication. Neither set of ballots or certificates were "false," and the continued suggestion that they are is nonsensical in general and even more so in the face of the precedent for such actions and the contemporaneous evidence of the ballot's provisional nature on the very day and time it was executed.

Also in error is the Motion's assertion that David Shafer "caused" various documents to be sent to the President of the U.S. Senate, the U.S. Archivist, the Georgia Secretary of State, and the Chief Judge of the U.S. District Court for the Northern District of Georgia (Statement No. 9). If it were true, however, it would not be incriminating for much the same reasons as above and would create no conflict. In reality, Mr. Shafer did not send any of these documents or request anyone do so  The entire process was managed by attorneys and staff working at the direction of attorneys.
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The process to appoint alternate electors in the event of the absence or inability to serve of a previously nominated elector is statutorily provided in O.C.G.A. § 21-2-12,[19] and that statutory process was followed on December 14, 2020 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

---

[19] This statute provides as follows:

> If any such presidential elector shall die, *or for any cause fail to attend at the seat of government at the time appointed by law,* the presidential electors present *shall proceed to choose* by voice vote *a person of the same political party or body,* if any, as such deceased or absent presidential elector, *to fill the vacancy occasioned thereby*; and immediately after such choice the name of the person so chosen shall be transmitted by the presiding officer of the college to the Governor, who shall immediately cause notice of his or her election in writing to be given to such person. *The person so elected, and not the person in whose place he or she shall have been chosen, shall be a presidential elector and shall, with the other presidential electors, perform the duties required of them by the Constitution and laws of the United States.*

████████████████████████████████████████████████████ In

short, all 16 of the nominee electors who met and acted on December 14, 2020 were

lawfully nominated electors under the applicable Georgia statutes.[20] The factual

distinctions between how or when the nominee electors became nominee electors is not

material or relevant to any potential criminal liability, and the FCDA has not even

attempted to explain how it could be or how this alleged but incorrect "fact" has any

relevance to an actual or even potential conflict of interest among the jointly represented

clients at this (or any other) stage of these proceedings.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████  Various additional communications exist beyond what the DA has described

(none of which are relevant to disqualification or in any way incriminating).   More

importantly, however, the communications alluded to by the FCDA ██████████████████

definitively show that *all* of the jointly represented electors served as nominee electors on

---

[20] ████████████████████████████████████████████████████████
████████████████████████████████████  The notion that the election was "over" as a legal matter
on December 14, 2020 is incorrect.  As outlined in detail in the Motion to Quash and Disqualify (and as
available as a matter of public record), the Georgia presidential election was subject to a pending judicial
challenge in Fulton County Superior Court until at least January 6, 2021 when Congress certified the votes,
and the case was rendered moot.  The presidential election in Georgia was not, as a matter of law, at least,
"over" by December 14, 2020, and the pending lawsuit directly challenged which set of presidential electors
were the correct and accurate ones for Georgia.  It is true that the voting was complete by that time, but that
is not the end of the matter under unambiguous Georgia law.  As provided by Georgia law, the certified
results were being challenged in Fulton County Superior Court.  Until that challenge was decided on the
merits (which it never was) or until it was rendered moot  on January 6, 2021 when jurisdiction moved to
Congress to adjudicate and count the electoral ballots, the election results in Georgia simply were not final
as a matter of law.  And, in any event, the FCDA has not even explained, much less met its burden to
establish, that these factual differences are material to any theory of criminal liability or that they would
require any of the jointly represented nominee electors to have antagonistic, non-aligned defenses to any
such charges.

December 14, 2020 based upon the *same material information* and *for the same reason* – to protect the right of the State of Georgia to have a valid presidential electoral ballot *if* the then-pending judicial challenge to the election were successful.  This rationale was the *only* one provided to Mr. Shafer by his attorneys in the pending Fulton County lawsuit and by lawyers for his co-plaintiff, Donald Trump.  This is the also the *only* rationale that was shared by lawyers and others who coordinated with the other Republican nominee electors and alternate electors regarding casting a provisional ballot on December 14, 2020, and it is the *only* rationale Mr. Shafer articulated to the few nominee electors who reached out to him with questions once they had been contacted by campaign officials.[21] This rationale is also the one reported by the press that day, *see, e.g.,* https://www.fox5atlanta.com/video/880535, and the one that David Shafer and

---

[21] The FCDA insinuates, but again does not directly say or in any way substantiate, that David Shafer and perhaps other high-placed leaders in the Georgia Republican Party were privy to and/or party to other plans by the Trump campaign unrelated to the pending judicial challenge. This insinuation is categorically false, and no evidence can or does support this speculations. Indeed, as the documents that Mr. Shafer himself turned over to the January 6 Committee and voluntarily provided to the FCDA prove, Mr. Shafer was specifically told by the attorneys representing him in the Fulton County judicial challenge and members of the Trump campaign that the purpose of executing the provisional Republican electoral ballot on December 14, 2020 was to ensure that there was an available remedy (a Republican electoral ballot) *if* the judicial challenge to the presidential election were successful. To the extent that there is any truth to media reports that certain high level members of the Trump team (Mr. Eastman, Mr. Giuliani, et al.) developed a different plan to, among other things, attempt to convince Vice President Pence to count these contingent presidential electoral slates as the valid elector slates despite the lack of any successful judicial ruling, such a plan was reportedly conceived in late December 2020, well after the elector nominees executed their provisional ballots. To the extent these reports are accurate (which the nominee electors have no way of knowing), the nominee electors did not and could not have had any involvement in or knowledge of any such plan, as it was not even alleged to have been conceived until several weeks after the GOP electors had completed their contingent electoral slates on December 14, 2020, and, in any event, it was never disclosed to or discussed with the nominee electors at any time. Indeed, John Eastman himself publicly confirmed on December 16, 2020 that the limited and legitimate purpose of the provisional Republican electoral slates was to preserve a remedy for pending judicial contests: "We have historical precedent here, and in each of these states, *there is pending litigation challenging the results of the election. If that litigation proved successful,* then the Trump electors, having met and voted, would be able to have those votes certified and be the ones properly counted in the joint session of Congress on January 6" available at https://www.ntd.com/john-eastman-explains-lhe-historical-precedents-on-dueling-electors 540953.html (December 16, 2020) (emphasis added). If some other plan existed or was later developed at the higher levels of the Trump campaign regarding the use of the provisional Republican presidential electoral ballots for any purpose other than preserving a judicial remedy, none of the jointly represented nominee electors were aware of, privy to, or involved in it.

34

other Republican nominee electors provided in public statements to the press and on social media on December 14, 2020. In sum, nothing in these email communications creates any inconsistency between the jointly represented nominee electors or would cause them to have antagonistic, incompatible defenses to any eventual charge. They engaged in the same material, lawful conduct for the same material, lawful reason.

### 2.   *Publicly available and non-incriminating facts.*

Several of the facts "developed" by the FCDA investigation are a matter of public record and have been since before the inception of this investigation. For example, it is no secret that David Shafer is, and was on December 14, 2020, the Chairman of the Republican Party (Statement No. 2); that Mr. Shafer notified all of the electors of their option to be represented by Pierson Law at the Party's expense ██████████;[22] that David Shafer attended and convened the meeting of the nominee electors on December 14, 2020 ███████████;[23] that Mr. Shafer communicated with some of the nominee electors about attending the December 14, 2020 meeting in response to their inquiries about the same ███████████;[24] that David Shafer and Shawn Still, as the Chairman

---

[22] The FCDA again implies, but does not affirmatively allege, that Mr. Shafer's communications with some of the other electors regarding legal representation is somehow problematic. The opposite is, in fact, true. The Georgia GOP passed a resolution for the Party to pay for the legal services of the presidential nominee electors (the vote from which Mr. Shafer recused himself). Mr. Shafer notified the other nominee electors of the availability of these paid-for legal services but in no way attempted to unduly influence anyone to sign up with Pierson Law or The Debrow Firm or not to hire their own counsel, and no evidence even suggests to the contrary. Indeed, several of the electors did just that, and the electors who have signed up with Pierson Law and The Debrow Firm are very satisfied with their representation and strenuously object to being involuntarily separated from their chosen counsel. As discussed below, each have been individually and fully advised in writing and in personal conferences with their attorneys (and some with independent counsel) about all of information required by the Georgia Rules of Professional Responsibility and have executed individual informed consent to the continued joint representation.

[23] ██████████████████████████████████████████

[24] ██████████████████████████████████████████

and Secretary of the December 14, 2020 meeting, signed certain publicly available documents relating to the provisional Republican electoral ballot (███████████ ██); and that Mark Amick and Cathy Latham testified in public legislative hearings in the Georgia Senate about alleged voter fraud (████████████). The FCDA offers no explanation as to how these publicly available facts are or could be material to any alleged criminal activity or future charge. More importantly for the purposes of this particular motion, the FCDA provides no argument, explanation, or authority as to how any of these facts could possibly create a conflict, much less a disqualifying or unwaivable conflict, among the jointly represented electors.

The conflict analysis under Georgia law for joint representation is *not* whether there are immaterial factual differences between the potential defendants but instead whether their potential defense(s) to any potential charges are synergistic and compatible. As a result, the FCDA's identification of some alleged factual differences between the jointly represented eleven nominee electors, even if they were accurate, are immaterial to the conflicts analysis under Georgia law. None of these factual allegations, even if true (many of which the FCDA has not substantiated and cannot substantiate), change the eleven nominee electors' unified claim of innocence and that no crime was or could have been committed by them or any of the other electors. Nor would such factual allegations, even if true, require any elector to "finger point" or shift blame to another jointly represented elector to defend him or herself from false allegations of criminal wrongdoing, and the FCDA provides no argument or substantiation that they would.

## IV. Informed Consent and Waiver.

As the FDCA has conceded and Georgia courts have confirmed, the supposed conflicts of interest that it has raised are waivable if proper informed consent is provided

36

by the clients.  Here, the issues involving conflicts of interest have been fully vetted with each of the individual clients repeatedly, and each has expressed their strong desire to remain in the joint representation and provided their informed consent to continue in the joint representation in writing.

By way of background, in April 2022, Ms. Pierson was approached about the possibility of representing the Republican nominee electors from the 2020 election in the context of the FCDA's investigation.  Ms. Pierson agreed to the representation, and the 16 Republican nominee electors were notified that if they wanted individual legal counsel in light of the FCDA's investigation, Ms. Pierson was available to consult with them and, if they so chose, to represent them.  Of the sixteen Republican Party nominee electors, eleven chose to hire Ms. Pierson as their counsel, and each of the eleven signed separate, individual engagement letters with Pierson Law.  In turn, Pierson Law, as permitted by the engagement letter with each client and in consultation with the eleven clients, retained Kimberly Bourroughs Debrow of Strickland Debrow LLP, formerly Debrow Law, P.C., ("Strickland Debrow") as co-counsel.

