# EXHIBIT B-134

FILED IN OFFICE

JAN 23 2023

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

IN RE 2 MAY 2022 SPECIAL PURPOSE
GRAND JURY

)
)
)
)

No. 2022-EX-000024

## BRIEF OF MEDIA INTERVENORS IN SUPPORT OF
## THE PUBLIC FILING OF THE GRAND JURY REPORT

The Atlanta Journal-Constitution; American Broadcasting Companies, Inc.; The

Associated Press; Bloomberg L.P.; Cable News Network, Inc.; CMG Media Corporation and its

television station WSB-TV; Dow Jones & Company, publisher of The Wall Street Journal;

Gannett Co., Inc. and its newspapers USA Today, the Athens Banner-Herald, The Augusta

Chronicle, and the Savannah Morning News; Gray Media Group, Inc. and its television station

WANF; The New York Times Company; Tegna Inc. and its television station WXIA-TV; and

Yahoo Inc. and its news publication Yahoo News (collectively, "Media Intervenors")

respectfully file this brief in support of the public release of the special purpose grand jury's final

report (the "Report").

### INTRODUCTION

On the morning of Wednesday, November 4, 2020 – the day after Georgia citizens had

finished casting their votes in the 2020 Presidential Election – the focus of the nation turned to

Georgia.  As poll workers continued to tabulate votes, it became clear that, by the narrowest

margins, the voting results in Georgia and a small group of other states would determine the

outcome of the Presidential election.

In the days and weeks that followed, enormous controversy and confusion descended on

the State.  Without credible evidence, an array of public officials, paid advocates, and private

citizens spread allegations that voting fraud had been rampant in Georgia.  The claims of fraud

were aimed with particular force at Fulton County where, for example, routine video of vote counting at a tabulating center was mischaracterized as illegal ballot stuffing using a "suitcase" of fake ballots. As pressure mounted in the weeks that followed, then-sitting President Donald J. Trump made a recorded telephone call to Georgia's Secretary of State asking for the assistance of the Secretary's Office to "find" more than 11,000 votes.

These and many other events from the post-election time-period have raised serious questions about whether the State's election system was subjected to a premeditated attempt to distort the results of the Presidential election. This question has been one of enormous public interest not just to Georgians, but also to citizens throughout the United States. The scale and scope of news organizations filing this brief reflect the profound public interest in this issue.[1]

In January 2022, at the request of District County Attorney Fani Willis, the Judges of the Fulton County Superior Court voted to convene an investigative mechanism that has existed in Georgia for decades – a special purpose grand jury. Like numerous other states, Georgia law authorizes "special" grand juries to conduct detailed and patient examinations of public controversies by giving them authority to investigate "any alleged violation of the laws of this state or any other matter subject to investigation by grand juries as provided by law." O.C.G.A § 15-12-100(a).

In a January 24, 2022 Order approving District Attorney Willis' request, then-Chief Judge Christopher Brasher stated that the authorization given the special purpose grand jury would encompass the making of "presentments and reports." He wrote:

---

[1] In Exhibit A to this Brief, Media Intervenors have submitted a listing of links to examples of news reports published and/or broadcast by them on the newsworthy issues relating to the special purpose grand jury's investigation reflecting the extensive public interest in this matter.

This authorization shall include the investigation of any overt acts or predicate acts relating to the subject of the special purpose grand jury's investigative purpose. The special purpose grand jury, when making presentments and reports, pursuant to O.C.G.A §§ 15-12-71 and 15-12-101, may make recommendations concerning criminal prosecution as it shall see fit.

Armed with this authorization, the special purpose grand jury subpoenaed evidence and witness testimony from a wide array of individuals, public officials, and government entities for approximately seven months. Although the proceedings of the grand jury remained confidential, efforts by certain subpoenaed witnesses to avoid providing testimony or evidence – including legal efforts by some of the most senior officials in State and federal government – played out publicly in courtrooms in this State and elsewhere around the nation.

By its Order issued on January 9, 2023 (the "Order"), the Court informed the public and press that the special purpose grand jury had "issued its final report pursuant to O.C.G.A. § 15-12-101(a)." Based upon the completion of the report and with the approval of a majority of the Fulton County Superior Court bench, the Court dissolved the special purpose grand jury and thanked the grand jurors for their service.

In the Order, the Court observed that the only remaining question concerned the "publication" of the Report. The Court explained that the special purpose grand jury "certified that it voted to recommend that [the Report] be published pursuant to O.C.G.A. § 15-12-80."[2] The Court noted that this "publication" statute "appears to apply to the work of special purpose grand juries" by virtue of the incorporation provision set forth at O.C.G.A. § 15-12-102, but also

---

[2] O.C.G.A. § 15-12-80 provides as follows: "Grand juries are authorized to recommend to the court the publication of the whole or any part of their general presentments and to prescribe the manner of publication. When the recommendation is made, the judge shall order the publication as recommended. Reasonable charges therefor shall be paid out of the county treasury, upon the certificate of the judge, as other court expenses are paid."

3

observed that it remained "unresolved" whether "the special purpose grand jury's final report constitutes a presentment."

In its Order, the Court invited argument on this issue by the District Attorney's Office and any consolidated media intervenors. In advance of providing argument on January 24, 2023, the Media Intervenors offer this brief in support of their position that the Report is a court record subject to a presumption of openness under Uniform Superior Court Rule 21, the First Amendment to the United States Constitution and Article I, Section 1, Paragraph 5 of the Georgia State Constitution. Media Intervenors respectfully submit the presumption of openness that applies to the Report cannot be overcome in this matter. The public interest in the Report is extraordinary, and there are no countervailing interests sufficient to overcome the presumption. The Court should file the Report in the public docket and publish it pursuant to O.C.G.A. § 15-12-80 as the special purpose grand jurors have requested.

**ARGUMENT**

**I.      GRAND JURY REPORTS, INCLUDING THE REPORT IN THIS MATTER, ARE COURT RECORDS SUBJECT TO A PRESUMPTION OF OPENNESS.**

**A.      Georgia Law Has Evolved to Strongly Favor Public Access to Court Documents, Including the Indictments, Presentments and Reports Returned by Grand Juries.**

The United States Supreme Court has repeatedly recognized that public access to the judicial system is not only deeply ingrained in the history of our system but also is an "indispensable" attribute of our judicial system protected by the First Amendment to the United States Constitution. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980). The Court recognized in *Richmond Newspapers* that public scrutiny of the court system is essential to its institutional well-being for numerous reasons, including because it is vital to obtaining the

public's trust. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." 448 U.S. at 572.

In conjunction with the U.S. Supreme Court's recognition of the protections afforded by the First Amendment, the Georgia Supreme Court has held that the Georgia Constitution independently requires our judicial system to operate in an open and public manner.

> This court has sought to open the doors of Georgia's courtrooms to the public and to attract public interest in all courtroom proceedings because it is believed that open courtrooms are a *sine qua non* of an effective and respected judicial system which, in turn, is one of the principal cornerstones of a free society.

*R.W. Page Corp. v. Lumpkin*, 249 Ga. 576, 576(1), 292 S.E.2d 815, 817(1) (1982). Indeed, *Page* makes clear that in the criminal context Georgia law is "more protective of the concept of open courtrooms than federal law." 249 Ga. at 578.

Side by side with preserving open court proceedings, the Georgia Supreme Court has embraced the importance of keeping court records available and accessible to the public. The United States Supreme Court recognized constitutional rights of access to court records in a series of decisions in the late 1970's and 1980s. *See generally Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597-98 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents" ); *In re Application of CBS, Inc.*, 828 F.2d 958, 959 (2d Cir. 1987) (characterizing existence of right of public access to criminal court records as "beyond dispute") (citation omitted).

Contemporaneously with the Unites States Supreme Court's decisions, the Georgia Supreme Court embraced the importance of keeping court records accessible to public inspection by enacting Uniform Superior Court Rule 21, which creates a presumptive right to inspect all

court records, and by infusing the Rule with substance in a series of forceful decisions rejecting efforts to seal court files. Most notably, in *Atlanta Journal & Atlanta Constitution v. Long*, the Georgia Supreme Court reversed a trial court order sealing a civil case file after the settlement of a lawsuit claiming sexual abuse by the Catholic Diocese of Savannah. The Court found that "the privacy interests of the appellees in the pre-judgment records of this civil suit do not clearly outweigh the public interest in open access to those records." 258 Ga. 410, 411, 369 S.E.2d 755, 760 (1988); *see also In re The Atlanta Journal-Constitution*, 271 Ga. 436, 438, 519 S.E.2d 909, 912 (1999) ("[J]ustice faces its greatest threat when courts dispense it secretly." (quoting *Long*, 258 Ga. at 411)).

Of course, with respect to grand jury proceedings, the Georgia Supreme Court has always acknowledged the calculation about access to court records must be approached with special care. The Court has frequently noted that secrecy plays a very important role in connection with the investigations conducted by these judicial bodies. *See, e.g., In re Gwinnett County Grand Jury*, 284 Ga. 510, 512, 668 S.E.2d 682, 684 (2008) ("There is no doubt that the preservation of the secrecy of grand jury proceedings is . . . a well-recognized principle in Georgia." (quoting *In re Hall County Grand Jury Proceedings*, 175 Ga. App. 349, 333 S.E.2d 389 (1985))). However, decisions from the Georgia appellate courts have consistently emphasized that the *outcome* of grand jury proceedings must be shared with the public to protect against public distrust of "star chamber court proceedings."

In commenting on the importance of the indictment being returned in open court, the Court of Appeals explained:

> The judge is the court for the reception of indictments only when he is presiding in open court. There must be a judge presiding, the clerk must be present, and the place of the reception of the indictment must be one where the court is being held open to the public. *Cadle v. State*, 101 Ga. App. 175, 180, 113 S.E.2d 180 (1960).

6

> "It is a fundamental part of our judicial system that the general public be permitted to witness court proceedings sufficiently to guarantee that there may never be practiced in this State secret or star-chamber court proceedings, the deliberations of the juries alone excepted." *Zugar v. State*, 194 Ga. 285, 289-290, 21 S.E.2d 647 (1942). "It is not enough to know that in this State there is hardly a chance that bogus indictments for personal spite will be filed in our courts. The preservation of the honor and purity of the courts, the confidence and respect of the public in those courts, and the good name of the citizens must not be left to chance. . . ." *Zugar, supra* at 291.

*State v. Byrd*, 197 Ga. App. 661, 399 S.E.2d 267, 268-69 (1990); *see also Zugar v. State*, 194 Ga. 285, 289-290, 21 S.E.2d 647 (1942) (requiring openness in return of indictment by grand jury: "public officials are made conscious of the duty to faithfully perform official acts when they are acting in the presence of the general public; and this fact causes the public to have confidence in the officials, and hence confidence in the governmental departments where such officials serve").

More recently, in *Olsen v. State*, 302 Ga. 288, 806 S.E.2d 556 (2017), the Georgia Supreme Court noted that the secrecy afforded to Georgia grand juries has been curtailed at times by the General Assembly and now is focused most specifically on "the deliberations" of grand juries and less on its evidentiary phase. The Court remarked that "[n]otably, the oath of secrecy no longer extends to the State's attorney, and even the grand jurors' oath encompasses only deliberations and not all things occurring in the grand jury room." *Id.* at 290-91. The Court explained that they presumed this was the intent of the General Assembly and therefore "decline[d] to extend the requirement of secrecy applicable to grand jury proceedings in Georgia beyond that which is currently imposed by statute." *Id.* at 291.

It is in this legal context that Georgia's precedent on grand jury presentments and reports must be considered. When examined in light of the evolution of Georgia law on public access to court records, the precedent demonstrates the Report is subject to a presumption of public access under Uniform Superior Court Rule 21.

7

**B.     Georgia's Precedent on Grand Jury Reports and Presentments Compels a Finding that the Report is a Court Record and, therefore, Presumptively Public under Rule 21.**

Investigative grand juries have played an important role in Georgia's judicial history.  As our Supreme Court has observed since their roots in colonial times, "[t]hrough presentments and other customary reports, the American grand jury in effect [has] enjoyed a roving commission to ferret out official malfeasance or self-dealing of any sort."  *In re Gwinnett County Grand Jury*, 284 Ga. at 512 (quoting Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 85 (1998)).  "There is a consensus among courts and commentators that, historically, common law grand juries performed a public reporting function by identifying official misconduct without initiating prosecutions."  Barry J. Stern, Revealing Misconduct by Public Officials Through Grand Jury Reports, 136 U. Pa. L. Rev. 73, 76 (1987) (https://scholarship.law.upenn.edu/penn_law_review/vol136/iss1/3).  As commentators have observed, "the reporting function can be viewed as a device that forces government to police itself.  Public confidence in the accountability of government is then furthered by requiring government to identify its own misconduct."  *Id.* at 92.

While acknowledging that the public reporting function of investigative grand juries provides a powerful tool to expose wrongdoing, Georgia's appellate courts have recognized that investigative grand juries should be supervised to prevent grand juries from exceeding the scope of their legal authorization.  As the Court of Appeals explained in *In re Floyd County Grand Jury Presentments for May Term 1996*, 225 Ga. App. 705, 484 S.E.2d 769 (1997), the responsibility of a supervising judge is to make sure the grand jury stays within the scope of its statutory authority.

> Since the grand jury proceedings are secret, OCGA § 15-12-73, it is possible that a grand jury as a group of lay-persons can exceed the scope of their authority and, because of their membership, become involved in politics and in local feuds. It is for this reason that a superior court judge supervises the grand jury and has the duty to scrutinize, receive, and order filed the presentment of the grand jury.

*Id.* at 707 (citations omitted).[3]

While empowering judges to supervise grand juries to avoid their involvement in "politics and local feuds," the Court of Appeals has also emphasized that the supervising judge has no authority to expunge or redact a grand jury's report so long as the grand jury is acting within its mandate. In 2004, the Court of Appeals clarified the limited role of a supervising court that was asked to expunge a grand jury presentment regarding Vernon Jones, the CEO of DeKalb County. In *In re July-August, 2003 DeKalb County Grand Jury*, 265 Ga. App. 870, 595 S.E.2d 674 (2004), the Court of Appeals conducted a detailed review of the history of appellate decisions addressing grand jury reports over more than 40 years and emphasized that the role of the supervising courts was confined to expunging statements based on "*ultra vires* acts of the grand jury." *Id.* at 873. The Court of Appeals rejected Jones' attempts to read Georgia precedent more broadly.

> There is nothing in [Georgia precedent on grand juries] that mandates the expungement of an entire presentment after the trial judge appropriately redacts all ultra vires criticism. *Kelley v. Tanksley* [] and *In re Hensley* [] allowed the presentments to be filed and published after the ultra vires matters were expunged.[4]

---

[3] In the legal authority the Court of Appeals cited to support the above-referenced statement about the filing of presentments, the Court first cited O.C.G.A.§ 15-12-80, the statute that requires the supervising judge to file and "publish" a presentment when requested by a grand jury. *Id.* Immediately, thereafter, the Court cited the statutes that authorize and empower special purpose grand juries, specifically O.C.G.A.§§ 15-12-100 and 15-12-101. *Id.* The sequence of these citations supports the interpretation that the publication requirement applies to special purpose grand juries through the incorporation clause contained in O.C.G.A.§ 15-12-102.

[4] *Id.* The Court cited decisions in *Thompson v. Macon-Bibb County Hosp. Auth.*, 246 Ga. 777, 273 S.E.2d 19 (1980); *In re Floyd County Grand Jury Presentments*, 225 Ga. App. at 707; *In re*

Based on its detailed review of Georgia precedent, and after the limited redaction of certain *ultra vires* content, the Court of Appeals affirmed the supervising court's decision to file a grand jury's report that addressed the conduct of Jones in his official capacity.

Georgia's history of decisions requiring the public filing and publication of grand jury reports was significantly reinforced by the Georgia Supreme Court's 2008 decision in *In re Gwinnett County Grand Jury*, 284 Ga. at 512. In *Gwinnett County Grand Jury*, the Georgia Supreme Court had its first opportunity to address the issue of grand jury records and reports in the aftermath of the United States' Supreme Court's series of decisions recognizing the public's constitutional right to court records under the First Amendment.[5] The decision also followed the Georgia Supreme Court's own precedent emphasizing its perspective that public court records "protect[] litigants both present and future" because "[o]ur system abhors star chamber proceedings with good reason."[6]

Not surprisingly, rather than looking to dated precedent, the Supreme Court's decision in *Gwinnett County Grand Jury* squarely addressed the issue of access to grand jury records and reports under the modern constitutional standards that inform Uniform Superior Court Rule 21. In determining whether Gwinnett County could obtain the records of a grand jury that examined the dissolution of the County's Office of Internal Audits, the Court explained,

---

*Hensley*, 184 Ga. App. 625, 362 S.E.2d 432 (1987); *In re Gwinnett County Grand Jury Proceedings*, 180 Ga. App. 241, 348 S.E.2d 757 (1986); *Harris v. Edmonds*, 119 Ga. App. 305, 166 S.E.2d 909 (1969); *Kelley v. Tanksley*, 105 Ga. App. 65, 123 S.E.2d 462 (1961); and 1996 Op. Atty. Gen. No. U96-15.

[5] *See generally supra* at p. 4-5 (citing *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597-98 (1978)).

> [Uniform Superior Court Rule 21], adopted by this Court and the Council of
> Superior Court Judges, states that "[a]ll court records are public and are to be
> available for public inspection unless public access is limited by law or by the
> procedure set forth below." The rule embodies the right of access to court records
> which the public and press in Georgia have traditionally enjoyed.

*Id.* at 511. The Court found that the presumption of openness applies to judicial records to which

the public and press have traditionally enjoyed access "when a judicial document is filed." *Id.*

(quoting *Long*, 258 Ga. 410). The Court noted it had extended this rule even to "an official court

reporter's tape of remarks made by a judge in open court." *Id.* (citing *Green v. Drinnon, Inc.*,

262 Ga. 264, 417 S.E.2d 11 (1992)).[7]

Guided by this standard, the Court ultimately determined that "evidence and testimony

presented to a grand jury" as part of its investigation were not court records to which the public

had a "presumptive right of access" because "the press and public have not traditionally enjoyed

access to such material due to the preservation of the secrecy of grand jury proceedings." *Id.* at

513 (citation omitted). In contrast, however, the Court held the presentment made by a grand

jury "is a court record under Uniform Superior Court Rule 21 that is available for public

inspection unless public access is otherwise limited by law or by [Rule 21]." *Id.* at 513-14.

