# EXHIBIT B-145

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

ORIGINAL

IN RE: SPECIAL PURPOSE      )      Case No.: 2022-EX-000024
GRAND JURY                  )
                            )
                            )      Hearing Requested
                            )

FILED IN OFFICE

MAR 20 2023

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

## MOTION TO QUASH THE SPECIAL PURPOSE GRAND JURY REPORT, TO PRECLUDE THE USE OF ANY EVIDENCE DERIVED THEREFROM, AND TO RECUSE THE FULTON COUNTY DISTRICT ATTORNEY'S OFFICE

Comes now, President Donald J. Trump, by and through undersigned counsel and files this Motion to Quash the Special Purpose Grand Jury Report and Preclude any State prosecuting agency from presenting or utilizing any evidence or testimony derived by the Special Purpose Grand Jury (hereinafter "SPGJ") in the above-referenced matter. Movant additionally requests that the District Attorney's Office be disqualified from any further involvement in this matter. This motion is based on the Fifth and Fourteenth Amendments to the United States Constitution and Ga. Const. Art. I, § I, Paras. I and XVI, and all other applicable federal and state laws.[1]

By agreement of the Fulton County Superior Court bench, Chief Judge Christopher Brasher authorized the impaneling of the special purpose grand jury, assigned its supervision to Judge Robert McBurney (hereinafter "Supervising Judge"), and the SPGJ was subsequently dissolved on January 9, 2023. Because this motion raises issues as to the governance of the SPGJ and the propriety of the Supervising Judge's conduct, Movant respectfully requests this motion be heard by the judicial officer responsible for impaneling the SPGJ, the Chief Judge, or a duly assigned Fulton County Superior Court judge other than the Supervising Judge. Undersigned Counsel requests a hearing on the matters set forth below.

---

[1] Hereinafter, said violations will collectively be referred to as "Fifth Amendment violations."

**TABLE OF CONTENTS**

I.     INTRODUCTION..................................................................................6

II.    STANDING.......................................................................................10

III.   THE GEORGIA STATUES AUTHORIZING THE USE OF A SPECIAL
PURPOSE GRAND JURY ARE UNCONSITUTIONAL.................................13

    A. The Statutes are Unconstitutional Due to Vagueness................................15

        i.  The Statutes Are Vague as to Whether the SPGJ is a Civil or
Criminal Body.....................................................................16

        ii.  The Statutes Are Vague as to the Contents and Release of the
Report(s)............................................................................19

    B. The Statutes are Unconstitutional As Applied to This SPGJ.........................21

        i.  The Supervising Judge Improperly Designated the SPGJ as a
Criminal Investigative Body when Case Law Mandates it is
Civil...................................................................................22

        ii.  The SPGJ Improperly Compelled the Appearance and Testimony
of Out-of-State Witnesses.......................................................25

    C. The Statutes were Unconstitutionally Applied to this SPGJ if Classified as
Criminal.............................................................................26

        i.  The FCDA's Arbitrary Use and Subsequent Abandonment of
"Target" Statuses Violated Principles of Fundamental Fairness.....27

        ii.  Jurors Improperly Drew Adverse Inferences from Witnesses'
Invocation of the Fifth Amendment..........................................30

IV.   THE FULTON COUNTY DISTRICT ATTORNEY'S OFFICE MUST BE
DISQUALIFIED..................................................................................31

    A. The Supervising Judge Should Have Disqualified the FCDA from the Entire
Investigation Rather than Just a Witness...........................................33

    B. The FCDA's Public Statements Violate Prosecutorial Standards, Constitute
Forensic Misconduct, and Create the Appearance of Impropriety Requiring
Disqualification....................................................................36

        i.  The FCDA's Statements to the Press Violate Prosecutorial
             Standards and Constitute Forensic Misconduct..........................37

        ii.  The FCDA's Online Activity Violates Prosecutorial Standards
             and Creates the Appearance of Impropriety.............................39

V.     THE PUBLIC COMMENTS MADE BY THE FOREPERSON AND GRAND
        JURORS REVEAL THAT THE GRAND JURY PROCEEDING WAS TAINTED
        BY IMPROPER INFLUENCES, INCOMPLETE OR INACCURATE
        INSTRUCTIONS, AND UNCONSTITUTIONAL INFERENCES........................43

VI.    THE SUPERVISING JUDGE VIOLATED THE RIGHTS OF PARTIES
        IMPACTED BY THIS INVESTIGATION.................................................48

        A.  The Supervising Judge Made Prejudicial Statements Regarding Witnesses'
           Invocation of the Fifth Amendment.................................................48

VII.   CONCLUSION.....................................................................................50

# INDEX OF EXHIBITS

**Exhibit 1**: January 24, 2021 Order Approving Request for Special Purpose Grand Jury, In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

**Exhibit 2**: January 20, 2021 Letter Requesting Special Purpose Grand Jury.

**Exhibit 3**: Transcript of January 24, 2023 Special Purpose Grand Jury Hearing before the Honorable Robert C.I. McBurney, Atlanta Georgia, In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

**Exhibit 4**: July 25, 2022 Order Disqualifying District Attorney's Office as to Senator Jones Only, In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

**Exhibit 5**: List of Fulton County District Attorney's Media Appearances and Social Media Posts.

**Exhibit 6**: January 9, 2023 Order Dissolving Special Purpose Grand Jury and Setting Hearing on Publication, In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

**Exhibit 7**: February 13, 2023 Order Re: Special Purpose Grand Jury's Final Report, In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

**Exhibit 8**: List of Foreperson's Media Appearances.

**Exhibit 9**: List of Supervising Judge's Media Appearances.

**Exhibit 10**: August 29, 2022 Order Denying Motion to Quash (Governor Kemp), In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

**Exhibit 11**: Transcript of August 25, 2022 Special Purpose Grand Jury Hearing

4

before the Honorable Robert C.I. McBurney, Atlanta Georgia, In re 2 May 2022
Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

**Exhibit 12**: Transcript of July 25, 2022 Special Purpose Grand Jury Hearing
before the Honorable Robert C.I. McBurney, Atlanta Georgia, In re 2 May 2022
Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

**Exhibit 13**: August 25, 2022 Order Denying Motion to Reconsider Disqualification Request, In
re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

**Exhibit 14**: July 11, 2022 Certificate of Material Witness Pursuant to the Uniform Act to Secure
the Attendance of Witnesses from Without the State, Codified in the State of Georgia as OCGA
24-13-90 et seq (Lindsey Graham), In re 2 May 2022 Special Purpose Grand Jury, Case No.
2022-EX-000024 (Fulton Co. Sup. Court).

**Exhibit 15**: August 25, 2022 Certificate of Material Witness Pursuant to the Uniform Act to
Secure the Attendance of Witnesses from Without the State, Codified in the State of Georgia as
OCGA 24-13-90 et seq (Mark Meadows), In re 2 May 2022 Special Purpose Grand Jury, Case
No. 2022-EX-000024 (Fulton Co. Sup. Court).

**Exhibit 16**: January 16, 2023 Ordering Entering Portions of Special Purpose Grand Jury's Final
Report into Court Record, In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-
000024 (Fulton Co. Sup. Court).

## I.  **INTRODUCTION**

On January 24, 2022, the Chief Judge of the Fulton County Superior Court entered an order approving the request made by the Fulton County District Attorney's Office (hereinafter the "FCDA's Office") to impanel a special purpose grand jury pursuant to O.C.G.A. § 15-12-100 et. seq. Ex. 1. The order of the Court merely echoed the recitation of need outlined by the FCDA's Office in their letter to the Court which specified:

> [A] special purpose grand jury [should] be impaneled for the purpose of investigating the facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia. Ex. 2.

The letter informed the Court that this rarely used investigative body was necessary because the FCDA's Office anticipated that the investigation would be a lengthy, complex process which a regular sitting grand jury wouldn't be able to complete in addition to their regular duties. *Id.* In the letter, the FCDA's Office made it abundantly clear that they understood that this SPGJ would be without authority to return an indictment. *Id.*

The laws that authorized this special purpose grand jury have existed in the Georgia Code since 1974 but have rarely been utilized and even more rarely litigated. The statutes themselves are vague and have left much to interpretation; further, the case law regarding the process and function of the special purpose grand jury is similarly scant, unclear and sometimes contradictory. This is the framework within which the FCDA's Office has chosen to undertake this investigation of undoubtedly historic and national significance. This is the framework which has been revealed through this process to be erroneous and, more importantly, unconstitutional.

For approximately eight months, the SPGJ met at the direction of the FCDA's Office. Pursuant to the impaneling order, the Supervising Judge was tasked with overseeing and assisting the SPGJ as well as charging said grand jury and receiving its reports. Ex. 1. The SPGJ considered evidence and heard from over 75 witnesses all within the walls of the Fulton County Justice Center. Ex. 3 at 6 (special purpose grand jury heard testimony from 75 witnesses). Over those eight months, movant President Donald J. Trump remained a non-witness as he was never subpoenaed nor asked to testify. Throughout the investigation, the elected District Attorney of Fulton County Fani Willis (hereinafter referred to as "FCDA") was the "very public face of this investigation" and routinely sat for interviews with various media outlets regarding the matter. Ex. 4 at 3, *see also* Ex. 5.

The Supervising Judge dissolved the SPGJ on January 9, 2023. Ex. 6. In his order of dissolution, the Supervising Judge, recognizing that the next steps of this process were unclear, invited briefing from the FCDA's Office and the media (notably excluding any other parties including witnesses and targets), and set a hearing on the issue of publication. Ex. 3 at 2. While stating the statute directed him to release the report, the Supervising Judge cited due process concerns in ultimately ruling that only a small portion of the report would become public at that time. Ex. 7 at 5 ("[T]he consequence of these due process deficiencies is not that the special purpose grand jury's final report is forever suppressed or that its recommendations for or against indictment are in any way flawed or suspect. Rather, the consequence is that those recommendations are for the District Attorney's eyes only – for now. Fundamental fairness requires this[.]").

However, on February 21, 2023, in contravention of the order of the Supervising Judge, the nation was given a view inside the SPGJ process when, in a bizarre turn of events, the SPGJ

foreperson engaged in a media tour where she shared the specifics of her experience publicly.[2] Ex. 8. The foreperson's public comments reveal that both the procedures set forth for the SPGJ, as well as the application of those procedures by the Supervising Judge and the FCDA's Office, failed to protect the most basic procedural and substantive constitutional rights of all individuals discussed by this investigative body. Compounding the harm inflicted by the foreperson's public comments, the Supervising Judge then gave numerous media interviews despite still presiding over this pending matter. Ex. 9.

This motion addresses the following issues which violate the principles of fundamental fairness and due process: (1) the unconstitutionality of the special purpose grand jury statutes as set forth in O.C.G.A. § 15-12-100 et. seq., both facially and as applied in this case, (2) the existing, actual conflict suffered by the FCDA's Office (specifically the FCDA) which has been exacerbated by instances of forensic misconduct and improper extrajudicial activity such that the FCDA's Office must be disqualified from this matter, (3) the unconstitutional taint infecting the grand jury proceeding and the corresponding taint on the potential grand jury (and petit jury) pool, and (4) the unconstitutional taint inflicted on the grand jury proceedings and potential grand jury (and petit jury) pool by the in-court as well as the extrajudicial statements made by the Supervising Judge.[3]

First, the special purpose grand jury statutes are unconstitutionally vague, resulting in disparate application. The statutes are silent as to key powers and duties of the grand jury, and they do not prescribe what shall be included in the report, nor do they specify how or if it should

---

[2] Since that time, additional grand jurors have also spoken out. Ex. 8 at No. 11.

[3] The concept of fundamental fairness is "essential to the very concept of justice," and is the cornerstone of due process. *Lisenba v. California*, 314 U.S. 219 (1941).

be disseminated. The failures in the statutory framework directly impact the fundamental fairness of the proceedings and violate the due process rights of the individuals involved.

Second, the Supervising Judge applied the statutes in a way that violated the due process rights of the individuals involved when he held, contrary to Georgia precedent, that this SPGJ was a *criminal* grand jury. That determination had a negative ripple effect on the constitutional integrity of the entire process as it permitted the compulsion of testimony from out-of-state witnesses and impacted the application of core constitutional privileges such as the Fifth Amendment and sovereign immunity.

Third, the Supervising Judge improperly disqualified the FCDA's Office from investigating a singular target when it was instead required to exclude the FCDA's Office from the entire investigation. The resulting prejudicial taint cannot be excised from the results of the investigation or any future prosecution by the FCDA's Office. Additionally, the FCDA's media interviews violate prosecutorial standards and constitute forensic misconduct, and her social media activity creates the appearance of impropriety compounding the necessity for disqualification.

Fourth, the foreperson's and grand jurors' comments illuminate the lack of proper instruction and supervision over the grand jury relating to clear evidentiary matters which violates the notions of fundamental fairness and due process. The results of the investigation cannot be relied upon and, therefore, must be suppressed given the constitutional violations. The foreperson's public comments in and of themselves likewise violate notions of fundamental fairness and due process and taint any future grand jury pool.

Finally, the Supervising Judge's improper conduct tainted the proceeding and similarly violated notions of fundamental fairness and due process. The Supervising Judge made inappropriate and prejudicial comments relating to the conduct under investigation as well as potential witnesses' invocation of the Fifth Amendment. He improperly applied the law and subsequently denied appellate review while knowing his application of the law in that manner had vast implications on the constitutionality of the investigation. His nexus to certain aspects of the SPGJ and subsequent drafting of the report, in combination with his prior rulings, necessitate review by the Chief Judge of the Fulton County Superior Court.

Accordingly, President Donald J. Trump hereby moves to quash the SPGJ's report and preclude the use of any evidence derived therefrom, as it was conducted under an unconstitutional statute, through an illegal and unconstitutional process, and by a disqualified District Attorney's Office who violated prosecutorial standards and acted with disregard for the gravity of the circumstances and the constitutional rights of those involved. Movant further requests that this Court disqualify the FCDA from any further proceedings in this matter, including any indictments and/or prosecutions, as her disqualifying conflict already found by the Supervising Judge commanded and commands this result.

## II.   **STANDING**

Although Movant, President Donald J. Trump, was not a witness who appeared before the SPGJ, his constitutional rights are clearly implicated in this matter. Georgia jurisprudence broadly recognizes standing of non-parties whose rights have or may be infringed upon by the illegal acts of the State or unconstitutional statutes to challenge the same: "[I]t has been recognized that the only prerequisite to attacking the constitutionality of a statute 'is a showing that it is hurtful to the attacker.'" *Bo Fancy Prods. V. Rabun Cty. Bd. Of Comm'rs*, 267 Ga. 341,

10

344 (1996) (quoting *Stewart v. Davidson*, 218 Ga. 760, 764 (1963)). "In order to challenge a statute or an administrative action taken pursuant to a statute, the plaintiff must normally show that it has interests or rights which *are or will be affected* by the statute or the action." *Atlanta Taxicab Co. Owners Ass'n v. City of Atlanta*, 281 Ga. 342, 345 (2006) (quoting *Preservation Alliance of Savannah v. Norfolk Southern Corp.*, 202 Ga. App. 116, 117 (1991) (emphasis added)). Additionally, under Georgia law, parties impacted by grand jury reports have standing to challenge the release of those reports. *See In re Floyd County Grand Jury Presentments for May Term 1996*, 225 Ga. App. 705 (1997) (Attorney General entitled to expungement of grand jury report); *In re July-August, 2003 County Grand Jury,* 265 Ga. App. 870 (2004) (DeKalb County CEO entitled to expungement of ultra vires portions of report); *Kelley v. Tanksley*, 105 Ga. App. 65 (1961) (Solicitor entitled to partial expungement of report which by implication and innuendo accused him of malpractice).

President Trump was inextricably intertwined with this investigation since its inception. The efforts under investigation squarely relate to his bid for a second term as President of the United States. The investigation began as a result of a conference call amongst numerous parties including Secretary of State Raffensperger and President Trump, and the call was the first piece of evidence reviewed by the SPGJ.[4] President Trump was mentioned in every news report and virtually every filing related to this matter and has remained a central figure, both in public perception and the court record, throughout this investigation.[5] Each time the FCDA and

---

[4] *See The Fulton County District Attorney 's Letter*, NEW YORK TIMES (Feb. 20, 2021), https://www.nytimes.com/ interactive/202 02/ O/us/politics/letters-to-georgia-officials-from-fulton-district-attorney.html; *See also,* Ex. 8 at No. 2.

[5] *See* Docket, Fulton County Clerk Superior & Magistrate Courts, http://www.fultonclerk.org/DocumentCenter/Index/94?GridorderBy=LastModifiedDate-desc (last visited Mar. 17, 2023).

Supervising Judge subpoenaed an out-of-state witness, President Trump or the Trump Campaign was mentioned in the language of the certificate of need as well as the order compelling that witness's testimony; the same was true for most motions filed in the matter. *Id.*

Furthermore, the FCDA has spoken to the media nearly forty times regarding this investigation and each news report references President Trump. Ex. 5. In interviews, the FCDA directly responded when asked about President Trump and personally referred to him by name. *Id.* at No. 20. On multiple occasions, she discussed subpoenaing President Trump and intimated he was the target of the investigation. *See* Ex. 5. In response to the question of whether President Trump would be subpoenaed, FCDA responded, "it is foreseeable that I would subpoena the target of this investigation... A target." *Id.* at No. 27. Even when not referring to him by name, she implied she was speaking about President Trump. *Id.* at No. 7 ("Nobody is above the law..."); *Id.* at No. 25 ("It's not much consequence what title they wore...."); *Id.* at No. 22 ("Everybody is equal before the law no matter what position they hold, no matter how much wealth..."); *Id.* at No. 25 ("I'm not taking on a former president. We're not adversaries. I don't know him personally. He does not know me personally."). In her first interview live on national television, FCDA opined about President Trump's *mens rea* during his call with Secretary of State Brad Raffensperger.[6]

---

[6] "When any prosecutor throughout this country is interviewing people trying to determine if a crime was committed, and if they understood what they were doing, the *mens rea* is always important. So you look at facts to see, 'did they really have intent?' [or] 'did they really understand what they were doing?' Detailed facts become important like, asking for a specific number and then going back to investigate and understand that that number is just one more than the number that is needed. It let's you know that someone had a clear mind. They understood what they were doing, and so when you are pursuing the investigation, facts like that that may not seem so important, become very important." Ex. 5 at No. 4.

The foreperson of the SPGJ likewise spoke freely (and directly) about President Trump in each of her interviews:

> I will tell you that it was a process where we heard his name a lot. We definitely heard a lot about former President Trump, and we definitely discussed him a lot in the room. And I will say that when this list comes out... there are no major plot twists waiting for you....We heard a lot of recordings of President Trump on the phone... It is amazing how many hours of footage you can find of that man on the phone... I could see how getting the former president to talk to us would have been a year in negotiation by itself...I'd be fascinated by what he [Trump] said, but do you think he would come in and say anything groundbreaking or just the same kinda thing we've heard?

> Ex. 8 at Nos. 3, 4, 5.

The investigation began as a result of the phone call between Secretary of State Raffensperger, President Trump, and others, but came to encompass a variety of actions related to President Trump's candidacy in the 2020 Election. He was mentioned in nearly every interview given by the FCDA as well as the foreperson, and President Trump himself or the 2020 Election was referenced in virtually every court filing. In short, President Trump's rights have been implicated pursuant to the Fifth and Fourteenth Amendments to the United States Constitution as well as Ga. Const. Art. I, § I, Paras. I and XVI and, therefore, he has standing to make these constitutional, legal, and procedural challenges.

## III.   THE GEORGIA STATUTES AUTHORIZING THE USE OF A SPECIAL PURPOSE GRAND JURY ARE UNCONSTITUTIONAL.

The Georgia legislature enacted the special purpose grand jury statutes in 1974. *See* O.C.G.A. § 15-12-100 et. seq. These statutes authorize the creation of a county-wide special purpose grand jury for the purpose of investigating any alleged violation of the laws of this state

13

or any other matter subject to investigation by grand juries, and the statutes grant special purpose

grand juries compulsory subpoena power.[7] Additionally, O.C.G.A. § 15-12-101 states in part:

> Once impaneled, the chief judge shall assign a superior court judge to supervise and
> assist the special grand jury in carrying out its investigation and duties. The judge so
> assigned shall charge the special grand jury as to its powers and duties and shall require
> periodic reports of the special grand jury's progress, as well as a final report.  When the
> judge assigned to a special grand jury decides that the special grand jury's investigation
> has been completed or on the issuance of a report by the special grand jury of the matter
> investigated by it reporting that the investigation has been completed, the judge so
> assigned shall recommend to the chief judge that the special grand jury be dissolved.

In practice, these statutes have been infrequently utilized. In those rare cases where they

are invoked, special purpose grand juries typically investigate governmental entities and/or

employees and issue diverse reports contemplating a wide range of legal options including both

criminal and non-criminal, legislative, administrative, or governmental recommendations.[8] Since

---

[7] "While conducting any investigation authorized by this part, investigative grand juries may
compel evidence and subpoena witnesses; may inspect records, documents, correspondence, and
books of any department, agency, board, bureau, commission, institution, or authority of the state
or any of its political subdivisions; and may require the production of records, documents,
correspondence, and books of any person, firm, or corporation which relate directly or indirectly
to the subject of the investigation being conducted by the investigative grand jury." O.C.G.A. §
15-12-100.

[8] Special Purpose Grand Jury Final Report, CHAMPION NEWSPAPER (August 21, 2013), Civil
Action No. 13CV1024, https://thechampionnewspaper.com/wp-
content/uploads/2013/08/000SpecialPurposeGrandJuryFinalReport.pdf (DeKalb County SPGJ
investigated allegations of public corruption surrounding the awarding of contracts within the
Watershed Management Department); Cobb County, Ga., Laptop Plan to Be Probed by Grand
Jury, MACDAILYNEWS (October 10, 2005), Civil Action No. 05-1-8242,
https://www.edweek.org/policy-politics/cobb-county-ga-laptop-plan-to-be-probed-by-grand-
jury/2005/10 (Cobb County SPGJ investigated alleged bias and deception in the bidding of a
computer laptop program); *State v. Lampl*, 296 Ga. 892 (2015) (Clayton County SPGJ
investigating public corruption and various crimes allegedly committed by currently or
previously elected county officials and county employees); *Kenerly v. State*, 311 Ga. App. 190
(2011) (Gwinnett SPGJ investigating suspected criminal activity surrounding the acquisition of
real property at fraudulently inflated prices).

their enactment, no appellate court has examined the constitutionality of the special purpose grand jury statutes.

## A. <u>The Statutes Are Unconstitutional Due to Vagueness.</u>

It is well-established that "a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio v. Pennsylvania*, 382 U.S. 399, 403 (1966) (*Citing Lanzetta v. New Jersey*, 306 U.S. 451 (1939)). In *Giaccio*, the Supreme Court reviewed a Pennsylvania statute that governed the procedure by which jurors determined court costs to be paid by an acquitted defendant. *See* 382 U.S. at 401. The Court held that "the law must be one that carries an understandable meaning with legal standards that courts must enforce." *Id.* at 403. Accordingly, the Court found the statute unconstitutionally vague because it invited arbitrary enforcement. *Id.* (statue allowed jurors to "make determinations of the crucial issue upon their own notions of what the law should be instead of what it is."). Similarly, in *Jekyll Island State Park Civic Auth. v. Jekyll Island Citizens Ass'n.*, 266 Ga. 152 (1996), the Georgia Supreme Court held that a portion of a civil statute was unconstitutional because it was vague and indefinite, as it contained "insufficient objective standards and guidelines to meet the requirements of Due Process." *Jekyll Island*, 266 Ga. at 153.

The statutes governing the special purpose grand jury, O.C.G.A. § 15-12-100, et. seq., are so standardless that they have invited arbitrary, amorphous enforcement by the FCDA's Office and the Supervising Judge. First, they fail to specify whether a SPGJ is a criminal or civil proceeding (or whether a SPGJ can be *either* depending on its scope and purpose). Second, the statutes lack specificity as to the form and substance of the report, the rights of individuals

15

named in the report, and the publication of the SPGJ's final report. Third, they fail to identify with adequate specificity the roles and responsibilities of the Supervising Judge versus the body requesting the investigation, here the FCDA.

> i.   The Statutes are Vague as to Whether the SPGJ is a Civil or Criminal Body.

The central constitutional concern at issue here is the conflicting interpretation of the statute - whether the SPGJ is a criminal or civil investigative body. This issue has been argued and repeated by numerous parties during the course of this proceeding with inconsistent and/or unsupported holdings by the Supervising Judge as well as courts in other jurisdictions. The fact that such a foundational aspect of this procedure is unclear under the law is definitive evidence that the statutes are overly vague and unconstitutional on their face.

Even though the Supervising Judge declared that this SPGJ was a criminal investigative grand jury, he offered no basis for this conclusion other than asserting that the impaneling order and scope of the investigation determined the nature of the grand jury proceeding.[9] There is no Georgia authority that supports the Supervising Judge's theory that the stated purpose of the investigation determines the nature of the body. The decision as to whether the SPGJ is a civil or criminal body is of the utmost significance, as it impacts whether the SPGJ can compel the attendance of out-of-state witnesses, what (if any) inferences can be made upon assertions of privilege, the applicability of sovereign immunity, and more. On these issues, the statutes are silent which renders them unconstitutionally vague.

---

[9] "Its purpose is unquestionably and exclusively to conduct a criminal investigation; its convening was sought by the elected official who investigates, lodges, and prosecutes criminal charges in this Circuit, its convening Order specifies its purpose as the investigation of possible criminal activities; and its final output is a report recommending whether criminal charges should be brought." Ex. 10 at 4.

The issue of whether the SPGJ is a civil or criminal proceeding came to have constitutional implications when the FCDA's office sought to compel the attendance of out-of-state witnesses. Civil and criminal compulsory powers differ greatly, and the FCDA compelled testimony from out-of-state witnesses utilizing criminal compulsory power via the Uniform Act to Secure the Attendance of Witnesses from Without a State (hereinafter "Uniform Act"), O.C.G.A. § 24-13-90 et. seq., which can only be utilized in criminal proceedings. Indeed, in the Material Witness Certificates, the Supervising Judge noted the power to compel witnesses from outside the state was predicated upon his ruling that the SPGJ was criminal. *See, e.g.,* August 25, 2022 Ex Parte Order of the Court, Certificate of Material Witness - Mark Randall Meadows ("Further, the authority for a special purpose grand jury to conduct a criminal investigation has been upheld by the Supreme Court of Georgia. *See State v. Lampl*, 296 Ga. 892 (2015). Accordingly, the provisions of the Uniform Act to Secure the Attendance of Witnesses from Without the State apply pursuant to § O.C.G.A. 24-13-92 et. seq."). Over the course of the SPGJ investigation, 19 orders were entered to compel witnesses to appear pursuant to § 24-13-90. This led to a host of litigation across the country where foreign courts were forced to grapple with the novel question of whether the Georgia SPGJ proceeding is criminal in nature such that citizens must travel to Georgia to provide testimony before this investigative body.[10]

For example, one witness, Jacki Pick Deason, raised the issue in Texas, where Judge Yeary with the Texas Court of Criminal Appeals provided relevant analysis in a dissenting opinion.[11] Judge Yeary, joined by three other Texas Court of Appeals judges, reasoned that the

---

[10] For example, *see In Re Jacki L. Pick*, WR-94, 066-01 (Tex. App. 2022).
[11] *In Re Jacki L. Pick*, WR-94, 066-01 (Tex. App. 2022) (Yeary, J. dissenting). The majority opinion did not address the applicability of the Uniform Act to the SPGJ because the subpoena at issue was moot.

subpoena which sought to compel the appearance of Deason in the SPGJ was void because, although Texas has adopted the Uniform Act, it only applies "when the proceedings to be attended are 'criminal' in nature, or where they are conducted by an actual 'grand jury.'" *Id.* at 3. The Texas Court further interpreted Georgia case law, finding that the SPGJ "at least according to present interpretations of the law from that state's own courts, conducts only *civil* investigations and may not itself present an indictment or initiate a criminal prosecution." *Id.*

The statutes' vagueness as to whether this is a criminal or civil body has similarly caused problems for witnesses claiming sovereign immunity. Specifically, United States Senator Lindsey Graham[12] and Georgia Governor Brian Kemp both raised sovereign immunity claims in response to their subpoenas to testify. *See* Ex. 11; *see also* August 17, 2022 Motion to Quash Subpoena Issued to Governor Brian P. Kemp. Counsel for Governor Kemp argued that he could not be compelled to testify before the *civil* SPGJ because he was protected from the subpoena by sovereign immunity. *Id.* While the Supervising Judge agreed that sovereign immunity would apply to a civil special purpose grand jury, he denied the motion and held that the SPGJ is a *criminal* investigative grand jury. Ex. 10 at 5 ("Put simply, there is nothing about this special purpose grand jury that involved or implicates civil practice."). As explained below, *see infra* Section III(B)(i), this ruling was contrary to established Georgia precedent, but the fact that the issue was raised by multiple witnesses points to the lack of statutory clarity on the subject.

The Supervising Judge's unilateral decision to declare the SPGJ a criminal body (despite its inability to indict and Georgia precedent to the contrary) created a litany of constitutional

---

[12] In re Graham, 2022 U.S. Dist. LEXIS 194033 (N. Dist. Ga.) (2022) (Civil Action No. 1:22-cv-03027-LMM).

violations for the witnesses called before it.[13] However, because the statutes are devoid of any

language that may guide a court in interpreting its meaning, its use, and its application to real-life

proceedings, such a determination is arbitrary. The statutes are so vague that they lack the

"objective standards and guidelines to meet the requirement of due process." *Jekyll Isle*, 256 Ga.

at 153. This double-bind cannot stand, as the distinction between criminal and civil has pertinent

implications on the permissible testimony and evidence which may come before this, and any

other, SPGJ body.

     ii.    The Statutes are Vague as to the Contents and Release of the Report(s).

     Pursuant to a majority vote of the Fulton County Superior Court bench, the SPGJ was

dissolved on January 9, 2023. Ex. 6. In the order of dissolution, the Supervising Judge,

recognizing that the next steps of this process were unclear, invited briefing from the FCDA's

Office and the media (notably excluding any other parties including witnesses as well as targets),

and set a hearing on the issue of publication. *Id.* at 2. While stating the statute clearly directed

him to release the report, the Supervising Judge cited due process concerns in ultimately ruling

that only a small portion of the report should be made public.[14] The parties raised issues as to

whether the report was a court record under Rule 21, whether it was a general presentment under

---

[13] The Supervising Judge insulated himself from appellate review of this critical and otherwise-unreviewable issue by denying a certificate of immediate review. *See* Ex. 10 FN 8 ("The Court also declines to issue a certificate of immediate review of this decision because it is clear that sovereign immunity does not apply to criminal matters. *See Rivera v. Washington*, 298 Ga. 770, 777 (2016) (recommending issuance of certificate of immediate review when resolution of immunity issue is not clear).")

[14] Ex. 7 at 4 ("[T]hus, facially, the final report should be published *in toto* pursuant to O.C.G.A §
15-12-80."); *Id.* at 5 ("[T]he consequence of these due process deficiencies is not that the special purpose grand jury's final report is forever suppressed or that its recommendation for or against indictment are in any way flawed or suspect. Rather, the consequence is that those recommendations are for the District Attorney's eyes only – for now. Fundamental fairness requires this[.]").

O.C.G.A. § 15-12-80, and whether a balancing test is required when rendering a decision regarding publication based upon the due process rights of the named individuals. *Id.; see also,* Ex. 3. Unfortunately, the issue of publicly releasing the special grand jury's final report was also not contemplated by the statute. O.C.G.A. § 15-12-100 et. seq. Now, posed with such a question, the Supervising Judge was left to make his own decisions, create his own standards and, thus, carve out an entirely unique scope of the SPGJ which may or may not have been originally intended by the Georgia legislature.

Upon further analysis, the special purpose grand jury statutes fail to address any aspect of the report; they are completely silent other than to say the Supervising Judge "shall require periodic reports of the special grand jury's progress as well as a final report." O.C.G.A. § 15-12-101(a). The statutes do not specify whether the reports should be oral or written, nor do they prescribe whether the reports should include substantive information such as summaries of evidence or formal recommendations. *Id.* Assuming *arguendo* the report is to be written, the statutes are silent as to whether the SPGJ writes the report alone or with the assistance of either the Supervising Judge or the body requesting the investigation, here the FCDA. *Id.*

Relevant to the due process rights of all those who may be mentioned in the report, the statutes are silent as to its public release. *Id.* It is unclear whether the report is a court record or whether it belongs to and remains in the hands of the body that requested the investigation as the Supervising Judge has held. *Id.; see also* Ex. 7. If the report is to be made public, the statutes fail to specify who shall make that determination or how such publishing may occur, especially since the statutes are further silent as to whether the report is considered a general presentment such that O.C.G.A § 15-12-80 applies. *Id.* Finally, the statutes fail to describe how or whether those

individuals named in the report may be offered an opportunity to review the report or otherwise challenge its release given the necessary implication of their due process rights. *Id.*

Given this lack of specificity, courts fail to interpret and apply the statutes in a uniform manner across jurisdictions. As such, the statutes violate the principles of fundamental fairness and are unconstitutionally vague.

### B. The Statutes are Unconstitutional As Applied to This SPGJ.

The Georgia special purpose grand jury statutes have been applied to this matter through an unconstitutional framework with little regard to the illegal consequences that resulted in prejudicing and violating the rights of all parties impacted by the investigation. As stated above, the Supervising Judge, along with the FCDA's Office, has operated under the assumption that, although baseless and contrary to established precedent, the SPGJ is a *criminal* investigative body. As the SPGJ is a *civil* investigative body pursuant to Georgia case law, this mischaracterization of its fundamental character resulted in a cascade of unconstitutional consequences. For example, the SPGJ was permitted to compel the attendance and testimony of out-of-state witnesses as well as the testimony of witnesses asserting valid claims of sovereign immunity. Even if, as the Supervising Judge declared, this SPGJ was somehow criminal, it was still unconstitutionally administered because the FCDA improperly and arbitrarily assigned "target" labels, compelled those "targets" to appear, and the grand jurors drew adverse inferences from witnesses' Fifth Amendment assertions. In both civil and criminal interpretations, the substantive due process rights of all parties impacted by the investigation have been violated. The unconstitutional administration of this SPGJ violated all notions of fundamental fairness; witnesses could not depend on the proper application of the law by the Supervising Judge, nor could they rely on statements from the FCDA in assessing how to adequately protect their rights.

21

i. <u>The Supervising Judge Improperly Designated the SPGJ as a Criminal Investigative Body When Case Law Mandates it is Civil.</u>

The only two cases in Georgia jurisprudence that touch upon the nature of a special purpose grand jury clarify that it is a civil, not a criminal, body. *See State v. Bartel*, 223 Ga. App. 696 (1996); *see also Kenerly v. State*, 311 Ga. App. 190 (2011). This issue was first raised before the Supervising Judge when counsel for Governor Kemp argued the sovereign immunity prevented the SPGJ from compelling his testimony. *See* Ex. 11; *see also* August 17, 2022 Motion to Quash Subpoena Issued to Governor Brian P. Kemp. The Supervising Judge agreed that a civil SPGJ could not compel such testimony from the Governor. Ex. 11 at 31 ("And that's your argument that, look, this special purpose grand jury is actually a civil thing. And if you're right, civil, I agree, sovereign immunity. I don't see any waiver anywhere."). In denying Governor Kemp's Motion, the Supervising Judge ruled (for the first time in this investigation) that the SPGJ was a *criminal* investigative grand jury – a ruling contrary to established Georgia precedent. Ex. 10. This ruling created a ripple effect of constitutional violations which implicated the due process rights of the Movant and other parties subpoenaed by this body.

In coming to this decision, the Supervising Judge drew misplaced conclusions as to the relevant case law. Specifically, he reasoned that the special purpose grand jury in *State v. Bartel*, 223 Ga. App. 696 (1996), was deemed a civil investigative body because it was "convened to conduct a civil investigation." Ex. 10 at 4. In other words, that the stated purpose for impaneling an investigative body determines whether it is a criminal or civil matter – not its inherent powers.

22

*Id.* The reasoning employed by the Supervising Judge was not derived from anything the *Bartel* Court held nor can it be traced to any other case.[15]

Georgia precedent applies a different standard. The Georgia Court of Appeals in *Kenerly v. State*, 311 Ga. App. 190 (2011), interpreted *Bartel* as "concluding that special purpose grand juries conduct only civil investigations." *Kenerly* at 194 (citing *Bartel*, 223 Ga. App. at 699) (emphasis added). Moreover, the *Kenerly* court relied on the stated *powers* of the body, rather than the body's *purpose*, as the Court did here, to interpret the boundaries of the SPGJ under the relevant statutes.[16] *Kenerly*, 311 Ga. App. at 194 (finding that a special purpose grand jury does not have the power to indict: "[B]ecause the powers and duties of a special grand jury *are* specifically provided for, the powers granted to regular grand juries, including the power to indict, do not apply.").

Counsel for Governor Kemp correctly argued that, "*Bartel* held that special purpose grand juries conduct only civil investigations." *See* Ex. 11; *see also* August 17, 2022 Motion to Quash Subpoena Issued to Governor Brian P. Kemp. In his Order denying their Motion, the Supervising Judge never addressed the fact that counsel's argument was a direct quote from binding Georgia precedent but, instead, stated counsel's "claim" was "unfounded." Ex. 10 FN 4. The Supervising Judge did not just fail to distinguish the *Kenerly* case - he completely refused to

---

[15] In *Bartel*, the Georgia Court of Appeals held that the oath required for witnesses testifying before a criminal grand jury was "irrelevant" in a civil grand jury proceeding. It was unclear whether the grand jury was impaneled pursuant to the special purpose grand jury statute, the grand jury statutes relating to civil investigations, or both, but the Court held that the result would be the same because they are all civil investigations. The Court noted that it defies logic to require the oath applicable for criminal grand juries to be administered in civil investigations where "there obviously is not and cannot be 'any indictment or special presentment' or any individual charged with a particular criminal offense."

[16] *See also In re Gwinnett County Grand Jury*, 284 Ga. 510, 512 (2008) (distinguishing between the "criminal accusatory and civil investigative roles" of grand juries).

acknowledge or address it. Ex. 10. While utterly ignoring binding precedent, the Supervising

Judge then denied appellate review despite the fact that his ruling affected the constitutional

integrity of the investigation moving forward. Ex. 10 FN 8 ("The Court also declines to issue a

certificate of immediate review of this decision because it is clear that sovereign immunity does

not apply to criminal matters. *See Rivera v. Washington*, 298 Ga. 770, 777 (2016)

(recommending issuance of certificate of immediate review when resolution of immunity issue is

not clear).").

    As stated previously, the Supervising Judge concluded the SPGJ was criminal because it

was impaneled to investigate whether certain activity constituted a crime under Georgia law. Ex.

10. In so doing, he ignored the fact that most special purpose grand juries are impaneled to do

just that – investigate certain questionable activity, oftentimes public malfeasance, where it is

unclear on its face whether the activity is criminal.[17] If there was such a thing as a criminal

special purpose grand jury, the Court of Appeals would have said so in *Kenerly. Kenerly*, 311

Ga. App. 190. Instead, it affirmed that special purpose grand jury investigations into possible

criminal activity are still civil in nature. *Id.* at 194. The *Kenerly* special purpose grand jury was

impaneled for the purpose of investigating suspected criminal activity surrounding the

acquisition of real property at fraudulently inflated prices, and Gwinnett County Commissioner,

Kevin Kenerly, was subsequently criminally indicted for his role in those deals.[18] In affirming

---

[17] *See infra* FN 6.

[18] *Special grand jury to look at Gwinnett land purchases,* ATLANTA JOURNAL-CONSTITUTION,
(Sep. 25, 2009), https://www.ajc.com/news/local/special-grand-jury-look-gwinnett-land-
purchases/Yf5VPyqKTWSsFBMOUVsdWM/ (District Attorney Danny Porter stated: "I think
the grand jury, as a group of citizens, needs to look at these expenditures of county money and
try to determine if there's anything criminal…If there is, it needs to be prosecuted.");
*Grand jury on Gwinnett land to wrap up work,* ASSOCIATED PRESS, (Oct. 4,
2010), https://accesswdun.com/print/2010/10/232745 (investigating allegation that county

the civil nature of that grand jury proceeding, the *Kenerly* Court implicitly rejected the notion

that a special purpose grand jury is criminal if investigating potential criminal activity.[19] Yet, this

was the sole basis cited by the Supervising Judge in declaring this SPGJ to be criminal. Ex. 10.

In fact, *Kenerly* is the only SPGJ case which provides substantive guidance on statutory

interpretation, and the Court of Appeals in that case thoughtfully delineated its use of "the

venerable principle of the maxim *expressum facit cessare tacitum*" to "assume *deliberate*

omission of actions not listed in a statute and not otherwise addressed elsewhere." (Emphasis

included) *Kenerly*, 311 Ga. App. at 193. *See also Hinton v. State*, 224 Ga. App. 49, 50 (1996).

The Supreme Court of Georgia and other Georgia courts have also applied this method of

statutory interpretation. *See Hinton v. State*, 224 Ga. App. 49, 50 (1996); *Chase v. State*, 285 Ga.

693, 695-96 (2009); *Battallia v. City of Columbus*, 199 Ga. App. 897, 898 (1991). Thus, the

Supervising Judge's decision that the SPGJ is a criminal body is affirmatively refuted by binding

Georgia precedent. This erroneous decision had vast constitutional and procedural implications,

and the resulting taint invalidates the constitutionality and validity of the entire proceeding.

ii.   The SPGJ Improperly Compelled the Appearance and Testimony of Out-of-State
      Witnesses.

The Uniform Act cannot be used to compel the attendance of a witness from outside the

state in a civil proceeding as discussed above, *see supra* Section III(A)(i). Thus, this SPGJ

illegally compelled the attendance and testimony of numerous witnesses from outside the State

---

commissioner pushed the Commission to purchase property for $7m more than it was valued at
two years earlier due to his friendship with landowner).
[19] Additionally, other SPGJ's investigating potential criminal activity were filed as civil actions.
*See* Dekalb County Civil Case No. 13CV1024 (SPGJ investigated allegations of public
corruption within the Watershed Management Department); Cobb County Civil Case No. 05-1-
8242 (SPGJ investigated alleged bias and deception in the bidding of a computer laptop
program).

of Georgia. Due to the substantial number of witnesses compelled to testify under the Uniform Act, their testimony is inexorably intertwined with the conclusions of the SPGJ, and there is no way to extricate the taint that this improperly compelled testimony caused.

In addition to improperly compelling testimony from out-of-state witnesses, the SPGJ improperly compelled testimony from Governor Kemp despite his valid assertion of sovereign immunity. Sovereign immunity is a constitutional doctrine. Ga. Const. art. I § 2, Para. IX(e). As explained, *see supra* Section III(A)(1), the doctrine of sovereign immunity was overcome by the Judge's decision to classify the SPGJ as a criminal investigative body in contradiction to binding Georgia precedent.

In declaring this was a criminal SPGJ, the Supervising Judge improperly and unconstitutionally imbued the SPGJ with powers it did not, in fact, have. The testimony illegally obtained by the SPGJ violates notions of fundamental fairness and the due process rights of Movant as well as other parties investigated by the SPGJ. This pervasive taint which impermissibly corrupted the investigation can only be remedied by quashing the report and precluding the use of all illegally obtained evidence.

## C. The Statutes Were Unconstitutionally Applied to this SPGJ if Classified as Criminal.

Even if, as the Supervising Judge concluded, the SPGJ was somehow criminal, it was still unconstitutionally interpreted and applied. All notions of fundamental fairness were violated by the FCDA's arbitrary assignment of "target" statuses and the adverse inferences the SPGJ drew from witnesses' Fifth Amendment assertions.

26

i.    The FCDA's Arbitrary Use and Subsequent Abandonment of "Target"
      Statuses Violated Principles of Fundamental Fairness.

Early on in the investigation, the FCDA sent target letters to a group of witnesses

affirmatively assigning them "target" status. Generally, a "target" is a definition given by the

Department of Justice to an individual contemplated for prosecution: "[a] 'target' is a person as

to whom the prosecutor or the grand jury has substantial evidence linking him or her to the

commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." *See*

United States Attorneys Manual ("USAM") 9-11.151. The label of a target within the federal

criminal justice system carries with it both weight as well as presumptive rights. USAM 9-

11.150 (subpoenaing targets of grand jury investigation "may carry the appearance of

unfairness"); and USAM 9-11.154 (when target of grand recount jury investigation informs

government that they plan to invoke their fifth amendment privilege in grand jury, they should

ordinarily be excused from appearing). There is no identifiable Georgia law or any other

authority that defines a target of an investigation and what that might mean or entail within State

proceedings.

As evidenced in the public motions and subsequent hearings held before the Supervising

Judge, while the FCDA's Office might have assigned "target" status to a number of individuals

whom they sought to subpoena, they offered no parallel rights or protections to those same

individuals as would be expected in a constitutionally-sound investigative process (as is done at

the federal level). *See* Ex. 12. In fact, neither the Court nor the FCDA's Office appeared to treat

those deemed targets any differently than any other witness who was subpoenaed to testify. *Id.*

This raises the question of what constitutional protections a target should have in a

*criminal* special purpose grand jury (which has never before been addressed under Georgia law).

27

Georgia law and the Georgia Constitution prohibit the appearance before a regular grand jury of a witness named in a proposed charging instrument. *See State v. Lampl*, 296 Ga. 892 (2015) (grand juries are prohibited from compelling the appearance of a witness who has been accused in a returned or proposed charging document at the time they are called to testify); *State v. Butler*, 177 Ga. App. 594 (1986) (holding that while it violates the Fifth Amendment to call a witness to testify to the grand jury which is considering an indictment against the witness, such was not the case here where defendant was called to testify to an alleged crime committed by her husband); *Jenkins v. State*, 65 Ga. App. 16 (1941) (grand jury had no lawful right to call the accused before it while considering a bill of indictment against him); O.C.G.A § 24-5-506.

A criminal SPGJ (as created here by the Supervising Judge) tasked with investigating criminal conduct and drafting a report recommending criminal indictment creates unique problems in this context relative to the Fifth Amendment, Ga. Con. Art. I, § I, para. xvi and O.C.G.A § 24-5-506. The SPGJ cannot return an indictment or even consider a proposed charging instrument, so a strict reading of the case law would allow the SPGJ to compel any witness to appear and provide testimony that could then be used in a subsequent grand jury proceeding considering a charging instrument naming that witness (even though that same testimony could not be compelled live before the regular grand jury). This circumvents the Fifth Amendment, Ga. Con. Art. I, § I, para. xvi, and O.C.G.A § 24-5-506 and would permit the use of a special purpose grand jury to obtain and present testimony which would otherwise be unavailable to and unable to be brought before a regular criminal grand jury.

Not only were purported "targets" not given any protections, but they also appear to have been assigned their "target" status on an arbitrary basis. The target notifications were publicly released in July of 2022, and the practice of labeling individuals as targets appeared to be

28

abandoned by the FCDA's Office soon thereafter. This shift coincided with the Supervising Judge expressing his own concerns about the use of this terminology.[20] *See* Ex. 12. During the disqualification hearing, the Supervising Judge pointed out the lack of meaning given to "target" status within State proceedings. *Id.* at 12 ("I don't think the word target is as magical in State proceedings as it is in Federal proceedings…"). Notably, he also warned the FCDA, "you may want to think through in the future labeling someone that and then hailing them in because of how this has played out." *Id.* at 13. Following those comments from the Supervising Judge, no other "targets" were publicly named.

This inconsistency is more than an inconvenience for those who had to make important decisions (both personally and upon advice of counsel) about how to conduct themselves in the public sphere as well as what key constitutional decisions needed to be made regarding the ability to answer questions while under oath. Whether an individual is labeled a target is often the ultimate question for both counsel and the client in deciding how best to defend themselves. The fact that the FCDA's Office chose to label some potential witnesses "targets" (which they certainly could have chosen not to do) but then chose not to label others as such, begs the question: are those "others" by this purposeful omission, "not targets"? If that answer is no: the only logical conclusion is that the target labels were arbitrarily given, and no witnesses called thereafter could rely on the legitimacy of their "witness" status.

---

[20] In his Order disqualifying the FCDA, the Supervising Judge stated: "The designation, borrowed from federal criminal practice, is a bit confusing in the context of this grand jury, which has no power to bring criminal charges against anyone. It is nonetheless A potent investigative signal that the District Attorney views Senator Jones (and the other alternate electors) as persons more closely connected to the alleged electoral improprieties than other witnesses who have come before the grand jury or who may yet do so." Ex. 4 at FN 6.

When witnesses appeared before the SPGJ pursuant to a subpoena and had not been given a target notification (while knowing such labels were already given to others), they made conscious decisions regarding their ability to testify based on that reliance. Either the FCDA's Office must admit that they unconstitutionally assigned target labels to some witnesses while failing to notify others or they must admit their use of target labels was misapplied and arbitrary. To either end, this substantial failure violates all notions of fundamental fairness and due process because no witness called to testify could depend on the designation given by FCDA's Office and were forced to make blind decisions in asserting constitutional privileges. Since the practice of naming "targets" began and ended in the early stages of the investigation (with the first round of Material Witness Certificates), the majority of the testimony heard by this SPGJ suffered from the cancerous and arbitrary application of this otherwise meaningful title with attendant rights.

      ii.    <u>Jurors Improperly Drew Adverse Inferences from Witnesses' Invocation of the Fifth Amendment.</u>

In a criminal matter, jurors cannot draw negative inferences when a witness asserts his rights under the Fifth Amendment. *Barnes v. State*, 335 Ga. App. 709 (2016). But here, as discussed further in Section V, the special purpose grand jurors plainly did so.[21] *See* Ex. 8. Further, the grand jurors formed opinions about certain witnesses' credibility based on whether or not a witness took a few moments to consider the question versus quickly asserting privilege. *See infra* Section V. From the foreperson's comments, it appears the grand jurors were not properly instructed on this important constitutional safeguard. As recently revealed, the unnamed jurors shared a completely inaccurate and impermissible understanding of Fifth Amendment

---

[21] "The scratching of pens on paper could be heard as jurors tallied how many times the person invoked the Fifth Amendment." Ex. 8 at No. 1.

rights. Ex. 8 at No. 10. The jurors attributed this failed understanding to the explanation provided

to them by the FCDA's office. *Id.* Moreover, if one or more of the special purpose grand jurors

watched the hearing online, they would have heard the Supervising Judge say, "but if they did

nothing wrong, why aren't they talking to the grand jury?" Ex. 12 at 27.

Thus, even if the SPGJ was somehow criminal, the SPGJ proceeding was

unconstitutionally administered. It violated the rights of impacted parties by arbitrarily assigning

"target" status while not providing adequate protections for those individuals. Furthermore,

grand jurors improperly drew adverse inferences from witnesses' invocation of the Fifth

Amendment and relied upon those inferences in forming their conclusions. Given the pervasive

and inextricable taint which ensued from this unconstitutional application, the report must be

quashed and all evidence compelled by this SPGJ must be suppressed.

## IV.  THE FULTON COUNTY DISTRICT ATTORNEY'S OFFICE MUST BE DISQUALIFIED.

The FCDA's Office must be recused, disqualified, and prevented from any further

investigation or prosecution of this matter. The Supervising Judge has already held that the

FCDA's Office has an actual, disqualifying conflict in this investigation. Ex. 4. Inexplicably,

however, the Supervising Judge refused to disqualify the FCDA from the investigation. Instead,

without any supporting authority, the Supervising Judge removed the now Lieutenant Governor

of Georgia, Burt Jones, from the investigation and prohibited any future action against him by

the FCDA. *Id.*

The FCDA's Office has maintained significant power and control over the SPGJ.  It was

the FCDA's Office who made the request to impanel the SPGJ and determined the scope of the

investigation, it decided who to subpoena to testify, and what evidence to compel. Ex. 7. As the

Supervising Judge noted in his order regarding publication, the structure of this investigation has been "imbalanced, incomplete, and one-sided." *Id.* at 5.

Given the national attention, gravity and positions of many of the individuals involved, it is even more imperative that the FCDA's Office remain unattached and impartial, as is required of all prosecutors. *See Berger v. United States*, 295 U.S. 78 (1935) (the prosecutor is "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore in a criminal prosecution is not that it shall win a case, but that justice shall be done."); *see also  Young v. U.S. ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 803 (1987); *Lux v. Commonwealth*, 24 Va. App. 561, 568 (1997). After all, "[t]he prosecutor has more control over life, liberty, and reputation than any other person in America." Robert H. Jackson, Att'y Gen. of the U.S., The Federal Prosecutor, Address to the Second Annual Conference of United States Attorneys (Apr. 1, 1940).

Georgia law delineates two distinct grounds for disqualification of a prosecuting attorney. First, a prosecutor must be disqualified when a conflict of interest exists - when the prosecutor has a personal interest or stake in the defendant's conviction. *See Williams v. State*, 258 Ga. 305, 315 (1988). Such a conflict may be either actual or perceived. *See Young*, 481 U.S. at 787. Second, a prosecutor can be removed on grounds of "forensic misconduct," which commonly arises from "improper expression by the prosecuting attorney of his [or her] personal belief in the defendant's guilt." *Williams*, 258 Ga. at 315 (citing *Vermont v. Hohman*, 420 A2d 852 (Vt. 1980)).

In this matter, the FCDA's Office has both an actual and perceived conflict of interest. The Supervising Judge previously found that an actual conflict exists prohibiting the FCDA's Office from investigating Lieutenant Governor Burt Jones but erred in failing to disqualify the

FCDA's Office from the entirety of the investigation as the law demands. Additionally, the scope of the FCDA's disqualifying conduct extends beyond the actual conflict already found by the Supervising Judge. The FCDA's Office, by and through the elected FCDA, exacerbated the already existing conflict by making extrajudicial statements throughout the entirety of this investigation which violate prosecutorial standards, constitute forensic misconduct and create an untenable appearance of impropriety. For all of the reasons below, the FCDA and the entirety of the FCDA's Office must be disqualified from any further investigation or potential prosecution of this matter.

### A. The Supervising Judge Should Have Disqualified the FCDA from the Entire Investigation Rather than Just a Witness.

On July 25, 2022, the Supervising Judge ordered the disqualification of the FCDA's Office from any further investigation and/or prosecution of Lieutenant Governor Burt Jones due to an "actual and untenable" conflict. Ex. 4 at 4. By entering an order of disqualification of the FCDA's Office as to Lt. Governor Jones, the Supervising Judge recognized what Georgia law clearly prescribes - that a prosecutor can be removed from a matter for which a legal conflict exists at any stage in the proceedings, including the investigative stage. The Supreme Court of Georgia recognizes that "'a Georgia district attorney is of counsel in all criminal cases or matters pending in his circuit. This includes the investigatory stages of matters preparatory to seeking an indictment as well as the pendency of the case." *McLaughlin v. Payne*, 295 Ga. 609 (2014) quoting *King v. State*, 246 Ga. 386, 389 (1980). The Supervising Judge was correct in determining that disqualification was appropriate for the FCDA's Office as it related to both the SPGJ as well as any potential future proceedings such as seeking an indictment or going to trial.

The Supervising Judge was incorrect, however, because the FCDA's conflict extends to the entire investigation - not just one witness.

The SPGJ was impaneled for the purpose of investigating "the facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia." Ex. 1. Thus, the FCDA and her office were tasked with a singular purpose. However, pursuant to the Supervising Judge's reasoning in his Disqualification Order, the investigation itself may continue – only with Lt. Governor Jones removed. Accordingly, if charges are lodged against a group of people, particularly in a multi-defendant prosecution, Lt. Gov. Jones will have effectively been preemptively severed out of that prosecution. Prosecutorial disqualification does not apply in such a haphazard or disjointed manner. Rather, when a district attorney is disqualified from a prosecution, as she was here, she must be disqualified from the *entire* prosecution. In those instances, the case remains a singular unit and the conflicted district attorney is excised; it is improper for a court to fragment an investigation or prosecution by carving out a target or defendant while permitting the conflicted district attorney to remain, and for good reason. The parade of unforeseen consequences to the parties remaining in the investigation, as well as the need for the public to have confidence in the judicial process, requires the removal of the conflicted district attorney from the investigation and all other proceedings. To do otherwise would, among other things, permit the district attorney to weaponize these conflicts against the other parties remaining in the proceeding.

The United States Supreme Court in *Young v. United States ex rel. Vuitton Et Fils S.A. et. Al*, 481 U.S. 787 (1987), recognized that the existence of an actual conflict cannot be limited to the investigation or prosecution of one individual but is a conflict that permeates the entire proceeding.

34

> Once we have drawn that conclusion [that a conflict exists], however, we have deemed
> the prosecutor subject to influences that undermine confidence that a prosecution can be
> conducted in a disinterested fashion. If this is the case, we cannot have confidence in a
> *proceeding* in which this officer plays the critical role of preparing and presenting the
> case..."

> *Id.* at 811. (Emphasis added).

The United States Supreme Court made clear in *Young* that the remedy for an actual conflict

could not be made piecemeal, as the Supervising Judge improperly chose to do here:

> Appointment of an interested prosecutor is also an error whose effects are pervasive.
> Such an appointment calls into question, and therefore requires scrutiny of, the conduct
> of an entire prosecution, rather than simply a discrete prosecutorial decision. Determining
> the effect of this appointment thus would be extremely difficult. A prosecution contains a
> myriad of occasions for the exercise of discretion, each of which goes to shape the record
> in a case, but few of which are part of the record.

> *Id.* at 811.

Lastly, the Court in *Young* emphasized that allowing a matter to continue where a conflicted

prosecutor remained constitutes clear error.

> Furthermore, appointment of an interested prosecutor creates an appearance of
> impropriety that diminishes faith in the fairness of the criminal justice system in general.
> The narrow focus of harmless-error analysis is not sensitive to this underlying concern. If
> a prosecutor uses the expansive prosecutorial powers to gather information for private
> purposes, the prosecution function has been seriously abused even if, in the process,
> sufficient evidence is obtained to convict a defendant. Prosecutors "have available a
> terrible array of coercive methods to obtain information," such as "police investigation
> and interrogation, warrants, informers and agents whose activities are immunized,
> authorized wiretapping, civil investigatory demands, [and] enhanced subpoena power."
> The misuse of those methods "would unfairly harass citizens, give unfair advantage to
> [the prosecutor's personal interests], and impair public willingness to accept the
> legitimate use of those powers."

> Id. at 811 (quoting C. Wolfram, Modern Legal Ethics 460 (1986)(emphasis added). The

Supreme Court added that:

> Public confidence in the disinterested conduct of that official is essential. Harmless-error
> analysis is not equal to the task of assuring that confidence. It is best suited for the review

of discrete exercises of judgment by lower courts, where information is available that makes it possible to gauge the effect of a decision on the trial as a whole. In this case, however, we establish a categorical rule against the appointment of an interested prosecutor, adherence to which requires no subtle calculations of judgment. Given the fundamental and pervasive effects of such an appointment, we therefore hold that harmless-error analysis is inappropriate in reviewing the appointment of an interested prosecutor in a case such as this.

*Id.* at 814 (citing *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 432 (1983) (prosecutorial use of grand jury to elicit evidence for use in civil case "improper per se") (emphasis added).

In applying the clear standard set forth by the United States Supreme Court to the actual conflict which exists in this proceeding, it cannot be understated how important this issue is, especially in an investigation of this magnitude. The rights of President Trump, as well as all others impacted by this investigation, are now subject to the prosecutorial discretion and decision-making of a prosecuting body that even the Supervising Judge acknowledged has an actual, disqualifying conflict. This is simply untenable. For this reason alone, the FCDA's Office must be removed from any further investigation or prosecution of this matter.

**B.** **The FCDA's Public Statements Violate Prosecutorial Standards, Constitute Forensic Misconduct, and Create the Appearance of Impropriety Requiring Disqualification.**

The FCDA's conflict has been amplified and exacerbated by the FCDA's extrajudicial statements which violate prosecutorial standards and constitute forensic misconduct, further necessitating disqualification. The Georgia Supreme Court has recognized that pretrial publicity poses a serious concern. *See Strong v. State*, 246 Ga. 612, 613 (1980) (citing *United States v. Sweig*, 316 F. Supp. 1148, 1153 (S.D.N.Y. 1970)).

36

A prosecutor is the administrator of justice who should exercise sound discretion and independent judgment in serving the public interest and must act with integrity while avoiding the appearance of impropriety. *See* ABA Standard 3-1.2. Prosecutors must be circumspect and not make comments that have a substantial likelihood of materially prejudicing a criminal proceeding or that heighten the public condemnation of the accused, and they should limit comments to what is *necessary* to inform the public of the prosecutor's action and that serve a legitimate law enforcement purpose. *See* ABA Standard 3-1.4; ABA Standard 3-1.10(c); *see also* Georgia Rule 3.8(g) (emphasis added). Furthermore, prosecutors should not allow improper considerations, such as partisan, political or personal considerations, to effect prosecutorial discretion, nor can their judgment be influenced by a personal interest in potential media attention. ABA Standard 3-1.6(a); ABA Standard 3-1.10(h).

Courts have previously looked at violations of the rules of professional conduct in evaluating whether a prosecutorial conflict exists, and these considerations form the foundation of much of the law on disqualification.[22] When comments go so far as to address the guilt of the accused, they constitute forensic misconduct thereby requiring disqualification under Georgia law. *See Williams v. State*, 258 Ga. 305 (1988) ("improper expression by the prosecuting attorney of his [or her] personal belief in the defendant's guilt") (citing *Vermont v. Hohman* and *In re J.S.*, 140 Vt. 230 (1981).

### i.    The FCDA's Statements to the Press Violate Prosecutorial Standards and Constitute Forensic Misconduct.

Since the inception of this investigation, the FCDA has spoken nearly forty times with at least fourteen different media outlets about this matter. Ex. 5. Even the Supervising Judge noted

---

[22] *See generally Ventura v. State*, 346 Ga. App. 309 (2018); *Young v. United States ex rel. Vuitton Et Fils S.A. et. Al*, 481 U.S. 787 (1987); *Berger v. United States*, 295 U.S. 78 (1935).

37

the FCDA's very public approach, which he described as being "on national media almost nightly talking about the investigation." Ex. 12 at 47. With each new development in the investigation, the FCDA repeatedly made public statements within days of each other in print articles, press conferences and videotaped interviews, and even live on prime-time national television. Ex. 5. Following each round of interviews, outside media sources repeated her comments, and a wave of additional coverage ensued across various networks for days to come. The FCDA regularly expressed her personal opinions about the criminality of the acts under investigation thereby suggesting the guilt of those who may be accused and has criticized the exercise of constitutional rights of witnesses contrary to the prosecutorial obligations of the FCDA's office.[23] *Id.*

When the investigation first began in February 2021, the FCDA sat down for a prime time interview on MSNBC and opined about President Trump's *mens rea* during the call with Secretary of State Raffensperger.[24] Similar interviews continued throughout the investigation. *Id.* The statements served no legitimate law enforcement purpose and heightened the public condemnation of the witnesses and those contemplated by the scope of this investigation. *See* Ex. 5.

---

[23] *In re J.S.*, 140 Vt. 230 (1981) ("it is unconscionable for a prosecutor representing the people... to undermine the rights specifically guaranteed in the Constitution he has taken an oath to uphold.")

[24] "When any prosecutor throughout this country is interviewing people trying to determine if a crime was committed, and if they understood what they were doing, the *mens rea* is always important. So you look at facts to see, 'did they really have intent?' [or] 'did they really understand what they were doing?' Detailed facts become important like, asking for a specific number and then going back to investigate and understand that that number is just one more than the number that is needed. It lets you know that someone had a clear mind. They understood what they were doing, and so when you are pursuing the investigation, facts like that that may not seem so important, become very important." Ex. 5 at No. 4.

Only days before the grand jurors would be charged with investigating *whether* the activity under investigation rose to that of a crime, the FCDA publicly and explicitly stated the conduct under investigation was in fact criminal.[25] Even after the grand jury was impaneled, the FCDA continued making public statements that the activities to be reviewed by the newly constituted SPGJ were illegal.[26] Most concerning, in September of 2022, while the SPGJ was in the middle of their investigation and (we now know, *see infra* Section V) were permitted to consume media coverage, the FCDA commented that "credible allegations of serious crimes" existed and "people are facing prison sentences." *Id.* at No. 37. In each such statement, the FCDA commented on the ultimate issue the grand jury was impaneled to decide. Given the SPGJ's daily consumption of the news media, the FCDA's comments created a substantial likelihood of materially prejudicing the SPGJ's decision. The FCDA's expression of her personal opinions of the criminality of the conduct and the guilt of those being investigated rose to the level of forensic misconduct which creates an actual conflict requiring disqualification. *See Williams v. State*, 258 Ga. 305 (1988).

### ii.     The FCDA's Online Activity Violates Prosecutorial Standards and Creates the Appearance of Impropriety.

In its order disqualifying the FCDA, the Supervising Judge noted: "[a]n investigation of this significance, garnering the public attention it necessarily does and touching so many political

---

[25] "So in this case, you have an allegation of a human being, of a person, of an American citizen, possibly doing something that would've infringed upon the rights of lots of Georgians. Specifically from my county—Fulton County—right to vote being infringed upon. And the allegations, quite frankly, were not a civil wrongdoing, but a crime." Ex. 5 at No. 22.
[26] "...and two, that if we live in a free land in a democracy, we have to have free and fair elections. And so, I am very concerned that if behavior that is illegal goes unchecked, that it could lead to a very bad start and a very, very bad path....[While discussing the electors] There are so many issues that could have come about if somebody participates in submitting a document that they know is false. You can't do that." Ex. 5 No. 24.

nerves in our society, cannot be burdened by legitimate doubts about the District Attorney's

Motives." Ex. 4 at 5. He concluded, "[t]he District Attorney does not have to be apolitical - but

her investigations do." *Id.* Further, the Supervising Judge held, "the fact that concern about the

District Attorney's partiality naturally, immediately, and reasonably arises in the minds of the

public, the pundits, and – most critically – the subjects of the investigation" is what necessitates

disqualification. *Id.* Courts have an interest in ensuring that "legal proceedings appear fair to all

who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988). A concern for actual

prejudice misses the point, for what is at stake is the public perception of the integrity of our

criminal justice system. *Young v. United States ex rel. Vuitton Et Fils S.A. et. Al*, 481 U.S. 787,

812 (1987).

> "Justice must satisfy the appearance of justice," and a prosecutor with conflicting
> loyalties presents the appearance of precisely the opposite. Society's interest in
> disinterested prosecution therefore would not be adequately protected by harmless-error
> analysis, for such analysis would not be sensitive to the fundamental nature of the error
> committed.
>
> *Id.* at 812 (quoting *Offutt v. United States*, 346 U.S. 11, 14 (1954)).
>
> Between the private life of the citizen and the public glare of criminal accusation stands
> the prosecutor. That state official has the power to employ the full machinery of the state
> in scrutinizing any given individual. Even if a defendant is ultimately acquitted, forced
> immersion in criminal investigation and adjudication is a wrenching disruption of
> everyday life. For this reason, we must have assurance that those who would wield this
> power will be guided solely by their sense of public responsibility for the attainment of
> justice.
>
> *Id.* at 814.

A court must consider how the facts would appear to a well-informed, thoughtful and objective

observer, *U.S. v. Jordan*, 49 F.3d 152, 156 (5th Cir. 1995), and courts should "resolve all doubts

in favor of disqualification." *United States v. Clarkson*, 567 F.2d 270, 273 (4th Cir. 1977).

The FCDA's social media activity during the investigation creates the appearance of impropriety. In July 2022, after subpoenaing a slew of high-profile witnesses, she used her campaign Twitter account to promote a biased political cartoon depicting the FCDA fishing a recently subpoenaed witness out of a swamp. [27] Posting a political cartoon depicting the influencing of witnesses in an "investigation of this significance, garnering the public attention it necessarily does and touching so many political nerves in our society," does not create the appearance of an unbiased and "apolitical" investigation.



Furthermore, the FCDA promoted her own campaign on the shoulders of partisan support for this SPGJ investigation.[28] Within a couple of days, the FCDA's Twitter account increased by

---

[27] On July 18, 2022, the FCDA posted the cartoon depicting her fishing Lyndsey Graham out of a swamp and President Trump stating, "I know you'll do the right thing for the swamp, Lyndsey." The timing of this post is particularly relevant because, less than two weeks prior, the SPGJ subpoenaed Lyndsey Graham to testify, and based on the foreperson's statements, *see supra* Section V, the grand jurors were aware of Senator Graham's challenges to that subpoena.
[28] On July 11, 2022, political strategist Adam Parkhomenko tweeted multiple times asking for 1) users to follow the FCDA's twitter account, 2) donations to the FCDA's campaign, and 3) one-thousand retweets of his requests stating, "I can't think of a better way to celebrate after Lyndsey Graham lost in court today then support the person who is holding them all accountable." The FCDA personally replied thanking him for his support on July 14, 2022 and her tweet was liked by close to twenty-two thousand followers and retweeted over eight-thousand times. On July 15, 2022, while continuing to solicit followers, Adam again tied his request to this investigation by posting a Yahoo! News article related to the target letters sent out that day. The next day, in a series of tweets, while noting the FCDA now had fifty-thousand new followers, he again tweeted

approximately one-hundred thousand followers, and requests for campaign donations were retweeted thousands of times. On at least three occasions, the FCDA personally inserted herself into this Twitter campaign for "followers, tweets and donations" which specifically referenced this investigation; it is that personal involvement and interest which creates the disqualifying conflict. The FCDA's posts do not further a legitimate law enforcement purpose but instead portray a biased prosecutor with a personal interest.

While these posts, if standing alone, might not be sufficient for disqualification, they must be considered in combination with the facts giving rise to the disqualifying conflict previously found to exist. The Supervising Judge called the FCDA's behavior in campaigning for the political opponent of a named target a "what were you thinking moment" resulting in "horrible optics" and "problematic" from a disqualification perspective. Ex. 12 at 46. Those sentiments apply equally to the FCDA's social media posts which cannot be considered in a vacuum. The cumulative impact of the FCDA's public behavior casts a shadow of bias over her office and the entire investigation as it touches upon the same concerns referenced by the Supervising Judge. *Id.* (noting the need for the public to believe a "fair and balanced approach" was taken in this "non-partisan" investigation driven only by the facts and following the evidence wherever it leads."). The FCDA's behavior does not paint the picture of an open-minded, uninterested prosecutor fairly seeking justice on behalf of the public. Therefore, in

---

asking for campaign donations, retweets and followers, this time stating, "her account has increased by 50k followers this week. She subpoenaed Lindsey Graham. Let's help build her platform..." On July 17, 2022, as her followers climbed to eighty-six thousand, he tweeted two additional times asking for more followers. The FCDA again retweeted publicly thanking Adam for his support, and her tweet was retweeted over twenty-five hundred times and liked by over fourteen-thousand followers. She then retweeted his original July 11, 2022 post thereby personally soliciting followers, retweets and campaign donations on the back of his requests which specifically referenced this investigation. Ex. 5 at 8-10.

addition to the actual conflict previously found to exist and the conflict created through forensic misconduct, this appearance of impropriety likewise creates a conflict. The totality of the circumstances demands disqualification.

## V.   THE PUBLIC COMMENTS MADE BY THE FOREPERSON AND GRAND JURORS REVEAL THAT THE GRAND JURY PROCEEDING WAS TAINTED BY IMPROPER INFLUENCES, INCOMPLETE OR INACCURATE INSTRUCTIONS, AND UNCONSTITUTIONAL INFERENCES.

On February 13, 2023, the Supervising Judge ordered the release of a redacted version of the final report as a means of protecting the due process rights of individuals who may be named in such report. Ex. 7. The Court referred to the SPGJ process as a "one-sided exploration," where lawyers were not allowed to be present, potential future defendants were not allowed to present evidence in their defense, and, in the words of the court "there was very limited due process in this process for those who might now be named as indictment-worthy in the final report." *Id.* at 5. The process was "imbalanced, incomplete, and one-sided." *Id.* at 5. Accordingly, the Supervising Judge felt that fundamental fairness required the severe redaction of the report upon its release to the public.

On February 21, 2023, five days after the Supervising Judge consciously decided to release only a limited, redacted version of the SPGJ's report, the foreperson of the SPGJ decided to speak with the media – first, in an interview with the Associated Press, then with the New York Times, and then the Atlanta Journal Constitution. Ex. 8. The foreperson then sat for a 42-minute interview with NBC's Blayne Alexander and was subsequently interviewed live on-air by CNN's Kate Bouldan that evening. *Id.* The foreperson's now widespread statements have provided a first-hand glimpse inside the SPGJ process – an otherwise historically secretive affair. Additionally, on March 15, 2023, five special purpose grand jurors spoke anonymously to the

Atlanta Journal Constitution. *Id.* at No. 11. Collectively, the six jurors' statements reveal a tainted process incapable of producing valuable evidentiary material and a District Attorney's Office who provided constitutionally flawed instructions.

In Georgia, the rules directed to grand jurors as they relate to grand jury secrecy are relatively permissive compared to other jurisdictions. O.C.G.A. § 15-12-67(b). The only limitation placed on grand jurors is that juror deliberations must remain confidential. *See In re Gwinnett County Grand Jury*, 284 Ga. 510, 512 (2008). Members of the grand jury are sworn to "keep the deliberations of the grand jury secret unless called upon to give evidence thereof in some sort of court of law of this state." *Id.*; O.C.G.A. § 15-12-67(b). It is difficult to take a scalpel to the work of grand juries and parse out what does or does not constitute deliberations, but the foreperson seemingly breached that obligation in her public appearances. The foreperson disclosed grand jurors' opinions as to the credibility of witnesses,[29] their strategic decisions in drafting the report,[30] and general discussions between the jurors.[31] She ultimately revealed that the SPGJ recommended at least twelve people for indictment. Ex. 8 at No. 4. That recommendation is, of course, the product of deliberations. In fact, the FCDA's Office would agree, as stated by Assistant District Attorney Wakeford: "The report is the necessary result of the deliberations of the grand jury." Ex. 3 at 38.

The collective grand juror interviews also revealed the many outside influences on the SPGJ during the eight months of their investigation. Specifically, the foreperson revealed that the

---

[29] Witnesses were "honest," "forthcoming," "not very willing to speak," and "genuine." Ex. 8.
[30] The foreperson stated the perjury section "ended up included there because it was less pointed of a suggestion" than the recommendations made elsewhere in the report. Ex. 8 at No. 4.
[31]"We definitely talked about the alternate electors a fair amount, they were absolutely part of the discussion....We talked a lot about December and things that happened in the Georgia legislature." Ex. 8 at No. 2.

FCDA's Office explicitly told the grand jurors that they were allowed to consume news coverage related to the investigation during the time period they conducted it. *Id.* at No. 1. Not only was the SPGJ permitted to review news coverage, but a grand juror brought a newspaper into the room every day and pointed out stories about the events under investigation. *Id.* The SPGJ's review of outside material must be analyzed in combination with the improper public statements contemporaneously made by both the FCDA's Office as well as the Supervising Judge. The foreperson made statements indicating that the grand jurors considered the viability of litigating legal issues outside of their purview, indicated knowledge of how witnesses responded to questioning in other matters outside of their purview, and that they considered the resources of the FCDA's Office in making their decisions which, again, was outside of their purview.[32] The foreperson disclosed that the grand jury reviewed footage and testimony from the Jan. 6 hearings and other pending litigation, as well as media interviews by certain witnesses.[33] Based upon that extraneous information, the grand jurors decided which witnesses to call (or not to call) and drew assumptions regarding what witnesses might testify (or not testify) to.[34] For example, the grand jurors assumed, "Trump, had he been summoned would likely have invoked the Fifth

---

[32]"At some point through this investigation, especially as we began to speak to higher profile witnesses, I think some of the combativeness that we experienced meant that the DA's team, as well as us, started to pick our battles. And when someone, like for example, goes before the January 6 Committee and says they plead the 5th 200 times, do you really expect them to come before you and say something different?" Ex. 8 at No. 5.

[33]"...The lawyers would show video of the person appearing on television or testifying before the U.S. House committee that investigated the Jan. 6, 2021, riot at the U.S. Capitol, periodically asking the witness to confirm certain things." Ex. 8 at No. 1.

[34]"We kind of knew what to expect, and so especially with our time being limited and with our resources being limited, when it came to that it was like "eh, we'd rather get this person, which is a battle that we can win, than this other one.... I could see how getting the former president to talk to us would have been a year in negotiation by itself.... I'd be fascinated by what he said, but do you think he would come in and say anything groundbreaking or just the same kinda thing we've heard? So, at some point you don't need to hear 50 people say the same thing." Ex. 8 at Nos. 1, 5.

Amendment, which he reportedly did more than 400 times when he sat for a deposition last summer with the New York Attorney General's office." Ex. 8 at No. 11.

Most concerning, the grand jurors spoke about the inferences which they drew from witnesses' invocations of the Fifth Amendment.[35] The foreperson described prosecutors engaging in what she came to think of as a "show and tell" process when witnesses refused to answer almost every question and stated, "the scratching of pens on paper could be heard as jurors tallied how many times the person invoked the Fifth Amendment." *Id.* at No. 1. Moreover, when a witness invoked the Fifth, "a prosecutor would play videos of speeches, TV interviews or testimony the witness had given elsewhere." *Id.* at No. 11. The juror's observation indicates the lack of respect for the Fifth Amendment shown by the FCDA's office: "I don't know if it was like cruelty, but they're like, if you're going to take the Fifth, we're going to watch you." *Id.* The fact that the juror had to question whether the prosecutor was acting cruelly speaks for itself.

As a continued display of the FCDA's failed understanding of the Fifth Amendment, the grand jurors recalled that the FCDA's office "repeatedly" told the grand jurors that they "should not perceive someone invoking his or her Fifth Amendment right against self-incrimination as an admission of guilt." In reality, a witnesses' assertion of the Fifth Amendment has nothing to do with guilt. As a refresher, the Fifth Amendment states, in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. The instruction given to the grand jurors, that the invocation was not an admission of guilt, was insufficient on its face. *See Barnes v. State*, 335 Ga. App. 709 (2016) (precisely forbidding jurors from drawing *any* inferences from a witness's invocation of the Fifth Amendment). The pattern

---

[35] She continuously says "we." Ex. 8.

and practice of the FCDA's office of forcing witnesses, after invoking the Fifth, to continue to testify while showing videos of them from outside sources violates all notions of the Fifth Amendment privilege.[36] As stated in *Barnes*, "too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are guilty of a crime."

The foreperson, armed with an improper education of the Fifth Amendment, as provided by the FCDA, shared some specific observations in her Fifth Amendment analysis. She said of former chief of staff Mark Meadows, "Mr. Meadows didn't share very much at all and was not very willing to speak on much of anything" and "I asked if he had Twitter, and he pled the Fifth." *Id.* at Nos. 6, 8. In contrast, she felt that Rudy Giuliani "genuinely seemed to consider whether it was merited before declining to answer." *Id.* at No. 1. Senator Lindsay Graham, despite challenging his subpoena, struck her as honest, forthcoming, and very willing to have a conversation. *Id.* at No. 6. Since the Supervising Judge declared this to be a criminal SPGJ, as previously stated, it was improper for a grand juror to draw *any inferences* from a witness invoking his rights under the Fifth Amendment. *See Barnes,* 335 Ga. App. 709 (2016). Not only did this SPGJ arbitrarily draw inferences from witnesses' invocation of the Fifth Amendment, but the foreperson then reiterated those negative inferences through the megaphone of the media, thereby tainting any future grand jury.

---

[36] The foreperson described prosecutors, in response to witnesses invoking the Fifth, engaging in what she came to think of as a "show and tell" process where they would show videos of that witness, periodically asking him or her to confirm certain things, and "the scratching of pens on paper could be heard as jurors tallied how many times the person invoked the Fifth Amendment." Ex. 8 at No. 1. "When people would take the Fifth over and over, we could kind of go, ugh" one juror said. "Not because we're like, oh my gosh you're guilty, whatever. It was like we're going to be here all day." Ex. 8 at No. 11.

The grand jurors' comments reveal a grand jury that relied upon improper outside sources and illegally drawn inferences in directing the course of their investigation and rendering their ultimate decision. Throughout the foreperson's media tour, and the subsequent statements of additional grand jurors, it became apparent that this grand jury was improperly supervised or, worse, improperly instructed from the outset. The public cannot have faith in the impartiality of this constitutionally unsound investigation. The results of this tainted investigation included in the final report will negatively impact the due process rights of the named individuals, and the report must be suppressed as it violates the principles of fundamental fairness.

## VI.   **THE SUPERVISING JUDGE VIOLATED THE RIGHTS OF PARTIES IMPACTED BY THIS INVESTIGATION.**

Compounding the various harms already inflicted upon the SPGJ, the Supervising Judge made improper comments – both to the press and in court - regarding the investigation.[37] Additionally, during the course of the SPGJ investigation, the Supervising Judge indicated bias on more than one occasion by making prejudicial comments.[38] More specifically, he made improper remarks impacting the Fifth Amendment rights of the accused. As argued above, this behavior affected the substantive rights of witnesses and non-witnesses alike, including President Trump.

---

[37] The supervising judge provided interviews to the Atlanta Journal Constitution, the Associated Press, 11 Alive, CNN, Yahoo! News, and ABC News. *See* Ex. 9.

[38] In speaking about the electors, the Supervising Judge stated, "we're not going to get into whether they should be surprised or not that they have become the subject of negative attention based on the decisions they made." Ex. 12 at 20.

A. **The Supervising Judge Made Prejudicial Statements Regarding Witnesses'**
   **Invocation of the Fifth Amendment.**

On July 21, 2022, the Supervising Judge heard argument from counsel for the Georgia

electors who sought to quash their subpoenas. In doing so, counsel argued the electors should not

be required to appear before the SPGJ in order to assert their Fifth Amendment rights. In

response, the Supervising Judge replied, "but if they did nothing wrong, why aren't they talking

to the grand jury?" Ex. 12 at 27. Counsel for the electors further argued that, because the

allegations against them related to signing certificates, questions about their name could

conceivably warrant a Fifth Amendment assertion. In response, the Supervising Judge stated,

"That may be something that the Grand Jury may want to know, that this person won't even give

her name under oath. That could be instructive to what the Grand Jury is doing but they wouldn't

know if they never met the person." *Id.* at 28. His statements were made in open-court and

streamed live on YouTube to the public.[39] As the Supreme Court held in *Ohio v. Reiner*, 532

U.S. 17, 20 (2001):

> [W]e have emphasized that one of the Fifth Amendment's "basic functions ... is to protect
> innocent men ... 'who otherwise might be ensnared by ambiguous circumstances.'" In
> Grunewald, we recognized that truthful responses of an innocent witness, as well as those
> of a wrongdoer, may provide the government with incriminating evidence from the
> speaker's own mouth.
>
> *Id.* (quoting Grunewald v. United States, 353 U. S. 391, 421-422 (1957) (quoting
> Slochower v. Board of Higher Ed. of New York City, 350 U. S. 551, 557-558 (1956))
> (emphasis in original).

The court may not suggest that a witness invoking their Fifth Amendment right is evidence of

guilt. *Griffin v. California*, 380 U.S. 609 (1965); *see also Carter v. Ky.*, 450 U.S. 288 (1981)

---

[39] Judge Robert McBurney, YouTube (July 25, 2022),
https://www.youtube.com/@judgerobertmcburney7938/streams

("The penalty imposed upon a defendant for the exercise of his constitutional privilege not to testify is severe when there is an adverse comment on his silence."). Yet the Supervising Judge publicly condemned witnesses who chose to invoke their Fifth Amendment privilege, and the comments were livestreamed to his YouTube channel for the world, including the special purpose grand jurors and any future jurors, to see. As discussed in Section V, *supra*, we now know the grand jurors were carefully watching the news as well as following the legal challenges filed by witnesses. Ex. 7. We also know they made impermissible inferences based on the invocation of the Fifth Amendment by various witnesses. *Id.*

The Supervising Judge's improper remarks to the jurors regarding witnesses' invocation of the Fifth Amendment violated the rights of those witnesses as well as all parties impacted by this investigation, including Movant. The Supervising Judge's Fifth Amendment commentary, combined with the FCDA's Office's ill-informed understanding and edification to the jurors of the Fifth Amendment, *see supra* Section V, evidences a flawed process. Accordingly, any evidence obtained by this SPGJ, in violation of the rights of witnesses and non-parties alike, must be quashed. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

## VII.   CONCLUSION

As it relates to this investigation, Fulton County, Georgia has become a topic of conversation across the United States and internationally. The whole world has watched the process of the SPGJ unfold and what they have witnessed was a process that was confusing, flawed and, at-times, blatantly unconstitutional. Given the scrutiny and the gravity of the investigation and those individuals involved—namely, the movant President Donald J. Trump, this process should have been handled correctly, fairly, and with deference to the law and the highest ethical standards. Instead, the SPGJ involved a constant lack of clarity as to the law,

inconsistent applications of basic constitutional protections for individuals brought before it, and a prosecutor's office that was found to have an actual conflict yet continued to pursue the investigation. These collective actions violated all notions of fundamental fairness and due process, Movant suffered an injury-in-fact, and the compounding result is one that the court cannot ignore. The errors and flaws detailed above are fatal to the report and recommendations made by the SPGJ as fruit of the poisonous tree.

WHEREFORE, Movant President Donald J. Trump respectfully requests that:

(1) The report of the SPGJ is quashed and expunged from the record;

(2) All evidence derived from the SPGJ is suppressed as unconstitutionally derived and any prosecuting body be prevented from its use; and

(3) The FCDA's Office be disqualified from any further investigation and/or prosecution of this matter or any related matter derived from their use of the SPGJ.

The Movant further respectfully requests that this motion be heard by the Chief Judge (or other duly assigned judge separate from the Supervising Judge), and that he be granted a hearing on the merits.

Respectfully submitted this 20th day of March, 2023.


JENNIFER L. LITTLE
Jennifer Little Law, LLC
400 Galleria Pkwy SE, Suite 1920
Atlanta, GA 30339
Tel: (404) 947-7778
Georgia Bar 141596

*Counsel for President Donald J. Trump*

DREW FINDLING
Findling Law Firm
3575 Piedmont Rd NE, Suite 1010
Atlanta, GA 30305
Tel: (404) 460-4500
Georgia Bar 260425

*Counsel for President Donald J. Trump*

MARISSA GOLDBERG
Findling Law Firm
3575 Piedmont Rd NE, Suite 1010
Atlanta, GA 30305
Tel: (404) 460 - 4500
Georgia Bar 672798

*Counsel for President Donald J. Trump*

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

IN RE: SPECIAL PURPOSE          )          Case No.: 2022-EX-000024
GRAND JURY                      )
                                )
                                )          Hearing Requested
                                )

## CERTIFICATE OF SERVICE

Undersigned counsel hereby confirms that it served the above and foregoing Motion to Quash the Special Purpose Grand Jury Report, to Preclude the Use of Any Evidence Derived Therefrom, and To Recuse the Fulton County District Attorney's Office via email and U.S Postage to:

District Attorney Fani Willis
Fulton County Justice Center
Office of the District Attorney
136 Pryor St. SW, Third Floor
Atlanta, Ga 30303
Email: Fani.WillisDA@fultoncountyga.gov

This 20th day of March, 2023

DREW FINDLING
Findling Law Firm
3575 Piedmont Rd NE, Suite 1010
Atlanta, GA 30305
Tel: (404) 460 - 4500
drew@thefindlingfirm.com
Georgia Bar 260425

*Counsel for President Donald J. Trump*

# **<u>Exhibit 1</u>**

January 24, 2021 Order Approving Request for Special Purpose Grand Jury, In re 2 May 2022 Special Purpose Grand Jury, Case NO. 2022-EX-000024 (Fulton Co. Sup. Court).



**IN THE SUPERIOR COURT OF FULTON COUNTY**
**ATLANTA JUDICIAL CIRCUIT**
**STATE OF GEORGIA**

IN RE:  **REQUEST FOR**
      **SPECIAL PURPOSE**
      **GRAND JURY**

2022-EX000024
FILED IN OFFICE
JAN 24 2022
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

**ORDER APPROVING REQUEST FOR SPECIAL PURPOSE**
**GRAND JURY PURSUANT TO O.C.G.A. §15-12-100, et seq.**

The District Attorney for the Atlanta Judicial Circuit submitted to the judges of the

Superior Court of Fulton County a request to impanel a special purpose jury for the purposes set

forth in that request.  This request was considered and approved by a majority of the total

number of the judges of this Court, as required by O.C.G.A. §15-12-100(b).

IT IS THEREFORE ORDERED that a special purpose grand jury be drawn and

impaneled to serve as provided in O.C.G.A. § 15-12-62.1, 15-12-67, and 15-12-100, to

commence on May 2, 2022, and continuing for a period not to exceed 12 months.  Such period

shall not include any time periods when the supervising judge determines that the special

purpose grand jury cannot meet for safety or other reasons, or any time periods when normal

court operations are suspended by order of the Supreme Court of Georgia or the Chief Judge of

the Superior Court.  The special purpose grand jury shall be authorized to investigate any and all

facts and circumstances relating directly or indirectly to alleged violations of the laws of the

State of Georgia, as set forth in the request of the District Attorney referenced herein above.

Pursuant to O.C.G.A. § 15-12-101(a), the Honorable Robert C. I. McBurney is hereby

assigned to supervise and assist the special purpose grand jury, and shall charge said special

purpose grand jury and receive its reports as provided by law.



This authorization shall include the investigation of any overt acts or predicate acts relating to the subject of the special purpose grand jury's investigative purpose. The special purpose grand jury, when making its presentments and reports, pursuant to O.C.G.A. §§ 15-12-71 and 15-12-101, may make recommendations concerning criminal prosecution as it shall see fit. Furthermore, the provisions of O.C.G.A. § 15-12-83 shall apply.

This Court also notes that the appointment of a special purpose grand jury will permit the time, efforts, and attention of the regular grand jury(ies) impaneled in this Circuit to continue to be devoted to the consideration of the backlog of criminal matters that has accumulated as a result of the COVID-19 Pandemic.

IT IS FURTHER ORDERED that this Order shall be filed in the Office of the Clerk of the Superior Court of Fulton County.

SO ORDERED, THIS 24 DAY OF January , 2022.

_____
CHRISTOPHER S. BRASHER, CHIEF JUDGE
Superior Court of Fulton County
Atlanta Judicial Circuit

# __Exhibit 2__

January 20, 2021 Letter Requesting Special
Purpose Grand Jury

OFFICE OF THE FULTON COUNTY DISTRICT ATTORNEY
ATLANTA JUDICIAL CIRCUIT
136 PRYOR STREET SW, 3RD FLOOR
ATLANTA, GEORGIA 30303

*Fani T. Willis*
District Attorney

TELEPHONE 404-612-4639

*2022-EX-000017*

FILED IN OFFICE
JAN 20 2022
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

The Honorable Christopher S. Brasher
Chief Judge, Fulton County Superior Court
Fulton County Courthouse
185 Central Avenue SW, Suite T-8905
Atlanta, Georgia 30303

January 20, 2022

Dear Chief Judge Brasher:

I hope this letter finds you well and in good spirits. Please be advised that the District Attorney's Office has received information indicating a reasonable probability that the State of Georgia's administration of elections in 2020, including the State's election of the President of the United States, was subject to possible criminal disruptions. Our office has also learned that individuals associated with these disruptions have contacted other agencies empowered to investigate this matter, including the Georgia Secretary of State, the Georgia Attorney General, and the United States Attorney's Office for the Northern District of Georgia, leaving this office as the sole agency with jurisdiction that is not a potential witness to conduct related to the matter. As a result, our office has opened an investigation into any coordinated attempts to unlawfully alter the outcome of the 2020 elections in this state.

We have made efforts to interview multiple witnesses and gather evidence, and a significant number of witnesses and prospective witnesses have refused to cooperate with the investigation absent a subpoena requiring their testimony. By way of example, Georgia Secretary of State Brad Raffensperger, an essential witness to the investigation, has indicated that he will not participate in an interview or otherwise offer evidence until he is presented with a subpoena by my office. Please see Exhibit A, attached to this letter.

Therefore, I am hereby requesting, as the elected District Attorney for Fulton County, pursuant to O.C.G.A. § 15-12-100 et. seq., that a special purpose grand jury be impaneled for the purpose of investigating the facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia. Specifically, a special purpose grand jury, which will not have the authority to return an indictment but may make recommendations concerning criminal prosecution as it shall see fit, is needed for three reasons: first, a special purpose grand jury can be impaneled by the Court for any time period required in order to accomplish its investigation, which will likely exceed a normal grand jury

term; second, the special purpose grand jury would be empowered to review this matter and this matter only, with an investigatory focus appropriate to the complexity of the facts and circumstances involved; and third, the sitting grand jury would not be required to attempt to address this matter in addition to their normal duties.

Additionally, I am requesting that, pursuant to O.C.G.A. § 15-12-101, a Fulton County Superior Court Judge be assigned to assist and supervise the special purpose grand jury in carrying out its investigation and duties.

I have attached a proposed order impaneling the special purpose grand jury for the consideration of the Court.

Respectfully,

Fani T. Willis
District Attorney, Atlanta Judicial Circuit

Exhibit A: Transcript of October 31, 2021 episode of *Meet the Press* on NBC News at 26:04 (video archived at https://www.youtube.com/watch?v=B71cBRPgt9k)
Exhibit B: Proposed Order

cc:
The Honorable Kimberly M. Esmond Adams
The Honorable Jane C. Barwick
The Honorable Rachelle Carnesdale
The Honorable Thomas A. Cox, Jr.
The Honorable Eric Dunaway
The Honorable Charles M. Eaton, Jr.
The Honorable Belinda E. Edwards
The Honorable Kelly Lee Ellerbe
The Honorable Kevin M. Farmer
The Honorable Ural Glanville
The Honorable Shakura L. Ingram
The Honorable Rachel R. Krause
The Honorable Melynee Leftridge
The Honorable Robert C.I. McBurney
The Honorable Henry M. Newkirk
The Honorable Emily K. Richardson
The Honorable Craig L. Schwall, Sr.
The Honorable Paige Reese Whitaker
The Honorable Shermela J. Williams
Fulton County Clerk of Superior Court Cathelene "Tina" Robinson

# EXHIBIT A

BRAD RAFFENSPERGER:

Well, there's nothing to recalculate because if you look at the numbers, the numbers are the numbers. And so you can slice that, dice that any way you want. But at the end of the day, President Trump came up 11,800 votes short. And I had the numbers. Here are the real facts, though, 28,000 Georgians did not vote for anyone for president of the United States of America in Georgia. They skipped. They didn't vote for Biden. They didn't vote for President Trump. They didn't vote for the libertarian Jo Jorgesen. They just left it blank. And Senator David Perdue got 20,000 more votes in the metropolitan areas of the met-- of metropolitan Atlanta and Athens. And that really tells the big story of why President Trump did not carry the state of Georgia.

CHUCK TODD:

The Fulton County district attorney has been investigating whether the president did break any laws in that phone call to you. Have you -- I know you've turned over documents and various things. Have you been interviewed by investigators? You hadn't the last time we talked. Have you since?

BRAD RAFFENSPERGER:

No, I haven't been. I think she's busy with other matters. She has an awful lot of other cases that she inherited. But we fully complied, sent all the documents that we had, and she actually talked to some of our staff members. So if she wants to interview me, there's a process for that and I will gladly participate in that because I want to make sure that I follow the law, follow the Constitution. And when you get a grand jury summons, you respond to it.

CHUCK TODD:

You believe this investigation is totally -- is very legitimate by the D.A.?

BRAD RAFFENSPERGER:

Well, I'm an engineer, not a lawyer. And so I'll let her follow that process and let her bring it before the people.

CHUCK TODD:

You said that you wouldn't have released the phone call had President Trump not tweeted. That's a little bit disconcerting to some. Here he was asking you to break the law. But you

# EXHIBIT B

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

IN RE:
SPECIAL PURPOSE GRAND JURY

ORDER IMPANELING SPECIAL PURPOSE GRAND JURY
PURSUANT TO O.C.G.A. § 15-12-100, ET SEQ.

Pursuant to the request of the District Attorney for the Atlanta Judicial Circuit to the Judges of the Superior Court of Fulton County to impanel a Special Purpose Grand Jury under the provisions of O.C.G.A. § 15-12-100 et seq., for the purpose of investigating the facts and circumstances surrounding potential disruptions to the lawful administration of the 2020 elections in the State of Georgia, including the election of the President of the United States; and

This matter having been discussed, considered, and approved by the Judges of this Court at the regularly scheduled DATE meeting;

**IT IS ORDERED** that a Special Purpose Grand Jury be drawn and serve as provided in O.C.G.A. §§ 15-12-62.1, 15-12-67, and 15-12-100 et. seq., by and under the supervision of the Honorable NAME, to commence serving on May 2, 2022, not to exceed 12 months under this Order, excluding any time periods when the supervising judge determines that the Special Purpose Grand Jury cannot meet for safety or other reasons, or any time periods when normal court operations are suspended by order of the Supreme Court of Georgia or the Chief Judge of the Superior Court. The Special Purpose Grand Jury shall be authorized to investigate any and all facts and circumstances relating directly or indirectly to alleged violations of the laws of the State of Georgia intended to change, disrupt, or influence the administration or outcome of the 2020 General Election in Georgia and its subsequent runoff, during the period from January 20, 2017,

to the present day. This authorization shall include the investigation of any overt acts or predicate acts relating to the subject of the Special Purpose Grand Jury's investigative purpose. The Special Purpose Grand Jury, when making its presentments and reports, pursuant to O.C.G.A. §§ 15-12-71 and 15-12-101, may make recommendations concerning criminal prosecution as it shall see fit. Furthermore, the provisions of O.C.G.A. § 15-12-83 shall apply.

**IT IS FURTHER ORDERED** that this Order be filed in the Office of the Clerk of the Superior Court of Fulton County, Georgia, and published in the newspaper of record.

**SO ORDERED**, this DATE,

_____
**The Honorable Christopher S. Brasher**
**Chief Judge, Superior Court of Fulton County**
**Atlanta Judicial Circuit**


**PROPOSED ORDER PREPARED BY:**
**Fani T. Willis**
**District Attorney**
**Atlanta Judicial Circuit**
**Georgia State Bar No. 223955**

# **Exhibit 3**

Transcript of January 24, 2023 Special
Purpose Grand Jury Hearing before the
Honorable Robert C.I. McBurney, Atlanta,
Georgia, In re 2 May 2022 Special Purpose
Grand Jury, Case No. 2022-EX-000024
(Fulton Co. Sup. Court).

1

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA


IN RE: 2 MAY SPECIAL      )

PURPOSE GRAND JURY       )

                         )

                         )   2022-EX-000024


TRANSCRIPT OF SPECIAL PURPOSE GRAND JURY HEARING
BEFORE THE HONORABLE ROBERT C.I. MCBURNEY
ON JANUARY 24, 2023, ATLANTA, GEORGIA

APPEARANCES:

   ON BEHALF OF THE STATE:

   *FANI WILLIAMS, ESQ.
   ELECTED DISTRICT ATTORNEY

   ADA FMCDONALD WAKEFORD, ESQ.

   ADA WILL WOOTEN, ESQ.

   ADA ADAM NEY, ESQ.

   ADA NATHAN WADE, ESQ.

   ON BEHALF OF THE MEDIA INTERVENORS':

   THOMAS M. CLYDE, ESQ.

   LESLI GAITHER, ESQ.

_____
        KAREN RIVERS, RMR, RPR, CCR-2575
            OFFICIAL COURT REPORTER
        FULTON COUNTY JUSTICE CENTER TOWER
            185 CENTRAL AVENUE, S.W.
            ATLANTA, GEORGIA  30303

THE COURT:  So, Mr. Ney, if I could have
the appearance for the State.

MR. NEY: Adam Ney, your Honor.

THE COURT:  And on behalf of the media
interveners?

MR. CLYDE: Your Honor, Tom Clyde and
Lesli Gaither.

THE COURT:  Welcome both of you.

Mr. Clyde, will you be doing the primary
speaking for the Media Intervenors'.  I'm happy to
have it spread out wherever, but if I have
questions for your side, should I just pose them
and you guys will flip a coin?

MR. CLYDE: I welcome just posing them,
and we'll flip a coin, but I anticipate I will be
doing the bulk of the argument.

THE COURT: Great.  Mr. Ney just breathed
a side of relief.

Mr. Wade, who will be answering questions
if I've got any for the District Attorney's Office.

MR. WADE:  So, Judge, here for the State
is myself, Nathan Wade.  Donald Wakeford is here as
well as well as Adam Ney and Will Wooten.  Madam
District Attorney will be making an appearance as
well, Judge.  But, for the bulk of the argument we

1    anticipate it will be Donald Wakeford.

2          THE COURT:  Great.  Well, welcome all of

3    you.

4          So, we're here to discuss whether the

5    final report that the special purpose grand jury

6    that was created, if you will, by Chief Judge

7    Brasher's order from January 24th of last year and

8    that was empaneled in May of last year.  Whether

9    their final report should be made public, in part,

10    in whole or if it should remain where it is, which

11    right now is solely in the District Attorney's

12    custody.  So everyone is clear, I hand delivered to

13    the District Attorney the copy of the final report

14    soon after it was available, and my colleagues have

15    voted that the special purpose grand jury had

16    completed its work and should be dissolved.,  And

17    that's the one copy I'm aware of that is in

18    circulation within the District Attorney's span of

19    control.  But the question has come up as to

20    whether it should be shared more broadly.  The

21    special purpose grand jury voted pursuant to

22    O.C.G.A. 15-12-80 to have the report made public.

23    We need to work through the consequences, if any,

24    of that vote.  We need to talk about whether this

25    final report is the equivalent of a general

presentment, if those terms really even make a
difference, and we need to talk a little bit about
how the final report might be viewed as what the
courts have referred to as court records, which
enjoy a presumption of public access, or if this
final report is somehow something different.  And
I'll note going in that there are precious and few
cases in Georgia dealing with special purpose grand
jury's because they are few and far between.  But
there are some, and they provide some guidance as
to what can happen with a final report from a
special purpose grand jury.  I think there is
precedent for their final reports being disclosed.
I'm holding one in my hand.  It was one of the
exhibits to the media intervenors' brief, so it's
been done before.  That doesn't mean that that was
the right thing to do.  It also doesn't mean that
that special purpose grand jury was sufficiently
similar to this one.  That this one's report ought
to be treated the same way.  I just want to be
thoughtful about it because there's clearly great
interest in the work that the special purpose grand
jury completed, and we need to be responsive to
what may be competing concerns of the investigative
interests of the District Attorney's Office and the

public's interest in understanding what its
colleagues, the members of the special purpose
grand jury did after they heard the evidence that
was presented to them.

So, Mr. Wakeford, I'm happy, if there's
something you want to say up front, but otherwise,
I've got questions that I'd love to get a DA's
Office prospective on to help me frame this, and
then I have similarly for Mr. Clyde and Ms. Gaither
some questions.

MS. WILLIS:  May I address the Court?

THE COURT: You may.

MS. WILLIS: Fani Willis, the Elected
District Attorney for Fulton County, on behalf of
the citizens and the state.

I believe that Mr. Wakeford will give you
some of the answers that you have required.  But
just as an overview -- first of all, the thought
that this is a presentment grand jury, you and I
both know it's really kind of a nonsensical
question.

THE COURT:  So, be thoughtful as you work
through this.  Because don't lump me with you as to
who thinks what is nonsensical and what's not.  So
you tell me what you think, and then I will let you

5

know later on what I think.

MS. WILLIS: Fair enough.

THE COURT: Excellent.

MS. WILLIS:  Back in May of last year,
the Honorable Chief Brasher swore in 26 members of
the public to create a special purpose grand jury.
Their entire function was to be an investigative
tool.  And we are very very thankful to those
citizens.  As you and I both know, they gave up a
great deal of their time.  Hopefully, you and I can
agree on that.

THE COURT:  We do.

MS. WILLIS: And heard from 75 witnesses,
saw countless exhibits, but all for the purpose of
investigation.  At this point, reaching back to
prior experience of both myself and I'm going to
say you again, because I know your history is that
you've been a prosecutor.  Often when a prosecutor
is in a trial courtroom they find themselves in
this position of not only protecting the rights of
the victims, witness and the community, but making
sure that Defendant's rights are protected, too.
Rights sometimes is a very selfish interest; you
don't want the case overturned.  And so as the
prosecutor we stand in that position of protecting

everyone in the courtroom's rights.  Having been
one of very few people that have had the
opportunity to read that report, you being the
other one, I think we can assume that fact is also
true.  In this case, the State's understands the
media inquiry and the world interests.  But we have
to be mindful of protecting future defendant's
rights.  And so what the State does not want to see
happen, and don't think that there's anyway the
Court would be able to guarantee, is that if that
report was released there somehow could be
arguments made that it impacts the right for later
individuals, (multiple) to get a fair trial, to
have a fair hearing, to be able to be tried in this
jurisdiction.  The list can go on and on.  And so
representing the state of Georgia and these
citizens, I know we have this common interest, we
want to make sure everyone is treated fairly, and
we think for future defendants to be treated fairly
it's not appropriate at this time to have this
report released.  I, as the elected District
Attorney, have made several commitments to the
public understanding, the public interest around
this case.  The first was before you were assigned
to this case.  I said by June of that year I would

make a decision as to whether we would ask for a

special purpose grand jury.  In fact, I did so in

May, which is why they were ruled on in May.  I

then asked for a special purpose grand jury to last

for a year, but made certain commitments by the end

of such year, meaning last year 2022, the special

purpose Grand Jury's work would end.  At this time,

in the interest of justice and the rights of not

the state but others, we are asking that the report

not be released.  Because you haven't seen that

report, decisions are imminent.

THE COURT:  All right.  Thank you.  And I

didn't mean to skip over you DA Willis.  Mr. Wade

had mentioned that you would be appearing at some

point, but that Mr. Wakeford would be primary

spokesperson.  So, I wasn't sure if the way in

which you all were going to present, but thank you

for sharing those overview comments.

Mr. Wakeford?

MR. WAKEFORD: Good morning, Judge.

THE COURT:  Or afternoon.  How are you

doing?

MR. WAKEFORD: I'm just fine, Judge.

THE COURT: Good.

MR. WAKEFORD: So I understand, your Honor

8

-- I have a question for your Honor first, and then
I understand that your Honor has questions for me.
If you'll indulge me?

THE COURT:  I will.  Maybe.

MR. WAKEFORD:  Sure.  That's your
prerogative, Judge.

Your order actually calling for this
hearing made mention of a certification from the
grand jury that they asked that their report be
published under O.C.G.A. 15-12-80.  To my knowledge
standing here, I also -- I don't want to make
comments about the contents of a report whose
confidentiality is the subject of this hearing.

THE COURT:  Sure.

MR. WAKEFORD:  But I'm prepared to say
that a mention of 15-12-80 is not in the report.

THE COURT: Sure.

MR. WAKEFORD: So I'm asking your Honor
what the source of the certification mentioned in
your order is.

THE COURT:  The grand jurors.  So, it's
not -- you're correct, it's not in the report.  It
is something that they did after they completed
their work.

MR. WAKEFORD:  Okay. All right.  Thank

you, your Honor.  That was not one thing I was not
able to ascertain.

THE COURT:  Sure.  You didn't miss
anything nor was I reading between the lines or
there's a footnote that was omitted.

MR. WAKEFORD:  Okay.  And I understand
your Honor has questions for me.  I'm fully
prepared to engage in a dialogue if that's the way
you would prefer to proceed.

THE COURT:  Well, let me ask some
threshold questions because that may help focus the
dialogue and also focus the dialogue with Mr. Clyde
and Ms. Gaither.  I'm trying to understand the
basis for the request for nondisclosure, and I'm
approaching it from a number of angles.  One is the
fairly limited scope of secrecy of grand jury work
in Georgia, and with that I'm particularly
influenced by the Olsen case where the Supreme
Court made plain that their view of the statutory
framework for grand jury's is that really only
deliberations are secret.  Secret isn't the only
touchstone here, but that's what's in the oath, is
that deliberations are kept secret.  You, had you
been present for anything that happened in front of
the grand jury are not bound by any statute or oath

10

to maintain secrecy about anything that happened.
None of the witnesses who appeared are bound by any
oath.  Their oath is simply to provide truthful
testimony.  Not to then not disclose their
testimony to the media, their uncle or anything
like that.  And grand jurors are bound by their
oath only not to discuss deliberations.  So unless
we -- and I believe it's a stretch.  Unless we
somehow stretch to say their final report is their
deliberations then, I think, we're already outside
the statutory realm of what's secret.  That doesn't
mean something should be disclosed just because
it's not secret as part of the grand jury.  But
going into this my thinking was everything with the
grand jury is secret and there had to be an
exception.  And in Georgia it seems like it's
almost the reverse.  It's very different from
federal grand jury.  And I know I asked you to
share some thoughts about how we're going to work
with the special grand jurors going forward.  And
there are lessons to be drawn from federal practice
but are not driving our decisions.  So talk me
through just first this question of secrecy and why
if that's one of the arguments you think that -- it
really doesn't matter what you want to do, Judge,

it's secret statutorily the final report.  And then
we'll evolve to a court record or not or this
notion that in someways may be nonsensical that a
final report is equivalent to a presentment of the
special purpose grand jury.

MR. WAKEFORD:  Okay. Yes, your Honor.
And let me say also, if there are questions -- I
would ask your Honor if there are questions at the
end of the hearing today that I feel that I can
request us to provide a written response or more
research on, I would simply ask for the opportunity
to do that.

THE COURT: Sure.

MR. WAKEFORD:  So, in other words, that
the report is not -- a decision is not rendered and
the report is not released at 12:59 pm on today.

THE COURT:  That's not how it will
happen. They'll be notice in case there's decisions
that want to be made after you understand what the
decision is.

MR. WAKEFORD:  Understood.  I also will
-- sorry for all the prefaces.  I have to be a
little bit circumspect because I have to talk about
this report while attempting not to divulge the
contents of the report.

THE COURT:  And I intend to do the same.
So none of my questions will be about -- well, what
about page six, if there's even a page six, if the
pages are numbered.  That's not --I promise I won't
be trying to drag you into -- oh, but wait this
part here or tell me what part you think ought to
be redacted.  That assumes that I would have
decided some part ought to be made public.  I
haven't. We can keep it at the very high level, and
in why is it a secret.

MR. WAKEFORD:  I'm glad to here that your
Honor.  I just didn't want to try your patience if
I keep talking about the report could be rather
than what the report is.  But, I'm glad you
understand the position that we're in.

THE COURT:  And I think it helps Mr.
Clyde and Ms. Gaither are necessarily going to have
to approach it that way.  They don't know what
color paper it was printed on.  Is it double
spaced, and what's in it.  By you and me having
exchanges at that level as well will make it easier
for the different prospective's to share their
views.

MR. WAKEFORD:  Right.  Okay.  So, then
the question of secrecy, your Honor -- I would say

13

that the special purpose grand jury's report in these circumstances -- well, actually in all circumstances.  Special grand jury's are special. We have learned that over the course of the past year.  As your Honor referred to at the outset of this hearing, there is precious little litigation on this topic.

THE COURT:  They are special.  I'm going to pause you from time to time because If I don't write my question down I need to ask it.  There are only two statutes about special purpose grand jury. And one of them says, use all the other statutes about grand jury's unless they somehow conflict.  I don't know how they conflict because there's so little in 101 and 102.  So, there are many things we know because we look at all the statutory framework for regular grand jury's.  Same oath. And that oath says your deliberations are secret. Your oath wasn't different, if you took one.  It doesn't bind you in anyway.  The witness's take the same oath and they're not bound in any way by any sense of secrecy.  Yes, special purpose grand jury's are different.  They last longer.  They investigate in a different way.  They cannot hand down a bill of indictment or anything like that.

14

But, in lots of ways their grand jury's.  And so I
think that needs to guide our discussion.  And a
regular grand jury per Olsen this is the pretty
narrow parameters of what's secret.  Their
deliberations. You can't be in there for them.
Grand jurors can't discuss their deliberations.
But when they're done, here's our indictment, our
presentment, whatever it may be.  And so I'm
analogizing, perhaps, mistakenly, and you can help
me work through that.  When we slide over here it's
a special purpose grand jury.  Those grand jurors
ought not talk about their deliberation, but when
we're done what pops out of the toaster.  Instead
of an indictment is a final report.  I don't see
how that's secret based on the statutory framework
in which we're working.  Again, not dispositive.
But, you may be able to convince me it is secret
because of this case or that case.  I know you
don't have a case, you would have sent it to me
long before, but I'm interested in your analysis.

          MR. WAKEFORD:  Thank you, Judge. I guess,
let's start up here then.  And the first point to
be made is that special purpose grand jury's can be
empaneled at the explicit request of the District
Attorney, the prosecutor, which is, in fact, what

happened in this case.  It was empaneled with the

request that they investigate certain matters and

also be in power to provide charging

recommendations, if any, to the District Attorney'

who would then not be bound by those

recommendations but could be advised by them moving

forward.

THE COURT:  Right.  The special purpose

grand jury whose report is Exhibit C of the media

intervenors' filing, which was Dekalb, presided

over by Judge Scott, do you know -- I don't, that's

why I'm asking.  Was that special purpose grand

Jury convened at the request of Robert James, who

would be Ms. Willis's counterpart at that time in

Dekalb County.

MR. WAKEFORD:  I actually do not know the

answer to that question.

THE COURT:  That would be an interesting

question to answer.

MR. WAKEFORD: But I will endeavor to find

out, of course.

THE COURT:  Me, too.

MR. WAKEFORD:  But in this case

specifically, I think the specialness of special

purpose grand jury's in someways point to how

individual they are.  So, in that case that's a

fine example.  The ambit of the authority for the

special purpose grand jury in that case was to look

into a civil investigation.  That is not what this

case is about.  This case, as we have litigated it

constantly, and as your Honor had purpose to look

into constantly, has been a criminal investigation

at the request of the District Attorney.  And the

report --

THE COURT:  I'm going to pause you for a

second.  Page six, pursuant to the relevant

statutes.  On September 7, 2011, the District

Attorney -- so Robert James --requested that a

special purpose grand jury be empaneled.  Dekalb

Stone Mountain Judicial Circuit voted to approve.

Entered an order, and thus, was created that

special purpose grand jury.  So structurally, it's

the same or similar.  DA James said, I need a

special purpose grand jury to investigate

something.  And as a result of their investigation

there was a report and it was published.

MR. WAKEFORD:  Yes, your Honor.  What I'm

saying is then in this case it was requested by the

District Attorney for the sole purpose of

conducting an investigation into possible criminal

17

activity.  And that the report, therefore, could

consist of several different types of information.

There could be a summary of what the grand jury

came to find out in the course of its

investigation.  There could be a list of statutes

that the grand jury thinks might have been violated

by someone.  There could be a list of individuals

with accompanying activities that the grand jury

believes could be-- could have broken the law.  It

could even get more detailed than that.  And so the

actual content of the report I think gives us some

guidance here as to how secret to perceive-- how

much respect to provide the secrecy of this report.

Because as your Honor knows ongoing criminal

investigations having different --a different

understanding as far as court records are concerned

in this case.  And in fact, records that are part

of an ongoing investigation are not subject to

public scrutiny.  When the District Attorney

requested that the special purpose grand jury

engage in this investigation and provide

recommendations if they saw fit, it was as part of

-- at that time and at this time ongoing criminal

investigation.  If that report contains information

it is for the use of the District Attorney per the

empaneling order.  If that report contains charging

recommendations that is certainly solely for the

use of the District Attorney, and I would argue

that under the law what the law tells us under

15-12-101, I believe, is that the only required

recipient of the special purpose grand jury's final

report is you as the supervising judge except in

this case where it was also the district attorney.

Because if -- whether there are recommendations or

not the District Attorney has to ascertain that.

So has to see the report.  So I think that's a

lesson right there, in that the content of the

report and the nature of the empaneling order in a

specific special purpose grand jury can affect how

we view it under the law.  And of course, I will

speak to court records and presentment versus

reports in greater detail.  But I think that is an

indication of what we are operating under with

regard to the statutory language.  The content of

the report should be the guide for this court as to

exercising its discretion and how to move forward

with respect to secrecy and publication.

          THE COURT:  But what -- I follow.  But

what about the process makes it secret?  I'm trying

to understand.  We need to be guided by the

statutes that are not there for optional

consideration and the deliberations are secret.

Are you saying this is deliberations or you're

saying you know what, judge, let's table the whole

secrecy thing.  Because I don't think you can

stretch the statutes to say the report is secret,

but maybe this is where you want to go next.  The

report is not a court record, so we don't get to

Uniform Superior Court Rule 21 analysis.

MR. WAKEFORD:  That's exactly where I

would head next.

THE COURT:  Okay.  Let's go there.

MR. WAKEFORD:  I would flip the question.

I would say in what respects is it secret is one

way in looking at it.  And certainly, I'm sure that

my colleagues from the intervenors' would look at

it from that prospective.  I think I have looked at

this question as what makes it subject to

publication.  And there's nothing in 15-12-100 or

101 that indicates that there is any contemplation

of publication.  Any special contemplation of

publication.  And I know where your Honor's going.

Because 15-12-102 says that part one of the grand

jury code sections applies unless otherwise

indicated.  But 15-12-80 which is with regard to

20

publication applies only to general presentments.
And again, the content of a special purpose grand
jury report can contain elements of both a general
and a special presentment. Making it a third kind
of thing. A special purpose grand jury report it's
an isolated instance under the law.

THE COURT: But I want to --I think we
may be able to dispose of one term so we don't get
too confused. My understanding is that this concept
of special presentment has gone away. That
basically indictments and special presentments, one
in the same. We don't do special presentments
anymore. A grand jury can indict someone if they
are presented --first, if it's not a special
purpose grand jury. But in reviewing case law that
you've provided and that I'd received from the
media intervenors', I got the sense that we really
don't even use that term "special presentment"
anymore. You're welcome to. I dont know that--I
think it's going to cloud things a little bit. I
think in one corner you've got charging documents
which this body had no authority to present. And
we have a history. There's at least one Supreme
Court case dealing with a rogue special purpose
grand jury that this said not only do we think you

should do this DA, but we've indicted him for you.

Thank you.  That's a step you can't take.  That's

the District Attorney's decision to make and then

ultimately a regular grand jury hearing the

evidence deciding whether there ought to be a true

bill.

        MR. WAKEFORD:  That was an court of

appeals decision.

        THE COURT:  Court of appeals.  Either

way, it was out of Gwinnett County.  That is not

what we're dealing with here.  So I don't know that

we get into special presentment.  Why is the final

report so distinct that it ought not to be treated

as a general presentment, and 15-12-80 ought to be

so narrowly read that it's only a general

presentment, whatever the heck a general

presentment is.

        MR. WAKEFORD:  That's sort of the problem

right there, your Honor.  Is that  -- first of all,

special presentments just to put that to bed, I

think the distinction is not only that they are

charging, but they make specific allegations of

wrong doing under the law.  So there is a

possibility that the report can contain what is

essentially a special presentment within it because

they were empowered to do precisely that.  So I'm
coming back to this thing again.  The content of
the report should guide their analysis.  The
special purpose grand jury was authorized to return
a report that was in all but name took the form
after of a special presentment.  That's something
they had been authorized to do.  They were also
authorized -- I mean, it just says report.  They
could have come back and just provided a summary of
what they heard everyday.  Or they could have
provided a two page summary of what overall they
thought the picture -- the picture painted for them
was.  That they are authorized to do any number of
these things.  And the report can take any of those
forms.  So a special purpose grand jury report as
we'll see can take the form of something akin to a
special presentment or to a general presentment or
have elements of either.  And where 15-12-80
specifically says general presentments I don't
think that we can say it applies without question
to a report issued by a special purpose grand jury.
Additionally, I would point your Honor to 15-12-71.
That is the duties of the grand jury statute.
There's something interesting within this statute
in a couple of instances.  It was actually pointed

out by the intervenors' in their submission to the

court.  Which is that 15-12-80 is specifically

mentioned in 15-12-71 with regards to presentments.

What's interesting is that when it appears the

legislature has taken pains to point out that a

report or presentment provided as a result of a

civil investigation conducted by a regular grand

jury is subject to 15-12-80 also.  They also later

say a decision by a grand jury not to pursue

charges or recommend charges against a peace

officer who has been accused of an unlawful use of

force is also subject to 15-12-80.  That report or

presentment is.  If they recommend that charges are

pursued, they can recommend it by either requesting

an indictment or special presentment.  So, in these

other places the legislature has not assumed that

15-12-80 applies to any report that a grand jury is

empowered to produce.  When they have to produce

these two reports as they are required to under the

law they have taken pains to say, oh, and 15-12-80

applies, and that is within part one of the grand

jury code sections.  Part two, which says that

unless contradicted everything in part one applies.

There's just no mention of 15-12-80 in the special

purpose grand jury statutes.

1        THE COURT:  There's not.  They don't

2    mention any other statute from that first part.

3    They simply say all of the first part is

4    incorporated insofar as it's not specifically in

5    conflict.

6        MR. WAKEFORD:  And the other term --Well,

7    it's specifically in conflict, I would say the term

8    they use is report, it is not general presentment.

9    Now, I understand the position of the intervenors'.

10   We're not closing our eyes to their position that

11   come on, there's no distinction between a report

12   and a general presentment.  I would refer you,

13   though, to where I began, which is that in this

14   situation the law has created a situation where

15   special purpose grand jury can return something

16   that is either special presentment, a general

17   presentment or has elements of both.  And so it

18   just cannot be considered to not be in conflict

19   with 15-12-80, which says general only.

20       THE COURT:  If it has elements of both

21   then are the general presentment elements

22   publishable at the special purpose grand jury's

23   direction but not the special presentment parts.  I

24   want to move away from labels.  They called that a

25   report.  They could have written on there general

25

presentment.  I think you would still be arguing

what you're arguing.  Even though they called it

general presentment, and thus literally under

15-12-80, the Court shall publish other than ultra

vires stuff that I am empowered to take out.  They

called it a final report.  I told them to call it a

final report.  You asked for a final report so

that's why it says final report.  But what if there

are -- as you said, it can contain components of

both if there are things that call out at you as

general presentment then what do we do with

15-12-80?

        MR. WAKEFORD:  Right.  And at that point

if it's not something that could be considered

solely a general presentment then it's not a

general presentment under the law.

        THE COURT:  A hybrid presentment?

        MR. WAKEFORD:  Hybrid --it's a special

purpose grand jury report.  We have a special

purpose grand jury statute that makes a special

grand jury that produces a report.  These are

isolated under the law and therefore fall outside

of the general understanding in certain instances.

One thing that's also not in 15-12-100 or 101 is

that a special purpose grand jury cannot indict.

26

So 15-12-102 says all the rest of the first part
applies.  That doesn't say they can indict.  So the
court of appeals in its wisdom has decided well
that means they can't indict.  So just because
these two statutes are brief and you have the catch
all statute does not mean we are incorporating a
single component of part 1 unless there is
something glaringly obvious.  It actually takes a
little bit of -- a lot of analysis to look into
this.  And I think were the choice of words is
report and where the report can take on this sort
of strange hybrid form that you cannot assume that
the general presentment as used in 15-12-80 applies
to a special purpose grand jury report.  I think
the content of that report again is going to guide
this court's analysis as to how really to look at
that.  And that ultimately if there is something
that isn't clearly a general presentment 15-12-80 I
cannot apply.

                    THE COURT:  Okay.

                    MR. WAKEFORD:  I also think that we can
reach to the conclusion there is a discretionary
aspect here, and that is something Madam DA was
actually speaking to.  If there are recommendations
the District Attorney requested those.  And if

there are any in there or if there are not any in

there the District Attorney in its ongoing

investigation has to assess what has been provided

by the special purpose grand jury.  This report was

issued 10 days ago.  I'm not even --

THE COURT:  I don't remember when we had

our hand off, but it's recent.

MR. WAKEFORD:  It's extremely recent.

There has been no opportunity whatsoever for this

office to incorporate anything in the document into

an ongoing investigation in a meaningful way, and

to make the ultimate decision that only the

District Attorney is empowered to make, which is

either there will be -- the investigation's over

and no charges will be pursued or the investigation

is over and charges will be pursued.  And where the

express purpose of the report is to investigate a

set of circumstances and provide or not provide

recommendations to the District Attorney, we think

immediately releasing before the District Attorney

has even had an opportunity to address publicly

whether there will be charges or not, because there

has not been a meaningful enough amount of time to

assess it, is dangerous.  It's dangerous to the

people who may or may not be named in the report

for various reasons.  It's also a disservice to the
witnesses who came to the grand jury and spoke the
truth to the grand jury.

THE COURT:  So, how do  -- how does one
reconcile this prospective with the parallel highly
public proceedings with the January 6th commission?
Many of the same witnesses hopefully saying similar
things if they were asked the same question, but
that's not my business, and the commission actually
referring to the Department of Justice, you need to
look at these people for these things.  Dangerous.
Pressure on the Department of Justice.  They seem
to withstand that, and they're doing what they're
doing.  Maybe they'll bring charges, maybe they
won't.  Those were recommendations.  I think they
were called referrals.  But clearly congress, one
branch, doesn't tell the executive DOJ, another
branch, what to do.  But there was nothing
clandestine, secret, tucked into a report that the
public didn't get to see about that process.  And
that's different.  That was not a special purpose
grand jury.  But that is another situation that has
been ongoing that I think I need to assess and
reconcile with how it's happening here.  Our
legislature didn't choose to have hearings like

that, and so the way the District Attorney explored
it was through the one means she had, a special
purpose grand jury. Parts of it secret. Some of
it, maybe not. But this danger and impact balance
it against the fact that the January 6th commission
seem to do what it did and DOJ didn't have to shut
down after those referrals came.

MR. WAKEFORD: Well, first of all they
were looking at issues in a different light than
the special purpose grand jury was asked to look at
them. Obviously, Congress addresses the entire
nation. Special purpose grand jury is focusing on
Georgia and possible criminal activity within the
state of Georgia or the touches upon the state of
Georgia. Additionally, Congress doesn't have to
contend with 15-12-101 and 102. I'm not making
fun. We are traveling under the law here. So
Congress -- if there's danger created because they
are not bound similarly by concerns of grand jury
secrecy or traditional secrecy here or the -- I'll
put it this way. Congress was going to conduct
this investigation because Congress can conduct
investigations. That's something it is empowered
to do. It was not conducting an investigation at
the request of the Department of Justice to provide

30

recommendations which would inform it's ongoing

investigation.  That's what happened here.  So to

--

THE COURT:  But I guess the point I'm

making through that observation is --it's 21.  I

don't know that you pointed to any law that says

the final report must not be disclosed.  Reasons

for it.  Policy reasons.  But it may not, must not,

I don't think that's what statute or case law says.

So I think it's going to be a balancing  -- and I

don't mean the balancing of Rule 21.  We may get

there.  I'm not saying that's where we are.  But I

see nothing that says thou shalt not disclose.  And

so many some of the very powerful policy arguments

that I've been hearing from you and from the

District Attorney we need to be thoughtful about

lots of stakeholders.  And you and I both heard the

District Attorney whisper "dangerous," and then you

said "dangerous." And I was merely observing a

parallel process occurred in Washington DC and the

world kept spinning and referrals were made and DOJ

processed that and they're going to do what they're

doing.  And clearly they didn't feel like, well, we

better do something right now because very publicly

the January 6th Commission referred certain charges

against certain people.  So, if an argument you're

making, the District Attorney's Office is making

whomever the person is.  But that your office is

making is look it may be post indictment.  It makes

all the sense in the world to disclose the report.

But before then you're hamstringing an

investigation.  Maybe putting inordinate pressure

on someone.  I get these things, but that doesn't

seem to have caused the wheels to fall off the DOJ

bus.

MR. WAKEFORD:  Well, we don't know, your

Honor.  We don't know because the DOJ operates in

such complete secrecy and their grand jury

proceedings are subject to much more powerful

secretive requirements.  So we don't quite know the

answer to that question.  Additionally, Congress's

proceedings happened in public.  They were

nationally televised.  They had witnesses come and

testify to the entire nation.  And then so when

they made recommendations it was based on

information that they were publicly releasing.

Sometimes live and in living color.

THE COURT:  Understood.  But if Fred

Jones was testifying up there and Fred Jones came

down here --I mean, that's the only point I'm

making.  Is that some of this  -- well, we don't

know what happened in the grand jury insofar as

there's overlap.  Maybe people do and things -- we

don't need to get into that.  You've shared with me

your prospective on how-- I understand it.  How

January 6th Commission was different and the fact

that they very publicly referred certain charges

against certain people to the Department of Justice

is sufficiently different that you don't think that

there should be a parallel drawn with the concerns

here.

MR. WAKEFORD: I would also add, your

Honor, that while by the necessity of the laws

governing serving subpoenas in different states

some of the witnesses have been made public.  But

the public does not know who the witnesses were for

the special purpose grand jury.

THE COURT:  That wasn't my point.  I

agree.  That wasn't my point at all.  We heard 75.

We heard a number but not names.  I was merely

observing that the public actually does know a fair

number, and some of those names overlapped with the

very public presentations to or refusal to share

thoughts and ideas and testimony with the January

6th Commission.  We can move pass that.

33

Talk to me about court record and Rule
21.  Why is this not -- you may have already
answered it because you were analogizing it, I
think, aptly to it's an investigative report.  And
if a detective wrote a final report saying I
recommend this person be prosecuted for this
homicide, that is not something that the public has
traditionally enjoyed right of access unless and
until it's part of discovery or it's introduced as
an exhibit at trial.

MR. WAKEFORD:  I think that is exactly
how to conceptualize the report at this time, your
Honor.  I also want to highlight a point that you
sort of alluded to a couple of minutes ago, which
is that the time for this conversation really
should be after the District Attorney -- what to do
with the report.  What is the nature of the public
or secret nature of the report should come after
the District Attorney has had an opportunity to
state I am not pursuing charges or I am pursuing
charges or even I have sought charges and here is
the indictment that has been true billed.  At that
point, the relative stance, the status of everyone
involved will be much clearer, and we will have a
much better road map for how to handle secrecy or

34

publication.  So, I actually think that this entire

conversation would be better handled after that

decision is made, which the District Attorney began

by stating that when she has made assurances as to

time frame she has held up or exceeded those

assurances.  But I will also want to point to

another thing.  The statute regarding court records

is very specific in that ongoing criminal

investigations are not subject to public scrutiny.

There is no presumption of public access to those.

This we think commonsensically falls within those.

THE COURT:  When you say the statute,

you're not referring to Rule 21?

MR. WAKEFORD:  I mean, Rule 21.  In re:

Gwinnett County Grand Jury, which is cited, I

believe, by intervenors' in their submission

actually clarifies that with regard to the kinds of

civil investigations which regular grand jury's are

empowered to pursue, and which they can produce

reports or presentments as a result of, in which

the statute says specifically 15-12-80 applies to.

They say that the term court records as used in

USCR 21 encompasses only the presentments made by

the grand jury in open court at the conclusions of

the grand jury's investigation.  There is a

longstanding requirement for which documents must
be presented in open court, including special
presentments and indictments.  Here, the report
under 15-12-71 had to be presented in open court
and actually already had been.  That is not a
requirement under 15-12-100 or 101.  The only
requirement for the final report is that it go to
you as the supervising judge, and then in this case
go to the jury District Attorney as recipient of
either a recommendation for charges or no
recommendation for charges.  So, there is no open
court requirement for special purpose grand jury
reports.  It's just not there.  And the Gwinnett
County case points to the fact that the
presentments-- it's not that they're presentments,
it's that they're made in open court that makes
them a court record.  You couple that with the
presumption that documents attached to an ongoing
criminal investigation are not subject to a
presumption of public scrutiny or access.  And I
think it's clear that the report in this case is
not a court record as contemplated by Rule 21.  I
think it's another indication that discretion and
the wise choice at this time is -- cannot be that
it's released at this time.  And everything about

the nature of this report indicates that it is
premature to make the report public at this time.
That I think is the strongest stance I will take
before your Honor today.

THE COURT: Okay. Let me throw a little
bit of a wrinkle at you. What would prevent a
special purpose grand juror from reaching out to
the media saying I'll tell you what's in the report
other than me telling them? But what would be the
basis for me telling them because it's not
deliberation. So we can step back from
presentments and Rule 21 and all these things.
It's not deliberations. Maybe it's investigative.
It is investigative. Maybe it's disclosable, maybe
it's not. Maybe it's disclosable after the
investigation is done. That's the reason rule
you're proposing. But now I'm special purpose
grand jury member McBurney and I disagree with that
approach. I'm not going to tell you our
deliberation. I'm going to tell you how we came up
with what we came up with; why we did. I'm going
to tell you what several witnesses said because I
didn't like what they said or I really liked what
they said. Because their testimony isn't protected
in any way. Why could that not happen, or on what

basis could I forbid it from happening so that

there could be contempt if it did happen?

MR. WAKEFORD: Because the report is the

necessary result of the deliberations of the grand

jury.

THE COURT: So is a jury verdict. So is

an indictment. So is a general presentment or a

special presentment. It's the synthesis of. It's

the end product of. But it's not the

deliberations. And that's where if we end where we

began our part of the conversation that's what

Olsen is all about. It's just the deliberation.

You can't be in there. I can't be in there while

they're deliberating. What goes into it, witness

testimony. You actually could have had five

assistant district attorneys in there even if only

one of them was asking a question. No harm, no

foul. Once they're done -- again, why is it not

something that is disclosable? And if they can

disclose it, why wouldn't it then just generally be

disclosable. And that's sort of the end of the

curve ball.

MR. WAKEFORD: Right.

THE COURT: You either hit it or miss it.

MR. WAKEFORD: All of the results that

you've mentioned like an indictment or verdict,
there is a requirement under the law that those be
made public which we're sort of  --we're going
around in circles.  There is no requirement that
the special purpose grand jury be made public.
There is not a requirement.  And again, we're going
to come -- we're going to see that the intervenors'
will likely come from the angle there's nothing
that says it has to be secret.  Well, we're saying
there's nothing that requires it to be public.
It's its own document.  And your Honor could forbid
them from speaking about its contents because right
now it hasn't been published in open court.  It's
not in the possession of anyone in the state of
Georgia or in the United States of America other
than briefly your Honor and the District Attorney,
who is engaging in an on going criminal
investigation.  And so it hasn't been publicized.
It hasn't been released.  There's nothing that
indicates a requirement that it be released, and
the only result of a grand juror talking about it
would be to shed light on the deliberations and
also in the bargain interfere with the ongoing
criminal investigation which their report was meant
to be a part of.

THE COURT:  So what odds do you give an appeal of an order that I would enter forbidding them from talking about the contents of the final report?  It gets appealed.  Restrain of speech, first amendment violation and special purpose grand juror X just sends the Supreme Court or Court of Appeals (Olsen).  So how's that going to play out?  I appreciate I could do things to help maintain the investigation and not get it prematurely derailed by things that it ought not to have to deal with until the time is right, and that's a decision that the District Attorney and her team would make as to when the time is right.  That's an important interest to uphold.  You've got my full support of that interest.  But, I don't know. I need to think through how that plays out.  And if we have a grand juror who says that's fascinating, you're not going to release the report, but I'm going to talk.  I muzzle you.  I suspect there'd be an appeal.  I'm not interested entering an order that we know is DOA (dead on appeal).

MR. WAKEFORD:  So, (1) your Honor, respectfully.  One thing I refuse to do is ever handicaps odds of what the court of appeals will and will not do.

40

THE COURT:  We do that all the time, and we're always wrong.

MR. WAKEFORD:  You're right, your Honor. What I'm saying is that the -- can I actually confer with the District Attorney for one second?

THE COURT: Sure. Please.  And you're almost done.

(Pause in record for counsel to confer.)

(Record resumed.)

MR. WAKEFORD:  So, there's two things I wanted to highlight.  And I appreciate you letting me confer with Madam District Attorney.

THE COURT:  Not a problem.

MR. WAKEFORD:  The first is that our position should not be understood to be a blanket opposition to release of the report forever and until the end of time.

THE COURT:  I have not, not heard that once.  I have heard, I think, a reasoned approach of not now and here's why.  Likely later and here's why. I haven't heard forever, bottle it up.  So, that's not my take away from what you've been saying.

MR. WAKEFORD:  But to your question what will a future appellate court do?  I think that's

41

an extremely relevant fact is that this is not

opposition that is intended to go to March to the

end of time and prevent public disclosure of what's

in this report forever.  That's not the position.

It is simply saying that now is not the time, and

that your Honor has the power to pursue that.

THE COURT:  It's like a temporary

sealing.  We're going to seal this to include seal

the mouths of some the people until --and that may

put some additional pressure onto reach a finish

line sooner, but it's not the same pressure that

what's actually in the report.  And if it says

certain things that complicates and maybe

compromises a more thoughtful approach to charging

decisions.

MR. WAKEFORD:  I think that there is a

clear time to have this conversation when we have a

much better idea of how to proceed, and it is after

the District Attorney has announced either we will

not be pursuing charges or we will or  --and here

they are.  That I think is really what I'm saying.

But additionally, there are other constitutional

rights that are impacted.  And those are the rights

of anyone who is possibly named in the report.

THE COURT:  So I'm going to ask the media

intervenors' about that.  But I guess we can end
with that.  So let's say that your special purpose
grand juror X says, you know what, Oscar the Grouch
should be indicted.  And we talked about it.  And
my gosh, Oscar the Grouch should be indicted for
treason-- if that's a state crime-- for inciting a
riot based on what happened here in Georgia.
What's Oscar the Grouch --who's he suing?  What
constitutional rights is he going to be invoking to
say, wait a minute, I can't believe someone said
that.  And of course the someone isn't the District
Attorney.  It's not you.  It's either in the report
because it's published or it's coming from someone
who is not bound by any oath of secrecy to not talk
about witness testimony or the final decision of
the special purpose grand jury.  Because the DA
brought this up as well.  I get it in part, but I'm
-- crystalize it for me.  So what does Oscar the
Grouch do?  He hires a lawyer and that lawyer has
conference -- a press conference to say we're
outraged.  We'll prove our innocence even though we
don't have to prove anything because we're innocent
until proven guilty.

MR. WAKEFORD:  Well, we know that the
cases exist which your Honor actually refer to in

43

your order where there were discussions of public

officials seeking expungement of statements made by

grand jury's that were different in color than a

special presentment or an indictment.  So, I guess

the simplest answer to this question is I'm not

totally sure, but we can avoid that question

entirely by not publicizing the report until after

the District Attorney has made --

THE COURT:  Why tangle with it if you

don't have to.

MR. WAKEFORD:  Exactly.  There's just no

reason when the report is sure to be eventually

disclosed because the District Attorney is not

going to forever oppose it.  There is no reason to

contemplate the release until there has been a

public decision made by the District Attorney of

the three options I have mentioned many times.

We're not pursuing anything.  We plan to pursue

something or we have pursued it and here is a bill

of indictment.  At that point we have a much better

idea of -- we don't have to worry about statements

made about individuals because they will either not

be any and we have a better idea of what to do or

there are and they are contained in a bill of

indictment.

THE COURT: Right. If Oscar gets

indicted and it's released and it says Oscar should

have been indicted, sort of I told you so. And if

Oscar's not indicted and the report said he should

be then someone could choose to explain from the

District Attorney's Office why Oscar the Grouch

wasn't indicted, but there isn't that cloud hanging

over Oscar's head in the interim.

MR. WAKEFORD: That's precisely right,

your Honor.

THE COURT: I'm not sure that it

necessarily invokes constitutional rights, but I

get the policy concern.

MR. WAKEFORD: Well, it also marches in

lock step with the concerns about an ongoing

criminal investigation. It's sidesteps all of

those problems. It also solves the issue of is

this a general or is this a special or is it -- it

sort of everything becomes clearer at a later date.

And we can come back and discuss in the clear light

of day as opposed to a lot of me standing here and

going well it could be this or it could be that and

you agreeing it could be that or this. And I think

the main point is today is not the time. Now is

not the time. But eventually, we will have a

45

better idea of when the time will be.  And the
District Attorney's Office is not opposed to the
eventual release.  It's opposed to it right now,
and it's opposed to releasing it without very
careful consideration in light of all the other
factors that are in play.  I just ask your Honor
once again to consider the contents of what the
actual report ends up being.  Because the law has
set up a situation where it could be little of
this, a little of that or something completely
different.  And I think that's part of the reason
why we're here to sort of get an idea of what are
we even dealing with.  And I would ask again if
there are further points of law, points of policy
or any other position that the District Attorney
should illuminate, that you will allow us a chance
to dig in on that and provide a written submission.
And otherwise, I remain available to answer any
other questions.  Thank you.

THE COURT: Okay.  Thank you so much.
Appreciate it.

So, Mr. Clyde, you're client's are going
to get the report eventually; can we go home?

MR. CLYDE:  No, your Honor.  Obviously,
we believe the report should be released now and in

46

its entirety.  And that approach is consistent with
the way the american judicial system operates.  In
other words, it is not unusual for a District
Attorney or a prosecuting authority to be generally
uncomfortable with having to release information
during the progress of a case.  That occurs all the
time.  But the judicial system time and time again
has said when matters are brought to the court
system we are going to be -- require them to be
made public because the faith of the public and the
court system is much improved by operating in a
public way.  And so it's only in the most
extraordinary situations where our appellate courts
and where United States Supreme Court has allowed
the sealing of records or and including, as you
articulated, the outcome of grand jury activity.
We acknowledge the operations of the grand jury
while it was ongoing were subject to a veil of
secrecy.  But that, as the Court has explained,
that has come to an end, and they have issued a
final report, and that final report is the outcome
of the judicial process, not an executive branch,
criminal investigation.  They invoked the judicial
process of the special purpose grand jury statutes
and now that's special purpose grand jury has

issued a report and the jurors themselves have

asked for it to be published.  There's enormous

public interest in what they have said, and that

exist in this state.  It exist the across nation.

It exist beyond the nation.  And we believe the

statutory law supports its public release right

now.  We believe the case law supports its public

release right now.  And we believe constitutional

law, including our own state constitution, requires

its release right now.

                    THE COURT:  So why isn't this one of

those extraordinary circumstances where disclosure

wouldn't be the standard?  I appreciate that you're

characterizing it as a judicial proceeding.

Because, of course, a judge had to be appointed to

supervise and ultimately received the report.  But

I don't think Mr. Wakeford was misdescribing it all

that much.  He didn't use the word "conduit," but

it basically was here, Judge, here's our report

that we prepared ultimately at the request of the

District Attorney to answer the questions that the

District Attorney had, not the Court had.  The

Court didn't sua sponte-- could have-- but it

didn't, to be clear in this case.  We want to know

more about what went on with the general election

in 2020.  That was something that the District
Attorney asked for.  Had to pull some levers to do
that, judicial levers.  But it was executive branch
saying we want to investigate this.  The mechanism
by which we investigate it is a grand jury, okay.
That means the courts have to be procedurally, not
substantively, but procedurally involved.  And then
we get our report.  We, the District Attorney's
Office, so we can figure out what we're going to do
next.  How is that -- that's how things flowed.
And it did pass through a court proceeding because
I had to swear the jurors in and what not.  But it
wasn't a trial.  It wasn't a hearing.  I didn't
issue any ruling.  So I'm pulling it out of that
framework.  I'm wondering how you say no, no, no,
it needs to stay in, in that framework.  Or at
least why is it not one of these extraordinary
uncommon situations where it's really not a court
record that came out.  I haven't filed it.  There's
nothing that says I need to file it, which is
usually -- when you are invoking -- I asked you a
bunch of questions.  So you'll get to answer.  Rule
21 kicks in usually because there's something in
the docket that your clients can't get their hands
on.  There's nothing in the docket and there's not

49

going to be anything in the docket unless I decided
that something needs to be published, and it
probably will be published by putting it in the
docket.  There is no requirement it go in the
docket.  So there isn't even a court filing that
we're talking about.

          MR. CLYDE: Okay.  Your Honor --

          THE COURT:  I'm done.

          MR. CLYDE:  I see that as three questions
and I'm going to answer them in order.  Number (1)
I understand your analogy that this is a conduit
situation and I'm going to speak to that.  And then
I'm going to speak to why there's really no
circumstances.  There's none of the extraordinary
circumstances that would justify sealing, and why
in the end this is a Rule 21 document.  And so let
me start first with this is a judicial process.  I
understand your Honor's point that it was requested
by the grand jury.  But it's actually an
extraordinary judicial process.  In other words,
that request is made to this court and this court's
-- this -- not just Judge Robert McBurney's
courtroom, but the Superior Court of Fulton
County's power is invoked.  Grand jurors are
required to come to this courthouse.  Those -- and

50

that can't happen until a majority of the Superior
Court judges agree that this is a worthy thing to
undertake. So, it's actually an extraordinary
exercise of judicial power. And so I don't think
it can be characterized as just a we helped out the
executive branch. It is fully invoking the
judicial branch's power and requiring jurors to
come and devote their time and their energy to
carry out a purpose for this court system. And
that is the kind of environment where the case law
says that's judicial.

So the next question you asked is, all
right, isn't this one of those extraordinary
circumstances. And respectfully, I don't think the
State has made any showing of any substance that
this is -- that's one of those extraordinary
circumstances, and let me explain that. I respect
the District Attorney's statement about the
protection of other people, and that is an admiral
statement for a - for any District Attorney to
make. But other people, particularly the other
people that were involved in this grand jury are
represented by their own counsel. This hearing
took place, was widely published. Their counsel
aren't here. The risk of prejudice to them is

actually much less than it is with many many

documents that are disclosed during the judicial

process.   Indictments get entered as the Court is

very well -- indictments get entered by the State

or by the federal government with a great deal of

detail.   Sometimes press conferences that drive

defense counsel crazy.   But there's never been any

suggestion, and there couldn't be that that process

should be closed.   Hearings take place about the

exclusion of evidence or the exclusion of

witnesses.   All those hearings take place publicly.

The documents related to them have to be disclosed

as court records.   Those are much more --much

closer in time to a trial, so there's a much

greater risk involved in those documents.   Here

we're -- if we're talking about risk to potential

defendants facing a trial years into the future

that this document is reeling, doesn't rise to the

level of the routine kind of documents that are

disclosed publicly during the judicial process.   So

I don't think there's a compelling case for

protecting other people's rights.

          The Court asked about, well, who does

somebody sue? The Court's exactly right; they can't

sue anybody.   Long ago, the United States Supreme

Court in 1976, in Paul vs. Davis said no.
Government institutions are going to make
statements that have negative impact on people's
reputation.  That alone will not ever create a
cause of action.  You have to show something called
stigma plus.  It has to be a deprivation of other
kind of rights.  Simply reputational interest
aren't enough.  So what the State is pointing to is
simply not the kind of information that justifies
sealing.  And there hasn't been any suggestion, any
evidence, any presentation that really makes a
compelling demonstration that there should be a
sealing in this case.  Ongoing investigation
--investigations obviously when people are indicted
they don't necessarily close.  They continue
throughout a case.  And so ongoing investigations
frequently continue after there is significant
disclosures of information about an investigation.
That's exactly what would occur here.  As the Court
has pointed out, the House of Representatives
January 6th committee also has disclosed enormous
amounts of information.  There's really no precise
showing that can support the kind of sealing that
they're asking for.

            And finally, the Court asked, all right,

Rule 21.   Really, why is this triggering Rule 21;

it's not filed.   And your Honor, it is filed for

purposes of Rule 21.   Let me explain what that is

for purposes of Rule 21.   The question is not

whether it's submitted to the clerk.   The question

is whether it is submitted to a judicial officer

that needs to take action on it.   And that's what

triggers Rule 21.   The -- I will give you a case

cite to that.

THE COURT:   Please.

MR. CLYDE:   And we're happy to provide

more authority on this issue.   This is -- I'm going

to give you Forsyth vs. Hale.   It is at *166 Ga.*

*App. 340.*   I'm quoting a part of it here.   "A paper

is said to be filed when it is delivered to the

proper officer and by him received to be kept on

file."   In this case that special report was by law

submitted to you as the supervising judge.   Based

on that, immediately you had responsibilities.   You

had to provide it to other judges and everybody to

reach a decision about whether this grand jury

could be dissolved.   There were decisions that had

to be made.   The power of this Court was invoked.

The decisions by you as the supervising judge had

to be made.   And so overall it falls exactly within

54

the category of Rule 21.  Now, I acknowledge that

there is a secrecy with respect-- that the Gwinnett

County grand jury decision recognize there's a

line.  That Court -- the records that the grand

jury looked at during its ongoing process are not

accessible as court records.  Because historically

they haven't been.  But then the Gwinnett County

Supreme Court or the Court of Appeals in the

Gwinnett -- the Supreme Court in the Gwinnett

County decision emphasized the -- in that case that

general presentment had to be made public because

it was the outcome of this process.  And so it was

subject to Rule 21, and essentially the same

process would apply here.

THE COURT:  Was that grand jury a special

purpose grand jury or a regular grand jury?

Because regular grand jury's can do general

presentments as well.  They're empowered to

investigate the Clerk's office.  They could --

they're not going to indict the Clerk, but they

could say, hey, we noticed that they use too much

paper in the copy machines and we should be more

environmentally conscious.

MR. CLYDE: Exactly.

THE COURT:  So if the case you're

referring to -- there are lots of Gwinnett cases.
So I'm not necessarily seizing upon the same one.
Was that a special purpose grand jury in which the
Supreme Court said that -- I know they use the term
general presentment, and we'll talk about report
versus presentment.  But, setting that aside they
were saying that special purpose grand jury's,
general presentment must be made public because it
is effectively a filing.

MR. CLYDE:  Correct.  And it was a
general presentment from a grand jury, and in a
civil context.  And I'm talking about 2008 In re:
Gwinnett County grand jury case.  Justice Benham
held that that document was subject to Rule 21.
And we would submit the same thing would be --with
the same conclusion would be reached with respect
to the final report.

Your Honor has, and I  understand the
questions relating to 15-12-80, and we're eager to
address that.  But one of the things I want to
emphasize, I think, from the Court's questions, you
fully understand this, but those are two
independent basis for the disclosure of the report.

THE COURT:  No, they are.  And I pressed
Mr. Wakeford on them because it's sort of mounting

56

1   pressure, if you will.  The grand jury itself said

2   you need to publish it.  And if one travels to

3   15-12-80 -- actually, it's a "shall." There aren't

4   a lot of statutes that say the Court "shall."  And

5   I've learned what that means.  If it applies, if 80

6   applies.  But I appreciate that that is a separate

7   basis.  If I were to find that the final report is

8   effectively a Rule 21 filing, then Rule 21.  And

9   all the case law that you and Ms. Gaither cited

10   that talk about the competing interest, and it

11   really is extraordinary and exceptional not to

12   disclose something that would fall under or within

13   Rule 21's gambit.  So that would be a second and

14   compelling reason if I were to find the final

15   report is a Rule 21 filing.

16          MR. CLYDE:  Exactly, your Honor.  If I

17   may add one item to your desk is  -- today we're

18   also going to provide the Court with another

19   example of a special report that was published.

20   This -- and this is a -- I'm going to provide a

21   copy to you in just a moment.  It involves the

22   Gwinnett County Grand Jury, and it is from 2009.

23   It was then looking at land transactions, and Judge

24   Clark at the end where I put that -- may I

25   approach?

THE COURT:  You may.

MR. CLYDE:  Where I put the blue tab is where Judge Clark has ordered this special purpose grand jury report to be published in the legal orbit.  It is an example -- and I would say that just as -- in a sense I would think that the two special purpose grand jury reports that are before the Court are in a sense examples of the two ends of the spectrum.  Obviously, in the Dekalb special purpose grand jury they recommended prosecutions of a named individual.  And that was disclosed and published by Judge Adams in the Dekalb situation. In the Gwinnett situation, this is a grand jury that found a great deal of discomfort and criticized various aspects of the land purchasing decisions made by Gwinnett, but generally is not recommend prosecution, is moving in the other direction.  But in both cases they were published in their entirety at the direction of the supervising court judges in both cases. These are special purpose grand jury's.

THE COURT:  So these would be then examples that it is possible to do it, and I assumed it had been legally challenged, and -- and a higher court had said the trial judge was in

error to do that, then Mr. Wakeford would have

shown me those opinions.  So those are out there.

But what about his argument that if -- and I know

you don't know the content of the final report for

lots of good reasons.  But what about the argument

that the contents should drive the decision making

process?

          MR. CLYDE:  So, your Honor, I'm going to

address--

          THE COURT:  Did I interrupt you before

you got all the--

          MR. CLYDE:  No, no, no.  You raised

another issue that I'd like to cover, and I will

directly answer that question.

          THE COURT:  Okay.

          MR. CLYDE:  With respect to the Dekalb

special purpose grand jury -- and the Court may

already be aware of this.

          THE COURT:  Full disclosure.  I was a

brand new judge and all of a sudden Mark Scott

Defendant was in front of me.  There was a whole

lawsuit that came out of Dekalb about not handing

over that report to the rest of the bench.  And it

-- so I'm a little familiar with that.  Nothing

about publication.  It was news --  I wasn't

interested in whether it was made public.  I was
interested in getting Judge Scott out of my
courtroom.

MR. CLYDE:  And the only thing I want to
point out is Burrell Ellis is ultimately prosecuted
for perjury in the aftermath of that special
purpose grand jury based on his testimony that was
presented at that special purpose grand jury.  He's
prosecuted.  He is --there's a verdict.  He was
convicted at trial.  And he ultimately on appeal --
parts of his conviction are affirmed.  Parts of it
are reversed.  But there's nowhere in that opinion,
and that opinion does recount the history of
special purpose grand jury, that it is anyway
critical of the release of the report nor did
Burrell Ellis and his counsel ever make any
argument that the release of the report somehow put
him in an impossible position at his trial.  It was
-- it obviously as the Court has pointed out there
hasn't been a decision directly on point with the
issue that we're taking on today.  But it is an
example of somebody who is prosecuted in the
aftermath of the release of a report, and it never
rose to the level of an issue worthy of appeal.

Then, your Honor, I'm going to address --

I apologize, I'm having trouble remembering --

THE COURT:   It's all right.   Mr. Wakeford was making the argument that we could -- when I was exploring reports, special presentment, general presentment, that really depends on the content of the document.   And the more it is like a special presentment, the more it is something that is an investigative tool for the District Attorney as opposed to a general report on here's the things we learned and saw and what not.   That would militate towards not disclosing now because it's much more like a detective's homicide report.   That's not a court filing.   That doesn't get filed with the Court.   But that's someone thinking long and hard about should the District Attorney bring charges against someone for killing someone.

MR. CLYDE:   And your Honor, in terms of suggesting to the Court that it has discretion to make independent judgments about what should be public and what shouldn't be public, I do not believe that that discretion exist in anything other than the law of Rule 21 and the law of essentially expungement of ultra vires activity. In other words, what do we believe the case law supports.   We believe the Court is within its

rights to read the report.  If this grand jury and

occasionally that happens  -- and if this grand

jury has gotten outside the ambit of its mandate

and made statements that have nothing to do with

what its actual role was, that is appropriate for

expungement, we aren't disputing that.  We only

note that that by implication suggest everything

within the scope of their mandate they're suppose

to be made public.

The second part is does the Court have

the authority to seal under Rule 21? Absolutely, it

does.  But, it has to meet the Rule 21 standards.

And there is the -- there is -- the argument that

has generally come from the State today is, it is

uncomfortable this report being released until

we've made these decisions.  And I don't fault the

expression of discomfort or --

THE COURT:  I fully understand it.  I

think it is a reasonable concern to raise.  But if

I find that we're within the realm of Rule 21, it's

just not one that weighs really heavily in the

scale that I understand the analysis that higher

courts have performed.  One doesn't ignore it, but

it's a lighter weight than the public's interest

and the general presumption that court filings are

to be made public.

MR. CLYDE:  And your Honor, I guess we would say it's not just a lighter presumption; it doesn't meet the standard.  In other words, the discomfort of the prosecuting authority in disclosing court records isn't enough to make them sealed.  It has to be significant identifiable evidence that's going to cause a problem.  And your Honor, I don't think that submission has been made.

THE COURT:  I have a question about that standard.  In your brief, page 18, you use the phrase "clear and convincing proof."  And clear and convincing evidence, that is a standard out there which is different from a preponderance.  Much more than that.  It's not well-defined.  It's less than a reasonable doubt.  It's actually what the JQC has to use for judges.  "Clear and convincing," and that's the phrase you used.  It's a whole lot more than a preponderance.  And I'm wondering if you have case law for that or it was just a colorful phrase trying to show that there is a burden that the parties seeking to seal something has to meet.  And there is.  But I'm not familiar with it being clear and convincing evidence.  That is a higher burden than I weigh it and find in which way do the

scales lean.  Where is the preponderance?  Sealing

and not sealing.  And that's why I was saying the

District Attorney's concern about timing and not

having the investigation unnecessarily rushed.  I

think that is a factor that I can weigh.  Your

point was -- my point was how heavily do I weigh

it.  You said, oh, it doesn't weigh as much as

public interest.  It might not, but there are other

concerns that the District Attorney raised.  The

rights of folks who may be named in an unfavorable

report if that's how it works.  So I envision the

process, the Rule 21 process to be stacking weights

on a scale just like a jury would in a civil trial.

I think that's a fair way to think about it.  There

are heavier and lighter weights, but in the end I

need to decide are the scales leaning in the

direction of sealing or in the direction of having

this be an open record.  I think I just need to see

that it is leaning in a direction.  I don't think

it has to be leaning in a particularly strong way,

and clear convincing is that it has to be leaning

in a particularly strong way.  So that was a long

way of saying where do you get clear and convincing

evidence as the standard?

      MR. CLYDE:  Your Honor, I believe clear

and convincing is the standard for closing the
courtroom.  I would say the way you've described
the sealing of records is correct with this caveat.
The items that you are putting on the scale have to
be constitutionally cognizable issues.  So, in
other words, a general statement that people's
reputations might get hurt has repeatedly been
identified by our appellate courts as not enough.
Not even beginning the discussion.

THE COURT:  Okay.  Because there's two
different things.  Not enough is what you keep
saying, and I'm saying, okay, it's not enough
standing alone, but maybe there's more, other
factors.  But then you shifted towards the end
saying actually that's not a factor at all.  It
would be improper to put that on the scale because
it's not constitutionally cognizable.  I'm not
disagreeing with you.  I'm asking you to educate
me.  Can I put whatever ought to be deemed
reasonable factors or there are cases out there
that say these kinds of thing might be someone's
concern but you may not put them on that scale to
decide which way the scales are leaning.

MR. CLYDE:  I would say it's the latter.
In other words, that's simply -- that kind of

65

general articulation of potential injury to
reputation simply doesn't get -- make the scale.

THE COURT:  It's not a factor to be
considered.  Whether one considers it lightly or
greatly, it's not a factor.

MR. CLYDE:  And if there is a detailed
showing about an individual made by their counsel
and the  -- it was an extraordinary situation --

THE COURT:  Stigma plus.

MR. CLYDE:  Well, extraordinary typically
involves juveniles.  Typically involves highly
private information.  It doesn't involve public
officials who are involved in activities following
a national election.  And so that's the part where
the fit is just not very tight.  And so that's --
so -- but your Honor also brings up a good point
that I would like to react to.  The only
organization that filed a brief in advance of this
hearing is us.  The State has articulated their
argument today.  We will plan to respond to that
argument with more detail so the Court has some of
the case law that has rejected sort of generic
concerns about reputation as a basis for sealing.
But I do think that is well established.  And so
what we would submit is when it comes to that

weighing process, and Rule 21 itself requires that
it significantly outweigh that presumption of
openness.   That when it comes to that weighing
process, I'd let the weight that you can put on the
closure side are really not compelling in the
situation that's before us here.   And then on our
side we're talking about really one of the most
compelling situations for legitimate public
interest that I can think of in this courthouse.
In other words, there is genuine public interest in
what these grand jurors found after they sifted the
evidence.   After they heard from all the witnesses
and its interest not just because of the role they
played on the grand jury but also because they are
community citizens.   And speaking to these issues
from that vantage point as well.   And so that's
also important and part of the public interest.

          THE COURT:   What is your response if I'm
the special purpose grand juror whose been told by
this judge you can't talk about your final report
to anyone, it's secret or at least I'm telling you
can't do it.   And they look in the online person
and the lawyer Tom Clyde pops up.   And you get a
call from the special purpose grand juror saying,
judge is telling me I can't talk about

1    deliberations, but I also can't talk about what any

2    witness testified about.  In particular, I want to

3    tell people about this special purpose --our final

4    report because the judge isn't publishing it, but I

5    want to talk to folks about it.  Can the judge tell

6    me I can't?  I mean, yes, he can, because he did.

7    Can we challenge this judge, and what's our

8    strategy?

9         MR. CLYDE:  Your Honor, I think they

10   could challenge that.  In other words, as the Olsen

11   case makes clear they are now required to take a

12   oath and that oath was narrowed by the general

13   assembly.  And so they are bound by that oath.

14   Could this court in extraordinary circumstances

15   impose what would be a prior restraint on their

16   speech?  Yes, in extraordinary circumstances.  But

17   as the court knows the extraordinary circumstances

18   to warrant a prior restraint are typically

19   situations, they're putting the national security

20   of the nation at risk.  In other words, the

21   examples that have been used by the United State's

22   Supreme Court are the location of warships and time

23   of war, things like that.  That can justify a prior

24   restraint.  But here, as long as that grand juror

25   abided by the oath they were required to take and

the general assembly approved I think they're

within their rights speaking about the experience.

And this is specifically what the Supreme Court

case, USC Supreme Court case that says witnesses

that appear before the grand jury are allowed to

speak about their experience before the grand jury.

THE COURT:  I think that the Olsen case

makes that clear.  I'm not talking about witnesses,

they're going to do what they do.  So you contend

that that would constitute a prior restraint saying

you can't talk about this.  Well, what about the

notion that the final report is really just an

extension of their deliberations?  It's not a

presentment.  It's not the kind of thing that grand

jury's --it is specifically what this grand jury

came up with at the end, but it's not a general

presentment.  It's not a special presentment.  So

really they shouldn't talk about the final report

because it is just an extension of those

deliberations.

MR. CLYDE: Your Honor --

THE COURT: I'm not really compelled by

that question.

MR. CLYDE:  It's a step too far.  In

other words, as the Court has indicated the outcome

69

of grand jury process, the outcome of those
deliberations is a public document and
historically.  And so that process of the
deliberations and an outcome gets rendered to the
court system is a significant and important step in
the process, but I don't think you could seal the
final report as being part of their deliberations.
And candidly, I think the statement by the special
purpose grand jurors that they wanted their report
published speaks to that.  I don't think they see
it as an exposure of their deliberations. They see
it as this is the judgment -- I read it as they see
it.  This is the judgment that we've reached, and
that's what the court system historically said that
document becomes public.

        Your Honor, unless you have other
questions, I will not take any further of your
time, but what we would propose is that just as
Judge Adams did in Dekalb, that you order that the
report be filed with the Clerk's office, and I
think the expression you used was spread among the
minutes of the Court.  And that it be published
pursuant to 15-12-80.

        THE COURT:  All right.  Ms. Gaither,
anything you want to add?  Did he cover it?

70

MS. GATHER: No, your Honor, he did a pretty good job.

THE COURT: Mr. Wakeford, I have seen the Post it notes flying in your direction, so why don't you come on up here and let me hear any brief rebuttal you may have.

MR. WAKEFORD: Brief, right, your Honor?

THE COURT: That's what the lawyer always say and 30 minutes later we're still hearing. I'm interested in what you've got to say in response. And in particular, touch upon -- I'm not familiar with the Forsyth case, *166 Ga. App. 340.* I'll read it, and I'll look for other cases like it. But I was intrigued by this notion that there's case law out there that one could use to characterize the final report as a filing. Certainly not in the clerk's possession right now and won't be anytime soon. But because it came into the Court's possession then it's a filing. And we are within the realm of Rule 21 and not some place you'd rather be.

MR. WAKEFORD: Right, your Honor. And I think opposing counsel or counsel for the intervenors' used an interesting phrase just a moment ago. We progressed away from filing in open

court to just maybe sort of filing to render to the
court system, which is now we're so far from the
language that is contained in the case they cited,
In Re: Gwinnett County jury, that we're no longer
talking about a presentment made by the grand jury
in open court, which is what the language that the
Court chose, the Supreme Court chose in that case.
Additionally, they cite to a portion of the
language of that case in their brief at page 11.  A
block quote from the Supreme Court's language where
they talk about Rule 21.  And it's at the top of
page 11.  They say "Rule 21 embodies the right of
access to court records which the public and press
in Georgia have traditionally enjoyed."  And as
opposing counsel also pointed out there's no law on
point as to what to do here because there's
actually nothing traditional about special purpose
grand jury.

THE COURT:  That's not the strong
argument for disclosure is that this report falls
into that category of traditional act.  There's
nothing traditional about this report or this
process.  I get that.  That doesn't mean; however,
that it falls outside of Rule 21.  It's just --it's
not a simple one, which is why we're having to have

72

this hearing.  If this were an indictment, it's a
simple one and we don't have this discussion.  And
it may be that there is the name of a critical
witness that the State is seeking to redact from
the indictment until it's appropriate to unseal
that piece because people haven't been arrested yet
or something.  That happens all the time.  That's
not this.  This is different.

MR. WAKEFORD:  Well, I would say that the
question of whether Rule 21 is applied in this
specific way -- going to your Honor's point, that
may be something that requires additional argument
from the District Attorney's Office because I
really think that demonstrates ably that we are not
within the realm court Rule 21, and that we are
much -- if we are this is a document that is much
more akin to a piece of an ongoing criminal
investigation, but you've heard me a lot on that.
I also want to point out that we got to take what
guidance we have, and 15-12-101 refers to a final
report not a general presentment.  In other places
where reports are mentioned like 15-12-71 they say
report or presentment.  That is not the choice that
was made in 15-12-101.  Additionally, there is no
open court requirement there.  There is only that

1   it goes to the supervising judge, and as we said in

2   this case to the District Attorney.  That would --

3   that seems to indicate something to me that is

4   significant, but mainly that we are not in the

5   realm of a general presentment and certainly my

6   comments about the content guiding the analysis

7   remain.  But let's go all the way to saying, okay,

8   fine, it is a general presentment.  Even then

9   15-12-80 just says that the Court shall order

10  publication.  But it also empower's the grand jury

11  to direct the manner.  And there is no indication

12  from your Honor that the manner was prescribed by

13  the grand jury indicating to me that says once

14  again the district attorney is not opposing the

15  eternal oppression of the report.  That your Honor

16  has discretion about the manner of publication.

17          THE COURT:  Which here would be timing as

18  opposed to --

19          MR. WAKEFORD: Precisely.

20          THE COURT:  No one's fussing about is it

21  put on a website or is it in a docket.  It's really

22  all about the clock.  When does it go to whatever

23  place that would be.

24          MR. WAKEFORD:  Precisely, your Honor.

25  There could be conversations about specific

74

portions depending again on what the content of the

report is.  But really going back to where we began

this is about timing.  Yes, your Honor.  That is

exactly correct.  And since the grand jury's

preference has been afforded great weight as it

should be.  And I'll take this opportunity to say

the District Attorney's Office, as I'm sure your

Honor is, are enormously grateful to these citizens

for the really above and beyond contribution of

their time, energy and efforts to this process.  We

want to act with respect to their wishes, but we

also have to act in as stewards of an ongoing

criminal investigation of which they were a vital

part.  And so with regard to the timing aspect we

think that that -- since they did not speak to

manner, your Honor has a discretion there, if this

is a general presentment.  And so no matter which

route we take to get -- where we end up is it's a

question of timing and now it's just not the time.

The time will come and the District Attorney

committed to that idea, it's just not immediate.

        THE COURT:  Got it.

        MR. WAKEFORD: Thank you, your Honor.

        THE COURT:  Thank you.  Well, I want to

thank both sides for being prepared and having

75

these thoughtful presentations.  This is not

simple.  I think the fact that we had to discuss

this for 90 minutes shows that it is somewhat

extraordinary, Mr. Clyde.  Partly what's

extraordinary is what's at issue here, the alleged

interference with a presidential election.  But

it's also extraordinary in the plain meaning of

that word.  Is that it's not ordinary to have

special purpose grand jury doing things.  That

doesn't mean, however, that there hasn't been

course of conduct developed over time as to what

happens with special purpose grand jury reports or

presentments.  It also doesn't mean that we can't

-- I can't figure out a way to assess the final

report through the lens of grand jury secrecy and

the statutory scheme for grand jury's as well as

viewing it through the lens of Rule 21 to decide if

it falls within the reach and scope of Rule 21, and

that's what I'll need to do.  My proposal is that I

think about this a little bit and then contact both

groups, the District Attorney's Office and the

intervenors' if I've got specific questions for

which I'd like more input.  And then you're welcome

to file something or provide an email that these

are the cases you should look at.  I won't dictate

76

steps they want to take in light of an order that

the format in which you respond.  I will be sure if
I have questions, even though they may be for one
group and not the other --I won't say side.  One
group and not the other -- they go out to both
groups because I may have a question for Mr. Clyde
and Ms. Gather, but Ms. Willis, your team may want
to be heard on that question even though it is
poking more at the media's position.  As I said
early on they'll be no rash decisions.  There's not
going to be an order that pops out with no notice
and attached to it is the report.  There will be an
order if there's going to be disclosure that
perhaps says this is when it happens so that both
sides have a chance to react and take whatever
steps they want to take in light of an order that
says this is going to happen a little ways down the
line.  So no one is going to wake up with the Court
having disclosed the report on the front page of a
newspaper.  The report, of course, exist in the
District Attorney's control.  So if it does show up
folks will need to work through that.  But I will
circle back, and we'll figure out the best way to
move forward with this.

         Ms. Willis, anything else from the
District Attorney's side?

MS. WILLIS: No. Thank you for allowing us
to be heard today.

THE COURT:  Thank you for being here, all
your team.

THE COURT:  Mr. Clyde, anything else on
behalf of the interveners?

MR. CLYDE: Your Honor, could I speak just
very briefly to one of the last things that you
mentioned?

We understand the Court will give the
opportunity for either side to take whatever action
they want in terms of appellate issues.  We believe
the proper court -- if there's an appeal in this
case, we believe the proper court should be the
Georgia Supreme Court.  And we believe the Georgia
Supreme Court would be interested if that's the
direction it takes.  But I will point out to your
Honor that the constitutional argument we are
making would have to be reached by your Honor in
order for that to be the clear choice and the
clearly appropriate court for resolution of the
issue.  So that is an area we hope the Court will
reach.

THE COURT:  I appreciate your concern.
And I think if there is a ruling of nondisclosure

1    it would need to address the different basis and

2    each of the basis that you raised.  That it's not

3    secret.  That it does fall within Rule 21.  And so

4    I think you'd find the tell holds you need to do

5    what you need to do if you feel that's appropriate

6    what you need to do it.  That's the end result.

7              MR. CLYDE: Thank you, your Honor.

8              THE COURT:  That's it.  Thank you

9    everyone.

10             (Whereupon, the proceedings are

11   concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

79

# **Exhibit 4**

July 25, 2022 Order Disqualifying District Attorney's Office as to Senator Jones Only, In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).



FILED IN OFFICE

JUL 25 2022

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| IN RE 2 MAY 2022 SPECIAL PURPOSE GRAND JURY | 2022-EX-000024 |

### ORDER DISQUALIFYING DISTRICT ATTORNEY'S OFFICE

On 20 January 2022, the District Attorney of Fulton County petitioned the Chief Judge of the Superior Court of Fulton County to convene the Superior Court bench to consider approving the District Attorney's request for impaneling a special purpose grand jury to investigate possible criminal interference in the November 2020 general election in Georgia. On 24 January 2022, the Chief Judge, having received a majority of the twenty judges' assent, issued an Order authorizing the special purpose grand jury. Among the various instances of possible electoral interference this body would be investigating was the decision by State Republican party officials to draft an alternate slate of Presidential electors -- despite the vote count indicating their candidate had lost by thousands of votes. One of the more prominent persons who chose to participate in this scheme was State Senator Burt Jones.

On 2 May 2022, the special purpose grand jury was selected and sworn in; in June 2022 it began receiving evidence.[1] The District Attorney serves as the "legal advisor" to the grand jury; she and her team of prosecutors also largely shape the grand jury's investigation by subpoenaing witnesses and leading their questioning. As forecast, the District Attorney -- and thus the grand jury -- began to investigate the alternate electors

---

[1] Notably, the District Attorney explained her pause in initiating the special purpose grand jury's investigative activity by referencing the 24 May 2022 primary elections in Georgia, indicating an awareness that her work with the grand jury could have an impact on electoral outcomes.

stratagem. The District Attorney has issued subpoenas to at least twelve of the alternate electors, including one to Senator Burt Jones, who is the Republican candidate for Lieutenant Governor in the upcoming 2022 general election.

Senator Jones has filed a motion to disqualify the District Attorney and her office from further investigation into his connection to the apparent efforts to interfere with or otherwise undermine the outcome of the 2020 general election. Eleven other alternate electors have jointly filed a motion to quash their grand jury subpoenas, asserting their Fifth Amendment privilege against compulsory incrimination. Senator Jones subsequently joined in his fellow electors' motion and they adopted his. On 21 July 2022, the Court held a hearing on these motions. Based on the arguments and evidence presented, and a review of relevant legal authorities, the Court GRANTS Senator Jones's motion to disqualify the District Attorney and her office -- as to Senator Jones only. The Court DENIES the motion to disqualify as to the other eleven alternate electors and also DENIES the motion to quash as to those eleven.[2]

## DISQUALIFICATION

On 24 May 2022, Senator Jones won outright the Republican primary for Lieutenant Governor, earning over 50% of the vote.[3] On the Democratic side, a runoff was necessary, as Kwanza Hall, the top vote getter, secured only 30% of the vote. Trailing him with 18% of the vote was the second-place finisher, Charlie Bailey. Hall and Bailey

---

[2] Given the Court's ruling on Senator Jones's motion to disqualify, his adopted motion to quash is moot, as he is no longer a permissible subject (or target or object) of *this* special purpose grand jury's investigation and so may not be compelled to appear before the grand jury. As discussed below, this prohibition does not mean the grand jury cannot receive evidence about Senator Jones's involvement in efforts to undo legitimate electoral results; rather, such evidence simply may not come Senator Jones and he may not be included in any final recommendations from the grand jury.

[3] All 2022 state primary election information for the lieutenant governor's race is taken from https://ballotpedia.org/Georgia_lieutenant_gubernatorial_election,_2022.

2

stood for a run-off election on 21 June 2022.  Bailey turned the tide and triumphed; he now faces Senator Jones in the 8 November 2022 general election.

On 14 June 2022, well after the grand jury had begun receiving evidence from witnesses called and examined by the District Attorney's team of prosecutors, the District Attorney hosted and headlined a fundraiser for Bailey.  By this time, media coverage of the grand jury proceedings was national and non-stop and the District Attorney was the very public face of those proceedings.  She also was one of the faces on the Bailey fundraiser announcement: it prominently featured the District Attorney's name, photo, and title and was widely shared on Bailey's campaign's social media outlets.  The fundraiser appears to have been a success, earning Bailey's campaign thousands of dollars.  It is important to note that, as counsel for the District Attorney rightly pointed out at the hearing on the motion to disqualify, the fundraiser was entitled a "Runoff Fundraiser" and occurred when Bailey was battling Kwanza Hall for the Democratic nomination.  But more relevant -- and harmful -- to the integrity of the grand jury investigation is that the die was already cast on the other side of the political divide: whoever won the Bailey-Hall runoff would face Senator Jones.  Thus, the District Attorney pledged her name, likeness, and office to Bailey as her candidate of choice at a time when, if Bailey were successful (which he was), he would face Senator Jones.[4]

---

[4] The District Attorney also, as a private citizen and in her personal capacity only, donated to Bailey's campaign.  Senator Jones points to this private donation as another basis for disqualification.  Alone, that is an insufficient basis for disqualification.  See, e.g., *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 884 (2009) ("Not every campaign contribution by a litigant or attorney creates a probability of bias that requires ... recusal."); *Gude v. State*, 289 Ga. 46, 50 (2011) (same) (both cases involve judicial recusals, where rules are more stringent).  However, it does add to the weight of the conflict created by the more extensive, direct, public, and job-related campaign work the District Attorney performed on behalf of candidate Bailey.

3

This choice -- which the District Attorney was within her rights as an elected official to make -- has consequences. She has bestowed her office's imprimatur upon Senator Jones's opponent. And since then, she has publicly (in her pleadings) labeled Senator Jones a "target" of the grand jury's investigation.[5] This scenario creates a plain -- and actual and untenable -- conflict.[6] Any decision the District Attorney makes about Senator Jones in connection with the grand jury investigation is necessarily infected by it. To label Jones a target or merely a subject, to subpoena him or instead allow him to proffer, to question him aggressively or mildly, to challenge or accept invocations of legislative privilege or assertions of Fifth Amendment privilege, to immunize or not -- each of these critical investigative decisions is different for him because of the District Attorney's actions taken on behalf of the Senator's electoral challenger. Perhaps the evidence shows that there should be a tighter, stricter focus on Senator Jones than on some of the other alternate electors.[7] Yet any effort to treat him differently -- even if justified -- will prompt

---

[5] The designation, borrowed from federal criminal practice, is a bit confusing in the context of this grand jury, which has no power to bring criminal charges against anyone. It is nonetheless a potent investigative signal that the District Attorney views Senator Jones (and the other alternate electors) as persons more closely connected to the alleged electoral improprieties than other witnesses who have come before the grand jury or who may yet do so.

[6] The Court appreciates the affidavit provided by Robert Smith, General Counsel for the Prosecuting Attorneys' Council of Georgia, on behalf of the District Attorney. His reliance on *Whitworth v. State*, 275 Ga. App. 79 (2005) and *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1247 (2nd Cir. 1979) is instructive but not persuasive. He is correct that a mere appearance of impropriety is generally not enough to support disqualification, except, as noted in *Nyquist*, in the "rarest of cases." This is one of those cases. But it is also a case where the conflict is actual and palpable, not speculative and remote.

[7] This is an entirely plausible scenario given the Senator's political experience and public responsibility. That is, if the District Attorney (or the grand jury) decides that participation in the alternate elector scheme constituted impermissible interference in the 2020 general election, someone of the Senator's public stature, influence, and presumed sophistication ought to be treated differently from an alternate elector who had no representative responsibility and who participated in the scheme merely out of partisan loyalty.

4

entirely reasonable concerns of politically motivated prosecution: is Senator Jones being singled out because of a desire to further assist the Bailey campaign?[8]

Of course, the actual answer does not matter.[9] It is the fact that concern about the District Attorney's partiality naturally, immediately, and reasonably arises in the minds of the public, the pundits, and -- most critically -- the subjects of the investigation that necessitates the disqualification. An investigation of this significance, garnering the public attention it necessarily does and touching so many political nerves in our society, cannot be burdened by legitimate doubts about the District Attorney's motives. The District Attorney does not have to be apolitical, but her investigations do. The Bailey fundraiser she sponsored -- in her official capacity -- makes that impossible when it comes to investigating Bailey's direct political opponent.[10]

The Court GRANTS Senator Jones's motion to disqualify the District Attorney and her office.[11] This District Attorney and her special prosecution team may no longer investigate Senator Jones in the following sense: they may not subpoena him (or seek to

---

[8] Candidate Bailey has wielded the District Attorney's investigation as a cudgel in his campaign against Jones. *See, e.g.,* https://www.ajc.com/politics/contrasts-on-voting-laws-and-ballot-access-define-georgia-candidates/7QT7XHSAGNGVXBNQPZ64AX56OU/ in which Bailey is quoted as saying "The only danger to safe and secure elections is people like Burt Jones, who come in and substitute their will for the will of the voters and try to overturn the election."

[9] Nor is it knowable, which is another reason to separate the District Attorney and her office from any investigation into Senator Jones. An "actual" conflict does not mean that Senator Jones has definitive proof that an investigative decision was made explicitly to benefit candidate Bailey. This rarely, if ever, occurs, absent wiretaps or leaked e-mails. The conflict is "actual" because *any* public criminal investigation into Senator Jones plainly benefits candidate Bailey's campaign, of which the District Attorney is an open, avid, and official supporter.

[10] Senator Jones also sought to disqualify Special Prosecutor Nathan Wade for a campaign donation he made to Charlie Bailey's earlier aborted campaign for Attorney General. As discussed above, a routine campaign contribution is not enough – and this one was to a different campaign altogether, with no connection to Senator Jones.

[11] When the elected District Attorney is disqualified, so, too, is her entire office. *McLaughlin v. Payne,* 295 Ga. 609, 613 (2014).

5

obtain any records from him via subpoena), they may not publicly categorize him as a subject or target (or anything else) of the grand jury's investigation, and they may not ask the grand jury to include any recommendations about him in their final report. This does not mean that the District Attorney cannot gather evidence about Senator Jones's involvement in efforts to interfere with or undermine the 2020 general election results. Her office may ask witnesses about the Senator's role in the various efforts the State Republican party undertook to call into question the legitimacy of the results of the election. What her office may *not* do is make use of any such evidence to develop a case against the Senator. That decision, as to whether any charges should be brought, and what they should be, will be left to a different prosecutor's office, as determined by the Attorney General.

The Court DENIES the motion to disqualify as adopted by the other eleven electors. There has been no showing that the District Attorney or any member of her prosecution team is impaired by a conflict of interest vis-à-vis any of these individuals. One of those eleven, Shawn Still, is running for the State Senate but he has offered no evidence that the District Attorney or anyone else from her office has materially supported either his campaign or the campaign of his opponent.[12]

---

[12] Counsel for the eleven also raised the specter of the District Attorney releasing the special purpose grand jury's final report on the eve of the November 2022 general election in an effort to advantage Democratic candidates over Republican ones. Apart from offering no basis for this claim beyond unsubstantiated hearsay, counsel's concern displays a misunderstanding of the investigative grand jury process. The grand jury will prepare a final report recommending action (or inaction). That report is released to the undersigned, who in turn passes it to the Chief Judge. Only after a majority of the Superior Court bench subsequently votes to dissolve the grand jury will the report be released to the District Attorney. O.C.G.A. § 15-12-101(b). The undersigned will not begin this dissolution process at or near the time of the 2022 general election, should the grand jury complete its work by then.

## QUASHAL

The eleven other alternate electors have moved to quash their subpoenas on the basis of their collective, blanket assertion of their Fifth Amendment privilege. This group assertion came after the District Attorney upgraded their status from witness to target in late June 2022 (following several alternate electors' voluntary interviews with the District Attorney's team (and the Bailey fundraiser)). These eleven now characterize the subpoenas for their testimony as "unreasonable and oppressive." The Court disagrees. Counsel for the eleven presented several creative legal arguments concerning the possible (in)validity of future charges that might conceivably be brought against these alternate electors. While intriguing, such argumentation is premature. This grand jury has no authority to bring charges. *Kenerly v. State*, 311 Ga. App. 190 (2011). It is merely investigating who did what after the 2020 general election and developing a perspective about whether anyone's post-election actions merit criminal prosecution in Fulton County.

The eleven electors' conduct falls well within the reach of this broad charter. It is not unreasonable to seek their testimony and it is not oppressive to require an appearance by way of subpoena. Nothing about that process deprives the electors of their Fifth Amendment privilege, which they may freely assert *as applicable* when they appear before the grand jury.[13] Their subpoenas will not be quashed. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 258-59 (1988); *State v. Lampl*, 296 Ga. 892, 898-99

---

[13] Counsel for the eleven revealed at the 21 July 2022 hearing that her advice to her clients will be to assert privilege as to *any and every* question asked, even something as mundane as name and profession. While this strikes the Court as a rather expansive view of what might be self-incriminating, that determination can be made at the time of the electors' appearances. *See State v. Pauldo*, 309 Ga. 130, 135 (2020) (investigating authorities may ask basic biographical questions, even in the face of the assertion of Fifth Amendment rights).

7

(2015) (target of grand jury investigation may be compelled to appear before grand jury); O.C.G.A. § 24-5-506(a) (only persons charged with the commission of a criminal offense are not compellable to testify).

SO ORDERED this 25th day of July 2022.

Judge Robert C.I. McBurney
Superior Court of Fulton County
Atlanta Judicial Circuit

8

# __Exhibit 5__

List of Media Appearances and Social Media Posts by FCDA and/or FCDA's Office

## List of Media Appearances and Social Media Posts by FCDA and/or FCDA's Office

1. January 4, 2021 - Jerry Lambe, *This is the Democratic DA for Atlanta Looking to Investigate Trump's Phone Call with Georgia's Secretary of State*, LAW AND CRIME (Jan. 4, 2021), https://lawandcrime.com/2020-election/this-is-the-democratic-da-for-atlanta-looking-to-investigate-trumps-phone-call-with-georgias-secretary-of-state/; *see also* Justin Gray (@JustinGrayWSB), Twitter (Jan. 4, 2021, 11:10 AM), https://twitter.com/JustinGrayWSB/status/1346126903141408772?s=20. (FCDA called "the President's telephone call with Georgia Secretary of State disturbing... anyone who commits a felony violation of Georgia law in my jurisdiction will be held accountable.")

2. February 10, 2021 - Christian Boone, Greg Bluestein, *Fulton's DA opens criminal investigation into Trump attempt to overturn Georgia's election*, ATLANTA JOURNAL-CONSTITUTION (Feb. 10, 2021), https://www.ajc.com/politics/fultons-da-opens-criminal-investigation-into-trump-demand-to-overturnelection/YWJPS4B4BREHDLHQCZYDDWBVIA/?d. (FCDA would not say whether anyone else besides the president was under investigation but stated she had no reason to believe that any Georgia official is a target of the investigation.)

3. February 12, 2021 - Fox 5 Atlanta, *Exclusive: Fulton County district attorney on decision to open investigation into Trump call,* YOUTUBE, (Feb. 12, 2021), https://www.youtube.com/watch?v=mKcczSo5tK8.

4. February 12, 2021 - Rachel Maddow, MSNBC, *GA Probe Of Trump Likely To Look Beyond Raffensperger Call: Fulton's D.A. Willis*, YOUTUBE, (Feb, 12, 2021), https://www.youtube.com/watch?v=IQz_v2hmtHQ. (FCDA discussed the investigation and stated, "When any prosecutor throughout this country is interviewing people trying to determine if a crime was committed, and if they understood what they were doing, the *mens rea* is always important. So you look at facts to see, 'did they really have intent?' [or] 'did they really understand what they were doing?' Detailed facts become important like, asking for a specific number and then going back to investigate and understand that that number is just one more than the number that is needed. It lets you know that someone had a clear mind. They understood what they were doing, and so when you are pursuing the investigation, facts like that that may not seem so important, become very important.")

5. February 13, 2021 - Danny Hakim, Richard Fausset, *In Georgia, a New District Attorney Starts Circling Trump and His Allies*, NEW YORK TIMES (Feb. 13, 2021), https://www.nytimes.com/2021/02/13/us/politics/fani-willis-trump.html. (FCDA was "open to considering not just conspiracy but racketeering charges" and even "criminal solicitation to commit election fraud." She explained that RICO charges apply to otherwise lawful organizations that are used to break the law,"if you have various overt acts for an illegal purpose, I think you can – you may – get there.")

6. February 10, 2021 - Danny Hakim, Richard Fausset, *Georgia Prosecutors Open Criminal Inquiry Into Trump's Efforts to Subvert Election*, NEW YORK TIMES (Feb. 10, 2021), https://www.nytimes.com/2021/02/10/us/politics/trump-georgia-investigation.html.

7. February 19, 2021 - Christian Boone, Tamar Hallerman, *New Fulton DA balances Trump probe, massive local workload,* ATLANTA JOURNAL CONSTITUTION, (Feb. 19, 2021), https://www.ajc.com/news/crime/new-fulton-da-balances-trump-probe-massive-localworkload/AHWEA3OAIFE55CTWB6LQBMS5R4/. (FCDA suggested she had no timetable for the investigation or her decision about whether to bring charges against President Trump. She insisted politics played no role in her probe stating that she took "no pleasure in this," and commented, "who else is going to do it.  Nobody is above the law.")

8. February 25, 2021 - Kate Brumback, *Georgia prosecutor investigating Trump call urges patience,* FOX 5 ATLANTA (AP), (Feb. 26, 2021), https://www.fox5atlanta.com/news/georgia-prosecutor-investigating-trump-call-urges-patience (FCDA discussed various aspects of the investigation and called the resignation of Byung J. 'Bjay' Pak "particularly peculiar.")

9. February 25, 2021 - Associated Press, *Georgia prosecutor discusses election inquiry,* YOUTUBE (Feb. 25, 2021), https://www.youtube.com/watch?v=2KfEdxsSwzE.

10. February 25, 2021 - Associated Press, *Georgia prosecutor discusses election inquiry,* YOUTUBE (Feb. 25, 2021), https://www.youtube.com/watch?v=2KfEdxsSwzE.

11. March 8, 2021 - Dale Russell, *Fulton County DA talks to the Fox 5 I-Team about Trump grand jury investigation,* FOX 5 ATLANTA (Mar. 8, 2021), https://www.fox5atlanta.com/news/grand-jury-investigation-of-former-president-trump-set-to-begin.

12. September 8, 2021 - Closer Look With Rose Scott, *District Attorney Willis Discusses COVID Crime Across Fulton County,* NPR-WABE, (Sep., 8, 2021), https://www.npr.org/podcasts/832218152/closer-look-with-rose-scott.

13. September 17, 2021 - Sara Murray, Jason Morris, *Georgia criminal probe into Trump's attempts to overturn 2020 election quietly moves forward,* CNN (Sep. 17, 2021), https://www.cnn.com/2021/09/17/politics/georgia-probe-trump-election/index.html (FCDA states, "I do not have the right to look the other way on any crime that may have happened in my jurisdiction."  She further comments that she hopes to strike a formal cooperation agreement with congressional committees investigating the insurrection stating, "it is certainly information my office needs to see.")

14. September 28, 2021 - Janell Ross, *Atlanta's First Black Female District Attorney Is at the Center of America's Converging Crises,* TIME, (Sep. 28, 2021), https://time.com/6099301/fani-willis-atlanta/ (She explained the moment when she heard the call and had one of those, Wait. What in the hell moments.)

15. September 29, 2021 - 11 Alive, *Fulton County DA to discuss backlog, possibility of violent criminals being released,* YOUTUBE, (Sep. 29, 2021), https://www.youtube.com/watch?v=sjGgiF0Wt9g (She told the crowd: "certainly, if someone did something as serious as interfere with people's right to vote—which you know as a woman, and a person of color, is a sacred right where people lost a lot of lives, we are going to invest in that.")

16. January 4, 2022 - Kate Brumback, Associated Press, *Fulton County DA investigating Trump closer to decision on charges*, FOX 5 ATLANTA, (Jan. 11, 2022), https://www.fox5atlanta.com/news/fulton-county-da-investigating-trump-closer-to-decision-on-charges.

17. January 24, 2022 - Janell Ross, *As Atlanta DA's Trump Election Probe Advances, She Explains Her Approach*, TIME, (Jan. 25, 2021), https://time.com/6141873/georgia-election-probe-trump-fani-willis/.

18. February 3, 2022 - Atlanta Journal Constitution, *Fulton DA details next stage of Trump probe*, YOUTUBE (Feb. 3, 2022), https://www.youtube.com/watch?v=LHbIZK8v0-k.

19. February 3, 2022 - Dale Russell, *Former President Trump's comments prompt new security measures for Fulton DA*, FOX 5 ATLANTA, (Feb. 3, 2022), https://www.fox5atlanta.com/news/former-president-trumps-comments-prompt-new-security-measures-for-fulton-da.

20. February 7, 2022 - Sara Murray, Devan Cole, *Atlanta DA investigating Trump's election interference: 'We're not here playing a game'* CNN, (Feb. 7, 2022), https://www.cnn.com/2022/02/07/politics/fani-willis-donald-trump-election-investigation/index.html. (FCDA stated, "this is a criminal investigation, we're not here playing games. I plan to use the power of the law. We are all citizens. Mr. Trump, just as any other American citizen, is entitled to dignity. He is entitled to being treated fairly. He will be treated fairly in this jurisdiction, but I plan to do my job, and my job is to make sure that we get the evidence that gives us the truth. I'm not concerned at all about games to delay this." The FCDA disclosed the previously unknown fact that President Trump had retained counsel in the Georgia investigation. She stated, "Last calendar year, I met with them and I assured them what I knew – we would not bring forth an indictment in the 2021 year. I met with them at the end of 2021 to tell them that I would be moving forward, not necessarily with an indictment, but with the next steps of the investigation."(video embedded within article))

21. February 14, 2022 - USA Today, *Georgia DA Fani Willis talks about Trump election*, YOUTUBE, (Feb. 14, 2022), https://www.youtube.com/watch?v=SuxGeLf3Mk4. FCDA said of the phone call, "almost immediately I knew that there was something to be investigated.")

22. April 19, 2022 - Tamar Hallerman, *Fulton DA clarifies timeline for witness testimony in Trump probe*, ATLANTA JOURNAL CONSTITUTION, (April 19, 2022), , https://www.ajc.com/news/georgia-news/fulton-da-clarifies-timeline-for-witness-testimony-in-trump-probe/QPKS7EJWYZHDRDXYH5NOR3KXGE/. (FCDA states, "I think it is also equally and fundamentally important that the government makes sure that in a free society that people can vote and that is not infringed upon by anyone. So in this case, you have an allegation of a human being, of a person, of an American citizen, possibly doing something that would've infringed upon the rights of lots of Georgians. Specifically from my county— Fulton County—right to vote being infringed upon. And the allegations, quite frankly, were not a civil wrongdoing, but a crime. And so everybody is equal before the law no matter what position they hold, no matter how much wealth, no matter how poor they are, no matter how educated, no matter how uneducated...People have many, many days of legal arguments. A

3

judge, and my guess is even the Supreme Court of Georgia will weigh in on that issue. I do not think that executive immunity would protect against prosecution in this case.")

23. April 29, 2022 - Ben Brasch, Tamar Hallerman, *Fulton DA faces biggest decision of career as Trump grand jury looms,* ATLANTA JOURNAL-CONSTITUTION, (April 29, 2022), https://www.ajc.com/politics/fulton-da-faces-biggest-decision-of-career-as-trump-grand-jury-looms/6OKYH6PMRZB3TPBSQZJSHL5CCU (FCDA said she has yet to make up her mind about whether the former president or his advocates broke the law and reiterates that she will treat President Trump like anyone else who crosses her desk.)

24. May 2, 2022 - Anderson Cooper, CNN, *Georgia district attorney: Trump grand jury subpoenas will be enforced,* YOUTUBE, (May 2, 2022), https://www.youtube.com/watch?v=vHcu0ex8e7Q. (FCDA discusses upcoming subpoenas to uncooperative witnesses, communications with President Trump's legal counsel and, in reference to the slate of electors, states, "…and two, that if we live in a free land in a democracy, we have to have free and fair elections. And so, I am very concerned that if behavior that is illegal, goes unchecked, that it could lead to a very bad start and a very, very bad path.")

25. May 26, 2022 - Danny Hakim, Richard Fausset, *Up to 50 Subpoenas Expected as Grand Jury Begins Trump Inquiry,* NEW YORK TIMES, (May 27, 2022), https://www.nytimes.com/2022/05/27/us/trump-grand-jury-georgia.html. (FCDA referenced President Trump stating, "it's not of much consequence what title they wore," and, "I'm not taking on a former president. We're not adversaries. I don't know him personally. He does not know me personally. We should have no personal feelings about him." She discussed the slate of electors and compared it to her 2014 RICO case stating, "There are so many issues that could have come about if somebody participates in submitting a document that they know is false. You can't do that. If you go back and look at Atlanta Public Schools, that's one of the things that happened, is they certified these test results that they knew were false. You cannot do that." She again disclosed the number of people who had declined to speak with her and plans for subpoenas. She discussed challenges to subpoenas stating, "I don't know how many games folks are going to play. I don't know how many times we're going to have to fight someone just to get them to come speak to a grand jury and tell the truth. And there could be delays for those reasons." FCDA said that there had been "no formal coordination" between her office and the Jan. 6 committee and further stated, "but, I mean, obviously, we're looking at everything that relates to Georgia that that committee is overturning.")

26. June 6, 2022 - Michael Isikoff, Daniel Klaidman, *Georgia DA Fani Willis is confident as her Trump probe takes shape,* YAHOO! NEWS, (June 6, 2022), https://news.yahoo.com/georgia-da-fani-willis-is-confident-as-her-trump-probe-takes-shape-145829588.html. (The outlet reported, "Willis spoke freely in her office for over an hour" just after Raffensperger spent 5 hours testifying. The FCDA commented directly on pending and future challenges to the investigation stating, "that's nothing for prosecutors." She further stated, "I did not choose this. I did not choose for Donald Trump to be on my plate," but noted that she had no choice. She again discussed RICO and what a great tool it is to use so the jury can see the "whole story." She commented that "since I was a very little bitty girl, you get dragged to the polls. So you understand very, very early on, voting is such an intrinsic right. And so I understand

4

how important the infraction on someone's right to vote is. So I do get the significance." In discussing the upcoming hearing on a motion to quash subpoenas by members of the Georgia legislature, she commented that, should they choose to challenge their subpoena further, they would need to do so from a jail cell: She will get a 'material witness' warrant commanding them to comply or face arrest. It's "just what you do," she said. "I've had a witness arrested before because they ignore my subpoena. And you do not expect to have to do it. But I will." She stated she would not bring an indictment once early voting begins but noted that she has plenty of time before that — "and after." )

27. June 27, 2022 -  Breakdown, *A force of nature,* ATLANTA JOURNAL-CONSTITUTION (June 27, 2022), https://podcasts.apple.com/us/podcast/a-force-of-nature/id992983540?i=1000567810613 (In response to the question of whether she would subpoena President Trump, she responded, "it is foreseeable that I would subpoena the target of this investigation, A target.")

28. June 30, 2022 - Tamar Hallerman, *Fulton DA pushes back against legislators fighting subpoenas,* ATLANTA JOURNAL-CONSTITUTION, (June 30, 2022), https://www.ajc.com/politics/fulton-da-pushes-back-against-legislators-fighting-subpoenas/COOXST6FYND3VNL7FZQLW5I4FA/.

29. July 6, 2022 - MSNBC, *Fulton County DA on Issuing Subpoenas: 'This Is Not A Game, At All',* YOUTUBE, (July 6, 2022), https://www.youtube.com/watch?v=gThpjjlTxO4. (FCDA said she expects to subpoena additional members of Trump's inner circle and further stated, "I think that people thought that we came into this as some kind of game. This is not a game at all. What I am doing is very serious. It's very important work. And we're going to do our due diligence and make sure that we look at all aspects of the case"); https://www.youtube.com/watch?v=HHWp82iyWgE (When asked about Senator Graham's comment that the investigation was a fishing expedition, FCDA replied "what do I have to gain from these politics? It's an inaccurate estimation. It's someone that doesn't understand the seriousness of what we're doing. I hope they don't come and testify truthfully before the grand jury." FCDA stated, "election interference is a very important subject… I think it's important that they hear from people that may have had something to do with an election interference." When asked about a subpoena for President Trump, she replied, "anything's possible." When asked how she would respond to resistance, FCDA stated, "we'll take you before the judge and the judge will make a ruling if we have a legal right to bring them before the court . . . that's why you have the power of the state, and the power of the subpoena to bring them here. My job is not to bring you here because you want to come, my job is to make sure the grand jurors get all of the evidence they want.")

30. July 13, 2022 -  Tamar Hallerman, *Graham moves to quash Fulton subpoena in Trump probe,* ATLANTA JOURNAL-CONSTITUTION, (July 13, 2022), https://www.ajc.com/politics/graham-moves-to-quash-fulton-subpoena-in-trumpprobe/CQX4KUFVABHMNBVPAAGI4FA53Q/. (FCDA confirmed that her team informed multiple people that they were "targets" of the investigation.)

31. July 14, 2022 - Tamar Hallerman, *AJC subpoena shows grand jury's interest in U.S. attorney tumult,* ATLANTA JOURNAL-CONSTITUTION, (July 14, 2022),

https://www.ajc.com/politics/ajc-subpoena-shows-grand-jurys-interest-in-us-
attorneytumult/YVPTG7QF35FGBNTW2VSMSEZ3HI/. (FCDA indicated she was open to
subpoenaing others who worked in the White House, including President Trump and his
former Chief of Staff, Mark Meadows: "I think it would be safe to say that if people have
information in particular about Georgia and interference in the Georgia elections, and they
were in the White House, that will not bar us from wanting to talk to them." She again
confirmed that multiple targets of her investigation have been identified.)

32. July 15, 2022 - Tamar Hallerman, Greg Bluestein, *Top Georgia Republicans informed
    they're targets of Fulton DA probe,* ATLANTA JOURNAL-CONSTITUTION, (July 15, 2022),
    https://www.ajc.com/politics/top-ga-republicans-informed-theyre-targets-of-fulton-
    daprobe/3CZJHEYOD5ADFDCVP3372HROFQ/.

33. August 2, 2022 - 11 Alive, *Fulton DA Fani Willis talks gangs, Donald Trump grand jury
    probe,* YOUTUBE (Aug. 2, 2022), https://www.youtube.com/watch?v=sUZVs6zDSME.
    (FCDA discussed whether to subpoena President Trump and stated, "the grand jury needs to
    hear as much information from as many people that are willing to come and testify
    truthfully.)

34. August 3, 2022 - Michael Isikoff, *Exclusive: Trump allies launch effort to recall Fulton
    County DA Fani Willis,* YAHOO! NEWS, (Aug. 3, 2022), https://ca.news.yahoo.com/exclusive-
    trump-allies-launch-effort-to-recall-fulton-county-da-fani-willis-224315547.html.

35. August 29, 2022 - 11 Alive, *Fulton County DA to announce 'major' gang arrests,
    indictments,* YOUTUBE, (Aug. 29, 2022), https://www.youtube.com/watch?v=Qzcyw-OnpG0.
    ("I think we're about 60% through of all of the people we need to be brought up....You
    know, there can't be any predictions. As you know, many people are unsuccessfully fighting
    our subpoenas. We will continue to fight to make sure that the grand jury and the public gets
    the truth.")

36. September 12, 2022 - Richard Fausset, *In Atlanta, a Local Prosecutor Takes on Murder,
    Street Gangs and a President,* NEW YORK TIMES, (Sep. 12, 2022),
    https://www.nytimes.com/2022/09/12/us/fani-t-willis-trump-atlanta.html (FCDA stated, "I
    mean, if crime happens in my jurisdiction, who's going to investigate it? I do not have the
    right to look the other way on a crime that could have impacted a major right of people in
    this community and throughout the nation." The authors of the article noted, her comfort in
    the public eye stands in marked contrast to the low-key approach of another Trump legal
    pursuer, Attorney General Merrick B. Garland.").

37. September 15, 2022 -  Matthew Brown, Tom Hamburger, *Georgia 2020 election inquiry may
    lead to prison sentences, prosecutor says,* THE WASHINGTON POST, (Sep. 15, 2022),
    https://www.washingtonpost.com/national-security/2022/09/15/fani-willis-georgia-prison/
    (FCDA suggested that serious crimes have been committed and "people are facing prison
    sentences." FCDA declined to comment on recent filings related to pressure on [Ruby]
    Freeman except to say: "I hate a bully. Obviously, I think we would find it offensive to bully
    an election official to influence an election." The author notes, "Willis's open and frank
    assessment is unusual for a prosecutor, as such high-profile investigations are often shrouded

6

in secrecy. Her approach in this inquiry has drawn criticism from some in the legal community, and it contrasts with the general reticence of Attorney General Merrick Garland. Willis said she believes transparency is a requirement of her job.")

38. November 2022 - Mark Binelli, *She Took On Atlanta's Gangs. Now She May Be Coming for Trump.*, NEW YORK TIMES MAGAZINE, (Feb. 2, 2023), https://www.nytimes.com/2023/02/02/magazine/fani-willis-trump.html?fbclid=IwAR0Yii9Uk3ySFRc2oIgkUVvSm2NXkjc-AbpW5zJwnTWSJeI-D0uQhKDMmec.

39. February 13, 2023 - Tamar Hallerman, Bill Rankin, *Fulton judge: Portions of Trump grand jury report to be released this week*, THE ATLANTA JOURNAL-CONSTITUTION, (Feb. 13, 2023), https://www.11alive.com/article/news/politics/trump-investigations-georgia-prosecutor/85-e08fc996-8305-4fed92c5-62ac57547bf2.





Adam Parkhomenko
@AdamParkhomenko

Can we get 1,000 retweets on this: The Fulton County DA is Fani Willis. Her campaign twitter account only has 13K followers. She is exactly the kind of candidate we must not only elect but re-elect. Can you retweet and follow @FaniWillisForDA

[illegible] PM · Jul 11, 2022

13.3K Retweets 238 Quote Tweets 19.8K Likes

Tweet your reply

Adam Parkhomenko @AdamParkhomenko · Jul 11, 2022
Replying to @AdamParkhomenko
Please consider taking a moment and making a contribution directly to her campaign account so she has the resources she needs when she needs them. Republicans will do everything they can to stop her when she is up for re-election.

secure.actblue.com
I just gave to Fani Willis
Show your support with a contribution

45 [illegible] [illegible]

Adam Parkhomenko @AdamParkhomenko · Jul 11, 2022
I can't think of a better way to celebrate after Lindsey Graham lost in court today than support the person who is holding all of them accountable.

[illegible] [illegible] [illegible]

Adam Parkhomenko @AdamParkhomenko · Jul 11, 2022
Thank you, 4,500 new followers and counting for Fulton County DA Fani Willis.

25 [illegible] [illegible]

Adam Parkhomenko @AdamParkhomenko · Jul 15, 2022
Let's go!

Hugo Lowell @hugolowell · Jul 15, 2022
Breaking via Yahoo News: Fulton County District Attorney Fani Willis has sent so-called "target" letters to prominent Georgia Republicans informing them they could be indicted for their role in the fake electors scheme.

2 [illegible] [illegible]

Adam Parkhomenko @AdamParkhomenko · Jul 15, 2022
30,000 new followers in four days for @FaniWillisForDA Keep spreading the word!

7 59 255

Carmen Ge @[illegible] · Jul 11, 2022
Replying to @AdamParkhomenko
How does Twitter following help get her reelected? I am always confused by such requests

5 17 78

Adam Parkhomenko @AdamParkhomenko · Jul 11, 2022
Replying to @[illegible]
It will help her get her campaign message out and raise money for her re-election. Neither of which you can do through official accounts.

5 54 [illegible]

34 · 90 · 221 · 323.2K

Promoted

Fani T. Willis Retweeted

**Adam Parkhomenko** @AdamParkhomenko · Jul 11, 2022

Can we get 1,000 retweets on this: The Fulton County DA is Fani Willis. Her campaign twitter account only has 13K followers. She is exactly the kind of candidate we must not only elect but re-elect. Can you retweet and follow @FaniWillisforDA

Show this thread

**Fani T. Willis** @FaniforDA · Jul 18, 2022

This is my first cartoon and likely the only time a boat will ever bear my name. #GeorgiaPolitics #DA #FCDA

FISHING EXPEDITION!"

Illustration by Steve Sack

**Fani T. Willis** @FaniforDA · Jul 17, 2022

Adam I am so humbled by your support. This week has been amazing! 60k - WOW. THANK YOU.

**Adam Parkhomenko** @AdamParkhomenko · Jul 17, 2022

60,000 new followers and counting this week thanks to all of you for the incredible Fulton County District Attorney @FaniWillisforDA. She is close to 70K followers. Let's get her to 100,000 and finish this week strong.

Show this thread

**Fani T. Willis** @FaniforDA · Jul 14, 2022

Thank you so much for the support and kind words Adam.

**Adam Parkhomenko** @AdamParkhomenko · Jul 11, 2022

Can we get 1,000 retweets on this: The Fulton County DA is Fani Willis. Her campaign twitter account only has 13K followers. She is exactly the kind of candidate we must not only elect but re-elect. Can you retweet and follow @FaniWillisforDA

Show this thread

6

Adam Parkhomenko ✓ @AdamParkhomenko · Jul 16, 2022

Can we get 500 retweets on this: The Fulton County DA's Fani Willis is on multiple twitter accounts that is dressed by 50K followers this week. She outsourced Lindsey Graham. Let's traffic for their platform while she is focused on her work. Can you retweet and follow @FaniGA4.ForDA

Adam Parkhomenko ✓ @AdamParkhomenko · Jul 16, 2022

Please consider taking a moment and reaching out to Fani Willis's campaign account so she can get the resources she needs when she needs them for re-election. Republicans will use everything they can to stop her when she is up for re-election.

I just gave to Fani Willis.

Share your reasons with a contribution.

Adam Parkhomenko ✓
@AdamParkhomenko

60,000 new followers and counting this week thanks to all of you for the incredible Fulton County District Attorney @FaniWillisForDA. She is not at 75K followers. Let's get her to 100,000 and finish this week strong.

5:04 AM · Jul 17, 2022

542 Retweets   24 Quote Tweets   1,533 Likes

Tweet your reply

Adam Parkhomenko ✓ @AdamParkhomenko · Jul 17, 2022
Replying to @AdamParkhomenko
Fulton County District Attorney @FaniWillisForDA is now only 15.7k away from hitting 100,000 followers. Please follow her and retweet to see efforts to get there soon!

Patricia ✓ @Trish_Abc2012 · Jul 17, 2022
Replying to @AdamParkhomenko
Following @AdamParkhomenko
Been there. Done that with Pleasure Service weeks ago.
#followed #willis

Marvin Seton @marvin_seton · Jul 16, 2022
Replying to @AdamParkhomenko
Voice from pushin past the 100k+ followers this week, let her also apply for @verified.

K. Murphy/Codify Roe @KindredRainbow · Jul 16, 2022
Replying to @AdamParkhomenko
Following and retweeted. Let's get her to 100k. #FaniWillisForDA

Julie Eyers @JulieconEyers · Jul 17, 2022
Replying to @AdamParkhomenko
$4.2k today! 7/21

Katezterer @Kaitl.ise37309350 · Jul 17, 2022
Replying to @AdamParkhomenko and pleased too.
Already for calling out will retweet 🖤

10

# <u>Exhibit 6</u>

January 9, 2023 Order Dissolving Special
Purpose Grand Jury and Setting Hearing on
Publication, In re 2 May 2022 Special
Purpose Grand Jury, Case No. 2022-EX-
000024 (Fulton Co. Sup. Court).



FILED IN OFFICE
JAN 09 2023
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

IN RE 2 MAY 2022 SPECIAL PURPOSE
GRAND JURY

2022-EX-000024

## ORDER DISSOLVING SPECIAL PURPOSE GRAND JURY
## AND SETTING HEARING ON QUESTION OF PUBLICATION

On 20 January 2022, the District Attorney of Fulton County petitioned the Chief

Judge of the Superior Court of Fulton County to convene the entire Superior Court bench

to consider the District Attorney's request for a special purpose grand jury.  That grand

jury's charter, if approved, would be to conduct a criminal investigation into "the facts

and circumstances relating directly or indirectly to possible attempts to disrupt the lawful

administration of the 2020 elections in the State of Georgia" and to prepare a report on

whether anyone should be prosecuted for such potential crimes.  On 24 January 2022,

the Chief Judge, having received a majority of the twenty judges' assent, issued an Order

authorizing the convening of a special purpose grand jury for this criminal investigation.

On 2 May 2022, the special purpose grand jury was selected and sworn in; in June

2022 it began receiving evidence and investigating the possibility of criminal interference

in the 2020 general election.  The special purpose grand jury, after many months of

witness testimony, has now issued its final report pursuant to O.C.G.A. § 15-12-101(a).

Based on the completion of that report, the undersigned subsequently recommended to

the Honorable Chief Judge Ural Glanville that the special purpose grand jury be dissolved.

O.C.G.A. § 15-12-101(b).  Chief Judge Glanville then polled the entire Superior Court

bench, a majority of which voted to dissolve the special purpose grand jury. *Id.*

1

Given the special purpose grand jury's delivery of its final report, the undersigned's recommendation, and the Superior Court bench's vote, it is the ORDER of this Court that the special purpose grand jury now stands DISSOLVED. The Court thanks the grand jurors for their dedication, professionalism, and significant commitment of time and attention to this important matter. It was no small sacrifice to serve.

Remaining is the question of publication of the final report. The special purpose grand jury certified that it voted to recommend that its report be published pursuant to O.C.G.A. § 15-12-80. That provision is mandatory: "the judge shall order the publication as recommended." And that provision appears to apply to the work of special purpose grand juries. O.C.G.A. § 15-12-102. Unresolved is the question of whether the special purpose grand jury's final report constitutes a presentment. The Court invites argument on this issue and sets the matter down for a hearing on **24 January 2023 at noon in Courtroom 8-D.** The District Attorney's Office shall be given an opportunity at that time to provide its perspective as will any consolidated media intervenors. Argument should focus on the applicability of O.C.G.A. § 15-12-80 to the special purpose grand jury's work as well as the precedential impact of *In re July-August, 2003 DeKalb Cnty. Grand Jury*, 265 Ga. App. 870, 872-73 (2004); *In re Floyd Cnty. Grand Jury Presentments for May Term 1996*, 225 Ga. App. 705, 707 (1997); and *Kelley v. Tanksley*, 105 Ga. App. 65, 66-67 (1961).

SO ORDERED this 9th day of January 2023.

Judge Robert C.I. McBurney
Superior Court of Fulton County
Atlanta Judicial Circuit

2

# **Exhibit 7**

February 13, 2023 Order Re: Special Purpose Grand Jury's Final Report, In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

FILED IN OFFICE

FEB 13 2023

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| IN RE 2 MAY 2022 SPECIAL PURPOSE GRAND JURY | 2022-EX-000024 |

## ORDER RE: SPECIAL PURPOSE GRAND JURY'S FINAL REPORT

On 20 January 2022, the District Attorney of Fulton County petitioned the Chief Judge of the Superior Court of Fulton County to convene the Superior Court bench to consider the District Attorney's request for a special purpose grand jury. That grand jury's charter, if approved by the Court, would be to conduct a criminal investigation into "the facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia" and to draft and submit a report recommending whether anyone should be prosecuted for such potential crimes. On 24 January 2022, the Chief Judge, having received a majority of the twenty judges' assent, issued an Order authorizing the convening of a special purpose grand jury for this criminal investigation.

On 2 May 2022, the special purpose grand jury was selected and sworn in; in June 2022 it began receiving evidence and investigating the possibility of criminal interference in the 2020 general election. The special purpose grand jury, after hearing months of testimony from dozens of witnesses, submitted its final report to the undersigned in December 2022 pursuant to O.C.G.A. § 15-12-101(a). In issuing its final report, the special purpose grand jury also recommended that its report be published. O.C.G.A. § 15-12-80. Upon reviewing that report, the undersigned subsequently recommended to the Honorable Chief Judge Ural Glanville that the special purpose grand jury be dissolved.

O.C.G.A. § 15-12-101(b).  Chief Judge Glanville then polled the Superior Court bench, a majority of which voted to dissolve the special purpose grand jury.  Following that vote, the undersigned dissolved the special purpose grand jury by way of an Order entered on 9 January 2023.

On 17 January 2023, the undersigned convened a hearing on the question of whether the special purpose grand jury's final report should be made public.  The District Attorney presented argument, as did counsel for a broad collection of media interests.  Having considered those arguments and relevant statutory and case law, and for the reasons set forth below, the undersigned concludes that much of the final report should not be disclosed until such time as the District Attorney completes her investigation, although two parts may now be published, consistent with protecting the due process rights of all involved.

As a threshold matter, the Court rejects the media intervenors' contention that the special purpose grand jury's final report is somehow a "court record" and thus subject to the public's general right of access to such things.[1]  *See, e.g., In re Atlanta Journal-Constitution*, 271 Ga. 436, 437 (1999).  The media intervenors' literalist argument that the final report is a court record because (1) the Court convened the special purpose grand jury and (2) the final report was delivered to the Court is unpersuasive.  The final report, as the District Attorney argued, was ultimately destined for her, not the Court.  It will inform her investigative decision-making process, not the Court's.  She requested it, she petitioned the Chief Judge to convene a special purpose grand jury for it, and she and her

---

[1] A corollary of this conclusion is that the Court is not bound by the sealing requirements of Uniform Superior Court Rule 21, although the Court notes that, incidentally consistent with Uniform Superior Court Rule 21.1, the Court held a hearing on the topic of disclosure and the Court will, in this Order, be addressing many of the factors it would be obligated to consider under Rule 21 if it were making a decision to seal a court record.

staff worked with that special purpose grand jury for months in an effort to provide the grand jury with sufficient evidence to generate the report for her. Moreover, the only physical copy of the report is in the District Attorney's possession, not the Court's; it sits in no docket or official court or clerk file. That the report, per statutory process, incidentally passed through the Court's hands does not make it an official record of the court any more so than a wiretap application or a search warrant affidavit. All three documents -- report, application, and affidavit -- are parts of criminal investigative processes, not court proceedings.[2]

There is also the matter of the special purpose grand jury's "recommendation," made pursuant to O.C.G.A. § 15-12-80, that its final report be published. The statutory language is somewhat misleading. An O.C.G.A. § 15-12-80 "recommendation" is more than a mere suggestion or request: if a grand jury recommends publication, "the judge *shall* order the publication as recommended." O.C.G.A. § 15-12-80 (emphasis added). Indeed, in general, the only screening function the supervising judge has, when faced with an O.C.G.A. § 15-12-80 "recommendation" to publish, is to ensure that those portions, if any, that are the product of *ultra vires* investigation by the grand jury are redacted. *In re July-August, 2003 DeKalb Cnty. Grand Jury*, 265 Ga. App. 870, 871 (2004). In other words, if the grand jury exceeded the scope of its authority in investigating (and subsequently reporting), that unauthorized part of the grand jury's presentment must be removed before publication.[3]

---

[2] Later, when the criminal investigation is complete and an indictment has been obtained, the wiretap application and the search warrant affidavit do become part of the court record through discovery and pre-trial litigation. *At that point* the public's right of access accrues. The special purpose grand jury's final report is no different.

[3] The District Attorney argues that O.C.G.A. § 15-12-80 does not apply to the special purpose grand jury's final report because § 15-12-80 speaks only to "general presentments" and not "final reports". The Court

Having reviewed the final report, the undersigned concludes that the special purpose grand jury did not exceed the scope of its prescribed mission. Indeed, it provided the District Attorney with exactly what she requested: a roster of who should (or should not) be indicted, and for what, in relation to the conduct (and aftermath) of the 2020 general election in Georgia. Thus, facially, the final report should be published *in toto* pursuant to O.C.G.A. § 15-12-80.

But, as with many things in the law, it is not that simple. This special purpose grand jury investigation was, appropriately, largely controlled by the District Attorney. She and her team decided who would be subpoenaed, when they would appear, what questions would be asked, and what aspects of the general election would be explored. The grand jurors were, of course, able to question the witnesses as well, but the process was essentially an investigative tool designed to enable the District Attorney to gather more information about what actually happened in the days following the general election in Fulton County (and elsewhere) so that she could make a more informed decision on whether Georgia law was violated and whether anyone should be charged for doing so. It was -- again, entirely appropriately -- a one-sided exploration. There were no lawyers advocating for any targets of the investigation.[4] Potential future defendants were not able

---

rejects this semantics-over-substance argument. Regular grand juries issue (1) indictments (and, formerly, "special presentments," which, like indictments, were charging documents in which crimes were formally alleged against a defendant) and (2) general presentments. General presentments are, in both form and substance, *reports* of grand jury investigations. Special purpose grand juries, unlike regular grand juries, may not issue indictments (or special presentments), *Kenerly v. State*, 311 Ga. App. 190 (2011), which leaves them only general presentments (or reports) as an end product. A general presentment by any other name remains subject to O.C.G.A. § 15-12-80's strictures.

[4] Many of the witnesses subpoenaed to appear before the special purpose grand jury had lawyers (and some had many). None, however, was permitted to have those lawyers appear beside him during the questioning, given the rules of grand jury proceedings. There was thus no opportunity for a witness's attorney to object to a question from a prosecutor or to elicit testimony from her client that might rebut or justify or explain the witness's answers or conduct.

to present evidence outside the scope of what the District Attorney asked them. They could not call their own witnesses who might rebut what other State's witnesses had said and they had no ability to present mitigating evidence. Put differently, there was very limited due process in this process for those who might now be named as indictment-worthy in the final report.[5] That does not mean that the District Attorney's investigative process was flawed or improper or in any way unconstitutional. By all appearances, the special purpose grand jury did its work by the book. The problem here, in discussing public disclosure, is that that book's rules do not allow for the objects of the District Attorney's attention to be heard in the manner we require in a court of law.

The consequence of these due process deficiencies is not that the special purpose grand jury's final report is forever suppressed or that its recommendations for or against indictment are in any way flawed or suspect. Rather, the consequence is that those recommendations are for the District Attorney's eyes only -- for now. Fundamental fairness requires this, as a report that may recommend that criminal charges be sought against specific individuals but which was

> drafted after a secret investigation and based on an uncertain standard of proof, may be remembered long after ... denials or objections from its targets are forgotten. And the report's readers may understandably but incorrectly assume that at least the rudiments of due process -- notice and an opportunity to be heard -- were offered the accused.

---

[5] It is true that every witness had the ability to pause the proceedings and consult with his or her lawyer outside the grand jury room -- and that lawyer could then escalate concerns to the supervising judge if necessary (which some did quite liberally) -- but that is a poor and insufficient proxy for the right to have counsel present in the grand jury room, able to object, able to examine her own client, and able to call other witnesses. (Again, this is not a critique of the grand jury's investigative process; it occurred exactly as the grand jury rules envisioned. It is rather an effort to highlight how imbalanced, incomplete, and one-sided the process is for someone who might be the target of the District Attorney's (and grand jury's) attention.)

*Thompson v. Macon-Bibb Cnty. Hosp. Auth.*, 246 Ga. 777, 779 (1980), quoting *In re Grand Jury of Hennepin County*, 271 N.W.2d 817, 819 (1978) (punctuation omitted).[6] This is particularly true if the grand jury's final report includes recommendations involving individuals who never appeared before the grand jury and so had no opportunity, limited or not, to be heard. The constitutionally protected due process rights of anyone who may be named in the final report also require this outcome: when "identifiable individuals referred to in such [reports] are afforded no statutory mechanism by which they may respond to the charges against them, 'serious questions of due process and fairness' are raised." *In re Presentments of Lowndes Cnty. Grand Jury, March Term 1982*, 166 Ga. App. 258, 258 (1983), quoting *Thompson*, 246 Ga. at 778; *see also Kelley v. Tanksley*, 105 Ga. App. 65 (1961) (restriction on publication necessary when grand jury report is critical of identifiable individuals but no indictment is returned).

A rare instance in which a general presentment (a/k/a final report) that was highly critical of the performance of a public figure but which was nonetheless allowed to be published illustrates this point about due process. Vernon Jones, in an earlier political incarnation, served as the Chief Executive Officer of DeKalb County from 2001-2009. A DeKalb County grand jury, following its investigation into Jones's alleged misuse of County funds in demanding and apparently over-deploying a personal security detail, issued a scathing report about his (mis)conduct. Jones sought to quash the report, contending that the grand jury was acting *ultra vires* when it criticized him. A trial judge

---

[6] *Thompson* was a somewhat fractured opinion. Its author, Justice Nichols, secured two full concurrences and three special concurrences (two of which were in the judgment only). There was also a wordless dissent. This splintered outcome seems to have had no impact on *Thompson's* precedential value, as it is routinely cited without reservation or reference to the split decision.

sealed everything and sent the issue to the Court of Appeals, which ruled that the report could be published pursuant to O.C.G.A. § 15-12-80 because

> Jones had an opportunity to testify before the grand jury under oath [and] those individuals that he would have called as witnesses also testified under subpoena; therefore, any of his due process rights under *Thompson v. Macon–Bibb County Hosp. Auth.*, 246 Ga. 777, 273 S.E.2d 19 (1980), were satisfied.

*In re July-August, 2003 DeKalb Cnty. Grand Jury*, 265 Ga. App. 870, 871 (2004). In other words, the Court of Appeals determined, in that unique scenario, that Jones -- who testified and who had all witnesses he would have called if presenting his side of the security detail story testify as well -- enjoyed sufficient due process for the report to be published. Here, however, for anyone named in the special purpose grand jury's final report who was not afforded the opportunity to appear before the grand jury, *none* of those due process rights has been satisfied. And for those who did appear -- willingly or not -- only the right to be heard (although without counsel or rebuttal) was protected. Given that, the Court finds that full disclosure of the final report at this time is not proper under *Thompson, Kelley,* and their progeny.

There are, however, three parts of the final report that are ripe for publication. They do not implicate the concerns raised in *Thompson* and *Kelley,* and, while publication may not be convenient for the pacing of the District Attorney's investigation, the compelling public interest in these proceedings and the unquestionable value and importance of transparency require their release. These three portions include the introduction and conclusion to the final report, as well as Section VIII, in which the special purpose grand jury discusses its concern that some witnesses may have lied under oath during their testimony to the grand jury. Because the grand jury does not identify those witnesses, that conclusion may be publicly disclosed at this time.

Therefore, consistent with the special purpose grand jury's recommendation made pursuant to O.C.G.A. § 15-12-80 that its final report be published, those three portions of the report will be placed in the docket for this matter (making those excerpts -- but only those excerpts -- a "court record") on 16 February 2023. The several-day delay will allow the District Attorney's team to meet with the undersigned, if necessary, to discuss logistics of publication and to determine if any portion of those three parts of the final report should be redacted for other reasons (notice of which will be provided in the 16 February 2023 docket entry).

Finally, the Court directs the District Attorney's Office to provide periodic updates on the progress of its investigation so that the Court can reassess if other parts of the special purpose grand jury's final report can properly be disclosed, consistent with the analysis set forth above.

SO ORDERED this 13th day of February 2023.

Judge Robert C.I. McBurney
Superior Court of Fulton County
Atlanta Judicial Circuit

# EXHIBIT 8:

List of Foreperson and Grand Jurors' Media
Appearances / Public Comments

**List of Foreperson and Grand Jurors' Media Appearances / Public Statements**

1. February 21, 2023 - Kate Brumback, *Inside the Trump grand jury that probed election meddling*, ASSOCIATED PRESS (Feb. 21, 2023), https://apnews.com/article/politics-new-york-city-only-on-ap-donald-trump-georgia-266e28c4e47e54731b233e0f770f6729. (Prosecutors played the then-president's phone call with Raffensperger on the first day the jurors met to consider evidence. Prosecutors told jurors they could consume news coverage related to the case but urged them to keep an open mind.  As the proceedings moved forward, one of her fellow jurors brought the newspaper every day and pointed out stories about the investigation. When witnesses refused to answer almost every question, the lawyers would engage in what Kohrs came to think of as "show and tell." The lawyers would show video of the person appearing on television or testifying before the U.S. House committee that investigated the Jan. 6, 2021, riot at the U.S. Capitol, periodically asking the witness to confirm certain statements. Then the scratching of pens on paper could be heard as jurors tallied how many times the person invoked the Fifth Amendment.)

2. February 21, 2023 - Danny Hakim, *Jury in Georgia Trump Inquiry Recommended Multiple Indictments, Forewoman Says*, NEW YORK TIMES, (Feb. 21, 2023), https://www.nytimes.com/2023/02/21/us/trump-georgia-grand-jury-indictments.html ("We definitely started with the first phone call, the call to Secretary Raffensperger that was so publicized.")

3. February 21, 2023 - Tamar Hallerman, Bill Rankin, *Fulton grand juror: Multiple indictments recommended*, ATLANTA JOURNAL-CONSTITUTION, (Feb. 21, 2023), https://www.ajc.com/politics/fulton-grand-juror-multiple-indictments-recommended/KGAJO32SP5CJXO4EYGCONSP5OE/ ("We heard a lot of recordings of President Trump on the phone… It is amazing how many hours of footage you can find of that man on the phone…. We kind of knew what to expect, and so especially with our time being limited and with our resources being limited, when it came to that it was like eh, we'd rather get this person, which is a battle that we can win, than this other one." With regard to the investigation, she stated: "It shouldn't have needed to happen and it shouldn't have been so complicated and it just was complicated. It just had all these extra alleys and all these extra twists and turns that it didn't need. I realized there was way too much going on and this should not have been this insane.")

4. February 21, 2023 - Kate Bouldan, CNN, *Foreperson reacts to Trump's claim that he gets total exoneration in GA probe*, YOUTUBE, (Feb, 21, 2023), https://www.youtube.com/watch?v=_qyEG7Wr7tY ("I will tell you that it was a process where we heard his name a lot. We definitely heard a lot about former President Trump, and we definitely discussed him a lot in the room…. and I will say that when this list comes out… there are no major plot twists waiting for you.") (On the section of the report containing perjury recommendations: "I would say that it ended up included there because it was less pointed of a suggestion than some of the other things we may have written in the parts of the report the judge chose to keep confidential . . . we thought it was important to keep it separate as well.") (On whether charges should be brought: "This was too much. Too much information. Too much of my time. Too much of

everyone's time. Too much of their time. Too much argument in court about getting people to appear before us. There was just too much for this to just be, oh okay, we're good. Bye. I will be fine as long as something happens. Personally, I hope to see her take almost any kind of decisive action, to actually do something. There are too many times in recent history that seem to me like someone has gotten called out for something that people had a problem with, and nothing ever happens.")(On how many people were recommended for indictment, when asked if it was more than a dozen she responded, "I believe so. That's probably a good assumption.")

5. February 21, 2023 - Lawrence O'Donnell, MSNBC, *Lawrence: Ga grand juror gives most revealing Trump investigation interview ever,* YOUTUBE (Feb. 21, 2023), https://www.youtube.com/watch?v=c-MG8f5QYVw ("I could see how getting the former president to talk to us would have been a year in negotiation by itself...I'd be fascinated by what he [Trump] said, but do you think he would come in and say anything groundbreaking or just the same kinda thing we've heard?") ("At some point through this investigation, especially as we began to speak to higher profile witnesses, I think some of the combativeness that we experienced meant that the DA's team, as well as us, started to pick our battles. And when someone, like for example, goes before the January 6th Committee and says they plead the fifth 200 times, do you really expect them to come before you and say something different?") ("We kind of knew what to expect, and so especially with our time being limited and with our resources being limited, when it came to that it was like eh, we'd rather get this person, which is a battle that we can win, than this other one.")

6. February 21, 2023 – Blayne Alexander, Dareh Gregorian, *Georgia grand jury recommended indictments for more than a dozen people in Trump probe, foreperson says,* NBC NEWS (Feb. 21, 2023), https://www.nbcnews.com/politics/donald-trump/georgia-grand-jury-recommended-indictments-dozen-people-trump-probe-fo-rcna71675. (Kohrs said Graham was "fantastic," adding: "He was personable. He was forthcoming. He was very willing to just have a conversation." A witness who did strike her as "honest" was Sen. Lindsey Graham, R-S.C., who'd fought his subpoena for testimony in the courts).

7. February 21, 2023 - The Reidout, *Did Georgia grand jury recommend charging Trump? "I'd bet yes," legal experts say,* MSNBC, (Feb. 21, 2023), https://www.msnbc.com/the-reidout/watch/special-grand-jury-forewoman-in-trump-georgia-election-interference-probe-on-recommended-indictments-163784261685.

8. February 22, 2023 - Marshall Cohen, Katie Carver, Devan Cole, *Foreperson on Georgia grand jury investigating Trump and 2020 election says jurors 'definitely discussed him a lot,'* CNN (Feb. 22, 2023), https://www.cnn.com/2023/02/21/politics/fulton-county-trump-grand-jury-foreperson-ebof/index.html. ("Can you imagine doing this for eight months and not coming out with a whole list [of recommended indictments]. It's not a short list. It's not.") ("I would love to see something actually happen. Don't make me take back my faith in the system. The only thing I would be disappointed in, at this point, is if this whole thing just disappears. That's the only thing that would make me sad.") (The foreperson was "pleasantly surprised" by the friendliness of some witnesses, like

Michael Flynn: "Flynn was honestly a very nice in person. He was a very nice man. He was definitely interesting. But I don't recall him saying anything earth-shattering." But revealed disdain for other witnesses who similarly invoked the fifth amendment: "Mark Meadows did not share very much," she said. "I asked if he had Twitter, and he pled the Fifth.")

9. February 22, 2023 - Morning Joe, *Fulton County grand jury foreperson speaks out,* MSNBC (Feb. 22, 2023), https://www.msnbc.com/morning-joe/watch/fulton-county-grand-jury-foreperson-speaks-out-163802693545.

10. February 22, 2023 - Alex Wagner, MSNBC, *Special grand jury foreperson shares details, drops heavy hints in Georgia Trump case,* YOUTUBE (Feb. 22, 2023), https://www.youtube.com/watch?v=vJ0b9WxIfkk.

11. March 15, 2023 – Tamar Hallerman, Bill Rankin, *Exclusive: Behind the scenes of the Trump grand jury*, ATLANTA JOURNAL-CONSTITUTION, (March 15, 2023), https://www.ajc.com/politics/exclusive-behind-the-scenes-of-the-trump-grand-jury/6CXLKTFMKNDU7O6TER4B7UTZPE/.

# **Exhibit 9**

List of Supervising Judge's Media
Appearances

### List of Appearances – Supervising Judge

1. February 22, 2023 – Tamar Hallerman, Bill Rankin, *Trump attorneys: Special grand jury probe 'a clown show'*, ATLANTA JOURNAL-CONSTITUTION (Feb. 23, 2023), https://www.ajc.com/politics/trump-attorneys-special-grand-jury-probe-a-clown-show/ZTR6VUWXGFC2BMOCX6FH6DAPCI/.

2. February 23, 2023 - Kate Brumback, *Trump investigation: Could grand juror's words tank charges?*, ASSOCIATED PRESS, (Feb. 23, 2023), https://apnews.com/article/politics-georgia-donald-trump-9938c36b008aaeb7a7b1502b09762bbd.

3. February 24, 2023 - Jonathan Raymond, *Judge takes question on Georgia Trump jury foreperson giving interviews,* 11 ALIVE (Feb. 24, 2023), https://www.11alive.com/article/news/politics/judge-robert-mcburney-question-on-georgia-trump-jury-foreperson-giving-interviews/85-5117a736-09db-4da2-8631-037e9d49e700.

4. February 24, 2023 - Sara Murray, *Fulton County judge who oversaw special grand jury in Trump probe says jurors are free to discuss final report*, CNN, (Feb. 24, 2023), https://www.cnn.com/2023/02/24/politics/georgia-grand-jury-trump-final-report-jurors/index.html.

5. February 24, 2023 - Michael Isikoff, Daniel Klaidman, *Georgia judge gave grand jurors lenient guidance on talking to media about Trump case,* YAHOO! NEWS, (Feb. 24, 2023).

6. February 27, 2023 - Olivia Rubin, *Judge overseeing Trump Georgia grand jury speaks after foreperson's controversial interviews*, ABC NEWS, (Feb. 27, 2023), https://abcnews.go.com/Politics/judge-overseeing-trump-georgia-grand-jury-speaks-after/story?id=97503245.

# **Exhibit 10**

August 29, 2022 Order Denying Motion to Quash (Governor Kemp), In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).



FILED IN OFFICE

AUG 2 9 2022

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

IN RE 2 MAY 2022 SPECIAL PURPOSE
GRAND JURY -- SUBPOENA FOR           2022-EX-000024
GOVERNOR KEMP

## ORDER DENYING MOTION TO QUASH

On 20 January 2022, the District Attorney of Fulton County, the elected official responsible for investigating, charging, and prosecuting felony criminal offenses in this Circuit, petitioned the Chief Judge of the Superior Court of Fulton County to convene the entire Superior Court bench to consider the District Attorney's request for a special purpose grand jury. That grand jury's charter, if approved, would be to conduct a criminal investigation into "the facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia" and to prepare a report and recommendation for the District Attorney advising her whether she should seek to prosecute anyone for such potential crimes. On 24 January 2022, the Chief Judge, having received a majority of the twenty judges' assent, issued an Order authorizing the convening of a special purpose grand jury for this criminal investigation.[1]

On 2 May 2022, the special purpose grand jury was selected and sworn in; in June 2022 it began receiving evidence and investigating the possibility of criminal interference in the 2020 general election. On 4 August 2022, the District Attorney issued a subpoena to Governor Brian Kemp; that subpoena, just like those received by the Attorney General

---

[1] Nothing in the convening request (or the subsequent convening Order) indicated that the District Attorney, the Superior Court bench, or the special purpose grand jury would be considering civil violations or the possibility of bringing any civil action. The focus and purpose were and have been ever since to investigate *criminal* violations and consider *criminal* charges.

1

and the Secretary of State, directed the Governor to appear before the special purpose grand jury so that that investigative body could learn more about whether criminal conduct had occurred in connection with alleged efforts to interfere with the 2020 general election in Georgia.  According to both the pleadings from and the lawyers for the Governor and the District Attorney, this subpoena came only after weeks of tortured and tortuous negotiations over obtaining an interview with the Governor -- the details of which do not bear repeating here, other than to note that both sides share responsibility for the torture and the tortuousness.

The date of the Governor's subpoenaed appearance before the special purpose grand jury was changed at least once, at his lawyer's request.  On the eve of the most recently agreed-upon date for the Governor to appear, his lawyers filed a motion to quash the subpoena.  The motion invoked sovereign immunity and asserted that this Court lacked jurisdiction to issue, enforce, or even consider the subpoena.  The State promptly responded and, on 25 August 2022, the Court held a public hearing on the matter.  Having considered the pleadings, oral arguments, and relevant case law, the Court finds that it does enjoy jurisdiction and that the subpoena should not be quashed; the motion is DENIED.  However, the Court will delay the Governor's appearance before the special purpose grand jury until some date soon after the 8 November 2022 general election.

<p style="text-align:center">*   *   *</p>

In Georgia, one cannot sue "the State" unless the State has enacted a specific waiver, legislative or constitutional, that permits a particular species of civil claim -- tort, contract, declaratory judgment, etc. -- to be brought against it.  That is, the State and its agencies and agents (of which the Governor is one) enjoy sovereign immunity, a constitutional doctrine that "forbids our courts to entertain a lawsuit against the State

2

without its consent." *Lathrop v. Deal*, 301 Ga. 408, 408 (2017); *see also* Ga. Const. art. I, § 2, ¶ IX(e). Absent that consent, Georgia's courts lack jurisdiction to consider the claim brought against the State. *McConnell v. Dept. of Labor*, 302 Ga. 18, 18-19 (2017) (if sovereign immunity applies, a court "lacks authority to decide the merits of a claim that is barred"); *see also City of Coll. Park v. Clayton Cnty.*, 306 Ga. 301, 314-15 (2019).

Both sides agree with the foregoing -- as they should, as it is well-settled law. Where they diverge is whether sovereign immunity applies in the context of this special purpose grand jury's criminal investigation. The Governor insists he is immune to the subpoena because there is no waiver, legislative or constitutional, that would allow the grand jury to require him (or, presumably, any other state agent, including the Secretary of State and Attorney General[2]) to appear in what he characterizes as a civil proceeding. The District Attorney argues that sovereign immunity does not apply in this context because, first, there is no lawsuit being brought against the State (or the Governor), and second, sovereign immunity simply has no application in criminal matters.

The Governor relies primarily on *State v. Bartel*, 223 Ga. App. 696 (1996), in support of his claim that what this special purpose grand jury is doing is conducting a civil investigation.[3] *Bartel* does not provide the support his claim needs because *Bartel* does

---

[2] Who, interestingly, is the lead signatory on the Governor's motion seeking quashal (despite having himself appeared before the special purpose grand jury without incident, objection, or invocation of the doctrine of sovereign immunity).

[3] He additionally relies on two cases that establish that a grand jury cannot conduct *civil* investigations of state offices and officials; rather, a grand jury's civil authority is limited by statute -- and likely by sovereign immunity, although these cases do not reach that doctrine -- to investigations of county-level entities. These cases are inapposite because this special purpose grand jury is engaged in a criminal investigation. Moreover, one of the two cases, *Floyd Cnty. Grand Jury v. Dep't of Family & Children Servs.*, 218 Ga. App. 832 (1995), suggests, albeit in dicta, that had the grand jury in that case been engaged in a criminal investigation, it would have been authorized to subpoena state agents. The Governor's legal team also points the Court to *Kenerly v. State*, 311 Ga. App. 190 (2011), but that case merely reaffirmed what the District Attorney has always acknowledged: special purpose grand juries do not have the authority to issue indictments. *Kenerly* in no way prohibits special purpose grand juries from engaging in criminal investigations and indeed the special purpose grand jury impanelment statute explicitly allows it. O.C.G.A.

not say what he says it does. In *Bartel*, a witness who had appeared before a special purpose grand jury in Floyd County was later prosecuted for allegedly having perjured himself while testifying. The *Bartel* special purpose grand jury was convened to conduct a civil investigation into "alleged irregularities in the operations of the Floyd County Hospital Authority." 223 Ga. App. at 696. Contrary to the Governor's presentation at the hearing on his motion to quash, the court in *Bartel* did *not* "conclude[] that special purpose grand juries conduct only civil investigations." (Movant's PowerPoint at Slide 3). No such language can be found in *Bartel*, which dealt with the nature of the oath the witnesses took before testifying.[4] It is correct to say that the special purpose grand jury in *Bartel* had, as its purpose, a civil investigation. It is incorrect to say that the Court of Appeals in *Bartel* in any way concluded that the *only* purpose a special purpose grand jury can have is civil.

Which brings us back to *this* special purpose grand jury. As described at the outset of this Order, its purpose is unquestionably and exclusively to conduct a criminal investigation: its convening was sought by the elected official who investigates, lodges, and prosecutes criminal charges in this Circuit; its convening Order specifies its purpose as the investigation of possible criminal activities; and its final output is a report recommending whether criminal charges should be brought. Unlike the special purpose grand jury in *Bartel*, it is not investigating "irregularities" in hospital administration. It

---

§ 15-12-100(a) ("The chief judge of the superior court of any county ... on his or her own motion [or] on motion or petition of the district attorney ... may request the judges of the superior court of the county to impanel a special grand jury for the purpose of investigating any alleged violation of the laws of this state...). That a special purpose grand jury engaged in a criminal investigation cannot issue an indictment does not diminish the criminal nature of its work or somehow transmogrify that criminal investigation into a civil one. Police officers, too, lack the authority to indict anyone, but their investigations are plainly criminal.

[4] Indeed, hopefully due only to inadvertence, the Governor's legal team, in its visual presentation making this unfounded claim about the holding of *Bartel*, directed the Court via citation to a page of the opinion (699) that does not exist.

4

will not be recommending whether anyone should be sued or should be referred for civil administrative proceedings; it will be recommending whether anyone should be prosecuted for crimes. Put simply, there is nothing about this special purpose grand jury that involves or implicates civil practice.[5]

Because neither the special purpose grand jury nor the District Attorney has brought (or is even contemplating) a lawsuit (*i.e.*, a civil proceeding) against the Governor, his office, or any of his agents, there is no sovereign immunity to invoke. Again, to quote *Lathrop*, that doctrine "forbids our courts to entertain a lawsuit against the State without its consent." 301 Ga. at 408. It is clear that the Governor is not consenting to this subpoena. It is also clear that his lack of consent is of no jurisdictional moment to this Court because there is before it no civil proceeding, suit, or action. The Governor must honor the subpoena -- as have the Secretary of State and the Attorney General and many other agents of the State in these criminal proceedings. Sovereign immunity wards off civil actions, not criminal ones.[6]

Given that decision, the Court turns next to the process concerns raised by the Governor: about what must he testify and when? As with several other witnesses who, in response to their lawful subpoenas, raised concerns about various privileges, the Governor's questioning will have limits. Neither the District Attorney nor the grand

---

[5] The one exception to date has been the lack of civility among the attorneys involved. As the streams of publicly revealed e-mails demonstrate, that all-too-common and always unwelcome aspect of civil litigation has intruded upon these criminal proceedings.

[6] That this is so was made all the more plain at the hearing by (1) the fact that *every* sovereign immunity case the Governor's well-resourced legal team cited in court and in its motion to quash involved civil proceedings; (2) the Court's observation that "the State" is the ultimate instigator of any legal proceedings that will flow from this investigation (*i.e.*, an indictment styled "The State of Georgia versus Defendant X"), which would explain why there are no "criminal" sovereign immunity appellate cases asserting that the State is immune from itself; and (3) the District Attorney's apt example of what would happen in a world in which sovereign immunity applied to criminal actions: police officers could flout subpoenas, GBI forensic experts could resist summonses on the basis that they work at the State level and not the "local" level, etc.

5

jurors may ask the Governor about the contents of any attorney-client privileged communications.   The Court is aware of several conversations of interest to the investigation in which the Governor participated and to which the attorney-client privilege applies.   As with those other witnesses, questioning must cease about the contents of the communications if the privilege is validly raised.   Undoubtedly, other issues will arise that do not fall neatly into this category of privilege.   If they cannot be resolved by the fleet of lawyers on each side, they should be brought to the Court for resolution (or at least helpful direction).[7]

Remaining is the question of when the Governor will need to honor his subpoena. The answer is after the 8 November 2022 general election.   The Governor is in the midst of a re-election campaign and this criminal grand jury investigation should not be used by the District Attorney, the Governor's opponent, or the Governor himself to influence the outcome of that election.   The sound and prudent course is to let the election proceed without further litigation or other activity concerning the Governor's involvement in the special purpose grand jury's work.   Once the election is over, the Court expects the Governor's legal team promptly to make arrangements for his appearance.[8]

SO ORDERED this 29th day of August 2022.


Judge Robert C.I. McBurney
Superior Court of Fulton County
Atlanta Judicial Circuit

---

[7] The Court declines the Governor's invitation to import wholesale into Georgia law the concept of executive privilege.   Its time may come, but this is not it.

[8] The Court also declines to issue a certificate of immediate review of this decision because it is clear that sovereign immunity does not apply to criminal matters.   *See Rivera v. Washington*, 298 Ga. 770, 777 (2016) (recommending issuance of certificate of immediate review when resolution of immunity issue is not clear).

# **Exhibit 11**

Transcript of August 25, 2022 Special
Purpose Grand Jury Hearing before the
Honorable Robert C.I. McBurney, Atlanta,
Georgia, In re 2 May 2022 Special Purpose
Grand Jury, Case No. 2022-EX-000024
(Fulton Co. Sup. Court).

1          IN THE SUPERIOR COURT OF FULTON COUNTY

2                STATE OF GEORGIA

3

4   IN RE:                )

5   SPECIAL PURPOSE GRAND JURY  )

6                         ) CASE NUMBER: 2022-EX-00024

7

8                  2022-EX-00024

9

10      SPECIAL PURPOSE GRAND JURY MOTIONS TRANSCRIPT

11      Before the HONORABLE JUDGE ROBERT C.I MCBURNEY

12        on July 25, 2022, Atlanta, GA 30303

13

14  APPEARANCES:

15  FOR THE STATE:ADA NATHAN WADE

16  FOR THE STATE:ADA DONALD WAKEFORD

17  FOR THE STATE: ATTORNEY ANNA GREEN-CROSS

18  FOR SENATOR JONES: BILL DILLON & ANNA CLAPP

19  FOR THE JURORS: ATTORNEYS MS. PEARSON & MS. DEBORROUGH

20

21          HADASSAH J. DAVID, CVR, CCR

22           #4857 8554 6837 1968

23          CERTIFIED COURT REPORTER

24        SUPERIOR COURT OF FULTON COUNTY

25       hadassah.david@fultoncountyga.gov

      HADASSAH J. DAVID, OFFICIAL COURT REPORTER

FILED IN OFFICE
AUG 25 2022
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

<u>**PROCEEDINGS**</u>

1

2 THE COURT:  Good afternoon.  Let's get on the record

3 in 2022-Ex-000024.  This is a special purpose Grand Jury.

4 It is about 2:00 o'clock on the 21st of July, and we are

5 going to work through, this afternoon, a couple of motions

6 that have been filed.  A motion filed on behalf of Senator

7 Jones seeking to disqualify the DA's office from handling

8 the case, the case that is Senator Jones and then a motion

9 to quash and disqualify, but to disqualify, I think, is

10 merely an adoption of Senator Jones' motion that was filed

11 on behalf of 11 of the --  for today we'll call them

12 alternate electors.

13 Those are the two motions I think we are covering.

14 The State has filed, the  District Attorney's Office has

15 filed, an opposition to the motion to disqualify.  I let

16 them know, because when I received the motion to quash

17 that they didn't need to file a written response motion

18 which is fine, and hopefully you will be able to address

19 it today.  It's a lot of moving parts.

20 We've got a lot of lawyers here, so I want to make

21 sure we get on the record who is here and who will be

22 speaking for the different parties.  Before we go any

23 further, though, Rule 22 wise.  There were some media

24 outlets that only reached out today to get the green

25 light.  If you were able to get equipment in here you are

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

2

1    free to use it, but I did not sign your Rule 22 today,
2    because the general Rule 22 is to be signed 24 hours in
3    advance, but you really only need the Rule 22 for purposes
4    of getting in the building with the big cameras, so if you
5    sought Rule 22 approval to record things while you're in
6    here and you've got a handheld device, you are welcome to
7    do that.

8        Going forward it's 24 hours in advance, and it would
9    really help if you could report back to your Rule 22
10   people, if you would designate more clearly on the Rule 22
11   forms what kind of equipment you want to bring in.  I am
12   all for having a pool feed rather than four big cameras in
13   here.  It gets a little crowded for you all, but I can't
14   tell because everyone who submits a Rule 22 checks
15   everything -- I want to bring in every kind of equipment
16   in.  I'm bringing in a drone.  I know you're not bringing
17   in a drone, but apparently for everyone bringing in the
18   big cameras we only need one, and like I said, I'm happy
19   to have a pool, but it's hard to tell.

20       With that, let's start with the State.  Who will be
21   handling -- it can be more than one person, but I just
22   don't want to omit anyone if I'm looking to the District
23   Attorney's Office for answers or responses to concerns
24   raised by some of these witnesses.  Who from the DA's
25   office or affiliated from the DA's office should I be

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

3

1    expected to hear from?

2          ATTORNEY GREEN-CROSS:  Good afternoon, Your Honor,

3    I'm Anna Green-Cross.  I'm here representing the District

4    Attorney's office on the motion to disqualify prosecutors.

5          THE COURT:  So if I have questions about quashal or

6    assertion of Fifth Amendment rights?

7          ADA WADE:  Good afternoon, Judge.  I'm Nathan Wade,

8    special prosecutor from the District Attorney's office as

9    well as Donald Wakeford.

10         THE COURT:  So Wade and Wakeford for Fifth Amendment

11   quashal and Green-Cross for the disqualification.

12         ATTORNEY GREEN-CROSS:  Yes.

13         THE COURT:  Okay, got it.  Thank you.  All right.  If

14   we pivot over to potential witnesses and counsel, Mr.

15   Dillon, good morning.  How are you?

16         ATTORNEY DILLON:  Good afternoon.  I'm fine, Judge.

17         THE COURT:  You are representing Senator Jones.  Is

18   there anyone else?  I don't want to ignore anyone.

19         ATTORNEY DILLON:  My associate Anna Clapp is also

20   here.

21         THE COURT:  Great.  Okay.  Clapp as in applause or

22   Platt as in . . .

23         ATTORNEY CLAPP:  Clapp as in applause, two P's.

24         THE COURT:  Got it.  Excellent, and then on behalf of

25   the 11 alternate electors, Ms. Pearson and Ms. Deborroughs

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

4

1    I see Ms. Deborroughs virtually.  She is appearing in

2    Newnan or even further away, but we greenlighted that

3    virtual appearance.  It's fine, and we've got Ms. Pearson

4    here.

5        ATTORNEY PEARSON:   You do, Your Honor.

6        THE COURT:  Okay.  Anyone else on behalf of your

7    clients or just the two of you?

8        ATTORNEY PEARSON:  No, Your Honor, just us.

9        THE COURT:  All right.  I want to start with a

10   question for either Mr. Dillon or Ms. Clapp, and that is

11   whether you are joining in the motion that Ms. Pearson

12   filed in which Fifth Amendment concerns are raised as

13   opposed to conflict issues?

14       ATTORNEY DILLON:  Yes, Your Honor.  Insofar as Ms.

15   Pearson's motion, I believe at page 7.  It raises the fact

16   that these witnesses who have received both subpoenas and

17   target letters should have their appearances waived.  We

18   join in that portion of her motion.

19       THE COURT:  What is the status of your client?  I

20   know he's received the subpoena, that is the only part

21   that's been disclosed to me.

22       ATTORNEY DILLON:  Well, in the government's response

23   to our motion, they actually point out that Senator Jones

24   received a target letter in this case.

25       THE COURT:  Okay.  Do you disagree with that or . . .

         HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          5

1          ATTORNEY DILLON:  No, I do not.  It is an irrefutable

2     fact at this point.  We publicly acknowledge that it is an

3     irrefutable fact.

4          THE COURT:  Okay, so my thought is that we talk about

5     some of the Fifth Amendment concerns first because it may

6     make moot for practical purposes the conflict concerns

7     that you raise in your motion.  Let me simplify my thought

8     process for you.  If in the end I determine that Senator

9     Jones need not appear because of Fifth Amendment reasons,

10    I don't know we need to reach the question of

11    disqualification if that would be his only connection to

12    this grand jury.

13         This Grand Jury is not a Grand Jury that would be

14    voting on a bill of indictment.  It is a Grand Jury that

15    has been tasked with generating a report that would

16    contain in it, ideally, a recommendation to the District

17    Attorney as to whether she should pursue charges or not

18    and what those charges might look like, and any other

19    things that that Grand Jury wants to put in there other

20    than a true bill.

21         So the way the Fifth Amendment analysis plays out is

22    that I conclude that Senator Jones doesn't need to appear,

23    if they state his name or something, and we can work

24    through those logistics probably in a smaller group

25    setting.  Do you agree that we don't need to reach the

                   HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              6

1     question of disqualification?

2         ATTORNEY DILLON:  No, Your Honor.  I do disagree.

3         THE COURT:  Okay.

4         ATTORNEY DILLON:  I think that the disqualification

5     issue is right, and I think that it has been exacerbated

6     by the media circus that's been generated out of the

7     Fulton County's DA's office in this case, and that the

8     harm to my client, Senator Jones, is that he's being drug

9     through the mud publicly as a subject of this special

10    Grand Jury.

11        THE COURT:  Well, apparently as a target, not a

12    subject.

13        ATTORNEY DILLON:  Well, I say a subject as someone

14    who has been affected by this special Grand Jury,

15    particularly as a target, but with the effort and focus

16    being that it's going to have an impact on the Lieutenant

17    Governor's race this fall.  And so if the DA's office has

18    a hand in it and they issue a report that says, Well,

19    we're going to recommend an indictment of Senator Jones,

20    it will have a direct impact on the election in November,

21    and that's been reported in the media numerous times.

22        THE COURT:  Okay.  So I'll correct a couple of things

23    for you.  One, and I may have misunderstood what you were

24    saying, but the District Attorney's Office is not offering

25    any report.  That would come from the grand jurors as

1    supervised by me.  I appreciate that the District Attorney
2    has fashioned herself as the legal adviser to the Grand
3    Jury, and that's an adaptation of the actual language of
4    the role that that office plays, but ultimately it's the
5    Grand Jury's report not the District Attorney's.
6         Second, and a concern we do need to cover today,
7    regardless of how we approach the disqualification piece
8    would be the timing of the release of the report.  Now, I
9    think that's something that everyone ought to leave here
10   today with a better understanding of how that will be
11   managed.
12        That is within my purview, and it was helpful to have
13   it brought to my attention that timelines could collide,
14   that the Grand Jury might complete Its work in October,
15   and that might not be the best time for Its work product
16   to be shared publicly in the way that many investigative
17   agencies, that's what the Grand Jury is an effect here,
18   they hold off on taking certain steps until an election
19   has passed with a few exceptions, and we need to see
20   what's going on with that report, if it's even ready by
21   then.
22        The Grand Jury is authorized to continue its work
23   through May 1 of next year, so I don't know that it's
24   right yet to worry about that other than to get a general
25   understanding that I wouldn't be a big fan of an October

               HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          8

1    surprise, so if we talk about when reports would be

2    released and we work through a Fifth Amendment analysis,

3    if that Fifth Amendment analysis is, in light of a target

4    letter, et. cetera, Senator Jones probably doesn't need to

5    -- and it's not my analysis yet, but if the end result of

6    that is that Senator Jones does not need to appear before

7    the Grand Jury, that it strikes me that the

8    disqualification piece is moot.

9          I don't know from what the office would be

10   disqualified if Senator Jones isn't being asked to do

11   anything between now and the release of the report other

12   than the timing of the report, which doesn't necessarily

13   tie into who is investigating.  If we were suddenly to

14   switch to the Lowndes County District Attorney's Office,

15   and they finished their work with the Grand Jury in

16   October, we'd be faced with that same chronological

17   challenge.

18         ATTORNEY DILLON:   We would, Your Honor, with the

19   exception of the issue that has to do with the press, and

20   the issue that has to do with the public favoring of my

21   client's opponent for Lieutenant Governor, Charlie Bailey,

22   and the the District Attorney in this case has raised

23   $32,000 for Charlie Bailey in the headliner that she

24   hosted for him in June.  Shortly thereafter, she issued my

25   client a target letter and then shortly after that, in

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              9

1 fact, two days ago when they filed their brief, that was

2 the first time that it was publicly known that Senator

3 Jones was a target of this Grand Jury investigation, so on

4 one side we have a public target, and on the other side we

5 have a headliner fundraiser raising $32,000, and we

6 contend that those two things create the appearance of

7 impropriety, that under the Rules of Ethics in the state

8 of Georgia this is prohibited conduct, and then with

9 regard to Senator Jones this investigation in Fulton

10 County should be complete at this point, that this

11 District Attorney's Office needs to be disqualified, and

12 perhaps some other district attorney can be appointed, and

13 in that case, Senator Jones would would be glad to

14 cooperate with that investigation, because he has

15 indicated and indicated early on that he was willing to

16 cooperate and give a statement and meet with their

17 investigators, and then two weeks later he gets a target

18 letter, and then six days after he gets that target

19 letter, and 'm getting ahead of myself.

20   THE COURT:  Yes, you are.  In fact, I'm going to cut

21 you off, because I simply wanted to know whether you

22 thought it was moot and you do not think it is.

23   ATTORNEY DILLON:  I do not think it is, Your Honor.

24 I think it is right at this point.

25   THE COURT:   Okay, and we may get to it.  I was

    HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                         10

1    expecting a different answer, but I appreciate your

2    answer.  I still think we need to start with the Fifth

3    Amendment concerns that were brought to a head in

4    Ms. Peterson's motion, but what I want to do is start with

5    the State on that because your perspective with the

6    District Attorney's Office on that, because your

7    perspective may help me better navigate what to do, and

8    for folks in the room here representatives of the District

9    Attorney's Office and a lawyer for another witness, that

10   witness and I have already had some basic discussions

11   about how we might work through the assertion of Fifth

12   Amendment privilege in certain context, and so we will

13   probably build on that.

14        So if I'm referring to what we talked about

15   yesterday, that is what I mean in connection with that

16   situation.  Mr. Wade or Mr. Wakeford, what I would like to

17   hear from you on is is your overarching reaction to

18   Ms.Deborroughs and Ms. Pearson's motion as we discussed in

19   the past.  I don't know that there is a blanket, I don't

20   have to answer any questions that would work here, but

21   insofar as their 11 client's sole connection to the

22   investigation is their participation in the alternate

23   electors scheme, and that was going to be the focus of

24   99 percent of your questions, if that is determined to be

25   in light of some of the target news that's been shared,

1    something that is protected that they don't need to

2    respond to.  I'm not sure what the point would be in

3    bringing those folks in on a non-immunized status before

4    the Grand Jury, so help me work through that, please.

5         ADA WAKEFORD:  Yes, Your Honor.  I would begin by

6    pointing, Your Honor, to the case of State v. Lampl, that

7    is spelled L-A-M-P-L.  Your Honor, may be aware of this

8    case.

9         THE COURT:  Is that Clayton County --- yes?

10        ADA WAKEFORD:  I believe, I'm not sure of the

11   jurisdiction that it began, but it speaks very poignantly

12   to this issue.  Specifically what it says is, that "Under

13   Georgia law, the designation as a target without a formal

14   charge being leveled against an individual doesn't change

15   the ability to subpoena someone to appear before a special

16   purpose Grand Jury."

17        THE COURT:  Fair point, and a footnote may have been

18   dropped somewhere with something that was provided, but

19   that was not my question.  I don't think the word target

20   is as magical in State proceedings as it is in Federal

21   proceedings, but it certainly has caused the temperature

22   in the room to go up and antennas to go up everywhere, and

23   so whether you you call him target or you call him less of

24   a friend, we now have witnesses who are saying, "I'm not

25   comfortable answering those questions, I think I may be

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

12

1    facing criminal liability."

2       In other words, I assert my Fifth Amendment privilege

3    or protection, whatever you want to call it, and that's

4    what Ms. Pearson and Ms. Deborrough have done on behalf of

5    their 11 clients, so my question isn't doesn't target mean

6    you can't go any further.  You may want to think through

7    in the future labeling someone that and then hailing them

8    in because of how this is played out.

9       Let's just stick to the topics.  If my sole

10    connection to the investigation that you are conducting

11    with this Grand Jury is that I was one of the people who

12    agreed or was nominated, or however it happened to be an

13    alternate elector, you're going to ask me about that, and

14    I have a good-faith basis to believe my decision to agree

15    to be an alternate elector exposes me to potential

16    criminal liability, why shouldn't I be able to say I'm not

17    answering any of those questions in the context of a Grand

18    Jury?

19       ADA WAKEFORD:  I understand, Your Honor.  Thank you

20    for the clarification.  I would say that the 11

21    individuals identified in the motion are not all situated

22    in exactly the same place, so there may be commonality

23    between them, but there is going to need to be an

24    individual determination with regard to each of them.  The

25    level of involvement is necessarily individual, so what I

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

13

1    think would work is for an individual assessment to be

2    made in each case, since we undoubtedly have the ability

3    under the law under Lampl to ask the witnesses to appear,

4    then there would be ahead of time a discussion between the

5    parties with Your Honor's involvement need be, to discuss

6    areas of inquiry that may lead to an identification of

7    Fifth Amendment rights.

8        If that is the case, I believe we would be able to

9    work out a procedure where there is not a badgering of a

10    witness, but simply an ability for the special purpose

11    Grand Jury to walk up to an area of inquiry and be told

12    this is going to be foreclosed by the Fifth Amendment and

13    move on if there are other areas to pursue, so each them

14    will require, I believe an individual assessment.

15        THE COURT:  Are there any of the 11 - - I'm gonna

16    make it 12.  I'm going to include Senator Jones in the

17    group, so any of those 12 where the only topic of interest

18    is that witness's participation in the alternate elector

19    scheme.

20        ADA WAKEFORD:  The answer to that is no.

21        THE COURT:  Every one of them - - it sounds like it's

22    a very diverse group, and one of the concerns Ms.

23    Deborrough and Ms. Pearson had brought up was that some of

24    them are remote, some of them have trouble with mobility,

25    but you are saying all of them have some other potential

1    connection to the investigation or area of interest to the

2    investigation.

3        ADA WAKEFORD:  Standing in my place right now, Your

4    Honor, this is an investigative Grand Jury, so we're not

5    at the stage, you know approaching, say a trial, where I

6    can give a statement with the definiteness that you might

7    be seeking.  What I can tell you is, right now, can I say

8    unless there's only one thing that we can connect one of

9    these people to, then no, Your Honor.

10       THE COURT:  Okay, so just to flip it around to the

11   type of questions asked, you envision, or you and your

12   colleagues envision asking each of the 12, including

13   Senator Jones, questions beyond simply why did you decide

14   to be an alternate elector?  Tell me more about that.

15   There are other aspects of the 2020 general election that

16   you would be asking each of the 12 about.  Mr. Wade.

17       ADA WADE:  Yes, sir, Judge.  If I may, much like the

18   witness on yesterday, we have planned categories to touch,

19   and we understand per the Court's instruction, if we can

20   narrow down these buckets, ask the general question about

21   that particular bucket, let the witness assert, at that

22   point ask the witness if they plan to assert their Fifth

23   Amendment privilege to any question concerning that issue,

24   once they say yes, we move on.

25       THE COURT:  Sure.

         HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                    15

1      ADA WADE:   Not a barrage of like 50 questions where

2   they decide to assert, but just to be able to hit the

3   different buckets though and to answer the Court's

4   question directly, that, yes, sir, there are other areas

5   that we plan to attack.

6      THE COURT:   There's more than one bucket for each of

7   the 12 - -

8      ADA WADE:   Yes, sir.

9      THE COURT:   -- Is what I'm hearing you say - - well,

10  then we would need to work through that.  That helps, I

11  appreciate that, and I think there is ample case law,

12  state and federal, that authorizes witnesses who say up

13  front that I'm going to assert the Fifth Amendment to

14  still be called before the Grand Jury to then assert it.

15     Bank of Nova Scotia from the US Supreme Court is the

16  earliest one I found where you sometimes need to have

17  those people get in front of the Grand Jury to actually

18  invoke, because they might not when put in that situation,

19  and then the investigators are not forced to rely on a

20  claim that they will, or to your point, Mr. Wakeford and

21  Mr. Wade, there may be areas that come up that aren't

22  properly covered by that protection.

23     I know we've been bouncing around a lot, but I think

24  it makes sense for me to hear now from Ms. Pearson or Ms.

25  Deborrough about the approach you've taken, which is my

                 HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              16

1    client shouldn't have to come in at all, and you may not

2    yet have been able to speak with Mr. Wade and his team to

3    know about these other buckets, to use his terms, but I

4    will just share with you in working with Mr. Wade and his

5    team yesterday and a different witness and lawyer, there

6    are other areas, they may be minor, but they're still

7    areas where even the lawyer agreed that my client doesn't

8    have the Fifth Amendment right not to say, this is my job.

9         I've had this job for 10 years, and then they move on

10   to what did you have to do with the electors scheme Fifth

11   Amendment, and then they stop.  They don't go any further

12   with that topic, but to the District Attorney's offices

13   point it's a broad waterfront, and you have seized upon

14   maybe the big bright lighthouse, vis-a-vis your client's,

15   but there could be some (unintelligible) buildings at that

16   that lighthouse that it's appropriate for questions to be

17   asked and more importantly answered.

18        So tell me why you think that instead the answers

19   should be, and I mean you, go to the extreme, it's

20   quashed, they shouldn't even have to show up to give

21   (unintelligible)

22        ATTORNEY PEARSON:  Correct, Your Honor.  I think the

23   first place to start is, just to correct a few things or

24   to clarify a few things, from my understanding of what you

25   just said, all of my clients are identically situated from

1    a legal perspective.  They were all witnesses, they were

2    all converted to targets, and there has been no

3    differentiation from the DA's office between that.

4         THE COURT:  Let me interrupt you for a second.  So,

5    you are saying all 11 of them have received target letters

6    or some communication from the District Attorney's Office

7    that uses the "T" word?

8         ATTORNEY PEARSON:  Yes.

9         THE COURT:  Whatever that may mean in the State

10   context, but just because two of your clients have, you

11   are saying they are similarly situated, it's just a matter

12   of time for the postman to get there.

13        ATTORNEY PEARSON:  I have 11 target letters.

14        THE COURT:  Okay.  So in that way they are similarly

15   situated, but it sounds like they are, and you note it in

16   your own motion, they are also very differently situated.

17   You have, and I apologize if I have the title wrong, Mr.

18   Schaffer as the chair of the Republican Party in Georgia,

19   A very, very, different role in connection with the

20   affairs of election then.   I don't remember who the

21   elderly individual difficulty with mobility and whatnot.

22   I've never heard of the person.

23        It is a differently situated individual once you get

24   outside of that lighthouse of, I was an alternate elector.

25        ATTORNEY PEARSON:  That's true, Your Honor, but I

                  HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              18

1    don't know what situation you dealt with yesterday or what
2    that person's role was or who they were, but in my
3    client's situation I genuinely cannot think of a single
4    topic or question that they could be asked that would not
5    be either under the Fifth Amendment or a link in the
6    chain.
7         What's your name under these charges that they have
8    said they are going to do by signing your name, by saying
9    who you are, by putting your signature on something could
10   arguably be, as ridiculous as that sounds, an
11   incriminating fact, so I don't think my clients are
12   similarly situated to these other witnesses that you are
13   dealing with, anything they could be asked.
14        What's your name?  That is incriminating.  What's
15   your job?  That could lead to other political links in the
16   chain, that could lead to e-mails where they talked about
17   various issues.  It could lead to anything.  I don't see
18   any topic that could actually be relevant to the Grand
19   Jury's inquiry, upon which my clients could not invoke
20   their federal, their state, or constitutional rights, and
21   their statutory rights, and I think absence of proffer
22   that there is such a subject that you would agree with
23   that is not incriminating.
24        Eleven people should not be essentially frogmarched
25   in front of the cameras and the Grand Jury to be forced to

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

19

1    invoke their rights, and I echo Mr. Dillon's concerns

2    about publicity, you know, we're not use to that.  We are

3    federal prosecutors, there is Grand Jury secrecy.  We

4    don't have that here, but the damage is being done and has

5    already been done to all of my 11 clients, and I assume to

6    Senator Jones, is affected, and it's only going to be

7    exacerbated.

8        I mean the threats that they're getting, the hate

9    mail that they're getting, the hate e-mails they're

10   getting here, Your Honor, for doing, in our view nothing

11   wrong.  They are caught up in ambiguous circumstances,

12   which gives them the right under the Supreme Court

13   precedent to invoke their privileges.

14       THE COURT:  We're not going to get into whether they

15   should be surprised or not that they have become the

16   subject of negative attention, based on the decisions

17   they've made, but I'm wondering.  You have now tried to

18   put your arm around Mr. Dillon's client, who is in an

19   actively contested election.  I am not aware of any of

20   your clients being in that position as well, but again, I

21   don't recognize all of their names.

22       ATTORNEY PEARSON:  Your Honor, Mr. Still, Mr. Sean

23   Still is a candidate for senate office, and in addition,

24   Mr. Schafer is the chairman of the GOP, and he is involved

25   in all of these, and many of these people are involved in

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          20

1    the electoral arm of the Georgia Republican Party for many

2    of these races, so while and I think the point is, Your

3    Honor, so while Mr. Jones is involved in his race, and Mr.

4    Still is involved in his race, a lot of these people are

5    involved in all of these races, and I think the point is,

6    Your Honor, AVA regulations with Georgia Professional

7    Responsibility Rules cite favorably with special

8    prosecutor rules.

9         They specifically say a target should not be put in a

10    Grand Jury unless they are immunized, and here you know

11    they can't be immunized because they're federal, and under

12    the statute you can't immunize against a federal, so here

13    the burden really should be on them to come forward with

14    some bucket, as you call it, that they can show we can't

15    invoke on it.  If we can invoke on all of the buckets they

16    should not be dragged down here in front of the Grand

17    Jury, Your Honor.

18         THE COURT:  Okay, do I need to check with Ms.

19    Debrrorogh as well, or do you guys both have an agreement

20    that she will speak up if there's something she wants to

21    add?

22         ATTORNEY PEARSON:  Your Honor, you know Ms.

23    Deborrough.  If she's got something to add she certainly

24    will, but I think I covered it.

25         THE COURT:  All right.  Mr. Wakeford or Mr. Wade,

          HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                      21

1   talk to me a little bit about the last, second to last

2   point I heard from Ms. Pearson about an inability to

3   immunize because, of course, one ticket you can punch that

4   you may not want to punch for anyone, but you may for some

5   of the alternate electors whose sole connection or primary

6   connection to what you're investigating may be the

7   alternate elector situation, would be to let them know

8   that nothing you say during a Grand Jury can be used

9   against you.

10       If you put that in writing then you magically have

11   some compulsory powers, I do, that did not exist before,

12   but if there is not a way to provide sufficient protection

13   you may not have that, and I hadn't processed it the way

14   Ms. Pearson did. Anything you want to add on that? Mr.

15   Wade is shaking his head. As in you disagree or I don't

16   want to add to it?

17       ADA WADE: I vehemently disagree, and there was no

18   effort or attempt or even any indication that our position

19   would be to offer any type of immunity, if that is what

20   she's looking for.

21       THE COURT: I didn't hear Ms. Pearson looking for

22   anything. What I heard her say was that even if you

23   wanted to, and you're saying I don't want to, the scope of

24   the District Attorney's offices offer of immunity wouldn't

25   be sufficient in Ms. Pearson's mind to protect her clients

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

22

1   such that they could be compelled to testify, but we don't

2   need to work through that if that's nothing that the

3   District Attorney's office is looking at right now.

4        ADA WADE:  Okay.

5        THE COURT:  So then what do you see, and I guess, the

6   vision you have for moving forward with the Fifth

7   Amendment concerns, Mr.Wade, would be to have the kinds of

8   individualized discussions like we had yesterday, and like

9   you suggested you would have with counsel.  I guess it

10  would be Ms. Pearson and  Ms. Deborrough for theses 11,

11  Mr. Dillon and Ms. Clapp for Senator Jones to talk about

12  the buckets.

13       In no way would I be requiring that here are the 112

14  questions, here is a script, but it would be that these

15  are the categories that we want to explore, and then there

16  are the disagreements between your team and counsel for

17  the witness, then we might need to have a group

18  discussion.

19       ADA WADE:  I think much like the process on last

20  evening, on the day of the witnesses testimony, have that

21  conversation.  If we can agree upon the buckets, great.

22  If we can't, then Your Honor would be asked to get

23  involved.  I don't think that having a conversation well

24  in advance of 11 people's testimony -- I don't think it's

25  fair.  I think it puts the State at a disadvantage.

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

23

1    THE COURT:  No, I agree.  I wasn't suggesting that

2    you had to map it out in a lot of detail or particularly,

3    far in advance, but more along the lines of what we talked

4    about yesterday.

5    ADA WADE:  Yes, sir.

6    THE COURT:  One more question for one or the two of

7    you.  If target letter is not a reason to conclude that a

8    witness shouldn't appear in front of the Grand Jury, this

9    is a two-part question, is it not at least a reason for

10   that witness to have heightened concern, and if not, why

11   send it?  What was the purpose of it?

12   If the purpose was to get them more concerned

13   shouldn't they be more concerned and say wait a minute?

14   I'm not going to answer these questions in front of a

15   Grand Jury.  I might sit down with you and have a proffer

16   if it's protected, if it can be protected enough.  I'm

17   trying to understand the thinking.

18   ADA WADE:  Judge, to be transparent with the Court,

19   the discussions that took place with our side and Ms.

20   Pearson and Ms. Deborrough prior to a few of their clients

21   having voluntary interviews, the questions were what is

22   the status of my client at this point?  We disclosed the

23   status of the client at that point - -

24   THE COURT:  So it was responsive.  It wasn't

25   proactive, it was reactive.  You're asking - -

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

24

1          ADA WADE:  And we said to them at that time, if at

2     any point the status of your client were to change, we'll

3     disclose that as well, and we did that.

4          THE COURT:  So that explains why, but then help me

5     think through what the consequences should be of that

6     elevation in status.   I assume it wasn't a downgrade that

7     you've been downgraded from, we've actually already

8     indicted you and we've dismissed it, and now you're only

9     target.  Why shouldn't there be the enhanced concern and

10    the beginning of the discussion that it may be that my

11    client is going to invoke his or her Fifth Amendment

12    rights here?

13         ADA WADE:  And certainly this discussion, Judge, from

14    our perspective, is not an attempt to circumvent anyone's

15    rights in terms of a fifth amendment, so I think that what

16    comes up is exactly what we're doing.

17         THE COURT:  Okay.

18         ADA WADE:   It gives Ms. Pearson the right to stand

19    up and say this is not what we want, and it gives the

20    State the right to stand up and cite Lampl, they'll have

21    to come in and do that.

22         THE COURT:  Lampl Bank of Nova Scotia.  They need to

23    come in and assert it in front of the Grand Jury as

24    opposed to having a lawyer say or the witness, him or

25    herself, you know what?   I'm thinking about it, I'm not

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        25

1    comfortable doing that.  No matter what you ask me, I'm
2    going to invoke.
3         ADA WADE:  Yes, sir.
4         ATTORNEY PEARSON:  Your Honor, may I respond briefly?
5         THE COURT:  I was just about to ask you that, and
6    there you go.
7         ATTORNEY PEARSON:  Your Honor, that's not what Lampl
8    says, as you accurately pointed out.  It says they can
9    subpoena people to a Grand Jury, and if that special Grand
10   Jury abuses its power, you'd better bring it up at the
11   time or there is nothing you can do about it later.  We're
12   not going to suppress the evidence.  We're not going to do
13   it, so it doesn't have anything to do with this Court's
14   authority, either under the quashal statute or the
15   supervisory ability of this Court to quash and otherwise
16   properly serve a subpoena.
17        We're not saying they can't subpoena us.  We're
18   saying you could quash it, and we're asking you to.  It's
19   clear, I don't think, Your Honor, that under these facts
20   it is sufficient to drag 11 people in here and then have
21   them figure out the buckets.  I genuinely cannot think of
22   a single question or area of questioning that I would be
23   comfortable allowing them to ask my clients including
24   their names, under these circumstances, and they shouldn't
25   be dragged down here from far away places of the State
          HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                    26

1    just to be told, you know, either by you or us coming to
2    you for 11 witnesses, however many times that they are not
3    going to answer the questions.
4         They should have to come forward with at least a
5    bucket list, so to speak, that Your Honor approves before
6    they are dragged down here.  That is not too much to ask,
7    and if it can't be done before their appearances next
8    week, then you can quash them and we can revisit it, and
9    we can set them for a different time, but they should not
10   be dragged down here and put on public display for doing,
11   in our view, nothing wrong, but their own ambiguous
12   circumstances being forced to invoke their rights, and
13   it's just not appropriate under the Ethical Standards
14   under the Georgia Professional Standards - -
15        THE COURT:  But if they did nothing wrong, why aren't
16   they talking to the Grand Jury?
17        ATTORNEY PEARSON:  Because she's called them targets.
18   I mean, Your Honor, we've outlined in our motion why we
19   don't even think there's jurisdiction here, why the law
20   protects what they did, but as you know the Supreme Court
21   has made clear that the main purpose, one of the main
22   purposes of the Fifth Amendment is to protect innocent
23   people who can be bound up in ambiguous circumstances, and
24   I don't think but you're going to find, at least the cases
25   that I've never been in where ambiguous circumstances are
              HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                           27

1    more ambiguous and politicized and fraught than this, and

2    so, you know, that is why - -

3          THE COURT:  I don't know that politicized makes it

4    ambiguous, but you're using the word ambiguous, and I'll

5    let you use that word.

6          ATTORNEY PEARSON:  We certainly have different views

7    of the facts in the law, Your Honor.

8          THE COURT:  There are entirely different views of

9    certain facts and non facts, I hear you on that, but I

10   don't know if that makes it ambiguous, but I hear you, and

11   I am mindful of an inconvenience factor, if in the end the

12   product of the exercise is to have a witness say I assert

13   the Fifth, and that's it.

14         Hopefully, folks will exercise discretion, but I

15   don't think there is, other than some rules that apply

16   more in a Federal setting where the word target means

17   something different, not entirely different, not entirely

18   different.  I wasn't able to find any legal precedent that

19   says it was improper that the Court should have barred the

20   investigating body from requiring someone to come in and

21   in their face saying I'm not answering any questions.  I'm

22   not even going to tell you my name.  That may actually be

23   something that the Grand Jury may want to know, that this

24   person won't even give her name under oath.  That could be

25   instructive to what the Grand Jury is doing, but they

                 HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          28

1    wouldn't know that if they never met the person.

2         ATTORNEY PEARSON:  Well, given that they're not

3    supposed to draw any negative inference from an

4    invocation  I wouldn't think that would be evidence, but

5    even if it were, I think the reason you can't find any

6    precedence is because in the Federal system, and then the

7    State system doesn't do Grand Jury work very often, and

8    then the Federal system they don't do this. .

9         They don't bring targets in and try to force them to

10   testify because they recognize it's unethical, as the AVA

11   has said and as the Georgia Professional Rules have

12   outlined, and we would ask that at a minimum, Your Honor,

13   that you ask them proffer the buckets to you or to us

14   before our people are brought in.

15        THE COURT:  Fair request.  I appreciate that.

16        ADA WAKEFORD:  Your Honor, may I address one point?

17        THE COURT:  Hold on.  Mr. Dillon, if you're going to

18   talk more about disqualification, not yet.  If it's the

19   Fifth Amendment you've been patient, so I'm happy to hear

20   from Senator Jones' perspective.

21        ATTORNEY DILLON:  Keeping quiet my mouth quiet in

22   this whole  disqualification thing -- -

23        THE COURT:  But go ahead.

24        ATTORNEY DILLON:  Trust me.  I call the Court's

25   attention to the Georgia Code, that's 15-12-100.  It's a

                 HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                          29

1    procedure for a special Grand Jury and hours of that Grand

2    Jury, and under Subparagraph C it says, "while conducting

3    any investigation authorized by this part, investigative

4    grand juries may compel evidence and subpoena witnesses."

5    It may inspect records, documents, correspondence, and

6    books, blah, blah, blah , and it specifically excludes

7    subpoena targets, Your Honor, and these are the rules --

8         THE COURT:  You mean it says you may not do that or?

9         ATTORNEY DILLON:  No, it doesn't, but because it is

10   not included in the list, we all know the cannons of

11   constructing statutes.  If there is a list and it's not

12   included in the list, it's excluded from the list, and

13   this is the provision under which this Grand Jury was

14   impaneled.

15        THE COURT:  It didn't say subpoena tall people or

16   short people, it says witnesses.

17        ATTORNEY DILLON:  It says witnesses.

18        THE COURT:  You're saying a target is not a witness?

19        ATTORNEY DILLON:  A target is a different category

20   than a witness, and the case law in the state of Georgia

21   says that because targets are discussed differently in the

22   Lampl case, and that's a good case to cite on.  A target

23   is different than a witness, and this doesn't say subpoena

24   targets.  It says subpoena witnesses.

25        THE COURT:  Okay.  Mr. Wakeford.

     HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                    30

```
 1              ADA WAKEFORD:  Your Honor, I'll read directly from
 2       Lampl.
 3              THE COURT:   Lampl is getting a lot of attention.  Am
 4       I right?  Is it a Clayton County - -  It was some sort of
 5       city counsel - -
 6              ADA WAKEFORD:   I think so, Your Honor.
 7              THE COURT:  Ms. Green-Cross is now nodding her head.
 8       She would know.  She's the appellate expert.   All right.
 9       Continue.
10              ADA WAKEFORD:  "One who has not been so charged,
11       meaning formally charged, in a formal charging instrument
12       --
13              THE COURT:  Which would be every single recipient of
14       a subpoena so far?
15              ADA WAKEFORD:  Yes.
16              THE COURT:  All right.
17              ADA WAKEFORD:  -- may be compelled to appear before a
18       Grand Jury that he retains the option during his
19       appearance of invoking his privilege against
20       self-incrimination and refusing to testify regarding the
21       incriminating matters, this is true even if the witness is
22       a target of the grand jury's investigation."
23              THE COURT:  So Mr. Dillon stood up first, and he's
24       freshest from saying ha ha, take Lampl that way, State.
25       So did he skip a sentence?  That's a pretty powerful
                    HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                              31
```

1    sentence, Mr. Dillon.

2         ATTORNEY DILLON:  A very powerful sentence, and with

3    regard to regular grand juries, I have no doubt that the

4    District Attorney might, but the statute under which the

5    subpoena is issued in this case properly is not that the

6    ordinary Grand Jury, nor the special grand jury, and it's

7    under this chapter in the Georgia code, and the rules are

8    different.

9         THE COURT:  So your argument is that a regular Grand

10   Jury that could indict and would target -- Lampl says you

11   can call that person in front of a that Grand Jury who has

12   the ability to indict Lample, and they can invoke his

13   Fifth from which they need to draw no adverse inference,

14   but a special purpose Grand Jury which can indict no one

15   or anything, they can't subpoena a target because they use

16   the word witness instead of target?

17        ATTORNEY DILLON:  Yes, Your Honor.

18        THE COURT:  Is the word target used in the

19   non-special purpose Grand Jury statute, or is the word

20   witness used?

21        ATTORNEY DILLON:  Interesting question, Your Honor,

22   but I do note that the subpoena is - -

23        THE COURT:  What's the answer?

24        ATTORNEY DILLON:  I don't know, but I do note that

25   the statute under which the subpoenas were supposed to be

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                              32

1    issued in this case is under Title 15, but the subpoena is
2    actually rolled out under the provision of the Georgia
3    code that is not under Title 15, and they were, in fact,
4    technically, improper subpoenas because they were issued
5    under the normal statute and not under this chapter.
6         THE COURT:  So I guess we could republish them and
7    resign them if that is the - -
8         ATTORNEY DILLON:  Exactly, and then recognize that
9    this rule applies, but not the Lampl rule that we're
10   citing here.
11        ATTORNEY PEARSON:  Your Honor, we would take a
12   slightly different differentiation of Lample  - -
13        THE COURT:  A third reading.
14        ATTORNEY PEARSON:  It's actually the same read, and
15   that is the sentence that he read is (unintelligible) What
16   the the Supreme Court is saying in Lampl, we have an
17   individual who didn't take his Fifth in the Grand Jury,
18   the special purpose grand jury, the special purpose Grand
19   Jury used its authority to have a conveyer who was later
20   indicted in an improper Grand Jury.
21        I'm not suggesting they were improper, but a
22   different regular Grand jury, and then he tried to get
23   evidence suppressed from the special Grand Jury.  This is
24   not about whether they can compel people.  We're not
25   disputing they can issue the subpoenas, everybody says

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                          33

1    they can.  That is the only thing Lample even arguably

2    says.  The only issue then is you get to quash them if you

3    want to.

4         If you believe that you should, and there's nothing

5    that says your authority under the statute, or under

6    supervisory authority is in any way affected by Lampl at

7    all whatsoever, so you clearly have the authority to do

8    what you think is proper with this Grand Jury here, and

9    we're asking you, on behalf of our clients, not to have

10   them frogmarched in front of a cameras and in this

11   courtroom.

12        THE COURT:  Okay.

13        ADA WAKEFORD:  At this point I was going to address

14   the original point I was going to make, which is I believe

15   we've heard the phrase "frog marched" in front of the

16   cameras three times now.

17        THE COURT:  All right.

18        ADA WAKEFORD:  I do not want to talk about this, but

19   I have to at this point.  Publicity is a hindrance to the

20   special purpose Grand Jury's work.  I believe earlier

21   Ms. Pearson stated that there may have been a witness in

22   here yesterday, but she didn't know who it was or how they

23   appeared, or what they had talked about, which is an

24   indication that the witnesses can come before the special

25   purpose Grand Jury, and no one ever know anything about

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        34

1    it.  If witnesses exercise their First Amendment right to
2    disclose after the fact or before the fact they were
3    called, then they are allowed to do that.  That is the
4    source of publicity around this.  It is, I think here we
5    are tired of hearing that there is publicity jammed up by
6    the District Attorney's Office in order to create a circus
7    around this when we have actually taken pains to try to
8    create an environment of circus around this, so there is
9    no frogmarching, and there are ways to come before the
10   special purpose Grand Jury without publicity being brought
11   into it.  I just wanted to clarify it right after the
12   third time we heard that phrase.
13        THE COURT:  Okay.  Well, I appreciate much of what
14   you said.  I think it's a little rich to suggest that any
15   particular side that has avoided the cameras.  One need
16   look only at basically any major news outlet, and you will
17   see who is talking to the media, and it is not always the
18   lawyers for the witnesses, so I think everyone involved in
19   this has taken full advantage of media coverage.
20        That said, they're are some things that can be done,
21   I know, because I've been asked to be involved with it to
22   ensure that witnesses can enter into the building and
23   leave the building without much harassment from the media,
24   and we can get to do that.
25        I don't know that there are many of Ms. Pearson's

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

35

1     clients that the media would even recognize when they

2     walked up the front steps of the courthouse if that's how

3     they came in, so I think the concern about putting people

4     on public display is a bit exaggerated for most of her

5     clients, but if there are clients who need special

6     accommodations and ingress and egress we can always

7     accommodate them, we've done it before and can do it

8     again.  Anything more from the District Attorney's office

9     on the fifth Amendment concerns raised in Ms. Pearson and

10    Mr. Deborrough's motion as expanded by Mr.Dillon?

11         ADA WAKEFORD:  No, your Honor.  We have responded to

12    your questions, and we have proposed a method going

13    forward, and we have nothing else to add.

14         THE COURT:  Thank you.  Okay.  Ms. Pearson or Ms.

15    Deborrough, anything else on behalf of your 11 clients in

16    connection with the quashal of the requests, in other

17    words the Fifth Amendment concerns?

18         ATTORNEY PEARSON:  I think that's it, Your Honor.

19         THE COURT:  Mr. Dillon, anything more on the Fifth

20    Amendment aspects?

21         ATTORNEY DILLON:  No, Your Honor, we've got the

22    motion as communicated earlier.

23         THE COURT:  Okay.  Thank You.  So I will not be

24    quashing any of the subpoenas, but I will be asking -- we

25    may need to change some of the timelines.  How many of

                    HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                              36

1    your 11 are coming all at once?  Are all 11 supposed to

2    come out the same day or are they spread out, Ms. Pearson?

3         ATTORNEY PEARSON:  Your Honor, we have - - they are

4    all coming on the 26th, 27th, and the 28th, so that's 3,

5    4, 5.  I allocated over the states maybe 9 exactly.

6         THE COURT:  The process is going to take longer

7    because what will happen, I suspect it will become more

8    regularized and streamlined after the first few of your

9    witnesses, but what will need to happen is that your

10   witness, and you Ms. Pearson and Ms. Deborroughs, if she

11   clears quarantine she can be here too.  She can appear

12   virtually, however we need to make it work, however we can

13   make it work.

14        We'll need to sit down, and it may just be lawyers at

15   first, so you can have your client wherever you want them

16   to be, as long as he or she is in the building, and

17   you're going to have that bucket conversation and see

18   where there is agreement or disagreement, and you've made

19   very clear that you can't think of anything, not even

20   astrological signs because somehow that would be tied to

21   something, or it would be irrelevant, but that

22   conversation needs to happen so that that we can, lawyers

23   and I can have a conversation about is it really a

24   complete impasse, of I may make the ruling, and you can

25   challenge it in whatever way you want, that the witnesses

         HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                      37

1    will need to go in front of the Grand Jury to answer name,

2    rank, and serial number and then the rest will be Fifth

3    Amendment.

4           It helps the District Attorney's office has 12

5    because they know basically that they're going to ask one

6    question beyond name, rank, and serial number, if I get

7    folks passed that because there is not an area that can be

8    explored that I don't think is unprotected by the Fifth

9    Amendment.

10    ADA WADE:  One thing I believe, Judge, from our side

11    that is noteworthy, is the very thing that the District

12    Attorney's office has fought so hard to do, was keep our

13    witnesses secret and out of the public eye.  What Ms.

14    Pearson just did was, she gave the dates that her clients

15    were coming in here, that's the exact thing she's

16    complaining about.  She gave - -

17    THE COURT:  Well, before we draw more attention to

18    this, I did not hear Ms. Pearson say Steve Jones is coming

19    in on this day.  She divided it over days and did not

20    identify people, and I mentioned, if there is a concern

21    about letting someone in the building discreetly, we can

22    address that and get someone in the building discreetly.

23           Most of these folks who walk, as long as they are

24    wearing normal clothes, they can walk right in the

25    courthouse, and those cameras that seem to be glued to our

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

38

1    courthouse steps right now wouldn't even pivot on that, so

2    I think the concern is greater than it needs to be, but we

3    can accommodate it.  I'm not going to ask someone to be

4    more specifically about who is going to be here when, I

5    just need to know if it's going to take a while for these

6    witnesses because there will be the conference before the

7    witness testifies. .

8         Testimony may be greatly reduced because of the

9    outcome of the conference may be that testimony is going

10   to be just as long as the District Attorney's Office had

11   forecast, but there's still this lawyer-to-lawyer

12   conference in advance, but that's how we're going to work

13   through it, and as I said, we may develop some guidelines.

14        A ruling I make with Witness One, isn't going to

15   apply to Witness Two insofar as she is similarly

16   situated.  I don't believe all are similarly situated.

17   There's still the overlap.  They are all alternate

18   electors, so there are certain commonalities, and I assume

19   that is why they all want to have you and Ms. Deborrough.

20   Similarly, they are all situated in this same situation,

21   but they are not clones, and so there may be areas that

22   are explorable with Witness One that are not explorable

23   with Witness Two, so I'm going to let the parties develop

24   the framework they want to use as we go forward.

25        I am here to assist when you reach an impasse, but I

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

39

1     don't think it's appropriate under the case law Lampl and

2     others to quash the subpoenas, but it may be that these

3     witnesses have very, very, brief appearances in front of

4     the Grand Jury.

5          ATTORNEY PEARSON:  Your Honor, just so that I

6     understand.  We aren't going to elaborate on it ahead of

7     time.  We will collaborate when the first witnesses come

8     here or in between each witness?  I mean, we've got 11

9     people to get through, so I guess I need some clarity on

10    how that's going to work for each witness.

11         THE COURT:  So I invite early collaboration, but I

12    also understand that if the District Attorney's Office is

13    reluctant to get too specific too far in advance, so they

14    may buckle under the pressure of how long that would take

15    as well, and there may be some basic frameworks that they

16    want to share with you in advance, but if you're now

17    getting into the nuts and bolts that I get to stay out of.

18        I will get in the mix should an impasse be reached.

19    If that impasse is reached tomorrow, because you're

20    talking about a witness who is coming on an undisclosed

21    date next week, at an undisclosed location, then I could

22    talk with you all tomorrow, but it may well be that the

23    default is let's talk when you're witness is here.

24        That may mean you won't get to everything next week.

25    That was - - the reason why I was asking is that if they

1    are spread out you four weeks you - - they're all coming

2    in next week.  I could see it being that what had been

3    scheduled for Thursday ends up being what was scheduled

4    for Tuesday, because you only got through two people on

5    Tuesday because of the confirming that doesn't occur until

6    Tuesday, so I'm not forcing an answer to your question,

7    what you develop with the District Attorney's Office.

8         ATTORNEY PEARSON:  In light of that, Your Honor,

9    would the Court at all be amenable to to moving our grand

10   jurors, not quashing them but moving them to later so that

11   we can work this process out in advance?

12        THE COURT:  So another really good question for you

13   to explore with the District Attorney's office, they may

14   think that's wise and necessary as well, and it may well

15   be that 6 of the 11 go next week because everything is

16   taking a little bit longer because we are being careful

17   about the concerns raised in your motion, but I have made

18   clear that other than checking on the welfare of the Grand

19   Jury, in other words they are not in session from 8 a.m.

20   to  10:00 p.m.

21        I don't micromanage who gets called it or when, but

22   I'll let you know that the District Attorney's office has

23   been flexible at having to move things if obstacles come

24   up.

25        ATTORNEY PEARSON:  Well, we had asked for that, Your

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          41

1    Honor, and they refused, that's why I brought that up, but

2    we'll talk to them about it.

3         THE COURT:  Well, things are a lot less streamlined

4    than they were before, so you work through that.

5         All right.  Let's talk about disqualification and

6    this process has moved up to the driver's seat on the DA's

7    side, and I think since Mr. Dillon got in about three

8    quarters of his argument in answering my simple question

9    of do you think it's moot or not, I want to give the DA's

10   office a chance to share some of their perspective about

11   it.

12        I think the word partisan gets thrown around a lot in

13   this and why they think disqualification doesn't fit or

14   how to manage what I think are some valid concerns that

15   Senator Jones has raised through counsel, but at a minimum

16   pretty clear appearance of conflict, if it's developed not

17   before the investigation started but in the midst of it.

18        ATTORNEY GREEN-CROSS:  Thank you, your Honor.  I

19   think Your Honor has used the phrase appearance of

20   impropriety.  There is Mr. Dillon's use of the phrase

21   appearance impropriety or appearance of conflict, and the

22   first place the State is going to direct your attention to

23   is on the law cited in the responsive brief that

24   appearance of conflict is enough.

25        Under Georgia law, the disqualification of a

                  HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          42

1    prosecuting attorney or entity requires an actual

2    conflict, not speculative, not conjecture, but an actual

3    personal interest, and in this case would be the

4    investigation of the special purpose Grand Jury or the

5    prosecution  potentially of Senator Jones.

6         So I think that while optics in this case may be

7    more front and center than in some others, optics doesn't

8    carry the day, it's an actual conflict, and there's just

9    nothing at all that suggests that there is the actual

10   personal interest on the behalf of the District Attorney.

11   I'll note that insofar as the motion target, special

12   prosecutor Wade, there is --

13        THE COURT:  Oh, thank you for that.  Pause on that.

14   Mr. Dillon, do you agree --  originally we were going to

15   talk about just disqualification and Ms. Deborrough, and

16   Ms. Pearson arrived on the scene about the Fifth

17   Amendment.  My first question was meant to be that, do you

18   agree, Mr. Dillon, that Mr. Wade's purported donations,

19   and I'm not attributing anything to him, but it looks like

20   from the records that Mr. Wade gave $2,000 to Mr. Bailey

21   when Mr. Bailey was running for Attorney General.

22        No donations of record or any public insofar as the

23   donations is the public because records are made of it, no

24   public donations in support of Charlie Bailey by Nathan

25   Wade since Charlie Bailey switched races, and is instead

1    trying to be Lieutenant Governor instead of Attorney

2    General; do you agree with that?

3            ATTORNEY DILLON:  I agree with that, Your Honor.

4            THE COURT:  Okay.

5            ATTORNEY GREEN-CROSS:  That was my whole paragraph.

6            THE COURT:  You don't need to cover that, because

7    that was very persuasive.

8            ATTORNEY GREEN-CROSS:  Thank you.

9            THE COURT:  If that fact is true, I am focused very

10   much on the appearance of the District Attorney.  Using

11   that title District Attorney Fani Willis, invites you and

12   encourages you to come to this fundraiser for the

13   political opponent of the target of my investigation.

14   That's what we need to navigate here, and I guess the

15   question is, if there's an actual conflict, is

16   disqualification mandatory or discretionary, and if it's

17   mandatory then does that mean that the appearance of

18   conflict still give the judge the discretion to fashion

19   some form of relief?

20           ATTORNEY GREEN-CROSS:  Let me start with the last

21   question. .No.

22           THE COURT:  No?

23           ATTORNEY GREEN-CROSS:  I don't think the Court has

24   the discretion law.  While I want to give the Court as

25   much discretion as you want to have - -

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        44

1        THE COURT:  Only what it should have.

2        ATTORNEY GREEN-CROSS:  Yes.  I don't think the law

3    allows the Court to elevate the standard, what the legal

4    standard is an actual conflict.  I don't believe that the

5    Court's discretion is broad enough to force a remedy for

6    an appearance of conflict.

7        THE COURT:  And examples of actual conflict that I

8    saw in your pleading were somehow the prosecutor was able

9    to be like a defense attorney at the same -- I mean it was

10   these things where like what were you thinking?  Yes, it

11   was kind of crazy.   I represent one co defendant and as

12   the defense attorney in a criminal proceeding become the

13   DA and the prosecute the co defendant.

14       THE COURT:  okay.

15       ATTORNEY GREEN-CROSS:  That makes no sense, and that

16   is not the situation we've got here, but that is the kind

17   of extreme example of what the law recognizes as an actual

18   conflict for a prosecuting attorney, at one time I

19   represented the victim in a case that is now before me in

20   a divorce preceding who is now before me in a case.

21       It's that kind of really striking in your face and

22   routine political support for a political ally.  It just

23   doesn't make it there.  It doesn't go that far.

24       THE COURT:  The routine -- I would interpret as Mr.

25   Wade strokes a check for the candidate he wants to

            HADASSAH J. DAVID, OFFICIAL COURT REPORTER

45

1    support.  Using the title of your office and having a

2    social media that you as this political office holder are

3    holding a fundraiser for the opponent of someone that this

4    political office is investigating.  I don't know that it's

5    an actual conflict, but I use that phrase, "what were you

6    thinking," where the prosecutor thought I could prosecute

7    the codefendant of someone I defended.

8         It's a what are you thinking moment?  The optics are

9    horrific.  If you are trying to have the public believe

10   that this is a non-partition driven by the facts, and I'm

11   not here to critique decisions.  The decision was made,

12   but If we are trying to maintain confidence that this

13   investigation is pursuing facts in a non-partisan sense,

14   no matter who the District Attorney is, we follow the

15   evidence where it goes and ignore that fact that I hosted

16   a fundraiser for the political opponent of someone I just

17   named a target.

18        That strikes me as problematic.  Maybe not from an

19   actual conflict level, but if we are at a cocktail party

20   and people are asking do you think that this is a fair and

21   balanced approach to things, I do.  Well, how do you

22   explain this?

23        I mean, how does one explain?  I mean, that is the

24   concern I'm working through is that it is not a lowercase

25   A appearance, it is a capital A with flashy lights

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

46

1 fundraiser District Attorney for the political opponent of

2 someone I've named a target of my investigation, while I'm

3 a legal adviser of the Grand Jury, and I'm on national

4 medial almost nightly talking about this investigation

5 and  That's problematic.

6  ATTORNEY GREEN-CROSS:  Okay.  Not accepting the

7 entirety of the Court's characterization of the series of

8 events.  I'm going to explain it in a couple of ways.

9 First, it's still not a legal conflict.  It's still not

10 anything within the Court's discretion to remedy in the

11 way that Mr. Dillon has advocated on behalf of Senator

12 Jones.  As a legal matter, everybody can talk at cocktail

13 parties all they want and watch the cable news station of

14 their choosing, but no matter what it still doesn't amount

15 to a legal conflict under Georgia law.

16  Second, I want to direct the Court's attention to the

17 absolute lack of any evidence to the case that any action

18 taken during the course of the investigation has been

19 politically motivated at all.  As the Court made

20 reference, and maybe I'm paraphrasing, but it's the Grand

21 Jury's duty to Senator Jones, not the District Attorney's

22 office.

23  The District Attorney is the legal adviser of the

24 special purpose Grand Jury, and may well have an

25 investigation of their own, but Senator Jones is trying to

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

47

1    fight a subpoena to the special purpose Grand Jury, and it

2    was brought under their authority.

3         THE COURT:  It was, and I think technically you are

4    correct.  I wouldn't want anyone to be misled, that the

5    special purpose Grand Jury is the only -- meaning those

6    grand jurors are the only source of subpoenas that they

7    say to their legal adviser, where is what we'd like to see

8    next.  That can happen, but what can also happen, and it

9    doesn't matter who it happened here because your point is

10   a good one, but I don't want people leaving here thinking

11   oh, it's only the special purpose Grand Jury that decides

12   to come in and.  Equally so and perhaps most of the time

13   it's the District Attorney's team that says, here's who we

14   would like to have come before the special purpose Grand

15   Jury next. .

16        That subpoena comes through the Grand Jury maybe the

17   wrong statute under the subpoena, but it comes through the

18   Grand Jury, but the idea, motivation, and the decision is

19   from the District Attorney's office.  I don't know how

20   Senator Jones' subpoena which channel from which it

21   flowed, I've got an inkling, but it doesn't matter.  Your

22   point is a good one.

23        I don't know that it cures the concern about

24   political support for an opponent not having any bearing

25   on how focused or not the special purpose Grand Jury would

          HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                  48

1    be on the person I'm supportings political opponent before

2    November X, whenever the election is.

3        ATTORNEY GREEN-CROSS:  I understand, and I didn't

4    mean to imply otherwise to the public in my report, but I

5    certainly understand the need to clarify that.  The larger

6    point being though, I think in this posture is that,

7    Senator Jones is still in obligation to some action taken

8    during the investigation that is the Court's allegation of

9    a political motivation, and you just haven't seen it here.

10   The -- Yes, sir.

11       THE COURT:  Mr. Dillon will get a chance to say more,

12   but part of his introductory remarks he emphasized a whole

13   lot then this target letter arise, like there was some

14   cause and effect.  I am not familiar with the timeline and

15   you mentioned that my description of events may have

16   gotten some of the timeline, and I'm not anchored to any

17   particular timeline other than the correct one.

18       Hopefully, there is only one set of facts as to the

19   timeline.  What was your reaction to the way Mr. Dillon

20   was painting -- it was almost a cause and effect timeline

21   that X happens and as a result of X support for Charlie

22   Bailey then Y happens, something that that in the public

23   eye would be negative to Senator Jones.

24       ATTORNEY GREEN-CROSS:  I represent to the Court, and

25   I believe it's accurate that all of the target letters

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          49

1    went out at the same time.

2         THE COURT:  Okay.

3         ATTORNEY GREEN-CROSS:  So it was not pegged to any

4    event that had any relevance of Lieutenant Governor's race

5    or any other political option was dictated by the terms

6    and the pace of that investigation.

7         THE COURT:  So the 11 that Ms. Pearce and Ms.

8    Deborrough received were issued on the same day, and

9    effectively the same time as Senator Jones?

10        ATTORNEY GREEN-CROSS:  Yes.

11        THE COURT:  It is not Senator Jones got his on a

12   special day, and it was a broadcasted event, and then the

13   other 11 went out?

14        ATTORNEY GREEN-CROSS:  It was a routine issuance of

15   the change of status as Mr. Wade explained in an effort to

16   be transparent to everyone who had been working and

17   talking with the State.

18        The final point I think I kind of want to make is

19   that, as noted in the brief, we have partisan District

20   Attorneys and partisan elections for those offices, so it

21   should surprise exactly nobody elected District Attorney's

22   should have political affiliations with other individual

23   within the same political party, and I think the post case

24   -- I've got a copy for the Court if you are not familiar

25   with it and a copy for Mr. Dillon.

         HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                    50

1        THE COURT:  Is there a cite?

2        ATTORNEY GREEN-CROSS:  It is.  298 Georgia 241.  It's

3     a 2015 decision.  It's post, P-O-S-T.  I've got a copy

4     that is highlighted.  I'll hand Mr. Dillon the same copies

5     that have been highlighted for the Court.  May I approach,

6     please?

7        THE COURT:  Sure.  Thank You.

8        ADA GREEN:  On page 5 it is a reference.  The case

9     doesn't raise the issue of a prosecuting attorney who has

10    been or sought disqualified by a defendant or target or a

11    subject, or a witness in the case.  It's an even higher

12    stand to what a judicial recusal would be, and I think

13    it's instructed as a lower standard -- I'm sorry, a lower

14    burden and a higher standard for a recusal of Court, and

15    in this case it was the situation where the District

16    Attorney had been listed as a campaign official of a

17    Superior Court judge's campaign at one time, and the Court

18    in that case found -- well, that's beyond routine, it's

19    beyond financial, it's beyond what we normally expect.

20        Although it even -- and so the Court concluded, You

21    know what, when you got that allegation and the affidavit

22    of recusal you should have sent that on.  I'll note too

23    though, that once it was sent on, the Court determined

24    that that wasn't an actual (unintelligible), and it went

25    right back, so I bring the language to the Court's

            HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          51

1      attention because it does draw a focus on these are the

2      things that happen when you have political affiliations

3      for elected offices.  It's expected, it's normal, and

4      until or it shows some actual conflict then that is just

5      maybe the upside, maybe the downside, but that's a

6      consequence of the system that we have.

7          THE COURT:  Okay.

8          ATTORNEY GREEN-CROSS:  One more final thing, and I

9      think this could streamline some of our other

10     conversations about remedy.  The State is not interested

11     in any summer surprises.  I couldn't source that October

12     deadline to anything.  I'm unable to determine when that

13     is.  I don't believe we have that here.  It's especially

14     unlikely.

15         THE COURT:  My understanding from speaking with the

16     Grand Jury directly.  My supervisory role is that the

17     timeline is whatever the timeline is.  There is no

18     deadline, they like to be done with this soon, but that is

19     only because they are giving much of their life to this

20     process, but they'll follow this process as it unfolds,

21     and as I intimated to Mr. Dillon and I'll make it clearer

22     when I wrap up the disqualification session that if the

23     work is completed such that it lands on or near the

24     election, it will state in the pleading and be in my

25     office until it gets disclosed after the election.

            HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                      52

1          ATTORNEY GREEN-CROSS:  You won't be hearing any

2     objection about that from the State.

3          THE COURT:  I never I heard any requests to the

4     contrary.  What I heard is we don't know when it will end.

5     When will it will be done, when we're done.

6          ATTORNEY GREEN-CROSS:  I got a passed a note that's

7     going to clear up that timeline.  The political event for

8     Mr. Bailey was June 14th, and the target letter was sent

9     to Senator Jones and the others in that July 5th, July 6th

10    timeline.

11         THE COURT:  So three weeks later.  All right.  Mr.

12    Dillon or Ms. Clapp.  I'm happy to hear what you want to

13    share.  Don't repeat what you already said because I heard

14    that.  I'd like you to start with Ms. Cross's focus, and

15    it is different.  I'm very familiar with the judicial

16    requirements and the impact and affect of apparent

17    conflicts, and Ms. Cross's observation is the District

18    Attorney is not a judge.

19         This is true, but because of that the apparent

20    conflict may be an area of concern that we ought to talk

21    about, but that it would not require me to take any

22    remedial action, only if there were an actual conflict,

23    and even if it was an actual conflict, but I don't

24    disagree with you if you say there is an appearance of a

25    conflict.  You don't need to try to convince me of that.

             HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          53

1          If that's not enough, legally, then we'll all agree

2     that there was an appearance of conflict, hopefully

3     something like that doesn't happen again between now and

4     the conclusion of this electoral cycle, but that is what I

5     need you to start with appearance verses actual and

6     anything else we need to cover that you already didn't.

7          ATTORNEY DILLON:  Your Honor, if I may.  My associate

8     has a power point, and we'd like to plug into the screen

9     if that is possible to the Court.

10         THE COURT:  It is, Ms. Clapp is a part of this zoom

11    session, and you're able to share your screen.  Is what

12    you're going to share something you shared with Ms. Cross

13    or is this brand new?

14         ATTORNEY DILLON:  We have not shared this with Ms.

15    Cross.

16         THE COURT:  It's not evidence?

17         ATTORNEY DILLON:  It's not evidence, but we do have

18    some exhibits, Your Honor, we do have some evidence here

19    today.

20         THE COURT:  Okay, if there is going to be evidence,

21    let's just make sure Ms. Cross gets a chance to see it

22    before we blast it on the screen.

23         ATTORNEY DILLON:  Absolutely.  oh, no.  It won't be

24    blasted on the screen.  It won't be published before --

25         THE COURT:  Okay.

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

54

1      ATTORNEY DILLON:  As the initial point, Your Honor,

2  I'd like to point out that Senator Jones received his

3  Grand Jury subpoena in late May, and he was set for

4  testimony in late July.

5      We won't go into the date because we don't want to

6  create a bottle neck, but he was assured by the DA's

7  office that he was a witness in the case, and he was glad

8  to do his civic duty.  We were trying to work out the

9  parameters for a voluntary interview to avoid the reptile

10  marching.  I won't use that term.  while I like it, I just

11  won't use it.

12      THE COURT:  Simple, but what you are avoiding is

13  answering my question.  My question was, appearance of

14  conflict verses actual conflict, what do you think the law

15  is, and where do you think this falls?

16      ATTORNEY DILLON:  I think, based on my reading of the

17  law that controls in this area is that when there is a

18  public perception of a conflict, then there's an issue

19  that this Court has to look at, and the standard is the

20  standard that is layed out in the Young case, the Supreme

21  Court case that the DA cites in their response brief.

22      THE COURT:  Young as in not old?

23      ATTORNEY DILLON:  Young as in not old, and I don't

24  have the cite in front of me.

25      THE COURT:  I'll get it.

        HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        55

1          ATTORNEY DILLON:  It's also in my brief.

2          THE COURT:  Lampl.

3          ATTORNEY DILLON:  Okay.  The DA cites it for the

4    proposition that, "The standard of neutrality for

5    prosecutors is not necessarily astringent as those

6    applicable to judicial or quasi -- judicial offices," and

7    she is correct, direct quote from Young.

8          It is not astringent, and the Court goes on to say

9    that the different in treatment is relevant whether a

10   conflict is found, however, not to it's gravity once

11   identified.  We may require a stronger showing for a

12   prosecutor that a judge in order to conclude that a

13   conflict of interest exists, but once we have drawn that

14   conclusion we have deemed the prosecutor subject to

15   influences that undermine confidence that a prosecution

16   can be conducted in a disinterested fashion.

17         If this is the case we can not have confidence that a

18   proceeding in which the officer plays the critical role of

19   preparing and presenting the case for the defendant's

20   guilt or hear the defendant's recommendation for a charge.

21         And so here is the Supreme Court saying that if the

22   confidence is undermined, if the Court is saying, what

23   were you thinking, then the decision is already made,

24   because if we have a what were you thinking factor that

25   even if they recommend discharge, and even if they died,

           HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                            56

1    and if they go to trial, and even if they win the case,

2    which we submit will never happen, there it has occurred

3    in the Young case.

4        The bigger issue here is not whether or not they can

5    indict him for submitting a false document, they determine

6    the falsity of all the documents in this case.   The issue

7    here is whether or not they can drag Senator Jones down by

8    literally releasing to the press that he's a target.   This

9    guy get's $32,000 dollars.   This guy get's a publicly

10   disclose target letter.

11       THE COURT:   You're going a little bit off the -- the

12   focus here is disqualification, and I'm not quite sure

13   what you are invoking from the press or who you think said

14   to the press that someone was a target, maybe other than

15   you or your client talking to the press, but that's not

16   what your motion was about.   Your motion was about the

17   decision the District Attorney made to support someone in

18   her political party --

19       ATTORNEY DILLON:   Yes, Your Honor.

20       THE COURT:   -- and how that may create, and it does

21   create the appearance of possible conflict, but is it an

22   actual conflict, and you are helping me process that maybe

23   an appearance would be enough, but that is what I need us

24   to focus on and not your theory that the District

25   Attorney's office is trying to affect someone's political

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

57

1   career as opposed to revelations about someones connection

2   to a series of events that are particularly controversial

3   in our society right now might prove problematic for that

4   political candidate.  I can't help that part.  Those were

5   choices that were made.  That might elevate that candidate

6   in the eyes of some.  They might not elevate that

7   candidate in the eyes of many.

8       ATTORNEY DILLON:  It may, Your Honor, and with regard

9   to those facts, Senator Jones was willing to come in and

10   meet with the prosecutor and sit down and say these are

11   the facts of the case, under oath and maybe not under

12   oath, but then they received this carpet bombing of target

13   letters for everyone who signed the document, it is

14   suddenly 16 witnesses had the door slammed in their face

15   because they were told that they less friends of the

16   investigation or targets.

17       Can we go to the next slide?  Mr. Jones received his

18   target letter on July 6th as the DA indicated.  Contrary

19   to their motion where they indicated he was a potential

20   target, he was told he was What?  Next slide.  "You are

21   advised that you are "A target" of the Grand Jury."  This

22   was on July 6th.

23       Next slide, please.  On July the 12th, six days

24   after, I received this target letter, and I will say that

25   we consider this to be highly confidential, and the only

1     two people in the world that knew about the target letter

2     were me and the district Attorney's office. I get this

3     unsolicited e-mail from a reporter with --

4          ATTORNEY GREEN-CROSS:  I'm sorry --

5          THE COURT:  Stop.

6          ATTORNEY GREEN-CROSS:  I'm sorry.  This isn't a

7     document that I've seen before, so before we publish it,

8     Mr. Dillon can you --

9          THE COURT:  Can you take that down, Ms. Clapp back to

10    the preceding page?  And so, Mr. Dillon, you had assured

11    me that --

12         ATTORNEY DILLON:  Yes, I did, Your Honor, and in my

13    zeal I got a little ahead of myself.

14         THE COURT:  Well, be less zealous.  Represent your

15    client, but let's not slap e-mails for which no foundation

16    has not been laid upon the screen. I thought you said, in

17    fact, I know you said don't worry, the actual exhibits I

18    won't put on the screen, they'll just be in my hands and

19    they won't be published.

20         ATTORNEY DILLON:  I had a carefully drafted script,

21    and I lost it because we started in the middle of my

22    argument.  May I approach and enter before the Court with

23    a copy.

24         THE COURT:  You may.

25         ATTORNEY GREEN-CROSS:  If it's a copy of Defense

1     Exhibit 2 then again, there's no foundation.  I haven't

2     seen it before.

3          THE COURT:  I'll take it.  I won't necessarily make

4     it a part of the record --

5          ATTORNEY GREEN-CROSS:  That was a part of my request.

6          THE COURT:  If we're going to have a discussion about

7     it, I need to be able to see it.  Thank you.

8          ATTORNEY DILLON:  It's an original and one.

9          THE COURT:  All right.  Any way.  Your representation

10    is that you previously shared with me what happened in

11    your life, and in your life a reporter out of the blue

12    reached out to you and said hey, I heard that your client

13    is targed in the District Attorney's investigation?

14         ATTORNEY DILLON:  Yes, Your Honor.

15         THE COURT:  Well, the special Grand Jury's

16    investigation.  Okay.

17         ATTORNEY DILLON:  Three days later this same reporter

18    broke the story, and we won't publish that either.  It's

19    not an exhibit, and it's on the internet, and we believe

20    the Court -- we'd love to publish the story.

21         THE COURT:  You're free to do that, not through the

22    Court's zoom.

23         ATTORNEY DILLON:  Okay.  We'll hold off on that slide

24    for now, but I will represent to the Court three days

25    later this same reporter broke that everyone who signed on

1    the alternate slate of electors and had received a target
2    letter including Senator Jones.
3         THE COURT:  Assuming for a minute that is exactly how
4    that played out with you and Mr. Isokoff (sp.) where does
5    that get us actual conflict, apparent conflict -- I
6    understand where your client is very frustrated by that.
7    You suggest that, gosh, the only two people on the planet
8    who should know about it would be the District Attorney
9    and you.
10        Certainly, it's a whole lot more than that.  We know
11   the District Attorney alone didn't, in fact, write all
12   these letters by herself.  In fact, she didn't sign the
13   letters.  It's on the screen right now.  Mr. Wade did, so
14   the universe has just grown by 50%.  It's three people.
15        ATTORNEY DILLON:  Right.
16        THE COURT:  So somehow -- let me finish.  Somehow
17   word got out and the reporting universe knows about it
18   now, and it flows as an unwelcomed development for your
19   client.  Actual conflict, appearance for conflict.  I need
20   you to bend it back to what I need to work through, which
21   is should I take any remedial action to address an actual
22   conflict or the appearance of conflict, if I have the
23   authority, that's what we're working through and not the
24   trials and tribulations of Senator Jones because there was
25   a leak.  Unless you've got proof that it was Charlie
          HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        61

1    Bailey who leaked it, and then now we have --

2            ATTORNEY DILLON:  Yes, Your Honor.

3            THE COURT:  But we don't have that here.

4            ATTORNEY DILLON:  I do not have that.  No indication

5    that Mr. Bailey was involved.  All I know is that this

6    organization knew and I knew, and of course my client

7    knew, and then six days later this internet reporter

8    knows, and then shortly after that there's an AJC story

9    about it.  If we could I'd like to publish Exhibit 3,

10   which is a flyer for it.

11           THE COURT:  That's in your pleading.

12           ATTORNEY DILLON:  It is.

13           THE COURT:  You may -- it's already public record.

14   Let me make sure the State can look at it,  but if it's in

15   the pleading --

16           ATTORNEY GREEN-CROSS:  If it is what's in the

17   pleading then we don't have an objection to the

18   authenticity of it.

19           THE COURT:  Okay.

20           ATTORNEY DILLON:  May I approach, Your Honor.

21           THE COURT:  I've got it on my screen.  So we have

22   this fundraiser, and it's a blockbuster headlining Fani

23   Willis the District Attorney.  In fine print you can see

24   where Mr. Bailey is, in fact, a candidate there, the font

25   is so small that I have to squint to see what it says.

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                          62

1     This occurs about three weeks before the decision is made

2     to make my client target in this case.

3         The District Attorney, according to publicly

4     available records, which I have marked as Exhibit 4.   This

5     particular document, Your Honor is from the public

6     campaign finance website here in Georgia, so this is

7     publicly available data.   It shows during the day of and

8     during the day after this fundraiser $32,000 made to the

9     office of Mr. Bailey.   We submit is a direct result of

10    this fundraiser.   I'm told that the custom is, often

11    people show up with a check or they give their regrets and

12    sent a check the next day.   During this particular

13    month,Mr. Bailey raised over $270,000 dollars.

14        THE COURT:   So this was a particularly small

15    fundraiser for him?

16        ATTORNEY DILLON:   This might have been a particularly

17    big one.   This might have been the one that caused the

18    avalanche of checks to come in.

19        THE COURT:   Could be for all those people who are

20    checking the ethics website to see what the cash flow

21    looking like for the first couple of weeks were, so I'll

22    put my money behind it.

23        ATTORNEY DILLON:   This is the sort of headline

24    fundraiser that gets people to say, oh, we have a big

25    wheel.   We have somebody who is on the nightly news, as

1    this Court knows, who is pulling for Charlie Bailey.

2         THE COURT:  Okay.

3         ATTORNEY DILLON:  One candidate in the Lieutenant

4    Governor's office or the Lieutenant Governor's race gets a

5    headliner, the other one, three weeks later gets a target

6    letter -- quietly get's a target letter.  Now, there were

7    numerous news stories speculating about the existence of

8    target letters on or about the time of the Yahoo news

9    article, and there was a lot of buzz about that.

10        In fact, there was even an AJC story where DA Wilis

11   was quoted as saying that numerous attorneys had received

12   target letters on their behalf.  It didn't name Senator

13   Jones, fortunately.  In fact, it wasn't publicly known

14   that Senator Jones received a target letter until the DA

15   filed their brief two days ago.

16        They were the first people to acknowledge he was a

17   target for this Grand Jury.  We had never acknowledged

18   that.  It was a mere speculation in the press, but it's

19   that sort of thing that gives the DA the the ability to

20   benefit their friends and harm somebody who is under

21   investigation, and that is really what we're talking

22   about.

23        The cases that the DA's point to in their motion from

24   1916 and 1936 are talking about transactions where the

25   financial transactions were $150, and was that materially,

             HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        64

1    and while those are interesting cases, but once that $150

2    was material in the depression, we were talking about

3    $30,000 and we're talking about swaying an election, a

4    statewide election in Georgia, and that's a significant

5    thing.

6         This is not something that is being done by accident.

7    This is being done by design.  This fundraiser was pointed

8    at benefiting Senator Jones --

9         THE COURT:  Isn't that the purpose of the fundraiser.

10   I agree -- the point of -- the question is does the

11   District Attorney decision to support someone with whom

12   she is politically aligned, it surprises no one that they

13   are politically aligned.  Does that rise to the level of

14   creating -- an appearance of -- , and I've opined on that

15   a little bit an actual conflict, and I understand because

16   you can't climb into someone's mind.

17        You have to do a little of this through the

18   shadowboxing of, okay -- there is a fundraiser and all of

19   this money came in, and then  there was a target letter.

20   Do you have more of a connection of one who proceeded the

21   other?

22        ATTORNEY DILLON:  As far as a direct connection?

23        THE COURT:  Any connection.

24        ATTORNEY DILLON:  What is out there in the press,

25   what is out there in the ether.  A part of Senator Jones'

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        65

1    concern is that this report is going to come out in
2    October.  I'm glad to hear there's no October surprise,
3    but there's been this whole series of drips, this whole
4    series of leaks out of the Fulton County DA's office that
5    have tilted benefit towards Mr. Bailey.  It pointed to my
6    client as being a presumptive violator of the law, and
7    it's only because the DA has the authority to do that.
8         So if this Court were to determine that she has a
9    conflict, and this appearance is sufficient, and we go to
10   the Attorney General's office to appoint a new prosecutor
11   with regard to Senator Jones who could sit down with him
12   and say, Well, Senator Jones, we're interested in what
13   happened in December 2020, would you like to talk to us,
14   and just like we did on day one, with the DA's office?
15        Certainly, we would be glad to.  Do we have a target
16   letter from your office?  No, you do not, Senator Jones,
17   because we have useful information that would age your
18   investigation, because this is an investigation when it
19   was impaneled that was supposed to gather evidence to see
20   whether or not there was an effort to undermine democracy
21   in this country, and when Senator Jones said, I have a
22   subpoena here, I'm going to talk to these people we said,
23   fine.  We prepared our rates, but then we've got this
24   target letter and then everything changed, just like it
25   did for these 11 clients.

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        66

1           So then where initially they indicated where they

2     wanted to gather evidence, now it appears that what they

3     really wanted to do is gather publicity, and they slammed

4     the door on all 16 witnesses who signed the document by

5     giving them target letters, and then they announced that

6     they're all bad people, and in essence they're going to

7     recommend their charges in this report, if and when it

8     comes to you desk.

9           THE COURT:  So the DA's office doesn't write the

10    report, the Grand Jury does, just to repeat.  You

11    mentioned something about the District Attorney's office

12    leaking this and leaking that.  Supposition or evidence?

13          ATTORNEY DILLON:  I certainly don't know that the

14    District Attorney's office talked to Yahoo News, but I

15    know that I was the only other person holding a copy of

16    that target letter on that day, and there are numerous

17    daily stories in the AJC, to quote learned sources from

18    inside the investigation are the people who are conducting

19    this special Grand Jury.

20          THE COURT:  I'm focused on your client, and I'm

21    asking you to direct me to anything other than the

22    gentleman from Yahoo who said, I heard X about your client

23    being a target. has there been other outreach from the

24    media to you saying, I heard Y, I heard Z about Senator

25    Jones that you can source only to the District Attorney's

                 HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                              67

1    office as opposed to, hey, any witness who comes before

2    that Grand Jury is free to talk to the media afterwards if

3    he or she wants to.

4        ATTORNEY DILLON:  That's absolutely correct, and as

5    you know, that's how the Grand Jury work.

6        THE COURT:  Right.

7        ATTORNEY DILLON:  You're supposed to operate in

8    secrecy, which is what was anticipated when this was

9    founded, but the witnesses are free to go talk, and some

10    of the witnesses probably do talk, but certainly Senator

11    Jones had an interest in the public not knowing that

12    Fulton County considered him a target, so he did not talk;

13    we know that.

14        The leak of the existence of this target letter and

15    subpoena actually, violate the the (unintelligible) of

16    ethics that the District Attorney operates under, and one

17    of the things that we have with regard to Exhibit 5 is the

18    ethics training that the DA's office gives from their

19    general counsel, Mr. Robert Smith, who is the general

20    counsel for the Prosecuting Attorney's Counsel of Georgia,

21    and with permission of the Court I'd like to mark this as

22    Exhibit 5.

23        ATTORNEY GREEN-CROSS:  No objection, Your Honor.

24        ATTORNEY DILLON:  I think the District Attorney

25    offered me an affidavit from Mr. Smith earlier today, so I

1    think they rely on him as an expert in regard to ethics.

2         THE COURT:  Okay.

3         ATTORNEY DILLON:  And so at this time I would offer

4    Exhibit 5 into evidence and request to publish it.

5         THE COURT:  Sure.

6         ATTORNEY GREEN-CROSS:  Your Honor, I don't object to

7    the submission of the document -- I can't verify it's

8    authenticity.  If Mr. Dillon is representing to the Court

9    the source of this information, where he got it, that it's

10   accurate, true, and complete, and that's probably going to

11   take care of my objection.  I just can't look at it and

12   know that this is the presentation that Mr. Smith gave.

13        THE COURT:  Right.  It's too long for you to do that,

14   just in this setting.  Any reason we should be concerned

15   that this has been altered in any way, or is anything

16   other that what Mr. Smith presented to this District

17   Attorney, but presumably all District Attorneys and their

18   processes?

19        ATTORNEY DILLON:  My understanding is that this is

20   his presentation and he does it periodically and that he

21   would have done it during the time period that Ms. Willis

22   was the District Attorney here.

23        THE COURT:  Okay.

24        ATTORNEY GREEN-CROSS:  Can I ask for a representation

25   of where you obtained this copy?

                   HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          69

1          ATTORNEY DILLON:  This was pulled off of the
2     internet.
3          ATTORNEY GREEN-CROSS:  Did you pull it from off of
4     the internet?
5          ATTORNEY DILLON:  Yes, I did.
6          ATTORNEY GREEN-CROSS:  Okay.  Was it from the PAC
7     website?
8          ATTORNEY DILLON:  You have to have access to the PAC
9     website to get it.
10          ATTORNEY GREEN-CROSS:  And I'm wondering how you got
11     it.
12          ATTORNEY DILLON:  It's out there in the ethers.
13          THE COURT:  He got it from Yahoo.
14          ATTORNEY DILLON:  I got it from Yahoo.
15          ATTORNEY GREEN-CROSS:  I want to kind of thank you
16     for your candor.
17          ATTORNEY DILLON:  Would you like to present it to
18     your client?  She would have attended this training, and
19     see if it's complete?
20          ATTORNEY GREEN-CROSS:  I would like to preserve
21     publication of the document until I can ascertain whether
22     it is true, accurate, and complete, because I understand
23     that it has been sourced to the internet, and that is not
24     something that I can accept, this authentication.
25          THE COURT:  Okay, so it's admitted.  I'll take it,
            HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                    70

1    just don't put it on the screen.  I want us to keep moving

2    forward.

3         ATTORNEY DILLON:  Okay.  We won't put it on the

4    screen, but it does quote the rules of professional

5    responsibility in Georgia, and so, I think those rules are

6    relevant here, and the fact that the District Attorney's

7    members and the District Attorney herself receives

8    training on this on and gets reminded on a periodic basis

9    of what their responsibilities are for the prosecutors is

10   relevant.

11        THE COURT:  Okay.  So are you going to be reminding

12   her now by reading it?

13        ATTORNEY DILLON:  I would love to just read a few

14   snippets, if I may, Your Honor.

15        THE COURT:  If they are truly snippets.

16        ATTORNEY DILLON:  "The DA and Assistant DA's should

17   refrain from making extra judicial comments that have a

18   substantial likelihood of heightening public condemnation

19   of the accused."  That is rule 3.8.

20        THE COURT:  This relates to your theory that there

21   was a leak that wasn't necessary -- one, we don't know

22   there was a leak.  Two, the District Attorney herself who

23   is the focus of your concern because of the political

24   support she has from someone with whom she is politically

25   aligned, that she somehow has been behind the leak that, I

               HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              71

1    guess would have been behind the leak that your client is

2    a target, but there is no evidence of that.

3         ATTORNEY DILLON:  There was no evidence that my

4    client was a client was a target until two days ago when

5    they said it in their reply brief, Your Honor.

6         THE COURT:  Okay.

7         ATTORNEY DILLON:  And that was not inadvertent.  That

8    came directly from the mouth of the District Attorney's

9    office, and so we're not talking merely about this runoff.

10   We're talking about the fact that it is publicly confirmed

11   that Senator Jones is a target of this Grand Jury.

12        THE COURT:  Okay.

13        ATTORNEY DILLON:  Irrefutably.

14        THE COURT:  So your focus is not on a theory that

15   would have got out but the confirmation, if you will, in

16   Ms. Cross's response to your response in your motion to

17   disqualify?

18        ATTORNEY DILLON:  Yes, Your Honor.

19        THE COURT:  Okay.  I'll let her talk about that.

20        ATTORNEY DILLON:  Yes, I understand.  That brings us

21   to the juncture that you pointed out where we began, which

22   is on one side, we have this headliner and they raised

23   $32,000, and on the other side we have this target letter

24   that they publicly disclosed, and we have these series of

25   leaks to the press, and this is an effort to sway the

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              72

1      outcome of the election for Lieutenant Governor in this

2      case.  It really has nothing to do with whether or not

3      they ultimately indict Senator Jones or the other group of

4      11, or anybody in this case, because once the publicity

5      machine has done it's business, the friends of the

6      District Attorney have won, and so that is really why

7      we're here, and so you ask, is there a real conflict here?

8      It couldn't be more.

9           THE COURT:  Okay.  Short of disqualification, what do

10     you view as a remedy?  If I conclude that something needs

11     to be done, and I have the authority to do it, but I don't

12     think that it's practical or appropriate to say that the

13     entire District Attorney apparatus for Fulton County has

14     to unplug from any investigation, questioning of,

15     exploration of your client's connection to the

16     interference of the 2020 general election.

17          What do you see as an intermediate -- one would be

18     for me to say there is an apparent conflict, but I can't

19     do anything about that, because I can only handle actual

20     conflicts.  Another would be to say either it's an actual

21     conflict, and I'm going to so something, or I'm going to

22     go out on a limb and do something even though it's only an

23     apparent conflict.

24          So if I'm going to do something, but it's not

25     disqualify the whole office, what is your second most

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                            73

1    preferable outcome?

2         ATTORNEY DILLON:  Well, as the Court is aware, there

3    are not numerous special Grand Juries of this magnitude to

4    point to for precedent, so what we suggest in our brief is

5    that the statutory provision  that requires, once there's

6    a conflict made apparent, that it be referred to Attorney

7    General Carr's office and he find someone to conduct that

8    portion of that here independent of this special Grand

9    Jury, and it can be as simple as finding a District

10   Attorney that doesn't have to find a good solid democratic

11   District Attorney somewhere who doesn't have a conflict

12   and give him the authority to pursue Senator Jones' issue

13   in this, and we would be glad to sit down with him.

14        We would be glad to sit down with you.  We would be

15   glad to approach this with the same willingness to say

16   let's get to the bottom of this issue and whether or not

17   there was a conspiracy to undermine democracy in this

18   country because that is an important issue, and let's put

19   the media circus behind us.  So let's answer the questions

20   and forget it affecting this election for Lieutenant

21   Governor, because there's no way she can keep a hand in

22   it.

23        THE COURT:  She being the District Attorney?

24        ATTORNEY DILLON:  She being the District Attorney.

25   Forgive me, Your Honor, and not affect the outcome of this

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

74

1    election for Lieutenant Governor.

2         THE COURT:   So if Attorney General Carr selected

3    fictional District Attorney X who had also given $2,000 to

4    Charlie Bailey's campaign for Lieutenant Governor --

5         ATTORNEY DILLON:   It would not be a problem at all.

6    It's an ordinary contribution, and it's exactly what

7    counsel points to.   Now, if they had hosted a fundraiser

8    during the time period that they were investigating

9    Senator Jones, I might have to go to that judge and talk

10   about that fundraiser.

11        THE COURT:   What if that District Attorney had

12   already hosted -- the District Attorney is not involved in

13   that investigation.   She hosted a fundraiser two weeks

14   ago, $50 grand or even more money than DA Willis, but it's

15   done.   It's over and done with, and I'm not going to do

16   anymore fundraisers from here on out, because now I've

17   been tasked with seeing what connection, if any, Senator

18   Jones had to what was going on in November and December.

19        ATTORNEY DILLON:   If every District Attorney in the

20   whole state had hosted a fundraiser for Mr. Bailey then

21   that issue might be apparent, but I suspect, giving the

22   list of good democratic District Attorneys in this state

23   that we can find somebody who doesn't have a conflict and

24   hasn't hosted a fundraiser for either one, because

25   certainly, if somebody that hosted a fundraiser for

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                              75

1    Senator Jones, the Attorney General shouldn't nominate

2    that person either.  Find somebody who doesn't have a dog

3    in the hunt.  Fani Willis has a dog in this hunt.

4         THE COURT:  Got it.  Thank you, sir.

5         ATTORNEY DILLON:  Thank you, Your Honor.  Oh, can we

6    offer into evidence Exhibits now.

7         ATTORNEY GREEN-CROSS:  Actually, I was going to ask

8    to leave it up.

9         THE COURT:  Leave it up?  Okay, don't take it down?

10   Too late.  Thank you, Ms. Clapp.

11        ATTORNEY DILLON:  Can we offer into evidence 1-5?

12        THE COURT:  If there's no objection, 1-5.  Was 5 the

13   one where the province was the internet?

14        ATTORNEY GREEN-CROSS:  Yes.  I was going to object to

15   the authenticity.  I believe the foundation has been shown

16   for Exhibit NO. 5, we entered it into evidence so I didn't

17   object to the Court reviewing it, but I do object to it

18   being tendered and admitted.

19        THE COURT:  Why don't we do this?  I will take 1-5,

20   and then I will give Mr. Dillon to maybe shore up his

21   sourcing of it, and if, in fact, it is pretty clear that

22   Smith was the name of -- Mr. Smith's presentation then

23   I'll add to 5 the other 4.  I'll hold on to it, but it

24   won't become part of the record until either Ms. Cross you

25   agree to talk to Mr. Dillon a little bit more and we see

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          76

1  the source, or we're substituting to you -- someone can

2  get it off the PACK site.

3    ATTORNEY GREEN-CROSS:  I do want to raise objections

4  to some of the others, but if they're being tendered now

5  into evidence, Exihibit 1, the letter, I don't have any

6  objection to that.

7    THE COURT:  Okay, 1 is admitted.

8    ATTORNEY GREEN-CROSS:  Exhibit No. 2 is the e-mail

9  that I do have an objection to that being tendered and

10  accepted into evidence without any providence of it.  I do

11  also object to the relevance of it.  There's nothing in

12  this e-mail that sources any information to the District

13  Attorney's office insofar as this being offered to show

14  that the leaks are coming from this side of the table.  I

15  object to the relevance of that, and I don't think it

16  shows that, and I object to the admission of it into

17  evidence.

18    THE COURT:  Okay.

19    ATTORNEY GREEN-CROSS:  No. 3 is the fundraiser flyer

20  that is up on the screen now, and we don't have any

21  objection to that being tendered and admitted into

22  evidence.  Exhibit No. 4.  Again, I have an objection to

23  the relevance of this.  I don't think it shows what, at

24  least what's been argued.  It's been identified and

25  offered for the purpose of establishing how much money was

1    raised at the fundraiser, but what the actual document is

2    or appears to be, based on Mr. Dillon's representation,

3    and I don't have any reason to doubt it.

4        This is publicly available about how much money was

5    donated to mr. Bailey campaign during a 2-day period in

6    this document to the fundraiser, and while w  I don't

7    think that is going, and because of that I don't think

8    that we have an objection to the ruling.

9        THE COURT:  Okay, and then 5 is being conditionally

10   admitted, provisionally admitted.  I'm assuming you can

11   clear up the source.

12       ATTORNEY GREEN-CROSS:  Yes, sir.

13       THE COURT:  All right.  Anything you want to add, Mr.

14   Dillon?

15       ATTORNEY DILLON:  No, Your Honor.

16       THE COURT:  All right.  I will admit Exhibits 1 and

17   3, and then 5 will be provisionally admitted.  We'll see

18   if the loose ends can be tied up there.  Last question,

19   Mr. Dillon, and I'll let you sit down.  Beyond the Young

20   case, is there a case or are there cases you want me to

21   look at that stand for the proposition that the appearance

22   of a conflict could be sufficient for a Judge to take any

23   of the forms of remedial action that you are seeking?

24       ATTORNEY DILLON:  Your Honor, I rely on the Davenport

25   case, and that is a Georgia case.

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

78

1       THE COURT:  I don't see it in here.  You're free to

2   rely on it.  It didn't manage to make it's way into your

3   motion.

4       ATTORNEY GREEN-CROSS:  It was in mine.  It's on page

5   4.

6       THE COURT:  You guys share very well when it comes to

7   cases.

8       ATTORNEY GREEN-CROSS:  The Cite is 170 -- I'm' sorry,

9   it's 157 Georgia Appeals 704, if that's the case you're

10  referring to.

11      THE COURT:  Okay.  Do you agree, Ms. Cross, that that

12  discusses the Davenport actual vs. apparent conflicts.

13      ATTORNEY GREEN-CROSS:  I didn't cite it for that

14  proposition, and that's not my recollection of discussion

15  in the case.

16      THE COURT:  Okay.  I'll look at it anyway.

17      ATTORNEY GREEN-CROSS:  Yes, but don't -- yes.

18      ATTORNEY DILLON:  Your Honor, I never did get clarity

19  on the basis for the objection to Exhibit 2, other than

20  she objected to it.

21      THE COURT:  Relevance was one, and I think it was

22  foundation, although, the recipient, Mr. Dillon, I think

23  he could authenticate it as receiving it, but I'm not sure

24  the relevance you suppose that Mr. Isokoff(sp.) theorized

25  what he did because the District Attorney's office let him

            HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        79

1     know about it, as opposed to the witness from the Grand

2     Jury or the grand juror.

3         I don't know who's in the circle of discussing who is

4     going to be a target or not, but you've made your point.

5     I'm just not going to make it part of the record.

6         ATTORNEY DILLON:  Okay, and with regard to Exhibit 4,

7     the financial fundraising report.  We offer that as to Mr.

8     Bailey's take over the two days, the day of the fundraiser

9     and the day after, and we submit that it is relevant.

10        THE COURT:  Okay.  I thought it showed his take for

11    the whole month.

12        ATTORNEY DILLON:  No, no, no, no.  It's just a 2-day

13    period.

14        THE COURT:  It is before and after the 14th?

15        ATTORNEY DILLON:  It is the day of the 14th and the

16    day after.

17        THE COURT:  And it is publicly available?

18        ATTORNEY DILLON:  Yes, it is, Your Honor.

19        THE COURT:  All right.  I'll admit it.

20        ATTORNEY DILLON:  That was Exhibit 4.

21        THE COURT:  Yes.

22        ATTORNEY DILLON:  May I offer a copy to the Court;

23    I'm not sure I did that, Your Honor.

24        THE COURT:  What you want to make sure is that the

25    court reporter, ultimately, has them.  I've got number 2

          HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                    ·80

1    of -- here when we're done will do that.  Just make sure

2    before you go that our court reporter has 1, 3, and 4, and

3    5 you're going to hold on to until you and Ms. Cross can

4    work out if you we're able to put more to the story to

5    that.

6          ATTORNEY DILLON:  Yes, Your Honor.

7          THE COURT:  Ms. Cross, your closing thoughts about

8    disqualification.

9          ATTORNEY GREEN-CROSS:  Very brief ones.  Your Honor,

10   we're taking a look now at what has been admitted as Mr.

11   Jones, Exhibit 3.  You'll notice that Mr. Jones is not Mr.

12   Bailey's opponent at this point in the Lieutenant

13   Governor's race.

14          If anybody's got a problem, or was the opponent of

15   Mr. Bailey at that time was Mr. Kwanzaa Hall because at

16   this point, Mr. Bailey was in a run off election, and he

17   was very clearly identified as District Attorney Willis

18   raising money for Mr. Bailey in the runoff fundraiser.

19          THE COURT:  It's the largest font on the page.  Even

20   larger than the District Attorney's name.

21          ATTORNEY GREEN-CROSS:  I understand, insofar, as

22   we're talking about appearances.  I think that shifts the

23   focus a little bit.  The District Attorney isn't raising

24   money for the opponent of Senator Jones in giving this

25   fund raiser, this is prior to Mr. Bailey becoming the

                    HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              81

1   actual Lieutenant Governor nominee for his party, so I

2   want to make that as clear as it can be.

3          THE COURT:  When was the runoff election?

4          ATTORNEY GREEN-CROSS:  Sometime after June.

5          THE COURT:  Good.

6          ATTORNEY GREEN-CROSS:  Someone with easier access to

7   google might be able to -- the last week of June.

8          THE COURT:  Late June?

9          ATTORNEY GREEN-CROSS:  Late June.

10         THE COURT:  All right.  Got it.

11         ATTORNEY GREEN-CROSS:  Mr. Smith is going to be so

12  pleased, because he gets another mention.  I shared with

13  Mr. Dillon an affidavit from Mr. Smith, who is actually

14  general counsel of the prosecuting of Georgia.  May I

15  approach, Your Honor?

16         THE COURT:  Yes.

17         ATTORNEY GREEN-CROSS:  I've got an original for the

18  court reporter, but I'll hold onto that until it's  been

19  tendered and amended.  This is an affidavit, thank you,

20  that I shred with Mr. Dillon not long before the hearing

21  identifying that Mr. Smith is someone who deals with

22  conflict.  He routinely advises District Attorney's as far

23  as general and other entities to the inquiry about the

24  legal requirements and that's the legal conflict for

25  individuals, prosecuting attorneys.

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          82

1            He's reviewed the motion, he's reviewed the response,

2       the motion of Senator Jones, including the runoff

3       fundraiser flyer that we're still looking at, and he

4       determined, in fact, in his opinion that it does not a

5       legal requirement.

6            I'm not suggesting that Mr. Smith's opinion

7       (undecipherable) the Court's, but insofar as the

8       individual who routinely advises district attorneys about

9       these matters, this is the individual who is saying that

10      there is not an actual conflict.  There is also language

11      in their indicating, of course, that he does advise that

12      an actual conflict is required, as opposed to the

13      appearance of one, so we ask that State's Exhibit No. 1 be

14      admitted.

15           THE COURT:  Any objection to State's 1 being

16      admitted, assuming Jones 5 ultimately get's admitted?

17           ATTORNEY DILLON:  Yes, Your Honor.  I'm going to

18      object, subject to Jones 5 being admitted along with this.

19           THE COURT:  Okay.

20           ATTORNEY DILLON:  I have no reason to doubt the

21      authenticity of this, but Mr. Smith also trains them on an

22      ethical (unintelligible) and so we could be back here next

23      week with a motion for prosecutorial misconduct, which I

24      won't define, but the ethical rules also apply to the

25      District Attorney's office, and in the presentation that I

               HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              83

1    provided the Court, he lays out exactly the rules that DA

2    Willis' office has violated.

3         THE COURT:  Okay.  Sort out Exhibit 5 soon, so I can

4    put that alarm on it.  I'm going to admit DA 1 or State's

5    1, but I'd love to see 5.  It seems like it ought to come

6    in.  I understand the State's concern.

7         ATTORNEY GREEN-CROSS:  I think we can work that out.

8    There comes a time when the Court considers Senator Jones'

9    offer of Exhibit No. 5, Mr. Smith's presentation.  I

10   believe at least the excerpt that Mr. Dillon read this

11   afternoon was a concern or admonishment, or flagging the

12   extra judicial statements of the District Attorney or

13   prosecuting entity.

14        You've heard no evidence this afternoon or to my

15   knowledge in the record anywhere that there has been any

16   extra judicial statement from the District Attorney's

17   office about Mr. Jones officer that has played a part in

18   this.

19        Insofar as the objection this afternoon came to the

20   identification, apparently, for the first time officially,

21   that Senator Jones has received a target letter, of course

22   that was in direct response in the motion to disqualify

23   that was file by Senator Jones on Friday.  They raised in

24   that motion equal protection and due process claims.  They

25   reference constitutional protections of the Federal and

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                            84

1    State Constitution, and they are essentially saying, hey,

2    look what you're doing.  You're investigating me, and

3    you're doing that only because I am a political opponent

4    of someone you like.

5        That is our whole point to you, that is the whole

6    thrust of this.  Friends get rewarded and enemies get

7    punished.  The fact of the matter is, and what the

8    District Attorneys represented in that was, no, You're

9    just like everybody else.  You're treated exactly like

10   everybody else, similarly situated to you, received the

11   same treatment and you can't show otherwise, and for that

12   reason the legal standard hasn't been met, so I wanted to

13   clear that up too.

14       Otherwise, I'm happy to address any concern or

15   comment further from the Court that I think the motion --

16   the burden hasn't been satisfied.  It is not a legal

17   conflict here and the motion should be denied after I

18   consult very briefly with my table.

19       THE COURT:  Please consult.  Can we take the screen

20   share down now?

21       ATTORNEY GREEN-CROSS:  Yes, and apparently we can

22   withdraw our objection to Exhibit 5.

23       THE COURT:  Great.

24       ATTORNEY GREEN-CROSS:  There's no need to go forward.

25       THE COURT:  Great.  So before you leave, Mr. Dillon,

         HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          85

```
 1    make sure a copy gets to our court reporter, but I'd like
 2    a copy of 5 as well.
 3        ATTORNEY GREEN-CROSS:  I'm handing up the original of
 4    the affidavit of Mr. Smith.
 5        THE COURT:  Thanks.  Mr. Dillon?
 6        ATTORNEY DILLON:  Very briefly, Judge.  Regarding to
 7    the last point raised by the State.
 8        THE COURT:  Which was?
 9        ATTORNEY DILLON:  That it is perfectly okay to out
10    the target letter status of Senator Jones in their
11    pleading.
12        THE COURT:  I didn't hear that it was perfectly
13    okay.  It was an explanation for --- the hand was forced,
14    and because an argument was made or treated differently.
15    I didn't hear that it was perfectly okay.  I heard that it
16    was a justification.  You don't think it's justified
17    because?
18        ATTORNEY DILLON:  I think they could have made that
19    argument under (unintelligible) and not further the
20    appearance that they're favoring Mr. Bailey in trying to
21    do what?  Hold my client up to public ridicule and
22    increase his shame, and do the things that Mr. Smith's
23    presentation says they should never do.
24        THE COURT:  Ms. Pearson, was there anything you
25    wanted to add.  Your motion with Ms. Deborrough, the
            HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        86
```

1    motion to quash and disqualify.  I mean your focus was
2    quashal, and I get that, but you adopted Mr. Dillon and
3    Ms. Clapp's motion.
4         You've shared with me that Mr. Still is a political
5    candidate.  I appreciate that Mr. Shaeffer is politically
6    prominent in the Republican party and you said that all of
7    your client's are active in one way or another.  What's
8    the disqualification argument?  They seem to be not in the
9    same category as Mr. Dillon's client.
10        ATTORNEY PEARSON:  Your Honor, I would agree that
11   Senator Jones has the most direct conflict.  In our view
12   not to ask for more relief than the senator himself has
13   asked for, in our view that remedy is not sufficient to
14   address that conflict, and the conflict is exacerbated --
15   the evidence, by the politicization of our client's cases
16   and our client's processes.
17        THE COURT:  Again, I'll have to have you explain what
18   you mean by politicization, given that it was your
19   client's were doing?  What is politicization their
20   politicizing their activity, their political choices,
21   their connection to a political -- what's politicization
22   about it. other than talking about that which is
23   inherently political; I'm not following.
24        ATTORNEY PEARSON:  I think it's a great distinction,
25   Your Honor.  We're not talking about -- although we're
                 HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                          87

1    talking about political things, we're talking about
2    political motivation by one party against another party,
3    and to actions taken in one uniform direction against
4    republican candidates, prominent republican actors --
5         THE COURT:  Was there a third group of alternate
6    democrat electors in case the democrat electors -- I'm not
7    aware that another group that the special purpose Grand
8    Jury should be investigating in connection with Republican
9    efforts to create republican alternate electors and to
10   challenge the outcome that, at that time, and continues to
11   show that a democrat won.  I was going to press Ms. Cross,
12   but she didn't go there about partisan, because partisan
13   has lots of meanings.
14        I don't think that partisan, the case that she cited
15   was democrat and republican, it was I'm partisan because
16   I'm trying to get this guy prosecuted.  I have a stake in
17   the outcome of this prosecution.  That is not where her
18   argument went today, but everything about this is
19   inherently political, because two political parties
20   collided, someone appears who have won, and folks who
21   appear to have lost didn't like that outcome and said
22   appearances can be deceiving and took some steps, and the
23   question is where those steps legal, and that's the
24   purpose of this special purpose Grand Jury is
25   investigating, so it seems to me utterly unremarkable that

HADASSAH J. DAVID, OFFICIAL COURT REPORTER
88

1   your clients are all republicans.  What would be

2   remarkable is if they weren't.  What's the politicization

3   because I don't want to miss it if there's a reason to be

4   concerned, but you're not asking, I'd hope for, we have to

5   have a Republican District Attorney investigate this

6   because that's the only way it will be fair.

7       ATTORNEY PEARSON:  No, not at all, Your Honor.  I

8   think the process, well, I know Mr. Dillon's motion is

9   that the Attorney General would be allowed to designate

10  the replacement, and so we think that should be done,

11  because I think the appearance of impropriety with Senator

12  Jones taints the entirety as office of the entire

13  investigation, not just with regard to him as the remedy

14  for what I'm trying to say, but you are correct that our

15  focus was quashal, and that we are joining in that motion

16  as an add on.

17      I would also say, Your Honor, that just on behalf of

18  my clients, you asked if there is another slate that they

19  should be investigating, and I would argue under the

20  authorities that I put in our motion to the extent we were

21  contingent electors, and so were the democrats, because

22  there was a pending judicial challenge that made it joint.

23      And so, yes.  The answer to your question is that

24  both electors were contingent about time contingent on the

25  judicial outcome which never came.

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

89

```
 1          THE COURT:  Okay.  I appreciate that perspective, but
 2     you did say you are seeking -- I'm paraphrasing you, more
 3     relief or greater relief than Mr. Dillon was seeking, but
 4     then I thought you ended it by saying we want what Mr.
 5     Dillon recommended, which is push for his client, Senator
 6     Jones situation to the Attorney General, and let the
 7     Attorney General decide should I, the Attorney General,
 8     find another District Attorney in her office to see if it
 9     bares having a conversation with Senator Jones, or
10     investigating, or sending a letter, whatever they choose
11     to do.  What's the difference between that and what you
12     think I ought to do in terms of disqualification and your
13     clients?
14          ATTORNEY PEARSON:  Your Honor, I think the
15     disqualification, if there is one, it is disqualification
16     to the entire investigation, and the disease cannot be
17     cabin to Senator Jones alone --
18          THE COURT:  Okay.
19          ATTORNEY PEARSON:  -- because it's still the special
20     Grand Jury being advised by this District Attorney, and
21     the report would still be advised by this District
22     Attorney, and so we don't believe that's a sufficient
23     cure, and that if there's a disqualification, it should be
24     from the entire investigation and not just from Senator
25     Jones.
```

1        THE COURT:  I follow that, and I thank you so much.

2        ATTORNEY DILLON:  Just as a suggestion, Judge, and my

3    learned counsel points to my own brief at page 6.   The

4    Magloclin(sp.) case, Magloclin v. Payne indicates that

5    where the elected District Attorney is totally

6    disqualified from the case, everybody in the office is.

7    Here the special grand jury has two focuses.

8        One, the focus of the call between the president and

9    the Secretary of State's office, and perhaps other

10   officials that related to finding the votes.  That's one

11   aspect of it, and then there's the other aspect of it that

12   could be carved off and sent to Mr. Carr's office to say,

13   let's find a new District Attorney who doesn't have a dog

14   in this hunt and do an investigation, do a proper

15   investigation.

16       They can still have this other aspect of it, but a

17   new District Attorney could come in and look at the

18   evidence.

19       THE COURT:  So without agreeing that there are only

20   two aspects to what the special purpose Grand Jury is

21   investigating, your creative idea is if I determine that

22   there is going to be disqualification, it could be not as

23   to individuals, but as to subject matter, and so this

24   question of an alternate slate of electors, if that is

25   something that needs to be further investigated, create a

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              91

1   separate entity to do that, that's not supervised by this

2   District Attorney?

3        ATTORNEY DILLON:  That's correct, Your Honor.

4        THE COURT:  Okay, thank you.  All right.  I think

5   we've covered everything, but let me find out from Ms.

6   Cross, Mr. Wade, Mr. Wakeford.  Anything else from the

7   District Attorney's office?

8        ADA WADE:  Nothing, Judge.  Thank you.

9        THE COURT:  Okay.  Mr. Dillon or Ms. Clapp, anything

10   further from Senator Jone's legal team?

11        ATTORNEY DILLON:  No, Your Honor.

12        THE COURT:  Ms. Pearson, Ms. Deborrough, anything

13   else from your clients?

14        ATTORNEY PEARSON:  No, Your Honor.  Thank You.

15        THE COURT:  All right.  So we're clear, some things

16   I'll need to memorialize in writing.  I am not quashing

17   the subpoenas.  I'm repeating myself, but I will be

18   issuing an order, a written order on the question of

19   disqualification, and it will address, not just Mr.

20   Dillon's client, bur Ms. Pearson and Ms. Deboroughs'

21   clients as well.

22        I'll probably put in there a little bit about the

23   timing of the issuance of the report, but I want to make

24   it clear now in front of everyone what I've heard from the

25   District Attorney's office as well, there is no plan for a

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                           92

1    date right now anyway.  It's not available.  If the way

2    the investigation flows, insofar as it stays with this

3    District Attorney's office and the special purpose Grand

4    Jury, that Grand Jury disgorges it's final report

5    somewhere near the election, it will not be published and

6    released until after the election.

7        I'll put that in writing as well, because from my

8    brief conversation with the grand jurors, just to check in

9    on their health and well being, they don't have that light

10    at the end of the tunnel, but things could change, and if

11    suddenly their work is done I will make sure that there is

12    a meaningful time buffer between release and election, and

13    it may well be that we need to publish the plan --- if it's

14    going to be released.  If the report is going to be

15    released before the election we make sure when that

16    elected date is, so that if people have concerns or

17    objections we could file those and we could air that out

18    before the release.

19        I'd be shocked if there is a report before then.  I'm

20    trying to prime interim report just for me from them on

21    how things are going.  I don't know at all how they do

22    that, so we'll see how that goes.  I appreciate everyone's

23    time, so with that you are all free to go.

24        (This matter has been adjourned.)

25

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

93

1                              Certificate

2

3

4    STATE OF GEORGIA)

5    COUNTY OF FULTON)

6

7

8    I, Hadassah J. David, official court reporter in and for the

9    state of Georgia, do hereby certify that I did report and take

10   down the foregoing pages on the 21th day of July 2022, that it

11   is a true, accurate, and complete transcript of the proceedings

12   transcribed herein to the best of my skill and ability.  I

13   further certify that the transcript is in conformity with the

14   judicial counsel of georgia and the georgia board of court

15   reporting.  I hereby witness my hand and official seal this

16   15th day of August 2022.

17

18

19

20

21                    /S/ HADASSAH J. DAVID, CCR

22         _____

23         HADASSAH J. DAVID, OFFICIAL COURT REPORTER

24                  #4857-8554-6837-1968

25             FULTON COUNTY SUPERIOR COURT

           HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          94

**ADA GREEN:** [1]  51/7

**ADA WADE:** [15]  4/6
15/16 15/25 16/7 22/16
23/3 23/18 24/4 24/17
24/25 25/12 25/17 26/2
38/9 92/7

**ADA WAKEFORD:** [14]
12/4 12/9 13/18 14/19 15/2
29/15 30/25 31/5 31/9
31/14 31/16 34/12 34/17
36/10

**ATTORNEY CLAPP:** [1]
4/22

**ATTORNEY DILLON:**
[93]  4/15 4/18 5/13 5/21
5/25 7/1 7/3 7/12 9/17
10/22 29/20 29/23 30/8
30/16 30/18 32/1 32/16
32/20 32/23 33/7 36/20
44/2 54/6 54/13 54/16
54/22 54/25 55/15 55/22
55/25 56/2 57/18 58/7
59/11 59/19 60/7 60/13
60/16 60/22 61/14 62/1
62/3 62/11 62/19 63/15
63/22 64/2 65/21 65/23
67/3 68/3 68/6 68/23 69/2
69/18 69/25 70/4 70/7
70/11 70/13 70/16 71/2
71/12 71/15 72/2 72/6
72/12 72/17 72/19 74/1
74/23 75/4 75/18 76/4
76/10 78/14 78/23 79/17
80/5 80/11 80/14 80/17
80/19 80/21 81/5 83/16
83/19 86/5 86/8 86/17 91/1
92/2 92/10

**ATTORNEY
GREEN-CROSS:** [53]  4/1
4/11 42/17 44/4 44/7 44/19
44/22 45/1 45/14 47/5 49/2
49/23 50/2 50/9 50/13 51/1
52/7 52/25 53/5 59/3 59/5

59/24 60/4 62/15 68/22
69/5 69/23 70/2 70/5 70/9
70/14 70/19 76/6 76/13
77/2 77/7 77/18 78/11 79/3
79/7 79/12 79/16 81/8
81/20 82/3 82/5 82/8 82/10
82/16 84/6 85/20 85/23
86/2

**ATTORNEY PEARSON:**
[26]  5/4 5/7 17/21 18/7
18/12 18/24 20/21 21/21
26/3 26/6 27/16 28/5 29/1
33/10 33/13 36/17 37/2
40/4 41/7 41/24 87/9 87/23
89/6 90/13 90/18 92/13

**THE COURT:** [189]

**$**

$150 [2]  64/25 65/1
$2,000 [2]  43/20 75/3
$270,000 [1]  63/13
$30,000 [1]  65/3
$32,000 [5]  9/23 10/5 57/9
63/8 72/23
$50 [1]  75/14

**/**

/S [1]  94/21

**0**

000024 [1]  2/3
00024 [2]  1/6 1/8

**1**

1-5 [3]  76/11 76/12 76/19
10 [1]  17/9
100 [1]  29/25
10:00 p.m [1]  41/20
11 [22]  2/11 4/25 11/21
13/5 13/20 14/15 18/5
18/13 20/5 23/10 23/24
26/20 27/2 36/15 37/1 37/1
40/8 41/15 50/7 50/13
66/25 73/4
112 [1]  23/13
12 [6]  14/16 14/17 15/12

15/16 16/7 38/4
12th [1]  58/23
14th [3]  53/8 80/14 80/15
15 [2]  33/1 33/3
15-12-100 [1]  29/25
157 [1]  79/9
15th [1]  94/16
16 [2]  58/14 67/4
170 [1]  79/8
1916 [1]  64/24
1936 [1]  64/24
1968 [2]  1/22 94/24

**2**

2-day [2]  78/5 80/12
2015 [1]  51/3
2020 [3]  15/15 66/13 73/16
2022 [3]  1/12 94/10 94/16
2022-Ex-000024 [1]  2/3
2022-EX-00024 [2]  1/6 1/8
21st of [1]  2/4
21th [1]  94/10
22 [8]  2/23 3/1 3/2 3/3 3/5
3/9 3/10 3/14
24 [2]  3/2 3/8
241 [1]  51/2
25 [1]  1/12
26th [1]  37/4
27th [1]  37/4
28th [1]  37/4
298 [1]  51/2
2:00 [1]  2/4

**3**

3.8 [1]  71/19
30303 [1]  1/12

**4**

4857 [1]  1/22
4857-8554-6837-1968 [1]
94/24

**5**

50 [2]  16/1 61/14
5th [1]  53/9

**6**

6th [3]  53/9 58/18 58/22

**7**

704 [1]  79/9

**8**

8554 [1]  1/22

**9**

99 percent [1]  11/24

**A**

a.m [1]  41/19
ability [7]  12/15 14/2 14/10
26/15 32/12 64/19 94/12
able [12]  2/18 2/25 13/16
14/8 16/2 17/2 28/18 45/8
54/11 60/7 81/4 82/7
about [85]  2/4 4/5 6/4 8/24
9/1 11/11 11/14 13/13
15/14 15/16 15/20 16/25
17/3 19/16 20/2 22/1 22/2
23/11 24/4 25/25 26/5
26/11 29/18 33/24 34/18
34/23 34/25 36/3 37/23
38/16 38/21 39/4 40/20
41/17 42/2 42/5 42/7 42/10
43/15 43/16 47/4 48/23
52/10 53/2 53/21 57/16
57/16 58/1 59/1 60/6 61/8
61/17 62/9 63/1 64/7 64/8
64/9 64/22 64/24 65/2 65/3
67/11 67/22 67/24 72/9
72/10 72/19 73/19 75/10
78/4 80/1 81/7 81/22 82/23
83/8 84/17 87/22 87/22
87/25 88/1 88/1 88/12
88/18 89/24 92/22
absence [1]  19/21
absolute [1]  47/17
absolutely [2]  54/23 68/4
abuses [1]  26/10
accept [1]  70/24
accepted [1]  77/10

accepting [1]  47/6
access [2]  70/8 82/6
accident [1]  65/6
accommodate [2]  36/7
39/3
accommodations [1]  36/6
according [1]  63/3
accurate [4]  49/25 69/10
70/22 94/11
accurately [1]  26/8
accused [1]  71/19
acknowledge [2]  6/2 64/16
acknowledged [1]  64/17
action [5]  47/17 49/7 53/22
61/21 78/23
actions [1]  88/3
active [1]  87/7
actively [1]  20/19
activity [1]  87/20
actors [1]  88/4
actual [30]  8/3 43/1 43/2
43/8 43/9 44/15 45/4 45/7
45/17 46/5 46/19 51/24
52/4 53/22 53/23 54/5
55/14 57/22 59/17 61/5
61/19 61/21 65/15 73/19
73/20 78/1 79/12 82/1
83/10 83/12
actually [11]  5/23 16/17
19/18 25/7 28/22 33/2
33/14 35/7 68/15 76/7
82/13
ADA [2]  1/15 1/16
adaptation [1]  8/3
add [9]  21/21 21/23 22/14
22/16 36/13 76/23 78/13
86/25 89/16
addition [1]  20/23
address [8]  2/18 29/16
34/13 38/22 61/21 85/14
87/14 92/19
adjourned [1]  93/24
admission [1]  77/16
admit [3]  78/16 80/19 84/4

admitted [12]  70/25 76/18
77/7 77/21 78/10 78/10
78/17 81/10 83/14 83/16
83/16 83/18
admonishment [1]  84/11
adopted [1]  87/2
adoption [1]  2/10
advance [8]  3/3 3/8 23/24
24/3 39/12 40/13 40/16
41/11
advantage [1]  35/19
adverse [1]  32/13
advise [1]  83/11
advised [3]  58/21 90/20
90/21
adviser [4]  8/2 47/3 47/23
48/7
advises [2]  82/22 83/8
advocated [1]  47/11
affairs [1]  18/20
affect [3]  53/16 57/25
74/25
affected [3]  7/14 20/6 34/6
affecting [1]  74/20
affidavit [5]  51/21 68/25
82/13 82/19 86/4
affiliated [1]  3/25
affiliations [2]  50/22 52/2
after [15]  9/25 10/18 35/2
35/11 37/8 52/25 58/24
62/8 63/8 80/9 80/14 80/16
82/4 85/17 93/6
afternoon [8]  2/2 2/5 4/2
4/7 4/16 84/11 84/14 84/19
afterwards [1]  68/2
again [6]  20/20 36/8 54/3
60/1 77/22 87/17
against [6]  12/14 21/12
22/9 31/19 88/2 88/3
age [1]  66/17
agencies [1]  8/17
ago [4]  10/1 64/15 72/4
75/14
agree [14]  6/25 13/14

# A

agree... [12]  19/22 23/21 24/1 43/14 43/18 44/2 44/3 54/1 65/10 76/25 79/11 87/10
agreed [2]  13/12 17/7
agreeing [1]  91/19
agreement [2]  21/19 37/18
ahead [5]  10/19 14/4 29/23 40/6 59/13
air [1]  93/17
AJC [3]  62/8 64/10 67/17
alarm [1]  84/4
aligned [3]  65/12 65/13 71/25
all [60]  3/12 3/13 4/13 5/9 13/21 14/25 17/1 17/25 18/1 18/2 18/5 20/5 20/21 20/25 21/5 21/15 21/25 30/10 31/8 31/16 34/7 34/17 37/1 37/1 37/4 39/16 39/17 39/19 39/20 40/22 41/1 41/9 42/5 43/9 47/13 47/19 49/25 53/11 54/1 57/6 60/9 61/11 62/5 63/19 65/18 67/4 67/6 69/17 75/5 78/13 78/16 80/19 82/10 87/6 89/1 89/7 92/4 92/15 93/21 93/23
allegation [2]  49/8 51/21
allocated [1]  37/5
allowed [2]  35/3 89/9
allowing [1]  26/23
allows [1]  45/3
ally [1]  45/22
almost [2]  47/4 49/20
alone [2]  61/11 90/11
along [2]  24/3 83/18
already [8]  11/10 20/5 25/7 53/13 54/6 56/23 62/13 75/12
also [11]  4/19 18/16 40/12 48/8 56/1 75/3 77/11 83/10 83/21 83/24 89/17

altered [1]  69/15
alternate [15]  2/12 4/25 11/22 13/13 13/15 14/18 15/14 18/24 22/5 22/7 39/17 61/1 88/5 88/9 91/24
although [3]  51/20 79/22 87/25
always [2]  35/17 36/6
am [9]  3/11 20/19 28/11 31/3 39/25 44/9 49/14 85/3 92/16
ambiguous [8]  20/11 27/11 27/23 27/25 28/1 28/4 28/4 28/10
amenable [1]  41/9
amended [1]  82/19
amendment [30]  4/6 4/10 5/12 6/5 6/9 6/21 9/2 9/3 11/3 11/12 13/2 14/7 14/12 15/23 16/13 17/8 17/11 19/5 23/7 25/11 25/15 27/22 29/19 35/1 36/9 36/17 36/20 38/3 38/9 43/17
amount [1]  47/14
ample [1]  16/11
analysis [4]  6/21 9/2 9/3 9/5
anchored [1]  49/16
ANNA [4]  1/17 1/18 4/3 4/19
announced [1]  67/5
another [9]  11/9 41/12 73/20 82/12 87/7 88/2 88/7 89/18 90/8
answer [12]  11/1 11/2 11/20 14/20 16/3 24/14 27/3 32/23 38/1 41/6 74/19 89/23
answered [1]  17/17
answering [5]  12/25 13/17 28/21 42/8 55/13
answers [2]  3/23 17/18
antennas [1]  12/22

anticipated [1]  68/8
any [53]  2/22 6/18 7/25 11/20 13/6 13/17 14/15 14/17 15/23 17/11 19/18 20/19 22/18 22/19 25/2 28/18 28/21 29/3 29/5 30/3 34/6 35/14 35/16 36/24 43/22 47/17 47/17 48/24 49/16 50/3 50/4 50/5 52/11 53/1 53/3 53/21 60/9 61/21 62/23 68/1 69/14 69/15 73/14 75/17 77/5 77/10 77/12 77/20 78/3 78/22 83/15 84/15 85/14
anybody [1]  73/4
anybody's [1]  81/14
anymore [1]  75/16
anyone [7]  3/22 4/18 4/18 5/6 22/4 25/14 48/4
anything [24]  9/11 19/13 19/17 22/14 22/22 26/13 32/15 34/25 36/8 36/15 36/19 37/19 43/19 47/10 52/12 54/6 67/21 69/15 73/19 78/13 86/24 92/6 92/9 92/12
anyway [2]  79/16 93/1
anywhere [1]  84/15
apologize [1]  18/17
apparatus [1]  73/13
apparent [8]  53/16 53/19 61/5 73/18 73/23 74/6 75/21 79/12
apparently [4]  3/17 7/11 84/20 85/21
Appeals [1]  79/9
appear [9]  6/9 6/22 9/6 12/15 14/3 24/8 31/17 37/11 88/21
appearance [26]  5/3 10/6 31/19 42/16 42/19 42/21 42/21 42/24 44/10 44/17 45/6 46/25 53/24 54/2 54/5 55/13 57/17 57/23 61/19

**A**

appearance... [7]  61/22 65/14 66/9 78/21 83/13 86/20 89/11

appearances [6]  1/14 5/17 27/7 40/3 81/22 88/22

appeared [1]  34/23

appearing [1]  5/1

appears [3]  67/2 78/2 88/20

appellate [1]  31/8

applause [2]  4/21 4/23

applicable [1]  56/6

applies [1]  33/9

apply [3]  28/15 39/15 83/24

appoint [1]  66/10

appointed [1]  10/12

appreciate [8]  8/1 11/1 16/11 29/15 35/13 87/5 90/1 93/22

approach [8]  8/7 16/25 46/21 51/5 59/22 62/20 74/15 82/15

approaching [1]  15/5

appropriate [4]  17/16 27/13 40/1 73/12

approval [1]  3/5

approves [1]  27/5

are [116]

area [6]  14/11 15/1 26/22 38/7 53/20 55/17

areas [7]  14/6 14/13 16/4 16/21 17/6 17/7 39/21

aren [2]  16/21 27/15

aren't [1]  40/6

arguably [2]  19/10 34/1

argue [1]  89/19

argued [1]  77/24

argument [7]  32/9 42/8 59/22 86/14 86/19 87/8 88/18

arise [1]  49/13

arm [2]  20/18 21/1

around [7]  15/10 16/23 20/18 35/4 35/7 35/8 42/12

arrived [1]  43/16

article [1]  64/9

as [113]

ascertain [1]  70/21

ask [17]  13/13 14/3 15/20 15/22 26/1 26/5 26/23 27/6 29/12 29/13 38/5 39/3 69/24 73/7 76/7 83/13 87/12

asked [10]  9/10 15/11 17/17 19/4 19/13 23/22 35/21 41/25 87/13 89/18

asking [10]  15/12 15/16 24/25 26/18 34/9 36/24 40/25 46/20 67/21 89/4

aspect [3]  91/11 91/11 91/16

aspects [3]  15/15 36/20 91/20

assert [8]  13/2 15/21 15/22 16/2 16/13 16/14 25/23 28/12

assertion [2]  4/6 11/11

assessment [2]  14/1 14/14

assist [1]  39/25

Assistant [1]  71/16

associate [2]  4/19 54/7

assume [3]  20/5 25/6 39/18

assuming [3]  61/3 78/10 83/16

assured [2]  55/6 59/10

astringent [2]  56/5 56/8

astrological [1]  37/20

Atlanta [1]  1/12

attack [1]  16/5

attempt [2]  22/18 25/14

attended [1]  70/18

attention [8]  8/13 20/16 29/25 31/3 38/17 42/22 47/16 52/1

attorney [72]  1/17 4/4 4/8 6/17 8/1 9/22 10/12 17/12

22/24 23/3 32/4 38/4 41/13 43/1 43/10 43/21 44/1 44/10 44/11 45/9 45/12 45/18 46/14 47/1 47/21 47/23 48/13 48/19 51/9 51/16 53/18 57/17 61/8 61/11 62/23 63/3 65/11 66/10 68/16 68/24 69/17 69/22 71/7 71/22 73/6 73/13 74/6 74/10 74/11 74/23 74/24 75/2 75/3 75/11 75/12 75/19 76/1 81/17 81/23 84/12 89/5 89/9 90/6 90/7 90/7 90/8 90/20 90/22 91/5 91/13 91/17 92/2

Attorney's [35]  2/14 3/23 7/24 8/5 9/14 10/11 11/6 11/9 18/6 35/6 36/8 38/12 39/10 40/12 41/7 41/22 50/21 57/25 59/2 60/13 67/1 67/14 67/25 68/20 71/6 72/8 77/13 79/25 81/20 82/22 83/25 84/16 92/7 92/25 93/3

attorneys [8]  1/19 50/20 64/1 69/17 75/22 82/25 83/8 85/8

attributing [1]  43/19

August [1]  94/16

authenticate [1]  79/23

authentication [1]  70/24

authenticity [4]  62/18 69/8 76/15 83/21

authorities [1]  89/20

authority [10]  26/14 33/19 34/5 34/6 34/7 48/2 61/23 66/7 73/11 74/12

authorized [2]  8/22 30/3

authorizes [1]  16/12

AVA [2]  21/6 29/10

available [5]  63/4 63/7 78/4 80/17 93/1

avalanche [1]  63/18

**A**

avoid [1]  55/9
avoided [1]  35/15
avoiding [1]  55/12
aware [4]  12/7 20/19 74/2
88/7
away [2]  5/2 26/25

**B**

back [5]  3/9 51/25 59/9
61/20 83/22
bad [1]  67/6
badgering [1]  14/9
Bailey [22]  9/21 9/23 43/20
43/21 43/24 43/25 49/22
53/8 62/1 62/5 62/24 63/9
63/13 64/1 66/5 75/20 78/5
81/15 81/16 81/18 81/25
86/20
Bailey's [3]  75/4 80/8
81/12
balanced [1]  46/21
Bank [2]  16/15 25/22
bares [1]  90/9
barrage [1]  16/1
barred [1]  28/19
based [3]  20/16 55/16 78/2
basic [2]  11/10 40/15
basically [2]  35/16 38/5
basis [3]  13/14 71/8 79/19
be [188]
bearing [1]  48/24
because [73]  2/16 3/2 3/14
6/5 6/9 10/14 10/21 11/5
11/6 13/8 16/18 18/10
21/11 22/3 27/17 29/6
29/10 30/9 30/21 32/15
33/4 35/21 37/7 37/20 38/5
38/7 39/6 39/8 40/19 41/4
41/5 41/15 41/16 43/23
44/6 48/9 52/1 52/19 53/13
53/19 55/5 56/24 58/15
59/21 61/24 65/15 66/7
66/17 66/18 70/22 71/23

73/4 73/19 74/18 74/21
75/16 75/24 78/7 79/25
81/15 82/12 85/3 86/14
86/17 88/12 88/15 88/19
89/3 89/6 89/11 89/21
90/19 93/7
become [4]  20/15 37/7
45/12 76/24
becoming [1]  81/25
been [45]  2/6 5/21 6/15 7/5
7/6 7/14 7/21 11/25 12/17
16/23 17/2 18/2 20/5 25/7
27/25 29/19 31/10 34/21
35/21 41/2 41/23 47/18
50/16 51/5 51/10 51/16
59/16 63/16 63/17 66/3
67/23 69/15 70/23 71/25
72/1 75/17 76/15 77/24
77/24 81/10 82/18 84/15
85/12 85/16 93/24
before [38]  1/11 2/22 9/6
12/3 12/15 16/14 22/11
27/5 27/7 29/14 31/17
34/24 35/2 35/9 36/7 38/17
39/6 42/4 42/17 45/19
45/20 48/14 49/1 54/22
54/24 59/7 59/7 59/22 60/2
63/1 68/1 80/14 81/2 82/20
85/25 93/15 93/18 93/19
began [2]  12/11 72/21
begin [1]  12/5
beginning [1]  25/10
behalf [11]  2/6 2/11 4/24
5/6 13/4 34/9 36/15 43/10
47/11 64/12 89/17
behind [4]  63/22 71/25
72/1 74/19
being [28]  7/8 7/16 9/10
12/14 20/4 20/20 27/12
35/10 41/2 41/3 41/16 49/6
65/6 65/7 66/6 67/23 74/23
74/24 76/18 77/4 77/9
77/13 77/21 78/9 83/15
83/18 90/20 93/9

believe [18]  5/15 12/10
13/14 14/8 14/14 34/4
34/14 34/20 38/10 39/16
45/4 46/9 49/25 52/13
60/19 76/15 84/10 90/22
bend [1]  61/20
benefit [2]  64/20 66/5
benefiting [1]  65/8
best [2]  8/15 94/12
better [3]  8/10 11/7 26/10
between [10]  9/11 13/23
14/4 18/3 23/16 40/8 54/3
90/11 91/8 93/12
beyond [6]  15/13 38/6
51/18 51/19 51/19 78/19
big [7]  3/4 3/12 3/18 8/25
17/14 63/17 63/24
bigger [1]  57/4
bill [3]  1/18 6/14 6/20
bit [8]  22/1 36/4 41/16
57/11 65/15 76/25 81/23
92/22
blah [3]  30/6 30/6 30/6
blanket [1]  11/19
blast [1]  54/22
blasted [1]  54/24
blockbuster [1]  62/22
blue [1]  60/11
board [1]  94/14
body [1]  28/20
bolts [1]  40/17
bombing [1]  58/12
books [3]  30/6
both [3]  5/16 21/19 89/24
bottle [1]  55/6
bottom [1]  74/16
bouncing [1]  16/23
bound [1]  27/23
brand [1]  54/13
brief [12]  10/1 40/3 42/23
50/19 55/21 56/1 64/15
72/5 74/4 81/9 91/3 93/8
briefly [3]  26/4 85/18 86/6
bright [1]  17/14

**B**

bring [5]  3/11 3/15 26/10 29/9 51/25
bringing [4]  3/16 3/16 3/17 12/3
brings [1]  72/20
broad [2]  17/13 45/5
broadcasted [1]  50/12
broke [2]  60/18 60/25
brought [7]  8/13 11/3 14/23 29/14 35/10 42/1 48/2
bucket [5]  15/21 16/6 21/14 27/5 37/17
buckets [8]  15/20 16/3 17/3 21/15 23/12 23/21 26/21 29/13
buckle [1]  40/14
buffer [1]  93/12
build [1]  11/13
building [6]  3/4 35/22 35/23 37/16 38/21 38/22
buildings [1]  17/15
bur [1]  92/20
burden [3]  21/13 51/14 85/16
business [1]  73/5
buzz [1]  64/9

**C**

C.I [1]  1/11
cabin [1]  90/17
cable [1]  47/13
call [8]  2/11 12/23 12/23 13/3 21/14 29/24 32/11 91/8
called [4]  16/14 27/17 35/3 41/21
came [5]  36/3 65/19 72/8 84/19 89/25
cameras [8]  3/4 3/12 3/18 19/25 34/10 34/16 35/15 38/25
campaign [5]  51/16 51/17

63/6 75/4 78/5
can [86]  3/21 6/23 10/12 13/6 15/6 15/7 15/7 15/8 15/19 21/12 21/14 21/14 21/15 22/3 22/8 23/21 23/22 24/16 26/8 26/11 26/17 27/7 27/8 27/8 27/9 27/23 29/5 32/11 32/12 32/14 32/15 33/24 33/25 34/1 34/24 35/20 35/22 35/24 36/6 36/7 37/11 37/11 37/12 37/15 37/19 37/22 37/23 37/24 38/7 38/21 38/24 39/3 41/11 47/12 48/8 48/8 56/16 56/17 57/4 57/7 58/17 59/8 59/9 62/14 62/23 67/25 69/24 70/21 70/24 73/19 74/9 74/21 75/23 76/5 76/11 77/1 78/10 78/18 81/3 82/2 84/3 84/7 85/19 85/21 88/22 91/16
can't [8]  3/13 21/11 58/4 65/16 69/7 69/11 73/18 85/11
candidate [8]  20/23 45/25 58/4 58/5 58/7 62/24 64/3 87/5
candidates [1]  88/4
candor [1]  70/16
cannons [1]  30/10
cannot [3]  19/3 26/21 90/16
capital [1]  46/25
care [1]  69/11
career [1]  58/1
careful [1]  41/16
carefully [1]  59/20
carpet [1]  58/12
Carr [1]  75/2
Carr's [2]  74/7 91/12
carry [1]  43/8
carved [1]  91/12
case [50]  1/6 2/8 2/8 5/24

7/7 9/22 10/13 12/6 12/8 14/2 14/8 16/11 30/20 30/22 30/22 32/5 33/1 40/1 43/3 43/6 45/19 45/20 47/17 50/23 51/8 51/11 51/15 51/18 55/7 55/20 55/21 56/17 56/19 57/1 57/3 57/6 58/11 63/2 73/2 73/4 78/20 78/20 78/25 78/25 79/9 79/15 88/6 88/14 91/4 91/6
cases [6]  27/24 64/23 65/1 78/20 79/7 87/15
cash [1]  63/20
categories [2]  15/18 23/15
category [2]  30/19 87/9
caught [1]  20/11
cause [2]  49/14 49/20
caused [2]  12/21 63/17
CCR [2]  1/21 94/21
center [1]  43/7
certain [4]  8/18 11/12 28/9 39/18
certainly [10]  12/21 21/23 25/13 28/6 49/5 61/10 66/15 67/13 68/10 75/25
Certificate [1]  94/1
CERTIFIED [1]  1/23
certify [2]  94/9 94/13
cetera [1]  9/4
chain [2]  19/6 19/16
chair [1]  18/18
chairman [1]  20/24
challenge [4]  9/17 37/25 88/10 89/22
chance [3]  42/10 49/11 54/21
change [5]  12/14 25/2 36/25 50/15 93/10
changed [1]  66/24
channel [1]  48/20
chapter [2]  32/7 33/5
characterization [1]  47/7
charge [2]  12/14 56/20

# C

charged [2] 31/10 31/11
charges [4] 6/17 6/18 19/7 67/7
charging [1] 31/11
Charlie [8] 9/21 9/23 43/24 43/25 49/21 61/25 64/1 75/4
check [5] 21/18 45/25 63/11 63/12 93/8
checking [2] 41/18 63/20
checks [2] 3/14 63/18
choices [2] 58/5 87/20
choose [1] 90/10
choosing [1] 47/14
chronological [1] 9/16
circle [1] 80/3
circumstances [5] 20/11 26/24 27/12 27/23 27/25
circumvent [1] 25/14
circus [4] 7/6 35/6 35/8 74/19
cite [7] 21/7 25/20 30/22 51/1 55/24 79/8 79/13
cited [2] 42/23 88/14
cites [2] 55/21 56/3
citing [1] 33/10
city [1] 31/5
civic [1] 55/8
claim [1] 16/20
claims [1] 84/24
CLAPP [11] 1/18 4/19 4/21 4/23 5/10 23/11 53/12 54/10 59/9 76/10 92/9
Clapp's [1] 87/3
clarification [1] 13/20
clarify [3] 17/24 35/11 49/5
clarity [2] 40/9 79/18
Clayton [2] 12/9 31/4
clear [12] 26/19 27/21 37/19 41/18 42/16 53/7 76/21 78/11 82/2 85/13 92/15 92/24

clearer [1] 52/21
clearly [3] 3/10 34/7 81/17
clears [1] 37/11
client [31] 5/19 7/8 9/21 9/25 11/21 17/1 17/7 20/18 24/22 24/23 25/2 25/11 37/15 57/15 59/15 60/12 61/6 61/19 62/6 63/2 66/6 67/20 67/22 70/18 72/1 72/4 72/4 86/21 87/9 90/5 92/20
client's [7] 17/14 19/3 73/15 87/7 87/15 87/16 87/19
clients [23] 5/7 13/5 17/25 18/10 19/11 19/19 20/5 20/20 22/25 24/20 26/23 34/9 36/1 36/5 36/5 36/15 38/14 66/25 89/1 89/18 90/13 92/13 92/21
climb [1] 65/16
clones [1] 39/21
closing [1] 81/7
clothes [1] 38/24
co [2] 45/11 45/13
cocktail [2] 46/19 47/12
code [3] 29/25 32/7 33/3
codefendant [1] 46/7
collaborate [1] 40/7
collaboration [1] 40/11
colleagues [1] 15/12
collide [1] 8/13
collided [1] 88/20
come [21] 7/25 16/21 17/1 21/13 25/21 25/23 27/4 28/20 34/24 35/9 37/2 40/7 41/23 44/12 48/12 48/14 58/9 63/18 66/1 84/5 91/17
comes [7] 25/16 48/16 48/17 67/8 68/1 79/6 84/8
comfortable [3] 12/25 26/1 26/23
coming [8] 27/1 37/1 37/4 38/15 38/18 40/20 41/1

77/14
comment [1] 85/15
comments [1] 71/17
commonalities [1] 39/18
commonality [1] 13/22
communicated [1] 36/22
communication [1] 18/6
compel [2] 30/4 33/24
compelled [2] 23/1 31/17
complaining [1] 38/16
complete [7] 8/14 10/10 37/24 69/10 70/19 70/22 94/11
completed [1] 52/23
compulsory [1] 22/11
concern [14] 8/6 24/10 25/9 36/3 38/20 39/2 46/24 48/23 53/20 66/1 71/23 84/6 84/11 85/14
concerned [4] 24/12 24/13 69/14 89/4
concerning [1] 15/23
concerns [13] 3/23 5/12 6/5 6/6 11/3 14/22 20/1 23/7 36/9 36/17 41/17 42/14 93/16
conclude [4] 6/22 24/7 56/12 73/10
concluded [1] 51/20
conclusion [2] 54/4 56/14
condemnation [1] 71/18
conditionally [1] 78/9
conduct [2] 10/8 74/7
conducted [1] 56/16
conducting [3] 13/10 30/2 67/18
conference [3] 39/6 39/9 39/12
confidence [4] 46/12 56/15 56/17 56/22
confidential [1] 58/25
confirmation [1] 72/15
confirmed [1] 72/10
confirming [1] 41/5

# C

conflict [54]  5/13 6/6 42/16
42/21 42/24 43/2 43/8
44/15 44/18 45/4 45/6 45/7
45/18 46/5 46/19 47/9
47/15 52/4 53/20 53/22
53/23 53/25 54/2 55/14
55/14 55/18 56/10 56/13
57/21 57/22 61/5 61/5
61/19 61/19 61/22 61/22
65/15 66/9 73/7 73/18
73/21 73/23 74/6 74/11
75/23 78/22 82/22 82/24
83/10 83/12 85/17 87/11
87/14 87/14
conflicts [3]  53/17 73/20
79/12
conformity [1]  94/13
conjecture [1]  43/2
connect [1]  15/8
connection [17]  6/11 11/15
11/21 13/10 15/1 18/19
22/5 22/6 36/16 58/1 65/20
65/22 65/23 73/15 75/17
87/21 88/8
consequence [1]  52/6
consequences [1]  25/5
consider [1]  58/25
considered [1]  68/12
considers [1]  84/8
conspiracy [1]  74/17
Constitution [1]  85/1
constitutional [2]  19/20
84/25
constructing [1]  30/11
consult [2]  85/18 85/19
contain [1]  6/16
contend [1]  10/6
contested [1]  20/19
context [3]  11/12 13/17
18/10
contingent [3]  89/21 89/24
89/24
continue [2]  8/22 31/9

continues [1]  88/10
contrary [2]  53/4 58/18
contribution [1]  75/6
controls [1]  55/17
controversial [1]  58/2
conversation [7]  23/21
23/23 37/17 37/22 37/23
90/9 93/8
conversations [1]  52/10
converted [1]  18/2
conveyer [1]  33/19
convince [1]  53/25
cooperate [2]  10/14 10/16
copies [1]  51/4
copy [10]  50/24 50/25 51/3
59/23 59/25 67/15 69/25
80/22 86/1 86/2
correct [9]  7/22 17/22
17/23 48/4 49/17 56/7 68/4
89/14 92/3
correspondence [1]  30/5
could [33]  3/9 8/13 17/15
19/4 19/9 19/13 19/15
19/16 19/17 19/18 19/19
23/1 26/18 28/24 32/10
33/6 40/21 41/2 46/6 52/9
62/9 63/19 66/11 78/22
79/23 83/22 86/18 91/12
91/17 91/22 93/10 93/17
93/17
couldn't [2]  52/11 73/8
counsel [12]  4/14 23/9
23/16 31/5 42/15 68/19
68/20 68/20 75/7 82/14
91/3 94/14
country [2]  66/21 74/18
COUNTY [11]  1/1 1/24
9/14 10/10 12/9 31/4 66/4
68/12 73/13 94/5 94/25
County's [1]  7/7
couple [4]  2/5 7/22 47/8
63/21
course [5]  22/3 47/18 62/6
83/11 84/21

court [57]  1/1 1/23 1/24
16/3 16/15 20/12 24/18
26/13 26/15 27/20 28/19
29/24 33/16 41/9 44/23
44/24 45/3 45/5 47/7 47/10
47/16 47/19 49/24 50/24
51/5 51/14 51/17 51/17
51/20 51/23 54/9 55/19
55/21 56/8 56/21 56/22
59/22 60/20 60/24 64/1
66/8 68/21 69/8 74/2 76/17
80/22 80/25 81/2 82/18
84/1 84/8 85/15 86/1 94/8
94/14 94/23 94/25
Court's [5]  15/19 49/8
51/25 60/22 83/7
courthouse [3]  36/2 38/25
39/1
courtroom [1]  34/11
cover [3]  8/6 44/6 54/6
coverage [1]  35/19
covered [3]  16/22 21/24
92/5
covering [1]  2/13
crazy [1]  45/11
create [8]  10/6 35/6 35/8
55/6 57/20 57/21 88/9
91/25
creating [1]  65/14
creative [1]  91/21
criminal [3]  13/1 13/16
45/12
critical [1]  56/18
critique [1]  46/11
CROSS [13]  1/17 4/3 4/11
31/7 54/12 54/15 54/21
76/24 79/11 81/3 81/7
88/11 92/6
Cross's [3]  53/14 53/17
72/16
crowded [1]  3/13
cure [1]  90/23
cures [1]  48/23
custom [1]  63/10

**C**

cut [1] 10/20
CVR [1] 1/21
cycle [1] 54/4

**D**

DA [14] 42/6 42/9 45/13
55/21 56/3 58/18 64/10
64/14 64/19 66/7 71/16
75/14 84/1 84/4
DA's [13] 2/7 3/24 3/25 7/7
7/17 18/3 55/6 64/23 66/4
66/14 67/9 68/18 71/16
daily [1] 67/17
damage [1] 20/4
data [1] 63/7
date [4] 40/21 55/5 93/1
93/16
dates [1] 38/14
Davenport [2] 78/24 79/12
DAVID [4] 1/21 94/8
94/21 94/23
day [19] 23/20 37/2 38/19
43/8 50/8 50/12 63/7 63/8
63/12 66/14 67/16 78/5
80/8 80/9 80/12 80/15
80/16 94/10 94/16
days [10] 10/1 10/18 38/19
58/23 60/17 60/24 62/7
64/15 72/4 80/8
deadline [2] 52/12 52/18
dealing [1] 19/13
deals [1] 82/21
dealt [1] 19/1
Deboroughs' [1] 92/20
DEBORROUGH [14]
1/19 13/4 14/23 16/25
21/23 23/10 24/20 36/10
36/15 39/19 43/15 50/8
86/25 92/12
Deborroughs [3] 4/25 5/1
37/10
Debrrorogh [1] 21/19
deceiving [1] 88/22

December [2] 66/13 75/18
decide [3] 15/13 16/2 90/7
decides [1] 48/11
decision [8] 13/14 46/11
48/18 51/3 56/23 57/17
63/1 65/11
decisions [2] 20/16 46/11
deemed [1] 56/14
default [1] 40/23
defendant [3] 45/11 45/13
51/10
defendant's [2] 56/19
56/20
defended [1] 46/7
defense [3] 45/9 45/12
59/25
define [1] 83/24
definiteness [1] 15/6
democracy [2] 66/20 74/17
democrat [4] 88/6 88/6
88/11 88/15
democratic [2] 74/10
75/22
democrats [1] 89/21
denied [1] 85/17
depression [1] 65/2
description [1] 49/15
design [1] 65/7
designate [2] 3/10 89/9
designation [1] 12/13
desk [1] 67/8
detail [1] 24/2
determination [1] 13/24
determine [5] 6/8 52/12
57/5 66/8 91/21
determined [3] 11/24
51/23 83/4
develop [3] 39/13 39/23
41/7
developed [1] 42/16
development [1] 61/18
device [1] 3/6
dictated [1] 50/5
did [24] 3/1 15/13 17/10

22/11 22/14 25/3 27/15
27/20 31/25 38/14 38/18
38/19 59/12 61/13 66/14
66/25 68/12 70/3 70/5
79/18 79/25 80/23 90/2
94/9
didn [5] 22/21 30/15 33/17
34/22 49/3
didn't [12] 2/17 54/6 61/11
61/12 64/12 76/16 79/2
79/13 86/12 86/15 88/12
88/21
died [1] 56/25
difference [1] 90/11
different [18] 2/22 11/1
16/3 17/5 18/19 27/9 28/6
28/8 28/17 28/17 28/18
30/19 30/23 32/8 33/12
33/22 53/15 56/9
differentiation [2] 18/3
33/12
differently [4] 18/16 18/23
30/21 86/14
difficulty [1] 18/21
DILLON [38] 1/18 4/15
5/10 20/1 20/18 23/11
29/17 31/23 32/1 36/19
42/7 42/20 43/14 43/18
47/11 49/11 49/19 50/25
51/4 52/21 53/12 59/8
59/10 69/8 76/20 76/25
78/14 78/19 79/22 82/13
82/20 84/10 85/25 86/5
87/2 90/3 90/5 92/9
Dillon's [4] 78/2 87/9 89/8
92/20
direct [9] 7/20 42/22 47/16
56/7 63/9 65/22 67/21
84/22 87/11
direction [1] 88/3
directly [4] 16/4 31/1
52/16 72/8
disadvantage [1] 23/25
disagree [5] 5/25 7/2 22/15

**D**

disagree... [2]  22/17 53/24
disagreement [1]  37/18
disagreements [1]  23/16
discharge [1]  56/25
diselose [3]  25/3 35/2
57/10
disclosed [4]  5/21 24/22
52/25 72/24
discreetly [2]  38/21 38/22
discretion [6]  28/14 44/18
44/24 44/25 45/5 47/10
discretionary [1]  44/16
discuss [1]  14/5
discussed [2]  11/18 30/21
discusses [1]  79/12
discussing [1]  80/3
discussion [6]  14/4 23/18
25/10 25/13 60/6 79/14
discussions [3]  11/10 23/8
24/19
disease [1]  90/16
disgorges [1]  93/4
disinterested [1]  56/16
dismissed [1]  25/8
display [2]  27/10 36/4
disputing [1]  33/25
disqualification [24]  4/11
6/11 7/1 7/4 8/7 9/8 29/18
29/22 42/5 42/13 42/25
43/15 44/16 52/22 57/12
73/9 81/8 87/8 90/12 90/15
90/15 90/23 91/22 92/19
disqualified [4]  9/10 10/11
51/10 91/6
disqualify [9]  2/7 2/9 2/9
2/15 4/4 72/17 73/25 84/22
87/1
distinction [1]  87/24
district [95]
diverse [1]  14/22
divided [1]  38/19
divorce [1]  45/20
do [82]  3/7 5/5 5/25 6/1

6/25 7/2 8/6 9/10 9/19 9/20
10/22 10/23 11/4 11/7
17/10 19/8 21/18 21/19
22/11 23/5 25/21 26/11
26/12 26/13 29/7 29/8 30/8
32/22 32/24 34/7 34/18
35/3 35/24 36/7 38/12 42/9
43/14 43/17 44/2 46/20
46/21 46/21 54/17 54/18
55/8 55/14 55/15 60/21
62/4 65/17 65/20 66/7
66/15 66/16 67/3 68/10
69/13 73/2 73/9 73/11
73/17 73/19 73/22 73/24
75/15 76/17 76/19 77/3
77/9 77/10 79/11 81/1
86/21 86/22 86/23 90/11
90/12 91/14 91/14 92/1
93/21 94/9
document [9]  57/5 58/13
59/7 63/5 67/4 69/7 70/21
78/1 78/6
documents [2]  30/5 57/6
does [13]  9/6 44/17 46/23
52/1 57/20 61/4 65/10
65/13 67/10 69/20 71/4
83/4 83/11
doesn [13]  9/4 9/12 13/5
26/13 29/7 30/9 30/23 43/7
45/23 45/23 47/14 48/9
48/21
doesn't [13]  6/22 12/14
17/7 41/5 42/13 51/9 54/3
67/9 74/10 74/11 75/23
76/2 91/13
dog [3]  76/2 76/3 91/13
doing [8]  20/10 25/16 26/1
27/10 28/25 85/2 85/3
87/19
dollars [2]  57/9 63/13
don [26]  4/18 8/23 12/1
17/11 19/11 19/17 20/21
22/15 22/23 23/1 23/23
23/24 26/19 27/24 28/3

28/10 29/8 29/9 32/24 44/6
44/23 45/2 45/4 46/4 48/10
48/23
don't [51]  3/22 6/10 6/25
9/9 11/19 11/19 12/19
18/20 19/1 20/4 27/19
28/15 35/25 38/8 39/16
40/1 41/21 48/19 52/13
53/4 53/13 53/23 53/25
55/5 55/23 59/17 62/3
62/17 67/13 69/6 71/1
71/21 73/11 76/9 76/19
77/5 77/15 77/20 77/23
78/3 78/6 78/7 79/1 79/17
80/3 86/16 88/14 89/3
90/22 93/9 93/21
DONALD [2]  1/16 4/9
donated [1]  78/5
donations [4]  43/18 43/22
43/23 43/24
done [19]  13/4 20/4 20/5
27/7 35/20 36/7 52/18 53/5
53/5 65/6 65/7 69/21 73/5
73/11 75/15 75/15 81/1
89/10 93/11
door [2]  58/14 67/4
doubt [3]  32/3 78/3 83/20
down [17]  15/20 21/16
24/15 26/25 27/6 27/10
37/14 57/7 58/10 59/9
66/11 74/13 74/14 76/9
78/19 85/20 94/10
downgrade [1]  25/6
downgraded [1]  25/7
downside [1]  52/5
drafted [1]  59/20
drag [2]  26/20 57/7
dragged [4]  21/16 26/25
27/6 27/10
draw [4]  29/3 32/13 38/17
52/1
drawn [1]  56/13
drips [1]  66/3
driven [1]  46/10

**D**

driver [1]  42/6
drone [2]  3/16 3/17
dropped [1]  12/18
drug [1]  7/8
due [1]  84/24
during [10]  22/8 31/18
47/18 49/8 63/7 63/8 63/12
69/21 75/8 78/5
duty [2]  47/21 55/8

**E**

e-mail [3]  59/3 77/8 77/12
e-mails [3]  19/16 20/9
59/15
each [8]  13/24 14/2 14/13
15/15 15/16 16/6 40/8
40/10
earlier [3]  34/20 36/22
68/25
earliest [1]  16/16
early [2]  10/15 40/11
easier [1]  82/6
echo [1]  20/1
effect [3]  8/17 49/14 49/20
effectively [1]  50/9
effort [5]  7/15 22/18 50/15
66/20 72/25
efforts [1]  88/9
egress [1]  36/6
either [9]  5/10 19/5 26/14
27/1 60/18 73/20 75/24
76/2 76/24
elaborate [1]  40/6
elderly [1]  18/21
elected [4]  50/21 52/3 91/5
93/16
election [20]  7/20 8/18
15/15 18/20 20/19 49/2
52/24 52/25 65/3 65/4 73/1
73/16 74/20 75/1 81/16
82/3 93/5 93/6 93/12 93/15
elections [1]  50/20
elector [6]  13/13 13/15

14/18 15/14 18/24 22/7
electoral [2]  21/1 54/4
electors [13]  2/12 4/25
11/23 17/10 22/5 39/18
61/1 88/6 88/6 88/9 89/21
89/24 91/24
elevate [3]  45/3 58/5 58/6
elevation [1]  25/6
Eleven [1]  19/24
else [9]  4/18 5/6 36/13
36/15 54/6 85/9 85/10 92/6
92/13
emphasized [1]  49/12
encourages [1]  44/12
end [5]  6/8 9/5 28/11 53/4
93/10
ended [1]  90/4
ends [2]  41/3 78/18
enemies [1]  85/6
enhanced [1]  25/9
enough [5]  24/16 42/24
45/5 54/1 57/23
ensure [1]  35/22
enter [2]  35/22 59/22
entered [1]  76/16
entire [4]  73/13 89/12
90/16 90/24
entirely [3]  28/8 28/17
28/17
entirety [2]  47/7 89/12
entities [1]  82/23
entity [3]  43/1 84/13 92/1
environment [1]  35/8
envision [2]  15/11 15/12
equal [1]  84/24
Equally [1]  48/12
equipment [3]  2/25 3/11
3/15
especially [1]  52/13
essence [1]  67/6
essentially [2]  19/24 85/1
establishing [1]  77/25
et [1]  9/4
ether [1]  65/25

ethers [1]  70/12
ethical [3]  27/13 83/22
83/24
ethics [5]  10/7 63/20 68/16
68/18 69/1
even [25]  5/2 8/20 17/7
17/20 22/18 22/22 27/19
28/22 28/24 29/5 31/21
34/1 36/1 37/19 39/1 51/11
51/20 53/23 56/25 56/25
57/1 64/10 73/22 75/14
81/19
evening [1]  23/20
event [3]  50/4 50/12 53/7
events [3]  47/8 49/15 58/2
ever [1]  34/25
every [4]  3/15 14/21 31/13
75/19
everybody [5]  33/25 47/12
85/9 85/10 91/6
everyone [8]  3/14 3/17 8/9
35/18 50/16 58/13 60/25
92/24
everyone's [1]  93/22
everything [6]  3/15 40/24
41/15 66/24 88/18 92/5
everywhere [1]  12/22
evidence [26]  26/12 29/4
30/4 33/23 46/15 47/17
54/16 54/17 54/18 54/20
66/19 67/2 67/12 69/4 72/2
72/3 76/6 76/11 76/16 77/5
77/10 77/17 77/22 84/14
87/15 91/18
EX [3]  1/6 1/8 2/3
exacerbated [3]  7/5 20/7
87/14
exact [1]  38/15
exactly [9]  13/22 25/16
33/8 37/5 50/21 61/3 75/6
84/1 85/9
exaggerated [1]  36/4
example [1]  45/17
examples [1]  45/7

**E**

Excellent [1] 4/24
exception [1] 9/19
exceptions [1] 8/19
excerpt [1] 84/10
excluded [1] 30/12
excludes [1] 30/6
exercise [3] 28/12 28/14 35/1
exhibit [18] 60/1 60/19 62/9 63/4 68/17 68/22 69/4 76/16 77/8 77/22 79/19 80/6 80/20 81/11 83/13 84/3 84/9 85/22
exhibits [4] 54/18 59/17 76/6 78/16
Exihibit [1] 77/5
exist [1] 22/11
existence [2] 64/7 68/14
exists [1] 56/13
expanded [1] 36/10
expect [1] 51/19
expected [2] 4/1 52/3
expecting [1] 11/1
expert [2] 31/8 69/1
explain [4] 46/22 46/23 47/8 87/17
explained [1] 50/15
explains [1] 25/4
explanation [1] 86/13
explorable [2] 39/22 39/22
exploration [1] 73/15
explore [2] 23/15 41/13
explored [1] 38/8
exposes [1] 13/15
extent [1] 89/20
extra [3] 71/17 84/12 84/16
extreme [2] 17/19 45/17
eye [2] 38/13 49/23
eyes [2] 58/6 58/7

**F**

face [3] 28/21 45/21 58/14
faced [1] 9/16

facing [1] 13/1
fact [22] 5/15 6/2 6/3 10/1 10/20 19/11 33/3 35/2 35/2 44/9 46/15 59/17 61/11 61/12 62/24 64/10 64/13 71/6 72/10 76/21 83/4 85/7
factor [2] 28/11 56/24
facts [9] 26/19 28/7 28/9 28/9 46/10 46/13 49/18 58/9 58/11
fair [5] 12/17 23/25 29/15 46/20 89/6
faith [1] 13/14
fall [1] 7/17
falls [1] 55/15
false [1] 57/5
falsity [1] 57/6
familiar [3] 49/14 50/24 53/15
fan [1] 8/25
Fani [3] 44/11 62/22 76/3
far [7] 24/3 26/25 31/14 40/13 45/23 65/22 82/22
fashion [2] 44/18 56/16
fashioned [1] 8/2
favorably [1] 21/7
favoring [2] 9/20 86/20
federal [10] 12/20 16/12 19/20 20/3 21/11 21/12 28/16 29/6 29/8 84/25
feed [1] 3/12
few [6] 8/19 17/23 17/24 24/20 37/8 71/13
fictional [1] 75/3
fifth [32] 4/6 4/10 5/12 6/5 6/9 6/21 9/2 9/3 11/2 11/11 13/2 14/7 14/12 15/22 16/13 17/8 17/10 19/5 23/6 25/11 25/15 27/22 28/13 29/19 32/13 33/17 36/9 36/17 36/19 38/2 38/8 43/16
fight [1] 48/1
figure [1] 26/21

file [3] 2/17 84/23 93/17
filed [8] 2/6 2/6 2/10 2/14 2/15 5/12 10/1 64/15
final [3] 50/18 52/8 93/4
finance [1] 63/6
financial [3] 51/19 64/25 80/7
find [10] 27/24 28/18 29/5 74/7 74/10 75/23 76/2 90/8 91/13 92/5
finding [2] 74/9 91/10
fine [5] 2/18 4/16 5/3 62/23 66/23
finish [1] 61/16
finished [1] 9/15
first [14] 6/5 10/2 17/23 31/23 35/1 37/8 37/15 40/7 42/22 43/17 47/9 63/21 64/16 84/20
fit [1] 42/13
flagging [1] 84/11
flashy [1] 46/25
flexible [1] 41/23
flip [1] 15/10
flow [1] 63/20
flowed [1] 48/21
flows [2] 61/18 93/2
flyer [3] 62/10 77/19 83/3
focus [12] 7/15 11/23 52/1 53/14 57/12 57/24 71/23 72/14 81/23 87/1 89/15 91/8
focused [3] 44/9 48/25 67/20
focuses [1] 91/7
folks [6] 11/8 12/3 28/14 38/7 38/23 88/20
follow [3] 46/14 52/20 91/1
following [1] 87/23
font [2] 62/24 81/19
footnote [1] 12/17
force [2] 29/9 45/5
forced [4] 16/19 19/25 27/12 86/13

**F**

forcing [1]  41/6
forecast [1]  39/11
foreclosed [1]  14/12
foregoing [1]  94/10
forget [1]  74/20
Forgive [1]  74/25
form [1]  44/19
formal [2]  12/13 31/11
formally [1]  31/11
forms [2]  3/11 78/23
fortunately [1]  64/13
forward [8]  3/8 21/13 23/6
27/4 36/13 39/24 71/2
85/24
fought [1]  38/12
found [3]  16/16 51/18
56/10
foundation [4]  59/15 60/1
76/15 79/22
founded [1]  68/9
four [2]  3/12 41/1
framework [1]  39/24
frameworks [1]  40/15
fraught [1]  28/1
free [6]  3/1 60/21 68/2 68/9
79/1 93/23
freshest [1]  31/24
Friday [1]  84/23
friend [1]  12/24
friends [4]  58/15 64/20
73/5 85/6
frog [1]  34/15
frogmarched [2]  19/24
34/10
frogmarching [1]  35/9
front [16]  16/13 16/17
19/25 21/16 24/8 24/14
25/23 32/11 34/10 34/15
36/2 38/1 40/3 43/7 55/24
92/24
frustrated [1]  61/6
full [1]  35/19
FULTON [9]  1/1 1/24 7/7

10/9 66/4 68/12 73/13 94/5
94/25
fultoncountyga.gov [1]
1/25
fund [1]  81/25
fundraiser [25]  10/5 44/12
46/3 46/16 47/1 62/22 63/8
63/10 63/15 63/24 65/7
65/9 65/18 75/7 75/10
75/13 75/20 75/24 75/25
77/19 78/1 78/6 80/8 81/18
83/3
fundraisers [1]  75/16
fundraising [1]  80/7
further [9]  2/23 5/2 13/6
17/11 85/15 86/19 91/25
92/10 94/13
future [1]  13/7

**G**

GA [1]  1/12
gather [3]  66/19 67/2 67/3
gave [4]  38/14 38/16 43/20
69/12
general [18]  3/2 8/24 15/15
15/20 43/21 44/2 68/19
68/19 73/16 74/7 75/2 76/1
82/14 82/23 89/9 90/6 90/7
90/7
General's [1]  66/10
generated [1]  7/6
generating [1]  6/15
gentleman [1]  67/22
genuinely [2]  19/3 26/21
georgia [26]  1/2 10/8 12/13
18/18 21/1 21/6 27/14
29/11 29/25 30/20 32/7
33/2 42/25 47/15 51/2 63/6
65/4 68/20 71/5 78/25 79/9
82/14 94/4 94/9 94/14
94/14
get [34]  2/2 2/21 2/24 2/25
8/24 10/25 16/17 18/12
18/23 20/14 23/22 24/12
33/22 34/2 35/24 38/6

38/22 40/9 40/13 40/17
40/18 40/24 49/11 55/25
59/2 61/5 70/9 74/16 77/2
79/18 85/6 85/6 87/2 88/16
get's [4]  57/9 57/9 64/6
83/16
gets [13]  3/13 10/17 10/18
41/21 42/12 52/25 54/21
63/24 64/4 64/5 71/8 82/12
86/1
getting [7]  3/4 10/19 20/8
20/9 20/10 31/3 40/17
give [10]  10/16 15/6 17/20
28/24 42/9 44/18 44/24
63/11 74/12 76/20
given [3]  29/2 75/3 87/18
gives [5]  20/12 25/18 25/19
64/19 68/18
giving [4]  52/19 67/5 75/21
81/24
glad [7]  10/13 55/7 66/2
66/15 74/13 74/14 74/15
glued [1]  38/25
go [23]  2/22 12/22 12/22
13/6 17/11 17/19 26/6
29/23 38/1 39/24 41/15
45/23 55/5 57/1 58/17 66/9
68/9 73/22 75/9 81/2 85/24
88/12 93/23
goes [3]  46/15 56/8 93/22
going [71]  2/5 3/8 7/16
7/19 8/20 10/20 11/23
13/13 13/23 14/12 14/16
16/13 19/8 20/6 20/14
24/14 25/11 26/2 26/12
26/12 27/3 27/24 28/22
29/17 34/13 34/14 36/12
37/6 37/17 38/5 39/3 39/4
39/5 39/9 39/12 39/14
39/23 40/6 40/10 42/22
43/14 47/8 53/7 54/12
54/20 57/11 60/6 66/1
66/22 67/6 69/10 71/11
73/21 73/21 73/24 75/15

**G**

going... [15] 75/18 76/7
76/14 78/7 80/4 80/5 81/3
82/11 83/17 84/4 88/11
91/22 93/14 93/14 93/21
gonna [1] 14/15
good [13] 2/2 4/2 4/7 4/15
4/16 13/14 30/22 41/12
48/10 48/22 74/10 75/22
82/5
good-faith [1] 13/14
google [1] 82/7
GOP [1] 20/24
gosh [1] 61/7
got [32] 2/20 3/6 4/13 4/24
5/3 21/23 36/21 40/8 41/4
42/7 45/16 48/21 50/11
50/24 51/3 51/21 53/6
59/13 61/17 61/25 62/21
66/23 69/9 70/10 70/13
70/14 72/15 76/4 80/25
81/14 82/10 82/17
gotten [1] 49/16
government [1] 5/22
Governor [7] 9/21 44/1
73/1 74/21 75/1 75/4 82/1
Governor's [5] 7/17 50/4
64/4 64/4 81/13
grand [104]
gravity [1] 56/10
great [5] 4/21 23/21 85/23
85/25 87/24
greater [2] 39/2 90/3
greatly [1] 39/8
green [5] 1/17 2/24 4/3
4/11 31/7
GREEN-CROSS [4] 1/17
4/3 4/11 31/7
greenlighted [1] 5/2
group [7] 6/24 14/17 14/22
23/17 73/3 88/5 88/7
grown [1] 61/14
guess [6] 23/5 23/9 33/6
40/9 44/14 72/1

guidelines [1] 39/13
guilt [1] 56/20
guy [3] 57/9 57/9 88/16
guys [2] 21/19 79/6

**H**

ha [2] 31/24 31/24
had [24] 11/10 14/23 17/9
23/8 24/2 34/23 39/10 41/2
41/25 50/4 50/16 51/16
58/14 59/10 59/20 61/1
64/11 64/17 68/11 75/3
75/7 75/11 75/18 75/20
HADASSAH [4] 1/21 94/8
94/17 94/23
hadassah.david [1] 1/25
hadn [1] 22/13
hailing [1] 13/7
Hall [1] 81/15
hand [5] 7/18 51/4 74/21
86/13 94/15
handheld [1] 3/6
handing [1] 86/3
handle [1] 73/19
handling [2] 2/7 3/21
hands [1] 59/18
happen [8] 37/7 37/9 37/22
48/8 48/8 52/2 54/3 57/2
happened [4] 13/12 48/9
60/10 66/13
happens [2] 49/21 49/22
happy [4] 3/18 29/19 53/12
85/14
harassment [1] 35/23
hard [2] 3/19 38/12
harm [2] 7/8 64/20
has [60] 2/14 2/14 6/15 7/5
7/14 7/17 8/2 8/19 9/19
9/20 9/22 10/14 12/21 18/2
20/4 27/21 29/11 31/10
32/11 35/15 35/19 38/4
38/12 41/22 42/6 42/15
42/19 44/23 47/11 47/18
51/9 54/8 55/19 57/2 59/16
61/14 66/7 66/8 67/23

69/15 70/23 71/24 71/25
73/2 73/5 73/13 76/3 76/15
80/25 81/2 81/10 84/2
84/15 84/17 84/21 87/11
87/12 88/13 91/7 93/24
hasn't [3] 75/24 85/12
85/16
hate [2] 20/8 20/9
have [150]
haven't [2] 49/9 60/1
having [8] 3/12 23/23
24/21 25/24 41/23 46/1
48/24 90/9
he [36] 10/14 10/15 10/17
10/18 20/24 31/18 31/23
31/25 33/15 33/22 37/16
45/25 49/12 55/3 55/6 55/7
55/7 58/19 58/20 58/20
64/16 68/3 68/12 69/9
69/20 69/20 70/13 74/7
79/23 79/25 81/16 82/12
82/22 83/3 83/11 84/1
he's [5] 5/20 7/8 57/8 83/1
83/1
head [3] 11/3 22/15 31/7
headline [1] 63/23
headliner [4] 9/23 10/5
64/5 72/22
headlining [1] 62/22
health [1] 93/9
hear [13] 4/1 11/17 16/24
22/21 28/9 28/10 29/19
38/18 53/12 56/20 66/2
86/12 86/15
heard [15] 18/22 22/2
22/22 34/15 35/12 53/3
53/4 53/13 60/12 67/22
67/24 67/24 84/14 86/15
92/24
hearing [4] 16/9 35/5 53/1
82/20
heightened [1] 24/10
heightening [1] 71/18
help [5] 3/9 11/7 12/4 25/4

## H

help... [1]  58/4
helpful [1]  8/12
helping [1]  57/22
helps [2]  16/10 38/4
her [13]  5/18 22/22 22/25
25/11 28/24 31/7 36/4
38/14 57/18 71/12 72/19
88/17 90/8
here [62]  2/20 2/21 2/25
3/6 3/13 4/3 4/20 5/4 8/9
8/17 11/8 11/20 20/4 20/10
21/10 21/12 21/16 23/13
23/14 25/12 26/20 26/25
27/6 27/10 27/19 33/10
34/8 34/22 35/4 37/11
38/15 39/4 39/25 40/8
40/23 44/14 45/16 46/11
48/9 48/10 48/13 49/9
52/13 54/18 56/21 57/4
57/7 57/12 62/3 63/6 66/22
69/22 71/6 73/7 73/7 74/8
75/16 79/1 81/1 83/22
85/17 91/7
hereby [2]  94/9 94/15
herein [1]  94/12
herself [5]  8/2 25/25 61/12
71/7 71/22
hey [3]  60/12 68/1 85/1
higher [2]  51/11 51/14
highlighted [2]  51/4 51/5
highly [1]  58/25
him [14]  9/24 12/23 12/23
25/24 43/19 57/5 63/15
66/11 68/12 69/1 74/12
74/13 79/25 89/13
himself [1]  87/12
hindrance [1]  34/19
his [26]  6/11 6/23 17/2 17/3
17/4 21/3 21/4 22/15 25/11
31/18 31/19 32/12 33/17
42/8 49/12 50/11 55/2 55/8
58/17 69/20 76/20 80/10
82/1 83/4 86/22 90/5

hit [1]  16/2
hold [7]  8/18 29/17 60/23
76/23 81/3 82/18 86/21
holder [1]  46/2
holding [2]  46/3 67/15
Honor [80]  4/2 5/5 5/8
5/14 7/2 9/18 10/23 12/5
12/6 12/7 13/19 15/4 15/9
17/22 18/25 20/10 20/22
21/3 21/6 21/17 21/22
23/22 26/4 26/7 26/19 27/5
27/18 28/7 29/12 29/16
30/7 31/1 31/6 32/17 32/21
33/11 36/11 36/18 36/21
37/3 40/5 41/8 42/1 42/18
42/19 44/3 54/7 54/18 55/1
57/19 58/8 59/12 60/14
62/2 62/20 63/5 68/23 69/6
71/14 72/5 72/18 74/25
76/5 78/15 78/24 79/18
80/18 80/23 81/6 81/9
82/15 83/17 87/10 87/25
89/7 89/17 90/14 92/3
92/11 92/14
Honor's [1]  14/5
HONORABLE [1]  1/11
hope [1]  89/4
hopefully [4]  2/18 28/14
49/18 54/2
horrific [1]  46/9
hosted [8]  9/24 46/15 75/7
75/12 75/13 75/20 75/24
75/25
hours [3]  3/2 3/8 30/1
how [25]  4/15 8/7 8/10
11/11 13/8 34/22 36/2
36/25 39/12 40/10 40/14
42/14 46/21 46/23 48/19
48/25 57/20 61/3 68/5
70/10 77/25 78/4 93/21
93/21 93/22
however [5]  13/12 27/2
37/12 37/12 56/10
hunt [3]  76/3 76/3 91/14

## I

I'd [8]  53/14 55/2 62/9
68/21 84/5 86/1 89/4 93/19
I'll [18]  51/4 51/22 52/21
55/25 60/3 63/21 70/25
72/19 76/23 76/23 78/19
79/16 80/19 82/18 87/17
92/16 92/22 93/7
I'm [45]  3/18 3/22 4/3
10/20 12/24 16/13 39/3
39/23 43/19 49/1 49/16
51/13 52/12 53/12 53/15
57/12 59/4 59/6 63/10 66/2
66/22 67/20 67/20 70/10
73/21 73/21 73/24 75/15
78/10 79/23 80/5 80/23
83/6 83/17 84/4 85/14 86/3
87/23 88/6 88/15 88/16
89/14 90/2 92/17 93/19
I'm' [1]  79/8
I've [11]  35/21 48/21 50/24
51/3 59/7 62/21 65/14
75/16 80/25 82/17 92/24
idea [2]  48/18 91/21
ideally [1]  6/16
identically [1]  17/25
identification [2]  14/6
84/20
identified [4]  13/21 56/11
77/24 81/17
identify [1]  38/20
identifying [1]  82/21
ignore [2]  4/18 46/15
immunity [2]  22/19 22/24
immunize [2]  21/12 22/3
immunized [3]  12/3 21/10
21/11
impact [3]  7/16 7/20 53/16
impaneled [2]  30/14 66/19
impasse [3]  37/24 39/25
40/18 40/19
imply [1]  49/4
important [1]  74/18
importantly [1]  17/17

# I

improper [4] 28/19 33/4 33/20 33/21
impropriety [4] 10/7 42/20 42/21 89/11
inability [1] 22/2
inadvertent [1] 72/7
include [1] 14/16
included [2] 30/10 30/12
including [4] 15/12 26/23 61/2 83/2
inconvenience [1] 28/11
increase [1] 86/22
incriminating [4] 19/11 19/14 19/23 31/21
incrimination [1] 31/20
independent [1] 74/8
indicated [5] 10/15 10/15 58/18 58/19 67/1
indicates [1] 91/4
indicating [1] 83/11
indication [3] 22/18 34/24 62/4
indict [5] 32/10 32/12 32/14 57/5 73/3
indicted [2] 25/8 33/20
indictment [2] 6/14 7/19
individual [11] 12/14 13/24 13/25 14/1 14/14 18/21 18/23 33/17 50/22 83/8 83/9
individualized [1] 23/8
individuals [3] 13/21 82/25 91/23
inference [2] 29/3 32/13
influences [1] 56/15
information [3] 66/17 69/9 77/12
ingress [1] 36/6
inherently [2] 87/23 88/19
initial [1] 55/1
initially [1] 67/1
inkling [1] 48/21
innocent [1] 27/22

inquiry [4] 14/6 14/11 19/19 82/23
inside [1] 67/18
insofar [10] 5/14 11/21 39/15 43/11 43/22 77/13 81/21 83/7 84/19 93/2
inspect [1] 30/5
instead [4] 17/18 32/16 43/25 44/1
instructed [1] 51/13
instruction [1] 15/19
instructive [1] 28/25
instrument [1] 31/11
interest [6] 14/17 15/1 43/3 43/10 56/13 68/11
interested [2] 52/10 66/12
interesting [2] 32/21 65/1
interference [1] 73/16
interim [1] 93/20
intermediate [1] 73/17
internet [6] 60/19 62/7 70/2 70/4 70/23 76/13
interpret [1] 45/24
interrupt [1] 18/4
interview [1] 55/9
interviews [1] 24/21
intimated [1] 52/21
introductory [1] 49/12
investigate [1] 89/5
investigated [1] 91/25
investigating [11] 9/13 22/6 28/20 46/4 75/8 85/2 88/8 88/25 89/19 90/10 91/21
investigation [34] 10/3 10/9 10/14 11/22 13/10 15/1 15/2 30/3 31/22 42/17 43/4 44/13 46/13 47/2 47/4 47/18 47/25 49/8 50/6 58/16 60/13 60/16 64/21 66/18 66/18 67/18 73/14 75/13 89/13 90/16 90/24 91/14 91/15 93/2
investigative [3] 8/16 15/4

30/3
investigators [2] 10/17 16/19
invite [1] 40/11
invites [1] 44/11
invocation [1] 29/4
invoke [10] 16/18 19/19 20/1 20/13 21/15 21/15 25/11 26/2 27/12 32/12
invoking [2] 31/19 57/13
involved [10] 20/24 20/25 21/3 21/4 21/5 23/23 35/18 35/21 62/5 75/12
involvement [2] 13/25 14/5
irrefutable [2] 6/1 6/3
Irrefutably [1] 72/13
irrelevant [1] 37/21
is [382]
isn [2] 9/10 13/5
isn't [4] 39/14 59/6 65/9 81/23
Isokoff [2] 61/4 79/24
issuance [2] 50/14 92/23
issue [16] 7/5 7/18 9/19 9/20 12/12 15/23 33/25 34/2 51/9 55/18 57/4 57/6 74/12 74/16 74/18 75/21
issued [5] 9/24 32/5 33/1 33/4 50/8
issues [2] 5/13 19/17
issuing [1] 92/18
it [349]
it's [62] 2/19 3/8 8/4 8/20 35/14 40/1 44/16 45/21 49/25 51/2 51/3 51/11 51/13 51/18 51/19 52/3 52/3 52/13 54/16 54/17 56/1 56/10 59/25 60/8 60/18 60/19 61/10 61/13 61/14 62/13 62/14 62/22 64/18 66/7 69/7 69/9 69/13 70/12 70/19 70/25 73/5 73/12 73/20 73/22 73/24 75/6 75/6 75/14 75/15

**I**

it's... [13]  77/24 79/2 79/4 79/9 80/12 81/19 82/18 86/16 87/24 90/19 93/1 93/4 93/13

its [5]  8/14 8/15 8/22 26/10 33/19

**J**

jammed [1]  35/5
job [3]  17/8 17/9 19/15 5/18
join [1]  5/18
joining [2]  5/11 89/15
joint [1]  89/22
Jone's [1]  92/10
JONES [68]  1/18 2/7 2/8 4/17 5/23 6/9 6/22 7/8 7/19 9/4 9/6 9/10 10/3 10/9 10/13 14/16 15/13 20/6 21/3 23/11 29/20 38/18 42/15 43/5 47/12 47/21 47/25 49/7 49/23 50/9 50/11 53/9 55/2 57/7 58/9 58/17 61/2 61/24 64/13 64/14 65/8 66/11 66/12 66/16 66/21 67/25 68/11 72/11 73/3 75/9 75/18 76/1 81/11 81/11 81/24 83/2 83/16 83/18 84/17 84/21 84/23 86/10 87/11 89/12 90/6 90/9 90/17 90/25
Jones' [5]  2/10 48/20 65/25 74/12 84/8
judge [15]  1/11 4/7 4/16 15/17 24/18 25/13 38/10 44/18 53/18 56/12 75/9 78/22 86/6 91/2 92/8
judge's [1]  51/17
judicial [10]  51/12 53/15 56/6 56/6 71/17 84/12 84/16 89/22 89/25 94/14
July [9]  1/12 2/4 53/9 53/9 55/4 58/18 58/22 58/23 94/10

juncture [1]  72/21
June [6]  9/24 53/8 82/4 82/7 82/8 82/9
juries [3]  30/4 32/3 74/3
jurisdiction [2]  12/11 27/19
juror [1]  80/2
jurors [5]  1/19 7/25 41/10 48/6 93/8
jury [93]  1/5 1/10 2/3 6/12 6/13 6/13 6/14 6/19 7/10 7/14 8/3 8/14 8/17 8/22 9/7 9/15 10/3 12/4 12/16 13/11 13/18 14/11 15/4 16/14 16/17 19/19 19/25 20/3 21/10 21/17 22/8 24/8 24/15 25/23 26/9 26/10 27/16 28/23 28/25 29/7 30/1 30/2 30/13 31/18 31/22 32/6 32/6 32/10 32/11 32/14 32/19 33/17 33/18 33/19 33/20 33/22 33/23 34/8 34/20 34/25 35/10 38/1 40/4 41/19 43/4 47/3 47/21 47/24 48/1 48/5 48/11 48/15 48/16 48/18 48/25 52/16 55/3 58/21 64/17 67/10 67/19 68/2 68/5 72/11 74/9 80/2 88/8 88/24 90/20 91/7 91/20 93/4 93/4
Jury's [2]  8/5 60/15
just [48]  3/21 5/7 5/8 13/9 15/10 16/2 17/4 17/23 17/25 18/10 18/11 26/5 27/1 27/13 35/11 37/14 38/14 39/5 39/10 40/5 43/8 43/15 45/22 46/16 49/9 52/4 54/21 55/10 59/18 61/14 66/14 66/24 67/10 69/11 69/14 71/1 71/13 80/5 80/12 81/1 85/9 89/13 89/17 90/24 91/2 92/19 93/8 93/20

justification [1]  86/16
justified [1]  86/16

**K**

keep [3]  38/12 71/1 74/21
Keeping [1]  29/21
kind [7]  3/11 3/15 45/11 45/16 45/21 50/18 70/15
kinds [1]  23/7
kmow [1]  15/5
knew [4]  59/1 62/6 62/6 62/7
know [52]  2/16 3/16 5/20 6/10 8/23 9/9 10/21 11/19 16/23 17/3 19/1 20/2 21/10 21/22 22/7 25/25 27/1 27/20 28/2 28/3 28/10 28/23 29/1 30/10 31/8 32/24 34/22 34/25 35/21 35/25 38/5 39/5 41/22 46/4 48/19 48/23 51/21 53/4 59/17 61/8 61/10 62/5 67/13 67/15 68/5 68/13 69/12 71/21 80/1 80/3 89/8 93/21
knowing [1]  68/11
knowledge [1]  84/15
known [2]  10/2 64/13
knows [3]  61/17 62/8 64/1
Kwanzaa [1]  81/15

**L**

L-A-M-P-L [1]  12/7
labeling [1]  13/7
lack [1]  47/17
laid [1]  59/16
Lampl [15]  12/6 14/3 25/20 25/22 26/7 30/22 31/2 31/3 31/24 32/10 33/9 33/16 34/6 40/1 56/2
Lample [3]  32/12 33/12 34/1
lands [1]  52/23
language [3]  8/3 51/25 83/10

# L

larger [2]  49/5 81/20
largest [1]  81/19
last [7]  22/1 22/1 23/19
44/20 78/18 82/7 86/7
late [5]  55/3 55/4 76/10
82/8 82/9
later [9]  10/17 26/11 33/19
41/10 53/11 60/17 60/25
62/7 64/5
law [16]  12/13 14/3 16/11
27/19 28/7 30/20 40/1
42/23 42/25 44/24 45/2
45/17 47/15 55/14 55/17
66/6
lawyer [6]  11/9 17/5 17/7
25/24 39/11 39/11
lawyer-to-lawyer [1]
39/11
lawyers [4]  2/20 35/18
37/14 37/22
layed [1]  55/20
lays [1]  84/1
lead [4]  14/6 19/15 19/16
19/17
leak [6]  61/25 68/14 71/21
71/22 71/25 72/1
leaked [1]  62/1
leaking [2]  67/12 67/12
leaks [3]  66/4 72/25 77/14
learned [2]  67/17 91/3
least [5]  24/9 27/4 27/24
77/24 84/10
leave [5]  8/9 35/23 76/8
76/9 85/25
leaving [1]  48/10
legal [17]  8/2 18/1 28/18
45/3 47/3 47/9 47/12 47/15
47/23 48/7 82/24 82/24
83/5 85/12 85/16 88/23
92/10
legally [1]  54/1
less [4]  12/23 42/3 58/15
59/14

let [18]  2/15 6/7 15/21 18/4
22/7 28/5 39/23 40/23
41/22 42/5 44/20 61/16
62/14 72/19 78/19 79/25
90/6 92/5
let's [9]  2/2 3/20 13/9 54/21
59/15 74/16 74/18 74/19
91/13
letter [26]  5/24 9/4 9/25
10/18 10/19 24/7 49/13
53/8 57/10 58/18 58/24
59/1 61/2 64/6 64/6 64/14
65/19 66/16 66/24 67/16
68/14 72/23 77/5 84/21
86/10 90/10
letters [10]  5/17 18/5 18/13
49/25 58/13 61/12 61/13
64/8 64/12 67/5
letting [1]  38/21
level [3]  13/25 46/19 65/13
leveled [1]  12/14
liability [2]  13/1 13/16
Lieutenant [12]  7/16 9/21
44/1 50/4 64/3 64/4 73/1
74/20 75/1 75/4 81/12 82/1
life [3]  52/19 60/11 60/1
light [5]  2/25 9/3 11/25
41/8 93/9
lighthouse [3]  17/14 17/16
18/24
lights [1]  46/25
like [36]  3/18 6/18 11/16
14/21 15/17 16/1 18/15
23/8 23/8 23/19 43/19 45/9
45/10 48/7 48/14 49/13
52/18 53/14 54/3 54/8 55/2
55/10 62/9 63/21 66/13
66/14 66/24 68/21 70/17
70/20 84/5 85/4 85/9 85/9
86/1 88/21
likelihood [1]  71/18
limb [1]  73/22
lines [1]  24/3
link [1]  19/5

links [1]  19/15
list [6]  27/5 30/10 30/11
30/12 30/12 75/22
listed [1]  51/16
literally [1]  57/8
little [11]  3/13 22/1 35/14
41/16 57/11 59/13 65/15
65/17 76/25 81/23 92/22
ll [8]  7/22 25/2 28/4 31/1
37/14 41/22 42/2 43/11
location [1]  40/21
logistics [1]  6/24
long [6]  37/16 38/23 39/10
40/14 69/13 82/20
longer [2]  37/6 41/16
look [10]  6/18 35/16 55/19
62/14 69/11 78/21 79/16
81/10 85/2 91/17
looking [6]  3/22 22/20
22/21 23/3 63/21 83/3
looks [1]  43/19
loose [1]  78/18
lost [2]  59/21 88/21
lot [11]  2/19 2/20 16/23
21/4 24/2 31/3 42/3 42/12
49/13 61/10 64/9
lots [1]  88/13
love [3]  60/20 71/13 84/5
lower [2]  51/13 51/13
lowercase [1]  46/24
Lowndes [1]  9/14

# M

machine [1]  73/5
made [18]  14/2 20/17
27/21 37/18 41/17 43/23
46/11 47/19 56/23 57/17
58/5 63/1 63/8 74/6 80/4
86/14 86/18 89/22
magical [1]  12/20
magically [1]  22/10
Magloclin [2]  91/4 91/4
magnitude [1]  74/3
mail [4]  20/9 59/3 77/8
77/12

# M

mails [3]  19/16 20/9 59/15
main [2]  27/21 27/21
maintain [1]  46/12
major [1]  35/16
make [24]  2/20 6/6 14/16
34/14 37/12 37/13 37/24
39/14 45/23 50/18 52/21
54/21 60/3 62/14 63/2 79/2
80/5 80/24 81/1 82/2 86/1
92/23 93/11 93/15
makes [4]  16/24 28/3 28/10
45/15
making [1]  71/17
manage [2]  42/14 79/2
managed [1]  8/11
mandatory [2]  44/16 44/17
many [7]  8/16 20/25 21/1
27/2 35/25 36/25 58/7
map [1]  24/2
marched [1]  34/15
marching [1]  55/10
mark [1]  68/21
marked [1]  63/4
material [1]  65/2
materially [1]  64/25
matter [10]  18/11 26/1
46/14 47/12 47/14 48/9
48/21 85/7 91/23 93/24
matters [2]  31/21 83/9
may [62]  6/5 7/23 8/23
10/25 11/7 12/7 12/17
12/25 13/6 13/22 14/6
15/17 16/21 17/1 17/6 18/9
22/4 22/4 22/6 22/13 25/10
26/4 28/22 28/23 29/16
30/4 30/5 30/8 31/17 34/21
36/25 37/14 37/24 39/8
39/9 39/13 39/21 40/2
40/14 40/15 40/22 40/24
41/13 41/14 43/6 47/24
49/15 51/5 53/20 54/7 55/3
56/11 57/20 58/8 59/22
59/24 62/13 62/20 71/14

80/22 82/14 93/13
maybe [11]  17/14 37/5
46/18 47/20 48/16 52/5
52/5 57/14 57/22 58/11
76/20
MCBURNEY [1]  1/11
me [39]  5/21 6/7 8/1 9/7
11/7 12/4 13/13 13/15
15/14 16/24 17/18 18/4
22/1 25/4 26/1 29/24 44/20
45/19 45/20 46/18 53/21
53/25 55/24 57/22 59/2
59/11 60/10 61/16 62/14
67/21 68/25 73/18 74/25
78/20 85/2 87/4 88/25 92/5
93/20
mean [16]  11/15 13/5
17/19 18/9 20/8 27/18 30/8
40/8 40/24 44/17 45/9
46/23 46/23 49/4 87/1
87/18
meaning [2]  31/11 48/5
meaningful [1]  93/12
meanings [1]  88/13
means [1]  28/16
meant [1]  43/17
media [11]  2/23 7/6 7/21
35/17 35/19 35/23 36/1
46/2 67/24 68/2 74/19
medial [1]  47/4
meet [2]  10/16 58/10
members [1]  71/7
memorialize [1]  92/16
mention [1]  82/12
mentioned [3]  38/20 49/15
67/11
mere [1]  64/18
merely [2]  2/10 72/9
met [2]  29/1 85/12
method [1]  36/12
micromanage [1]  41/21
middle [1]  59/21
midst [1]  42/17
might [17]  6/18 8/14 8/15

11/11 15/6 16/18 23/17
24/15 32/4 58/3 58/5 58/6
63/16 63/17 75/9 75/21
82/7
mind [2]  22/25 65/16
mindful [1]  28/11
mine [1]  79/4
minimum [2]  29/12 42/15
minor [1]  17/6
minute [2]  24/13 61/3
misconduct [1]  83/23
misled [1]  48/4
miss [1]  89/3
misunderstood [1]  7/23
mix [1]  40/18
mobility [2]  14/24 18/21
moment [1]  46/8
money [7]  63/22 65/19
75/14 77/25 78/4 81/1
81/24
month [1]  80/11
month,Mr [1]  63/13
moot [4]  6/6 9/8 10/22 42/9
more [28]  3/10 3/21 15/14
16/6 17/17 24/3 24/6 24/12
24/13 28/1 28/16 29/18
36/8 36/19 37/7 38/17 39/4
43/7 49/11 52/8 61/10
65/20 73/8 75/14 76/25
81/4 87/12 90/2
morning [1]  4/15
most [5]  36/4 38/23 48/12
73/25 87/11
motion [40]  2/6 2/8 2/10
2/15 2/16 2/17 4/4 5/11
5/15 5/18 5/23 6/7 11/4
11/18 13/21 18/16 27/18
36/10 36/22 41/17 43/11
57/16 57/16 58/19 64/23
72/16 79/3 83/1 83/2 83/23
84/22 84/24 85/15 85/17
86/25 87/1 87/3 89/8 89/15
89/20
motions [3]  1/10 2/5 2/13

**M**

motivated [1]  47/19
motivation [3]  48/18 49/9
88/2
mouth [2]  29/21 72/8
move [4]  14/13 15/24 17/9
41/23
moved [1]  42/6
moving [5]  2/19 23/6 41/9
41/10 71/1
mr [103]
Mr. [2]  17/2 17/4
Mr. Wade [2]  17/2 17/4
Mr.Dillon [1]  36/10
Mr.Wade [1]  23/7
MS [61]  1/19 1/19 4/25 5/1
5/3 5/14 11/18 13/4 13/4
14/22 14/23 16/24 16/24
21/18 21/22 22/2 22/14
22/21 22/25 23/10 23/10
23/11 24/19 24/20 25/18
31/7 36/14 37/2 37/10
38/13 38/18 39/19 43/15
43/16 50/7 50/7 53/12
53/14 53/17 54/10 54/12
54/14 54/21 59/9 69/21
72/16 76/10 76/24 79/11
81/3 81/7 86/24 86/25 87/3
88/11 92/5 92/9 92/12
92/12 92/20 92/20
Ms. [9]  4/25 5/10 5/11 11/4
34/21 35/25 36/9 36/14
37/10
Ms. Clapp [1]  5/10
Ms. Pearson [6]  4/25 5/11
34/21 36/9 36/14 37/10
Ms. Pearson's [1]  35/25
Ms. Peterson's [1]  11/4
Ms.Deborroughs [1]  11/18
much [11]  15/17 23/19
27/6 35/13 35/23 44/10
44/25 52/19 77/25 78/4
91/1
mud [1]  7/9

my [66]  4/19 6/4 6/7 7/8
8/12 8/13 9/5 9/20 9/24
12/19 13/2 13/5 13/9 13/14
15/3 16/25 17/7 17/8 17/24
17/25 19/2 19/11 19/19
20/5 24/22 25/10 26/23
28/22 29/21 42/8 43/17
44/5 44/13 47/2 49/4 49/15
52/15 52/16 52/24 54/7
55/13 55/13 55/16 56/1
59/12 59/18 59/21 60/5
62/6 62/21 63/2 63/22 66/5
69/11 69/19 72/3 79/14
84/14 85/18 86/21 89/18
91/2 91/3 93/7 94/12 94/15
myself [3]  10/19 59/13
92/17

**N**

name [11]  6/23 19/7 19/8
19/14 28/22 28/24 38/1
38/6 64/12 76/22 81/20
named [2]  46/17 47/2
names [2]  20/21 26/24
narrow [1]  15/20
NATHAN [3]  1/15 4/7
43/24
national [1]  47/3
navigate [2]  11/7 44/14
near [2]  52/23 93/5
necessarily [4]  9/12 13/25
56/5 60/3
necessary [2]  41/14 71/21
neck [1]  55/6
need [44]  2/17 3/3 3/18 6/9
6/10 6/22 6/25 8/6 8/19 9/4
9/6 11/2 12/1 13/23 14/5
16/10 16/16 21/18 23/2
23/17 25/22 32/13 35/15
36/5 36/25 37/9 37/12
37/14 38/1 39/5 40/9 44/6
44/14 49/5 53/25 54/5 54/6
57/23 60/7 61/19 61/20
85/24 92/16 93/13
needs [5]  10/11 37/22 39/2

73/10 91/25
negative [3]  20/16 29/3
49/23
neutrality [1]  56/4
never [9]  18/22 27/25 29/1
53/3 57/2 64/17 79/18
86/23 89/25
new [4]  54/13 66/10 91/13
91/17
Newnan [1]  5/2
news [7]  11/25 35/16 47/13
63/25 64/7 64/8 67/14
next [13]  8/23 27/7 40/21
40/24 41/2 41/15 48/8
48/15 58/17 58/20 58/23
63/12 83/22
nightly [2]  47/4 63/25
no [57]  5/8 6/1 7/2 14/20
15/9 18/2 22/17 23/13 24/1
26/1 30/9 32/3 32/13 32/14
34/25 35/9 36/11 36/21
43/22 43/23 44/21 44/22
45/15 46/14 47/14 52/17
54/23 59/15 60/1 62/4
65/12 66/2 66/16 68/23
72/2 72/3 74/21 76/12
76/16 77/8 77/19 77/22
78/15 80/12 80/12 80/12
80/12 83/13 83/20 84/9
84/14 85/8 85/24 89/7
92/11 92/14 92/25
nobody [1]  50/21
nodding [1]  31/7
nominate [1]  76/1
nominated [1]  13/12
nominee [1]  82/1
non [5]  12/3 28/9 32/19
46/10 46/13
non-immunized [1]  12/3
non-partisan [1]  46/13
non-partition [1]  46/10
non-special [1]  32/19
normal [3]  33/5 38/24 52/3
normally [1]  51/19

**N**

not [181]

note [6]  18/15 32/22 32/24 43/11 51/22 53/6

noted [1]  50/19

noteworthy [1]  38/11

nothing [12]  20/10 22/8 23/2 26/11 27/11 27/15 34/4 36/13 43/9 73/2 77/11 92/8

notice [1]  81/11

Nova [2]  16/15 25/22

November [3]  7/20 49/2 75/18

now [33]  8/8 9/11 12/24 15/3 15/7 16/24 20/17 23/3 25/8 31/7 34/16 39/1 40/16 45/19 45/20 54/3 58/3 60/24 61/13 61/18 62/1 64/6 67/2 71/12 75/7 75/16 76/6 77/4 77/20 81/10 85/20 92/24 93/1

number [4]  1/6 38/2 38/6 80/25

numerous [5]  7/21 64/7 64/11 67/16 74/3

nuts [1]  40/17

**O**

o'clock [1]  2/4

oath [3]  28/24 58/11 58/12

object [8]  69/6 76/14 76/17 76/17 77/11 77/15 77/16 83/18

objected [1]  79/20

objection [14]  53/2 62/17 68/23 69/11 76/12 77/6 77/9 77/21 77/22 78/8 79/19 83/15 84/19 85/22

objections [2]  77/3 93/17

obligation [1]  49/7

observation [1]  53/17

obstacles [1]  41/23

obtained [1]  69/25

occur [1]  41/5

occurred [1]  57/2

occurs [1]  63/1

October [6]  8/14 8/25 9/16 52/11 66/2 66/2

of Charlie [1]  43/24

off [9]  8/18 10/21 57/11 60/23 70/1 70/3 77/2 81/16 91/12

offer [8]  22/19 22/24 69/3 76/6 76/11 80/7 80/22 84/9

offered [3]  68/25 77/13 77/25

offering [1]  7/24

office [66]  2/7 2/14 3/23 3/25 3/25 4/4 4/8 7/7 7/17 7/24 8/4 9/9 9/14 10/11 11/6 11/9 18/3 18/6 20/23 23/3 35/6 36/8 38/4 38/12 39/10 40/12 41/7 41/13 41/22 42/10 46/1 46/2 46/4 47/22 48/19 52/25 55/7 57/25 59/2 63/9 64/4 66/4 66/10 66/14 66/16 67/9 67/11 67/14 68/1 68/18 72/9 73/25 74/7 77/13 79/25 83/25 84/2 84/17 89/12 90/8 91/6 91/9 91/12 92/7 92/25 93/3

officer [2]  56/18 84/17

offices [5]  17/12 22/24 50/20 52/3 56/6

official [4]  51/16 94/8 94/15 94/20

officially [1]  84/20

officials [1]  91/10

often [2]  29/7 63/10

oh [5]  43/13 48/11 54/23 63/24 76/5

okay [58]  4/13 4/21 5/6 5/25 6/4 7/3 7/22 10/25 15/10 18/14 21/18 23/4 25/17 30/25 34/12 35/13 36/14 36/23 44/4 45/14

47/6 50/2 52/7 54/20 54/25 56/3 60/16 60/23 62/19 64/2 65/18 69/2 69/23 70/6 70/25 71/3 71/11 72/6 72/12 72/19 73/9 76/9 77/7 77/18 78/9 79/11 79/16 80/6 80/10 83/19 84/3 86/9 86/13 86/15 90/1 90/18 92/4 92/9

old [2]  55/22 55/23

omit [1]  3/22

once [9]  15/24 18/23 37/1 51/23 56/10 56/13 65/1 73/4 74/5

one [55]  3/18 3/21 7/23 10/4 13/11 14/21 14/22 15/8 15/8 16/6 16/16 22/3 24/6 24/6 27/21 29/16 31/10 32/14 34/25 35/15 38/5 38/10 39/14 39/22 45/11 45/18 46/23 48/10 48/22 49/17 49/18 51/17 52/8 60/8 63/17 63/17 64/3 64/5 65/12 65/20 66/14 68/16 71/21 72/22 73/17 75/24 76/13 79/21 83/13 87/7 88/2 88/3 90/15 91/8 91/10

ones [1]  81/9

only [30]  2/24 3/3 3/18 5/20 6/11 14/17 15/8 20/6 25/8 34/1 34/2 35/16 41/4 45/1 48/5 48/6 48/11 49/18 52/19 53/22 58/25 61/7 66/7 67/15 67/25 73/19 73/22 85/3 89/6 91/19

operate [1]  68/7

operates [1]  68/16

opined [1]  65/14

opinion [2]  83/4 83/6

opponent [11]  9/21 44/13 46/3 46/16 47/1 48/24 49/1 81/12 81/14 81/24 85/3

opposed [6]  5/13 25/24

# O

opposed... [4]  58/1 68/1 80/1 83/12

opposition [1]  2/15

optics [3]  43/6 43/7 46/8

option [2]  31/18 50/5

order [4]  35/6 56/12 92/18 92/18

ordinary [2]  32/6 75/6

organization [1]  62/6

original [4]  34/14 60/8 82/17 86/3

originally [1]  43/14

other [40]  6/18 6/19 8/24 9/11 10/4 10/12 13/2 14/13 14/25 15/15 16/4 17/3 17/6 19/12 19/15 28/15 36/16 41/18 41/19 49/17 50/5 50/13 50/22 52/9 57/14 64/5 65/21 67/15 67/21 67/23 69/16 72/23 73/3 76/23 79/19 82/23 87/22 91/9 91/11 91/16

others [4]  40/2 43/7 53/9 77/4

otherwise [4]  26/15 49/4 85/11 85/14

ought [4]  8/9 53/20 84/5 90/12

our [27]  5/23 20/10 22/18 24/19 25/14 27/11 27/18 29/14 34/9 38/10 38/12 38/25 41/9 52/9 58/3 66/23 74/4 81/2 85/5 85/22 86/1 87/11 87/13 87/15 87/16 89/14 89/20

out [41]  2/24 5/23 6/21 7/6 13/8 14/9 24/2 26/8 26/21 33/2 37/2 37/2 38/13 40/17 41/1 41/11 50/1 50/13 55/2 55/8 55/20 60/11 60/12 61/4 61/17 65/24 65/25 66/1 66/4 70/12 72/15 72/21 73/22 75/16 81/4

84/1 84/3 84/7 86/9 92/5 93/17

outcome [8]  39/9 73/1 74/1 74/25 88/10 88/17 88/21 89/25

outlet [1]  35/16

outlets [1]  2/24

outlined [2]  27/18 29/12

outreach [1]  67/23

outside [1]  18/24

over [6]  4/14 37/5 38/19 63/13 75/15 80/8

overarching [1]  11/17

overlap [1]  39/17

own [4]  18/16 27/11 47/25 91/3

# P

P-O-S-T [1]  51/3

p.m [1]  41/20

PAC [2]  70/6 70/8

pace [1]  50/6

PACK [1]  77/2

page [6]  5/15 51/8 59/10 79/4 81/19 91/3

page 7 [1]  5/15

pages [1]  94/10

pains [1]  35/7

painting [1]  49/20

paragraph [1]  44/5

parameters [1]  55/9

paraphrasing [2]  47/20 90/2

part [12]  5/20 24/9 30/3 49/12 54/10 58/4 60/4 60/5 65/25 76/24 80/5 84/17

participation [2]  11/22 14/18

particular [5]  15/21 35/15 49/17 63/5 63/12

particularly [5]  7/15 24/2 58/2 63/14 63/16

parties [5]  2/22 14/5 39/23 47/13 88/19

partisan [8]  42/12 46/13

50/19 50/20 88/12 88/12 88/14 88/15

partition [1]  46/10

parts [1]  2/19

party [9]  18/18 21/1 46/19 50/23 57/18 82/1 87/6 88/2 88/2

passed [3]  8/19 38/7 53/6

past [1]  11/19

patient [1]  29/17

Pause [1]  43/13

Payne [1]  91/4

Pearce [1]  50/7

PEARSON [27]  1/19 4/25 5/3 5/11 5/15 11/18 13/4 14/23 16/24 22/2 22/14 22/21 22/25 23/10 24/20 25/18 34/21 36/9 36/14 37/2 37/10 38/14 38/18 43/16 86/24 92/12 92/20

Pearson's [1]  35/25

pegged [1]  50/3

pending [1]  89/22

people [32]  3/10 13/11 15/9 16/17 19/24 20/25 21/4 23/24 26/9 26/20 27/23 29/14 30/15 30/16 33/24 36/3 38/20 40/9 41/4 46/20 48/10 59/1 61/7 61/14 63/11 63/19 63/24 64/16 66/22 67/6 67/18 93/16

per [1]  15/19

percent [1]  11/24

perception [1]  55/18

perfectly [3]  86/9 86/12 86/15

perhaps [3]  10/12 48/12 91/9

period [4]  69/21 75/8 78/5 80/13

periodic [1]  71/8

periodically [1]  69/20

permission [1]  68/21

**P**

person [8] 3/21 18/22 28/24 29/1 32/11 49/1 67/15 76/2
person's [1] 19/2
personal [2] 43/3 43/10
perspective [7] 11/5 11/7 18/1 25/14 29/20 42/10 90/1
persuasive [1] 44/7
Peterson's [1] 11/4
phrase [5] 34/15 35/12 42/19 42/20 46/5
piece [2] 8/7 9/8
pivot [2] 4/14 39/1
place [5] 13/22 15/3 17/23 24/19 42/22
places [1] 26/25
plan [4] 15/22 16/5 92/25 93/13
planet [1] 61/7
planned [1] 15/18
Platt [1] ·4/22
played [3] 13/8 61/4 84/17
plays [3] 6/21 8/4 56/18
pleading [6] 45/8 52/24 62/11 62/15 62/17 86/11
please [4] 12/4 51/6 58/23 85/19
pleased [1] 82/12
plug [1] 54/8
poignantly [1] 12/11
point [34] 5/23 6/2 10/10 10/24 12/2 12/17 15/22 16/20 17/13 21/2 21/5 22/2 24/22 24/23 25/2 29/16 34/13 34/14 34/19 48/9 48/22 49/6 50/18 54/8 55/1 55/2 64/23 65/10 74/4 80/4 81/12 81/16 85/5 86/7
pointed [4] 26/8 65/7 66/5 72/21
pointing [1] 12/6
points [2] 75/7 91/3

political [29] 19/15 44/13 45/22 45/22 46/2 46/4 46/16 47/1 48/24 49/1 49/9 50/5 50/22 50/23 52/2 53/7 57/18 57/25 58/4 71/23 85/3 87/4 87/20 87/21 87/23 88/1 88/2 88/19 88/19
politically [5] 47/19 65/12 65/13 71/24 87/5
politicization [5] 87/15 87/18 87/19 87/21 89/2
politicized [2] 28/1 28/3
politicizing [1] 87/20
pool [2] 3/12 3/19
portion [2] 5/18 74/8
position [2] 20/20 22/18
possible [2] 54/9 57/21
post [2] 50/23 51/3
postman [1] 18/12
posture [1] 49/6
potential [4] 4/14 13/15 14/25 58/19
potentially [1] 43/5
power [2] 26/10 54/8
powerful [2] 31/25 32/2
powers [1] 22/11
practical [2] 6/6 73/12
precedence [1] 29/6
precedent [3] 20/13 28/18 74/4
preceding [2] 45/20 59/10
preferable [1] 74/1
prepared [1] 66/23
preparing [1] 56/19
present [1] 70/17
presentation [6] 69/12 69/20 76/22 83/25 84/9 86/23
presented [1] 69/16
presenting [1] 56/19
preserve [1] 70/20
president [1] 91/8
press [9] 9/19 57/8 57/13

57/14 57/15 64/18 65/24 72/25 88/11
pressure [1] 40/14
presumably [1] 69/17
presumptive [1] 66/6
pretty [3] 31/25 42/16 76/21
previously [1] 60/10
primary [1] 22/5
prime [1] 93/20
print [1] 62/23
prior [2] 24/20 81/25
privilege [4] 11/12 13/2 15/23 31/19
privileges [1] 20/13
proactive [1] 24/25
probably [6] 6/24 9/4 11/13 68/10 69/10 92/22
problem [2] 75/5 81/14
problematic [3] 46/18 47/5 58/3
procedure [2] 14/9 30/1
proceeded [1] 65/20
proceeding [2] 45/12 56/18
proceedings [4] 2/1 12/20 12/21 94/11
process [10] 6/8 23/19 37/6 41/11 42/6 52/20 52/20 57/22 84/24 89/8
processed [1] 22/13
processes [2] 69/18 87/16
product [2] 8/15 28/12
professional [4] 21/6 27/14 29/11 71/4
proffer [3] 19/21 24/15 29/13
prohibited [1] 10/8
prominent [2] 87/6 88/4
proof [1] 61/25
proper [2] 34/8 91/14
properly [3] 16/22 26/16 32/5
proposed [1] 36/12
proposition [3] 56/4 78/21

**P**

proposition... [1]  79/14
prosecute [2]  45/13 46/6
prosecuted [1]  88/16
prosecuting [7]  43/1 45/18
51/9 68/20 82/14 82/25
84/13
prosecution [3]  43/5 56/15
88/17
prosecutor [9]  4/8 21/8
43/12 45/8 46/6 56/12
56/14 58/10 66/10
prosecutorial [1]  83/23
prosecutors [4]  4/4 20/3
56/5 71/9
protect [2]  22/25 27/22
protected [3]  12/1 24/16
24/16
protection [4]  13/3 16/22
22/12 84/24
protections [1]  84/25
protects [1]  27/20
prove [1]  58/3
provide [1]  22/12
provided [2]  12/18 84/1
providence [1]  77/10
province [1]  76/13
provision [3]  30/13 33/2
74/5
provisionally [2]  78/10
78/17
public [17]  9/20 10/4 27/10
36/4 38/13 43/22 43/23
43/24 46/9 49/4 49/22
55/18 62/13 63/5 68/11
71/18 86/21
publication [1]  70/21
publicity [7]  20/2 34/19
35/4 35/5 35/10 67/3 73/4
publicly [12]  6/2 7/9 8/16
10/2 57/9 63/3 63/7 64/13
72/10 72/24 78/4 80/17
publish [6]  59/7 60/18
60/20 62/9 69/4 93/13

published [3]  54/24 59/19
93/5
pull [1]  70/3
pulled [1]  70/1
pulling [1]  64/1
punch [2]  22/3 22/4
punished [1]  85/7
purported [1]  43/18
purpose [29]  1/5 1/10 2/3
12/16 14/10 24/11 24/12
27/21 32/14 32/19 33/18
33/18 34/20 34/25 35/10
43/4 47/24 48/1 48/5 48/11
48/14 48/25 65/9 77/25
88/7 88/24 88/24 91/20
93/3
purposes [3]  3/3 6/6 27/22
pursue [3]  6/17 14/13
74/12
pursuing [1]  46/13
purview [1]  8/12
push [1]  90/5
put [16]  6/19 16/18 20/18
21/9 22/10 27/10 59/18
63/22 71/1 71/3 74/18 81/4
84/4 89/20 92/22 93/7
puts [1]  23/25
putting [2]  19/9 36/3

**Q**

quarantine [1]  37/11
quarters [1]  42/8
quash [8]  2/9 2/16 26/15
26/18 27/8 34/2 40/2 87/1
quashal [6]  4/5 4/11 26/14
36/16 87/2 89/15
quashed [1]  17/20
quashing [3]  36/24 41/10
92/16
quasi [1]  56/6
question [28]  5/10 6/10 7/1
12/19 13/5 15/20 15/23
16/4 19/4 24/6 24/9 26/22
32/21 38/6 41/6 41/12 42/8
43/17 44/15 44/21 55/13

55/13 65/10 78/18 88/23
89/23 91/24 92/18
questioning [2]  26/22
73/14
questions [16]  4/5 11/20
11/24 12/25 13/17 15/11
15/13 16/1 17/16 23/14
24/14 24/21 27/3 28/21
36/12 74/19
quiet [2]  29/21 29/21
quietly [1]  64/6
quite [1]  57/12
quote [3]  56/7 67/17 71/4
quoted [1]  64/11

**R**

race [6]  7/17 21/3 21/4
50/4 64/4 81/13
races [3]  21/2 21/5 43/25
raise [3]  6/7 51/9 77/3
raised [11]  3/24 5/12 9/22
36/9 41/17 42/15 63/13
72/22 78/1 84/23 86/7
raiser [1]  81/25
raises [1]  5/15
raising [3]  10/5 81/18
81/23
rank [2]  38/2 38/6
rates [1]  66/23
rather [1]  3/12
re [31]  1/4 3/16 7/19 13/13
15/4 17/6 20/2 20/8 20/9
20/9 20/14 21/11 22/6
22/23 24/25 25/8 25/16
26/11 26/12 26/17 26/18
28/4 29/17 30/18 33/9
33/24 34/9 37/17 38/5
39/12 41/1
re going [1]  37/17
reach [3]  6/10 6/25 39/25
reached [4]  2/24 40/18
40/19 60/12
reaction [2]  11/17 49/19
reactive [1]  24/25
read [5]  31/1 33/14 33/15

# R

read... [2]  71/13 84/10
reading [3]  33/13 55/16
71/12
ready [1]  8/20
real [1]  73/7
really [10]  3/3 3/9 21/13
37/23 41/12 45/21 64/21
67/3 73/2 73/6
reason [9]  24/7 24/9 29/5
40/25 69/14 78/3 83/20
85/12 89/3
reasons [1]  6/9
received [15]  2/16 5/16
5/20 5/24 18/5 50/8 55/2
58/12 58/17 58/24 61/1
64/11 64/14 84/21 85/10
receives [1]  71/7
receiving [1]  79/23
recipient [2]  31/13 79/22
recognize [4]  20/21 29/10
33/8 36/1
recognizes [1]  45/17
recollection [1]  79/14
recommend [3]  7/19 56/25
67/7
recommendation [2]  6/16
56/20
recommended [1]  90/5
record [9]  2/2 2/21 3/5
43/22 60/4 62/13 76/24
80/5 84/15
records [4]  30/5 43/20
43/23 63/4
recusal [3]  51/12 51/14
51/22
reduced [1]  39/8
reference [3]  47/20 51/8
84/25
referred [1]  74/6
referring [2]  11/14 79/10
refrain [1]  71/17
refused [1]  42/1
refusing [1]  31/20

regard [9]  10/9 13/24 32/3
58/8 66/11 68/17 69/1 80/6
89/13
regarding [2]  31/20 86/6
regardless [1]  8/7
regrets [1]  63/11
regular [3]  32/3 32/9 33/22
regularized [1]  37/8
regulations [1]  21/6
related [1]  91/10
relates [1]  71/20
release [4]  8/8 9/11 93/12
93/18
released [4]  9/2 93/6 93/14
93/15
releasing [1]  57/8
relevance [6]  50/4 77/11
77/15 77/23 79/21 79/24
relevant [5]  19/18 56/9
71/6 71/10 80/9
relief [4]  44/19 87/12 90/3
90/3
reluctant [1]  40/13
rely [4]  16/19 69/1 78/24
79/2
remarkable [1]  89/2
remarks [1]  49/12
remedial [3]  53/22 61/21
78/23
remedy [6]  45/5 47/10
52/10 73/10 87/13 89/13
remember [1]  18/20
reminded [1]  71/8
reminding [1]  71/11
remote [1]  14/24
repeat [2]  53/13 67/10
repeating [1]  92/17
replacement [1]  89/10
reply [1]  72/5
report [21]  3/9 6/15 7/18
7/25 8/5 8/8 8/20 9/11 9/12
49/4 66/1 67/7 67/10 80/7
90/21 92/23 93/4 93/14
93/19 93/20 94/9

reported [1]  7/21
reporter [12]  1/23 59/3
60/11 60/17 60/25 62/7
80/25 81/2 82/18 86/1 94/8
94/23
reporting [2]  61/17 94/15
reports [1]  9/1
represent [4]  45/11 49/24
59/14 60/24
representation [3]  60/9
69/24 78/2
representatives [1]  11/8
represented [2]  45/19 85/8
representing [3]  4/3 4/17
69/8
reptile [1]  55/9
republican [9]  18/18 21/1
87/6 88/4 88/8 88/9
88/15 89/5
republicans [1]  89/1
republish [1]  33/6
request [3]  29/15 60/5 69/4
requests [2]  36/16 53/3
require [3]  14/14 53/21
56/11
required [1]  83/12
requirement [1]  83/5
requirements [2]  53/16
82/24
requires [2]  43/1 74/5
requiring [2]  23/13 28/20
resign [1]  33/7
respond [2]  12/2 26/4
responded [1]  36/11
response [7]  2/17 5/22
55/21 72/16 72/16 83/1
84/22
responses [1]  3/23
responsibilities [1]  71/9
responsibility [2]  21/7
71/5
responsive [2]  24/24 42/23
rest [1]  38/2
result [3]  9/5 49/21 63/9

| R | S | |
|---|---|---|
| | | script [2]  23/14 59/20 |
| retains [1]  31/18 | said [19]  3/18 17/25 19/8 | seal [1]  94/15 |
| revelations [1]  58/1 | 25/1 29/11 35/14 35/20 | Sean [1]  20/22 |
| reviewed [2]  83/1 83/1 | 39/13 53/13 57/13 59/16 | seat [1]  42/6 |
| reviewing [1]  76/17 | 59/17 60/12 66/21 66/22 | second [5]  8/6 18/4 22/1 |
| revisit [1]  27/8 | 67/22 72/5 87/6 88/21 | 47/16 73/25 |
| rewarded [1]  85/6 | same [16]  9/16 13/22 33/14 | secrecy [2]  20/3 68/8 |
| rich [1]  35/14 | 37/2 39/20 45/9 50/1 50/8 | secret [1]  38/13 |
| ridicule [1]  86/21 | 50/9 50/23 51/4 60/17 | Secretary [1]  91/9 |
| ridiculous [1]  19/10 | 60/25 74/15 85/11 87/9 | see [22]  5/1 8/19 19/17 |
| right [37]  4/13 5/9 7/5 8/24 | satisfied [1]  85/16 | 23/5 35/17 37/17 41/2 48/7 |
| 10/24 15/3 15/7 17/8 20/12 | saw [1]  45/8 | 54/21 60/7 62/23 62/25 |
| 21/25 23/3 25/18 25/20 | say [35]  7/13 13/16 13/20 | 63/20 66/19 70/19 73/17 |
| 31/4 31/8 31/16 34/17 35/1 | 15/5 15/7 15/24 16/9 16/12 | 76/25 78/17 79/1 84/5 90/8 |
| 35/11 38/24 39/1 42/5 | 17/8 21/9 22/8 22/22 24/13 | 93/22 |
| 51/25 53/11 58/3 60/9 | 25/19 25/24 28/12 30/15 | seeing [1]  75/17 |
| 61/13 61/15 68/6 69/13 | 30/23 38/18 48/7 49/11 | seeking [5]  2/7 15/7 78/23 |
| 78/13 78/16 80/19 82/10 | 53/24 56/8 58/10 58/24 | 90/2 90/3 |
| 92/4 92/15 93/1 | 63/24 66/12 73/12 73/18 | seem [2]  38/25 87/8 |
| rights [8]  4/6 14/7 19/20 | 73/20 74/15 89/14 89/17 | seems [2]  84/5 88/25 |
| 19/21 20/1 25/12 25/15 | 90/2 91/12 | seen [3]  49/9 59/7 60/2 |
| 27/12 | saying [20]  7/24 12/24 | seized [1]  17/13 |
| rise [1]  65/13 | 14/25 18/5 18/11 19/8 | selected [1]  75/2 |
| ROBERT [2]  1/11 68/19 | 22/23 26/17 26/18 28/21 | self [1]  31/20 |
| role [5]  8/4 18/19 19/2 | 30/18 31/24 33/16 56/21 | self-incrimination [1] |
| 52/16 56/18 | 56/22 64/11 67/24 83/9 | 31/20 |
| rolled [1]  33/2 | 85/1 90/4 | senate [1]  20/23 |
| room [2]  11/8 12/22 | says [18]  7/18 12/12 26/8 | senator [67]  1/18 2/6 2/8 |
| routine [4]  45/22 45/24 | 26/8 28/19 30/2 30/8 30/16 | 2/10 4/17 5/23 6/8 6/22 7/8 |
| 50/14 51/18 | 30/17 30/21 30/24 32/10 | 7/19 9/4 9/6 9/10 10/2 10/9 |
| routinely [2]  82/22 83/8 | 33/25 34/2 34/5 48/13 | 10/13 14/16 15/13 20/6 |
| rule [11]  2/23 3/1 3/2 3/3 | 62/25 86/23 | 23/11 29/20 42/15 43/5 |
| 3/5 3/9 3/10 3/14 33/9 33/9 | scene [1]  43/16 | 47/11 47/21 47/25 48/20 |
| 71/19 | Schafer [1]  20/24 | 49/7 49/23 50/9 50/11 53/9 |
| rules [11]  10/7 21/7 21/8 | Schaffer [1]  18/18 | 55/2 57/7 58/9 61/2 61/24 |
| 28/15 29/11 30/7 32/7 71/4 | scheduled [2]  41/3 41/3 | 64/12 64/14 65/8 65/25 |
| 71/5 83/24 84/1 | scheme [3]  11/23 14/19 | 66/11 66/12 66/16 66/21 |
| ruling [3]  37/24 39/14 78/8 | 17/10 | 67/24 68/10 72/11 73/3 |
| run [1]  81/16 | scope [1]  22/23 | 74/12 75/9 75/17 76/1 |
| running [1]  43/21 | Scotia [2]  16/15 25/22 | 81/24 83/2 84/8 84/21 |
| runoff [4]  72/9 81/18 82/3 | screen [12]  54/8 54/11 | 84/23 86/10 87/11 87/12 |
| 83/2 | 54/22 54/24 59/16 59/18 | 89/11 90/5 90/9 90/17 |
| | 61/13 62/21 71/1 71/4 | 90/24 92/10 |
| | 77/20 85/19 | send [1]  24/11 |

**S**

sending [1]  90/10
sense [3]  16/24 45/15 46/13
sent [5]  51/22 51/23 53/8
 63/12 91/12
sentence [4]  31/25 32/1
 32/2 33/15
separate [1]  92/1
serial [2]  38/2 38/6
series [5]  47/7 58/2 66/3
 66/4 72/24
serve [1]  26/16
session [3]  41/19 52/22
 54/11
set [3]  27/9 49/18 55/3
setting [3]  6/25 28/16
 69/14
shadowboxing [1]  65/18
Shaeffer [1]  87/5
shaking [1]  22/15
shame [1]  86/22
share [8]  17/4 40/16 42/10
 53/13 54/11 54/12 79/6
 85/20
shared [7]  8/16 11/25
 54/12 54/14 60/10 82/12
 87/4
she [37]  5/1 6/17 9/23 9/24
 21/20 21/20 21/23 21/23
 22/20 31/8 31/8 34/22
 37/10 37/11 37/11 37/16
 38/14 38/15 38/16 38/19
 39/15 56/7 61/12 65/12
 66/8 68/3 70/18 71/24
 71/24 71/25 74/21 74/23
 74/24 75/13 79/20 88/12
 88/14
she's [1]  27/17
shifts [1]  81/22
shocked [1]  93/19
shore [1]  76/20
short [2]  30/16 73/9
shortly [3]  9/24 9/25 62/8
should [31]  3/25 5/17 6/17

10/10 17/19 19/24 20/15
 21/9 21/13 21/16 25/5 27/4
 27/9 28/19 34/4 40/18 45/1
 50/21 50/22 51/22 61/8
 61/21 69/14 71/16 85/17
 86/23 88/8 89/10 89/19
 90/7 90/23
shouldn [6]  13/16 17/20
 24/8 24/13 25/9 26/24
shouldn't [2]  17/1 76/1
show [6]  17/20 21/14 63/11
 77/13 85/11 88/11
showed [1]  80/10
showing [1]  56/11
shown [1]  76/15
shows [4]  52/4 63/7 77/16
 77/23
shred [1]  82/20
side [9]  10/4 10/4 24/19
 35/15 38/10 42/7 72/22
 72/23 77/14
sign [2]  3/1 61/12
signature [1]  19/9
signed [4]  3/2 58/13 60/25
 67/4
significant [1]  65/4
signing [1]  19/8
signs [1]  37/20
similarly [7]  18/11 18/14
 19/12 39/15 39/16 39/20
 85/10
simple [3]  42/8 55/12 74/9
simplify [1]  6/7
simply [3]  10/21 14/10
 15/13
since [3]  14/2 42/7 43/25
single [3]  19/3 26/22 31/13
sir [7]  15/17 16/4 24/5 26/3
 49/10 76/4 78/12
sit [7]  24/15 37/14 58/10
 66/11 74/13 74/14 78/19
site [1]  77/2
situated [11]  13/21 17/25
 18/11 18/15 18/16 18/23

19/12 39/16 39/16 39/20
 85/10
situation [9]  11/16 16/18
 19/1 19/3 22/7 39/20 45/16
 51/15 90/6
six [3]  10/18 58/23 62/7
skill [1]  94/12
skip [1]  31/25
slammed [2]  58/14 67/3
slap [1]  59/15
slate [3]  61/1 89/18 91/24
slide [4]  58/17 58/20 58/23
 60/23
slightly [1]  33/12
small [2]  62/25 63/14
smaller [1]  6/24
Smith [10]  68/19 68/25
 69/12 69/16 76/22 82/11
 82/13 82/21 83/21 86/4
Smith's [4]  76/22 83/6 84/9
 86/22
snippets [2]  71/14 71/15
so [121]
social [1]  46/2
society [1]  58/3
sole [3]  11/21 13/9 22/5
solid [1]  74/10
some [37]  2/23 3/24 6/5
 10/12 11/10 11/25 14/23
 14/24 14/25 17/15 18/6
 21/14 22/4 22/11 28/15
 31/4 35/20 36/25 39/13
 40/9 40/15 42/10 42/14
 43/7 44/19 49/7 49/13
 49/16 52/4 52/9 54/18
 54/18 58/6 68/9 77/4 88/22
 92/15
somebody [5]  63/25 64/20
 75/23 75/25 76/2
somehow [5]  37/20 45/8
 61/16 61/16 71/25
someone [21]  7/13 12/15
 13/7 28/20 38/21 38/22
 39/3 46/3 46/7 46/16 47/2

**S**

someone... [10]  57/14
57/17 65/11 71/24 74/7
77/1 82/6 82/21 85/4 88/20
someone's [2]  57/25 65/16
someones [1]  58/1
something [21]  6/23 8/9
12/1 12/18 19/9 21/20
21/23 28/17 28/23 37/21
49/22 54/3 54/12 65/6
67/11 70/24 73/10 73/21
73/22 73/24 91/25
Sometime [1]  82/4
sometimes [1]  16/16
somewhere [3]  12/18
74/11 93/5
soon [2]  52/18 84/3
sorry [4]  51/13 59/4 59/6
79/8
sort [4]  31/4 63/23 64/19
84/3
sought [2]  3/5 51/10
sounds [3]  14/21 18/15
19/10
source [7]  35/4 48/6 52/11
67/25 69/9 77/1 78/11
sourced [1]  70/23
sources [2]  67/17 77/12
sourcing [1]  76/21
sp [3]  61/4 79/24 91/4
speak [3]  17/2 21/20 27/5
speaking [2]  2/22 52/15
speaks [1]  12/11
special [40]  1/5 1/10 2/3
4/8 7/9 7/14 12/15 14/10
21/7 26/9 30/1 32/6 32/14
32/19 33/18 33/18 33/23
34/20 34/24 35/10 36/5
43/4 43/11 47/24 48/1 48/5
48/11 48/14 48/25 50/12
60/15 67/19 74/3 74/8 88/7
88/24 90/19 91/7 91/20
93/3
specific [1]  40/13

specifically [4]  12/12 21/9
30/6 39/4
speculating [1]  64/7
speculation [1]  64/18
speculative [1]  43/2
spelled [1]  12/7
spread [2]  37/2 41/1
squint [1]  62/25
stage [1]  15/5
stake [1]  88/16
stand [4]  25/18 25/20
51/12 78/21
standard [8]  45/3 45/4
51/13 51/14 55/19 55/20
56/4 85/12
Standards [2]  27/13 27/14
Standing [1]  15/3
start [8]  3/20 5/9 11/2 11/4
17/23 44/20 53/14 54/5
started [2]  42/17 59/21
state [32]  1/2 1/15 1/16
1/17 2/14 3/20 6/23 10/7
11/5 12/6 12/20 16/12 18/9
19/20 23/25 25/20 26/25
29/7 30/20 31/24 42/22
50/17 52/10 52/24 53/2
62/14 75/20 75/22 85/1
86/7 94/4 94/9
State's [5]  83/13 83/15
84/4 84/6 91/9
stated [1]  34/21
statement [3]  10/16 15/6
84/16
statements [1]  84/12
states [1]  37/5
statewide [1]  65/4
station [1]  47/13
status [8]  5/19 12/3 24/22
24/23 25/2 25/6 50/15
86/10
statute [8]  21/12 26/14
32/4 32/19 32/25 33/5 34/5
48/17
statutes [1]  30/11

statutory [2]  19/21 74/5
stay [1]  40/17
stays [1]  93/2
steps [5]  8/18 36/2 39/1
88/22 88/23
Steve [1]  38/18
stick [1]  13/9
still [18]  11/2 16/14 17/6
20/22 20/23 21/4 39/11
39/17 44/18 47/9 47/9
47/14 49/7 83/3 87/4 90/19
90/21 91/16
stood [1]  31/23
stop [2]  17/11 59/5
stories [2]  64/7 67/17
story [5]  60/18 60/20 62/8
64/10 81/4
streamline [1]  52/9
streamlined [2]  37/8 42/3
strikes [2]  9/7 46/18
striking [1]  45/21
strokes [1]  45/25
stronger [1]  56/11
subject [9]  7/9 7/12 7/13
19/22 20/16 51/11 56/14
83/18 91/23
submission [1]  69/7
submit [3]  57/2 63/9 80/9
submits [1]  3/14
submitting [1]  57/5
Subparagraph [1]  30/2
subpoena [22]  5/20 12/15
26/9 26/16 26/17 30/4 30/7
30/15 30/23 30/24 31/14
32/5 32/15 32/22 33/1 48/1
48/16 48/17 48/20 55/3
66/22 68/15
subpoenas [8]  5/16 32/25
33/4 33/25 36/24 40/2 48/6
92/17
substantial [1]  71/18
substituting [1]  77/1
such [3]  19/22 23/1 52/23
suddenly [3]  9/13 58/14

**S**

suddenly... [1]  93/11
sufficient [7]  22/12 22/25
 26/20 66/9 78/22 87/13
 90/22
suggest [3]  35/14 61/7 74/4
suggested [1]  23/9
suggesting [3]  24/1 33/21
 83/6
suggestion [1]  91/2
suggests [1]  43/9
summer [1]  52/11
SUPERIOR [4]  1/1 1/24
 51/17 94/25
supervised [2]  8/1 92/1
supervisory [3]  26/15 34/6
 52/16
support [8]  43/24 45/22
 46/1 48/24 49/21 57/17
 65/11 71/24
supportings [1]  49/1
suppose [1]  79/24
supposed [5]  29/3 32/25
 37/1 66/19 68/7
Supposition [1]  67/12
suppress [1]  26/12
suppressed [1]  33/23
Supreme [6]  16/15 20/12
 27/20 33/16 55/20 56/21
sure [16]  2/21 12/2 12/10
 15/25 51/7 54/21 57/12
 62/14 69/5 79/23 80/23
 80/24 81/1 86/1 93/11
 93/15
surprise [3]  9/1 50/21 66/2
surprised [1]  20/15
surprises [2]  52/11 65/12
suspect [2]  37/7 75/21
sway [1]  72/25
swaying [1]  65/3
switch [1]  9/14
switched [1]  43/25
system [4]  29/6 29/7 29/8
 52/6

**T**

table [2]  77/14 85/18
taints [1]  89/12
take [19]  31/24 33/11
 33/17 37/6 39/5 40/14
 53/21 59/9 60/3 61/21
 69/11 70/25 76/9 76/19
 78/22 80/8 80/10 85/19
 94/9
taken [6]  16/25 35/7 35/19
 47/18 49/7 88/3
taking [3]  8/18 41/16 81/10
talk [22]  6/4 9/1 22/1 23/11
 29/18 34/18 40/22 40/23
 42/2 42/5 43/15 47/12
 53/20 66/13 66/22 68/2
 68/9 68/10 68/12 72/19
 75/9 76/25
talked [5]  11/14 19/16 24/3
 34/23 67/14
talking [17]  27/16 35/17
 40/20 47/4 50/17 57/15
 64/21 64/24 65/2 65/3 72/9
 72/10 81/22 87/22 87/25
 88/1 88/1
tall [1]  30/15
targed [1]  60/13
target [69]  5/17 5/24 7/11
 7/15 9/3 9/25 10/3 10/4
 10/17 10/18 11/25 12/13
 12/19 12/23 13/5 18/5
 18/13 21/9 24/7 25/9 28/16
 30/18 30/19 30/22 31/22
 32/10 32/15 32/16 32/18
 43/11 44/13 46/17 47/2
 49/13 49/25 51/10 53/8
 57/8 57/10 57/14 58/12
 58/18 58/20 58/21 58/24
 59/1 61/1 63/2 64/5 64/6
 64/8 64/12 64/14 64/17
 65/19 66/15 66/24 67/5
 67/16 67/23 68/12 68/14
 72/2 72/4 72/11 72/23 80/4
 84/21 86/10

**T**

targets [7]  18/2 27/17 29/9
 30/7 30/21 30/24 58/16
tasked [2]  6/15 75/17
team [5]  17/2 17/5 23/16
 48/13 92/10
technically [2]  33/4 48/3
tell [6]  3/14 3/19 15/7
 15/14 17/18 28/22
temperature [1]  12/21
tendered [5]  76/18 77/4
 77/9 77/21 82/19
term [1]  55/10
terms [4]  17/3 25/15 50/5
 90/12
testifies [1]  39/7
testify [3]  23/1 29/10 31/20
testimony [5]  23/20 23/24
 39/8 39/9 55/4
than [24]  3/12 3/21 6/20
 8/24 9/12 16/6 28/1 28/15
 30/20 30/23 39/2 41/18
 42/4 43/7 49/17 57/14
 61/10 67/21 75/14 79/19
 81/20 87/12 87/22 90/3
thank [18]  4/13 13/19
 36/14 36/23 42/18 43/13
 44/8 51/7 60/7 70/15 76/4
 76/5 76/10 82/19 91/1 92/4
 92/8 92/14
Thanks [1]  86/5
that [666]
that's [31]  5/21 7/6 7/21
 8/3 8/17 11/25 36/2 38/15
 40/10 41/14 44/14 51/18
 52/5 53/6 54/1 57/15 61/23
 62/11 65/4 68/4 68/5 69/10
 79/9 79/14 82/24 88/23
 89/6 90/22 91/10 92/1 92/3
their [48]  5/17 9/15 10/1
 10/16 11/21 11/22 13/5
 15/22 19/20 19/20 19/21
 20/1 20/13 20/21 24/20
 26/24 27/7 27/11 27/12
 28/21 35/1 42/10 47/14

**T**

their... [25]  47/25 48/2
48/7 52/19 55/21 58/14
58/19 63/11 64/12 64/15
64/20 64/23 67/7 68/18
69/17 71/9 72/5 83/11
86/10 87/19 87/20 87/20
87/21 93/9 93/11
them [36]  2/11 2/16 13/7
13/23 13/24 14/13 14/21
14/24 14/24 14/25 18/5
20/12 21/13 22/7 24/12
25/1 26/21 26/23 27/8 27/9
27/17 29/9 29/13 33/6 33/7
34/2 34/10 36/7 37/15
41/10 41/10 42/2 67/5
80/25 83/21 93/20
then [59]  2/8 4/24 8/21
9/25 10/8 10/17 10/18 13/7
14/4 15/9 16/10 16/14
16/19 17/9 17/11 18/20
22/10 23/5 23/15 23/17
23/22 25/4 26/20 27/8 29/6
29/8 33/8 33/22 34/2 35/3
38/2 40/21 44/17 49/13
49/22 50/12 52/4 54/1
55/18 56/23 58/12 60/1
62/1 62/7 62/8 62/17 65/19
66/23 66/24 67/1 67/5
75/20 76/20 76/22 78/9
78/17 90/4 91/11 93/19
then I [1]  40/21
theorized [1]  79/24
theory [3]  57/24 71/20
72/14
there [102]
there's [16]  21/20 27/19
43/8 55/18 60/1 62/8 66/2
66/3 74/5 74/21 76/12
77/11 85/24 89/3 90/23
91/11
thereafter [1]  9/24
these [28]  3/24 5/16 15/9
15/20 17/3 19/7 19/12

20/25 20/25 21/2 21/4 21/5
23/14 24/14 26/19 26/24
30/7 38/23 39/5 40/2 45/10
52/1 58/10 61/12 66/22
66/25 72/24 83/9
theses [1]  23/10
they [143]
they'll [3]  25/20 52/20
59/18
they're [6]  29/2 35/20 67/6
67/6 77/4 86/20
thing [9]  15/8 29/22 34/1
38/10 38/11 38/15 52/8
64/19 65/5
things [18]  3/5 6/19 7/22
10/6 17/23 17/24 35/20
41/23 42/3 45/10 46/21
52/2 68/17 86/22 88/1
92/15 93/10 93/21
think [91]  2/9 2/13 7/4 7/5
8/9 10/22 10/23 10/24 11/2
12/19 12/25 13/6 14/1
16/11 16/23 17/18 17/22
19/3 19/11 19/21 21/2 21/5
21/24 23/19 23/23 23/24
23/25 25/5 25/15 26/19
26/21 27/19 27/24 28/15
29/4 29/5 31/6 34/8 35/4
35/14 35/18 36/3 36/18
37/19 38/8 39/2 40/1 41/14
42/7 42/9 42/12 42/13
42/14 42/19 43/6 44/23
45/2 46/20 48/3 49/6 50/18
50/23 51/12 52/9 55/14
55/15 55/16 57/13 68/24
69/1 71/5 73/12 77/15
77/23 78/7 78/7 79/21
79/22 81/22 84/7 85/15
86/16 86/18 87/24 88/14
89/8 89/10 89/11 90/12
90/14 92/4
thinking [8]  24/17 25/25
45/10 46/6 46/8 48/10
56/23 56/24

third [3]  33/13 35/12 88/5
this [198]
those [20]  2/13 6/18 6/24
10/6 12/3 12/25 13/17
14/17 16/17 38/25 48/5
50/20 56/5 58/4 58/9 63/19
65/1 71/5 88/23 93/17
though [5]  2/23 16/3 49/6
51/23 73/22
thought [7]  6/4 6/7 10/22
46/6 59/16 80/10 90/4
thoughts [1]  81/7
threats [1]  20/8
three [8]  34/16 42/7 53/11
60/17 60/24 61/14 63/1
64/5
through [23]  2/5 6/24 7/9
8/23 9/2 11/11 12/4 13/6
16/10 23/2 25/5 39/13 40/9
41/4 42/4 42/15 46/24
48/16 48/17 60/21 61/20
61/23 65/17
thrown [1]  42/12
thrust [1]  85/6
Thursday [1]  41/3
ticket [1]  22/3
tie [1]  9/13
tied [2]  37/20 78/18
tilted [1]  66/5
time [25]  8/15 10/2 14/4
18/12 25/1 26/11 27/9
35/12 40/7 45/18 48/12
50/1 50/9 51/17 64/8 69/3
69/21 75/8 81/15 84/8
84/20 88/10 89/24 93/12
93/23
timeline [9]  49/14 49/16
49/17 49/19 49/20 52/17
52/17 53/7 53/10
timelines [2]  8/13 36/25
times [3]  7/21 27/2 34/16
timing [3]  8/8 9/12 92/23
tired [1]  35/5
title [5]  18/17 33/1 33/3

**T**

title... [2]  44/11 46/1
to be [1]  35/21
today [9]  2/11 2/19 2/24
3/1 8/6 8/10 54/19 68/25
88/18
told [5]  14/11 27/1 58/15
58/20 63/10
tomorrow [2]  40/19 40/22
too [8]  27/6 37/11 40/13
40/13 51/22 69/13 76/10
85/13
took [2]  24/19 88/22
topic [4]  14/17 17/12 19/4
19/18
topics [1]  13/9
totally [1]  91/5
touch [1]  15/18
towards [1]  66/5
training [3]  68/18 70/18
71/8
trains [1]  83/21
transactions [2]  64/24
64/25
transcribed [1]  94/12
transcript [3]  1/10 94/11
94/13
transparent [2]  24/18
50/16
treated [2]  85/9 86/14
treatment [2]  56/9 85/11
trial [2]  15/5 57/1
trials [1]  61/24
tribulations [1]  61/24
tried [2]  20/17 33/22
trouble [1]  14/24
true [8]  6/20 18/25 31/21
44/9 53/19 69/10 70/22
94/11
truly [1]  71/15
Trust [1]  29/24
try [3]  29/9 35/7 53/25
trying [11]  24/17 44/1 46/9
46/12 47/25 55/8 57/25

86/20 88/16 89/14 93/20
Tuesday [3]  41/4 41/5 41/6
tunnel [1]  93/10
two [22]  2/13 4/23 5/7 10/1
10/6 10/17 18/10 24/6 24/9
39/15 39/23 41/4 59/1 61/7
64/15 71/22 72/4 75/13
80/8 88/19 91/7 91/20
two-part [1]  24/9
type [2]  15/11 22/19

**U**

ultimately [4]  8/4 73/3
80/25 83/16
unable [1]  52/12
undecipherable [1]  83/7
under [38]  10/7 12/12 14/3
14/3 19/5 19/7 20/12 21/11
26/14 26/19 26/24 27/13
27/14 28/24 30/2 30/13
32/4 32/7 32/25 33/1 33/2
33/3 33/5 33/5 34/5 34/5
40/1 40/14 42/25 47/15
48/2 48/17 58/11 58/11
64/20 68/16 86/19 89/19
undermine [3]  56/15 66/20
74/17
undermined [1]  56/22
understand [13]  13/19
15/19 24/17 40/6 40/12
49/3 49/5 61/6 65/15 70/22
72/20 81/21 84/6
understanding [5]  8/10
8/25 17/24 52/15 69/19
undisclosed [2]  40/20
40/21
undoubtedly [1]  14/2
unethical [1]  29/10
unfolds [1]  52/20
uniform [1]  88/3
unintelligible [7]  17/15
17/21 33/15 51/24 68/15
83/22 86/19
universe [2]  61/14 61/17
unless [3]  15/8 21/10 61/25

unlikely [1]  52/14
unplug [1]  73/14
unprotected [1]  38/8
unremarkable [1]  88/25
unsolicited [1]  59/3
until [11]  8/18 41/5 52/4
52/25 64/14 70/21 72/4
76/24 81/3 82/18 93/6
unwelcomed [1]  61/18
up [33]  12/22 12/22 14/11
14/23 16/12 16/21 17/20
20/11 21/20 25/16 25/19
25/20 26/10 27/23 31/23
35/5 36/2 41/3 41/24 42/1
42/6 52/22 53/7 63/11 76/8
76/9 76/20 77/20 78/11
78/18 85/13 86/3 86/21
upon [4]  17/13 19/19 23/21
59/16
upside [1]  52/5
us [11]  5/8 16/15 26/17
27/1 29/13 57/23 61/5
66/13 71/1 72/20 74/19
use [10]  3/1 17/3 20/2 28/5
32/15 39/24 42/20 46/5
55/10 55/11
used [5]  22/8 32/18 32/20
33/19 42/19
useful [1]  66/17
uses [1]  18/7
using [3]  28/4 44/10 46/1
utterly [1]  88/25

**V**

valid [1]  42/14
various [1]  19/17
ve [14]  5/3 16/23 16/25
17/9 18/22 20/17 25/7
27/18 27/25 36/21 37/18
40/8 45/16 47/2
vehemently [1]  22/17
verify [1]  69/7
verses [2]  54/5 55/14
very [20]  12/11 14/22
18/16 18/19 18/19 29/7

## V

very... [14]  32/2 37/19
38/11 40/3 40/3 44/7 44/9
53/15 61/6 79/6 81/9 81/17
85/18 86/6
victim [1]  45/19
view [5]  20/10 27/11 73/10
87/11 87/13
views [2]  28/6 28/8
violate [1]  68/15
violated [1]  84/2
violator [1]  66/6
virtual [1]  5/3
virtually [2]  5/1 37/12
vis [2]  17/14 17/14
vis-a-vis [1]  17/14
vision [1]  23/6
voluntary [2]  24/21 55/9
votes [1]  91/10
voting [1]  6/14

## W

WADE [17]  1/15 4/7 4/10
11/16 15/16 16/21 17/2
17/4 21/25 22/15 43/12
43/20 43/25 45/25 50/15
61/13 92/6
Wade's [1]  43/18
wait [1]  24/13
waived [1]  5/17
WAKEFORD [8]  1/16 4/9
4/10 11/16 16/20 21/25
30/25 92/6
walk [3]  14/11 38/23 38/24
walked [1]  36/2
want [43]  2/20 3/11 3/15
3/22 4/18 5/9 11/4 13/3
13/6 22/4 22/14 22/16
22/23 23/15 25/19 28/23
34/3 34/18 37/15 37/25
39/19 39/24 40/16 42/9
44/24 44/25 47/13 47/16
48/4 48/10 50/18 53/12
55/5 70/15 71/1 77/3 78/13

78/20 80/24 82/2 89/3 90/4
92/23
wanted [7]  10/21 22/23
35/11 67/2 67/3 85/12
86/25
wants [4]  6/19 21/20 45/25
68/3
was [140]
wasn [4]  24/1 24/24 25/6
28/18
wasn't [3]  51/24 64/13
71/21
watch [1]  47/13
waterfront [1]  17/13
way [18]  6/21 8/16 18/14
22/12 22/13 23/13 31/24
34/6 37/25 47/11 49/19
60/9 69/15 74/21 79/2 87/7
89/6 93/1
ways [2]  35/9 47/8
we [198]
we'd [2]  54/8 60/20
we'll [5]  2/11 54/1 60/23
78/17 93/22
we're [20]  26/17 53/5 60/6
61/23 64/21 65/3 66/12
72/9 72/10 73/7 77/1 81/1
81/4 81/10 81/22 83/3
87/25 87/25 88/1 92/15
we've [7]  2/20 25/7 25/8
34/15 36/7 66/23 92/5
wearing [1]  38/24
website [4]  63/6 63/20 70/7
70/9
week [7]  27/8 40/21 40/24
41/2 41/15 82/7 83/23
weeks [7]  10/17 41/1 53/11
63/1 63/21 64/5 75/13
welcome [1]  3/6
welfare [1]  41/18
well [34]  4/9 5/22 7/11
7/13 7/18 16/9 20/20 21/19
23/23 25/3 29/2 35/13
38/17 40/15 40/22 41/14

41/14 41/25 42/3 46/21
47/24 51/18 59/14 60/15
66/12 74/2 79/6 86/2 89/8
92/21 92/25 93/7 93/9
93/13
went [4]  50/1 50/13 51/24
88/18
were [42]  2/23 2/25 7/23
9/13 11/3 18/1 18/1 19/2
24/21 25/2 29/5 32/25 33/3
33/4 33/21 35/2 38/15 42/4
43/14 45/8 45/10 46/5 50/8
53/22 55/8 56/23 56/24
58/4 58/5 58/15 59/2 63/21
64/6 64/16 64/25 65/2 66/8
75/8 87/19 89/20 89/21
89/24
weren't [1]  89/2
what [115]
what's [8]  8/20 19/14
62/16 77/24 87/7 87/21
89/2 90/11
whatever [5]  13/3 18/9
37/25 52/17 90/10
whatnot [1]  18/21
whatsoever [1]  34/7
wheel [1]  63/25
when [30]  2/16 9/1 10/1
16/18 35/7 36/1 39/4 39/25
40/7 40/23 41/21 43/21
51/21 52/2 52/12 52/22
53/4 53/5 53/5 55/17 66/18
66/21 67/7 68/8 72/4 79/6
81/1 82/3 84/8 93/15
whenever [1]  49/2
where [31]  14/9 14/17 15/5
16/1 16/16 17/7 19/16
27/25 28/16 37/18 45/10
46/6 46/15 48/7 51/15
55/15 58/19 61/4 61/6
62/24 64/10 64/24 67/1
67/1 69/9 69/25 72/21
76/13 88/17 88/23 91/5
wherever [1]  37/15

**W**

whether [13]  5/11 6/17 10/21 12/23 20/14 33/24 56/9 57/4 57/7 66/20 70/21 73/2 74/16

which [29]  2/18 5/12 9/12 16/25 19/19 20/12 30/13 31/13 32/4 32/13 32/14 32/25 34/14 34/23 48/20 48/20 56/18 57/2 59/15 61/20 62/10 63/4 68/8 72/21 83/23 86/8 87/22 89/25 90/5

while [11]  3/5 21/2 21/3 30/2 39/5 43/6 44/24 47/2 55/10 65/1 78/6

who [62]  2/21 2/21 3/14 3/20 3/24 5/16 7/14 9/13 12/24 13/11 16/12 18/20 19/2 19/9 20/18 27/23 31/10 32/11 33/17 33/19 34/22 35/17 36/5 38/23 39/4 40/20 41/21 45/20 46/14 48/9 48/13 50/16 51/9 57/13 58/13 60/25 61/8 62/1 63/19 63/25 64/1 64/20 65/20 66/11 67/4 67/18 67/22 68/1 68/19 71/22 74/11 75/3 75/23 76/2 80/3 82/13 82/21 83/8 83/9 88/20 88/20 91/13

who's [1]  80/3

whole [11]  29/22 44/5 49/12 61/10 66/3 66/3 73/25 75/20 80/11 85/5 85/5

whom [2]  65/11 71/24

whose [1]  22/5

why [16]  13/16 15/13 17/18 24/10 25/4 25/9 27/15 27/18 27/19 28/2 39/19 40/25 42/1 42/13 73/6 76/19

Wilis [1]  64/10

will [42]  2/18 2/21 3/20 7/20 8/10 11/12 14/14 16/20 17/4 21/20 21/24 28/14 35/16 36/23 36/24 37/7 37/7 37/9 38/1 38/2 39/6 40/7 40/18 49/11 52/24 53/4 53/5 53/5 57/2 58/24 60/24 72/15 76/19 76/20 78/16 78/17 81/1 89/6 92/17 92/19 93/5 93/11

willing [2]  10/15 58/9

willingness [1]  74/15

Willis [6]  44/11 62/23 69/21 75/14 76/3 81/17

Willis' [1]  84/2

win [1]  57/1

wise [2]  2/23 41/14

withdraw [1]  85/22

within [3]  8/12 47/10 50/23

without [5]  12/13 35/10 35/23 77/10 91/19

witness [34]  11/9 11/10 14/10 15/18 15/21 15/22 17/5 23/17 24/8 24/10 25/24 28/12 30/18 30/20 30/23 31/21 32/16 32/20 34/21 37/10 39/7 39/14 39/15 39/22 39/23 40/8 40/10 40/20 40/23 51/11 55/7 68/1 80/1 94/15

witness's [1]  14/18

witnesses [28]  3/24 4/14 5/16 12/24 14/3 16/12 18/1 19/12 23/20 27/2 30/4 30/16 30/17 30/24 34/24 35/1 35/18 35/22 37/9 37/25 38/13 39/6 40/3 40/7 58/14 67/4 68/9 68/10

won [5]  28/24 40/24 73/6 88/11 88/20

won't [13]  53/1 54/23 54/24 55/5 55/10 55/11 59/18 59/19 60/3 60/18

71/3 76/24 83/24

wondering [2]  20/17 70/10

word [10]  12/19 18/7 28/4 28/5 28/16 32/16 32/18 32/19 42/12 61/17

words [3]  13/2 36/17 41/19

work [29]  2/5 6/23 8/14 8/15 8/22 9/2 9/15 11/11 11/20 12/4 14/1 14/9 16/10 23/2 29/7 34/20 37/12 37/13 39/12 40/10 41/11 42/4 52/23 55/8 61/20 68/5 81/4 84/7 93/11

working [4]  17/4 46/24 50/16 61/23

world [1]  59/1

worry [2]  8/24 59/17

would [76]  3/8 3/10 6/11 6/13 6/15 7/25 8/8 9/1 9/9 9/18 10/13 10/13 11/16 11/20 12/2 12/5 13/20 14/1 14/4 14/8 15/16 16/10 19/4 19/22 22/7 22/19 23/7 23/9 23/10 23/13 23/14 23/22 26/22 29/4 29/12 31/8 31/13 32/10 33/11 36/1 37/20 37/21 40/14 41/9 43/3 45/24 48/14 48/25 49/23 51/12 53/21 57/23 61/8 66/13 66/15 66/17 69/3 69/21 70/17 70/18 70/20 71/13 72/1 72/15 73/17 73/20 74/13 74/14 74/14 75/5 87/10 89/1 89/9 89/17 89/19 90/21

would be [1]  6/13

wouldn [6]  8/25 22/24 29/1 29/4 39/1 48/4

wrap [1]  52/22

write [2]  61/11 67/9

writing [3]  22/10 92/16 93/7

written [2]  2/17 92/18

wrong [5]  18/17 20/11

**W**

wrong... [3]  27/11 27/15
48/17

**Y**

Yahoo [5]  64/8 67/14
67/22 70/13 70/14
year [1]  8/23
years [1]  17/9
yes [35]  4/12 5/14 10/20
12/5 12/9 15/17 15/24 16/4
18/8 24/5 26/3 31/15 32/17
45/2 45/10 49/10 50/10
57/19 59/12 60/14 62/2
70/5 72/18 72/20 76/14
78/12 79/17 79/17 80/18
80/21 81/6 82/16 83/17
85/21 89/23
Yes, sir [1]  16/8
yesterday [7]  11/15 15/18
17/5 19/1 23/8 24/4 34/22
yet [4]  8/24 9/5 17/2 29/18
you [284]
You'll [1]  81/11
you're [19]  3/5 27/24 40/16
40/19 40/23 54/11 54/12
57/11 60/21 68/7 79/1 79/9
81/3 85/2 85/2 85/3 85/8
85/9 89/4
you've [6]  3/6 29/19 61/25
80/4 84/14 87/4
Young [6]  55/20 55/22
55/23 56/7 57/3 78/19
your [161]

**Z**

zeal [1]  59/13
zealous [1]  59/14
zoom [2]  54/10 60/22

# **Exhibit 12**

Transcript of July 25, 2022 Special Purpose Grand Jury Hearing before the Honorable Robert C.I. McBurney, Atlanta, Georgia, In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

```
 1              IN THE SUPERIOR COURT OF FULTON COUNTY

 2                       STATE OF GEORGIA

 3

 4     IN RE:                    )

 5     SPECIAL PURPOSE GRAND JURY )

 6                               ) CASE NUMBER: 2022-EX-00024

 7

 8                      2022-EX-00024

 9

10         SPECIAL PURPOSE GRAND JURY MOTIONS TRANSCRIPT

11         Before the HONORABLE JUDGE ROBERT C.I MCBURNEY

12             on July 25, 2022, Atlanta, GA 30303

13

14     APPEARANCES:

15     FOR THE STATE:ADA NATHAN WADE

16     FOR THE STATE:ADA DONALD WAKEFORD

17     FOR THE STATE: ATTORNEY ANNA GREEN-CROSS

18     FOR SENATOR JONES: BILL DILLON & ANNA CLAPP

19     FOR THE JURORS: ATTORNEYS MS. PEARSON & MS. DEBORROUGH

20

21              HADASSAH J. DAVID, CVR, CCR

22                 #4857 8554 6837 1968

23              CERTIFIED COURT REPORTER

24            SUPERIOR COURT OF FULTON COUNTY

25           hadassah.david@fultoncountyga.gov

            HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                              1
```

FILED IN OFFICE

AUG 25 2022

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

**PROCEEDINGS**

1
2          THE COURT:  Good afternoon.  Let's get on the record

3      in 2022-Ex-000024.  This is a special purpose Grand Jury.

4      It is about 2:00 o'clock on the 21st of July, and we are

5      going to work through, this afternoon, a couple of motions

6      that have been filed.  A motion filed on behalf of Senator

7      Jones seeking to disqualify the DA's office from handling

8      the case, the case that is Senator Jones and then a motion

9      to quash and disqualify, but to disqualify, I think, is

10     merely an adoption of Senator Jones' motion that was filed

11     on behalf of 11 of the --  for today we'll call them

12     alternate electors.

13          Those are the two motions I think we are covering.

14     The State has filed, the  District Attorney's Office has

15     filed, an opposition to the motion to disqualify.  I let

16     them know, because when I received the motion to quash

17     that they didn't need to file a written response motion

18     which is fine, and hopefully you will be able to address

19     it today.  It's a lot of moving parts.

20          We've got a lot of lawyers here, so I want to make

21     sure we get on the record who is here and who will be

22     speaking for the different parties.  Before we go any

23     further, though, Rule 22 wise.  There were some media

24     outlets that only reached out today to get the green

25     light.  If you were able to get equipment in here you are

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              2

1   free to use it, but I did not sign your Rule 22 today,

2   because the general Rule 22 is to be signed 24 hours in

3   advance, but you really only need the Rule 22 for purposes

4   of getting in the building with the big cameras, so if you

5   sought Rule 22 approval to record things while you're in

6   here and you've got a handheld device, you are welcome to

7   do that.

8       Going forward it's 24 hours in advance, and it would

9   really help if you could report back to your Rule 22

10  people, if you would designate more clearly on the Rule 22

11  forms what kind of equipment you want to bring in.  I am

12  all for having a pool feed rather than four big cameras in

13  here.  It gets a little crowded for you all, but I can't

14  tell because everyone who submits a Rule 22 checks

15  everything -- I want to bring in every kind of equipment

16  in.  I'm bringing in a drone.  I know you're not bringing

17  in a drone, but apparently for everyone bringing in the

18  big cameras we only need one, and like I said, I'm happy

19  to have a pool, but it's hard to tell.

20      With that, let's start with the State.  Who will be

21  handling -- it can be more than one person, but I just

22  don't want to omit anyone if I'm looking to the District

23  Attorney's Office for answers or responses to concerns

24  raised by some of these witnesses.  Who from the DA's

25  office or affiliated from the DA's office should I be

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

3

1    expected to hear from?

2         ATTORNEY GREEN-CROSS:  Good afternoon, Your Honor,

3    I'm Anna Green-Cross.  I'm here representing the District

4    Attorney's office on the motion to disqualify prosecutors.

5         THE COURT:  So if I have questions about quashal or

6    assertion of Fifth Amendment rights?

7         ADA WADE:  Good afternoon, Judge.  I'm Nathan Wade,

8    special prosecutor from the District Attorney's office as

9    well as Donald Wakeford.

10        THE COURT:  So Wade and Wakeford for Fifth Amendment

11   quashal and Green-Cross for the disqualification.

12        ATTORNEY GREEN-CROSS:  Yes.

13        THE COURT:  Okay, got it.  Thank you.  All right.  If

14   we pivot over to potential witnesses and counsel, Mr.

15   Dillon, good morning.  How are you?

16        ATTORNEY DILLON:  Good afternoon.  I'm fine, Judge.

17        THE COURT:  You are representing Senator Jones.  Is

18   there anyone else?  I don't want to ignore anyone.

19        ATTORNEY DILLON:  My associate Anna Clapp is also

20   here.

21        THE COURT:  Great.  Okay.  Clapp as in applause or

22   Platt as in . . .

23        ATTORNEY CLAPP:  Clapp as in applause, two P's.

24        THE COURT:  Got it.  Excellent, and then on behalf of

25   the 11 alternate electors, Ms. Pearson and Ms. Deborroughs

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        4

1    I see Ms. Deborroughs virtually.  She is appearing in

2    Newnan or even further away, but we greenlighted that

3    virtual appearance.  It's fine, and we've got Ms. Pearson

4    here.

5          ATTORNEY PEARSON:   You do, Your Honor.

6          THE COURT:  Okay.  Anyone else on behalf of your

7    clients or just the two of you?

8          ATTORNEY PEARSON:  No, Your Honor, just us.

9          THE COURT:  All right.  I want to start with a

10   question for either Mr. Dillon or Ms. Clapp, and that is

11   whether you are joining in the motion that Ms. Pearson

12   filed in which Fifth Amendment concerns are raised as

13   opposed to conflict issues?

14         ATTORNEY DILLON:  Yes, Your Honor.  Insofar as Ms.

15   Pearson's motion, I believe at page 7.  It raises the fact

16   that these witnesses who have received both subpoenas and

17   target letters should have their appearances waived.  We

18   join in that portion of her motion.

19         THE COURT:  What is the status of your client?  I

20   know he's received the subpoena, that is the only part

21   that's been disclosed to me.

22         ATTORNEY DILLON:  Well, in the government's response

23   to our motion, they actually point out that Senator Jones

24   received a target letter in this case.

25         THE COURT:  Okay.  Do you disagree with that or . . .

          HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          5

1       ATTORNEY DILLON:  No, I do not.  It is an irrefutable

2   fact at this point.  We publicly acknowledge that it is an

3   irrefutable fact.

4       THE COURT:  Okay, so my thought is that we talk about

5   some of the Fifth Amendment concerns first because it may

6   make moot for practical purposes the conflict concerns

7   that you raise in your motion.  Let me simplify my thought

8   process for you.  If in the end I determine that Senator

9   Jones need not appear because of Fifth Amendment reasons,

10  I don't know we need to reach the question of

11  disqualification if that would be his only connection to

12  this grand jury.

13      This Grand Jury is not a Grand Jury that would be

14  voting on a bill of indictment.  It is a Grand Jury that

15  has been tasked with generating a report that would

16  contain in it, ideally, a recommendation to the District

17  Attorney as to whether she should pursue charges or not

18  and what those charges might look like, and any other

19  things that that Grand Jury wants to put in there other

20  than a true bill.

21      So the way the Fifth Amendment analysis plays out is

22  that I conclude that Senator Jones doesn't need to appear,

23  if they state his name or something, and we can work

24  through those logistics probably in a smaller group

25  setting.  Do you agree that we don't need to reach the

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

6

 1    question of disqualification?

 2         ATTORNEY DILLON:  No, Your Honor.  I do disagree.

 3         THE COURT:  Okay.

 4         ATTORNEY DILLON:  I think that the disqualification

 5    issue is right, and I think that it has been exacerbated

 6    by the media circus that's been generated out of the

 7    Fulton County's DA's office in this case, and that the

 8    harm to my client, Senator Jones, is that he's being drug

 9    through the mud publicly as a subject of this special

10    Grand Jury.

11         THE COURT:  Well, apparently as a target, not a

12    subject.

13         ATTORNEY DILLON:  Well, I say a subject as someone

14    who has been affected by this special Grand Jury,

15    particularly as a target, but with the effort and focus

16    being that it's going to have an impact on the Lieutenant

17    Governor's race this fall.  And so if the DA's office has

18    a hand in it and they issue a report that says, Well,

19    we're going to recommend an indictment of Senator Jones,

20    it will have a direct impact on the election in November,

21    and that's been reported in the media numerous times.

22         THE COURT:  Okay.  So I'll correct a couple of things

23    for you.  One, and I may have misunderstood what you were

24    saying, but the District Attorney's Office is not offering

25    any report.  That would come from the grand jurors as

                 HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                              7

1     supervised by me.  I appreciate that the District Attorney

2     has fashioned herself as the legal adviser to the Grand

3     Jury, and that's an adaptation of the actual language of

4     the role that that office plays, but ultimately it's the

5     Grand Jury's report not the District Attorney's.

6         Second, and a concern we do need to cover today,

7     regardless of how we approach the disqualification piece

8     would be the timing of the release of the report.  Now, I

9     think that's something that everyone ought to leave here

10     today with a better understanding of how that will be

11     managed.

12         That is within my purview, and it was helpful to have

13     it brought to my attention that timelines could collide,

14     that the Grand Jury might complete Its work in October,

15     and that might not be the best time for Its work product

16     to be shared publicly in the way that many investigative

17     agencies, that's what the Grand Jury is an effect here,

18     they hold off on taking certain steps until an election

19     has passed with a few exceptions, and we need to see

20     what's going on with that report, if it's even ready by

21     then.

22         The Grand Jury is authorized to continue its work

23     through May 1 of next year, so I don't know that it's

24     right yet to worry about that other than to get a general

25     understanding that I wouldn't be a big fan of an October

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

8

1    surprise, so if we talk about when reports would be
2    released and we work through a Fifth Amendment analysis,
3    if that Fifth Amendment analysis is, in light of a target
4    letter, et. cetera, Senator Jones probably doesn't need to
5    -- and it's not my analysis yet, but if the end result of
6    that is that Senator Jones does not need to appear before
7    the Grand Jury, that it strikes me that the
8    disqualification piece is moot.
9        I don't know from what the office would be
10   disqualified if Senator Jones isn't being asked to do
11   anything between now and the release of the report other
12   than the timing of the report, which doesn't necessarily
13   tie into who is investigating.  If we were suddenly to
14   switch to the Lowndes County District Attorney's Office,
15   and they finished their work with the Grand Jury in
16   October, we'd be faced with that same chronological
17   challenge.
18       ATTORNEY DILLON:   We would, Your Honor, with the
19   exception of the issue that has to do with the press, and
20   the issue that has to do with the public favoring of my
21   client's opponent for Lieutenant Governor, Charlie Bailey,
22   and the the District Attorney in this case has raised
23   $32,000 for Charlie Bailey in the headliner that she
24   hosted for him in June.  Shortly thereafter, she issued my
25   client a target letter and then shortly after that, in

1     fact, two days ago when they filed their brief, that was

2     the first time that it was publicly known that Senator

3     Jones was a target of this Grand Jury investigation, so on

4     one side we have a public target, and on the other side we

5     have a headliner fundraiser raising $32,000, and we

6     contend that those two things create the appearance of

7     impropriety, that under the Rules of Ethics in the state

8     of Georgia this is prohibited conduct, and then with

9     regard to Senator Jones this investigation in Fulton

10    County should be complete at this point, that this

11    District Attorney's Office needs to be disqualified, and

12    perhaps some other district attorney can be appointed, and

13    in that case, Senator Jones would would be glad to

14    cooperate with that investigation, because he has

15    indicated and indicated early on that he was willing to

16    cooperate and give a statement and meet with their

17    investigators, and then two weeks later he gets a target

18    letter, and then six days after he gets that target

19    letter, and 'm getting ahead of myself.

20          THE COURT:  Yes, you are.  In fact, I'm going to cut

21    you off, because I simply wanted to know whether you

22    thought it was moot and you do not think it is.

23          ATTORNEY DILLON:  I do not think it is, Your Honor.

24    I think it is right at this point.

25          THE COURT:    Okay, and we may get to it.  I was

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          10

1    expecting a different answer, but I appreciate your
2    answer.  I still think we need to start with the Fifth
3    Amendment concerns that were brought to a head in
4    Ms. Peterson's motion, but what I want to do is start with
5    the State on that because your perspective with the
6    District Attorney's Office on that, because your
7    perspective may help me better navigate what to do, and
8    for folks in the room here representatives of the District
9    Attorney's Office and a lawyer for another witness, that
10   witness and I have already had some basic discussions
11   about how we might work through the assertion of Fifth
12   Amendment privilege in certain context, and so we will
13   probably build on that.

14       So if I'm referring to what we talked about
15   yesterday, that is what I mean in connection with that
16   situation.  Mr. Wade or Mr. Wakeford, what I would like to
17   hear from you on is is your overarching reaction to
18   Ms.Deborroughs and Ms. Pearson's motion as we discussed in
19   the past.  I don't know that there is a blanket, I don't
20   have to answer any questions that would work here, but
21   insofar as their 11 client's sole connection to the
22   investigation is their participation in the alternate
23   electors scheme, and that was going to be the focus of
24   99 percent of your questions, if that is determined to be
25   in light of some of the target news that's been shared,

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                          11

1    something that is protected that they don't need to

2    respond to.  I'm not sure what the point would be in

3    bringing those folks in on a non-immunized status before

4    the Grand Jury, so help me work through that, please.

5        ADA WAKEFORD:  Yes, Your Honor.  I would begin by

6    pointing, Your Honor, to the case of State v. Lampl, that

7    is spelled L-A-M-P-L.  Your Honor, may be aware of this

8    case.

9        THE COURT:  Is that Clayton County -- yes?

10       ADA WAKEFORD:  I believe, I'm not sure of the

11   jurisdiction that it began, but it speaks very poignantly

12   to this issue.  Specifically what it says is, that "Under

13   Georgia law, the designation as a target without a formal

14   charge being leveled against an individual doesn't change

15   the ability to subpoena someone to appear before a special

16   purpose Grand Jury."

17       THE COURT:  Fair point, and a footnote may have been

18   dropped somewhere with something that was provided, but

19   that was not my question.  I don't think the word target

20   is as magical in State proceedings as it is in Federal

21   proceedings, but it certainly has caused the temperature

22   in the room to go up and antennas to go up everywhere, and

23   so whether you you call him target or you call him less of

24   a friend, we now have witnesses who are saying, "I'm not

25   comfortable answering those questions, I think I may be

                 HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                           12

1    facing criminal liability."

2        In other words, I assert my Fifth Amendment privilege

3    or protection, whatever you want to call it, and that's

4    what Ms. Pearson and Ms. Deborrough have done on behalf of

5    their 11 clients, so my question isn't doesn't target mean

6    you can't go any further.  You may want to think through

7    in the future labeling someone that and then hailing them

8    in because of how this is played out.

9        Let's just stick to the topics.  If my sole

10   connection to the investigation that you are conducting

11   with this Grand Jury is that I was one of the people who

12   agreed or was nominated, or however it happened to be an

13   alternate elector, you're going to ask me about that, and

14   I have a good-faith basis to believe my decision to agree

15   to be an alternate elector exposes me to potential

16   criminal liability, why shouldn't I be able to say I'm not

17   answering any of those questions in the context of a Grand

18   Jury?

19       ADA WAKEFORD:  I understand, Your Honor.  Thank you

20   for the clarification.  I would say that the 11

21   individuals identified in the motion are not all situated

22   in exactly the same place, so there may be commonality

23   between them, but there is going to need to be an

24   individual determination with regard to each of them.  The

25   level of involvement is necessarily individual, so what I

             HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        13

1 think would work is for an individual assessment to be

2 made in each case, since we undoubtedly have the ability

3 under the law under Lampl to ask the witnesses to appear,

4 then there would be ahead of time a discussion between the

5 parties with Your Honor's involvement need be, to discuss

6 areas of inquiry that may lead to an identification of

7 Fifth Amendment rights.

8   If that is the case, I believe we would be able to

9 work out a procedure where there is not a badgering of a

10 witness, but simply an ability for the special purpose

11 Grand Jury to walk up to an area of inquiry and be told

12 this is going to be foreclosed by the Fifth Amendment and

13 move on if there are other areas to pursue, so each them

14 will require, I believe an individual assessment.

15   THE COURT:  Are there any of the 11 - - I'm gonna

16 make it 12.  I'm going to include Senator Jones in the

17 group, so any of those 12 where the only topic of interest

18 is that witness's participation in the alternate elector

19 scheme.

20   ADA WAKEFORD:  The answer to that is no.

21   THE COURT:  Every one of them - - it sounds like it's

22 a very diverse group, and one of the concerns Ms.

23 Deborrough and Ms. Pearson had brought up was that some of

24 them are remote, some of them have trouble with mobility,

25 but you are saying all of them have some other potential

1      connection to the investigation or area of interest to the

2      investigation.

3          ADA WAKEFORD:  Standing in my place right now, Your

4      Honor, this is an investigative Grand Jury, so we're not

5      at the stage, you know approaching, say a trial, where I

6      can give a statement with the definiteness that you might

7      be seeking.  What I can tell you is, right now, can I say

8      unless there's only one thing that we can connect one of

9      these people to, then no, Your Honor.

10         THE COURT:  Okay, so just to flip it around to the

11     type of questions asked, you envision, or you and your

12     colleagues envision asking each of the 12, including

13     Senator Jones, questions beyond simply why did you decide

14     to be an alternate elector?  Tell me more about that.

15     There are other aspects of the 2020 general election that

16     you would be asking each of the 12 about.  Mr. Wade.

17         ADA WADE:  Yes, sir, Judge.  If I may, much like the

18     witness on yesterday, we have planned categories to touch,

19     and we understand per the Court's instruction, if we can

20     narrow down these buckets, ask the general question about

21     that particular bucket, let the witness assert, at that

22     point ask the witness if they plan to assert their Fifth

23     Amendment privilege to any question concerning that issue,

24     once they say yes, we move on.

25         THE COURT:  Sure.

           HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        15

1    ADA WADE:  Not a barrage of like 50 questions where

2    they decide to assert, but just to be able to hit the

3    different buckets though and to answer the Court's

4    question directly, that, yes, sir, there are other areas

5    that we plan to attack.

6    THE COURT:  There's more than one bucket for each of

7    the 12 - -

8    ADA WADE:  Yes, sir.

9    THE COURT:   -- Is what I'm hearing you say - - well,

10   then we would need to work through that.  That helps, I

11   appreciate that, and I think there is ample case law,

12   state and federal, that authorizes witnesses who say up

13   front that I'm going to assert the Fifth Amendment to

14   still be called before the Grand Jury to then assert it.

15   Bank of Nova Scotia from the US Supreme Court is the

16   earliest one I found where you sometimes need to have

17   those people get in front of the Grand Jury to actually

18   invoke, because they might not when put in that situation,

19   and then the investigators are not forced to rely on a

20   claim that they will, or to your point, Mr. Wakeford and

21   Mr. Wade, there may be areas that come up that aren't

22   properly covered by that protection.

23   I know we've been bouncing around a lot, but I think

24   it makes sense for me to hear now from Ms. Pearson or Ms.

25   Deborrough about the approach you've taken, which is my

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

16

1    client shouldn't have to come in at all, and you may not
2    yet have been able to speak with Mr. Wade and his team to
3    know about these other buckets, to use his terms, but I
4    will just share with you in working with Mr. Wade and his
5    team yesterday and a different witness and lawyer, there
6    are other areas, they may be minor, but they're still
7    areas where even the lawyer agreed that my client doesn't
8    have the Fifth Amendment right not to say, this is my job.
9        I've had this job for 10 years, and then they move on
10   to what did you have to do with the electors scheme Fifth
11   Amendment, and then they stop.  They don't go any further
12   with that topic, but to the District Attorney's offices
13   point it's a broad waterfront, and you have seized upon
14   maybe the big bright lighthouse, vis-a-vis your client's,
15   but there could be some (unintelligible) buildings at that
16   that lighthouse that it's appropriate for questions to be
17   asked and more importantly answered.
18       So tell me why you think that instead the answers
19   should be, and I mean you, go to the extreme, it's
20   quashed, they shouldn't even have to show up to give
21   (unintelligible)
22       ATTORNEY PEARSON:  Correct, Your Honor.  I think the
23   first place to start is, just to correct a few things or
24   to clarify a few things, from my understanding of what you
25   just said, all of my clients are identically situated from
               HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                          17

1 a legal perspective.  They were all witnesses, they were

2 all converted to targets, and there has been no

3 differentiation from the DA's office between that.

4  THE COURT:  Let me interrupt you for a second.  So,

5 you are saying all 11 of them have received target letters

6 or some communication from the District Attorney's Office

7 that uses the "T" word?

8  ATTORNEY PEARSON:  Yes.

9  THE COURT:  Whatever that may mean in the State

10 context, but just because two of your clients have, you

11 are saying they are similarly situated, it's just a matter

12 of time for the postman to get there.

13  ATTORNEY PEARSON:  I have 11 target letters.

14  THE COURT:  Okay.  So in that way they are similarly

15 situated, but it sounds like they are, and you note it in

16 your own motion, they are also very differently situated.

17 You have, and I apologize if I have the title wrong, Mr.

18 Schaffer as the chair of the Republican Party in Georgia,

19 A very, very, different role in connection with the

20 affairs of election then.   I don't remember who the

21 elderly individual difficulty with mobility and whatnot.

22 I've never heard of the person.

23  It is a differently situated individual once you get

24 outside of that lighthouse of, I was an alternate elector.

25  ATTORNEY PEARSON:  That's true, Your Honor, but I

  HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                18

1    don't know what situation you dealt with yesterday or what
2    that person's role was or who they were, but in my
3    client's situation I genuinely cannot think of a single
4    topic or question that they could be asked that would not
5    be either under the Fifth Amendment or a link in the
6    chain.
7        What's your name under these charges that they have
8    said they are going to do by signing your name, by saying
9    who you are, by putting your signature on something could
10    arguably be, as ridiculous as that sounds, an
11    incriminating fact, so I don't think my clients are
12    similarly situated to these other witnesses that you are
13    dealing with, anything they could be asked.
14        What's your name? That is incriminating. What's
15    your job? That could lead to other political links in the
16    chain, that could lead to e-mails where they talked about
17    various issues. It could lead to anything. I don't see
18    any topic that could actually be relevant to the Grand
19    Jury's inquiry, upon which my clients could not invoke
20    their federal, their state, or constitutional rights, and
21    their statutory rights, and I think absence of proffer
22    that there is such a subject that you would agree with
23    that is not incriminating.
24        Eleven people should not be essentially frogmarched
25    in front of the cameras and the Grand Jury to be forced to

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

19

1    invoke their rights, and I echo Mr. Dillon's concerns

2    about publicity, you know, we're not use to that.  We are

3    federal prosecutors, there is Grand Jury secrecy.  We

4    don't have that here, but the damage is being done and has

5    already been done to all of my 11 clients, and I assume to

6    Senator Jones, is affected, and it's only going to be

7    exacerbated.

8        I mean the threats that they're getting, the hate

9    mail that they're getting, the hate e-mails they're

10   getting here, Your Honor, for doing, in our view nothing

11   wrong.  They are caught up in ambiguous circumstances,

12   which gives them the right under the Supreme Court

13   precedent to invoke their privileges.

14       THE COURT:  We're not going to get into whether they

15   should be surprised or not that they have become the

16   subject of negative attention, based on the decisions

17   they've made, but I'm wondering.  You have now tried to

18   put your arm around Mr. Dillon's client, who is in an

19   actively contested election.  I am not aware of any of

20   your clients being in that position as well, but again, I

21   don't recognize all of their names.

22       ATTORNEY PEARSON:  Your Honor, Mr. Still, Mr. Sean

23   Still is a candidate for senate office, and in addition,

24   Mr. Schafer is the chairman of the GOP, and he is involved

25   in all of these, and many of these people are involved in

1    the electoral arm of the Georgia Republican Party for many

2    of these races, so while and I think the point is, Your

3    Honor, so while Mr. Jones is involved in his race, and Mr.

4    Still is involved in his race, a lot of these people are

5    involved in all of these races, and I think the point is,

6    Your Honor, AVA regulations with Georgia Professional

7    Responsibility Rules cite favorably with special

8    prosecutor rules.

9         They specifically say a target should not be put in a

10   Grand Jury unless they are immunized, and here you know

11   they can't be immunized because they're federal, and under

12   the statute you can't immunize against a federal, so here

13   the burden really should be on them to come forward with

14   some bucket, as you call it, that they can show we can't

15   invoke on it.  If we can invoke on all of the buckets they

16   should not be dragged down here in front of the Grand

17   Jury, Your Honor.

18        THE COURT:  Okay, do I need to check with Ms.

19   Debrrorogh as well, or do you guys both have an agreement

20   that she will speak up if there's something she wants to

21   add?

22        ATTORNEY PEARSON:  Your Honor, you know Ms.

23   Deborrough.  If she's got something to add she certainly

24   will, but I think I covered it.

25        THE COURT:  All right.  Mr. Wakeford or Mr. Wade,

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          21

1    talk to me a little bit about the last, second to last

2    point I heard from Ms. Pearson about an inability to

3    immunize because, of course, one ticket you can punch that

4    you may not want to punch for anyone, but you may for some

5    of the alternate electors whose sole connection or primary

6    connection to what you're investigating may be the

7    alternate elector situation, would be to let them know

8    that nothing you say during a Grand Jury can be used

9    against you.

10        If you put that in writing then you magically have

11   some compulsory powers, I do, that did not exist before,

12   but if there is not a way to provide sufficient protection

13   you may not have that, and I hadn't processed it the way

14   Ms. Pearson did.  Anything you want to add on that?  Mr.

15   Wade is shaking his head.  As in you disagree or I don't

16   want to add to it?

17        ADA WADE:  I vehemently disagree, and there was no

18   effort or attempt or even any indication that our position

19   would be to offer any type of immunity, if that is what

20   she's looking for.

21        THE COURT:  I didn't hear Ms. Pearson looking for

22   anything.  What I heard her say was that even if you

23   wanted to, and you're saying I don't want to, the scope of

24   the District Attorney's offices offer of immunity wouldn't

25   be sufficient in Ms. Pearson's mind to protect her clients

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

22

1    such that they could be compelled to testify, but we don't

2    need to work through that if that's nothing that the

3    District Attorney's office is looking at right now.

4         ADA WADE:  Okay.

5         THE COURT:  So then what do you see, and I guess, the

6    vision you have for moving forward with the Fifth

7    Amendment concerns, Mr.Wade, would be to have the kinds of

8    individualized discussions like we had yesterday, and like

9    you suggested you would have with counsel.  I guess it

10   would be Ms. Pearson and  Ms. Deborrough for theses 11,

11   Mr. Dillon and Ms. Clapp for Senator Jones to talk about

12   the buckets.

13        In no way would I be requiring that here are the 112

14   questions, here is a script, but it would be that these

15   are the categories that we want to explore, and then there

16   are the disagreements between your team and counsel for

17   the witness, then we might need to have a group

18   discussion.

19        ADA WADE:  I think much like the process on last

20   evening, on the day of the witnesses testimony, have that

21   conversation.  If we can agree upon the buckets, great.

22   If we can't, then Your Honor would be asked to get

23   involved.  I don't think that having a conversation well

24   in advance of 11 people's testimony -- I don't think it's

25   fair.  I think it puts the State at a disadvantage.

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          23

1            THE COURT:  No, I agree.  I wasn't suggesting that

2       you had to map it out in a lot of detail or particularly,

3       far in advance, but more along the lines of what we talked

4       about yesterday.

5            ADA WADE:  Yes, sir.

6            THE COURT:  One more question for one or the two of

7       you.  If target letter is not a reason to conclude that a

8       witness shouldn't appear in front of the Grand Jury, this

9       is a two-part question, is it not at least a reason for

10      that witness to have heightened concern, and if not, why

11      send it?  What was the purpose of it?

12           If the purpose was to get them more concerned

13      shouldn't they be more concerned and say wait a minute?

14      I'm not going to answer these questions in front of a

15      Grand Jury.  I might sit down with you and have a proffer

16      if it's protected, if it can be protected enough.  I'm

17      trying to understand the thinking.

18           ADA WADE:  Judge, to be transparent with the Court,

19      the discussions that took place with our side and Ms.

20      Pearson and Ms. Deborrough prior to a few of their clients

21      having voluntary interviews, the questions were what is

22      the status of my client at this point?  We disclosed the

23      status of the client at that point - -

24           THE COURT:  So it was responsive.  It wasn't

25      proactive, it was reactive.  You're asking - -

            HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        24

1      ADA WADE:  And we said to them at that time, if at

2      any point the status of your client were to change, we'll

3      disclose that as well, and we did that.

4      THE COURT:  So that explains why, but then help me

5      think through what the consequences should be of that

6      elevation in status.   I assume it wasn't a downgrade that

7      you've been downgraded from, we've actually already

8      indicted you and we've dismissed it, and now you're only

9      target.  Why shouldn't there be the enhanced concern and

10     the beginning of the discussion that it may be that my

11     client is going to invoke his or her Fifth Amendment

12     rights here?

13     ADA WADE:  And certainly this discussion, Judge, from

14     our perspective, is not an attempt to circumvent anyone's

15     rights in terms of a fifth amendment, so I think that what

16     comes up is exactly what we're doing.

17     THE COURT:  Okay.

18     ADA WADE:   It gives Ms. Pearson the right to stand

19     up and say this is not what we want, and it gives the

20     State the right to stand up and cite Lampl, they'll have

21     to come in and do that.

22     THE COURT:  Lampl Bank of Nova Scotia.  They need to

23     come in and assert it in front of the Grand Jury as

24     opposed to having a lawyer say or the witness, him or

25     herself, you know what?   I'm thinking about it, I'm not

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

25

1    comfortable doing that.  No matter what you ask me, I'm

2    going to invoke.

3        ADA WADE:  Yes, sir.

4        ATTORNEY PEARSON:  Your Honor, may I respond briefly?

5        THE COURT:  I was just about to ask you that, and

6    there you go.

7        ATTORNEY PEARSON:  Your Honor, that's not what Lampl

8    says, as you accurately pointed out.  It says they can

9    subpoena people to a Grand Jury, and if that special Grand

10   Jury abuses its power, you'd better bring it up at the

11   time or there is nothing you can do about it later.  We're

12   not going to suppress the evidence.  We're not going to do

13   it, so it doesn't have anything to do with this Court's

14   authority, either under the quashal statute or the

15   supervisory ability of this Court to quash and otherwise

16   properly serve a subpoena.

17       We're not saying they can't subpoena us.  We're

18   saying you could quash it, and we're asking you to.  It's

19   clear, I don't think, Your Honor, that under these facts

20   it is sufficient to drag 11 people in here and then have

21   them figure out the buckets.  I genuinely cannot think of

22   a single question or area of questioning that I would be

23   comfortable allowing them to ask my clients including

24   their names, under these circumstances, and they shouldn't

25   be dragged down here from far away places of the State

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        26

1    just to be told, you know, either by you or us coming to

2    you for 11 witnesses, however many times that they are not

3    going to answer the questions.

4        They should have to come forward with at least a

5    bucket list, so to speak, that Your Honor approves before

6    they are dragged down here.  That is not too much to ask,

7    and if it can't be done before their appearances next

8    week, then you can quash them and we can revisit it, and

9    we can set them for a different time, but they should not

10    be dragged down here and put on public display for doing,

11    in our view, nothing wrong, but their own ambiguous

12    circumstances being forced to invoke their rights, and

13    it's just not appropriate under the Ethical Standards

14    under the Georgia Professional Standards - -

15        THE COURT:  But if they did nothing wrong, why aren't

16    they talking to the Grand Jury?

17        ATTORNEY PEARSON:  Because she's called them targets.

18    I mean, Your Honor, we've outlined in our motion why we

19    don't even think there's jurisdiction here, why the law

20    protects what they did, but as you know the Supreme Court

21    has made clear that the main purpose, one of the main

22    purposes of the Fifth Amendment is to protect innocent

23    people who can be bound up in ambiguous circumstances, and

24    I don't think but you're going to find, at least the cases

25    that I've never been in where ambiguous circumstances are

1   more ambiguous and politicized and fraught than this, and

2   so, you know, that is why - -

3        THE COURT:  I don't know that politicized makes it

4   ambiguous, but you're using the word ambiguous, and I'll

5   let you use that word.

6        ATTORNEY PEARSON:  We certainly have different views

7   of the facts in the law, Your Honor.

8        THE COURT:  There are entirely different views of

9   certain facts and non facts, I hear you on that, but I

10  don't know if that makes it ambiguous, but I hear you, and

11  I am mindful of an inconvenience factor, if in the end the

12  product of the exercise is to have a witness say I assert

13  the Fifth, and that's it.

14       Hopefully, folks will exercise discretion, but I

15  don't think there is, other than some rules that apply

16  more in a Federal setting where the word target means

17  something different, not entirely different, not entirely

18  different.  I wasn't able to find any legal precedent that

19  says it was improper that the Court should have barred the

20  investigating body from requiring someone to come in and

21  in their face saying I'm not answering any questions.  I'm

22  not even going to tell you my name.  That may actually be

23  something that the Grand Jury may want to know, that this

24  person won't even give her name under oath.  That could be

25  instructive to what the Grand Jury is doing, but they

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                            28

1    wouldn't know that if they never met the person.

2        ATTORNEY PEARSON:  Well, given that they're not

3    supposed to draw any negative inference from an

4    invocation  I wouldn't think that would be evidence, but

5    even if it were, I think the reason you can't find any

6    precedence is because in the Federal system, and then the

7    State system doesn't do Grand Jury work very often, and

8    then the Federal system they don't do this. .

9        They don't bring targets in and try to force them to

10   testify because they recognize it's unethical, as the AVA

11   has said and as the Georgia Professional Rules have

12   outlined, and we would ask that at a minimum, Your Honor,

13   that you ask them proffer the buckets to you or to us

14   before our people are brought in.

15       THE COURT:  Fair request.  I appreciate that.

16       ADA WAKEFORD:  Your Honor, may I address one point?

17       THE COURT:  Hold on.  Mr. Dillon, if you're going to

18   talk more about disqualification, not yet.  If it's the

19   Fifth Amendment you've been patient, so I'm happy to hear

20   from Senator Jones' perspective.

21       ATTORNEY DILLON:  Keeping quiet my mouth quiet in

22   this whole  disqualification thing -- -

23       THE COURT:  But go ahead.

24       ATTORNEY DILLON:  Trust me.  I call the Court's

25   attention to the Georgia Code, that's 15-12-100.  It's a

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              29

```
 1      procedure for a special Grand Jury and hours of that Grand
 2      Jury, and under Subparagraph C it says, "while conducting
 3      any investigation authorized by this part, investigative
 4      grand juries may compel evidence and subpoena witnesses."
 5      It may inspect records, documents, correspondence, and
 6      books, blah, blah, blah , and it specifically excludes
 7      subpoena targets, Your Honor, and these are the rules --
 8          THE COURT:  You mean it says you may not do that or?
 9          ATTORNEY DILLON:  No, it doesn't, but because it is
10      not included in the list, we all know the cannons of
11      constructing statutes.  If there is a list and it's not
12      included in the list, it's excluded from the list, and
13      this is the provision under which this Grand Jury was
14      impaneled.
15          THE COURT:  It didn't say subpoena tall people or
16      short people, it says witnesses.
17          ATTORNEY DILLON:  It says witnesses.
18          THE COURT:  You're saying a target is not a witness?
19          ATTORNEY DILLON:  A target is a different category
20      than a witness, and the case law in the state of Georgia
21      says that because targets are discussed differently in the
22      Lampl case, and that's a good case to cite on.  A target
23      is different than a witness, and this doesn't say subpoena
24      targets.  It says subpoena witnesses.
25          THE COURT:  Okay.  Mr. Wakeford.
            HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                          30
```

1        ADA WAKEFORD:  Your Honor, I'll read directly from

2    Lampl.

3        THE COURT:   Lampl is getting a lot of attention.  Am

4    I right?  Is it a Clayton County - -  It was some sort of

5    city counsel - -

6        ADA WAKEFORD:   I think so, Your Honor.

7        THE COURT:  Ms. Green-Cross is now nodding her head.

8    She would know.  She's the appellate expert.   All right.

9    Continue.

10        ADA WAKEFORD:   "One who has not been so charged,

11    meaning formally charged, in a formal charging instrument

12    --

13        THE COURT:  Which would be every single recipient of

14    a subpoena so far?

15        ADA WAKEFORD:  Yes.

16        THE COURT:  All right.

17        ADA WAKEFORD:  -- may be compelled to appear before a

18    Grand Jury that he retains the option during his

19    appearance of invoking his privilege against

20    self-incrimination and refusing to testify regarding the

21    incriminating matters, this is true even if the witness is

22    a target of the grand jury's investigation."

23        THE COURT:  So Mr. Dillon stood up first, and he's

24    freshest from saying ha ha, take Lampl that way, State.

25    So did he skip a sentence?  That's a pretty powerful

            HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        31

1    sentence, Mr. Dillon.

2         ATTORNEY DILLON:  A very powerful sentence, and with

3    regard to regular grand juries, I have no doubt that the

4    District Attorney might, but the statute under which the

5    subpoena is issued in this case properly is not that the

6    ordinary Grand Jury, nor the special grand jury, and it's

7    under this chapter in the Georgia code, and the rules are

8    different.

9         THE COURT:  So your argument is that a regular Grand

10   Jury that could indict and would target -- Lampl says you

11   can call that person in front of a that Grand Jury who has

12   the ability to indict Lample, and they can invoke his

13   Fifth from which they need to draw no adverse inference,

14   but a special purpose Grand Jury which can indict no one

15   or anything, they can't subpoena a target because they use

16   the word witness instead of target?

17        ATTORNEY DILLON:  Yes, Your Honor.

18        THE COURT:  Is the word target used in the

19   non-special purpose Grand Jury statute, or is the word

20   witness used?

21        ATTORNEY DILLON:  Interesting question, Your Honor,

22   but I do note that the subpoena is - -

23        THE COURT:  What's the answer?

24        ATTORNEY DILLON:  I don't know, but I do note that

25   the statute under which the subpoenas were supposed to be

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              32

1    issued in this case is under Title 15, but the subpoena is

2    actually rolled out under the provision of the Georgia

3    code that is not under Title 15, and they were, in fact,

4    technically, improper subpoenas because they were issued

5    under the normal statute and not under this chapter.

6         THE COURT:  So I guess we could republish them and

7    resign them if that is the - -

8         ATTORNEY DILLON:  Exactly, and then recognize that

9    this rule applies, but not the Lampl rule that we're

10   citing here.

11        ATTORNEY PEARSON:  Your Honor, we would take a

12   slightly different differentiation of Lample  - -

13        THE COURT:  A third reading.

14        ATTORNEY PEARSON:  It's actually the same read, and

15   that is the sentence that he read is (unintelligible) What

16   the the Supreme Court is saying in Lampl, we have an

17   individual who didn't take his Fifth in the Grand Jury,

18   the special purpose grand jury, the special purpose Grand

19   Jury used its authority to have a conveyer who was later

20   indicted in an improper Grand Jury.

21        I'm not suggesting they were improper, but a

22   different regular Grand jury, and then he tried to get

23   evidence suppressed from the special Grand Jury.  This is

24   not about whether they can compel people.  We're not

25   disputing they can issue the subpoenas, everybody says

             HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        33

1    they can.  That is the only thing Lample even arguably

2    says.  The only issue then is you get to quash them if you

3    want to.

4         If you believe that you should, and there's nothing

5    that says your authority under the statute, or under

6    supervisory authority is in any way affected by Lampl at

7    all whatsoever, so you clearly have the authority to do

8    what you think is proper with this Grand Jury here, and

9    we're asking you, on behalf of our clients, not to have

10   them frogmarched in front of a cameras and in this

11   courtroom.

12        THE COURT:  Okay.

13        ADA WAKEFORD:  At this point I was going to address

14   the original point I was going to make, which is I believe

15   we've heard the phrase "frog marched" in front of the

16   cameras three times now.

17        THE COURT:  All right.

18        ADA WAKEFORD:  I do not want to talk about this, but

19   I have to at this point.  Publicity is a hindrance to the

20   special purpose Grand Jury's work.  I believe earlier

21   Ms. Pearson stated that there may have been a witness in

22   here yesterday, but she didn't know who it was or how they

23   appeared, or what they had talked about, which is an

24   indication that the witnesses can come before the special

25   purpose Grand Jury, and no one ever know anything about

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

34

1     it.  If witnesses exercise their First Amendment right to

2     disclose after the fact or before the fact they were

3     called, then they are allowed to do that.  That is the

4     source of publicity around this.  It is, I think here we

5     are tired of hearing that there is publicity jammed up by

6     the District Attorney's Office in order to create a circus

7     around this when we have actually taken pains to try to

8     create an environment of circus around this, so there is

9     no frogmarching, and there are ways to come before the

10    special purpose Grand Jury without publicity being brought

11    into it.  I just wanted to clarify it right after the

12    third time we heard that phrase.

13         THE COURT:  Okay.  Well, I appreciate much of what

14    you said.  I think it's a little rich to suggest that any

15    particular side that has avoided the cameras.  One need

16    look only at basically any major news outlet, and you will

17    see who is talking to the media, and it is not always the

18    lawyers for the witnesses, so I think everyone involved in

19    this has taken full advantage of media coverage.

20         That said, they're are some things that can be done,

21    I know, because I've been asked to be involved with it to

22    ensure that witnesses can enter into the building and

23    leave the building without much harassment from the media,

24    and we can get to do that.

25         I don't know that there are many of Ms. Pearson's

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              35

1     clients that the media would even recognize when they
2     walked up the front steps of the courthouse if that's how
3     they came in, so I think the concern about putting people
4     on public display is a bit exaggerated for most of her
5     clients, but if there are clients who need special
6     accommodations and ingress and egress we can always
7     accommodate them, we've done it before and can do it
8     again.  Anything more from the District Attorney's office
9     on the fifth Amendment concerns raised in Ms. Pearson and
10    Mr. Deborrough's motion as expanded by Mr.Dillon?
11         ADA WAKEFORD:  No, your Honor.  We have responded to
12    your questions, and we have proposed a method going
13    forward, and we have nothing else to add.
14         THE COURT:  Thank you.  Okay.  Ms. Pearson or Ms.
15    Deborrough, anything else on behalf of your 11 clients in
16    connection with the quashal of the requests, in other
17    words the Fifth Amendment concerns?
18         ATTORNEY PEARSON:  I think that's it, Your Honor.
19         THE COURT:  Mr. Dillon, anything more on the Fifth
20    Amendment aspects?
21         ATTORNEY DILLON:  No, Your Honor, we've got the
22    motion as communicated earlier.
23         THE COURT:  Okay.  Thank You.  So I will not be
24    quashing any of the subpoenas, but I will be asking -- we
25    may need to change some of the timelines.  How many of
                HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        36

1    your 11 are coming all at once?  Are all 11 supposed to

2    come out the same day or are they spread out, Ms. Pearson?

3        ATTORNEY PEARSON:  Your Honor, we have - - they are

4    all coming on the 26th, 27th, and the 28th, so that's 3,

5    4, 5.  I allocated over the states maybe 9 exactly.

6        THE COURT:  The process is going to take longer

7    because what will happen, I suspect it will become more

8    regularized and streamlined after the first few of your

9    witnesses, but what will need to happen is that your

10   witness, and you Ms. Pearson and Ms. Deborroughs, if she

11   clears quarantine she can be here too.  She can appear

12   virtually, however we need to make it work, however we can

13   make it work.

14       We'll need to sit down, and it may just be lawyers at

15   first, so you can have your client wherever you want them

16   to be, as long as he or she is in the building, and

17   you're going to have that bucket conversation and see

18   where there is agreement or disagreement, and you've made

19   very clear that you can't think of anything, not even

20   astrological signs because somehow that would be tied to

21   something, or it would be irrelevant, but that

22   conversation needs to happen so that that we can, lawyers

23   and I can have a conversation about is it really a

24   complete impasse, of I may make the ruling, and you can

25   challenge it in whatever way you want, that the witnesses

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          37

1   will need to go in front of the Grand Jury to answer name,

2   rank, and serial number and then the rest will be Fifth

3   Amendment.

4        It helps the District Attorney's office has 12

5   because they know basically that they're going to ask one

6   question beyond name, rank, and serial number, if I get

7   folks passed that because there is not an area that can be

8   explored that I don't think is unprotected by the Fifth

9   Amendment.

10       ADA WADE:  One thing I believe, Judge, from our side

11  that is noteworthy, is the very thing that the District

12  Attorney's office has fought so hard to do, was keep our

13  witnesses secret and out of the public eye.  What Ms.

14  Pearson just did was, she gave the dates that her clients

15  were coming in here, that's the exact thing she's

16  complaining about.  She gave -- --

17       THE COURT:  Well, before we draw more attention to

18  this, I did not hear Ms. Pearson say Steve Jones is coming

19  in on this day.  She divided it over days and did not

20  identify people, and I mentioned, if there is a concern

21  about letting someone in the building discreetly, we can

22  address that and get someone in the building discreetly.

23       Most of these folks who walk, as long as they are

24  wearing normal clothes, they can walk right in the

25  courthouse, and those cameras that seem to be glued to our

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

38

1    courthouse steps right now wouldn't even pivot on that, so
2    I think the concern is greater than it needs to be, but we
3    can accommodate it.  I'm not going to ask someone to be
4    more specifically about who is going to be here when, I
5    just need to know if it's going to take a while for these
6    witnesses because there will be the conference before the
7    witness testifies. .
8        Testimony may be greatly reduced because of the
9    outcome of the conference may be that testimony is going
10   to be just as long as the District Attorney's Office had
11   forecast, but there's still this lawyer-to-lawyer
12   conference in advance, but that's how we're going to work
13   through it, and as I said, we may develop some guidelines.
14       A ruling I make with Witness One, isn't going to
15   apply to Witness Two insofar as she is similarly
16   situated.  I don't believe all are similarly situated.
17   There's still the overlap.  They are all alternate
18   electors, so there are certain commonalities, and I assume
19   that is why they all want to have you and Ms. Deborrough.
20   Similarly, they are all situated in this same situation,
21   but they are not clones, and so there may be areas that
22   are explorable with Witness One that are not explorable
23   with Witness Two, so I'm going to let the parties develop
24   the framework they want to use as we go forward.
25       I am here to assist when you reach an impasse, but I
                 HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        39

1    don't think it's appropriate under the case law Lampl and

2    others to quash the subpoenas, but it may be that these

3    witnesses have very, very, brief appearances in front of

4    the Grand Jury.

5         ATTORNEY PEARSON:  Your Honor, just so that I

6    understand.  We aren't going to elaborate on it ahead of

7    time.  We will collaborate when the first witnesses come

8    here or in between each witness?  I mean, we've got 11

9    people to get through, so I guess I need some clarity on

10   how that's going to work for each witness.

11       THE COURT:  So I invite early collaboration, but I

12   also understand that if the District Attorney's Office is

13   reluctant to get too specific too far in advance, so they

14   may buckle under the pressure of how long that would take

15   as well, and there may be some basic frameworks that they

16   want to share with you in advance, but if you're now

17   getting into the nuts and bolts that I get to stay out of.

18       I will get in the mix should an impasse be reached.

19   If that impasse is reached tomorrow, because you're

20   talking about a witness who is coming on an undisclosed

21   date next week, at an undisclosed location, then I could

22   talk with you all tomorrow, but it may well be that the

23   default is let's talk when you're witness is here.

24       That may mean you won't get to everything next week.

25   That was - - the reason why I was asking is that if they

1  are spread out you four weeks you - - they're all coming
2  in next week.  I could see it being that what had been
3  scheduled for Thursday ends up being what was scheduled
4  for Tuesday, because you only got through two people on
5  Tuesday because of the confirming that doesn't occur until
6  Tuesday, so I'm not forcing an answer to your question,
7  what you develop with the District Attorney's Office.
8       ATTORNEY PEARSON:  In light of that, Your Honor,
9  would the Court at all be amenable to to moving our grand
10  jurors, not quashing them but moving them to later so that
11  we can work this process out in advance?
12       THE COURT:  So another really good question for you
13  to explore with the District Attorney's office, they may
14  think that's wise and necessary as well, and it may well
15  be that 6 of the 11 go next week because everything is
16  taking a little bit longer because we are being careful
17  about the concerns raised in your motion, but I have made
18  clear that other than checking on the welfare of the Grand
19  Jury, in other words they are not in session from 8 a.m.
20  to  10:00 p.m.
21       I don't micromanage who gets called it or when, but
22  I'll let you know that the District Attorney's office has
23  been flexible at having to move things if obstacles come
24  up.
25       ATTORNEY PEARSON:  Well, we had asked for that, Your
           HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                     41

1   Honor, and they refused, that's why I brought that up, but

2   we'll talk to them about it.

3       THE COURT:  Well, things are a lot less streamlined

4   than they were before, so you work through that.

5       All right.  Let's talk about disqualification and

6   this process has moved up to the driver's seat on the DA's

7   side, and I think since Mr. Dillon got in about three

8   quarters of his argument in answering my simple question

9   of do you think it's moot or not, I want to give the DA's

10  office a chance to share some of their perspective about

11  it.

12      I think the word partisan gets thrown around a lot in

13  this and why they think disqualification doesn't fit or

14  how to manage what I think are some valid concerns that

15  Senator Jones has raised through counsel, but at a minimum

16  pretty clear appearance of conflict, if it's developed not

17  before the investigation started but in the midst of it.

18      ATTORNEY GREEN-CROSS:  Thank you, your Honor.  I

19  think Your Honor has used the phrase appearance of

20  impropriety.  There is Mr. Dillon's use of the phrase

21  appearance impropriety or appearance of conflict, and the

22  first place the State is going to direct your attention to

23  is on the law cited in the responsive brief that

24  appearance of conflict is enough.

25      Under Georgia law, the disqualification of a

    HADASSAH J. DAVID, OFFICIAL COURT REPORTER

        42

1 prosecuting attorney or entity requires an actual

2 conflict, not speculative, not conjecture, but an actual

3 personal interest, and in this case would be the

4 investigation of the special purpose Grand Jury or the

5 prosecution  potentially of Senator Jones.

6  So I think that while optics in this case may be

7 more front and center than in some others, optics doesn't

8 carry the day, it's an actual conflict, and there's just

9 nothing at all that suggests that there is the actual

10 personal interest on the behalf of the District Attorney.

11 I'll note that insofar as the motion target, special

12 prosecutor Wade, there is --

13  THE COURT:  Oh, thank you for that.  Pause on that.

14 Mr. Dillon, do you agree --  originally we were going to

15 talk about just disqualification and Ms. Deborrough, and

16 Ms. Pearson arrived on the scene about the Fifth

17 Amendment.  My first question was meant to be that, do you

18 agree, Mr. Dillon, that Mr. Wade's purported donations,

19 and I'm not attributing anything to him, but it looks like

20 from the records that Mr. Wade gave $2,000 to Mr. Bailey

21 when Mr. Bailey was running for Attorney General.

22  No donations of record or any public insofar as the

23 donations is the public because records are made of it, no

24 public donations in support of Charlie Bailey by Nathan

25 Wade since Charlie Bailey switched races, and is instead

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

43

1        trying to be Lieutenant Governor instead of Attorney

2        General; do you agree with that?

3              ATTORNEY DILLON:  I agree with that, Your Honor.

4              THE COURT:  Okay.

5              ATTORNEY GREEN-CROSS:  That was my whole paragraph.

6              THE COURT:  You don't need to cover that, because

7        that was very persuasive.

8              ATTORNEY GREEN-CROSS:  Thank you.

9              THE COURT:  If that fact is true, I am focused very

10       much on the appearance of the District Attorney.  Using

11       that title District Attorney Fani Willis, invites you and

12       encourages you to come to this fundraiser for the

13       political opponent of the target of my investigation.

14       That's what we need to navigate here, and I guess the

15       question is, if there's an actual conflict, is

16       disqualification mandatory or discretionary, and if it's

17       mandatory then does that mean that the appearance of

18       conflict still give the judge the discretion to fashion

19       some form of relief?

20             ATTORNEY GREEN-CROSS:  Let me start with the last

21       question.  No.

22             THE COURT:  No?

23             ATTORNEY GREEN-CROSS:  I don't think the Court has

24       the discretion law.  While I want to give the Court as

25       much discretion as you want to have — —

                    HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              44

1          THE COURT:  Only what it should have.

2          ATTORNEY GREEN-CROSS:  Yes.  I don't think the law

3     allows the Court to elevate the standard, what the legal

4     standard is an actual conflict.  I don't believe that the

5     Court's discretion is broad enough to force a remedy for

6     an appearance of conflict.

7          THE COURT:  And examples of actual conflict that I

8     saw in your pleading were somehow the prosecutor was able

9     to be like a defense attorney at the same -- I mean it was

10    these things where like what were you thinking?  Yes, it

11    was kind of crazy.   I represent one co defendant and as

12    the defense attorney in a criminal proceeding become the

13    DA and the prosecute the co defendant.

14         THE COURT:  okay.

15         ATTORNEY GREEN-CROSS:  That makes no sense, and that

16    is not the situation we've got here, but that is the kind

17    of extreme example of what the law recognizes as an actual

18    conflict for a prosecuting attorney, at one time I

19    represented the victim in a case that is now before me in

20    a divorce preceding who is now before me in a case.

21         It's that kind of really striking in your face and

22    routine political support for a political ally.  It just

23    doesn't make it there.  It doesn't go that far.

24         THE COURT:  The routine -- I would interpret as Mr.

25    Wade strokes a check for the candidate he wants to

             HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              45

1     support.  Using the title of your office and having a

2     social media that you as this political office holder are

3     holding a fundraiser for the opponent of someone that this

4     political office is investigating.  I don't know that it's

5     an actual conflict, but I use that phrase, "what were you

6     thinking," where the prosecutor thought I could prosecute

7     the codefendant of someone I defended.

8          It's a what are you thinking moment?  The optics are

9     horrific.  If you are trying to have the public believe

10    that this is a non-partition driven by the facts, and I'm

11    not here to critique decisions.  The decision was made,

12    but If we are trying to maintain confidence that this

13    investigation is pursuing facts in a non-partisan sense,

14    no matter who the District Attorney is, we follow the

15    evidence where it goes and ignore that fact that I hosted

16    a fundraiser for the political opponent of someone I just

17    named a target.

18         That strikes me as problematic.  Maybe not from an

19    actual conflict level, but if we are at a cocktail party

20    and people are asking do you think that this is a fair and

21    balanced approach to things, I do.  Well, how do you

22    explain this?

23         I mean, how does one explain?  I mean, that is the

24    concern I'm working through is that it is not a lowercase

25    A appearance, it is a capital A with flashy lights

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          46

1    fundraiser District Attorney for the political opponent of
2    someone I've named a target of my investigation, while I'm
3    a legal adviser of the Grand Jury, and I'm on national
4    medial almost nightly talking about this investigation
5    and  That's problematic.
6        ATTORNEY GREEN-CROSS:  Okay.  Not accepting the
7    entirety of the Court's characterization of the series of
8    events.  I'm going to explain it in a couple of ways.
9    First, it's still not a legal conflict.  It's still not
10   anything within the Court's discretion to remedy in the
11   way that Mr. Dillon has advocated on behalf of Senator
12   Jones.  As a legal matter, everybody can talk at cocktail
13   parties all they want and watch the cable news station of
14   their choosing, but no matter what it still doesn't amount
15   to a legal conflict under Georgia law.
16       Second, I want to direct the Court's attention to the
17   absolute lack of any evidence to the case that any action
18   taken during the course of the investigation has been
19   politically motivated at all.  As the Court made
20   reference, and maybe I'm paraphrasing, but it's the Grand
21   Jury's duty to Senator Jones, not the District Attorney's
22   office.
23       The District Attorney is the legal adviser of the
24   special purpose Grand Jury, and may well have an
25   investigation of their own, but Senator Jones is trying to

1   fight a subpoena to the special purpose Grand Jury, and it
2   was brought under their authority.
3       THE COURT:  It was, and I think technically you are
4   correct.  I wouldn't want anyone to be misled, that the
5   special purpose Grand Jury is the only -- meaning those
6   grand jurors are the only source of subpoenas that they
7   say to their legal adviser, where is what we'd like to see
8   next.  That can happen, but what can also happen, and it
9   doesn't matter who it happened here because your point is
10  a good one, but I don't want people leaving here thinking
11  oh, it's only the special purpose Grand Jury that decides
12  to come in and.  Equally so and perhaps most of the time
13  it's the District Attorney's team that says, here's who we
14  would like to have come before the special purpose Grand
15  Jury next. .
16      That subpoena comes through the Grand Jury maybe the
17  wrong statute under the subpoena, but it comes through the
18  Grand Jury, but the idea, motivation, and the decision is
19  from the District Attorney's office.  I don't know how
20  Senator Jones' subpoena which channel from which it
21  flowed, I've got an inkling, but it doesn't matter.  Your
22  point is a good one.
23      I don't know that it cures the concern about
24  political support for an opponent not having any bearing
25  on how focused or not the special purpose Grand Jury would

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

48

1    be on the person I'm supportings political opponent before

2    November X, whenever the election is.

3         ATTORNEY GREEN-CROSS:  I understand, and I didn't

4    mean to imply otherwise to the public in my report, but I

5    certainly understand the need to clarify that.  The larger

6    point being though, I think in this posture is that,

7    Senator Jones is still in obligation to some action taken

8    during the investigation that is the Court's allegation of

9    a political motivation, and you just haven't seen it here.

10   The -- Yes, sir.

11        THE COURT:  Mr. Dillon will get a chance to say more,

12   but part of his introductory remarks he emphasized a whole

13   lot then this target letter arise, like there was some

14   cause and effect.  I am not familiar with the timeline and

15   you mentioned that my description of events may have

16   gotten some of the timeline, and I'm not anchored to any

17   particular timeline other than the correct one.

18        Hopefully, there is only one set of facts as to the

19   timeline.  What was your reaction to the way Mr. Dillon

20   was painting -- it was almost a cause and effect timeline

21   that X happens and as a result of X support for Charlie

22   Bailey then Y happens, something that that in the public

23   eye would be negative to Senator Jones.

24        ATTORNEY GREEN-CROSS:  I represent to the Court, and

25   I believe it's accurate that all of the target letters

                 HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              49

1    went out at the same time.

2         THE COURT:  Okay.

3         ATTORNEY GREEN-CROSS:  So it was not pegged to any

4    event that had any relevance of Lieutenant Governor's race

5    or any other political option was dictated by the terms

6    and the pace of that investigation.

7         THE COURT:  So the 11 that Ms. Pearce and Ms.

8    Deborrough received were issued on the same day, and

9    effectively the same time as Senator Jones?

10        ATTORNEY GREEN-CROSS:  Yes.

11        THE COURT:  It is not Senator Jones got his on a

12   special day, and it was a broadcasted event, and then the

13   other 11 went out?

14        ATTORNEY GREEN-CROSS:  It was a routine issuance of

15   the change of status as Mr. Wade explained in an effort to

16   be transparent to everyone who had been working and

17   talking with the State.

18        The final point I think I kind of want to make is

19   that, as noted in the brief, we have partisan District

20   Attorneys and partisan elections for those offices, so it

21   should surprise exactly nobody elected District Attorney's

22   should have political affiliations with other individual

23   within the same political party, and I think the post case

24   --- I've got a copy for the Court if you are not familiar

25   with it and a copy for Mr. Dillon.

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        50

1      THE COURT:  Is there a cite?

2      ATTORNEY GREEN-CROSS:  It is.  298 Georgia 241.  It's

3  a 2015 decision.  It's post, P-O-S-T.  I've got a copy

4  that is highlighted.  I'll hand Mr. Dillon the same copies

5  that have been highlighted for the Court.  May I approach,

6  please?

7      THE COURT:  Sure.  Thank You.

8      ADA GREEN:  On page 5 it is a reference.  The case

9  doesn't raise the issue of a prosecuting attorney who has

10  been or sought disqualified by a defendant or target or a

11  subject, or a witness in the case.  It's an even higher

12  stand to what a judicial recusal would be, and I think

13  it's instructed as a lower standard -- I'm sorry, a lower

14  burden and a higher standard for a recusal of Court, and

15  in this case it was the situation where the District

16  Attorney had been listed as a campaign official of a

17  Superior Court judge's campaign at one time, and the Court

18  in that case found -- well, that's beyond routine, it's

19  beyond financial, it's beyond what we normally expect.

20      Although it even -- and so the Court concluded, You

21  know what, when you got that allegation and the affidavit

22  of recusal you should have sent that on.  I'll note too

23  though, that once it was sent on, the Court determined

24  that that wasn't an actual (unintelligible), and it went

25  right back, so I bring the language to the Court's

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

51

1   attention because it does draw a focus on these are the

2   things that happen when you have political affiliations

3   for elected offices.  It's expected, it's normal, and

4   until or it shows some actual conflict then that is just

5   maybe the upside, maybe the downside, but that's a

6   consequence of the system that we have.

7           THE COURT:  Okay.

8           ATTORNEY GREEN-CROSS:  One more final thing, and I

9   think this could streamline some of our other

10  conversations about remedy.  The State is not interested

11  in any summer surprises.  I couldn't source that October

12  deadline to anything.  I'm unable to determine when that

13  is.  I don't believe we have that here.  It's especially

14  unlikely.

15          THE COURT:  My understanding from speaking with the

16  Grand Jury directly.  My supervisory role is that the

17  timeline is whatever the timeline is.  There is no

18  deadline, they like to be done with this soon, but that is

19  only because they are giving much of their life to this

20  process, but they'll follow this process as it unfolds,

21  and as I intimated to Mr. Dillon and I'll make it clearer

22  when I wrap up the disqualification session that if the

23  work is completed such that it lands on or near the

24  election, it will state in the pleading and be in my

25  office until it gets disclosed after the election.

1       ATTORNEY GREEN-CROSS:  You won't be hearing any

2  objection about that from the State.

3       THE COURT:  I never I heard any requests to the

4  contrary.  What I heard is we don't know when it will end.

5  When will it will be done, when we're done.

6       ATTORNEY GREEN-CROSS:  I got a passed a note that's

7  going to clear up that timeline.  The political event for

8  Mr. Bailey was June 14th, and the target letter was sent

9  to Senator Jones and the others in that July 5th, July 6th

10 timeline.

11      THE COURT:  So  three weeks later.  All right.  Mr.

12 Dillon or Ms. Clapp.  I'm happy to hear what you want to

13 share.  Don't repeat what you already said because I heard

14 that.  I'd like you to start with Ms. Cross's focus, and

15 it is different.  I'm very familiar with the judicial

16 requirements and the impact and affect of apparent

17 conflicts, and Ms. Cross's observation is the District

18 Attorney is not a judge.

19      This is true, but because of that the apparent

20 conflict may be an area of concern that we ought to talk

21 about, but that it would not require me to take any

22 remedial action, only if there were an actual conflict,

23 and even if it was an actual conflict, but I don't

24 disagree with you if you say there is an appearance of a

25 conflict.  You don't need to try to convince me of that.

1          If that's not enough, legally, then we'll all agree

2     that there was an appearance of conflict, hopefully

3     something like that doesn't happen again between now and

4     the conclusion of this electoral cycle, but that is what I

5     need you to start with appearance verses actual and

6     anything else we need to cover that you already didn't.

7          ATTORNEY DILLON:  Your Honor, if I may.  My associate

8     has a power point, and we'd like to plug into the screen

9     if that is possible to the Court.

10         THE COURT:  It is, Ms. Clapp is a part of this zoom

11    session, and you're able to share your screen.  Is what

12    you're going to share something you shared with Ms. Cross

13    or is this brand new?

14         ATTORNEY DILLON:  We have not shared this with Ms.

15    Cross.

16         THE COURT:  It's not evidence?

17         ATTORNEY DILLON:  It's not evidence, but we do have

18    some exhibits, Your Honor, we do have some evidence here

19    today.

20         THE COURT:  Okay, if there is going to be evidence,

21    let's just make sure Ms. Cross gets a chance to see it

22    before we blast it on the screen.

23         ATTORNEY DILLON:  Absolutely.  oh, no.  It won't be

24    blasted on the screen.  It won't be published before --

25         THE COURT:  Okay.

          HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                    54

1     ATTORNEY DILLON:  As the initial point, Your Honor,

2     I'd like to point out that Senator Jones received his

3     Grand Jury subpoena in late May, and he was set for

4     testimony in late July.

5         We won't go into the date because we don't want to

6     create a bottle neck, but he was assured by the DA's

7     office that he was a witness in the case, and he was glad

8     to do his civic duty.  We were trying to work out the

9     parameters for a voluntary interview to avoid the reptile

10    marching.  I won't use that term.  while I like it, I just

11    won't use it.

12        THE COURT:  Simple, but what you are avoiding is

13    answering my question.  My question was, appearance of

14    conflict verses actual conflict, what do you think the law

15    is, and where do you think this falls?

16        ATTORNEY DILLON:  I think, based on my reading of the

17    law that controls in this area is that when there is a

18    public perception of a conflict, then there's an issue

19    that this Court has to look at, and the standard is the

20    standard that is layed out in the Young case, the Supreme

21    Court case that the DA cites in their response brief.

22        THE COURT:  Young as in not old?

23        ATTORNEY DILLON:  Young as in not old, and I don't

24    have the cite in front of me.

25        THE COURT:  I'll get it.

          HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          55

1          ATTORNEY DILLON:  It's also in my brief.

2          THE COURT:  Lampl.

3          ATTORNEY DILLON:  Okay.  The DA cites it for the

4    proposition that, "The standard of neutrality for

5    prosecutors is not necessarily astringent as those

6    applicable to judicial or quasi --- judicial offices," and

7    she is correct, direct quote from Young.

8          It is not astringent, and the Court goes on to say

9    that the different in treatment is relevant whether a

10   conflict is found, however, not to it's gravity once

11   identified.  We may require a stronger showing for a

12   prosecutor that a judge in order to conclude that a

13   conflict of interest exists, but once we have drawn that

14   conclusion we have deemed the prosecutor subject to

15   influences that undermine confidence that a prosecution

16   can be conducted in a disinterested fashion.

17         If this is the case we can not have confidence that a

18   proceeding in which the officer plays the critical role of

19   preparing and presenting the case for the defendant's

20   guilt or hear the defendant's recommendation for a charge.

21         And so here is the Supreme Court saying that if the

22   confidence is undermined, if the Court is saying, what

23   were you thinking, then the decision is already made,

24   because if we have a what were you thinking factor that

25   even if they recommend discharge, and even if they died,

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

56

1    and if they go to trial, and even if they win the case,

2    which we submit will never happen, there it has occurred

3    in the Young case.

4         The bigger issue here is not whether or not they can

5    indict him for submitting a false document, they determine

6    the falsity of all the documents in this case.  The issue

7    here is whether or not they can drag Senator Jones down by

8    literally releasing to the press that he's a target.  This

9    guy get's $32,000 dollars.  This guy get's a publicly

10   disclose target letter.

11        THE COURT:  You're going a little bit off the -- the

12   focus here is disqualification, and I'm not quite sure

13   what you are invoking from the press or who you think said

14   to the press that someone was a target, maybe other than

15   you or your client talking to the press, but that's not

16   what your motion was about.  Your motion was about the

17   decision the District Attorney made to support someone in

18   her political party --

19        ATTORNEY DILLON:  Yes, Your Honor.

20        THE COURT:  -- and how that may create, and it does

21   create the appearance of possible conflict, but is it an

22   actual conflict, and you are helping me process that maybe

23   an appearance would be enough, but that is what I need us

24   to focus on and not your theory that the District

25   Attorney's office is trying to affect someone's political

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          57

1   career as opposed to revelations about someones connection

2   to a series of events that are particularly controversial

3   in our society right now might prove problematic for that

4   political candidate.  I can't help that part.  Those were

5   choices that were made.  That might elevate that candidate

6   in the eyes of some.  They might not elevate that

7   candidate in the eyes of many.

8       ATTORNEY DILLON:  It may, Your Honor, and with regard

9   to those facts, Senator Jones was willing to come in and

10  meet with the prosecutor and sit down and say these are

11  the facts of the case, under oath and maybe not under

12  oath, but then they received this carpet bombing of target

13  letters for everyone who signed the document, it is

14  suddenly 16 witnesses had the door slammed in their face

15  because they were told that they less friends of the

16  investigation or targets.

17      Can we go to the next slide?  Mr. Jones received his

18  target letter on July 6th as the DA indicated.  Contrary

19  to their motion where they indicated he was a potential

20  target, he was told he was What?  Next slide.  "You are

21  advised that you are "A target" of the Grand Jury."  This

22  was on July 6th.

23      Next slide, please.  On July the 12th, six days

24  after, I received this target letter, and I will say that

25  we consider this to be highly confidential, and the only

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

58

1    two people in the world that knew about the target letter

2    were me and the district Attorney's office. I get this

3    unsolicited e-mail from a reporter with --

4        ATTORNEY GREEN-CROSS:  I'm sorry --

5        THE COURT:  Stop.

6        ATTORNEY GREEN-CROSS:  I'm sorry.  This isn't a

7    document that I've seen before, so before we publish it,

8    Mr. Dillon can you --

9        THE COURT:  Can you take that down, Ms. Clapp back to

10   the preceding page?  And so, Mr. Dillon, you had assured

11   me that --

12       ATTORNEY DILLON:  Yes, I did, Your Honor, and in my

13   zeal I got a little ahead of myself.

14       THE COURT:  Well, be less zealous.  Represent your

15   client, but let's not slap e-mails for which no foundation

16   has not been laid upon the screen. I thought you said, in

17   fact, I know you said don't worry, the actual exhibits I

18   won't put on the screen, they'll just be in my hands and

19   they won't be published.

20       ATTORNEY DILLON:  I had a carefully drafted script,

21   and I lost it because we started in the middle of my

22   argument.  May I approach and enter before the Court with

23   a copy.

24       THE COURT:  You may.

25       ATTORNEY GREEN-CROSS:  If it's a copy of Defense

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

59

1  Exhibit 2 then again, there's no foundation.  I haven't

2  seen it before.

3    THE COURT:  I'll take it.  I won't necessarily make

4  it a part of the record --

5    ATTORNEY GREEN-CROSS:  That was a part of my request.

6    THE COURT:  If we're going to have a discussion about

7  it, I need to be able to see it.  Thank you.

8    ATTORNEY DILLON:  It's an original and one.

9    THE COURT:  All right.  Any way.  Your representation

10  is that you previously shared with me what happened in

11  your life, and in your life a reporter out of the blue

12  reached out to you and said hey, I heard that your client

13  is targed in the District Attorney's investigation?

14    ATTORNEY DILLON:  Yes, Your Honor.

15    THE COURT:  Well, the special Grand Jury's

16  investigation.  Okay.

17    ATTORNEY DILLON:  Three days later this same reporter

18  broke the story, and we won't publish that either.  It's

19  not an exhibit, and it's on the internet, and we believe

20  the Court -- we'd love to publish the story.

21    THE COURT:  You're free to do that, not through the

22  Court's zoom.

23    ATTORNEY DILLON:  Okay.  We'll hold off on that slide

24  for now, but I will represent to the Court three days

25  later this same reporter broke that everyone who signed on

     HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                   60

1    the alternate slate of electors and had received a target

2    letter including Senator Jones.

3         THE COURT:  Assuming for a minute that is exactly how

4    that played out with you and Mr. Isokoff (sp.) where does

5    that get us actual conflict, apparent conflict -- I

6    understand where your client is very frustrated by that.

7    You suggest that, gosh, the only two people on the planet

8    who should know about it would be the District Attorney

9    and you.

10        Certainly, it's a whole lot more than that.  We know

11   the District Attorney alone didn't, in fact, write all

12   these letters by herself.  In fact, she didn't sign the

13   letters.  It's on the screen right now.  Mr. Wade did, so

14   the universe has just grown by 50%.  It's three people.

15        ATTORNEY DILLON:  Right.

16        THE COURT:  So somehow -- let me finish.  Somehow

17   word got out and the reporting universe knows about it

18   now, and it flows as an unwelcomed development for your

19   client.  Actual conflict, appearance for conflict.  I need

20   you to bend it back to what I need to work through, which

21   is should I take any remedial action to address an actual

22   conflict or the appearance of conflict, if I have the

23   authority, that's what we're working through and not the

24   trials and tribulations of Senator Jones because there was

25   a leak.  Unless you've got proof that it was Charlie

1        Bailey who leaked it, and then now we have --

2             ATTORNEY DILLON:  Yes, Your Honor.

3             THE COURT:  But we don't have that here.

4             ATTORNEY DILLON:  I do not have that.  No indication

5        that Mr. Bailey was involved.  All I know is that this

6        organization knew and I knew, and of course my client

7        knew, and then six days later this internet reporter

8        knows, and then shortly after that there's an AJC story

9        about it.  If we could I'd like to publish Exhibit 3,

10       which is a flyer for it.

11            THE COURT:  That's in your pleading.

12            ATTORNEY DILLON:  It is.

13            THE COURT:  You may -- it's already public record.

14       Let me make sure the State can look at it,  but if it's in

15       the pleading --

16            ATTORNEY GREEN-CROSS:  If it is what's in the

17       pleading then we don't have an objection to the

18       authenticity of it.

19            THE COURT:  Okay.

20            ATTORNEY DILLON:  May I approach, Your Honor.

21            THE COURT:  I've got it on my screen.  So we have

22       this fundraiser, and it's a blockbuster headlining Fani

23       Willis the District Attorney.  In fine print you can see

24       where Mr. Bailey is, in fact, a candidate there, the font

25       is so small that I have to squint to see what it says.

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                              62

1        This occurs about three weeks before the decision is made
2    to make my client target in this case.
3        The District Attorney, according to publicly
4    available records, which I have marked as Exhibit 4.   This
5    particular document, Your Honor is from the public
6    campaign finance website here in Georgia, so this is
7    publicly available data.   It shows during the day of and
8    during the day after this fundraiser $32,000 made to the
9    office of Mr. Bailey.   We submit is a direct result of
10   this fundraiser.   I'm told that the custom is, often
11   people show up with a check or they give their regrets and
12   sent a check the next day.   During this particular
13   month,Mr. Bailey raised over $270,000 dollars.
14       THE COURT:   So this was a particularly small
15   fundraiser for him?
16       ATTORNEY DILLON:   This might have been a particularly
17   big one.   This might have been the one that caused the
18   avalanche of checks to come in.
19       THE COURT:   Could be for all those people who are
20   checking the ethics website to see what the cash flow
21   looking like for the first couple of weeks were, so I'll
22   put my money behind it.
23       ATTORNEY DILLON:   This is the sort of headline
24   fundraiser that gets people to say, oh, we have a big
25   wheel.   We have somebody who is on the nightly news, as
              HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        63

1    this Court knows, who is pulling for Charlie Bailey.

2          THE COURT:  Okay.

3          ATTORNEY DILLON:  One candidate in the Lieutenant

4    Governor's office or the Lieutenant Governor's race gets a

5    headliner, the other one, three weeks later gets a target

6    letter -- quietly get's a target letter.  Now, there were

7    numerous news stories speculating about the existence of

8    target letters on or about the time of the Yahoo news

9    article, and there was a lot of buzz about that.

10         In fact, there was even an AJC story where DA Wilis

11   was quoted as saying that numerous attorneys had received

12   target letters on their behalf.  It didn't name Senator

13   Jones, fortunately.  In fact, it wasn't publicly known

14   that Senator Jones received a target letter until the DA

15   filed their brief two days ago.

16         They were the first people to acknowledge he was a

17   target for this Grand Jury.  We had never acknowledged

18   that.  It was a mere speculation in the press, but it's

19   that sort of thing that gives the DA the the ability to

20   benefit their friends and harm somebody who is under

21   investigation, and that is really what we're talking

22   about.

23         The cases that the DA's point to in their motion from

24   1916 and 1936 are talking about transactions where the

25   financial transactions were $150, and was that materially,

          HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                      64

1    and while those are interesting cases, but once that $150

2    was material in the depression, we were talking about

3    $30,000 and we're talking about swaying an election, a

4    statewide election in Georgia, and that's a significant

5    thing.

6         This is not something that is being done by accident.

7    This is being done by design.  This fundraiser was pointed

8    at benefiting Senator Jones --

9         THE COURT:  Isn't that the purpose of the fundraiser.

10   I agree -- the point of -- the question is does the

11   District Attorney decision to support someone with whom

12   she is politically aligned, it surprises no one that they

13   are politically aligned.  Does that rise to the level of

14   creating -- an appearance of -- , and I've opined on that

15   a little bit an actual conflict, and I understand because

16   you can't climb into someone's mind.

17        You have to do a little of this through the

18   shadowboxing of, okay -- there is a fundraiser and all of

19   this money came in, and then  there was a target letter.

20   Do you have more of a connection of one who proceeded the

21   other?

22        ATTORNEY DILLON:  As far as a direct connection?

23        THE COURT:  Any connection.

24        ATTORNEY DILLON:  What is out there in the press,

25   what is out there in the ether.  A part of Senator Jones'

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                            65

1    concern is that this report is going to come out in

2    October.  I'm glad to hear there's no October surprise,

3    but there's been this whole series of drips, this whole

4    series of leaks out of the Fulton County DA's office that

5    have tilted benefit towards Mr. Bailey.   It pointed to my

6    client as being a presumptive violator of the law, and

7    it's only because the DA has the authority to do that.

8         So if this Court were to determine that she has a

9    conflict, and this appearance is sufficient, and we go to

10   the Attorney General's office to appoint a new prosecutor

11   with regard to Senator Jones who could sit down with him

12   and say, Well, Senator Jones, we're interested in what

13   happened in December 2020, would you like to talk to us,

14   and just like we did on day one, with the DA's office?

15        Certainly, we would be glad to.  Do we have a target

16   letter from your office?  No, you do not, Senator Jones,

17   because we have useful information that would age your

18   investigation, because this is an investigation when it

19   was impaneled that was supposed to gather evidence to see

20   whether or not there was an effort to undermine democracy

21   in this country, and when Senator Jones said, I have a

22   subpoena here, I'm going to talk to these people we said,

23   fine.  We prepared our rates, but then we've got this

24   target letter and then everything changed, just like it

25   did for these 11 clients.

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

66

1              So then where initially they indicated where they

2       wanted to gather evidence, now it appears that what they

3       really wanted to do is gather publicity, and they slammed

4       the door on all 16 witnesses who signed the document by

5       giving them target letters, and then they announced that

6       they're all bad people, and in essence they're going to

7       recommend their charges in this report, if and when it

8       comes to you desk.

9              THE COURT:  So the DA's office doesn't write the

10      report, the Grand Jury does, just to repeat.  You

11      mentioned something about the District Attorney's office

12      leaking this and leaking that.  Supposition or evidence?

13             ATTORNEY DILLON:  I certainly don't know that the

14      District Attorney's office talked to Yahoo News, but I

15      know that I was the only other person holding a copy of

16      that target letter on that day, and there are numerous

17      daily stories in the AJC, to quote learned sources from

18      inside the investigation are the people who are conducting

19      this special Grand Jury.

20             THE COURT:  I'm focused on your client, and I'm

21      asking you to direct me to anything other than the

22      gentleman from Yahoo who said, I heard X about your client

23      being a target. has there been other outreach from the

24      media to you saying, I heard Y, I heard Z about Senator

25      Jones that you can source only to the District Attorney's

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              67

1    office as opposed to, hey, any witness who comes before

2    that Grand Jury is free to talk to the media afterwards if

3    he or she wants to.

4         ATTORNEY DILLON:  That's absolutely correct, and as

5    you know, that's how the Grand Jury work.

6         THE COURT:  Right.

7         ATTORNEY DILLON:  You're supposed to operate in

8    secrecy, which is what was anticipated when this was

9    founded, but the witnesses are free to go talk, and some

10   of the witnesses probably do talk, but certainly Senator

11   Jones had an interest in the public not knowing that

12   Fulton County considered him a target, so he did not talk;

13   we know that.

14        The leak of the existence of this target letter and

15   subpoena actually, violate the the (unintelligible) of

16   ethics that the District Attorney operates under, and one

17   of the things that we have with regard to Exhibit 5 is the

18   ethics training that the DA's office gives from their

19   general counsel, Mr. Robert Smith, who is the general

20   counsel for the Prosecuting Attorney's Counsel of Georgia,

21   and with permission of the Court I'd like to mark this as

22   Exhibit 5.

23        ATTORNEY GREEN-CROSS:  No objection, Your Honor.

24        ATTORNEY DILLON:  I think the District Attorney

25   offered me an affidavit from Mr. Smith earlier today, so I

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

68

1    think they rely on him as an expert in regard to ethics.

2         THE COURT:  Okay.

3         ATTORNEY DILLON:  And so at this time I would offer

4    Exhibit 5 into evidence and request to publish it.

5         THE COURT:  Sure.

6         ATTORNEY GREEN-CROSS:  Your Honor, I don't object to

7    the submission of the document -- I can't verify it's

8    authenticity.  If Mr. Dillon is representing to the Court

9    the source of this information, where he got it, that it's

10   accurate, true, and complete, and that's probably going to

11   take care of my objection.  I just can't look at it and

12   know that this is the presentation that Mr. Smith gave.

13        THE COURT:  Right.  It's too long for you to do that,

14   just in this setting.  Any reason we should be concerned

15   that this has been altered in any way, or is anything

16   other that what Mr. Smith presented to this District

17   Attorney, but presumably all District Attorneys and their

18   processes?

19        ATTORNEY DILLON:  My understanding is that this is

20   his presentation and he does it periodically and that he

21   would have done it during the time period that Ms. Willis

22   was the District Attorney here.

23        THE COURT:  Okay.

24        ATTORNEY GREEN-CROSS:  Can I ask for a representation

25   of where you obtained this copy?

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        69

1          ATTORNEY DILLON:  This was pulled off of the
2     internet.
3          ATTORNEY GREEN-CROSS:  Did you pull it from off of
4     the internet?
5          ATTORNEY DILLON:  Yes, I did.
6          ATTORNEY GREEN-CROSS:  Okay.  Was it from the PAC
7     website?
8          ATTORNEY DILLON:  You have to have access to the PAC
9     website to get it.
10         ATTORNEY GREEN-CROSS:  And I'm wondering how you got
11    it.
12         ATTORNEY DILLON:  It's out there in the ethers.
13         THE COURT:  He got it from Yahoo.
14         ATTORNEY DILLON:  I got it from Yahoo.
15         ATTORNEY GREEN-CROSS:  I want to kind of thank you
16    for your candor.
17         ATTORNEY DILLON:  Would you like to present it to
18    your client?  She would have attended this training, and
19    see if it's complete?
20         ATTORNEY GREEN-CROSS:  I would like to preserve
21    publication of the document until I can ascertain whether
22    it is true, accurate, and complete, because I understand
23    that it has been sourced to the internet, and that is not
24    something that I can accept, this authentication.
25         THE COURT:  Okay, so it's admitted.  I'll take it,
              HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        70

1    just don't put it on the screen.  I want us to keep moving

2    forward.

3        ATTORNEY DILLON:  Okay.  We won't put it on the

4    screen, but it does quote the rules of professional

5    responsibility in Georgia, and so, I think those rules are

6    relevant here, and the fact that the District Attorney's

7    members and the District Attorney herself receives

8    training on this on and gets reminded on a periodic basis

9    of what their responsibilities are for the prosecutors is

10   relevant.

11       THE COURT:  Okay.  So are you going to be reminding

12   her now by reading it?

13       ATTORNEY DILLON:  I would love to just read a few

14   snippets, if I may, Your Honor.

15       THE COURT:  If they are truly snippets.

16       ATTORNEY DILLON:  "The DA and Assistant DA's should

17   refrain from making extra judicial comments that have a

18   substantial likelihood of heightening public condemnation

19   of the accused."  That is rule 3.8.

20       THE COURT:  This relates to your theory that there

21   was a leak that wasn't necessary -- one, we don't know

22   there was a leak.  Two, the District Attorney herself who

23   is the focus of your concern because of the political

24   support she has from someone with whom she is politically

25   aligned, that she somehow has been behind the leak that, I

1   guess would have been behind the leak that your client is

2   a target, but there is no evidence of that.

3       ATTORNEY DILLON:  There was no evidence that my

4   client was a client was a target until two days ago when

5   they said it in their reply brief, Your Honor.

6       THE COURT:  Okay.

7       ATTORNEY DILLON:  And that was not inadvertent.  That

8   came directly from the mouth of the District Attorney's

9   office, and so we're not talking merely about this runoff.

10  We're talking about the fact that it is publicly confirmed

11  that Senator Jones is a target of this Grand Jury.

12      THE COURT:  Okay.

13      ATTORNEY DILLON:  Irrefutably.

14      THE COURT:  So your focus is not on a theory that

15  would have got out but the confirmation, if you will, in

16  Ms. Cross's response to your response in your motion to

17  disqualify?

18      ATTORNEY DILLON:  Yes, Your Honor.

19      THE COURT:  Okay.  I'll let her talk about that.

20      ATTORNEY DILLON:  Yes, I understand.  That brings us

21  to the juncture that you pointed out where we began, which

22  is on one side, we have this headliner and they raised

23  $32,000, and on the other side we have this target letter

24  that they publicly disclosed, and we have these series of

25  leaks to the press, and this is an effort to sway the

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

72

1    outcome of the election for Lieutenant Governor in this

2    case.  It really has nothing to do with whether or not

3    they ultimately indict Senator Jones or the other group of

4    11, or anybody in this case, because once the publicity

5    machine has done it's business, the friends of the

6    District Attorney have won, and so that is really why

7    we're here, and so you ask, is there a real conflict here?

8    It couldn't be more.

9        THE COURT:  Okay.  Short of disqualification, what do

10    you view as a remedy?  If I conclude that something needs

11    to be done, and I have the authority to do it, but I don't

12    think that it's practical or appropriate to say that the

13    entire District Attorney apparatus for Fulton County has

14    to unplug from any investigation, questioning of,

15    exploration of your client's connection to the

16    interference of the 2020 general election.

17        What do you see as an intermediate -- one would be

18    for me to say there is an apparent conflict, but I can't

19    do anything about that, because I can only handle actual

20    conflicts.  Another would be to say either it's an actual

21    conflict, and I'm going to so something, or I'm going to

22    go out on a limb and do something even though it's only an

23    apparent conflict.

24        So if I'm going to do something, but it's not

25    disqualify the whole office, what is your second most

1     preferable outcome?

2        ATTORNEY DILLON:  Well, as the Court is aware, there

3     are not numerous special Grand Juries of this magnitude to

4     point to for precedent, so what we suggest in our brief is

5     that the statutory provision  that requires, once there's

6     a conflict made apparent, that it be referred to Attorney

7     General Carr's office and he find someone to conduct that

8     portion of that here independent of this special Grand

9     Jury, and it can be as simple as finding a District

10    Attorney that doesn't have to find a good solid democratic

11    District Attorney somewhere who doesn't have a conflict

12    and give him the authority to pursue Senator Jones' issue

13    in this, and we would be glad to sit down with him.

14        We would be glad to sit down with you.  We would be

15    glad to approach this with the same willingness to say

16    let's get to the bottom of this issue and whether or not

17    there was a conspiracy to undermine democracy in this

18    country because that is an important issue, and let's put

19    the media circus behind us.  So let's answer the questions

20    and forget it affecting this election for Lieutenant

21    Governor, because there's no way she can keep a hand in

22    it.

23        THE COURT:  She being the District Attorney?

24        ATTORNEY DILLON:  She being the District Attorney.

25    Forgive me, Your Honor, and not affect the outcome of this

1    election for Lieutenant Governor.

2         THE COURT:  So if Attorney General Carr selected

3    fictional District Attorney X who had also given $2,000 to

4    Charlie Bailey's campaign for Lieutenant Governor --

5         ATTORNEY DILLON:  It would not be a problem at all.

6    It's an ordinary contribution, and it's exactly what

7    counsel points to.  Now, if they had hosted a fundraiser

8    during the time period that they were investigating

9    Senator Jones, I might have to go to that judge and talk

10   about that fundraiser.

11        THE COURT:  What if that District Attorney had

12   already hosted -- the District Attorney is not involved in

13   that investigation.  She hosted a fundraiser two weeks

14   ago, $50 grand or even more money than DA Willis, but it's

15   done.  It's over and done with, and I'm not going to do

16   anymore fundraisers from here on out, because now I've

17   been tasked with seeing what connection, if any, Senator

18   Jones had to what was going on in November and December.

19        ATTORNEY DILLON:  If every District Attorney in the

20   whole state had hosted a fundraiser for Mr. Bailey then

21   that issue might be apparent, but I suspect, giving the

22   list of good democratic District Attorneys in this state

23   that we can find somebody who doesn't have a conflict and

24   hasn't hosted a fundraiser for either one, because

25   certainly, if somebody that hosted a fundraiser for

                HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                              75

1     Senator Jones, the Attorney General shouldn't nominate

2     that person either.  Find somebody who doesn't have a dog

3     in the hunt.  Fani Willis has a dog in this hunt.

4           THE COURT:  Got it.  Thank you, sir.

5           ATTORNEY DILLON:  Thank you, Your Honor.  Oh, can we

6     offer into evidence Exhibits now.

7           ATTORNEY GREEN-CROSS:  Actually, I was going to ask

8     to leave it up.

9           THE COURT:  Leave it up?  Okay, don't take it down?

10    Too late.  Thank you, Ms. Clapp.

11          ATTORNEY DILLON:  Can we offer into evidence 1-5?

12          THE COURT:  If there's no objection, 1-5.  Was 5 the

13    one where the province was the internet?

14          ATTORNEY GREEN-CROSS:  Yes.  I was going to object to

15    the authenticity.  I believe the foundation has been shown

16    for Exhibit NO. 5, we entered it into evidence so I didn't

17    object to the Court reviewing it, but I do object to it

18    being tendered and admitted.

19          THE COURT:  Why don't we do this?  I will take 1-5,

20    and then I will give Mr. Dillon to maybe shore up his

21    sourcing of it, and if, in fact, it is pretty clear that

22    Smith was the name of -- Mr. Smith's presentation then

23    I'll add to 5 the other 4.  I'll hold on to it, but it

24    won't become part of the record until either Ms. Cross you

25    agree to talk to Mr. Dillon a little bit more and we see

1      the source, or we're substituting to you -- someone can

2      get it off the PACK site.

3          ATTORNEY GREEN-CROSS:   I do want to raise objections

4      to some of the others, but if they're being tendered now

5      into evidence, Exihibit 1, the letter, I don't have any

6      objection to that.

7          THE COURT:   Okay, 1 is admitted.

8          ATTORNEY GREEN-CROSS:   Exhibit No. 2 is the e-mail

9      that I do have an objection to that being tendered and

10     accepted into evidence without any providence of it.  I do

11     also object to the relevance of it.  There's nothing in

12     this e-mail that sources any information to the District

13     Attorney's office insofar as this being offered to show

14     that the leaks are coming from this side of the table.  I

15     object to the relevance of that, and I don't think it

16     shows that, and I object to the admission of it into

17     evidence.

18         THE COURT:   Okay.

19         ATTORNEY GREEN-CROSS:.  No. 3 is the fundraiser flyer

20     that is up on the screen now, and we don't have any

21     objection to that being tendered and admitted into

22     evidence.  Exhibit No. 4.  Again, I have an objection to

23     the relevance of this.  I don't think it shows what, at

24     least what's been argued.  It's been identified and

25     offered for the purpose of establishing how much money was

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                            77

1    raised at the fundraiser, but what the actual document is

2    or appears to be, based on Mr. Dillon's representation,

3    and I don't have any reason to doubt it.

4         This is publicly available about how much money was

5    donated to mr. Bailey campaign during a 2-day period in

6    this document to the fundraiser, and while w  I don't

7    think that is going, and because of that I don't think

8    that we have an objection to the ruling.

9         THE COURT:  Okay, and then 5 is being conditionally

10   admitted, provisionally admitted.  I'm assuming you can

11   clear up the source.

12        ATTORNEY GREEN-CROSS:  Yes, sir.

13        THE COURT:  All right.  Anything you want to add, Mr.

14   Dillon?

15        ATTORNEY DILLON:  No, Your Honor.

16        THE COURT:  All right.  I will admit Exhibits 1 and

17   3, and then 5 will be provisionally admitted.  We'll see

18   if the loose ends can be tied up there.  Last question,

19   Mr. Dillon, and I'll let you sit down.  Beyond the Young

20   case, is there a case or are there cases you want me to

21   look at that stand for the proposition that the appearance

22   of a conflict could be sufficient for a Judge to take any

23   of the forms of remedial action that you are seeking?

24        ATTORNEY DILLON:  Your Honor, I rely on the Davenport

25   case, and that is a Georgia case.

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                      78

1       THE COURT:  I don't see it in here.  You're free to

2  rely on it.  It didn't manage to make it's way into your

3  motion.

4       ATTORNEY GREEN-CROSS:  It was in mine.  It's on page

5  4.

6       THE COURT:  You guys share very well when it comes to

7  cases.

8       ATTORNEY GREEN-CROSS:  The Cite is 170 -- I'm' sorry,

9  it's 157 Georgia Appeals 704, if that's the case you're

10  referring to.

11       THE COURT:  Okay.  Do you agree, Ms. Cross, that that

12  discusses the Davenport actual vs. apparent conflicts.

13       ATTORNEY GREEN-CROSS:  I didn't cite it for that

14  proposition, and that's not my recollection of discussion

15  in the case.

16       THE COURT:  Okay.  I'll look at it anyway.

17       ATTORNEY GREEN-CROSS:  Yes, but don't -- yes.

18       ATTORNEY DILLON:  Your Honor, I never did get clarity

19  on the basis for the objection to Exhibit 2, other than

20  she objected to it.

21       THE COURT:  Relevance was one, and I think it was

22  foundation, although, the recipient, Mr. Dillon, I think

23  he could authenticate it as receiving it, but I'm not sure

24  the relevance you suppose that Mr. Isokoff(sp.) theorized

25  what he did because the District Attorney's office let him

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

79

1    know about it, as opposed to the witness from the Grand

2    Jury or the grand juror.

3         I don't know who's in the circle of discussing who is

4    going to be a target or not, but you've made your point.

5    I'm just not going to make it part of the record.

6         ATTORNEY DILLON:  Okay, and with regard to Exhibit 4,

7    the financial fundraising report.  We offer that as to Mr.

8    Bailey's take over the two days, the day of the fundraiser

9    and the day after, and we submit that it is relevant.

10         THE COURT:  Okay.  I thought it showed his take for

11    the whole month.

12         ATTORNEY DILLON:  No, no, no, no.  It's just a 2-day

13    period.

14         THE COURT:  It is before and after the 14th?

15         ATTORNEY DILLON:  It is the day of the 14th and the

16    day after.

17         THE COURT:  And it is publicly available?

18         ATTORNEY DILLON:  Yes, it is, Your Honor.

19         THE COURT:  All right.  I'll admit it.

20         ATTORNEY DILLON:  That was Exhibit 4.

21         THE COURT:  Yes.

22         ATTORNEY DILLON:  May I offer a copy to the Court;

23    I'm not sure I did that, Your Honor.

24         THE COURT:  What you want to make sure is that the

25    court reporter, ultimately, has them.  I've got number 2

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          80

```
 1    of -- here when we're done will do that.  Just make sure
 2    before you go that our court reporter has 1, 3, and 4, and
 3    5 you're going to hold on to until you and Ms. Cross can
 4    work out if you we're able to put more to the story to
 5    that.
 6         ATTORNEY DILLON:  Yes, Your Honor.
 7         THE COURT:  Ms. Cross, your closing thoughts about
 8    disqualification.
 9         ATTORNEY GREEN-CROSS:  Very brief ones.  Your Honor,
10    we're taking a look now at what has been admitted as Mr.
11    Jones, Exhibit 3.  You'll notice that Mr. Jones is not Mr.
12    Bailey's opponent at this point in the Lieutenant
13    Governor's race.
14         If anybody's got a problem, or was the opponent of
15    Mr. Bailey at that time was Mr. Kwanzaa Hall because at
16    this point, Mr. Bailey was in a run off election, and he
17    was very clearly identified as District Attorney Willis
18    raising money for Mr. Bailey in the runoff fundraiser.
19         THE COURT:  It's the largest font on the page.  Even
20    larger than the District Attorney's name.
21         ATTORNEY GREEN-CROSS:  I understand, insofar, as
22    we're talking about appearances.  I think that shifts the
23    focus a little bit.  The District Attorney isn't raising
24    money for the opponent of Senator Jones in giving this
25    fund raiser, this is prior to Mr. Bailey becoming the
```

1     actual Lieutenant Governor nominee for his party, so I

2     want to make that as clear as it can be.

3           THE COURT:  When was the runoff election?

4           ATTORNEY GREEN-CROSS:  Sometime after June.

5           THE COURT:  Good.

6           ATTORNEY GREEN-CROSS:  Someone with easier access to

7     google might be able to -- the last week of June.

8           THE COURT:  Late June?

9           ATTORNEY GREEN-CROSS:  Late June.

10          THE COURT:  All right.  Got it.

11          ATTORNEY GREEN-CROSS:  Mr. Smith is going to be so

12    pleased, because he gets another mention.  I shared with

13    Mr. Dillon an affidavit from Mr. Smith, who is actually

14    general counsel of the prosecuting of Georgia.  May I

15    approach, Your Honor?

16          THE COURT:  Yes.

17          ATTORNEY GREEN-CROSS:  I've got an original for the

18    court reporter, but I'll hold onto that until it's  been

19    tendered and amended.  This is an affidavit, thank you,

20    that I shred with Mr. Dillon not long before the hearing

21    identifying that Mr. Smith is someone who deals with

22    conflict.  He routinely advises District Attorney's as far

23    as general and other entities to the inquiry about the

24    legal requirements and that's the legal conflict for

25    individuals, prosecuting attorneys.

              HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                          82

1   He's reviewed the motion, he's reviewed the response,

2 the motion of Senator Jones, including the runoff

3 fundraiser flyer that we're still looking at, and he

4 determined, in fact, in his opinion that it does not a

5 legal requirement.

6   I'm not suggesting that Mr. Smith's opinion

7 (undecipherable) the Court's, but insofar as the

8 individual who routinely advises district attorneys about

9 these matters, this is the individual who is saying that

10 there is not an actual conflict.  There is also language

11 in their indicating, of course, that he does advise that

12 an actual conflict is required, as opposed to the

13 appearance of one, so we ask that State's Exhibit No. 1 be

14 admitted.

15   THE COURT:  Any objection to State's 1 being

16 admitted, assuming Jones 5 ultimately get's admitted?

17   ATTORNEY DILLON:  Yes, Your Honor.  I'm going to

18 object, subject to Jones 5 being admitted along with this.

19   THE COURT:  Okay.

20   ATTORNEY DILLON:  I have no reason to doubt the

21 authenticity of this, but Mr. Smith also trains them on an

22 ethical (unintelligible) and so we could be back here next

23 week with a motion for prosecutorial misconduct, which I

24 won't define, but the ethical rules also apply to the

25 District Attorney's office, and in the presentation that I

   HADASSAH J. DAVID, OFFICIAL COURT REPORTER

               83

1    provided the Court, he lays out exactly the rules that DA

2    Willis' office has violated.

3         THE COURT:  Okay.  Sort out Exhibit 5 soon, so I can

4    put that alarm on it.  I'm going to admit DA 1 or State's

5    1, but I'd love to see 5.  It seems like it ought to come

6    in.  I understand the State's concern.

7         ATTORNEY GREEN-CROSS:  I think we can work that out.

8    There comes a time when the Court considers Senator Jones'

9    offer of Exhibit No. 5, Mr. Smith's presentation.  I

10   believe at least the excerpt that Mr. Dillon read this

11   afternoon was a concern or admonishment, or flagging the

12   extra judicial statements of the District Attorney or

13   prosecuting entity.

14        You've heard no evidence this afternoon or to my

15   knowledge in the record anywhere that there has been any

16   extra judicial statement from the District Attorney's

17   office about Mr. Jones officer that has played a part in

18   this.

19        Insofar as the objection this afternoon came to the

20   identification, apparently, for the first time officially,

21   that Senator Jones has received a target letter, of course

22   that was in direct response in the motion to disqualify

23   that was file by Senator Jones on Friday.  They raised in

24   that motion equal protection and due process claims.  They

25   reference constitutional protections of the Federal and

          HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                      84

1    State Constitution, and they are essentially saying, hey,

2    look what you're doing.  You're investigating me, and

3    you're doing that only because I am a political opponent

4    of someone you like.

5        That is our whole point to you, that is the whole

6    thrust of this.  Friends get rewarded and enemies get

7    punished.  The fact of the matter is, and what the

8    District Attorneys represented in that was, no, You're

9    just like everybody else.  You're treated exactly like

10   everybody else, similarly situated to you, received the

11   same treatment and you can't show otherwise, and for that

12   reason the legal standard hasn't been met, so I wanted to

13   clear that up too.

14       Otherwise, I'm happy to address any concern or

15   comment further from the Court that I think the motion --

16   the burden hasn't been satisfied.  It is not a legal

17   conflict here and the motion should be denied after I

18   consult very briefly with my table.

19       THE COURT:  Please consult.  Can we take the screen

20   share down now?

21       ATTORNEY GREEN-CROSS:  Yes, and apparently we can

22   withdraw our objection to Exhibit 5.

23       THE COURT:  Great.

24       ATTORNEY GREEN-CROSS:  There's no need to go forward.

25       THE COURT:  Great.  So before you leave, Mr. Dillon,

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

85

1    make sure a copy gets to our court reporter, but I'd like

2    a copy of 5 as well.

3         ATTORNEY GREEN-CROSS:  I'm handing up the original of

4    the affidavit of Mr. Smith.

5         THE COURT:  Thanks.  Mr. Dillon?

6         ATTORNEY DILLON:  Very briefly, Judge.  Regarding to

7    the last point raised by the State.

8         THE COURT:  Which was?

9         ATTORNEY DILLON:  That it is perfectly okay to out

10   the target letter status of Senator Jones in their

11   pleading.

12        THE COURT:  I didn't hear that it was perfectly

13   okay.  It was an explanation for -- the hand was forced,

14   and because an argument was made or treated differently.

15   I didn't hear that it was perfectly okay.  I heard that it

16   was a justification.  You don't think it's justified

17   because?

18        ATTORNEY DILLON:  I think they could have made that

19   argument under (unintelligible) and not further the

20   appearance that they're favoring Mr. Bailey in trying to

21   do what?  Hold my client up to public ridicule and

22   increase his shame, and do the things that Mr. Smith's

23   presentation says they should never do.

24        THE COURT:  Ms. Pearson, was there anything you

25   wanted to add.  Your motion with Ms. Deborrough, the

                 HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                              86

1    motion to quash and disqualify.  I mean your focus was

2    quashal, and I get that, but you adopted Mr. Dillon and

3    Ms. Clapp's motion.

4         You've shared with me that Mr. Still is a political

5    candidate.  I appreciate that Mr. Shaeffer is politically

6    prominent in the Republican party and you said that all of

7    your client's are active in one way or another.  What's

8    the disqualification argument?  They seem to be not in the

9    same category as Mr. Dillon's client.

10        ATTORNEY PEARSON:  Your Honor, I would agree that

11   Senator Jones has the most direct conflict.  In our view

12   not to ask for more relief than the senator himself has

13   asked for, in our view that remedy is not sufficient to

14   address that conflict, and the conflict is exacerbated --

15   the evidence, by the politicization of our client's cases

16   and our client's processes.

17        THE COURT:  Again, I'll have to have you explain what

18   you mean by politicization, given that it was your

19   client's were doing?  What is politicization their

20   politicizing their activity, their political choices,

21   their connection to a political -- what's politicization

22   about it. other than talking about that which is

23   inherently political; I'm not following.

24        ATTORNEY PEARSON:  I think it's a great distinction,

25   Your Honor.  We're not talking about -- although we're

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

87

1    talking about political things, we're talking about
2    political motivation by one party against another party,
3    and to actions taken in one uniform direction against
4    republican candidates, prominent republican actors --
5        THE COURT:  Was there a third group of alternate
6    democrat electors in case the democrat electors -- I'm not
7    aware that another group that the special purpose Grand
8    Jury should be investigating in connection with Republican
9    efforts to create republican alternate electors and to
10   challenge the outcome that, at that time, and continues to
11   show that a democrat won.  I was going to press Ms. Cross,
12   but she didn't go there about partisan, because partisan
13   has lots of meanings.
14        I don't think that partisan, the case that she cited
15   was democrat and republican, it was I'm partisan because
16   I'm trying to get this guy prosecuted.  I have a stake in
17   the outcome of this prosecution.  That is not where her
18   argument went today, but everything about this is
19   inherently political, because two political parties
20   collided, someone appears who have won, and folks who
21   appear to have lost didn't like that outcome and said
22   appearances can be deceiving and took some steps, and the
23   question is where those steps legal, and that's the
24   purpose of this special purpose Grand Jury is
25   investigating, so it seems to me utterly unremarkable that
        HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                    88

1    your clients are all republicans.  What would be
2    remarkable is if they weren't.  What's the politicization
3    because I don't want to miss it if there's a reason to be
4    concerned, but you're not asking, I'd hope for, we have to
5    have a Republican District Attorney investigate this
6    because that's the only way it will be fair.
7        ATTORNEY PEARSON:  No, not at all, Your Honor.  I
8    think the process, well, I know Mr. Dillon's motion is
9    that the Attorney General would be allowed to designate
10   the replacement, and so we think that should be done,
11   because I think the appearance of impropriety with Senator
12   Jones taints the entirety as office of the entire
13   investigation, not just with regard to him as the remedy
14   for what I'm trying to say, but you are correct that our
15   focus was quashal, and that we are joining in that motion
16   as an add on.
17       I would also say, Your Honor, that just on behalf of
18   my clients, you asked if there is another slate that they
19   should be investigating, and I would argue under the
20   authorities that I put in our motion to the extent we were
21   contingent electors, and so were the democrats, because
22   there was a pending judicial challenge that made it joint.
23       And so, yes.  The answer to your question is that
24   both electors were contingent about time contingent on the
25   judicial outcome which never came.

         HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        89

1          THE COURT:  Okay.  I appreciate that perspective, but
2      you did say you are seeking -- I'm paraphrasing you, more
3      relief or greater relief than Mr. Dillon was seeking, but
4      then I thought you ended it by saying we want what Mr.
5      Dillon recommended, which is push for his client, Senator
6      Jones situation to the Attorney General, and let the
7      Attorney General decide should I, the Attorney General,
8      find another District Attorney in her office to see if it
9      bares having a conversation with Senator Jones, or
10      investigating, or sending a letter, whatever they choose
11      to do.  What's the difference between that and what you
12      think I ought to do in terms of disqualification and your
13      clients?
14          ATTORNEY PEARSON:  Your Honor, I think the
15      disqualification, if there is one, it is disqualification
16      to the entire investigation, and the disease cannot be
17      cabin to Senator Jones alone --
18          THE COURT:  Okay.
19          ATTORNEY PEARSON:  -- because it's still the special
20      Grand Jury being advised by this District Attorney, and
21      the report would still be advised by this District
22      Attorney, and so we don't believe that's a sufficient
23      cure, and that if there's a disqualification, it should be
24      from the entire investigation and not just from Senator
25      Jones.

          HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                                                        90

1       THE COURT:  I follow that, and I thank you so much.

2       ATTORNEY DILLON:  Just as a suggestion, Judge, and my

3   learned counsel points to my own brief at page 6.   The

4   Magloclin(sp.) case, Magloclin v. Payne indicates that

5   where the elected District Attorney is totally

6   disqualified from the case, everybody in the office is.

7   Here the special grand jury has two focuses.

8       One, the focus of the call between the president and

9   the Secretary of State's office, and perhaps other

10  officials that related to finding the votes.  That's one

11  aspect of it, and then there's the other aspect of it that

12  could be carved off and sent to Mr. Carr's office to say,

13  let's find a new District Attorney who doesn't have a dog

14  in this hunt and do an investigation, do a proper

15  investigation.

16      They can still have this other aspect of it, but a

17  new District Attorney could come in and look at the

18  evidence.

19      THE COURT:  So without agreeing that there are only

20  two aspects to what the special purpose Grand Jury is

21  investigating, your creative idea is if I determine that

22  there is going to be disqualification, it could be not as

23  to individuals, but as to subject matter, and so this

24  question of an alternate slate of electors, if that is

25  something that needs to be further investigated, create a

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

91

```
 1    separate entity to do that, that's not supervised by this
 2    District Attorney?
 3          ATTORNEY DILLON:  That's correct, Your Honor.
 4          THE COURT:  Okay, thank you.  All right.  I think
 5    we've covered everything, but let me find out from Ms.
 6    Cross, Mr. Wade, Mr. Wakeford.  Anything else from the
 7    District Attorney's office?
 8          ADA WADE:  Nothing, Judge.  Thank you.
 9          THE COURT:  Okay.  Mr. Dillon or Ms. Clapp, anything
10    further from Senator Jone's legal team?
11          ATTORNEY DILLON:  No, Your Honor.
12          THE COURT:  Ms. Pearson, Ms. Deborrough, anything
13    else from your clients?
14          ATTORNEY PEARSON:  No, Your Honor.  Thank You.
15          THE COURT:  All right.  So we're clear, some things
16    I'll need to memorialize in writing.  I am not quashing
17    the subpoenas.  I'm repeating myself, but I will be
18    issuing an order, a written order on the question of
19    disqualification, and it will address, not just Mr.
20    Dillon's client, bur Ms. Pearson and Ms. Deboroughs'
21    clients as well.
22          I'll probably put in there a little bit about the
23    timing of the issuance of the report, but I want to make
24    it clear now in front of everyone what I've heard from the
25    District Attorney's office as well, there is no plan for a
```

HADASSAH J. DAVID, OFFICIAL COURT REPORTER

92

1   date right now anyway.  It's not available.  If the way

2   the investigation flows, insofar as it stays with this

3   District Attorney's office and the special purpose Grand

4   Jury, that Grand Jury disgorges it's final report

5   somewhere near the election, it will not be published and

6   released until after the election.

7        I'll put that in writing as well, because from my

8   brief conversation with the grand jurors, just to check in

9   on their health and well being, they don't have that light

10  at the end of the tunnel, but things could change, and if

11  suddenly their work is done I will make sure that there is

12  a meaningful time buffer between release and election, and

13  it may well be that we need to publish the plan -- if it's

14  going to be released.  If the report is going to be

15  released before the election we make sure when that

16  elected date is, so that if people have concerns or

17  objections we could file those and we could air that out

18  before the release.

19       I'd be shocked if there is a report before then.  I'm

20  trying to prime interim report just for me from them on

21  how things are going.  I don't know at all how they do

22  that, so we'll see how that goes.  I appreciate everyone's

23  time, so with that you are all free to go.

24            (This matter has been adjourned.)

25

Certificate

STATE OF GEORGIA)

COUNTY OF FULTON)


I, Hadassah J. David, official court reporter in and for the
state of Georgia, do hereby certify that I did report and take
down the foregoing pages on the 21st day of July 2022, that it
is a true, accurate, and complete transcript of the proceedings
transcribed herein to the best of my skill and ability.  I
further certify that the transcript is in conformity with the
judicial counsel of georgia and the georgia board of court
reporting.  I hereby witness my hand and official seal this
15th day of August 2022.




                    /S/ HADASSAH J. DAVID, CCR

          _____

          HADASSAH J. DAVID, OFFICIAL COURT REPORTER
                    #4857-8554-6837-1968
              FULTON COUNTY SUPERIOR COURT
          HADASSAH J. DAVID, OFFICIAL COURT REPORTER

                                                        94

**ADA GREEN: [1]** 51/7
**ADA WADE: [15]** 4/6
15/16 15/25 16/7 22/16
23/3 23/18 24/4 24/17
24/25 25/12 25/17 26/2
38/9 92/7
**ADA WAKEFORD: [14]**
12/4 12/9 13/18 14/19 15/2
29/15 30/25 31/5 31/9
31/14 31/16 34/12 34/17
36/10
**ATTORNEY CLAPP: [1]**
4/22
**ATTORNEY DILLON:**
**[93]** 4/15 4/18 5/13 5/21
5/25 7/1 7/3 7/12 9/17
10/22 29/20 29/23 30/8
30/16 30/18 32/1 32/16
32/20 32/23 33/7 36/20
44/2 54/6 54/13 54/16
54/22 54/25 55/15 55/22
55/25 56/2 57/18 58/7
59/11 59/19 60/7 60/13
60/16 60/22 61/14 62/1
62/3 62/11 62/19 63/15
63/22 64/2 65/21 65/23
67/12 68/3 68/6 68/23 69/2
69/18 69/25 70/4 70/7
70/11 70/13 70/16 71/2
71/12 71/15 72/2 72/6
72/12 72/17 72/19 74/1
74/23 75/4 75/18 76/4
76/10 78/14 78/23 79/17
80/5 80/11 80/14 80/17
80/19 80/21 81/5 83/16
83/19 86/5 86/8 86/17 91/1
92/2 92/10
**ATTORNEY**
**GREEN-CROSS: [53]** 4/1
4/11 42/17 44/4 44/7 44/19
44/22 45/1 45/14 47/5 49/2
49/23 50/2 50/9 50/13 51/1
52/7 52/25 53/5 59/3 59/5

59/24 60/4 62/15 68/22
69/5 69/23 70/2 70/5 70/9
70/14 70/19 76/6 76/13
77/2 77/7 77/18 78/11 79/3
79/7 79/12 79/16 81/8
81/20 82/3 82/5 82/8 82/10
82/16 84/6 85/20 85/23
86/2
**ATTORNEY PEARSON:**
**[26]** 5/4 5/7 17/21 18/7
18/12 18/24 20/21 21/21
26/3 26/6 27/16 28/5 29/1
33/10 33/13 36/17 37/2
40/4 41/7 41/24 87/9 87/23
89/6 90/13 90/18 92/13
**THE COURT: [189]**

**$**
$150 [2]  64/25 65/1
$2,000 [2]  43/20 75/3
$270,000 [1]  63/13
$30,000 [1]  65/3
$32,000 [5]  9/23 10/5 57/9
63/8 72/23
$50 [1]  75/14

**/**
/S [1]  94/21

**0**
000024 [1]  2/3
00024 [2]  1/6 1/8

**1**
1-5 [3]  76/11 76/12 76/19
10 [1]  17/9
100 [1]  29/25
10:00 p.m [1]  41/20
11 [22]  2/11 4/25 11/21
13/5 13/20 14/15 18/5
18/13 20/5 23/10 23/24
26/20 27/2 36/15 37/1 37/1
40/8 41/15 50/7 50/13
66/25 73/4
112 [1]  23/13
12 [6]  14/16 14/17 15/12

15/16 16/7 38/4
12th [1]  58/23
14th [3]  53/8 80/14 80/15
15 [2]  33/1 33/3
15-12-100 [1]  29/25
157 [1]  79/9
15th [1]  94/16
16 [2]  58/14 67/4
170 [1]  79/8
1916 [1]  64/24
1936 [1]  64/24
1968 [2]  1/22 94/24

**2**
2-day [2]  78/5 80/12
2015 [1]  51/3
2020 [3]  15/15 66/13 73/16
2022 [3]  1/12 94/10 94/16
2022-Ex-000024 [1]  2/3
2022-EX-00024 [2]  1/6 1/8
21st of [1]  2/4
21th [1]  94/10
22 [8]  2/23 3/1 3/2 3/3 3/5
3/9 3/10 3/14
24 [2]  3/2 3/8
241 [1]  51/2
25 [1]  1/12
26th [1]  37/4
27th [1]  37/4
28th [1]  37/4
298 [1]  51/2
2:00 [1]  2/4

**3**
3.8 [1]  71/19
30303 [1]  1/12

**4**
4857 [1]  1/22
4857-8554-6837-1968 [1]
94/24

**5**
50 [2]  16/1 61/14
5th [1]  53/9

**6**

6th [3]  53/9 58/18 58/22

**7**

704 [1]  79/9

**8**

8554 [1]  1/22

**9**

99 percent [1]  11/24

**A**

a.m [1]  41/19
ability [7]  12/15 14/2 14/10
 26/15 32/12 64/19 94/12
able [12]  2/18 2/25 13/16
 14/8 16/2 17/2 28/18 45/8
 54/11 60/7 81/4 82/7
about [85]  2/4 4/5 6/4 8/24
 9/1 11/11 11/14 13/13
 15/14 15/16 15/20 16/25
 17/3 19/16 20/2 22/1 22/2
 23/11 24/4 25/25 26/5
 26/11 29/18 33/24 34/18
 34/23 34/25 36/3 37/23
 38/16 38/21 39/4 40/20
 41/17 42/2 42/5 42/7 42/10
 43/15 43/16 47/4 48/23
 52/10 53/2 53/21 57/16
 57/16 58/1 59/1 60/6 61/8
 61/17 62/9 63/1 64/7 64/8
 64/9 64/22 64/24 65/2 65/3
 67/11 67/22 67/24 72/9
 72/10 72/19 73/19 75/10
 78/4 80/1 81/7 81/22 82/23
 83/8 84/17 87/22 87/22
 87/25 88/1 88/1 88/12
 88/18 89/24 92/22
absence [1]  19/21
absolute [1]  47/17
absolutely [2]  54/23 68/4
abuses [1]  26/10
accept [1]  70/24
accepted [1]  77/10

accepting [1]  47/6
access [2]  70/8 82/6
accident [1]  65/6
accommodate [2]  36/7
 39/3
accommodations [1]  36/6
according [1]  63/3
accurate [4]  49/25 69/10
 70/22 94/11
accurately [1]  26/8
accused [1]  71/19
acknowledge [2]  6/2 64/16
acknowledged [1]  64/17
action [5]  47/17 49/7 53/22
 61/21 78/23
actions [1]  88/3
active [1]  87/7
actively [1]  20/19
activity [1]  87/20
actors [1]  88/4
actual [30]  8/3 43/1 43/2
 43/8 43/9 44/15 45/4 45/7
 45/17 46/5 46/19 51/24
 52/4 53/22 53/23 54/5
 55/14 57/22 59/17 61/5
 61/19 61/21 65/15 73/19
 73/20 78/1 79/12 82/1
 83/10 83/12
actually [11]  5/23 16/17
 19/18 25/7 28/22 33/2
 33/14 35/7 68/15 76/7
 82/13
ADA [2]  1/15 1/16
adaptation [1]  8/3
add [9]  21/21 21/23 22/14
 22/16 36/13 76/23 78/13
 86/25 89/16
addition [1]  20/23
address [8]  2/18 29/16
 34/13 38/22 61/21 85/14
 87/14 92/19
adjourned [1]  93/24
admission [1]  77/16
admit [3]  78/16 80/19 84/4

admitted [12]  70/25 76/18
 77/7 77/21 78/10 78/10
 78/17 81/10 83/14 83/16
 83/16 83/18
admonishment [1]  84/11
adopted [1]  87/2
adoption [1]  2/10
advance [8]  3/3 3/8 23/24
 24/3 39/12 40/13 40/16
 41/11
advantage [1]  35/19
adverse [1]  32/13
advise [1]  83/11
advised [3]  58/21 90/20
 90/21
adviser [4]  8/2 47/3 47/23
 48/7
advises [2]  82/22 83/8
advocated [1]  47/11
affairs [1]  18/20
affect [3]  53/16 57/25
 74/25
affected [3]  7/14 20/6 34/6
affecting [1]  74/20
affidavit [5]  51/21 68/25
 82/13 82/19 86/4
affiliated [1]  3/25
affiliations [2]  50/22 52/2
after [15]  9/25 10/18 35/2
 35/11 37/8 52/25 58/24
 62/8 63/8 80/9 80/14 80/16
 82/4 85/17 93/6
afternoon [8]  2/2 2/5 4/2
 4/7 4/16 84/11 84/14 84/19
afterwards [1]  68/2
again [6]  20/20 36/8 54/3
 60/1 77/22 87/17
against [6]  12/14 21/12
 22/9 31/19 88/2 88/3
age [1]  66/17
agencies [1]  8/17
ago [4]  10/1 64/15 72/4
 75/14
agree [14]  6/25 13/14

**A**

agree... [12] 19/22 23/21 24/1 43/14 43/18 44/2 44/3 54/1 65/10 76/25 79/11 87/10
agreed [2] 13/12 17/7
agreeing [1] 91/19
agreement [2] 21/19 37/18
ahead [5] 10/19 14/4 29/23 40/6 59/13
air [1] 93/17
AJC [3] 62/8 64/10 67/7
alarm [1] 84/4
aligned [3] 65/12 65/13 71/25
all [60] 3/12 3/13 4/13 5/9 13/21 14/25 17/1 17/25 18/1 18/2 18/5 20/5 20/21 20/25 21/5 21/15 21/25 30/10 31/8 31/16 34/7 34/17 37/1 37/1 37/4 39/16 39/17 39/19 39/20 40/22 41/1 41/9 42/5 43/9 47/13 47/19 49/25 53/11 54/1 57/6 60/9 61/11 62/5 63/19 65/18 67/4 67/6 69/17 75/5 78/13 78/16 80/19 82/10 87/6 89/1 89/7 92/4 92/15 93/21 93/23
allegation [2] 49/8 51/21
allocated [1] 37/5
allowed [2] 35/3 89/9
allowing [1] 26/23
allows [1] 45/3
ally [1] 45/22
almost [2] 47/4 49/20
alone [2] 61/11 90/17
along [2] 24/3 83/18
already [8] 11/10 20/5 25/7 53/13 54/6 56/23 62/13 75/12
also [11] 4/19 18/16 40/12 48/8 56/1 75/3 77/11 83/10 83/21 83/24 89/17

altered [1] 69/15
alternate [15] 2/12 4/25 11/22 13/13 13/15 14/18 15/14 18/24 22/5 22/7 39/17 61/1 88/5 88/9 91/24
although [3] 51/20 79/22 87/25
always [2] 35/17 36/6
am [9] 3/11 20/19 28/11 31/3 39/25 44/9 49/14 85/3 92/16
ambiguous [8] 20/11 27/11 27/23 27/25 28/1 28/4 28/4 28/10
amenable [1] 41/9
amended [1] 82/19
amendment [30] 4/6 4/10 5/12 6/5 6/9 6/21 9/2 9/3 11/3 11/12 13/2 14/7 14/12 15/23 16/13 17/8 17/11 19/5 23/7 25/11 25/15 27/22 29/19 35/1 36/9 36/17 36/20 38/3 38/9 43/17
amount [1] 47/14
ample [1] 16/11
analysis [4] 6/21 9/2 9/3 9/5
anchored [1] 49/16
ANNA [4] 1/17 1/18 4/3 4/19
announced [1] 67/5
another [9] 11/9 41/12 73/20 82/12 87/7 88/2 88/7 89/18 90/8
answer [12] 11/1 11/2 11/20 14/20 16/3 24/14 27/3 32/23 38/1 41/6 74/19 89/23
answered [1] 17/17
answering [5] 12/25 13/17 28/21 42/8 55/13
answers [2] 3/23 17/18
antennas [1] 12/22

anticipated [1] 68/8
any [53] 2/22 6/18 7/25 11/20 13/6 13/17 14/15 14/17 15/23 17/11 19/18 20/19 22/18 22/19 25/2 28/18 28/21 29/3 29/5 30/3 34/6 35/14 35/16 36/24 43/22 47/17 47/17 48/24 49/16 50/3 50/4 50/5 52/11 53/1 53/3 53/21 60/9 61/21 62/23 68/1 69/14 69/15 73/14 75/17 77/5 77/10 77/12 77/20 78/3 78/22 83/15 84/15 85/14
anybody [1] 73/4
anybody's [1] 81/14
anymore [1] 75/16
anyone [7] 3/22 4/18 4/18 5/6 22/4 25/14 48/4
anything [24] 9/11 19/13 19/17 22/14 22/22 26/13 32/15 34/25 36/8 36/15 36/19 37/19 43/19 47/10 52/12 54/6 67/21 69/15 73/19 78/13 86/24 92/6 92/9 92/12
anyway [2] 79/16 93/1
anywhere [1] 84/15
apologize [1] 18/17
apparatus [1] 73/13
apparent [8] 53/16 53/19 61/5 73/18 73/23 74/6 75/21 79/12
apparently [4] 3/17 7/11 84/20 85/21
Appeals [1] 79/9
appear [9] 6/9 6/22 9/6 12/15 14/3 24/8 31/17 37/11 88/21
appearance [26] 5/3 10/6 31/19 42/16 42/19 42/21 42/21 42/24 44/10 44/17 45/6 46/25 53/24 54/2 54/5 55/13 57/21 57/23 61/19

**A**

appearance... [7] 61/22 65/14 66/9 78/21 83/13 86/20 89/11
appearances [6] 1/14 5/17 27/7 40/3 81/22 88/22
appeared [1] 34/23
appearing [1] 5/1
appears [3] 67/2 78/2 88/20
appellate [1] 31/8
applause [2] 4/21 4/23
applicable [1] 56/6
applies [1] 33/9
apply [3] 28/15 39/15 83/24
appoint [1] 66/10
appointed [1] 10/12
appreciate [8] 8/1 11/1 16/11 29/15 35/13 87/5 90/1 93/22
approach [8] 8/7 16/25 46/21 51/5 59/22 62/20 74/15 82/15
approaching [1] 15/5
appropriate [4] 17/16 27/13 40/1 73/12
approval [1] 3/5
approves [1] 27/5
are [116]
area [6] 14/11 15/1 26/22 38/7 53/20 55/17
areas [7] 14/6 14/13 16/4 16/21 17/6 17/7 39/21
aren [2] 16/21 27/15
aren't [1] 40/6
arguably [2] 19/10 34/1
argue [1] 89/19
argued [1] 77/24
argument [7] 32/9 42/8 59/22 86/14 86/19 87/8 88/18
arise [1] 49/13
arm [2] 20/18 21/1

around [7] 15/10 16/23 20/18 35/4 35/7 35/8 42/12
arrived [1] 43/16
article [1] 64/9
as [113]
ascertain [1] 70/21
ask [17] 13/13 14/3 15/20 15/22 26/1 26/5 26/23 27/6 29/12 29/13 38/5 39/3 69/24 73/7 76/7 83/13 87/12
asked [10] 9/10 15/11 17/17 19/4 19/13 23/22 35/21 41/25 87/13 89/18
asking [10] 15/12 15/16 24/25 26/18 34/9 36/24 40/25 46/20 67/21 89/4
aspect [3] 91/11 91/11 91/16
aspects [3] 15/15 36/20 91/20
assert [8] 13/2 15/21 15/22 16/2 16/13 16/14 25/23 28/12
assertion [2] 4/6 11/11
assessment [2] 14/1 14/14
assist [1] 39/25
Assistant [1] 71/16
associate [2] 4/19 54/7
assume [3] 20/5 25/6 39/18
assuming [3] 61/3 78/10 83/16
assured [2] 55/6 59/10
astringent [2] 56/5 56/8
astrological [1] 37/20
Atlanta [1] 1/12
attack [1] 16/5
attempt [2] 22/18 25/14
attended [1] 70/18
attention [8] 8/13 20/16 29/25 31/3 38/17 42/22 47/16 52/1
attorney [72] 1/17 4/4 4/8 6/17 8/1 9/22 10/12 17/12

22/24 23/3 32/4 38/4 41/13 43/1 43/10 43/21 44/1 44/10 44/11 45/9 45/12 45/18 46/14 47/1 47/21 47/23 48/13 48/19 51/9 51/16 53/18 57/17 61/8 61/11 62/23 63/3 65/11 66/10 68/16 68/24 69/17 69/22 71/7 71/22 73/6 73/13 74/6 74/10 74/11 74/23 74/24 75/2 75/3 75/11 75/12 75/19 76/1 81/17 81/23 84/12 89/5 89/9 90/6 90/7 90/8 90/20 90/22 91/5 91/13 91/17 92/2
Attorney's [35] 2/14 3/23 7/24 8/5 9/14 10/11 11/6 11/9 18/6 35/6 36/8 38/12 39/10 40/12 41/7 41/22 50/21 57/25 59/2 60/13 67/11 67/14 67/25 68/20 71/6 72/8 77/13 79/25 81/20 82/22 83/25 84/16 92/7 92/25 93/3
attorneys [8] 1/19 50/20 64/11 69/17 75/22 82/25 83/8 85/8
attributing [1] 43/19
August [1] 94/16
authenticate [1] 79/23
authentication [1] 70/24
authenticity [4] 62/18 69/8 76/15 83/21
authorities [1] 89/20
authority [10] 26/14 33/19 34/5 34/6 34/7 48/2 61/23 66/7 73/11 74/12
authorized [2] 8/22 30/3
authorizes [1] 16/12
AVA [2] 21/6 29/10
available [5] 63/4 63/7 78/4 80/17 93/1
avalanche [1] 63/18

**A**

avoid [1]  55/9
avoided [1]  35/15
avoiding [1]  55/12
aware [4]  12/7 20/19 74/2
88/7
away [2]  5/2 26/25

**B**

back [5]  3/9 51/25 59/9
61/20 83/22
bad [1]  67/6
badgering [1]  14/9
Bailey [22]  9/21 9/23 43/20
43/21 43/24 43/25 49/22
53/8 62/1 62/5 62/24 63/9
63/13 64/1 66/5 75/20 78/5
81/15 81/16 81/18 81/25
86/20
Bailey's [3]  75/4 80/8
81/12
balanced [1]  46/21
Bank [2]  16/15 25/22
bares [1]  90/9
barrage [1]  16/1
barred [1]  28/19
based [3]  20/16 55/16 78/2
basic [2]  11/10 40/15
basically [2]  35/16 38/5
basis [3]  13/14 71/8 79/19
be [188]
bearing [1]  48/24
because [73]  2/16 3/2 3/14
6/5 6/9 10/14 10/21 11/5
11/6 13/8 16/18 18/10
21/11 22/3 27/17 29/6
29/10 30/9 30/21 32/15
33/4 35/21 37/7 37/20 38/5
38/7 39/6 39/8 40/19 41/4
41/5 41/15 41/16 43/23
44/6 48/9 52/1 52/19 53/13
53/19 55/5 56/24 58/15
59/21 61/24 65/15 66/7
66/17 66/18 70/22 71/23
73/4 73/19 74/18 74/21
75/16 75/24 78/7 79/25
81/15 82/12 85/3 86/14
86/17 88/12 88/15 88/19
89/3 89/6 89/11 89/21
90/19 93/7
become [4]  20/15 37/7
45/12 76/24
becoming [1]  81/25
been [45]  2/6 5/21 6/15 7/5
7/6 7/14 7/21 11/25 12/17
16/23 17/2 18/2 20/5 25/7
27/25 29/19 31/10 34/21
35/21 41/2 41/23 47/18
50/16 51/5 51/10 51/16
59/16 63/16 63/17 66/3
67/23 69/15 70/23 71/25
72/1 75/17 76/15 77/24
77/24 81/10 82/18 84/15
85/12 85/16 93/24
before [38]  1/11 2/22 9/6
12/3 12/15 16/14 22/11
27/5 27/7 29/14 31/17
34/24 35/2 35/9 36/7 38/17
39/6 42/4 42/17 45/19
45/20 48/14 49/1 54/22
54/24 59/7 59/7 59/22 60/2
63/1 68/1 80/14 81/2 82/20
85/25 93/15 93/18 93/19
began [2]  12/11 72/21
begin [1]  12/5
beginning [1]  25/10
behalf [11]  2/6 2/11 4/24
5/6 13/4 34/9 36/15 43/10
47/11 64/12 89/17
behind [4]  63/22 71/25
72/1 74/19
being [28]  7/8 7/16 9/10
12/14 20/4 20/20 27/12
35/10 41/2 41/3 41/16 49/6
65/6 65/7 66/6 67/23 74/23
74/24 76/18 77/4 77/9
77/13 77/21 78/9 83/15
83/18 90/20 93/9
believe [18]  5/15 12/10
13/14 14/8 14/14 34/4
34/14 34/20 38/10 39/16
45/4 46/9 49/25 52/13
60/19 76/15 84/10 90/22
bend [1]  61/20
benefit [2]  64/20 66/5
benefiting [1]  65/8
best [2]  8/15 94/12
better [3]  8/10 11/7 26/10
between [10]  9/11 13/23
14/4 18/3 23/16 40/8 54/3
90/11 91/8 93/12
beyond [6]  15/13 38/6
51/18 51/19 51/19 78/19
big [7]  3/4 3/12 3/18 8/25
17/14 63/17 63/24
bigger [1]  57/4
bill [3]  1/18 6/14 6/20
bit [8]  22/1 36/4 41/16
57/11 65/15 76/25 81/23
92/22
blah [3]  30/6 30/6 30/6
blanket [1]  11/19
blast [1]  54/22
blasted [1]  54/24
blockbuster [1]  62/22
blue [1]  60/11
board [1]  94/14
body [1]  28/20
bolts [1]  40/17
bombing [1]  58/12
books [1]  30/6
both [3]  5/16 21/19 89/24
bottle [1]  55/6
bottom [1]  74/16
bouncing [1]  16/23
bound [1]  27/23
brand [1]  54/13
brief [12]  10/1 40/3 42/23
50/19 55/21 56/1 64/15
72/5 74/4 81/9 91/3 93/8
briefly [3]  26/4 85/18 86/1
bright [1]  17/14

**B**

bring [5]  3/11 3/15 26/10 29/9 51/25

bringing [4]  3/16 3/16 3/17 12/3

brings [1]  72/20

broad [2]  17/13 45/5

broadcasted [1]  50/12

broke [2]  60/18 60/25

brought [7]  8/13 11/3 14/23 29/14 35/10 42/1 48/2

bucket [5]  15/21 16/6 21/14 27/5 37/17

buckets [8]  15/20 16/3 17/3 21/15 23/12 23/21 26/21 29/13

buckle [1]  40/14

buffer [1]  93/12

build [1]  11/13

building [6]  3/4 35/22 35/23 37/16 38/21 38/22

buildings [1]  17/15

bur [1]  92/20

burden [3]  21/13 51/14 85/16

business [1]  73/5

buzz [1]  64/9

**C**

C.I [1]  1/11

cabin [1]  90/17

cable [1]  47/13

call [8]  2/11 12/23 12/23 13/3 21/14 29/24 32/11 91/8

called [4]  16/14 27/17 35/3 41/21

came [5]  36/3 65/19 72/8 84/19 89/25

cameras [8]  3/4 3/12 3/18 19/25 34/10 34/16 35/15 38/25

campaign [5]  51/16 51/17

63/6 75/4 78/5

can [86]  3/21 6/23 10/12 13/6 15/6 15/7 15/7 15/8 15/19 21/12 21/14 21/14 21/15 22/3 22/8 23/21 23/22 24/16 26/8 26/11 26/17 27/7 27/8 27/8 27/9 27/23 29/5 32/11 32/12 32/14 32/15 33/24 33/25 34/1 34/24 35/24 35/22 35/24 36/6 36/7 37/11 37/11 37/12 37/15 37/19 37/22 37/23 37/24 38/7 38/21 38/24 39/3 41/11 47/12 48/8 48/8 56/16 56/17 57/4 57/7 58/17 59/8 59/9 62/14 62/23 67/25 69/24 70/21 70/24 73/19 74/9 74/21 75/23 76/5 76/11 77/1 78/10 78/18 81/3 82/2 84/3 84/7 85/19 85/21 88/22 91/16

can't [8]  3/13 21/11 58/4 65/16 69/7 69/11 73/18 85/11

candidate [8]  20/23 45/25 58/4 58/5 58/7 62/24 64/3 87/5

candidates [1]  88/4

candor [1]  70/16

cannons [1]  30/10

cannot [3]  19/3 26/21 90/16

capital [1]  46/25

care [1]  69/11

career [1]  58/1

careful [1]  41/16

carefully [1]  59/20

carpet [1]  58/12

Carr [1]  75/2

Carr's [2]  74/7 91/12

carry [1]  43/8

carved [1]  91/12

case [50]  1/6 2/8 2/8 5/24

7/7 9/22 10/13 12/6 12/8 14/2 14/8 16/11 30/20 30/22 30/22 32/5 33/1 40/1 43/3 43/6 45/19 45/20 47/17 50/23 51/8 51/11 51/15 51/18 55/7 55/20 55/21 56/17 56/19 57/1 57/3 57/6 58/11 63/2 73/2 73/4 78/20 78/20 78/25 78/25 79/9 79/15 88/6 88/14 91/4 91/6

cases [6]  27/24 64/23 65/1 78/20 79/7 87/15

cash [1]  63/20

categories [2]  15/18 23/15

category [2]  30/19 87/9

caught [1]  20/11

cause [2]  49/14 49/20

caused [2]  12/21 63/17

CCR [2]  1/21 94/21

center [1]  43/7

certain [4]  8/18 11/12 28/9 39/18

certainly [10]  12/21 21/23 25/13 28/6 49/5 61/10 66/15 67/13 68/10 75/25

Certificate [1]  94/1

CERTIFIED [1]  1/23

certify [2]  94/9 94/13

cetera [1]  9/4

chain [2]  19/6 19/16

chair [1]  18/18

chairman [1]  20/24

challenge [4]  9/17 37/25 88/10 89/22

chance [3]  42/10 49/11 54/21

change [5]  12/14 25/2 36/25 50/15 93/10

changed [1]  66/24

channel [1]  48/20

chapter [2]  32/7 33/5

characterization [1]  47/7

charge [2]  12/14 56/20

# C

charged [2]  31/10 31/11
charges [4]  6/17 6/18 19/7
67/7
charging [1]  31/11
Charlie [8]  9/21 9/23 43/24
43/25 49/21 61/25 64/1
75/4
check [5]  21/18 45/25
63/11 63/12 93/8
checking [2]  41/18 63/20
checks [2]  3/14 63/18
choices [2]  58/5 87/20
choose [1]  90/10
choosing [1]  47/14
chronological [1]  9/16
circle [1]  80/3
circumstances [5]  20/11
26/24 27/12 27/23 27/25
circumvent [1]  25/14
circus [4]  7/6 35/6 35/8
74/19
cite [7]  21/7 25/20 30/22
51/1 55/24 79/8 79/13
cited [2]  42/23 88/14
cites [2]  55/21 56/3
citing [1]  33/10
city [1]  31/5
civic [1]  55/8
claim [1]  16/20
claims [1]  84/24
CLAPP [11]  1/18 4/19
4/21 4/23 5/10 23/11 53/12
54/10 59/9 76/10 92/9
Clapp's [1]  87/3
clarification [1]  13/20
clarify [3]  17/24 35/11
49/5
clarity [2]  40/9 79/18
Clayton [1]  12/9 31/4
clear [12]  26/19 27/21
37/19 41/18 42/16 53/7
76/21 78/11 82/2 85/13
92/15 92/24

clearer [1]  52/21
clearly [3]  3/10 34/7 81/17
clears [1]  37/11
client [31]  5/19 7/8 9/21
9/25 11/21 17/1 17/7 20/18
24/22 24/23 25/2 25/11
37/15 57/15 59/15 60/12
61/6 61/19 62/6 63/2 66/6
67/20 67/22 70/18 72/1
72/4 72/4 86/21 87/9 90/5
92/20
client's [7]  17/14 19/3
73/15 87/7 87/15 87/16
87/19
clients [23]  5/7 13/5 17/25
18/10 19/11 19/19 20/5
20/20 22/25 24/20 26/23
34/9 36/1 36/5 36/5 36/15
38/14 66/25 89/1 89/18
90/13 92/13 92/21
climb [1]  65/16
clones [1]  39/21
closing [1]  81/7
clothes [1]  38/24
co [2]  45/11 45/13
cocktail [2]  46/19 47/12
code [3]  29/25 32/7 33/3
codefendant [1]  46/7
collaborate [1]  40/7
collaboration [1]  40/11
colleagues [1]  15/12
collide [1]  8/13
collided [1]  88/20
come [21]  7/25 16/21 17/1
21/13 25/21 25/23 27/4
28/20 34/24 35/9 37/2 40/7
41/23 44/12 48/12 48/14
58/9 63/18 66/1 84/5 91/17
comes [7]  25/16 48/16
48/17 67/8 68/1 79/6 84/8
comfortable [3]  12/25 26/1
26/23
coming [8]  27/1 37/1 37/4
38/15 38/18 40/20 41/1

77/14
comment [1]  85/15
comments [1]  71/17
commonalities [1]  39/18
commonality [1]  13/22
communicated [1]  36/22
communication [1]  18/6
compel [2]  30/4 33/24
compelled [2]  23/1 31/17
complaining [1]  38/16
complete [7]  8/14 10/10
37/24 69/10 70/19 70/22
94/11
completed [1]  52/23
compulsory [1]  22/11
concern [14]  8/6 24/10
25/9 36/3 38/20 39/2 46/24
48/23 53/20 66/1 71/23
84/6 84/11 85/14
concerned [4]  24/12 24/13
69/14 89/4
concerning [1]  15/23
concerns [13]  3/23 5/12
6/5 6/6 11/3 14/22 20/1
23/7 36/9 36/17 41/17
42/14 93/16
conclude [4]  6/22 24/7
56/12 73/10
concluded [1]  51/20
conclusion [2]  54/4 56/14
condemnation [1]  71/18
conditionally [1]  78/9
conduct [2]  10/8 74/7
conducted [1]  56/16
conducting [3]  13/10 30/2
67/18
conference [3]  39/6 39/9
39/12
confidence [4]  46/12 56/15
56/17 56/22
confidential [1]  58/25
confirmation [1]  72/15
confirmed [1]  72/10
confirming [1]  41/5

# C

conflict [54] 5/13 6/6 42/16 42/21 42/24 43/2 43/8 44/15 44/18 45/4 45/6 45/7 45/18 46/5 46/19 47/9 47/15 52/4 53/20 53/22 53/23 53/25 54/2 55/14 55/14 55/18 56/10 56/13 57/21 57/22 61/5 61/5 61/19 61/19 61/22 61/22 65/15 66/9 73/7 73/18 73/21 73/23 74/6 74/11 75/23 78/22 82/22 82/24 83/10 83/12 85/17 87/11 87/14 87/14
conflicts [3] 53/17 73/20 79/12
conformity [1] 94/13
conjecture [1] 43/2
connect [1] 15/8
connection [17] 6/11 11/15 11/21 13/10 15/1 18/19 22/5 22/6 36/16 58/1 65/20 65/22 65/23 73/15 75/17 87/21 88/8
consequence [1] 52/6
consequences [1] 25/5
consider [1] 58/25
considered [1] 68/12
considers [1] 84/8
conspiracy [1] 74/17
Constitution [1] 85/1
constitutional [2] 19/20 84/25
constructing [1] 30/11
consult [2] 85/18 85/19
contain [1] 6/16
contend [1] 10/6
contested [1] 20/19
context [3] 11/12 13/17 18/10
contingent [3] 89/21 89/24 89/24
continue [2] 8/22 31/9

continues [1] 88/10
contrary [2] 53/4 58/18
contribution [1] 75/6
controls [1] 55/17
controversial [1] 58/2
conversation [7] 23/21 23/23 37/17 37/22 37/23 90/9 93/8
conversations [1] 52/10
converted [1] 18/2
conveyer [1] 33/19
convince [1] 53/25
cooperate [2] 10/14 10/16
copies [1] 51/4
copy [10] 50/24 50/25 51/3 59/23 59/25 67/15 69/25 80/22 86/1 86/2
correct [9] 7/22 17/22 17/23 48/4 49/17 56/7 68/4 89/14 92/3
correspondence [1] 30/5
could [33] 3/9 8/13 17/15 19/4 19/9 19/13 19/15 19/16 19/17 19/18 19/19 23/6 26/18 28/24 32/10 33/6 40/21 41/2 46/6 52/9 62/9 63/19 66/11 78/22 79/23 83/22 86/18 91/12 91/17 91/22 93/10 93/17 93/17
couldn't [2] 52/11 73/8
counsel [12] 4/14 23/9 23/16 31/5 42/15 68/19 68/20 68/20 75/7 82/14 91/3 94/14
country [2] 66/21 74/18
COUNTY [11] 1/1 1/24 9/14 10/10 12/9 31/4 66/4 68/12 73/13 94/5 94/25
County's [1] 7/7
couple [4] 2/5 7/22 47/8 63/21
course [5] 22/3 47/18 62/6 83/11 84/21

court [57] 1/1 1/23 1/24 16/3 16/15 20/12 24/18 26/13 26/15 27/20 28/19 29/24 33/16 41/9 44/23 44/24 45/3 45/5 47/7 47/10 47/16 47/19 49/24 50/24 51/5 51/14 51/17 51/17 51/20 51/23 54/9 55/19 55/21 56/8 56/21 56/22 59/22 60/20 60/24 64/1 66/8 68/21 69/8 74/2 76/17 80/22 80/25 81/2 82/18 84/1 84/8 85/15 86/1 94/8 94/14 94/23 94/25
Court's [5] 15/19 49/8 51/25 60/22 83/7
courthouse [3] 36/2 38/25 39/1
courtroom [1] 34/11
cover [3] 8/6 44/6 54/6
coverage [1] 35/19
covered [3] 16/22 21/24 92/5
covering [1] 2/13
crazy [1] 45/11
create [8] 10/6 35/6 35/8 55/6 57/20 57/21 88/9 91/25
creating [1] 65/14
creative [1] 91/21
criminal [3] 13/1 13/16 45/12
critical [1] 56/18
critique [1] 46/11
CROSS [13] 1/17 4/3 4/11 31/7 54/12 54/15 54/21 76/24 79/11 81/3 81/7 88/11 92/6
Cross's [3] 53/14 53/17 72/16
crowded [1] 3/13
cure [1] 90/23
cures [1] 48/23
custom [1] 63/10

**C**

cut [1] 10/20
CVR [1] 1/21
cycle [1] 54/4

**D**

DA [14] 42/6 42/9 45/13
 55/21 56/3 58/18 64/10
 64/14 64/19 66/7 71/16
 75/14 84/1 84/4
DA's [13] 2/7 3/24 3/25 7/7
 7/17 18/3 55/6 64/23 66/4
 66/14 67/9 68/18 71/16
daily [1] 67/17
damage [1] 20/4
data [1] 63/7
date [4] 40/21 55/5 93/1
 93/16
dates [1] 38/14
Davenport [2] 78/24 79/12
DAVID [4] 1/21 94/8
 94/21 94/23
day [19] 23/20 37/2 38/19
 43/8 50/8 50/12 63/7 63/8
 63/12 66/14 67/16 78/5
 80/8 80/9 80/12 80/15
 80/16 94/10 94/16
days [10] 10/1 10/18 38/19
 58/23 60/17 60/24 62/7
 64/15 72/4 80/8
deadline [2] 52/12 52/18
dealing [1] 19/13
deals [1] 82/21
dealt [1] 19/1
Deboroughs' [1] 92/20
DEBORROUGH [14]
 1/19 13/4 14/23 16/25
 21/23 23/10 24/20 36/10
 36/15 39/19 43/15 50/8
 86/25 92/12
Deborroughs [3] 4/25 5/1
 37/10
Debrrorogh [1] 21/19
deceiving [1] 88/22

December [2] 66/13 75/18
decide [3] 15/13 16/2 90/7
decides [1] 48/11
decision [8] 13/14 46/11
 48/18 51/3 56/23 57/17
 63/1 65/11
decisions [2] 20/16 46/11
deemed [1] 56/14
default [1] 40/23
defendant [3] 45/11 45/13
 51/10
defendant's [2] 56/19
 56/20
defended [1] 46/7
defense [3] 45/9 45/12
 59/25
define [1] 83/24
definiteness [1] 15/6
democracy [2] 66/20 74/17
democrat [4] 88/6 88/6
 88/11 88/15
democratic [2] 74/10
 75/22
democrats [1] 89/21
denied [1] 85/17
depression [1] 65/2
description [1] 49/15
design [1] 65/7
designate [2] 3/10 89/9
designation [1] 12/13
desk [1] 67/8
detail [1] 24/2
determination [1] 13/24
determine [5] 6/8 52/12
 57/5 66/8 91/21
determined [3] 11/24
 51/23 83/4
develop [3] 39/13 39/23
 41/7
developed [1] 42/16
development [1] 61/18
device [1] 3/6
dictated [1] 50/5
did [24] 3/1 15/13 17/10

22/11 22/14 25/3 27/15
 27/20 31/25 38/14 38/18
 38/19 59/12 61/13 66/14
 66/25 68/12 70/3 70/5
 79/18 79/25 80/23 90/2
 94/9
didn [5] 22/21 30/15 33/17
 34/22 49/3
didn't [12] 2/17 54/6 61/11
 61/12 64/12 76/16 79/2
 79/13 86/12 86/15 88/12
 88/21
died [1] 56/25
difference [1] 90/11
different [18] 2/22 11/1
 16/3 17/5 18/19 27/9 28/6
 28/8 28/17 28/17 28/18
 30/19 30/23 32/8 33/12
 33/22 53/15 56/9
differentiation [2] 18/3
 33/12
differently [4] 18/16 18/23
 30/21 86/14
difficulty [1] 18/21
DILLON [38] 1/18 4/15
 5/10 20/1 20/18 23/11
 29/17 31/23 32/1 36/19
 42/7 42/20 43/14 43/18
 47/11 49/11 49/19 50/25
 51/4 52/21 53/12 59/8
 59/10 69/8 76/20 76/25
 78/14 78/19 79/22 82/13
 82/20 84/10 85/25 86/5
 87/2 90/3 90/5 92/9
Dillon's [4] 78/2 87/9 89/8
 92/20
direct [9] 7/20 42/22 47/16
 56/7 63/9 65/22 67/21
 84/22 87/11
direction [1] 88/3
directly [4] 16/4 31/1
 52/16 72/8
disadvantage [1] 23/25
disagree [5] 5/25 7/2 22/15

**D**

disagree... [2]  22/17 53/24
disagreement [1]  37/18
disagreements [1]  23/16
discharge [1]  56/25
disclose [3]  25/3 35/2
57/10
disclosed [4]  5/21 24/22
52/25 72/24
discreetly [2]  38/21 38/22
discretion [6]  28/14 44/18
44/24 44/25 45/5 47/10
discretionary [1]  44/16
discuss [1]  14/5
discussed [2]  11/18 30/21
discusses [1]  79/12
discussing [1]  80/3
discussion [6]  14/4 23/18
25/10 25/13 60/6 79/14
discussions [3]  11/10 23/8
24/19
disease [1]  90/16
disgorges [1]  93/4
disinterested [1]  56/16
dismissed [1]  25/8
display [2]  27/10 36/4
disputing [1]  33/25
disqualification [24]  4/11
6/11 7/1 7/4 8/7 9/8 29/18
29/22 42/5 42/13 42/25
43/15 44/16 52/22 57/12
73/9 81/8 87/8 90/12 90/15
90/15 90/23 91/22 92/19
disqualified [4]  9/10 10/11
51/10 91/6
disqualify [9]  2/7 2/9 2/9
2/15 4/4 72/17 73/25 84/22
87/1
distinction [1]  87/24
district [95]
diverse [1]  14/22
divided [1]  38/19
divorce [1]  45/20
do [82]  3/7 5/5 5/25 6/1

6/25 7/2 8/6 9/10 9/19 9/20
10/22 10/23 11/4 11/7
17/10 19/8 21/18 21/19
22/11 23/5 25/21 26/11
26/12 26/13 29/7 29/8 30/8
32/22 32/24 34/7 34/18
35/3 35/24 36/7 38/12 42/9
43/14 43/17 44/2 46/20
46/21 46/21 54/17 54/18
55/8 55/14 55/15 60/21
62/4 65/17 65/20 66/7
66/15 66/16 67/3 68/10
69/13 73/2 73/9 73/11
73/17 73/19 73/22 73/24
75/15 76/17 76/19 77/3
77/9 77/10 79/11 81/1
86/21 86/22 86/23 90/11
90/12 91/14 91/14 92/1
93/21 94/9
document [9]  57/5 58/13
59/7 63/5 67/4 69/7 70/21
78/1 78/6
documents [2]  30/5 57/6
does [13]  9/6 44/17 46/23
52/1 57/20 61/4 65/10
65/13 67/10 69/20 71/4
83/4 83/11
doesn [13]  9/4 9/12 13/5
26/13 29/7 30/9 30/23 43/7
45/23 45/23 47/14 48/9
48/21
doesn't [13]  6/22 12/14
17/7 41/5 42/13 51/9 54/3
67/9 74/10 74/11 75/23
76/2 91/13
dog [3]  76/2 76/3 91/13
doing [8]  20/10 25/16 26/1
27/10 28/25 85/2 85/3
87/19
dollars [2]  57/9 63/13
don [26]  4/18 8/23 12/1
17/11 19/11 19/17 20/21
22/15 22/23 23/1 23/23
23/24 26/19 27/24 28/3

28/10 29/8 29/9 32/24 44/6
44/23 45/2 45/4 46/4 48/10
48/23
don't [51]  3/22 6/10 6/25
9/9 11/19 11/19 12/19
18/20 19/1 20/4 27/19
28/15 35/25 38/8 39/16
40/1 41/21 48/19 52/13
53/4 53/13 53/23 53/25
55/5 55/23 59/17 62/3
62/17 67/13 69/6 71/1
71/21 73/11 76/9 76/19
77/5 77/15 77/20 77/23
78/3 78/6 78/7 79/1 79/17
80/3 86/16 88/14 89/3
90/22 93/9 93/21
DONALD [2]  1/16 4/9
donated [1]  78/5
donations [4]  43/18 43/22
43/23 43/24
done [19]  13/4 20/4 20/5
27/7 35/20 36/7 52/18 53/5
53/5 65/6 65/7 69/21 73/5
73/11 75/15 75/15 81/1
89/10 93/11
door [2]  58/14 67/4
doubt [3]  32/3 78/3 83/20
down [17]  15/20 21/16
24/15 26/25 27/6 27/10
37/14 57/7 58/10 59/9
66/11 74/13 74/14 76/9
78/19 85/20 94/10
downgrade [1]  25/6
downgraded [1]  25/7
downside [1]  52/5
drafted [1]  59/20
drag [2]  26/20 57/7
dragged [4]  21/16 26/25
27/6 27/10
draw [4]  29/3 32/13 38/17
52/1
drawn [1]  56/13
drips [1]  66/3
driven [1]  46/10

**D**

driver [1]  42/6
drone [2]  3/16 3/17
dropped [1]  12/18
drug [1]  7/8
due [1]  84/24
during [10]  22/8 31/18
 47/18 49/8 63/7 63/8 63/12
 69/21 75/8 78/5
duty [2]  47/21 55/8

**E**

e-mail [3]  59/3 77/8 77/12
e-mails [3]  19/16 20/9
 59/15
each [8]  13/24 14/2 14/13
 15/12 15/16 16/6 40/8
 40/10
earlier [3]  34/20 36/22
 68/25
earliest [1]  16/16
early [2]  10/15 40/11
easier [1]  82/6
echo [1]  20/1
effect [3]  8/17 49/14 49/20
effectively [1]  50/9
effort [5]  7/15 22/18 50/15
 66/20 72/25
efforts [1]  88/9
egress [1]  36/6
either [9]  5/10 19/5 26/14
 27/1 60/18 73/20 75/24
 76/2 76/24
elaborate [1]  40/6
elderly [1]  18/21
elected [4]  50/21 52/3 91/5
 93/16
election [20]  7/20 8/18
 15/15 18/20 20/19 49/2
 52/24 52/25 65/3 65/4 73/1
 73/16 74/20 75/1 81/16
 82/3 93/5 93/6 93/12 93/15
elections [1]  50/20
elector [6]  13/13 13/15

14/18 15/14 18/24 22/7
electoral [2]  21/1 54/4
electors [13]  2/12 4/25
 11/23 17/10 22/5 39/18
 61/1 88/6 88/6 88/9 89/21
 89/24 91/24
elevate [3]  45/3 58/5 58/6
elevation [1]  25/6
Eleven [1]  19/24
else [9]  4/18 5/6 36/13
 36/15 54/6 85/9 85/10 92/6
 92/13
emphasized [1]  49/12
encourages [1]  44/12
end [5]  6/8 9/5 28/11 53/4
 93/10
ended [1]  90/4
ends [2]  41/3 78/18
enemies [1]  85/6
enhanced [1]  25/9
enough [5]  24/16 42/24
 45/5 54/1 57/23
ensure [1]  35/22
enter [2]  35/22 59/22
entered [1]  76/16
entire [4]  73/13 89/12
 90/16 90/24
entirely [3]  28/8 28/17
 28/17
entirety [2]  47/7 89/12
entities [1]  82/23
entity [3]  43/1 84/13 92/1
environment [1]  35/8
envision [2]  15/11 15/12
equal [1]  84/24
Equally [1]  48/12
equipment [3]  2/25 3/11
 3/15
especially [1]  52/13
essence [1]  67/6
essentially [2]  19/24 85/1
establishing [1]  77/25
et [1]  9/4
ether [1]  65/25

ethers [1]  70/12
ethical [3]  27/13 83/22
 83/24
ethics [5]  10/7 63/20 68/16
 68/18 69/1
even [25]  5/2 8/20 17/7
 17/20 22/18 22/22 27/19
 28/22 28/24 29/5 31/21
 34/1 36/1 37/19 39/1 51/11
 51/20 53/23 56/25 56/25
 57/1 64/10 73/22 75/14
 81/19
evening [1]  23/20
event [3]  50/4 50/12 53/7
events [3]  47/8 49/15 58/2
ever [1]  34/25
every [4]  3/15 14/21 31/13
 75/19
everybody [5]  33/25 47/12
 85/9 85/10 91/6
everyone [8]  3/14 3/17 8/9
 35/18 50/16 58/13 60/25
 92/24
everyone's [1]  93/22
everything [6]  3/15 40/24
 41/15 66/24 88/18 92/5
everywhere [1]  12/22
evidence [26]  26/12 29/4
 30/4 33/23 46/15 47/17
 54/16 54/17 54/18 54/20
 66/19 67/2 67/12 69/4 72/2
 72/3 76/6 76/11 76/16 77/5
 77/10 77/17 77/22 84/14
 87/15 91/18
EX [3]  1/6 1/8 2/3
exacerbated [3]  7/5 20/7
 87/14
exact [1]  38/15
exactly [9]  13/22 25/16
 33/8 37/5 50/21 61/3 75/6
 84/1 85/9
exaggerated [1]  36/4
example [1]  45/17
examples [1]  45/7

**E**

Excellent [1]  4/24
exception [1]  9/19
exceptions [1]  8/19
excerpt [1]  84/10
excluded [1]  30/12
excludes [1]  30/6
exercise [3]  28/12 28/14
  35/1
exhibit [18]  60/1 60/19
  62/9 63/4 68/17 68/22 69/4
  76/16 77/8 77/22 79/19
  80/6 80/20 81/11 83/13
  84/3 84/9 85/22
exhibits [4]  54/18 59/17
  76/6 78/16
Exihibit [1]  77/5
exist [1]  22/11
existence [2]  64/7 68/14
exists [1]  56/13
expanded [1]  36/10
expect [1]  51/19
expected [2]  4/1 52/3
expecting [1]  11/1
expert [2]  31/8 69/1
explain [4]  46/22 46/23
  47/8 87/17
explained [1]  50/15
explains [1]  25/4
explanation [1]  86/13
explorable [2]  39/22 39/22
exploration [1]  73/15
explore [2]  23/15 41/13
explored [1]  38/8
exposes [1]  13/15
extent [1]  89/20
extra [3]  71/17 84/12 84/16
extreme [2]  17/19 45/17
eye [2]  38/13 49/23
eyes [2]  58/6 58/7

**F**

face [3]  28/21 45/21 58/14
faced [1]  9/16
facing [1]  13/1
fact [22]  5/15 6/2 6/3 10/1
  10/20 19/11 33/3 35/2 35/2
  44/9 46/15 59/17 61/11
  61/12 62/24 64/10 64/13
  71/6 72/10 76/21 83/4 85/7
factor [2]  28/11 56/24
facts [9]  26/19 28/7 28/9
  28/9 46/10 46/13 49/18
  58/9 58/11
fair [5]  12/17 23/25 29/15
  46/20 89/6
faith [1]  13/14
fall [1]  7/17
falls [1]  55/15
false [1]  57/5
falsity [1]  57/6
familiar [3]  49/14 50/24
  53/15
fan [1]  8/25
Fani [3]  44/11 62/22 76/3
far [7]  24/3 26/25 31/14
  40/13 45/23 65/22 82/22
fashion [2]  44/18 56/16
fashioned [1]  8/2
favorably [1]  21/7
favoring [2]  9/20 86/20
federal [10]  12/20 16/12
  19/20 20/3 21/11 21/12
  28/16 29/6 29/8 84/25
feed [1]  3/12
few [6]  8/19 17/23 17/24
  24/20 37/8 71/13
fictional [1]  75/3
fifth [32]  4/6 4/10 5/12 6/5
  6/9 6/21 9/2 9/3 11/2 11/11
  13/2 14/7 14/12 15/22
  16/13 17/8 17/10 19/5 23/6
  25/11 25/15 27/22 28/13
  29/19 32/13 33/17 36/9
  36/17 36/19 38/2 38/8
  43/16
fight [1]  48/1
figure [1]  26/21
file [3]  2/17 84/23 93/17
filed [8]  2/6 2/6 2/10 2/14
  2/15 5/12 10/1 64/15
final [3]  50/18 52/8 93/4
finance [1]  63/6
financial [3]  51/19 64/25
  80/7
find [10]  27/24 28/18 29/5
  74/7 74/10 75/23 76/2 90/8
  91/13 92/5
finding [2]  74/9 91/10
fine [5]  2/18 4/16 5/3 62/23
  66/23
finish [1]  61/16
finished [1]  9/15
first [14]  6/5 10/2 17/23
  31/23 35/1 37/8 37/15 40/7
  42/22 43/17 47/9 63/21
  64/16 84/20
fit [1]  42/13
flagging [1]  84/11
flashy [1]  46/25
flexible [1]  41/23
flip [1]  15/10
flow [1]  63/20
flowed [1]  48/21
flows [2]  61/18 93/2
flyer [3]  62/10 77/19 83/3
focus [12]  7/15 11/23 52/1
  53/14 57/12 57/24 71/23
  72/14 81/23 87/1 89/15
  91/8
focused [3]  44/9 48/25
  67/20
focuses [1]  91/7
folks [6]  11/8 12/3 28/14
  38/7 38/23 88/20
follow [3]  46/14 52/20 91/1
following [1]  87/23
font [2]  62/24 81/19
footnote [1]  12/17
force [2]  29/9 45/5
forced [4]  16/19 19/25
  27/12 86/13

**F**

forcing [1]  41/6
forecast [1]  39/11
foreclosed [1]  14/12
foregoing [1]  94/10
forget [1]  74/20
Forgive [1]  74/25
form [1]  44/19
formal [2]  12/13 31/11
formally [1]  31/11
forms [2]  3/11 78/23
fortunately [1]  64/13
forward [8]  3/8 21/13 23/6
27/4 36/13 39/24 71/2
85/24
fought [1]  38/12
found [3]  16/16 51/18
56/10
foundation [4]  59/15 60/1
76/15 79/22
founded [1]  68/9
four [2]  3/12 41/1
framework [1]  39/24
frameworks [1]  40/15
fraught [1]  28/1
free [6]  3/1 60/21 68/2 68/9
79/1 93/23
freshest [1]  31/24
Friday [1]  84/23
friend [1]  12/24
friends [4]  58/15 64/20
73/5 85/6
frog [1]  34/15
frogmarched [2]  19/24
34/10
frogmarching [1]  35/9
front [16]  16/13 16/17
19/25 21/16 24/8 24/14
25/23 32/11 34/10 34/15
36/2 38/1 40/3 43/7 55/24
92/24
frustrated [1]  61/6
full [1]  35/19
FULTON [9]  1/1 1/24 7/7

10/9 66/4 68/12 73/13 94/5
94/25
fultoncountyga.gov [1]
1/25
fund [1]  81/25
fundraiser [25]  10/5 44/12
46/3 46/16 47/1 62/22 63/8
63/10 63/15 63/24 65/7
65/9 65/18 75/7 75/10
75/13 75/20 75/24 75/25
77/19 78/1 78/6 80/8 81/18
83/3
fundraisers [1]  75/16
fundraising [1]  80/7
further [9]  2/23 5/2 13/6
17/11 85/15 86/19 91/25
92/10 94/13
future [1]  13/7

**G**

GA [1]  1/12
gather [3]  66/19 67/2 67/3
gave [4]  38/14 38/16 43/20
69/12
general [18]  3/2 8/24 15/15
15/20 43/21 44/2 68/19
68/19 73/16 74/7 75/2 76/1
82/14 82/23 89/9 90/6 90/7
90/7
General's [1]  66/10
generated [1]  7/6
generating [1]  6/15
gentleman [1]  67/22
genuinely [2]  19/3 26/21
georgia [26]  1/2 10/8 12/13
18/18 21/1 21/6 27/14
29/11 29/25 30/20 32/7
33/2 42/25 47/15 51/2 63/6
65/4 68/20 71/5 78/25 79/9
82/14 94/4 94/9 94/14
94/14
get [34]  2/2 2/21 2/24 2/25
8/24 10/25 16/17 18/12
18/23 20/14 23/22 24/12
33/22 34/2 35/24 38/6

38/22 40/9 40/13 40/17
40/18 40/24 49/11 55/25
59/2 61/5 70/9 74/16 77/2
79/18 85/6 85/6 87/2 88/16
get's [4]  57/9 57/9 64/6
83/16
gets [13]  3/13 10/17 10/18
41/21 42/12 52/25 54/21
63/24 64/4 64/5 71/8 82/12
86/1
getting [7]  3/4 10/19 20/8
20/9 20/10 31/3 40/17
give [10]  10/16 15/6 17/20
28/24 42/9 44/18 44/24
63/11 74/12 76/20
given [3]  29/2 75/3 87/18
gives [5]  20/12 25/18 25/19
64/19 68/18
giving [4]  52/19 67/5 75/21
81/24
glad [7]  10/13 55/7 66/2
66/15 74/13 74/14 74/15
glued [1]  38/25
go [23]  2/22 12/22 12/22
13/6 17/11 17/19 26/6
29/23 38/1 39/24 41/15
45/23 55/5 57/1 58/17 66/9
68/9 73/22 75/9 81/2 85/24
88/12 93/23
goes [3]  46/15 56/8 93/22
going [71]  2/5 3/8 7/16
7/19 8/20 10/20 11/23
13/13 13/23 14/12 14/16
16/13 19/8 20/6 20/14
24/14 25/11 26/2 26/12
26/12 27/3 27/24 28/22
29/17 34/13 34/14 36/12
37/6 37/17 38/5 39/3 39/4
39/5 39/9 39/12 39/14
39/23 40/6 40/10 42/22
43/14 47/8 53/7 54/12
54/20 57/11 60/6 66/1
66/22 67/6 69/10 71/11
73/21 73/21 73/24 75/15

## G

going... [15] 75/18 76/7 76/14 78/7 80/4 80/5 81/3 82/11 83/17 84/4 88/11 91/22 93/14 93/14 93/21
gonna [1] 14/15
good [13] 2/2 4/2 4/7 4/15 4/16 13/14 30/22 41/12 48/10 48/22 74/10 75/22 82/5
good-faith [1] 13/14
google [1] 82/7
GOP [1] 20/24
gosh [1] 61/7
got [32] 2/20 3/6 4/13 4/24 5/3 21/23 36/21 40/8 41/4 42/7 45/16 48/21 50/11 50/24 51/3 51/21 53/6 59/13 61/17 61/25 62/21 66/23 69/9 70/10 70/13 70/14 72/15 76/4 80/25 81/14 82/10 82/17
gotten [1] 49/16
government [1] 5/22
Governor [7] 9/21 44/1 73/1 74/21 75/1 75/4 82/1
Governor's [5] 7/17 50/4 64/4 64/4 81/13
grand [104]
gravity [1] 56/10
great [5] 4/21 23/21 85/23 85/25 87/24
greater [2] 39/2 90/3
greatly [1] 39/8
green [5] 1/17 2/24 4/3 4/11 31/7
GREEN-CROSS [4] 1/17 4/3 4/11 31/7
greenlighted [1] 5/2
group [7] 6/24 14/17 14/22 23/17 73/3 88/5 88/7
grown [1] 61/14
guess [6] 23/5 23/9 33/6 40/9 44/14 72/1

guidelines [1] 39/13
guilt [1] 56/20
guy [3] 57/9 57/9 88/16
guys [2] 21/19 79/6

## H

ha [2] 31/24 31/24
had [24] 11/10 14/23 17/9 23/8 24/2 34/23 39/10 41/2 41/25 50/4 50/16 51/16 58/14 59/10 59/20 61/1 64/11 64/17 68/11 75/3 75/7 75/11 75/18 75/20
HADASSAH [4] 1/21 94/8 94/21 94/23
hadassah.david [1] 1/25
hadn [1] 22/13
hailing [1] 13/7
Hall [1] 81/15
hand [5] 7/18 51/4 74/21 86/13 94/15
handheld [1] 3/6
handing [1] 86/3
handle [1] 73/19
handling [2] 2/7 3/21
hands [1] 59/18
happen [8] 37/7 37/9 37/22 48/8 48/8 52/2 54/3 57/2
happened [4] 13/12 48/9 60/10 66/13
happens [2] 49/21 49/22
happy [4] 3/18 29/19 53/12 85/14
harassment [1] 35/23
hard [2] 3/19 38/12
harm [2] 7/8 64/20
has [60] 2/14 2/14 6/15 7/5 7/14 7/17 8/2 8/19 9/19 9/20 9/22 10/14 12/21 18/2 20/4 27/21 29/11 31/10 32/11 35/15 35/19 38/4 38/12 41/22 42/6 42/15 42/19 44/23 47/11 47/18 51/9 54/8 55/19 57/2 59/16 61/14 66/7 66/8 67/23

69/15 70/23 71/24 71/25 73/2 73/5 73/13 76/3 76/15 80/25 81/2 81/10 84/2 84/15 84/17 84/21 87/11 87/12 88/13 91/7 93/24
hasn't [3] 75/24 85/12 85/16
hate [2] 20/8 20/9
have [150]
haven't [2] 49/9 60/1
having [8] 3/12 23/23 24/21 25/24 41/23 46/1 48/24 90/9
he [36] 10/14 10/15 10/17 10/18 20/24 31/18 31/23 31/25 33/15 33/22 37/16 45/25 49/12 55/3 55/6 55/7 55/7 58/19 58/20 58/20 64/16 68/3 68/12 69/9 69/20 69/20 70/13 74/7 79/23 79/25 81/16 82/12 82/22 83/3 83/11 84/1
he's [5] 5/20 7/8 57/8 83/1 83/1
head [3] 11/3 22/15 31/7
headline [1] 63/23
headliner [4] 9/23 10/5 64/5 72/22
headlining [1] 62/22
health [1] 93/9
hear [13] 4/1 11/17 16/24 22/21 28/9 28/10 29/19 38/18 53/12 56/20 66/2 86/12 86/15
heard [15] 18/22 22/2 22/22 34/15 35/12 53/3 53/4 53/13 60/12 67/22 67/24 67/24 84/14 86/15 92/24
hearing [4] 16/9 35/5 53/1 82/20
heightened [1] 24/10
heightening [1] 71/18
help [5] 3/9 11/7 12/4 25/4

**H**

help... [1]  58/4
helpful [1]  8/12
helping [1]  57/22
helps [2]  16/10 38/4
her [13]  5/18 22/22 22/25
25/11 28/24 31/7 36/4
38/14 57/18 71/12 72/19
88/17 90/8
here [62]  2/20 2/21 2/25
3/6 3/13 4/3 4/20 5/4 8/9
8/17 11/8 11/20 20/4 20/10
21/10 21/12 21/16 23/13
23/14 25/12 26/20 26/25
27/6 27/10 27/19 33/10
34/8 34/22 35/4 37/11
38/15 39/4 39/25 40/8
40/23 44/14 45/16 46/11
48/9 48/10 48/13 49/9
52/13 54/18 56/21 57/4
57/7 57/12 62/3 63/6 66/22
69/22 71/6 73/7 73/7 74/8
75/16 79/1 81/1 83/22
85/17 91/7
hereby [2]  94/9 94/15
herein [1]  94/12
herself [5]  8/2 25/25 61/12
71/7 71/22
hey [3]  60/12 68/1 85/1
higher [2]  51/11 51/14
highlighted [2]  51/4 51/5
highly [1]  58/25
him [14]  9/24 12/23 12/23
25/24 43/19 57/5 63/15
66/11 68/12 69/1 74/12
74/13 79/25 89/13
himself [1]  87/12
hindrance [1]  34/19
his [26]  6/11 6/23 17/2 17/3
17/4 21/3 21/4 22/15 25/11
31/18 31/19 32/12 33/17
42/8 49/12 50/11 55/2 55/8
58/17 69/20 76/20 80/10
82/1 83/4 86/22 90/5

hit [1]  16/2
hold [7]  8/18 29/17 60/23
76/23 81/3 82/18 86/21
holder [1]  46/2
holding [2]  46/3 67/15
Honor [80]  4/2 5/5 5/8
5/14 7/2 9/18 10/23 12/5
12/6 12/7 13/19 15/4 15/9
17/22 18/25 20/10 20/22
21/3 21/6 21/17 21/22
23/22 26/4 26/7 26/19 27/5
27/18 28/7 29/12 29/16
30/7 31/1 31/6 32/17 32/21
33/11 36/11 36/18 36/21
37/3 40/5 41/8 42/1 42/18
42/19 44/3 54/7 54/18 55/1
57/19 58/8 59/12 60/14
62/2 62/20 63/5 68/23 69/6
71/14 72/5 72/18 74/25
76/5 78/15 78/24 79/18
80/18 80/23 81/6 81/9
82/15 83/17 87/10 87/25
89/7 89/17 90/14 92/3
92/11 92/14
Honor's [1]  14/5
HONORABLE [1]  1/11
hope [1]  89/4
hopefully [4]  2/18 28/14
49/18 54/2
horrific [1]  46/9
hosted [8]  9/24 46/15 75/7
75/12 75/13 75/20 75/24
75/25
hours [3]  3/2 3/8 30/1
how [25]  4/15 8/7 8/10
11/11 13/8 34/22 36/2
36/25 39/12 40/10 40/14
42/14 46/21 46/23 48/19
48/25 57/20 61/3 68/5
70/10 77/25 78/4 93/21
93/21 93/22
however [5]  13/12 27/2
37/12 37/12 56/10
hunt [3]  76/3 76/3 91/14

**I**

I'd [8]  53/14 55/2 62/9
68/21 84/5 86/1 89/4 93/19
I'll [18]  51/4 51/22 52/21
55/25 60/3 63/21 70/25
72/19 76/23 76/23 78/19
79/16 80/19 82/18 87/17
92/16 92/22 93/7
I'm [45]  3/18 3/22 4/3
10/20 12/24 16/13 39/3
39/23 43/19 49/1 49/16
51/13 52/12 53/12 53/15
57/12 59/4 59/6 63/10 66/2
66/22 67/20 67/20 70/10
73/21 73/21 73/24 75/15
78/10 79/23 80/5 80/23
83/6 83/17 84/4 85/14 86/3
87/23 88/6 88/15 88/16
89/14 90/2 92/17 93/19
I'm' [1]  79/8
I've [11]  35/21 48/21 50/24
51/3 59/7 62/21 65/14
75/16 80/25 82/17 92/24
idea [2]  48/18 91/21
ideally [1]  6/16
identically [1]  17/25
identification [2]  14/6
84/20
identified [4]  13/21 56/11
77/24 81/17
identify [1]  38/20
identifying [1]  82/21
ignore [2]  4/18 46/15
immunity [2]  22/19 22/24
immunize [2]  21/12 22/3
immunized [3]  12/3 21/10
21/11
impact [3]  7/16 7/20 53/16
impaneled [2]  30/14 66/19
impasse [4]  37/24 39/25
40/18 40/19
imply [1]  49/4
important [1]  74/18
importantly [1]  17/17

**I**

improper [4]  28/19 33/4
33/20 33/21
impropriety [4]  10/7 42/20
42/21 89/11
inability [1]  22/2
inadvertent [1]  72/7
include [1]  14/16
included [2]  30/10 30/12
including [4]  15/12 26/23
61/2 83/2
inconvenience [1]  28/11
increase [1]  86/22
incriminating [4]  19/1
19/14 19/23 31/21
incrimination [1]  31/20
independent [1]  74/8
indicated [5]  10/15 10/15
58/18 58/19 67/1
indicates [1]  91/4
indicating [1]  83/11
indication [3]  22/18 34/24
62/4
indict [5]  32/10 32/12
32/14 57/5 73/3
indicted [2]  25/8 33/20
indictment [2]  6/14 7/19
individual [11]  12/14
13/24 13/25 14/1 14/14
18/21 18/23 33/17 50/22
83/8 83/9
individualized [1]  23/8
individuals [3]  13/21 82/25
91/23
inference [2]  29/3 32/13
influences [1]  56/15
information [3]  66/17 69/9
77/12
ingress [1]  36/6
inherently [2]  87/23 88/19
initial [1]  55/1
initially [1]  67/1
inkling [1]  48/21
innocent [1]  27/22

inquiry [4]  14/6 14/11
19/19 82/23
inside [1]  67/18
insofar [10]  5/14 11/21
39/15 43/11 43/22 77/13
81/21 83/7 84/19 93/2
inspect [1]  30/5
instead [4]  17/18 32/16
43/25 44/1
instructed [1]  51/13
instruction [1]  15/19
instructive [1]  28/25
instrument [1]  31/11
interest [6]  14/17 15/1 43/3
43/10 56/13 68/11
interested [2]  52/10 66/12
interesting [2]  32/21 65/1
interference [1]  73/16
interim [1]  93/20
intermediate [1]  73/17
internet [6]  60/19 62/7
70/2 70/4 70/23 76/13
interpret [1]  45/24
interrupt [1]  18/4
interview [1]  55/9
interviews [1]  24/21
intimated [1]  52/21
introductory [1]  49/12
investigate [1]  89/5
investigated [1]  91/25
investigating [11]  9/13
22/6 28/20 46/4 75/8 85/2
88/8 88/25 89/19 90/10
91/21
investigation [34]  10/3
10/9 10/14 11/22 13/10
15/1 15/2 30/3 31/22 42/17
43/4 44/13 46/13 47/2 47/4
47/18 47/25 49/8 50/6
58/16 60/13 60/16 64/21
66/18 66/18 67/18 73/14
75/13 89/13 90/16 90/24
91/14 91/15 93/2
investigative [3]  8/16 15/4

30/3
investigators [2]  10/17
16/19
invite [1]  40/11
invites [1]  44/11
invocation [1]  29/4
invoke [10]  16/18 19/19
20/1 20/13 21/15 21/15
25/11 26/2 27/12 32/12
invoking [2]  31/19 57/13
involved [10]  20/24 20/25
21/3 21/4 21/5 23/23 35/18
35/21 62/5 75/12
involvement [2]  13/25 14/5
irrefutable [2]  6/1 6/3
Irrefutably [1]  72/13
irrelevant [1]  37/21
is [382]
isn [2]  9/10 13/5
isn't [4]  39/14 59/6 65/9
81/23
Isokoff [2]  61/4 79/24
issuance [2]  50/14 92/23
issue [16]  7/5 7/18 9/19
9/20 12/12 15/23 33/25
34/2 51/9 55/18 57/4 57/6
74/12 74/16 74/18 75/21
issued [5]  9/24 32/5 33/1
33/4 50/8
issues [2]  5/13 19/17
issuing [1]  92/18
it [349]
it's [62]  2/19 3/8 8/4 8/20
35/14 40/1 44/16 45/21
49/25 51/2 51/3 51/11
51/13 51/18 51/19 52/3
52/3 52/13 54/16 54/17
56/1 56/10 59/25 60/8
60/18 60/19 61/10 61/13
61/14 62/13 62/14 62/22
64/18 66/7 69/7 69/9 69/13
70/12 70/19 70/25 73/5
73/12 73/20 73/22 73/24
75/6 75/6 75/14 75/15

**I**

it's... [13]  77/24 79/2 79/4 79/9 80/12 81/19 82/18 86/16 87/24 90/19 93/1 93/4 93/13

its [5]  8/14 8/15 8/22 26/10 33/19

**J**

jammed [1]  35/5
job [3]  17/8 17/9 19/15
join [1]  5/18
joining [2]  5/11 89/15
joint [1]  89/22
Jone's [1]  92/10
JONES [68]  1/18 2/7 2/8 4/17 5/23 6/9 6/22 7/8 7/19 9/4 9/6 9/10 10/3 10/9 10/13 14/16 15/13 20/6 21/3 23/11 29/20 38/18 42/15 43/5 47/12 47/21 47/25 49/7 49/23 50/9 50/11 53/9 55/2 57/7 58/9 58/17 61/2 61/24 64/13 64/14 65/8 66/11 66/12 66/16 66/21 67/25 68/11 72/11 73/3 75/9 75/18 76/1 81/11 81/11 81/24 83/2 83/16 83/18 84/17 84/21 84/23 86/10 87/11 89/12 90/6 90/9 90/17 90/25
Jones' [5]  2/10 48/20 65/25 74/12 84/8
judge [15]  1/11 4/7 4/16 15/17 24/18 25/13 38/10 44/18 53/18 56/12 75/9 78/22 86/6 91/2 92/8
judge's [1]  51/17
judicial [10]  51/12 53/15 56/6 56/6 71/17 84/12 84/16 89/22 89/25 94/14
July [9]  1/12 2/4 53/9 53/9 55/4 58/18 58/22 58/23 94/10

**J** (continued)

juncture [1]  72/21
June [6]  9/24 53/8 82/4 82/7 82/8 82/9
juries [3]  30/4 32/3 74/3
jurisdiction [2]  12/11 27/19
juror [1]  80/2
jurors [5]  1/19 7/25 41/10 48/6 93/8
jury [93]  1/5 1/10 2/3 6/12 6/13 6/13 6/14 6/19 7/10 7/14 8/3 8/14 8/17 8/22 9/7 9/15 10/3 12/4 12/16 13/11 13/18 14/11 15/4 16/14 16/17 19/19 19/25 20/3 21/10 21/17 22/8 24/8 24/15 25/23 26/9 26/10 27/16 28/23 28/25 29/7 30/1 30/2 30/13 31/18 31/22 32/6 32/6 32/10 32/11 32/14 32/19 33/17 33/18 33/19 33/20 33/22 33/23 34/8 34/20 34/25 35/10 38/1 40/4 41/19 43/4 47/3 47/21 47/24 48/1 48/5 48/11 48/15 48/16 48/18 48/25 52/16 55/3 58/21 64/17 67/10 67/19 68/2 68/5 72/11 74/9 80/2 88/8 88/24 90/20 91/7 91/20 93/4 93/4
Jury's [2]  8/5 60/15
just [48]  3/21 5/7 5/8 13/9 15/10 16/2 17/4 17/23 17/25 18/10 18/11 26/5 27/1 27/13 35/11 37/14 38/14 39/5 39/10 40/5 43/8 43/15 45/22 46/16 49/9 52/4 54/21 55/10 59/18 61/14 66/14 66/24 67/10 69/11 69/14 71/1 71/13 80/5 80/12 81/1 85/9 89/13 89/17 90/24 91/2 92/19 93/8 93/20

**K** (from col 3)

justification [1]  86/16
justified [1]  86/16

**K**

keep [3]  38/12 71/1 74/21
Keeping [1]  29/21
kind [7]  3/11 3/15 45/11 45/16 45/21 50/18 70/15
kinds [1]  23/7
kmow [1]  15/5
knew [4]  59/1 62/6 62/6 62/7
know [52]  2/16 3/16 5/20 6/10 8/23 9/9 10/21 11/19 16/23 17/3 19/1 20/2 21/10 21/22 22/7 25/25 27/1 27/20 28/2 28/3 28/10 28/23 29/1 30/10 31/8 32/24 34/22 34/25 35/21 35/25 38/5 39/5 41/22 46/4 48/19 48/23 51/21 53/4 59/17 61/8 61/10 62/5 67/13 67/15 68/5 68/13 69/12 71/21 80/1 80/3 89/8 93/21
knowing [1]  68/11
knowledge [1]  84/15
known [2]  10/2 64/13
knows [3]  61/17 62/8 64/1
Kwanzaa [1]  81/15

**L**

L-A-M-P-L [1]  12/7
labeling [1]  13/7
lack [1]  47/17
laid [1]  59/16
Lampl [15]  12/6 14/3 25/20 25/22 26/7 30/22 31/2 31/3 31/24 32/10 33/9 33/16 34/6 40/1 56/2
Lample [3]  32/12 33/12 34/1
lands [1]  52/23
language [3]  8/3 51/25 83/10

# L

larger [2]  49/5 81/20
largest [1]  81/19
last [7]  22/1 22/1 23/19
44/20 78/18 82/7 86/7
late [5]  55/3 55/4 76/10
82/8 82/9
later [9]  10/17 26/11 33/19
41/22 53/11 60/17 60/25
62/7 64/5
law [16]  12/13 14/3 16/11
27/19 28/7 30/20 40/1
42/23 42/25 44/24 45/2
45/17 47/15 55/14 55/17
66/6
lawyer [6]  11/9 17/5 17/7
25/24 39/11 39/11
lawyer-to-lawyer [1]
39/11
lawyers [4]  2/20 35/18
37/14 37/22
layed [1]  55/20
lays [1]  84/1
lead [4]  14/6 19/15 19/16
19/17
leak [6]  61/25 68/14 71/21
71/22 71/25 72/1
leaked [1]  62/1
leaking [2]  67/12 67/12
leaks [3]  66/4 72/25 77/14
learned [2]  67/17 91/3
least [5]  24/9 27/4 27/24
77/24 84/10
leave [5]  8/9 35/23 76/8
76/9 85/25
leaving [1]  48/10
legal [17]  8/2 18/1 28/18
45/3 47/3 47/9 47/12 47/15
47/23 48/7 82/24 82/24
83/5 85/12 85/16 88/23
92/10
legally [1]  54/1
less [4]  12/23 42/3 58/15
59/14

let [18]  2/15 6/7 15/21 18/4
22/7 28/5 39/23 40/23
41/22 42/5 44/20 61/16
62/14 72/19 78/19 79/25
90/6 92/5
let's [9]  2/2 3/20 13/9 54/21
59/15 74/16 74/18 74/19
91/13
letter [26]  5/24 9/4 9/25
10/18 10/19 24/7 49/13
53/8 57/10 58/18 58/24
59/1 61/2 64/6 64/6 64/14
65/19 66/16 66/24 67/16
68/14 72/23 77/5 84/21
86/10 90/10
letters [10]  5/17 18/5 18/13
49/25 58/13 61/12 61/13
64/8 64/12 67/5
letting [1]  38/21
level [3]  13/25 46/19 65/13
leveled [1]  12/14
liability [2]  13/1 13/16
Lieutenant [12]  7/16 9/21
44/1 50/4 64/3 64/4 73/1
74/20 75/1 75/4 81/12 82/1
life [3]  52/19 60/11 60/11
light [5]  2/25 9/3 11/25
41/8 93/9
lighthouse [3]  17/14 17/16
18/24
lights [1]  46/25
like [36]  3/18 6/18 11/16
14/21 15/17 16/1 18/15
23/8 23/8 23/19 43/19 45/9
45/10 48/7 48/14 49/13
52/18 53/14 54/3 54/8 55/2
55/10 62/9 63/21 66/13
66/14 66/24 68/21 70/17
70/20 84/5 85/4 85/9 85/9
86/1 88/21
likelihood [1]  71/18
limb [1]  73/22
lines [1]  24/3
link [1]  19/5

links [1]  19/15
list [6]  27/5 30/10 30/11
30/12 30/12 75/22
listed [1]  51/16
literally [1]  57/8
little [11]  3/13 22/1 35/14
41/16 57/11 59/13 65/15
65/17 76/25 81/23 92/22
ll [8]  7/22 25/2 28/4 31/1
37/14 41/22 42/2 43/11
location [1]  40/21
logistics [1]  6/24
long [6]  37/16 38/23 39/10
40/14 69/13 82/20
longer [2]  37/6 41/16
look [10]  6/18 35/16 55/19
62/14 69/11 78/21 79/16
81/10 85/2 91/17
looking [6]  3/22 22/20
22/21 23/3 63/21 83/3
looks [1]  43/19
loose [1]  78/18
lost [2]  59/21 88/21
lot [11]  2/19 2/20 16/23
21/4 24/2 31/3 42/3 42/12
49/13 61/10 64/9
lots [1]  88/13
love [3]  60/20 71/13 84/5
lower [2]  51/13 51/13
lowercase [1]  46/24
Lowndes [1]  9/14

# M

machine [1]  73/5
made [18]  14/2 20/17
27/21 37/18 41/17 43/23
46/11 47/19 56/23 57/17
58/5 63/1 63/8 74/6 80/4
86/14 86/18 89/22
magical [1]  12/20
magically [1]  22/10
Magloclin [2]  91/4 91/4
magnitude [1]  74/3
mail [4]  20/9 59/3 77/8
77/12

## M

mails [3]  19/16 20/9 59/15
main [2]  27/21 27/21
maintain [1]  46/12
major [1]  35/16
make [24]  2/20 6/6 14/16
34/14 37/12 37/13 37/24
39/14 45/23 50/18 52/21
54/21 60/3 62/14 63/2 79/2
80/5 80/24 81/1 82/2 86/1
92/23 93/11 93/15
makes [4]  16/24 28/3 28/10
45/15
making [1]  71/17
manage [2]  42/14 79/2
managed [1]  8/11
mandatory [2]  44/16 44/17
many [7]  8/16 20/25 21/1
27/2 35/25 36/25 58/7
map [1]  24/2
marched [1]  34/15
marching [1]  55/10
mark [1]  68/21
marked [1]  63/4
material [1]  65/2
materially [1]  64/25
matter [10]  18/11 26/1
46/14 47/12 47/14 48/9
48/21 85/7 91/23 93/24
matters [2]  31/21 83/9
may [62]  6/5 7/23 8/23
10/25 11/7 12/7 12/17
12/25 13/6 13/22 14/6
15/17 16/21 17/1 17/6 18/9
22/4 22/4 22/6 22/13 25/10
26/4 28/22 28/23 29/16
30/4 30/5 30/8 31/17 34/21
36/25 37/14 37/24 39/8
39/9 39/13 39/21 40/2
40/14 40/15 40/22 40/24
41/13 41/14 43/6 47/24
49/15 51/5 53/20 54/7 55/3
56/11 57/20 58/8 59/22
59/24 62/13 62/20 71/14

80/22 82/14 93/13
maybe [11]  17/14 37/5
46/18 47/20 48/16 52/5
52/5 57/14 57/22 58/11
76/20
MCBURNEY [1]  1/11
me [39]  5/21 6/7 8/1 9/7
11/7 12/4 13/13 13/15
15/14 16/24 17/18 18/4
22/1 25/4 26/1 29/24 44/20
45/19 45/20 46/18 53/21
53/25 55/24 57/22 59/2
59/11 60/10 61/16 62/14
67/21 68/25 73/18 74/25
78/20 85/2 87/4 88/25 92/5
93/20
mean [16]  11/15 13/5
17/19 18/9 20/8 27/18 30/8
40/8 40/24 44/17 45/9
46/23 46/23 49/4 87/1
87/18
meaning [2]  31/11 48/5
meaningful [1]  93/12
meanings [1]  88/13
means [1]  28/16
meant [1]  43/17
media [11]  2/23 7/6 7/21
35/17 35/19 35/23 36/1
46/2 67/24 68/2 74/19
medial [1]  47/4
meet [2]  10/16 58/10
members [1]  71/7
memorialize [1]  92/16
mention [1]  82/12
mentioned [3]  38/20 49/15
67/11
mere [1]  64/18
merely [2]  2/10 72/9
met [2]  29/1 85/12
method [1]  36/12
micromanage [1]  41/21
middle [1]  59/21
midst [1]  42/17
might [17]  6/18 8/14 8/15

11/11 15/6 16/18 23/17
24/15 32/4 58/3 58/5 58/6
63/16 63/17 75/9 75/21
82/7
mind [2]  22/25 65/16
mindful [1]  28/11
mine [1]  79/4
minimum [2]  29/12 42/15
minor [1]  17/6
minute [2]  24/13 61/3
misconduct [1]  83/23
misled [1]  48/4
miss [1]  89/3
misunderstood [1]  7/23
mix [1]  40/18
mobility [2]  14/24 18/21
moment [1]  46/8
money [7]  63/22 65/19
75/14 77/25 78/4 81/18
81/24
month [1]  80/11
month,Mr [1]  63/13
moot [4]  6/6 9/8 10/22 42/9
more [28]  3/10 3/21 15/14
16/6 17/17 24/3 24/6 24/12
24/13 28/1 28/16 29/18
36/8 36/19 37/7 38/17 39/4
43/7 49/11 52/8 61/10
65/20 73/8 75/14 76/25
81/4 87/12 90/2
morning [1]  4/15
most [5]  36/4 38/23 48/12
73/25 87/11
motion [40]  2/6 2/8 2/10
2/15 2/16 2/17 4/4 5/11
5/15 5/18 5/23 6/7 11/4
11/18 13/21 18/16 27/18
36/10 36/22 41/17 43/11
57/16 57/16 58/19 64/23
72/16 79/3 83/1 83/2 83/23
84/22 84/24 85/15 85/17
86/25 87/1 87/3 89/8 89/15
89/20
motions [3]  1/10 2/5 2/13

**M**

motivated [1]  47/19
motivation [3]  48/18 49/9
 88/2
mouth [2]  29/21 72/8
move [4]  14/13 15/24 17/9
 41/23
moved [1]  42/6
moving [5]  2/19 23/6 41/9
 41/10 71/1
mr [103]
Mr. [2]  17/2 17/4
Mr. Wade [2]  17/2 17/4
Mr.Dillon [1]  36/10
Mr.Wade [1]  23/7
MS [61]  1/19 1/19 4/25 5/1
 5/3 5/14 11/18 13/4 13/4
 14/22 14/23 16/24 16/24
 21/18 21/22 22/2 22/14
 22/21 22/25 23/10 23/10
 23/11 24/19 24/20 25/18
 31/7 36/14 37/2 37/10
 38/13 38/18 39/19 43/15
 43/16 50/7 50/7 53/12
 53/14 53/17 54/10 54/12
 54/14 54/21 59/9 69/21
 72/16 76/10 76/24 79/11
 81/3 81/7 86/24 86/25 87/3
 88/11 92/5 92/9 92/12
 92/12 92/20 92/20
Ms. [9]  4/25 5/10 5/11 11/4
 34/21 35/25 36/9 36/14
 37/10
Ms. Clapp [1]  5/10
Ms. Pearson [6]  4/25 5/11
 34/21 36/9 36/14 37/10
Ms. Pearson's [1]  35/25
Ms. Peterson's [1]  11/4
Ms.Deborroughs [1]  11/18
much [11]  15/17 23/19
 27/6 35/13 35/23 44/10
 44/25 52/19 77/25 78/4
 91/1
mud [1]  7/9

my [66]  4/19 6/4 6/7 7/8
 8/12 8/13 9/5 9/20 9/24
 12/19 13/2 13/5 13/9 13/14
 15/3 16/25 17/7 17/8 17/24
 17/25 19/2 19/11 19/19
 20/5 24/22 25/10 26/23
 28/22 29/21 42/8 43/17
 44/5 44/13 47/2 49/4 49/15
 52/15 52/16 52/24 54/7
 55/13 55/13 55/16 56/1
 59/12 59/18 59/21 60/5
 62/6 62/21 63/2 63/22 66/5
 69/11 69/19 72/3 79/14
 84/14 85/18 86/21 89/18
 91/2 91/3 93/7 94/12 94/15
myself [3]  10/19 59/13
 92/17

**N**

name [11]  6/23 19/7 19/8
 19/14 28/22 28/24 38/1
 38/6 64/12 76/22 81/20
named [2]  46/17 47/2
names [2]  20/21 26/24
narrow [1]  15/20
NATHAN [3]  1/15 4/7
 43/24
national [1]  47/3
navigate [2]  11/7 44/14
near [2]  52/23 93/5
necessarily [4]  9/12 13/25
 56/5 60/3
necessary [2]  41/14 71/21
neck [1]  55/6
need [44]  2/17 3/3 3/18 6/9
 6/10 6/22 6/25 8/6 8/19 9/4
 9/6 11/2 12/1 13/23 14/5
 16/10 16/16 21/18 23/2
 23/17 25/22 32/13 35/15
 36/5 36/25 37/9 37/12
 37/14 38/1 39/5 40/9 44/6
 44/14 49/5 53/25 54/5 54/6
 57/23 60/7 61/19 61/20
 85/24 92/16 93/13
needs [5]  10/11 37/22 39/2

73/10 91/25
negative [3]  20/16 29/3
 49/23
neutrality [1]  56/4
never [9]  18/22 27/25 29/1
 53/3 57/2 64/17 79/18
 86/23 89/25
new [4]  54/13 66/10 91/13
 91/17
Newnan [1]  5/2
news [7]  11/25 35/16 47/13
 63/25 64/7 64/8 67/14
next [13]  8/23 27/7 40/21
 40/24 41/2 41/15 48/8
 48/15 58/17 58/20 58/23
 63/12 83/22
nightly [2]  47/4 63/25
no [57]  5/8 6/1 7/2 14/20
 15/9 18/2 22/17 23/13 24/1
 26/1 30/9 32/3 32/13 32/14
 34/25 35/9 36/11 36/21
 43/22 43/23 44/21 44/22
 45/15 46/14 47/14 52/17
 54/23 59/15 60/1 62/4
 65/12 66/2 66/16 68/23
 72/2 72/3 74/21 76/12
 76/16 77/8 77/19 77/22
 78/15 80/12 80/12 80/12
 80/12 83/13 83/20 84/9
 84/14 85/8 85/24 89/7
 92/11 92/14 92/25
nobody [1]  50/21
nodding [1]  31/7
nominate [1]  76/1
nominated [1]  13/12
nominee [1]  82/1
non [5]  12/3 28/9 32/19
 46/10 46/13
non-immunized [1]  12/3
non-partisan [1]  46/13
non-partition [1]  46/10
non-special [1]  32/19
normal [3]  33/5 38/24 52/3
normally [1]  51/19

**N**

not [181]
note [6]  18/15 32/22 32/24
 43/11 51/22 53/6
noted [1]  50/19
noteworthy [1]  38/11
nothing [12]  20/10 22/8
 23/2 26/11 27/11 27/15
 34/4 36/13 43/9 73/2 77/11
 92/8
notice [1]  81/11
Nova [2]  16/15 25/22
November [3]  7/20 49/2
 75/18
now [33]  8/8 9/11 12/24
 15/3 15/7 16/24 20/17 23/3
 25/8 31/7 34/16 39/1 40/16
 45/19 45/20 54/3 58/3
 60/24 61/13 61/18 62/1
 64/6 67/2 71/12 75/7 75/16
 76/6 77/4 77/20 81/10
 85/20 92/24 93/1
number [4]  1/6 38/2 38/6
 80/25
numerous [5]  7/21 64/7
 64/11 67/16 74/3
nuts [1]  40/17

**O**

o'clock [1]  2/4
oath [3]  28/24 58/11 58/12
object [8]  69/6 76/14 76/17
 76/17 77/11 77/15 77/16
 83/18
objected [1]  79/20
objection [14]  53/2 62/17
 68/23 69/11 76/12 77/6
 77/9 77/21 77/22 78/8
 79/19 83/15 84/19 85/22
objections [2]  77/3 93/17
obligation [1]  49/7
observation [1]  53/17
obstacles [1]  41/23
obtained [1]  69/25

occur [1]  41/5
occurred [1]  57/2
occurs [1]  63/1
October [6]  8/14 8/25 9/16
 52/11 66/2 66/2
of Charlie [1]  43/24
off [9]  8/18 10/21 57/11
 60/23 70/1 70/3 77/2 81/16
 91/12
offer [8]  22/19 22/24 69/3
 76/6 76/11 80/7 80/22 84/9
offered [3]  68/25 77/13
 77/25
offering [1]  7/24
office [66]  2/7 2/14 3/23
 3/25 3/25 4/4 4/8 7/7 7/17
 7/24 8/4 9/9 9/14 10/11
 11/6 11/9 18/3 18/6 20/23
 23/3 35/6 36/8 38/4 38/12
 39/10 40/12 41/7 41/13
 41/22 42/10 46/1 46/2 46/4
 47/22 48/19 52/25 55/7
 57/25 59/2 63/9 64/4 66/4
 66/10 66/14 66/16 67/9
 67/11 67/14 68/1 68/18
 72/9 73/25 74/7 77/13
 79/25 83/25 84/2 84/17
 89/12 90/8 91/6 91/9 91/12
 92/7 92/25 93/3
officer [2]  56/18 84/17
offices [5]  17/12 22/24
 50/20 52/3 56/6
official [4]  51/16 94/8
 94/15 94/23
officially [1]  84/20
officials [1]  91/10
often [2]  29/7 63/10
oh [5]  43/13 48/11 54/23
 63/24 76/5
okay [58]  4/13 4/21 5/6
 5/25 6/4 7/3 7/22 10/25
 15/10 18/14 21/18 23/4
 25/17 30/25 34/12 35/13
 36/14 36/23 44/4 45/14

47/6 50/2 52/7 54/20 54/25
 56/3 60/16 60/23 62/19
 64/2 65/18 69/2 69/23 70/6
 70/25 71/3 71/11 72/6
 72/12 72/19 73/9 76/9 77/7
 77/18 78/9 79/11 79/16
 80/6 80/10 83/19 84/3 86/9
 86/13 86/15 90/1 90/18
 92/4 92/9
old [2]  55/22 55/23
omit [1]  3/22
once [9]  15/24 18/23 37/1
 51/23 56/10 56/13 65/1
 73/4 74/5
one [55]  3/18 3/21 7/23
 10/4 13/11 14/21 14/22
 15/8 15/18 16/6 16/16 22/3
 24/6 24/6 27/21 29/16
 31/10 32/14 34/25 35/15
 38/5 38/10 39/14 39/22
 45/11 45/18 46/23 48/10
 48/22 49/17 49/18 51/17
 52/8 60/8 63/17 63/17 64/3
 64/5 65/12 65/20 66/14
 68/16 71/21 72/22 73/17
 75/24 76/13 79/21 83/13
 87/7 88/2 88/3 90/15 91/8
 91/10
ones [1]  81/9
only [30]  2/24 3/3 3/18
 5/20 6/11 14/17 15/8 20/6
 25/8 34/1 34/2 35/16 41/4
 45/1 48/5 48/6 48/11 49/18
 52/19 53/22 58/25 61/7
 66/7 67/15 67/25 73/19
 73/22 85/3 89/6 91/19
operate [1]  68/7
operates [1]  68/16
opined [1]  65/14
opinion [2]  83/4 83/6
opponent [11]  9/21 44/13
 46/3 46/16 47/1 48/24 49/1
 81/12 81/14 81/24 85/3
opposed [6]  5/13 25/24

**O**

opposed... [4]  58/1 68/1
80/1 83/12
opposition [1]  2/15
optics [3]  43/6 43/7 46/8
option [2]  31/18 50/5
order [4]  35/6 56/12 92/18
92/18
ordinary [2]  32/6 75/6
organization [1]  62/6
original [4]  34/14 60/8
82/17 86/3
originally [1]  43/14
other [40]  6/18 6/19 8/24
9/11 10/4 10/12 13/2 14/13
14/25 15/15 16/4 17/3 17/6
19/12 19/15 28/15 36/16
41/18 41/19 49/17 50/5
50/13 50/22 52/9 57/14
64/5 65/21 67/15 67/21
67/23 69/16 72/23 73/3
76/23 79/19 82/23 87/22
91/9 91/11 91/16
others [4]  40/2 43/7 53/9
77/4
otherwise [4]  26/15 49/4
85/11 85/14
ought [4]  8/9 53/20 84/5
90/12
our [27]  5/23 20/10 22/18
24/19 25/14 27/11 27/18
29/14 34/9 38/10 38/12
38/25 41/9 52/9 58/3 66/23
74/4 81/2 85/5 85/22 86/1
87/11 87/13 87/15 87/16
89/14 89/20
out [41]  2/24 5/23 6/21 7/6
13/8 14/9 24/2 26/8 26/21
33/2 37/2 37/2 38/13 40/17
41/1 41/11 50/1 50/13 55/2
55/8 55/20 60/11 60/12
61/4 61/17 65/24 65/25
66/1 66/4 70/12 72/15
72/21 73/22 75/16 81/4

84/1 84/3 84/7 86/9 92/5
93/17
outcome [8]  39/9 73/1 74/1
74/25 88/10 88/17 88/21
89/25
outlet [1]  35/16
outlets [1]  2/24
outlined [2]  27/18 29/12
outreach [1]  67/23
outside [1]  18/24
over [6]  4/14 37/5 38/19
63/13 75/15 80/8
overarching [1]  11/17
overlap [1]  39/17
own [4]  18/16 27/11 47/25
91/3

**P**

P-O-S-T [1]  51/3
p.m [1]  41/20
PAC [2]  70/6 70/8
pace [1]  50/6
PACK [1]  77/2
page [6]  5/15 51/8 59/10
79/4 81/19 91/3
page 7 [1]  5/15
pages [1]  94/10
pains [1]  35/7
painting [1]  49/20
paragraph [1]  44/5
parameters [1]  55/9
paraphrasing [2]  47/20
90/2
part [12]  5/20 24/9 30/3
49/12 54/10 58/4 60/4 60/5
65/25 76/24 80/5 84/17
participation [2]  11/22
14/18
particular [5]  15/21 35/15
49/17 63/5 63/12
particularly [5]  7/15 24/2
58/2 63/14 63/16
parties [5]  2/22 14/5 39/23
47/13 88/19
partisan [8]  42/12 46/13

50/19 50/20 88/12 88/12
88/14 88/15
partition [1]  46/10
parts [1]  2/19
party [9]  18/18 21/1 46/19
50/23 57/18 82/1 87/6 88/2
88/2
passed [3]  8/19 38/7 53/6
past [1]  11/19
patient [1]  29/19
Pause [1]  43/13
Payne [1]  91/4
Pearce [1]  50/7
PEARSON [27]  1/19 4/25
5/3 5/11 5/15 11/18 13/4
14/23 16/24 22/2 22/14
22/21 22/25 23/10 24/20
25/18 34/21 36/9 36/14
37/2 37/10 38/14 38/18
43/16 86/24 92/12 92/20
Pearson's [1]  35/25
pegged [1]  50/3
pending [1]  89/22
people [32]  3/10 13/11
15/9 16/17 19/24 20/25
21/4 23/24 26/9 26/20
27/23 29/14 30/15 30/16
33/24 36/3 38/20 40/9 41/4
46/20 48/10 59/1 61/7
61/14 63/11 63/19 63/24
64/16 66/22 67/6 67/18
93/16
per [1]  15/19
percent [1]  11/24
perception [1]  55/18
perfectly [3]  86/9 86/12
86/15
perhaps [3]  10/12 48/12
91/9
period [4]  69/21 75/8 78/5
80/13
periodic [1]  71/8
periodically [1]  69/20
permission [1]  68/21

# P

person [8]  3/21 18/22 28/24 29/1 32/11 49/1 67/15 76/2
person's [1]  19/2
personal [2]  43/3 43/10
perspective [7]  11/5 11/7 18/1 25/14 29/20 42/10 90/1
persuasive [1]  44/7
Peterson's [1]  11/4
phrase [5]  34/15 35/12 42/19 42/20 46/5
piece [2]  8/7 9/8
pivot [2]  4/14 39/1
place [5]  13/22 15/3 17/23 24/19 42/22
places [1]  26/25
plan [4]  15/22 16/5 92/25 93/13
planet [1]  61/7
planned [1]  15/18
Platt [1]  4/22
played [3]  13/8 61/4 84/17
plays [3]  6/21 8/4 56/18
pleading [6]  45/8 52/24 62/11 62/15 62/17 86/11
please [4]  12/4 51/6 58/23 85/19
pleased [1]  82/12
plug [1]  54/8
poignantly [1]  12/11
point [34]  5/23 6/2 10/10 10/24 12/2 12/17 15/22 16/20 17/13 21/2 21/5 22/2 24/22 24/23 25/2 29/16 34/13 34/14 34/19 48/9 48/22 49/6 50/18 54/8 55/1 55/2 64/23 65/10 74/4 80/4 81/12 81/16 85/5 86/7
pointed [4]  26/8 65/7 66/5 72/21
pointing [1]  12/6
points [2]  75/5 91/3

political [29]  19/15 44/13 45/22 45/22 46/2 46/4 46/16 47/1 48/24 49/1 49/9 50/5 50/22 50/23 52/2 53/7 57/18 57/25 58/4 71/23 85/3 87/4 87/20 87/21 87/23 88/1 88/2 88/19 88/19
politically [5]  47/19 65/12 65/13 71/24 87/5
politicization [5]  87/15 87/18 87/19 87/21 89/2
politicized [2]  28/1 28/3
politicizing [1]  87/20
pool [2]  3/12 3/19
portion [2]  5/18 74/8
position [2]  20/20 22/18
possible [2]  54/9 57/21
post [2]  50/23 51/3
postman [1]  18/12
posture [1]  49/6
potential [4]  4/14 13/15 14/25 58/19
potentially [1]  43/5
power [2]  26/10 54/8
powerful [2]  31/25 32/2
powers [1]  22/11
practical [2]  6/6 73/12
precedence [1]  29/6
precedent [3]  20/13 28/18 74/4
preceding [2]  45/20 59/10
preferable [1]  74/1
prepared [1]  66/23
preparing [1]  56/19
present [1]  70/17
presentation [6]  69/12 69/20 76/22 83/25 84/9 86/23
presented [1]  69/16
presenting [1]  56/19
preserve [1]  70/20
president [1]  91/8
press [9]  9/19 57/8 57/13

57/14 57/15 64/18 65/24 72/25 88/11
pressure [1]  40/14
presumably [1]  69/17
presumptive [1]  66/6
pretty [3]  31/25 42/16 76/21
previously [1]  60/10
primary [1]  22/5
prime [1]  93/20
print [1]  62/23
prior [2]  24/20 81/25
privilege [4]  11/12 13/2 15/23 31/19
privileges [1]  20/13
proactive [1]  24/25
probably [6]  6/24 9/4 11/13 68/10 69/10 92/22
problem [2]  75/5 81/14
problematic [3]  46/18 47/5 58/3
procedure [2]  14/9 30/1
proceeded [1]  65/20
proceeding [2]  45/12 56/18
proceedings [4]  2/1 12/20 12/21 94/11
process [10]  6/8 23/19 37/6 41/11 42/6 52/20 52/20 57/22 84/24 89/8
processed [1]  22/13
processes [2]  69/18 87/16
product [2]  8/15 28/12
professional [4]  21/6 27/14 29/11 71/4
proffer [3]  19/21 24/15 29/13
prohibited [1]  10/8
prominent [2]  87/6 88/4
proof [1]  61/25
proper [2]  34/8 91/14
properly [3]  16/22 26/16 32/5
proposed [1]  36/12
proposition [3]  56/4 78/21

**P**

proposition... [1] 79/14
prosecute [2] 45/13 46/6
prosecuted [1] 88/16
prosecuting [7] 43/1 45/18
51/9 68/20 82/14 82/25
84/13
prosecution [3] 43/5 56/15
88/17
prosecutor [9] 4/8 21/8
43/12 45/8 46/6 56/12
56/14 58/10 66/10
prosecutorial [1] 83/23
prosecutors [4] 4/4 20/3
56/5 71/9
protect [2] 22/25 27/22
protected [3] 12/1 24/16
24/16
protection [4] 13/3 16/22
22/12 84/24
protections [1] 84/25
protects [1] 27/20
prove [1] 58/3
provide [1] 22/12
provided [2] 12/18 84/1
providence [1] 77/10
province [1] 76/13
provision [3] 30/13 33/2
74/5
provisionally [2] 78/10
78/17
public [17] 9/20 10/4 27/10
36/4 38/13 43/22 43/23
43/24 46/9 49/4 49/22
55/18 62/13 63/5 68/11
71/18 86/21
publication [1] 70/21
publicity [7] 20/2 34/19
35/4 35/5 35/10 67/3 73/4
publicly [12] 6/2 7/9 8/16
10/2 57/9 63/3 63/7 64/13
72/10 72/24 78/4 80/17
publish [6] 59/7 60/18
60/20 62/9 69/4 93/13

published [3] 54/24 59/19
93/5
pull [1] 70/3
pulled [1] 70/1
pulling [1] 64/1
punch [2] 22/3 22/4
punished [1] 85/7
purported [1] 43/18
purpose [29] 1/5 1/10 2/3
12/16 14/10 24/11 24/12
27/21 32/14 32/19 33/18
33/18 34/20 34/25 35/10
43/4 47/24 48/1 48/5 48/11
48/14 48/25 65/9 77/25
88/7 88/24 88/24 91/20
93/3
purposes [3] 3/3 6/6 27/22
pursue [3] 6/17 14/13
74/12
pursuing [1] 46/13
purview [1] 8/12
push [1] 90/5
put [16] 6/19 16/18 20/18
21/9 22/10 27/10 59/18
63/22 71/1 71/3 74/18 81/4
84/4 89/20 92/22 93/7
puts [1] 23/25
putting [2] 19/9 36/3

**Q**

quarantine [1] 37/11
quarters [1] 42/8
quash [8] 2/9 2/16 26/15
26/18 27/8 34/2 40/2 87/1
quashal [6] 4/5 4/11 26/14
36/16 87/2 89/15
quashed [1] 17/20
quashing [3] 36/24 41/10
92/16
quasi [1] 56/6
question [28] 5/10 6/10 7/1
12/19 13/5 15/20 15/23
16/4 19/4 24/6 24/9 26/22
32/21 38/6 41/6 41/12 42/8
43/17 44/15 44/21 55/13

55/13 65/10 78/18 88/23
89/23 91/24 92/18
questioning [2] 26/22
73/14
questions [16] 4/5 11/20
11/24 12/25 13/17 15/11
15/13 16/1 17/16 23/14
24/14 24/21 27/3 28/21
36/12 74/19
quiet [2] 29/21 29/21
quietly [1] 64/6
quite [1] 57/12
quote [3] 56/7 67/17 71/4
quoted [1] 64/11

**R**

race [6] 7/17 21/3 21/4
50/4 64/4 81/13
races [3] 21/2 21/5 43/25
raise [3] 6/7 51/9 77/3
raised [11] 3/24 5/12 9/22
36/9 41/17 42/15 63/13
72/22 78/1 84/23 86/7
raiser [1] 81/25
raises [1] 5/15
raising [3] 10/5 81/18
81/23
rank [2] 38/2 38/6
rates [1] 66/23
rather [1] 3/12
re [31] 1/4 3/16 7/19 13/13
15/4 17/6 20/2 20/8 20/9
20/9 20/14 21/11 22/6
22/23 24/25 25/8 25/16
26/11 26/12 26/17 26/18
28/4 29/17 30/18 33/9
33/24 34/9 37/17 38/5
39/12 41/1
re going [1] 37/17
reach [3] 6/10 6/25 39/25
reached [4] 2/24 40/18
40/19 60/12
reaction [2] 11/17 49/19
reactive [1] 24/25
read [5] 31/1 33/14 33/15

**R**

read... [2]  71/13 84/10
reading [3]  33/13 55/16
71/12
ready [1]  8/20
real [1]  73/7
really [10]  3/3 3/9 21/13
37/23 41/12 45/21 64/21
67/3 73/2 73/6
reason [9]  24/7 24/9 29/5
40/25 69/14 78/3 83/20
85/12 89/3
reasons [1]  6/9
received [15]  2/16 5/16
5/20 5/24 18/5 50/8 55/2
58/12 58/17 58/24 61/1
64/11 64/14 84/21 85/10
receives [1]  71/7
receiving [1]  79/23
recipient [2]  31/13 79/22
recognize [4]  20/21 29/10
33/8 36/1
recognizes [1]  45/17
recollection [1]  79/14
recommend [3]  7/19 56/25
67/7
recommendation [2]  6/16
56/20
recommended [1]  90/5
record [9]  2/2 2/21 3/5
43/22 60/4 62/13 76/24
80/5 84/15
records [4]  30/5 43/20
43/23 63/4
recusal [3]  51/12 51/14
51/22
reduced [1]  39/8
reference [3]  47/20 51/8
84/25
referred [1]  74/6
referring [2]  11/14 79/10
refrain [1]  71/17
refused [1]  42/1
refusing [1]  31/20

regard [9]  10/9 13/24 32/3
58/8 66/11 68/17 69/1 80/6
89/13
regarding [2]  31/20 86/6
regardless [1]  8/7
regrets [1]  63/11
regular [3]  32/3 32/9 33/22
regularized [1]  37/8
regulations [1]  21/6
related [1]  91/10
relates [1]  71/20
release [4]  8/8 9/11 93/12
93/18
released [4]  9/2 93/6 93/14
93/15
releasing [1]  57/8
relevance [6]  50/4 77/11
77/15 77/23 79/21 79/24
relevant [5]  19/18 56/9
71/6 71/10 80/9
relief [4]  44/19 87/12 90/3
90/3
reluctant [1]  40/13
rely [4]  16/19 69/1 78/24
79/2
remarkable [1]  89/2
remarks [1]  49/12
remedial [3]  53/22 61/21
78/23
remedy [6]  45/5 47/10
52/10 73/10 87/13 89/13
remember [1]  18/20
reminded [1]  71/8
reminding [1]  71/11
remote [1]  14/24
repeat [2]  53/13 67/10
repeating [1]  92/17
replacement [1]  89/10
reply [1]  72/5
report [21]  3/9 6/15 7/18
7/25 8/5 8/8 8/20 9/11 9/12
49/4 66/1 67/7 67/10 80/7
90/21 92/23 93/4 93/14
93/19 93/20 94/9

reported [1]  7/21
reporter [12]  1/23 59/3
60/11 60/17 60/25 62/7
80/25 81/2 82/18 86/1 94/8
94/23
reporting [2]  61/17 94/15
reports [1]  9/1
represent [4]  45/11 49/24
59/14 60/24
representation [3]  60/9
69/24 78/2
representatives [1]  11/8
represented [2]  45/19 85/8
representing [3]  4/3 4/17
69/8
reptile [1]  55/9
republican [9]  18/18 21/1
87/6 88/4 88/4 88/8 88/9
88/15 89/5
republicans [1]  89/1
republish [1]  33/6
request [3]  29/15 60/5 69/4
requests [2]  36/16 53/3
require [3]  14/14 53/21
56/11
required [1]  83/12
requirement [1]  83/5
requirements [2]  53/16
82/24
requires [2]  43/1 74/5
requiring [2]  23/13 28/20
resign [1]  33/7
respond [2]  12/2 26/4
responded [1]  36/11
response [7]  2/17 5/22
55/21 72/16 72/16 83/1
84/22
responses [1]  3/23
responsibilities [1]  71/9
responsibility [2]  21/7
71/5
responsive [2]  24/24 42/23
rest [1]  38/2
result [3]  9/5 49/21 63/9

| R | S | script [2]  23/14 59/20 |
|---|---|---|

**R**

retains [1]  31/18
revelations [1]  58/1
reviewed [2]  83/1 83/1
reviewing [1]  76/17
revisit [1]  27/8
rewarded [1]  85/6
rich [1]  35/14
ridicule [1]  86/21
ridiculous [1]  19/10
right [37]  4/13 5/9 7/5 8/24
10/24 15/3 15/7 17/8 20/12
21/25 23/3 25/18 25/20
31/4 31/8 31/16 34/17 35/1
35/11 38/24 39/1 42/5
51/25 53/11 58/3 60/9
61/13 61/15 68/6 69/13
78/13 78/16 80/19 82/10
92/4 92/15 93/1
rights [8]  4/6 14/7 19/20
19/21 20/1 25/12 25/15
27/12
rise [1]  65/13
ROBERT [2]  1/11 68/19
role [5]  8/4 18/19 19/2
52/16 56/18
rolled [1]  33/2
room [2]  11/8 12/22
routine [4]  45/22 45/24
50/14 51/18
routinely [2]  82/22 83/8
rule [11]  2/23 3/1 3/2 3/3
3/5 3/9 3/10 3/14 33/9 33/9
71/19
rules [11]  10/7 21/7 21/8
28/15 29/11 30/7 32/7 71/4
71/5 83/24 84/1
ruling [3]  37/24 39/14 78/8
run [1]  81/16
running [1]  43/21
runoff [4]  72/9 81/18 82/3
83/2

**S**

said [19]  3/18 17/25 19/8
25/1 29/11 35/14 35/20
39/13 53/13 57/13 59/16
59/17 60/12 66/21 66/22
67/22 72/5 87/6 88/21
same [16]  9/16 13/22 33/14
37/2 39/20 45/9 50/1 50/8
50/9 50/23 51/4 60/17
60/25 74/15 85/11 87/9
satisfied [1]  85/16
saw [1]  45/8
say [35]  7/13 13/16 13/20
15/5 15/7 15/24 16/9 16/12
17/8 21/9 22/8 22/22 24/13
25/19 25/24 28/12 30/15
30/23 38/18 48/7 49/11
53/24 56/8 58/10 58/24
63/24 66/12 73/12 73/18
73/20 74/15 89/14 89/17
90/2 91/12
saying [20]  7/24 12/24
14/21 18/5 18/11 19/8
22/23 26/17 26/18 28/21
30/18 31/24 33/16 56/21
56/22 64/11 67/24 83/9
85/1 90/4
says [18]  7/18 12/12 26/8
26/8 28/19 30/2 30/8 30/16
30/17 30/21 30/24 32/10
33/25 34/2 34/5 48/13
62/25 86/23
scene [1]  43/16
Schafer [1]  20/24
Schaffer [1]  18/18
scheduled [2]  41/3 41/3
scheme [3]  11/23 14/19
17/10
scope [1]  22/23
Scotia [2]  16/15 25/22
screen [12]  54/8 54/11
54/22 54/24 59/16 59/18
61/13 62/21 71/1 71/4
77/20 85/19

**S** (continued)

script [2]  23/14 59/20
seal [1]  94/15
Sean [1]  20/22
seat [1]  42/6
second [5]  8/6 18/4 22/1
47/16 73/25
secrecy [2]  20/3 68/8
secret [1]  38/13
Secretary [1]  91/9
see [22]  5/1 8/19 19/17
23/15 35/17 37/17 41/2 48/7
54/21 60/7 62/23 62/25
63/20 66/19 70/19 73/17
76/25 78/17 79/1 84/5 90/8
93/22
seeing [1]  75/17
seeking [5]  2/7 15/7 78/23
90/2 90/3
seem [2]  38/25 87/8
seems [2]  84/5 88/25
seen [3]  49/9 59/7 60/2
seized [1]  17/13
selected [1]  75/2
self [1]  31/20
self-incrimination [1]
31/20
senate [1]  20/23
senator [67]  1/18 2/6 2/8
2/10 4/17 5/23 6/8 6/22 7/8
7/19 9/4 9/6 9/10 10/2 10/9
10/13 14/16 15/13 20/6
23/11 29/20 42/15 43/5
47/11 47/21 47/25 48/20
49/7 49/23 50/9 50/11 53/9
55/2 57/7 58/9 61/2 61/24
64/12 64/14 65/8 65/25
66/11 66/12 66/16 66/21
67/24 68/10 72/11 73/3
74/12 75/9 75/17 76/1
81/24 83/2 84/8 84/21
84/23 86/10 87/11 87/12
89/11 90/5 90/9 90/17
90/24 92/10
send [1]  24/11

**S**

sending [1] 90/10
sense [3] 16/24 45/15 46/13
sent [5] 51/22 51/23 53/8
63/12 91/12
sentence [4] 31/25 32/1
32/2 33/15
separate [1] 92/1
serial [2] 38/2 38/6
series [5] 47/7 58/2 66/3
66/4 72/24
serve [1] 26/16
session [3] 41/19 52/22
54/11
set [3] 27/9 49/18 55/3
setting [3] 6/25 28/16
69/14
shadowboxing [1] 65/18
Shaeffer [1] 87/5
shaking [1] 22/15
shame [1] 86/22
share [8] 17/4 40/16 42/10
53/13 54/11 54/12 79/6
85/20
shared [7] 8/16 11/25
54/12 54/14 60/10 82/12
87/4
she [37] 5/1 6/17 9/23 9/24
21/20 21/20 21/23 21/23
22/20 31/8 31/8 34/22
37/10 37/11 37/11 37/16
38/14 38/15 38/16 38/19
39/15 56/7 61/12 65/12
66/8 68/3 70/18 71/24
71/24 71/25 74/21 74/23
74/24 75/13 79/20 88/12
88/14
she's [1] 27/17
shifts [1] 81/22
shocked [1] 93/19
shore [1] 76/20
short [2] 30/16 73/9
shortly [3] 9/24 9/25 62/8
should [31] 3/25 5/17 6/17

10/10 17/19 19/24 20/15
21/9 21/13 21/16 25/5 27/4
27/9 28/19 34/4 40/18 45/1
50/21 50/22 51/22 61/8
61/21 69/14 71/16 85/17
86/23 88/8 89/10 89/19
90/7 90/23
shouldn [6] 13/16 17/20
24/8 24/13 25/9 26/24
shouldn't [2] 17/1 76/1
show [6] 17/20 21/14 63/11
77/13 85/11 88/11
showed [1] 80/10
showing [1] 56/11
shown [1] 76/15
shows [4] 52/4 63/7 77/16
77/23
shred [1] 82/20
side [9] 10/4 10/4 24/19
35/15 38/10 42/7 72/22
72/23 77/14
sign [2] 3/1 61/12
signature [1] 19/9
signed [4] 3/2 58/13 60/25
67/4
significant [1] .65/4
signing [1] 19/8
signs [1] 37/20
similarly [7] 18/11 18/14
19/12 39/15 39/16 39/20
85/10
simple [3] 42/8 55/12 74/9
simplify [1] 6/7
simply [3] 10/21 14/10
15/13
since [3] 14/2 42/7 43/25
single [3] 19/3 26/22 31/13
sir [7] 15/17 16/4 24/5 26/3
49/10 76/4 78/12
sit [7] 24/15 37/14 58/10
66/11 74/13 74/14 78/19
site [1] 77/2
situated [11] 13/21 17/25
18/11 18/15 18/16 18/23

19/12 39/16 39/16 39/20
85/10
situation [9] 11/16 16/18
19/1 19/3 22/7 39/20 45/16
51/15 90/6
six [3] 10/18 58/23 62/7
skill [1] 94/12
skip [1] 31/25
slammed [2] 58/14 67/3
slap [1] 59/15
slate [3] 61/1 89/18 91/24
slide [4] 58/17 58/20 58/23
60/23
slightly [1] 33/12
small [2] 62/25 63/14
smaller [1] 6/24
Smith [10] 68/19 68/25
69/12 69/16 76/22 82/11
82/13 82/21 83/21 86/4
Smith's [4] 76/22 83/6 84/9
86/22
snippets [2] 71/14 71/15
so [121]
social [1] 46/2
society [1] 58/3
sole [3] 11/21 13/9 22/5
solid [1] 74/10
some [37] 2/23 3/24 6/5
10/12 11/10 11/25 14/23
14/24 14/25 17/15 18/6
21/14 22/4 22/11 28/15
31/4 35/20 36/25 39/13
40/9 40/15 42/10 42/14
43/7 44/19 49/7 49/13
49/16 52/4 52/9 54/18
54/18 58/6 68/9 77/4 88/22
92/15
somebody [5] 63/25 64/20
75/23 75/25 76/2
somehow [5] 37/20 45/8
61/16 61/16 71/25
someone [21] 7/13 12/15
13/7 28/20 38/21 38/22
39/3 46/3 46/7 46/16 47/2

**S**

someone... [10] 57/14
57/17 65/11 71/24 74/7
77/1 82/6 82/21 85/4 88/20
someone's [2] 57/25 65/16
someones [1] 58/1
something [21] 6/23 8/9
12/1 12/18 19/9 21/20
21/23 28/17 28/23 37/21
49/22 54/3 54/12 65/6
67/11 70/24 73/10 73/21
73/22 73/24 91/25
Sometime [1] 82/4
sometimes [1] 16/16
somewhere [3] 12/18
74/11 93/5
soon [2] 52/18 84/3
sorry [4] 51/13 59/4 59/6
79/8
sort [4] 31/4 63/23 64/19
84/3
sought [2] 3/5 51/10
sounds [3] 14/21 18/15
19/10
source [7] 35/4 48/6 52/11
67/25 69/9 77/1 78/11
sourced [1] 70/23
sources [2] 67/17 77/12
sourcing [1] 76/21
sp [3] 61/4 79/24 91/4
speak [3] 17/2 21/20 27/5
speaking [2] 2/22 52/15
speaks [1] 12/11
special [40] 1/5 1/10 2/3
4/8 7/9 7/14 12/15 14/10
21/7 26/9 30/1 32/6 32/14
32/19 33/18 33/18 33/23
34/20 34/24 35/10 36/5
43/4 43/11 47/24 48/1 48/5
48/11 48/14 48/25 50/12
60/15 67/19 74/3 74/8 88/7
88/24 90/19 91/7 91/20
93/3
specific [1] 40/13

specifically [4] 12/12 21/9
30/6 39/4
speculating [1] 64/7
speculation [1] 64/18
speculative [1] 43/2
spelled [1] 12/7
spread [2] 37/2 41/1
squint [1] 62/25
stage [1] 15/5
stake [1] 88/16
stand [4] 25/18 25/20
51/12 78/21
standard [8] 45/3 45/4
51/13 51/14 55/19 55/20
56/4 85/12
Standards [2] 27/13 27/14
Standing [1] 15/3
start [8] 3/20 5/9 11/2 11/4
17/23 44/20 53/14 54/5
started [2] 42/17 59/21
state [32] 1/2 1/15 1/16
1/17 2/14 3/20 6/23 10/7
11/5 12/6 12/20 16/12 18/9
19/20 23/25 25/20 26/25
29/7 30/20 31/24 42/22
50/17 52/10 52/24 53/2
62/14 75/20 75/22 85/1
86/7 94/4 94/9
State's [5] 83/13 83/15
84/4 84/6 91/9
stated [1] 34/21
statement [3] 10/16 15/6
84/16
statements [1] 84/12
states [1] 37/5
statewide [1] 65/4
station [1] 47/13
status [8] 5/19 12/3 24/22
24/23 25/2 25/6 50/15
86/10
statute [8] 21/12 26/14
32/4 32/19 32/25 33/5 34/5
48/17
statutes [1] 30/11

statutory [2] 19/21 74/5
stay [1] 40/17
stays [1] 93/2
steps [5] 8/18 36/2 39/1
88/22 88/23
Steve [1] 38/18
stick [1] 13/9
still [18] 11/2 16/14 17/6
20/22 20/23 21/4 39/11
39/17 44/18 47/9 47/9
47/14 49/7 83/3 87/4 90/19
90/21 91/16
stood [1] 31/23
stop [2] 17/11 59/5
stories [2] 64/7 67/17
story [5] 60/18 60/20 62/8
64/10 81/4
streamline [1] 52/9
streamlined [2] 37/8 42/3
strikes [2] 9/7 46/18
striking [1] 45/21
strokes [1] 45/25
stronger [1] 56/11
subject [9] 7/9 7/12 7/13
19/22 20/16 51/11 56/14
83/18 91/23
submission [1] 69/7
submit [3] 57/2 63/9 80/9
submits [1] 3/14
submitting [1] 57/5
Subparagraph [1] 30/2
subpoena [22] 5/20 12/15
26/9 26/16 26/17 30/4 30/7
30/15 30/23 30/24 31/14
32/5 32/15 32/22 33/1 48/1
48/16 48/17 48/20 55/3
66/22 68/15
subpoenas [8] 5/16 32/25
33/4 33/25 36/24 40/2 48/6
92/17
substantial [1] 71/18
substituting [1] 77/1
such [3] 19/22 23/1 52/23
suddenly [3] 9/13 58/14

**S**

suddenly... [1] 93/11
sufficient [7] 22/12 22/25
26/20 66/9 78/22 87/13
90/22
suggest [3] 35/14 61/7 74/4
suggested [1] 23/9
suggesting [3] 24/1 33/21
83/6
suggestion [1] 91/2
suggests [1] 43/9
summer [1] 52/11
SUPERIOR [4] 1/1 1/24
51/17 94/25
supervised [2] 8/1 92/1
supervisory [3] 26/15 34/6
52/16
support [8] 43/24 45/22
46/1 48/24 49/21 57/17
65/11 71/24
supportings [1] 49/1
suppose [1] 79/24
supposed [5] 29/3 32/25
37/1 66/19 68/7
Supposition [1] 67/12
suppress [1] 26/12
suppressed [1] 33/23
Supreme [6] 16/15 20/12
27/20 33/16 55/20 56/21
sure [16] 2/21 12/2 12/10
15/25 51/7 54/21 57/12
62/14 69/5 79/23 80/23
80/24 81/1 86/1 93/11
93/15
surprise [3] 9/1 50/21 66/2
surprised [1] 20/15
surprises [2] 52/11 65/12
suspect [2] 37/7 75/21
sway [1] 72/25
swaying [1] 65/3
switch [1] 9/14
switched [1] 43/25
system [4] 29/6 29/7 29/8
52/6

**T**

table [2] 77/14 85/18
taints [1] 89/12
take [19] 31/24 33/11
33/17 37/6 39/5 40/14
53/21 59/9 60/3 61/21
69/11 70/25 76/9 76/19
78/22 80/8 80/10 85/19
94/9
taken [6] 16/25 35/7 35/19
47/18 49/7 88/3
taking [3] 8/18 41/16 81/10
talk [22] 6/4 9/1 22/1 23/11
29/13 34/18 40/22 40/23
42/2 42/5 43/15 47/12
53/20 66/13 66/22 68/2
68/9 68/10 68/12 72/19
75/9 76/25
talked [5] 11/14 19/16 24/3
34/23 67/14
talking [17] 27/16 35/17
40/20 47/4 50/17 57/15
64/21 64/24 65/2 65/3 72/9
72/10 81/22 87/22 87/25
88/1 88/1
tall [1] 30/15
targed [1] 60/13
target [69] 5/17 5/24 7/11
7/15 9/3 9/25 10/3 10/4
10/17 10/18 11/25 12/13
12/19 12/23 13/5 18/5
18/13 21/9 24/7 25/9 28/16
30/18 30/19 30/22 31/22
32/10 32/15 32/16 32/18
43/11 44/13 46/17 47/2
49/13 49/25 51/10 53/8
57/8 57/10 57/14 58/12
58/18 58/20 58/21 58/24
59/1 61/1 63/2 64/5 64/6
64/8 64/12 64/14 64/17
65/19 66/15 66/24 67/5
67/16 67/23 68/12 68/14
72/2 72/4 72/11 72/23 80/4
84/21 86/10

targets [7] 18/2 27/17 29/9
30/7 30/21 30/24 58/16
tasked [2] 6/15 75/17
team [5] 17/2 17/5 23/16
48/13 92/10
technically [2] 33/4 48/3
tell [6] 3/14 3/19 15/7
15/14 17/18 28/22
temperature [1] 12/21
tendered [5] 76/18 77/4
77/9 77/21 82/19
term [1] 55/10
terms [4] 17/3 25/15 50/5
90/12
testifies [1] 39/7
testify [3] 23/1 29/10 31/20
testimony [5] 23/20 23/24
39/8 39/9 55/4
than [24] 3/12 3/21 6/20
8/24 9/12 16/6 28/1 28/15
30/20 30/23 39/2 41/18
42/4 43/7 49/17 57/14
61/10 67/21 75/14 79/19
81/20 87/12 87/22 90/3
thank [18] 4/13 13/19
36/14 36/23 42/18 43/13
44/8 51/7 60/7 70/15 76/4
76/5 76/10 82/19 91/1 92/4
92/8 92/14
Thanks [1] 86/5
that [666]
that's [31] 5/21 7/6 7/21
8/3 8/17 11/25 36/2 38/15
40/10 41/14 44/14 51/18
52/5 53/6 54/1 57/15 61/23
62/11 65/4 68/4 68/5 69/10
79/9 79/14 82/24 88/23
89/6 90/22 91/10 92/1 92/3
their [48] 5/17 9/15 10/1
10/16 11/21 11/22 13/5
15/22 19/20 19/20 19/21
20/1 20/13 20/21 24/20
26/24 27/7 27/11 27/12
28/21 35/1 42/10 47/14

T

their... [25]  47/25 48/2
48/7 52/19 55/21 58/14
58/19 63/11 64/12 64/15
64/20 64/23 67/7 68/18
69/17 71/9 72/5 83/11
86/10 87/19 87/20 87/20
87/21 93/9 93/11
them [36]  2/11 2/16 13/7
13/23 13/24 14/13 14/21
14/24 14/24 14/25 18/5
20/12 21/13 22/7 24/12
25/1 26/21 26/23 27/8 27/9
27/17 29/9 29/13 33/6 33/7
34/2 34/10 36/7 37/15
41/10 41/10 42/2 67/5
80/25 83/21 93/20
then [59]  2/8 4/24 8/21
9/25 10/8 10/17 10/18 13/7
14/4 15/9 16/10 16/14
16/19 17/9 17/11 18/20
22/10 23/5 23/15 23/17
23/22 25/4 26/20 27/8 29/6
29/8 33/8 33/22 34/2 35/3
38/2 40/21 44/17 49/13
49/22 50/12 52/4 54/1
55/18 56/23 58/12 60/1
62/1 62/7 62/8 62/17 65/19
66/23 66/24 67/1 67/5
75/20 76/20 76/22 78/9
78/17 90/4 91/11 93/19
then I [1]  40/21
theorized [1]  79/24
theory [3]  57/24 71/20
72/14
there [102]
there's [16]  21/20 27/19
43/8 55/18 60/1 62/8 66/2
66/3 74/5 74/21 76/12
77/11 85/24 89/3 90/23
91/11
thereafter [1]  9/24
these [28]  3/24 5/16 15/9
15/20 17/3 19/7 19/12

20/25 20/25 21/2 21/4 21/5
23/14 24/14 26/19 26/24
30/7 38/23 39/5 40/2 45/10
52/1 58/10 61/12 66/22
66/25 72/24 83/9
theses [1]  23/10
they [143]
they'll [3]  25/20 52/20
59/18
they're [6]  29/2 35/20 67/6
67/6 77/4 86/20
thing [9]  15/8 29/22 34/1
38/10 38/11 38/15 52/8
64/19 65/5
things [18]  3/5 6/19 7/22
10/6 17/23 17/24 35/20
41/23 42/3 45/10 46/21
52/2 68/17 86/22 88/1
92/15 93/10 93/21
think [91]  2/9 2/13 7/4 7/5
8/9 10/22 10/23 10/24 11/2
12/19 12/25 13/6 14/1
16/11 16/23 17/18 17/22
19/3 19/11 19/21 21/2 21/5
21/24 23/19 23/23 23/24
23/25 25/5 25/15 26/19
26/21 27/19 27/24 28/15
29/4 29/5 31/6 34/8 35/4
35/14 35/18 36/3 36/18
37/19 38/8 39/2 40/1 41/14
42/7 42/9 42/12 42/13
42/14 42/19 43/6 44/23
45/2 46/20 48/3 49/6 50/18
50/23 51/12 52/9 55/14
55/15 55/16 57/13 68/24
69/1 71/5 73/12 77/15
77/23 78/7 78/7 79/21
79/22 81/22 84/7 85/15
86/16 86/18 87/24 88/14
89/8 89/10 89/11 90/12
90/14 92/4
thinking [8]  24/17 25/25
45/10 46/6 46/8 48/10
56/23 56/24

third [3]  33/13 35/12 88/5
this [198]
those [20]  2/13 6/18 6/24
10/6 12/3 12/25 13/17
14/17 16/17 38/25 48/5
50/20 56/5 58/4 58/9 63/19
65/1 71/5 88/23 93/17
though [5]  2/23 16/3 49/6
51/23 73/22
thought [7]  6/4 6/7 10/22
46/6 59/16 80/10 90/4
thoughts [1]  81/7
threats [1]  20/8
three [8]  34/16 42/7 53/11
60/17 60/24 61/14 63/1
64/5
through [23]  2/5 6/24 7/9
8/23 9/2 11/11 12/4 13/6
16/10 23/2 25/5 39/13 40/9
41/4 42/4 42/15 46/24
48/16 48/17 60/21 61/20
61/23 65/17
thrown [1]  42/12
thrust [1]  85/6
Thursday [1]  41/3
ticket [1]  22/3
tie [1]  9/13
tied [2]  37/20 78/18
tilted [1]  66/5
time [25]  8/15 10/2 14/4
18/12 25/1 26/11 27/9
35/12 40/7 45/18 48/12
50/1 50/9 51/17 64/8 69/3
69/21 75/8 81/15 84/8
84/20 88/10 89/24 93/12
93/23
timeline [9]  49/14 49/16
49/17 49/19 49/20 52/17
52/17 53/7 53/10
timelines [2]  8/13 36/25
times [3]  7/21 27/2 34/16
timing [3]  8/8 9/12 92/23
tired [1]  35/5
title [5]  18/17 33/1 33/3

**T**

title... [2]  44/11 46/1
to be [1]  35/21
today [9]  2/11 2/19 2/24
3/1 8/6 8/10 54/19 68/25
88/18
told [5]  14/11 27/1 58/15
58/20 63/10
tomorrow [2]  40/19 40/22
too [8]  27/6 37/11 40/13
40/13 51/22 69/13 76/10
85/13
took [2]  24/19 88/22
topic [4]  14/17 17/12 19/4
19/18
topics [1]  13/9
totally [1]  91/5
touch [1]  15/18
towards [1]  66/5
training [3]  68/18 70/18
71/8
trains [1]  83/21
transactions [2]  64/24
64/25
transcribed [1]  94/12
transcript [3]  1/10 94/11
94/13
transparent [2]  24/18
50/16
treated [2]  85/9 86/14
treatment [2]  56/9 85/11
trial [2]  15/5 57/1
trials [1]  61/24
tribulations [1]  61/24
tried [2]  20/17 33/22
trouble [1]  14/24
true [8]  6/20 18/25 31/21
44/9 53/19 69/10 70/22
94/11
truly [1]  71/15
Trust [1]  29/24
try [3]  29/9 35/7 53/25
trying [11]  24/17 44/1 46/9
46/12 47/25 55/8 57/25

86/20 88/16 89/14 93/20
Tuesday [3]  41/4 41/5 41/6
tunnel [1]  93/10
two [22]  2/13 4/23 5/7 10/1
10/6 10/17 18/10 24/6 24/9
39/15 39/23 41/4 59/1 61/7
64/15 71/22 72/4 75/13
80/8 88/19 91/7 91/20
two-part [1]  24/9
type [2]  15/11 22/19

**U**

ultimately [4]  8/4 73/3
80/25 83/16
unable [1]  52/12
undecipherable [1]  83/7
under [38]  10/7 12/12 14/3
14/3 19/5 19/7 20/12 21/11
26/14 26/19 26/24 27/13
27/14 28/24 30/2 30/13
32/4 32/7 32/25 33/1 33/2
33/3 33/5 33/5 34/5 34/5
40/1 40/14 42/25 47/15
48/2 48/17 58/11 58/11
64/20 68/16 86/19 89/19
undermine [3]  56/15 66/20
74/17
undermined [1]  56/22
understand [13]  13/19
15/19 24/17 40/6 40/12
49/3 49/5 61/6 65/15 70/22
72/20 81/21 84/6
understanding [5]  8/10
8/25 17/24 52/15 69/19
undisclosed [2]  40/20
40/21
undoubtedly [1]  14/2
unethical [1]  29/10
unfolds [1]  52/20
uniform [1]  88/3
unintelligible [7]  17/15
17/21 33/15 51/24 68/15
83/22 86/19
universe [2]  61/14 61/17
unless [3]  15/8 21/10 61/25

unlikely [1]  52/14
unplug [1]  73/14
unprotected [1]  38/8
unremarkable [1]  88/25
unsolicited [1]  59/3
until [11]  8/18 41/5 52/4
52/25 64/14 70/21 72/4
76/24 81/3 82/18 93/6
unwelcomed [1]  61/18
up [33]  12/22 12/22 14/11
14/23 16/12 16/21 17/20
20/11 21/20 25/16 25/19
25/20 26/10 27/23 31/23
35/5 36/2 41/3 41/24 42/1
42/6 52/22 53/7 63/11 76/8
76/9 76/20 77/20 78/11
78/18 85/13 86/3 86/21
upon [4]  17/13 19/19 23/21
59/16
upside [1]  52/5
us [11]  5/8 16/15 26/17
27/1 29/13 57/23 61/5
66/13 71/1 72/20 74/19
use [10]  3/1 17/3 20/2 28/5
32/15 39/24 42/20 46/5
55/10 55/11
used [5]  22/8 32/18 32/20
33/19 42/19
useful [1]  66/17
uses [1]  18/7
using [3]  28/4 44/10 46/1
utterly [1]  88/25

**V**

valid [1]  42/14
various [1]  19/17
ve [14]  5/3 16/23 16/25
17/9 18/22 20/17 25/7
27/18 27/25 36/21 37/18
40/8 45/16 47/2
vehemently [1]  22/17
verify [1]  69/7
verses [2]  54/5 55/14
very [20]  12/11 14/22
18/16 18/19 18/19 29/7

**V**

very... [14]  32/2 37/19
38/11 40/3 40/3 44/7 44/9
53/15 61/6 79/6 81/9 81/17
85/18 86/6
victim [1]  45/19
view [5]  20/10 27/11 73/10
87/11 87/13
views [2]  28/6 28/8
violate [1]  68/15
violated [1]  84/2
violator [1]  66/6
virtual [1]  5/3
virtually [2]  5/1 37/12
vis [2]  17/14 17/14
vis-a-vis [1]  17/14
vision [1]  23/6
voluntary [2]  24/21 55/9
votes [1]  91/10
voting [1]  6/14

**W**

WADE [17]  1/15 4/7 4/10
11/16 15/16 16/21 17/2
17/4 21/25 22/15 43/12
43/20 43/25 45/25 50/15
61/13 92/6
Wade's [1]  43/18
wait [1]  24/13
waived [1]  5/17
WAKEFORD [8]  1/16 4/9
4/10 11/16 16/20 21/25
30/25 92/6
walk [3]  14/11 38/23 38/24
walked [1]  36/2
want [43]  2/20 3/11 3/15
3/22 4/18 5/9 11/4 13/3
13/6 22/4 22/14 22/16
22/23 23/15 25/19 28/23
34/3 34/18 37/15 37/25
39/24 39/24 40/16 42/9
44/24 44/25 47/13 47/16
48/4 48/10 50/18 53/12
55/5 70/15 71/1 77/3 78/13

78/20 80/24 82/2 89/3 90/4
92/23
wanted [7]  10/21 22/23
35/11 67/2 67/3 85/12
86/25
wants [4]  6/19 21/20 45/25
68/3
was [140]
wasn [4]  24/1 24/24 25/6
28/18
wasn't [3]  51/24 64/13
71/21
watch [1]  47/13
waterfront [1]  17/13
way [18]  6/21 8/16 18/14
22/12 22/13 23/13 31/24
34/6 37/25 47/11 49/19
60/9 69/15 74/21 79/2 87/7
89/6 93/1
ways [2]  35/9 47/8
we [198]
we'd [2]  54/8 60/20
we'll [5]  2/11 54/1 60/23
78/17 93/22
we're [20]  26/17 53/5 60/6
61/23 64/21 65/3 66/12
72/9 72/10 73/7 77/1 81/1
81/4 81/10 81/22 83/3
87/25 87/25 88/1 92/15
we've [7]  2/20 25/7 25/8
34/15 36/7 66/23 92/5
wearing [1]  38/24
website [4]  63/6 63/20 70/7
70/9
week [7]  27/8 40/21 40/24
41/2 41/15 82/7 83/23
weeks [7]  10/17 41/1 53/11
63/1 63/21 64/5 75/13
welcome [1]  3/6
welfare [1]  41/18
well [34]  4/9 5/22 7/11
7/13 7/18 16/9 20/20 21/19
23/23 25/3 29/2 35/13
38/17 40/15 40/22 41/14

41/14 41/25 42/3 46/21
47/24 51/18 59/14 60/15
66/12 74/2 79/6 86/2 89/8
92/21 92/25 93/7 93/9
93/13
went [4]  50/1 50/13 51/24
88/18
were [42]  2/23 2/25 7/23
9/13 11/3 18/1 18/1 19/2
24/21 25/2 29/5 32/25 33/3
33/4 33/21 35/2 38/15 42/4
43/14 45/8 45/10 46/5 50/8
53/22 55/8 56/23 56/24
58/4 58/5 58/15 59/2 63/21
64/6 64/16 64/25 65/2 66/8
75/8 87/19 89/20 89/21
89/24
weren't [1]  89/2
what [115]
what's [8]  8/20 19/14
62/16 77/24 87/7 87/21
89/2 90/11
whatever [5]  13/3 18/9
37/25 52/17 90/10
whatnot [1]  18/21
whatsoever [1]  34/7
wheel [1]  63/25
when [30]  2/16 9/1 10/1
16/18 35/7 36/1 39/4 39/25
40/7 40/23 41/21 43/21
51/21 52/2 52/12 52/22
53/4 53/5 53/5 55/17 66/18
66/21 67/7 68/8 72/4 79/6
81/1 82/3 84/8 93/15
whenever [1]  49/2
where [31]  14/9 14/17 15/5
16/1 16/16 17/7 19/16
27/25 28/16 37/18 45/10
46/6 46/15 48/7 51/15
55/15 58/19 61/4 61/6
62/24 64/10 64/24 67/1
67/1 69/9 69/25 72/21
76/13 88/17 88/23 91/5
wherever [1]  37/15

## W

whether [13]  5/11 6/17 10/21 12/23 20/14 33/24 56/9 57/4 57/7 66/20 70/21 73/2 74/16

which [29]  2/18 5/12 9/12 16/25 19/19 20/12 30/13 31/13 32/4 32/13 32/14 32/25 34/14 34/23 48/20 48/20 56/18 57/2 59/15 61/20 62/10 63/4 68/8 72/21 83/23 86/8 87/22 89/25 90/5

while [11]  3/5 21/2 21/3 30/2 39/5 43/6 44/24 47/2 55/10 65/1 78/6

who [62]  2/21 2/21 3/14 3/20 3/24 5/16 7/14 9/13 12/24 13/11 16/12 18/20 19/2 19/9 20/18 27/23 31/10 32/11 33/17 33/19 34/22 35/17 36/5 38/23 39/4 40/20 41/21 45/20 46/14 48/9 48/13 50/16 51/9 57/13 58/13 60/25 61/8 62/1 63/19 63/25 64/1 64/20 65/20 66/11 67/4 67/18 67/22 68/1 68/19 71/22 74/11 75/3 75/23 76/2 80/3 82/13 82/21 83/8 83/9 88/20 88/20 91/13

who's [1]  80/3

whole [11]  29/22 44/5 49/12 61/10 66/3 66/3 73/25 75/20 80/11 85/5 85/5

whom [2]  65/11 71/24

whose [1]  22/5

why [16]  13/16 15/13 17/18 24/10 25/4 25/9 27/15 27/18 27/19 28/2 39/19 40/25 42/1 42/13 73/6 76/19

Wilis [1]  64/10

will [42]  2/18 2/21 3/20 7/20 8/10 11/12 14/14 16/20 17/4 21/20 21/24 28/14 35/16 36/23 36/24 37/7 37/7 37/9 38/1 38/2 39/6 40/7 40/18 49/11 52/24 53/4 53/5 53/5 57/2 58/24 60/24 72/15 76/19 76/20 78/16 78/17 81/1 89/6 92/17 92/19 93/5 93/11

willing [2]  10/15 58/9

willingness [1]  74/15

Willis [6]  44/11 62/23 69/21 75/14 76/3 81/17

Willis' [1]  84/2

win [1]  57/1

wise [2]  2/23 41/14

withdraw [1]  85/22

within [3]  8/12 47/10 50/23

without [5]  12/13 35/10 35/23 77/10 91/19

witness [34]  11/9 11/10 14/10 15/18 15/21 15/22 17/5 23/17 24/8 24/10 25/24 28/12 30/18 30/20 30/23 31/21 32/16 32/20 34/21 37/10 39/7 39/14 39/15 39/22 39/23 40/8 40/10 40/20 40/23 51/11 55/7 68/1 80/1 94/15

witness's [1]  14/18

witnesses [28]  3/24 4/14 5/16 12/24 14/3 16/12 18/1 19/12 23/20 27/2 30/4 30/16 30/17 30/24 34/24 35/1 35/18 35/22 37/9 37/25 38/13 39/6 40/3 40/7 58/14 67/4 68/9 68/10

won [5]  28/24 40/24 73/6 88/11 88/20

won't [13]  53/1 54/23 54/24 55/5 55/10 55/11 59/18 59/19 60/3 60/18

71/3 76/24 83/24

wondering [2]  20/17 70/10

word [10]  12/19 18/7 28/4 28/5 28/16 32/16 32/18 32/19 42/12 61/17

words [3]  13/2 36/17 41/19

work [29]  2/5 6/23 8/14 8/15 8/22 9/2 9/15 11/11 11/20 12/4 14/1 14/9 16/10 23/2 29/7 34/20 37/12 37/13 39/12 40/10 41/11 42/4 52/23 55/8 61/20 68/5 81/4 84/7 93/11

working [4]  17/4 46/24 50/16 61/23

world [1]  59/1

worry [2]  8/24 59/17

would [76]  3/8 3/10 6/11 6/13 6/15 7/25 8/8 9/1 9/9 9/18 10/13 10/13 11/16 11/20 12/2 12/5 13/20 14/1 14/4 14/8 15/16 16/10 19/4 19/22 22/7 22/19 23/7 23/9 23/10 23/13 23/14 23/22 26/22 29/4 29/12 31/8 31/13 32/10 33/11 36/1 37/20 37/21 40/14 41/9 43/3 45/24 48/14 48/25 49/23 51/12 53/21 57/23 61/8 66/13 66/15 66/17 69/3 69/21 70/17 70/18 70/20 71/13 72/1 72/15 73/17 73/20 74/13 74/14 74/14 75/5 87/10 89/1 89/9 89/17 89/19 90/21

would be [1]  6/13

wouldn [6]  8/25 22/24 29/1 29/4 39/1 48/4

wrap [1]  52/22

write [2]  61/11 67/9

writing [3]  22/10 92/16 93/7

written [2]  2/17 92/18

wrong [5]  18/17 20/11

**W**

wrong... [3]  27/11 27/15
48/17

**Y**

Yahoo [5]  64/8 67/14
67/22 70/13 70/14
year [1]  8/23
years [1]  17/9
yes [35]  4/12 5/14 10/20
12/5 12/9 15/17 15/24 16/4
18/8 24/5 26/3 31/15 32/17
45/2 45/10 49/10 50/10
57/19 59/12 60/14 62/2
70/5 72/18 72/20 76/14
78/12 79/17 79/17 80/18
80/21 81/6 82/16 83/17
85/21 89/23
Yes,sir [1]  16/8
yesterday [7]  11/15 15/18
17/5 19/1 23/8 24/4 34/22
yet [4]  8/24 9/5 17/2 29/18
you [284]
You'll [1]  81/11
you're [19]  3/5 27/24 40/16
40/19 40/23 54/11 54/12
57/11 60/21 68/7 79/1 79/9
81/3 85/2 85/2 85/3 85/8
85/9 89/4
you've [6]  3/6 29/19 61/25
80/4 84/14 87/4
Young [6]  55/20 55/22
55/23 56/7 57/3 78/19
your [161]

**Z**

zeal [1]  59/13
zealous [1]  59/14
zoom [2]  54/10 60/22

# **Exhibit 13**

August 25, 2022 Order Denying Motion to
Reconsider Disqualification Request, In re 2
May 2022 Special Purpose Grand Jury, Case
No. 2022-EX-000024 (Fulton Co. Sup.
Court).



IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

IN RE 2 MAY 2022 SPECIAL PURPOSE
GRAND JURY

2022-EX-000024

### ORDER DENYING MOTION TO RECONSIDER
### DISQUALIFICATION REQUEST

On 25 July 2022, the undersigned entered an Order disqualifying the District Attorney of Fulton County and her Office from investigating State Senator Burt Jones as part of the special purpose grand jury's investigation into possible criminal interference in the November 2020 general election in Georgia. The Court disqualified the District Attorney and her Office from investigating Senator Jones for good reason: her obvious and irreconcilable conflict of interest created by her decision to "pledge[] her name, likeness, and office" in support of Senator Jones's opponent in the upcoming election for Lieutenant Governor. Order of 25 July 2022 at 3.

In that same Order, the Court denied the motion to disqualify the District Attorney and her Office from investigating eleven other "alternate" electors who, like Senator Jones, had offered themselves up as potential electoral college votes for former President Trump even after he lost the Georgia popular tally by over 10,000 votes. These eleven, despite their disparate backgrounds, divergent roles in post-election activities, and fundamentally different postures in the District Attorney's investigation, remain a legal bloc represented by the same attorneys. Those attorneys, in a 16 August 2022 filing, are asking the Court to reconsider its ruling denying their motion to disqualify. Having

1

reviewed the record as well as the eleven alternate electors' recent motion, the Court re-affirms its position and DENIES the motion to reconsider.[1]

The eleven alternate electors, despite their assertions to the contrary, are not similarly situated with Senator Jones. None is locked in a high-profile statewide political campaign against someone whom the District Attorney has personally and professionally endorsed.[2] Indeed, these alternate electors have provided no evidence that the District Attorney (or any member of her staff) has done anything that suggests a possible political motivation for investigating *them* -- beyond the banal observation that they are active Republicans and the District Attorney is not.[3] Plainly that is not enough. Nor is it sufficient to point out that these alternate electors have all donated to Senator Jones's campaign for Lieutenant Governor (and the District Attorney has not). Their legal campaign donations are no more disqualifying that the District Attorney's. *See, e.g., Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 884 (2009) ("Not every campaign contribution by a litigant or attorney creates a probability of bias that requires ... recusal."); *Gude v. State*, 289 Ga. 46, 50 (2011) (same) (both cases involve judicial recusals, where disqualification rules are more stringent).

---

[1] The Court also declines to provide a certificate of immediate review.

[2] Alternate elector Shawn Still is running for a State Senate seat. His contest is local and relatively low profile. More important, unlike Senator Jones, candidate Still offers no evidence that the District Attorney has supported his opponent in any manner (other than the bald claim that the District Attorney's pursuit of the election interference investigation is designed to harm him and aid his opponent). Thus, apart from the different political affiliations of the District Attorney and candidate Still, there is nothing to suggest any political link to the District Attorney's investigation into Still's activities as an alternate elector.

[3] Remarkably, counsel for the eleven alternate electors cites as proof of the District Attorney's bias "her targeting of only Republicans." Mot. at 10. It eludes the undersigned how an investigation into allegations of *Republican* interference in the 2020 general election in Georgia would have any other list of targets than Republicans.

2

IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

FILED IN OFFICE

JUL 11 2022

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

IN RE:                                    )
SPECIAL PURPOSE GRAND JURY                )      2022-EX-000024
                                          )
                                          )      Judge Robert C. I. McBurney
                                          )
                                          )

## CERTIFICATE OF MATERIAL WITNESS PURSUANT TO UNIFORM ACT TO SECURE THE ATTENDANCE OF WITNESSES FROM WITHOUT THE STATE, CODIFIED IN THE STATE OF GEORGIA AS O.C.G.A. § 24-13-90 ET SEQ.

Upon the petition of Fani T. Willis, District Attorney, Atlanta Judicial Circuit, pursuant to the Uniform Act to Secure the Attendance of Witnesses from Without the State, codified at O.C.G.A. § 24-13-90 et seq., the Court issues the following Certificate under seal of this Court, and further says as follows:

1. A Special Purpose Grand Jury investigation commenced in Fulton County, Georgia, by order of this Court on May 2, 2022. *See* Order Impaneling Special Purpose Grand Jury Pursuant to O.C.G.A. § 15-12-100, et seq., **"Exhibit A"**. The Special Purpose Grand Jury is authorized to investigate any and all facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia. *See* Letter Requesting Special Purpose Grand Jury, **"Exhibit B"**.

2. Based on the representations made by the State in the attached "Petition for Certification of Need for Testimony Before Special Purpose Grand Jury Pursuant to O.C.G.A. § 24-13-90 et seq.", the Court finds that Lindsey Olin Graham, born July 9,

Campaign, and other known and unknown individuals involved in the multi-state, coordinated efforts to influence the results of the November 2020 election in Georgia and elsewhere. Finally, the Witness's anticipated testimony is essential in that it is likely to reveal additional sources of information regarding the subject of this investigation.

5. The testimony of the Witness will not be cumulative of any other evidence in this matter.

6. The Witness will be required to be in attendance and testify before the Special Purpose Grand Jury on August 2, 2022, and continuing through and until the conclusion of the Witness's testimony on or before August 31, 2022, at the Superior Court of Fulton County, Fulton County Courthouse, 136 Pryor Street, 3rd Floor, Atlanta, Georgia 30303.

7. The Office of the Fulton County District Attorney, in and for the State of Georgia, will pay all reasonable and necessary travel expenses and witness fees required to secure the Witness's attendance and testimony, in accordance with O.C.G.A. §24-13-90 et seq.

8. The Witness shall be given protection from arrest and from service of civil or criminal process, both within this State and in any other state through which the Witness may be required to pass in the ordinary course of travel, for any matters which arose before the Witness's entrance into this State and other states, while traveling to and from this Court for the purpose of testifying for this case.

9. The State of Georgia is a participant in a reciprocal program providing for the securing of witnesses to testify in foreign jurisdictions which likewise provide for such methods of securing witnesses to testify in their courts.

10. This Certificate is made for the purpose of being presented to a judge of the Superior Court of the District of Columbia by the United States Attorney for the District of Columbia or his duly authorized representative, who is proceeding at the request and on behalf of the Office of the Fulton County District Attorney to compel the Witness to be in attendance and testify before the Special Purpose Grand Jury on August 2, 2022, and continuing through and until the conclusion of the Witness's testimony on or before August 31, 2022, at the Superior Court of Fulton County, Fulton County Courthouse, 136 Pryor Street, 3rd Floor, Atlanta, Georgia 30303.

**WITNESS MY HAND AND SEAL** as a judge of the Superior Court of Fulton County, Georgia,

This the 8th day of July, 2022.

Hon. Robert C. I. McBurney
Superior Court of Fulton County
Atlanta Judicial Circuit
State of Georgia

# Exhibit A

IN THE SUPERIOR COURT OF FULTON COUNTY
ATLANTA JUDICIAL CIRCUIT
STATE OF GEORGIA

2022 - EX 000024

FILED IN OFFICE

JAN 24 2022

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

IN RE: REQUEST FOR
SPECIAL PURPOSE
GRAND JURY

ORDER APPROVING REQUEST FOR SPECIAL PURPOSE
GRAND JURY PURSUANT TO O.C.G.A. §15-12-100, et seq.

The District Attorney for the Atlanta Judicial Circuit submitted to the judges of the

Superior Court of Fulton County a request to impanel a special purpose jury for the purposes set

forth in that request. This request was considered and approved by a majority of the total

number of the judges of this Court, as required by O.C.G.A. §15-12-100(b).

IT IS THEREFORE ORDERED that a special purpose grand jury be drawn and

impaneled to serve as provided in O.C.G.A. § 15-12-62.1, 15-12-67, and 15-12-100, to

commence on May 2, 2022, and continuing for a period not to exceed 12 months. Such period

shall not include any time periods when the supervising judge determines that the special

purpose grand jury cannot meet for safety or other reasons, or any time periods when normal

court operations are suspended by order of the Supreme Court of Georgia or the Chief Judge of

the Superior Court. The special purpose grand jury shall be authorized to investigate any and all

facts and circumstances relating directly or indirectly to alleged violations of the laws of the

State of Georgia, as set forth in the request of the District Attorney referenced herein above.

Pursuant to O.C.G.A. § 15-12-101(a), the Honorable Robert C. I. McBurney is hereby

assigned to supervise and assist the special purpose grand jury, and shall charge said special

purpose grand jury and receive its reports as provided by law.

This authorization shall include the investigation of any overt acts or predicate acts relating to the subject of the special purpose grand jury's investigative purpose. The special purpose grand jury, when making its presentments and reports, pursuant to O.C.G.A. §§ 15-12-71 and 15-12-101, may make recommendations concerning criminal prosecution as it shall see fit. Furthermore, the provisions of O.C.G.A. § 15-12-83 shall apply.

This Court also notes that the appointment of a special purpose grand jury will permit the time, efforts, and attention of the regular grand jury(ies) impaneled in this Circuit to continue to be devoted to the consideration of the backlog of criminal matters that has accumulated as a result of the COVID-19 Pandemic.

IT IS FURTHER ORDERED that this Order shall be filed in the Office of the Clerk of the Superior Court of Fulton County.

SO ORDERED, THIS 24 DAY OF January, 2022.

CHRISTOPHER S. BRASHER, CHIEF JUDGE
Superior Court of Fulton County
Atlanta Judicial Circuit

# Exhibit B

OFFICE OF THE FULTON COUNTY DISTRICT ATTORNEY
ATLANTA JUDICIAL CIRCUIT
136 PRYOR STREET SW, 3RD FLOOR
ATLANTA, GEORGIA 30303

*Fani T. Willis*
District Attorney

TELEPHONE 404-612-4639

2022-EX-000017

FILED IN OFFICE
JAN 20 2022
DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

The Honorable Christopher S. Brasher
Chief Judge, Fulton County Superior Court
Fulton County Courthouse
185 Central Avenue SW, Suite T-8905
Atlanta, Georgia 30303

January 20, 2022

Dear Chief Judge Brasher:

I hope this letter finds you well and in good spirits. Please be advised that the District Attorney's Office has received information indicating a reasonable probability that the State of Georgia's administration of elections in 2020, including the State's election of the President of the United States, was subject to possible criminal disruptions. Our office has also learned that individuals associated with these disruptions have contacted other agencies empowered to investigate this matter, including the Georgia Secretary of State, the Georgia Attorney General, and the United States Attorney's Office for the Northern District of Georgia, leaving this office as the sole agency with jurisdiction that is not a potential witness to conduct related to the matter. As a result, our office has opened an investigation into any coordinated attempts to unlawfully alter the outcome of the 2020 elections in this state.

We have made efforts to interview multiple witnesses and gather evidence, and a significant number of witnesses and prospective witnesses have refused to cooperate with the investigation absent a subpoena requiring their testimony. By way of example, Georgia Secretary of State Brad Raffensperger, an essential witness to the investigation, has indicated that he will not participate in an interview or otherwise offer evidence until he is presented with a subpoena by my office. Please see Exhibit A, attached to this letter.

Therefore, I am hereby requesting, as the elected District Attorney for Fulton County, pursuant to O.C.G.A. § 15-12-100 et. seq., that a special purpose grand jury be impaneled for the purpose of investigating the facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia. Specifically, a special purpose grand jury, which will not have the authority to return an indictment but may make recommendations concerning criminal prosecution as it shall see fit, is needed for three reasons: first, a special purpose grand jury can be impaneled by the Court for any time period required in order to accomplish its investigation, which will likely exceed a normal grand jury

term; second, the special purpose grand jury would be empowered to review this matter and this matter only, with an investigatory focus appropriate to the complexity of the facts and circumstances involved; and third, the sitting grand jury would not be required to attempt to address this matter in addition to their normal duties.

Additionally, I am requesting that, pursuant to O.C.G.A. § 15-12-101, a Fulton County Superior Court Judge be assigned to assist and supervise the special purpose grand jury in carrying out its investigation and duties.

I have attached a proposed order impaneling the special purpose grand jury for the consideration of the Court.

Respectfully,

Fani T. Willis
District Attorney, Atlanta Judicial Circuit

Exhibit A: Transcript of October 31, 2021 episode of *Meet the Press* on NBC News at 26:04 (video archived at https://www.youtube.com/watch?v=B71cBRPgt9k)
Exhibit B: Proposed Order

cc:
The Honorable Kimberly M. Esmond Adams
The Honorable Jane C. Barwick
The Honorable Rachelle Carnesdale
The Honorable Thomas A. Cox, Jr.
The Honorable Eric Dunaway
The Honorable Charles M. Eaton, Jr.
The Honorable Belinda E. Edwards
The Honorable Kelly Lee Ellerbe
The Honorable Kevin M. Farmer
The Honorable Ural Glanville
The Honorable Shakura L. Ingram
The Honorable Rachel R. Krause
The Honorable Melynee Leftridge
The Honorable Robert C.I. McBurney
The Honorable Henry M. Newkirk
The Honorable Emily K. Richardson
The Honorable Craig L. Schwall, Sr.
The Honorable Paige Reese Whitaker
The Honorable Shermela J. Williams
Fulton County Clerk of Superior Court Cathelene "Tina" Robinson

# **Exhibit 15**

August 25, 2022 Certificate of Material Witness Pursuant to the Uniform Act to Secure the Attendance of Witnesses from Without the State, Codified in the State of Georgia as O.C.G.A. § 24-13-90 et seq. (Mark Meadows), In re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

## IN THE SUPERIOR COURT OF FULTON COUNTY

### STATE OF GEORGIA

```
FILED IN OFFICE

AUG 2 5 2022

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA
```

IN RE:                                   )
**SPECIAL PURPOSE GRAND JURY**           )        **2022-EX-000024**
                                         )
*Witness:*                               )        **Judge Robert C. I. McBurney**
*Mark Randall Meadows*                   )

### PETITION FOR CERTIFICATION OF NEED FOR TESTIMONY BEFORE SPECIAL PURPOSE GRAND JURY PURSUANT TO THE UNIFORM ACT TO SECURE THE ATTENDANCE OF WITNESSES FROM WITHOUT THE STATE, CODIFIED IN THE STATE OF GEORGIA AS O.C.G.A. § 24-13-90 ET SEQ.

**COMES NOW** the State of Georgia, by and through Fani T. Willis, District Attorney, Atlanta Judicial Circuit, Fulton County, Georgia, and petitions this Honorable Court for a Certificate of Need for Testimony Before Special Purpose Grand Jury, pursuant to O.C.G.A. § 24-13-92 et seq., and in support thereof says as follows:

1. A Special Purpose Grand Jury investigation commenced in Fulton County, Georgia, by order of this court on May 2, 2022. *See* Order Impaneling Special Purpose Grand Jury Pursuant to O.C.G.A. § 15-12-100, Et Seq, **"Exhibit A"**. The Special Purpose Grand Jury is authorized to investigate any and all facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia. *See* Letter Requesting Special Purpose Grand Jury, **"Exhibit B"**.

2. While Georgia law authorizes special purpose grand juries to conduct both civil and criminal investigations, the Special Purpose Grand Jury's investigation is criminal in nature in that it was requested for the purpose of investigating criminal disruptions

authorized to make recommendations concerning criminal prosecution. Further, the authority for a special purpose grand jury to conduct a criminal investigation has been upheld by the Supreme Court of Georgia. *See State v. Lampl,* 296 Ga. 892 (2015). Accordingly, the provisions of the Uniform Act to Secure the Attendance of Witnesses from Without the State apply pursuant to O.C.G.A. § 24-13-92 et seq.

3. Based on the representations made by the State in the attached "Petition for Certification of Need for Testimony Before Special Purpose Grand Jury" the Court finds that Mark Randall Meadows, born July 28, 1959, (hereinafter, "the Witness") is a necessary and material witness to the Special Purpose Grand Jury's investigation. The Court further finds that the Witness currently resides in Sunset, Pickens County, South Carolina.

4. Based on the representations made by the State in the attached "Petition for Certification of Need for Testimony Before Special Purpose Grand Jury" the Court finds that the Witness is known to be affiliated with both former President Donald Trump and the Trump Campaign.

5. Based on the representations made by the State in the attached "Petition for Certification of Need for Testimony Before Special Purpose Grand Jury" the Court finds that from March 31, 2020, to January 20, 2021, the Witness served as Chief of Staff to former President Donald Trump and was in constant contact with former President Trump in the weeks following the November 2020 election.

6. Based on the representations made by the State in the attached "Petition for Certification of Need for Testimony Before Special Purpose Grand Jury" the Court finds that on December 21, 2020, the Witness attended a meeting at the White House

with former President Trump, members of Congress, and others to discuss allegations

of voter fraud and the certification of electoral college votes from Georgia and other

states. The Witness confirmed this meeting in a Tweet on December 21, 2020, when

he stated, "Several members of Congress just finished a meeting in the Oval Office

with President @realDonaldTrump, preparing to fight back against mounting

evidence of voter fraud. Stay tuned."

7.  Based on the representations made by the State in the attached "Petition for

Certification of Need for Testimony Before Special Purpose Grand Jury" the Court

finds that on December 22, 2020, the Witness made a surprise visit to the Cobb

County Civic Center in Marietta, Georgia, where the Georgia Secretary of State's

Office and the Georgia Bureau of Investigation were conducting an absentee ballot

signature match audit. Officials conducting the audit were unaware of the Witness's

trip to Georgia until shortly before he arrived at the Civic Center. The Witness

requested to personally observe the audit process but was prevented from doing so

because the audit was not open to the public.

8.  Based on the representations made by the State in the attached "Petition for

Certification of Need for Testimony Before Special Purpose Grand Jury" the Court

finds that between at least December 30, 2020, and January 1, 2021, the Witness sent

e-mails to United States Department of Justice officials, including Acting Attorney

General Jeffrey Rosen, making various allegations of voter fraud in Georgia and

elsewhere and requesting that the Department of Justice conduct investigations into

these allegations. The e-mails were obtained by the United States Senate Judiciary

Committee and were released publicly.

9. Based on the representations made by the State in the attached "Petition for Certification of Need for Testimony Before Special Purpose Grand Jury" the Court finds that on January 2, 2021, former President Donald Trump and members of his team, including the Witness, participated in a lengthy telephone call with Georgia Secretary of State Brad Raffensperger and others to discuss allegations of voter fraud in Georgia. An audio recording of the telephone call was widely broadcast. During the telephone call, former President Trump stated to Secretary Raffensperger, "I just want to find 11,780 votes." The Witness actively participated in and spoke on the call, and the Special Purpose Grand Jury's investigation has revealed that the Witness was involved in setting up the call.

10. Based on the representations made by the State in the attached "Petition for Certification of Need for Testimony Before Special Purpose Grand Jury" the Court finds that the Witness is a necessary and material witness. The Witness possesses unique knowledge concerning the logistics, planning, and subject matter of the meeting at the White House on December 21, 2020. The Witnesses possess unique knowledge concerning the logistics, planning, and execution of his visit to the Cobb County Civic Center on December 22, 2020. The Witness possesses unique knowledge concerning the logistics, planning, and subject matter of his e-mails to United States Department of Justice officials. The Witnesses possesses unique knowledge concerning the logistics, planning, execution, and subject matter of the January 2, 2021, phone call with Georgia Secretary of State Brad Raffensperger. The Witness possesses unique knowledge concerning relevant communications between the Witness, former President Donald Trump, the Trump Campaign, and other known

and unknown individuals involved in the multi-state, coordinated efforts to influence the results of the November 2020 elections in Georgia and elsewhere. Finally, the Witness's anticipated testimony is essential in that it is likely to reveal additional sources of information regarding the subject of this investigation.

11. The testimony of the Witness will not be cumulative of any other evidence in this matter.

12. The Witness will be required to be in attendance and testify before the Special Purpose Grand Jury on Tuesday, September 27, 2022, at 9:00 a.m., at the Superior Court of Fulton County, Fulton County Courthouse, 136 Pryor Street, 3rd Floor, Atlanta, Georgia 30303. The Court notes that the District Attorney anticipates that the Witness's testimony will not exceed one day.

13. The Office of the Fulton County District Attorney, in and for the State of Georgia, will pay all reasonable and necessary travel expenses and witness fees required to secure the Witness's attendance and testimony, in accordance with O.C.G.A. §24-13-90 et seq.

14. The Witness shall be given protection from arrest and from service of civil or criminal process, both within this State and in any other state through which the Witness may be required to pass in the ordinary course of travel, for any matters which arose before the Witness's entrance into this State and other states, while traveling to and from this Court for the purpose of testifying for this case.

15. The State of Georgia is a participant in a reciprocal program providing for the securing of witnesses to testify in foreign jurisdictions which likewise provide for such methods of securing witnesses to testify in their courts.

16. This Certificate is made for the purpose of being presented to a judge of the Court of

General Sessions of Pickens County, South Carolina, by the Office of the Solicitor,

Thirteenth Judicial Circuit, or his duly authorized representative, who is proceeding at

the request and on behalf of the Office of the Fulton County District Attorney.

**WITNESS MY HAND AND SEAL** as a judge of the Superior Court of Fulton County,

Georgia,

This the 22nd day of August, 2022.

Hon. Robert Q. I. McBurney
Superior Court of Fulton County
Atlanta Judicial Circuit
State of Georgia

# Exhibit A

IN THE SUPERIOR COURT OF FULTON COUNTY
ATLANTA JUDICIAL CIRCUIT
STATE OF GEORGIA

2022 - EX 000024

FILED IN OFFICE

JAN 2 4 2022

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

IN RE:  REQUEST FOR
SPECIAL PURPOSE
GRAND JURY

## ORDER APPROVING REQUEST FOR SPECIAL PURPOSE
## GRAND JURY PURSUANT TO O.C.G.A. §15-12-100, et seq.

The District Attorney for the Atlanta Judicial Circuit submitted to the judges of the

Superior Court of Fulton County a request to impanel a special purpose jury for the purposes set

forth in that request. This request was considered and approved by a majority of the total

number of the judges of this Court, as required by O.C.G.A. §15-12-100(b).

IT IS THEREFORE ORDERED that a special purpose grand jury be drawn and

impaneled to serve as provided in O.C.G.A. § 15-12-62.1, 15-12-67, and 15-12-100, to

commence on May 2, 2022, and continuing for a period not to exceed 12 months. Such period

shall not include any time periods when the supervising judge determines that the special

purpose grand jury cannot meet for safety or other reasons, or any time periods when normal

court operations are suspended by order of the Supreme Court of Georgia or the Chief Judge of

the Superior Court. The special purpose grand jury shall be authorized to investigate any and all

facts and circumstances relating directly or indirectly to alleged violations of the laws of the

State of Georgia, as set forth in the request of the District Attorney referenced herein above.

Pursuant to O.C.G.A. § 15-12-101(a), the Honorable Robert C. I. McBurney is hereby

assigned to supervise and assist the special purpose grand jury, and shall charge said special

purpose grand jury and receive its reports as provided by law.

This authorization shall include the investigation of any overt acts or predicate acts relating to the subject of the special purpose grand jury's investigative purpose. The special purpose grand jury, when making its presentments and reports, pursuant to O.C.G.A. §§ 15-12-71 and 15-12-101, may make recommendations concerning criminal prosecution as it shall see fit. Furthermore, the provisions of O.C.G.A. § 15-12-83 shall apply.

This Court also notes that the appointment of a special purpose grand jury will permit the time, efforts, and attention of the regular grand jury(ies) impaneled in this Circuit to continue to be devoted to the consideration of the backlog of criminal matters that has accumulated as a result of the COVID-19 Pandemic.

IT IS FURTHER ORDERED that this Order shall be filed in the Office of the Clerk of the Superior Court of Fulton County.

SO ORDERED, THIS 24 DAY OF January, 2022.

CHRISTOPHER S. BRASHER, CHIEF JUDGE
Superior Court of Fulton County
Atlanta Judicial Circuit

# Exhibit B

OFFICE OF THE FULTON COUNTY DISTRICT ATTORNEY
ATLANTA JUDICIAL CIRCUIT
136 PRYOR STREET SW, 3RD FLOOR
ATLANTA, GEORGIA 30303

*Toni T. Willis*
District Attorney

TELEPHONE 404-612-4639

2022-EX-000017

FILED IN OFFICE

JAN 20 2022

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

The Honorable Christopher S. Brasher
Chief Judge, Fulton County Superior Court
Fulton County Courthouse
185 Central Avenue SW, Suite T-8905
Atlanta, Georgia 30303

January 20, 2022

Dear Chief Judge Brasher:

I hope this letter finds you well and in good spirits. Please be advised that the District Attorney's Office has received information indicating a reasonable probability that the State of Georgia's administration of elections in 2020, including the State's election of the President of the United States, was subject to possible criminal disruptions. Our office has also learned that individuals associated with these disruptions have contacted other agencies empowered to investigate this matter, including the Georgia Secretary of State, the Georgia Attorney General, and the United States Attorney's Office for the Northern District of Georgia, leaving this office as the sole agency with jurisdiction that is not a potential witness to conduct related to the matter. As a result, our office has opened an investigation into any coordinated attempts to unlawfully alter the outcome of the 2020 elections in this state.

We have made efforts to interview multiple witnesses and gather evidence, and a significant number of witnesses and prospective witnesses have refused to cooperate with the investigation absent a subpoena requiring their testimony. By way of example, Georgia Secretary of State Brad Raffensperger, an essential witness to the investigation, has indicated that he will not participate in an interview or otherwise offer evidence until he is presented with a subpoena by my office. Please see Exhibit A, attached to this letter.

Therefore, I am hereby requesting, as the elected District Attorney for Fulton County, pursuant to O.C.G.A. § 15-12-100 et. seq., that a special purpose grand jury be impaneled for the purpose of investigating the facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia. Specifically, a special purpose grand jury, which will not have the authority to return an indictment but may make recommendations concerning criminal prosecution as it shall see fit, is needed for three reasons: first, a special purpose grand jury can be impaneled by the Court for any time period required in order to accomplish its investigation, which will likely exceed a normal grand jury

term; second, the special purpose grand jury would be empowered to review this matter and this matter only, with an investigatory focus appropriate to the complexity of the facts and circumstances involved; and third, the sitting grand jury would not be required to attempt to address this matter in addition to their normal duties.

Additionally, I am requesting that, pursuant to O.C.G.A. § 15-12-101, a Fulton County Superior Court Judge be assigned to assist and supervise the special purpose grand jury in carrying out its investigation and duties.

I have attached a proposed order impaneling the special purpose grand jury for the consideration of the Court.

Respectfully,

Fani T. Willis
District Attorney, Atlanta Judicial Circuit

Exhibit A: Transcript of October 31, 2021 episode of *Meet the Press* on NBC News at 26:04 (video archived at https://www.youtube.com/watch?v=B71cBRPgt9k)
Exhibit B: Proposed Order

cc:
The Honorable Kimberly M. Esmond Adams
The Honorable Jane C. Barwick
The Honorable Rachelle Carnesdale
The Honorable Thomas A. Cox, Jr.
The Honorable Eric Dunaway
The Honorable Charles M. Eaton, Jr.
The Honorable Belinda E. Edwards
The Honorable Kelly Lee Ellerbe
The Honorable Kevin M. Farmer
The Honorable Ural Glanville
The Honorable Shakura L. Ingram
The Honorable Rachel R. Krause
The Honorable Melynee Leftridge
The Honorable Robert C.I. McBurney
The Honorable Henry M. Newkirk
The Honorable Emily K. Richardson
The Honorable Craig L. Schwall, Sr.
The Honorable Paige Reese Whitaker
The Honorable Shermela J. Williams
Fulton County Clerk of Superior Court Cathelene "Tina" Robinson

# **Exhibit 16**

January 16, 2023 Order Entering Portions of Special Purpose Grand Jury's Final report into Court Record, in re 2 May 2022 Special Purpose Grand Jury, Case No. 2022-EX-000024 (Fulton Co. Sup. Court).

FILED IN OFFICE

FEB 1 6 2023

DEPUTY CLERK SUPERIOR COURT
FULTON COUNTY, GA

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

IN RE 2 MAY 2022 SPECIAL PURPOSE
GRAND JURY

2022-EX-000024

## ORDER ENTERING PORTIONS OF SPECIAL PURPOSE GRAND JURY'S FINAL REPORT INTO COURT RECORD

On 13 February 2023, the undersigned entered an Order directing the publication, pursuant to O.C.G.A. § 15-12-80 and consistent with the holding in *Thompson v. Macon-Bibb Cnty. Hosp. Auth.*, 246 Ga. 777 (1980), of certain portions of the Special Purpose Grand Jury's final report that sets forth its findings and recommendations to the District Attorney of Fulton County concerning its investigation into possible criminal interference in the 2020 general election in Georgia. Those three portions are attached to this Order as Exhibits A – C. The Clerk is directed to make this Order and its attachments available to the public.

SO ORDERED this 16th day of February 2023.

Judge Robert C.I. McBurney
Superior Court of Fulton County
Atlanta Judicial Circuit

1

# EXHIBIT A

# to Order of 16 February 2023

# 2022-EX-000024

# SPECIAL PURPOSE GRAND JURY REPORT

3   This Special Purpose Grand Jury (herein referred to as "the Grand Jury") was
4   impaneled pursuant to an Order dated January 24, 2022 by Christopher S. Brasher,
5   Chief Judge of the Superior Court of Fulton County, Atlanta Judicial Circuit. The
6   Grand Jury consisted of twenty-six Fulton County residents, three of whom were
7   alternates. On any day testimony was received or deliberations were had, the number
8   of jurors present ranged between sixteen and twenty-four as availability allowed.
9   Pursuant to statute, if we had our needed quorum of sixteen jurors present, we could
10  do business with that.

11   The Grand Jury was impaneled to investigate a specific issue: the facts and
12  circumstances relating directly or indirectly to possible attempts to disrupt the lawful
13  administration of the 2020 presidential elections in the State of Georgia.

14   This Grand Jury was selected on May 2nd, 2022 and first heard evidence on
15  June 1st, 2022.   We continued to hear evidence and receive information into
16  December 2022. The Grand Jury received evidence from or involving 75 witnesses
17  during the course of this investigation, the overwhelming majority of which
18  information was delivered in person under oath.  The Grand Jury also received
19  information in the form of investigator testimony and various forms of digital and
20  physical media.  Pursuant to Georgia law, a team of assistant district attorneys
21  provided the Grand Jury with applicable statutes and procedures.  Any
22  recommendation set out herein is the sole conclusion of the Grand Jury based on
23  testimony presented, facts received, and our deliberations.

24   Following is the final report of the Special Purpose Grand Jury. We set forth
25  for the Court our recommendations on indictments and relevant statutes, including
26  the votes by the Grand Jurors. This includes the votes respective to each topic,
27  indicated in a "Yea/Nay/Abstain" format throughout.  The total number of
28  Grand Jurors who placed a vote on each topic has been indicated in each section.
29  Footnotes have been added in certain places where a juror requested the opportunity
30  to clarify their vote for any reason. Each applicable statute is referenced by citation

1

1    number.   Attached to this document as Appendix A is a complete set of Georgia

2    statutes referenced below.

3          The Grand Jury heard extensive testimony on the subject of alleged election

4    fraud from poll workers, investigators, technical experts, and State of Georgia

5    employees and officials, as well as from persons still claiming that such fraud took

6    place. We find by a unanimous vote that no widespread fraud took place in the

7    Georgia 2020 presidential election that could result in overturning that election.

8

# EXHIBIT B

# to Order of 16 February 2023

# 2022-EX-000024

13                                        VIII.

14          A majority of the Grand Jury believes that perjury may have been committed

15 by one or more witnesses testifying before it.  The Grand Jury recommends that the

16 District Attorney seek appropriate indictments for such crimes where the evidence is

17 compelling.

18                                    CONCLUSION

19

20          The Grand Jury wishes to acknowledge the hardworking attorneys and staff of

21 the Fulton County District Attorney's office.  Any legal errors contained in this report

22 should not be laid at their feet, however, because that Office had nothing to do with

23 the recommendations contained herein.

24          If this report fails to include any potential violations of referenced statutes that

25 were shown in the investigation, we acknowledge the discretion of the District

26 Attorney to seek indictments where she finds sufficient cause.  Furthermore, this

27 Grand Jury contained no election law experts or criminal lawyers.  The majority of

28 this Grand Jury used their collective best efforts, however, to attend every session,

29 listen to every witness, and attempt to understand the facts as presented and the laws

30 as explained.

                                            8

1       If the Court finds this report to have satisfied the purpose of the Special
2   Purpose Grand Jury as impaneled, we request that we be formally discharged from
3   our service.

4

5

6   This 15th day of December, 2022

7

8                     _____/s/____ ███████

9                     Foreperson ██████

10

11                   _____/s/____ ██████

12                   Deputy Foreperson ██████

13

# EXHIBIT C

# to Order of 16 February 2023

# 2022-EX-000024

Addendum to Special Purpose Grand Jury Final Report

The undersigned Special Purpose Grand Jury Foreperson and Deputy Foreperson hereby make this Addendum to the Special Purpose Grand Jury Final Report to clarify two matters:

1. Before its dissolution, the Special Purpose Grand Jury voted to recommend that the Special Purpose Grand Jury Final Report be published. The Special Purpose Grand Jury did not recommend a manner or time for such publication.

2. At no time were 24 or more jurors present when evidence was received. 24 jurors, including alternates, were present only at an introductory meeting at the Fulton County Courthouse on May 12, 2022.



Foreperson


Deputy Foreperson