# Exhibit 1

E-FILED IN OFFICE - KMG
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

23-C-05058-S7

7/20/2023 2:49 PM

TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY

## STATE OF GEORGIA

LIFEBRITE LABORATORIES, LLC; and
CHRISTIAN FLETCHER,

                Plaintiffs,

v.

BLUE CROSS BLUE SHIELD OF
FLORIDA, INC. d/b/a FLORIDA BLUE;
BLUE CROSS BLUE SHIELD
HEALTHCARE PLAN OF GEORGIA,
INC.; THE ELEVANCE HEALTH
COMPANIES, INC. f/k/a ANTHEM
INSURANCE COMPANIES, INC.;
UNITEDHEALTH GROUP
INCORPORATED; and CVS HEALTH
CORPORATION d/b/a AETNA,

                Defendants.

CIVIL ACTION 23-C-05058-S7

FILE NO. _____

JURY TRIAL DEMANDED

588102.4

## TABLE OF CONTENTS

SUMMARY OF THE CASE …………………………………………….....…..…3

PARTIES, JURISDICTION AND VENUE…..……………………………….………4

FACTS COMMON TO ALL CAUSES OF ACTION…………………………….......6

    A.    LifeBrite Laboratories………………………………….………....6

    B.    Defendants Refuse to Grant LifeBrite In-Network Privileges……………….……...7

    C.    LifeBrite Grows Its Laboratory Business……………….…………….……...8

    D.    LifeBrite Reinvests Profits and Expands Business Operations….…………………12

    E.    Defendants Maliciously Destroy Plaintiffs' Business and Reputation……………13

        1.    Summary of Defendants' Scheme ……………..………………………...14

        2.    Florida Blue's Acts in Furtherance of the Scheme …………….…..……18

        3.    Aetna's Acts in Furtherance of the Scheme………..……………………20

        4.    BCBS Georgia's Acts in Furtherance of the Scheme……………………22

        5.    Anthem's Acts in Furtherance of the Scheme……………………………23

        6.    UHC's Acts in Furtherance of the Scheme………………………………24

    F.    Defendants Had No Basis to Accuse Plaintiffs of Fraud…………….…………25

    G.    The Little River Arbitration……………………………………….……...27

    H.    Plaintiffs Did Not Release the Claims Herein…………………….……….28

    I.    The Discovery Rule…………………………………………………...29

CAUSES OF ACTION…………………………………………………..……29

PRAYER FOR RELIEF………………………………………………….....…36

DEMAND FOR JURY TRIAL………………………………….…………….37

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

COMES NOW LifeBrite Laboratories LLC, a Georgia limited liability company, and Christian Fletcher, Plaintiffs in the above-styled action, who hereby file this Complaint for Damages against Defendants as follows:

**SUMMARY OF THE CASE**

1. Plaintiff LifeBrite Laboratories, LLC ("LifeBrite") is a national clinical laboratory located in the Atlanta, Georgia area. LifeBrite provides clinical testing services, including blood and urine toxicology testing, to healthcare organizations, physician practices, pain management clinics, addiction clinics and employers nationwide. Plaintiff Christian Fletcher ("Fletcher") is the founder and CEO of LifeBrite.

2. This action arises out of Defendants' campaign to maliciously prosecute and spread false allegations to regulators, insurance payors and others in the health care industry that LifeBrite and Fletcher were engaged in a widespread fraudulent billing scheme involving rural hospitals.

3. The purpose of Defendants' campaign was to leverage regulators, other insurance payors and health care industry participants to save Defendants from having to pay tens of millions of dollars in legitimate claims.

4. Defendants' tortious actions set forth herein harmed LifeBrite's economic interests, damaged its business, caused a substantial loss of profits and revenue and left LifeBrite a shell of its former self.

5. Based on Defendants' false information and documents, Fletcher was indicted and prosecuted for healthcare fraud in the Middle District of Florida. During Fletcher's criminal trial, Defendants' representatives repeatedly changed their story and admitted that they provided false information to criminal authorities and testified inaccurately under oath before the Grand Jury and

at trial.

6.      Fletcher was acquitted of all charges in March 2023.  By the time Fletcher was acquitted, the damage to LifeBrite and Christian was complete.  In 2019, LifeBrite was worth in excess of $400 million and was in the process of selling its business at that valuation.  Defendants' smear campaign tarnished LifeBrite's reputation, destroyed its business and sunk the deal.

7.      As a result, LifeBrite is now earning a small fraction of its prior revenues and has been egregiously harmed.  Fletcher has also suffered significant reputational harm and emotional distress damages.

8.      By this action, Plaintiffs seek full compensation for Defendants' tortious conduct in an amount that is currently estimated to exceed a billion dollars.

## PARTIES, JURISDICTION AND VENUE

9.      Plaintiff LifeBrite Laboratories, LLC is a Georgia limited liability company headquartered in Atlanta, Georgia.

10.     Plaintiff Christian Fletcher ("Fletcher") is an individual who resides in Atlanta, Georgia.

11.     Defendant Blue Cross Blue Shield of Florida, Inc. d/b/a Florida Blue ("Florida Blue") is a Florida corporation headquartered in Jacksonville, Florida.  Florida Blue regularly transacts business with Georgia businesses including, but not limited to, Blue Cross Blue Shield licensees and other companies located within the state of Georgia and in Gwinnett County.

12.     Defendant Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. ("BCBS Ga") is a Georgia corporation that is headquartered in Atlanta, Georgia.  BCBS Ga is authorized to do business in the state of Georgia and does in fact transact business in Gwinnett County.  Service can be made on Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. by serving its Registered

Agent, CT Corporation System, at 289 S. Culver Street, Lawrenceville, Georgia 30046-4805.

13.     Defendant The Elevance Health Companies, Inc. f/k/a Anthem Insurance Companies, Inc. ("Anthem") is an Indiana corporation that is headquartered in Indianapolis, Indiana. Anthem, through its subsidiaries, is authorized to do business in the state of Georgia and does in fact transact business in Gwinnett County. Service can be made on The Elevance Health Companies, Inc. by serving its Registered Agent, CT Corporation System, at 289 S. Culver Street, Lawrenceville, Georgia 30046-4805.

14.     Defendant UnitedHealth Group Incorporated ("UHC") is a Delaware corporation that is headquartered in Minnetonka, Minnesota. UHC, through its subsidiaries, including UnitedHealthcare of Georgia, Inc., is authorized to do business in the state of Georgia and does in fact transact business in Gwinnett County.

15.     Defendant CVS Health Corporation d/b/a Aetna ("Aetna") is a Delaware corporation that is headquartered in Woonsocket, Rhode Island. Aetna, through its subsidiaries, including Aetna Health Inc., is authorized to transact business in and does in fact transact business in Georgia, including in Gwinnett County.

