# EXHIBIT 8

E-FILED IN OFFICE - CE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
23-A-05550-1
6/28/2023 12:54 AM
TIANA P. GARNER, CLERK

**IN THE SUPERIOR COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| BRENDA BULLARD | ) | |
| | ) | |
|     PLAINTIFF | ) | |
| | ) | **CIVIL ACTION** |
| VS. | ) | **FILE NO.:**  23-A-05550-1 |
| | ) | |
| CARMAX ENTERPRISE | ) | |
| SERVICES, LLC and CARMAX | ) | |
| SOUTHLAKE | ) | |
|     DEFENDANT(S) | ) | |

## <u>GENERAL COMPLAINT FOR DAMAGES UNDER THE FEDERAL FAIR BUSINESS PRACTICE ACT and BRIEF IN SUPPORT THEREOF</u>

COMES NOW, BRENDA BULLARD, Plaintiff, by and through the undersigned counsel, and files this statement of claim and brief in support thereof, against CARMAX ENTERPRISE SERVICES, LLC and CARMAX SOUTHLAKE, Defendant(s), for violations of the Georgia Fair Business Practices Act, Georgia Sale of Frame-Damaged Car Statues and Georgia Contract Law/Statues. Most specifically, for Deceptive or Unfair Business Practices, False Advertising, Liability under the Georgia Lemon Law, Unlawful Motor Vehicle Franchise Practices, Unfair Deceptive Practices Toward the Elderly; for unlawful sale of a Frame-Damaged Damaged Automobile; and for breach of contract regarding Fraud in the Inducement, Actual and Constructive Fraud, Willful Misrepresentation, Misrepresentation of a Material Fact, and Breach of Contract Warranties, and shows the Court the following:

**PARTIES**

1.

Plaintiff is a resident of Muscogee County, Georgia and has been for six (6) months preceding the filing of this Statement of Claims.

2.

Defendant, CarMax Enterprise Service, LLC, is a resident of Gwinnett County, Georgia and can be served at its registered place of business at 2 Sun Court, Suite 400, Peachtree Corners, Georgia, 30092.

3.

Defendant, CarMax Southlake, is a resident of Henry County, Georgia and can be served at its principal place of business of 3100 Mt Zion Parkway, Stockbridge, Georgia, 30281.

**JURISDICTION AND VENUE**

4.

This Court has subject matter jurisdiction over this matter.

5.

This Court has personal jurisdiction over the Plaintiff and Defendants.

6.

Venue is Proper in this Court.

## STATEMENT OF FACTS

7.

In June of 2021, Ms. Brenda Bullard responded to several CarMax South Lake "CarMax" advertisements for sale of a Silver 2019 Toyota Avalon Touring, VIN#421BZ1FB9KU005752. The advertisement represented the car to be free of damage and free of prior accidents.

8.

Ms. Bullard entered into negotiations to buy said vehicle from CarMax.

9.

During said negotiations, CarMax indicated verbally and through written documentation that said vehicle had never been in an accident.

10.

Relying upon said representations by CarMax, Ms. Bullard entered into a contract to purchase the vehicle.

11.

Pursuant to said contract, Ms. Bullard proceeded to make three separate payments, starting on 7/6/2021 one for $3,000.00 another for $20,081.87 and another the final payment for $10,000.00 to consummate full purchase of the vehicle.

12.

In September of 2022, the vehicle began to have problems, prompting dashboard lights to illuminate repeatedly.

13.

Ms. Bullard proceeded to take the vehicle to seek service in which it was discovered through a Carfax report that the vehicle had past issues including damage from a sideswipe

accident. Said damage was reported on 12/19/2019…A full year and a half BEFORE the vehicle was represented to Ms. Bullard as having had no accidents and no accident damage by CarMax.

14.

Said accidents resulted in damage to the car, including, but not limited to: right front and rear damage.

15.

Said damage has rendered the car gravely defective with a "Serious Safety Defect". Namely, the rear backup camera became inoperable.

16.

Said Serious Safety Defect, an inoperable rear backup camera, poses an extreme danger and grave threat to the safety of Ms. Bullard & the public. (See Infra)

17.

As a result of this sequence of events, CarMax is directly liable for a myriad of contract and consumer protection violations.

WHEREFORE, Plaintiff respectfully request the following relief:

    a. That the Plaintiff be awarded the full amount of up to $750,000.00 associated with this Statement of Claim;
    b. That a Rule Nisi be scheduled by the Court requiring the Defendants to appear and show cause why the relief sought should not be granted;
    c. That the Defendants be required to pay Court and Attorney Fees associated with this action; and
    d. That the Court order any all relief that the Court deems appropriate.

Respectfully submitted this 26th day of June, 2023.

