# EXHIBIT C

1

2

3

4       SELECT COMMITTEE TO INVESTIGATE THE

5       JANUARY 6TH ATTACK ON THE U.S. CAPITOL,

6       U.S. HOUSE OF REPRESENTATIVES,

7       WASHINGTON, D.C.

8

9

10

11      DEPOSITION OF:     SHAWN STILL

12

13

14

15                                  Friday, February 25, 2022

16

17                                  Washington, D.C.

18

19

20              The deposition in the above matter was held in Room 4480, O'Neill House Office

21      Building, commencing at 2:10 p.m.

1

2    <u>Appearances:</u>

3

4

5    For the SELECT COMMITTEE TO INVESTIGATE

6    THE JANUARY 6TH ATTACK ON THE U.S. CAPITOL:

7

8    ███████████ SENIOR ADMINISTRATIVE ASSISTANT

9    ████████████ STAFF ASSOCIATE

10    █████████ SENIOR INVESTIGATIVE COUNSEL

11    ████████, CHIEF INVESTIGATIVE COUNSEL

12    █████████ INVESTIGATIVE COUNSEL

13    ████████ CHIEF CLERK

14    ███████████, PROFESSIONAL STAFF MEMBER

15

16

17    For SHAWN STILL:

18

19    ALFRED CARRY

20    ROBERT DRISCOLL

1

2          Ms. ████   Good afternoon, Mr. Still and everyone.

3          This is a deposition of Shawn Still conducted by the House Select Committee to

4   Investigate the January 6th Attack on the United States Capitol pursuant to House

5   Resolution 503.

6          At this time, I'd ask the witness to please state your full name and spell your last

7   name for the record.

8          The Witness.   Shawn, S-h-a-w-n, Still, S-t-i-l-l.

9          Ms. ████   Okay.   And, counsel, could you please identify yourselves for the

10  record?

11         Mr. Driscoll.   Sure.   Bob Driscoll from the McGlinchey firm, counsel to Mr. Still.

12         Mr. Carry.   And Alfred Carry from McGlinchey for Shawn Still.

13         Ms. ████   Okay.   Thank you.

14         This will be a staff-led deposition, but members of the select committee may

15  choose to join us and may, of course, ask questions.

16         I'm ██████   I'm an investigative counsel for the select committee.   I'm

17  joined here by my colleague, ██████, senior investigative counsel for the select

18  committee.

19         Mr. ████   Good afternoon.

20         The Witness.   Good afternoon.

21         Ms. ████   We also have a couple of other members of our select committee

22  staff on the video.   There is ██████ who has just turned on his video.

23         Mr. ██████   Thanks, ████

24  Good afternoon, everybody.

25         Mr. Driscoll.   Good afternoon.

1          Ms. ████████ ██████████ is chief investigative counsel for our committee.

2          We also have ████████████ our chief clerk, on the line.

3          And, as you can see, you can see the participants on the screen here.    If we're

4    joined by any members of the committee, I'll do my best to note when they appear both

5    so that you know and for the record.

6          So some preliminaries to get through here before we get started.

7          Under the House deposition rules, neither committee members nor staff may

8    discuss the substance of testimony that you provide today unless the committee

9    approves a release.

10          You and your attorneys will have an opportunity to review the transcript.

11          And, before we begin, just want to go over a couple of deposition ground rules.

12          We will follow the House deposition rules that we provided to you with the

13    subpoena.

14          There is an official reporter here transcribing the record of the deposition.

15          As you noted before, we are recording this deposition.    The Webex is being

16    recorded as well as the video here.    But the official record of the deposition is the

17    transcript that the official reporters take.

18          So to make that transcript as clean as possible, please wait until each question is

19    completed before you begin to speak your response, and we will also try to wait until

20    your responses are complete before asking any other questions.

21          The stenographers also cannot record nonverbal responses, like shaking your

22    head, so please answer your question with an audible verbal response.

23          And, of course, we're here today to ask you to provide complete answers based

24    on your best recollection.    If the question is not clear -- and I fully anticipate some of

25    mine will not be -- please don't hesitate to ask for clarification.    I'm happy to provide

1     that.

2          If you don't know the answer to any questions, please just say so.

3          You may only refuse to answer a question to preserve a privilege recognized by

4     the select committee.    If you refuse to answer a question based on a privilege, staff, we

5     may either proceed with the deposition or choose to seek a ruling from the chair on that

6     objection.    If the chair overrules an objection, you would be required to answer the

7     question.

8          I do not have any reason to believe that we will be following that procedure today.

9          I also want to remind you that it is unlawful to deliberately provide false

10    information to Congress.    Since this deposition will be under oath, providing false

11    information could result in criminal penalties for perjury or providing false statements.

12          Do you understand that?

13          The <u>Witness.</u>    Yes.

14          Ms. █████    Okay.

15          Could you please stand, raise your right hand, and be sworn by the official

16    reporter?

17          The <u>Reporter.</u>    Do you solemnly declare and affirm under the penalty of perjury

18    that the testimony you are about to give will be the truth, the whole truth, and nothing

19    but the truth?

20          The <u>Witness.</u>    Yes.

21          Ms. █████    Okay.    Logistically, we are going to try to make this as efficient as

22    possible.    I don't expect that we're going to be here for a lengthy period this afternoon.

23    But if at any time during the deposition you would like to take a break, please just let us

24    know.

25          If you also have a question and you need to consult with your lawyers during the

1    deposition, that's, of course, absolutely fine, too.    Just let us know.    You can take a

2    brief sidebar in this room or, if you want to take a break off the record, you can go back to

3    the holding room and have a discussion there.

4           The Witness.    Okay.

5           Ms. ██████    Okay?

6           Any other questions or matters that you'd like to address, Mr. Driscoll, before we

7    get going?

8           Mr. Driscoll.    Sure.    As with the last deposition, I'm just going to preserve for

9    the record that we object to the authority of the committee to issue subpoenas based on

10   noncompliance with its authorizing statute and authorizing resolutions and to the extent

11   the question does not comply with the rules laid out by the committee for itself.

12          But, again, we just reserve those for the record, and we'll allow for this to go

13   forward in the same spirit as we did this morning.

14          That's it.

15          Ms. ██████    Okay.    Thank you.

16          Anything else before we get going?

17          Mr. ████    No.

18          Ms. ██████    Okay.

19                              EXAMINATION

20                        BY MS. ██████

21          Q       Mr. Still, you have in front of you a binder of documents.    These are

22   exhibits for our depositions.

23          We have spoken to another one of the electors from Georgia, Mr. Shafer, this

24   morning.    I think the majority of these documents were produced by and relate more to

25   Mr. Shafer, so I don't want you to look at that binder and think that we will be here

1    talking about each one of these documents today.

2            But can we start by looking at the document behind tab 1, please?

3        A    Okay.

4        Q    Do you recognize what you're looking at there as the subpoena issued to you

5    by the select committee?

6        A    Yes, it is.

7        Q    Okay.    And you are the person who is listed on the subpoena.    You are the

8    same Shawn Still.    Is that correct?

9        A    I am.

10        Q    Okay.    And do you understand that your appearance here today is pursuant

11    to the subpoena?

12        A    Yes.

13        Q    Okay.    I'm going to ask you a few questions about the document collection

14    efforts.    We received documents from your lawyers.    And, of course, part of the

15    subpoena that you received from the select committee required you to produce

16    documents and information, including any electronically stored information.

17            Do you understand that?

18        A    Yes.

19        Q    Okay.    Did you search for records that are responsive to the subpoena as

20    set forth in the schedule attached to it?

21        A    Yes.

22        Q    Okay.    Did you search your email accounts for any responsive information?

23        A    Yes.

24        Q    Do you have a work and personal accounts?

25        A    No, just my work account.

1          Q      Just work.   Okay.

2                 Do you have any other email addresses or accounts other than the one -- the work

3   one that you searched?

4          A      I do for my personal, like, that I use just, like, for my Google backup, but

5   no -- nothing passes through it.

6          Q      Okay.

7          A      So --

8          Q      Okay.   Thank you.

9                 Did you search for any text messages that might have information responsive to

10   the subpoena?

11          A      Yes.

12          Q      And did you locate any information -- any such responsive information?

13          A      No, there wasn't anything.

14          Q      Okay.   What about hard-copy documents, did you search those for

15   responsive information?

16          A      I was never given any hard-copy documents for any of the work that we did

17   as Presidential electors.

18          Q      Okay.   So is it fair to say that you didn't recall the existence of any

19   documents and, thus, didn't feel -- didn't need to go search for them?

20          A      There was no hard copy presented to me prior to and on the day of

21   December 14th, when we met.   Everything was in the meeting space.   And then I left.

22   I came in with nothing.   I left with nothing.   So --

23          Q      Okay.   What about any electronic versions of documents, like a Word or a

24   PDF document that would be stored on a computer, did you search for those?

25          A      I did.

1      Q      Okay.

2      A      There were -- there was nothing.

3      Q      Nothing?   Okay.

4             Did you search on personal devices for responsive information, like a laptop or cell

5      phone or other device?

