## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CARGOPRIME CORPORATION,

      Plaintiff,

      v.

TROY LOGISTICS LLC,

      Defendant.

Case No. _____

## <u>VERIFIED COMPLAINT</u>

CargoPrime Corporation, by and through its undersigned counsel, files this Complaint asserting claims for damages and injunctive relief against Troy Logistics LLC, showing the Court as follows:

## <u>INTRODUCTION</u>

1.    This case stems from a simple misunderstanding, which Troy Logistics has ballooned into a smear campaign to soil CargoPrime's reputation across the freight-transportation industry, to harm its business, and to renege on Troy Logistics' contractual obligations.

2.    CargoPrime is a freight delivery company. From January to early February 2023, Troy Logistics hired CargoPrime seven times to deliver freight from Reno, Nevada, to Houston, Texas. The first six deliveries were completed

successfully. But on the seventh, the shipper (on information and belief, after conferring with Troy Logistics) refused to entrust the freight to CargoPrime's drivers. This was supposedly for two reasons: (1) because the truck they were using was not adorned with a "CargoPrime" decal, and (2) because only one driver was present when the freight was to be loaded, even though Troy Logistics required two drivers for each job.

3.     Both alleged issues were easily explained. First, the delivery truck did not have CargoPrime's decal because CargoPrime was leasing it from another company. And second, CargoPrime had two drivers scheduled to transport the delivery to its destination. During the pickup window that Troy Logistics mandated, one of the two drivers was occupied with a personal matter. In order to meet Troy Logistics' delivery timeline and avoid delays, the first driver proceeded to the shipper's location to pick up the load himself, planning to then meet up with the second driver and proceed together to Houston for delivery.

4.     CargoPrime provided the shipper and Troy Logistics these explanations, both during and after the incident. But Troy Logistics refused to accept them, insisting that CargoPrime's use of a truck bearing another company's decal somehow established that CargoPrime had engaged in "double-brokering"— a practice where a delivery company books a freight load from a broker but then,

rather than delivering the freight itself, hires another delivery company to handle the delivery. This practice is frowned upon by brokers and shippers alike. Even though CargoPrime explained that it was not double brokering, Troy Logistics then submitted a report making the same false and defamatory double-brokering allegation to Carrier411, a popular source of performance reviews often used to find, vet, and make hiring decisions about carriers such as CargoPrime.

5.     Unfortunately, Troy Logistics' smear campaign has worked. In recent months, a number of CargoPrime's customers and prospective customers have declined to retain CargoPrime for shipping jobs because of Troy Logistics' false report. As a result, CargoPrime has seen a decline in profits, and it expects the harm to its business to continue.

6.     CargoPrime now seeks to hold Troy Logistics accountable for its actions and to stop the company from continuing to slander CargoPrime's good name.

## **PARTIES, JURISDICTION, AND VENUE**

7.     Plaintiff CargoPrime is a Pennsylvania business corporation with its principal office located at 134 Three Degree Road, 1st Floor, Pittsburgh, Pennsylvania, 15220. CargoPrime submits to the jurisdiction of this Court.

8.     Troy Logistics is a Georgia limited liability company that acts as a shipping broker and non-asset based third-party logistics company. Upon information and belief, its sole member/owner is David Troy. Troy Logistics may be served with a copy of the Summons and Complaint through its registered agent for service of process, David Troy, at 38 Macon Street, McDonough, Georgia, 30253.

9.     This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, as complete diversity exists between the parties. CargoPrime is a corporation headquartered in Pennsylvania, and Troy Logistics is a Georgia citizen because David Troy, who upon information and belief is Troy Logistics' sole member, is a Georgia resident. The amount in controversy exceeds $75,000.

10.     This Court has personal jurisdiction over Troy Logistics under Federal Rule of Civil Procedure 4, O.C.G.A. § 9-10-91, and the U.S. Constitution because the company does business in Georgia and has its principal place of business in Georgia.

