## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UBS FINANCIAL SERVICES INC., <br><br> Plaintiff, <br><br> v. <br><br> LESLIE LAUER, WAYNE CURT RUBINAS, and REBECCA GLASGOW, <br><br> Defendants. | Civil Action No.: |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff UBS Financial Services Inc. ("UBS") as for its Complaint against Defendants Leslie Lauer ("Lauer"), Wayne Curt Rubinas ("Rubinas"), and Rebecca Glasgow ("Glasgow") (collectively "Defendants"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      Until they abruptly resigned on August 18, 2023, to join UBS competitor RBC Wealth Management ("RBC"), Defendants were the key members of one of the preeminent financial advisor teams at UBS. At the time of their resignation, Defendants and their team serviced UBS clients with assets of more than $5 billion, generating annual revenues for UBS in excess of $21 million.

2.     Known as the "ESOP Group" and based out of UBS's Atlanta, Georgia branch office, Defendants provided wealth management advice and solutions to hundreds of UBS clients throughout the country. While they serviced a range of high net and ultra-high net worth clients, Defendants specialized in providing wealth management solutions for business owners who were looking to transition ownership of all or part of their company to an employee stock ownership plan ("ESOP").

3.     In addition, UBS uniquely promoted Defendants and their team internally to other UBS financial advisors throughout the country, who were, in turn, encouraged to introduce Defendants to their UBS clients so that Defendants could provide ESOP-related advice and solutions to these existing UBS clients. Critically, Defendants signed partnering agreements with these other UBS financial advisors in which they promised that if they ever left UBS, they would not solicit the clients to whom they had been introduced by the other UBS financial advisors.

4.     Significantly, Defendants were not the originators of the ESOP business in the Atlanta. Rather, they were brought into the ESOP business by a senior UBS financial advisor who was the original leader of the ESOP Group. In 2020, this senior advisor decided to transition out of the business pursuant to UBS's "ALFA" client transition program. In connection with his exit and the

transitioning of his interests in the ESOP business to his teammates over five years, Defendants Lauer, Rubinas, and Glasgow each signed an agreement in 2020 known as an ALFA Receiving FA Agreement (described in detail below) pursuant to which they agreed not to solicit clients they were inheriting under the ALFA arrangement, which would continue to pay the senior advisor on a portion of the revenues generated by team clients through 2025.

5.    In addition, in 2021 Lauer signed a separate "ALFA Premier Plus" agreement to herself enter the ALFA program at a future date. In connection with her agreement to enter the ALFA program at a future date, Lauer received loans worth in excess of $7 million and signed award agreements in which she agreed that she would not solicit UBS customers if she left the firm.

6.    In short, Defendants were all highly cossetted and valued employees who had all received huge financial and other professional benefits from UBS through the ALFA program and the unique access to the clients of other UBS financial advisors via the partnership arrangements championed by UBS management. All these lucrative benefits and inducements, however, proved insufficient to deter them from jumping ship to UBS competitor, RBC Wealth Management ("RBC"), and immediately reneging on their contractual obligations. UBS is informed and believes that Defendants received an enormous payday from RBC, in the range of $70 million.

7.     The hiring of such a high-profile team was a coup for RBC. Shortly after the news broke of the hire, an RBC manager (who formerly worked for UBS) sent a text to a current UBS employee boasting about what had occurred:

> We cracked the ALFA code. If we can do Leslie, we can certainly do [Redacted] and team. Please let me know when you are ready to learn more.

Upon information and belief, the reference to "we cracked the ALFA code" refers to the various ALFA non-solicitation agreements that Defendants had signed.

8.     Compounding the irreparable harm and damage to UBS, Defendants took their entire ESOP Team with them, including Senior Wealth Strategy Associates Catherine Mericka and Kurt Hirshman; Senior Investment Associates Dana Breland and Dianna Moore; and Client Associates Andrew Beckett, Rebecca Leichter, and Christy Dryden.

9.     Crucially, within hours of their resignations, Defendants *immediately* commenced soliciting UBS customers they were entrusted to service, seeking to have them transfer their assets to RBC.

10.     Although each of the Defendants had signed agreements containing non-solicitation covenants as well as agreements containing confidentiality covenants, those contractual promises have not stopped them from brazenly

soliciting UBS clients and unfairly competing. Instead, within hours of their resignations, they immediately and unlawfully began soliciting UBS's clients in a malicious effort to pirate some or all of the $5 billion in managed assets UBS helped them develop.

