# Exhibit A

 **UBS**

# UBS Private Wealth Management
# Financial Advisor/Private Wealth Advisor Partnering Agreement

## PARTIES

This Financial Advisor/Private Wealth Advisor revenue sharing agreement (the "Partnering Agreement") is made and entered into on the         17    day of     January      , 2020, by and between:

    (1)  Benjamin Domingue
    (2)  Keith Mericka, Leslie Lauer

## PURPOSE OF AGREEMENT

The above-mentioned Introducing Advisor(s) ("Introducing FA") and Private Wealth Advisors/Family Office Consultants(s) ("PWA/FOC") (collectively, the "Advisors") hereby enter into this Partnering Agreement (the "Agreement") setting forth the terms and conditions under which they will work together to provide wealth management services to each of the clients or client prospects listed on Exhibit "A" annexed hereto ("Shared Clients"). Each party hereby acknowledges and agrees that, although UBS Financial Services, Inc. ("UBS") is a third-party beneficiary of this Agreement, the terms described herein must be approved, in writing, by UBS Management [1] prior to its execution. Further, and for the avoidance of doubt, nothing contained herein shall alter or amend the employment relationship currently in existence between any Advisor and UBS.

## PARTNERSHIP INCENTIVE STRUCTURE

In consideration for the introduction of the Shared Client(s) by the Introducing FA(s) and the agreement of the Advisors to work together to service such Shared Clients, the Advisors hereby agree to the Partnering Incentive Structure set forth in Exhibit "A" pursuant to which the parties will open a Shared Client Account (and share in: (a) commissions, sales credits and fees generated by the Shared Clients' Accounts ("Gross Commission"); (b) assets under management; (c) expenses incurred in servicing the Shared Clients; and, (d) Net New assets (collectively, "Shared Client Revenue") generated by a Shared Client (but only to the extent such Shared Client Revenue exceeds the monthly historical average over the prior 24 months, if any (the "Base Revenue Amount").

All Advisors will be paid in accordance with the respective UBS Financial Advisor compensation plan applicable to such Advisor and in effect during their employment. Enhanced payouts shall be available in accordance with the compensation plan prescribed by UBS Management for a subgroup of clients as described in further detail in Exhibit A.

Furthermore, the Advisors agree that the assets held in a Shared Client Account shall be held in the applicable Private Wealth Management or UBS International wire code and that a single, unique split ID number will be assigned thereto.

---

1 For the purposes of this Agreement, UBS Management shall mean the Head of Ultra-High Net Worth Americas or such person as that individual shall delegate that responsibility to.

For Internal Use Only

 **UBS**

This Agreement shall become effective upon its execution by all Advisors and formal approval by UBS management ("Effective Date"). The Partnership Incentive Structure shall be implemented on the first day of the monthly commission period immediately following such Effective Date.

## TERMINATION

This Agreement may only be terminated in accordance with the following conditions:

1. **Voluntarily:**

   a. **If there are only two Advisors:** Either Advisor may terminate this Agreement by providing sixty (60) days advance written notice containing the intended effective date of such termination, which must be the last day of a monthly commission period. Upon voluntary termination, the Shared Client Account(s) will be reassigned in accordance with the terms of this Agreement described in more detail below.

   b. **If there are more than two Advisors:** Any Advisor may withdraw from this Agreement by providing sixty (60) days advance written notice of the intended withdrawal date, which must be the last day of a monthly commission period. Any such voluntary withdrawal shall be approved by UBS management and, subject to such review and approval, the Agreement will only remain in effect provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement. The remaining Advisors will be subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

2. **Automatically**

   a. **If there are only two Advisors, the Agreement will terminate automatically if one of the Advisors:**
      1. Dies or experiences a Total Disability (defined as the meaning given to the term "Disability" in the UBS Financial Services Inc.'s Long Term Disability Plan);
      2. Loses a necessary license;
      3. Moves to a non-producing role; or
      4. Experiences a termination of employment for any reason whatsoever.

   b. **If there are more than two Advisors:** An Advisor will be considered to have automatically withdrawn from the Agreement upon the occurrence of the above automatic termination events. Subject to review and approval by UBS management, the Agreement will remain in effect, provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement and subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

3. **Termination by UBS**

   a. Notwithstanding anything contained in this Agreement, the Advisors acknowledge and agree that, consistent with its regulatory obligations and its obligations to its clients, UBS has the right to terminate any Shared Clients and Shared Client Accounts covered by this Agreement and reassign such accounts, at any time in its sole and absolute discretion.

 **UBS**

4. **Account Reassignment**

    **a.**  In the event this Agreement is terminated in accordance with any of the above referenced provisions, ongoing coverage of the Shared Client accounts will be reassigned in accordance with any mutual agreement among the Advisors and subject to UBS review and approval (consistent with firm policies regarding account assignments).

## CONFIDENTIALITY

Advisors may not directly or indirectly use, maintain, take or disclose any Confidential Information, except (i) in the course of carrying out Advisor's duties for UBS during Advisor's employment, (ii) as otherwise required by law or by governmental or regulatory agency with appropriate jurisdiction, or, (iii) as otherwise permitted by this Agreement. "Confidential information" as used herein includes, but is not limited to, any nonpublic information concerning UBS or its related entities, its financial data, strategic business plans, products and product development, services, client relationships and/or prospective client relationships, client lists and/or contact information, client information (including but not limited to clients' past and present financial conditions, investment practices, preferences, activities, objectives and plans and other client data Advisors have obtained in any way connected to their employment at UBS), marketing plans, and any other trade secrets or confidential or proprietary information related thereto.

Please note that an Advisor must provide immediate written notice to UBS (Attention: General Counsel's Office, 1000 Harbor Boulevard, 8th Floor, Weehawken, New Jersey 07086) of any disclosure requirement by a court, regulatory, or government agency in order to allow UBS an opportunity to respond to such a request. Notwithstanding the foregoing, nothing in this Agreement or any other agreement or document prohibits an Advisor from voluntarily communicating, without notice to, or approval by UBS, with any government agency or self-regulatory organization ("SRO") about a potential violation of a law, regulation, or SRO regulation and/or court order.  With respect to an Advisor's obligation to maintain in confidence any and all confidential and/or trade secret information of UBS, the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1833(b), provides each Advisor with immunity from criminal or civil liability under any federal or state trade secret law for an Advisor's disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, provided that it is disclosed solely for the purpose of reporting or investigating a suspected violation of law, or is made in a complaint or other document filed in a lawsuit or other proceeding and the document is filed under seal so that it is not disclosed to the public.

## NON-SOLICITATION

Should the employment of any Advisor terminate at any time (while party to this Agreement or not and regardless of whether such employment termination is voluntary or not), such Advisor agrees that: (i) he/she will not directly or indirectly solicit or interfere with any of the Shared Clients serviced pursuant to this Agreement for a period of one year from the date of termination; and (ii) he/she will immediately disconnect with any Shared Client with whom the Advisor is connected on LinkedIn.

 **UBS**

For purposes of this provision, "solicit" means that the departing Advisor will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of: (i) initiating contact with a Shared Client to notify such client of his or her departure from UBS and/or to provide information about such new employer to any Shared Client; or (ii) inviting, encouraging or requesting a Shared Client, or that may have the effect of inviting, encouraging or requesting a Shared Client to: (a) transfer his or her UBS account(s) to anyone else including to the departing Advisor or his or her new employer; (b) open a new account with the departing Advisor or anyone else including his or her new employer; or (c) otherwise discontinue his or her existing business relationship with UBS.

Further, in the event that a Shared Client contacts an Advisor following the Advisor's departure from UBS, such Advisor agrees to inform the Shared Client of the existence of the terms of this paragraph.

In the event that any Advisor becomes employed at another firm, moreover, he or she agrees to bring this Agreement to the attention of such new employer so that it may be made aware of all of the obligations to UBS contained herein and can take all appropriate steps to ensure compliance with such obligations.

## INJUNCTIVE RELIEF

Each Advisor understands that the Confidentiality and Non-Solicitation provisions contained herein (the "Restrictive Covenants") are material to the UBS and that UBS has the exclusive right to enforce the Restrictive Covenants and, therefore, if a court or arbitration panel of competent jurisdiction rules that he or she has breached the terms of the Restrictive Covenants, each Advisor agrees that damages in the event of such breach would not be possible to ascertain and that UBS will suffer immediate and irreparable harm. Accordingly, each Advisor also agrees and expressly consents that, in addition to and without limiting any other remedy or right that it may have, UBS shall be entitled to an injunction or other equitable relief enjoining such breach or prospective breach to maintain the status quo pending the outcome of any arbitration proceeding. If any of the Restrictive Covenants or any part thereof are determined to be unenforceable because of the scope or duration of such provision, such Restrictive Covenant shall be modified so that it becomes enforceable. UBS shall not be required to post any bond in connection with the foregoing.

## DAMAGES

In the event that any Advisor breaches any of the Restrictive Covenants contained herein, he or she understands that UBS will suffer damages that would not be possible to ascertain at the time of such breach, including but not limited to: (a) costs related to investigating, monitoring or remedying the misuse of Confidential Information; (b) costs related to maintaining, restoring or repairing UBS's relationship with its clients; (c) revenue lost from client assets transferred or diverted from UBS to competitor; (d) revenue lost due to decreased use of UBS services; (e) costs related to replacing employees, including recruiting, hiring and training replacement employees; and (f) lost productivity. In the event that an Advisor violates any of the Restrictive Covenants contained herein, he/she agrees to pay UBS one hundred percent (100%) of the Trailing-12 months gross commission production generated on Shared Client assets transferred from UBS to another broker-dealer or investment advisory firm for any Shared Client who was solicited or interfered with in violation of this Agreement and/or where any Confidential Information was used or disclosed in violation of this Agreement. For purposes of this Agreement, "Trailing-12 months gross commission production" shall be defined as the total aggregate amount of commissions and fees generated on client assets during the preceding twelve (12) month period prior to the Shared Client assets transferring from UBS as determined by UBS in its sole discretion.

 **UBS**

It is agreed and understood that UBS is not seeking a double recovery with respect to the application of the liquidated damages provision contained herein and that UBS does not and will not seek damages in an amount greater than 100 percent (100%) of the Trailing-12 months gross commission production agreed to herein as its liquidated damages. For purposes of clarification, if an Advisor breaches the Restrictive Covenants in both the Confidentiality and Non-Solicitation provisions of this Agreement, UBS will be entitled to a total of one hundred percent (100%) of the Trailing-12 months gross commission production transferred from UBS notwithstanding its right to liquidated damages under both the Confidentiality and Non-Solicitation provisions contained herein. The Advisors agree that these formulas represent reasonable estimates of the compensatory damages that UBS will incur as a result of violations of the Restrictive Covenants and do not constitute a penalty.  These liquidated damages are in addition to any other non-compensatory remedy that UBS may be entitled to, including but not limited to injunctive relief and/or punitive damages.

## OTHER TERMS AND CONDITIONS

UBS is not a party to this Agreement.  However, given the highly-regulated nature of the UBS' business and its obligations to the  Shared Clients serviced by the Advisors, UBS may in its sole discretion terminate or modify the Agreement and resolve disputes as it deems necessary and appropriate.  UBS is a third party beneficiary of this Agreement with the exclusive right to enforce the Confidentiality and Non-Solicitation provisions and those provisions shall survive any termination of the Agreement.

Nothing in this Agreement modifies or alters any UBS policies, including without limitation the Employee Handbook, Account Reassignment Policy or Code of Conduct. The Advisors' employment with UBS remains at all times "at will," which means that their employment may be terminated at any time and for any reason by them or UBS.

This Agreement contains all of the terms of the agreement between the Advisors and supersedes all prior written or oral agreements relating to the subject matter of the Agreement. This Agreement may not be amended unless such amendment is made in writing and executed by all of the Advisors and approved by UBS management. No waiver of any breach of any term will be construed as a waiver of any subsequent breach of such term or any other term.

Each Advisor acknowledges that he/she may have entered, or may in the future enter, into other agreements with UBS or any of its related entities that contain confidentiality and/or non-solicitation obligations.  Each Advisor understands and agrees that the Confidentiality and Non-Solicitation provisions in this Agreement are in addition to, and not in lieu of, any other such agreements (including equity plan documents), all of which will remain in full force and effect.  If there is a conflict between a provision in this Agreement and a provision in any other agreement, the provision that gives the greater protection to UBS shall govern.

This Agreement is not intended to create a legal partnership, joint venture or any other legal entity.

The provisions of this Agreement are severable and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the other provisions.

This agreement shall be governed by the laws of the State of New York without reference to principles of conflict of laws.

 **UBS**

All controversies or claims arising out of or relating to this Agreement, or its construction, performance or breach shall be brought before the Financial Industry Regulatory Authority (FINRA) in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes.

# FA-PWA/FOC Partnering Agreement
# Exhibit 'A'

**I. Parties**

This Financial Advisor-Private Wealth Advisor/Family Office Consultant partnering agreement (the "Agreement") is made and entered on the

|  |  |  |  |
|---|---|---|---|
| **17th** | day of | **January** | , 2020, by and between: |

| **Names of Financial Advisor(s)** | | **Names of Private Wealth Advisor(s)** | |
|---|---|---|---|
| ("Financial Advisor" or "FA" or "Private Wealth Advisor" or "PWA") | **FAID** | ("Private Wealth Advisor" or "PWA"; "Family Office Consultant" or "FOC") | **FAID** |
| 1. Benjamin Domingue | JT78 | 1. Keith Mericka | Y532 |
| 2. | | 2. Leslie Lauer | Y5LL |
| 3. | | 3. | |
| 4. | | 4. | |
| 5. | | 5. | |

| **Location of Branch:** | Lafayette, LA | **Location of Branch:** | Atlanta, GA |
|---|---|---|---|
| **Branch Code:** | JT | **Branch Code:** | Y5 |

**$100mm Client that qualifies for Enhanced payout:**

**Financial Advisors/ Private Wealth Advisors:**

Benjamin Domingue
**Financial Advisor #1 [Print]**          **Financial Advisor #2 [Print]**

X _____          X _____
Financial Advisor #1 [Signature]          Financial Advisor #2 [Signature]

Date: 1/27/20          Date:

❄ **UBS**

| | |
|---|---|
| **Financial Advisor #3 [Print]** | **Financial Advisor #4 [Print]** |
| X | X |
| Financial Advisor #3 [Signature] | Financial Advisor #4 [Signature] |
| Date: | Date: |

| | |
|---|---|
| | _John N. Gherardi_ |
| **Financial Advisor #5 [Print]** | **Branch Office Manager [Print]** |
| X | X |
| Financial Advisor #5 [Signature] | Branch Office Manager [Signature] |
| Date: | Date: 01/29/2020 |

**Private Wealth Advisors/Family Office Consultants:**

| | |
|---|---|
| Keith Mericka | Leslie Lauer |
| **Private Wealth Advisor #1 [Print]** | **Private Wealth Advisor #2 [Print]** |
| X | X |
| Private Wealth Advisor #1 [Signature] | Private Wealth Advisor #2 [Signature] |
| Date: 1/30/20 | Date: 2/3/2020 |

| | |
|---|---|
| **Private Wealth Advisor #3 [Print]** | **Private Wealth Advisor #4 [Print]** |
| X | X |
| Private Wealth Advisor #3 [Signature] | Private Wealth Advisor #4 [Signature] |
| Date: | Date: |

| | |
|---|---|
| **Private Wealth Advisor #5 [Print]** | **PWM Market Head [Print]** |
| | Lane Strumlauf |
| X | X |
| Private Wealth Advisor #5 [Signature] | PWM Market Head [Signature] |

7

 **UBS**

Date: _____     Date: _____

**Approval by UHNW Management**

**X**
_____

**Head UHNW Americas or Delegate**
 **II. Shared Client Model Incentive Structures**

**Partnering Structure**

**Refer and Stay Involved**

Where  FA and PWA/FOC *partner in responsibilities* for ongoing client relationship management:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
|---|---|---|
| | PWA/FOC | FA |
| Ongoing | 50% | 50% |

**Refer and Step Away**

Where  FA *shifts responsibilities* of ongoing client relationship management, operations and servicing to PWA/FOC by referring the client relationship and stepping away going forward:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
|---|---|---|
| | PWA/FOC | FA |
| Year 1 | 50% | 50% |
| Year 2 | 50% | 50% |
| Years 3+ | 60% | 40% |

For Internal Use Only

 **UBS**

**Note**: All advisors will be paid in accordance to their applicable UBS Financial Advisor compensation plan except in instances where an FA partners with a PWA/FOC for $100mm+ net worth clients. In such instances, the FA will be paid at 50% grid rate.



