**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

LINDA SUE HINTON,

     Plaintiff,

-vs-

     CASE NO.

EQUIFAX INFORMATION
SERVICES LLC, TRANS UNION
LLC, and U.S. BANK, N.A.,

     Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, LINDA SUE HINTON (hereinafter "Plaintiff"), by and through her undersigned counsel, for her cause of action against Defendants, EQUIFAX INFORMATION SERVICES LLC ("Equifax"), TRANS UNION LLC ("Trans Union"), and U.S. BANK, N.A. ("US Bank") (hereinafter collectively "Defendants"), and in support thereof respectfully alleges violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

## PRELIMINARY STATEMENT

1.    This is an action for actual damages, statutory damages, punitive damages, costs, and attorney's fees brought pursuant to the FCRA.

2.     Today in America there are three major consumer reporting agencies, Equifax Information Services, LLC (hereinafter "Equifax"), Trans Union LLC (hereinafter "Trans Union"), and Experian Information Solutions, Inc. (hereinafter "Experian") (hereinafter collectively "CRAs").

3.     Consumer reporting agencies that create consumer reports, like Equifax, Experian, and Trans Union are charged with using reasonable procedures designed to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities, particularly where a consumer makes a dispute about information reported.

4.     When a consumer like Plaintiff disputes information through the agencies, those disputes are transmitted to the party furnishing the information. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

5.     This is an action alleging Defendants violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. (FCRA) by producing and selling credit reports inaccurately reporting Plaintiff as "deceased", and thereby failing to follow policies and procedures to ensure the maximum possible accuracy of the credit report it produced and sold, as Plaintiff was of course very much alive.

6. The FCRA creates a private right of action against a consumer reporting agency for the negligent, 15 U.S.C. § 1681o, or willful, 15 U.S.C. § 1681n, violation of any duty imposed by the FCRA. *Alexander v. Certegy Check Servs.*, No. 8:16-CV-859-17JSS, 2016 U.S. Dist. LEXIS 180072, at *5 (M.D. Fla. Dec. 29, 2016) (*citing Collins v. Equifax Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir. 2015)).

7. The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017).

## JURISDICTION, VENUE, AND PARTIES

8. Jurisdiction for this Court is conferred by 28 U.S.C. § 1331, as this action involves violations of the FCRA.

9. Venue is proper for this Court pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

10. Venue is proper in this District as Equifax's principal address is in this District, Defendants transact business within this District, and a substantial portion of the violations described in this Complaint occurred in this District.

11.     Plaintiff is a natural person and resident of Warren County in the State of Kentucky.

12.     Plaintiff is a "consumer" as defined by 15 U.S.C. § 1681a(c).

13.     Equifax is a corporation headquartered at 1550 Peachtree Street, Northwest, Atlanta, Georgia 30309.

14.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681(f). Equifax is regularly engaged in the business of assembling, evaluating and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681(d) to third parties.

15.     Equifax disburses such consumer reports to third parties under contract for monetary compensation.

16.     Trans Union is a corporation with its principal place of business in the State of Illinois and is authorized to do business in the State of Georgia through its registered agent, Corporation Service Company located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

17.     Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681(d) to third parties.

18.     Trans Union disburses such consumer reports to third parties under contract for monetary compensation.

19.     US Bank is a FDIC-insured national bank headquartered at 425 Walnut Street in Cincinnati, Ohio 45202 that conducts business in the State of Georgia.

20.     US Bank is a "furnisher of information" as that term is used in 15 U.S.C § 1681s-2.

21.     US Bank furnished inaccurate information about Plaintiff to the CRAs.

## FACTUAL ALLEGATIONS

22.     Plaintiff has a revolving credit account with US Bank, partial account no. 403784107360xxxx.

23.     Plaintiff has an installment loan account with US Bank, partial account no. 55802xxxx.

24.     Plaintiff made timely payments throughout the history of US Bank, partial account no. 403784107360xxxx, always making the monthly minimum payment amount and oftentimes making more than one payment in a month.

25.     In April 2023, Plaintiff made three (3) payments on US Bank, partial account no. 403784107360xxxx, totaling $325.00.

