# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**SECURITIES AND EXCHANGE COMMISSION,**

      **Plaintiff,**

      **v.**

**WILLIAM V. CONN, JR.,**

      **Defendant.**

**Civil Action No. _____**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, the Securities and Exchange Commission ("Commission" or "SEC"), alleges the following:

## SUMMARY

1.      For over a decade, Defendant William V. Conn, Jr. aided and abetted the perpetration of a massive Ponzi scheme by his close friend John Woods.  The scheme raised more than $100 million from 400 investors, many of whom were elderly retirees.  When the scheme unraveled, investors suffered millions of dollars in losses, and many lost their life savings.

2.      Woods ran the fraudulent scheme using an investment fund that he

created and controlled called Horizon Private Equity, III, LLC ("Horizon III"). Many

of the victims in Horizon III were preyed upon by investment adviser representatives

at Southport Capital ("Southport"), a registered investment adviser firm that Woods

also owned and controlled.

3.      Woods and other Southport advisers made numerous false statements to

induce clients to invest in Horizon III, and they did not disclose that Horizon III was

using investor funds to pay the purported returns to earlier investors. They also failed

to disclose the millions of dollars in investor funds that they personally received or

used for their own benefit.

4.      Conn was crucial to the Horizon III scheme. As a registered

representative of a dually registered broker-dealer and investment adviser, Woods'

employer would not permit him to run Horizon III. To conceal his operation of the

fund, Woods recruited Conn, his close friend of many years, to be the publicly-named

manager of Horizon III.

5.      Conn agreed, and for more than a decade Conn was listed in various

documents as the manager of Horizon III, including the private placement

memorandum for the fund. In reality, Conn was the manager of Horizon III only on

paper. He did not perform any of the duties typically handled by a fund manager.

6.      Conn also actively aided Woods' efforts to conceal his control over

-2-

Horizon III.  Conn met with one of Woods' supervisors and led him to believe that Conn was running Horizon III; Conn personally signed numerous documents as the "manager" of Horizon III; and Conn provided Woods with a biography of himself knowing it would be used to convince potential Horizon III investors to invest in the fund.  Conn was thus instrumental in enabling Woods secretly to run Horizon III.

7.      In addition to aiding and abetting the Horizon III scheme, Conn also orchestrated his own fraudulent scheme using an investment fund called Horizon Private Equity, LLC ("Horizon I").

8.      Conn formed Horizon I and controlled every aspect of the fund.  The private placement memorandum for Horizon I stated that the fund was "formed for the purpose of collectively investing in selected hedge funds."  In total, Conn, who is an accountant, persuaded 21 of his clients to invest nearly $2 million in Horizon I.

9.      From 2012-2022, Conn repeatedly misappropriated and misused Horizon I funds.  Conn used more than $500,000 to support his accounting business and pay personal expenses; he spent more than $380,000 to pay expenses related to a failed real estate development project; and, after transferring Horizon I funds into other accounts under his control, he wrote checks totaling $600,000 to a dozen women who had no business reason to receive Horizon I funds.  In addition, Conn used Horizon I funds to purchase a condominium that he used for his own benefit.

10.     Conn did not disclose these payments to investors in Horizon I, and they are contrary to the representations made in the private placement memorandum for the fund.

## **VIOLATIONS**

11.     Conn has engaged in acts or practices, or aided and abetted, and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute, or will aid and abet violations of Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)]; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## **JURISDICTION AND VENUE**

12.     The Commission brings this action pursuant to Sections 15, 20, and 22 of the Securities Act [15 U.S.C. §§ 77o(b), 77t, and 77v]; Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)]; and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14] to enjoin Conn from engaging in the

transactions, acts, practices, and courses of business alleged in this Complaint, and

transactions, acts, practices, and courses of business of similar purport and object, for

disgorgement plus prejudgment interest, for civil penalties, and for other equitable

relief.

13.     This Court has jurisdiction over this action pursuant to Section 22 of the

Securities Act [15 U.S.C. § 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange

Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)], Section 214 of the Advisers Act [15

U.S.C. § 80b-14(a)], and 28 U.S.C. § 1331.

14.     Venue is proper in this Court under Section 22(a) of the Securities Act

[15 U.S.C. § 77v], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa], Section 214

of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1391.

15.     Conn, directly and indirectly, made use of the mails, and the means and

instrumentalities of interstate commerce in connection with the transactions, acts,

practices, and courses of business alleged in this complaint.

16.     Certain of the transactions, acts, practices, and courses of business

constituting violations of the Advisers Act, Securities Act, and the Exchange Act

occurred in the Northern District of Georgia.  Among other things, Conn resides,

works, and engaged in fraudulent conduct in this judicial district.  In addition, Conn

recommended that clients invest in Horizon I, which has its principal place of

business in this judicial district, and the fraudulent Horizon III scheme was orchestrated and carried out from within this judicial district.

