# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| JUSTIN M. SPAUNHORST,<br><br>    Plaintiff,<br><br>-vs-<br><br>EQUIFAX INFORMATION SERVICES LLC,<br><br>    Defendants. | CASE NO. |

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES, Plaintiff, JUSTIN M. SPAUNHORST (hereinafter "Plaintiff"), by and through his undersigned counsel, for his cause of action against Defendant, EQUIFAX INFORMATION SERVICES LLC ("Equifax"), and in support thereof respectfully alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*.

## PRELIMINARY STATEMENT

1.  This is an action alleging Equifax violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*. (FCRA) by producing and selling credit reports inaccurately reporting Plaintiff as "deceased", and thereby failing to follow policies and procedures to ensure the maximum possible accuracy of the credit report it produced and sold.

1

2. The FCRA creates a private right of action against a consumer reporting agency for the negligent, 15 U.S.C. § 1681o, or willful, 15 U.S.C. § 1681n, violation of any duty imposed by the FCRA. *Alexander v. Certegy Check Servs.*, No. 8:16-CV-859-17JSS, 2016 U.S. Dist. LEXIS 180072, at *5 (M.D. Fla. Dec. 29, 2016) (*citing Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir. 2015)).

3. The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017).

4. Plaintiff seeks entry of judgment, actual damages, statutory damages, punitive damages, costs, and attorneys' fees. 15 U.S.C. §§ 1681n and 1681o.

## JURISDICTION, VENUE, AND PARTIES

5. Jurisdiction for this Court is conferred by 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

6. Plaintiff is a natural person and resident of Franklin County in the State of Missouri. He is a "consumer" as defined by 15 U.S.C. § 1681a(c).

7. Venue is proper in this District as Equifax's principal address is in this District, Equifax transacts business within this District, and a substantial portion of the violations described in this Complaint occurred in this District.

8. Equifax is a corporation headquartered at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309.

9. Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681(f). Equifax is regularly engaged in the business of assembling, evaluating and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681(d) to third parties.

10. Equifax disburses such consumer reports to third parties under contract for monetary compensation.

## FACTUAL ALLEGATIONS

11. Since at least since March of 2023, Equifax has reported Plaintiff as "deceased" on his Equifax consumer credit report regarding five different accounts from the same underlying creditor, non-party, Navy Federal Credit Union ("Navy Federal").

12. Plaintiff learned about the "deceased" reporting around April of 2023 when Plaintiff received an alert from the Credit Karma app regarding the deceased remark on his credit report.

13. On or about May 1, 2023, Plaintiff obtained a copy of his Equifax credit report. Upon review, Plaintiff observed that he was listed as "deceased" as to all five of his Navy Federal accounts.

14. At the same time that Equifax was reporting Plaintiff as "deceased" regarding his Navy Federal accounts, Plaintiff's other accounts with different creditors were reporting him with the status of "current" as he pays his bills on time.

15. It is difficult to understand how Equifax could report an individual as both "deceased" and paying his obligations on time, as this clearly makes no sense and is *per se* inaccurate.

16. As a result of the major inaccuracy on his Equifax credit report, on May 3, 2023, Plaintiff mailed a detailed written dispute letter to Equifax concerning the erroneous reporting. Plaintiff made Equifax aware that he was very much alive and well. Plaintiff included an image of his driver's license to confirm his identity. Additionally, Plaintiff included images from his credit report of the inaccurate reporting and images of the current weather in his place of residence and current news article as proof that he was alive and well.

17. Plaintiff mailed his detailed dispute letter to Equifax via USPS Certified Mail, tracking number 9589 0710 5270 0614 1495 12.

18. On May 12, 2023, Equifax responded to Plaintiff's written dispute letter by stating all five of the Navy Federal accounts had been updated to no longer report as deceased. Equifax did maintain the wrongfully issued "charge off". Plaintiff

never missed a Payment. The misreporting of the charge off occurred because of the deceased reporting.

19.     During the relevant time period, Plaintiff was denied the ability to obtain or use credit.

20.     Equifax had good reason to know that Plaintiff was not "deceased". For example, Equifax was aware that Plaintiff was making payments for his other open lines of credit during the relevant time period.

