## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Doreen M. Rodriguez, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Experian Information Solutions, | ) | **COMPLAINT** |
| Inc., | ) | **WITH JURY TRIAL DEMAND** |
| | ) | |
| Defendant. | ) | |

## PRELIMINARY STATEMENT

1.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq*. (the "FCRA") to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

2.      Under the FCRA, consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum

1

possible accuracy of information when preparing consumer reports; and the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because the furnisher of the disputed information stands in a better position to make a thorough investigation of the disputed information than the credit reporting agency.

3.     Defendant compiles, maintains, and reports information concerning Plaintiff's credit-worthiness, credit-standing, credit capacity, character, and general reputation. That information is then made available for use by third-parties in credit transactions involving Plaintiff, for employment purposes, the underwriting of insurance for Plaintiff, and even in connection with a determination of Plaintiff's eligibility for a license or other governmental benefit. Accordingly, and pursuant to various provisions of the FCRA, Plaintiff has a legally protected interest in Defendant fulfilling its respective duties under the FCRA, so that the information reported and maintained by Defendant is done so in a manner which is fair and

equitable to Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information.

4.     This action for damages is based on Defendant's false reporting on Plaintiff's credit files and/or consumer reports, failures to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff, and failures to conduct reasonable investigations and reinvestigations with respect to disputes of such information.

## **PARTIES**

5.     Plaintiff, Doreen M. Rodriguez, is a natural person who resides in Hall County, Georgia.

6.     Plaintiff is an individual and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

7.     Defendant, Experian Information Solutions, Inc. (hereinafter "Experian"), is a corporation formed under the laws of the State of California and registered to do business in the State of Georgia. Experian may be served with process via its registered agent, C T Corporation System at 89 S Culver St, Lawrenceville, GA, 30046-4805.

8.     Experian regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses interstate commerce to prepare and/or furnish the reports. Accordingly, Experian is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

## JURISDICTION AND VENUE

9.     This Court has federal question jurisdiction over Plaintiff's Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

10.    This Court has personal jurisdiction over Defendant pursuant to O.C.G.A. § 9-10-91(1) because, *inter alia*, Defendant frequently and routinely conducts business in the State of Georgia, including the conduct complained of herein.

11.    Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district.

12.    Pursuant to LR 3.1B(3), venue is proper in the Atlanta Division because Defendant maintains an agent for service of process within the Atlanta Division.

## ALLEGATIONS OF FACT

4

**Plaintiff's Mortgage**

13.     On or about September 15, 2014, Plaintiff obtained a residential home loan from Homestar Financial Corp. for the original principal amount of $83,673.00 (the "Mortgage").

14.     The Mortgage was transferred from Homestar Financial Corp. to Carrington Mortgage.

15.     In 2019, Plaintiff filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Gainesville Division, (the "Bankruptcy Case").

16.     On May 31, 2023, the Bankruptcy Court issued an Order of Discharge in favor of Plaintiff.

17.     As recently as December of 2022, Carrington advised the Bankruptcy Court and Plaintiff that Plaintiff's Mortgage was being serviced by Carrington and that Plaintiff's obligation is ongoing.

18.     Accordingly, Plaintiff has continued to make her Mortgage payments to Carrington, and Carrington has continued to service Plaintiff's Mortgage and accept her Mortgage payments.

**Effect of Consumer Reports Which Contain
Inaccurate or Misleading Information**

5

19.   Under the FCRA, the term "consumer report" generally refers to:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:
>
> > i.   credit or insurance to be used primarily for personal, family, or household purposes;
> >
> > ii.   employment purposes; or
> >
> > iii.   any other purpose authorized under section 1681b of this title.
>
> 15 U.S.C. § 1681a(d)(1).

20.   The information contained in a consumer report bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics.

21.   The information contained in a consumer report can have a tremendous effect on the consumer; to name only a few, the report can impact the consumer's:

a.   Eligibility for and terms for credit;

b.   Potential for refinancing of existing credit;

c.   Eligibility for leasing prospects;

d.   Eligibility for utility services;

e.  Eligibility for and the terms of insurance;

f.  Employment or potential employment;

g.  Accounts which are under collection or review;

h.  Eligibility for a license or other benefit granted by a governmental instrumentality, particularly where the instrumentality is required by law to consider an applicant's financial responsibility or status;

i.  Standing with potential investors or servicers; and

j.  Eligibility for individually-billed travel charge cards used by executive departments and agencies.

