

⊕ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FULTON COUNTY, GEORGIA

**2023CV383456**

**JUL 31, 2023 04:48 PM**

*Ché Alex\**
Ché Alexander, Clerk
Fulton County Superior Court

# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA

136 PRYOR STREET, ROOM J2 C-103, ATLANTA, GEORGIA 30303

## SUMMONS

| | |
|---|---|
| PEACHTREE CENTER REHAB, LLC | ) Case |
| | ) No.: 2023CV383456 |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| STATE FARM MUTUAL AUTOMOBILE | ) |
| INSURANCE COMPANY | ) |
| | ) |
| STATE FARM FIRE AND CASUALTY | ) |
| COMPANY | ) |
| **Defendant** | ) |
| | ) |

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at https://peachcourt.com/ (unless you are exempt from filing electronically) and serve upon plaintiff's attorney, whose name and address is:

> **Douglas Dean**
> **Dean Thaxton**
> **P.O. Box 5005**
> **Cordele, Georgia 31010**

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This_____31st day of_____July, 20 23

Honorable Ché Alexander,
Clerk of Superior Court

_____
Ché Alexander, Clerk
Fulton County Superior Court

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20_____

Deputy Sheriff

**Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used**

Exhibit No. 1



⊕ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FULTON COUNTY, GEORGIA

**2023CV383456**

**JUL 31, 2023 04:48 PM**

*Ché Alexan*
Ché Alexander, Clerk
Fulton County Superior Court

# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
### 136 PRYOR STREET, ROOM J2 C-103, ATLANTA, GEORGIA 30303
## SUMMONS

| | |
|---|---|
| PEACHTREE CENTER REHAB, LLC | ) Case |
| | ) No.: 2023CV383456 |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| STATE FARM MUTUAL AUTOMOBILE | ) |
| INSURANCE COMPANY | ) |
| | ) |
| | ) |
| STATE FARM FIRE AND CASUALTY | ) |
| COMPANY | ) |
| **Defendant** | ) |
| | ) |

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at https://peachcourt.com/ (unless you are exempt from filing electronically) and serve upon plaintiff's attorney, whose name and address is:

> **Douglas Dean**
> **Dean Thaxton**
> **P.O. Box 5005**
> **Cordele, Georgia 31010**

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed within five (5) business days of such service. Then time to answer shall not commence until such proof of service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This_____31st day of_____July, 20 23

                                        Honorable Ché Alexander,
                                        Clerk of Superior Court

                                        *Ché Alexan*
                                        _____
                                        Ché Alexander, Clerk
                                        Fulton County Superior Court

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you _____, 20_____

                                        Deputy Sheriff

**Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used**

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FULTON COUNTY, GEORGIA

**2023CV383456**

**JUL 31, 2023 04:48 PM**

Ché Alexander, Clerk
Fulton County Superior Court

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| PEACHTREE CENTER REHAB, LLC | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION FILE NO. _____ |
| v. | : | |
| | : | |
| STATE FARM MUTUAL AUTOMOBILE | : | |
| INSURANCE COMPANY, and | : | **JURY TRIAL DEMANDED** |
| STATE FARM FIRE AND CASUALTY | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

## VERIFIED COMPLAINT FOR DECLARATORY RELIEF

COMES NOW PEACHTREE CENTER REHAB, LLC ("Plaintiff" or "Peachtree"), in the above-captioned civil action and files this complaint against STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE AND CASUALTY COMPANY (collectively, "State Farm"), and, in support thereof, shows this Court the following:

## PRELIMINARY STATEMENT

Peachtree is a Chiropractic practice which provides, amongst other services, rehabilitative and pain management treatment to patients who have been injured in motor vehicle accidents. Peachtree is owned by Dr. Jeremy Broe, a Georgia licensed chiropractor. The majority of patients treated at Peachtree are minorities. Unfortunately, the race of Plaintiff's patients and the fact that Plaintiff represents a source of third-party auto claim expense, has made Plaintiff the target of a racially motivated profit scheme employed by State Farm which its executives secretly call "Filling the Cups." The scheme involves manufacturing accusations of fraud against providers such as Plaintiff as a means of intimidation and driving down claim expense.

State Farm recently revealed that it is now targeting Plaintiff with its "fill the cups" scheme. Plaintiff therefore brings this action for Declaratory Relief to declare its rights under Georgia law in order to guide and protect Plaintiff from uncertainty and insecurity with regard to its future conduct.

## JURISDICTION AND VENUE

1.

Plaintiff is a Chiropractic practice located at 241 Peachtree Street, Ste. B, Atlanta, Georgia 30303.

2.

Defendants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company are foreign corporations authorized to do business in the State of Georgia.  State Farm is engaged in the business of selling automobile insurance policies to the general public and to residents of Georgia, which policies are governed by, among other laws, the Georgia Motor Vehicle Reparations Act ("the Act").

3.

Defendant State Farm Mutual Automobile Insurance Company may be served with process on its registered agent, Corporation Service Company, 2 Sun Court, Ste. 400, Peachtree Corners, Georgia 30092.

4.

Defendant State Farm Fire and Casualty Company may be served with process on its registered agent, Corporation Service Company, 2 Sun Court, Ste. 400, Peachtree Corners, Georgia 30092.

5.

This Court has personal jurisdiction over Defendants.

6.

This Court has subject matter jurisdiction over the matters set forth in this Complaint.

7.

Venue is appropriate in this Court.

8.

Process and service are appropriate and valid in all respects

9.

This Complaint is timely.

10.

The Complaint is valid procedurally and otherwise.

11.

Plaintiff provides reasonable and necessary chiropractic and rehabilitation services to patients whom have been injured in auto accidents.

12.

The majority of Plaintiff's patients are African-American.

13.

The Georgia Motor Vehicle Accident Reparations Act (the "Act") requires that all Georgia car insurance policies include liability coverage, but Medical Payments Coverage Benefits ("MPC Benefits") are optional.  O.C.G.A. § 33-34-2 et seq.

14.

The large majority of auto accident patients treated by Plaintiff do not have MPC Benefits and, where a patient is represented by counsel who obtains a recovery of some kind from a responsible third party, the costs for Plaintiff's services are paid to Plaintiff by the patient's counsel out of said recovery.

3

15.

Plaintiff sends its records of treatment and a statement of the costs for same solely to the attorney representing the patient.

16.

In such circumstances, Plaintiff does not know whether there even is a third-party liability insurer against whom the patient's claim may be pressed, nor does Plaintiff have any interaction with the third-party insurer if one exists.

17.

To the extent any of Plaintiff's treatment records and/or billing statements are provided to a third-party insurer by a patient's attorney, Plaintiff has no knowledge of nor input into what records and/or information about the patient's injuries is actually submitted, nor does Plaintiff know or have any input into how the attorney characterizes Plaintiff's records and/or bills to support the patient's third-party claim.

18.

State Farm is by far the dominant private passenger auto insurance company in America and in Georgia, where its market share is nearly 25% and dwarfs all other competitors in the state.

19.

State Farm's dominance in Georgia necessarily means that a large percentage of the injury claims being pursued by Plaintiff's patients are and will be made against State Farm insureds.

20.

