FILED 7/31/2023 4:41 PM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

# IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

TBI DIAGNOSTIC
CENTERS OF GEORGIA

Case No.: 23CV6931

Plaintiff

VS

STATE FARM FIRE AND CASUALTY
COMPANY

Defendant

# SUMMONS

## TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said court at
https://efilega.tylerhost.net/ofsweb and serve upon the Plaintiff's attorney, whose name, address and email is:

Douglas H. Dean

P.O. Box 5005
Cordele, GA 31015
doug@deanthaxton.law

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons
upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint.

This _____31st_____ day of _____July_____, 20__23__.

Honorable Debra DeBerry
Clerk of Superior Court
/s/ Selena Anderson
By_____
Deputy Clerk

E-Filing and E-Service

Pursuant to the Superior Court of DeKalb County's E-File Order, dated December 27, 2016, and available at www.dksuperiorclerk.com/civil, the
parties must file all documents electronically through eFileGA unless expressly exempted under the Rule.  All orders and notices from the Court will
be electronically filed and served through eFileGA.  The parties must register for an eFileGA account, link their service contact information with the
case and the party represent, and take whatever steps are necessary to ensure that correspondence from eFileGA reaches the parties' inboxes.  To
access eFileGA, please go to http://www.odysseyefilega.com/

Instructions:  Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

Exhibit No. 1

FILED 7/31/2023 4:41 PM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

## IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

23CV6931

TBI DIAGNOSTIC

CENTERS OF GEORGIA
_____

Case No.:     _____

_____

                    Plaintiff

            VS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY

_____

_____

                    Defendant

# SUMMONS

## TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said court at
https://efilega.tylerhost.net/ofsweb and serve upon the Plaintiff's attorney, whose name, address and email is:

Douglas H. Dean

P.O. Box 5005
Cordele, GA 31015
doug@deanthaxton.law

An answer to the complaint which is herewith served upon you, within 30 days after service of this summons
upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint.

This _____31st_____ day of ____July____, 20_23_.

Honorable Debra DeBerry
Clerk of Superior Court

                    /s/ Selena Anderson
By_____
            Deputy Clerk

E-Filing and E-Service

Pursuant to the Superior Court of DeKalb County's E-File Order, dated December 27, 2016, and available at www.dksuperiorclerk.com/civil, the
parties must file all documents electronically through eFileGA unless expressly exempted under the Rule.   All orders and notices from the Court will
be electronically filed and served through eFileGA.  The parties must register for an eFileGA account, link their service contact information with the
case and the party represent, and take whatever steps are necessary to ensure that correspondence from eFileGA reaches the parties' inboxes.  To
access eFileGA, please go to http://www.odysseyefilega.com/

Instructions:  Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

**General Civil and Domestic Relations Case Filing Information Form**

☒ **Superior** or ☐ **State Court of** _____DEKALB_____ **County**

| **For Clerk Use Only** | 23CV6931 |
|---|---|
| **Date Filed** 07-31-2023 | **Case Number** _____ |
| **MM-DD-YYYY** | |

**Plaintiff(s)**

TBI Diagnostic Centers of Georgia, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**

State Farm Mutual Automobile Insurance Company

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

State Farm Fire and Casualty Company

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney** __Douglas H. Dean__   **State Bar Number** __130988__   **Self-Represented** ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ **Automobile Tort**
- ☐ **Civil Appeal**
- ☐ **Contempt/Modification/Other Post-Judgment**
- ☐ **Contract**
- ☐ **Garnishment**
- ☐ **General Tort**
- ☐ **Habeas Corpus**
- ☐ **Injunction/Mandamus/Other Writ**
- ☐ **Landlord/Tenant**
- ☐ **Medical Malpractice Tort**
- ☐ **Product Liability Tort**
- ☐ **Real Property**
- ☐ **Restraining Petition**
- ☒ **Other General Civil**

**Domestic Relations Cases**
- ☐ **Adoption**
- ☐ **Contempt**
  - ☐ **Non-payment of child support, medical support, or alimony**
- ☐ **Dissolution/Divorce/Separate Maintenance/Alimony**
- ☐ **Family Violence Petition**
- ☐ **Modification**
  - ☐ **Custody/Parenting Time/Visitation**
- ☐ **Paternity/Legitimation**
- ☐ **Support – IV-D**
- ☐ **Support – Private (non-IV-D)**
- ☐ **Other Domestic Relations**

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____   _____
**Case Number**                        **Case Number**

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

FILED 7/31/2023 4:41 PM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

## IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| TBI DIAGNOSTIC CENTERS OF GEORGIA, LLC, | : | |
| | : | |
| | : | |
| Plaintiff, | : | 23CV6931 |
| | : | CIVIL ACTION FILE NO. _____ |
| v. | : | |
| | : | |
| STATE FARM MUTUAL AUTOMOBILE | : | |
| INSURANCE COMPANY, and | : | **JURY TRIAL DEMANDED** |
| STATE FARM FIRE AND CASUALTY | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

## <u>VERIFIED COMPLAINT FOR RESCISSION & DECLARATORY RELIEF</u>

COMES NOW TBI DIAGNOSTIC CENTERS OF GEORGIA, LLC ("Plaintiff" or "TBI"), in the above-captioned civil action and files this complaint against STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE AND CASUALTY COMPANY (collectively, "State Farm"), and, in support thereof, shows this Court the following:

## <u>PRELIMINARY STATEMENT</u>

This is an action for Rescission of a Contract between the Parties as well as Declaratory Relief to determine various rights and obligations between the parties and as to the existence or nonexistence of facts upon which the existence or nonexistence of such rights and obligations depend, both now and in the future.

Plaintiff is an independent diagnostic testing facility which provides testing of individuals who have been referred by their treating doctors for the testing TBI provides, namely concussion and traumatic brain injury testing. The referring doctors are most often treating their test subjects for traumatic injuries related to motor vehicle accidents. TBI is a minority-owned business and the majority of individuals who receive testing there are also minorities from metropolitan Atlanta.

Unfortunately, this has made Plaintiff the target of a racially motivated profit scheme employed by State Farm which its executives secretly call "Filling the Cups."  The scheme involves manufacturing the appearance of "fraud" in claims involving minorities as a means of intimidation and driving down claim expense.

## PARTIES, JURISDICTION AND VENUE

1.

Plaintiff is an independent diagnostic testing facility located at, among other locations, 4294 Memorial Drive, Suite D, Decatur, Georgia 30032.

2.

Defendants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company are foreign corporations authorized to do business in the State of Georgia.  State Farm is engaged in the business of selling automobile insurance policies to the general public and to residents of Georgia, which policies are governed by, among other laws, the Georgia Motor Vehicle Reparations Act ("the Act").

