## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| TONI FRANKLIN, | * | |
| as the natural mother of decedent and as | * | |
| representative of estate of minor | * | |
| decedent LE'DEN BOYKINS and | * | |
| ANTHONY BOYKINS, as natural father | * | Civil Action No. |
| of decedent LE'DEN BOYKINS, | * | |
| | * | |
| | * | **Jury Trial Demanded** |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| GEORGIA DEPARTMENT OF | * | |
| PUBLIC SAFETY, and | * | |
| DAVID PETERSON, | * | |
| | * | |
| **Defendants.** | * | |

## COMPLAINT

**NOW COMES** Toni Denise Franklin ("Plaintiff Franklin"), in her individual

capacity as mother and as the representative of the Estate of Le'Den Makai-Lavell

Boykins, minor decedent, individually ("Decedent"), and Anthony Darnell Boykins

(Plaintiff Boykins) in his individual capacity as father of Decedent, by and through

undersigned counsel, brings this Complaint against Defendants Georgia Department

of Public Safety (Defendant GDPS) and David Peterson (Defendant Peterson), and

John Does Nos. 1-10 (collectively, "John Doe Defendants"), and makes the

following allegations upon personal knowledge as to Plaintiffs' own acts, upon information and belief, and Plaintiffs' attorneys' investigation as to all other matters, and states as follows:

## I.    INTRODUCTION

1.    This action arises out of Defendant Peterson's conduct in intentionally and maliciously crashing his Georgia State patrol vehicle into a car being driven by Charles Moore ("Mr. Moore") which took the young life of Decedent, an innocent 12-year-old boy.

2.    At all times herein, and as will be shown below, Defendant Peterson's arbitrary conduct was shocking to the conscience, because it was undertaken with a purpose to cause harm to Decedent unrelated to the legitimate object of arrest, all in violation of the Fourteenth Amendment to the United States Constitution.

3.    As the representative of Decedent's Estate, Plaintiff Franklin brings this action per Title 42 U.S.C. § 1983 for violations of Decedent's rights under the United States Constitution.

4.    Plaintiffs bring this action per the law of the State of Georgia, to wit: O.C.G.A. § 51-4-1 *et seq*.

5.    Plaintiffs also bring this claim per the Georgia Supreme Court's

interpretation of O.C.G.A. § 50-21-24(6) which asserts: where an officer or employee acts negligently in carrying out official law enforcement policy, government liability may exist under the Tort Claims Act. *See, Georgia Dept. of Pub. Safety. v. Davis*, 285 Ga. 203, 205-206 (2009).

## II. PARTIES

### A. Plaintiffs

6.     All preceding paragraphs are incorporated herein by this reference.

7.     Plaintiff Toni Denise Franklin, an adult individual, is the mother of Decedent, and she is the representative of Decedent's Estate.[1]

8.     Plaintiff Anthony Darnell Boykins, an adult individual, is the father of Decedent.

9.     Plaintiffs are residents of Paulding County, Georgia, and Genesee County, Michigan.

10.     Accordingly, Plaintiffs are the proper parties to bring an action for the wrongful death of their son, and Plaintiff Franklin is the proper party to bring all actions on behalf of the Estate of Decedent Le'Den Boykins.

### B. Defendants

---

[1] *See* Exhibit A.

### *Defendant Peterson and Defendant John Does Nos. 1-10*

11.   All preceding paragraphs are incorporated herein by this reference.

12.   At all times relevant to this action, Defendant Peterson and/or Defendant John Does Nos. 1-10 are employed as State Troopers for Defendant GDPS and are residents of Paulding and/or DeKalb County, Georgia.

13.   Defendant John Does 1-10 are believed to be supervisors, law enforcement officers from agencies other than Defendant GDPS, and/or State Troopers employed by GDPS who recklessly and/or intentionally violated law enforcement policies or procedures and caused harm to Plaintiffs and Decedent thereby.

14.   Plaintiffs have unsuccessfully, though diligently, tried to identify Defendants John Does Nos. 1-10 as wrongdoers in this case, to wit:

   a.   Efforts to secure public records did not reveal the identities of these Defendants;

   b.   Efforts to use investigators did not reveal the identities of these Defendants; and

   c.   Review of all available public information on-line did not reveal the identities of these Defendants.

15.   At all times relevant to this action, Defendants Peterson and John Does 1-10 were acting under color of state law.

16.   Defendants Peterson and John Does 1-10 are hereby sued in his/her/their individual and official capacity(ies).

### *Defendant Georgia Department of Public Safety*

17.   All preceding paragraphs are incorporated herein by this reference.

18.   Defendant GDPS is a state agency responsible for the supervision, investigation, discipline, control, and operation of the Georgia State Patrol's Office.

