## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| WARING LESTER, | |
| Plaintiff, | Civil Action No.: |
| UNITED PARCEL SERVICES, INC, | JURY TRIAL DEMANDED |
| Defendants | |

## VERIFIED COMPLAINT FOR DAMAGES

Plaintiff Waring Lester, through the undersigned counsel, respectfully submits the following Verified Complaint against Defendant United Parcel Services, Inc. as follows:

### Preliminary Statement

1.     Plaintiff Waring Lester ("Mr. Lester" or "Plaintiff") began working for Defendant United Parcel Service, Inc. ("UPS"), as a loader on July 15, I987, while he was a college student, and over the next 34 years, ascended to management positions covering various multistate districts.  In his roles as President/District Manger over the last several years of his employment in different geographic regions, including residences in California, New York, Texas, Missouri, and Arizona,

Mr. Lester was employed directly by and reported to UPS's global headquarters located in Atlanta, Georgia.

2.     Mr. Lester, who is Black, achieved unprecedented success at UPS by consistently turning around operations that were in turmoil. Mr. Lester's success, however, was seen as a threat to his White manager, Scott Bremerman, who has a track record of forcing well qualified and successfully performing Black managers to leave UPS and replacing them with underqualified White males.

3.     Mr. Lester's employment with Defendant United Parcel Services, Inc. ("UPS") was abruptly terminated on October 18, 2021, based on his race, and UPS provided an incredible and completely fabricated reason as pretext for the termination.

4.     Through the actions of Scott Bremerman, with assistance from others, UPS has replaced Mr. Lester with a significantly less qualified and underqualified White individual based on no act, omission or performance by Mr. Lester but instead, based solely on the racially biased preferences and cronyism regularly exercised by Scott Bremerman with impunity.

5.     Mr. Lester was discriminated against and discharged from his employment with UPS because of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. as amended.

6.     Mr. Lester brings this action against UPS for violations of Title VII of the Civil Rights Act of 1964 pursuant to 42 U.S.C. §§ 2000e et seq ("Title VII") as detailed below.

7.     Mr. Lester filed a timely charge of discrimination against UPS with the U.S. Equal Employment Opportunity Commission ("EEOC"), on April 4, 2022, Charge No. 410-2022-04310, concerning the conduct at issue in this Complaint.

8.     On June 13, 2023, the U.S. Equal Employment Opportunity Commission ("EEOC") issued to Mr. Lester a Notice of Right to Sue.[1]  A copy of the Notice of Right to Sue is attached hereto as Exhibit A.

### Parties, Jurisdiction and Venue

9.     UPS is a corporation organized under the laws of Ohio with its corporate headquarters located at 55 Glenlake Parkway, NE, Atlanta, Georgia, 30328.  UPS is subject to the jurisdiction of this Court and can be served with process

---

[1] The Notice of Right to Sue was signed by the EEOC District Director and published to the EEOC Public Portal for distribution, on June 13, 2023, although text in the document states, "Issued On: 06/08/2023".

3

by serving its registered agent, CSS of Cobb County, 192 Anderson Street SE, Suite 125, Marietta, GA 30060.

10.     UPS is an American multinational package delivery and supply chain management company with more than 495,000 employees, over 450,000 of which are based in the United States.

11.     Subject-matter jurisdiction of this Complaint is proper pursuant to 28 U.S.C. § 1331, as this is a civil action arising under Title VII.

12.     This Court has supplemental jurisdiction over Plaintiff's related claim arising under state law pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this Court under 28 U.S.C. § 1391.

## Factual Allegations

14.     Plaintiff Mr. Lester started working for UPS on July 15, 1987, as a loader, and through the course of dedicated service and marked success, was eventually promoted to management in 1997.

15.     Since 2010, following UPS's restructuring, Mr. Lester held various management positions covering multi-state territories within the company.

16.     From July 8, 2019, until October 18. 2021, Mr. Lester worked as the President/District Manager of the Desert Mountain District for UPS, a corporate employee position which reported directly to UPS's global headquarters.

