## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **AMBER ELLISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION FILE NO.** |
| **v.** | ) | _____ |
| | ) | |
| **CITY OF ATLANTA, GEORIGA,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff Amber Ellison ("Ms. Ellison" or "Plaintiff") hereby files this Complaint against Defendant City of Atlanta ("Defendant" or the "City") for damages and other relief for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").[1]

## INTRODUCTION

Ms. Ellison, a thirty-one-year-old African American woman, was accepted last year into a new class of firefighters for the City of Atlanta. She was one of five females in her class of approximately 21 new recruits. She was excited about the opportunity to do something that not many women have

---

[1] This Complaint only includes counts for the violations of Title VII that Ms. Ellison detailed in a May 30, 2023 EEOC charge that she filed against City while still employed. Prior to filing this lawsuit and in an attempt to avoid dual litigation of overlapping claims and unnecessary expense, Plaintiff attempted to secure a tolling agreement for the present claims so that they could be filed at a later time along with the termination claims, but the City's lawyers refused to agree to do so.

achieved in a profession traditionally dominated by men.   However, that excitement quickly turned into a nightmare when the lead instructor of her class, a long time City of Atlanta instructor, Chief William Jucks (referred to as "Chief Jucks"), a man some 40 years older than Ms. Ellison, made her the target of his sexual desires and subjected her to severe and pervasive sexual harassment.   Mr. Jucks' sexual stalking quickly led to targeted solicitations and more, including multiple instances of inappropriate sexually charged touching, inappropriate sexual comments, and solicitations to her both during work hours and through calls before work in which he asked what she was wearing.   These incidents culminated in an occasion when he put three of his fingers in his mouth individually and groaned while looking at Ms. Ellison and said in front of the whole class, said, "I wanna put icing all over you."   Several people burst out laughing, including Lt. Pittman.

Yet the male dominated department used its purported "paramilitary" structure to obfuscate Ms. Ellion's complaints, protect Chief Jucks, and retaliate against Ms. Ellison for opposing his behavior after she reached out for help.   Ms. Ellison first complained internally at the Atlanta Fire and Rescue Department ("AFRD"), where she was scorned and disciplined.   She then escalated her complaint to the City's human resources department, where she was similarly rebuked and scolded for rocking the boat.   Rather than remedying the situation, April Dunn, the human resources employee handling

her case, worked in tandem with the AFRD to monitor her actions and coordinate retaliation against her.

Feeling justifiably helpless and distraught and with her harassment continuing unabated, Ms. Ellison suffered a panic attack after a particularly demeaning encounter with Mr. Jucks.  The attack was so severe that the urgent care doctor she saw that day sent her to the emergency room.  The next day, her doctor diagnosed her with anxiety disorder and communicated this to the City, recommending that she be out of work for two weeks.  Ms. Ellison made repeated attempts to secure leave under the Family Medical Leave Act to begin when she became eligible in August, but Ms. Dunn repeatedly blocked her attempts to do so.  She then made a request for an additional six weeks of leave, consistent with her doctor's recommendation.

The City never responded to this request and instead terminated her shortly after.  In the end, following months of vile treatment at the AFRD that included sexual assault, public humiliation, and stalking, those in positions of power at the City whose jobs it was to protect her instead rebuffed and attempted to silence her.   Ms. Ellison is more than a victim of a negligent bureaucracy.  She was thwarted and intimidated at every turn by multiple City employees whose actions were very much intentional.  She brings this suit not only to make herself whole, but to help ensure that the systems that enabled

3

her victimization are dismantled and to vindicate the women that came before her who surely suffered in the same way that she did.

## JURISDICTION AND VENUE

### 1.

This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.

### 2.

Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391 because Defendant resides in this this District.

## ADMINISTRATIVE PREREQUISITES

### 3.

Plaintiff has exhausted all administrative requirements necessary to bring her Title VII claims.  Plaintiff filed an EEOC charge based on her claims under Title VII within 180 days of the Title VII-violative conduct at issue.  The EEOC issued its Notice of Right to Sue on June 13, 2023.

