IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JOSEPH FLOWNORY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | COMPLAINT |
| | ) | |
| FEMCO, INC. d/b/a | ) | |
| THE FINGER COMPANIES, | ) | |
| | ) | <u>JURY TRIAL DEMANDED</u> |
| Defendant. | ) | |

## **<u>COMPLAINT</u>**

PLAINTIFF JOSEPH FLOWNORY (hereinafter "Mr. Flownory" or "Plaintiff") by his attorneys Goddard Law PLLC, alleges upon knowledge with respect to himself, and upon information and belief as to all other matters, as follows:

## **<u>PRELIMINARY STATEMENT</u>**

1.

This is a civil action brought on behalf of Plaintiff against his former employer Defendant FEMCO, INC. d/b/a The Finger Companies to remedy the race discrimination, sexual orientation discrimination, disability discrimination and retailiations, which resulted in his constructive termination from Defendant FEMCO INC. d/b/a THE FINGER COMPANIES (hereinafter "Defendant").

Plaintiff alleges violations of Title VII of the Civil Rights act of 1964, as amended U.S.C. § 2000 et seq. ("Title VII"), the American with Disabilities Act, as amended 42 U.S.C. § 12101 *et. seq.*,  and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. Section 1981 ("Section 1981"), as well as together with any and all other causes of action which can reasonably be inferred from the facts as set forth below.

## PARTIES

2.

Mr. Flownory is a Black male citizen who was formerly employed by Defendant at all relevant times. Mr. Flownory was subject to race, sexual orientation, disability discrimination, and retaliation that resulted, ultimately, in his constructive termination from Defendant.

3.

Upon information and belief, Defendant is a for profit corporation authorized to do business in Georgia whose headquarters are located at 99 Detering Street, Suite 200, Houston, Texas 77007.

4.

Plaintiff is, and was, at all times relevant herein, Defendant's "employee" within the meaning of all Federal, State and local laws, including, but not limited to, Title VII.  At all relevant times, Defendant employed more than 15 employees.

5.

Upon information and belief, Defendant Femco, Inc. has been using the trading name The Finger Companies to conduct business in the State of Georgia.

6.

At all times relevant herein, Plaintiff worked at Defendant's Phipps Place location, located at 3460 Kingsboro Road, Atlanta, Georgia 30319.

7.

Defendant was, at all times relevant herein, Plaintiff's "employer," within the meaning of all relevant Federal, State and local laws, including, but not limited to, Title VII.

## JURISDICTION AND VENUE

8.

The Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

9.

The violations of Plaintiff's rights occurred in the Northern District of Georgia. Venue for this action in the Northern District of Georgia under 28 U.S.C. § 1391(b) is appropriate because a substantial part of the events or omissions, and the unlawful actions and practices which give rise to Plaintiff's claims, occurred in this District.

## SATISFACTION OF ADMINSTRATIVE REQUIREMENTS

### 10.

All conditions precedent to filing the instant action have been fulfilled. On or about  November 9, 2021 Plaintiff timely filed a Charge of Discrimination with the Atlanta district office of the Equal Employment Opportunity Commission ("EEOC") alleging claims of race, sexual orientation, and disability discrimination and retaliation. On or about June 14, 2023 the EEOC issued Plaintiff a Notice of Right to Sue. This action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

## FACTUAL ALLEGATIONS

### Plaintiff is Hired by Defendant The Finger Companies

### 11.

In late December 2017 or early January 2018, after approximately eight years working as a leasing specialist, Plaintiff was made aware, via word-of-mouth, of a potential opportunity with Defendant The Finger Companies, a developer of luxury apartment communities, at one of their locations in Atlanta, Georgia. Because Plaintiff was actively seeking new opportunities and better pay at the time, he reached out for more information.

12.

Plaintiff was excited when, in about the second week of January 2018, Connie O'Hern, the property manager at Defendant The Finger Companies' Phipps Place property, (hereinafter "Property Manager O'Hern"), contacted Plaintiff and invited him to the office for an interview.

13.

Within days of the interview, Property Manager O'Hern contacted Plaintiff to offer him the position of Leasing Specialist at Defendant The Finger Companies' Phipps Place community, which consisted of over two hundred units. He was offered a wage of $18.00 per hour plus monthly commissions. Plaintiff enthusiastically accepted the position.

14.

On January 26, 2018, Plaintiff officially started employment with Defendant The Finger Companies. As the new leasing specialist, he was responsible for touring and leasing apartments, meeting and maintaining Phipps Place's residents' needs, acting as a main contact for them for a wide variety of matters, and growing the company's reputation of excellence and commitment to luxury living.

15.

Upon information and belief, sometime within his first weeks of employment with Defendant The Finger Companies, Plaintiff attended an online orientation during which the company's anti-discrimination policies were covered.

**Plaintiff Works Hard to Establish Himself as an Asset but is Hesitant to be Openly Gay Around New Colleagues**

16.

Plaintiff quickly adjusted to the intimate work environment which consisted of small office rooms from which he worked with Property Manager O'Hern and her assistant manager at the time, (hereinafter "Assistant Manager Doe").

17.

In early 2018, Plaintiff was quiet and observant in the office, as he did not know the personalities and temperaments of his new colleagues. As a gay man, he did not know who would or would not be accepting of his sexual orientation.

18.

Plaintiff felt pressured in the new work environment to "blend in" and keep a low profile. He opted to wear simple black and white business attire and purposely did not participate in casual office conversation that would potentially "out" him.

19.

However, because he worked so closely with them every day and wanted to establish a positive workplace environment, he was also purposefully personable

and took it upon himself to foster amiable relationships with his new colleagues, among them Nicholas Eastern, the property's maintenance supervisor, (hereinafter "Maintenance Supervisor Eastern").

20.

Plaintiff observed that Maintenance Supervisor Eastern could be blunt and gruff, sometimes raising his voice and getting easily irritated.

21.

Plaintiff decided it was in his interest to continue to keep his head down and not call attention to himself, to avoid any uncomfortable situation with Maintenance Supervisor Eastern.

22.

Meanwhile, Plaintiff's reputation among the Phipps Place residents was immediately positive, as they quickly came to recognize his responsiveness to their needs and his energetic desire to provide excellent service.

## **Plaintiff Witnesses an Abuse of Power Among Senior Level Employees**

23.

Upon information and belief, Property Manager O'Hern, a straight, white woman, and Maintenance Supervisor Eastern, a straight, black man, held the two most senior positions at the Phipps Place location.

24.

In early Spring 2018, Plaintiff noted that Property Manager O'Hern and Maintenance Supervisor Eastern had a consistent work relationship that served to protect them both.

25.

Though they spoke negatively about one another to Plaintiff behind one another's back, one often being annoyed with the other, Plaintiff observed an alliance that protected them from things that others in less powerful positions would not be protected from.

26.

For instance, if Maintenance Supervisor Eastern left work early or brushed off his responsibilities, Property Manager O'Hern looked the other way and let him get away with it. Plaintiff knew that he would be reprimanded for doing the same.

27.

Assistant Manager Doe told Plaintiff that Property Manager O'Hern and Maintenance Supervisor Eastern had worked together for approximately two decades. Plaintiff understood that the abuse of power was, therefore, well established, and that pointing it out would, upon information and belief, be futile or even risky.

## Maintenance Supervisor Eastern Demonstrates Hostility and Homophobia

28.

Within a few months of his employment at Defendant The Finger Companies, Plaintiff had formed many pleasant relationships with residents on the property.

29.

He was confident that he was performing and excelling and meeting the expectations of his position.

30.

Finally feeling more and more comfortable and settled-in, Plaintiff, who had worn black suit jackets and white shirts to work early-on in an effort to blend-in, began wearing the clothes he actually preferred, including colorful pants and shirts.

31.

As soon as Plaintiff began to dress more authentically himself, Maintenance Supervisor Eastern demonstrated homophobia and hostility toward Plaintiff.

32.

