# Exhibit A



**SOCIAL SECURITY ADMINISTRATION**

Office of Hearings Operations
Suite 500, Marquis 1
245 Peachtree Ctr. Ave
Atlanta, GA 30303-9913

Date: December 20, 2022

Tashod O D Murray
86 Church St
Mcdonough, GA 30253

## Notice of Decision – Unfavorable

I carefully reviewed the facts of your case and made the enclosed decision. Please read this notice and my decision.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you or your representative must ask in writing that the Appeals Council review my decision. The preferred method for filing your appeal is by using our secure online process available at https://www.ssa.gov/benefits/disability/appeal.html.

You may also use our Request for Review form (HA-520) or write a letter. The form is available at https://www.ssa.gov/forms/ha-520.html. Please write the Social Security number associated with this case on any appeal you file. You may call (800) 772-1213 with questions.

Please send your request to:

**Appeals Council**
**5107 Leesburg Pike**
**Falls Church, VA 22041-3255**

**Time Limit To File An Appeal**

You must file your written appeal **within 60 days** of the date you get this notice. The Appeals Council assumes you got this notice 5 days after the date of the notice unless you show you did not get it within the 5-day period.

Form HA-L76-OP2 (03-2010)

**Suspect Social Security Fraud?**
**Please visit http://oig.ssa.gov/r or call the Inspector General's Fraud Hotline**
**at 1-800-269-0271 (TTY 1-866-501-2101).**

See Next Page

Tashod O D Murray (BNC#: 21Q9913K02350)                     Page 2 of 3

The Appeals Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**What Else You May Send Us**

You or your representative may send us a written statement about your case.  You may also send us new evidence.  You should send your written statement and any new evidence **with your appeal**.  Sending your written statement and any new evidence with your appeal may help us review your case sooner.

**How An Appeal Works**

The Appeals Council will consider your entire case.  It will consider all of my decision, even the parts with which you agree.  Review can make any part of my decision more or less favorable or unfavorable to you.  The rules the Appeals Council uses are in the Code of Federal Regulations, Title 20, Chapter III, Part 416 (Subpart N).

The Appeals Council may:

- Deny your appeal,
- Return your case to me or another administrative law judge for a new decision,
- Issue its own decision, or
- Dismiss your case.

The Appeals Council will send you a notice telling you what it decides to do.  If the Appeals Council denies your appeal, my decision will become the final decision.

**The Appeals Council May Review My Decision On Its Own**

The Appeals Council may review my decision even if you do not appeal.  If the Appeals Council reviews your case on its own, it will send you a notice within 60 days of the date of this notice.

**When There Is No Appeals Council Review**

If you do not appeal and the Appeals Council does not review my decision on its own, my decision will become final.  A final decision can be changed only under special circumstances.  You will not have the right to Federal court review.

**New Application**

You have the right to file a new application at any time, but filing a new application is not the same as appealing this decision.  If you disagree with my decision and you file a new application instead of appealing, you might lose some benefits or not qualify for benefits at all.  If you disagree with my decision, you should file an appeal within 60 days.

Form HA-L76-OP2 (03-2010)

See Next Page

Tashod O D Murray (BNC#: 21Q9913K02350)                    Page 3 of 3

**If You Have Any Questions**

1. Visit www.ssa.gov for fast, simple, and secure online service.
2. Call us at **1-800-772-1213**, weekdays from 8:00 am to 7:00 pm. If you are deaf or hard of hearing, call TTY **1-800-325-0778**. Please mention this notice and decision when you call.
3. You may also call your local office at (866) 331-2215.

SOCIAL SECURITY
6665 PARK PLACE
MORROW, GA 30260-2349

**How are we doing?** Go to www.ssa.gov/feedback to tell us.

Hon. Charles Murray
Administrative Law Judge

Enclosures:
Decision Rationale

cc:     Kathleen Marie Flynn
        KATHLEEN M FLYNN LLC
        315 W PONCE DE LEON AV
        SUITE 940
        DECATUR, GA 30030

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings Operations**

**DECISION**

| | |
|---|---|
| **IN THE CASE OF** | **CLAIM FOR** |
| Tashod O D Murray | Supplemental Security Income |
| (Claimant) | |
| | 21Q9913K02350 |
| (Wage Earner) | (Beneficiary Notice Control Number) |
| | *Social Security Number removed for your protection* |

## JURISDICTION AND PROCEDURAL HISTORY

On March 6, 2020, the claimant filed an application for supplemental security income, alleging disability beginning January 15, 2017. The claim was denied initially on April 12, 2021, and upon reconsideration on September 2, 2021. Thereafter, the claimant filed a written request for hearing received on October 5, 2021 (20 CFR 416.1429 *et seq.*). On July 19, 2022, the undersigned held a telephone hearing due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic. All participants attended the hearing by telephone. The claimant agreed to appear by telephone before the hearing, and confirmed such agreement at the start of the hearing (Exhibit 15E; Testimony). The claimant is represented by Ms. Kathleen Flynn, an attorney. William Starke, an impartial vocational expert, also appeared and testified at the hearing.

The claimant submitted or informed the Administrative Law Judge about all written evidence at least five business days before the date of the claimant's scheduled hearing (20 CFR 416.1435(a)).

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912.

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since March 6, 2020, the date the application was filed.

See Next Page

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)).  Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful.  "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)).  "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)).  Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975).  If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)).  An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.922, Social Security Rulings (SSRs) 85-28 and 16-3p).  If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)).  An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965).  If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, he is not disabled.  If the claimant is not able to do other work and meets the duration requirement, he is disabled.  Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.  In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912 and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.    The claimant has not engaged in substantial gainful activity since March 6, 2020, the application date (20 CFR 416.971 *et seq*.).**

**2.    The claimant has the following severe impairments: bipolar disorder; schizophrenia; depression; anxiety; polysubstance addition (20 CFR 416.920(c)).**

The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.

