# **Exhibit 5**
# **Franchise Agreement**

## FRANCHISE AGREEMENT

This Franchise Agreement (this "Agreement") is made and entered into on **September 6, 2022** between Advanced Fresh Concepts Franchise Corp. a California corporation whose address is 19700 Mariner Avenue, Torrance, California 90503 ("Franchisor"), and **Pau Sian Mung** whose address is **1344 Weston Dr, Decatur, GA 30032** ("Franchisee"), with reference to the following facts:

## R E C I T A L S

Franchisor is the owner of certain intellectual property comprised of trademarks, know-how, trade secrets and other intangible property and a licensee of other marks, all comprising a system (the "AFC System") for developing and operating food service counters in grocery stores, retail stores and other locations. Franchisee desires to be granted a franchise to establish and operate food service counter(s) using the AFC System. Franchisor is willing to grant a franchise to Franchisee on the terms in this Agreement. Accordingly, the parties now agree as follows:

## A G R E E M E N T

**1.  Appointment.**

Franchisor grants to Franchisee, and Franchisee accepts, the right to operate one or more AFC Food Service Counter(s) or Wild Blue Counter(s) (the "Food Service Counter(s)") as indicated in and at the location(s) identified in the Franchise Addendum(s) attached to this Agreement (the "Franchise Addendum(s)") using the AFC System as it may be modified or further developed by Franchisor, all according to the terms in this Agreement. Franchisee acknowledges that the Franchise Addendum(s) may be comprised of one or more of the following:  Full-Time Location Franchise Addendum, Part-Time Location Franchise Addendum and/or Self-Service Location Addendum. Franchisee shall use Franchisee's best efforts to develop and expand the market for the goods and services offered by the Food Service Counter(s) and shall cooperate with Franchisor in accomplishing the purposes of this Agreement.

**2.  Term.**

The term of this Agreement shall be five years starting on the date stated in the introductory paragraph of this Agreement and ending on the fifth anniversary of that date, notwithstanding any start date stated in any Franchise Addendum between Franchisee and Franchisor. Regardless of the term, this Agreement shall terminate earlier on the date this Agreement is terminated as provided in Sections 15.1 through 15.5. Further, at any time during the five year term, Franchisee may apply to Franchisor in writing to terminate this Agreement early, with the termination to be effective on the 90th day following delivery of written notice, or such earlier time as the parties mutually agree in writing. Franchisor shall have 30 days to accept Franchisee's early termination request. Franchisor's failure to accept Franchisee's request within such 30 day period shall be deemed Franchisor's election to reject Franchisee's early termination request.

**3.  Location(s).**

3.1.  <u>Initial Location(s)</u>.  Franchisee shall operate the Food Service Counter(s) only at the location(s) identified in the Franchise Addendum(s).

3.2.  <u>Relocation</u>.  In the event of the loss of the right or consent to operate at any of Franchisee's location(s), or the location owner's or manager's objection to Franchisee, without fault of Franchisee, Franchisor shall attempt to identify a new location for Franchisee, and shall consent to relocation of the

ZF-34230
2022 FA SY

1

affected Food Service Counter to an alternate location and site acceptable to Franchisor. Any such relocation shall be at Franchisee's sole expense. Franchisee acknowledges that relocation may not be possible before expiration of term of this Agreement, or at all; that any new location may not be comparable to the old; and that relocation, if possible, could involve a substantial interruption in operating the Food Service Counter until a new location is identified and prepared. Franchisee releases Franchisor and its affiliates, and each of their respective officers, directors, agents and employees from any loss of right or consent to operate at the location, and further agrees not to hold Franchisor liable for any such event during the term of this Agreement or thereafter.

      3.3.   <u>Acknowledgment.</u>  Franchisee acknowledges that the right to locate any Food Service Counter at a particular location, may be derived from an agreement between Franchisor (or an entity affiliated with Franchisor, such as Advanced Fresh Concepts Corp.) and the owner or lessee of the location where the Food Service Counter is located; that the agreement may be modified or terminable by the owner and/or manager of the location at any time and on short notice; and/or the owner or facility manager may object to Franchisee operating there; and that modification, termination or objection by the owner or facility manager may therefore result in the need for relocation and resulting disruption and interruption to Franchisee or adjustment to the franchise operations (such as if the facility owner requests that the operations be converted from a full time location to a self-service, or part time location, and vice versa). Franchisee also acknowledges that the owner or facility manager may require changes to the type of food products offered at the Food Service Counter and other changes. Franchisee acknowledges that the choice of location (identified in the Franchise Addendum(s)), types of food offered at the location, types of operations (full time, part time or self-service) and right to continue operating at the location is subject to the location owner's and/or manager's consent.

      3.4.   <u>No Exclusivity.</u>  This Agreement does not include any territory or marketing exclusivity. Franchisor shall have the right to operate or grant franchises or licenses to others to operate food service counters under the marks "AFC," "SOUTHERN TSUNAMI," "Wild Blue" or any other mark anywhere, regardless of how close they are to the Food Service Counter(s) that Franchisee operates; to sell products and other items to anyone and anywhere (even in the facilities where Franchisee operates), including pre-packaged products identified by the Marks (as defined below) or other marks, whether or not such marks are authorized for use by Franchisee, as well as other products or services under the Marks and other trademarks and service marks. Furthermore, Franchisor shall have the right to use other channels of distribution, such as the Internet, telemarketing, catalog sales, other direct marketing sales and other means to advertise, sell and distribute products to anyone and anywhere; and other AFC/Southern Tsunami/Wild Blue Food Service Counters (regardless of who owns or operates them) may advertise to and solicit prospective customers regardless of geographic location. Franchisor shall have no obligation to compensate Franchisee for any sales made through these methods or any other methods.

      3.5.   <u>Restrictions on Distribution Methods.</u>  Franchisee shall only sell products to end customers who are physically present at Franchisee's Food Service Counter(s). Franchisee shall not engage in the resale of any product or supply at wholesale, retail or otherwise without Franchisor's express written consent. Franchisee shall not use any other channels of distribution such as the Internet, catalog sales, telemarketing or otherwise to conduct sales.

4. **Trademarks.**

4.1.   Ownership.  Franchisee acknowledges that Franchisee owns no right, title, interest or goodwill in the trademarks "Southern Tsunami," the Southern Tsunami logo, "Advanced Fresh," the oval AFC logo, "Hybrid Sushi," "Wild Blue" or any other marks or trade dress that Franchisor adopts and permits Franchisee to use from time to time (collectively, the "Marks"); that as between Franchisee and Franchisor all right, title and interest in and to the Marks shall be deemed to be owned by Franchisor; that all usage of the Marks and goodwill established by that use is exclusively for Franchisor's benefit; and that this Agreement does not confer any goodwill or other interests in the Marks on Franchisee.

4.2.   Use.  Franchisee shall not use any Mark or portion of any Mark as part of the name of any business entity. Franchisee shall not use any Mark in selling any unauthorized product or service or in any manner not expressly authorized in writing by Franchisor. Franchisee shall not establish an email address or an Internet web site or the like using any domain name containing the words "Southern Tsunami," "Advanced Fresh," "AFC," "Hybrid Sushi," "Wild Blue" or any variation without Franchisor's prior written consent. Franchisee shall only use the Marks associated with the Food Service Counter concept Franchisee is permitted to operate. Franchisee shall give notices of trademark and service mark registration that Franchisor specifies and obtain fictitious or assumed name registrations as may be required by applicable law. Franchisee shall restrict use of the Marks as may be required by each owner of the facility where the Food Service Counter(s) is/are located.

4.3.   Notice.  Franchisee shall notify Franchisor immediately of any claim or demand arising from any attempt by any other person or entity to use the Marks or any similar marks or if Franchisee discovers anyone else is infringing the Marks. Franchisor shall have the sole right and obligation to decide what action, if any, to take with regard to any such matter and Franchisee shall cooperate with Franchisor and execute any and all documents and take all actions that Franchisor requests with regard to the matter.

4.4.   Change.  If it becomes advisable at any time, in Franchisor's sole discretion, for Franchisor to modify or discontinue use of any Mark, and/or use one or more additional or substitute trade names, trademarks, service marks or other commercial symbols, Franchisee shall comply with Franchisor's directions to do so at Franchisee's cost and expense.

4.5.   Inspection.  To preserve the validity and integrity of the Marks and to assist Franchisor in steps seeking to assure that Franchisee operates according to this Agreement and uses the Marks properly in operating the Food Service Counter(s), Franchisor or its agents shall have the right to enter and inspect the Food Service Counter(s), and to interview customers, suppliers or others, at all reasonable times. Franchisee shall fully cooperate with Franchisor in any inspection or visit Franchisor conducts and shall provide Franchisor's personnel full access to the Food Service Counter(s) for this purpose.  Any obstruction, interference or prohibition by Franchisee of Franchisor's right to inspect the Food Service Counter(s), including, without limitation, to investigate threats or dangers to public health and safety, shall constitute a material breach of this Agreement.  If Franchisor, in its sole discretion, determines that a lab test is required to test the quality, safety and freshness of the foods sold at any Food Service Counter operated by Franchisee, Franchisor shall have the right to assess Franchisee a lab fee of up to $500 for each sample tested.

4.6   Location Exceptions.  Franchisee acknowledges that at certain locations, Franchisee may not be able to use the Marks due to agreements with the facility owner.  Franchisee shall abide by such requirements.

**5.      Confidential Operations Manuals.**

5.1.    <u>Loan of Operations Manuals</u>.  Franchisor shall loan to Franchisee during the term of this Agreement one copy of Franchisor's confidential Operations Manual, one copy of Franchisor's Standard Sanitation Operating Procedure and Methods Manual, Recipe Manual(s) applicable to the franchise and one Steam Table Operating Manual, if applicable to Franchisee's business (collectively the "Manuals") for each Food Service Counter operated by Franchisee, except, no Manuals shall be provided for a Self Service location. The Manuals shall contain mandatory and suggested specifications, standards, operating procedures and rules prescribed from time to time by Franchisor for AFC Food Service Counters. Franchisor shall have the right to modify the Manuals from time to time. Franchisee shall comply with the Manuals, as modified by Franchisor.  Franchisee shall pay Franchisor's then current manual lease fee for each Manual received from Franchisor.  The manual lease fee paid by Franchisee shall be refunded to Franchisee when Franchisee returns the Manuals to Franchisor within 30 days of the termination or expiration of this Agreement or any applicable addendum.  For purpose of clarification, there shall be no refund if Franchisee fails to return the Manual(s) or returns any manual more than 30 days after expiration or termination of this Agreement or any applicable addendum.

5.2.    <u>Ownership</u>.  The Manuals shall be at all times the sole property of Franchisor. Franchisee shall return the Manuals immediately on expiration or termination of this Agreement.  Franchisee shall not make and shall not let Franchisee's personnel make any copy of all or part of the Manuals.

5.3.    <u>Confidentiality</u>.  Franchisee acknowledges that the Manuals contains confidential information and that its loss or disclosure would cause substantial damage to Franchisor.  Franchisee shall protect the Manuals as a trade secret of Franchisor.

