# Exhibit 1

THIS AGREEMENT ("Agreement") dated as of March 13, 2020 (the "Effective Date") is made between YOUNG AND MEATHE HOMES, LLC ("Builder") 416 E Paces Ferry Rd NE, 2ND Floor, Atlanta, GA 30305, and FLOWER MAGAZINE, a division of Peony Publishing, LLC, 3020 Pump House Road, Birmingham, Alabama 35243 ("Publisher").

The purpose of this Agreement is to set forth certain mutually beneficial terms and conditions for the design, construction, and furnishing of the 2021 FLOWER MAGAZINE Show House (the "House"), which shall be situated on 389 Blackland Road NW, Atlanta, Georgia 30342 (the "Property"), and the House shall be held open to members of the public in accordance with the terms of this Agreement.  Intending to be legally bound hereby, the parties hereby agree as follows:

1. **DESIGN AND CONSTRUCTION.**

    A.   Builder, either on its own or through independent contractors, shall be responsible for constructing the House on the Property in accordance with the plans and specifications prepared and provided by an appropriately licensed architect (the "Architect"), selected by Builder, and whose preliminary plans have been approved by Publisher (the "Plans"). For the avoidance of doubt, Publisher is approving Plans with respect to general design elements, only, such as architectural style, overall square footage and number of bedrooms, in recognition of its role in coordinating with advertisers and product suppliers. Publisher is not approving Plans with respect to structural soundness, building code or any other construction element.  Approval of Plans by Publisher in no way reflects Publisher's responsibility or warranty for the soundness or structural integrity of the Plans and, as between the parties, Publisher assumes no liability in connection with any third party claims in connection with design, or Plan defects generally and, as between the parties, Builder assumes any such liabilities for third party claims.  Builder will diligently make commercially reasonable efforts to complete the construction of the House for installation of furnishings by August 1, 2021 (the "Target Date"). Publisher may, but is not required to, extend the Target Date to account for Force Majeure Events, as defined in paragraph 14.I, if, in Publisher's reasonable opinion, such delay is warranted. In the event of Target Date delays, Publisher shall nevertheless be entitled to access the House to fulfill its obligations in connection herewith including, without limitation, access for any and all magazine photo shoots and/or before and after video. Notwithstanding the foregoing, neither party shall be liable to the other for damages for delays caused by Force Majeure Events.

B. Any substantive changes or deviations from the Plan must be approved in writing by Publisher.

C. Builder, either on its own or through independent contractors hired on its behalf, will supervise and direct the construction of the House in a professional and workmanlike manner in accordance with the highest standards in the industry. As between the parties, Builder will be solely responsible for all designs, construction means, methods, techniques, and procedures used to construct the House and any liability in connection with third party claims in connection therewith. Publisher will have no involvement in or control over the construction means, methods, techniques or procedures used by Builder in constructing the House.

D. Builder, either on its own or through independent contractors hired on its behalf, will supervise and direct the construction of the House using only materials, appliances and equipment in conformity with the Plans. Builder acknowledges and agrees to work with the Publisher, to select products, systems, and/or services (collectively, "Products") from specified suppliers ("Sponsors") to be used by Builder in the construction of the House. By way of example only, and not by limitation, Products may include siding materials, flooring materials, kitchen and bathroom cabinetry, interior and exterior fixed lighting, windows, doors, countertop materials, kitchen appliances, HVAC system, landscaping and hardscaping materials and bathroom fixtures and fittings. Builder will be responsible for the proper installation or application of the Products in the House in accordance with their applicable specifications and shall be responsible for any third party claims for damages, judgments, settlements or liabilities in connection therewith. Builder shall not substitute or alter any Product without Publisher's express written authorization. Builder's failure to install an approved Product, and the removal, substitution or alteration of any Product without Publisher's authorization shall be considered a material breach of this Agreement.

E. For the avoidance of doubt, the parties acknowledge and agree that, as between the parties, Builder shall be solely responsible for selling the House, and shall be solely responsible for any risk of failure or delay in selling the House.

F. Unless otherwise provided in this Agreement, Builder will provide at its sole expense all labor, materials (including Products), equipment, and other facilities and services necessary for proper construction of the House. Builder assumes all costs associated with the construction of the house and acknowledges that Publisher has made no representations with regard to any financial assistance or benefits to be derived from the Show House concept other than those set forth in this Agreement.

