# Exhibit 1

## SALES REPRESENTATIVE EMPLOYMENT AGREEMENT

**This Sales Representative Employment Agreement** ("Agreement"), effective as of August 8th, 2017, between **Partsmaster, a division of NCH Corporation**, ("Company") with offices at 2727 Chemsearch Blvd., Irving, Texas 75062, and **Donald Kenton Conner** ("Associate"), residing at 1417 Addison Place, Pooler GA 31322.  Company and Associate are each referred to as the "party" and collectively referred to as the "parties."  The parties agree as follows:

1. **Duties**.  Company employs, and Associate accepts employment, as a Sales Representative for the **Partsmaster** division ("Business") of Company.  Company sells the following products: welding, abrasives, cutting tools, polymers, fasteners, and other MRO-related products ("Products").  Associate's duties are those assigned by Company.  Without limiting the above, Associate's initial duties are:  to sell Products, to handle assigned existing accounts and to develop new accounts (collectively, "Accounts") for the Products.  Associate will scout assigned territory, plan and conduct an assigned number of sales calls, submit completed Daily Analysis Sheets or other required reports to the designated company representative at the required times, attend meetings and training sessions, devote time as required to learn product knowledge and sales skills, write a specified amount of quality orders and volume to validate compensation, forward orders to the designated company representative at the end of each day, and maintain required phone contact with sales managers.  Company may change Associate's Products, Accounts or duties at any time in its discretion.  Associate will perform Associate's duties faithfully, completely, diligently, ethically and to Company's satisfaction.  Associate will comply with Company's policies, procedures, any applicable laws and the attached Policies, which are incorporated into this Agreement.  Associate will devote full time, attention and energy to Company's Business.  Associate will comply fully with Company's Code of Conduct, which is always available to Associates at http://www.mynch.com.  Associate will read and review the Code at this site at least once per year.  During employment, Associate has a duty of loyalty to Company and may not engage in any consulting activities, employment or other activities that conflict or interfere with Associate's complete performance of the above duties, including soliciting or selling similar or competing products while employed by Company or acting to Company's detriment.  Associate does not have any contract with a previous employer that would restrict or impair Associate's ability to compete or sell products for the Business.

2. **Territory**.  Associate's initial and non-exclusive territory is listed below Associate's signature.  Company may change Associate's Territory and or assigned Accounts at any time in its discretion.  Company may assign technical, channel, market or product specialists or others to the Territory to develop business for Company, to solicit or sell Products, to service Accounts, or as deemed appropriate by Company.  Company has several divisions and subsidiaries ("Related Companies") selling similar products such as chemicals, parts, plumbing, and other products in the Territory or to Accounts.  Associate is not involved in those sales and no compensation will be due for sales by Related Companies.

3. **Compensation and Benefits**.  Associate will be paid a base salary and other compensation as the Company deems appropriate. The salary will be paid semi-monthly with the pay periods consisting of the 1st-15th of each month and the 16th-last day of each month.  Other compensation may include commissions as determined by Company and paid in accordance with the Company's commission policies, a current copy of which are attached. If Associate is eligible for a bonus, the bonus will be based on net sales and Associate must be employed at the end of the bonus period to be paid the bonus.  This compensation program is introductory only and Company may change Associate's compensation at any time in its discretion.  Upon completion of applicable eligibility and participation requirements, Associate may be eligible for certain employee benefits programs that are in existence from time to time.   Associate is not eligible for and will not receive paid vacation benefits.  Company may split Associate's base compensation between taxable compensation and non-taxable mileage compensation requiring submission of mileage logs.

4. **Confidential Information and Goodwill**.  Company will train Associate, as it deems appropriate, in its proprietary selling methods, products, and matters pertinent to the above duties and send Associate to its New Rep School.  As a sales representative, Company will provide Associate with support such as novelties and expense reimbursement in accordance with Company policy to develop goodwill for Company.  Company will assist Associate in identifying and facilitating contact with Company customers or prospective customers to help

