## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; | ) | |
| DOE 1 ; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF REMOVAL

COMES NOW Defendant Old Navy, LLC ("Defendant") and, pursuant to 28 U.S.C. §§ 1332 and 1446, files this Notice of Removal within the time prescribed by law, showing the Court as follows:

1.

On January 9, 2023, Plaintiff filed a complaint in the State Court of Gwinnett County, Civil Action No. 23-C-00137-S4. Gwinnett County is within the Atlanta Division of the Northern District of Georgia.

2.

On December 1, 2023, Judge Ronda S. Colvin granted a Motion for Summary Judgment dismissing Lisa Allen as a defendant in the case, leaving Old Navy, LLC as the sole named defendant in the case.

3.

This notice is timely filed because it is being filed within 30 days of the order granting the Motion for Summary Judgment. 28 U.S.C. § 1332.

4.

The Affidavit of Defendant's counsel, Brittany A. DeDiego, Esq., is submitted as Exhibit A in support of this Notice of Removal.

5.

This is a civil action regarding Plaintiff's claims of negligence against Defendant.

6.

Through this civil action, Plaintiff intends to seek damages in excess of $75,000.

7.

Upon information and belief, at all times material to this action, Plaintiff was a citizen of the State of Georgia.

8.

At all times material to this action, Defendant was a Florida limited liability company with its principal place of business in State of California.

9.

Old Navy, LLC is a wholly owned subsidiary of The Gap, Inc. The Gap, Inc. is a Delaware corporation with a principal place of business in California.

10.

The basis for this Court's jurisdiction is diversity jurisdiction.

11.

Venue is proper in the Northern District of Georgia because, at the time of filing the Complaint, Plaintiff resided in Gwinnett County and the cause of action arose in Gwinnett County. This case is properly assigned to the Atlanta Division of the Northern District of Georgia because, pursuant to 28 U.S.C. § 1441(a), it is the division of the district court embracing the place where this action is pending.

12.

Copies of all process, pleadings, and orders served upon Defendant and such other papers that are attachments as required by 28 U.S.C. § 1446 and local court rules are filed herein. (See composite Exhibit B).

13.

Pursuant to 28 U.S.C. § 1446(d), Defendant has provided written notice to all adverse parties and has filed a copy of this Notice of Removal with the Clerk of Court for the State Court of Gwinnett County, Georgia. (A copy of the Notice of Filing Notice of Removal to opposing counsel is attached hereto as Exhibit C; a copy of the Certificate of Removal is attached hereto as Exhibit D).

WHEREFORE, Defendant respectfully submits this matter to this Court's jurisdiction.

Respectfully submitted this 18th day of December, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendant Old Navy, LLC*

4

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served all counsel of record in the foregoing matter with a copy of **NOTICE OF REMOVAL** has been mailed to all parties via U.S. Mail, addressed as follows:

Michael P. Walker
Brianna N. Yates
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
brianna@pnwlaw.com
*Counsel for Plaintiff*

This 18th day of December, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendant Old Navy, LLC*

5

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; | ) | |
| DOE 1 ; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF BRITTANY A. DEDIEGO, ESQ.**

STATE OF GEORGIA

COUNTY OF FULTON

Before me, the undersigned officer, duly authorized to administer oaths, personally appeared Brittany A. DeDiego, Esq., who, being duly sworn according to law did depose and state:

1. I, Brittany A. DeDiego, Esq., am over the age of eighteen, have personal knowledge of the facts and matters set forth herein, and am competent to testify as to the facts and matters set forth herein.

2. The undersigned is counsel for Defendant Old Navy, LLC ("Defendant") in the above-captioned civil action.

3. This is a civil action arising from an incident involving Plaintiff and alleged injuries she sustained on April 13, 2021, while shopping at an Old Navy retail store. (See Plaintiff's Complaint, ¶ 9, 12, attached within composite Exhibit B).

4. This action was commenced in the State Court of Gwinnett County, Georgia on January 9, 2023.

5. In her Complaint, Plaintiff intends to seek damages for personal injuries, pain and suffering, medical expenses, disability, mental anguish, loss of the capacity for the enjoyment of life, and permanent injuries. Accordingly, upon information and belief, Plaintiff intends to seek damages in this action in excess of $75,000.

6. As pled in the Complaint, Plaintiff was a citizen of the State of Georgia at all times material to this action. (See Complaint, ¶ 1).

7. At all times material to this action, Defendant was a Florida limited liability company with its principal place of business in the State of California.

8. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1332 to decide this controversy.

9. On December 18, 2023, I enclosed copies of the Notice of Removal to Plaintiff's counsel, together with a copy of the foregoing Notice, in an

envelope addressed to Plaintiff's counsel at their address, duly sealed, stamped, and deposited in the U.S. Mail in Atlanta, Georgia, for transmission to the same address on the date aforesaid.

FURTHER AFFIANT SAYETH NOT.

      This 18th day of December, 2023.

                                      Brittany A. DeDiego, Esq.

Notary Public
My Commission Expires: 9/30/2025

# **EXHIBIT B**

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**1/9/2023 3:19 PM**

**TIANA P. GARNER, CLERK**

# IN THE STATE COURT OF GWINNETT COUNTY
# STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **23-C-00137-S4** |
| | ) | Civil Action No. _____ |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |
| | ) | |

## COMPLAINT

COMES NOW Plaintiff and files this Complaint for Damages, as follows:

## PARTIES, JURISDICTION, AND VENUE

### 1.

Plaintiff Linda D. Clemons ("Plaintiff") is a Georgia resident and citizen and submits herself to the jurisdiction and venue of this Court.

### 2.

Defendant Old Navy, LLC ("Old Navy" or "Defendant(s)") is a limited liability company authorized to do business in Georgia. Old Navy may be served through its registered agent, CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia 30046.

### 3.

Jurisdiction and venue are proper as to Old Navy.

4.

Old Navy has been properly served with process in this action.

5.

Defendant Lisa Allen ("Allen" or "Defendant(s)") is a natural person and Georgia resident and citizen. She may be served at her usual place of abode, 1477 Hickory Drive SW, Lilburn, Georgia 30047.

6.

Jurisdiction and venue are proper as to Allen.

7.

Allen has been properly served with process in this action.

8.

Out of abundance of caution, Plaintiff identifies Doe 1, Doe 2, Doe 3, and Doe 4 as party Defendants. The true names of Does 1 through 4 are unknown to Plaintiff. These John Does are legally responsible in some manner for Plaintiff's injuries under theories of premises liability, vicarious liability, and direct liability for the dangerous condition that caused Plaintiff's injury. This Defendant has received such notice of the institution of the action that it will not be prejudiced in maintaining a defense on the merits. Does 1 through 4 are on notice, or should have been on notice, that but for a mistake as to the real party, the action would have been brought against them.

2

## OPERATIVE FACTS

9.

On or about April 13, 2021 (the "date of incident"), Plaintiff Linda Clemons was shopping at the Old Navy Store located at 2059 Scenic Highway North, Suite 106, Snellville, Georgia 30078. At all times relevant to this case, the Old Navy store was owned, occupied, controlled, managed, and operated by Defendants.

10.

Defendant Allen was the manager of the Old Navy store located on the premises and were responsible for operating, managing, and maintaining the Old Navy store on the date of incident.

11.

Defendant Allen was responsible for identifying, removing, and warning Old Navy patrons of hazardous conditions on the Premises. On the date and time of the incident, Defendant Allen was also responsible for implementing and enforcing store policies, procedures, and practices for identifying and removing hazards at the store, such that she exercised control over the subject premises at the time of the incident.

12.

While she was shopping in the store, Plaintiff was struck by a falling metal sign on her feet and ankles and sustained serious injury.

3

13.

The metal sign was supposed to be secured to prevent it from falling and causing injury to store customers but was not.

14.

At the time of the incident, Plaintiff was an invitee at the subject store.

15.

Plaintiff required medical treatment to address bodily injuries caused by the fall on the date of incident.

16.

Plaintiff incurred medical bills for medical treatment for the fall.

17.

Before the subject incident, Defendants had actual and/ or constructive knowledge of the hazardous condition presented by the unsecured metal sign on the Premises that caused Plaintiff's injuries.

18.

Defendants should have known of the hazard created by the unsecured metal sign due to the presence of employees in the immediate vicinity of the area, the length of time the unsecured sign remained on the floor of the Premises, and because Defendants failed to follow reasonable policies and procedures for inspecting the area in the Old Navy store on the date of incident.

4

19.

Plaintiff exercised ordinary care at the time of the incident.

20.

Plaintiff did not have knowledge of the hazardous condition presented by the unsecured metal sign prior to her injuries.

**LEGAL CLAIMS**

21.

Plaintiff was an invitee of Defendants as defined by O.C.G.A. § 51-3-1, *et seq.*

22.

As the owner and/ or occupier of the Premises, Defendants owed an invitee such as Plaintiff a duty to exercise ordinary care to keep the Premises safe.

23.

Defendants knew or should have known that the hazardous condition on the Premises posed a risk to Old Navy's patrons, including Plaintiff, and that the failure to inspect, properly secure, or remove the metal sign was likely to result in injuries to their invitees.

24.

Defendants had actual and constructive knowledge of the hazardous condition(s) existing on the Premises due to the presence of their employees and

agents within the immediate area of the hazardous condition, and due to the existence of the condition(s) for an unreasonable period of time.

25.

Defendants had actual knowledge of the hazardous condition(s) existing on their Premises through the direct knowledge of their employees and agents.

26.

Although Defendants knew or should have known of the risks of injuries to their invitees from the hazardous conditions, they negligently failed to take reasonable precautions to guard against the dangerous conditions and failed to protect their invitees from the conditions, including Plaintiff.

27.

Defendants negligently failed to ensure that the Premises were safe for their customers, including Plaintiff, and failed to inspect, repair, secure, warn, or mark the dangerous condition, thereby causing Plaintiff's injuries.

28.

Defendants were negligent and said negligence proximately caused Plaintiff's injuries in the following ways:

a) Violation of O.C.G.A. § 51-3-1 by failing to use ordinary care to keep the Premises safe;

b) Failing to reasonably inspect the floor of the Premises;

c) In failing to properly maintain and repair the Premises;

6

d)  In knowingly allowing their invited guests to use an unsafe area of the Premises;

e)  In failing to post warning signs or warning markings;

f)  In failing to properly train and supervise their employees to the care of said Premises; and

g)  In negligently retaining, entrusting, hiring, training and supervising said employees.

29.

Defendants were, and are, negligent *per se*.

30.

Each of the forgoing acts and omissions constitute an independent act of negligence by Defendants and one or more or all of said herein above stated acts was the proximate cause of the injuries and damages sustained by Plaintiff.

31.

The injuries sustained by Plaintiff are the direct and proximate result of Defendants' negligence. But for said negligence, Plaintiff would not have suffered the injuries and losses discussed herein.

32.

Because of said injuries, Plaintiff has incurred reasonable and necessary medical and doctor expenses, and will continue to incur expenses in the future.

33.

Plaintiff is entitled to recover for the injuries and pain and suffering sustained, and all other elements of damages allowed under Georgia law, including but not limited to all compensatory, general, special, incidental, consequential, and other damages permitted. Plaintiff states her intention to seek all compensatory, general, special, incidental, consequential, and other damages permissible under Georgia law, including, but not limited to:

   a)  Personal injuries;

   b)  Past, present and future pain and suffering;

   c)  Past, present and future medical expenses;

   d)  Disability;

   e)  Mental anguish;

   f)  Loss of the capacity for the enjoyment of life;

   g)  Incidental expenses;

   h)  Permanent injuries; and

   i)  Consequential damages to be proven at trial.

34.

To the extent that Defendant Old Navy denies fault, Plaintiff is entitled to attorneys' fees and the expenses of litigation because Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense under O.C.G.A. § 13-6-11.

8

WHEREFORE, the Plaintiff prays for a judgment to be awarded to her and against the Defendants for the following:

a)   Plaintiff be awarded actual damages in amounts to be shown at trial from the Defendants;

b)   Plaintiff be awarded all general, special, compensatory, economic, attorney's fees and expenses, and other allowable damages in accordance with the enlightened conscience of an impartial jury from the Defendants and as permitted under Georgia law;

c)   Plaintiff be awarded a trial by jury; and

d)   Plaintiff has such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Dated:  January 9, 2023.


Respectfully submitted,

**PIASTA NEWBERN WALKER, LLC**

3301 Windy Ridge Parkway          */s/ Michael P. Walker*
Suite 110                                      MICHAEL P. WALKER
Atlanta, GA 30339                        Georgia Bar No. 954678
(404) 996-1296                             ANDREW L. HAGENBUSH
Fax: (404) 996-1316                      Georgia Bar No. 127945
mike@pnwlaw.com
andrew@pnwlaw.com

9

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**
1/9/2023 3:19 PM
TIANA P. GARNER, CLERK

## General Civil and Domestic Relations Case Filing Information Form

☐ Superior or ☒ State Court of ___Gwinnett State Court___ County

| For Clerk Use Only | |
|---|---|
| Date Filed _____ | Case Number ___23-C-00137-S4___ |
| **MM-DD-YYYY** | Case Number _____ |

**Plaintiff(s)**
Clemons, Linda D

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**
Old Navy, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Allen, Lisa | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| 1, Doe | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| 2, Doe | | | | |

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney** ___Michael P Walker___   **State Bar Number** ___954678___   **Self-Represented** ☐

### Check one case type and one sub-type in the same box (if a sub-type applies):

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☒ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____   _____
**Case Number**                          **Case Number**

☒ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____   **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-00137-S4**
**1/9/2023 3:19 PM**
**TIANA P. GARNER, CLERK**

# IN THE STATE COURT OF GWINNETT COUNTY
# STATE OF GEORGIA

LINDA D. CLEMONS,                      )
                                       )
    Plaintiff,                     )               **23-C-00137-S4**
                                       )
                                       )        Civil Action No. _____
v.                                     )
                                       )
OLD NAVY, LLC; LISA ALLEN;             )
DOE 1; DOE 2; DOE 3; and DOE 4;        )        **JURY TRIAL DEMANDED**
                                       )
    Defendants.                    )

## PLAINTIFF'S FIRST REQUESTS FOR ADMISSION TO DEFENDANTS

TO:   EACH DEFENDANT

      Pursuant to O.C.G.A. Section 9-11-36, you are hereby requested to answer, in the form provided by law, the following Requests for Admission:

1.

      You have been correctly named in the present cause insofar as the legal designation of names is concerned.

2.

      You have been properly served as a party Defendant.

3.

      Process is sufficient with regard to you in this case.

4.

      Service of process is sufficient with regard to you in this case.

5.

Gwinnett County State Court has jurisdiction over the subject matter of this case.

6.

Gwinnett County State Court has personal jurisdiction over you as a party Defendant in this case.

7.

Venue is proper in Gwinnett County State Court.

8.

The incident in Plaintiff's Complaint occurred on April 13, 2021, in the Old Navy store located at 2059 Scenic Highway North, Suite 106, Snellville, Georgia 30078 ("the subject premises").

9.

On April 13, 2021, and at the time of Plaintiff's injury, this Defendant managed the subject premises.

10.

On April 13, 2021, and at the time of Plaintiff's injury, this Defendant was responsible for maintaining the subject premises and where the metal sign fell upon Plaintiff.

2

11.

On April 13, 2021, and at the time of Plaintiff's injury, this Defendant was in control of the subject premises and where the metal sign fell upon Plaintiff.

12.

Defendant hired no other company, person or business (other than its direct employees) to assist with inspecting, repairing, and maintaining the premises at issue in Plaintiff's Complaint and where the metal sign fell upon Plaintiff.

13.

Plaintiff has not failed to join an indispensable party in this action.

14.

Plaintiff has not failed to join a non-party who may be liable for Plaintiff's injuries.

Dated: January 9, 2023.

Respectfully submitted,

**PIASTA NEWBERN WALKER, LLC**

/s/ Michael P.  Walker
Michael P. Walker
Georgia Bar No. 954678

3301 Windy Ridge Parkway,
Suite 110
Atlanta, GA 30339
T: (404) 996-1296
F: (404) 996-1316
E: mike@pnwlaw.com

3

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**1/9/2023 3:19 PM**
**TIANA P. GARNER, CLERK**

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

LINDA D. CLEMONS,                )
                                 )                    23-C-00137-S4
    Plaintiff,               )
                                 )         Civil Action No. _____
v.                               )
                                 )
OLD NAVY, LLC; LISA ALLEN;       )
DOE 1; DOE 2; DOE 3; and DOE 4;  )         **JURY TRIAL DEMANDED**
                                 )
    Defendants.              )

### PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANTS

TO:    EACH DEFENDANT

    Plaintiff hereby requests pursuant to O.C.G.A. § 9-11-26 and § 9-11-33 that Defendant(s) respond to the following written interrogatories under oath within the time permitted by law.  Each of the following interrogatories shall be deemed continuing and must be supplemented by Defendant(s) to the extent required by O.C.G.A. § 9-11-26(e).

### DEFINITIONS AND INSTRUCTIONS

    A.  These interrogatories shall be deemed continuing to the extent permitted by O.C.G.A. § 9-11-26, et seq., so as to require Defendant(s) to serve upon all parties supplemental answers if Defendant(s) or its attorneys obtain further information between the time the answers are served and the time of trial.

    B.  "Document," whether singular or plural, means documents and other

tangible things defined in the broadest sense permitted by the Georgia Civil Practice Act and shall include without limitation originals or, if such are not available, true copies, including copies of documents, videotapes, computer data, and sound material, **whether in physical or electronic form**.

C.  "Person" means any natural person, corporation, partnership, association, governmental entity, agency, group, organization, etc.

## INTERROGATORIES

### 1.

Please identify the person(s) or entity who owned, managed and controlled the premises referred to in the Complaint where the incident involving Plaintiff occurred and for the date of her injuries.  If the ownership, control, or maintenance changed at any time since said occurrence, please identify every subsequent person or entity.

### 2.

Please identify all persons who repaired, altered, renovated, inspected, managed, cleaned, or maintained the item and/or area where a metal sign fell onto Plaintiff on April 13, 2021, including a detailed description of the action that was taken in regard to repairing, altering, renovating, inspecting, managing, or maintaining the item and/or area at issue in Plaintiff's Complaint.

### 3.

If you are aware of any claim or complaint occurring in the eight hours before Plaintiff's injuries regarding any claimed problem or defect in or near the area

2

where a metal sign fell onto Plaintiff, please identify the details of said report or complaint, including what happened, dates, times, persons involved, and whether suit was filed.

4.

Please identify and describe in detail any program, policy or action implemented by you (before and at the time of Plaintiff's injuries) to inspect, repair, alter, manage, clean, or maintain the premises at issue in Plaintiff's Complaint and where a metal sign fell onto Plaintiff. This request also includes training procedures of your employees, agents, or business invitees that had any responsibility for the premises and approaches in question.

5.

Please describe each and every warning that you claim was provided to Plaintiff or other person regarding any danger associated with the premises at issue.

6.

Give the name, address, and telephone number of all witnesses that have knowledge regarding the incident giving rise to this lawsuit or have knowledge of any fact or circumstance regarding the incident giving rise to this lawsuit. For each witness, please state the following:

(a) Whether the witness investigated any aspect of the occurrence which is the subject of this litigation, and whether each made a written record of the investigation;

(b) Whether the witness was an eyewitness to the incident;

(c) Whether the witness is or was an employee of Defendant(s).  If the witness is an employee of Defendant(s), state their job title, whether they were a manager or supervisor, and whether they were working at the time of the incident;

(d) If you obtained a statement (oral, written, recorded, court or deposition transcript, etc.) from any witness identified by you.  If you did obtain a statement, please state the name of each person giving the statement, the name and address of the person or entity taking each statement, the date each statement was taken, and the name and address of each person having possession, custody, or control of each statement.

7.

Please identify any and all insurance, including excess or umbrella coverage or coverage by any other description (med-pay, etc.), which does or may afford insurance coverage to you for the claims made in this lawsuit, including the name of each insurance company, the applicable coverage, the insured(s) under each policy, and whether you have received any type of reservation of rights letter regarding coverage.

4

8.

Please identify all persons who have in any way investigated the claims made in this lawsuit, and whether each has made a written record of the investigation.

9.

Please list each act of negligence, contributory negligence, or comparative negligence you contend Plaintiff or any other person or entity, did or failed to do, which in any way contributed to the subject occurrence and Plaintiff's injuries.

10.

Please state in detail how you contend the subject occurrence took place and the order in which the events took place.  Please include in this response a listing of each person and circumstance you believe to have caused, or contributed to causing, the subject occurrence.

11.

Please state the basis (factual and legal) for each defense that you assert in this action, to include any service defenses.

12.

Please state the name and address of all expert witnesses or professional consultants retained or consulted by you or on your behalf to make an evaluation or investigation of the cause of the occurrence giving rise to this lawsuit or the damages sustained by Plaintiff.  With respect to each person, please state:

(a)     the specific subject matter on which you expect such expert to testify;

5

(b)     the substance of the facts, opinions, and conclusions which you expect such expert to testify;

(c)     the grounds for each such opinion or conclusion;

(d)     whether any of such persons have prepared or provided you with a written or recorded statement, or report concerning their investigation or study, or the facts found by them, or the conclusions or opinions arrived at by them or the grounds of their opinions or conclusions.  If so, state the date of each such report or statement, and the names and addresses of all persons who have a copy of such report or statement.

(e)     the name, business telephone number, and business address, of each person you retained or specially employed in the anticipation of litigation or preparation for trial whom you do not expect to call as a witness at the trial of the case.

(f)     whether the expert has ever been limited in the expert's ability to testify or ever been denied qualifications under a Daubert standard.

<div align="center">13.</div>

Please identify with specificity all injury claims or complaints made against you for injuries at the subject Old Navy, either before or after the incident that is the subject matter of this litigation, including the date, time and place of occurrence; the name, address and telephone number of all parties involved in said accident; the address of all investigating people or departments, personal injuries, if

<div align="center">6</div>

any, claimed in such incident; a short description of how the incident occurred, and whether suit was filed.

14.

Describe with particularity all photographs, charts, diagrams, videotapes, documents, illustrations, and/or other tangible items, of any person, place or thing involved in this lawsuit, giving the date each was made and the name and address of the person(s) with possession, custody or control of each item. (NOTE: You need not describe any document that was produced <u>and</u> specifically listed as having been produced in your responses to Plaintiff's First Request for Production of Documents.)

15.

State the substance of each conversation you or your agents or employees had with Plaintiff or her family or agents at the time of or at any time before the occurrence giving rise to this lawsuit, or any statement made by Plaintiff or her family or agents.

16.

Please identify any and all documentary or other tangible evidence, not previously identified, which you believe demonstrates and/or supports facts relevant to the claims and/or defenses in this case.

7

17.

Please identify all potential parties, individuals, entities or other person that you contend are indispensable parties or that would be liable for any judgment obtained by Plaintiff in this action. This interrogatory includes any entity or person who may be nonparties at fault (such as under O.C.G.A. § 51-12-33 or other statute), including any non-party who may have caused or contributed to the hazardous condition at issue and/or caused or contributed to Plaintiff's injuries.

18.

If there was an investigation made of the incident that forms the basis of this suit, please state whether the defendant conducted such investigation in anticipation of litigation, and if so, state each fact of which defendant was aware of at the time of the investigation that caused it to believe that it was conducting the investigation in anticipation of litigation.

19.

Please identify what efforts were made by the Defendant to modify, repair, renovate, or alter the premises at issue, the area where a metal sign fell onto Plaintiff, and inspection procedures before and/or after the incident at issue.

20.

All personnel actions, canceled contracts, or other action related to the subject incident, including any reprimands, termination letters, contract

terminations, or counseling statements to Defendant's employees, agents, contractors or other person for acts or omissions related to the subject incident.

21.

Please state when you first anticipated the litigation that is the subject matter of Plaintiff's Complaint, and identify all people, evidence, and documents supporting your response on when you first anticipated this litigation.

22.

Please describe in detail your evidence and document retention policies, practices, and procedures concerning incidents at the subject store.

23.

Please identify each and every document, electronically stored information, or other tangible piece of evidence that was responsive to Plaintiff's First Request for Production of Documents that has been lost, destroyed, or cannot be found. For each such document, ESI, or tangible piece of evidence, please state (1) when it was lost or destroyed, (2) who lost or destroyed it, and (3) the reasons it was lost or destroyed.

24.

Please describe in detail your efforts to locate documents, information, and evidence (including e-mail and electronically stored information) in response to Plaintiff's First Requests for Production of Documents and First Interrogatories. In your response, please state where you searched for documents (i.e, which records

custodians); the search terms you used, if any; and the identity of every person who participated in locating responsive documents.

Dated: January 9, 2023.

Respectfully submitted,

**PIASTA NEWBERN WALKER, LLC**

/s/ Michael P.  Walker
Michael P. Walker
Georgia Bar No. 954678
Andrew L. Hagenbush
Georgia Bar No. 127945

3301 Windy Ridge Parkway,
Suite 110
Atlanta, GA 30339
T: (404) 996-1296
F: (404) 996-1316
E: mike@pnwlaw.com
E: andrew@pnwlaw.com

10

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**1/9/2023 3:19 PM**
**TIANA P. GARNER, CLERK**

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| LINDA D. CLEMONS,               ) | |
|                          ) | |
|      Plaintiff,              ) | 23-C-00137-S4 |
|                          ) | Civil Action No. _____ |
| v.                           ) | |
|                          ) | |
| OLD NAVY, LLC; LISA ALLEN;    ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4;  ) | **JURY TRIAL DEMANDED** |
|                          ) | |
|      Defendants.           ) | |

### PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION
### AND NOTICE TO PRODUCE DOCUMENTS TO DEFENDANTS

TO:   EACH DEFENDANT

Pursuant to O.C.G.A. § 9-11-26, *et seq*., Plaintiff hereby requests that the Defendant(s) respond as provided by law, with a copy of the responses being served upon the undersigned counsel of record for the Plaintiff at Piasta Newbern Walker, LLC, 3301 Windy Ridge Parkway, Suite 110, Atlanta, Georgia 30339.

### DEFINITIONS AND INSTRUCTIONS

A. These Requests for Production of Documents and notice to produce shall be deemed continuing to the extent permitted by O.C.G.A. § 9-11-26 *et. seq.,* so as to require Defendant to serve upon all parties supplemental answers or documents if Defendant or its attorneys obtain further information between the time the answers are served and the time of the trial.  Plaintiff also requests that Defendant produce the originals of each document at trial and

any deposition of Defendant or their agents or employees.

B. "Document," whether singular or plural, means documents and other tangible things defined in the broadest sense permitted by the Georgia Civil Practice Act and shall include without limitation originals or, if such are not available, true copies, including copies of documents, videotapes, computer data, and sound material, **whether in physical or electronic form**.

C. You are to produce all documents that are in the possession, control or custody of you or in the possession, control or custody of any attorney for you. Without limiting the term "control," a document is deemed to be within your control if you have ownership, possession or custody of the document, or the right to secure the document or copy thereof from any person or public or private entity having physical possession thereof.

D. All duplicates or copies of documents are to be provided to the extent they have handwriting, additions, or deletions of any kind different from the original document being produced.

E. Unless otherwise indicated, documents requested by this Document Request are documents referring to, relating to, or prepared during the period October 16, 2012 through and including the date of your response.

F. This Document Request requires you amend or supplement your production of documents called for by this Document Request.

G. In the event that any document requested has been lost or destroyed, you

shall identify such document and, in addition, specify (a) the date of its loss or destruction; (b) the reason for its destruction; (c) the person authorizing its destruction; and (d) the custodian of the document immediately preceding its loss or destruction.

H. Plaintiff requests that, with respect to each document not produced because of a claim of privilege, you specify in writing with respect to each purportedly privileged document, its author(s), recipient(s), nature (e.g. memorandum, letter), date, subject matter, the nature of the claimed privilege and all facts you rely on to support the claim of privilege.  Plaintiff requests that you provide such descriptions within fifteen days after service of your response, or responses, to these documents requests.

I. If you object to any part of a document request, you shall produce all documents, or any portions thereof, covered by the request to which you do not object.

J. "You," "your," or "yours" shall mean, unless otherwise specified in a particular request, Defendant and/or any agent or representative of Defendant during all times relevant to this action.

K. The terms "and/or," "or," and "and" are used inclusively, not exclusively.

L. The term "identify," or "identity," when used herein in reference to a natural person, means to state (1) his/her full name and the present or last known address of his/her residence, and last known telephone number (with area

3

code prefix); (2) his/her present or last known business affiliation and positions with respect thereto during the relevant time period as herein defined, including a description of his/her duties and responsibilities. If any of the above information is not available, state any other available means of identification.

M. "The terms "concerning" or "relating to" as used herein shall mean referring to, reflecting or related in any manner, logically, factually, indirectly or directly to the matter discussed.

N. The terms "evidencing" as used herein shall mean constituting, reflecting, memorializing, referring to and/or supporting - logically, factually, indirectly or directly - the matter discussed.

O. The term "Damages" shall mean all claims for relief alleged by Plaintiff in her Complaint.

P. As used herein, the term "communication" includes, without limitation, every manner or means of statement, utterance, notation, disclaimer, transfer, or exchange of information of any nature whatsoever, by or to whomever, whether oral, written, or face-to-face, by telephone, U.S. mail, personal delivery, electronic mail, computer, or otherwise, specifically including, without limitation, correspondence, conversations, dialogue, discussions, interviews, consultations, agreements, and other understandings.

Q. All documents responsive to this request shall be produced in their original

form.  Documents originally in hard copy form shall be produced in that form. Documents or items requested in electronic, optical, or magnetic media form shall be produced in the form requested as kept by you.  In the event Plaintiff experiences difficulty in retrieving or translating said electronic, computer or magnetic data, Defendant shall produce all such documentary information contained within said data in hard copy form that does not require translation within five (5) days of receiving objection from Plaintiff without the necessity of court order.

R. The singular includes the plural number, and vice versa.  The masculine includes the feminine and neuter gender.  The past tense includes the present tense where the clear meaning is not distorted by change of tense.

S. "Equipment" shall refer to any of the equipment that was being used during the incident that formed the basis of this suit.

T. "Entity" or "Entities" shall mean any corporation, corporate form (such as a limited partnership, limited liability partnership, or limited liability company), parent company, affiliate, subsidiary, partner, member, venture, partnership, or any other structure (or a chain of successive entities) that conducts business, has conducted business, or anticipates conducting business.

U. If you assert the attorney-client privilege or work-product doctrine as to any document requested by any of the following specific requests, please identify

5

the document in sufficient detail to permit the Court to reach a determination in the event of Motion to Compel.

V. **If you have any objections such as vague, overbroad, etc., please do not object. Instead, call me and I will try to take into account your objections and specific concerns in hopes of working such disputes out amicably.**

## REQUESTS FOR PRODUCTION

Defendant is requested to produce each of the following:

1.

Any statement in your control from any person possessing relevant knowledge of the incident giving rise to this lawsuit, whether written or recorded.

2.

All photographs, charts, diagrams, videotapes, and other illustrations of any person, place or thing involved in this lawsuit.

3.

All documents evidencing, reflecting, relating to or constituting any communication between you and another party in this action.

4.

All documents supporting or relating to Plaintiff's or any Defendant's contentions of negligence, including any allegation of non-party fault.

5.

Any correspondence, statements, documents, or other tangible evidence involving any of the witnesses or other individuals involved or with knowledge of the incident forming the basis of Plaintiff's Complaint.

6.

All documents evidencing, reflecting, relating to or constituting an accident or incident report regarding the occurrence forming the basis of this lawsuit.

7.

All documents that you receive in response to your Requests for Production of Documents to nonparties.

8.

All documents identified, referenced, or used to answer Plaintiff's discovery requests in this matter.

9.

Any and all documents that support any defenses or contentions raised in your Answer and pleadings, or any relevant fact to this litigation.

10.

All documents, pleadings and/or exhibits filed, served or prepared with any litigation involving personal injuries to which you have been a party and involving the premises and approaches in question for the past (5) years.

11.

Any maintenance, landscaping, permit, repair, inspection, or service records reflecting repairs, service, additions, modifications, or changes to the area where a metal sign fell upon Plaintiff, and the premises and approaches at issue in Plaintiff's Complaint.

12.

All documentary evidence or other tangible evidence which relates, or is reasonably calculated to lead to the discovery of relevant or admissible evidence, regarding any of the Plaintiff's claims in this action or Defendant's defenses.

13.

Please produce all policies of insurance, to include the declaration pages, which do or may afford insurance coverage Defendant for Plaintiff's claims against Defendant.  This Request includes primary insurance coverage, excess insurance coverage, or any other type of liability insurance coverage, and medical-payments coverage. This request includes all documents affecting coverage, including reservation of rights documents.

14.

Please produce all reports and documents received from any persons who have investigated any issue(s) relevant to the subject falling sign and relevant to this lawsuit.

15.

Please produce all documents evidencing or reflecting any agreement regarding maintenance, cleaning, or inspecting the approaches and area where the metal sign fell upon Plaintiff.

16.

Please produce all claims forms, accident reports, or other documentation evidencing prior or subsequent complaints, problems, injuries, falling merchandise, or falls occurring on the premises or approaches where Plaintiff was injured.

17.

Please produce all log books, maintenance or inspection reports, permits, applications, work orders, or all other documents of any kind or by any other name which relate in any way to modifications to the inspection, walkthrough, cleaning, or maintenance of the area in question before and after the metal sign fell upon Plaintiff.

18.

Please produce any demonstrative evidence relevant to the issues of this case.

19.

Please produce all documents, including employee handbooks, policy or procedure manuals, or video tapes, Defendant's policies regarding safety, training, testing, inspecting, repairing, or maintaining the premises, means of egress and ingress, approaches and the area forming the basis of Plaintiff's Complaint.

20.

Produce all safety inspection and maintenance reports / documents completed by any of your employees, agents or independent contractors with regard to the premises and approaches at issue from April 7, 2021, through and including April 27, 2021.

21.

Please produce safety inspection procedures with regard to the premises and approaches at issue.

22.

Produce all civil Complaints, or internal incident reports, warnings, e-mails, and documents completed by your employees, agents or independent contractors regarding substantially similar claims, complaints, or incidents for the past seven (7) years at the Old Navy store located at 2059 Scenic Highway North, Suite 106, Snellville, Georgia 30078.

23.

Please produce all contracts or agreements entered into between Defendant and/or any other individual or company and regarding maintaining or inspecting the premises, approaches and area forming the basis of Plaintiff's Complaint.

24.

The entire file of all experts you intend to call at trial, including any document the expert reviewed, considered, or relied upon in forming his/her opinions; the expert's testimony/case lists; and the expert's curriculum vitae.

25.

Produce all notes, memoranda, minutes, and all other written evidence of safety meetings held by you from 2017 to the present at the subject Old Navy store.

26.

Produce all architectural plans, drawings or designs of the premises in question, including the layout of the area where the metal sign fell upon Plaintiff.

27.

Please produce any complaints, notices, memoranda, emails, security logs, or any other documents concerning the area where the metal sign fell upon Plaintiff from April 7, 2021 through April 27, 2021.

28.

All disciplinary actions, adverse actions, counseling statements, cancelled contracts, reprimands, termination letters, or other documents related in any way to the incident at issue.

29.

All documents which relate in any way to the inspection, maintenance, condition and repairs which in any way concern or affect the area where the metal sign fell upon Plaintiff from 2017 through present.

You are requested to comply with said requests by producing and permitting the Plaintiff's attorney to inspect and copy the documents requested. In lieu of appearance at a document production, you may instead mail true and accurate copies of all documents or evidence to Piasta Newbern Walker, LLC, 3301 Windy Ridge Parkway, Suite 110, Atlanta, Georgia 30339

Dated: January 9, 2023.

Respectfully submitted,

**PIASTA NEWBERN WALKER, LLC**

/s/ Michael P.  Walker
Michael P. Walker
Georgia Bar No. 954678
Andrew L. Hagenbush
Georgia Bar No. 127945

3301 Windy Ridge Parkway,
Suite 110
Atlanta, GA 30339
T: (404) 996-1296
F: (404) 996-1316
E: mike@pnwlaw.com
E: andrew@pnwlaw.com

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**
**1/9/2023 3:19 PM**
**TIANA P. GARNER, CLERK**

# IN THE STATE COURT OF GWINNETT COUNTY

## STATE OF GEORGIA

_____

_____

_____

PLAINTIFF

VS.

CIVIL ACTION
NUMBER: 23-C-00137-S4 _____

_____

_____

_____

DEFENDANT

# SUMMONS

**TO THE ABOVE NAMED DEFENDANT:  Lisa Allen**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

9th day of January, 2023

This _____ day of _____, 20\_\_\_\_\_.

**Tiana P. Garner**
**Clerk of State Court**

By _____
**Deputy Clerk**

**INSTRUCTIONS: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.**

**SC-1 Rev. 2011**

E-FILED IN OFFICE - JT
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**
**1/9/2023 3:19 PM**
**TIANA P. GARNER, CLERK**

# IN THE STATE COURT OF GWINNETT COUNTY

## STATE OF GEORGIA

_____

_____

_____

**PLAINTIFF**

VS.

_____

_____

_____

**DEFENDANT**

CIVIL ACTION 23-C-00137-S4
NUMBER:_____

# SUMMONS

**TO THE ABOVE NAMED DEFENDANT:  Old Navy, LLC**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

9th day of January, 2023

This _____ day of _____,  20_____.

**Tiana P. Garner**
**Clerk of State Court**

By _____
**Deputy Clerk**

**INSTRUCTIONS: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.**

**SC-1 Rev. 2011**

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**1/19/2023 3:42 PM**

**TIANA P. GARNER, CLERK**

## AFFIDAVIT OF SERVICE

**State of Georgia**                **County of Gwinnett**                **State Court**

Case Number: 23-C-00137-S4

Plaintiff: **Linda D. Clemons**
vs.
Defendant: **Old Navy, LLC; Lisa Allen**

For:
Michael Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Parkway
Suite 110
Atlanta, GA 30339

Received by Ancillary Legal Corporation on the 13th day of January, 2023 at 11:05 am to be served on **Lisa Allen, 2059 Scenic Highway North, Suite 106, Snellville, GA 30078**.

I, Lee Gauthreaux, being duly sworn, depose and say that on the **17th day of January, 2023** at 11:50 am, I:

**INDIVIDUALLY/PERSONALLY** served by delivering a true copy of the **Summons, Complaint, Plaintiff's First Requests For Admission To Defendants, Plaintiff's First Interrogatories To Defendants, Plaintiff's First Requests For Production And Notice To Produce Documents To Defendants** to: **Lisa Allen** at the address of: **2059 Scenic Highway North, Suite 106, Snellville, GA 30078**.

**Military Status:** Based upon inquiry of party served, Defendant is not in the military service of the United States of America.

**Marital Status:** Based upon inquiry of party served, Defendant is married.

**Additional Information pertaining to this Service:**
1/17/2023  11:50 am  Perfected individual service at 2059 Scenic Highway North Suite 106 Snellville, GA 30078. She stated that she was the subject defendant at the time of service. She was at the store on duty.

**Description** of Person Served: Age: ~35, Sex: F, Race/Skin Color: Black, Height: ~5'6", Weight: 160, Hair: Black, Glasses: N

I am an agent of Ancillary Legal Corporation and am competent in all respects to testify regarding the matters set forth herein. I have personal knowledge of the facts stated herein and know them to be true.I have no interest in the outcome of this action and am not related to any of  the parties. I am 18 or more years of age and am authorized to serve process.

Subscribed and Sworn to before me on the 19th
day of January 2023 by the affiant
who is personally known to me.

_____
NOTARY PUBLIC

**Lee Gauthreaux**
Process Server

**Ancillary Legal Corporation**
**2900 Chamblee Tucker Road**
**Building 13**
**Atlanta, GA 30341**
**(404) 459-8006**

Our Job Serial Number: ANC-2023000386
Ref: Clemons

BOYD KENNETH WARD
NOTARY
EXPIRES
GEORGIA
08/22/2026
PUBLIC
FULTON COUNTY

Copyright © 1992-2023 Database Services, Inc. - Process Server's Toolbox V8.2i

E-FILED IN OFFICE - AK
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**
**1/27/2023 2:37 PM**
**TIANA P. GARNER, CLERK**

## AFFIDAVIT OF SERVICE

State of Georgia                                   County of Gwinnett                              State Court

Case Number: 23-C-00137-S4

Plaintiff: **Linda D. Clemons**
vs.
Defendant: **Old Navy, LLC; Lisa Allen**

For:
Michael Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Parkway
Suite 110
Atlanta, GA 30339

Received by Ancillary Legal Corporation on the 20th day of January, 2023 at 2:50 pm to be served on **Old Navy LLC c/o CT Corporation System, 289 S. Culver Street, Lawrenceville, GA 30046**.

I, Christopher Todd Horton, being duly sworn, depose and say that on the **23rd day of January, 2023** at **2:30 pm, I:**

served **Old Navy LLC c/o CT Corporation System** by delivering a true copy of the **SUMMONS, COMPLAINT, PLAINTIFF'S FIRST REQUESTS FOR ADMISSION TO DEFENDANTS,PLAINTIFF'S FIRST INTERROGATORIES TO DEFENDANTS, PLAINTIFF'S FIRST REQUESTS FOR PRODUCTION AND NOTICE TO PRODUCE DOCUMENTS TO DEFENDANTS** to: CT Corporation System as **Registered Agent, BY LEAVING THE SAME WITH** Jane Richardson as **Authorized to Accept** at the address of: **289 S. Culver Street, Lawrenceville, GA 30046**.

**Additional Information pertaining to this Service:**
1/23/2023  2:30 pm  Perfected corporate service at 289 S. Culver St., Lawrenceville, GA 30046, by serving Jane Richardson, process specialist.

White female, light brown hair,
60-65 years old , 5'7", 190 lbs,
wears glasses.

I am an agent of Ancillary Legal Corporation and am competent in all respects to testify regarding the matters set forth herein. I have personal knowledge of the facts stated herein and know them to be true.I have no interest in the outcome of this action and am not related to any of  the parties. I am 18 or more years of age and am authorized to serve process.

Subscribed and Sworn to before me on the ___
day of _____, _____ by the affiant
who is personally known to me.

_____
NOTARY PUBLIC

Christopher Todd Horton
Process Server

Ancillary Legal Corporation
2900 Chamblee Tucker Road
Building 13
Atlanta, GA 30341
(404) 459-8006

Our Job Serial Number: ANC-2023000647
Ref: Clemons

BOYD KENNETH WARD
NOTARY
EXPIRES
GEORGIA
08/22/2026
PUBLIC
FULTON COUNTY

Copyright © 1992-2023 Database Services, Inc. - Process Server's Toolbox V8.2i

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**2/16/2023 9:58 AM**

TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1 ; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT LISA ALLEN'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

COMES NOW Defendant Lisa Allen (herein "Defendant Allen") and files her Answer to Plaintiff's Complaint and shows this Court as follows:

### FIRST DEFENSE

Plaintiff's Complaint fails to state a claim upon which relief can be granted against Defendant Allen.

### SECOND DEFENSE

Defendant Allen did not breach any duty of care owed to Plaintiff and, therefore, Plaintiff cannot recover against Defendant Allen.

### THIRD DEFENSE

No act or omission on the part of Defendant Allen either caused or contributed to whatever injury or damage Plaintiff may have sustained, if any.

### FOURTH DEFENSE

The sole proximate cause of Plaintiff's damage, if any, was the negligence of Plaintiff herself.

1

## FIFTH DEFENSE

Plaintiff's own actions contributed proximately to her alleged damage or injury as she was not exercising ordinary care for her own safety at the time it is claimed she was damaged.

## SIXTH DEFENSE

Even if Defendant Allen was negligent in the manner set out and charged in the Complaint, which negligence is denied, the negligence of Plaintiff was equal to or greater than any negligence charged against Defendant Allen in the Complaint, and the consequences of such negligence, if any in fact existed, could have been avoided had Plaintiff been in the exercise of ordinary care.

## SEVENTH DEFENSE

Defendant Allen raises the defense of assumption of risk.

## EIGHTH DEFENSE

Any condition of the premises on the subject date was patent, open, and obvious.

## NINTH DEFENSE

Defendant Allen states that her investigation and discovery are continuing, and Defendant Allen reserves the right to assert any affirmative defenses set forth in O.C.G.A. § 9-11-8(c), additional defenses, claims, and denials as may be disclosed during the course of additional investigation and discovery.

## TENTH DEFENSE

Plaintiff's claims are barred by the plain view doctrine.

## ELEVENTH DEFENSE

Any special damages not specifically pleaded are not recoverable. *See* O.C.G.A. § 9-11-9(g).

## TWELFTH DEFENSE

The sole proximate cause of Plaintiff's damage, if any were sustained, was the acts of third parties other than Defendant Allen.

## THIRTEENTH DEFENSE

Defendant Allen asserts that if Plaintiff has released, settled, entered into an accord and satisfaction, or otherwise compromised Plaintiff's claims herein, then accordingly, said claims are barred or reduced by payment, accord, satisfaction, arbitration and award, release and res judicata.

## FOURTEENTH DEFENSE

Defendant Allen asserts that the allegations in this matter do not show superior knowledge on behalf of Defendant Allen Therefore, Plaintiff is barred from recovering against Defendant Allen.

## FIFTEENTH DEFENSE

Responding to the numbered paragraphs of Plaintiff's Complaint, Defendant Allen shows the Court the following:

1.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1 of Plaintiff's Complaint; therefore, it is denied.

2.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 of Plaintiff's Complaint; therefore, it is denied.

3.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 3 of Plaintiff's Complaint; therefore, it is denied.

3

4.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 4 of Plaintiff's Complaint; therefore, it is denied.

5.

Defendant Allen admits the allegations contained in Paragraph 5 of Plaintiff's Complaint.

6.

Defendant Allen admits the allegations contained in Paragraph 6 of Plaintiff's Complaint.

7.

Defendant Allen admits the allegations contained in Paragraph 7 of Plaintiff's Complaint.

8.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8 of Plaintiff's Complaint; therefore, it is denied.

**OPERATIVE FACTS**

9.

Defendant Allen admits that on April 13, 2021, Defendant Old Navy and operated the Old Navy store located at 2059 Scenic Highway North, Suite 106, Snellville, Georgia 30078. Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 9 of Plaintiff's Complaint; therefore, it is denied.

10.

Defendant Allen admits that Defendant Allen was the manager of the Old Navy store. Defendant Allen denies the remaining allegations contained in Paragraph 10 of Plaintiff's Complaint.

11.

Defendant Allen denies that Defendant Allen was solely responsible for identifying, removing, and warning Old Navy patrons of hazardous conditions on the premises and further denies that Defendant Allen was solely responsible for implementing and enforcing store policies, procedures, and practices for identifying and removing hazards at the store. Defendant Allen further denies that Defendant Allen exercised control over the subject premises at the time of the subject incident.

12.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 of Plaintiff's Complaint; therefore, it is denied.

13.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13 of Plaintiff's Complaint; therefore, it is denied.

14.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 of Plaintiff's Complaint; therefore, it is denied.

15.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 of Plaintiff's Complaint; therefore, it is denied.

16.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of Plaintiff's Complaint; therefore, it is denied.

17.

Defendant Allen denies the allegations contained in Paragraph 17 of Plaintiff's Complaint.

18.

Defendant Allen denies the allegations contained in Paragraph 18 of Plaintiff's Complaint.

19.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of Plaintiff's Complaint; therefore, it is denied.

20.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of Plaintiff's Complaint; therefore, it is denied.

**LEGAL CLAIMS**

21.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 of Plaintiff's Complaint; therefore, it is denied.

22.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of Plaintiff's Complaint; therefore, it is denied.

23.

Defendant Allen denies the allegations contained in Paragraph 23 of Plaintiff's Complaint.

24.

Defendant Allen denies the allegations contained in Paragraph 24 of Plaintiff's Complaint.

25.

Defendant Allen denies the allegations contained in Paragraph 25 of Plaintiff's Complaint.

26.

Defendant Allen denies the allegations contained in Paragraph 26 of Plaintiff's Complaint.

27.

Defendant Allen denies the allegations contained in Paragraph 27 of Plaintiff's Complaint.

28.

Defendant Allen denies the allegations contained in Paragraph 28, including subparagraphs "a" through "g", of Plaintiff's Complaint.

29.

Defendant Allen denies the allegations contained in Paragraph 29 of Plaintiff's Complaint.

30.

Defendant Allen denies the allegations contained in Paragraph 30 of Plaintiff's Complaint.

31.

Defendant Allen denies the allegations contained in Paragraph 31 of Plaintiff's Complaint.

32.

Defendant Allen is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 of Plaintiff's Complaint; therefore, it is denied.

33.

Defendant Allen denies the allegations contained in Paragraph 33, including subparagraphs "a" through "i", of Plaintiff's Complaint.

34.

Defendant Allen denies the allegations contained in Paragraph 34 of Plaintiff's Complaint.

**WHEREFORE**, Defendant Allen respectfully demands judgment in its favor, a trial by jury of twelve (12) persons, all costs and attorney's fees and for all other relief as this Court deems proper.

Respectfully submitted this 16th day of February, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

/s/  Brittany DeDiego
_____
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

8

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served all counsel of record in the foregoing matter with a copy of **DEFENDANT LISA ALLEN'S ANSWER TO PLAINTIFF'S COMPLAINT** has this day been filed with the Clerk of the Court by electronically filing with the Court's E-File system, which automatically serves copies upon all counsel of record, b**y *STATUTORY ELECTRONIC SERVICE O.C.G.A. § 9-11-5(f)*** as follows:

<div align="center">

Michael P. Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
*Counsel for Plaintiff*

</div>

This 16th day of February, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

|  |  |
|---|---|
| Bank of America Plaza | */s/  Brittany DeDiego* |
| 600 Peachtree Street NE | S. CHRISTOPHER COLLIER |
| Suite 4700 | Georgia Bar No. 178307 |
| Atlanta, Georgia  30308 | BRITTANY DEDIEGO |
| Telephone:  (404) 348-8585 | Georgia Bar No. 296392 |
| Facsimile: (404) 467-8845 |  |
| Chris.Collier@lewisbrisbois.com | *Counsel for Defendants Old Navy, LLC and Lisa* |
| Brittany.DeDiego@lewisbrisbois.com | *Allen* |

9

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-00137-S4**
**2/16/2023 9:58 AM**
TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1 ; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

COMES NOW Defendant Old Navy, LLC, pursuant to Superior and State Court Rule 5.2, and notifies the Court that Defendant served upon all counsel of record a copy of the following:

- Defendant Old Navy, LLC's Responses to Plaintiff's First Request for Admissions

- Defendant Old Navy, LLC's First Continuing Interrogatories and Request for Production of Documents to Plaintiff Linda D. Clemons

This 16th day of February, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

1

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true and correct copy of the foregoing pleading using Odyssey eFile GA's electronic filing system which will send notification of the same, or in the alternative, via U.S. Mail to all counsel of record as follows:

Michael P. Walker
Andrew L. Hagenbush
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
andrew@pnwlaw.com
*Counsel for Plaintiff*

This 16th day of February, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-00137-S4**
**2/16/2023 9:58 AM**
TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1 ; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT OLD NAVY, LLC'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

COMES NOW Defendant Old Navy, LLC ("Old Navy") and files its Answer to Plaintiff's Complaint and shows this Court as follows:

### FIRST DEFENSE

Plaintiff's Complaint fails to state a claim upon which relief can be granted against Defendant Old Navy.

### SECOND DEFENSE

Defendant Old Navy did not breach any duty of care owed to Plaintiff and, therefore, Plaintiff cannot recover against Defendant Old Navy.

### THIRD DEFENSE

No act or omission on the part of Defendant Old Navy either caused or contributed to whatever injury or damage Plaintiff may have sustained, if any.

### FOURTH DEFENSE

The sole proximate cause of Plaintiff's damage, if any, was the negligence of Plaintiff herself.

1

**FIFTH DEFENSE**

Plaintiff's own actions contributed proximately to her alleged damage or injury as she was not exercising ordinary care for her own safety at the time it is claimed she was damaged.

**SIXTH DEFENSE**

Even if Defendant Old Navy was negligent in the manner set out and charged in the Complaint, which negligence is denied, the negligence of Plaintiff was equal to or greater than any negligence charged against Defendant Old Navy in the Complaint, and the consequences of such negligence, if any in fact existed, could have been avoided had Plaintiff been in the exercise of ordinary care.

**SEVENTH DEFENSE**

Defendant Old Navy raises the defense of assumption of risk.

**EIGHTH DEFENSE**

Any condition of the premises on the subject date was patent, open, and obvious.

**NINTH DEFENSE**

Defendant Old Navy states that its investigation and discovery are continuing, and Defendant Old Navy reserves the right to assert any affirmative defenses set forth in O.C.G.A. § 9-11-8(c), additional defenses, claims, and denials as may be disclosed during the course of additional investigation and discovery.

**TENTH DEFENSE**

Plaintiff's claims are barred by the plain view doctrine.

**ELEVENTH DEFENSE**

Any special damages not specifically pleaded are not recoverable. *See* O.C.G.A. § 9-11-9(g).

## TWELFTH DEFENSE

The sole proximate cause of Plaintiff's damage, if any were sustained, was the acts of third parties other than Defendant Old Navy.

## THIRTEENTH DEFENSE

Defendant Old Navy asserts that if Plaintiff has released, settled, entered into an accord and satisfaction, or otherwise compromised Plaintiff's claims herein, then accordingly, said claims are barred or reduced by payment, accord, satisfaction, arbitration and award, release and res judicata.

## FOURTEENTH DEFENSE

Defendant Old Navy asserts that the allegations in this matter do not show superior knowledge on behalf of Defendant Old Navy. Therefore, Plaintiff is barred from recovering against Defendant Old Navy.

## FIFTEENTH DEFENSE

Responding to the numbered paragraphs of Plaintiff's Complaint, Defendant Old Navy shows the Court the following:

1.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 1 of Plaintiff's Complaint; therefore, it is denied.

2.

Defendant Old Navy admits the allegations contained in Paragraph 2 of Plaintiff's Complaint for purposes of this lawsuit only.

3.

Defendant Old Navy admits the allegations contained in Paragraph 3 of Plaintiff's Complaint for purposes of this lawsuit only.

4.

Defendant Old Navy admits the allegations contained in Paragraph 4 of Plaintiff's Complaint.

5.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 of Plaintiff's Complaint; therefore, it is denied.

6.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 of Plaintiff's Complaint; therefore, it is denied.

7.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 of Plaintiff's Complaint; therefore, it is denied.

8.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 8 of Plaintiff's Complaint; therefore, it is denied.

**OPERATIVE FACTS**

9.

Defendant Old Navy admits that on April 13, 2021, Defendant operated the Old Navy store located at 2059 Scenic Highway North, Suite 106, Snellville, Georgia 30078. Defendant Old Navy

is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 9 of Plaintiff's Complaint; therefore, it is denied.

10.

Defendant Old Navy admits that Defendant Allen was the manager of the Old Navy store. Defendant Old Navy denies the remaining allegations contained in Paragraph 10 of Plaintiff's Complaint.

11.

Defendant Old Navy denies that Defendant Allen was solely responsible for identifying, removing, and warning Old Navy patrons of hazardous conditions on the premises and further denies that Defendant Allen was solely responsible for implementing and enforcing store policies, procedures, and practices for identifying and removing hazards at the store. Defendant Old Navy further denies that Defendant Allen exercised control over the subject premises at the time of the subject incident.

12.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 of Plaintiff's Complaint; therefore, it is denied.

13.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13 of Plaintiff's Complaint; therefore, it is denied.

14.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 of Plaintiff's Complaint; therefore, it is denied.

15.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 of Plaintiff's Complaint; therefore, it is denied.

16.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 16 of Plaintiff's Complaint; therefore, it is denied.

17.

Defendant Old Navy denies the allegations contained in Paragraph 17 of Plaintiff's Complaint.

18.

Defendant Old Navy denies the allegations contained in Paragraph 18 of Plaintiff's Complaint.

19.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 of Plaintiff's Complaint; therefore, it is denied.

20.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 20 of Plaintiff's Complaint; therefore, it is denied.

## LEGAL CLAIMS

21.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 21 of Plaintiff's Complaint; therefore, it is denied.

22.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of Plaintiff's Complaint; therefore, it is denied.

23.

Defendant Old Navy denies the allegations contained in Paragraph 23 of Plaintiff's Complaint.

24.

Defendant Old Navy denies the allegations contained in Paragraph 24 of Plaintiff's Complaint.

25.

Defendant Old Navy denies the allegations contained in Paragraph 25 of Plaintiff's Complaint.

26.

Defendant Old Navy denies the allegations contained in Paragraph 26 of Plaintiff's Complaint.

27.

Defendant Old Navy denies the allegations contained in Paragraph 27 of Plaintiff's Complaint.

28.

Defendant Old Navy denies the allegations contained in Paragraph 28, including subparagraphs "a" through "g", of Plaintiff's Complaint.

29.

Defendant Old Navy denies the allegations contained in Paragraph 29 of Plaintiff's Complaint.

30.

Defendant Old Navy denies the allegations contained in Paragraph 30 of Plaintiff's Complaint.

31.

Defendant Old Navy denies the allegations contained in Paragraph 31 of Plaintiff's Complaint.

32.

Defendant Old Navy is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 of Plaintiff's Complaint; therefore, it is denied.

33.

Defendant Old Navy denies the allegations contained in Paragraph 33, including subparagraphs "a" through "i", of Plaintiff's Complaint.

34.

Defendant Old Navy denies the allegations contained in Paragraph 34 of Plaintiff's Complaint.

**WHEREFORE**, DEFENDANT OLD NAVY, LLC respectfully demands judgment in its favor, a trial by jury of twelve (12) persons, all costs and attorney's fees and for all other relief as this Court deems proper.

Respectfully submitted this 16th day of February, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

9

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all counsel of record in the foregoing matter with a copy of **DEFENDANT OLD NAVY, LLC'S ANSWER TO PLAINTIFF'S COMPLAINT** has this day been filed with the Clerk of the Court by electronically filing with the Court's E-File system, which automatically serves copies upon all counsel of record, by *STATUTORY ELECTRONIC SERVICE O.C.G.A. § 9-11-5(f)* as follows:

Michael P. Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
*Counsel for Plaintiff*

This 16th day of February, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

10

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**3/3/2023 10:12 AM**

TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

COMES NOW Defendant Lisa Allen, pursuant to Superior and State Court Rule 5.2, and notifies the Court that Defendant served upon all counsel of record a copy of the following:

- Defendant Lisa Allen's Responses to Plaintiff's First Request for Admission

This 3rd day of March, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*
_____
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

1

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day a true and correct copy of the foregoing pleading using Odyssey eFile GA's electronic filing system which will send notification of the same, or in the alternative, via U.S. Mail to all counsel of record as follows:

<div align="center">

Michael P. Walker
Andrew L. Hagenbush
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
andrew@pnwlaw.com
*Counsel for Plaintiff*

</div>

This 3rd day of March, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**
**12/5/2023 11:19 AM**
TIANA P. GARNER, CLERK

To: All Judges, Clerks of Court, and Counsel of Record

From: S. Christopher Collier, Lewis Brisbois Bisgaard & Smith, LLP

### NOTICE OF LEAVE OF ABSENCE

COMES NOW S. Christopher Collier and respectfully notifies all Judges before whom he has cases pending, all affected Clerks of Court, and all opposing counsel that he will be on leave pursuant to Uniform Court Rule 16.

The periods of leave during which time Applicant will be away from the practice of law are as follows:

(1)     January 15-16, 2024;

(2)     February 16-25, 2024;

(3)     March 11, 2024;

(4)     March 29 – April 7, 2024;

The purpose for these leaves is for family vacation and legal instruction.

All affected Judges and opposing counsel shall have ten (10) days from the date of this Notice to object to it.  If no objections are filed, then leave shall be granted. The undersigned shows that he is counsel of record in the cases listed on the attached Exhibit "A" and that the periods requested will not interfere with any presently scheduled hearing, trial, or other proceeding.

This 5th day of December, 2023.

LEWIS BRISBOIS BISGAARD & SMITH, LLP

*/s/ S. Christopher Collier*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307

600 Peachtree St NE, Suite 4700
Atlanta, GA 30308
(404) 476-2060 (Phone)
Chris.Collier@lewisbrisbois.com

1

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this date served a copy of the foregoing Notice of Leave of Absence upon all Judges, Clerks and opposing counsel listed on the attached Exhibit "A", electronically via Odyssey eFileGA, File & ServeXpress, PeachCourt, or by depositing a copy of same in the U.S. Mail, proper postage paid, addressed to counsel of record.

This 5th day of December, 2023.

LEWIS BRISBOIS BISGAARD & SMITH, LLP

*/s/ S. Christopher Collier*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307

600 Peachtree St NE, Suite 4700
Atlanta, GA 30308
(404) 476-2060 (Phone)
Chris.Collier@lewisbrisbois.com

2

**EXHIBIT "A"**

| Court | Case No. | Case Style | Judge | Counsel of Record |
|---|---|---|---|---|
| State Court of Clayton County | 2021CV00850 | *Martin Amaya v. Thanh Vu* | Hon. Sonyja George | Serma Kebede Law Office of W. Bryant Green III, P.C. |
| Superior Court of Fulton County | 2021CV356795 | *Marvalyne Arnold v. Fairway Management, Inc., et al.* | Hon. Robert McBurney | Roy K. Starkey Magua B. Benson Hilliard Starkey Law |
| State Court of Whitfield County | 22CI01187 | *Bobby Kenneth Cantrell v. Alvaro A. Valdovinos* | Hon. Bert Poston | Tom D. Weldon, Jr. Weldon Law Firm<br><br>Sean L. Hayes Downey & Cleveland, LLP<br><br>Nikolai Makarenko, Jr. Groth Makarenko Kaier & Eidex LLC<br><br>Patrick S. Reames Christina L. Gulas Bovis Kyle Burch & Medlin, LLC |
| Superior Court of Sumter County | 2021-CV-00381 | *Kimberly Carnes v. City of Americus Georgia* | Hon. R. Rucker Smith | David F. Ellison Fortson, Bentley, & Griffin, PA |
| State Court of Gwinnett County | 23-C-00137-S4 | *Linda D. Clemons v. Old Navy, LLC, et al.* | Hon. Ronda S. Colvin | Michael P. Walker Piasta Newbern Walker, LLC |
| State Court of Cobb County | 18-A-3330 | *Jason Dang, et al. v. Quoqiang Hua, et al.* | Hon. John S. Morgan | Talal "Perez" Ghoseh |

3

| | | | | Ghoseh Law Firm LLC |
|---|---|---|---|---|
| Superior Court of Fulton County | 2023CV382291 | *Gyana Dewberry v. Gauthier Properties, LLC, et al.* | Hon. Melynee Leftridge | Morgan E. M. Harrison Arnall Golden Gregory LLP |
| State Court of Muscogee County | SC2023CV000396 | *Jane Doe v. Old Home Town Properties, LLC, et al.* | Hon. Pythias Temesgen | Shellea D. Crochet Morgan & Morgan Atlanta, PLLC |
| State Court of Gwinnett County | 23-C-06773-S1 | *Brian M. Douglas, et al. v. Xochilt Miranda Wences, et al.* | Hon. Emily J. Brantley | Darl H. Champion, Jr. Andrienne McKay The Champion Firm, P.C.  Hung Q. Nguyen Adam Klein 770GoodLaw, H.Q. Alex Nguyen Law Firm, LLC |
| State Court of Gwinnett County | 23-C-07089-S7 | *Armer Early, et al. v. Xochilt Miranda Wences, et al.* | Hon. Emily J. Brantley | Darl H. Champion, Jr. Andrienne McKay The Champion Firm, P.C.  Hung Q. Nguyen Adam Klein 770GoodLaw, H.Q. Alex Nguyen Law Firm, LLC |
| Superior Court of Newton County | SUCV2023000866 | *Vinnette Gibson v. Ortega Maxey* | Hon. Kevin Morris | Tim C. Cramer Cramer & Peavy  Michael C. Davis |

| | | | | Law Office of Andrews and Manganiello |
|---|---|---|---|---|
| State Court of Macon-Bibb County | 23-SCCV-0095397 | *Freddie Graham and Janet Graham v. 3M Company, et al.* | Hon. Jeffrey B. Hanson | Sharon Zinns Zinns Law, LLC |
| State Court of DeKalb County | 20A79081 | *Donald G. Lassiter v. Akebono Brake Corporation, et al.* | Hon. Johnny Panos | Sharon Zinns Zinns Law, LLC |
| State Court of Cobb County | 22-A-1642 | *Peggy Martin, Individually and as Executor of the Estate of Calvin Martin v. Karl F. Eidam, et al.* | Hon. John S. Morgan | Christopher Rodd The Rodd Law Firm, LLC |
| State Court of Hall County | 2022SV001003 | *Christopher Maynor, et al. v. Stacie & Company, LLC* | Hon. Larry A. Baldwin, II | T. Preston Moore, II Beasley Allen Crow Methvin Portis & Miles, PC |
| State Court of Clayton County | 2023CV01294 | *Arnita Murphy v. Aleise Woods a/k/a Aleise M. Berry* | Hon. Sonyja George | Joseph M. Todd Joseph M. Todd, PC  Chanelle Robinson Law Offices of Kelly Goodwin |
| State Court of Cobb County | 23-A-1258 | *Michael C. Pascale v. William Mangine, et al.* | Hon. Carl W. Bowers | Daniel T. Gholston Titus Law, LLC |
| State Court of Fulton County | 21EV006733 | *Lee Voine Phillips, et al. v. Fairway Management, Inc., et al.* | Hon. Diane E. Bessen | Roy K. Starkey Magua B. Benson Hilliard Starkey Law  Jay M. O'Brien Copeland Stair Valz & Lovell, LLP |

| State Court of Cobb County | 22-A-1809 | *Meagan Sheets v. Jermaine Long, et al.* | Hon. Eric A. Brewton | Kelli Hooper Morgan & Morgan Atlanta PLLC<br><br>Meghan E. Olson Fain Major & Brennan, P.C.<br><br>Marcia S. Freeman Aspen E. Thompson Waldon Adelman Castilla Hiestand & Prout |
| State Court of Muscogee County | SC2022CV001014 | *Lois Sims-Cline v. Tyazhia Averett* | Hon. Andrew Prather | Cody M. Allen Gary O. Bruce, PC<br><br>Dennis L. Duncan Law Office of Dennis L. Duncan |
| Superior Court of DeKalb County | 23CV6666 | *Drew Westen v. Maranda Jackson, et al.* | Hon. Asha F. Jackson | Ramin Kermani-Nejad Kermani Firm, LLC<br><br>Dennis Manganiello Law Office of Andrews and Manganiello<br><br>Daimon L. Carter Susan J. Levy Levy Pruett Cullen<br><br>Joseph A. Kaiser |

| | | | | Ankur P. Trivedi Davis D. Lackey Groth Makarenko Kaiser & Eidex |
|---|---|---|---|---|
| State Court of Burke County | 2022S0067 | *Carveta Wilkerson and Glenn Wilkerson v. Jamel A. Murray, et al.* | Hon. Jackson E. Cox, II | Jenna Matson Kenneth S. Nugent, PC  Meghan E. Olson Fain Major & Brennan, PC |

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**3/22/2023 1:04 PM**

TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1 ; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

**IT IS HEREBY STIPULATED** by and between the parties to the case entitled *Linda D. Clemons v. Old Navy, LLC; Lisa Allen; Doe 1, Doe 2, Doe 3, and Doe 4*, Case No. 23-C-00137-S4 (hereinafter collectively referred to as the "Parties"), by and through their respective counsel of record, that in order to facilitate the exchange of information and documents which may be subject to confidentiality limitations on disclosure due to federal laws, state laws, and privacy rights, the Parties stipulate as follows:

1.      In this Stipulation and Protective Order, the words set forth below shall have the following meanings:

a.      "Proceeding" means the above-entitled proceeding, Case No. 23-C-00137-S4.

b.      "Court" means any judge to which this Proceeding may be assigned, including court staff participating in such proceedings.

c.      "Confidential" means any Documents, Testimony, or Information which is in the possession of a Designating Party who believes in good faith that such Documents, Testimony, or Information is entitled to confidential treatment under applicable law.

d.      "Confidential Materials" means any Documents, Testimony, or Information as defined below designated as "Confidential" pursuant to the provisions of this Stipulation and Protective Order.

e.     "Designating Party" means the Party that designates Documents, Testimony, or Information, as defined below, as "Confidential."

f.     "Disclose" or "Disclosed" or "Disclosure" means to reveal, divulge, give, or make available Materials, or any part thereof, or any information contained therein.

g.     "Documents" means (i) any "Writing," "Original," and "Duplicate" as those items which have been produced in discovery in this Proceeding by any person or entity, and (ii) any copies, reproductions, or summaries of all or any part of the foregoing.

h.     "Information" means the content of Documents or Testimony.

i.     "Testimony" means all depositions, declarations, or other testimony taken or used in this Proceeding.

2.     The entry of this Stipulation and Protective Order does not alter, waive, modify, or abridge any right, privilege, or protection otherwise available to any Party with respect to the discovery of matters, including but not limited to any Party's right to assert the attorney-client privilege, the attorney work product doctrine, or other privileges, or any Party's right to contest any such assertion.

3.     Any Documents, Testimony, or Information to be designated as "Confidential" must be clearly so designated before the Document, Testimony, or Information is Disclosed or produced. The "Confidential" designation should not obscure or interfere with the legibility of the designated Information.

a.     For Documents (apart from transcripts of depositions or other pretrial or trial proceedings), the Designating Party must affix the legend "Confidential" on each page of any Document containing such designated material.

b.     For Testimony given in depositions the Designating Party may either:

i.     identify on the record, before the close of the deposition, all "Confidential" Testimony, by specifying all portions of the Testimony that qualify as "Confidential" or

STIPULATION AND PROTECTIVE ORDER – CONFIDENTIAL  DESIGNATIONS

ii.       designate the entirety of the Testimony at the deposition as "Confidential" (before the deposition is concluded) with the right to identify more specific portions of the Testimony as to which protection is sought within 30 days following receipt of the deposition transcript. In circumstances where portions of the deposition Testimony are designated for protection, the transcript pages containing "Confidential" Information may be separately bound by the court reporter, who must affix to the top of each page the legend "Confidential" as instructed by the Designating Party.

c.       For Information produced in some form other than Documents, and for any other tangible items, including, without limitation, compact discs or DVDs, the Designating Party must affix in a prominent place on the exterior of the container or containers in which the Information or item is stored the legend "Confidential." If only portions of the Information or item warrant protection, the Designating Party, to the extent practicable, shall identify the "Confidential" portions.

4.       The inadvertent production by any of the undersigned Parties or non-Parties to the Proceedings of any Document, Testimony, or Information during discovery in this Proceeding without a "Confidential" designation, shall be without prejudice to any claim that such item is "Confidential" and such Party shall not be held to have waived any rights by such inadvertent production. In the event that any Document, Testimony, or Information that is subject to a "Confidential" designation is inadvertently produced without such designation, the Party that inadvertently produced the document shall give written notice of such inadvertent production within twenty (20) days of discovery of the inadvertent production, together with a further copy of the subject Document, Testimony, or Information designated as "Confidential" (the "Inadvertent Production Notice"). Upon receipt of such Inadvertent Production Notice, the Party that received the inadvertently produced Document, Testimony, or Information shall promptly destroy the inadvertently produced Document, Testimony, or Information and all copies thereof, or, at the expense of the producing Party, return such together with all copies of such Document, Testimony or Information to counsel for the producing Party and shall retain only the

"Confidential" or materials. Should the receiving Party choose to destroy such inadvertently produced Document, Testimony, or Information, the receiving Party shall notify the producing Party in writing of such destruction within ten (10) days of receipt of written notice of the inadvertent production. This provision is not intended to apply to any inadvertent production of any Document, Testimony, or Information protected by attorney-client or work product privileges. In the event that this provision conflicts with any applicable law regarding waiver of confidentiality through the inadvertent production of Documents, Testimony or Information, such law shall govern.

5.     In the event that counsel for a Party receiving Documents, Testimony or Information in discovery designated as "Confidential" objects to such designation with respect to any or all of such items, said counsel shall advise counsel for the Designating Party, in writing, of such objections, the specific Documents, Testimony or Information to which each objection pertains, and the specific reasons and support for such objections (the "Designation Objections"). Counsel for the Designating Party shall have thirty (30) days from receipt of the written Designation Objections to either (a) agree in writing to de-designate Documents, Testimony, or Information pursuant to any or all of the Designation Objections and/or (b) file a motion with the Court seeking to uphold any or all designations on Documents, Testimony, or Information addressed by the Designation Objections (the "Designation Motion"). Pending a resolution of the Designation Motion by the Court, any and all existing designations on the Documents, Testimony, or Information at issue in such Motion shall remain in place. The Designating Party shall have the burden on any Designation Motion of establishing the applicability of its "Confidential" designation. In the event that the Designation Objections are neither timely agreed to nor timely addressed in the Designation Motion, then such Documents, Testimony, or Information shall be de-designated in accordance with the Designation Objection applicable to such material.

6.     Access to and/or Disclosure of Confidential Materials shall be permitted only to the following persons or entities:

a. the Court;

b. (1) Attorneys of record in the Proceeding and their affiliated attorneys, paralegals, clerical and secretarial staff employed by such attorneys who are actively involved in the Proceeding and are not employees of any Party; (2) In-house counsel to the undersigned Parties and the paralegal, clerical and secretarial staff employed by such counsel. Provided, however, that each non-lawyer given access to Confidential Materials shall be advised that such materials are being Disclosed pursuant to, and are subject to, the terms of this Stipulation and Protective Order and that they may not be Disclosed other than pursuant to its terms;

c. those officers, directors, partners, members, employees and agents of all non-designating Parties that counsel for such Parties deems necessary to aid counsel in the prosecution and defense of this Proceeding; provided, however, that prior to the Disclosure of Confidential Materials to any such officer, director, partner, member, employee or agent, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain that such person is bound to follow the terms of such Order, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A;

d. court reporters in this Proceeding (whether at depositions, hearings, or any other proceeding);

e. any deposition, trial, or hearing witness in the Proceeding who previously has had access to the Confidential Materials, or who is currently or was previously an officer, director, partner, member, employee or agent of an entity that has had access to the Confidential Materials;

f. any deposition, trial, or hearing witness in the Proceeding who previously did not have access to the Confidential Materials; provided, however, that each such witness given access to Confidential Materials shall be advised that such materials are being Disclosed pursuant to, and are subject to, the terms of this Stipulation and Protective Order and that they may not be Disclosed other than pursuant to its terms;

g. mock jury participants, provided, however, that prior to the Disclosure of

Confidential Materials to any such mock jury participant, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain that such person is bound to follow the terms of such Order, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A.

        h.     outside experts or expert consultants consulted by the undersigned Parties or their counsel in connection with the Proceeding, whether or not retained to testify at any oral hearing; provided, however, that prior to the Disclosure of Confidential Materials to any such expert or expert consultant, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain its terms to such person, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A. It shall be the obligation of counsel, upon learning of any breach or threatened breach of this Stipulation and Protective Order by any such expert or expert consultant, to promptly notify counsel for the Designating Party of such breach or threatened breach; and

        i.     any other person or entity that the Designating Party agrees to in writing.

    7.     Confidential Materials shall be used by the persons or entities receiving them only for the purposes of preparing for, conducting, participating in the conduct of, and/or prosecuting and/or defending the Proceeding, and not for any business or other purpose whatsoever.

    8.     Any Party to the Proceeding (or other person subject to the terms of this Stipulation and Protective Order) may ask the Court, after appropriate notice to the other Parties to the Proceeding, to modify or grant relief from any provision of this Stipulation and Protective Order.

    9.     Entering into, agreeing to, and/or complying with the terms of this Stipulation and Protective Order shall not:

        a.     operate as an admission by any person that any particular Document, Testimony, or Information marked "Confidential" contains or reflects trade secrets, proprietary, confidential or competitively sensitive business, commercial, financial or personal information; or

        b.     prejudice in any way the right of any Party (or any other person subject to the terms of this Stipulation and Protective Order):

> i.      to seek a determination by the Court of whether any particular Confidential Materials should be subject to protection under the terms of this Stipulation and Protective Order; or

> ii.      to seek relief from the Court on appropriate notice to all other Parties to the Proceeding from any provision(s) of this Stipulation and Protective Order, either generally or as to any particular Document, Material or Information.

10.      Any Party to the Proceeding who has not executed this Stipulation and Protective Order as of the time it is presented to the Court for signature may thereafter become a Party to this Stipulation and Protective Order by its counsel's signing and dating a copy thereof and filing the same with the Court, and serving copies of such signed and dated copy upon the other Parties to this Stipulation and Protective Order.

11.      Any Information that may be produced by a non-Party witness in discovery in the Proceeding pursuant to subpoena or otherwise may be designated by such non-Party as "Confidential" under the terms of this Stipulation and Protective Order, and any such designation by a non-Party shall have the same force and effect, and create the same duties and obligations, as if made by one of the undersigned Parties hereto. Any such designation shall also function as consent by such producing non-Party to the authority of the Court in the Proceeding to resolve and conclusively determine any motion or other application made by any person or Party with respect to such designation, or any other matter otherwise arising under this Stipulation and Protective Order.

12.      If any person subject to this Stipulation and Protective Order who has custody of any Confidential Materials receives a subpoena or other process ("Subpoena") from any government or other person or entity demanding production of such materials, the recipient of the Subpoena shall promptly give notice of the same by electronic mail transmission, followed by either express mail or overnight delivery to counsel of record for the Designating Party, and shall furnish such counsel with a copy of the Subpoena. Upon receipt of this notice, the Designating Party may, in its sole discretion and at its own cost, move to quash or limit the

Subpoena, otherwise oppose production of the Confidential Materials, and/or seek to obtain confidential treatment of such materials from the subpoenaing person or entity to the fullest extent available under law. The recipient of the Subpoena may not produce any Confidential Materials pursuant to the Subpoena prior to the date specified for production on the Subpoena.

13.     Nothing in this Stipulation and Protective Order shall be construed to preclude either Party from asserting in good faith that certain Confidential Materials require additional protection. The Parties shall meet and confer to agree upon the terms of such additional protection.

14.     If, after execution of this Stipulation and Protective Order, any Confidential Materials submitted by a Designating Party under the terms of this Stipulation and Protective Order is Disclosed by a non-Designating Party to any person other than in the manner authorized by this Stipulation and Protective Order, the non-Designating Party responsible for the Disclosure shall bring all pertinent facts relating to the Disclosure of such Confidential Materials to the immediate attention of the Designating Party.

15.     This Stipulation and Protective Order is entered into without prejudice to the right of any Party to knowingly waive the applicability of this Stipulation and Protective Order to any Confidential Materials designated by that Party. If the Designating Party uses Confidential Materials in a non-confidential manner, then the Designating Party shall advise that the designation no longer applies.

16.     Where any Confidential Materials or Information derived therefrom, is included in any motion or other proceeding, the Parties and any involved non-party shall follow those rules. With respect to discovery motions or other proceedings the following shall apply: If Confidential Materials or Information derived therefrom are submitted to or otherwise disclosed to the Court in connection with discovery motions and proceedings, the same shall be separately filed under seal with the clerk of the Court in an envelope marked: "CONFIDENTIAL – FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER AND WITHOUT ANY FURTHER SEALING ORDER REQUIRED."

17.     The Parties shall meet and confer regarding the procedures for use of any Confidential Materials at trial and shall move the Court for entry of an appropriate order.

18.     Nothing in this Stipulation and Protective Order shall affect the admissibility into evidence of Confidential Materials, or abridge the rights of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Court concerning the issue of the status of any Confidential Materials.

19.     This Stipulation and Protective Order shall continue to be binding after the conclusion of this Proceeding and all subsequent proceedings arising from this Proceeding, except that a Party may seek the written permission of the Designating Party or may move the Court for relief from the provisions of this Stipulation and Protective Order. To the extent permitted by law, the Court shall retain jurisdiction to enforce, modify, or reconsider this Stipulation and Protective Order, even after the Proceeding is terminated.

20.     Upon written request made within thirty (30) days after the settlement or other termination of the Proceeding, the undersigned Parties shall have thirty (30) days to either (a) promptly return to counsel for each Designating Party all Confidential Materials and all copies thereof (except that counsel for each Party may maintain in its files, in continuing compliance with the terms of this Stipulation and Protective Order, all work product, and one copy of each pleading filed with the Court, (b) agree with counsel for the Designating Party upon appropriate methods and certification of destruction or other disposition of such materials, or (c) as to any Documents, Testimony, or other Information not addressed by sub-paragraphs (a) and (b), file a motion seeking a Court order regarding proper preservation of such Materials. To the extent permitted by law the Court shall retain continuing jurisdiction to review and rule upon the motion referred to in sub-paragraph (c) herein.

21.     After this Stipulation and Protective Order has been signed by counsel for all Parties, it shall be presented to the Court for entry. Counsel agree to be bound by the terms set forth herein with regard to any Confidential Materials that have been produced before the Court signs this Stipulation and Protective Order.

22.     The Parties and all signatories to the Certification attached hereto as Exhibit A agree to be bound by this Stipulation and Protective Order pending its approval and entry by the Court. In the event that the Court modifies this Stipulation and Protective Order, or in the event that the Court enters a different Protective Order, the Parties agree to be bound by this Stipulation and Protective Order until such time as the Court may enter such a different Order. It is the Parties' intent to be bound by the terms of this Stipulation and Protective Order pending its entry so as to allow for immediate production of Confidential Materials under the terms herein.

This Stipulation and Protective Order may be executed in counterparts.

**IT IS SO STIPULATED.**

DATED:  March 22, 2023                    **PIASTA NEWBERN WALKER, LLC**

                                          By:  */s/ Michael P. Walker*
3301 Windy Ridge Pkwy                          *(w/e/p Brittany DeDiego)*
Suite 110                                      Michael P. Walker
Atlanta, GA 30339                              Georgia Bar No. 954678
(404) 996-1296                                 *Attorney for Plaintiff*
mike@pnwlaw.com


DATED:  March 22, 2023                    **LEWIS BRISBOIS BISGAARD & SMITH LLP**

                                          By:  */s/ Brittany DeDiego*
                                               Chris Collier
600 Peachtree Street NE, Suite 4700            Georgia Bar No. 178307
Atlanta, Georgia 30308                         Brittany DeDiego
(404) 348-8585 ( Telephone)                    Georgia Bar No. 296392
(404) 467-8845 ( Facsimile)
Chris.Collier@lewisbrisbois.com                *Attorneys for Defendants Old Navy, LLC and Lisa*
Brittany.DeDiego@lewisbrisbois.com             *Allen*

**IN THE STATE COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1 ; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING THE PARTIES' STIPULATION FOR PROTECTIVE ORDER**

Having considered the Stipulation for Protective Order Regarding Confidential Information ("Protective Order") entered into by and between the parties to this action, and good cause appearing therein, the Court approves the parties' Stipulation and adopts its provisions as a Protective Order in this matter.

**IT IS SO ORDERED.**

DATED: _____, 2023.

_____
Judge, Ronda C. Colvin of State Court of
Gwinnett

**EXHIBIT A**

**CERTIFICATION RE CONFIDENTIAL DISCOVERY MATERIALS**

      I hereby acknowledge that  I,  _____,  am  about  to  receive Confidential Materials supplied in connection with the Proceeding, State Court of Gwinnett County Court Case No. 23-C-00137-S4.  I certify that I understand that the Confidential Materials are provided to me subject to the terms and restrictions of the Stipulation and Protective Order filed in this Proceeding.  I have been given a copy of the Stipulation and Protective Order; I have read it, and I agree to be bound by its terms.

      I understand that Confidential Materials, as defined in the Stipulation and Protective Order, including any notes or other records that may be made regarding any such Materials, shall not be disclosed to anyone except as expressly permitted by the Stipulation and Protective Order.  I will not copy or use, except solely for the purposes of this Proceeding, any Confidential Materials obtained pursuant to this Protective Order, except as provided therein or otherwise ordered by the Court in the Proceeding.

      I further understand that I am to retain all copies of all Confidential Materials provided to me in the Proceeding in a secure manner, and that all copies of such Materials are to remain in my personal custody until termination of my participation in this Proceeding, whereupon the copies of such Materials will be returned to counsel who provided me with such Materials.

      I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

      I further agree to submit to the jurisdiction of the State Court of the State of Georgia County of Gwinnett for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I declare under penalty of perjury, under the laws of the State of Georgia, that the foregoing is true and correct.    Executed this _____ day of _____, 2023, at _____.

DATED: _____, 2023

BY:    _____
       Signature

       _____
       Title

       _____
       Address

       _____
       City, State, ZIP

       _____
       Telephone Number

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
23-C-00137-S4
3/23/2023 1:03 PM
TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

LINDA D. CLEMONS,                    )
                                     )
        Plaintiff,                   )
                                     )        CIVIL ACTION NO.: 23-C-00137-S4
vs.                                  )
                                     )
OLD NAVY, LLC; LISA ALLEN;           )
DOE 1 ; DOE 2; DOE 3; and DOE 4;     )
                                     )
        Defendants.                  )

### ORDER GRANTING THE PARTIES' STIPULATION FOR PROTECTIVE ORDER

Having considered the Stipulation for Protective Order Regarding Confidential Information ("Protective Order") entered into by and between the parties to this action, and good cause appearing therein, the Court approves the parties' Stipulation and adopts its provisions as a Protective Order in this matter.

**IT IS SO ORDERED.**

DATED: ___March 23___, 2023.

_____
Judge, Ronda C. Colvin of State Court of Gwinnett

STIPULATION AND PROTECTIVE ORDER – CONFIDENTIAL DESIGNATIONS

## **EXHIBIT A**

### **CERTIFICATION RE CONFIDENTIAL DISCOVERY MATERIALS**

I hereby acknowledge that  I,  _____,  am  about  to  receive Confidential Materials supplied in connection with the Proceeding, State Court of Gwinnett County Court Case No. 23-C-00137-S4.  I certify that I understand that the Confidential Materials are provided to me subject to the terms and restrictions of the Stipulation and Protective Order filed in this Proceeding.  I have been given a copy of the Stipulation and Protective Order; I have read it, and I agree to be bound by its terms.

I understand that Confidential Materials, as defined in the Stipulation and Protective Order, including any notes or other records that may be made regarding any such Materials, shall not be disclosed to anyone except as expressly permitted by the Stipulation and Protective Order.  I will not copy or use, except solely for the purposes of this Proceeding, any Confidential Materials obtained pursuant to this Protective Order, except as provided therein or otherwise ordered by the Court in the Proceeding.

I further understand that I am to retain all copies of all Confidential Materials provided to me in the Proceeding in a secure manner, and that all copies of such Materials are to remain in my personal custody until termination of my participation in this Proceeding, whereupon the copies of such Materials will be returned to counsel who provided me with such Materials.

I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the State Court of the State of Georgia County of Gwinnett for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

STIPULATION AND PROTECTIVE ORDER – CONFIDENTIAL  DESIGNATIONS

I declare under penalty of perjury, under the laws of the State of Georgia, that the foregoing is true and correct. Executed this _____ day of _____, 2023, at _____.

DATED: _____, 2023

BY: _____
Signature

_____
Title

_____
Address

_____
City, State, ZIP

_____
Telephone Number

STIPULATION AND PROTECTIVE ORDER – CONFIDENTIAL  DESIGNATIONS

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**3/23/2023 1:54 PM**

TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

LINDA D. CLEMONS,             )
                                   )
        Plaintiff,          )
                                   )     CIVIL ACTION NO.: 23-C-00137-S4
vs.                       )
                                   )
OLD NAVY, LLC; LISA ALLEN;  )
DOE 1; DOE 2; DOE 3; and DOE 4;   )
                                   )
        Defendants.      )

## CERTIFICATE OF SERVICE

COMES NOW Defendant Lisa Allen and Old Navy, LLC, pursuant to Superior and State Court Rule 5.2, and notifies the Court that Defendant served upon all counsel of record a copy of the following:

- Defendant Lisa Allen's Objections and Responses to Plaintiff's First Interrogatories

- Defendant Lisa Allen's Objections and Responses to Plaintiff's First Request for Production of Documents

- Defendant Old Navy, LLC's Objections and Responses to Plaintiff's First Interrogatories

- Defendant Old Navy, LLC's Objections and Responses to Plaintiff's First Request for Production of Documents

This 23rd day of March, 2023.

*[Signature on following page]*

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*

S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day a true and correct copy of the foregoing pleading using Odyssey eFile GA's electronic filing system which will send notification of the same, or in the alternative, via U.S. Mail to all counsel of record as follows:

Michael P. Walker
Andrew L. Hagenbush
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
andrew@pnwlaw.com
*Counsel for Plaintiff*

This 23rd day of March, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*

S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**
**5/1/2023 12:41 PM**
**TIANA P. GARNER, CLERK**

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

LINDA D. CLEMONS, )
)
    Plaintiff, )
)    CIVIL ACTION NO.: 23-C-00137-S4
vs. )
)
OLD NAVY, LLC; LISA ALLEN; )
DOE 1; DOE 2; DOE 3; and DOE 4; )
)
    Defendants. )

## <u>CERTIFICATE OF SERVICE</u>

COMES NOW Defendant Old Navy, LLC, pursuant to Superior and State Court Rule 5.2, and notifies the Court that Defendant served upon all counsel of record a copy of the following:

- Defendant Old Navy, LLC's Supplemental Objections and Responses to Plaintiff's First Request for Production of Documents

This 1st day of May, 2023.

                                       **LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza         */s/ Brittany DeDiego*
600 Peachtree Street NE      ——————————————————
Suite 4700                  S. CHRISTOPHER COLLIER
Atlanta, Georgia 30308      Georgia Bar No. 178307
Telephone: (404) 348-8585   BRITTANY DEDIEGO
Facsimile: (404) 467-8845    Georgia Bar No. 296392
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com   *Counsel for Defendants Old Navy, LLC and Lisa Allen*

1

## CERTIFICATE OF SERVICE

I hereby certify that on this day a true and correct copy of the foregoing pleading using Odyssey eFile GA's electronic filing system which will send notification of the same, or in the alternative, via U.S. Mail to all counsel of record as follows:

Michael P. Walker
Andrew L. Hagenbush
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
andrew@pnwlaw.com
*Counsel for Plaintiff*

This 1st day of May, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

2

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**
**6/21/2023 1:15 PM**
TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

COMES NOW Defendant Old Navy, LLC, pursuant to Superior and State Court Rule 5.2,

and notifies the Court that Defendant served upon all counsel of record a copy of the following:

- Defendant Old Navy, LLC's Request for Production of Documents to the

   following non-parties:

   - *Emory at Miller Grove Primary Care*
   - *Ankle and Foot Centers of Georgia*
   - *Emory Decatur Hospital*
   - *The Emory Clinic*
   - *Peachtree Immediate Care*

This 21st day of June, 2022.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*

S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

1

## CERTIFICATE OF SERVICE

I hereby certify that on this day a true and correct copy of the foregoing pleading using Odyssey eFile GA's electronic filing system which will send notification of the same, or in the alternative, via U.S. Mail to all counsel of record as follows:

<div align="center">

Michael P. Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
*Counsel for Plaintiff*

</div>

This 21st day of June, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**7/12/2023 12:57 PM**

TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

COMES NOW Defendant Old Navy, LLC, pursuant to Superior and State Court Rule 5.2, and notifies the Court that Defendant served upon all counsel of record a copy of the following:

- Defendant Old Navy, LLC's Request for Production of Documents to the following non-parties:

  - *CVS Pharmacy*
  - *Midtown Neurology*
  - *Walgreens Pharmacy*
  - *Thomas Eye Group*
  - *Parris & Associates Rheumatology*

This 12th day of July, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*

S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

1

## CERTIFICATE OF SERVICE

I hereby certify that on this day a true and correct copy of the foregoing pleading using Odyssey eFile GA's electronic filing system which will send notification of the same, or in the alternative, via U.S. Mail to all counsel of record as follows:

Michael P. Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
*Counsel for Plaintiff*

This 12th day of July, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**7/14/2023 9:08 AM**

TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

LINDA D. CLEMONS,                    )
                                     )
     Plaintiff,                     )
                                     )          CIVIL ACTION NO.: 23-C-00137-S4
vs.                                  )
                                     )
OLD NAVY, LLC; LISA ALLEN;           )
DOE 1 ; DOE 2; DOE 3; and DOE 4;     )
                                     )
     Defendants.                    )

## <u>JOINT MOTION TO EXTEND DISCOVERY</u>

COME NOW the Parties in the above-styled matter, by and through their undersigned counsel of record, and file this Joint Motion to Extend Discovery Period, showing this Honorable Court as follows:

1.

Discovery in this matter will expire on August 16, 2023.

2.

The Parties have exchanged initial written discovery, but there is additional discovery to be completed as to Plaintiff's claims against Defendants, including expert discovery and depositions of the Parties.

3.

The Parties certify that this Motion to Extend Discovery Period is not asserted solely for the purpose of delay and that no party will be prejudiced by the granting of an extension in this case.

4.

Accordingly, for all of the foregoing reasons, the parties respectfully request that discovery in this case be extended up to and including November 30, 2023.

Respectfully submitted on this 14th day of July, 2023.

/s/ Michael P. Walker

_____
(w/e/p Brittany DeDiego)
MICHAEL P. WALKER
Georgia Bar No. 954678
*Attorney for Plaintiff*

Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339

/s/ Brittany DeDiego

_____
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392
*Counsel for Defendants Old Navy, LLC and Lisa Allen*

LEWIS BRISBOIS BISGAARD & SMITH
600 Peachtree St NE, Suite 4700
Atlanta, GA 30308

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the within and foregoing **JOINT MOTION TO EXTEND DISCOVERY** upon all parties to this matter electronically via Odyssey E-File GA, addressed to counsel of records as follows:

<div align="center">

Michael P. Walker
Andrew L. Hagenbush
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
andrew@pnwlaw.com
*Counsel for Plaintiff*

</div>

This 14th day of July, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

<div align="center">

3

</div>

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**7/17/2023 3:30 PM**

**TIANA P. GARNER, CLERK**

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

LINDA D. CLEMONS,          )
      Plaintiff(s),        )     CIVIL ACTION FILE
                             )     NO.: 23-C-00137-S4
v.                        )
                             )
OLD NAVY, LLC, et al,      )
      Defendant(s).      )

### CASE MANAGEMENT AND MEDIATION DEADLINE ORDER

After consideration of the record in this case and pursuant to this Court's inherent authority to control discovery and the disposition of the cases on its docket, this Court **HEREBY** sets forth its Case Management and Mediation Deadline Order in this action as follows.

### TRIAL SETTING

This case shall be scheduled for trial on the next available trial calendar:

- After the close of discovery;

- After resolution of dispositive motions; and

- After the parties file their consolidated pre-trial order and *motions in limine*, as further described below.

### DISCOVERY

**DISCOVERY** shall close on **December 1, 2023**.  ALL discovery shall be **COMPLETED** by this date.  Discovery requests shall be served no later than thirty (30) days prior to the close of discovery.

1

## DISCOVERY DISPUTES/ DISCOVERY MOTIONS

Any motion regarding a discovery dispute shall be filed within thirty (30) days following the date of the response or event (e.g. deposition) that is the subject of the motion.

If a discovery dispute occurs, the parties shall attempt to resolve the dispute without the Court's intervention.  Parties may request a telephone conference to discuss the discovery dispute prior to filing a motion.  Counsel may contact the Court's office at 770-822-8547 to request a telephone conference.  The Court will consider such requests on a case-by-case basis.

## EXPERT/ REBUTTAL WITNESSES

EXPERT WITNESSES (if any) shall be disclosed and deposed no later than **December 1, 2023**.  REBUTTAL WITNESSES (if any) shall be disclosed and deposed no later than thirty (30) days after the close of discovery.

## SUBSTANTIVE & *DAUBERT* MOTIONS

All SUBSTANTIVE MOTIONS, including motions for summary judgment and *Daubert* motions, shall be filed no later than sixty (60) days after the close of discovery.  *Daubert* motions shall be filed separately, not as part of a *motion in limine*.

There shall be no extensions of these deadlines by agreement of the parties.  Any extension of time to file a motion shall be by Order of this Court.  The Court may not consider motion(s) filed after the deadline(s) set herein.  Reply briefs – if any – shall be filed no later than ten (10) days following the filing of the brief to which the reply brief responds.

2

## **MEDIATION**

If the parties consent to participate in **MEDIATION**, the parties shall schedule mediation to be completed NO LATER THAN **45 days** after the close of discovery.

## **PRE-TRIAL ORDER/ MOTIONS IN LIMINE**

A **CONSOLIDATED PRE-TRIAL ORDER** (in the form suggested in USCR 7.2), and any ***MOTIONS IN LIMINE,*** shall be filed no later than **SIXTY** (60) days following the close of discovery.  Plaintiff's counsel shall consolidate the order. All other parties shall deliver their portion(s) of the Pre-Trial Order to Plaintiff's counsel no later than ten (10) days prior to the due date for the Consolidated Pre-Trial Order.  No party shall submit their individual portion of the Pre-Trial Order to the Court.  The due date for the Consolidated Pre-Trial Orders shall be extended only for good cause shown and by Order of this Court.

All documentary and physical evidence shall be identified with reasonable particularity in the Consolidated Pre-Trial Order.  All witnesses shall be identified by name.  Only evidence and witnesses disclosed during discovery shall be included in the Consolidated Pre-Trial Order.  The Court may strike any witness or evidence not disclosed prior to the close of the discovery period.

Parties shall file *motions in limine* regarding disputed issues only.  Prior to filing any *motion in limine*, counsel shall consult with one another to determine whether or not the motion will be opposed.  *Motions in limine* shall affirmatively state that the issue(s) in the motion remain

3

in dispute after consultation with opposing counsel.  Failure to consult prior to filing a *motion in limine* may cause the Court to disregard the motion.

## DEPOSITIONS

The parties shall attempt to resolve all deposition objections prior to trial.  The parties shall submit to the Court a written report identifying objection(s) that remains in dispute despite attempts at resolution.  The written report shall be filed with the Court no later than fifteen (15) days prior to the first scheduled date of trial. The report shall identify the objection(s) by line and page number.   The Court will **NOT** rule on deposition objections on the day of trial.

## EXHIBITS

All exhibits shall be pre-marked and an exhibit list shall be furnished to the Court prior to trial.  Copies of all exhibits and a copy of the list of exhibits shall be made for each opposing counsel. All copies and lists of exhibits shall be exchanged no later than ten (10) days prior to the first scheduled date of trial, and the parties shall confer before trial to discuss any objection(s) to any exhibit(s).

## REQUESTS TO CHARGE

Requests to charge shall be submitted to the Court when the case is called for trial. Pattern Charges shall be requested in writing and identified by Pattern Charge number and name, only (*e.g.* "02.010 Pleadings").  No party shall file more than ten (10) non-pattern requests to charge. No requested charge will be given if the same principle is covered by a Pattern Charge.

4

## <u>COMPLIANCE / VIOLATION OF THIS ORDER</u>

**Failure to comply with the deadlines and other provisions set forth in this Case Management Order may result in the exclusion of evidence or witnesses at trial, or other appropriate sanctions.  This Case Management Deadline Order sets forth and/or supersedes all previous dates and deadlines and it shall control the course of the trial and shall not be amended except by consent of the parties and by Order of the Court to prevent manifest injustice.**

**SO ORDERED**, this __17__ day of _July_, 2023.

_Ronda S. Colvin_
_____
Judge Ronda S. Colvin
State Court of Gwinnett County


Copies to:

All Counsel/Parties of Record

**IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA**

LINDA D. CLEMONS,         )
                               )
        Plaintiff,          )        Civil Action No. 23-C-00137-S4
v.                           )
                               )
OLD NAVY, LLC, et       )
al,                           )
        Defendant.      )

**NOTICE TO TAKE DEPOSITION OF
<u>MICHAEL RINEHART</u>**

PLEASE TAKE NOTICE, pursuant to Section 26 and 30 of the Georgia Civil Action Act, O.C.G.A. § 9-11-26 and § 9-11-30 that on **1 p.m. EST on Thursday, August 31st, 2023,** the deposition of **Michael Rinehart via ZOOM** and continuing from hour to hour until adjourned, Plaintiffs' counsel shall take the deposition of witnesses upon oral examination before an officer authorized by law to administer oaths and to take depositions. The depositions may be videotaped. The deposition will be taken for any law purpose allowable under Georgia Civil Practice Act and Georgia law.

Dated: August 28, 2023

Respectfully Submitted,

**PIASTA WALKER HAGENBUSH, LLC**

/s/ Michael P. Walker
MICHAEL P. WALKER
Georgia Bar No. 954678
Attorneys for Plaintiff

3301 Windy Ridge Parkway, Suite 110
Atlanta, GA 30339
(404) 996-1296
Fax: (404) 996-1316
mike@piastawalker.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a true and correct copy of the

foregoing *Notice to Take Deposition* via Odyssey, which will send electronic

notification to all counsel of record.

S. Christopher Collier
Georgia Bar No. 178307
Brittany DeDiego
Georgia Bar No. 296392
Lewis Brisbois Bisgaard & Smith, LLP
600 Peachtree Street NE Suite 4700
Atlanta, Georgia 30308
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

Dated: August 28, 2023

**PIASTA WALKER HAGENBUSH, LLC**

/s/ Michael P. Walker
MICHAEL P. WALKER
Georgia Bar No. 954678
Attorneys for Plaintiff

3301 Windy Ridge Parkway, Suite 110
Atlanta, GA 30339
(404) 996-1296
Fax: (404) 996-1316
mike@piastawalker.com

3

**IN THE STATE COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**

LINDA D. CLEMONS,        )
                         )
       Plaintiff,         )        Civil Action No. 23-C-00137-S4
v.                         )
                         )
OLD NAVY, LLC, et      )
al,                       )
       Defendant.      )
                         )

**NOTICE TO TAKE DEPOSITIONS OF**
**HEATHER CHAMBERS AND LISA ALLEN**

PLEASE TAKE NOTICE, pursuant to Section 26 and 30 of the Georgia Civil Action Act, O.C.G.A. § 9-11-26 and § 9-11-30 that on **Friday, September 1st, 2023, via ZOOM** and continuing from hour to hour until adjourned, Plaintiffs' counsel shall take the deposition of witnesses upon oral examination before an officer authorized by law to administer oaths and to take depositions as follows:

- **10:00 A.M.** Heather Chambers

- **11:00 A.M.** Lisa Allen

The depositions may be videotaped. The deposition will be taken for any law purpose allowable under Georgia Civil Practice Act and Georgia law.

Dated: August 28, 2023

Respectfully Submitted,

**PIASTA WALKER HAGENBUSH, LLC**

/s/ Michael P. Walker
MICHAEL P. WALKER
Georgia Bar No. 954678
Attorneys for Plaintiff

3301 Windy Ridge Parkway, Suite 110
Atlanta, GA 30339
(404) 996-1296
Fax: (404) 996-1316
mike@piastawalker.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a true and correct copy of the

foregoing ***Notice to Take Depositions*** via Odyssey, which will send electronic

notification to all counsel of record.

S. Christopher Collier
Georgia Bar No. 178307
Brittany DeDiego
Georgia Bar No. 296392
Lewis Brisbois Bisgaard & Smith, LLP
600 Peachtree Street NE Suite 4700
Atlanta, Georgia 30308
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com


Dated: August 28, 2023

**PIASTA WALKER HAGENBUSH, LLC**

<u>/s/ Michael P. Walker</u>
MICHAEL P. WALKER
Georgia Bar No. 954678
Attorneys for Plaintiff

3301 Windy Ridge Parkway, Suite 110
Atlanta, GA 30339
(404) 996-1296
Fax: (404) 996-1316
mike@piastawalker.com

3

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**9/19/2023 1:58 PM**

TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

## <u>NOTICE OF VIDEOTAPED DEPOSITION</u>

TO:     Linda D. Clemons
        c/o Michael P. Walker
        Piasta Walker Hagenbush, LLC
        3301 Windy Ridge Pkwy, Suite 110
        Atlanta, GA 30339

PLEASE TAKE NOTICE that Defendant Old Navy, LLC will take the deposition of **Plaintiff Linda D. Clemons** commencing on **Wednesday, October 18, 2023, at 10:00 am at Piasta Newbern Hagenbush, LLC, 3301 Windy Ridge Pkwy, Suite 110, Atlanta, GA 30339.**

This deposition shall be taken upon oral examination before an officer authorized by law to administer oaths and will be recorded by stenographic and videographic means. It will be taken for the purposes of discovery and cross-examination, and for all other purposes that may be legally permissible under the Georgia Civil Practice Act.

This deposition will continue from day to day until its completion.

This 19th day of September, 2023.

*{Signature on Following Page}*

1

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

2

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing pleading upon all parties to this matter electronically via Odyssey E-File GA and/or by depositing a true copy of same in the U.S. Mail, proper postage prepaid, addressed to counsel of record as follows:

<div align="center">

Michael P. Walker
Andrew L. Hagenbush
Piasta Walker Hagenbush, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
andrew@pnwlaw.com
*Counsel for Plaintiff*

</div>

This 19th day of September, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

<div align="center">

3

</div>

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**10/6/2023 3:42 PM**

TIANA P. GARNER, CLERK

**IN THE STATE COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| LINDA D. CLEMONS, | ) |
| | ) |
|     Plaintiff, | ) |
| | )    CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) |
| | ) |
| OLD NAVY, LLC; LISA ALLEN; | ) |
| DOE 1 ; DOE 2; DOE 3; and DOE 4; | ) |
| | ) |
|     Defendants. | ) |

**DEFENDANT LISA ALLEN'S BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Lisa Allen, by and through her undersigned counsel of record, and submits this Brief in Support of her Motion for Summary Judgment, showing the Court as follows:

**I.**    **INTRODUCTION**

This cases arises out of an alleged injury that occurred on April 13, 2021, at an Old Navy store located at 2059 Scenic Highway North, Suite 106, Snellville, Georgia 30078. Compl. ¶ 9. According to the Complaint, Plaintiff Linda Clemons was shopping in the store when she was struck by a falling metal shelf strip sign that hit her feet and ankles. Compl. ¶ 12. At the time of the subject incident, Lisa Allen was the general manager of the Snellville Old Navy. However, Ms. Allen was not present at the time of the subject incident and was not responsible for the placement of the metal sign at issue. Accordingly, the allegations of negligence asserted in Plaintiff's Complaint fail as to Defendant Lisa Allen.

**II.**    **PROCEDURAL HISTORY**

In her Complaint, Plaintiff alleges that Lisa Allen and Old Navy, LLC were negligent by failing to keep the premises and approaches safe, failing to reasonably inspect the floor of the

1

premises, failing to properly maintain and repair the premises, allowed invited guests to use an unsafe area, in failing to post warning signs or warning markings, failing to properly train and supervise their employees to the care of the premises, and in negligently retaining, entrusting, hiring, training, and supervising employees. Compl. ¶ 28. In her Answer, Defendant Allen denied all allegations of negligence asserted against her in Plaintiff's Complaint. There is no evidence in the record to support any claims of negligence against Defendant Allen. Rather, the evidence shows that Defendant Allen was not involved in any events leading up to or during the alleged injury to Plaintiff on April 13, 2021.

## III.    STATEMENT OF FACTS

At the time of Plaintiff's alleged injury on April 13, 2021, Defendant Allen was the general manager of the Snellville Old Navy store. (Lisa Allen Dep. 6:13-23.) As the general manager, Defendant Allen did not undergo any training on installing or securing metal shelf strip signs. (Allen Dep. 7:18-25.) As the general manager, Defendant Allen would not have installed the metal shelf strip sign at issue. (Allen Dep. 11:22-24.) Defendant Allen did not create any policies or procedures in place at the Old Navy location. (Allen Dep. 16:5-10.) All of the policies and procedures are created by Old Navy. *Id*. Defendant Allen did not train the merchandise manager who oversaw the placement of the signs in the store. (Allen Dep. 16:11-12.) Further, Defendant Allen has no personal knowledge regarding the subject incident or Plaintiff's claims. (Allen Dep. 14:17-25.) Defendant Allen was not present when the incident happened and she has never spoken with the Plaintiff. (Allen Dep. 14:17-25.)

IV.     **ARGUMENT AND CITATION OF AUTHORITY**

A.     **Standard of Review for Summary Judgment**

To prevail on summary judgment under O.C.G.A. § 9-11-56 (c), the moving party must demonstrate there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant granting summary judgment. *Peterson et al. v. Peterson et al*, 303 Ga. 211, 213 (2018). At summary judgment, a party who will not bear the burden of proof at trial need not conclusively prove false each element of the non-moving party's case. *Ponse v. Atlanta Cas. Co.*, 254 Ga. App. 641, 644 (2002). Instead, a defendant moving for summary judgment may discharge his burden by pointing out by reference to affidavits, depositions and other documents in the record that there is no evidence sufficient to create a jury issue in at least one essential element of a non-moving party's case. *Lau's Corp., Inc. v. Haskins*, 261 Ga. 491, 495 (1991). Here, the record establishes there is no evidence sufficient to create a jury issue as to any element of Plaintiff's claims against Defendant Allen.

B.  **Defendant Allen is entitled to summary judgment because she cannot be held personally liable for Old Navy's premises.**

O.C.G.A. § 51-3-1 states, "where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." In *Hill v. Davison-Paxon Co*., 80 Ga. App. 840, 841 (1950) it is said: "As between landlord and tenant, master and servant, and owner and customer, one who sustains injuries upon the property of the other, in order to recover, must show that two elements at least exist, viz., fault on the part of the owner, and ignorance of danger on the part of the invitee."

Here, Defendant Allen was neither the owner or occupier of the land. She was not the owner of the store; she simply worked there. Accordingly, Defendant Allen cannot be held personally liable for any premises liability claims asserted against Old Navy.

### C. Defendant Allen is entitled to summary judgment because Plaintiff cannot recover for negligence against a store manager.

Plaintiff's Complaint alleges that Defendant Allen was negligent by failing to inspect the premises and was negligent in training and supervising the employees at the Old Navy location. To state a cause of action for negligence in Georgia, a plaintiff must establish the following essential elements: (1) a legal duty; (2) a breach of this duty; (3) an injury; and (4) a causal connection between the breach and the injury. *Martin v. Ledbetter*, 342 Ga. App. 208, 211 (2017). However, a store patron who is injured while shopping cannot recover against a store manager where there is no evidence of the manager's individual negligence. *Walmart Stores E. L. P. v. Benson*, 343 Ga. App. 74 (2017); *See also O'Connell v. Cora Bett Thomas Realty, Inc.*, 254 Ga. App. 311 (2002) (holding a tenant could not hold a property manager liable for negligence to the same degree as a property owner for injuries the tenant sustained when a roof collapsed because the property manager did not have total control over the property). Further, a corporate officer's alleged failure to provide proper training is not sufficiently direct participation in a tort to expose a corporate officer to personal liability under Georgia law. *Dempsey v. Southeastern Indus. Contr. Co.*, 309 Ga. App. 140, 144 (2011).

In this case, there is no evidence that Defendant Allen was individually negligent. She did not install the metal shelf strip sign at issue. (Allen Dep. 11:22-24.) Defendant Allen did not create any policies or procedures in place at the Old Navy location. (Allen Dep. 16:5-10.) Further, she was not present when the incident happened and she has never spoken with Plaintiff. (Allen Dep. 14:17-25.) Accordingly, Plaintiff's alleged injuries were not caused by some actionable negligence

4

on the part of Defendant Allen. Defendant Allen did not breach any duty owed to Plaintiff, and all claims asserted against Defendant Allen fail as a matter of law.

### D.  Plaintiff is not owed compensatory damages, attorney's fees, or costs of litigation.

Plaintiff's Complaint also argues for the reward of compensatory damages, attorney's fees, and costs of litigation. (Compl. ¶ 34). Under Georgia law, compensatory damages may be given where the injury is of a character capable of being estimated in money. *Zedan v. Bailey*, 522 F. Supp. 3d 1363, 1373-74 (M.D. Ga. 2021) (*quoting* O.C.G.A. § 51-12-4). If no damages are awarded, litigation costs, including attorney's fees, are not recoverable. *Gardner v. Kinney*, 230 Ga. App. 771 (1998). As previously stated, Plaintiff has no valid legal claim against Defendant Allen, so no compensatory damages can be awarded. Therefore, Plaintiff's argument for attorney's fees and costs of litigation fails as well.

## V.   <u>CONCLUSION</u>

For the within and foregoing reasons, Defendant Allen respectfully requests the Court grant her Motion for Summary Judgment and dismiss Plaintiff's claims against her individually.   There are simply no issues for jury determination as to any alleged negligence by Defendant Allen.

Respectfully submitted this 6th day of October, 2023.

<div align="right">

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

</div>

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile:  (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
_____
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served all counsel of record in the foregoing matter with a copy of **DEFENDANT LISA ALLEN'S BRIEF IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT** has this day been filed with the Clerk of the Court by electronically filing with the Court's E-File system, which automatically serves copies upon all counsel of record, b**y *STATUTORY ELECTRONIC SERVICE O.C.G.A. § 9-11-5(f)*** as follows:

Michael P. Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
*Counsel for Plaintiff*

This 6th day of October, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

6

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**10/6/2023 3:42 PM**

TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| LINDA D. CLEMONS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| OLD NAVY, LLC; LISA ALLEN; | ) |
| DOE 1 ; DOE 2; DOE 3; and DOE 4; | ) |
| | ) |
| Defendants. | ) |

CIVIL ACTION NO.: 23-C-00137-S4

### DEFENDANT LISA ALLEN'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Lisa Allen, by and through her undersigned counsel of record, and submits this Motion for Summary Judgment, and pursuant to O.C.G.A. § 9-11-56, respectfully requests this Court enter judgment as a matter of law on all of Plaintiff's claims against Defendant Lisa Allen. Defendant relies on the following in support of this motion:

1.    Defendant Allen's  Brief in Support of Defendant Allen's Motion for Summary Judgment and  attached exhibits;

2.    Defendant Allen's Statement of Undisputed Material Facts;

3.    Defendant Allen's Statement of Plaintiff's Theories of Recovery;

4.    The deposition of Defendant Lisa Allen, attached hereto as Exhibit A;

5.    The pleadings in this case; and

6.    All other evidence deemed relevant by the Court.

WHEREFORE, Defendant Allen respectfully requests that this Court inquire into and grant this Motion for Summary Judgment.

Respectfully submitted this 6th day of  October, 2023.

*{Signature on following page}*

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all counsel of record in the foregoing matter with a copy of **DEFENDANT LISA ALLEN'S MOTION FOR SUMMARY JUDGMENT** has this day been filed with the Clerk of the Court by electronically filing with the Court's E-File system, which automatically serves copies upon all counsel of record, b***y STATUTORY ELECTRONIC SERVICE O.C.G.A. § 9-11-5(f)*** as follows:

Michael P. Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
*Counsel for Plaintiff*

This 6th day of October, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

# EXHIBIT A

**In The Matter Of:**

*Clemons v.*
*Old Navy, LLC, et al.*

---

*Lisa Renee Allen*
*September 1, 2023*
*Video Deposition*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



REGENCY-BRENTANO, INC.
*Certified Court Reporters*

Min-U-Script® with Word Index

**Video Deposition**                                              1

```
 1          IN THE STATE COURT OF GWINNETT COUNTY
                       STATE OF GEORGIA
 2

 3
    LINDA D. CLEMONS,
 4
              Plaintiff,
 5                                    CIVIL ACTION FILE
        v.                            NO. 23-C-00137-S4
 6
    OLD NAVY, LLC, et al.,
 7
              Defendants.
 8  ~~~~~~~~~~~~~~~~~~~~~~

 9            VIDEOTAPED DEPOSITION OF
                 LISA RENEE ALLEN
10

11              September 1, 2023
                   1:01 p.m.
12
                Location of Witness:
13              Snellville, Georgia

14

15     Deborah P. Longoria, RPR, CCR B-1557

16

17
               REGENCY-BRENTANO, INC.
18           Certified Court Reporters
               13 Corporate Square
19                  Suite 140
               Atlanta, Georgia 30329
20                (404) 321-3333

21

22

23

24

25
```

**Regency-Brentano, Inc.**

Video Deposition                                    2

```
 1            APPEARANCES (all via videoconference)

 2   On behalf of the Plaintiff:
          PIASTA WALKER HAGENBUSH, LLC
 3        MICHAEL P. WALKER, ESQUIRE
          3301 Windy Ridge Parkway
 4        Suite 110
          Atlanta, Georgia  30339
 5        404.996.1296
          Mike@piastawalker.com
 6
     On behalf of the Defendants:
 7        LEWIS BRISBOIS BISGAARD & SMITH, LLP
          BRITTANY DE DIEGO, ESQUIRE
 8        600 Peachtree Street NE
          Suite 4700
 9        Atlanta, Georgia  30308
          404.348.8585
10        Brittany.DeDiego@lewisbrisbois.com

11   Also Present:
          George Bush, Videographer
12        Atlanta Legal Media

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Regency-Brentano, Inc.

**Video Deposition**                                                    **3**

```
 1                    INDEX TO EXAMINATIONS

 2   WITNESS:  Lisa Renee Allen

 3                                              Page

 4   Examination by Mr. Walker                    6

 5   Examination by Ms. DeDiego                  16

 6

 7

 8                     INDEX TO EXHIBITS

 9   Previously Marked
     Plaintiff's          Description        Marked/First
10   Exhibit                                 Identified

11   P-1          Document re Shelf Strips;
                  Safety Reminder                    8
12
     P-2          Documents and Photos re Shelf Strips   10
13

14       (Exhibits P-1 and P-2 have been attached to the
     original transcript.)
15

16

17

18

19

20

21

22

23

24

25
```

**Regency-Brentano, Inc.**

1    Videotaped Deposition by Remote Videoconference of

2                    Lisa Renee Allen

3                  September 1, 2023

4                      - - -

5         THE VIDEOGRAPHER:  We are on the record at

6    1:01 p.m.

7         MR. WALKER:  This will be the deposition

8    of Lisa Allen, taken pursuant to notice and

9    agreement of counsel.

10        Brittany, I would propose we reserve all

11   objections except to the form of the question

12   and responsiveness of the answer until first use

13   of the deposition.

14        MS. DE DIEGO:  Yes, that's fine.

15        MR. WALKER:  All right.  Hi, Ms. Allen.

16   My name is Mike Walker.  I represent Linda

17   Clemons.  Thanks for being here today.

18        Have you ever been deposed before?

19        MS. ALLEN:  No.

20        MR. WALKER:  So basically I'll just being

21   asking some questions about your experience at

22   Old Navy, anything you know about the Linda

23   Clemons incident.

24        And what we ask from you during the

25   process is just if you would give me a verbal

```
 1          response to the question.  That way the court
 2          reporter can take it down.
 3                 It's really important to me and my client
 4          that you understand everything I'm asking you.
 5          And so if I ask you a question that you don't
 6          understand, please just let me know and I'll do
 7          my best to rephrase it.  Okay?
 8                 MS. ALLEN:  Okay.
 9                 MR. WALKER:  The flip side to it is that
10          if I ask you something and you do respond to it,
11          I'll assume you understood it.  Is that fair?
12                 MS. ALLEN:  Yes.
13                 MR. WALKER:  All right.  Give me your full
14          name for the record, please.
15                 THE COURT REPORTER:  Okay.  Excuse me.
16          I'm sorry.  I'm going to go ahead and --
17                 MR. WALKER:  I need to swear her in, don't
18          I?  Go ahead.
19                 THE COURT REPORTER:  Yes, sir.
20                 MR. WALKER:  Sorry.  I forgot.
21                 THE COURT REPORTER:  That's okay.
22                        LISA RENEE ALLEN,
23     having been first duly sworn or affirmed, testifies
24     as follows.
25                 MS. DE DIEGO:  And, Mike, no objection to
```

```
 1       remote swearing.
 2                 MR. WALKER:  Thanks.
 3                      EXAMINATION
 4   BY MR. WALKER:
 5       Q.    All right.  Would you please give me your
 6   full name, Ms. Allen.
 7       A.    Lisa Renee Allen.
 8       Q.    And I'm not going to come to your house or
 9   anything, but if I had to send you a subpoena, what
10   would be your home address?
11       A.    1477 Hickory Drive, Lilburn, Georgia
12   30047.
13       Q.    And do you currently work at Old Navy?
14       A.    I do.
15       Q.    How long have you worked there?
16       A.    Going on about 24 years.
17       Q.    And what's your current job title?
18       A.    General manager.
19       Q.    Are you the person in charge of the store?
20       A.    I am.
21       Q.    And I was referring to the Snellville
22   store.  Are you in charge of the Snellville store?
23       A.    I am.
24       Q.    Would you be the highest ranking person at
25   the store level?
```

Lisa Renee Allen - September 1, 2023                    7
Video Deposition

1        A.    Yes.

2        Q.    How long have you been the general manager

3   of the Snellville store?

4        A.    Been about 20 years.

5        Q.    Who do you report to?

6        A.    My supervisor is Ross Hoffman.

7        Q.    What's his title?

8        A.    District manager.

9        Q.    And what district is his district?

10        A.    Atlanta North.

11        Q.    Did you say Atlanta, Georgia?

12        A.    Atlanta North.

13        Q.    Oh, Atlanta North.  Okay.  What stores are

14   in the Atlanta North division or district?

15        A.    I mean there are like 11 stores.  I can't

16   name them offhand.  But we have 11 stores in the

17   district.

18        Q.    All right.  In your capacity as the

19   general manager at the Snellville store, did you ever

20   receive any training on installing or securing shelf

21   strips?

22        A.    I can't say that I have.

23        Q.    Do you know what I'm referring to when I

24   say a "shelf strip"?

25        A.    Yes.

1          Q.     If you could just kind of explain what
2     that is.
3          A.     A shelf strip is a metal sign that is
4     placed on our walls.
5          Q.     Are they placed on the shelves?
6          A.     The shelves and the walls, correct.
7          Q.     Do you know how to secure a shelf strip to
8     a shelf?
9          A.     Yes.
10         Q.     How do you go about doing that?
11         A.     To secure a shelf strip into a shelf, you
12    would just make sure that it has Velcro on the top
13    and the bottom of it, and then you would secure it to
14    the shelf.
15         Q.     Velcro between the shelf and the shelf
16    strip?
17         A.     Correct.
18         Q.     All right.  So I want to show you what
19    I've marked as Plaintiff's Exhibit No. 1.
20              (Plaintiff's Exhibit P-1, having been
21         previously marked, was introduced into the
22         record.)
23         Q.     (By Mr. Walker)  Can you see this document
24    before -- can you see this document, Ms. Allen?
25         A.     I see it.

Lisa Renee Allen - September 1, 2023                    9
Video Deposition

```
 1          Q.    Have you ever seen this document before?

 2          A.    Yes.

 3          Q.    When do you think you saw this document?

 4          A.    It'd probably have to been some years ago

 5    since I've been with the company for so long.

 6          Q.    It says here that -- at the top it says,

 7    Metal Shelf Strip Sign Holder:  Added safety.  Right?

 8          A.    Yes.

 9          Q.    Then it says, Men's khaki metal shelf

10    strip sign holders used as example, same principle

11    applies to all metal shelf strips.  Right?

12          A.    Yes.

13          Q.    And then it describes how you put the

14    Velcro on the underside of the shelf strip to secure

15    it to the shelf, right?

16          A.    Yes.

17          Q.    And if you go down to the page -- the

18    second page, it says:  The metal shelf strip sign

19    holders, used in denim and khaki presentations, are

20    at risk of sliding forward off the shelf and falling

21    when someone removes a product from a stack.  All

22    stores with the metal shelf strip sign holders must

23    use Velcro strips to help secure the sign holder to

24    the shelf they sit upon.

25                Did I read that correctly?
```

**Regency-Brentano, Inc.**

```
 1        A.    Yes.

 2        Q.    All right.  Is that what you were

 3   referring to earlier about how to secure the shelf

 4   strip?

 5        A.    Yes.

 6        Q.    And the risk of not doing that is that

 7   they can fall off the shelf and hit somebody?

 8        A.    Yes.

 9        Q.    All right.  I'm going to show you what

10   I've marked as Plaintiff's Exhibit No. 2.

11             (Plaintiff's Exhibit P-2, having been

12        previously marked, was introduced into the

13        record.)

14        Q.    (By Mr. Walker)  Have you ever seen this

15   -- these photographs and incident report before?

16        A.    Yes.

17        Q.    Okay.  When did you see these?

18        A.    That I saw when I was going over from

19   having a conversation with Brittany.

20        Q.    And I'm not asking about your

21   conversations with your counsel.  I was just more

22   wondering when you saw this document and if you'd

23   seen outside the context of preparing for a

24   deposition.

25        A.    No.
```

Lisa Renee Allen - September 1, 2023                    11
Video Deposition

```
 1        Q.    Okay.  So page 1 shows a shelf strip,
 2   right?
 3        A.    Yes.
 4        Q.    And it's got the Velcro on top of it?
 5        A.    Yes.
 6        Q.    And if you look at pages 4 and 5, that's
 7   other -- that -- page 4 is also at the top of the
 8   shelf strip, right?
 9        A.    Yes.
10        Q.    And then page 5 of the exhibit is the
11   underside of the shelf strip, right?
12        A.    Yes.
13        Q.    And the underside of the shelf strip does
14   not have the Velcro straps on it?
15        A.    No.
16        Q.    Is that correct; it does not?
17        A.    I don't see it, no.
18        Q.    This would be against the policies and
19   procedures on how to properly secure the shelf strip,
20   right?
21        A.    Yes.
22        Q.    Do you know who would have installed this
23   shelf strip?
24        A.    It would be the merchandise manager.
25        Q.    Okay.  Do you know who that would have
```

1   been in April of 2021?

2        A.    It would have been Mike Rinehart.

3        Q.    Did you ever have any conversation with

4   Mr. Rinehart on how to secure the shelf strips?

5        A.    No.

6        Q.    Do you know if he received any training on

7   the shelf strips?

8        A.    No.

9        Q.    Do you know who would have been

10  responsible for training him on the shelf strips?

11       A.    Whoever he started off with at the time

12  that he came on with the company, whoever did his

13  training.

14       Q.    But if Mr. Rinehart did not use the shelf

15  -- the Velcro on the shelf strip on the bottom, that

16  would have been in violation of Old Navy's policies?

17       A.    Yes.

18       Q.    And that would have made the shelf strip

19  more likely to fall?

20            MS. DE DIEGO:  Object to form.

21            You can answer.

22            THE WITNESS:  Not necessarily.

23       Q.    (By Mr. Walker)  Well, the shelf strip is

24  there as an added safety benefit, right?

25       A.    Yes.

1          Q.    And without the added safety benefit, it's

2     more likely to fall?

3               MS. DE DIEGO:  Objection.

4               You can answer.

5               THE WITNESS:  No.

6          Q.    (By Mr. Walker)  Well, do strip shelves

7     [sic] provide a good benefit for customer safety?

8          A.    Yes.

9          Q.    And you agree the shelf strip should be

10    added to the bottom of the -- excuse me.

11               You agree the Velcro should be added to

12    the bottom of the shelf strip to help prevent it from

13    sliding and hitting somebody, right?

14         A.    Yes, to give it extra support.

15         Q.    Did you ever have any conversations after

16    April of 2029 [sic] with anybody regarding the shelf

17    strips or the Velcro?

18         A.    No.

19         Q.    Is there anything else that you're

20    supposed to do at Old Navy to help secure the shelf

21    strip on a shelf?

22         A.    Say your question again.

23         Q.    Is there anything else that you're

24    supposed to do to help secure the shelf strip?

25         A.    I guess I don't understand your question.

1   You say anything else that you should do?

2       Q.    Well, I notice there's like a hole in the

3   upper right-hand corner on this shelf strip.  Are you

4   supposed to bolt it down or do anything like that?

5       A.    No.

6       Q.    Okay.  So it would just be the Velcro

7   strips?

8       A.    Yes.

9       Q.    After -- when did you learn about the

10  Linda Clemons incident?

11      A.    I really can't recall.

12      Q.    Did you speak with Mr. Rinehart about it?

13      A.    I don't remember.

14      Q.    Other than your attorney, can you recall

15  speaking with anybody about the incident?

16      A.    No.

17      Q.    Do you know anything about what happened?

18      A.    No.

19      Q.    Were you present when it happened?

20      A.    No.

21      Q.    Have you ever spoken to Ms. Clemons?

22      A.    No.

23      Q.    And you don't recall speaking with anybody

24  else about her other than your attorney?

25      A.    No.

1        Q.    So it's fair to say that other than your

2    -- what you've learned from your attorney, you don't

3    have any knowledge of what happened to Ms. Clemons?

4        A.    No.

5        Q.    Do you know when Mr. Rinehart began

6    working at the Snellville location?

7        A.    Repeat your question.  I'm having a hard

8    time hearing.

9        Q.    I apologize.

10             Do you know when Mr. Rinehart began

11   working at the Snellville location?

12       A.    I can't remember.

13       Q.    Are there any policies and procedures at

14   Old Navy to periodically check the shelf strips to

15   see that they're properly secured?

16       A.    We do what's called -- it's under risk

17   management, and monthly we have different topics that

18   we cover, like different safety topics, every single

19   month, but each month they rotate.

20       Q.    Do you recall if there was ever any

21   discussion about the shelf strips and checking them?

22       A.    No.

23             MR. WALKER:  All right.  That's all I have

24       for you today.  I appreciate your time.

25             THE WITNESS:  Thank you.

**Regency-Brentano, Inc.**

Lisa Renee Allen - September 1, 2023                    16
Video Deposition

```
 1              MS. DE DIEGO:  I just have a couple
 2        questions for you real quick, Ms. Allen.
 3                       EXAMINATION
 4   BY MS. DE DIEGO:
 5        Q.    The policies and procedures at Old Navy,
 6   who creates those?
 7        A.    Corporate.
 8        Q.    Do you personally create any of those
 9   policies and procedures?
10        A.    No.
11        Q.    Did you personally train Mr. Rinehart?
12        A.    No.
13        Q.    Are you the only manager at the Snellville
14   location?
15        A.    The only general manager.
16        Q.    Are there other managers that work there?
17        A.    There are other managers, yes.
18        Q.    Were you working on April 13th, 2021 --
19        A.    No, I don't think so.
20        Q.    -- the day that this --
21        A.    No.
22              MS. DE DIEGO:  Okay.  No further questions
23        from me.
24              MR. WALKER:  None from me.  Thank you.
25              THE VIDEOGRAPHER:  Off the record at
```

Lisa Renee Allen - September 1, 2023                    17
Video Deposition

```
 1        1:16 p.m.

 2              (Deposition concluded at 1:16 p.m.)

 3              MS. DE DIEGO:  We'll read and sign.

 4              [Orders to court reporter:

 5              MR. WALKER:  Transcribe, electronic copy.

 6              MS. DE DIEGO:  E-tran with exhibits.]

 7              (Pursuant to Rule 30(e) of the Federal

 8        Rules of Civil Procedure and/or O.C.G.A.

 9        9-11-30(e), signature of the witness has been

10        reserved.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Regency-Brentano, Inc.**

1          R E P O R T E R'S   C E R T I F I C A T E

2   STATE OF GEORGIA:

3   COUNTY OF PAULDING:

4          I, Deborah P. Longoria, RPR, Certified

5      Court Reporter for the State of Georgia, hereby

6      certify that the witness was duly sworn by me,

7      and that the foregoing proceeding took place

8      before me at the time and place herein set out.

9          I further certify that the foregoing was

10     recorded stenographically by me and reduced to

11     typewriting by me or under my control; that the

12     foregoing pages 1 through 17 represent a true,

13     complete, and correct transcript.

14         I further certify that I am not of kin or

15     counsel to any counsel or party to this matter,

16     nor am I in any way interested in the outcome of

17     this action.

18         This, the 12th day of September 2023.

19

20

21

22     _____

23       DEBORAH LONGORIA, RPR, B-1557

24

25

```
 1              COURT REPORTER DISCLOSURE

 2

 3        Pursuant to Article 10.B. of the Rules and
     Regulations of the Board of Court Reporting of the
 4   Judicial Council of Georgia which states: "Each court
     reporter shall tender a disclosure form at the time
 5   of the taking of the deposition stating the
     arrangements made for the reporting services of the
 6   certified court reporter, by the certified court
     reporter, the court reporter's employer, or the
 7   referral source for the deposition, with any party to
     the litigation, counsel to the parties or other
 8   entity.  Such form shall be attached to the
     deposition transcript," I make the following
 9   disclosure:

10

          I am a Georgia Certified Court Reporter.  I was
11   contacted to provide court reporting services for the
     deposition.  I will not be taking this deposition
12   under any contract that is prohibited by O.C.G.A.
     15-14-37(a) and (b).

13

14        I have no contract/agreement to provide
     reporting services with any party to the case, any
15   counsel in the case, or any reporter or reporting
     agency from whom a referral might have been made to
16   cover this deposition.  I will charge the usual and
     customary rates to all parties in the case, and a
17   financial discount will not be given to any party to
     this litigation.

18

19

20

21

22             DEBORAH LONGORIA, RPR, B-1557

23

24

25
```

**Regency-Brentano, Inc.**

**Video Deposition**                                    20

```
 1   ERRATA PAGE(S) - LISA RENEE ALLEN/DPL

 2        I, LISA RENEE ALLEN, having reserved my
     signature, do hereby certify that I have read all
 3   questions propounded to me and all answers given by
     me on September 1, 2023, and that:

 4

 5        1)  There are no changes noted.
          2)  The following changes are noted:

 6

 7   I, LISA RENEE ALLEN, hereby state my desire to make
     corrections entered upon the sworn testimony given
 8   and I have set forth the reason for making them.
     Accordingly, I have entered the same on the form
 9   below and if supplemental or additional pages were
     necessary, I have furnished the same in typewriting
10   annexed herewith.

11   Page No.        Line No.        should read:

12
     Page No.        Line No.        should read:
13

14   Page No.        Line No.        should read:

15
     Page No.        Line No.        should read:
16

17   Page No.        Line No.        should read:

18
     Page No.        Line No.        should read:
19

20   Page No.        Line No.        should read:

21
     Page No.        Line No.        should read:
22

23   Page No.        Line No.        should read:

24
     Page No.        Line No.        should read:
25
```

**Regency-Brentano, Inc.**

```
 1    (Continued) ERRATA PAGE - LISA RENEE ALLEN/DPL

 2    Page No.        Line No.        should read:

 3
      Page No.        Line No.        should read:
 4

 5    Page No.        Line No.        should read:

 6
      Page No.        Line No.        should read:
 7

 8    Page No.        Line No.        should read:

 9
      Page No.        Line No.        should read:
10

11    Page No.        Line No.        should read:

12
      Page No.        Line No.        should read:
13

14

15    I, LISA RENEE ALLEN, declare under penalty of perjury
      pursuant to 28 U.S. Code Section 1746 that I have
16    read the foregoing transcript of my sworn deposition,
      that the deposition transcript accurately reflects my
17    sworn testimony, and any changes or amendments, if
      applicable, were made by me and are noted above on
18    the attached errata sheet and any additional pages
      herewith.
19

20
                     _____
21                   LISA RENEE ALLEN

22    Sworn to and subscribed before me,
      This the      day of            , 20   .
23

24    Notary Public

25    My commission expires:
```

**Regency-Brentano, Inc.**

**[**

**[Orders (1)**
17:4
**[sic] (2)**
13:7,16

**A**

**Added (5)**
9:7;12:24;13:1,10,
11
**address (1)**
6:10
**affirmed (1)**
5:23
**again (1)**
13:22
**against (1)**
11:18
**ago (1)**
9:4
**agree (2)**
13:9,11
**agreement (1)**
4:9
**ahead (2)**
5:16,18
**Allen (11)**
4:2,8,15,19;5:8,12,
22;6:6,7;8:24;16:2
**and/or (1)**
17:8
**apologize (1)**
15:9
**applies (1)**
9:11
**appreciate (1)**
15:24
**April (3)**
12:1;13:16;16:18
**assume (1)**
5:11
**Atlanta (5)**
7:10,11,12,13,14
**attorney (3)**
14:14,24;15:2

**B**

**basically (1)**
4:20
**began (2)**
15:5,10
**benefit (3)**
12:24;13:1,7
**best (1)**
5:7
**bolt (1)**
14:4
**bottom (4)**
8:13;12:15;13:10,

**12**
**Brittany (2)**
4:10;10:19

**C**

**called (1)**
15:16
**came (1)**
12:12
**can (4)**
5:2;8:23,24;10:7;
12:21;13:4;14:14
**capacity (1)**
7:18
**charge (2)**
6:19,22
**check (1)**
15:14
**checking (1)**
15:21
**Civil (1)**
17:8
**Clemons (5)**
4:17,23;14:10,21;
15:3
**client (1)**
5:3
**company (2)**
9:5;12:12
**concluded (1)**
17:2
**context (1)**
10:23
**conversation (2)**
10:19;12:3
**conversations (2)**
10:21;13:15
**copy (1)**
17:5
**corner (1)**
14:3
**Corporate (1)**
16:7
**correctly (1)**
9:25
**counsel (2)**
4:9;10:21
**couple (1)**
16:1
**court (5)**
5:1,15,19,21;17:4
**cover (1)**
15:18
**create (1)**
16:8
**creates (1)**
16:6
**current (1)**
6:17
**currently (1)**
6:13
**customer (1)**

**13:7**

**D**

**day (1)**
16:20
**DE (9)**
4:14;5:25;12:20;
13:3;16:1,4,22;17:3,6
**denim (1)**
9:19
**deposed (1)**
4:18
**Deposition (5)**
4:1,7,13;10:24;17:2
**describes (1)**
9:13
**DIEGO (9)**
4:14;5:25;12:20;
13:3;16:1,4,22;17:3,6
**different (1)**
15:17,18
**discussion (1)**
15:21
**District (5)**
7:8,9,9,14,17
**division (1)**
7:14
**document (5)**
8:23,24;9:1,3;10:22
**down (3)**
5:2;9:17;14:4
**Drive (1)**
6:11
**duly (1)**
5:23
**during (1)**
4:24

**E**

**earlier (1)**
10:3
**electronic (1)**
17:5
**else (4)**
13:19,23;14:1,24
**E-tran (1)**
17:6
**EXAMINATION (2)**
6:3;16:3
**example (1)**
9:10
**except (1)**
4:11
**Excuse (2)**
5:15;13:10
**Exhibit (5)**
8:19,20;10:10,11;
11:10
**exhibits) (1)**
17:6
**experience (1)**

**4:21**
**explain (1)**
8:1
**extra (1)**
13:14

**F**

**fair (2)**
5:11;15:1
**fall (3)**
10:7;12:19;13:2
**falling (1)**
9:20
**Federal (1)**
17:7
**fine (1)**
4:14
**first (2)**
4:12;5:23
**flip (1)**
5:9
**follows (1)**
5:24
**forgot (1)**
5:20
**form (2)**
4:11;12:20
**forward (1)**
9:20
**full (2)**
5:13;6:6
**further (1)**
16:22

**G**

**General (4)**
6:18;7:2,19;16:15
**Georgia (2)**
6:11;7:11
**good (1)**
13:7
**guess (1)**
13:25

**H**

**happened (3)**
14:17,19;15:3
**hard (1)**
15:7
**hearing (1)**
15:8
**help (4)**
9:23;13:12,20,24
**Hi (1)**
4:15
**Hickory (1)**
6:11
**highest (1)**
6:24
**hit (1)**

**10:7**
**hitting (1)**
13:13
**Hoffman (1)**
7:6
**Holder (2)**
9:7,23
**holders (3)**
9:10,19,22
**hole (1)**
14:2
**home (1)**
6:10
**house (1)**
6:8

**I**

**important (1)**
5:3
**incident (4)**
4:23;10:15;14:10,
15
**installed (1)**
11:22
**installing (1)**
7:20
**into (3)**
8:11,21;10:12
**introduced (2)**
8:21;10:12

**J**

**job (1)**
6:17

**K**

**khaki (2)**
9:9,19
**kind (1)**
8:1
**knowledge (1)**
15:3

**L**

**learn (1)**
14:9
**learned (1)**
15:2
**level (1)**
6:25
**likely (2)**
12:19;13:2
**Lilburn (1)**
6:11
**Linda (3)**
4:16,22;14:10
**Lisa (4)**
4:2,8;5:22;6:7
**location (3)**

Case 1:23-mi-99999-UNA   Document 4195   Filed 12/18/23   Page 155 of 351

Clemons v.
Old Navy, LLC, et al.

Video Deposition

Lisa Renee Allen
September 1, 2023

15:6,11;16:14
**long (3)**
  6:15;7:2;9:5
**look (1)**
  11:6

## M

**management (1)**
  15:17
**manager (7)**
  6:18;7:2,8,19;
  11:24;16:13,15
**managers (2)**
  16:16,17
**marked (4)**
  8:19,21;10:10,12
**mean (1)**
  7:15
**Men's (1)**
  9:9
**merchandise (1)**
  11:24
**metal (6)**
  8:3;9:7,9,11,18,22
**Mike (3)**
  4:16;5:25;12:2
**month (2)**
  15:19,19
**monthly (1)**
  15:17
**more (3)**
  10:21;12:19;13:2
**must (1)**
  9:22

## N

**name (4)**
  4:16;5:14;6:6;7:16
**Navy (5)**
  4:22;6:13;13:20;
  15:14;16:5
**Navy's (1)**
  12:16
**necessarily (1)**
  12:22
**need (1)**
  5:17
**None (1)**
  16:24
**North (4)**
  7:10,12,13,14
**notice (2)**
  4:8;14:2

## O

**Object (1)**
  12:20
**objection (2)**
  5:25;13:3
**objections (1)**

4:11
**OCGA (1)**
  17:8
**off (4)**
  9:20;10:7;12:11;
  16:25
**offhand (1)**
  7:16
**Old (6)**
  4:22;6:13;12:16;
  13:20;15:14;16:5
**only (2)**
  16:13,15
**outside (1)**
  10:23
**over (1)**
  10:18

## P

**P-1 (1)**
  8:20
**P-2 (1)**
  10:11
**page (5)**
  9:17,18;11:1,7,10
**pages (1)**
  11:6
**periodically (1)**
  15:14
**person (2)**
  6:19,24
**personally (2)**
  16:8,11
**photographs (1)**
  10:15
**placed (2)**
  8:4,5
**Plaintiff's (4)**
  8:19,20;10:10,11
**please (3)**
  5:6,14;6:5
**pm (3)**
  4:6;17:1,2
**policies (5)**
  11:18;12:16;15:13;
  16:5,9
**preparing (1)**
  10:23
**present (1)**
  14:19
**presentations (1)**
  9:19
**prevent (1)**
  13:12
**previously (2)**
  8:21;10:12
**principle (1)**
  9:10
**probably (1)**
  9:4
**Procedure (1)**
  17:8

**procedures (4)**
  11:19;15:13;16:5,9
**process (1)**
  4:25
**product (1)**
  9:21
**properly (2)**
  11:19;15:15
**propose (1)**
  4:10
**provide (1)**
  13:7
**pursuant (2)**
  4:8;17:7
**put (1)**
  9:13

## Q

**quick (1)**
  16:2

## R

**ranking (1)**
  6:24
**read (2)**
  9:25;17:3
**real (1)**
  16:2
**really (2)**
  5:3;14:11
**recall (4)**
  14:11,14,23;15:20
**receive (1)**
  7:20
**received (1)**
  12:6
**record (5)**
  4:5;5:14;8:22;
  10:13;16:25
**referring (3)**
  6:21;7:23;10:3
**regarding (1)**
  13:16
**remember (2)**
  14:13;15:12
**Remote (2)**
  4:1;6:1
**removes (1)**
  9:21
**Renee (3)**
  4:2;5:22;6:7
**Repeat (1)**
  15:7
**rephrase (1)**
  5:7
**report (2)**
  7:5;10:15
**reporter (5)**
  5:2,15,19,21;17:4
**represent (1)**
  4:16

**reserve (1)**
  4:10
**reserved (1)**
  17:10
**respond (1)**
  5:10
**response (1)**
  5:1
**responsible (1)**
  12:10
**responsiveness (1)**
  4:12
**right (17)**
  4:15;5:13;6:5;7:18;
  8:18;9:7,11,15;10:2,
  9;11:2,8,11,20;12:24;
  13:13;15:23
**right-hand (1)**
  14:3
**Rinehart (7)**
  12:2,4,14;14:12;
  15:5,10;16:11
**risk (3)**
  9:20;10:6;15:16
**Ross (1)**
  7:6
**rotate (1)**
  15:19
**Rule (1)**
  17:7
**Rules (1)**
  17:8

## S

**safety (5)**
  9:7;12:24;13:1,7;
  15:18
**same (1)**
  9:10
**saw (3)**
  9:3;10:18,22
**second (1)**
  9:18
**secure (10)**
  8:7,11,13;9:14,23;
  10:3;11:19;12:4;
  13:20,24
**secured (1)**
  15:15
**securing (1)**
  7:20
**send (1)**
  6:9
**September (1)**
  4:3
**shelf (43)**
  7:20,24;8:3,7,8,11,
  11,14,15,15,9:7,9,11,
  14,15,18,20,22,24;
  10:3,7;11:1,8,11,13,
  19,23;12:4,7,10,14,
  15,18,23;13:9,12,16,

20,21,24;14:3;15:14,
  21
**shelves (3)**
  8:5,6;13:6
**show (2)**
  8:18;10:9
**shows (1)**
  11:1
**side (1)**
  5:9
**sign (7)**
  8:3;9:7,10,18,22,
  23;17:3
**signature (1)**
  17:9
**single (1)**
  15:18
**sit (1)**
  9:24
**sliding (2)**
  9:20;13:13
**Snellville (7)**
  6:21,22;7:3,19;
  15:6,11;16:13
**somebody (2)**
  10:7;13:13
**someone (1)**
  9:21
**sorry (2)**
  5:16,20
**speak (1)**
  14:12
**speaking (2)**
  14:15,23
**spoken (1)**
  14:21
**stack (1)**
  9:21
**started (1)**
  12:11
**store (5)**
  6:19,22,22,25;7:3,
  19
**stores (4)**
  7:13,15,16;9:22
**straps (1)**
  11:14
**strip (26)**
  7:24;8:3,7,11,16;
  9:7,10,14,18,22;10:4;
  11:1,8,11,13,19,23;
  12:15,18,23;13:6,9,
  12,21,24;14:3
**strips (10)**
  7:21;9:11,23;12:4,
  7,10;13:17;14:7;
  15:14,21
**subpoena (1)**
  6:9
**supervisor (1)**
  7:6
**support (1)**
  13:14

**supposed (3)**
13:20,24;14:4
**sure (1)**
8:12
**swear (1)**
5:17
**swearing (1)**
6:1
**sworn (1)**
5:23

**T**

**testifies (1)**
5:23
**Thanks (2)**
4:17;6:2
**title (2)**
6:17;7:7
**today (2)**
4:17;15:24
**top (4)**
8:12;9:6;11:4,7
**topics (2)**
15:17,18
**train (1)**
16:11
**training (4)**
7:20;12:6,10,13
**Transcribe (1)**
17:5

**U**

**under (1)**
15:16
**underside (3)**
9:14;11:11,13
**understood (1)**
5:11
**upon (1)**
9:24
**upper (1)**
14:3
**use (3)**
4:12;9:23;12:14
**used (2)**
9:10,19

**V**

**Velcro (10)**
8:12,15;9:14,23;
11:4,14;12:15;13:11,
17;14:6
**verbal (1)**
4:25
**Videoconference (1)**
4:1
**VIDEOGRAPHER (2)**
4:5;16:25
**Videotaped (1)**
4:1

**violation (1)**
12:16

**W**

**WALKER (17)**
4:7,15,16,20;5:9,13,
17,20;6:2,4;8:23;
10:14;12:23;13:6;
15:23;16:24;17:5
**walls (2)**
8:4,6
**way (1)**
5:1
**what's (3)**
6:17;7:7;15:16
**without (1)**
13:1
**WITNESS (4)**
12:22;13:5;15:25;
17:9
**wondering (1)**
10:22
**work (2)**
6:13;16:16
**worked (1)**
6:15
**working (3)**
15:6,11;16:18

**Y**

**years (3)**
6:16;7:4;9:4

**1**

**1 (3)**
4:3;8:19;11:1
**1:01 (1)**
4:6
**1:16 (2)**
17:1,2
**11 (2)**
7:15,16
**13th (1)**
16:18
**1477 (1)**
6:11

**2**

**2 (1)**
10:10
**20 (1)**
7:4
**2021 (2)**
12:1;16:18
**2023 (1)**
4:3
**2029 (1)**
13:16
**24 (1)**

6:16

**3**

**30047 (1)**
6:12
**30e (1)**
17:7

**4**

**4 (2)**
11:6,7

**5**

**5 (2)**
11:6,10

**9**

**9-11-30e (1)**
17:9

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-00137-S4**
**10/6/2023 3:42 PM**
TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

LINDA D. CLEMONS,        )
                          )
      Plaintiff,        )
                          )     CIVIL ACTION NO.: 23-C-00137-S4
vs.                     )
                          )
OLD NAVY, LLC; LISA ALLEN;    )
DOE 1 ; DOE 2; DOE 3; and DOE 4;  )
                          )
      Defendants.     )

## DEFENDANT LISA ALLEN'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF PLAINTIFF'S THEORIES OF RECOVERY

COMES NOW Defendant Lisa Allen, by and through her undersigned counsel of record, and hereby files her Statement of Undisputed Material Facts as to Which There Exists No Genuine Issue to be Tried and Statement of Plaintiff's Theories of Recovery, respectfully showing this Court as follows:

### STATEMENT OF UNDISPUTED FACTS

1.

At the time of Plaintiff's alleged injury on April 13, 2021, Defendant Allen was the general manager of the Snellville Old Navy store. (Lisa Allen Dep. 6:13-23.)

2.

As the general manager, Defendant Allen did not undergo any training on installing or securing metal shelf strip signs. (Allen Dep. 7:18-25.)

3.

As the general manager, Defendant Allen would not have installed the metal shelf strip sign at issue. (Allen Dep. 11:22-24.)

1

4.

Defendant Allen did not create any policies or procedures in place at the Old Navy location. (Allen Dep. 16:5-10.)

5.

Defendant Allen did not train the merchandise manager who oversaw the placement of the signs in the store. (Allen Dep. 16:11-12.)

6.

Defendant Allen has no personal knowledge regarding the subject incident or Plaintiff's claims. (Allen Dep. 14:17-25.)

7.

Defendant Allen was not present when the incident happened and she has never spoken with the Plaintiff. (Allen Dep. 14:17-25.)

## STATEMENT OF PLAINTIFF'S THEORIES OF RECOVERY

Plaintiff alleges that Lisa Allen and Old Navy, LLC were negligent by failing to keep the premises and approaches safe, failing to reasonably inspect the floor of the premises, failing to properly maintain and repair the premises, allowed invited guests to use an unsafe area, in failing to post warning signs or warning markings, failing to properly train and supervise their employees to the care of the premises, and in negligently retaining, entrusting, hiring, training, and supervising employees. Compl. ¶ 28. Plaintiff's Complaint also argues for the reward of compensatory damages, attorney's fees, and costs of litigation. Compl. ¶ 34.

Respectfully submitted this 6th day of October, 2023.

*{Signature on following page}*

2

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all counsel of record in the foregoing matter with a copy of **DEFENDANT LISA ALLEN'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF PLAINTIFF'S THEORIES OF RECOVERY** has this day been filed with the Clerk of the Court by electronically filing with the Court's E-File system, which automatically serves copies upon all counsel of record, b*y **STATUTORY ELECTRONIC SERVICE O.C.G.A. § 9-11-5(f)*** as follows:

Michael P. Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
*Counsel for Plaintiff*

This 6th day of October, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

/s/  Brittany DeDiego
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

4

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**10/24/2023 11:59 AM**

TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

COMES NOW Defendant Old Navy, LLC, pursuant to Superior and State Court Rule 5.2,

and notifies the Court that Defendant served upon all counsel of record a copy of the following:

- Defendant Old Navy, LLC's Request for Production of Documents to the

   following non-parties:

     - *American Health Imaging*
     - *Emory University Hospital*
     - *Emory Hillendale Hospital*
     - *Piedmont Urgent Care*
     - *Peachtree Immediate Care*
     - *WellStar Atlanta Medical Center*
     - *Atlanta Neurological & Spine*
     - *BenchMark Rehabilitation Partners*
     - *Summit Spine & Joint Centers*
     - *DeKalb Comprehensive Physical Therapy*
     - *Emry Physical Therapy*
     - *Emory at Buford*

This 24th day of October, 2023.

*{Signature on following page}*

1

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*

S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa
Allen*

2

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day a true and correct copy of the foregoing pleading using Odyssey eFile GA's electronic filing system which will send notification of the same, or in the alternative, via U.S. Mail to all counsel of record as follows:

Michael P. Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
*Counsel for Plaintiff*

This 24th day of October, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*

S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**
**10/31/2023 4:38 PM**
TIANA P. GARNER, CLERK

**IN THE STATE COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

COMES NOW Defendant Old Navy, LLC, pursuant to Superior and State Court Rule 5.2,

and notifies the Court that Defendant served upon all counsel of record a copy of the following:

- Defendant Old Navy, LLC's Request for Production of Documents to the

  following non-party:

  - *Alliance Spine and Pain Centers*

This 31st day of October, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*
_____
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

## CERTIFICATE OF SERVICE

I hereby certify that on this day a true and correct copy of the foregoing pleading using Odyssey eFile GA's electronic filing system which will send notification of the same, or in the alternative, via U.S. Mail to all counsel of record as follows:

Michael P. Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
*Counsel for Plaintiff*

This 31st day of October, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**10/31/2023 4:18 PM**

TIANA P. GARNER, CLERK

**IN THE STATE COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

COMES NOW Defendant Old Navy, LLC, pursuant to Superior and State Court Rule 5.2, and notifies the Court that Defendant served upon all counsel of record a copy of the following:

- Defendant Old Navy, LLC's Request for Production of Documents to the following non-parties:
  - ○ *Southeastern Lung Cancer, PC*
  - ○ *Atlanta Gastroenterology Associates*

This 31st day of October, 2023.

 

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*

S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

1

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day a true and correct copy of the foregoing pleading using Odyssey eFile GA's electronic filing system which will send notification of the same, or in the alternative, via U.S. Mail to all counsel of record as follows:

Michael P. Walker
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
*Counsel for Plaintiff*

This 31st day of October, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*

S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**
**11/9/2023 5:18 PM**
TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

LINDA D. CLEMONS,                         )
                                          )
     Plaintiff,                   )
                                          )        CIVIL ACTION NO.: 23-C-00137-S4
vs.                                       )
                                          )
OLD NAVY, LLC; LISA ALLEN;                )
DOE 1 ; DOE 2; DOE 3; and DOE 4;          )
                                          )
     Defendants.                  )

## STIPULATION

    Plaintiff and Defendants stipulate and agree that Plaintiff shall have through and including

November 17, 2023 to file a response to Defendant Lisa Allen's Motion for Summary Judgment.

DATED:  November 8, 2023          **PIASTA WALKER HAGENBUSH, LLC**


                                  By:   /s/ Michael P. Walker
3301 Windy Ridge Pkwy                   _____
Suite 110                               Michael P. Walker
Atlanta, GA 30339                       Georgia Bar No. 954678
(404) 996-1296                          *Attorney for Plaintiff*
mike@piastawalker.com


DATED:  March 20, 2023            **LEWIS BRISBOIS BISGAARD & SMITH** LLP


                                  By:   /s/ Brittany DeDiego
600 Peachtree Street NE, Suite 4700     _____
Atlanta, Georgia 30308                  Brittany DeDiego
(404) 348-8585 ( Telephone)             Georgia Bar No. 296392
(404) 467-8845 ( Facsimile)             Chris Collier
Michael. DiOrio @lewisbrisbois.com      Georgia Bar No. 178307
Chris.Collier@lewisbrisbois.com         *Attorneys for Defendants Old Navy, LLC and Lisa*
Brittany.DeDiego@lewisbrisbois.com      *Allen*

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**11/17/2023 5:28 PM**
**TIANA P. GARNER, CLERK**

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

LINDA D. CLEMONS,                    )
                                     )
      Plaintiff,               )          Civil Action No. 23-C-00137-S4
v.                                   )
                                     )
OLD NAVY, LLC, et                    )
al,                                  )
      Defendant.               )
                                     )
                                     )

## ENTRY OF APPEARANCE

COMES NOW Brianna N. Yates, with the law firm of Piasta Walker Hagenbush, LLC, and hereby enters an appearance as additional counsel for Plaintiff. Attorney Brianna N. Yates Esq.'s address, phone number and bar number are as follows:

<div align="center">

Brianna N. Yates, Esq.
Georgia Bar No.: 266121
Piasta Walker Hagenbush, LLC
3301 Windy Ridge Parkway, Suite 110
Atlanta, Georgia 30339
T: (404) 996-1296
F: (404) 996-1316
E: brianna@piastawalker.com

</div>

All further pleadings, correspondence, notices, and other filings to be served on Plaintiff, should be sent to and served on additional counsel, Brianna N. Yates, Esq.

Dated: November 17, 2023.

<div align="center">

(SIGNATURE APPEARS ON FOLLOWING PAGE)

</div>

**PIASTA WALKER HAGENBUSH, LLC**

/s/ Brianna N. Yates
MICHAEL P. WALKER
Georgia Bar No. 954678
BRIANNA N. YATES
Georgia Bar No. 266121
*Counsel for Plaintiff*

3301 Windy Ridge Parkway
Suite 110
Atlanta, GA 30339
T: (404) 996-1296
E: mike@piastawalker.com
    brianna@piastawalker.com

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the foregoing **ENTRY OF APPEARANCE** by filing the same via Odyssey Court filing system, which will send automatic notification to Counsel of record:

S. Christopher Collier
Georgia Bar No. 178307
Brittany DeDiego
Georgia Bar No. 296392
Lewis Brisbois Bisgaard & Smith, LLP
600 Peachtree Street NE Suite 4700
Atlanta, Georgia 30308
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

Dated: November 17, 2023.

**PIASTA WALKER HAGENBUSH, LLC**

/s/ Brianna N. Yates
MICHAEL P. WALKER
Georgia Bar No. 954678
Brianna N. Yates
Georgia Bar No.
*Counsel for Plaintiff*

3301 Windy Ridge Parkway
Suite 110
Atlanta, GA 30339
T: (404) 996-1296
E: mike@piastawalker.com
   brianna@piastawalker.com

3

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**11/17/2023 5:36 PM**
TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY
# STATE OF GEORGIA

|  |  |  |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 23-C-00137-S4 |
| v. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT
## LISA ALLEN'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff files this *Response in Opposition to Lisa Allen's Motion for Summary Judgment*, as follows:

## I.    INTRODUCTION

This personal injury case arises from the negligent maintenance of an Old Navy store that caused serious injuries to Plaintiff Linda Clemons. In April 2021, an improperly secured metal shelf strip sign in Old Navy's Snellville location fell and struck Ms. Clemons' feet and ankles while she was shopping at the store, causing permanent nerve damage to Ms. Clemons. Defendants should have known of this hazard; however, their failure to follow Old Navy's own policies and procedures for inspecting the area was the proximate cause of Plaintiff's injuries.

Despite that, Defendant Lisa Allen, the sole general manager and highest-ranking employee of the Snellville Old Navy at the time of the incident, moves for

summary judgment, claiming she had no duty to keep the premises safe. Defendant's motion should be denied because there are disputed issues of material fact as to Ms. Allen's involvement with the security of the Snellville Old Navy store in her capacity as general manager. Defendant Allen can be held liable, both personally and in her role as the general manager, and, therefore, we respectfully ask that Defendant's motion be denied.

## II.    PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Plaintiff Linda Clemons was shopping at the Old Navy Store in Snellville, Georgia on April 13, 2021. (Ex. A, Clemons depo. at 11.) As she walked through the store, she reached to grab a pair of jeans from the rack, when a metal shelf came crashing down. (*Id.* at 27.) The shelf hit her feet, causing her feet and toes to bleed and burn. (*Id.* at 34–37.)

Before and at the time of the incident causing Ms. Clemons' injuries, Defendant Allen was the general manager of the Old Navy where the incident took place. (Ex. B, Allen depo. at 6–7.) Allen has worked as the general manager of the Snellville store for roughly 20 years. (*Id.* at 7.) When asked about metal shelf strips like the one that injured Plaintiff, Defendant Allen testified that she has never received any training on installing or securing shelf strips. (*Id.*) However, Defendant Allen testified that she is aware of the purpose of securing the metal shelf strips, and she acknowledged that improperly securing them can create a risk of the strip falling off the shelf and hitting someone. (*Id.* at 10.) The shelf that injured Ms. Clemons was not properly secured according to Old Navy

policies and procedures at the time of the incident. (*Id*. at 11.)

Although Defendant Allen disclaimed any knowledge or awareness of training on the metal shelf strips at her Old Navy location, others have a different memory. Michael Rinehart, who was the assistant general manager of merchandising at the time of the incident, testified that Old Navy employees receive formal training concerning how to secure shelving and signs. (Ex. C, Rinehart depo. at 9.)

> Q: And did you undergo any training prior to April of 2021 concerning how to secure the strip shelves?
>
> A: It would fall under typical merchandising training and signage SOPs, but yes.
>
> Q: Okay. What do you recall the training being on – on that particular issue?
>
> A: For the shelf strip, you basically – you place it onto the shelf. It has a nonskid pad on the bottom. And you just make sure it's – it's pushed all the way flush against the – the shelf.

(*Id*. at 9–10.) Thus, while Ms. Allen disclaims any training on these mechanisms, the training exists.

Ms. Allen admits that at the time of the incident, Old Navy had policies in place which required her, in her capacity as manager, to check the safety of the store. (Allen depo. at 15.) Yet, Allen failed to check the metal safety strips, ultimately leading to Plaintiff's injuries. (*Id*.)

> Q: Are there any policies and procedures at Old Navy to periodically check the shelf strips to see that they're properly secured?
>
> A: We do what's called – it's under risk management, and monthly we have different topics that we cover, like different safety topics,

3

every single month, but each month they rotate.

Q: Do you recall if there was ever any discussion about the shelf strips and checking them?

A: No.

(*Id.* at 15.)

## III.   ARGUMENT AND CITATION TO AUTHORITY

### a.  Summary judgment is a high hurdle for Defendant.

In the context of negligence cases, Georgia courts have continually held that summary judgment is rarely appropriate. *E.g.*, *Robinson v. Kroger Co.*, 268 Ga. 735, 748 (1997). To prevail at this stage, the Defendant must show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." O.C.G.A. § 9-11-56(c). The nonmoving plaintiff gets "the benefit of all reasonable doubt," and the Court should construe all evidence and inferences in their favor. *Mairs v. Whole Food Mrkt Group, Inc.*, 303 Ga. App. 638, 638 (2010). Even "slight evidence" is enough to create a genuine issue of fact requiring the denial of summary judgment. *Dalton v. City of Marietta*, 280 Ga. App. 202, 203 (2006).

Summary judgment should be granted "only when the evidence is plain, palpable, and undisputed." *Robinson*, 268 Ga. at 748. Stated another way, "questions of negligence, diligence, contributory negligence and proximate cause are peculiarly matters for the jury, and a court should not take the place of the jury in solving them, except in plain and undisputable cases." *Reed v. Carolina*

*Cas. Ins. Co.*, 327 Ga. App. 130, 130 (2014). As discussed below, the evidence in this case is not "plain, palpable, and undisputed" in Defendant's favor, and therefore summary judgment should be denied.

### b. Defendant Allen can be held personally liable.

Defendant Allen alleges in her Motion for Summary Judgment that she "simply worked" at the subject Old Navy; however, this is a mischaracterization of Defendant Allen's role. Defendant Allen not only worked at the subject Old Navy, but she was the one and only general manager at the store, making her the highest-ranking employee at the store level. (Allen depo. at 6–7.) Defendant Allen is individually liable for her negligence and culpability contributing to the injuries of Ms. Clemons.

Georgia cases have held that an individual may be liable under Georgia law in O.C.G.A. § 51-3-1 cases. In *Ashley v. Balcor Property Management, Inc.*, 205 Ga. App. 590, 423 S.E.2d 14, 15-16 (1992), the appellate court reversed the grant of summary judgment to a residential management company <u>and its manager</u>, finding that a question of fact existed as to <u>both</u> parties' liability under O.C.G.A. § 51-3-1. In *Ashley*, the Court cited evidence that the manager should have known about the possibility of a fire due to a prior arson attempt. Here, similarly, Defendant Allen should have known the likelihood of unsecured metal shelf strips because Old Navy issued a bulletin on metal shelf strips to employees. *Ashley* indicates that Defendant Allen, as manager, based upon Plaintiff's allegations, may be held liable under O.C.G.A. § 51-3-1.

5

### c. Defendant Allen can be held liable in her capacity as store manager.

Defendant Allen moves for summary judgment, arguing that she did not participate in a tort because she was not present at the subject property and "was not involved in any events leading up to or during the alleged injury to Plaintiff on April 13, 2021." (Def's Motion for Summary Judgment at 2.) In support, Allen relies on law stating that a store patron cannot recover against a store manager "where there is no evidence of the manager's individual negligence." (*Id.* at 5 (citing *Walmart Stores E. L. P. v. Benson*, 343 Ga. App. 74 (2017). Here, however, there is evidence of Defendant Allen's individual negligence as a manager.

Although Defendant Allen personally disclaims any responsibility for the securing of metal shelf strips, she admitted to knowing how to secure the shelf strips. (Allen depo. at 8.) Allen even was able to explain exactly how to install the metal shelf strips. (*Id.*) Her role as a manager required her to check the safety of the store, and she was the highest-ranked employee at the store, ultimately responsible for her employees below. But for Defendant Allen's failure to properly follow Old Navy standards of safety, Ms. Clemons would not have sustained her serious injuries on April 13, 2021. The fact that Defendant Allen was not present in the store at the time of the incident does not allow her to evade liability; her duties as the general manager of the store require her to make sure the premises is a secure and safe area even if she is not physically present.

In short, there is ample evidence for a jury to conclude that Defendant Allen

was involved in the securing of the metal shelf strips that led to Ms. Clemons' injuries. Plaintiff requests that the Court deny summary judgment as to Defendant Allen.

### d. Plaintiff is owed compensatory damages, attorney's fees, and costs of litigation.

Defendant Allen alleges in her Motion for Summary Judgment that Plaintiff is not entitled to recover damages because she has no valid legal claim against Defendant Allen. However, as illustrated above, Ms. Clemons has valid legal claims against Defendant Allen, and, therefore, Plaintiff's argument for compensatory damages, attorney's fees, and costs of litigation should survive under O.C.G.A. § 13-6-11.

Indeed, Defendant Allen should have known of the dangerous condition which resulted in Plaintiff's injuries, and she failed to address this hazard, despite her position as the highest-ranking employee at the subject Old Navy. As discussed above, there is a basis under Georgia law to hold Defendant Allen liable for her involvement. Therefore, the Motion for Summary Judgment should be denied, and Plaintiff should be entitled to receiving compensatory damages, attorney's fees, and costs of litigation.

## IV.   CONCLUSION

Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment and grant any other relief the Court deems just and proper in this matter.

Dated:  November 17, 2023.

Respectfully submitted,

**PIASTA WALKER HAGENBUSH, LLC**

_/s/ Brianna N. Yates_
Brianna N. Yates
Georgia Bar No. 266121
Michael P. Walker
Georgia Bar No. 954678
_Attorneys for Plaintiff_

3301 Windy Ridge Parkway,
Suite 110
Atlanta, Georgia 30339
(404) 996-1296
mike@piastawalker.com
brianna@piastawalker.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the foregoing *Plaintiff's*

*Opposition to Defendant Lisa Allen's Motion for Summary Judgment* via Statutory

Electronic Service to the following attorney of record:

Brittany DeDiego
S. Christopher Collier
Lewis Brisbois Bisgaard & Smith, LLP
Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, GA 30308
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com
*Attorneys for Defendant*

Dated: November 17, 2023.

**PIASTA WALKER HAGENBUSH, LLC**

*/s/ Brianna N. Yates*
Brianna N. Yates
Georgia Bar No. 266121
Michael P. Walker
Georgia Bar No. 954678
*Attorneys for Plaintiff*

3301 Windy Ridge Parkway,
Suite 110
Atlanta, Georgia 30339
(404) 996-1296
mike@piastawalker.com
brianna@piastawalker.com

9

# EXHIBIT A

Linda D. Clemons                          October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 1

1              IN THE STATE COURT OF GWINNETT COUNTY

2                       STATE OF GEORGIA

3       _____

4       LINDA D. CLEMONS,

5                 Plaintiff,

6            v.                          Civil Action No.

7       OLD NAVY, LLC; LISA ALLEN;        23-C-00137-S4

8       DOE 1; DOE 2; DOE 3; and

9       DOE 4,

10                Defendants.

11      _____

12                   VIDEOTAPED DEPOSITION OF

13                      LINDA D. CLEMONS

14      DATE:        Wednesday, October 18, 2023

15      TIME:        10:08 a.m.

16      LOCATION:    Piasta Walker Hagenbush, LLC

17                   3301 Windy Ridge Parkway, Suite 110

18                   Atlanta, GA 30339

19      REPORTED BY:  Deidra Nash

20      JOB NO.:     6114182

21

22

23

24

25

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 2

```
1        A P P E A R A N C E S
2   ON BEHALF OF PLAINTIFF LINDA D. CLEMONS:
3      HALEY KAMLA KAIRAB, ESQUIRE
4      Piasta Walker Hagenbush, LLC
5      3301 Windy Ridge Parkway, Suite 110
6      Atlanta, GA 30339
7      haley@piastawalker.com
8      (404) 996-1296
9
10  ON BEHALF OF DEFENDANTS OLD NAVY, LLC AND LISA ALLEN:
11     BRITTANY DEDIEGO, ESQUIRE
12     Lewis, Brisbois, Bisgaard & Smith, LLP
13     600 Peachtree Street Northeast, Suite 4700
14     Atlanta, GA 30308
15     brittany.dediego@lewisbrisbois.com
16     (404) 348-8585
17
18  ALSO PRESENT:
19     Brandon Brantley, Videographer
20
21
22
23
24
25
```

Page 3

```
1              I N D E X
2   EXAMINATION:                        PAGE
3     By Ms. DeDiego               6
4
5            E X H I B I T S
6   NO.       DESCRIPTION              PAGE
7   Exhibit 1   Photographs (Old Navy
8               Clemons 000001-000006)      30
9   Exhibit 2    Foot Diagrams            35
10  Exhibit 3   Customer Injury Report     40
11  Exhibit 4   Photographs Produced by
12              Plaintiff            64
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1          P R O C E E D I N G S
2        THE VIDEOGRAPHER:  This is the video
3   deposition of Linda Clemons.  We are on the record at
4   10:08 a.m.
5        THE REPORTER:  Good morning.  My name
6   is Deidra Nash; I am the reporter assigned by Veritext
7   to take the record of this proceeding.
8        This is the deposition of Linda D.
9   Clemons taken in the matter of Linda D. Clemons vs.
10  Old Navy, et al. on October 18, 2023, at 3301 Windy
11  Ridge Parkway, Suite 110, Atlanta, Georgia 30339.
12        I am a notary authorized to take
13  acknowledgment and administer oaths in the state of
14  Georgia.
15        Additionally, absent an objection on
16  the record before the witness is sworn, all parties
17  and the witness understand and agree that any
18  certified transcript produced from the recording of
19  this proceeding:
20        - is intended for all uses permitted
21          under applicable procedural and
22          evidentiary rules and laws in the
23          same manner as a deposition recorded
24          by stenographic means; and
25        - shall constitute written stipulation
```

Page 5

```
1   of such.
2        At this time will everyone in
3   attendance, beginning with the taking attorney, please
4   identify yourself for the record.
5        MS. DEDIEGO:  Brittany DeDiego for the
6   defendants.
7        MS. KAIRAB:  Haley Kairab for the
8   plaintiff.
9        MS. CLEMONS:  Linda Clemons.
10        THE REPORTER:  Thank you.  Thank you.
11        Hearing no objections, I will now swear
12  in the witness.
13        Ms. Clemons, can you please raise your
14  right hand.
15  WHEREUPON,
16        LINDA D. CLEMONS,
17  called as a witness and having been first duly sworn
18  to tell the truth, the whole truth, and nothing but
19  the truth, was examined and testified as follows:
20        THE REPORTER:  Thank you so much.
21        Ms. Brittany, please begin when you're
22  ready.
23        MS. DEDIEGO:  Okay.  This will be the
24  deposition of plaintiff Linda Clemons taken in the
25  action currently pending in the State Court of
```

2 (Pages 2 - 5)

Linda D. Clemons                                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 6

1  Gwinnett County.
2          It is taken pursuant to notice and
3  agreement of counsel with respect to the scheduling of
4  the deposition.  It is taken for all purposes under
5  the Civil Practice Act, including cross-examination
6  and all other purposes that are set forth in the Civil
7  Practice Act and the notice.
8          Haley, I propose that we stipulate to
9  reserve all objections except those that go to the
10  form of the question or responsiveness of the answer
11  until time of trial or other use of the deposition.
12  Is that agreeable?
13          MS. KAIRAB:  Yes, it is.
14          MS. DEDIEGO:  Perfect.  And is
15  Ms. Clemons going to read and sign?
16          MS. KAIRAB:  Yes, she will.
17              EXAMINATION
18  BY MS. DEDIEGO:
19      Q    Okay.  Good morning, Ms. Clemons.
20      A    Good morning.
21      Q    My name is Brittany DeDiego, and I represent
22  the defendants in this case.
23          Have you ever given a deposition before?
24      A    No.
25      Q    Okay.  I'm sure your attorneys went over how

Page 7

1  it works with you; but basically, I'm here to ask you
2  some questions.  And the court reporter is here,
3  taking down everything that's said.
4      A    Okay.
5      Q    And she can only take down one person
6  talking at a time.  So I just ask that you let me
7  finish completely asking my question before you start
8  to answer, and I'm going to do my best not to cut you
9  off, because she can't take down two people at a time.
10      A    Okay.
11      Q    She can also only take down a verbal
12  response.  So it's natural sometimes to say "uh-huh"
13  or "uh-uh," and that just doesn't translate well for a
14  written transcript.  So if any time you do and I
15  prompt you "is that a yes or a no," I'm not trying to
16  pick on you or be rude.  I'm just trying to get a
17  clear record.
18      A    I understand.
19      Q    Also, if you need to take a break at any
20  time, please let me know.  I'm happy to take a break
21  whenever you need to.
22      A    Okay.
23      Q    I just ask that if I have a question
24  pending, that you answer my question before we take a
25  break.

Page 8

1          Also, if at any time you don't understand my
2  question or you don't hear my question, please ask me
3  to repeat or rephrase it.  If you answer my question,
4  I'm going to assume that you understood it.  Is that
5  fair?
6      A    Understood.
7      Q    Okay.  And, ma'am, I ask everybody this
8  question.  Are you under the influence of any drug or
9  alcohol today?
10      A    No.
11      Q    Okay.  Can you please state your full legal
12  name?
13      A    Linda D. Clemons -- Donzell Clemons.
14          THE REPORTER:  I didn't hear the middle
15  name.
16          THE WITNESS:  Donzell.
17  BY MS. DEDIEGO:
18      Q    And have you ever gone by any other name?
19      A    My maiden name.
20      Q    What was your maiden name?
21      A    Dubose.  It's D-U-B-O-S-E.
22      Q    Okay.  What's your date of birth?
23      A    6/14/58.
24      Q    What's your hometown?  Where'd you grow up?
25      A    Ohio -- Cleveland, Ohio.

Page 9

1      Q    Is that where you went to high school?
2      A    I did.
3      Q    And what high school did you go to?
4      A    East Technical High School.
5      Q    Did you graduate?
6      A    I did.
7      Q    Did you go to college afterwards?
8      A    No.
9      Q    Did you take any sort of professional
10  courses?
11      A    No.
12      Q    When did you move to Georgia?
13      A    I believe it was '93.
14      Q    And what brought you to Georgia?
15      A    My father lived here, and my father was
16  raised and born here.
17      Q    Have you moved out of the state of Georgia
18  since 1993?
19      A    No.
20      Q    What's your current address?
21      A    It's 1-7-4 -- I just moved.
22      Q    Okay.
23      A    I believe it's 1749 Amphora.  It's in
24  Hoschton, Georgia.
25      Q    I can never spell that one, but I know what

3 (Pages 6 - 9)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 10

1   you're talking about.
2        What county is that?
3      A   Do you mind if I look at my phone to give
4   you the correct address --
5      Q   Yeah, that's fine.
6      A   -- because it -- it is in my phone.
7        Okay.  It's 1746 Amphora -- that's
8   A-M-P-H-O-R-A -- Drive.  And Hoschton, Georgia, is
9   H-O-S-C-H-T-O-N, Georgia 30548.
10      Q   And when did you move to that address?
11      A   About 30 days ago.
12      Q   What was your address before that?
13      A   7095 Lancaster Crossing.  And that's in
14   Flowery Branch, Georgia.
15      Q   And why did you move?
16      A   I moved a year ago to that address from the
17   1845 Clearlake Trace in Stone Mountain.  We moved
18   there because we had already planned to move out of
19   that area into a different area, which was Flowery
20   Branch.
21        And we moved there thinking that that's
22   where we were going to stay, but the stairs -- my
23   master bedroom's upstairs, and I'm having a hard time
24   getting upstairs now.  So we moved to another place,
25   which still has stairs; but my master is on the main

Page 11

1   floor.
2      Q   Okay.  So you said you moved out of Stone
3   Mountain just to get out of the area?
4      A   Yeah.  We just moved out of Stone Mountain
5   because we had been planning to move, and my husband
6   wanted to be closer to the lake.  So that's why we
7   moved to Flowery Branch.
8      Q   Got you.
9        And I've got the date of the incident at Old
10   Navy as April 13, 2021.  Does that sound right?
11      A   Yeah, sounds about right.
12      Q   Where were you living at that time?
13      A   At the 1845 in Stone Mountain.
14      Q   Okay.  Who is currently living with you?
15      A   Me and my husband.
16      Q   What's your husband's name?
17      A   Wesley Clemons.
18      Q   Who was living with you in April of 2021?
19      A   Me and my husband.
20      Q   When did you and Wesley get married?  When
21   did you get married to Wesley?
22      A   '85.
23      Q   Any other marriages?
24      A   I was married before then.
25      Q   And what was your ex-husband's name?

Page 12

1      A   Say that again?
2      Q   What was your ex-husband's name?
3      A   Andre --
4      Q   What was his --
5      A   -- Munds, M-U-N-D-S.
6      Q   And approximately how long were you married
7   to Andre?
8      A   I think about five years.
9      Q   Do you have any children?
10      A   I do.
11      Q   What are their --
12      A   Three.
13      Q   What are their names?
14      A   Angel, Derail, and Wesley.
15      Q   Do they all have the last name Clemons?
16      A   Except for my daughter.  She's the oldest.
17      Q   Okay.  And how old is she?
18      A   Forty-two.
19      Q   What's her last name?
20      A   Her last name is Hall.
21      Q   How old is Derail?
22      A   I can't hear you.
23      Q   How old is Derail?
24      A   Derail is 33.
25      Q   And Wesley?

Page 13

1      A   Wesley is 38.
2      Q   Do they all live in the Georgia -- state of
3   Georgia?
4      A   They do.
5      Q   Do you have any relatives by blood or
6   marriage that live in Gwinnett County?
7      A   Yes.
8      Q   What would their last name be?
9      A   My daughter, her last name is Hall.  And I
10   have a niece.  Her last name is Brewington.
11      Q   Have you ever served in the military?
12      A   I have not.
13      Q   Have you ever been arrested?
14      A   No.
15      Q   Do you have any grandchildren?
16      A   I do.
17      Q   How many?
18      A   Two.
19      Q   And how old are they?
20      A   Thirteen.
21      Q   Are they twins?
22      A   They're twins.
23      Q   Are you currently employed?
24      A   I am not.
25      Q   What's the last job that you had?

4 (Pages 10 - 13)

Linda D. Clemons                                  October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 14

1     A   U.S. Postal Service.
2     Q   When's the last time you worked for the U.S.
3  Postal Service?
4     A   1995.
5     Q   And why did you leave that job?
6     A   I was injured.
7     Q   What injuries did you sustain?
8     A   A broken clavicle bone, my shoulder, and
9  neck.
10    Q   Was it a car accident or --
11    A   It was a car accident by another employee.
12    Q   Did you make a workers' comp claim?
13    A   I did.
14    Q   Did you have to go under any surgery?
15    A   No, I didn't.  I just had a cast from the
16  broken clavicle bone.
17    Q   And the shoulder, was it left or right
18  shoulder?
19    A   It's left.
20    Q   I assume it was the left clavicle?  Was it
21  your left clavicle as well?
22    A   Yes.
23    Q   And then what injuries did you have to your
24  neck?
25    A   The disk.

Page 15

1     Q   And what treatment did you have for that?
2     A   I had a lot of stellate ganglion blocks,
3  nerve blocks.
4     Q   Do you remember what doctor or practice you
5  went to for that treatment?
6     A   I saw -- I went to a lot of doctors, but the
7  one that has been from the beginning to end is
8  Dr. Mishu, Husham Mishu.
9     Q   Do you know where his or her office is
10  located?
11    A   It's in -- it's off of -- I guess that would
12  be considered as Atlanta, off of Boulevard.
13    Q   Have you ever been a party to any other
14  lawsuit?
15    A   No.
16    Q   Any other workers' comp claims?
17    A   No.
18    Q   Have you ever filed for bankruptcy?
19    A   My husband has, yes.
20    Q   Do you remember when that was,
21  approximately?  And you could tell me it was more than
22  ten years ago --
23    A   Long time -- yeah, more than ten years ago.
24    Q   Okay.
25    A   Maybe about 30.

Page 16

1     Q   Have you ever received any sort of medical
2  training or taken any medical classes?
3     A   No.
4     Q   What type of hobbies do you enjoy?
5     A   Walking.  That's the main thing I like to
6  do, is walk.
7     Q   How often do you go for walks?
8     A   Well, I used to walk every day in Stone
9  Mountain.
10    Q   So you used to go to the Stone Mountain Park
11  every day?
12    A   Yeah, I used to walk up there.
13    Q   How often do you go for walks now?
14    A   I don't.
15    Q   When did you stop going for walks?
16    A   When I injured my foot.
17    Q   Have you been able to go for a walk at all
18  since you injured your foot?
19    A   I have not.
20    Q   Do you enjoy traveling?
21    A   I do.
22    Q   When's the last time you took a trip?
23    A   May.
24    Q   May of this year?
25    A   May -- mm-hmm.

Page 17

1     Q   And where'd you go?
2     A   Me -- we went to Dominican.
3     Q   Did you fly or take a cruise?
4     A   Did I fly?  Yes.
5     Q   And what did you do when you were in the
6  Dominican?
7     A   We went for a concert, but I didn't go to
8  any -- really went to any of the concerts.  I think we
9  went to two.  It was like a -- I believe it was a
10  four-day affair.  And we went to the comedy show and
11  maybe, like, 30 minutes for one of the concerts.
12    Q   Is there a reason you only attended part of
13  the concert?  Is there a reason you only attended a
14  part of the concert?
15    A   No, not -- not really.  We just -- I just
16  didn't get a chance to, like, really enjoy myself
17  during that time, still in a lot of pain.  So I
18  didn't, like, go down a lot to the concerts, because
19  we were quite a way -- our room was quite a ways from
20  the room where the concert was going to be inside.
21    Q   And where were you experiencing pain?
22    A   In my foot.
23    Q   And which foot is it?
24    A   The left foot.
25    Q   Did you play any sports in high school or in

5 (Pages 14 - 17)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 18

1   your --
2     A   No.
3     Q   No. Are you a member of a gym?
4     A   No.
5     Q   Other than the accident you told me about
6   with the post office, have you ever been involved in
7   any other motor vehicle accident?
8     A   A motor vehicle, I had an accident -- I'm
9   thinking that might have been in 2001, I think it was.
10  I don't know if it was really considered an accident,
11  because it was in a parking lot, so.
12    Q   Were you injured in that accident?
13    A   I -- I wasn't. Well, I had, like, some
14  stiffness in my shoulder, but other than that, no.
15    Q   Did you make a claim?
16    A   No.
17    Q   Who is your primary care physician?
18    A   Now, Dr. Henry.
19    Q   And where's his or her office located?
20    A   In -- off -- off of Buford Drive in
21  Gwinnett.
22    Q   And when did you switch to Dr. Henry?
23    A   Maybe six months ago.
24    Q   Do you know the name of the practice?
25    A   It's Emory, with Emory. That's ...

Page 19

1     Q   And who did you see before Dr. Henry?
2     A   Dr. White, Candace White.
3     Q   Is she also with Emory?
4     A   No, she's at DeKalb.
5     Q   And where's her office located?
6     A   In -- it's in DeKalb. It's across from
7   Emory and DeKalb, off of -- is that Hillandale? I
8   think it's Hillandale.
9     Q   Hillandale. Yeah.
10        What pharmacy do you use?
11    A   Walgreens.
12    Q   Have you ever used any other pharmacy in the
13  past three years?
14    A   I used CVS a couple of times, but it's
15  mainly Walgreens.
16    Q   Do you wear contacts or glasses?
17    A   I wear glasses for reading.
18    Q   Have you ever been diagnosed with arthritis?
19    A   Yes.
20    Q   And what treatment have you received for
21  that?
22    A   Treatment, I haven't really received
23  treatment. I recently -- in the last three weeks, I
24  believe it was -- got on a medication for it.
25    Q   Was that prescribed by Dr. Henry?

Page 20

1     A   No. It's a rheumatologist, Dr. Parris.
2     Q   And where is Dr. Parris's office?
3     A   In Sugarloaf.
4     Q   In what body parts do you have arthritis?
5     A   My wrist, this -- this wrist right here.
6     Q   Your right wrist?
7     A   Yes. I'm sorry.
8     Q   No, that's okay. She just can't type that.
9     A   Okay.
10    Q   Have you ever been diagnosed with diabetes?
11    A   Yes.
12    Q   And when were you first diagnosed?
13    A   Long time -- maybe in 2000, could possibly
14  be longer.
15    Q   And do you take any medication?
16    A   Yes.
17    Q   What do you take?
18    A   Now, I take Ozempic, glimepiride. And I
19  take -- I haven't really had to take it in a -- in a
20  long time; but I have it for -- in case my sugar
21  levels go up. God, what is it called? It's an
22  insulin, but I haven't had to take it in a long time.
23    Q   And what doctor do you see for the diabetes?
24    A   Diabetes, Dr. Giles [ph].
25    Q   And where's his or her office located?

Page 21

1     A   Emory.
2     Q   Did you have any neuropathy related to your
3   diabetes?
4     A   I didn't.
5     Q   Do you have any issues with your toenails or
6   feet due to your diabetes?
7     A   No.
8     Q   Have you ever gone to an urgent care?
9     A   Yes.
10    Q   What's the name of it?
11    A   Piedmont Urgent Care.
12    Q   Do you remember about where it was located?
13    A   It's across the street from Emory Hospital
14  in DeKalb.
15    Q   And why'd you go to Piedmont?
16    A   I went there to get a tetanus shot.
17    Q   And that was after the Old Navy incident?
18    A   That was after the Old Navy, but I didn't --
19  I did not get it from there. You know, I went there
20  to have the shot; but I didn't get it from there,
21  because the first -- when I first went, I had to make
22  an appointment, because COVID was out.
23        And so I had to make an appointment,
24  which -- I believe it was the next day, that I got the
25  appointment. But when I got there, I was told since I

6 (Pages 18 - 21)

Linda D. Clemons
October 18, 2023

Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 22

1    had recently got a COVID shot, that they would not
2    give me the tetanus shot, because they can counteract
3    with each other.
4         So I did that two weeks later, because they
5    told me I can come back in two weeks.  But -- I did it
6    in two weeks, but with Dr. White, my regular
7    physician.
8    Q    Other than the clavicle, have you broken any
9    other bone?
10   A    No.
11   Q    Have you ever undergone any surgery?
12   A    Back surgery.
13   Q    And when did you have back surgery?
14   A    I believe it was in 2002.
15   Q    And why did you need back surgery?
16   A    From the accident I had with the RSD in
17   my -- in my clavicle.  I -- I really don't know how to
18   explain it, but I ended up having it from there.
19   Actually, I was like -- from being on pain medication.
20        I had an injury with my back, but when I had
21   the actual surgery, it came from actually trying to
22   have -- I don't want to get too graphic, but trying to
23   have a bowel movement.  And the disk -- I didn't know
24   that at the time, but the disk had came out of my back
25   and was just floating around in my back.

Page 23

1         So I had one -- the -- the first time I had
2    one, and then it didn't really help.  So then the
3    second time was in two-thousand -- I believe '02 was
4    when that happened, and I ended up having to have
5    another back surgery.
6    Q    Was it your low back, mid back, upper back?
7    A    It was the low back.
8    Q    Do you remember if it was, like, a fusion or
9    what kind of surgery it was?
10   A    I believe it was a fusion.
11   Q    Did the low back fusion or surgery limit
12   your mobility at all?
13   A    No.
14   Q    Do you remember where you had that surgery?
15   A    It was at Atlanta Medical Center,
16   Dr. Christopher Edwards.  And I -- I don't believe it
17   was fused.  I know I had screws put in it, but I don't
18   believe it was fused.  It's been so long.
19   Q    Do you still experience low back pain?
20   A    I do not.
21   Q    Okay.  Other than Atlanta Medical Center and
22   Emory, have you sought treatment from any other
23   hospital?
24   A    No, I -- I don't believe so.  I think those
25   are the only two hospitals I've been to.

Page 24

1    Q    Okay.  And it would have been Emory at
2    Hillandale and DeKalb?  Did you go to the Emory in
3    DeKalb, or did you go to one of their other locations?
4    A    I've been to the one in DeKalb, and I've
5    also been to the one in -- off of Clifton.  That's
6    where Dr. Giles [ph] is.
7    Q    Do you have health insurance?
8    A    I do.
9    Q    And what health insurance do you have?
10   A    Blue Cross -- Anthem Blue Cross Blue Shield.
11   Q    And I meant to ask you this before.  What
12   did you do when you worked at the post office?  What
13   was your job?
14   A    I just worked in -- on the floor.  And then
15   after I was injured, I worked in -- I worked in the
16   office -- in the finance office.
17   Q    Did you retire from that job?
18   A    I didn't.  Still, right now, I've been on
19   workers' comp for 20 years on that job.
20   Q    Any of the doctors, when you did the
21   workers' comp, did they say that you were disabled in
22   any way -- the doctors for the workers' comp claim?
23   Did they say you were disabled or that you weren't
24   able to work?
25   A    That I was not able to work.

Page 25

1    Q    And why are you not able to work?
2    A    Just the pain that I deal with.
3    Q    Where is the pain?
4    A    In my neck, my wrist, my hand.
5    Q    Which leg?  Did you say leg?
6    A    Neck.
7    Q    Neck.
8    A    My neck.  My hand, my wrist, my neck, and my
9    shoulder.
10   Q    Do you take pain medication for that?
11   A    Yes.
12   Q    Is that daily?
13   A    Yes.
14   Q    What do you take?
15   A    Percocet.
16   Q    The pain in your neck, hand, and wrist, is
17   that -- and shoulder -- is that constant?
18   A    Yes.
19   Q    On a scale of 1 to 10, with 10 being the
20   worst pain you've ever felt, how would you rate that
21   shoulder, hand --
22   A    Eight.
23   Q    And would you describe it as, like, an
24   aching, stabbing, burning?  How would you describe
25   that pain?

7 (Pages 22 - 25)

Linda D. Clemons                                October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 26

1    A    Burning, aching.
2    Q    Does it affect your sleep?
3    A    Yes.
4    Q    Okay.  Prior to the incident that happened
5    at Old Navy in 2021, had you ever experienced pain in
6    your right foot?
7    A    No.
8    Q    Your left foot?
9    A    No.
10   Q    Your left ankle?
11   A    No.
12   Q    Right ankle?
13   A    No.
14   Q    Have you ever gone to a chiropractor?
15   A    No.
16   Q    Have you ever been to physical therapy?
17   A    Yes.
18   Q    Had you ever been to physical therapy before
19   the Old Navy incident?
20   A    Before Old -- yeah, I've been to physical
21   therapy for the -- my wrist and my hand and stuff.
22   Q    And where'd you go?
23   A    That's been so long.  Emory.
24   Q    Okay.  Are you still good, or you need a
25   break or anything like that?

Page 27

1    A    I'm still good.
2    Q    Okay.  So moving on to April 13, 2021, can
3    you just kind of walk me through, as much as you can
4    remember, what happened from the time you get to the
5    Old Navy until the time the sign falls?
6    A    Well, I went into the store.  I was looking
7    for some jeans.  And I looked around the store.  And
8    in, say, like in the -- when I first came in, they had
9    jeans, like, to the right -- I guess that would be to
10   the right of me.  So I went down that aisle.
11        And then I came back up and saw another rack
12   of jeans.  And I went to look at those jeans.  I went
13   to take a pair down.  And that's when the sign fell
14   down.
15   Q    Had you ever been to that Old Navy store
16   before?
17   A    Yeah, a few times.
18   Q    Had you ever shopped for jeans there?
19   A    Yes.
20   Q    Had you ever seen a sign fall in that store
21   before?
22   A    No.
23   Q    Do you remember about what time of day it
24   was that you got to the Old Navy?
25   A    I don't.  Could have been, like,

Page 28

1    twelve -- can't be exact.  I know it was, like, in --
2    in -- before noon.
3    Q    Okay.  Do you know if it was raining that
4    day?
5    A    I don't recall.
6    Q    Did you go there specifically for jeans?
7    A    Yes.
8    Q    Was anyone with you?
9    A    No.
10   Q    Did you drive yourself?
11   A    Yes.
12   Q    Do you know anyone who works at that Old
13   Navy?
14   A    I don't.
15   Q    Have you ever worked for Old Navy?
16   A    No.
17   Q    Had you taken any medication that day?
18   A    No.
19   Q    Had you taken the Percocet?  Did you take
20   the Percocet that day?
21   A    No.  If I'm going to drive, I -- I don't
22   take it.
23   Q    Had you consumed any alcohol?
24   A    No.
25   Q    Do you know about approximately how long you

Page 29

1    had been in the store before the sign fell?
2    A    I don't.
3    Q    Had you ever shopped for jeans on that
4    specific rack before?
5    A    I have not.
6    Q    Have you been back to that Old Navy?
7    A    No.
8    Q    Was the store busy?
9    A    It wasn't a lot of people in the store; but
10   when I got to the line, there -- there was quite a
11   long line.
12   Q    Is that the line to check out?
13   A    Yes.
14   Q    Was there anyone else around you when the
15   sign fell?
16   A    No, not that I know of.
17   Q    What did the sign look like?
18   A    It was, like, a square sign.  And it had,
19   like, metal around it.  And I don't recall if it was
20   glass or plastic, but there was something in the
21   middle of it.
22   Q    And the jeans that you -- you were pulling
23   jeans out of the wall; right?
24   A    They were on a rack.
25   Q    On a rack.  So they're hanging?

8 (Pages 26 - 29)

Linda D. Clemons                                          October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 30

1    A   No. It's like -- like -- or a table rack.
2  I mean, it was like ...
3    Q   So were the jeans stacked on top of each
4  other?
5    A   Yeah. The jeans were stacked on top of each
6  other.
7    Q   Okay. And so were you trying to pull the
8  jeans out of one of the stacks?
9    A   No. I was trying to take the jeans off of
10  the top of the -- where the jeans were.
11    Q   Okay. So --
12    A   Because, like, it was like some right here.
13  Then it's like a rack, table, whatever you want to
14  call it, and then some -- and under that.
15        MS. DEDIEGO: Okay. I'm going to show
16  you a picture. Maybe that can help.
17        I'm going to mark this as Exhibit 1.
18  It's a series of photos, and they've got numbers at
19  the bottom.
20        And, Haley, I've got a copy for you
21  too.
22        (Exhibit 1 was marked for
23        identification.)
24        THE WITNESS: So it's -- it's more
25  pictures under here --

Page 31

1        MS. DEDIEGO: So if you go to the
2  second page -- you can take the paper clip off, if
3  that helps.
4        THE WITNESS: Oh, okay.
5  BY MS. DEDIEGO:
6    Q   The second page is labeled "Old Navy
7  Clemons 4." Do you see that one?
8        Is that what the sign looked like?
9    A   The sign? No.
10    Q   No?
11    A   No. It had, like, a picture in the front of
12  them, saying, I guess, what it was or whatever.
13    Q   Was it bigger or smaller than this sign?
14    A   It seemed like it was bigger, but I never
15  saw the back of the sign. That -- that -- that's the
16  back. The front didn't look like that. This is --
17  no, that's not what it looked like either.
18    Q   So the page that's labeled "Old Navy
19  Clemons 6" at the bottom, the jean wall, that's not
20  what rack you're talking about?
21    A   I did look over there, but -- on a rack
22  like that, but -- yeah, no.
23    Q   The jeans that you were shopping, were they
24  on a wall like this?
25    A   No. It was -- they were, like, on a table,

Page 32

1  if -- a rack, maybe. I mean, I don't know what --
2  what you would call it; but it was like -- I know
3  these was -- this was, like, on the side. But this
4  table was, like, in the middle of the store.
5    Q   So the jeans, were they stacked similar to
6  this, on the table?
7    A   Yeah, they were -- they were stacked like
8  that.
9    Q   Okay. On a table. And there was a sign on
10  the --
11    A   It might have been a shelf, not -- it could
12  have been a shelf like this; but it wasn't, like, tall
13  like that.
14        If -- if I can remember correctly, it was
15  maybe, like, two; but it was, like, on the -- okay.
16  Say, for instance, like this, the top right here, and
17  that's a rack, like that. And then maybe there was
18  something under it, but -- all the ones -- under it.
19        That's not the rack that I was -- I was at.
20    Q   Okay. The sign that fell, was it --
21    A   And I thought the sign had, like, something
22  in the middle of it, like -- I never saw the back of
23  the sign. It was, like, the front of the sign.
24    Q   Okay.
25    A   But it was metal, like that.

Page 33

1    Q   Was it on the table, like the edge of the
2  table?
3    A   Yeah, it was -- no, it was on -- not the
4  edge of the table, but like -- say, like, some jeans
5  right here, and then the sign was, like, on a strip
6  like that.
7    Q   I'm just trying to understand if the sign
8  was in front of the jeans you were going for --
9    A   Yeah, it was in front of them.
10    Q   -- if it was slid underneath the jeans --
11    A   No, it was in -- it -- it was in the front,
12  hanging on a shelf.
13    Q   And so when you took the jeans off, the sign
14  fell at the same time?
15    A   Yeah. When I took the jeans off, the sign
16  fell.
17    Q   If I asked you to draw what the sign looked
18  like, would you be able to do that?
19    A   I'm not a "drawer," but -- I can show you
20  like this.
21    Q   That pen stopped working, so you don't want
22  to use that one.
23    A   Oh, okay.
24        Like, this could be the shelf right here.
25  And I believe the sign was like -- like that.

9 (Pages 30 - 33)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 34

1    Q   Okay.  It went over and under the shelf?
2    A   I'm not sure if it went over and under, but
3 I just seen -- the sign -- I mean, I just -- when I
4 took the jeans down, the sign fell down --
5    Q   Okay.
6    A   -- and hit my feet.
7    Q   Okay.
8    A   And I thought the sign was, like, thicker;
9 and it had, like, glass in the front of it.
10       THE REPORTER:  Ms. Clemons, can you
11 move your microphone up just a little bit, please?  It
12 keeps hitting -- your hands keep hitting it.
13       THE WITNESS:  Right there --
14       THE REPORTER:  Yeah.
15       THE WITNESS:  -- is that good?
16       THE REPORTER:  That should be okay.
17       THE WITNESS:  Okay.
18 BY MS. DEDIEGO:
19    Q   Okay.  So it fell.  And you said it hit your
20 feet?
21    A   Yeah, both of them.
22       MS. DEDIEGO:  I'm going to ask you to
23 draw one more time.
24       We'll mark this as Exhibit 2.
25 //

Page 35

1       (Exhibit 2 was marked for
2       identification.)
3 BY MS. DEDIEGO:
4    Q   Okay.  So I've got a diagram -- there's two
5 pages, whichever one's easier for you -- that has feet
6 on it.  Can you just circle which part of your feet or
7 ankles the sign hit?
8       THE REPORTER:  Ms. Brittany, can you
9 move yours up as well?
10       THE WITNESS:  And it hit my -- also.
11       THE REPORTER:  Thank you.
12 BY MS. DEDIEGO:
13    Q   Okay.  So that was your left foot.  Did it
14 hit the same part on your right foot?
15    A   Mainly in the front of -- of the right foot,
16 mainly, like, right here.  And it got, like, up here,
17 and my toes.
18    Q   Okay.  So it would have been the front of
19 your feet?
20    A   Yeah, the front and like -- like, at the
21 top, right here, the front, and then right -- right
22 over here, yeah, like right in there.
23    Q   Okay.
24    A   And my toes.
25    Q   What shoes were you wearing?

Page 36

1    A   I had a pair of blue T-strap sandals on --
2 basically, no shoes, just a strap.
3    Q   Did the sign cut you?
4    A   Yes.
5    Q   And where did you have the cuts?
6    A   On my toes and up in here.
7    Q   I'm going to label this as left and right.
8 Would you have cuts on both your left and your right?
9    A   Yes, but the ones on the right was, like,
10 mainly just right here.
11    Q   So the top of the foot?
12    A   Yes.
13    Q   Do you know approximately how many cuts you
14 had?
15    A   I had more on the left foot, maybe four.
16 And there was -- I know I had one deep one, like right
17 here and on my -- by my big toe.
18    Q   Were you bleeding?
19    A   Yes.
20    Q   Were you bleeding enough that it was, like,
21 blood on the floor or --
22    A   No.
23    Q   So did the sign fall off of the table or
24 shelf directly onto your feet?
25    A   Directly onto my feet.

Page 37

1    Q   And then did it fall onto the floor?
2    A   Yes.
3    Q   The sign only hit you one time?
4    A   Yes.
5    Q   And after that, what did you do?  Did you
6 pick up the sign or leave it on the floor?
7    A   I think I left it on the floor.  And I
8 didn't -- I didn't notice that my feet was bleeding at
9 that time.
10       When I got to the register, it was kind of a
11 long line, maybe like -- maybe six or seven people in
12 front of me.  And they started burning.  That's when I
13 noticed they were bleeding.
14    Q   When the sign hit you, did you scream or
15 make a noise?
16    A   I didn't.
17    Q   Okay.  So did you go to the -- oh, sorry.
18 Go ahead.
19    A   I'm good.
20    Q   Did you go to the register immediately after
21 the sign fell?
22    A   Yeah.  I was -- I was getting ready to
23 leave.  I was going -- ready to check out.
24       And the longer I stood there, the more it
25 burned and the more pain I started to feel, because I

10 (Pages 34 - 37)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 38

1   started to leave; but then I just wanted to get to the
2   register to talk to somebody, because I was going
3   to -- that's when I asked for a manager. "Can you
4   have a manager come out?"
5        And that's when the manager came out. And
6   he asked me can I -- "can you show me where it
7   happened?"
8        Q   Did you purchase the jeans?
9        A   I did.
10       Q   Do you still have them?
11       A   Yes.
12       Q   Okay. So you went and talked to -- or you
13   asked for a manager?
14       A   Yeah, asked for a manager. I was standing
15   at the register. I was standing there for not a long
16   time, but a good while. And then the manager finally
17   came out and asked me did I need him.
18       And I told him yeah. I told him that the --
19   I was trying to get some jeans down and the sign fell
20   on my feet.
21       And he went to the back and -- he saw where
22   they were bleeding and went and got some gauze, I
23   think it was some alcohol wipes, and some Band-Aids.
24   And he did ask me did I need an ambulance.
25       Q   And what did you say?

Page 39

1        A   I told him no.
2        Q   So did you ask the cashier for a manager?
3        A   Yes.
4        Q   Do you remember her name?
5        A   I don't.
6        Q   Do you remember the manager's name?
7        A   I believe it was Mike.
8        Q   You said Mike offered to call 911?
9        A   Yes.
10       Q   And he offered you some first aid? He
11   offered you first aid?
12       A   Yes.
13       Q   Do you remember if you filled out an
14   incident report with him?
15       A   I did.
16       Q   Was that on, like, a tablet?
17       A   He -- he did, a tablet.
18       Q   Did you get a copy of that report?
19       A   I did not. He told me that I could get a
20   copy of the report, but I didn't get a copy of the
21   report. And he gave me a claim number.
22       Q   Have you seen a copy of the report?
23       A   I haven't. I was told that I don't get a
24   copy of the report.
25       MS. DEDIEGO: Okay. We'll mark this as

Page 40

1   Exhibit Number 3.
2        (Exhibit 3 was marked for
3        identification.)
4   BY MS. DEDIEGO:
5        Q   So on the first page, it's got "injured
6   person"; and it's got "Linda Clemons." Do you
7   remember giving Mr. Rinehart, or Mike, that
8   information?
9        A   My name, yes.
10       Q   Your name and your phone number?
11       A   Yes.
12       Q   And then it looks like you gave him your
13   e-mail address?
14       A   Mm-hmm.
15       THE REPORTER: Was that a "yes"?
16       THE WITNESS: Yes.
17   BY MS. DEDIEGO:
18       Q   And then it looks like you gave him your
19   address as well?
20       A   Yes.
21       Q   And then it's got the time of incident at
22   3:20 p.m. Does that sound like maybe it was right --
23   sometime in the afternoon?
24       A   I thought it was earlier than that, but I
25   guess it's right.

Page 41

1        Q   And it was the Old Navy in Snellville that
2   you went to?
3        A   Yes.
4        Q   And then the second page has "body part
5   injured, ankle," "type of injury, cut." And then
6   "summary of incident," it says: "Customer was
7   shopping a denim wall in women's. A shelf strip sign
8   holder fell out of the denim wall and cut her ankles."
9        Do you remember if you walked over -- and
10   did you say you walked over and showed the manager --
11       A   Yes.
12       Q   -- where it happened?
13       Do you know if he took any pictures at that
14   time?
15       A   No. I remember him picking it up. I don't
16   remember if it was from the floor or from the shelf,
17   but I remember him picking up.
18       And I remember him saying: "They forgot to
19   put the bolts -- I see what happened. They forgot to
20   put the screws back in the sign."
21       So that's why this right here -- I don't
22   remember that at all.
23       Q   So he picked up the sign that fell?
24       A   Mm-hmm.
25       Q   That's a "yes"?

11 (Pages 38 - 41)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 42

1    A   Yes.  Sorry.
2    Q   No, it's okay.
3        And he told you that they forgot to put
4    screws?
5    A   Yeah.  He turned the sign over, and we -- we
6    was -- we was right there at the shelf.  And he said:
7    "I see how it fell.  They forgot to put the screws
8    back in it."
9    Q   Did you record your conversation with the
10   manager?
11   A   No.
12   Q   Did you take any photos?
13   A   No.
14   Q   Any videos?
15   A   No.
16   Q   Did you ever speak with anyone named Lisa
17   Allen at the store?
18   A   Lisa -- not -- not -- I don't know, I mean,
19   unless that was the cashier.  I don't recall what her
20   name was.
21   Q   Other than the manager and the cashier, did
22   you speak to any other employee?
23   A   No.
24   Q   Did you speak with any of the other
25   customers?

Page 43

1    A   No.
2    Q   Okay.  So you said at first, you didn't
3    notice you were bleeding.  Did you have any pain at
4    first?
5    A   No.  I felt burning.
6    Q   Had you ever felt burning in your feet
7    before?
8    A   No.
9    Q   Why did you decline the ambulance?
10   A   Because I didn't feel like I needed an
11   ambulance.
12   Q   Did you call anybody from the store?
13   A   I believe I might have called my doctor.
14   Q   And which doctor would you have called?
15   A   Dr. White.
16   Q   And what would you have told Dr. White?
17   A   I told her that a sign fell on my foot and
18   they were burning.
19       And she asked me when was the last time I
20   had a tetanus shot.  And I told her I didn't know.
21   And she said: "Well, you need to go to urgent care
22   and get a tetanus shot."
23       She -- she might have had said something
24   like: "In the last -- have you had in -- in the last
25   few years?"  And I told her no.

Page 44

1        And -- because she -- she hadn't been my
2    doctor for a long time.  It was another doctor before
3    her, but at the same place.
4    Q   Have you posted anything on social media
5    about the incident?
6    A   No.
7    Q   Do you use social media at all?
8    A   I don't.
9    Q   Did anyone at Old Navy apologize to you?
10   A   No.
11   Q   Okay.  So you said the manager gave you a
12   claim number.
13   A   Yes.
14   Q   Did you follow up with anyone at Old Navy?
15   A   I did, several times.
16   Q   And did you call that number they gave you?
17   A   Yes.
18   Q   Did you give a recorded statement?  Did you
19   give a recorded statement to Old Navy?
20   A   I don't recall.
21   Q   Do you generally recall what conversations
22   you had with the people at the corporate office?
23   A   Do I normally call?
24   Q   No.  Do you recall what you spoke to them
25   about?

Page 45

1    A   Are you saying:  Do I recall what I spoke to
2    her about?
3    Q   Yeah.
4    A   I -- I told her about the incident.  And she
5    said someone would be in contact with me.  And I gave
6    her the claim number.
7    Q   Did someone call you back?
8    A   No.
9    Q   When you spoke to the corporate
10   representative at Old Navy, did you ask for any sort
11   of compensation?
12   A   No.
13   Q   Going back to the sign, when you first saw
14   it, was it sticking out from the shelf?  Did it look
15   like it was about to fall, or it looked normal?
16   A   It looked normal.
17   Q   Okay.  So other than your feet and your
18   ankles, did -- were you -- did you injure any other
19   body part?
20   A   No.
21   Q   Did you have any bruises?
22   A   Did I have any bruises?  I had the cuts;
23   and, yeah, there were some bruises on there also.
24   Q   Would that have been the same areas of your
25   feet?

12 (Pages 42 - 45)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 46

1     A   Mm-hmm.
2     Q   Was that a "yes"?
3     A   Yes. I'm sorry.
4     Q   So what did you do when you left the store?
5     A   When I left the store? I think that's when
6  I went to -- headed to the urgent care.
7     Q   Did you drive yourself?
8     A   Yes.
9     Q   Did you call your husband?
10    A   I'm not sure if I called him right then or I
11 called him afterwards to let him know that I had to go
12 to urgent care.
13    Q   Does your husband work?
14    A   Yes.
15    Q   What's he do?
16    A   He's a chief of construction for MARTA.
17    Q   Okay. And so the first place would have
18 been that Piedmont Urgent Care, that you went?
19    A   Yes. Well, I went to emergency; but there
20 were so many people there. And then I went to --
21 across the street, which was -- I didn't even know it
22 was Piedmont at the time. I just knew it was urgent
23 care. And I went there. And that's when they told me
24 that I had to schedule an appointment to come in.
25    Q   Okay. Did you get any treatment from the

Page 47

1  Piedmont Urgent Care, because I know you said you
2  couldn't get the tetanus shot?
3     A   No. They -- I didn't get any treatment from
4  them, because, like, the doctor never came in after.
5  She asked me questions, and she took my -- I think she
6  took my blood pressure and my temperature.
7         And she came back, and she said that the
8  doctor didn't want to give me a tetanus shot at this
9  time. He told me I -- I need to wait for two weeks
10 before I could be able to get one.
11        So I called my physician back and told her
12 what they said. And she said: "Well, I can see you
13 within two weeks. Just schedule an appointment for
14 me." And I scheduled an appointment for her.
15    Q   Did the urgent care do anything for the
16 cuts: like clean them, anything like that?
17    A   No. I had the Band-Aids on there from where
18 I had cleaned the blood off and stuff when I got to my
19 car.
20    Q   Okay.
21    A   There were already people in there when I
22 got there; so I guess that's why I couldn't stay in,
23 because they said only a certain amount of people
24 could be in there.
25    Q   So Emory at Miller Grove, is that where

Page 48

1  Dr. White's office is?
2     A   Yes.
3     Q   Okay. So when you went to see Dr. White,
4  she gave you the tetanus shot. Did she do anything
5  else for your feet or ankles?
6     A   No. She just told me if I had any problems,
7  I needed to follow up.
8     Q   Had the cuts healed by that time?
9     A   No.
10    Q   Did Dr. White look at the cuts?
11    A   No. I just got the tetanus shot.
12    Q   Were you still feeling pain at that time?
13    A   Yes.
14    Q   Was it the same burning pain?
15    A   It was still the same burning pain.
16    Q   Did you talk to Dr. White about the burning
17 pain?
18    A   No. No, I just -- she just told me to
19 reschedule something with her if it got any worse.
20 And it did get worse, but I didn't reschedule with
21 her. I made an appointment with a foot doctor.
22    Q   Did Dr. White do any sort of X-rays or
23 anything?
24    A   No.
25    Q   Did she give you any medication, other than

Page 49

1  the tetanus shot?
2     A   No.
3     Q   Okay. And the foot doctor, is that Ankles
4  and Foot Centers of Georgia?
5     A   Yes.
6     Q   And how'd you find that provider?
7     A   I usually -- I went to him a couple of times
8  before. I hadn't been to him in a long time, but I
9  went to a couple of times for him just to get my
10 diabetic check-ups.
11    Q   You went to a podiatrist --
12    A   Yes.
13    Q   -- for diabetic check-ups?
14    A   Yes.
15    Q   Is that different than your normal --
16    A   He did, like, for my feet. You know, they
17 were checked to make sure you didn't have any sores on
18 your feet and stuff like that.
19        And I had seen him a couple of times years
20 before then. And my husband had also saw him before,
21 because he had a -- I didn't even know what -- what
22 exactly it was; but I -- I knew he was a good doctor.
23        So I went back -- I went to him and told him
24 what was going on. And he did the X-rays, and then he
25 had me follow up with the MRI. And I went back to do

13 (Pages 46 - 49)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 50

1  the MRIs. Actually, I had two different sets of MRIs
2  from -- after time went by, he wanted another MRI.
3     Q   What's the doctor's name there?
4     A   Dr. Shaheed.
5     Q   And do they have more than one location, or
6  do you know? Which location do you go to?
7     A   I'm not sure. I went to the one --
8  actually, it's across the street from Hillandale also.
9     Q   Okay. So when you went to the Ankles and
10 Foot Centers of Georgia, were you still having pain in
11 your feet and ankles?
12    A   Yes.
13    Q   Was it more your feet, ankles, or both?
14    A   It was both.
15    Q   And it was both left and right?
16    A   Yes.
17    Q   Did one hurt more than the other?
18    A   Yes. The left one hurt a lot more than
19 the -- the right one.
20    Q   Going back to -- this might sound like a
21 stupid question -- when you were standing at the jean
22 wall, did you have your feet together?
23    A   When I was --
24    Q   Standing in front of the jeans, did you have
25 your feet together?

Page 51

1     A   Yeah, I think so.
2     Q   Okay.
3     A   I don't know -- I don't know if they were,
4  like, right together; but I was facing the sign.
5     Q   Okay. So you mentioned the X-rays and the
6  MRIs. What treatment did the podiatrist recommend?
7     A   The first time, he put me, like, in a shoe.
8  It wasn't a boot; it was a shoe.
9          And then when I had -- when I went back to
10 see him the next time, he put me in a boot. That's
11 when he told me that I had torn the tendon, actually
12 in both -- he said both. The -- it was a small one
13 in -- on the right foot, and I had the tear on the
14 left foot also.
15         And that's when he put me in a boot. And I
16 went -- I had a boot for -- for a long time, a really
17 long time. And he told me he didn't want me to put
18 any weight on it, that I had to purchase the scooter
19 and not put any weight on it.
20    Q   So the boot and this shoe, is that both
21 feet, left foot?
22    A   Just -- he told me that he only wanted to
23 concentrate on the left foot, because that was the
24 worser one.
25    Q   Okay. So he said you had a torn tendon?

Page 52

1     A   Mm-hmm.
2     Q   And what treatment did he recommend for
3  that? Did you have to have surgery?
4     A   He didn't want me -- do -- do surgery. He
5  said we were going to avoid everything we could to not
6  have the surgery. So I went from a boot -- then I was
7  in a cast and back to a boot.
8     Q   Did you end up needing a surgery?
9     A   I did.
10    Q   And when was the surgery?
11    A   It was almost, like, a year later; but he
12 didn't -- that doctor didn't do the surgery. I went
13 for a second opinion.
14    Q   And where'd you go for the second opinion?
15    A   To Dr. Stanley Kalish.
16    Q   And where's his office?
17    A   He has several offices, one in Jonesboro and
18 one in Perimeter. And I'm not sure where the other
19 ones are, but those are the only two places I saw him.
20    Q   Do you know the name of the practice?
21    A   It's an Atlanta foot -- I mean, it's a foot
22 and ankle center; but I don't know if it's Atlanta
23 Foot and Ankle. I know it's a foot and ankle center.
24         MS. KAIRAB: Brittany, we've been going
25 for about an hour. Do you mind if we take a break or

Page 53

1  if --
2         MS. DEDIEGO: Yeah, that's fine. We
3  can take a break.
4         MS. KAIRAB: Okay. Perfect.
5         THE VIDEOGRAPHER: Off the record at
6  11:12 a.m.
7         (Off the record.)
8         THE VIDEOGRAPHER: We're back on the
9  record at 11:23 a.m.
10 BY MS. DEDIEGO:
11    Q   Okay. So before the break, we were talking
12 about your -- Dr. -- you said it was Kalish?
13    A   Kalish.
14    Q   And you got a second opinion from him, and
15 then you ended up having surgery on your left foot?
16    A   Yes.
17    Q   And do you remember what the surgery was:
18 what he did?
19    A   Tendon repair.
20    Q   Did you need surgery on your right foot?
21    A   No, they just did it on the left foot.
22    Q   After the surgery, what was the recovery
23 like?
24    A   Long, painful. I had, like, a drainage
25 tube. And with that, I still went from, like, a boot

14 (Pages 50 - 53)

Linda D. Clemons                                      October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 54

1  to a cast to back to a boot.
2      Q   Did you have to do physical therapy?
3      A   Yes.
4      Q   Do you remember where you went?
5      A   I went to DeKalb Physical Therapy. I also
6  went to BenchMark Physical Therapy. And now I'm at
7  Emory Physical Therapy; that's closer to where to
8  where I live.
9      Q   The DeKalb Physical Therapy, was that
10 through the --
11     A   Before -- that was before the surgery,
12 though.
13     Q   Okay. But it was for the same foot?
14     A   Yes.
15     Q   And was it through the hospital, or was it
16 just called DeKalb Physical Therapy?
17     A   It was called Comprehensive Physical
18 Therapy. It was next -- it was in the same -- not the
19 same suite, but the same building that Dr. Shaheed was
20 in.
21     Q   And the physical therapy you did
22 pre-surgery, did that help at all with the pain?
23     A   It didn't.
24     Q   And then BenchMark, was that after the
25 surgery?

Page 55

1      A   Yes.
2      Q   And you said Emory Physical Therapy, that's
3  close to your house now?
4      A   Yes.
5      Q   Are you still going?
6      A   Yes.
7      Q   How often do you go?
8      A   I was going twice a week. Now, I only go
9  once a week.
10     Q   Is it focused on your left foot or both?
11     A   It's focusing on the left foot.
12     Q   Did you need to use a wheelchair any time
13 after the surgery?
14     A   No, just a scooter.
15     Q   Did your husband go to any of the medical
16 appointments with you?
17     A   Yes, most of them.
18     Q   Did any of your children go to the doctor
19 with you?
20     A   No, just my husband.
21     Q   Have you discussed the incident with your
22 children?
23     A   They know I had surgery. We talked about
24 the surgery, and.
25     Q   You said you used to go walking every day.

Page 56

1      Q   Did you go by yourself, or did you go with other
2  people?
3      A   I went with other people.
4      Q   Who'd you normally go with?
5      A   It was two different ladies that was in my
6  neighborhood. One passed away.
7      Q   What was the other one's name?
8      A   Her name was Cheryl, but she -- they -- they
9  were next-door neighbors. I lived further down the
10 street from them.
11     Q   Did you talk to Cheryl about the incident?
12     A   No.
13         THE REPORTER: Ms. Clemons, be careful
14 not to hit the microphones, because they're very
15 sensitive.
16         THE WITNESS: Okay.
17         THE REPORTER: I'm sorry.
18         THE VIDEOGRAPHER: And also the wires.
19 If you're playing with the wires --
20         THE REPORTER: Yeah.
21         THE VIDEOGRAPHER: -- it'll make noise.
22 Thank you.
23 BY MS. DEDIEGO:
24     Q   Do you still see the podiatrist --
25 Dr. Kalish?

Page 57

1      A   Dr. Kalish? Yes.
2      Q   When's the last time you went to Dr. Kalish?
3      A   About a week ago.
4      Q   And what did he say about your left foot?
5      A   That he wants to do another procedure. It's
6  a surgery, but it's a noninvasive surgery; but I have
7  to be put to sleep to have it done.
8      Q   And why does he say you need another
9  surgery?
10     A   Because the nerves is -- is so bad. I'm
11 still having a lot of pain, especially the burning and
12 the stabbing.
13         And I went to a pain center. And he wants
14 to do something also, but I'm just trying to find out
15 more about it. And I'm not saying no to it; but I'm
16 trying to find out, because it's a big procedure and
17 they have to place something in my back.
18         And I just want to find more about the
19 whole, you know, exactly what's all -- it's going to
20 all entail.
21     Q   So the procedure that would place something
22 in your back, was that recommended by the pain center?
23     A   Yes.
24     Q   What's the name of the doctor? Is it Summit
25 Joint and Spine?

15 (Pages 54 - 57)

Linda D. Clemons                                October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 58

1    A   Summit. Yes.
2    Q   And why would they put something in your
3  back for your foot?
4    A   Because the nerves is -- is -- the nerves
5  are so bad. They're saying that this would be
6  something that will calm those nerves down. They said
7  they would first place it on the outside of my back,
8  put leads in it and place it. And then if it worked,
9  then they would put it internal.
10   Q   Is it a spinal cord simulator?
11   A   Yes.
12   Q   And the surgery that Dr. Kalish recommended,
13  what is that?
14   A   It's -- it's basically like -- the way I was
15  explained it, it's basically like a TENS; but it's,
16  like, a thousand times higher. And it would be a lot
17  of pain. That's why they would have to put me to
18  sleep.
19   Q   Did you say like a TENS unit?
20   A   You know, the electrical shocks.
21   Q   Right.
22   A   That's what -- yeah.
23   Q   Have you used the TENS before?
24   A   Yes. I'm having it actually in physical
25  therapy. I'm having it now; but it's like -- I only

Page 59

1  can tolerate it on a real low.
2    Q   And they use the TENS on your foot?
3    A   Yes. They're using it on my foot right now.
4    Q   Do you have one at home?
5    A   No.
6    Q   Have you seen any other doctors or gone
7  anywhere else for your feet?
8    A   No.
9    Q   In the records we have from DeKalb Medical
10  Center for May of 2021, it says that you had fallen
11  three weeks prior. Did you injure yourself falling;
12  no?
13   A   No.
14   Q   And then were you ever diagnosed with hammer
15  toes?
16   A   Hammer toes? I do have one toe that's,
17  like, crossing over. Yeah.
18   Q   Did you have that before the sign fell?
19   A   I -- I -- it -- it wasn't like it is now.
20  And it's, like, way more crossed over than what it --
21  what it -- it was, like, just close together; but now,
22  it's, like, crossed over the -- the toe that's next to
23  it.
24   Q   Did you have any bunions before?
25   A   Bunions? I really don't know what a bunion

Page 60

1  is, but I have a corn.
2    Q   Okay. In the records we have for the first
3  surgery you underwent, it says that you also underwent
4  a hammer toe surgery. Do you know anything about
5  that?
6    A   I've never had a surgery on my foot before.
7    Q   On your left foot?
8    A   No.
9    Q   You had a surgery with Dr. Kalish?
10   A   Yeah, on my -- for my -- not for hammer toe.
11   Q   Have you -- strike that.
12        Do you still experience pain in your left
13  foot?
14   A   Yes.
15   Q   How often?
16   A   Every day. Some days, it's not as bad as
17  others; but I have pain every day.
18   Q   You said you take Percocet for your other
19  pain.
20   A   Yes.
21   Q   Does that Percocet help with your foot pain?
22   A   It does. I also take Lyrica, and.
23   Q   Have you ever had nerve damage to any other
24  part of your body?
25   A   In my hand.

Page 61

1    Q   Do you still feel pain in your right foot?
2    A   I do, but not -- nowhere near as bad as the
3  left foot.
4    Q   The left foot pain, how would you describe
5  it: like burning, aching?
6    A   Burning, stabbing, aching.
7    Q   And where on your foot does it hurt?
8    A   Across the top and on the side, where my
9  ankle is, on the inner -- inner side. And on the
10  other side, like, between the -- the middle toe -- the
11  small toe, straight up into the ankle, like --
12   Q   And that's on your left foot?
13   A   Yes. Like -- it's, like, through here.
14   Q   Okay. Do you have any pain in your heel?
15   A   No, I don't have any pain in my heel. I
16  have like -- I don't know if that would be considered
17  the heel or not; but it's like -- and through here,
18  that's where the stabbing is. Sometimes, like, I'll,
19  like, just be sitting here; and then it just -- it
20  just hit me.
21   Q   So you pointed to kind of the bottom --
22   A   It's, like, through here.
23   Q   So through your arch up to your ankle?
24   A   No, not my arch -- like, right through here
25  to my ankle.

16 (Pages 58 - 61)

Linda D. Clemons                              October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 62

1    Q   The side of your heel up to the ankle.
2        And that's on the inside of your foot?
3    A   Mm-hmm.
4    Q   That's a "yes"?
5    A   Yes.
6        And I have it on the outside, but it doesn't
7    go back towards the heel.
8    Q   What about the right foot?  Where does it
9    hurt?
10   A   Just on that -- on the -- on the front, on
11   that side, like through here.
12   Q   On the top of the foot?
13   A   Mm-hmm, but on -- more towards the side.
14   Q   Which side -- left or right, or inside or
15   outside?
16   A   On the outside of this -- this foot.
17   Q   And did Dr. Kalish say anything about the
18   right foot?
19   A   Same thing, just they want to concentrate
20   more on getting the -- me out of the pain from the
21   left foot.
22       He did say that I'm starting to get -- he
23   mentioned, like, a spur.  And he said that comes from
24   using -- having all the weight on the right -- on my
25   right foot.

Page 63

1    Q   And I noticed that you had a cane today.
2    When did you start using a cane?
3    A   I've had it basically after -- I had it
4    before surgery, when I first started going to --
5    after I got my -- after I stopped using the scooter, I
6    had to go to the cane.
7    Q   Does the pain in your left foot affect your
8    ability to drive?
9    A   It doesn't affect my ability to drive.  It's
10   just the -- the -- when I get that stabbing feeling,
11   it just -- I'm afraid to -- to drive, like, far
12   places, because it -- it -- it's not, like, a certain
13   time that it'll hit.  It just comes at any time.
14   Q   Have you fallen or been injured at all since
15   April of 2021?
16   A   No.
17   Q   Any motor vehicle accidents -- any motor
18   vehicle accidents since 2021?
19   A   Not since 2021, no.
20   Q   Have you fallen at all as a result of the
21   pain in your feet?
22   A   I haven't.
23   Q   Did you review any documents in preparation
24   for the deposition today?
25   A   No.

Page 64

1        MS. DEDIEGO:  Okay.  We're going to go
2    through the photos that you produced to us in the
3    case.
4        I'm going to mark them as Exhibit
5    Number 4.
6        (Exhibit 4 was marked for
7        identification.)
8        I'm sorry.  Here's the one with the
9    sticker.
10       And you can take the paper clip off if
11   that makes it easier for you.
12   BY MS. DEDIEGO:
13   Q   Let's just go through them one by one, if
14   that's okay with you.
15       So this first page looks like it's a picture
16   of your left foot?
17   A   Yes.
18   Q   And is this after the surgery?
19   A   This is after the surgery.
20   Q   Is that the first surgery?  Well, you've
21   only had one so far; right?
22   A   I only had one surgery, yes.
23   Q   Okay.  So this is after the surgery?
24   A   Mm-hmm.
25   Q   And then why did you take this picture?

Page 65

1        MS. KAIRAB:  Object to the extent that
2    calls for attorney-client communications.
3    BY MS. DEDIEGO:
4    Q   Is this the bandages that they put on you
5    after the surgery?
6    A   Those are the bandages over the --
7    Q   How soon after the surgery did you take the
8    picture?
9    A   I don't recall how soon it was.
10   Q   Do you have a scar from the surgery?
11   A   I do.
12   Q   And then if you go to the second page, what
13   is that a photo of?
14   A   Probably a little further up, around by the
15   ankle area.
16   Q   Is that a photo of a scar or a cut?
17   A   A cut.
18   Q   Would that have been taken soon after the
19   sign hit you?
20   A   Yes.  Not soon -- I don't know how soon
21   after, but it was after the sign fell.
22   Q   Is this your ankle?
23   A   Yeah.  I think it's, like, the ankle, top
24   part of the leg, like just above the ankle.
25   Q   Do you know if it was the left or right?

17 (Pages 62 - 65)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 66

1    A   This -- this was the left one.
2    Q   Okay.  And the next page, is this that drain
3  you were talking about?
4    A   Yes.
5    Q   How long did you have the drain on there?
6    A   A long time.  I -- I don't know how long,
7  but I know after I had the drain taken off, I did have
8  another surgery.  It wasn't, like, another cut; but I
9  had -- they had to go back in, because it was too hard
10  to get the staples that was in there -- because I had
11  stitches and staples.  And he had to go back in
12  to -- they had to put me to sleep to get it out.
13    Q   To remove the staple?
14    A   To remove the staples and clean the cut up
15  more, because it was --
16    Q   Okay.  And the next one, is that after the
17  surgery?
18    A   Yes.
19    Q   Do you know how soon after the surgery that
20  was taken?
21    A   Maybe about a month after, because it look
22  like -- yeah, maybe about a month afterwards.
23    Q   Did you take the photos yourself, or did you
24  have someone else take them for you?
25    A   I had somebody else take them.

Page 67

1    Q   Who took them?
2    A   Probably my husband.
3    Q   Okay.  And the next page, you're wearing, it
4  looks like, a cast.  Do you know if this was before
5  or --
6    A   I think this was before -- before.  I'm not
7  sure.  I had it on twice, you know.  I had a cast on
8  before the surgery, and I had one after the surgery.
9    Q   Okay.  Was it purple both times?
10    A   I believe so.
11    Q   Okay.
12    A   That's my favorite color, so.
13    Q   Me too.
14        The next one, it looks like a picture of the
15  top of your left foot; is that right?
16    A   Mm-hmm.
17    Q   Is that a "yes"?
18    A   Yes.  Sorry.
19    Q   And then what's this picture of?
20    A   My foot.
21    Q   And is it showing something specific?
22    A   Just it was swollen.
23    Q   Would this be taken soon after the sign
24  fell?
25    A   I think so.  I'm not sure.

Page 68

1    Q   Do you still have the photos -- do you have,
2  like, the dates they were taken?
3    A   No.  I -- I mean, I -- I don't know how --
4  my phone is, like, kind of crazy.  Like, it's like my
5  pictures is not, like, in one order.  For some reason,
6  they just -- they -- they move around sometimes, I
7  guess.  I don't even know how to explain it.
8    Q   How long did you have swelling on the top of
9  your foot?
10    A   A long time.  I still have swelling on the
11  foot.  And they said it takes a long time for the
12  swelling to completely go away.
13    Q   Did you have swelling on the right foot?
14    A   I did, but not -- nothing like this.
15    Q   Okay.  The next one --
16    A   This was after the -- this was after the
17  surgery.  I had had another cast put on -- that was
18  the second time.  They had to go in and clean
19  everything up and get the staples out.  They didn't
20  want me to put any weight on it.
21    Q   So were you using crutches at that time?
22    A   I was using crutches and a scooter and --
23  shoe was like -- it was -- I -- I don't even know how
24  to explain it.  It was weird.  It kind of had, like, a
25  heel on it.

Page 69

1    Q   Is that the shoe you're wearing in the
2  photo?
3    A   Yeah.  It's actually -- yeah, that's the
4  shoe.  And then I had another shoe too -- it looked
5  like a high-heel shoe or something.  But he didn't
6  want me to put no weight at all on it.
7    Q   The next picture looks like a picture of a
8  toenail?
9    A   Yeah.  That's on my -- on the right foot,
10  because it kind of hit me more -- for some reason, it
11  got hit more down there.  It was, like, black and
12  blue, the toenail.  And he told me eventually, it was
13  going to fall off.  And it was starting to come off.
14    Q   Did it grow out?
15    A   It did.  It grew out.
16    Q   And then did you grow a new toenail?
17    A   I grew a new toenail.
18    Q   Okay.  The next picture looks like a picture
19  of your right foot.  Do you know why you took this
20  picture?
21    A   Because it -- it was still, you know,
22  swelling.  And he said it was, you know -- all my
23  weight was going on there and I still did have a tear
24  there, and I was using more of the -- my right foot to
25  bear all my weight on, because I couldn't put any on

18 (Pages 66 - 69)

Linda D. Clemons                     October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 70

1   the -- on the left foot.
2       Q   Where was the swelling on your right foot?
3       A   Up around the ankle area.
4       Q   On the top of your foot?
5       A   On the top of the foot.
6       Q   Do you still get swelling in the right foot?
7       A   I do.
8       Q   How often?
9       A   I guess the more I be on it. I don't know,
10  though. Yeah, but it doesn't get up that big any --
11  anymore. It doesn't swell that big.
12      Q   Is there anything specific that you do that
13  causes your feet to swell?
14      A   Just being on it, being -- being -- you
15  know, like, standing.
16      Q   Did you ever have issues with swelling feet
17  before the incident?
18      A   I didn't.
19      Q   Okay. The next one looks like your left
20  foot. Is that the boot you were talking about?
21      A   Yeah, but I don't know if it was a boot
22  after the surgery, because even after I took the cast
23  on, I still went back to another boot, so -- and I had
24  a boot that was knee-high also. So -- and I think
25  that -- that -- the knee-high boot was before I had

Page 71

1   any surgeries.
2       Q   Okay. The next one -- and that's your left
3   foot again?
4       A   Yes.
5       Q   And that's after the surgery?
6       A   Yes.
7       Q   The next one --
8       A   That's when the staples were still in it.
9       Q   Okay. So this was closer in time after the
10  surgery?
11      A   I think that's when they were cleaning it
12  up, where I had to go in for another surgery.
13      Q   To remove the staples?
14      A   Yeah.
15      Q   Okay. And then the next one -- I think --
16  skipped one.
17      A   That's -- that's the one I was telling you
18  about, the shoe. It was kind of like a high-heel
19  shoe.
20      Q   Did you just put more pressure on your toes
21  than your heel?
22      A   Yeah. Yeah, so they wanted me to keep the
23  pressure -- I -- I don't really know why that boot,
24  but it was like -- it was like a high shoe. So I
25  guess they wanted me to keep the -- the weight off of

Page 72

1   my -- the heel area.
2       Q   Okay. The next one --
3       A   See, that's a blue cast, so.
4       Q   Yeah. It looks purple in mine.
5       A   Oh, it looks purple? I don't know.
6       Q   I don't know.
7       A   I -- I believe I had purple casts the whole
8   time.
9       Q   Okay. And then the next one, that's your
10  left foot?
11      A   Mm-hmm.
12      Q   And then do you know what this picture is
13  showing?
14      A   Just my -- where my ankle was starting to
15  swell again. It was, like, off and on.
16      Q   Okay. And then this next picture looks like
17  it's the drain again?
18      A   Yes.
19      Q   The next one, I think, is the same, just a
20  different angle?
21      A   Yes.
22      Q   And then that's --
23      A   They're, like, the same pictures.
24      Q   Okay. Yeah. I don't know. Some of them
25  might be duplicates.

Page 73

1       And then you can skip -- that one looks the
2   same.
3       A   Purple.
4       Q   And you've got the purple cast again.
5       And that's the top of your left foot?
6       A   Yes.
7       Q   And that's just to show swelling?
8       A   Yes.
9       Q   And it looks like there's a boot again?
10      A   Same pictures.
11      Yeah, that was the -- this was the first
12  boot that I had.
13      Q   Okay. So the one where you're wearing the
14  green pants, you can skip to that one, because I think
15  the other ones look kind of duplicate.
16      A   Yeah.
17      Q   So that's the first boot?
18      A   Mm-hmm.
19      Q   So that's pre-surgery?
20      A   That's before I had any surgery at all.
21  This is -- I had to wear that -- seemed like forever,
22  for a long time.
23      Q   When you were wearing the boot, were you
24  also using the scooter, crutches, or were you --
25      A   Yes, scooter.

19 (Pages 70 - 73)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 74

1    Q   A scooter?
2        Okay. I think the rest of them are
3    duplicates --
4    A   The same things.
5    Q   Yeah. So we had served you with some
6    discovery responses that I think you helped your
7    attorneys answer. And in here, it has your
8    doctor -- that you went to Peachtree Urgent Care. Do
9    you know if you went to Peachtree Urgent Care, or
10   would it have been Piedmont?
11   A   I think it was Piedmont.
12   Q   Okay.
13   A   That was -- I never knew that was Piedmont,
14   though. I just knew it was urgent care, so I just --
15   she said go to urgent care. So that was close to her
16   office and my doctor's office, so.
17   Q   Okay. So other than your husband, anyone
18   else go to the doctor with you?
19   A   Just my husband.
20   Q   Have you discussed the case with anyone
21   other than your husband?
22   A   No.
23   Q   Any other way the incident at Old Navy has
24   impacted your life, that we haven't talked about
25   today?

Page 75

1    A   That impacted my life, no, just from the
2    injury.
3    Q   Has it affected your ability to do any
4    household chores?
5    A   Yes.
6    Q   How has it affected your ability to do
7    chores?
8    A   A lot -- you know, I just can't stand up for
9    a long period of time. My husband's been doing most
10   of those. Sometimes my daughter comes over and do it.
11   I have a niece sometimes come over and help me also.
12   Q   And what was your niece's name?
13   A   Her name is Danielle.
14       MS. DEDIEGO: Can we just take, like, a
15   five-, ten-minute break; and then I might be done?
16       THE VIDEOGRAPHER: Off the record at
17   11:54 a.m.
18       (Off the record.)
19       THE VIDEOGRAPHER: Back on the record
20   at 11:57 a.m.
21   BY MS. DEDIEGO:
22   Q   Ms. Clemons, have you ever received Medicare
23   or Medicaid benefits?
24   A   No.
25   Q   Have you ever applied for Social Security

Page 76

1    Disability?
2    A   When I first got injured back in '95, but I
3    never received it.
4    Q   Do you plan to reapply?
5    A   Yes. I have to eventually, I'm sure. I'm
6    65, so.
7    Q   Has any doctor told you that the injury to
8    your left foot might be permanent?
9    A   Dr. Shaheed had told me that -- that -- not
10   that it would be permanent, but I would -- it's a
11   possibility that I will walk different and not be able
12   to do the things that I used to do.
13   Q   And what sort of things?
14   A   Like what I like to -- love to do, walk long
15   distance.
16   Q   When you used to go for walks, how far would
17   you go?
18   A   I mean, I don't -- I don't know how many
19   miles it would be, but like hours, two, three hours at
20   a time.
21   Q   Have you tried to go for a walk at all
22   since --
23   A   Yes. Yeah, in my neighborhood.
24   Q   How recently was that?
25   A   Last year.

Page 77

1    Q   And what happened when you tried to go for a
2    walk?
3    A   Too much pain -- couldn't even make it a
4    block.
5    Q   Was the pain in your left foot or your right
6    foot or both?
7    A   My left foot.
8    Q   And I'm sorry if I already asked you this.
9    Where in your foot does it hurt now?
10   A   On the side and on the top, on both sides --
11   like in between my -- up the front, through my middle
12   toe, and on the side, and on the top part of it.
13   Q   Okay. And what chores did you do before
14   that you can't do anymore?
15   A   Going up and down the stairs, sweeping,
16   standing to cook. Yard work, that's something I used
17   to like to do, but.
18   Q   Is there anything that you do that helps
19   reduce the pain in your foot?
20   A   No.
21   Q   Does the pain medication help at all?
22   A   It helps a little. I can tell the
23   difference when I'm -- when I've taken it and when I
24   haven't taken it.
25   Q   You described the stabbing and burning. Did

20 (Pages 74 - 77)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 78

1  you ever feel any tingling in your feet?
2      A  I do have some tingling, but more -- it's
3  more of a stabbing and a burning.
4      Q  Did you break any of the bones in your feet?
5      A  No.
6      Q  Do you still have pain in your ankles or is
7  it --
8      A  I do.
9      Q  How far up your ankle does the pain go?
10     A  Just, like, where -- you don't have the
11  picture -- through here.
12     Q  Okay.  So kind of where your sock would hit?
13     A  A footie maybe, a little bit higher than
14  where a footie would hit.
15     Q  Okay.  Do you remember if anyone from the
16  Old Navy store -- if that manager called after that to
17  check up on you?
18     A  Nobody called.
19        MS. DEDIEGO:  I don't think I have any
20  further questions.  Do you have anything, Haley?
21        MS. KAIRAB:  I don't have anything.
22        THE REPORTER:  I have some questions
23  off the video record.
24        THE VIDEOGRAPHER:  We're off the video
25  record at 12:02 p.m.

Page 79

1        THE REPORTER:  I have a couple
2  questions before we go off the written record.
3        Miss Brittany, would you like a copy of
4  the transcript?
5        MS. DEDIEGO:  Yes, E-Tran with
6  exhibits, please.
7        THE REPORTER:  All right.  And would
8  you like a copy?
9        MS. KAIRAB:  Yeah, same, just E-Tran
10  with exhibits, and if you could do a condensed version
11  as well.
12        THE REPORTER:  You said E-Tran with
13  exhibits and condensed?
14        MS. KAIRAB:  Yeah.
15        THE REPORTER:  Okay.  All right.  The
16  time is 12:03, and we are off the written record.
17        (Signature reserved.)
18        (Whereupon, at 12:03 p.m., the
19        proceeding was concluded.)
20
21
22
23
24
25

Page 80

1        CERTIFICATE OF DEPOSITION OFFICER
2        I, DEIDRA NASH, the officer before whom the
3  foregoing proceedings were taken, do hereby certify
4  that any witness(es) in the foregoing proceedings,
5  prior to testifying, were duly sworn; that the
6  proceedings were recorded by me and thereafter reduced
7  to typewriting by a qualified transcriptionist; that
8  said digital audio recording of said proceedings are a
9  true and accurate record to the best of my knowledge,
10  skills, and ability; that I am neither counsel for,
11  related to, nor employed by any of the parties to the
12  action in which this was taken; and, further, that I
13  am not a relative or employee of any counsel or
14  attorney employed by the parties hereto, nor
15  financially or othe_____ ome of
16  this action.

17              DEIDRA NASH
18           Notary Public in and for the
19                State of Georgia
20
21  [X] Review of the transcript was requested.
22
23
24
25

Page 81

1        CERTIFICATE OF TRANSCRIBER
2        I, KIANA COOK, do hereby certify that this
3  transcript was prepared from the digital audio
4  recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to,
8  nor employed by any of the parties to the action in
9  which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise interested in the outcome of this action.
13
14
15              KIANA COOK
16
17
18
19
20
21
22
23
24
25

21 (Pages 78 - 81)

Linda D. Clemons                                          October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 82

1  Haley Kairab
2  haley@piastawalker.com
3            November 1, 2023
4  RE: Clemons, Linda D. v. Old Navy, LLC, Et Al.
5     10/18/2023, Linda D. Clemons (#6114182)
6     The above-referenced transcript is available for
7  review.
8       Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-southeast@veritext.com.
16
17  Return completed errata within 30 days from
18 receipt of testimony.
19   If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 83

1  Clemons, Linda D. v. Old Navy, LLC, Et Al.
2  Linda D. Clemons (#6114182)
3       E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22       SIGNED UNDER PENALTY OF PERJURY
23 _____  _____
24 Linda D. Clemons            Date
25

Page 84

1  Clemons, Linda D. v. Old Navy, LLC, Et Al.
2  Linda D. Clemons (#6114182)
3       ACKNOWLEDGEMENT OF DEPONENT
4    I, Linda D. Clemons, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10     SIGNED UNDER PENALTY OF PERJURY
11 _____  _____
12 Linda D. Clemons            Date
13 *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20___.
16
17
18 _____
19 NOTARY PUBLIC
20
21
22
23
24
25

Veritext Legal Solutions
800.808.4958                                           770.343.9696

# EXHIBIT B

**In The Matter Of:**

*Clemons v.*
*Old Navy, LLC, et al.*

---

*Lisa Renee Allen*
*September 1, 2023*
*Video Deposition*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



REGENCY-BRENTANO, INC.
Certified Court Reporters

Min-U-Script® with Word Index

Case 1:23-mi-99999-UNA   Document 4195   Filed 12/18/23   Page 206 of 351

Clemons v.                     Video Deposition                    Lisa Renee Allen
Old Navy, LLC, et al.                                              September 1, 2023

Page 1

```
 1        IN THE STATE COURT OF GWINNETT COUNTY
              STATE OF GEORGIA
 2

 3
   LINDA D. CLEMONS,
 4
          Plaintiff,
 5                               CIVIL ACTION FILE
      v.                         NO. 23-C-00137-S4
 6
   OLD NAVY, LLC, et al.,
 7
          Defendants.
 8   ----------------------

 9        VIDEOTAPED DEPOSITION OF
              LISA RENEE ALLEN
10

11          September 1, 2023
               1:01 p.m.
12
            Location of Witness:
13          Snellville, Georgia

14

15     Deborah P. Longoria, RPR, CCR B-1557

16

17          REGENCY-BRENTANO, INC.
18        Certified Court Reporters
            13 Corporate Square
19             Suite 140
           Atlanta, Georgia 30329
20            (404) 321-3333

21

22

23

24

25
```

Page 3

```
 1        INDEX TO EXAMINATIONS

 2   WITNESS:  Lisa Renee Allen

 3                                        Page

 4   Examination by Mr. Walker              6

 5   Examination by Ms. DeDiego            16

 6

 7

 8        INDEX TO EXHIBITS

 9   Previously Marked
     Plaintiff's       Description      Marked/First
10   Exhibit                            Identified

11   P-1        Document re Shelf Strips;
                Safety Reminder              8
12
     P-2        Documents and Photos re Shelf Strips   10
13

14     (Exhibits P-1 and P-2 have been attached to the
     original transcript.)
15

16

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1        APPEARANCES (all via videoconference)

 2   On behalf of the Plaintiff:
 3       PIASTA WALKER HAGENBUSH, LLC
         MICHAEL P. WALKER, ESQUIRE
         3301 Windy Ridge Parkway
 4       Suite 110
         Atlanta, Georgia  30339
 5       404.996.1296
         Mike@piastawalker.com
 6
   On behalf of the Defendants:
 7       LEWIS BRISBOIS BISGAARD & SMITH, LLP
         BRITTANY DE DIEGO, ESQUIRE
 8       600 Peachtree Street NE
         Suite 4700
 9       Atlanta, Georgia  30308
         404.348.8585
10       Brittany.DeDiego@lewisbrisbois.com

11   Also Present:
         George Bush, Videographer
12       Atlanta Legal Media

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1   Videotaped Deposition by Remote Videoconference of
 2   Lisa Renee Allen
 3   September 1, 2023
 4   - - -
 5      THE VIDEOGRAPHER: We are on the record at
 6   1:01 p.m.
 7      MR. WALKER: This will be the deposition
 8   of Lisa Allen, taken pursuant to notice and
 9   agreement of counsel.
10      Brittany, I would propose we reserve all
11   objections except to the form of the question
12   and responsiveness of the answer until first use
13   of the deposition.
14      MS. DE DIEGO: Yes, that's fine.
15      MR. WALKER: All right.  Hi, Ms. Allen.
16   My name is Mike Walker.  I represent Linda
17   Clemons.  Thanks for being here today.
18      Have you ever been deposed before?
19      MS. ALLEN: No.
20      MR. WALKER: So basically I'll just being
21   asking some questions about your experience at
22   Old Navy, anything you know about the Linda
23   Clemons incident.
24      And what we ask from you during the
25   process is just if you would give me a verbal
```

Clemons v.
Old Navy, LLC, et al.

Video Deposition

Lisa Renee Allen
September 1, 2023

Page 5

1 response to the question. That way the court
2 reporter can take it down.
3     It's really important to me and my client
4 that you understand everything I'm asking you.
5 And so if I ask you a question that you don't
6 understand, please just let me know and I'll do
7 my best to rephrase it. Okay?
8     MS. ALLEN: Okay.
9     MR. WALKER: The flip side to it is that
10 if I ask you something and you do respond to it,
11 I'll assume you understood it. Is that fair?
12     MS. ALLEN: Yes.
13     MR. WALKER: All right. Give me your full
14 name for the record, please.
15     THE COURT REPORTER: Okay. Excuse me.
16 I'm sorry. I'm going to go ahead and --
17     MR. WALKER: I need to swear her in, don't
18 I? Go ahead.
19     THE COURT REPORTER: Yes, sir.
20     MR. WALKER: Sorry. I forgot.
21     THE COURT REPORTER: That's okay.
22     LISA RENEE ALLEN,
23 having been first duly sworn or affirmed, testifies
24 as follows.
25     MS. DE DIEGO: And, Mike, no objection to

Page 6

1 remote swearing.
2     MR. WALKER: Thanks.
3     EXAMINATION
4     BY MR. WALKER:
5 Q. All right. Would you please give me your
6    full name, Ms. Allen.
7 A. Lisa Renee Allen.
8 Q. And I'm not going to come to your house or
9    anything, but if I had to send you a subpoena, what
10   would be your home address?
11 A. 1477 Hickory Drive, Lilburn, Georgia
12   30047.
13 Q. And do you currently work at Old Navy?
14 A. I do.
15 Q. How long have you worked there?
16 A. Going on about 24 years.
17 Q. And what's your current job title?
18 A. General manager.
19 Q. Are you the person in charge of the store?
20 A. I am.
21 Q. And I was referring to the Snellville
22   store. Are you in charge of the Snellville store?
23 A. I am.
24 Q. Would you be the highest ranking person at
25   the store level?

Page 7

1 A. Yes.
2 Q. How long have you been the general manager
3    of the Snellville store?
4 A. Been about 20 years.
5 Q. Who do you report to?
6 A. My supervisor is Ross Hoffman.
7 Q. What's his title?
8 A. District manager.
9 Q. And what district is his district?
10 A. Atlanta North.
11 Q. Did you say Atlanta, Georgia?
12 A. Atlanta North.
13 Q. Oh, Atlanta North. Okay. What stores are
14    in the Atlanta North division or district?
15 A. I mean there are like 11 stores. I can't
16    name them offhand. But we have 11 stores in the
17    district.
18 Q. All right. In your capacity as the
19    general manager at the Snellville store, did you ever
20    receive any training on installing or securing shelf
21    strips?
22 A. I can't say that I have.
23 Q. Do you know what I'm referring to when I
24    say a "shelf strip"?
25 A. Yes.

Page 8

1 Q. If you could just kind of explain what
2    that is.
3 A. A shelf strip is a metal sign that is
4    placed on our walls.
5 Q. Are they placed on the shelves?
6 A. The shelves and the walls, correct.
7 Q. Do you know how to secure a shelf strip to
8    a shelf?
9 A. Yes.
10 Q. How do you go about doing that?
11 A. To secure a shelf strip into a shelf, you
12    would just make sure that it has Velcro on the top
13    and the bottom of it, and then you would secure it to
14    the shelf.
15 Q. Velcro between the shelf and the shelf
16    strip?
17 A. Correct.
18 Q. All right. So I want to show you what
19    I've marked as Plaintiff's Exhibit No. 1.
20       (Plaintiff's Exhibit P-1, having been
21    previously marked, was introduced into the
22    record.)
23 Q. (By Mr. Walker) Can you see this document
24    before -- can you see this document, Ms. Allen?
25 A. I see it.

Page 9

1 Q. Have you ever seen this document before?
2 A. Yes.
3 Q. When do you think you saw this document?
4 A. It'd probably have to been some years ago
5 since I've been with the company for so long.
6 Q. It says here that -- at the top it says,
7 Metal Shelf Strip Sign Holder: Added safety. Right?
8 A. Yes.
9 Q. Then it says, Men's khaki metal shelf
10 strip sign holders used as example, same principle
11 applies to all metal shelf strips. Right?
12 A. Yes.
13 Q. And then it describes how you put the
14 Velcro on the underside of the shelf strip to secure
15 it to the shelf, right?
16 A. Yes.
17 Q. And if you go down to the page -- the
18 second page, it says: The metal shelf strip sign
19 holders, used in denim and khaki presentations, are
20 at risk of sliding forward off the shelf and falling
21 when someone removes a product from a stack. All
22 stores with the metal shelf strip sign holders must
23 use Velcro strips to help secure the sign holder to
24 the shelf they sit upon.
25     Did I read that correctly?

Page 10

1 A. Yes.
2 Q. All right. Is that what you were
3 referring to earlier about how to secure the shelf
4 strip?
5 A. Yes.
6 Q. And the risk of not doing that is that
7 they can fall off the shelf and hit somebody?
8 A. Yes.
9 Q. All right. I'm going to show you what
10 I've marked as Plaintiff's Exhibit No. 2.
11     (Plaintiff's Exhibit P-2, having been
12 previously marked, was introduced into the
13 record.)
14 Q. (By Mr. Walker) Have you ever seen this
15 -- these photographs and incident report before?
16 A. Yes.
17 Q. Okay. When did you see these?
18 A. That I saw when I was going over from
19 having a conversation with Brittany.
20 Q. And I'm not asking about your
21 conversations with your counsel. I was just more
22 wondering when you saw this document and if you'd
23 seen outside the context of preparing for a
24 deposition.
25 A. No.

Page 11

1 Q. Okay. So page 1 shows a shelf strip,
2 right?
3 A. Yes.
4 Q. And it's got the Velcro on top of it?
5 A. Yes.
6 Q. And if you look at pages 4 and 5, that's
7 other -- that -- page 4 is also at the top of the
8 shelf strip, right?
9 A. Yes.
10 Q. And then page 5 of the exhibit is the
11 underside of the shelf strip, right?
12 A. Yes.
13 Q. And the underside of the shelf strip does
14 not have the Velcro straps on it?
15 A. No.
16 Q. Is that correct; it does not?
17 A. I don't see it, no.
18 Q. This would be against the policies and
19 procedures on how to properly secure the shelf strip,
20 right?
21 A. Yes.
22 Q. Do you know who would have installed this
23 shelf strip?
24 A. It would be the merchandise manager.
25 Q. Okay. Do you know who that would have

Page 12

1 been in April of 2021?
2 A. It would have been Mike Rinehart.
3 Q. Did you ever have any conversation with
4 Mr. Rinehart on how to secure the shelf strips?
5 A. No.
6 Q. Do you know if he received any training on
7 the shelf strips?
8 A. No.
9 Q. Do you know who would have been
10 responsible for training him on the shelf strips?
11 A. Whoever he started off with at the time
12 that he came on with the company, whoever did his
13 training.
14 Q. But if Mr. Rinehart did not use the shelf
15 -- the Velcro on the shelf strip on the bottom, that
16 would have been in violation of Old Navy's policies?
17 A. Yes.
18 Q. And that would have made the shelf strip
19 more likely to fall?
20     MS. DE DIEGO: Object to form.
21     You can answer.
22     THE WITNESS: Not necessarily.
23 Q. (By Mr. Walker) Well, the shelf strip is
24 there as an added safety benefit, right?
25 A. Yes.

Page 13

1  Q.  And without the added safety benefit, it's
2  more likely to fall?
3      MS. DE DIEGO: Objection.
4      You can answer.
5      THE WITNESS: No.
6  Q.  (By Mr. Walker)  Well, do strip shelves
7  [sic] provide a good benefit for customer safety?
8  A.  Yes.
9  Q.  And you agree the shelf strip should be
10  added to the bottom of the -- excuse me.
11      You agree the Velcro should be added to
12  the bottom of the shelf strip to help prevent it from
13  sliding and hitting somebody, right?
14  A.  Yes, to give it extra support.
15  Q.  Did you ever have any conversations after
16  April of 2029 [sic] with anybody regarding the shelf
17  strips or the Velcro?
18  A.  No.
19  Q.  Is there anything else that you're
20  supposed to do at Old Navy to help secure the shelf
21  strip on a shelf?
22  A.  Say your question again.
23  Q.  Is there anything else that you're
24  supposed to do to help secure the shelf strip?
25  A.  I guess I don't understand your question.

Page 14

1      You say anything else that you should do?
2  Q.  Well, I notice there's like a hole in the
3  upper right-hand corner on this shelf strip.  Are you
4  supposed to bolt it down or do anything like that?
5  A.  No.
6  Q.  Okay.  So it would just be the Velcro
7  strips?
8  A.  Yes.
9  Q.  After -- when did you learn about the
10  Linda Clemons incident?
11  A.  I really can't recall.
12  Q.  Did you speak with Mr. Rinehart about it?
13  A.  I don't remember.
14  Q.  Other than your attorney, can you recall
15  speaking with anybody about the incident?
16  A.  No.
17  Q.  Do you know anything about what happened?
18  A.  No.
19  Q.  Were you present when it happened?
20  A.  No.
21  Q.  Have you ever spoken to Ms. Clemons?
22  A.  No.
23  Q.  And you don't recall speaking with anybody
24  else about her other than your attorney?
25  A.  No.

Page 15

1  Q.  So it's fair to say that other than your
2  -- what you've learned from your attorney, you don't
3  have any knowledge of what happened to Ms. Clemons?
4  A.  No.
5  Q.  Do you know when Mr. Rinehart began
6  working at the Snellville location?
7  A.  Repeat your question.  I'm having a hard
8  time hearing.
9  Q.  I apologize.
10      Do you know when Mr. Rinehart began
11  working at the Snellville location?
12  A.  I can't remember.
13  Q.  Are there any policies and procedures at
14  Old Navy to periodically check the shelf strips to
15  see that they're properly secured?
16  A.  We do what's called -- it's under risk
17  management, and monthly we have different topics that
18  we cover, like different safety topics, every single
19  month, but each month they rotate.
20  Q.  Do you recall if there was ever any
21  discussion about the shelf strips and checking them?
22  A.  No.
23      MR. WALKER: All right.  That's all I have
24  for you today.  I appreciate your time.
25      THE WITNESS: Thank you.

Page 16

1      MS. DE DIEGO: I just have a couple
2  questions for you real quick, Ms. Allen.
3      EXAMINATION
4      BY MS. DE DIEGO:
5  Q.  The policies and procedures at Old Navy,
6  who creates those?
7  A.  Corporate.
8  Q.  Do you personally create any of those
9  policies and procedures?
10  A.  No.
11  Q.  Did you personally train Mr. Rinehart?
12  A.  No.
13  Q.  Are you the only manager at the Snellville
14  location?
15  A.  The only general manager.
16  Q.  Are there other managers that work there?
17  A.  There are other managers, yes.
18  Q.  Were you working on April 13th, 2021 --
19  A.  No, I don't think so.
20  Q.  -- the day that this --
21  A.  No.
22      MS. DE DIEGO: Okay.  No further questions
23  from me.
24      MR. WALKER: None from me.  Thank you.
25      THE VIDEOGRAPHER: Off the record at

Clemons v.
Old Navy, LLC, et al.

Video Deposition

Lisa Renee Allen
September 1, 2023

Page 17

```
 1   1:16 p.m.
 2   (Deposition concluded at 1:16 p.m.)
 3   MS. DE DIEGO: We'll read and sign.
 4   [Orders to court reporter:
 5   MR. WALKER: Transcribe, electronic copy.
 6   MS. DE DIEGO: E-tran with exhibits.]
 7   (Pursuant to Rule 30(e) of the Federal
 8   Rules of Civil Procedure and/or O.C.G.A.
 9   9-11-30(e), signature of the witness has been
10   reserved.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 19

```
 1              COURT REPORTER DISCLOSURE
 2
 3        Pursuant to Article 10.B. of the Rules and
 4   Regulations of the Board of Court Reporting of the
     Judicial Council of Georgia which states: "Each court
 5   reporter shall tender a disclosure form at the time
     of the taking of the deposition stating the
 6   arrangements made for the reporting services of the
     certified court reporter, by the certified court
 7   reporter, the court reporter's employer, or the
     referral source for the deposition, with any party to
 8   the litigation, counsel to the parties or other
     entity.  Such form shall be attached to the
 9   deposition transcript," I make the following
     disclosure:
10
        I am a Georgia Certified Court Reporter.  I was
11   contacted to provide court reporting services for the
     deposition.  I will not be taking this deposition
12   under any contract that is prohibited by O.C.G.A.
     15-14-37(a) and (b).
13
        I have no contract/agreement to provide
14   reporting services with any party to the case, any
     counsel in the case, or any reporter or reporting
15   agency from whom a referral might have been made to
     cover this deposition.  I will charge the usual and
16   customary rates to all parties in the case, and a
     financial discount will not be given to any party to
17   this litigation.
18
19
20
21            Deborah P. Longoria
22            DEBORAH LONGORIA, RPR, B-1557
23
24
25
```

Page 18

```
 1       R E P O R T E R ' S   C E R T I F I C A T E
 2   STATE OF GEORGIA:
 3   COUNTY OF PAULDING:
 4       I, Deborah P. Longoria, RPR, Certified
 5   Court Reporter for the State of Georgia, hereby
 6   certify that the witness was duly sworn by me,
 7   and that the foregoing proceeding took place
 8   before me at the time and place herein set out.
 9       I further certify that the foregoing was
10   recorded stenographically by me and reduced to
11   typewriting by me or under my control; that the
12   foregoing pages 1 through 17 represent a true,
13   complete, and correct transcript.
14       I further certify that I am not of kin or
15   counsel to any counsel or party to this matter,
16   nor am I in any way interested in the outcome of
17   this action.
18       This, the 12th day of September 2023.
19
20
21            Deborah P. Longoria
22
23            DEBORAH LONGORIA, RPR, B-1557
24
25
```

Page 20

```
 1   ERRATA PAGE(S) - LISA RENEE ALLEN/DPL
 2       I, LISA RENEE ALLEN, having reserved my
 3   signature, do hereby certify that I have read all
     questions propounded to me and all answers given by
     me on September 1, 2023, and that:
 4
         1)   There are no changes noted.
 5       2)   The following changes are noted:
 6
 7   I, LISA RENEE ALLEN, hereby state my desire to make
     corrections entered upon the sworn testimony given
 8   and I have set forth the reason for making them.
     Accordingly, I have entered the same on the form
 9   below and if supplemental or additional pages were
     necessary, I have furnished the same in typewriting
10   annexed herewith.
11   Page No.       Line No.       should read:
12   Page No.       Line No.       should read:
13
14   Page No.       Line No.       should read:
15   Page No.       Line No.       should read:
16
17   Page No.       Line No.       should read:
18   Page No.       Line No.       should read:
19
20   Page No.       Line No.       should read:
21   Page No.       Line No.       should read:
22
23   Page No.       Line No.       should read:
24
25   Page No.       Line No.       should read:
```

| Clemons v. | Video Deposition | Lisa Renee Allen |
|---|---|---|
| Old Navy, LLC, et al. | | September 1, 2023 |

Page 21

```
 1   (Continued)  ERRATA PAGE - LISA RENEE ALLEN/DPL

 2   Page No.        Line No.         should read:

 3
     Page No.        Line No.         should read:
 4

 5   Page No.        Line No.         should read:

 6
     Page No.        Line No.         should read:
 7

 8   Page No.        Line No.         should read:

 9
     Page No.        Line No.         should read:
10

11   Page No.        Line No.         should read:

12
     Page No.        Line No.         should read:
13

14

15   I, LISA RENEE ALLEN, declare under penalty of perjury
     pursuant to 28 U.S. Code Section 1746 that I have
16   read the foregoing transcript of my sworn deposition,
     that the deposition transcript accurately reflects my
17   sworn testimony, and any changes or amendments, if
     applicable, were made by me and are noted above on
18   the attached errata sheet and any additional pages
     herewith.
19

20

21              LISA RENEE ALLEN

22   Sworn to and subscribed before me,
     This the       day of            , 20   .
23

24   Notary Public

25   My commission expires:
```

# EXHIBIT C

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

LINDA D. CLEMONS,                )
                                 )
          Plaintiff,             )    Civil Action
                                 )    No. 23-C-00137-S4
v.                               )
                                 )
OLD NAVY, LLC, et al.,           )    ORIGINAL
                                 )
          Defendant.             )
_____  )

REMOTE VIDEOTAPED DEPOSITION OF
MICHAEL RINEHART

August 31, 2023
1:02 p.m.

Piper Lynn Quinn, CCR B-2198

REGENCY-BRENTANO, INC.
Certified Court Reporters
13 Corporate Square
Suite 140
Atlanta, Georgia 30329
(404) 321-3333

1              APPEARANCES OF COUNSEL (Via Remote)

2

   On behalf of the Plaintiff:
3
        MICHAEL P. WALKER, Esq.
4       Piasta Walker Hagenbush, LLC
        3301 Windy Ridge Parkway
5       Suite 110
        Atlanta, Georgia 30339
6       Tel: (404) 996-1316
        mike@piastawalker.com
7
   On behalf of the Defendant:
8
        BRITTANY A. DeDIEGO, Esq.
9       Lewis Brisbois Bisgaard & Smith, LLP
        600 Peachtree Street, N.E.
10      Suite 4700
        Atlanta, Georgia 30308
11      Tel: (404) 348-8585
        brittany.dediego@lewisbrisbois.com
12
   Also present:
13
        George Bush, Videographer
14      Atlanta Legal Media

15

16

17

18

19

20

21

22

23

24

25

**Video Deposition**                                                          **3**

```
 1                    INDEX TO EXAMINATIONS

 2   EXAMINATION:                              Page No.

 3   Examination by Mr. Walker                    6

 4

 5                       *   *   *

 6                    INDEX TO EXHIBITS

 7   Exhibit No.    Description              Page No.

 8     P-1      Photographs and Diagrams        11

 9     P-2      Customer Injury Report, Bates   18
               Numbers Old Navy-Clemons000001
10             through 000009

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Regency-Brentano, Inc.**

Video Deposition                                        **4**

```
1                REPORTER DISCLOSURE
2          Pursuant to Article 10.B of the Rules and
3     Regulations of the Board of Court Reporting of the
4     Judicial Council of Georgia, I make the following
5     disclosure:
6          I am a Georgia Certified Court Reporter. I am
7     here as a representative of Regency-Brentano, Inc.
8     I am not disqualified for a relationship of
9     interest under the provisions of O.C.G.A. §9-11-28.
10    Regency-Brentano, Inc., was contacted to provide
11    court reporting services for this deposition.
12         Regency-Brentano, Inc., will not be taking this
13    deposition under any contract that is prohibited by
14    O.C.G.A. §15-14-37 (a) and (b).  Regency-Brentano,
15    Inc., has no exclusive contract to provide reporting
16    services with any party to the case, any counsel in
17    the case, or any reporter or reporting agency from
18    whom a referral might have been made to cover this
19    deposition.
20         Regency-Brentano, Inc., will charge its usual
21    and customary rates to all parties in the case, and a
22    financial discount will not be given to any party to
23    this litigation.
24
25                    Piper L. Quinn, CCR B-2198
```

Regency-Brentano, Inc.

1        THE VIDEOGRAPHER:  We are on the record

2     at 1:02 p.m.

3        MR. WALKER:  This will be the deposition

4     of Michael Rinehart.  It's taken pursuant to

5     notice and agreement of counsel.  Brittany, I

6     propose that we observe all objections except

7     to the form of the question and responsiveness

8     of the answer until first use of the

9     deposition.

10       MS. DEDIEGO:  That's Fine.

11          MICHAEL RINEHART,

12  having been first duly sworn, was examined and

13  testified as follows:

14       MR. WALKER:  All right, Mr. Rinehart.

15     Thanks for being here.  We met just a minute

16     ago.  Again, my name is Mike Walker.  I

17     represent Linda Clemons in this case, and I'll

18     be taking your deposition.

19       Have you been deposed before?

20       THE DEPONENT:  I have not, no.

21       MR. WALKER:  Okay.  We've got great

22     lawyers in the case.  I'm sure that they

23     explained the process to you a little bit.

24     I'll just be asking you questions primarily

25     about your background and your experience with

```
 1              Linda Clemons.  And if you don't understand

 2              what I'm asking, just let me know.  I'll be

 3              happy to clarify.  Okay?

 4                   THE DEPONENT:  Sure.

 5                   MR. WALKER:  If I -- if I ask you

 6              something and you respond to it, I'll assume

 7              you understood it.  Is that fair?

 8                   THE DEPONENT:  Fair.

 9                   MR. WALKER:  I don't anticipate we're

10              going to take a very long deposition today, but

11              if you need a break at any point, just let me

12              know and we'll take a break.  Okay?

13                   THE DEPONENT:  Will do.  Thank you.

14                   MR. WALKER:  All right.  And then,

15              Brittany, is there any objection to the witness

16              being sworn in remotely?

17                   MS. DEDIEGO:  No objection.

18                   MR. WALKER:  All right.

19                        EXAMINATION

20  BY MR. WALKER:

21      Q    All right.  Mr. Rinehart, if you would

22  please just give me your full name for the record.

23      A    Sure.  My name is Michael Rinehart.

24      Q    And I'm not going to come to your house or

25  anything, but if you're no longer represented by
```

1  counsel or you leave Old Navy or something and I need

2  to send you a subpoena for trial, what's your home

3  address?

4        A    It's going to be 2379 Philadelphia Road,

5  Conyers, Georgia 30012.

6        Q    All right.  And are you currently employed?

7        A    I am, yes.

8        Q    Where do you work?

9        A    Old Navy, Conyers.

10       Q    How long have you worked there?

11       A    At this location, I -- I came back July of

12  last year.  I left the company for a -- a brief --

13  like a year.

14       Q    What's your current job title?

15       A    Assistant general manager of merchandising.

16       Q    And have you done that role since you came

17  back, since July?

18       A    I'm sorry.  I don't understand.

19       Q    Have you been the assistant general manager

20  of merchandising since you came back in July?

21       A    Yes.  I briefly was the acting general

22  manager when we were without.  That was for about two

23  months.  But, yeah, I came back as assistant general

24  manager, went into an acting role, and now I'm back to

25  assistant general manager.

1      Q     Gotcha.  And we don't need to go through it

2   in terms of detail, but would you mind just kind of

3   giving me a little bit of history in terms of where

4   you've worked.

5      A     Sure.  Started out in high school, I worked

6   at a -- a small mom-and-pop music store, worked there

7   for quite a few years.  I joined Old Navy in 2013 at

8   this location, the Conyers location, worked through a

9   couple promotions.  I got a promotion to where I had

10  to transfer to Snellville for that position, left the

11  company, came back at the Conyers location, and then

12  here I am.

13     Q     Okay.  So you've worked at Old Navy pretty

14  much continuously since 2013, other than that year

15  when you left?

16     A     Correct.

17     Q     What did you do during that year when you

18  left Old Navy?

19     A     I went to a different retailer.  I worked

20  for Ulta Beauty.

21     Q     All right.  So the incident that we're here

22  about happened in April of 2021.  During that time

23  period, were you working at the Snellville location?

24     A     Yes, sir.

25     Q     What was your job title?

1        A     At that point in time, it was still

2   assistant general manager of merchandising.

3        Q     Did you -- did you undergo any training

4   during your time period at Old Navy, up through

5   April 13th of 2021, concerning how to secure shelving

6   and signs, things like that?

7        A     Yes.  I mean, you go through continuous

8   training as things change, as things develop, and

9   then, of course, you know, when you first start out or

10  anytime you take a promotion -- or change roles, I

11  should say.

12       Q     So it's my understanding that -- that a

13  strip shelf fell and hit Ms. Clemons's ankle and foot.

14  Is that your understanding?

15       A     Yes.

16       Q     And did you undergo any training prior to

17  April of 2021 concerning how to secure the strip

18  shelves?

19       A     It would fall under typical merchandising

20  training and signage SOPs, but yes.

21       Q     Okay.  What do you recall the training being

22  on -- on that particular issue?

23       A     For the shelf strip, you basically -- you

24  place it onto the shelf.  It has a nonskid pad on the

25  bottom.  And you just make sure it's -- it's pushed

1  all the way flush against the -- the shelf.

2      Q    And what is the purpose of -- of that

3  procedure?

4      A    It's our marketing.

5      Q    And what --

6      A    (Interruption.)

7      Q    I'm sorry?

8      A    It has a little strip inside that will

9  basically say what kind of denim it is, whether it's a

10  boot cut, a skinny, et cetera.

11      Q    But what's the purpose of the training in

12  terms of, like, how to place the shelf strip?

13      A    Mark -- marketing placing, signage placing,

14  everything, you know, has a standard operating

15  procedure, so everything has a correct place that it's

16  supposed to be placed in.

17      Q    So let me show you what I'm going to mark as

18  Plaintiff's Exhibit No. 1.  I'm going to share my

19  screen with you.  If you have trouble seeing this or

20  you want me to zoom in, whatever, just let me know and

21  we'll do that.  Okay?

22      A    Sure.

23      Q    All right.

24           (Exhibit No. P-1 was marked.)

25  BY MR. WALKER:

1      Q    All right.  Mr. Rinehart, can you see this

2  document I just pulled up?

3      A    I do, yes.

4      Q    All right.  And for the record, it's got

5  some Bates numbers at the bottom that say Old-Navy209.

6  Do you see that?

7      A    I do, yes.

8      Q    Okay.  Up here at the top, there's a stamp

9  on it that says Confidential.  So it may be hard to

10  read, but I read it to say Metal Shelf Strip Sign

11  Holder:  Added Safety.

12           Is that what it says?

13      A    Correct.

14      Q    And have you seen this document before?

15      A    No, I am not familiar with this document.

16      Q    Okay.  Let's take a -- take a look at it.

17  It says -- well, first of all, do you see the pictures

18  on page 1?

19      A    I do.

20      Q    And are these the strip signs that we've

21  been talking about that you put underneath the jeans

22  or khakis that advertise what they are or maybe any

23  slash reductions?

24      A    Yes.

25      Q    And these are the ones that you were talking

Michael Rinehart - August 31, 2023                    12
Video Deposition

1   about you push far back so they're flush with the

2   shelf?

3        A    Correct.

4        Q    And there's a little white strip -- do you

5   see that? -- on the back of it?

6        A    Correct.

7        Q    And that white strip, you put -- you put on

8   the back of -- the shelf strip against the shelf

9   itself; right?

10       A    I have not seen this document.  That is not

11  typically how the -- the fixture is placed, no.

12       Q    Okay.  How would you place the fixture?

13       A    As I said before, you place the fixture on

14  the shelf and it pushes back flush.  There is a

15  nonskid, like nonslip, material on the bottom of that

16  shelf bracket -- or shelf fixture.

17       Q    What kind of nonskid material?

18       A    If you can see in the picture, like, the top

19  right-hand corner, where it's slightly reflective,

20  it's like a hard rubber, almost kind of tacky-feeling

21  rubber, that covers the entire bottom of the denim

22  strip holder.

23       Q    Okay.  So the stuff here about the Velcro,

24  you haven't heard that before?

25       A    No, sir.

**Regency-Brentano, Inc.**

1      Q    Okay.  Let's go down to page 2.  It says

2    Metal Shelf Sign Holders:  Added Safety Reminder.

3           Do you see that?

4      A    I do.

5      Q    It says, "The Metal Shelf Strip Sign

6    Holders, used in Denim and Khaki presentations, are at

7    risk of sliding forward off the shelf and falling,

8    when someone removes a product from the stack.  All

9    stores with the Metal Shelf Strip Sign Holders must

10   use Velcro strips to help secure the sign holder to

11   the shelf they sit upon."

12          Did I read that correctly?

13     A    Yes.

14     Q    Okay.  So -- but you haven't seen this

15   safety notice?

16     A    No, I'm not familiar with this document.

17     Q    Is this the first time you're hearing that

18   there was a safety reminder concerning use of Velcro

19   strips on the -- on the bottoms of the strip shelves?

20     A    Yes.

21     Q    And you don't recall ever receiving any

22   training on this safety procedure?

23     A    For this Velcro strip?  No.

24     Q    There is a -- let me zoom out here.  On

25   page 3, there's an engineering drawing.  Do you see

1  that?

2        A    Yes.  I'm not sure exactly what I'm looking

3  for on here, but, yes, I do see an engineering

4  drawing.

5        Q    It looks like there is a strip shelf over

6  here in the -- in the right-hand corner that's gray.

7  Do you see that?

8        A    Correct.

9        Q    And do you see there's a little mark there

10  that says "D"?

11        A    Yes.

12        Q    And it points to a hole in the strip

13  shelf -- or shelf strip?

14        A    Yes.

15        Q    Well, do you know what that -- what that

16  hole is for?

17        A    I do not.  I've never seen that hole be used

18  in any -- in any form.

19        Q    Okay.  So what are the -- what are the

20  procedures, if any, that you're aware of that existed

21  prior to April 13th, 2021, to make sure the shelf

22  strips didn't come off when people would grab the

23  jeans or khakis?

24        A    You just make sure they're flush.  If you

25  see anything that's, you know, out of place, push it

Michael Rinehart - August 31, 2023                    15
Video Deposition

1    back.  If they, for some reason, will be missing that

2    nonskid bottom, you would dispose of the -- the

3    hardware, as is like any hardware.  If a hardware is

4    broken, you would just, you know, dispose of that,

5    that piece of hardware.  You would throw it away.

6          Q    Can you point me to any particular document

7    or any -- or video of training material that you saw

8    concerning this nonskid material on the bottom of this

9    shelf strip?

10         A    No, I don't have any documents.

11         Q    Can you -- can you recall one that you've

12   seen?

13         A    A specific document?  No.

14         Q    Okay.  Or like a video or anything that you

15   can point me to to help me find that?

16         A    Nothing specifically, no.  We -- upon

17   onboarding, there's a fashionably-safe video.  They do

18   talk about procedures for broken hardware, proper

19   placement of hardware, et cetera.  Or you could look

20   at signage SOPs and that would tell you the correct

21   placement.

22         Q    Gotcha.  All right.  So I assume you were

23   working on April 13th, 2021, when Ms. Clemons was

24   injured.

25         A    Yes, sir.

Michael Rinehart - August 31, 2023                16
Video Deposition

```
 1      Q    If you would, just in your own words, just
 2  kind of walk me through what happened and what you
 3  recall.
 4      A    I mean, it's over two and a half years ago,
 5  so I don't remember a lot of the details.  I don't
 6  remember if any cus -- if the customer came to me and
 7  told me she was injured or if another associate had --
 8  or she had approached another associate and the
 9  associate told me.
10          But I did assist Ms. Clemons.  I went over.
11  She stated that the item came out of the wall and
12  struck her ankle.  I do recall a scratch. I don't
13  recall any kind of blood, any kind of, like, serious
14  cut.
15          At that point, I offered a Band-Aid, if, you
16  know, she wanted to cover it and filled out the --
17  what's called an LPRM report.  It's basically an
18  incident report.
19      Q    Was she cooperative during that process?
20      A    She was, yes.
21      Q    Okay.  From your perspective, was she acting
22  reasonable?  Appropriate?
23      A    At that point in time, yes.
24      Q    And did you ever -- other than that initial
25  interaction that you had with her, did you ever speak
```

Michael Rinehart - August 31, 2023                    17
Video Deposition

1    to her again?

2        A    I believe it was the next day I gave her a

3    courtesy call just to follow up and -- it's basically

4    Old Navy's policy anytime there's an incident, we call

5    and just kind of check in as a -- a goodwill -- or a

6    show of goodwill.  Basically just said, you know, hey,

7    just checking in to see how you are and if she had any

8    questions, refer her to the 1 (800) Old Navy customer

9    service line.

10       Q    Okay.  Do you remember anything from that

11   conversation other than what you just told me?

12       A    No, not specific details.

13       Q    Okay.  So during that conversation, did you

14   draw any conclusions about her, like she was acting

15   inappropriately or was being rude or anything of that

16   nature?

17       A    No.  If anything stood out, I would remember

18   the conversation.  It was a very normal conversation.

19       Q    Okay.  She was acting polite and reasonable?

20       A    To the best of my knowledge.  I don't --

21   like I say, I don't remember the specific

22   conversation, but I don't think she was acting

23   unreasonably.

24       Q    Gotcha.  All right.  Let me -- let me show

25   you what I'm going to mark as Plaintiff's Exhibit 2.

Regency-Brentano, Inc.

Michael Rinehart - August 31, 2023                   18
Video Deposition

```
 1    And this is marked Bates numbers 1 through 11.
 2              (Exhibit No. P-2 was marked.)
 3              MR. WALKER:  I didn't intend to attach
 4         those dec pages, Brittany.
 5              MS. DEDIEGO:  That's okay.
 6              MR. WALKER:  But we can -- I'm going to
 7         call this -- I'm going to say it's going to
 8         be -- this is going to be Bates one through
 9         nine.  I'm just going to remove those Bates
10         numbers -- I mean remove those dec pages, if
11         that's okay, Brittany.
12              MS. DEDIEGO:  That's fine with me.
13    BY MR. WALKER:
14         Q    All right.  So Mr. Rinehart, do you
15    recognize the customer incident report that begins on
16    page 2?
17         A    Yes.
18         Q    Is this something that you would have filled
19    out?
20         A    Yes.  That's LPRM report, the incident
21    report, we fill out anytime there's a -- any kind of
22    incident with a customer injury, employee injury.
23    It's a very similar system if we have loss-prevention
24    issues, basically any kind of issue.
25         Q    Is all the data in here you would have
```

Michael Rinehart - August 31, 2023                    19
Video Deposition

```
 1    personally inputted?
 2         A    Yes, sir.
 3         Q    There are some photographs.  Do you see
 4    those on page 1?
 5         A    I do.
 6         Q    And then there's also photographs on page 4,
 7    5, and 6.
 8         A    Correct.
 9         Q    Did you take those photographs?
10         A    I don't remember specifically.  Yeah, I
11    don't recall.
12         Q    Okay.  Because -- let's start with page 1.
13    It's a photo of a strip shelf.  Is that, to the best
14    of your memory, the strip shelf that fell?
15         A    Yes.
16         Q    Does that fairly and accurately depict the
17    strip shelf?
18         A    It does.
19         Q    Same question for 4 -- pages 4 and 5, the
20    photographs in there:  Do those photographs fairly and
21    accurately depict the strip shelf that fell and hit
22    Ms. Clemons?
23         A    It does, yes.
24         Q    All right.  On page 6, it looks like there's
25    a display shelf for some jeans.  Is that the shelf
```

**Regency-Brentano, Inc.**

1    where the strip shelf -- excuse me.  I keep saying

2    strip shelf.  It's shelf strip.

3          A    Correct, shelf strip.

4          Q    Is that the shelf where the shelf strip came

5    from?

6          A    I can't say for sure because I'm not sure

7    who took the photos.  I don't recall specifically

8    taking them.  But it would be, if not that specific

9    booth, a very, very similar booth.

10         Q    All right.  Let's go back to five.  Do you

11   see on page 5 it looks like it's the underside of the

12   shelf strip?

13         A    I do.

14         Q    And is there any, like -- do you see any

15   Velcro on there?

16         A    No.  I just see the nonskid pad or nonslid

17   pad.

18         Q    Okay.  So that -- there's a -- you'd say

19   there's a nonskid pad on that?

20         A    Yes.

21         Q    Who puts the nonskid pad on there?

22         A    They come like that when we receive them.  I

23   guess the manufacturer.

24         Q    As far as you can recall, have there always

25   been the skid pads on the back of those?

Michael Rinehart - August 31, 2023                    21
Video Deposition

1        A    As long as I've worked for the company, yes.

2        Q    Since 2013?

3        A    Yes.

4        Q    It looks like, to me, on page 4, that

5   Velcro's on the top side of the shelf strip.  Do you

6   see that?

7        A    Correct.  That would have been for planogram

8   stickers.  It's basically a plastic thing that would

9   have sat on top, and it would tell you exactly which

10  SKUs would go into that row, so specific to that jean

11  or khaki.

12       Q    I see.  So the Velcro is being used for

13  inventory purposes?

14       A    Correct.

15       Q    You would -- you would agree with me that

16  the Velcro on the top of the shelf strip is different

17  from that safety reminder we looked at on Exhibit 1;

18  right?

19       A    Correct.  The Velcro on top would have

20  nothing to do with safety.  That would be specifically

21  for merchandising purposes.

22       Q    Okay.  Do you recall if anybody else spoke

23  to Ms. Clemons?

24       A    I believe we had a cashier that also spoke

25  with her that day.

**Regency-Brentano, Inc.**

Michael Rinehart - August 31, 2023                 22
Video Deposition

1      Q      Do you know anything about that
2  conversation?
3      A      I do not.
4      Q      Did you ever -- not you, but did Old Navy,
5  to your knowledge, ever bolt down the shelf strips?
6      A      No.  There's no way to bolt them down.
7      Q      Have you ever heard of these falling before?
8      A      You would have to be extremely aggressive in
9  pulling the jeans out of the wall or the khakis out of
10  the wall to make them slide out.
11      Q      So that wasn't exactly my question.
12             Did you ever -- prior to April of 2021, did
13  you ever see them fall or hear about them falling?
14      A      I would say no.  I mean, if you're moving a
15  shelf and you do not remove that first, it is going to
16  fall.  I have never had another incident involving one
17  of these fixtures, no.
18      Q      Earlier, when we referred to an incident, I
19  just mean in general have you ever, you know, found
20  them on the ground or had to put them back or had
21  to -- had to tell anyone to put them back or seen
22  anybody putting them back?
23      A      Yes.  It's a very generalized question.  I
24  mean, anything can fall over, you know.  Just like the
25  books can fall over.  Anything can fall.

Regency-Brentano, Inc.

```
 1        Q    Sure.  So I'm just trying to be more
 2   specific, though.  I mean, prior to April of 2021, had
 3   you ever been aware of one of these falling before
 4   from the shelf?
 5        A    Yes.
 6        Q    Tell -- tell me what you can recall from
 7   that.
 8        A    I don't have a specific instance of one
 9   falling.  Like I said, it's like a stack of books.  If
10   you push a stack of books, it's going to fall.
11   Anything can fall over, essentially.
12        Q    Are these things made from metal?
13        A    Yes.
14        Q    Do you have an idea about how heavy they
15   are?
16        A    I couldn't give you specifics.  I don't want
17   to give you the wrong number.  They're not heavy, but
18   they're not paper-light either.
19        Q    Okay.  How would it compare to, like, a red
20   brick?
21        A    Excuse me?
22        Q    How would it compare to, like, a red brick,
23   you know, like -- just like a brick that you use for
24   building?
25        A    Yeah, lighter than a brick.
```

**Regency-Brentano, Inc.**

Michael Rinehart - August 31, 2023                    24
Video Deposition

```
 1        Q    Okay.  Heavier than, like, a mug?

 2        A    I don't know.

 3        Q    What would you compare the weight to?

 4        A    I don't know.  I'd have to hold one and hold

 5   something else.  Like I said, they're -- they're not

 6   heavy, they're not light, at the same time.

 7        Q    Fair enough.  Do you go by Mike?

 8        A    I do, yes.

 9        Q    So if she says here that the manager said he

10   didn't know how it happened because the sign should

11   have been bolted down, do you recall saying that?

12        A    No, I do not.

13        Q    Do you know why she would say that or recall

14   that?

15        A    I don't.  Like I said, there's no way to

16   physically bolt those down.

17        Q    Are there any other displays bolted down?

18        A    No.

19        Q    Since the Linda Clemons incident, do you

20   know if the Snellville Old Navy store started doing

21   any other precautions or procedures with the shelf

22   strips to prevent them from sliding out and falling?

23        A    I don't know.

24        Q    Since you've worked there, have you -- are

25   you aware of any additional procedures?
```

**Regency-Brentano, Inc.**

1      A     Not that I'm aware of.

2      Q     What about Conyers?  Have y'all -- have

3   y'all had to follow any different procedures?

4      A     No, same procedures.

5      Q     Anything else you can remember about

6   Linda Clemons?

7      A     No.  Like I said, this was two and a half

8   years ago.  You know, I've had probably thousands of

9   customer interactions since I spoke with her.  Like I

10  said, she was reasonable, she wasn't out of line, she

11  wasn't hysterical or anything to that -- that sense.

12              MR. WALKER:  All right.  I think that's

13          all the questions I have for you.  I appreciate

14          your time.

15              THE DEPONENT:  All right.  Thank you.

16              MS. DEDIEGO:  I don't have any questions

17          for you, Mike.

18              THE VIDEOGRAPHER:  We're off the record

19          at 1:27.

20              THE COURT REPORTER:  And you said yes,

21          you're going to read and sign?  I'm sorry.

22              MS. DEDIEGO:  Yes, ma'am.

23              THE COURT REPORTER:  Okay.  And what are

24          you ordering for a transcript, ma'am?

25              MS. DEDIEGO:  I'll take an E-Tran,

1          please, with the exhibits.

2                  MR. WALKER:  Same with me.

3                     (Signature was reserved.)

4              (The deposition concluded at 1:27 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2    STATE OF GEORGIA:

3    COUNTY OF CHEROKEE:

4        I hereby certify that the foregoing transcript

5    was reported as stated in the caption and the

6    questions and answers thereto were reduced to

7    typewriting under my direction; that the foregoing

8    26 pages represent a true, complete, and correct

9    transcript of the evidence given upon said hearing;

10   and I further certify that I am not of kin or

11   counsel to the parties in the case, am not in the

12   employ of counsel for any of said parties, nor am I

13   in any way interested in the result of said case.

14   This 10th day of September 2023.

15

16

17

18

19   _____
     Piper L. Quinn, CCR B-2198
20

21

22

23

24

25

<div style="border: 1px solid black;">

1           **ERRATA SHEET**

2      I, Michael Rinehart, the witness herein, do
hereby certify that I have read the transcript of

3    August 31, 2023, of my deposition testimony and the
same is true and correct, to the best of my knowledge,

4    with the exception of the following changes noted
below, if any:

5

6    Page_____ Line_____ should read:_____

7    Reason for change:_____

8    Page_____ Line_____ should read:_____

9    Reason for change:_____

10   Page_____ Line_____ should read:_____

11   Reason for change:_____

12   Page_____ Line_____ should read:_____

13   Reason for change:_____

14   Page_____ Line_____ should read:_____

15   Reason for change:_____

16   Page_____ Line_____ should read:_____

17   Reason for change:_____

18   Page_____ Line_____ should read:_____

19   Reason for change:_____

20   Page_____ Line_____ should read:_____

21   Reason for change:

22

23   __10/9/23__                  _[signature]_

24   Date                       MICHAEL RINEHART

25

</div>

CONFIDENTIAL

## Metal Shelf Strip Sign Holder: Added Safety

**Men's Khaki Metal Shelf Strip Sign Holders used as example, same principle applies to all Metal Shelf Strips.**



**Metal Shelf Strip Sign Holder.**



**Remove metal shelf strip and flip upside down; adhere velcro strip (both sides).**



**With both sides of velcro attached to bottom of metal shelf strip - flip right side up.**



**Finished product.**
**Place metal shelf strip sign holder in proper location on shelf and press down (to adhere velcro to both the bottom of sign holder and the shelf). Replace stacks of product.**



EXHIBIT
**P-1**

Old-Navy000209

CONFIDENTIAL

# Metal Shelf Sign Holders: Added Safety Reminder

OCT 19, 2015 • OLD NAVY • SENT ON OCT 18

> This section contains sensitive information and is not visible to stores

> Sent to All stores
>
> Of your 997 stores: 997 are behind and 0 are on track or completed

The Metal Shelf Strip Sign Holders, used in Denim and Khaki presentations, are at risk of sliding forward off the shelf and falling, when someone removes a product from a stack.

- All stores with the Metal Shelf Strip Sign Holders must use Velcro strips to help secure the sign holder to the shelf they sit upon.
  - Use the Velcro provided for POG.
- All Metal Shelf Strip Sign Holders must be secured with Velcro by store opening on **Mon 10/26**.

**The process:**

1. Remove Metal Shelf Strip Sign Holder from the shelf and flip over.
2. Attach both sides of Velcro to the bottom side of sign holder.
3. Place sign holder in desired position on shelf and press, to ensure one side of the Velcro adheres to the shelf (while the other adheres to bottom of sign holder).

**See attached photographs for reference.**

## 1 Attachment

Metal Shelf Strip Sign Holder Photos.pdf

---

## Tasks

| Oct 19, 2015 | Read Communication and share with team. |
| Oct 19, 2015 | Secure Metal Shelf Strip Sign Holders with Velcro. Must be complete by store opening on Mon 10/26. |

Old-Navy000210
2/13/18, 12:15 PM

CONFIDENTIAL

Old-Navy000211

# ABSOLUTELY NO BURRS OR SHARP EDGES. ALL WELDMENTS MUST BE SQUARE AND FLAT AFTER WELDS.

CONFIDENTIAL

**EV2134**



| | REVISIONS | | |
|---|---|---|---|
| REV. | DESCRIPTION | DATE | APPROVED |
| B | REVISED PRODUCT NAME | 7/23/15 | LA |

DETAIL A
SCALE 2 : 1

WHITE VELCRO
(HOOK & LOOP)

Rear Support Angle

SKIP TYP

WHITE VELCRO
(HOOK & LOOP)

WINDOW

WINDOW

APPROVED
By Emily Fishman at 11:37 am, Jul 24, 2015

| # | QTY. | PART # | DESCRIPTION |
|---|---|---|---|
| 1 | 1 | Z04046P-000 | FORMED SHELF |
| 2 | 1 | Z04046P-001 | FORMED ANGLE |
| 3 | 2 | Z04046P-002 | WHITE VELCRO (HOOK & LOOP) |

NOTE:
1. BREAK ALL SHARP EDGES & REMOVE ALL BURRS.
2. MATERIAL:COLD ROLLED STEEL.
3. FINISH: CLEAR POWDER COAT 70 DEGREE SHEEN.
4. WHITE VELCRO - ADHESIVE BACKED (HOOK & LOOP).

SALES PART #: **EV2134**

DIMENSIONS IN INCHES & MM
DO NOT SCALE DRAWINGS
INTERPRET DIM AND TOL. PER ASME Y14.5M-1994

| FRACTIONS | TOLERANCES / DECIMALS | ANGLES |
|---|---|---|
| X.X ±1/16 | X.XX ±.03   X.XXX ±.015 | ANGLE ±1° |

REV: **B**

THIRD ANGLE PROJECTION

PROJECT #:

**OLD NAVY**
GAP INC.
OLD NAVY STORE DESIGN
2 FOLSOM ST 6TH FLOOR
SAN FRANCISCO CA 94105

LAST SAVED:
Thursday, July 23, 2015
11:54:24 AM

TITLE:
**SIGN SHELF STRIP 10"**

WEIGHT (lbs):
.04

DWG NO.  Z04046A-000

Thursday, July 23, 2015 11:54:24 AM

Old-Navy000212

**ABSOLUTELY NO BURRS OR SHARP EDGES. ALL WELDMENTS MUST BE SQUARE AND FLAT AFTER WELDS.**

# CONFIDENTIAL



9.500
[241.300]
Rear Flange

.625
[15.875]

.250
[6.350]
Typ

Ø.188
[4.763]

.375
[9.525]

.375
[9.525]

SECTION B-B



| SALES PART #: | EV2134 | PROJECT #: | | | |
|---|---|---|---|---|---|

**DIMENSIONS IN INCHES & MM**
DO NOT SCALE DRAWINGS
INTERPRET DIM AND TOL. PER ASME Y14.5M-1994

| FRACTIONS | TOLERANCES / DECIMALS | | ANGLES |
|---|---|---|---|
| X.X | X.XX | X.XXX | ANGLE |
| ±1/16 | ±.03 | ±.015 | ±1° |

**REV:** B

THIRD ANGLE PROJECTION

**OLD NAVY**

GAP INC.
OLD NAVY STORE DESIGN
2 FOLSOM ST 6TH FLOOR
SAN FRANCISCO CA 94105

USED ON:

WEIGHT (lbs):

**TITLE:**
**SIGN SHELF STRIP 10"**

DATE: 5/12/2008  DWG NO. Z04046A-000

SIZE B   SCALE 1:2   DRAWN BY:   ALL   IN SHEET  2 OF 2

**Old-Navy000213**

Q:\CJPM\CAD FILES\Z04047A PS 10 X 2.25 SHELF STRIP\Z04046A-000



EXHIBIT
**P-2**

Record Number 11029055638



Status: Close    Submitted By: Michael Rinehart
Submitted On: Apr 13, 2021 3:47 PM (America/New_York)

# Customer Injury Report

| 1 | **Instructions** |
|---|---|

This form must be completed any time a customer is injured on the premises. Please ensure that all emergency services have been contacted if they are needed or requested, before filling out this form.

| 3 | **Report Preparer** |
|---|---|

| EmployeeID | First Name | Last Name |
|---|---|---|
| 2485711 | Michael | Rinehart |

| Store phone number | Best contact phone number | Email |
|---|---|---|
| 770-972-1402 | 770 972 1402 | michael_rinehart@stores.gap.com |

| 4 | **Location of Incident** |
|---|---|

| Location code - must be entered as 5-digit number, i.e Store 00150 | Store Details | Date Incident Reported to Store |
|---|---|---|
| 06095 | OLD NAVY, SNELLVILLE PAVILION, 2059 Scenic Hwy N Ste #106, Snellville, GA, 30078, UNITED STATES OF AMERICA | April 13, 2021 |

| Location Type | Date of Incident | Time of Incident |
|---|---|---|
| Store | April 13, 2021 | 3:20 PM |

| 5 | **Injured Person** |
|---|---|

| Customer willing or able to provide information | Type of Incident |
|---|---|
| Yes | Customer |

**Record 1 of 1**

**Injured Person**

| First Name | Middle Initial | Last Name |
|---|---|---|
| linda | | clemons |

| Phone Number | Preferred Language | Gender | Age |
|---|---|---|---|
| 6783601358 | English | Female | 61 |

| Minor Customer | E-mail Address |
|---|---|
| No | geeegeee1424@gmail.com |

**Address**

| Street Address | Suite/Apartment | City | Country | State / Province | Postal Code |
|---|---|---|---|---|---|
| 1845 clear lake trace | | stone mountain | United States of America | Georgia | 30088 |

| 7 | **Incident Details** |
|---|---|

**Record 1 of 1**

Old Navy-Clemons000002

| *Accident Cause Code* | *Part of Body Injured* | *Type of Injury* |
|---|---|---|
| Struck by- Person or Object | Ankle | Cut |

| *Area Where Incident Occurred* | *Object that may have contributed to the incident* | *Name of Employee Who Walked Area Prior to the Incident* |
|---|---|---|
| Selling Floor - Women's | Signage | michael rinehart |

*Summary of Incident*

Customer was shopping a denim wall in womens. A shelf strip sign holder fell out of the denim wall and cut her ankles

*Describe how injured person stated the INCIDENT occurred*

Same as summary

| *Did an Employee Assist the Customer?* | *Employee First Name* | *Employee Last Name* |
|---|---|---|
| • Yes | michael | rinehart |

*First Aid Provided*

- No

*Was Mall Security involved*

- No

| *Did the customer refuse treatment* | *Was the Injured Person transported via ambulance?* |
|---|---|
| • No | • No |

**8    Emergency Service**

*Were emergency services called?*

- No

**9    Witness Information**

*Did anyone hear or see the accident?*

- No

**10    Manager On Duty at Time Of Incident**

| *Employee ID* | *First Name* | *Last Name* |
|---|---|---|
| 2485711 | Michael | Rinehart |

| *Title* | *Email Address* | *Best Number to reach you* |
|---|---|---|
| Asst General Mgr | michael_rinehart@stores.gap.com | 7709721402 |

*Do you have any questions for Risk Management or have additional information to provide to Risk Management?*

- No

Old Navy-Clemons000003





Old Navy-Clemons000005



Old Navy-Clemons000006

**Moy, Chris**

| | |
|---|---|
| **Subject:** | FW: Risk Management // ON // Clemons, Linda |
| **Importance:** | High |

---

**From:** Adam Ross <Adam_Ross@gap.com>
**Sent:** Friday, April 30, 2021 9:50 AM
**To:** Jesse Licea <Jesse_Licea@gap.com>; Robin Crawford <Robin_Crawford@gap.com>
**Cc:** Brandi Spellacy <Brandi_Spellacy@gap.com>
**Subject:** FW: Risk Management // ON // Clemons, Linda
**Importance:** High

Hello-

This customer sought treatment and is seeking medical reimbursement and compensation. Call attached. Could you please open a claim?

Thanks,
Adam

# Old Navy Risk Management Incident
(Follow up for alleged injuries, property damage & safety incidents)

**Customer Information:**

Linda Clemons

Phone:6783601358
Mobile:
Email: geeegeee1424@gmail.com
DOB:

**Incident Information:**

| | |
|---|---|
| Store number: | Old Navy / 06095 |
| CR Specialist: | Emily Potter |
| Case number: | 31319235 |
| Product number: | |
| Reason for complaint: | Safety Concerns |
| Date and time of incident: | Apr 13 2021 3:00 PM EDT |
| Date and time customer called CR: | Apr 29 2021 12:01 PM EDT |

**Information customer stated to Customer Relations:**
Record as much information as possible from the customer relating to the alleged incident

1

Old Navy-Clemons000007

When going to grab some pants the store fixture fell on my toes and sliced them.
I was in a lot of pain.
I had to get a tetanus shot.
The MOD took information but told me to call you guys too.

Irene 4/29
I'm doing a lot better now.
I have a lot bruising and swelling on my toes and ankle.
The day it happened, I called my doctor and she told me to go to urgent care and get a tetanus shot.
I had to get it a couple weeks later because I had just got my Covid shot and they told me I have to wait.
This happened on 4/13/21, around 3 pm.
I had purchased the item and then I asked to speak to a manager because they burning so bad.
I was in womens blue jeans.
I was going through the pants looking for my size.
I pulled out my size and a metal sign came out with it and hit my feet.
The manager said he didn't know how it happened because the sign should have been bolted down.
He did give gauze, cleaning wipes, and band aids to clean it up.
And then he did the report.
I want to say his name is Mike.
There was bleeding.
One of the cuts was deep but not deep enough for stitches.
There were cut on my ankles and the tops of feet.
Because it was metal, they wanted me to get a tetanus shot.
The first doctor told me to soak them and keep them clean and to put neosporin on them.
And to stay off them for the swelling to go down.
My appointment for the tetanus shot was today.
My doctor said they were healing pretty good.
I would like my medical bills and some type of compensation.

**CR Rep notes:**
Record what expectations were set with the customer from the CR department, and any other important information relating to this customer's concerns

Took customers contact info & transferred to rm line

Irene 4/29
I apologized for the experience.
I advised we take this very seriously.
I advised feedback will be sent to appropriate leadership.
I gave case #.
I advised someone in leadership will reach out in the next 3-5 BD.
I thanked the customer for calling.
Audio requested.

Reason for forwarding complaint:                                    Medical Bills


CR contacted the store (not required)                              NO

Store complete Incident Report                                     NO


**Your feedback is important to us.**

Old Navy-Clemons000008

**We invite you to take a few minutes to fill out our Email Customer Satisfaction Survey by following the link below:**

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**

**11/17/2023 5:36 PM**

TIANA P. GARNER, CLERK

# IN THE STATE COURT OF GWINNETT COUNTY
# STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 23-C-00137-S4 |
| v. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

## AND

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

---

Plaintiff responds to *Defendant's Statement of Facts*, and also files this Statement of Material Facts in opposition to summary judgment, as follows:

### <u>RESPONSE TO DEFENDANT'S STATEMENT OF FACTS</u>

Defendant Allen's Statement of Facts are disputed in that they do not accurately state the facts in their entirety and do not eliminate material questions of fact. Plaintiff denies and contends that Defendant's statement of facts Nos. 2, 3, 6, and 7 are not fully accurate, complete, and/or are not in proper context. Also, Plaintiff objects to having to respond to Defendant's motions and statements and facts under the circumstances. *Hodge v. Sada Enterprises, Inc.*, 217 Ga. App. 688 (1995). Any fact not otherwise responded to is hereby denied.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1.

Plaintiff Linda Clemons was shopping at the Old Navy Store in Snellville, Georgia on April 13, 2021. (Ex. A, Clemons depo. at 11.)

2.

As Ms. Clemons walked through the store, she reached to grab a pair of jeans from the rack, when the metal shelf came crashing down. (*Id.* at 27.) The shelf hit her feet, causing her feet and toes to bleed and burn. (*Id.* at 34–37.)

3.

Before and at the time of the incident causing Ms. Clemons' injuries, Defendant Lisa Allen was the general manager of the Old Navy where the incident took place. (Ex. B, Allen depo. at 6–7.) Allen has worked as the general manager of the Snellville store for roughly 20 years. (*Id.* at 7.)

4.

When asked about metal shelf strips like the one that injured Ms. Clemons, Defendant Allen testified that she has never received any training on installing or securing shelf strips. (*Id.*)

5.

Defendant Allen testified that she is aware of the purpose of securing the metal shelf strips, and she acknowledged that improperly securing them can create a risk of the strip falling off the shelf and hitting someone. (*Id.* at 10.)

6.

The shelf that injured Ms. Clemons was not properly secured according to Old Navy policies and procedures at the time of the incident. (*Id.* at 11.)

7.

Although Defendant Allen disclaimed any knowledge or awareness of training on the metal shelf strips at her Old Navy location, others have a different memory. Michael Rinehart, who was the assistant general manager of merchandising at the time of the incident, testified that Old Navy employees receive formal training concerning how to secure shelving and signs. (Ex. C, Rinehart depo. at 9.)

> Q: And did you undergo any training prior to April of 2021 concerning how to secure the strip shelves?
>
> A: It would fall under typical merchandising training and signage SOPs, but yes.
>
> Q: Okay. What do you recall the training being on – on that particular issue?
>
> A: For the shelf strip, you basically – you place it onto the shelf. It has a nonskid pad on the bottom. And you just make sure it's – it's pushed all the way flush against the – the shelf.

(*Id.* at 9–10.) Thus, while Ms. Allen disclaims any training on these mechanisms, the training exists.

8.

Ms. Allen admits that at the time of the incident, Old Navy had policies in place which required her, in her capacity as manager, to check the safety of the

store. (Allen depo. at 15.)

<div align="center">9.</div>

Yet, Allen failed to check the metal safety strips, ultimately leading to

Plaintiff's injuries. (*Id*.)

> Q: Are there any policies and procedures at Old Navy to periodically check the shelf strips to see that they're properly secured?
>
> A: We do what's called – it's under risk management, and monthly we have different topics that we cover, like different safety topics, every single month, but each month they rotate.
>
> Q: Do you recall if there was ever any discussion about the shelf strips and checking them?
>
> A: No.

(*Id*. at 15.)

Dated:  November 17, 2023.

<div style="margin-left: 40%">

Respectfully submitted,

**PIASTA WALKER HAGENBUSH, LLC**

*/s/ Brianna N. Yates*
Brianna N. Yates
Georgia Bar No. 266121
Michael P. Walker
Georgia Bar No. 954678
*Attorneys for Plaintiff*

</div>

3301 Windy Ridge Parkway,
Suite 110
Atlanta, Georgia 30339
(404) 996-1296
mike@piastawalker.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the foregoing *Plaintiff's*

*Opposition to Defendant Lisa Allen's Motion for Summary Judgment* via Statutory

Electronic Service to the following attorney of record:

Brittany DeDiego
S. Christopher Collier
Lewis Brisbois Bisgaard & Smith, LLP
Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, GA 30308
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com
*Attorneys for Defendant*

Dated: November 17, 2023.

**PIASTA WALKER HAGENBUSH, LLC**

*/s/ Brianna N. Yates*
Brianna N. Yates
Georgia Bar No. 266121
Michael P. Walker
Georgia Bar No. 954678
*Attorneys for Plaintiff*

3301 Windy Ridge Parkway,
Suite 110
Atlanta, Georgia 30339
(404) 996-1296
mike@piastawalker.com
brianna@piastawalker.com

# EXHIBIT A

Case 1:23-mi-99999-UNA  Document 4195  Filed 12/18/23  Page 261 of 351

Linda D. Clemons                                October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 1

1              IN THE STATE COURT OF GWINNETT COUNTY

2                        STATE OF GEORGIA

3        _____

4      LINDA D. CLEMONS,

5               Plaintiff,

6          v.                           Civil Action No.

7      OLD NAVY, LLC; LISA ALLEN;       23-C-00137-S4

8      DOE 1; DOE 2; DOE 3; and

9      DOE 4,

10              Defendants.

11       _____

12                  VIDEOTAPED DEPOSITION OF

13                     LINDA D. CLEMONS

14     DATE:        Wednesday, October 18, 2023

15     TIME:        10:08 a.m.

16     LOCATION:    Piasta Walker Hagenbush, LLC

17                  3301 Windy Ridge Parkway, Suite 110

18                  Atlanta, GA 30339

19     REPORTED BY:  Deidra Nash

20     JOB NO.:     6114182

21

22

23

24

25

Linda D. Clemons                                          October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 2

```
 1        A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF LINDA D. CLEMONS:
 3      HALEY KAMLA KAIRAB, ESQUIRE
 4      Piasta Walker Hagenbush, LLC
 5      3301 Windy Ridge Parkway, Suite 110
 6      Atlanta, GA 30339
 7      haley@piastawalker.com
 8      (404) 996-1296
 9
10   ON BEHALF OF DEFENDANTS OLD NAVY, LLC AND LISA ALLEN:
11      BRITTANY DEDIEGO, ESQUIRE
12      Lewis, Brisbois, Bisgaard & Smith, LLP
13      600 Peachtree Street Northeast, Suite 4700
14      Atlanta, GA 30308
15      brittany.dediego@lewisbrisbois.com
16      (404) 348-8585
17
18   ALSO PRESENT:
19      Brandon Brantley, Videographer
20
21
22
23
24
25
```

Page 3

```
 1          I N D E X
 2   EXAMINATION:                        PAGE
 3     By Ms. DeDiego              6
 4
 5          E X H I B I T S
 6   NO.      DESCRIPTION              PAGE
 7   Exhibit 1   Photographs (Old Navy
 8          Clemons 000001-000006)      30
 9   Exhibit 2    Foot Diagrams         35
10   Exhibit 3    Customer Injury Report   40
11   Exhibit 4    Photographs Produced by
12          Plaintiff             64
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  This is the video
 3   deposition of Linda Clemons.  We are on the record at
 4   10:08 a.m.
 5          THE REPORTER:  Good morning.  My name
 6   is Deidra Nash; I am the reporter assigned by Veritext
 7   to take the record of this proceeding.
 8          This is the deposition of Linda D.
 9   Clemons taken in the matter of Linda D. Clemons vs.
10   Old Navy, et al. on October 18, 2023, at 3301 Windy
11   Ridge Parkway, Suite 110, Atlanta, Georgia 30339.
12          I am a notary authorized to take
13   acknowledgment and administer oaths in the state of
14   Georgia.
15          Additionally, absent an objection on
16   the record before the witness is sworn, all parties
17   and the witness understand and agree that any
18   certified transcript produced from the recording of
19   this proceeding:
20          - is intended for all uses permitted
21            under applicable procedural and
22            evidentiary rules and laws in the
23            same manner as a deposition recorded
24            by stenographic means; and
25          - shall constitute written stipulation
```

Page 5

```
 1          of such.
 2          At this time will everyone in
 3   attendance, beginning with the taking attorney, please
 4   identify yourself for the record.
 5          MS. DEDIEGO:  Brittany DeDiego for the
 6   defendants.
 7          MS. KAIRAB:  Haley Kairab for the
 8   plaintiff.
 9          MS. CLEMONS:  Linda Clemons.
10          THE REPORTER:  Thank you.  Thank you.
11          Hearing no objections, I will now swear
12   in the witness.
13          Ms. Clemons, can you please raise your
14   right hand.
15   WHEREUPON,
16          LINDA D. CLEMONS,
17   called as a witness and having been first duly sworn
18   to tell the truth, the whole truth, and nothing but
19   the truth, was examined and testified as follows:
20          THE REPORTER:  Thank you so much.
21          Ms. Brittany, please begin when you're
22   ready.
23          MS. DEDIEGO:  Okay.  This will be the
24   deposition of plaintiff Linda Clemons taken in the
25   action currently pending in the State Court of
```

2 (Pages 2 - 5)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 6

1  Gwinnett County.
2        It is taken pursuant to notice and
3  agreement of counsel with respect to the scheduling of
4  the deposition.  It is taken for all purposes under
5  the Civil Practice Act, including cross-examination
6  and all other purposes that are set forth in the Civil
7  Practice Act and the notice.
8        Haley, I propose that we stipulate to
9  reserve all objections except those that go to the
10 form of the question or responsiveness of the answer
11 until time of trial or other use of the deposition.
12 Is that agreeable?
13       MS. KAIRAB:  Yes, it is.
14       MS. DEDIEGO:  Perfect.  And is
15 Ms. Clemons going to read and sign?
16       MS. KAIRAB:  Yes, she will.
17       EXAMINATION
18 BY MS. DEDIEGO:
19    Q  Okay.  Good morning, Ms. Clemons.
20    A  Good morning.
21    Q  My name is Brittany DeDiego, and I represent
22 the defendants in this case.
23       Have you ever given a deposition before?
24    A  No.
25    Q  Okay.  I'm sure your attorneys went over how

Page 7

1  it works with you; but basically, I'm here to ask you
2  some questions.  And the court reporter is here,
3  taking down everything that's said.
4    A  Okay.
5    Q  And she can only take down one person
6  talking at a time.  So I just ask that you let me
7  finish completely asking my question before you start
8  to answer, and I'm going to do my best not to cut you
9  off, because she can't take down two people at a time.
10   A  Okay.
11   Q  She can also only take down a verbal
12 response.  So it's natural sometimes to say "uh-huh"
13 or "uh-uh," and that just doesn't translate well for a
14 written transcript.  So if any time you do and I
15 prompt you "is that a yes or a no," I'm not trying to
16 pick on you or be rude.  I'm just trying to get a
17 clear record.
18   A  I understand.
19   Q  Also, if you need to take a break at any
20 time, please let me know.  I'm happy to take a break
21 whenever you need to.
22   A  Okay.
23   Q  I just ask that if I have a question
24 pending, that you answer my question before we take a
25 break.

Page 8

1        Also, if at any time you don't understand my
2  question or you don't hear my question, please ask me
3  to repeat or rephrase it.  If you answer my question,
4  I'm going to assume that you understood it.  Is that
5  fair?
6    A  Understood.
7    Q  Okay.  And, ma'am, I ask everybody this
8  question.  Are you under the influence of any drug or
9  alcohol today?
10   A  No.
11   Q  Okay.  Can you please state your full legal
12 name?
13   A  Linda D. Clemons -- Donzell Clemons.
14       THE REPORTER:  I didn't hear the middle
15 name.
16       THE WITNESS:  Donzell.
17 BY MS. DEDIEGO:
18   Q  And have you ever gone by any other name?
19   A  My maiden name.
20   Q  What was your maiden name?
21   A  Dubose.  It's D-U-B-O-S-E.
22   Q  Okay.  What's your date of birth?
23   A  6/14/58.
24   Q  What's your hometown?  Where'd you grow up?
25   A  Ohio -- Cleveland, Ohio.

Page 9

1    Q  Is that where you went to high school?
2    A  I did.
3    Q  And what high school did you go to?
4    A  East Technical High School.
5    Q  Did you graduate?
6    A  I did.
7    Q  Did you go to college afterwards?
8    A  No.
9    Q  Did you take any sort of professional
10 courses?
11   A  No.
12   Q  When did you move to Georgia?
13   A  I believe it was '93.
14   Q  And what brought you to Georgia?
15   A  My father lived here, and my father was
16 raised and born here.
17   Q  Have you moved out of the state of Georgia
18 since 1993?
19   A  No.
20   Q  What's your current address?
21   A  It's 1-7-4 -- I just moved.
22   Q  Okay.
23   A  I believe it's 1749 Amphora.  It's in
24 Hoschton, Georgia.
25   Q  I can never spell that one, but I know what

3 (Pages 6 - 9)

Linda D. Clemons                                      October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 10

1  you're talking about.
2       What county is that?
3     A   Do you mind if I look at my phone to give
4  you the correct address --
5     Q   Yeah, that's fine.
6     A   -- because it -- it is in my phone.
7       Okay.  It's 1746 Amphora -- that's
8  A-M-P-H-O-R-A -- Drive.  And Hoschton, Georgia, is
9  H-O-S-C-H-T-O-N, Georgia 30548.
10    Q   And when did you move to that address?
11    A   About 30 days ago.
12    Q   What was your address before that?
13    A   7095 Lancaster Crossing.  And that's in
14  Flowery Branch, Georgia.
15    Q   And why did you move?
16    A   I moved a year ago to that address from the
17  1845 Clearlake Trace in Stone Mountain.  We moved
18  there because we had already planned to move out of
19  that area into a different area, which was Flowery
20  Branch.
21       And we moved there thinking that that's
22  where we were going to stay, but the stairs -- my
23  master bedroom's upstairs, and I'm having a hard time
24  getting upstairs now.  So we moved to another place,
25  which still has stairs; but my master is on the main

Page 11

1  floor.
2     Q   Okay.  So you said you moved out of Stone
3  Mountain just to get out of the area?
4     A   Yeah.  We just moved out of Stone Mountain
5  because we had been planning to move, and my husband
6  wanted to be closer to the lake.  So that's why we
7  moved to Flowery Branch.
8     Q   Got you.
9       And I've got the date of the incident at Old
10  Navy as April 13, 2021.  Does that sound right?
11    A   Yeah, sounds about right.
12    Q   Where were you living at that time?
13    A   At the 1845 in Stone Mountain.
14    Q   Okay.  Who is currently living with you?
15    A   Me and my husband.
16    Q   What's your husband's name?
17    A   Wesley Clemons.
18    Q   Who was living with you in April of 2021?
19    A   Me and my husband.
20    Q   When did you and Wesley get married?  When
21  did you get married to Wesley?
22    A   '85.
23    Q   Any other marriages?
24    A   I was married before then.
25    Q   And what was your ex-husband's name?

Page 12

1     A   Say that again?
2     Q   What was your ex-husband's name?
3     A   Andre --
4     Q   What was his --
5     A   -- Munds, M-U-N-D-S.
6     Q   And approximately how long were you married
7  to Andre?
8     A   I think about five years.
9     Q   Do you have any children?
10    A   I do.
11    Q   What are their --
12    A   Three.
13    Q   What are their names?
14    A   Angel, Derail, and Wesley.
15    Q   Do they all have the last name Clemons?
16    A   Except for my daughter.  She's the oldest.
17    Q   Okay.  And how old is she?
18    A   Forty-two.
19    Q   What's her last name?
20    A   Her last name is Hall.
21    Q   How old is Derail?
22    A   I can't hear you.
23    Q   How old is Derail?
24    A   Derail is 33.
25    Q   And Wesley?

Page 13

1     A   Wesley is 38.
2     Q   Do they all live in the Georgia -- state of
3  Georgia?
4     A   They do.
5     Q   Do you have any relatives by blood or
6  marriage that live in Gwinnett County?
7     A   Yes.
8     Q   What would their last name be?
9     A   My daughter, her last name is Hall.  And I
10  have a niece.  Her last name is Brewington.
11    Q   Have you ever served in the military?
12    A   I have not.
13    Q   Have you ever been arrested?
14    A   No.
15    Q   Do you have any grandchildren?
16    A   I do.
17    Q   How many?
18    A   Two.
19    Q   And how old are they?
20    A   Thirteen.
21    Q   Are they twins?
22    A   They're twins.
23    Q   Are you currently employed?
24    A   I am not.
25    Q   What's the last job that you had?

4 (Pages 10 - 13)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 14

1    A   U.S. Postal Service.
2    Q   When's the last time you worked for the U.S.
3  Postal Service?
4    A   1995.
5    Q   And why did you leave that job?
6    A   I was injured.
7    Q   What injuries did you sustain?
8    A   A broken clavicle bone, my shoulder, and
9  neck.
10   Q   Was it a car accident or --
11   A   It was a car accident by another employee.
12   Q   Did you make a workers' comp claim?
13   A   I did.
14   Q   Did you have to go under any surgery?
15   A   No, I didn't.  I just had a cast from the
16  broken clavicle bone.
17   Q   And the shoulder, was it left or right
18  shoulder?
19   A   It's left.
20   Q   I assume it was the left clavicle?  Was it
21  your left clavicle as well?
22   A   Yes.
23   Q   And then what injuries did you have to your
24  neck?
25   A   The disk.

Page 15

1    Q   And what treatment did you have for that?
2    A   I had a lot of stellate ganglion blocks,
3  nerve blocks.
4    Q   Do you remember what doctor or practice you
5  went to for that treatment?
6    A   I saw -- I went to a lot of doctors, but the
7  one that has been from the beginning to end is
8  Dr. Mishu, Husham Mishu.
9    Q   Do you know where his or her office is
10  located?
11   A   It's in -- it's off of -- I guess that would
12  be considered as Atlanta, off of Boulevard.
13   Q   Have you ever been a party to any other
14  lawsuit?
15   A   No.
16   Q   Any other workers' comp claims?
17   A   No.
18   Q   Have you ever filed for bankruptcy?
19   A   My husband has, yes.
20   Q   Do you remember when that was,
21  approximately?  And you could tell me it was more than
22  ten years ago --
23   A   Long time -- yeah, more than ten years ago.
24   Q   Okay.
25   A   Maybe about 30.

Page 16

1    Q   Have you ever received any sort of medical
2  training or taken any medical classes?
3    A   No.
4    Q   What type of hobbies do you enjoy?
5    A   Walking.  That's the main thing I like to
6  do, is walk.
7    Q   How often do you go for walks?
8    A   Well, I used to walk every day in Stone
9  Mountain.
10   Q   So you used to go to the Stone Mountain Park
11  every day?
12   A   Yeah, I used to walk up there.
13   Q   How often do you go for walks now?
14   A   I don't.
15   Q   When did you stop going for walks?
16   A   When I injured my foot.
17   Q   Have you been able to go for a walk at all
18  since you injured your foot?
19   A   I have not.
20   Q   Do you enjoy traveling?
21   A   I do.
22   Q   When's the last time you took a trip?
23   A   May.
24   Q   May of this year?
25   A   May -- mm-hmm.

Page 17

1    Q   And where'd you go?
2    A   Me -- we went to Dominican.
3    Q   Did you fly or take a cruise?
4    A   Did I fly?  Yes.
5    Q   And what did you do when you were in the
6  Dominican?
7    A   We went for a concert, but I didn't go to
8  any -- really went to any of the concerts.  I think we
9  went to two.  It was like a -- I believe it was a
10  four-day affair.  And we went to the comedy show and
11  maybe, like, 30 minutes for one of the concerts.
12   Q   Is there a reason you only attended part of
13  the concert?  Is there a reason you only attended a
14  part of the concert?
15   A   No, not -- not really.  We just -- I just
16  didn't get a chance to, like, really enjoy myself
17  during that time, still in a lot of pain.  So I
18  didn't, like, go down a lot to the concerts, because
19  we were quite a way -- our room was quite a ways from
20  the room where the concert was going to be inside.
21   Q   And where were you experiencing pain?
22   A   In my foot.
23   Q   And which foot is it?
24   A   The left foot.
25   Q   Did you play any sports in high school or in

5 (Pages 14 - 17)

Linda D. Clemons                                October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 18

1   your --
2      A   No.
3      Q   No.  Are you a member of a gym?
4      A   No.
5      Q   Other than the accident you told me about
6   with the post office, have you ever been involved in
7   any other motor vehicle accident?
8      A   A Motor vehicle, I had an accident -- I'm
9   thinking that might have been in 2001, I think it was.
10  I don't know if it was really considered an accident,
11  because it was in a parking lot, so.
12     Q   Were you injured in that accident?
13     A   I -- I wasn't.  Well, I had, like, some
14  stiffness in my shoulder, but other than that, no.
15     Q   Did you make a claim?
16     A   No.
17     Q   Who is your primary care physician?
18     A   Now, Dr. Henry.
19     Q   And where's his or her office located?
20     A   In -- off -- off of Buford Drive in
21  Gwinnett.
22     Q   And when did you switch to Dr. Henry?
23     A   Maybe six months ago.
24     Q   Do you know the name of the practice?
25     A   It's Emory, with Emory.  That's ...

Page 19

1      Q   And who did you see before Dr. Henry?
2      A   Dr. White, Candace White.
3      Q   Is she also with Emory?
4      A   No, she's at DeKalb.
5      Q   And where's her office located?
6      A   In -- it's in DeKalb.  It's across from
7   Emory and DeKalb, off of -- is that Hillandale?  I
8   think it's Hillandale.
9      Q   Hillandale.  Yeah.
10         What pharmacy do you use?
11     A   Walgreens.
12     Q   Have you ever used any other pharmacy in the
13  past three years?
14     A   I used CVS a couple of times, but it's
15  mainly Walgreens.
16     Q   Do you wear contacts or glasses?
17     A   I wear glasses for reading.
18     Q   Have you ever been diagnosed with arthritis?
19     A   Yes.
20     Q   And what treatment have you received for
21  that?
22     A   Treatment, I haven't really received
23  treatment.  I recently -- in the last three weeks, I
24  believe it was -- got on a medication for it.
25     Q   Was that prescribed by Dr. Henry?

Page 20

1      A   No.  It's a rheumatologist, Dr. Parris.
2      Q   And where is Dr. Parris's office?
3      A   In Sugarloaf.
4      Q   In what body parts do you have arthritis?
5      A   My wrist, this -- this wrist right here.
6      Q   Your right wrist?
7      A   Yes.  I'm sorry.
8      Q   No, that's okay.  She just can't type that.
9      A   Okay.
10     Q   Have you ever been diagnosed with diabetes?
11     A   Yes.
12     Q   And when were you first diagnosed?
13     A   Long time -- maybe in 2000, could possibly
14  be longer.
15     Q   And do you take any medication?
16     A   Yes.
17     Q   What do you take?
18     A   Now, I take Ozempic, glimepiride.  And I
19  take -- I haven't really had to take it in a -- in a
20  long time; but I have it for -- in case my sugar
21  levels go up.  God, what is it called?  It's an
22  insulin, but I haven't had to take it in a long time.
23     Q   And what doctor do you see for the diabetes?
24     A   Diabetes, Dr. Giles [ph].
25     Q   And where's his or her office located?

Page 21

1      A   Emory.
2      Q   Did you have any neuropathy related to your
3   diabetes?
4      A   I didn't.
5      Q   Do you have any issues with your toenails or
6   feet due to your diabetes?
7      A   No.
8      Q   Have you ever gone to an urgent care?
9      A   Yes.
10     Q   What's the name of it?
11     A   Piedmont Urgent Care.
12     Q   Do you remember about where it was located?
13     A   It's across the street from Emory Hospital
14  in DeKalb.
15     Q   And why'd you go to Piedmont?
16     A   I went there to get a tetanus shot.
17     Q   And that was after the Old Navy incident?
18     A   That was after the Old Navy, but I didn't --
19  I did not get it from there.  You know, I went there
20  to have the shot; but I didn't get it from there,
21  because the first -- when I first went, I had to make
22  an appointment, because COVID was out.
23         And so I had to make an appointment,
24  which -- I believe it was the next day, that I got the
25  appointment.  But when I got there, I was told since I

6 (Pages 18 - 21)

Linda D. Clemons                                     October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 22

1   had recently got a COVID shot, that they would not
2   give me the tetanus shot, because they can counteract
3   with each other.
4        So I did that two weeks later, because they
5   told me I can come back in two weeks.  But -- I did it
6   in two weeks, but with Dr. White, my regular
7   physician.
8      Q   Other than the clavicle, have you broken any
9   other bone?
10     A   No.
11     Q   Have you ever undergone any surgery?
12     A   Back surgery.
13     Q   And when did you have back surgery?
14     A   I believe it was in 2002.
15     Q   And why did you need back surgery?
16     A   From the accident I had with the RSD in
17  my -- in my clavicle.  I -- I really don't know how to
18  explain it, but I ended up having it from there.
19  Actually, I was like -- from being on pain medication.
20       I had an injury with my back, but when I had
21  the actual surgery, it came from actually trying to
22  have -- I don't want to get too graphic, but trying to
23  have a bowel movement.  And the disk -- I didn't know
24  that at the time, but the disk had came out of my back
25  and was just floating around in my back.

Page 23

1        So I had one -- the -- the first time I had
2   one, and then it didn't really help.  So then the
3   second time was in two-thousand -- I believe '02 was
4   when that happened, and I ended up having to have
5   another back surgery.
6      Q   Was it your low back, mid back, upper back?
7      A   It was the low back.
8      Q   Do you remember if it was, like, a fusion or
9   what kind of surgery it was?
10     A   I believe it was a fusion.
11     Q   Did the low back fusion or surgery limit
12  your mobility at all?
13     A   No.
14     Q   Do you remember where you had that surgery?
15     A   It was at Atlanta Medical Center,
16  Dr. Christopher Edwards.  And I -- I don't believe it
17  was fused.  I know I had screws put in it, but I don't
18  believe it was fused.  It's been so long.
19     Q   Do you still experience low back pain?
20     A   I do not.
21     Q   Okay.  Other than Atlanta Medical Center and
22  Emory, have you sought treatment from any other
23  hospital?
24     A   No, I -- I don't believe so.  I think those
25  are the only two hospitals I've been to.

Page 24

1      Q   Okay.  And it would have been Emory at
2   Hillandale and DeKalb?  Did you go to the Emory in
3   DeKalb, or did you go to one of their other locations?
4      A   I've been to the one in DeKalb, and I've
5   also been to the one in -- off of Clifton.  That's
6   where Dr. Giles [ph] is.
7      Q   Do you have health insurance?
8      A   I do.
9      Q   And what health insurance do you have?
10     A   Blue Cross -- Anthem Blue Cross Blue Shield.
11     Q   And I meant to ask you this before.  What
12  did you do when you worked at the post office?  What
13  was your job?
14     A   I just worked in -- on the floor.  And then
15  after I was injured, I worked in -- I worked in the
16  office -- in the finance office.
17     Q   Did you retire from that job?
18     A   I didn't.  Still, right now, I've been on
19  workers' comp for 20 years on that job.
20     Q   Any of the doctors, when you did the
21  workers' comp, did they say that you were disabled in
22  any way -- the doctors for the workers' comp claim?
23  Did they say you were disabled or that you weren't
24  able to work?
25     A   That I was not able to work.

Page 25

1      Q   And why are you not able to work?
2      A   Just the pain that I deal with.
3      Q   Where is the pain?
4      A   In my neck, my wrist, my hand.
5      Q   Which leg?  Did you say leg?
6      A   Neck.
7      Q   Neck.
8      A   My neck.  My hand, my wrist, my neck, and my
9   shoulder.
10     Q   Do you take pain medication for that?
11     A   Yes.
12     Q   Is that daily?
13     A   Yes.
14     Q   What do you take?
15     A   Percocet.
16     Q   The pain in your neck, hand, and wrist, is
17  that -- and shoulder -- is that constant?
18     A   Yes.
19     Q   On a scale of 1 to 10, with 10 being the
20  worst pain you've ever felt, how would you rate that
21  shoulder, hand --
22     A   Eight.
23     Q   And would you describe it as, like, an
24  aching, stabbing, burning?  How would you describe
25  that pain?

7 (Pages 22 - 25)

Linda D. Clemons                                October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 26

1    A   Burning, aching.
2    Q   Does it affect your sleep?
3    A   Yes.
4    Q   Okay.  Prior to the incident that happened
5  at Old Navy in 2021, had you ever experienced pain in
6  your right foot?
7    A   No.
8    Q   Your left foot?
9    A   No.
10   Q   Your left ankle?
11   A   No.
12   Q   Right ankle?
13   A   No.
14   Q   Have you ever gone to a chiropractor?
15   A   No.
16   Q   Have you ever been to physical therapy?
17   A   Yes.
18   Q   Had you ever been to physical therapy before
19  the Old Navy incident?
20   A   Before Old -- yeah, I've been to physical
21  therapy for the -- my wrist and my hand and stuff.
22   Q   And where'd you go?
23   A   That's been so long.  Emory.
24   Q   Okay.  Are you still good, or you need a
25  break or anything like that?

Page 27

1    A   I'm still good.
2    Q   Okay.  So moving on to April 13, 2021, can
3  you just kind of walk me through, as much as you can
4  remember, what happened from the time you get to the
5  Old Navy until the time the sign falls?
6    A   Well, I went into the store.  I was looking
7  for some jeans.  And I looked around the store.  And
8  in, say, like in the -- when I first came in, they had
9  jeans, like, to the right -- I guess that would be to
10  the right of me.  So I went down that aisle.
11      And then I came back up and saw another rack
12  of jeans.  And I went to look at those jeans.  I went
13  to take a pair down.  And that's when the sign fell
14  down.
15   Q   Had you ever been to that Old Navy store
16  before?
17   A   Yeah, a few times.
18   Q   Had you ever shopped for jeans there?
19   A   Yes.
20   Q   Had you ever seen a sign fall in that store
21  before?
22   A   No.
23   Q   Do you remember about what time of day it
24  was that you got to the Old Navy?
25   A   I don't.  Could have been, like,

Page 28

1  twelve -- can't be exact.  I know it was, like, in --
2  in -- before noon.
3    Q   Okay.  Do you know if it was raining that
4  day?
5    A   I don't recall.
6    Q   Did you go there specifically for jeans?
7    A   Yes.
8    Q   Was anyone with you?
9    A   No.
10   Q   Did you drive yourself?
11   A   Yes.
12   Q   Do you know anyone who works at that Old
13  Navy?
14   A   I don't.
15   Q   Have you ever worked for Old Navy?
16   A   No.
17   Q   Had you taken any medication that day?
18   A   No.
19   Q   Had you taken the Percocet?  Did you take
20  the Percocet that day?
21   A   No.  If I'm going to drive, I -- I don't
22  take it.
23   Q   Had you consumed any alcohol?
24   A   No.
25   Q   Do you know about approximately how long you

Page 29

1  had been in the store before the sign fell?
2    A   I don't.
3    Q   Had you ever shopped for jeans on that
4  specific rack before?
5    A   I have not.
6    Q   Have you been back to that Old Navy?
7    A   No.
8    Q   Was the store busy?
9    A   It wasn't a lot of people in the store; but
10  when I got to the line, there -- there was quite a
11  long line.
12   Q   Is that the line to check out?
13   A   Yes.
14   Q   Was there anyone else around you when the
15  sign fell?
16   A   No, not that I know of.
17   Q   What did the sign look like?
18   A   It was, like, a square sign.  And it had,
19  like, metal around it.  And I don't recall if it was
20  glass or plastic, but there was something in the
21  middle of it.
22   Q   And the jeans that you -- you were pulling
23  jeans out of the wall; right?
24   A   They were on a rack.
25   Q   On a rack.  So they're hanging?

8 (Pages 26 - 29)

Linda D. Clemons                                          October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 30

1     A   No. It's like -- like -- or a table rack.
2   I mean, it was like ...
3     Q   So were the jeans stacked on top of each
4   other?
5     A   Yeah. The jeans were stacked on top of each
6   other.
7     Q   Okay. And so were you trying to pull the
8   jeans out of one of the stacks?
9     A   No. I was trying to take the jeans off of
10   the top of the -- where the jeans were.
11     Q   Okay. So --
12     A   Because, like, it was like some right here.
13   Then it's like a rack, table, whatever you want to
14   call it, and then some -- and under that.
15         MS. DEDIEGO: Okay. I'm going to show
16   you a picture. Maybe that can help.
17         I'm going to mark this as Exhibit 1.
18   It's a series of photos, and they've got numbers at
19   the bottom.
20         And, Haley, I've got a copy for you
21   too.
22         (Exhibit 1 was marked for
23         identification.)
24         THE WITNESS: So it's -- it's more
25   pictures under here --

Page 31

1         MS. DEDIEGO: So if you go to the
2   second page -- you can take the paper clip off, if
3   that helps.
4         THE WITNESS: Oh, okay.
5   BY MS. DEDIEGO:
6     Q   The second page is labeled "Old Navy
7   Clemons 4." Do you see that one?
8         Is that what the sign looked like?
9     A   The sign? No.
10     Q   No?
11     A   No. It had, like, a picture in the front of
12   them, saying, I guess, what it was or whatever.
13     Q   Was it bigger or smaller than this sign?
14     A   It seemed like it was bigger, but I never
15   saw the back of the sign. That -- that -- that's the
16   back. The front didn't look like that. This is --
17   no, that's not what it looked like either.
18     Q   So the page that's labeled "Old Navy
19   Clemons 6" at the bottom, the jean wall, that's not
20   what rack you're talking about?
21     A   I did look over there, but -- on a rack
22   like that, but -- yeah, no.
23     Q   The jeans that you were shopping, were they
24   on a wall like this?
25     A   No. It was -- they were, like, on a table,

Page 32

1   if -- a rack, maybe. I mean, I don't know what --
2   what you would call it; but it was like -- I know
3   these was -- this was, like, on the side. But this
4   table was, like, in the middle of the store.
5     Q   So the jeans, were they stacked similar to
6   this, on the table?
7     A   Yeah, they were -- they were stacked like
8   that.
9     Q   Okay. On a table. And there was a sign on
10   the --
11     A   It might have been a shelf, not -- it could
12   have been a shelf like this; but it wasn't, like, tall
13   like that.
14         If -- if I can remember correctly, it was
15   maybe, like, two; but it was, like, on the -- okay.
16   Say, for instance, like this, the top right here, and
17   that's a rack, like that. And then maybe there was
18   something under it, but -- all the ones -- under it.
19         That's not the rack that I was -- I was at.
20     Q   Okay. The sign that fell, was it --
21     A   And I thought the sign had, like, something
22   in the middle of it, like -- I never saw the back of
23   the sign. It was, like, the front of the sign.
24     Q   Okay.
25     A   But it was metal, like that.

Page 33

1     Q   Was it on the table, like the edge of the
2   table?
3     A   Yeah, it was -- no, it was on -- not the
4   edge of the table, but like -- say, like, some jeans
5   right here, and then the sign was, like, on a strip
6   like that.
7     Q   I'm just trying to understand if the sign
8   was in front of the jeans you were going for --
9     A   Yeah, it was in front of them.
10     Q   -- if it was slid underneath the jeans --
11     A   No, it was in -- it -- it was in the front,
12   hanging on a shelf.
13     Q   And so when you took the jeans off, the sign
14   fell at the same time?
15     A   Yeah. When I took the jeans off, the sign
16   fell.
17     Q   If I asked you to draw what the sign looked
18   like, would you be able to do that?
19     A   I'm not a "drawer," but -- I can show you
20   like this.
21     Q   That pen stopped working, so you don't want
22   to use that one.
23     A   Oh, okay.
24         Like, this could be the shelf right here.
25   And I believe the sign was like -- like that.

9 (Pages 30 - 33)

Linda D. Clemons                                          October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 34

1    Q   Okay. It went over and under the shelf?
2    A   I'm not sure if it went over and under, but
3  I just seen -- the sign -- I mean, I just -- when I
4  took the jeans down, the sign fell down --
5    Q   Okay.
6    A   -- and hit my feet.
7    Q   Okay.
8    A   And I thought the sign was, like, thicker;
9  and it had, like, glass in the front of it.
10         THE REPORTER: Ms. Clemons, can you
11  move your microphone up just a little bit, please? It
12  keeps hitting -- your hands keep hitting it.
13         THE WITNESS: Right there --
14         THE REPORTER: Yeah.
15         THE WITNESS: -- is that good?
16         THE REPORTER: That should be okay.
17         THE WITNESS: Okay.
18  BY MS. DEDIEGO:
19    Q   Okay. So it fell. And you said it hit your
20  feet?
21    A   Yeah, both of them.
22         MS. DEDIEGO: I'm going to ask you to
23  draw one more time.
24         We'll mark this as Exhibit 2.
25  //

Page 35

1         (Exhibit 2 was marked for
2          identification.)
3  BY MS. DEDIEGO:
4    Q   Okay. So I've got a diagram -- there's two
5  pages, whichever one's easier for you -- that has feet
6  on it. Can you just circle which part of your feet or
7  ankles the sign hit?
8         THE REPORTER: Ms. Brittany, can you
9  move yours up as well?
10         THE WITNESS: And it hit my -- also.
11         THE REPORTER: Thank you.
12  BY MS. DEDIEGO:
13    Q   Okay. So that was your left foot. Did it
14  hit the same part on your right foot?
15    A   Mainly in the front of -- of the right foot,
16  mainly, like, right here. And it got, like, up here,
17  and my toes.
18    Q   Okay. So it would have been the front of
19  your feet?
20    A   Yeah, the front and like -- like, at the
21  top, right here, the front, and then right -- right
22  over here, yeah, like right in there.
23    Q   Okay.
24    A   And my toes.
25    Q   What shoes were you wearing?

Page 36

1    A   I had a pair of blue T-strap sandals on --
2  basically, no shoes, just a strap.
3    Q   Did the sign cut you?
4    A   Yes.
5    Q   And where did you have the cuts?
6    A   On my toes and up in here.
7    Q   I'm going to label this as left and right.
8  Would you have cuts on both your left and your right?
9    A   Yes, but the ones on the right was, like,
10  mainly just right here.
11    Q   So the top of the foot?
12    A   Yes.
13    Q   Do you know approximately how many cuts you
14  had?
15    A   I had more on the left foot, maybe four.
16  And there was -- I know I had one deep one, like right
17  here and on my -- by my big toe.
18    Q   Were you bleeding?
19    A   Yes.
20    Q   Were you bleeding enough that it was, like,
21  blood on the floor or --
22    A   No.
23    Q   So did the sign fall off of the table or
24  shelf directly onto your feet?
25    A   Directly onto my feet.

Page 37

1    Q   And then did it fall onto the floor?
2    A   Yes.
3    Q   The sign only hit you one time?
4    A   Yes.
5    Q   And after that, what did you do? Did you
6  pick up the sign or leave it on the floor?
7    A   I think I left it on the floor. And I
8  didn't -- I didn't notice that my feet was bleeding at
9  that time.
10         When I got to the register, it was kind of a
11  long line, maybe like -- maybe six or seven people in
12  front of me. And they started burning. That's when I
13  noticed they were bleeding.
14    Q   When the sign hit you, did you scream or
15  make a noise?
16    A   I didn't.
17    Q   Okay. So did you go to the -- oh, sorry.
18  Go ahead.
19    A   I'm good.
20    Q   Did you go to the register immediately after
21  the sign fell?
22    A   Yeah. I was -- I was getting ready to
23  leave. I was going -- ready to check out.
24         And the longer I stood there, the more it
25  burned and the more pain I started to feel, because I

10 (Pages 34 - 37)

Linda D. Clemons                                   October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 38

1  started to leave; but then I just wanted to get to the
2  register to talk to somebody, because I was going
3  to -- that's when I asked for a manager. "Can you
4  have a manager come out?"
5       And that's when the manager came out. And
6  he asked me can I -- "can you show me where it
7  happened?"
8  Q   Did you purchase the jeans?
9  A   I did.
10  Q   Do you still have them?
11  A   Yes.
12  Q   Okay. So you went and talked to -- or you
13  asked for a manager?
14  A   Yeah, asked for a manager. I was standing
15  at the register. I was standing there for not a long
16  time, but a good while. And then the manager finally
17  came out and asked me did I need him.
18       And I told him yeah. I told him that the --
19  I was trying to get some jeans down and the sign fell
20  on my feet.
21       And he went to the back and -- he saw where
22  they were bleeding and went and got some gauze, I
23  think it was some alcohol wipes, and some Band-Aids.
24  And he did ask me did I need an ambulance.
25  Q   And what did you say?

Page 39

1  A   I told him no.
2  Q   So did you ask the cashier for a manager?
3  A   Yes.
4  Q   Do you remember her name?
5  A   I don't.
6  Q   Do you remember the manager's name?
7  A   I believe it was Mike.
8  Q   You said Mike offered to call 911?
9  A   Yes.
10  Q   And he offered you some first aid? He
11  offered you first aid?
12  A   Yes.
13  Q   Do you remember if you filled out an
14  incident report with him?
15  A   I did.
16  Q   Was that on, like, a tablet?
17  A   He -- he did, a tablet.
18  Q   Did you get a copy of that report?
19  A   I did not. He told me that I could get a
20  copy of the report, but I didn't get a copy of the
21  report. And he gave me a claim number.
22  Q   Have you seen a copy of the report?
23  A   I haven't. I was told that I don't get a
24  copy of the report.
25       MS. DEDIEGO: Okay. We'll mark this as

Page 40

1  Exhibit Number 3.
2       (Exhibit 3 was marked for
3       identification.)
4  BY MS. DEDIEGO:
5  Q   So on the first page, it's got "injured
6  person"; and it's got "Linda Clemons." Do you
7  remember giving Mr. Rinehart, or Mike, that
8  information?
9  A   My name, yes.
10  Q   Your name and your phone number?
11  A   Yes.
12  Q   And then it looks like you gave him your
13  e-mail address?
14  A   Mm-hmm.
15       THE REPORTER: Was that a "yes"?
16       THE WITNESS: Yes.
17  BY MS. DEDIEGO:
18  Q   And then it looks like you gave him your
19  address as well?
20  A   Yes.
21  Q   And then it's got the time of incident at
22  3:20 p.m. Does that sound like maybe it was right --
23  sometime in the afternoon?
24  A   I thought it was earlier than that, but I
25  guess it's right.

Page 41

1  Q   And it was the Old Navy in Snellville that
2  you went to?
3  A   Yes.
4  Q   And then the second page has "body part
5  injured, ankle," "type of injury, cut." And then
6  "summary of incident," it says: "Customer was
7  shopping a denim wall in women's. A shelf strip sign
8  holder fell out of the denim wall and cut her ankles."
9       Do you remember if you walked over -- and
10  did you say you walked over and showed the manager --
11  A   Yes.
12  Q   -- where it happened?
13       Do you know if he took any pictures at that
14  time?
15  A   No. I remember him picking it up. I don't
16  remember if it was from the floor or from the shelf,
17  but I remember him picking up.
18       And I remember him saying: "They forgot to
19  put the bolts -- I see what happened. They forgot to
20  put the screws back in the sign."
21       So that's why this right here -- I don't
22  remember that at all.
23  Q   So he picked up the sign that fell?
24  A   Mm-hmm.
25  Q   That's a "yes"?

11 (Pages 38 - 41)

Linda D. Clemons                                   October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 42

1    A   Yes. Sorry.
2    Q   No, it's okay.
3        And he told you that they forgot to put
4    screws?
5    A   Yeah. He turned the sign over, and we -- we
6    was -- we was right there at the shelf. And he said:
7    "I see how it fell. They forgot to put the screws
8    back in it."
9    Q   Did you record your conversation with the
10   manager?
11   A   No.
12   Q   Did you take any photos?
13   A   No.
14   Q   Any videos?
15   A   No.
16   Q   Did you ever speak with anyone named Lisa
17   Allen at the store?
18   A   Lisa -- not -- not -- I don't know, I mean,
19   unless that was the cashier. I don't recall what her
20   name was.
21   Q   Other than the manager and the cashier, did
22   you speak to any other employee?
23   A   No.
24   Q   Did you speak with any of the other
25   customers?

Page 43

1    A   No.
2    Q   Okay. So you said at first, you didn't
3    notice you were bleeding. Did you have any pain at
4    first?
5    A   No. I felt burning.
6    Q   Had you ever felt burning in your feet
7    before?
8    A   No.
9    Q   Why did you decline the ambulance?
10   A   Because I didn't feel like I needed an
11   ambulance.
12   Q   Did you call anybody from the store?
13   A   I believe I might have called my doctor.
14   Q   And which doctor would you have called?
15   A   Dr. White.
16   Q   And what would you have told Dr. White?
17   A   I told her that a sign fell on my foot and
18   they were burning.
19       And she asked me when was the last time I
20   had a tetanus shot. And I told her I didn't know.
21   And she said: "Well, you need to go to urgent care
22   and get a tetanus shot."
23       She -- she might have had said something
24   like: "In the last -- have you had in -- in the last
25   few years?" And I told her no.

Page 44

1        And -- because she -- she hadn't been my
2    doctor for a long time. It was another doctor before
3    her, but at the same place.
4    Q   Have you posted anything on social media
5    about the incident?
6    A   No.
7    Q   Do you use social media at all?
8    A   I don't.
9    Q   Did anyone at Old Navy apologize to you?
10   A   No.
11   Q   Okay. So you said the manager gave you a
12   claim number.
13   A   Yes.
14   Q   Did you follow up with anyone at Old Navy?
15   A   I did, several times.
16   Q   And did you call that number they gave you?
17   A   Yes.
18   Q   Did you give a recorded statement? Did you
19   give a recorded statement to Old Navy?
20   A   I don't recall.
21   Q   Do you generally recall what conversations
22   you had with the people at the corporate office?
23   A   Do I normally call?
24   Q   No. Do you recall what you spoke to them
25   about?

Page 45

1    A   Are you saying: Do I recall what I spoke to
2    her about?
3    Q   Yeah.
4    A   I -- I told her about the incident. And she
5    said someone would be in contact with me. And I gave
6    her the claim number.
7    Q   Did someone call you back?
8    A   No.
9    Q   When you spoke to the corporate
10   representative at Old Navy, did you ask for any sort
11   of compensation?
12   A   No.
13   Q   Going back to the sign, when you first saw
14   it, was it sticking out from the shelf? Did it look
15   like it was about to fall, or it looked normal?
16   A   It looked normal.
17   Q   Okay. So other than your feet and your
18   ankles, did -- were you -- did you injure any other
19   body part?
20   A   No.
21   Q   Did you have any bruises?
22   A   Did I have any bruises? I had the cuts;
23   and, yeah, there were some bruises on there also.
24   Q   Would that have been the same areas of your
25   feet?

12 (Pages 42 - 45)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 46

1     A   Mm-hmm.
2     Q   Was that a "yes"?
3     A   Yes.  I'm sorry.
4     Q   So what did you do when you left the store?
5     A   When I left the store?  I think that's when
6  I went to -- headed to the urgent care.
7     Q   Did you drive yourself?
8     A   Yes.
9     Q   Did you call your husband?
10    A   I'm not sure if I called him right then or I
11 called him afterwards to let him know that I had to go
12 to urgent care.
13    Q   Does your husband work?
14    A   Yes.
15    Q   What's he do?
16    A   He's a chief of construction for MARTA.
17    Q   Okay.  And so the first place would have
18 been that Piedmont Urgent Care, that you went?
19    A   Yes.  Well, I went to emergency; but there
20 were so many people there.  And then I went to --
21 across the street, which was -- I didn't even know it
22 was Piedmont at the time.  I just knew it was urgent
23 care.  And I went there.  And that's when they told me
24 that I had to schedule an appointment to come in.
25    Q   Okay.  Did you get any treatment from the

Page 47

1  Piedmont Urgent Care, because I know you said you
2  couldn't get the tetanus shot?
3     A   No.  They -- I didn't get any treatment from
4  them, because, like, the doctor never came in after.
5  She asked me questions, and she took my -- I think she
6  took my blood pressure and my temperature.
7         And she came back, and she said that the
8  doctor didn't want to give me a tetanus shot at this
9  time.  He told me I -- I need to wait for two weeks
10 before I could be able to get one.
11        So I called my physician back and told her
12 what they said.  And she said:  "Well, I can see you
13 within two weeks.  Just schedule an appointment for
14 me."  And I scheduled an appointment for her.
15    Q   Did the urgent care do anything for the
16 cuts:  like clean them, anything like that?
17    A   No.  I had the Band-Aids on there from where
18 I had cleaned the blood off and stuff when I got to my
19 car.
20    Q   Okay.
21    A   There were already people in there when I
22 got there; so I guess that's why I couldn't stay in,
23 because they said only a certain amount of people
24 could be in there.
25    Q   So Emory at Miller Grove, is that where

Page 48

1  Dr. White's office is?
2     A   Yes.
3     Q   Okay.  So when you went to see Dr. White,
4  she gave you the tetanus shot.  Did she do anything
5  else for your feet or ankles?
6     A   No.  She just told me if I had any problems,
7  I needed to follow up.
8     Q   Had the cuts healed by that time?
9     A   No.
10    Q   Did Dr. White look at the cuts?
11    A   No.  I just got the tetanus shot.
12    Q   Were you still feeling pain at that time?
13    A   Yes.
14    Q   Was it the same burning pain?
15    A   It was still the same burning pain.
16    Q   Did you talk to Dr. White about the burning
17 pain?
18    A   No.  No, I just -- she just told me to
19 reschedule something with her if it got any worse.
20 And it did get worse, but I didn't reschedule with
21 her.  I made an appointment with a foot doctor.
22    Q   Did Dr. White do any sort of X-rays or
23 anything?
24    A   No.
25    Q   Did she give you any medication, other than

Page 49

1  the tetanus shot?
2     A   No.
3     Q   Okay.  And the foot doctor, is that Ankles
4  and Foot Centers of Georgia?
5     A   Yes.
6     Q   And how'd you find that provider?
7     A   I usually -- I went to him a couple of times
8  before.  I hadn't been to him in a long time, but I
9  went to a couple of times for him just to get my
10 diabetic check-ups.
11    Q   You went to a podiatrist --
12    A   Yes.
13    Q   -- for diabetic check-ups?
14    A   Yes.
15    Q   Is that different than your normal --
16    A   He did, like, for my feet.  You know, they
17 were checked to make sure you didn't have any sores on
18 your feet and stuff like that.
19        And I had seen him a couple of times years
20 before then.  And my husband had also saw him before,
21 because he had a -- I didn't even know what -- what
22 exactly it was; but I -- I knew he was a good doctor.
23        So I went back -- I went to him and told him
24 what was going on.  And he did the X-rays, and then he
25 had me follow up with the MRI.  And I went back to do

13 (Pages 46 - 49)

Linda D. Clemons                                October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 50

1 the MRIs.  Actually, I had two different sets of MRIs
2 from -- after time went by, he wanted another MRI.
3     Q    What's the doctor's name there?
4     A    Dr. Shaheed.
5     Q    And do they have more than one location, or
6 do you know?  Which location do you go to?
7     A    I'm not sure.  I went to the one --
8 actually, it's across the street from Hillandale also.
9     Q    Okay.  So when you went to the Ankles and
10 Foot Centers of Georgia, were you still having pain in
11 your feet and ankles?
12    A    Yes.
13    Q    Was it more your feet, ankles, or both?
14    A    It was both.
15    Q    And it was both left and right?
16    A    Yes.
17    Q    Did one hurt more than the other?
18    A    Yes.  The left one hurt a lot more than
19 the -- the right one.
20    Q    Going back to -- this might sound like a
21 stupid question -- when you were standing at the jean
22 wall, did you have your feet together?
23    A    When I was --
24    Q    Standing in front of the jeans, did you have
25 your feet together?

Page 51

1     A    Yeah, I think so.
2     Q    Okay.
3     A    I don't know -- I don't know if they were,
4 like, right together; but I was facing the sign.
5     Q    Okay.  So you mentioned the X-rays and the
6 MRIs.  What treatment did the podiatrist recommend?
7     A    The first time, he put me, like, in a shoe.
8 It wasn't a boot; it was a shoe.
9         And then when I had -- when I went back to
10 see him the next time, he put me in a boot.  That's
11 when he told me that I had torn the tendon, actually
12 in both -- he said both.  The -- it was a small one
13 in -- on the right foot, and I had the tear on the
14 left foot also.
15        And that's when he put me in a boot.  And I
16 went -- I had a boot for -- for a long time, a really
17 long time.  And he told me he didn't want me to put
18 any weight on it, that I had to purchase the scooter
19 and not put any weight on it.
20    Q    So the boot and this shoe, is that both
21 feet, left foot?
22    A    Just -- he told me that he only wanted to
23 concentrate on the left foot, because that was the
24 worser one.
25    Q    Okay.  So he said you had a torn tendon?

Page 52

1     A    Mm-hmm.
2     Q    And what treatment did he recommend for
3 that?  Did you have to have surgery?
4     A    He didn't want me -- do -- do surgery.  He
5 said we were going to avoid everything we could to not
6 have the surgery.  So I went from a boot -- then I was
7 in a cast and back to a boot.
8     Q    Did you end up needing a surgery?
9     A    I did.
10    Q    And when was the surgery?
11    A    It was almost, like, a year later; but he
12 didn't -- that doctor didn't do the surgery.  I went
13 for a second opinion.
14    Q    And where'd you go for the second opinion?
15    A    To Dr. Stanley Kalish.
16    Q    And where's his office?
17    A    He has several offices, one in Jonesboro and
18 one in Perimeter.  And I'm not sure where the other
19 ones are, but those are the only two places I saw him.
20    Q    Do you know the name of the practice?
21    A    It's an Atlanta foot -- I mean, it's a foot
22 and ankle center; but I don't know if it's Atlanta
23 Foot and Ankle.  I know it's a foot and ankle center.
24        MS. KAIRAB:  Brittany, we've been going
25 for about an hour.  Do you mind if we take a break or

Page 53

1 if --
2        MS. DEDIEGO:  Yeah, that's fine.  We
3 can take a break.
4        MS. KAIRAB:  Okay.  Perfect.
5        THE VIDEOGRAPHER:  Off the record at
6 11:12 a.m.
7        (Off the record.)
8        THE VIDEOGRAPHER:  We're back on the
9 record at 11:23 a.m.
10 BY MS. DEDIEGO:
11    Q    Okay.  So before the break, we were talking
12 about your -- Dr. -- you said it was Kalish?
13    A    Kalish.
14    Q    And you got a second opinion from him, and
15 then you ended up having surgery on your left foot?
16    A    Yes.
17    Q    And do you remember what the surgery was:
18 what he did?
19    A    Tendon repair.
20    Q    Did you need surgery on your right foot?
21    A    No, they just did it on the left foot.
22    Q    After the surgery, what was the recovery
23 like?
24    A    Long, painful.  I had, like, a drainage
25 tube.  And with that, I still went from, like, a boot

14 (Pages 50 - 53)

Linda D. Clemons                                        October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 54

1   to a cast to back to a boot.
2       Q   Did you have to do physical therapy?
3       A   Yes.
4       Q   Do you remember where you went?
5       A   I went to DeKalb Physical Therapy. I also
6   went to BenchMark Physical Therapy. And now I'm at
7   Emory Physical Therapy; that's closer to where to
8   where I live.
9       Q   The DeKalb Physical Therapy, was that
10  through the --
11      A   Before -- that was before the surgery,
12  though.
13      Q   Okay. But it was for the same foot?
14      A   Yes.
15      Q   And was it through the hospital, or was it
16  just called DeKalb Physical Therapy?
17      A   It was called Comprehensive Physical
18  Therapy. It was next -- it was in the same -- not the
19  same suite, but the same building that Dr. Shaheed was
20  in.
21      Q   And the physical therapy you did
22  pre-surgery, did that help at all with the pain?
23      A   It didn't.
24      Q   And then BenchMark, was that after the
25  surgery?

Page 55

1       A   Yes.
2       Q   And you said Emory Physical Therapy, that's
3   close to your house now?
4       A   Yes.
5       Q   Are you still going?
6       A   Yes.
7       Q   How often do you go?
8       A   I was going twice a week. Now, I only go
9   once a week.
10      Q   Is it focused on your left foot or both?
11      A   It's focusing on the left foot.
12      Q   Did you need to use a wheelchair any time
13  after the surgery?
14      A   No, just a scooter.
15      Q   Did your husband go to any of the medical
16  appointments with you?
17      A   Yes, most of them.
18      Q   Did any of your children go to the doctor
19  with you?
20      A   No, just my husband.
21      Q   Have you discussed the incident with your
22  children?
23      A   They know I had surgery. We talked about
24  the surgery, and.
25      Q   You said you used to go walking every day.

Page 56

1       Q   Did you go by yourself, or did you go with other
2   people?
3       A   I went with other people.
4       Q   Who'd you normally go with?
5       A   It was two different ladies that was in my
6   neighborhood. One passed away.
7       Q   What was the other one's name?
8       A   Her name was Cheryl, but she -- they -- they
9   were next-door neighbors. I lived further down the
10  street from them.
11      Q   Did you talk to Cheryl about the incident?
12      A   No.
13          THE REPORTER: Ms. Clemons, be careful
14  not to hit the microphones, because they're very
15  sensitive.
16          THE WITNESS: Okay.
17          THE REPORTER: I'm sorry.
18          THE VIDEOGRAPHER: And also the wires.
19  If you're playing with the wires --
20          THE REPORTER: Yeah.
21          THE VIDEOGRAPHER: -- it'll make noise.
22  Thank you.
23  BY MS. DEDIEGO:
24      Q   Do you still see the podiatrist --
25  Dr. Kalish?

Page 57

1       A   Dr. Kalish? Yes.
2       Q   When's the last time you went to Dr. Kalish?
3       A   About a week ago.
4       Q   And what did he say about your left foot?
5       A   That he wants to do another procedure. It's
6   a surgery, but it's a noninvasive surgery; but I have
7   to be put to sleep to have it done.
8       Q   And why does he say you need another
9   surgery?
10      A   Because the nerves is -- is so bad. I'm
11  still having a lot of pain, especially the burning and
12  the stabbing.
13          And I went to a pain center. And he wants
14  to do something also, but I'm just trying to find out
15  more about it. And I'm not saying no to it; but I'm
16  trying to find out, because it's a big procedure and
17  they have to place something in my back.
18          And I just want to find more about the
19  whole, you know, exactly what's all -- it's going to
20  all entail.
21      Q   So the procedure that would place something
22  in your back, was that recommended by the pain center?
23      A   Yes.
24      Q   What's the name of the doctor? Is it Summit
25  Joint and Spine?

15 (Pages 54 - 57)

Linda D. Clemons                                      October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 58

1    A   Summit. Yes.
2    Q   And why would they put something in your
3  back for your foot?
4    A   Because the nerves is -- is -- the nerves
5  are so bad. They're saying that this would be
6  something that will calm those nerves down. They said
7  they would first place it on the outside of my back,
8  put leads in it and place it. And then if it worked,
9  then they would put it internal.
10   Q   Is it a spinal cord simulator?
11   A   Yes.
12   Q   And the surgery that Dr. Kalish recommended,
13 what is that?
14   A   It's -- it's basically like -- the way I was
15 explained it, it's basically like a TENS; but it's,
16 like, a thousand times higher. And it would be a lot
17 of pain. That's why they would have to put me to
18 sleep.
19   Q   Did you say like a TENS unit?
20   A   You know, the electrical shocks.
21   Q   Right.
22   A   That's what -- yeah.
23   Q   Have you used the TENS before?
24   A   Yes. I'm having it actually in physical
25 therapy. I'm having it now; but it's like -- I only

Page 59

1  can tolerate it on a real low.
2    Q   And they use the TENS on your foot?
3    A   Yes. They're using it on my foot right now.
4    Q   Do you have one at home?
5    A   No.
6    Q   Have you seen any other doctors or gone
7  anywhere else for your feet?
8    A   No.
9    Q   In the records we have from DeKalb Medical
10 Center for May of 2021, it says that you had fallen
11 three weeks prior. Did you injure yourself falling;
12 no?
13   A   No.
14   Q   And then were you ever diagnosed with hammer
15 toes?
16   A   Hammer toes? I do have one toe that's,
17 like, crossing over. Yeah.
18   Q   Did you have that before the sign fell?
19   A   I -- I -- it -- it wasn't like it is now.
20 And it's, like, way more crossed over than what it --
21 what it -- it was, like, just close together; but now,
22 it's, like, crossed over the -- the toe that's next to
23 it.
24   Q   Did you have any bunions before?
25   A   Bunions? I really don't know what a bunion

Page 60

1  is, but I have a corn.
2    Q   Okay. In the records we have for the first
3  surgery you underwent, it says that you also underwent
4  a hammer toe surgery. Do you know anything about
5  that?
6    A   I've never had a surgery on my foot before.
7    Q   On your left foot?
8    A   No.
9    Q   You had a surgery with Dr. Kalish?
10   A   Yeah, on my -- for my -- not for hammer toe.
11   Q   Have you -- strike that.
12       Do you still experience pain in your left
13 foot?
14   A   Yes.
15   Q   How often?
16   A   Every day. Some days, it's not as bad as
17 others; but I have pain every day.
18   Q   You said you take Percocet for your other
19 pain.
20   A   Yes.
21   Q   Does that Percocet help with your foot pain?
22   A   It does. I also take Lyrica, and.
23   Q   Have you ever had nerve damage to any other
24 part of your body?
25   A   In my hand.

Page 61

1    Q   Do you still feel pain in your right foot?
2    A   I do, but not -- nowhere near as bad as the
3  left foot.
4    Q   The left foot pain, how would you describe
5  it: like burning, aching?
6    A   Burning, stabbing, aching.
7    Q   And where on your foot does it hurt?
8    A   Across the top and on the side, where my
9  ankle is, on the inner -- inner side. And on the
10 other side, like, between the -- the middle toe -- the
11 small toe, straight up into the ankle, like --
12   Q   And that's on your left foot?
13   A   Yes. Like -- it's, like, through here.
14   Q   Okay. Do you have any pain in your heel?
15   A   No, I don't have any pain in my heel. I
16 have like -- I don't know if that would be considered
17 the heel or not; but it's like -- and through here,
18 that's where the stabbing is. Sometimes, like, I'll,
19 like, just be sitting here; and then it just -- it
20 just hit me.
21   Q   So you pointed to kind of the bottom --
22   A   It's, like, through here.
23   Q   So through your arch up to your ankle?
24   A   No, not my arch -- like, right through here
25 to my ankle.

16 (Pages 58 - 61)

Linda D. Clemons                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 62

1    Q   The side of your heel up to the ankle.
2        And that's on the inside of your foot?
3    A   Mm-hmm.
4    Q   That's a "yes"?
5    A   Yes.
6        And I have it on the outside, but it doesn't
7  go back towards the heel.
8    Q   What about the right foot?  Where does it
9  hurt?
10   A   Just on that -- on the -- on the front, on
11 that side, like through here.
12   Q   On the top of the foot?
13   A   Mm-hmm, but on -- more towards the side.
14   Q   Which side -- left or right, or inside or
15 outside?
16   A   On the outside of this -- this foot.
17   Q   And did Dr. Kalish say anything about the
18 right foot?
19   A   Same thing, just they want to concentrate
20 more on getting the -- me out of the pain from the
21 left foot.
22       He did say that I'm starting to get -- he
23 mentioned, like, a spur.  And he said that comes from
24 using -- having all the weight on the right -- on my
25 right foot.

Page 63

1    Q   And I noticed that you had a cane today.
2  When did you start using a cane?
3    A   I've had it basically after -- I had it
4  before surgery, when I first started going to --
5  after I got my -- after I stopped using the scooter, I
6  had to go to the cane.
7    Q   Does the pain in your left foot affect your
8  ability to drive?
9    A   It doesn't affect my ability to drive.  It's
10 just the -- the -- when I get that stabbing feeling,
11 it just -- I'm afraid to -- to drive, like, far
12 places, because it -- it -- it's not, like, a certain
13 time that it'll hit.  It just comes at any time.
14   Q   Have you fallen or been injured at all since
15 April of 2021?
16   A   No.
17   Q   Any motor vehicle accidents -- any motor
18 vehicle accidents since 2021?
19   A   Not since 2021, no.
20   Q   Have you fallen at all as a result of the
21 pain in your feet?
22   A   I haven't.
23   Q   Did you review any documents in preparation
24 for the deposition today?
25   A   No.

Page 64

1        MS. DEDIEGO:  Okay.  We're going to go
2  through the photos that you produced to us in the
3  case.
4        I'm going to mark them as Exhibit
5  Number 4.
6        (Exhibit 4 was marked for
7        identification.)
8        I'm sorry.  Here's the one with the
9  sticker.
10       And you can take the paper clip off if
11 that makes it easier for you.
12 BY MS. DEDIEGO:
13   Q   Let's just go through them one by one, if
14 that's okay with you.
15       So this first page looks like it's a picture
16 of your left foot?
17   A   Yes.
18   Q   And is this after the surgery?
19   A   This is after the surgery.
20   Q   Is that the first surgery?  Well, you've
21 only had one so far; right?
22   A   I only had one surgery, yes.
23   Q   Okay.  So this is after the surgery?
24   A   Mm-hmm.
25   Q   And then why did you take this picture?

Page 65

1        MS. KAIRAB:  Object to the extent that
2  calls for attorney-client communications.
3  BY MS. DEDIEGO:
4    Q   Is this the bandages that they put on you
5  after the surgery?
6    A   Those are the bandages over the --
7    Q   How soon after the surgery did you take the
8  picture?
9    A   I don't recall how soon it was.
10   Q   Do you have a scar from the surgery?
11   A   I do.
12   Q   And then if you go to the second page, what
13 is that a photo of?
14   A   Probably a little further up, around by the
15 ankle area.
16   Q   Is that a photo of a scar or a cut?
17   A   A cut.
18   Q   Would that have been taken soon after the
19 sign hit you?
20   A   Yes.  Not soon -- I don't know how soon
21 after, but it was after the sign fell.
22   Q   Is this your ankle?
23   A   Yeah.  I think it's, like, the ankle, top
24 part of the leg, like just above the ankle.
25   Q   Do you know if it was the left or right --

17 (Pages 62 - 65)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 66

1    A    This -- this was the left one.
2    Q    Okay.  And the next page, is this that drain
3  you were talking about?
4    A    Yes.
5    Q    How long did you have the drain on there?
6    A    A long time.  I -- I don't know how long,
7  but I know after I had the drain taken off, I did have
8  another surgery.  It wasn't, like, another cut; but I
9  had -- they had to go back in, because it was too hard
10 to get the staples that was in there -- because I had
11 stitches and staples.  And he had to go back in
12 to -- they had to put me to sleep to get it out.
13   Q    To remove the staple?
14   A    To remove the staples and clean the cut up
15 more, because it was --
16   Q    Okay.  And the next one, is that after the
17 surgery?
18   A    Yes.
19   Q    Do you know how soon after the surgery that
20 was taken?
21   A    Maybe about a month after, because it look
22 like -- yeah, maybe about a month afterwards.
23   Q    Did you take the photos yourself, or did you
24 have someone else take them for you?
25   A    I had somebody else take them.

Page 67

1    Q    Who took them?
2    A    Probably my husband.
3    Q    Okay.  And the next page, you're wearing, it
4  looks like, a cast.  Do you know if this was before
5  or --
6    A    I think this was before -- before.  I'm not
7  sure.  I had it on twice, you know.  I had a cast on
8  before the surgery, and I had one after the surgery.
9    Q    Okay.  Was it purple both times?
10   A    I believe so.
11   Q    Okay.
12   A    That's my favorite color, so.
13   Q    Me too.
14        The next one, it looks like a picture of the
15 top of your left foot; is that right?
16   A    Mm-hmm.
17   Q    Is that a "yes"?
18   A    Yes.  Sorry.
19   Q    And then what's this picture of?
20   A    My foot.
21   Q    And is it showing something specific?
22   A    Just it was swollen.
23   Q    Would this be taken soon after the sign
24 fell?
25   A    I think so.  I'm not sure.

Page 68

1    Q    Do you still have the photos -- do you have,
2  like, the dates they were taken?
3    A    No.  I -- I mean, I -- I don't know how --
4  my phone is, like, kind of crazy.  Like, it's like my
5  pictures is not, like, in one order.  For some reason,
6  they just -- they -- they move around sometimes, I
7  guess.  I don't even know how to explain it.
8    Q    How long did you have swelling on the top of
9  your foot?
10   A    A long time.  I still have swelling on the
11 foot.  And they said it takes a long time for the
12 swelling to completely go away.
13   Q    Did you have swelling on the right foot?
14   A    I did, but not -- nothing like this.
15   Q    Okay.  The next one --
16   A    This was after the -- this was after the
17 surgery.  I had had another cast put on -- that was
18 the second time.  They had to go in and clean
19 everything up and get the staples out.  They didn't
20 want me to put any weight on it.
21   Q    So were you using crutches at that time?
22   A    I was using crutches and a scooter and --
23 shoe was like -- it was -- I -- I don't even know how
24 to explain it.  It was weird.  It kind of had, like, a
25 heel on it.

Page 69

1    Q    Is that the shoe you're wearing in the
2  photo?
3    A    Yeah.  It's actually -- yeah, that's the
4  shoe.  And then I had another shoe too -- it looked
5  like a high-heel shoe or something.  But he didn't
6  want me to put no weight at all on it.
7    Q    The next picture looks like a picture of a
8  toenail?
9    A    Yeah.  That's on my -- on the right foot,
10 because it kind of hit me more -- for some reason, it
11 got hit more down there.  It was, like, black and
12 blue, the toenail.  And he told me eventually, it was
13 going to fall off.  And it was starting to come off.
14   Q    Did it grow out?
15   A    It did.  It grew out.
16   Q    And then did you grow a new toenail?
17   A    I grew a new toenail.
18   Q    Okay.  The next picture looks like a picture
19 of your right foot.  Do you know why you took this
20 picture?
21   A    Because it -- it was still, you know,
22 swelling.  And he said it was, you know -- all my
23 weight was going on there and I still did have a tear
24 there, and I was using more of the -- my right foot to
25 bear all my weight on, because I couldn't put any on

18 (Pages 66 - 69)

Linda D. Clemons                                   October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 70

1  the -- on the left foot.
2      Q   Where was the swelling on your right foot?
3      A   Up around the ankle area.
4      Q   On the top of your foot?
5      A   On the top of the foot.
6      Q   Do you still get swelling in the right foot?
7      A   I do.
8      Q   How often?
9      A   I guess the more I be on it. I don't know,
10  though. Yeah, but it doesn't get up that big any --
11  anymore. It doesn't swell that big.
12     Q   Is there anything specific that you do that
13  causes your feet to swell?
14     A   Just being on it, being -- being -- you
15  know, like, standing.
16     Q   Did you ever have issues with swelling feet
17  before the incident?
18     A   I didn't.
19     Q   Okay. The next one looks like your left
20  foot. Is that the boot you were talking about?
21     A   Yeah, but I don't know if it was a boot
22  after the surgery, because even after I took the cast
23  on, I still went back to another boot, so -- and I had
24  a boot that was knee-high also. So -- and I think
25  that -- that -- the knee-high boot was before I had

Page 71

1  any surgeries.
2      Q   Okay. The next one -- and that's your left
3  foot again?
4      A   Yes.
5      Q   And that's after the surgery?
6      A   Yes.
7      Q   The next one --
8      A   That's when the staples were still in it.
9      Q   Okay. So this was closer in time after the
10  surgery?
11     A   I think that's when they were cleaning it
12  up, where I had to go in for another surgery.
13     Q   To remove the staples?
14     A   Yeah.
15     Q   Okay. And then the next one -- I think --
16  skipped one.
17     A   That's -- that's the one I was telling you
18  about, the shoe. It was kind of like a high-heel
19  shoe.
20     Q   Did you just put more pressure on your toes
21  than your heel?
22     A   Yeah. Yeah, so they wanted me to keep the
23  pressure -- I -- I don't really know why that boot,
24  but it was like -- it was like a high shoe. So I
25  guess they wanted me to keep the -- the weight off of

Page 72

1  my -- the heel area.
2      Q   Okay. The next one --
3      A   See, that's a blue cast, so.
4      Q   Yeah. It looks purple in mine.
5      A   Oh, it looks purple? I don't know.
6      Q   I don't know.
7      A   I -- I believe I had purple casts the whole
8  time.
9      Q   Okay. And then the next one, that's your
10  left foot?
11     A   Mm-hmm.
12     Q   And then do you know what this picture is
13  showing?
14     A   Just my -- where my ankle was starting to
15  swell again. It was, like, off and on.
16     Q   Okay. And then this next picture looks like
17  it's the drain again?
18     A   Yes.
19     Q   The next one, I think, is the same, just a
20  different angle?
21     A   Yes.
22     Q   And then that's --
23     A   They're, like, the same pictures.
24     Q   Okay. Yeah. I don't know. Some of them
25  might be duplicates.

Page 73

1      And then you can skip -- that one looks the
2  same.
3      A   Purple.
4      Q   And you've got the purple cast again.
5      And that's the top of your left foot?
6      A   Yes.
7      Q   And that's just to show swelling?
8      A   Yes.
9      Q   And it looks like there's a boot again?
10     A   Same pictures.
11     Yeah, that was the -- this was the first
12  boot that I had.
13     Q   Okay. So the one where you're wearing the
14  green pants, you can skip to that one, because I think
15  the other ones look kind of duplicate.
16     A   Yeah.
17     Q   So that's the first boot?
18     A   Mm-hmm.
19     Q   So that's pre-surgery?
20     A   That's before I had any surgery at all.
21  This is -- I had to wear that -- seemed like forever,
22  for a long time.
23     Q   When you were wearing the boot, were you
24  also using the scooter, crutches, or were you --
25     A   Yes, scooter.

19 (Pages 70 - 73)

Linda D. Clemons                                      October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 74

1    Q   A scooter?
2        Okay. I think the rest of them are
3    duplicates --
4    A   The same things.
5    Q   Yeah. So we had served you with some
6    discovery responses that I think you helped your
7    attorneys answer. And in here, it has your
8    doctor -- that you went to Peachtree Urgent Care. Do
9    you know if you went to Peachtree Urgent Care, or
10   would it have been Piedmont?
11   A   I think it was Piedmont.
12   Q   Okay.
13   A   That was -- I never knew that was Piedmont,
14   though. I just knew it was urgent care, so I just --
15   she said go to urgent care. So that was close to her
16   office and my doctor's office, so.
17   Q   Okay. So other than your husband, anyone
18   else go to the doctor with you?
19   A   Just my husband.
20   Q   Have you discussed the case with anyone
21   other than your husband?
22   A   No.
23   Q   Any other way the incident at Old Navy has
24   impacted your life, that we haven't talked about
25   today?

Page 75

1    A   That impacted my life, no, just from the
2    injury.
3    Q   Has it affected your ability to do any
4    household chores?
5    A   Yes.
6    Q   How has it affected your ability to do
7    chores?
8    A   A lot -- you know, I just can't stand up for
9    a long period of time. My husband's been doing most
10   of those. Sometimes my daughter comes over and do it.
11   I have a niece sometimes come over and help me also.
12   Q   And what was your niece's name?
13   A   Her name is Danielle.
14       MS. DEDIEGO: Can we just take, like, a
15   five-, ten-minute break; and then I might be done?
16       THE VIDEOGRAPHER: Off the record at
17   11:54 a.m.
18       (Off the record.)
19       THE VIDEOGRAPHER: Back on the record
20   at 11:57 a.m.
21   BY MS. DEDIEGO:
22   Q   Ms. Clemons, have you ever received Medicare
23   or Medicaid benefits?
24   A   No.
25   Q   Have you ever applied for Social Security

Page 76

1    Disability?
2    A   When I first got injured back in '95, but I
3    never received it.
4    Q   Do you plan to reapply?
5    A   Yes. I have to eventually, I'm sure. I'm
6    65, so.
7    Q   Has any doctor told you that the injury to
8    your left foot might be permanent?
9    A   Dr. Shaheed had told me that -- that -- not
10   that it would be permanent, but I would -- it's a
11   possibility that I will walk different and not be able
12   to do the things that I used to do.
13   Q   And what sort of things?
14   A   Like what I like to -- love to do, walk long
15   distance.
16   Q   When you used to go for walks, how far would
17   you go?
18   A   I mean, I don't -- I don't know how many
19   miles it would be, but like hours, two, three hours at
20   a time.
21   Q   Have you tried to go for a walk at all
22   since --
23   A   Yes. Yeah, in my neighborhood.
24   Q   How recently was that?
25   A   Last year.

Page 77

1    Q   And what happened when you tried to go for a
2    walk?
3    A   Too much pain -- couldn't even make it a
4    block.
5    Q   Was the pain in your left foot or your right
6    foot or both?
7    A   My left foot.
8    Q   And I'm sorry if I already asked you this.
9    Where in your foot does it hurt now?
10   A   On the side and on the top, on both sides --
11   like in between my -- up the front, through my middle
12   toe, and on the side, and on the top part of it.
13   Q   Okay. And what chores did you do before
14   that you can't do anymore?
15   A   Going up and down the stairs, sweeping,
16   standing to cook. Yard work, that's something I used
17   to like to do, but.
18   Q   Is there anything that you do that helps
19   reduce the pain in your foot?
20   A   No.
21   Q   Does the pain medication help at all?
22   A   It helps a little. I can tell the
23   difference when I'm -- when I've taken it and when I
24   haven't taken it.
25   Q   You described the stabbing and burning. Did

20 (Pages 74 - 77)

Linda D. Clemons                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 78

1  you ever feel any tingling in your feet?
2      A  I do have some tingling, but more -- it's
3  more of a stabbing and a burning.
4      Q  Did you break any of the bones in your feet?
5      A  No.
6      Q  Do you still have pain in your ankles or is
7  it --
8      A  I do.
9      Q  How far up your ankle does the pain go?
10     A  Just, like, where -- you don't have the
11  picture -- through here.
12     Q  Okay.  So kind of where your sock would hit?
13     A  A footie maybe, a little bit higher than
14  where a footie would hit.
15     Q  Okay.  Do you remember if anyone from the
16  Old Navy store -- if that manager called after that to
17  check up on you?
18     A  Nobody called.
19        MS. DEDIEGO:  I don't think I have any
20  further questions.  Do you have anything, Haley?
21        MS. KAIRAB:  I don't have anything.
22        THE REPORTER:  I have some questions
23  off the video record.
24        THE VIDEOGRAPHER:  We're off the video
25  record at 12:02 p.m.

Page 79

1        THE REPORTER:  I have a couple
2  questions before we go off the written record.
3        Miss Brittany, would you like a copy of
4  the transcript?
5        MS. DEDIEGO:  Yes, E-Tran with
6  exhibits, please.
7        THE REPORTER:  All right.  And would
8  you like a copy?
9        MS. KAIRAB:  Yeah, same, just E-Tran
10  with exhibits, and if you could do a condensed version
11  as well.
12        THE REPORTER:  You said E-Tran with
13  exhibits and condensed?
14        MS. KAIRAB:  Yeah.
15        THE REPORTER:  Okay.  All right.  The
16  time is 12:03, and we are off the written record.
17        (Signature reserved.)
18        (Whereupon, at 12:03 p.m., the
19          proceeding was concluded.)
20
21
22
23
24
25

Page 80

1        CERTIFICATE OF DEPOSITION OFFICER
2        I, DEIDRA NASH, the officer before whom the
3  foregoing proceedings were taken, do hereby certify
4  that any witness(es) in the foregoing proceedings,
5  prior to testifying, were duly sworn; that the
6  proceedings were recorded by me and thereafter reduced
7  to typewriting by a qualified transcriptionist; that
8  said digital audio recording of said proceedings are a
9  true and accurate record to the best of my knowledge,
10  skills, and ability; that I am neither counsel for,
11  related to, nor employed by any of the parties to the
12  action in which this was taken; and, further, that I
13  am not a relative or employee of any counsel or
14  attorney employed by the parties hereto, nor
15  financially or othe_____ome of
16  this action.

                    _Deidra Nash_

17              DEIDRA NASH
18          Notary Public in and for the
19             State of Georgia
20
21  [X] Review of the transcript was requested.
22
23
24
25

Page 81

1        CERTIFICATE OF TRANSCRIBER
2        I, KIANA COOK, do hereby certify that this
3  transcript was prepared from the digital audio
4  recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to,
8  nor employed by any of the parties to the action in
9  which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise interested in the outcome of this action.
13
14
                    _Kiana Cook_
15              KIANA COOK
16
17
18
19
20
21
22
23
24
25

21 (Pages 78 - 81)

Linda D. Clemons                                                    October 18, 2023
Clemons, Linda D. Vs. Old Navy, LLC, Et Al.

Page 82

1  Haley Kairab
2  haley@piastawalker.com
3          November 1, 2023
4  RE: Clemons, Linda D. v. Old Navy, LLC, Et Al.
5     10/18/2023, Linda D. Clemons (#6114182)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-southeast@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25

Page 83

1  Clemons, Linda D. v. Old Navy, LLC, Et Al.
2  Linda D. Clemons (#6114182)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22       SIGNED UNDER PENALTY OF PERJURY
23  _____   _____
24  Linda D. Clemons            Date
25

Page 84

1  Clemons, Linda D. v. Old Navy, LLC, Et Al.
2  Linda D. Clemons (#6114182)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Linda D. Clemons, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10      SIGNED UNDER PENALTY OF PERJURY
11  _____  _____
12  Linda D. Clemons          Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

22 (Pages 82 - 84)

# EXHIBIT B

**In The Matter Of:**

*Clemons v.*
*Old Navy, LLC, et al.*

---

*Lisa Renee Allen*
*September 1, 2023*
*Video Deposition*

---

*Regency-Brentano, Inc.*
*13 Corporate Square*
*Suite 140*
*Atlanta, Georgia 30329*
*404.321.3333*



REGENCY-BRENTANO, INC.
*C e r t i f i e d   C o u r t   R e p o r t e r s*

Min-U-Script® with Word Index

Clemons v.
Old Navy, LLC, et al.

Video Deposition

Lisa Renee Allen
September 1, 2023

---

Page 1

```
 1        IN THE STATE COURT OF GWINNETT COUNTY
               STATE OF GEORGIA
 2

 3

 4   LINDA D. CLEMONS,

 5        Plaintiff,          CIVIL ACTION FILE
     v.                       NO. 23-C-00137-S4
 6
     OLD NAVY, LLC, et al.,
 7
          Defendants.
 8   ----------------------

 9        VIDEOTAPED DEPOSITION OF
               LISA RENEE ALLEN
10

11          September 1, 2023
                1:01 p.m.
12
             Location of Witness:
13            Snellville, Georgia

14

15      Deborah P. Longoria, RPR, CCR B-1557

16

17           REGENCY-BRENTANO, INC.
18         Certified Court Reporters
              13 Corporate Square
19               Suite 140
             Atlanta, Georgia 30329
20             (404) 321-3333

21

22

23

24

25
```

---

Page 3

```
 1           INDEX TO EXAMINATIONS

 2   WITNESS:  Lisa Renee Allen

 3                                        Page

 4   Examination by Mr. Walker               6

 5   Examination by Ms. DeDiego             16

 6

 7

 8           INDEX TO EXHIBITS

 9   Previously Marked
     Plaintiff's        Description      Marked/First
10   Exhibit                             Identified

11   P-1        Document re Shelf Strips;
                Safety Reminder              8
12
     P-2        Documents and Photos re Shelf Strips  10
13

14      (Exhibits P-1 and P-2 have been attached to the
     original transcript.)
15

16

17

18

19

20

21

22

23

24

25
```

---

Page 2

```
 1        APPEARANCES (all via videoconference)

 2   On behalf of the Plaintiff:
 3       PIASTA WALKER HAGENBUSH, LLC
         MICHAEL P. WALKER, ESQUIRE
 4       3301 Windy Ridge Parkway
         Suite 110
 5       Atlanta, Georgia  30339
         404.996.1296
 6       Mike@piastawalker.com

 7   On behalf of the Defendants:
         LEWIS BRISBOIS BISGAARD & SMITH, LLP
 8       BRITTANY DE DIEGO, ESQUIRE
         600 Peachtree Street NE
 9       Suite 4700
         Atlanta, Georgia  30308
10       404.348.8585
         Brittany.DeDiego@lewisbrisbois.com

11   Also Present:
         George Bush, Videographer
12       Atlanta Legal Media

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

Page 4

1 Videotaped Deposition by Remote Videoconference of

2 Lisa Renee Allen

3 September 1, 2023

4 - - -

5 **THE VIDEOGRAPHER:** We are on the record at

6 1:01 p.m.

7 **MR. WALKER:** This will be the deposition

8 of Lisa Allen, taken pursuant to notice and

9 agreement of counsel.

10 Brittany, I would propose we reserve all

11 objections except to the form of the question

12 and responsiveness of the answer until first use

13 of the deposition.

14 **MS. DE DIEGO:** Yes, that's fine.

15 **MR. WALKER:** All right. Hi, Ms. Allen.

16 My name is Mike Walker. I represent Linda

17 Clemons. Thanks for being here today.

18 Have you ever been deposed before?

19 **MS. ALLEN:** No.

20 **MR. WALKER:** So basically I'll just being

21 asking some questions about your experience at

22 Old Navy, anything you know about the Linda

23 Clemons incident.

24 And what we ask from you during the

25 process is just if you would give me a verbal

---

Page 5

1 response to the question. That way the court
2 reporter can take it down.
3    It's really important to me and my client
4 that you understand everything I'm asking you.
5 And so if I ask you a question that you don't
6 understand, please just let me know and I'll do
7 my best to rephrase it. Okay?
8    **MS. ALLEN:** Okay.
9    **MR. WALKER:** The flip side to it is that
10 if I ask you something and you do respond to it,
11 I'll assume you understood it. Is that fair?
12    **MS. ALLEN:** Yes.
13    **MR. WALKER:** All right. Give me your full
14 name for the record, please.
15    **THE COURT REPORTER:** Okay. Excuse me.
16 I'm sorry. I'm going to go ahead and --
17    **MR. WALKER:** I need to swear her in, don't
18 I? Go ahead.
19    **THE COURT REPORTER:** Yes, sir.
20    **MR. WALKER:** Sorry. I forgot.
21    **THE COURT REPORTER:** That's okay.
22    LISA RENEE ALLEN,
23 having been first duly sworn or affirmed, testifies
24 as follows.
25    **MS. DE DIEGO:** And, Mike, no objection to

Page 6

1 remote swearing.
2    **MR. WALKER:** Thanks.
3    **EXAMINATION**
4    **BY MR. WALKER:**
5 Q. All right. Would you please give me your
6    full name, Ms. Allen.
7 A. Lisa Renee Allen.
8 Q. And I'm not going to come to your house or
9    anything, but if I had to send you a subpoena, what
10    would be your home address?
11 A. 1477 Hickory Drive, Lilburn, Georgia
12 30047.
13 Q. And do you currently work at Old Navy?
14 A. I do.
15 Q. How long have you worked there?
16 A. Going on about 24 years.
17 Q. And what's your current job title?
18 A. General manager.
19 Q. Are you the person in charge of the store?
20 A. I am.
21 Q. And I was referring to the Snellville
22    store. Are you in charge of the Snellville store?
23 A. I am.
24 Q. Would you be the highest ranking person at
25    the store level?

Page 7

1 A. Yes.
2 Q. How long have you been the general manager
3    of the Snellville store?
4 A. Been about 20 years.
5 Q. Who do you report to?
6 A. My supervisor is Ross Hoffman.
7 Q. What's his title?
8 A. District manager.
9 Q. And what district is his district?
10 A. Atlanta North.
11 Q. Did you say Atlanta, Georgia?
12 A. Atlanta North.
13 Q. Oh, Atlanta North. Okay. What stores are
14    in the Atlanta North division or district?
15 A. I mean there are like 11 stores. I can't
16    name them offhand. But we have 11 stores in the
17    district.
18 Q. All right. In your capacity as the
19    general manager at the Snellville store, did you ever
20    receive any training on installing or securing shelf
21    strips?
22 A. I can't say that I have.
23 Q. Do you know what I'm referring to when I
24    say a "shelf strip"?
25 A. Yes.

Page 8

1 Q. If you could just kind of explain what
2    that is.
3 A. A shelf strip is a metal sign that is
4    placed on our walls.
5 Q. Are they placed on the shelves?
6 A. The shelves and the walls, correct.
7 Q. Do you know how to secure a shelf strip to
8    a shelf?
9 A. Yes.
10 Q. How do you go about doing that?
11 A. To secure a shelf strip into a shelf, you
12    would just make sure that it has Velcro on the top
13    and the bottom of it, and then you would secure it to
14    the shelf.
15 Q. Velcro between the shelf and the shelf
16    strip?
17 A. Correct.
18 Q. All right. So I want to show you what
19    I've marked as Plaintiff's Exhibit No. 1.
20       (Plaintiff's Exhibit P-1, having been
21    previously marked, was introduced into the
22    record.)
23 Q. (By Mr. Walker) Can you see this document
24    before -- can you see this document, Ms. Allen?
25 A. I see it.

Case 1:23-mi-99999-UNA   Document 4195   Filed 12/18/23   Page 287 of 351

Clemons v.                          Video Deposition                   Lisa Renee Allen
Old Navy, LLC, et al.                                                  September 1, 2023

Page 9

1  Q.  Have you ever seen this document before?
2  A.  Yes.
3  Q.  When do you think you saw this document?
4  A.  It'd probably have to been some years ago
5  since I've been with the company for so long.
6  Q.  It says here that -- at the top it says,
7  Metal Shelf Strip Sign Holder:  Added safety.  Right?
8  A.  Yes.
9  Q.  Then it says, Men's khaki metal shelf
10  strip sign holders used as example, same principle
11  applies to all metal shelf strips.  Right?
12  A.  Yes.
13  Q.  And then it describes how you put the
14  Velcro on the underside of the shelf strip to secure
15  it to the shelf, right?
16  A.  Yes.
17  Q.  And if you go down to the page -- the
18  second page, it says:  The metal shelf strip sign
19  holders, used in denim and khaki presentations, are
20  at risk of sliding forward off the shelf and falling
21  when someone removes a product from a stack.  All
22  stores with the metal shelf strip sign holders must
23  use Velcro strips to help secure the sign holder to
24  the shelf they sit upon.
25      Did I read that correctly?

Page 10

1  A.  Yes.
2  Q.  All right.  Is that what you were
3  referring to earlier about how to secure the shelf
4  strip?
5  A.  Yes.
6  Q.  And the risk of not doing that is that
7  they can fall off the shelf and hit somebody?
8  A.  Yes.
9  Q.  All right.  I'm going to show you what
10  I've marked as Plaintiff's Exhibit No. 2.
11      (Plaintiff's Exhibit P-2, having been
12  previously marked, was introduced into the
13  record.)
14  Q.  (By Mr. Walker)  Have you ever seen this
15  -- these photographs and incident report before?
16  A.  Yes.
17  Q.  Okay.  When did you see these?
18  A.  That I saw when I was going over from
19  having a conversation with Brittany.
20  Q.  And I'm not asking about your
21  conversations with your counsel.  I was just more
22  wondering when you saw this document and if you'd
23  seen outside the context of preparing for a
24  deposition.
25  A.  No.

Page 11

1  Q.  Okay.  So page 1 shows a shelf strip,
2  right?
3  A.  Yes.
4  Q.  And it's got the Velcro on top of it?
5  A.  Yes.
6  Q.  And if you look at pages 4 and 5, that's
7  other -- that -- page 4 is also at the top of the
8  shelf strip, right?
9  A.  Yes.
10  Q.  And then page 5 of the exhibit is the
11  underside of the shelf strip, right?
12  A.  Yes.
13  Q.  And the underside of the shelf strip does
14  not have the Velcro straps on it?
15  A.  No.
16  Q.  Is that correct; it does not?
17  A.  I don't see it, no.
18  Q.  This would be against the policies and
19  procedures on how to properly secure the shelf strip,
20  right?
21  A.  Yes.
22  Q.  Do you know who would have installed this
23  shelf strip?
24  A.  It would be the merchandise manager.
25  Q.  Okay.  Do you know who that would have

Page 12

1  been in April of 2021?
2  A.  It would have been Mike Rinehart.
3  Q.  Did you ever have any conversation with
4  Mr. Rinehart on how to secure the shelf strips?
5  A.  No.
6  Q.  Do you know if he received any training on
7  the shelf strips?
8  A.  No.
9  Q.  Do you know who would have been
10  responsible for training him on the shelf strips?
11  A.  Whoever he started off with at the time
12  that he came on with the company, whoever did his
13  training.
14  Q.  But if Mr. Rinehart did not use the shelf
15  -- the Velcro on the shelf strip on the bottom, that
16  would have been in violation of Old Navy's policies?
17  A.  Yes.
18  Q.  And that would have made the shelf strip
19  more likely to fall?
20      MS. DE DIEGO:  Object to form.
21      You can answer.
22      THE WITNESS:  Not necessarily.
23  Q.  (By Mr. Walker)  Well, the shelf strip is
24  there as an added safety benefit, right?
25  A.  Yes.

Page 13

1  Q.  And without the added safety benefit, it's
2  more likely to fall?
3      MS. DE DIEGO: Objection.
4      You can answer.
5      THE WITNESS: No.
6  Q.  (By Mr. Walker)  Well, do strip shelves
7  [sic] provide a good benefit for customer safety?
8  A.  Yes.
9  Q.  And you agree the shelf strip should be
10  added to the bottom of the -- excuse me.
11      You agree the Velcro should be added to
12  the bottom of the shelf strip to help prevent it from
13  sliding and hitting somebody, right?
14  A.  Yes, to give it extra support.
15  Q.  Did you ever have any conversations after
16  April of 2029 [sic] with anybody regarding the shelf
17  strips or the Velcro?
18  A.  No.
19  Q.  Is there anything else that you're
20  supposed to do at Old Navy to help secure the shelf
21  strip on a shelf?
22  A.  Say your question again.
23  Q.  Is there anything else that you're
24  supposed to do to help secure the shelf strip?
25  A.  I guess I don't understand your question.

Page 14

1      You say anything else that you should do?
2  Q.  Well, I notice there's like a hole in the
3  upper right-hand corner on this shelf strip.  Are you
4  supposed to bolt it down or do anything like that?
5  A.  No.
6  Q.  Okay.  So it would just be the Velcro
7  strips?
8  A.  Yes.
9  Q.  After -- when did you learn about the
10  Linda Clemons incident?
11  A.  I really can't recall.
12  Q.  Did you speak with Mr. Rinehart about it?
13  A.  I don't remember.
14  Q.  Other than your attorney, can you recall
15  speaking with anybody about the incident?
16  A.  No.
17  Q.  Do you know anything about what happened?
18  A.  No.
19  Q.  Were you present when it happened?
20  A.  No.
21  Q.  Have you ever spoken to Ms. Clemons?
22  A.  No.
23  Q.  And you don't recall speaking with anybody
24  else about her other than your attorney?
25  A.  No.

Page 15

1  Q.  So it's fair to say that other than your
2  -- what you've learned from your attorney, you don't
3  have any knowledge of what happened to Ms. Clemons?
4  A.  No.
5  Q.  Do you know when Mr. Rinehart began
6  working at the Snellville location?
7  A.  Repeat your question.  I'm having a hard
8  time hearing.
9  Q.  I apologize.
10      Do you know when Mr. Rinehart began
11  working at the Snellville location?
12  A.  I can't remember.
13  Q.  Are there any policies and procedures at
14  Old Navy to periodically check the shelf strips to
15  see that they're properly secured?
16  A.  We do what's called -- it's under risk
17  management, and monthly we have different topics that
18  we cover, like different safety topics, every single
19  month, but each month they rotate.
20  Q.  Do you recall if there was ever any
21  discussion about the shelf strips and checking them?
22  A.  No.
23      MR. WALKER: All right.  That's all I have
24  for you today.  I appreciate your time.
25      THE WITNESS: Thank you.

Page 16

1      MS. DE DIEGO: I just have a couple
2  questions for you real quick, Ms. Allen.
3      EXAMINATION
4      BY MS. DE DIEGO:
5  Q.  The policies and procedures at Old Navy,
6  who creates those?
7  A.  Corporate.
8  Q.  Do you personally create any of those
9  policies and procedures?
10  A.  No.
11  Q.  Did you personally train Mr. Rinehart?
12  A.  No.
13  Q.  Are you the only manager at the Snellville
14  location?
15  A.  The only general manager.
16  Q.  Are there other managers that work there?
17  A.  There are other managers, yes.
18  Q.  Were you working on April 13th, 2021 --
19  A.  No, I don't think so.
20  Q.  -- the day that this --
21  A.  No.
22      MS. DE DIEGO: Okay.  No further questions
23  from me.
24      MR. WALKER: None from me.  Thank you.
25      THE VIDEOGRAPHER: Off the record at

Case 1:23-mi-99999-UNA   Document 4195   Filed 12/18/23   Page 289 of 351

Clemons v.                              Video Deposition                       Lisa Renee Allen
Old Navy, LLC, et al.                                                          September 1, 2023

Page 17

1   1:16 p.m.
2   (Deposition concluded at 1:16 p.m.)
3   **MS. DE DIEGO:** We'll read and sign.
4   [Orders to court reporter:
5   **MR. WALKER:** Transcribe, electronic copy.
6   **MS. DE DIEGO:** E-tran with exhibits.]
7   (Pursuant to Rule 30(e) of the Federal
8   Rules of Civil Procedure and/or O.C.G.A.
9   9-11-30(e), signature of the witness has been
10  reserved.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 19

1                    COURT REPORTER DISCLOSURE
2
3        Pursuant to Article 10.B. of the Rules and
     Regulations of the Board of Court Reporting of the
4   Judicial Council of Georgia which states: "Each court
     reporter shall tender a disclosure form at the time
5   of the taking of the deposition stating the
     arrangements made for the reporting services of the
6   certified court reporter, by the certified court
     reporter, the court reporter's employer, or the
7   referral source for the deposition, with any party to
     the litigation, counsel to the parties or other
8   entity.  Such form shall be attached to the
     deposition transcript," I make the following
9   disclosure:
10
11       I am a Georgia Certified Court Reporter.  I was
     contacted to provide court reporting services for the
11  deposition.  I will not be taking this deposition
     under any contract that is prohibited by O.C.G.A.
12  15-14-37(a) and (b).
13
14       I have no contract/agreement to provide
     reporting services with any party to the case, any
15  counsel in the case, or any reporter or reporting
     agency from whom a referral might have been made to
16  cover this deposition.  I will charge the usual and
     customary rates to all parties in the case, and a
17  financial discount will not be given to any party to
     this litigation.
18
19
20
21                    *Deborah P. Longoria*
22                    DEBORAH LONGORIA, RPR, B-1557
23
24
25

Page 18

1        R E P O R T E R ' S   C E R T I F I C A T E
2   STATE OF GEORGIA:
3   COUNTY OF PAULDING:
4        I, Deborah P. Longoria, RPR, Certified
5   Court Reporter for the State of Georgia, hereby
6   certify that the witness was duly sworn by me,
7   and that the foregoing proceeding took place
8   before me at the time and place herein set out.
9        I further certify that the foregoing was
10  recorded stenographically by me and reduced to
11  typewriting by me or under my control; that the
12  foregoing pages 1 through 17 represent a true,
13  complete, and correct transcript.
14       I further certify that I am not of kin or
15  counsel to any counsel or party to this matter,
16  nor am I in any way interested in the outcome of
17  this action.
18       This, the 12th day of September 2023.
19
20
21                    *Deborah P. Longoria*
22
23                    DEBORAH LONGORIA, RPR, B-1557
24
25

Page 20

1   ERRATA PAGE(S) - LISA RENEE ALLEN/DPL
2        I, LISA RENEE ALLEN, having reserved my
     signature, do hereby certify that I have read all
3   questions propounded to me and all answers given by
     me on September 1, 2023, and that:
4        1)   There are no changes noted.
5        2)   The following changes are noted:
6
7   I, LISA RENEE ALLEN, hereby state my desire to make
     corrections entered upon the sworn testimony given
8   and I have set forth the reason for making them.
     Accordingly, I have entered the same on the form
9   below and if supplemental or additional pages were
     necessary, I have furnished the same in typewriting
10  annexed herewith.
11  Page No.        Line No.        should read:
12  Page No.        Line No.        should read:
13
14  Page No.        Line No.        should read:
15  Page No.        Line No.        should read:
16
17  Page No.        Line No.        should read:
18  Page No.        Line No.        should read:
19
20  Page No.        Line No.        should read:
21  Page No.        Line No.        should read:
22
23  Page No.        Line No.        should read:
24
25  Page No.        Line No.        should read:

Video Deposition

Page 21

```
 1   (Continued) ERRATA PAGE - LISA RENEE ALLEN/DPL

 2   Page No.        Line No.        should read:

 3

 4   Page No.        Line No.        should read:

 5   Page No.        Line No.        should read:

 6

 7   Page No.        Line No.        should read:

 8   Page No.        Line No.        should read:

 9

10   Page No.        Line No.        should read:

11   Page No.        Line No.        should read:

12

13   Page No.        Line No.        should read:

14

15   I, LISA RENEE ALLEN, declare under penalty of perjury
     pursuant to 28 U.S. Code Section 1746 that I have
16   read the foregoing transcript of my sworn deposition,
     that the deposition transcript accurately reflects my
17   sworn testimony, and any changes or amendments, if
     applicable, were made by me and are noted above on
18   the attached errata sheet and any additional pages
     herewith.

19

20

21             LISA RENEE ALLEN

22   Sworn to and subscribed before me,
     This the      day of           , 20   .
23

24   Notary Public

25   My commission expires:
```

# EXHIBIT C

Video Deposition                                          1

```
        IN THE STATE COURT OF GWINNETT COUNTY
               STATE OF GEORGIA


LINDA D. CLEMONS,              )
                              )
        Plaintiff,            )    Civil Action
                              )    No. 23-C-00137-S4
v.                            )
                              )
OLD NAVY, LLC, et al.,        )    ORIGINAL
                              )
        Defendant.            )
_____)


        REMOTE VIDEOTAPED DEPOSITION OF
               MICHAEL RINEHART


               August 31, 2023
                 1:02 p.m.



        Piper Lynn Quinn, CCR B-2198




            REGENCY-BRENTANO, INC.
          Certified Court Reporters
              13 Corporate Square
                  Suite 140
           Atlanta, Georgia 30329
              (404) 321-3333
```

Regency-Brentano, Inc.

1          APPEARANCES OF COUNSEL (Via Remote)

2

   On behalf of the Plaintiff:

3

      MICHAEL P. WALKER, Esq.
4     Piasta Walker Hagenbush, LLC
      3301 Windy Ridge Parkway
5     Suite 110
      Atlanta, Georgia 30339
6     Tel: (404) 996-1316
      mike@piastawalker.com

7

   On behalf of the Defendant:

8

      BRITTANY A. DeDIEGO, Esq.
9     Lewis Brisbois Bisgaard & Smith, LLP
      600 Peachtree Street, N.E.
10    Suite 4700
      Atlanta, Georgia 30308
11    Tel: (404) 348-8585
      brittany.dediego@lewisbrisbois.com

12

   Also present:

13

      George Bush, Videographer
14    Atlanta Legal Media

15

16

17

18

19

20

21

22

23

24

25

**Video Deposition**                                        **3**

```
 1              INDEX TO EXAMINATIONS

 2   EXAMINATION:                          Page No.

 3   Examination by Mr. Walker                 6

 4

 5                   *   *   *

 6              INDEX TO EXHIBITS

 7   Exhibit No.   Description            Page No.

 8     P-1     Photographs and Diagrams      11

 9     P-2     Customer Injury Report, Bates  18
10             Numbers Old Navy-Clemons000001
             through 000009
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Regency-Brentano, Inc.**

Video Deposition                                          **4**

```
 1              REPORTER DISCLOSURE

 2        Pursuant to Article 10.B of the Rules and

 3   Regulations of the Board of Court Reporting of the

 4   Judicial Council of Georgia, I make the following

 5   disclosure:

 6        I am a Georgia Certified Court Reporter. I am

 7   here as a representative of Regency-Brentano, Inc.

 8   I am not disqualified for a relationship of

 9   interest under the provisions of O.C.G.A. §9-11-28.

10   Regency-Brentano, Inc., was contacted to provide

11   court reporting services for this deposition.

12        Regency-Brentano, Inc., will not be taking this

13   deposition under any contract that is prohibited by

14   O.C.G.A. §15-14-37 (a) and (b).  Regency-Brentano,

15   Inc., has no exclusive contract to provide reporting

16   services with any party to the case, any counsel in

17   the case, or any reporter or reporting agency from

18   whom a referral might have been made to cover this

19   deposition.

20        Regency-Brentano, Inc., will charge its usual

21   and customary rates to all parties in the case, and a

22   financial discount will not be given to any party to

23   this litigation.

24

25              Piper L. Quinn, CCR B-2198
```

**Regency-Brentano, Inc.**

1          THE VIDEOGRAPHER:  We are on the record

2       at 1:02 p.m.

3          MR. WALKER:  This will be the deposition

4       of Michael Rinehart.  It's taken pursuant to

5       notice and agreement of counsel.  Brittany, I

6       propose that we observe all objections except

7       to the form of the question and responsiveness

8       of the answer until first use of the

9       deposition.

10          MS. DEDIEGO:  That's Fine.

11             MICHAEL RINEHART,

12   having been first duly sworn, was examined and

13   testified as follows:

14          MR. WALKER:  All right, Mr. Rinehart.

15       Thanks for being here.  We met just a minute

16       ago.  Again, my name is Mike Walker.  I

17       represent Linda Clemons in this case, and I'll

18       be taking your deposition.

19          Have you been deposed before?

20          THE DEPONENT:  I have not, no.

21          MR. WALKER:  Okay.  We've got great

22       lawyers in the case.  I'm sure that they

23       explained the process to you a little bit.

24       I'll just be asking you questions primarily

25       about your background and your experience with

```
 1              Linda Clemons.  And if you don't understand
 2              what I'm asking, just let me know.  I'll be
 3              happy to clarify.  Okay?
 4                    THE DEPONENT:  Sure.
 5                    MR. WALKER:  If I -- if I ask you
 6              something and you respond to it, I'll assume
 7              you understood it.  Is that fair?
 8                    THE DEPONENT:  Fair.
 9                    MR. WALKER:  I don't anticipate we're
10              going to take a very long deposition today, but
11              if you need a break at any point, just let me
12              know and we'll take a break.  Okay?
13                    THE DEPONENT:  Will do.  Thank you.
14                    MR. WALKER:  All right.  And then,
15              Brittany, is there any objection to the witness
16              being sworn in remotely?
17                    MS. DEDIEGO:  No objection.
18                    MR. WALKER:  All right.
19                         EXAMINATION
20   BY MR. WALKER:
21        Q    All right.  Mr. Rinehart, if you would
22   please just give me your full name for the record.
23        A    Sure.  My name is Michael Rinehart.
24        Q    And I'm not going to come to your house or
25   anything, but if you're no longer represented by
```

```
 1   counsel or you leave Old Navy or something and I need
 2   to send you a subpoena for trial, what's your home
 3   address?
 4        A    It's going to be 2379 Philadelphia Road,
 5   Conyers, Georgia 30012.
 6        Q    All right.  And are you currently employed?
 7        A    I am, yes.
 8        Q    Where do you work?
 9        A    Old Navy, Conyers.
10        Q    How long have you worked there?
11        A    At this location, I -- I came back July of
12   last year.  I left the company for a -- a brief --
13   like a year.
14        Q    What's your current job title?
15        A    Assistant general manager of merchandising.
16        Q    And have you done that role since you came
17   back, since July?
18        A    I'm sorry.  I don't understand.
19        Q    Have you been the assistant general manager
20   of merchandising since you came back in July?
21        A    Yes.  I briefly was the acting general
22   manager when we were without.  That was for about two
23   months.  But, yeah, I came back as assistant general
24   manager, went into an acting role, and now I'm back to
25   assistant general manager.
```

1    Q    Gotcha.  And we don't need to go through it

2  in terms of detail, but would you mind just kind of

3  giving me a little bit of history in terms of where

4  you've worked.

5    A    Sure.  Started out in high school, I worked

6  at a -- a small mom-and-pop music store, worked there

7  for quite a few years.  I joined Old Navy in 2013 at

8  this location, the Conyers location, worked through a

9  couple promotions.  I got a promotion to where I had

10  to transfer to Snellville for that position, left the

11  company, came back at the Conyers location, and then

12  here I am.

13    Q    Okay.  So you've worked at Old Navy pretty

14  much continuously since 2013, other than that year

15  when you left?

16    A    Correct.

17    Q    What did you do during that year when you

18  left Old Navy?

19    A    I went to a different retailer.  I worked

20  for Ulta Beauty.

21    Q    All right.  So the incident that we're here

22  about happened in April of 2021.  During that time

23  period, were you working at the Snellville location?

24    A    Yes, sir.

25    Q    What was your job title?

1       A    At that point in time, it was still

2  assistant general manager of merchandising.

3       Q    Did you -- did you undergo any training

4  during your time period at Old Navy, up through

5  April 13th of 2021, concerning how to secure shelving

6  and signs, things like that?

7       A    Yes.  I mean, you go through continuous

8  training as things change, as things develop, and

9  then, of course, you know, when you first start out or

10  anytime you take a promotion -- or change roles, I

11  should say.

12       Q    So it's my understanding that -- that a

13  strip shelf fell and hit Ms. Clemons's ankle and foot.

14  Is that your understanding?

15       A    Yes.

16       Q    And did you undergo any training prior to

17  April of 2021 concerning how to secure the strip

18  shelves?

19       A    It would fall under typical merchandising

20  training and signage SOPs, but yes.

21       Q    Okay.  What do you recall the training being

22  on -- on that particular issue?

23       A    For the shelf strip, you basically -- you

24  place it onto the shelf.  It has a nonskid pad on the

25  bottom.  And you just make sure it's -- it's pushed

1  all the way flush against the -- the shelf.

2      Q    And what is the purpose of -- of that

3  procedure?

4      A    It's our marketing.

5      Q    And what --

6      A    (Interruption.)

7      Q    I'm sorry?

8      A    It has a little strip inside that will

9  basically say what kind of denim it is, whether it's a

10  boot cut, a skinny, et cetera.

11      Q    But what's the purpose of the training in

12  terms of, like, how to place the shelf strip?

13      A    Mark -- marketing placing, signage placing,

14  everything, you know, has a standard operating

15  procedure, so everything has a correct place that it's

16  supposed to be placed in.

17      Q    So let me show you what I'm going to mark as

18  Plaintiff's Exhibit No. 1.  I'm going to share my

19  screen with you.  If you have trouble seeing this or

20  you want me to zoom in, whatever, just let me know and

21  we'll do that.  Okay?

22      A    Sure.

23      Q    All right.

24          (Exhibit No. P-1 was marked.)

25  BY MR. WALKER:

1       Q     All right.  Mr. Rinehart, can you see this

2   document I just pulled up?

3       A     I do, yes.

4       Q     All right.  And for the record, it's got

5   some Bates numbers at the bottom that say Old-Navy209.

6   Do you see that?

7       A     I do, yes.

8       Q     Okay.  Up here at the top, there's a stamp

9   on it that says Confidential.  So it may be hard to

10  read, but I read it to say Metal Shelf Strip Sign

11  Holder:  Added Safety.

12            Is that what it says?

13      A     Correct.

14      Q     And have you seen this document before?

15      A     No, I am not familiar with this document.

16      Q     Okay.  Let's take a -- take a look at it.

17  It says -- well, first of all, do you see the pictures

18  on page 1?

19      A     I do.

20      Q     And are these the strip signs that we've

21  been talking about that you put underneath the jeans

22  or khakis that advertise what they are or maybe any

23  slash reductions?

24      A     Yes.

25      Q     And these are the ones that you were talking

1   about you push far back so they're flush with the

2   shelf?

3          A    Correct.

4          Q    And there's a little white strip -- do you

5   see that? -- on the back of it?

6          A    Correct.

7          Q    And that white strip, you put -- you put on

8   the back of -- the shelf strip against the shelf

9   itself; right?

10         A    I have not seen this document.  That is not

11  typically how the -- the fixture is placed, no.

12         Q    Okay.  How would you place the fixture?

13         A    As I said before, you place the fixture on

14  the shelf and it pushes back flush.  There is a

15  nonskid, like nonslip, material on the bottom of that

16  shelf bracket -- or shelf fixture.

17         Q    What kind of nonskid material?

18         A    If you can see in the picture, like, the top

19  right-hand corner, where it's slightly reflective,

20  it's like a hard rubber, almost kind of tacky-feeling

21  rubber, that covers the entire bottom of the denim

22  strip holder.

23         Q    Okay.  So the stuff here about the Velcro,

24  you haven't heard that before?

25         A    No, sir.

1      Q    Okay.  Let's go down to page 2.  It says

2   Metal Shelf Sign Holders:  Added Safety Reminder.

3           Do you see that?

4      A    I do.

5      Q    It says, "The Metal Shelf Strip Sign

6   Holders, used in Denim and Khaki presentations, are at

7   risk of sliding forward off the shelf and falling,

8   when someone removes a product from the stack.  All

9   stores with the Metal Shelf Strip Sign Holders must

10  use Velcro strips to help secure the sign holder to

11  the shelf they sit upon."

12          Did I read that correctly?

13     A    Yes.

14     Q    Okay.  So -- but you haven't seen this

15  safety notice?

16     A    No, I'm not familiar with this document.

17     Q    Is this the first time you're hearing that

18  there was a safety reminder concerning use of Velcro

19  strips on the -- on the bottoms of the strip shelves?

20     A    Yes.

21     Q    And you don't recall ever receiving any

22  training on this safety procedure?

23     A    For this Velcro strip?  No.

24     Q    There is a -- let me zoom out here.  On

25  page 3, there's an engineering drawing.  Do you see

Michael Rinehart - August 31, 2023                14
Video Deposition

```
1   that?
2       A    Yes.  I'm not sure exactly what I'm looking
3   for on here, but, yes, I do see an engineering
4   drawing.
5       Q    It looks like there is a strip shelf over
6   here in the -- in the right-hand corner that's gray.
7   Do you see that?
8       A    Correct.
9       Q    And do you see there's a little mark there
10  that says "D"?
11      A    Yes.
12      Q    And it points to a hole in the strip
13  shelf -- or shelf strip?
14      A    Yes.
15      Q    Well, do you know what that -- what that
16  hole is for?
17      A    I do not.  I've never seen that hole be used
18  in any -- in any form.
19      Q    Okay.  So what are the -- what are the
20  procedures, if any, that you're aware of that existed
21  prior to April 13th, 2021, to make sure the shelf
22  strips didn't come off when people would grab the
23  jeans or khakis?
24      A    You just make sure they're flush.  If you
25  see anything that's, you know, out of place, push it
```

1  back.  If they, for some reason, will be missing that

2  nonskid bottom, you would dispose of the -- the

3  hardware, as is like any hardware.  If a hardware is

4  broken, you would just, you know, dispose of that,

5  that piece of hardware.  You would throw it away.

6      Q    Can you point me to any particular document

7  or any -- or video of training material that you saw

8  concerning this nonskid material on the bottom of this

9  shelf strip?

10     A    No, I don't have any documents.

11     Q    Can you -- can you recall one that you've

12 seen?

13     A    A specific document?  No.

14     Q    Okay.  Or like a video or anything that you

15 can point me to to help me find that?

16     A    Nothing specifically, no.  We -- upon

17 onboarding, there's a fashionably-safe video.  They do

18 talk about procedures for broken hardware, proper

19 placement of hardware, et cetera.  Or you could look

20 at signage SOPs and that would tell you the correct

21 placement.

22     Q    Gotcha.  All right.  So I assume you were

23 working on April 13th, 2021, when Ms. Clemons was

24 injured.

25     A    Yes, sir.

1      Q     If you would, just in your own words, just
2   kind of walk me through what happened and what you
3   recall.
4      A     I mean, it's over two and a half years ago,
5   so I don't remember a lot of the details.  I don't
6   remember if any cus -- if the customer came to me and
7   told me she was injured or if another associate had --
8   or she had approached another associate and the
9   associate told me.
10         But I did assist Ms. Clemons.  I went over.
11   She stated that the item came out of the wall and
12   struck her ankle.  I do recall a scratch. I don't
13   recall any kind of blood, any kind of, like, serious
14   cut.
15         At that point, I offered a Band-Aid, if, you
16   know, she wanted to cover it and filled out the --
17   what's called an LPRM report.  It's basically an
18   incident report.
19      Q     Was she cooperative during that process?
20      A     She was, yes.
21      Q     Okay.  From your perspective, was she acting
22   reasonable?  Appropriate?
23      A     At that point in time, yes.
24      Q     And did you ever -- other than that initial
25   interaction that you had with her, did you ever speak

Michael Rinehart - August 31, 2023                    17
Video Deposition

1   to her again?

2       A    I believe it was the next day I gave her a

3   courtesy call just to follow up and -- it's basically

4   Old Navy's policy anytime there's an incident, we call

5   and just kind of check in as a -- a goodwill -- or a

6   show of goodwill.  Basically just said, you know, hey,

7   just checking in to see how you are and if she had any

8   questions, refer her to the 1 (800) Old Navy customer

9   service line.

10      Q    Okay.  Do you remember anything from that

11  conversation other than what you just told me?

12      A    No, not specific details.

13      Q    Okay.  So during that conversation, did you

14  draw any conclusions about her, like she was acting

15  inappropriately or was being rude or anything of that

16  nature?

17      A    No.  If anything stood out, I would remember

18  the conversation.  It was a very normal conversation.

19      Q    Okay.  She was acting polite and reasonable?

20      A    To the best of my knowledge.  I don't --

21  like I say, I don't remember the specific

22  conversation, but I don't think she was acting

23  unreasonably.

24      Q    Gotcha.  All right.  Let me -- let me show

25  you what I'm going to mark as Plaintiff's Exhibit 2.

Regency-Brentano, Inc.

```
 1    And this is marked Bates numbers 1 through 11.
 2              (Exhibit No. P-2 was marked.)
 3                   MR. WALKER:  I didn't intend to attach
 4         those dec pages, Brittany.
 5                   MS. DEDIEGO:  That's okay.
 6                   MR. WALKER:  But we can -- I'm going to
 7         call this -- I'm going to say it's going to
 8         be -- this is going to be Bates one through
 9         nine.  I'm just going to remove those Bates
10         numbers -- I mean remove those dec pages, if
11         that's okay, Brittany.
12                   MS. DEDIEGO:  That's fine with me.
13    BY MR. WALKER:
14         Q    All right.  So Mr. Rinehart, do you
15    recognize the customer incident report that begins on
16    page 2?
17         A    Yes.
18         Q    Is this something that you would have filled
19    out?
20         A    Yes.  That's LPRM report, the incident
21    report, we fill out anytime there's a -- any kind of
22    incident with a customer injury, employee injury.
23    It's a very similar system if we have loss-prevention
24    issues, basically any kind of issue.
25         Q    Is all the data in here you would have
```

Michael Rinehart - August 31, 2023                    19
Video Deposition

```
 1    personally inputted?
 2         A    Yes, sir.
 3         Q    There are some photographs.  Do you see
 4    those on page 1?
 5         A    I do.
 6         Q    And then there's also photographs on page 4,
 7    5, and 6.
 8         A    Correct.
 9         Q    Did you take those photographs?
10         A    I don't remember specifically.  Yeah, I
11    don't recall.
12         Q    Okay.  Because -- let's start with page 1.
13    It's a photo of a strip shelf.  Is that, to the best
14    of your memory, the strip shelf that fell?
15         A    Yes.
16         Q    Does that fairly and accurately depict the
17    strip shelf?
18         A    It does.
19         Q    Same question for 4 -- pages 4 and 5, the
20    photographs in there:  Do those photographs fairly and
21    accurately depict the strip shelf that fell and hit
22    Ms. Clemons?
23         A    It does, yes.
24         Q    All right.  On page 6, it looks like there's
25    a display shelf for some jeans.  Is that the shelf
```

1  where the strip shelf -- excuse me.  I keep saying

2  strip shelf.  It's shelf strip.

3      A    Correct, shelf strip.

4      Q    Is that the shelf where the shelf strip came

5  from?

6      A    I can't say for sure because I'm not sure

7  who took the photos.  I don't recall specifically

8  taking them.  But it would be, if not that specific

9  booth, a very, very similar booth.

10     Q    All right.  Let's go back to five.  Do you

11 see on page 5 it looks like it's the underside of the

12 shelf strip?

13     A    I do.

14     Q    And is there any, like -- do you see any

15 Velcro on there?

16     A    No.  I just see the nonskid pad or nonslid

17 pad.

18     Q    Okay.  So that -- there's a -- you'd say

19 there's a nonskid pad on that?

20     A    Yes.

21     Q    Who puts the nonskid pad on there?

22     A    They come like that when we receive them.  I

23 guess the manufacturer.

24     Q    As far as you can recall, have there always

25 been the skid pads on the back of those?

Michael Rinehart - August 31, 2023                    21
Video Deposition

```
 1        A    As long as I've worked for the company, yes.

 2        Q    Since 2013?

 3        A    Yes.

 4        Q    It looks like, to me, on page 4, that

 5   Velcro's on the top side of the shelf strip.  Do you

 6   see that?

 7        A    Correct.  That would have been for planogram

 8   stickers.  It's basically a plastic thing that would

 9   have sat on top, and it would tell you exactly which

10   SKUs would go into that row, so specific to that jean

11   or khaki.

12        Q    I see.  So the Velcro is being used for

13   inventory purposes?

14        A    Correct.

15        Q    You would -- you would agree with me that

16   the Velcro on the top of the shelf strip is different

17   from that safety reminder we looked at on Exhibit 1;

18   right?

19        A    Correct.  The Velcro on top would have

20   nothing to do with safety.  That would be specifically

21   for merchandising purposes.

22        Q    Okay.  Do you recall if anybody else spoke

23   to Ms. Clemons?

24        A    I believe we had a cashier that also spoke

25   with her that day.
```

**Regency-Brentano, Inc.**

Michael Rinehart - August 31, 2023                  22
Video Deposition

```
 1        Q     Do you know anything about that
 2   conversation?
 3        A     I do not.
 4        Q     Did you ever -- not you, but did Old Navy,
 5   to your knowledge, ever bolt down the shelf strips?
 6        A     No.  There's no way to bolt them down.
 7        Q     Have you ever heard of these falling before?
 8        A     You would have to be extremely aggressive in
 9   pulling the jeans out of the wall or the khakis out of
10   the wall to make them slide out.
11        Q     So that wasn't exactly my question.
12              Did you ever -- prior to April of 2021, did
13   you ever see them fall or hear about them falling?
14        A     I would say no.  I mean, if you're moving a
15   shelf and you do not remove that first, it is going to
16   fall.  I have never had another incident involving one
17   of these fixtures, no.
18        Q     Earlier, when we referred to an incident, I
19   just mean in general have you ever, you know, found
20   them on the ground or had to put them back or had
21   to -- had to tell anyone to put them back or seen
22   anybody putting them back?
23        A     Yes.  It's a very generalized question.  I
24   mean, anything can fall over, you know.  Just like the
25   books can fall over.  Anything can fall.
```

**Regency-Brentano, Inc.**

Michael Rinehart - August 31, 2023                23
Video Deposition

```
 1        Q    Sure.  So I'm just trying to be more

 2   specific, though.  I mean, prior to April of 2021, had

 3   you ever been aware of one of these falling before

 4   from the shelf?

 5        A    Yes.

 6        Q    Tell -- tell me what you can recall from

 7   that.

 8        A    I don't have a specific instance of one

 9   falling.  Like I said, it's like a stack of books.  If

10   you push a stack of books, it's going to fall.

11   Anything can fall over, essentially.

12        Q    Are these things made from metal?

13        A    Yes.

14        Q    Do you have an idea about how heavy they

15   are?

16        A    I couldn't give you specifics.  I don't want

17   to give you the wrong number.  They're not heavy, but

18   they're not paper-light either.

19        Q    Okay.  How would it compare to, like, a red

20   brick?

21        A    Excuse me?

22        Q    How would it compare to, like, a red brick,

23   you know, like -- just like a brick that you use for

24   building?

25        A    Yeah, lighter than a brick.
```

Regency-Brentano, Inc.

Michael Rinehart - August 31, 2023                    24
Video Deposition

1      Q     Okay.  Heavier than, like, a mug?

2      A     I don't know.

3      Q     What would you compare the weight to?

4      A     I don't know.  I'd have to hold one and hold

5   something else.  Like I said, they're -- they're not

6   heavy, they're not light, at the same time.

7      Q     Fair enough.  Do you go by Mike?

8      A     I do, yes.

9      Q     So if she says here that the manager said he

10  didn't know how it happened because the sign should

11  have been bolted down, do you recall saying that?

12     A     No, I do not.

13     Q     Do you know why she would say that or recall

14  that?

15     A     I don't.  Like I said, there's no way to

16  physically bolt those down.

17     Q     Are there any other displays bolted down?

18     A     No.

19     Q     Since the Linda Clemons incident, do you

20  know if the Snellville Old Navy store started doing

21  any other precautions or procedures with the shelf

22  strips to prevent them from sliding out and falling?

23     A     I don't know.

24     Q     Since you've worked there, have you -- are

25  you aware of any additional procedures?

**Regency-Brentano, Inc.**

Michael Rinehart - August 31, 2023                    25
Video Deposition

```
 1        A     Not that I'm aware of.
 2        Q     What about Conyers?  Have y'all -- have
 3   y'all had to follow any different procedures?
 4        A     No, same procedures.
 5        Q     Anything else you can remember about
 6   Linda Clemons?
 7        A     No.  Like I said, this was two and a half
 8   years ago.  You know, I've had probably thousands of
 9   customer interactions since I spoke with her.  Like I
10   said, she was reasonable, she wasn't out of line, she
11   wasn't hysterical or anything to that -- that sense.
12               MR. WALKER:  All right.  I think that's
13          all the questions I have for you.  I appreciate
14          your time.
15               THE DEPONENT:  All right.  Thank you.
16               MS. DEDIEGO:  I don't have any questions
17          for you, Mike.
18               THE VIDEOGRAPHER:  We're off the record
19          at 1:27.
20               THE COURT REPORTER:  And you said yes,
21          you're going to read and sign?  I'm sorry.
22               MS. DEDIEGO:  Yes, ma'am.
23               THE COURT REPORTER:  Okay.  And what are
24          you ordering for a transcript, ma'am?
25               MS. DEDIEGO:  I'll take an E-Tran,
```

Michael Rinehart - August 31, 2023                26
Video Deposition

1            please, with the exhibits.

2                    MR. WALKER:  Same with me.

3                       (Signature was reserved.)

4               (The deposition concluded at 1:27 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Regency-Brentano, Inc.**

1          C E R T I F I C A T E

2   STATE OF GEORGIA:

3   COUNTY OF CHEROKEE:

4        I hereby certify that the foregoing transcript

5   was reported as stated in the caption and the

6   questions and answers thereto were reduced to

7   typewriting under my direction; that the foregoing

8   26 pages represent a true, complete, and correct

9   transcript of the evidence given upon said hearing;

10  and I further certify that I am not of kin or

11  counsel to the parties in the case, am not in the

12  employ of counsel for any of said parties, nor am I

13  in any way interested in the result of said case.

14  This 10th day of September 2023.

15

16

17

18

19
    _____
20   Piper L. Quinn, CCR B-2198

21

22

23

24

25

**Regency-Brentano, Inc.**

ERRATA SHEET

1
2      I, Michael Rinehart, the witness herein, do
hereby certify that I have read the transcript of
3  August 31, 2023, of my deposition testimony and the
same is true and correct, to the best of my knowledge,
4  with the exception of the following changes noted
below, if any:
5
Page_____ Line_____ should read:_____
6
Reason for change:_____
7
Page_____ Line_____ should read:_____
8
Reason for change:_____
9
Page_____ Line_____ should read:_____
10
Reason for change:_____
11
Page_____ Line_____ should read:_____
12
Reason for change:_____
13
Page_____ Line_____ should read:_____
14
Reason for change:_____
15
Page_____ Line_____ should read:_____
16
Reason for change:_____
17
Page_____ Line_____ should read:_____
18
Reason for change:_____
19
Page_____ Line_____ should read:_____
20
Reason for change:
21
22
23  ___10/9/23___
24  Date
25

                              _____
                              MICHAEL RINEHART

CONFIDENTIAL

## Metal Shelf Strip Sign Holder: Added Safety

**Men's Khaki Metal Shelf Strip Sign Holders used as example, same principle applies to all Metal Shelf Strips.**



**Metal Shelf Strip Sign Holder.**



**Remove metal shelf strip and flip upside down; adhere velcro strip (both sides).**



**With both sides of velcro attached to bottom of metal shelf strip - flip right side up.**



**Finished product.**
**Place metal shelf strip sign holder in proper location on shelf and press down (to adhere velcro to both the bottom of sign holder and the shelf).** Replace stacks of product



EXHIBIT
P-1

Old-Navy000209

CONFIDENTIAL

# Metal Shelf Sign Holders: Added Safety Reminder

OCT 19, 2015 • OLD NAVY • SENT ON OCT 18

This section contains sensitive information and is not visible to stores

Sent to All stores

Of your 997 stores: 997 are behind and 0 are on track or completed

The Metal Shelf Strip Sign Holders, used in Denim and Khaki presentations, are at risk of sliding forward off the shelf and falling, when someone removes a product from a stack.

- All stores with the Metal Shelf Strip Sign Holders must use Velcro strips to help secure the sign holder to the shelf they sit upon.
  - Use the Velcro provided for POG.
- All Metal Shelf Strip Sign Holders must be secured with Velcro by store opening on **Mon 10/26**.

**The process:**

1. Remove Metal Shelf Strip Sign Holder from the shelf and flip over.
2. Attach both sides of Velcro to the bottom side of sign holder.
3. Place sign holder in desired position on shelf and press, to ensure one side of the Velcro adheres to the shelf (while the other adheres to bottom of sign holder).

**See attached photographs for reference.**

## 1 Attachment

Metal Shelf Strip Sign Holder Photos.pdf

## Tasks

| Oct 19, 2015 | Read Communication and share with team. |
| --- | --- |
| Oct 19, 2015 | Secure Metal Shelf Strip Sign Holders with Velcro. Must be complete by store opening on Mon 10/26. |

Old-Navy000210

CONFIDENTIAL

Old-Navy000211

# ABSOLUTELY NO BURRS OR SHARP EDGES. ALL WELDMENTS MUST BE SQUARE AND FLAT AFTER WELDS.

## EV2134

CONFIDENTIAL



Case 1:20-cv-05008-LJL Document 44-31 Filed 10/28/22 Page 323 of 351

| | | REVISIONS | | |
|---|---|---|---|---|
| REV. | | DESCRIPTION | DATE | APPROVED |
| B | | REVISED PRODUCT NAME | 7/23/15 | LA |

DETAIL A
SCALE 2 : 1

**WHITE VELCRO (HOOK & LOOP)**

90° TYP

SKIP TYP

Rear Support Angle

WINDOW

WINDOW

*APPROVED*
*By Emily Fishman at 11:37 am, Jul 24, 2015*

| # | QTY. | PART # | DESCRIPTION |
|---|---|---|---|
| 1 | 1 | Z04046P-000 | FORMED SHELF |
| 2 | 1 | Z04046P-001 | FORMED ANGLE |
| 3 | 2 | Z04046P-002 | WHITE VELCRO (HOOK & LOOP) |

SALES PART #: **EV2134**

**DIMENSIONS IN INCHES & MM**
DO NOT SCALE DRAWINGS
INTERPRET DIM AND TOL. PER ASME Y14.5M-1994

| FRACTIONS | TOLERANCES / DECIMALS | | ANGLES |
|---|---|---|---|
| ±1/16 | X.X ±.03 | X.XX ±.015 | X.XXX ±1° |

**REV:** B

THIRD ANGLE PROJECTION

PROJECT #:

LAST SAVED:
Thursday, July 23, 2015
11:54:24 AM

WEIGHT (lbs):

**OLD NAVY**
GAP INC.
OLD NAVY STORE DESIGN
2 FOLSOM ST 6TH FLOOR
SAN FRANCISCO CA 94105

TITLE: **SIGN SHELF STRIP 10"**

DWG NO. Z04046A-000

## NOTE:
1. BREAK ALL SHARP EDGES & REMOVE ALL BURRS.
2. MATERIAL: COLD ROLLED STEEL.
3. FINISH: CLEAR POWDER COAT 70 DEGREE SHEEN.
4. WHITE VELCRO - ADHESIVE BACKED (HOOK & LOOP).

Thursday, July 23, 2015 11:54:24 AM

Old-Navy000212

**ABSOLUTELY NO BURRS OR SHARP EDGES. ALL WELDMENTS MUST BE SQUARE AND FLAT AFTER WELDS.**

CONFIDENTIAL



9.500
[241.300]
Rear Flange

.625
[15.875]

.250
[6.350]
Typ

Ø.188
[4.763]

.375
[9.525]

.375
[9.525]

SECTION B-B



| SALES PART #: | EV2134 | | PROJECT #: | | | | |
|---|---|---|---|---|---|---|---|
| **DIMENSIONS IN INCHES & MM** | | | | | | | |
| DO NOT SCALE DRAWINGS | | | | | | | |
| INTERPRET DIM AND TOL. PER ASME Y14.5M-1994 | | | | | | | |
| FRACTIONS | TOLERANCES / DECIMALS | ANGLES | USED ON: | | | | |
| X.X ±1/16 | X.XX ±.03 | X.XXX ±.015 | ANGLE ±1° | | | | |
| **REV:** B | THIRD ANGLE PROJECTION | | | **TITLE:** SIGN SHELF STRIP 10" | | | |
| | | | WEIGHT (lbs): | | | | |

OLD NAVY

GAP INC.
OLD NAVY STORE DESIGN
2 FOLSOM ST 6TH FLOOR
SAN FRANCISCO CA 94105

SIZE B | DATE: 5/12/2008 | DWG NO. Z04046A-000
SCALE 1:2 | DRAWN BY: ALLEN | SHEET 2 OF 2

Q:\CJPM\CAD FILES\Z04047A PS-10 X 2.25 SHELF STRIP Z04046A-000

Old-Navy000213



EXHIBIT
**P-2**

Old Navy-Clemons000001



Record Number 11029055638

Status: Close    Submitted By: Michael Rinehart
Submitted On: Apr 13, 2021 3:47 PM (America/New_York)

# Customer Injury Report

| 1 | **Instructions** |
|---|---|

This form must be completed any time a customer is injured on the premises. Please ensure that all emergency services have been contacted if they are needed or requested, before filling out this form.

| 3 | **Report Preparer** |
|---|---|

| EmployeeID | First Name | Last Name |
|---|---|---|
| 2485711 | Michael | Rinehart |

| Store phone number | Best contact phone number | Email |
|---|---|---|
| 770-972-1402 | 770 972 1402 | michael_rinehart@stores.gap.com |

| 4 | **Location of Incident** |
|---|---|

| Location code - must be entered as 5-digit number, i.e Store 00150 | Store Details | Date Incident Reported to Store |
|---|---|---|
| 06095 | OLD NAVY, SNELLVILLE PAVILION, 2059 Scenic Hwy N Ste #106, Snellville, GA, 30078, UNITED STATES OF AMERICA | April 13, 2021 |

| Location Type | Date of Incident | Time of Incident |
|---|---|---|
| Store | April 13, 2021 | 3:20 PM |

| 5 | **Injured Person** |
|---|---|

| Customer willing or able to provide information | Type of Incident |
|---|---|
| Yes | Customer |

**Record 1 of 1**

**Injured Person**

| First Name | Middle Initial | Last Name |
|---|---|---|
| linda | | clemons |

| Phone Number | Preferred Language | Gender | Age |
|---|---|---|---|
| 6783601358 | English | Female | 61 |

| Minor Customer | E-mail Address |
|---|---|
| No | geeegeee1424@gmail.com |

**Address**

| Street Address | Suite/Apartment | City | Country | State / Province | Postal Code |
|---|---|---|---|---|---|
| 1845 clear lake trace | | stone mountain | United States of America | Georgia | 30088 |

| 7 | **Incident Details** |
|---|---|

**Record 1 of 1**

Old Navy-Clemons000002

| | | |
|---|---|---|
| *Accident Cause Code* | *Part of Body Injured* | *Type of Injury* |
| Struck by- Person or Object | Ankle | Cut |

| | | |
|---|---|---|
| *Area Where Incident Occurred* | *Object that may have contributed to the incident* | *Name of Employee Who Walked Area Prior to the Incident* |
| Selling Floor - Women's | Signage | michael rinehart |

*Summary of Incident*

Customer was shopping a denim wall in womens. A shelf strip sign holder fell out of the denim wall and cut her ankles

*Describe how injured person stated the INCIDENT occurred*

Same as summary

| | | |
|---|---|---|
| *Did an Employee Assist the Customer?* | *Employee First Name* | *Employee Last Name* |
| • Yes | michael | rinehart |

*First Aid Provided*

• No

*Was Mall Security involved*

• No

| | |
|---|---|
| *Did the customer refuse treatment* | *Was the Injured Person transported via ambulance?* |
| • No | • No |

**8** | **Emergency Service**

*Were emergency services called?*

• No

**9** | **Witness Information**

*Did anyone hear or see the accident?*

• No

**10** | **Manager On Duty at Time Of Incident**

| | | |
|---|---|---|
| *Employee ID* | *First Name* | *Last Name* |
| 2485711 | Michael | Rinehart |

| | | |
|---|---|---|
| *Title* | *Email Address* | *Best Number to reach you* |
| Asst General Mgr | michael_rinehart@stores.gap.com | 7709721402 |

*Do you have any questions for Risk Management or have additional information to provide to Risk Management?*

• No





Old Navy-Clemons000005



Old Navy-Clemons000006

**Moy, Chris**

| | |
|---|---|
| **Subject:** | FW: Risk Management // ON // Clemons, Linda |
| **Importance:** | High |

**From:** Adam Ross <Adam_Ross@gap.com>
**Sent:** Friday, April 30, 2021 9:50 AM
**To:** Jesse Licea <Jesse_Licea@gap.com>; Robin Crawford <Robin_Crawford@gap.com>
**Cc:** Brandi Spellacy <Brandi_Spellacy@gap.com>
**Subject:** FW: Risk Management // ON // Clemons, Linda
**Importance:** High

Hello-

This customer sought treatment and is seeking medical reimbursement and compensation. Call attached. Could you please open a claim?

Thanks,
Adam

# Old Navy Risk Management Incident
### (Follow up for alleged injuries, property damage & safety incidents)

## Customer Information:

Linda Clemons

Phone:6783601358
Mobile:
Email: geeegeee1424@gmail.com
DOB:

## Incident Information:

| | |
|---|---|
| Store number: | Old Navy / 06095 |
| CR Specialist: | Emily Potter |
| Case number: | 31319235 |
| Product number: | |
| Reason for complaint: | Safety Concerns |
| Date and time of incident: | Apr 13 2021 3:00 PM EDT |
| Date and time customer called CR: | Apr 29 2021 12:01 PM EDT |

## Information customer stated to Customer Relations:
Record as much information as possible from the customer relating to the alleged incident

1

Old Navy-Clemons000007

When going to grab some pants the store fixture fell on my toes and sliced them.
I was in a lot of pain.
I had to get a tetanus shot.
The MOD took information but told me to call you guys too.

Irene 4/29
I'm doing a lot better now.
I have a lot bruising and swelling on my toes and ankle.
The day it happened, I called my doctor and she told me to go to urgent care and get a tetanus shot.
I had to get it a couple weeks later because I had just got my Covid shot and they told me I had to wait.
This happened on 4/13/21, around 3 pm.
I had purchased the item and then I asked to speak to a manager because they burning so bad.
I was in womens blue jeans.
I was going through the pants looking for my size.
I pulled out my size and a metal sign came out with it and hit my feet.
The manager said he didn't know how it happened because the sign should have been bolted down.
He did give gauze, cleaning wipes, and band aids to clean it up.
And then he did the report.
I want to say his name is Mike.
There was bleeding.
One of the cuts was deep but not deep enough for stitches.
There were cut on my ankles and the tops of feet.
Because it was metal, they wanted me to get a tetanus shot.
The first doctor told me to soak them and keep them clean and to put neosporin on them.
And to stay off them for the swelling to go down.
My appointment for the tetanus shot was today.
My doctor said they were healing pretty good.
I would like my medical bills and some type of compensation.

**CR Rep notes:**
Record what expectations were set with the customer from the CR department, and any other important information relating to this customer's concerns

Took customers contact info & transferred to rm line

Irene 4/29
I apologized for the experience.
I advised we take this very seriously.
I advised feedback will be sent to appropriate leadership.
I gave case #.
I advised someone in leadership will reach out in the next 3-5 BD.
I thanked the customer for calling.
Audio requested.

Reason for forwarding complaint:                                        Medical Bills

CR contacted the store (not required)                                   NO

Store complete Incident Report                                          NO

**Your feedback is important to us.**

Old Navy-Clemons000008

**We invite you to take a few minutes to fill out our Email Customer Satisfaction Survey by following the link below:**

Old Navy-Clemons000009

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA
**23-C-00137-S4**
**11/28/2023 3:44 PM**
**TIANA P. GARNER, CLERK**

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; LISA ALLEN; | ) | |
| DOE 1; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

COMES NOW Defendant Old Navy, LLC, pursuant to Superior and State Court Rule 5.2,

and notifies the Court that Defendant served upon all counsel of record a copy of the following:

- Defendant Old Navy, LLC's Supplemental Objections and Responses to Plaintiff's First Interrogatories

- Defendant Old Navy, LLC's Second Supplemental Objections and Responses to Plaintiff's First Request for Production of Documents

This 28th day of November, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*
_____
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

1

**CERTIFICATE OF SERVICE**

I hereby certify that on this day a true and correct copy of the foregoing pleading using Odyssey eFile GA's electronic filing system which will send notification of the same, or in the alternative, via U.S. Mail to all counsel of record as follows:

<div align="center">

Michael P. Walker
Andrew L. Hagenbush
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
andrew@pnwlaw.com
*Counsel for Plaintiff*

</div>

This 28th day of November, 2023.

<div align="right">

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

</div>

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia 30308
Telephone: (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/ Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendants Old Navy, LLC and Lisa Allen*

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**
**12/1/2023 1:14 PM**
**TIANA P. GARNER, CLERK**

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

LINDA D. CLEMONS,                        )
                                         )
     Plaintiff,                         )
                                         )          Case number:
vs.                                      )          23C-137-4
                                         )
OLD NAVY, LLC; LISA ALLEN;               )
DOE 1; DOE 2; DOE 3 AND DOE 4,           )
                                         )
     Defendants                         )

## ORDER GRANTING DEFENDANT LISA ALLEN'S MOTION FOR SUMMARY JUDGMENT

Defendant Lisa Allen's ("Allen") Motion for Summary Judgment is before this Court. After consideration of Defendant's motion, Plaintiff Linda D. Clemons' response, all other matters of record, and the applicable and controlling law, this Court finds as follows:

This case arises out of an alleged injury that occurred on April 13, 2021 at an Old Navy Store located on Scenic Highway in Snellville, Georgia. Clemons alleges that she was shopping in the Old Navy Store when she was struck by a falling metal shelf strip sign that hit her feet and ankles. At the time of Clemons' injury, Defendant Allen was the general manager of the store. Allen was not present at the time of the subject incident and Allen did not place the metal sign at issue.

O.C.G.A. §51-3-1 states "where an owner or occupier of land. . . induces or leads others to come upon his premises fo a lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." Allen is neither an owner or an occupier of the store. Furthermore, there is no evidence before this Court that Allen was individually negligent. Allen did not breach any duty owed to Plaintiff.

Defendant Allen has demonstrated that there are no issues of genuine material fact remaining in this case, and as such Defendant's Motion for Summary Judgment shall be GRANTED. Thus, no compensatory damages shall be awarded and as a result Plaintiff cannot be awarded attorney's fees and

cost of litigation against Allen.

      SO ORDERED this _____ day of _____, 2023.

                              Ronda S. Colvin, Judge
                              State Court of Gwinnett County

Linda D. Clemons vs. Old Navy, LLC et al, 23C-137-4, Order Granting Defendant Lisa Allen's Motion for Summary Judgment

E-FILED IN OFFICE - JM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**23-C-00137-S4**
**12/5/2023 11:19 AM**
TIANA P. GARNER, CLERK

To: All Judges, Clerks of Court, and Counsel of Record

From: S. Christopher Collier, Lewis Brisbois Bisgaard & Smith, LLP

## **NOTICE OF LEAVE OF ABSENCE**

COMES NOW S. Christopher Collier and respectfully notifies all Judges before whom he has cases pending, all affected Clerks of Court, and all opposing counsel that he will be on leave pursuant to Uniform Court Rule 16.

The periods of leave during which time Applicant will be away from the practice of law are as follows:

(1)     January 15-16, 2024;

(2)     February 16-25, 2024;

(3)     March 11, 2024;

(4)     March 29 – April 7, 2024;

The purpose for these leaves is for family vacation and legal instruction.

All affected Judges and opposing counsel shall have ten (10) days from the date of this Notice to object to it.  If no objections are filed, then leave shall be granted. The undersigned shows that he is counsel of record in the cases listed on the attached Exhibit "A" and that the periods requested will not interfere with any presently scheduled hearing, trial, or other proceeding.

This 5th day of December, 2023.

LEWIS BRISBOIS BISGAARD & SMITH, LLP

*/s/ S. Christopher Collier*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307

600 Peachtree St NE, Suite 4700
Atlanta, GA 30308
(404) 476-2060 (Phone)
Chris.Collier@lewisbrisbois.com

1

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this date served a copy of the foregoing Notice of Leave of Absence upon all Judges, Clerks and opposing counsel listed on the attached Exhibit "A", electronically via Odyssey eFileGA, File & ServeXpress, PeachCourt, or by depositing a copy of same in the U.S. Mail, proper postage paid, addressed to counsel of record.

This 5th day of December, 2023.

<div align="right">

LEWIS BRISBOIS BISGAARD & SMITH, LLP

*/s/ S. Christopher Collier*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307

</div>

600 Peachtree St NE, Suite 4700
Atlanta, GA 30308
(404) 476-2060 (Phone)
Chris.Collier@lewisbrisbois.com

EXHIBIT "A"

| Court | Case No. | Case Style | Judge | Counsel of Record |
|---|---|---|---|---|
| State Court of Clayton County | 2021CV00850 | *Martin Amaya v. Thanh Vu* | Hon. Sonyja George | Serma Kebede Law Office of W. Bryant Green III, P.C. |
| Superior Court of Fulton County | 2021CV356795 | *Marvalyne Arnold v. Fairway Management, Inc., et al.* | Hon. Robert McBurney | Roy K. Starkey Magua B. Benson Hilliard Starkey Law |
| State Court of Whitfield County | 22CI01187 | *Bobby Kenneth Cantrell v. Alvaro A. Valdovinos* | Hon. Bert Poston | Tom D. Weldon, Jr. Weldon Law Firm<br><br>Sean L. Hayes Downey & Cleveland, LLP<br><br>Nikolai Makarenko, Jr. Groth Makarenko Kaier & Eidex LLC<br><br>Patrick S. Reames Christina L. Gulas Bovis Kyle Burch & Medlin, LLC |
| Superior Court of Sumter County | 2021-CV-00381 | *Kimberly Carnes v. City of Americus Georgia* | Hon. R. Rucker Smith | David F. Ellison Fortson, Bentley, & Griffin, PA |
| State Court of Gwinnett County | 23-C-00137-S4 | *Linda D. Clemons v. Old Navy, LLC, et al.* | Hon. Ronda S. Colvin | Michael P. Walker Piasta Newbern Walker, LLC |
| State Court of Cobb County | 18-A-3330 | *Jason Dang, et al. v. Quoqiang Hua, et al.* | Hon. John S. Morgan | Talal "Perez" Ghoseh |

3

| | | | | Ghoseh Law Firm LLC |
|---|---|---|---|---|
| Superior Court of Fulton County | 2023CV382291 | *Gyana Dewberry v. Gauthier Properties, LLC, et al.* | Hon. Melynee Leftridge | Morgan E. M. Harrison Arnall Golden Gregory LLP |
| State Court of Muscogee County | SC2023CV000396 | *Jane Doe v. Old Home Town Properties, LLC, et al.* | Hon. Pythias Temesgen | Shellea D. Crochet Morgan & Morgan Atlanta, PLLC |
| State Court of Gwinnett County | 23-C-06773-S1 | *Brian M. Douglas, et al. v. Xochilt Miranda Wences, et al.* | Hon. Emily J. Brantley | Darl H. Champion, Jr. Andrienne McKay The Champion Firm, P.C. Hung Q. Nguyen Adam Klein 770GoodLaw, H.Q. Alex Nguyen Law Firm, LLC |
| State Court of Gwinnett County | 23-C-07089-S7 | *Armer Early, et al. v. Xochilt Miranda Wences, et al.* | Hon. Emily J. Brantley | Darl H. Champion, Jr. Andrienne McKay The Champion Firm, P.C. Hung Q. Nguyen Adam Klein 770GoodLaw, H.Q. Alex Nguyen Law Firm, LLC |
| Superior Court of Newton County | SUCV2023000866 | *Vinnette Gibson v. Ortega Maxey* | Hon. Kevin Morris | Tim C. Cramer Cramer & Peavy Michael C. Davis |

| | | | | Law Office of Andrews and Manganiello |
|---|---|---|---|---|
| State Court of Macon-Bibb County | 23-SCCV-0095397 | *Freddie Graham and Janet Graham v. 3M Company, et al.* | Hon. Jeffrey B. Hanson | Sharon Zinns Zinns Law, LLC |
| State Court of DeKalb County | 20A79081 | *Donald G. Lassiter v. Akebono Brake Corporation, et al.* | Hon. Johnny Panos | Sharon Zinns Zinns Law, LLC |
| State Court of Cobb County | 22-A-1642 | *Peggy Martin, Individually and as Executor of the Estate of Calvin Martin v. Karl F. Eidam, et al.* | Hon. John S. Morgan | Christopher Rodd The Rodd Law Firm, LLC |
| State Court of Hall County | 2022SV001003 | *Christopher Maynor, et al. v. Stacie & Company, LLC* | Hon. Larry A. Baldwin, II | T. Preston Moore, II Beasley Allen Crow Methvin Portis & Miles, PC |
| State Court of Clayton County | 2023CV01294 | *Arnita Murphy v. Aleise Woods a/k/a Aleise M. Berry* | Hon. Sonyja George | Joseph M. Todd Joseph M. Todd, PC Chanelle Robinson Law Offices of Kelly Goodwin |
| State Court of Cobb County | 23-A-1258 | *Michael C. Pascale v. William Mangine, et al.* | Hon. Carl W. Bowers | Daniel T. Gholston Titus Law, LLC |
| State Court of Fulton County | 21EV006733 | *Lee Voine Phillips, et al. v. Fairway Management, Inc., et al.* | Hon. Diane E. Bessen | Roy K. Starkey Magua B. Benson Hilliard Starkey Law Jay M. O'Brien Copeland Stair Valz & Lovell, LLP |

| State Court of Cobb County | 22-A-1809 | *Meagan Sheets v. Jermaine Long, et al.* | Hon. Eric A. Brewton | Kelli Hooper Morgan & Morgan Atlanta PLLC<br><br>Meghan E. Olson Fain Major & Brennan, P.C.<br><br>Marcia S. Freeman Aspen E. Thompson Waldon Adelman Castilla Hiestand & Prout |
| State Court of Muscogee County | SC2022CV001014 | *Lois Sims-Cline v. Tyazhia Averett* | Hon. Andrew Prather | Cody M. Allen Gary O. Bruce, PC<br><br>Dennis L. Duncan Law Office of Dennis L. Duncan |
| Superior Court of DeKalb County | 23CV6666 | *Drew Westen v. Maranda Jackson, et al.* | Hon. Asha F. Jackson | Ramin Kermani-Nejad Kermani Firm, LLC<br><br>Dennis Manganiello Law Office of Andrews and Manganiello<br><br>Daimon L. Carter Susan J. Levy Levy Pruett Cullen<br><br>Joseph A. Kaiser |

| | | | | Ankur P. Trivedi<br>Davis D. Lackey<br>Groth Makarenko<br>Kaiser & Eidex |
|---|---|---|---|---|
| State Court of Burke County | 2022S0067 | *Carveta Wilkerson and Glenn Wilkerson v. Jamel A. Murray, et al.* | Hon. Jackson E. Cox, II | Jenna Matson Kenneth S. Nugent, PC<br><br>Meghan E. Olson<br>Fain Major & Brennan, PC |

# **<u>EXHIBIT C</u>**

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

LINDA D. CLEMONS,                    )
                                     )
      Plaintiff,                    )
                                     )    CIVIL ACTION NO.:
vs.                                  )
                                     )
OLD NAVY, LLC;                       )
DOE 1 ; DOE 2; DOE 3; and DOE 4;  )
                                     )
      Defendants.                   )

**<u>NOTICE OF REMOVAL TO OPPOSING COUNSEL</u>**

TO:  Michael P. Walker
      Piasta Newbern Walker, LLC
      3301 Windy Ridge Pkwy, Suite 110
      Atlanta, GA 30339
      mike@pnwlaw.com

**YOU ARE HEREBY NOTIFIED** that on the 18th day of December, 2023,

Defendant filed in the Office of the Clerk of Gwinnett County, Georgia, its Notice

of Removal to the United States District Court for the Northern District of Georgia,

Atlanta Division.

Please serve the undersigned with copies of all pleadings that may be filed by

you in the United States District Court for the Northern District of Georgia, Atlanta

Division, pursuant to the removal of this case and in accordance with the Federal Rules of Civil Procedure.

Respectfully submitted this 18ᵗʰ day of December, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendant Old Navy, LLC*

2

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served all counsel of record in the foregoing matter with a copy of **NOTICE OF REMOVAL TO OPPOSING COUNSEL** has been mailed to all parties via U.S. Mail, addressed as follows:

Michael P. Walker
Brianna N. Yates
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
brianna@pnwlaw.com
*Counsel for Plaintiff*

This 18th day of December, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendant Old Navy, LLC*

# EXHIBIT D

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| LINDA D. CLEMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| | ) | 23-C-00137-S4 |
| vs. | ) | |
| | ) | |
| OLD NAVY, LLC; | ) | |
| DOE 1 ; DOE 2; DOE 3; and DOE 4; | ) | |
| | ) | |
| Defendants. | ) | |

### CERTIFICATION OF NOTICE OF REMOVAL

TO:   State Court of Gwinnett County
       Clerk's Office
       75 Langley Drive
       Lawrenceville, GA 30046

In compliance with 28 U.S.C. § 1446(d), you are hereby notified of the filing of a Notice

of Removal of State Court Case No. 23-C-00137-S4, styled *Linda D. Clemons v. Old Navy, LLC*,

to the United States District Court for the Northern District of Georgia, Atlanta Division. A copy

of the Notice of Removal is attached hereto as Exhibit A.

Respectfully submitted this 18th day of December, 2023.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendant Old Navy, LLC*

1

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all counsel of record in the foregoing matter with a copy of **CERTIFICATION OF NOTICE OF REMOVAL** has been filed with the Clerk of Court utilizing the electronic filing system, which automatically sends an electronic copy of same to all counsel of record, and by certified electronic service to:

Michael P. Walker
Brianna N. Yates
Piasta Newbern Walker, LLC
3301 Windy Ridge Pkwy, Suite 110
Atlanta, GA 30339
mike@pnwlaw.com
brianna@piastawalker.com
*Counsel for Plaintiff*

This 18th day of December, 2023.

Bank of America Plaza
600 Peachtree Street NE
Suite 4700
Atlanta, Georgia  30308
Telephone:  (404) 348-8585
Facsimile: (404) 467-8845
Chris.Collier@lewisbrisbois.com
Brittany.DeDiego@lewisbrisbois.com

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

*/s/  Brittany DeDiego*
S. CHRISTOPHER COLLIER
Georgia Bar No. 178307
BRITTANY DEDIEGO
Georgia Bar No. 296392

*Counsel for Defendant Old Navy, LLC*

2