# **Exhibit A**

LEASE ADMINISTRATION
STORE# _5260_
SCANNED DGG  APR 0 4 2013

# Dollar Tree Stores, Inc.,

## at

## North DeKalb Mall

## Decatur, GA

North DeKalb Mall–Decatur, GA

TABLE OF CONTENTS

*TABLE OF CONTENTS* ................................................................................................ *i*

*LEASE AGREEMENT* ................................................................................................ *1*

*A. BASIC LEASE PROVISIONS AND DEFINITIONS* .......................................... *1*

   1. Premises ....................................................................................................... 1

   2. Permitted Use ............................................................................................. 1

   3. Addresses .................................................................................................... 1

   4. Effective Date of Lease ............................................................................. 2

   5. Delivery ....................................................................................................... 2

   6. Lease Term Commencement Date ........................................................... 2

   7. Rent Commencement Date ....................................................................... 2

   8. Term of this Lease ..................................................................................... 2

   9. Base Rent .................................................................................................... 3

   10. Additional Rent ......................................................................................... 3

   11. Operating Charges .................................................................................... 3

   12. Early Termination ...................................................................................... 3

   13. Exclusive Use and Restricted Uses ...................................................... 3

   14. Co-Tenancy ............................................................................................... 5

   15. Tenant Allowance ..................................................................................... 6

*B. PREMISES AND SHOPPING CENTER* ............................................................ *6*

   1. Description .................................................................................................. 6

   2. Access ......................................................................................................... 6

   3. Right to Remeasure ................................................................................... 7

*C. TERM OF THIS LEASE* ..................................................................................... *7*

   1. Term of this Lease ..................................................................................... 7

   2. Commencement Certificate ...................................................................... 7

   3. Option to Renew ......................................................................................... 7

*D. CONSTRUCTION* ............................................................................................... *7*

   1. Delivery ....................................................................................................... 7

   2. HVAC ......................................................................................................... 10

   3. Signage ..................................................................................................... 10



North DeKalb Mall–Decatur, GA

4.  Code Compliance ................................................................................. 11

5.  Prevailing Criteria ............................................................................. 12

E.  RENT .................................................................................................. 12

1.  Base Rent and Additional Rent .......................................................... 12

2.  Alternate Rent ................................................................................... 12

4.  Refund ................................................................................................ 13

5.  Late Fee ............................................................................................. 13

F.  TAXES ............................................................................................... 13

1.  Real Estate Taxes and Assessments ................................................... 13

2.  Procedure for Payment ...................................................................... 13

3.  Municipal, County, State, or Federal Taxes ....................................... 13

4.  Other Taxes ....................................................................................... 13

G.  COMMON AREAS .............................................................................. 14

1.  Common Areas ................................................................................... 14

2.  Common Area Maintenance Charge .................................................... 14

H.  UTILITIES AND RUBBISH DISPOSAL .............................................. 14

1.  Utilities .............................................................................................. 14

2.  Rubbish Disposal ............................................................................... 15

I.  USE OF PREMISES BY TENANT ....................................................... 15

1.  Use of Premises ................................................................................. 15

2.  Operation of Business ........................................................................ 15

J.  LANDLORD ACCESS .......................................................................... 16

K.  REPAIRS AND ALTERATIONS .......................................................... 16

1.  Repairs by Landlord ........................................................................... 16

2.  Repairs by Tenant .............................................................................. 17

3.  Alterations or Improvements by Tenant ............................................. 17

4.  Removal of Improvements .................................................................. 18

L.  INDEMNITY AND INSURANCE .......................................................... 18

1.  Indemnification by Tenant .................................................................. 18

2.  Indemnification by Landlord ............................................................... 18

3.  Tenant's General Liability Insurance ................................................... 18

4.  Landlord's Insurance .......................................................................... 19



   5.  Self-insure ............................................................................... 19

   6.  Mutual Waiver ........................................................................ 19

M.  DAMAGE AND DESTRUCTION ............................................. 19

   1.  Partial Damage ...................................................................... 19

   2.  Total Damage ........................................................................ 20

   3.  Repair .................................................................................... 20

   4.  Abatement of Rent ................................................................ 20

N.  ASSIGNING AND SUBLETTING .......................................... 20

   1.  Tenant's Rights ..................................................................... 20

   2.  Consent of Landlord ............................................................. 21

   3.  Affiliated Corporation ........................................................... 21

O.  EMINENT DOMAIN ................................................................ 21

   1.  Condemnation Award ........................................................... 21

   2.  Rights of Termination ........................................................... 21

   3.  Restoration ............................................................................ 22

P.  DEFAULT AND REMEDIES .................................................. 22

   1.  Default by Tenant ................................................................. 22

   3.  Failure to Exercise Rights .................................................... 24

   4.  Sums in Dispute ................................................................... 24

Q.  NOTICES .............................................................................. 24

   1.  Proper Notice ........................................................................ 24

   2.  Change of Address ............................................................... 24

   3.  Service of Process ................................................................ 24

R.  MORTGAGE SUBORDINATION ........................................... 24

S.  ESTOPPEL CERTIFICATES ................................................. 25

T.  COVENANT OF QUIET ENJOYMENT ................................... 25

U.  LIABILITY OF LANDLORD .................................................... 26

   1.  Judgments ............................................................................ 26

   2.  Transfer of Title .................................................................... 26

V.  ENVIRONMENTAL MATTERS .............................................. 26

   1.  Acts ....................................................................................... 26

   2.  Asbestos and Other Hazardous Materials ........................... 27



3. Tenant's Operations ............................................................................... 27

4. Indemnification ..................................................................................... 27

5. Limitation of Liability ............................................................................ 27

*W. MISCELLANEOUS PROVISIONS* .......................................................... 27

1. Broker's Commissions ........................................................................... 27

2. Surrender and Holding Over .................................................................. 27

3. Storage Trailer ....................................................................................... 28

4. Audit Rights ........................................................................................... 28

5. Mechanic's Liens ................................................................................... 28

6. Mortgagee Consent ................................................................................ 28

7. Landlord Title Report ............................................................................. 28

8. Recording ............................................................................................... 28

9. Severability ............................................................................................. 28

10. Attorneys' Fees ..................................................................................... 28

11. Jury Trial ............................................................................................... 28

12. Waiver .................................................................................................... 28

13. Force Majeure ........................................................................................ 28

14. No Partnership ....................................................................................... 29

15. Section Headings ................................................................................... 29

16. Lease Inures to the Benefit of Assignees .............................................. 29

17. No Presumption Against Drafter ............................................................ 29

18. Authority to Sign Lease .......................................................................... 29

19. Entire Agreement ................................................................................... 29

20. Landlord's Alteration ............................................................................. 29

21. Incorporation by Reference .................................................................... 32

*EXHIBIT A - Site Plan* ............................................................................... 35

*EXHIBIT A-2 - Trash/Dumpster Location* .................................................. 36

*EXHIBIT B - Legal Description* .................................................................. 38

*EXHIBIT C - Landlord's Work and Tenant's Work* ..................................... 41

*EXHIBIT D - Tenant's Sign Package* .......................................................... 58

*EXHIBIT E – Exclusives and Restrictions* .................................................. 59

*EXHIBIT F - Elevation* ............................................................................... 67

**LEASE AGREEMENT**

THIS LEASE AGREEMENT ("Lease"), made as of this 25ᵗʰ day of *March*, 2013, between **HENDON NORTH DEKALB, LLC,** a Georgia limited liability company whose address is Two Live Oak Center, 3445 Peachtree Road, Suite 465, Atlanta, Georgia 30326 (hereinafter referred to as "Landlord") and **DOLLAR TREE STORES, INC.,** a Virginia corporation whose address is 500 Volvo Parkway, Chesapeake, Virginia 23320 (hereinafter referred to as "Tenant").

WITNESSETH

THAT in consideration of the mutual covenants and agreements herein contained, it is agreed by and between Landlord and Tenant as follows:

A. BASIC LEASE PROVISIONS AND DEFINITIONS

The following constitute the basic provisions of this Lease:

1. Premises ("Premises"). Landlord hereby leases to Tenant the space within a one-story unit without basement, balcony, or mezzanine described as follows:

   a. 
   | | |
   |---|---|
   | Shopping Center (as defined in B.1) | North DeKalb Mall |
   | Address | 2050 Lawrenceville Highway |
   | Space Number | 5009A |
   | City, State, Zip Code | Decatur, GA 30033 |
   | County | DeKalb |
   | | |
   | Square Footage | 9,969 square feet |
   | Frontage | 70' |

2. Permitted Use ("Permitted Use"). A variety store selling general merchandise including food products. Tenant agrees that no one category will become the principal product of Tenant's retail business, and Landlord covenants that so long as the Tenant is not in default beyond any applicable cure period, Tenant will be permitted to occupy the Premises for the entire Lease Term as a general merchandise store, subject to the limitations set forth in Exhibit E attached hereto. Landlord warrants that as of the date hereof there are no recorded or unrecorded restrictions or other tenant exclusives that would prohibit Tenant's use of the Premises as stated above except for those set forth in Exhibit E. The exclusives and restrictions in place as of the date hereof affecting the Premises, if any, are attached hereto as Exhibit E. In addition, during the Lease Term Tenant may, with written notice to Landlord, change Tenant's use to any lawful retail purpose so long as Tenant agrees that it will not violate other than existing uses in the Shopping Center in place at the time of Tenant's proposed change of use without Landlord's consent, not to be unreasonably withheld.

3. Addresses.

   a. Landlord    Notices and Payments to:
   
   c/o Hendon Properties
   Two Live Oak Center
   3445 Peachtree Road
   Suite 465
   Atlanta, Georgia 30326
   Attn: J. Charles Hendon, Jr.
   Telephone: (404) 262-7400
   Facsimile: (404) 262-2030



|   | | and Notice only to: | Hartman Simons & Wood LLP<br>6400 Powers Ferry Road, N.W.<br>Suite 400<br>Atlanta, GA 30339<br>Attn: Kenneth J. Clayman, Esq.<br>Tele. No.: (678) 589-6305<br>Fax No.: (770) 618-8554 |
|---|---|---|---|
| b. | Tenant | Notices to: | Dollar Tree Stores, Inc.<br>Attn: Lease Administration Department<br>500 Volvo Parkway<br>Chesapeake, VA 23320<br>Telephone: (757) 321-5000<br>Facsimile: (757) 321-5220<br>Reference: Store # (to be furnished) |
|   | | Billing/Invoices to: | Dollar Tree Stores, Inc.<br>500 Volvo Parkway<br>Department 300<br>Chesapeake, VA 23320<br>Reference: Store # (to be furnished) |

4.  Effective Date of Lease ("Effective Date").  The Effective Date shall be the date upon which this Lease has been fully executed by both Landlord and Tenant (with all Exhibits completed and attached), and a fully executed copy hereof delivered to both parties.

5.  Delivery.

    a.  Delivery Date for Possession of Premises ("Anticipated Delivery Date"). **December 1, 2013.**

    b.  Turnover Date:  The Turnover Date ("Turnover Date") shall be the date the Premises are actually delivered to Tenant in accordance with the terms of this Lease, but in no event earlier than the Anticipated Delivery Date unless approved in writing by Landlord and Tenant.

6.  Lease Term Commencement Date ("Lease Term Commencement Date").  The term of this Lease shall commence the earlier of (a) ninety (90) days after the Turnover Date or (b) when Tenant opens for business in the Premises.

7.  Rent Commencement Date ("Rent Commencement Date").  Tenant's obligation to pay Base Rent and Additional Rent shall commence upon the Lease Term Commencement Date.

8.  Term of this Lease.

    a.  The Original Lease Term ("Original Lease Term") shall commence upon the Lease Term Commencement Date and, subject to Section C.1, shall expire on the last day of the sixtieth (60th) full month following the Lease Term Commencement Date ("Lease Expiration Date"), unless sooner terminated in accordance with the terms of this Lease.

    b.  Tenant shall have the right and option to extend the term of this Lease for three (3) additional periods of five (5) years each (each period referred to as "Renewal Term") in accordance with Section C.3.

Each of the Original Lease Term and Renewal Term(s), if so exercised, shall be individually deemed a "Lease Term" for the purposes of this Lease.

9.  Base Rent ("Base Rent").

| LEASE TERM | YEARS | PER SQ FT | MONTHLY | ANNUALLY |
|---|---|---|---|---|
| Original Lease Term | 1-5 | $13.00 | $10,799.75 | $129,597.00 |
| First Renewal Term | 6-10 | $14.00 | $11,630.50 | $139,566.00 |
| Second Renewal Term | 11-15 | $15.00 | $12,461.25 | $149,535.00 |
| Third Renewal Term | 16-20 | $16.00 | $13,292.00 | $159,504.00 |

10.  Additional Rent.  It is agreed that this is a "Gross" Lease, and that, as such, the Base Rent set forth in Section A.9 of this Lease shall be inclusive of all Common Area maintenance charges or expenses, real estate taxes and Landlord's property insurance costs with respect to the Shopping Center. Any amounts, other than Base Rent, to be paid by Tenant to Landlord pursuant to the provisions of this Lease, whether such payments are to be periodic and recurring or not, shall be deemed to be "Additional Rent" and otherwise subject to all provisions of this Lease as to the default in the payment of Base Rent.

11.  Operating Charges.  Intentionally Deleted.

12.  Early Termination.  Intentionally Deleted.

13.  Exclusive Use and Restricted Uses.  As a material inducement for Tenant to enter into this Lease, **provided Tenant is not in default beyond any applicable cure period and is open and operating from the entire Premises as a typical Dollar Tree Store,** Landlord hereby agrees as follows:

　　a.  Exclusive Use.  **Except as set forth herein to the contrary,** Tenant shall have the exclusive use **in the Shopping Center** for the operation of a single price point variety retail store. **Except as set forth herein to the contrary,** Landlord shall not lease, rent, occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant, whose "principal business" (hereinafter defined) is for the operation of a single price point variety retail store **and which occupies less than 30,000 square feet in the Shopping Center such as Big Lots, Dollar General or Family Dollar ("Exclusive or "Exclusive Use"). This Exclusive does not apply to any junior department stores such as Ross Dress for Less, Shoppers World, TJ Maxx, Marshalls, AJ Wright, or any other primarily apparel retailer, or any store such as Hallmark Card Stores, Spencer Gifts or any grocery store (including any specialty grocery store) or any drug store.**

　　b.  Restricted Uses.  **Except as set forth in Section A.13.a above,** Landlord will not permit any other occupant **occupying under 30,000 square feet** in the Shopping Center to operate the following uses (hereinafter, "Restricted Uses") without Tenant's consent and such consent shall be in Tenant's sole and absolute discretion:

　　　　**(1) Single price point variety retail store as its primary business; and**

　　　　(2) Variety retail operations with the word "Dollar" in their trade name;



c.    For the purpose of Sections A.13.a and A.13.b hereof, "principal business" shall be defined as selling such merchandise in twenty-five percent (25%) or more of the sales floor area (including one-half [1/2] of the adjacent aisle space).

Notwithstanding the foregoing, this Section A.13 shall not apply to **(1) any tenant or occupant selling single price point apparel as its principal business, or (2)** any current occupant or tenant of the Shopping Center who is operating under their current use clause or trade name as of the date of this Lease; provided, however, in the event Landlord's consent is required for a change in permitted use or trade name, or Landlord has the ability to challenge a change of permitted use or trade name, then Landlord shall not consent to a change of any tenant's use or trade name which would violate the Exclusive Use or Restricted Uses, and Landlord shall **include the language restricting occupants from violating the** Exclusive Use and Restricted Use **provisions in other new occupants' leases.**

If any provision of this Section A.13 is violated and such violation continues for a period of thirty (30) days after written notice from Tenant, Tenant's rights and remedies shall be as follows:

y.    Paying Exclusive Alternate Rent (as hereinafter defined) beginning immediately after the violation occurs and continuing until the violation is cured.  For the purposes of this Lease, "Exclusive Alternate Rent" shall be equal to one percent (1%) of Gross Sales, as defined in Section E.2, from the Premises (not to exceed one-half [1/2] of all rents due under this Lease); **provided, however, if Tenant ceases operations (other than as a result of an Exempted Discontinuance (as defined in Section I.2.c), then during such cessation, Exclusive Alternate Rent shall equal one-half (1/2) of all rents due under this Lease, until Tenant recommences business operations..**  Tenant shall pay Exclusive Alternate Rent in the manner set forth in Section E.2 of this Lease until the violation is cured.

z.    The right to terminate this Lease with thirty (30) days written notice to Landlord, which shall be a continuing option until such violation is cured.

In the event Tenant does elect to terminate this Lease pursuant to this Section A.13, Landlord shall reimburse Tenant within thirty (30) days of Landlord's receipt of written notice for the unamortized value (using a straight-line amortization schedule over the Original Lease Term) of the cost of Tenant's **documented** improvements **to the Premises or** other **actual, out-of-pocket** costs **directly related to the Premises** incurred by Tenant **which were not paid by Landlord, not to exceed thirty dollars ($30) per square foot.**  The foregoing rights and remedies shall be in addition to all other rights and remedies available at law or in equity to Tenant for violation of the Exclusive Use or Restricted Uses; **provided, however, Tenant shall not be entitled to recover consequential damages.**

Notwithstanding the foregoing, Landlord shall not be considered to be in violation of this provision if a tenant in the Shopping Center acts as a "Renegade Tenant" (which is defined as another tenant within the Shopping Center who violates the Exclusive Use or Restricted Uses and such tenant's lease would not allow such violation without Landlord's consent). In such event, Landlord agrees to pursue commercially reasonable efforts to stop the Renegade Tenant's continued operation in violation of **the** Exclusive **Use or** Restricted Uses.  Such efforts shall include but not be limited to (i) filing of pleadings in a court of competent jurisdiction and diligently pursuing such litigation to conclusion (however, Landlord shall not be obligated to pursue an appeal of a final

decision of the court); and (ii) filing for temporary or permanent injunctive relief asking the court to stop the Renegade Tenant from violating **the** Exclusive **Uses** or Restricted Uses. In the event of such violation as provided above, Tenant shall remain at full Base Rent plus full Additional Rent for four (4) months beginning after the violation occurs. If the violation has not been cured after said four (4) months, Tenant shall begin paying as "Renegade Alternate Rent" the lesser of (x) one percent (1%) of Gross Sales in the Premises, or (y) one-half (1/2) of all rents due under this Lease, until **either** the violation is cured **or a court of competent jurisdiction has determined that the actions of the Renegade Tenant are either not a violation of the Exclusive Use or Restricted Use or are otherwise permitted by law. If a court of competent jurisdiction has determined that the actions of the Renegade Tenant are either not a violation of the Exclusive Use or Restricted Use or are otherwise permitted by law, then Tenant shall, within thirty (30) days thereafter, pay Landlord the difference between the Renegade Alternate Rent paid by Tenant and the Base Rent that would have been due during the time period Tenant paid the Renegade Alternate Rent. If the violation has not been cured or a court of competent jurisdiction has not determined that the actions of the Renegade Tenant are either not a violation of the Exclusive Use or Restricted Use or are otherwise permitted by law after twelve (12) months, Tenant shall have the option to terminate this Lease or continue to pay Renegade Alternate Rent until the violation is cured or a court of competent jurisdiction has determined that the actions of the Renegade Tenant are either not a violation of the Exclusive Use or Restricted Use or are otherwise permitted by law.** If Tenant elects to terminate this Lease as a result of the violation of the Exclusive Use or Restricted Uses by a Renegade Tenant, Tenant shall provide Landlord with thirty (30) days' written notice of termination, relieving Landlord of the obligation for reimbursement of Tenant's leasehold improvements.    Should Tenant elect not to terminate this Lease and exercise a Renewal Term, Tenant shall return to paying full Base Rent and Additional Rent upon commencement of the Renewal Term

14.    Co-Tenancy.    In the event two (2) of the following tenants:  Marshalls, Macy's, Burlington Coat Factory or Ross, its successors, assigns, or replacement tenants (each a "Co-Tenant"), vacates the premises or ceases to operate the premises leased by them as shown on Exhibit A (each a "Co-Tenant Space"), Tenant will begin immediately paying to Landlord **in lieu of Base Rent**, three percent (3%) of Gross Sales, as defined in Section E.2, not to exceed one-half (½) of all rents due under this Lease ("Co-Tenancy Alternate Rent"), for the period that the **two (2)** Co-Tenant Spaces **each** remain vacant.  Tenant shall pay such Co-Tenancy Alternate Rent in the manner set forth in Section E.2 of this Lease.  If the **two (2)** Co-Tenant Space remain unoccupied for a period of six (6) **consecutive** months, or **neither is** leased and open for business to a **national or regional retail** tenant **occupying at least seventy-five percent (75%) of the first floor of the** vacated Co-Tenant at the end of the aforementioned six (6) month period, then Tenant shall have the right to terminate this Lease with thirty (30) days' written notice to Landlord, with neither Landlord nor Tenant having any further obligation to the other under this Lease. This termination right shall be a continuing option until such violation is cured **or until such right expires as set forth below.**  If Tenant does not exercise its right to terminate, then Tenant will continue to pay the Co-Tenancy Alternate Rent until the Co-Tenant Space vacancy is cured as provided herein. **However, notwithstanding the above, if after the Co-Tenant Space vacancy remains uncured for twelve (12) months, and Tenant has not exercised its right to terminate the Lease, Tenant will revert back to full rent and Tenant's right of termination shall be void and of no further force or effect.** Landlord shall, within ten (10) days of the Co-Tenant vacating the Co-Tenant Space, give Tenant written notice of the closure, cancellation, or other termination of **the** Co-Tenant during the Lease Term ("Co-Tenant Vacancy Notice"). The following cessations of retail operations shall be exempted from the applicability of Tenant's right to pay Co-Tenancy Alternate Rent hereunder:    (i) any good faith

discontinuance occasioned by a force majeure event; (ii) cessation of retail operations in connection with a transfer of possession; or (iii) any discontinuance in connection with a remodeling.

