# **Exhibit B**

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

## AMENDMENT AND RELOCATION AGREEMENT

THIS AMENDMENT AND RELOCATION AGREEMENT (this "Amendment") is made this _____21st_____ day of ___March___, 2023 (the "Effective Date") by and between **NDM (EDENS), LLC**, as successor in interest to Hendon North DeKalb, LLC, hereinafter referred to as "Landlord", and **DOLLAR TREE STORES, INC.**, hereinafter referred to as "Tenant".

WITNESSETH:

WHEREAS, Landlord and Tenant are parties to that certain Lease Agreement dated March 25, 2013 (the "Lease") with respect to certain premises containing approximately 9,969 square feet in suite number 200 (the "Original Premises") as more particularly described in the Lease and referenced to in the Lease as the "Premises", located in the shopping center known as North DeKalb Mall (the "Shopping Center");

WHEREAS, in addition to Landlord's right to relocate Tenant pursuant to Article 22 of the Lease, which right shall remain, Landlord and Tenant desire to relocate the Original Premises to space C60 in the Shopping Center containing approximately 10,000 square feet defined below as the Relocation Premises; provided, however, Landlord shall be under no obligation to perform such relocation; and

WHEREAS, Landlord's current redevelopment plan anticipates Landlord to demolish the Original Premises prior to construction and completion of the Relocation Premises, provided, however, Landlord shall be under no obligation to do so, and the relocation will require Tenant to close its current operations before opening in the Relocation Premises which closure could be twelve (12) months or longer.

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Landlord and Tenant hereby agree as follows:

1.  **Definitions**

    a.  Relocation Premises:   Unit Number C60 containing approximately 10,000 square feet as shown as on **Exhibit "A"**.

    b.  Premises:   The term "Premises" shall mean the Original Premises or the Relocation Premises as the context of the Lease shall so admit or require.   The Relocation Premises shall be delivered by Landlord with Landlord's Relocation Work substantially complete.

    c.  Landlord's Relocation Work:   The work described on **Exhibit "C"** attached hereto.

HSB 7402617 V.5



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

d. New Premises
Commencement
Date:      The earlier of two hundred ten (210) days following the Delivery Date (as defined below) or the date Tenant opens for business to the public in the Relocation Premises.

e. Relocation Notice:      Landlord shall provide up to one hundred twenty (120) days' notice of the date Landlord anticipates delivering the Relocation Premises to Tenant.

f. Closure Notice:      Landlord shall provide the Tenant with ninety (90) days advanced notice of the date it must cease operating in the Original Premises (the "Closure Date") and surrender the same to Landlord in broom clean condition with all encumbered furniture, fixtures and equipment removed and Tenant shall convey to Landlord good and clear title to any and all other items that remain in the Premises (the "Surrender Condition"); provided, however, in no event shall the Closure Date occur between November 15 through January 15 and in no event occur before January 31, 2023. In the event Tenant does not surrender the Original Premises to Landlord on or before the date which is five (5) days after the Closure Date with the Surrender Conditions satisfied, time being of the essence, then Tenant shall pay to Landlord a late surrender fee equal to One Thousand and 00/100 Dollars ($1,000.00) per day for each day of delay thereafter. The late surrender fee shall be due within thirty (30) days of Landlord's demand for the same.

g. Omitted.      Omitted.

h. Delivery Date:      The date that Landlord delivers possession of the Relocation Premises to Tenant with all of Landlord's Relocation Work substantially completed as required by this Amendment. Substantially complete shall mean the completion of Landlord's Relocation Work such that Tenant can commence its work in the Relocation Premises.

i. Outside Delivery
Date:      The date that is twelve (12) months after the later of the date Tenant surrenders the Original Premises to Landlord with the Surrender Conditions satisfied or the Closure Date.

2. **Effectiveness of This Amendment; Closure of Premises.** During the period between the Closure Date and the Delivery Date (as defined above) Landlord and Tenant's respective

HSB 7402617 V.5

DocuSign Envelope ID: 8B30DC59-1C43-4E01-A005-E96AA2364A78

ongoing obligations under the Lease with regard to the Original Premises and the operations therein shall be suspended and such obligations shall be governed solely under the terms of this Amendment. On the Delivery Date, the ongoing obligations of Landlord and Tenant under the Lease shall be reinstated with respect to the Relocation Premises; provided, however, that the payment of Base Rent and Additional Rent shall not commence until the New Premises Commencement Date. Following the Closure Date, notwithstanding anything herein or in the Lease to the contrary, Tenant shall have no right to any pylon, directional or monument signage and Landlord shall have the right to remove the same on or after the Closure Date; provided, however, from the Delivery Date until the date which is one hundred eighty (180) days following the New Premises Commencement Date the Landlord shall provide reasonable directional signage identifying the Relocation Premises. The time period from the later of the date Tenant surrenders the Original Premises to Landlord with the Surrender Conditions satisfied or the Closure Date, through the New Premises Commencement Date is hereinafter referred to as the "Closure Period" and the term of the Lease shall be extended for the Closure Period effective as of the New Premises Commencement Date (the "Extended Term").

3. **Base Rent.** Base Rent and all other charges payable under the Lease will be payable for and with respect to the Original Premises at the rates set forth in the Lease until the later of (i) the Closure Date, or (ii) the date Tenant vacates and surrenders the Original Premises with the Surrender Conditions satisfied. Following the New Premises Commencement Date Base Rent shall be due and payable in the manner provided in Section E.1 of the Lease with regard to the Relocation Premises as follows:

| Period | Monthly | Per Square Foot |
|---|---|---|
| New Premises Commencement Date through the time period of 1/31/2024 (the "Existing Term")* | $11,666.67 | $14.00 |
| Second Remaining Renewal Term: the day following the Existing Term as the same may be extended* through the date that is 60 calendar months thereafter | $12,500.00 | $15.00 |
| Third Remaining Renewal Term: The end of the Second Remaining Renewal Term as the same may be extended* through the date that is 60 calendar months thereafter | $13,333.33 | $16.00 |

*If there is an Extended Term, as defined above, then the applicable term above (whether the Existing Term or the applicable Renewal Term) shall be extended for the Extended Term and the subsequent term shall commence on the day following the Extended Term.

4. **Delivery of Relocation Premises.**

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

(a)     Landlord shall, subject to delays due to Force Majeure, delays caused by Tenant or delays beyond the reasonable control of Landlord, deliver the Relocation Premises to Tenant on or before the Outside Delivery Date, with all of Landlord's Relocation Work substantially complete at Landlord's sole cost and expense.  Tenant hereby approves a floor plan for the Relocation Premises in accordance with **Exhibit "B-1"** attached hereto; provided, however, Landlord shall not be obligated to construct such floor plan.

(b)     Landlord shall notify Tenant in writing promptly when Landlord's Relocation Work is substantially complete (the "Delivery Notice").  As soon as practical following receipt of Landlord's Delivery Notice, but no later than fifteen (15) days after the Delivery Notice, Tenant will arrange an inspection of the Relocation Premises with Landlord ("Delivery Inspection") intended to verify that the Relocation Work is substantially complete.  As part of the Delivery Inspection, Tenant shall identify Punch List Items ("Punch List Items" shall be defined as minor items of Landlord's Relocation Work that will not prevent Tenant from opening for business, in whole or in part) which will remain Landlord's obligation to complete; provided that Tenant's failure to identify any Punch List Items during the Delivery Inspection shall not relieve Landlord of its obligation to complete such items.  Unless otherwise agreed to by Tenant in writing, all Punch List Items shall be completed by Landlord within thirty (30) days following the later of the Delivery Inspection and the preparation of the Punch List Items (if not completed at the Delivery Inspection).  Tenant may, but shall not be required to, conduct the Delivery Inspection prior to the Delivery Date.  If the Delivery Inspection confirms that the condition of the Relocation Premises satisfies the requirements of Landlord's Relocation Work (other than Punch List Items), then Tenant will accept delivery of the Relocation Premises.  If, however, the Delivery Inspection discloses, as mutually agreed by the parties in writing, that the condition of the Relocation Premises does not satisfy the applicable requirements of Landlord's Relocation Work (other than Punch List Items), then delivery and the Delivery Date will be delayed until Landlord completes the outstanding conditions and corrects any deficiencies as required, and Landlord provides a subsequent Delivery Notice to Tenant, in which event the inspection procedures described above shall be repeated.  However, mutual agreement by the parties that Landlord's Relocation Work was completed (other than Punch List Items) and/or Tenant's acceptance of the Premises shall not be a condition of delivery, nor shall it affect whether Landlord delivered the Relocation Premises with Landlord's Relocation Work substantially complete. Notwithstanding the foregoing, if the Delivery Date is deemed to have occurred (whether as a result of inspection or otherwise) and Tenant subsequently determines that a requirement of Landlord's Relocation Work has not been satisfied, Landlord shall remain obligated to complete such work as originally required.

5.     **Late Delivery; Remedies.**  In the event Landlord does not deliver the Relocation Premises to Tenant with Landlord's Relocation Work substantially completed on or before the Outside Delivery Date, and Landlord does not cure the same and deliver the Relocation Premises to Tenant within sixty (60) days thereafter, then the Lease shall terminate and Landlord shall owe Tenant a termination fee in the amount of Two Million and 00/100 Dollars ($2,000,000.00) (the "Termination Fee").  Tenant acknowledges and agrees that the Termination Fee is the sole and exclusive remedy for Landlord's failure to timely deliver the Relocation Premises including, but not limited to, any claims at law or in equity and Tenant

HSB 7402617 V.5

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

waives and unconditionally relinquishes any and all claims in any way related to the late delivery of the Relocation Premises to Tenant other than the Termination Fee. Prior to the Closure Date Landlord shall deposit an irrevocable letter of credit in the amount of the Termination Fee and as security for the Termination Fee in substantially the form attached hereto as **Exhibit "D"** and issued by Wells Fargo Bank, National Association, PNC Bank, Bank of America, N.A. or such other comparable banking institution as reasonably designated by Landlord or if the financial institution uses a different form than that which is attached then the form shall be reasonably approved by Tenant and shall contain the key economic terms set forth in that attached. In the event the Tenant ever draws upon the letter of credit then the Lease shall be deemed terminated.

6. **Moratorium; Opening in the Relocation Premises; Remedies.** If Tenant does not open for business in the Relocation Premises as of the New Premises Commencement Date then the Lease shall be deemed terminated. Furthermore, Landlord and Tenant acknowledge that as of the date of this Amendment, DeKalb County has issued a moratorium on the opening of new dollar stores in the County. Landlord understands that Tenant is only agreeing to the relocation of its premises with the anticipation that Tenant will be able to open for business in the Relocation Premises and operate its prototypical business. If governmental restrictions in the form of such moratorium or any other restriction or prohibition on Tenant's business issued by any applicable governmental authority (collectively, "Governmental Restrictions") prohibit Tenant from being able to open and operate its prototypical business in the Relocation Premises as of the New Premises Commencement Date due to no fault of Tenant, its employees, agents or contractors, then as Tenant's sole and exclusive remedy the Lease shall terminate and Landlord shall owe Tenant the Termination Fee, which Termination Fee shall be due and payable within thirty (30) days of the later of date Tenant surrenders the Relocation Premises to Landlord and the date Tenant provides notice that it cannot open in the Relocation Premises because of Governmental Restrictions along with reasonable back up documentation demonstrating the same. For illustrative purposes only, such moratoriums, restrictions or prohibitions may include (a) failure of applicable governmental authorities to issues building permits, health permits, business licenses or other permits for Tenant's prototypical store, (b) requirements placed by an applicable governmental authority on Tenant's merchandising or business that would prevent Tenant from being able to operate its prototypical business or raise Tenant's cost of doing business.

7. **Tenant Improvement Allowance.** Tenant shall improve the Relocation Premises, including, but not limited to, making all interior improvements, alterations and changes to the Premises to place same in a first class, modern and attractive condition, to enable Tenant to use the Premises for the permitted use (collectively, the "Tenant's Work") pursuant to plans and specifications reasonably approved by Landlord. Subject to the provisions of this Section 67, Landlord shall reimburse Tenant for the actual costs incurred by Tenant for Leasehold Improvements (as defined below) performed in connection with Tenant's Work, in an amount not to exceed Two Hundred Fifty Thousand and no/100 Dollars ($250,000.00) (the "Tenant Improvement Allowance"). As used herein "Leasehold Improvements" shall mean alterations, additions, improvements, and/or installations attached to the Premises in a way as to require significant effort and costs to remove. It is specifically understood and agreed that Tenant shall only use the Tenant Improvement Allowance for the construction and installation

E-5

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E98AA2364A78

of Leasehold Improvements, and in no event shall the Tenant Improvement Allowance be used to purchase and/or install any movable goods, inventory, furniture, equipment, trade fixtures or other movable personal property belonging to or used by Tenant that are not attached to the Premises.

In the event Tenant has not provided the TIA Request (as defined below) within fifteen (15) months of the New Premises Commencement Date then, notwithstanding anything herein to the contrary, the Tenant Improvement Allowance shall not be due after such date.

Provided Tenant is open and operating in the Relocation Premises and not in monetary default, Landlord shall pay to Tenant the Tenant Improvement Allowance within thirty (30) days after Landlord has received and approved all of the following:

(i)     copies of paid invoices, certified by Tenant as being for such Tenant's Work totaling an amount equal to or greater than the amount of the Tenant Improvement Allowance being requested by Tenant, along with a reasonable description of the work performed.

(ii)    Tenant has opened for business in the Relocation Premises;

(iii)   Lien Waivers. Tenant has provided Landlord with a copy of an executed final lien waiver from Tenant's General Contractor or the statutory period for the filing of a lien by the general contractor shall have expired without the filing of any liens or in the event a lien has been timely filed, the lien has been bonded or discharged.

(iv)    Certificate of Occupancy. A copy of the certificate of occupancy, temporary certificate of occupancy, certificate of completion or their equivalent for the Relocation Premises.

(v)     Tenant has made a written request of Landlord for the Tenant Allowance. Tenant's request shall include confirmation that all of the foregoing conditions have been satisfied (the "TIA Request").

If Landlord fails to pay the Tenant Improvement Allowance as and when due the Tenant shall have the right to provide written notice of the same to Landlord and, if the Landlord does not pay the Tenant Improvement Allowance within fifteen (15) days of such notice, or issue a written dispute that the same is due, then the Tenant shall have the right to offset Base Rent in the amount due.

If by reason of any alteration, repair, labor performed or materials furnished to the Relocation Premises for or on behalf of Tenant, including, but not limited to, the Tenant's Work, any mechanic's or other lien is filed, attempted to be filed, claimed, perfected or otherwise established as provided by Law or otherwise against the Premises, the building of which it is a part, or any part of the Shopping Center, as the case may be, Tenant shall indemnify and hold the Landlord harmless for any loss, cost, expense or liability resulting from the same (including attorney's fees), and Tenant must discharge or remove the lien by bonding or otherwise, within ten (10) days after Notice from Landlord to Tenant. If Tenant fails to timely

E-6



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

discharge or remove any such lien, the failure will be an immediate event of default and in addition to other remedies reserved by Landlord on account of the event of default, Landlord may, but will not be obligated to, cause such lien to be removed or bonded over and Tenant must pay to Landlord the costs Landlord incurs as a result, as additional rent under the Lease. Tenant's obligations hereunder will survive the expiration or earlier termination of this Lease.

8.    **Rubbish Disposal.** Section H.2. of the Lease shall be replaced with the following: Tenant shall, in accordance with governmental regulations and at its expense, including any and all governmental fees, provide for the regular removal of all trash, rubbish and garbage from the Premises.

9.    **Legal Description.** The legal description for the Shopping Center is attached hereto as **Exhibit "B".**

10.   **Signage/Exterior.** Notwithstanding anything herein or in the Lease to the contrary, any façade elevations, signage, and exterior elements of the Relocation Premises, along with Landscaping at the Relocation Premises, shall be at Landlord's discretion and, if installed or performed by or on behalf of Tenant, shall be subject to Landlord's prior written approval in its sole and absolute discretion and Landlord will install the storefront sign in substantial accordance with the signage set forth on **Exhibit "F"** attached hereto and such signage shall be no larger than thirty inches (30").