At the outset of the joint representation, counsel explained in the engagement letter, in email communications, and in telephone conferences with the clients the Georgia Rules of Professional Conduct regarding potential and actual conflicts and required each nominee elector to provide affirmation that they understood those rules.  Further, a Statement of Client Policies was provided as part of Counsel's engagement letter, which outlines in pertinent part additional terms of the engagement as it specifically relates to actual or potential conflicts of interest.  Each potential client was required to affirm in advance of the beginning of the representation that they have no legal or ethical conflict with any of the other 16 individual nominee electors whom

counsel represents or even *may* represent, including any information that could incriminate any of the proposed clients. Each client made this affirmative representation specifically and individually by email to counsel and by signing their respective engagement letters and Statement of Client Policies. Each client also agreed to immediately make counsel aware of any actual or potential conflicts if any arose during the scope of the joint representation.

The engagement letter also explains that, although the Georgia Republican Party is paying for the clients' legal fees and expenses in connection with their representation, the payment is subject to Rules 1.8[25] and 5.4(c)[26] of the Georgia Rules of Professional Conduct. With great detail, the letter explains these rules and expressly states that the payment of attorney's fees and expenses by the Georgia Republican Party will not cloud or influence counsel's professional judgment and obligations to each respective client. And, as a factual matter, the fact that the Georgia GOP is paying for these services has had no impact on counsel's representation, nor would it ever be allowed to do so.



---

[25] Rule 1.8 provides as follows:

A lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client consents after consultation; (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and (3) information relating to representation of a client is protected as required by Rule 1.6.

[26] Rule 5.4(c) provides as follows:

The lawyer shall not permit a person who recommends, employs or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.



Despite the absence of any ▓▓▓▓▓▓▓▓▓▓▓▓▓ actual conflict of interest, on August 1, 2022, counsel sent to each of their jointly represented clients additional written communication outlining all recent developments arising from the communications with the FCDA, including a thirteen-page, single-spaced memo again explaining all of the information required by the Georgia Rules of Professional Conduct, including but not limited to Rule 1.7. Both in writing and during lengthy follow-up telephone conversations with each individual client, counsel explained to each elector the rules relating to actual and potential conflicts of interest and how those apply or might

39

apply to these facts, █████████████████████████████████████████
██████; the advantages, disadvantages, and alternatives to the joint representation; and the right to consult with independent counsel before deciding whether to continue in the joint representation.  Once again, each nominee elector was specifically asked to confirm the accuracy and correctness of the facts relayed to counsel and, if there were any discrepancies or changes in their recollection, to notify counsel immediately.  After having been advised by counsel about their rights and responsibilities under the Georgia Rules of Professional Responsibility in writing and in individual teleconferences, and having the opportunity to consult with independent counsel (which some did), each of the elector clients chose to continue in the joint representation and executed to that effect.

On August 5, 2022, counsel notified the FCDA and this Court that this laborious process had been completed in full accord with the Georgia Rules of Professional Conduct and that each of the jointly represented clients had decided to stay in the jointly representation.  Despite these facts, the FCDA has persisted in bringing this Motion.

In sum, even if there were actual or potential conflicts in the joint representation at this stage in the process, which there are not, each jointly represented client has been fully apprised of the necessary information to make an informed choice to waive any such conflicts and remain in the joint representation.  Such waivers, when properly executed, are enforced by the Georgia courts, especially, as here, in the absence of any evidence that counsel for the jointly represented clients cannot adequately represent each of them in the matter.  Even if this Court were to determine that there were any conflict here, the clients have knowingly and intelligently waived any such conflict and should be allowed to retain their chosen counsel of choice.

## CONCLUSION

The FCDA's motion fails on its face, and the eleven nominee electors should not be involuntarily separated from their chosen counsel. The law required the FCDA to assert and substantiate that it had standing to seek Pierson and Debrow's disqualification, an obligation it failed to meet.  The law also required the FCDA to substantiate an actual conflict or impropriety sufficient to justify the extraordinary and sparingly granted remedy of disqualification, and it has provided only speculation, conjecture, and inapposite authority.

The law presumes that Ms. Pierson and Ms. Debrow - officers of the court and respected members of the Bar in good standing - have adequately determined whether they might ethically undertake the joint representation of the nominee electors. And the law shields that determination from intrusion without strong and supported justification. Otherwise the temptation to deselect one's opponent for strategic reasons would be too great.  The FCDA's Motion to Disqualify should be denied.


Respectfully submitted,


/s/ Holly A. Pierson                          /s/ Kimberly Bourroughs Debrow
Holly A. Pierson                              Kimberly Bourroughs Debrow
Georgia Bar No. 579655                        Georgia Bar No. 231480
PIERSON LAW LLC                               STRICKLAND & DEBROW
2951 Piedmont Road NE                         246 Bullsboro Drive, Suite A
Suite 200                                     Newnan, GA 30263
Atlanta, GA 30305                             kbdebrow@stricklanddebrow.com
hpierson@piersonlawllc.com                    470-683-4402
404-353-2316

*Counsel for Eleven Nominee Electors*

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have filed the foregoing ***Opposition to Motion to Disqualify*** with the Clerk of Court of the Fulton County Superior Court and that date-stamped copy will be hand-delivered to the Fulton County District Attorney's Office today.

Respectfully submitted this the 26th day of October, 2022.

<u>/s/ *Holly Pierson*</u>
Holly A. Pierson
Georgia Bar No. 579655

42

# EXHIBIT A



IN THE FULTON COUNTY SUPERIOR COURT
STATE OF GEORGIA

IN RE SUBPOENAS FROM MAY 2022 )        Case No. 2022-EX-000024
SPECIAL PURPOSE GRAND JURY      )
                                )

SUBPOENAS ISSUED TO: Presidential Nominee Electors Mark Amick, Joseph Brannan, Brad
Carver, Vikki Consiglio, John Downey, Carolyn Fish, Kay Godwin, Cathy Latham, David Shafer,
Shawn Still, CB Yadav

## MOTION TO QUASH AND DISQUALIFY[1]

NOW COME the above-referenced subpoena recipients, pursuant to O.C.G.A. § 23-13-23

and this Court's inherent authority over the Special Purpose Grand Jury ("Grand Jury"), and move

this Court to quash their Grand Jury subpoenas for appearances beginning July 25, 2022 as

unreasonable and oppressive, showing this Court as follows:[2]

### I.    Introduction

From April 19, 2022 until June 28, 2022, the Fulton County District Attorney's ("DA")

Office correctly and appropriately represented that the above-referenced eleven individuals, who

are eleven of the sixteen Georgia Republican nominee presidential electors ("nominee electors")

in the 2020 election, were witnesses, not subjects or targets, of the DA Office's and the Grand

Jury's investigation into the 2020 election.  In reliance on this representation, all of these nominee

electors agreed to voluntary interviews with the DA's Investigative Team.[3]  Those interviews

began on April 25, 2022, with David Shafer.  Vikki Consiglio's interview took place April 26,

2022.  Mark Amick was scheduled to be interviewed on April 28, 2022, but that interview was

---

[1] These nominee electors also join in Senator Jones' Motion to Disqualify filed July 15, 2022 for the reasons set forth there and herein.

[2] If this Court believes that oral argument would be useful in resolving this Motion, we request oral argument.

[3] The team is Nathan Wade, Don Wakeford, Will Wooten, Adam Ney, and Investigators Mike Hill and Trina Lucas.

canceled by the Investigative Team. The team said that they would reschedule Mr. Amick's interview and schedule the remaining eight nominee electors' interviews, but that never happened.[4]

Instead, on June 1, 2022, the Investigative Team sent Grand Jury Subpoenas for all eleven nominee electors. We raised concerns with members of the Investigative Team about these subpoenas, including that the nominee electors had agreed to voluntary interviews, that coming to Atlanta for a Grand Jury appearance for many of them would be difficult, and that it seemed unnecessarily cumulative for them all to testify. We also noted the potential danger attendant in a Grand Jury appearance in this case and the abuse and harassment that the nominee electors have already experienced, and would inevitably experience again, as a result. We asked that these concerns be raised with the rest of their team and requested that they either continue the voluntary interviews or, at least, limit the number of the nominee electors to testify in the Grand Jury. We never received any response to these requests. *At no time in our communications with the DA's Office before June 28 did anyone ever suggest that the nominee electors' status had changed or that they were no longer considered witnesses, including when they were subpoenaed.*

On June 28, 2022, we contacted the Investigative Team to discuss logistics regarding the nominee electors' grand jury appearances. Immediately upon learning that the nominee electors were, in fact, planning to testify substantively to the Grand Jury, Special Prosecutor Nathan Wade informed us for the first time that all of these eleven nominee electors were suddenly targets,

---

[4] On May 1, 2022, the Investigative Team requested that we provide the documents that Mr. Shafer had previously supplied to the House of Representatives' January 6 Committee, and we did so on May 2, 2022. We also provided additional documents and information showing that the nominee electors' actions in December 2020 were proper, even necessary, under the governing law. This exculpatory information is discussed in greater detail herein. On May 5, 2022, having heard nothing further from the Investigative Team about the schedule for the voluntary interviews of the remaining 9 nominee electors whom we represent, we contacted the team to discuss schedules and inform the team of upcoming conflicts that we had to facilitate setting interview dates. That same day, Mr. Wade responded to that email, stating "Thank you Holly, as of now our investigation has us tied up with other components so no worries."

stating that "as our investigation has matured and new evidence has come to light, in a spirit of integrity we feel it only fitting to inform you that your clients' status has changed to 'Target.'"

As discussed herein, it is virtually impossible on these facts for that representation to be accurate.[5] First, the unchanged law governing the actions and duties of presidential electors and nominee electors makes plain that the actions they took on December 14, 2020 -- executing a *contingent* slate of elector ballots that would only spring into validity *if* the then-pending judicial contest in the Fulton County Superior Court were successful -- were lawful and done upon the advice of counsel. *See infra.*

Second, the nominee electors' actions and their reasons taking them were public and transparent – indeed, they broadcast on the news on December 14, 2020. *See* https://www.fox5atlanta.com/video/880535. Georgia GOP Chairman Shafer made the point explicitly in social media posts he published that day, which specifically reference "the *Republican nominees* for Presidential Elector" and discuss the need for them to act provisionally, as follows:

> Because the President's lawsuit contesting the Georgia election is still pending, the Republican nominees for Presidential Elector met today at noon at the State Capitol today and cast their votes for President and Vice President.
>
> Had we not meet [*sic.*] today and cast our votes, the President's pending election contest would have been effectively mooted. Our action today preserves his rights under Georgia law.

Importantly, these facts have been known to the DA's Office *since the beginning of its investigation.* Based upon these known facts, the DA's Office properly labeled these nominee electors as *witnesses*, which induced the nominee electors' voluntary cooperation. With *no* change in the law or the facts, however, the eleven nominee electors were *all* suddenly transformed into

---

[5] In our July 12 Letter, we asked the DA to share with us this supposed new evidence, if it exists, so that we could respond to it and debunk it. We have received no response.