The *Gwinnett County Grand Jury* decision demonstrates the Report should be

presumptively public. It has been filed with the Court by virtue of its delivery to the supervising

judge. It is a judicial record that memorializes the determinations of a properly convened special

---

[6] *See generally supra* at p. 5-6 (citing *Atlanta Journal & Atlanta Constitution v. Long*, 258 Ga. 410, 411 (1988)).

[7] The Court subsequently elaborated on the presumption of public access to all judicial documents filed with the court in *Undisclosed LLC v. State*, 302 Ga. 418, 431, 807 S.E.2d 393, 403 (2017) ("Materials admitted into evidence, that call for court action, or play a central role in the adjudicative process are part of the judicial record, so long such materials are on file with the court.").

purpose grand jury with a broad mandate.  There is no basis to contend the special purpose grand

jury acted in an *ultra vires* manner.  Under such circumstances, grand jury reports are not just the

type of judicial record that are "traditionally" available to the public; they are the type of judicial

record that is "published" at County expense pursuant to O.C.G.A.§ 15-12-80.[8]

Just as with the presentment in *Gwinnett County Grand Jury*, the Report should be made

public.[9]

---

[8] An example of a Superior Court Order directing a county clerk to publish a Special Purpose
Grand Jury Final Report under O.C.G.A. § 15-12-80 can be found at Exhibit B.  The exhibit is an
Order issued by DeKalb Superior Court Judge Gregory Adams requiring the publication of the
"Final Report" of a Special Purpose Grand Jury impaneled on January 20, 2012, in connection
with controversies relating to the DeKalb County Department of Watershed Management.
Pursuant to the Order, the final report was published in DeKalb County's legal organ, *The
Champion Newspaper* and remains online:  http://thechampionnewspaper.com/wp-
content/uploads/2013/08/000SpecialPurposeGrandJuryFinalReport.pdf.  A true and correct copy
of the final report is attached as Exhibit C.  CEO Burrell Ellis was subsequently prosecuted after
the publication of the final report, but no challenge to the publication of the final report was
raised in his appeal.  *See Ellis v. State*, 300 Ga. 371, 794 S.E.2d 601 (2016).

[9] The presumption in Georgia law that grand jury reports will be made public is consistent with
the law of other states.  *See generally Miami Herald Publishing Co. v. Marko*, 352 So.2d 518,
523 (Fla. 1977) (affirming release of grand jury report and noting "[t]he benefits to be derived
from this extraordinary exercise in citizen participation would be severely limited if the fruits of
that activity were not available to the public on whose behalf it is undertaken."); *In re Final
Report of the 29th Statewide Grand Jury*, 343 So.3d 584 (Fla. Dist. Ct. App. 2022) (ordering
release of all but two paragraphs of grand jury report following Marjory Stoneman Douglas
school shooting), *reh'ring denied*, 343 So.3d 600 (Fla. Dist. Ct. App. 2022), *review denied sub
nom. D.K. v. Final Report of 20th Statewide Grand Jury*, No. SC22-983, 2022 WL 3573084 (Fla.
Aug. 19, 2022, *and review denied sub nom. Murray v. Final Report of 20th Statewide Grand
Jury*, No. SC22-1108, 2022 9801736 (Fla. Oct. 17, 2022); *Matter of Report of Washoe Cnty.
Grand Jury*, 95 Nev. 121, 128, 590 P.2d 622 (1979) ("[T]he report was generally issued in the
legitimate community interest, and [the interested target], with one exception, has not
demonstrated that justice requires further expungement.") *People v. Super. Ct.*, 13 Cal.3d 430,
434, 531 P.2d 761 (1975) (holding that courts may only seal portions of grand jury reports that
"extend beyond the legal boundaries of the grand jury's broad reportorial power").

**C.    Our Courts and the General Assembly Have Not Attempted to Distinguish "Presentments" from Grand Jury "Reports," so Construing O.C.G.A. § 15-12-80 as Applicable to the Report is Appropriate and Required by the Federal and State Constitution.**

In its Order, the Court noted it was "unresolved" whether the "special purpose grand jury's final report constitutes a presentment" subject to the publication requirements of O.C.G.A. § 15-12-80.  Order at 2.  However, the term "presentment" and "report" have been used interchangeably for decades by the Georgia judiciary, the General Assembly, and courts in other jurisdictions.  There is no basis to find that the Report is outside the scope of the mandatory "publication" requirement of O.C.G.A. § 15-12-80.

In the historical development of grand juries, a presentment was a criminal charge initiated by the grand jury based on its own knowledge, not at the request of prosecutors.  4 W. BLACKSTONE, COMMENTARIES *298.  Today, the use of a grand jury "presentment" to initiate a criminal prosecution is obsolete in Georgia and in most other jurisdictions.  Instead, Georgia employs the term "special presentment" to identify a charging instrument initiated by the grand jury that effectively functions as an indictment.  *See* O.C.G.A § 15-12-74(b).  "In this state the difference between an indictment and a special presentment has been abolished, with respect to the requirements of law in regard to trials under them, a mere technical distinction remaining that in an indictment the accusation is presented by a prosecutor, and in a special presentment it is preferred by the grand jury without a prosecutor."  *Carmichael v. State*, 228 Ga. 834, 837, 188 S.E.2d 495, 497 (1972) (citation omitted).

Based on this development, the modern legal practice is to refer interchangeably to the written account of an investigation delivered by a grand jury as either a "report" or "presentment" or "general presentment" when it is not for the purpose of initiating criminal

proceedings.  Regardless of the legal vernacular used, each term refers to a document that is in substance a report.  This is true in Georgia.  *See, e.g., In re Presentments of Lowndes County Grand Jury*, 166 Ga. App. 258, 304 S.E.2d 423 (1983) (referring interchangeably to "presentments" against members of a city police department as "reports"); *Kelley*, 105 Ga. App. at 66 ("The report of the grand jury sought to be expunged from the records in the instant case was not a special presentment or true bill of indictment charging any individual with the violation of the penal laws of this State.  It was in the nature of a general presentment or recommendation in which the grand jury took note of an unsolved theft involving county funds which occurred on county property").  The equivalence of the words "general presentment," "presentment" and "report" has also been noted in other jurisdictions.  *See, e.g., In re: Final Report of the 20th Statewide Grand Jury*, 343 So.3d at 588 ("We will refer to the statewide grand jury's report interchangeably as either a report or presentment in this opinion.").[10]

Because there is no legally meaningful distinction between a "general presentment" and a "report" when issued by the grand jury, there is no basis to contend that the publication requirement contained in O.C.G.A. § 15-12-80 is not applicable to special purpose grand juries.

---

[10] The Georgia General Assembly amended O.C.G.A. § 15-12-71 in 2016 to permit local grand juries to examine controversies relating to law enforcement's use of deadly force.  In amending the law, the General Assembly also referred to "presentments" and "reports" interchangeably as documents that could be issued by the grand jury while bringing charges and stated that both would be subject to O.C.G.A. § 15-12-80.  *See* Georgia Laws 2016, Act 350, § 1, (eff. July 1, 2016) (adding subsection (e)(1) to O.C.G.A. § 15-12-71: "If the grand jury conducts a review [in connection with a peace officer's use of deadly force], and the grand jury does not request that the district attorney create a bill of indictment or special presentment, the grand jury shall prepare a report or issue a general presentment based upon its inspection, and any such report or presentment shall be subject to publication as provided for in Code Section 15-12-80").

The Court correctly observed in its Order that O.C.G.A. § 15-12-102[11] incorporates the

statutory procedures of regular grand juries into the operation of special purpose grand juries

unless the procedures of the special grand jury are "otherwise provided" for in the authorizing

statute. There is no conflicting provision that "otherwise" speaks to the publication or secrecy

of special purpose grand jury reports. Accordingly, O.C.G.A. § 15-12-80 applies to the

Report.[12]

      This result is particularly clear in the aftermath of the Georgia Supreme Court's decision

in *Olsen v. State*, 302 Ga. 288 (2017). In *Olsen*, the Georgia Supreme Court emphasized it

would not "extend the requirement of secrecy applicable to grand jury proceedings in Georgia"

unless there was a clear mandate "imposed by statute." *Id.* The General Assembly could easily

have required by statute that the reports of a special purpose grand jury be maintained by the

supervising court in secret, but they imposed no such rule in the enabling legislation.

      Various courts have recognized that the right of access to court records is grounded not

just in the common law, but also in constitutional principles protecting the public's right of

access to information about government. *See, e.g.*, *In re Providence Journal Co.*, 293 F.3d 1,

10-13 (1st Cir. 2002) ("Apart from the prerogatives attendant to the common-law right of access

to judicial records, the public and the press enjoy a constitutional right of access to criminal

proceedings under the First and Fourteenth Amendments."); *Phoenix Newspapers v. U.S. Dist.

Court*, 156 F.3d 940, 948 (9th Cir. 1998); *United States v. Antar*, 38 F.3d 1348, 1359-60 (3d Cir.

---

[11] O.C.G.A. § 15-12-102 states that, "[e]xcept as otherwise provided by this part [governing special purpose grand juries], Part 1 [governing regular grand juries] of this article shall apply to the grand juries authorized by this part."

[12] *See also* Exhibit B (Order of DeKalb County Superior Court Chief Judge requiring publication of a special purpose grand jury's "Final Report" under O.C.G.A. § 15-12-80).

1994); *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 505 (1st Cir. 1989); *In re Search Warrant*, 855 F.2d 569, 573 (8th Cir. 1988). An interpretation of the mandatory publication requirement set forth in O.C.G.A. § 15-12-80 that allowed supervising courts to set the requirement aside without a constitutionally meaningful showing of harm would violate not just the common law, but also the First Amendment to the U.S. Constitution and Article I, Section 1, Paragraph 5 of the Georgia State Constitution (protecting the right of "every person" to "publish sentiments on all subjects").

The Report is subject to publication under O.C.G.A. § 15-12-80.

## II.  NEITHER THE STATE NOR ANY OTHER PARTY CAN MAKE A COMPELLING CASE THAT EXPUNGEMENT OR SEALING IS WARRANTED HERE.

The presumption of openness that applies to the Report cannot be overcome. Georgia law provides two paths through which the State or an interested party may seek to restrict all or portions of the Report in extraordinary circumstances: (1) though expungement of *ultra vires* content contained in the Report; (2) through a motion to seal pursuant to Uniform Superior Court Rule 21. Neither have merit here.

### A.  There is No Basis to Expunge Any Portion of the Report.

As set forth above, under Georgia law courts have historically expunged portions of a report or presentment deemed "*ultra vires*," i.e., containing "statements" that arise from investigative activity outside the scope of the grand jury's mandate. In this case, the special purpose grand jury's mandate was extraordinarily broad. The special purpose grand jury was authorized to investigate "facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia." January 20, 2022 Letter of District Attorney Fani Willis to Chief Judge Christopher Brasher; *see*

16

*also* January 24, 2022 Order Approving Request for Special Purpose Grand Jury Pursuant to

O.C.G.A. § 15-12-100, et seq. ("The special purpose grand jury shall be authorized to investigate

any and all facts and circumstances relating directly or indirectly to alleged violations of the laws

of the State of Georgia, as set forth in the request of the District Attorney referenced herein

above.").

Pursuant to O.C.G.A. § 15-12-101(a), the special purpose grand jury has been

"supervise[d] and "assist[ed]" throughout its investigation.  Various motions relating to the

proper scope of testimony and evidence have been heard.  There is simply no indication that

anything in the Report exceeded the scope of the special purpose grand jury's authority in a

manner that would be appropriate for expungement.

**B.     There is No Basis to Seal Any Portion of the Report Pursuant to Rule 21.**

In addition, as noted above, the Report is a court record, so it is subject to sealing only

under the demanding standards of Uniform Superior Court Rule 21.  *See generally In re*

*Gwinnett County Grand Jury*, 284 Ga. at 513-14.

The Georgia Supreme Court has articulated the standard for sealing as requiring a finding

that the movants' privacy *clearly outweighs* the public interest in disclosure.  *Long*, 258 Ga. at

413.  The burden of demonstrating that court records should be sealed is on the party seeking the

sealing, and the Court must make factual findings on the record supporting the sealing order.  *Id.*;

*see also In re Atlanta Journal-Constitution*, 271 Ga. at 438 ("[I]t is not sufficient for the trial

court to forego making findings of fact and simply state that the public's interest in access to

court records is clearly outweighed by potential harm to the parties' privacy").  The burden is

intended to require public access in all cases except those involving a "clear necessity."  *Long*,

258 Ga. at 413, 369 S.E.2d at 758; *see also Merchant Law Firm, P.C. v. Emerson*, 301 Ga. 609,

17

613, 800 S.E.2d 557 (2017); *see also Long*, 258 Ga. at 413 ("In designing USCR 21, this court

and the council of superior court judges . . . incorporated the presumption that the public will

have access to all court records.").

    This standard is and is intended to be a difficult one to satisfy.  Indeed, in enforcing the

State's commitment to open courtrooms and court records, Georgia courts have consistently

emphasized, for example, that embarrassment and reputational harm are not sufficient interests to

justify sealing.  *See, e.g., In re Atlanta Journal-Constitution*, 271 Ga. at 438 (reversing trial court

order sealing probate case involving claim by illegitimate child seeking portion of the estate of

former owner of The Atlanta Falcons: "[C]ivil lawsuits quite often cause litigants to experience

an invasion of privacy and resulting embarrassment, yet that fact alone does not permit trial

courts to routinely seal court records"); *Long*, 258 Ga. at 413 (reversing trial court order sealing

case file and holding that the privacy interests of Catholic Diocese of Savannah "do not clearly

outweigh the public interest in open access to those records").

    There is no basis for sealing here.  This investigation has been a matter of profound

public interest that goes to the heart of the nation's democratic forms of government.  Much of

the matters before the special purpose grand jury are already public knowledge through related

federal and state court proceedings and Congressional hearings.  There is quite simply no "clear

and convincing proof" that sealing, either in whole or in part, is warranted.

## CONCLUSION

    The Georgia Supreme Court has explicitly stated that it would "decline to extend the

requirement of secrecy applicable to grand jury proceedings beyond that which is currently

imposed by statute." *Olsen*, 302 Ga. at 291.  There is no basis to do so here. The Media

Intervenors respectfully request that the Report be publicly filed and published as the special

purpose grand jurors have requested.

Dated this the 23rd day of January, 2023

Respectfully submitted,

FOR:   KILPATRICK TOWNSEND & STOCKTON LLP

Thomas M. Clyde
  Georgia State Bar No.: 170955
  tclyde@kilpatricktownsend.com
Lesli N. Gaither
  Georgia State Bar No.: 621501
  lgaither@kilpatricktownsend.com
Suite 2800, 1100 Peachtree Street, N.E.
Atlanta, Georgia 30309
Phone: (404) 815-6500

Attorneys for Media Intervenors

EXHIBIT A

100% Recycled

30% PCW

**APPENDIX**

| Date | Headline | Link |
|---|---|---|
| 11/6/2021 | Georgia Grand Jury Looms in Trump Inquiry | https://www.nytimes.com/2021/11/06/us/politics/trump-election-interference-investigation.html |
| 1/20/2022 | DA for Atlanta area requests special grand jury to probe Trump's election interference | https://www.cnn.com/2022/01/20/politics/georgia-trump-grand-jury/index.html |
| 1/24/2022 | Grand Jury Approved to Examine Trump's Efforts to Overturn Georgia's 2020 Election Results | https://www.wsj.com/articles/judges-approve-grand-jury-for-trump-election-probe-in-georgia-11643065452 |
| 1/24/2022 | Fulton judges greenlight special grand jury for Trump probe | https://www.ajc.com/news/atlanta-news/breaking-fulton-judges-greenlight-special-grand-jury-for-trump-probe |
| 4/29/2022 | Special grand jury to convene Monday to determine if Trump broke law with infamous phone call | https://www.wsbradio.com/county-shut-down-streets-around-fulton-county-courthouse-trump-grand-jury-gets-underway |
| 4/29/2022 | Fulton County Sheriff says deputies are ready for Trump special grand jury | https://www.wsbtv.com/video/local-video/fulton-county-sheriff-says-deputies-are-ready-for-trump-special-grand-jury |
| 4/29/2022 | Fulton County to shut streets down around courthouse as Trump grand jury gets underway Monday | https://www.wsbtv.com/video/local-video/fulton-county-shut-streets-down-around-courthouse-trump-grand-jury-gets-underway-monday |
| 5/2/2022 | Trump grand jury hearings set to start in Fulton County on monday | https://www.wsbtv.com/video/local-video/trump-grand-jury-hearings-set-start-fulton-county-monday |
| 5/2/2022 | Georgia Jury to Consider Whether Trump Illegally Interfered in 2020 Election | https://www.nytimes.com/2022/05/02/us/trump-election-georgia-grand-jury.html |
| 5/2/2022 | Trump election probe special grand jury selection in Atlanta | https://apnews.com/article/2022-midterm-elections-donald-trump-georgia-presidential- |
| 5/2/2022 | Trump probe: How would the Fulton County special grand jury work? | https://news.yahoo.com/politics/trump-probe-how-would-the-fulton-county-special-grand-jury-work/YSSH3O2XG7HTXMC67J4VB4B540/ |
| 5/2/2022 | Preps in place at Fulton County courthouse ahead of Trump investigation grand jury | https://www.wsbtv.com/preps-place-fulton-county-courthouse-ahead-grand-jury-investigation-former-pres-trump |
| 5/6/2022 | Georgia Elections Chief Rebuffs Trump-Backed Opponent on Fraud Claims | https://www.bloomberg.com/news/articles/2022-05-06/georgia-elections-chief-rebuffs-trump-backed-foe-on-fraud-claims |
| 6/1/2022 | These people have been subpoenaed in Trump election interference probe | https://www.11alive.com/article/news/politics/fulton-county-special-grand-jury-trump-election-probe/ |
| 7/5/2022 | Fulton grand jury subpoenas Giuliani, Graham, Trump campaign lawyers | https://www.ajc.com/politics/fulton-grand-jury-subpoenas-giuliani-graham-trump-confidantes/POUNSTTUX2DGDJ83D5LKA7TIOOM/ |
| 7/6/2022 | Sen. Graham to fight Georgia election subpoena, lawyers say | https://apnews.com/article/2022-midterm-elections-donald-trump-georgia-presidential-new-york |
| 7/15/2022 | Fulton County DA says she's considering asking Trump to testify to special grand jury | https://www.ajc.com/news/fulton-county-da-says-shes-considering-asking-trump-to-testify-to-special-grand-jury |
| 7/15/2022 | Exclusive: Fulton County DA sends 'target' letters to Trump allies in Georgia investigation | https://news.yahoo.com/exclusive-fulton-county-da-sends-target-letters-to-trump-allies-in-georgia-investigation-152517469.html |
| 7/19/2022 | Georgia prosecutors say all 16 fake Trump electors are targets in criminal probe | https://www.cnn.com/2022/07/19/politics/georgia-grand-jury-trump-electors/index.html |
| 7/27/2022 | Federal judge denies Athens-area U.S. Rep. Hice's bid to quash subpoena in Trump probe | https://www.onlineathens.com/federal-judge-denies-us-rep-jody-hices-bid-quash-subpoena-trump-probe |
| 8/11/2022 | Prominent Atlanta defense law to represent former President Trump to special grand jury | https://www.wsbtv.com/prominent-atlanta-defense-lawyer-represent-former-president-trump-front-special-grand-jury |