16.     This Court has personal jurisdiction over foreign Defendants Florida Blue, Anthem, UHC and Aetna because they all have minimum contacts with the State of Georgia, transact substantial business in the State of Georgia, have committed torts in the State of Georgia, and have aided and abetted, and tortiously conspired with, Defendant BCBS Ga, which is a Georgia corporation; and they have done so in Gwinnett County.

17.     Venue properly lies in Gwinnett County pursuant to O.C.G.A. § 9-10-31 because Defendants are joint-tortfeasors and at least one Defendant resides in Gwinnett County.

## FACTS COMMON TO ALL CAUSES OF ACTION

**A.**      **LifeBrite Laboratories**

18.      LifeBrite was founded in 2014 by Christian Fletcher ("Fletcher"), an African American entrepreneur, investor and philanthropist.  Fletcher has been referred to as one of Atlanta, Georgia's most prominent Minority Business Enterprise owners.

19.      LifeBrite owns and operates a national clinical medical testing laboratory located in the Atlanta, Georgia area.

20.      From approximately November 2014 to March 2015, LifeBrite was in a "startup" phase where the company invested heavily in hiring and training personnel, building out the laboratory, and obtaining the necessary licenses and credentials to service clients across the country.

21.      During this "startup" phase, LifeBrite's laboratory was accredited by the Commission on Office Laboratory Accreditation ("COLA") and obtained certification under the Clinical Laboratory Improvement Amendments ("CLIA").  LifeBrite hired sales representatives to market the laboratory and generate business.

22.      LifeBrite received its first sample for testing in March 2015 and began receiving revenue in June 2015.  LifeBrite's clients during this initial period were mostly pain management clinics and substance abuse treatment centers located across the country.

23.      When these clients needed lab tests for patients, the clients would send the specimens to LifeBrite's laboratory with instructions on what tests to run.  LifeBrite has no role in determining whether the tests are medically necessary.  That is done by the hospital, physician, clinic or center ordering the test.

24.      LifeBrite performs the tests and reports the results to the client.  LifeBrite bills the

patient or the patient's insurer for reimbursement.   LifeBrite relies on experienced billing professionals to ensure that its billing operations are compliant and lawful.

25.     By the end of 2015, LifeBrite earned over $11 million in revenue and nearly $6 million in profit.  LifeBrite reinvested the profits to grow its laboratory business and expand into other areas.

### B.     Defendants Refuse to Grant LifeBrite In-Network Privileges

26.     LifeBrite met the requirements to be credentialed as an "in network" provider for Defendants' insurance plans.  In fact, LifeBrite exceeded Defendants' requirements.

27.     LifeBrite was the only laboratory with zero citations in its 2015 original accreditation survey by COLA.  The laboratory was voted best laboratory in 2016 and 2017 by The Atlanta Award Program.  The laboratory was recognized as the 2018 Pacesetter in the Healthcare category by the Atlanta Business Chronicle.

28.     LifeBrite went state by state to present its laboratory as a candidate to be added to various branded insurance plans.  LifeBrite hired attorneys and other professionals to assist with the process.

29.     Defendants refused to credential LifeBrite as an "in network" provider, but did not provide an explanation.  At the same time, Defendants credentialed lesser-qualified independent laboratories, such as Salvus Labs, a white-owned independent laboratory that had only three employees.

30.     The professionals that LifeBrite hired to assist with this process have significant experience credentialing healthcare businesses as "in network" providers, and they advised LifeBrite that it met the requirements and should be credentialed.

31.     LifeBrite kept knocking on the door for years, but Defendants refused to add

LifeBrite as an "in network" laboratory.  Defendants' representatives who were working with LifeBrite in this process informed LifeBrite that they could not provide an answer as the decision was "above their paygrade."  Defendants' representatives did not explain what that meant.

32.     Plaintiffs are investigating whether racial discrimination occurred.  Plaintiffs hereby put Defendants on notice that based on the results of Plaintiffs' investigation, Plaintiffs may amend this Complaint to assert racial discrimination claims.

### C.     LifeBrite Grows Its Laboratory Business

33.     With Defendants refusing to grant LifeBrite "in network" privileges, LifeBrite was forced to look for other ways to grow its business.  LifeBrite hired consultants and marketers to that end.

34.     In the Fall of 2015, one of LifeBrite's consultants presented LifeBrite with an opportunity to serve as a reference laboratory[1] for a hospital laboratory outreach program operated out of Campbellton-Graceville Hospital ("CGH").  CGH was a critical access hospital ("CAH")[2] that was in severe financial distress.

35.     A hospital laboratory outreach program is a well-known business practice for hospitals interested in expanding their laboratory services to people who are not patients of the hospital.  The testing may be done at the hospital lab or at an outside "reference" lab affiliated with the hospital.

---

[1] A reference laboratory is defined by the Centers for Medicare & Medicaid Services ("CMS") as a Medicare-enrolled laboratory that receives a specimen from another, referring laboratory for testing.

[2] The CAH designation was created by Congress through the Balanced Budget Act of 1997 (Public Law 105-33) in response to over 400 rural hospital closures during the 1980s and early 1990s,  The CAH designation is designed to reduce the financial vulnerability of rural hospitals and improve access to healthcare by keeping essential services in rural communities.

36.     Without an outreach program, hospital labs are limited to running tests for patients who receive care at the hospital.  An outreach program expands the client base for a hospital's laboratory to patients of physician groups as well as pain management clinics and substance abuse centers who need lab tests for their clients.

37.     Laboratory outreach programs have been around for nearly four decades.  In 1987, 61% of all hospitals in the United States had implemented a hospital laboratory outreach program, with that number rising to 80% by the mid-2000s.  By 2018, there were an estimated 1,000 hospitals operating laboratory outreach programs.  In 2021, the Mayo Clinic recommended that hospitals implement outreach programs to increase revenue during the COVID-19 pandemic.

38.     Hospital laboratory outreach programs are particularly important for hospitals in rural areas with a small population base.  Outreach programs help rural hospitals increase revenue and profitability to avoid the catastrophic outcome of losing what is often the only hospital in the community.

39.     LifeBrite was interested in serving as a reference laboratory for CGH because LifeBrite was in a growth phase and wanted to increase its client base and increase the volume of testing at the lab.  LifeBrite wanted to increase the volume of testing to, in turn, reduce the company's cost per test.

40.     LifeBrite's attorneys reviewed the proposal and advised LifeBrite that this was a legal arrangement that was not prohibited by law or the hospital's contracts with insurers.  Based on advice of counsel, LifeBrite agreed to serve as a reference laboratory for CGH.

41.     LifeBrite's primary role was to perform confirmatory testing on specimens as ordered and directed by CGH or CGH's clients.  LifeBrite had no role in determining whether laboratory testing was medically necessary for any in-patients, out-patients or non-patients of the

hospital.