[SIGNATURE ON THE NEXT PAGE]

|S| *CHRISTOPHER COLEMAN*
_____
Christopher Coleman
Georgia Bar Number 607619
Attorney for the Plaintiff

**The Pacific and Southern Law Group**
P.O. Box 965161
2886 Sandy Plains Road
Marietta, Ga. 30066
chris@pacificlaw.net

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| BRENDA BULLARD | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | CIVIL ACTION |
| VS. | ) | FILE NO.: |
| | ) | 23-A-05550-1 |
| CARMAX ENTERPRISE | ) | |
| SERVICES, LLC and CARMAX | ) | |
| SOUTHLAKE | ) | |
| DEFENDANT(S) | ) | |

# BRIEF IN SUPPORT OF CLAIM UNDER THE FAIR BUSINESS PRACTICES ACT, O.C.G.A 40-5-1, SALE OF FRAME DAMAGED AUTOMOBILES, AND GEORGIA CONTRACT LAW

COMES NOW, BRENDA BULLARD, Plaintiff, by and through the undersigned counsel, and hereby files this Brief in Support of her Claim under the Fair Business Practice Act, O.C.G.A. §40-5-1, Sale of Frame Damaged Automobiles, and Georgia Contract Law, showing the Court the following:

## STATEMENT OF FACTS AND UNDERLINING CASE

In June of 2021, Ms. Brenda Bullard responded to several CarMax South Lake "CarMax" advertisements for sale of a Silver 2019 Toyota Avalon Touring, VIN#421BZ1FB9KU005752. The advertisement represented the car to be free of damage and free of prior accidents. Ms. Bullard entered into negotiations to buy said vehicle from CarMax. During said negotiations, CarMax indicated verbally and through written documentation that said vehicle had never been in an accident. Relying upon said representations by CarMax, Ms. Bullard entered into a contract to purchase the vehicle. Pursuant to said contract, Ms. Bullard proceeded to make three separate payments, starting on 7/6/2021 one for $3,000.00 another for $20,081.87 and another the final payment for $10,000.00 to consummate full purchase of the vehicle.

6

In September of 2022, the vehicle began to have problems, prompting dashboard lights to illuminate repeatedly. Ms. Bullard proceeded to take the vehicle to seek service in which it was discovered through a Carfax report that the vehicle had past issues including damage from a sideswipe accident. Said damage was reported on 12/19/2019…A full year and a half BEFORE the vehicle was represented to Ms. Bullard as having had no accidents and no accident damage by CarMax. Said accidents resulted in damage to the car, including, but not limited to: right front and rear damage. Said damage has rendered the car gravely defective with a "Serious Safety Defect". Namely, the rear backup camera became inoperable.

### HISTORICAL CONTEXT – THE GRAVE DANGER OF BROKEN BACKUP CAMARAS

A. Rear View Cameras Reduce 90% of Back-Over Accidents –Kelly/Uustal Legal Blog - 2018

Rear cameras or backup cameras are becoming a standard feature in many new cars—and for good reason. According to the Insurance Institute for Highway Safety, nearly 300 people are killed and 18,000 injured by drivers who mistakenly back over them. Most typically, children are the prime victims because their size and small stature make them virtually impossible to see in a rearview mirror.

The larger the vehicle, like a truck, the larger the blind zone is in the rear. Large SUVs, vans, pickup trucks, and minivans are especially likely to miss a child that has wandered up behind them. The result is often tragic and, in many cases, fatal, in this case, a truck accident lawyer would be your point of contact.

A recent IIHS study confirmed that rear cameras, or backup cameras, are the most promising technology available for avoiding such devastating accidents. The study was conducted in an empty parking lot. Participants took turns backing large vehicles out of

parking spots. They were only told that they were evaluating the vehicle's entertainment system, not that they were taking part in a backup camera study. At random times, the researcher would place something behind the vehicle—a foam cutout of a child. The driver was then told to back out of the parking spot.

The results of the study showed that SUVs had the worst visibility, while small cars had the best. Yet when backup cameras were utilized, back-over accidents were reduced by 90%.

B. Posted in Car Accidents on June 7, 2021

Backup cameras have been standard on all new motor vehicles since May 1, 2018. Still, backup accidents continue to occur at a surprising rate. The Insurance Institute for Highway Safety (IIHS) estimates that backup accidents result in about 18,000 injuries and 300 fatalities each year in the United States.

Approximately one-quarter of motor vehicle accidents are related to backing up. Backing up accidents involve other vehicles, pedestrians, toys, animals, fixed objects, and other items in a driver's blind spot.

C. When Did Backup Cameras Become Standard Equipment?

A lawsuit filed against the U.S. Department of Transportation in 2013 forced the department to comply with the requirements of the K.T. Safety Act of 2007. The result of the lawsuit was that backup cameras became standard equipment on all new motor vehicles beginning on May 1, 2018. All vehicles sold in the United States after that date must be equipped with backup cameras.

Many vehicle manufacturers already offered backup cameras as standard equipment on some vehicles. Other manufacturers included backup cameras as part of their driver assistance technology packages.

D.  How Does Your Backup Camera Work?

When you put your vehicle in reverse, small cameras at the rear of the vehicle display the area behind your car on a dashboard screen. You can see the area immediately behind your vehicle. Depending on the vehicle, backup cameras may show a more extensive area behind the vehicle.

The backup cameras let you see if there is a child, animal, or other objects directly behind the vehicle. The assumption was that backup cameras would reduce the number of reverse driving accidents because drivers could see what was in their blind spot.

The NHTSA pointed out that the number of fatalities caused by these accidents fell during that same period. It estimates that 58 to 69 lives could be saved each year if all vehicles had backup cameras installed.

A backing-up accident can cause severe injuries for the person hit by the vehicle, such as:

- Broken bones

- Back and spinal cord injuries

- Brain damage

- Neck injuries

- Internal organ damage

- Wrongful death

The damages caused by the rear driving accident could be significant. For example, a person may have large medical bills and lost income due to the accident.

In addition to the economic damages, victims may also experience significant pain and suffering, permanent impairments, and decreased quality of life. These non-economic damages can also be included in a personal injury claim.