6      A      I checked my cell phone, but there were no attachments, and there was no

7      text conversation with anyone pertaining to what we did other than when to appear.

8      Q      Okay.    Thank you.

9             Did you search any messaging applications on devices?    So, separate from kind of

10     regular text messages, any applications like WhatsApp, Signal, Telegram?

11     A      I did check those, but the Signal group that I'm on doesn't have anything to

12     do with the electors, so there was nothing in there.

13     Q      Okay.    What about social media applications on any of your devices?    Did

14     you search for potentially responsive information on, like, Facebook Messenger or

15     Twitter, direct messages, anything like that?

16     A      I didn't have Facebook at the time.    I only started a Facebook account a few

17     months ago.    But my Twitter from that day was nothing.    Mainly I just use it to follow

18     news sources, but there was nothing posted or received.

19     Q      Okay.    What about any handwritten or other hard-copy documents that

20     recorded your notes?    Did you search for anything responsive to the subpoena?

21     A      No.    I didn't have any notes taken on anything.    Everything was just

22     verbal.

23     Q      Okay.    Did you coordinate or have any discussions with former members of

24     President Trump's campaign, the President's lawyers, or anyone at the RNC in responding

25     to your document requests --

1          A      No.

2          Q      -- to our subpoena?

3          A      No.    I don't know anybody at that level.

4          Q      Okay.    So did anyone, whether it's those or otherwise, affect or attempt to

5    influence the documents that you produced to the select committee?

6          A      No.

7          Q      Okay.    And, wrapping up this conversation, have you produced to the select

8    committee all the documents and communications in your possession, custody, or control

9    that are responsive to the request in the subpoena?

10         A      Yes.

11         Q      Okay.    So in the course of preparing for this deposition, was there anything

12   that you recalled that existed that you weren't able to find when you searched for

13   documents?

14         A      No.

15         Q      Okay.    Okay.    Thank you, Mr. Still.

16                So can you just give us a couple of brief background facts about yourself?

17                Where do you live?

18         A      I live in Johns Creek, Georgia.    I serve as the volunteer finance chairman for

19   the Georgia Republican Party.    I own a swimming pool construction company, so that's

20   my day job.    And I'm currently running for the Georgia State Legislature.    I filed my

21   candidacy 2 months ago for that, unrelated to anything else.

22         Q      Great.

23         A      Just timing.

24         Q      Great.    Okay.    Thank you.

25                And you noted that you are a volunteer as the finance director for the Georgia

1    Republican Party.

2        A    Yes.

3        Q    How long have you held that position?

4        A    About two and a half years.

5        Q    Two and a half years.    Okay.    So you had that position at the time of the

6    meeting of the electors in December 2020?

7        A    Yes.

8        Q    Okay.    That's great.

9             How long have you lived in Georgia?

10       A    Twenty-four years.

11       Q    Okay.    Okay.    So you were -- you're here because you were a Republican

12   elector in the 2020 election in Georgia.    Is that correct?

13       A    Right.

14       Q    Okay.    Had you ever been a Presidential elector before?

15       A    No.

16       Q    Okay.    How did you come to be a Republican elector in Georgia?

17       A    David Shafer asked me to.    He asked me -- he appointed me to be the

18   finance chairman, and he asked me to be the secretary of our Presidential elector

19   delegation, because he knew that I knew most of the people that he had asked to be in

20   that role.

21       Q    Okay.    And do you remember around what time you became a Republican

22   elector?

23       A    It was in March.    I don't remember the exact day.

24       Q    2020?

25       A    Yeah.

1      Q     Okay.

2      Let's look at the document behind tab No. 2, please.

3      So this looks like an email that was sent to you on March 3rd, 2020, 2:34 p.m.

4      Do you recognize this document?

5      A     Yes.

6      Q     Okay.    Great.    Looks like an email from Stewart Bragg.

7      Who is Stewart Bragg?

8      A     He was the executive director of the party.   He left the party, and he's

9   working on a political campaign now full time.

10     Q     Okay.

11     A     As campaign chair.

12     Q     Okay.    So, in addition to yourself, there is another individual on the "to"

13   line of the email, david@gagop.org.   Is that Mr. Shafer?

14     A     That's David Shafer's email.

15     Q     Okay.    Great.

16     So what do you remember about this email?    I assume that it relates to what you

17   were just describing as the process of becoming a Presidential elector.

18     A     Right.   I just -- I know Stewart very well from working with him.   So he, I

19   assume, sent this email to everybody else that was an elector.   And that was it.

20     Q     Okay.   If you look at the body of the email, the second sentence, Mr. Bragg

21   writes, "Please let me know if you will not be able to submit the form at the Capital

22   during qualifying in person, as it will have to be notarized prior to myself or anyone else

23   submitting it."

24     What do you remember about the process it sounds like that occurred in person

25   at the capitol of qualifying as a Presidential elector?

1     A     The qualifying process was at the same time that we were doing qualifying

2     for other political candidates, so a room not dissimilar from this.    Staff were sitting there

3     receiving people's applications.    And so, just as anyone was doing their filing paperwork

4     to run for State rep or State senate, the electors came in and had to present and submit

5     their document in the same manner and fashion.

6     Q     Okay.    Thank you.

7           If you turn to the next tab, tab No. 3, this is a blank document, but it's

8     the document that was attached to the email that we were just looking at.

9           Does this look familiar to you?

10     A     Yes.

11     Q     Okay.    Is this the document that you were required to complete and submit

12     at that --

13     A     Yes.    Yes, it is.

14     Q     Okay.    If I could direct your attention to -- there is a paragraph maybe

15     two-thirds of the way down that's the wordiest part of the document.    It starts with, "I

16     have never been convicted and sentenced."

17     A     Uh-huh.    Right.

18     Q     What's your understanding of the obligations incurred or, you know, the

19     meaning of signing on, that, you know, sort of attesting to this document?

20     A     Just that I wasn't a felon and that I was in good standing as a citizen of

21     Georgia, but not that there was anything further about it.    And I have never been

22     convicted or anything else.

23           [Laughter.]

24     Q     Right.    And is it -- my understanding correct that this is the -- this is a

25     candidacy affidavit that is completed by Presidential electors as well as other candidates

1    for office in Georgia?

2         A    That was my understanding, yes.

3         Q    Okay.   So, earlier, you recalled that Mr. Shafer suggested that you would

4    be -- to become a Presidential elector and specifically asked you to serve as secretary of

5    the electors.    Is that correct?

6         A    Yes.

7         Q    Okay.   So what was your understanding of the duties of the secretary's

8    role?

9         A    The duties were just to verify -- to try to help staff verify who all the

10   members were, because Chairman Shafer didn't know all 16 of the people, and neither

11   did I.   But at least it allowed me to make sure that I was able to, face to face, verify who

12   they were before we admitted them into the room.

13        Q    Okay.   So you had a role to play at the in-person qualification ceremony?

14   Is that right?

15        A    On December 14th.

16        Q    Oh, I see.   Okay.   So when the -- not when we're talking about naming

17   electors, but, rather, making sure that the right people are the ones who are actually

18   attending the --

19        A    That's all it was, yeah.

20        Q    Okay.   Got it.

21        Did you have any role in helping to prepare paperwork or maintaining minutes or

22   anything else?

23        A    No.

24        Q    Okay.   And was it Mr. Shafer who gave you the understanding of what the

25   secretary's role was?

1    A    Yes.   Yes.   The other person was Robert Sinners, who is head of election

2    day operations and worked for the Trump campaign.

3    Q    Okay.   What kind of communications did you have with Mr. Sinners

4    about -- either generally about being an elector, or specifically about being the secretary?

5    A    I think it was -- from March until December, I think we maybe had three

6    phone conversations total.

7    Q    Okay.   And do you remember -- was Mr. Sinners involved at the early stage

8    here of -- in March -- of identifying the people who would serve as Republican elector?

9    A    No.

10    Q    Okay.   When did he become involved?

11    A    I think, you know, by midsummer he was involved.

12    Q    Okay.   And so I think you said you remembered maybe three conversations

13    with him.   Were any of those specific to your role as secretary?

14    A    No.

15    Q    Okay.

16    A    No.

17    Q    Okay.   I think we can put a pin in that and talk about Mr. Sinners when we

18    get chronologically up to the December -- a little bit closer to the December 14th date.

19        Can I ask you to turn to the next tab, No. 4, please?

20        This is an email and sent by David Shafer.

21        Do you know who the group of individuals who are the recipients of this email

22    are?

23    A    Yes.

24    Q    And who are they?

25    A    Largely party activists, people that just either had been involved in the

1    Georgia Republican Party or people who were maybe recommended to us by the Trump

2    campaign as having been particularly vocal about the campaign and promoting Trump

3    with that.

4          A couple of those people ended up being disqualified off of this list, which is why

5    this is the initial, but this is not the final list of people.