11.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because (i) Troy Logistics is headquartered in, and has its principal places of business in, this District; (ii) Troy Logistics intentionally and regularly conducts business in

this District; and (iii) a substantial part of the events, acts, and omissions giving

rise to CargoPrime's claims occurred in this District.

## FACTUAL ALLEGATIONS

12.     CargoPrime is a transportation company focused on supplying over-

the-road trucking services to deliver freight from one point to another. CargoPrime

sometimes partners directly with a shipper. Other times, CargoPrime contracts with

a broker who, in turn, maintains a customer relationship with the shipper.

13.     CargoPrime is an asset-based carrier, meaning it owns trucks, trailers,

and equipment. CargoPrime also rents and leases trucks and trailers from time to

time. Regardless of whether it owns or leases the equipment, the trucks are

operated by CargoPrime employees or contractors.

14.     CargoPrime was established in 2018. In that short time, CargoPrime

has cemented itself as a go-to provider for transportation services. CargoPrime has

partnered with household names like Amazon, UPS, FedEx, and Pepsi. And today,

CargoPrime has offices in four states, hundreds of employees, and hundreds of

trucks on the road, as well as a management team boasting more than 15 years of

industry experience.

15.     Despite this success, CargoPrime is still a relatively young business

that continues to build its share in the market. CargoPrime's reputation is therefore

key not only to maintaining relationships with existing clients, but also for attracting new lines of business. Indeed, CargoPrime advertises itself as "built on trustworthy relationships."

### The Parties' Dealings

16.     In January and February 2023, Troy Logistics entered into a series of contracts with CargoPrime, pursuant to which CargoPrime transported shipments of electronic equipment from the shipper Arrow Electronics in Reno, Nevada, to the purchaser Cloud Network Tech USA in Houston, Texas. True and correct copies of CargoPrime's contracts with Troy Logistics are attached hereto as Exhibit A.

17.     Troy Logistics dispatched these loads through "Price/Service Contracts," commonly referred to as Rate Confirmation Sheets (RCS). Each RCS lists Troy Logistics as the broker and CargoPrime as the carrier for the shipment.

18.     The RCSs required a quick turnaround on shipments—generally just two or three days. As a result, CargoPrime needed to utilize a team of two drivers for each job because federal regulations limit the amount of time a single driver can spend operating a vehicle. With two-driver teams, drivers alternate their driving schedules to comply with these regulations, allowing the passenger to catch up on rest and maximize safety.

19.     CargoPrime routinely uses teams of drivers in its business. In fact, CargoPrime has more than 60 teams in its employ.

20.     The RCSs contemplate the use of driver-teams and imposes monetary penalties for failing to do so, stating: "If team drivers are required and a single driver is used, compensation will be reduced by 30%."

21.     Before the parties executed any RCS, Troy Logistics required CargoPrime to supply specific information, including the names and phone numbers of the driver team that would be handling the shipment. Troy Logistics then used the drivers' cellphone numbers to track the drivers' whereabouts via a mobile application called TruckerTools. In fact, Troy Logistics would not even send CargoPrime an RCS until both drivers had TruckerTools downloaded and location-tracking enabled.

### The First Six Deliveries

22.     On January 11, 2023, John Haren sent CargoPrime an RCS to transport 10,200 lbs of electronic equipment from Reno to Houston by January 13. *See* Ex. A at 1. The parties executed that RCS, and CargoPrime completed the delivery as agreed.

23.     Four days later, on January 17, Troy Logistics sent CargoPrime an RCS to make the same delivery run for another shipment of electronic equipment

by January 20. *Id.* at 2. The parties executed that RCS, and CargoPrime completed the delivery as agreed.

24.     Then, on January 20, the parties executed two more RCSs for CargoPrime to transport two shipments from Reno to Houston, both by January 23. *Id.* at 3-4. On January 25, the parties executed another RCS for delivery on January 27. *Id.* at 5. And on February 2, they executed a sixth RCS for delivery on February 6. *Id.* at 6.