11.     While soliciting clients in violation of their obligations, Defendants are falsely assuring UBS that they have not solicited and will not solicit UBS clients. Defendant Lauer has sent texts to UBS management falsely stating that she and the other Defendants will not call the clients of other UBS financial advisors to whom they were provided access in exchange for agreement to non-solicitation covenants in the partnering agreements. All the while, Defendants have been and continue to aggressively solicit these clients to move to RBC, including by falsely stating that UBS will raise their loan rates and that UBS was somehow not "supportive" of the ESOP business notwithstanding the enormous success they achieved at UBS as a result of, among other things, being afforded the unique opportunity and access to the partnership clients by firm management.  Upon information and belief, Defendants have been contacting UBS clients by calling and texting from their personal phones.

12.     Defendants' misconduct in violation of the multiple agreements they signed has already caused UBS significant harm. As of the filing of this action, more than $16 million in assets formerly managed by Defendants have already

transferred to RBC, and UBS believes that Defendants have secured commitments to transfer hundreds of millions of dollars in additional UBS assets in the coming days.

13.    Further, in the weeks leading up to their resignation, Defendants or their staff printed thousands of pages of documents containing highly confidential UBS client information, including client lists, "client windows" and prospect lists. The timing and volume of printing, coupled with the nature of the documents printed, strongly suggest they were printed and taken by Defendants to be used for their transition to RBC, rather than for any legitimate UBS business purpose. While Defendants have denied taking the information, the printing is nonetheless highly suspicious and suggests that Defendants have misappropriated confidential UBS information.

14.    By their actions, each Defendant has breached his or her contractual obligations and fiduciary duties.

15.    By those same actions, each Defendant has engaged in tortious and malicious conduct.

16.    UBS brings this action to enforce Defendants' contractual promises, protect its customers, goodwill, and confidential information, and prevent

irreparable injury to its business.[1]

17.    Defendants' blatant and unabated disregard for their contractual obligations and fiduciary duties have caused and are continuing to cause irreparable harm to UBS such that immediate injunctive relief is necessary and warranted.

18.    By this action, UBS seeks temporary and preliminary injunctive relief against the actions of Defendants pursuant to the valid and enforceable contractual agreements between UBS and each Defendant, as well as the statutory and common law of Georgia.

19.    UBS further seeks expedited discovery in this matter in order to preserve and protect its proprietary information from actual and threatened misappropriation by Defendants, as well as to safeguard its valuable relationships with key employees, customers, and referral sources from unlawful interference by Defendants.  *See* Rule 26(d), Fed. R. Civ. P.

## **PARTIES**

20.    UBS is a Delaware corporation with its principal place of business in the State of New York. UBS is a securities broker-dealer and commodities futures commission merchant throughout the United States and a FINRA member firm.

---

[1] As required by securities industry rules, UBS is simultaneously filing an arbitration claim for permanent injunctive relief and damages against Defendants at FINRA Dispute Resolution.

21.     Until recently, Defendants were UBS employees.

22.     Defendant Lauer is a citizen of the United States and the State of Ohio. Lauer is domiciled at One Miranova Place, Columbus, Ohio, which is where she makes her home and plans to make her home going forward indefinitely. Lauer worked for UBS in Columbus from May 2006 until her voluntary resignation on August 18, 2023. She currently works for RBC in Columbus, Ohio.

23.     Although Defendant Lauer officed in Ohio during her employment with UBS, she was a member of the ESOP team based in UBS's Atlanta, Georgia branch office. The FA ID number that she was connected with was based in the Atlanta branch office. She regularly communicated and transacted business with other ESOP Group team members in Atlanta.

24.     Defendant Glasgow is a citizen of the United States and the State of Georgia. Glasgow is domiciled at 2574 Red Valley Road, Atlanta, Georgia, which is where she makes her home and plans to make her home going forward indefinitely. She worked for UBS in Atlanta from May 2008 until her voluntary resignation on August 18, 2023. She currently works for RBC in Atlanta.

25.     Defendant Rubinas is a citizen of the United States and the State of Georgia. Rubinas is domiciled at 4620 Jettridge Drive, NW, Atlanta, Georgia, which is where he makes his home and plans to make his home going forward

indefinitely. He worked for UBS in Atlanta from August 2006 until his voluntary resignation on August 18, 2023. He currently works for RBC in Atlanta.

## JURISDICTION AND VENUE

26.     The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because each Defendant resides in this judicial district or is subject to personal jurisdiction in this Court, and because a substantial part of the events giving rise to UBS's claims occurred in this judicial district.

28.     This Court has personal jurisdiction over Defendant Lauer due to her significant contacts with the State of Georgia, including her management and leadership of the ESOP Team, based in Atlanta, Georgia, her management of client accounts for clients in the State of Georgia, and her actions in soliciting UBS customers in the State of Georgia that are directly tied to UBS's claims in this litigation.