## III. Client/Prospect details

**Is this agreement pertaining to a ☐ client or a ☑ prospect?**

**Client/Prospect Name:** AMG, GVT

**Client/Prospect Company Affiliation:** _____

**Client/Prospect Address:** _____

**New Split ID:** Y5XG   Must be created at time of account opening or before additional funding to existing accounts.

**Please choose one of the following:**
Refer and Stay Involved ___   ___   Refer and Step Away ___   ___

| Account Number | Base Revenue [1] (if applicable) |
|---|---|
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

[1]   **Only if applicable.**  Base revenue is the **monthly historical average** from the 24 months *prior to the partnering agreement.*  (for example, account generated $1,000 in revenue, per month, for the 24 months prior to agreement. Base revenue is **$1,000** ($1,000 x 24 months / 24 months = average).

**PWM and WM Market Leadership:**

PLEASE SCAN AND RETAIN A COPY OF THE SIGNED AGREEMENT WITH A FINAL COPY TO THE PARTNERSHIPS & CLIENT MANAGEMENT TEAM.

 **UBS**

## UBS Private Wealth Management
## Financial Advisor/Private Wealth Advisor Partnering Agreement

**PARTIES**

This Financial Advisor/Private Wealth Advisor revenue sharing agreement (the "Partnering Agreement") is made and entered into on the 21 day of August , 2020, by and between:

   (1) Leslie Lauer, Rebecca Glasgow, Curt Rubinas, Keith Mericka
   (2) Anatoly Iofe

**PURPOSE OF AGREEMENT**

The above-mentioned Introducing Advisor(s) ("Introducing FA") and Private Wealth Advisors/Family Office Consultant(s) ("PWA/FOC") (collectively, the "Advisors") hereby enter into this Partnering Agreement (the "Agreement") setting forth the terms and conditions under which they will work together to provide wealth management services to each of the clients or client prospects listed on Exhibit "A" annexed hereto ("Shared Clients"). Each party hereby acknowledges and agrees that, although UBS Financial Services, Inc. ("UBS") is a third-party beneficiary of this Agreement, the terms described herein must be approved, in writing, by UBS Management [1] prior to its execution. Further, and for the avoidance of doubt, nothing contained herein shall alter or amend the employment relationship currently in existence between any Advisor and UBS.

**PARTNERSHIP INCENTIVE STRUCTURE**

In consideration for the introduction of the Shared Client(s) by the Introducing FA(s) and the agreement of the Advisors to work together to service such Shared Clients, the Advisors hereby agree to the Partnering Incentive Structure set forth in Exhibit "A" pursuant to which the parties will open a Shared Client Account (and share in: (a) commissions, sales credits and fees generated by the Shared Clients' Accounts ("Gross Commission"); (b) assets under management; (c) expenses incurred in servicing the Shared Clients; and, (d) Net New assets (collectively, "Shared Client Revenue") generated by a Shared Client (but only to the extent such Shared Client Revenue exceeds the monthly historical average over the prior 24 months, if any (the "Base Revenue Amount").

All Advisors will be paid in accordance with the respective UBS Financial Advisor compensation plan applicable to such Advisor and in effect during their employment. Enhanced payouts shall be available in accordance with the compensation plan prescribed by UBS Management for a subgroup of clients as described in further detail in Exhibit A.

Furthermore, the Advisors agree that the assets held in a Shared Client Account shall be held in the applicable Private Wealth Management or UBS International wire code and that a single, unique split ID number will be assigned thereto.

This Agreement shall become effective upon its execution by all Advisors and formal approval by UBS management ("Effective Date"). The Partnership Incentive Structure shall be implemented on the first day of the monthly commission period immediately following such Effective Date.

---

1 For the purposes of this Agreement, UBS Management shall mean the Head of Ultra-High Net Worth Americas or such person as that individual shall delegate that responsibility to.



**TERMINATION**

This Agreement may only be terminated in accordance with the following conditions:

1. **Voluntarily:**

   a. **If there are only two Advisors:** Either Advisor may terminate this Agreement by providing sixty (60) days advance written notice containing the intended effective date of such termination, which must be the last day of a monthly commission period. Upon voluntary termination, the Shared Client Account(s) will be reassigned in accordance with the terms of this Agreement described in more detail below.

   b. **If there are more than two Advisors:** Any Advisor may withdraw from this Agreement by providing sixty (60) days advance written notice of the intended withdrawal date, which must be the last day of a monthly commission period. Any such voluntary withdrawal shall be approved by UBS management and, subject to such review and approval, the Agreement will only remain in effect provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement. The remaining Advisors will be subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

2. **Automatically**

   a. **If there are only two Advisors, the Agreement will terminate automatically if one of the Advisors:**
      1. Dies or experiences a Total Disability (defined as the meaning given to the term "Disability" in the UBS Financial Services Inc.'s Long Term Disability Plan);
      2. Loses a necessary license;
      3. Moves to a non-producing role; or
      4. Experiences a termination of employment for any reason whatsoever.

   b. **If there are more than two Advisors:** An Advisor will be considered to have automatically withdrawn from the Agreement upon the occurrence of the above automatic termination events. Subject to review and approval by UBS management, the Agreement will remain in effect, provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement and subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

3. **Termination by UBS**

   a. Notwithstanding anything contained in this Agreement, the Advisors acknowledge and agree that, consistent with its regulatory obligations and its obligations to its clients, UBS has the right to terminate any Shared Clients and Shared Client Accounts covered by this Agreement and reassign such accounts, at any time in its sole and absolute discretion.



4. **Account Reassignment**

    **a.** In the event this Agreement is terminated in accordance with any of the above referenced provisions, ongoing coverage of the Shared Client accounts will be reassigned in accordance with any mutual agreement among the Advisors and subject to UBS review and approval (consistent with firm policies regarding account assignments).

## CONFIDENTIALITY

Advisors may not directly or indirectly use, maintain, take or disclose any Confidential Information, except (i) in the course of carrying out Advisor's duties for UBS during Advisor's employment, (ii) as otherwise required by law or by governmental or regulatory agency with appropriate jurisdiction, or, (iii) as otherwise permitted by this Agreement. "Confidential information" as used herein includes, but is not limited to, any nonpublic information concerning UBS or its related entities, its financial data, strategic business plans, products and product development, services, client relationships and/or prospective client relationships, client lists and/or contact information, client information (including but not limited to clients' past and present financial conditions, investment practices, preferences, activities, objectives and plans and other client data Advisors have obtained in any way connected to their employment at UBS), marketing plans, and any other trade secrets or confidential or proprietary information related thereto.

Please note that an Advisor must provide immediate written notice to UBS (Attention: General Counsel's Office, 1000 Harbor Boulevard, 8th Floor, Weehawken, New Jersey 07086) of any disclosure requirement by a court, regulatory, or government agency in order to allow UBS an opportunity to respond to such a request. Notwithstanding the foregoing, nothing in this Agreement or any other agreement or document prohibits an Advisor from voluntarily communicating, without notice to, or approval by UBS, with any government agency or self-regulatory organization ("SRO") about a potential violation of a law, regulation, or SRO regulation and/or court order. With respect to an Advisor's obligation to maintain in confidence any and all confidential and/or trade secret information of UBS, the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1833(b), provides each Advisor with immunity from criminal or civil liability under any federal or state trade secret law for an Advisor's disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, provided that it is disclosed solely for the purpose of reporting or investigating a suspected violation of law, or is made in a complaint or other document filed in a lawsuit or other proceeding and the document is filed under seal so that it is not disclosed to the public.

## NON-SOLICITATION

Should the employment of any Advisor terminate at any time (while party to this Agreement or not and regardless of whether such employment termination is voluntary or not), such Advisor agrees that: (i) he/she will not directly or indirectly solicit or interfere with any of the Shared Clients serviced pursuant to this Agreement for a period of one year from the date of termination; and (ii) he/she will immediately disconnect with any Shared Client with whom the Advisor is connected on LinkedIn.

For purposes of this provision, "solicit" means that the departing Advisor will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of: (i) initiating contact with a Shared Client to notify such client of his or her departure from UBS and/or to provide information about such new employer to any Shared Client; or (ii) inviting, encouraging



or requesting a Shared Client, or that may have the effect of inviting, encouraging or requesting a Shared Client to: (a) transfer his or her UBS account(s) to anyone else including to the departing Advisor or his or her new employer; (b) open a new account with the departing Advisor or anyone else including his or her new employer; or (c) otherwise discontinue his or her existing business relationship with UBS.

Further, in the event that a Shared Client contacts an Advisor following the Advisor's departure from UBS, such Advisor agrees to inform the Shared Client of the existence of the terms of this paragraph.

In the event that any Advisor becomes employed at another firm, moreover, he or she agrees to bring this Agreement to the attention of such new employer so that it may be made aware of all of the obligations to UBS contained herein and can take all appropriate steps to ensure compliance with such obligations.

## INJUNCTIVE RELIEF

Each Advisor understands that the Confidentiality and Non-Solicitation provisions contained herein (the "Restrictive Covenants") are material to the UBS and that UBS has the exclusive right to enforce the Restrictive Covenants, and, therefore, if a court or arbitration panel of competent jurisdiction rules that he or she has breached the terms of the Restrictive Covenants, each Advisor agrees that damages in the event of such breach would not be possible to ascertain and that UBS will suffer immediate and irreparable harm. Accordingly, each Advisor also agrees and expressly consents that, in addition to and without limiting any other remedy or right that it may have, UBS shall be entitled to an injunction or other equitable relief enjoining such breach or prospective breach to maintain the status quo pending the outcome of any arbitration proceeding. If any of the Restrictive Covenants or any part thereof are determined to be unenforceable because of the scope or duration of such provision, such Restrictive Covenant shall be modified so that it becomes enforceable. UBS shall not be required to post any bond in connection with the foregoing.

## DAMAGES

In the event that any Advisor breaches any of the Restrictive Covenants contained herein, he or she understands that UBS will suffer damages that would not be possible to ascertain at the time of such breach, including but not limited to: (a) costs related to investigating, monitoring or remedying the misuse of Confidential Information; (b) costs related to maintaining, restoring or repairing UBS's relationship with its clients; (c) revenue lost from client assets transferred or diverted from UBS to competitor; (d) revenue lost due to decreased use of UBS services; (e) costs related to replacing employees, including recruiting, hiring and training replacement employees; and (f) lost productivity. In the event that an Advisor violates any of the Restrictive Covenants contained herein, he/she agrees to pay UBS one hundred percent (100%) of the Trailing-12 months gross commission production generated on Shared Client assets transferred from UBS to another broker-dealer or investment advisory firm for any Shared Client who was solicited or interfered with in violation of this Agreement and/or where any Confidential Information was used or disclosed in violation of this Agreement.  For purposes of this Agreement, "Trailing-12 months gross commission production" shall be defined as the total aggregate amount of commissions and fees generated on client assets during the preceding twelve (12) month period prior to the Shared Client assets transferring from UBS as determined by UBS in its sole discretion.

It is agreed and understood that UBS is not seeking a double recovery with respect to the application of the liquidated damages provision contained herein and that UBS does not and will not seek damages in an amount greater than 100 percent (100%) of the Trailing-12 months gross commission production agreed to herein as its liquidated damages. For purposes of clarification, if

4



an Advisor breaches the Restrictive Covenants in both the Confidentiality and Non-Solicitation provisions of this Agreement, UBS will be entitled to a total of one hundred percent (100%) of the Trailing-12 months gross commission production transferred from UBS notwithstanding its right to liquidated damages under both the Confidentiality and Non-Solicitation provisions contained herein. The Advisors agree that these formulas represent reasonable estimates of the compensatory damages that UBS will incur as a result of violations of the Restrictive Covenants and do not constitute a penalty.  These liquidated damages are in addition to any other non-compensatory remedy that UBS may be entitled to, including but not limited to injunctive relief and/or punitive damages.

## OTHER TERMS AND CONDITIONS

UBS is not a party to this Agreement.  However, given the highly-regulated nature of the UBS' business and its obligations to the  Shared Clients serviced by the Advisors, UBS may in its sole discretion terminate or modify the Agreement and resolve disputes as it deems necessary and appropriate.  UBS is a third party beneficiary of this Agreement with the exclusive right to enforce the Confidentiality and Non-Solicitation provisions and those provisions shall survive any termination of the Agreement.

Nothing in this Agreement modifies or alters any UBS policies, including without limitation the Employee Handbook, Account Reassignment Policy or Code of Conduct. The Advisors' employment with UBS remains at all times "at will," which means that their employment may be terminated at any time and for any reason by them or UBS.

This Agreement contains all of the terms of the agreement between the Advisors and supersedes all prior written or oral agreements relating to the subject matter of the Agreement. This Agreement may not be amended unless such amendment is made in writing and executed by all of the Advisors and approved by UBS management. No waiver of any breach of any term will be construed as a waiver of any subsequent breach of such term or any other term.

Each Advisor acknowledges that he/she may have entered, or may in the future enter, into other agreements with UBS or any of its related entities that contain confidentiality and/or non-solicitation obligations.  Each Advisor understands and agrees that the Confidentiality and Non-Solicitation provisions in this Agreement are in addition to, and not in lieu of, any other such agreements (including equity plan documents), all of which will remain in full force and effect.  If there is a conflict between a provision in this Agreement and a provision in any other agreement, the provision that gives the greater protection to UBS shall govern.

This Agreement is not intended to create a legal partnership, joint venture or any other legal entity.

The provisions of this Agreement are severable and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the other provisions.

This agreement shall be governed by the laws of the State of New York without reference to principles of conflict of laws.

All controversies or claims arising out of or relating to this Agreement, or its construction, performance or breach shall be brought before the Financial Industry Regulatory Authority (FINRA) in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes.