26.     Plaintiff made timely payments throughout the history of US Bank, partial account no. 55802xxxx.

27.     On or about May 2023, Plaintiff attempted to make a payment to US Bank, partial account no. 403784107360xxxx, through the US Bank application. However, Plaintiff was unable to make payment because US Bank, partial account no. 403784107360xxxx, had been removed, and she was blocked from making payment on that account.

28.     However, on or about May 2023, Plaintiff was able to make payment on her other account, US Bank, partial account no. 55802xxxx, without any issue.

29.     Since she was unable to make payment through the banking application, on or about May 2023, Plaintiff contacted US Bank to make a payment and was informed that the account was closed because they had a received a death certificate for Plaintiff, Therefore, Plaintiff was told US Bank, partial account no. 403784107360xxxx, was closed due to Plaintiff being deceased. Plaintiff advised US Bank that she was alive and well and requested to make a payment on US Bank, partial account no. 403784107360xxxx.

30.     US Bank denied Plaintiff's request to correct the deceased reporting and refused to take payment on US Bank, partial account no. 403784107360xxxx.

31.     Utterly confused, Plaintiff reviewed the history of her Trans Union and Equifax credit files through Credit Karma.

32.    Upon review of her Trans Union credit report dated March 6, 2023, Plaintiff observed that as of at least February 28, 2023, Trans Union was reporting US Bank, partial account no. 403784107360xxxx, with a status of open, in good standing, with a "deceased" remark, and most recent payment made on February 21, 2023. Upon further review, Trans Union was reporting the separate US Bank, partial account no. 55802xxxx with a status of open, in good standing, without any other remarks. and most recent payment on February 14, 2023. Further, Trans Union was reporting Plaintiff with a **credit score of 1**.

33.    Plaintiff observed that as of April 20, 2023, Trans Union was still reporting US Bank, partial account no. 403784107360xxxx as open, in good standing, with a "deceased" remark with the last reported date of payment as still February 28, 2023. Interestingly, the loan account, US Bank, partial account no. 55802xxxx, continued to be reported with a status of open in good standing, as of March 31, 2023, without any other remarks and most recent payment on March 14, 2023. This payment date fell after the date Trans Union reported Plaintiff as deceased on the other account, US Bank, partial account no. 403784107360xxxx. Further, Trans Union continued to report Plaintiff with a credit score of 1.

34.    In reviewing her Trans Union credit history further, Plaintiff observed that as of the May 3, 2023, credit report, US Bank, partial account no.

403784107360xxxx was reported as open, in good standing and the "deceased" remark had been removed and still had a last reported date of February 28, 2023, even though Plaintiff had made payments since that last reporting date. Her other account, US Bank, partial account no. 55802xxxx, remained unchanged from the April 20, 2023, report. However, Trans Union was now reporting Plaintiff as having a credit score of 767.

35.     Upon review of her Equifax credit history, Plaintiff observed that on the March 6, 2023, report, Equifax reported both the US Bank, partial account no. 403784107360xxxx, and the US Bank, partial account no. 55802xxxx, as open and in good standing. Equifax was not reporting any "deceased" remarks, and Plaintiff had a credit score of 812.

36.     Upon further review of her credit history, Plaintiff observed that on the April 21, 2023, report, Equifax continued to report both US Bank, partial account no. 403784107360xxxx, and US Bank, partial account no. 55802xxxx, as open and in good standing. Equifax was not reporting any "deceased" remarks, and Plaintiff had a credit score of 782.

37.     Continuing to review her credit history, Plaintiff observed that on the May 3, 2023, report, Equifax continued to report both the US Bank, partial account no. 403784107360xxxx, and the US Bank, partial account no. 55802xxxx, as open

and in good standing. Equifax was not reporting any "deceased" remarks, and Plaintiff had a credit score of 782.

38.     Additionally, Plaintiff reviewed her Equifax credit score history and on June 11, 2023, Plaintiff's credit score had dropped 111 points to 666.

39.     On or about June 22, 2023, Plaintiff obtained copies of her Equifax and Trans Union credit reports and upon review learned that US Bank, partial account no. 403784107360xxxx, was being reported with an owner as "Undesignated Account" and with a status of charge off and a balance of $8987. The last payment received was in April 2023. It was also reported that timely payments were made from the opening of the account through February 2023, the first date of delinquency was February 2023, and the date of closing and charge off was March 2023. Her other account, US Bank, partial account no. 55802xxxx, continued to be reported as open and pays as agreed.