17.     Conn, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this Complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## DEFENDANT

18.     **William V. Conn, Jr.**, age 71, is a resident of Sandy Springs, GA. Conn is a licensed CPA and owns the accounting firm William Conn & Company, P.C. ("Conn & Co.").  Conn served as manager of Horizon I, and was also the named manager of Horizon III.  Conn testified twice during the SEC's investigation in this matter, asserting his Fifth Amendment right against self-incrimination the second time.

## RELEVANT THIRD PARTIES

19.     **John J. Woods**, age 57, is a resident of Marietta, Georgia.  Woods had been the majority owner and in control of the operations of Southport since approximately 2008.  From 2008 to 2016, Woods concealed his ownership of and control over Southport because, during that time, he was a registered representative at an institutional, dually registered broker-dealer and investment adviser firm

("the Institutional Investment Adviser"), which was unaware of his involvement with Southport.  Woods also concealed his control over Horizon III from the Institutional Investment Adviser.

20.     In August 2021, the Commission charged Woods with multiple counts of securities fraud based on his role in orchestrating the Horizon III Ponzi scheme. *See SEC v. Woods, et al.*, Civil Action No. 1:21-cv-3413-SDG (N.D. Ga.).  On March 8, 2023, the Court entered by consent a judgment that imposed injunctive relief against Woods.  The Commission's claims for monetary relief against Woods remain pending.

21.     On March 23, 2023, Woods pled guilty based on his conduct related to the Horizon III scheme to one count of wire fraud, in violation of 18 U.S.C. § 1343. *See United States v. Woods,* Criminal Action No. 1:23-cr-64-SEG (N.D. Ga.).  Woods is awaiting sentencing in that case.

22.     **Livingston Group Asset Management Company d/b/a Southport Capital** is a Delaware corporation with its principal place of business in Chattanooga, Tennessee.  At all relevant times, Southport was an SEC-registered investment adviser, and, as of March 2021, the firm reported assets under management of $824 million.  Woods was the President and majority owner of Southport.  Southport was a defendant in the case captioned *SEC v. Woods, et al.*,

Civil Action No. 1:21-cv-3413-SDG (N.D. Ga.).  The Court has entered final judgment against Southport in that case.

23.     **Horizon Private Equity, LLC** is a Georgia limited liability company with its principal place of business in Sandy Springs, GA.  Conn is the manager of Horizon I, and at all relevant times Conn controlled Horizon I.  On August 31, 2022, Conn changed the name of Horizon I to Barfield Mt. Vernon Partners LLC because of negative publicity from related Horizon III litigation.  The Commission will continue to refer to the entity as Horizon I throughout this Complaint.

24.     **Horizon Private Equity, III, LLC** is a Georgia limited liability company with its principal place of business in Atlanta, Georgia, that was formed in 2007.  Horizon III, which was never registered with the Commission, is the vehicle through which Woods raised more than $100 million from investors.

25.     Horizon III was a defendant in the case captioned *SEC v. Woods, et al.*, Civil Action No. 1:21-cv-3413-SDG (N.D. Ga.).  The Court appointed a receiver over Horizon III on September 1, 2021, and has entered final judgment against Horizon III in that case.

## THE HORIZON III PONZI SCHEME

**A.     Overview of the Horizon III Ponzi Scheme**

26.     In November 2007, while employed by the Institutional Investment

Adviser, Woods formed Horizon III as its sole member and agent. From November 2007 until the Court appointed a receiver over Horizon III in September 2021, Woods controlled Horizon III, its bank accounts, and the ultimate disposition of funds in the Horizon III bank accounts. In short, Horizon III was the alter ego of Woods.

27.    In or around September 2008, Woods purchased Southport, and he functioned as the controlling shareholder of Southport until the Commission filed suit against him in 2021.

28.    Between 2008 and 2021, Woods and other Southport investment adviser representatives used their positions as fiduciaries to cultivate trusted advisory relationships with clients, and then convinced those clients to invest in Horizon III.

29.    The Horizon III investor base largely comprised elderly and inexperienced investors who sought safe investment opportunities for their assets, a large percentage of which were earmarked for retirement.

30.    Many of Horizon III's investors had long-standing relationships with their advisers before being solicited to invest in Horizon III. These investors trusted the recommendations of Woods and the other Southport advisers.

31.    Woods and other Southport advisers falsely led investors to believe

-9-

that their funds would be used to purchase low risk investments. Woods and others at Southport told investors that the Horizon III investment was very safe, that it would pay a guaranteed rate of return, and that clients could get their principal back without penalty.