21.     Despite this, Equifax willingly chose to continue reporting that Plaintiff was "deceased" even though Equifax knew or had reason to know he was alive and well.

22.     As a result of the action and/or inaction of Equifax, Plaintiff has suffered damages, including, but not limited to:

    i.   Monies lost by attempting to fix his credit;

    ii.  Loss of time attempting to cure the errors;

    iii. Denials for credit;

    iv.  Emotional distress including but not limited to anger, worry, frustration, embarrassment, fear, and sleeplessness. Plaintiff has been physically affected by Equifax's misreporting;

    v.   Apprehensiveness to apply for credit due to the fear of rejection; and

    vi.    Defamation as Equifax published inaccurate information to third party entities.

## COUNT I
### Violation of 15 U.S.C. § 1681e(b) as to Defendant, Equifax Information Services LLC (Negligent)

23. Plaintiff re-alleges and re-incorporates paragraphs one (1) through twenty-two (22) as if fully stated herein.

24. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure the maximum possible accuracy in the preparation of the credit report and credit files it published and maintains concerning the Plaintiff. Despite Equifax believing that Plaintiff was dead, it published his credit report (containing the "customer deceased") to furnishers. Moreover, Equifax has records of timely payments on his open accounts. No other furnisher ever reported to Equifax that Plaintiff was deceased.

25. The FCRA requires that Equifax must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

26. The FCRA requires that Equifax must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C.

§§ 1681e(a) & 1681b. Equifax, despite having access to the Social Security Death Index, refuses to cross-check individuals for accuracy of deceased reporting.

27. Equifax places a "deceased" notation or marking on reports when it is advised from any of their many data furnishing sources that a given consumer is deceased.

28. Equifax does not request or require a death certificate or any other proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

29. Equifax does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

30. Indeed, Equifax employs no procedures at all which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

31. Even in instances where other data on the face of the consumer's report indicates that he is not deceased, Equifax employs no procedures which assure that a consumer with a "deceased" mark on his report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

32. Once a "deceased" mark is placed upon a consumer's report, Equifax will not calculate and will not provide a credit score for that consumer.

33. Equifax has received and documented thousands of disputes from consumers complaining that Equifax's credit reports have them erroneously marked as "deceased."

34. Nevertheless, Equifax employs no procedures which assure that a consumer marked as "deceased" on Equifax's reports is, in fact, deceased.

35. Equifax has no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source.

36. Nor does Equifax employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

37. For years after a consumer's actual death, Equifax will continue to sell for profit credit reports about that consumer.

38. Equifax will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to Equifax – meaning that nobody is continuing to buy those reports.

39. Equifax charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

40. Equifax profits from the sale of reports on the deceased.

41. Equifax has in their credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

42. Equifax knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

43. Equifax warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

44. Equifax has no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

45. Indeed, Equifax sells reports of the deceased to third parties in an automated fashion and without any specific or general certification that could

reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

46. For consumers who are deceased, there exists no permissible purpose under the FCRA for Equifax to ever sell their credit reports, absent a court order.

47. Equifax knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

48. At all times pertinent hereto, Equifax was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Equifax.

49. At all times pertinent hereto, the conduct of Equifax, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

50. The conduct, action and/or inaction of Equifax was negligent, rendering it liable for actual damages in an amount to be determined by the Court pursuant to 15 USC § 1681o.

51. Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 USC § 1681o.

WHEREFORE, Plaintiff, JUSTIN M. SPAUNHORST, respectfully requests that this Court award actual damages against Defendant, EQUIFAX INFORMATION SERVICES LLC, jointly and severally; award Plaintiff his attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

### COUNT II
### Violation of 15 U.S.C. § 1681e(b) as to
### Defendant, Equifax Information Services LLC (Willful)

52. Plaintiff re-alleges and re-incorporates paragraphs one (1) through twenty-two (22) as if fully stated herein.

53. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure the maximum possible accuracy in the preparation of the credit report and credit files it published and maintains concerning the Plaintiff. Despite Equifax believing that Plaintiff was dead, it published his credit report (containing the "customer deceased") to furnishers. Moreover, Equifax has records of timely payments on his open accounts. No other furnisher ever reported to Equifax that Plaintiff was deceased.