22.  The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

23.  Approximately two million consumer reports are issued by credit bureaus each day. See, Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p. 48-49, available at

https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf, *archived at* https://perma.cc/DCY4-ZS6C (last accessed on December 12, 2022).

24.     In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p. iv of Executive Summary, available at https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf, *archived at* https://perma.cc/R3P4-FGV9 (last accessed on December 12, 2022).

25.     The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id.*

<u>*Credit Scoring*</u>

26.     The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported

by credit reporting agencies. See, https://www.myfico.com/credit-education/credit-scores/ (last accessed on December 12, 2022).

27.     The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id*.

28.     The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p. 53, available at http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf, *archived at* http://perma.cc/JF32-RFAA, (last accessed on December 12, 2022).

29.     FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types

of credit accounts for 10% of a consumer's FICO score. See, https://www.myfico.com/credit-education/whats-in-your-credit-score/, *archived at* https://perma.cc/E8Y3-F4AA (last accessed December 12, 2022).

30.    Payment history is the most important aspect of a consumer's credit score because it shows how the consumer has managed his finances, including any late payments. Credit history is also very important, as it demonstrates how long the consumer has been managing his accounts, when his last payments were made, and any recent charges. See, https://www.transunion.com/credit-score, *archived at* https://perma.cc/NRZ4-W83U (last accessed December 12, 2022).

31.    The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

32.    Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

33.     Incorrectly reporting the tradeline of Plaintiff's Mortgage—which is open, active, and has a balance that Plaintiff is making payments on—with incorrect, outdated payment information and as having a $0 balance, adversely affects Plaintiff's FICO scores, as it excludes any recent positive payment history associated with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

34.     There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

35.     Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See,        https://www.myfico.com/credit-education/questions/fix-errors-on-credit-

11

report*/, archived at* https://perma.cc/9TQN-S5WP (last accessed December 12, 2022).

*Credit-Based Insurance Scoring*

36.     Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

37.     Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

38.     Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including, but not limited to, the length and age of credit history and the use of certain types of credit. Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p. 11, available at https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf*, archived at* https://perma.cc/B2VQ-452N (last accessed December 12, 2022). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010).

39.     Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id*. at 22.

40.     A Wallethub study determined that a change in credit scores caused a consumer's automobile insurance rates to rise by an average of 67% nationwide, and an average of 84% in Georgia. *2018's States Where Credit Scores Affect Car Insurance the Most – Credit Score & Car Insurance Report*, available at https://wallethub.com/edu/car-insurance-by-credit-score-report/4343/, *archived at* https://perma.cc/CSL8-D47Y (last accessed December 12, 2022).

41.     Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See    https://www.consumer.ftc.gov/articles/0152-credit-scores,    *archived    at* https://perma.cc/EB3D-54UP (last accessed December 12, 2022).

42.     The National Association of Insurance Commissioners ("NAIC") is the U.S. standard-setting and regulatory support organization created and governed by

the chief insurance regulators from the 50 states, the District of Columbia, and five

U.S. territories. See, http://www.naic.org/index_about.htm (last accessed December

12, 2022).

43.    The NAIC advises consumers who find errors on their credit reports to

contact the credit reporting company to have the errors corrected, as the errors can

affect the consumer's credit-based insurance score. National Association of

Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance*

*Company Can Use Your Credit to Determine Your Premium*, available at

http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.ht

m, *archived at* https://perma.cc/S4F2-9VTL (last accessed December 12, 2022).

44.    There are several different companies that create credit-based insurance

score reports for insurers to use, including the Fair Isaac Corporation. In calculating

credit-based insurance scores, FICO looks at five general areas it believes will best

determine how an individual manage risks. *Id*.