State Farm has achieved its market dominance in large part due to a sophisticated model of handling auto injury claims designed to devalue them by all means possible.

21.

One particular strategy of claim devaluation which State Farm employs involves automatically targeting claims involving minorities as fraudulent and is sometimes internally referred to within the company as "filling the cups."

22.

The origin of the "filling the cups" strategy can be traced back to a Division Claims Superintendents Conference in 1986, and later to guidance provided by the notorious consulting McKinsey & Company, which advocated a "fraud funnel" strategy of generating massive profit by devaluing injury claims with accusations of fraud and/or exaggeration.

23.

Using pretextual "NICB indicators" as cover, the fraud funnel seeks to isolate and attack as fraudulent and/or exaggerated injury claims emanating from "metro" areas of the country; "metro" being a euphemism for urban centers with large minority populations, such as Atlanta.

24.

"Metro area" injury claims, because they involve auto accidents in densely populated urban areas, generally occur at lower speeds and more frequently involve injuries to the neck and back which are evidenced by subjective complaints of pain and reduced ranges of motion, as well as self-reported limitations on activities of daily living.

25.

The medical providers most frequently consulted accident victims experiencing such injuries are chiropractors and, as a result, chiropractic treatment represents a huge percentage of the expenses involved in auto injury claims in "metro areas."

26.

The injuries treated by chiropractors often cannot be specifically identified by diagnostic testing and their severity is largely evidenced by subjective reporting such as pain scales, diminished ranges of motion, and limitations on the patient's activities of daily living.

27.

Initially through its consultation with McKinsey and later on through development of its own standard claims processes, State Farm recognized that the value of such subjectively supported injury claims depends not only on the personal credibility of the claimant, but even more so on the credibility medical provider substantiating the complaints.

28.

This reality revealed what McKinsey called an "opportunity" to dramatically reduce injury claim expenses in "metro areas" by attacking the personal credibility of both claimants and their medical providers with accusations of fraud and exaggeration by creating a "fraud funnel" model of claims handling.

29.

But McKinsey and State Farm recognized that such predetermined treatment of claims from "metro areas" flagrantly flouted the contractual (and often codified) requirements of insurer good faith, so upon McKinsey's recommendation, State Farm sought to insulate itself by conjuring pretextual justifications for automatically treating "metro area" claims as fraudulent.

30.

State Farm sought further insulation from bad faith claims by narrowing the fraud funnel to injury claims made by the people most vulnerable to stereotyping based on already existing prejudices and who more frequently lack the resources to resist bad faith insurer tactics: minorities, immigrants, and low-income claimants.

31.

Amongst the many different medical providers who help injured auto accident victims, chiropractors were identified as most vulnerable to the fraud funnel given their lesser stature within the medical community, a stature State Farm has prominently spent decades and millions of dollars intentionally helping to foster.

32.

Over the past two decades, State Farm has taken McKinsey's original advice and steadily perfected a system of claims handling designed to maximize the "fraud opportunity" by targeting injury claims of minorities, immigrants, and low-income claimants while also minimizing its exposure to bad faith claims.

33.

State Farm has accomplished this by setting up a system of "fraud indicators" as pretextual justifications for characterizing a claim as "potentially fraudulent" from its inception.

34.

State Farm's "fraud indicators" are pretenses unsubtly designed to capture claims more likely to involve minorities, immigrants and/or low-income claimants, such as:

- Is the treating doctor's office in an "unsafe part of town";

- Was the claimant driving an "older model vehicle";

- Are the parties involved in an accident part of the same "ethnic background";

- Is a claimant "self-employed";

- Is a claimant's cell phone on a "month to month payment plan?"

35.

There is no possible reason other than racial and economic stereotyping to call it an "indicator of fraud" that a treating doctor's office is in an "unsafe part of town" or that the claimant was driving an "older model vehicle" or that the parties in an accident are of the same "ethnic background."

36.

To make sure that the fraud funnel filtered in mostly *chiropractic* treatment claims (as opposed to orthopedic or neurologic treatment less vulnerable to credibility attacks), State Farm also identified as "indicators of fraud" the exact types of injuries for which it knows accident victims most often seek the help of a chiropractor.  For example, according to State Farm:

- It is an indicator of potential fraud if injuries claimed are subjective (e.g., pain, headaches, nausea, inability to sleep, depression, dizziness and soft tissue);

- It is an indicator of potential fraud if a claimant is diagnosed with muscle spasms as the result of an accident;

- It is an indicator of potential fraud if a claimant is diagnosed with sprain and/or strain injuries as the result of an accident.

37.

The fraud "opportunity" to reduce claim expenses by attacking the credibility of "metro area" claimants and their medical providers has been exploited by State Farm to the tune of tens of billions of dollars since the turn of the century.

38.

Initially called "ACE" (for Advancing Claims Excellence), then through formalized procedures called Standard Claims Processes ("SCP"), and more recently through the secret corporate culture its executives call "Filling the Cups," State Farm has built its entire injury claim handling culture around the fraud funnel.

39.

In February of 2022, a high-ranking executive within State Farm's fraud unit ("S.I.U."), publicly revealed in a sworn declaration State Farm's secret scheme of funneling claims of minorities into the fraud unit as a means of manufacturing massive claim expense avoidance. A copy of the Declaration of Carla Campbell-Jackson, Ph.D. is attached as Exhibit "A".

40.

As revealed by Dr. Campbell-Jackson, State Farm's S.I.U. executives from across the country would meet weekly via videoconference to review statistics and "discuss ways of increasing the number of claims sent to the SIU in an effort to 'Fill the Cups.'"

41.

Filling the Cups is transparent code for the strategy first sold to State Farm by McKinsey and thereafter baked over time into State Farm's entire culture of claims handling whereby the company automatically attacks claims of minorities as fraudulent as a means of intimidation and avoiding payments the company is obligated to make.

42.

As further revealed by Dr. Campbell-Jackson, State Farm at its highest executive levels demands automatic referral to State Farm's fraud units of claims which emanate from "inner city" neighborhoods in large metropolitan areas under the pretense that such claims present "high risk for fraud," and Dr. Campbell-Jackson confirmed that indeed, most claims sent to the SIU and denied during her tenure involved African-American and minority groups.

43.

According to Dr. Campbell-Jackson, company-wide SIU Leadership Meetings have been regularly held amongst leaders of State Farm's "Multi-Claim Investigation Units" ("MCIU") from across the country.

9

44.

State Farm's MCIU's are sub-sections of the SIUs and are dedicated specifically to targeting multi-claim generating entities, with a significant focus on medical providers such as chiropractors.

45.

According to Dr. Campbell-Jackson, at one meeting of State Farm's top SIU/MCIU executives from around the country, the subject of "Filling the Cups" was on the agenda and State Farm representatives shared SIU/MCIU statistics reflecting "how much State Farm saved by SIU/MCIU denying claims."

46.

At another company-wide meeting, a high-ranking State Farm SIU executive reportedly exhorted SIU Section Managers that, "We must fill the cups."

47.

In another company-wide meeting, State Farm reportedly crowed to its gathered SIU/MCIU top brass that, "We hit a home run in Filling the Cups" and that the MCIU had enabled State Farm to avoid $1.5 *billion* in claims expense in 2015 *alone.*

48.