3.

Defendant State Farm Mutual Automobile Insurance Company may be served with process on its registered agent, Corporation Service Company, 2 Sun Court, Ste. 400, Peachtree Corners, Georgia 30092.

4.

Defendant State Farm Fire and Casualty Company may be served with process on its registered agent, Corporation Service Company, 2 Sun Court, Ste. 400, Peachtree Corners, Georgia 30092.

5.

This Court has personal jurisdiction over Defendants.

6.

This Court has subject matter jurisdiction over the matters set forth in this Complaint.

7.

Venue is appropriate in this Court.

8.

Process and service are appropriate and valid in all respects.

9.

This Complaint is timely.

10.

The Complaint is valid procedurally and otherwise.

## **BACKGROUND**

11.

Plaintiff is an independent facility which provides diagnostic testing for concussion and traumatic brain injury, predominantly to individuals who have suffered traumatic injuries related to a motor vehicle accident and whom have been referred by doctors treating them for said injuries.

12.

TBI is minority-owned and the majority of the test subjects seen there are African-American.

13.

The Georgia Motor Vehicle Accident Reparations Act (the "Act") requires that all Georgia car insurance policies include liability coverage, but Medical Payments Coverage Benefits ("MPC Benefits") are optional. O.C.G.A. § 33-34-2 et seq.

14.

Virtually none of the individuals seen at Plaintiff's testing facility have MPC Benefits and, where an individual is represented by counsel who obtains a recovery of some kind from a responsible

3

third party, the costs for Plaintiff's services are paid to Plaintiff by the individual's counsel out of said recovery.

15.

In such circumstances, Plaintiff sends its records and statement of costs to the attorney representing the test subject.

16.

When forwarding its records to the attorney of a test subject, Plaintiff does not have any interaction with the third-party insurer (if one even exists).

17.

To the extent any of Plaintiff's treatment records and/or billing statements are provided to a third-party insurer by a test subject's attorney, Plaintiff has no knowledge of nor input into what records and/or information about the test subject's injuries is actually submitted, nor does Plaintiff know or have any input into how the attorney characterizes Plaintiff's records and/or bills to support the test subject's third-party claim.

18.

In forwarding its records to a test subject's attorney, Plaintiff does not intend nor does it make any representations to any insurer.

**STATE FARM AND THE "FRAUD OPPORTUNITY"**

19.

State Farm is by far the dominant private passenger auto insurance company in America and in Georgia, where its market share is nearly 25% and dwarfs all other competitors in the state.

20.

State Farm's dominance in Georgia necessarily means that a large percentage of the injury claims being pursued by Plaintiff's test subjects likely are and will be made against State Farm insureds.

21.

State Farm has achieved its market dominance in large part due to a sophisticated model of handling auto injury claims designed to devalue them by all means possible.

22.

One strategy of claim devaluation which State Farm employs involves automatically targeting claims involving minorities as fraudulent and is sometimes internally referred to within the company as "filling the cups."

23.

The origin of the "filling the cups" strategy can be traced back to a Division Claims Superintendents Conference in 1986, and later to guidance provided by the notorious consulting McKinsey & Company, which advocated a "fraud funnel" strategy of generating massive profit by devaluing injury claims with accusations of fraud and exaggeration.

24.

Using pretextual "NICB indicators" as cover, the fraud funnel seeks to isolate and attack as fraudulent and/or exaggerated injury claims emanating from "metro" areas of the country; "metro" being a euphemism for urban centers with large minority populations, such as Atlanta.

25.

"Metro area" injury claims, because they involve auto accidents in densely populated urban areas, generally occur at lower speeds and more frequently involve injuries to the neck and back which are evidenced by subjective complaints of pain and reduced ranges of motion, as well as self-reported limitations on activities of daily living.

26.

Initially through its consultation with McKinsey, and later on through development of its own standard claims processes, State Farm recognized that the value of such subjectively supported injury

claims depends not only on the personal credibility of the claimant, but even more so on the credibility of medical provider substantiating the complaints with diagnoses and treatment.

27.

This reality revealed what McKinsey called an "opportunity" to dramatically reduce injury claim payouts in "metro areas" by undermining the personal credibility of both claimants and their medical providers with accusations of fraud and exaggeration.

28.

McKinsey characterized this approach as, amongst other things, the "fraud funnel."

29.

But McKinsey and State Farm recognized that such predetermined treatment of claims from "metro areas" flagrantly flouted the contractual (and often codified) requirements of insurer good faith, so upon McKinsey's recommendation, State Farm sought to insulate itself by conjuring pretextual justifications for automatically treating "metro area" claims as fraudulent.

30.

State Farm sought further insulation from bad faith claims by narrowing the fraud funnel to injury claims made by the people most vulnerable to stereotyping based on already existing prejudices and who more frequently lack the resources to resist bad faith insurer tactics: minorities, immigrants, and low-income claimants.

31.

Over the past two decades, State Farm has taken McKinsey's original advice and steadily perfected its system of claims handling to maximize the "fraud opportunity" by targeting injury claims of minorities, immigrants, and low-income claimants in "metro areas" with accusations of fraud.

32.

State Farm has accomplished this by setting up a system of pretextual "fraud indicators" designed to pull such claims into the fraud funnel, whereupon the claimant and their medical providers are subjected to a predetermined protocol of claim handling designed to create the impression of fraud and exaggeration.

33.

State Farm's "fraud indicators" are pretenses unsubtly designed to capture "metro area" claims more likely to involve minorities, immigrants and/or low-income claimants, such as:

- Is the treating doctor's office in an "unsafe part of town";

- Was the claimant driving an "older model vehicle";

- Are the parties involved in an accident part of the same "ethnic background";

- Is a claimant "self-employed";

- Is a claimant's cell phone on a "month to month payment plan?"

34.

There is no possible reason other than racial and economic stereotyping to call it an "indicator of fraud" that a medical provider's office is in an "unsafe part of town" or that the claimant was driving an "older model vehicle" or that the parties in an accident are of the same "ethnic background."

35.

The fraud "opportunity" to reduce claim expenses by attacking the credibility of "metro area" claimants has been exploited by State Farm to the tune of tens of billions of dollars.

36.

Initially called "ACE" (for Advancing Claims Excellence), then through formalized procedures called Standard Claims Processes ("SCP"), and more recently through the secret corporate

culture its executives call "Filling the Cups," State Farm has built its entire injury claim handling culture around the fraud funnel.

## THE WHISTLEBLOWER

37.