19.   Defendant GDPS is located at Post 29, in Paulding County, Georgia.

20.   Per Georgia statutory and case law, Defendant GDPS is obligated to ensure that State Troopers, including Defendant Peterson, conduct themselves in a manner consistent with the United States Constitution and Georgia law.

21.   Per Georgia statutory and case law, Defendant GDPS is an entity capable of being sued for the negligent and/or reckless and/or intentional failure of Defendant Peterson to follow GDPS policies as detailed herein.

## III.  JURISDICTION AND VENUE

22.   All preceding paragraphs are incorporated herein by this reference.

23.   Federal question subject matter jurisdiction exists in this Honorable \
Court, pursuant to 28 U.S.C. §§ 1331 and 1343, as this action is brought
pursuant to 42 U.S.C. § 1983, to redress a deprivation of the Fourteenth
Amendment rights of Decedent.

24.   Supplemental jurisdiction exists in this Honorable Court, pursuant to
28 U.S.C. § 1367, because Plaintiffs' pendent state law claims are so
related to Plaintiffs' federal claims that they form part of the same case
or controversy under Article III of the United States Constitution.

25.   Venue is proper in this Honorable Court under 28 U.S.C. § 1391 as
Defendants' constitutional violations, tortious conduct, and/or other
illegal conduct occurred within the Northern District of Georgia.

## IV.  FACTS

26.   All preceding paragraphs are incorporated herein by this reference.

27.   At about 1:09 am on September 10, 2021, Defendant Peterson is on
duty, in uniform, and in a marked patrol car.

28.   Defendant Peterson notices Mr. Charles Moore to be an African
American male driving on Ridge Road in Paulding County, State of

Georgia.

29.    Seeing no traffic infraction or other violation of law, Defendant

Peterson decides to conduct a traffic stop of Mr. Moore.

30.    At this point, and in the moments before he initially stops Mr. Moore,

Defendant Peterson has no lawful basis for the stop, to wit:

a.  Defendant Peterson does not see erratic, illegal, or unsafe driving;

b.  When Defendant Peterson runs Mr. Moore's license plate number

on his CAD system, he finds the address where Mr. Moore's vehicle

was registered, and discovers the vehicle is not stolen;

c.  Defendant Peterson does not observe, nor does he have evidence of,

speeding;

d.  Defendant Peterson does not find a warrant for Mr. Moore;

e.  Defendant Peterson did not see any threats of violence nor anyone

in danger of violence;

f.  Defendant Peterson does not see Mr. Moore fleeing from arrest;

g.  Defendant Peterson does not observe an equipment violation on Mr.

Moore's car;

h.  Defendant Peterson does not observe any occupant in Mr. Moore's

car violating the law;

i. Defendant Peterson does not observe any other illegality or criminality; and

j. Yet, Defendant Peterson concludes that Mr. Moore is trying to "evade" him.

31. Having made up his mind that Mr. Moore should be detained and questioned for driving while Black, Defendant Peterson approaches the driver's side window of the vehicle.

32. Mr. Moore rolls down his driver-side window.

33. Mr. Moore asks Defendant Peterson why he is being pulled over.

34. Defendant Peterson says, "you're trying to evade me."

35. Mr. Moore again asks why he is being pulled over and what crime he has committed.

36. At no point does Defendant Peterson inform Mr. Moore of any criminal or traffic violation as the basis for the traffic stop.

37. Instead, Defendant Peterson insists on securing Mr. Moore's license.

38. Mr. Moore repeats he committed no crime, and he refuses to provide his license.

39. Mr. Moore then asks for Defendant Peterson's supervisor.

40. Defendant Peterson pulls out his flashlight, opens the driver's side door,

steps back, and shines his flashlight into the car.

41. Defendant Peterson sees two African American children in the vehicle.

42. Mr. Moore's fourteen-year-old son, Blake Zyier, sits in the front passenger seat.

43. Twelve-year-old Decedent, a friend of Blake, sits in the seat behind Mr. Moore.

44. Decedent is not wearing a seatbelt.

45. Defendant Peterson orders Mr. Moore out of the vehicle.

46. Mr. Moore refuses to leave his vehicle.

47. Defendant Peterson walks to the back of Mr. Moore's vehicle and shines his flashlight on Moore's car and license plate.

48. Defendant Peterson radios the dispatcher, requesting back up.

49. Shortly thereafter, three Paulding County Deputy Sheriff's Deputies (Defendant John Does 1-3) arrive on scene.

50. Defendant Peterson returns to the driver's side of the vehicle.

51. Defendant Peterson again orders Mr. Moore out of the car.

52. Mr. Moore refuses.

53. Two Paulding County Sheriff's Deputies meet Defendant Peterson at the driver's side of Mr. Moore's car.

54.   At the direction of Defendant Peterson, one of the Deputies, whose identity is unknown at this time, smashes the driver's side window.