17.    In each of Mr. Lester's multi-state territory management roles since 2010, and up until the day his employment was terminated, Mr. Lester successfully led his UPS district operations to achieving previously unmatched success.

18.    No one in the entire UPS company had better proven results than Mr. Lester.

19.    On July 8, 2019, Mr. Lester accepted his most recent assignment as President/District Manager of UPS's Desert Mountain District, with a territory covering Arizona, Colorado, New Mexico, and Utah and between 18,000 to 20,000 employees.

20.    After struggling prior to Mr. Lester becoming President/District Manager, the Desert Mountain District experienced a turnaround under Mr. Lester's leadership.

21.    For example, prior to Mr. Lester's tenure as its President/District Manager, the Desert Mountain District had an annual turnover among staff level managers in the double digits, with between 10 to 15 managers leaving annually via terminations or demotions. The District consistently ranked in the bottom and regularly had to rely on receiving help from all over the country, in the magnitude of between 150 to 200 additional employees every week.

5

22.     Since 2017 and up until Mr. Lester became its President/District Manager, the Desert Mountain District had been failing and the district had a reputation that was widely known as the place no UPS manager wanted to go work.

23.     Mr. Lester, however, quickly improved operations of the Desert Mountain District to the point where no additional personnel were needed each week.

24.     The Desert Mountain District achieved notable success under Mr. Lester and in the first quarter of 2021, the District was awarded UPS's prestigious Horizon Award, receiving the Horizon Award for Customer Excellence for 2020.

25.     The Horizon Award for 2020 was the second time over a four-year span and at two successive stops, that Mr. Lester had led a region to receiving the award; as the Central Plains District won the Horizon Award for Internal Business Excellence in 2017 under Mr. Lester's leadership as the Packing Operations Manager then overseeing nine divisions in the District.

26.     About six months after Mr. Lester began his tenure as the President/District Manager of the Desert Mountain District, his direct manager, was replaced in early 2020 by Scott Bremerman, UPS West Region Manager and Vice President.

27.     Mr. Bremerman has a history of racist behavior and demeaning conduct displayed toward Black employees of UPS, which are well known and, upon information and belief, apparently documented by UPS.

28.     Consistent with Mr. Bremerman's well-known reputation at UPS, during Mr. Bremerman's first meeting with Mr. Lester and his team, in 2020, Mr. Bremerman began the meeting by stating to Mr. Lester's entire staff of about 15 to 20 direct reports, that "the problem with this district is a lack of leadership" -- indicating, with no rational basis, that Mr. Lester was deficient in doing his job. Mr. Bremerman and Mr. Lester had never met prior to this meeting.

29.     Mr. Bremerman's conduct toward Mr. Lester during their first meeting was so obviously insulting that one of UPS's most influential Operations Managers inquired of Mr. Lester what was wrong with Mr. Bremerman.

30.     Soon thereafter, Harvey Hill, Human Resources Manager and a 37-year employee with UPS, who is also Black, informed Mr. Lester that he could not work in the toxic environment Mr. Bremerman created.

31.     Over the course of the next two years, Mr. Bremerman's behavior in reference to Mr. Lester was consistently insulting. For example, Mr. Bremerman regularly scheduled one-on-one meetings with Mr. Lester on Fridays at 4:00 pm but

very rarely, if ever, showed up for the scheduled meeting.  Instead, he left Mr. Lester waiting for him with no further communication about a delay, rescheduling or cancellation of the meeting.  Mr. Lester's team would devote hours preparing for the meetings, producing 6-to-10-page reports for discussion and review only for Mr. Bremerman not to show up for the meetings or provide any communication about a cancellation, rescheduling, or otherwise.

32.     As another example, during a Zoom videoconference including over 40 participants from among the UPS West Region Presidents and Operations Managers from various districts on January 29, 2021, Mr. Bremerman was belligerent and insulting to Mr. Lester.