### 4.

This action is timely filed with respect to Plaintiff Title VII claims as less than 90 days have passed since Plaintiff's receipt of the Notice of Right to Sue for the same.

## THE PARTIES

### 5.

The City of Atlanta is a body politic which is able to be sued in its corporate name.

### 6.

Plaintiff is a former employee of Defendant, having worked for it for as a Firefighter/Advanced-EMT Recruit at the Atlanta Fire and Rescue Department ("AFRD") from August 2022 until her discharge in June 2023.

## STATEMENT OF FACTS

### 7.

Ms. Ellison began working as an AFRD recruit in August 2022.  She was part of a class of other recruits who were also beginning a training regimen that included classroom instruction, practice drills, ride-alongs, and other instructional exercises on firefighting, EMT, and rescue skills.  The instruction was carried out by AFRD instructors and active-duty firefighters.

### 8.

The recruits' classroom training was completed at the AFRD training facility at 5155 Clipper Dr, Atlanta, GA 30349.  Particularly at the beginning of their training period, much of their time was spent in the classroom.

**9.**

The AFRD is characterized by an emphasis on chain of command, discipline, the prominence of the group over the individual, and subservience to one's superiors that resembles a military environment, particularly during the training program.

**10.**

Recruits are disciplined for even the slightest deviations and hesitancy in following the orders of their superiors.

**11.**

One of Ms. Ellison's instructors was a man named William Jucks.  Mr. Jucks is in his 70's and has been with AFRD for decades.  He began instructing her class of recruits in February 2023.  This class included approximately 21 recruits, of whom approximately five were female.

**12.**

Following the first-class Mr. Jucks taught, after the rest of the recruits had left, Mr. Jucks approached Ms. Ellison and asked her who she was.   He introduced himself as Chief Jucks and stated that he would be the class's new instructor.  He then signaled with his fingers for Ms. Ellison to come over to him.  As she drew near, Mr. Jucks then grabbed her wrists and turned her around, saying, "Turn around and let me get a good look at you."  Ms. Ellison

turned her head back in disbelief, but he had already run his finger from the back of her neck down to her tail bone.  She quickly walked out of the classroom.

## 13.

At times, at the direction of their class president, recruits would have to remove their outer shirts while in class, leaving them in just their undershirts. When this happened, Mr. Jucks would call out Ms. Ellison by name, groan in a sexually provocative manner and say, "If only I were just forty years younger."  He did this in front the entire class of her male peers.

## 14.

He also commented several times in front of her entire class that he was going to "take [her] away" and "[she'd] never come back."  Her male classmates would snicker at these comments.

## 15.

When they were in private, Jucks would sometimes add that he had 33 acres of land and that he would take her away and she would never come back.

## 16.

At times, Ms. Ellison was left alone in the classroom with Mr. Jucks.  In these times, Mr. Jucks would continue to make sexually inappropriate

comments, such as "how mature in the mind and in the hips" she was and other similar comments about her body features.

### 17.

Ms. Ellison began to try to tune him out.  She knew that he had probably been doing this to female recruits for a long time given how old he was and how nonchalantly he harassed her but felt that she just needed to get through it and graduate, and it would all be over.

### 18.

During the month of April, the recruits began reviewing elements of their training that would be on their upcoming practical exams.  Jucks used this as an opportunity to continue inappropriately touching Ms. Ellis.  On one occasion, the recruits were practicing applying leg splints, and Jucks had sat Ms. Ellison next to him while her classmates were dispersed on the floor.  Jucks asked Ms. Ellison to scratch his shoulder.  When she reached over to do so, Jucks leaned in towards her and started to stroke the small of her back while groaning heavily and looking into her eyes.  Ms. Ellison asked him to stop and told him that another female classmate could see him.  He continued stroking her while telling her not to worry about the classmate and that he would take care of her.