Maintenance Supervisor Eastern commented on Plaintiff's attire, laughing at him and calling him a "fashionista."

33.

Maintenance Supervisor Eastern was also newly curt and short-tempered toward Plaintiff.

34.

Upon information and belief, Maintenance Supervisor Eastern perceived Plaintiff to be gay, did not like that Plaintiff was openly gay, and treated him with hostility and disrespect, making it clear that he disapproved of him.

35.

Because he had observed the alliance between Property Manager O'Hern and Maintenance Supervisor Eastern, Plaintiff was scared to report Maintenance Supervisor Eastern's hostility and homophobia.

36.

Plaintiff hoped this hostility would dissipate as he continued to prove his competence and professionalism. He hoped that his sexual orientation and choice of clothes would become accepted and less of an issue for his coworker.

**Property Manager O'Hern Degrades and Stereotypes Plaintiff Based on his Sexual Orientation**

37.

Within a few months of employment, Plaintiff believed he had formed a pleasant relationship with Property Manager O'Hern, who, unlike Maintenance Supervisor Eastern, seemed to not have "a problem" with his sexual orientation.

38.

Property Manager O'Hern even invited Plaintiff to her home for a birthday party in March 2018.

10

39.

As he became more comfortable with her, Plaintiff and Property Manager O'Hern began to fill down-time in the office with conversation about work and life.

40.

Trusting the relationship, in the Spring of 2018, Plaintiff shared with Property Manager O'Hern, in confidence, that he and his boyfriend broke up. He told her that the break-up occurred in a parking lot and that he was heartbroken.

41.

Disturbingly, Property Manager O'Hern acted amused by the story.

42.

More disturbingly, she began to tell residents, some of whom did not know Plaintiff's sexual orientation, all about this very private and personal matter. She asked several people what they would do if their boyfriend broke up with them in a parking lot the way Plaintiff's ex-boyfriend had. She often laughed while telling the story, as if she found it scandalous and hilarious.

43.

Property Manager O'Hern did this over and over again, using Plaintiff's personal heartbreak and sexual orientation as fodder for gossip within the community. Plaintiff was betrayed and humiliated each time it happened.

44.

Property Manager O'Hern also assumed knowledge of Plaintiff's lifestyle. She began to prod him about his love life and asked what dating apps he used. It was clear to Plaintiff that she stereotyped him as a promiscuous, club-going, gay man who partied all the time.

45.

Plaintiff, still somewhat the "new guy," did not know if he would be retaliated against if he told Property Manager O'Hern that she was being offensive and inappropriate. Therefore, he was forced to begrudgingly laugh along with Property Manager O'Hern at his own expense in order to protect himself and his new job.

46.

Upon information and belief, Property Manager O'Hern did not gossip to residents about her heterosexual staffs' relationships nor did she grill her heterosexual staff for details about their personal lives.

47.

Plaintiff was beyond disheartened to realize that Property Manager O'Hern, indeed, held belief in stereotypical and harmful generalizations about gay men and that she expected him to play along good-naturedly while she embarrassed and degraded him in front of others.

## Property Manager O'Hern and Maintenance Supervisor Eastern
## <u>Discriminate Against a Transgender Resident</u>

48.

Shortly thereafter, in the Summer of 2018, Plaintiff was shocked to witness outright homophobic slights toward a transgendered resident at the Phipps Place property.

49.

The resident, a black transgender woman, came into the office very upset and wanting to discuss a late fee that Assistant Manager Doe had posted against her.

50.

Property Manager O'Hern, Maintenance Supervisor Eastern, and Assistant Manager Doe were present in the office along with Plaintiff.

51.

When the resident left the office with resolution, Property Manager O'Hern laughingly made derogatory comments about the resident. She said that "he or she needed to pick" if she wanted to be a woman or a man because she "can't come in here dressing like a woman but carrying on like a man."

52.

Maintenance Supervisor Eastern also made fun of the resident. He mocked the tone of her voice and said that it was "too manly" for her to "try to be a woman."

53.

Plaintiff was shocked to witness the two people in senior roles at the property ridicule the resident with blatantly homophobic comments.

54.

Worse, they did so openly and boldly, in front of Plaintiff, a gay man, which deeply unsettled him.

55.

Upon information and belief, Property Manager O'Hern and Maintenance Supervisor Eastern believed that joking about transgender people was allowable and funny.

56.

Because of what he witnessed, Plaintiff instantly understood that he was at risk of being a target of Property Manager O'Hern's and Maintenance Supervisor Eastern's homophobic jokes and ridicule.

57.

Because they held the two senior positions on site, Plaintiff had no choice but to remain quiet in response to Property Manager O'Hern and Maintenance Supervisor Eastern's blatant homophobia. He went about his work knowing he had to somehow manage to perform within an increasingly uncomfortable and unsupportive environment.

**Property Manager O'Hern Condones Maintenance Supervisor Eastern's**
**Increased Hostility and a Culture of Homophobia**

58.

In a short time, Plaintiff's worst fears were realized when he, too, became the victim of ramped-up hostility and shocking homophobic insults.

59.

As Plaintiff's "new guy" status wore off, so did any semblance of professionalism from Maintenance Supervisor Eastern, who not only failed to accept him but instead hostilely intimidated and tormented him with increased frequency.

60.

By August 2018, Maintenance Supervisor Eastern regularly yelled at Plaintiff for asking questions about work orders or for communicating maintenance requests on behalf of residents, even though it was his job to do so.

61.

Many times, Maintenance Supervisor Eastern called Plaintiff "stupid motherfucker."

62.

Property Manager O'Hern was often within earshot of the verbal abuse and either ignored it or brushed it off as an allowable facet of Maintenance Supervisor Eastern's personality.

15

63.

In addition to the hostility, Maintenance Supervisor Eastern soon added homophobic insults when yelling at Plaintiff.

64.

Maintenance Supervisor Eastern, who had displayed his homophobia toward Plaintiff in manner since his hire, now began to outright verbally bully and degrade Plaintiff because of his sexual orientation, accusing him of not being "manly" enough.

65.

Many times, Property Manager O'Hern and her new assistant property manager, Kimberly Curtis, (hereinafter "Assistant Property Manager Curtis"), would join in, making fun of Plaintiff's clothes and style.

66.

They laughed at and called his outfits "flamboyant" or "over the top."

67.

Once, pointing out a person she deemed to be more "flamboyantly" dressed than him, Property Manager O'Hern told Plaintiff that he was "nothing like *that*. You're not *THAT* extra!," comparing Plaintiff's attire and making it clear that she was barely tolerant of how Plaintiff dressed and did not want him to dress more

"extra." Upon information and belief, Property Manager O'Hern did not want her employee to be "too" gay.

68.

Further, Property Manager O'Hern and Assistant Property Manager Curtis appallingly asked Plaintiff which sexual positions he preferred.

69.

The straight-identifying coworkers did not ask each other questions of thiskind; they reserved them only for Plaintiff because of his sexual orientation.

70.

Again and again, Plaintiff was forced to tolerate the homophobic and verbal abuse, fearing that he would risk losing the job by speaking out against the discriminatory and hostile workplace culture.

**Maintenance Supervisor Eastern Repeatedly Calls Plaintiff a "Faggot" While
Property Manager O'Hern Does Nothing to Stop Him**

71.

To Plaintiff's shock and horror, towards the end of 2018, Maintenance Supervisor Eastern started to use the word "faggot" when he verbally abused Plaintiff.

72.

Commonly, Maintenance Supervisor Eastern would get heated about a work order, berate and insult Plaintiff, and then say the slur while walking away.

73.

Property Manager O'Hern and Assistant Property Manager Curtis were often in the office and, upon information and belief, could hear these outrageous attacks on Plaintiff.

74.

Unbelievably, Property Manager O'Hern usually pretended she didn't hear Maintenance Supervisor Eastern's disgusting attacks and, because of Property Manager O'Hern's meaningful indifference and Plaintiff's fear of retaliation, the incidents would pass as if nothing had happened.