In addition, the undersigned notes that the claimant has the following "non-severe" medically determinable impairments: hypertension with heart complications; gout; stroke with seizure; obesity.  A "non-severe" impairment produces a slight abnormality or a combination of slight abnormalities that has had no more than a minimal effect on the ability to perform basic work activities.  For instance, here, the record shows the claimant has a history of hypertension with some heart complications, at times.  However, records do not show that the claimant has developed any significant complications or functional restrictions related to this condition.  The medical evidence suggests no more than slight abnormalities related to hypertension, such as issues with vertigo, headaches, tinnitus, vision loss, coronary artery disease, heart failure, peripheral vascular disease, or chronic kidney disease.  Moreover, the medical evidence suggests no more than slight abnormalities related to heart complications, such as with unstable angina,

myocardial infarction, shortness of breath, blocked coronary artery, arrhythmia, or heart failure. Additionally, while the claimant sometimes had elevated blood pressure, the objective medical evidence generally shows mild findings.  For example, on May 25, 2020, a CT of the chest was negative for acute process. The claimant's EKG also showed normal axis, intervals, and no ST segment changes.  On his physical examination, the claimant had a blood pressure level of 119/69.  His cardiovascular exam also showed a normal rate, regular rhythm, and normal heart sounds with no signs of friction rub or murmur heard (Ex. 8F, p.84-85, 92-93; 9F, p. 5; 11F, p. 6, 17).  Likewise, most examinations show the claimant exhibited adequate blood pressure and cardiovascular function (Ex.; 9F, p. 4; 14F, p. 55, 99, 111; 15F, p. 19; 16F, p. 12, 24; 19F, p. 21-22).  Therefore, the undersigned finds the claimant's hypertension and heart complications are non-severe.

The undersigned finds that the claimant's medically determinable impairment of gout is nonsevere because it does not significantly limit the ability to perform basic work activities for 12 consecutive months (SSR 85-28).  The medical evidence suggests no more than slight abnormalities related to gout, such as issues with severe acute inflammatory arthritis, swelling of the big toe, significant joint pain, increased uric acid levels, nephropathy, or bone erosion. Furthermore, the medical evidence generally shows the claimant has sought only sporadic care for acute gout flare ups.  For example, on April 7, 2020, the claimant complained of gout in the right knee.  However, the claimant stated he has gout once a year and did not take medication for it.  The claimant's right knee was a bit warm on the exam, but there was no cellulitis and perhaps slight effusion.  He improved with prednisone and then discharged (Ex. 14F, p. 70-72). Similarly, on October 7, 2020, the claimant was seen for a gout exacerbation.  His musculoskeletal exam showed no deformity and only mild swelling noted to the left great toe with redness and warmth.  The claimant reported he has noted previous gout flares in this area. The claimant was discharged to home with PO Medrol dose pack, refill of colchyrs and instructions to follow-up with his PCP (Ex. 14F, p. 118-121).  On March 21, 2021, the claimant presented with acute gout arthritis.  There only was tenderness at the left 1st MTP joint with edema and erythema, along with decreased range of motion in the great toe due 2/2 pain.  He was discharged with a prescription of indomethacin and given Percocet for acute pain (Ex. 14F, p. 140-141).  Since March 2021, the record does not appear to show the claimant sought treatment again for his gout.  Therefore, the undersigned finds the claimant's gout is non-severe.

The claimant alleged having seizures due to a stroke on April 6, 2021 (Ex. 7E; *See also* Ex. 8E). On April 6, 2021, the claimant was brought to Gateway Medical center by EMS from the jail with chief complaint of suspected stroke.  The claimant stated he was having a headache and had a complete syncopal episode.  The claimant stated he has never had headaches before in the past. He also denied having any medical conditions and reported he does not take any medications. He had been in the jail for 5 days so far.  He was started on stroke protocol workup. On his neurological exam, the claimant was alert and well oriented.  The claimant was observed to have normal speech.  He also was cooperative on his psychiatric exam, along with exhibiting an appropriate mood and affect with normal judgment.  A CT of the head was normal and showed no acute intracranial process. The brain was normal with no signs of hemorrhage.  White matter was unremarkable and no signs of mass effect. There was no ventriculomegaly of the cerebral ventricles and the soft tissues were unremarkable.  A tele-neurology consultation with Dr. Chitturi was done.  However, it was a limited neurological exam due to telemedicine.  On his

mental status exam, the claimant was alert and well oriented, he had intact language and speech, as well as fair attention and concentration.  The claimant's cranial nerve visual fields were full, his pupils round and reactive to light, and his extra ocular muscles were intact.  Trigeminal showed V1, V2, and V3 intact.  On examination of his facial nerves, left UMN facial weakness was noted.  His motor exam showed normal tone and bulk and he had reduced strength in his left extremities.  The impression by Dr. Chitturi at the time was a stroke.  Dr. Chitturi, then spoke with the treating physician who specifically noted "Dr. Chitturi thinks patient may have been malingering secondary to his social status." Nonetheless, he recommended treating this a s a stroke and going forward with TPA.  The claimant agreed to TPA after discussing risks and benefits of it.  The police officers then released the claimant on warrant.  However, as soon as he was released, the clamant "stood up, was moving all 4 extremities and "wants to leave immediately."  The claimant was then refusing TPA at that time.  Further, the claimant was reported to no longer have any focal neurological symptoms and specifically noted to have "recovered spontaneously as soon as judge released [the claimant] from jail."  The claimant discharged home with instruction to follow-up with PCP for reevaluation (Ex. 16F).  On April 14, 2021, the claimant was seen at Skyline Medical Center reporting approximately 8 days of daily headache.  The claimant also reported having bizarre behavior and possible auditory hallucinations.  Following workup, the claimant was found to have no discernible neurologic deficit.  CT imaging of the brain was benign (Ex. 17F, p. 25-30).  Subsequently, the medical evidence does not appear the claimant sought further treatment related to his stroke with seizure event.  Therefore, the undersigned finds the claimant's stroke with seizure is also non-severe.

Additionally, with respect to precipitating and aggravating factors, the claimant has the non-severe medical condition of obesity.  He is approximately 172.7 centimeters tall and weighs 113.4 kilograms (Ex. 11F, p. 23).  As noted in SSR 19-2p, obesity can affect physical and mental health and can cause additional limitations related to sitting, standing, walking, lifting, carrying, pushing, and pulling.  It may also affect a person's ability to sustain mental and physical function over time due to fatigue caused by obesity.  Consequently, the claimant may be more limited mentally and physically than indicated by the objective evidence due to these precipitating and aggravating factors.  However, any limitations are only minimal in nature and, therefore, are also non-severe.