**6.      Confidential Information.**

6.1.    <u>Secrets</u>.  Franchisee acknowledges that Franchisor's product recipes, methods of preparing the products, and operating procedures for a Food Service Counter are valuable and secret in the sense that they are not generally known to competitors of Franchisor.  Other information that Franchisor designates as confidential shall be deemed confidential for this Agreement, except information that Franchisee proves he or it knew before disclosure from Franchisor; or lawfully entered the public domain, through publication by others.

6.2.    <u>Protection</u>.  Franchisee shall maintain the confidentiality of all trade secrets during and after the term of this Agreement. Franchisee shall not use this information in any other business or in any manner not specifically authorized or approved in writing by Franchisor.  Franchisee shall reveal the trade secrets to employees only to the extent they need the information to perform their jobs. Franchisee shall use reasonable precautions to require employees to keep the information confidential; and shall take any additional steps to protect confidentiality that Franchisor requests from time to time.

6.3.    <u>Acknowledgments</u>.  Franchisee acknowledges that (a) the trade secrets also include information that cannot be removed from Franchisee's knowledge and memory and that would inevitably be used and disclosed if Franchisee held interests in any competitive business; (b) Franchisor could not protect the trade secrets against unauthorized use or disclosure, could not readily assure compliance with Sections 6.1 through 6.2 if Franchisee held interests in any competitive business; and that (c) involvement by Franchisee in any competitive business would create a high level of temptation and opportunity to use Franchisor's trade secrets.

6.4.    <u>Exclusive Dealing</u>.  Franchisee acknowledges that Franchisor enters into this Agreement in consideration of, and reliance on Franchisee's agreement to deal exclusively with Franchisor and to refrain

from using any of Franchisor's trade secrets in any activity competitive with Franchisor, and to refrain from transferring the goodwill associated with the Marks to any other business. Therefore, during the term of this Agreement, Franchisee and, collectively and individually all directors, officers and holders of any direct or indirect beneficial ownership interest of five percent (5%) or more of the securities or other equity interests of Franchisee, or of any corporation, limited liability company, partnership or other form of entity affiliated with or directly or indirectly controlling or controlled by Franchisee, and each relative of each such person who is an individual, including each such person's mother, father, husband, wife, brother, sister, son or daughter (collectively "Covered Persons"), shall not have any interest as an owner, investor, partner, lender, director, officer, member, manager, employee, consultant, representative or agent or in any other capacity in any business selling Asian style foods, sushi or fresh fish products, steamed foods or any other retail food business without Franchisor's prior written consent.   For 2 years after this Agreement expires without renewal or terminates, Franchisee and all Covered Persons shall not have any interest as an owner, investor, partner, lender, director, officer, member, manager, employee, consultant, representative or agent or in any other capacity in any business selling Asian style foods, sushi or fresh fish products, steamed foods or other food items developed or sold in the AFC System without Franchisor's prior written consent within:

    A.    5 miles of any food service counter operated by Franchisor or by any franchisee or licensee or other affiliate of Franchisor in a major city (as defined below);

    B.    10 miles of any food service counter operated by Franchisor or by any franchisee or licensee or other affiliate of Franchisor in a metropolitan area (as defined below);

    C.    15 miles of any food service counter operated by Franchisor or by any franchisee or licensee or other affiliate of Franchisor in a rural area (as defined below).

    D.    For this Agreement, a "major city" means any of the top 25 cities in the U.S. measured by population; a "metropolitan city" means any city other than a major city where the population density is greater than 1,000 people per square mile; and a "rural area" means an area whose population density is 1,000 people per square miles or less. These figures shall be measured at the time of expiration or termination.

    E.    On written request from Franchisee, Franchisor will provide Franchisee a list of locations within a reasonable geographic area, to assist Franchisee in complying with this obligation.

6.5.    <u>Exceptions</u>.  The restrictions in Section 6.1 through 6.4 shall not apply to ownership of (a) securities listed on a stock exchange or traded on the over the counter market that represent two percent (2%) or less of the number of shares of the class of securities issued and outstanding; or (b) other food service counters that Franchisee has an interest in pursuant to a written agreement with Franchisor.

6.6.    <u>Separate Covenants</u>.  Each of the covenants in Sections 6.1 through 6.4 and each portion thereof, shall be construed as independent of any other covenant or provision. If all or any portion of a covenant is unenforceable due to its scope in terms of geography, duration, or activity covered or otherwise, but could be enforced if reduced in scope, then the parties agree to be bound by any lesser covenant subsumed within the terms of such covenant imposing the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of the applicable provision within Sections 6.1 through 6.4.

7.    **System Changes.**

7.1.    Changes by Franchisor.  Franchisee acknowledges that periodically Franchisor may modify any aspect of the AFC System, including, but not limited to, as required by law.  Franchisor reserves the right to expand food offerings available at Food Service Counter(s), including hot foods and other food types. Franchisor shall communicate modifications through the Manuals or other ways. Franchisee shall comply with all modifications that Franchisor makes from time to time, at Franchisee's expense.

7.2.    No Changes by Franchisee; Improvements to the AFC System.  Franchisee shall not modify or deviate from any aspect of the AFC System without Franchisor's prior written consent. Franchisee shall notify Franchisor in writing of any proposed improvement to the AFC System ("Improvement") and provide to Franchisor such information as Franchisor requests regarding the Improvement. Any Improvement to the AFC System made by Franchisee for any purpose will be deemed to be a "work made for hire" under U.S. copyright law for the benefit of Franchisor, and therefore, Franchisor shall own the intellectual property rights in and to the improvements and may use the same for any and all purposes. To the extent any Improvement does not qualify as a work made for hire, Franchisee hereby assigns those Improvements to Franchisor for no additional consideration and with no further action required.  Franchisee shall sign all further assignments or instruments, as Franchisor may request to effectuate the parties' agreement hereunder. If Franchisee should fail to do so, Franchisee hereby appoints Franchisor as Franchisee's attorney-in-fact with full power and authority for the sole purpose of executing and filing all assignments and other instruments necessary to obtain title to the Improvements in the name of Franchisor. This appointment shall be deemed to be coupled with an interest and shall continue in full force and effect following the termination or expiration of this Agreement. Franchisor shall have the right to incorporate the Improvements into the AFC System and into any other businesses in which Franchisor or its Affiliates have an interest without compensation to Franchisee. If the foregoing provisions of this Section 7.2 are found to be invalid or otherwise unenforceable, Franchisee hereby grants Franchisor a worldwide, perpetual, non-exclusive, fully paid license to use and sublicense the use of the Improvement to the extent Franchisor's use or sublicense would, absent this Agreement, directly or indirectly infringe Franchisee's rights therein.

8.    **Advertising.**

8.1.    Approval.  Franchisee shall submit to Franchisor for prior approval, all advertising and promotion that Franchisee proposes to use, whether for print, broadcast, electronic or other media (including on the Internet), as well as novelty items, signs and containers.  Franchisee shall use those materials only after receiving Franchisor's written consent, and shall not use any material without first obtaining Franchisor's written consent. Franchisor may withhold or later revoke consent, or may condition consent on modifications or other restrictions.  Delay by Franchisor to require compliance or cure does not waive Franchisor's rights under this Section 8.1.

8.2.    Advertising Restrictions.  Franchisor shall have the right to impose geographic and/or other restrictions on advertising that Franchisee conducts or proposes to conduct.  Franchisee shall include trademark and copyright notices and notices of independent ownership in advertising as Franchisor requests from time to time.

8.3.    Phone Directory.  Franchisor shall have the right to require Franchisee to maintain a listing in local telephone directories, according to standards set by Franchisor.

8.4.    Cooperative Advertising.  Franchisor reserves the right, in the future, to designate a geographic region that includes Franchisee's Food Service Counter(s) and at least one other AFC/Southern Tsunami/Wild Blue food service counter as a local, regional or national cooperative area, for the purpose of developing a cooperative program. Franchisee shall participate in and contribute its share to the cooperative

designated by Franchisor, as determined according to the cooperative's operating procedures. The cooperative shall operate according to written governing documents prepared by or consented to by Franchisor. Franchisor shall have the right to veto any decision of the cooperative. Franchisor shall have the power to form, change, dissolve or merge cooperatives, at Franchisor's discretion.

8.5.   <u>Grocery Store Objection</u>. Franchisee shall not conduct any advertising that is objectionable to the owner or manager of the premises where the Food Service Counter is located.

## 9.   Fees and Compensation.

9.1   <u>Initial Fee</u>. Franchisee shall pay to Franchisor Franchisor's then current initial franchise fee for each Full Time Location to be operated by Franchisee under this Agreement. The initial fee shall be specified in the applicable Full Time Location Addendum. Franchisee acknowledges that Franchisor does not currently charge initial fees for Part-Time or Self Service location(s), however, Franchisee must have at least one operating Full Time location to be granted rights to a Part Time or Self Service location. While Franchisor does not currently charge initial fees for Part Time and Self Service locations, Franchisor reserves the right to implement such fees in the future. Franchisee shall pay the initial fee(s) in a lump sum on signing each Full Time Location Addendum. The fee is deemed to be fully earned on signing each addendum, and is nonrefundable. There shall be no refunds or prorations if a location starts as a Full Time location and later is transformed into a Self Service or Part-Time location. However, if a location starts as a Self Service or Part-Time location and is transformed into a Full Time location, then Franchisee shall pay Franchisor's then current initial franchise fee for such Full Time location.

9.2.   <u>Customer Payments</u>. Franchisee acknowledges that under the AFC System's initial structure, Franchisee shall not receive payments for sales of goods and services of the Food Service Counter(s); and that those payments will be made directly or indirectly from customers to the facility (for example, a grocery store) where the Food Service Counter(s) is/are located, which shall then direct all payments to Franchisor, less an amount to be retained by the facility owner, pursuant to the facility owner's separate agreement with Franchisor. Franchisee acknowledges that under the AFC System, all sales will be sold by and through cash registers owned or operated by the owner of the facility where the Food Service Counter(s) is/are located. Franchisee shall not make any sales through cash registers of Franchisee without prior written consent of Franchisor. Franchisor shall have the right, but no obligation, to modify this payment structure from time to time.

9.3.   <u>Payments to Franchisee</u>. Franchisor shall return to Franchisee the percentage amounts stated in the applicable Franchise Addendums attached to this Agreement. Franchisor shall have the right to deduct all amounts owed by Franchisee to Franchisor from the payments to Franchisee provided for in the applicable Franchise Addendum, or elsewhere, either as lump sum deductions or partial deductions made over time, until such deductions equal the full amounts owed to Franchisor. Franchisee acknowledges that Franchisor's sole responsibility shall be to remit to Franchisee the agreed commission percentage on amounts actually received from the facility owner. Franchisor shall have no responsibility to pay any commission to Franchisee on amounts not received from the facility owner. If Franchisor pays Franchisee's commission in any given month before receiving payment from the facility owner, and the facility owner does not pay Franchisor as required, Franchisee shall reimburse Franchisor the commissions paid. Franchisee shall reimburse Franchisor any amounts paid to Franchisee, that Franchisor discovers were paid in error. At Franchisor's discretion, Franchisor shall have the right (in lieu of Franchisee reimbursement) to withhold from future payments due to Franchisee such amounts paid in error. Franchisor shall send payments to Franchisee via direct deposit. Franchisee shall pay Franchisor's then current direct deposit fee for this purpose.