G. Builder, either on its own or through independent contractors hired on its behalf, will perform the construction of the House in compliance with all applicable federal, state, and local laws, rules and regulations including, without limitation, building codes and restrictions and environmental laws.

H. Builder, either on its own or through independent contractors hired on its behalf, will initiate, maintain, and supervise all safety precautions and programs in connection with construction of the House, and will comply with all federal, state, and local safety laws and regulations.

I. During construction, Publisher will have the right to periodically visit the House during regular business hours, upon reasonable prior notice and in accordance with any reasonable job site safety rules and regulations established by Builder.

J. Builder in the fulfillment of its obligations hereunder, will use its best efforts to cooperate with all third parties, including sponsors, vendors, and others as may be requested by Publisher.

K. Builder agrees that as between the parties, Publisher shall not be liable in any respect under or in connection with Builder's agreements with third parties, including liability for payment.

L. The review and approval of the Plans and any inspection of the House by Publisher will not be construed as Publisher's approval of the structural integrity of the House, the House's fitness for its intended use or purpose, or that it was constructed in compliance with applicable laws, ordinances, rules, or regulations.  As between the parties, Publisher shall not be liable for any third party claims for damages, judgments, settlements, disputes or other liabilities based upon the design or construction of the House. No party will be entitled to bring any action, proceeding, or suit against the other party with respect to any decision, approval, or disapproval of the Plans, and no party will be liable to any other party for any claims arising out of such decisions, approvals, or disapprovals with the exception that Publisher may bring an action against Builder for indemnification of claims for which Builder is responsible hereunder.

2. **LANDSCAPING.**

A. Builder, at its expense, will provide a proposed landscaping plan for the House (the "Landscape Plan"), to Publisher for review and approval, which approval shall not be unreasonably withheld, conditioned or delayed.  Builder acknowledges and agrees that Publisher, at any time, and in its sole discretion, may designate Products of specified Sponsors to be used by Builder in the design and installation of the Landscape Plan.  By way of example only, and not by limitation, Products may include brick or stone paving materials, fencing, fixed lighting, specific branded plants and tile treatment.  Builder will be responsible for the proper installation or application of the Products in the House in accordance with their applicable specifications.

B. In accordance with the Landscaping Plan, Builder, either on its own or through independent contractors hired on its behalf, will provide, perform and/or install rough grading,

3

general tree pruning and clean-up, a landscape irrigation system, all other landscape items and hardscape items (driveways, walkways, retaining walls, steps, etc.) at its expense.

    C.    As between the parties, Builder shall be responsible for any third party claims for damages, judgments, settlements or liabilities in connection with the Landscape Plan.

3.    **OWNERSHIP.**

    A.    Builder shall own, and represents and warrants that it does and will continue during the term of this Agreement to hold clear title to, the House and the Property. Builder assumes all risks associated with constructing and selling the House. Except as otherwise expressly provided in this Agreement, Publisher has no legal or equitable rights in connection with the House or the Property and has no obligations or liabilities concerning the design, construction, maintenance, use or sale of the House or the Property.

    B.    Builder hereby agrees that Publisher shall not be responsible for any warranties associated with the House or Products. Builder will not represent to prospective purchasers of the House that Publisher employed Builder, or that Publisher supervised, controlled, or directed the construction means, methods, techniques or procedures used to build the House in any manner whatsoever. Builder hereby agrees that it will incorporate the following statement into any purchase contract prepared in connection with the sale of the House:

> *"Purchaser understands that the house was the 2021 Flower Magazine Show House and that the house was constructed from a plan from the Builder. Purchaser further acknowledges and understands that Flower Magazine did not design, supervise or control the construction of the house, and that (Builder) has made no statements or representations that Flower Magazine designed, supervised or controlled the construction, and that Purchaser is not relying on any such statements or representations in purchasing the house."*

4.    **FURNISHINGS AND INTERIORS; SPONSOR PRODUCTS.**

    A.    Publisher, in consultation with Builder, will retain interior designers ("Interior Designers") for finishing and décor. Builder and the Interior Designers will use the Products, as well as furniture, decorative accessories, rugs, lighting, wallpaper, paint, tile, and other materials or items to furnish and decorate the House. Any items (including Products) which are permanently installed in the House shall be provided by Builder at its expense. The Publisher will assist in trying to secure a Show House discount for said Products. With regard to items on loan, which will include tabletop, artwork, antiques, furniture, rugs, portable lighting, soft window treatments, decorative accessories, etc., Publisher will arrange for such items to remain in the House for the

duration of the three week Open House currently planned for mid-September 2021 for three weeks ("Open House Period"). The exact date for the Open House Period to be determined by the parties.