Associate develop goodwill on behalf of Company.  Company will provide Associate with confidential information, which may include customer lists, assigned accounts, potential leads, and customer buying history.  Associate agrees that all customer lists, identities, buying history, preferences, purchasing habits, pricing and pricing variations, sales manuals, completed daily analysis sheets or other customer solicitation records or reports, supplier lists and pricing, business plans, and other confidential or proprietary information relating to Company's Business (collectively, "Confidential Information"), whether provided by Company or prepared, developed or contributed to in whole or in part by Associate, whether marked confidential or not, constitute confidential and proprietary trade secret information and are owned solely by Company.  Company would not provide Associate its Confidential Information unless Associate agreed to maintain secrecy and agreed to the covenants contained in the Section entitled "Post-Employment Covenants".  Therefore, during and after employment by Company, Associate will: (a) hold the Confidential Information in the strictest confidence; (b) not disclose, publish, make available to others, copy, misappropriate or use the Confidential Information, other than as solely required in the performance of Associate's duties during employment for Company's benefit; and (c) exercise Associate's best efforts to safeguard all Confidential Information and take all necessary steps to ensure they are not exposed to unauthorized persons.  The promises by Company contained in this Section are intended to be fully enforceable at the time they are made, are not contingent upon Associate's continued employment, and are contingent upon Associate's full compliance with the restrictions in the Section entitled "Post-Employment Covenants".

5.    **Post-Employment Covenants**. Company is engaged in a highly competitive industry and employs sales representatives as its principal connection with its customers. Company will provide Associate with Company's Confidential Information, which Company has expended substantial time, money and effort to develop and which is integral to Company's success.  Company will expend considerable sums to train Associate and support Associate to develop goodwill with its customers. Associate will have personal contact and conduct business with the Accounts, which are important assets of Company. After training by Company, receipt of Company's Confidential Information and introduction and development of goodwill with Company's customers, Associate could leave Company and attempt to divert the business and goodwill of Company's customers.  Company will suffer great loss if Associate solicits its customers, directly or indirectly, after employment ends.

**In recognition of the above, for a period of 18 months after termination of Associate's employment with Company by either party for any reason, Associate will not**, directly or indirectly, by any means or device or in any capacity whatsoever:

(1)    Within the Territory, sell, solicit, service, handle, participate in, assist, coordinate or advise about a sale of products similar or related to Company's Products to any account that Associate sold, serviced, handled, solicited, was assigned or had responsibility for within eighteen (18) months before any termination of employment with Company;

(2)    Employ, hire, recruit, interview, solicit or make any offers of employment to any employee of Company or Affiliates (or any former employee of Company or Affiliates who has been employed with Company or Affiliates within the six months prior to any such act), assist anyone in or be involved in employing, hiring, recruiting, interviewing, soliciting or making any offers of employment to such employees or former employees of Company or Affiliates, or otherwise induce, entice, solicit, or attempt to induce, entice, solicit any such employee to terminate their employment with Company or Affiliates; or

(3)    Induce, entice, solicit or attempt to induce, entice or solicit any customer of Company that Associate sold, handled, served, had contact with, was involved in, was responsible for or had knowledge about through Company to terminate, discontinue, diminish or otherwise change to Company's detriment, its business arrangements, purchasing patterns, dealings or relationships with Company.

For the purposes of this Section, "Territory" means any counties in which customers are located to whom Associate solicited, sold, serviced, handled, managed, or had responsibility for within eighteen (18) months before the termination of Associate's employment.  Affiliates means any entities owned or controlled, in whole or in part, by NCH Corporation or its subsidiaries or any entities that are part of the common control group with NCH Corporation for benefits purposes or that have adopted NCH benefits, such as Coldfire Technology, LLC.  If Associate violates any of these covenants, the term of the violated covenant will automatically be extended by a period from the date of first violation until the date the violation has ceased or the date of entry of a final order or judgment by a court enforcing the covenant. Associate acknowledges that unique benefits will be obtained from

employment with Company and the provisions in this Section are reasonably necessary to protect Company's legitimate business interests, which include, among other things, Confidential Information and the substantial relationships between Company and Accounts and the goodwill established with Accounts.  The parties agree that the provisions of this Section are ancillary to the remaining otherwise enforceable binding obligations of the parties under this Agreement.  If the restrictions in this Section are found to be unreasonable or overbroad, the parties agree that a court may reform this Section to specify restrictions the court deems reasonable.