15.   Tenant Allowance.   As a material inducement for Tenant to enter into this Lease, Landlord hereby agrees to pay the sum of Forty Nine Thousand Eight Hundred Forty-Five Dollars \$49,845.00 ("Landlord's Cash Contribution") **based on five dollars (\$5) per square foot of the Premises within sixty (60) days after Tenant opens for business. If payment is not made by Landlord within such sixty (60) day period, Tenant will have the right to collect any or all of Landlord's Cash Contribution, together with interest at the rate of ten percent (10%) per annum, by taking a credit against one hundred percent (100%) of Base Rent and Additional Rent commencing on the next installment of rent after such nonpayment by Landlord.**

16.   Free Rent.   Intentionally Deleted.

B.   PREMISES AND SHOPPING CENTER

1.   Description.   The Premises, as described in Section A.1.a of this Lease, is crosshatched on the site plan attached hereto as Exhibit A.   The term "Shopping Center", as used in this Lease, shall be deemed to mean that certain retail shopping facility, including the Premises, located at the address set forth in Section A.1.a above, as more fully described in the legal description attached hereto as Exhibit B.   Notwithstanding the foregoing, Landlord agrees it shall not make any changes or alterations **which would have a material and adverse effect on the Tenant's operations** to the configuration of the Shopping Center within the "No Build Area" as marked on Exhibit A; **provided, however, any changes in the No Build Area which are made to replace existing structures, improvements or landscaping or which are made in order to comply with governmental requirements shall be permitted. Furthermore, the Shopping Center is currently subject to that certain Restated Construction, Operation and Reciprocal Easement Agreement Market Square at North DeKalb, dated as of December 7, 1987 and recorded on December 11, 1987 in Deed Book 6017, Page 142 of the Official Records of DeKalb County, Georgia as modified by; (i) that certain Letter Agreement dated April 30, 1990 and recorded on July 26, 1990 in Deed Book 6755, Page 545 of said Official Records of DeKalb County, Georgia; (ii) that certain Letter Agreement dated April 30, 1990 and recorded on July 26, 1990 in Deed Book 6755, Page 540 of said Official Records; (iii) that certain Letter Agreement dated April 30, 1990 and recorded on July 26, 1990 in Deed Book 6755, Page 548 of said Official Records; (iv) that certain Agreement respecting Restated Construction, Operation and Reciprocal Easement Agreement North DeKalb Mall, DeKalb County, Georgia dated June 30, 1997 and recorded on July 18, 1997 in Deed Book 9532, Page 626 of said Official Records; (v) that certain Amendment to Restated Construction, Operation and Reciprocal Easement Agreement North DeKalb Mall, DeKalb County, Georgia dated August 28, 2007 and recorded on September 21, 2007 in Deed Book 20318, Page 304 of said Official Records; and (vi) that certain Second Amendment to Restated Construction, Operation and Reciprocal Easement Agreement North DeKalb Mall, DeKalb County, Georgia dated November 14, 2011 and recorded on July 26, 2012 in Deed Book 23151, Page 583 of said Official Records (collectively, as may be further amended, the "COREA"). This Lease and all of its terms are subject and subordinate to the provisions of the COREA and in the event of a conflict between this Lease and the COREA, the terms of the COREA shall govern and control.**

2.   Access.   Landlord represents that there is, as of the date of this Lease, paved tractor-trailer access to and from within five feet (5') of the rear service door of the Premises sufficient to support Tenant's tractor trailer delivery and dumpster truck ingress to and



egress from Tenant's dumpster, and such access shall remain throughout the Lease Term. Landlord will take no action which would deprive Tenant's delivery tractor-trailers of continued ingress and egress to and from the Premises for the purpose of making deliveries; **provided, however, Tenant acknowledges that Tenant's loading area is non-exclusive and temporary delays may occur while other tenants are using the loading area.**

3. Right to Remeasure. Prior to the Rent Commencement Date, Landlord and Tenant shall have the right to remeasure the Premises to determine the Premises GLA. In the event the remeasurement discloses that the actual Premises GLA as set forth in Section A.1.b is incorrect, Landlord and Tenant shall execute an amendment to this Lease (i) reflecting the actual Premises GLA; and (ii) adjusting the Base Rent and Landlord's Cash Contribution based on the new square footage. In the event of an adjustment, Tenant will pay any excess Base Rent owed to Landlord within thirty (30) days after receipt of a statement, or Tenant shall take a credit for any overpayment against the next monthly Base Rent payments. For the purposes of this Lease, the Premises shall be measured from the exterior face of any exterior walls and to the centerline of common walls.

C. TERM OF THIS LEASE

1. Term of this Lease. The term of this Lease shall be for the period set forth in Section A.8, as the same may be extended pursuant to Section C.3 below. Notwithstanding anything to the contrary contained herein, in no event shall the Lease Expiration Date, as defined in Section A.8, occur during the months of October, November, or December, and in such event the Lease Expiration Date shall be extended to January 31 following the date of natural expiration of this Lease.

2. Commencement Certificate. Upon the Rent Commencement Date, Tenant will prepare a written instrument to be approved and signed by all parties stipulating the Lease Term Commencement Date, the Rent Commencement Date, the Lease Expiration Date, and any other critical dates as provided in this Lease.

3. Option to Renew. Provided Tenant is not in default beyond any applicable cure period under any of the terms and provisions herein contained at the time of renewal and provided further that Tenant is open and operating for business in the Premises as permitted by this Lease, Landlord hereby grants to Tenant the option to renew this Lease for the Renewal Terms stipulated in Section A.8. The First Renewal Term and each succeeding Renewal Term(s) (if any) shall be based upon all the terms and conditions contained in this Lease except for payment of Base Rent that shall be increased pursuant to Section A.9. Notice of election by Tenant to exercise each option shall be given to Landlord in writing at least seven (7) months prior to the expiration of the Lease Term. Notwithstanding the foregoing, in the event Tenant misses the Option Notice Period as provided herein, then the Option Notice Period shall be extended for an additional period of thirty (30) days before Tenant's right to exercise an option to renew may be deemed null and void hereunder.

D. CONSTRUCTION

1. Delivery.

   a. Delivery Conditions. The Anticipated Delivery Date of the Premises from Landlord to Tenant shall be as set forth in Section A.5.a. **Tenant will not be required to accept delivery of Premises between August 1st and November 1st.** Except as specifically provided otherwise in this Lease, Tenant shall accept the Premises in Substantially Complete condition, as hereinafter defined "Substantially Complete" is defined as: parking lot complete, the Delivery

Conditions (as hereinafter set forth) fulfilled (subject to "Punch List Items", as defined herein), including, without limitation, the substantial completion of Landlord's Work as set forth in Exhibit C, and final inspections by the applicable building or other governmental inspector (to the extent required by law) received on all work performed by Landlord to the Premises, to include (i) a certificate of occupancy; or (ii) a certificate of completion; or (iii) the equivalent of (i) or (ii), any of which shall be issued by the municipality having jurisdiction. "Punch List Items" shall be defined as minor items of Landlord's Work that do not prevent Tenant from opening for business, in whole or in part. Tenant shall have a period of fifteen (15) days following the Turnover Date to provide Landlord with a written list of Punch List Items. In the event Tenant shall fail to identify Punch List Items within said fifteen (15) day period, Tenant shall be deemed to have accepted Landlord's Work. If Tenant shall deliver a written list of Punch List Items to Landlord within said fifteen (15) day period, then Landlord shall be obligated within thirty (30) days to cure any such actual defects identified by Tenant on such written list relating to Landlord's Work (as said 30-day period may be extended due to an event of Force Majeure, as defined in Section W.13); provided, however, if the cure of any such actual defects identified by Tenant on such written list relating to Landlord's Work cannot be reasonably cured within such thirty (30) day period, Landlord shall commence the cure within such thirty (30) day period and shall thereafter diligently pursue such cure to completion. Notwithstanding the foregoing, Landlord shall not be deemed to have delivered the Premises unless and until all of the following conditions have been fulfilled (collectively referred to as the "Delivery Conditions"):

1) All utilities, including (i) water, (ii) gas, (iii) sewer, (iv) electricity, (v) telephone service and (vi), if required by code, the fire sprinkler system including monitoring panel, are all separated and brought to the point of connection to the Premises and in good working order;

2) The Premises are in compliance with all applicable building codes pursuant to Section D.4 of this Lease;

3) The building and foundations (including the walls and floor slab) of which the Premises forms a part are structurally sound and the floor slab of the Premises is both level and sufficient and ready for polishing and/or covering;

4) The roof is structurally sound and water tight;

5) No asbestos or Hazardous Materials exist within the Premises pursuant to Section V.2;

6) All doors and plate glass of the Premises are in good working order;

7) The previous tenant's signs are removed from the sign band on the exterior of the Premises and from the interior of the Premises with any damage to the sign band or Premises as a result of such removal repaired, including necessary patching and painting, (in the event Landlord does not satisfy this Delivery Condition, Tenant shall do so and Landlord shall reimburse Tenant for the **reasonable and actual** cost incurred to satisfy such Delivery Condition. If reimbursement is **not** made by Landlord within thirty (30) days of Landlord's receipt of invoice from Tenant, then Tenant will have the right to collect the cost incurred by Tenant to satisfy such Delivery Condition, together with interest at the rate of twelve percent (12%) per annum, by taking a credit against one

hundred percent (100%) of Base Rent and Additional Rent commencing on the next installment of rent after such nonpayment by Landlord);

8)    If required by code, Landlord agrees to construct a trash enclosure sufficient for Tenant's dumpsters;

9)    Landlord to provide Tenant with an engineered site plan to ensure that Tenant has adequate room for tractor-trailer delivery adjacent to the Premises. In addition Landlord agrees that the paved surface of the drive aisle **leading to Tenant's delivery door** shall be within five feet (5") of Tenant delivery door;

10)    Landlord at Landlord's sole cost and expense, shall provide a Junior Anchor façade bump per Tenant's final plans and specifications as shown on Exhibit F attached hereto;

11)    All of Landlord's Work pursuant to Exhibit C attached hereto and the final approved plans and specifications is Substantially Complete.

b.    <u>Delivery Notice.</u>  Upon Landlord's completion of all the foregoing Delivery Conditions, Landlord shall notify Tenant in writing ("Delivery Notice") that all Delivery Conditions have been fulfilled and Landlord is ready to deliver the Premises.  As soon as practical, Tenant will arrange an inspection ("Delivery Inspection") of the Premises with Landlord to insure that all Delivery Conditions have been fulfilled **(or if Tenant declines to perform the Delivery Inspection).** Tenant may, but shall not be required to, conduct the Delivery Inspection prior to the Anticipated Delivery Date. If the Delivery Inspection confirms that all Delivery Conditions have been fulfilled, then Tenant will accept delivery of the Premises, and the date Tenant received the Delivery Notice shall conclusively be the Turnover Date as referenced in Section A.5.b of this Lease. If it is determined at the time of Delivery Inspection that all Delivery Conditions have not been satisfied then Tenant will not be required to accept delivery of the Premises at that time.  Once Landlord has completed or corrected the deficiency in the Delivery Conditions, Landlord will again provide a Delivery Notice to Tenant and arrange for another Delivery Inspection.  This process shall continue until all Delivery Conditions have been fulfilled.  At the Delivery Inspection, Tenant shall create and deliver to Landlord a list of minor defects which will not materially hinder or delay Tenant's performance of Tenant's Work ("Punchlist Items"). Landlord shall endeavor to remedy such Punchlist Items in a reasonably prompt and diligent manner.  The existence of Punchlist Items shall not be deemed a failure of Delivery Conditions and if Landlord's Work is complete, but for Punchlist Items, the Landlord's Work shall be deemed Substantially Complete.

c.    <u>Remedies for Failure to Deliver.</u>

1.    Subject to **day for day extension due to** Force Majeure, **delay caused by Tenant or Tenant's agents, employees or contractors ("Tenant Delay")** if all of the Delivery Conditions have not been fulfilled on or before the Anticipated Delivery Date, then Tenant shall have the right, in Tenant's sole discretion, to charge as liquidated damages, which the parties acknowledge are a reasonable estimate of Tenant's actual damages which will be difficult or impossible to ascertain, and do not constitute a penalty, a late fee equal to One Thousand Dollars ($1,000.00) per day ("Late Fee") for each day or part thereof which elapses between the Anticipated Delivery Date specified in Section A.5.a. and the date when all of the Delivery Conditions shall have been

satisfied by Landlord.  If the Delivery Conditions have not been satisfied within sixty (60) days after the Anticipated Delivery Date, **subject to day for day extension for Force Majeure or Tenant Delay,** Tenant may cancel this Lease by notifying Landlord prior to satisfaction of the Delivery Conditions with no further obligation hereunder.  In the event Landlord is charged such Late Fee pursuant to subsection (i) above, and payment is not made by Landlord within thirty (30) days of notice from Tenant, Tenant will have the right to collect any or all of the Late Fee together with interest at the rate of twelve percent (12%) annum, by taking a credit against one hundred percent (100%) of Base Rent and Additional Rent commencing on the next installment of rent after such nonpayment by Landlord.  Should Tenant exercise its right as provided above, it will not affect any other rights or remedies available to Tenant for recovery that may be available in equity in the jurisdiction where the Premises are located, but shall be Tenant's sole legal remedy for such late delivery.

2.      Tenant shall have the right, but not the obligation, to enter upon the Premises for all purposes permitted under this Lease from and after the Anticipated Delivery Date specified in Section A.5.a, even if the Delivery Conditions have not been met, provided, however, Tenant's entry into the Premises prior to the Turnover Date shall not interfere with Landlord's Work and any interference caused by Tenant or its agents or contractors shall be deemed a Tenant Delay.  Notwithstanding anything to the contrary contained in this Lease, Tenant's occupation of the Premises for the purpose of commencing Tenant's Work, or for the fixturing and stocking or opening of the Premises to the public for business prior to the performance of all of the Delivery Conditions, shall not cause the Turnover Date to occur or constitute a waiver or acceptance of or relieve Landlord from any of its obligations hereunder, including without limitation, the obligations to complete construction of Landlord's Work as set forth in Exhibit C.

2.   <u>HVAC</u>.  Landlord agrees that the heating, ventilation and air conditioning ("HVAC") system equal to one (1) ton of HVAC for every three hundred-fifty (350) square feet servicing the Premises ("HVAC System") will be a new, fully operational system (pursuant to the requirements set forth in Exhibit C attached hereto) when the Premises are delivered to Tenant.  Landlord shall assign to Tenant, for maintenance purposes only, the benefit of any manufacturer's warranty for the HVAC System.

3.   <u>Signage</u>.

a.      <u>Sign Package</u>.  Tenant's sign package is attached as Exhibit D and made a part of this Lease.  Tenant will place no sign on the exterior of the Premises or on the interior surface of any windows of the Premises (except for Tenant's standard window decal treatment which in no event shall occupy more than fifteen percent [15%] of said window) unless such signage meets the standards set forth in Exhibit D attached hereto.  Exterior signs are to be provided by Tenant, individually lit, of the largest size channel letters allowed by local code (but in no event smaller than **forty-two** inches [**42"**]) in Dollar Tree's registered trademark logo and face color 5121-0 Green by Cero, and are to be located on the store front.  Exterior signage as shown on Exhibit D is hereby approved by Landlord, subject to local codes.  Tenant will have the right to place temporary signage, including pennants, announcing the opening of the new store.  Tenant agrees not to display any other temporary advertising media, to include searchlights or window signs.  Tenant may display banners inside the Premises within two (2)



feet from the front of the Premises as long as such banners are professionally prepared. Tenant shall have the right to change Tenant's signage, provided that such new signage meets local code and has been approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

    b.    <u>Pylon</u>.  Tenant shall have the right to place signage on **the** pylon sign on Lawrenceville Highway, **in the location** shown on Exhibit D, at no additional cost other than manufacture and installation of its panel ("Pylon Requirements") prior to Tenant opening for business. In the event the Pylon Requirements are not satisfied as provided herein, Tenant shall pay rent equal to one-half (1/2) of Base Rent and one hundred percent (100%) of Additional Rent until the Pylon Requirements are satisfied. Tenant's panel on the existing pylon sign of the Shopping Center shall be as shown on Exhibit D attached hereto.

    c.    <u>Maintenance and Removal</u>. Tenant agrees to maintain its signs in good states of repair and save Landlord harmless from any loss, cost, or damage resulting from the signs' condition and shall repair any damage which may have been caused by the erection, existence, maintenance, or removal of such signs. Notwithstanding the foregoing, in the event Landlord performs maintenance or renovations of any area of the Shopping Center or Premises in which Tenant has signs, then Landlord shall be responsible at Landlord's sole cost and expense for any repairs or replacement of the new or old signs and/or sign area that are necessitated by such maintenance or renovations. Upon vacating the Premises, Tenant agrees to remove all signs and repair all damages caused by such removal.

    d.    <u>Landlord Approval</u>. Tenant shall forward Tenant's sign package, including storefront signs and pylon signs (if applicable) ("Tenant's Sign Package"), to Landlord for approval. Landlord shall have fifteen (15) days after Landlord's receipt of Tenant's Sign Package for approval or disapproval of Tenant's Sign Package ("Approval Period"). If Landlord disapproves Tenant's Sign Package within the Approval Period, then Landlord shall notify Tenant in writing of such decision, along with detailed comments regarding such disapproval. If Landlord does not notify Tenant in writing regarding the approval or disapproval of Tenant's Sign Package within the Approval Period, Tenant's Sign Package shall be deemed approved.

4.    <u>Code Compliance</u>.

    a.    Landlord warrants that, to the best of Landlord's knowledge, as of the Turnover Date, the following will be in compliance with all applicable laws, codes, rules, and regulations of any municipality or governmental authority having jurisdiction with respect to the condition of the same ("Applicable Laws"): (i) the building in which the Premises are a part (the "Building") and the Premises; and (ii) to the extent the same affects Tenant's ability to obtain Tenant's required permits and approvals and/or Certificate of Occupancy, the Common Areas (as defined in Section G.1). In addition, in the event it is determined at any time during the Lease Term that the Building, Premises and/or Common Areas are not in compliance with Applicable Laws, Landlord shall act promptly to bring the Building, Premises and/or Common Areas into compliance with such Applicable Laws at Landlord's sole cost and expense and in accordance with Section K.1 of this Lease, unless such work is Tenant's responsibility as set forth herein. In addition, in the event any structural modifications to the Building or the Premises are required by Applicable Laws or governmental, municipality, or insurance regulations, Landlord shall be responsible to perform any such modifications at Landlord's expense, except as hereinafter provided. Notwithstanding anything



contained herein to the contrary, the foregoing shall not apply (and Tenant shall be solely responsible for compliance) to that work to be undertaken by Tenant according to Tenant's plans ("Tenant's Work"), including any subsequent alterations, and Landlord shall not be responsible for compliance with Applicable Laws if the non-compliance is caused by Tenant's Work or alterations or solely by Tenant's specific use or occupancy of the Premises. Nothing contained herein shall negate Landlord's or Tenant's right to challenge any such requirements in administrative and/or judicial proceedings.

b.    In the event Landlord does not act to bring the Premises into compliance with Applicable Laws, to the extent Landlord is required to do so in accordance with the terms of this Lease, and as a result Tenant's ability to operate in the Premises is materially impaired, then if non-compliance continues for fifteen (15) days after notice to Landlord and Landlord is not diligently pursuing completion of such work, Tenant, at Tenant's option, may perform the work necessary and Landlord agrees to reimburse Tenant for all amounts reasonably and actually expended in connection herewith within thirty (30) days after receipt of Tenant's invoice specifying the work performed and the costs. If payment is not made by Landlord within thirty (30) days as set forth in this Section D.4, Tenant will have the right to collect any or all of the amounts due, together with interest at the rate of twelve percent (12%) per annum, by taking a credit against fifty percent (50%) of Base Rent and Additional Rent commencing on the next installment of rent after such nonpayment by Landlord.

5.    Prevailing Criteria. In the event of conflict between Section D and Exhibit C of this Lease, this Section D shall prevail.

E.    RENT

1.    Base Rent and Additional Rent. Tenant agrees to pay to Landlord, at the address noted in Section A.3, or at such place as Landlord may from time to time designate in writing, Base Rent and Additional Rent for the Premises during the Lease Term, as set forth in Sections A.9 and A.10, in advance without demand, deduction or offset (except as otherwise expressly set forth herein) on the first day of each calendar month, except as provided in Section E.2 below. The amounts to be paid by Tenant for Base Rent and Additional Rent shall be pro-rated on a per diem basis for any partial month in the Original Lease Term. In addition, payments as required hereunder shall be payable to Landlord, which shall be one (1) person or one (1) business entity, and which in any event shall be one (1) taxpayer identification number.

2.    Alternate Rent. If at any time during the Lease Term Tenant is entitled to pay Exclusive Alternate Rent, Renegade Alternate Rent, Co-Tenancy Alternate Rent or Alteration Alternate Rent in accordance with Section A.13, Section A.14 or Section W.20 (collectively, "Alternate Rent") in lieu of the full Base Rent and Additional Rent set forth in this Lease, Tenant's payment of such Alternate Rent shall be due and payable within fifteen (15) days following the end of each month for the entire period that the payment of such Alternate Rent applies. Tenant's payment of such Alternate Rent shall be accompanied by a written statement signed by Tenant and certified by it to be true and correct, showing the amount of Gross Sales (hereinafter defined) during the preceding month. For the purpose of this Section, the term "Gross Sales" shall mean the aggregate gross amount of all sales of merchandise made and all charges for services performed in the Premises (including orders taken in the Premises for delivery from places other than the Premises), whether wholesale or retail, and whether cash or credit, and including the value of all non-monetary consideration received for any of the foregoing, and all amounts received by Tenant from conducting business on or from the Premises, including without limitation, all display fees, slotting allowances, promotional

considerations, rebates or other payments received by Tenant to stock, promote or advertise any product, less (i) cash refunds or credit for merchandise returned if the price of such merchandise was originally included in Gross Sales; (ii) the amount of sales taxes and excise taxes to the extent included in sales; (iii) the amount of any governmental rebates; and (iv) the amount of sales representing uncollectible checks or uncollectible credit or charge accounts. Merchandise transferred from the Premises to other stores of Tenant, or merchandise returned for credit to factories or jobbers shall not be included in determining Gross Sales.