11.   **Exhibit E -- Exclusives and Restrictions.** Exhibit E to the Lease is hereby deleted in its entirety and replaced with **Exhibit "E"** attached hereto.

12.   **No Build Area.** Following the New Premises Commencement Date the No Build Area shall refer to the area marked as the "No Build Area" on **Exhibit "A"** attached hereto. Notwithstanding anything in the Lease to the contrary, and without any implication that the same is required, Tenant hereby consents to the redevelopment of the Shopping Center including, but not limited to, that shown on **Exhibit "A".**

13.   **Relocation Premises.** Following the New Premises Commencement Date all references in the Lease to the Leased Premises shall refer to the Relocation Premises and the Tenant shall have no further rights to occupy the Original Premises.

14.   **Surrender.** The Tenant shall surrender the Original Premises to the Landlord on the Closure Date with the Surrender Conditions satisfied, time being of the essence.

15.   **Lease Ratified.** Except as expressly modified by this Amendment, all the terms, covenants and conditions of the Lease shall remain the same and in full force and effect, shall be binding on the parties hereto, and are hereby ratified and affirmed. This Amendment is hereby deemed to be part of the Lease as of the date hereof. The parties acknowledge and agree that the termination right set forth in Section 22 of the Lease shall not be deemed applicable to the relocation of Tenant pursuant to this Amendment.

HSB 7402617 V.5



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

16.   **Headings.**  Headings used in this Amendment are for convenience only and shall not be construed to be a part of this Amendment for any purpose.

17.   **Capitalized Terms.**  Capitalized terms not otherwise defined in this Amendment shall have the meanings given to them in the Lease.

18.   **Counterparts.**   This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. In addition, the parties agree that this Lease will be considered executed when the signature of a party is delivered by electronic signature technology (e.g., DocuSign). Such electronic signature will be treated in all respects as having the same effect as an original "wet ink" signature.

{Remainder of page intentionally left blank; signature pages follow.}

E-8

HSB 7402617 V.5



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

IN WITNESS WHEREOF, the parties have set their hands and seals, and caused this Amendment to be executed as of the day and year first above-written.

WITNESSES AS TO LANDLORD:

N/A DocuSign
_____
Signature


_____
Printed Name

**LANDLORD:**

**NDM (EDENS), LLC,** a South Carolina limited liability company

By:  Edens Limited Partnership, a Delaware limited partnership, its sole member

   By:  Edens GP, LLC, a Delaware limited liability company, its sole general partner

      By: _Jodie W. McLean_____
          735BF0d0e4...
          Jodie W. McLean
          Chief Executive Officer


WITNESSES AS TO TENANT

N/A DocuSign
_____
Signature


_____
Printed Name

**TENANT:**

**DOLLAR TREE STORES, INC.**

By: _____
                    _[Signature]_

Todd Miller _[Name]_
Senior Vice President
Real Estate Leasing
_____
                      _[Title]_

E-9

BSB 7402617 V.5

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

E-10

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

EXHIBIT A

SITE PLAN

PLEASE SEE ATTACHED

E-11

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78



NO BUILD AREA

NEW PREMISES

EDENS™

1221 Main Street ○ Suite 1000 ○ Columbia, SC ○ 29201  Phone: 803.779.4420 ○ Fax: 877.217.365

Exhibit A
North Dekalb Mall

DATE  2/3/2023

DRAWN BY  JAL

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

EXHIBIT B

LEGAL DESCRIPTION

E-12

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

EXHIBIT B

LEGAL DESCRIPTION OF THE LAND

**Main Tract**
TRACT ONE
All that tract or parcel of land lying or being in Land Lot 100, 18th District, Dekalb County, Georgia, and being more particularly described as follows:

Beginning at a concrete monument found at the intersection of the Westerly right-of-way of Lawrenceville Highway (U.S. Highway 29, Georgia Highway 8) (variable right-of-way) with the Northerly right-of-way of Stone Mountain Freeway (U.S. Highway 29/78) (variable right-of-way); thence along said right-of-way of Stone Mountain Freeway South 54 degrees 13 minutes 44 seconds West, a distance of 231.11 feet to a concrete monument found; thence South 58 degrees 57 minutes 28 seconds West, a distance of 0.71 feet to a 5/8 inch rebar found; ; thence leaving said right-of-way North 08 degrees 30 minutes 11 seconds West, a distance of 49.53 feet to a nail found; thence South 81 degrees 31 minutes 51 seconds West, a distance of 270.26 feet to a nail found; thence South 08 degrees 28 minutes 09 seconds East, a distance of 110.00 feet to a 5/8 inch rebar found; thence North 81 degrees 27 minutes 16 seconds East, a distance of 125.23 feet to a 5/8 inch rebar found on the Northerly right-of-way of Stone Mountain Freeway; thence along said right-of-way South 58 degrees 48 minutes 20 seconds West, a distance of 372.99 feet to a 1/2 inch rebar found; thence leaving said right-of-way North 48 degrees 31 minutes 39 seconds West, a distance of 13.69 feet to a 1/2 inch rebar found; thence along a curve to the left, said curve having an arc length of 27.85 feet with a radius of 131.39 feet, being subtended by a chord bearing of South 35 degrees 30 minutes 32 seconds West, a distance of 27.79 feet to a nail found; thence South 29 degrees 26 minutes 08 seconds West, a distance of 141.10 feet to a nail found; thence along a curve to the left, said curve having an arc length of 17.02 feet with a radius of 303.36 feet, being subtended by a chord bearing of South 31 degrees 02 minutes 34 seconds West, a distance of 17.02 feet to a nail found; thence along a curve to the left, said curve having an arc length of 6.28 feet with a radius of 27.00 feet, being subtended by a chord bearing of South 25 degrees 58 minutes 53 seconds West, a distance of 6.27 feet to a nail found; thence along a curve to the right, said curve having an arc length of 97.01 feet with a radius of 350.00 feet, being subtended by a chord bearing of South 44 degrees 27 minutes 06 seconds West, a distance of 96.70 feet to a nail found; thence along a curve to the right, said curve having an arc length of 81.23 feet with a radius of 302.36 feet, being subtended by a chord bearing of South 59 degrees 45 minutes 17 seconds West, a distance of 80.99 feet to a nail found; thence South 67 degrees 26 minutes 54 seconds West, a distance of 34.87 feet to a nail found; thence along a curve to the right, said curve having an arc length of 115.56 feet with a radius of 347.00 feet, being subtended by a chord bearing of South 76 degrees 59 minutes 11 seconds West, a distance of 115.03 feet to a nail found; thence along a curve to the right, said curve having an arc length of 323.11 feet with a radius of 623.13 feet, being subtended by a chord bearing of North 78 degrees 37 minutes 28 seconds West, a distance of 319.50 feet to a nail found; thence North 63 degrees 46 minutes 24 seconds West, a distance of 332.42 feet to a nail found; thence along a curve to the right, said curve having an arc length of 218.97 feet with a radius of 311.00 feet, being subtended by a chord bearing of North 43 degrees 36 minutes 27 seconds West, a distance of 214.48 feet to a nail found; thence North 23 degrees 26 minutes 29 seconds West, a distance of 139.20 feet to a nail found; thence along a curve to the right, said curve having an arc length of 111.43 feet with a radius of 296.99 feet, being subtended by a chord bearing of North 12 degrees 41 minutes 45 seconds West, a distance of 110.78 feet to a nail found; thence North 01 degrees 57 minutes 01 seconds West, a distance of 216.73 feet to a nail found; thence along a curve to the right, said curve having an arc length of 116.80 feet with a radius of 2283.00 feet, being subtended by a chord bearing of North 00 degrees 29 minutes 06 seconds West, a distance of 116.79 feet to a 5/8 inch rebar found; thence North 00 degrees 58 minutes 49 seconds East, a distance of 38.93 feet to a 5/8 inch rebar found; thence along a curve to the right, said curve having an arc length of 99.82 feet with a radius of 7018.44 feet, being subtended by a chord bearing of North 00 degrees 34 minutes 20 seconds East, a distance of 99.82 feet to a 5/8 inch rebar

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

found; thence North 00 degrees 57 minutes 32 seconds East, a distance of 390.76 feet to a 1/2 inch rebar found; thence along a curve to the right, said curve having an arc length of 197.89 feet with a radius of 233.00 feet, being subtended by a chord bearing of North 36 degrees 51 minutes 10 seconds East, a distance of 192.00 feet to a 1/2 inch rebar found; thence along a curve to the left, said curve having an arc length of 13.45 feet with a radius of 27.00 feet, being subtended by a chord bearing of North 46 degrees 55 minutes 32 seconds East, a distance of 13.31 feet to a 5/8 inch rebar found on the Southerly right-of-way of Sweetbriar Road (variable right-of-way); thence along said right-of-way South 20 degrees 54 minutes 10 seconds East, a distance of 54.88 feet to a nail found; thence along a curve to the right, said curve having an arc length of 118.33 feet with a radius of 182.00 feet, being subtended by a chord bearing of North 81 degrees 31 minutes 39 seconds East, a distance of 116.26 feet to a 5/8 inch rebar found; thence South 79 degrees 50 minutes 46 seconds East, a distance of 344.04 feet to a 5/8 inch rebar found; thence along a curve to the right, said curve having an arc length of 186.10 feet with a radius of 219.00 feet, being subtended by a chord bearing of South 55 degrees 30 minutes 10 seconds East, a distance of 180.55 feet to a 5/8 inch rebar found; thence South 31 degrees 09 minutes 35 seconds East, a distance of 67.78 feet to a 5/8 inch rebar found; thence along a curve to the left, said curve having an arc length of 102.25 feet with a radius of 217.00 feet, being subtended by a chord bearing of South 44 degrees 39 minutes 28 seconds East, a distance of 101.31 feet to a 5/8 inch rebar found; thence North 40 degrees 25 minutes 58 seconds East, a distance of 60.81 feet to a 3/4 inch rebar found; thence leaving said right-of-way South 89 degrees 24 minutes 31 seconds East, a distance of 295.17 feet to a 1/2 inch rebar found; thence South 89 degrees 22 minutes 16 seconds East, a distance of 227.46 feet to a 3/4 inch crimp top pipe found; thence South 89 degrees 18 minutes 45 seconds East, a distance of 172.42 feet to a 1/2 inch rebar found; thence South 89 degrees 35 minutes 34 seconds East, a distance of 197.03 feet to a 1/2 inch rebar found; thence South 89 degrees 35 minutes 34 seconds East, a distance of 194.13 feet to a 5/8 inch rebar found on the Westerly right-of-way of Lawrenceville Highway; thence along said right-of-way South 22 degrees 48 minutes 07 seconds West, a distance of 28.21 feet to a 1/2 inch rebar found; thence leaving said right-of-way North 65 degrees 23 minutes 44 seconds West, a distance of 56.53 feet to a 5/8 inch rebar found; thence North 89 degrees 35 minutes 34 seconds West, a distance of 346.32 feet to a 1/2 inch rebar found; thence South 00 degrees 17 minutes 10 seconds West, a distance of 24.24 feet to a nail found; thence along a curve to the right, said curve having an arc length of 161.32 feet with a radius of 114.00 feet, being subtended by a chord bearing of South 48 degrees 56 minutes 11 seconds East, a distance of 148.19 feet to a nail found; thence South 08 degrees 24 minutes 17 seconds East, a distance of 175.89 feet to a nail found; thence along a curve to the left, said curve having an arc length of 51.69 feet with a radius of 33.00 feet, being subtended by a chord bearing of South 53 degrees 24 minutes 16 seconds East, a distance of 46.56 feet to a nail found; thence North 81 degrees 33 minutes 14 seconds East, a distance of 48.82 feet to a nail found; thence along a curve to the right, said curve having an arc length of 64.57 feet with a radius of 441.76 feet, being subtended by a chord bearing of North 85 degrees 52 minutes 43 seconds East, a distance of 64.52 feet to a nail found; thence along a curve to the left, said curve having an arc length of 39.15 feet with a radius of 48.00 feet, being subtended by a chord bearing of North 66 degrees 41 minutes 00 seconds East, a distance of 38.07 feet to a nail found on the Westerly right-of-way of Lawrenceville Highway; thence along said right-of-way, along a curve to the left, said curve having an arc length of 78.21 feet with a radius of 1203.92 feet, being subtended by a chord bearing of South 05 degrees 39 minutes 35 seconds West, a distance of 78.20 feet to a nail found; thence South 05 degrees 14 minutes 03 seconds West, a distance of 100.92 feet to a 5/8 inch rebar found; thence South 84 degrees 45 minutes 57 seconds East, a distance of 8.00 feet to a 5/8 inch rebar found; thence South 05 degrees 14 minutes 44 seconds West, a distance of 145.00 feet to a concrete monument found, said point being the True Point of Beginning.

LESS AND EXCEPT THE FOLLOWING TRACT OF LAND

All that tract or parcel of land lying or being in Land Lot 100, 18th District, Dekalb County, Georgia, and being more particularly described as follows:



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Commencing at a concrete monument found at the intersection of the Easterly right-of-way of Lawrenceville Highway (U.S. Highway 29, Georgia Highway 8) (variable right-of-way) with the Northerly right-of-way of Stone Mountain Freeway (U.S. Highway 29/78) (variable right-of-way); thence along said right-of-way of Stone Mountain Freeway South 54 degrees 13 minutes 44 seconds West, a distance of 231.11 feet to a concrete monument found; thence South 58 degrees 57 minutes 28 seconds West, a distance of 0.71 feet to a 5/8 inch rebar found; thence leaving said right-of-way North 08 degrees 30 minutes 11 seconds West, a distance of 49.53 feet to a nail found; thence South 81 degrees 31 minutes 51 seconds West, a distance of 270.26 feet to a nail found; thence along a tie-line North 58 degrees 10 minutes 08 seconds West, a distance of 84.98 feet to a nail found, said point being the True Point of Beginning; thence South 81 degrees 34 minutes 33 seconds West, a distance of 304.00 feet to a nail found; thence North 08 degrees 25 minutes 27 seconds West, a distance of 368.00 feet to a drill hole found; thence North 81 degrees 34 minutes 33 seconds East, a distance of 398.04 feet to a nail found; thence South 08 degrees 25 minutes 27 seconds East, a distance of 200.00 feet to a drill hole found; thence South 81 degrees 34 minutes 33 seconds West, a distance of 94.04 feet to a drill hole found; thence South 08 degrees 25 minutes 27 seconds East, a distance of 168.00 feet to a nail found, said point being the True Point of Beginning.

Said tract of land contains 45.306 Acres.

TRACT FOUR
All that tract or parcel of land lying or being in Land Lot 100, 18th District, Dekalb County, Georgia, and being more particularly described as follows:

Beginning at a 1/2 inch rebar found at the intersection of the Northerly right-of-way of Sweet Briar Road (variable right-of-way) with the Easterly right-of-way of Birch Road (60 foot right-of-way); thence along said right-of-way of Birch Road North 09 degrees 14 minutes 08 seconds East, a distance of 86.03 feet to a 5/8 inch rebar found; thence North 17 degrees 25 minutes 03 seconds East, a distance of 109.86 feet to a 1/2 inch rebar found; thence leaving said right-of-way South 72 degrees 13 minutes 06 seconds East, a distance of 236.14 feet to a 1/2 inch rebar found; thence South 12 degrees 22 minutes 11 seconds West, a distance of 30.67 feet to a 5/8 inch rebar found; thence South 71 degrees 24 minutes 15 seconds East, a distance of 160.12 feet to a 5/8 inch rebar found; thence South 11 degrees 56 minutes 08 seconds West, a distance of 109.33 feet to a 1/2 inch rebar found on the Northerly right-of-way of Sweet Briar Road; thence along said right-of-way North 79 degrees 52 minutes 39 seconds West, a distance of 400.37 feet to a 1/2 inch rebar found, said point being the True Point of Beginning.

Said tract of land contains 1.439 Acres.