*targets* of the Grand Jury when the DA learned that they were planning to continue their cooperation and provide substantive testimony to the Grand Jury.

The abrupt, unsupportable, and public elevation of all eleven nominee electors' status wrongfully converted them from witnesses who were cooperating voluntarily and prepared to testify in the Grand Jury to persecuted targets of it. In light of the escalation, counsel advised the elector nominees to invoke their federal and state constitutional and statutory rights not to provide substantive testimony to the Grand Jury, advice they have reluctantly accepted.[6] The unavoidable conclusion is that the nominee electors' change of status was not precipitated by new evidence or an honestly-held belief that the they have criminal exposure but instead an improper desire to force them to publicly invoke their rights as, at best, a publicity stunt.[7]

On July 12, 2022, we outlined these concerns to the DA, objecting to the target label, explaining in detail the exculpatory documents and information that we had already provided to her Investigative Team on behalf of the nominee electors, and informing her that the sudden change of their status from witness to target would deprive the Grand Jury of testimony that they were

---

[6] *"[N]o implication of guilt"* can be drawn from an individual's invocation of her Fifth Amendment privilege before the grand jury. *Grunewald v. United States*, 353 U.S. 391, 421 (1957) (emphasis added). "Recent re-examination of the history and meaning of the Fifth Amendment has emphasized anew *that one of the basic functions of the privilege is to protect innocent men." Id.* (citation omitted). *"Too many,* even those who should be better advised, *view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege.' Id.* (quoting *Ullmann v. United States*, 350 U.S. 422, 426 (1956) (emphasis added)). *"The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances."* Id. (quoting *Slochower v. Board of Higher Education*, 350 U.S. 551, 557-558 (1956).) (emphasis added). The Supreme Court has consistently reaffirmed these principles. *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 327 (1976) ("And *it is not necessary that a person be guilty of criminal misconduct to invoke the privilege; an innocent person, perhaps fearing that revelation of information would tend to connect him with a crime he did not commit, also has its protection.") (internal citations and quotations omitted) (emphasis added); *Ohio v. Reiner*, 532 U.S. 17 (2001) (witness could assert Fifth Amendment privilege despite claim of innocence because she had reasonable cause to apprehend danger from her answers).

[7] Bolstering this conclusion is the fact that the Grand Jury has subpoenaed no documents from the nominee electors or, upon information and belief, from other witnesses it has subpoenaed. Also, as set forth in Section II, federal and state law protect the right of the nominee electors to execute contingent presidential ballots, and they, therefore, cannot have committed a crime by so doing, a fact presumably known to the DA's Office. *See also* FN 8.

prepared to give. *See* July 12, 2022 Letter to DA Willis (attached hereto as **Exhibit A**). We also informed her that, because of these changed circumstances, we had advised the nominee electors to invoke their state and federal rights, that they had grudgingly agreed, and that customary practice and ethical rules dictate that they should be excused from their Grand Jury appearances, citing ABA STANDARDS OF PROSECUTION FUNCTION 3-4.6(f) (prosecutor should not force targets into grand jury without immunity) (emphasis added); *see also* Ga. R. Prof. Resp. 3.8, Special Responsibilities of a Prosecutor, Comment 1 (citing favorably the ABA Standards of Prosecution); United States Attorney Manual ("USAM") 9-11.150 (subpoenaing targets of grand jury investigation "may carry the appearance of unfairness"); and USAM 9-11.154 (when target of grand recount jury investigation informs government that they plan to invoke their 5th Amendment privilege in grand jury, they should ordinarily be excused from appearing). We asked DA Willis to confirm by Thursday, July 14 that she would excuse the nominee electors. We received no response from the DA's Office.

On July 15, 2022, the AJC quoted DA Willis as saying that "[The DA's Office has] informed some [of the nominee electors] that they are being looked at as a target — or let me say more clearly, we've told people's lawyers that." (available at https://www.ajc.com/politics/top-ga-republicans-informed-theyre-targets-of-fulton-da-probe/3CZJHEYQD5ADFDCVP3372HROFQ/). This public (mis)branding of the nominee electors is an improper abuse of this investigatory process.[8] The substance and timing of all of these events, especially in light of the known facts and governing law, and the attempt to force the

---

[8] These comments by the DA also appear to run afoul of Ga. R. Prof. Resp. 3.8(g), Special Responsibilities of a Prosecutor: "[E]xcept for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose, [*a prosecutor must*] *refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused.*") (emphasis added).

nominee electors to be publicly marched into the Grand Jury only to invoke their rights is political theater and gamesmanship, not a good faith use of the Grand Jury.[9]

The subpoenas are unreasonable and oppressive for other reasons. The nominee electors' personal appearance to invoke their rights can have little to no value to the Grand Jury's investigation, and the disruption, potential danger, and inconvenience them outweighs any alleged slight value. Additionally, the DA knows (or should know), and therefore the Grand Jury knows or should know, that under the governing law, the nominee electors' actions were legal. Despite this fact, the DA's office persists in publicly claiming otherwise and misusing the Grand Jury process to harass, embarrass, and attempt to intimidate the nominee electors, not to investigate their conduct. For these reasons and as set forth herein, we ask that this Court quash the subpoenas for the nominee electors' scheduled appearances for the week of July 25, 2022.

II.   **The Grand Jury Subpoenas Should Be Quashed As Unreasonable and Oppressive.**

Subpoenas, including grand jury subpoenas, may be quashed by this Court when they are unreasonable or oppressive. *See* O.C.G.A. § 24-13-23(b)(1). Additionally, in the context of a special purpose grand jury, this Court has inherent powers of oversight. Here, the subpoenas are

---

[9] Other facts suggest that political, not legal, considerations are improperly infecting this investigatory process. As explained in the disqualification motion filed on Friday, July 15, 2022 by Senator Burt Jones, DA Willis and Nathan Wade appear to have serious and direct conflicts of interest in this investigation. Additionally, as pointed out in that motion, the Grand Jury is authorized to be empaneled through at least April 2023, but the DA has made known her intention to have the Grand Jury release its report in October 2022, *one month before the November elections.* Despite the year-long authorization of the Grand Jury, the DA refused our requests for any extension of the time for the nominee electors to appear in the Grand Jury, and upon information and belief, the DA has refused requests to move Grand Jury appearances for other elected officials until after the election so that she can maintain the October pre-election deadline for the release of the report. Also, the manner in which the DA's Office has pursued certain of the nominee electors as targets while ignoring other nominee electors speaks to a political motivation. Specifically, many, but not all, of the nominee electors are prominent figures in the Georgia GOP. David Shafer is its volunteer chairman, Vikki Consiglio is its Assistant Treasurer, Shawn Still is a Republican candidate for State Senate, many of our eleven clients are on the Republican State Executive Board or hold or have held other positions within the Party. Although all of the nominee electors performed the same functions on December 14, 2020, the ones with these more prominent roles in Georgia GOP have been actively pursued while, on information and belief, other nominee electors without such political roles have not been subpoenaed or even contacted by the DA or the Grand Jury.

6

unreasonable and oppressive under the circumstances, and this Court should excuse the eleven presidential nominee electors from their appearances in front of the Grand Jury next week.

### A.  Targets of a Grand Jury Investigation Should Be Excused From Appearing Before the Grand Jury.

As set forth herein, there is no legal or factual basis to label the nominee electors as targets of this or any Grand Jury. Nonetheless, the DA has rashly elevated them from witnesses to targets, and the nominee electors have informed her of their intention to follow our legal counsel to invoke their state and federal constitutional and statutory rights not to provide substantive testimony. *See* Exhibit A. Under these circumstances, customary practice and ethical rules countenance that they be excused from their appearances. *See, e.g.,* ABA STANDARDS OF PROSECUTION FUNCTION 3-4.6(f) ("If the prosecutor concludes that a *witness is a target of a criminal investigation, the prosecutor should not seek to compel the witness's testimony before the grand jury absent immunity.*") (emphasis added); *see also* Ga. R. Prof. Resp. 3.8, Special Responsibilities of a Prosecutor, Comment 1 (citing favorably the ABA Standards of Prosecution); United States Attorney Manual ("USAM") 9-11.150 (subpoenaing targets of grand jury investigation "may carry the appearance of unfairness"); USAM 9-11.154 (when target of grand jury investigation informs government that they plan to invoke their 5th Amendment privilege in the grand jury, they should ordinarily be excused from having to appear in front of the grand jury). Because the DA has not, we ask that this Court excuse their appearances.

### B.  The Fulton County DA and the Grand Jury Lack Jurisdiction.

Under the Supremacy Clause, a State has *no* jurisdiction to criminalize actions (such as the casting of or determination of the validity of presidential electoral ballots) that are taken pursuant to federal constitutional and statutory authority and are inseparably connected to the functioning of the National Government. When a State attempts to meddle in such areas in which they have

no jurisdiction, federal courts are empowered to prevent such abuses. *See, e.g., In re Loney*, 134 U.S. 372, 375 (1890);[10] *see also Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 507–08 (1973) ("The situations in which pretrial or preconviction federal interference by way of habeas corpus with state criminal processes is justified involve *the lack of jurisdiction, under the Supremacy Clause, for the State to bring any criminal charges against the petitioner*.") (citing *Wildenhus's Case*, 120 U.S. 1 (1887); *In re Loney*, 134 U.S. 372 (1890); and *In re Neagle*, 135 U.S. 1 (1890)[11]) (emphasis added).

"While presidential electors are not officers or agents of the federal government, *they exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States.*" *Burroughs v. United States*, 290 U.S. 534, 545 (1934) (emphasis added). Indeed, presidential electors are created by the U.S. Constitution, not by state authority. *See* U.S. CONST. art. II, cl. 2; Amendment 12.[12] Further, the Twelfth Amendment

---

[10] Loney was arrested and held in custody by the state authorities under a charge of perjury committed in giving his deposition as a witness before a notary public Virginia, in the case of a contested election of a member of Congress. The intended effect of Loney's arrest by the State of Virginia was to embarrass one of the parties in the contested Congressional election, to impede him in obtaining evidence on his behalf, to intimidate witnesses he might wish to present, and to delay or disrupt the preparation of the case for final determination by Congress. The Supreme Court affirmed the issuance of the writ releasing him from state custody, stating as follows:

> It is essential to the impartial and efficient administration of justice in the tribunals of the nation that witnesses should be able to testify freely before them, unrestrained by legislation of the state, or by fear of punishment in the state courts. *The administration of justice in the national tribunals would be greatly embarrassed and impeded if a witness testifying before a court of the United States, or upon a contested election of a member of congress, were liable to prosecution and punishment in the courts of the state upon a charge of perjury, preferred by a disappointed suitor or contestant, or instigated by local passion or prejudice.*

*In re Loney*, 134 U.S. at 375. The Court concluded that "[t]he courts of Virginia having no jurisdiction of the matter of the charge on which the prisoner was arrested, and he being in custody, *in violation of the constitution and laws of the United States, for an act done in pursuance of those laws, by testifying in the case of a contested election of a member of congress,* law and justice required that he should be discharged from such custody . . . ." *Id.* at 376–77.