| Date | Headline | Link |
|---|---|---|
| 8/15/2022 | Lindsey Graham ordered to testify in Fulton probe of bid to overturn Georgia election | https://www.onlineathens.com/story/news/2022/08/15/lindsey-graham-must-testify-georgia-grand-jury-probe-election |
| 8/15/2022 | Rudy Giuliani told by prosecutors he is a target in Georgia 2020 presidential election probe | https://www.cnn.com/2022/08/15/politics/rudy-giuliani-georgia-presidential-election-probe/index.html |
| 8/16/2022 | Trump legal adviser ordered to testify in Ga. election probe | https://apnews.com/article/2022-midterm-elections-colorado-donald-trump-georgia-atlanta |
| 8/17/2022 | Rudy Giuliani testifies before Fulton grand jury on alleged 2020 election tampering | https://www.atlantanewsfirst.com/2022/08/17/rudy-giuliani-appearing-before-fulton-grand-jury-alleged-2020-election-tampering/ |
| 8/19/2022 | Graham Ordered to Appear Before Atlanta Grand Jury Investigating Trump | https://www.nytimes.com/2022/08/19/us/lindsey-graham-atlanta-grand-jury-trump.html |
| 8/29/2022 | Georgia's Kemp Must Testify in Trump Election Probe, Judge Says | https://www.bloomberg.com/news/articles/2022-08-29/georgia-s-kemp-must-testify-in-trump-election-probe-judge-says |
| 9/29/2022 | Trump attorney and adviser testified before Georgia grand jury investigating election interference | https://www.cnn.com/2022/09/29/politics/boris-epshteyn-testimony-georgia-grand-jury-election-interference-trump/index.html |
| 10/4/2022 | Georgia GOP bankrolls lawyers for 'fake' Trump electors in Fulton County DA probe | https://news.yahoo.com/georgia-da-gop-bankrolling-lawyers-for-fake-trump-electors-rife-with-serious-ethical-problems-191434263.html |
| 10/27/2022 | Mark Meadows ordered by court to testify in Georgia 2020 election meddling probe | https://www.cnn.com/2022/10/26/politics/mark-meadows-georgia-election-grand-jury/index.html |
| 11/1/2022 | Supreme Court rejects Lindsey Graham's request to block Georgia grand jury subpoena | https://www.cnn.com/2022/11/01/politics/lindsey-graham-supreme-court/index.html |
| 11/1/2022 | US Supreme Court Allows Election Grand Jury Questioning of Lindsey Graham | https://www.bloomberg.com/news/articles/2022-11-01/us-supreme-court-allows-election-grand-jury-questioning-of-lindsey-graham |
| 11/9/2022 | Judge orders Gingrich to testify in Georgia election probe | https://apnews.com/article/donald-trump-georgia-atlanta |
| 11/15/2022 | Georgia Gov. Brian Kemp appears before grand jury on 2020 election interference | https://www.cnn.com/2022/11/15/politics/brian-kemp-georgia-grand-jury-2020-election/index.html |
| 11/15/2022 | Michael Flynn ordered to testify in Atlanta grand jury probe into Trump's election subversion | https://www.cnn.com/2022/11/15/politics/michael-flynn-grand-jury/index.html |
| 11/15/2022 | Georgia Gov. Brian Kemp appears before Atlanta jury in election probe | https://www.usatoday.com/story/news/politics/2022/11/15/georgia-governor-brian-kemp-testifies-grand-jury |
| 11/16/2022 | Former White House aid Cassidy Hutchinson testifies before Georgia grand jury | https://www.cnn.com/2022/11/16/politics/cassidy-hutchinson-testifies-georgia-grand-jury/index.html |
| 11/16/2022 | Georgia DA floats immunity deals for fake electors as investigation into Trump hits roadblock | https://www.cnn.com/2022/11/16/politics/fulton-county-da-georgia-fake-electors-investigation-fake-electors-roadblock-immunity/index.html |
| 11/22/2022 | Lindsey Graham testifies before Georgia grand jury investigating 2020 election aftermath | https://www.cnn.com/2022/11/22/politics/lindsey-graham-fulton-county-grand-jury-2020-election/index.html |
| 11/29/2022 | Mark Meadows Ordered to Testify on Trump by South Carolina's Top Court | https://www.bloomberglaw.com/news/articles/2022-11-29/meadows-ordered-to-testify-on-trump-by-south-carolina-top-court |
| 12/6/2022 | Florida appeals court: No delay for Michael Flynn in Fulton County Trump grand jury testimony | https://www.11alive.com/article/news/politics/michael-flynn-fulton-county-trump-grand-jury/ |
| 12/12/2022 | Trump Special Counsel Subpoenas Official Asked to Find Votes (1) | https://news.bloomberglaw.com/white-collar-and-criminal-law/trump-special-counsel-subpoenas-official-asked-to-find-votes-1 |

2

| Date | Headline | Link |
|---|---|---|
| 12/17/2022 | Georgia grand jury investigating Trump election interference is winding down and has begun writing final report | https://www.cnn.com/2022/12/17/politics/georgia-grand-jury-trump-2020-election/index.html |
| 12/24/2022 | Georgia special grand jury wraps up probe of Trump, allies | https://www.usatoday.com/story/news/politics/2022/12/24/trump-special-grand-jury-georgia-charges-investigation |
| 12/27/2022 | Georgia special grand jury wraps up probe of Trump, allies | https://www.atlantanewsfirst.com/2022/12/27/georgia-special-grand-jury-wraps-up-probe-trump-allies/ |
| 1/9/2023 | Fulton special grand jury completes Trump investigation | https://www.ajc.com/politics/breaking-fulton-special-grand-jury-completes-trump-investigation |
| 1/9/2023 | Georgia grand jury investigating Trump election interference completes its work | https://www.cnn.com/2023/01/09/politics/fulton-county-grand-jury-trump-election/index.html |
| 1/9/2023 | Fulton County grand jury submits final report on Trump's alleged interference in 2020 election | https://abcnews.go.com/Politics/fulton-county-grand-jury-submits-final-report-on-donald/story |
| 1/9/2023 | Special Grand Jury in Georgia Trump Inquiry Concludes Its Investigation | https://www.nytimes.com/2023/01/09/us/trump-georgia-election-grand-jury.html |
| 1/9/2023 | Fulton County grand jury submits final report on Trump's alleged interference in 2020 election | https://news.yahoo.com/georgia-grand-jury-submits-153810676.html |
| 1/9/2023 | Fulton County grand jury submits final report on Donald Trump's alleged interference in 2020 election | https://www.wsj.com/fulton-county-grand-jury-submits-final-report-on-donald-trumps-alleged-interference-in-2020-election/ |
| 1/9/2023 | Fulton County special grand jury ends its Trump investigation. What happens next? | https://www.11alive.com/article/news/politics/fulton-county-grand-jury-ends-trump-investigation |
| 1/9/2023 | Special Grand Jury in Georgia Trump Inquiry Concludes Its Investigation | https://news.yahoo.com/georgia-grand-jury-wraps-trump |
| 1/9/2023 | Georgia grand jury wraps up Trump 2020 election probe | https://news.wsj.com/articles/georgia-special-grand-jury-completes-report |
| 1/9/2023 | Georgia grand jury completes report on Trump election interference probe | https://www.nytimes.com/2023/01/09/us/trump-georgia-election-grand-jury.html |
| . | Georgia grand jury ends probe of Trump, 2020 decision | https://www.atlantanewsfirst.com/2023/01/09/special-grand-jury-probing-trump-allies-georgia-finishes-work/ |
| 1/9/2023 | Fulton County grand jury wraps up its investigation into Donald Trump | https://www.atlantanewsfirst.com/2023/01/09/fulton-county-grand-jury-wraps-up-its-work-donald-trump/ |
| 1/9/2023 | Georgia Special Grand Jury Completes Trump Investigation | https://www.wsj.com/articles/georgia-special-grand-jury-completes-donald-trump-investigation |
| 1/9/2023 | Georgia grand jury investigating Trump and 2020 election aftermath completes its work | https://www.cnn.com/2023/01/09/politics/fulton-county-grand-jury-trump-election/index.html |
| 1/9/2023 | Georgia Grand Jury Investigating Trump Submits Recommendations, Disbands | https://www.bloomberg.com/news/georgia-grand-jury-investigating-trump-submits-recommendations-and-disbands |
| 1/9/2023 | All eyes on Georgia after grand jury wraps work on Donald Trump investigation | https://www.usatoday.com/story/news/politics/2023/01/09/trump-georgia-grand-jury-whats-next |
| 1/9/2023 | Georgia grand jury completes work in Donald Trump probe tied to 2020 election | https://www.usatoday.com/story/news/politics/2023/01/09/georgia-grand-jury-donald-trump-probe |
| 1/9/2023 | Charging decision on Trump now loom large in Georgia after grand jury completes its work | https://www.usatoday.com/story/news/politics/2023/01/09/donald-trump-grand-jury-georgia-decisions-loom |

| Date | Headline | Link |
|------|----------|------|
| 1/9/2023 | Grand jury in Georgia delivers report on Trump, charges could come in next few months | https://news.yahoo.com/grand-jury-in-georgia-delivers-report-on-trump-charges-could-come-in-next-few-months-173112072.html |
| 1/10/2023 | Georgia grand jury completes Trump election investigation; what happens now? | https://news.yahoo.com/georgia-grand-jury-completes-trump |
| 1/18/2023 | Fulton County Trump probe: Prosecutors have final report as court hearing nears | https://www.11alive.com/article/news/politics/fulton-county-trump-probe-final-report-with-prosecutors-hearing-nears |
| 1/20/2023 | Fulton County prosecutors finalize report in Trump probe | https://www.atlantanewsfirst.com/2023/01/20/fulton-county-prosecutors-finalize-report-trump-probe/ |

4

EXHIBIT B



100% Recycled    30% PCW

IN THE SUPERIOR COURT OF DEKALB COUNTY
STATE OF GEORGIA

IN RE SPECIAL PURPOSE )
GRAND JURY )
) ADMINISTRATIVE ORDER NO. 13CV1024
)
)

A Special Purpose Grand Jury was impaneled on January 20, 2012 pursuant to

O.C.G.A. § 15-12-100 to investigate the facts and circumstances surrounding the bidding,

awarding and management of contracts, as well as the policies and procedures of, and any

payments made under and for any contracts by, the DeKalb County Department of

Watershed Management during the period of January 1, 2002 through December 31,

2010.

On August 15, 2013, Presiding Judge Mark Anthony Scott delivered a copy of the

Special Purpose Grand Jury's Final Report to Chief Judge Gregory A. Adams.  The Final

Report is dated January 18, 2013.

As required by O.C.G.A. § 15-12-101(b), Chief Judge Gregory A. Adams

convened a meeting of the Superior Court Judges on August 19, 2013 and reported to

them the Presiding Judge's recommendation that the Grand Jury be dissolved.  A

majority of the Superior Court Judges at the meeting voted to accept the Final Report, file

the Final Report and dissolve the Special Purpose Grand Jury.

Accordingly, the Special Grand Jury is hereby dissolved instanter.

Page 1 of 2

The Final Report, having been presented, it is hereby ordered that the same be filed with the Clerk of this Court and spread among the minutes thereof.

It is also ordered that the Final Report be published pursuant to O.C.G.A. § 15-12-80 as legal notice in the official legal organ of the county, *The Champion Newspaper*, at least once with the costs to be paid from the general funds of DeKalb County.

SO ORDERED this 21st day of August, 2013.

Chief Judge Gregory A. Adams
Superior Court of DeKalb County
Stone Mountain Judicial Circuit

EXHIBIT C



100% Recycled

30% PCW



2013 AUG 21  PM 4: 53

CLERK OF SUPERIOR COURT
DEKALB COUNTY GA



**Stone Mountain Judicial Circuit**

**PRESENTMENT OF THE SPECIAL PURPOSE GRAND JURY**

**2012-2013**

**CIVIL CASE # 12CV1000**

**HONORABLE MARK ANTHONY SCOTT,
PRESIDING JUDGE, SUPERIOR COURT**

**HONORABLE ROBERT D. JAMES
DISTRICT ATTORNEY**

1

## DEKALB COUNTY SPECIAL PURPOSE GRAND JURY PRESENTMENT
## JANUARY 2012 – JANUARY 2013 TERM

TO THE HONORABLE JUDGES:     COURTNEY L. JOHNSON
ASHA JACKSON
CLARENCE F. SEELIGER
GREGORY A. ADAMS
CYNTHIA J. BECKER
GAIL C. FLAKE
DANIEL M. COURSEY, JR.
LINDA W. HUNTER
MARK ANTHONY SCOTT
TANGELA BARRIE

of the Superior Court of DeKalb County, Georgia, Stone Mountain Judicial Circuit.

This Special Purpose Grand Jury, sworn in by the Honorable Mark Anthony Scott

in the DeKalb County Superior Court on January 20, 2012, respectively submits

the following presentment.


## REQUEST FOR PUBLICATION


Pursuant to O.C.G.A § 15-2-80, we the presently constituted 2012 Special Grand

Jury of DeKalb County, recommend to the Honorable Mark Anthony Scott that this

presentment be published in whole in the County Legal Organ.

2

# TABLE OF CONTENTS

INTRODUCTION......................................................................................................6

History and Scope of this Investigative Grand Jury...............................................6

Grand Jury's formation .................................................................................6

DeKalb County's Consent Decree .................................................................8

THE RESULTS OF THE INVESTIGATION AND SPECIFIC FINDINGS ........................9

A. General................................................................................................9

B. History of bribery, fraud and other criminal activity within DeKalb County ...........10

1. Bribery by Department of Watershed Management Employees .............10

2. Champion Tree Service .................................................................11

3. Ace Environmental .......................................................................17

4. G4 Technologies (David Gallemore) ..............................................19

5. MM&E ........................................................................................21

6. Universal Business Development (Hadi Haeri) and Brown & Caldwell...................22

7. Universal Business Development (Hadi Haeri) and DMD Engineering...................25

8. Global Business Development (Jeffrey Walker) and Brown & Caldwell .................26

9. Global Business Development (Jeffrey Walker) and MM&E...................................27

10. Global Business Development (Jeffrey Walker) and Desmear Systems.............27

11. Global Business Development (Jeffrey Walker) and Parsons Water Infrastructure, Inc. ....................................................................................................29

12. Inland Waters and Superior Pipeline (Dion Allen) ...........................31

C. Improper Activities within the CEO's Office ........................................32

1.   CEO Soliciting Campaign Contributions from Vendors with Pending or new

contracts with the County ........................................................ 34

2. CEO Ellis canceling or attempting to cancel contracts in order to create an "emergency situation" for which an emergency contract can be then be issued to another vendor without a competitive process.......................... 41

3. CEO Ellis directing the cancellation of contracts for punitive and political reasons. 44

4. CEO Ellis dictating which individuals should be placed on selection committees for RFPs for which major campaign donors and/or clients of Kevin Ross will be submitting offers. ...................................................... 48

5. CEO Ellis interfering in the evaluation process for RFPs by discussing secret selection committee information with committee members during the active evaluation period;.............................................. 49

6. CEO Ellis communicating with a submitting vendor and/or vendor representative during an active evaluation period for the related RFP about matters directly related to the pending RFP and subsequent contract award ...................... 49

7. CEO interfering with and/or altering a selection committee's final recommendation (prior to submission to the Board of Commissioners) in favor of vendors represented by Kevin Ross or for vendors with a history of significant campaign contributions/raising significant campaign contributions for Mr. Ellis. ............... 52

DETAILED RECOMMENDATIONS OF THE 2012 SPECIAL PURPOSE GRAND JURY .. 54

A. RECOMMENDED INDICTMENTS ..................................................... 54
  1. Burrell Ellis ....................................................................... 54
B. RECOMMENDED FURTHER CRIMINAL INVESTIGATION ............................. 55
  1. Burrell Ellis ....................................................................... 55
  2. William "Wiz" Miller ............................................................. 56
  3. Jabari Simama .................................................................... 56

4. Roy Barnes .................................................................................................. 56

5. Hadi Haeri .................................................................................................. 57

6. Nadine Maghsoudlou .................................................................................. 57

7. Vernon Jones .............................................................................................. 57

8. Paul Champion ........................................................................................... 57

9. Kevin Ross .................................................................................................. 57

10. Jeffrey Walker ........................................................................................... 58

11. Christian Vann ........................................................................................... 58

12. John Willis and, possibly, other individuals with Brown & Caldwell .................... 58

C. REORGANIZATION OF COUNTY GOVERNMENT ................................................... 59

D. FUNDAMENTALLY CHANGE OR OTHERWISE ELIMINATE THE LSBE PROGRAM .............. 62

E. INTERNAL AUDIT ACTIVITY INDEPENDENT OF THE CEO OR MANAGEMENT ............... 65

F. TRAINING FOR THE COUNTY EMPLOYEES .......................................................... 66

G. ETHICS REFORM ......................................................................................... 67

H. TRANSPARENCY .......................................................................................... 69

I. ASSET MANAGEMENT ................................................................................... 70

J. CORPORATE CREDIT CARD USE AND P-CARDS ................................................... 71

K. INFORMATION TECHNOLOGY ......................................................................... 72

CONCLUSION .................................................................................................. 73

ACKNOWLEDGEMENTS, THANKS, AND REQUEST FOR DISCHARGE ............................. 75

ORDER ........................................................................................................... 78

## INTRODUCTION

### History and Scope of this Investigative Grand Jury

### Grand Jury's formation

Pursuant to O.C.G.A. § 15-12-100 et seq., on September 7, 2011, the District Attorney requested that a Special Purpose Grand Jury be impaneled. Superior Court Judges voted to approve the request on November 17, 2011, and entered an Order on January 11, 2012, mandating such. Accordingly, this Special Purpose Grand Jury was impaneled, sworn, and charged on January 20, 2012.

We, as common and ordinary citizens of DeKalb County, impaneled as the Special Purpose Grand Jury, recognize that we are privileged to serve our fellow citizens of DeKalb County. We recognize that we represent the common and ordinary citizens of DeKalb County and that we have a special charge to represent them in ensuring that their elected officials and hired personnel perform in a manner that is consistent with the laws and codes of the United States, the State of Georgia, and the County of DeKalb, Georgia.