42.     In general, urine toxicology testing is broken down between screens and confirmatory tests.  A screen is a preliminary determination as to whether substances are present.

43.     A confirmatory test is a definitive determination as to whether substances are present and it often includes additional data, such as the quantity of the substance in the sample. Confirmatory testing requires a more sophisticated laboratory.

44.     CGH hired marketers to broaden the client base and increase revenue for the hospital.  The CGH laboratory outreach program was successful in that the laboratory program was smaller than its competitors, LabCorp and Quest, and could beat its competitors in client service and response times.

45.     When a client chose to use CGH and LifeBrite for laboratory testing, CGH representatives would give the client co-branded requisition forms confirming that the testing would be performed by CGH and, if necessary, LifeBrite.

46.     There were other independent laboratories that agreed to join CGH's laboratory outreach program.  LifeBrite was not aware of CGH's arrangement with these other laboratories. LifeBrite was focused on fulfilling its obligations to CGH and its clients as part of the hospital laboratory outreach program.

47.     As for LifeBrite, the specimens first underwent a screen at CGH's laboratory.  If confirmatory testing was needed, CGH would order LifeBrite to perform the more sophisticated confirmatory test.

48.     LifeBrite was contractually prohibited from billing for the services it provided as part of the CGH laboratory outreach program.  All of the billing was done by, or at the direction of, CGH.

49.     To obtain payment from Defendants for laboratory testing, CGH submitted claims either electronically or on paper using the UB-04 uniform medical billing form.  There are specific fields or lines on the UB-04 billing form that must be completed when submitting a claim, including the Type of Bill, the rural hospital's NPI number and tax ID, the patient's name, the patient's diagnosis described by standardized codes, a description of the service(s) rendered to the patient using standardized codes, the date the services were rendered, and the amount claimed for payment.

50.     One Type-of-Bill code that can be included on the UB-04 billing form when submitting claims is the code 141, which signifies to the Defendants that laboratory services were provided at the rural hospital for a "non-patient."  A "non-patient" is defined as an individual that is neither an "inpatient" nor an "outpatient" of the rural hospital.  A claim submitted with a 141 code is a disclosure to the insurance company that the claim is for laboratory services for a patient who is not physically present at the rural hospital.

51.     When LifeBrite served as a reference laboratory for CGH, virtually all of the claims submitted to Defendants where LifeBrite provided any part of the testing used a Type-of-Bill code 141, designating to Defendants that the test was for a "non-patient" who never physically went to CGH.

52.     The CGH laboratory outreach program was a success, which led to expansion. LifeBrite agreed to serve as a reference laboratory under a similar arrangement with additional rural hospitals—Regional General Hospital ("RGH") and Putnam County Memorial Hospital ("Putnam").

53.     This billing practice continued at RGH and Putnam.  RGH and Putnam submitted claims to Defendants using the UB-04 billing form using a Type-of-Bill code 141.  For the duration

of LifeBrite's reference laboratory arrangement with RGH and Putnam, virtually all of the claims submitted to Defendants where any portion of the claimed services included LifeBrite laboratory testing used a Type-of-Bill code 141.

**D.      LifeBrite Reinvests Profits and Expands Business Operations**

54.      LifeBrite reinvested its profits to expand its laboratory business and to expand into other areas.  For instance, Fletcher founded LifeBrite Hospital Group, LLC to own and operate hospitals.

55.      In 2017, LifeBrite Hospital Group, LLC acquired a rural hospital in Stokes County, North Carolina that was rebranded LifeBrite Community Hospital of Stokes ("Stokes").  Stokes operates a laboratory outreach program as well, and uses LifeBrite Laboratories as its reference laboratory.

56.      By 2019, LifeBrite was worth in excess of $400 million.  LifeBrite secured a term sheet from a sophisticated buyer to buy the business at that valuation, with a commitment to pay $280 million in cash within 10 days of closing.

57.      This $400 million term sheet was offered even though insurance companies, including Defendants, took the position that the laboratory outreach programs at CGH, RGH and Putnam were not permitted under the insurance contracts between Defendants and the rural hospitals.

58.      LifeBrite viewed this as a contractual dispute between insurance companies and rural hospitals.  As a reference laboratory for hospital outreach programs, LifeBrite relied on the hospital and its management to resolve those disputes.

59.      Based on their claim that the laboratory outreach programs at CGH, RGH and Putnam were not permitted under the insurance payors' policies and/or existing contracts with the

hospitals, Defendants took action to disrupt the programs, such as by stopping payments, placing the programs under performance review and conducting audits.

60.     These actions severely impacted the financial health of the rural hospitals.  CGH was ultimately forced to file for bankruptcy.

61.     In response to these claims by insurers, LifeBrite made the decision to cease its involvement in these particular outreach programs and focus its efforts on growing its laboratory and hospital businesses in other ways.

62.     LifeBrite entered into settlements with various Defendants to resolve billing disputes without admitting liability.

63.     LifeBrite was then in a position to pursue the $400 million offer in earnest.  This deal fell apart, however, because of Defendants' tortious conduct as alleged below.

E.     **Defendants Maliciously Destroy Plaintiffs' Business and Reputation**

64.     By August 2016, Defendants had paid millions of dollars for laboratory testing performed on nonpatients of CGH and RGH, with the prospect of paying millions of dollars more for future claims on claims submitted by CGH, RGH and Putnam.  Because Defendants did not see a clear legal path to deny further payments under existing contracts, Defendants conspired with each other to wrongfully withhold payment of tens of millions of dollars owed to the rural hospitals and to destroy LifeBrite and others involved in the programs.

65.     Defendants' tortious scheme included providing false documents and false information to the Department of Justice ("DOJ") to persuade the DOJ to prosecute Fletcher and others, and providing false testimony and false documentation to a federal Grand Jury to persuade the Grand Jury to return an indictment against Fletcher and others.

66.     Defendants presented the laboratory outreach programs, and Plaintiffs' role therein,

as not merely breaches of insurance contracts since that would not be sufficient to persuade the Department of Justice to take up the criminal case. Rather, Defendants falsely and maliciously represented that the laboratory outreach programs, and Plaintiffs' role therein, was criminal healthcare billing fraud accomplished through the submission of false claims for payment to insurers.

67.   Not one but two separate offices within the DOJ—the United States Attorney's Offices in Georgia and Missouri—declined to pursue cases presented by Defendants. But Defendants kept shopping the case until the United States Attorney's Office for the Middle District of Florida took on the case.

68.   Based on Defendants' false documents and information, Fletcher was indicted for an alleged billing fraud scheme where the Defendants herein claimed that they were billed as if the laboratory tests were performed at the rural hospitals from samples taken from patients who were physically present at the hospital.

69.   Defendants accused Plaintiffs of being part of this alleged billing fraud scheme. Defendants' accusations were false, malicious and made without probable cause.