E.  Preventing Backup Accidents with Cameras – Does It Work?

Preventing Backup Accidents with Cameras – Does It Work? Driveway back overs are a parent's and driver's worst nightmare, and adults can be injured in a backing up accident as well as children. Responsibility in back over car accidents usually falls on the driver who backs into the other vehicle, an object, or a person. Drivers must always remember to be alert, look behind the vehicle, and use rear view mirrors to check for pedestrians or other vehicles in their path.

According to KidsAndCars.org, a national nonprofit organization dedicated to saving children's lives, "Every year, thousands of children are killed or seriously injured because a driver backing up didn't see them. A back over incident typically takes place when a car is backing out of a driveway or parking space." Per the organization: "At least fifty children are being backed over by vehicles every week in the United States the predominant age of victims is 12-23 months. About 60% of back overs involve larger vehicles like SUVs and pickup trucks. Some of the most common places for back over accidents are driveways and parking lots, especially school lots, and assisted living lots. Arming vehicles with backup cameras is newly mandated for all vehicles and is helping to prevent these back over tragedies and injuries from happening."

F.  What the data shows regarding camera use and back over accidents

A 2016 Insurance Institute for Highway Safety (IIHS) study concluded that cameras reduced back over accidents by 16%, and that drivers aged over 70 benefitted the most from the use of the cameras. In fact, rear-view cameras reduced back over crashes in older drivers by 40%, but only by 15% in younger drivers. These rear-view cameras may be more useful for older drivers who may have trouble turning their heads to look over their shoulders. In addition to pedestrian incidents, backup cameras also help prevent parking accidents. The cameras help guide drivers when parallel parking, they take the guesswork out of this tricky skill and result in less fender benders while parallel parking in tight spaces.

Motor biscuit reports that rear-view camera systems provide, "a broader field of vision for accident avoidance." The systems give us eyes beyond the rear window, and trunk level which helps to eliminate trunk-level blind spots.

As of May 2018, all passenger cars, trucks, vans and vehicles under 10,000 pounds have been required to include rear view monitoring technology by federal law. Before this rule went into effect, the National Highway Traffic Safety Administration (NHTSA) estimated that 210 individuals were killed and 15,000 were injured each year by vehicles backing over them. Sadly, those statistics also showed that 31% of those killed were children under 5 years old.

For example, as it usually happens with recent technology, there have been numerous recalls due to faulty cameras over the past five years, including a Ford recall due to distortion of images and blank screens in rear view cameras. Honda has also had to issue recalls due to a glitch in the software causing blank screens or delayed images. Similar recalls have also been made for Tesla, Porsche, and Nissan

G.  Why are there so many auto recalls for faulty backup cameras?

Ford is recalling another 277,000 vehicles to address this issue. Photo Ford Motor Company is recalling 277,040 model year 2017-2020 F-Super Duty F-250s, F-350 s F-450s, and model year 2017-2020 Lincoln Continentals with the 360-degree camera system. So far this year, the automaker has recalled more than 700,000 vehicles due to camera issues. In this latest instance, degradation of the camera's anti-reflective lens coating can lead to a foggy or cloudy rearview camera image.

H.  Lack of a clear rearview camera image can reduce the driver's visibility of what is behind the vehicle and increase the risk of a crash.

A Washington, D.C., reporter for more than 30 years, Jim Limbach covers the federal agencies for Consumer Affairs. Previously, he was a reporter and news anchor for Associated Press Broadcast Services, where he covered business and consumer news as well as space shots and other major spot news events.

I.  Faulty Backup Camera May Put VWs in Violation of Federal Safety Regs

Faulty Backup Camera May Put VWs in Violation of Federal Safety Regs In July 2022, Volkswagen announced a voluntary recall of more than 43,000 vehicles due to a software problem that could fail to display an image from the backup camera when the vehicle was reversing. This flaw, which the company says can be fixed with a software update, could potentially put these vehicles in violation of a federal vehicle safety requirement mandating that new cars must come standard with rear visibility technology. According to the National Highway Traffic Safety Administration (NHTSA), before the federal rule mandating rear visibility technology went into effect in 2018, at least 183 people were killed and 15,000 injured each year by vehicles backing over them.

J.   What are back over accidents?

A back over accident occurs when a vehicle strikes a person while reversing. As devastating as back over accidents can be, they are preventable. Here are some ways to help avoid them: Look around. Always walk around a vehicle and look underneath it before getting in and starting it up. If there are children nearby, take note of how many and make sure that you can see all of them as you back up. Listen carefully. Roll the windows down, turn the radio off, and keep the windows rolled down as you reverse your vehicle so you can hear what's happening around you. Use cameras and sensors, but don't rely on them.

Tests have found that cameras and sensors mounted on vehicles are extremely helpful in preventing back over accidents. However, they are not foolproof. Detection results can vary according to the type, position, and number of sensors and/or cameras; the number and location of people behind a vehicle; weather conditions; and the slope of the road or driveway. Nevertheless, here are some systems that are available to assist drivers in backing up safely: Radar or ultrasonic-based proximity sensors: systems that utilize electromagnetic waves to alert drivers of an object or someone in their path as they back up.

Electromagnetic proximity detection systems: systems that utilize electromagnetic fields to detect ferromagnetic objects, such as a metal tag, to alert a driver that an object or person associated with the tag is within proximity of the vehicle. Rearview cameras: cameras installed at the back of a vehicle (such as the ones recalled by Volkswagen) that can help a driver see any person or object directly in in the vehicle's path while backing up.