6          Q     Okay.

7          Mr. Driscoll.    Just to be clear, are you talking about the list of people going down

8    vertically --

9          The Witness.    Yes.

10         Mr. Driscoll.   -- or the list of addressees?

11         The Witness.    Sorry.    The list of people going vertically.

12         Ms. ███████    Great.    Thank you, Mr. Still.

13                BY MS. ███████

14         Q     So the list of names vertically in this document, are these the individuals that

15    you understood to be the qualified Republican Presidential electors as of March 5th?

16         A     Yes.

17         Q     Okay.    And, just generally speaking, I think I heard you to describe them as

18    people that were involved in the party or were otherwise recommended by the Trump

19    campaign.

20         A     Yes.

21         Q     Is that fair?

22         A     Yes.

23         Q     Okay.    How well did you know the individuals on this list?

24         A     Twelve of the 16 I know very well.

25         Q     Okay.    So, after the process of determining who will serve as a Republican

1     elector in Georgia, what communications did you have with these individuals or with

2     Mr. Shafer between March 5th and election day?

3          A     Very little about this role, because we just -- we were excited to be part of

4     history and thought it was kind of a neat novelty thing to do.     And so that was -- we

5     were just looking forward to getting called in to fulfill the duty as a nominee, as an

6     elector.

7          Q     Okay.     And, in March, or in the early time period there before election day,

8     generally what was your understanding of the duties of a Presidential elector in Georgia?

9          A     Just no different than I had learned in civics class as a kid, that, you know,

10     you're going to go in and, at the prescribed day and time, that you're going to go in and

11     fill out the paperwork and take an oath that you're casting your vote for whoever the

12     winner was based on the election outcome.

13          Q     Okay.     And did you have any understanding of how the winner of the

14     Presidential election was to be determined in Georgia?

15          A     Other than popular vote, or -- right.

16          Q     That's right.     Yeah, you referred in your description of the role of a

17     Presidential elector that, once the winner was determined, I think, then you would have a

18     role to play.

19          A     Right.

20          Q     And my understanding -- my question is just, what was your understanding

21     of how that winner is determined under Georgia law?

22          A     As every other State, that it's based on popular vote.

23          Q     Okay.     Thank you.

24     So when did you first hear about the possibility of casting electoral votes for

25     Donald Trump as candidate for President of the United States, even if he lost the popular

1    vote in the State of Georgia?

2         A     It wasn't until after the election.

3         Q     Okay.     That was going to be my next question.

4              So no discussion of the possibility of an alternate slate of electors before election

5    day?

6         A     No.

7         Q     Okay.

8         A     It was never a consideration.

9         Q     Okay.     There is an article that was published before the election actually

10   end of September 2020 in The Atlantic by a reporter named Barton Gellman that

11   addressed the possibility of an alternate slate of electors.     It sort of suggested that there

12   were discussions that were occurring by -- within the Trump campaign or the Republican

13   Party about testing the assumption that electors would be chosen by popular vote.

14             Were you aware of that before election day at all?

15        A     No.

16        Q     Okay.     Did you later come to be aware of that article or any of the

17   discussions in it?

18        A     No.    I can't say that I've ever read an article from The Atlantic.

19        Q     Okay.    Understood.

20             What about in other experience that you may have had in the Republican Party in

21   Georgia?    Have you ever heard of the concept of an alternate slate of electors meeting?

22        A     Not until probably mid-November, mid to late November, when we were still

23   very tumultuous about the election results.

24        Q     Okay.    Okay.    So we'll come back to that.

25             In -- well, actually, go ahead, why don't you tell me, what did you understand

1 when you came to have this -- when somebody raised the issue? Or how did you come

2 to think that this was a possibility in mid to late November?

3   A We just knew that the election results were very much in question, and

4 there was enough evidence to want to continue investigating further the election

5 outcome.

6   So we knew that the electoral college or the Presidential electors had to meet at a

7 certain day and time, so we were trying to get through all of the recounts and

8 investigative work prior to that.

9   And so the only discussion was, if we had to preserve the integrity of those

10 lawsuits, that we were told by counsel that it was possible that we would have to cast the

11 ballots in the same manner and fashion as if he had won so that there had been two sets

12 of ballots and that it could be substituted if needed, but only in the event of an overturn

13 of the ballots as they were, because the number kept changing.

14   Q Okay. Thank you.

15   So you used the term "we" a couple of times there. Who is the "we" that you're

16 thinking of?

17   A Well, being on the executive committee for the Georgia Republican

18 Party -- several of those members are on that list on exhibit 4 -- so it was with them. It

19 was with our legal counsel. It was with obviously Chairman Shafer.

20   Q Okay. And I think we'll talk a little bit more about some of those

21 conversations in a few minutes.

22   But let me just ask you, at that time when -- in mid to late November that we're

23 referring to, were you aware of any other planning that was being done about convening

24 alternate slates of electors in other States?

25   A No.

1      Q    Okay.   So your knowledge was specific to Georgia?

2      A    Yes.

3      Q    Okay.   And I think you've just generally addressed this, but what was your

4    understanding of why it was necessary to convene as Republican electors on

5    December 14th?

6      A    Specifically, because our ballot count was changing, because we felt like

7    there was enough evidence to be within a very tight margin of error, that if in some

8    recount, whether it was signature verification, if it was scanning the ballots, or whatever

9    the issue was, that when you're talking a fraction of a percent difference, we wanted to

10   make sure that, because we couldn't meet at a later date, if we had not met, then the

11   President's lawsuit would not have had any merit and could not have been overturned if

12   the election results had been overturned.

13      It was explained to me like this.    It's like, when you have the Super Bowl, you

14   print T-shirts, both teams as being the winner, and you keep the T-shirts for the ones that

15   were the winner, and you throw away the ones that weren't, but you still have to have

16   two sets of T-shirts for both sets of winners.

17      Q    A very helpful description.    So who explained it to you that way?

18      A    Just a friend of the family when I was asking, like, how does this work?

19   So --

20      Q    A friend of -- a personal friend of yours?

21      A    A personal friend outside of all of it.

22      Q    Okay.   Is that person involved at all in --

23      A    No.

24      Q    -- in elections in Georgia?

25      A    Not at all.

1        Q      Or a lawyer giving you advice?

2        A      I was trying to explain -- it was actually just a -- it was spoken of loosely back

3    in December of '20, but that description I just gave you actually just came to me a few

4    weeks ago in the example of the Super Bowl because it just occurred.    So, anyway.

5             The question was, what do you do with the Bengals T-shirts?    You destroy them.

6    You can't sell them.    You can't do anything else with them.    By law, they're required to

7    destroy those T-shirts that say that somebody else won the Super Bowl.

8             In the same manner, it was explained to us, the electors, that we were only doing

9    this to preserve that possibility of, if it had been overturned, that these would have then

10   replaced the Biden elector ballots, and that was it.

11       Q      Okay.    Very helpful.    Let me go back and unpack that a little bit with you,

12   ask you a couple of follow-up questions, okay?

13            So you were just -- you just referred to lawyers, I believe, explaining to you the

14   purpose of meeting as Republican electors in December of 2020.

15            Who are the lawyers that you recall explaining that to you?

16       A      Brad Carver, who is one of the people on this list; Alex Kaufman; and the

17   other -- the only two other people that I spoke to about it were Sinners and Shafer?

18       Q      Okay.    Who is Brad Carver?

19       A      Brad Carver is a member of the Georgia GOP Executive Committee.    He's

20   one of our congressional district chairs.    He's an election law attorney, and so very well

21   respected in that regard.

22       Q      Okay.    We may address this a little bit later, but I'm aware that you were a

23   plaintiff in a lawsuit --

24       A      Right.

25       Q      -- after the election.    Is that correct?

1    A    Yes.

2    Q    Okay.    Did any of those lawyers represent you in that lawsuit?

3    A    Yes.    They're the ones that asked me to add my name, because I had higher

4  standing than the gentleman who had initially filed the lawsuit, so to give it more

5  credence in the court they just asked me to attach my name to it with that.

6        So it was -- the lawsuit was filed in a different county than the one I live in, but, in

7  order to -- they needed a Presidential elector's name attached to it.    So that's why they

8  asked me to.    So that came from Kaufman.

9    Q    I see.    Okay.    So that was Alex Kaufman?

10    A    Yes.

11    Q    Okay.    Was Mr. Carver also involved in that, representing you in that

12  lawsuit?

13    A    Not in that one, no.

14    Q    Okay.    So, without asking about any communications that you had with

15  Mr. Kaufman or Mr. Carver in the other circumstance, right, any potentially privileged

16  advice that they gave to you, but just specific to communications that you had with them

17  about the role of Presidential electors, do you -- about how many conversations did you

18  have with them?

19    A    Probably two.

20    Q    Okay.    And is that -- were they on the phone with you together or separate,

21  two separate conversations with each?

22    A    I think twice with Kaufman and once with Carver.    But it was just making

23  sure, "Are you good with this?    Do you understand?"    That was kind of it.