25.     CargoPrime completed all six of these deliveries on-time and in compliance with Troy Logistics' terms. CargoPrime received no negative feedback from Troy Logistics after completing the deliveries.

### *The Seventh Delivery*

26.     On February 13, 2023, CargoPrime emailed Troy Logistics Operations Manager John Haren to inquire whether Troy had any available loads for the Reno-to-Houston route because CargoPrime had a truck and team of drivers available in Reno. Ex. B at 14.[1]

---

[1]     A true and correct copy of email correspondence between CargoPrime and Troy Logistics concerning the seventh delivery is attached hereto as Exhibit B.

27.    Haren confirmed that there was a shipment available that needed to be delivered by February 15. *Id.* at 11. Haren then sent CargoPrime another RCS, which CargoPrime executed and returned. Ex. A at 7; Ex. B at 3.

28.    In addition, consistent with the parties' earlier dealings, CargoPrime provided Haren with the information he requested about the two CargoPrime drivers. Ex. B at 9-10. Troy Logistics pushed out the TruckerTools application to those drivers, and they used the application to permit Troy Logistics to track their locations. *Id.* at 3-9

29.    At the time CargoPrime booked the delivery, CargoPrime's drivers were at a truck stop, and one driver was still doing his laundry. To stay on Troy Logistics' schedule, the second driver went to the shipper alone to secure the shipment while the first driver stayed behind to finish his laundry. The second driver planned to pick up his co-driver from the truck stop after picking up the shipment so the two could depart for Houston.

30.    The driver arrived at the shipper that evening, driving a truck that CargoPrime leased from a company called Borderlanders, Inc. Specifically, under a Motor Carrier Motor Vehicle Lease Agreement, CargoPrime had leased from Borderlanders the 2020 Eco-Torque Freightliner at issue and agreed that the truck "shall be operated by and under the complete control of the lessee [CargoPrime]

for the duration of the lease" from January 1, 2023 to December 31, 2023. Ex. C.[2] Because the truck was leased, it bore a "Borderlanders" logo instead of a CargoPrime logo.

31.     Upon arrival, the shipper informed CargoPrime's driver that it could not find the load or would not make a shipment that day.

32.     Upon information and belief, the shipper contacted Troy Logistics, and Troy Logistics instructed the shipper not to release the delivery to CargoPrime.

33.     CargoPrime followed up with Troy Logistics for direction on how to proceed. Troy Logistics, however, refused to allow CargoPrime to obtain the shipment.

### Troy Logistics Publicly Accuses CargoPrime of Double Brokering

34.     On February 14, David Troy sent an email to Sam Collins, CargoPrime's operations manager, asking simply why CargoPrime "sen[t] in a single driver from Borderland [sic] trucking for this" job. Ex. B at 2.

35.     The next day, and before CargoPrime could respond, Troy Logistics filed a FreightGuard report on Carrier411, falsely accusing CargoPrime of unauthorized double brokering and unethical or deceptive business practices.

---

[2]     A true and correct copy of the Motor Carrier Motor Vehicle Lease Agreement between CargoPrime and Borderlanders is attached hereto as Exhibit C.

Ex. D.[3] The report falsely stated that the truck was being driven for a different company and also falsely charged CargoPrime with supplying Troy Logistics with a fake phone number for a second "non existent" driver. *Id.*

36.     Within hours of the FreightGuard report being posted, Sam Collins contacted Troy Logistics and sent them a copy of CargoPrime's lease with Borderlanders showing that CargoPrime was properly operating the truck. Ex. B at 2. The next morning, on February 16, CargoPrime again followed up with Troy Logistics and provided in writing detailed explanations disproving Troy Logistics' baseless double-brokering accusations. *Id.* at 1.