29.     The merits of this dispute are subject to mandatory arbitration before the Financial Industry Regulatory Authority ("FINRA").  However, under Rule 13804 of the FINRA Code of Arbitration Procedure, UBS is exercising its right to seek preliminary injunctive relief in this Court.  In compliance with the FINRA

Code, UBS is filing a Statement of Claim with FINRA against Defendants and their new employer, RBC.

## DEFENDANTS' FORMER UBS EMPLOYMENT

30.     The Defendants worked together as a financial advisor team, known as the ESOP Group and, as noted above, provided wealth management advice and solutions for business owners, particularly financial services for business owners selling all or part of their company to an ESOP.

31.     Defendants were a highly successful team at UBS. At the time of their resignation, Defendants were responsible for managing $5 billion in assets for UBS clients. Defendants generated approximately $21 million in revenue for UBS in the twelve months prior to their resignation.

32.     As noted above, however, a significant portion of the assets managed by Defendants was generated from the existing customers of other UBS financial advisors across the country who were encouraged to introduce Defendants to their clients and promote Defendants' ESOP-related services or was inherited from a legacy UBS financial advisor as part of the ALFA program.

33.     In connection with both programs that enabled Defendants to become the highly successful team that they were, Defendants were required to sign agreements with non-solicitation covenants: (a) Partnering Agreements for the clients they were introduced to by other UBS advisors and (b) ALFA Receiving

FA Agreements for the clients they inherited from their former teammate.

*The Partnering Agreements*

34.     Notably, Defendants were parties to numerous UBS Private Wealth Management Financial Advisor/Private Wealth Advisor Partnering Agreements ("Partnering Agreements") (representative examples of these Partnering Agreements are attached as **Exhibit A**) between the Defendants on one hand and various UBS Financial Advisors on the other hand.

35.     UBS is expressly designated in the agreements as a third-party beneficiary entitled to enforce the Partnering Agreements.

36.     These Partnering Agreements were designed to prevent and protect against precisely the behavior the Defendants have now undertaken.  To that end, page 3 of the Partnering Agreement states:

> **<u>NON-SOLICITATION</u>**
>
> Should the employment of any Advisor terminate at any time (while party to this Agreement or not and regardless of whether such employment termination is voluntary or not), such Advisor agrees that: (i) he/she will not directly or indirectly solicit or interfere with any of the Shared Clients serviced pursuant to this Agreement for a period of one year from the date of termination; and (ii) he/she will immediately disconnect with any Shared Client with whom the Advisor is connected on LinkedIn.
>
> For purposes of this provision, "solicit" means that the departing Advisor will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of: (i) initiating contact with a

Shared Client to notify such client of his or her departure from UBS and/or to provide information about such new employer to any Shared Client, or (ii) inviting, encouraging or requesting a Shared Client, or that may have the effect of inviting, encouraging or requesting a Shared Client to: (a) transfer his or her account(s) to anyone else including to the departing Advisor or his or her new employer; (b) open a new account with the departing Advisor or anyone else including his or her new employer; or (c) otherwise discontinue his or her existing business relationship with UBS.

Further, in the event that a Shared Client contacts an Advisor following the Advisor's departure from UBS, such Advisor agrees to inform the Shared Client of the existence of the terms of this paragraph.

The Partnering Agreements also prohibit Defendants from using or disclosing any nonpublic information concerning UBS or UBS clients that they obtained in connection with their employment. *See, e.g.,* Partnering Agreements, at p. 3.

### *The 2020 ALFA Receiving FA Agreements*

44.     In May of 2020, Defendants were invited to participate as Receiving FAs in a program at UBS referred to as the Aspiring Legacy Financial Advisor ("ALFA") Program under which they would inherit clients serviced by their former teammate and the founder of the ESOP Group.

45.     The ALFA Program gives eligible UBS financial advisors who plan on leaving the industry in the coming years the opportunity to transition their client relationships to other UBS financial advisors.

46.     Under the ALFA Program, a "Legacy FA" transitions his or her client

accounts to "Receiving FAs" in exchange for monthly payments for a five-year transition period. The Receiving FA must execute a Receiving Advisor Agreement to attain status as a Receiving FA under the ALFA Program.

47.    On May 23, 2020 (Defendant Lauer) and May 28, 2020 (Defendants Glasgow and Rubinas), the Defendants executed a Receiving FA Agreement under the ALFA Program (the "2020 ALFA Agreements," **Exhibit B** hereto), which provide the terms under which the Defendants would become a Receiving FA and inherit UBS clients serviced by another senior financial advisor at UBS (who will be referred to as the "Legacy ALFA FA").