 **UBS**

# FA-PWA/FOC Partnering Agreement
## Exhibit 'A'

### I.  Parties

This Financial Advisor-Private Wealth Advisor/Family Office Consultant partnering agreement (the "Agreement") is made and entered on the

day ____21st____ of ____August____ , 2020, by and between:

| **Names of Financial Advisor(s)** | | **FAID** |
|---|---|---|
| ("Financial Advisor" or "FA" or "Private Wealth Advisor" or "PWA") | | |
| 1. Anatoly Iofe   50% | | J3AI |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |

| **Names of Private Wealth Advisor(s)** | **FAID** |
|---|---|
| ("Private Wealth Advisor" or "PWA"; "Family Office Consultant" or "FOC") | |
| 1. Leslie Lauer 25 % | Y5LL |
| 2. Rebecca Glasgow 12.5 % | Y5RG |
| 3. Curt Rubinas 12.5 % | Y5CR |
| 4. Keith Mericka 0% | Y532 |
| 5. | |

**Location of Branch:**  Aventura, FL

**Branch Code:**  J3

**Location of Branch:**  Atlanta, GA

**Branch Code:**  Y5

**$100mm Client that qualifies for Enhanced payout:**

**Financial Advisors/ Private Wealth Advisors:**

Anatoly Iofe
_____
**Financial Advisor #1 [Print]**

X
_____
Financial Advisor #1 [Signature]

_____
Date:

_____
**Financial Advisor #2 [Print]**

X
_____
Financial Advisor #2 [Signature]

_____
Date:

_____
**Financial Advisor #3 [Print]**

X
_____
Financial Advisor #3 [Signature]

_____
Date:

_____
**Financial Advisor #4 [Print]**

X
_____
Financial Advisor #4 [Signature]

_____
Date:

For Internal Use Only



Bor van der Weerden

**Financial Advisor #5 [Print]**

X *Anatoly Iofe*

Financial Advisor #5 [Signature]

August 25, 2020

Date:

**Branch Office Manager [Print]**

X

Branch Office Manager [Signature]

Date:   9/9/2020

**Private Wealth Advisors/Family Office Consultants:**

Leslie Lauer

**Private Wealth Advisor #1 [Print]**

X *Leslie Lauer*

Private Wealth Advisor #1 [Signature]

8/24/20

Date:

Rebecca Glasgow

**Private Wealth Advisor #2 [Print]**

X *Rebecca Glasgow*

Private Wealth Advisor #2 [Signature]

8/24/20

Date:

Curt Rubinas

**Private Wealth Advisor #3 [Print]**

X *Curt Rubinas*

Private Wealth Advisor #3 [Signature]

8/24/2020

Date:

**Private Wealth Advisor #4 [Print]**

X

Private Wealth Advisor #4 [Signature]

Date:

**Private Wealth Advisor #5 [Print]**

X

Private Wealth Advisor #5 [Signature]

Date:

Lane Strumlauf

**PWM Market Head [Print]**

X

PWM Market Head [Signature]

Date:

**Approval by UHNW Management**

**Head UHNW Americas or Delegate [Print]**

X

Head UHNW Americas or Delegate [Signature]

Date:



## II. Shared Client Model Incentive Structures

**Partnering Structure**

**<u>Refer and Stay Involved</u>**

Where  FA and PWA/FOC *partner in responsibilities* for ongoing client relationship management:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue ||
|---|---|---|
| | **PWA/FOC** | **FA** |
| **Ongoing** | 50% | 50% |

**<u>Refer and Step Away</u>**

Where FA *shifts responsibilities* of ongoing client relationship management, operations and servicing to PWA/FOC by referring the client relationship and stepping away going forward:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue ||
|---|---|---|
| | **PWA/FOC** | **FA** |
| **Year 1** | 50% | 50% |
| **Year 2** | 50% | 50% |
| **Years 3+** | 60% | 40% |

**<u>Note</u>**: All advisors will be paid in accordance to their applicable UBS Financial Advisor compensation plan except in instances where an FA partners with a PWA/FOC for $100mm+ net worth clients. In such instances, the FA will be paid at 50% grid rate.



### III. Client/Prospect details

**Is this agreement pertaining to a ☐ client or a ☑ prospect?**

**Client/Prospect Name:** _____

**Client/Prospect Company Affiliation:** United Development Corp

**Client/Prospect Address:** 1301 Municipal Way, Suite 200
Grapevine, Texas 76051

**New Split ID:** Y5E7 — Must be created at time of account opening or before additional funding to existing accounts.

### Please choose one of the following:

Refer and Stay Involved ____    ____        Refer and Step Away ____     ____

| Account Number | Base Revenue [1] (if applicable) |
|---|---|
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

[1] **Only if applicable.** Base revenue is the **monthly historical average** from the 24 months *prior to the partnering agreement.* (for example, account generated $1,000 in revenue, per month, for the 24 months prior to agreement. Base revenue is **$1,000** ($1,000 x 24 months / 24 months = average).

**PWM and WM Market Leadership:**

PLEASE SCAN AND RETAIN A COPY OF THE SIGNED AGREEMENT WITH A FINAL COPY TO THE PARTNERSHIPS & CLIENT MANAGEMENT TEAM.



# UBS Private Wealth Management
# Financial Advisor/Private Wealth Advisor Partnering Agreement

## PARTIES

This Financial Advisor/Private Wealth Advisor revenue sharing agreement (the "Partnering Agreement") is made and entered into on the 20 day of December , 2021, by and between:

(1)  Levi Robinson. Alex Grumman

(2)  Leslie Lauer, Rebecca Glasgow, Curt Rubinas

## PURPOSE OF AGREEMENT

The above-mentioned Introducing Advisor(s) ("Introducing FA") and Private Wealth Advisors/Family Office Consultant(s) ("PWA/FOC") (collectively, the "Advisors") hereby enter into this Partnering Agreement (the "Agreement") setting forth the terms and conditions under which they will work together to provide wealth management services to each of the clients or client prospects listed on Exhibit "A" annexed hereto ("Shared Clients"). Each party hereby acknowledges and agrees that, although UBS Financial Services, Inc. ("UBS") is a third-party beneficiary of this Agreement, the terms described herein must be approved, in writing, by UBS Management [1]prior to its execution. Further, and for the avoidance of doubt, nothing contained herein shall alter or amend the employment relationship currently in existence between any Advisor and UBS.

## PARTNERSHIP INCENTIVE STRUCTURE

In consideration for the introduction of the Shared Client(s) by the Introducing FA(s) and the agreement of the Advisors to work together to service such Shared Clients, the Advisors hereby agree to the Partnering Incentive Structure set forth in Exhibit "A" pursuant to which the parties will open a Shared Client Account (and share in: (a) commissions, sales credits and fees generated by the Shared Clients' Accounts ("Gross Commission"); (b) assets under management; (c) expenses incurred in servicing the Shared Clients; and, (d) Net New assets (collectively, "Shared Client Revenue") generated by a Shared Client (but only to the extent such Shared Client Revenue exceeds the monthly historical average over the prior 24 months, if any (the "Base Revenue Amount").

All Advisors will be paid in accordance with the respective UBS Financial Advisor compensation plan applicable to such Advisor and in effect during their employment. Enhanced payouts shall be available in accordance with the compensation plan prescribed by UBS Management for a subgroup of clients as described in further detail in Exhibit A.

Furthermore, the Advisors agree that the assets held in a Shared Client Account shall be held in the applicable Private Wealth Management or UBS International wire code and that a single, unique split ID number will be assigned thereto.

This Agreement shall become effective upon its execution by all Advisors and formal approval by UBS management ("Effective Date"). The Partnership Incentive Structure shall be implemented on the first day of the monthly commission period immediately following such Effective Date.

---

1 For the purposes of this Agreement, UBS Management shall mean the Head of Ultra-High Net Worth Americas or such person as that individual shall delegate that responsibility to.



**TERMINATION**

This Agreement may only be terminated in accordance with the following conditions:

1.  **Voluntarily:**

    a.  **If there are only two Advisors:** Either Advisor may terminate this Agreement by providing sixty (60) days advance written notice containing the intended effective date of such termination, which must be the last day of a monthly commission period.  Upon voluntary termination, the Shared Client Account(s) will be reassigned in accordance with the terms of this Agreement described in more detail below.
    b.  **If there are more than two Advisors:** Any Advisor may withdraw from this Agreement by providing sixty (60) days advance written notice of the intended withdrawal date, which must be the last day of a monthly commission period.  Any such voluntary withdrawal shall be approved by UBS management and, subject to such review and approval, the Agreement will only remain in effect provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement.  The remaining Advisors will be subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

2.  **Automatically**

    a.  **If there are only two Advisors, the Agreement will terminate automatically if one of the Advisors:**
        1.  Dies or experiences a Total Disability (defined as the meaning given to the term "Disability" in the UBS Financial Services Inc.'s Long Term Disability Plan);
        2.  Loses a necessary license;
        3.  Moves to a non-producing role; or
        4.  Experiences a termination of employment for any reason whatsoever.

    b.  **If there are more than two Advisors:** An Advisor will be considered to have automatically withdrawn from the Agreement upon the occurrence of the above automatic termination events. Subject to review and approval by UBS management, the Agreement will remain in effect, provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement and subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

3.  **Termination by UBS**

    a.  Notwithstanding anything contained in this Agreement, the Advisors acknowledge and agree that, consistent with its regulatory obligations and its obligations to its clients, UBS has the right to terminate any Shared Clients and Shared Client Accounts covered by this Agreement and reassign such accounts, at any time in its sole and absolute discretion.

For Internal Use Only



4. **Account Reassignment**

    **a.** In the event this Agreement is terminated in accordance with any of the above referenced provisions, ongoing coverage of the Shared Client accounts will be reassigned in accordance with any mutual agreement among the Advisors and subject to UBS review and approval (consistent with firm policies regarding account assignments).

## CONFIDENTIALITY

Advisors may not directly or indirectly use, maintain, take or disclose any Confidential Information, except (i) in the course of carrying out Advisor's duties for UBS during Advisor's employment, (ii) as otherwise required by law or by governmental or regulatory agency with appropriate jurisdiction, or, (iii) as otherwise permitted by this Agreement. "Confidential information" as used herein includes, but is not limited to, any nonpublic information concerning UBS or its related entities, its financial data, strategic business plans, products and product development, services, client relationships and/or prospective client relationships, client lists and/or contact information, client information (including but not limited to clients' past and present financial conditions, investment practices, preferences, activities, objectives and plans and other client data Advisors have obtained in any way connected to their employment at UBS), marketing plans, and any other trade secrets or confidential or proprietary information related thereto.

Please note that an Advisor must provide immediate written notice to UBS (Attention: General Counsel's Office, 1000 Harbor Boulevard, 8th Floor, Weehawken, New Jersey 07086) of any disclosure requirement by a court, regulatory, or government agency in order to allow UBS an opportunity to respond to such a request. Notwithstanding the foregoing, nothing in this Agreement or any other agreement or document prohibits an Advisor from voluntarily communicating, without notice to, or approval by UBS, with any government agency or self-regulatory organization ("SRO") about a potential violation of a law, regulation, or SRO regulation and/or court order. With respect to an Advisor's obligation to maintain in confidence any and all confidential and/or trade secret information of UBS, the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1833(b), provides each Advisor with immunity from criminal or civil liability under any federal or state trade secret law for an Advisor's disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, provided that it is disclosed solely for the purpose of reporting or investigating a suspected violation of law, or is made in a complaint or other document filed in a lawsuit or other proceeding and the document is filed under seal so that it is not disclosed to the public.

## NON-SOLICITATION

Should the employment of any Advisor terminate at any time (while party to this Agreement or not and regardless of whether such employment termination is voluntary or not), such Advisor agrees that: (i) he/she will not directly or indirectly solicit or interfere with any of the Shared Clients serviced pursuant to this Agreement for a period of one year from the date of termination; and (ii) he/she will immediately disconnect with any Shared Client with whom the Advisor is connected on LinkedIn.

For purposes of this provision, "solicit" means that the departing Advisor will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of: (i) initiating contact with a Shared Client to notify such client of his or her departure from UBS and/or to provide information about such new employer to any Shared Client; or (ii) inviting, encouraging

For Internal Use Only



or requesting a Shared Client, or that may have the effect of inviting, encouraging or requesting a Shared Client to: (a) transfer his or her UBS account(s) to anyone else including to the departing Advisor or his or her new employer; (b) open a new account with the departing Advisor or anyone else including his or her new employer; or (c) otherwise discontinue his or her existing business relationship with UBS.

Further, in the event that a Shared Client contacts an Advisor following the Advisor's departure from UBS, such Advisor agrees to inform the Shared Client of the existence of the terms of this paragraph.

In the event that any Advisor becomes employed at another firm, moreover, he or she agrees to bring this Agreement to the attention of such new employer so that it may be made aware of all of the obligations to UBS contained herein and can take all appropriate steps to ensure compliance with such obligations.

## INJUNCTIVE RELIEF

Each Advisor understands that the Confidentiality and Non-Solicitation provisions contained herein (the "Restrictive Covenants") are material to the UBS and that UBS has the exclusive right to enforce the Restrictive Covenants, and, therefore, if a court or arbitration panel of competent jurisdiction rules that he or she has breached the terms of the Restrictive Covenants, each Advisor agrees that damages in the event of such breach would not be possible to ascertain and that UBS will suffer immediate and irreparable harm. Accordingly, each Advisor also agrees and expressly consents that, in addition to and without limiting any other remedy or right that it may have, UBS shall be entitled to an injunction or other equitable relief enjoining such breach or prospective breach to maintain the status quo pending the outcome of any arbitration proceeding. If any of the Restrictive Covenants or any part thereof are determined to be unenforceable because of the scope or duration of such provision, such Restrictive Covenant shall be modified so that it becomes enforceable. UBS shall not be required to post any bond in connection with the foregoing.

## DAMAGES

In the event that any Advisor breaches any of the Restrictive Covenants contained herein, he or she understands that UBS will suffer damages that would not be possible to ascertain  at the time of such breach, including but not limited to: (a) costs related to investigating, monitoring or remedying the misuse of Confidential Information; (b) costs related to maintaining, restoring or repairing UBS's relationship with its clients; (c) revenue lost from client assets transferred or diverted from UBS to competitor; (d) revenue lost due to decreased use of UBS services; (e) costs related to replacing employees, including recruiting, hiring and training replacement employees; and (f) lost productivity. In the event that an Advisor violates any of the Restrictive Covenants contained herein, he/she agrees to pay UBS one hundred percent (100%) of the Trailing-12 months gross commission production generated on Shared Client assets transferred from UBS to another broker-dealer or investment advisory firm for any Shared Client who was solicited or interfered with in violation of this Agreement and/or where any Confidential Information was used or disclosed in violation of this Agreement.  For purposes of this Agreement, "Trailing-12 months gross commission production" shall be defined as the total aggregate amount of commissions and fees generated on client assets during the preceding twelve (12) month period prior to the Shared Client assets transferring from UBS as determined by UBS in its sole discretion.

It is agreed and understood that UBS is not seeking a double recovery with respect to the application of the liquidated damages provision contained herein and that UBS does not and will not seek damages in an amount greater than 100 percent (100%) of the Trailing-12 months gross commission production agreed to herein as its liquidated damages. For purposes of clarification, if

For Internal Use Only



an Advisor breaches the Restrictive Covenants in both the Confidentiality and Non-Solicitation provisions of this Agreement, UBS will be entitled to a total of one hundred percent (100%) of the Trailing-12 months gross commission production transferred from UBS notwithstanding its right to liquidated damages under both the Confidentiality and Non-Solicitation provisions contained herein. The Advisors agree that these formulas represent reasonable estimates of the compensatory damages that UBS will incur as a result of violations of the Restrictive Covenants and do not constitute a penalty.  These liquidated damages are in addition to any other non-compensatory remedy that UBS may be entitled to, including but not limited to injunctive relief and/or punitive damages.

## OTHER TERMS AND CONDITIONS

UBS is not a party to this Agreement.  However, given the highly-regulated nature of the UBS' business and its obligations to the  Shared Clients serviced by the Advisors, UBS may in its sole discretion terminate or modify the Agreement and resolve disputes as it deems necessary and appropriate.  UBS is a third party beneficiary of this Agreement with the exclusive right to enforce the Confidentiality and Non-Solicitation provisions and those provisions shall survive any termination of the Agreement.

Nothing in this Agreement modifies or alters any UBS policies, including without limitation the Employee Handbook, Account Reassignment Policy or Code of Conduct. The Advisors' employment with UBS remains at all times "at will," which means that their employment may be terminated at any time and for any reason by them or UBS.

This Agreement contains all of the terms of the agreement between the Advisors and supersedes all prior written or oral agreements relating to the subject matter of the Agreement. This Agreement may not be amended unless such amendment is made in writing and executed by all of the Advisors and approved by UBS management. No waiver of any breach of any term will be construed as a waiver of any subsequent breach of such term or any other term.