40.     The reported date of the charge off of US Bank, partial account no. 403784107360xxxx correlates with the initial date that Trans Union reported Plaintiff as deceased.

41.     Further, it is hard to understand how Equifax and Trans Union could simultaneously report a timely payment and a delinquent payment at the same time as well as a charge off shortly after timely payment was made.

42.     As a result of the major inaccuracy on her Equifax and Trans Union credit reports, on July 7, 2023, Plaintiff mailed a detailed written dispute letter to Equifax and Trans Union concerning the erroneous reporting. Plaintiff made Defendants aware that she was very much alive and well. Plaintiff included an image of her driver's license to confirm her identity. Additionally, Plaintiff included images of her confirmed payments in April 2023, images from her credit report of the inaccurate reporting, a copy of a letter from DCM Services regarding her estate, and an image of herself with a recent newspaper as proof that she was alive and well.

43.     Plaintiff mailed her detailed written dispute letter via USPS Certified Mail to Equifax (9589 0710 5270 1059 9111 53) and Trans Union (9589 0710 5270 1059 9111 46).

44.     On August 2, 2023, Trans Union responded to Plaintiff's written dispute letter by stating the US Bank Account was "VERIFIED AS ACCURATE".

45.     Trans Union failed to do any independent investigation into Plaintiff's dispute, but rather parroted the inaccurate information it received from the furnisher, US Bank.

46.     Trans Union never attempted to contact Plaintiff during the alleged investigation.

47.    Upon information and belief, Trans Union notified US Bank of Plaintiff's written dispute. However, US Bank failed to conduct a reasonable investigation and merely compared its own erroneous data.

48.    On August 4, 2023, Equifax responded to Plaintiff's written dispute letter by stating the US Bank Account was "VERIFIED AS ACCURATE".

49.    Equifax failed to do any independent investigation into Plaintiff's dispute, but rather parroted the inaccurate information it received from the furnisher, US Bank.

50.    Equifax never attempted to contact Plaintiff during the alleged investigation.

51.    Upon information and belief, Equifax notified US Bank of Plaintiff's written dispute. However, US Bank failed to conduct a reasonable investigation and merely compared its own erroneous data.

52.    On August 10, 2023, Plaintiff obtained copies of her Equifax and Trans Union credit reports and observed that the US Bank, partial account no. 403784107360xxxx continued to be reported with an owner as "Undesignated Account" and with a status of charge off and a balance of $8987. The last payment received was in April 2023. It was also reported that timely payments were made from the opening of the account through February 2023, the first date of delinquency

was February 2023, and the date of closing and charge off was March 2023. Her other account, US Bank, partial account no. 55802xxxx, continued to be reported as open and pays as agreed.

53.     When Plaintiff was first unable to make a payment online for US Bank, partial account no. 403784107360xxxx, Plaintiff visited a US Bank branch to make a payment in person. The teller at the branch informed that she could not explain why the US Bank, partial account no. 403784107360xxxx, was charged off and could see Plaintiff was current on payments up until the charge off. The teller advised that US Bank would contact Plaintiff for payment. As of the filing of this Complaint, US Bank has not contacted Plaintiff for payment on US Bank, partial account no. 403784107360xxxx.

54.     Since May 2023, Plaintiff has made multiple times to make a payment, but US Bank has continually refused to take payment on US Bank, partial account no. 403784107360xxxx.

55.     Most recently, on August 10, 2023, Plaintiff called US Bank to make a payment on US Bank, partial account no. 403784107360xxxx. Plaintiff was transferred approximately four to five times before being connected to a supervisor who refused to accept payment and offered to "look into" this to try to resolve it. This was not the first time a supervisor stated they would "look into" the issue.

56.     Interestingly, US Bank has continued to accept timely payments on her other account, US Bank, partial account no. 55802xxxx, which is reported by both Trans Union and Equifax with a status of open, paid as agreed, and was never a charge off.

57.     Since Plaintiff has been unsuccessful with getting the US Bank, partial account no. 403784107360xxxx, corrected, Plaintiff recently applied for a Prosper credit card. On or about August 8, 2023, Prosper denied Plaintiff's application due to her credit file.