32.     In reality, Horizon III used investor funds to make high risk investments, and it earned very few profits from its investments. In fact, investor proceeds were used primarily to make principal and interest payments to earlier Horizon III investors and to fund Woods' personal projects, such as his purchase of a minor league baseball team. Investor funds were also used to pay compensation to certain Southport advisers who recommended that their clients invest in Horizon III.

33.     Woods and the other investment adviser representatives at Southport did not tell investors in Horizon III—most if not all of whom were clients to whom they owed a fiduciary duty—that investor funds would or could be used to make payments to earlier investors, either for the payment of interest or for the return of principal.

34.     Woods and other investment adviser representatives at Southport made material misrepresentations to Horizon III investors, including but not limited to the following:

    a.   Investor funds would be used exclusively to purchase government bonds, collateralized mortgage obligations, real estate, or similar investments;

    b.   Returns to investors would be paid from profits of Horizon III's investments;

    c.   Horizon III guaranteed a fixed rate of return for a specified period of time;

    d.   Horizon III investments carried little risk and were extremely safe; and

    e.   Investors could not lose their principal investment in Horizon III.

35.    As a registered investment adviser, Southport and its employees owed their clients a fiduciary duty to act in their clients' best interest and to disclose any conflicts of interest.

36.    Southport administrative personnel facilitated the mechanics of the Horizon III investments.  Once an investor purchased a membership interest in Horizon III, Southport administrative staff assisted the investor in setting up an account (typically a self-directed IRA) at an independent custodial trust company (the "Trust Company").

37.    After the investor's account at the Trust Company was funded, the investment principal was, at the direction of Woods, transferred to Horizon III's bank accounts.  Southport administrative employees tracked the outstanding

principal of each Horizon III investor and the periodic interest due to each investor, and provided this information to Woods monthly.

38.     Woods then transferred a lump sum to the Trust Company and sent an e-mail to the company setting out how it should allocate the funds to each Horizon III investor's account at the Trust Company.

39.     Horizon III investors received periodic account statements that were generated and sent to investors by Southport administrative employees.  The account statements reflected the investor's Horizon III principal investment and the purported interest payments received both during the period and over the life of the investment.

**B.    The Horizon III Ponzi Scheme was Massive**

40.     The Horizon III Ponzi scheme involved more than $100 million in funds from retail investors.

41.     Between January 2019 and August 2021, Horizon III used accounts at Bank of America and IBERIABANK (the "Horizon III Accounts") to receive money from and send money to Horizon III investors.  On January 1, 2019, the Horizon III Accounts had a combined balance of approximately $47,777.

42.     From January 1, 2019 to May 28, 2021, Horizon III received approximately $49 million in deposits in the Horizon III Accounts.  Of that

amount, more than $40 million was deposited by the Trust Company and represented new investor money.  In other words, only approximately $9 million was deposited in the Horizon III Accounts from sources other than investors.

43.     During that same period, Horizon III withdrew or transferred approximately $48 million from the Horizon III Accounts.  Of that amount, more than $21 million was sent to the Trust Company for interest payments to investors and/or returns of investor capital.

44.     Without the $40 million in new investor money, Horizon III would not have had enough money to pay the $21 million in interest payments and returns of investor capital that it made during the period from January 1, 2019, through May 28, 2021.

45.     Of the deposits that came into the Horizon III Accounts from sources other than new investors, very few represented profits from investments.  Instead, large sums of money (that largely cancel each other out) flowed to and from various real estate projects in which Woods arranged for Horizon III to invest. Several of the large, round-trip transfers represented up-front loans made by Horizon III for real estate projects that were repaid once the project obtained traditional financing.

46.     The records from this 2019-2021 period also reflect millions of dollars in payments sent to and received from an insurance brokerage company of which Woods was the majority owner.

47.     The pattern described above holds true when looking at specific months—interest and principal payments to existing investors were necessarily funded with new investor money.  For example, on April 1, 2021, Horizon III's IBERIABANK account had a balance of $684,024.  That amount includes $250,000 deposited from an investor on March 31, 2021, $100,000 deposited from an investor on March 29, 2021, and $50,000 from two other investors that same day.  In other words, at least $400,000 of the money in Horizon III's bank account at the beginning of April 2021 was new investor money.

48.     During April 2021, the Trust Company deposited $1,377,200 in new investor funds in the IBERIABANK account.  That amount represents 99% of the funds deposited into the account during that month.

49.     Also during the month of April 2021, Horizon III transferred $725,335 from the IBERIABANK account to the Trust Company for payments to existing investors.

50.     Without the deposits of new investor money referred to above, Horizon III would not have had enough money to make interest payments to

investors in April 2021.

51.     As of the end of July 2021, Horizon III owed investors more than
$110 million in principal.  At that time, however, Horizon III had liquid assets
worth less than $16 million.  The majority of the other Horizon III assets were
fractional ownership interests in small real estate projects in various stages of
development.  The Commission estimates that Horizon III invested less than $20
million in those projects.