54. The FCRA requires that Equifax must follow procedures which assure that the reports they sell meet the standard of "maximum possible accuracy." 15 U.S.C. § 1681e(b).

55. The FCRA requires that Equifax must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes." 15 U.S.C. §§ 1681e(a) & 1681b. Equifax, despite having access to the Social Security Death Index, refuses to cross-check individuals for accuracy of deceased reporting.

56. Equifax places a "deceased" notation or marking on reports when it is advised from any of their many data furnishing sources that a given consumer is deceased.

57. Equifax does not request or require a death certificate or any other proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

58. Equifax does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

59. Indeed, Equifax employs no procedures at all which assure that a consumer with a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

60. Even in instances where other data on the face of the consumer's report indicates that he is not deceased, Equifax employs no procedures which assure that

a consumer with a "deceased" mark on his report is, in fact, deceased before placing the "deceased" mark on that consumer's report.

61. Once a "deceased" mark is placed upon a consumer's report, Equifax will not calculate and will not provide a credit score for that consumer.

62. Equifax has received and documented thousands of disputes from consumers complaining that Equifax's credit reports have them erroneously marked as "deceased."

63. Nevertheless, Equifax employs no procedures which assure that a consumer marked as "deceased" on Equifax's reports is, in fact, deceased.

64. Equifax has no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source.

65. Nor does Equifax employ any procedures to limit or stop the furnishing of reports to third parties for consumers which it has marked as "deceased" under any circumstances.

66. For years after a consumer's actual death, Equifax will continue to sell for profit credit reports about that consumer.

67. Equifax will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to Equifax – meaning that nobody is continuing to buy those reports.

68. Equifax charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

69. Equifax profits from the sale of reports on the deceased.

70. Equifax has in their credit reporting database hundreds of thousands of "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

71. Equifax knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Equifax to be a common and major source of identity theft.

72. Equifax warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other proofs, before accessing the deceased consumer's credit information or report.

73. Equifax has no similar death certificate, executorship paper, or any other proof requirements for their data sources which report a consumer as deceased or for the buyers of their reports which access the purportedly deceased consumer's information.

74. Indeed, Equifax sells reports of the deceased to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

75. For consumers who are deceased, there exists no permissible purpose under the FCRA for Equifax to ever sell their credit reports, absent a court order.

76. Equifax knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

77. At all times pertinent hereto, Equifax was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Equifax.

78. At all times pertinent hereto, the conduct of Equifax, as well as that of its agents, servants and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

79. The conduct, action and/or inaction of Equifax was willful, rendering it liable for actual or statutory damages and punitive damages in an amount to be determined by the Court pursuant to 15 USC § 1681n.

80.  Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 USC § 1681n.

WHEREFORE, Plaintiff, JUSTIN M. SPAUNHORST, respectfully requests that this Court award actual or statutory damages and punitive damages against Defendant, EQUIFAX INFORMATION SERVICES LLC, jointly and severally; award Plaintiff his attorneys' fees and costs; award pre-judgment and post-judgment interest at the legal rate; and grant all such additional relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, JUSTIN M. SPAUNHORST, demands judgment for actual, statutory, compensatory, and punitive damages against Defendant, EQUIFAX INFORMATION SERVICES LLC, jointly and severally; attorneys' fees and costs; prejudgment and post-judgment interest at the judgment rate; and such other relief the Court deems just and proper.

DATED this 29th day of August 2023.

Respectfully submitted,

/s/ *Octavio Gomez*
Octavio "Tav" Gomez, Esq.
Florida Bar #: 0338620
Georgia Bar #: 617963
Pennsylvania Bar #: 325066
The Consumer Lawyers PLLC
412 E. Madison St. Ste 916
Tampa, Florida 33602
Cell: (813) 299-8537
Facsimile: (844) 951-3933
Primary Email:
Tav@theconsumerlawyers.com
Secondary Email:
Lisa@theconsumerlawyers.com