45.    The following is a breakdown of what FICO considers in calculating

credit-based insurance scores, and how much the information generally weighs in

that calculation: payment history accounts for 40% of a consumer's of a consumer's

FICO credit-based insurance score; debt/amounts owed accounts for 30% of a

14

consumer's of a consumer's FICO credit-based insurance score; age/length of credit history accounts for 15% of a consumer's FICO credit-based insurance score; new credit/recent inquiries accounts for 10% of a consumer's of a consumer's FICO credit-based insurance score; and, mix of accounts/types of credit accounts for 5% of a consumer's of a consumer's FICO credit-based insurance score. *Id*.

46.     Incorrectly reporting the tradeline of Plaintiff's Mortgage—which is open, active, and has a balance that Plaintiff is making payments on—with incorrect, outdated payment information and as having a $0 balance, adversely affects Plaintiff's FICO credit-based insurance scores, as it excludes any recent positive payment history associated with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

## The CDIA Metro 2 Credit Reporting Standards

### *The CDIA has Imposed Rigorous Industry Standards to Ensure FCRA Compliance*

47.     The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment. Between two and three

million consumer reports are issued by credit bureaus each day. See, http://www.cdiaonline.org/about.cfm (last accessed December 12, 2022).

48.    The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

49.    Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

50.    To further assist CRAs and data furnishers with performing their due diligence and reporting accurate, complete, and timely data, in satisfaction of the FCRA's legal requirements, the CDIA offers extensive training, education, and support to CRAs and data furnishers.

16

51.    The CDIA's extensive training and support offerings include FCRA certification programs for both CRAs and data furnishers, to assist each in maintaining compliance with FCRA regulations.

52.    Because standardized methods are of paramount importance to the accurate, complete and timely reporting of consumer credit data, the CDIA can and will revoke FCRA certification for failure to adhere to the standards set by the CDIA.

53.    In cooperation with the major CRAs, CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year.

See,      http://www.cdiaonline.org/about/index.cfm?unItemNumber=515      (last accessed December 12, 2022).

54.    The Metro 2 Format Task Force is comprised of representatives from Equifax, Experian, Innovis, and TransUnion, and is supported by the CDIA. Metro 2 Format Task Force's mission is to provide a standardized method for the reporting of accurate, complete and timely data, and has developed the Metro 2 standards. *Id.*

55.    In order to ensure compliance with the FCRA, and in furtherance of its mission, the Metro 2 Format Task Force has developed an industry standard (the

17

"Metro2 standard") for reporting consumer accounts that "will ensure the integrity and consistency of the credit information being reported."

56.    In the credit reporting industry, Metro 2 is widely known as the well-established industry standard, uniformly adopted by furnishers and CRAs alike.

57.    As such, viewers/users of consumer reports both expect and rely on the information contained in consumer reports to be reported in compliance with the Metro 2 standards.

58.    A deviation from the Metro 2 standards results in a reported item being incomplete and/or misleading to viewers/users of consumer reports.

59.    In fact, the existence of an "industry standard" itself—one which is uniformly adopted and contractually enforced—compounds errors because it gives more credibility to false reporting.

60.    Without the existence of Metro 2, a viewer/user of consumer reports *might* presume that the furnisher or CRA simply made a mistake with respect to erroneous, negative credit reporting.

61.    However, since viewers/users of consumer reports know that Metro 2 has layers of rules and checks to ensure accuracy, they are more likely to "blame" the consumer for the false, negative credit reporting.

62.     Thus, a deviation from the Metro 2 standards results in adverse consequences for the consumer.

63.     15 U.S.C. § 1681e(b) requires consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of information concerning the individual about whom a report relates. Similarly, 15 U.S.C. § 1681i(a)(1) requires consumer reporting agencies to conduct reasonable reinvestigations of a consumer's dispute of the completeness or accuracy of any item of information contained in the consumer's file.

64.     The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and furnishers ensure that they are in compliance with their respective duties to ensure that they maintain complete and accurate information under the FCRA.

65.     The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

66.     The Metro 2 standards are documented in the Credit Reporting Resource Guide ("CRRG"), an industry-standard publication produced and distributed by the CDIA.