Dr. Campbell-Jackson confirmed that one way State Farm "Fills the Cups" is by maintaining lists of physicians frequented by minority policy holders and claimants and scrutinizing claims from such physicians for fraud opportunities.

49.

State Farm has designed an entire system of claims handling, spearheaded by its SIU/MCIU's around the country, which manufacture pretextual justifications for injecting allegations of fraud into claims most likely to involve minorities, immigrants, and low-income claimants in urban areas of the country.

10

50.

As applied to chiropractors in metropolitan areas treating minority patients, the false fraud allegation most frequently manufactured by State Farm is an allegation of "non-individualized" care based on alleged "patterns" in the doctors past records, which patterns alone supposedly demonstrate that every treatment provided to any individual patient was "predetermined" and therefore fraudulent.

51.

Over the past 20 years, as part and parcel of its "Fill the Cups" program and in addition to other manufactured claims of fraud, State Farm has filed and/or threatened massive federal lawsuits against doctors in the metropolitan areas of Georgia and virtually every other "metro area" of the country alleging fraud based on supposedly "predetermined treatment protocols" identified by its MCIU.

52.

Such lawsuits are designed to create attention-grabbing headlines which foster a general perception of rampant fraud in auto injury claims and destroy the reputations of the targeted medical providers so as to ruin their practices and eliminate them as sources of claim expense.

53.

Not content, however, with the billions of dollars it has avoided paying to medical providers directly billing it for treatment of State Farm insureds, State Farm in recent years has expanded the litigation component of its strategy of filling the cups to include accusations of fraud against chiropractors like Plaintiff, whose bills and records are actually being submitted by lawyers in support of third-party claims against State Farm insureds without any input or knowledge of Plaintiff.

54.

State Farm contends in such cases that providers such as Plaintiff submit bills, medical documentation and narrative reports "to the personal injury attorney representing the patient, with

the knowledge, understanding, and intention that this documentation will be submitted to insurers like [State Farm], as part of a demand package seeking to obtain a settlement in the form of insurance benefits, in which the medical provider has a financial interest."

55.

State Farm further contends in such lawsuits that the medical provider's records are fraudulent for various reasons, the most frequently alleged of which is that the "patterns" across the provider's past records reflect "predetermined" treatment.

56.

Regardless, however, of the pretextual justification for its assignment of fraud within the targeted provider's records, State Farm alleges that simply by sending its records to the patient's attorney, who then included the records somehow in a settlement demand package, the targeted medical provider actually "made untrue statements of material facts to State Farm" which State Farm "justifiably relied upon" in issuing whatever payments it made on the claim.

57.

State Farm has used this theory of fraud as the basis for numerous lawsuits it has filed and/or threatened against medical providers across the country through "nationally retained counsel" who specialize in threatening and pursuing such suits.

58.

One such "nationally retained counsel" is the law firm of Holland & Knight and its "Insurance Fraud and Recovery" team, including its Partner, Andrew Loewenstein, Esquire, whom State Farm regularly retains to pursue actions against medical providers in Georgia.

12

59.

State Farm retains Holland & Knight and Mr. Loewenstein only after its MCIU has decided to pull a medical provider into the fraud funnel and seek a pre-litigation "settlement" from the provider in lieu of being sued in federal court based on one of State Farm's ginned up fraud claims.

60.

The overture from Holland & Knight invariably takes the form of a letter from Mr. Loewenstein or another member of the firm's "Insurance Fraud & Recovery Team" demanding a meeting to discuss State Farm's "concerns" or "questions" regarding the provider's billings.

61.

Although such a letter is itself an announcement by State Farm that it has decided to accuse the medical provider of fraud, Mr. Loewenstein and State Farm make its threat to file a lawsuit unequivocally clear by demanding that the medical provider sign a "Confidentiality, Tolling and Moratorium Agreement" just to hear the specifics of State Farm's accusations and demands for settlement thereof.

62.

State Farm, Holland & Knight, and Mr. Loewenstein have now targeted Plaintiff with a threatened lawsuit alleging fraud based on Plaintiff having submitted bills and records to various patients' attorneys whom, in turn, have (somehow) included said bills and records in demand packages resulting in payments to the attorneys and/or their clients.

63.

On May 23, 2023, Mr. Loewenstein wrote to Plaintiff requesting a meeting to discuss "questions that have arisen regarding treatment and billing for services rendered to patients whose claims are covered by an auto policy written by the State Farm Companies."  A copy of Mr. Loewenstein's letter is attached as Exhibit "B".

64.

Given that so few of Plaintiff's patients over the years have had MPC coverage with State Farm, State Farm's "questions" can only relate to third-party claims in which Plaintiff's treatment and billing records were submitted to State Farm by attorneys representing Plaintiff's patients rather than by Plaintiff.

65.

On June 5, 2023, Plaintiff's owner emailed Mr. Loewenstein acknowledging his letter and suggesting, given his schedule, that they target a date in early July for a call.

66.

On June 6, 2023, Mr. Lowenstein responded that early July would be acceptable but asked that Plaintiff's owner execute an attached "Confidentiality, Tolling and Moratorium Agreement."

67.

On June 8, 2023, Plaintiff's owner indicated a time crunch which prevented him from trying to understand the terms of the Agreement and asked simply to have a call scheduled to understand the questions State Farm supposedly has.

68.

On June 9, 2023, however, Mr. Loewenstein made clear that he would only provide details about State Farm's supposed questions once the "CTM agreement had been executed."

69.

The demanded "CTM Agreement" is attached as Exhibit "C".

70.

The terms of the demanded "CTM Agreement" were that State Farm and Plaintiff would "enter into discussions for purposes of attempting to resolve the issues between them", which discussions the Agreement calls "settlement discussions." **Ex. "C", ¶ 8.**

14

71.

The CTM Agreement provided further that State Farm would hold off on filing its lawsuit against Plaintiff while "settlement discussions" occur, but only if Plaintiff first agreed, *inter alia*, that:

- **The statute of limitations on any lawsuit by State Farm against Plaintiff would be tolled while "settlement discussions" were ongoing and that Plaintiff could not file any lawsuit against State Farm during the "moratorium" period. (Ex. "C", ¶ 4-5);**

- **The tolling period would be considered to have started "from the beginning of the world" and extended through to the expiration of the CTM Agreement. (Ex. "C", ¶4);**

- **Federal and state rules of evidence would apply to the "settlement discussions" and any information disclosed in their course cannot be "used for any other purpose if the Parties are unable to reach an agreement, including but not limited to, any future lawsuits of any kind." (Ex. "C", ¶ 8); and**

- **Plaintiff must agree to waive the jurisdictional dictates of the "first-to-file" rule (Ex. "C", ¶ 16).**

72.

State Farm's unequivocal threat of a lawsuit based on Plaintiff's records having been included (somehow) by attorneys in third-party claims, combined with its demand for "settlement discussions" contingent upon Plaintiff waiving such important protections as the statute of limitations and first to file rule, places Plaintiff in an impossible position.

73.