In February of 2022, a high-ranking executive within State Farm's fraud unit ("S.I.U."), publicly revealed in a sworn declaration State Farm's secret scheme of funneling claims of minorities into the fraud unit as a means of manufacturing massive claim expense avoidance.  A copy of the Declaration of Carla Campbell-Jackson, Ph.D. is attached as Exhibit "A".

38.

As revealed by Dr. Campbell-Jackson, State Farm's S.I.U. executives from across the country would meet weekly via videoconference to review statistics and "discuss ways of increasing the number of claims sent to the SIU in an effort to 'Fill the Cups.'"

39.

Filling the Cups is transparent code for the strategy first sold to State Farm by McKinsey and thereafter baked over time into State Farm's entire culture of claims handling whereby the company automatically treats claims of minorities as fraudulent as a means of intimidation and avoiding payments the company is obligated to make.

40.

As revealed by the whistleblower, State Farm at its highest executive levels demands automatic referral to State Farm's fraud units of claims which emanate from "inner city" neighborhoods in large metropolitan areas under the pretense that such claims present "high risk for fraud," and Dr. Campbell-Jackson confirmed that indeed, most claims sent to the SIU and denied during her tenure involved African-American and minority groups.

41.

According to the whistleblower, company-wide SIU Leadership Meetings have been regularly held amongst leaders of State Farm's "Multi-Claim Investigation Units" ("MCIU") from across the country.

42.

State Farm's MCIU's are sub-sections of the SIUs and are dedicated specifically to targeting multi-claim generating entities, with a significant focus on medical providers.

43.

According to Dr. Campbell-Jackson, at one meeting of State Farm's top SIU/MCIU executives from around the country, the subject of "Filling the Cups" was on the agenda and State Farm representatives shared SIU/MCIU statistics reflecting "how much State Farm saved by SIU/MCIU denying claims."

44.

At another company-wide meeting, a high-ranking State Farm SIU executive reportedly exhorted SIU Section Managers that, "We must fill the cups."

45.

In another company-wide meeting, State Farm reportedly crowed to its gathered SIU/MCIU top brass that, "We hit a home run in Filling the Cups" and that the MCIU had enabled State Farm to avoid $1.5 *billion* in claims expense in 2015 *alone.*

46.

Dr. Campbell-Jackson confirmed that one way State Farm "Fills the Cups" is by maintaining lists of physicians frequented by minority policy holders and claimants and scrutinizing claims from such physicians for fraud opportunities.

47.

State Farm has designed an entire system of claims handling, spearheaded by its SIU/MCIU's around the country, which manufacture pretextual justifications for injecting allegations of fraud into claims most likely to involve minorities, immigrants, and low-income claimants in urban areas of the country.

**THE LAWSUITS**

48.

Over the past 20 years, as part and parcel of its "Fill the Cups" program and in addition to other manufactured claims of fraud, State Farm has filed and/or threatened federal lawsuits against medical providers in the metropolitan areas of Georgia and virtually every other urban center of the country alleging fraud.

49.

Such lawsuits against medical providers are designed to fortify the fraud funnel from bad faith claims by creating attention-grabbing headlines which foster a perception of rampant fraud in "metro area" auto injury claims and, as an added benefit, destroy the reputations of the targeted medical providers so as to ruin their practices and eliminate them as ongoing sources of claim expense.

50.

Not content, however, with the billions of dollars it has avoided paying to medical providers directly billing it for treatment of State Farm insureds, State Farm in recent years has expanded the litigation component of its strategy to include accusations of fraud against facilities such as Plaintiff, who merely perform diagnostic testing at the referral of treating physicians, and whose bills and records are being submitted by lawyers in support of third-party claims against State Farm insureds without any input or knowledge of the facility.

51.

State Farm falsely contends in such lawsuits that mere testing facilities such as Plaintiff submit bills and reports "to the personal injury attorney representing [the test subject], with the knowledge, understanding, and intention that this documentation will be submitted to insurers like [State Farm], as part of a demand package seeking to obtain a settlement in the form of insurance benefits, in which the medical provider has a financial interest."

52.

State Farm's thus widens the fraud funnel to suck in independent diagnostic testing facilities such as Plaintiff on the false premise that the diagnostic testing facility knows or should know that treating physicians in "metro area" injury claims order diagnostic testing not out of medical necessity, but rather solely to manufacture the appearance of a more serious injury to increase the value of the test subject's injury claim and generate more referrals from personal injury attorneys.

53.

State Farm accuses testing facilities such as Plaintiff of fraud on the theory that the testing facilities have a duty to separately assess the reasonableness and necessity of a given diagnostic test ordered by a physician; that the testing facility knows the test is unreasonable and unnecessary; and that the testing facility renders the test and its reading as part of a conspiracy to assist in fabricating and/or exaggerating the severity of a test subject's injury.

54.

But State Farm's foundational premise that an independent diagnostic testing facility performing a test upon the referral of a prescribing physician has an independent duty to assess the reasonableness and/or necessity of the prescription, is false.

55.

It is the sole responsibility of the ordering physician to document and determine the reasonableness and necessity of a diagnostic test being ordered by the physician.

56.

Just by way of example, when determining whether a given diagnostic test is reasonable and necessary, the Centers for Medicare and Medicaid Services (CMS) looks to the records of the ordering physician because it is the ordering physician's responsibility to determine and justify the medical necessity of a diagnostic test.  (See, e.g., 42 CFR § 410.32(3)(C)(iii)).

57.

In other words, an independent diagnostic facility such as Plaintiff has no authority, much less legal responsibility, to determine the medical necessity of a test prescribed by a treating physician.

58.

State Farm knows this of course, but because it must "fill the cups", it alleges falsely that by sending its records to the test subject's attorney, who then included the records (somehow) in a settlement demand package, the targeted testing facility "represented" to State Farm that the tests performed were medically necessary and, further, that State Farm "justifiably relied upon" such representation in issuing whatever payments it made on the claim.

59.

State Farm has used this theory of fraud as the basis for numerous lawsuits it has filed and/or threatened against medical providers across the country through "nationally retained counsel" who specialize in threatening and pursuing such suits.

## STATE FARM'S "FRAUD AND RECOVERY TEAM"

60.

One such "nationally retained counsel" is the law firm of Holland & Knight and its "Insurance Fraud and Recovery" team, including its Partner, Andrew Loewenstein, Esquire, whom State Farm regularly retains to pursue fraud actions against medical providers in Georgia.

61.

State Farm retains Holland & Knight and Mr. Loewenstein only after its MCIU has decided to pull a medical provider into the fraud funnel and seek a pre-litigation "settlement" from the provider in lieu of being sued in federal court based on one of State Farm's ginned up fraud claims.

62.