55.   As Defendant Peterson reaches through the smashed window to grab Mr. Moore, Mr. Moore drives away from the scene.

56.   Defendant Peterson sees no one exit Mr. Moore's car before Mr. Moore drives away.

57.   Defendant Peterson and the deputies run to their cars and pursue Mr. Moore.

58.   As he beings his chase of Mr. Moore, Defendant Peterson does not radio the fact that he knows there are two children in Mr. Moore's car or that he knows at least one child is unrestrained and sitting in the back seat.

59.   Although he pursues a car containing innocent children for nearly 10 minutes, Defendant Peterson never discusses with a supervisor that at least one child is unrestrained.

60.   In fact, Defendant Peterson pursues the car for 8 minutes and 30 seconds and never discusses with a supervisor that at least one child is unrestrained.

61.   Soon after driving away, Mr. Moore calls 911 saying he has children

on board.

62. Mr. Moore says he is afraid for his life and needs a supervisor.

63. He tells the dispatcher to tell the officers behind him that there are children on board.

64. The dispatcher tells Defendant Peterson there are children on board.

65. Defendant Peterson follows Mr. Moore onto Highway 92, heading southbound.

66. There are no overhead/streetlights on Highway 92 South.

67. Defendant Peterson notices he is in a construction zone on Highway 92.

68. Defendant Peterson sees construction cones and concrete barriers on his right.

69. Defendant Peterson sees a construction ditch on his left.

70. Defendant Peterson sees no pedestrians and little traffic on the highway.

71. Defendant Peterson periodically notes his speed.

72. He follows close behind Moore, who is accelerating to nearly 90 miles an hour.

73. Even though he's in a construction zone following Mr. Moore at nearly 90 miles an hour, Defendant Peterson considers forcing Mr. Moore and the children off the road.

74.   As time passes, Defendant Peterson experiences no crisis requiring split-second decision-making.

75.   Defendant Peterson observes no reckless driving by Mr. Moore, other than perhaps speeding.

76.   Defendant Peterson sees no near-collisions or threats of accident to any other vehicles.

77.   Defendant Peterson can hear his radio.

78.   Defendant Peterson routinely communicates with the sheriff's deputies regarding the positioning of his cruiser with their vehicles as they pursue Mr. Moore's car.

79.   Defendant Peterson routinely checks his speed.

80.   Defendant Peterson routinely announces his location.

81.   Defendant Peterson has time and knows he can slow his vehicle and stop the chase.

82.   Defendant Peterson has time and knows he can radio the sheriff deputies and stop the chase.

83.   Defendant Peterson has time and knows to consider the rights and safety of Decedent and stop the chase.

84.   Defendant Peterson has time and knows to assess the increased risk of

death to Decedent posed by running Mr. Moore's car off the road at nearly 90 miles an hour in a construction zone.

85.  Near the end of the chase, Defendant Peterson gets informed by dispatch that a child inside Mr. Moore's car has called 911 and spoken with dispatch.

86.  The dispatcher tells Defendant Peterson the child is pleading to have the trooper and deputies abandon the chase.

87.  Throughout the chase, Defendant Peterson has a clear and practical opportunity for actual deliberation regarding the risks that would be created to the unrestrained child if he were to force Mr. Moore's vehicle off the road at nearly 90 miles an hour, to wit:

   a.  Defendant Peterson pursues Mr. Moore for more than 8 minutes;

   b.  Traffic is light;

   c.  Mr. Moore drives in his lane without weaving or trying evasive maneuvers;

   d.  Mr. Moore is in communication with dispatch, asking for a supervisor and an end to the chase; and

   e.  Defendant Peterson sees no threats directed at any pedestrians nor towards any motorists from Mr. Moore or any occupant inside his

car.

88.    Yet, as Defendant Peterson has time to balance the law enforcement goal
of apprehending Mr. Moore following a baseless initial traffic stop
against the threat to the child occupants from causing Mr. Moore to lose
control of his car in a construction zone, Defendant Peterson grows angry
and intentionally chooses to increase the danger to all the occupants in
Mr. Moore's car by puishing Mr. Moore's car off the road in a
construction zone.

89.    Before the boy-caller can hang up with the dispatcher, and before Mr.
Moore's car leaves the construction zone, Defendant Peterson
disregards his training, ignores the obvious dangers present in the
construction zone, and in a fit of ego-driven frustration pushes his foot
down on the gas pedal of his car until he rams into the back end of Mr.
Moore's car.