33.     While Mr. Bremerman was insulting him, Mr. Lester gathered his composure, informed Mr. Bremerman that he would call him after the videoconference, and immediately sent a text message to UPS Vice President of Human Resources, Jeff Grant, stating that he would also be calling Mr. Grant following the videoconference.

34.     Following the Zoom videoconference on January 29, 2021, however, Mr. Bremerman immediately telephoned Mr. Lester and had Jeff Grant on the call. During the phone call, Mr. Lester reminded Mr. Bremerman and Jeff Grant thar UPS

had conducted mandatory training for the management team about the treatment of other UPS personnel, but the way Mr. Bremerman treated Mr. Lester and select others was unacceptable and completely against the direction UPS was attempting to go.

35.    During the phone call, Mr. Lester cautioned Mr. Bremerman and Jeff Grant about Mr. Bremerman's conduct, saying, "We're going to end up in a courtroom one day because of how [Mr. Bremerman] treats people and he conducts himself on these calls."

36.    During the phone call, Mr. Lester cautioned Mr. Bremerman and Jeff Grant that he could no longer explain to his team why nothing is ever done about Mr. Bremerman's mistreatment of people—particularly his mistreatment of Black UPS managers.

37.    Mr. Bremerman's pattern of behavior was in stark contrast to the mandatory professionalism training instituted by UPS's then new Chief Executive Officer.

38.    After the Zoom videoconference and the phone call with Mr. Bremerman and Jeff Grant, leaders from other Districts telephoned Mr. Lester to

convey their sentiments and alarm about Mr. Bremerman's behavior toward Mr. Lester during the videoconference.

39.    On the following Monday, February 1, 2021, Mr. Lester followed up with a phone call to Jeff Grant to discuss Mr. Bremerman. Mr. Lester spoke with Jeff Grant about the consistently unfair treatment he and others received from Mr. Bremerman and reiterated how Mr. Bremerman's conduct was detrimental to UPS and could not continue.

40.    Mr. Lester informed Jeff Grant that his team members were also disturbed by Mr. Bremerman's conduct and several team members repeatedly inquired why was nothing being done by UPS in response to Mr. Bremerman's behavior.

41.    At the conclusion of the phone call on February 1, 2021, Jeff Grant said to Mr. Lester, "thank you for helping me with Scott!"

**UPS's Unlawful Hiring and Promotion Practices**

42.    Through Mr. Bremerman, UPS has engaged in a double standard in the treatment of Black managers and the hiring and promotion decisions for management within UPS.

43.     UPS explicitly and repeatedly required a college-degree as a prerequisite for UPS management candidates.   But through Mr. Bremerman, UPS applied that standard to only Black candidates while promoting underqualified and lesser qualified White employees without a college degree to management positions.

44.     For example, in early 2021, Mr. Bremerman promoted Dennis Davis, an underqualified White employee, to the role of District Operations Manager, over a well-qualified Black candidate, Vinny Manuel.

45.     The promotion of Dennis Davis was the second time Mr. Bremerman ultimately decided to deprive Vinny Manuel of a promotion to District Operations Manager and instead promoted a lesser qualified White employee to the position.

46.     Although Vinny Manuel was more qualified, Mr. Bremerman also promoted Brian James to fill a District Operations Manager position.

47.     Among several candidates including Brian James and Dennis Davis, Vinny Manuel was determined by a consensus among a group of UPS stakeholders—including Mr. Lester, Corporate Operations Manager and acting President of U.S. Operations, Ken Cherry, West Region Operations Manager, Derrick Waters, and District Human Resources Manager, Jeff Bloedom, to be the best candidate to fill the District Operations Manager positions.

48.     However, Scott Bremerman hired the clearly less qualified White candidates.

49.     After Dennis Davis was hired notwithstanding his lack of qualifications, it quickly became apparent that he was not capable of doing the job of District Operations Manager.

50.     In fact, Dennis Davis had a well-known and documented history of poor performance in his prior role as Division Manager.