**19.**

While preparing for practical exams, if any members of the class had questions about where to palpate the body of a patient who needed chest compressions, Jucks would almost always use Ms. Ellison as an example. He called her to the front of the class, then would have her stand in front of him while he was seated, and squeeze firmly from directly under her breast, and down to her hips while looking into her eyes.

**20.**

During the end of April, Ms. Ellison began to receive calls from Jucks on her personal phone before and after class. On these calls, Jucks would tell her how he couldn't stop thinking about her and how he didn't like her missing his phone calls. He would continue to tell her how he thought she was such a good woman and that he was going to take her away.

**21.**

Throughout this time, Jucks continued to make comments when Ms. Ellison was changing into her PT gear about what he would do to her if he were forty years younger and that he was going to take her away.

**22.**

Around this same time, Instructor Jucks called Ms. Ellison around 5:45 a.m. to ask what she had on.

**23.**

Throughout the spring, Jucks continued to call Ms. Ellison more frequently before and after work.  If she missed one of his calls, he would tell her the next morning upon his arrival that he wanted to speak to her and wanted her attention.  Ms. Ellison always responded by saying the she wasn't interested in anyone in the AFRD and just wanted to be left alone.

**24.**

Sometime in the beginning of May, Jucks invited the class to brunch at IHOP.  Ms. Ellison did not want to spend any more time in Jucks' presence than she had to, so she asked the classmate with whom she carpooled if she could sit in their car.  It wasn't long before Jucks called her to ask where she had gone.  She responded that she was in the car relaxing and didn't want breakfast.  He then told her to get his keys and go to his truck.  When she did, Jucks met her outside and told her that he would drive her back to the training facility, as he had told the class that they could have an extended lunch.  When she got in his truck, he told me how he was worried about her and that he missed the happy girl that he met a few months ago.  She responded that she just wanted to be to herself and finish her course.

**25.**

On or about May 12th, Ms. Ellison's class had a cadaver lab that was attended by other students, outside instructors, and physicians. After the lab ended, an instructor from Gwinnett County entered the room and asked Ms. Ellison what her name was. He then looked over to Instructor Jucks and asked, "Where did you get her from?" Jucks answered crossly, "Well, they're a good class, aren't they?"

**26.**

The instructor from Gwinnett gave Ms. Ellison his business card and told her that she should take a look at his classes sometime down the road. Then he left the room. Almost immediately after, Jucks told the class to go collect chairs they had been sitting in for the lab. As Ms. Ellison started to leave with them, Jucks stopped her and said, "come here." He said, "You know I don't like you talking to them old ass men." Ms. Ellison said, "okay" and quickly left the room.

**27.**

When she returned to the classroom, Jucks berated her in front of the class over a frivolous matter in a plain attempt to intimidate her for having spoken to the Gwinnett instructor.

**28.**

Ms. Ellison had finally had enough and complained to Barham about her treatment soon after.

**29.**

Her complaint sparked a swift backlash from ARFD.  Several of her captain and sergeants pulled her aside and lambasted her for complaining of her treatment by Jucks.  They wrote her up for her having done so and made her write out several incident memoranda about what she had done.

**30.**

This was the first of several write ups and reprimands that she would receive as she continued to seek redress for her treatment.  These write ups were not mere gestures but counted towards a point total that if she exceeded, she was to be dismissed from the program.

**31.**

In an incident memorandum that she submitted towards the end of May, she detailed some of Jucks' unfair treatment of her.

**32.**

The next day, Lt. Pittman pulled Ms. Ellison outside of the classroom and told her that she needed to watch what she put in her incident memoranda because her captain (referring to Cpt. Cox) was an investigator for the police

department and was former OPS, so she couldn't know which way his wheels would spin.  He then told Ms. Ellison to return to the classroom so he could give the same message to the class.

### 33.

Once inside, Lt. Pittman demanded the class look up at him and Jucks and proceeded to give a speech on how Jucks was a wonderful man and well-respected Chief amongst many fire departments.  He proceeded to tell the class that they needed to watch what they said on their incident memorandums, repeating what he had said about Cpt. Cox and similarly admonishing them about reporting unflattering information about their instructors.