75.

However, because the slur was so deeply offensive and violent, Plaintiff did not always remain silent. Several times, he found the courage to speak up and object to being verbally assaulted, saying that the slur was beyond "offensive."

76.

On these occasions, Property Manager O'Hern usually brushed it off and diminished its harmfulness in order to, upon information and belief, avoid having to confront Maintenance Supervisor Eastern about it.

77.

Property Manager O'Hern consistently ignored the victimization of Plaintiff. Therefore, upon information and belief, Maintenance Supervisor Eastern knew he

could get away with his homophobic hostility and harassment without reprimand. Plaintiff understood that this meant that he would not stop.

78.

Maintenance Supervisor Eastern was physically larger than Plaintiff and, because of his short temper and hostility toward him, Plaintiff constantly felt threatened and intimidated.

79.

Plaintiff knew he was not protected from unlawful and disgusting homophobic attacks in the workplace and that his boss, Property Manager O'Hern, actually downplayed and condoned them.

**Property Manager O'Hern Condones a Hostile Work Environment and a Culture of Racism**

80.

By the end of his first year of employment at Defendant The Finger Companies, Plaintiff was also witness to and a victim of Property Manager O'Hern's race discrimination.

81.

Many times, Property Manager O'Hern sat at her desk, thumbed through paperwork, and commented on the number of people of color who were leasing apartments in a negative and disapproving way. More than once, Property Manager O'Hern told Plaintiff that "hood people are taking over the property."

82.

Other times she bemoaned that too many "ghetto people" and "thugs" were interested in tours and told Plaintiff that he should show them apartments near exits so that they could "deal drugs" outside.

83.

Plaintiff was disgusted that Property Manager O'Hern thought it was acceptable to use these discriminatory stereotypes at all, let alone in front of him, a black employee.

84.

Upon information and belief, Property Manager O'Hern taunted him with her discriminatory behavior because she thought that, in order to keep his job, he would not strongly contest the constant racist and derogatory language he witnessed at Phipps Place. Therefore, she knew she could continue to force him to tolerate it.

85.

Maintenance Supervisor Eastern was also aware of Property Manager O'Hern's racism but would stay silent to maintain the flow of favors they afforded one another. Upon information and belief, there was a long-standing, unspoken agreement: she allowed him to leave early and get away with homophobic abuse and he allowed her to discriminate and get away with racism.

86.

Because Plaintiff was without those favors and protections, he was forced to survive the painful culture of racism and homophobia that Property Manager O'Hern generated and perpetuated, which increasingly made him feel both dehumanized and numb.

### Property Manager O'Hern Tone-Polices Plaintiff; Generalizes Black Men as Scary

87.

By 2019, Plaintiff knew that he was trapped by Property Manager O'Hern's multiple stereotypes and generalizations about people of color and gay men.

88.

Once, when speaking seriously about a situation that warranted attention, Plaintiff was taken aback when Property Manager O'Hern accused him of having a "tone."

89.

It would not be the last time Property Manager O'Hern policed Plaintiff's tone. Many times, she let him know that he came across as threatening or angry when he spoke seriously about a matter and that he should be careful to not sound that way.

90.

These discriminatory insinuations that Plaintiff was an "angry or scary black man" were in line with other comments Property Manager O'Hern made about "threatening" and "scary" black men. She once told Plaintiff that she had to stop for gas at an "urban" gas station and feared for her life because "they walk up on you."

91.

Plaintiff knew that as much as Property Manager O'Hern believed in the flamboyant, hilarious, gay man trope, she also believed in the "angry black man" and "scary black criminal" tropes and used them to discriminate against him with racist comments and insults.

**Property Manager O'Hern Minimizes Plaintiff's Professional Contribution
and Personal Feelings**

92.

However much Plaintiff was forced to play along with Property Manager O'Hern's reductive assumptions of him as a black, gay man, he was most committed to being professional, impressing the residents he served, and upholding the stellar reputation he had as a competent, proactive and helpful staff.

93.

In the Summer of 2019, Plaintiff brought it to Property Manager O'Hern's attention that he felt deserving of a leasing award, Defendant The Finger

Companies' periodic acknowledgment of employee excellence that included prize money and a plaque.

94.

Property Manager O'Hern made him feel like it was a silly ambition for him to have, but he had proven himself to be a great asset to the company, serving outstanding customer service and performing with a closing ratio of 30%-40%. Plaintiff felt that an acknowledgement of his good work would be personally gratifying.

95.

When he did not receive the award, Property Manager O'Hern mockingly and humiliatingly presented him with a "participation award:" a sheet of paper with a star drawn in the middle. Plaintiff knew she was making a mockery of his genuine disappointment.

96.

Plaintiff was humiliated by Property Manager O'Hern's heartless response to his disappointment. He was further degraded when she forced him to play along and pose while she took a photo of him holding up the fake "award." She circulated the photo to another property manager, casting him again as the butt of a joke.

97.

That same summer, Plaintiff's pet shark died. It was well known to Property Manager O'Hern that Plaintiff had a genuine affection and love for his fish, as he often shared photos of his aquarium with his officemates.

98.

On the day he told Property Manager O'Hern and Assistant Property Manager Curtis that his shark died, Plaintiff found a piece of paper in the office with a shark and "R.I.P." drawn on it. Upon information and belief, Property Manager O'Hern placed it there to mock him.

99.

On both above occasions, Plaintiff knew his grief was being mocked because his boss fostered the opinion that as a gay, black man, he was silly and wasn't worth being taken seriously.

100.

Upon information and belief, Property Manager O'Hern only wanted Plaintiff to be the funny, easy-going, gay sidekick who made her laugh, who provided her with stories she could retell, and who went along with her discrimination without objection.

101.

Upon information and belief, she did not like when Plaintiff was ambitious, serious or sad, nor did she care about his personal or professional hopes, goals, disappointments or pain, though she did care about white, straight employees' personal or professional hopes, goals, disappointments or pain.

**Property Manager O'Hern and Maintenance Supervisor Eastern Perpetuate an Environment of Chronic Sexual Orientation Discrimination**

102.

Continuing through 2019 and into 2020, Plaintiff found himself constantly stressed and taxed by the ongoing discrimination and homophobia he witnessed and faced in the workplace.

103.

Once, while in the office, Property Manager O'Hern, who identified herself as a Christian, asked Plaintiff about his sexual orientation as it relates to religion.

104.

Specifically, Property Manager O'Hern knew that Plaintiff's sister served as a pastor at a Baptist church and asked Plaintiff how his sister felt about him being gay.

105.

Upon information and belief, Property Manager O'Hern projected her own Christian beliefs onto Plaintiff's sister and concluded that she was anti-gay.

Property Manager O'Hern concluded that Plaintiff did not have a relationship with Christianity because she did not believe he could have Christian beliefs as a gay man.

106.

Plaintiff was deeply offended that Property Manager O'Hern would assume any knowledge of his sister's opinion of him or of his personal faith.

107.

Several times, Plaintiff dyed his hair and Property Manager O'Hern told him he shouldn't because he looked too "flamboyant." Meanwhile, Assistant Property Manager Curtis, who was a straight, white woman, also dyed her hair regularly without any criticism or comment from Property Manager O'Hern.

108.

Upon information and belief, Property Manager O'Hern thought Plaintiff looked "too gay" when he dyed his hair.

109.

Also around this time, Plaintiff requested help from Maintenance Supervisor Eastern with the installation of a closet rack. Maintenance Supervisor Eastern said that Plaintiff must need the extra rack for all of his "booty shorts."

110.

At other times, Property Manager O'Hern and Maintenance Supervisor Eastern continued to bully him with homophobic jokes and insults, calling him "girly" and "extra."

111.

When Plaintiff dared to defend himself, saying that they were being offensive, Property Manager O'Hern, Maintenance Supervisor Eastern and Assistant Property Manager Curtis called him a "drama king," implying that he was too sensitive, fussy and emotional to take a joke, or that he was, in their eyes, a stereotypical, dramatic gay man.