**3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**

No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment.  Moreover, the record does not document medical findings equivalent in severity and duration to any of the listed findings, and the claimant's impairments therefore do not medically equal a listing under this section.  The undersigned has reviewed the records and finds that the claimant does not have a physical or mental impairment, which meets or equals the requirements of any section of 20 CFR, Part 404, Subpart P, Appendix 1, including, but not limited to, listings 12.04, 12.06, and 12.08.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.08.  In making this finding,

the undersigned has considered whether the "paragraph B" criteria are satisfied.  To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning.  An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis.  A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has a **mild** limitation.  There is insufficient evidence to establish that the claimant's ability to learn, recall, or use information to perform work activities independently, appropriately, effectively, and on a sustained basis was fairly limited (*See* 20 CFR 404, Subpart P, Appendix 1, Listing of Impairments 12.00(F)(2)).  At the psychological consultative examination, he appeared to have only a below average intelligence and he was able to demonstrate adequate verbal skills. The claimant was able to recall several activities of the previous day in detail.  He was able to recall a remote information, some in detail.  His description of some remote history, such as legal and employment histories, tended to be vague.  However, this was likely noted at least partially because the information did not pain him in a flattering light (Ex. 13F).  Additionally, most examinations show the claimant demonstrated adequate cognition.  On February 28, 2020, the claimant's recent and remote memory were unimpaired.  His IQ estimate was also average (Ex. 7F, p. 5).  On July 1, 2021, the claimant was alert and oriented to person, place, and time.  The claimant's manner was cooperative during his psychiatric exam.  He also exhibited a good mood and the claimant's speech was clear with a normal rate and tone.  The claimant also had logical and organized thought processes, along with content reality based and goal oriented (Ex. 18F, p. 31). On February 9, 2022, the claimant's short term and long term memory were both intact (Ex. 22F, p. 18-28).  The claimant's short term and long term memory were also intact during his examination on July 14, 2022 (Ex. 23F, p. 23).  Based on these findings, the undersigned finds the claimant has no more than a **mild** limitation in this area.

In interacting with others, the claimant has a **moderate** limitation.  There is insufficient evidence to establish that the claimant's ability to relate to and work with supervisors, co-workers, or the public independently, appropriately, effectively, and on a sustained basis was seriously limited (*See* 20 CFR 404, Subpart P, Appendix 1, Listing of Impairments 12.00(F)(2)).  At the psychological consultative examination, the claimant's mood was only "mildly" dysthymic and he had an appropriate affect.  The claimant was also friendly and polite during the exam, and rapport was adequately established (Ex. 13F).  Additionally, most examinations show the claimant displayed appropriate behavior.  On February 28, 2020, while the claimant's mood was anxious with reported feeling of worthlessness, he exhibited a euthymic and appropriate affect (Ex. 7F, p. 5).  On May 25, 2020, the claimant's behavior was normal on his psychiatric exam.  He displayed a normal mood and affect (Ex. 8F. 85).  On April 6, 2021, the claimant was cooperative on his psychiatric exam.  The claimant exhibited an appropriate mood and affect, along with normal judgment (Ex. 16F, p. 12, 25). On July 1, 2021, the claimant exhibited a good mood and the claimant's speech was clear with a normal rate and tone (Ex. 18F, p. 31).   On July 29, 2021, the claimant's manner was cooperative on his psychiatric exam and he exhibited a good mood (Ex. 18F, p. 41).  On February 9, 2022, the claimant mood was expansive and his speech hyperverbal, though he was alert and oriented to person, place, situation, and time.  The claimant was also cooperative and he had normal psychomotor activity (Ex. 22F, p. 18-28).  On

May 10, 2022, the claimant's attitude was cooperative and he displayed an appropriate mood and affect (Ex. 23F, p. 10-22).  On July 14, 2022, the claimant had an appropriate mood and affect on his psychiatric exam (Ex. 23F, p. 23).  Therefore, based on these findings, the undersigned finds the claimant has a **moderate** limitation in this area.

With regard to concentrating, persisting or maintaining pace, the claimant has a **moderate** limitation.  There is insufficient evidence to establish that the claimant's ability focus attention on work activities or stay on task at a sustained rate independently, appropriately, effectively, and on a sustained basis was seriously limited (*See* 20 CFR 404, Subpart P, Appendix 1, Listing of Impairments 12.00(F)(2)).  At the psychological consultative examination, he appeared to have only a below average intelligence and he was able to demonstrate adequate verbal skills.  The claimant made good eye contact during his exam.  Although he reported having auditory and visual hallucinations on a daily basis, he was well oriented and he was able to understand and respond to questions.  Furthermore, repetition was not necessary.  He did tend to ramble at times, he required only mild redirection.  While he complained of forgetfulness and distractibility, he was able to recall several activities of the previous day in detail, as well as able to recall a remote information, some in detail (Ex. 13F).  Additionally, most examinations show the claimant displayed appropriate behavior and demonstrated adequate cognition.  On February 28, 2020, the claimant's speech was talkative and appropriate.  He also was alert and oriented to person, place, time, and situation.  While he reported auditory hallucinations, they were non-command and he had coherent thought process on his exam, along with thought content that was reality based (Ex. 7F, p. 5). On April 6, 2021, the claimant was cooperative on his psychiatric exam.  The claimant exhibited an appropriate mood and affect, along with normal judgment (Ex. 16F, p. 12, 25).  On July 1, 2021, the claimant was alert and oriented to person, place, and time.  The claimant's manner was cooperative during his psychiatric exam (Ex. 18F, p. 31).  On February 9, 2022, the claimant was alert and oriented to person, place, situation, and time.  The claimant was also cooperative and he had normal psychomotor activity.  Additionally, the claimant had focused attention and concentration (Ex. 22F, p. 18-28).  On May 10, 2022, the claimant's attitude was cooperative and he displayed an appropriate mood and affect.  Moreover, the claimant had focused attention and concentration (Ex. 23F, p. 11).  The claimant also had focused attention and concentration on July 14, 2022 (Ex. 23F, p. 23).  Therefore, based on these findings, the undersigned finds the claimant has a **moderate** limitation in this area.