9.4.   Payment Responsibility.  Franchisee shall be solely responsible to pay when due all costs and expenses of the Food Service Counter(s), including but not limited to the purchase price of food items and inventory, utilities, employee compensation, sales and any other taxes imposed on, required to be collected, or paid on account of goods or services furnished by Franchisee.  Franchisee acknowledges and agrees that if the facility owner, due to labor contracts or otherwise, requires Food Service Counter(s) employees to be employed directly by the facility owner, and Franchisor is asked to reimburse the facility owner for these employment costs, that Franchisor shall have the right to and shall deduct such payments from the amounts due to Franchisee pursuant to Section 9.3 of the Franchise Agreement.

9.5.   Royalty.  Franchisor shall have the right at any time to revise the AFC System so that Franchisee collects revenues from sales, and pays Franchisor royalties on a basis approximately equivalent in amount or rate to amounts or rates that Franchisor receives and retains pursuant to this Agreement. Any such revisions made from time to time shall be deemed to occur pursuant to this Agreement and shall not constitute a modification of the Franchise or of this Agreement.

9.6.   Gross Sales.  "Gross Sales" shall mean revenues derived from Franchisee's sales.  Gross Sales does not include sales tax, credits or refunds.

9.7   Customer Satisfaction Fee.  Franchisor shall have the right to assess Franchisee up to One Thousand Dollars ($1,000) for each customer complaint received, whether the complaint has any merit or not. This fee is not a penalty but to compensate Franchisor for the efforts the Franchisor must take to address the complaint.  Franchisor's assessment of the customer satisfaction fee shall not constitute a waiver by Franchisor of its rights to seek damages and/or other relief against Franchisee due to Franchisee's conduct.

9.8   Default Charge Fee.  Franchisor shall have the right to assess Franchisee up to $1,000 per violation of any term, obligation or requirement of the Manuals or this Agreement.  Franchisor's assessment of this fee shall not constitute a waiver by Franchisor of its rights to seek damages and/or other relief against Franchisee arising from the violation.

9.9   Web and Data Charges.  To gain access to Franchisor's website pages which enable Franchisee to submit purchase orders online, and obtain information on new products, product specifications and other information, updates to Franchisee's tablet data, and access to Franchisor's inventory tracking software, Franchisor shall charge Franchisee a monthly fee of up to $100 per Food Service Counter operated by Franchisee.

9.10   Bankruptcy By Facility Owner.  If the facility owner where Franchisee's Food Service Counter(s) is/are located files for bankruptcy, or other similar proceeding, Franchisor's sole responsibility shall be to remit to Franchisee the agreed percentage on amounts actually received from the facility owner. Franchisor shall have no responsibility to pay any commission to Franchisee on amounts not received from the facility owner.  If Franchisor pays Franchisee's commission in any given month before receiving payment from the facility owner, and the facility owner does not pay Franchisor as required, Franchisee shall reimburse Franchisor the commissions paid.

9.11   Early Termination Fee.  If this Agreement or any Franchise Addendum is terminated and/or if Franchisee abandons any Food Service Counter before the end of the term of this Agreement, Franchisor shall have the right, in addition to all other rights and remedies available to Franchisor in law and/or equity, to assess Franchisee an early termination fee of $1,000 for each location terminated and/or abandoned. Such fee shall be payable at the earlier of (1) the time Franchisee notifies Franchisor of the desire to terminate/abandon, or (2) actual termination or abandonment of any location.  Franchisor's assessment of the early termination fee shall not constitute a waiver by Franchisor of its rights to seek damages and/or other relief against Franchisee due to the early termination and/or breach.

ZF-34230
2022 FA SY

9.12    Administrative Fee.   Franchisee shall reimburse Franchisor for Franchisor's costs and expenses in complying with tax levies and wage garnishments issued against Franchisee or Franchisee's owners, up to $100 per garnishment/levy request.

9.13    Third Party Audits and Charges. Franchisee shall reimburse Franchisor for amounts paid by Franchisor to third parties (including, but not limited to, government agencies and facility owner(s)) for audits, inspections, fines and/or charges imposed or levied against the Food Service Counter, including food safety, facility audits and customer service.

9.14    Shipping Administrative Fee. Franchisor shall have the right to charge and Franchisee shall pay Franchisor's administrative charges, to ship products to Franchisee's Food Service Counter, in an amount up to two and one-half percent (2 ½%) of the purchase price.  The administrative fee is in addition to actual shipping costs to ship products to Franchisee's Food Service Counter.

9.15    Account Broker Fee. If Franchisor pays a fee for the right to locate the Food Service Counter in the facility or store, Franchisee shall reimburse Franchisor for the amounts paid, not to exceed $500 per quarter for each Food Service Counter subject to this fee.

**10.    Accounting.**

10.1.    Recordkeeping.   Franchisee shall maintain full, complete and accurate books, records and accounts of the sales and expenses of the Food Service Counter(s). Franchisee shall conform these records to any accounting system that Franchisor may prescribe in the Manuals or otherwise in writing.  Franchisee shall retain all books and records relating to the Food Service Counter(s) for at least four years.

10.2.    Reports.   Franchisee shall provide Franchisor each week on or at other frequencies that Franchisor specifies from time to time, in the form approved by Franchisor, a report of sales for the week ending the prior day (Sunday).  Franchisee shall provide Franchisor at frequencies that Franchisor requests, profit and loss statements and balance sheets for months, quarters and years, all as Franchisor specifies. These financial statements shall be certified to be true and correct by Franchisee.  Franchisee shall provide Franchisor copies of all federal and state income tax returns and sales tax returns. Franchisee shall submit to Franchisor other periodic reports, forms and records as Franchisor requests from time to time.

10.3.    Discrepancies.   In any discrepancy between data as reported by Franchisee and as reported by the owner or lessee of the premises where the Food Service Counter is located, the data reported by the premises owner or lessee shall control.  Franchisee shall notify Franchisor in writing within 30 days of receipt of the statement from the store premises of any alleged discrepancy.  Franchisee shall have no right to seek adjustments for any discrepancy after such 30 day period.

10.4.    Audit.   Franchisor or its designated agents shall have the right at reasonable times to examine and copy books, records and tax returns of Franchisee. Franchisor shall also have the right, at any time, to have an independent audit made of books and records of Franchisee at Franchisor's expense.  If an inspection reveals a discrepancy or underreporting of sales of one percent (1%) or more for any period, then Franchisee shall take corrective action, including but not limited to paying Franchisor the amounts that would have been paid but for any underreporting, all as Franchisor specifies; and interest at the rate of 1% per month (12% per year) from the date the amount would have been due until paid; and Franchisee shall, in addition, reimburse Franchisor for all costs and expenses connected with the inspection. These remedies shall be in addition to any other remedies Franchisor may have.

## 11.    Training, Quality and Performance Standards.

11.1.    <u>Compliance with System/Reports</u>. Franchisee shall comply with the Manuals and all other written policies provided to Franchisee by Franchisor. Franchisee shall not make any material changes to the operation or structure or facilities of the Food Service Counter(s) nor make any material replacement or alterations to equipment, fixtures, signs or decor without Franchisor's prior written consent. Franchisee shall submit to Franchisor such periodic reports, forms and records as Franchisor requests from time to time, including but not limited to, cleaning schedules, daily production reports, delivery logs, overnight rice cooling logs, pH logs, temperature logs and sushi cooling logs.  Franchisee shall obtain and provide Franchisor an email address to which Franchisor may send written communications and sales reports to Franchisee.

11.2.    <u>Condition</u>. Franchisee shall maintain the condition and appearance of the Food Service Counter(s) and all equipment consistent with Franchisor's standards. Franchisee shall maintain each Food Service Counter in a high level of cleanliness and first class appearance, including but not limited to, replacing worn or obsolete signs, fixtures, decor and equipment. Franchisee shall repair, at Franchisee's sole cost and expense, any equipment and/or worn or obsolete signs, fixtures and décor. If at any time in Franchisor's judgment the appearance of a Food Service Counter or equipment, fixtures, signs or decor does not meet Franchisor's standards, Franchisor shall have the right to notify Franchisee, specifying the corrective action to be taken by Franchisee. Franchisee shall correct the deficiency within 15 days after receipt of the notice, or such shorter period of time that Franchisor reasonably requests, provided that any deficiency that Franchisor believes could threaten public health or safety shall be corrected immediately.

11.3.    <u>No Other Purpose</u>.  Franchisee shall not conduct any business or activity from the location(s) of the Food Service Counter(s) other than the operation of the Food Service Counter according to the AFC System. All food items prepared at the Food Service Counter shall be sold at the Food Service Counter only and at no other location without the prior written consent of Franchisor. Under no circumstances are the premises of the Food Service Counter to be used for the preparation of food items to be sold other than on the premises, except Franchisee may prepare and deliver prepared foods to Self Service locations owned by Franchisee, if operated pursuant to an addendum to this Agreement.

11.4.    <u>Proprietary Products</u>.   Franchisor has developed and may continue to develop other proprietary food products, sauces and spices. To protect Franchisor's trade secrets and maintain quality control, Franchisor shall have the right to require Franchisee to purchase such proprietary items only from Franchisor or third parties that Franchisor designates.

11.5.    <u>Full Menu</u>.  Franchisee shall offer for sale and sell at the Food Service Counter(s) all food items that Franchisor authorizes from time to time; and shall not offer for sale or sell at the Food Service Counter(s) any other category of products. Franchisee shall have the right to offer additional prepared food items from time to time on a special or market test basis, provided that Franchisee shall notify Franchisor in writing at least 30 days in advance and shall comply with any request by Franchisor to refrain from offering any one or more such items.

11.6.    <u>New Products</u>.  From time to time, Franchisor may introduce new products, or reintroduce previously introduced new products. Franchisee shall purchase, maintain and display reasonable inventories of such new products for at least 120 days. Franchisor may require Franchisee to again purchase, maintain and display the products regardless of prior compliance with this section 11.6.  Franchisee shall not introduce, offer or sell any new items that have not been approved by franchisor in writing.

11.7.    <u>Samples</u>.  Franchisee shall comply with sampling policies that Franchisor establishes from time to time.  These may include requirements to provide free samples to customers and potential customers.

ZF-34230
2022 FA SY

11.8.   Preparation.  To ensure that all items produced by Franchisee meet Franchisor's standards, and to protect Franchisor's goodwill and Marks, all food products shall be prepared only by properly trained personnel according to Franchisor's recipes, preparation techniques and processes as designated in the Manuals, and shall be sold only at retail to customers in conformity with Franchisor's marketing plan and concept.

11.9.   Proposed Suppliers.  If Franchisee proposes to offer at the Food Service Counter(s) any brand of product, or to use any item not then approved by Franchisor or to purchase from a supplier not then designated by Franchisor as an approved supplier, Franchisee shall first notify Franchisor and on Franchisor's request, submit samples and other information that Franchisor requires for examination and/or testing or to otherwise determine if the product, or proposed supplier meets Franchisor's specifications and quality standards.  Franchisee shall pay Franchisor a reasonable charge for the cost of inspection and evaluation, including a reasonable amount for Franchisor's costs of personnel to conduct the inspection and evaluation. Franchisor reserves the right to re-inspect facilities and products of any supplier and to revoke approval of any item that does not continue to meet Franchisor's standards. Franchisor reserves the right to approve any and all supplies, suppliers, brands and other products and services, whether currently approved or submitted for approval.