      B.     Publisher, with the assistance of the Interior Designers, will be responsible for and bear the expense of shipment, storage, placement, and timely removal of any loaned interior products, furniture and accessories placed in the House by Publisher. Products, as previously defined herein and any furnishings that are permanently installed in the House shall remain. After the Open House Period, Publisher shall make reasonable efforts to provide those parties associated with the project (Builder, Publisher, participating Interior Designers, etc.) with an opportunity to purchase available furnishing, accessories and materials at cost or at a reasonable Show House cost, as determined by the supplier or lender. Any available items Builder desires to purchase from the Show House must be identified and communicated to Publisher or Show House Manager, in writing, prior to the Show House closing no later than October 1, 2021, unless otherwise agreed upon by the parties. Payment is due in full before any items are removed from the property. Builder is not obligated to purchase any items from the Show House.

      C.     Builder will be solely responsible for insuring and physically securing the contents of the House, including loaned items from damage, loss or harm while installed at the House. Builder shall provide an appropriate and comprehensive security system (and shall be responsible for costs related to such security system) for the House from the date that any sponsor products are installed through the move-out date.

      D.     At the conclusion of the Open House Period, Builder shall provide Publisher with reasonable access to the House and Property as needed to de-install and remove all furnishings and interior Products not intended to remain in the House.

**5.    FEES.**    Builder shall pay Publisher an advertising and promotional fee ("Fee") covering the preview party, magazine editorial content and ad inclusion in the amount of $65,000 dollars. Fee to be paid with the following payment schedule: $25,000 due March 1, 2021, $20,000 due May 15, 2021, $20,000 due September 1, 2021.

**6.    OPEN HOUSE**.

      A.     The House shall be held open for visitation by members of the public (the "Open House") during the Open House Period. The exact hours of operation shall be mutually agreed upon by Publisher and Builder prior to the commencement of the Open House Period.

      B.     Publisher shall provide the following items at its expense: (i) one (1) Show House Journal per each paid admission to the House and (ii) temporary, interior signage listing all Sponsors. Builder will provide exterior signage referencing that the House is the 2021 Flower

Magazine Show House, and listing the participants (i.e., Architect, Builder, Landscape Architect, the Interior Designer(s), and Sponsors). All signage is subject to the content and design parameters provided by Publisher and subject to Publisher's final approval.  Any use of the FLOWER MAGAZINE logo by Builder shall be subject to Publisher's prior written approval in each instance.

C. Publisher, Sponsors, Architect and Builder will have the right to place collateral in the House for distribution to the public, specific area of the house to be designated by Publisher (e.g., the 'Information Center").

D. Publisher will develop an Open House schedule with a listing of events on site.

E. The Open House admission fee, which shall be charged to members of the public to tour the House, shall be mutually determined by Builder and Publisher prior to commencement of the Open House Period.  A mutually agreed upon portion or percentage of each admission fee collected shall be donated to a charitable organization selected by Publisher with Builder approval.

F. The remaining balance of each admission fee (fee less any portion allocated to Charity) shall be used to cover operational costs related to the House.

G. The parties agree to follow generally accepted accounting procedures for any disbursements made from the fees collected.

H. The parties acknowledge and agree that Publisher shall have the right, at all times, to access the House and retrieve property loaned to Builder hereunder, if necessary.

I. Builder shall take all commercially reasonable precautions to protect and safeguard the loaned Products, from damage, loss or harm during the Open House Period.

7. **MARKETING AND PUBLICATION.**

A. Publisher will develop and implement a marketing, promotional and publicity program for the Open House, in a timely manner.  The promotional, marketing and publicity program and all materials developed in connection therewith shall be reviewed with Builder prior to implementation.