6. **Intellectual Property**.  Associate agrees that all inventions, discoveries, ideas, copyrights, trademarks, patents and patent rights, trade names, trade dress, trade secrets, work product and other intellectual property relating in any way to Company's Business ("Intellectual Property"), whether created or developed by Associate during working hours or otherwise and whether working alone or jointly with others, are owned by Company and Associate transfers all rights to such Intellectual Property to Company.  During and after employment, Associate will inform, promptly reduce to writing and submit to Company all Intellectual Property and assist in the preparation of and sign any appeals, assignments, or other documents deemed appropriate by Company to transfer ownership of Intellectual Property to Company, to obtain and maintain the Intellectual Property in Company's name and to protect Company's interests.  Company will provide Associate with certain technical tools, which may include computers, PDA's, e-mail, hardware and software, and agrees that such technical tools are owned by Company and may be monitored or inspected by Company in its discretion.  Associate waives any right to publicity and grants Company the right to use Associate's likeness. Associate will not use or publish Company's trademarks or trade names in any manner that is not authorized by Company, including any web site, telephone directory listing or advertising.  Associate will not represent, in any form, that the Associate's home is an office of Company or that any Internet site or e-mail address is authorized to represent Company, solicit bids or accept orders on behalf of Company.  Associate does not possess any confidential information from any former employer and, at any rate, will not use any such confidential information in performing Associate's duties.

7. **Termination**. Associate is and will be an at-will employee of Company.  Either party may terminate this Agreement at any time, with or without any reason, cause or advance notice.  Without limiting the above, Company may terminate Associate upon Associate's refusal or failure to perform Associate's duties to the satisfaction of Company.  If either party terminates Associate's employment for any reason, Associate will immediately return (by collect delivery to Company) all of Company's property including, but not limited to, Confidential Information, any documents or data provided to Associate by Company, any documents or data relating to Company's Business and any copies or other documents containing such information.  Associate will certify that Associate has in fact returned all Company property and documents.  If Associate fails to return any Company property upon request or after any termination, Associate authorizes Company to offset, deduct or withhold all funds due and owing to Associate, from Associate's paychecks and compensation, until Associate returns such Company property in the condition Associate received it, ordinary wear and tear excepted.  Upon termination, Associate will not thereafter disparage Company and will submit to an exit interview, upon Company's request. The post-employment obligations or covenants will survive any termination of this Agreement.

8. **Offset**.  If Associates is paid a draw and the cumulative draw exceeds the cumulative earned commissions, then the excess (or debit) balance, whether deferred or otherwise is payable to Company upon demand by Company.  If Company overpays Associate, Associate authorizes Company to offset, deduct or withhold the amount of such overpayment from any amount that Company may owe Associate.  The lawful purpose of such deduction is to repay Company for the amount overpaid.

9. **Assignment**.  Company may assign this Agreement to any related or successor subsidiary or otherwise.

10. **Entire Agreement**.  This Agreement represents the entire agreement and understanding of the parties and supersedes all prior representations, agreements, understandings or promises between the parties.  Neither party is relying upon any other statement, promise, representation, condition or understanding of the other party.  This Agreement may not be modified or changed except in writing.  Any notices sent under this Agreement are deemed delivered when deposited for delivery in the U.S. mails.

11. **Severability**.  The parties intend that all provisions of this Agreement will be enforced to the fullest extent permissible.  However, if any provision of this Agreement is found to be illegal, invalid or unenforceable, that

provision will be severed from this Agreement.  This Agreement and its remaining provisions will then remain in full force and effect.  The parties intend this Agreement to then be automatically reformed by revising any illegal, invalid or unenforceable provision to a legal, valid and enforceable provision that is as similar as possible to the severed provision.

12. **Injunction**.  If either party breaches this Agreement, the other party will be entitled to injunctive and other relief.  This will be in addition to all other available remedies.

13. **Certification**.  Associate received this Agreement to review before Associate was asked to sign it.  Associate has read the Agreement carefully.  Associate had sufficient opportunity to ask questions about the provisions of the Agreement before signing.  Associate understands the rights and obligations under the Agreement. This Agreement is binding and enforceable in all respects.

14. **Prior Agreements**.  Any post-employment covenants in previously signed employment agreements with Company remain in full force.  Such post-employment covenants are in addition to the post-employment covenants in this Agreement.

**The parties have agreed to the above terms by signing below this Agreement in multiple originals:**

| Associate: | Company: |
|---|---|
| By: */s/ Donald Kenton Conner/* | By: */s/ kenny Smoak/* |
| Printed Name: Donald Kenton Conner | Title: Senior Vice President of Sales |

**Territory:**

**Chatham, Effingham, Bryan, Liberty, Screven, Bulloch, and McIntosh in the state of Georgia.**