3.      Tenant shall keep accurate records showing in detail all of its Gross Sales for Alternate Rent periods only, from the Premises. Such Gross Sales shall be subject to audit by Landlord or an audit firm of Landlord's choice, at Landlord's expense. These records shall, upon demand and after reasonable notice, be made available during normal business hours at the address designated by Tenant for inspection by Landlord. Landlord shall keep such information confidential, except in connection with any proceeding regarding same between Landlord and Tenant. Landlord shall pay all costs in connection with any audit by Landlord, unless Tenant has understated Gross Sales by more than five percent (5%), in which event the reasonable cost of such audit shall be borne by Tenant. Subject to the limitations set forth in Section E.2 above, each party shall also immediately pay to the other party any over or underpayment **shown by the audit** of Exclusive Alternate Rent, Renegade Alternate Rent, Co-Tenancy Alternate Rent or Alteration Alternate Rent occasioned by such under reporting or over reporting of Gross Sales.

4.      Refund. In the event Tenant exercises its termination rights as provided in Section A.13 (Exclusive Use), Section A.14 (Co-Tenancy), or Section P.2 (Default by Landlord) hereof, then Landlord shall promptly refund to Tenant all unearned Base Rent, Additional Rent, or any other amount prepaid by Tenant under this Lease.

5.      Late Fees. If Tenant fails to pay any installment of Rent or any other sum payable to Landlord when due, Landlord shall have the right to accrue interest at the rate of twelve percent (12%) percent per annum on such unpaid amount, compounded monthly, from the date such payment was due until such payment is made. Any of Tenant's checks returned unpaid by Landlord's bank shall be subject to a fee equal to the greater of $35.00 or the actual fee charged by Landlord's bank.

F.    TAXES

1.      Real Estate Taxes and Assessments. Intentionally Deleted.

2.      Procedure for Payment. Intentionally Deleted.

3.      Municipal, County, State, or Federal Taxes. Tenant shall pay, before delinquent, all municipal, county, state, or federal taxes assessed against Tenant's fixtures, furnishings, equipment, stock-in-trade, or other personal property owned by Tenant in the Premises.

4.      Other Taxes. Should any governmental taxing authority levy, assess, or impose any tax, excise, or assessment (other than income, inheritance, gift, or franchise tax) upon or against the rentals payable by Tenant to Landlord, by way of substitution for or in addition to any existing tax on land and buildings, Tenant shall be responsible for and shall pay any such tax, excise, or assessment, or shall reimburse Landlord for the amount thereof, as the case may be.

5.      Conveyance. Intentionally Deleted.



G.   COMMON AREAS

    1.   Common Areas. Landlord grants to Tenant and Tenant's invitees the right to use for their intended purposes, in common with all others to whom Landlord has or may hereafter grant rights to use same, the Common Areas located within the Shopping Center. The term "Common Areas," as used in this Lease, shall mean the parking areas, roadways, pedestrian sidewalks, common loading docks and delivery areas, landscaped areas, service courts, fire corridors, and all other areas or improvements which may be provided by Landlord for the common use of the tenants of the Shopping Center. Landlord shall operate, equip, light, repair, and maintain said Common Areas for their intended purposes in an efficient and economical manner consistent with the operation of a first-class shopping center. However, Landlord hereby reserves the following rights with respect to the Common Areas:

        a.   Rules and Regulations. To establish reasonable rules and regulations for the use thereof which shall be uniformly enforced;

        b.   Use. To use, or to permit or prohibit occupants of Shopping Center to use, the Common Areas for promotional activities, provided, however, in no event shall any such promotional activities be located within the "No Build Area" as shown on Exhibit A or materially interfere with Tenant's business operations, parking or customer access, or close any portion of the Common Areas which would affect Tenant's business operations; and

        c.   Closings. To close all or any portion thereof as may be deemed necessary by Landlord's counsel to prevent a dedication thereof or the accrual of any rights to any person or the public therein.

    2.   Common Area Maintenance Charge. Intentionally Deleted.

    3.   Common Area Maintenance Exclusions. Intentionally Deleted.

    4.   Procedure for Payment. Intentionally Deleted.

H.   UTILITIES AND RUBBISH DISPOSAL

    1.   Utilities.

        a.   Maintenance. Commencing on the Turnover Date, Landlord shall provide and maintain all necessary pipes, mains, conduits, wires, and cables leading to the Premises for water, sewer, gas, electricity, and telephone service that are not otherwise provided and maintained by their respective service provider.

        b.   Tenant's Responsibilities. Prior to Tenant commencing business operations from the Premises, Tenant shall at Tenant's sole cost and expense, have all utilities serving the Premises (electric, gas, water, sewer, and telephone) placed in Tenant's name and Tenant shall be responsible for the payment of all utility bills directly to the provider.

        c.   Landlord's Responsibilities. Notwithstanding the foregoing, Tenant will not be responsible for the cost of any tax-based utility tap fees, cost of meter installation, or any other cost which may be levied by a utility other than those charges specifically related to establishing service in Tenant's name and Tenant's consumption of such utility. Such cost shall be the sole responsibility of Landlord.

2.   <u>Rubbish Disposal</u>.   Landlord will provide Tenant an area **in close proximity to the Premises for the location of shared trash container and a shared compactor for cardboard as shown on Exhibit A-2 attached hereto. Landlord contracts with a third-party vendor for removal of trash and cardboard. Tenant's share of waste removal costs will be billed directly to Tenant by the waste removal vendor on a monthly basis. If additional or increased waste removal services are required for Tenant's operations at the Premises, such services shall be provided by Landlord's waste removal vendor, and Tenant shall pay its share, as billed by the waste removal vendor, of any additional cost for such additional or increased services. Landlord shall use commercially reasonable efforts to ensure the fees charged by its waste removal vendor are reasonably competitive with other vendors in the market. If required by code, Landlord agrees to construct a trash enclosure sufficient for Tenant's compactor and dumpsters.** In addition, Tenant agrees to:

   a.   <u>Proper Containers</u>.  Keep any of Tenant's refuse in proper containers until the same is removed from the Shopping Center and to permit none of Tenant's refuse to accumulate around the exterior of the Premises; and

   b.   <u>Regulations</u>.  Handle and dispose of all of Tenant's rubbish, garbage, and waste in accordance with regulations established by Landlord and not permit the accumulation (unless in sealed metal containers) or burning of any of Tenant's trash, rubbish, refuse, garbage, or waste materials in, on, or about any part of the Shopping Center.

   In no event shall Landlord be liable for the quality, quantity, failure, or interruption of the foregoing utility or rubbish disposal services to the Premises unless caused by Landlord's negligent or willful acts.

3.   <u>Trash Compactor.</u> **Intentionally Deleted.**

I.   USE OF PREMISES BY TENANT

   1.   <u>Use of Premises</u>.  Tenant's use of Premises will be for the Permitted Use as set forth in Section A.2.

   2.   <u>Operation of Business</u>.   The following shall govern Tenant's operations within the Premises:

      a.   Tenant agrees to open for business in the Premises under the trade name "Dollar Tree" fully fixtured, stocked and staffed for the Permitted Use no later than the Rent Commencement Date.

      b.   <u>Discontinuance of Operations</u>. Notwithstanding any provision in this Lease to the contrary, it is expressly acknowledged by Landlord that other than Tenant's covenant to initially open for business as set forth above this Lease contains no implied or express covenant for Tenant to conduct business in the Premises, continuously or otherwise, subject to the terms and conditions of this Lease. In the event Tenant discontinues operating in the Premises (excluding, however, an Exempted Discontinuance of operations, as defined in Section I.2.c), and such discontinuance continues for thirty (30) consecutive days, Landlord may, at any time thereafter during the Lease Term, elect to terminate this Lease and regain possession of the Premises by written notice to Tenant (the "Termination Notice"), in which event this Lease shall terminate as to all obligations of the parties which would accrue thirty (30) days after the date of receipt of the Termination Notice. Tenant shall give Landlord advance notice of any intended

discontinuance of operations from the Premises as soon as would be reasonable for Tenant to do so, considering Tenant's need to keep such decision confidential.   However, unless Landlord terminates this Lease and takes possession as provided above, Tenant shall be obligated to fulfill all of its obligations under this Lease, including payment of Base Rent and Additional Rent until the end of the Lease Term with respect to this Section I.2.

c.   Exempted Discontinuances.  The following discontinuances of operations shall be exempted from the applicability of Landlord's right to terminate hereunder ("Exempted Discontinuance"): (i) any good faith discontinuance occasioned by a Force Majeure event as defined in Section W.13; (ii) cessation of operations not to exceed ninety (90) days in connection with a transfer of possession caused by a permitted assignment or sublet; (iii) any discontinuance not to exceed thirty (30) days in connection with a remodeling; or (iv) a period not to exceed three (3) days per year to conduct inventory.

d.   Tenant shall be permitted to stock the Premises at night.

J.   LANDLORD ACCESS

Tenant agrees to permit Landlord free access to the Premises at all reasonable times after notice to Tenant (except in the event of an emergency when no prior notice shall be required) for the purpose of examining the same or making alterations or repairs to the Premises that Landlord may deem necessary for the safety or preservation thereof or to show the Premises to potential lenders or purchasers.  Tenant agrees to permit Landlord or its agents, during the last one hundred eighty (180) days of the Lease Term, to show the Premises to potential tenants.

K.   REPAIRS AND ALTERATIONS

1.   Repairs by Landlord.  As of the Effective Date, Landlord shall keep the foundations, roof, floor slab, and structural portions of the Premises in good repair.  Tenant shall give Landlord written notice of the necessity for repairs coming to the attention of Tenant, following which Landlord shall commence such repairs within fifteen (15) days of receipt of notice as provided in Section Q and shall have a reasonable time to complete such repairs.  Notice from Tenant of the need for Landlord to perform a repair to the Premises shall not be a condition to Landlord commencing such repair if Landlord has actual knowledge of the need for repairs.  The provisions of this subsection shall not apply in the case of damage or destruction by fire or other casualty or by Eminent Domain (as defined in Section O.1 of this Lease), in which event either Section M or O shall control the obligations of Landlord hereof.  Notwithstanding the foregoing and further notwithstanding the waiver of subrogation as provided in Section L.6 hereof, if Landlord shall fail to commence repairs as provided herein or as provided in Section M hereof, then Landlord shall be liable for any damage to property or other loss thereby sustained by Tenant.  Other than emergency repairs or repairs required by law, Landlord shall not perform construction or alterations to any exterior portion of the Premises or in the No Build Area during the months of October, November or December without the prior written consent of Tenant, which consent shall not be unreasonably withheld, conditioned or delayed.

a.   Emergency Repairs.   Notwithstanding the foregoing, in the event of an emergency which would affect the health, safety, and welfare of Tenant's employees or customers, Tenant may make, but shall not be required to make, such emergency repairs to the Premises as Tenant deems reasonably necessary to protect Tenant's employees and/or customers and property.  Tenant will notify Landlord as soon as possible as to what repairs were made and the cost to affect such repairs.  Landlord agrees to reimburse Tenant within thirty (30) days after Landlord's receipt of a breakdown for such reasonable and actual costs incurred

by Tenant for such repairs. If Landlord fails to reimburse Tenant within such thirty (30) days, Tenant shall have the Right of Offset, as provided below, until Tenant has recovered the cost of such emergency repairs.

b.  Right of Offset. If Landlord fails to reimburse Tenant for emergency repairs as provided above, then Landlord agrees that Tenant shall offset against fifty percent (50%) of the Base Rent and Additional Rent ("Right of Offset") until Tenant has recovered the full amount of all reasonable costs incurred by Tenant to make such emergency repairs, together with interest at the rate of twelve percent (12%) per annum.

c.  Rights of Recovery. Should Tenant exercise Tenant's Right of Offset as provided hereunder, Tenant shall be deemed to have waived any other rights or remedies that may be available to Tenant at law or in equity in the jurisdiction where the Premises are located.

d.  HVAC System. The HVAC System is owned by and is the property of Landlord. **See Section K.2.b for Tenant's obligations related to the HVAC System.**

e.  Tenant's Portion of Construction. It is expressly understood that Landlord shall not be responsible for any portions of the Premises constructed by Tenant.

2.  Repairs by Tenant. Except as provided in Section K.1, Tenant shall keep:

a.  Premises. The Premises and any fixtures, facilities or equipment contained therein in good condition and repair, including, but not limited to, exterior and interior portions of all doors, windows, plate glass, and showcases surrounding the Premises, the HVAC System, electrical, plumbing (excluding any repair to the fire sprinkler system, the monitoring panel, sub-panel and any other fire sprinkler equipment) and sewer systems, the exterior doors, window frames, and all portions of the store front area, and shall make any replacements thereof of all broken and/or cracked plate and window glass which may become necessary during the Lease Term, excepting any repairs to items of Landlord's original construction made necessary by reason of damage due to fire or other casualty covered by standard fire and extended coverage insurance.

b.  HVAC System. The HVAC System is owned by and is the property of Landlord. During the Lease Term, Tenant shall, at its sole cost and expense, maintain a service contract for and perform routine performance of standard HVAC System maintenance on a quarterly basis. Within fifteen (15) days of Landlord's written request, Tenant shall provide Landlord with a copy of the foregoing HVAC System service contract. Tenant shall be responsible for the repair and/or replacement of the HVAC System unless such repair and/or replacement is necessitated due to Landlord negligence or a casualty covered by Landlord's insurance as such insurance is required under this Lease. Landlord shall assign to Tenant any HVAC warranties.

3.  Alterations or Improvements by Tenant. Tenant shall be permitted to make any interior, nonstructural alterations to the Premises without Landlord's prior written consent. Tenant shall obtain all necessary permits for such alterations and improvements and shall make such alterations and improvements in accordance with the applicable laws, building codes and ordinances in a good workmanlike manner. Tenant agrees to indemnify Landlord against any mechanic's lien or other liens or claims in connection with the making of such alterations, additions, or improvements. Tenant shall promptly repair any damages to the Premises or Building caused by any alterations, additions, or improvements to the Premises by Tenant. Notwithstanding anything else contained in

this Lease, except for the limitations of Section I.2.c. Landlord agrees that such alterations or improvements may require that the business conducted in the Premises discontinue during such construction.

4. <u>Removal of Improvements</u>. All items of Landlord's construction, all heating and air conditioning equipment, and all alterations, additions, wall coverings, and other improvements by Tenant shall be the property of Landlord and shall not be removed from the Premises. All trade fixtures, furniture, furnishings, and signs installed in the Premises by Tenant and paid for by Tenant shall remain the property of Tenant and shall be removed upon the expiration of the Lease Term; provided (a) that any of such items as are affixed to the Premises and require severance may be removed only if Tenant repairs any damage caused by such removal, and (b) that Tenant shall have fully performed all of the covenants and agreements to be performed by Tenant under the provisions of this Lease. If Tenant fails to remove such items from the Premises within ten (10) days of the expiration or earlier termination of this Lease, all such trade fixtures, furniture, furnishings, and signs shall become the property of Landlord. Landlord shall have the right to remove same and sell such trade fixtures, furniture, furnishings, and signs to pay for the cost of removal.

L. INDEMNITY AND INSURANCE

1. <u>Indemnification by Tenant</u>. Except to the extent caused by Landlord's negligence, Tenant will indemnify and hold Landlord harmless from and against all loss, cost, expense, and liability resulting or occurring by reason of Tenant's construction, use, or occupancy of the Premises or by reason of Tenant's breach of any representations and warranties made by Tenant contained in this Lease or Tenant's operation and maintenance of the Premises (including Landlord's costs of defending any action, such cost to include reasonable attorneys' fees and costs).

2. <u>Indemnification by Landlord</u>. Except to the extent caused by Tenant's negligence, Landlord will indemnify and hold Tenant harmless from and against all loss, cost, expense, and liability resulting or occurring by reason of Landlord's construction, use, or occupancy of the Shopping Center (excluding the Premises to the extent not caused by Landlord's negligence) or by reason of Landlord's breach of any representations and warranties made by Landlord contained in this Lease or Landlord's operation and maintenance of the Shopping Center (excluding the Premises to the extent not caused by Landlord's negligence) and Common Areas (including Tenant's costs of defending any action, such costs to include reasonable attorneys' fees and costs).

3. <u>Tenant's General Liability Insurance</u>. Tenant, at Tenant's expense, shall carry general commercial liability insurance issued by a carrier licensed to issue policies in the State of Georgia, covering the Premises and Tenant's use thereof, with a minimum limit of One Million Dollars ($1,000,000) for any casualty resulting in bodily injury, death, or property damage for each occurrence and a minimum limit of Two Million Dollars ($2,000,000) general aggregate and an umbrella policy with a minimum additional coverage of One Million Dollars ($1,000,000). Tenant shall provide certificates of such coverage to Landlord prior to the date of any use or occupancy of the Premises by Tenant; said certificate shall name Landlord, and if requested by Landlord in writing, Landlord's mortgagee, as additional insureds, as their interests may appear, under such insurance policy; and the insurer agrees to notify Landlord and such other parties designated by Landlord as additional insureds not less than ten (10) days in advance of any substantial modification or cancellation thereof. If the Tenant is no longer the original Tenant under this Lease and has not assigned or sublet the Lease to an Affiliated Corporation (defined in Section N.3), Landlord may require an increase in limits of liability for the successor Tenant so long as such limits are consistent with the requirements of prudent landlords in the metropolitan Atlanta area. In such instance, Landlord may also require the successor

Tenant to carry its policies with an insurance carrier with an A.M. Best Rating of at least A-/X.

4.   Landlord's Insurance.

a.   Property Insurance. Landlord agrees to carry policies insuring the improvements on the Shopping Center and Common Areas, to include, but not to be limited to vandalism of the HVAC System, fire and such other perils as are normally covered by special coverage endorsements in the county where the Premises are located, in an amount equal to at least eighty percent (80%) of the insurable value of such improvements ("Property Insurance"). Tenant shall have no rights in said policy or policies maintained by Landlord and shall not be entitled to be a named additional insured thereunder.

b.   Tenant's Proportionate Share. Intentionally Deleted.

c.   Liability Insurance. Landlord, at Landlord's expense, shall carry general commercial liability insurance covering the Shopping Center and Common Areas with a minimum limit of One Million Dollars ($1,000,000) for any casualty resulting in bodily injury, death, or property damage for each occurrence and a minimum limit of Two Million Dollars ($2,000,000) general aggregate. Landlord shall provide certificates of such coverage to Tenant prior to the date of any use or occupancy of the Premises by Tenant; said certificate shall name Tenant as an additional insured, as its interests may appear, under such insurance policy; and the insurer agrees to notify Tenant and such other parties designated by Tenant as additional insureds not less than ten (10) days in advance of any substantial modification or cancellation thereof

5.   Self-insure. Tenant **(but not any subtenant or assignee excluding any affiliated corporation of Tenant)** shall have the right to self-insure its leasehold improvements, inventory, fixtures, equipment, and plate glass in the Premises during the Lease Term so long as Tenant shall have a tangible net worth of at least Ten Million Dollars ($10,000,000). At Landlord's written request, Tenant shall furnish Landlord with an Annual Report evidencing such net worth if Landlord cannot access the Annual Report and other financial data on Tenant's web site at www.dollartree.com.

6.   Mutual Waiver. Tenant hereby waives any claim against Landlord for property damage occurring in the Premises and Tenant shall ensure that Tenant's all-risk insurer shall waive its rights of subrogation against Landlord for property damage occurring in the Premises, and in consideration thereof, Landlord waives any claim against Tenant for property damage occurring in the Shopping Center (excluding the Premises) and Common Areas and Landlord shall ensure that Landlord's all-risk insurer shall waive its rights of subrogation against Tenant for property damage occurring in and to the Shopping Center (excluding the Premises) and Common Areas.

M.   DAMAGE AND DESTRUCTION

1.   Partial Damage. In the event the Premises are damaged to an extent which is less than fifty percent (50%) of the cost of replacement of the Premises, the damage shall, except as hereinafter provided, promptly be repaired by Landlord, at Landlord's expense, and such repairs shall commence not later than forty-five (45) days after such casualty and shall be completed within one hundred fifty (150) days after commencement of repairs. In the event the Premises are damaged less than fifty percent (50%) of the cost of replacement of the Premises in the last two (2) years of any Lease Term, Landlord or Tenant shall have the right to terminate this Lease; however, if Landlord can repair the damage and return the Premises to Tenant so that there is a minimum of thirteen and

one-half (13½) months remaining on the Lease Term, then Tenant shall not have the right to terminate this Lease. If Landlord elects to terminate this Lease as provided above, then Tenant can negate Landlord's election to terminate this Lease by exercising early its upcoming Renewal Term, provided there is at least one additional Renewal Term remaining under this Lease. If this Lease is not terminated as provided herein and Landlord does not complete the required repairs and deliver the Premises to Tenant within one hundred fifty (150) days after commencement of repairs, then regardless of the time remaining in the Lease Term, Tenant shall have the option to terminate this Lease by providing written notice to Landlord **prior to completion of repairs**, in which event this Lease shall terminate thirty (30) days after Landlord's receipt or rejection of written notice from Tenant.

2.  Total Damage. In the event (a) the Premises are damaged to the extent of fifty percent (50%) or more of the cost of replacement of the Premises or (b) the buildings in the Shopping Center are damaged to the extent of fifty percent (50%) or more of the cost of replacement, notwithstanding the extent of damage to the Premises, then either Landlord or Tenant (but as to Tenant, only if Landlord cannot complete restoration of the Premises or Shopping Center, as applicable, within two hundred seventy (270) days of the casualty as estimated by Landlord's architect) may elect to terminate this Lease upon giving notice of such election in writing to the other within thirty (30) days after the event causing the damage. If this Lease is not terminated as provided for above, Landlord will commence the repairs or rebuilding not later than forty-five (45) days after the casualty and complete such repairs within two hundred seventy (270) days after commencement of such repairs. If this Lease is not terminated as provided herein and Landlord does not complete the required repairs and deliver the Premises to Tenant within two hundred seventy (270) days after commencement of repairs, then Tenant shall have the option to terminate this Lease by providing written notice to Landlord prior to completion of repairs, in which event this Lease shall terminate thirty (30) days after Landlord's receipt or rejection of written notice from Tenant.