Tract Five
All that tract or parcel of land lying or being in Land Lot 100, 18th District, Dekalb County, Georgia, and being more particularly described as follows:

Beginning at a 1/2 inch rebar found at the intersection of the Southerly right-of-way of North Druid Hills Road (100 foot right-of-way) with the Westerly right-of-way of Birch Road 60 foot right-of-way); thence along said right-of-way of Birch Road South 17 degrees 52 minutes 15 seconds West, a distance of 11.94 feet to a 5/8 inch rebar found; thence leaving said right-of-way North 71 degrees 05 minutes 44 seconds West, a distance of 27.36 feet to a 5/8 inch rebar found; thence North 17 degrees 52 minutes 15 seconds East, a distance of 11.94 feet to a 5/8 inch rebar found on the Southerly right-of-way of North Druid Hills Road; thence along said right-of-way South 71 degrees 05 minutes 44 seconds East, a distance of 27.36 feet to a 1/2 inch rebar found, said point being the True Point of Beginning.

Said tract of land contains 0.007 Acres.



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

TRACT SIX

All that tract or parcel of land lying or being in Land Lot 100 and 101, 18th District, Dekalb County, Georgia, and being more particularly described as follows:

Commencing at a concrete monument found at the intersection of the Westerly right-of-way of Lawrenceville Highway (U.S. Highway 29, Georgia Highway 8) (variable right-of-way) with the Northerly right-of-way of Stone Mountain Freeway (U.S. Highway 29/78) (variable right-of-way); thence along said right-of-way of Stone Mountain Freeway South 54 degrees 13 minutes 44 seconds West, a distance of 231.11 feet to a concrete monument found; thence South 58 degrees 57 minutes 28 seconds West, a distance of 0.71 feet to a 5/8 inch rebar found; ; thence leaving said right-of-way North 08 degrees 30 minutes 11 seconds West, a distance of 49.53 feet to a nail found; thence South 81 degrees 31 minutes 51 seconds West, a distance of 270.26 feet to a nail found; thence South 08 degrees 28 minutes 09 seconds East, a distance of 110.00 feet to a 5/8 inch rebar found; thence North 81 degrees 27 minutes 16 seconds East, a distance of 125.23 feet to a 5/8 inch rebar found on the Northerly right-of-way of Stone Mountain Freeway; thence along said right-of-way South 58 degrees 48 minutes 20 seconds West, a distance of 372.99 feet to a 1/2 inch rebar found; thence leaving said right-of-way North 48 degrees 31 minutes 39 seconds West, a distance of 13.69 feet to a 1/2 inch rebar found; thence along a curve to the left, said curve having an arc length of 27.85 feet with a radius of 131.39 feet, being subtended by a chord bearing of South 35 degrees 30 minutes 32 seconds West, a distance of 27.79 feet to a nail found; thence South 29 degrees 26 minutes 08 seconds West, a distance of 141.10 feet to a nail found; thence along a curve to the left, said curve having an arc length of 17.02 feet with a radius of 303.36 feet, being subtended by a chord bearing of South 31 degrees 02 minutes 34 seconds West, a distance of 17.02 feet to a nail found; thence along a curve to the left, said curve having an arc length of 6.28 feet with a radius of 27.00 feet, being subtended by a chord bearing of South 25 degrees 58 minutes 53 seconds West, a distance of 6.27 feet to a nail found; said point being the True Point of Beginning;

Thence South 53 degrees 25 minutes 58 seconds East, a distance of 113.93 feet to a 1/2 inch rebar found; thence along a curve to the right, said curve having an arc length of 138.57 feet with a radius of 240.00 feet, being subtended by a chord bearing of South 36 degrees 53 minutes 41 seconds East, a distance of 136.65 feet to a 1/2 inch rebar found on the Northwesterly right-of-way of Stone Mountain Highway; thence along said right-of-way South 30 degrees 08 minutes 39 seconds West, a distance of 243.96 feet to a 1/2 inch rebar found; thence South 40 degrees 44 minutes 02 seconds West, a distance of 199.85 feet to a 1/2 inch rebar found; thence South 52 degrees 36 minutes 08 seconds West, a distance of 153.58 feet to a point in the center of South Fork of Peachtree Creek; thence leaving said right-of-way, along the center of said creek, the following courses and distances:

North 53 degrees 09 minutes 35 seconds West, a distance of 434.97 feet to a point; North 38 degrees 04 minutes 08 seconds West, a distance of 153.48 feet to a point; North 78 degrees 26 minutes 02 seconds West, a distance of 180.67 feet to a point; North 29 degrees 16 minutes 48 seconds West, a distance of 64.55 feet to a point; North 72 degrees 13 minutes 24 seconds West, a distance of 123.12 feet to a point; North 62 degrees 58 minutes 32 seconds West, a distance of 121.41 feet to a point; North 37 degrees 52 minutes 15 seconds West, a distance of 176.23 feet to a point; North 15 degrees 02 minutes 20 seconds West, a distance of 112.11 feet to a point; North 38 degrees 43 minutes 09 seconds West, a distance of 73.00 feet to a point; North 76 degrees 08 minutes 37 seconds West, a distance of 94.20 feet to a point; North 64 degrees 52 minutes 52 seconds West, a distance of 115.76 feet to a point; North 83 degrees 34 minutes 40 seconds West, a distance of 108.47 feet to a point; South 70 degrees 53 minutes 40 seconds West, a distance of 64.33 feet to a point; North 66 degrees 56 minutes 16 seconds West, a distance of 205.88 feet to a point; North 77 degrees 52 minutes 31 seconds West, a distance of 251.45 feet to a point; North 42 degrees 43 minutes 34 seconds West, a distance of 115.89 feet to a point; North 68 degrees 44 minutes 26 seconds West, a distance of 56.55 feet to a point; South 73 degrees 16 minutes 21 seconds West, a distance of 49.11 feet to a point; North 59 degrees 29 minutes 32 seconds West, a distance of 34.21 feet to

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

a point; South 87 degrees 21 minutes 59 seconds West, a distance of 40.77 feet to a point; North 71 degrees 35 minutes 51 seconds West, a distance of 56.42 feet to a point;

Thence leaving the center of said creek North 62 degrees 04 minutes 40 seconds East, a distance of 574.80 feet to a 1 inch open top pipe found; thence South 89 degrees 44 minutes 44 seconds East, a distance of 292.63 feet to a 5/8 inch rebar set; thence South 89 degrees 34 minutes 27 seconds East, a distance of 130.30 feet to a 1 inch crimp top pipe found; thence South 89 degrees 32 minutes 28 seconds East, a distance of 149.71 feet to a 1 inch crimp top pipe found; thence South 89 degrees 27 minutes 16 seconds East, a distance of 105.03 feet to a 1 inch axle found; thence North 00 degrees 54 minutes 58 seconds East, a distance of 15.01 feet to a 1 inch crimp top pipe found; thence North 01 degrees 35 minutes 58 seconds East, a distance of 130.76 feet to a 1 inch crimp top pipe found; thence North 00 degrees 30 minutes 17 seconds East, a distance of 300.09 feet to a 1/2 inch rebar found; thence North 00 degrees 08 minutes 04 seconds West, a distance of 46.10 feet to a 5/8 inch rebar set; thence South 88 degrees 28 minutes 44 seconds East, a distance of 50.13 feet to a 1/2 inch rebar found; thence South 00 degrees 57 minutes 32 seconds West, a distance of 390.76 feet to a 5/8 inch rebar found; thence along a curve to the left, said curve having an arc length of 99.82 feet with a radius of 7018.44 feet, being subtended by a chord bearing of South 00 degrees 34 minutes 20 seconds West, a distance of 99.82 feet to a 5/8 inch rebar found; thence South 00 degrees 58 minutes 49 seconds West, a distance of 38.93 feet to a 5/8 inch rebar found; thence along a curve to the left, said curve having an arc length of 116.80 feet with a radius of 2283.00 feet, being subtended by a chord bearing of South 00 degrees 29 minutes 06 seconds East, a distance of 116.79 feet to a nail found; thence South 01 degrees 57 minutes 01 seconds East, a distance of 216.73 feet to a nail found; thence along a curve to the left, said curve having an arc length of 111.43 feet with a radius of 296.99 feet, being subtended by a chord bearing of South 12 degrees 41 minutes 45 seconds East, a distance of 110.78 feet to a nail found; thence South 23 degrees 26 minutes 29 seconds East, a distance of 139.20 feet to a nail found; thence along a curve to the left, said curve having an arc length of 218.97 feet with a radius of 311.00 feet, being subtended by a chord bearing of South 43 degrees 36 minutes 27 seconds East, a distance of 214.48 feet to a nail found; thence South 63 degrees 46 minutes 24 seconds East, a distance of 332.42 feet to a nail found; thence along a curve to the left, said curve having an arc length of 323.11 feet with a radius of 623.13 feet, being subtended by a chord bearing of South 78 degrees 37 minutes 28 seconds East, a distance of 319.50 feet to a nail found; thence along a curve to the left, said curve having an arc length of 115.56 feet with a radius of 347.00 feet, being subtended by a chord bearing of North 76 degrees 59 minutes 11 seconds East, a distance of 115.03 feet to a nail found; thence North 67 degrees 26 minutes 54 seconds East, a distance of 34.87 feet to a nail found; thence along a curve to the left, said curve having an arc length of 81.23 feet with a radius of 302.36 feet, being subtended by a chord bearing of North 59 degrees 45 minutes 17 seconds East, a distance of 80.99 feet to a nail found; thence along a curve to the left, said curve having an arc length of 97.01 feet with a radius of 350.00 feet, being subtended by a chord bearing of North 44 degrees 27 minutes 06 seconds East, a distance of 96.70 feet to a nail found, said point being the True Point of Beginning.

Said tract of land contains 21.585 Acres.

TRACT SEVEN

All that tract or parcel of land lying or being in Land Lot 100, 18th District, Dekalb County, Georgia, and being more particularly described as follows:

Commencing at a 1/2 inch rebar found at the intersection of the Northerly right-of-way of Sweet Briar Road (variable right-of-way) with the Easterly right-of-way of Birch Road (60 foot right-of-way); thence leaving said right-of-way, along a tie line, South 48 degrees 12 minutes 28 seconds West, a distance of 63.19 feet to a 5/8 inch rebar found on the Westerly right-of-way of Birch Road, said point being the True Point of Beginning;

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Thence leaving said right-of-way, along a curve to the right, said curve having an arc length of 13.45 feet with a radius of 27.00 feet, being subtended by a chord bearing of South 46 degrees 55 minutes 32 seconds West, a distance of 13.31 feet to a 1/2 inch rebar found; thence along a curve to the left, said curve having an arc length of 197.89 feet with a radius of 233.00 feet, being subtended by a chord bearing of South 36 degrees 51 minutes 10 seconds West, a distance of 192.00 feet to a 1/2 inch rebar found; thence North 88 degrees 28 minutes 44 seconds West, a distance of 50.13 feet to a 5/8 inch rebar set; thence North 00 degrees 08 minutes 04 seconds West, a distance of 151.39 feet to a 1 inch crimp top pipe found; thence North 00 degrees 39 minutes 29 seconds East, a distance of 249.77 feet to a 1/2 inch rebar found; thence South 72 degrees 19 minutes 41 seconds East, a distance of 196.38 feet to a 5/8 inch rebar set on the Westerly right-of-way of Birch Road; thence along said right-of-way South 15 degrees 05 minutes 19 seconds West, a distance of 55.15 feet to a 1/2 inch rebar found; thence South 08 degrees 42 minutes 52 seconds West, a distance of 86.40 feet to a 5/8 inch rebar set; thence South 17 degrees 09 minutes 08 seconds East, a distance of 43.42 feet to a 5/8 inch rebar found, said point being the True Point of Beginning.

Said tract of land contains 1.194 Acres.

SURVEY TRACT EIGHT
All that tract or parcel of land lying or being in Land Lot 101, 18th District, Dekalb County, Georgia, and being more particularly described as follows:

Commencing at an axle found on the Easterly line of Land Lot 101, said axle being the Southeasterly corner of Lot 3, Pine Ridge Park Subdivision, recorded at Plat book 25, page 96, Dekalb County records; thence North 89 degrees 27 minutes 16 seconds West, a distance of 105.03 feet to a 1 inch crimp top pipe found; thence North 89 degrees 32 minutes 28 seconds West, a distance of 149.71 feet to a 1 inch crimp top pipe found, said point being the True Point of Beginning;

thence North 89 degrees 34 minutes 27 seconds West, a distance of 130.30 feet to a 5/8 inch rebar set; thence North 05 degrees 12 minutes 15 seconds West, a distance of 201.36 feet to a 5/8 inch rebar set on the Southerly right-of-way of Latham Road (60 foot right-of-way); thence along said right-of-way, along a curve to the left, said curve having an arc length of 89.86 feet with a radius of 309.76 feet, being subtended by a chord bearing of North 79 degrees 54 minutes 18 seconds East, a distance of 89.55 feet to a 5/8 inch rebar set; thence leaving said right-of-way South 15 degrees 32 minutes 21 seconds East, a distance of 225.44 feet to a 1 inch crimp top pipe found, said point being the True Point of Beginning.

Said tract of land contains 0.526 Acres.

TRACT NINE
All that tract or parcel of land lying or being in Land Lot 101, 18th District, Dekalb County, Georgia, and being more particularly described as follows:

Commencing at an axle found on the Easterly line of Land Lot 101, said axle being the Southeasterly corner of Lot 3, Pine Ridge Park Subdivision, recorded at Plat book 25, page 96, Dekalb County records; thence North 89 degrees 27 minutes 16 seconds West, a distance of 105.03 feet to a 1 inch crimp top pipe found, said point being the True Point of Beginning;

Thence North 89 degrees 32 minutes 28 seconds West, a distance of 149.71 feet to a 1 inch crimp top pipe found; thence North 15 degrees 32 minutes 21 seconds West, a distance of 225.44 feet to a 5/8 inch rebar set on the Southerly right-of-way of Latham Road (60 foot right-of-way); thence along said right-of-way, along a curve to the left, said curve having an arc length of 90.45 feet with a radius of 309.76 feet, being subtended by a chord bearing of North 63 degrees 13 minutes 43 seconds East, a distance of 90.13 feet to



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

a 5/8 inch rebar set; thence leaving said right-of-way South 26 degrees 35 minutes 18 seconds East, a distance of 289.62 feet to a 1 inch crimp top pipe found, said point being the True Point of Beginning.

Said tract of land contains 0.667 Acres.

**Macy's Tract**

TRACT TWO

All that tract or parcel of land lying or being in Land Lot 100, 18th District, Dekalb County, Georgia, and being more particularly described as follows:

Commencing at a concrete monument found at the intersection of the Westerly right-of-way of Lawrenceville Highway (U.S. Highway 29, Georgia Highway 8) (variable right-of-way) with the Northerly right-of-way of Stone Mountain Freeway (U.S. Highway 29/78) (variable right-of-way); thence along said right-of-way of Stone Mountain Freeway South 54 degrees 13 minutes 44 seconds West, a distance of 231.11 feet to a concrete monument found; thence South 58 degrees 57 minutes 28 seconds West, a distance of 0.71 feet to a 5/8 inch rebar found; thence leaving said right-of-way North 08 degrees 30 minutes 11 seconds West, a distance of 49.53 feet to a nail found; thence South 81 degrees 31 minutes 51 seconds West, a distance of 270.26 feet to a nail found; thence along a tie-line North 58 degrees 10 minutes 08 seconds West, a distance of 84.98 feet to a nail found, said point being the True Point of Beginning.

Thence South 81 degrees 34 minutes 33 seconds West, a distance of 304.00 feet to a nail found; thence North 08 degrees 25 minutes 27 seconds West, a distance of 368.00 feet to a drill hole found; thence North 81 degrees 34 minutes 33 seconds East, a distance of 398.04 feet to a nail found; thence South 08 degrees 25 minutes 27 seconds East, a distance of 200.00 feet to a drill hole found; thence South 81 degrees 34 minutes 33 seconds West, a distance of 94.04 feet to a drill hole found; thence South 08 degrees 25 minutes 27 seconds East, a distance of 168.00 feet to a nail found, said point being the True Point of Beginning. Said tract of land contains 3.000 Acres.