[11] In *In re Neagle*, a deputy U.S. Marshal assigned to protect a federal judge killed an individual attempting to assassinate that judge. He was arrested by the State for homicide, and the federal district court issued a writ of habeas corpus requiring his release because the State had no jurisdiction

[12] That section provides

commits exclusive authority to Congress to adjudicate and count electoral votes.  The Electoral Count Act ("ECA") specifies that, when States fail to resolve disputes before January 6 (as the Georgia court here did), Congress is the sole body authorized to resolve remaining disputes about presidential electors, *including* when two slates of electors are submitted by a single state. *See* 3 U.S.C. §§ 5, 6, and 15.

Here, the dispute in the Georgia 2020 election about which slate of presidential electors were the proper ones was committed in the first instance to the state judiciary, who failed to timely act to resolve the dispute.  By operation of Constitutional authority and federal law, the responsibility at that point to receive, adjudicate, and count all presidential electoral ballots devolved entirely and solely to Congress, and only Congress had authority at that point to determine whether any submitted electoral slate or ballot from any State was valid or invalid.[13] State and local courts have no jurisdiction to interfere or attempt to interfere with the submission of these electoral ballots to Congress or Congress' right and duty to adjudicate their validity and count the valid ballots, especially by attempting to criminalize actions taken in furtherance of these exclusive federal duties.  In other words, the States have no jurisdiction to determine which elector slates are "fake" or valid; the Constitution is clear that only Congress may do that.  As such, States

---

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector,

U.S. CONST. art. II, cl. 2.  State legislatures are directed to create the manner of appointment of such electors, but Congress has the *exclusive* authority to count and determine the validity of the presidential electoral ballots, including choosing between two "dueling" slates of electoral ballots from one state when the state has not resolved that dispute through its judicial process. *See* Amendment XII and Electoral Count Act, 3 U.S.C. §§ 5, 6, and 15.

[13] Indeed, several court opinions and decisions have concluded that this power vested in Congress divests even federal courts from interfering with its exercise. *See, e.g. Bush v. Gore*, 531 U.S. 98 (2000) (Breyer, J., dissenting) ("Given this detailed, comprehensive scheme [in the 12th Amendment and the Electoral Count Act] for counting electoral votes, *there is no reason to believe that federal law either foresees or requires resolution of such a political issue by this Court*."); *cf. Hutchinson v. Miller*, 797 F.2d 1279, 1284 (4th Cir. 1986) ("Had the framers wished the federal judiciary to umpire election contests, they could have so provided. Instead, they reposed primary trust in popular representatives and in political correctives.").

(and their local governments) have no authority to interfere (through attempted criminalization or otherwise) with the process of sending potential elector slates to Congress for it to adjudicate.

### C.    Federal Law Protects The Nominee Electors' Right to Cast Contingent Ballots.

Even if the DA and the Grand Jury had jurisdiction here, federal law specifically anticipates and permits the submission of more than one slate of presidential electors from a State and, as noted, gives Congress exclusive jurisdiction to adjudicate the validity of those slates within the parameters set in the Electoral Count Act ("ECA") and through their own internal procedures. *See* 3 U.S.C.A. § 15.[14] Obviously, an action specifically permitted by federal law cannot be a crime.

Indeed, two slates of presidential elector ballots were previously submitted to Congress by the State of Hawaii in the close, judicially contested presidential election between Nixon and Kennedy in 1960. There, the contingent, provisional electoral ballots cast by the Kennedy presidential electors were ultimately the ones counted by Congress as Hawaii's electoral votes.

---

[14] That statute states, in pertinent part, as follows:

> If *more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate*, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; *but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law;* and *in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State*, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. *But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted.*

3 U.S.C. § 15 (emphasis added); *see also* COUNTING ELECTORAL VOTES: AN OVERVIEW OF PROCEDURES AT THE JOINT SESSION, INCLUDING OBJECTIONS BY MEMBERS OF CONGRESS, Congressional Research Service at pp. 8-9 (explaining Congress' process to adjudicate between two slates of presidential elector ballots from the same state).

*See, e.g.,* Todd Zywicki, THE LAW OF PRESIDENTIAL ELECTIONS AND THE 2000 ELECTION at pp. 27-28 (March 8 2001) (discussing the 1960 Hawaii contested election), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=262338.

Specifically, in the 1960 Hawaii Presidential election, the original vote count was for Nixon, not Kennedy, but the margin was small. Hawaii's Governor certified the votes for Nixon in November 1960. Democrats sued to contest the election results, and a court-ordered recount ensued in December 1960. That recount was still ongoing on the mandatory federal date for presidential electors to cast their ballots,[15] which that year was December 19. While the recount continued, both the sets of presidential electors separately met on December 19, and each cast an electoral slate for their respective candidates that was transmitted to Congress. *Id.*

When the recount was complete, Kennedy won, and the state court entered judgment for Kennedy. *Only because* the Democrat *nominee* electors had taken the necessary step of casting their contingent presidential electoral ballots by the federally mandated date of December 19 was Hawaii able to certify the Kennedy elector slate to Congress on January 4, 1961. Congress then ultimately counted that electoral slate for Kennedy, discounting the previously certified one for Nixon, even though the Kennedy slate was not certified until January 1961 (after the ECA's purported deadline) and conflicted with the previously timely certification for Nixon. *Id.* The Democratic Hawaii nominee electors' contingent slate had, in essence, saved Hawaii's ability to have its electoral votes counted. Appropriately, no one suggested that they were criminals.

The Georgia nominee electors took the same steps for the same reasons on December 14, 2020. In the Georgia 2020 presidential election, Biden was the apparent winner, and he was so

---

[15] The Constitution and the ECA require that the presidential electors meet on the first Monday after the second Wednesday in December (which was December 14 in 2020) to cast their votes for President and Vice President of the United States. *See* U.S. CONST. art. II, § 1, cl. 4; U.S. CONST, Amendment 12; 3 U.S.C. §§ 7-8).

certified by Georgia in November 2020. But, as in Hawaii in 1960, there was a pending judicial challenge to the validity of the election results that had not been decided by the mandatory federal deadline for presidential electors to execute electoral ballots (December 14, 2020).[16] As in Hawaii, both slates of nominated Georgia presidential electors met on the required day and executed electoral votes for their party's candidates and transmitted them to Congress as required, thus ensuring that no matter the resolution of the judicial contest to the election, Georgia would have a valid slate of electoral votes for Congress to count on January 6, 2021.

*Unlike* in Hawaii, the Georgia judicial contest did not change the election results, and so the contingent Republican presidential electoral votes appropriately were not certified by the State or counted by Congress.[17] But, had the nominee electors *failed* to execute their contingent slate on December 14, 2020 and the legal challenge to the election *had* been successful (a result that

---

[16] The judicial challenge pending in Fulton County contesting the election's validity and, therefore, ultimately who the correct presidential electors were, was *Trump et al., v. Raffensperger et al.,* Case No. 2020CV343255 (Fulton County Superior Court Dec. 2020), filed on December 4, 2020. Georgia law such lawsuits to be heard within 20 days, but this lawsuit was not scheduled for a hearing until January 8, 2021 - more than two weeks after the statutory deadline and two days *after* Congress met on January 6, 2021 to count and certify the votes of the Electoral College - effectively mooting the lawsuit. No Georgia court ever held an evidentiary hearing or ruled on the merits of the lawsuit.

[17] Much has been made in the press about an email from Robert Sinners of the Trump campaign that was apparently sent to some or all of the nominee electors advising them to, in essence, conduct their work in secret. While we are aware of no law that would have prevented the nominee electors from adhering to this request, it is obvious from the news coverage and the public tweets cited to herein that they did not follow it. Instead, they acted publicly and transparently. It has also been reported in the media that certain high level members of the Trump team (Mr. Eastman, Mr. Giuliani, et al.) developed a *different* plan in late December 2020 (after Christmas) to, among other things, attempt to convince Vice President Pence to count these contingent presidential electoral slates as the valid elector slates despite the lack of any successful judicial ruling. To the extent these reports are accurate (which we have no way of knowing), the nominee electors did not and could not have had any involvement in or knowledge of any such plan, as it was not even *conceived* until several weeks *after* the GOP electors had completed their contingent electoral slates on December 14, 2020, and, in any event, it was never disclosed to or discussed with the nominee electors at any time. Indeed, John Eastman himself publicly confirmed on December 16, 2020 that the limited and legitimate purpose of the provisional Republican electoral slates was to preserve a remedy for pending judicial contests: "We have historical precedent here, and in each of these states, there is pending litigation challenging the results of the election. *If that litigation proved successful, then the Trump electors, having met and voted, would be able to have those votes certified and be the ones properly counted in the joint session of Congress on January 6*", available at https://www.ntd.com/john-eastman-explains-the-historical-precedents-on-dueling-electors_540953.html (December 16, 2020) (emphasis added). Additionally, as Vice President Pence and his team determined, such a plan is unprecedented and unlawful under both the Constitution and the provisions of the ECA. As such, none of the nominee electors could have anticipated on December 14, 2020 that there could or would be any attempt to misuse their lawfully cast contingent electoral slate in such a manner, nor did they or could they have participated in the same.

was not and could not have been known on December 14, 2020), the State of Georgia would have had *no valid presidential electoral votes* to be counted in Congress on January 6, 2021, and citizens of Georgia could have had their voice in the 2020 presidential election silenced.

No law countenances, much less commands, such a result. Instead, federal law specifically provides for these very actions, and no state law does or can criminalize these actions of presidential nominee electors acting under Constitutional and federal authority to preserve their legal challenge and the electoral votes of the State of Georgia in a contested election.

Rather than suggesting that such actions are improper or illegal, legal and political luminaries have lauded the execution of two presidential elector slates as the gold standard in a contested presidential election that has not been resolved by the mandatory federal deadline to execute presidential electoral ballots. In the hotly contested Presidential election of 2000, for example, Justice Stevens cited with approval the 1960 Hawaii precedent in his dissent in *Bush v. Gore,* stating as follows:

> In the interest of finality, however, the majority effectively orders the disenfranchisement of an unknown number of voters whose ballots reveal their intent—and are therefore legal votes under state law—but were for some reason rejected by ballot-counting machines. It does so on the basis of the deadlines set forth in Title 3 of the United States Code. *Ante,* at 532. *But, as I have already noted, those provisions merely provide rules of decision for Congress to follow when selecting among conflicting slates of electors. Supra,* at 540. They do not prohibit a State from counting what the majority concedes to be legal votes until a bona fide winner is determined. *Indeed, in 1960, Hawaii appointed two slates of electors and Congress chose to count the one appointed on January 4, 1961, well after the Title 3 deadlines.* See Josephson & Ross, Repairing the Electoral College, 22 J. Legis. 145, 166, n. 154 (1996).