We heard testimonial evidence and reviewed documentary evidence almost weekly since January 20, 2012. Additionally, we toured the Snapfinger Creek Advanced Wastewater Treatment Plant and interviewed its employees. We have followed the order and charge which impaneled the Special Purpose Grand Jury and inquired, in part, into procurement practices of DeKalb County related to Department of Watershed Management (also known as DWM) contracts; the

6

structure of the Department of Watershed Management over time; and, the companies with which the Department of Watershed Management does business. In that regard, pursuant to our statutory authority, we

- compelled evidence;
- subpoenaed witnesses;
- inspected records, documents, correspondence, and books of the various departments of DeKalb County government; and,
- required the production of records, documents, correspondence, and books of persons, firms, and corporations which related directly and indirectly to the subject of this investigation.

The Special Purpose Grand Jury initially focused on reports of incompetence, patronage, fraud and cronyism within the Department of Watershed Management that emerged during the Vernon Jones administration and the lasting impact of same on the services provided to citizens and any increased expense passed on to citizens. Over time, this body became very concerned with reports of ongoing fraud and incompetence, most specifically those that impact areas of vendor selection, contract issuance and contract administration within the Department of Watershed Management and (as we learned eventually) in other County departments as well.

The evidence reviewed by this Special Purpose Grand Jury calls into question the efficiency, transparency and the fairness of the procurement process to be utilized to facilitate the approximately $1.35 billion ($1,350,000,000.00) Capital Improvement Plan ("CIP") that is currently in its infancy stage, as well as other County operations for which outside vendors are to be utilized.

**DeKalb County's Consent Decree**

The CIP, consisting of eighty (80) plus construction or rehabilitation projects for the County's water collection system, includes projects mandated by the Consent Decree between the County, the Environmental Protection Agency and the Georgia Environmental Protection Division. The Consent Decree arose out of a Complaint filed by the EPA and EPD alleging that DeKalb County violated the Federal Water Pollution Control Act, also known as the Clean Water Act, and the Georgia Water Quality Control Act, and the associated regulations. The State of Georgia joined as a plaintiff in this action.   The County, without admitting liability to the EPA or the EPD arising out of the transactions or occurrences alleged in the Complaint, entered a Consent Decree that calls for improvement projects for the County's old and aging water collection system over a specified period of time.

The projects included in the CIP total approximately 1.35 Billion dollars ($1,350,000,000.00), of which approximately Seven Hundred Million dollars ($700,000,000.00) relate directly to the improvement projects mandated by the Consent Decree.  The Special Purpose Grand Jury does not believe that the fair and efficient facilitation of the projects mandated by the Consent Decree and those included in the larger CIP can be accomplished through the current procurement practices of the County, particularly in light of the ongoing and improper influence of CEO Burrell Ellis and others on those practices.

8

## THE RESULTS OF THE INVESTIGATION AND SPECIFIC FINDINGS

### A. General

DeKalb County has approximately 5,000 miles of water and sewer lines servicing its citizens. The mission of the DeKalb County Department of Watershed Management is to protect the public health, safety and welfare through the provision of safe drinking water and quality wastewater treatment.

The DeKalb County Department of Water and Sewer was established in 1942. In 1985, the department became a division of a larger Public Works Department. In addition to the estimated 5,000 miles of pipe in the distribution and collection systems, major facilities operated and maintained by the Department include the Scott Candler Water Filter Plant, the PoleBridge Advanced Wastewater Treatment Plant, the Snapfinger Advanced Wastewater Treatment Plant, and the DeKalb County Raw Water Pumping Station. The management of these fixed assets, totaling over a billion dollars, requires planning, operation, maintenance, and monitoring of the activities of DeKalb's Department of Watershed Management, its employees, and its construction activities.

The Department of Watershed Management has approximately 670 employees working within five internal divisions: Administrative Services, Construction & Maintenance, Filtration & Treatment, GIS/GPS Mapping & System Inventory, and Technical & Production Services.

For the past ten years, the Department of Watershed Management has been building a countywide water and sanitary sewer GIS (Geographic Information System) as a tool for updating, mapping, and analyzing the water and sewer

9

distribution and collection network.  The Department of Watershed Management GIS is a computer-based system used for geographic data creation, maintenance, storage, analysis and mapping.  The system is being implemented by the GIS / GPS / Data Management Department.

In December 2010, DeKalb County reached a Clean Water Act settlement in the form of a consent decree with the U.S. Environmental Protection Agency (EPA) and the Georgia Environmental Protection Division (EPD) that formalizes implementation of certain sanitary sewer system programs and improvements, many of which the County is already implementing. These programs and improvements, which focus on the collection and transmission components of the County's sewers, are supposed to ensure long-term protection of public health and the environment, particularly with respect to the rivers and streams in the County. The programs and improvements will also ensure compliance with the federal Clean Water Act and the Georgia Water Quality Control Act, and will improve the viability of the County's sewers for generations to come.

The consent decree provides a road map for working cooperatively with the EPA and EPD. All of the programs contained in the consent decree are included in the County's Department of Watershed Management Capital Improvement Program (CIP). The approximate cost of the CIP is $1.35 billion dollars and includes eighty (80) plus specified construction and rehabilitation projects.

## B. History of bribery, fraud and other criminal activity within DeKalb County

### 1. Bribery by Department of Watershed Management Employees

The Grand Jury heard testimony pertaining to the November 2010

indictment of a DeKalb County Department of Watershed Management employee, Dameco Moss, who worked as a "Fats, Oil & Grease ("FOG") Inspector," on charges of Bribery and Theft by Taking. The defendant entered a guilty plea in May 2011. After the entry of the plea, the then Deputy Director of the Department of Watershed Management, Jo Ann Macrina, approached the District Attorney's Office and indicated that the corruption within the Department of Watershed Management was much more far reaching than this employee and the FOG program.

The Deputy Director revealed that an investigation into allegations regarding invoice padding, contract fraud, and bid rigging within the Department of Watershed Management during the Jones administration had been initiated by Detective Jamie Payton of the DeKalb County Police Department in August 2009. This investigation centered on the Champion Tree Service easement contracts but was now being hindered by the administration within the DeKalb County Police Department.

### 2. Champion Tree Service

As a result of the meeting and subsequent interview of Deputy Director Macrina, the District Attorney's Office contacted the DeKalb County Police Department to inquire as to the status of the Department of Watershed Management investigation. The District Attorney's Office learned the DeKalb County Police Department had initiated a criminal investigation pertaining to two contracts between DeKalb County and Champion Tree Service. The investigation centered on allegations of overbilling by Champion Tree Service which was owned and operated by Paul Champion. The investigation quickly expanded to

11

allegations that Mr. Champion had internal assistance in the overbilling scheme by former Deputy Director Nadine Maghsoudlou's brother-in-law, Hadi Haeri, a contract employee with the County, and other county employees to include former Deputy Director John Walker.

Champion Tree Service was awarded its first easement clearing contract with DeKalb County on June 24, 2003. The contract, administered by the Department of Watershed Management, lasted until early 2006. Champion Tree Service was paid approximately $8,800,000.00 under the contract.

In 2003, prior to the issuance of the DeKalb contract to Champion Tree Service, Mr. Champion was approached by Mr. Don Tyler, the principal at Video Industrial Service, Inc., located in Decatur, Alabama, to bid on tree and easement clearing contracts in DeKalb County. Mr. Tyler had met Mr. Champion through a mutual friend in Birmingham, AL, where Mr. Champion resided. At the time, Mr. Champion's small tree service business made approximately $50,000.00 per year. His company had no ties to Georgia, much less DeKalb County, and had no experience with municipal contracts for ongoing easement clearing services.

In exchange for assisting Mr. Champion in obtaining the lucrative DeKalb contract, Mr. Tyler was to receive eleven percent (11%) of the gross earnings of Mr. Champion on the contract as a "finder's fee". Mr. Tyler shared an unknown portion of the "finder's fee" with Mr. Hadi Haeri. According to a grand jury witness, Mr. Tyler introduced Mr. Champion to Mr. Haeri, but did not disclose that Mr. Tyler and Mr. Haeri had an agreement to share the aforementioned "finder's fee". It should be noted, contingency fee contracts such as this are expressly prohibited by the 2002 procurement rules.

As noted, Paul Champion began providing easement clearing services to the

12

County in September 2003. Several months passed and Mr. Champion was not paid by DeKalb County. At the time, Mr. Hadi Haeri was working in an unknown capacity at the Department of Watershed Management under the supervision of Deputy Director John Walker.[1] Mr. Champion went to Mr. Haeri in order to gain assistance in getting DeKalb County to remit payment for his services. Mr. Haeri took Mr. Champion to Deputy Director John Walker, who called DeKalb County Finance and had a hold removed that allowed Mr. Champion to get paid.

The grand jury heard evidence that Deputy Director John Walker, a Jones appointee, was known to be longtime close friends with former DeKalb County CEO Vernon Jones.  Furthermore, Mr. Walker's twin brother, Jeff Walker, and his sister, Joy Walker, are also known to be longtime close friends of CEO Jones. Vernon Jones appointed Joy Walker as the Chief Judge of the DeKalb County Recorder's Court.  She later resigned from this office in 2010 after an investigation into criminal activity within Recorders Court was initiated by the District Attorney's Office.

Mr. Paul Champion later entered into an agreement to pay Mr. Hadi Haeri ten percent (10%) of his revenues derived from his (first) DeKalb contract. In early 2005, Mr. Champion ceased paying Mr. Don Tyler. Mr. Tyler threatened civil action, but Mr. Champion and Mr. Tyler reached an "Accord and Satisfaction" settlement agreement in April 2006. The agreement was that Mr. Champion would pay Mr. Tyler the sum of $100,000.00. The agreement also involved Mr. Haeri. The agreement indicates Mr. Tyler and Mr. Haeri had a signed agreement for the

---

[1] Mr. John Walker was hired by DeKalb County as an Assistant Compliance Manager in the Water and Sewer Department in December 2001, and was promoted to Deputy Director on or about July 18, 2005. He died October 20, 2007.

payment of a finder's fee that was dated May 12, 2003. This 2006 agreement released Mr. Tyler from his 2003 agreement with Mr. Haeri.

As part of his new agreement, Mr. Haeri was tasked with creating and submitting invoices to DeKalb County on behalf of Champion Tree Services. A witness stated that Mr. Paul Champion also entered into this agreement with Mr. Hadi Haeri because Mr. Haeri had known connections with John Walker and other officials in CEO Jones's administration. It should be noted that Mr. Haeri was, at times during the term of his agreement with Mr. Champion, still employed as a contract employee within the Department of Watershed Management and reported daily to an office space within the department. Also during this time, Hadi Haeri's sister-in-law, Nadine Maghsoudlou, was hired into the department and, after the death of John Walker in 2007, was promoted to Deputy Director.

Multiple Department of Watershed Management inspectors that were tasked with oversight of Mr. Champion's work complained to Mr. John Walker about issues with Mr. Champion's work. Mr. Walker, however, dismissed these complaints. Some of these complaints included allegations of made-up or exaggerated work. These complaints could easily have been verified by simple observation of areas claimed to have been cleared by Champion per submitted invoices.

As part of the probe into this activity, the Special Purpose Grand Jury heard testimony that on February 16, 2010, a link analysis chart developed by Detective Jamie Payton of the DeKalb County Police Department was provided to the senior officials within the DeKalb County Police Department. The chart linked numerous vendors and subcontractors to  high ranking Department of Watershed Management officials, including John Walker, who also had known close

14

relationships to former CEO Vernon Jones.

According to testimony heard by the Special Purpose Grand Jury, the link analysis chart was given to DeKalb County Police Department Assistant Chief Annette Lane-Woodard. On or about February 18, 2010, the DeKalb County Police Department investigation was abruptly halted by Public Safety Director William (Wiz) Miller. Detectives were instructed to cease the investigation without explanation. In addition, the detectives who worked on the case were separated ..

In accord with the January 20, 2012, Order's provision, Judge Scott's written charge to this Special Purpose Grand Jury, and our statutory authority to look into related matters, this body also inquired into actions of Public Safety Director William Miller. It was apparent that his actions were related to stopping an ongoing, active criminal investigation into the Department of Watershed Management when it became obvious that the investigation would involve current county officials. Accordingly, we heard testimony from Director Miller and Deputy Chief Lane-Woodard.  We were deeply disturbed by the conflicting testimony of Director Miller and Deputy Chief Lane-Woodard on the simple issue of whether information concerning possible corruption was even given to the FBI for their review. Based on their testimony, we are forced to conclude that Director Miller and Deputy Chief Lane-Woodard either perjured themselves or are abjectly incompetent.

As DeKalb County's Public Safety Director and a sworn law enforcement officer, Director Miller had an obligation to ensure appropriate crime control and prevention strategies. We believe that with respect to the DeKalb County Police Department's investigation of the Department of Watershed

15

Management, Director Miller failed in that duty. A law enforcement officer can fail to do his duty for many reasons: incompetence, ignorance, or perhaps criminal collusiveness. The Special Purpose Grand Jury finds that Director Miller's behavior was not the result of incompetence. Rather, the Special Purpose Grand Jury finds that, with complete awareness that an active investigation involved current county employees, Director Miller interfered with the investigation and failed to take reasonable steps to ensure that the apparent and obvious criminal behavior was stopped or thoroughly investigated.

According to witness testimony, Department of Watershed Management Deputy Director, Charles Lambert, had been cooperating with the investigation and had been providing DeKalb County Police Department detectives with information pertaining to the aforementioned issues. Mr. Lambert had conducted an internal review of the Champion Tree Service invoices in question. This internal review found unequivocal evidence that multiple Champion Tree Services invoices had been inflated, and that Champion charged the County for services that it had not even provided. The Special Purpose Grand Jury heard evidence that Mr. Lambert met with Director Miller and Assistant Chief Lane-Woodard near the time period when the DeKalb County Police Department detectives provided the link analysis chart to their supervisors. At that meeting, Mr. Lambert provided details of his internal findings. Within weeks Mr. Lambert could not get any of the DeKalb County Police Department detectives that he had been working with to return his calls.

During the same time period, the District Attorney's Office learned of an ongoing civil lawsuit involving Champion Tree Service and DeKalb County. Paul

16

Champion had filed a lawsuit against the County claiming he was owed money for unpaid invoices stemming from his 2006 easement clearing contract. The District Attorney's Office, after much effort, obtained files and transcripts from the County Attorney's Office. The documents, which included emails of former Department of Watershed Director Roy Barnes[2], and former Deputy Director Nadine Maghsoudlou, appeared to reveal an alleged fraudulent scheme involving current and former employees of the Department of Watershed Management and other DeKalb County government departments, public/elected officials, and outside contractors during the time period of 2000 - present.

The Department of Watershed Management's own internal procedures were not enough to stop the Champion scheme. An Inspector with the Department of Watershed Management objected to the manner and billing of Paul Champion. That inspector testified to the Grand Jury that he reported to his superiors that Champion Tree Service was grossly overestimating the tree count and the linear feet cleared. Former Deputy Director John Walker and Nadine Maghsoudlou, however, told the inspector to sign the work orders and the invoices despite his concerns.

### 3. Ace Environmental

As noted above, Champion Tree Service was awarded two easement clearing contracts with DeKalb County in 2003 and 2007.   The events that

---

[2] Mr. Barnes was the Associate Director of the DeKalb County Water and Sewer Department. Mr. Barnes was appointed to this position by CEO Vernon Jones on or about June 3, 2003. Mr. Barnes had been hired as an engineer. The promotion from engineer to Associate Director effectively meant Mr. Barnes jumped multiple ranks in the organization to head the entire department. The DA's Office investigation revealed Mr. Barnes to be a close friend of CEO Jones and both John and Jeff Walker.

occurred between the expiration of the 2003 contract (in 2006) and the award of the 2007 contract to Champion Tree Service greatly concern the Special Purpose Grand Jury.  Witness testimony indicated that Deputy Director John Walker told Mr. Champion (in the presence of Hadi Haeri) that he needed a "black face" on this contract.  In response to this, Paul Champion asked his childhood friend, Christian Vann, an African-American then employed by the Cartoon Network, to help him secure or re-secure the contract that Mr. Champion previously had with DeKalb County. Mr. Champion wanted Mr. Vann to sign off on the bid documents for the easement clearing contract – and then submit it to DeKalb County.   Mr. Vann and Mr. Champion came to an agreement that in the event Mr. Vann won the bid, then Mr. Champion would come in as a subcontractor and do all the required work issued under the contract.

Mr. Vann then registered a fictitious company with the Georgia Secretary of State named ACE Environmental.  Mr. Champion completed the Invitation to Bid for easement clearing services by handwriting in the line item figures for various clearing services and the names of references (including that of Deputy Director John Walker, whom Mr. Vann had never met).  Mr. Vann signed the bid document. No one from the County tried to verify that Mr. Vann was a responsive and responsible bidder and that he and his "company" were qualified to do the work. Ironically, Mr. Vann did not even own a chainsaw at this point in time.  Mr. Vann, per the directive of Mr. Champion, subsequently attended a mandatory pre-bid meeting at the County offices.

Despite not having any actual qualifications, ACE Environmental won the bid for the easement clearing contract.  The amount of the contract was from two million two hundred thousand dollars ($2,200,000.00) to two million five hundred

18

thousand dollars ($2,500,000.00). After a dispute with Mr. Champion over fees to be paid to Mr. Vann under the contract (for his role in securing the County contract through his fictitious company), Mr. Vann, now facing complaints from the County regarding non-performance, attempted to enter into an agreement with Mr. David Gallemore. Mr. Gallemore has registered tens of companies with the Georgia Secretary of State, many of which have held contracts with DeKalb County (particularly in the area of IT). Gallemore's company, Arbor People, bought the name "ACE Environmental" from Mr. Vann. The contract issued to ACE Environmental was canceled by the County shortly thereafter for non-performance. It should be noted that Mr. Gallemore's employment company employed Mr. Hadi Haeri and placed him at DeKalb's Department of Watershed Management as a contracted or supplemental employee.

The realization that a fictitious company with no assets, no equipment, no employees and no experience in the relevant area of work can win a multi-million dollar services contract with the County is of great concern to the Special Purpose Grand Jury. Several employees from the Purchasing and Contracting Department testified to the Grand Jury and none were able to provide concrete answers as to how this situation could have occurred and, perhaps more importantly, what checks and balances are now in place to prevent a repeat of the situation.