70.   Based upon the charges filed, Fletcher faced the possibility of being imprisoned for 20 or more years. Fletcher incurred over two million dollars in legal fees to defend against the baseless charges brought against him.

### 1.   Summary of Defendants' Scheme

71.   By August 2016, Defendants' investigators were each investigating millions of dollars paid in reimbursements to CGH and RGH for laboratory testing services. Early in the investigation, Defendants realized from a review of the rural hospital contracts that there was no clear legal path to deny laboratory testing claims under those contracts. Nevertheless, Defendants

searched for a way to "stop the bleeding," *i.e.*, to stop paying.

72.     Defendants concocted a scheme whereby they would falsely accuse Plaintiffs of being part of a massive insurance billing fraud conspiracy.  The alleged billing fraud was that rural hospitals including RGH and CGH would bill for laboratory testing "as if" the testing was done on in-patients or out-patients of the hospital, when in fact it was done on non-patients who were not physically present at the hospital.

73.     Defendants alleged that this "fraud" occurred through the use of the Place of Service ("POS") Code 22.   According to Defendants, a POS Code 22 was an affirmative representation by the submitting hospital that the hospital itself performed the test on behalf of patients who were physically present at the hospital (either as in-patients or out-patients).

74.     This allegation was false because none of the claims submitted by or on behalf of CGH, RGH and Putnam had a POS Code 22.  In fact, there is no place on the UB-04 form to insert a POS code at all.

75.     The claims were submitted by or on behalf of CGH, RGH and Putnam using a code 141, which honestly and accurately represented that the testing was done on behalf of non-patients, meaning patients who never set foot in the hospital.

76.     Defendants knew that none of the claims were submitted using a POS Code 22, but they maliciously and without probable cause made the allegations anyway to convince federal authorities to instigate criminal proceedings against Fletcher and others.   In fact, it was the Defendants who concocted the POS Code 22.

77.     Defendants corresponded with federal agents wherein they accused Plaintiffs and others of engaging in a POS Code 22 billing fraud scheme.  Defendants did not inform federal agents that the actual claims submitted by or on behalf of CGH and RGH did not contain POS

Code 22.

78.     Defendants also did not inform federal agents that the POS Code 22 was, in fact, inserted by Defendants on claims data spreadsheets that they created.

79.     When the United States Attorney's Office for the Middle District of Florida decided to pursue the case, the DOJ requested billing data from Defendants.  The DOJ also issued Grand Jury subpoenas to Defendants for the same documentation.

80.     In response, Defendants produced the claims data spreadsheets with the phony POS Code 22 designation.  Defendants did not produce the underlying claims data submitted by or on behalf of CGH, RGH and Putnam.  Defendants claimed that the claims data had been "lost." Defendants represented that the claims data spreadsheets with the POS Code 22 set forth the information that was submitted by or on behalf of CGH, RGH and Putnam.

81.     From the time these claims data spreadsheets were produced by Defendants in 2018 through November 2021, representatives of Defendants met with and discussed the phony claims data spreadsheets with the government on numerous occasions.

82.     In these meetings, no representative of Defendants ever revealed to the government that the claims data spreadsheets falsely represented that the hospital had submitted claims with a POS Code 22.  In fact, Defendants continued to allege that the claims contained a POS Code 22— they perpetrated the lie.

83.     FBI agents testified before the Grand Jury based on these false allegations made by Defendants.  On April 3, 2019, FBI Agent Schwinger testified before the Grand Jury that all of the claims submitted by the rural hospitals were false because the claims were billed with codes and identifiers to make it appear as if these were tests done for patients physically present at the hospital.

84.     FBI Agent Schwinger testified again before the Grand Jury in February 2020.  This time he testified that the laboratory services claims were submitted to Defendants using a POS Code 22.  Shortly after this appearance, Agent Schwinger retired from the FBI and took a job with Florida Blue.

85.     At the conclusion of the Grand Jury proceedings, Fletcher and others were indicted based on Defendants' POS Code 22 claim and testimony from federal agents based on this false information.  After the return of the indictment, Schwinger, now with Florida Blue, circulated celebratory e-mails with his new colleagues at Florida Blue.

86.     When attorneys for one of Fletcher's co-defendants met with the federal prosecutors before trial, the attorneys asked the prosecutors what were the alleged false statements that were part of this alleged insurance billing fraud scheme because the indictment did not specify them.

87.     The prosecutors told the defense attorneys that the fraud was the POS Code 22. The prosecutors told the defense attorneys to have their client present evidence that any of the patients actually visited any of the rural hospitals.  The prosecutors did not know that the claims were, in fact, billed properly using code 141 to signify that the patients never set foot in the hospital.

88.     Defendants also informed the prosecutors that the billing scheme was fraudulent because the vast majority of claims were submitted for confirmatory testing when, based on industry standards, the vast majority of claims should have been for screens.

89.     At the first trial, Defendants testified that the majority of claims were submitted for confirmatory testing.  But at the second trial, Defendants were forced to admit on cross-examination that they provided false testimony.  Defendants' witnesses conceded that the vast

majority of claims submitted were for screens and not confirmatory testing.

90.     Fletcher was acquitted of all charges in March 2023.  In the course of the criminal proceedings, in or about 2022 and 2023, Plaintiffs learned the following.  They did not and could not know about it when it was occurring.

2.     **Florida Blue's Acts in Furtherance of the Scheme**

91.     In August 2016, Florida Blue representatives corresponded with federal agents, in which Florida Blue made allegations that claims submitted by CGH and RGH were fraudulent because they falsely represented that the testing was done at the hospital on behalf of patients who were physically present at the hospital.

92.     Between August 17, 2016 and August 22, 2016, Florida Blue arranged a meeting between federal agents, Florida Blue officials and representatives of CGH, to confront the CGH representatives with this claim of fraud.

93.     On August 22, 2016, Florida Blue representatives and the federal agents traveled to CGH and confronted various representatives of CGH, including CGH laboratory personnel and CGH's legal counsel, and falsely claimed that all laboratory testing billed by CGH was false because the claims were all submitted with a POS Code 22.

94.     CGH representatives investigated these allegations, and they determined that Florida Blue's accusations were not true.  None of the claims were submitted with a POS Code 22. The claims were submitted properly and correctly using the 141 code.

95.     Florida Blue ignored this contrary evidence and proceeded to continue its malicious campaign of falsely alleging that CGH and the reference laboratories that were part of the laboratory outreach program, including LifeBrite, were engaged in insurance billing fraud through the submission of claims for testing done at outside reference laboratories on behalf of nonpatients

using the POS Code 22 to conceal the true nature of the testing.

96.     On September 1, 20216, Florida Blue representatives attended a Healthcare Fraud Prevention Partnership ("HFPP") meeting held by various private insurers.  At that meeting, representatives from Defendants discussed Florida Blue's allegations of POS Code 22 billing fraud.