In 2009, Jessica and Ken Mundy recovered $40 million from Ford Motor Company after the transmission in Jessica's Ford Explorer malfunctioned and ran her over, causing her to sustain a fractured spine and be rendered a paraplegic. Lawyers showed that Ford had known

for decades that their transmissions had a defect known as "false park," but Ford ignored the problem until it was too late.

Jed Manton is committed to representing individuals and business that have been harmed by the actions of others. With a solid track record, Jed has helped numerous clients who have been seriously injured or who have lost a loved one obtain justice, while holding the wrongdoer accountable.

K.  Nissan Recalls 1.2 Million Vehicles with Defective Backup Cameras

Nissan Has No Fix for Auto Defect That Puts 400,000 Vehicles on the Road at Risk

Nissan has issued a recall of about 1.2 million cars and SUVs after discovering a backup camera defect including in its two top-selling vehicles, the Rogue SUV and Altima sedan. According to a USA Today news report, the Japanese automaker, which sells the Nissan and Infiniti brands, is recalling about 1.2 million vehicles in the United States.

L.  Details of the Recall

The company acknowledged in a letter to the National Highway Traffic Safety Administration (NHTSA) that the affected vehicles are not in compliance with federal regulations because of the defect. According to NHTSA documents, the backup camera and display settings can be adjusted such that the rearview image is no longer visible. The system will then retain that setting the next time the vehicle is placed in reverse, increasing the risk of a crash. The recall is expected to start Oct. 21. Nissan will notify vehicle owners and dealers will fix the vehicles at no cost by installing a software upgrade.

M.  The Tragedy of Back over Accidents

Every year, thousands of children are killed or seriously injured because a driver backing up didn't see them. A back over incident typically takes place when a car is backing out of a driveway or parking space. Back over accidents change the lives of parents, families and communities forever, and they often occur because the driver could not see the victims, often young children, behind the vehicle or in a blind zone.

According to the advocacy website, KidsandCars.org, in the United States, at least 50 children are being backed over by vehicles every week. The predominant age of victims in these cases is 1 year. Most victims are between 12 and 23 months old. Tragically, in more than 70 percent of these incidents, a parent, neighbor or close relative is behind the wheel of the vehicle that struck and killed the child.

N.  Liability Issues

When a back over accident occurs, an action can be file to determine who can be held liable for the injuries, damages and losses caused. Victims and their families can seek compensation by filing an auto product liability lawsuit against the automaker and other applicable parties. On March 31, 2014, NHTSA announced that it would require all automobiles sold in the United States built beginning in May 2018 to include backup cameras. This law was passed for a reason – to stop preventable child deaths.

O.  Ford recalls 462,000 vehicles for rear camera display failure

Ford Motor Co (F.N) is recalling 462,000 vehicles worldwide because video output may fail, preventing the rearview camera image from displaying. The U.S. automaker said the recall covers some 2020-2023 model year Explorer, Lincoln Aviator, and 2020-2022 Lincoln Corsair vehicles equipped with 360-degree cameras and includes 382,000 in the United

States. Ford said it has reports of 17 minor crashes relating to the recall issue and more than

2,100 warranty reports but no reports of injuries. The recall expands and replaces a 2021

recall of 228,000 vehicles. Dealers will update the image processing module software and

vehicles previously updated under the old recall will need the new update.

P.  Mercedes-Benz And BMW Backup Camera Accident Lawsuits

According to an online news alert posted on motorillustrated.com, Mercedes-Benz and

BMW have initiated a safety  recall concerning their backup camera infotainment systems. The

recalls concern defective backup cameras, which could cause a severe motor vehicle accident.

## ARGUMENT AND CITATION OF LAW

**I.   CARMAX IS LIABLE UNDER THE FAIR BUSINESS PRACTICES ACT FOR
DECEPTIVE OR UNFAIR BUSINESS PRACTICES BECAUSE OF DECEPTIVE
TRADE PRACTICES, UNFAIR OR DECEPTIVE PRACTICES IN CONSUMER
TRANSACTIONS AND PURPOSEFUL PROTECTION FOR MS. BULLARD**

A.  DECEPTIVE OR UNFAIR BUSINESS PRACTICES

A person engages in a deceptive trade practice when, in the course of his business,

vocation, or occupation, he: passes off goods or services as those of another, causes

likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or

certification of goods or services, causes likelihood of confusion or of misunderstanding

as to affiliation, connection, or association with or certification by another, uses deceptive

representations or designations of geographic origin in connection with goods or services,

represents that goods or services have sponsorship, approval, characteristics, ingredients,

uses, benefits, or quantities that they do not have or that a person has a sponsorship,

approval, status, affiliation, or connection that he does not have, represents that goods are

original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or

secondhand, represents that goods or services are of a particular standard, quality, or

grade or that goods are of a particular style or model, if they are of another, disparages

the goods, services, or business of another by false or misleading representation of fact,

advertises goods or services with intent not to sell them as advertised, advertises goods or

services with intent not to supply reasonably expectable public demand, unless the

advertisement discloses a limitation of quantity, makes false or misleading statements of

fact concerning the reasons for, existence of, or amounts of price reductions; or engages

in any other conduct which similarly creates a likelihood of confusion or of

misunderstanding, in order to prevail in an action under this part, a complainant need not

prove competition between the parties or actual confusion or misunderstanding, this Code

section does not affect unfair trade practices otherwise actionable at common law or

under other statutes of this state. Ga. L. 1968, p. 337, § 2.