24  There wasn't a long walk-through process on that.

25    Q    Okay.    And about what timeframe do you recall those conversations taking

1    place?

2        A    The lawsuit that my name was attached to is on December, I think, 20th, so

3    sometime between December 14th and December 20th.    It was all pretty tight.

4        Q    Oh, I see.    So you recall these conversations happening after the meeting of

5    the Presidential electors?

6        A    Right.    The idea about me joining that lawsuit in Coffee County didn't

7    happen until after we had met as electors.

8        Q    I see.    Okay.

9        Did you have any conversations with either Mr. Carver or Mr. Kaufman before

10    December 14th about the purpose of the meeting of Republican electors?

11        A    Oh, no.

12        Q    No.    Okay.

13        So when you gave us the Super Bowl analogy as a means of remembering what

14    your understanding was of the purpose of the meeting of the electors, were there any

15    other communications you had that gave you that understanding?    Anyone else you

16    talked to that helped you to understand that that was the purpose?

17        A    Just David Shafer.

18        Q    David Shafer.    Okay.

19        Mr. ██████    So if I could just clarify?

20        Ms. ██████    Of course.

21            BY MR. ██████

22        Q    Because I heard the testimony I think the same way ██████ did.    After you

23    gave the analogy of the Super Bowl, which I know you said came up much later, recently,

24    you said that your understanding of the elector situation was exactly the same, and the

25    lawyers had explained to you, and then you went on to state what they explained.

1        Was that -- I think that's why she was circling back, to see if those were the

2    lawyers who had explained that to you.

3        A        The explanation just that we were trying to preserve the integrity of the

4    lawsuit and that we had to just fill out the paperwork the same way, so that it wouldn't

5    moot the lawsuit that was still pending by the President.

6        That's just what -- I'm a simple pool builder, right?    So, like, I didn't understand

7    the exact code of where that was coming from.    So they just were saying that, in order

8    to preserve this, we're filling it out the exact same way, and that's all we were told.

9        And so Sinners, Shafer were getting, I guess, their direction from Kaufman and

10   Carver.    But we all know each other through so many different levels, it was -- I think it's

11   hard to kind of segregate exactly when each conversation happened.

12       But it was a very consistent message that we were told throughout all of that, is

13   this is the only reason why we're doing this, is to preserve the integrity of being able to

14   have a challenge.

15       Q       Got it.    Got it.

16       So it sounds like you talked to Shafer and Sinners about the concept?

17       A       Yes.

18       Q       And they may have recounted to you what they had heard from lawyers?

19       A       Yes.

20       Q       You didn't specifically -- or you don't specifically recall talking to lawyers

21   yourself about that concept?

22       A       Correct.    I did not seek independent legal advice on this.

23       Q       Okay.    I think that clarifies the confusion in my mind.    Thank you.

24       A       Sorry.

25       Ms. ██████    Yep.    Same here.    Thank you.

1            BY MS. ███

2       Q    Okay.   We made -- this may become relevant again later, but going back to

3  your Super Bowl analogy where you were thinking about what happens to the loser, the

4  T-shirts that showed that the loser actually won the Super Bowl, I think you suggested

5  that those T-shirts are destroyed once the outcome of the Super Bowl is determined.

6       Do you remember having similar conversations with anyone about the votes that

7  were cast by the Republican electors in Georgia, that they would be destroyed or set

8  aside if the election contest suit had not gone the way you --

9       A    When we met and when we signed the documents, Robert Sinners printed

10  them in the room at the capitol.   We signed them at the capitol.   We gave them all to

11  him.   And then he packaged them up and said that he was sending them to D.C., to the

12  Archives to hold.

13       And I remember specifically asking him what happens to them if there is not an

14  overturn.   And he said, "Well, that's not up to me to decide, but I guess we'll just set

15  them aside and box them up somewhere, and that'll be the end of it."

16       Q    Okay.   That was what Mr. Sinners responded when you asked that

17  question?

18       A    Yes.

19       Q    Okay.   And, when he said, "I guess they'll just box them up," what was your

20  sense of who he was referring to?

21       A    I assumed that he meant somebody that dealt with Federal election.   I

22  guess there is a department or a unit somewhere here that deals with that.

23       Q    Okay.   But I think you said that Mr. Sinners collected the documents and

24  that he was immediately going to send them to D.C.   Is that accurate?

25       A    Yes.

1    Q    So was there any suggestion that they would only be sent to D.C. later, in the

2    event that there was an outcome of the election to contest litigation?

3    A    I don't know.    He didn't say.

4    Q    Okay.    So, earlier, when we were talking about the context of the meeting,

5    you referred to the fact that you believed that the election results were very much in

6    question at this time period.

7    A    Yes.

8    Q    Is that right?    Okay.    Let me ask you a couple of questions.    I won't

9    belabor the timeline in any way.    But let's talk a little bit about what happened from

10   November 3rd, election day, up to the meeting of the electors on December 14th.

11   A    Okay.

12   Q    Is that okay?

13        So did you have any official role on election day?

14   A    No.

15   Q    Okay.

16   A    No.

17   Q    And, just generally speaking, what were your impressions of how election

18   day went in Georgia on November 3rd, 2020?

19   A    It was a complete disaster.    We had countless numbers of reports of

20   people -- because I had no official capacity, but I was trying to help coordinate people to

21   be poll watchers.    And so trying to find volunteers, making sure they could get into poll

22   places.

23        But then we were hearing from the poll watch volunteers they were being blocked

24   out, that they were locked out of buildings, not permitted to see anything, they were

25   pushed aside, that -- I don't know if you all saw the footage, but of the head of

1    the -- Fulton County is the largest county in Georgia, and the director of elections pulls

2    out two large suitcases full of ballots mysteriously under a paper -- or under a

3    table -- when no one else is looking.    It just -- it presented a tremendous amount of

4    stress and questions on the outcome.

5           And so we felt, "we" being those of us who were electors, but just, I think,

6    Republicans in general were very skeptical of what was happening.    And so we were

7    begging and demanding answers and investigations into the irregularities with how

8    everything happened on election day.

9           Q     Okay.    A couple of follow-ups for you.

10          So you said -- you referred to "we", and the one sense of the "we" was electors.

11   So did you have communications with other members of the individuals actually who are

12   still in front of you on that list of the Republican electors for President in Georgia?

13          A     Yeah.    So Joseph Brannan is our treasurer.    He lives in Columbus, Georgia.

14   He's a good friend.    So I remember talking to him a little bit about it.

15          Daryl Moody is chairman of our Georgia Republican Foundation and a neighbor, so

16   we had talked about it.

17          But people who had nothing to do with anything in the party, just concerned

18   citizens, were really upset about it.    And from election day until December 14th, so

19   many efforts had been made to try to get to the bottom of the irregularities.

20          And I think that's why the number kept changing.    Every time they would scan

21   the votes, every time they'd look back at signature verification, it just -- there was always

22   some discrepancy, sometimes in the hundreds, sometimes in the thousands of ballots,

23   but every time that someone was looking at it.

24          And so people were just very, very concerned.    And so we knew that lawsuits

25   were coming, and we knew that we wanted to make sure that we had done our part, our

1    very, very small part in all this, to at least make sure that, if there had been an overturn in

2    the election results -- we were told that, if the election results had been overturned and

3    we had not met and not filled out the paperwork exactly the way it was, that the overturn

4    wouldn't have happened because we had not met.

5         Q    Okay.

6         A    And that was made crystal clear to us.

7         Q    Got it.    But that was -- is it fair that those -- your understanding of the role

8    that you might have to play as an elector came later and wasn't in your mind on election

9    day itself?    Is that fair?

10        A    Not election -- no.    This is --

11        Q    Okay.

12        A    But over the course of those 6 weeks, that's -- the progression led to that,

13   that in the week of December 14th, we just felt like there is a really good chance this

14   might overturn.

15        Q    Okay.    And you mentioned that you had -- you were playing a role in help

16   trying to coordinate poll watchers.    I assume that's on behalf of the Republican Party of

17   Georgia?

18        A    Right.

19        Q    Had you ever done that in a Presidential election before?

20        A    No.    No.

21        Q    Okay.

22        A    I've been a precinct captain in my local area just for yard signs and door

23   knocking, things like that.    I had never coordinated poll watchers.

24        Q    Okay.    And you specifically recalled the -- an incident in Fulton County.    I

25   think you referred to somebody saying something.

1       A     Suitcases.

2       Q     This is the suitcases of ballots under a table.     Is that fair?

3       A     Right.

4       Q     Okay.    How did you come to understand those -- that fact pattern?

5       A     I saw it on the evening news.

6       Q     On the news.    Okay.    Okay.

7             Did you have any direct interaction with poll watchers in Fulton County about that

8       incident or fact pattern?

9       A     No.    No.

10      Q     Okay.

11      A     No.

12      Q     Okay.    So just to again run through a little bit of the timeline of the election

13      after November 3rd, election day itself, is it consistent with your recollection that it took

14      many days for ballots to be counted in Georgia following the Presidential election?