37.     CargoPrime explained to Troy that CargoPrime leased the truck from Borderlanders, again providing Troy with the lease agreement. *Id.* CargoPrime also explained why only one driver, instead of two, arrived at the shipper and confirmed that both drivers worked for CargoPrime. *Id.* As further proof, CargoPrime noted that this specific team of drivers had completed a Reno-to-Houston delivery for Troy Logistics before. *Id.*

38.     Despite CargoPrime's explanations, Troy Logistics refused to withdraw the FreightGuard report. In fact, on February 17, Troy Logistics

---

[3]     A true and correct copy of the email notice CargoPrime received after Troy Logistics' initial FreightGuard report is attached hereto as Exhibit D.

amended the report to bolster its false allegations. The amended report now

included Borderlanders' name and carrier number, and it attempted to discredit the

CargoPrime-Borderlanders lease agreement by deeming it a "supposed contract."

Ex. E.[4]

39.    In full, Troy Logistics' FreightGuard report states:



| REPORTED COMPANY | REPORT SUBMITTED BY |
|---|---|
| CARGOPRIME CORPORATION<br>134 THREE DEGREE RD FIRST FLOOR<br>PITTSBURGH, PA 15237<br>DOCKET: MC075729<br>PHONE: (412) 444-8989<br>FAX: (412) 774-2060<br>EMAIL: SAFETY@CARGOPRIMECORP.COM | JOHN HAREN<br>TROY LOGISTICS, LLC<br>38 MACON STREET<br>MCDONOUGH, GA 30253<br>PHONE: (770) 305-9700<br>FAX: (404) 806-4444<br>EMAIL: DAVIDTROY@TROYLOGISTICS.COM<br>FGID:5FBFB23220A8651257BB874282970C4 |
| **REPORTED ITEMS** | **REPORTED COMMENTS** |
| UNAUTHORIZED RE-BROKERING OF SHIPMENT<br>UNETHICAL OR DECEPTIVE BUSINESS PRACTICES | WE HIRED THEM FOR A TEAM ONLY LOAD. WE TOLD THEM AT<br>LEAST 5X THAT IT'S TEAM ONLY. TRUCK ARRIVED AT SHIPPER<br>WITH SOLO AND DRIVING FOR A DIFFERENT COMPANY<br>(BORDERLANDS MC1019332). THEY PROVIDED 2 PHONE<br>NUMBERS THAT BOTH TRACKED TOGETHER IN THE TRUCK.<br>APPARENTLY, THEY USED A FAKE PHONE NUMBER FOR THE<br>NON EXISTENT CO-DRIVER. SHIPPER DOCUMENTED THE SOLO<br>DRIVER AND TRUCKING COMPANY, WE HAVE TRACKING<br>RECORDS. RE: SUPPOSED CONTRACT - BORDERLANDERS IS<br>AN OPERATING CARRIER WITH ITS OWN AUTH AND INS. |

40.    Carrier411—where Troy Logistics posted the report—is a frequently

used tool in the transportation industry to, among other things, "research, qualify

and monitor the insurance, operating authority and safety ratings of . . . trucking

companies." *Carrier411 Overview*, CARRIER411,

---

[4]    A true and correct copy of the current FreightGuard report against
CargoPrime is attached hereto as Exhibit E.

https://www.carrier411.com/overview.cfm. Brokers and shippers that use Carrier411 submit FreightGuard reports based on their experiences with carriers, and when new information is posted about a carrier, the system alerts users that work with that carrier.

41.    Brokers and shippers who subscribe to Carrier411 use it to, among other things, research carriers and stay informed of others' experiences with carriers in order to decide whether to hire a specific carrier for shipments. The tool is used by the majority of brokers and shippers involved in CargoPrime's industry.

42.    Troy Logistics therefore knew that its FreightGuard report against CargoPrime would not only be made available to all Carrier411 subscribers but was likely to reach CargoPrime's current customer base, as well as potential customers who may be researching CargoPrime or who CargoPrime may solicit for business in the future.