48.    Pursuant to the 2020 ALFA Agreements, the Legacy ALFA FA introduced the Defendants to an identified list ALFA Clients so that the ALFA Clients would continue to receive investment and financial services from UBS without any interruption after the Legacy ALFA FA voluntarily separated from employment at UBS.

49.    Under the 2020 ALFA Agreements, the Defendants earned a split percentage of the commissions and revenues generated on the client accounts for the ALFA Clients for a period of five years. Specifically, following the Defendants' execution of the 2020 ALFA Agreement, the Defendants were to receive compensation based on a percentage of the gross commissions and

13

revenues generated by the ALFA Clients' accounts. The percentage to which the Defendants was credited increased each year.

50.     The Legacy ALFA FA likewise received compensation based on an identified percentage of the gross commission and revenues generated by the ALFA Clients for a period of five years, in exchange for agreeing to transition the ALFA Clients to the Defendants. The Legacy ALFA FA's percentage of the commission and revenues decreased over the five-year period.

51.     In exchange for the opportunity to inherit the ALFA Clients and continue to work with them following the Legacy ALFA FA's separation from UBS, the Defendants expressly agreed to a confidentiality provision in the 2020 ALFA Agreement. Specifically, the Defendants agreed that, during their employment with UBS and following the termination of their employment with UBS, they would be prohibited from directly or indirectly using or disclosing any UBS client information, except in the course of carrying out their employment duties with UBS.

52.     The 2020 ALFA Agreement also contained non-solicitation provisions whereby the Defendants were prohibited from soliciting ALFA Clients to transition their accounts away from UBS during the "Restricted Period." The "Restricted Period" is defined as the date the Defendants entered into the 2020 ALFA Agreement through to the last to occur of either: (1) one year from the date

on which the Defendants' employment terminates with UBS or (2) the end of the

five-year period. Specifically, the 2020 ALFA Agreements provide as follows:

> <u>Non-Solicitation</u>. You also agree that during the Restricted Period you will not directly or indirectly solicit or interfere with any client who maintains or maintained an ALFA Account. Your agreement 'not to solicit' includes but is not limited to your agreement not to initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client to transfer any account from the UBS Group to you or any other entity or person; to open a new account with you or any other entity or person; or to discontinue the client's business relationship with the UBS Group.
>
> ***
>
> You understand that the terms of this section ('Non-Disclosure and Non-Solicitation') are material to the UBS Group and, therefore, if a court or arbitration panel of competent jurisdiction rules that you have breached the terms of this section, you agree that damages in the event of breach of this section would not be possible to ascertain. Therefore, you also agree that in addition to and without limiting any other remedy or right the UBS Group may have, it shall have a right to an injunction or other equitable relief enjoining any such breach or prospective breach. The existence of this right shall not limit any other rights and remedies at law or in equity. The UBS Group shall not be required to post any bond in connection with the foregoing. For the avoidance of doubt, the restrictions set forth herein are in addition to and not in lieu of any post-employment restrictions set forth in any plan rules governing awards, and nothing in this Agreement limits the terms and conditions of the applicable plan rules.

(EX. B at p. 2.)

37.    The ALFA Client accounts subject to the restrictive covenant in the 2020 ALFA Agreement constituted a significant percentage of the total client assets that were managed by the Defendants while employed at UBS, Similarly, the ALFA Clients generated the majority of the annual gross revenue for the client accounts the Defendants serviced at UBS at the time of their resignation.

*ALFA Premier Plus Agreement*

38.    In 2021, Lauer entered into a separate and highly lucrative "ALFA Premier Plus" arrangement with UBS.

39.    ALFA Premier Plus is a prelude to the ALFA program that is made available to certain select UBS financial advisors.

40.    Under ALFA Premier Plus, the financial advisor enters into a written commitment to enter and complete the ALFA program.  In exchange for this written commitment, the ALFA Premier Plus financial advisor receives upfront payments in the form of a loan, plus annual cash transition payments approximating the annual installment payments due under the loan, plus interest.

41.    In connection with her agreement to enter the ALFA program at a future date, Lauer received loans worth in excess of $7 million and signed award agreements in which she agreed that she would not solicit UBS customers if she left the company.

16

42.     Specifically, Respondent Lauer executed two separate Premier Plus Award Agreements: (a) a Premier Plus Accelerate Option Transition Payment Award Agreement and (b) Premier Plus Transition Payment Award Agreement, (collectively, the "Premier Plus Award Agreements") attached as **Exhibits C and D** respectively.