Each Advisor acknowledges that he/she may have entered, or may in the future enter, into other agreements with UBS or any of its related entities that contain confidentiality and/or non-solicitation obligations.  Each Advisor understands and agrees that the Confidentiality and Non-Solicitation provisions in this Agreement are in addition to, and not in lieu of, any other such agreements (including equity plan documents), all of which will remain in full force and effect.  If there is a conflict between a provision in this Agreement and a provision in any other agreement, the provision that gives the greater protection to UBS shall govern.

This Agreement is not intended to create a legal partnership, joint venture or any other legal entity.

The provisions of this Agreement are severable and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the other provisions.

This agreement shall be governed by the laws of the State of New York without reference to principles of conflict of laws.

All controversies or claims arising out of or relating to this Agreement, or its construction, performance or breach shall be brought before the Financial Industry Regulatory Authority (FINRA) in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes.

For Internal Use Only

 **UBS**

# FA-PWA/FOC Partnering Agreement
## Exhibit 'A'

**I.  Parties**

This Financial Advisor-Private Wealth Advisor/Family Office Consultant partnering agreement (the "Agreement") is made and entered on the

day of _____20th_____ of _____December_____ , 2021, by and between:

| Names of Financial Advisor(s) | FAID | | Names of Private Wealth Advisor(s) | FAID |
|---|---|---|---|---|
| ("Financial Advisor" or "FA or "Private Wealth Advisor" or "PWA") | | | ("Private Wealth Advisor" or "PWA"; "Family Office Consultant" or FOC") | |
| 1. Levi Robinson  25% | UC57 | | 1. Leslie Lauer  16.68 % | Y5LL |
| 2. Alex Grumman 25% | UC19 | | 2. Rebecca Glasgow 16.66% | Y5RG |
| 3. | | | 3. Curt Rubinas      16.66% | Y5CR |
| 4. | | | 4. | |
| 5. | | | 5. | |

**Location of Branch:** ANCHORAGE, AK          **Location of Branch:** Atlanta, GA

**Branch Code:** UC          **Branch Code:** Y5

**$100mm Client that qualifies for Enhanced payout:**

**Financial Advisors/ Private Wealth Advisors:**

Levi Robinson

**Financial Advisor #1 [Print]**

Alex Grumman

**Financial Advisor #2 [Print]**

**APPROVED**
**By Levi Robinson  at 7:20 am, Dec 21, 2021**

**APPROVED**
**By Alex Grumman at 5:33 am, Dec 21, 2021**

Date:          Date:

**Financial Advisor #3 [Print]**          **Financial Advisor #4 [Print]**

X          X

Financial Advisor #3 [Signature]          Financial Advisor #4 [Signature]

Date:          Date:

6

 **UBS**

**Financial Advisor #5 [Print]**

X

Financial Advisor #5 [Signature]

Date:

**Branch Office Manager [Print]**

*APPROVED*
*By Jeff Head at 7:49 am, Dec 21, 2021*
X

Branch Office Manager [Signature]

Date:

**Private Wealth Advisors/Family Office Consultants:**

Leslie Lauer

*APPROVED*
*By le03283 at 9:26 am, Dec 22, 2021*

Private Wealth Advisor #1 [Print]

Private Wealth Advisor #1 [Signature]

Date:

Rebecca Glasgow

*APPROVED*
*By Rebecca Glasgow at 4:47 pm, Dec 21, 2021*

Private Wealth Advisor #2 [Print]

Private Wealth Advisor #2 [Signature]

Date:

Curt Rubinas

*APPROVED*
*By Curt Rubinas at 5:50 pm, Dec 21, 2021*

Private Wealth Advisor #3 [Print]

Private Wealth Advisor #3 [Signature]

Date:

**Private Wealth Advisor #4 [Print]**

X

Private Wealth Advisor #4 [Signature]

Date:

**Private Wealth Advisor #5 [Print]**

X

Private Wealth Advisor #5 [Signature]

Date:

Lane Strumlauf

**PWM Market Head [Print]**

X

PWM Market Head [Signature]

12/27/2021

Date:

**Approval by UHNW Management**

**Head UHNW Americas or Delegate [Print]**

X

Head UHNW Americas or Delegate [Signature]

Date:

For Internal Use Only



## II. Shared Client Model Incentive Structures

**Partnering Structure**

<u>**Refer and Stay Involved**</u>

Where  FA and PWA/FOC *partner in responsibilities* for ongoing client relationship management:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
|---|---|---|
| | **PWA/FOC** | **FA** |
| **Ongoing** | 50% | 50% |

<u>**Refer and Step Away**</u>

Where  FA *shifts responsibilities* of ongoing client relationship management, operations and servicing to PWA/FOC by referring the client relationship and stepping away going forward:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
|---|---|---|
| | **PWA/FOC** | **FA** |
| **Year 1** | 50% | 50% |
| **Year 2** | 50% | 50% |
| **Years 3+** | 60% | 40% |

**Note**: All advisors will be paid in accordance to their applicable UBS Financial Advisor compensation plan except in instances where an FA partners with a PWA/FOC for $100mm+ net worth clients. In such instances, the FA will be paid at 50% grid rate.

For Internal Use Only

 **UBS**

**III. Client/Prospect details**

**Is this agreement pertaining to a** ☒ **client or a** ☐ **prospect?**

**Client/Prospect Name:**                     Tom South

**Client/Prospect
Company Affiliation:**               Alaska Packaging Inc.

**Client/Prospect
Address:**                                 400 N. Sitka St, Anchorage, AK 99501

**New Split ID:**            Y5Z9            Must be created at time of account opening or before additional funding to existing accounts.

**Please choose one of the following:**
Refer and Stay Involved ___        ___       Refer and Step Away ___        ___

| Account Number | Base Revenue [1] (if applicable) |
|---|---|
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |

[1]   **Only if applicable.**  Base revenue is the **monthly historical average** from the 24 months *prior to the partnering agreement.*  (for example, account generated $1,000 in revenue, per month, for the 24 months prior to agreement. Base revenue is **$1,000** ($1,000 x 24 months / 24 months = average).

**PWM and WM Market Leadership:**

PLEASE SCAN AND RETAIN A COPY OF THE SIGNED AGREEMENT WITH A FINAL COPY TO THE PARTNERSHIPS & CLIENT MANAGEMENT TEAM.

For Internal Use Only



# UBS Private Wealth Management
# Financial Advisor/Private Wealth Advisor Partnering Agreement

## PARTIES

This Financial Advisor/Private Wealth Advisor revenue sharing agreement (the "Partnering Agreement") is made and entered into on the 14 day of December, 2021 by and between:

- (1) Leslie Lauer, Rebecca Glasgow, Curt Rubinas
- (2) Michael Shoaf

## PURPOSE OF AGREEMENT

The above-mentioned Introducing Advisor(s) ("Introducing FA") and Private Wealth Advisors/Family Office Consultant(s) ("PWA/FOC") (collectively, the "Advisors") hereby enter into this Partnering Agreement (the "Agreement") setting forth the terms and conditions under which they will work together to provide wealth management services to each of the clients or client prospects listed on Exhibit "A" annexed hereto ("Shared Clients"). Each party hereby acknowledges and agrees that, although UBS Financial Services, Inc. ("UBS") is a third-party beneficiary of this Agreement, the terms described herein must be approved, in writing, by UBS Management [1] prior to its execution. Further, and for the avoidance of doubt, nothing contained herein shall alter or amend the employment relationship currently in existence between any Advisor and UBS.

## PARTNERSHIP INCENTIVE STRUCTURE

In consideration for the introduction of the Shared Client(s) by the Introducing FA(s) and the agreement of the Advisors to work together to service such Shared Clients, the Advisors hereby agree to the Partnering Incentive Structure set forth in Exhibit "A" pursuant to which the parties will open a Shared Client Account (and share in: (a) commissions, sales credits and fees generated by the Shared Clients' Accounts ("Gross Commission"); (b) assets under management; (c) expenses incurred in servicing the Shared Clients; and, (d) Net New assets (collectively, "Shared Client Revenue") generated by a Shared Client (but only to the extent such Shared Client Revenue exceeds the monthly historical average over the prior 24 months, if any (the "Base Revenue Amount").

All Advisors will be paid in accordance with the respective UBS Financial Advisor compensation plan applicable to such Advisor and in effect during their employment. Enhanced payouts shall be available in accordance with the compensation plan prescribed by UBS Management for a subgroup of clients as described in further detail in Exhibit A.

Furthermore, the Advisors agree that the assets held in a Shared Client Account shall be held in the applicable Private Wealth Management or UBS International wire code and that a single, unique split ID number will be assigned thereto.

This Agreement shall become effective upon its execution by all Advisors and formal approval by UBS management ("Effective Date"). The Partnership Incentive Structure shall be implemented on the first day of the monthly commission period immediately following such Effective Date.

---

1 For the purposes of this Agreement, UBS Management shall mean the Head of Ultra-High Net Worth Americas or such person as that individual shall delegate that responsibility to.



**TERMINATION**

This Agreement may only be terminated in accordance with the following conditions:

1. **Voluntarily:**

    a. **If there are only two Advisors:** Either Advisor may terminate this Agreement by providing sixty (60) days advance written notice containing the intended effective date of such termination, which must be the last day of a monthly commission period.  Upon voluntary termination, the Shared Client Account(s) will be reassigned in accordance with the terms of this Agreement described in more detail below.
    b. **If there are more than two Advisors:** Any Advisor may withdraw from this Agreement by providing sixty (60) days advance written notice of the intended withdrawal date, which must be the last day of a monthly commission period.  Any such voluntary withdrawal shall be approved by UBS management and, subject to such review and approval, the Agreement will only remain in effect provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement.  The remaining Advisors will be subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

2. **Automatically**

    a. **If there are only two Advisors, the Agreement will terminate automatically if one of the Advisors:**
        1. Dies or experiences a Total Disability (defined as the meaning given to the term "Disability" in the UBS Financial Services Inc.'s Long Term Disability Plan);
        2. Loses a necessary license;
        3. Moves to a non-producing role; or
        4. Experiences a termination of employment for any reason whatsoever.

    b. **If there are more than two Advisors:** An Advisor will be considered to have automatically withdrawn from the Agreement upon the occurrence of the above automatic termination events. Subject to review and approval by UBS management, the Agreement will remain in effect, provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement and subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

3. **Termination by UBS**

    a. Notwithstanding anything contained in this Agreement, the Advisors acknowledge and agree that, consistent with its regulatory obligations and its obligations to its clients, UBS has the right to terminate any Shared Clients and Shared Client Accounts covered by this Agreement and reassign such accounts, at any time in its sole and absolute discretion.

For Internal Use Only



4. **Account Reassignment**

    **a.** In the event this Agreement is terminated in accordance with any of the above referenced provisions, ongoing coverage of the Shared Client accounts will be reassigned in accordance with any mutual agreement among the Advisors and subject to UBS review and approval (consistent with firm policies regarding account assignments).

## CONFIDENTIALITY

Advisors may not directly or indirectly use, maintain, take or disclose any Confidential Information, except (i) in the course of carrying out Advisor's duties for UBS during Advisor's employment, (ii) as otherwise required by law or by governmental or regulatory agency with appropriate jurisdiction, or, (iii) as otherwise permitted by this Agreement. "Confidential information" as used herein includes, but is not limited to, any nonpublic information concerning UBS or its related entities, its financial data, strategic business plans, products and product development, services, client relationships and/or prospective client relationships, client lists and/or contact information, client information (including but not limited to clients' past and present financial conditions, investment practices, preferences, activities, objectives and plans and other client data Advisors have obtained in any way connected to their employment at UBS), marketing plans, and any other trade secrets or confidential or proprietary information related thereto.

Please note that an Advisor must provide immediate written notice to UBS (Attention: General Counsel's Office, 1000 Harbor Boulevard, 8th Floor, Weehawken, New Jersey 07086) of any disclosure requirement by a court, regulatory, or government agency in order to allow UBS an opportunity to respond to such a request. Notwithstanding the foregoing, nothing in this Agreement or any other agreement or document prohibits an Advisor from voluntarily communicating, without notice to, or approval by UBS, with any government agency or self-regulatory organization ("SRO") about a potential violation of a law, regulation, or SRO regulation and/or court order.  With respect to an Advisor's obligation to maintain in confidence any and all confidential and/or trade secret information of UBS, the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1833(b), provides each Advisor with immunity from criminal or civil liability under any federal or state trade secret law for an Advisor's disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, provided that it is disclosed solely for the purpose of reporting or investigating a suspected violation of law, or is made in a complaint or other document filed in a lawsuit or other proceeding and the document is filed under seal so that it is not disclosed to the public.

## NON-SOLICITATION

Should the employment of any Advisor terminate at any time (while party to this Agreement or not and regardless of whether such employment termination is voluntary or not), such Advisor agrees that: (i) he/she will not directly or indirectly solicit or interfere with any of the Shared Clients serviced pursuant to this Agreement for a period of one year from the date of termination; and (ii) he/she will immediately disconnect with any Shared Client with whom the Advisor is connected on LinkedIn.

For purposes of this provision, "solicit" means that the departing Advisor will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of: (i) initiating contact with a Shared Client to notify such client of his or her departure from UBS and/or to provide information about such new employer to any Shared Client; or (ii) inviting, encouraging



or requesting a Shared Client, or that may have the effect of inviting, encouraging or requesting a Shared Client to: (a) transfer his or her UBS account(s) to anyone else including to the departing Advisor or his or her new employer; (b) open a new account with the departing Advisor or anyone else including his or her new employer; or (c) otherwise discontinue his or her existing business relationship with UBS.

Further, in the event that a Shared Client contacts an Advisor following the Advisor's departure from UBS, such Advisor agrees to inform the Shared Client of the existence of the terms of this paragraph.

In the event that any Advisor becomes employed at another firm, moreover, he or she agrees to bring this Agreement to the attention of such new employer so that it may be made aware of all of the obligations to UBS contained herein and can take all appropriate steps to ensure compliance with such obligations.

## INJUNCTIVE RELIEF

Each Advisor understands that the Confidentiality and Non-Solicitation provisions contained herein (the "Restrictive Covenants") are material to the UBS and that UBS has the exclusive right to enforce the Restrictive Covenants, and, therefore, if a court or arbitration panel of competent jurisdiction rules that he or she has breached the terms of the Restrictive Covenants, each Advisor agrees that damages in the event of such breach would not be possible to ascertain and that UBS will suffer immediate and irreparable harm. Accordingly, each Advisor also agrees and expressly consents that, in addition to and without limiting any other remedy or right that it may have, UBS shall be entitled to an injunction or other equitable relief enjoining such breach or prospective breach to maintain the status quo pending the outcome of any arbitration proceeding. If any of the Restrictive Covenants or any part thereof are determined to be unenforceable because of the scope or duration of such provision, such Restrictive Covenant shall be modified so that it becomes enforceable. UBS shall not be required to post any bond in connection with the foregoing.

## DAMAGES

In the event that any Advisor breaches any of the Restrictive Covenants contained herein, he or she understands that UBS will suffer damages that would not be possible to ascertain  at the time of such breach, including but not limited to: (a) costs related to investigating, monitoring or remedying the misuse of Confidential Information; (b) costs related to maintaining, restoring or repairing UBS's relationship with its clients; (c) revenue lost from client assets transferred or diverted from UBS to competitor; (d) revenue lost due to decreased use of UBS services; (e) costs related to replacing employees, including recruiting, hiring and training replacement employees; and (f) lost productivity. In the event that an Advisor violates any of the Restrictive Covenants contained herein, he/she agrees to pay UBS one hundred percent (100%) of the Trailing-12 months gross commission production generated on Shared Client assets transferred from UBS to another broker-dealer or investment advisory firm for any Shared Client who was solicited or interfered with in violation of this Agreement and/or where any Confidential Information was used or disclosed in violation of this Agreement.  For purposes of this Agreement, "Trailing-12 months gross commission production" shall be defined as the total aggregate amount of commissions and fees generated on client assets during the preceding twelve (12) month period prior to the Shared Client assets transferring from UBS as determined by UBS in its sole discretion.