58.     Defendants failed to do any investigation about Plaintiff's disputes.

59.     Defendants have never made any efforts to contact Plaintiff about her disputes.

60.     As of the filing of this Complaint, Equifax and Trans Union continue to report negative information on Plaintiff's credit report regarding the US Bank Account, and Plaintiff's damages are on-going.

61.     Plaintiff continues to suffer as of the filing of this Complaint with Defendants' reluctance to conduct a thorough investigation or otherwise make her credit file accurate.

62.     As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

i.   Monies lost by attempting to fix her credit;

ii.   Loss of time attempting to cure the errors;

iii.   Mental anguish, added stress, aggravation, embarrassment, sleepless nights, and other related impairments to the enjoyment of life; Plaintiff is being physically affected by Defendants' actions and/or inactions;

iv.   Reduction in credit score;

v.   Denials for new lines of credit;

vi.   Apprehensiveness to apply for credit due to the fear of rejection; and

vii.   Defamation as Defendants published inaccurate information to third party entities.

viii.   Plaintiff has suffered damages in the form of wasted time, paid postage, paper, and ink.

## <u>COUNT I</u>
### Violation of 15 U.S.C. § 1681e(b) as to
### Defendant, Equifax Information Services LLC (Negligent)

63.   Plaintiff re-alleges and re-incorporates paragraphs one (1) through sixty-two (62) as if fully stated herein.

64.     Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure the maximum possible accuracy in the preparation of the credit report and credit files it published and maintains concerning Plaintiff.

65.     Upon information and belief, Equifax prevents its agents from calling consumers, like Plaintiff, during the dispute process or from calling witnesses with knowledge about the dispute.

66.     The FCRA requires that Equifax must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

67.     At all times pertinent hereto, the conduct, action, and/or inaction of Equifax, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

68.     As a direct result of this conduct, action and/or inaction of Equifax, Plaintiff suffered damages, including without limitation, by loss of the ability to benefit from lower interest rates; denials for new lines of credit; mental and emotional pain stemming from the anguish, humiliation, and apprehension in applying for credit; and the damages otherwise outlined in this Complaint.

69.    The conduct, action, and/or inaction of Equifax was negligent, entitling Plaintiff to recover actual damages under 15 USC § 1681o.

70.    Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 USC § 1681o.

WHEREFORE, Plaintiff, LINDA SUE HINTON, respectfully requests that this Court award actual damages against Defendant, EQUIFAX INFORMATION SERVICES LLC, jointly and severally; award Plaintiff her attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

## COUNT II
### Violation of 15 U.S.C. § 1681e(b) as to
### Defendant, Equifax Information Services LLC (Willful)

71.    Plaintiff re-alleges and re-incorporates paragraphs one (1) through sixty-two (62) as if fully stated herein.

72.    Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure the maximum possible accuracy in the preparation of the credit report and credit files it published and maintains concerning Plaintiff.

73.     Upon information and belief, Equifax prevents its agents from calling consumers, like Plaintiff, during the dispute process or from calling witnesses with knowledge about the dispute.

74.     The FCRA requires that Equifax must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

75.     At all times pertinent hereto, the conduct, action, and/or inaction of Equifax, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

76.     As a direct result of this conduct, action and/or inaction of Equifax, Plaintiff suffered damages, including without limitation, by loss of the ability to benefit from lower interest rates; denials for new lines of credit; mental and emotional pain stemming from the anguish, humiliation, and apprehension in applying for credit; and the damages otherwise outlined in this Complaint.

77.     The conduct, action, and/or inaction of Equifax was willful, entitling Plaintiff to recover actual or statutory damages and punitive damages under 15 USC § 1681n.

78.     Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 USC § 1681n.

WHEREFORE, Plaintiff, LINDA SUE HINTON, respectfully requests that this Court award actual or statutory damages and punitive damages against Defendant, EQUIFAX INFORMATION SERVICES LLC, jointly and severally; award Plaintiff her attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

## COUNT III
### Violation of 15 U.S.C. § 1681i as to
### Defendant, Equifax Information Services LLC (Negligent)

79.     Plaintiff re-alleges and re-incorporates paragraphs one (1) through sixty-two (62) as if fully stated herein.

80.     After receiving Plaintiff's disputes, Equifax violated 15 U.S.C. § 1681i by: (1) failing to delete inaccurate information in Plaintiff's credit file after receiving notice of such inaccuracies; (2) failing to conduct a lawful reinvestigation; (3) failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file, and (4) relying upon verification from a source it has to know is unreliable.