### C.     Conn's Crucial Role in the Horizon III Ponzi Scheme

52.     Conn and Woods developed a professional relationship in the early
1990s when Conn first performed tax and other accounting work for Woods.
Conn's tax work for Woods included various entities owned and controlled by
Woods.

53.     Conn and Woods continued their business relationship since that time
and also began a close friendship that lasted for more than twenty years.  They
remained close friends during the period Woods ran the Horizon III Ponzi scheme.

54.     At the time Woods established Horizon III and purchased Southport,
he was employed as a registered representative and investment adviser
representative with the Institutional Investment Adviser.

55.     Although Woods controlled Horizon III, he asked Conn to be the

person disclosed to the Institutional Investment Adviser and the public as the manager of Horizon III.

56.    In or around 2008, Conn agreed to be touted publicly as the manager of Horizon III.

57.    Conn knew that Woods asked him to be publicized as the manager of Horizon III because Woods could not serve in that capacity while also employed by the Institutional Investment Adviser.

58.    Woods could not work as an investment adviser representative at the Institutional Investment Adviser and manage an investment fund on the side because the latter would be an outside business activity that should be disclosed to the Institutional Investment Adviser and that presented a conflict of interest for Woods.

59.    As a result, Woods needed Conn—at least on paper—to be listed as the manager of Horizon III.

60.    Woods hid his control of Horizon III by telling one of his supervisors and others at the Institutional Investment Adviser that Conn was the manager of Horizon III and the person running the fund.

61.    Conn helped Woods circumvent the Institutional Investment Adviser's internal controls by allowing Woods to list him as the manager of

Horizon III.

62.     Woods left the Institutional Investment Adviser in 2016.

63.     In 2018, Woods joined Southport Capital and became the firm's CEO. At Southport, it was still impermissible for Woods secretly to run Horizon III and fail to disclose his involvement in the fund to Southport and investors.

64.     As a result, Woods continued to conceal his control of Horizon III after joining Southport by falsely touting Conn as the manager of the fund.

65.     Woods misled Southport's personnel by stating that Conn managed Horizon III. Woods enlisted other Southport advisers to promote Horizon III as an investment opportunity for their clients by falsely telling them that Conn was the manager of the fund.

66.     Woods also relied on Conn to be listed as the manager for Horizon III at times to avoid revealing to investors that Woods was actually running the fund.

67.     Investors may have been less likely to invest in Horizon III at Woods' recommendation if they knew that Woods was the person running the fund and using investor assets for his own purposes.

68.     In fact, it was a conflict of interest for Woods to recommend that investors invest in Horizon III without disclosing that he was the person running the fund.

-17-

69.     In reality, Conn did not perform any of the duties typically carried out by a fund manager.

70.     Nevertheless, Conn agreed to allow Woods publicly to list him as the manager for Horizon III on numerous documents.

71.     For example, the private placement memorandum for Horizon III stated that Conn was the sole member of the board of managers for the fund.  The private placement memorandum also indicated that Conn held the titles of President and CEO, and listed biographical information about Conn.

72.     The private placement memorandum also falsely indicated that "Mr. Conn is responsible for the final investment decisions for" Horizon III and that the "development and success of" Horizon III "will be materially dependent upon the active participation and ultimate decision making of William V. Conn, Jr."

73.     Conn was also falsely listed on Southport's Form ADV—a form that investment advisers registered with the Commission are required to complete—as "the Elected Manager" of Horizon III.

74.     In addition to allowing Woods to list him as the manager of Horizon III, Conn also personally and actively engaged in conduct to conceal Woods' control of Horizon III.

75.     For starters, Conn falsely held himself out to one of Woods'

supervisors at the Institutional Investment Adviser as the manager of Horizon III at various events.

76.     Conn misled one of Woods' supervisors at the Institutional Investment Adviser into believing that Conn was running Horizon III.

77.     In addition, Conn signed numerous documents as the manager of Horizon III even though he knew such a representation was false.  These documents included corporate operating agreements, leases, bank loan documents, and partnership agreements for Horizon III.

78.     For example, in August 2008, Conn signed the First Amended and Restated Operating Agreement for Horizon III as the company's sole member of the Board of Managers.  The document stated that Conn was entitled to an annual salary of $18,000.

79.     In March 2013, Conn signed a certification as the "Manager of Horizon Private Equity, III, LLC" as part of a bank loan application with Georgia Commerce Bank.  Conn attested that, among other things, he had custody and control of the company's records.

80.     Conn also signed the operating agreements for several companies on behalf of Horizon III.  In June 2014, for instance, Conn signed the operating agreement for Warner Coopers Partners, LLC.  Conn signed the operating

agreement as the "manager" of Horizon III, which was one of the members of the company.