67.     As an integral aspect of its duties under the FCRA, Experian is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Experian produces reports; the requirement to maintain reasonable procedures extends to Experian's handling and reinvestigation of disputed information.

68.     At all times relevant hereto, Experian adopted and implemented the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

69.     At all times relevant hereto, Experian has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

*The National CRAs and the Furnishers of Consumer Information Communicate Metro 2 Compliant Notices of Consumer Disputes and Responses, Respectively, Through the e-Oscar Reporting Platform*

70.     The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to the CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

71.     To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian (the three major "National CRAs"),

along with Innovis Data Solutions, Inc., developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

72.    The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. See *http://www.e-oscar.org/* (last accessed October 30, 2018).

73.    The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes. *Id*.

74.    The National CRAs, provide notice of a consumer's dispute to data furnishers in the ACDV format, and forward the ACDV to the furnisher through e-OSCAR.

75.    If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the CRA that sent the ACDV, but

with all other CRAs to whom the furnisher reported that information. 15 U.S.C. §
1681s-2(b)(1)(D).

76.     The e-OSCAR system facilitates the furnisher's compliance with 15
U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to
each CRA with whom the [furnisher] has a reporting relationship" in addition to the
response to the initiating CRA. See *https://www.e-oscar.org/implementation/about-
us* (last accessed February 19, 2019).

77.     Additionally, a furnisher can manually correct a tradeline with a CRA
other than the one that initiated a dispute by sending an AUD within e-OSCAR.

78.     Experian requires data furnishers that report to Experian to register with
and use e-OSCAR, and states that e-OSCAR is "in compliance with FCRA and
Metro 2 standards." See, *https://www.transunion.com/data-reporting/support-teams*
(last accessed October 30, 2018).

### *Viewers of Credit Reports Presume Compliance with the Metro 2 Standards; Departures from the Standards are, Therefore, Inherently Misleading*

79.     The CRRG and the Metro 2 guidelines have been uniformly adopted
across the credit reporting industry.

80.     All entities which contribute to consumer reports have agreed to
comply with the Metro 2 guidelines, which are "accepted by all consumer reporting

22

agencies;" likewise, consumer reporting agencies require their furnishers to comply with the Metro2 guidelines as a condition of their agreements. CRRG at 2-1.

81.    Given the universal adoption of Metro 2, a creditor or other entity performing risk scoring or other functions using the data provided in a consumer report will view the report in the light of the guidelines, presuming that the information reported is in compliance with industry standards.

82.    For example, The FICO scoring system utilizes data reported by CRAs and furnishers which are, ostensibly, in compliance with Metro 2 standards.

83.    As Metro 2 format has been adopted as the credit reporting industry standard, the failure on the part of a CRA to adhere to the accepted Metro 2 standards increases the probability of a reported item being false or materially misleading to viewers of consumer reports, as those users reasonably presume that the information in the consumer reports is being reported in compliance with Metro 2 standards, and interpret that information accordingly.

84.    Thus, failure to adhere to Metro 2 in consumer credit reporting adversely affects consumers, as it causes inconsistent, misleading, and/or incorrect interpretation of information regarding consumers.

85.     Experian has actual knowledge that entities reviewing consumer credit reports presume that Experian has complied with the Metro 2 standards.

86.     Because users of consumer credit reports presume the information in those reports complies with the Metro 2 standards, the failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards increases the probability of a reported item being false or materially misleading to users of consumer reports, and thus adversely affecting the consumer.

87.     The failure on the part of a CRA and/or a furnisher to adhere to the accepted Metro 2 standards can itself support a finding of willful violation as described by 15 U.S.C. § 1681n when that failure results in a report that is false, incomplete, and misleading.

88.     Further, the failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n(a). *See*, *Gillespie v. Equifax Info. Servs., LLC*, No. 05C138, 2008 WL 4316950, at *8 (N.D. Ill. Sept. 15, 2008).

*The Metro 2 Guidelines Mandate Regular Monthly Reporting of All Accounts*

89.     As part of that industry standard, the Metro 2 Format Task Force has declared, "All accounts must be reported *on a monthly basis*." [Emphasis added] CRRG at 2-2.