In order just to engage in "settlement discussions" Plaintiff must first agree to give up its right to file its own suit challenging the legitimacy of State Farm's accusations and also agree that State Farm shall have the right to dictate the forum in which the dispute can be litigated. This gives Plaintiff a Hobson's Choice: Agree in advance of seeing them that State Farm's fraud allegations are sufficiently legitimate to actually warrant "settlement discussions" in the first place; or refuse and be hit with a federal fraud lawsuit in which any opportunity to challenge the factual credibility of State Farm's accusations is effectively impossible while Plaintiff's reputation is destroyed by accusation alone.

74.

In any federal fraud lawsuit State Farm files, the Court would be bound under the Federal Rules of Civil Procedure to accept the truth of State Farm's allegations that Plaintiff "made untrue statements of material facts to State Farm" which State Farm "justifiably relied upon" and the lawsuit would be permitted to proceed past the pleadings stage.

75.

State Farm knows that all it needs for this litigation component of the "fill the cups" scheme to succeed is for the case to proceed to the discovery phase, because it knows (and knows the targeted medical provider knows) that the overwhelming reputational damage and burden of defending the accusations of such a dominant corporate behemoth over the course of many months (if not years) is impossible for any small business such as Plaintiff to withstand.

76.

It is critical therefore that Plaintiff have the opportunity to challenge by way of this declaratory judgment action the essential fallacy of State Farm's accusations.

77.

It is simply false that State Farm relies in any way on the truth or accuracy of any medical record submitted in support of a third-party injury claim, and it is further false that that State Farm relies in any way on the truth or accuracy of any medical record submitted in support of a third-party injury claim when determining whether and how much to pay out on the claim.

78.

State Farm, as a property and casualty insurer, is in the business of resolving personal injury claims. After State Farm receives a settlement demand from a claimant's attorney, its trained employees conduct a detailed, multi-faceted dissection of the claimant's medical bills and records using highly-sophisticated computer software programs designed specifically to challenge (i) whether the

16

claimant's medical care was reasonable, necessary, and causally related to the accident, and (ii) whether the costs of the claimant's medical care are usual, customary, and reasonable for the area based on aggregated data from millions of prior claims.

79.

Additionally, especially with respect to claims from "metro areas", State Farm frequently funnels the claim to its Special Investigation Unit (the division of State Farm that is specifically tasked with identifying and deterring potential fraud in individual claims); And/or it accepts liability for the accident but contests damages; And/or it requires the a recorded statement or an independent medical examination; And/or it retains an outside expert to contest the reasonableness and necessity the claimants' treatment and bills; and/or it Deposes the claimant's treating physicians—all for purposes of finding every possible excuse to avoid paying and/or reduce the amount it cannot find any justification to avoid.

80.

Even for those medical bills State Farm cannot find any justification to avoid paying, it will internally adjust a provider's "billed" amounts (i.e., the value a treating physician ascribes to his or her services) to "allowed" amounts (i.e., the value that State Farm ascribes, based on its own computations, to a treating physician's services).

81.

Moreover, State Farm always tries to negotiate a settlement with the claimant's attorney (whether prior to or during litigation), entirely without any involvement, input, or even the knowledge of Plaintiff.

82.

The truth is State Farm resolves personal injury claims for various reasons which are completely unrelated to anything contained in the records or bills of Plaintiff.

17

83.

This truth is evidenced by the fact that upon settlement, State Farm makes a lump-sum payment to the claimant's attorney; State Farm does not tell the attorney how much of Plaintiff's bills were considered for settlement purposes; nor does State Farm tell the attorney how to apportion the money (e.g., whether to pay anything to Plaintiff out of the settlement).  The lump-sum payment comprises special damages (e.g., medical expenses and lost wages) and general damages (e.g., pain and suffering), without a breakdown between each category of damages.

84.

After receiving a settlement, the patient's attorney negotiates discounts of the patient's bills with each of the patient's medical providers (including Peachtree).  The amount that Peachtree receives in satisfaction of its bill varies from patient to patient.  State Farm is not involved in those discussions. Absent a settlement or judgment, the patient remains fully responsible for his or her bill.

85.

In short, it is a false representation that State Farm *ever* makes payments in any third-party claim in "reliance" upon any aspect of Plaintiff's bills or records, and it is equally false to represent that State Farm accepted such records and bills as substantively true.  But if Plaintiff waits to be sued in federal court based on this allegation, and the Court accepts the allegations as true as it must under Fed.R.Civ.Pro. 12(b)(6), the matter would be permitted to proceed to a litigation which Plaintiff cannot possibly survive.

86.

In the meantime, Plaintiff continues to treat patients and provide its records and bills to their attorneys without knowing whether the records and bills are being submitted to State Farm and thus increasing the "damages" State Farm threatens to seek.  This leaves Plaintiff in a position of desperate uncertainty as to whether treating any current or future patient or submitting bills and records to any

patient's attorney exposes Plaintiff to a greater claim of "damages" in State Farm's threatened lawsuit.

87.

Plaintiff therefore brings this action for declaratory relief as it represents the only real opportunity Plaintiff has to challenge the actual merits of State Farm's false, racially motivated accusation of fraud.

## COUNT ONE:  DECLARATORY JUDGMENT

88.

Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

89.

Pursuant to O.C.G.A. § 9-4-2, Plaintiff seeks a declaration that:

(a)     State Farm has not and is not presently relying on the truth or accuracy of any representation made by Plaintiff in determining the settlement amount of any third-party injury claim made by a patient of Plaintiff through the patient's counsel;

(b)     No portion of any settlement paid by State Farm in any third-party claim in which Plaintiff was a treating medical provider was proximately caused to be paid by any representation by Plaintiff;

(c)     Any payment made by State Farm in settlement of a third-party claim which State Farm apportions to Plaintiff was voluntary.

90.

The above facts show that Plaintiff is in a position of uncertainty or insecurity because of a dispute and of having to take some future action which is properly incident to its rights, and which future action without direction from the Court might reasonably jeopardize its interest.

19

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award the following relief:

(1)      That summons issue and Defendants be served as provided by law;

(2)      Declaratory judgment be awarded in favor of Plaintiff as outlined above;

(3)      That Plaintiff be awarded reasonable attorney fees, costs, and expenses;

(4)      That this Court grant a trial by a jury of twelve on all issues so triable; and

(5)      This Court grants such other and further relief as this Honorable Court deems equitable and just.

Respectfully submitted this 31st day of July 2023.

DEAN THAXTON, LLC


By:    /s/ Douglas H. Dean
           Georgia Bar No. 130988
           601 E. 14th Avenue (31015)
           Post Office Box 5005
           Cordele, Georgia  31010
           O: (229) 271-9323
           F:  (229) 271-9324
           E:  *doug@deanthaxton.law*


           ***Attorney for Plaintiff***

Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| THE CONNECTORS REALTY GROUP CORPORATION and DARRYL WILLIAMS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.    19-cv-00743 |
| STATE FARM FIRE & CASUALTY COMPANY, | ) ) ) | Honorable Charles P. Kocoras |
| Defendant. | ) ) ) | |

### DECLARATION OF CARLA CAMPBELL-JACKSON, PH.D.

Carla Campbell-Jackson, Ph.D., does declare and swear as follows:

1. I am over the age of 18 years and have personal knowledge of the following matters set forth in this Declaration to which, if called as a witness, I could competently testify.