The overture from Holland & Knight invariably takes the form of a letter from Mr. Loewenstein or another member of the firm's "Insurance Fraud & Recovery Team" seeking a meeting to discuss "questions" which have arisen regarding "treatment and billing for services rendered to patients whose claims are covered" by a State Farm policy.

63.

Although such a letter is itself an announcement that State Farm is targeting the medical provider with the threat of a fraud lawsuit, Mr. Loewenstein and State Farm make its threat of litigation unequivocally clear by demanding that the medical provider sign a "Confidentiality, Tolling and Moratorium Agreement" just to hear the specifics of State Farm's accusations (and demands for settlement thereof).

64.

On or about June 23, 2023, Mr. Loewenstein lobbed this standard opening salvo at Plaintiff.

65.

Given that Plaintiff does not render any "treatment" to patients and never submits bills to State Farm, Mr. Lowenstein's letter could only mean that State Farm was targeting Plaintiff with its fallacious premise that Plaintiff had made, and State Farm had relied on, "false" representations as to the reasonableness and/or necessity of diagnostic tests performed by Plaintiff on test subjects "whose claims are covered" by a State Farm policy.

66.

The threat of litigation announced by Mr. Loewenstein's opening letter was confirmed when Mr. Loewenstein thereafter demanded that Plaintiff execute a "Confidentiality, Tolling and Moratorium Agreement" ("CTM") in order just to hear State Farm's accusations.

67.

The standard purpose of State Farm's "CTM Agreement" is for State Farm and Plaintiff to "enter into discussions for purposes of attempting to resolve the issues between them, which discussions State Farm calls "the Settlement Discussions."

68.

The CTM Agreement generally provides further that State Farm will hold off on filing its threatened fraud lawsuit against Plaintiff while "settlement discussions" occur, but only if Plaintiff first agrees, *inter alia*, that:

- **The statute of limitations on any lawsuit by State Farm against Plaintiff will be tolled while "settlement discussions" are ongoing and that Plaintiff cannot file any lawsuit against State Farm during the "moratorium" period;**

- **The tolling period is considered to have started "from the beginning of the world" and extend through to the expiration of the CTM Agreement;**

- **Federal and state rules of evidence apply to the "settlement discussions" and any information disclosed in their course cannot be "used for any other purpose if the Parties are unable to reach an agreement, including but not limited to, any future lawsuits of any kind"; and**

- **Plaintiff must agree to waive the jurisdictional dictates of the "first-to-file" rule.**

69.

Given the Hobson's choice of being hit with a reputationally crushing federal fraud lawsuit based on a false premise and giving up the rights as demanded by the CTM Agreement just to hear State Farm's demands, Plaintiff capitulated to State Farm's demanded agreement on July 7, 2023 and State Farm signed on July 10, 2023, making the effective date of the Agreement July 10.

70.

Given the critical rights Plaintiff was being required to give up just to enter into State Farm's demanded "Settlement Discussions," however, time was of the essence.

71.

The need for State Farm's demanded "settlement discussions" to occur quickly was reflected in State Farm's own drafting, wherein it required, in bold-faced type, that the "date and time of the meeting shall be scheduled within **fourteen (14)** business days" of July 10, 2023, which would be July 28, 2023.

72.

Contrary, however, to this material and fundamental term, the earliest dates sought for the meeting by Mr. Lowenstein was "late July/early August" and no meeting was scheduled by July 28, 2023.

73.

Therefore, on July 31, 2023, Plaintiff notified Mr. Loewenstein that it was exercising its right under OCGA § 13-4-60 and OCGA § 13–4–62 to rescind the CTM Agreement for nonperformance. A copy of Plaintiff's rescission notice is attached as Exhibit "B".

## STATE FARM'S FOUNDATIONAL PREMISE IS FALSE

74.

As detailed above, the foundational premise of State Farm's threatened lawsuit against an independent diagnostic facility such as Plaintiff is simply false.

75.

Unfortunately, State Farm regularly exploits the Federal Rules of Civil Procedure to push this false premise past the pleadings stage and effectively precludes independent diagnostic facilities such as Plaintiff from ever actually litigating the truth of State Farm's accusations.

76.

Under Fed. R. Civ. P. 12(b)(6), a federal district Court would be bound under the Federal Rules of Civil Procedure to accept the truth of State Farm's allegations and allow the case to proceed to the discovery phase, but the overwhelming reputational damage and burden of defending the accusations of such a dominant corporate behemoth over the course of many months (if not years) is impossible for any small business such as Plaintiff to withstand.

77.

It is this grim reality which ultimately forces most medical providers confronted with State Farm's demanded CTM agreement and "settlement discussions" to sign the agreement and capitulate to State Farm's extortive demands.

78.

It is critical therefore that Plaintiff have the opportunity to challenge by way of this declaratory judgment action the essential fallacy of State Farm's accusations.

79.

It is simply false that an independent diagnostic testing facility such as Plaintiff performing diagnostic tests upon the referral of a prescribing physician is making any independent representation as to the reasonableness and/or necessity of the test.

80.

It is further false that State Farm relies in any way on the truth or accuracy of any medical record submitted in support of a third-party injury claim when determining whether and how much to pay out on the claim.

81.

State Farm, as a property and casualty insurer, is in the business of resolving personal injury claims.  After State Farm receives a settlement demand from a claimant's attorney, its trained employees conduct a detailed, multi-faceted dissection of the claimant's medical bills and records using highly-sophisticated computer software programs designed specifically to challenge (i) whether the test subject's medical care was reasonable, necessary, and causally related to the accident, and (ii) whether the costs of the test subject's medical care are usual, customary, and reasonable for the area based on aggregated data from millions of prior claims.

82.

Additionally, especially with respect to claims from "metro areas", State Farm frequently funnels the claim to its Special Investigation Unit (the division of State Farm that is specifically tasked with identifying and deterring potential fraud in individual claims); And/or it accepts liability for the accident but contests damages; And/or it requires a recorded statement or an independent medical examination; And/or it retains an outside expert to contest the reasonableness and necessity the claimants' treatment and bills; and/or it Deposes the claimant's treating physicians — all for purposes

of finding every possible excuse to avoid paying and/or reduce the amount it cannot find any justification to avoid.

83.

Even for those medical bills State Farm cannot find any justification to avoid paying, it will internally adjust a provider's "billed" amounts (i.e., the value a treating physician ascribes to his or her services) to "allowed" amounts (i.e., the value that State Farm ascribes, based on its own computations, to a treating physician's services).

84.

Moreover, State Farm always tries to negotiate a settlement with the claimant's attorney (whether prior to or during litigation), entirely without any involvement, input, or even the knowledge of Plaintiff.