90.    Defendant Peterson continues to push on the gas until the car containing
innocent children completely loses control – all the while intending to
send the car off the roadway at somewhere between 80 and 90 miles an
hour into a construction zone ditch – an act that can only be
characterized as a cruel, senseless, use of lethal force, unjustifiable by

any government interest.

91.   The dispatcher's audio system records the crunching and banging sounds as Mr. Moore's car tumbles into the ditch.

92.   When the crashing stops, Mr. Moore's voice is heard breaking the momentary silence as he realizes Decedent has been partially ejected through the sunroof of the car.

93.   Seeing the boy half in and half under the car, Mr. Moore cries out, "Nooooo!".

94.   Following the crash, Decedent is transported to Kennestone WellStar Hospital, where he is pronounced dead due to blunt force trauma to his head.

## V.  CAUSES OF ACTION

## COUNT I:

### (42 U.S.C. § 1983: Shocks the Conscience)

95.   All preceding paragraphs are incorporated herein by this reference.

96.   This claim is brought pursuant to Title 42 U.S.C. § 1983.

97.   Title 42 U.S.C. §1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United

States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

98.   For decades, the United States Supreme Court has interpreted the Fourteenth Amendment to the United States Constitution to gurantee the well-established substantive due process right of being protected from deliberate decisions and arbitrary actions of government officials that result in a deprivation of life. See *Daniels v. Williams,* 474 U.S. 327, 331-332 (1986); *see also Wolf v. McDonnell*, 418 U.S. 539 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government.").

99.   While acting under color of state law, Defendant Peterson deprived Decedent of his well-established right to be free from deliberate decisions and arbitrary actions of government officials that result in a deprivation of life.

100.  In other words, on September 10, 2021, Defendant Peterson was not permitted to take action with a purpose to cause harm unrelated to the legitimate object of arrest, i.e. he was not permitted to undertake

16

conduct that was/is shocking to the conscience.

101.  At all times relevant to this matter, Defendant Peterson was clothed with the authority of the state and misused that authority.

102.  In this case, Plaintiff claims Defendant Peterson engaged in conduct shocking to the conscience and in violation of the protections of the Fourteenth Amendment when he deliberately chose to take action that served no justifiable governement interest, to wit, Defendant Peterson:

   a.  Applied no known law enforcement policy or procedure when he chose to force a car containing two innocent children off the road at nearly 90 miles an hour in a construction zone;

   b.  Made a deliberate choice to cause a car to lose control knowing or having reason to belive that one of the children passengers was an unrestrained passenger;

   c.  Made the deliberate choice to cause the car to lose control with an unrestrained child passenger at nearly 90 miles an hour in a construction zone, knowing a ditch and other hazards were present that increased the risk of death to the unrestrained passenger, i.e., the Decedent; and

   d.  Timed his collision with the car in question and/or made sure to

press on the gas long enough and/or hard enough to ensure that the car containing decedent did not just spin to a safe stop but would in all likelihood be forced into a deadly crash.

103. In other words, Defendant Peterson did not execute any tactic designed to affect an arrest of anyone.

104. Defendant Peterson simply ran Mr. Moore off the road at 90 miles an hour in a construction zone, a place where no sane law enforcement officer would opt to do such a thing.

105. When he ran Mr. Moore's car off the road, Defendant Peterson lost his patience and had determined that the chase would end on his terms: Mr. Moore had engaged in conduct that disrespected his authority – conduct often referred to as "contempt of cop" – and he decided that everyone in Mr. Moore's car was going to have to pay a steep price, even if that price was death.

106. Defendant Peterson slammed into Mr. Moore's car with malice, to wit: he knew that running the car off the road under the circumstances articulated herein created the likelihood that he would kill at least one occupant (or perhaps all occupants) in the car.

107. Nor did Defendant Peterson comport his actions with any prior training

18

he may have had regarding the safe stopping of a fleeing motorist, to wit:

    a.  Defendant Peterson did not attempt to deploy other measures to slow the car;

    b.  Defendant Peterson did not follow the car out of the construction zone;

    c.  Defendant Peterson did not consider action that would prevent the loss of innocent life from a high-speed crash; and

    d.  Defendant Peterson forced a car off the road into a construction zone ditch at nearly 90 miles an hour, knowing that it contained an unrestrained child.

108.  Defendant Peterson thrust the 12-year-old Decedent into a lethal scenario for no governmental purpose, to wit: his only goal was to cause the suffering and/or risk the death of those in the car.

109.  As a direct and proximate result of Defendant Peterson's actions, as set forth above, Decedent has been damaged, including but not limited to, being terrorized by Defendant Peterson's high-speed pursuit, conscious awareness of impending death, losing his life while being crushed by a car, and enduring terror, pain, anguish, loss of dignity, and

legal fees and costs.