51.     Mr. Lester was informed by Josh Needles, President of the North California District, that Dennis Davis struggled greatly in that role when he worked for Mr. Needles. Josh Needles told Mr. Lester that Mr. Lester's "job just got tougher when Dennis Davis got the promotion over Vinny Manuel."

52.     At the time it was announced that Dennis Davis would be promoted and reporting to Mr. Lester, Mr. Lester also spoke with Darren Jones and Debbie Massingill, each of whom Dennis Davis previously reported to.

53.     Both Danen Jones and Debbie Massingill were equally perplexed as to why Dennis Davis was promoted to the position, instead of Vinny Manuel.

54.     Soon after Dennis Davis started in the District Operations Manager role for the Desert Mountain District, UPS Human Resources and Mr. Lester, as Dennis

Davis's supervisor, had to meet with Mr. Davis to develop a performance improvement plan for him.

55.    Mr. Lester and Human Resources then had to meet with Dennis Davis on several other occasions following the initial performance improvement plan meeting and Mr. Lester personally visited Dennis Davis's operations in the Denver area between five to six days per week in an effort to help him do his job.

**The 2021 UPS 360-Review**

56.    UPS conducts a period 360-Rreview of its employees.

57.    A 360-Review, also known as a 360-degree feedback or multi-rater assessment, is a comprehensive performance evaluation process that gathers feedback from multiple sources about an individual's work-related behavior and skills. It is designed to provide a well-rounded and holistic assessment of an individual's performance, taking into account perspectives from various stakeholders, including supervisors, peers, subordinates, and sometimes even external contacts, like customers or partners.

58.    In July 2021, Mr. Lester was informed by the facilitator of the UPS 360-Review that the results of the most recent 360-Review were very favorable for Mr. Lester and showed that Mr. Lester had obtained "impeccable results."

59.     In July 2021, Mr. Lester complained in his UPS 360-Review that, in summary, dealing with Mr. Bremerman was the greatest challenge he ever faced from a diversity and inclusion standpoint.

60.     Other Black UPS managers who have recently left the company because of unfair treatment by Mr. Bremerman include Ray Rochette, Derrick Waters, Derrick Johnson and Harvey Quinn.

**UPS's Termination of Mr. Lester's Employment Under False Pretenses**

61.     UPS, through Mr. Bremerman, fired Mr. Lester in October 2021, under false pretenses and as a pretext for unlawful racial discrimination.

62.     Jeff Grant, UPS Vice President of Human Resources, sent Mr. Lester a text message on Friday October 15, 2021, while Mr. Lester was on vacation, and requested him to be in Denver, Colorado, with his entire team for a peak-review meeting on Monday, October 18.

63.     In response to the request, on October 18, 2021, Mr. Lester flew to Denver where he was supposed to meet with UPS personnel about the peak-review. That morning, however, Mr. Lester received a telephone call from Jeff Grant asking him to meet Mr. Bremerman at a Starbucks location in Denver.

64.     When Mr. Lester arrived at the Starbucks in Denver, to his surprise, Scott Bremerman was present with Denelle McCusker, from UPS Human Resources.

65.     At the meeting, Denelle McCusker mentioned an internal investigation concerning a former UPS employee named Jerwin Burke, who had left Mr. Lester's Desert Mountain District at the beginning of the year and subsequently retired from UPS.

66.     Denelle McCusker and Mr. Bremerman then accused Mr. Lester of violating a non-retaliation policy concerning Jerwin Burke.

67.     When Mr. Lester asked, "what retaliation policy," and asked for an explanation of how he could have violated the unidentified and alleged non-retaliation policy, incredibly, both Denelle McCusker and Mr. Bremerman said that they could not discuss it.

68.     Then instead of identifying the alleged non-retaliation policy and providing an explanation of how Mr. Lester allegedly violated the policy, Denelle McCusker presented Mr. Lester with a document she and Mr. Bremerman identified as a severance package for Mr. Lester.