### 34.

Later that day, Jucks pulled her aside and said, "Let's you and I just throw all of this out of the window.  Be a sweet girl again.  I miss you."

### 35.

That same afternoon, Ms. Ellison phoned the City's human resources department and spoke with a woman named April Dunn.

### 36.

She told Ms. Dunn the entire story of what had happened to her over the previous months—about Jucks' harassment and the AFRD's backlash against her when she attempted to address it.

**37.**

Dunn responded, something to the effect of "I can't have this.  Who is this again?  I can't tell you where to turn in a complaint like that."  She stated that she was on her lunch break but to send her an email.  She instructed Ms. Ellison not to write anything in the email about the sexual harassment because it was "too personal."  She said that she would send it to her supervisor, who would decide if "it's even a valid complaint."  She also mentioned that her son was in the same recruit class.

**38.**

Ms. Ellison sent that list of names to Ms. Dunn immediately after.

**39.**

Later that day, Cox pulled Ms. Ellison aside.  He had clearly spoken with April Dunn.  He stated, "If you ever write anything or submit a report stating that I'm harassing you, it'll never stick.  I don't have to answer to anyone."

**40.**

Ms. Ellison phoned Dunn again at the end of the day when she was in the car with her mother.  By this time, Ms. Dunn's tone had changed to blatantly rude, aggressive, and dismissive.  She said words to the effect of, "If you can't handle it, then just go ahead, and leave.  You are angry and you're in

your feelings." When Amber's mother asked if there was an incident number, Dunn said, "there is no incident number."

### 41.

The next morning, Jucks called five students, including Ms. Ellison, aside into an empty classroom and told them that they had not passed their written tests the previous week. When Ms. Ellison asked to see her test, he refused.

### 42.

As they exited, Jucks held Amber back as the rest of the five exited the room. He said, "I miss you, okay, so you don't want to talk to me, that's fine." As she walked away, he grazed her with his fingers and sniffed them deeply while looking at her and groaning.

### 43.

The five students then returned to the classroom. There, Jucks was demonstrating an EMS maneuver on another female student. He stroked her in front of the whole class, and while looking directly at Ms. Ellison, put three of his fingers in his mouth individually, then groaned, and while looking at Ms. Ellison said, "I wanna put icing all over you." Several people burst out laughing, including Lt. Pittman.

**44.**

As a result of this incident, Ms. Ellison felt sick and told her class president and Lt. Pittman she had to leave to go to the doctor.  They told her to clock out and leave.  She called her mother, who took her to urgent care.  The doctors there ran an EKG on her and declared it "abnormal" based on her heart rate and blood pressure.  They ordered that she be rushed to the emergency room.

**45.**

The next day, she saw her primary care physician who diagnosed her with anxiety disorder and wrote her a note to be out of work for two weeks.  He transmitted the note, which contained the diagnosis to AFRD.

**46.**

Prior to returning from leave, Ms. Ellison spoke with Lt. Pittman and stated that she needed to arrange an appointment with her therapist and receive treatment before coming back.  Her doctor held her out of work for an additional week.

**47.**

She also spoke with Dunn that day and asked her about the status of her complaint of harassment.  She said, "I sent it up to my supervisor."

**48.**

Later, she went to see her doctor, who asked her to get FMLA paperwork from the City so he could fill it out.

**49.**

Dunn refused to speak with Ms. Ellison in reference to her FMLA paperwork request and in fact refused to speak with Ms. Ellison at all, so in late June, she went into her office with her mother to attempt to get the paperwork.

**50.**

Once there, Ms. Ellison and her mother checked via iPad in the lobby of the office suite where Ms. Dunn worked.  It indicated that Dunn had seen their check-in.  Around five or ten minutes went by, and Dunn messaged them asking if they had an appointment.  They indicated that they did not, and they waited for some more time.