112.

They suggested they were being nice by calling him a "drama king" and said that it was "better" than calling him a "drama queen." They joked that they were being less rude and discriminatory by using the word "king."

113.

Upon information and belief, telling Plaintiff that he was a "drama king" was a strategic manipulation. Knowing Plaintiff would want to avoid such labels, Property Manager O'Hern and Maintenance Supervisor Eastern believed he would speak up less and less in response to their abuse and would learn to just "roll with it" without objection.

114.

The stress of maintaining a positive attitude and performance in the face of these chronic, unlawful abuses wore on Plaintiff. He struggled more and more to maintain his morale knowing that he was seen as silly and unworthy of respect.

115.

He endured the dehumanization by telling himself that he just had to focus on the positive aspects of the job like the pay, benefits, and work experience.

**Plaintiff is Accused of Being "Fussy" in Light of the COVID 19 Pandemic**

116.

In early Spring 2020, when the COVID 19 pandemic spread quickly and demanded companies to put policies in place to protect their employees and/or customers and clients, Plaintiff found himself alone among his colleagues in his opinion that it would be best if they followed advice from the Centers for Disease Control, (hereinafter "CDC") in order to secure a safe working environment.

117.

While the CDC advised mask-wearing and distancing, Property Manager O'Hern showed little intent to enforce those rules, despite being the person in the leadership role at Phipps Place who could urge employees and residents to practice safety measures.

118.

Instead, she declared that she didn't like mask-wearing and, while she technically had to post notices about mask-wearing and social distancing in the common areas on the property, she did little to ensure that these policies were actually practiced, nor did she practice them herself.

119.

Plaintiff knew that COVID 19 was a life or death matter. He found the courage to make it clear that he strongly objected to Property Manager O'Hern's nonchalance about his and others' safety and that he wanted the property to adhere to the CDC recommendations. He repeatedly told Property Manager O'Hern that they should all be wearing masks, like he did, for the wellbeing of everyone.

120.

Specifically, Plaintiff asked that others wear masks in the small office rooms where Plaintiff worked so closely with Property Manager O'Hern and Assistant Property Manager Curtis.

121.

Regardless, Property Manager O'Hern thought his concerns were silly and allowed staff and residents to go freely in and out of the small office in which Plaintiff worked, without masks and without keeping distance, completely disregarding his fears.

122.

Property Manager O'Hern often demonstrated with her body language that she was annoyed that Plaintiff was being a "drama king," sighing or rolling her eyes when he mentioned feeling unsafe with so few protective measures in place at Defendant The Finger Companies' Phipps Place property.

123.

More than once, she questioned why he was so worried at work if he was fine with being out "at the clubs" at night. Plaintiff was offended that she continued to stereotype him as a silly, risk-taking, promiscuous, "party boy" based on his sexual orientation and her disparaging generalizations about gay men.

124.

Plaintiff was furious that Property Manager O'Hern used his sexual orientation and derogatory generalizations about gay men to insinuate that he was both risk-taking in one area of his life and dramatically fussy at work.

**Defendant The Finger Companies Commits Disability Discrimination**

125.

In the Spring of 2020, the property manager at Defendant The Finger Companies' Kingsboro property, (hereinafter "Kingsboro Property Manager Doe"), who was, upon information and belief, very well-liked and respected by her team, suffered a stroke.

126.

Upon information and belief, it had been well known that Kingsboro Property Manager Doe had been generally feeling unwell and suffering a variety of ailments for some time before the stroke, though she continued to perform at work.

127.

Plaintiff, who was friendly with Kingsboro Property Manager Doe, was naturally concerned about her and was relieved when she reached out from the hospital, assuring him that she would recover.

128.

Kingsboro Property Manager Doe shared with Plaintiff that she had been worn out prior to her stroke and that Defendant The Finger Companies had recently had her "running all over" the property, demanding that she tolerate more and more physical burden than was usual.

129.

Plaintiff was profoundly upset when Kingsboro Property Manager Doe confided that she believed Defendant The Finger Companies was purposely trying to make work intolerable for her.

130.

That week, in the Phipps Place office, Assistant Property Manager Curtis told Plaintiff that Defendant The Finger Companies was "planning to get rid of" Kingsboro Property Manager Doe because of her stroke.

131.

Plaintiff was shocked that Defendant The Finger Companies was so intolerant of Kingsboro Property Manager Doe's health concerns that they were planning to push her out. Seeing his surprise, Assistant Property Manager Curtis told Plaintiff to stay quiet about it.

132.

Within days, while Kingsboro Property Manager Doe continued to recover in the hospital, unaware that her job was in jeopardy, multiple candidates were actively interviewing for her position.

133.

The following week, Plaintiff asked Property Manager O'Hern, who had been on vacation the week before, if it was true that they were going to fire Kingsboro Property Manager Doe because she was ill.

134.

Property Manager O'Hern confirmed that it was true and told Plaintiff that her plan was to visit Kingsboro Property Manager Doe in the hospital to "see where her head [was] at" before firing her.

135.

Kingsboro Property Manager Doe continued to be in touch with Plaintiff during the two weeks of her in-patient recovery. She told him she found an ad online for what appeared to be her job. Upset by the betrayal and disability discrimination, she put in her resignation notice so as to not give Defendant The Finger Companies the satisfaction of firing her.

136.

Upon information and belief, despite the fact that she continued to perform her responsibilities, Defendant The Finger Companies was intolerant of Kingsboro Property Manager Doe's unwellness and plotted to wear her out by adding increased physical demands and workloads to her schedule. When she eventually suffered a stroke, they re-plotted to outright fire her.

137.

Upon information and belief, Defendant The Finger Companies did not care about its employees' wellbeing and discriminated against temporary or chronic disabilities.

## Property Manager O'Hern Violates Privacy and Ridicules Plaintiff's Style

138.

Property Manager O'Hern continued to initiate and/or condone the sexual orientation discrimination and homophobic culture against Plaintiff.

139.

In the Spring of 2020, Plaintiff had a personal package shipped to the office.

140.

While Plaintiff was out on an errand, Property Manager O'Hern texted him to let him know that his package had arrived and was open.

141.

When he returned to the office, Plaintiff was hurt when Property Manager O'Hern and Assistant Property Manager Curtis joked about the contents of his package, which was open and included underwear and swimming trunks.

142.

Property Manager O'Hern and Assistant Property Manager Curtis made fun of the items. They called them "very extra," referenced "crossdressing," and said that girls would be more likely to wear his "see-through underwear" than men.

143.

Though he had continuously tried to stay numb to survive the culture of discrimination at Defendant The Finger Companies, Plaintiff was deeply hurt by

the insulting jokes.  The repulsive homophobia he dealt with every day continued to wear on him mentally and emotionally.

### **Property Manager O'Hern Continues to Racially Discriminate**

144.

Throughout this same time, Property Manager O'Hern continued to display outrageous, unlawful race discrimination.

145.

In about June 2020, Plaintiff worked with two white women who were considering leasing at Defendant The Finger Companies' Phipps Place property.

146.

Plaintiff gave them a property tour and showed them an available apartment in their price range. The women asked if they could request upgrades and Plaintiff detailed for them what both full and partial renovations consisted of. Upon weighing the cost differences, the women agreed to a partial renovation.

147.

When they arrived on their move-in day, the women complained that they had expected hardwood floors. Hardwood floors had not been a part of the agreed upon partial renovation or upgrades.

148.

Hearing of the situation, Property Manager O'Hern demanded that Plaintiff allow the women to pick out an apartment that had all of the fully renovated features they wanted and to lease it to them for the same price as the partially renovated apartment they had been unsatisfied with.

149.

While he found it unusual, Plaintiff did as he was told. The two women chose an upgraded apartment and paid far less than what it was marketed for.

150.

About a month later, in July or August 2020, a black woman, also looking to lease at Phipps Place, toured the property with Plaintiff.

151.