As for adapting or managing oneself, the claimant has experienced a **moderate** limitation.  There is insufficient evidence to establish that the claimant's ability to regulate emotions, control behavior, or maintain well-being in a work setting independently, appropriately, effectively, and on a sustained basis was seriously limited (*See* 20 CFR 404, Subpart P, Appendix 1, Listing of Impairments 12.00(F)(2)).  At the psychological consultative examination, although he reported having auditory and visual hallucinations on a daily basis, he was well oriented and he was able to understand and respond to questions.  Repetition was not necessary.  He did tend to ramble at times, but required only mild redirection.  Rapport was adequately established with the claimant.  His mood was only "mildly" dysthymic, his affect was appropriate, and he was friend and polite during the exam was friendly and polite during the exam.  He was not circumstantial or tangential.  There was no looseness of associations.  Based upon his history, Dr. Clancy noted his insight and judgment were limited at times and he had been prone to impulsive behavior.  His coping skills were limited, though his overall his self-esteem was fair (Ex. 13F).  Additionally,

most examinations show the claimant displayed appropriate behavior and demonstrated adequate cognition.  On February 28, 2020, although the claimant reported auditory hallucinations, they were non-command.  Additionally, his thought process was coherent and his thought content was reality based (Ex. 7F, p. 5).  On May 25, 2020, the claimant's behavior was normal on his psychiatric exam.  His judgment and thought content were also normal (Ex. 8F. 85).  On April 6, 2021, the claimant was cooperative on his psychiatric exam.  The claimant exhibited an appropriate mood and affect, along with normal judgment (Ex. 16F, p. 12, 25).  On July 29, 2021, the claimant's was cooperative during his examination.  He also had logical and organized thought process, along with content reality based and goal oriented on his psychiatric exam (Ex. 18F, p. 41).  On July 1, 2021, the claimant was alert and oriented to person, place, and time.  The claimant also had logical and organized thought processes, along with content reality based and goal oriented (Ex. 18F, p. 31).  On February 9, 2022, the claimant's mood was expansive and his speech hyperverbal, though he was alert and oriented to person, place, situation, and time.  The claimant was also cooperative and he had normal psychomotor activity.  Moreover, his thought process was linear and goal directed.  There were no hallucinations or delusions noted.  The claimant had focused attention and concentration.  Further, his insight was good and he had adequate judgement (Ex. 22F, p. 18-28).  On May 10, 2022, there were no reported hallucinations, suicidal or homicidal ideations, or delusions on his psychiatric special exam.  The claimant's attitude was cooperative and he displayed an appropriate mood and affect.  The claimant also had adequate judgment and good insight (Ex. 23F, p. 11).  On July 14, 2022, the claimant exhibited a cooperative attitude on his psychiatric exam, along with an appropriate mood and affect.  There were no hallucinations or delusions noted, his thought process was linear and goal directed, his insight was good, and he had adequate judgment (Ex. 23F, p. 23).  Furthermore, despite his allegations, the claimant admitted he is capable of most basic self-care needs.  In his function report completed by his girlfriend, the claimant reported no problems as personal care, such as with dressing, bathing, shaving, and feeding himself, as well as caring for his hair and using the toilet.  The claim can prepare his own meals including sandwiches, full meals, and frozen foods.  The claimant can perform household chores such as laundry, sweeping the floor, and cleaning the yard.  He shops in stores for food and sometimes personal items. The claimant goes outside every day and when he travels he will walk, use public transportation, and drive or ride in a car.  The claimant is able to pay bills and count change.  He spends time with his girlfriend such as going out weekly to eat or go to the movies (Ex. 4E).  These activities show good functioning capability inconsistent with allegations of ongoing and total disability.  Based on these findings, the undersigned finds the claimant has a **moderate** limitation in this area.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.  There is neither any evidence in the record indicating that the claimant requires ongoing medical treatment, therapy, psychosocial support, or a highly structured setting, nor any evidence to suggest a marginal adjustment whereby the claimant cannot adapt to changes that are not part of the claimant's environment or daily life.

See Next Page

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple tasks; occasional interaction with the public, coworkers; frequent interaction with direct line supervisors one on one.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

The claimant alleged disability due to PTSD and schizoaffective disorder (Ex. 2E). At the consultative examination, the claimant indicated having unpredictable moods, being anxious with racing thoughts, along with trouble with concentration and memory (Ex. 13F). Similar testimony was provided at the hearing. At the hearing, the claimant testified that the has to stay to himself and away from others, spending time in parks and abandoned houses. Some situations cause him anxiety, such as when people lie to him or things are not how people present them. He has had multiple arguments with people including hitting a few family members, along with arguments with staff or inmates when he was incarcerated. The claimant was suicidal while he was in jail. On a daily basis, he will hear things and see other people that are not there (Testimony). The claimant's uncle, Mr. Shelton Murray, testified that the claimant has a short fuse and any little thing will set him off. He also indicated the claimant seemed have concentration on conversations.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.  For instance, despite these allegations, the claimant admitted he is capable of most basic self-care needs.  In his function report completed by his girlfriend, the claimant reported no problems as personal care, such as with dressing, bathing, shaving, and feeding himself, as well as caring for his hair and using the toilet.  The claim can prepare his own meals including sandwiches, full meals, and frozen foods.  The claimant can perform household chores such as laundry, sweeping the floor, and cleaning the yard.  He shops in stores for food and sometimes personal items. The claimant goes outside every day and when he travels he will walk, use public transportation, and drive or ride in a car.  The claimant is able to pay bills and count change.  He spends time with his girlfriend such as going out weekly to eat or go to the movies (Ex. 4E).  These activities show good functioning capability inconsistent with allegations of ongoing and total disability.

The longitudinal medical evidence of record does not fully support the claimant's allegations of disability.  For instance, the medical evidence generally shows mild findings on psychiatric exams prior to 2021  Further, the medical evidence generally shows the claimant sought only conservative care and intermittent treatment for his condition from 2019 through 2020.  While the medical record shows areas of limited psychological functioning, the record supports only the limitations set forth in the residual functional capacity.