11.10.   Suppliers.  From time to time, Franchisor may provide Franchisee a list of approved products, brands, and/or suppliers for food products and other items necessary to operate the Food Service Counter(s), identifying manufacturers, brands, suppliers, and products and services that Franchisor has approved to be carried or used in the AFC System.  Franchisor may revise the list from time to time.  If Franchisee wishes to purchase a product or use a supplier not on the list, Franchisee shall submit Franchisee's request in writing to Franchisor before making any purchase and shall pay Franchisor's then current fees, costs and expenses to investigate the product or supplier. Franchisor is not under any obligation to approve the requested product or supplier and Franchisee shall comply with Franchisor's decision. Franchisor shall have the right to revoke any approval previously given.

11.11.   Use of Approved Items.  All goods and services used in operating the Food Service Counter(s) that are not specifically required to be purchased according to Franchisor's approved suppliers list, shall conform to specifications and standards that Franchisor establishes from time to time.  Franchisee shall also comply with any source restrictions imposed by the facility owner to maintain quality control or an identifiable source for products in the event of product recalls.

11.12.   Inventory.  Franchisee shall always maintain an inventory of food and other products, materials and supplies to permit operation of the Food Service Counter(s) at maximum capacity.

11.13.   Private Label.  Franchisor may develop proprietary or private-labeled products for the Food Service Counter(s).   To monitor the manufacture, packaging, processing and sale of these products Franchisor shall: (a) manufacture, supply and sell the proprietary or private labeled products to franchisees; and/or (b) disclose the designs or specifications of these products to a limited number of suppliers who Franchisor will authorize to make them to Franchisor's specifications and to sell them to franchisees. Franchisee acknowledges that Franchisee shall be required to purchase the proprietary or private labeled products from Franchisor, or from a limited number of suppliers designated by Franchisor.

11.14.   Charges for Purchases.  From time to time Franchisee may purchase food and other items from Franchisor or Franchisor's Affiliate. Franchisor shall have the right to charge, and Franchisee shall pay, freight, and other ancillary charges for such items, as well as Franchisor's and/or Franchisor's Affiliate's prices for such items.  Franchisor shall have the right to deduct product purchases from payments owed to Franchisee.

11.15.  <u>Product Purchases</u>.

(a)    Franchisee shall reimburse Franchisor and/or Franchisor's Affiliate for product purchases from third party suppliers shipped to Franchisee on Franchisee's behalf.

(b)    For Franchisee's convenience, Franchisor may ship routine shipments of products, including but not limited to, ingredients, product supplies and retail items, to Franchisee for use at the Food Service Counter(s).  Franchisee may cancel such shipment(s) by providing Franchisor written notice of Franchisee's desire to do so at least one week prior to the scheduled delivery date.

11.16.  <u>Licenses</u>.  Franchisee shall obtain and maintain all required licenses, permits and certificates needed to operate the Food Service Counter(s) and provide copies of such licenses and permits to Franchisor. At Franchisor's election, Franchisor shall have the right, but no obligation, to obtain any required licenses and permits in Franchisee's name.  Franchisee hereby grants Franchisor a power of attorney to apply for any required licenses, permits and any renewals of these for Franchisee's Food Service Counter(s).  Franchisee shall reimburse Franchisor for any costs and fees incurred by Franchisor in applying for these licenses and/or permits on Franchisee's behalf.  Franchisee shall operate the Food Service Counter(s) in full compliance with all applicable laws, ordinances and regulations, including but not limited to health, safety and sanitation laws.

11.17.  <u>Personal Involvement</u>.  Franchisee, or Franchisee's manager, or if Franchisee is an entity, Franchisee's principal owner (or such other person/manager ), shall participate in day-to-day operation of the Food Service Counter(s), and shall directly supervise the operation of the Food Service Counter(s) and its employees.  If Franchisee operates more than one location, then at least one trained employee with ServSafe Manager certification shall act as manager for those other locations.  To assure Franchisor is aware of whom to contact in the event of Franchisee's absence, Franchisee shall provide to Franchisor a written list of every manager employed by Franchisee.  Franchisee shall update and provide a revised manager list to Franchisor in writing within 24 hours of: (1) any new manager being hired; and/or (2) any manager leaving Franchisee's employment.  Franchisee shall abide by lawful requests of the business owner or manager of the premises regarding any employee or prospective employee.  Before start of employment, Franchisee shall train each manager and require each manager to sign a confidentiality and non-disclosure agreement in a form satisfactory to Franchisor requiring the manager to protect Franchisor's trade secrets and any other item Franchisor specifies in writing from time to time.  Franchisee shall ensure each manager is trained before start of employment.

11.18.  <u>Uniforms</u>.  Franchisee shall purchase and Franchisee's employees shall at all times wear uniforms imprinted with the Marks and conforming to other specifications prescribed by Franchisor.

11.19.  <u>Computer and Software Requirements</u>.  Franchisee shall purchase a computer system meeting Franchisor's specifications with Internet connectivity capabilities to permit Franchisee to submit purchase orders online and to obtain information on new products, product specifications and other information Franchisor designates from time to time.  Franchisee shall be solely responsible for the computer system, including maintaining and repairing it when necessary.  Franchisor may require Franchisee to provide Franchisor independent access to the information generated or stored on Franchisee's computer system.  Franchisee shall keep the computer system current.  Franchisor may, in the future, develop or designate additional and/or alternate hardware and/or software for performing various functions for the Food Service Counter(s).  Franchisee shall implement and use the hardware and software in operating the Food Service Counter(s) and comply with all standards prescribed by Franchisor regarding such hardware and software.

11.20.  <u>Tablet and Inventory Scanner</u>.  Franchisee shall purchase a tablet, inventory scanner and printer ("Tablet System") meeting Franchisor's specifications with Internet connectivity capabilities to permit Franchisee to print labels, track daily products made at the Food Service Counter(s) and conduct other functions prescribed by Franchisor.  Franchisee shall be solely responsible for the Tablet System, including maintaining and repairing it when necessary.  Franchisor may require Franchisee to upgrade and/or update the Tablet System and to provide Franchisor independent access to the information generated or stored on Franchisee's tablet, including inventory tracking logs.  Franchisee shall keep the Tablet System current. Franchisor may, in the future, develop or designate computer application software for use with the Tablet System for performing various functions for the Food Service Counter(s).  Franchisee shall purchase, implement and use the software in operating the Food Service Counter(s) and comply with all standards prescribed by Franchisor regarding the software, including upgrade and maintenance requirements.

11.21.  <u>Quality</u>.  Franchisee shall use only fresh ingredients and products of the highest quality, as determined by Franchisor in its reasonable discretion.

11.22.  <u>Operating Hours; Staffing</u>.  Franchisee or Franchisee's approved manager shall operate each Food Service Counter every day that the location where the Food Service Counter is located is open for business and subject to any additional requirements in any applicable Franchise Addendum attached to this Agreement.  Franchisee shall ensure each Food Service Counter is adequately staffed and managed.  In locations operated by a manager, Franchisee shall remain personally and actively involved in the Food Service Counter(s) operations and shall remain responsible for operating the Food Service Counter(s) and supervising employees.  The personnel Franchisee retains to work at Franchisee's Food Service Counter(s) shall be Franchisee's agents and employees and Franchisor shall not be a joint employer of those persons. Franchisee alone shall determine who to retain, how many personnel to retain (subject to any minimum staffing requirements Franchisor may prescribe), compensation terms, employment terms and working conditions for Franchisee's personnel, and when and how to discipline or terminate the employment of Franchisee's personnel.

11.23.  <u>Store's Rules</u>.  Franchisee shall comply with the rules, policies and guidelines of the facility where the Food Service Counter(s) is/are located and sign any code of conduct or equivalent document required by the facility owner.   If required by the facility owner, Franchisee shall obtain proof of employability for each prospective employee by completing the Department of Homeland Security's electronic employee verification system (E-Verify) before hiring.

11.24.  <u>Complaints</u>.  Franchisee shall promptly notify Franchisor in writing of any complaints from the owner(s) or manager(s) of the facility where any Food Service Counter is located, or from the public of problems relating to operation of the Food Service Counter or its products.  Franchisee shall be primarily responsible to resolve and remedy all complaints to the satisfaction of the complaining person or entity.

11.25.  <u>Pricing</u>.  Franchisor may recommend resale prices or pricing schedules to Franchisee and may provide pricing labels conforming to these recommendations. Franchisee shall have the right to determine prices that Franchisee charges for products sold from the Food Service Counter(s).  If Franchisee desires to charge a price or prices that differ from a price or price schedule recommended by Franchisor, then Franchisee shall pay or reimburse any additional reasonable costs that Franchisor incurs to prepare price labels containing the pricing determined by Franchisee. When allowed by law, Franchisor shall have the right to specify maximum and minimum prices for products sold at the Food Service Counter(s), and Franchisee shall abide by these specifications.

11.26   <u>Initial Training</u>.  Franchisor shall provide Franchisee on one occasion, an initial training program in Franchisor's methods and techniques to prepare fresh sushi and/or other products and to operate a retail food service counter.  If Franchisee is an entity, each of Franchisee's Principal Owners, shall be

required to attend training.  For this Section 11.26, the term "Principal Owner" shall mean any individual owning directly or indirectly thirty percent (30%) or more of Franchisee. The training program shall take place at Franchisor's headquarters, online or other location that Franchisor designates.  The training program shall include classroom and on-the-job training and cover various aspects of the operation of a retail food service counter, with emphasis on techniques and examples used in the operation of food service counters bearing the Marks.  Topics to be covered may include, but are not limited to legal compliance, sanitation, sushi and other food preparation and evaluation, steam table menu, cooking and evaluation (if applicable to the franchise), franchise management, including, basic accounting, operations, business insurance, inventory control, employee management, marketing, license and permitting requirements.  Before starting operations, Franchisee and Franchisee's manager shall also take and pass the ServSafe Manager certification offered by Franchisor and the ServSafe Allergen Awareness Training provided online by ServSafe.  Franchisor shall have the right to reduce the scope of any training provided, if Franchisor, in its sole discretion, determines that Franchisee already has experience in these subjects.   Each person attending Franchisor's training program(s) shall pay Franchisor's then current fee for this training.  Franchisee shall be solely responsible for all travel and living expenses incurred for Franchisee, Franchisee's Principal Owners and other staff Franchisee elects to send to the training program.  If Franchisee or any owner of Franchisee attending the training fails to complete the training to Franchisor's satisfaction, Franchisor may cancel this Agreement in Franchisor's sole judgment on written notice to Franchisee.  There shall be no refunds of any sums paid to Franchisor if Franchisor cancels this Agreement under this Section 11.26.  Franchisor reserves the right to waive the training requirement in Franchisor's absolute discretion where Franchisor is satisfied that Franchisee or Franchisee's principals have sufficient skill, knowledge and experience with both the operational requirements and Franchisor's prescribed and preferred procedures.  Franchisor may also exempt Franchisee from some or all training (at Franchisor's sole discretion) if Franchisee or any affiliate of Franchisee already owns or operates a Food Service Counter or the Franchise Agreement is executed as a Renewal Franchise Agreement (as defined in Section 13.1).  Franchisee acknowledges that all training is provided to protect the AFC System and the Marks and not to control the day-to-day of Franchisee's operations.