B. Builder and Publisher will properly credit all parties involved in the House project, including without limitation, the Architect, Builder, the Landscape Architect, the Interior Designers and Sponsors, in all press releases and other marketing, promotional and publicity materials distributed.

C. Publisher will feature the Show House in FLOWER Magazine (the "Magazine") and on its website and social media platforms prior to, during, and after the Open House Period .

Publisher will have the right to photograph and videotape the property, and will have first publication rights to such images for use in the Magazine, on its website and/or social media platforms. Publisher will provide Builder, Sponsors, and participating Interior Designers with images to use on their respective websites and social media platforms. Publisher shall make reasonable commercial efforts to ensure any images released identify the House, Builder, and Photographer. Publisher will provide the Builder, Sponsors, and participating Interior Designers with reasonable advance notice of the issue date of the Magazine in which editorial coverage of the House is expected to appear, but any such editorial coverage shall be in Publisher's sole discretion. In any such features, Publisher will properly credit Builder, Sponsors, and participating Interior Designers as well as any other contractually agreed upon parties.

**8.**     **PREVIEW PARTY.**  Publisher and Builder will jointly plan and host a preview party prior to the public opening of the Show House, the cost and expense thereof to be covered by the advertising and promotional fee set forth in paragraph 5, except as set forth below. Publisher will manage and execute event. Each party may submit a guest list for the preview party and, subject to any space and cost considerations, reasonably imposed by Publisher in its sole discretion, all guests listed on such guest lists shall receive invitations from Publisher. Guest list will include Interior Designers, Sponsors, Design Bloggers, Tastemakers, Architects, as well as friends and clients of Publisher and Builder.

**9.**     **OTHER USES OF THE HOUSE.**  Builder, Publisher and Sponsors shall have the right to hold seminars or social gatherings in the House during the hours in which the House is closed to members of the public. Publisher and/or Show House Manager shall be responsible for coordination and scheduling of all such gatherings.  The host of any such gathering or event shall be responsible for any and all costs and expenses, including without limitation clean-up costs and repair costs associated with any damage caused to the Property, the House or any of the contents thereof during such gathering or seminar.  Publisher and Builder will each indemnify, defend and hold harmless the other party, its affiliates, members, officers, directors, agents, representatives and employees from and against any and all liabilities, claims, suits, causes of action, damages, costs and expenses, including without limitation reasonable attorneys fees, caused during or in connection with the gatherings hosted by the indemnifying party, including claims of personal injury, loss of life, or damages to the Property, the House and its contents, but excluding claims based on the negligence or other fault of the indemnified party. In addition, Publisher will ensure that any Sponsor that uses the House agrees to indemnify, defend and hold harmless Builder, and its partners, members, officers, directors, agents, representatives and employees, from and against any and all liabilities, claims, suits, causes of action, damages, costs and expenses, including without limitation reasonable attorneys' fees caused during or in connection with such Sponsor's

gathering or seminar in the House, including, claims of personal injury, loss of life and damage to the Property, the House and to any of the contents of the House, but specifically excluding claims based on the negligence or other fault of the Builder.  Upon request from Builder or Publisher, a host Sponsor may be required to present evidence of commercial general liability insurance, including personal injury, property damage and liquor liability (if applicable) with sufficient coverage to meet the indemnification obligations herein. Any such policy will name Builder and Publisher as additional insureds.

**10.     MUTUAL TRADEMARK LICENSE.**  Publisher and Builder may use the trademarks, trade names, logos (the "Marks"), social handles and agreed upon hashtags of the other party (that such other party has specifically made available for use hereunder) subject to the following conditions:

    A.     The Marks may be used solely in connection with the respective party's specific rights and obligations under this Agreement, and in connection with advertising, promotional, marketing and publicity materials generated, used or distributed in connection with the House and the Open House, as specifically contemplated by this Agreement.

    B.     Each party will provide the other party with camera-ready or electronic artwork of the Marks for inclusion in all advertising, promotional, marketing and publicity materials or will otherwise provide guidelines as to formatting and use of the Marks.  Each party will use the Marks as instructed by the owner thereof, will not alter the Marks in any way, and will secure the prior written approval of the owner before including the Marks in any advertising, promotional, marketing or publicity materials, radio and television promotional spots, press releases, or other advertising or promotional activities.