3.  Repair. If Landlord is required to repair under Section M.1, or has elected to repair under Section M.2, and provided that this Lease has not been terminated as provided in Sections M.1 and M.2, then Tenant shall repair or replace as needed its stock-in-trade, trade fixtures, furniture, furnishings, equipment, and personal property in a manner and to at least a condition equal to that prior to its damage or destruction and open for business promptly after restoration.

4.  Abatement of Rent. If the casualty, repairing, or rebuilding shall render the Premises untenable, in whole or in part, a proportionate abatement if a partial casualty or full abatement if a total casualty, of the Base Rent and Additional Rent shall be allowed until the date Landlord completes the repairs or rebuilding and Tenant has a reasonable time, not to exceed ninety (90) days from delivery by Landlord, to complete Tenant's required build out and open for business.

N.  ASSIGNING AND SUBLETTING

1.  Tenant's Rights. Subject to the provisions of Section N.2 below, Tenant shall have the right, without Landlord's consent, to assign this Lease or to sublet the whole Premises at any time provided that notice is given to Landlord within thirty (30) days after such assignment or sublet, and further provided that:

    a.  Tenant will remain liable hereunder;

    b.  Tenant's assignee or sub-tenant will assume all obligations under this Lease; and



c. The Premises will continue to be used only for retail sales consistent with the Permitted Use clause.

2. <u>Consent of Landlord</u>. In the event of any assignment or sublet involving a material change in the Permitted Use, Tenant shall not enter into any assignment or sublet without the prior written consent of Landlord, which consent shall not be unreasonably withheld, delayed, or conditioned. The use of such sublet or assignment shall be for any lawful retail use, as reasonably approved by Landlord, which does not violate any recorded restriction, any existing exclusives of other tenants or any primary use of any other tenants at the time of such assignment or sublet. Landlord's consent to the assignment or subletting shall not waive the requirements that Landlord's consent be obtained for further assignment or sublets. Notwithstanding anything to the contrary contained in this Section N, in the event of an assignment of this lease or sublet of the whole or any part of the Premises in accordance with this Section N.2, Tenant shall remain liable under this Lease, for the performance of each and every covenant herein contained binding upon Tenant, including the payment of Base Rent, Additional Rent and any other sum due under this Lease.

3. <u>Affiliated Corporation</u>. Notwithstanding anything to the contrary contained herein, Tenant may assign this Lease or sublet all or part of the Premises to an "Affiliated Corporation" (as defined herein) without Landlord's consent, but such assignment or subletting shall not be effective until Landlord has been notified as required hereunder. For purposes of this provision, an "Affiliated Corporation" means (i) Tenant's parent corporation, (ii) a corporation owned or controlled by Tenant's parent corporation, (iii) a wholly-owned subsidiary of Tenant, or (iv) a corporation which acquires all or a majority of the outstanding stock of Tenant.

a. In the event of a sublease to an Affiliated Corporation, Tenant shall, notwithstanding such sublease, remain fully liable for performance of the obligations under the terms of this Lease.

b. In the event of assignment to an Affiliated Corporation, the assignee shall expressly assume for the benefit of Landlord the obligations of Tenant under this Lease. However, Tenant shall guarantee the assignee's performance under this Lease.

Tenant shall provide written notice to Landlord of any transfer to an Affiliated Corporation within thirty (30) days of its effective date.

O. EMINENT DOMAIN

1. <u>Condemnation Award</u>. In the event the Shopping Center or any part thereof shall be taken or condemned either permanently or temporarily for any public or quasi-public use or purpose by any authority in appropriate proceedings or by any right of eminent domain ("Eminent Domain"), the entire compensation award thereof shall belong to Landlord, without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby assigns to Landlord all its right, title, and interest to any such award. Tenant shall have the right to recover such compensation as may be awarded for moving and relocating expenses.

2. <u>Rights of Termination</u>. In the event of a taking under the power of Eminent Domain of (a) more than twenty-five percent (25%) of the Premises or (b) a sufficient portion of the Shopping Center so that after such taking less than fifty percent (50%) of the Shopping Center GLA (as constituted prior to such taking) are occupied by tenants, either Landlord or Tenant shall have the right to terminate this Lease by notice in writing given within



thirty (30) days after the condemning authority takes possession, in which event all Base Rent and Additional Rent shall be pro-rated as of the date of such termination.

3.   Restoration. In the event of a taking of any portion of the Premises not resulting in a termination of this Lease, Landlord shall use as much of the proceeds of Landlord's award for the Premises as is required therefore to restore the Premises to a complete architectural unit and this Lease shall continue in effect with respect to the balance of the Premises, with a reduction of Base Rent and Additional Rent in proportion to that portion of the Premises taken.

## P.   DEFAULT AND REMEDIES

1.   Default by Tenant.

a.   Financial Default. Tenant shall be in financial default beyond any written notice and cure period if it fails to pay when due each installment of Base Rent or Additional Rent.

b.   Notice of Financial Default. In the event Tenant is in financial default, Tenant shall have a grace period of ten (10) days to cure such default after Tenant shall have received notice of such default in accordance with Section Q of this Lease; provided, that Landlord receives payment through ACH transaction. If Tenant does not elect to send payment through ACH transaction then Landlord shall not be required to give notice of late rent more than three (3) times in a calendar year and any subsequent failure to pay shall be a default without the requirement of notice.

c.   General Default. Tenant shall be in general default beyond any written notice and cure period if it shall fail to keep or shall violate any other conditions, stipulations, or agreements contained herein on the part of Tenant to be kept and performed.

d.   Notice of General Default. In the event Tenant is in general default, it shall have a grace period of thirty (30) days to cure such default after Tenant shall have received notice of such default in accordance with Section Q of this Lease. Notwithstanding the foregoing, the default hereunder shall be deemed cured if Tenant in good faith commences performance requisite to cure same within thirty (30) days after receipt of notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such default.

e.   Landlord's Remedies. In the event Tenant is in either financial or general default beyond any applicable notice and cure period, Landlord, at its option may:

1)   Terminate this Lease and Tenant's right of possession of the Premises, and recover damages to which Landlord is entitled as a result of Tenant's breach. These damages include, but are not limited to: (a) any existing arrearage; (b) all costs and expenses (including reasonable attorneys' fees and court costs) incurred by Landlord in enforcing its rights under this Lease, or (c) all expenses of reletting the Premises (including reasonable repairs, legal fees and brokerage commissions); or

2)   Terminate Tenant's right of possession of the Premises without terminating this Lease, in which event Landlord may, but shall not be obligated to, relet all or part of the Premises for the account of Tenant, for such rent and term and upon such terms and conditions as are acceptable to Landlord. Landlord may, at its option, enter the Premises

as the agent of Tenant, and without being liable for any claim for trespass or damages therefor, and in connection therewith, re-key the Premises, remove Tenant's signs and other evidences of tenancy, and take and hold possession of the Premises; provided, however, that such entry and possession shall not terminate this Lease or release Tenant, in whole or in part, from Tenant's obligation to pay all Base Rent, Additional Rent and other charges provided in this Lease for the full Lease Term, or from any other obligation of Tenant under this Lease.   Upon such reentry, Landlord is authorized to repair the Premises to the condition in which Tenant received on the Turnover Date.   Until Landlord relets the Premises, Tenant shall continue to pay Landlord all Base Rent, Additional Rent and other charges provided in this Lease for the full Lease Term, or from any other obligation of Tenant under this Lease.   If and when the Premises are relet and a sufficient sum is not realized from such reletting, after payment of all Landlord's expenses of reletting (including cost to repair the Premises back to the condition in which Tenant received on the Turnover Date, legal fees and brokerage commissions), to satisfy the payment of Base Rent and other charges payable under this Lease for any month, Tenant shall pay Landlord the deficiency monthly upon demand.   Tenant agrees that Landlord may file suit to recover any sums due to Landlord under this Section P.1.e. from time to time and that the filing of a suit or the recovery of any amount due Landlord shall not be any defense to any subsequent action brought for any amount not previously reduced to judgment in favor of Landlord.

No remedy provided in this Lease otherwise available to Landlord under law shall be considered exclusive of any other remedy, and every remedy provided to Landlord in this Lease, at law or in equity may be exercised from time to time as often as occasion may arise. Landlord's failure or delay to exercise any remedy following a default by Tenant shall not impair any such remedy, or be construed to be a waiver of such default. In particular, the receipt by Landlord of rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach, and no provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and signed by Landlord.

f.     Re-entry.  In addition to all other rights granted to Landlord under this Lease, or under prevailing law, if Tenant shall be in default beyond any written notice and cure period, Landlord, its agents or employees may immediately or any time hereafter re-enter the Premises and remove Tenant's agents, any subtenants, any licensees, any concessionaires and any invitees, and any of its or their property from the Premises, provided Landlord has an appropriate court order. Re-entry and removal may be effectuated by summary dispossession proceedings, by any suitable action or proceeding at law, by force, or otherwise. Landlord shall be entitled to the benefits of all provisions of law respecting the speedy recovery of lands and tenements held over by Tenant or proceedings in forcible entry and detainer.  Tenant's liability under the terms of this Lease shall survive Landlord's re-entry, the institution of summary proceedings, and the issuance of any warrants with respect thereto.

2.     Default by Landlord.  Landlord shall be in default if Landlord fails to perform any of Landlord's obligations or if Landlord breaches any representations or warranties contained in this Lease and fails to cure same within thirty (30) days after Landlord shall have received notice of default from Tenant; provided, however, if the default cannot reasonably be cured within such thirty (30) day period, Landlord shall not be in default so long as Landlord commences cure within such thirty (30) day period and diligently

prosecutes same to completion. Upon such uncured default, Tenant shall have all remedies specified in this Lease in addition to any other remedies available to Tenant at law or in equity in the jurisdiction where the Premises are located.

3.  Failure to Exercise Rights. No delay or omission by Landlord or Tenant to exercise any right or power accruing upon any noncompliance or default by Tenant or Landlord with respect to any of the terms hereof, shall impair any such right or power or be construed to be a waiver thereof. A waiver by Landlord or Tenant of any of the covenants and agreements hereof to be performed by Tenant or Landlord shall not be construed to be a waiver of any subsequent breach thereof or of any covenant or agreement herein contained.

4.  Sums in Dispute. The withholding, deducting or offsetting by either party, or failure to pay rent by Tenant, pursuant to a bona fide dispute between Landlord and Tenant shall not be deemed a default by the non-paying party under the provisions of this Lease if such withheld deductions, offset right or non-payment of rent is expressly allowed pursuant to the provisions of this Lease; provided, however, in such event this disputed amount shall be placed into escrow with a mutually agreed upon third party pending resolution of the dispute.

Q.  NOTICES

1.  Proper Notice. Any notice or consent required to be given by or on behalf of either party to the other shall be given in writing to the address stated in Section A.3 of this Lease and shall be deemed given and effective: (a) upon signed receipt (or refusal to sign or accept such notice) if personally delivered; or (b) upon signed receipt of a notice (or refusal to sign or accept such notice) sent by certified or registered mail, return receipt requested and postage prepaid; or (c) upon signed receipt of a notice (or refusal to sign or accept such notice) sent by a nationally recognized overnight courier that provides verification of receipt. Landlord shall not mail or deliver any notice or consent to the Premises that is required to be given by or on behalf of Landlord; furthermore, in the event Landlord does mail or deliver such notice or consent to the Premises, proper notice shall not be deemed to have occurred. In addition, any notice to or from Landlord (as the case may be) as required by this Lease shall be sent to or from Landlord (as the case may be) as identified in Section A.3 hereof, which shall be one (1) person or one (1) business entity, and which in any event shall be one (1) taxpayer identification number.

2.  Change of Address. Either party's address as shown in Section A.3 may be changed from time to time by such party giving written notice to the other party of the new address.

3.  Service of Process. Notwithstanding anything to the contrary in the Lease or applicable law, (a) service of process ("Service") related to any action or proceeding under this Lease or related to the Premises shall not constitute valid Service upon Tenant if made by serving Tenant at the Premises, and (b) Service upon Tenant shall only be valid if such Service is served upon Tenant through Tenant's Registered Agent for such Service in the state in which the property is located. As of the date hereof, Tenant's Registered Agent for Service in Georgia is: CT Corporation System, 1201 Peachtree Street, NE, Atlanta, GA 30361. Tenant agrees to provide written notice to Landlord as provided in Section Q of any change in its Registered Agent for Service at least ten (10) days prior to such change.

R.  MORTGAGE SUBORDINATION



Landlord is the fee simple owner of the Shopping Center. This Lease is and shall at all times, unless Landlord shall otherwise elect, be subject and subordinate to all easements and encumbrances now or hereafter affecting the fee title of the Shopping Center and to all mortgages, deeds of trust, financing or refinancing in any amounts which may now or hereafter be placed against or affect any or all of the land or any or all of the building and improvements now or at any time hereafter constituting part of the Shopping Center. Notwithstanding the foregoing, any successor to Landlord's interest in the Premises, including any ground lessor or holder of any mortgage or deed of trust, or to any purchaser at foreclosure (or by deed in lieu of foreclosure) shall, so long as Tenant is not in material default under this Lease beyond applicable notice and cure periods, recognize and accept this Lease and all terms, conditions, and obligations of Landlord contained herein. Tenant also agrees that any mortgagee or trustee may elect to have this Lease deemed prior to the lien of its mortgage or deed of trust, and upon notification by such mortgagee or trustee to Tenant to that effect, this Lease shall be deemed prior in lien to the said mortgage or deed of trust, whether this Lease is dated prior to or subsequent to the date of said mortgage or deed of trust. Tenant agrees that if Landlord's mortgagee or trustee requests confirmation of such subordination, within twenty (20) days after receipt of written request therefor, Tenant shall execute and deliver whatever instruments (including but not limited to a Memorandum of Lease and/or a Non-Disturbance and Attornment Agreement in recordable form) as may be required for such purposes to carry out the intent of this Section R. Notwithstanding the foregoing, after the second Subordination Request in any twelve (12) consecutive month period, it is agreed that Landlord shall pay Tenant the sum of Two Hundred Fifty Dollars ($250.00) for each such additional Subordination Request within said twelve (12) month period as an administrative charge for the processing of the subordination instrument. Notwithstanding anything herein to the contrary, processing of the subordination instrument shall not commence prior to receipt of the required administrative charge, which is due and payable at the time of such subsequent Subordination Request.

S.   ESTOPPEL CERTIFICATES

At any time and from time to time, subject to the terms and conditions of this Section S, Tenant agrees, within twenty (20) days after receipt of written request from Landlord, to execute and deliver to Landlord for the benefit of such persons as Landlord designates in such request, a statement in writing on a form provided by Tenant, certifying to the following, to the extent they are true: (a) that this Lease constitutes the entire agreement between Landlord and Tenant and is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications); (b) the dates to which the Base Rent, Additional Rent, and other charges hereunder have been paid; (c) that the Premises have been completed on or before the date of such letter and that all conditions precedent to this Lease taking effect have been carried out; (d) that Tenant has accepted possession, that the term of this Lease has commenced, that Tenant is occupying the Premises, that Tenant knows of no default under this Lease by Landlord and that there are no defaults or offsets which Tenant has against enforcement of this Lease by Landlord; (e) the actual Rent Commencement Date and the Lease Expiration Date; and (f) that Tenant's store is open for business. Notwithstanding the foregoing, after the second Estoppel Request in any twelve (12) consecutive month period, it is agreed that Landlord shall pay Tenant the sum of Two Hundred Fifty Dollars ($250.00) for each such additional Estoppel Request within said twelve (12) month period as an administrative charge for the processing of the estoppel statement. Notwithstanding anything herein to the contrary, processing of the estoppel statement shall not commence prior to receipt of the required administrative charge, which is due and payable at the time of such subsequent Estoppel Request.

T.   COVENANT OF QUIET ENJOYMENT

Landlord hereby covenants that if Tenant shall perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall at all times during the continuance

hereof have quiet enjoyment of the Premises without hindrance from any person claiming by, through or under Landlord.

U.    LIABILITY OF LANDLORD

1.    <u>Judgments</u>.   Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Landlord, that if Landlord shall fail to perform any covenant, term, condition, or warranty contained in this Lease upon Landlord's part to be performed and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levied thereon against the right, title, and interest of Landlord in the Shopping Center, as the same may then be encumbered, and neither Landlord, nor, if Landlord be a partnership, corporation or limited liability company, any of the partners comprising such partnership, shareholders comprising the corporation or members comprising the limited liability company, shall be liable for any deficiency. It is understood that in no event shall Tenant have any right to levy execution against any property of Landlord other than its interest in the Shopping Center as herein before expressly provided.

2.    <u>Transfer of Title</u>.   In the event of the sale or other transfer of Landlord's right, title, and interest in the Premises or the Shopping Center, Landlord shall, upon providing Tenant with written notice of said transfer, be released from all liability and obligations hereunder only if its transferee shall assume in writing the obligations of Landlord herein set forth.

V.    ENVIRONMENTAL MATTERS – NO HAZARDOUS MATERIALS

1.    <u>Acts</u>.   For the purposes of this Lease, the term "Hazardous Materials" shall include, without limitation, those substances, materials, or waste described in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (CERCLA), (42 U.S.C. 9601, *et seq.*); The Resource Conservation and Recovery Act, as amended (RCRA), (42 U.S.C. 6901, *et seq.*); Emergency Planning & Community Right-to-Know Act, as amended (EPCRA), (42 U.S.C. 11991, *et seq.*); Clean Water Act, as amended (CWA), (33 U.S.C. 1251, *et seq.*); Clean Air Act, as amended (CAA), (42 U.S.C. 7401, *et seq.*); Toxic Substances Control Act, as amended (TSCA), (15 U.S.C. 2601, *et seq.*); Safe Drinking Water Act, implementing regulations for such Acts, and as amended (SDWA), (42 U.S.C. 300(f) *et seq.*); and any other applicable federal, state, local laws or ordinances, and the regulations adopted thereunder, or any other substance, material or waste which has been determined by the United States Environmental Protection Agency, the Federal Occupational Health and Safety Administration, or any other federal or state agency, to be capable of posing significant risk of injury to human health or safety. Hazardous Materials shall not include ordinary household cleaning and maintenance products or those which are part of Tenant's inventory of items for retail sale, provided that such products and items are used with due care, and are used, stored and maintained in accordance with manufacturer's recommendations.



2. <u>Asbestos and Other Hazardous Materials</u>.

    a. Landlord warrants that upon the Turnover Date to Tenant the Premises will be free of asbestos, and if found, Landlord will remove immediately at Landlord's expense and provide Tenant with an asbestos abatement report certifying that the Premises are free of asbestos.

    b. Landlord warrants that upon the Turnover Date to Tenant the Premises will be free of Hazardous Materials other than asbestos as provided in V.2.a above, and if found, Landlord will remove immediately at Landlord's expense.

3. <u>Tenant's Operations</u>. Except as otherwise provided herein, Tenant shall not engage in operations at the Premises which involve the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of Hazardous Materials without the prior written consent of Landlord, which consent shall be at Landlord's sole discretion.

4. <u>Indemnification</u>. Tenant will defend, protect, indemnify, and hold Landlord harmless from and against any and all claims, causes of action, liabilities, damages, costs, and expenses, including, without limitation, attorneys' fees, arising from or in any way connected with Hazardous Materials introduced to the Premises by Tenant or Tenant's agents, employees or contractors. Landlord will defend, protect, indemnify, and hold Tenant harmless from and against any and all claims, causes of action, liabilities, damages, costs, and expenses, including, without limitation, attorneys' fees, arising from or in any way connected with Hazardous Materials introduced to the Premises or the Shopping Center by Landlord or any other tenant of Landlord.

5. <u>Limitation of Liability</u>.

    a. If asbestos is found in the Premises, Landlord shall have the asbestos removed.

    b. Notwithstanding the provisions of this Section V except for subsection V.5.a, Landlord's and Tenant's liability hereunder will be limited to compliance with all federal and state environmental regulations dealing with release of Hazardous Materials by Landlord or Tenant. Tenant's and Landlord's rights under this Section V except for subsection V.5.a shall not extend to requiring Landlord or Tenant to perform any duties in excess thereof.

W. MISCELLANEOUS PROVISIONS

1. <u>Broker's Commissions</u>. Landlord and Tenant hereby agree to recognize Monetha Cobb with **Franklin Street Real Estate Services** as Tenant's broker in this transaction. Landlord shall be responsible to pay any commissions related to this transaction. Landlord and Tenant hereby warrant to the other that there are no other claims for brokers' commissions or finders' fees in connection with the execution of this Lease, and Landlord and Tenant agree to indemnify and save the other harmless from any liability that may arise from such claims, including reasonable attorneys' fees.

2. <u>Surrender and Holding Over</u>.

    a. <u>Surrender</u>. Subject to the provisions of Section K.4, Tenant shall deliver up and surrender to Landlord possession of the Premises upon the expiration of the Lease Term, or its prior termination for any reason, in good condition and repair, broom clean (damage by fire and other perils covered by standard fire and extended coverage insurance and ordinary wear and tear excepted).

b.   Holdover. If Tenant fails to surrender the Premises on the date that the Lease Term expires or terminates, Tenant's continued occupancy shall be deemed to be a tenancy from month-to-month and such tenancy shall be subject to all of the provisions of this Lease in effect at the time of holdover with Base Rent payable at a rate equal to one hundred fifty percent (150%) of the Base Rent in effect immediately prior to such holdover.

3.   Storage Trailer. Intentionally Deleted.

4.   Audit Rights. Intentionally Deleted.

5.   Mechanic's Liens. Should any mechanic's liens or other liens or affidavits claiming liens be filed against the Premises or any portion thereof or interest therein for any reason whatsoever incident to the acts or omissions of Tenant, its agents or contractors, Tenant shall cause the same to be canceled and discharged of record by payment, bonding, or otherwise, within thirty (30) days after notice by Landlord.