TRACT THREE

All that tract or parcel of land lying or being in Land Lot 100, 18th District, Dekalb County, Georgia, and being more particularly described as follows:

Commencing at a concrete monument found at the intersection of the Westerly right-of-way of Lawrenceville Highway (U.S. Highway 29, Georgia Highway 8) (variable right-of-way) with the Northerly right-of-way of Stone Mountain Freeway (U.S. Highway 29/78) (variable right-of-way); thence along said right-of-way of Stone Mountain Freeway South 54 degrees 13 minutes 44 seconds West, a distance of 231.11 feet to a concrete monument found; thence South 58 degrees 57 minutes 28 seconds West, a distance of 0.71 feet to a 5/8 inch rebar found, said point being the True Point of Beginning;

Thence leaving said right-of-way North 08 degrees 30 minutes 11 seconds West, a distance of 49.53 feet to a nail found; thence South 81 degrees 31 minutes 51 seconds West, a distance of 270.26 feet to a nail found; thence South 08 degrees 28 minutes 09 seconds East, a distance of 110.00 feet to a 5/8 inch rebar found; thence North 81 degrees 27 minutes 16 seconds East, a distance of 125.23 feet to a 5/8 inch rebar found on the Northerly right-of-way of Stone Mountain Freeway; thence along said right-of-way North 58 degrees 48 minutes 20 seconds East, a distance of 2.92 feet to a concrete monument found; thence North 58 degrees 57 minutes 28 seconds East, a distance of 154.17 feet to a 5/8 inch rebar found, said point being the True Point of Beginning.

Said tract of land contains 0.581 Acres.

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

EXHIBIT B-1

FLOOR PLAN

HSB 7402617 v.5

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

E-14

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

## EXHIBIT C

## LANDLORD'S RELOCATION WORK

Please see attached.

HSB 7402617 V.5

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Vanilla Box"
Construction Criteria

*North DeKarg Mou*
Shopping Center Name *(NDM)*

Deal #

This "Exhibit C" provides specific criteria related to work that will be performed by the landlord ("Landlord") in the Premises leased by tenant ("Tenant") at the above-referenced Shopping Center for the operation of a Dollar Tree or Family Dollar retail store. Landlord is responsible for performing those items indicated below ("Landlord's Work").

| DESCRIPTION OF LANDLORD'S WORK | PART OF LL WORK? "X" IF YES | ATTACHED SCHEDULE |
|---|---|---|
| "LANDLORD'S BOX" | | |
| HEATING, VENTILATION AND AIR CONDITIONING ("HVAC") | | I. |
| WALLS AND INTERIOR DOORS | | II. |
| FLOORS | | III. |
| ELECTRICAL | | IV. |
| OTHER UTILITIES (EXCEPT ELECTRICAL) | | V. |
| STOREFRONT AND EXTERIOR IMPROVEMENTS | | VI. |
| DEMOLITION AND HAZARDOUS MATERIALS | | VII. |
| CEILING | | VIII. |
| LIGHTING | | IX. |
| TOILET(S) | | X. |
| OFFICE AND EMPLOYEE ROOM | | XI. |
| SPECIAL PROJECTS (ATTACH CRITERIA FROM DT DESIGN) | | XII. |
| TENANT'S "VANILLA BOX" | X | I THRU XI |
| TENANT FREE-STANDING ADDENDUM – ADD TO ANY F/S STORE | | F/S |
| TENANT RISK CLASS "4" / HIGH SECURITY ADDENDUM – ADD TO ANY RISK CLASS "4" / HIGH SECURITY PROJECT | | RISK CLASS "4" |

ATTACH ONLY THOSE SCHEDULES THAT ARE MARKED ABOVE AS PART OF LANDLORD'S WORK. IF THE SCHEDULES MARKED ABOVE ARE NOT ATTACHED, LANDLORD SHALL PERFORM LANDLORD'S WORK IN ACCORDANCE WITH TENANT'S STANDARD DESIGN REQUIREMENTS.

General Conditions:

The attached schedules describe Tenant's specific requirements for Landlord's Work. Landlord must show any deviation from Tenant's requirements by revising the attached language, and Tenant's construction director must approve any revisions by initialing the changes. Any mechanical drawings, floor plans, and elevation drawings attached are provided for examples only, not for construction.

Construction Drawings:

Landlord shall provide Tenant with engineered construction drawings for Landlord's Work, which may include an architectural floor plan, exterior elevations, wall sections, roof plan, mechanical and electrical drawings, in CADD format, and Landlord shall provide such other information as Tenant may request as may be reasonably necessary for Tenant to prepare its construction drawings. Landlord shall request Tenant's site specific drawings prior to starting any and all

Initial Here;

*HPA*

*SL*

Landlord
rev. 05/12/2021

Construction Director
Page 1 of 18

RE Director

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Vanilla Box"
Construction Criteria

*NDM*

Shopping Center Name                                          Deal #

construction it Landlord has not already received them, Tenant will not provide Landlord with drawings from which to permit or build. Landlord shall hire its own architect and/or engineer to complete drawings for Landlord's Work.

In addition to the foregoing, Landlord shall provide Tenant with one (1) full size engineered site plan depicting current site conditions in CADD format. The site plan shall show all improvements, property lines, site setbacks, easements, drive aisles, parking spaces (with handicap spaces marked), striped handicap paths, curbing and curb cuts, and current tenants. The site plan shall be provided with a WB-67 truck template showing how Tenant's freight truck will maneuver throughout the site to Tenant's delivery area and the truck's path of exit from the site without obstacles that will disrupt delivery or parking. If Landlord does not provide said site plan within fifteen days after Tenant's demand, then Tenant may develop the plan at Landlord's expense, and Landlord will reimburse Tenant for all related costs.

## Code Compliance:

Landlord's Work shall be performed in accordance with all applicable laws, including all state and local building codes, fire department regulations, health department and sanitation rules and regulations, Federal ADA law and local handicap codes, and EPA rules and regulations. Landlord shall be responsible for delivering the Premises to Tenant in compliance with any applicable municipal codes, regulations, or law, as required for general retail use, except to the extent such conditions would be cured by the performance of Tenant's Work. Landlord is responsible for closing all permits, completing inspections, and obtaining certificates of completion related to existing conditions or Landlord's Work, unless the foregoing cannot be performed until Tenant's Work is complete. If the governing municipality requires a certificate of occupancy for the building shell (exclusive of Tenant's Work), Landlord shall obtain a certificate of occupancy prior to the Delivery Date.

IMPORTANT NOTE: ANY CHANGE MADE TO THESE CRITERIA BY THE LANDLORD OR TENANT SHALL BE DOCUMENTED CLEARLY ON THIS AGREEMENT EITHER ELECTRONICALLY OR MANUALLY. FAILURE TO DO SO VOIDS THIS AGREEMENT.

Landlord's Acceptance of tenants Criteria

**PLEASE RETURN WITH YOUR SIGNED LEASE PROPOSAL**

By: _____

Name: Herbert Ames

Title: Managing Director

Date: 3/13/23

SCHEDULE(S) INDICATED ON PAGE ONE MUST BE ATTACHED AND INITIALED.
DO NOT SIGN WITHOUT REQUIRED SCHEDULE(S)

Initial Here:

*HPA*

Landlord
rev. 05/12/2021

**SL**

Construction Director
Page 2 of 18

RE Director

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
**Landlord's Work – "Vanilla Box"**
**Construction Criteria**

*NDM*
Shopping Center Name                                                      Deal #

**SCHEDULE 9**
**HVAC**

Landlord shall provide and install new HVAC units in accordance with the manufacturer's recommendations consistent with Tenant's minimum HVAC requirements (defined herein). Landlord is required to install the HVAC units, roof curbs, duct type smoke detector(s) and full sized supply and return duct drops to the bottom cord of roof joists. In order to install this system in a timely manner, Landlord is required to supply design documents to Tenant ninety (90) days prior to turnover of space, which documents shall contain all required information including, but not limited to, HVAC equipment manufacturer, model number, serial number, and details of the main electrical feed to the Premises. Where applicable, Landlord shall install gas piping to all HVAC units, connect and run to incoming gas service locations. HVAC units shall be electric and none shall have gas.

**IF LANDLORD TO INSTALL UNITS AND DISTRIBUTION**
The system must be balanced and include all galvanized steel sheet metal ductwork with a minimum of 1-1/2" external wrap insulation with vapor barrier, diffusers, grilles, registers, exhaust fans, and other equipment associated with a fully functional HVAC system. When required by local codes, Landlord shall provide Tenant with building envelope energy code calculations. Landlord shall have all HVAC units and accessories completely connected, tested and fully operational prior to Delivery Date.

**Minimum HVAC Requirements:**

Tenant requires that all HVAC equipment be High Efficiency (equal to Carrier's HC series) packaged units. Carrier is Tenant's preferred manufacturer for HVAC equipment, however Landlord may provide equivalent HVAC equipment from alternative manufacturers (Lennox, Trane, etc.). Units shall be supplied with differential enthalpy economizer controls capable of CO2 based demand controlled ventilation, duct type smoke detector(s) with monitoring device as required by code, gravity back draft dampers, a separately wired convenience outlet, disconnect switch and louvered coil guards. HVAC equipment voltage and phase shall match the electrical service voltage and phase brought to the space. Landlord shall provide a source of natural gas to program for heating, unless gas is unavailable, in which case the heat source is approved by Tenant, HVAC units shall be electric fired pumps and there shall be no gas service to the premises.

Landlord will provide a minimum of one (1) ton of cooling for every three hundred and fifty (350) square feet. Landlord is required to perform exact site specific space load calculations to account for all internal and external heat gains and losses. Landlord will provide a minimum of three (3) HVAC units and a maximum of five (5) HVAC units to serve the sales area and a separate, dedicated unit to serve the stockroom.

Space load calculations shall be performed with, but not limited to the required steps in the list below:

The space temperature shall be as follows: Cooling periods: 74 degrees Fahrenheit at 50 percent relative humidity. Heating periods: 70 degrees Fahrenheit.

The heating supply air temperature shall be 85 degrees Fahrenheit minimum.

Lighting load based on 2 watts per square foot in the sales area and 1 watt per square foot in the stockroom, utility room and toilet room.

People load based on ASHRAE recommended occupancy calculations with a design factor of 280 BTUH/person sensible gains and 270 BTUH/person latent gains.

Infiltration based on 2 CFM per square foot of exterior door area.

Miscellaneous equipment gain of thirty five thousand (35,000) BTUH.

Outside air based on mechanical code.

The building envelope load calculations shall be performed based on actual building type and materials.

[END OF SCHEDULE I]

*HFA*
_____
Initial Here:
Landlord
rev. 05/12/2021

**SL**
_____
**Construction Director**
Page 3 of 18

_____
**RE Director**

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

**Exhibit "C"**
**Landlord's Work – "Vanilla Box"**
**Construction Criteria**

*NDM*

Shopping Center Name                                              Deal #

**SCHEDULE II**
**WALLS AND INTERIOR DOORS**

**Tenant Approved Wall Construction Methods**

Metal or Wood (where approved by code) Studs, Metal Girts/Panels: Demising Walls or Interior Walls shall include installation of GWB on each side to roof deck. Exterior walls shall include installation of GWB to deck.

Concrete Masonry Unit ("CMU") or Tilt-Up Concrete: Demising Walls or Interior Walls made from CMU or Tilt-Up Concrete shall be furred with metal or wood (where approved by code) furring and GWB to roof deck on Tenant side only, unless otherwise required by code. All sales area perimeter walls shall be furred, covered with GWB, finished and ready for Tenant's finishes. All furring shall be run vertically, not horizontally, for Tenant's fixture installation. Exposed CMU walls are allowed in Tenant's stock room area only.

Landlord shall install GWB to roof deck above storefront framing to separate the Premises from Shopping Center canopy and/or sign façade area.

Landlord shall coordinate all exact Demising Wall and Interior Wall locations with Tenant's final plans (site specific plans) prior to Wall construction. Failure to do so will result in additional expense to the Landlord for removal and reinstallation of walls.

Note: All Interior GWB walls shall have a "Level 4" finish as defined by the Gypsum Association.

**Demising Walls:**

~~Landlord shall provide walls separating Tenant from all other adjacent tenants. The exterior subdividing (existing interior) sidewalls, dividing walls etc.) common wall corridors (i.e. fire, egress, etc.) and Shopping Center canopy and/or sign facade area ("Demising Walls"). Landlord shall construct Demising Walls as the common plans (approved) shown on the proposed floor plan of the Premises (ACCEPT PROPOSED FLOOR PLAN). Demising Walls constructed by Landlord as part of Landlord's Work shall be in accordance with Tenant's approved wall construction methods as set forth below.~~

***If Landlord is separating a larger space by installing a Demising Wall, Schedule IV "Electrical" and Schedule V "Other Utilities" should also be attached to indicate work to be performed by Landlord.***

**Interior Walls:**

Landlord shall provide interior walls separating spaces within Tenant's demised premises as provided below.

**Stockroom:**
Landlord shall install stockroom wall (separation wall between Tenant's sales area and stockroom) and all necessary doors for stockroom in accordance with this Schedule II. Stockroom wall shall be a minimum six inch (6"), twenty (20) gauge metal studs at sixteen inches (16") on center and have GWB on each side to roof deck. Wall shall be finished and ready for Tenant's finishes from finished floor to roof deck on stockroom side and to six inches (6") above proposed finished ceiling on sales area side.

**Egress Hallway:**
Landlord shall install segregated egress fire hallway wall(s), if required by code, for Tenant's occupancy and all necessary doors for hallway in accordance with this Schedule II. Egress hallway walls shall have GWB on each side to roof deck and shall be finished and ready for Tenant's finishes from finished floor to roof deck.

Toilet Hallway (from sales area to toilet):
Landlord shall install wall(s) with GWB each side and a three foot by six foot eight inch (3'-0" x 6'-8") opening from Tenant's sales area to the hallway.

**[SCHEDULE II CONTINUED ON NEXT PAGE]**

Initial Here:

*HDA*

*SL*

Landlord
rev. 05/17/2021

Construction Director
Page 4 of 18

RE Director

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Vanilla Box"
Construction Criteria

*NDM*

Shopping Center Name                                                    Deal #

[WALLS/INTERIOR DOORS SCHEDULE II CONTINUED]

---

**Interior Doors**

Stockroom:
Landlord shall install one (1) pair of three foot by seven foot (3'-0" x 7'-0") hollow metal doors and metal frame in accordance with Tenant's final plans. Door shall be a minimum eighteen (18) gauge material and have a clear six foot zero inch by seven foot zero inch (6'-0" x 7'-0") opening with no obstructions (no mullions between doors). Door hardware shall include three (3) pair hinges (4-1/2" heavy weight, ball bearing pins), closers (both doors), and push/pull latch set. If door is rated Landlord shall install one (1) astragal, one (1) pair of automatic bolts, and one (1) one-half inch (1/2" high) maximum aluminum threshold.

Egress Hallway:
Landlord shall install one (1) three foot by six foot eight inch (3'-0" x 6'-8") hollow metal door and metal frame in accordance with Tenant's final plans. Door shall be a minimum eighteen (18) gauge material. Door hardware shall include one and one-half (1-1/2) pair hinges (standard weight, ball bearing pins), closer, and push/pull latch set.

Note: If any of the doors above are installed in a fire rated wall, Landlord shall install fire rated door and all required hardware required by code to meet that rating.

---

[END OF SCHEDULE II]

Initial Here:

*HFA*

Landlord
rev. 05/12/2021

**SL**

Construction Director
Page 5 of 16

RE Director



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

**Exhibit "C"**
**Landlord's Work – "Vanilla Box"**
**Construction Criteria**

*NDM*

Shopping Center Name

Deal #

**SCHEDULE 8**
**FLOORS**

**All Areas:**

Landlord shall deliver to Tenant a level and smooth concrete slab exposed throughout Premises, free of leveling products (unless existing construction), with not more than one-quarter inch (1/4") variation in ten feet (10'-0"). All required expansion and control joints shall be properly installed by Landlord and shall be ready to accept Tenant's floor finishes. On-grade floors shall have functioning vapor barrier installed beneath the slab (unless existing construction).