*Bush v. Gore,* 531 U.S. 98, 127 (2000) (Stevens, J., dissenting) (emphasis added). Democrat Congresswoman Patsy Mink of Hawaii, the first woman of color to serve in the House of Representatives, specifically referenced the Hawaii precedent in advocating for the provision of two elector slates to Congress from Florida in the 2000 Bush v. Gore election as follows:

The [Hawaii] precedent of 40 years ago *suggests the means for resolving the electoral dispute in Florida:* count the votes under the supervision of the court pursuant to Florida law, *both slates of electors meet on December 18 and send their certificates to Congress;* the Governor of Florida send a subsequent certificate of election based on the decision of the count supervised by the court accompanied by the decision of the court; *and Congress accepts the slate of electors named by the Governor in his final certification.*

Under this procedure Florida need not rush to complete its recount in an attempt to meet unrealistic deadlines set by the court or the legislature. *The key date is not December 12 or December 18. It is January 6, the date on which the electoral votes are counted.* As the 1960 experience of Hawaii shows, the Florida recount does not have to be completed until just before the electoral votes are counted.

Statement of Rep. Patsy Mink, CONGRESSIONAL RECORD, December 13, 2000 (emphasis added), available at https://www.govinfo.gov/content/pkg/CRECB-2000-pt18/html/CRECB-2000-pt18-Pg26609-2.htm. Electoral college scholars have echoed these sentiments, arguing that executing two slates of electoral ballots and submitting both to Congress is "the model" for how to decide a close presidential election. *See, e.g.,* Michael L. Rosin and Jason Harrow, *How to Decide a Very Close Election for Presidential Electors: Part 2,* available at https://takecareblog.com/blog/how-to-decide-a-very-close-election-for-presidential-electors-part-2.

Because federal law controls[18] and it permits, even anticipates, the actions taken by the presidential nominee electors, they cannot have committed and did not commit any criminal

---

[18] Much has been made in the press about an email from Robert Sinners of the Trump campaign that was apparently sent to some or all of the nominee electors advising them to, in essence, conduct their work in secret. While we are aware of no law that would have prevented the nominee electors from adhering to this request, it is obvious from the news coverage and the public tweets cited to herein that they did not follow it. Instead, they acted publicly and transparently. It has also been reported in the media that certain high level members of the Trump team (Mr. Eastman, Mr. Giuliani, et al.) developed a *different* plan in late December 2020 (after Christmas) to, among other things, attempt to convince Vice President Pence to count these contingent presidential electoral slates as the valid elector slates despite the lack of any successful judicial ruling. To the extent these reports are accurate (which we have no way of knowing), the nominee electors did not have had any involvement in or knowledge of any such plan, as it was not even *conceived* until several weeks *after* the GOP electors had completed their contingent electoral slates on December 14, 2020; and, in any event, it was never disclosed to or discussed with the nominee electors at any time. Indeed, John Eastman himself publicly confirmed on December 16, 2020 that the limited and legitimate purpose of the provisional Republican electoral slates was to preserve a remedy for pending judicial contests: "We have historical precedent here, and in each of these states, there is pending litigation challenging the results of the election. *If that litigation proved successful, then the Trump electors, having met and voted, would be able to have those votes certified*

offense. In the light of this fact, the DA's labeling the presidential nominee electors as targets of the Grand Jury's investigation is inaccurate and improper. But having done so, the injury and disruption to the nominee electors should not be compounded. Forcing them to publicly march into the Grand Jury only to harass and embarrass them is both unreasonable and oppressive.

**D.      Georgia Law Protects The Nominee Electors' Right to Cast Contingent Ballots.**

Georgia law governing the resolution of contested elections is entirely consistent with these principles and with the provisional actions taken by the nominee electors. As an initial matter, O.C.G.A. § 21-2-502(e) governs the certification of the election of presidential electors as follows:

> (e) *Presidential electors.* The Secretary of State, on receiving and computing the returns of presidential electors, shall lay them before the Governor, who shall enumerate and ascertain the number of votes for each person so voted for and shall cause a certificate of election to be delivered to each person so chosen.

In turn, O.C.G.A. § 21-2-521 allows any candidate for elected office or any aggrieved elector who was entitled to vote for such a person to contest the election results in the Georgia courts. After hearing the allegations and the evidence in such a contest, O.C.G.A. § 21-2-527 empowers the relevant court to "declare as elected" the qualified candidate who received the requisite number of votes and "pronounce judgment accordingly."

When election results have been certified by the State, but a judicial contest is still pending (as it was in the 2020 election), Georgia law provides that any necessary commission shall be issued to the initial apparent winner and that the initial victors can be sworn into office.

---

and be the ones properly counted in the joint session of Congress on January 6", available at https://www.ntd.com/john-eastman-explains-the-historical-precedents-on-dueling-electors_540953.html (December 16, 2020) (emphasis added). Additionally, as Vice President Pence and his team determined, such a plan is unprecedented and unlawful under both the Constitution and the provisions of the ECA. As such, none of the nominee electors could have anticipated on December 14, 2020 that there could or would be any attempt to misuse their lawfully cast contingent electoral slate in such a manner, nor did they or could they have participated in the same.

O.C.G.A. § 21-2-503(a) and (c)   But, importantly, if the court in the judicial contest determines that the person so commissioned or sworn in was not the actual winner, then commissions are issued to the actual winner and that ultimate winner is sworn into office.   The issuance of these commissions and swearing in of the ultimate winner nullifies the prior commissions and the authority of the initial winner.   O.C.G.A. § 21-2-503(a) and (c) (emphasis added).

     Applying those provisions here, the nominee electors' actions on December 14, 2020 are expressly provided for and protected by Georgia law.   A contest to the presidential election was filed in Fulton County Superior Court on December 4, 2020, *Trump et al., v. Raffensperger et al.,* Case No. 2020CV343255 (Fulton County Superior Court Dec. 2020), which contest would decide who the rightful presidential electors for Georgia were.   Federal law mandates that presidential elector ballots *must* be executed on the first Monday after the second Wednesday in December, which was December 14, 2020.   The court case, however, was still pending on that date.   To preserve their right and ability to serve as presidential electors in the event that the pending judicial contest were successful and to keep the judicial contest from being mooted, the nominee electors took the obvious and required procedural step of executing provisional electoral ballots.   These provisional ballots would only become the operative Georgia electoral votes if the judicial election contest were decided in favor of the Republican presidential electors.   Here, the judicial contest remained was unresolved and ultimately mooted.

     To label that these actions as criminal is plainly contrary to Georgia law.   It is the equivalent of suggesting that when a candidate for political office in Georgia exercises his or her rights under express Georgia law to contest the results of an election, taking the necessary procedural steps to preserve and continue that challenge until it is adjudicated by the Georgia courts, it is a crime.   To the contrary, it is a specifically given and articulated right under Georgia law.

The mere suggestion that this lawfully permitted activity is or could be criminal is not just patently incorrect – it is exceedingly dangerous. If this were the law, state or local law enforcement officials of an opposing political party could threaten to *criminalize* necessary actions taken in furtherance of a legitimate legal challenge to an election, allowing these partisan, elected local officials to inject themselves into state and federal elections in potentially outcome determinative ways. It would also permit such officials to effectively cut off access to the judicial remedy that Georgia law expressly provides to contest elections. State and local law enforcement officials could, in effect, shut down judicial election contests in close elections by criminalizing (or threatening to criminalize) the actions necessary to preserve such contests, forcing political candidates to concede or moot their judicial challenges before any court has heard the first bit of evidence, much less been able render a final decision.

Indeed, what the DA is actually saying when she labels the nominee electors as targets is that she believes that she has the right to prohibit them, upon pain of criminal prosecution and imprisonment, from exercising their right to preserve a judicial challenge to the results of their own election as presidential electors, even when Georgia law expressly permits such a challenge. That notion is antithetical to both federal and Georgia law and would be a terrifying intrusion by a local law enforcement official into a consequential national election. This type of political interference in federal elections and tribunals born of local passion and prejudice is the very harm against which the Supreme Court cautioned in *In re Loney* and other such cases, *supra.* In short, this is most decidedly not the law, and may it never be.

The DA's Office lacks the jurisdiction or authority to attempt to criminalize that which federal and state law specifically permit and protect. On December 14, 2020, the nominee electors took the same contingent, provisional actions that the Kennedy electors took in Hawaii in 1960,

actions specifically provided for by federal law and protected by state law, actions that Justice Stevens, Representative Mink, and noted electoral college scholars have identified as the model to be followed in close, contested presidential elections. The nominee electors contemporaneously made explicit the contingent nature of their electoral ballot dependent upon the outcome of a pending judicial challenge that would have, had it been heard on its merits, determined the question of who the lawful presidential electors for Georgia were.[19]

The actions of the Georgia presidential nominee electors simply are not and cannot be criminal under either federal or state law. Instead, they are specifically contemplated by federal law and expressly protected by State law. So, for the DA to improperly label it criminal and then misuse the power of the Grand Jury to force these wrongfully labeled "targets" of her investigation into the Grand Jury for personal appearances just to invoke their rights serves no other than their attempted public humiliation and harassment. This is the epitome of unreasonable and oppressive.

### E. Personal Appearance in Front of the Grand Jury Is Unnecessary, Unreasonable and Oppressive.

In the light of the facts and circumstances outlined herein, the personal appearance of the nominee electors before the Grand Jury is unnecessary, and it would prove extremely burdensome and costly to them. Especially because guilt cannot be inferred from any invocation of an individual's state and federal 5th Amendment rights, *see* FN 5, forcing the nominee electors to personally appear before the Grand Jury has limited, if any, value, and the Grand Jury, acting through the DA's Office, has not and cannot meet their burden of establishing that it does. *See, e.g., Morris v. State,* 246 Ga. 510, 512 (1980) (individual(s) moving to quash a grand jury subpoena

---

[19] Even if their activities were not protected by federal and state authority, which they are, the elector nominee's public statements and actions negate any claim that they were improper or illegal: they cannot be and were not knowingly or willfully false or fraudulent, nor were the nominee electors attempting to deceive or trick anyone, much less Congress, which is the body to whom the contingent elector slate would have been presented had the pending litigation been successful.

as unreasonable has the general burden of persuasion, but grand jury has burden to make *prima facie* case that the actions commanded by the grand jury subpoena are relevant to investigation).

In contrast, the cost and burden for the nominee electors is considerable. Virtually all of them have been subjected to significant, abusive threats -- both personally and through social media -- for serving as presidential nominee electors, and the public spectacle of forcing them to personally appear will re-enliven and invigorate these threats and harassment, just as the DA's public announcement of their target status has done. As has been publicly reported, the DA's Office has been forced to increase its own security because of this investigation, and the nominee electors do not have law enforcement resources to protect them during and after such an event.