### 4. G4 Technologies (David Gallemore)

A November 2007 DeKalb County internal audit report revealed that DeKalb County paid fourteen (14) consultants and technology service providers millions of dollars through various, individual contracts or purchase orders capped at the amount of $50,000.00 each (Note: one of the fourteen companies had a

19

contract in excess of $50,000.00, but was still paid in excess of a million dollars of their contracted amount.) The audit further revealed the payments made to the aforementioned contractors were done through the "splitting" of Purchase Orders. The "splitting" was done to circumvent the Board of Commissioner's approval and to avoid putting the contracts out for competitive bid (requirements made necessary for contracts of certain monetary thresholds). The DeKalb County internal auditors discovered that Mr. Richard Stogner, Executive Assistant to CEO Vernon Jones, directed employees to split the Purchase Orders in violation of County policy.   Testimony heard by the Special Purpose Grand Jury indicated that Mr. Stogner knowingly violated these policies despite his own approval in 2004 of the very policies at issue.

G4 Enterprises was one of the fourteen (14) contractors referenced in the 2007 internal audit report. G4 Enterprises had a single contract in the amount of $50,000.00; however, G4 Enterprises was paid a total of $2,616,884.00 from June 30, 2004 - September 20, 2007. G4 Enterprises was also paid approximately $20,000.00 in 2008, but their services were later terminated.

The internal audit report was sent to CEO Vernon Jones on November 14, 2007. Dr. Michael Bell and the Board of Commissioners commissioned an external audit through KPMG. This audit confirmed and expanded on the findings of the internal audit.

On November 15, 2007, CEO Vernon Jones ordered Internal Auditor Eugene O'Mard to issue an addendum to his audit report to include the roles of various departments in the contract payment deficiencies. Mr. O'Mard issued the addendum to his report on November 21, 2007, finding no connection to the finance department and the deficiencies.   CEO Jones commissioned another

external audit through a company known as NashHill, which confirmed the findings of the internal audit.  This third audit report commissioned by CEO Jones, in the opinion of the Special Purpose Grand Jury, was self-serving, unnecessary and a waste of tax payer money.

The Special Purpose Grand Jury heard testimony and saw evidence that between October 2006 and October 17, 2007, David Gallemore, operating under the business name of G4 Enterprises, Inc., sent threatening emails to Director Roy Barnes and Deputy Director John Walker.  During this time, Mr. Gallemore had fallen out of favor with the Walkers and, therefore, with DeKalb County. The emails threatened to expose Barnes', Walker's and CEO Jones' involvement in corrupt activities, that included the Champion Tree Service contract and Christian Vann's contract, threats received by vendors from CEO Jones, reports of kickbacks in the form of trips, and bid and contract manipulation.  The emails also claimed that  as a form of retribution, Mr. Gallemore's company was no longer receiving work under his County contract and was not receiving timely payment from the County.

The Special Purpose Grand Jury heard testimony that Mr. Roy Barnes, as Associate Director of the Department of Watershed Management, investigated the emails and possibly sent the emails to someone in the law department.   Mr. Barnes, however, did not investigate the allegations in the aforementioned emails. It should be noted that Mr. Barnes, during his time of employment as an Associate Director and a Deputy Director in the Department of Watershed Management, received thousands of dollars from John Walker for unknown purposes.

### 5. MM&E

Mr. Barry Bennett is the owner of Metals and Materials Engineers, LLC.

21

MM&E was started in 2001 with Mr. Bennett as the principal owner.  Mr. Bennett wanted to get his company into the public sector arena and sought certification with DeKalb County as a Local Small Business Enterprise and a Minority Business Enterprise.

MM&E was awarded several Department of Watershed Management contracts between 2002 to present.  Its initial success with the County was short-lived.  Several contracts awarded to MM&E, which were under the control of Ms. Nadine Maghsoudlou, were drastically reduced in scope upon award or subsequently no work was issued to MM&E under the contract.  Also, MM&E experienced issues with receiving timely payment on other Department of Watershed Management contracts.  There is also some question as to whether a bid for a later contract was purposefully rigged to select another vendor when MM&E was actually the lowest bidder.  MM&E representatives believe these actions on various contracts were forms of retribution for Mr. Bennett having fired Jeffrey Walker.  Testimony provided to the Special Purpose Grand Jury indicated that Mr. Bennett had hired Mr. Jeffrey Walker as a business development consultant at a rate of $8,000 per month in 2005. That agreement was terminated by Mr. Bennett after five months.

### 6. Universal Business Development (Hadi Haeri) and Brown & Caldwell

The Special Purpose Grand Jury heard testimony about Hadi Haeri who provided services on the County's mapping project regarding DeKalb's effort to locate and determine the GPS coordinates of its approximately 75,000 manholes. The contract was worth approximately twenty million dollars ($20,000,000.00).  Mr.

22

Haeri ostensibly worked as a "business consultant" through his company Universal Business Development. In that capacity, according to Mr. Haeri, he worked to put together a team of subcontractors to work under a prime contractor, Brown & Caldwell, to pursue the mapping contract.

Mr. Haeri testified that he had no influence on bids/offers. However, the Special Purpose Grand Jury notes that Mr. Haeri's sister-in-law, Nadine Maghsoudlou at the time Deputy Director in the Department of Watershed Management, did have influence on bids/offers pertaining to the Department of Watershed Management. Ms. Maghsoudlou was a participant on various selection committees that reviewed and evaluated Request For Proposals (RFPs) vying for County contracts, including the lucrative mapping contract. In fact, one subcontractor involved in Brown & Caldwell's RFP for the mapping project testified that Mr. Haeri told the RFP group that they had nothing to worry about because Nadine would be on the selection committee for the contract award.

One of the subcontractors set up by Mr. Haeri to be included on the Brown and Caldwell bid for the mapping project, DMD Engineering, had no experience in the area of manhole inspections — the very scope of work DMD and Brown & Caldwell represented that DMD would perform under the contract. Despite this, Brown & Caldwell won the mapping contract with DMD still listed as the subcontractor on the project responsible for the manhole inspection portion of the work. As stated above, the ability for County contracts to be issued to unqualified vendors, especially those included on contracts as a Local Small Business Enterprise, is very troubling to the Special Purpose Grand Jury.

The Special Purpose Grand Jury reviewed the RFP submittal by Brown & Caldwell for the mapping contract. It included a detailed section about the quality

23

control services to be provided by Brown & Caldwell employees on the mapping project. The RFP listed three Brown & Caldwell employees that would oversee the quality control aspect of the project, one of whom had a Ph.D. Despite this impressive and qualified oversight group, just some weeks after the County issued the mapping project contract to Brown & Caldwell, Brown & Caldwell entered into an agreement to pay Hadi Haeri for the very same services.

Witnesses testified that Deputy Directors John Walker and Nadine Maghsoudlou directed Brown & Caldwell to hire Mr. Haeri under the Brown & Caldwell contract. In response to this directive, Brown & Caldwell sent two letters to Ms. Maghsoudlou to memorialize her directive. One of those letters stated in part:

> In accordance with your request, we propose to add to our team, Mr. Hadi Haeri, who will be responsible for assisting DeKalb County Public Works Water and Sewer Department (DCWS), with project administration, as required. We understand that he will be based mainly at your offices and will report to you and other personnel at DCWS for project assignments and direction.
> As instructed, we shall subcontract the services of Mr. Hadi Haeri with effect from January 1, 2007, under the above project. We propose to bill his services as a Junior Engineer at the rate of $100 per hour, in accordance with the hourly rates given in the above Contract.

An acknowledgement attached to the letter goes on to state:

> "It is understood and acknowledged by DeKalb County that Brown and Caldwell shall not scope, direct or review the work performed by Mr. Hadi Haeri for DeKalb County, and that Mr. Hadi Haeri shall not be under the direction or control of Brown and Caldwell at any time."

Ms. Maghsoudlou signed the acknowledgement to the first letter. The acknowledgement to the second version of the letter, which changed Mr. Haeri's title and significantly increased his hourly fee, was signed by Associate Director Barnes.

24

Mr. Haeri was paid over seven hundred thousand dollars for his services under the Brown & Caldwell contract — services that were already accounted for by Brown & Caldwell under its RFP submittal. As such, Mr. Haeri's and Brown & Caldwell's assertions that Mr. Haeri was added to the Brown & Caldwell prime contract under its "Additional Services" clause lack credibility.

With full knowledge of Mr. Haeri's created role under the Brown & Caldwell contract, Ms. Maghsoudlou approved Brown & Caldwell invoices which covered the expenses associated with Mr. Haeri. Additionally, both Ms. Maghsoudlou and Associate Director Roy Barnes approved various time sheets for invoices by Mr. Haeri under the mapping project during an eight month period in 2009 in which work on the mapping project had been halted due to a delay of the approval of the budget by the County Commissioners.

Hadi Haeri was fired by Brown & Caldwell on or about the time that Nadine Maghsoudlou was placed on administrative leave by DeKalb County in 2010.

### 7. Universal Business Development (Hadi Haeri) and DMD Engineering

The Special Purpose Grand Jury also learned through testimony that Mr. Haeri was also being paid by DMD Engineering, another subcontractor to Brown & Caldwell, during the course of the mapping project. DMD paid Mr. Haeri over five-hundred thousand dollars. The exact services, if any, provided by Mr. Haeri on the mapping project for or through DMD is unknown as the former principal of DMD is now deceased.

## 8. Global Business Development (Jeffrey Walker) and Brown & Caldwell

Per testimony provided to the Special Purpose Grand Jury, Brown & Caldwell hired Jeff Walker as a political or "business development" consultant in order to gain further favor with DeKalb County. Brown & Caldwell paid Jeff Walker, through his company Global Business Development, approximately $106,000.00 from February 2008 through May 2010.

The Grand Jury reviewed invoices and reimbursement forms that were submitted to Brown & Caldwell by Jeff Walker. These documents show that Jeff Walker was meeting with and entertaining:

- CEO Jones' Chief of Staff, Ann Kimbrough,
- Debra Brewer (Deputy Director of DeKalb County Purchasing and Contracting),
- Rudy Chen (Deputy Director of DeKalb County Department of Watershed Management),
- Roy Barnes (Assistant/Deputy Director of DeKalb County Department of Watershed Management),
- Richard Calhoun (DeKalb County Department of Watershed Management),
- Kelvin Walton (Director of DeKalb County Purchasing and Contracting).

The documentation produced by Brown & Caldwell indicates a pattern of Mr. Jeff Walker meeting with the aforementioned individuals, in addition to other DeKalb County officials and employees, over a period of time from December

26

2007 to December 2009. Of the twenty-five Jeffrey Walker invoices produced by Brown & Caldwell, twenty reference his meetings with DeKalb officials including the department heads for DeKalb Watershed Management and Contracting and Procurement.

It should be noted that Mr. Walker, prior to the creation of his business development company in 2002, had no experience in engineering, construction or public policy. His only qualification for his role as a business developer for Brown & Caldwell and the below listed companies appears to be his connections with his twin brother, Deputy Director John Walker, his sister, former Chief Judge of Recorders Court Joy Walker, the Walker's longtime and close friendship with CEO Vernon Jones, and his friendship with Associate Director of Watershed Roy Barnes.

### 9. Global Business Development (Jeffrey Walker) and MM&E

The Special Purpose Grand Jury heard testimony and saw evidence that Metals, Materials Engineers, LLC (MM&E) entered into an agreement to pay Global Business Development a monthly sum of $8,000.00 in December 2005 for "advice". MM&E terminated the agreement after five (5) months.

### 10. Global Business Development (Jeffrey Walker) and Desmear Systems

Additionally, the Grand Jury heard testimony and saw evidence that a company known as Desmear Systems paid Jeff Walker, through his company, Global Business Development, $8,000.00 in 2008. Desmear Systems was paid approximately $2,254,000.00 by DeKalb County from November 2007 - November 2009. In addition, Desmear Systems has provided work space for Mr. Walker in

27

their Northlake area offices since at least 2011.  This particular company gained the interest of the Grand Jury because of the following press release published May 22, 2012.

---

MAY 22, 2012 FOR IMMEDIATE RELEASE

### The First ONE DeKalb Works Sewer Contract Awarded

DECATUR – DeKalb County Chief Executive Officer Burrell Ellis announces that DeKalb County awarded the first contract in the $1.35 billion water and sewer system upgrades using bond funds that will be taking place over the next eight years.

"This is a historic day in DeKalb County as we begin these critical upgrades for future generations, and start putting people back to work under the ONE DeKalb Works jobs initiative," said CEO Ellis.

The winning bidder, Desmear Systems, Inc., in Tucker, begins work in June.  The $7.6 million project prepares the Snapfinger Wastewater Treatment Facilities Expansion for later construction which includes clearing, grubbing, rock and soil excavation, and construction of a retaining wall.

There is a 20 percent Local and Small Business Enterprise participation required, as well as a good faith effort to hire at least 50 percent of DeKalb County residents for new jobs created as a result of this contract.  Also, contractors are encouraged to have 25% or more of their labor force consisting of preferred employees from labor organizations selected from the First Source Registry and trained by a U.S. Department of Labor registered apprenticeship program.

"One of the key components of the American Jobs Act is targeted to rebuilding our nation's crumbling infrastructure," said CEO Ellis.  "We are investing $1.35 billion to upgrade and repair of our aging water and sewer system, but we have the opportunity to implement our own local stimulus program that will create jobs now and help citizens grow businesses now."

ONE DeKalb Works is a public service, jobs initiative that will leverage the completion of water and sewer infrastructure improvements and other construction projects to cultivate a skilled workforce and promote local businesses.  According to a recent study by the Carl Vinson Institute of Government at the University of Georgia, up to 4,700 jobs will be created at the programs peak.

For more information on ONE DeKalb Works, visit www.DeKalbcountyga.gov.

---

28

**11. Global Business Development (Jeffrey Walker) and Parsons Water Infrastructure, Inc.**

DeKalb County advertised and initiated the RFP process for design work for the Polebridge-Snapfinger Wastewater Plant Expansion project (hereinafter "Polebridge Project") (worth approximately thirty million dollars) on three consecutive occasions starting in 2005. Parsons Water Infrastructure, Inc. (hereinafter "Parsons") submitted offers on these RFPs for the aforementioned project. After not being shortlisted on the first two occasions, Parsons teamed up with Jeffrey Walker in preparing for the third attempt for the lucrative contract. Mr. Walker met the Parson's general manager overseeing the Parson's efforts for the Polebridge Project RFP, Mr. Tony Taylor, through Barry Bennett of MM&E.

According to testimony provided to the Special Purpose Grand Jury, Parsons entered into a consulting agreement with Mr. Walker in 2006. Under the agreement Mr. Walker provided "technical writing and proofreading services" on the Parsons RFP notebook to be submitted to DeKalb County. The agreement was for a term of six (6) months and provided for fees to Mr. Walker in the amount of eight thousand dollars ($8,000) a month for a total amount in fees of forty-eight thousand dollars ($48,000). Parsons executed two amendments to the agreement which extended the term of Mr. Walker's agreement and increased his fees an additional forty thousand, nine hundred dollars ($40,900). Under the consulting agreement, Parsons paid Jeffrey Walker a total amount of eighty-eighty thousand, nine hundred dollars ($88,900) for six months of technical writing and proofreading services. Parsons won the Polebridge Project contract award.

After winning the contract on the third RFP issued by the County for the

29

Polebridge Project, Parsons then hired Jeffrey Walker as an employee for a short time in 2008/2009. Documents produced by Parsons and reviewed by the Special Purpose Grand Jury indicate that Mr. Walker, as an employee of Parsons, engaged in numerous breakfast, lunch and dinner meetings from March of 2008 to June of 2009 with Parsons' Tony Taylor and various high level DeKalb County employees and officials. These employees and officials included former CEO Vernon Jones, former Chief of Staff Ann Kimbrough, Associate Director of Watershed Management, Roy Barnes, DeKalb County Director of Contracting and Procurement, Kelvin Walton and other lower level Department of Watershed Management employees.

During part of the period of time that Mr. Jeffrey Walker was employed full-time by Parsons to perform "marketing and business development" services, he was also a paid consultant for Brown & Caldwell providing the very same services. Both companies held and were seeking lucrative DeKalb County Department of Watershed Management projects with the County during this period of time.

The activities of Mr. Walker and his many consulting agreements with contractors and subcontractors (particularly small companies serving as subcontractors to larger prime contractors in order for the larger prime contractors to meet their Local Small Business Enterprise ("LSBE") requirement, and thus receive extra points during an RFP or bid assessment) is very troubling to the Special Purpose Grand Jury. Additional concern over these agreements arose upon learning that Mr. Walker's sister, former Recorders Court Chief Judge Joy Walker, provided ongoing assistance in drafting and preparing these consulting agreements for Mr. Walker. According to a 2005 email reviewed by the Special

30

Purpose Grand Jury, Ms. Walker conferred with a county attorney serving then as the Assistant Director of Purchasing and Contracting, Terry Phillips, to develop the contingency fee language used in many of Mr. Walker's contracts with DeKalb vendors. It should be noted that this very type of language regarding contingency fee agreements with consultants seeking work in DeKalb is expressly prohibited by Section 7, subsection 7, of the county's Purchasing Manual entitled "Ethics in Public Purchasing for DeKalb County".   The manual, issued in 2002, specifically indicates that it was submitted to "Mr. Terry Phillips, Assistant Director Purchasing and Contracting". The Special Purpose Grand Jury finds the actions of Ms. Walker and Mr. Phillips to be unacceptable, in violation of the established purchasing policies, and contrary to the best interests of the County.

### 12. Inland Waters and Superior Pipeline (Dion Allen)

Dion Allen owned and operated Superior Pipeline. The company primarily performed pipe bursting services and CCTV inspection services related to water systems. Superior Pipeline sought and received certification from DeKalb County as a Local Small Business Enterprise. After that, Mr. Allen began teaming up with larger companies to bid on County contracts out of the Department of Watershed Management. In 2008 or 2009, Mr. Allen (Superior Pipeline) was approached by Inland Waters ("Inland") wanting to team up with Mr. Allen to pursue DeKalb projects (CCTV and pipe bursting). Inland, at that time, had no contracts with the County and was looking to get a foot in the door.

Superior Pipeline did not have the financial resources to pursue larger contracts out of the Department of Watershed Management as a prime contractor. Mr. Allen did own four CCTV trucks and other equipment needed to

31

perform services under a CCTV contract and a pipe bursting contract. Inland and Mr. Allen reached an agreement to pursue the aforementioned projects. Under the subcontractor agreement, Mr. Allen/Superior was to perform 100% of the work on the CCTV contract and 20% of the work on the pipe bursting contract. Inland, with Superior as its subcontractor, won both contracts in 2010.