97.     On September 7, 2016, Florida Blue posted an alert on the SIRIS database stating that Florida Blue discovered RGH had "been billing for drug urine lab tests on members with a place of service 22 – Outpatient Hospital and the members have never been to these hospitals for any of these services."

98.     The SIRIS database is operated by the National Health Care Anti-Fraud Association ("NHCAA") and serves as an information-sharing database where law enforcement, government agencies and private insurers share information.

99.     The alert further stated that "labs were drawn in other States and the specimen was sent to [RGH].  The billing was changed to outpatient hospital (22) and billed to Florida Blue. Data analysis confirmed that urine drug screens were being billed with a place of service 22 (Outpatient Hospital) for Out of State members."

100.     SIRIS fraud alerts are treated very seriously among NHCAA members.  The members who have access to this site have an obligation to conduct an investigation before making accusations, and they have an obligation to update the post as they learn new material information.

101.     Regulators, government payors and private insurance payors are members of NHCAA and have tremendous power to take action against companies like LifeBrite.  That is what they did here.

102.     The false NHCAA SIRIS report was published on the system through

approximately May 2023.  Despite authoring and posting the false report, Florida Blue did not take any steps to take it down or correct it.

103.    On September 14, 2016, Florida Blue representatives responsible for the false alert scheduled a call with Aetna representatives responsible for Aetna's false claims about CGH.

104.    Thereafter, Florida Blue continued to allege that Plaintiffs and others were involved in a POS Code 22 billing fraud scheme.

105.    Florida Blue provided claims data spreadsheets to the DOJ in response to Grand Jury subpoenas to the effect that the laboratory services claims were billed using POS Code 22. Florida Blue did not disclose to the DOJ or to the Grand Jury that, in fact, none of the claims were submitted using a POS Code 22 and that this phony code was inserted by Florida Blue.

106.    At trial, Howard Roche of Florida Blue admitted that POS Code 22 is not even an option on the UB-04 form.  In other words, Florida Blue spread false allegations and provided false information and documentation to the Department of Justice and to the Grand Jury to prosecute Fletcher, but after Fletcher was indicted, Florida Blue representatives were forced to admit at trial that its fraud allegations were literally impossible—there was no place on the form to apply a POS Code 22.

107.    Florida Blue knew that its allegations were false.  CGH representatives told Florida Blue back in 2016 that these claims were billed as non-patient samples using a 141 code.  Florida Blue also had access to the billing and claims data to verify this claim, and yet Florida Blue continued to spread false and malicious allegations of POS Code 22 billing fraud.

### 3.    Aetna's Acts in Furtherance of the Scheme

108.    On August 4, 2016, Aetna representatives corresponded with federal agents, falsely alleging that CGH was submitting claims for urine testing samples where the testing was not being

performed at the hospital.  On August 12, 2016, Aetna representatives transmitted claims data for CGH to federal agents, falsely alleging that CGH was billing for urine drug testing not performed at CGH.

109.    On September 1, 2016, Aetna representatives attended an HFPP meeting held by various private insurers.  At that meeting, representatives from Defendants discussed Florida Blue's false allegations of POS Code 22 billing fraud.

110.    On September 8, 2016, Susan Belair of Aetna reviewed the false NHCAA SIRIS alert published by Florida Blue.  On September 14, 2016, Florida Blue representatives responsible for the false alert scheduled a call with Aetna representatives responsible for Aetna's false claims about CGH.  On January 9, 2017, Brittany Kiefer of Aetna reviewed the false NHCAA SIRIS alert published by Florida Blue.

111.    Aetna provided claims data spreadsheets to the DOJ in response to Grand Jury subpoenas that showed the laboratory services claims were billed using POS Code 22.  Aetna did not disclose to the Department of Justice or to the Grand Jury that, in fact, none of the claims were submitted using a POS Code 22 and that these codes were inserted by Aetna.

112.    On March 22, 2019, Theresa Jackson of Aetna was interviewed by FBI Agent Schwinger about the claims spreadsheets provided by Aetna in response to the Grand Jury subpoenas.  Jackson specifically referred to the spreadsheets in the interview. She falsely claimed that the inclusion of the POS Code 22 on the claims made it appear as though the patients were going to the hospital for the toxicology testing.

113.    On June 5, 2019, Jackson testified again before the Grand Jury.  She testified that the claims were false because they included a POS Code 22, but the hospital did not perform the test and the patient never came to the hospital.

114.     At trial, Jackson testified in support of Aetna's allegations of fraud, but she too was forced to admit that there was no fraud.  She admitted that the hospital's contracts allowed for pass-through billing and that there was no Aetna policy that prohibited billing for non-patients using a 141 code.

115.     Jackson also admitted that the hospitals did not use a place of service code on the forms, but rather it was Aetna who added the POS Code 22.  She admitted that she told prosecutors before trial that the laboratory services claims had a POS Code 22 and that the claims "appeared to show" that the patients were physically present at the hospital, but she admitted on cross-examination at trial that the testimony she gave to the Grand Jury was "not completely accurate."

116.     Garrett Shohan of Aetna also testified at trial.  He admitted that it was the POS Code 22 that led him to believe the patients were physically present at the hospitals.  He admitted that he told prosecutors and investigators that this was improper pass-through billing because the hospitals were not doing any of the testing.  He admitted that this was the story he told prosecutors up until June 2022, at which point he claims to have learned that, in fact, "lots of testing was actually going on at the hospitals."

### 4.     BCBS Georgia's Acts in Furtherance of the Scheme

117.     BCBS Ga was also investigating a spike in insurance claims for its members that were submitted by or on behalf of rural hospitals in Georgia.  BCBS Ga investigators discussed their investigation with investigators from Florida Blue and others.  After these discussions, BCBS Ga claimed that Georgia rural hospitals were engaging in an insurance billing fraud scheme similar to that alleged by Florida Blue and other Defendants as to CGH and RGH.

118.     On August 9, 2017, Special Investigative Unit investigator John Iacovelli at BCBS

Ga[3] made a referral of fraudulent activity to the United States Attorney's Office for the Northern District of Georgia.

119.    On August 11, 2017, a telephone call was held between the United States Attorney's Office for the Northern District of Georgia and Investigator Iacovelli.  During this call, the prosecutors wanted to know about the alleged fraud and the contractual arrangement.  After this call, the United States Attorney's Office for the Northern District of Georgia declined to prosecute.

120.    After his referral was declined by the Department of Justice in Atlanta, Investigator Iacovelli continued to "shop" his referral.  By January 2018, he was sharing e-mails with Gary Winters with the DOJ Fraud Division in Washington, D.C.

121.    Based on this referral, the United States Attorney's Office for the Middle District of Florida and the DOJ decided to pursue the case.