Here, by indicating that their product had never been in an accident, CarMax

represented their product in a condition in which it was not. This was done through lack

of thorough investigation and vetting of their product. The Carfax report that was

procured by Ms. Bullard clearly indicated that the car she purchased had, in fact,

sustained accident damage. Damage that was absolutely substantial to the point of

disclosure and substantial to the point of causing malfunctions to the car.

Said malfunction, an in operable rear backup camera what could have resulted in

serious accident or injury or death to Ms. Bullard, but moreover to someone else...in

which Ms. Bullard would be responsible. Lack of a rear camera could result in a motorist

backing into another vehicle, a pole, a fire hydrant or fixed structure or another person

causing serious injury or or death. Lack of a rear camera could also result in an accident-

causing damage to the gas tank of the vehicle leading to explosion. The smallest of threshold investigation by CarMax, at the very least procuring a Carfax report, would have revealed the accident damage and avoided the deceptive sale.

The fact that CarMax put forth an Auto Check report only is even more suspect as to their deceptive intentions. What is clear here is one vehicle report is not enough. A thorough investigation of all vehicles, including multiple background reports from the likes of Carfax, Auto Check, and others, is needed to present a safe, sound product to the public. Otherwise, there is knowledge by the dealer/seller that the product could be defective. And in proceeding to go ahead and sell that product, passing it off as clear of defections, is deceptive and therefore actionable by law.

## B.  UNFAIR OR DECEPTIVE PRACTICES

Unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful. By way of illustration only and without limiting the scope of subsection (a) of this Code section, the following practices are declared unlawful. Passing off goods or services as those of another. Causing actual confusion or actual misunderstanding as to the source, sponsorship, approval, or certification of goods or services. Causing actual confusion or actual misunderstanding as to affiliation, connection, or association with or certification by another.

Here, actual confusion was caused by CarMax to Ms. Bullard in selling a product had been in an accident when they represented it never had. As a result of this deceptive practice, Ms. Bullard was caused the hardship of dealing with a defective car that she had

no knowledge she was buying and being placed in danger from any consequences the actual defect could have wrought.

### C.   PURPOSE AND CONSTRUCTION

The purpose of this part shall be to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state. It is the intent of the General Assembly that such practices be swiftly stopped, and this part shall be liberally construed and applied to promote its underlying purposes and policies. It is the intent of the General Assembly that this part be interpreted and construed consistently with interpretations given by the Federal Trade Commission in the federal courts pursuant to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. Section 45(a)(1)), as from time to time amended. Ga. L. 1975, p. 376, § 1.

Ms. Bullard is protected under this section of The Act because she was deceptively and effectively deceived into buying a car that she thought was clear of defects.

## II.   <u>CARMAX IS LIABLE UNDER THE FAIR BUSINESS PRACTICES ACT FOR FALSE ADVERTISING BECAUSE OF ADVERTISING WITHOUT INTENDING TO SELL ON STATED TERMS</u>

### D.   FALSE ADVERTISING

No person, firm, or corporation shall offer for sale merchandise, commodities, or services by making, publishing, disseminating, circulating, or placing before the public within this state in a newspaper or other publication, or in the form of a book, notice, handbill, poster, sign, billboard, bill, circular, pamphlet, letter, photograph, motion picture, or by radio, loud-speaker, telephone, television, telegraph, or in any other way, or

advertise merchandise, commodities, or services with intent, design, or purpose not to sell the merchandise, commodities, or services so advertised or offered for sale at the price or upon the terms stated therein or otherwise communicated, or with intent not to sell the merchandise, commodities, or services so advertised.

Any disclaimer that merchandise, commodities, or services advertised for sale may not be available or that availability may be limited or any statement containing the conditions of a lease or rental agreement shall be in the same style as the advertisement and, if in written or printed form, such disclaimer and any asterisk or other symbol directing the attention of the reader to such disclaimer shall be not smaller than one-fifth of the type size used in the main body of the advertisement, provided that the minimum type size shall be not smaller than six-point type in Helvetica font. Any person, firm, or corporation violating this Code section shall be guilty of a misdemeanor. Ga. L. 1958, p. 411, §§ 1, 3; Ga. L. 1993, p. 701, § 1.

No person, firm, corporation, or association or any employee thereof, with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or to do anything of any nature whatsoever to induce the public to enter into any obligation relating thereto, shall make or disseminate or cause to be made or disseminated before the public in this state, in any newspaper or other publication, radio, television, or advertising device or by public outcry or proclamation or any other manner or means whatever, any statement concerning such real or personal property or services, professional or otherwise, or concerning any circumstances or matter of fact connected with the proposed performance or disposition thereof which is

untrue or fraudulent and which is known or which by the exercise of reasonable care should be known to be untrue or fraudulent.

Nothing in this Code section shall apply to any visual or sound broadcasting station or to any publisher or printer of a newspaper, magazine, or other form of printed advertising who broadcasts, telecasts, publishes, or prints such advertisement in good faith without knowledge of its false or fraudulent character. Whoever violates this Code section shall be fined not less than $200.00 nor more than $1,000.00 or imprisoned not more than 20 days, or both. Ga. L. 1961, p. 197, § 1; Ga. L. 1963, p. 507, § 1.

Here, CarMax represented their product, a vehicle, as free of vehicular accidents when it had, in fact, been involved in accidents which caused deficiencies in the vital safety functions of the car...namely a dysfunctional rear backup camera. This misrepresentation was clear and widely published to the public. Ms. Bullard relied on this false advertising to her detriment. As a result, CarMax is liable under this section of The Act.