15      A     That's correct.

16      Q     Okay.    And do you remember -- generally speaking, give us your

17      understanding of that.

18            When did you feel that the counting and the results had been determined?

19      A     It didn't.

20      Q     Didn't.    Okay.

21      A     It was -- there are still lingering to this day many unanswered questions

22      about that.    But once President Biden was sworn in, we've let a lot of that go.

23            But, speaking as someone who is currently running for the State legislature, the

24      only thing people want to talk about, even today, as recently as this past weekend, is

25      what am I going to do, if elected, what's the number one thing I'm going to do to try to

1   make sure that elections are safe and secure in Georgia, because no Republican primary

2   voter believes that it was accurate and fair.

3        Q     Okay.    Understood.

4        You also described, I can't remember the exact words that you said, but

5   investigations or, rather, audits that have been done about the result.

6        Were you referring to audits and recounts that were done by the secretary of

7   state's office in Georgia?

8        A     Yes.

9        Q     Okay.    And, generally speaking, before the meeting of electors on

10   December 14th, what was your understanding of the results of those audits insofar as

11   who had been determined by the secretary of state's office to be the winner of the

12   popular vote?

13        A     So bigger answer to that question, what the secretary of state's office was

14   doing was rescanning the same ballots through the same machines, and then trying to

15   demonstrate that there may or may not be a different result, but they weren't actually

16   doing an investigation on the bigger picture of it.

17        All they were trying to say and do -- and I know Raffensperger very well.    He was

18   trying to save face in all of this.    So that he would just say that he was conducting an

19   audit, but he's just running the same ballots through the same machines and then sitting

20   back and saying, "See, everything was normal."

21        But there was never an investigation on the thousands and thousands of absentee

22   ballots.    There was no investigation on the 6.8 million absentee ballots that were mailed

23   out unsolicited.    There was no checking on the signature-match verification.

24        There were just so many other questions regarding how they were conducting the

25   audits that every time they did another audit and tried to say, "Look, same result," it

1    just -- it created such a fury with people that were asking them to please look at this in a

2    bigger sense.

3          So long answer to your question, but I think it's important for you all to

4    understand the context of what was in everyone's mind at the time, is that it felt like

5    there was fraud, it felt like there was a cover-up.    And we were really just trying to -- we

6    weren't trying to do anything other than get to the bottom of, what's the real number?

7          Q      Okay.    Understood.

8          Ms. ████    So leaving that topic, unless you have anything, ████ that you'd like

9    to --

10         Mr. ████    I'll say no.

11         Ms. ████    Okay.

12         ████ I'll pause and see if there is anything you'd like to ask?

13         We will interpret that as a no.

14              BY MS. ████

15         Q      Okay.    Let's talk a little bit more specifics about December 14th, if that's

16    okay.

17         A      Sure.

18         Q      So you told us a little bit earlier about how you heard that there would be a

19    meeting of the electors.

20         Do you remember how far in advance before December 14th you heard that you

21    would be meeting?

22         A      It was a couple of weeks beforehand.    Robert Sinners called me because he

23    didn't have phone numbers on all these people.    He asked me who I knew and if I could

24    help him track down some folks.

25         So I don't remember, we'd have to look back through, but, I mean, I'm sure there

1    is some correspondence of when that call was made.    But I was just trying to help him

2    tell people when and where to be.

3         Q    Okay.    And I think you earlier identified Mr. Sinners and thought that

4    maybe you had three or so conversations with him about it.    Is this the first one

5    that you're recalling now?

6         A    Yes.

7         Q    Okay.    And you said maybe it was a couple of weeks before December

8    14th?

9         A    Yes.

10        Q    Okay.    Did he -- you've explained to us already what your understanding

11   was of the purpose of the meeting.    Did that come up in that original call with Robert

12   where he asked you for phone numbers for electors?

13        A    No.    I think he was just saying we're still going to do this.    And I knew from

14   talking to David Shafer that we were going to meet, because I had questioned, "Are we

15   still going to meet?    Are we -- do we still need to do this?"

16        And he said, "Well, because of the impending legal action on it, yes, we still have

17   to meet so that we have an alternate set of elector ballots."

18        But the call with Sinners was really just when and where and, "Hey, can you help

19   me track down Pat, Pat Gartland, and Daryl Moody?"    And I think there were a couple

20   others on there that he didn't have numbers for.

21        So I made those calls just to tell them the same thing he had told me:    We're still

22   going to meet at the capitol, here's the date and time, and that's it.

23        Q    Got it.    Okay.

24        So when Mr. Sinners called you in this first conversation that you're recalling, do

25   you -- was it already determined when and where you would meet?

1    A    Yes.   It was going to be at the capitol.   I forget the room number.

2    Second floor.

3    Q    Okay.   And I think you just told us that you communicated with a couple of

4    the other electors at that time.   And was that merely to convey the same information

5    that you had received from Mr. Sinners?

6    A    Yes.

7    Q    Okay.

8    A    And that's when one of the members in particular told me he couldn't serve

9    because his wife had just passed a couple of days prior.   And so I had to report back to

10   Robert that Pat was offline and wasn't going to be able to make it.

11   Q    Okay.   And was there anything that you were asked to do or did do to

12   secure, find a replacement for that elector who couldn't serve due to a family tragedy?

13   A    No.   No, I would -- he said that he had a list of alternates and that he'd be

14   going down that list to plug in whoever couldn't make it.

15   Q    That was Mr. Sinners did?

16   A    Right.

17   Q    Okay.   Okay.

18   Ms. ███████    Yep.

19        BY MR. ███████

20   Q    Could I ask, Mr. Still, when you reached out to Mr. Gartland and someone

21   else you mentioned, were you asked to convey to them the need for the meeting, or had

22   they already been sort of primed for the idea that there was going to be a meeting and

23   you were just recounting the time and place?

24   A    Everybody was on standby, that we may still be needed.   So it was just

25   touching base with folks to, "Hey, just making sure you got the email, that you knew

1    when and where to be."

2        Q     So you weren't breaking the news -- as far as you knew -- breaking news to

3    folks that --

4        A     No.

5        Q     -- there was going to be this meeting for the purposes of preserving the

6    remedies in the lawsuit and so forth?

7        A     Correct.    No.    I mean, I wasn't -- I was not introducing that concept to

8    anyone, no.

9                    BY MS. ████████

10       Q     Okay.    So other than Mr. Sinners, did you have direct communications with

11   anyone from the Trump campaign about the meeting of electors?

12       A     No.    The only person I spoke to related to the Trump campaign was Robert.

13       Q     Mr. Sinners.    Okay.

14             And is that also true not only just for election or campaign staff, but also lawyers

15   representing the campaign or the President?

16       A     I didn't speak to anybody representing the President, no.

17       Q     At all?    Okay.    Thank you.

18             What about with the RNC?    Did you have any communications with anyone from

19   the national party about the meeting of electors?

20       A     No, just the people that were working in the Georgia office.

21       Q     Okay.    And who are those people that you're thinking of in the Georgia

22   office?

23       A     Well, so the RNC staff and the Georgia GOP staff were all in the same

24   building on the same floor, and so you'd -- there is a lot of cross-pollination with that.

25             So, like, Sinners, as head of the election day operations, shared an office and sat

1    as close as Alfred and I with the political director for the Georgia GOP.   And so people's

2    roles were fluid through a little bit of that.    But Sinners was specifically employed by the

3    RNC as the election day operations director.

4          Q    Okay.    Great.    So other than more incidental or casual communications

5    with folks with whom you shared an office space in the Georgia GOP.

6          A    Well, and I didn't have an office there.

7          Q    Right.

8          A    It was just if I came to visit for some reason.

9          Q    Great.    Okay.    No other communications with them --

10         A    No.

11         Q    -- officials from the RNC about the electors meeting?

12         A    No.

13         Q    Okay.    Thank you.

14         What about anybody who were on staff or officials with the White House, did you

15    ever talk to anyone about this?

16         A    No.    I've never spoken to anybody from the White House.

17         Q    Got it.

18         Were you aware of any coordination among the electors in other States?

19         A    No.

20         Q    Okay.

21         A    No, other than seeing it on the news when it was happening.

22         Q    Got it.    And you're referring to December 14th, 2020 --

23         A    Yes.

24         Q    -- seeing some news reports that meetings had happened in other States.

25         A    Correct.

1      Q    Is that right?   Were you surprised by that?

2      A    No.    It made sense, because those were all the closely contested States.

3  And so we knew that lawsuits -- you can just see on the evening news that lawsuits were

4  pending in those other States, too.

5      Q    Okay.    Had you had any communications with anyone about the reasons

6  why those were the States where other people -- other Republican electors would meet?

7      A    No conversations.

8      Q    Okay.

9      A    It just was common sense.

10      Q    Okay.    Did you ever receive or review any legal memos about the meeting

11  of electors?

12      A    No.    The only email and letter I got were exhibits here that I've already

13  presented to the committee, one from Stewart Bragg, and then one from Robert Sinners

14  on the details, and that was pretty much it.