43.    Troy Logistics also knew, or reasonably should have known, that the allegations in its FreightGuard report were false because:

- CargoPrime repeatedly denied engaging in double brokering and, in a February 16, 2023, email to David Troy, CargoPrime's Operations Manager fully explained why only one driver from its two-driver team arrived at the shipper operating a Borderlanders truck;

- CargoPrime provided its lease agreement with Borderlanders for the truck that arrived at the shipper to David Troy;

- The very same CargoPrime team had worked with Troy Logistics in the past, under the January 17, 2023, RCS; and

- Neither the presence of a single driver nor the operation of a truck bearing another company's name establishes double brokering. In fact, both of those acts are permitted by the parties' contract, which requires the carrier to "specif[y] its . . . sole authority under which it shall provide the service" under the RCS "us[ing] a truck and trailer controlled and/or operated"—not necessarily owned—"by Carrier to transport the load," and simply reduces the compensation owed to the carrier by 30% "[i]f team drivers are required and a single driver is used[.]"

44.    Despite this knowledge, Troy Logistics published the FreightGuard report anyway, even doubling down on its accusations by amending the report after CargoPrime provided its lease for the truck in question. Troy Logistics has repeatedly refused to remove the report from Carrier411, despite CargoPrime's explanations and multiple requests that it do so.

14

45.    There is no reasonable explanation for Troy Logistics' publishing of, and subsequent refusal to remove, the FreightGuard report, other than a desire to disparage CargoPrime's name and interfere with its current and prospective business.

46.    This does not appear to be the first time Troy Logistics has lodged knee-jerk and unsubstantiated accusations of wrongdoing. Indeed, Troy Logistics has a history of posting similar reports that charge other carriers with misconduct such as double brokering, even when those carriers have fiercely disputed such accusations.

47.    For example, in November 2019, David Troy, on behalf of Troy Logistics, submitted a FreightGuard report accusing SK Courier of double brokering. SK Courier explained in response that it had not re-brokered the load at issue, but simply borrowed another truck to complete the shipment:

> We so appreciate the opportunity to respond to these kind of false, guess work, accusations. Reputation is everything we thrive on. . . . Troy Broker is in McDonough GA. Load is picking up in Cranston, RI. . . . We borrowed my brothers truck to do this load because one of our trucks was down. So just because your shipper 1000+, sees a different MC# on the side of the truck. That doesn't mean anything. Stop making false accusations . . . .

48.    Similarly, in April 2022, Troy Logistics submitted a FreightGuard report accusing RTS Transport, Inc. of unauthorized re-brokering of a shipment.

RTS insisted in a response comment that it completed delivery of that shipment using its own driver, after which it received no communication or complaint from Troy Logistics until seeing the FreightGuard report.

49.     Numerous reviews on Google suggest that Troy Logistics has lodged many other similar, unsubstantiated accusations against carriers.

50.     Accusations of double brokering carry great weight in CargoPrime's industry. Shippers and brokers who hire carriers are aware of, and concerned over, the practice of double brokering because it can increase the risk of liability and is potentially illegal.

51.     Double brokering occurs when a licensed broker contracts with a licensed carrier, but that carrier (usually unbeknownst to the broker) does not deliver the shipment itself and instead sub-contracts with a different carrier to do so, usually to turn a profit.

52.     When double brokering occurs, no contract exists between the company that set up the delivery and the motor carrier that ultimately handles the delivery. This could result in increased exposure to, and complications in evaluating, liability in the event of an accident, damage, or loss of the shipment, or in a dispute over payment.

53.    Additionally, according to one commentator, "[w]hile there do not appear to be any reported administrative or court decisions that deal with this precise issue, double brokering is often considered illegal in light of the wording of federal regulations." James C. Hardman, *Third Party Contract Issues Concerning Motor Carriers, Brokers, and Shippers*, 34 TRANSP. L.J. 307, 310 (2007) (citing 49 C.F.R. § 371.7 (2007)).