43.     The Premier Plus Agreements contain identical non-solicitation and confidentiality provisions. Specifically, each Premier Plus Award Agreement provides as follows at Paragraph 14:

> Non-Solicitation. Employee … also agrees that during the Restricted Period Employee will not directly or indirectly solicit or interfere with any client who maintains or maintained an Premier Account (i.e., an Account transitioned to a Receiving Financial Advisor under the Premier Core Program) or any of the clients or client relationships of any UBS Group entity that Employee either performed work for, supervised or actively solicited work from during the twelve months prior to the date on which Employee's employment terminates or whose name became known to Employee during Employee's employment. Employee's agreement 'not to solicit' includes but is not limited to Employee's agreement not to initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may  have the effect of inviting, encouraging or requesting a client to transfer any account from the UBS Group to Employee or any other entity or person; to open a new account with Employee or any other entity or person; or to discontinue the client's business relationship with the UBS Group.

44.    The "Restricted Period" is, in turn, defined as "the period during which employee is employed by UBSFS until one year from the last to occur of the following: (i) the date on which Employee's employment terminates with UBSFS for any reason whatsoever and (ii) the scheduled Inactive Phase End Date as defined in Employee's Premier Plus Commitment Agreement."

45.    The Premier Plus Award Agreements also prohibit Lauer from using, disclosing or taking UBS confidential information, including "client lists and contact information," except in connection with her duties as a UBS employee.

### The NFA Trainee Agreement.

46.    When Glasgow joined UBS in 2008, she signed The Agreement for New Financial Advisors in the Development Program (the "NFA Trainee Agreement," **Exhibit E** hereto).

47.    The NFA Trainee Agreement contained a confidentiality provision. Specifically, the confidentiality provision defined confidential information as including names, addressed, and telephone numbers of UBS's clients. The confidentiality provision of the NFA Trainee Agreement also prohibited Glasgow from using any confidential information upon the termination of her employment with UBS.

48.     In the NFA Trainee Agreement, she also explicitly agreed to a non-solicitation provision. Specifically, the non-solicitation provision provided as follows:

> 2.1     In the event of Employee's termination from [UBS] for any reason whatsoever, whether voluntary or involuntary, Employee agrees that he or she:
>
> (a)     Will not solicit, directly or indirectly, for a period of six months from the date of termination of Employee's employment, any of the clients who maintain accounts at UBS Financial Services Inc. ("Clients of UBS Financial Services Inc.") whom Employee serviced during his or her employment at UBS Financial Services Inc. or other Clients of UBS Financial Services Inc. whose names became known to Employee while in the employ of UBS Financial Services Inc.
>
> ***
>
> (c)     Return any and all original, copied and computerized Restricted Information or Company Records, in whatever form they may exist.

49.     The NFA Trainee Agreement defined "solicit" as follows:

> 2.2     "Solicit" as used in Paragraph 2.1(a) means that the Employee will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client, or that may have the effect of inviting, encouraging or requesting a client:
>
> (a)     To transfer his or her UBS Financial Services Inc. account(s) to the Employee or his or her new employer; or
>
> (b)     To open a new account with Employee or his or her new employer; or
>
> (c)     To otherwise discontinue its existing business relationship with UBS Financial Services Inc. Without limiting the generality of

the foregoing, UBS Financial Services Inc. and Employee specifically and further agree that the term "solicit" as used in Paragraph 2.1(a) includes any mailing or other communication that is sent directly to one or more of the Clients of UBS Financial Services Inc. whom Employee serviced during his or her employment at UBS Financial Services Inc. or other Clients of UBS Financial Services Inc. whose names became known to Employee while in the employment of UBS Financial Services Inc.

### *UBS Policies Regarding Confidentiality of Information*

50.    As UBS financial advisors and employees, Defendants had access to confidential UBS information relating to, among other things, client names and contact information, client investment information and account performance reporting, client financial data, and client estate planning information, to name a few.

51.    Throughout their UBS employment, Defendants *repeatedly* acknowledged the confidentiality of information concerning UBS's clients. Each advisor was provided, and was required to read and comply with all firm policies and procedures, including UBS's Code of Conduct and Ethics ("the Code of Conduct"). (*See* Code of Conduct, attached hereto as **Exhibit F**.)

52.    A financial advisor's agreement to comply with UBS's policies and procedures, including the Code of Conduct and other policies designed to ensure the confidentiality and security of UBS's confidential client and business information, is a condition of his or her continued employment with UBS.

53.     In addition, Defendants were required to annually certify to UBS that they fully complied with and adhered to firm policies, including those contained in the Firm's Code of Conduct and Business Ethics and all other applicable firm policy manuals, Compliance Bulletins, Guidelines, and Directives; as well as the laws, rules, and regulations that govern or are otherwise applicable to the financial services industry.