It is agreed and understood that UBS is not seeking a double recovery with respect to the application of the liquidated damages provision contained herein and that UBS does not and will not seek damages in an amount greater than 100 percent (100%) of the Trailing-12 months gross commission production agreed to herein as its liquidated damages. For purposes of clarification, if



an Advisor breaches the Restrictive Covenants in both the Confidentiality and Non-Solicitation provisions of this Agreement, UBS will be entitled to a total of one hundred percent (100%) of the Trailing-12 months gross commission production transferred from UBS notwithstanding its right to liquidated damages under both the Confidentiality and Non-Solicitation provisions contained herein. The Advisors agree that these formulas represent reasonable estimates of the compensatory damages that UBS will incur as a result of violations of the Restrictive Covenants and do not constitute a penalty.  These liquidated damages are in addition to any other non-compensatory remedy that UBS may be entitled to, including but not limited to injunctive relief and/or punitive damages.

## **OTHER TERMS AND CONDITIONS**

UBS is not a party to this Agreement.  However, given the highly-regulated nature of the UBS' business and its obligations to the  Shared Clients serviced by the Advisors, UBS may in its sole discretion terminate or modify the Agreement and resolve disputes as it deems necessary and appropriate.  UBS is a third party beneficiary of this Agreement with the exclusive right to enforce the Confidentiality and Non-Solicitation provisions and those provisions shall survive any termination of the Agreement.

Nothing in this Agreement modifies or alters any UBS policies, including without limitation the Employee Handbook, Account Reassignment Policy or Code of Conduct. The Advisors' employment with UBS remains at all times "at will," which means that their employment may be terminated at any time and for any reason by them or UBS.

This Agreement contains all of the terms of the agreement between the Advisors and supersedes all prior written or oral agreements relating to the subject matter of the Agreement. This Agreement may not be amended unless such amendment is made in writing and executed by all of the Advisors and approved by UBS management. No waiver of any breach of any term will be construed as a waiver of any subsequent breach of such term or any other term.

Each Advisor acknowledges that he/she may have entered, or may in the future enter, into other agreements with UBS or any of its related entities that contain confidentiality and/or non-solicitation obligations.  Each Advisor understands and agrees that the Confidentiality and Non-Solicitation provisions in this Agreement are in addition to, and not in lieu of, any other such agreements (including equity plan documents), all of which will remain in full force and effect.  If there is a conflict between a provision in this Agreement and a provision in any other agreement, the provision that gives the greater protection to UBS shall govern.

This Agreement is not intended to create a legal partnership, joint venture or any other legal entity.

The provisions of this Agreement are severable and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the other provisions.

This agreement shall be governed by the laws of the State of New York without reference to principles of conflict of laws.

All controversies or claims arising out of or relating to this Agreement, or its construction, performance or breach shall be brought before the Financial Industry Regulatory Authority (FINRA) in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes.

For Internal Use Only

 **UBS**

# FA-PWA/FOC Partnering Agreement
## Exhibit 'A'

**I.  Parties**

This Financial Advisor-Private Wealth Advisor/Family Office Consultant partnering agreement (the "Agreement") is made and entered on the

_____14_____ day of _____December_____ , 2021, by and between:

| Names of Financial Advisor(s) ("Financial Advisor" or "FA" or "Private Wealth Advisor" or "PWA") | FAID | Names of Private Wealth Advisor(s) ("Private Wealth Advisor" or "PWA"; "Family Office Consultant" or FOC ) | FAID |
|---|---|---|---|
| 1.  Michael Shoaf  50% | HGCK | 1.  Leslie Lauer 16.68% | Y5LL |
| 2. | | 2.  Rebecca Glasgow 16.66% | Y5RG |
| 3. | | 3.  Curt Rubinas 16.66% | Y5CR |
| 4. | | 4. | |
| 5. | | 5. | |

**Location of Branch:** _____Hartford_____      **Location of Branch:** _____Atlanta_____

**Branch Code:** ___HG___      **Branch Code:** ___Y5___

**$100mm Client that qualifies for Enhanced payout:**  Yes

**Financial Advisors/ Private Wealth Advisors:**

Michael Shoaf

**X**  *Michael F. Shoaf*
Financial Advisor #1 [Signature]

12/22/21
Date:

_____
**Financial Advisor #2 [Print]**

**X** _____
Financial Advisor #2 [Signature]

_____
Date:

_____
**Financial Advisor #3 [Print]**

**X** _____
Financial Advisor #3 [Signature]

_____
Date:

_____
**Financial Advisor #4 [Print]**

**X** _____
Financial Advisor #4 [Signature]

_____
Date:

For Internal Use Only

 **UBS**

---

**Financial Advisor #5 [Print]**

X
_____
Financial Advisor #5 [Signature]

Date: _____

William Cholawa
**Branch Office Manager [Print]**

*William Cholawa*
Branch Office Manager [Signature]

12-22-21
Date: _____

**Private Wealth Advisors/Family Office Consultants:**

Leslie Lauer
**Private Wealth Advisor #1 [Print]**

APPROVED
By le03283 at 9:25 am, Dec 22, 2021

Date: _____

Rebecca Glasgow
**Private Wealth Advisor #2 [Print]**

APPROVED
By Rebecca Glasgow at 4:48 pm, Dec 21, 2021

Date: _____

Curt Rubinas
**Private Wealth Advisor #3 [Print]**

APPROVED
By Curt Rubinas at 5:52 pm, Dec 21, 2021

Date: _____

**Private Wealth Advisor #4 [Print]**

X
_____
Private Wealth Advisor #4 [Signature]

Date: _____

**Private Wealth Advisor #5 [Print]**

X
_____
Private Wealth Advisor #5 [Signature]

Date: _____

Lane Strumlauf
**PWM Market Head [Print]**

X
_____
PWM Market Head [Signature]

12/27/2021
Date: _____

**Approval by UHNW Management**

_____
**Head UHNW Americas or Delegate [Print]**

X _____
Head UHNW Americas or Delegate [Signature]

_____
Date: _____

7



## II. Shared Client Model Incentive Structures

**Partnering Structure**

**Refer and Stay Involved**

Where  FA and PWA/FOC *partner in responsibilities* for ongoing client relationship management:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
|---|---|---|
| | **PWA/FOC** | **FA** |
| **Ongoing** | 50% | 50% |

**Refer and Step Away**

Where  FA *shifts responsibilities* of ongoing client relationship management, operations and servicing to PWA/FOC by referring the client relationship and stepping away going forward:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
|---|---|---|
| | **PWA/FOC** | **FA** |
| **Year 1** | 50% | 50% |
| **Year 2** | 50% | 50% |
| **Years 3+** | 60% | 40% |

**Note**: All advisors will be paid in accordance to their applicable UBS Financial Advisor compensation plan except in instances where an FA partners with a PWA/FOC for $100mm+ net worth clients. In such instances, the FA will be paid at 50% grid rate.

For Internal Use Only



## III. Client/Prospect details

**Is this agreement pertaining to a** ☒ **client or a** ☐ **prospect?**

**Client/Prospect Name:**     Julie and Charles Myers

**Client/Prospect Company Affiliation:**     Chippewa Aerospace Inc.

**Client/Prospect Address:**

**New Split ID:**     Y5Z7     Must be created at time of account opening or before additional funding to existing accounts.

**Please choose one of the following:**

Refer and Stay Involved ✔ ___     Refer and Step Away ___    ___

| Account Number | Base Revenue [1]<br>(if applicable) |
|---|---|
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

**1**   **Only if applicable.** Base revenue is the **monthly historical average** from the 24 months *prior to the partnering agreement.* (for example, account generated $1,000 in revenue, per month, for the 24 months prior to agreement. Base revenue is **$1,000** ($1,000 x 24 months / 24 months = average).

**PWM and WM Market Leadership:**

PLEASE SCAN AND RETAIN A COPY OF THE SIGNED AGREEMENT WITH A FINAL COPY TO THE PARTNERSHIPS & CLIENT MANAGEMENT TEAM.

For Internal Use Only



# UBS Private Wealth Management
# Financial Advisor/Private Wealth Advisor Partnering Agreement

**PARTIES**

This Financial Advisor/Family Office Consultant revenue sharing agreement (the "Partnering Agreement") is made and entered into on the 26 day of  September , 2022, by and between:

(1) Daniel Lewin
(2) Leslie Lauer, Rebecca Glasgow, Curt Rubinas

**PURPOSE OF AGREEMENT**

The above-mentioned Introducing Advisor(s) ("Introducing FA") and Private Wealth Advisors/Family Office Consultant(s) ("PWA/FOC") (collectively, the "Advisors") hereby enter into this Partnering Agreement (the "Agreement") setting forth the terms and conditions under which they will work together to provide wealth management services to each of the clients or client prospects listed on Exhibit "A" annexed hereto ("Shared Clients"). Each party hereby acknowledges and agrees that, although UBS Financial Services, Inc. ("UBS") is a third-party beneficiary of this Agreement, the terms described herein must be approved, in writing, by UBS Management [1]prior to its execution. Further, and for the avoidance of doubt, nothing contained herein shall alter or amend the employment relationship currently in existence between any Advisor and UBS.

**PARTNERSHIP INCENTIVE STRUCTURE**

In consideration for the introduction of the Shared Client(s) by the Introducing FA(s) and the agreement of the Advisors to work together to service such Shared Clients, the Advisors hereby agree to the Partnering Incentive Structure set forth in Exhibit "A" pursuant to which the parties will open a Shared Client Account (and share in: (a) commissions, sales credits and fees generated by the Shared Clients' Accounts ("Gross Commission"); (b) assets under management; (c) expenses incurred in servicing the Shared Clients; and, (d) Net New assets (collectively, "Shared Client Revenue") generated by a Shared Client (but only to the extent such Shared Client Revenue exceeds the monthly historical average over the prior 24 months, if any (the "Base Revenue Amount").

All Advisors will be paid in accordance with the respective UBS Financial Advisor compensation plan applicable to such Advisor and in effect during their employment. Enhanced payouts shall be available in accordance with the compensation plan prescribed by UBS Management for a subgroup of clients as described in further detail in Exhibit A.

Furthermore, the Advisors agree that the assets held in a Shared Client Account shall be held in the applicable Private Wealth Management or UBS International wire code and that a single, unique split ID number will be assigned thereto.

This Agreement shall become effective upon its execution by all Advisors and formal approval by UBS management ("Effective Date"). The Partnership Incentive Structure shall be implemented on the first day of the monthly commission period immediately following such Effective Date.

---

1 For the purposes of this Agreement, UBS Management shall mean the Head of Ultra-High Net Worth Americas or such person as that individual shall delegate that responsibility to.



**TERMINATION**

This Agreement may only be terminated in accordance with the following conditions:

1. **Voluntarily:**

    a. **If there are only two Advisors:** Either Advisor may terminate this Agreement by providing sixty (60) days advance written notice containing the intended effective date of such termination, which must be the last day of a monthly commission period.  Upon voluntary termination, the Shared Client Account(s) will be reassigned in accordance with the terms of this Agreement described in more detail below.
    b. **If there are more than two Advisors:** Any Advisor may withdraw from this Agreement by providing sixty (60) days advance written notice of the intended withdrawal date, which must be the last day of a monthly commission period.  Any such voluntary withdrawal shall be approved by UBS management and, subject to such review and approval, the Agreement will only remain in effect provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement.  The remaining Advisors will be subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

2. **Automatically**

    a. **If there are only two Advisors, the Agreement will terminate automatically if one of the Advisors:**
       1. Dies or experiences a Total Disability (defined as the meaning given to the term "Disability" in the UBS Financial Services Inc.'s Long Term Disability Plan);
       2. Loses a necessary license;
       3. Moves to a non-producing role; or
       4. Experiences a termination of employment for any reason whatsoever.

    b. **If there are more than two Advisors:** An Advisor will be considered to have automatically withdrawn from the Agreement upon the occurrence of the above automatic termination events. Subject to review and approval by UBS management, the Agreement will remain in effect, provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement and subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

3. **Termination by UBS**

    a. Notwithstanding anything contained in this Agreement, the Advisors acknowledge and agree that, consistent with its regulatory obligations and its obligations to its clients, UBS has the right to terminate any Shared Clients and Shared Client Accounts covered by this Agreement and reassign such accounts, at any time in its sole and absolute discretion.

For Internal Use Only



4. **Account Reassignment**

    **a.** In the event this Agreement is terminated in accordance with any of the above referenced provisions, ongoing coverage of the Shared Client accounts will be reassigned in accordance with any mutual agreement among the Advisors and subject to UBS review and approval (consistent with firm policies regarding account assignments).

## CONFIDENTIALITY

Advisors may not directly or indirectly use, maintain, take or disclose any Confidential Information, except (i) in the course of carrying out Advisor's duties for UBS during Advisor's employment, (ii) as otherwise required by law or by governmental or regulatory agency with appropriate jurisdiction, or, (iii) as otherwise permitted by this Agreement. "Confidential information" as used herein includes, but is not limited to, any nonpublic information concerning UBS or its related entities, its financial data, strategic business plans, products and product development, services, client relationships and/or prospective client relationships, client lists and/or contact information, client information (including but not limited to clients' past and present financial conditions, investment practices, preferences, activities, objectives and plans and other client data Advisors have obtained in any way connected to their employment at UBS), marketing plans, and any other trade secrets or confidential or proprietary information related thereto.

Please note that an Advisor must provide immediate written notice to UBS (Attention: General Counsel's Office, 1000 Harbor Boulevard, 8th Floor, Weehawken, New Jersey 07086) of any disclosure requirement by a court, regulatory, or government agency in order to allow UBS an opportunity to respond to such a request. Notwithstanding the foregoing, nothing in this Agreement or any other agreement or document prohibits an Advisor from voluntarily communicating, without notice to, or approval by UBS, with any government agency or self-regulatory organization ("SRO") about a potential violation of a law, regulation, or SRO regulation and/or court order.  With respect to an Advisor's obligation to maintain in confidence any and all confidential and/or trade secret information of UBS, the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1833(b), provides each Advisor with immunity from criminal or civil liability under any federal or state trade secret law for an Advisor's disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, provided that it is disclosed solely for the purpose of reporting or investigating a suspected violation of law, or is made in a complaint or other document filed in a lawsuit or other proceeding and the document is filed under seal so that it is not disclosed to the public.

## NON-SOLICITATION

Should the employment of any Advisor terminate at any time (while party to this Agreement or not and regardless of whether such employment termination is voluntary or not), such Advisor agrees that: (i) he/she will not directly or indirectly solicit or interfere with any of the Shared Clients serviced pursuant to this Agreement for a period of one year from the date of termination; and (ii) he/she will immediately disconnect with any Shared Client with whom the Advisor is connected on LinkedIn.

For purposes of this provision, "solicit" means that the departing Advisor will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of: (i) initiating contact with a Shared Client to notify such client of his or her departure from UBS and/or to provide information about such new employer to any Shared Client; or (ii) inviting, encouraging



or requesting a Shared Client, or that may have the effect of inviting, encouraging or requesting a Shared Client to: (a) transfer his or her UBS account(s) to anyone else including to the departing Advisor or his or her new employer; (b) open a new account with the departing Advisor or anyone else including his or her new employer; or (c) otherwise discontinue his or her existing business relationship with UBS.

Further, in the event that a Shared Client contacts an Advisor following the Advisor's departure from UBS, such Advisor agrees to inform the Shared Client of the existence of the terms of this paragraph.

In the event that any Advisor becomes employed at another firm, moreover, he or she agrees to bring this Agreement to the attention of such new employer so that it may be made aware of all of the obligations to UBS contained herein and can take all appropriate steps to ensure compliance with such obligations.