81.     Despite the large amount of information and documentation produced by Plaintiff demonstrating the inaccurate reporting, Equifax refused to conduct any independent investigations into Plaintiff's disputes and simply transferred the duty to investigate to and parroted the information provided by the furnisher, US Bank.

82.     As a direct result of this conduct, action and/or inaction of Equifax, Plaintiff suffered damages, including without limitation, by loss of the ability to benefit from lower interest rates; denials for new lines of credit; mental and emotional pain stemming from the anguish, humiliation, and apprehension in applying for credit; and the damages otherwise outlined in this Complaint.

83.     The conduct, action, and/or inaction of Equifax was negligent, rendering it liable for actual damages in an amount to be determined by the Court pursuant to 15 USC § 1681o.

84.     Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

WHEREFORE Plaintiff, LINDA SUE HINTON, respectfully requests that this Court award actual damages against Defendant, EQUIFAX INFORMATION SERVICES LLC, jointly and severally; award Plaintiff her attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

**COUNT IV**
**Violation of 15 U.S.C. § 1681i as to**
**Defendant, Equifax Information Services LLC (Willful)**

85.    Plaintiff re-alleges and re-incorporates paragraphs one (1) through sixty-two (62) as if fully stated herein.

86.    After receiving Plaintiff's disputes, Equifax violated 15 U.S.C. § 1681i by: (1) failing to delete inaccurate information in Plaintiff's credit file after receiving notice of such inaccuracies; (2) failing to conduct a lawful reinvestigation; (3) failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file, and (4) relying upon verification from a source it has to know is unreliable.

87.    Despite the large amount of information and documentation produced by Plaintiff demonstrating the inaccurate reporting, Equifax refused to conduct any independent investigations into Plaintiff's disputes and simply transferred the duty to investigate to and parroted the information provided by the furnisher, US Bank.

88.    As a direct result of this conduct, action and/or inaction of Equifax, Plaintiff suffered damages, including without limitation, by loss of the ability to benefit from lower interest rates; denials for new lines of credit; mental and emotional pain stemming from the anguish, humiliation, and apprehension in applying for credit; and the damages otherwise outlined in this Complaint.

89.    The conduct, action, and/or inaction of Equifax was willful, rendering it liable for actual or statutory damages and punitive damages in an amount to be determined by the Court pursuant to 15 USC § 1681n.

90.    Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

WHEREFORE Plaintiff, LINDA SUE HINTON, respectfully requests that this Court award actual or statutory damages and punitive damages against Defendant, EQUIFAX INFORMATION SERVICES LLC, jointly and severally; award Plaintiff her attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

## COUNT V
### Violation of 15 U.S.C. § 1681e(b) as to
### Defendant, Trans Union LLC (Negligent)

91.    Plaintiff re-alleges and re-incorporates paragraphs one (1) through sixty-two (62) as if fully stated herein.

92.    Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure the maximum possible accuracy in the preparation of the credit report and credit files it published and maintains concerning Plaintiff.

93.    Upon information and belief, Trans Union prevents its agents from calling consumers, like Plaintiff, during the dispute process or from calling witnesses with knowledge about the dispute.

94.    Despite Trans Union believing that Plaintiff was dead, it published her credit report to furnishers.

95.    Moreover, Trans Union has records of timely payments on Plaintiff's open accounts, and no other furnisher ever reported to Trans Union that Plaintiff was deceased.

96.    The FCRA requires that Trans Union must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

97.    The FCRA requires that Trans Union must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b.  Trans Union, despite having access to the Social Security Death Index, refuses to cross-check individuals for accuracy of deceased reporting.

98.    Trans Union places a "deceased" notation or marking on reports when it is advised from any of their many data furnishing sources that a given consumer is deceased.

99.     Trans Union does not request or require a death certificate or any other proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

100.    Trans Union does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

101.    Indeed, Trans Union employs no procedures at all which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

102.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Trans Union employs no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

103.    Once a "deceased" mark is placed upon a consumer's report, Trans Union will not calculate and will not provide a credit score for that consumer.

104.    Trans Union has received and documented thousands of disputes from consumers complaining that Trans Union's credit reports have them erroneously marked as "deceased".