81.    In 2014, Conn also signed the operating agreements for Chandler Alma School Partners, LLC and 2A Partners, LLC as the manager of Horizon III, which was one of the members of the companies.

82.    In December 2014, Conn signed a stock purchase agreement as the "manager" of Horizon III.

83.    In May 2016, Conn signed on behalf of Horizon III a construction loan guaranty for Warner Cooper Partners LLC, which was seeking a $2.52 million bank loan.  The guaranty document specified that "without this Guaranty [from Horizon III] the Lender [bank] would be unwilling to make the Loan to the Borrower."

84.    In August 2020, Southport and Horizon III entered into a lease agreement, with Horizon III as the landlord.  Conn signed the lease agreement on behalf of Horizon III as the manager.  Woods signed on behalf of Southport as the CEO of the firm.

85.    Additionally, as recently as January 2021, Conn provided Woods with a biography of himself in response to a request from Woods, who stated he wanted to show it to a potential Horizon III investor.

86.     In February 2021, Woods and others at Southport prepared a flyer for Horizon III that falsely listed Conn as the fund manager.  The flyer, which was provided to a Southport adviser in Texas to share with potential investors in the fund, stated:  "The Horizon Fund is an alternative investment strategy established in 2008, managed by Bill Conn, and currently holds $300+ Million in assets."

87.     The February 2021 flyer for Horizon III included a biography of Conn that described his professional experience.

88.     In addition, Conn occasionally proposed investment opportunities to Woods for Horizon III, some in which Horizon III did in fact invest.  For example, Conn solicited Horizon III to invest in USA Sands, LLC—a company in which Conn was heavily involved.  Conn also solicited and received loans from Horizon III to Horizon I.

89.     Conn knew or was reckless in not knowing that Woods' control of Horizon III was a violation of the federal securities laws.  Conn knowingly helped his business associate and close friend anyway.

90.     Conn also knew or was reckless in not knowing that Horizon III was using new Horizon III investor funds to pay returns to existing Horizon III investors.

91.     Conn's accounting firm, Conn & Co., prepared annual 1099 forms for

Horizon III investors, some of whom were also Conn & Co. tax accounting clients.

92.    As a result, Conn knew or was reckless in not knowing that Horizon III was paying returns to investors on a regular basis.

93.    At the same time, Conn also prepared and signed Woods' tax returns through 2020.  Horizon III was listed on Woods' tax returns as a single-member LLC (where Woods was the only member), and each year, Horizon III showed significant losses as a result of the large payments made to investors, which Woods was able to carry forward and use to offset his own personal tax liability.

94.    Conn knew or was reckless in not knowing that the source of investor "returns" was new investor funds.  Nevertheless, Conn continued to help Woods carry out the Horizon III scheme.

### THE HORIZON I SCHEME

**A.    Background on Horizon I**

95.    Conn formed Horizon I in or around the end of 2007.  Horizon I was separate and distinct from Conn's accounting firm, Conn & Co.

96.    The operating agreement for Horizon I listed Conn as the "Initial Member" of the company and stated that he made a capital contribution of $50,000.

97.    The January 1, 2008 private placement memorandum for Horizon I indicated that Horizon I was "formed for the purpose of collectively investing in

selected hedge funds."

98.     The private placement memorandum for Horizon I provided that Conn would serve as the manager of Horizon I and also stated that Conn would be the President and CEO.

99.     In fact, Conn controlled virtually all aspects of Horizon I and was the final decision maker for the fund.

100.    Conn decided when and where Horizon I invested funds.

101.    As the private placement memorandum stated:  "The development and success of [Horizon I's] business will be materially dependent upon the active participation and ultimate decision making of William V. Conn, Jr."

102.    Conn controlled Horizon I's financial accounts.

103.    Conn determined whether Horizon I would distribute funds back to investors, and the amount of any such distribution.

104.    Conn was also the primary point of contact for investors in Horizon I, and the private placement memorandum stated that any inquiries regarding the fund be directed to him.

105.    The private placement memorandum for Horizon I also stated that Woods, at the time an investment adviser representative at the Institutional Investment Adviser, would serve as the investment adviser to Horizon I's investment

account at Woods' firm.

106.   The private placement memorandum for Horizon I indicated that Horizon I would invest solely in hedge funds offered by Woods' firm.

107.   The private placement memorandum outlined compensation for the manager, stating that "Mr. Conn shall be entitled to 10 percent of any cash distributions that the company makes to members at any time, including upon the liquidation of the company, which shall be an expense of the company paid to Mr. Conn only after the related distribution has been paid to the members."

108.   Conn recommended Horizon I as an investment opportunity to several individuals who he knew as a result of his accounting business.  Conn recommended that some of his clients invest in Horizon I during phone calls with them.