90.     Because consumer credit information changes monthly, failure to update that information on a monthly basis, yet still publishing reports containing the previously reported information without updates, means that the information being reported is almost certainly incomplete, inaccurate, and misleading.

### *The Significance of the Consumer Information Indicator*

91.     Of particular importance in reporting under the Metro2 standards is the Consumer Information Indicator ("CII"), a single-character code which indicates an account's status in relation to a consumer's bankruptcy.

92.     Furnishers and CRAs are required to update the CII code when a petition for bankruptcy is filed, and again when the bankruptcy is discharged, dismissed, or withdrawn.

93.     The reporting of a proper CII code for a consumer's account ensures that the tradeline for that account accurately discloses that account's relationship to the bankruptcy case, and can suppress other statements about the account (i.e., "in

collections", "charged off") which are inconsistent with its status with respect to the bankruptcy.

94.     While furnishers sometimes report derogatory information about an account during and after a bankruptcy, the reporting of an accurate CII code ensures that if such derogatory information is reported, it is either withheld from viewers of the report, or placed in its proper context relative to the consumer's bankruptcy.

95.     This is especially important, as not all accounts are included in and/or dischargeable by consumer bankruptcy.

96.     The failure to report an accurate CII code for an account which was discharged in bankruptcy, or is included in an active bankruptcy, can lead to a consumer's report containing derogatory information which would otherwise not be visible to viewers of the report, and render other portions of the report misleading, since a viewer would not be aware that the account is included in bankruptcy.

97.     Similarly, where an account which *is not* discharged or dischargeable in bankruptcy is reported with an incorrect CII indicator, the consumer's report can falsely indicate that the account is subject to bankruptcy or discharge, and suppress the consumer's positive history of making payments toward the account.

98.    These false impressions become even greater in the light of the universally adopted Metro 2 standards, which require that an account within, or discharged by, a consumer bankruptcy be identified as such.

*Reporting of Non-Discharged Accounts Included in*
*a Completed Chapter 13 Bankruptcy, under Metro 2*

99.    Upon completion of a Chapter 13 plan, Metro 2 requires furnishers and CRAs to report on any account which is *not* discharged in the bankruptcy, for which the consumer continues to make payments, as follows:

a.    A **Consumer Information Indicator** ("CII") of "Q", removing any indication of the bankruptcy from the tradeline;

b.    An **Account Status Code**, **Payment History**, **Amount Past Due**, **Current Balance**, and **Scheduled Monthly Payment Amount** reflecting the current, month-to-month, post-bankruptcy status of the account; and

c.    A **Date of Account** Information of the current month's date.

CRRG, FAQ 28(a)-(b), at 6-21 to 6-24.

**Plaintiff's Experian Consumer Report**

100.    On or about November of 2022, Plaintiff obtained a copy of her consumer report as published by Experian.

27

101.   That report contained erroneous information as provided by Carrington, and as published and reported by Experian.

102.   The relevant portion of the Carrington tradeline showed the Mortgage as closed, having a balance of $0, and a monthly payment of $0.

103.   Because the Mortgage is not closed, the Mortgage was not discharged in Plaintiff's Bankruptcy Case, and is not subject to discharge, and Plaintiff continues to make payments to Carrington on the Mortgage, the information described above was both false and misleading in a number of key respects (the "Inaccurate Reporting"), including, *inter alia*:

      a.   The account's balance is reported as $0, rather than the actual current, correct balance of the account; and

      b.   The date of last payment fails to reflect payments made by Plaintiff; and

      c.   The tradeline was not reported in compliance with CDIA / Metro 2 standards.

104.   The Inaccurate Reporting was in derogation of accepted industry standards for reporting the Mortgage as set forth by the CDIA and Metro 2 and as adopted by Defendant, including, *inter alia*:

    a.    The continued notation of bankruptcy on the account indicates that the CII has not been updated to "Q", as required by Metro 2; and

    b.    The Balance Owed is reported as $0, rather than the actual current, correct balance as provided for under the Chapter 13 plan, as required by Metro 2;

    c.    The Monthly Payment is reported as $0, rather than the current contractual monthly payment amount, as required by Metro 2.