2. I have received a Doctorate in Organizational Leadership in 2013 from University of Phoenix. I have received a Masters of Business Administration Degree from Illinois State University in 2003. I have received a Bachelors Degree in Communications in 1987 from Drake University. I am an African American (Black) female.

3. I began working for State Farm Insurance Company ("State Farm") as a College Intern in approximately 1986 in Des Moines, Iowa. In approximately 1988 I was hired by State Farm as Claim Representative in Chicago, Illinois. In approximately 1993 I was promoted to the position of Human Resources Representative in Chicago, Illinois. In approximately 1995 I was promoted to the position of Auto Claims Supervisor in Chicago, Illinois. In approximately 1998 I was promoted to the position of Superintendent/Team Manager in Auto Claims. In

approximately 2003 I moved to Auto Claims Central as a Claims Manager. In approximately 2009 I was promoted to the position of Section Manager for Auto Claims in Kalamazoo, Michigan. In 2014 State Farm assigned me to the position of Claims Section Manager in the Special Investigations Unit ("SIU"), Kalamazoo, Michigan, primarily for the states of Michigan, Illinois, Missouri, Indiana and Iowa ("my Section"). I had never asked to be an SIU Section Manager, but, instead it was State Farm on its own that moved me to that position. My employee ratings with State Farm were always exceptional until State Farm became alarmed by my expressing that the SIU Claims denial process was being used to target and deny minority claims as set forth further below.

4. During the period 2014-2016 I also held the voluntary, unpaid, position of First Vice President and, subsequently, President of the Bloomington-Normal Chapter of the National Association for the Advancement of Colored People (NAACP).

5. As an SIU Claims Section Manager I was informed by State Farm that my duties included, but were not limited to, the following:

A. Review claim files from claims originating in my Section;

B. Review claims determinations made by SIU Claim Specialists/Representatives and submitted to me from their respective SIU Claims Team Managers in my Section;

C. Handle customer complaints;D. Handle human resources issues related to employees;

E. Coach and develop leaders and employees;

F. Participate in Claim Committee Reviews with the Team Managers and Internal Claims Consultants;

G. Attend SIU Conferences, meetings and weekly Huddles; and

H. Other duties as assigned.

2

6. In 2014 Claims Manager Celeste C. Dodson met with me telephonically when I first started in the position of Claims Section Manager in the Special Investigations Unit. She told me not to question the claims decisions of the Team Managers of the SIU that were sent to me for review because she stated that the Team Managers were more experienced with the SIU Claims denial process. I said, "Why would I not question the claims decisions?" Celeste responded by asking, "Do you want to be a civil rights advocate or an SIU Section Manager?" During this conversation Ms. Dodson explained that a part of my role as SIU Section Manager was to make sure that the SIU employees must "Fill the Cup(s)." This was the very first time that I heard the term "Fill the Cup(s)." She said we would review the SIU statistics during our weekly huddles.

7. Approximately once per week Ms. Dodson would hold and facilitate a recurring SIU Section Manager "huddle," *i.e.,* a meeting via videoconference, where we would review the statistics regarding referral of claims to the SIU and discuss ways of increasing the number of claims sent to SIU in an effort to "Fill the Cup(s)." Section Managers that reported to Dodson SIU Division included Beth O'Connor, Carla Campbell-Jackson, Carlos Diaz, Cortes Williams, Dave Banks, Gregory Law and Nicole Campbell Redd. During the huddles Ms. Dodson would show statistical comparisons of how many claims were coming into each Section in the Dodson SIU Division. She would also encourage us to take action to increase the number of claims into SIU. For example, Ms. Dodson and the Section Managers would discuss the concept of "Shaking Hands and Kissing Babies," by which they meant to encourage front line claim representatives (Property Damage and Bodily Injury Claim Representatives) to submit claims to SIU. Often Ms. Dodson encouraged the SIU Section Managers to have their employees attend Property Damage and Bodily Injury Team meetings to encourage submissions of claims to SIU. During the huddles and in personal one-on-one meetings with me, Ms. Dodson discussed the

3

various neighborhoods where she said there was a high propensity for the submission of fraudulent claims, including the inner cities of Chicago, St. Louis, Indianapolis, Des Moines, Detroit and many other inner city areas, including, but not limited to, the South Side of Chicago, the West Side of Chicago, East St. Louis, and the North Side of St. Louis. She referred to these neighborhoods as "inner city" and/or "high risk for fraud" neighborhoods. During one of the huddles I suggested that maybe no fraud existed in a particular inner city neighborhood. Ms. Dodson interrupted me and said "Oh, yes, there is fraud in those areas." On many occasions during the one-on-one huddles with Ms. Dotson, I verbally shared my concerns about the high number of minority claims being sent to, and denied by, SIU. When I shared these concerns Ms. Dodson dismissed my concerns and repeated that claims from inner city neighborhoods had "high fraudulent activity."

8. In the course of reviewing the claims files that were routed to me for review, I noted that the preponderance of denied claims were those of policyholders and claimants that were African-American and minority groups. I came to this conclusion by reviewing the names, addresses and agents of these policyholders. For example, the majority of the claims that I reviewed were from policyholders and claimants that had Afro-centric names. I found that often when insureds and claimants would call to complain about State Farm, and those calls were routed to me to handle, the claimants would tell me their race and that they felt that State Farm was discriminating against them by denying their claims simply based on their race and neighborhood. These callers were African-Americans, Hispanics, West Asians, and Middle Easterners.

9. During my tenure as SIU Claims Section Manager, most the Claims determinations that were sent to me for review from the SIU Team Managers were from predominantly African

4

American and other minority inner city neighborhoods, including from the inner cities of Chicago, St. Louis, Indianapolis, Des Moines, Detroit and many other inner city areas, including, but not limited to, the South Side of Chicago, the West Side of Chicago, East St. Louis, and the North Side of St. Louis. I do not recall receiving either Claims determinations or Claims denials from non-predominantly minority neighborhoods.

10. An Enterprise-led SIU Leadership Meeting was held October 27-29, 2014 at the Hilton Hotel in Nashville, Tennessee, attended by all SIU and Multi-Claim Investigations Unit ("MCIU") leaders from across the United States. (The Multi-Claim Investigations Unit was an investigations unit to which purportedly fraudulent claims were sent from multiple-claim generating entities, such as doctor's offices and automobile repair shops.) Each attendee enjoyed a private room and/or suite and elaborate accommodations at the hotel that included meals, hors d'oeuvres, snacks, drinks and music. In addition to all of the SIU and MCIU leaders being present, this conference was also attended and hosted by Vice President of Operations, Kelly Bever, SIU Claims Manager, Celeste Dodson, and all other SIU and MCIU Claims Managers and several Claims Consultants (some of whom were being groomed for role of Vice President of Operations.) At this meeting the subject of "Filling Cups" was on the agenda and was discussed in detail. State Farm representatives shared the results from the SIU/MCIU statistics, as well as stated how much State Farm saved by SIU/MCIU denying claims.