85.

During the negotiation process, State Farm always challenges the reasonableness and necessity of every aspect of the claimant's medical care and often does so by injecting allegations of fraud and exaggeration whenever possible pursuant to the "fill the cups" scheme.

86.

The truth is State Farm resolves personal injury claims for various reasons which are completely unrelated to the performance and/or results of any testing at Plaintiff's facility.

87.

This truth is evidenced by the fact that upon settlement, State Farm makes a lump-sum payment to the claimant's attorney; State Farm does not tell the attorney how much of Plaintiff's bills were considered for settlement purposes; nor does State Farm tell the attorney how to apportion the money (e.g., whether to pay anything to Plaintiff out of the settlement).  The lump-sum payment

comprises special damages (e.g., medical expenses and lost wages) and general damages (e.g., pain and suffering), without a breakdown between each category of damages.

88.

In point of fact, State Farm's negotiated lump-sum settlement payment is frequently made without any regard at all for Plaintiff's bill — *i.e.*, State Farm may settle the claim for an amount of money that would be sufficient for the test subject to satisfy his or her bill with Plaintiff even if State Farm did not consider the bill from Plaintiff in its analysis of the claim.

89.

After receiving a settlement, the attorney negotiates discounts of the client's outstanding bills with each of the medical providers (including Plaintiff). The amount that Plaintiff receives in satisfaction of its bill varies from test subject to test subject. State Farm is not involved in those discussions.

90.

In short, it is simply false that State Farm *ever* makes payments in any third-party claim in "reliance" upon any aspect of Plaintiff's bills or records, and it is equally false to represent that State Farm accepted such records and bills as substantively true.

91.

But if Plaintiff waits to be sued in federal court based on this allegation, and the Court accepts the allegations as true as it must under Fed. R. Civ. P. 12(b)(6), the matter would be permitted to proceed to a litigation which Plaintiff's professional reputation cannot possibly survive.

92.

In the meantime, Plaintiff continues to provide diagnostic testing to test subjects and provide its records and bills to attorneys without any way of knowing whether the records and bills are being submitted to State Farm and thus theoretically increasing its exposure to State Farm's bogus

"damages" claim.  This leaves Plaintiff in a position of desperate uncertainty as to whether providing diagnostic testing to any current or future test subject, or submitting bills and records to any test subject's attorney, exposes Plaintiff to a greater claim of "damages" in State Farm's threatened lawsuit.

93.

Plaintiff therefore brings this action for rescission and declaratory relief as it represents the only real opportunity Plaintiff has to challenge the actual merits of State Farm's falsely premised, racially motivated accusations.

## COUNT ONE: RESCISSION

94.

Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

95.

The effective date of the CTM Agreement was July 10, 2023.  (State Farm is in possession of the CTM Agreement).

96.

The sole purpose of the Agreement was for the Parties to engage in "Settlement Discussions" in forbearance of litigation threatened by State Farm, which discussions were promised by State Farm to occur within 14 business days of July 10, 2023.

97.

State Farm did not act to schedule its demanded "settlement discussion" meeting to occur by July 28, 2023.

98.

Plaintiff therefore notified State Farm on July 31, 2023 that they were rescinding the contract.

99.

The only benefit Plaintiff theoretically received from the CTM Agreement was State Farm's forbearance from filing a lawsuit against them, which benefit has obviously been relinquished back to State Farm. To the extent it ever becomes an issue, Plaintiff will not raise the period of time between the signing of the agreement and the date of rescission as part of any statute of limitations defense.

100.

As a result of the above, Plaintiff submits that this Court should enter an Order confirming Rescission of the Confidentiality, Tolling and Moratorium Agreement entered into by the Parties on July 10, 2023.

## COUNT TWO: DECLARATORY JUDGMENT

101.

Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

102.

The above facts show that Plaintiff is in a position of uncertainty or insecurity because of a dispute and of having to take some future action which is properly incident to its rights, and which future action without direction from the Court might reasonably jeopardize its interest.

103.

Pursuant to O.C.G.A. § 9-4-2, Plaintiff seeks a declaration that:

(a)    Plaintiff, as an independent diagnostic testing facility, does not represent that a diagnostic test it performs upon the referral of a treating doctor is medically necessary;

(b)    State Farm has not and is not presently relying on the truth or accuracy of any representation made by Plaintiff in determining the settlement amount of any third-party injury claim made by a test subject who received testing at Plaintiff's facility;

(c)      No portion of any settlement paid by State Farm in any third-party claim in which Plaintiff provided diagnostic testing upon the referral of a treating physician was proximately caused to be paid by any representation by Plaintiff;

(d)      Any payment made by State Farm in settlement of a third-party claim which State Farm apportions to Plaintiff was voluntary.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court award the following relief:

(1)      That summons issue and Defendants be served as provided by law;

(2)      That the Court enter an order confirming Rescission of the Confidentiality, Tolling and Moratorium Agreement entered into by the Parties on July 10, 2023;

(3)      Declaratory judgment be awarded in favor of Plaintiff as outlined above;

(4)      That Plaintiff be awarded reasonable attorney fees, costs, and expenses;

(5)      That this Court grant a trial by a jury of twelve on all issues so triable; and

(6)      This Court grants such other and further relief as this Honorable Court deems equitable and just.

Respectfully submitted this 31st day of July 2023.

DEAN THAXTON, LLC


By:      /s/ Douglas H. Dean
            Georgia Bar No. 130988
            601 E. 14th Avenue (31015)
            Post Office Box 5005
            Cordele, Georgia  31010
            O: (229) 271-9323
            F:  (229) 271-9324
            E:  *doug@deanthaxton.law*


            ***Attorney for Plaintiff***

Exhibit A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE CONNECTORS REALTY GROUP CORPORATION and DARRYL WILLIAMS, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.    19-cv-00743 |
| STATE FARM FIRE & CASUALTY COMPANY, | ) ) ) | Honorable Charles P. Kocoras |
| Defendant. | ) ) ) | |

## DECLARATION OF CARLA CAMPBELL-JACKSON, PH.D.

Carla Campbell-Jackson, Ph.D., does declare and swear as follows:

1. I am over the age of 18 years and have personal knowledge of the following matters set forth in this Declaration to which, if called as a witness, I could competently testify.

2. I have received a Doctorate in Organizational Leadership in 2013 from University of Phoenix. I have received a Masters of Business Administration Degree from Illinois State University in 2003. I have received a Bachelors Degree in Communications in 1987 from Drake University. I am an African American (Black) female.