## COUNT II

### (Wrongful Death)

110.   All preceding paragraphs are incorporated herein by this reference.

111.   "Under OCGA §§ 19–7–1 (c) and 51-4-4, when a child (either a minor or *sui juris*) dies as the result of . . . negligence, and the child did not leave a spouse or children, the child's parents have the right to recover for the full value of the child's life." *Baker v. Sweat*, 281 Ga. App. 863, 866, 637 S.E.2d 474 (2006).

112.   Pursuant to O.C.G.A. § 50-21-26(a)(4), the requisite pre-suit notice to Defendant GDPS was provided, a copy of which along with the corresponding proof of delivery receipt are attached hereto and incorporated herein as "Exhibit 1."

113.   Although Plaintiffs maintain that Defendant Peterson intentionally used lethal force against Decedent out of frustration and hubris and did not actually execute a P.I.T. maneuver or any other tactic to arrest Mr. Moore, nor did he follow any prior training in that regard, Plaintiffs plead in the alternative that Defendant Peterson negligently and/or recklessly and/or intentionally violated the Georgia Department of

Public Safety's policy(ies) and/or rules regarding vehicle pursuits and a tactic known as a pursuit immobilization technique or pursuit intervention technique (P.I.T. maneuver).

114.  A P.I.T. maneuver occurs, per the rules and policies of Defendant GDPS, when a Georgia State Trooper uses his vehicle to cause a fleeing vehicle to abruptly turn sideways on the highway.

115.  A P.I.T. maneuver is known by law enforcement officers and trainers to cause a driver of a fleeing vehicle to lose control while driving.

116.  A P.I.T. maneuver is known by law enforcement officers and trainers to create a serious risk of death to a driver or passenger in a fleeing vehicle that is out of control.

117.  For these and other safety reasons, Georgia State Troopers, like Defendant Peterson are trained on how to evaluate the circumstances that would justify a P.I.T. maneuver.

118.  Defendant Peterson has been trained on the aforementioned risks of a P.I.T. maneuver, including the risk of death.

119.  Defendant Peterson has been trained on the proper manner in which to conduct a pursuit and a P.I.T. maneuver.

a.  At all times during his pursuit of Mr. Moore's car, Defendant

Peterson knows the risk of death or serious injury to an unrestrained passenger who is in a car that is subjected to a P.I.T. maneuver at high speeds.

120. As a state trooper for the State of Georgia, Defendant Peterson has been trained that he must follow the safety rules and policies of the Georgia Department of Public Safety, including Policy 17.02, regarding vehicle pursuits and P.I.T. maneuvers.

121. Accordingly, per his education and training as a Georgia State Trooper, Defendant Peterson owed Plaintiffs and Decedent a duty to comply with the safety rules and policies of the Georgia Department of Public Safety.

122. GDPS Policy No. 17.02, last revised May 15, 2019, states, in assessing the appropriateness of a pursuit, troopers must consider:

a. The nature of the offense committed by the suspect;

b. The potential danger to the public if the suspect is not immediately apprehended; and

c. The probability of the suspect's arrest at a later date.

123. GDPS Policy No. 17.02 states, in assessing the appropriateness of a P.I.T. maneuver, troopers should only use a P.I.T. maneuver when:

a. The danger from the continued pursuit is greater than the danger

22

associated with using the maneuver to stop the pursuit;

b. After factors that affect the safety of using the technique are considered, including: the condition of the road; visibility; traffic volume; pedestrian traffic; type of fleeing vehicle; whether children are visible in the vehicle; and speed of pursuit;

c. Other methods for stopping a fleeing vehicle (e.g. tire deflation devices and roadblocks) have been considered and determined to be not feasible.

124. During his pursuit of Mr. Moore, Defendant Peterson chooses to breach his duty to follow the above policy and discard his training regarding vehicle pursuits and P.I.T. maneuvers.

125. Defendant Peterson breaches his duty to follow the policy and training of Defendant GDPS when he engages in a vehicle pursuit of Mr. Moore in violation of Policy 17.02, to wit:

a. Defendant Peterson had no legitimate basis for the initial stop of Mr. Moore;

b. Defendant Peterson had no basis to continue the pursuit of Mr. Moore;

c. Defendant Peterson knew there was no real danger to the public if

Mr. Moore was not apprehended;

d. Defendant Peterson knew Mr. Moore committed no violent crime and had placed no person in danger when he was initially stopped; and

e. Defendant Peterson discovered the address of Mr. Moore when he ran Mr. Moore's license and registration on the night in question, thus ensuring a high probability of arresting Mr. Moore at a later date.