15

69.    Instead of identifying the alleged non-retaliation policy and providing an explanation of how Mr. Lester allegedly violated the policy, Denelle McCusker and Mr. Bremerman informed Mr. Lester that he was being fired by UPS.

70.    Instead of identifying the alleged non-retaliation policy and providing an explanation of how Mr. Lester allegedly violated the policy, Denelle McCusker and Mr. Bremerman explained that Mr. Lester had 21 days to review and accept the severance package they presented him with.

71.    UPS's alleged reason for terminating Mr. Lester's employment, as communicated by Mr. Bremerman and Denelle McCusker, was obviously the pretext for an unlawful reason because they could not even identify the alleged non-retaliation policy and, moreover, there is no reasonable factual basis to conclude that Mr. Lester could have violated any non-retaliation policy concerning Jerwin Burke.

72.    Jerwin Burke did not report directly to Mr. Lester, Mr. Lester had no involvement with Mr. Burke leaving the Desert Mountain District, had no involvement with Mr. Burke's retirement from UPS, and no direct involvement in the investigation concerning Mr. Burke—which Mr. Lester had been informed and understood involved Mr. Burke's alleged improper hiring of a UPS driver.

16

73.   The true reason for UPS terminating Mr. Lester's employment was so that Mr. Bremerman could continue the unlawful employment practices by replacing Mr. Lester with an underqualified White employee, and because Mr. Lester complained on prior occasions and in July 2021, about the unfair employment practices of Mr. Bremerman.

74.   Following the termination of Mr. Lester's employment, Mr. Bremerman replaced him with Ryan Flynn, a White employee, and backfilled Ryan Flinn's position with Chuck Herny, another White employee with no college degree.

75.   Prior to his appointment to Mr. Lester's Desert Mountain District, Ryan Flynn had thousands of service failures in his prior role in the North California District, but was nevertheless promoted to District President of the Ohio Valley District—a wholly undeserved promotion that sent shock waves through UPS.

76.   When Ryan Flynn was moved to fill Mr. Lester's position as President of the Desert Mountain District, Chuck Henry was promoted from Operations Manager to District President of the Ohio Valley District. even though he has no college degree, based upon information and belief.

## Count One – Racial Discrimination in Violation of Title VII

77.   Mr. Lester incorporates each of the above factual allegations as if fully stated herein.

17

78.     Defendant UPS violated Mr. Lester's rights under Title VII of the Civil Rights Act of 1964, as amended, by among other things, subjecting him to unlawful racial discrimination and terminating his employment based on his race, through its agent, Scott Bremerman.

79.     UPS's rationale for terminating Mr. Lester's employment based on a purported internal investigation concerning Jerwin Burke was pretext and a sham for racial discrimination against Mr. Lester.

80.     As evidence of pretext, UPS violated its own corporate disciplinary policies in its purported termination of Mr. Lester's employment based on an internal investigation concerning Jerwin Burke—even if UPS did conduct and believed the findings of a purported investigation.

81.     Tellingly, and in complete disregard of its own policies, UPS did not afford Mr. Lester with the UPS required notice and an opportunity to present exculpatory evidence prior to, during, or after UPS's termination of his employment.

82.     For all times relevant to the facts at issue, UPS had a three-stage disciplinary procedure, including (stage 1) invitation to a disciplinary meeting, (stage 2) disciplinary meeting, and (stage 3) appeal. *See* Exhibit B hereto, *UPS Employee Handbook Reference 8/2018*, pp. 15-16.

18

83.     In addition, UPS had six types of disciplinary sanctions ranging from (1) verbal warning, (2) written warning, (3) final written warning, (4) action short of dismissal (downgrading or transfer and/or suspension without pay – accompanied by a Final Written Warning), (5) dismissal with notice, (6) summary dismissal (without notice).  *UPS Employee Handbook Reference 8/2018*, pp. 14, 16-17.