**51.**

Eventually, another employee in the office recognized Ms. Ellison and asked her what she was there for.  She said that she only needed FMLA paperwork.  He responded that that was easy and invited her to the main lobby.

**52.**

Once there, a different employee recognized Ms. Ellison and indicated that he could get FMLA paperwork for her.  At that moment, Dunn stormed around the corner and entered the lobby, warning this employee not to give her any FMLA paperwork.  She demanded, "Do you have an appointment?"  She insisted that Ms. Ellison needed to have an appointment and said that it would be at least two weeks before she could get one.  The man retorted that they did not need an appointment.

**53.**

Ms. Ellison's mother then interjected, reiterating that all she needed was some paperwork.  Dunn walked towards her aggressively and yelled, "I don't know who you are.  Why are you talking to me?"  Dunn then looked at the other man and said, "**You should not be talking to her**," and announced, "**no one needs to help her with what she's got going on.**"  They eventually did get the FMLA paperwork from the other employee.

**54.**

Ms. Ellison sent the paperwork to her doctor who over the next few days sent it to the City around six times, but she never heard anything back.

**55.**

She submitted FMLA paperwork again in which she asked for six weeks' additional leave to end on August 24 when her FMLA would begin, which was recommended by her doctors.

**56.**

Later, Ms. Ellison received a call from a man who introduced himself as Captain Smith from the City's internal affairs division.  She could hear Cox yell in the background.  Captain Smith bizarrely tried to get her to admit that she was "OK" multiple times.

**57.**

Having never been told whether her leave was approved or whether she was terminated, Ms. Ellison called Dunn.  Dunn at first hung up on her.  When she called again, Dunn said that she had been terminated on June 26.

**58.**

This Complaint is intended only as a short and plain recitation of the facts of Ms. Ellison's case and may not contain all of the facts that she may use to support her claims.

## COUNT I
## VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

**59.**

Plaintiff incorporates all previous paragraphs by reference as if fully stated herein.

**60.**

As a woman, Plaintiff is a member of a recognized protected class for purposes of Title VII.

**61.**

Plaintiff was subjected to unwelcome sexual harassment and discrimination by multiple employees of Defendant.

**62.**

The harassment that Plaintiff suffered at the hands of these individuals was so severe and pervasive as to create a hostile working environment.

**63.**

Additionally, Defendant treated Plaintiff differently on the basis of her sex.

**64.**

To wit, Defendant treated Plaintiff differently than other, similarly situated male peers.

**65.**

This different treatment resulted in adverse actions taken against her including being effectively forced to go on leave from the program and the accumulation of disciplinary "points."

**66.**

Plaintiff is entitled to all damages permitted by law, including but not limited to, compensatory damages, emotional distress damages, punitive damages, and attorneys' fees and costs.

**WHEREFORE** Plaintiff respectfully requests judgment in her favor on each count in this Complaint and demands:

1. A Jury Trial;

2. Judgment in Plaintiff's favor and against Defendant under all claims in this Complaint;

3. An order Defendant to make whole Plaintiff by providing her with out-of-pocket losses as well as back pay in an amount equal to the sum of wages, salary, employment benefits and other compensation denied or lost as a result of Defendant's unlawful acts, together with interest thereon, all in an amount to be proven at trial;

4. Statutory damages and/or penalties under the Title VII;

5. An Order granting Plaintiff her reasonable attorney's fees and all other fees and costs associated with this action;

6. Declarative and injunctive relief appropriate to remedy the Title VII violations;

7. Interest; and

8. Such other and further relief as is just and proper.

This 11th day of September 2023.

/s/ S. Graham White

James M. McCabe
Georgia Bar No. 724618
jim@mccabe-lawfirm.com
S. Graham White
Georgia Bar No. 535538
graham@mccabe-lawfirm.com

The McCabe Law Firm, LLC
3355 Lenox Road
Suite 750
Atlanta, GA  30326
Office: (404) 250-3233
Fax: (404) 400-1724

Attorneys for Plaintiff Amber Ellison