When Plaintiff showed her an apartment, the woman asked about potentially upgrading the unit.

152.

Because the two white women were recently afforded the opportunity, Plaintiff believed that this potential resident might be granted the same opportunity, too, and told her he would inquire and let her know.

153.

Disturbingly, Property Manager O'Hern refused to approve the black woman's request. She would not consider the same upgrade opportunity that she had insisted the white women get just a month or so earlier. Property Manager O'Hern simply said that Defendant The Finger Companies was no longer doing upgrades.

154.

Plaintiff was stunned and saddened by the clear racism at play and was embarrassed that the company he represented condoned and perpetuated such outright race discrimination and unfair bias.

155.

Property Manager O'Hern continuously specified what apartments potential black residents should be shown, prioritized the needs and requests of white residents, and bemoaned the influx of "weed-smoking" "thugs."

156.

That same summer, 2020, Plaintiff told a former coworker that he was aware of a position at Defendant The Finger Companies' Kingsboro property.

157.

He was familiar with her experience and knew she would be a strong candidate.

158.

The woman, who was black, was contacted for an interview with Property Manager O'Hern.

159.

After the woman left the interview, Property Manager O'Hern made comments to Plaintiff about the woman's hair. She asked him: "Why was her hair so gelled down like that?"

160.

Plaintiff told Property Manager O'Hern that maybe she wanted a sleek look for her interview and decided to slick it back.

161.

Property Manager O'Hern continued to act baffled by the woman's appearance and Plaintiff was forced to explain to her about black hair texture and treatments.

162.

The woman did not get the job because, upon information and belief, Property Manager O'Hern did not like her appearance based on her hair style and texture.

**Plaintiff Suffers Anxiety and Mental Distress Due to**
**Hostile Work Environment**

163.

Plaintiff made every effort to protect his mental and emotional health, trying hard to ignore or work around the incessant barrage of unlawful behavior displayed in the workplace. Still, it wore on him greatly.

164.

In about November 2020, Plaintiff felt a new level of anxiety while at work. The constant trauma of being racially stereotyped, as well as the consistent risk of being targeted for his sexual orientation, threatened by Maintenance Supervisor Eastern, or ridiculed for his hair, clothes, or lifestyle had grown overwhelming.

165.

Once confined to the office, the mental distress now bled into his life outside of work, as well, as he was less and less able to shake a feeling of dread before and after the workday.

166.

Still, Plaintiff was forced to accept his situation, knowing that the homophobic and racist culture at Defendant The Finger Companies' Phipps Place property was well established and condoned.

167.

Because speaking up or complaining about the unlawful culture could risk his job, Plaintiff pushed through his discomfort while continuing to exceed residents' expectations and serve commendable work.

**Assistant Property Manager Curtis Contracts COVID 19; Risks Exposing Plaintiff**

168.

In late December 2020, while Plaintiff had vacation time off for the holidays, Assistant Property Manager Curtis texted him and told him that she had been exposed to COVID 19 and had officially tested positive after Christmas.

169.

Plaintiff was concerned and sympathetic. He said he was glad she was feeling better when she later texted him to report that she had returned to work on December 30, 2020. But he was also very concerned about what her return meant in regard to his own safety.

170.

Assistant Property Manager Curtis texted Plaintiff saying that while she was back to work, she "still [had] a residual cough" and that her sense of smell was still gone.

171.

Plaintiff was due to return to work on January 4, 2021 and was deeply concerned that Defendant The Finger Companies had not followed the CDC guidelines by allowing Assistant Property Manager Curtis to return to work before completing a full 14-day quarantine.

172.

Because he had already been struggling with the toxicity of his work environment, Plaintiff did not want to be even further stressed by the possible exposure risk to a deadly virus that neither Defendant The Finger Companies, Property Manager O'Hern, nor his coworkers seemed to take seriously.

173.

Plaintiff reached out to Property Manager O'Hern to express his concern about returning to the small office he shared with Assistant Property Manager Curtis, knowing that she did not quarantine for 14 days after her positive test result and knowing that she was admittedly still coughing.

174.

Plaintiff wrote in a text exchange with Property Manager O'Hern that he was not "comfortable working in an environment risking my own health" and that he was "shocked that corporate didn't require her to test again before returning to

work" to make sure she was no longer COVID 19 positive, since they all "work so closely together [in the office]."

175.

Plaintiff also reported within the text that he still felt "compelled to work because [he] had no other choice."

176.

Property Manager O'Hern insisted that Defendant The Finger Companies' protocol was followed, saying that Human Resources "cleared" Assistant Property Manager Curtis to return to work.

177.

However, she also said that she understood his concern. Therefore, at Property Manager O'Hern's suggestion, Plaintiff delayed his return to work by one day to return instead on Tuesday, January 5, 2021, when Assistant Property Manager Curtis was not scheduled to be in the office. Property Manager O'Hern said that she would contact Heather Ellis, Defendant The Finger Companies' area supervisor, (hereinafter "Area Supervisor Ellis"), on his behalf to discuss the situation.

178.

Relieved, Plaintiff said that he would also contact Human Resources on January 4, 2021. He planned to make a complaint about their questionable safety

protocols as well as to further explain why he was trepidatious about being in the office that day while Assistant Property Manager Curtis was still coughing.

### Defendant The Finger Companies Obstructs Plaintiff's Efforts to Make an Official Complaint About Their Insufficient COVID 19 Response

179.

As planned, on January 4, 2021, Plaintiff tried to contact both Area Supervisor Ellis and a human resources representative from Defendant The Finger Companies' Houston headquarters, Courtney Wright, (hereinafter "HR Representative Wright"), to discuss his concerns about Defendant The Finger Companies' COVID 19 response. However, he could never get through to either line.

180.

Plaintiff became frustrated when he continuously got operator messages saying that his calls could not be connected to either Area Supervisor Ellis or to the corporate human resources department.

181.

Plaintiff texted his sister and asked her to call the numbers to see if she might be able to get through. She called and, oddly, all of her calls were connected immediately. When she told him that she was successful, Plaintiff quickly tried again, but, still, he only got the same operator message saying that his call could not be connected.

182.

Further, mere minutes after trying HR Representative Doe's line again, Plaintiff was alerted, via the office Customer Centric/TeleLink system that his work email was connected to, that Property Manager O'Hern had just received a message from HR Representative Wright. HR Representative Wright's message, visible to Plaintiff, simply said that Property Manager O'Hern would "know what the call [was] regarding."

183.

Plaintiff understood immediately that he was being schemed against and silenced for having been critical of Defendant The Finger Companies' and Property Manager O'Hern's handling of COVID 19 in the workplace.

184.

Upon information and belief, Property Manager O'Hern was annoyed that Plaintiff was making a "fuss" about COVID 19 and worried that he would report that she had neglected to adequately protect Phipps Place's employees and residents when she, as the property manager, continuously downplayed the safety threat. Upon information and belief, Property Manager O'Hern warned both Area Supervisor Ellis and HR Representative Wright in advance that Plaintiff would be calling on Monday, January 4, 2021, to complain about Defendant The Finger Companies' insufficient and unenforced safety protocols.

185.

Upon information and belief, in advance of his anticipated calls, both Area Supervisor Ellis and HR Representative Wright maliciously blocked Plaintiff's phone number in order to avoid having to speak with him and to thwart his right to express a concern or make a complaint to human resources.

186.

Upon information and belief, Defendant The Finger Companies did not care about the concerns and wellbeing of its employees. Plaintiff understood that he was being obstructed and retaliated against for having an objection to Defendant Finger Companies' handling of the safety of its employees.

187.

Plaintiff felt dismissed, furious, and heartbroken. He had been with Defendant The Finger Companies for two years and was a committed member of the team. To be unvalued and disrespected was terribly painful.

188.

That evening, Plaintiff texted his sister, who had supported him through the situation, and told her that he had "just prayed (…). I've literally been bursting into tears all day (…). I'm human."

**HR Representative Wright Accuses Plaintiff of "Job Abandonment"**

189.