Records from McIntosh Trail on December 13, 2019, note the claimant reported he had been out of jail since October 28th of the current year and he was out of his medication for six weeks that were prescribed by the jail.  Interestingly, the claimant indicated that "[b]etween his legal record and use [of] THC he has trouble getting a job."  The clamant was given a olanzapine sample until he was seen the following week.  On December 20, 2019, the claimant reported he was compliant with taking his sample of olanzapine, but he stated that he does not notice anything different though his mood and affect appeared improved (Ex. 12F, p. 18). The claimant reported his symptoms continue.  While he reported hearing voices, he reported they say positive things.  He also denied having visual hallucinations, as well as denied having any harmful ideations.  On his psychiatric exam, the claimant's mood was euthymic with a broad affect. The claimant was oriented to four spheres.  His speech was spontaneous, coherent, and fluent with normal rate and tone.  The claimant also had good eye contact.  His thought process was logical and organized, as well as showing content reality based and goal oriented.  While he endorsed auditory hallucinations, he denied commands.  There also was no psychomotor agitation or retardation reported or observed. Increase olanzapine and begin divalproex acid and trazodone (Ex. 12F).  However, at his follow-up on March 18, 2020, the claimant stated he never filled his prescriptions sent in December.  The claimant stated he started smoking 1 week ago and stated "it helps but it doesn't help."  The claimant continued to report auditory hallucinations, but "nothing threatening, nothing violent." (Ex. 23F, p. 18).  At his follow-up on May 14, 2020, the claimant reported feeling out of it a couple weeks after taking Vraylar.  However, his overall mood was stable.  The claimant also stated that he had been working with his girlfriend.

Additionally, the claimant denied having any auditory or visual hallucinations (Ex. 18F, p. 16-17; *See* Ex. 18F).

Subsequent records generally show the claimant sought only sporadic care, if any, through early 2021.  For example, following his May 2020 visit where his overall mood was stable and he reported he had been working with his girlfriend, the next record from McIntosh Trail is from December 1, 2020.  However, this record appears to be an information record of problems, goals, objectives, interventions, and services with some start dates listed as December 1, 2020, such as one problem for the claimant being "interested in securing his own housing an assistance with social security benefits." (Ex. 12F, p. 5).

The consultative examination suggests even greater functioning.  For instance, at the mental status examination and consultative examination with Dr. Clancy on January 30, 2021, the claimant reported he was currently only prescribed only alprazolam, and has an unfilled prescription for trazadone.  Moreover, the claimant's mental status examination with Dr. Clancy did not reflect findings commensurate with the extent and frequency of symptoms as alleged by the claimant.  For instance, the claimant's mood was only "mildly" dysthymic and his affect appropriate.  Further, he was friendly and polite during the exam, and rapport was adequately established.  He appeared to have only a below average intelligence and he was able to demonstrate adequate verbal skills. The claimant made good eye contact during his exam.  Although he reported having auditory and visual hallucinations on a daily basis, he was well oriented and he was able to understand and respond to questions.  Repetition was not necessary.  He did tend to ramble at times, but required only mild redirection.  While he complained of forgetfulness and distractibility, he was able to recall several activities of the previous day in detail. Additionally, he was able to recall a remote information, some in detail.  His description of some remote history, such as legal and employment histories, tended to be vague.  This was likely noted at least partially because the information did not pain him in a flattering light.  Moreover, the claimant's speech was fluent and goal-directed. The quantity of his speech was within normal limits, as were his rate and volume.  Further, he is not circumstantial or tangential.  There was no looseness of associations.  Based upon his history, Dr. Clancy noted his insight and judgment were limited at times and he had been prone to impulsive behavior.  His coping skills were limited, though his overall his self-esteem was fair (Ex. 13F).

Additionally, treatment records also show some reduced functioning, but document improvement with treatment.  The record does show that on April 14, 2021, the claimant presented to the emergency room at Skyline Medical Center with his girlfriend reporting a headache for the previous eight days.  He was also exhibiting bizarre behavior and possible auditory hallucinations.  The claimant reported he had not taken his prescribed psychotropic medications in quite some time.  The nursing staff also noted that he was responding to internal stimuli.  He had been increasingly agitated and aggressive with staff to where he required chemical sedation and seclusion.  On April 15, 2021, the claimant was verbal that day.  He was talkative with pressured speech and labile affect.  He was crying one minute and laughing the next over the same subject.  He also was reporting vague auditory hallucination.  He also was illogical at times with word expressions.  The claimant's Haldol was increased and his Depakote was continued.  The following day, he was laughing inappropriately.  However, he was cooperative on his mental status exam.  He reported his mood as good and had a bright affect.  During his exam, he was

giddy appearing and his speech was somewhat rapid, but he was less labile than he had been the previous two days. He did report he was still having vague auditory hallucinations, but "they are way much better." The claimant stated that he slept better last night. Subsequently, the claimant was discharged and he did follow-up with McIntosh the following month (Ex. 15F; 17F). On May 26, 2021, the claimant next presented to McIntosh Trail, approximately one year following his last treatment visit. At the time, the claimant presented to re-establish services in order to secure case management services "to help with my case." The claimant reported leaving Tennessee after his mother passed away several months ago and that he ended up getting an assault charge while out of state due to spitting on a girl he went to live with. Notably, the claimant stated that he had not taken any psychiatric medications since they were last prescribed at McIntosh in May of 2020. At the time, the claimant reported his mood lability and vague hallucinations, but he had a logical thought process and was not responding to internal stimuli. He also was very goal-oriented about requiring services so he can have his "brother's check taken care of" adding that "there are some adults in the family claiming to take care of [his] disabled brother but they are not and [the claimant] need[s] help with that." The claimant requested to be started on Latuda (Ex. 18F, p. 15-16). At his follow-up on July 29, 2021, the claimant stated that he has started taking his Latuda and reported benefit from it. The claimant was also started on Propranolol as needed for anxiety and irritability (Ex. 18F, p. 35-43). Subsequently, the claimant was not seen again at McIntosh until February 2022.