11.27   Post Opening Training.   For Franchisee's initial location only, Franchisor shall provide Franchisee up to 3 days training at Franchisee's location.  Franchisor shall not charge a fee for this post opening training.  If Franchisee asks, or Franchisor decides that additional post opening training is needed, Franchisor shall have the right to charge its then current fee per additional day of training provided.

11.28.   Additional Training.  From time to time Franchisor may require Franchisee or Franchisee's manager to attend and satisfactorily complete additional training programs at Franchisor's headquarters, online or other location designated by Franchisor.  Franchisor shall have the right to charge Franchisee Franchisor's then current fee for each person for whom Franchisor provides any additional training, even if that training was required by Franchisor.  Franchisee shall be solely responsible for all travel and living expenses incurred to attend any training programs.  If Franchisee fails to attend any mandatory additional training, Franchisor shall have the right to assess Franchisee a $250 penalty for the failure to attend. Franchisee acknowledges that all training is provided to protect the AFC System and the Marks and not to control the day-to-day of Franchisee's operations.

11.29   Mailing, Reproduction Costs and Handling Costs.   Franchisor may charge Franchisee a reproduction, service and handling charge for written materials provided to Franchisee, such as manuals and marketing materials up to $100 per shipment.

11.30   Testing and Criminal Background Checks.   Whenever requested by Franchisor or the facility owner where Franchisee is located, Franchisee shall require specified personnel (which may also include Franchisee), to undergo drug, tuberculosis and other chemical and disease testing and/or criminal background investigation.   The foregoing obligations are subject to the condition that the request is lawful in the

jurisdiction where the Franchisee and Franchisee's personnel are located. Franchisee shall pay all costs of the testing and investigation, complete all forms and consents, and take all other action needed to comply with such request. If Franchisee fails any required test or background check, Franchisor may cancel this Agreement on written notice to Franchisee. There shall be no refunds of any sums paid to Franchisor if Franchisor cancels this Agreement under this Section 11.30.

11.31   Operational Communications. Franchisee agrees to receive notices and other communications from Franchisor on operations, recalls and other emergency communications via all available means, including, but not limited to, telephone calls, text messages, emails, instant messaging and other then current modes of communication.

11.32   Franchisee's Demeanor. Franchisee shall at all times act professionally and respectfully in dealing with customers, clients, the facility's personnel and Franchisor's employees.

## 12.   Risk Management.

12.1.   Insurance.   Franchisee shall obtain and maintain in effect all the following insurance coverage through insurance companies satisfactory to Franchisor for each location operated by Franchisee:

(a) Commercial General Liability coverage covering the premises and Franchisee's operations for bodily injury and property damage liability including contractual liability, personal injury and product liability coverage in amounts not less than $1,000,000 per occurrence and $2,000,000 aggregate;

(b) Worker's Compensation Insurance in statutory amounts as required in the state(s) where Franchisee's operations are conducted, including a Voluntary Worker's Compensation endorsement extending coverage to all employees exempted from coverage due to numerical employment requirements of the state;

(c) Employer's Liability Insurance with limits of $1,000,000 per occurrence;

(d) Unemployment Insurance covering Franchisee's employees;

(e) Property Insurance in an amount adequate to replace contents in the event of an insured loss;

(f) Business Income Insurance with limits adequate to insure profits and continuing business expenses for one year;

(g) State disability insurance for Franchisee's employees (as required by law); and

(h) Automobile liability insurance including coverage for autos owned, leased, hired or borrowed by Franchisee or Franchisee's owners, with limits of at least five hundred thousand dollars ($500,000) per occurrence of bodily injury and property damage combined, and any other or increased amounts of insurance that Franchisor may require from time to time for each vehicle used by Franchisee (whether principally or occasionally) in connection with the franchised business (for example, to drive to the franchised location(s), to deliver products to self service locations, or otherwise).

These coverages shall name Franchisor, Franchisor's parent and the facility owner where Franchisee operates as additional insureds (using such endorsements and endorsement forms approved by Franchisor); the additional insured must be primary and non-contributory; and the coverages must provide that Franchisor is entitled to receive at least 30 days prior written notice of any intent to reduce coverage or policy limits, cancel or otherwise amend the policy.

12.2.   <u>Changes</u>.  Franchisor shall have the right from time to time to establish and revise the minimum coverages, coverage amounts and required policy terms that Franchisee is required to obtain and maintain. Promptly after delivery of written notice to Franchisee of any revisions, Franchisee shall obtain and thereafter maintain insurance conforming to the revised requirements.

12.3.   <u>Proof</u>.  Franchisee shall provide Franchisor within 30 days of the date of this Agreement, certificates of insurance proving the coverages required above as well as a copy of Franchisee's insurance declaration pages with all endorsements. Franchisee shall deliver a complete copy of Franchisee's then prevailing insurance policies within 30 days after delivery of the certificates of insurance. Immediately on renewal or the purchase of replacement insurance, Franchisee shall deliver to Franchisor a certificate of insurance and declaration pages for the new or renewal policy.

12.4.   <u>Failure to Maintain</u>.  If Franchisee fails to purchase and maintain insurance required by Section 12.1 then Franchisor will have the right, but no obligation, to obtain that insurance through agents and insurers Franchisor chooses, or other insurance that Franchisor is able to obtain for such purpose. Franchisee shall, at Franchisor's election, pay all premiums for such insurance or reimburse premium payments made by Franchisor. Franchisor will also have the right to offset the amounts of those premiums against any amounts due from Franchisor to Franchisee. Franchisee hereby grants Franchisor a power of attorney to obtain any required insurance and any renewals thereof on Franchisee's behalf.

12.5.   <u>Insurance Disclaimer</u>.  Franchisor has no obligation to obtain or maintain any insurance for or on behalf of Franchisee.  Nothing in this Agreement is an undertaking or representation that the required insurance will be sufficient for any purpose.

12.6.   <u>Indemnity</u>.  Franchisee shall defend, indemnify and hold harmless Franchisor, Franchisor's affiliated entities, and the owner(s) and lessee(s) of the location(s) where the Food Service Counter(s) is/are located, and each of their respective members, shareholders, managers, partners, directors, officers, employees, agents, and representatives and other personnel (collectively "Indemnified Parties") from all losses, costs and expenses incurred in connection with any claim, action, suit or other proceeding or government demand (including any state and/or federal agency imposed charges, fines, penalties and taxes), based on actual or alleged acts or omissions of Franchisee, Franchisee's personnel, or others, arising from or related to the operation of the Food Service Counter(s).  Franchisee shall also defend, indemnify and hold harmless the Indemnified Parties from any liability or claims by Franchisee's employees against the Indemnified Parties for wage and hour and/or other labor and employment law violations arising from such employees' employment or work at the Food Service Counter(s).

12.7.   <u>Disclaimers</u>.  Franchisor does not represent or warrant, and disclaims any guaranty or other assurance, that Franchisee will derive income from or as a result of entering into and/or performing this Agreement; or that Franchisor will repurchase, or refund all or part of any payment or purchase of, any products, equipment supplies or other items.   The parties acknowledge that this Agreement pertains to establishing and operating food service counter(s) where Franchisee will make prepared food products for sale to the public; and is not a vending machine, rack, display case or amusement machine business.

**13.    Renewal.**

13.1.   <u>Renewal</u>.  If Franchisee fully complied with all conditions to renewal in Sections 13.2 through 13.3, and if this Agreement has not previously terminated, then Franchisee shall have the right, but no obligation, on expiration of this Agreement, to enter into a renewal Franchise Agreement (the "Renewal Agreement") for one consecutive term of five years (the "Renewal Term").  Each of the conditions stated in

Sections 13.2 through 13.3 shall be conditions precedent to Franchisee's right to enter into a Renewal Agreement.

13.2.   Conditions to Renewal.  As conditions to the right to enter into a Renewal Agreement, Franchisee shall have (a) complied with all provisions of this Agreement and any applicable Addendum during its entire term, including the time when Franchisee gives notice of intent to renew; (b) the ability to maintain possession of all Food Service Counter locations operated by Franchisee under this Agreement; (c) brought the Food Service Counter(s) into full compliance with the specifications and standards then applicable for new or renewing AFC/Southern Tsunami/Wild Blue Food Service Counters; (d) given written notice of renewal to Franchisor as provided in Section 13.3; (e) signed Franchisor's then-current form of Franchise Agreement and applicable addendum(s) at least 30 days before the expiration date (with appropriate modifications to reflect the fact that the Franchise Agreement relates to the grant of a renewal franchise), and that agreement shall supersede this Agreement. The terms of that Agreement may differ materially from the terms in this Agreement including, without limitation, different payment amounts or arrangements; (f) complied with Franchisor's then-current qualifications and training requirements; and (g) paid a non-refundable renewal fee which shall equal Franchisor's then current initial franchise fee charged by Franchisor to new franchisees for each location to be renewed.  Franchisee's failure to provide the notice in Section 13.3 or otherwise comply with each obligation under this Section 13.2 by the applicable deadline shall be deemed Franchisee's desire not to renew this Agreement.

13.3.   Notice.  If Franchisee desires to enter into a Renewal Agreement, then before expiration of this Agreement, Franchisee shall give Franchisor written notice of its desire at least 180 days but not more than 360 days prior to the expiration of the initial term of this Agreement.  Renewal shall also be conditioned on Franchisee's compliance with this Agreement through termination of the initial term and Franchisee retaining all Food Service Counter locations operated by Franchisee under this Agreement.

13.4   Month-to-Month.   If Franchisee does not sign Franchisor's then-current Franchise Agreement prior to the expiration date and Franchisee continues to accept the benefits of this Agreement after it expires, then at Franchisor's option, this Agreement may be treated either as (i) expired as of the expiration date with Franchisee then operating without a license to do so and in violation of Franchisor's rights; or (ii) continued on a month-to-month basis ("Month-to-Month Agreement") until one party provides the other with written notice of such party's intent to terminate the Month-to-Month Agreement, in which case the Month-to-Month Agreement will terminate thirty (30) days after receipt of the notice to terminate the Month-to-Month Agreement, or such longer notice period as is required by Applicable Law. In the latter case, all of Franchisee's obligations shall remain in full force and effect during the Month-to-Month Agreement as if this Agreement had not expired, and all obligations and restrictions imposed on Franchisee upon expiration of this Agreement shall be deemed to take effect upon termination of the Month-to-Month Agreement.

14.   **Transfer Restrictions.**

14.1.   Assignment by Franchisor.  Franchisor shall have the right to transfer or assign any or all rights and obligations under this Agreement in whole or in part, on one or more occasions, to any person, corporation or other entity.

14.2.   Assignment by Franchisee. Franchisee acknowledges that Franchisor entered into this Agreement and each Franchise Addendum in reliance on characteristics personal to Franchisee, Franchisee's principal owners and officers, and personal to the entity constituting Franchisee. Therefore, Franchisee shall have no right or power to, and shall not purport to sell, transfer, assign, sublicense, give, mortgage, pledge or encumber any interest in this Agreement, in any Franchise Addendum, in the business contemplated by this Agreement, or if Franchisee is an entity, a majority of the shares of stock or ownership interests in that entity

(collectively, "Transfer"), without the prior written consent of Franchisor.  Franchisor shall have the right to withhold consent to any sale or transfer proposed to be entered into within 2 years of the date of the applicable addendum for the location proposed to be sold or transferred.  Franchisor shall also have the right to withhold approval to any proposed sale or transfer, at Franchisor's discretion, if such sale or transfer involves the sale/transfer of some but not all of Franchisee's locations operated under this Agreement.