    C.     Each party agrees that its licensed use of a Mark belonging to the other party inures to the benefit of the owner of the Mark and that such party will not acquire any rights in such Mark or any goodwill associated therewith by such use.

    D.     This mutual license will terminate promptly upon termination of this Agreement or at the expiration of the Open House Period, whichever is earlier, except as otherwise approved in writing by the owner of a Mark.

**11.     INSURANCE**. During the term of this Agreement:

    A.     Builder and Publisher will each maintain at its expense, Commercial General Liability insurance on ISO form CGL 01 07 98 or its equivalent, including bodily injury, property damage, products/completed operations, liquor liability and contractual liability, with minimum limits of $3,000,000.00 per occurrence and $3,000,000.00 in the aggregate.

  B. Builder at its expense, or those acting on its behalf at their expense, will maintain (1) workers compensation insurance with (state) statutory minimum limits and (2) Business Automobile Liability with limits of not less than $2,000,000.00 Combined Single Limit.

  C. Builder, at its expense, will provide all risk property insurance including loss, damage and related coverages for the structure of the House including fire and extended peril as well as coverage for any contents of the House provided solely by Builder as set forth in Sections 1E and 4D of this Agreement. Publisher, at its expense will provide property loss or damage coverage for all furnishings, accessories and Products furnished by Publisher to decorate the House during the Open House Period and which do not become permanent fixtures in the House;

  D. Upon the written request of either party, the non-requesting party shall promptly deliver Certificates of Insurance evidencing all of the required insurance coverage outlined above to the requesting party. Each party shall be added as an additional insured on all applicable coverage provided by the other party under this paragraph 10. All policies provided under this paragraph 10 shall include a waiver of subrogation and the requirement that thirty (30) days written notice of cancellation or material change be given. All policies shall be written with an insurance carrier with a Best's rating of not less than A-VIII.

**12. REPRESENTATIONS AND WARRANTIES.**

  A. Each party represents and warrants that:

  (i) It is a business duly incorporated, validly existing, and in good standing under the laws of its state of domicile;

  (ii) It has all requisite power, financial capacity, and authority to execute, deliver, and perform its obligations under this Agreement;

  (iii) It is duly licensed, authorized, or qualified to do business and is in good standing in every jurisdiction in which a license, authorization, or qualification is required for the operation of its business;

  (iv) The execution, delivery, and performance of this Agreement has been duly authorized by it and this Agreement constitutes the legal, valid, and binding agreement of it and is enforceable against it in accordance with its terms;

  (v) It shall comply with all applicable federal, state, local, laws, rules, and regulations applicable to the performance of its duties and obligations under this Agreement, and it shall obtain and at all times maintain all applicable consents, licenses, permits, and other authorizations from any and all third parties that are required of it in connection with its obligations under this Agreement; and

(vi) There is no settled, pending, or threatened claim, action, demand, lawsuit, inquiry, proceeding, litigation, or investigation of any kind that, if decided unfavorably to such party, would reasonably be expected to have an actual or potential adverse effect on its ability to perform its duties or obligations under this Agreement, and it has no knowledge of any factual, legal, or other reasonable basis for any such type of action.

B.	In addition, Builder further represents and warrants that:

(i) Its obligations and duties will be rendered in a commercially reasonable manner in accordance with the standards generally prevailing in the building industry;

(ii) Builder has sufficient skill, knowledge and expertise to perform its obligations hereunder; and

(iii) Builder has the ability and capacity to fully and timely perform its obligations, including that it has sufficient capital and assets to carry on all activities necessary to comply fully with this Agreement.

**13.	INDEMNIFICATION.**

A.	Publisher and Builder shall each indemnify, defend, and hold the other harmless from and against any and all claims, damages causes of actions, suits, costs and expenses (including reasonable attorneys' fees), arising out of (i) any misconduct, negligence, error or omission in the performance of the indemnifying party's obligations under this Agreement; (ii) breach or default of any term, covenant, obligation, representation or warranty provided by the indemnifying party under this Agreement; and (iii) any injury or death to persons or damage to property if such injury or damage occurs as a result of the indemnifying party's acts or failure to act.  Without limiting the foregoing, Builder's agreement to indemnify Publisher hereunder shall include indemnification of third party claims arising out of or related to acts or omissions by subcontractors hired by Builder hereunder.