6.   Mortgagee Consent. Landlord represents that it has obtained the existing mortgagee's consent to this Lease Agreement, or that such consent is not necessary.

7.   Landlord Title Report. Landlord agrees to furnish Tenant with a copy of the Schedule B (Title Exceptions) to the current title policy for the Shopping Center prior to Tenant's execution of this Lease.

8.   Recording. Upon the request of either Landlord or Tenant, the other party agrees to execute a Memorandum of Lease setting forth such terms and provisions as may be acceptable to both Landlord and Tenant that may be recorded at the cost of the party desiring recording.

9.   Severability. In the event that any provision or section of this Lease is rendered invalid by the decision of any court or by the enactment of any law, ordinance or regulation, such provision of this Lease shall be deemed to have never been included therein, and the balance of this Lease shall continue in effect in accordance with its terms.

10.  Attorneys' Fees.

a.   In the event of any legal proceeding arising out of a dispute among Landlord and Tenant with regard to enforcement of any provision of this Lease, the substantially prevailing party will be entitled to an award of its reasonable attorneys' fees and costs from the non-prevailing party.

b.   In the event it shall be reasonably necessary for either Landlord or Tenant to appear in any action or proceeding related to this Lease or to protect its rights under this Lease, the appearing party will be entitled to an award of its reasonable attorneys' fees and costs from the other party.

11.  Jury Trial. In the event of a dispute, Landlord and Tenant agree to waive the right to jury trial.

12.  Waiver. No waiver of any condition or legal right or remedy shall be implied by the failure of Landlord or Tenant to declare a forfeiture, or for any other reason, and no waiver of any condition or covenant shall be valid unless it is in writing and signed by Landlord or Tenant.

13.  Force Majeure. Force Majeure shall mean delays caused by any governmental or quasi-governmental entity; shortages of materials, natural resources or labor; fire; catastrophe; 

labor strikes; civil commotion; riots; war; acts of God; governmental prohibitions or regulations including administrative delays in obtaining building permits; inability to obtain materials; or any and all other extraordinary causes (but not including financial inability). Therefore, if an event of Force Majeure occurs, neither party shall have any liability to the other for non-performance of the affected provision of this Lease. Neither party shall be in default under this Lease for failure to perform due to Force Majeure; except that after the store opens for business the payment of any sums due hereunder by Landlord or Tenant shall not be subject to Force Majeure. If an event of Force Majeure occurs, the period of time Landlord or Tenant has for performance as provided in this Lease shall be extended one day for each day performance is delayed by such event of Force Majeure.

14.   No Partnership.  Landlord and Tenant do not, in any way or for any purpose, become a partner with the other in the conduct of either's business.  Tenant has only a usufruct under this Lease, not subject to levy or sale.  No estate shall pass out of Landlord by this Lease.

15.   Section Headings.  Other than where a heading defines a term to be used in this Lease, the section headings are inserted only as a matter of convenience and for reference and in no other way define, limit, or describe the scope or intent of this Lease nor in any way affect this Lease.

16.   Lease Inures to the Benefit of Assignees.  This Lease and all of the covenants, provisions, and conditions herein contained shall inure to the benefit of and be binding upon the heirs, personal representatives, successors, and permitted assigns respectively, of the parties hereto, provided, however, that no assignment by, from, through, or under Tenant in violation of the provisions hereof shall vest in the assigns any right, title, or interest whatsoever, and no assignment by Landlord shall be valid unless such assignment is made to the then current fee simple owner of the Shopping Center.

17.   No Presumption Against Drafter.  Both parties have freely negotiated this Lease.  In any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions, there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

18.   Authority to Sign Lease.  Each of the persons signing this Lease represents and warrants that he has been duly authorized to sign this Lease by all necessary action on the part of the entity on whose behalf he has signed this Lease.

19.   Entire Agreement.  This Lease and the exhibits attached hereto set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Premises, and there are no covenants, promises, agreements, conditions, or understandings, either oral or written, between them other than as herein set forth.  No subsequent alteration, amendment, change, or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both parties.

20.   Landlord's Alteration.  Subject to the provisions of Section B.2 hereof, Landlord shall have the right to engage in construction, remodeling, or other alterations of the Shopping Center and Common Areas that are not as a result of a casualty as provided for in Section M of this Lease ("Landlord Alteration").  In the event such Landlord Alteration **materially and adversely** impacts customer or employee access to or visibility of the Premises or the Common Areas in front of the Premises and such condition exists for more than **twenty (20)** days, then in lieu of Base Rent and Additional Rent Tenant shall have the right to pay the lesser of (i) six percent (6%) Gross Sales or (ii) one-half (1/2) Base Rent and full Additional Rent ("Alteration Alternate Rent").  Tenant shall have the



right to pay Alteration Alternate Rent for each day or part thereof which elapses between the date the condition commenced and the date the condition is corrected.

21.    Contingency. Landlord and Tenant acknowledge that as of the execution of this Lease, Great Price Furniture ("Great Price Furniture") is occupying the Premises in the Shopping Center. If Great Price Furniture does not terminate its leasehold interest in and to the Premises and vacate the Premises before October 1, 2013, Tenant or Landlord shall have the option to terminate this Lease, and neither Landlord nor Tenant shall have any obligation or liability to the other.

22.    RELOCATION.

Landlord shall have the right to redevelop the Shopping Center in accordance with this Section. In the event Landlord elects to redevelop the Shopping Center, and the remodel will impact Tenant and require that Tenant be relocated, then Landlord shall provide Tenant with written notice ("Relocation Notice") not less than one hundred twenty (120) days prior to the date Landlord expects such relocation to take effect.

Notwithstanding the foregoing, if Tenant notifies Landlord within forty-five (45) days of Landlord's Relocation Notice that Tenant elects to terminate the Lease rather than relocate as proposed by the Landlord, then this Lease shall terminate ninety (90) days after Tenant's notice ("Termination Date"). If this Lease is terminated pursuant to this Section, Tenant shall vacate the Premises no later than the Termination Date, deliver possession of the Premises to Landlord in the condition required by Section W.2.a of this Lease, subject to all charges which are due and owing or which shall accrue up to such date, and Landlord will pay to Tenant the unamortized costs of Tenant's documented cost of improvements in the Premises (amortized on a straight line basis over the Original Lease Term), which charges shall be paid (either to Landlord or Tenant) within thirty (30) days of the Termination Date.

a.    Notice. Landlord's Relocation Notice shall include all of the following and shall not be deemed to have been properly provided in the event any of the required information or documentation is omitted:

1.    an estimated delivery date ("EDD") on which Landlord expects to deliver the space within the redeveloped Shopping Center ("Relocation Space") to Tenant in accordance with the terms hereof. If Landlord fails to deliver the Relocation Space to Tenant by the EDD, Tenant shall not be required to accept the Relocation Space and surrender the original Premises until Tenant has received at least thirty (30) days written notice of the new date of delivery of the Relocation Space;

2.    if not previously provided, a complete set of plans and specifications for the Relocation Space in ".dwg", ".dwf", or comparable electronic format, including mechanical drawings and façade elevations, which shall: (i) provide for Relocation Space of approximately 10,000 square feet at a location with visibility and proximity to the other anchor tenants comparable to Tenant's original Premises as of the Effective Date, which location shall be subject to Tenant's reasonable approval, (ii) comply with "Tenant's Vanilla Box Criteria" attached to the Lease as Exhibit C ("Construction Criteria"), and (iii) be subject to Tenant's right to approve such plans and specifications, with reasonable modifications, within thirty (30) days after the date Tenant receives

such plans and specifications (such approved plans being herein referred to as the "Tenant's Approved Plans & Specs").

b.    <u>Turnover</u>.  The turnover date for the Relocation Space ("Relocation Turnover Date") shall occur on the date on which the last of the following conditions ("Relocation Delivery Conditions") is satisfied:

1.    Landlord has Substantially Completed (as defined in Section D.1.a of this Lease) construction of the Relocation Space in accordance with the Construction Criteria and the Approved Plans & Specs;

2.    Landlord has caused the Relocation Space to be inspected by all required governmental authorities and all required final inspection certificates, certificates of occupancy and other prerequisites to occupancy by Tenant have been received;

3.    The building of which the Relocation Space is a part (including the foundation, walls, roof, and floor slab) is structurally sound and water-tight;

4.    The parking lot and other Common Areas serving the Relocation Space are in compliance with Applicable Laws, and are complete and free of obstructions, including construction materials, equipment, and debris; and

5.    Landlord has delivered the keys to the Relocation Space to Tenant.

c.    <u>Delivery</u>.  Upon Landlord's completion of all the foregoing Relocation Delivery Conditions, Landlord shall notify Tenant in writing ("Relocation Delivery Notice") that all Relocation Delivery Conditions have been fulfilled and Landlord is ready to deliver the Relocation Space.  Not later than five (5) business days after Tenant's receipt of the Delivery Notice, Tenant will arrange an inspection ("Relocation Delivery Inspection") of the Relocation Space with Landlord to insure that all Relocation Delivery Conditions have been fulfilled.  If it is determined at the time of Relocation Delivery Inspection that all Relocation Delivery Conditions have not been satisfied, then Tenant will not be required to accept delivery of the Relocation Space at that time, and Tenant will provide notice to Landlord of any deficiencies. Once Landlord has completed or corrected the deficiencies in the Relocation Delivery Conditions, Landlord will again provide a Relocation Delivery Notice to Tenant and arrange for another Relocation Delivery Inspection.   This process shall continue until all Relocation Delivery Conditions have been fulfilled. When the Delivery Inspection confirms that all Relocation Delivery Conditions have been fulfilled, then Tenant will accept delivery of the Relocation Premises, and the date of such final Relocation Delivery Inspection shall be the Relocation Turnover Date.

d.    <u>Surrender</u>. Tenant shall vacate the Premises initially covered by the Lease ("Original Premises") within thirty (30) days after the Relocation Turnover Date; provided that if the Relocation Turnover Date occurs between September 2 and December 15, the Relocation Turnover Date shall be deemed extended until January 1 of the following year and Tenant shall have no obligation to vacate the Original Premises until January 31. Tenant shall surrender the Original Premises to Landlord in the condition required by Section W.2.a of this Lease.



e. **Relocation Commencement. On the first to occur of (a) the date Tenant opens for business in the Relocation Space or (b) the date which is thirty (30) days after the Relocation Turnover Date (such date being herein referred to as the "Relocation Commencement Date") the requirement for performance of Landlord's and Tenant's obligations, covenants and conditions relating to the Original Premises shall cease, and, thereafter, the term "Premises" shall refer to the Relocation Space. Landlord and Tenant shall enter into an agreement, effective as of the Relocation Commencement Date, modifying this Lease only with respect to the description of the Premises, the Base Rent and all other items of rent which this Lease expressly states are calculated on a per square foot basis and any other items which are appropriate to modify based on the location of the Premises or renovation of the Shopping Center (e.g. No Build Area, Co-Tenancy, etc.). At the request of Tenant, Landlord and Tenant shall confirm the Relocation Commencement Date in writing.**

f. **SNDA. On or before the Relocation Turnover Date, Landlord shall provide a Subordination, Non-Disturbance and Attornment Agreement from each lender providing financing secured by the Shopping Center, in a recordable form mutually agreed to by Tenant and Landlord's mortgagee.**

g. **Reimbursement of Tenant Expenses. Landlord shall reimburse Tenant for: (i) the reasonable and actual out-of-pocket costs Tenant incurs which are directly related to such relocation, which costs shall include moving its inventory and equipment, removal and reinstallation of its fixtures, changing stationery, and relocating telephone equipment; and (ii) the unamortized portion of Tenant's documented cost of improvements in the Premises (amortized on a straight-line basis over the Original Lease Term), which amount shall not exceed eighteen dollars ($18) per square foot. Such reimbursement shall be made within thirty (30) days after Tenant provides Landlord with sufficient evidence of such costs. In the event Landlord fails to reimburse such costs within the aforesaid 30-day period, Tenant shall be entitled to take credit toward the payment of Base Rent until Tenant has recovered such costs.**

23. Incorporation by Reference. All exhibits, schedules and attachments to this Lease referred to in this Lease are incorporated into this Lease by reference and made a part of this Lease.

-BALANCE OF PAGE INTENTIONALLY LEFT BLANK -



IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be signed as of the date and year first above written.

**LANDLORD**

**HENDON NORTH DEKALB, LLC**

By:  DEKALB EQUITY ASSOCIATES, LLC, a Georgia limited liability company, its Manager

By:  Hendon NDM SPE, LLC, a Delaware limited liability company, its Manager

By: _____

Name: J. Charles Hendon, Jr.

Title: President

FEIN # 13 . 4259169

Date ___ MARCH 25 , 2013 ___

Landlord's Acknowledgment

STATE OF ___ GEORGIA ___ )

COUNTY ___ FULTON ___ )   ) SS.

The foregoing instrument was acknowledged before me, a Notary Public, this ___ 25TH ___ day of ___ MARCH ___, 2013, by J. Charles Hendon, Jr., the President of Hendon NDM SPE, LLC, a Delaware limited liability company, the Manager of DeKalb Equity Associates, a Georgia limited liability company, the manager of Hendon North DeKalb, LLC



_____
NOTARY PUBLIC



**TENANT**

**DOLLAR TREE STORES, INC.**
a Virginia corporation

By _____

Name _____ TODD LITTLER _____

_____ VP OF LEASING _____
Title _____

FEIN # 54-1387365

Date _____ March 18, 2013 _____


Tenant's Acknowledgment

STATE OF VIRGINIA

                ) SS.

CITY OF CHESAPEAKE

    The foregoing instrument was acknowledged before me, a Notary Public, this _18th_ day of _March_____, 2013, by _Todd Littler_____, the _Vice President_ of Dollar Tree Stores, Inc.

_____Kristin Cain_____
NOTARY PUBLIC

KRISTIN CAIN
NOTARY
PUBLIC
REG # 267110
MY COMMISSION
EXPIRES
4/30/2017
COMMONWEALTH OF VIRGINIA



**EXHIBIT A**

SITE PLAN



CONCEPTUAL SITE PLAN
FOR
NORTH DEKALB MALL
ATLANTA, GA 30331
(404) 344-6611

HENDON
PROPERTIES

3445 PEACHTREE RD.
SUITE 465
ATLANTA, GA 30326
(404) 262-7400

**MONUMENT SIGN**

NO
BUILD
AREA

EXHIBIT

35

North DeKalb Mall—Decatur, GA

**EXHIBIT A-2**

<u>TRASH/DUMPSTER LOCATION</u>



North DeKalb Mall–Decatur, GA

37





**EXHIBIT B**

LEGAL DESCRIPTION

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 100 of the 18th District of Dekalb County, Georgia and more particularly described as follows:

HENDON NORTH DEKALB

BEGINNING at an iron pin found on the northwestern Right-of-Way line of Lawrenceville Highway (also known as State Route #8, and U. S. Highway #29) (100-foot Right-of-Way at this point) which iron pin is located 112 feet Southwesterly (as measured along said Northwestern Right-of-Way line of Lawrenceville Highway) from the intersection of said Northwestern Right-of-Way line of Lawrenceville Highway with the Southwestern Right-of-Way line of North Druid Hills Road (100-foot Right-of-Way); thence along said Northwestern Right-of-Way line of Lawrenceville Highway South 21 Degrees 50 Minutes 00 Seconds West 26.81 feet to a point; thence leaving said Northwestern Right-of-Way line of Lawrenceville Highway North 68 Degrees 10 Minutes 00 Seconds West 56.53 feet to a point; running thence South 89 Degrees 12 Minutes 26 Seconds West 346.11 feet to a point,

running thence South 00 Degrees 12 Minutes 34 Seconds East 24.25 feet to a point; running thence in a Southeasterly direction along the arc of a 114.00-foot radius an arc distance of 161.29 feet to a point (said arc being subtended by a chord lying to the Southwest thereof and bearing South 50 Degrees 20 Minutes 34 Seconds East 148.17 feet); running thence South 09 Degrees 48 Minutes 40 Seconds East 175.86 feet to a point; running thence in a Southeasterly direction along the arc of a 33.00-foot radius curve an arc distance of 51.84 feet to a point (said arc being subtended by a chord lying to the Northeast thereof and bearing South 54 Degrees 48 Minutes 40 Seconds East 46.67 feet); running thence North 80 Degrees 11 Minutes 20 Seconds East 48.81 feet to a point; running thence in a Northeasterly direction along the arc of a 441.76-foot radius curve an arc distance of 64.64 feet to a point (said arc being subtended by a chord lying to the south thereof and bearing North 84 Degrees 22 Minutes 48 Seconds East 64.58 feet); running thence in a Northeasterly direction along the arc of 48.00-foot radius curve an arc distance of 39.19 feet to a point on the Northwestern Right-of-Way line of Lawrenceville Highway (said arc being subtended by a chord lying to the Northwest thereof and bearing North 65 Degrees 11 Minutes 05 Seconds East 38.11 feet); running thence in a Southwesterly direction along said Right-of-Way line of Lawrenceville Highway the following courses and distances: along the arc of a 1,203.92-foot radius curve an arc distance of 78.49 feet to a point (said arc being subtended by a chord lying to the East thereof and bearing South 04 Degrees 17 Minutes 38 Seconds West 78.47 feet), and South 03 Degrees 54 Minutes 00 Seconds West 101.29 feet to a point; running thence South 86 Degrees 06 Minutes 00 Seconds East  8.00 feet to a point; running thence South 03 Degrees 54 Minutes 00 Seconds West 145.53 feet to a point; running thence South 52 Degrees 51 Minutes 59 Seconds West 231.11 feet to a point; running thence South 57 Degrees 35 Minutes 43 Seconds West 154.88 feet to a point; running thence South 57 Degrees 26 Minutes 26 Seconds West 375.90 feet to a point; running thence North 49 Degrees 45 Minutes 51 Seconds West 13.77 feet to a point; running thence in a Southwesterly direction along the arc of a 131.39-foot radius curve an arc distance of 27.85 feet to a point (said arc being subtended by a chord lying to the Southeast thereof and bearing South 34 Degrees 09 Minutes 05 Seconds



West 27.80 feet); running thence South 28 Degrees 04 Minutes 41 Seconds West 141.13 feet to a point; running thence in a Southwesterly direction along the arc of 303.36-foot radius curve an arc distance of 17.02 feet to a point (said arc being subtended by a chord lying to the Southeast thereof and bearing South 29 Degrees 41 Minutes 07 Seconds West 17.02 feet); running thence in a Southeasterly direction along the arc of a 27.00-foot radius curve an arc distance of 6.29 feet (said arc being subtended by a chord lying to the Southeast thereof and bearing South 24 Degrees 37 Minutes 26 Seconds West 6.27 feet); running thence in a Southwesterly direction along the arc of a 350.00-foot radius curve an arc distance of 96.99 feet to a point (said arc being subtended by a chord lying to the Northwest thereof and bearing South 43 Degrees 04 Minutes 08 Seconds West 96.68 feet); running thence in a Southwesterly direction along the arc of a 302.36-foot radius curve an arc distance of 81.21 feet to a point (said arc being subtended by a chord lying to the Northwest thereof and bearing South 58 Degrees 22 Minutes 19 Seconds West 80.97 feet); running thence South 66 Degrees 03 Minutes 56 Seconds West 34.86 feet to a point; running thence in a Southwesterly direction along the arc of a 347.00-foot radius curve an arc distance of 115.53 feet to a point (said arc being subtended by a chord lying to the Northwest thereof and bearing South 75 Degrees 36 Minutes 13 Seconds West 115.00 feet); running thence in a Northwesterly direction along the arc of a 623.13-foot radius curve an arc distance of 323.03 feet to a point (said arc being subtended by a chord lying to the North thereof and bearing North 80 Degrees 00 Minutes 26 Seconds West 319.43 feet); running thence North 65 Degrees 09 Minutes 22 Seconds West 332.34 feet to a point; running thence in a Northwesterly direction along the arc of a 311.00-foot radius curve an arc distance of 218.92 feet to a point (said arc being subtended by a chord lying to the Northeast thereof and bearing North 44 Degrees 59 Minutes 25 Seconds West 214.43 feet); running thence North 24 Degrees 49 Minutes 27 Seconds West 139.17 feet to a point; running thence in Northwesterly direction along the arc of a 296.99-foot radius curve an arc distance of 111.40 feet to a point (said arc being subtended by a chord lying to the Northeast thereof and bearing North 14 Degrees 04 Minutes 43 Seconds West 110.75 feet); running thence North 03 Degrees 19 Minutes 59 Seconds West 216.68 feet to a point; running thence in a Northwesterly direction along the arc of a 2283.00-foot radius curve an arc distance of 116.77 feet to a point (said arc being subtended by a chord lying to the East thereof and bearing North 01 Degrees 52 Minutes 04 Seconds West 116.76 feet); running thence North 00 Degrees 24 Minutes 09 Seconds West 38.92 feet to a point; running thence in a Northwesterly direction along the arc of a 7018.44-foot radius curve an arc distance of 99.80 feet to a point (said arc being subtended by a chord lying to the east thereof and bearing North 00 Degrees 48 Minutes 36 Seconds West 99.80 feet); running thence North 00 Degrees 25 Minutes 26 Seconds West 390.67 feet to a point; running thence in Northeasterly direction along the arc of a 233.00-foot radius curve an arc distance of 197.94 feet to a point (said arc being subtended by a chord lying to the Southeast thereof and bearing North 35 Degrees 27 Minutes 47 Seconds East 192.04 feet); running thence in Northeasterly direction along the arc of a 27.00-foot radius curve an arc distance of 13.45 feet to a point (said arc being subtended by a chord lying to the Northwest thereof and being subtended by a chord lying to the Northwest thereof and bearing North 45 Degrees 32 Minutes 09 Seconds East 13.31 feet); running thence South 22 Degrees 17 Minutes 33 Seconds East 54.88 feet to a point on the southerly Right of Way line of Sweet Briar Road; running thence along the southerly Right of Way line of Sweet Briar Road in Northeasterly direction along the arc of a 182.00-foot radius curve an arc distance of 118.33 feet to a point (said arc being subtended by a chord lying to the Southeast thereof and bearing North 80 Degrees 06 Minutes 37 Seconds East 116.26 feet); running thence along the southerly Right of Way line



of Sweet Briar Road in an easterly direction South 81 Degrees 15 Minutes 48 Seconds East 344.04 feet to a point; running thence in Southeasterly direction along the arc of a 219.00-foot radius curve an arc distance of 186.09 feet to a point (said arc being subtended by a chord lying to the Southwest thereof and bearing South 56 Degrees 55 Minutes 12 Seconds East 180.55 feet); running thence along the southerly Right of Way line of Sweet Briar Road in an southeasterly direction South 32 Degrees 34 Minutes 37 Seconds East 67.78 feet to a point; running thence in Southeasterly direction along the arc of a 217.00-foot radius curve an arc distance of 102.26 feet to a point (said arc being subtended by a chord lying to the Northeast thereof and bearing South 46 Degrees 04 Minutes 34 Seconds East 101.31 feet); running thence North 39 Degrees 02 Minutes 55 Seconds East 60.81 feet to a iron pin found on the Southeastern Right-of-Way line of Oak Tree Road at a point 462.00 feet Southwesterly (as measured along the Southeastern Right-of-Way line of Oak Tree Road) from the intersection of said Southeastern Right-of-Way line of Oak Tree Road with the Southwestern Right-of-Way line of North Druid Hills Road, running thence North 89 Degrees 12 Minutes 26 Seconds East 1,086.71 feet to the TRUE POINT OF BEGINNING containing 48.90 Acres.