[END OF SCHEDULE 8]

Initial Here:

*HFA*

Landlord
rev. 09/12/2021

**SL**

Construction Director
Page 5 of 18

RE Director

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Vanilla Box"
Construction Criteria

*NDM*

Shopping Center Name                                                    Deal #

SCHEDULE IV
ELECTRICAL

General Electrical Service Standards:

| STORE SIZE | REQUIRED SERVICE |
|---|---|
| 0 square feet up to 14,999 square feet: | ☐ 4300A 480Y277V — OR — ☐ 600A 208Y120V |
| 15,000 square feet up to 19,000 square feet: | ☐ 400A 480Y277V — OR — ☐ 800A 208Y120V |

(Check Appropriate Box)

☐ #300A 480Y277 Volt (3 phase, 4 wire) Service (Tenant preferred):
Landlord shall provide a separately metered electrical service with over current protection, a forty-two (42) circuit main electrical panel (sized per schedule above), a seventy five (75) KVA step-down transformer fed from the 480V panel, and a forty-two (42) circuit sub-panel (208Y120 volt with two hundred twenty-five (225) amp main circuit breaker) fed from the transformer. All light fixtures and HVAC equipment is to be fed from the main panel. The main panel shall also have a spare 20A/3P circuit breaker for the Tenant's future use. Install spare 20A circuit breakers in all un-used breaker spaces. A CT cabinet and meter enclosure if required by code or utility company.

– OR –

☐ 400A 480Y277 Volt (3 phase, 4 wire) Service (Tenant preferred):
Landlord shall provide a separately metered electrical service with over current protection, a forty-two (42) circuit main electrical panel (sized per schedule above) and will have a one hundred fifty (150) amp three-pole circuit breaker feeding a 480V one hundred fifty (150) amp (42) circuit sub-panel, a seventy (75) kVA step-down transformer fed from the main 480V panel, and a forty-two (42) circuit sub-panel (208Y120 volt with two hundred twenty-five (225) amp main circuit breaker) fed from the transformer. All light fixtures are to be fed from the 480V sub-panel and all HVAC equipment is to be fed from the main panel. The main panel shall also have a spare 20A/3P circuit breaker for the Tenant's future use. Install spare 20A circuit breakers in all un-used breaker spaces.

– OR –

☐ 600A or 800A 208Y120 Volt (3 phase, 4 wire) Service:
Landlord shall provide a separately metered electrical service with over current protection, MDP panel, disconnect and two (2) forty-two (42) circuit electrical panels. The main panel shall be sized per the schedule above and will have a one-hundred (100) amp, three-pole circuit breaker feeding the second panel and a one-hundred fifty (150) amp, three-pole circuit breaker feeding the third panel. All light fixtures are to be fed from the third panel and all HVAC equipment is to be fed from the main panel. Install a spare 20A/3P circuit breaker in the main panel for the Tenant's future use. Install spare 20A circuit breakers in all un-used breaker spaces.

Landlord shall terminate all circuits in panel boards except for general lighting, infill lighting, and exterior wall pack circuits, these circuits shall terminate at terminal strips as described above. All other lighting (ext. exit, exterior emergency, interior emergency) shall also terminate at panel boards.

If Landlord is separating larger space to form the Premises, Landlord is required to provide electrical service serving the in accordance with Tenant's General Electrical Service Requirements. Landlord is responsible for providing service to the remaining portion of the larger space in accordance with applicable law as may be necessary for legal occupancy of the Premises.

If Landlord is combining smaller spaces to form the Premises, Landlord shall be responsible for combining electrical service to meet Tenant's General Electrical Service Requirements. Tenant shall not be responsible for any service to the Premises in excess of what is required or used during Tenant's occupancy of the Premises.

[SCHEDULE IV CONTINUED ON NEXT PAGE]

Initial Here:
*HPA*

Landlord
rev. 09/10/2021

SL

Construction Director
Page 7 of 18

RE Director



**Exhibit "C"**
**Landlord's Work – "Vanilla Box"**
**Construction Criteria**

NDM

Shopping Center Name                                                                    Deal #

**[ELECTRICAL SCHEDULE IV CONTINUED]**

Note: Landlord shall have all electrical items completely connected, tested and fully operational prior to Delivery Date.

**Electrical Service Connection:**
Landlord shall install all main distribution panel(s) (MDP), electrical panel(s), disconnect(s), meter and meter base, breakers and transformer(s) per the attached diagrams [████████████] based on Tenant's General Electrical Service Requirements (described below). All electrical panels must be installed in the locations shown on Tenant's final plans. Landlord shall install panel schedules inside each electrical panel giving a description for each circuit used. If the site has a different service voltage configuration, Landlord must notify Tenant to determine appropriate service size. Tenant shall transfer meter to tenants name at turnover.

**Electrical – Signage:**
Landlord shall install Tenant's signage circuit(s) consisting of one (1) twenty (20) amp, one hundred and ten (110) volt circuit(s) at each. Terminate circuit in junction box(s) at the storefront and any other exterior wall / signage location and in the laminal strip enclosure per the attached diagrams [████████████] described in the "Electrical - Lighting" paragraph below near electrical panels. [████]

**Electrical - Checkouts:**
Landlord shall install one (1) junction box consisting of one (1) dedicate circuit and one isolated dedicated circuit for each checkout. Junction box shall be located above the ceiling above each checkout, refer to Tenant's final plans for quantity and location.

**Electrical - Duplex Outlets:**
Landlord shall install one (1) ceiling mounted duplex outlet centered on storefront doors and twelve foot (12'-0") from front wall.

Sales Area: Landlord shall install standard duplex receptacles at four inches (4") above finished floor and spaced no more than twenty-five feet (25'-0") apart on the sales area perimeter walls. Landlord storefront doors. A minimum of three (3) circuits shall be used to feed the sales area receptacles with the circuit loads balanced as best possible. Landlord shall install one (1) ceiling mounted duplex outlet centered on storefront doors and twelve foot (12'-0") from front wall. Stockroom: Landlord shall install standard duplex receptacles at eighteen inches (18") above finished floor and spaced no more than forty feet (40'-0") apart on the stock room perimeter wall unless otherwise required by code.

**Electrical - Above Storefront Door**
Landlord shall install isolated dedicated duplex receptacle above storefront doors between ten foot (10'-0") and twelve foot (12'-0") AFF.

**Electrical - Doorbell:**
Landlord shall install doorbell button on exterior latch side of the freight door and a doorbell chime on the sales side of stockroom wall above the stockroom doors.

**Electrical - Employee Area:**
Landlord shall install Tenant's employee electrical/data package to include but not limited to junction boxes, conduit with pull strings, electrical devices, face plates, etc. per the attached diagrams [████████]

**Electrical - ATM (Family Dollar Only)**
Landlord shall install isolated dedicated duplex receptacle at eighteen inches (18") AFF.

**Electrical - Communication Board (Family Dollar Only)**
Landlord shall install two (2) isolated dedicated duplex receptacles.

**Electrical - Future Vending (Family Dollar Only)**
Landlord shall install two (2) waterproof GFI receptacles on storefront exterior, one (1) on each side of storefront entrance.

**Electrical - Water Vending (Family Dollar Only)**
Landlord shall install two (2) waterproof GFI receptacles on storefront exterior, side by side at four foot (4') AFF. Landlord shall coordinate final locations with Tenant prior to installation. Landlord shall install in AZ, CA, CO, FL, NV, NM and TX.

Initial Here:

HFA                                    SL

Landlord                           Construction Director              RE Director
rev. 05/12/2021                        Page 8 of 18



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Vanilla Box"
Construction Criteria

*NOM*

Shopping Center Name                                                        Deal #

Electrical – Lighting
Landlord shall install an enclosure (with terminal strips) per the attached diagrams ▓▓▓▓▓▓ adjacent to the electrical panels. Landlord shall connect all circuits from the light fixtures to the terminals within this enclosure. Each row of light fixtures shall be on an individual circuit on the electrical panel for separation of control. Tenant will install an Energy Management System (EMS) at a later date and will use this enclosure as the interface point for controlling the lighting circuits. Night lights and exit signs shall be wired directly to the electrical panel. Landlord shall have all lights completely connected, tested and ready to energize prior to Delivery Date.

[END OF SCHEDULE IV]

Initial Here:

*HDA*

Landlord
rev 05/12/2021

*SL*

Construction Director
Page 9 of 18

_____
RE Director

Exhibit "C"
Landlord's Work – "Vanilla Box"
Construction Criteria

*NOM*

Shopping Center Name                                                                Deal #

SCHEDULE 10
OTHER UTILITIES – EXCEPT ELECTRICAL

General Utility Service Requirements

If Landlord is repurposing larger space to form the Premises, Landlord is required to provide utility service serving the Premises in accordance with Tenant's general service requirements set forth below. Landlord is responsible for providing any service to the remaining portion of the larger space in accordance with applicable law as may be necessary for legal occupancy of the Premises.

If Landlord is combining smaller spaces to form the Premises, Landlord shall be responsible for combining utility service to meet Tenant's general service requirements set forth below. Tenant shall not be responsible for any service to the Premises in excess of what is required or used during Tenant's occupancy of the Premises.

**Sanitary Waste:**
Landlord shall provide and install underground a four inch (4") minimum sanitary waste line. Sanitary waste lines shall be free of obstructions and blockage.

**Domestic Water:**
Landlord shall provide a separately metered one-inch (1") cold water line with shut-off valve, back flow preventer, or other required devices. Domestic water service shall be provided complete from the local utility, including meter at the Landlord's meter bank, ready for transfer to Tenant. If the domestic water supply serving the Premises is not separately metered by the local utility, Landlord shall provide a sub-meter, which shall be read, serviced, and invoiced to Tenant by an independent company.

Family Dollar Only – Landlord shall install one (1) three quarter inch (3/4") cold water line with freeze proof hose bib ready to Woodland Bill in areas of line with required insulation and shut-off valve for Tenants water vending machine at location FL-03-ARF installation. In areas with minimal. Landlord shall install in AZ, CA, CO, FL, NV, NM and TX.

**Gas Service:**
Landlord shall provide a separately metered gas service. Landlord will coordinate installation of gas meter. Landlord shall label the gas service piping with the appropriate gas pressure provided by the utility company.

**Fire Suppression System:**
If required by any authority having jurisdiction, Landlord shall install a fully functional Fire Sprinkler System to include but not limited to the riser, backflow preventer, mains, all pipes and heads. Fire Sprinkler System must be installed in accordance with all local ordinances, and any fire underwriters having jurisdiction over the space. Landlord is responsible for coordination of sprinkler head locations based on Tenant's final reflected ceiling plan. If the fire suppression system is required to be monitored then Landlord shall install monitoring system complete. Landlord shall mount all horns, strobes and other fire devices required for monitoring system on ceiling so not to disturb Tenant's perimeter graphics package. Landlord shall have Fire Sprinkler System completely connected, tested and fully operational prior to Delivery Date. If Tenant is installing the solution, sprinkler head offset to latch in the fuel portions if Landlord is recalling the ceiling. Heads shall be turned down and finished.

[END OF SCHEDULE V]

Initial Here!

*HFA*

Landlord
rev. 05/12/2021

**SL**

Construction Director
Page 10 of 18

RE Director

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Vanilla Box"
Construction Criteria

*NOM*

Shopping Center Name

Deal #

SCHEDULE VI
STOREFRONT AND EXTERIOR IMPROVEMENTS

Storefront/Sign Facade: [STRIKE ONE]

IF LANDLORD IS PROVIDING TENANT'S PROTOTYPE: ~~Landlord shall provide Tenant's prototypical storefront/sign facade (see attached) [ATTACH TENANT PROTOTYPE FACADE RENDERING]. Landlord shall provide all materials, all construction, and all drawings necessary to build Tenant's prototypical storefront/sign facade. Landlord shall install plywood for support of Tenant's future signage in area indicated on Tenant's final signage plan with letters not less than forty-eight inches (48") in height. Landlord shall provide a two foot by two foot (2'-0"x2'-0") access panel in canopy for access to Tenant's signage.~~

IF LANDLORD IS PROVIDING LANDLORD'S STOREFRONT DESIGN
Landlord shall provide ~~Tenant's with an Anchor-like~~ a storefront/sign facade substantially similar in appearance to the conceptual rendering attached hereto [ATTACH LANDLORD FACADE RENDERING]. ~~Facade design must be substantially typical upon by Landlord and Tenant prior to construction. Landlord shall provide all materials, all construction, and all drawings necessary to build Tenant's attached conceptual storefront/ sign facade. Landlord shall install plywood for support of Tenant's future signage in area indicated on Tenant's final signage plan with letters not less than forty-eight inches (48") in height. Landlord shall provide a two foot by two foot (2'-8"x2'-0") access panel in canopy for access to Tenant's signage.~~ Building facade is brick so plywood is not necessary to install signage.

Storefront Doors and Windows:

Inline Strip Center or Freestanding Building: If the Premises are located in an inline strip shopping center, Landlord shall install glass and aluminum storefront at least ten feet (10'-0") tall with a pair of three foot by seven foot (3'-0"x7'-0") doors located in accordance with Tenant's final plans. Storefront aluminum shall be ~~white~~ dark bronze or clear anodized aluminum material. Storefront glazing (glass) shall be a minimum one inch (1") clear insulated low "E" glazing throughout entire storefront area, including storefront doors. Tenant requires full-height glass on seventy-five percent (75%) of the width of the Premises. Tenant will accept knee walls no higher than four feet (4'-0") AFF where site conditions exist only. Landlord shall also install an entrance vestibule per Tenant's final plans. Please refer to attached ~~mechanical rendering~~ elevations for examples ~~Deleted~~ ~~WIN - 102350~~

Other Exterior Doors and Hardware:

Freight Delivery Door:
Landlord shall install one (1) pair of three foot by seven foot (pair 3'-0" x 7'-0") hollow metal doors and metal frame in accordance with Tenant's final plans. Door shall be a minimum eighteen (18) gauge material and have a clear six foot zero inch by seven foot zero inch (6'-0" x 7'-0") opening with no obstructions (no mullions between doors). Door hardware shall include three (3) pair hinges (4-1/2" heavy weight, non-removable pins), door sweeps, flush bolt, overhead holder/stops (both doors), rain drip (above door), one-half inch (1/2" high) maximum aluminum threshold, closer (s), weather stripping and a commercial grade non-alarmed panic device to secure Premises until Landlord turns Premises over to Tenant.

Exterior Egress Door:
Landlord shall install one (1) three foot by seven foot (3'-0" x 7'-0") hollow metal door and metal frame in accordance with Tenant's final plans. Door shall be a minimum eighteen (18) gauge material. Door hardware shall include one and one-half (1-1/2) pair hinges (standard weight, non-removable pins), door sweep, rain drip (above door), closer, one-half inch (1/2" high) maximum aluminum threshold, weather stripping and a commercial grade non-alarmed panic device to secure Premises until Landlord turns Premises over to Tenant.

[SCHEDULE VI CONTINUED ON NEXT PAGE]

Initial Here:
*HFA*

Landlord
rev. 05/12/2021

*SL*

Construction Director
Page 11 of 18

RE Director

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

**Exhibit "C"**
**Landlord's Work – "Vanilla Box"**
**Construction Criteria**

*NDM*

Shopping Center Name                                                                 Deal #

**[STOREFRONT AND EXTERIOR SCHEDULE VI CONTINUED]**

**Egress Access Ramp:**
Landlord shall install exterior landing, area of refuge, stairs, ramp, and associated railing as required by code at each required egress door that has a difference in grade and interior floor height. Stairs off landing are acceptable by Tenant when landing is large enough for an "area of refuge" and where code allows. Platforms and landings can be constructed of either concrete or metal, meet the sealed architectural and related to protect from vehicle elements. Landlord shall may elect to install bollards as may be necessary to protect the platform, landing, stair, and ramp from damage by vehicles or use curbs and landscape areas to protect landing and stairs.

**Exterior Loading Platforms and Landings:**
If the difference from the exterior grade to the Premises interior finish floor is six inches (6") or less, Landlord shall install concrete exterior landing, ramp, and railing (per code) at exterior freight door if a difference in grade and finish floor height exists.

If the difference from the exterior grade to the Premises interior finish floor is over six inches (6"), Landlord shall install exterior loading platform, ramp, swing gate, and railing at outside the exterior freight door at all locations where the elevation change between platform and adjacent grade is greater than 6". The difference in grade and adjacent loading dock platform. Platform design must be approved by Tenant prior to construction. Stairs off platform are acceptable by Tenant when platform is large enough for an "area of refuge" and where code allows.