Also, traveling to Atlanta to personally invoke their rights before the Grand Jury is especially burdensome for several of the nominee electors. For example, two of the electors are their 70s and live 4 and 5 hours away from Atlanta, respectively, and one has medical conditions that prevent her from driving, and she would have to secure some other mode of transportation to the Grand Jury. Another elector nominee lives almost 6 hours away.

In short, the actual substantive benefit of the nominee electors' personal appearances under these circumstances is low to nonexistent and the cost and burden to them is high. Because there is little to no value in their personal appearances under these circumstances, they should be excused from appearing, as customary practice and the ethics rules specify.

## III.    Conclusion and Prayer for Relief

For the reasons set forth herein, the Grand Jury subpoenas to these eleven nominee electors are unreasonable and oppressive, and we respectfully request the following relief:

1) that the nominee electors be excused from personally appearing before the Grand Jury;

2) that this Court inquire into the District Attorney's actions outlined herein indicating the improper politicization of this investigatory process, including but not limited to the alleged new evidence upon which the District Attorney supposedly relied to change the nominee electors' status in light of the legal and factual authorities provided herein;

3) that this Court ensure that the exculpatory information that the nominee electors have provided to the District Attorney's Office be provided to the Grand Jury as outlined herein and in Exhibit A;

4) that this Court grant Senator Jones' Motion to Disqualify for the reasons set forth therein;

5) that this Court grant Senator Jones' request that the Grand Jury report be embargoed or placed under seal until after the November elections for the reasons set forth therein and in this Motion;

6) that this Court grant all other appropriate relief.

Respectfully submitted,


Holly A. Pierson
Georgia Bar No. 579655
PIERSON LAW LLC
2951 Piedmont Road NE
Suite 200
Atlanta, GA 30305
hpierson@piersonlawllc.com
404-353-2316

Kimberly Bourroughs Debrow
Georgia Bar No. 231480
STRICKLAND & DEBROW
246 Bullsboro Drive, Suite A
Newnan, GA 30263
kimberly@debrowlaw.com
678-350-1095

*Counsel for Nominee Electors*

20

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing *Motion to Quash and Disqualify* with the Clerk of Court of the Fulton County Superior Court and that date-stamped copy will be hand-delivered to the Fulton County District Attorney's Office today.

Respectfully submitted this the 19th day of July, 2022.


Holly A. Pierson
Georgia Bar No. 579655

# EXHIBIT A


PIERSON LAW

Holly A. Pierson
404-353-2316
hpierson@piersonlawllc.com
www.piersonlawllc.com

July 12, 2022

**VIA EMAIL** (fani.willis@fultoncountyga.gov)

District Attorney Fani Willis
Fulton County District Attorney's Office
136 Pryor St SW 3rd Floor
Atlanta, GA 30303

Re:    *Target Status of Georgia GOP Nominee Electors and the Fulton
       County Special Purpose Grand Jury*

Dear District Attorney Willis:[1]

As you know, Kim Debrow and I represent 11 of the 16 Georgia GOP
nominee electors (the "GOP electors") from the 2020 Election,[2] all of whom have
been subpoenaed to appear before the Fulton County Special Purpose Grand Jury
(the "Grand Jury") at the end of July. For all of the factual and legal
reasons outlined in this letter, including your team's abrupt and seemingly
arbitrary post-subpoena change in our clients' status from witness to target, our
clients have all accepted our advice to exercise their applicable state and federal
constitutional and statutory rights not to give testimony. Customary practice and
ethical rules dictate that they should, therefore, be excused from their appearance
before the Grand Jury. We request that they be so excused.

I.    **Background**

Before the Grand Jury was empaneled, we were informed by your
investigative team[3] that each of our 11 clients were witnesses, not subjects or
targets, of your investigation into the 2020 election. On the basis of those
representations, we worked cooperatively with your office in its investigation and
agreed to present our clients for voluntary interviews with your team overseeing

---

[1] This letter is an attorney proffer and constitutes negotiations and settlement discussions regarding
this matter with your office. It is protected under all applicable state and federal laws and rules of
procedure and/or evidence, including but not limited to O.C.G.A. § 24-4-408, Fed. R. Evid. 408,
and Fed. R. Evid. 410. Additionally, this letter does not purport to outline or address every potential
factual or legal argument of our clients, and they do not waive any such argument or defense by
virtue of this letter.

[2] We represent David Shafer, Vikki Consiglio, Shawn Still, Brad Carver, Carolyn Fish, Cathy
Latham, Kay Godwin, Mark Amick, Joseph Brannan, CB Yadav, and John Downey.

[3] The team consists of Nathan Wade, Don Wakeford, Will Wooten, Adam Ney, Investigator Mike
Hill, and Investigator Trina Lucas.

the investigation relating to the electors. Specifically, on April 25, 2022, David Shafer presented himself to your team for a voluntary interview, and Vikki Consiglio did so on April 26, 2022. The status of all of our clients as witnesses was reaffirmed at these interviews. Mark Amick was scheduled to meet with your team on April 28, 2022, but that interview was canceled because a scheduling conflict for your team had arisen. They informed us at that time that they would be back in touch to reschedule Mr. Amick's interview and to schedule the remaining 8 GOP electors' interviews.

On May 1, 2022, Investigator Mike Hill contacted us to request that we provide the documents that Mr. Shafer had previously supplied to the House of Representatives' January 6 Committee, and we voluntarily supplied that information to your team on May 2, 2022. We also provided to your team at that same time additional documents and information definitively showing that the GOP electors' actions in December 2020 were proper, even necessary, under the governing federal law and demonstrating that there could be no legitimate question about their lawful intent in taking the contingent, provisional actions upon advice of legal counsel at that time.

## II.   Exculpatory Document and Information Presented to the District Attorney's Office.

Specifically, we provided your team with a link to a news outlet's coverage of the GOP electors on December 14, 2020. That clip is available here: https://www.fox5atlanta.com/video/880535 (relevant coverage starts around 40-45 seconds and at 1 minute and 40 seconds into the clip). As reported in that clip, the GOP electors made clear at the time that they met on December 14, 2020 that the elector slate they executed was contingent, provisional, and would only spring into validity if the then-pending legal challenge to Georgia's election were successful.[4]  Georgia GOP Chairman Shafer made this same point explicitly in tweets he published on December 14, 2020, which refer to the GOP electors as "the Republican nominees for Presidential Elector" and discuss the need for them to act provisionally to preserve then-President Trump's remedies in pending litigation. Those tweets were also provided to your office on May 2, 2022, and they state as follows:

Because the President's lawsuit contesting the Georgia election is still pending, the Republican nominees for Presidential Elector met today

---

[4] Although there was significant litigation in various forums contesting the election, the one pending in Fulton County challenging its validity was *Trump et al., v. Raffensperger et al.,* Case No. 2020CV343255 (Fulton County Superior Court Dec. 2020). Georgia law requires lawsuits contesting elections to be heard within 20 days, but this lawsuit was not even scheduled for a hearing until January 8, 2021 – more than two weeks after the statutory deadline for it to be heard and two days after Congress met on January 6, 2021 to count and certify the votes of the Electoral College – effectively mooting it. No Georgia court ever held an evidentiary hearing or ruled on the merits of the lawsuit.

at noon at the State Capitol today and cast their votes for President and Vice President.

Had we not meet [*sic.*] today and cast our votes, the President's pending election contest would have been effectively mooted. Our action today preserves his rights under Georgia law.

The news coverage and Chairman Shafer's tweets make plain that the GOP electors cast contingent, provisional votes to preserve a legal remedy and the ability of Georgia to have presidential electors in the event of a judicial ruling in President Trump's favor in a then-undecided legal contest.5

We also sent to your team on May 2, 2022, an annotated copy of 3 U.S.C. § 15, part of the Electoral Count Act ("ECA"), which is the federal law (in conjunction with U.S. CONST. art. II, § 1 and the Twelfth Amendment) giving Congress the

---

5 Much has been made in the press about an email from Robert Sinners of the Trump campaign that was apparently sent to some or all of the nominee electors advising them to, in essence, conduct their work in secret. While we are aware of no law that would have prevented the GOP electors from adhering to this request, it is obvious from the news coverage and the public tweets about what the Georgia GOP electors did on December 14, 2020 that, to the extent any of them received and read this advice, they did not follow it. Instead, the GOP electors acted and spoke publicly so as to be transparent about what they were doing and why. Chairman Shafer invited members of the news media, including TV cameras, into the room to observe and record the meeting. Additionally, the documents that we have voluntarily provided to you from Mr. Shafer (based upon his status as a witness) confirm that the representatives of the Trump campaign involved with the contingent presidential elector slates were clear at that time that the sole purpose of the contingent elector slates was to preserve a remedy in the event of a successful legal challenge.

It has also been reported in the media that certain high level members of the Trump team (Mr. Eastman, Mr. Giuliani, et al.) developed a *different* plan in late December 2020 (after Christmas) to, among other things, attempt to force Vice President Pence to count these contingent presidential electoral slates as the valid elector slates despite the lack of any successful judicial ruling. To the extent these reports are accurate (which we have no way of knowing), the Georgia GOP electors did not and could not have had any involvement in or knowledge of any such plan, as it was not even conceived until several weeks *after* the GOP electors had completed their contingent electoral slates on December 14, 2020, and it was never disclosed to or discussed with the Georgia GOP electors. Indeed, at the relevant time, John Eastman himself publicly confirmed on December 16, 2020 that the limited and legitimate purpose of the provisional Republican electoral slates was to preserve a remedy for pending judicial contests to the election: "We have historical precedent here, and in each of these states, there is pending litigation challenging the results of the election. *If that litigation proved successful, then the Trump electors, having met and voted, would be able to have those votes certified* and be the ones properly counted in the joint session of Congress on January 6", available at https://www.ntd.com/john-eastman-explains-the-historical-precedents-on-dueling-electors_540053.html (December 16, 2020) (emphasis added). Additionally, as Vice President Pence and his team determined, the alleged later plan -- to have VP Pence, as President of the Senate, determine the validity between competing elector slates and to count the uncertified provisional slates as valid in the absence of a successful judicial challenge -- is unprecedented and unlawful under both the Constitution and the provisions of the ECA (which Mr. Eastman himself at one point apparently conceded). As such, none of the Georgia GOP electors could have possibly known or anticipated on December 14, 2020 that there could or would be any attempt to misuse their lawfully and appropriately cast contingent electoral slate in such a manner, nor did they or could they have participated in the same.

exclusive right to count electoral votes and to decide objections to those votes, including determinations between competing slates of electors from the same state. That statute specifically anticipates that in cases like the 2020 election, where the results in certain States are close and contested, Congress may well receive two competing elector slates from a State. The federal statute is plain that there is nothing improper about the submission of two slates and that the decision of which of these two competing slates is to be counted must be resolved solely by Congress:

> If *more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate*, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; *but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law*; and in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. *But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted.*

*See* 3 U.S.C.A. § 15 (emphasis added). In other words, federal law specifically anticipates and permits the submission of more than one slate of electors from a State and gives Congress the exclusive jurisdiction to adjudicate the validity of those slates within the parameters set in the ECA. These principles are further set forth, among other places, in an article from the Congressional Research Service (CRS) addressing this issue. *See* COUNTING ELECTORAL VOTES: AN OVERVIEW OF PROCEDURES AT THE JOINT SESSION, INCLUDING OBJECTIONS BY MEMBERS OF CONGRESS, Congressional Research Service at pp. 8-9 (also provided to your team on May 2, 2022).