According to testimony heard by the Special Purpose Grand Jury, Mr. Allen was contacted by the Inland project manager (Randy Hebert) only months into starting work on the CCTV contract. Mr. Hebert indicated that Inland now wanted to bring in another subcontractor on the contract who had some political connections to DeKalb's new administration (referring to CEO Burrell Ellis' administration). Mr. Allen's work would now be reduced from 100% to a much lower percentage (despite his original agreement with Inland when preparing the bid on the contract). Mr. Allen was told that he either play ball or risk losing the (sub)contract all together. Mr. Hebert indicated that Inland had a new lobbyist, Kevin Ross, and that the sudden change in subcontractors on the project was coming down from him. Mr. Ross is the former campaign manager to Burrell Ellis. Mr. Allen fought Inland on the matter. He subsequently was removed from the contract as Inland's subcontractor. Mr. Allen plans to file a civil suit over the matter this year.

## C. Improper Activities within the CEO's office

As a result of this Grand Jury's efforts, numerous people have testified and voluminous documents have been reviewed. The investigation has yielded evidence that current Chief Executive Officer Burrell Ellis (hereinafter CEO Ellis) is involved in a scheme that entails the following: 1) soliciting campaign contributions

32

under the color of his title as CEO with vendors that have a just-approved or pending contract with DeKalb County; 2)canceling or attempting to cancel contracts in order to create an "emergency situation" for which an emergency contract can then be issued to another vendor without a competitive process; 3) directing the cancellation of contracts or the non-issuance of work to vendors for punitive and political reasons; 4) dictating which individuals should be placed on selection committees for RFPs for which major campaign donors will be submitting offers; 5) interfering in the evaluation process for RFPs by discussing secret selection committee information with committee members during the active evaluation period; 6) communicating with a submitting vendor and/or vendor representative during an active evaluation period for the related RFP about matters directly related to the pending RFP and subsequent contract award; and 7) interfering with and/or altering a selection committee's final recommendation (prior to submission to the Board of Commissioners) in favor of vendors represented by Kevin Ross or for vendors with a history of paying significant campaign contributions/raising significant campaign contributions for Mr. Ellis.

The Grand Jury has received information that, on a routine basis, CEO Ellis demands and receives an updated list of vendors that have been recently approved for contracts by the DeKalb County Board of Commissioners. CEO Ellis then utilizes the information provided in the vendor lists, specifically the name and phone number of the successful company representative who signed the ITB or RFP document, to contact the vendors to solicit campaign contributions. In some instances, if the vendors refuse or are not initially receptive or "responsive", CEO Ellis will make repeated calls to the vendor for the purpose of soliciting campaign contributions. These calls often are made prior to an issued contract to the vendor

33

being finalized or just after a contract is finalized and the vendor is in its initial phase of the contract.

## 1. CEO Soliciting Campaign Contributions from Vendors with Pending or new contracts with the County

### a) Jeffrey Walker-"Things to Know"

During its investigation, the Grand Jury received a memorandum that is titled "Things to Know" which contains allegations against CEO Ellis. More than one witness testified that Mr. Jeff Walker authored the memorandum.

The aforementioned "Things to Know" memorandum indicates CEO Ellis is involved in a scheme to withhold his signature on contracts until receiving a campaign contribution from the vendor, specifically in regards to Desmear Systems.

### b) Desmear Systems

The Grand Jury heard testimony that Desmear Systems was awarded a contract for sidewalk repair and landscaping in August of 2011. Systems did not receive a notice to proceed (to begin the work) until after a call from CEO Burrell Ellis on February 8, 2012, in which CEO Ellis asked for a $2,500.00 campaign contribution. The company's principal agreed to make the contribution and the following day, Purchasing and Contracting told Desmear that DeKalb County was ready to proceed with its contract. On May 22, 2012, CEO Ellis' office issued the news release included above regarding a subsequent contract award for Desmear Systems.

### c) Power and Energy Services

The Grand Jury also received evidence about a contract between DeKalb

34

County and Power and Energy Services.   In April 2012, Power and Energy Services was awarded a DeKalb County contract (to service generators). Another company was also awarded the same contract (a split award).  A review of the bid abstract indicates that Power and Energy Services significantly underbid the other vendor, Prime, on the majority of the line items included in the Invitation to Bid.

On June 4, 2012, CEO Ellis contacted Mr. Brandon Cummings, the co-owner of Power and Energy, via telephone and requested Mr. Cummings contribute $2,500.00 through his company (Power and Energy Services) to CEO Ellis' campaign. Mr. Cummings advised CEO Ellis that Mr. Cummings was not sure if he would be able to make a campaign contribution, but that Mr. Cummings would check and advise CEO Ellis. Mr. Cummings talked with his wife, Danice Cummings, and the two decided they would not contribute to CEO Ellis' campaign. Mr. Cummings advised his administrative staff about CEO Ellis' request and that no contribution would be made.

On the following day, CEO Ellis again contacted Power and Energy Services and spoke to Ms. Eneida Robles, an employee. Ms. Robles advised CEO Ellis that Mr. Cummings was not available and CEO Ellis asked if Ms. Robles could take a message. CEO Ellis called back and again asked to speak to Mr. Cummings. Ms. Robles advised CEO Ellis that Power and Energy Services would not be able to help with CEO Ellis' solicitation for a campaign contribution. CEO Ellis' demeanor changed, and he became upset. CEO Ellis stated something to the effect of "Oh, so you are not interested in doing work in DeKalb County".

Within a few minutes after the call from CEO Ellis to Ms. Robles, a DeKalb County employee contacted Power and Energy Services and spoke to Ms. Danice Cummings, the other co-owner of Power and Energy Services. The DeKalb County

employee advised Ms. Cummings that CEO Ellis needed to speak to Mr. Cummings. Ms. Cummings advised the employee that Mr. Cummings was unavailable at the time. The employee then asked something to the effect of why Mr. Cummings would not be willing to speak to "the person that signs their contract". Ms. Cummings stated that she was able to get the employee to acknowledge that CEO Ellis was calling for the purpose of soliciting a campaign contribution.

The Grand Jury heard a recording of yet another phone call between Mr. Cummings and CEO Ellis. CEO Ellis came on the line and thanked "Brandon" for calling back. CEO Ellis stated that he was in a friend's office and that CEO Ellis normally gives out his (Ellis') cell phone, 404-625-7086, for these type calls.

CEO Ellis stated he had campaigned for CEO and that it takes approximately $1 million dollars to run for the office The CEO had raised approximately three fourths (¾) of the amount. CEO Ellis advised Mr. Cummings that CEO Ellis was holding a fundraiser on October 11, 2012, and asked Mr. Cummings to contribute the "maximum level" of $2,500.00.

CEO Ellis advised Mr. Cummings that CEO Ellis had been trying to reach Mr. Cummings for some time. CEO Ellis stated that he had spoken to Mr. Cummings on June 4, 2012, and made attempts to call Mr. Cummings back on June 5, 2012, June 7, 2012, and June 11, 2012. CEO Ellis stated that he also called on June 25, 2012, and was advised by a person CEO Ellis described as Aneida (CEO Ellis spelled the name on the recording) and was told "he is not interested in your services".

Mr. Cummings stated that there may have been some confusion on the previous calls and that Mr. Cummings had received a call from a DeKalb County

Director of Purchasing and Contracting about the CEO's calls. CEO Ellis stated that he did not know why the employee had called, and that CEO Ellis would have to check his notes. CEO Ellis then stated that he recalled that he had been told by someone at Power and Energy Services that the company was not interested in his (Ellis') services. CEO Ellis stated that he was taken aback by this, but someone from Power and Energy Services had since called and apologized and CEO Ellis wanted to move forward.

CEO Ellis again inquired about financial support for the upcoming fundraiser on October 11, 2012. Mr. Cummings stated that he did not typically donate to campaigns and that Mr. Cummings was not a resident of DeKalb County.

CEO Ellis, his tone now becoming more firm and reprimanding, replied that he was not asking why Mr. Cummings should support DeKalb County Government, but why Mr. Cummings should support CEO Ellis with a campaign contribution. Mr. Cummings stated he did not know CEO Ellis' platform, and he is only a vendor that is based in Cobb County.

CEO Ellis stated that Power and Energy Services does business with DeKalb County and "If I got to sit down and explain to you why you would want to support this County government...." Mr. Cummings then replied, that Mr. Cummings was not asking about the County government.

### d) National Property Institute

The Special Purpose Grand Jury heard recorded conversations involving CEO Ellis related to his efforts to solicit a campaign contribution from the owners of National Property Institute (hereinafter "NPI"), Greg and Trina Shealey.   The recordings and related testimony on the topic indicate that CEO Ellis called Trina

37

Shealey, who signed the RFP form submitted on behalf of NPI to DeKalb County for a contract related to a neighborhood stabilization project, seven times. The phone calls were made in the summer months of 2012. The Shealeys were awarded their contract in April of 2012.

Ms. Shealey spoke to CEO Ellis on two occasions. In response to CEO Ellis' request for a campaign contribution in the amount of $2,500.00, Ms. Shealey indicated that she needed to speak to her husband about the request. Nothing related to the Shealey's contract, their scope of work and/or their performance under the County contract was discussed during these short calls.

The CEO, in response to Ms. Shealey's failure to call him back regarding his solicitation for a campaign contribution, directed the staff member who oversees the Shealey's one million dollar ($1,000,000) contract to coordinate a meeting with the Shealeys in his County office. After several meetings between the CEO and the Shealeys over the course of a few weeks, the decision was made by the Shealeys to make a contribution to Mr. Ellis' campaign in the amount of $2,500 (the maximum level for a campaign contribution). The Shealeys made the campaign contribution because they were afraid that their contract with the county would be terminated if they did not.

### e) Reeves and Associates Consulting and Training, Inc.

On October 10, 2012, Mr. Michael Reeves, Vice President of Reeves and Associates Consulting and Training, Inc., received a call from CEO Ellis. Mr. Reeves had a subcontract with E2 Assure on a DeKalb County contract at the time of the phone call. During this call, CEO Ellis advised Mr. Reeves that Mr. Reeves was going to serve on the host committee for a fundraiser for the CEO on October 11, 2012, and that Mr. Reeves would be responsible for making a $2,500.00

38

campaign contribution. CEO Ellis referenced the specific amounts that Mr. Reeves had contributed, as if CEO Ellis was "watching every penny" and stated that Mr. Reeves still needed to raise more money. CEO Ellis stated that Mr. Reeves had benefitted from doing work for DeKalb County.

Mr. Reeves never asked to be on the host committee. Mr. Reeves felt a great deal of pressure to contribute to CEO Ellis' campaign, and that he might lose his contract with the County if he did not contribute. Mr. Reeves did not feel that his company was in a financial position to make the contribution requested by CEO Ellis.

Mr. Reeves advised CEO Ellis that Mr. Reeves was struggling financially, and CEO Ellis brokered a deal that a company by the name of E2 Assure would cover the balance of the $2,500.00 that Mr. Reeves could not pay. Mr. Reeves is currently a subcontractor of E2 Assure, which has an active contract with DeKalb County.

### f) Merrell Brothers, Inc.

The Special Purpose Grand Jury heard testimony that on October 4, 2012, Purchasing and Contracting employees Yolanda Broome and Felton Williams participated in a conference call with Mr. Terry Merrell of Merrell Brothers, Inc. Merrell Brothers, Inc. had recently been awarded a DeKalb County Department of Watershed Management contract worth approximately four million dollars ($4,000,000). Prior to the conference call, Mr. Merrell wrote an email to Ms. Broome indicating that an event had just occurred that now made him want to withdraw from his contract award with DeKalb County. During the conference call, Mr. Merrell stated Mr. Merrell had received a call from CEO Burrell Ellis and that CEO Ellis had requested a $25,000.00 campaign contribution. Mr. Merrell twice

mentioned the amount requested was $25,000.00. Mr. Merrell stated that he wished to withdraw from his contract if Merrell Brothers, Inc. was required to make a contribution, because that is not the way he does business.

In the call between Mr. Ellis and Mr. Merrell, CEO Ellis identified himself as the CEO of DeKalb County and stated that he (Ellis) had just been re-elected to the position of CEO. CEO Ellis went on to say that it takes approximately $1,000,000.00 to run for his office and that he had already raised approximately $800,000.00. CEO Ellis stated that he was attempting to retire his campaign debt and was holding a fundraiser on October 11, 2012. CEO Ellis then stated that he saw that Mr. Merrell's company had recently been awarded a $4,000,000.00 contract with DeKalb County, and CEO Ellis wanted to know if he could count on Mr. Merrell to come to the fundraiser and bring a $25,000.00 contribution.

Mr. Merrell stated that after CEO Ellis made the request, Mr. Merrell advised him that he was not yet a DeKalb vendor, because Mr. Merrell was still trying to work through an issue with his LSBE prior to finalizing the contract. CEO Ellis replied that he had a feeling that it would get worked out, and he asked Mr. Merrell if he wanted CEO Ellis to make a phone call on behalf of Mr. Merrell on the LSBE issue. Mr. Merrell told CEO Ellis "no". CEO Ellis then replied that he knew what Mr. Merrell meant and that CEO Ellis would contact Mr. Merrell back in approximately one month.

**2. CEO Ellis canceling or attempting to cancel contracts in order to create an "emergency situation" for which an emergency contract can be then be issued to another vendor without a competitive process**

> **a) CEO Ellis' two attempts to cancel the contract with Judicial Correction Services related to probation services in Recorders Court.**

As a result of the "Things to Know" memorandum and the testimony of numerous witnesses, the Special Purpose Grand Jury also examined the relationship between CEO Ellis and Mr. Kevin Ross. Our research revealed an August 5, 2010, Atlanta Journal-Constitution (AJC) article which states CEO Ellis had canceled three contracts since he took office. Two of the canceled contracts were associated with Mr. Kevin Ross. The contracts canceled by CEO Ellis were the DeKalb County Recorder's Court Probation Services contract with Judicial Correction Services (JCS) and the Care Ambulance contract. The third contract was not named in the AJC article.

The AJC article quoted Mr. Ross as being "a friend and an advisor to the CEO". The article states that Mr. Ross recommended to CEO Ellis the cancellation of the JCS contract. The article also indicated Mr. Ross was a consultant for Sentinel, which is a competitor of JCS. The article quoted Mr. Ross as stating "I did tell CEO Ellis to look into the procurement and he consider exercising the termination of the contract for convenience and to put it out to bid. I advocated and appealed to the County discretion to look at a procurement that is flawed". In the article, CEO Ellis acknowledged being contacted by Mr. Ross, but denied Mr. Ross having influence on CEO Ellis' decision to cancel the contract. It should be noted the "flawed" procurement related to the issuance of the contract to JCS took place

in 2008.

The Grand Jury heard testimony about the DeKalb County Recorder's Court Probation Services contract. According to that testimony, Judge Nelly Withers, Chief Judge of DeKalb County Recorder's Court, received a great deal of pressure from CEO Ellis and CEO Ellis' staff to terminate the current probation contract that is held by JCS. Purchasing and Contracting sent a letter to JCS without notifying Judge Withers that Purchasing and Contracting was terminating the JCS contract. Purchasing and Contracting, however, had no legal authority to terminate the contract, because that authority rests with the Court.

Judge Withers wrote a letter to CEO Ellis advising CEO Ellis that Purchasing and Contracting had no authority to terminate the JCS contract and that the actions of Purchasing and Contracting were illegal. After Judge Withers hand delivered the letter, the Director of Public Safety William "Wiz" Miller called her and screamed at her about the letter. Director Miller directed Judge Withers to stop accusing CEO Ellis of any illegal acts pertaining to the JCS contract. It should be noted, Director Miller has no statutory or administrative authority over Judge Withers.

The Grand Jury heard testimony that Judge Withers also contacted the DeKalb County Law Department in reference to the matter; however, no one had consulted with the Law Department on the termination of the JCS contract. The Law Department ultimately backed Judge Withers' legal opinion that only the Court had the legal authority to terminate the probation services contract. It should be noted that testimony from more than one witness associated with the Recorders Court indicated that there are no performance issues on the part of JCS to warrant contract termination.

After the aforementioned phone call with Director Miller, Judge Withers was called into a meeting with CEO Ellis, Chief Communications Officer Sheila Edwards, Chief of Staff Keith Barker, and other staff.   Judge Withers provided a copy of the statute that supported Judge Withers' findings on the issue. CEO Ellis stated that CEO Ellis would "give it" to the Law Department. CEO Ellis advised Judge Withers the law had been changed regarding Judge Withers' appointment and that Judge Withers could be fired for any or no reason (which is incorrect). Within a few weeks, Purchasing and Contracting rescinded the decision to terminate the JCS contract.

At a subsequent meeting on or about December 2011, CEO Ellis approached Judge Withers to ask "a personal favor". CEO Ellis asked that Judge Withers allow the probation services contract to go back out for bid.

### b) Cancellation of CARE Ambulance contract and issuance of emergency contract to Rural Metro

The Grand Jury discovered that Mr. Ross is also employed as a consultant with Rural Metro Ambulance, which was awarded an "emergency" contract in July 2010, after CEO Ellis terminated the contract with the previous vendor, Care Ambulance. Testimony heard by the Special Purpose Grand Jury indicates the decision to cancel the CARE Ambulance contract was not supported by the user the department, the Fire Department.  Additionally, the issuance of the emergency ambulance services contract to Mr. Ross' client, Rural Metro, was contrary to the recommended vendor selected by the user department.   The user department, after due diligence efforts, completed the Procurement and Contract Departments "Emergency Services" form necessary to request the issuance of an emergency contract and indicated its choice for the contract to be American Medical Response

43

("AMR").  The choice of AMR was communicated to the Public Safety Director, Wiz Miller and was also communicated to the Procurement and Contracts Department by the submittal of the "Emergency Services" form.  Within just a couple of days, and with no notification to the Fire Department, the CEO's Office issued a press release indicating that it had entered into an emergency contract with Rural Metro for ambulance services and that Rural Metro would begin providing said services in six (6) days.  The emergency contract issued to Rural Metro was for a term of one (1) year.  The original understanding by the user department was that the emergency contract for ambulance services would be only for a term of six (6) months — just long enough to have an RFP issued and permanent contract awarded for ambulance services.

In the article, Mr. Ross acknowledged being a consultant with Rural Metro Ambulance, but denied involvement in the termination of Care Ambulance. The article also reported that CEO Ellis toured Rural Metro's Arizona headquarters two months before canceling the ambulance service contract.

### 3. CEO Ellis directing the cancellation of contracts for punitive and political reasons.

#### a) Cancellation of the Cornelius Group's contract.

The Grand Jury also heard testimony about a marketing contract issued to The Cornelius Group in 2011.  The contract was associated with a project out of the Department of Watershed Management and Public Works Department.  The Cornelius Group's contract was canceled at the direction of CEO Ellis in March 2012.