**5.      Anthem's Acts in Furtherance of the Scheme**

122.    Anthem was also investigating a spike in insurance claims for its members that were submitted by or on behalf of rural hospitals in Florida, Georgia and Missouri.  Anthem investigators discussed their investigation with investigators from Florida Blue and others.  After these discussions, Anthem claimed that these rural hospitals were engaging in an insurance billing fraud scheme similar to that alleged by Florida Blue and other Defendants.

123.    On information and belief, Anthem discovered in or around 2017 that the laboratory services claims did not contain POS Code 22 and therefore were not billed fraudulently.  Yet

---

[3] In 2019, BCBS Ga was acquired by Anthem.  During the relevant time period, BCBS Ga was not owned or affiliated with Anthem.  It was a licensee of the Blue Cross Blue Shield Association and its investigators, including Investigator Iacovelli, worked with Blue Cross Blue Shield licensees in different states.

Anthem continued to accuse Plaintiffs and others of engaging in an insurance billing fraud scheme through the inclusion of a POS Code 22 on the claims.

124.   Anthem provided claims data spreadsheets to the DOJ in response to Grand Jury subpoenas that showed that the laboratory services claims were billed using POS Code 22.  Anthem did not disclose to the DOJ or to the Grand Jury that, in fact, none of the claims were submitted using a POS Code 22 and that these codes were inserted by Anthem.

125.   Anthem did not disclose to the Grand Jury or federal authorities that the laboratory services claims were submitted using code 141 and that such coding was entirely proper and legitimate.

126.   Anthem's corporate representative in a separate proceeding involving a different rural hospital admitted under oath that code 141 was the proper way to bill the insurer for non-patient samples collected and tested through a hospital laboratory outreach program.  This information was concealed from federal authorities and the Grand Jury.

### 6.   UHC's Acts in Furtherance of the Scheme

127.   UHC was also investigating a spike in insurance claims for its members that were submitted by or on behalf of rural hospitals in Florida and Georgia.  UHC investigators discussed their investigation with investigators from Florida Blue and others.  After these discussions, UHC claimed that the rural hospitals were engaging in an insurance billing fraud scheme similar to that alleged by Florida Blue and other Defendants.

128.   On April 24, 2017, Kelly Tobin, Director of Special Investigations Unit for UHC, requested UHC employees to conduct a data search for all services billed by RGH using a search parameter of the POS Code 22 with certain laboratory billing codes.

129.   On information and belief, Tobin and others within UHC discovered in or around

2017 that the laboratory services claims did not contain POS Code 22.  Yet UHC produced claims

data spreadsheets in response to Grand Jury subpoenas that the rural hospitals billed for laboratory

testing using POS Code 22.  UHC did not disclose to the federal authorities or the Grand Jury that,

in fact, none of the hospitals used POS Code 22.

130.    When Tobin testified at trial, she was forced to admit that the claims data that UHC

used to pay the claims contained information that was not provided by the hospitals, including the

POS Code 22 and other data fields.

131.    Tobin admitted that the vast majority of the claims were submitted accurately and

honestly using a 141 code, which represents that the sample came from a non-patient

132.    Tobin admitted that none of the claims submitted by CGH, RGH or Putnam had a

POS Code 22, and that it was the insurers who inserted the POS Code 22 outpatient designation

on their claims data spreadsheets.

### F.    Defendants Had No Basis to Accuse Plaintiffs of Fraud

133.    There was and is nothing illegal or impermissible about laboratory outreach

programs.  Federal law allows rural hospitals to outsource 100% of their lab work and bill for those

services even though the hospital did not perform the service.

134.    The hospitals billed for LifeBrite's laboratory testing services honestly and

properly.  The hospitals used the proper billing codes for the services rendered and to identify that

the specimens came from "non-patients" of the hospital (Code 141).  There is no place on the form

to identify which lab performed the specific part of the test, but despite this, the hospitals went out

of their way to include the name of the reference lab on the claims.

135.    What happened here is that Defendants saw the increase in claims from the rural

hospitals, realized that there was nothing improper, and concocted a scheme to leverage regulators,

law enforcement and others in the health care community to save Defendants from having to pay monies owed and to punish LifeBrite and set an example.

136.    For the Defendants, it was all about money—hundreds of millions of dollars.

137.    Plaintiffs' investigation has uncovered compelling evidence of this scheme.  For example, there are internal e-mails at Anthem regarding the outreach program at Putnam showing that Anthem knew that there was no legitimate basis to deny the claims, but they did it anyway.

138.    John Houston of Anthem wrote in an e-mail on January 23, 2017 that "We have paid over 12 million for drug tox in the past 6 months or so.  We need to put them [Putnam] on PPR right away.  The problem is, is that they do not fit within one of the exceptions . . . ."

139.    On February 1, 2017, Heather Burch, Provider Network Manager at Anthem, admitted in an e-mail that Anthem's current contract with Putnam "does not address pass through billing."  She later said in a subsequent e-mail that "I don't feel we can hold them to the pass through rule if it is silent in their current contract."

140.    Thus, the insurers knew that their agreements did not prohibit pass-through billing, and so they could not legitimately deny the claims because the hospital failed to perform all of the tests.  But despite knowing this, they spread false allegations that these hospitals and their reference laboratories, including LifeBrite, were engaging in fraud through improper pass-through billing.

141.    The insurers knew they were supposed to pay the claims.  But motivated by greed and a callous disregard for the truth, the insurers denied the claims anyway and alleged "fraud." Defendants knew that there was no basis to allege "fraud."

142.    Defendants falsely and fraudulently took the position that Plaintiffs were part of a criminal conspiracy aimed at defrauding insurance companies.  The goal was to malign and pressure Plaintiffs so that they would not be able to survive as a business, and so that the

Defendants would not have to pay for testing.

143.    Defendants were not interested in the truth.  They were interested in saving money. They knew their fraud allegations were fabricated, but they spread them anyway hoping that prosecutors, regulators and others would pressure Plaintiffs and destroy LifeBrite's business.

144.    This scheme had the desired effect.  Clients stopped using LifeBrite.  LifeBrite lost opportunities to sell the business.  Shortly before Fletcher's criminal trial, the Centers for Medicare & Medicaid Services, a federal agency within the United States Department of Health and Human Services, suspended LifeBrite's privileges to receive reimbursements for Medicare and Medicaid patients.  The basis for the suspension was the allegation of fraud as set forth in the criminal indictment, even though not one judge or jury had found that Plaintiffs engaged in any fraud or conspiracy.

### G.    The Little River Arbitration

145.    Defendants did not just target Plaintiffs and those associated with the laboratory outreach programs at CGH, RGH and Putnam.  Other rural hospitals throughout the country implemented outreach programs similar to those at CGH, RGH and Putnam, and private insurers engaged in similar smear campaigns of false accusations.