III. **CARMAX IS LIABLE UNDER THE GEORGIA LEMON LAW BUCAUSE OF CARMAX'S ACTIONS WERE CONTRARY TO LEGISLATIVE INTENT, CONSUMER LIABILITY, LACK OF PROVIDING COMPREHENSIVE AND ADEQUATE CAR REPORTS, LACK OF REASONABLE ATTEMPT TO CORRECT NONCONFORMITY**

E. THE GEORGIA LEMON LAW

The General Assembly recognizes that a new motor vehicle is a major consumer purchase and that a defectively manufactured new motor vehicle is likely to create hardship for, or may cause injury to, the consumer. It is the intent of the General Assembly to create a procedure for expeditious resolution of complaints and disputes concerning nonconforming new motor vehicles, to provide a method for notifying

consumers of their rights under this article, and to ensure that consumers receive information, documents, and service necessary to enable them to exercise their rights under this article. In enacting these comprehensive measures, the General Assembly intends to encourage manufacturers to take all steps necessary to correct nonconformities in new motor vehicles and to create the proper blend of private and public remedies necessary to enforce this article. Code 1981, § 10-1-781, enacted by Ga. L. 2008, p. 746, § 1/HB 470.

CarMax is liable under this section of The Act because they failed to "ensure that consumers receive the information, documents and service necessary to enable them to exercise their rights under this article" which is directly mandated by the legislative intent of The Act. As a result, the actions of CarMax are in direct contravention of the letter and spirit of the act and are therefore liable under this section of The Act.

F.   CONSUMER LIABILITY

"Consumer" means each of the following, A person who purchases or leases a new motor vehicle for personal, family, or household use and not for the purpose of selling or leasing the new motor vehicle to another person. Ms. Bullard qualifies under this section of The Act as a consumer because she is a consumer.

G.   LACK OF PROVIDING COMPREHENSIVE AND ADEQUATE CAR REPORTS

The manufacturer shall publish an owner's manual and provide it to the new motor vehicle dealer. The owner's manual shall include a clear and conspicuous listing of addresses, e-mail addresses, facsimile numbers, and toll-free telephone numbers for the manufacturer's customer service personnel who are authorized to direct activities

regarding repair of the consumer's vehicle. A manufacturer shall also provide all applicable manufacturer's written warranties to the new motor vehicle dealer, who shall transfer the owner's manual and all applicable manufacturer's written warranties to the consumer at the time of purchase or vehicle acquisition.

At the time of purchase or vehicle acquisition, the new motor vehicle dealer shall provide the consumer with a written statement that explains the consumer's rights under this article. The statement shall be written by the administrator and shall contain information regarding the procedures and remedies under this article. Upon request of the consumer, the manufacturer, its authorized agent, or the new motor vehicle dealer shall provide a copy of any report or computer reading compiled by the manufacturer's representative regarding inspection, diagnosis, or test drive of the consumer's new motor vehicle. Code 1981, § 10-1-783, enacted by Ga. L. 2008, p. 746, § 1/HB 470.

CarMax is liable under this section of The Act because they simply provided a part of the story to Ms. Bullard in order for her to buy their vehicle. The Auto Check report they provided did not disclose the accident damage that the vehicle had. Moreover, CarMax absolutely represented to Ms. Bullard that her car was never in an accident. This was a distinct make-or-break factor in Ms. Bullard purchasing the car. But for this misrepresentation by CarMax, Ms. Bullard would not have purchased it.

H.  LACK OF REASONABLE ATTEMPT TO CORRECT NONCONFORMITY

If a consumer reports a nonconformity during the lemon law rights period, the manufacturer, its authorized agent, or the new motor vehicle dealer shall be allowed a reasonable number of attempts to repair and correct the nonconformity. A reasonable number of attempts shall be deemed to have been undertaken by the manufacturer, its

23

authorized agent, or the new motor vehicle dealer if, during the lemon law rights period:

a serious safety defect has been subject to repair one time and the serious safety defect

has not been corrected, the same nonconformity has been subject to repair three times,

and the nonconformity has not been corrected; or the vehicle is out of service by reason

of repair of one or more nonconformities for a cumulative total of 30 days. Code 1981, §

10-1-784, enacted by Ga. L. 2008, p. 746, § 1/HB 470.

CarMax was afforded a chance to correct the rear camera issue and the effects

thereof through a November 7, 2022, Notice of Claim Letter issued to them by

undersigned counsel on behalf of Ms. Bullard.  Said letter was responded to on December

1, 2022, in which CarMax essentially refused to acknowledge any problem.

**IV.     CARMAX IS LIABLE UNDER THE FAIR BUSINESS PRACTICES ACT FOR MOTOR VEHICLE DEALER/FRANCHISE PRACTICES BECAUSE OF STATEMENTS INCIDENT TO A FALSE REPRESENTATION AND AGGRAVATED OR MULTIPLE INTENTIONAL VIOLATIONS, WHICH AFFORDS MS. BULLARD TREBLE DAMAGES AND DAMAGES UP TO $750,000.00. AND REASONABLE ATTORNEY'S FEES**

I.   TREBLE DAMAGES

CarMax is a dealer and a franchisor under this section of The Act because they are

in the business of selling new motor vehicles and they have licensed other CarMax

dealers to do the same. Statements, representations and warranties given by CarMax

qualify under this section of The Act because they were given in incident to the guarantee

that the car in question had never been in an accident. The car was, in fact, in an accident,

contrary the representations CarMax made directly to Ms. Bullard, places them in clear

liable breach of this section of The Act.