15      Q    Okay.    Did you ever ask any -- go seek out any legal advice about the

16  process of Republican electors meeting in -- following the 2020 election?

17      A    No.

18      Q    Okay.

19      Ms. ████    Okay.    Going forward.    Do you have any questions?    Okay.

20         BY MS. ████

21      Q    Did you ever, Mr. Still, have any discussion with anyone about provisions of

22  Georgia law that related to the replacement of electors?

23      A    Just David Shafer.

24      Q    Okay.    And what -- tell us about that conversation with Mr. Shafer.

25      A    The conversation was, "Why are we doing this if we don't have a firm

1    outcome?"    And he just kept reiterating that we're just preserving the rights, and that's

2    it.

3            I said, "Is this a Georgia thing?"

4            He goes, "No, this is a Federal thing.    This is any State that's in question."    Then

5    he gave me the example of Hawaii in 1960 of doing something similar and casting two

6    sets of ballots because the election outcome was uncertain at the time.

7            Q    Okay.    What else do you remember about the Hawaii example?

8            A    I just remember it was a very narrow vote and that both sets of electors cast

9    their votes and then submitted them to whoever the point of contact is in D.C. for that.

10   And once that was determined, then the electoral ballots were counted in that, you

11   know, who they deemed as being the winner.

12           Q    Okay.    Did you have any conversations with anyone else, other than

13   Mr. Shafer, about the Hawaii 1960 example?

14           A    No.    I didn't know about it until he told me, and then I read about it.

15           Q    Okay.    And did you learn anything further from your reading after speaking

16   to Mr. Shafer about the circumstances of that election?

17           A    I just read that it didn't really change the outcome of the election.

18           [Laughter.]

19           Q    Okay.    Did you -- do you remember reading anything about there being a

20   court-ordered recount in -- related to the Hawaii election?

21           A    I don't recall.

22           Q    Okay.    What about -- earlier, you were remembering a conversation with

23   one of the electors who had been named in the spring who couldn't participate because

24   of the recent loss of his wife.

25           Do you remember any conversations about the process where if an elector who

1    had been on the list couldn't attend on the 14th, whereby they would be replaced?

2            A    I didn't know what the process would be to replace anybody.    I was not

3    part of that.

4            There was another guy here, C.J. Pearson.    We had appointed him to be, but

5    then forgot -- he forgot, conveniently, that he was registered to vote in Alabama.    And

6    so he couldn't be an elector for us, so we had to remove and put him on -- college kid.

7            Q    Got it.

8            A    So --

1

2       [3:09 p.m.]

3                    BY MS. ██████

4       Q     Got it.    What about the other electors who couldn't participate, did you

5    have any conversations with John Isakson about that?

6       A     No.

7       Q     Did you ever come to have an understanding of why he couldn't participate?

8       A     I never found out why.    I mean, I -- I don't know John well, so I didn't get

9    into it with him.

10      Q     Okay.

11      A     Last time I spoke to him was at his father's funeral a couple months ago.

12      Q     I saw that.    How about Susan Holmes, did you have any understanding of

13   why she didn't participate?

14      A     No, and I didn't know who she is.    She was one of the people I didn't know.

15      Q     Okay.    Do you have any reason to believe that any of these electors

16   declined to participate out of concern about the validity of the process or other concerns?

17      A     I had no reason to believe anyone didn't participate because of that.

18      Q     Okay.    Okay.    One more question for you on the subject of replacing

19   electors.    Did you ever have a conversation with anyone about the -- any relevant

20   Georgia statutes that relate to the process of replacing presidential electors?

21      A     No.

22      Q     Okay.    Were you aware of anyone raising concerns before December 14th

23   about whether the process that -- of the Republican electors meeting would be in

24   compliance with State law?

25      A     Not specific to that.    I think it -- the only conversation was just we need to

1    do this to preserve the right, and that was -- everyone kind of took it at face value.

2    Because the media in Georgia was day and night talking about election irregularities.

3    It -- I think everyone wanted to do something and so no one stopped to question, you

4    know, to look -- go back and look up statutes as to why we were doing this.    We

5    just -- we knew we were doing it to try to keep the door open if the investigations had

6    come through.

7            Q      Okay.    Before the meeting on the 14th, as you came to understand that

8    there would be a meeting and had at least a few discussions about it, did anyone raise the

9    issue of January 6th and the Joint Session of Congress?

10           A      No.

11           Q      Okay.    Did you have any understanding of the connection between the

12   submission of your Republican electoral votes and what would happen in Congress on

13   January 6th?

14           A      No.

15           Q      Okay.    There are a couple other names that I would just like to run by you

16   to see if you have an understanding of what role they may have played in organizing or,

17   you know, getting the Republican electors to meet.    Are you familiar with someone

18   named Joshua Findlay?

19           A      I think he worked for the RNC, but I never spoke to Josh.

20           Q      Okay.    Not -- no understanding of what role he may have played --

21           A      No.

22           Q      -- in helping to organize this?    Okay.

23           What about somebody named John Black?

24           A      I don't know that name.

25           Q      Okay.    What about the name Mike Roman?

1          A      I don't know that name.

2          Q      Okay.    What about Rudy Giuliani, Mayor Giuliani, lawyer for the President?

3          A      I mean, obviously I know who Rudy is, but I've never spoken to him.    I've

4    never even seen him in person.

5          Q      Got it.    And did anyone ever give you an understanding of any role that he

6    may have played in the process of Republican electors meeting in Georgia?

7          A      No.

8          Q      Okay.    What about an associate of him named Bernard or Bernie Kerik --

9          A      I don't know.

10         Q      -- any role?    Okay.

11         So talking about December 14th itself, I think you already referred to the fact that

12   Mr. Sinners, as of the first conversation you remember having with him, gave you the

13   sense of when and where the meeting would take place, and I think you said you would

14   recall that it would be in the Capitol on the second floor.

15         A      Right.

16         Q      Is that right?

17         Did you have any role in reserving the room or handling the logistics of how the

18   electors would meet in the Capitol?

19         A      No.    My job -- well, the logistics were just that I was kind of posted up at

20   the door to make sure that the people that were coming in, it wasn't just open to the

21   public until we had everyone in there that was supposed to be in there.    And then once

22   everyone was situated then we opened it up to the media.    So that was my one glorious

23   role was opening the door for the media and letting them all in.

24         Q      Okay.    Before we talk about what happened inside the room, I think earlier

25   you had recalled a few, like maybe three conversations with Mr. Sinners.    You've told us

1    about the first one, and after that you had some conversations with other electors.    Did

2    you have other conversations with Mr. Sinners before December 14th?

3          A    I don't think I ever spoke to Robert Sinners after December 14th, but I think

4    it was just -- he had just reached out to me to help find some of these people and that

5    was it.    There was never -- there was no coordination or anything on what I was going to

6    do.    And I didn't know I was going to be the door guy until I got there.

7          Q    Okay.

8          A    Shafer just said, hey, you know most of these people.    Go stand out there.

9    Yes, sir.    That's what I did.

10          Q    You're the bouncer?

11          A    That's it.

12          Q    Okay.    Got it.    So you remember a few conversations with Mr. Sinners, but

13    it seems like they were all about the same general topic.

14          A    It was.

15          Q    Is that fair?

16          A    Yes.

17          Q    Okay.    Okay.    What significance did you attach or understand to the fact

18    that the meeting would take place at the Capitol as opposed to in the offices of the

19    Republican Party in Georgia?

20          A    I think the way that it's written is that it has to be in public and it states

21    specifically that it has to be in the Capitol.    And so we met on just -- the Georgia State

22    Capitol is a four-story building.    The first floor is the basement essentially, the

23    windowless offices; second floor; and then the third floor is where the Democratic

24    electors met.    So we knew that we were all going in at the same time.    I don't know

25    who reserved the room, but when I arrived it was already set up and they were -- staffers

1    and everybody were in there just getting the printers figured out and all that to print the

2    documents.

3          Q      Okay.    Just a minute ago you referred to the way that it is written requiring

4    you to meet at the Capitol.    What was the writing that you're referring to there?

5          A      I was -- in preparation for this I was just Googling like what Georgia says

6    about where to meet.    And so there was a, I guess, a subsection paragraph that just

7    described that, you know, they have to meet at the Capitol, that they've always met at

8    the Georgia Capitol, that the electors meet there.    I don't know the details of why.    I

9    just -- it was just a Google page on it, so --

10         Q      Got it.    Was it -- do you remember that it was a Georgia statute, like part of

11   the code of Georgia, or was it another sort of more informational page?

12         A      I think it was just more informational.

13         Q      Okay.    Okay.    Were you ever given anything by either the Georgia

14   Republican Party or the Trump campaign that laid out the statutory requirements for

15   when, where, and how to meet?

16         A      No.    I mean, this is Sinners' thing.    This is what he was in charge of.    So

17   he sent out an email to everybody, this room, at this day, at this time, and that's it.