54.    The practice of double brokering is therefore condemned across the transportation industry.

## Troy Logistics' Baseless Accusations Have Damaged CargoPrime

55.    Troy Logistics' false and misleading FreightGuard report has deceived shippers and brokers, including CargoPrime's current and prospective customers, causing them to believe that CargoPrime has engaged in highly disfavored, and perhaps illegal, conduct and thus cannot be trusted as a carrier.

56.    Troy Logistics' decision to post the FreightGuard report and its subsequent refusal to remove it have caused irreparable injury to CargoPrime. Moreover, Troy Logistics' actions will continue to damage CargoPrime by deceiving current and prospective customers and by disparaging CargoPrime's name in the market, so long as the FreightGuard report remains posted.

57.     Since February 15, 2023, and as a result of Troy Logistics' false and misleading FreightGuard report, CargoPrime has lost sales and will continue to lose sales.

58.     At least three companies have refused to continue working with CargoPrime.

59.     For example, on February 20, 2023, one of CargoPrime's customers, UniLink Transportation, contacted CargoPrime about Troy Logistics' FreightGuard report and stated that they may not be able to continue working with CargoPrime unless and until the report is removed.

60.     UniLink later cancelled its contract with CargoPrime, and CargoPrime has not received any business from UniLink since.

61.     CargoPrime also had discussions with prospective customers that were planning to contract with CargoPrime for shipping services but declined to do so after Troy Logistics submitted its FreightGuard report.

62.     Since the FreightGuard report was posted in February, CargoPrime has repeatedly attempted to get Troy Logistics to remove the post. Troy has refused. In fact, in response to CargoPrime's final settlement offer, Troy posted a new FreightGuard report, stating: "CargoPrime is now threatening to sue us if we

don't take down the previous FreightGuard report. In our opinion this is unethical."
Ex. F at 1.[5]

63.    CargoPrime responded to the report that it was attempting to resolve a
legitimate dispute and acted "ethically and professionally per standard business
practices." *Id.*

64.    Troy Logistics then amended its report to claim—falsely—that it had
"confirmed with Borderlanders that the truck was theirs and covered by their
insurance. We also confirmed that the truck was not covered by CargoPrime's
insurance." *Id.*

65.    Because of Troy Logistics' refusal to remove the report, CargoPrime
has had no choice but to file this lawsuit.

## CLAIMS FOR RELIEF

### COUNT I:
### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

66.    CargoPrime incorporates and realleges the allegations in each of the
preceding paragraphs as if fully set forth herein.

67.    As alleged above, Troy Logistics interfered with CargoPrime's
existing business relationships by posting the false FreightGuard report. In the

---

[5]    A true and correct copy of Troy's August 16, 2023, FreightGuard report is
attached hereto as Exhibit F.

same manner, Troy Logistics also interfered with CargoPrime's prospective

contracts for freight transportation and business relationships with various

nonparty shippers and brokers.

68.     Troy Logistics acted without privilege in interfering with

CargoPrime's prospective contracts and existing and prospective business

relationships.

69.     Troy Logistics was a stranger to the various prospective contracts and

business relationships with which it interfered.

70.     But for Troy Logistics' improper interference, CargoPrime would

have obtained business from these shippers and brokers.

71.     Troy Logistics intended to injure CargoPrime.

72.     Troy Logistics' tortious interference proximately caused financial

injury to CargoPrime in an amount to be proven at trial.

## COUNT II:
## TORTIOUS INTERFERENCE WITH CONTRACT

73.     CargoPrime incorporates and realleges the allegations in each of the

preceding paragraphs as if fully set forth herein.

74.     As alleged above, Troy Logistics interfered with CargoPrime's

existing contracts and contractual rights with at least three third parties, including

UniLink, by posting the false FreightGuard report.

20

75.     Troy Logistics acted without privilege in interfering with CargoPrime's existing contracts and contractual rights.

76.     Troy Logistics was a stranger to CargoPrime's contract with UniLink and its contracts with other third parties.

77.     Troy Logistics' publishing of, and subsequent refusal to retract, the false and defamatory FreightGuard report caused UniLink and other third parties to discontinue their contracts with CargoPrime.