54.     UBS's client base is the lifeblood of its business. UBS spends millions of dollars each year on national and local advertising.  UBS also spends millions of dollars more each year for: (a) sales support staff; (b) clearing services, operations personnel, systems, and support; (c) management and compliance supervision; (d) salaries; (e) annual registration fees; (f) computer services and equipment, phone systems, and mail handling facilities; (g) securities research and the publication of literature concerning securities and investments; (h) investment seminars and promotional events; (i) subscriptions to trade, professional and news publications; and (j) the retention of experts in tax, employee, and health benefits, insurance, real estate, underwriting, and numerous other sub-specialties.  UBS incurs these many and substantial expenditures for the specific purpose of attracting and maintaining a loyal client base, and in order to establish and maintain customer goodwill.

***Defendants Print Thousands of Pages***
***of Confidential Information Prior to Resigning***

55.    As noted above, in the lead up to their coordinated resignations, Defendants or their subordinates printed thousands of pages of documents containing UBS's confidential information.

56.    For example, during the period from August 1 to August 18, Defendants or their subordinates printed no fewer than 800 separate documents containing UBS confidential information, equating to 3,000 pages of printing.

57.    Among these items were numerous lists of clients and details regarding client relationships and accounts.

58.    In the weeks and months leading up to their resignations, Defendants or their subordinates printed documents and spreadsheets with the following descriptions: : "TEG Client Spreadsheet", "List of my clients", "Dana's Pending Items and Client List", "ESOP Client List – Running List", "529s – List of Accounts", "MasterList_HouseholdsProductionTiersAndCoverage", "CD clients", "CD relationships", "Becky Clients", "client list most current", "List of Y5 Accounts", "CW_Relationship_A-Z_List", "2023 Prospects", and "Leads", among other titles.

59.    There was no business reason for Defendants to print these materials. The information in question is readily accessible in a proprietary database to which that all Defendants had regular access, and a simple database query is far easier than flipping through hundreds of physical pages to find a client.

60.     In response to UBS post-resignation efforts to secure return of these documents, Defendants have stated that the documents were destroyed or left in the branch. This flat denial is simply not credible.

### *Defendants Simultaneous Resign from the UBS and Immediately Begin Soliciting UBS Clients and Utilizing UBS Confidential Information*

61.     On Friday, August 18, 2023, at approximately 8:34 A.M., Defendants Lauer, Rubinas and Glasgow abruptly and simultaneously resigned from UBS, without providing any prior notice.

62.     That very same day, August 18, 2023, the Defendants all became employed by RBC.

63.     Upon information and belief, Defendants have received a highly lucrative transition deal from RBC pursuant to which they will be eligible to receive substantial incentive compensation tied based on the amount of UBS client assets they are able to move to RBC.

64.     The total value of Defendants' transition deal, upon information and belief, is likely in the $70 million range.

65.     As discussed above, three of the Defendants were subject to multiple written agreements at the time of their separations from UBS prohibiting them, directly or indirectly, from (a) soliciting clients and (b) possessing, disclosing, or using any confidential UBS client information.

66.    On Thursday, August 24, 2023, Lauer sent the following text to a senior UBS manager:



Text Message
Today 8:25 AM

Hi Redacted Leslie Lauer here. Just want you to know we won't be calling any of our partnerships' clients or prospects.

**Redacted**

It was a pleasure getting to know you and thank you for the years of support!

If you'd like to talk about anything feel free to reach out. Best of luck to you.

67.    Lauer's unsolicited communication, however, is demonstrably false and apparently intended to buy Defendants more time to solicit their UBS customer base.

68.    Indeed, the evidence gathered at this early stage establishes that Defendants began directly targeting UBS' customers in violation of their continuing legal obligations *immediately* following their abrupt, early-morning email resignations on August 18, 2023.

69.    One client subject to a Partnering Agreement told UBS late in the afternoon of the same day Defendants resigned that they were aware Defendants had moved to RBC.

70.    On Saturday August 19, another UBS client emailed Defendant Glasgow at her UBS email address asking for help so that she could log in to RBC's Account Opening and Servicing Platform:



71.    On Monday, August 21, the client informed UBS that they had talked with Defendant Lauer over the weekend and had decided to move their accounts to RBC, and therefore was cancelling a pre-planned dinner with the UBS representative.

72.    Also on Monday, August 21, just one business day after Defendants' resignation, UBS management received three separate calls from UBS customers – Defendant Rubinas or another of Defendants' team members actually *on the line* as facilitators – asking to pay off existing loans or otherwise liquidate assets for the purpose of transferring their accounts from UBS to RBC.