## INJUNCTIVE RELIEF

Each Advisor understands that the Confidentiality and Non-Solicitation provisions contained herein (the "Restrictive Covenants") are material to the UBS and that UBS has the exclusive right to enforce the Restrictive Covenants, and, therefore, if a court or arbitration panel of competent jurisdiction rules that he or she has breached the terms of the Restrictive Covenants, each Advisor agrees that damages in the event of such breach would not be possible to ascertain and that UBS will suffer immediate and irreparable harm. Accordingly, each Advisor also agrees and expressly consents that, in addition to and without limiting any other remedy or right that it may have, UBS shall be entitled to an injunction or other equitable relief enjoining such breach or prospective breach to maintain the status quo pending the outcome of any arbitration proceeding. If any of the Restrictive Covenants or any part thereof are determined to be unenforceable because of the scope or duration of such provision, such Restrictive Covenant shall be modified so that it becomes enforceable. UBS shall not be required to post any bond in connection with the foregoing.

## DAMAGES

In the event that any Advisor breaches any of the Restrictive Covenants contained herein, he or she understands that UBS will suffer damages that would not be possible to ascertain  at the time of such breach, including but not limited to: (a) costs related to investigating, monitoring or remedying the misuse of Confidential Information; (b) costs related to maintaining, restoring or repairing UBS's relationship with its clients; (c) revenue lost from client assets transferred or diverted from UBS to competitor; (d) revenue lost due to decreased use of UBS services; (e) costs related to replacing employees, including recruiting, hiring and training replacement employees; and (f) lost productivity. In the event that an Advisor violates any of the Restrictive Covenants contained herein, he/she agrees to pay UBS one hundred percent (100%) of the Trailing-12 months gross commission production generated on Shared Client assets transferred from UBS to another broker-dealer or investment advisory firm for any Shared Client who was solicited or interfered with in violation of this Agreement and/or where any Confidential Information was used or disclosed in violation of this Agreement.  For purposes of this Agreement, "Trailing-12 months gross commission production" shall be defined as the total aggregate amount of commissions and fees generated on client assets during the preceding twelve (12) month period prior to the Shared Client assets transferring from UBS as determined by UBS in its sole discretion.

It is agreed and understood that UBS is not seeking a double recovery with respect to the application of the liquidated damages provision contained herein and that UBS does not and will not seek damages in an amount greater than 100 percent (100%) of the Trailing-12 months gross commission production agreed to herein as its liquidated damages. For purposes of clarification, if



an Advisor breaches the Restrictive Covenants in both the Confidentiality and Non-Solicitation provisions of this Agreement, UBS will be entitled to a total of one hundred percent (100%) of the Trailing-12 months gross commission production transferred from UBS notwithstanding its right to liquidated damages under both the Confidentiality and Non-Solicitation provisions contained herein. The Advisors agree that these formulas represent reasonable estimates of the compensatory damages that UBS will incur as a result of violations of the Restrictive Covenants and do not constitute a penalty.  These liquidated damages are in addition to any other non-compensatory remedy that UBS may be entitled to, including but not limited to injunctive relief and/or punitive damages.

**<u>OTHER TERMS AND CONDITIONS</u>**

UBS is not a party to this Agreement.  However, given the highly-regulated nature of the UBS' business and its obligations to the  Shared Clients serviced by the Advisors, UBS may in its sole discretion terminate or modify the Agreement and resolve disputes as it deems necessary and appropriate.  UBS is a third party beneficiary of this Agreement with the exclusive right to enforce the Confidentiality and Non-Solicitation provisions and those provisions shall survive any termination of the Agreement.

Nothing in this Agreement modifies or alters any UBS policies, including without limitation the Employee Handbook, Account Reassignment Policy or Code of Conduct. The Advisors' employment with UBS remains at all times "at will," which means that their employment may be terminated at any time and for any reason by them or UBS.

This Agreement contains all of the terms of the agreement between the Advisors and supersedes all prior written or oral agreements relating to the subject matter of the Agreement. This Agreement may not be amended unless such amendment is made in writing and executed by all of the Advisors and approved by UBS management. No waiver of any breach of any term will be construed as a waiver of any subsequent breach of such term or any other term.

Each Advisor acknowledges that he/she may have entered, or may in the future enter, into other agreements with UBS or any of its related entities that contain confidentiality and/or non-solicitation obligations.  Each Advisor understands and agrees that the Confidentiality and Non-Solicitation provisions in this Agreement are in addition to, and not in lieu of, any other such agreements (including equity plan documents), all of which will remain in full force and effect.  If there is a conflict between a provision in this Agreement and a provision in any other agreement, the provision that gives the greater protection to UBS shall govern.

This Agreement is not intended to create a legal partnership, joint venture or any other legal entity.

The provisions of this Agreement are severable and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the other provisions.

This agreement shall be governed by the laws of the State of New York without reference to principles of conflict of laws.

All controversies or claims arising out of or relating to this Agreement, or its construction, performance or breach shall be brought before the Financial Industry Regulatory Authority (FINRA) in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes.

For Internal Use Only



## FA-PWA/FOC Partnering Agreement
### Exhibit 'A'
**I. Client/Prospect details**

**Is this agreement pertaining to a ☒client or a ☐prospect?**

**Does this client/prospect have a net worth of $100m+ and therefore qualify for enhanced payout option?  ☐Yes ☒No**

**Client/Prospect Name:** _William Dutra_

**Client/Prospect Company Affiliation:** _Ghilotti_

**Client/Prospect Address:** _____

**New Split ID:** _Y5EG_    Must be created at time of account opening or before additional funding to existing accounts.

**Please choose one of the following (refer to page 9):**

☐Refer and Stay Involved          ☐Refer and Step Away

| Account Number | Base Revenue [1] (if applicable) |
|---|---|
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

[1]  **Only if applicable.** Base revenue is the **monthly historical average** from the 24 months *prior to the partnering agreement*. (for example, account generated $1,000 in revenue, per month, for the 24 months prior to agreement. Base revenue is **$1,000** ($1,000 x 24 months / 24 months = average).

For Internal Use Only

 **UBS**

## II.  Parties

This Financial Advisor-Private Wealth Advisor/Family Office Consultant partnering agreement (the "Agreement") is made and entered on the ___26th___ day of ___September___ , 2022, by and between:

| **Names of Financial Advisor(s)** | **FAID** | **Names of Private Wealth Advisor(s)** | **FAID** |
|---|---|---|---|
| ("Financial Advisor" or "FA" or "Private Wealth Advisor" or "PWA") | | ("Private Wealth Advisor" or "PWA"; "Family Office Consultant" or "FOC") | |
| 1. Daniel Lewin 50% | PWLD | 1. Leslie Lauer 16.68 % | Y5LL |
| 2. | | 2. Rebecca Glasgow 16.66 % | Y5RG |
| 3. | | 3. Curt Rubinas 16.66% | Y5CR |
| 4. | | 4. | |
| 5. | | 5. | |

**Location of Branch:** ___Boston, MA___
**Branch Code:** ___PW___

**Location of Branch:** ___Atlanta, GA___
**Branch Code:** ___Y5___

**Financial Advisors/ Private Wealth Advisors:**

Daniel Lewin
_____
**Financial Advisor #1 [Print]**
**X** *Daniel Lewin*
_____
Financial Advisor #1 [Signature]

_____
Date:

_____
**Financial Advisor #2 [Print]**
**X**
_____
Financial Advisor #2 [Signature]

_____
Date:

_____
**Financial Advisor #3 [Print]**
**X**
_____
Financial Advisor #3 [Signature]

_____
Date:

_____
**Financial Advisor #4 [Print]**
**X**
_____
Financial Advisor #4 [Signature]

_____
Date:

_____
**Financial Advisor #5 [Print]**
**X**
_____
Financial Advisor #5 [Signature]

_____
**Branch Office Manager [Print]**
**X**
_____
Branch Office Manager [Signature]

7

**UBS**

Date: _____          Date: _____

**Private Wealth Advisors/Family Office Consultants:**

Leslie Lauer
_____
**Private Wealth Advisor #1 [Print]**

*APPROVED*
*By le03283 at 10:02 am, Oct 19, 2022*

Rebecca Glasgow
_____
**Private Wealth Advisor #2 [Print]**

X
*APPROVED*
*By Rebecca Glasgow at 2:49 pm, Sep 29, 2022*

Date: _____          Date: _____

Curt Rubinas
_____
**Private Wealth Advisor #3 [Print]**

*APPROVED*
Private Wealth Advisor #3 [Signature]
*By Curt Rubinas at 6:19 pm, Sep 29, 2022*

_____
**Private Wealth Advisor #4 [Print]**

X
_____
Private Wealth Advisor #4 [Signature]

Date: _____          Date: _____

_____
**Private Wealth Advisor #5 [Print]**

X
_____
Private Wealth Advisor #5 [Signature]

Lane Strumlauf
_____
**PWM Market Head [Print]**

X
_____
PWM Market Head [Signature]

10/20/2022

Date: _____          Date: _____

**Approval by UHNW Management**

_____
**Head UHNW Americas or Delegate [Print]**

X _____          _____
Head UHNW Americas or Delegate [Signature]    Date:

**PWM and WM Market Leadership:**

PLEASE SCAN AND RETAIN A COPY OF THE SIGNED AGREEMENT WITH A FINAL COPY TO THE UHNW
CLIENT ENGAGEMENT & DEVELOPMENT TEAM



**III. Shared Client Model Incentive Structures**

**Partnering Structure**

**<u>Refer and Stay Involved</u>**

Where  FA and PWA/FOC *partner in responsibilities* for ongoing client relationship management:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
|---|---|---|
| | **PWA/FOC** | **FA** |
| **Ongoing** | 50% | 50% |

**<u>Refer and Step Away</u>**

Where  FA *shifts responsibilities* of ongoing client relationship management, operations and servicing to PWA/FOC by referring the client relationship and stepping away going forward:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
|---|---|---|
| | **PWA/FOC** | **FA** |
| **Year 1** | 50% | 50% |
| **Year 2** | 50% | 50% |
| **Years 3+** | 60% | 40% |

**<u>Note</u>**: All advisors will be paid in accordance to their applicable UBS Financial Advisor compensation plan except in instances where an FA partners with a PWA/FOC for $100mm+ net worth clients. In such instances, the FA will be paid at 50% grid rate.



# UBS Private Wealth Management
## Financial Advisor/Private Wealth Advisor Partnering Agreement

**PARTIES**

This Financial Advisor/Private Wealth Advisor revenue sharing agreement (the "Partnering Agreement") is made and entered into on the 20th  day of April , 2022, by and between:

(1) Leslie Lauer, Rebecca Glasgow, Curt Rubinas

(2) Lisa Chapman, Natalie Barron,Lindsay Mais

**PURPOSE OF AGREEMENT**

The above-mentioned Introducing Advisor(s) ("Introducing FA") and Private Wealth Advisors/Family Office Consultant(s) ("PWA/FOC") (collectively, the "Advisors") hereby enter into this Partnering Agreement (the "Agreement") setting forth the terms and conditions under which they will work together to provide wealth management services to each of the clients or client prospects listed on Exhibit "A" annexed hereto ("Shared Clients"). Each party hereby acknowledges and agrees that, although UBS Financial Services, Inc. ("UBS") is a third-party beneficiary of this Agreement, the terms described herein must be approved, in writing, by UBS Management [1]prior to its execution. Further, and for the avoidance of doubt, nothing contained herein shall alter or amend the employment relationship currently in existence between any Advisor and UBS.

**PARTNERSHIP INCENTIVE STRUCTURE**

In consideration for the introduction of the Shared Client(s) by the Introducing FA(s) and the agreement of the Advisors to work together to service such Shared Clients, the Advisors hereby agree to the Partnering Incentive Structure set forth in Exhibit "A" pursuant to which the parties will open a Shared Client Account (and share in: (a) commissions, sales credits and fees generated by the Shared Clients' Accounts ("Gross Commission"); (b) assets under management; (c) expenses incurred in servicing the Shared Clients; and, (d) Net New assets (collectively, "Shared Client Revenue") generated by a Shared Client (but only to the extent such Shared Client Revenue exceeds the monthly historical average over the prior 24 months, if any (the "Base Revenue Amount").

All Advisors will be paid in accordance with the respective UBS Financial Advisor compensation plan applicable to such Advisor and in effect during their employment. Enhanced payouts shall be available in accordance with the compensation plan prescribed by UBS Management for a subgroup of clients as described in further detail in Exhibit A.

Furthermore, the Advisors agree that the assets held in a Shared Client Account shall be held in the applicable Private Wealth Management or UBS International wire code and that a single, unique split ID number will be assigned thereto.

This Agreement shall become effective upon its execution by all Advisors and formal approval by UBS management ("Effective Date"). The Partnership Incentive Structure shall be implemented on the first day of the monthly commission period immediately following such Effective Date.

---

1 For the purposes of this Agreement, UBS Management shall mean the Head of Ultra-High Net Worth Americas or such person as that individual shall delegate that responsibility to.



**TERMINATION**

This Agreement may only be terminated in accordance with the following conditions:

1.  **Voluntarily:**

    a.  **If there are only two Advisors:** Either Advisor may terminate this Agreement by providing sixty (60) days advance written notice containing the intended effective date of such termination, which must be the last day of a monthly commission period.  Upon voluntary termination, the Shared Client Account(s) will be reassigned in accordance with the terms of this Agreement described in more detail below.
    b.  **If there are more than two Advisors:** Any Advisor may withdraw from this Agreement by providing sixty (60) days advance written notice of the intended withdrawal date, which must be the last day of a monthly commission period.  Any such voluntary withdrawal shall be approved by UBS management and, subject to such review and approval, the Agreement will only remain in effect provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement.  The remaining Advisors will be subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

2.  **Automatically**

    a.  **If there are only two Advisors, the Agreement will terminate automatically if one of the Advisors:**
        1.  Dies or experiences a Total Disability (defined as the meaning given to the term "Disability" in the UBS Financial Services Inc.'s Long Term Disability Plan);
        2.  Loses a necessary license;
        3.  Moves to a non-producing role; or
        4.  Experiences a termination of employment for any reason whatsoever.

    b.  **If there are more than two Advisors:** An Advisor will be considered to have automatically withdrawn from the Agreement upon the occurrence of the above automatic termination events. Subject to review and approval by UBS management, the Agreement will remain in effect, provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement and subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

3.  **Termination by UBS**

    a.  Notwithstanding anything contained in this Agreement, the Advisors acknowledge and agree that, consistent with its regulatory obligations and its obligations to its clients, UBS has the right to terminate any Shared Clients and Shared Client Accounts covered by this Agreement and reassign such accounts, at any time in its sole and absolute discretion.

For Internal Use Only



4. **Account Reassignment**

    **a.** In the event this Agreement is terminated in accordance with any of the above referenced provisions, ongoing coverage of the Shared Client accounts will be reassigned in accordance with any mutual agreement among the Advisors and subject to UBS review and approval (consistent with firm policies regarding account assignments).

## CONFIDENTIALITY

Advisors may not directly or indirectly use, maintain, take or disclose any Confidential Information, except (i) in the course of carrying out Advisor's duties for UBS during Advisor's employment, (ii) as otherwise required by law or by governmental or regulatory agency with appropriate jurisdiction, or, (iii) as otherwise permitted by this Agreement. "Confidential information" as used herein includes, but is not limited to, any nonpublic information concerning UBS or its related entities, its financial data, strategic business plans, products and product development, services, client relationships and/or prospective client relationships, client lists and/or contact information, client information (including but not limited to clients' past and present financial conditions, investment practices, preferences, activities, objectives and plans and other client data Advisors have obtained in any way connected to their employment at UBS), marketing plans, and any other trade secrets or confidential or proprietary information related thereto.