105.   Nevertheless, Trans Union employs no procedures which assure that a consumer marked as "deceased" on Trans Union's reports is, in fact, deceased.

106.   Trans Union has no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source.

107.   Nor does Trans Union employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

108.   For years after a consumer's actual death, Trans Union will continue to sell for profit credit reports about that consumer.

109.   Trans Union will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to Trans Union – meaning that nobody is continuing to buy those reports.

110.   Trans Union charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

111.   Trans Union profits from the sale of reports on the deceased.

112.   Trans Union has in their credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

113.   Trans Union knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Trans Union to be a common and major source of identity theft.

114.   Trans Union warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

115.   Trans Union has no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

116.   Indeed, Trans Union sells reports of the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

117.   For consumers who are deceased, there exists no permissible purpose under the FCRA for Trans Union to ever sell their credit reports, absent a court order.

118.   Trans Union knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

119.   At all times pertinent hereto, Trans Union was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Trans Union herein.

120.   At all times pertinent hereto, the conduct, action, and/or inaction of Trans Union, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

121.   The conduct, action, and/or inaction of Trans Union was negligent, entitling Plaintiff to recover actual damages under 15 USC § 1681o.

122.   Plaintiff is entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 USC § 1681o.

WHEREFORE, Plaintiff, LINDA SUE HINTON, respectfully requests that this Court award actual damages against Defendant, TRANS UNION LLC, jointly and severally; award Plaintiff her attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

### COUNT VI
### Violation of 15 U.S.C. § 1681e(b) as to
### Defendant, Trans Union LLC (Willful)

123.   Plaintiff re-alleges and re-incorporates paragraphs one (1) through sixty-two (62) as if fully stated herein.

124.   Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure the maximum possible accuracy in the preparation of the credit report and credit files it published and maintains concerning Plaintiff.

125.   Upon information and belief, Trans Union prevents its agents from calling consumers, like Plaintiff, during the dispute process or from calling witnesses with knowledge about the dispute.

126.   Despite Trans Union believing that Plaintiff was dead, it published her credit report to furnishers.

127.   Moreover, Trans Union has records of timely payments on Plaintiff's open accounts, and no other furnisher ever reported to Trans Union that Plaintiff was deceased.

128.   The FCRA requires that Trans Union must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

129.   The FCRA requires that Trans Union must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b.  Trans Union, despite having access to the Social Security Death Index, refuses to cross-check individuals for accuracy of deceased reporting.

130.   Trans Union places a "deceased" notation or marking on reports when it is advised from any of their many data furnishing sources that a given consumer is deceased.

131.   Trans Union does not request or require a death certificate or any other proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

132.   Trans Union does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

133.   Indeed, Trans Union employs no procedures at all which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

134.   Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Trans Union employs no procedures which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

135.   Once a "deceased" mark is placed upon a consumer's report, Trans Union will not calculate and will not provide a credit score for that consumer.

136.   Trans Union has received and documented thousands of disputes from consumers complaining that Trans Union's credit reports have them erroneously marked as "deceased".

137.   Nevertheless, Trans Union employs no procedures which assure that a consumer marked as "deceased" on Trans Union's reports is, in fact, deceased.

138.   Trans Union has no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source.

139.   Nor does Trans Union employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

140.   For years after a consumer's actual death, Trans Union will continue to sell for profit credit reports about that consumer.

141.   Trans Union will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to Trans Union – meaning that nobody is continuing to buy those reports.

142.   Trans Union charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

143.   Trans Union profits from the sale of reports on the deceased.

144.   Trans Union has in their credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

145.   Trans Union knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Trans Union to be a common and major source of identity theft.

146.   Trans Union warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

147.   Trans Union has no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

148.   Indeed, Trans Union sells reports of the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

149.   For consumers who are deceased, there exists no permissible purpose under the FCRA for Trans Union to ever sell their credit reports, absent a court order.

150.   Trans Union knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

151.   At all times pertinent hereto, Trans Union was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Trans Union herein.

152.   At all times pertinent hereto, the conduct, action, and/or inaction of Trans Union, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of the Plaintiff herein.

153.   The conduct, action, and/or inaction of Trans Union was willful, entitling Plaintiff to recover actual or statutory damages and punitive damages under 15 USC § 1681n.