109.   Conn provided each investor with the January 2008 private placement memorandum for Horizon I either in person or by mail.  It was the only private placement memorandum that ever existed for the fund.

110.   In total, Conn raised nearly $2 million for Horizon I from 21 accounting clients of Conn & Co.

111.   Conn and his wife invested $147,000 in Horizon I.

112.   At Conn's direction, Woods initially invested Horizon I investor proceeds in various funds offered through the Institutional Investment Adviser and

Southport.

113.   By 2012, however, Conn had emptied the Southport account and began focusing primarily on alternative investments in high risk, high-interest loans.  Conn left a small amount of funds remaining invested with the Institutional Investment Adviser in equities, mutual funds, and options.

114.   Until 2015, Conn sent monthly statements to investors that detailed Horizon I's holdings in its advisory accounts with Southport and/or the Institutional Investment Adviser.  The statements also included broader categories titled vaguely "other investments" and "mortgage receivables" that encompassed Horizon I's investments in high-interest loans.

115.   In 2016, Conn began to provide quarterly statements instead of monthly statements to Horizon I investors.  The quarterly statements were frequently late and had errors, and investors often had to contact Conn, sometimes multiple times, before receiving the statements.

116.   In 2017, Conn generally stopped sending statements to Horizon I investors.

**B.     Conn's Undisclosed, Serial Misappropriation and Misuse of Investor Funds in Horizon I**

117.    Conn had significant personal and business expenses that he could not afford to pay using income from his accounting practice alone.

118.    By 2012, Conn's personal finances became increasingly strained, as Conn lived a lifestyle that he simply could not support.

119.    For example, from January 1, 2015 through November 30, 2021, bank records show that Conn paid one of his personal drivers $144,876, he withdrew $644,604 from ATMs, and he wrote checks totaling $601,573 to a dozen women. Conn also made more than $100,000 in payments to the University Yacht Club and Miracle Marine—a company that specializes in aluminum jet boats.  Accounts for Conn and his affiliated entities also incurred $35,708 in overdraft fees.

120.    To cover his increasing financial shortfalls, including for Conn & Co., Conn misappropriated and misused at least $1 million of investor funds from Horizon I between May 2012 and November 2022.

Direct Transfers to Accounts Controlled by Conn

121.    From February 1, 2013 until November 30, 2022, Conn transferred at least $568,000 of Horizon I investor funds to various bank accounts that he controlled, including accounts belonging to Conn & Co. and Conn personally.

-26-

122.   Conn transferred funds from various bank accounts belonging to Horizon I, as well as from Horizon I advisory accounts, generally through an internet transfer.  Conn then used the funds to support Conn & Co., which was itself experiencing financial difficulties, and to pay personal expenses.

123.   On quarterly statements prepared either at Conn's direction or by Conn himself for Horizon I investors, he described the funds transferred to Conn & Co. into a line item titled "Other Investments."

124.   Internally, Horizon I's accounting records reflected the transfers to Conn & Co. on a line item entitled "Conn & Co. Loan."

125.   Conn misappropriated funds from Horizon I to support Conn & Co. on a monthly basis.  For example, on August 2, 2018, the Conn & Co. account balance was negative $967.17.  Conn transferred $6,000 from Horizon I to the Conn & Co. account to cover checks that cleared to Mercedes Benz Financial Services, an aesthetic and anti-aging doctor, himself, and a home equity line of credit.

126.   On August 3, 2018, Conn & Co.'s account was overdrawn by $2,104. The next business day, August 6, Conn transferred an additional $3,000 from Horizon I to cover a check for $2,000 to a woman for whom there was no business reason to receive Horizon I funds, $3,302 to a Conn & Co. employee, and $231 for

a business expense.  On August 7, the account was overdrawn by $4,423, so Conn

transferred another $6,000 from Horizon I to cover various business and personal

checks, including $1,371 to the University Yacht Club and $500 to a woman for

whom there was no business reason to receive Horizon I funds.

127.   Another example is June 2020.  On June 15, 2020, the ending balance

in the Conn & Co. account was negative $4,753.74.  On June 16, 2020, Conn

transferred $5,000 from the Horizon I account, $1,000 from his personal checking

account, and made a deposit of $2,000 from a third party into the account.

128.   That same day, Conn has numerous transactions in the account,

including a $500 ATM withdrawal, a $47 internet purchase, a $500 check to

Miracle Marine, a $2,000 check to an individual who had no business connection

to Horizon I, a $460 insurance payment debit, and a $34 overdraft fee.  The ending

balance in the Conn and Co. account was negative $294.74.

129.   On June 17, 2020, Conn transferred another $1,000 from Horizon I to

the Conn & Co. account to cover the $34 overdraft fee and other funds being

withdrawn from the account.  Even with the additional Horizon I funds, however,

the Conn & Co. account had a balance of negative $361.36 by June 19, 2020.