105.   In a letter dated May of 2023, Plaintiff disputed the inaccurate and misleading information directly to Experian and advised Experian that her mortgage was not closed, did not have a balance of $0, and did not have a monthly payment of $0.

106.   The dispute letter provided Defendant with sufficient information to identify and correct the inaccurate reporting.

107.   Pursuant to 15 U.S.C. § 1681i, Experian had a duty to notify Carrington of Plaintiff's dispute within five business days of receiving the dispute, to forward the supporting documents submitted with Plaintiff's dispute for Carrington's review,

to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Plaintiff's consumer file.

108.   Upon information and belief, Experian timely notified Carrington of Plaintiff's dispute, via e-OSCAR or otherwise, and provided the supporting documents submitted with Plaintiff's dispute.

109.   Alternatively, Experian failed to notify Carrington of Plaintiff's dispute, and/or failed to provide the supporting documents submitted with Plaintiff's dispute.

110.   Plaintiff did not receive a response from Experian to her dispute.

111.   Plaintiff incurred out of pocket expenses and loss of time to resubmit a second dispute in June of 2023.

112.   Plaintiff did not receive a response from Experian to her second dispute.

113.   Plaintiff accessed her Experian credit report again in July of 2023.

114.   The July 2023 Experian report repeated the same errors about the Mortgage which Plaintiff had previously disputed twice.

115.   Defendant's post-investigation reporting is false and misleading.

116.   Upon information and belief, Experian failed to notify Carrington of Plaintiff's dispute and to provide the supporting documents supplied by Plaintiff as

required by 15 U.S.C. § 1681i despite its written assurance to Plaintiff to the contrary.

117. Upon information and belief, Defendant did not perform any reinvestigation of Plaintiff's dispute, under either "standard" or "expedited" procedures, as described by § 1681i(a)(8), but instead simply repeated the inaccurate tradeline information.

118. Plaintiff's dispute was neither frivolous nor irrelevant.

119. Defendant did not inform Plaintiff that it had determined the dispute was frivolous or irrelevant.

120. Defendant never informed Plaintiff that it required additional information to investigate Plaintiff's dispute.

121. Defendant's post-investigation reporting is, independently and jointly, false and misleading.

122. Defendant's post-investigation reporting is in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendant's compliance with Metro 2 standards in reporting consumer information.

123.   There is no indication in the tradeline of the "verified" report that Plaintiff has disputed the information reported and published by Defendant, and the failure to note Plaintiff's legitimate dispute of the Carrington tradeline renders the reporting materially misleading.

124.   Plaintiff is informed and believes that the revised tradeline reflects any information provided by Carrington to Experian in response to Plaintiff's dispute.

## **INJURIES-IN-FACT**

125.   Defendant's actions and omissions have caused Plaintiff to lose time attempting to correct the false information on Plaintiff's consumer report.

126.   The time spent by a person attempting to correct a false credit report constitutes a concrete injury for purposes of an FCRA claim. *Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 16-17107, 2019 U.S. App. LEXIS 33662, at *5 (11th Cir. Nov. 12, 2019), citing Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017).

127.   Defendant's actions and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit score and other credit rating model scores.

128.   The adverse effect on Plaintiff's credit score places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than she otherwise would.

129.   Further, the Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to

a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc.*, No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc.*, No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

130.   Defendant's actions and omissions have resulted in the illegitimate suppression of Plaintiff's credit-based insurance scores.

131.   The adverse effect on Plaintiff's credit-based insurance scores places Plaintiff at the material risk of being denied insurance or receiving less favorable insurance rates and terms than she otherwise would.

132.   Defendant's actions and omissions have caused Plaintiff's credit report to falsely indicate that Plaintiff's Mortgage is closed and has a balance of $0, suggesting that the account was discharged in Plaintiff's Bankruptcy Case, thereby

denying Plaintiff the positive effect of the reporting of their Mortgage payments over the course of the Chapter 13.