11. Another SIU Enterprise-Led meeting was held on August 12, 2015 at a building leased by State Farm adjacent to the Chicago Marriott Suites in Downers Grove, Illinois, a Chicago suburb, where we were housed. At that meeting SIU Claims Manager Celeste Dodson reviewed SIU statistics and data with SIU Section Managers. She reviewed each Section's data and told SIU Section Managers that "We must 'Fill the cups.'"

5

12. Additionally, on or about January 26, 2016 another SIU/MCIU Enterprise-Led meeting was held in Dallas, Texas at the City-Line Building. Specifically, the attendees were told by State Farm representatives that, "We hit a home run in Filling the Cups." This meeting was attended by all of the SIU and MCIU Section Managers, Operations Vice President Shyama Terry, Vice President of Operations, Kelly Bever, SIU Claims Manager, Celeste Dodson, and all other SIU and MCIU Claims Managers and several Claims Consultants (some of whom were being groomed for role of Vice President of Operations.) At this meeting the subject of "Filling Cups" was discussed in detail. State Farm shared the results from the SIU/MCIU statistics, as well as stated how much State Farm saved by SIU/MCIU denying claims. The attendees were told by a representative of State Farm that there were 30,049 cause of loss, *i.e.,* claims, sent to SIU as a result of Filling the Cups. State Farm representatives told the attendees that savings to State Farm for claims not paid, *i.e.,* denied, in the SIU for the year 2015 was $135,551,132.72 and that 2015 savings for State Farm for claims not paid, *i.e.,* denied, in the MCIU was $1.5 billion. The attendees were told by representatives of State Farm that this savings helps State Farm to grow and keeps its premiums low.

13. TAC (commonly known as Technology Analytics for Claims) was a software application utilized by State Farm and managed by Jeff Legner, Section Manager of SIU Analytics. TAC was employed as another method to identify claims that could plausibly be considered fraudulent and sent to SIU to "Fill the Cups." Dennis Schulkins was the Claims Manager responsible for TAC.

14. I was told by experienced SIU Section Mangers and SIU Claims Managers that Patricia "Pat" Parr-Armelegos was instrumental in the formation of SUI and MCIU. In addition,

6

SIU Claims Specialist Tony Guy made a disparaging comment to Paul Lehmann, SIU Team Manager, about the minority customer base for an African American State Farm agent.

15. State Farm created and maintained a list of certain attorneys, physicians and body shops frequented by minority policyholders and claimants. State Farm scrutinized the claims from these attorneys by providing low-ball settlement offers. State Farm scrutinized the claims from these physicians and repair shops by denying significant portions of the medical bills and repair bills.

16. State Farm can easily access information relating to "Fill the Cup(s)" through its system-wide use of Microsoft Outlook and Microsoft MSWord.

17. Referrals to the SIU sent to me for review were made by State Farm Claims Representatives from auto and homeowners' lines of State Farm's business, *i.e.* State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company.

18. Ms. Dodson told me during my one-on-one huddles with her that she wanted me to increase the number of purportedly fraudulent claims coming into my section. She informed me that my Section had the lowest number of purportedly fraudulent claims. These comments were made during my performance reviews and were likely correlated to my performance ratings and salary increases.

19. As soon as I noticed a trend regarding the denial of claims by SIU from predominantly African American and other minority inner city neighborhoods, I shared my concerns with Ms. Dodson at the next one-on-one huddle with Ms. Dodson and did so at every one-on-one huddle with Ms. Dodson from the beginning of 2015 through May, 2016, about the preponderance of SIU claims involving African Americans, Hispanics, Asians and other minority customers. After sharing these concerns with Claims Manager Celeste Dodson, Claim

Consultant Juliann Klokkenga and even Human Resources Vice-President Rich Garcia, State Farm began to retaliate unrelentingly by rating me unfairly on my performance reviews. I typically received superior, exceptional, and Level 3 ratings (which was the highest rating possible) until I expressed my concerns about State Farm discriminating against minority employees and customers. Ultimately, State Farm relieved me of my duties.

20. I even offered State Farm leaders specific policyholders' names and claim numbers that were denied. Specifically, on February 24, 2016, I sent Claim Consultant Juliann Klokkenga an email with a list of claim numbers and names--expressing my concerns regarding State Farm's propensity to deny minority group members' claims. She called me on the telephone and said that all claims are handled on their merits.

21. However, while Ms. Klokkenga and State Farm say that "all claims are handled on their merits," my experience proves otherwise. In actuality, a preponderance of claims that I reviewed that "Filled the Cups" were from African American and other minorities, were prejudged as non-meritorious, and often were denied. If each claim was handled "on its merits," then what would have been the need for the "Fill the Cups" process? Why does one need a "Fill the Cups" process to "handle a claim on its merits?" State Farm Claim Representatives were trained in State Farm's contractual obligations under its policies so as to be able to handle a claim on its merits. So, absent the "Fill the Cups" process, State Farm would have handled each claim on its merits as a matter of course. Based on my experience, "Fill the Cups" accomplished just the opposite and disenfranchised many African Americans and other minorities by not paying their legitimate claims. "Fill the Cups" was simply a means of denying payment of millions of dollars to African American and other minority policyholders and claimants.

8

22. I also telephoned and wrote to all the state Departments Of Insurance ("DOI") for each of the states in my Section regarding African American and other minority claims denials by State Farm. The departments from Illinois and Indiana responded in writing and met me in person at the Peoria Public Library where I expressed my concerns about the number of African American and other minority claims denials by State Farm. In a letter from the Michigan Department of Insurance and Consumer Services dated June 14, 2017, the Department stated, "We do appreciate you bringing your concerns to our attention and will be monitoring the complaint activity against State Farm over the next several months."

23. At a meeting on Monday, May 9, 2016, attended by Human Resources Vice President of Operations Rich Garcia and Claims Vice President of Operations Kelly Bever, I was informed by Rich Garcia and Kelly Bever that State Farm was terminating me. I informed them that this termination solely was being done in retaliation for me expressing my concerns over State Farm's discrimination, racism and retaliation against minority employees and minority claimants. I said that it was not until I began expressing my concerns about State Farm's discrimination against African American and minority employees and African American and minority State Farm policyholders did State Farm decide to terminate me. While at State Farm, I was one of the most decorated employees at the organization (including earning a Bachelors, MBA, Ph.D., CPCU, CLLP, AIS, AIC and AIM). I was selected for the highly coveted "Spirit of State Farm Award." Rich Garcia then offered me $175,315.00 in exchange for a Confidential Separation and Release Agreement (including a non-disclosure clause). I immediately told him that my morals and ethics would not allow me to accept "hush money." I further informed Rich Garcia that State Farm's behavior was racist, discriminatory and retaliatory--simply because I raised concerns related to State Farm's racism and discrimination against minority employees

9

and minority customers. My integrity and values did not allow me to participate in the disenfranchisement and discrimination against African American and other minority employees and customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 2/19/2022

*Dr. Carla Campbell-Jackson*

Carla Campbell-Jackson, Ph.D.