3. I began working for State Farm Insurance Company ("State Farm") as a College Intern in approximately 1986 in Des Moines, Iowa. In approximately 1988 I was hired by State Farm as Claim Representative in Chicago, Illinois. In approximately 1993 I was promoted to the position of Human Resources Representative in Chicago, Illinois. In approximately 1995 I was promoted to the position of Auto Claims Supervisor in Chicago, Illinois. In approximately 1998 I was promoted to the position of Superintendent/Team Manager in Auto Claims. In

approximately 2003 I moved to Auto Claims Central as a Claims Manager. In approximately 2009 I was promoted to the position of Section Manager for Auto Claims in Kalamazoo, Michigan. In 2014 State Farm assigned me to the position of Claims Section Manager in the Special Investigations Unit ("SIU"), Kalamazoo, Michigan, primarily for the states of Michigan, Illinois, Missouri, Indiana and Iowa ("my Section"). I had never asked to be an SIU Section Manager, but, instead it was State Farm on its own that moved me to that position. My employee ratings with State Farm were always exceptional until State Farm became alarmed by my expressing that the SIU Claims denial process was being used to target and deny minority claims as set forth further below.

    4. During the period 2014-2016 I also held the voluntary, unpaid, position of First Vice President and, subsequently, President of the Bloomington-Normal Chapter of the National Association for the Advancement of Colored People (NAACP).

    5. As an SIU Claims Section Manager I was informed by State Farm that my duties included, but were not limited to, the following:

    A. Review claim files from claims originating in my Section;

    B. Review claims determinations made by SIU Claim Specialists/Representatives and submitted to me from their respective SIU Claims Team Managers in my Section;

    C. Handle customer complaints;D. Handle human resources issues related to employees;

    E. Coach and develop leaders and employees;

    F. Participate in Claim Committee Reviews with the Team Managers and Internal Claims Consultants;

    G. Attend SIU Conferences, meetings and weekly Huddles; and

    H. Other duties as assigned.

6. In 2014 Claims Manager Celeste C. Dodson met with me telephonically when I first started in the position of Claims Section Manager in the Special Investigations Unit. She told me not to question the claims decisions of the Team Managers of the SIU that were sent to me for review because she stated that the Team Managers were more experienced with the SIU Claims denial process. I said, "Why would I not question the claims decisions?" Celeste responded by asking, "Do you want to be a civil rights advocate or an SIU Section Manager?" During this conversation Ms. Dodson explained that a part of my role as SIU Section Manager was to make sure that the SIU employees must "Fill the Cup(s)." This was the very first time that I heard the term "Fill the Cup(s)." She said we would review the SIU statistics during our weekly huddles.

7. Approximately once per week Ms. Dodson would hold and facilitate a recurring SIU Section Manager "huddle," *i.e.,* a meeting via videoconference, where we would review the statistics regarding referral of claims to the SIU and discuss ways of increasing the number of claims sent to SIU in an effort to "Fill the Cup(s)." Section Managers that reported to Dodson SIU Division included Beth O'Connor, Carla Campbell-Jackson, Carlos Diaz, Cortes Williams, Dave Banks, Gregory Law and Nicole Campbell Redd. During the huddles Ms. Dodson would show statistical comparisons of how many claims were coming into each Section in the Dodson SIU Division. She would also encourage us to take action to increase the number of claims into SIU. For example, Ms. Dodson and the Section Managers would discuss the concept of "Shaking Hands and Kissing Babies," by which they meant to encourage front line claim representatives (Property Damage and Bodily Injury Claim Representatives) to submit claims to SIU. Often Ms. Dodson encouraged the SIU Section Managers to have their employees attend Property Damage and Bodily Injury Team meetings to encourage submissions of claims to SIU. During the huddles and in personal one-on-one meetings with me, Ms. Dodson discussed the

3

various neighborhoods where she said there was a high propensity for the submission of fraudulent claims, including the inner cities of Chicago, St. Louis, Indianapolis, Des Moines, Detroit and many other inner city areas, including, but not limited to, the South Side of Chicago, the West Side of Chicago, East St. Louis, and the North Side of St. Louis. She referred to these neighborhoods as "inner city" and/or "high risk for fraud" neighborhoods. During one of the huddles I suggested that maybe no fraud existed in a particular inner city neighborhood. Ms. Dodson interrupted me and said "Oh, yes, there is fraud in those areas." On many occasions during the one-on-one huddles with Ms. Dotson, I verbally shared my concerns about the high number of minority claims being sent to, and denied by, SIU. When I shared these concerns Ms. Dodson dismissed my concerns and repeated that claims from inner city neighborhoods had "high fraudulent activity."

8. In the course of reviewing the claims files that were routed to me for review, I noted that the preponderance of denied claims were those of policyholders and claimants that were African-American and minority groups. I came to this conclusion by reviewing the names, addresses and agents of these policyholders. For example, the majority of the claims that I reviewed were from policyholders and claimants that had Afro-centric names. I found that often when insureds and claimants would call to complain about State Farm, and those calls were routed to me to handle, the claimants would tell me their race and that they felt that State Farm was discriminating against them by denying their claims simply based on their race and neighborhood. These callers were African-Americans, Hispanics, West Asians, and Middle Easterners.

9. During my tenure as SIU Claims Section Manager, most the Claims determinations that were sent to me for review from the SIU Team Managers were from predominantly African

4

American and other minority inner city neighborhoods, including from the inner cities of
Chicago, St. Louis, Indianapolis, Des Moines, Detroit and many other inner city areas, including,
but not limited to, the South Side of Chicago, the West Side of Chicago, East St. Louis, and the
North Side of St. Louis. I do not recall receiving either Claims determinations or Claims denials
from non-predominantly minority neighborhoods.

10. An Enterprise-led SIU Leadership Meeting was held October 27-29, 2014 at the
Hilton Hotel in Nashville, Tennessee, attended by all SIU and Multi-Claim Investigations Unit
("MCIU") leaders from across the United States. (The Multi-Claim Investigations Unit was an
investigations unit to which purportedly fraudulent claims were sent from multiple-claim
generating entities, such as doctor's offices and automobile repair shops.) Each attendee enjoyed
a private room and/or suite and elaborate accommodations at the hotel that included meals, hors
d'oeuvres, snacks, drinks and music. In addition to all of the SIU and MCIU leaders being
present, this conference was also attended and hosted by Vice President of Operations, Kelly
Bever, SIU Claims Manager, Celeste Dodson, and all other SIU and MCIU Claims Managers
and several Claims Consultants (some of whom were being groomed for role of Vice President
of Operations.) At this meeting the subject of "Filling Cups" was on the agenda and was
discussed in detail. State Farm representatives shared the results from the SIU/MCIU statistics,
as well as stated how much State Farm saved by SIU/MCIU denying claims.