126. Regarding the notion that Defendant Peterson acted with a legitimate law enforcement purpose to effect the arrest of Mr. Moore and attempted a P.I.T. maneuver – notions which are expressly denied herein – Plaintiffs additionally plead in the alternative, as follows:

a. Defendant Peterson failed to use ordinary care and/or acted recklessly as he pursued Moore's vehicle and attempted a P.I.T. maneuver because he knew or should have known that the conditions of the roadway increased the risk of death to the child occupants at the point where he rammed Mr. Moore's vehicle in a construction zone;

b. Defendant Peterson failed to use ordinary care and/or acted

recklessly as he pursued Moore's vehicle and attempted a P.I.T. maneuver against Moore's vehicle, because the danger of the pursuit was far less than the danger associated with using a P.I.T. maneuver to stop the pursuit in a construction zone;

c. Defendant Peterson failed to use ordinary care and/or acted recklessly when he opted to cause the car containing innocent children to crash in a ditch at a point in the chase when it was travelling at nearly 90 miles an hour;

d. Defendant Peterson failed to use ordinary care and/or acted recklessly as when he attempted a P.I.T. maneuver while being aware of at least one unrestrained child in the car;

e. Defendant Peterson failed to use ordinary care and/or acted recklessly as he never attempted any other method for stopping the car, despite having the opportunity to contact other troopers to make that happen;

f. Defendant Peterson failed to use ordinary care and/or acted recklessly as he undertook his actions to initiate a P.I.T. maneuver in an area where the roadway was unlit, where the roadway involved a construction zone, and where he could not see the surroundings

25

clearly;

g. Defendant Peterson failed to use ordinary care and/or acted recklessly when he initiated a P.I.T. maneuver because he did so when he knew the car was in a construction zone with no pedestrians nearby; and

h. Defendant Peterson failed to use ordinary care and/or acted recklessly when he initiated a P.I.T. maneuver because he did not consider whether other methods for stopping Moore's fleeing vehicle (e.g. tire deflation devices and roadblocks) were feasible, despite having the opportunity to do so.

127.  As he considers stopping Mr. Moore's car with a P.I.T. maneuver, Defendant Peterson is trained to consider the facts and circumstances of the situation, including:

a. The fact that he has no basis for stopping Mr. Moore in the first place;

b. The fact that he has no reason to suspect Mr. Moore of any serious crime or felony;

c. The fact that he has the license plate and address information of Mr. Moore;

d.  The fact that he can arrest Mr. Moore later, and knows that to be a safer option;

e.  The fact that there are child passengers in Mr. Moore's car;

f.  The fact that Mr. Moore's car is moving fast, to wit: at times it's going nearly 90 miles an hour in a construction zone.

g.  The fact that stopping a fast-moving car with a P.I.T. maneuver carries the risk of death to the occupants in the car;

h.  The fact that stopping Mr. Moore's car with a P.I.T. maneuver in a construction zone increases the risk of death or grievous bodily harm to Decedent due to the construction barriers and roadside ditches that are present;

i.  The fact that stopping Mr. Moore's car with a P.I.T. maneuver in a construction zone increases the risk of death or grievous bodily harm to Decedent because he is an unrestrained child;

j.  The fact that Decedent is at a greater risk of death from a P.I.T. maneuver while being an unrestrained passenger in a fast-moving car; and

k.  The balance between law enforcement goal of apprehending Mr. Moore for no reason – or for at worst fleeing a traffic stop (a low-level

27

penalty likely carrying no prison time) – and the threat of death or greivous bodily harm posed to innocent children by a P.I.T. maneuver on a fast moving car in a construction zone.

128.   In breaching his duty to Plaintiffs to use reasonable care in following the policies of Defendant GDPS regarding vehcile pursuits and P.I.T maneuvers, Defendant failed to use the degree of care an ordinarily careful persons under the same or similar circumstances would use, to wit:

a.   As detailed herein, Defendant Peterson violated the express dictates of the Georgia Department of Public Safety Policy 17.02;

b.   As detailed herein, Defendant Petereson's efforts to stop Mr. Moore's car were undertaken with reckless and/or intentional disregard for the rights and safety of Decedent; and

c.   Defedandant Peterson's actions were undertaken with malice, as aforesaid.

129.   Defendant Peterson negligently and/or recklessly failed to follow GDPS Policy No. 17.02 by needlessly chasing Moore's vehicle as part of a police pursuit, as described above.

130.   Defendant Peterson was acting in the course and scope of his

employment with Defendant GDPS when he negligently and/or recklessly caused the death of Decedent.

131.  As a result of Defendant Peterson failures to use ordinary care and or to employ reckless and/or intentional conduct when he violated Policy 17.02 and attempted a P.I.T. maneuver as described herein, Defendant Peterson caused Mr. Moore's vehicle to flip over and crash, thus partially ejecting twelve-year-old Decedent through the sunroof and killing him.