84.     Pursuant to its policies, two other important requirements were always followed by UPS, both of which Mr. Lester was denied: (i) "Irrespective of the level of potential disciplinary sanction, the purpose of any disciplinary meeting should be clearly explained to the employee together with an explanation of the matters giving cause for concern." (ii) "All employees have the right of appeal against any action resulting in a disciplinary sanction." *UPS Employee Handbook Reference 8/2018*, p. 14.

85.     Critically, stage 1 of UPS's disciplinary procedure requires that:

> The employee will be given notification in writing of the purpose of the disciplinary meeting and an explanation of the alleged misconduct or poor performance as well as the possible disciplinary sanctions that may follow. [. . .] The employee will also be given copies of relevant information and evidence available to the Company, which is to be referred to and/or relied upon during the disciplinary meeting.

*Id*. at 15 (Section 4.1).

19

86.    The letter inviting the employee to the disciplinary meeting must also set out the time, date, and location of the meeting, and other details. *Id*.

87.    Notwithstanding these clear requirements and as evidence of pretext for racial discrimination, UPS did not provide Mr. Lester with a letter inviting him to a disciplinary meeting, nor other prior notice of a disciplinary meeting, nor copies of relevant information and evidence available to the company.

88.    And after he was ambushed with vague allegations of his misconduct on October 18, 2021, Mr. Lester pressed Denelle McCusker and Scott Bremerman for information and details of what he was being accused of.

89.    At what turned out to be a surprise employment termination meeting on October 18, 2021, in complete violation of UPS policies, Ms. McCusker and Scott Bremerman replied that they could not discuss the allegations, and then offered Mr. Lester a severance package, and informed him that he had 21 days to review and accept it.

90.    At no relevant time did Mr. Lester have any idea of what the alleged cryptic acts of "retaliation" he was being accused of by UPS.

91.    UPS treated similarly situated White employees differently and afforded those employees the UPS disciplinary procedures.

20

92.     UPS failed to comply with its statutory duty to take all reasonable and necessary steps to eliminate racial discrimination from the workplace and to prevent it from occurring in the future.

93.     As a direct and proximate result of UPS's willful, knowing and intentional discrimination against him, Mr. Lester has suffered a loss of earnings and other employment benefits. Mr. Lester is thereby entitled to general and compensatory damages in amounts to be proven at trial.

94.     As a further direct and proximate result of UPS's unlawful racial discrimination, as heretofore described, Mr. Lester has been compelled to retain the services of counsel, and has thereby incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Mr. Lester. Mr. Lester requests that attorneys' fees be awarded as allowed by law.

95.     The conduct of UPS described above was done with oppression and malice; with a conscious disregard for Mr. Lester's rights; and with the intent, design and purpose of injuring Mr. Lester.  UPS, through its officers and managing agents, committed and authorized, condoned and/or ratified the unlawful conduct of Mr. Bremerman.  By reason thereof, Mr. Lester is entitled to punitive or exemplary damages from UPS in a sum according to proof at trial.

## **Count Two – Retaliation in Violation of Title VII**

96.    Mr. Lester incorporates each of the above factual allegations as if fully stated herein.

97.    Title VII prohibits employers from retaliating against employees who report or oppose racial discrimination.

98.    UPS's conduct as alleged herein amounts to retaliation by UPS against Mr. Lester for opposing Scott Bremerman's unlawful discrimination.

99.    As herein alleged, UPS illegally retaliated against Mr. Lester when it terminated Mr. Lester's employment, under false pretenses because Mr. Lester complained about Scott Bremerman's unlawful conduct of unfair treatment of UPS's Black managers.

100.   UPS had no legitimate business reasons for any of such acts.  Each of said acts of retaliation are in violation of federal law.

101.   As a direct and proximate result of UPS's willful, knowing and intentional discrimination and retaliation against him, Mr. Lester has suffered and will continue to suffer a loss of earnings and other employment benefits. Mr. Lester is thereby entitled to compensatory damages in amounts to be proven at trial.

102.   As a further, direct and proximate result of UPS's retaliation in violation of federal law, as heretofore described, Plaintiff has been compelled to retain the

22

services of counsel, and has thereby incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to him.