As planned, Plaintiff returned to work the next day on Tuesday, January 5, 2021, feeling completely jarred by the actions of his manager, supervisor and HR, and also fearing retaliation and job insecurity.

190.

While at work, Plaintiff finally connected with HR Representative Wright who, unbelievably, told Plaintiff that his absence the day before could be seen by corporate as "job abandonment."

191.

Plaintiff was completely confused, as Property Manager O'Hern was the one who suggested that he stay home on Monday, January 4, 2021, while Assistant Property Manager Curtis was still in the office, possibly still contagious.

192.

Plaintiff explained to HR Representative Wright that his reason for the one-day delay in his return was not "job abandonment" but rather a valid fear of a potentially unsafe work environment. Further, he explained that it had been supported by his on-site boss, Property Manager O'Hern. He told her that Assistant Property Manager Curtis had not stayed out of the office for the recommended

quarantine period, had not retested before returning to work, and still had a cough which could easily spread the virus in the small office they worked together in.

193.

He told her that he had tried all day to reach her and Area Supervisor Ellis so that he could explain the situation and bring up his concerns, but that he was never able to get through.

194.

HR Representative Wright said that they had been having issues with their phones and strangely ended the conversation, leaving the threat of "job abandonment" very vague and cautionary.

195.

Upon information and belief, Area Supervisor Ellis and HR Representative Wright not only blocked Plaintiff's number because they wanted to avoid addressing his concerns, but because they wanted to set him up in retaliation for his intended complaint about Defendant The Finger Companies' inadequate employee protections against COVID 19. By preventing him from being able to reach them or contact anyone at Defendant The Finger Companies' corporate offices, they were able to both avoid the complaint *and* accuse him of "job abandonment," as if he just never showed up to work that day without official word or permission.

196.

Because of their scheme and false narrative, Plaintiff knew he was vulnerable to retaliatory termination.

## Sexual Orientation Discrimination Comes Full Circle

197.

Plaintiff was distraught by the messaging and accusations from corporate which were, upon information and belief, influenced by Property Manager O'Hern.

198.

He understood that there had been an active, collaborated effort on the part of Property Manager O'Hern, Area Supervisor Ellis and HR Representative Wright to make him look like he had been a no-show on Monday, January 4, 2021.

199.

Further, Plaintiff knew that preceding this retaliatory scheme were years of sexual orientation discrimination and homophobic generalizations through which he had been constantly and repeatedly referred to as "extra" and a "drama king."

200.

In about January or February 2021, Plaintiff spoke with an employee who cleaned and maintained the buildings and grounds.

201.

Plaintiff was furious to hear that Property Manager O'Hern had told this employee that he was very "difficult" about COVID 19. This confirmed for Plaintiff that Property Manager O'Hern was, indeed, generating a perception of him that emphasized her opinion that he was a fussy, dramatic gay man.

202.

Upon information and belief, the "dramatic gay man" stereotype fed directly into Property Manager O'Hern's conclusion that he was the only one on her team who was "extra" sensitive and worried about COVID 19. Property Manager O'Hern perceived Plaintiff to be a fussy, problematic employee who insisted his workplace have safety measures in place, and when there were not any, she made Plaintiff out to be the fussy employee who complained about it.

203.

Upon information and belief, Property Manager O'Hern found Plaintiff's sexual orientation to be problematic and wanted him gone.

**Plaintiff Grows Ill and is Threatened by Disability Discrimination and Retaliation**

204.

In early April of 2021, Plaintiff began to feel unwell, experiencing stomach pains and severe abdominal discomfort. Plaintiff attempted to push through it and

stayed committed to work, drinking ginger ales and eating soup at his desk to try to ease his continual stomach aches and get through the days.

205.

However, on April 6, 2021, Plaintiff felt worse than ever and passed out in a hallway in the office.

206.

Plaintiff was taken to the hospital where he was observed overnight, but was treated only for the pain, as they were not able to diagnose him conclusively.

207.

He was released the next day, April 7, 2021, with half a dozen prescribed medications to manage his terrible pain.

208.

When Plaintiff returned to work days later, still significantly uncomfortable but able to manage it, he noted a vague attitude change toward him.

209.

Property Manager O'Hern and Assistant Property Manager Curtis were less chatty with him and seemed to use a less familiar and friendly tone, despite having worked so closely with him for years.

210.

Plaintiff worked consistently for weeks, managing through the days as the pain came and went.

211.

When his symptoms still did not get better, he began to seek doctors' opinions on what could be going on and it was discovered that Plaintiff had kidney stones. His doctor advised a "wait and see" approach, told him how to better manage symptoms, and told him that movement and activity sometimes helped kidney stones to pass less painfully.

212.

To this end, Plaintiff was told by his doctor that it would not be necessary to cancel an already-arranged and work-approved vacation to Disney World for his birthday later that month of April 2021.

213.

Further, his doctor advised that some extensive walking in the park and rollercoaster riding could actually help his body to more easily pass the kidney stones.

214.

Plaintiff maintained total transparency in regard to his diagnosis, treatments, and appointments. He sent all documentation regarding his medical care, doctors' notes, and his need for sick days to Property Manager O'Hern, as was required.

215.

Meanwhile, he continued to work around his disability and the inconveniences of it, managed all of his responsibilities with his usual competence, and maintained the level of excellent communication and service the residents had come to appreciate.

216.

Ultimately, Plaintiff remained sick and his pain became newly unrelenting. He was told that he would require surgery.

217.

In mid-May 2021, Plaintiff had surgery to place a stent.

218.

When he returned to the office on May 17, 2021, he once again noted that his colleagues were strangely disinterested in speaking with him and he clearly noted the avoidant attitude toward him.

219.

Property Manager O'Hern's texts to him were blunt and cold. She curtly sent demands and orders without greetings. It was clear that she was angry with him for being sick.

220.

Plaintiff was well aware that he was being ostracized and retaliated against for needing to take days off for his illness and surgeries. On top of being sick, he feared for his job, knowing that Property Manager O'Hern had plotted to fire Kingsboro Property Manager Doe the year before while she was sick and recovering from her stroke.

**Maintenance Supervisor Eastern Threatens Plaintiff While Property Manager O'Hern Does Nothing to Support Him**

221.

On the day of his return to work post-surgery, May 17, 20021, a resident contacted Plaintiff and requested that her faulty kitchen disposal be replaced. Because it was a fairly straightforward task, Plaintiff entered the work order into the system and quickly contacted the property's maintenance technician, (hereinafter "Maintenance Technician Doe").

222.

It was completely common for Plaintiff to delegate routine tasks to maintain workflow and efficiency for the residents. Further, he knew that Maintenance Technician Doe was more than capable of handling the job.

223.

However, hours later, Maintenance Supervisor Eastern entered the office and, while he looked up and ordered parts for another project in a small room behind Plaintiff's desk, he grumbled audibly, sounding agitated and upset.

224.

When Plaintiff asked him what he was upset about, Maintenance Supervisor Eastern said that he was mad that Plaintiff hadn't spoken to him about the work order for the kitchen disposal before he delegated the task to Maintenance Technician Doe.

225.

Plaintiff clarified that he knew that Maintenance Supervisor Eastern was very busy with quite a few big orders to handle already and that something like the kitchen disposal could easily be handled by Maintenance Technician Doe. Plaintiff reminded him that his job was to handle the needs of the residents in the most effective way possible and, aside from that, he also thought he was doing Maintenance Supervisor Eastern a favor by lightening his load.

226.

Maintenance Supervisor Eastern was not happy with Plaintiff's explanation and grew louder and more hostile, yelling and demanding that Plaintiff always come directly to him first, "no matter what," despite that there hadn't been a problem with Plaintiff's handling of work orders before this.

227.

While he ranted at Plaintiff, Maintenance Supervisor Eastern cracked his knuckles with his fists up in front of his torso. The threatening gesture clearly implied that he might punch Plaintiff at any moment.

228.