On February 2, 2022, the claimant reported having mood swings, anxiety, and depressed mood, along with auditory and visual hallucinations. However, on his brief mental status exam, the claimant was alert and well oriented, his thought process was coherent and his perceptions were also normal. The claimant also displayed a euthymic mood and appropriate affect. His thought content appeared reality based and concrete. His recent and remote memory also were unimpaired. The claimant reported his medication prescribed at Henry County was not effective and he requested a revaluation (Ex. 22F, p. 4-16). On February 9, 2022, the claimant was seen by a psychiatrist. The claimant reported he was incarcerated for 3 months at Henry County Jail and was released in December 2021. The claimant reported walking to his appointment that day and that he was staying with his sister. The claimant reported having difficulty with sleeping and panica attacks, paranoia, and mood lability, though he did not appear to be responding to internal stimuli. On his mental status exam, the claimant mood was expansive and his speech hyperverbal. However, he was alert and oriented to person, place, situation, and time. The claimant was also cooperative and he had normal psychomotor activity. Additionally, his thought process was linear and goal directed. There were no hallucinations or delusions noted. The claimant had focused attention and concentration. Additionally, the claimant's short term and long term memory were both intact. Moreover, his insight was good and he had adequate judgement. The claimant was again restarted on Zyprexa for his mood, sleep, and psychosis, along with propranolol as needed for anxiety (Ex. 22F, p. 18-28). At his follow-up on March 17, 2022, the claimant stated he had been doing well on Zyprexa. The claimant denied mood or psychotic symptoms. The claimant was also sleeping well (Ex. 22F, p. 30). On May 20, 2022, the claimant reported having some mood swings and requested a medication increase. The claimant's Zyprexa was increased that visit. At his follow-up with his psychiatrist on July 14, 2022, the claimant was alert and well oriented. There were no reported hallucinations, suicidal or homicidal ideations, or delusions on his psychiatric special exam. The claimant's attitude was cooperative and he displayed an appropriate mood and affect. The claimant had focused

See Next Page

attention and concentration.  His short term memory and long term memory were both intact.
The claimant also had adequate judgment and good insight.  At the time, the claimant did report
he continued to have difficulty sleeping.  This claimant's psychiatrist noted he would increase
his Zyprexa to 20 mg today to address sleep (Ex. 23F).  The file of record contains no further
treatment records since his July 2022 visit.   Therefore, the claimant's allegations are not
supported by objective findings, and the claimant has fewer restrictions than alleged.

Based on these findings and the totality of the record, while the undersigned acknowledges the
claimant has some limitations, the objective medical findings do not support a disabling
condition.  Significantly, his impairments are generally managed with medication and have not
required hospitalization or ongoing significant treatment, if any, indicative of a disabling
condition.  Further, the medical evidence of record shows the claimant displayed generally
normal findings on examinations without abnormalities in several critical areas of cognitive
functioning and behavior, including, but not limited to, concentration, memory, and social skills.
Therefore, the undersigned finds the claimant is capable of performing a significant range of
work activity with limitations to account for his severe impairments.

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot
defer or give any specific evidentiary weight, including controlling weight, to any prior
administrative medical finding(s) or medical opinion(s), including those from medical sources.
The undersigned has fully considered the medical opinions and prior administrative medical
findings as follows:

In regards to opinion evidence, the opinion of the psychological consultative examiner, Dr.
Clancy, is generally unpersuasive (Ex. 13F).  To begin, Dr. Clancy's opinion is based solely on
her single examination and clinical interview of the claimant, along with review of
accompanying documents.  Dr. Clancy's opinion is generally vague and uses some undefined
terms.  For example, Dr. Clancy states the claimant's ability to comprehend and implement
instructions would be "limited,…".  However, the term *limited* is neither defined, nor does it
readily translate into programmatic terms.  Further, Dr. Clancy's additional note the instructions
would be "limited, particularly related to more complex instructions" is more vague as it fails to
delineate what is the varying description or degree of 'limited.'  Moreover, some portions of her
opinion appear to be based on the claimant's self reported history, rather than supported by her
clinical exam.  For example, preceding her statement regarding the claimant's ability to
comprehend and implement instructions, Dr. Clancy specifically stated "[h]e reported learning
trouble in school and distractibility."  This appears to be based solely on the claimant's self-
reported history; the file also does not contain any school records.  Additionally, Dr. Clancy's
opinion does not appear consistent with her exam findings.  For example, Dr. Clancy stated that
the claimant's ability to "maintain focused attention and complete tasks in a timely manner over
an extended period in a competitive employment setting is likely moderately limited at best,…."
This does not appear consistent with her exam findings where she noted the claimant was able to
recall several activities of the previous day in detail, as well as able to recall remote information,
some in detail.  Further, while the claimant's description of some remote history, such as legal
and employment histories, tended to be vague, Dr. Clancy specifically noted this was likely at
least partially because the information does not paint him in a flattering light.  This suggests her
opinion was based on his voluntary avoidance of his personal history, rather than clinical

cognitive findings observed by Dr. Clancy.  Therefore, the undersigned finds this opinion is generally unpersuasive.

The prior administrative findings by the physicians, psychiatrists, and others employed by the State Disability Determination Services (DDS) were also considered (Ex. 1A; 4A).
The prior administrative findings regarding the claimant's psychological functioning made by Dr. Warren and Dr. Williams are somewhat persuasive.  Dr. Warren and Dr. Williams both found the claimant had a mild limitation in understanding, remembering, or applying information, as well as no more than moderate limitations in interacting with others, adapting or managing oneself, and with concentration, persistence, or maintaining pace.  These findings are persuasive as they are consistent with the objective medical evidence, which fails to demonstrate findings that the claimant was seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.  However, the findings by Dr. Warren and Dr. Williams regarding the claimant's psychological residual functional capacity are generally persuasive. While Dr. Warren and Dr. Williams findings are generally supported by the evidence, they are both non-examining and, thus, based their findings only on review of the medical evidence available at the time of their assessments.  The extensive evidence received subsequent to their determinations including psychiatric exams showing generally mild or unremarkable findings while the claimant was compliant with medication (Ex. 20F; 22F-23F).  Additionally, their findings are generally inconsistent with the longitudinal medical evidence, which shows the claimant sought only conservative care and sporadic treatment, if any, through 2021, as well as psychiatric exams where the claimant displayed appropriate behavior and demonstrated adequate cognition as discussed herein (Ex. 12F, p. 18; 22F, p. 4-16, 18-28; 23F).  Therefore, the undersigned finds these findings are generally unpersuasive.

Regarding other opinion evidence not previously discussed, the opinion of Dhebry Georges-Ramdeen, APRN, is not persuasive (Ex. 10F).  To begin, Mr. Georges-Ramdeen's opinion is neither supported by the objective medical evidence, nor consistent with the medical record.  For example, he opined that the claimant had marked limitations in the four corresponding B'criteria areas.  However, he cites to no specific objective findings to support his opinion, but only provides a statement indicating the claimant has poor insight and judgment, unstable moods with anxiety, impaired social communication, and often noncompliant treatment.  Furthermore, Mr. Georges-Ramdeen indicated he first examined the claimant on March 18, 2020, and last examined the claimant on May 14, 2020.  This is a very brief period to make clinical observations and determine such conclusions in his opinion.  Moreover, these findings are internally inconsistent with Mr. Georges-Ramdeen's records from both dates show the claimant was alert to four spheres, his thought processes were logical and organized, and content reality based and goal oriented during his examinations (Ex. 18F, p. 8).  Additionally, these findings are inconsistent with the medical evidence of record, such as psychiatric exams where the claimant displayed appropriate behavior and demonstrated adequate cognition discussed herein (Ex. Ex. 12F, p. 18; 22F, p. 4-16, 18-28; 23F; *See* Ex. 18F; 22F-23F).  Therefore, the undersigned finds this opinion is not persuasive.