14.3.   Entity Documents.  If Franchisee or any assignee of Franchisee is an entity, then Franchisee and the assignee shall provide Franchisor a copy of its charter documents (operating agreement, regulations, articles of incorporation; partnership agreement, bylaws; and other governing documents designated by Franchisor), list of owners including the ownership interest of each, managers, directors and officers, all amendments to these documents, and all other information about the organization, structure and personnel that Franchisor requests from time to time. Franchisee shall promptly notify Franchisor in writing of any change in any information provided under this Section 14.3.

14.4   Notice of Restrictions.  Franchisee shall place on the face of each certificate, agreement and other instrument evidencing ownership of the entity constituting Franchisee, the following statement in conspicuous typeface:

> The transfer of the interest in [name of Franchisee] evidenced by this certificate [or instrument] is subject to the terms of a Franchise Agreement with Advanced Fresh Concepts Franchise Corp. dated [state date of this Agreement]. Any purported transfer made without complying with those terms is void and of no effect.

14.5   Transfer to Entity. Franchisor will not unreasonably withhold consent to a written request by Franchisee to transfer/assign Franchisee's interest in this Agreement to a corporation, limited liability company or equivalent entity, provided that Franchisee satisfies all the following conditions precedent: (a) the entity is newly organized and its activities will be limited to acting as an AFC franchisee; (b) the entity's name shall not include the words "AFC," "Advanced Fresh Concepts," "Wild Blue," "Southern Tsunami," "Hybrid Sushi" or any variant, or words confusingly similar thereto without Franchisor's prior written consent; (c) Franchisee shall be the sole owner of at least 51% of the ownership of the entity and any remaining ownership is owned only by Franchisee's spouse or children; (d) if Franchisee is two or more individuals, then each owns the same percentage of the entity as his or her interest in the business prior to the transfer/assignment; (e) the entity's articles of incorporation, articles of organization and bylaws state that the issuance and transfer of any interest in the entity are restricted by this Agreement; (f) all the entity's ownership certificates provide the notice stated in Section 14.4; and (g) Franchisee pays Franchisor's then current transfer to entity fee.  A transfer/assignment made pursuant to this Section 14.5 shall not be subject to Franchisor's rights of first refusal in Section 14.6 of this Agreement.

14.6.   Right of First Refusal.  Franchisor shall have a right of first refusal itself to accept the terms of any sale, transfer or assignment of any interest in any Food Service Counter operated by Franchisee, this Agreement or in Franchisee, offered by Franchisee or offered to and proposed to be accepted by Franchisee, whether voluntarily, by operation of law or otherwise. If Franchisor exercises the right of first refusal, then Franchisor will also have the right but no obligation to substitute cash for any form of payment proposed in the offer; and will have 60 days after notifying Franchisee of its election to exercise the right of first refusal to prepare for closing.  If a proposed transaction would involve more than 20% of the stock or other ownership interest of Franchisee then Franchisor will also have the right, but no obligation, to purchase not only the interest involved but also all the remaining interests, to acquire up to 100% of the interest in Franchisee, at a price proportionate to the price of the interests initially involved. If Franchisor exercises the right of first refusal, then at Franchisor's request, Franchisee shall also take all action necessary to cause the lease for the location(s) affected, and any other agreements designated by Franchisor, to be assigned to Franchisor.

ZF-34230
2022 FA SY

14.7.   <u>Exercise of First Refusal</u>.  To provide Franchisor the opportunity to exercise the right of first refusal, Franchisee shall deliver to Franchisor a written notice stating all the terms of any proposed sale, transfer or assignment covered by the right of first refusal and shall provide any additional information that Franchisor requests about the proposed transaction.  Franchisee shall require its owners to provide Franchisee sufficient information to enable Franchisee to comply with this obligation with regard to a transaction proposed by any of the owners of Franchisee.  Within 45 days after Franchisor receives the notice and the additional information requested by Franchisor, Franchisor will notify Franchisee whether Franchisor accepts for itself or its nominee the terms in the notice.

14.8.   <u>Waiver</u>.  If Franchisor elects not to exercise the right of first refusal and consents to the proposed sale, assignment or transfer, then Franchisee will be authorized to complete the proposed transaction with the proposed assignee on the terms in the original notice to Franchisor.  Any change to the terms constitutes a new proposal which again requires compliance with the procedures in Sections 14.6 through 14.7 (and this Section 14.8, if applicable).  Franchisor's election not to exercise the right of first refusal for any proposed transaction does not affect Franchisor's right of first refusal for any other transaction and does not constitute approval of the proposed transferee or assignee or of the transaction.  Franchisee and any proposed transferee or assignee shall comply with all provisions in this Agreement relating to transfer and assignment.

14.9.   <u>Sale To Third Party</u>.  If Franchisor elects not to exercise the right of first refusal, then Franchisor's consent to a proposed sale, transfer and/or assignment by Franchisee shall not be unreasonably withheld.  It shall be deemed to be reasonable for Franchisor to require, as conditions precedent to consenting to the proposed sale, transfer and/or assignment, among other requirements, that (a) Franchisee first comply with the right of first refusal provisions in Sections 14.6 through 14.7; (b) the proposed transferee/assignee apply to Franchisor to become a franchisee; provide information that Franchisor requests to assess the proposed transferee's/assignee's skills, qualifications, integrity, honesty and resources (financial and otherwise) sufficient in Franchisor's judgment to operate the Food Service Counter(s) in a manner that Franchisor expects to be satisfactory; (c) the proposed transferee/assignee cooperates in arranging one or more personal interviews at times and places designated by Franchisor; (d) consent is obtained, of the owner(s) of the location(s) where the Food Service Counter(s) is/are located if such owner(s) has/have the right to consent pursuant to an agreement with such owner; (e) the proposed transferee/assignee attends and successfully completes Franchisor's initial training program and any other training Franchisor requires, all at the proposed transferee's/assignee's expense; (f) at Franchisor's option, the proposed transferee/assignee, either: (i) signs Franchisor's then current form of Franchise Agreement, modified to delete any initial fee, and to expire on the expiration date of this Agreement or (ii) signs Franchisor's then current form of Franchise Agreement for a full term and pays Franchisor's then current initial franchise fee; (g) Franchisee pays all moneys owed to Franchisor and to any affiliated entities of Franchisor and in addition pays Franchisor a transfer fee of $1,000 for each location to be transferred; (h) Franchisee and the principal owners of Franchisee execute a general release in a form satisfactory to Franchisor of all claims against Franchisor, its owners, directors, officers, members, managers and employees; (i) Franchisee agrees not to retain any security interest in any assets of the franchise or business following the transfer; (j) that the terms of the sale and/or assignment not be unduly burdensome to the transferee/assignee in Franchisor's judgment; and (k) that the sale, transfer and/or assignment close within 90 days of Franchisor's election not to exercise the right of first refusal.

14.10.   <u>Transfer On Death or Incapacity</u>.  If Franchisee is an individual who dies, or becomes permanently incapacitated, then Franchisor shall allow the deceased's surviving spouse, heirs, or estate or the incapacitated person's legal representative, the opportunity to participate in ownership of Franchisee during 180 days after the death or incapacity, provided that during that time the surviving spouse, heirs or estate or legal representative (a) maintains all standards of the franchise, performs all obligations of Franchisee and

satisfies all then current qualifications for a purchaser of a franchise or, (b) in accordance with the requirements of Sections 14.2 and 14.6 through 14.9 sells that person's ownership interest in Franchisee and the Food Service Counter(s) to a person who satisfies Franchisor's then current standards for new franchisees.

14.11.  Death or Incapacity of Individual Affiliated with Entity.  If Franchisee is an entity, then the death or incapacity of a shareholder, owner, director, manager, officer or partner of Franchisee shall not constitute an assignment or transfer of this Agreement under Section 14.2, provided that during 180 days after the death or incapacity the surviving spouse, heirs or estate or the incapacitated person's legal representative (a) maintains all standards of the franchise, performs all obligations of Franchisee and satisfies all then current qualifications for a purchaser of a franchise or, (b) in accordance with the requirements of Sections 14.2 and 14.6 through 14.9 sells that person's ownership interest in Franchisee and the Food Service Counter(s) to a person who satisfies Franchisor's then current standards for new franchisees.

14.12.  Operation by Franchisor.  From the date of death or incapacity until satisfied that a qualified and trained individual assumed full-time operational supervision of the Food Service Counter(s), Franchisor shall have the right, but no obligation, to enter and operate the Food Service Counter(s). Any decision by Franchisor to do so shall be deemed to be an accommodation to assist Franchisee. Franchisor makes no representation or warranty regarding its ability to operate the Food Service Counter(s) profitably, and Franchisor shall not be responsible for results of operation.  Franchisee shall reimburse all Franchisor's expenses incurred to operate the Food Service Counter(s) pursuant to this Section 14.12, including but not limited to travel, lodging, meals, and personnel compensation; and shall pay Franchisor, in addition to all other amounts provided for in this Agreement, a management fee of up to $450 per day per person Franchisor sends for the period of operation by Franchisor.  Franchisor shall have the right to increase this daily rate effective on delivery of written notice to Franchisee. Franchisor shall have the right to cause itself to be paid and reimbursed any or all these amounts from revenues of the Food Service Counter(s), as well as all other amounts required to be paid under this Agreement.

14.13.  Operation for Cause.  If Franchisor determines that operation of the Food Service Counter(s) may be in jeopardy or if a default occurs, then in addition to all Franchisor's other rights and remedies, Franchisor shall have the right to operate the Food Service Counter(s) in the manner and on the terms provided in Section 14.12, for as long as Franchisor believes necessary or practical.

## 15.   Default and Termination.

15.1.  Immediate Termination Without Opportunity to Cure.  Franchisee shall be deemed to be in default and Franchisor shall have the right to terminate this Agreement and/or any applicable addendum, without allowing Franchisee any opportunity to cure the default, effective immediately on delivery to Franchisee of written notice of termination, on the occurrence of any of the following events:

A.     Franchisee is adjudicated bankrupt or insolvent or any substantial part of Franchisee's assets is assigned to or for the benefit of any creditor, or a petition in bankruptcy is filed by or against Franchisee and not immediately contested and dismissed within 60 days after filing, or a bill in equity or other proceeding for appointment of a receiver or other custodian of Franchisee or any assets of Franchisee is filed and consented to by Franchisee, or a court appoints a receiver or other temporary or permanent custodian of all or part of Franchisee's assets, or proceedings for a composition or arrangement with creditors under any federal or state law are instituted by or against Franchisee;

B.     Franchisee is voluntarily or involuntarily dissolved;

C. Execution is levied against Franchisee or any real or personal property of Franchisee is sold after levy by a government body or official.

D. Franchisee stops operating or abandons the franchise by failing to operate at any Food Service Counter for three (3) consecutive days when Franchisee is required to operate, or any shorter period of time in which it is reasonable in the circumstances for Franchisor to conclude that Franchisee does not intend to continue to operate the Food Service Counter(s).

E. Any material complaint or subjective dissatisfaction expressed by the owner(s) or managers of the facility where any Food Service Counter operated by Franchisee is located, regardless of the reason for such complaint or subjective dissatisfaction; or the owner(s) or managers of the facility object for any reason to the continued operation of the Food Service Counter at the facility.