B.	Each party's duty to indemnify as described above is conditioned on (i) reasonably prompt notice to the indemnifying party of any potential liability of the party to be indemnified, after the party to be indemnified receives actual notice of any such potential liability, and (ii) the indemnifying party's right to join in the defense of any such claims or suits. Upon notice of a claim for which indemnity is sought the indemnifying party shall assume the defense of the claim with counsel reasonably acceptable to the indemnified party. A party shall not settle or compromise a claim without the consent of the other party, such consent shall not be unreasonably withheld or delayed.

**14.	TERM AND TERMINATION**.  This Agreement shall terminate upon the full discharge of the parties' respective responsibilities hereunder. Notwithstanding the foregoing, if a party

materially breaches any provision of this Agreement or defaults in the performance of any of its obligations hereunder, the party not in breach may terminate this agreement by giving written notice to the other party detailing the breach or default, such termination to be effective fifteen (15) calendar days following the giving of such notice, unless the party in breach or default cures the breach or default prior to the expiration of such period. This Agreement may be terminated immediately and without prior notice or legal action by either party if the other party generally does not pay its debts as such debts become due or admits in writing to its inability to pay its debts generally, or makes a general assignment for the benefit of creditors, or any proceeding is instituted by or against the other party seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any Law relating to bankruptcy, insolvency or reorganization or relief of debtors or seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and such proceeding is not dismissed within sixty (60) calendar days or the other party takes any action to authorize any of the actions set forth above in this paragraph.

**15.    LIMITATION OF LIABILITY.** PUBLISHER'S PRODUCTS AND SERVICES ARE PROVIDED WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED. IN NO EVENT SHALL PUBLISHER BE LIABLE FOR ANY REASON WHATSOEVER FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY PROVISION OF THIS AGREEMENT, EVEN IF PUBLISHER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. Without limitation, Publisher shall not be liable for any loss or damages whatsoever arising out of or with respect to any failure to publish, disseminate or deliver any advertisement or any other content or material; or any publication error.

**16.    MISCELLANEOUS**.

A.    Confidentiality. The parties acknowledge that in connection with the performance of the Agreement, that each may have access to certain Confidential Information of the other party. During the Term of the Agreement and thereafter, each Party agrees to hold Confidential Information of the other party in strict confidence and to use it solely for the performance of its obligations hereunder and not for its own benefit or that of any other person or entity. Each party will use the same care as it uses to maintain the confidentiality of its own Confidential Information of similar value, which will in no event be less than reasonable care. The parties agree to take all necessary steps and procedures to ensure that it and its employees and personnel comply with the obligations set forth in this paragraph, including limiting disclosure to such employees and personnel who need to know Confidential Information to perform their duties. Confidential

Information shall not be deemed to include information that: (a) is or becomes publicly known other than through the wrongful act or omission of the other party, or by their breach of any obligation or warranty under this Agreement; (b) was known to the party receiving the information prior to the disclosing party making the disclosure; or (c) was independently developed by the party receiving the information without breach of this Agreement or reliance upon any Confidential Information of the disclosing party. A party may disclose Confidential Information which must be disclosed, pursuant to a judicial, regulatory, legal or other government mandate, provided that the other party is provided with prompt notice prior to any disclosure, so that the other party may seek legal remedies to maintain the confidentiality of such Confidential Information.

      B.      Mediation. In the event of any dispute arising out of or relating to this Agreement, and the performance hereunder, the parties agree that they will within ten (10) days following mailing of written notice of a dispute, engage in face-to-face negotiations in an attempt to resolve the dispute and shall, upon failing to negotiate a resolution, choose a mutually agreeable third party neutral, who shall mediate the dispute between the parties. Mediation shall be non-binding and shall be confidential. The parties shall refrain from court proceedings during the mediation process insofar as they can do so without prejudicing their legal rights. The parties shall participate in good faith in accordance with the recommendations of the mediator and shall follow the procedures for mediation as suggested by the mediator. All expenses of mediation except expenses of the individual parties, shall be shared equally by the parties. Each party shall be represented in the mediation by a person with authority to settle the dispute. If the parties are unable to resolve the dispute in good faith within six (6) months of the date of the initial demand by either party for such fact finding shall be finally determined by a court of competent jurisdiction.