Less and except (2) Macy's Tracts.



**EXHIBIT C**

LANDLORD'S WORK and TENANT'S WORK

In addition to the Delivery Conditions set forth in Section D.1 hereof, Landlord's Work includes the conditions set forth in the sixteen (16) page "Tenant's Vanilla Box" criteria that follows, as may be modified therein.



Exhibit "C"- Construction Criteria
Landlord's Scope of Work
"Tenant's Vanilla Box" (New or Existing Construction)

North DeKalb Mall

Shopping Center Name                                                    Deal #

GENERAL CONDITIONS:

A) Landlord shall provide Dollar Tree Stores, Inc. (hereinafter "Tenant") with one (1) full size engineered site plan (updated and current) in CADD format within fifteen (15) business days from the date Landlord signs the LOI/Exhibit "C". Site plan shall show all improvements, property lines, site setbacks, easements, drive aisles, parking spaces (with handicap spaces marked), striped handicap paths, curbing and curb cuts, and current tenants. Site plan shall be provided with a "WD-67" truck template showing how Tenant's freight truck will maneuver throughout the site to Tenant's delivery area and the truck's path of exit from the site without obstacles that will disrupt delivery or parking. If Landlord cannot provide said site plan, then Landlord will reimburse Tenant 100% of the costs associated with the development of said plan. Paper copy acceptable for existing centers only.

*As it notes — OK JL*

B) If required by any authority having jurisdiction, Landlord shall be responsible, as part of the Landlord's work provided herein, for any code required upgrades to the Premises specific to Tenant's retail use of the Premises. Such items shall include, but not be limited to, fire suppression system, fire monitoring system, all state codes, all local codes, health department rules and regulations, ADA law, handicap code, energy compliance, EPA rules and regulations, and any structural or site modifications required for code compliance.

C) All new construction, all new materials, all installation, all new fixtures, and quantities provided by Landlord shall meet ADA Law, handicap code, energy compliance, EPA rules and regulations, OSHA rules and regulations, health department rules and regulations, state codes, local codes, and national codes currently in effect.

*As is unkit — OK JL*

D) If required by any authority having jurisdiction, Landlord shall upgrade the existing building shell and components to meet the current International Energy Conservation Code or local code for an energy efficient building envelope as required for a conditioned mercantile space. Landlord shall provide drawings (by a registered professional for that jurisdiction) that sufficiently indicate the pertinent data of the U & R factors of the envelope systems associated with any upgrade required to complete such work.

E) Landlord shall remove all previous tenant signs and/or reimburse Tenant for the cost of such removal. Landlord shall deliver the sign band in new or like-new condition, and Landlord, at Landlord's expense, will complete all patching and painting of the sign band as required.

F) Landlord will provide Landlord, for Landlord's approval, Tenant's construction documents detailing Tenant's scope of work. Approval and/or comments must be received in writing by Tenant from Landlord within five (5) business days from the date Landlord receives Tenant's construction documents. If approval or comments are not received from Landlord within the above time frame, then Tenant will proceed with construction as indicated on the final plans provided to Landlord. Tenant will provide Landlord a preliminary drawing showing the condition in which the space should be provided to Tenant in accordance with the Lease Criteria. Tenant will not provide Landlord drawings to permit or build from. Landlord shall hire an Architect and Engineer to complete drawings for Landlord's scope of work. Landlord shall provide Architectural and Engineering drawings to Tenant for review and approval. Landlord shall pull permit and obtain Certificate of Occupancy prior to Turnover Date.

*is equivalent to enable Tenant to future & OPEN — OK JL*

G) Landlord warrants that, upon the Turnover Date to Tenant, the Premises will be free of asbestos. If found, Landlord will remove asbestos immediately at Landlord's expense and provide Tenant with an asbestos abatement report certifying that the Premises are free of asbestos. Prior to Lease execution, Landlord shall provide Tenant with an asbestos survey report for the Premises. Landlord also warrants that, upon the Turnover Date to Tenant, the Premises will be free of Hazardous Materials other than asbestos as provided above, and if found, Landlord will remove immediately at Landlord's expense.

H) Landlord shall abide by all terms, conditions and requirements set forth in the Lease and this Exhibit "C". To the extent that this Exhibit "C" conflicts with the express requirements of the Lease, the requirements of the Lease shall be controlling.

*(should) NO   (or comparable) NO*

I) Landlord shall provide Tenant with an area for Tenant's trash dumpster. Tenant requires four (4) eight (8) yard-each dumpsters for their daily operations. If required by any authority having jurisdiction, Landlord shall build any trash enclosures, provide dumpster pad(s), install drain(s) and provide any required water supply at Landlord's sole expense. Landlord shall provide all necessary drawings required to complete such work. *Tenant will pay for their share of trash removal.*

*LANGUAGE MUST STAY   NO*

J) Landlord shall provide Tenant with an architectural floor plan, all exterior elevations, wall sections, roof plan, mechanical and electrical drawings in CADD format for the Premises, for Tenant's use in completing their construction documents within fifteen (15) business days from the date Landlord signs the LOI/Exhibit "C". If Landlord can not provide, Landlord will reimburse Tenant 100% of the costs associated with the development of said plans. *Lease*

K) Prior to the Turnover Date, the Landlord shall provide all necessary pipes, mains, conduits, wire and cables to the Premises and services for domestic water, natural gas, electricity and telephone which shall

Revised 10/30/2009                                                    1

Exhibit "C" - Construction Criteria
Landlord's Scope of Work
"Tenant's Vanilla Box" (New or Existing Construction)

North DeKalb Mall

Shopping Center Name _____     Deal # _____

be separately metered. Landlord will provide telephone lines to the Premises and to the D-mark. All plumbing, electrical, natural gas and telephone shall be in good working order prior to Turnover Date.

L) Tenant shall have the right, but not the obligation, to enter upon the Premises for all purposes permitted under the Lease from and after the Anticipated Delivery Date specified in Section A.5.a of the Lease, even if the Delivery Conditions have not been met. Notwithstanding anything to the contrary contained in the Lease, Tenant's occupation of the Premises for the purpose of commencing Tenant's Work, or to fixture, stock and/or opening of the Premises to the public for business prior to the performance of all of the Delivery Conditions, shall not cause the Turnover Date to occur or constitute a waiver or acceptance of or relieve Landlord from any of its obligations hereunder, including without limitation, the obligations to complete construction of Landlord's Work as set forth in this Exhibit "C."

M) The Landlord acknowledges that it has certain work or other performance obligation required under this Exhibit C ("Landlord's Work"). If such Landlord's Work is not performed or completed by Landlord as provided herein, Tenant shall provide Landlord written notice stating specifically what items of the Landlord's Work have not been completed. Landlord shall have five (5) days after receipt of the above notice to commence such Landlord's Work. If Landlord fails to commence such work within five (5) days, the Landlord agrees and hereby authorizes Tenant to perform such Landlord's Work. After Tenant's completion of the Landlord's Work, Tenant shall submit to Landlord an invoice for the cost to perform such work. If Landlord fails to pay the invoice within ten (10) days after receipt, Tenant will have the right to collect any and all of the invoice amount together with interest at the rate of twelve percent (12%) per annum by taking a credit against one hundred percent (100%) of Base Rent and Additional Rent commencing on the next month first full rent after such non-payment by Landlord. 

### SITE SPECIFIC:

The following are specific details for Tenant's Vanilla Box requirements. Any deviation to the criteria below must be negotiated prior to Lease execution. Tenant's final plans will reflect exact locations, quantities and materials to be used. Landlord shall contact Tenant for site specific drawings prior to starting any and all construction if Landlord has not already received them.

1) Walls:

Demising Walls: Defined as any wall that separates Tenant from all other adjacent tenants, exterior of building (parking lot area, sidewalks, loading area, etc), common corridors (freight, egress, etc), Shopping Center canopy and/or sign facade area, etc.

Demising Walls: Landlord shall install demising walls to separate Tenant as defined above. Demising wall shall have GWB on each side to roof deck and shall be finished and ready for Tenant's finishes from finished floor to six inches (6") above finished ceiling. Demising walls shall be free of obstructions to include but not limited to emergency lights, exit signs and fire horns and strobes. See below for Tenant approved wall construction methods.

Interior Walls: Defined as any wall that separates spaces within Tenant's demised premises.

Stockroom Wall: Landlord shall install stockroom wall (separation wall between Tenant's sales area and stockroom). Landlord shall install all doors as per Section 9. Stockroom wall shall be a minimum six inch (6"), twenty (20) gauge metal studs at sixteen inches (16") on center and have GWB on each side to roof deck. Wall shall be finished and ready for Tenant's finishes from finished floor to roof deck on stockroom side and to six inches (6") above finished ceiling on sales area side. See below for Tenant approved wall construction methods.

Egress Hallway: Landlord shall install segregated egress fire hallway (walls), if required by code, for Tenant's occupancy and all necessary doors for hallway as per Section 9. Egress hallway walls shall have GWB on each side to roof deck and shall be finished and ready for Tenant's finishes from finished floor to roof deck. See below for Tenant approved wall construction methods.

Toilet Room(s): Landlord shall install toilet room walls. Interior toilet room walls shall be constructed of water resistant gypsum wallboard. Landlord shall install water fiberglass reinforced panels (FRP) on interior walls full height. Landlord shall install door(s) as per section 9 for each toilet. Landlord shall install adequate blocking in wall to accommodate plumbing fixtures, grab bars, etc. See below for Tenant approved wall construction methods.

Revised 10/19/2009

2

Exhibit "C"- Construction Criteria
Landlord's Scope of Work
"Tenant's Vanilla Box" (New or Existing Construction)

*North DeKalb Mall* _____

Shopping Center Name                     Deal #

~~Toilet Hallway (from sales area to toilet):~~ Landlord shall install toilet hallway walls from ~~Tenant's sales floor to Tenant's toilets.~~ Landlord shall install a three foot by six foot eight inch (3'-0" x 6'-8") opening from Tenant's sales area to the hallway. See below for Tenant ~~approved wall construction methods.~~ *Toilet locations per approved landlord plans*   **NO**

~~Note:~~ Landlord shall coordinate all wall locations with Tenant's final plans (site specific plans) prior to wall construction. Failure to do so will result in additional expense to the Landlord for removal and reinstallation of walls. Landlord shall install GWB to roof deck above storefront framing to separate the Premises from Shopping Center canopy and/or sign-facade area.   **MUST Be Approved By Store Design Grp**

**Tenant Approved Construction Methods**

(Demising, Stockroom, Egress Hallway, Toilet Rooms and Toilet Hallway)

**Metal or Wood** (where approved by code) **Studs:** with gypsum wallboard on each side to roof deck.

**Concrete Masonry Unit (CMU) or Tilt-Up Concrete:** walls shall be furred with metal or wood (where approved by code) furring and gypsum wallboard to six inches (6") above finish ceiling on Tenant side only, unless otherwise required by code. All sales area perimeter walls shall be furred and cover with gypsum wallboard, finished and ready for Tenant's finishes. All furring to be run vertically, not horizontally, for Tenant's fixture installation. Exposed CMU walls are allowed in Tenant's stock room area only.

Finished is defined as caulked, taped, mudded, and sanded smooth and ready for Tenant's finishes.

2) **Floors:**

**All Area's Except Toilet Rooms:** A level and smooth concrete slab exposed throughout Premises, free of leveling products (unless existing construction), with not more than one-quarter inch (1/4") variation in ten feet (10'-0"). All required expansion and control joints properly installed and ready to accept Tenant's floor finishes. On grade floors shall have a functioning vapor barrier installed beneath the slab (unless existing construction).

**Toilet Rooms:** Landlord shall install twelve inch by twelve inch (12" x 12"), three-thirty seconds inch (3/32") neutral VCT (vinyl composite tile- beige or white) and six inch (6") vinyl wall cove base (black). If required by code Landlord shall install an impervious floor finish in toilet area similar to commercial grade heated welded sheet vinyl or other acceptable flooring finish. California Health Code requires an impervious floor in all locations and Landlord shall install.

3) **Ceiling:**

**Sales Area:** Landlord shall install a two foot by four foot (2'-0" x 4'-0") acoustical ceiling tile (ACT) and grid system at a minimum height of eleven foot (11'-0") AFF and a maximum height of fourteen foot (14'-0") AFF. Tenant's preferred ceiling height is 12'-0" AFF. Grid and tile shall be white in color and new or like new condition (all tiles shall match). Prior to construction, Landlord shall contact Tenant if these requirements cannot be met.

**Stockroom Area:** Exposed roof deck is acceptable by Tenant in stockroom area unless ceiling is required by code and/or to accommodate a plenum return air system. If ceiling is required to be installed, Landlord shall install a two foot by four foot (2'-0"x4'-0") acoustical ceiling tile (ACT) and grid system at a height no lower than ten foot (10'-0") AFF. Grid and tile shall be white in color and new or like new condition (all tiles shall match- if required or needed). Prior to construction, Landlord shall contact Tenant if these requirements cannot be met.   *un acceptable* **X** *NoT   Acceptable*

**Toilets:** Landlord shall install a ~~GWB, water resistant~~ ceiling at eight foot (8'-0") AFF. ~~Landlord shall paint ceiling with washable Semi gloss paint (neutral color).~~ Prior to construction, Landlord shall contact Tenant if these requirements cannot be met.

**Hallway (from sales area to toilet):** Landlord shall install a two foot by four foot (2'-0"x4'-0") acoustical ceiling tile (ACT) and grid system at a height no lower than ten foot (10'-0") AFF and new or like new condition (all tiles shall match). Prior to construction, Landlord shall contact Tenant if these requirements cannot be met.

*(paint) +* **X** *No*

Revised 10/30/2009                                                                 3

Exhibit "C"- Construction Criteria
Landlord's Scope of Work
"Tenant's Vanilla Box" (New or Existing Construction)

*North DeKalb Mall*

Shopping Center Name _____    *Mall*    "Al...:"  OV    Deal #

~~Egress  Hallway:  Exposed  roof  deck  is  acceptable  by  Tenant  in  egress  hallway  area~~
~~unless  ceiling  is  required  by  code  and/or  corridor  is  open  to  Tenant's  sales  floor  with  no~~
~~door  separation;  and/or  to  accommodate  a  plenum  return  air  system.  If  ceiling  is  required~~
~~to  be  installed,  Landlord  shall  install  a  two  foot  by  four  foot  (2'-0"x 4'-0")  acoustical  ceiling~~
~~tile  (ACT)  and  grid  system  at  a  height  no  lower  than  ten  foot  (10'-0")  AFF.  Grid  and  tile~~
~~shall  be  white  in  color  and  new  or  like  new  condition  (all  tiles  shall  match  if  required  or~~
~~needed).  Prior  to  construction,  Landlord  shall  contact  Tenant  if  these  requirements~~
~~cannot  be  met.~~

4) Lighting:

Exact lighting quantities and locations will be based on Tenant's final reflected ceiling and
lighting plan. Tenant's architects will send the Landlord a copy of the reflected ceiling and
lighting plan to incorporate into Landlord's plans.

Sales Floor, Egress Corridor, Toilet Hallway and Stockroom:

**General Lighting:** Landlord shall install eight foot (8'-0") strip fluorescent light
fixtures mounted with hangers to the ACT grid. Light fixtures shall be connected
end-to-end to form a continuous row (no space between fixtures in row) and as
indicated on Tenant's reflected ceiling plan. Fixtures are to have two (2) four foot
(4'-0") T8 lamps and shall have electronic ballast. Lamps are to be
F028/841/SSECO series 841-4100 Kelvin color temp bulbs. Landlord shall have
light fixtures completely connected, tested and fully operational prior to Turnover
Date.

**Infill Lighting:** Landlord shall install four foot (4'-0") strip fluorescent light fixtures
mounted with hangers to the ACT grid. Light fixtures shall be connected end-to-
end to form a continuous row (no space between fixtures in row) and as indicated
on Tenant's reflected ceiling plan. Fixtures are to have two (2) four foot (4'-0") T8
lamps and shall have electronic ballast. Lamps are to be F028/841/SSECO
series 841-4100 color temp bulbs. Landlord shall have light fixtures
completely connected, tested and fully operational prior to Turnover Date.

**Emergency Lights:** Landlord shall install emergency lighting ballast in general
lighting fixtures described above where allowed by code. In jurisdictions that do
not allow this, stand-alone emergency lighting units shall be used and shall be
ceiling mounted (no lights mounted on interior perimeter walls). Exact quantities
will be detailed by local and national codes. Landlord to install per Tenant's final
reflected ceiling plan. Landlord shall have light fixtures completely connected,
tested and fully operational prior to Turnover Date.

**Exit Lights:** Landlord shall install high efficiency LED exit light fixtures with
battery back-up. Quantity and locations will be dictated by local, state, and
national code requirements. Exit signs must be ceiling mounted to avoid conflict
with Tenant's wall graphics. Landlord shall have light fixtures completely
connected, tested and fully operational prior to Turnover Date.

Toilets:    *....... ..........i* NO

**General Lighting:** Landlord shall install four foot (4'-0") strip fluorescent light
fixtures mounted to the ceiling per manufacturer's instructions. Fixtures are to
have two (2) four foot (4'-0") T8 lamps and shall have electronic ballast. Lamps
are to be F028/841/SSECO series 841-4100 Kelvin color temp bulbs. Landlord
shall have light fixtures completely connected, tested and fully operational prior to
Turnover Date.

Exterior Lights:

**Exterior Wall Pack:** Landlord shall install High Intensity Discharge (H.I.D.) light
fixtures above every exterior door to the Premise. These fixtures shall be a
minimum of 70 watts. Landlord shall have light fixtures completely connected,
tested and fully operational prior to Turnover Date.

**Emergency Exit:** Landlord shall install exterior emergency egress lighting at
each exterior door from the Premise. These exterior fixtures shall have remote
batteries mounted just inside the Tenant space. Landlord shall have light fixtures
completely connected, tested and fully operational prior to Turnover Date.

Light Fixture Mounting Methods:

*Revised 10/10/2009*                                                                    4



Exhibit "C"- Construction Criteria
Landlord's Scope of Work
"Tenant's Vanilla Box" (New or Existing Construction)

*North DeKalb Mall*
Shopping Center Name                                    Deal #

**No Ceiling:** Areas with no ceiling (exposed roof deck) shall have light fixtures suspended as follows, sales area twelve foot (12'-0") AFF and stockroom at ten foot (10'-0") A.F.F.

**Suspended ACT Ceiling:** All areas with a suspended ACT ceiling shall have light fixtures attached to the ceiling grid using lighting manufacturer approved hardware. Ceiling grid shall be supported from structure as required.

**Hard/GWB Ceiling:** All areas with a suspended Hard/GWB ceiling shall have light fixtures attached to the ceiling using lighting manufacturer approved hardware.

5) HVAC:

Tenant requires that all HVAC equipment be High Efficiency (equal to Carrier's TC series) packaged units with differential enthalpy economizer controls capable of $CO_2$ based demand controlled ventilation, duct-type smoke detectors with monitoring device as required by code, gravity back draft dampers, a separately wired convenience outlet, disconnect switch, and louvered coil guards. HVAC equipment voltage and phase shall match the electrical service voltage and phase brought to the space. Natural gas is the required source for heating. Prior to installation, electric heat units and heat pumps must be approved by Tenant. Carrier is Tenant's required manufacturer for HVAC equipment. The following represents a guideline for Tenant's minimum HVAC capacity standards. Landlord is responsible to provide Tenant with complete as-built mechanical drawings with an air balance report prior to Turnover Date. Landlord shall have all HVAC units completely connected, tested and fully operational prior to Turnover Date.

Minimum HVAC requirements: A minimum of one (1) ton of cooling for every three hundred and fifty (350) square feet is required. Landlord is required to perform exact site specific space load calculations to account for all internal and external heat gains and losses. Tenant requires a minimum of three (3) HVAC units and a maximum of five (5) HVAC units to serve the sales area as a separate, dedicated unit to serve the stock area. Supply and return ductwork shall be mounted no higher than twelve feet (12'-0") A.F.F. in stockroom area.

The list below includes but is not limited to steps required to properly perform a space load calculation:

The space temperature shall be as follows: Cooling periods: 74 degrees Fahrenheit at 50 percent relative humidity, heating periods: 70 degrees Fahrenheit.

The heating supply air temperature shall be 85 degrees Fahrenheit minimum.

Lighting load based on 2 watts per square foot in the sales area and 1 watt per square foot in the stockroom, utility room and toilet room.

People load based on ASHRAE recommended occupancy calculations with a design factor of 250 BTUH/person sensible gains and 270 BTUH/person latent gains.

Infiltration based on 2 CFM per square foot of exterior door area.