**Roof:**
Landlord shall complete all necessary repairs to the roof structure and [install a new roof membrane over the Premises] OR [repair the existing roof membrane over the Premises] to provide a complete, structurally sound, and leak free roof system, including structural support adequate to accommodate HVAC roof top package units. Landlord shall install roof insulation with a minimum "R" factor of not less than thirty (30) or such greater value as may be required to meet local code requirements for a mercantile building.

**[END OF SCHEDULE VI]**

*HFA*

Initial Here:
Landlord
rev. 05/12/2021

SL

Construction Director
Page 12 of 18

RE Director

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Vanilla Box"
Construction Criteria

*NDM*

Shopping Center Name

Deal #

SCHEDULE 13
DEMOLITION AND HAZARDOUS MATERIALS

Landlord is providing a new building shell so nothing on this page is applicable.

**Demolition:**
Landlord is to fully remove all existing interior improvements within the Premises, including, but not limited to, the existing ceiling, lights, mechanical, millwork, masonry installations, vaults, previous tenant finishes and fixtures, interior walls, and restrooms.

Landlord shall remove load bearing/center walls within the Premises as shown on the attached floor plan [ATTACH FLOOR PLAN] and install reinforcement to provide any necessary structural supports to the building. The location of any columns or other reinforcement within the floor space of the Premises shall be performed in accordance to construction drawings approved by Tenant.

All debris resulting from demolition work performed by the Landlord shall be removed and disposed of in accordance with applicable law. The space shall be delivered to the Tenant in "Broom Clean" condition.

***If Landlord is combining smaller spaces to form the Premises, Landlord shall be responsible for combining utility service to meet Tenant's general service requirements set forth in Schedule IV "Electrical" and Schedule V "Other Utilities".***

**Asbestos:**
Asbestos has been identified within the Premises. Prior to the Delivery Date, Landlord will remove all asbestos within the Premises at Landlord's expense. Upon completion of asbestos removal, Landlord shall provide Tenant with an asbestos abatement report certifying that asbestos has been removed and disposed of in accordance with applicable laws, and that the Premises are free of asbestos.

**Hazardous Materials:**
Hazardous Materials have been identified within Shopping Center or the Premises. Prior to the Delivery Date, Landlord will, at Landlord's expense, perform any and all remediation or other work required to comply with applicable laws related to the presence of such Hazardous Materials. Prior to the Delivery Date, Landlord shall provide to Tenant certification from the governing environmental protection authority that Landlord has satisfied all of the requirements of the governing authority. Landlord shall perform, at Landlord's expense, any ongoing repairing, testing, or other requirement related to the presence of such Hazardous Materials.

[END OF SCHEDULE VII]



Initial Here
Landlord
rev. 05/12/2021

*SL*

Construction Director
Page 13 of 18

RE Director



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Vanilla Box"
Construction Criteria

*NSM*

_____                              _____
Shopping Center Name                                    Deal #

### SCHEDULE 14
CEILING

**If Tenant is installing HVAC distribution and/or sprinkler system, Landlord shall not be responsible for ceiling installation in the affected areas as indicated by Tenant!!

**Sales Area:**
Landlord shall install a two foot by four foot (2'-0" x 4'-0") acoustical ceiling tile (ACT) and grid system at a minimum height of eleven foot (11'-0") AFF and a maximum height of fourteen foot (14'-0") AFF. Tenant's preferred ceiling height is 12'-0" AFF. Grid and tile shall be white, new or in like new condition.

**Stockroom:**
If ceiling is required by code, Landlord shall install a two foot by four foot (2'-0" x 4'-0") acoustical ceiling tile (ACT) and grid system at a height no lower than ten foot (10'-0" AFF. Grid and tile shall be white, new or in like new condition. Stockroom shall have an open ceiling.

**Hallway (from sales area to toilet):**
Landlord shall install a two foot by four foot (2'-0"x4'-0") acoustical ceiling tile (ACT) and grid system at eight foot (8'-0") AFF. Grid and tile shall be white, new or in like new condition.

**Egress Hallway:**
If ceiling is required by code, Landlord shall install a two foot by four foot (2'-0" x 4'-0") acoustical ceiling tile (ACT) and grid system at a height no lower than eight foot (8'-0") AFF. Grid and tile shall be white, new or in like new condition.

[END OF SCHEDULE VIII]

Initial Here:

*HFA*                        SL
_____          _____          _____
Landlord                    Construction Director       RE Director
rev. 05/12/2021                 Page 14 of 18

Exhibit "C"
**Landlord's Work – "Vanilla Box"**
**Construction Criteria**

_NDM_

Shopping Center Name                                                                 Deal #

## SCHEDULE 15
## LIGHTING

### General Light Fixture Mounting Methods:

Exterior lighting quantities and locations will be dictated by the applicable local building and life safety codes. These quantities both will conform to the location and design of the exterior lighting fixtures.

Landlord shall provide lighting quantities, location, and type in accordance with Tenant reflected ceiling plans. Landlord shall provide lighting quantities, location and type in substantial conformance with Tenant reference information and drawings as indicated on the reflected ceiling plan provided by Landlord.

**No Ceiling:** Areas with no ceiling (exposed roof deck) shall have light fixtures suspended as follows, sales area twelve foot (12'-0") AFF and stockroom at ten foot (10'-0") AFF.

**Suspended ACT Ceiling:** All areas with a suspended ACT ceiling shall have light fixtures attached to the ceiling grid using lighting manufacturer approved hardware. Ceiling grid shall be supported from structure as required.

**Hard/GWB Ceiling:** All areas with a suspended Hard/GWB ceiling shall have light fixtures attached to the ceiling using lighting manufacturer approved hardware.

**Note:** Landlord shall have light fixtures completely connected, tested and fully operational prior to Delivery Date.

### Interior Lighting

**General Interior Lighting:**
In the area of the sales area, office, stockroom, employee area, egress and toilet hallways, Landlord shall install eight foot (8'-0") light fixtures. Light fixtures shall be connected end-to-end to form a continuous row (no space between fixtures in row) and as indicated on Tenant's reflected ceiling plan. Fixtures are to have two (2) four foot (4'-0") 18W LED lamps. Lamps are to be LED 4000 Kelvin color temp. bulbs.

**Infill Lighting:**
Landlord shall install four foot (4'-0") strip light fixtures. Light fixtures shall be connected end-to-end to form a continuous row (no space between fixtures in row) and as indicated on Tenant's reflected ceiling plan. Fixtures are to have one (1) four foot (4'-0") 18W LED lamp. Lamps are to be LED 4000 Kelvin color temp. bulbs.

**Emergency/Night Lights:**
Landlord shall install LED interior emergency/night lighting ballast in the same fixtures as general lighting where allowed by code. In jurisdictions that do not allow this, stand-alone emergency lighting units shall be used and shall be ceiling mounted (no lights mounted on interior perimeter walls). Quantity and locations will be dictated by local and national codes.

**Exit Lights:**
Landlord shall install LED exit light fixtures with battery back-up. Quantity and locations will be dictated by local and national codes. Exit signs must be ceiling mounted to avoid conflict with Tenant's wall graphics.

### Exterior Lighting

**Wall Pack:**
Landlord shall install LED light fixtures above or adjacent to every exterior door to the Premise to meet code requirements. These fixtures shall be a minimum of 70 watts.

**Emergency Exit:**
Landlord shall install LED exterior egress lighting at each exterior door from the Premise. These exterior fixtures shall have remote batteries mounted just inside the Tenant space.

[END OF SCHEDULE IX]

Landlord
rev 05/12/2021

SL

Construction Director
Page 15 of 18

RE Director

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

**Exhibit "C"**
**Landlord's Work – "Vanilla Box"**
**Construction Criteria**

*NDM*

Shopping Center Name                                      Deal #

**SCHEDULE X**
**TOILET(S)**

Note: Landlord shall have all electrical items including water heater and all plumbing fixtures completely connected, tested and fully operational prior to Delivery Date.

**Walls:**
Landlord shall install wall(s). Interior toilet room walls shall be constructed of water resistant gypsum wallboard. Landlord shall install white fiberglass reinforced panels (FRP) on interior walls full height. Landlord shall install adequate blocking in wall to accommodate plumbing fixtures, grab bars, etc.

**Floor:**
Landlord shall install an impervious floor finish in toilet area similar to commercial grade heated welded sheet vinyl or other acceptable flooring finish.

**Ceiling:**
Landlord shall install a GWB (water resistant) ceiling at eight foot (8'-0") AFF. Landlord shall paint ceiling with washable semi-gloss paint (neutral color).

**Door:**
Landlord shall install one (1) three foot zero inch by six foot eight inch (3'-0" x 6'-8") solid core wood door and metal frame in accordance with Tenant's final plans for each toilet room. Landlord shall paint door and frame white with semi-gloss enamel paint. Door hardware shall include one and one-half (1-1/2) pair hinges (standard weight), closer, doorwall stop if required, and commercial grade lever style handle.

**Electrical:**
Landlord shall install wall mounted junction box per Tenant's final plans for Tenant supplied and installed hand dryer(s).

**Lighting:**
Landlord shall install four foot (4'-0") strip fluorescent LED light fixture(s) mounted to GWB ceiling per manufacturer's instructions. Fixture(s) are to be have one (1) four foot (4'-0") 18W LED lamps LED 4000 Kelvin color temp. and shall have electronic ballast. Lamps are to be F03B041AS5 series 4100 Kelvin color temp bulbs.

**Exhaust System:**
Landlord shall install an exhaust system in each toilet complete. Exhaust fans shall be wired to the terminal strip enclosure per the attached diagrams [ATTACH DIAGRAM].

**Plumbing Fixtures and Accessories:**
Landlord shall install TWO (2) fully functional toilet room(s) including but are not limited to: lavatories, water closets and floor drains furnished with all necessary accessories including, but not limited to, water closet seats, faucets, commercial grade power assist flush valves, grab bars, one (1) mirror at each lavatory, four (4) roll toilet paper holders (one per water closet), and toilet partitions (handicap and standard partitions as present vandalism as required. Landlord shall install a urinal if required as noted. Each toilet room shall be provided with a three inch (3") floor drain with the appropriate floor grate and trap primer. Landlord shall locate toilet rooms, mop sink, and drinking fountain as per Tenant's final plans.

[SCHEDULE X CONTINUED ON NEXT PAGE]

Initial Here

*HFA*                          *SL*

Landlord                    Construction Director              RE Director
rev. 05/12/2021                  Page 16 of 18

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Vanilla Box"
Construction Criteria

*NDM*

Shopping Center Name

Deal #

[TOILETS SCHEDULE X CONTINUED]

**Drinking Fountain:**
Landlord shall install a Hi-Lo non-electric (unless required by code) drinking fountain and FRP back splash at surrounding walls to eight foot (8'-0") AFF. Landlord shall install drinking fountain apron to meet the ADA requirements for protruding objects.

**Mop Sink:**
Landlord shall install a floor mounted thirty six inch by twenty four inch (36"x 24") mop service basin with the appropriate faucet, backflow prevention and FRP back splash at surrounding walls to eight foot (8'-0") AFF.

**Water Heater:**
Landlord shall install a water heater (located above or near toilet rooms) with a minimum of six (6) gallons storage capacity, seven (7) gallons per hour recovery rate at one hundred (100) degrees Fahrenheit temperature rise. It is the responsibility of Landlord to provide a water heater with the required recovery rate, storage capacity, appropriately terminated temperature and pressure relief valve, drain pan and hot water expansion tank as required by code. Landlord shall have the water heater properly mounted and secured as required by code. If the water heater is more than thirty five (35) feet away from any plumbing fixture requiring hot water, Landlord shall provide all components necessary for a properly functioning hot water recirculation line. If required by code Landlord shall install a larger water heater as required, twenty (20) gallon as required in California and other area's and/or thirty (30) gallon as required in Arizona and other areas and shall be located above or near toilet rooms.

[END OF SCHEDULE X]

Initial Here:

*HFA*

Landlord
rev. 05/12/2021

SL

Construction Director
Page 17 of 16

RE Director

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Vanilla Box"
Construction Criteria

_IVgM_

Shopping Center Name                                    Deal #

SCHEDULE XI
OFFICE AND EMPLOYEE ROOM

Note: Landlord shall have all electrical items completely connected, tested and fully operational prior to Delivery Date.

### OFFICE

**Wall(s) (Dollar Tree):**

Landlord shall install wall(s) to eight foot (8'-0") AFF with GWB on each side framed out in wood one by (1x). Landlord shall install two (2) four foot by two foot (4'-0" x 2'-0") one way windows in wall(s) per the attached diagrams [ATTACH DIAGRAMS].

**Wall(s) (Family Dollar):**

Landlord shall install wall(s) with GWB on each side per the attached diagrams [ATTACH DIAGRAMS] unless the property falls in tenants risk class four (4) / high security, then Landlord shall follow the risk class 4 / high security addendum requirements.

**Ceiling (Family Dollar):**

Landlord shall install a GWB ceiling at eight foot (8'-0") AFF. Landlord shall paint ceiling with semi-gloss paint (neutral color). Note : if the property falls in tenants risk class four (4) / high security, then no ceiling will be installed in the office if the office is placed on the sales floor.

**Door:**

Landlord shall install one (1) three foot by six foot eight inch (3'-0" x 6'-8") solid core wood door and metal frame in accordance with Tenant's final plans. Door hardware shall include one and one-half (1-1/2) pair hinges (standard weight, ball bearing pins), closer and floor stop.

**Counter and Shelf:**

Landlord shall install wood framed office counter and shelf (team of millwork or similar finish) in accordance with Tenant's final plans. Tenant to provide dimensioned plans and elevations, material specifications, and/or record shop drawings for counter and shelf.

**Electrical:**

Landlord shall install Tenant's office electrical/data package to include but not limited to junction boxes, conduit with pull

### EMPLOYEE ROOM
### (Dollar Tree Only)

**Wall(s)**

Landlord shall install two by four (2 x 4) wood stud wall(s) to five foot (5'-0") AFF with three quarter inch (3/4") MDO plywood on each side with one by (1 x) wood cap per the attached diagrams [ATTACH DIAGRAMS].

**Counter and Shelf:**

Landlord shall install wood framed employee counter and shelf (team of millwork or similar finish) in accordance with Tenant's final plans . Tenant to provide dimensioned plans and elevations, material specifications, and/or record shop drawings for counter and shelf.

[END OF SCHEDULE XI]

HPA                          _SL_

Initial Here:
Landlord                     Construction Director              RE Director
rev. 05/12/2021                   Page 16 of 18

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Free-Standing Addendum"
Construction Criteria

NDM

Shopping Center Name _____ Deal # _____

## FREE-STANDING ADDENDUM

Landlord shall be responsible for compliance with any and all requirements of applicable laws related to the aforesaid improvements, including, without limitation, any zoning variances or approvals, storm water or other drainage requirements, parking requirements, environmental regulations, or wetlands preservation regulations.

Strike any work that will not be performed by Landlord as part of Landlord's Work.

### Site Work:

**Sidewalk(s):**
Landlord shall install a sidewalk at storefront a minimum depth of ten foot (10'-0") or as required by code. Landlord may install sidewalk at less than 10' at corner of building due to unique site condition. Landlord shall install all required sidewalk curbs at from four inches (4") high to six inches (6") high- or as required by code. Landlord shall install handicap ramp and sidewalk as required to meet local code and ADA requirements. If parking is adjacent to side of building, Landlord shall install a five foot (5'-0") deep minimum sidewalk or larger if required by code to protect the building. Landlord shall coordinate final size per Tenant's final plans and/or approval.

**Trash:**
Landlord shall provide Tenant with a concrete dumpster pad(s) and bollards as required for building protection for Tenant's trash dumpsters. Tenant requires three (3) eight (8) yard trash dumpsters for their daily operations. Landlord will provide one trash enclosure for one (1) yard trash dumpster. Dumpster area shall allow proper access for trucks to service dumpsters. If required by any authority having jurisdiction, Landlord shall build any trash enclosures, install drain(s) and provide any required water supply at Landlord's sole expense.