We also provided your team with articles and information illustrating on point precedent for a contingent elector slate such as that executed by the Georgia GOP electors. In particular, in Hawaii in the 1960 Presidential election, the original vote count was for Nixon, the Republican, not Kennedy, the Democrat, but the margin of victory was small. Hawaii, through its Governor, certified the votes for Nixon in November 1960. Democrats sued to contest the election results, and a court-ordered recount ensued in December 1960. That recount was still ongoing on the required date under the Constitution and the ECA for the presidential electors to cast their ballots,[6] which that year was December 19. While Hawaii continued its recount, both the Republican and Democrat presidential electors (or, more specifically, the putative Republican presidential electors and the Democrat nominees for presidential elector) separately met on December 19, and each cast an electoral slate for their respective candidates that was transmitted to Congress. When the recount was completed, Kennedy was the actual winner, and the state court declared that Kennedy had won Hawaii by 113 votes. Because the Democrat nominee electors had taken the necessary step of casting their contingent presidential electoral ballots by the federally mandated date of December 19, 1960, the new Governor of Hawaii was able to certify the Kennedy Certificate of Ascertainment to Congress on January 4, 1961. Congress then ultimately counted that electoral slate for Kennedy, discounting the previously certified one for Nixon, even though the Kennedy slate was not certified until January 1961 (after the ECA's purported deadline) and conflicted with the previously timely certified Certificate of Ascertainment for Nixon from Hawaii.[7]

---

[6] The Constitution and the ECA require that the presidential electors meet on the first Monday after the second Wednesday in December (which was December 14 in 2020) to cast their votes for President and Vice President of the United States. *See* U.S. CONST. art. II, § 1, cl. 4; U.S. CONST, Amendment 12; 3 U.S.C. §§ 7-8).

[7] In the hotly contested Presidential election of 2000, this same Hawaii precedent and the concept of two elector slates again received significant attention. Justice Stevens cited with approval the 1960 Hawaii precedent of providing two slates of electors when a contested election was still undecided at the time electors are required by the Constitution and federal law to execute their electoral ballots in his dissent in *Bush v. Gore*, stating as follows:

> In the interest of finality, however, the majority effectively orders the disenfranchisement of an unknown number of voters whose ballots reveal their intent—and are therefore legal votes under state law—but were for some reason rejected by ballot-counting machines. It does so on the basis of the deadlines set forth in Title 3 of the United States Code. *Ante*, at 532. *But, as I have already noted, those provisions merely provide rules of decision for Congress to follow when selecting among conflicting slates of electors. Supra*, at 540. They do not prohibit a State from counting what the majority concedes to be legal votes until a bona fide winner is determined. *Indeed, in 1960, Hawaii appointed two slates of electors and Congress chose to count the one appointed on January 4, 1961, well after the Title 3 deadlines.* See Josephson & Ross, Repairing the Electoral College, 22 J. Legis. 145, 166, n. 154 (1996).[5] *Thus, nothing prevents the majority, even if it properly found an equal protection violation, from ordering relief appropriate to remedy that violation without depriving Florida voters of their right to have their votes counted.* As the majority notes, "[a]

The Hawaii precedent is instructive here. As in the 2020 election in Georgia, the presidential election in Hawaii was contested through litigation and a determination of the final results had not been made by the date upon which federal law mandates that presidential electors must execute their electoral votes. As in Georgia in the 2020 election, the presidential election in Hawaii had been certified by the State for the apparent winner (Nixon) despite the ongoing election disputes and contests. But because the federal deadline for presidential electors to vote is set in stone (the first Monday after the second Wednesday in December) and because the election dispute had not been finally resolved by that time, the presidential electors for *both* the putative winner (Nixon) and for the candidate contesting the election results (Kennedy) met on the date required by the Constitution and federal law (Dec. 19, 1960) to execute electoral votes for their respective candidates to preserve the electoral votes for whomever the ultimate winner of the election contests was. In Hawaii, the ultimate winner turned out to be Kennedy, and *only because* the elector nominees for Kennedy had taken the federally required step of executing an electoral slate for Kennedy (even when Hawaii had already certified its election for Nixon) did Congress have electoral votes for Kennedy that it could then count. Had the Kennedy elector nominees *not* executed their provisional electoral votes on December 19, 1961 and transmitted them to Congress, Kennedy would have won the State of Hawaii but still been *deprived of its electoral votes*, and the citizens of Hawaii would have had their voice in the 1960 presidential election silenced.

---

desire for speed is not a general excuse for ignoring equal protection guarantees." *Ante*, at 532.

*Bush v. Gore*, 531 U.S. 98, 127 (2000) (Justice Stevens, dissenting) (emphasis added). Around this same time, Democrat Congresswoman Patsy Mink of Hawaii, the first woman of color to serve in the House of Representatives, specifically referenced the Hawaii precedent and advocated for the provision of two elector slates from Florida to Congress as follows:

The [Hawaii] precedent of 40 years ago suggests the means for resolving the electoral dispute in Florida: count the votes under the supervision of the court pursuant to Florida law, *both slates of electors meet on December 18 and send their certificates to Congress*; the Governor of Florida send a subsequent certificate of election based on the decision of the count supervised by the court accompanied by the decision of the court; and Congress accepts the slate of electors named by the Governor in his final certification.

Under this procedure Florida need not rush to complete its recount in an attempt to meet unrealistic deadlines set by the court or the legislature. *The key date is not December 12 or December 18. It is January 6, the date on which the electoral votes are counted.* As the 1960 experience of Hawaii shows, the Florida recount does not have to be completed until just before the electoral votes are counted.

Statement of Representative Patsy Mink, CONGRESSIONAL RECORD, December 13, 2000 (emphasis added), available at https://www.govinfo.gov/content/pkg/CRECB-2000-pt18/html/CRECB-2000-pt18-Pg26609-2.htm. Suffice to say that neither esteemed Supreme Court Justice Stevens nor Representative Mink found anything improper or illegal with two slates of competing presidential electors being presented to Congress in a contested presidential election; indeed, both *endorsed* that path as the *correct one*.

So too in the 2020 presidential election in Georgia. As in Hawaii in 1960, in the Georgia 2020 presidential election, Biden was the apparent winner and the results in his favor were certified by the State. But, as in Hawaii, there was a pending judicial contest to the validity of the election results that had not been decided by the mandatory federal deadline for electors to execute their electoral ballots (December 14, 2020). As occurred in Hawaii, both slates of nominated Georgia presidential electors met on the required day and executed electoral votes for their political party's chosen candidates and transmitted them to Congress as required by law, thus ensuring that no matter how the judicial contest to the election turned out, the State of Georgia would have a slate of electoral votes for Congress to count on January 6, 2021.

Unlike the 1960 Hawaii election, the judicial contest in Georgia did not change the election results, and so the contingent presidential electoral votes executed by the Republican nominee electors appropriately were not certified by the Governor of Georgia nor were they presented to or counted by Congress as the final, certified vote for the State. But, had the GOP elector nominees *failed* to execute their contingent slate on December 14, 2020 and the legal challenge to the election *had* been successful (a result that was not and could not have been known on December 14, 2020), the State of Georgia would have had *no presidential electoral votes* to be counted in Congress on January 6, 2021, and citizens of Georgia would have had their voice in the 2020 presidential election silenced. No law countenances, much less commands, such a result, and no state law or law enforcement body can or should attempt to criminalize actions of presidential electors acting under Constitutional and federal authority to preserve the electoral votes of the State of Georgia in a contested election.[8]

In sum, on May 2, 2022, we voluntarily and proactively provided your team with ample evidence that the Georgia GOP nominee electors acted in a proper, legal, precedented – even necessary – manner, and that they were transparent in their actions and the legitimate intent for the same at the time that these actions occurred on December 14, 2020.[9]

---

[8] Indeed, well-known and highly credentialed electoral college scholars contend that executing the two slates of electoral ballots and submitting both to Congress is "the model" for how a close presidential election should be decided. *See, e.g.,* Michael L. Rosin and Jason Harrow, *How to Decide a Very Close Election for Presidential Electors: Part 2* (explaining that both sets of presidential elector nominees casting votes for their candidates as occurred in the 1960 Hawaii presidential election is the model that should be followed in a close election), available at https://takecareblog.com/blog/how-to-decide-a-very-close-election-for-presidential-electors-part-2.

[9] The fact that the GOP electors publicly and contemporaneously made explicit the contingent nature of their electoral slate pending the outcome of ongoing litigation that would, when heard on its merits, determine the question of who the lawful presidential electors for Georgia were, obviously negates any claim that such actions taken by the GOP electors were knowingly or willfully false or fraudulent or that the GOP electors were attempting to deceive or trick anyone, much less Congress, which is the body to whom the contingent elector slate would have been presented had

### III.   Post-Subpoena Change of Status from Witness to Target.

On May 5, 2022, having heard nothing further from your team about the schedule for the voluntary interviews of the remaining 9 GOP elector nominees whom we represent, we reached out to your team to discuss schedules and inform the team of some upcoming conflicts that we had to facilitate setting interview dates. That same day, Mr. Wade responded to that email, stating "Thank you Holly, as of now our investigation has us tied up with other components so no worries." For approximately another month, we heard nothing further from your team. On June 1, 2022, Investigator Lucas sent – out of the blue – an email attaching Grand Jury subpoenas for each of our 11 clients.[10]

Understandably, we were surprised by the service of these subpoenas: we had been waiting since May 5 for your team to reach back out to us to schedule the remaining voluntary interviews to which we had agreed, and which had begun in April. In a subsequent call that Ms. Debrow and I had with Investigators Lucas and Hill to discuss this development, we raised our objections and concerns about these subpoenas, including the fact that it was not the path to which we had all previously agreed and that coming to Atlanta for a Grand Jury appearance for many of our clients would be extremely laborious, inconvenient, and difficult given their remote locations and age. We also noted the unnecessarily cumulative nature of the testimony of most of our clients, the potential danger attendant in a Grand Jury appearance in this case, and asked Investigators Lucas and Hill to raise these concerns with the rest of your team and to see if we could either revert to voluntary interviews or, at least, limit the number of our clients who would be needed to provide testimony to the Grand Jury. While we were assured that these concerns would be raised with Mr. Wade and the team, we never received any feedback or response to these requests.