According to that testimony, Ms. Cornelius supported CEO Ellis the first

44

time that he ran for DeKalb CEO. Ms. Cornelius subsequently served on CEO Ellis' transition team. During the time on the transition team, Ms. Cornelius grew to believe that CEO Ellis was not trustworthy and stopped supporting CEO Ellis. Ms. Cornelius did not like the way CEO Ellis treated certain people and she was very concerned that CEO Ellis would never make a decision without getting approval from his campaign manager, Mr. Kevin Ross. Additional testimony indicated that Mr. Ross had a close personal relationship with CEO Ellis' Chief Communications Officer, Shelia Edwards. (Note: witness testimony indicated that Ms. Edwards was very involved in the decision to terminate the CARE Ambulance contract and the awarding of the emergency contract to Rural Metro discussed above).

Ms. Cornelius made her lack of support of CEO Ellis public in late January or early February 2012 to Joel Alvarado, (a member of the CEO executive staff). Mr. Alvarado told Ms. Cornelius that he was going to report this to CEO Ellis. When Mr. Alvarado told CEO Ellis, CEO Ellis became angry. He cursed at Chief of Staff Jabari Simama when CEO Ellis found out Ms. Cornelius had a contract with DeKalb County. CEO Ellis then directed a County employee to cancel Ms. Cornelius' contract. The directive came with no discussion of the performance of the Cornelius Group under its contract.

The CEO provided false testimony to the Special Purpose Grand Jury regarding whether he had ever directed the cancellation of a vendor's contract due to the vendor's lack of political support for the CEO and/or its support of a political opponent to the CEO.

### b) Cancellation of the Collaborative Firm's contract.

The Special Purpose Grand Jury heard testimony that CEO Ellis canceled a contract with the Collaborative Firm, which is owned by Mr. Michael Hightower.

45

The testimony indicated the contract was likely canceled due to Mr. Hightower's association and political support of Ms. Barnes Sutton, a DeKalb County Commissioner who is sometimes at odds with CEO Ellis.

When he asked about the cancellation of his contract, Mr. Hightower was told his contract was canceled because of lack of funding. Mr. Hightower felt the cancellation was likely political in nature, because it is his experience that contracts are not awarded without funding already being available. Due to this, Mr. Hightower contacted CEO Ellis directly. In this conversation, CEO Ellis re-iterated the contract was canceled due to funding not being in place, but CEO Ellis also commented that CEO Ellis was not pleased that Mr. Hightower was supporting one of CEO Ellis political foes, Sharon Barnes Sutton.

The CEO provided false testimony to the Special Purpose Grand Jury regarding whether he had ever directed the cancellation of a vendor's contract due to the vendor's lack of political support for the CEO and/or its support of a political opponent to the CEO.

### c) Cancellation directive for the NPI Contract

The Special Purpose Grand Jury heard testimony from witnesses that CEO Ellis, in response to the Shealeys failing to be "responsive" to CEO Ellis' calls requesting campaign contributions, directed an employee of the Contracts and Procurement Department to effectively cancel the NPI contract. Recordings indicate that CEO Ellis gave the directive to "just dry them up," meaning to not issue any additional work to NPI under its contract.

The CEO provided false testimony to the Special Purpose Grand Jury regarding whether he had ever directed the non-issuance of work to a vendor due to the vendor's failure to return his calls for campaign contributions and/or failure to

46

proffer a contribution.

### d) Cancellation directive for the Power and Energy Services contract.

The Special Purpose Grand Jury heard witness testimony and recordings of CEO Ellis related to his directive to a Purchasing and Contracting employee to let the Power and Energy contract expire. This directive was given after the CEO became very upset after the owner of Power and Energy Services questioned why he should make a contribution to the CEO's political campaign. A subsequent conversation with the same employee reveals that the CEO directed that employee to relay to Department of Watershed Management Director Joe Basista that Power and Energy Services should not be utilized anymore under their new contract, because they are "not responsive". The CEO further directed the employee to place a note in Power and Energy's vendor file that were "not responsive" in the event the company tried to ever bid on future work with the Department of Watershed Management.

The Grand Jury notes that Power and Energy Services' pricing is significantly lower than that of the other company, Prime Power, who is under contract with DeKalb County to provide the same services. Thus the directive to no longer utilize Power and Energy Services comes at a financial detriment to DeKalb County.

The CEO provided false testimony to the Special Purpose Grand Jury regarding whether he had ever directed the non-issuance of work to a vendor due to the vendor's failure to return his calls for campaign contributions and/or failure to proffer a contribution.

47

**4. CEO Ellis dictating which individuals should be placed on selection committees for RFPs for which major campaign donors and/or clients of Kevin Ross will be submitting offers.**

### a) RFP for Consent Decree Program Management Services

The Special Purpose Grand Jury heard witness testimony and recordings of CEO Ellis that indicated that CEO directed an employee to place a certain individual on the selection committee for the Consent Decree Program Management Services RFP. CEO Ellis also directed this employee to submit all names to be on the committee to his Chief of Staff, Dr. Jabari Simama and to "check with Jabari" as to other specific individuals to be on the selection committee. After following the CEO's directive to this end, the employee then came back to the CEO for final approval of the members to be on the selection committee. Testimony provided to the Special Purpose Grand Jury indicated that a vendor submitting on the Consent Decree RFP was Montgomery Watson, a client of Kevin Ross'. Additionally, the Special Purpose Grand Jury heard testimony and recordings of individuals that represented that Mr. Ross and/or Sheila Edwards were actual subcontractors to Montgomery Watson for the project.

It should be noted that the CEO denied to the Special Purpose Grand Jury having ever directed the placement of an individual on an RFP selection committee.

48

**5. CEO Ellis interfering in the evaluation process for RFPs by discussing secret selection committee information with committee members during the active evaluation period;**

### a) Ambulance Services RFP

The Special Purpose Grand Jury heard testimony from more than one witness and recordings of the CEO that indicate that the CEO held at least two meetings with the chairman of the selection committee for the then pending RFP for Ambulance Services. The discussions in these meetings centered wholly on the status of the RFP submittal of Rural Metro, exceptions requested by Rural Metro to the RFP and contract requirements, and whether or not the County could break from its normal practice and enter into contract negotiations with the winning offeror after the award of the contract. As stated above, Kevin Ross is a consultant to Rural Metro. Additional recordings indicate that CEO Ellis, around the same time of his meetings with the selection committee chairman, was having ongoing discussions with Kevin Ross about the RFP issues related to Rural Metro (this aspect is discussed in further detail below).

The CEO provided false testimony to the Special Purpose Grand Jury as to the issue of whether he has ever met with a selection committee member to discuss issues related to a pending RFP for which an active evaluation was ongoing.

**6. CEO Ellis communicating with a submitting vendor and/or vendor representative during an active evaluation period for the related RFP about matters directly related to the pending RFP and subsequent contract award.**

49

### a)  Rural Metro (Kevin Ross)-Ambulance Services RFP

The Special Purpose Grand Jury heard testimony and recordings regarding the CEO's early investment and interest in the Ambulance Services RFP.  While the RFP was being advertised, prior to the county's acceptance of submittals by offerors, CEO Ellis requested a copy of the Ambulance Services RFP from an employee within the Contracting and Procurement Department.  He also requested that a copy of the RFP be provided to his Chief of Staff, Hakim Hilliard.  This was the first time known to this employee that the CEO wanted to receive and review an RFP issued by the county.  Both the CEO and the Chief of Staff received copies of the RFP per the request.

Additional recordings and testimony revealed conversations between CEO Ellis and Kevin Ross pertaining to Rural Metro's RFP submittal for the Ambulance Services contract.  CEO Ellis counseled Kevin Ross as to Rural Metro's options regarding whether to withdraw its exceptions that were submitted with its RFP submittal.  CEO Ellis, after disclosing that the other submitting vendors on the RFP either had not included any exceptions or already withdrawn their submitted exceptions, directed Kevin Ross to have Rural Metro withdraw all their exceptions. This is significant because if Rural Metro did not withdraw their exceptions, it would have been subsequently dropped from the ongoing RFP evaluation process and would not been in contention for consideration for the contract award.  As these discussions were ongoing, Rural Metro received three extensions to the time in which they were to declare its intentions with regards to its exceptions.  These extensions delayed the evaluation process and the issuance of the contract to the successful offeror — which is alarming especially considering the importance of the Ambulance Services contract to the citizens of the County.

50

After directing Rural Metro to withdrawal its exceptions, CEO Ellis then began to have conversations with Kevin Ross, staff and the selection committee chairman about possibly deviating from the normal RFP/Contracting process and allowing the winning vendor to "negotiate" its contracts terms after the award of the contract.   The normal process is to have the winning offeror sign the contract template that was included in the RFP issued and advertised by the County.

b)   **Massey Bowers (Lewis Massey)-State Lobbying Services RFP**

The Special Purpose Grand Jury heard testimony from more than one witness that leads to the reasonable conclusion that CEO Ellis was engaged in communications with Lewis Massey, partner of the lobbying firm Massey Bowers, regarding the pending RFP for State Lobbying Services during the evaluation period for the RFP.  Recordings of former staff for CEO Ellis indicate that "the plan" was to have Lewis Massey continue with its services despite its previous contract's expiration.   This same recording indicates that CEO Ellis received over ten thousand dollars ($10,000) in campaign contributions from the members of the Massey Bowers firm and that the firm was responsible for raising even more money for the CEO through others contacts.

The CEO provided false testimony to the Special Purpose Grand Jury as to the issue of whether he has ever discussed issues related to a pending RFP for which an active evaluation was ongoing with a submitting vendor or vendor representative.

**7. CEO interfering with and/or altering a selection committee's final recommendation (prior to submission to the Board of Commissioners) in favor of vendors represented by Kevin Ross or for vendors with a history of significant campaign contributions/raising significant campaign contributions for Mr. Ellis.**

### a) Ambulance Services RFP

The Special Purpose Grand Jury heard recordings of the CEO and heard testimony from witnesses that yield information as to CEO's intentions to interfere and possibly alter the selection committee's recommendation of AMR for the Ambulance Services Contract. One recording indicates that the CEO is waiting to receive materials from Kevin Ross related to ambulance response times so as to refute the representation by AMR in its RFP submittal that it can meet the required response time indicated in the RFP issued by the County. Additionally, over the objections of the Director of Contracting and Purchasing and the Chief of Staff, the CEO attempted to manufacture reasons for the termination of the entire RFP process "based on technical deficiencies". Witness testimony indicated that had Rural Metro received the recommendation, the CEO would not be involved in these conversations and would certainly not be calling for the entire process to be thrown out.

### b) State Lobbying Services RFP

The Special Purpose Grand Jury heard recordings of the CEO and others and heard testimony from witnesses to indicate that the CEO, upon learning that Massey Bowers did not receive the recommendation for contract award for the state lobbying services work, was questioning the criteria used included in the County's RFP and the validity of the recommendation. Witness testimony

52

indicated that had Lewis Massey received the recommendation, the CEO would not be involved in these conversations and would certainly not be calling for the entire process to be thrown out.  If the entire process is thrown out, recordings and witness testimony indicate that the plan was then to issue an emergency contract to Massey Bowers for the work.  Since the execution of search warrants by the District Attorney's Office, this plan has been abandoned by the CEO.

53

## DETAILED RECOMMENDATIONS OF THE 2012 SPECIAL PURPOSE GRAND JURY

After the conclusion of twelve months of testimony and receiving evidence, including recordings, the 2012 Special Purpose Grand Jury makes the following recommendations::

### A. Recommended Indictments

The 2012 Special Purpose Grand Jury strongly recommends the indictment of the following person:

#### 1. Burrell Ellis

Lying to the Special Purpose Grand Jury pertaining to the following matters:

- directing the cancellation of contracts or the non-issuance of work to vendors for punitive and political reasons
- dictating which individuals should be placed on selection committees for RFPs for which major campaign donors will be submitting offers
- interfering in the evaluation process for RFPs by discussing secret selection committee information with committee members during the active evaluation period
- communicating with a submitting vendor and/or vendor representative during an active evaluation period for the related RFP about matters directly related to the pending RFP and subsequent contract award

54

- interfering with and/or altering a selection committee's final recommendation (prior to submission to the Board of Commissioners) in favor of vendors represented by Kevin Ross or for vendors with a history of paying significant campaign contributions/raising significant campaign contributions for Mr. Ellis.

## B. Recommended further Criminal Investigation

The 2012 Special Purpose Grand Jury strongly recommends that the District Attorney criminally investigate the following individuals for possible indictment as to the listed topics:

### 1. Burrell Ellis

- soliciting campaign contributions under the color of his title as CEO with vendors that have a just approved or pending contract with DeKalb County;
- canceling or attempting to cancel contracts in order to create an "emergency situation" for which an emergency contract can then be issued to another vendor without a competitive process;
- directing the cancellation of contracts or the non-issuance of work to vendors for punitive and political reasons;
- dictating which individuals should be placed on selection committees for RFPs for which major campaign donors will be submitting offers;
- interfering in the evaluation process for RFPs by discussing

secret selection committee information with committee members during the active evaluation period;

- communicating with a submitting vendor and/or vendor representative during an active evaluation period for the related RFP about matters directly related to the pending RFP and subsequent contract award;

- interfering with and/or altering a selection committee's final recommendation (prior to submission to the Board of Commissioners) in favor of vendors represented by Kevin Ross or for vendors with a history of paying significant campaign contributions/raising significant campaign contributions for Mr. Ellis.

**2. William "Wiz" Miller**

- Obstructing a criminal investigation

**3. Jabari Simama**

- Manipulation of selection committee process
- Perjury
- Bid Rigging

**4. Roy Barnes**

- Bid Rigging
- Kickbacks
- Perjury

56

### 5. Hadi Haeri

- Theft
- False writings
- Perjury
- Bid Rigging

### 6. Nadine Maghsoudlou

- Theft
- False writings
- Perjury
- Bid Rigging

### 7. Vernon Jones

- Bid Rigging
- Theft

### 8. Paul Champion

- Manipulation of the ITB process
- False writings
- Theft
- Perjury

### 9. Kevin Ross

- Interference with government operations
- Manipulation of the RFP/ITB process
- Bid Rigging

**10. Jeffrey Walker**

- Theft

- Bid Rigging

- Perjury

**11. Christian Vann**

- False writings

**12. John Willis and, possibly, other individuals with Brown & Caldwell**

- Theft

- Bid Rigging

- Perjury

## C. Reorganization of County Government

The Special Purpose Grand Jury recommends that the fundamental structure of DeKalb County government be changed. The current system of an elected Chief Executive Officer and seven part-time district commissioners does not provide adequate representation to the citizens of the County. The current system, with its over-reliance on County staff and departments who ultimately report to an elected official, provides too many opportunities for fraudulent influences and fosters a culture that is overly politicized and in which inappropriate business relationships are created.   Inept policies and procedures and an attitude of non-compliance with same has been a strong thread throughout our investigation.

The Special Purpose Grand Jury strongly urges and requests that the DeKalb Delegation, per Section 23 of the DeKalb County Organizational Act, take immediate steps to initiate a process to revise the Organizational Act and/or take other appropriate measures in pursuit of the below recommendations:

The Special Purpose Grand Jury strongly recommends the immediate removal of Burrell Ellis as CEO of DeKalb County and the elimination of the office of CEO.  The CEO position, an elected position, creates an unnecessary layer of politics within our government for which the return to the citizens of DeKalb County is minimal.  The true facilitation of running the government already lies with the Executive Assistant to the CEO (who also has reporting responsibilities to the Board of Commissioners).

59

The Special Purpose Grand Jury recommends making all current County commission seats full-time positions. Essential to this concept would be that commissioners would be adequately compensated and would be prevented from having any undocumented outside business interests which could potentially conflict with their responsibilities to govern. The expectation of these full-time commissioners would be that they would have the opportunity to be better informed and make better decisions on behalf of their constituents. This system would also help to eliminate potential conflicts between their private life and public responsibility.

The Special Purpose Grand Jury strongly recommends that the position of Director of Public Safety be eliminated immediately. It should be noted that testimony heard by the Special Purpose Grand Jury revealed that some police officers report directly to the Director of Public Safety and not to an employee of the police department. This arrangement calls into question the true function of the Director's role and creates unnecessary tension and bureaucracy within the police department. This Grand Jury finds that the Office of Public Safety Director is not necessary and only hinders the ability of the Police Chief to properly manage the Police Department in all aspects. More importantly, as a political appointee of the CEO, the position and its functions runs the risk of becoming a repository of "internal investigations" where cases can be hidden and never see the light of public scrutiny. We recommend the position of Public Safety Director be eliminated immediately.

The Special Purpose Grand Jury recommends that the Purchasing and Contracting Department be reorganized in a way that proper subject matter experts are overseeing various areas of the procurement and contracting

process. For instance, contracting officers or attorneys with knowledge of the Georgia Competitive Award Statutes (and other related public construction statutes) should be solely focused on contracts subject to those statutory requirements. Other contracting officers should be solely focused on procurement procedures and the issuance of contracts related to goods and those services not related to public construction projects.

Along these lines, the Special Purpose Grand Jury strongly encourages that the contracting and procurement polices be revised so that the ITB and the RFP process called for by the state competitive award statutes be adopted by the county for all contract awards, including those that are not related to the public construction projects. In doing so, a uniform process can be applied to the ITB and RFP process used in the county regardless of the type of contract to be awarded and/or for what type of project a contract is covering. Lastly, following the RFP process laid out in the competitive award statues will require the opening of price before short listing of vendors and interviews. In doing so, the selection committee can engage in negotiations with vendors during said interviews (and in subsequent Best and Final Offers) that could result in better services and better pricing for the County.

The Special Purpose Grand Jury strongly recommends that the Organizational Act be revised so that Sections 18 and 22 fully incorporate by reference the purchasing and contracting policies and procedures manual (which should also be modified per the above recommendation regarding changes to the ITB and RFP process to be used). In addition, it is recommended that specific acts be made illegal and recognized as a misdemeanor per local ordinance including the following: communication by a

61

selection committee member to any vendor submitting on the RFP or RFQ that is being evaluated by the committee member; communication by a selection committee member to any individual outside of the selection committee for the purposes of influencing or otherwise altering the status of a submitting vendor or the outcome of the selection committee's recommendation; receipt of gifts by a vendor with a current contract with the county or that is a potential offeror on an advertised RFP or RFQ, and the purposeful communication by any individual to a known selection committee member for the purpose of discussing selection committee information prior to recommendation and/or influencing the selection committee process and outcome.