146.    One example is Little River, a rural hospital in Rockdale, Texas.  Little River implemented its own outreach program with reference laboratories and billed insurers openly and honestly.

147.    Blue Cross Blue Shield of Texas ("BCBSTX") had no basis to deny claims submitted by Little River from its outreach program.  Nonetheless, BCBSTX claimed that Little River had engaged in billing fraud through misstatements and improper pass-through billing, but Little River would not capitulate.

148.    Little River took BCBSTX to arbitration and won.  The arbitrators found that Little River's claims were legitimate and properly billed under the non-patient 141 code and that there was no improper pass-through billing when Little River submitted claims for tests run by reference laboratories.  The arbitrators rejected BCBSTX's fraud theories across the board and awarded Little River over $100 million.

149.    But the damage had already been done.  During the arbitration, Little River was forced to file for bankruptcy.  Little River is currently pursuing claims against BCBSTX by way of an adversary complaint in the bankruptcy.

150.    There were other victims too, including Fletcher's co-defendants in the criminal case.  Defendants spread false allegations of billing fraud about Aaron Durall, the owner of Reliance Laboratories that served as a reference laboratory for some of the same rural hospitals as LifeBrite.

151.    Durall was maliciously prosecuted based on Defendants' lies.  Durall was acquitted of all charges.

**H.      Plaintiffs Did Not Release The Claims Alleged Herein**

152.    Plaintiffs entered into settlement agreements with Defendants to resolve claims related to payment in connection with the CGH and Putnam laboratory outreach programs.  These settlements contained releases that do not bar the claims alleged herein.

153.    The claims alleged herein involve actionable conduct which post-dates the execution of the settlement agreements and falls outside of the limited releases set forth therein.  Further, the fraudulent scheme herein was concealed from Plaintiffs who did not know and had no way of knowing about it until the criminal proceedings.

I.      **Discovery Rule**

154.    To the extent applicable, the Discovery Rule applies to delay the accrual of Plaintiffs' causes of action, as the nature of Plaintiffs' injuries and Defendants' conduct was undiscoverable.  Plaintiffs exercised due diligence prior to the assertion of these claims and only upon uncovering Defendants' conduct were Plaintiffs able to assert these claims within the applicable statutes of limitations.  Defendants were fraudulently concealing their actions.

## CAUSES OF ACTION

## COUNT I – MALICIOUS PROSECUTION

### (By Christian Fletcher Against All Defendants)

155.    Plaintiffs incorporate by reference each and every foregoing allegation contained in the proceeding paragraphs.

156.    Defendants instigated without probable cause a criminal prosecution against Fletcher with malice.

157.    Defendants' instigation included false reporting of criminal activity and making false statements and providing false and misleading documentation to investigators, prosecutors, the Grand Jury and at trial.

158.    Defendants maliciously instigated a criminal prosecution against Fletcher out of greed.  They wanted to save money and dissuade Fletcher and others from participating in rural hospital laboratory outreach programs, and to punish Fletcher in particular for LifeBrite's participation in the CGH, RGH and Putnam hospital laboratory outreach programs.

159.    The criminal prosecution was terminated favorably for Fletcher.  He was acquitted of all charges.

160.    Defendants' instigation of criminal proceedings was without probable cause.  The

first trial resulted in a hung jury and is therefore a nullity. The second trial involved different evidence including admissions by Defendants that they provided false testimony to the Grand Jury and during the first trial. Fletcher was acquitted of all charges.

161.    Defendants also intentionally assisted each other's malicious prosecution such that each Defendant is liable for aiding and abetting each Defendant's malicious prosecution.

162.    Defendants also conspired to maliciously prosecute Fletcher and others by agreeing to concoct an alleged billing fraud scheme and falsely and maliciously accuse Fletcher and others of participating in said scheme.

163.    Fletcher has been damaged as a result of Defendants' malicious prosecution, including pecuniary and emotional distress damages.

164.    Fletcher's damages include over two million in legal fees to defend the criminal charges brought against him and emotional distress, including pain and suffering, caused by the malicious prosecution. Fletcher's damages will conform to proof at trial.

165.    Fletcher is entitled to an award of punitive and exemplary damages as a result of Defendants' malicious, fraudulent and wanton conduct.

## <u>COUNT II – GEORGIA RICO</u>

### (By Plaintiffs Against All Defendants)

166.    Plaintiffs incorporate by reference each and every foregoing allegation contained in the proceeding paragraphs.

167.    The Georgia RICO statute, O.C.G.A. § 16-14-4, subsection (a), prohibits "any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money," and subsection (b) prohibits "any person

employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

168.    Defendants engaged in a pattern of racketeering activity in violation of the Georgia RICO statute by conducting their coordinated smear campaign spreading false allegations through the use of the mail and interstate wire communications, and by committing perjury and providing false information to federal authorities.

169.    Defendants further conspired and/or endeavored to violate the Georgia RICO statute in violation of O.C.G.A. § 15-14-4, subsection (c).  Defendants formed an "enterprise" under the Georgia RICO statute.  Defendants had a common purpose to avoid payments and to destroy Plaintiffs.  Defendants worked together to do so, forming relationships among them of sufficient longevity to permit their co-conspirators to pursue the enterprise's purpose.

170.    Plaintiffs suffered economic injury that flowed directly from Defendants' violations of the Georgia RICO statute and was proximately caused thereby.

171.    Plaintiffs' damages will conform to proof at trial but which is estimated to exceed $400 million.

172.    Plaintiffs are also entitled to treble damages pursuant to O.C.G.A. § 16-14-6, subsection (c).

173.    Plaintiffs are also entitled to an award of punitive damages due to Defendants' malicious, fraudulent and wanton conduct, plus attorneys' fees.

### COUNT III – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

#### (By LifeBrite Against All Defendants)

174.    Plaintiffs incorporate by reference each and every foregoing allegation contained in the proceeding paragraphs.

175.   LifeBrite had valid contractual relationships with rural hospitals and clients including, but not limited to, pain management clinics, substance abuse and treatment centers and physicians practices.

176.   Defendants, who were not parties to those contracts, induced those clients to sever their contracts and not continue their business relationship with LifeBrite.

177.   In doing so, Defendants acted improperly and without privilege, and purposefully and maliciously with the intent to injure.  This included, among others, spreading false and malicious allegations orally and in writing, including in its letters, e-mails and other communications to regulators, government agencies, physicians, clinics, centers, hospitals and others in the healthcare industry, with the intent to disrupt and interfere with LifeBrite's contracts with its clients, third-party payors, and other payors with whom LifeBrite enjoyed beneficial contractual relationships.

178.   Defendants' interference was wrongful and not privileged in that it was conducted through false and defamatory statements that were part of a coordinated smear campaign that was intentionally designed to destroy LifeBrite's business.