Notwithstanding the terms, provisions, or conditions of any agreement or franchise or other terms or provisions of any novation, waiver, or other written instrument, any person who is or may be injured by a violation of a provision of this article or any party to a franchise who is so injured in his or her business or property by a violation of a provision of this article relating to that franchise or any person so injured because he or she refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of this article may file a petition with the Department of Revenue as provided in Code Section 10-1-667 or may bring an action in any court of competent jurisdiction for damages and equitable relief including injunctive relief. Said person may recover damages therefor in any amount equal to the greater of (1) the actual pecuniary loss or (2) three times the actual pecuniary loss, not to exceed $750,000.00. In addition, said person may recover costs and reasonable attorney's fees as damages. Upon a prima-facie showing by the person filing the petition or cause of action that a violation of this article has occurred; the burden of proof shall then be upon the opposing party to prove that such violation did not occur. Code 1981, § 10-1-623, enacted by Ga. L. 1993, p. 1585, § 2; Ga. L. 1999, p. 1194, § 2; Ga. L. 2000, p. 136, § 10; Ga. L. 2010, p. 988, § 3/HB 1072.

CarMax's egregious and direct violations of this section of The Act, the Plaintiff is entitled to treble damages and damages up to $750,000.00. CarMax have indicated that they routinely provide the faulty Auto Check report, as opposed to the more comprehensive Carfax report, to their customers as a regular course of business. This would indicate that CarMax exacts this essential bait-and-switch tactic on their customers

25

on a repetitive basis...Which would make them squarely liable under this section of The
Act.

    J.  ATTORNEY'S FEES

Whenever any person brings an action or complaint to enforce any provision of this
article in any court of competent jurisdiction and prevails or substantially prevails in such
action or complaint, the court may award the person bringing such action or complaint
his reasonable attorney's fees. Such attorney's fees shall be taxed and collected as part of
the costs and shall be in addition to any other costs or penalties imposed. Code 1981, §
10-1-628, enacted by Ga. L. 1993, p. 1585, § 2.

CarMax's egregious and direct violations of this section of The Act, the Plaintiff is
entitled reasonable attorney's fees.

**V.  CARMAX IS LIABLE UNDER THE FAIR BUSINESS PRACTICES ACT FOR
UNFAIR OR DECEPTIVE PRACTICES TOWARD THE ELDERLY BECAUSE
MS. BULLARD IS OVER 60 YEARS OF AGE AND VULNERABLE**

    K.  UNFAIR PRACTICES TOWARDS THE ELDERLY

An elder or disabled person who suffers damage or injury as a result of an offense
or violation described in this article has a cause of action to recover actual damages,
punitive damages, if appropriate, and reasonable attorney's fees. Restitution ordered
pursuant to this Code section has priority over a civil penalty imposed pursuant to this
article. Code 1981, § 10-1-853, enacted by Ga. L. 1993, p. 1092, § 2.

The Plaintiff is 65 years of age and is entitled to all of the protections, rights and
remedies thereto. In addition, CarMax knew or should have known that because of Ms.
Bullard age she could have been more vulnerable to being deceived the declaration that

her car has not been in an accident and by a lack of a full investigation into the overall
condition of the car.

**VI.**     **CARMAX IS LIABLE UNDER O.C.G.A SECTION 40-1-5 - SALE OF FRAME-DAMAGED AUTOMOBILES BECAUSE OF NON-DISCLOSURE, IGNORANCE IS NOT AN EXCUSE, NOT ENOUGH DISCLOSURE**

      L.   NON-DISCLOSURE BY DEALER OF DAMAGE TO MOTOR VEHICLE

Prior to the sale of a new motor vehicle, a dealer must disclose to the buyer any
damage which has occurred to the vehicle of which the dealer has actual knowledge and
which costs more than 5 percent of the manufacturer's suggested retail price to repair.
Prior to the sale of a new motor vehicle, a dealer must also disclose to the buyer any
damage which has occurred to the paint of which the dealer has actual knowledge and
which costs more than $500.00 to repair. Damages shall be calculated at the actual cost of
such repair. Code 1981, §40-1-5, enacted by Ga. L. 1990, p. 1657, § 1; Ga. L. 1994, p.
97, § 40.

CarMax sold a frame-damaged vehicle to Ms. Bullard without disclosing it. The
potential CarMax response that they did not know that the vehicle was frame-damaged
fails because quite simply they are supposed to know. Selling a car that has been in an
accident while representing that is has not is patently dangerous to the public and could
result in grave injury or death. The potential CarMax response that they met their
investigative burden be supplying an Auto Check report to Ms. Bullard fails because that
is simply not enough. If Ms. Bullard could discover that her vehicle had. In fact, been in
accidents and frame-damaged by simply procuring a Carfax report, surely a multi-billion-
dollar company such as CarMax, with all of its resources, could also...at the drop of a
hat...and, most importantly, as a practice. Under the spirit of this law, It should be a

systemic practice of CarMax to provide multiple investigative reports to any and all of their potential customers to safeguard the health and welfare of all its consumers.

**VII.** **CARMAX IS LIABLE FOR BREACH OF CONTRACT LIABILITY UNDER O.C.G.A. SECTION BECAUSE OF FRAUD IN THE INDUCEMENT, ACTUAL AND CONSTRUCTIVE FRAUD, WILLFUL MISREPRESENTATION, MISREPRESENTATION OF A MATERIAL FACT AND BREACH OF CONTRACT WARRANTIES**

J.   FRAUD INDUCEMENT

CarMax is liable for fraud in the inducement because they misrepresented the mere material fact that the car was in an accident. This concealment and/or falsehood directly induced Ms. Bullard purchasing the defective car. As a result, CarMax is directly liable under this section of The Act.