18         Q      Got it.    Perfect.    I think I can find that email, which would be helpful.

19         A      Yeah, it's in --

20         Q      Give me one moment.    Let's see.

21         Mr. Driscoll.    I think it's 27.

22                BY MS. ████████

23         Q      Thank you.    There we go.    Yeah, let's look at tab 27 if you can.

24         A      Okay.    That's it.

25         Q      Okay.    So this is a document that you produced to us.    Do you remember

1    receiving it on what looks like December 13th?

2        A    Yes.

3        Q    Okay.    What do you remember about this?

4        A    I remember the third paragraph as being kind of funny because he says, you

5    know, state to the guards that you're attending a meeting with Senator Beach or Senator

6    Burt Jones and proceed to the room.    They don't ask.    There's no -- there was no

7    guards, why are you here.    I just thought it was kind of funny.

8            I can't speculate as to why he was being that way, other than I think he just didn't

9    want people running their mouths about where we were going.    Just go in, show up

10   where you're supposed to go, and then we'll let people know why we're there.    So I

11   just -- I found that peculiar, but just having been at the Capitol quite often over the last

12   decade, I just thought that was kind of silly.

13       Q    Okay.    Helpful context for those of us who have spent less time at the

14   Georgia State Capitol.

15           So who are Senators Brandon Beach and Burt Jones?    Did they have any role with

16   the electors on December 14th?

17       A    I think Burt ended up being one of them.

18       Q    Oh, I see.

19       A    So Burt ended up being the substitute.    Brandon Beach is -- he was not a

20   substitute elector, but he's just been there a long time.    And so I think he was probably

21   helping -- they -- one of them likely probably helped secure the room, because I think you

22   have to have a legislator to help you reserve the room.    So that would've been my guess

23   as to why they were there.    I know them both very well.

24       Q    Okay.    Were you aware of any concern about the possibility that security or

25   Capitol Police would not allow Republican electors to meet?

1      A      No.    You walk up, you show your ID, they let you in.    They don't ask why

2  you're there.

3      Q      Got it.    Okay.    And did you have any understanding of why you were told

4  not to mention anything to do with presidential electors or speak to the media?

5      A      Not knowing -- I didn't ask Robert why he wrote that, but the idea I think

6  was just to make sure that everyone got in the building and got to where you're supposed

7  to be, because there are media buzzing around, why are you here, and what are you

8  doing, and what are you meeting about.    And so I think he just wanted people to

9  say -- just come in, quietly go to where you're supposed to go.    Don't run your mouth on

10  why you're here or anything else.    Just go in the building, go find your room, wait there,

11  and then we'll tell you what to do after that.

12      Q      Okay.    We skipped over the paragraph above that that starts with the word

13  "first."    When you look at that and Mr. Sinners writes, first, I must ask for your complete

14  discretion in this process.    Your duties are imperative to ensure the end result -- a win in

15  Georgia for President Trump -- but will be hampered unless we have complete secrecy

16  and discretion.

17      You may have just addressed this in your answers already, but what was your

18  understanding of why it was imperative to have complete secrecy and discretion?

19      A      Probably not a great answer but one that is just being completely honest.    I

20  think Robert was a bit over his skis in his level of self-importance, and I think he wanted

21  to make this seem like it was a bigger deal than it was.

22      Q      Understood.    Any concern about the -- about somebody preventing the

23  Republican electors from meeting if they knew that that was what was occurring?

24      A      It's not that anyone would've kept us from meeting.    And so as the door

25  guy, the media were asking, what are you all doing?    What are you all doing?    Don't

1    worry about it.    Like I just -- I was just vague.    We're just -- we're just having a meeting.

2    Meeting about what?    What are you doing?    And they're trying to get cameras in there.

3    We will let you know in just a few minutes.    Just hang out.    They knew why we were

4    there.    They just wanted to be sensational about it.

5          Q    Okay.    Did you have any -- I think you already told us that you knew that

6    the electors for President Biden, the Democratic electors were also meeting in the Capitol

7    at the same time.

8          A    Right.

9          Q    Did you have any interaction with them?

10         A    No.

11         Q    No, okay.    Okay.    So why don't you walk us through what happened after

12    you got to the Capitol on December 14.

13         A    I got there.    I was in the room for about 30 seconds.    Shafer posted me up

14    on the door, and then I stood out there until everyone got seated.    And then once

15    everyone kind of figured out, you know, what we were there to do, and Shafer explained

16    to everybody we're doing this just to preserve, you know, just as a contingency.    And

17    then he said, okay, let the -- anybody that wants to sit in, media, whatever.    And then

18    we let them come in, gave them a few minutes to set up, and then we went through it.

19         The thing that took the most time when we met was that Sinners bought a new

20    printer at Target the day of and never set it up and never installed the driver software on

21    his computer, and he spent 20 minutes trying to figure out how to set up the new printer

22    before he could -- so he didn't even walk in with the documents.    He was trying to print

23    them there.    And as he just fumbled through that, it just kind of became a bit of a

24    snicker moment for everyone.    But I'm like, all right, fine.    Mr., you know, complete

25    discretion in this process walking in with a printer new in the box, so --

1      Q      Under the circumstances, 20 minutes is bad for setting up a new printer.

2      A      Right.

3      Q      I would presume that he had a lot of attention on him at the time that he

4    was doing so, so --

5      A      Yes.

6      Q      Okay.    Got it.    Were there any restrictions as to who could come in after

7    the time period that you described when you were at the door once you opened it up?

8      A      Anybody could come in as long as there was room to fit.

9      Q      Okay.    And was anyone told not to bring their cell phones to the meeting?

10     A      No.

11     Q      Okay.

12     A      Everything was recorded.

13     Q      Okay.    Did you keep any copies of photos or video recordings of the

14   meeting?

15     A      I didn't.    I took a couple of screen shots of the Atlanta Journal-Constitution

16   writer who took a picture of me standing outside the door and described me as a

17   low-level aide, and so everybody got a big chuckle out of that.    And he said, the

18   low-level aide wouldn't let him in, but then I did let him in.    And then he had posted a

19   couple things about why we met and had posted those, so I took a screen shot of them.

20   I didn't submit them as evidence because they were Twitter posts.

21          But ironically, I was scrolling back through his Twitter feed, his name is Greg

22   Bluestein, and he deleted all of his tweets from that day.    And when I got the subpoena

23   notice from you all for this, I read about it in the New York Times 5 days before I received

24   it.    And I got to read Greg Bluestein describing us as phony electors and, you know, the

25   people that were trying to cause all this trouble, but he was actually in the room

1    recording it.    And then he's since gone back and deleted his media post on it.

2            So I'm not reading too far into that other than to say that the media that were

3    there have tried to make it seem like they weren't there.    And, you know, I don't know if

4    that's worth digging into for you all, but it meant something to me, because we were

5    there, and I did have the screen shots.

6            And I knew we were there and I knew our intention.    And for them to write

7    about it and to say, well, you know, they're only doing this, you know, it seems like a lost

8    cause but they're giving it their best shot or whatever, you know, whatever he said that

9    day, and then to go back and delete it and there's no reference of it whatsoever, and then

10   to come out at the time of your subpoena and then to call us phony electors and then all

11   the things that were written, you know, in the media and locally as well, it's just -- it's

12   been very eye opening about the perception that the media has on this and the way that

13   they've continued to -- it's just -- it has been spun and spun so many different ways.

14       Q      Okay.    Thank you.

15              BY MR. ███████

16       Q      Mr. Still, you said you had the screen shots.    You didn't submit it as

17   evidence.    Did you mean you didn't produce it?    Do you still have them?

18       A      My cell phone is in the room.

19       Q      Do you have them deleted?    They're still there as far as you know?

20       A      I have them.

21       Mr. Driscoll.    Why don't you send them to me and I'll pass them on?

22       The Witness.    Sure.

23       Mr. ██████    Great.    I think it would be helpful.

24       The Witness.    Yeah, I mean, maybe you guys have access to their, you know,

25   Twitter that I don't have, but when I scrolled back to December 14, 2020, there's just

1    conveniently nothing there anymore.

2           Ms. ███      That's helpful.     We can follow up with your counsel about that.

3           Mr. Driscoll.   Yeah.

4           The Witness.    Okay.

5               BY MS. ███

6           Q    Okay.    So about how long did the process last from when you got into the

7    room to when you were concluded?

8           A    If we include the time for Robert learning how to set up a printer, probably

9    about 45 minutes.

10          Q    Forty-five minutes, okay.    Let me direct your attention to the document

11   behind tab 33, please.    This is not a document that you produced, but I'm going to ask

12   you, you know, to flip through it if you can and tell me if it looks familiar to you, and if so,

13   if it looks like the documents that were executed at the meeting on the 14th?

14          A    Those are my signatures.    When we were going through the signatures it

15   felt like a real estate closing where they just sign -- they just put pieces of paper in front

16   of you so you just -- you just sign and sign and sign.