78.     Troy Logistics intended to injure CargoPrime.

79.     Troy Logistics' tortious interference proximately caused financial injury to CargoPrime in an amount to be proven at trial.

**COUNT III:**
**<u>DEFAMATION</u>**

80.     CargoPrime incorporates and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

81.     As alleged above, Troy Logistics knowingly and without privilege published false statements on Carrier411 that CargoPrime engaged in double brokering.

82.     These statements make charges against CargoPrime in reference to its trade or business and are thus actionable per se. O.C.G.A. § 51-5-4(a)(3).

83.    These statements maligned CargoPrime in its trade and profession and imputed unethical, improper, and perhaps illegal conduct to CargoPrime.

84.    Troy Logistics has failed and refused to retract or remove these false statements, despite receiving information from CargoPrime undermining Troy Logistics' assertions.

85.    CargoPrime has suffered damages because of these false statements in an amount to be proven at trial.

### COUNT IV:
### DECEPTIVE TRADE PRACTICES

86.    CargoPrime incorporates and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

87.    Troy Logistics has violated Georgia's Uniform Deceptive Trade Practices Act because it disparaged the services and business of CargoPrime by making false and misleading statements of fact, *see* O.C.G.A. § 10-1-372(a)(8)— specifically, that CargoPrime engaged in unauthorized re-brokering of a shipment and unethical or deceptive business practices; failed to use a team of drivers as the parties agreed; and utilized "a fake phone number for the non existent co-driver."

88.    These statements were untrue.

89.     Troy Logistics published these statements to Carrier411, where they were made available to, and seen by, CargoPrime's current and prospective customers.

90.     Troy Logistics made these statements maliciously.

91.     The purpose of the statements was to disparage the services that CargoPrime provides by conveying that CargoPrime has engaged in unethical business practices and may do so again. But Troy Logistics knew full well—or at a minimum, reasonably should have known—that the statements were false.

92.     Troy Logistics has failed and refused to retract or remove the false statements.

93.     CargoPrime has suffered damages because of these false statements and will continue to suffer monetary and reputational injury so long as Troy Logistics' FreightGuard report remains published on Carrier411.

**COUNT V:**
**<u>BREACH OF CONTRACT</u>**

94.     CargoPrime incorporates and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

95.     On February 13, 2023, Troy Logistics entered into a contract with CargoPrime via the RCS bearing the same date (shipment contract number 36968). Ex. A at 7.

96.     Specifically, Troy Logistics prepared the RCS, sent it to CargoPrime, and CargoPrime signed and returned the RCS, creating a legally enforceable agreement.

97.     The RCS is valid and binding.

98.     Under the RCS, CargoPrime agreed to pick up a specific load of electronic equipment on February 13, 2023, from the shipper in Reno, Nevada, then transport that shipment to the specified delivery address in Houston, Texas on February 15. In exchange, Troy Logistics agreed to pay CargoPrime $4,200.

99.     CargoPrime attempted to perform its obligations under the RCS by directing its driver to pick up the shipment.

100.    Upon information and belief, Troy Logistics directed the shipper not to load the shipment, blocking CargoPrime from fully performing its contractual obligations and breaching the RCS.

101.    The RCS does not allow Troy Logistics to cancel the parties' agreement under the circumstances described above in this complaint. CargoPrime's actions were consistent with—and did not breach any term of—the RCS.

102.    The RCS permitted CargoPrime to use the Borderlanders truck that it was leasing to transport the shipment:

> Carrier pursuant to 49 USC 13901C hereby specifies its motor carrier authority as the sole authority under which it shall provide the service hereunder and agrees to use a truck and trailer controlled and/or operated by Carrier to transport the load described below:

Ex. A at 7.