73.     In addition to initiating contact with clients immediately after their resignation, Defendants are also seeking to induce the clients by promising more favorable loan rates at RBC and by misstating information about UBS's rates. For example, on Monday, August 21, one client told UBS that Defendant Lauer said that UBS is going to "reprice" margin loans and that RBC has a much better credit rating than UBS and can therefore offer "cheaper paper" right away.

74.     In a different conversation with a separate client, Defendant Lauer reportedly told the client that UBS was not "supportive" of the ESOP business and likely would change the clients' rates.

75.     Defendants Glasgow and Rubinas have reached out to several key accounts, falsely telling them that UBS will raise their fees and directly soliciting them to move their business to RBC, further promising them that RBC will offer them new loans with more favorable terms.  In so doing, Glasgow and Rubinas are directly referring to the confidential, specific terms and details of those clients' current accounts with UBS.

76.     Upon information and belief, Defendants have used confidential UBS customer information to facilitate their communications with clients in person and by cell phone calls, texts, and emails.

77.     As noted above, several clients that Defendants serviced while at UBS have already moved their business to RBC, or informed UBS that they intend to do

so, and have notified UBS that they already have been contacted by Defendants.

78.    Indeed, on numerous occasions, Defendants or their RBC team members have literally joined on phone calls with customers to "facilitate" these transfers.

79.    As of the date of filing, UBS has received electronic account transfer instructions to transfer more than $16 million in client assets formerly managed by Defendants at UBS to RBC via the Automated Customer Account Transfer Service system ("ACAT")

80.    In order to initiate an electronic account transfer via the ACAT system, clients must execute written account transfer paperwork authorizing the transfer.

81.    Upon information and belief, Defendants' misconduct as set forth above is merely the first to be discovered, and represents the tip of the iceberg in terms of their intentional breaches of their obligations to UBS.

82.    UBS has attempted in good faith to resolve this matter.  On August 18, 2023, the very same day of their resignations, UBS sent letters to the attorney for Defendants Lauer, Rubinas and Glasgow, reminding them of their continuing obligations to UBS and insisting that they refrain from soliciting UBS customers, or misappropriating UBS confidential information.  (See UBS Reminder Letters, August 18, 2023, attached hereto as **Exhibit G**.)

83.     UBS's good faith and lawful requests have been met largely with silence, as Defendants have apparently been fully occupied by their efforts to breach those very same contractual obligations, or misstatements regarding their intentions..

84.     Absent injunctive relief, UBS has no adequate remedy at law.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract – Non-Solicitation of Clients – Against Defendants Lauer, Rubinas and Glasgow)

85.     UBS realleges and incorporates the preceding paragraphs as if set forth fully herein.

86.     Each Agreement containing a non-solicitation covenant signed by Defendants Lauer, Rubinas and Glasgow ("the Soliciting Defendants") is valid and enforceable.

87.     Each Soliciting Defendant violated his or her non-solicitation covenants, the provisions of which are set forth above, by soliciting, servicing and/or otherwise interfering with UBS's relationships with its clients.

88.     All of the Agreements were supported by adequate consideration, as set forth above, and contain reasonable post-employment restrictions that are necessary to protect UBS's legitimate business interests.

89.     UBS fully performed its obligations under the Agreements containing non-solicitation covenants.

28

90.     As direct and proximate result of the Soliciting Defendants' breaches of their non-solicitation agreements, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

91.     UBS will continue to suffer this harm unless and until the Soliciting Defendants are restrained from their current conduct and are compelled to abide by the terms of their non-solicitation covenants.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract – Confidential Information – Against All Defendants)

92.     UBS realleges and incorporates the preceding paragraphs as if set forth fully herein.

93.     Each agreement containing a confidentiality covenant signed by each Defendant is valid and enforceable.

94.     Under the confidentiality covenants, Defendants are prohibited from directly or indirectly using, disseminating or disclosing UBS's Confidential Information, as the term is defined in the agreements set forth above, except as required to carry out their duties as an employee of UBS.

95.     Upon information and belief, each Defendant has used or disclosed, or threatens to use or disclose, UBS's Confidential Information, in violation of his or her Confidentiality covenants.

96.     UBS fully performed its obligations under the Agreements set forth above, which contain confidentiality covenants.

97.     As direct and proximate result of Defendants' breaches of the confidentiality covenants, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. UBS will continue to suffer this harm unless and until Defendants are restrained from their current conduct and are compelled to abide by the terms of the Confidentiality covenants.

## THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duties – Against All Defendants)

98.     UBS realleges and incorporates the preceding paragraphs as if set forth fully herein.

99.     Each Defendant was employed by UBS in a position of trust and confidence.

100.    By virtue of his or her position at UBS, each Defendant owed a fiduciary duty and a duty of loyalty to UBS both during and after his or her employment and was obligated not to divert UBS's business in which it had a tangible expectancy, and not to subvert or misappropriate UBS's Confidential Information.

101.    Each Defendant breached his or her fiduciary duties owed to UBS by directly or indirectly soliciting and/or diverting UBS's clients and business

opportunities, in which it had a tangible expectancy, to RBC, a direct competitor, and/or subverting or misappropriating UBS's Confidential Information and Trade Secrets.

102.   As a direct and proximate result of Defendants' breaches of their fiduciary duties, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. UBS will continue to suffer this harm unless and until Defendants are restrained from taking further actions in breach of their fiduciary duties to UBS.

### FOURTH CLAIM FOR RELIEF
### (Tortious Interference with Existing and Prospective Business Relationships – Against All Defendants)

103.   UBS realleges and incorporates the preceding paragraphs as if set forth fully herein.

104.   As a result of their employment with UBS, Defendants were intimately familiar with, and had detailed knowledge concerning, the business relationships that existed between UBS and certain clients.

105.   The Defendants intentionally, with malice, and without privilege or justification, interfered with UBS's business relationships with certain clients using unfair or improper means, and/or with the intent to interfere with such relationships.

106.   UBS possesses a protectable interest in its contracts and relations with its clients, in that it has a reasonable expectation of their continued association with UBS.

107.   Defendants' conduct was undertaken with malice, or in knowing disregard of or indifference to, the rights and interests of UBS.

108.   As a direct and proximate result of Defendants' interference, jointly and severally, UBS suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.

109.   UBS will suffer this harm unless and until Defendants' are restrained from their respective current and intended conduct.

### FIFTH CLAIM FOR RELIEF
### (Misappropriation of Confidential Information - Against All Defendants)

110.   UBS realleges and incorporates the preceding paragraphs as if set forth fully herein.

111.   As senior employees of UBS, each Defendant learned or had access to UBS's Confidential Information.

112.   Upon information and belief, each Defendant has used or disclosed, or threatens to use or disclose, UBS's Confidential Information.

113.   Upon   information   and   belief,   Defendants   are   presently misappropriating UBS's Confidential Information, and using such information to the detriment of UBS.

114.   As a direct and proximate result of Defendants' conduct, jointly and severally, UBS has suffered and will continue to suffer extensive irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law.  UBS will suffer this harm unless and until Defendants are restrained from their current and intended conduct.

**WHEREFORE**, UBS demands judgment for temporary and preliminary injunctive relief, pending FINRA arbitration, as follows:

A.   Enjoining and restraining Defendants, and any person or entity acting in concert with them or under their supervision, through the end of the restricted periods set forth in Defendants' respective agreements, and as extended during any period that Defendants have breached their obligations to UBS, from directly or indirectly soliciting or influencing any of UBS's clients or client relationships that each Defendant either performed work for, supervised or actively solicited work from during the twelve months prior to the date on which each Defendant resigned their UBS employment;

B.   Enjoining and restraining Defendants, and any person or entity acting in concert with them or under their supervision, from possessing, using, disclosing

or disseminating UBS's Confidential Information;

   C. Enjoining Defendants, and any person or entity acting in concert with them or under their supervision, from any other actions in violation of any Defendant's contractual obligations or fiduciary duties owed to UBS; and

   D. Granting UBS its costs and disbursements incurred in connection with this litigation, including attorneys' fees, together with such other further relief as the Court may deem just and proper.

     Respectfully submitted,

     */s/ Jacob S. Gibson*
     Jacob S. Gibson, Bar No. 218566
     jsgibson@littler.com

     LITTLER MENDELSON, P.C.
     3424 Peachtree Road N.E. Suite 1200
     Atlanta, GA  30326.1127
     Telephone:  404.233.0330
     Facsimile:   404.233.2361

     William H. Foster
     *Pro Hac Vice* Motion Forthcoming
     bfoster@littler.com

     LITTLER MENDELSON, P.C.
     110 East Court Street, Suite 201
     Greenville, SC 29601
     Telephone:  (864) 775-3191
     Facsimile:   (864) 752-1249

     *Attorneys for Plaintiff UBS Financial Services, Inc,*

August 25, 2023

## **FONT CERTIFICATION**

The undersigned hereby certifies that this pleading complies with the font requirements of LR 5.1B because the document has been prepared in Times New Roman, 14 point.

*/s/ Jacob S. Gibson*
Jacob S. Gibson