Please note that an Advisor must provide immediate written notice to UBS (Attention: General Counsel's Office, 1000 Harbor Boulevard, 8th Floor, Weehawken, New Jersey 07086) of any disclosure requirement by a court, regulatory, or government agency in order to allow UBS an opportunity to respond to such a request. Notwithstanding the foregoing, nothing in this Agreement or any other agreement or document prohibits an Advisor from voluntarily communicating, without notice to, or approval by UBS, with any government agency or self-regulatory organization ("SRO") about a potential violation of a law, regulation, or SRO regulation and/or court order. With respect to an Advisor's obligation to maintain in confidence any and all confidential and/or trade secret information of UBS, the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1833(b), provides each Advisor with immunity from criminal or civil liability under any federal or state trade secret law for an Advisor's disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, provided that it is disclosed solely for the purpose of reporting or investigating a suspected violation of law, or is made in a complaint or other document filed in a lawsuit or other proceeding and the document is filed under seal so that it is not disclosed to the public.

## NON-SOLICITATION

Should the employment of any Advisor terminate at any time (while party to this Agreement or not and regardless of whether such employment termination is voluntary or not), such Advisor agrees that: (i) he/she will not directly or indirectly solicit or interfere with any of the Shared Clients serviced pursuant to this Agreement for a period of one year from the date of termination; and (ii) he/she will immediately disconnect with any Shared Client with whom the Advisor is connected on LinkedIn.

For purposes of this provision, "solicit" means that the departing Advisor will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of: (i) initiating contact with a Shared Client to notify such client of his or her departure from UBS and/or to provide information about such new employer to any Shared Client; or (ii) inviting, encouraging

For Internal Use Only



or requesting a Shared Client, or that may have the effect of inviting, encouraging or requesting a Shared Client to: (a) transfer his or her UBS account(s) to anyone else including to the departing Advisor or his or her new employer; (b) open a new account with the departing Advisor or anyone else including his or her new employer; or (c) otherwise discontinue his or her existing business relationship with UBS.

Further, in the event that a Shared Client contacts an Advisor following the Advisor's departure from UBS, such Advisor agrees to inform the Shared Client of the existence of the terms of this paragraph.

In the event that any Advisor becomes employed at another firm, moreover, he or she agrees to bring this Agreement to the attention of such new employer so that it may be made aware of all of the obligations to UBS contained herein and can take all appropriate steps to ensure compliance with such obligations.

**INJUNCTIVE RELIEF**

Each Advisor understands that the Confidentiality and Non-Solicitation provisions contained herein (the "Restrictive Covenants") are material to the UBS and that UBS has the exclusive right to enforce the Restrictive Covenants, and, therefore, if a court or arbitration panel of competent jurisdiction rules that he or she has breached the terms of the Restrictive Covenants, each Advisor agrees that damages in the event of such breach would not be possible to ascertain and that UBS will suffer immediate and irreparable harm. Accordingly, each Advisor also agrees and expressly consents that, in addition to and without limiting any other remedy or right that it may have, UBS shall be entitled to an injunction or other equitable relief enjoining such breach or prospective breach to maintain the status quo pending the outcome of any arbitration proceeding. If any of the Restrictive Covenants or any part thereof are determined to be unenforceable because of the scope or duration of such provision, such Restrictive Covenant shall be modified so that it becomes enforceable. UBS shall not be required to post any bond in connection with the foregoing.

**DAMAGES**

In the event that any Advisor breaches any of the Restrictive Covenants contained herein, he or she understands that UBS will suffer damages that would not be possible to ascertain  at the time of such breach, including but not limited to: (a) costs related to investigating, monitoring or remedying the misuse of Confidential Information; (b) costs related to maintaining, restoring or repairing UBS's relationship with its clients; (c) revenue lost from client assets transferred or diverted from UBS to competitor; (d) revenue lost due to decreased use of UBS services; (e) costs related to replacing employees, including recruiting, hiring and training replacement employees; and (f) lost productivity. In the event that an Advisor violates any of the Restrictive Covenants contained herein, he/she agrees to pay UBS one hundred percent (100%) of the Trailing-12 months gross commission production generated on Shared Client assets transferred from UBS to another broker-dealer or investment advisory firm for any Shared Client who was solicited or interfered with in violation of this Agreement and/or where any Confidential Information was used or disclosed in violation of this Agreement.  For purposes of this Agreement, "Trailing-12 months gross commission production" shall be defined as the total aggregate amount of commissions and fees generated on client assets during the preceding twelve (12) month period prior to the Shared Client assets transferring from UBS as determined by UBS in its sole discretion.

It is agreed and understood that UBS is not seeking a double recovery with respect to the application of the liquidated damages provision contained herein and that UBS does not and will not seek damages in an amount greater than 100 percent (100%) of the Trailing-12 months gross commission production agreed to herein as its liquidated damages. For purposes of clarification, if

For Internal Use Only



an Advisor breaches the Restrictive Covenants in both the Confidentiality and Non-Solicitation provisions of this Agreement, UBS will be entitled to a total of one hundred percent (100%) of the Trailing-12 months gross commission production transferred from UBS notwithstanding its right to liquidated damages under both the Confidentiality and Non-Solicitation provisions contained herein. The Advisors agree that these formulas represent reasonable estimates of the compensatory damages that UBS will incur as a result of violations of the Restrictive Covenants and do not constitute a penalty.  These liquidated damages are in addition to any other non-compensatory remedy that UBS may be entitled to, including but not limited to injunctive relief and/or punitive damages.

## <u>OTHER TERMS AND CONDITIONS</u>

UBS is not a party to this Agreement.  However, given the highly-regulated nature of the UBS' business and its obligations to the  Shared Clients serviced by the Advisors, UBS may in its sole discretion terminate or modify the Agreement and resolve disputes as it deems necessary and appropriate.  UBS is a third party beneficiary of this Agreement with the exclusive right to enforce the Confidentiality and Non-Solicitation provisions and those provisions shall survive any termination of the Agreement.

Nothing in this Agreement modifies or alters any UBS policies, including without limitation the Employee Handbook, Account Reassignment Policy or Code of Conduct. The Advisors' employment with UBS remains at all times "at will," which means that their employment may be terminated at any time and for any reason by them or UBS.

This Agreement contains all of the terms of the agreement between the Advisors and supersedes all prior written or oral agreements relating to the subject matter of the Agreement. This Agreement may not be amended unless such amendment is made in writing and executed by all of the Advisors and approved by UBS management. No waiver of any breach of any term will be construed as a waiver of any subsequent breach of such term or any other term.

Each Advisor acknowledges that he/she may have entered, or may in the future enter, into other agreements with UBS or any of its related entities that contain confidentiality and/or non-solicitation obligations.  Each Advisor understands and agrees that the Confidentiality and Non-Solicitation provisions in this Agreement are in addition to, and not in lieu of, any other such agreements (including equity plan documents), all of which will remain in full force and effect.  If there is a conflict between a provision in this Agreement and a provision in any other agreement, the provision that gives the greater protection to UBS shall govern.

This Agreement is not intended to create a legal partnership, joint venture or any other legal entity.

The provisions of this Agreement are severable and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the other provisions.

This agreement shall be governed by the laws of the State of New York without reference to principles of conflict of laws.

All controversies or claims arising out of or relating to this Agreement, or its construction, performance or breach shall be brought before the Financial Industry Regulatory Authority (FINRA) in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes.

 **UBS**

# FA-PWA/FOC Partnering Agreement
## Exhibit 'A'

**I. Parties**

This Financial Advisor-Private Wealth Advisor/Family Office Consultant partnering agreement (the "Agreement") is made and entered on the

____20th____ day of ____April____ , 2022, by and between:

| Names of Financial Advisor(s) | FAID | | Names of Private Wealth Advisor(s) | FAID |
|---|---|---|---|---|
| ("Financial Advisor" or "FA or "Private Wealth Advisor" or "PWA") | | | ("Private Wealth Advisor" or "PWA"; "Family Office Consultant" or "FOC") | |
| 1. Lisa Chapman 16.67% | LB16 | 1. | Leslie Lauer 16.68% | Y5LL |
| 2. Natalie Barron 16.67% | LB42 | 2. | Rebecca Glasgow 16.66% | Y5RG |
| 3. Lindsay Mais 16.66% | LBC3 | 3. | Curt Rubinas 16.66% | Y5CR |
| 4. | | 4. | | |
| 5. | | 5. | | |

**Location of Branch:** ___Seal Beach, CA___   **Location of Branch:** ___Atlanta, GA___

**Branch Code:** ___LB___   **Branch Code:** ___Y5___

**$100mm Client that qualifies for Enhanced payout:** No

**Financial Advisors/ Private Wealth Advisors:**

Lisa Chapman
**Financial Advisor #1 [Print]**

X *Lisa Chapman*
Financial Advisor #1 [Signature]
04/20/22
Date:

Natalie Barron
**Financial Advisor #2 [Print]**

X *Natalie Barron*
Financial Advisor #2 [Signature]
4/20/22
Date:

Lindsay Mais
**Financial Advisor #3 [Print]**

X *Lindsay Mais*
Financial Advisor #3 [Signature]
04/20/2022
Date:

**Financial Advisor #4 [Print]**

X
Financial Advisor #4 [Signature]

Date:

For Internal Use Only



Leslie Chang
_____
**Financial Advisor #5 [Print]**          **Branch Office Manager [Print]**

X _____          X _____
Financial Advisor #5 [Signature]          Branch Office Manager [Signature]

                                                      4/22/2022
_____          _____
Date:                                          Date:


**Private Wealth Advisors/Family Office Consultants:**

Leslie Lauer
_____          Rebecca Glasgow
**Private Wealth Advisor #1 [Print]**          _____
                                                      **Private Wealth Advisor #2 [Print]**

> **APPROVED**
> **By le03283 at 10:40 am, May 10, 2022**

X _____          X *Rebecca Glasgow*
Private Wealth Advisor #1 [Signature]          Private Wealth Advisor #2 [Signature]

                                                      4/22/22
_____          _____
Date:                                          Date:


Curt Rubinas
_____          _____
**Private Wealth Advisor #3 [Print]**          **Private Wealth Advisor #4 [Print]**

X *Wayne C Rubinas*          X _____
Private Wealth Advisor #3 [Signature]          Private Wealth Advisor #4 [Signature]

4/22/2022
_____          _____
Date:                                          Date:


                                                      Lane Strumlauf
_____          _____
**Private Wealth Advisor #5 [Print]**          **PWM Market Head [Print]**

X _____          X _____
Private Wealth Advisor #5 [Signature]          PWM Market Head [Signature]

                                                      5/10/2022
_____          _____
Date:                                          Date:


**Approval by UHNW Management**

_____
**Head UHNW Americas or Delegate [Print]**

X _____          _____
Head UHNW Americas or Delegate [Signature]          Date:

7



**II. Shared Client Model Incentive Structures**

**Partnering Structure**

<u>**Refer and Stay Involved**</u>

Where  FA and PWA/FOC *partner in responsibilities* for ongoing client relationship management:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
| --- | --- | --- |
| | **PWA/FOC** | **FA** |
| **Ongoing** | 50% | 50% |

<u>**Refer and Step Away**</u>

Where  FA *shifts responsibilities* of ongoing client relationship management, operations and servicing to PWA/FOC by referring the client relationship and stepping away going forward:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
| --- | --- | --- |
| | **PWA/FOC** | **FA** |
| **Year 1** | 50% | 50% |
| **Year 2** | 50% | 50% |
| **Years 3+** | 60% | 40% |

**<u>Note</u>**: All advisors will be paid in accordance to their applicable UBS Financial Advisor compensation plan except in instances where an FA partners with a PWA/FOC for $100mm+ net worth clients. In such instances, the FA will be paid at 50% grid rate.



**III. Client/Prospect details**

**Is this agreement pertaining to a ☒ client or a ☐ prospect?**

**Client/Prospect Name:** Shari Sunada

**Client/Prospect
Company Affiliation:** Physicians Choice Home Health, Inc.

**Client/Prospect
Address:** Torrance, CA

**New Split ID:** Y5OC    Must be created at time of account opening or before additional funding to existing accounts.

**Please choose one of the following:**
Refer and Stay Involved ____     ____     Refer and Step Away ____     ____

| Account Number | Base Revenue [1] (if applicable) |
| --- | --- |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |
|  | $ |

**1** **Only if applicable.** Base revenue is the **monthly historical average** from the 24 months *prior to the partnering agreement.* (for example, account generated $1,000 in revenue, per month, for the 24 months prior to agreement. Base revenue is **$1,000** ($1,000 x 24 months / 24 months = average).

**PWM and WM Market Leadership:**

PLEASE SCAN AND RETAIN A COPY OF THE SIGNED AGREEMENT WITH A FINAL COPY TO THE PARTNERSHIPS & CLIENT MANAGEMENT TEAM.

For Internal Use Only



# UBS Private Wealth Management
# Financial Advisor/Private Wealth Advisor Partnering Agreement

## PARTIES

This Financial Advisor/Family Office Consultant revenue sharing agreement (the "Partnering Agreement") is made and entered into on the 24th day of May, 2023, by and between:

  (1) Leslie Lauer, Rebecca Glasgow, Curt Rubinas, Joshua Young
  (2) John Sicklesteel, Michael Lau, Patricia Whitney, Michael Belknap

## PURPOSE OF AGREEMENT

The above-mentioned Introducing Advisor(s) ("Introducing FA") and Private Wealth Advisors/Family Office Consultant(s) ("PWA/FOC") (collectively, the "Advisors") hereby enter into this Partnering Agreement (the "Agreement") setting forth the terms and conditions under which they will work together to provide wealth management services to each of the clients or client prospects listed on Exhibit "A" annexed hereto ("Shared Clients"). Each party hereby acknowledges and agrees that, although UBS Financial Services, Inc. ("UBS") is a third-party beneficiary of this Agreement, the terms described herein must be approved, in writing, by UBS Management [1] prior to its execution. Further, and for the avoidance of doubt, nothing contained herein shall alter or amend the employment relationship currently in existence between any Advisor and UBS.

## PARTNERSHIP INCENTIVE STRUCTURE

In consideration for the introduction of the Shared Client(s) by the Introducing FA(s) and the agreement of the Advisors to work together to service such Shared Clients, the Advisors hereby agree to the Partnering Incentive Structure set forth in Exhibit "A" pursuant to which the parties will open a Shared Client Account (and share in: (a) commissions, sales credits and fees generated by the Shared Clients' Accounts ("Gross Commission"); (b) assets under management; (c) expenses incurred in servicing the Shared Clients; and, (d) Net New assets (collectively, "Shared Client Revenue") generated by a Shared Client (but only to the extent such Shared Client Revenue exceeds the monthly historical average over the prior 24 months, if any (the "Base Revenue Amount").

All Advisors will be paid in accordance with the respective UBS Financial Advisor compensation plan applicable to such Advisor and in effect during their employment. Enhanced payouts shall be available in accordance with the compensation plan prescribed by UBS Management for a subgroup of clients as described in further detail in Exhibit A.

Furthermore, the Advisors agree that the assets held in a Shared Client Account shall be held in the applicable Private Wealth Management or UBS International wire code and that a single, unique split ID number will be assigned thereto.

This Agreement shall become effective upon its execution by all Advisors and formal approval by UBS management ("Effective Date"). The Partnership Incentive Structure shall be implemented on the first day of the monthly commission period immediately following such Effective Date.

---

1 For the purposes of this Agreement, UBS Management shall mean the Head of Ultra-High Net Worth Americas or such person as that individual shall delegate that responsibility to.