154.   Plaintiff is entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 USC § 1681n.

WHEREFORE, Plaintiff, LINDA SUE HINTON, respectfully requests that this Court award actual or statutory damages and punitive damages against Defendant, TRANS UNION LLC, jointly and severally; award Plaintiff her attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

**COUNT VII**
**Violation of 15 U.S.C. § 1681i as to**

**Defendant, Trans Union LLC (Negligent)**

155.   Plaintiff re-alleges and re-incorporates paragraphs one (1) through sixty-two (62) as if fully stated herein.

156.   After receiving Plaintiff's disputes, Trans Union violated 15 U.S.C. § 1681i by: (1) failing to delete inaccurate information in Plaintiff's credit file after receiving notice of such inaccuracies; (2) failing to conduct a lawful reinvestigation; (3) failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file, and (4) relying upon verification from a source it has to know is unreliable.

157.   Despite the large amount of information and documentation produced by Plaintiff demonstrating the inaccurate reporting, Trans Union refused to conduct any independent investigations into Plaintiff's disputes and simply transferred the duty to investigate to and parroted the information provided by the furnisher, US Bank.

158.   As a direct result of this conduct, action and/or inaction of Trans Union, Plaintiff suffered damages, including without limitation, by loss of the ability to benefit from lower interest rates; denials for new lines of credit; mental and emotional pain stemming from the anguish, humiliation, and apprehension in applying for credit; and the damages otherwise outlined in this Complaint.

159.   The conduct, action, and/or inaction of Trans Union was negligent, rendering it liable for actual damages in an amount to be determined by the Court pursuant to 15 USC § 1681o.

160.   Plaintiff is entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

WHEREFORE Plaintiff, LINDA SUE HINTON, respectfully requests that this Court award actual damages against Defendant, TRANS UNION LLC, jointly and severally; award Plaintiff her attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

## COUNT VIII
### Violation of 15 U.S.C. § 1681i as to
### Defendant, Trans Union LLC (Willful)

161.   Plaintiff re-alleges and re-incorporates paragraphs one (1) through sixty-two (62) as if fully stated herein.

162.   After receiving Plaintiff's disputes, Trans Union violated 15 U.S.C. § 1681i by: (1) failing to delete inaccurate information in Plaintiff's credit file after receiving notice of such inaccuracies; (2) failing to conduct a lawful reinvestigation; (3) failing to maintain reasonable procedures with which to filter and verify disputed

information in Plaintiff's credit file, and (4) relying upon verification from a source it has to know is unreliable.

163.   Despite the large amount of information and documentation produced by Plaintiff demonstrating the inaccurate reporting, Trans Union refused to conduct any independent investigations into Plaintiff's disputes and simply transferred the duty to investigate to and parroted the information provided by the furnisher, US Bank.

164.   As a direct result of this conduct, action and/or inaction of Trans Union, Plaintiff suffered damages, including without limitation, by loss of the ability to benefit from lower interest rates; denials for new lines of credit; mental and emotional pain stemming from the anguish, humiliation, and apprehension in applying for credit; and the damages otherwise outlined in this Complaint.

165.   The conduct, action, and/or inaction of Trans Union was willful, rendering it liable for actual or statutory damages and punitive damages in an amount to be determined by the Court pursuant to 15 USC § 1681n.

166.   Plaintiff is entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

WHEREFORE Plaintiff, LINDA SUE HINTON, respectfully requests that this Court award actual or statutory damages and punitive damages against

Defendant, TRANS UNION LLC, jointly and severally; award Plaintiff her attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

**COUNT IX**
**Violation of 15 U.S.C § 1681s-2(b) as to**
**Defendant, U.S. Bank, N.A. (Negligent)**

167.   Plaintiff re-alleges and re-incorporates paragraphs one (1) through sixty-two (62) as if fully stated herein.

168.   US Bank furnished inaccurate account information to Equifax and Trans Union and through Equifax and Trans Union to all of Plaintiff's potential lenders.

169.   After receiving Plaintiff's disputes, US Bank violated 15 U.S.C. § 1681s-2(b) by (1) failing to fully and properly investigate Plaintiff's dispute of the account; (2) failing to review all relevant information regarding same; (3) failing to accurately respond to Equifax and Trans Union; and (4) failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the representations to CRAs.