130.   Conn failed to disclose to investors his misappropriation of Horizon I

funds to bank accounts under his control, including his Conn & Co. accounts.

Conn also failed to disclose the conflict of interest presented by his transfer of the Horizon I funds to those accounts.

Expenses Related to Conn's Failed Real Estate Development Project

131.   Conn also used investor funds in Horizon I to pay expenses for Old Bull Gap Development, LP. ("OBG"), a limited partnership that Conn had formed in 2004 along with three other partners, none of whom were Horizon I investors.

132.   Conn formed OBG to develop and subdivide a tract of land in Pickens County, Georgia.  The project stalled in 2008, however, as a result of the financial crisis, and, by 2012, Conn was the sole remaining partner in the project.

133.   At that time, Conn was personally liable for a $1 million bank loan taken out on the property.

134.   In total, from May 2012 through December 2020, Conn used $384,500 of Horizon I funds to make payments on the OBG loan and to pay miscellaneous upkeep expenses related to the OBG property.

135.   In addition, Conn selectively told certain investors that Horizon I was the owner of OBG, but there is no record of Horizon I acquiring the property.

136.   The OBG property does not appear to have been conveyed to Horizon I, and OBG never appeared on any monthly or quarterly statements received by investors in Horizon I.

137.   Conn also reported the OBG property as a personal asset used to secure various personal bank loans.

138.   Moreover, in the few instances in which Conn was able to sell lots from the OBG development project, Conn sometimes transferred the sale proceeds to his personal bank accounts and other bank accounts that he controlled.

139.   Conn never disclosed the OBG loan, or his associated personal liability, to investors in Horizon I.  Conn also failed to disclose his personal use of proceeds from the OBG lot sales.

140.   As an example of Conn's use of proceeds from an OBG lot sale, on July 23, 2021, the OBG account received $42,727, which represented the net proceeds from a lot sale.  The beginning balance of the OBG account before receiving the transfer was $11.78.  That same month, Conn transferred $16,500 of those sale proceeds to his personal checking and Conn & Co. bank accounts.

141.   In August and September 2021, Conn continued to transfer Horizon I funds for his personal use to bank accounts he controlled, and paid personal expenses directly out of the OBG account, including $9,729 to the IRS, $600 to his personal driver, and nearly $1,000 to a woman for whom there was no business reason to receive funds from Horizon I.

142.   Of the sale proceeds, Conn only transferred $5,250 to Horizon I.

143.   The few other times that Conn did transfer OBG lot sales proceeds to Horizon I, he did so only to redeem from the fund investors who were threatening him with legal action.

144.   For example, one investor reached an agreement with Conn that included accepting all the proceeds from the sale of a particular lot as part of the investor's redemption.  OBG's bank account received $26,225.57 in proceeds on December 3, 2021.  On December 14, 2021, Conn transferred the proceeds from the OBG account to the Horizon I account to cover a December 10, 2021 check to the investor out of the Horizon I account in that exact amount.

145.   Conn treated these investors preferentially, giving them far more than their pro-rata share of the lot sale proceeds to avoid legal issues for himself.

<u>Purchase of a Condominium Used Exclusively By Conn for Personal Purposes</u>

146.   In October 2014, Conn caused Horizon I to purchase a condominium in Atlanta, Georgia.  Conn recorded $92,028 as the purchase price plus costs of the condominium in Horizon I's books.

147.   Conn held the condominium out to investors on monthly account statements as a fund asset under the category of "other investments."

148.   Conn never rented the condominium to generate any revenue for Horizon I.

149.   Instead, Conn utilized the condominium for his own personal use, including entertaining guests.

150.   While Conn used the condominium for his own purposes, bank account records show that he directed Horizon I to pay for expenses associated with the property, such as association fees, power bills, and attorney fees and costs associated with the reassignment of a parking space.

151.   Conn did not disclose to investors that he used the condominium purchased with Horizon I funds for his own purposes instead of renting out the property, which would have created an income stream for the fund or, at a minimum, helped offset expenses associated with the property.

152.   In addition, public records reflect that on November 19, 2021, a mortgage was taken out on the property in the amount of $80,000.

153.   Public records also reflect that the property sold on March 25, 2022 for $181,000, but bank records do not reflect any of the sale proceeds flowing to Horizon I's bank accounts.

<u>Checks Written to Individuals Who Had No Business Relationship With Horizon I</u>

154.   Conn commingled Horizon I funds with funds from Conn & Co., OBG, and other entities under his control.

155.   In fact, Conn regularly transferred funds from Horizon I to bank accounts for those entities, including more than $400,000 to Conn & Co. alone.  Conn then wrote checks from those bank accounts to women with whom Horizon I had no business relationship.

156.   From January 1, 2015 through November 30, 2021, bank records reflect that Conn wrote more than $600,000 in checks to a dozen women who had no business relationship with Horizon I.