133.   This false impression creates a material risk that Plaintiff would be denied credit, receive less favorable credit treatment than Plaintiff otherwise would, or receive other unfavorable treatment than Plaintiff otherwise would, from any viewer of Plaintiff's Experian credit report engaged in judgment-based lending.

134.   The existence of consumer reports which inaccurately report Plaintiff's Mortgage, and/or falsely suggest that Plaintiff's Mortgage has been discharged or is subject to discharge, make it inherently more difficult and more expensive for Plaintiff to refinance the Mortgage.

135.   For example, for Plaintiff to obtain an FHA loan, the FHA's general credit policy requires lenders to obtain Plaintiff's full credit report–not just Plaintiff's credit scores, and analyze Plaintiff's credit history, liabilities, and debts to determine creditworthiness. U.S. Dep't of Hous. and Urban Dev., *Handbook 4000.1, FHA Single Family Housing Policy Handbook*, 250 (December 30, 2016), *https://www.hud.gov/sites/documents/40001HSGH.PDF* (January 16, 2018) archived at https://perma.cc/UE3H-N3BS.

35

136.   To obtain an FHA refinance of a potential mortgage, the lender must be able to verify Plaintiff's payments for a potential mortgage for the preceding 12 months. *Id*. at 409.

137.   In the event this information cannot be obtained via the consumer's credit report, FHA guidelines mandate that the consumer meet this burden through other, more difficult and time-consuming means. *Id*. at 410.

138.   Plaintiff's correct payment history would be included in Plaintiff's Experian credit report if Defendant had conducted appropriate investigation of Plaintiff's dispute.

139.   However, because the Mortgage is falsely reported in Plaintiff's Experian credit report as having a $0 balance, $0 monthly payment, and being closed, Plaintiff will be forced to pursue alternative, more time-consuming, and more expensive means of demonstrating her payment history to a potential lender.

140.   Because Defendant failed to comply with their duties under the FCRA as detailed herein, Plaintiff will need to obtain and provide verification of the Mortgage, bank statements, and/or other documents to demonstrate his payment history for the previous 12 months.

141.   This requires Plaintiff to expend more time, effort, and money due to Defendant's failures to abide by its obligations under the FCRA.

## DAMAGES

### Actual Damages

142.   As a result of Defendant's actions and omissions, Plaintiff has suffered actual damages.

143.   These damages include out-of-pocket expenses incurred as a result of Defendant's wrongful representations regarding the Mortgage, and Defendant's failures to abide by their obligations under the FCRA.

144.   Plaintiff has suffered a decrease in Plaintiff's credit score as a result of Defendant's wrongful representations regarding the Mortgage, and Defendant's failures to abide by their obligations under the FCRA.

145.   Plaintiff has also experienced aggravation, frustration, and stress due to the fact that Defendant is thwarting Plaintiff from receiving the Fresh Start guaranteed by bankruptcy process and discharge.

### Statutory and Punitive Damages

146.   At the time Defendant reported the information at issue in this matter, Defendant had actual notice that the information it was reporting regarding Plaintiff and the Mortgage was false, deceptive, and misleading.

147.   Defendant had more than enough information to correct its false, deceptive, and misleading reporting.

148.   Despite that, Defendant continued to report the false, deceptive, and misleading information regarding Plaintiff and the Mortgage.

149.   Defendant failed to correct its false, deceptive, and misleading reporting, and in fact continued to report false, deceptive, and misleading information regarding Plaintiff, as described herein.

150.   Accordingly, Defendant's conduct was willful.

151.   As a result of Defendant's willful actions and omissions, Plaintiff is eligible to recover actual damages or statutory damages of up to $1,000, potential punitive damages, costs of this action, and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and/or 1681o.

## **CAUSES OF ACTION**

### **VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
### **15 U.S.C. §§ 1681e(b) and 1681i**
### **Experian Information Solutions, Inc.**

152.   Plaintiff incorporates by reference the preceding paragraphs as though fully stated herein.

153.   Pursuant to 15 U.S.C. § 1681e(b), Experian is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports about Plaintiff.

154.   Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Experian had an affirmative duty to independently investigate the dispute submitted by Plaintiff.