**Holland & Knight**    Exhibit B

777 South Flagler Drive | Suite 1900, West Tower | West Palm Beach, FL 33401 | T 561.833.2000 | F 561.650.8399
Holland & Knight LLP | www.hklaw.com

Andrew M. Loewenstein
+1 561-650-8354
Andrew.Loewenstein@hklaw.com

May 23, 2023

**VIA FEDEX**

**Dr. Jeremy Broe**
**Peachtree Center Rehab, LLC**
439 Dobbs Road,
Woodstock, GA
30188, USA

      **Re:**    **Peachtree Center Rehab, LLC.**

Dear Dr. Broe:

      Our firm represents State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, the "State Farm Companies"). We would like to speak with you to discuss questions that have arisen regarding treatment and billing for services rendered to patients whose claims are covered by an auto policy written by the State Farm Companies. We would like to schedule a brief telephone call to discuss scheduling a meeting with you so we can hear your perspective.

      You can contact me at (561) 650-8354 or by email at: andrew.loewenstein@hklaw.com. If you are represented by an attorney, then please provide this letter to him or her and ask them to contact me. I appreciate your response on or before June 2, 2023 and look forward to hearing from you.

      Yours truly,

      HOLLAND & KNIGHT LLP

*Andrew M. Loewenstein*

      Andrew M. Loewenstein
      Attorney

Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Fort Worth | Houston
Jacksonville | Los Angeles | Miami | New York | Orange County | Orlando | Philadelphia | Portland
San Francisco | Stamford | Tallahassee | Tampa | Tysons | Washington, D.C. | West Palm Beach

Exhibit C

## **CONFIDENTIALITY, TOLLING, AND MORATORIUM AGREEMENT**

This Confidentiality, Tolling, and Moratorium Agreement ("Agreement") is entered into between: (a) State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire") (collectively, the "State Farm Parties"); and (b) Jeremy J. Broe, DC, individually; and Peachtree Center Rehab, LLC (collectively, the "Peachtree Parties"). The foregoing entities are individually referred to as a "Party" and are collectively referred to as "the Parties."

1. This Agreement shall be effective as of the date it is fully executed ("the Effective Date"). This Agreement will be deemed fully executed on the date it is signed by the last Party and is therefore fully executed by all signatories.

2. This Agreement will terminate 90 days from the Effective Date at 11:59 p.m. ("Termination Date"). If the Termination Date falls on a weekend day or a national holiday, then the Termination Date shall be deemed to be the next weekday. The Parties may extend the Termination Date by separate written agreement; the terms of this Agreement shall have the same force and effect during any agreed to, extended periods of time beyond the initial Termination Date.

3. The "Moratorium Period" shall mean the Effective Date through 11:59 p.m. on the Termination Date.

4. This Agreement covers any lawsuits, claims, or causes of action, whether based on statute, contract, common law, or otherwise, the Parties may have against each other from the beginning of the world to the Termination Date, known or unknown, as well as any defenses the Parties may have to such lawsuits, claims, or causes of action, known or unknown (the "Tolled Claims"). During the Moratorium Period, to the extent permitted by law, the Parties agree to toll the period of any applicable statutes of limitations and/or repose, contractual time limitations, and any other time-related defense or bar, whether legal or equitable (collectively, "Time Defenses"), with regard to any of the Tolled Claims. This means the Parties agree the days between the Effective Date and the Termination Date shall not be taken into account in applying any Time Defenses as to any lawsuits, claims or causes of action brought against each other after the Termination Date, nor shall such time be taken into account in determining whether any of the Parties acted unreasonably by delaying the filing of the Tolled Claims against another Party or Parties. This provision shall in no way operate to revive any claims or causes of action (or portions of claims or causes of action) that were barred prior to the start of the Moratorium Period.

5. During the Moratorium Period, State Farm Mutual and State Farm Fire agree not to file any new lawsuits against the Peachtree Parties. During the Moratorium Period the Peachtree Parties agree not to file any lawsuits against State Farm Mutual or State Farm Fire or reassign any rights that were previously assigned by a patient to the Peachtree Parties. In the event State Farm Mutual or State Farm Fire, on the one hand, or the Peachtree Parties, on the other hand, file or cause to be filed any lawsuits against each other during the Moratorium Period, the filing Party agrees to immediately dismiss the lawsuit without prejudice.

6.      The Parties further agree in the event any lawsuit is filed against another Party during the Moratorium Period, such filing will neither operate to implicate the "first-to-file" rule nor establish the jurisdiction or venue for any such claim.

7.      The Parties agree to meet in person, or if necessary, by means of a secure video conferencing program, like Zoom, during the Moratorium Period to discuss potential resolution of the issues between them; the date and time of the meeting shall be scheduled within **fourteen (14)** business days of the Effective Date. The parties also agree they will access any video conferences held between them via a secure (e.g. encrypted) network.

8.      Following the Parties' execution of this Agreement, the Parties will enter into discussions for purposes of attempting to resolve the issues between them (the "Settlement Discussions").   The Parties agree that the Settlement Discussions or information exchanged between the Parties during the Moratorium Period, including the existence and contents of this Agreement ("Confidential Information"), are confidential and shall not be disclosed in any manner whatsoever or for any reason without the express written consent of the other Party unless: (1) required by law; or (2) such disclosure is necessary to enforce any term of this Agreement.   This Agreement, the Settlement Discussions, and any documents or information provided by the other party during such discussions shall be:

(a)     For settlement purposes only and without waiver of any Party's rights;

(b)     Deemed statements made during compromise negotiations under Federal Rule of Evidence 408 and Georgia Code § 24-4-408;

(c)     Subject to the confidentiality provisions set forth in the Georgia Supreme Court Alternative Dispute Resolution Rules; and

(d)     Not used for any other purpose if the Parties are unable to reach an agreement, including, but not limited to, any future lawsuits of any kind.

9.      The Settlement Discussions, and the protection and privilege of information and documents exchanged during same, shall include, but not be limited to, telephonic or in-person communications, virtual meetings via Zoom or similar secured video-conferencing platform, electronic and written correspondence, and any other discussions or communications between the Parties to resolve the issues between them during the Moratorium Period.  To the extent any Party provides any documents, data, or other information ("Confidential Settlement Documents") to any other Party, these materials shall not be disclosed or shared in any manner whatsoever or for any reason by the Parties to anyone.  There is no prohibition on the use of information or documents obtained from sources independent of the Settlement Discussions, including information or documents obtained through the course of discovery in any lawsuit that may ultimately be filed by any of the Parties.  Nothing in this Paragraph 9 will require an attorney to destroy their notes or mental impressions made in connection with their representation of a Party in this matter.  The provisions of this section eight (8) regarding the disclosure and use of Confidential Information, the disclosure and use of the Settlement Discussions, and the disclosure and use of Confidential Settlement Documents, shall survive the Termination of this Agreement.  By entering into this Agreement and agreeing to engage in the Settlement Discussions, the Parties are in no way waiving

2

any applicable attorney-client privilege, work product protection or any other applicable privileges, immunities, protections, or confidentiality rights under federal, Georgia or other governing law.

10.     Each person executing this Agreement expressly represents and warrants that he or she is fully empowered and authorized by such Party to execute the Agreement on the Party's behalf.

11.     Written notice to State Farm Mutual or State Farm Fire shall be effective if sent by e-mail to Andrew.Loewenstein@hklaw.com.   Written notice to the Peachtree Parties shall be effective if sent by e-mail to: Jeremy Broe drjbroe43@gmail.com.