11. Another SIU Enterprise-Led meeting was held on August 12, 2015 at a building
leased by State Farm adjacent to the Chicago Marriott Suites in Downers Grove, Illinois, a
Chicago suburb, where we were housed. At that meeting SIU Claims Manager Celeste Dodson
reviewed SIU statistics and data with SIU Section Managers. She reviewed each Section's data
and told SIU Section Managers that "We must 'Fill the cups.'"

12. Additionally, on or about January 26, 2016 another SIU/MCIU Enterprise-Led meeting was held in Dallas, Texas at the City-Line Building. Specifically, the attendees were told by State Farm representatives that, "We hit a home run in Filling the Cups." This meeting was attended by all of the SIU and MCIU Section Managers, Operations Vice President Shyama Terry, Vice President of Operations, Kelly Bever, SIU Claims Manager, Celeste Dodson, and all other SIU and MCIU Claims Managers and several Claims Consultants (some of whom were being groomed for role of Vice President of Operations.) At this meeting the subject of "Filling Cups" was discussed in detail. State Farm shared the results from the SIU/MCIU statistics, as well as stated how much State Farm saved by SIU/MCIU denying claims. The attendees were told by a representative of State Farm that there were 30,049 cause of loss, *i.e.,* claims, sent to SIU as a result of Filling the Cups. State Farm representatives told the attendees that savings to State Farm for claims not paid, *i.e.,* denied, in the SIU for the year 2015 was $135,551,132.72 and that 2015 savings for State Farm for claims not paid, *i.e.,* denied, in the MCIU was $1.5 billion. The attendees were told by representatives of State Farm that this savings helps State Farm to grow and keeps its premiums low.

13. TAC (commonly known as Technology Analytics for Claims) was a software application utilized by State Farm and managed by Jeff Legner, Section Manager of SIU Analytics. TAC was employed as another method to identify claims that could plausibly be considered fraudulent and sent to SIU to "Fill the Cups." Dennis Schulkins was the Claims Manager responsible for TAC.

14. I was told by experienced SIU Section Mangers and SIU Claims Managers that Patricia "Pat" Parr-Armelegos was instrumental in the formation of SUI and MCIU. In addition,

6

SIU Claims Specialist Tony Guy made a disparaging comment to Paul Lehmann, SIU Team Manager, about the minority customer base for an African American State Farm agent.

15. State Farm created and maintained a list of certain attorneys, physicians and body shops frequented by minority policyholders and claimants. State Farm scrutinized the claims from these attorneys by providing low-ball settlement offers. State Farm scrutinized the claims from these physicians and repair shops by denying significant portions of the medical bills and repair bills.

16. State Farm can easily access information relating to "Fill the Cup(s)" through its system-wide use of Microsoft Outlook and Microsoft MSWord.

17. Referrals to the SIU sent to me for review were made by State Farm Claims Representatives from auto and homeowners' lines of State Farm's business, *i.e.* State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company.

18. Ms. Dodson told me during my one-on-one huddles with her that she wanted me to increase the number of purportedly fraudulent claims coming into my section. She informed me that my Section had the lowest number of purportedly fraudulent claims. These comments were made during my performance reviews and were likely correlated to my performance ratings and salary increases.

19. As soon as I noticed a trend regarding the denial of claims by SIU from predominantly African American and other minority inner city neighborhoods, I shared my concerns with Ms. Dodson at the next one-on-one huddle with Ms. Dodson and did so at every one-on-one huddle with Ms. Dodson from the beginning of 2015 through May, 2016, about the preponderance of SIU claims involving African Americans, Hispanics, Asians and other minority customers. After sharing these concerns with Claims Manager Celeste Dodson, Claim

7

Consultant Juliann Klokkenga and even Human Resources Vice-President Rich Garcia, State Farm began to retaliate unrelentingly by rating me unfairly on my performance reviews. I typically received superior, exceptional, and Level 3 ratings (which was the highest rating possible) until I expressed my concerns about State Farm discriminating against minority employees and customers. Ultimately, State Farm relieved me of my duties.

20. I even offered State Farm leaders specific policyholders' names and claim numbers that were denied. Specifically, on February 24, 2016, I sent Claim Consultant Juliann Klokkenga an email with a list of claim numbers and names--expressing my concerns regarding State Farm's propensity to deny minority group members' claims. She called me on the telephone and said that all claims are handled on their merits.

21. However, while Ms. Klokkenga and State Farm say that "all claims are handled on their merits," my experience proves otherwise. In actuality, a preponderance of claims that I reviewed that "Filled the Cups" were from African American and other minorities, were prejudged as non-meritorious, and often were denied. If each claim was handled "on its merits," then what would have been the need for the "Fill the Cups" process? Why does one need a "Fill the Cups" process to "handle a claim on its merits?" State Farm Claim Representatives were trained in State Farm's contractual obligations under its policies so as to be able to handle a claim on its merits. So, absent the "Fill the Cups" process, State Farm would have handled each claim on its merits as a matter of course. Based on my experience, "Fill the Cups" accomplished just the opposite and disenfranchised many African Americans and other minorities by not paying their legitimate claims. "Fill the Cups" was simply a means of denying payment of millions of dollars to African American and other minority policyholders and claimants.

8

22. I also telephoned and wrote to all the state Departments Of Insurance ("DOI") for each of the states in my Section regarding African American and other minority claims denials by State Farm. The departments from Illinois and Indiana responded in writing and met me in person at the Peoria Public Library where I expressed my concerns about the number of African American and other minority claims denials by State Farm. In a letter from the Michigan Department of Insurance and Consumer Services dated June 14, 2017, the Department stated, "We do appreciate you bringing your concerns to our attention and will be monitoring the complaint activity against State Farm over the next several months."

23. At a meeting on Monday, May 9, 2016, attended by Human Resources Vice President of Operations Rich Garcia and Claims Vice President of Operations Kelly Bever, I was informed by Rich Garcia and Kelly Bever that State Farm was terminating me. I informed them that this termination solely was being done in retaliation for me expressing my concerns over State Farm's discrimination, racism and retaliation against minority employees and minority claimants. I said that it was not until I began expressing my concerns about State Farm's discrimination against African American and minority employees and African American and minority State Farm policyholders did State Farm decide to terminate me. While at State Farm, I was one of the most decorated employees at the organization (including earning a Bachelors, MBA, Ph.D., CPCU, CLLP, AIS, AIC and AIM). I was selected for the highly coveted "Spirit of State Farm Award." Rich Garcia then offered me $175,315.00 in exchange for a Confidential Separation and Release Agreement (including a non-disclosure clause). I immediately told him that my morals and ethics would not allow me to accept "hush money." I further informed Rich Garcia that State Farm's behavior was racist, discriminatory and retaliatory--simply because I raised concerns related to State Farm's racism and discrimination against minority employees

9

and minority customers. My integrity and values did not allow me to participate in the disenfranchisement and discrimination against African American and other minority employees and customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 2/19/2022

*Dr. Carla Campbell-Jackson*

Carla Campbell-Jackson, Ph.D.