132.  Defendant Peterson's actions and resulting breach of duty were the foreseeable, direct, and proximate cause of Decedent's violent, horrific suffering and untimely death and Plaintiff's damage, i.e., the loss of the full value of the life of their son due to a senseless car crash.

133.  Being the parents of Decedent, Plaintiffs are entitled to recover the full value of the life of Decedent Boykins.

134.  Accordingly Plaintiffs seek the full value of the life of Decedent, to wit: the economic value of the deceased's normal life expectancy and the intangible benefits of his life which are incapable of exact proof but which are more fully stated below. See O.C.G.A. § 51–4–1.

135.  Pursuant to Pursuant to O.C.G.A. §§ 50-21-21, 50-21-23(a) and 50-21-

25(b), Defendant GDPS has waived its sovereign immunity for the torts committed by Defendant Peterson.

136.   No statutory exception to Defendant GDPS's waiver of sovereign immunity applies.

137.   Defendant GDPS is liable for Defendant Peterson's negligence and/or recklessness and/or intentional conduct regarding Policy No. 17.02, which in turn was the proximate cause of Decedent Boykins' death. *See Ga. Dept. of Pub. Safety v. Davis*, 285 Ga. 203, 676 S.E.2nd 1, 3 (2009).

138.   As a direct and proximate cause of Defendant Peterson's negligent and/or reckless conduct as stated herein, Plaintiff has been damaged as follows, including but not limited to: loss of the full value of the life of Decedent (both economic and intangible), loss of the Decedent's affection, care, society, support, medical expenses, funeral expenses, burial expenses, Plaintiff's pain, suffering, grief, agony, loss of dignity, and attorney fees and costs, all in an amount in excess of $75,000.00.

## COUNT III

**(Survival Action)**

139.   All preceding paragraphs are incorporated herein by this reference.

140.   As stated herein, Defendant Peterson negligently and/or recklessly

30

and/or intentionally failed to adhere to the dictates of Policy 17.02 and otherwise operated his motor vehicle in a manner that needlessly exposed Decedent to a great risk of serious bodily injury and death.

141. As a direct, foreseeable, and proximate cause of Defendant Peterson's negligent and/or reckless and/or intentional conduct as stated herein:

    a. Decedent underwent the fear and horror of knowing his own death was imminent as Defendant Peterson drove into the rear of Mr. Moore's car and pushed it off the road and into a construction ditch;

    b. Decedent experienced sensations of terrible pain as he repeatedly struck the inside Mr. Moore's vehicle during the crash;

    c. Decedent experienced suffering as he was thrown around the inside of Mr. Moore's vehicle during the crash; and

    d. Decedent experience the pain of Mr. Moore's car crushing his upper body and head until he lost consciousness and died.

142. As a direct and proximate cause of Defendant Peterson's negligent and/or reckless conduct as stated herein, Plaintiff has been damaged as follows, including but not limited to: medical expenses, funeral expenses, burial expenses, pre-death pain, pre-death suffering, pre-death emotional distress and sense of loss of safety, and pre-death agony, including loss of

dignity and attorney fees and costs, all in an amount in excess of $75,000.00.

## VI.  PRAYER FOR RELIEF

144. WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, for not less than $10,000,000.00, including but not limited to:

a. That Plaintiff Toni Denise Franklin, as the mother of Decedent Le'Den Makai-Lavell Boykins, recovers the full value of the life of her son;

b. That Plaintiff Anthony Darnell Boykins, as the father of Le'Den Makai-Lavell Boykins, recovers the full value of the life of his son;

c. That Plaintiff Franklin, as representative of the Estate of Le'Den Makai-Lavell Boykins, recovers for Decedent his pain and suffering, funeral expenses, medical expenses, and all other claims held by his Estate;

d. That Plaintiffs and Decedent receive all compensatory and consequential damages available under Georgia and/or federal law in an amount to be determined by the Court in excess of the Court's jurisdictional amount;

e. That Plantiffs and Decedent receive all punitive damages available under Georgia and/or federal law in an amount to be determined at

trial, for the intentional, deliberate, arbitrary, reckless, and conscience-shocking conduct of Defendants;

f.  That Plantiffs and Decedent receive all equitable relief, including, without limitation, that Defendant GDPS be made to adopt an appropriate policy to prevent future instances of the type of misconduct described herein;

g.  That Plantiffs and Decedent receive all attorneys's fees per Title 42 U.S.C. § 1988 and the costs or interst accrued as a result of this action and any other costs that may be associated with this action; and

h.  That Plaintiffs and Decedent receive any and all other relief that this Court deems equitable, just and proper.