103.   The conduct of UPS as described above was done with malice and oppression, with conscious disregard for Mr. Lester's rights, and with the intent, design and purpose of injuring him. UPS, through its officers and managing agents, authorized, condoned and/or ratified the unlawful conduct of Scott Bremerman.  By reason thereof, Mr. Lester is entitled to punitive or exemplary damages from UPS in a sum according to proof at trial.

## <u>Count Three – Breach of Contract</u>

104.   Mr. Lester incorporates each of the above factual allegations as if fully stated herein.

105.   UPS provided Mr. Lester with a corporate American Express credit card for his use to make credit card purchases for his UPS related employment expenses such as travel, hotel and rooming accommodations, and meals.

106.   Mr. Lester agreed to only use the American Express credit card for his UPS related employment expenses, and UPS agreed to pay the American Express credit card bill.

107.   Prior to his termination on October 18, 2021, UPS always paid the bill for the corporate American Express credit card issued to Mr. Lester.

108.   Mr. Lester used the corporate American Express credit card only for UPS employment related purchases.

109.   For the charges made during the last billing period of Mr. Lester's employment with UPS, however, UPS has refused to pay the bill for the corporate American Express credit card.

110.   Although Mr. Lester has requested and demanded that UPS pay the last bill for the outstanding charges on the corporate American Express credit card, UPS has refused to pay the bill.

111.   At the same time, Mr. Lester has been harassed by American Express and a collection agency to pay the credit card balance of over $4,500.

112.   Mr. Lester has incurred damages in the form of the outstanding debt and resulting injuries to his creditworthiness as a result of UPS's breach of its contractual duty to pay the bill for the corporate American Express credit card.

113.   UPS is liable to Mr. Lester for breach of contract in refusing to pay the American Express credit card bill.

**WHEREFORE**, Plaintiff prays:

24

I.      that a summons be issued and served requiring the UPS to appear as provided by law to answer this Complaint;

II.     a declaratory judgment that UPS violated Mr. Lester's rights under Title VII;

III.    an injunction prohibiting UPS from engaging in such unlawful conduct in the future;

IV.     full back pay from the date of Mr. Lester's termination, taking into account all raises to which Mr. Lester would have been entitled and all fringe benefits of employment, including base salary, incentive plans compensation, relocation compensation, and the cost of health insurance with prejudgment interest thereon;

V.      front pay to compensate Mr. Lester for his lost future wages and benefits, taking into account all raises to which Mr. Lester would have been entitled and all fringe benefits of employment, including base salary, incentive plans compensation, retirement pay, and the cost of health insurance;

VI.     punitive damages against UPS in an amount to be determined by the enlightened conscience of the jury to be sufficient to punish UPS, up to the maximum statutory amount allowed under Title VII;

VII.   reasonable attorneys' fees and costs pursuant to 42 U.S.C.A. § 2000e-5(k) and Title VII;

VIII.   all damages arising from UPS's failure to pay the American Express bill for the corporate credit card issued to Mr. Lester;

IX.   for such other and further relief as may be just and equitable.

Respectfully submitted this 11th day of September, 2023.

STRICKLAND DEBROW LLP

*/s/ Vernon M. Strickland*
Vernon M. Strickland
Georgia Bar No. 345346
246 Bullsboro Drive, Suite A
Newnan, Georgia 30263
Telephone: 470-683-4402
Facsimile: 470-683-4412
vstrickland@stricklanddebrow.com

*Attorneys for Plaintiff Waring Lester*

26

## **DECLARATION**

I declare under penalty of perjury that I have read the foregoing VERIFIED

COMPLAINT FOR DAMAGES and that the contents stated therein are true to the

best of my knowledge, information and belief.

Waring Lester

## **RULE 7.1.D CERTIFICATE**

The undersigned counsel certifies that this document has been prepared with

Times New Roman 14-point font in accordance with Local Rule 5.1.C.

*/s/ Vernon M. Strickland*
Vernon M. Strickland