When Plaintiff again tried to respond that he was only trying to take care of the resident and that he didn't understand why it was a big deal, Maintenance Supervisor Eastern yelled: "You need to get your panties out of a bunch!" in front of Property Manager O'Hern and Maintenance Technician Doe, who were still in the office.

229.

Plaintiff, upset by the homophobic slight, told Maintenance Supervisor Eastern that what he said was offensive to him and that he knew when someone was trying to belittle him, intimidate him, or make him feel weak based on his sexual orientation.

230.

Property Manager O'Hern closed the office doors so that the three of them were alone in the office and hidden from witnesses.

231.

Plaintiff once again expressed confusion over what caused so much anger when he only did the job he had always done in the way he'd always done it.

232.

Property Manager O'Hern spoke in favor of Maintenance Supervisor Eastern. She threw Plaintiff under the bus and said that he should have gone to Maintenance Supervisor Eastern before he called Maintenance Technician Doe, despite the fact that such a thing had not been mandatory before.

233.

Maintenance Supervisor Eastern then aggressively and sarcastically said "[Property Manager O'Hern], why don't we tell him how the residents don't even like him!" He said that the residents don't enjoy coming into the office anymore because of their negative opinions of Plaintiff.

234.

Plaintiff had tremendous pride in his ability to build and maintain positive relationships with people, namely the individuals and families of the Phipps Place property. He genuinely enjoyed knowing and supporting so many of the residents.

235.

Knowing that their opinions of him unlikely just spontaneously changed for no reason, Plaintiff suspected that either Maintenance Supervisor Eastern was simply tormenting him with false claims that no one liked him, or that there had been a coordinated attack on his character and a purposeful attempt to tarnish his reputation.

236.

Given the retaliatory schemes Property Manager O'Hern was, upon information and belief, responsible for, and given her pattern of gossiping about him to residents, Plaintiff feared she had initiated an active and collaborated effort to turn residents against him, leaving him all the more vulnerable to termination.

237.

Plaintiff courageously told Maintenance Supervisor Eastern that he was not going to tolerate the harassment and hostility anymore.

238.

Maintenance Supervisor Eastern scoffed at Plaintiff and asked him what he thought management would do about it. "Write me up?" he asked, while sarcastically laughing.

239.

Upon information and belief, Maintenance Supervisor Eastern knew that Property Manager O'Hern would not write him up because of their long-established alliance and would, instead, continue to protect him while blaming Plaintiff for the tense argument rather than Maintenance Supervisor Eastern's years-long patterns of abuse, threats, homophobic discrimination and hostility.

240.

Plaintiff told Property Manager O'Hern that he wanted to speak with her privately and left the room.

241.

Property Manager O'Hern had failed to speak up against Maintenance Supervisor Eastern's homophobic slurs toward her employee. She failed to acknowledge or try to stop the physical threat and intimidation he boldly displayed toward Plaintiff.

242.

Further, Property Manager O'Hern was potentially behind a targeted attack against Plaintiff's reputation and employment security.

**Plaintiff Reports Discrimination and Hostile Work Environment to Property Manager O'Hern**

243.

Later that day, while leaving work, Plaintiff, who was physically and mentally shaken, called Property Manager O'Hern to express the toll the situation took on him as a human being and as an employee.

244.

He told her that it was an awful feeling to be discriminated against, attacked and intimidated by Maintenance Supervisor Eastern with no support from her.

245.

Property Manager O'Hern seemed uninterested in addressing the incident and instead, tried to brush it off. Plaintiff knew that Property Manager O'Hern wanted him to accept Maintenance Supervisor Eastern's abuse without objection, as if the homophobic bullying and physical aggression was something Plaintiff should have simply learned to tolerate by then instead of expecting her to ever do anything about it.

**CEO Marvy A. Finger's Son Sides with Homophobic and Hostile Abuser; Dismisses Plaintiff's Experience**

246.

Sometime after the incident, Plaintiff received a call from the son of Defendant The Finger Companies' CEO and founder, Marvy A. Finger. The son

held a very senior position at corporate. Plaintiff had met him once or twice at company holiday parties or events.

247.

Upon information and belief, he had been made aware of the incident between Plaintiff and Maintenance Supervisor Eastern on May 17, 2021 and was calling with the sole intent of smoothing things over.

248.

Referencing the derogatory phrase "you need to get your panties out of a bunch," he told Plaintiff that he "didn't think [Maintenance Supervisor Eastern] meant it that way," meaning, upon information and belief, that he wanted Plaintiff to give Maintenance Supervisor Eastern the benefit of the doubt and let the incident go.

249.

Plaintiff, tired of talking about it and needing to focus on an upcoming surgery and his immediate health, did not press the matter. It was clear that regardless of how many incidents he reported, Maintenance Supervisor Eastern was going to be protected by Property Manager O'Hern and Defendant The Finger Companies instead of him due to the rampant sexual orientation discrimination and disability discrimination that was constantly working against Plaintiff.

## **Plaintiff Has a Second Surgery and Develops a Complication**

250.

Within days of the rattling and stressful incident involving Maintenance Supervisor Eastern, Plaintiff had a second surgery to remove the stent that was placed during his first surgery.

251.

Plaintiff knew that any surgery should be preceded with and followed by rest and calm. He resented that the outrageous abuse he endured at work could compromise his physical health as he struggled to recover.

252.

Unfortunately, Plaintiff developed a complication while recovering from the surgery. He was rushed to the hospital where he was urgently treated with antibiotics to control a raging infection.

253.

Plaintiff texted Property Manager O'Hern and made sure she was constantly aware of updates that would determine when he was stable and would be returning to work. Plaintiff was acutely aware of how easily and eagerly Defendant The Finger Companies might try to accuse him of "job abandonment." Fearing this, he even had his family members contact Property Manager O'Hern to update her on his progress.

254.

Plaintiff was given an anticipated return-to-work day on May 24, 2021 and relayed this to Property Manager O'Hern.

**Defendant The Finger Companies Seeks to Maliciously Fire Plaintiff in a Discriminatory and Retaliatory Move**

255.

On Sunday, May 23, 2021, the day before his return to work post-surgery, Plaintiff checked emails and discovered a message in his inbox from Indeed.com. It described a recent and active job opening and encouraged him to follow up on it.

256.

When Plaintiff clicked on the link, he was stunned to see that the job was located at Phipps Place and that the ad below the listing was from Defendant The Finger Companies.

257.

Plaintiff researched and concluded that it was his Leasing Manager position at Defendant The Finger Companies' Phipps Place property that was listed on the site.

258.

Plaintiff was shaken to his core knowing that Defendant The Finger Companies planned to fire him while he recovered from surgery and was already actively seeking his replacement.

## Plaintiff Confronts Property Manager O'Hern and Area Supervisor Ellis

259.

The next day, May 24, 2021, Plaintiff returned to the office to a cold, toxic environment. No one spoke to him. No one asked him how he was feeling after his surgery.

260.

Finally, within an hour of his arrival, Property Manager O'Hern spoke to Plaintiff and he asked her if they could talk about the job he saw listed on Indeed.com.

261.

Property Manager O'Hern confirmed that his position was listed and agreed that they should talk with Area Supervisor Ellis to discuss that development.

262.

When Area Supervisor Ellis connected via phone, she told Plaintiff that they posted his job due to his "absentees."

263.

Plaintiff told Area Manager Ellis that he had provided proof of every doctor appointment, emergency hospital stay, and surgery, each of which were necessary from pre-diagnosis to post-surgery recovery.

264.

To his surprise, Area Supervisor Ellis then mentioned Plaintiff's Disney World birthday vacation that Spring 2021, accusing him of lying about his illness and suggesting that he wouldn't have been able to go on vacation if he had really been sick.

265.

Again, Plaintiff said that he had explained to Property Manager O'Hern at the time that his doctor encouraged and even recommended that he go on his trip as planned, as movement and activity are often helpful in passing kidney stones.

266.