The undersigned did not provide articulation about the evidence in this case that is inherently neither valuable nor persuasive in accordance with 20 CFR 416.920b(c).  Nonetheless, as for other evidence not discussed herein, the undersigned has considered the entire evidence of record

as whole, to include any evidence not dispositive to the findings or final determinations by the undersigned.

In conclusion, although the evidence as a whole establishes underlying medical conditions capable of producing some limitations, that evidence neither confirms disabling limitations arising from the claimant's underlying medical conditions, nor does it support a conclusion that the objectively determined medical conditions are of such severity that they could reasonably be expected to give rise to disabling limitations.  After having carefully considered the entire documentary evidence of record, as well as the testimony at the hearing, the undersigned concludes that the claimant retained the residual functional capacity to perform work as described above.

**5.     The claimant has no past relevant work (20 CFR 416.965).**

A finding regarding the claimant's capacity for past relevant work is not material because there is insufficient information about the claimant's past work and all potentially applicable Medical-Vocational Guidelines would direct a finding of "not disabled" given the individual's age, education, and residual functional capacity.  Thus, the claimant's past work is not further developed or analyzed for purposes of this decision that could further delay adjudication because the claimant was able to perform other work (20 CFR 416.920(h)).

**6.     The claimant was born on August 10, 1990 and was 29 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).**

**7.     The claimant has a limited education (20 CFR 416.964).**

**8.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).  When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14).  If the

claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

The claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations.  To determine the extent to which these limitations erode the unskilled occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and with a residual functional capacity to perform medium exertional work with the following non-exertional limitations: avoid climbing ropes, ladders, scaffolds and unprotected heights; avoid operating hazardous machinery and tools; simple tasks; occasional interaction with the public, coworkers; frequent interaction with direct line supervisors one on one; avoid heat and cold extremes in the work place and loud noises and sounds; require a 5 minute change of position break every 2 to 3 hours; only off task five percent (5%) of the work day.

The impartial vocation expert, William Starke, testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as: Warehouse Worker (DOT #922.687-058, medium, unskilled SVP 2) with approximately 20,000 jobs nationally; Kitchen Helper (DOT #318.687-010, medium, unskilled SVP 2) with approximately 107,000 jobs nationally; Rack Room Worker (DOT #920.665-014, medium, unskilled SVP 2) with approximately 7,600 jobs nationally.

The claimant's residual functional capacity as found in this decision is less restrictive than the hypothetical residual functional capacity given to the vocational expert.  Specifically, the claimant has no exertional, postural, or environmental limitations.  In considering the vocational expert's testimony, where he indicated that a person with a more restrictive residual functional capacity can perform the aforementioned jobs, the undersigned hereby finds that the claimant can perform said jobs as he has a less restrictive residual functional capacity.

The vocational expert testified that his testimony is fully consistent with the Dictionary of Occupational Titles SSR 00 4p and his many years of professional experience in the rehabilitation field.

Additionally, Social Security Ruling 85-15, as reinforced by Social Security Ruling 96-9p, specifies that the basic mental demands of competitive, remunerative work include the abilities on a sustained basis to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.  The claimant has the ability to understand, carry out, and remember simple instructions.  He can respond to supervision and coworkers, and deal with changes in routine work settings.  The claimant is thus able to meet the mental demands of unskilled work.

Based on the testimony of the vocational expert and SSRs 85-15 and 96-9p, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule and SSRs 85-15 and 96-9p.

See Next Page

**10.  The claimant has not been under a disability, as defined in the Social Security Act, since March 6, 2020, the date the application was filed (20 CFR 416.920(g)).**

**<u>DECISION</u>**

Based on the application for supplemental security income filed on March 6, 2020, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.


/s/ *Charles Murray*
_____
Hon. Charles Murray
Administrative Law Judge

December 20, 2022
_____
Date

# LIST OF EXHIBITS

## Payment Documents/Decisions

| Component | No. | Description | Received | Dates | Pages |
|-----------|-----|-------------|----------|-------|-------|
| Y13 | 1A | Disability Determination Explanation | | 2021-04-12 | 22 |
| Y13 | 2A | Disability Determination Transmittal | | 2021-04-12 | 1 |
| Y13 | 3A | Disability Determination Transmittal | | 2021-09-02 | 1 |
| Y13 | 4A | Disability Determination Explanation | | 2021-09-02 | 10 |

## Jurisdictional Documents/Notices

| Component | No. | Description | Received | Dates | Pages |
|-----------|-----|-------------|----------|-------|-------|
| Y13 | 1B | SSA-1696 - Claimant's Appointment of a Representative | | 2020-03-06 | 4 |
| Y13 | 2B | Fee Agreement for Representation before SSA | | 2020-03-06 | 1 |
| Y13 | 3B | Claimant's Change of Address Notification | | 2020-05-27 | 2 |
| Y13 | 4B | T16 Notice of Disapproved Claim | | 2021-04-12 | 6 |
| Y13 | 5B | Request for Reconsideration | | 2021-04-21 | 9 |
| Y13 | 6B | SSA-1696 - Claimant's Appointment of a Representative | | 2021-06-23 | 5 |
| Y13 | 7B | Request for Reconsideration | | 2021-06-23 | 3 |
| Y13 | 8B | Fee Agreement for Representation before SSA | | 2021-06-23 | 1 |
| Y13 | 9B | T16 Disability Reconsideration Notice | | 2021-09-02 | 3 |
| Y13 | 10B | Request for Hearing by ALJ | | 2021-10-07 | 3 |

| Y13 | 11B | Request for Hearing Acknowledgement Letter | 2021-10-25 | 15 |
| Y13 | 12B | Request for Hearing Acknowledgement Letter | 2021-11-15 | 20 |
| Y13 | 13B | Hearing Notice | 2022-04-28 | 14 |
| Y13 | 14B | Notice Of Hearing Reminder | 2022-06-24 | 4 |