F. Franchisee (or, if Franchisee is an entity, any owner, member, partner, director, manager or officer of Franchisee) is convicted of or pleads no contest to a felony, fraud, crime involving moral turpitude, or other crime or offense which Franchisor reasonably believes is related to Franchisee's operation of the Food Service Counter(s) or is likely to have an adverse effect on the AFC System, the Marks or the goodwill associated with the Marks.

G. Franchisor determines that a threat or danger to public health or safety may result from Franchisee's continued operation of any Food Service Counter and/or Franchisee fails to cure any health and safety violation within 24 hours after notice of the violation.

H. Franchisee engages in any unlawful act, form of harassment or discrimination.

I. Franchisee (or, if Franchisee is an entity, any owner, member, partner, director, manager, or officer of Franchisee) purports to transfer any rights or obligations under this Agreement or any interest in Franchisee or any Food Service Counter operated by Franchisee, or any security interest, to any third party in violation of any terms or without satisfying any of the conditions within Sections 14.2 through 14.11.

J. There occurs any breach of any of the covenants in Sections 5.3, 6.1 through 6.4 or 14.2 through 14.11.

K. Franchisee makes any material misrepresentations relating to the acquisition of the franchise or engages in conduct which reflects materially and unfavorably on the operation and reputation of the franchise or franchise system.

L. Franchisor discovers that Franchisee knowingly or with reckless disregard maintained false books or records, or submitted a false report to Franchisor; intentionally concealed revenues; attempted to defraud Franchisor; misdirected or appropriated for Franchisee's own use any funds withheld from wages of employees; failed to properly withhold taxes, FICA, insurance or other benefits from employee wages; appropriated for Franchisee's own use any funds or other property of Franchisor; or knowingly permitted or, having discovered the facts, failed to take action against or discharge any employee who embezzled funds or other property of any customer of Franchisor, or anyone else.

M. Franchisee interferes or attempts to interfere with Franchisor's contractual relations with any third party, including but not limited to other franchisees, or interferes or attempts to interfere with Franchisor's ability or right to grant franchises or licenses to others to use the Marks or AFC System.

N.      Franchisee repeatedly fails to comply with one or more provisions of this Agreement, whether or not cured after notice.

O.      Franchisee fails to cure any default under this Agreement that materially impairs the goodwill associated with the Marks within 48 hours after delivery of written notice to cure;

P.      Franchisee fails to satisfactorily complete initial training in Franchisor's sole judgment or to pass any required criminal background check and/or drug, tuberculosis or other chemical and disease testing;

Q.      Any act of dishonesty or moral turpitude, either in Franchisee's operations, or in dealings with the facility owner where Franchisee's Food Service Counter(s) is/are located or in Franchisee's interactions with Franchisor.

15.2.    <u>Termination After Notice and Opportunity to Cure</u>.  Except as stated in Section 15.1, Franchisee shall have 15 calendar days after delivery by Franchisor of written notice to cure the breach or default under this Agreement and/or any applicable addendum, or if it cannot be cured in that time, to take within that time, and continue, all available steps to cure and to provide proof of those steps to Franchisor. Failure to cure in this time, or within this time to take and continue all available steps to cure, shall at Franchisor's election, result in termination of this Agreement and/or the applicable Franchise Addendum, effective on expiration of the period allowed for cure as specified in the notice of default. However, if applicable law requires Franchisor to allow a larger period of time, then Franchisee shall have the period of time required by law to cure the breach or default.

15.3    <u>Cross Default</u>.  Franchisee's breach of one agreement/addendum with Franchisor shall, at Franchisor's election also constitute a breach of every other agreement/addendum between Franchisee and Franchisor.  A breach by franchisee of this Agreement shall also constitute, at Franchisor's election, a breach of all other agreements/addendums between Franchisee and Franchisor.  Franchisor's election to enforce or not enforce this provision shall not constitute a waiver of any of Franchisor's rights or remedies against Franchisee hereunder.

15.4    <u>Acts of Others</u>.  Franchisee shall be responsible for all acts and/or omissions of Franchisee's employees, managers, independent contractors and family members, regardless of whether Franchisee had actual notice of such actions/omissions.

15.5.    <u>Notice Required By Law</u>.  If any applicable law or regulation limits Franchisor's right to terminate this Agreement or requires greater notice or time to cure than stated in this Agreement, then Franchisor may allow additional time to conform to the minimum notice or cure period or restriction on termination required by that law or regulation.  This Section 15.5 does not waive any right of Franchisor to challenge the validity or application of such law or regulation.

15.6.    <u>Effects of Termination or Expiration</u>.  On termination or expiration of this Agreement without renewal, Franchisee shall do all of the following:

A.      Immediately pay all amounts due and owing to Franchisor and all sums due and owing to any third party relating to the operation of each of Franchisee's Food Service Counter(s);

B.      Immediately stop using the Marks, and permanently refrain from doing business using any name or in any way that could tend to give the public the impression that Franchisee is or previously was operating a Food Service Counter associated with Franchisor; and refrain from using, in any manner, or for any purpose, any confidential information or trade secrets of Franchisor;

   C. Immediately take all action needed to cancel any assumed name or equivalent registration pertaining to the Food Service Counter(s);

   D. Revise all websites and social media pages controlled by Franchisee to remove references to the Food Service Counter(s) and Franchisor's Marks and System; and at Franchisor's request, assign to Franchisor all Internet domain names and social media accounts owned by Franchisee relating to the Food Service Counter(s).

   E. Pay Franchisor all expenses incurred by Franchisor as a result of any breach or default by Franchisee, including, but not limited to, expenses Franchisor incurs on account of travel, lodging, meals, personnel compensation and operational costs;

   F. At Franchisor's request, assign to Franchisor all of Franchisee's possessory interest in the Food Service Counter(s) operated by Franchisee; vacate the premises and provide all necessary assistance to enable Franchisor to take possession thereof;

   G. Immediately return to or, as applicable, deliver to Franchisor the Manuals, all customer lists, all promotion material, all materials, signs and related items bearing the Marks; all forms and other materials or property of Franchisor, and any copies of these, in Franchisee's possession or control. Franchisee shall also return to the facility owner, all property of the facility owner including, but not limited to, the facility owner's manuals, equipment, assets and any other items owned by the facility owner in Franchisee's possession;

   H. Assign to Franchisor or its designee, all right, title and interest in and to the phone numbers of the Food Service Counter(s), notify the phone company and all listing agencies that Franchisee's right to use the phone numbers ended, and authorize the transfer of the phone numbers to Franchisor or its designee;

   I. Cooperate with Franchisor in providing records of the Food Service Counter(s) and disclosing all other pertinent information;

   J. Sign all documents which Franchisor may reasonably require to evidence and further accomplish termination of this Agreement and of Franchisee's rights to use the Marks and AFC System; and

   K. Refrain from destroying, damaging, hiding or taking any equipment or inventory from the Food Service Counter(s) without Franchisor's written consent.

 15.7 <u>Option to Purchase</u>.  On termination or expiration of this Agreement, Franchisor shall have the option (but not the obligation), exercisable by delivering notice to Franchisee during the thirty (30) days following termination or expiration, to purchase the Assets of the Food Service Counter(s).  For this Section 15.7, "Assets" means equipment, supplies, signage and non-perishable inventory.

   A. The purchase price for the Assets will be the fair market value as reasonably determined by Franchisor. Any amounts Franchisee owes to Franchisor or its affiliates shall be applied to reduce the purchase price.

   B. The balance of the purchase price, after the deductions in Section 15.7(A), shall be payable by Franchisor to Franchisee, at the closing. The closing shall occur at a date stated by Franchisor in the notice to Franchisee of Franchisor's exercise of the purchase option.  That date shall be no later than 30 days after delivery of the notice, provided that the date may be later as reasonably determined by Franchisor

to allow time for compliance with bulk sales laws. At closing, the parties shall execute and deliver all documents necessary to vest title in the purchased assets in Franchisor, free and clear of liens and encumbrances. Franchisee shall provide Franchisor with all information necessary to close the transaction.

        C.     Franchisor shall also have the right (but not the obligation) to purchase non-expired approved perishable inventory at Franchisee's Food Service Counter(s) at the time of expiration or termination of this Agreement. The purchase price for the non-expired approved perishable inventory will be the product cost paid by franchisee to acquire these products from Franchisor or Franchisor's approved suppliers. Any amounts Franchisee owes to Franchisor or its affiliates shall be applied to reduce the purchase price.

    15.8    <u>Continuing Effect</u>. All provisions which by their terms or nature survive expiration or termination of this Agreement shall continue in effect regardless of expiration or termination until fully performed or until they expire by their nature.

## 16.    **Additional Provisions.**

    16.1.   <u>Compliance With Law</u>. Franchisee shall operate the Food Service Counter(s) in compliance with all applicable laws, rules and regulations of all government authorities, including but not limited to federal and state laws pertaining to wages, hours, working conditions, unlawful discrimination, employment verification, record keeping, workers compensation, leaves of absence, restrictions on employment of minors and other labor laws, social security and unemployment insurance contribution requirements, disability insurance, income tax and other withholdings, contributions, deposits and reporting as well as federal and state laws on operating a restaurant, health, safety and sanitation laws which also include health department inspections, menu and menu board labeling laws, food labeling laws, the Hazard Analysis and Critical Control Point ("HACCP") food safety program adopted by the U.S. Food & Drug Administration and rules on handling, preparing and serving foods by people with communicable or infectious diseases.

    16.2.   <u>Interpretation</u>. Headings and section numbers in this Agreement are for convenience only and are not part of this Agreement. References to the owner or lessee of the premises where a Food Service Counter is located also include the applicable operator with whom Franchisor has arrangements that permit the establishment of the franchise granted by this Agreement. The provisions of this Agreement shall be interpreted according to their fair meanings and not strictly for or against any party.

    16.3.   <u>Entire Agreement</u>. This Agreement is the entire agreement of the parties. All prior written agreements, discussions, negotiations, representations and understandings of the parties are merged into and superseded by this Agreement. Franchisee acknowledges that Franchisee did not receive any promise, representation, or warranty, express or implied, as to potential sales, volume, profits or success of any Food Service Counter. Nothing in the Agreement is intended to disclaim the representations made to Franchisee in the Franchise Disclosure Document.

    16.4.   <u>Amendment</u>. No modification of this Agreement will be valid unless executed in writing and signed by both parties. This provision shall not restrict updates and revisions to the Manuals.

    16.5.   <u>Relationship of the Parties</u>. The parties shall be independent contractors and not partners, joint venturers, principal-agent, employer-employee, or other relationship with each other. Franchisee shall have no authority or power to and shall not purport to obligate Franchisor to any person or entity. In all public records, letterhead and on signage at the Food Service Counter, Franchisee shall indicate its independent ownership of the franchised business and that the Food Service Counter is independently owned and operated. Franchisee shall not interfere with or disrupt Franchisor's relationship with the owner(s) or lessee(s) of the premises where the Food Service Counter(s) is/are located, and shall not communicate with

such owner(s) or lessee(s) concerning the relationship with Franchisor or any other matter not involving regular day to day operations of the Food Service Counter(s), without first obtaining Franchisor's written consent. By way of example, and not limitation, Franchisee shall not communicate with the facility owner or its agents about pricing, menu changes, new concepts or other types of business opportunities involving the facility owner or otherwise. Franchisee shall never represent himself/ herself as an agent or employee of Advanced Fresh Concepts Franchise Corp. or Advanced Fresh Concepts Corp. Any complaint, petition and/or application that takes a position inconsistent with this Section, or other claim filed in violation of this Section shall be deemed a material breach of this Agreement.