      C.      Notices. All notices required or permitted under this Agreement shall be in writing and shall be deemed effective upon personal delivery or upon deposit in the United States Post Office, by registered or certified mail, postage prepaid, or by recognized overnight courier, addressed to the other Party at the address shown in the introductory paragraph, or at such other address or addresses as either Party shall designate to the other in accordance with this Section

      D.      Governing Law; Venue. This Agreement shall be construed according to the law of the State of Alabama, without reference to its conflicts of laws provisions. Each party agrees that any legal action, proceeding, controversy or claim between the parties arising out of or relating to this Agreement may be brought only in the United States District Court for the Northern District of Alabama or the appropriate State Court of Alabama in and for Jefferson County Alabama, and by the execution of this Agreement each party hereto submits to the exclusive jurisdiction of such courts, and waives any objection it might have based upon improper venue or inconvenient forum.

E. Binding Effect. This Agreement will bind and benefit the heirs, successors, and assigns of parties hereto. Builder may not assign this Agreement without the written permission of Publisher.

F. Waiver. A waiver of any breach of this Agreement will not be deemed a waiver of any repetition of such breach.

G. Entire Agreement Set Forth. This Agreement contains the entire agreement between the parties and supersedes all prior proposals, agreements, representations and other communications whether written or oral, relating to the subject matter of this Agreement. This Agreement may not be modified except by a writing executed by the parties.

H. Severability. If any provision of this Agreement is held illegal or invalid for any reason, such illegality or invalidity will not affect the remaining parts of this Agreement.

I. No Offer. The delivery of this Agreement does not constitute and will not be deemed to constitute an offer or acceptance of any kind. No binding agreement between the parties will exist unless and until this Agreement is fully executed and delivered by all parties and no party will rely on any agreement until such time.

J. Relationship of the Parties. By virtue of entering into this Agreement, the parties do not, in any way or for any purpose, become a partner of the other parties in the conduct of its/their business, or otherwise, or a member of a joint venture or other enterprise with the other parties. The Publisher and Builder hereby agree that they do not intend to benefit any third parties by entering this Agreement, and this Agreement shall not create or convey any rights in third parties.

K. Binding Authority. No party has authority to bind or commit the other in any respect whatsoever; and neither party shall hold itself out as the other's agent, principal, partner, or joint venture or as having any power to bind or commit the other.

L. Force Majeure. Except for the payment of any monetary obligations as required under this Agreement, any delay or failure of any party to perform its obligations under this Agreement will be excused to the extent that it is caused by an event beyond its reasonable control, including, without limitation, acts of God, actions by governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, terrorism, sabotage, or labor problems (a "Force Majeure Event"); provided, however, that the party claiming that its delay in performing its obligations under this Agreement is due to a Force Majeure Event shall promptly notify the other party of the Force Majeure Event, the anticipated duration of the Force Majeure Event, and the steps being taken to remedy the delay or failure. The party not asserting a Force Majeure Event shall assist as reasonably necessary to remedy the delay or failure caused by such Force Majeure Event. Should a Force Majeure continue beyond 30 days, this Agreement may be terminated by either party upon ten (10) day written notice to the other party.

M.    Survival.  Any provision of this Agreement that would by its nature survive the expiration or termination of this Agreement shall so survive, including without limitation, the provisions respecting confidentiality, representations and warranties, indemnification and insurance.

N.    Counterparts.  This Agreement may be executed in counterparts, all such executed counterparts shall constitute the same Agreement, and the signature of either party to any counterpart shall be deemed a signature to, and may be appointed to, any other counterpart.

O.    Facsimile Signatures.  In order to expedite the transactions contemplated in this Agreement, faxed signatures and signatures on locked .pdf files may be used in place of original signatures on this Agreement.  Publisher and Builder intend to be bound by the signatures on the faxed document or signatures on locked .pdf files, are aware that the other parts will rely on the faxed signatures or locked .pdf file signatures, and hereby waive any defenses to the enforcement of the terms of this Agreement based on the form of signature.

ACCEPTED AND AGREED TO:

| YOUNG AND MEATHE HOMES, INC. | FLOWER MAGAZINE, |
| --- | --- |
| | a division of Peony Publishing |
| By: _[signature]_____ | By: _Jennel O'Brien_____ |
| Date: _8/14/20_____ | Date: _8/31/20_____ |

14