Miscellaneous equipment gain of thirty five thousand (35,000) BTU/h

Outside air based on .3 CFM per square foot of net free area in the sales area and .15 CFM per square foot of net free area in the stock room, or as required by local code.

The building envelope load calculations shall be performed based on actual building type and materials.

Landlord must be prepared to produce engineered space load calculations and design documents and forward to Tenant. The system must be balanced and include all galvanized steel sheet metal ductwork with a minimum of 1-1/2" external wrap insulation with vapor barrier, diffusers, grilles, registers, exhaust fans, etc. associated with a fully functional HVAC system. Tenant will install a energy management system that will control all HVAC, interior and exterior signs, all exterior signs and monitor phase control for protection of all three (3) phase equipment. In order to install this system in a timely manner, Landlord is required to supply to Tenant ninety (90) days prior to turnover of space, design documents with all required information including, but not limited to, HVAC equipment manufacturer, model number, serial number and the main electrical feed to

*Two inch X*
*h sever*
*side areas,*
*load density*
*Stock room*

*Design No*
*Must Be*
*Use Reviewed*
*By Sayre*
*Designs*
*Approvals*



Exhibit "C"- Construction Criteria
Landlord's Scope of Work
"Tenant's Vanilla Box" (New or Existing Construction)

_North DeKalb Mall_
Shopping Center Name                                    Deal #

the demised premises. Landlord is also required to provide a fully functioning, code compliant, toilet exhaust system which, if applicable, will serve the janitors closet also.
_Landlord will balance the HVAC system prior to delivery of space_

**6) Toilet Accessories/Plumbing Fixtures:**  _Is Per_

**Plumbing Fixtures and Toilet Accessories:** Landlord shall install fully functional toilet rooms including but are not limited to, lavatories, water closets and floor drains furnished with all necessary accessories including, but not limited to, water closet seats, faucets, commercial grade power assist flush valves, grab bars, one (1) mirror at each lavatory, four (4) roll toilet paper holders (one per water closet), and toilet partitions (henceforth, with concaved-surface to prevent vandalism) as required. Landlord shall install a urinal, if required by code. Each toilet room shall be provided with a three inch (3") floor drain with the appropriate floor grate and trap primer. Landlord shall install toilet room door (per Section 9), walls per Section 1, and flooring per Section 2. Landlord shall locate toilet rooms, mop sink, and drinking fountain as per Tenant's final plans. Landlord shall have plumbing fixtures completely connected, tested and fully operational prior to Turnover Date.

**Drinking Fountain:** Landlord shall install an ADA approved (Hi-Lo) non-electric (unless required by code) drinking fountain. Landlord shall have plumbing fixtures completely connected, tested and fully operational prior to Turnover Date.

**Mop Sink:** Landlord shall install a floor mounted thirty six inch by twenty four inch (36"x 24") mop service basin with the appropriate faucet, backflow prevention and FRP back splash at surrounding walls to eight foot (8'-0") AFF. Landlord shall have plumbing fixtures completely connected, tested and fully operational prior to Turnover Date.

**Water Heater:** Landlord shall install a water heater (located above or near toilet rooms) with a minimum of six (6) gallons storage capacity, seven (7) gallons per hour recovery rate at one hundred (100) degrees Fahrenheit temperature rise. It is the responsibility of Landlord to provide a water heater with the required recovery rate, storage capacity, appropriately terminated temperature and pressure relief valve, drain pan and hot water expansion tank as required by code. Landlord shall have the water heater properly mounted and secured as required by code. If the water heater is more than thirty five (35) feet away from any plumbing fixture requiring hot water, Landlord shall provide all components necessary for a properly functioning hot water recirculation line. If required by code Landlord shall install a larger water heater as required, twenty (20) gallon as required in California and other area's and/or thirty (30) gallon as required in Arizona and other area's and shall be located above or near toilet rooms. Landlord shall have plumbing fixtures completely connected, tested and fully operational prior to Turnover Date.

**7) Electrical:**

**Tenant Signage:** Landlord shall install Tenant's signage circuits consisting of three (3) twenty (20) amp, one hundred and ten (110) volt circuits from storefront to the electrical panel location. Terminate circuit in junction box at the storefront and in the terminal strip enclosure (refer to attachment detail VB6) described in the "Lighting" paragraph below near electrical panels. This will provide an interface point for Tenant's future Energy Management System (EMS). Landlord shall have all circuits completely connected, tested and ready to energize prior to Turnover Date.

**Duplex Outlets:** Landlord shall install standard duplex receptacles at four inches (4") above finished floor and spaced no more than twenty-five feet (25'-0") apart on the sales area perimeter walls. A minimum of three (3) circuits shall be used to feed the sales area receptacles with the circuit loads balanced as best possible. Landlord shall have all outlets completely connected, tested and ready to energize prior to Turnover Date.

Landlord shall install standard duplex receptacles at eighteen inches (18") above finished floor and spaced no more than forty feet (40'-0") apart on the stock room perimeter wall unless otherwise required by code. Landlord shall have all outlets completely connected, tested and ready to energize prior to Turnover Date.

**Lighting:** Landlord shall install an enclosure (with terminal strips, refer to attachment VB6) adjacent to the electrical panels. Landlord shall connect all circuits from the light fixtures to the terminal strips within this enclosure. Each row of light fixtures shall be on an individual circuit on the electrical panel for separation of control. Tenant will install an Energy Management System (EMS) at a later date and will use this enclosure as the interface point for controlling the lighting circuits.  Night lights and exit signs shall be

Revised 10/30/2009                                                                    6



Exhibit "C"- Construction Criteria
Landlord's Scope of Work
"Tenant's Vanilla Box" (New or Existing Construction)

North DeKalb Mall
_____                    _____
Shopping Center Name                                Deal #

wired directly to the electrical panel. Landlord shall have all lights completely connected, tested and ready to energize prior to Turnover Date.

HVAC Units: Landlord shall connect HVAC units and all accessories per Section 5 to the electrical panels and deliver units in good working order. All HVAC units shall be fed from the same electrical panel. Landlord shall provide Tenant with exact power feed information within the above timeframe noted in Section 5 above 'HVAC', to accommodate Tenant's Energy Management System. Service receptacles shall be provided at each unit and shall be wired. Exhaust fans shall be wired to the terminal strip enclosure (refer to attachment detail V86) described in the Lighting section above. Landlord shall have all HVAC units and exhaust system completely connected, tested and ready to energize prior to Turnover Date.

Water Heater: Landlord shall connect water heater to the electrical panel, provide a thirty (30) amp breaker and disconnect at the water heater as required by code. Landlord shall have water heater completely connected, tested and ready to energize prior to Turnover Date.

Electrical Panels: Landlord shall install all MDP panel(s), electrical panel(s), disconnect(s), meter base, breakers and transformer(s) per diagrams attached (V02 thru V86) based on selected service. Tenant's requirements listed below. All electrical panels must be installed in the locations shown on Tenant's final plans. Landlord shall install panel schedules inside each electrical panel giving a description for each circuit used. Below are the electrical service requirements for 208Y120V and 480Y277V service configurations. If the site has a different service voltage configuration, please contact Tenant for appropriate service site. Landlord shall have electrical system completely connected, tested and ready to energize prior to Turnover Date.

**Electrical Service:**

0 square feet up to 14,999 square feet-

208Y120V, 600A   OR   480Y277V, 300A    OK

15,000 square feet up to 18,000 square feet-

208Y120V, 800A   OR   480Y277V, 400A

**300A 480Y277 Volt (3 phase, 4 wire) Service (Tenant preferred):** Landlord shall provide a separately metered electrical service with over current protection, a forty-two (42) circuit main electrical panel (sized per schedule above), a seventy five (75) kVA step-down transformer fed from the 480V panel, and a forty-two (42) circuit sub-panel (208Y120 volt with two hundred twenty-five (225) amp main circuit breaker) fed from the transformer. All light fixtures and HVAC equipment is to be fed from the main panel. The main panel shall also have a spare 20A/3P circuit breaker for the Tenant's future use. Install spare 20A circuit breakers in all un-used breaker spaces.

**400A 480Y277 Volt (3 phase, 4 wire) Service (Tenant preferred):** Landlord shall provide a separately metered electrical service with over current protection, a forty-two (42) circuit main electrical panel (sized per schedule above) and will have a one-hundred fifty (150) amp three-pole circuit breaker feeding a 480V one hundred fifty (150) amp (42) circuit sub-panel, a seventy (75) kVA step-down transformer fed from the main 480V panel, and a forty-two (42) circuit sub-panel (208Y120 volt with two hundred twenty-five (225) amp main circuit breaker) fed from the transformer. All light fixtures are to be fed from the 480V sub-panel and all HVAC equipment is to be fed from the main panel. The main panel shall also have a spare 20A/3P circuit breaker for the Tenant's future use. Install spare 20A circuit breakers in all un-used breaker spaces.

OR

**300A or 400A 208Y120 Volt (3 phase, 4 wire) Service:** Landlord shall provide a separately metered electrical service with over current protection, MDP panel, disconnect and two (2) forty-two (42) circuit electrical panels. The main panel shall be sized per the schedule above and will have a one-hundred (100) amp, three-pole circuit breaker feeding the second panel and a one-hundred fifty (150) amp, three-pole circuit breaker feeding the third panel. All light fixtures are to be fed from the third panel and all HVAC equipment is to be fed from the main panel. Install a spare 20A/3P circuit breaker in the main panel for the Tenant's future use. Install spare 20A circuit breakers in all un-used breaker spaces.

Revised 10/10/2009                                                                 7

Exhibit "C"- Construction Criteria
Landlord's Scope of Work
"Tenant's Vanilla Box" (New or Existing Construction)

___North DeKalb Mall___                                    Deal # _____
Shopping Center Name

*Note: Landlord shall terminate all circuits in panel boards except for general lighting, infill lighting, and exterior wall pack circuits, these circuits shall terminate at terminal strips as described above. All other lighting (ex: exit, exterior emergency, interior emergency) shall also terminate at panel boards.*

**8) Fire Sprinkler System:**

If required by any authority having jurisdiction, Landlord shall install a fully functional Fire Sprinkler System to include but not limited to the riser, backflow preventer, mains, all pipes and heads. Fire Sprinkler System must be installed in accordance with all local ordinances and any fire underwriters having jurisdiction over the space. Landlord is responsible for coordination of sprinkler head locations based on Tenant's final reflected ceiling plan, if the fire suppression system is required to be monitored then Landlord shall install monitoring system complete. Landlord shall mount all horns, strobes and other fire devices required for monitoring system on ceiling so not to disturb Tenant's perimeter graphics package. Landlord shall have Fire Sprinkler System completely connected, tested and fully operational prior to Turnover Date.

**9) Doors and Hardware:**

~~Freight Delivery Door: Landlord shall install one (1) pair of three foot by seven foot (pair (3'-0" x 7'-0") hollow metal doors and metal frame in accordance with Tenant's final plans. Door shall be a minimum eighteen (18) gauge material and have a clear six foot zero inch by seven foot zero inch (6'-0" x 7'-0") opening with no obstructions (no mullions between doors). Door hardware shall include three (3) pair hinges (4-1/2" heavy weight, non-removable pins), door sweep (both doors), rain drip (above door), one-half inch (1/2" high) maximum aluminum threshold, closer (b), weather stripping and a commercial grade non-alarmed panic device to secure Premises until Landlord turns Premises over to Tenant.~~

*[handwritten: 9) Landlord shall provide --- No Mullion Swing]*

Toilet Room Door: Landlord shall install one (1) three foot zero inch by six foot eight inch (3'-0" x 6'-8") solid core wood door and metal frame in accordance with Tenant's final plans for each toilet room. Door hardware shall include one and one-half (1-1/2) pair hinges (standard weight), closer, door/wall stop if required, and commercial grade lever style handle.

Stockroom Door: Landlord shall install one (1) pair of three foot by seven foot (3'-0" x 7'-0") hollow metal doors and metal frame in accordance with Tenant's final plans. Door shall be a minimum eighteen (18) gauge material and have a clear six foot zero inch by seven foot zero inch (6'-0" x 7'-0") opening with no obstructions (no mullions between doors). Door hardware shall include three (3) pair hinges (4-1/2" heavy weight, ball bearing pins), closers (both doors), and push/pull latch set. If door is rated Landlord shall install one (1) astragal, one (1) pair of automatic bolts, and one (1) one-half (1/2" high) maximum aluminum threshold.

~~Egress Hallway: Landlord shall install one (1) three foot by six foot eight inch (3'-0" x 6'-8") hollow metal door and metal frame in accordance with Tenant's final plans. Door shall be a minimum eighteen (18) gauge material. Door hardware shall include one and one-half (1-1/2) pair hinges (standard weight), closer, and push/pull latch set.~~   *[handwritten: not applicable or 9]*

Exterior Egress Door: Landlord shall install one (1) three foot by seven foot (3'-0" x 7'-0") hollow metal door and metal frame in accordance with Tenant's final plans. Door shall be a minimum eighteen (18) gauge material. Door hardware shall include one and one-half (1-1/2) pair hinges (standard weight, non-removable pins), door sweep, flush bolts (both doors), overhead holder/stops (both doors), rain drip (above door), closer, one-half inch (1/2" high) maximum aluminum threshold, weather stripping and a commercial grade non-alarmed panic device to secure Premises until Landlord turns Premises over to Tenant.

Note: If any of the above doors are installed in a fire rated wall, Landlord shall install fire rated door and all required hardware required by code to meet that rating. See Tenant's final plans for list of hardware required.

**10) Storefront, Doors and Windows:**

Inline Strip Center: Landlord shall install glass and aluminum storefront at least ten feet (10'-0") tall with a pair of three foot by seven foot (3'-0"x7'-0") doors located in

Revised 10/30/2009                                                          8

Exhibit "C"- Construction Criteria
Landlord's Scope of Work
"Tenant's Vanilla Box" (New or Existing Construction)

North DeKalb Mall _____   twenty _____ 25°
Shopping Center Name                            Deal #

accordance with Tenant's final plans. Storefront aluminum shall be either dark bronze or
clear anodized aluminum material. Storefront glazing (glass) shall be a minimum one inch
(1") clear insulated low "E" glazing throughout entire storefront area, including storefront
doors. Tenant requires full height glass on seventy five percent (75%) of the width of the
Premises. Tenant will accept knee walls no higher than four feet (4'-0") AFF where size
restrictions exist only. On existing centers only any unused storefront doors Landlord
shall remove and replace with new storefront framing and glazing to match existing.
Landlord shall have all storefront doors operational and glass in good condition prior to
Turnover Date.

Enclosed Mall- Landlord shall In-Vision-Guard-M9 roll-up gate by Metro Door or equal.
All gates in excess of fifteen feet (15'-0") wide must have motorized controls to raise and
lower the gate. Landlord shall have roll-up gate completely connected, tested and fully
operational prior to Turnover Date.

11) Exterior Loading Platforms and Landing:

Tenant does not require a loading dock for all stores. Tenant will require a loading
platform and/or landing where existing site conditions warrant the need for one due to a
difference in exterior grade and interior finish floor height. Landlord will be responsible to
install per Tenant's schematic design. See below for Tenant's requirements of a loading
platform and/or landing.

If the difference from exterior grade to interior finish floor is:

Freight Door Location:

Six inches (6") or less- Landlord shall install concrete exterior landing, ramp,
and railing at exterior freight door if a difference in grade and finish floor height
exists.

Over six inches (6")- Landlord shall install exterior loading platform, ramp,
swing gate, and railing at exterior freight door if a difference in grade and finish
floor height exists. Platform design must be approved by Tenant prior to
construction. Stairs off platform are acceptable by Tenant when platform is large
enough for an "area of refuge" and where code allows.

Egress Door Location(s):

Landlord shall install exterior landing, ramp, and associated railing as required by
code at each required egress door that has a difference in grade and interior floor
height. Stairs off landing are acceptable by Tenant when landing is large enough
for an "area of refuge" and where code allows.

Note: Loading platforms and landings can be constructed of either concrete or
metal, must be sealed and/or primed and painted to protect from exterior elements.
Landlord shall install bollards as required to protect platform, landing, stair, and
ramp as necessary.

12) Miscellaneous items:  Tenant acknowledges that electrical, plumbing & sprinkler ____
                          that Tenant promises to serve the trade.  OW

Landlord shall construct all necessary walls to separate Tenant from other adjacent
tenants' electrical and mechanical equipment and sprinkler risers. Tenant does not allow
adjacent tenants' mechanical and electrical to fall within Tenant's Premises. Landlord will
also be responsible to install all associated doors to accommodate such rooms.

13) Storefront/Sign Facade:

Tenant's Prototype: Landlord shall provide Tenant's prototypical storefront/sign façade
(see attached). Landlord shall provide all materials, all construction, and all drawings
necessary to build Tenant's prototypical storefront/ sign façade. Landlord shall install
plywood for support of Tenant's future signage in area indicated on Tenant's final signage
plan. Landlord shall provide a two foot by two foot (2'-0"x2'-0") access panel in canopy for
access to Tenant's signage.

Or

Landlord's Design: Landlord shall provide Tenant's with an Anchor-like storefront/sign
façade. Façade design must be mutually agreed upon by Landlord and Tenant prior to
construction. Landlord shall provide all materials, all construction, and all drawings

Lease    direction

Revised 10/10/2009                                                              9

North DeKalb Mall–Decatur, GA                    50



Exhibit "C" - Construction Criteria
Landlord's Scope of Work
"Tenant's Vanilla Box" (New or Existing Construction)

Shopping Center Name: _No-K DeKalb Mall_          Deal #: _____

necessary to build Tenant's storefront/ sign façade. Landlord shall install plywood for support of Tenant's future signage in area indicated on Tenant's final signage plan. Landlord shall provide a two foot by two foot (2'-0"x2'-0") access panel in canopy for access to Tenant's signage.

14) **Demolition:**

**Existing Construction Only:** Landlord is to fully demolish the entire space including, but not limited to, the existing ceiling, lights, mezzanines, millwork, previous tenant finishes, fixtures and signage (interior and exterior), all interior walls, restrooms, load bearing walls, any abandoned roof top mechanical equipment, etc. The space shall be in "Broom Clean" condition prior to Turnover Date.

15) **Roof Structure:**   _As is however   on g_

Landlord shall provide complete structurally sound and leak free roof system for building with structural support adequate to accommodate HVAC roof top package units. Tenant requires a minimum "R"-factor for the roof insulation to meet local code requirements for a mercantile building.

**Landlord's Acceptance of Dollar Tree's Criteria**

PLEASE RETURN WITH YOUR SIGNED LEASE PROPOSAL

By: _____

Name: _Stephen E. Spigel_

Title: _Development Partner_

Date: _4/11/12_

Revised 10/30/2009                                                     10





**RISER DIAGRAM**
NO SCALE





# DOLLAR TREE

| | |
|---|---|
| DEAL TYPE | SHEET |
| TENANT'S VANILLA BOX CRITERIA | VB2 |
| SHEET TITLE | DATE: |
| RISER DIAGRAM & PANEL SCHED. - 170/200V (0-14,999 Sq Ft) | 10/30/04 |





Existing Service in Bld

GAS METER SHALL BE PROVIDED BY UTILITY.
METER INSTALLATION SHALL BE COORDINATED
BY THE TENANT.

PIPE CAP BY LANDLORD

GAS SERVICE, VALVES, PRESSURE REGULATORS,
PIPING WITH FINAL CONNECTIONS TO HVAC
EQUIPMENT SHALL BE FURNISHED AND INSTALLED
BY THE LANDLORD.

| DOLLAR TREE | | SHEET |
|---|---|---|
| | | VB1 |
| DEAL TYPE | TENANT'S VANILLA BOX CRITERIA | |
| SHEET TITLE | GAS SERVICE | DATE: 10/30/04 |





Ⓘ **RISER DIAGRAM**
NO SCALE.



| | | | | |
|---|---|---|---|---|
| **DOLLAR TREE** | | | **SHEET** | **VB3** |
| DEAL TYPE | TENANT'S VANILLA BOX CRITERIA | | | |
| SHEET TITLE | RISER DIAGRAM & PANEL SCHED.- 120/200V 115,000-10,000 Sq FU | | **DATE** | 10/30/09 |





① **RISER DIAGRAM**
NO SCALE

| DOLLAR TREE | SHEET VB4 |

DEAL TYPE: TENANT'S VANILLA BOX CRITERIA

SHEET TITLE: RISER DIAGRAM AND PANEL SCHED. - 277/480V (0-14,999 SQ FT)

DATE: 10/30/01





① RISER DIAGRAM
NO SCALE





DOLLAR TREE

| DEAL TYPE | | SHEET |
|---|---|---|
| | TENANT'S VANILLA BOX CRITERIA | VB6 |
| SHEET TITLE | | DATE: |
| | RISER DIAGRAM & PANEL SCHED.- 277/480V (13,000-18,000 Sq Ft) | 10/30/09 |







**EXHIBIT D**

<u>TENANT'S SIGN PACKAGE</u>





# DOLLAR TREE

| SIGN A | 42' Linear Dollar Tree |
|---|---|
| Type: | Channel Letters on a Raceway |
| Illumination: | Internally Illuminated LED |
| Square Footage: | 131.47 |
| To Grade: | Top of sign to grade = 23'-4"<br>Bottom of sign to grade = 19'-10" |

| SIGN B | Dollar Tree |
|---|---|
| Type: | replacement vinyl - Applied vinyl on 3/16"<br>white lexan (existing panels) |
| Actual Size: | 30" x 131" |
| Viewable Size: | 27-1/4" x 128-1/2" |
| Square Footage: | 27 |

CONCEPTUAL SITE PLAN
FOR
**NORTH DEKALB MALL**
ATLANTA, GA 30331
(404) 344-6611

**HENDON**
PROPERTIES

3445 PEACHTREE RD.
SUITE 465
ATLANTA, GA 30326
(404) 262-7400

Sign B

Sign A

EXHIBIT

| DOLLAR TREE | Client: | Dollar Tree | | 09/05/2012 | Original Rendering | BJ | This rendering is the property of Anchor Sign, Inc. It is for the exclusive use of Anchor Sign, Inc. and the party which requested the rendering. It is an unpublished original drawing not to be distributed, reproduced or exhibited without the consent of Anchor Sign, Inc. Please contact your account manager with questions regarding this statement. |
|---|---|---|---|---|---|---|---|
| | Site #: | DL-A16347 | | 12/17/2012 | Updated building and Sign A | DH | |
| | Address: | 250 Lawrenceville Highway (Suite 5009-A) | | | | | |
| | | Decatur, GA 30033 | | | | | |





| SIGN A | 42" Linear Dollar Tree |
| --- | --- |
| Type: | Channel Letters on a Raceway |
| Illumination: | Internally Illuminated LED |
| Square Footage: | 131.47 |
| To Grade: | Top of sign to grade = 23'-4"<br>Bottom of sign to grade = 19'-10" |

*Awnings by LL



**Front Elevation (South)**
Scale: 3/32" = 1'-0"

| Allowable Square Footage this Elevation: | 150 |
| --- | --- |
| Actual Square Footage this Elevation: | 131.47 |

| DOLLAR TREE | Client: | Dollar Tree | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Site #: | DL-A16347 | 09/05/2012 | Original Rendering | BJ |
| | Address: | 250 Lawrenceville Highway (Suite 5009-A) | 12/17/2012 | Updated building and Sign A | DH |
| | | Decatur, GA 30033 | | | |


1.800.213.3331



| SIGN A | 42" Linear Dollar Tree |
|---|---|
| **Type:** | Channel Letters on a Raceway |
| **Illumination:** | Internally Illuminated LED |
| **Square Footage:** | 131.47 |
| **To Grade:** | Top of sign to grade = 23'-4" |
| | Bottom of sign to grade = 19'-10" |

37'-6 3/4"

21'-7 1/2"    2'-7 1/4"    3'-4 3/4"

42"

# DOLLAR TREE

### Sign Layout Detail
Scale: 3/16" = 1'-0"

**Electrical Detail:**

AGILIGHT TUFFRAYZ GREEN LED
(3) 60w Transformers @ .85 each
Total Amps = 2.55

**General Notes:**

This sign is to be installed in accordance with
the requirements of Article 600 of the National
Electrical Code.