**Parking Lot:**
Landlord shall provide parking lot complete, to include but not limited to all curbs, curb cuts, wheel stops (at all parking spaces adjacent to building strips no sidewalk or landscape areas exist), gutters, drainage, signage, and stripping. Landlord shall install a minimum of four (4) parking spaces per one thousand (1,000) square feet of building space. Landlord shall install handicap parking spaces (properly marked and signed) as required. Landlord shall provide proper access for Tenant's freight trucks, wide radius curves on all entries, corners and exits. Landlord shall provide heavy duty paving at all truck paths, refer to General Conditions section "A" for additional requirements. (EDENS find not marked. General Conditions section "A" for paving on the bus haul paths).

**Site Lighting:**
Landlord shall install all site/parking lot lighting. Foot candles to be a minimum average of: ten (10) at the surface level of the storefront and delivery area, five (5) at the surface level of the dumpster area, and three (3) at the surface area of all other areas within the No BUIA Area to the extent allowed by code. [unless the property falls in tenants risk class four (4) / high security, then landlord shall follow the risk class 4 / High security addendum requirements]. Landlord shall install adequate pole and wall lighting for night vision at all entries, parking area and dumpster areas and have lights completed connected, tested and ready to energize prior to the Delivery Date.

**Pylon/Monument Signage:**
Landlord shall install Tenant's pylon/monument signage complete to include but not limited to the pylon/monument at least or maximum size, foundation, and electrical including lighting. Landlord shall have the pylon/monument significantly constructed, tested and ready to charge to code by the Delivery Date. Landlord shall install blank trim panels and Tenant will replace said panels with Tenant's final panels after the Delivery Date. Tenant shall approve final location prior to Landlord installing the pylon/monument.

**Landscaping and Irrigation:**
Landlord shall install the minimum landscaping allowed required by code and shall not install more than required. Landlord shall install all low growth and maintenance landscaping or as required by code. Landlord shall install fully operational irrigation system with back flow preventer to maintain exterior landscaping. System shall be connected, tested and fully operation prior to Delivery Date.

**Job Site Camera System:**
Landlord shall provide, install, and maintain OxBlue job-site camera system until Turnover acceptance by Tenant. Landlord shall provide Tenant with access to the job-site camera for Tenant's use to monitor Landlords contractors' progress. Landlord shall contact OxBlue four (4) weeks prior to construction start for order processing and delivery.

Contact:
OxBlue Corporation
ATTN: Jim Sewell
3423 Piedmont Industrial Blvd NW, Atlanta, GA 30318
888-849-2583 Toll Free or 404-917-0200
jimbybelue@oxblue.com
Ask for Family Dollar Pricing

[F/S ADDENDUM CONTINUED ON NEXT PAGE]

Initial Here:

HFA

Landlord
Rev: 05/12/2021

SL

Construction Director
Page 1 of 2

RE Director

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Exhibit "C"
Landlord's Work – "Free-Standing Addendum"
Construction Criteria

_NDM_
Shopping Center Name                                          Deal #

[F/S ADDENDUM CONTINUED]

**Building Requirements (Exterior Shell)**

**Exterior Wall Construction:**
Landlord shall construct of porcelain-base CMU, tint-line, as required, E.I.F.S. (STO or equal), standard shutting bond (cement-tie-Sched.), or as applicable, and paint as per Tenant's color rendering. Landlord shall construct exterior walls. Wall(s) shall to be insulated to provide a minimum of R-19 or as required by code. Exterior wall finish, materials, and colors to be selected by Landlord similar to attached conceptual building rendering.

**Painting:**
Landlord shall paint exterior of building similar in appearance to attached conceptual building rendering, and components to include but not limited to the exterior walls (left, and right), storefront façade (including sign area, gutters, downspout, and doors per the Tenant provided signing scheme rendering. Tenant provided color scheme rendering provided exact colors match and no deviations accepted unless otherwise approved by Tenant.

**Exterior Awnings:**
Tenant shall be permitted to install exterior building awnings / canopies. Awning / canopies will be non-illuminated. Landlord will furnish and install exterior building awning / canopies. Tenant shall not be permitted to install or modify awning / canopies.

**Roof Structure:**
Landlord shall install complete structurally sound and leak free roof system for building with structural support adequate to accommodate HVAC roof top package units. Roof shall be White/Cool roofing material. Overall building height shall be adequate to accommodate Tenant's ductwork while maintaining a minimum interior ceiling height of twelve feet (12'-0") AFF. Tenant requires a minimum of two foot (2'-0") clearance between Tenant's finish ceiling and any obstruction above ceiling (bar joist, steel beam, sprinkler piping, etc) for Tenant's ductwork. Tenant requires a minimum "R" factor for the roof insulation to meet local code requirements for a conditioned mercantile building. Landlord shall install roof hatch or and no exterior roof ladder as required by code for roof access. Ladder shall be located in Tenant's stockroom area on exterior wall.

[END OF F/S ADDENDUM]

Initial Here:
_HA_
Landlord
Rev: 05/12/2021

SL
Construction Director
Page 2 of 2

RE Director

Delete this page from work letter. There will not be gas service to premises.



GAS METER SHALL BE PROVIDED BY LANDLORD. TENANT SHALL TRANSFER METER NTO TENANTS NAME ON DAY OF TURNOVER

PIPE CAP BY LANDLORD

GAS SERVICE, VALVES, PRESSURE REGULATORS, PIPING WITH FINAL CONNECTIONS TO HVAC EQUIPMENT SHALL BE FURNSHED AND INSTALLED BY THE LANDLORD.

HFA SL

| DOLLAR TREE / FAMILY DOLLAR | SHEET VB-01 |
|---|---|
| DEAL TYPE   TENANT'S VANILLA BOX CRITERIA | |
| SHEET TITLE   GAS EXHIBIT | DATE: 05/12/2021 |



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

CT Cabinet will only be provided if required by Code / Georgia Power.



① RISER DIAGRAM
NO SCALE

HFA SL

| DOLLAR TREE / FAMILY DOLLAR | | SHEET |
|---|---|---|
| | | VB-02 |
| DEAL TYPE TENANT'S VANILLA BOX CRITERIA | 300 AMPS | |
| SHEET TITLE RISER DIAGRAM AND PANEL SCHED. – 277 480V (0–14,999 Sq Ft) | | DATE: 05/12/2021 |



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Delete this page from work letter – Riser Diagram not applicable.



① RISER DIAGRAM
   NO SCALE

HFA SL

| DOLLAR TREE / FAMILY DOLLAR | | SHEET |
|---|---|---|
| | | VB-03 |
| DEAL TYPE | TENANT'S VANILLA BOX CRITERIA        400 AMPS | |
| SHEET TITLE | RISER DIAGRAM & PANEL SCHED.– 277 /480V (15,000–18,000 Sq Ft) | DATE: 05/12/2021 |



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Delete this page from work letter – Riser Diagram not applicable.



HFA   SL

**DOLLAR TREE / FAMILY DOLLAR**

| | SHEET |
|---|---|
| DEAL TYPE: TENANT'S VANILLA BOX CRITERIA    400 AMPS | **VB-03** |
| SHEET TITLE: RISER DIAGRAM & PANEL SCHED.– 277/480V (15,000–18,000 Sq Ft) | DATE: 05/12/2021 |



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Delete this page from work letter – Riser Diagram not applicable.



### ① RISER DIAGRAM
NO-SCALE

| DOLLAR TREE / FAMILY DOLLAR | | SHEET |
|---|---|---|
| DEAL TYPE: TENANT'S VANILLA BOX CRITERIA | 600 AMPS | VB-04 |
| SHEET TITLE: RISER DIAGRAM & PANEL SCHED. – 120/208V (0-14,999 Sq Ft) | | DATE: 05/12/2021 |



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Delete this page from work letter – Riser Diagram not applicable.



**RISER DIAGRAM**
NO SCALE



| DOLLAR TREE / FAMILY DOLLAR | | SHEET |
|---|---|---|
| | | VB-05 |
| DEAL TYPE | TENANT'S VANILLA BOX CRITERIA | 800 AMPS |
| SHEET TITLE | RISER DIAGRAM & PANEL SCHED.— 120/208V (15,000–18,000 Sq Ft) | DATE: 05/12/2021 |

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78



HFA SL

| DOLLAR TREE / FAMILY DOLLAR | SHEET |
|---|---|
| | VB-06 |
| DEAL TYPE<br>TENANT'S VANILLA BOX CRITERIA | |
| SHEET TITLE<br>TERMINAL STRIP DETAIL | DATE:<br>05/12/2021 |



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78



OFFICE PLAN



ELECTRICAL AND DATA

INTERIOR OFFICE ELEVATION

## DOLLAR TREE

| | | SHEET |
|---|---|---|
| DEAL TYPE | TENANT'S VANILLA BOX CONTROL | VB-07 |
| SHEET TITLE | OFFICE PLAN & ELECTRICAL / DATA ELEVATION | DATE: 05/12/2021 |

HFA SL



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78



EMPLOYEE PLAN
SCALE   NTS

EMPLOYEE ELECTRICAL ELEVATION
SCALE   NTS

| DOLLAR TREE | SHT 23. VB-08 |
| --- | --- |
| DRA. TYPE: TENANT'S VANILLA BOX CRITERIA | |
| SHEET TITLE: EMPLOYEE PLAN & ELECTRICAL / DATA ELEVATION | DATE 05/12/2021 |

HFA SL



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Delete this page from work letter as it pertains to Family Dollar



OFFICE ELEVATION

ELECTRICAL AND DATA

INTERIOR OFFICE ELEVATION

**FAMILY DOLLAR**

| | | SHEET |
|---|---|---|
| SUB TYPE | TENANT'S VANILLA BOX CRITERIA | VB-09 |
| SHEET TITLE | FAMILY DOLLAR OFFICE DETAILS | DATE 05/12/2021 |

HFA   SL



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Delete this page from work letter as it pertains to Family Dollar



OFFICE ELEVATION

ELECTRICAL AND DATA

INTERIOR OFFICE ELEVATION

| FAMILY DOLLAR | | VB-10 |
|---|---|---|
| | TENANT'S VANILLA BOX CRITERIA | |
| | FAMILY DOLLAR OFFICE - RISK CLASS 4 ONLY | 05/13/2021 |

HFASL



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

EXHIBIT D

FORM OF LETTER OF CREDIT

FORM OF LETTER OF CREDIT

[BANK AND ADDRESS]

IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER
NUMBER:[_____]
ISSUE DATE: [_____]

BENEFICIARY:                           APPLICANT:
  DOLLAR TREE STORES, INC.             _____
                                       1221 MAIN STREET, SUITE 1000 COLUMBIA, SC 29201

LETTER OF CREDIT ISSUE AMOUNT: USD $2,000,000.00       EXPIRY DATE: [1 YR AFTER
                                                        ISSUE DATE]

WE HEREBY OPEN OUR IRREVOCABLE STANDBY LETTER OF CREDIT IN YOUR FAVOR FOR THE ACCOUNT OF THE ABOVE REFERENCED APPLICANT IN THE AMOUNT OF USD $2,000,000.00 (USD TWO MILLION AND NO/100'S), WHICH IS AVAILABLE BY PAYMENT WHEN ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

1.    A DRAFT AT SIGHT DRAWN ON WELLS FARGO BANK, N.A. DULY ENDORSED BY THE BENEFICIARY, SPECIFICALLY REFERENCING THIS LETTER OF CREDIT NUMBER IN THE FORM OF EXHIBIT B ATTACHED HERETO.

2.    THE ORIGINAL LETTER OF CREDIT AND ANY AMENDMENTS ATTACHED THERETO.

3.    A DATED STATEMENT ISSUED ON THE LETTERHEAD OF THE BENEFICIARY AND PURPORTEDLY SIGNED BY AN AUTHORIZED REPRESENTATIVE STATING: "BENEFICIARY IS ENTITLED TO DRAW ON THIS LETTER OF CREDIT PURSUANT TO THE TERMS OF THAT CERTAIN AMENDMENT AND RELOCATION AGREEMENT (THE "CONTRACT") BETWEEN NDM (EDENS), LLC, AS LANDLORD, AND DOLLAR TREE STORES, INC., AS TENANT. EDENS LIMITED PARTNERSHIP IS THE SOLE MEMBER OF NDM (EDENS), LLC. WE THEREFORE DEMAND PAYMENT IN THE AMOUNT OF $2,000,000.00 AS SAME IS DUE AND OWING DUE TO LANDLORD'S FAILURE TO TIMELY DELIVER THE RELOCATION PREMISES TO TENANT."

PARTIAL AND MULTIPLE DRAWINGS ARE NOT PERMITTED.

DRAWINGS MAY ALSO BE PRESENTED TO US BY FACSIMILE TRANSMISSION TO FACSIMILE NUMBER [_____] (EACH SUCH DRAWING, A "FAX DRAWING"); PROVIDED, HOWEVER, THAT A FAX DRAWING WILL NOT BE EFFECTIVELY PRESENTED UNTIL YOU CONFIRM BY TELEPHONE OUR RECEIPT OF SUCH FAX DRAWING BY CALLING US AT TELEPHONE NUMBER [_____], OPTION [2]. IF YOU PRESENT A FAX DRAWING UNDER THIS LETTER OF CREDIT YOU DO NOT NEED TO PRESENT THE ORIGINAL OF ANY DRAWING DOCUMENTS, AND IF WE RECEIVE ANY SUCH ORIGINAL DRAWING DOCUMENTS THEY WILL NOT BE EXAMINED BY US. IN THE EVENT OF A FULL OR FINAL DRAWING THE ORIGINAL STANDBY LETTER OF CREDIT MUST BE RETURNED TO US BY OVERNIGHT COURIER.

CONTINUED ON NEXT PAGE WHICH FORMS AN INTEGRAL PART OF THIS IRREVOCABLE STANDBY LETTER OF CREDIT

E-16

HSB 7402617 V.5

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

IRREVOCABLE STANDBY LETTER OF CREDIT NO. [_____] PAGE NO. 2

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT WRITTEN AMENDMENT FOR ONE YEAR PERIODS FROM THE PRESENT OR ANY FUTURE EXPIRY DATE UNLESS AT LEAST SIXTY (60) DAYS PRIOR TO SUCH EXPIRY DATE, WE SEND THE BENEFICIARY NOTICE AT THE ABOVE STATED ADDRESS BY OVERNIGHT COURIER THAT WE ELECT NOT TO EXTEND THIS LETTER OF CREDIT BEYOND THE INITIAL OR ANY EXTENDED EXPIRY DATE THEREOF.

HOWEVER, THIS STANDBY LETTER OF CREDIT SHALL NOT BE EXTENDED BEYOND OCTOBER 14, 2026 WHICH WILL BE CONSIDERED THE FINAL EXPIRY DATE. ANY REFERENCE TO A FINAL EXPIRY DATE DOES NOT IMPLY THAT WE ARE OBLIGATED TO EXTEND THIS CREDIT BEYOND THE INITIAL EXPIRY DATE OR ANY EXTENDED DATE THEREOF.

THIS IRREVOCABLE LETTER OF CREDIT SETS FORTH IN FULL THE TERMS OF OUR UNDERTAKING. THIS UNDERTAKING IS INDEPENDENT OF AND SHALL NOT IN ANY WAY BE MODIFIED, AMENDED, AMPLIFIED, OR INCORPORATED BY REFERENCE TO ANY DOCUMENT, CONTRACT, OR AGREEMENT REFERENCED HEREIN.

THIS LETTER OF CREDIT IS TRANSFERABLE IN ITS ENTIRETY, BUT IN EACH INSTANCE ONLY TO A SINGLE TRANSFEREE AND ONLY IN THE FULL AMOUNT AVAILABLE TO BE DRAWN UNDER THE LETTER OF CREDIT AT THE TIME OF SUCH TRANSFER. ANY SUCH TRANSFER MAY BE EFFECTED ONLY THROUGH WELLS FARGO BANK, N.A. AND ONLY UPON PRESENTATION TO US AT OUR PRESENTATION OFFICE SPECIFIED HEREIN OF A DULY EXECUTED TRANSFER REQUEST IN THE FORM ATTACHED HERETO AS EXHIBIT A, WITH INSTRUCTIONS THEREIN IN BRACKETS COMPLIED WITH, TOGETHER WITH THE ORIGINAL OF THIS LETTER OF CREDIT AND ANY AMENDMENT THERETO AND PAYMENT OF OUR TRANSFER FEE. EACH TRANSFER SHALL BE EVIDENCED BY OUR ENDORSEMENT ON THE REVERSE OF THE ORIGINAL OF THIS LETTER OF CREDIT, AND WE SHALL DELIVER SUCH ORIGINAL TO THE TRANSFEREE. THE TRANSFEREE'S NAME SHALL AUTOMATICALLY BE SUBSTITUTED FOR THAT OF THE BENEFICIARY WHEREVER SUCH BENEFICIARY'S NAME APPEARS WITHIN THIS LETTER OF CREDIT. ALL CHARGES IN CONNECTION WITH ANY TRANSFER OF THIS LETTER OF CREDIT ARE FOR THE BENEFICIARY'S ACCOUNT.