On June 28, 2022, Ms. Debrow contacted Mr. Wade and his team in an attempt to resolve some scheduling conflicts that both counsel and some of our clients had with the assigned Grand Jury appearance dates at the end of July. Despite having previously agreed to work with us and our clients on dates and conflicts, Mr. Wade responded that same day declining to make any changes to the Grand Jury schedule. Mr. Wade also took that opportunity to inform us that "as our investigation has matured and new evidence has come to light, in a spirit of integrity we feel it only fitting to inform you that your clients' status has changed

---

the then-unknown contingencies come to fruition. Additionally, to the extent that any of the GOP electors had a genuinely held belief at that time that irregularities in the Georgia election rendered or could render them the actual presidential electors of Georgia, any contingent attestation to that effect to preserve their right to claim their rightful status cannot be false or deceitful, and certainly not knowingly or intentionally so. And, of course, the GOP electors, like all citizens, have a right to assemble and petition their government – in this case, Congress – for grievances under the First Amendment and, here, the specific provisions of the Constitution and the ECA.

[10] We were also sent in this same email a Grand Jury subpoena for Mark Hennessy, a GOP elector whom we do not represent, and we informed your team by return email that we could not accept service on his behalf for that reason.

to 'Target.' Madam DA has continually made certain that her office operate [*sic.*] with transparency and integrity and as such, your clients will receive target letters soon." On July 5, 2022, Investigator Hill sent an email attaching target letters for each of our clients.

In light of all of these facts and the governing law, this series of events - particularly the precipitous change from of our clients being properly characterized as witnesses to them being abruptly and inaccurately labeled as targets -- is concerning on a number of fronts. First, we question the existence of jurisdiction for either the Fulton County District Attorney's Office or any of its grand juries to interfere with, much less prosecute, presidential electors or elector nominees executing electoral ballots (including *contingent* electoral ballots) for their party's candidates for President and Vice President, especially where a legal contest to the election is then pending and federal law explicitly recognizes the right of such electors and elector nominees to do expressly that, setting Congress as the sole arbiter of which of the competing slates is the valid one. Our clients cannot properly be called "targets" of your or the Grand Jury's investigation when there is no state jurisdiction over the actions that they performed, and our legal research indicates that jurisdiction over these actions and functions is exclusively federal.

Setting aside the jurisdictional issue here for purposes of discussion, the existing facts and legal authority -- much of which has already been presented to your investigative team and herein -- make it plain that the GOP electors acted in an entirely proper and legal manner. *See infra.* Additionally, the actions that our clients took in their capacities as GOP electors has been a matter of public record and media coverage since December 14, 2020. All of the actions taken by our clients and the purpose for which they were taken were known to you and your investigative team before your team labeled our clients witnesses, disavowing that they were subjects or targets, and induced us to participate in voluntary interviews with your team. Those facts are fixed -- they cannot and have not matured or evolved. Additionally, to our knowledge, the Grand Jury has subpoenaed no documents from any of the GOP electors (and perhaps not from any other witness it has subpoenaed for appearance), and the documents that we voluntarily provided when our clients were labeled as witnesses are exculpatory. Thus, it is difficult to accept at face value the assertion that your team has or could have uncovered any credible evidence that incriminates our clients. We request that you share this supposed new evidence with us so that we can respond to/explain/correct/debunk it.

The timing of our clients' change in status adds to our concern: your team consistently represented that all of our clients were witnesses to, not subjects or targets of, your office's or the Grand Jury's investigation from our initial contact, through our voluntary interviews in April and service of the Grand Jury subpoenas in early June, and up until we notified your team in late June, through our email requesting scheduling changes, that our clients were planning to testify in the Grand Jury. Only upon learning that our clients were actually planning to testify

did their status suddenly change from "witness" to "target." The timing of these events, especially in light of the known facts and governing law, leaves the impression of gamesmanship rather than good faith.

## IV.   Excusing Individuals Labeled As Targets From Appearing Before the Grand Jury.

As set forth herein, we believe that labeling our clients as targets is factually and legally unjustifiable. But because your office has invoked that label, each of our clients has accepted our advice to invoke their state and federal statutory and 5th Amendment rights and will not be providing substantive testimony to the Grand Jury.[11] We request, therefore, that you release our clients from their Grand Jury appearances. *See, e.g.*, ABA STANDARDS OF PROSECUTION FUNCTION 3-4.6(f) ("If the prosecutor concludes that a *witness is a target of a criminal investigation, the prosecutor should not seek to compel the witness's testimony before the grand jury absent immunity.*") (emphasis added); *see also* Ga. R. Prof. Resp. 3.8, Special Responsibilities of a Prosecutor, Comment 1 (citing favorably the ABA Standards of Prosecution); United States Attorney Manual ("USAM") 9-11.150 (subpoenaing targets of grand jury investigation "may carry the appearance of unfairness"); USAM 9-11.154 (when target of grand jury investigation informs government that they plan to invoke their 5th Amendment privilege in the grand jury, they should ordinarily be excused from having to appear in front of the grand jury).

In addition to these material fairness and ethical considerations that counsel strongly against forcing a target into a grand jury, our clients have very real and practical challenges in appearing for this limited purpose that cannot be of much, if any, value to the Grand Jury's investigation. As we have previously discussed with your team, there are significant and heightened safety concerns

---

[11] *"[N]o implication of guilt"* can be drawn from an individual's invocation of her Fifth Amendment privilege before the grand jury. *Grunewald v. United States*, 353 U.S. 391, 421 (1957) (emphasis added). Expanding on this principle, the Supreme Court noted that "[r]ecent re-examination of the history and meaning of the Fifth Amendment has emphasized anew *that one of the basic functions of the privilege is to protect innocent men." Id.* (citation omitted). Further elaborating, the Court noted that *"[t]oo many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege.' Id.* (quoting *Ullmann v. United States*, 350 U.S. 422, 426 (1956) (emphasis added)). "'The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." *Id.* (quoting *Slochower v. Board of Higher Education*, 350 U.S. 551, 557-558 (1956)). Since *Grunewald*, the Supreme Court has consistently reaffirmed these principles. *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 327 (1976) ("And it is not *necessary that a person be guilty of criminal misconduct to invoke the privilege; an innocent person, perhaps fearing that revelation of information would tend to connect him with a crime he did not commit, also has its protection.* The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances.") (internal citations and quotations omitted) (emphasis added); *Ohio v. Reiner*, 532 U.S. 17 (2001) (witness could assert Fifth Amendment privilege despite claim of innocence because she had reasonable cause to apprehend danger from her answers).

surrounding this Grand Jury in particular. Your office has been forced to increase its own security measures in light of this investigation, and it is fair to say that things are fraught, unpredictable, and uncertain for both the government and the subpoenaed individuals in this investigation. The inevitable news coverage of each of our clients being forced into the Grand Jury to follow their counsel's advice to invoke their rights will undoubtedly re-enliven and invigorate the significant and abusive threats that many of our clients have already received. And, quite obviously, they do not have the law enforcement resources of your office to protect them during and after such an event. Also, traveling all the way to Atlanta to have to personally invoke their state and federal 5th Amendment rights before the Grand Jury is extremely burdensome for several of our clients and of little if any value to the Grand Jury's investigation. For example, Ms. Godwin and Ms. Fisher are both in their 70s and live 4 and 5 hours away from Atlanta in Blackshear and Saint Simons, respectively. Ms. Godwin has medical conditions that prevent her from driving and would, therefore, have to secure a driver or some other mode of transportation to the Grand Jury. Mr. Yadav lives almost 6 hours away in St. Marys, Georgia. So for all of these reasons, we ask that our clients be excused from appearing before the Grand Jury.

## V.     Presentation of Exculpatory Information to the Grand Jury.

We also request that you and your team provide to the Grand Jury the significant exculpatory information that we have already provided to your team and that is set forth in more detail in this letter. Our clients wanted to and were prepared to testify, but the abrupt change in their status has made that impossible. Even still, if the goal of the Grand Jury is to receive the facts and get to the truth, they should be given this important, relevant, exonerating information, including the news coverage and Shafer tweets from December 14, 2020, a copy and accurate explanation of 3 U.S.C. § 15, a copy of the CRS article with attention drawn to the section on competing elector slates, a full and accurate description of the 1960 Hawaii precedent, a copy of Justice Stevens' dissent in *Bush v. Gore* with the favorable reference to the Hawaii precedent highlighted, a copy of Representative Mink's statement in the Congressional Record, and the Supreme Court precedent provided in Footnote 11.

## VI.    Conclusion.

Please confirm by close of business this Thursday, July 14, 2022 that the Grand Jury will excuse our 11 clients from their Grand Jury appearances. Please also advise us at your earliest convenience if you are willing to share with us the evidence that your team believes justifies the elevation of our clients from witnesses to targets so that we might have the opportunity to respond to it.

*[Signatures on Following Page]*

Page 11 of 12

Very truly yours,

/s/ Holly A. Pierson

Holly A. Pierson

/s/ Kimberly Bourroughs Debrow

Kimberly Bourroughs Debrow

cc:   Nathan Wade
      Don Wakeford
      Will Wooten
      Adam Ney
      Trina Lucas
      Mike Hill

## IN THE FULTON COUNTY SUPERIOR COURT
## STATE OF GEORGIA

IN RE SUBPOENAS FROM MAY 2022   )          Case No. 2022-EX-000024
SPECIAL PURPOSE GRAND JURY        )

ISSUED TO:  Presidential Nominee Electors Mark Amick, Joseph Brannan, Brad Carver, Vikki Consiglio, John Downey, Carolyn Fish, Kay Godwin, Cathy Latham, David Shafer, Shawn Still, CB Yadav

### (PROPOSED) ORDER

The above-named recipients of subpoenas from the Fulton County Special Purpose Grand Jury ("Grand Jury") have moved this Court to excuse their personal appearances before the Grand Jury, arguing that such appearances are unreasonable and oppressive under O.C.G.A. § 23-13-23. The movants have also joined in Senator Burt Jones' Motion to Disqualify, filed in this Court on July 15, 2022,[1] and requested additional relief in their motion. Having considered the motion, and for good cause shown, the Court hereby ORDERS as follows:

1.  Each of the eleven movants are excused from having to personally appear before the Grand Jury;

2.  The District Attorney is directed to provide to the Grand Jury the information that movants describe as exculpatory in Exhibit A to their motion; and

3.  The District Attorney will provide to this Court, *ex parte* and *in camera*, no later than _____ the evidence or testimony upon which it is relying to claim that the movants status in this investigation was properly changed from that of witnesses to targets of the investigation.

---

[1] The Court's ruling on Senator Jones' motion will be made by separate order.

SO ORDERED this ___ day of July, 2022.

 

_____
Judge Robert C.I. McBurney
Superior Court of Fulton County
Atlanta Judicial Circuit