### D. Fundamentally change or otherwise eliminate the LSBE Program

The Special Purpose Grand Jury strongly recommends that the current LSBE Program (and the applicable ordinance regarding same) be significantly revised or otherwise eliminated altogether.   The LSBE mandates were intended to serve a laudable purpose: to open greater opportunities for participation in government-funded contracts by local small businesses.   The achievement of this purpose, according to testimony heard by the Special Purpose Grand Jury, has not happened and is not actively tracked in a meaningful way by the Purchasing and Contracting Department.

Over the years this program has become susceptible to fraudulent practices by those trying to take perverse advantage of them and the millions of DeKalb dollars that flow from them. One common abuse has featured non-LSBE firms who partner with, and sometimes create, sham firms who meet

62

LSBE eligibility criteria on paper but who perform no actual work — or, in the words of LSBE regulations, perform no "commercially useful function" — on the government-funded project.

The Special Purpose Grand Jury heard multiple times about a general contractor submitting paperwork indicating that the LSBE is properly certified and is performing the contracted work, but the general contractor actually performed the work with its own forces. Here, a general contractor may run the payroll through the LSBE to create the illusion that employees are working for the LSBE. The LSBE is usually paid a small sum and the LSBE allows the use of its name on invoices, trucks, and equipment to create the appearance of LSBE participation (thus allowing the prime contractor to receive the extra bid points allotted to prime contractors who make use of an LSBE for 20% of the contracted work). The Grand Jury finds that in this case, the LSBE is a mere pass-through performing no commercially useful function and, in certain instances, their presence only added additional costs to the project and to the County.

The Special Purpose Grand Jury finds that the following are "red flags" of LSBE abuse:

- Contracts for work for which LSBE has no previous history, licenses, or equipment
- LSBE has no business office and little equipment
- LSBE business owners absent for job
- Ghost employees or certified payroll irregularities
- Small LSBE contractors in unusual businesses

63

- General contractors always using the same LSBE (and the LSBE provides a different function under different contracts)

The Special Purpose Grand Jury recommends the elimination of this program and retraction of the LSBE ordinance. In the alternative, if the program is to stay in place, the following are recommended measures for correcting the program:

- The program must be funded well enough to ensure compliance to the program's criteria by those LSBEs seeking certification. Those criteria should include the following:

- Revenues (based on verified, certified financial statements)

- Location (with primary office verified by submission of documents to include insurance documents, bills, etc.)

- Area of focus by the LSBE (for which a pre-qualification process should be established and verified)

- Implement a Semi-Annual Prequalification Process that allows companies to seek LSBE certification upon approval of qualified status — the process should certify LSBE firms only in the substantive areas of work for which the County has verified (through the prequalification process) that the company can actually perform;

- Increasing staffing in the County's administration of the LSBE program and also changing its culture so that employees understand that their mission includes not only assisting small local businesses in obtaining work in DeKalb but also ensuring accountability and integrity to prevent

64

fraudulent and improper actions from depriving procurement opportunities for legitimate firms seeking to actually perform work under a subcontract with a prime contractor with the County;

- Provide discretion to the Purchasing and Contracting Department as to which contracts the LSBE bid/RFP requirement and advantage will apply. Testimony from various employees of the department agreed that this change is necessary.

- Include harsh penalties to the prime contractors that do not properly utilize LSBEs on a contract. Also provide for de-certification of a LSBE company (and its owner) when a pass-through arrangement is uncovered.

### E. Internal Audit Activity Independent of the CEO or Management

As stated above, to maintain objectivity, internal auditors should have no personal or professional involvement with or allegiance to the area being audited, and should maintain an un-biased and impartial mindset in regard to all engagements.

The Special Purpose Grand Jury recommends the revision of Section 10, subsection D of the Organizational Act to reflect the following. The internal audit function should report to the Board of Commissioners. The function is to review the conduct of CEO/BOC or any Department. This activity can create significant tension since independence is necessary for the auditor to objectively assess the actions of the entity being audited.

Therefore, the internal audit activity should have a mandate through a

65

written audit charter that establishes its purpose, authority, and responsibility to support its independence and objectivity within DeKalb County and its various Departments. The internal auditors should have access to records and personnel as necessary, and be allowed to employ appropriate probing techniques without impediment.

Internal auditors should not assume any operational responsibility. Objectivity can be presumed to be impaired when internal auditors perform an assurance review of any activity for which they had any authority or responsibility within the past year or a period significant enough to influence their judgment or opinion. Internal auditors should not accept gifts or favors from others such as employees, clients or business associates.

The internal auditors should adopt a policy that endorses their commitment to abiding by the Code of Ethics, avoiding conflicts of interest, and disclosing any activity that could result in a possible conflict of interests.

## F. Training for the County Employees

The Special Purpose Grand Jury encourages all Board of Commissioners and Procurement officers that work in our government to become more knowledgeable to the various forms of collusion. Most criminal antitrust prosecutions involve activity known as "bid rigging" or "price fixing". It is not necessary that the conspirators entered into a formal written or express agreement. Price fixing, bid rigging and other collusive agreements can be established either by direct evidence, or by circumstantial evidence, such as suspicious bid patterns, travel and

66

expense reports, telephone records, e-mails and business diary entries.

**G. Ethics Reform**

We heard testimony concerning DeKalb County elected officials and employees accepting meals, gifts, money, trips and other compensation from vendors, lobbyists and others that greatly concerned the Special Purpose Grand Jury. The Special Purpose Grand Jury recommends that the County maintain a registry of lobbyists and business consultants working on behalf of vendors doing business with the County. The County needs to adopt policies and practices to monitor and enforce the access and influence afforded these lobbyists and consultants.

We are all members of DeKalb County. In this country, governmental organizations derive their authority from the trust and confidence placed in it by its citizens. Without this trust, representative democracy could not exist, either because people would not respect the authority of their institutions, or because government would usurp that authority for itself, and cease acting in the interests of its citizens.

A critical task of DeKalb County government officeholders and employees is to preserve and protect the public's trust in government. Like any trustee, government officeholders and employees owe a special duty of care to those who place the institutions and resources of government under our management and control.

The Special Purpose Grand Jury has heard sufficient testimony to

67

conclude that a comprehensive and enforceable code of ethics should be a priority for DeKalb County Government. This code of ethics will address gifting, transparency and other regulations.

Public officeholders and employees need to have an understanding of what will or will not constitute proper behavior in their jobs. Ethics provides the roadmap for behavior that promotes essential public trust in government. Ethics is of such importance that our recommendation is for DeKalb County to create a full time Ethics Officer position, supported with proper departmental resources, that reports to the Board of Commissioners. The sole purpose of this position and department will be to establish and enforce new ethical guidelines for employees, vendors and elected officials. As a point of reference, we have reviewed the Ethical Guidelines for Employees of the City of Atlanta and the United States Government Executive Branch Code of Ethics. These documents can be found at the following locations:

**U. S. Government:**
http://www.pacom.mil/documents/pdf/newcomers-code-of-ethics[1].pdf

**City of Atlanta:**
http://www.atlantaga.gov.index.aspx?

We would like for the new Ethics Officer to use this information as a model for establishing Ethical Guidelines for DeKalb County.

The current Board of Ethics established by the Organizational Act is inept for many reasons. Most pertinent, the members of the Board are political appointees. The Special Purpose Grand Jury notes that the Board of Ethics website has not been updated since 2010 and lists its last meeting having been in

68

November of 2010.

## H. Transparency

The Special Purpose Grand Jury recommends the establishment of a website for greater transparency. The Special Purpose Grand Jury recommends for consideration two such websites. For example, the State of Nebraska's budget transparency website[3]– "Nebraska Spending"– which was created in July 2007 as part of several accountability reforms initiated by their State Treasurer's office. The website allows Nebraskans to access state revenue and spending information in a straightforward and comprehensible format. The website includes:

- **Fiscal Year Expenditures**
  Which provides transaction-level detail on the expenditures made by the state. Such information is formatted in a searchable database that can target spending down to accounts such as "Board & Lodging".

- **Current Fiscal Year Budget**
  Which includes a pie chart that details each agency's percent of the state's overall appropriation, as well as definitions of the different funds that provides resources to each agency.

- **Source of Funds**
  Which shows the dollars received, the source of dollars, and a historical comparison using bar graphs.

Internationally, the Ministry of Infrastructure in Ontario, Canada launched a

---

[3]http://nebraskaspending.com/

69

website to allow users to track the progress of recently announced infrastructure stimulus projects in their community and across the province.[4] The website provides another model/example to provide greater transparency and accountability to residents regarding infrastructure stimulus funding by highlighting the citizen's contribution towards projects, tracking construction progress and providing regular updates on new investments. This website also provides interactive maps of infrastructure projects, webcams of jobsites, and videos with more information on projects. The "By the Numbers" section of the site uses graphs and charts to detail how infrastructure dollars are being spent across broad categories of spending.

## I. Asset Management

The Special Purpose Grand Jury has heard sufficient testimony and seen enough evidence to conclude that the Department of Watershed Management's internal controls were inadequate to ensure that assets were properly accounted for and safeguarded. During our visit to the Wastewater treatment facility and the questioning of its employees, the Special Purpose Grand Jury witnessed and saw an abysmal lack of inventory control or monitoring equipment. Indeed, during our tour, the Special Purpose Grand Jury witnessed a sewage spill actively occurring near Snapfinger Creek which was unknown to the employees until we arrived at the scene. Worse, it was unknown how long this raw sewage had been spilling. This is simply

---

[4] https://www.infrastructureapp.mei.gov.on.ca/en/

70

unacceptable.

Understanding the vulnerability of physical assets, consequently, will provide a clearer picture of the vulnerability of other assets. During the past year, this Special Purpose Grand Jury heard testimony and saw media accounts of employee thefts in DeKalb County. We did not see sufficient measures in place for the protection of the Department of Watershed Management's assets. Protecting the County's physical assets often will serve as a first step in protecting many of its other assets.

Related to the protection of the physical assets of our Department of Watershed Management is the actual maintenance of these assets. This Special Purpose Grand Jury was comprised of citizens with varied backgrounds to include – management and operations of various companies. Business experience dictates that maintenance is the key to the sustainability of every water and wastewater system. A preventive maintenance program, combined with good operational practices, will reduce the need for much corrective or emergency maintenance. A good preventive maintenance program will service not only mechanical and electrical equipment, but also the distribution and collection systems, as well as grounds and buildings.

## J. Corporate Credit Card use and P-Cards

All officials that are capable of being issued a P-Card should only be issued a P-Card for official purposes. Any other extraneous credit card currently held and funded by County by an employee or official of the County should be eliminated. The Special Purpose Grand Jury has been made aware of the fact that CEO Ellis has a corporate card funded by the County that is not under the P-Card

71

restrictions.  The Special Purpose Grand Jury takes great exception to this.

## K. Information Technology

The Special Purpose Grand Jury recommends that the IT organization and all its functions be outsourced to a private company for management and enhancement.

72

## CONCLUSION

Customers are the lifeblood of the utility and the purpose of the utility's existence. As with day-to-day operations, the utility should strive to meet, and if possible, exceed customer expectations when it comes to evaluating vulnerabilities, planning for emergencies and responding to, and recovering from disasters. Communications, service continuation, and financial integrity are the focus of assuring that this very important asset is protected.

Based upon the evidence gathered during the course of our investigation, the Special Purpose Grand Jury, as a group of citizens, has been increasingly concerned about the path that DeKalb County government is on. We have seen decisions involving millions of dollars made with little or no information or for the most venal reasons.

As interested citizens we have carefully considered our decisions and recommendations. It is now up to the elected leaders of DeKalb County to carefully consider these recommendations and implement those they believe would best serve the public interest.

In many ways, DeKalb County is still a great place to live, work, and raise our children but in order to remain great, changes must be made.

In addition to the publication of presentments, we recommend that a copy of these presentments be delivered to:

Mr. Burrell Ellis, CEO, DeKalb County

73

Ms. Elaine Boyer, DeKalb County Board of Commissioners, District 1

Mr. Jeff Rader, DeKalb County Board of Commissioners, District 2

Mr. Larry Johnson, DeKalb County Board of Commissioners, District 3

Mr. Sharon Sutton, DeKalb County Board of Commissioners, District 4

Mr. Lee May, DeKalb County Board of Commissioners, District 5

Mr. Kathie Gannon, DeKalb County Board of Commissioners, District 6

Mr. Stan Watson, DeKalb County Board of Commissioners, District 7


Done this 18th day of January, 2013

By the Special Purpose Grand Jury

74

**Acknowledgements, Thanks, and Request for Discharge**

From the beginning, each individual Special Purpose Grand Jury member believed that he/she was engaged in important work. It was our goal as a body to determine whether or not the elected officials and County employees were making decisions that were ethical, legal and otherwise in the best interests of the citizens of DeKalb County. This task was undertaken at no small price, both personally and financially, by each Special Purpose Grand Jury member.

The Special Purpose Grand Jury wishes to thank and commend many of the witnesses who appeared before us, including members of the County staff who brought records for our review and prepared for their testimony by looking at notes to assist us. The ability of this Special Purpose Grand Jury to make meaningful recommendations that are intended to clean up our County government, promote fair and transparent processes and procedures, and ensure the best services for the citizens of DeKalb County hinged on the veracity of the testimony provided by witnesses.

It is unfortunate that the former Chief Executive Officer, Vernon Jones, refused to provide meaningful testimony to the Special Purpose Grand Jury. His refusal to answer questions related to his structuring of the County government, the appointment of unqualified friends to high-ranking positions (including the Department of Watershed Management), his relationships with outside vendors, in particular "business developer" Jeffrey Walker (whose brother was a high-ranking Department of Watershed Management official up to the time of his death in late 2007 and whose sister was a Jones appointee as Chief Judge of Recorders Court)

75

and as to other matters of great concern certainly led the Special Purpose Grand Jury to conclude that he has something to hide.  Mr. Jones had an opportunity to assist this Special Purpose Grand Jury in its efforts to address and make right the many flaws of his administration.  He failed to rise to the occasion.

In light of the huge amount of testimony heard and our review of voluminous documents and records, this Special Purpose Grand Jury is certain that numerous witnesses lied under oath as to matters related to procurement and contract manipulation, kickbacks, and abuse of the County's Local Small Business and Minority Business program.  To the extent possible, the Special Purpose Grand Jury believes these individuals should be criminally investigated further by the District Attorney's Office.

The Special Purpose Grand Jury wishes to express our appreciation to District Attorney Robert James, to Assistant District Attorneys John Melvin, Kellie Hill, Cynthia Hill, and to Investigators Clay Nix, Crispin Henry, and Jerald Dalton for providing legal guidance and investigative support.  Additionally, we thank Kim Ackerman and Jamita Vortice-Bowden for their administrative support throughout the term of the Special Purpose Grand Jury.

We also want to express our appreciation to court reporter Mary K. McMahan.  Lastly, we thank the DeKalb County Sheriff's staff for their professionalism and their support provided to the Special Purpose Grand Jury.  In particular, Deputy Small is an exemplary representative of the Sheriff's Department and was a pleasure to work alongside.

That being said, it is our purpose that the citizens of DeKalb County know

76

the results of our investigation, hear our recommendations, and that the Judges of the Superior Court consider our work complete.

77

## WITNESSES TESTIFYING BEFORE THE 2012 SPECIAL PURPOSE GRAND JURY

Ajy, George
Ajy, Kimberly
Albuquerque, Hector
Allen, Dion
Alvarado, Joel
Amato, Michael
Barnes, Roy
Basista, Joe
Bekele, Yafet
Bell, Dr. James Michael
Bennett, Barry
Bocarro, Robert
Broome, Yolanda
Carruth, Sgt. Jerry
Champion, Paul
Chatterjee, Jib
Coffin, Sgt. Bruce P.
Cole, Claude
Cornelius, Brenda
Crowe, Sgt John
Cummings, Brandon
Cummings, Danice
Daftarian, Terri
Daniel, Rick
Ellis, Burrell
Figueroa-Fred Det. Alexander
Gallemore, David W.
Gudowicz, Chester
Haeri, Hadi
Hall, Nina
Harris, Ken
Hightower, Michael
Hilliard, Hakim
Idowu, Omotayo
Jacobs, Larry
Jones, Vernon
Kung'u, Dr. Francis
Lambert, Charles
Lane-Woodard, Dep Chief
Annette
Lindsey, Angela
Linkous, Bill
Macrina, Joanne
Maghsoudlou, Nadine
Malone, William
Mason, Charles
Medlin, Lt. Craig
Miller, William (Wiz)
Mohammad, Sartaj
Morris, Chris
Oak Sgt, Daniel DCPD
O'Brien, Chief Eddie

O'Brien, Chief William
O'Mard, Eugene
Nix, Clay
Payton, Det. Jaime
Phillips, Terry
Reeves, Mike
Rhinehart, Ted
Robles, Eneida
Rogers, Kurlis
Roy, Samit
Saunders, Kenneth
Simama, Jabari
Sirdah, Ismail
Shaw, Doyle
Shealey, Gregory
Shealey, Trina
Sheffield, Merri
Stanfield, Sgt. Shane- DCPD
Stewart, Phyllis
Stogner, Richard
Taylor, Eugene
Taylor, Tony
Thompson, Mark
Thompson, Troy
Trabue, Dana
Van Gundy, BJ
Vann, Christian
Walker, Jeff
Walker, Joy
Walker, Sharon
Walton, Kelvin
Ware, Judy
Williams, Felton
Williams, Karen
Willis, John
Withers, Judge Nelly
Wright, Debra
Zarreii, Merat

ALBERT TRUJILLO, FOREMAN

KATHARYNE FOWLKES MENSAH,

ASSISTANT FOREMAN

CATHERINE O. SCHEFFER, SECRETARY

JANET HORTON, ASST. SECRETARY

GEORGIA MAE BROCK
JOYCE A. BROWN
KEVIN CARRAGHER
NANCY CHAMBERS
ALAN CRAVEN
BARRETT CROSS
JIMMY F. DAVIS
JEFFREY J. ENGELKING
CLEMENT GRIFFIN
ROBERT E. HICKS
WALTER HOUSTON
NYOKA KIMBRO
GLORIA A. MCCLAIN
ERIC D. MONGERSON
EDGAR L. SARDEN
VICKIE L. SCOTT
WYNESHIA SIMS
KIMBERLY M. WILSON
NYKKI I. YOUNG

**CERTIFICATE OF SERVICE**

This is to certify that the undersigned has this day served a true and correct copy of the

above via Electronic and United States Mail upon:


Fani T. Willis
Will Wooten
District Attorney's Office
136 Pryor Street SW, 3rd Floor
Atlanta, Georgia 30303
Fani.willisda@fultoncountyga.gov
Will.wooten@fultoncountyga.gov


DATED this the 23rd day of January, 2023