179.   Defendants' wrongful interference disrupted LifeBrite's existing and prospective contractual relationships, causing damage which will conform to proof at trial but is estimated to exceed $400 million.

180.   In addition, Defendants acted in bad faith and have caused LifeBrite unnecessary trouble and expense.  Accordingly, pursuant to O.C.G.A. § 13-6-11, LifeBrite is entitled to recovery of its litigation expenses, including but not limited to its reasonable attorneys' fees.

181.   Plaintiff is entitled to an award of punitive and exemplary damages as a result of Defendants' malicious, fraudulent and wanton conduct.

## <u>COUNTY IV – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS</u>

### (By LifeBrite Against All Defendants)

182.    Plaintiffs incorporate by reference each and every foregoing allegation contained in the proceeding paragraphs.

183.    LifeBrite expected business relationships with clients in the healthcare industry.

184.    Defendants knew about LifeBrite's current and prospective business relationships, and intentionally and unjustifiably interfered with them by disrupting those relationships and inducing clients to not enter into or continue their business relationships with LifeBrite,

185.    Defendants acted improperly and without privilege, and purposefully and maliciously with the intent to injure.

186.    As a direct and proximate result of Defendants' interference, LifeBrite has suffered and will continue to suffer financial injury; LifeBrite will be directly deprived of any future revenues deriving from each opportunity, as well as the additional benefits and credibility that would have accrued to it as a result of concluding and successfully completing those opportunities.

187.    LifeBrite's damages will conform to proof at trial but which is estimated to exceed $400 million.

188.    In addition, Defendants acted in bad faith and have caused LifeBrite unnecessary trouble and expense.  Accordingly, pursuant to O.C.G.A. § 13-6-11, LifeBrite is entitled to recovery of its litigation expenses, including but not limited to its reasonable attorneys' fees.

189.    Plaintiff is entitled to an award of punitive and exemplary damages as a result of Defendants' malicious, fraudulent and wanton conduct.

## <u>COUNT V – FRAUDULENT SCHEME</u>

### (By Plaintiffs Against All Defendants)

190.    Plaintiffs incorporate by reference each and every foregoing allegation contained in the proceeding paragraphs.

191.    Defendants directly engaged in a fraudulent scheme, and/or conspired with others to engage in a fraudulent scheme, that was intentionally designed to injure LifeBrite and make an example of it.

192.    Defendants' fraudulent scheme consisted of a smear campaign whereby they published false allegations of LifeBrite billing fraud to regulators, government agencies, insurance payors and others in the health care industry with the intent to leverage these industry participants to take action to destroy LifeBrite.

193.    Defendants knew and intended that these industry participants and law enforcement would rely on their false allegations of billing fraud to deny contracts, terminate contracts, suspend and terminate privileges, perform reviews and audits and ultimately pursue criminal charges against LifeBrite and its founder.

194.    This fraudulent scheme was coordinated and widespread, and undertaken with malicious intent to punish LifeBrite and others for their participation in rural hospital laboratory outreach programs and to avoid paying tens of millions of dollars in legitimate claims.

195.    Plaintiffs were injured as a proximate result of Defendants' fraudulent scheme and suffered damage, which will conform to proof at trial but which is estimated to exceed $400 million.

196.    Plaintiffs are entitled to an award of punitive and exemplary damages as a result of Defendants' malicious, fraudulent and wanton conduct.

## COUNT VI – DEFAMATION

### (By Plaintiffs Against All Defendants)

197.    Plaintiffs incorporate by reference each and every foregoing allegation contained in the proceeding paragraphs.

198.    Defendants published false and defamatory statements about LifeBrite in letters, e-mails and through other means designed to widely disseminate their false and defamatory statements.

199.    Defendants' defamatory statements are unprivileged and false.

200.    Defendants' defamatory statements literally state and reasonably imply that LifeBrite, and those associated with LifeBrite, including Fletcher, were engaged in a billing fraud scheme that violated federal criminal laws as well as breached insurer contracts and policies.

201.    A reasonable person hearing these statements would form an intense negative impression of Plaintiffs.  Industry participants would form the same impression and would likely choose to avoid doing business with LifeBrite and Fletcher as a result.

202.    Plaintiffs have been directly injured as a result of Defendants' defamatory statements and suffered damage, which will conform to proof at trial.

203.    Fletcher has also suffered financial and emotional distress damages as a result of Defendants' intentional and malicious defamatory conduct in an amount that will conform to proof at trial.

204.    Plaintiffs are entitled to an award of punitive and exemplary damages as a result of Defendants' malicious, fraudulent and wanton conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.     Actual, compensatory and special damages in excess of $1 billion, according to

       proof;

B.     Punitive and exemplary damages;

C.     Pre- and post-judgment interest, and costs and attorneys' fees to the fullest extent

       allowable by law; and

D.     Any further relief the Court deems just and proper.

Dated this 20th day of July, 2023.

                                        DELCAMPO GRAYSON LÓPEZ LLC

                                        /s/ Dax E. Lêpez
                                        DAX E. LÓPEZ
                                        Georgia Bar No. 457888
                                        J. ANTONIO DELCAMPO
                                        Georgia Bar No. 216815
                                        RANDALL D. GRAYSON
5455 Chamblee Dunwoody Road             Georgia Bar No. 306560
Dunwoody, Georgia 30338
(770) 481-0444
(770) 395-0806 FAX
tony@dglattorneys.com
rgrayson@dglattorneys.com
dax@dglattorneys.com


                                        LIFEBRITE LABORATORIES, LLC
                                        and CHRISTIAN FLETCHER


Louis R. Miller (*pro hac vice application forthcoming*)
David W. Schecter (*pro hac vice application forthcoming*)
MILLER BARONDESS, LLP
2121 Avenue of the Stars, 26th Floor
Los Angeles, California 90067
(310) 552-4400

*Attorneys for Plaintiffs*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial on all claims so triable.

DELCAMPO GRAYSON LÓPEZ LLC

*/s/ Dax E. Lêpez*
DAX E. LÓPEZ
Georgia Bar No. 457888
J. ANTONIO DELCAMPO
Georgia Bar No. 216815
RANDALL D. GRAYSON
Georgia Bar No. 306560

5455 Chamblee Dunwoody Road
Dunwoody, Georgia 30338
(770) 481-0444
(770) 395-0806 FAX
tony@dglattorneys.com
rgrayson@dglattorneys.com
dax@dglattorneys.com

LIFEBRITE LABORATORIES, LLC and
CHRISTIAN FLETCHER

Louis R. Miller (*pro hac vice application forthcoming*)
David W. Schecter (*pro hac vice application forthcoming*)
MILLER BARONDESS, LLP
2121 Avenue of the Stars, 26th Floor
Los Angeles, California 90067
(310) 552-4400

*Attorneys for Plaintiffs*