Fraud may be actual or constructive. Actual fraud consists of any kind of artifice by which another is deceived. Constructive fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another. Actual fraud implies moral guilt; constructive fraud may be consistent with innocence. Orig. Code 1863, § 3104; Code 1868, § 3116; Code 1873, § 3173; Code 1882, § 3173; Civil Code 1895, § 4025; Civil Code 1910, § 4622; Code 1933, § 37-702.

CarMax is liable for actual and constructive fraud because they purposefully concealed the fact that the car was in an accident when, in fact, it had been. Further, through only providing the Auto Check report only, as opposed to the CarMax report in addition to the Auto Check report, and any other reports that would have given a complete accident picture of the vehicle, they omitted material facts upon which the

contract for sale was based. As a result, CarMax is directly in violation of the section of the act.

Willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action. Mere concealment of a material fact, unless done in such a manner as to deceive and mislead, will not support an action. In all cases of deceit, knowledge of the falsehood constitutes an essential element of the tort. A fraudulent or reckless representation of facts as true when they are not, if intended to deceive, is equivalent to a knowledge of their falsehood even if the party making the representation does not know that such facts are false. Orig. Code 1863, § 2901; Code 1868, § 2907; Code 1873, § 2958; Code 1882, § 2958; Civil Code 1895, § 3814; Civil Code 1910, § 4410; Code 1933, § 105-302.

CarMax willfully misrepresented the material fact that of the car's accident history and pre-existing damage. This pre-existing damage led to the rear camera of the car being inoperable, which, has been shown to extremely dangerous to the point where fatal accidents can occur. As a result of this willful and deceitful misrepresentation, CarMax is liable under this section of the act. The misrepresentation directly induced or caused Mr. Bullard to act in the form of purchasing the car even though was fatally flawed. But for this material misrepresentation, Ms. Bullard would not have purchased the car and been in the Peril that she was put in.

K. BRACH OF CONTRACT WARRANTY

A warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this Code section the serving for value of food or drink to be consumed either on the premises or elsewhere

is a sale. Goods to be merchantable must be at least such as, pass without objection in the trade under the contract description; and in the case of fungible goods, are of fair average quality within the description; and are fit for the ordinary purposes for which such goods are used; and run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and are adequately contained, packaged, and labeled as the agreement may require; and conform to the promises or affirmations of fact made on the container or label if any. Unless excluded or modified (Code Section 11-2-316) other implied warranties may arise from course of dealing or usage of trade. Code 1933, § 109A-2 - 314, enacted by Ga. L. 1962, p. 156, § 1.

CarMax is liable for breach of contract warranties because the vehicle that they sold to Ms. Bullard was not merchantable because it was damage to the extent that it could cost serious injury or death.

## VII.  CONCLUSION

As outlined in the forgoing, CarMax, because of its willful, wanton and deliberately deceptive sales practices toward Mr. Brenda Bullard, should be liable for violations of the Georgia Fair Business Practices Act, Georgia Sale of Frame-Damaged Car Statues and Georgia Contract Law/Statues. Most specifically for Deceptive or Unfair Business Practices, False Advertising, Liability under the Georgia Lemon Law, Unlawful Motor Vehicle Franchise Practices, Unfair Deceptive Practices Toward the Elderly; for unlawful sale of a Frame-Damaged Damaged Automobile; and for breach of contract regarding Fraud in the Inducement, Actual and Constructive Fraud, Willful Misrepresentation, Misrepresentation of a Material Fact, and Breach of Contract Warranties.

Respectfully submitted this 26<u>th</u> day of <u>June</u>, 2023.

/S/ *CHRISTOPHER COLEMAN*

_____
Christopher Coleman
Georgia Bar Number 607619
Attorney for the Plaintiff

**The Pacific and Southern Law Group**
P.O. Box 965161
2886 Sandy Plains Road
Marietta, Ga. 30066
chris@pacificlaw.net

DocuSign Envelope ID: EEE5BE03-BF93-4361-BCEC-2481A48AA101

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **BRENDA BULLARD** | ) | |
| | ) | |
| **PLAINTIFF** | ) | |
| | ) | **CIVIL ACTION** |
| **VS.** | ) | **FILE NO.:** 23-A-05550-1 |
| | ) | |
| **CARMAX ENTERPRISE** | ) | |
| **SERVICES, LLC and CARMAX** | ) | |
| **SOUTHLAKE** | ) | |
|     **DEFENDANT(S)** | ) | |

### VERIFICATION

I, BRENDA BULLARD, personally appeared before the undersigned officer, duly

authorized to administer oaths in the State of Georgia, who after being duly sworn, deposes and

states that I am the Plaintiff in the above-styled action and the facts and statement of the amount

owing by defendant to plaintiff contained in the foregoing Statement of Claims are true and

correct, exclusive of any set-offs and just grounds for defense, to the best of my knowledge and

belief.


This _____20_____ day of _____June_____, 20_____2023_____.

 

                                     _Brenda Bullard_
                                          BRENDA BULLARD
                                             Plaintiff


Sworn and subscribed before me

This _20th_ day of _June_, 2022.

_____

Notary Public

My Commission Expires _September 12_, _2026_.

IASIAH JONES
Notary Public, Georgia
Gwinnett County
My Commission Expires
September 12, 2026