17          Q    Okay.    So those are your signatures you're referring to.    There's a -- on

18   page four your signature, one of all of the electors, and then your signature is on the

19   following pages as the secretary.

20          A    Yes.

21          Q    Is that right?   Okay.

22          Okay.    These look consistent with your recollection of the documents that were

23   executed and submitted to the archives?

24          A    Yes.

25          Q    Okay.    If I could have you turn to page two, so it's the back of this first piece

1        of paper here.

2                A        Okay.

3                Q        It starts, certificate of the votes of the 2020 electors from Georgia.        And the

4        first paragraph there, it says, we, the undersigned, being the duly elected and qualified

5        electors for President and Vice President of the United States of America from the State

6        of Georgia, do hereby certify the following.

7                What was your understanding at the time that you were at the meeting of

8        Republican electors on December 14, 2020, of the phrase here being the duly elected and

9        qualified electors?

10               A        We were told that we were filling this out exactly as if Donald Trump had

11       won so that if there was a substitution with the exact same document -- the Democrats

12       were filling out the exact same document, just saying that it was 16 votes for Joe Biden,

13       that we were just filling it out the exact same way so that it didn't appear that there was a

14       different set --

15               Q        Okay.

16               A        -- or any conflicting language, I guess, is the better way to describe it.

17               Q        Okay.    That's helpful.    So, yeah, I was wondering what you meant by a

18       different set.    So you -- what you --

19               A        We didn't want our documents to be different in any way, shape, or form

20       from the Democrat counterparts doing the same thing.

21               Q        And why was that?

22               A        So that if there was a substitution in the overturn then it would have been

23       accurate information.

24               Q        Okay.    Understood.

25               So I think when you started to explain that to us, you said that you were told that

1    you were filling it out as if Donald Trump had won.    At the time that you signed this

2    document on December 14th, did you believe that Donald Trump had won?

3         A    I believe that it was in the margin of error that he could still win.

4         Q    Okay.    And you said that you were told this by whom?

5         A    Just by seeing what was happening in the media on the recounts, that --

6         Q    Got it.    Sorry.    That was a bad question.

7    Mr. ███    Yeah, what was the --

8              BY MS. ███

9         Q    Yeah.    You've previously told us about conversations that you had that gave

10   you the understanding of the fact that you were -- that the presidential electors were

11   going to meet and cast votes for Donald Trump so that if there was an overturn verdict on

12   an election contest litigation.    When you're referring to your understanding here, are

13   those the same conversations that you're referring to that you were told about?

14        A    Exact same conversations.

15        Q    Okay.    No others?

16        A    Correct.

17        Q    Okay.    Thank you.    Do you recall any discussion about whether there

18   should be some language added to this document or another one that would reflect the

19   fact that they were contingent on the outcome of election contest litigation?

20        A    Shafer had told us that it had to be worded as if Trump had won, but when

21   we walked out of that room he stated publicly for the local media that were present and

22   then he tweeted, it's still hard for me to use that as a verb, when he posted that we had

23   met he said that in that document and verbally to everyone there that this is only being

24   done as a contingency in the event of an overturn.

25              So I think he made that very clear in the moment and digitally, but he said that if

1    we had done this differently -- the legal counsel he had received was that if we had done

2    this differently, then it may not be valid in the event of the overturn.

3          Q    Okay.

4          A    And I didn't question it further than that and neither did anyone else.

5          Q    Okay.    Got it.    Did you get a copy of the paperwork that we're looking at

6    here after the meeting?

7          A    No.

8          Q    Okay.    And I think you've referred to this earlier when discussing your

9    conversations with Mr. Sinners.    But how did you come to understand who was

10   responsible for submitting these documents to the appropriate authorities?

11         A    Sinners was very clear that he was head of Election Day operations, and this

12   was what he was there to do.

13         Q    Okay.

14         A    So --

15         Q    Okay.    Let's look at the document behind tab 35, please.    Do you

16   recognize this document?

17         A    Yes.

18         Q    Okay.    It looks like an email from Mr. Sinners to yourself and Robert

19   Barker?

20         A    Correct.

21         Q    Who is Mr. Barker?

22         A    Not the game show host from The Price Is Right, but he -- he's an Election

23   Day attorney in Atlanta, just a good friend.    And so he was inquiring, you know, what

24   was going on.    And so when he asked for, you know, just the list of electors and what

25   was going on, I was forwarding it to Sinners on Barker's behalf and so that's why I'm

1    copied on the email.    I wasn't really involved in the conversation other than just to have

2    been in the middle from forwarding from Barker to Sinners to make sure that Sinners got

3    it and responded to it.

4          Q    Got it.    So is it -- is my understanding accurate that Mr. Barker had asked

5    for the list of electors?

6          A    Yes.

7          Q    Okay.    Was he involved in convening or organizing the meeting --

8          A    No.

9          Q    -- of electors?

10          A    No, not at all.

11          Q    Was he present at the meeting?

12          A    No.

13          Q    Okay.    Do you know why he was asking for the list of electors?

14          A    I think he just wanted to know.

15          Q    Okay.

16          Mr. Driscoll.    I had a case with him years ago --

17          The Witness.    You did?

18          Mr. Driscoll.    -- Bob Barker, yeah.

19          The Witness.    All right.    He told me some really good things about you, by the

20    way.

21                BY MS. █████

22          Q    In the top email here in the document, this is Mr. Sinners writing, Hi, Shawn

23    and Robert.    The notice of filing of electoral college vacancy was filed with Governor

24    Kemp's office immediately upon appointment.

25          Do you remember what the -- what significance, if any, there was about the filing

1    notice of electoral college vacancy with the governor's office?

2    A   I don't know.

3    Q   Okay.   Were you aware of any interaction or communications between the

4    Republican electors for President Trump and Vice President Pence and Governor Kemp or

5    his staff?

6    A   I'm not aware of any correspondence or any communication with them at

7    all.

8    Q   Okay.   So I think -- I just have a couple more questions if --

9    Mr. Driscoll.   Go ahead.

10    Ms. ███   We've been going for a little while, but if you're okay, I think we push

11    through and we'll wrap up very quickly.

12    Mr. Driscoll.   Yeah.

13    BY MS. ███

14    Q   So, Mr. Still, I think I asked you earlier and I just want to make sure I

15    understood, before December 14th, did you have any understanding of what role, if any,

16    the votes that the Republican electors were submitting would have at the Joint Session of

17    Congress on January 6th?

18    A   No, we had no clue that there was any thought about that.

19    Q   Okay.   After December 14th, did you come to have any understanding of

20    what role, if any, they would play?

21    A   None whatsoever.

22    Q   Okay.   And even just all the way up through January 5th, 6th, on the eve of

23    the Joint Session, did you ever have any understanding about what role this alternate

24    slate of electors might have?

25    A   I didn't know anything until about 3 weeks ago that there was any

1    connection to this.

2          Q     Understood.    Okay.    Did you have any communications with anyone

3    before, you know, January 6, 2021, about the role of the Vice President or the role of

4    Congress in counting the electoral votes?

5          A     I mean, other than knowing what the media was portraying, the pressure

6    that Vice President Pence was under with this, but I didn't feel like we had a role to play

7    in any of that because, going back to the Super Bowl analogy, as far as we knew, this was

8    an exercise in futility and that the only ballots that were counted were the ones for Biden.

9          So it didn't matter really what we thought, that what we -- this work had nothing

10   to do with January 6th.    I had no idea that there was any connection drawn to any of

11   this.    It was -- it was all very new to me, to see that in the news.

12         Q     Okay.    So other than public reporting about what you referred to a moment

13   ago about pressure on Vice President Pence, you didn't have any communications with

14   anyone, either Members of Congress or leaders of the Republican Party either in Georgia

15   or here in Washington, about that counting of electoral votes on January 6th?

16         A     No.    I learned about the attacks on the Capitol as it was happening.    I was

17   watching it in my office.    So --

18         Q     Okay.    Understood.

19         Anything else?    Okay.

20         I will pause here to see if there are any other questions?

21         Mr. ███████    None for me, ███████    Thank you.

22         Ms. ███████    Okay.    Thanks, ███████

23         Okay.    That's it for me.    Thank you, Mr. Still, very much for your appearance

24   here today.    Unless there's anything you'd like to address, Mr. Driscoll, we can go off the

25   record.

1          Mr. <u>Driscoll.</u>   I think we're fine.    Thank you.

2          Ms. █████   Thank you.

3          Mr. <u>Driscoll.</u>    And thanks for being speedy on the second half there.    That's

4      great.

5          Ms. █████   Okay.    And just to be clear, we are concluding the deposition and

6      going off the record.

7          Thank you.

8          [Whereupon, at 3:41 p.m., the deposition was concluded.]

1                                  Certificate of Deponent/Interviewee

2

3

4          I have read the foregoing _____ pages, which contain the correct transcript of the

5     answers made by me to the questions therein recorded.

6

7

8

9                                    _____

10                                           Witness Name

11

12

13                                   _____

14                                               Date

15