103.   The RCS did not prevent CargoPrime from having a solo driver pick up the shipment before completing the shipment with a two-driver team. In fact, even if CargoPrime had used a single driver for the delivery itself—which it had no plans to do—the only remedy the RCS affords Troy Logistics is a 30% reduction of the payment to CargoPrime: "If team drivers are required and a single driver is used, compensation will be reduced by 30%."

104.   By cancelling the RCS without justification, preventing CargoPrime from fulfilling its contractual obligations, and refusing to pay CargoPrime for the delivery, Troy Logistics breached its express and implied contractual obligations.

105.   As a direct and proximate result of Troy Logistics' breach of the RCS, CargoPrime has suffered damages in an amount to be proven at trial.

## COUNT VI:
## <u>INJUNCTIVE RELIEF</u>

106.   CargoPrime incorporates and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

107.   CargoPrime will be irreparably harmed if Troy Logistics is not enjoined from further tarnishing CargoPrime's good name and business reputation through its false accusations of double brokering.

108.   CargoPrime has no adequate remedy at law as to future damages if Troy Logistics does not remove its false accusations and if its report remains visible to CargoPrime's current and future customers on Carrier411.

109.   CargoPrime is therefore entitled to an injunction requiring Troy Logistics to take down the false, disparaging, and defamatory statements about CargoPrime that it published on Carrier411.

110.   Specifically, CargoPrime requests that the Court grant injunctive relief—both preliminary and final—to compel Troy Logistics to immediately remove from Carrier411 the FreightGuard report submitted on or about February 15, 2023, accusing CargoPrime of engaging in double brokering and to refrain from posting further false reports about CargoPrime.

111.   All other preconditions and requirements necessary to grant injunctive relief have been satisfied.

## COUNT VII:
## ATTORNEYS' FEES AND LITIGATION EXPENSES

112.   CargoPrime incorporates and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

113.   Troy Logistics' actions show that it has acted in bad faith, been stubbornly litigious, and caused CargoPrime unnecessary trouble and expense.

114.   In accordance with O.C.G.A. § 13-6-11, CargoPrime should be awarded its reasonable attorneys' fees and expenses of litigation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CargoPrime respectfully requests that this Court:

a.      Enter a preliminary injunction requiring Troy Logistics to immediately remove from Carrier411 the FreightGuard report submitted on or about February 15, 2023, accusing CargoPrime of engaging in double brokering and to refrain from posting further false reports about CargoPrime;

b.      Enter a final injunction requiring Troy Logistics to immediately remove from Carrier411 the FreightGuard report submitted on or about February 15, 2023, accusing CargoPrime of engaging in double brokering and to refrain from posting further false reports about CargoPrime;

c.      Award CargoPrime damages incurred as a result of Troy Logistics' tortious interference with CargoPrime's current and prospective business relations;

d.      Award CargoPrime damages sufficient to compensate CargoPrime for the damage to its reputation and lost profits incurred as a result of Troy Logistics' defamatory statements;

e.      Award CargoPrime punitive damages and attorneys' fees for Troy Logistics' willful, malicious, and defamatory conduct;

f.      Award CargoPrime damages for Troy Logistics' breach of the February 13, 2023, RCS;

g.      Grant CargoPrime all preliminary and permanent injunctive relief to which it is entitled; and

h.      Grant CargoPrime such other and further relief as this Court deems just and proper.

Respectfully submitted this 25th day of August, 2023.

/s/ Sarah Brewerton-Palmer
Sarah Brewerton-Palmer
Georgia Bar. No. 589898
Alan M. Long
Georgia Bar No. 367326
**CAPLAN COBB LLC**
75 Fourteenth Street, NE, Suite 2700
Atlanta, Georgia 30309
Tel: (404) 596-5600
Fax: (404) 596-5604
spalmer@caplancobb.com
along@caplancobb.com

*Counsel for Plaintiff CargoPrime Corp.*

## **VERIFICATION**

I, Inomjon Madumarov, individually and as authorized agent of CargoPrime Corporation, verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing Complaint and know the contents thereof and the same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe them to be true.

Inomjon Madumarov