**TERMINATION**

This Agreement may only be terminated in accordance with the following conditions:

1. **Voluntarily:**

   a. **If there are only two Advisors:** Either Advisor may terminate this Agreement by providing sixty (60) days advance written notice containing the intended effective date of such termination, which must be the last day of a monthly commission period.  Upon voluntary termination, the Shared Client Account(s) will be reassigned in accordance with the terms of this Agreement described in more detail below.
   b. **If there are more than two Advisors:** Any Advisor may withdraw from this Agreement by providing sixty (60) days advance written notice of the intended withdrawal date, which must be the last day of a monthly commission period.  Any such voluntary withdrawal shall be approved by UBS management and, subject to such review and approval, the Agreement will only remain in effect provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement.  The remaining Advisors will be subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

2. **Automatically**

   a. **If there are only two Advisors, the Agreement will terminate automatically if one of the Advisors:**
      1. Dies or experiences a Total Disability (defined as the meaning given to the term "Disability" in the UBS Financial Services Inc.'s Long Term Disability Plan);
      2. Loses a necessary license;
      3. Moves to a non-producing role; or
      4. Experiences a termination of employment for any reason whatsoever.

   b. **If there are more than two Advisors:** An Advisor will be considered to have automatically withdrawn from the Agreement upon the occurrence of the above automatic termination events. Subject to review and approval by UBS management, the Agreement will remain in effect, provided that at least one Introducing FA and one PWA/FOC remain parties to the Agreement and subject to any adjustment made in writing to the Partnership Incentive Structure set forth in Exhibit "A" and approved by UBS management.

3. **Termination by UBS**

   a. Notwithstanding anything contained in this Agreement, the Advisors acknowledge and agree that, consistent with its regulatory obligations and its obligations to its clients, UBS has the right to terminate any Shared Clients and Shared Client Accounts covered by this Agreement and reassign such accounts, at any time in its sole and absolute discretion.

For Internal Use Only



**4. Account Reassignment**

    **a.** In the event this Agreement is terminated in accordance with any of the above referenced provisions, ongoing coverage of the Shared Client accounts will be reassigned in accordance with any mutual agreement among the Advisors and subject to UBS review and approval (consistent with firm policies regarding account assignments).

**CONFIDENTIALITY**

Advisors may not directly or indirectly use, maintain, take or disclose any Confidential Information, except (i) in the course of carrying out Advisor's duties for UBS during Advisor's employment, (ii) as otherwise required by law or by governmental or regulatory agency with appropriate jurisdiction, or, (iii) as otherwise permitted by this Agreement. "Confidential information" as used herein includes, but is not limited to, any nonpublic information concerning UBS or its related entities, its financial data, strategic business plans, products and product development, services, client relationships and/or prospective client relationships, client lists and/or contact information, client information (including but not limited to clients' past and present financial conditions, investment practices, preferences, activities, objectives and plans and other client data Advisors have obtained in any way connected to their employment at UBS), marketing plans, and any other trade secrets or confidential or proprietary information related thereto.

Please note that an Advisor must provide immediate written notice to UBS (Attention: General Counsel's Office, 1000 Harbor Boulevard, 8th Floor, Weehawken, New Jersey 07086) of any disclosure requirement by a court, regulatory, or government agency in order to allow UBS an opportunity to respond to such a request. Notwithstanding the foregoing, nothing in this Agreement or any other agreement or document prohibits an Advisor from voluntarily communicating, without notice to, or approval by UBS, with any government agency or self-regulatory organization ("SRO") about a potential violation of a law, regulation, or SRO regulation and/or court order.  With respect to an Advisor's obligation to maintain in confidence any and all confidential and/or trade secret information of UBS, the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1833(b), provides each Advisor with immunity from criminal or civil liability under any federal or state trade secret law for an Advisor's disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, provided that it is disclosed solely for the purpose of reporting or investigating a suspected violation of law, or is made in a complaint or other document filed in a lawsuit or other proceeding and the document is filed under seal so that it is not disclosed to the public.

**NON-SOLICITATION**

Should the employment of any Advisor terminate at any time (while party to this Agreement or not and regardless of whether such employment termination is voluntary or not), such Advisor agrees that: (i) he/she will not directly or indirectly solicit or interfere with any of the Shared Clients serviced pursuant to this Agreement for a period of one year from the date of termination; and (ii) he/she will immediately disconnect with any Shared Client with whom the Advisor is connected on LinkedIn.

For purposes of this provision, "solicit" means that the departing Advisor will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of: (i) initiating contact with a Shared Client to notify such client of his or her departure from UBS and/or to provide information about such new employer to any Shared Client; or (ii) inviting, encouraging

For Internal Use Only

 **UBS**

or requesting a Shared Client, or that may have the effect of inviting, encouraging or requesting a Shared Client to: (a) transfer his or her UBS account(s) to anyone else including to the departing Advisor or his or her new employer; (b) open a new account with the departing Advisor or anyone else including his or her new employer; or (c) otherwise discontinue his or her existing business relationship with UBS.

Further, in the event that a Shared Client contacts an Advisor following the Advisor's departure from UBS, such Advisor agrees to inform the Shared Client of the existence of the terms of this paragraph.

In the event that any Advisor becomes employed at another firm, moreover, he or she agrees to bring this Agreement to the attention of such new employer so that it may be made aware of all of the obligations to UBS contained herein and can take all appropriate steps to ensure compliance with such obligations.

## INJUNCTIVE RELIEF

Each Advisor understands that the Confidentiality and Non-Solicitation provisions contained herein (the "Restrictive Covenants") are material to the UBS and that UBS has the exclusive right to enforce the Restrictive Covenants, and, therefore, if a court or arbitration panel of competent jurisdiction rules that he or she has breached the terms of the Restrictive Covenants, each Advisor agrees that damages in the event of such breach would not be possible to ascertain and that UBS will suffer immediate and irreparable harm. Accordingly, each Advisor also agrees and expressly consents that, in addition to and without limiting any other remedy or right that it may have, UBS shall be entitled to an injunction or other equitable relief enjoining such breach or prospective breach to maintain the status quo pending the outcome of any arbitration proceeding. If any of the Restrictive Covenants or any part thereof are determined to be unenforceable because of the scope or duration of such provision, such Restrictive Covenant shall be modified so that it becomes enforceable. UBS shall not be required to post any bond in connection with the foregoing.

## DAMAGES

In the event that any Advisor breaches any of the Restrictive Covenants contained herein, he or she understands that UBS will suffer damages that would not be possible to ascertain  at the time of such breach, including but not limited to: (a) costs related to investigating, monitoring or remedying the misuse of Confidential Information; (b) costs related to maintaining, restoring or repairing UBS's relationship with its clients; (c) revenue lost from client assets transferred or diverted from UBS to competitor; (d) revenue lost due to decreased use of UBS services; (e) costs related to replacing employees, including recruiting, hiring and training replacement employees; and (f) lost productivity. In the event that an Advisor violates any of the Restrictive Covenants contained herein, he/she agrees to pay UBS one hundred percent (100%) of the Trailing-12 months gross commission production generated on Shared Client assets transferred from UBS to another broker-dealer or investment advisory firm for any Shared Client who was solicited or interfered with in violation of this Agreement and/or where any Confidential Information was used or disclosed in violation of this Agreement.  For purposes of this Agreement, "Trailing-12 months gross commission production" shall be defined as the total aggregate amount of commissions and fees generated on client assets during the preceding twelve (12) month period prior to the Shared Client assets transferring from UBS as determined by UBS in its sole discretion.

It is agreed and understood that UBS is not seeking a double recovery with respect to the application of the liquidated damages provision contained herein and that UBS does not and will not seek damages in an amount greater than 100 percent (100%) of the Trailing-12 months gross commission production agreed to herein as its liquidated damages. For purposes of clarification, if



an Advisor breaches the Restrictive Covenants in both the Confidentiality and Non-Solicitation provisions of this Agreement, UBS will be entitled to a total of one hundred percent (100%) of the Trailing-12 months gross commission production transferred from UBS notwithstanding its right to liquidated damages under both the Confidentiality and Non-Solicitation provisions contained herein. The Advisors agree that these formulas represent reasonable estimates of the compensatory damages that UBS will incur as a result of violations of the Restrictive Covenants and do not constitute a penalty.  These liquidated damages are in addition to any other non-compensatory remedy that UBS may be entitled to, including but not limited to injunctive relief and/or punitive damages.

## <u>OTHER TERMS AND CONDITIONS</u>

UBS is not a party to this Agreement.  However, given the highly-regulated nature of the UBS' business and its obligations to the  Shared Clients serviced by the Advisors, UBS may in its sole discretion terminate or modify the Agreement and resolve disputes as it deems necessary and appropriate.  UBS is a third party beneficiary of this Agreement with the exclusive right to enforce the Confidentiality and Non-Solicitation provisions and those provisions shall survive any termination of the Agreement.

Nothing in this Agreement modifies or alters any UBS policies, including without limitation the Employee Handbook, Account Reassignment Policy or Code of Conduct. The Advisors' employment with UBS remains at all times "at will," which means that their employment may be terminated at any time and for any reason by them or UBS.

This Agreement contains all of the terms of the agreement between the Advisors and supersedes all prior written or oral agreements relating to the subject matter of the Agreement. This Agreement may not be amended unless such amendment is made in writing and executed by all of the Advisors and approved by UBS management. No waiver of any breach of any term will be construed as a waiver of any subsequent breach of such term or any other term.

Each Advisor acknowledges that he/she may have entered, or may in the future enter, into other agreements with UBS or any of its related entities that contain confidentiality and/or non-solicitation obligations.  Each Advisor understands and agrees that the Confidentiality and Non-Solicitation provisions in this Agreement are in addition to, and not in lieu of, any other such agreements (including equity plan documents), all of which will remain in full force and effect.  If there is a conflict between a provision in this Agreement and a provision in any other agreement, the provision that gives the greater protection to UBS shall govern.

This Agreement is not intended to create a legal partnership, joint venture or any other legal entity.

The provisions of this Agreement are severable and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the other provisions.

This agreement shall be governed by the laws of the State of New York without reference to principles of conflict of laws.

All controversies or claims arising out of or relating to this Agreement, or its construction, performance or breach shall be brought before the Financial Industry Regulatory Authority (FINRA) in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes.

For Internal Use Only



## FA-PWA/FOC Partnering Agreement
### Exhibit 'A'
**I. Client/Prospect details**

**Is this agreement pertaining to a ☒client or a ☐prospect?**

**Does this client/prospect have a net worth of $100m+ and therefore qualify for enhanced payout option?  ☐Yes ☒No**

**Client/Prospect Name:** ___Raymond  J. Persia___

**Client/Prospect Company Affiliation:** _____

**Client/Prospect Address:** _____

**New Split ID:** ___Y5S3___   Must be created at time of account opening or before additional funding to existing accounts.

**Please choose one of the following (refer to page 9):**

☐Refer and Stay Involved          ☐Refer and Step Away

| Account Number | Base Revenue [1] (if applicable) |
|---|---|
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

[1]   **Only if applicable.**  Base revenue is the **monthly historical average** from the 24 months *prior to the partnering agreement*. (for example, account generated $1,000 in revenue, per month, for the 24 months prior to agreement. Base revenue is **$1,000** ($1,000 x 24 months / 24 months = average).

6

 **UBS**

## II.  Parties

This Financial Advisor-Private Wealth Advisor/Family Office Consultant partnering agreement (the "Agreement") is made and entered on the

_____24th_____ day of _____May_____ , 2023, by and between:

| **Names of Financial Advisor(s)** | **FAID** | **Names of Private Wealth Advisor(s)** | **FAID** |
|---|---|---|---|
| ("Financial Advisor" or "FA" or "Private Wealth Advisor" or "PWA") | | ("Private Wealth Advisor" or "PWA"; "Family Office Consultant" or "FOC") | |
| 1. John Sicklesteel  24.215% | DE71 | 1. Leslie Lauer 15% | Y5LL |
| 2. Michael Lau    24.215% | DE05 | 2. Rebecca Glasgow 15% | Y5RG |
| 3. Patricia Whitney  .895 % | TZPW | 3. Curt Rubinas 15% | Y5CR |
| 4. Michael Belknap  .675 % | TZ5J | 4. Joshua Young (OH)    5 % | NVJY |
| 5. | | 5. | |

**Location of Branch:**  various
**Branch Code:**  _____

**Location of Branch:**  Atlanta, GA
**Branch Code:**  Y5

## Financial Advisors/ Private Wealth Advisors:

John Sicklesteel
**Financial Advisor #1 [Print]**
**X** *John P Sicklesteel*
Financial Advisor #1 [Signature]
6/2/23
Date:

Michael Lau
**Financial Advisor #2 [Print]**
**X** *Michael W Lau*
Financial Advisor #2 [Signature]
06/02/2023
Date:

Patricia Whitney
**Financial Advisor #3 [Print]**
**X** *Patricia Whitney*
Financial Advisor #3 [Signature]
6/2/23
Date:

Michael Belknap
**Financial Advisor #4 [Print]**
**X** *Michael Belknap*
Financial Advisor #4 [Signature]
6/2/23
Date:

Joshua Young
**Financial Advisor #5 [Print]**
**X**
Financial Advisor #5 [Signature]

**Branch Office Manager [Print]**
**X**
Branch Office Manager [Signature]

7

**UBS**

Date: _____          Date: _____

**Private Wealth Advisors/Family Office Consultants:**

Leslie Lauer
_____
**Private Wealth Advisor #1 [Print]**

APPROVED
By le03283 at 12:04 pm, Jun 05, 2023

Private Wealth Advisor #1 [Signature]

Date: _____

Rebecca Glasgow
_____
**Private Wealth Advisor #2 [Print]**

X  APPROVED
By Rebecca Glasgow at 2:08 pm, Jun 05, 2023

Private Wealth Advisor #2 [Signature]

Date: _____

Curt Rubinas
_____
**Private Wealth Advisor #3 [Print]**

X  *Wayne C Rubinas*
Private Wealth Advisor #3 [Signature]

6/5/2023
Date: _____

_____
**Private Wealth Advisor #4 [Print]**

X _____
Private Wealth Advisor #4 [Signature]

Date: _____

_____
**Private Wealth Advisor #5 [Print]**

X _____
Private Wealth Advisor #5 [Signature]

Date: _____

Lane Strumlauf
_____
**PWM Market Head [Print]**

X _____
PWM Market Head [Signature]

6/8/2023
Date: _____

**Approval by UHNW Management**

_____
**Head UHNW Americas or Delegate [Print]**

X _____          _____
Head UHNW Americas or Delegate [Signature]   Date:

**PWM and WM Market Leadership:**

PLEASE SCAN AND RETAIN A COPY OF THE SIGNED AGREEMENT WITH A FINAL COPY TO THE UHNW
CLIENT ENGAGEMENT & DEVELOPMENT TEAM



## III. Shared Client Model Incentive Structures

**Partnering Structure**

**<u>Refer and Stay Involved</u>**

Where  FA and PWA/FOC *partner in responsibilities* for ongoing client relationship management:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
| --- | --- | --- |
| | **PWA/FOC** | **FA** |
| **Ongoing** | 50% | 50% |

**<u>Refer and Step Away</u>**

Where FA *shifts responsibilities* of ongoing client relationship management, operations and servicing to PWA/FOC by referring the client relationship and stepping away going forward:

FA and PWA/FOC agree to the sharing of Shared Client Revenue in excess of the Base Revenue Amount as set forth below:

| Time period | Sharing of gross commissions, assets, net new asset credit and expenses in excess of base revenue | |
| --- | --- | --- |
| | **PWA/FOC** | **FA** |
| **Year 1** | 50% | 50% |
| **Year 2** | 50% | 50% |
| **Years 3+** | 60% | 40% |

**<u>Note</u>**: All advisors will be paid in accordance to their applicable UBS Financial Advisor compensation plan except in instances where an FA partners with a PWA/FOC for $100mm+ net worth clients. In such instances, the FA will be paid at 50% grid rate.

For Internal Use Only