170.   US Bank violated 15 U.S.C. § 1681s-2(b) by continuing to furnish inaccurate information to CRAs after it had been notified that the information it was furnishing was inaccurate.

171.   US Bank did not have a reasonable basis to believe that the account status it was reporting as to Plaintiff was accurate. It also had sufficient evidence by which to have verified that US Bank, partial account no. 403784107360xxxx, was paid as agreed, including information provided to US Bank by Plaintiff in connection with her disputes of US Bank, partial account no. 403784107360xxxx, in question. Instead, it knowingly chose to follow procedures which did not review, confirm, or verify the correct pay status.

172.   As a result of the conduct, action, and/or inaction of US Bank, Plaintiff suffered damages, including without limitation, by loss of the ability to benefit from lower interest rates; denials for new lines of credit; mental and emotional pain stemming from the anguish, humiliation, and apprehension in applying for credit; and the damages otherwise outlined in this Complaint.

173.   The conduct, action, and/or inaction of US Bank was negligent, rendering it liable for actual damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

174.   Plaintiff is entitled to recover reasonable attorney's fees and costs from US Bank in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

WHEREFORE Plaintiff, LINDA SUE HINTON, respectfully requests that this Court award actual damages against Defendant, U.S. BANK, N.A., jointly and

severally; award Plaintiff her attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

### COUNT X
### Violation of 15 U.S.C § 1681s-2(b) as to
### Defendant, U.S. Bank, N.A. (Willful)

175.   Plaintiff re-alleges and re-incorporates paragraphs one (1) through sixty-two (62) as if fully stated herein.

176.   US Bank furnished inaccurate account information to Equifax and Trans Union and through Equifax and Trans Union to all of Plaintiff's potential lenders.

177.   After receiving Plaintiff's disputes, US Bank violated 15 U.S.C. § 1681s-2(b) by (1) failing to fully and properly investigate Plaintiff's dispute of the account; (2) failing to review all relevant information regarding same; (3) failing to accurately respond to Equifax and Trans Union; and (4) failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the representations to CRAs.

178.   US Bank violated 15 U.S.C. § 1681s-2(b) by continuing to furnish inaccurate information to CRAs after it had been notified that the information it was furnishing was inaccurate.

179.   US Bank did not have a reasonable basis to believe that the account status it was reporting as to Plaintiff was accurate. It also had sufficient evidence by which to have verified that US Bank, partial account no. 403784107360xxxx, was paid as agreed, including information provided to US Bank by Plaintiff in connection with her disputes of US Bank, partial account no. 403784107360xxxx, in question. Instead, it knowingly chose to follow procedures which did not review, confirm, or verify the correct pay status.

180.   As a result of the conduct, action, and/or inaction of US Bank, Plaintiff suffered damages, including without limitation, by loss of the ability to benefit from lower interest rates; denials for new lines of credit; mental and emotional pain stemming from the anguish, humiliation, and apprehension in applying for credit; and the damages otherwise outlined in this Complaint.

181.   The conduct, action, and/or inaction of US Bank was willful, rendering it liable for actual or statutory damages and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

182.   Plaintiff is entitled to recover reasonable attorney's fees and costs from US Bank in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

WHEREFORE Plaintiff, LINDA SUE HINTON, respectfully requests that this Court award actual or statutory damages and punitive damages against

Defendant, U.S. BANK, N.A., jointly and severally; award Plaintiff her attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, LINDA SUE HINTON, demands judgment for actual, statutory, compensatory, and punitive damages against Defendants, EQUIFAX INFORMATION SERVICES LLC, TRANS UNION LLC, and U.S. BANK, N.A., jointly and severally; attorneys' fees and costs; prejudgment and post-judgment interest at the judgment rate; and such other relief the Court deems just and proper.

DATED this 28th day of August, 2023.

Respectfully submitted,

/s/ *Octavio Gomez*
Octavio "Tav" Gomez, Esq.
Florida Bar #: 0338620
Georgia Bar #: 617963
Pennsylvania Bar #: 325066
The Consumer Lawyers PLLC
412 E. Madison St. Ste 916
Tampa, Florida 33602

Cell: (813) 299-8537
Facsimile: (844) 951-3933
Primary Email:
Tav@theconsumerlawyers.com
Secondary Email:
Lisa@theconsumerlawyers.com
*Attorney for Plaintiff*