157.   For example, from January 13, 2017 through February 4, 2019, Conn wrote checks totaling $152,820 to Individual A.

158.   From February 23, 2015 through July 2, 2020, Conn wrote checks totaling $113,966 to Individual B, including $700 directly from a Horizon I bank account.

159.   From October 5, 2015 through November 8, 2021, Conn wrote checks totaling $86,537 to Individual C.

160.   From December 26, 2019 through November 18, 2021, Conn wrote checks totaling $64,937 to Individual D.

161.   Conn did not disclose these payments to Horizon I investors or account for the payments in Horizon I's records.

## COUNT I – FRAUD

### Violations of Section 206(1) of the Advisers Act
### [15 U.S.C. § 80b-6(1)]

162.   Paragraphs 1 through 161 are hereby realleged and are incorporated herein by reference.

163.   Defendant, acting as an investment adviser for Horizon I, using the mails and the means and instrumentalities of interstate commerce, directly and indirectly, employed devices, schemes and artifices to defraud one or more advisory clients and/or prospective clients.

164.   Defendant knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.  In engaging in such conduct, Defendant acted with scienter, that is, with intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

165.   By reason of the foregoing, Defendant, directly and indirectly, has violated, and, unless enjoined, will continue to violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT II – FRAUD

### Violations of Section 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(2)]

166.   Paragraphs 1 through 161 are hereby realleged and are incorporated

-34-

herein by reference.

167.   Defendant, acting as an investment adviser for Horizon I, by the use of the mails and the means and instrumentalities of interstate commerce, directly and indirectly, engaged in transactions, practices, and courses of business which would and did operate as a fraud and deceit on one or more advisory clients and/or prospective clients.

168.   By reason of the foregoing, Defendant, directly and indirectly, has violated and, unless enjoined, will continue to violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT III – FRAUD

**Violations of Section 206(4) of the Advisers Act**
**[15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder**
**[15 C.F.R. § 275.206(4)-8]**

169.   Paragraphs 1 through 161 are hereby realleged and are incorporated herein by reference.

170.   Defendant, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, while acting as an investment adviser to a pooled investment vehicle (Horizon I) has (a) made an untrue statement of a material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances in which they were made, not misleading, to an investor or

prospective investor in the pooled investment vehicle, or (b) otherwise engaged in an act, practice, or course of business which is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

171.   By reason of the foregoing, Defendant violated and, unless enjoined, will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## <u>COUNT IV – AIDING AND ABETTING (FRAUD)</u>

**Aiding and Abetting Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)]**

172.   Paragraphs 1 through 161 are realleged and incorporated by reference herein.

173.   As alleged above, Woods, Southport, and Horizon III violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

174.   Defendant knew, or recklessly disregarded, that Woods', Southport's, and Horizon III's conduct was improper and knowingly rendered to them substantial assistance in this conduct.

-36-

175.    By reason of the foregoing, Defendant aided and abetted violations of and, unless enjoined, will continue to aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## COUNT V – AIDING AND ABETTING (FRAUD)

**Aiding and Abetting Violations of
Sections 206(1) and 206(2) of the Advisers Act
[15 U.S.C. §§ 80b-6(1), 80b-6(2)]**

176.    Paragraphs 1 through 161 are realleged and incorporated by reference herein.

177.    As alleged above, Woods and Southport violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

178.    Defendant knew, or recklessly disregarded, that the conduct of Woods and Southport was improper and knowingly rendered substantial assistance to them in this conduct.

179.    By reason of the foregoing, Defendant aided and abetted violations of and, unless enjoined, will continue to aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

## PRAYER FOR RELIEF

The Commission respectfully requests that this Court:

1.      Find that Defendant committed the violations alleged;

2.      Permanently enjoin Defendant and each of his agents, employees, and attorneys, and any other person or entity in active concert or participation with him who receives actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in conduct in violation of the following provisions: Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. § 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

3.      Order Defendant to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, plus pay prejudgment interest thereon;

4.      Order Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] in an amount to be determined by the Court;

5.      Retain jurisdiction of this action in accordance with the principles of

equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all order and decrees that may be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court; and

6.     Order such other and further relief as this Court may deem just, equitable, and appropriate.

## **JURY TRIAL DEMAND**

The Commission demands a trial by jury as to all issues that may be so tried.

Dated:  August 28, 2023          Respectfully submitted,

/s/ Harry B. Roback
M. Graham Loomis (GA Bar No. 457868)
Harry B. Roback (GA Bar No. 706790)
950 East Paces Ferry Rd. NE, Suite 900
Atlanta, GA 30326
Telephone:  (404) 942-0690
Facsimile:  (404) 842-7679
robackh@sec.gov

Attorneys for Plaintiff