155.   Pursuant to 15 U.S.C. § 1681i(a)(2), Experian was required to communicate the specifics of Plaintiff's dispute to Carrington, including the forwarding of any documents provided by Plaintiff in support of that dispute.

156.   A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

157.   A reasonable reinvestigation clearly requires some degree of careful inquiry, and more than just a superficial inquiry.

158.   The reasonableness of a reinvestigation under the FCRA is generally a question of fact for the jury.

159.   In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Experian was required to review and consider all relevant information submitted by Plaintiff.

160.   Plaintiff's dispute were clear and unambiguous as to the inaccuracies of Experian's reporting of the Mortgage.

161.   Plaintiff provided all the relevant information necessary for Experian to conduct a reasonable reinvestigation, and correct the inaccuracies in its reporting.

162.   Experian breached its duties as described herein.

163.   If Experian had conducted a reasonable reinvestigation of Plaintiff's dispute, Experian would have reviewed and considered all of the information Plaintiff submitted in her dispute, and would have easily detected that what was being reported regarding the Mortgage was factually incorrect, inaccurate, and misleading.

164.   If Experian had conducted a reasonable reinvestigation of Plaintiff's dispute, the Carrington tradeline on Plaintiff's Experian consumer report would have been appropriately corrected.

165.   Due to Experian's failures to follow reasonable procedures to assure maximum possible accuracy of information, and failures to conduct a reasonable

reinvestigation of Plaintiff's dispute, the false and misleading information in Plaintiff's credit file and on Plaintiff's Experian report was not appropriately modified.

166. Experian had all the information necessary to correct its reporting. Despite that, Experian failed to correct the false, disputed information, in the face of clear evidence that its reporting was false and misleading. That failure indicates that Experian's reinvestigation procedures were not reasonable.

167. The fact that Experian had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that Experian recklessly disregarded Plaintiff's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

168. Upon information and belief, Experian has prepared consumer reports containing the incomplete and inaccurate information at issue, and has published the incomplete and inaccurate information to third parties.

169. Experian willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Plaintiff in her consumer reports, in

reckless disregard of the statutory requirements, Plaintiff's dispute, and the publicly recorded Bankruptcy Case filings.

170.   Experian willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to properly notify Carrington of Plaintiff's dispute, by failing to provide Carrington with all the supporting information/documents included with Plaintiff's dispute, by failing to conduct a reasonable reinvestigation of Plaintiff's dispute, and by failing thereafter to appropriately modify information in Plaintiff's file and on her consumer reports, in reckless disregard of the statutory requirements, Plaintiff's dispute, and the publicly recorded Bankruptcy Case filings.

171.   As a result of Experian's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Plaintiff has suffered actual damages as described herein. Plaintiff is, therefore, entitled to recover actual damages from Experian pursuant to 15 U.S.C. §§ 1681n and 1681o.

172.   Experian's actions and omissions were willful, rendering Experian liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

173.   Plaintiff is entitled to recover costs and attorneys' fees from Experian pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **TRIAL BY JURY**

174.   Plaintiff is entitled to and hereby request a trial by jury.

**WHEREFORE**, Plaintiff prays that judgment be entered in her favor and against Defendant for:

a)   Plaintiff's actual damages;

b)   Statutory damages of $1,000 per violation of the FCRA pursuant to 15 U.S.C. § 1681n;

c)   Punitive damages pursuant to 15 U.S.C. § 1681n;

d)   Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

e)   Such other and further relief as may be just and proper.

Respectfully submitted this 28th day of August, 2023.

BERRY & ASSOCIATES

*/s/ Matthew T. Berry*
Matthew T. Berry
Georgia Bar No.: 055663
matt@mattberry.com
Telephone: (404) 235-3334

2751 Buford Highway, Suite 600
Atlanta, GA 30324

*/s/ Chris Armor*
Christopher N. Armor
Georgia Bar No. 614061
P.O. Box 509
Londonderry, Vermont 05148
Phone 651-208-6441
Fax 404-592-6102
chris.armor@armorlaw.com

*Counsel for Plaintiff*