12.     This Agreement shall not be construed against one Party or the other because it may have been drafted initially by one party.

13.     The Parties agree this Agreement constitutes the entire understanding between the Parties.  Neither the execution of this Agreement nor anything herein contained is intended, nor shall be deemed, to be an admission of liability or of the existence of any facts upon which liability could be based.  Moreover, no right of action is created by this Agreement and no Party shall assert any right of action based on this Agreement, except to enforce the provisions, terms, and conditions of this Agreement, and except as this Agreement may be asserted as an affirmative defense or as the basis for an affirmative claim to require its specific performance in the event of a breach of this Agreement by any Party.

14.     Any agreement to amend or modify the terms and conditions of this Agreement must be in writing and executed by the Parties hereto.

15.     Any and all disputes or claims between or among the Parties arising from this Agreement shall be governed by Georgia law without reference to conflict of laws principles.

16.     The Parties agree that in the event any action of any kind is taken in connection with, or to enforce this, Agreement, the prevailing Party shall be entitled to recover its attorneys' fees jointly and severally, from the opposing Party or Parties.  The Parties also agree that the Prevailing Party shall be entitled to recover its costs and expenses, to the extent provided by applicable law.  This provision shall not be construed to and shall not apply to any lawsuit or other proceeding that may be filed by any Party with regard to the underlying issues between the Parties that give rise to the Tolled Claims.

17.     Each Party represents and warrants that: (a) the Party has carefully read this Agreement and has been afforded reasonable opportunity to have the contents and legal effect of this Agreement explained by legal counsel of the Party's choice; (b) each Party executing this Agreement does so of the Party's own free will; (c) no promise or inducement has been offered or made with respect to the matters set forth herein except as expressly stated in this Agreement; and (d) the Party has determined to execute this Agreement without reliance upon any such statement or representation by any other Party or the other Party's attorneys.

3

18.     This Agreement may be signed via facsimile or e-mail in counterparts, all of which shall constitute one original agreement.  A copy of this Agreement shall be binding and admissible in evidence as the original.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE AND CASUALTY COMPANY**

By:_____, its: _____
                    [Printed Name]                                                [Title]

_____ Dated: _____
                    [Signature]


**JEREMY BROE, DC, individually**

By:_____,
                    [Printed Name]

_____ Dated: _____
                    [Signature]


**PEACHTREE CENTER REHAB, LLC**

By:_____, its: _____
                    [Printed Name]                                                [Title]

_____ Dated: _____
                    [Signature]

4

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

PEACHTREE CENTER REHAB, LLC     :
    :
    Plaintiff,     :
    :    CIVIL ACTION FILE NO. _____
v.     :
    :
STATE FARM MUTUAL AUTOMOBILE   :
INSURANCE COMPANY, and     :    **JURY TRIAL DEMANDED**
STATE FARM FIRE AND CASUALTY     :
COMPANY,     :
    :
    Defendants.     :

---

## VERIFICATION

Personally appeared before the undersigned officer duly authorized to administer oaths,

Jeremy Broe, D.C., as principal of Plaintiff Peachtree Center Rehab, LLC, who upon oath, states

that the information and allegations contained in the foregoing Verified Complaint for Declaratory

Relief are true and accurate to the best of his knowledge.

This 28ᵗʰ day of July 2023.

By: _____ (Seal)
Jeremy Broe, D.C., for Plaintiff
Peachtree Center Rehab, LLC

Sworn and subscribed to before me
this 28ᵗʰ day of July 2023:

_____
Notary Public
My commission expires:

S WHYMNS
NOTARY PUBLIC
Gwinnett County
State of Georgia
My Comm. Expires Dec. 2, 2023

## AFFIDAVIT OF SERVICE

📠 EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FULTON COUNTY, GEORGIA

**2023CV383456**

AUG 07, 2023 03:45 PM

Ché Alexander, Clerk
Fulton County Superior Court

| Case:<br>2023CV383456 | Court:<br>Superior Court | County:<br>Fulton, GA | Job:<br>9292736 |
|---|---|---|---|
| Plaintiff / Petitioner:<br>PEACHTREE CENTER REHAB, LLC | | Defendant / Respondent:<br>STATE FARM FIRE AND CASUALTY COMPANY | |
| Received by:<br>Phoenix Legal | | For:<br>Lawson, Reid & Dean, LLC | |
| To be served upon:<br>STATE FARM FIRE AND CASUALTY COMPANY C/O Corporation Service Company | | | |

I, Frank James, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

Recipient Name / Address:   Alisha Smith, 2 SUN CT STE- 400, PEACHTREE CORNERS, GA 30092

Manner of Service:   Registered Agent, Aug 2, 2023, 11:30 am EDT

Documents:   SUMMONS AND COMPLAINT

Additional Comments:
1) Successful Attempt: Aug 2, 2023, 11:30 am EDT at 2 SUN CT STE- 400, PEACHTREE CORNERS, GA 30092 received by Alisha Smith. Age: 40; Ethnicity: African American; Gender: Female; Weight: 170; Height: 6'0"; Hair: Black; Relationship: Authorized Agent ;

_____   8/3/23
Frank James            Date
179

Phoenix Legal
251 Springs Xing
Canton, GA 30114
770-873-6999

*Subscribed and sworn to before me by the affiant who is personally known to me.*

_____
Notary Public
8/3/23
_____
Date            Commission Expires



**AFFIDAVIT OF SERVICE**

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FULTON COUNTY, GEORGIA

**2023CV383456**

AUG 07, 2023 03:45 PM

Ché Alexander, Clerk
Fulton County Superior Court

| Case: 2023CV383456 | Court: Superior Court | County: Fulton, GA | Job: 9292724 |
|---|---|---|---|
| Plaintiff / Petitioner: PEACHTREE CENTER REHAB, LLC | | Defendant / Respondent: STATE FARM FIRE AND CASUALTY COMPANY | |
| Received by: Phoenix Legal | | For: Lawson, Reid & Dean, LLC | |
| To be served upon: STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY C/O Corporation Service Company | | | |

I, Frank James, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

Recipient Name / Address:   Alisha Smith, 2 SUN CT STE- 400, PEACHTREE CORNERS, GA 30092

Manner of Service:   Registered Agent, Aug 2, 2023, 11:30 am EDT

Documents:   SUMMONS AND COMPLAINT

Additional Comments:
1) Successful Attempt: Aug 2, 2023, 11:30 am EDT at 2 SUN CT STE- 400, PEACHTREE CORNERS, GA 30092 received by Alisha Smith. Age: 40; Ethnicity: African American; Gender: Female; Weight: 170; Height: 6'0"; Hair: Black; Relationship: Authorized Agent ;

_____     8/3/23
Frank James                           Date
179

Phoenix Legal
251 Springs Xing
Canton, GA 30114
770-873-6999

Subscribed and sworn to before me by the affiant who is personally known to me.

_____
Notary Public
8/3/23

Date              Commission Expires

KRISTA MEADOWS
MY COMMISSION EXPIRES
NOTARY PUBLIC
AUGUST 04, 2026
FULTON COUNTY, GEORGIA