Exhibit B

# dean | thaxton
### *a    b o u t i q u e    l i t i g a t i o n    f i r m*

Doug Dean, Partner
doug@deanthaxton.law

Ken Thaxton, Partner
ken@deanthaxton.law

Janelle Zabresky, Associate
janelle@deanthaxton.law

July 31, 2023

*Via email to andrew.loewenstein@hklaw.com*

Mr. Andrew Loewenstein
Holland & Knight LLP
777 South Flagler Drive
Suite 1900, West Tower
West Palm Beach, Florida 33401

      Re:    TBI Diagnostic Centers of Georgia, LLC
              Our File No. 1215-001

Dear Mr. Loewenstein:

As you know, on July 7, 2023, my clients Gairy Johnson, TBI Diagnostic Centers of Georgia, LLC, and Dr. Ben Behrendt entered into a "Confidentiality, Tolling and Moratorium Agreement" proffered to them by your clients, State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company. The stated purpose of the Agreement was for the parties to enter into "Settlement Discussions" which were to be scheduled "within fourteen (14) business days of the Effective Date." State Farm executed the Agreement on July 10, 2023.

Unfortunately, despite the fourteen-day time frame clearly being of the essence and a material term, State Farm has failed to schedule its demanded "settlement discussions" by July 28, 2023, as required. Accordingly, this letter shall serve as formal notice that my clients are exercising their rights of rescission under O.C.G.A. § 13-4-60 and § 13-4-62. Although we do not believe State Farm provided any benefit to my clients as consideration, in order to ensure that State Farm is fully restored to even its theoretical pre-Agreement position, my clients will not ever attempt to argue that the 24 days between July 7, 2023, and July 31, 2023, are included in any statute of limitations calculation which might become relevant between the Parties.

Thank you for your attention to the matter.

Sincerely,

*Douglas Dean*

Douglas H. Dean
Attorney at Law

# S E R V I C E    A B O V E    S E L F

IN THE SUPERIOR COURT OF DEKALB COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| TBI DIAGNOSTIC CENTERS OF GEORGIA, LLC | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION FILE NO. _____ |
| v. | : | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and STATE FARM FIRE AND CASUALTY COMPANY, | : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |

## VERIFICATION

Personally appeared before the undersigned officer duly authorized to administer oaths, Gairy Johnson, as principal of Plaintiff TBI Diagnostic Centers of Georgia, LLC, who upon oath, states that the information and allegations contained in the foregoing Verified Complaint Rescission and Declaratory Relief are true and accurate to the best of his knowledge.

This 27th day of July 2023.

By: _____ (Seal)
Gairy Johnson for Plaintiff
TBI Diagnostic Centers of Georgia, LLC

Sworn and subscribed to before me
this 27th day of July 2023:

_____
Notary Public
My commission expires: 03/06/2026

RENAE TURLEY
NOTARY
Comm. Exp.
GEORGIA
Mar. 6, 2026
PUBLIC
DEKALB COUNTY, GA

Scanned with CamScanner

## AFFIDAVIT OF SERVICE

| Case: 23CV6931 | Court: Superior Court | County: Dekalb, GA | Job: 9292358 |
|---|---|---|---|
| **Plaintiff / Petitioner:** TBI DIAGNOSTIC CENTERS OF GEORGIA | | **Defendant / Respondent:** STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY | |
| **Received by:** Phoenix Legal | | **For:** Lawson, Reid & Dean, LLC | |
| **To be served upon:** STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY/ Corporation Service Company | | | |

I, Frank James, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**   Alisha Smith, 2 SUN CT STE- 400, PEACHTREE CORNERS, GA 30092

**Manner of Service:**   Registered Agent, Aug 2, 2023, 11:41 am EDT

**Documents:**   SUMMONS AND COMPLAINT

**Additional Comments:**
1) Successful Attempt: Aug 2, 2023, 11:41 am EDT at 2 SUN CT STE- 400, PEACHTREE CORNERS, GA 30092 received by Alisha Smith. Age: 40; Ethnicity: African American; Gender: Female; Weight: 170; Height: 6'0"; Hair: Black; Relationship: Authorized Agent ;

_____   8/3/23

Frank James   Date
179

Phoenix Legal
251 Springs Xing
Canton, GA 30114
770-873-6999

Subscribed and sworn to before me by the affiant who is personally known to me.

_____

Notary Public
8/3/23

Date   Commission Expires

*Notary seal: KRISTA MEADOWS, NOTARY PUBLIC, FULTON COUNTY, GEORGIA, MY COMMISSION EXPIRES AUGUST 04, 2026*

## AFFIDAVIT OF SERVICE

| Case: 23CV6931 | Court: Superior Court | County: Dekalb, GA | Job: 9292365 |
|---|---|---|---|
| Plaintiff / Petitioner: TBI DIAGNOSTIC CENTERS OF GEORGIA | | Defendant / Respondent: STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY | |
| Received by: Phoenix Legal | | For: Lawson, Reid & Dean, LLC | |
| To be served upon: STATE FARM FIRE AND CASUALTY COMPANY/ Corporation Service Company | | | |

I, Frank James, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

| | |
|---|---|
| Recipient Name / Address: | Alisha Smith, 2 SUN CT STE- 400, PEACHTREE CORNERS, GA 30092 |
| Manner of Service: | Registered Agent, Aug 2, 2023, 11:30 am EDT |
| Documents: | SUMMONS AND COMPLAINT |

Additional Comments:
1) Successful Attempt: Aug 2, 2023, 11:30 am EDT at 2 SUN CT STE- 400, PEACHTREE CORNERS, GA 30092 received by Alisha Smith. Age: 40; Ethnicity: African American; Gender: Female; Weight: 170; Height: 6'0"; Hair: Black; Relationship: Authorized Agent ;

_____     8/3/23
Frank James                  Date
179

Phoenix Legal
251 Springs Xing
Canton, GA 30114
770-873-6999

Subscribed and sworn to before me by the affiant who is personally known to me.

_____
Notary Public
8/3/23
Date          Commission Expires

KRISTA MEADOWS
COMMISSION EXPIRES
NOTARY PUBLIC
AUGUST 04, 2026
FULTON COUNTY, GEORGIA