## VII.  JURY DEMAND

Plaintiffs respectfully demand a trial by jury of all claims so triable of the within matter.

Respectfully submitted,

*/S/ DESNI A. SCAIFE*
DESNI A. SCAIFE
Georgia Bar No. 621445
MAWULI M. DAVIS
Georgia Bar No. 212029

**Davis Bozeman Law Firm, PC**
4153 C Flat Shoals Parkway; Suite 332
Decatur, Georgia 30034
(404) 244-2004
(404) 244-2020 (Fax)
dscaife@davisbozemanlaw.com
mdavis@davisbozemanlaw.com

Robert F. DiCello*
Kenneth Abbarno*
Peter C. Soldato*
Justin Hawal*
Elizabeth Paige White*
**DiCELLO LEVITT LLP**
8160 Norton Parkway
Mentor, Ohio 44060
Tel.: 440-953-8888
rfdicello@dicellolevitt.com
jhawal@dicellolevitt.com
kabbarno@dicellolevitt.com
psoldato@dicellolevitt.com
pwhite@dicellolevitt.com

*Counsel for Plaintiffs*

*Pro hac vice* motion forthcoming

**EXHIBIT A**

IN THE PROBATE COURT OF _____PAULDING_____ COUNTY
STATE OF GEORGIA

2023 AUG -2 PM 2: 33

IN RE:  ESTATE OF                                  )
                                                   )
Le'Den Makai-Lavell Boykins_____ ,              )    ESTATE NO. 2023-356
DECEASED                                           )

## TEMPORARY LETTERS OF ADMINISTRATION

At a regular term of probate court, this Court granted an order allowing
Toni Denise Franklin_____ to qualify as temporary administrator(s) of the
above-named decedent, who was domiciled in this county at the time of his or her death or was
domiciled in another state but owned property in this county at the time of his or her death, and
that upon so doing, temporary letters of administration be issued to such temporary
administrator(s).

THEREFORE, the said temporary administrator(s), having taken the oath of office and
complied with all necessary prerequisites of the law, is/are legally authorized to collect and
preserve the assets of the decedent until a personal representative is appointed (or the temporary
administrator is discharged); and thereupon to deliver up such assets to the personal representative
of the estate of said decedent, according to Georgia law.

_____ [optional, initial if Order grants temporary administrator(s) powers to expend funds]
FURTHERMORE, the said temporary administrator(s) is/are granted powers to expend funds to
collect and preserve the assets of the estate as follows:

IN TESTIMONY WHEREOF, I have hereunto affixed my signature as judge of the probate
court of said county and the seal of this office this _2nd_ day of _____August_____, 20_23_.

_____
Judge of the Probate Court

*The following must be signed if the judge
does not sign the original of this document:*

I CERTIFY THIS TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL

[Seal]

Issued by:

_____
Clerk of the Probate Court

CLERK, PROBATE COURT OF PAULDING
COUNTY, DALLAS, GEORGIA 30132

GPCSF 2                                [8]                          Eff. July 2021

IN THE PROBATE COURT OF _____PAULDING_____ COUNTY
STATE OF GEORGIA

IN RE:  ESTATE OF               )

                                     )

Le'Den Makai-Lavell Boykins _____,  )     ESTATE NO. 2023-356
DECEASED                     )

## TEMPORARY LETTERS OF ADMINISTRATION

At a regular term of probate court, this Court granted an order allowing Toni Denise Franklin _____ to qualify as temporary administrator(s) of the above-named decedent, who was domiciled in this county at the time of his or her death or was domiciled in another state but owned property in this county at the time of his or her death, and that upon so doing, temporary letters of administration be issued to such temporary administrator(s).

THEREFORE, the said temporary administrator(s), having taken the oath of office and complied with all necessary prerequisites of the law, is/are legally authorized to collect and preserve the assets of the decedent until a personal representative is appointed (or the temporary administrator is discharged); and thereupon to deliver up such assets to the personal representative of the estate of said decedent, according to Georgia law.

_____ [optional, initial if Order grants temporary administrator(s) powers to expend funds] FURTHERMORE, the said temporary administrator(s) is/are granted powers to expend funds to collect and preserve the assets of the estate as follows:

IN TESTIMONY WHEREOF, I have hereunto affixed my signature as judge of the probate court of said county and the seal of this office this _2nd_ day of _____August_____, 20 _23_.

_____
Judge of the Probate Court

*The following must be signed if the judge*
*does not sign the original of this document:*

Issued by:

_____
Clerk of the Probate Court

I CERTIFY THIS TO BE A TRUE AND
CORRECT COPY OF THE ORIGINAL

_____
CLERK, PROBATE COURT OF PAULDING
COUNTY, DALLAS, GEORGIA 30132