Plaintiff was totally thrown and confused by the accusatory nature of the call with Area Supervisor Ellis and Property Manager O'Hern, especially since he was allowed sick days and his vacation time had been approved by Defendant The Finger Companies.

267.

When Plaintiff reiterated all of this, Area Supervisor Ellis seemed to back away from her earlier confirmation that they listed his job due to his absentees.

268.

Suddenly, Area Supervisor Ellis changed the story and said that it wasn't his position that they were looking to interview for, but rather that they "created another leasing position" along with his.

269.

Plaintiff was very familiar with the office and knew there logistically was not room to employ another full-time staff and concluded that he was being lied to.

### Plaintiff is Constructively Terminated from Defendant The Finger Companies

270.

It was clear that Area Supervisor Ellis was lying to buy time to figure out how to fire Plaintiff without making Defendant The Finger Companies look bad.

271.

While Property Manager O'Hern stayed mostly quiet, Area Supervisor Ellis suggested that they move on and just get to work and focus on getting leases.

272.

Plaintiff knew that he was not safe or job-secure at Defendant The Finger Companies and that they were blatantly retaliating against his January 2021 criticisms and attempts to formally complain about the lack of employee protection during the pandemic. He also knew that the sexual orientation discrimination and

reputation smear were at play and that they were using his temporary disability as a logistical reason to get rid of him.

273.

When Area Supervisor Ellis ended the call on her end, Plaintiff informed Property Manager O'Hern that he would be handing over his keys effective immediately.

274.

After over three years of dedicated and exemplary performance, Plaintiff was never protected from the unbelievable discrimination that was fostered and condoned by Defendant The Finger Companies. From Property Manager O'Hern and Maintenance Supervisor Eastern, to Area Supervisor Ellis, to the human resources department and a member of the CEO and founder's family; at every level, Plaintiff was dismissed and forced to tolerate the harassment and unlawful abuses he faced daily in the workplace and he had no choice but to leave.

**Plaintiff Suffers Anxiety; Employs an Emotional Support Dog**

275.

Consequent of the deeply established culture of homophobia, racism, intimidation, harassment, threats and abuse inflicted upon him for years at Defendant The Finger Companies, Plaintiff left feeling, among many things, emotionally and mentally shaken.

276.

Plaintiff sought professional help to learn how to cope with the severe anxiety and trauma from his experience.

277.

Plaintiff secured an ESA document, establishing that he suffered a post-traumatic stress disability that warranted a need for an assistance animal.

## **COUNT I**
*(Gender, Sex, and Sexual Orientation Discrimination in Violation of Title VII)*

278.

Plaintiff incorporates herein by reference paragraphs 1 through 277 of this Complaint.

279.

Defendant has discriminated against Plaintiff in violation of Title VII by subjecting him to different treatment and a hostile work environment on the basis of his gender, sex, and sexual orientation. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant's wrongful conduct.

280.

Defendant has discriminated against Plaintiff by treating him differently from, and less preferably than, similarly-situated non

gay/lesbian/bisexual/transgender individuals on the basis of his gender, sex, and sexual orientation in violation of the law.

281.

The hostile work environment that Plaintiff suffered was severe, pervasive, and unwelcome by Plaintiff, would be offensive to a reasonable person, and severely affected the terms and conditions of his employment.

282.

Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

283.

By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

## **COUNT II**
*Race Discrimiation in Violation of Title VII*

284.

Plaintiff incorporates herein by reference paragraphs 1 through 283 of this Complaint.

285.

Defendant has discriminated against Plaintiff in violation of Title VII by subjecting him to different treatment and a hostile work environment on the basis

of his race. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant's wrongful conduct.

286.

Defendant has discriminated against Plaintiff by treating him differently from and less preferably than similarly-situated Caucasianand non-Black colleauges.

287.

The hostile work environment that Plaintiff suffered was severe, pervasive, and unwelcome by Plaintiff, would be offensive to a reasonable person, and severely affected the terms and conditions of his employment.

288.

Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

289.

By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

## **COUNT III**
*(Retaliation in Violation of Title VII)*

290.

Plaintiff incorporates herein by reference paragraphs 1 through 289 of this Complaint.

291.

Plaintiff reported to Defendant about Defendant's discriminatory treatment of him.In retaliation, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to, the constructive termination of Plaintiff's employment.

292.

Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

293.

As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

294.

By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

## **COUNT IV**
*(Race Discrimination, Violation of 42 U.S.C. § 1981)*

295.

Plaintiff incorporates herein by reference paragraphs 1 through 294 of this Complaint.

296.

Defendant has discriminated against Plaintiff in violation of Section 1981, by subjecting him to different treatment and a hostile work environment on the basis of his race. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant's wrongful conduct.

297.

Defendant has discriminated against Plaintiff by treating him differently from and less preferably than similarly-situated Caucasions and non-Black employees and by subjecting him to disparate terms and conditions of employment on the basis of his race in violation of 42 U.S.C. §1981.

298.

Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

299.

By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Section 1981. Plaintiff shall seek attorney's fees and punitive damages.

<u>**COUNT V**</u>

*(ADA – Disability Discrimination, Perceived Disability Discrimination, Interference, and Retaliation)*

300.

Plaintiff incorporates herein by reference paragraphs 1 through 299 of this Complaint.

301.

Plaintiff has had at all relevant times a disability or disabilities within the meaning of the ADA.  Plaintiff was able to perform the essential functions of his job and therefore was at all relevant times a qualified individual with a disability within the meaning of the ADA.

302.

By the acts described above, Defendant discriminated against Plaintiff in the terms and conditions of his employment on the basis of his disability known to Defendant and perceived disabilities, in violation of the ADA.

303.

When Plaintiff opposed these practices, Defendant retaliated against him.

304.

Plaintiff attempted to exercise and enjoy his rights under the ADA, and Defendant's actions prevented and interfered with his ability to do so.

305.

Defendant acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights, entitling Plaintiff to punitive damages.

306.

As a result of Defendant's acts of discrimination, interference, and retaliation, Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury to his professional and personal reputation, monetary damage, mental anguish, pain and suffering, extreme humiliation, and other compensable damages unless and until this Court grants the declaratory and prospective injunctive relief requested herein.

## **COUNT VI**
*(Punitive Damages and Expenses of Litigation)*

307.

Plaintiff incorporates herein by reference paragraphs 1 through 306 of this Complaint.

308.

The actions of Defendant complained of herein evidence such willful misconduct, wantonness, malice, oppression, and an entire want of care which would raise a presumption of conscious indifference to the consequences thereof. Such conduct was committed reckless indifference to Plaintiff's federally protected

rights so as to make appropriate the imposition of punitive damages on the Defendant.

309.

An award of reasonable attorneys' fees and costs expended by Plaintiff in the prosecution of this civil action is also appropriate in this civil action in accordance with Title VII and other applicable law.

## DEMAND FOR JURY TRIAL

310.

Plaintiff hereby demands a jury trial of each count of the complaint.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

A.     On Count I, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

B.     On Count II, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

C.      On Count III, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

D.      On Count IV, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

E.      On Plaintiff's Count V, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

F.      On Plaintiff's Count VI, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

G.      Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Respectfully submitted this 11th day of September, 2023.

**L F Barnes Law LLC**

/s/ L'Erin Wiggins
L'Erin Wiggins, Esq.
Georgia Bar No. 141797
P.O. Box 250464
Atlanta, Georgia 30325
Tel: (404) 680-6498

Fax: (404) 393-5763
Email: lerin@lfbarneslaw.com

**GODDARD LAW PLLC**

/s/ Megan S. Goddard
Megan S. Goddard, Esq.
[*Pro Hac Vice*]
Rachel R. Feingold, Esq.
*[Pro Hac Vice]*
39 Broadway, Suite 1540
New York, NY 10006
Telephone: (646) 504-8363
Facsimile: (212) 208-2914
Email: Megan@goddardlawnyc.com

*Attorneys for Plaintiff*
**Joseph Flownory**