## Non-Disability Development

| Component | No. | Description | Received | Dates | Pages |
|---|---|---|---|---|---|
| Y13 | 1D | Application for Supplemental Security Income Benefits (Abbreviated) | | 2020-03-06 | 10 |
| Y13 | 2D | Application for Disability Insurance Benefits | | 2020-03-06 | 5 |
| Y13 | 3D | Application for Disability Insurance Benefits | | 2020-04-10 | 2 |
| Y13 | 4D | Certified Earnings Records | | 2022-02-04 | 2 |
| Y13 | 5D | Detailed Earnings Query | | 2022-02-05 | 2 |
| Y13 | 6D | Summary Earnings Query | | 2022-02-05 | 1 |
| Y13 | 7D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2022-02-05 | 1 |
| Y13 | 8D | Detailed Earnings Query | | 2022-07-19 | 2 |
| Y13 | 9D | Summary Earnings Query | | 2022-07-19 | 1 |
| Y13 | 10D | New Hire, Quarter Wage, Unemployment Query (NDNH) | | 2022-07-19 | 1 |

## Disability Related Development

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| Y13 | 1E | Disability Report - Field Office | | | to 2020-04-10 | 3 |
| Y13 | 2E | Disability Report - Adult | | | to 2020-04-10 | 9 |
| Y13 | 3E | 3rd Party Function Report - Adult | | Tanika Price, Girlfriend | to 2020-05-26 | 12 |

| Component | No. | Description | | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| Y13 | 4E | Function Report - Adult | | | to 2020-07-07 | 11 |
| Y13 | 5E | Representative Correspondence | | Re-Open Prior Applications | to 2021-04-21 | 1 |
| Y13 | 6E | Disability Report - Field Office | | | to 2021-06-23 | 2 |
| Y13 | 7E | Disability Report - Appeals | | | to 2021-06-23 | 8 |
| Y13 | 8E | Seizure Questionnaire | | Erika Boyd | to 2021-08-01 | 3 |
| Y13 | 9E | Disability Report - Field Office | | | to 2021-10-07 | 2 |
| Y13 | 10E | Disability Report - Appeals | | | to 2021-10-07 | 7 |
| Y13 | 11E | Exhibit List to Rep PH2E | | | to 2022-02-05 | 22 |
| Y13 | 12E | Representative Correspondence | | Kathleen Flynn | 2022-05-03 to 2022-05-03 | 1 |
| Y13 | 13E | Resume of Vocational Expert | | William E. Starke | 2022-06-20 to 2022-06-20 | 2 |
| Y13 | 14E | Correspondence regarding efforts to obtain evidence | | Kathleen Flynn | 2022-06-29 to 2022-06-29 | 2 |
| Y13 | 15E | Representative Correspondence | | Kathleen Flynn | 2022-07-15 to 2022-07-15 | 1 |

## **Medical Records**

| Component | No. | Description | Received | Source | Dates | Pages |
|---|---|---|---|---|---|---|
| Y13 | 1F | Individualized Education Plan | | Henry County Schools | 2000-03-17 to 2008-02-14 | 575 |
| Y13 | 2F | Hospital Records | | West Central Regl Hosp | 2011-05-22 to 2011-06-16 | 12 |
| Y13 | 3F | Medical Records covering the period | | Georgia Department Of Corrections | 2014-08-18 to 2015-09-21 | 176 |
| Y13 | 4F | Medical Records covering the period | | Georgia Dept Of Corrections | 2015-10-01 to 2016-02-23 | 15 |

| | | | | | |
|---|---|---|---|---|---|
| Y13 | 5F | Emergency Department Records | Piedmont | 2014-06-11 to 2018-10-30 | 82 |
| Y13 | 6F | Medical Records covering the period | Henry CO. Jail | 2018-08-19 to 2019-10-03 | 246 |
| Y13 | 7F | Outpatient/Inpatient Rehabilitation Records | Mcintosh Trail Csb | 2019-11-27 to 2020-02-28 | 51 |
| Y13 | 8F | Hospital Records | Piedmont Henry Hospital | 2016-10-04 to 2020-05-25 | 93 |
| Y13 | 9F | Emergency Department Records | Grady Hospital | 2020-05-27 to 2020-05-27 | 7 |
| Y13 | 10F | Medical Assessment Mental Ability-Work Related Activities | Dherby Georgs-Ramdeen | 2020-07-28 to | 9 |
| Y13 | 11F | Hospital Records | Piedmont Healthcare | 2020-05-25 to | 67 |
| Y13 | 12F | Outpatient/Inpatient Rehabilitation Records | Mcintosh Trail Csb | 2019-12-20 to 2020-12-01 | 29 |
| Y13 | 13F | Consultative Examination Report | Priscilla Wilson Clancy PhD Llc | to 2021-01-30 | 6 |
| Y13 | 14F | Emergency Department Records | Grady Memorial Hospital | 2019-09-01 to 2021-03-21 | 148 |
| Y13 | 15F | Medical Records covering the period | Skyline Medical Center | 2021-04-14 to 2021-04-19 | 118 |
| Y13 | 16F | Emergency Department Records | Gateway Medical Center | 2021-04-06 to | 38 |
| Y13 | 17F | Emergency Department Records | Skyline Medical Center | 2021-04-14 to | 33 |
| Y13 | 18F | Outpatient/Inpatient Rehabilitation Records | Mcintosh Trail Csb | 2019-12-02 to 2021-08-20 | 52 |
| Y13 | 19F | Emergency Department Records | Nashville General Hospital | 2021-08-28 to 2021-08-29 | 52 |
| Y13 | 20F | Outpatient/Inpatient Rehabilitation Records | Mcintosh Trail Csb | 2021-08-20 to 2021-10-07 | 12 |

| Y13 | 21F | Progress Notes | Henry County Jail | 2019-10-05 to 2021-12-14 | 126 |
| Y13 | 22F | Progress Notes | Mcintosh Trail Csb | 2021-10-21 to 2022-04-12 | 41 |
| Y13 | 23F | Progress Notes | Mcintosh Trail Community Service Board | 2022-03-18 to 2022-07-15 | 27 |