    16.6.  <u>No Waiver</u>. Waiver of any breach or default on any occasion shall not constitute a waiver of any other or future breach or default.

    16.7.  <u>Governing Law</u>. This Agreement takes effect upon its acceptance and execution by Franchisor in California. This agreement shall be governed by and interpreted and construed according to the internal laws of California without regard for its principles of conflicts of law. However, (a) if a provision of this Agreement would not be enforceable under California law, and (b) if the Food Service Counter is located outside California; and (c) such provision would be enforceable under the laws of the state where the Food Service Counter is located; then such provision shall be interpreted and construed under the laws of the state where the Food Service Counter(s) is/are located. Where a California statute or rule of law provides that such statute or rule is inapplicable outside the state, for example, to a franchise located outside of California, or is inapplicable for another reason, such as an exemption, such law or rule shall not apply to Franchisee if located outside of California or if the circumstances of inapplicability apply. Nothing in this <u>Section 16.7</u> is intended to subject this Agreement to any franchise or similar law, rule, or regulation of any state to which it would not otherwise be subject.

    16.8.  <u>Arbitration</u>

        A.  <u>Scope Of Arbitration</u>:  Any dispute that arises out of or relates directly or indirectly to this Agreement, including, without limitation, any claimed breach of this Agreement or any claim that any part of this Agreement (including this Section 16.8 or any part thereof) is invalid, illegal, unenforceable, voidable or void, or the relationship of the parties hereto shall be resolved by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "Rules" - available upon request and at www.adr.org), except as provided for otherwise in paragraph I below. Sections 1281.4 and 1283.05 of the California Code of Civil Procedure are, by this reference, incorporated in and made a part of this Agreement and shall apply in connection with any arbitration under this Section 16.8. In the event the terms of this Agreement, (including Section 16.8), the Rules or any applicable arbitration statute differ or conflict with each other, the terms of this Agreement shall control over the Rules and the arbitration statute, and the Rules shall control over the arbitration statute. This arbitration provision shall be self-executing, and shall remain in effect after and regardless of expiration or termination of this Agreement.

        B.  <u>Number Of Arbitrators</u>:  Should at any point the alleged damages exceed $1,000,000 in total, exclusive of alleged interest, costs and/or attorney's fees, the dispute shall be heard and determined by a panel of three arbitrators. For all disputes, at least one arbitrator shall be a practicing attorney that specializes in franchise law.

        C.  <u>Independent Arbitrations</u>:  The parties intend any dispute to be resolved as an independent arbitration, which is neither consolidated, classed, nor certified with any other claimant, arbitration or dispute. The parties waive all rights to resolving any dispute as consolidated, classed or certified with any other claimant, arbitration or dispute.

        D.  <u>Location Of Arbitration</u>:  Arbitration shall occur in Los Angeles, California.

E.   Discovery:  After the appointment of the arbitrator(s), each side may commence discovery.  Each side shall be limited to the following discovery:  (a) no more than five (5) depositions of potential witnesses;  (b) one set of written interrogatories;  (c) one set of requests for production;  and (d) one set of requests for admission.  The aforementioned forms of written discovery shall not include more than 25 questions or requests within each set.  The arbitrator(s) may permit requests for additional discovery for good cause.  All objections are preserved for the arbitration hearing, except for objections based on privilege or proprietary/confidential information.  All discovery shall be completed within eight months after the selection of the arbitrator(s), unless this period of time is shortened or extended by the arbitrator(s) for good cause or by stipulation of the parties.

F.   Law And Motion:  The arbitrator(s) shall set a briefing schedule, which sets a law and motion hearing date and the submission deadline for opposition and reply memoranda, no later than five days after the submission of any law and motion.  The law and motion hearing date shall in no case be set more than 30 days after the original submission of any law and motion.  Law and motion matters shall be decided, and a reasoned ruling issued as soon as practical, but in no case later than 15 business days after the scheduled law and motion hearing.  Nothing in this subsection prevents any party from requesting ex parte relief as permitted by California law.

G.   Pre-Award Costs of Arbitration:  During the course of the arbitration proceeding, the costs of arbitration, including the fees and costs for the arbitrator(s) and for the alternative dispute center, and all transcript and similar court reporter charges incurred at a merits hearing (collectively the "Arbitration Costs"), shall be allocated equally between each side.  Unless accommodated otherwise by the alternative dispute resolution center and/or the Rules, any party's failure to pay its portion of the fees and costs for the arbitration within the due dates set by the alternative dispute center shall result in the immediate suspension of the arbitration.  In the event a suspension for non-payment of arbitration fees and costs continues for 30 days, the alternative dispute resolution center shall either enter the default of the non-paying party or the arbitration shall be dismissed.  At the conclusion of the arbitration proceeding, the arbitrator(s) shall award the prevailing party the prevailing party's Arbitration Costs pursuant to Section 16.8(J).

H.   Awards:  All awards, including, without limitation, an interim or partial award, by the arbitrator(s) regarding the merits of the dispute shall be articulated in writing, signed by the arbitrator or a majority of the arbitrators (if applicable) and include a statement setting forth the reasons for the decision (a "reasoned award") and shall be issued no later than 30 days after the merits hearing is closed as to any further evidence or briefs, notwithstanding post hearing motions, including, but not limited to, petitions for fees and bills of costs.  All awards shall be based on established law and shall not be made on broad principles of justice and equity. An award may be appealed to a court of competent jurisdiction for any errors of law, errors of legal reasoning or determination of fact that are clearly erroneous. Judgment on the final award may be entered in any court with competent jurisdiction.  Except as otherwise provided in Section 16.8, an award may be entered against any party that fails to appear, defend, advance, attend, participate in, prosecute or obtain a postponement after being afforded due notice of the arbitration.

I.   Injunctive/Provisional Remedies:  Nothing in Section 16.8 or elsewhere in this Agreement limits a party's rights or remedies in connection with any action in any court of competent jurisdiction for injunctive or other provisional relief that a party deems necessary or appropriate to compel the other party to comply with the party's obligations under this Agreement, to protect the trade secrets or other intellectual property of a party against disclosure, or to prevent any threatened conduct that may cause loss or damage to a party under rules of equity, pending completion of arbitration.  The parties agree that any failure to immediately cease operation, vacate the location of the operation or cease the use of intellectual property will cause irreparable injury and that money damages will not provide an adequate remedy.  Both parties therefore consent to the issuance of an appropriate injunction.

J.   Fees And Costs:   The arbitrator(s) shall award to the prevailing party(ies), the prevailing party's fees and costs that were both incurred and relate directly to the claims allowing for an award of fees and costs. The arbitrator(s) shall consider the results of the entire arbitration and all claims filed, whether based in contract, statute or otherwise, in determining whether there is a prevailing party. The arbitrator(s) shall deny any motion/petition for fees that is not supported by a verified and detailed account of the time and expenses incurred. An award of fees and costs for all claims, including, without limitation, those based on a breach of this Agreement or for claims based on statute, may not exceed either: (a) in the event of a money award, one third the amount of compensatory damages awarded; or (b) in the event of a defense award, one third the greatest total amount claimed as damages at any point during the arbitration, including, without limitation, within any writing, testimony or argument. "Fees and costs" mean all reasonable pre-award expenses of the arbitration, including the prevailing party's Arbitration Costs (as defined in Section 16.8(G)), administrative fees, travel expenses, out of pocket expenses, such as copying and telephone, court costs, legal research costs, expert witness fees, and attorney's fees. Except as otherwise provided above, a court of competent jurisdiction shall award fees and costs to the party that prevails on either a motion/petition for injunctive relief, as provided for in paragraph I above, or on a motion/petition to compel arbitration pursuant to this Section 16.8.

K.   Severability Of Section 16.8:   Should any part of Section 16.8 be ruled invalid, illegal, unenforceable, voidable or void, then the remainder of Section 16.8 shall still remain in effect. Should any part of Section 16.8 conflict with any non-waivable or non-modifiable statutory rights, Section 16.8 shall be interpreted and applied to the extent possible without conflicting with statutory rights.

16.9.   Relief.   Franchisee acknowledges that the breach or threatened breach of any provision within Sections 5.3, 6.1 through 6.4, 14.2 through 14.11 or 15.6 (B) through 15.6(K) would cause irreparable harm to Franchisor for which there is no adequate remedy at law. Therefore Franchisor shall be entitled to preliminary and permanent injunctive relief to enjoin actual or threatened violation of any such provision.

16.10   Severability.   If any provision of this Agreement is held to be invalid, the remaining provisions of this Agreement shall remain in effect. Should any provision of this Agreement be held to conflict with any statutory rights, such provision shall be interpreted and applied to the extent possible without conflicting with such statutory rights.

16.11.   Notices.   Except as otherwise stated in this agreement, all notices which are required by this Agreement shall be deemed to be delivered 3 days after being placed in the U.S. Mail, certified mail, return receipt requested or priority mail with delivery receipt confirmation, or one day after being sent by United Parcel Service or other receipted overnight courier service if addressed to a party at the address stated in the introductory paragraph of this Agreement, or other address of which a party has given notice to the other, or immediately by hand delivery to a party. Franchisee shall provide Franchisor Franchisee's physical address for notice purposes under this Section and shall keep Franchisor updated of any changes thereto.

16.12.   Force Majeure.   A party shall not be liable for delay in performance of up to 30 days, other than performance of an obligation to pay money to the other party, if the delay is due to terrorism, war, riot, strike or other labor trouble, utility failure, storm, fire, flood, earthquake, hurricane, explosion, embargo, blockade, insurrection, act of God or other similar event that is beyond the control of the parties. In the event of such delay, the time for performance will be extended by a period of time equal to the cause of the delay, but no longer than 30 days.

16.13.   Opportunity to Review.   Franchisee acknowledges having had an opportunity to review Franchisor's Franchise Disclosure Document for at least 14 calendar days before signing any agreement with

Franchisor or making any payment to Franchisor, to consult with an attorney and other professional advisors of Franchisee's choice, and Franchisee has made the decision whether or not to consult with such advisors.

Executed as of the date first stated above:

FRANCHISEE

**Pau Sian Mung**

Signature _____

Printed Name _Pau Sian Mung_____

Title _____

FRANCHISOR

ADVANCED FRESH CONCEPTS FRANCHISE CORP.

Signature _____

Printed Name Gerardo Siordia Posadas

Title General Manager of Compliance

GUARANTY

In exchange for Franchisor's execution of this Agreement, the undersigned unconditionally, absolutely and irrevocably guaranties and promises to pay and perform any and all indebtedness and obligations of Franchisee (an entity and/or operation in which the undersigned has an ownership interest) to Franchisor under this Agreement and all other Franchise Documents.  If more than one person signs below, the obligations of the undersigned shall be joint and several.

Signature: _____

Print Name: _Pau Sian Mung_____

Signature: _____

Print Name: _____

Signature: _____

Print Name: _____