1) Grounded and bonded per NEC 600.7/NEC 250
2) Existing branch circuit in compliance with
   NEC 600.5, not to exceed 20 amps
3) Sign is to be UL listed per NEC 600.3
4) UL disconnect switch per NEC 600.6- required per
   sign component before leaving manufacturer*
   *For multiple signs, a disconnect is permitted but
   not required for each section

**Specifications: Channel Letters**

1. Existing Facade: Eifs/Plywood/Metal Studs
2. 0.040" Aluminum letter returns painted to match bronze
3. 0.125" x 1" trim cap to match bronze
4. 3mm Signabond Lite composite backs
   (interior of sign can painted ultra white for maximum illumination)
5. Green LEDs
6. 3/16" White #2447 Acrylic with first surface applied vinyl to match:
   ■ Arlon#2500-156 (Vivid Green)
7. Waterproof disconnect switch per NEC 600-6
8. Primary electrical feed
9. Transformers
10. 0.080" Aluminum raceway painted to match the facade
11. 15" x 2" x 0.1875" Aluminum mounting tabs welded to raceway
    · Maximum 6" from each end and every 48" o.c.
12. #12 x 1" TEC screws with 11/4" fender washers
13. Mounting hardware to suit



5"    7"

¼" Drain holes at bottom
of letter cans (2) per letter

### Section @ LED Channel Letter
**Raceway (Center)**                    Scale: N.T.S.

| DOLLAR TREE | Client: Dollar Tree | REVISION INFO | 09/05/2012 | Original Rendering | | BJ | This rendering is the property of Anchor Sign, Inc. It is for the exclusive use of Anchor Sign, Inc. and the party which requested the rendering. It is an unpublished original drawing not to be distributed, reproduced or exhibited without the consent of Anchor Sign, Inc. Please contact your account manager with questions regarding this statement. |
|---|---|---|---|---|---|---|---|
| | Site #: DL-A16347 | | 12/17/2012 | Updated building and Sign A | | DH | |
| | Address: 250 Lawrenceville Highway (Suite 5009-A) | | | | | | |
| | Decatur, GA 30033 | | | | | | |


1.800.213.3331



| SIGN B | Dollar Tree |
|---|---|
| Type: | replacement vinyl - Applied vinyl on 3/16" white lexan (existing panels) |
| Actual Size: | 30" x 131" |
| Viewable Size: | 27-1/4" x 128-1/2" |
| Square Footage: | 27 |



## Vinyl Replacement On Existing D/F Pylon

**QTY 2 (1 SET)**                    Scale:  1/2" = 1'-0"

**Specifications:**
1. Existing 3/16" white lexan
2. New applied vinyl:  ☐ Arlon#2500-156 (Vivid Green)
3. Existing Retainers



**Multi-Tenant Pylon Elevation**
Scale:  N.T.S.

| DOLLAR TREE | Client: Dollar Tree | | | | | |
| | Site #: DL-A16347 | | | 09/05/2012 | Original Rendering | BJ |
| | Address: 250 Lawrenceville Highway (Suite 5009-A) | | | 12/17/2012 | Updated building and Sign A | DH |
| | Decatur, GA 30033 | | | | | |

This rendering is the property of Anchor Sign, Inc. It is for the exclusive use of Anchor Sign, Inc. and the party which requested this rendering. It is an unpublished original drawing not to be duplicated, reproduced or exhibited without the consent of Anchor Sign, Inc. Please contact your Account manager with questions regarding this statement.



1.800.213.3331

EXHIBIT E

EXCLUSIVES and RESTRICTIONS

## NORTH DEKALB MALL

**ROSS LEASE**

The Shopping Center shall remain retail in character, and no part of the Shopping Center (excluding the Rich's Parcel) shall be used for the following:

1.  Office purposes (excluding the following which shall be permitted: "Retail Offices" which shall include a shopping center management office and office use typically found in shopping centers, including, but not limited to, travel agencies, real estate brokerage offices, financial institutions, title companies, insurance agencies, a post office, and armed service recruiters provided that such retail office use shall not exceed, in the aggregate, ten percent (10%) of the Leasable Floor Area of the Shopping Center (excluding the Rich's Parcel) and provided further that no more than six thousand eight hundred ninety-eight (6,898) square feet of Retail Offices shall be permitted within two hundred (200) feet from the front entrance of the Ross Store);

2.  Residential purposes;

3.  Theater (except that a theater operating in the existing theater building is permitted), auditorium, meeting hall, school, church or other place of public assembly;

4.  Flea market (except that a retail operator specializing in the sale and display of second-hand merchandise [i.e., for example only: "Play It Again Sports", "Funcoland", or "Once Upon a Child"] is permitted);

5.  Gymnasium (except that the LA Fitness health club or a comparable replacement tenant in the LA Fitness location is permitted);

6.  Veterinary services or overnight stay pet facilities (except that a pet store, with veterinary services and overnight stay pet facilities such as PetsMart or Petco or a similar retailer shall be permitted in the Shopping Center, provided that the front doors of such pet store shall not be any closer than two hundred [200] feet from the front doors of the Ross Store, and further provided that all of the following conditions are complied with throughout the term of the Ross Store lease: (A) the pet store shall not exceed twenty thousand [20,000] square feet of Leasable Floor Area; (B) the veterinary services and overnight stay pet facilities are only incidental to the operation of the pet store, and such combined services and facilities in the aggregate



shall occupy no more than fifteen percent ([15%] of the Leasable Floor Area of the pet store; (C) there shall be no boarding of pets in the pet store as a separate customer service; (D) all kennels, runs and pens shall be totally located inside the pet store; and (E) the pet store shall be completely contained within a fully enclosed building structure);

7. Dance hall (except that a dance floor as an incidental use to a permitted restaurant is permitted), billiard or pool hall (except that billiards or pool tables as an incidental use to a permitted restaurant are permitted);

8. Massage parlor (except that massage services provided within a permitted day spa or health club or as an incidental use to the retail sale of health care products are permitted);

9. Video game arcade (except that a video game arcade is permitted so long as such video game arcade is at least fifty (50) feet from the Ross Store entrance);

10. Bowling alley or skating rink;

11. Car wash;

12. Facility for the sale, display, leasing or repair of motor vehicles;

13. Night club, adult products, adult books or adult audio/video products (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to children under seventeen (17) years old because such inventory explicitly deals with or depicts human sexuality); or

14. Restaurant or other "High Intensity Parking User" shall not be permitted within fifty (50) feet of the front and side perimeter walls of the Ross Store. A "High Intensity Parking User" is a tenant or occupant which typically uses more than five (5) parking spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with either customary shopping center practices or governmental regulations, whichever has a higher parking requirement.

**Ross:**
**Section 15.3**

Without the prior written consent of Tenant, which consent may be withheld in the absolute and sole discretion of Tenant, no tenant or occupant of the Shopping Center (other than Tenant, any full price department store, any store located on an Outparcel, or any store operated as of the Effective Date by an Existing Tenant listed on **Exhibit K**, during the term of such Existing Tenant's lease or occupancy agreement or during any extensions or renewals of such Existing Tenant's lease or occupancy agreement) may use, and Landlord, if it has the capacity to do so, shall not (a) lease space or allow space in the Shopping Center to be occupied by a full line, "off-price retailer" such as: Nordstrom Rack, Goody's, Filene's Basement, or Factory 2U



(however, an "off-price retailer" shall not include T.J. Maxx, Marshall's, Marshall's Home, Steinmart, Old Navy, Burlington Coat, or their successors or assigns); or (b) permit any other tenant or occupant of the Shopping Center (other than Tenant, Nordstrom Rack, Goody's, Filene's Basement, or Factory 2U, any full price department store, any store located on an Outparcel or any store operated by an Existing Tenant listed on **Exhibit K** during the term of such Existing Tenant's lease or occupancy agreement or during any extensions or renewals of such Existing Tenant's lease or occupancy agreement) to use in excess of fifteen thousand (15,000) square feet of Leasable Floor Area or more of its premises for an Off-Price Use. "Off-Price Use" for the purpose hereof, shall mean the display and/or sale of all or substantially all of the following: soft goods merchandise, including men's, women's and children's apparel, shoes, accessories, such as jewelry and cosmetics, domestics and linens, housewares, art, pictures, posters, frames, artificial floral, office supplies, sporting goods, furniture and lamps, window and floor coverings, electronics, videos, books, toys, party goods, pet supplies, luggage and packaged foods, and such other items as are sold in Tenant's similarly merchandised stores, in Georgia, on an every day basis at prices substantially below the manufactures suggested retail price; provided, however, this definition shall not prohibit sales events by a retailer at a price discounted from that retailer's every day price. Tenant acknowledges that the term "Off-Price Use" as used herein shall not mean the type of operations presently being conducted by discount retailers such as Costco, Target, Wal-Mart, Office Depot, Office Max, Staples, Circuit City, Rack Room Shoes, Bed, Bath and Beyond, Linens 'N Things, PETsMART, Petco, Best Buy, Michaels, Sports Authority, Dick's and other similar retailers. Moreover, Tenant expressly agrees that the above restrictions shall not prohibit the operation of store(s) similar to Family Dollar, Dollar Tree and other similar retailers.

## BURLINGTON COAT FACTORY LEASE:

As long as Tenant is operating within the Shopping Center in at least 30,000 square feet, subject to permitted title exceptions and existing leases, Landlord agrees that no bowling alleys, movie theaters (other than the existing theater premises or any expansion thereof into adjoining space), skating rink, gymnasiums and/or health or fitness clubs (within 250 feet of the Premises) shall be hereafter erected or maintained in the Shopping Center, no sit down full service or fast food restaurant may be erected or hereafter leased or occupied within 150 feet of the Premises, not less than 85% of the GLA of the Shopping Center shall be leased, used, occupied or held out for lease as "retail" stores; and no building in the Shopping Center shall be leased, used or occupied by a store selling infant furniture and accessories or bath and linen items or for the sale of items listed in Exhibits C-1 and C-2 (see below). Tenant's rights with respect to limitation on infant furniture and accessories or bath and linen items expire ninety (90) days after the earlier of Landlord's receipt of notice of Tenant's intention to permanently cease operations of the premises or transactional association of operations. Retail uses exclude flea markets; fairs; conventions; exhibitions; temporary tenants of any kind in excess of 5% other than the Christmas season; bingo parlors; pool halls and gambling establishments of any kind (provided that a store that sells state lottery tickets as an incidental part of its operations shall not be deemed a gambling establishment); hotels, motels, inns and lodging establishments of any kind; storage facilities of any kind (other than small storage units commonly found in malls, i.e. locker type); gas stations, TBA Pads, and auto and other repair shops of any kind other than in the outparcels along the Ring Road and fuel dispensing stations are permitted in the Shopping Center other than



in the restricted area; office buildings, offices in excess of 5% of the floor area, massage parlors, rental agencies, video or game rooms within 350 feet of the demised premises; auditoriums, convention halls and the like; ballrooms, dance halls; pubs, bar rooms, clubs, package stores and purveyors of liquor of any kind, whether for on or off premises consumption; groceries, convenient stores, super markets in the Restricted Area.

Exhibits C-1 and C-2:

A. Baby Depot Exclusive

    1.    cribs
    2.    changing tables
    3.    toy boxes
    4.    children's and adult rocking chairs
    5.    glider/rockers
    6.    juvenile furniture
        a.    tables
        b.    chairs
        c.    chests
        d.    dressers
        e.    bean bags
    7.    crib comforters, dust ruffles, bumpers, sheets and mattress pads
    8.    diaper stackers and diaper bags
    9.    strollers
    10.    high chairs
    11.    car seats
    12.    play pens
    13.    walkers and entertainers
    14.    infant swings
    15.    infant and layette clothing
    16.    diapers
    17.    such additional items that are typically sold in
           an infant and children toys, furnishings and furniture store

B. Luxury Linens Exclusive

    1.    Bedding
           Sheets, comforters, bedspreads, bed pillows, mattress pads, duvet covers, blankets, quilts and decorative throws

    2.    Bath and Kitchen Towels -beach towels, aprons, potholders, oven mitts, robes and body wraps

    3.    Decorative Pillows and Chair Pads

    4.    Tabletop -tablecloths, napkins, placements, runners, scarves and doilies



5.   Rugs- scatter rugs, bath rugs, area rugs, novelty rugs

6.   Bath Room Accessories and Shower Curtains
         plastic ensembles, ceramic ensembles, metal ensembles, scales,
         hampers, toilet seats, shower hooks, personal care products

7.   Curtains and Draperies-drapery hardware

8.   Closet and Storage Items

9.   Luggage

Tenant's rights with respect to limitation on the sale of infant furniture and accessories or bath and linen items or the sale of the items listed in Exhibit "C-1" (items listed in 1-17 above, inclusive) and Exhibit "C-2" (i.e. items listed in 1-9 above, inclusive) will not pertain to: (i) any tenants in the Shopping Center as of the Lease Commencement Date whose leases do not prohibit the sale of infant furniture or the items listed in Exhibit "C-1" and Exhibit "C-2", (ii) Costco, BJ's, Stein Mart, Shopper's World, Conway Stores, Marshall's, T. J. Maxx, A. J. Wright or any department store or wholesale club tenant occupying over 50,000 square feet   (collectively, "Permitted Retailer") or any replacement tenant, successor or assign of such Permitted Retailer which operates a use substantially similar to such Permitted Retailer  In addition to the foregoing exception, all other occupants of the Shopping Center to which the limitation on the sale of the items listed in Exhibit "C-1" and Exhibit "C-2" do pertain shall be permitted to conduct the incidental sale of the products identified in Exhibit "C-1" and Exhibit "C-2", incidental sales being the sale of such products in the lesser of 2,000 square feet, or 10% of the floor area of such store, in both instances, inclusive of aisle space.

## AMC THEATRES LEASE:

No other theaters permitted in Shopping Center or within 500 feet of Shopping Center if owned by Landlord or affiliate; if Landlord violates this provision annual fixed rent will abate by an amount equal to the product obtained by multiplying the number of seats in such other theater by the quotient obtained by dividing the amount of the annual fixed rent then payable under the Lease by the numbers of seats than in Tenant's facility.  Furthermore, Landlord will not sell or permit to be sold any popcorn or candy generally sold in theater concession stands in or from any premises located within 150 feet from the interior entrance to Tenant's building or in or from any part of the parking area or other common areas in the Shopping Center within 300 feet of Tenant's building; provided however, Landlord will not be in violation of the provisions of this paragraph with respect to those leases in existence as of the day of the Lease and the foregoing shall not be deemed to prohibit the sale of fine quality chocolate such as "Godiva" chocolates.



## MARSHALL'S

Except with respect to Burlington Coat, Ross and Macy's (or, as to Macy's, a full line department store in the present Macy's premises or a portion thereof) their successors and assigns (or Shopper's World if it opens a store in the Shopping Center within twenty-four (24) months of April 6, 2010) until Tenant has ceased selling apparel from the Demised Premises for one hundred eighty (180) days for reasons other than force majeure, Landlord agrees that, during the term of this Lease, Landlord will not lease any other premises in the Shopping Center containing more than fifteen thousand (15,000) square feet of floor area to be primarily used or occupied for, or primarily devoted to , the sale or display of apparel, including in the computation of such floor area one-half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale of apparel. As used herein, the term "apparel" shall not include (i) any apparel sold in a store the primary business of which is sale or display of sporting goods (i.e., REI, Modell's, Dick's, Sports Authority and similar stores), or (ii) a wholesale club such as Sam's or BJ's, or (iii) a discount department store of over one hundred thousand (100,000) square feet such as Wal-Mart or Target. No shoe store may be more than thirteen thousand (13,000) square feet.

Landlord agrees that as long as any retail sales activity shall be conducted in the Demised Premises the Shopping Center shall not be used (a) for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks, small loan offices, dentists, chiropractors, real estate brokerage offices or other service office, which provide services to the general public and are typically found in shopping centers or regional malls similar to this Shopping Center not being deemed non-retail), or (b) for any entertainment purposes such as a bowling alley, skating rink, cinema, bar, nightclub, discotheque, amusement gallery, poolroom, massage parlor, sporting event, sports or game facility, off-track betting club or (c) for any establishment which sells or displays pornographic materials or (d) for any establishment which sells or displays used merchandise or second hand goods (except for consignment shops such as Play It Again Sports typically found in similar Shopping Centers). No restaurants or establishments selling food prepared on premises for consumption on or off premises ("Restaurants") (but a grocery store or supermarket or existing restaurants shall not be excluded) shall be located in the Limited Restaurant Area (except that area may have up to six thousand (6,000) square feet of restaurants in the aggregate with no one restaurant exceeding three thousand (3,000) square feet). Landlord agrees that there may not be more than fifty thousand (50,000) square feet of Restaurants in the Shopping Center, counting for this purpose, those in the Limited Restaurant Area, but not counting outparcels. Incidental food sale such as a movie concession stand or a café in a Barnes and Noble shall not be counted for this purpose



**AGREEMENT RESPECTING RESTATED CONSTRUCTION, OPERATING AND RECIPROCAL EASEMENT AGREEMENT NORTH DEKALB MALL DEKALB COUNTY, GEORGIA DATED JUNE 30, 1997**
**and**
**RESTATED CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT MARKETSQUARE AT NORTH DEKALB DEKALB COUNTY, GEORGIA DATED DECEMBER 7, 1987**

Section 9.1   Use and Operation of Shopping Center. Each of the Parties hereby covenants and agrees for the benefit of the other Parties that (during the time that any one (1) or more of the Department Store Parties is operating a Department Store on its Parcel and Developer is operating the Mall Store Building on its Parcel, either during the term of this Agreement or subsequent thereto, including, but not limited to, the period after which any Party terminates this Agreement as to itself) no part of its Parcel may be used for any purpose other than commercial, business or residential, provided, however that a residential use shall only be permitted in the area between the outside of the Ring Road and the perimeter of the Shopping Center Site, nor will any use or operation that is inconsistent with the then-existing use of the Shopping Center Site be made, conducted or permitted on or with respect to all or any part of its respective Parcel including, but not limited to, the following:



(a)   any public or private nuisance;

(b)   any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness;

(c)   any obnoxious odor;

(d)   any noxious, toxic, caustic or corrosive fuel or gas;

(e)   any dust, dirt or fly ash in excessive quantities;

(f)   any unusual fire, explosion or other damaging or dangerous hazard (including the storage, display or sale of explosives or fireworks);

(g)   any warehouse, prior to the 20th anniversary of the Grand Opening Date (any area for the storage of goods intended to be sold at any retail establishment in the Shopping Center shall not be deemed to be a warehouse); and

(h)   assembling, manufacturing, distilling, refining, smelting, agriculture or mining operation.



**EXHIBIT F**

<u>ELEVATION</u>





| SIGN A | 42" Linear Dollar Tree |
|---|---|
| Type: | Channel Letters on a Raceway |
| Illumination: | Internally Illuminated LED |
| Square Footage: | 131.47 |
| To Grade: | Top of sign to grade =  23'-4" |
| | Bottom of sign to grade =  19'-10" |

*Awnings by LL



**Front Elevation (South)**
Scale:  3/32" = 1'-0"

| Allowable Square Footage this Elevation: | 150 |
|---|---|
| Actual Square Footage this Elevation: | 131.47 |

| DOLLAR TREE | Client: | Dollar Tree | | 09/05/2012 | Original Rendering | BJ | This rendering is the property of Anchor Sign, Inc. It is for the exclusive use of Anchor Sign, Inc. and the party which requested the rendering. It is an unpublished original drawing not to be distributed, reproduced or exhibited without the consent of Anchor Sign, Inc. Please contact your account manager with concerns regarding this statement. | AnchorSign. |
|---|---|---|---|---|---|---|---|---|
| | Site #: | DL-A16347 | | 12/17/2012 | Updated building and Sign A | DH | | 1.800.213.3331 |
| | Address: | 250 Lawrenceville Highway (Suite 5009-A) | | | | | | |
| | | Decatur, GA 30033 | | | | | | |