WE WILL NOT BE LIABLE FOR DELAY, NON-RETURN OF DOCUMENTS, NON-PAYMENT, OR OTHER ACTION OR INACTION COMPELLED BY A LAW, EXECUTIVE OR JUDICIAL ORDER OR GOVERNMENT REGULATION APPLICABLE TO US.

WE SHALL NOT RECOGNIZE ANY TRANSFER OF THE CREDIT UNTIL AN EXECUTED TRANSFER REQUEST IS FILED WITH US IN THE FORM ATTACHED AS EXHIBIT A, BEARING YOUR BANKER'S CERTIFICATION THAT THE SIGNATURE THEREON IS VALID, AND OUR CUSTOMARY FEE OF 1/4 OF 1% (MINIMUM FEE - $250 – MAXIMUM FEE - $1,500.00) IS PAID AND UPON RECEIPT OF SUCH, WE SHALL ENDORSE THE REVERSE OF THIS CREDIT AND FORWARD IT TO THE TRANSFEREE AND WHERE THE BENEFICIARY'S NAME APPEARS WITHIN THIS STANDBY LETTER OF CREDIT, THE TRANSFEREE'S NAME IS AUTOMATICALLY SUBSTITUTED THEREFOR.

CONTINUED ON NEXT PAGE WHICH FORMS AN INTEGRAL PART OF THIS
IRREVOCABLE STANDBY LETTER OF CREDIT

HSB 7402617 V.5



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

IRREVOCABLE STANDBY LETTER OF CREDIT NO. [＿＿＿＿] PAGE NO. 3

WE HEREBY AGREE WITH YOU THAT DRAFT DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS CREDIT SHALL BE DULY HONORED WITHIN FIVE (5) BUSINESS DAYS OF PRESENTMENT IF PRESENTED TOGETHER WITH DOCUMENT(S) AS SPECIFIED ABOVE AT OUR OFFICES LOCATED AT [＿＿＿＿＿＿＿＿＿＿＿＿]. ATTENTION: STANDBY LETTER OF CREDIT DEPT. ON OR BEFORE THE ABOVE STATED EXPIRY DATE, OR ANY EXTENDED EXPIRY DATE IF APPLICABLE.

EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS, ESTABLISHED BY THE INTERNATIONAL CHAMBER OF COMMERCE, AS IN EFFECT ON THE DATE IS ISSUANCE OF THIS CREDIT.

VERY TRULY YOURS,

WELLS FARGO BANK, N.A.

BY: ＿＿＿＿＿＿＿＿＿＿＿＿＿
    (AUTHORIZED SIGNATURE)

THE ORIGINAL OF THIS LETTER OF CREDIT CONTAINS AN EMBOSSED SEAL OVER THE AUTHORIZED SIGNATURE.

PLEASE DIRECT ANY CORRESPONDENCE INCLUDING DRAWING OR INQUIRY QUOTING OUR REFERENCE NUMBER TO:

WELLS FARGO BANK, N.A.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

ATTN: STANDBY LETTER OF CREDIT DEPT.

OUR CUSTOMER CARE PHONE NUMBER FOR ANY QUERIES IS [＿＿＿＿＿＿＿＿]
OUR FAX NUMBER IS [＿＿＿＿＿＿]

E-18



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

## EXHIBIT A TO IRREVOCABLE STANDBY LETTER OF CREDIT

TRANSFER APPLICATION OF IRREVOCABLE STANDBY LETTER OF CREDIT
NUMBER [_____] DATE [_____]

TO:    [BANK NAME AND ADDRESS]
       ATTN: STANDBY LETTER OF CREDIT DEPT.

FOR VALUE RECEIVED, THE UNDERSIGNED BENEFICIARY HEREBY IRREVOCABLY TRANSFERS TO:
       (NAME OF TRANSFEREE) [_____]
       (ADDRESS OF TRANSFEREE) [_____]

ALL RIGHTS OF THE UNDERSIGNED BENEFICIARY IN THE AGGREGATE AMOUNT OF USD [_____].        UNDER THE ABOVE IRREVOCABLE STANDBY LETTER OF CREDIT, SUBJECT TO THE SAME TERMS AND CONDITIONS.

BY THIS TRANSFER, ALL RIGHTS OF THE UNDERSIGNED BENEFICIARY IN SUCH STANDBY LETTER OF CREDIT ARE TRANSFERRED TO THE TRANSFEREE NAMED ABOVE AND SUCH TRANSFEREE SHALL HAVE THE SOLE RIGHT AS BENEFICIARY THEREOF. YOU ARE HEREBY IRREVOCABLY INSTRUCTED TO ADVISE FUTURE AMENDMENT(S) TO THE LETTER OF CREDIT TO THE TRANSFEREE WITHOUT THE TRANSFEROR'S CONSENT OR NOTICE TO THE TRANSFEROR.

WE HEREBY ENCLOSE:

- THE ORIGINAL STANDBY LETTER OF CREDIT IDENTIFIED ABOVE AND ALL ORIGINAL AMENDMENTS THERETO, IF ANY.
- AN OFFICIAL OR CERTIFIED CHECK IN THE AMOUNT OF $ _____ REPRESENTING YOUR TRANSFER FEE (1/4 OF 1% OF THE TRANSFER AMOUNT, $250.00 MINIMUM, $1,500.00 MAXIMUM), OR YOU ARE AUTHORIZED TO DEBIT OUR ACCOUNT NUMBER _____ MAINTAINED WITH US.

SIGNATURE GUARANTEE


_____
AUTHORIZED SIGNATURE (BENEFICIARY)             _____
                                               AUTHORIZED SIGNATURE (BANK)

                                               BY: _____
                                                       NAME OF BANK


_____             _____
NAME/TITLE OF SIGNER                           NAME/TITLE OF SIGNER
                                               (THE BANK SIGNER HEREBY GUARANTIES
                                               SIGNATURE OF THE BENEFICIARY SIGNER
_____             AND FURTHER GUARANTEES THAT THE
DATE OF TRANSFER REQUEST                        INDIVIDUAL SIGNING THE REQUEST HAS THE
                                               AUTHORITY TO DO SO).

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

## EXHIBIT B TO IRREVOCABLE STANDBY LETTER OF CREDIT

### FORM OF SIGHT DRAFT

SIGHT DRAFT
REFERENCE

RE:  [BANK]  IRREVOCABLE  STANDBY  LETTER  OF  CREDIT
NO.: [_____]

DATE: [_____]

PAY TO THE ORDER OF: [BENEFICIARY] (THE "BENEFICIARY") [_____] AND 00/100
UNITED STATES DOLLARS (USD $[_____].00) BY WIRE TRANSFER IN SAME DAY FUNDS TO
ACCOUNT NO. [_____], ABA ROUTING NO. [_____]

[BENEFICIARY]
BY: _____
NAME: _____
TITLE: _____
DATE: _____

DATE: _____

E-20



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

EXHIBIT E
SHOPPING CENTER RESTRICTIONS

Formatted: Height: 11"

2

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

EXHIBIT E

EXCLUSIVE AND PROHIBITED USES @ NORTH DEKALB

**MARSHALLS AT NORTH DEKALB**

**FROM MARSHALLS LEASE - SCHEDULE B**

4. (A) Landlord agrees that as long as any retail sales activity shall be conducted in the Demised Premises the Shopping Center shall not be used (a) for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks, small loan offices, dentists, chiropractors, real estate brokerage offices or other service office, which provide services to the general public and are typically found in shopping centers or regional malls similar to this Shopping Center not being deemed non-retail), or (b) for any entertainment purposes such as a bowling alley, skating rink, cinema, bar, nightclub, discotheque, amusement gallery, poolroom, massage parlor, sporting event, sports or game facility, off-track betting club (c) or for any establishment which sells or displays pornographic materials or (d) for any establishment which sells or displays used merchandise or second hand goods (except for consignment shops such as Play It Again Sports typically found in similar Shopping Centers). No restaurants or establishments selling food prepared on premises for consumption on or off premises ("Restaurants") (but a grocery store or supermarket or existing restaurants shall not be excluded) shall be located in the Limited Restaurant Area (except that area may have up to six thousand (6,000) square feet of restaurants in the aggregate with no one restaurant exceeding three thousand (3,000) square feet). Landlord agrees that there may not be more than fifty thousand (50,000) square feet of Restaurants in the Shopping Center, counting for this purpose, those in the Limited Restaurant Area, but not counting outparcels. Incidental food sale such as a movie concession stand or a café in a Barnes and Noble shall not be counted for this purpose. In addition, Landlord shall not permit any of the uses restricted in Schedule F.

(B) Except with respect to Burlington Coat, Ross and Macy's (or, as to Macy's, a full line department store in the present Macy's premises or a portion thereof), their successors and assigns (or Shoppers World if it opens a store in the Shopping Center within twenty-four (24) months of the date of this lease) until Tenant has ceased selling apparel from the Demised Premises for one hundred eighty (180) days for reasons other than force majeure, Landlord agrees that, during the term of this Lease, Landlord will not lease any other premises in the Shopping Center containing more than fifteen thousand (15,000) square feet of floor area to be primarily used or occupied for, or primarily devoted to, the sale or display of apparel, including in the computation of such floor area one-half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale of apparel. As used herein, the term "apparel" shall not include (i) any apparel sold in a store the primary business of which is sale or display of sporting goods (i.e., REI, Modell's, Dick's, Sports Authority and similar stores), or (ii) a wholesale club such as Sam's or BJ's, or (iii) a discount department store of over one hundred thousand (100,000) square feet such as Wal-Mart or Target. No shoe store may be more than

[continued]



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

**Marshalls continued**

thirteen thousand (13,000) square feet.

5. The Demised Premises shall not be used in violation of any provision of any lease existing on the date hereof of space in the Shopping Center which provides for use restrictions or which shall give the tenant thereunder an "exclusive" without the consent of such tenant,

provided such exclusive or use restriction is fully set forth in Schedule F attached hereto. The Demised Premises shall not be used in violation of the restrictions set forth in Schedule F (to the extent applicable to the Demised Premises). Landlord warrants and represents that except for the exclusives and use restrictions set forth on Schedule F, there are no other exclusives or use restrictions which would in any manner be applicable to the Demised Premises.



[continued]



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

REA

From: Agreement Respecting Restated Construction, Operation and Reciprocal Easement Agreement
North DeKalb Mall- dated 6.30.1997
AND
Restated Construction, Operation and Reciprocal Easement Agreement Dated 12.7.1987

    5.    The first paragraph of Section 9.1 of the COREA is
hereby deleted and replaced with the following:

    Section 9.1    Use and Operation of Shopping Center.  Each
    of the Parties hereby covenants and agrees for the benefit
    of the other Parties that (during the time that any one (1)
    or more of the Department Store Parties is operating a
    Department Store on its Parcel and Developer is operating
    the Mall Store Building on its Parcel, either during the
    term of this Agreement or subsequent thereto, including, but
    not limited to, the period after which any Party terminates
    this Agreement as to itself) no part of its Parcel may be
    used for any purpose other than commercial, business or
    residential, provided, however that a residential use shall
    only be permitted in the area between the outside of the
    Ring Road and the perimeter of the Shopping Center Site, nor
    will any use or operation that is inconsistent with the
    then-existing use of the Shopping Center Site be made,
    conducted or permitted on or with respect to all or any part
    of its respective Parcel including, but not limited to, the
    following:

            (a)  any public or private nuisance;

            (b)  any noise or sound that is objectionable due
    to intermittence, beat, frequency, shrillness or loudness;

            (c)  any obnoxious odor;

            (d)  any noxious, toxic, caustic or corrosive fuel
    or gas;

            (e)  any dust, dirt or fly ash in excessive quanti-
    ties;

            (f)  any unusual fire, explosion or other damaging
    or dangerous hazard (including the storage, display or sale
    of explosives or fireworks);

            (g)  any warehouse, prior to the 20th anniversary
    of the Grand Opening Date (any area for the storage of goods
    intended to be sold at any retail establishment in the Shop-
    ping Center shall not be deemed to be a warehouse); and

            (h)  assembling, manufacturing, distilling, refin-
    ing, smelting, agriculture or mining operation.

[Continued]

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

Section 9.2  Kiosks.  Except as shown on Exhibit B hereof, no
kiosks shall be permitted, and no merchandise and/or services
displayed, sold, leased or offered for sale or lease or
stored outside the Floor Area without prior written approval
of the Parties hereto.

**General Restrictive Uses:**

1.    GENERAL RESTRICTIVE USES:

    (a)    Bowling alley
    (b)    Funeral parlor
    (c)    Offices
    (d)    Hotel or lodging facilities
    (e)    Gun range
    (f)    Flea market
    (g)    Night club, discotheque or dance hall
    (h)    Warehouse
    (i)    Game room
    (j)    Skating rink
    (k)    Billiard room or pool hall

    (l)    Health spa or studio
    (m)    Gymnasium
    (n)    Massage parlor
    (o)    Adult bookstore
    (p)    Theater primarily showing "X" rated or other sexually explicit, youth-restricted movies
    (q)    "Head shop" or drug paraphernalia store
    (r)    Store showing so called "peep" shows
    (s)    Store selling items primarily concerning sexuality (e.g. a so-called "sex shop")
    (t)    Off-track betting parlor
    (u)    Bar serving alcoholic beverages; except as an incidental to a full kitchen restaurant operation
    (v)    Training or educational facility
    (w)    For the purposes of manufacturing

**[continued]**



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

AMC AT NDM

29.   Other Theatres and Restrictions.

(A)   If at any time during the term hereof Tenant is operating Tenant's Facility primarily as a movie theatre, and a movie theatre for which an admission price is imposed, other than the one operated in Tenant's Facility, is open for business by a party other than Tenant (or its affiliate) within the Shopping Center or on premises which are (i) owned or controlled (i.e., voting control), directly or indirectly, by Landlord or by any officer, 50% shareholder or general partner of Landlord, and (ii) located within 500 feet from any boundary line of the Entire Premises, then the Annual Fixed Rent hereunder shall be abated during the continuance of the operation of such movie theatre and Tenant's continued use of Tenant's Facility primarily as a movie theatre, by an amount equal to the product obtained by multiplying the number of seats in such other theatre by the quotient obtained by dividing the amount of the Annual Fixed Rent then payable under this Lease by the number of seats then in Tenant's Facility.

(B)   Landlord will use reasonable efforts to not use or not permit to be used any other premises or equipment owned or controlled by Landlord and located in the Shopping Center in any manner that would result in any noise or vibration interfering with the acoustics required by Tenant in its use of Tenant's Facility or would result in any offensive odors penetrating Tenant's Facility, provided that the noise insulation in Tenant's Facility is in accordance with the Final Construction Documents.

(C)   Landlord will not sell or permit to be sold any popcorn or candy generally sold in theatre concession stands in or from any premises located within 150 feet from the interior entrance to Tenant's Facility or in or from any part of the parking area or other Common Facilities in the Shopping Center within 300 feet of Tenant's Facility; PROVIDED, HOWEVER, (i) Landlord will not be deemed in violation of the provisions of this Paragraph with respect to those leases in existence as of the date of this Lease, as to which Landlord does not have the right to prohibit the sale of such items, and (ii) the foregoing shall not be deemed to prohibit the sale of fine quality chocolates, such as "Godiva" chocolates,



DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

EXHIBIT F

SIGNAGE

22

DocuSign Envelope ID: 8B30DC59-1C13-4E01-A005-E96AA2364A78

EXHIBIT F



**CONCEPTUAL RENDERING**

