# Exhibit B

**EFILED IN OFFICE**
CLERK OF THE GEORGIA
STATE-WIDE BUSINESS COURT
**23-GSBC-0013**
JUDGE BILL HAMRICK
**DEC 01, 2023 06:18 PM**

*Angie T. Davis*
Angie T. Davis, Clerk of Court
Georgia State-wide Business Court

## IN THE STATE-WIDE BUSINESS COURT
## STATE OF GEORGIA

|  |  |
|---|---|
| WELLS FARGO BANK, N.A. and WELLS FARGO DELAWARE TRUST COMPANY, N.A<br><br>     Plaintiffs,<br><br>     - against -<br><br>BRUCE ACHENBACH, NANCY BELSER, ANDREW COSTANZA, ANDREW DARROW, DAVID DARROW, JONATHAN DARROW, JAY GRIMM, JR., ROBERT KRAKOVITZ, MOSHE MALKA, LEON MALNIK, BARRY SEPTIMUS, and PHYLLIS SIFEN<br><br>     Defendants. | CIVIL CASE NO.<br><br>23-GSBC_____ |

## PLAINTIFFS' MOTION TO STAY ARBITRATION

Pursuant to O.C.G.A. §§ 9-9-5(a) and 9-9-6(b)(1) and (b)(3), Plaintiffs Wells Fargo Bank, N.A. and Wells Fargo Delaware Trust Company, N.A. (together, "Wells Fargo" or "Plaintiffs"), file this Motion to Stay Arbitration (the "Motion"). Wells Fargo adopts and relies on its contemporaneously filed Memorandum of Law in Support of this Motion, and the arguments and evidence cited therein, including the Declaration of Jonathan P. Hersey and related evidence.

WHEREFORE, Wells Fargo respectfully requests that the Court grant its Motion to Stay Arbitration and for such other relief as may be appropriate.

Respectfully submitted this 1st day of December, 2023.

*Attorneys for Plaintiffs*
*/s/ Terry R. Weiss*

Terry R. Weiss, Esq.
Ga. Bar No. 746495
trweiss@duanemorris.com
Catherine G. Lucas, Esq.
Ga. Bar No. 567369
klucas@duanemorris.com

**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309-3929
(404) 253-6912 (telephone)
(404) 759-2158 (fax)
Words: 305

-and-

*Jonathan P. Hersey, Esq.
Cal. Bar No. 189240
jonathan.hersey@klgates.com
*Kennedy M. Myers, Esq.
Cal. Bar No. 343152
kennedy.loenhorst@klgates.com

**K&L GATES LLP**
1 Park Plaza, Twelfth Floor
Irvine, CA 92614
(949) 253-0900

*pro hac vice applications pending*

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the foregoing **PLAINTIFF'S MOTION TO STAY ARBITRATION** upon all parties to this matter by electronically filing a copy of same with the Court's electronic filing system, which will automatically send an electronic copy to all counsel of record.

This 1st day of December, 2023.

Respectfully Submitted,

**DUANE MORRIS LLP**

*/s/Catherine G. Lucas*
Catherine G. Lucas, Esq.
Ga. Bar No. 567369

**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309-3929
(404) 253-6912 (telephone)
(404) 601-9839 (fax)
klucas@duanemorris.com

EFILED IN OFFICE
CLERK OF THE GEORGIA
STATE-WIDE BUSINESS COURT

**23-GSBC-0013**
**JUDGE BILL HAMRICK**
**DEC 01, 2023 06:18 PM**

Angie T. Davis, Clerk of Court
Georgia State-wide Business Court

# IN THE GEORGIA STATE-WIDE BUSINESS COURT
## STATE OF GEORGIA

| | |
|---|---|
| WELLS FARGO BANK, N.A. and WELLS FARGO DELAWARE TRUST COMPANY, N.A.<br><br>Plaintiffs,<br><br>- against -<br><br>BRUCE ACHENBACH, NANCY BELSER, ANDREW COSTANZA, ANDREW DARROW, DAVID DARROW, JONATHAN DARROW, DEAN FLOCK, JAY GRIMM, JR., ROBERT KRAKOVITZ, MOSHE MALKA, LEON MALNIK, BARRY SEPTIMUS, and PHYLLIS SIFEN,<br><br>Defendants. | **CIVIL CASE NO.**<br><br>**23-GSBC_____** |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY ARBITRATION

Terry R. Weiss, Esq.
Ga. Bar No. 746495
trweiss@duanemorris.com
Catherine G. Lucas, Esq.
Ga. Bar No. 567369
klucas@duanemorris.com

**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309-3929
(404) 253-6912 (telephone)
(404) 759-2158 (fax)

-and-

*Jonathan P. Hersey, Esq.
Cal. Bar No. 189240
jonathan.hersey@klgates.com
*Kennedy M. Myers, Esq.
Cal. Bar No. 343152
kennedy.loenhorst@klgates.com

**K&L GATES LLP**
1 Park Plaza, Twelfth Floor
Irvine, CA 92614
(949) 253-0900

*pro hac vice applications pending*

## **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................... 1

II.    STATEMENT OF FACTS .................................................... 5

    A.    The Liberty Financing Agreements.................................. 5

    B.    The *Achenbach* Arbitration ............................................ 7

    C.    Relevant Provisions of the Financing Agreements ........................... 9

III.   LEGAL STANDARDS .................................................... 11

IV.   ARGUMENTS AND AUTHORITIES .................................................... 12

    A.    Wells Fargo Did Not Agree to Arbitrate, and to the Extent Wells Fargo Bank Was a Party to Any Liberty Financing Agreement, it was Solely and Expressly in its Capacity as Securities Intermediary ................................................................. 13

        1.    WFDTC Was Not a Signatory to Any of the Financing Agreements ................................................................. 15

        2.    Wells Fargo Bank Is Not a Party to Any Liberty Financing Agreement with Decedents Jay Grimm, Sylvia Hankin, Abraham Malnik, or Paul Sifen, or Any of Their Respective Heirs ...................................................... 15

        3.    To the Extent Wells Fargo Bank Was a Party to Any Liberty Financing Agreements With Any Other Insured Decedents, It Was So Solely and Expressly in Its Capacity as Securities Intermediary ...................................................... 16

    B.    The Defendants Lack Standing and May Not Compel Arbitration of Individual Claims Because They Are Not Signatories to the Agreements, Nor Can They Brings Claims for the Insureds' Estates Because They Have Not Been Appointed as Legal Representatives of the Estates.......................... 19

    C.    Defendants' Claims are Untimely, and Their Belated Litigation Will Prejudice Wells Fargo........................................... 23

        1.    The Statute of Limitations for Illegal Wagering and Lack of Insurable Interest Expired More Than a Decade Ago ................................................................. 24

        2.    Each Defendants' Alleged Breach of Contract Claim Expired No Later Than Six Years After the Insured Died ................................................................. 25

        3.    The RICO Claims Are Also Time-Barred ............................. 27

V.    CONCLUSION ........................................................ 28

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Agency Holding Corp. v. Malley-Drift Associates, Inc.*,
    483 U.S. 143 (1987)...............................................................27

*Allied World Assurance Co., Ltd. v. Bank of Utah*,
    No. 217CV01188RJSJCB, 2023 WL 1785700 (D. Utah Feb. 6,
    2023) ..................................................................................17, 18

*Archer W. Contractors, Ltd. v. Est. of Pitts*,
    292 Ga. 219 (2012) ...............................................................21

*Ashburn Health Care Center v. Poole*,
    286 Ga. App. 24 (2007) .........................................................14

*Benedict v. State Farm Bank, FSB*,
    309 Ga. App. 133, 709 S.E.2d 314 (2011).............................14

*Berger v. Welsh*,
    326 Ga. App. 290 (2014) .......................................................17

*Campbell v. Harmon*,
    628 S.E.2d 308 (2006) ...........................................................19

*Canada (Attorney General) v. Hislop*,
    [2007] .....................................................................................20

*Estate of Carmel, et al. v. Sail Guernsey Funding Trust, et al.*,
    AAA Case No. 01-21-0003-7544............................................26

*De La Riva v. Chavez*,
    303 So. 3d 955 (Fla. Dist. Ct. App. 2020) .............................19

*Dominic v. Eurocar Classics*,
    310 Ga. App. 825 (2011) ..................................................11, 21

*Emory Healthcare, Inc. v. Farrell*,
    859 S.E.2d 576 (Ga. Ct. App. 2021) .....................................13

*Envision Printing, LLC v. Evans*,
    336 Ga. App. 635, 786 S.E.2d 250 (2016)..................16, 17, 18

*Griffin v. Stewart*,
    870 S.E.2d 3 (Ga. Ct. App. 2022) .........................................12

*Helms v. Franklin Builders,*
   305 Ga.App. 863 (2010) ...................................................................13

*Jackson Nat'l Life Ins. Co. v. Crum,*
   2023 WL 6442932 (N.D. Ga. July 20, 2023), *appeal filed,*
   No. 23-13192 (11th Cir. Sept. 21, 2023) .........................................26

*McKean v. GGNSC Atlanta, LLC,*
   329 Ga. App. 507 (2014) ........................................... 11, 13, 14, 15

*Miller v. GGNSC Atlanta,*
   323 Ga. App. 114 (2013) ...................................................................13

*Norton v. United Health Servs. of Georgia, Inc.,*
   336 Ga. App. 51 (2016) ....................................................................13

*Occidental Fire & Cas. of N. Carolina v. Goodman,*
   793 S.E.2d 606 (Ga. Ct. App. 2016) ................................................25

*Resurgens, LLC v. Ervin,*
   No. A23A0892, 2023 WL 7011731 (Ga. Ct. App. Oct. 25, 2023)....................21

*Rosebrock v. E. Shore Emergency Physicians, LLC,*
   221 Md. App. 1, 108 A.3d 423 (2015) ............................................19

*SCSJ Enterprises, Inc. v. Hansen & Hansen Enterprises, Inc.,*
   319 Ga. App. 210 (2012) ................................................14, 16, 18

*Witherington v. Adkins,*
   271 Ga. App. 837 (2005) ..................................................................14

*Youngblood-West v. Aflac Inc.,*
   796 F. App'x 985 (11th Cir. 2019)...................................................27

## Statutes

RICO Act, 18 U.S.C. § 1962.........................................................*passim*

Md. Code Ann., Est. & Trusts § 7-401 ...............................................19

N.Y. Est. Powers & Trusts Law § 11-3.2 ...........................................19

O.C.G.A. § 9-2-20(a) ...................................................................11, 21

O.C.G.A. § 9-3-24 ......................................................................24, 25

O.C.G.A. § 9-3-26 ...............................................................................24

O.C.G.A. § 9-9-1, *et seq.* ...................................................................10

O.C.G.A. § 9-9-5 .................................................................................11

O.C.G.A. § 9-9-5(a) ................................................................................4

O.C.G.A. § 9-9-6 ...........................................................................11, 16

O.C.G.A. § 11-8-102 ......................................................................3, 17

O.C.G.A. § 13-2-1 ..............................................................................13

O.C.G.A. § 13-2-3 .........................................................................16, 18

O.C.G.A. § 33-24-3 ............................................................................25

O.C.G.A. § 53-6-2 ..............................................................................20

O.C.G.A. § 53-7-45 ............................................................................19

## I.     INTRODUCTION

Defendants, who are the purported heirs and beneficiaries of eleven (11) unrelated insured persons who passed away many years ago (the "Insureds"), recently initiated an arbitration with the American Arbitration Association ("AAA") in Atlanta, Georgia against several respondents concerning the Liberty life insurance funding programs in which certain the Insureds participated before they died. *See Achenbach, et al. v. Liberty One Funding Trust, et al.*, AAA Case No. 1-23-0004-4523 (initiated October 10, 2023) (the "*Achenbach* Arbitration").[1]

The Liberty life insurance funding programs allowed individual insureds to purchase insurance on their own lives using non-recourse financing provided by Liberty One Funding Trust or Liberty Two Funding Trust, as the case may be (collectively, "Liberty" or "Funding Trusts") with an agreement that Liberty would be repaid out of the proceeds of the insurance policies after the Insured passed away. All of the financing agreements (the "Liberty Financing Agreements") to which an Insured was a party were signed and the insurance policies were obtained almost two

---

[1] True and correct copies of the Demand for Arbitration and Statement of Claim with exhibits are attached as Exhibit A to Plaintiff's Complaint in this case. Plaintiffs filed Exhibit A provisionally under seal and have submitted a motion to have them remain permanently sealed. Rather than re-attaching those same confidential documents again in support of this Motion to Stay Arbitration with a second motion to seal, Plaintiffs incorporate and refer the Court and parties to that previously filed Exhibit A. *See* Declaration of Jonathan P. Hersey in support of Motion to Stay Arbitration (hereinafter "Hersey Decl."), ¶ 2.

decades ago, in 2004 and 2005. Liberty paid the premiums for many years, and when each such Insured died, the death benefits were used to pay back the financing, and after deduction of other contracted amounts, the remainder of the net benefits were paid to such Insureds' beneficiaries. The aggregate amount of those payments to the Insureds' beneficiaries exceeded $1.6 million.

Now however, many years after the Insureds signed the Liberty Financing Agreements and benefited from the use of those financed premiums, and many years after the Insureds died and the net policy benefits were paid to their beneficiaries, Defendants (as the Insureds' purported heirs) have initiated the *Achenbach* Arbitration in an attempt to unwind the insurance financing transaction, and for additional damages based on supposed breaches of the Liberty Financing Agreements and exaggerated claims of federal criminal racketeering. While the gravamen of the claims are focused against the Funding Trusts, Defendants have also named Wells Fargo Bank, N.A. ("Wells Fargo Bank") and Wells Fargo Delaware Trust Company, N.A. ("WFDTC," and collectively with Wells Fargo Bank, "Wells Fargo" or "Plaintiffs") as additional respondents in the *Achenbach* Arbitration.

The Defendants' claims certainly lack merit, and if necessary Wells Fargo will address them on the merits at some later time. By this current Complaint and Motion, however, Plaintiffs seek an order staying and precluding any further arbitration

proceedings against them. Georgia law, which governs the Liberty Financing Agreements and upon which the Defendants have initiated the *Achenbach* Arbitration, vests this Court with the authority and directive to abate the arbitration for each of the following reasons.

First, Wells Fargo is not a party to or bound by the arbitration clauses in the Liberty Financing Agreements by which Defendants have sought to invoke the AAA's jurisdiction. Indeed, WFDTC was never a party to any agreement with any of the Insureds (or their heirs) regarding the Liberty Financing Agreements. Likewise, Wells Fargo Bank was never a party to any Liberty Financing Agreements with the purported Insureds Jay Grimm, Sylvia Hankin, Abraham Malnik or Paul Sifen, or their heirs. While Wells Fargo Bank was a party to certain Liberty Financing Agreements to which Insureds Walter Achenbach, Dana Belser, Angelo Costanza, Stanley Darrow, Henry Flock, Victor Malka, and Helen Wilkenfeld were parties, it was so *solely and expressly* in the limited capacity as Securities Intermediary.[2] Wells Fargo Bank never acted or agreed to arbitrate with the any of the Insureds or their heirs in its individual capacity. Of course, the Defendants have not named Wells Fargo Bank as a respondent solely in its capacity as Securities

---

[2] A securities intermediary means "[a] person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is *acting in that capacity*." O.C.G.A. § 11-8-102 (emphasis added).

Intermediary, and instead seek to hold it separately liable as if it had provided the premium financing, which it did not.

Second, the Defendants lack standing to bring their claims *on their individual behalves* because they themselves were not parties to the Liberty Financing Agreements, are not in privity with Wells Fargo, and they were not third-party beneficiaries to such agreements. Nor do the Defendants have standing to bring claims *on behalf of their respective Insureds' estate* because none of the Defendants appear to have been appointed or recognized by any probate court as the estate's legal representative.

Third, even if the Defendants had standing and the right to compel Wells Fargo to arbitration, each of the Defendants' three claims is time-barred by the applicable statute of limitations. From the time the Insureds entered into the Liberty Financing Agreements in 2004 and 2005 until their deaths, none complained about Liberty's premium payments or the contractual terms of repayment. When the Insureds died,[3] their beneficiaries collected the remaining net policy benefits without raising a claim.  The claims have long-since expired, and the Court should exercise its statutory discretion to stay the arbitration. *See* O.C.G.A. § 9-9-5(a) ("If a claim sought to be arbitrated would be barred by limitation of time had the claim sought

---

[3] With the exception of Henry Flock who died in 2022, all of the Insureds died between 2010 and 2016.

to be arbitrated been asserted in court, a party may apply to the court to stay arbitration . . . .").

For each of these reasons, and as more fully explained below, the Court should grant Plaintiffs' Motion and preclude Defendants from attempting to arbitrate their claims against Wells Fargo.

## II.    STATEMENT OF FACTS[4]

### A.    The Liberty Financing Agreements

The Liberty premium finance programs allowed individuals to obtain life insurance on their own lives using non-recourse financing provided by Liberty. *See* Ex. D to Statement of Claim, attached as Ex. A to Plaintiff's Complaint (Hersey Decl. ¶ 2). Through these programs, the Insureds, who were all high net worth individuals (or represented themselves to be such), knowingly entered into financing agreements for which they were required to—and certified they did—obtain advice from independent legal and financial advisors about the transaction. The Insureds benefited from the non-recourse premium financing, and upon their deaths, the policy net benefits were paid to their beneficiaries. *Id.*, s*ee also*, *e.g.*, Liberty Compl., Oct. 31, 2023, at ¶ 22.

---

[4] These facts are taken from Defendants' Statement of Claim and exhibits in the *Achenbach* Arbitration attached as Exhibit A to Plaintiffs' Complaint, the evidence described in and attached to the Hersey Declaration, and including the evidence Liberty proffered in support of its complaint and motion to stay arbitration in Case No. 23-GSBC-0009.

In exchange, the Insureds agreed that Liberty would be repaid out of the proceeds of the insurance policies after the Insureds' passing in respect of the funds advanced by them and certain costs with accrued interest. *See* Ex. G to Statement of Claim, attached as part of Ex. A to Plaintiffs' Complaint (Hersey Decl. ¶ 2).

The Liberty Financing Agreements set forth explicit formulas for calculating the amounts due to Liberty upon death of the Insureds. *Id*. Following the payment of the amounts owed to Liberty upon the deaths of the Insureds, the remaining net benefit proceeds from the life insurance policies were paid to the Insureds' beneficiaries. The Insureds' beneficiaries received all of the benefits of the bargains the Insureds made when they contracted with Liberty. Now, almost two decades after the Insureds signed the Liberty Financing Agreements and many years after the Insureds died and their beneficiaries received the bargained-for net policy benefits, Defendants are attempting to raise specious and expired claims in arbitration.

For convenience, the date of each identifiable Liberty Financing Agreement and corresponding information related to the payment of the policies net death benefits are summarized in the table below.

| Insured | Date of Financing Agreement | Date of Death (Appx) | Insured's Estate Residence | Defendant (Insured's heir or beneficiary) | Date of Payment of Death Benefit | Amount of Death Benefit Payment |
|---|---|---|---|---|---|---|
| Dana Belser | 11/22/2004 | 10/8/2010 | Maryland | Nancy Belser | 12/18/2010 | $271,239.49 |
| Angelo Costanza | 12/7/2004 | 12/22/2011 | New York | Andrew Costanza | 3/18/2012 | $260,961.30 |

| Stanley Darrow | 9/20/2004 | 6/22/2014 | Maryland | Andrew Darrow, David Darrow, Jonathan Darrow | 9/18/2014 | $288,355.61 |
|---|---|---|---|---|---|---|
| Helen Wilkenfeld | 12/3/2004 | 3/14/2011 | Florida | Barry Septimus | 4/18/2011 | $292,670.00 |
| Walter Achenbach | 6/7/2005 | 4/6/2016 | Florida | Bruce Achenbach | 6/18/2016 | $275,278.95 |
| Victor Malka | 4/27/2005 | 12/13/2013 | New York | Moshe Malka | 5/18/2014 | $224,982.85 |
| Henry Flock | 05/04/2005 | 3/28/2022 | Alberta, Canada | Dean Flock | 10/26/2023 | $227,196.71 |
| Jay Grimm | N/A | N/A | New York | Jay Grimm, Jr. | N/A | N/A |
| Sylvia Hankin | N/A | N/A | Florida | Robert Krakovitz | N/A | N/A |
| Abraham Malnik | N/A | N/A | Maryland | Leon Malnik | N/A | N/A |
| Paul Sifen | N/A | N/A | Florida | Phyllis Sifen | N/A | N/A |

## B.    The *Achenbach* Arbitration

The Liberty Financing Agreements contain a clause providing that disputes may—but are not required to be exclusively—resolved by arbitration. Ex. G to Statement of Claim, attached as Ex. A to Plaintiff's Complaint. (Hersey Decl. ¶ 2). Pursuant to those clauses, on October 10, 2023, Defendants initiated an arbitration proceeding against Liberty, as well as against Wells Fargo. Ex. A to Plaintiffs' Complaint.

In the *Achenbach* Arbitration, Defendants assert claims for (1) Illegal Wagering and Lack of Insurable Interest under Georgia law (first cause of action); (2) Breach of Contract and Indemnification, and Breach of Implied Covenant of Good Faith and Fair Dealing under Georgia law (second cause of action); and, (3)

Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C §§ 1962(c) and 1962(d) under Federal law ("RICO") (third cause of action). *See* Statement of Claim attached as Exh. A to Plaintiffs' Complaint ( Hersey Decl. ¶ 2).

According to the Statement of Claim, Defendants seek:

i)      the full face amount of the Insureds' life insurance policies, disregarding Liberty's payment of in premiums and costs, and disregarding the formulas set forth in the Financing Agreements;

ii)      treble damages under RICO;

iii)      attorneys' fees and costs;

iv)      interest, including pre-judgment interest.

*Id.*

Plaintiffs have not participated in the *Achenbach* Arbitration other than to submit jurisdictional objections, and solely and expressly for the purpose of preserving their rights if necessary, an answer and affirmative defenses to the three claims for relief alleged in the Statement of Claim. Hersey Decl. ¶ 3. Plaintiffs submitted those objections and other responses and reservations of rights to the AAA on December 1, 2023, the same day that Plaintiffs filed their Complaint and Motion to Stay Arbitration in this Court. No arbitrators have been appointed in the *Achenbach* Arbitration yet, there has been no discovery, and no hearing dates have been set. *Id.*

## C.      Relevant Provisions of the Financing Agreements

Section 7.11 of the Liberty Financing Agreements provides that the parties to those agreements may, but are not necessarily required, to arbitrate their unresolved grievances:

> (b)      All Disputes shall in the first instance be discussed amicably between the parties with a view to resolving such Dispute, commencing upon one party giving other parties written notice of such Dispute. In the event that such a Dispute is not resolved within thirty (30) days after such notice (or such longer period as the parties may agree in writing with respect to any such Dispute), any party may submit such Dispute to be finally settled by arbitration administered under the Rules by a panel of three arbitrators sitting in Atlanta, Georgia. One arbitrator shall be nominated by the party initiating arbitration at the time of the filing of its demand for arbitration, the second arbitrator shall be nominated by the opposing party(ies) at the time of the filing of its answering statement, and the third arbitrator (who shall act as chairman) shall be jointly nominated by party-nominated arbitrators if they are able to agree. If the first two party nominated arbitrators are unable to agree upon a third within thirty (30) days after the nomination of the second, or if either party fails to nominate an arbitrator as set forth herein, an arbitrator shall be appointed pursuant to the Rules. The award of the arbitrators shall be final and binding upon the parties, and shall not be subject to any appeal or review. The parties agree that such award may be recognized and enforced in any court of competent jurisdiction. The parties agree to submit to the personal jurisdiction of the federal and state courts sitting in Fulton County, Georgia, for the sole purpose of enforcing this Agreement (including, where appropriate, issuing injunctive relief), the agreement to arbitrate contained herein and any award resulting from arbitration pursuant to this section 7.11 and, to the fullest extent permitted by law, waive any objects which they may have at any time to the laying of venue of any proceedings brought in such court and any claim that such proceedings have been brought in in inconvenient forum.

*E.g.,* Ex. G to Statement of Claim, attached as Ex. A to Plaintiffs' Complaint.

The Liberty Financing Agreements state they are to be governed under the law of the State of Georgia, including "*all rights and remedies being governed by said law*." *Id.* (emphasis added).

> SECTION 7.12. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with the local law of the State of Georgia (without regard to conflict of laws principles that could or would cause the application of any other laws), all rights and remedies being governed by said law.

As such, the interpretation and enforceability of the Liberty Financing Agreements' arbitration provisions are governed by Georgia state law, particularly the GAC, O.C.G.A. § 9-9-1, *et seq*.

Importantly, while the Liberty Financing Agreements are binding on the parties and their successors, they expressly do ***not*** "confer upon any other Person a legal or equitable right." *Id.* The heirs were not intended as third party beneficiaries of the agreements simply because they might receive benefits from the Insureds' estates after the Insureds' passed away.  The Liberty Financing Agreements provide:

> SECTION 7.07. <u>Assignment</u>. The LLC and Insured may not assign this Agreement, or any of their rights, duties, or obligations hereunder, without the prior written consent of the Secured Parties […]

> SECTION 7.08 <u>Third Party Beneficiaries</u>. Except as otherwise expressly provided herein to the contrary, this Agreement shall be binding upon and inure solely to the benefit of the parties hereto and the Secured Party, and their respective successors and permitted assigns, and nothing herein is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Ex. G to Statement of Claim, attached as Ex. A to Plaintiffs' Complaint.

### III.   LEGAL STANDARDS

GAC Section 6 provides that a party may apply to stay arbitration on the grounds that: "No valid agreement to submit to arbitration was made." O.C.G.A. § 9-9-6(b)(1). As set forth below, Defendants have failed to meet their burden that an arbitration agreement exists: parties "seeking arbitration … bear the burden of proving the existence of a valid and enforceable agreement to arbitrate." *McKean v. GGNSC Atlanta, LLC,* 329 Ga. App. 507, 509 (2014).

Further, Defendants must, but fail, to establish that they have been appointed as personal representatives of the Insureds' estates in order to have standing to pursue their claims. Defendants do not stand in privity of contract with Wells Fargo, and thus further lack standing to assert their contract-based claims on their individual behalves. *Dominic v. Eurocar Classics*, 310 Ga. App. 825, 828, 714 (2011); *see also* O.C.G.A. § 9–2–20(a).

Furthermore, GAC Section 5 provides that: "If a claim sought to be arbitrated would be barred by limitation of time had the claim sought to be arbitrated been asserted in court, a party may apply to the court to stay arbitration or to vacate the award." O.C.G.A. §§ 9-9-5(a) 9-9-6(b)(3). Therefore, even if the Defendants could establish the existence of a governing arbitration agreement, and then demonstrate standing to pursue claims on behalf of the Insureds' estates or on their own behalf

as an "heir" or beneficiary," Georgia law authorizes the Court to stay arbitration of claims being raised outside of the applicable statutes of limitation.

GAC Section 5 provides the Court with wide "discretion in deciding whether to apply the bar." *Id*. Although Wells Fargo has located no authorities addressing the factors courts may consider in exercising that discretion, it stands to reason that the Court should impose the time bar absent special circumstances that would warrant tolling, such as fraudulent concealment (not alleged here) or incapacity (also not alleged here). Indeed, when evaluating whether a statute of limitations expires during the brief period between the date of filing a complaint and the date of service thereof, a far shorter delay than that here, courts consider factors such as the length of the delay in filing, the filing party's diligence, and whether the party acted in a "reasonable" manner. *Griffin v. Stewart*, 870 S.E.2d 3, 7-8 (Ga. Ct. App. 2022) (internal citation omitted). All weigh in favor of an on order staying the *Achenbach* Arbitration.

## IV.   ARGUMENTS AND AUTHORITIES

The Court should stay Defendants' claims in the *Achenbach* Arbitration against Wells Fargo because (1) Wells Fargo has not agreed to arbitrate with Defendants under the Liberty Financing Agreements, and to the extent Wells Fargo Bank is a party to the Liberty Financing Agreements it is solely and expressly in its capacity as Securities Intermediary; (2) Defendants are not signatories or third party

beneficiaries to any of the Liberty Financing Agreements, nor have they been appointed as representatives of the Insured decedents' estates, so Defendants not only lack the ability to compel arbitration, they lack standing to sue on behalf of the estates because they have not been appointed as the Insureds' estates' personal representatives; and (3) even if Defendants could compel Wells Fargo to arbitrate the claims before the AAA, Defendants' claims are time-barred and the Court should exercise its discretion to stay the arbitration.

> **A.** **Wells Fargo Did Not Agree to Arbitrate, and to the Extent Wells Fargo Bank Was a Party to Any Liberty Financing Agreement, it was Solely and Expressly in its Capacity as Securities Intermediary**

"Arbitration in Georgia is a matter of contract." *Helms v. Franklin Builders,* 305 Ga.App. 863, 864 (2010). As such, only parties that have expressly agreed to arbitrate may be compelled to do so. *Norton v. United Health Servs. of Georgia, Inc.*, 336 Ga. App. 51, 55 (2016) ("Arbitration is a matter of consent, not coercion, and a party can be compelled to arbitrate only upon a showing that he entered into an enforceable agreement to arbitrate.") "Whether a valid and enforceable arbitration agreement exists is a question of law for the court," *McKean, supra,* 329 Ga. App. at 509, and "is governed by state law principles of contract formation." *Emory Healthcare, Inc. v. Farrell*, 859 S.E.2d 576, 579–80 (Ga. Ct. App. 2021) (internal quotations and citations omitted). *See also* O.C.G.A. § 13–2–1; *Miller v. GGNSC*

*Atlanta,* 323 Ga. App. 114, 117 (2013); *Ashburn Health Care Center v. Poole,* 286 Ga. App. 24, 25 (2007).

Parties "seeking arbitration … bear the burden of proving the existence of a valid and enforceable agreement to arbitrate." *McKean*, *supra*, 329 Ga. App. at 509. In addition, "as a general rule, only those signatories to an arbitration agreement may be" forced to arbitrate. *SCSJ Enterprises, Inc. v. Hansen & Hansen Enterprises, Inc.*, 319 Ga. App. 210, 213 (2012); *Witherington v. Adkins,* 271 Ga. App. 837, 842(1) (2005). Indeed, "[a]rbitration is a matter of consent, not coercion, and a party" cannot be compelled to arbitrate if there is no enforceable agreement to arbitrate. *Benedict v. State Farm Bank, FSB*, 309 Ga. App. 133, 139, 709 S.E.2d 314, 319 (2011).

The *only* agreement to arbitrate between any of the parties in the *Achenbach* Arbitration is found in the Liberty Financing Agreements that the Insureds signed as part of the Liberty financing program. WFDTC was not a party to those agreements, and the few that Wells Fargo Bank was a party to, it was so solely and expressly in its capacity as Securities Intermediary, not in its individual capacity, not as a funding agent, and not in any other capacity. Wells Fargo Bank in its individual capacity did not agree to arbitration and therefore may not be compelled to participate in the *Achenbach* Arbitration in which Defendants are alleging claims against Wells Fargo Bank in its individual capacity, and not as Securities Intermediary.

### 1.    WFDTC Was Not a Signatory to Any of the Financing Agreements

WFDTC is not a party at all to any of the Financing Agreements at issue, and did not agree to arbitrate any claims with the Insured decedents or their heirs (the Defendants) regarding the Liberty Financing Agreements. *E.g.*, Ex. G to Statement of Claim (attached as Ex. A to Plaintiff's Complaint); *see also* Liberty Financing Agreements proffered by Liberty in support of its Complaint and Motion to Stay Arbitration, filed Oct. 31, 2023. Indeed, Defendants provided no evidence of any such agreements signed by WFDTC with the Demand for Arbitration or Statement of Claim submitted to the AAA in the *Achenbach* Arbitration.

### 2.    Wells Fargo Bank Is Not a Party to Any Liberty Financing Agreement with Decedents Jay Grimm, Sylvia Hankin, Abraham Malnik, or Paul Sifen, or Any of Their Respective Heirs

As discussed above, each Defendant bears "the burden of proving the existence of a valid and enforceable agreement to arbitrate" against Wells Fargo Bank. *McKean*, *supra*, 329 Ga. App. at 509.

Wells Fargo Bank, however, has no record of a Liberty Financing Agreement with at least four of the Insureds and their respective heirs: Jay Grimm and his purported heir defendant Jay Grimm, Jr.; Sylvia Hankin and her purported heir defendant Robert Krakovitz; Abraham Malnik and his purported heir defendant Leon Malnik; and Paul Sifen and his purported heir defendant Phyllis Sifen.

Pursuant to O.C.G.A. § 9-9-6, the Court should therefore stay each of these Defendants' claims in the *Achenbach* Arbitration as to Wells Fargo Bank, as well as to WFDTC.

### 3. To the Extent Wells Fargo Bank Was a Party to Any Liberty Financing Agreements With Any Other Insured Decedents, It Was So Solely and Expressly in Its Capacity as Securities Intermediary

As previously noted, "[a]rbitration in Georgia is a matter of contract [and] [t]he construction of an arbitration clause in a contract is subject to the ordinary rules of contract construction." *SCSJ Enterprises,* 319 Ga. App. at 212; *quoting South Point Retail Partners v. North American Properties Atlanta,* 304 Ga. App. 419, 421 (2010). In interpreting contracts, courts should seek to ascertain and uphold the intention of the parties, *see* O.C.G.A. § 13-2-3, and "avoid an interpretation … which renders portions of the language of the contract meaningless." *SCSJ Enterprises*, 319 Ga. App. at 212; *quoting Etowah Environmental Group v. Advanced Disposal Svcs.,* 297 Ga. App. 126, 131–132 (2009).

Georgia courts have recognized a party's right to sign a contract only in a certain capacity. *See generally Envision Printing, LLC v. Evans*, 336 Ga. App. 635, 637, 786 S.E.2d 250, 251–52 (2016) (individual signed an arbitration agreement only in his capacity as officer of a limited liability company, Court of Appeals upheld summary judgment in favor of the individual because the individual did not sign the agreement in his individual capacity and it was clear that the intention of the

signatories was that the individual signed only in his capacity as officer). Georgia

Courts therefore enforce contracts only in the capacity in which they are signed. *Id*.

In a case similar to the case at bar, a Utah District Court[5] noted that a court

"must focus on the particular capacity in which a party is being sued in determining

whether it has personal jurisdiction" over that party. *Allied World Assurance Co.,*

*Ltd. v. Bank of Utah*, No. 217CV01188RJSJCB, 2023 WL 1785700, at *8 (D. Utah

Feb. 6, 2023). That includes concerns about arbitral jurisdiction, so the District Court

concluded that when the subject of an arbitration includes an entity only in a specific

capacity, the arbitration would not include the entity in its individual capacity. *Id.* at

*9.  In short, "capacity matters." *Id*. at *8.

Securities intermediary means "[a] person, including a bank or broker, that in

the ordinary course of its business maintains securities accounts for others and is

*acting in that capacity*." O.C.G.A. § 11-8-102 (emphasis added). Here, with the few

Insureds where Wells Fargo Bank was a party to the Liberty Financing Agreements,

it clearly was a party *only* as Securities Intermediary. Indeed, even in the title and

signature block of the Liberty Financing Agreements, Wells Fargo Bank is identified

as Securities Intermediary:

---

[5] "Because [the Georgia] state arbitration code closely tracks federal arbitration law, we look to federal cases for guidance in construing" Georgia law regarding arbitration. *Berger v. Welsh*, 326 Ga. App. 290, 291 (2014).

WELLS FARGO BANK, N.A.,
in its capacity as securities intermediary

By: _____

Name:
Title:          EDWARD L. TRUITT, JR.
Date: 12/7/04   VICE PRESIDENT
Place of execution:   Atlanta, Georgia

*E.g.*, Ex. G to Statement of Claim (attached as Ex. A to Plaintiff's Complaint); *see also* Liberty Financing Agreements proffered by Liberty in support of its Complaint and Motion to Stay Arbitration, filed Oct. 31, 2023.

Defendants' attempt to force Wells Fargo Bank to participate in the arbitration in any capacity other than as a securities intermediary would render the plain language of the Liberty Financing Agreements meaningless and would alter the parties' intent. O.C.G.A. § 13-2-3; *SCSJ Enterprises*, 319 Ga. App. at 212. Accordingly, even if Defendants can show Wells Fargo Bank's signature on a Liberty Financing Agreement with an Insured, Wells Fargo Bank cannot be compelled to arbitrate claims alleged against it on its individual behalf, but only as Securities Intermediary, if at all. All such other claims should be stayed. *See generally Envision Printing*, 336 Ga. App. at 637; *Allied World Assurance*, No. 217CV01188RJSJCB, 2023 WL 1785700, at *8.

**B.**  **The Defendants Lack Standing and May Not Compel Arbitration of Individual Claims Because They Are Not Signatories to the Agreements, Nor Can They Brings Claims for the Insureds' Estates Because They Have Not Been Appointed as Legal Representatives of the Estates**

Defendants cannot pursue their claims in the *Achenbach* Arbitration because they lack standing to bring the claims on their own behalves, and they have not been appointed as the legal representatives of the Insureds' estates.

Defendants did not sign any Liberty Financing Agreement and are therefore not parties to them. Accordingly, Defendants could only bring their claims, if at all, *on behalf of* the actual signatory, the Insured. *See* O.C.G.A. § 53-7-45. As far as Wells Fargo understands, none of the Defendants have been appointed as the legal representatives of the Insureds' estates. Hersey Decl. ¶ , Ex, 1, G. Under Georgia law and the law of every state in which the Insured lived, only personal representatives are authorized to prosecute and settle claims in favor of or against an estate. O.C.G.A. § 53-7-45 [permitting an estate's appointed representative to assign a claim to an heir or beneficiary]; *De La Riva v. Chavez*, 303 So. 3d 955, 959 (Fla. Dist. Ct. App. 2020) [a personal representative is the only proper party to litigation involving the estate of decedent]; N.Y. Est. Powers & Trusts Law § 11-3.2 [actions that belonged to the decedent may be pursued by the personal representatives]; *Campbell v. Harmon*, 628 S.E.2d 308, 312 (2006) [personal representatives may bring action on behalf of an estate and have standing]; Md. Code Ann., Est. & Trusts

§ 7-401 [personal representatives have the right to pursue litigation]; *Rosebrock v. E. Shore Emergency Physicians, LLC*, 221 Md. App. 1, 12, 108 A.3d 423, 429 (2015) [personal representative of the estate is authorized to maintain an action on behalf of decedent]; *Canada (Attorney General) v. Hislop*, [2007] 1 S.C.R. 429, 2007 SCC 10 [ordinarily, personal actions on behalf of decedents are barred].

Here, there is no evidence that the Defendants have been appointed as the representatives of the respective Insureds' estates, and there is no evidence of any assignment by any other representatives to them. The Defendants are not authorized to pursue the claims in the *Achenbach* Arbitration (or even in court) unless and until they are properly so authorized. Indeed, if the Defendants act on behalf of the respective estates without express permission of the Probate Court, they could be liable to the other heirs and beneficiaries for any harm caused to the estate under the legal doctrine of *executor de son tort.* O.C.G.A. § 53-6-2. Indeed, just because the Defendants call themselves heirs, does not mean they have standing to pursue these claims.[6]

---

[6] Defendants' lack of standing to bring claims on behalf of the Insured estates is highlighted by Defendants' statement that it intends to replace one of the alleged heirs—Bruce Achenbach—with another heir, Brian Achenbach. By letter dated November 30, 2023, Defendants' counsel informed the AAA that claimant Bruce Achenbach, the purported heir of Walter Achenbach, has passed away and that they intend to file an amended Statement of Claim naming Brian Achenbach as a new claimant because he is also an heir of Walter Achenbach. *See* Ex. 3 to Hersey Decl. (attaching letter). That does not cure the lack of standing. Neither Bruce nor Brian Achenbach were/would be purporting to bring claims *on behalf*

Additionally, Defendants do not stand in privity of contract even with Wells Fargo Bank in its capacity as securities intermediary and, therefore, lack standing to pursue their second cause of action against Wells Fargo – Breach of Contract, and Indemnification and Breach of Implied Covenant of Good Faith and Fair Dealing. "As a general rule, one not in privity of contract with another lacks standing to assert any claims arising from violations of the contract." *Dominic v. Eurocar Classics*, 310 Ga. App. 825, 828, 714 (2011); *See* O.C.G.A. § 9–2–20(a). A "third party has standing to enforce that type of contract if it clearly appears from the contract that it was intended for his benefit; the mere fact that he would benefit from performance of the contract is insufficient." *Id.* However, "[s]tatus as a third-party beneficiary does not imply standing to enforce every promise within a contract, including those not made for that party's benefit." *Archer W. Contractors, Ltd. v. Est. of Pitts*, 292 Ga. 219, 226–27 (2012). Therefore, third parties must establish standing, even in

---

*of* Henry Achenbach's estate. They are still only asserting claims in their individual capacities as purported "heirs," but neither was a party to any Liberty Financing Agreement. Nor would they have the legal entitlement to sue on behalf of Walter Achenbach's estate because neither of them has been formally appointed as the legal representative of the estate. But even Brian Achenbach (and the other heirs) were somehow permitted to pursue claims on behalf of their respective Insureds' estates without first having been appointed as the estate's legal representative, those claims should be stayed by this Court and dismissed from the *Achenbach* Arbitration for the failure to include of all other heirs and beneficiaries who would be indispensable parties to the same claims and defenses, and without whose joinder and participation in the arbitration could result in future duplicative and *seriatim* claims by those various other heirs and beneficiaries.

arbitration. *Resurgens, LLC v. Ervin*, No. A23A0892, 2023 WL 7011731, at *5 (Ga. Ct. App. Oct. 25, 2023); *citing Boller v. Robert W. Woodruff Arts Ctr., Inc.*, 311 Ga. App. 693, 698 (2011).

Nor can the Defendants create proper standing by asserting that they were intended third party beneficiaries of the Liberty Financing Agreements. The plain language of the Liberty Financing Agreements would belie such a claim. The Liberty Financing Agreements specifically state that "this Agreement shall be binding up on and inure solely ***to the benefit of the parties hereto and the Secured Party***, and their permitted assigns, and nothing herein is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement." Ex. G to Statement of Claim (attached as Ex. A to Plaintiffs' Complaint) (emphasis added). The net death benefits of the life insurance policies were paid to the Insureds' designated beneficiaries, not necessarily the "heirs," which were not parties to the policies or the Liberty Financing Agreements. *Id.*; *see also* Liberty Financing Agreements proffered by Liberty in support of its Complaint and Motion to Stay Arbitration. Moreover, the Liberty Financing Agreement expressly states that "the Insured may not assign this Agreement, or any of their rights, duties, or obligations hereunder, without the prior written consent of the Secured Party." *Id.* Here, Defendants have provided no

evidence of such written assignment and, thus, cannot bring allegedly "assigned" claims from the Insureds' estate. *Id.*

**C.    Defendants' Claims are Untimely, and Their Belated Litigation Will Prejudice Wells Fargo**

In the *Achenbach* Arbitration, Defendants have asserted claims for (1) Illegal Wagering and Lack of Insurable Interest under Georgia law (first cause of action); (2) Breach of Contract and Indemnification, and Breach of Implied Covenant of Good Faith And Fair Dealing under Georgia law (second cause of action); and (3) Violation of Racketeer Influenced and Corrupt Organizations Act under federal law, 18 U.S.C §§ 1962(c) and 1962(d) (third cause of action). *See* Statement of Claim, attached as Ex. A to Plaintiffs' Complaint (Hersey Decl. ¶ 2). None of the claims is timely.

Defendants cannot justify their delay. The Statement of Claim in the *Achenbach* Arbitration cites and relies on no facts that learned after the date of the payment of the net death benefits to Defendants.  In fact, the insurable interest claim relies entirely on conduct that occurred at the time the Insureds entered into the Liberty Financing Agreements two decades ago, in 2004 and 2005.

The Insureds made the knowing and conscious decisions to finance the insurance policy premiums through Liberty so that they could keep those premium funds for themselves while alive, and with the understanding that Liberty would recover its investment from the policy proceeds after the Insureds died. The Insured

benefitted from those premium payments and the Defendants received the policies'
net death benefits after the Insured died. They should not be allowed to contest those
policies or payouts now, and Wells Fargo would be prejudiced if forced to arbitrate
those stale claims. All of the Insureds' have passed away, their testimony is no longer
available, and the net policy proceeds were paid to their beneficiaries.  Given the
length of time that has passed both since the signing of the Liberty Financing
Agreement and the Insureds' deaths, it is uncertain and unlikely that their email
accounts and files are fully preserved and searchable. The loss of records over time
is illustrated by the fact that Defendants' counsel cannot even determine at this point
who did or did not enter into transactions with Liberty or Wells Fargo. Indeed,
Defendants' counsel, earlier this year argued in a different matter that a party's
twelve-year delay in bringing suit was "objectively unreasonable" and caused
"evidence to disappear and memories to fade." *See* Exs. 1 & 2 to Hersey Decl.

### 1.      The Statute of Limitations for Illegal Wagering and Lack of Insurable Interest Expired More Than a Decade Ago

Defendants allege that the Liberty Financing Agreements should be declared
void *ab initio* because the insurance policies here lacked insurable interest. Claims
deriving from simple written contracts must be brought within six years of accrual
of the claim, O.C.G.A. § 9-3-24, while "all other actions upon contracts express or
implied not otherwise provided for shall be brought within four years from the
accrual of the right of action," O.C.G.A. § 9-3-26. The cause of action accrues "on

the date that suit on the claim can first be brought," or "when the plaintiff could first have maintained his action to a successful result." *Occidental Fire & Cas. of N. Carolina v. Goodman*, 793 S.E.2d 606, 611 (Ga. Ct. App. 2016) (citations omitted).

Here, if the Liberty Financing Agreements were void on account of the related policies lacking an insurable interest, that was true on the same days they each of the Insureds signed the Liberty Financing Agreements in 2004 and 2005. The assessment of insurable interest is made at the time of a transaction, O.C.G.A. § 33-24-3. Thus, any claim the Insureds' possessed accrued in 2004 and 2005, and expired six years later, meaning that all of the Defendants' claims to void the agreements lapsed at the latest in 2011.

### 2.  Each Defendants' Alleged Breach of Contract Claim Expired No Later Than Six Years After the Insured Died[7]

The statute of limitations for breach of contract actions is six years from when the contract becomes due and payable. O.C.G.A. § 9-3-24. Defendants allege breach of contract and breach of the implied covenant of good faith and fair dealing based on the amount of death benefits the beneficiaries received. Liberty began making the premium payment in 2004 and 2005, so again, the claims expired no later than 2011.

Even assuming, however, that the contract claims accrued at the time the beneficiaries received those payments after the Insureds died, all but Dean Flock's

---

[7] The Breach of Contract claims have expired as to all Defendants except Dean Flock.

claim as the purported heir of Henry Flock would be barred. While Henry Flock passed away in 2022, all other Insureds dies between 2010 and 2016, meaning all of those other Defendants' claims expired at the latest in 2022. S*ee Jackson Nat'l Life Ins. Co. v. Crum*, 2023 WL 6442932, at *10 (N.D. Ga. July 20, 2023), *appeal filed*, No. 23-13192 (11th Cir. Sept. 21, 2023).

Defendants were aware of the amounts of the death benefits they received when the policy benefits were paid, and nothing has changed in the interim that would shed any further light on their claims such that they should have been tolled. To be timely, the Defendants (assuming they had standing), should have raised their claims within 6 years of the Insureds' passing. Defendants can offer no reasonable justification for failing to do so. *C.f.*, APPLEMAN ON INS. LAW & PRAC. ARCHIVE § 11584 (2d ed. 2011) ("[W]here no action is brought on a life insurance policy for ten years after the right accrues, the plaintiff is guilty of such laches as to prevent a recovery.").

### 3.   The RICO Claims Are Also Time-Barred[8]

Civil RICO claims are subject to a four-year statute of limitations period. *See Agency Holding Corp. v. Malley-Drift Associates, Inc.*, 483 U.S. 143, 156 (1987). In the Eleventh Circuit, the statute of limitations begins running when the plaintiff discovers or should have discovered the injury. *See Youngblood-West v. Aflac Inc.*, 796 F. App'x 985, 991 (11th Cir. 2019) (affirming dismissal of RICO claim on statute of limitations grounds and concluding plaintiff was not entitled to equitable tolling given plaintiff's failure to act with due diligence).

In their Statement of Claim, Defendants allege that the "pattern of racketeering activity and violations of § 1962(c) began in approximately 2005, was perpetrated in connection with all of the transactions at issue in this case as well as many more, and continues to this day, as each time an Insured dies, [Wells Fargo] improperly reaps profits from these transactions as explained herein." Ex. G to Statement of Claim (attached as Ex. A to Plaintiffs' Complaint). As this language acknowledges, at the latest, Defendants could and should have "discovered" any

---

[8] Wells Fargo does not purport to address the merits of Defendants' claims in this Motion, but notes that numerous arbitration panels have rejected the same exaggerated RICO claims that Defendants are attempting to assert in the *Achenbach* Arbitration. *See, e.g., Estate of Carmel, et al. v. Sail Guernsey Funding Trust, et al.*, AAA Case No. 01-21-0003-7544, Partial Final Award dated August 8, 2023; *Estate of Adele Wolinsky, et al. v. Liberty One Funding Trust, et al.*, ICDR Case No. 01-19-0002-4689, Partial Award dated September 12, 2022.

injury when they received the payments of the net death benefits. Indeed, there are no facts learned since that time that were needed to bring the claims in the *Achenbach* Arbitration. And, the Statement of Claim in the *Achenbach* Arbitration cites and relies on no facts that were learned after the date of the payment of the net death benefits. *Id.* All of the Insureds signed the Liberty Financing Agreements in 2004 and 2005, and all of the RICO claims expired four years, no later than 2009.

There is no basis for the Defendants to argue that the RICO claims did not accrue until each Insured died.  But even if they could advance such a claim, all of the Insureds but for Henry Flock died between 2010 and 2016, and the net policy benefits were all paid soon thereafter. To that extent, all of the Defendants' RICO claims (but for the claim allegedly brought on behalf of Henry Flock's estate) expired between 2014 and 2020. Again, Defendants cannot offer any reasonable explanation or justified excuse for choosing not to have filed their claims long ago before the expiration of the applicable statutes of limitation.

## V.    CONCLUSION

For the foregoing reasons, this Court should stay the *Achenbach* Arbitration as to Defendants' claims until such time as the Court rules on Wells Fargo's request for a declaration that: (1) WFDTC did not agreed to arbitrate claims brought by any Defendant regarding the Liberty One or Liberty Two financing program; (2) Wells Fargo Bank has *no* agreement to arbitrate claims brought by Defendants Jay Grimm,

Jr., Robert Krakovitz, Leon Malnik, and Phyllis Sifen; (3) to the extent Wells Fargo

Bank was a party to any Liberty Financing Agreement with any other Insured related

to a Defendant, it was so only in its limited capacity as securities intermediary and

did not agree to arbitrate in its individual capacity; (4) the Defendants are not

signatories to any agreements nor are they third party beneficiaries, nor have they

been appointed as the personal representatives of their respective Insured's estate,

so they lack standing and privity to arbitrate their claims against Wells Fargo, and

(5) the Defendants' claims are time-barred.

 Respectfully submitted this 1st day of December, 2023.

*Attorneys for Plaintiffs*

*/s/Terry R. Weiss*
Terry R. Weiss, Esq.
Ga. Bar No. 746495
trweiss@duanemorris.com
Catherine G. Lucas, Esq.
Ga. Bar No. 567369
klucas@duanemorris.com

**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309-3929
(404) 253-6912 (telephone)
(404) 759-2158 (fax)
Words: 7833

-and-

*Jonathan P. Hersey, Esq.
Cal. Bar No. 189240
jonathan.hersey@klgates.com

*Kennedy M. Myers, Esq.
Cal. Bar No. 343152
kennedy.loenhorst@klgates.com

**K&L GATES LLP**
1 Park Plaza, Twelfth Floor
Irvine, CA 92614
(949) 253-0900

*pro hac vice applications pending*

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the foregoing **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STAY ARBITRATION** upon all parties to this matter by electronically filing a copy of the same with the Court's electronic filing system, which will automatically send an electronic copy to all counsel of record.

This 1st day of December, 2023.

Respectfully Submitted,

**DUANE MORRIS LLP**

*/s/Catherine G. Lucas*
Catherine G. Lucas, Esq.
Ga. Bar No. 567369

**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309-3929
(404) 253-6912 (telephone)
(404) 601-9839 (fax)
klucas@duanemorris.com

**IN THE GEORGIA STATE-WIDE BUSINESS COURT**
**STATE OF GEORGIA**

| | |
|---|---|
| WELLS FARGO BANK, N.A. AND WELLS FARGO DELAWARE TRUST COMPANY, N.A.<br><br>       Plaintiffs,<br><br>    - against -<br><br>BRUCE ACHENBACH, NANCY BELSER, ANDREW COSTANZA, ANDREW DARROW, DAVID DARROW, JONATHAN DARROW, DEAN FLOCK, JAY GRIMM, JR., ROBERT KRAKOVITZ, MOSHE MALKA, LEON MALNIK, BARRY SEPTIMUS, and PHYLLIS SIFEN<br>       Defendants. | **CIVIL CASE NO.**<br><br>**23-GSBC_____** |

<u>**[PROPOSED] ORDER GRANTING MOTION TO STAY ARBITRATION**</u>

   Having considered the Motion to Stay Arbitration (the "Motion") brought by Plaintiffs Wells Fargo Bank, N.A. ("Wells Fargo Bank") and Wells Fargo Delaware Trust Company, N.A.'s ("WFDTC," and collectively with Wells Fargo Bank, "Wells Fargo" or "Plaintiffs"), and for good cause shown, the Court **GRANTS** the Motion.

   The arbitration against Wells Fargo before the American Arbitration Association (AAA) in Atlanta, Georgia, *Achenbach et al. v. Liberty One Funding Trust et al.*, AAA Case No. 1-23-0004-4523 (initiated October 10, 2023), is hereby stayed until such time as the Court rules on Plaintiffs' request for a declaration that: (1) WFDTC did not agreed to arbitrate claims brought by any Defendant regarding

the Liberty One or Liberty Two financing program; (2) Wells Fargo Bank has *no* agreement to arbitrate claims brought by Defendants Jay Grimm, Jr., Robert Krakovitz, Leon Malnik, and Phyllis Sifen; (3) to the extent Wells Fargo Bank did sign any agreement with any other insured decedent, it did so only in its limited capacity as securities intermediary and did not agree to arbitrate in any other capacity; (4) the Defendants are not signatories to any agreements or third party beneficiaries, and they have not been appointed as the personal representatives of their respective insured decedent's estate, so they lack standing and privity to arbitrate their claims against Wells Fargo, and (5) the Defendants' claims are time-barred.

**IT IS SO ORDERED**, this      day of, 2023.

_____
Hon. William "Bill" Grady Hamrick,
III Georgia State-wide Business Court

*Prepared and presented by:*

Catherine G. Lucas, Esq.
Ga. Bar No. 567369
**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309-3929
(404) 253-6912 (telephone)
(404) 759-2158 (fax)
klucas@duanemorris.com

*Attorney for Plaintiffs*

⚖ EFILED IN OFFICE
CLERK OF THE GEORGIA
STATE-WIDE BUSINESS COURT
**23-GSBC-0013**
**JUDGE BILL HAMRICK**
**DEC 01, 2023 06:18 PM**

*Angie T. Davis*
Angie T. Davis, Clerk of Court
Georgia State-wide Business Court

**IN THE GEORGIA STATE-WIDE BUSINESS COURT
STATE OF GEORGIA**

| | |
|---|---|
| WELLS FARGO BANK, N.A. and WELLS FARGO DELAWARE TRUST, N.A.<br><br>Plaintiffs,<br><br>- against -<br><br>BRUCE ACHENBACH, NANCY BELSER, ANDREW COSTANZA, ANDREW DARROW, DAVID DARROW, JONATHAN DARROW, DEAN FLOCK, JAY GRIMM, JR., ROBERT KRAKOVITZ, MOSHE MALKA, LEON MALNIK, BARRY SEPTIMUS, and PHYLLIS SIFEN<br><br>Defendants. | CIVIL CASE NO.<br><br>_____ |

## DECLARATION OF JONATHAN P. HERSEY IN SUPPORT OF PLAINTIFFS' MOTION TO STAY ARBITRATION

I, Jonathan P. Hersey, declare under penalty of perjury pursuant to the laws of the State of Georgia as follows:

1.    I am an attorney with a pro hac vice application pending in this matter, and I am a partner with the law firm of K&L Gates LLP, attorneys of record for plaintiffs Wells Fargo Bank, N.A. and Wells Fargo Delaware Trust Company, N.A. (collectively, "Plaintiffs") in this action.  I submit this Declaration in support of Plaintiff's Motion to Stay Arbitration (the "Motion").  I have personal knowledge

of the matters set forth herein, and would testify competently to them if called upon to do so.

2.      Attached as Exhibit "A" to Plaintiffs' Complaint filed in this case on December 1, 2023 are the Demand for Arbitration and the Statement of Claim with its exhibits that the Defendants, who are the Claimants in that arbitration, recently submitted to the American Arbitration Association (AAA) to initiate a private arbitration proceeding against Plaintiffs and two other respondents, Liberty One Funding Trust and Liberty Two Funding Trust (collectively, the "Liberty Funding Trusts").  The arbitration is styled *Achenbach, et al. v. Liberty One Funding Trust, et al.*, AAA Case No. 1-23-0004-4523 (initiated Oct. 10, 2023) (hereinafter the "*Achenbach* Arbitration").

3.      Plaintiffs have not participated in the *Achenbach* Arbitration other than to submit jurisdictional objections, and solely and expressly for the purpose of preserving their rights if necessary, an answer and affirmative defenses to the three claims for relief alleged in the Statement of Claim.  Plaintiffs submitted those objections and other responses and reservations of rights on December 1, 2023, the same day as Plaintiffs filed the Complaint and Motion to Stay Arbitration in this Court.  No arbitrators have been appointed in the *Achenbach* Arbitration yet.  There has been no discovery and no hearing dates have been set.

4.     Plaintiffs are aware that the Liberty Funding Trusts filed their own Complaint and Motion to Stay Arbitration (with supporting evidence) with this Court on October 31, 2023, captioned *Liberty One Funding Trust, et al. v. Achenbach, et al.*, Case No. 23-GSBC-0009.  For the convenience of the Court and the parties, Plaintiffs incorporate and rely on the same evidence presented by the Liberty Funding Trusts in support of their Motion to Stay Arbitration into this Motion, as though submitted again in this matter.

5.     Attached hereto as Exhibit "1" is a true and correct copy of a Reply Brief filed by Defendants' counsel in the case of *Jackson Nat'l Life Ins. Co. v. Crum*, 1:17-cv-03857-WMR (N.D. Ga. Mar. 7, 2023), wherein counsel argued on page 5 that a 12-year delay in bringing suit was "objectively unreasonable."

6.     Attached hereto as Exhibit "2" is a true and correct copy of a Memorandum of Law filed by Defendants' counsel in that same case of *Jackson Nat. Life Ins. Co. v. Crum*, 1:17-cv-03857-WMR (N.D. Ga. Jan. 31, 2023), wherein counsel argued on page 9 that the delay in bringing a lawsuit resulted in prejudice because it allowed "evidence to disappear and memories to fade."

7.     By letter dated November 30, 2023, Defendants' counsel (on behalf of Claimants in the *Achenbach* Arbitration) informed the AAA and the Respondents that claimant Bruce Achenbach, the purported heir of Walter Achenbach, has passed away and that Claimants intend to file an Amended

Statement of Claim naming Brian Achenbach as a new claimant because he is a different heir of Walter Achenbach. A true and correct copy of that letter is attached hereto as Exhibit "3."

Executed this 1st day of December, 2023, in Irvine, California.


_____
Jonathan P. Hersey

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| | : | |
| JACKSON NATIONAL LIFE INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff/Counterclaim Defendant, | : | |
| | : | |
| v. | : | Case No.: 1:17-cv-03857 |
| | : | |
| | : | |
| STERLING CRUM, | : | |
| | : | |
| Defendant/Counterclaim Plaintiff. | : | |

---

## <u>JACKSON NATIONAL LIFE INSURANCE COMPANY'S REPLY BRIEF IN SUPPORT OF JUDGMENT ON THE BASIS OF LACHES AND DELAY</u>

**COZEN O'CONNOR**
*Attorneys for Plaintiff*
Michael J. Miller (*pro hac vice*)
Michael J. Broadbent (*pro hac vice*)
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel. (215) 665-2000
Fax (215) 665-2013
MJMiller@cozen.com
MBroadbent@cozen.com

**MILLER & MARTIN, PLLC**
*Attorneys for Plaintiff*
Eileen H. Rumfelt (No. 04608)
James T. Williams (No. 185084)
1180 W. Peachtree Street, N.W.
Suite 2100
Atlanta, Georgia 30309
Tel. (404) 962-6100
Fax (404) 962-6300
Eileen.Rumfelt@millermartin.com
James.williams@millermartin.com

Dated: March 7, 2023

# **TABLE OF CONTENTS**

Page

**ARGUMENT IN REPLY** .......................................................................1

  A. Jackson preserved and did not waive its delay arguments. ........................1

  B. Jackson did not improperly object to Crum's timeliness evidence. ...........4

  C. Jackson established that Crum's delay was unreasonable. ........................5

  D. Crum fails to show that Jackson did not suffer prejudice. ......................10

  E. Crum is not entitled to any interest without additional briefing. .............15

  F. Conclusion ...............................................................................15

## ARGUMENT IN REPLY

Crum's *twelve-year delay* should preclude his counterclaim based on (a) the laches rule applicable to insurance contracts under *Burton v. Metropolitan Life Ins. Co.*, 48 Ga. App. 828, 173 S.E. 922, 923 (1934); (b) the statute of limitations that applies where there is no set time for a claim submission in the contract, *see, e.g.*, *Childs v. Armour Food Co.*, 175 Ga. App. 455, 455, 333 S.E.2d 377, 377 (1985); or (c) under a traditional laches rule requiring presumed prejudice based on the length of the delay or evidence establishing actual prejudice, *Prudential Ins. Co. v. Sailors*, 69 Ga. App. 628, 26 S.E.2d 557, 561 (1943). Nothing in Crum's response to Jackson's motion and supporting memorandum changes this result.

### A. Jackson preserved and did not waive its delay arguments.

Crum opens by arguing that there was never any "motion" based on delay, but Crum is wrong. A "motion" is any "written or oral application requesting a court to make a specified ruling or order." *See* Black's Law Dictionary, *Motion* (11th ed. 2019). As explained herein, Jackson repeatedly requested relief based on delay, and by way of its renewed motion, Jackson is renewing that request. Crum next focuses his attention on the Pre-Trial Order, arguing that "Jackson 'abandoned' its laches and statute of limitations defenses before trial" because "Jackson failed to include [those defenses] in the Pre-Trial Order in this case." Crum is wrong again.

*First*, Jackson raised affirmative defenses on delay (including laches and statute of limitations) in its pleadings. (ECF #34, Aff. Defs ¶¶ 4, 5, 7, 8, 12.)

*Second*, regardless of the content of the Pre-Trial Order, Jackson's Proposed Findings of Fact and Conclusions of Law submitted *in advance of the trial* included the delay issues Jackson initially raised as affirmative defenses. (*See* ECF #109 at ¶¶ 108-112 (facts) and ¶¶ 63-72 (argument).)

*Third*, Crum already objected and argued at the outset of trial that "Jackson [should] be limited to the theories that [it] raised in the[] pre-trial order," and this was overruled. (Ex. A, N.T. Vol. I at 19:20-24:10.) And if Crum now denies that his objection was this broad, Crum has a waiver problem because, when the trial moved forward, Crum stood by without further objection while Jackson repeatedly made delay arguments and introduced delay evidence. *See, e.g.*, *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277 (11th Cir. 2000) (party must object to admission of evidence at trial to preserve objection, even if raised or ruled upon earlier). Indeed, the parties made more than just "passing reference" to the delay issues at trial and, instead, significantly discussed and litigated delay without objection from Crum. (*See, e.g.*, Ex. A, N.T. Vol. I at 44:6-44:14 (opening on delay as laches and statute of limitations); Ex. B, N.T. Vol. II at 5:8-13:20; 38:1-39:22 (cross-examination of Crum on delayed claim submission); Ex. B, N.T. Vol. II at 32:12-33:7; 34:14-18

(Crum lost emails as a result of delay); Ex. C, N.T. Vol. III at 40:17-55:17 (cross-examination of Crum's lawyer, James Jantos, relating to delay and Jantos's efforts to monitor Couch's mortality); Ex. C, Vol. III-A at 25:1-34:5 (closing argument on delay as laches and statute of limitations); Ex. D, Jackson Closing Presentation at Slides 14-17; 23).[1] Indeed, every delay fact and legal authority cited by Jackson in its post-appeal delay briefs is already in the Court's record.

*Fourth*, considering delay here is consistent with the rule that issues not raised before trial "may be treated as if they were properly raised when they are 'tried by express or implied consent of the parties.'" *See Drill So., Inc. v. Int'l Fid. Ins. Co.*, 234 F.3d 1232, 1239 (11th Cir. 2000) (per curiam) (emphasis added).

*Fifth*, Crum is wrong to suggest that this Court already found that Jackson failed to establish the merits of its delay arguments. The Court's post-trial comments informed the parties that the Court anticipated ruling only on the validity of the

---

[1] For additional example, Crum did not object when Jackson presented evidence and testimony related to Crum's conduct and the delayed submission of his claim— evidence that was immaterial on questions of validity and could be relevant *only* to questions of the timeliness of Crum's claim. (*See, e.g.*, Ex. B, N.T. Vol. II at 5:8-13:20; 38:1-39:22 (cross-examination of Crum as to conduct and claim submission, with objection only to a single question related to Crum's personal knowledge); Ex. C, N.T. Vol. III at 40:17-55:17 (cross-examination of Jantos investigating Jantos's actions on behalf of Crum and Jantos's efforts to monitor Couch's mortality, with objections based only on attorney-client privilege).) Crum took no action designed to prevent the Court from considering this timeliness evidence, effectively consenting to the Court's consideration.

Policy—the comments were not rulings or findings that considered all of the delay facts and authorities in the trial court record. The Court could have made an alternative finding in its judgment, but the Court did not do so and expressly "decline[d] to address Jackson's laches argument." (ECF #116 at 24 n.16.)[2]

*Sixth*, and finally, Crum argued on appeal that Jackson "fail[ed] to identify [its laches] defense in its portion of the pretrial order," (Appeal #30 at 21), but the Eleventh Circuit rejected this argument (Appeal #45 at 18-19) and instead directed further consideration of delay. *See, e.g.*, *Piambino v. Bailey*, 757 F.2d 1112 (11th Cir. 1985) (trial court must follow express and implied appellate mandates).

### B.      Jackson did not improperly object to Crum's timeliness evidence.

Crum points to objections by Jackson as evidence that the timeliness of his Counterclaim was not before the Court, but Crum omits the relevant context for those objections: Jackson was objecting to certain evidence of its conduct, policies, and underwriting *prior to and at the time of issuance* because such evidence was immaterial *to the validity of the Policy*. Crum offered no other grounds for admission of such evidence and did not ask the Court to admit such evidence to address delay.[3]

---

[2] On appeal, the Eleventh Circuit stated that the "District Court declined to address Jackson's laches argument," and Crum then argued that the Eleventh Circuit "should not address an issue not decided below." (Appeal # 30 at 21.)

[3] For example, Crum cites to Jackson's objections to questions directed to its expert regarding pre-issuance activities (Brief at 4); the full discussion on that issue reveals

4

### C.  Jackson established that Crum's delay was unreasonable.

The *twelve-year* delay between Couch's death in 2005 and Crum's claim in 2017 is undisputed. It is also objectively unreasonable. *See Burton v. Metropolitan Life Ins. Co.*, 48 Ga. App. 828, 173 S.E. 922 (1934); APPLEMAN ON INS. LAW & PRAC. ARCHIVE § 11584 (2nd 2011) ("[W]here no action is brought on a life insurance policy for ten years after the right accrues, the plaintiff is guilty of such laches as to prevent a recovery."). The effect of this unreasonable delay is to bar any claim for benefits under the Policy. *Id.* Claiming ignorance, Crum must show that he was without fault to overcome the rule against laches and delay in the submission

---

that Crum's counsel posed such questions to offer evidence of Jackson's intent *at the time of issuance and on the question of contestability*, neither of which were before the Court—not delay. (*See* Ex. B, N.T. Vol. II at 205:12-16; 205:23-207:16.) Crum also cites to his proffer of Jackson's responses to Requests for Admission, but the record shows that Crum was unable to articulate the relevance of the evidence beyond the question of Jackson's understanding at the time of issuance. (*See* Ex. C, N.T. Vol. III at 100:17-106:7.) Similarly, Crum cites discussions regarding the possibility of securing testimony from a representative of Jackson who attended trial, but the record again reveals that Crum did not reference delay and could not articulate any relevant basis for admitting the testimony. (*See* Ex. A, N.T. Vol. I at 51:1-9 (showing only that Jackson noted it may have an objection to testimony regarding underwriting evidence); Ex. C, N.T. Vol. III at 250:24-259:5 (consisting entirely of a discussion between Crum's counsel and the Court in which the Court rejected Crum's reasons for questioning Jackson's witness, with no objection stated by Jackson and no preservation of error by Crum).) To the extent any evidence was not admitted as a result of Jackson's objections, it was because Crum failed to offer an alternative legitimate basis for admission (and there is none), thus waiving this issue.

of an insurance claim. *See Progressive Life Ins. Co. v. Haygood*, 53 Ga. App. 231, 185 S.E. 534, 535 (1936); *Pilgrim Health & Life Ins. Co. v. Chism*, 49 Ga. App. 121, 174 S.E. 212, 212 (1934); *see also Woods v. State Farm Mut. Auto. Ins. Co.*, 234 Ga. 782, 218 S.E.2d 65, 68 (Ga. 1975). Crum cannot do so.

### 1. Crum's reliance on Jantos alone is unreasonable.

Crum admits that he was in the business of wagering on the lives of strangers, specifically young men in the 1990's who were HIV-positive. (*See* Ex. A, N.T. Vol. I at 95:3-19 (Crum preferred HIV-positive insureds because he wanted "short term" investments to generate larger profits).) Crum was involved in hundreds of these deals through his estate entity, and he was also involved in multiple deals for his own direct benefit. (Ex. A, N.T. Vol. I at 86:17-19; 90:2-11.) Crum knew that Jackson would have asked Couch about any illnesses at the time of application and issuance of the policy. (Ex. A, N.T. Vol. I at 91:24-92:3.)

When these facts are considered, Crum's abject failure to realize for *twelve years* that Couch was dead is inexcusable. As a professional death bettor, Crum must have known when he acquired the Policy that one way or another he needed to track Couch's mortality, but Crum admitted that he personally did nothing to do this. (Ex. B, N.T. Vol. II at 38:1-11.) Instead, as he did at trial, Crum defends his conduct as reasonable because he asked his attorney, James Jantos, to monitor Couch's

mortality, and Jantos then (according to Crum) conducted reasonable searches. This *post hoc* justification fails, in part because Jantos and Crum did not even have a shared understanding of what Jantos was supposed to be doing. Jantos testified that Crum did not ask him to track Couch's mortality, and that he (Jantos) did not know if Crum relied on him for mortality tracking. (*See* Ex. C, N.T. Vol. III at 42:16-19; 43:4-5.) Crum admitted he did not know what Jantos was doing to monitor Couch's mortality, and he did not supervise Jantos's efforts. (Ex. B, N.T. Vol. II at 38:1-11.)

Moreover, Jantos did not monitor Couch's mortality *generally* but instead as part of his role as premium payor on Crum's behalf. As Jantos explained at trial, "I don't know if we really discussed tracking and so forth. It was more just paying the premium, but as part of paying the premium, I would check -- try to check and see if the individual was still alive." (*See* Ex. C, N.T. Vol. III at 42:16-19; *see also id.* at 77:4-7.) Jantos was not tracking Couch's life and death so that Crum could submit a claim; he was running searches to determine if a premium should be paid. Accordingly, neither Crum nor Jantos took any steps between December 2009 (when Crum stopped paying premium) and December 2016 to determine if Couch died.[4] Thus, over the nearly twenty-year period in which Crum held an interest in the

---

[4] Consistent with this, Jantos's privilege log reveals no email with Crum between 2010 and January 2017. (Ex. V (Trial Ex. P-24).)

Policy, Crum never did anything to determine if Couch was alive, and Jantos only checked on Couch's mortality four times after Couch's 2005 death when paying premiums in January 2006, January 2007, January 2008, and January 2009.[5]

Even if the number of searches were sufficient, the searches were plainly deficient. Jantos flatly admitted at trial that the Social Security Association Death Master File he searched was *not a reliable source of information* on its own. (Ex. C, N.T. Vol. III at 54:10-13.) Jantos also admitted that he was aware that there were vendors in existence that tracked mortality for deals like this, but he elected not to use those vendors. (*Id.* at 53:13-15.) If Jantos in fact had conducted a simple Google search for Couch by name when paying premiums in 2006, 2007, 2008, and 2009, Jantos easily would have discovered Couch's online obituary from 2005 during the decade-plus time it was available—just as Jantos was able to do in December 2016 and January 2017 when submitting Crum's claim.

### 2. Crum cannot defend his inaction by blaming Jackson.

Laches and delay in the insurance context focuses on the claimant, not the insurer, yet Crum argues that Jackson acted inequitably. This argument fails too.

---

[5] Accepting the testimony at trial, Jantos paid seven premiums for Crum, and thus no more than seven searches were run between August 1999 and December 2016. Premiums were pre-paid to January 2001, and Crum paid directly in 2001 and 2002. Jantos or a colleague assumed responsibility for paying premiums beginning in 2003, and that arrangement lasted until 2009 when Crum stopped paying premiums.

*First*, in Georgia and elsewhere, insurers like Jackson have the right to rely on the truthfulness of information provided by an insured in a life insurance application. Ga. Code Ann. § 33-24-6(c); *see also U.S. Fid. & Guar. Co. v. Paul Assocs., Inc.*, 230 Ga. App. 243, 245 (1998) ("Thus it is implicit that *an insurer is entitled to rely on statements of an applicant as true, without conducting an independent investigation*.") (emphasis in original). Thus, Jackson had no duty to investigate whether Couch was telling the truth about his health status, social security number, or prior bankruptcy.[6]

*Second*, Crum is wrong that Jackson had a duty to monitor mortality based on O.C.G.A. § 33-25-14. This statute was not enacted until 2014, nine years after Couch had died, *and almost five years after the Policy lapsed*. The statute requires searches only in connection with *in-force policies*, not lapsed policies like the Policy here.[7]

---

[6] Although Jackson only gets two years to challenge a policy for fraud or misrepresentations under the applicable contestability rules, Georgia law is clear that lack of insurable interest can be raised at any time. *Wood v. New York Life Ins. Co.*, 255 Ga. 300, 306-07, 336 S.E.2d 806, 811-12 (1985).

[7] Crum also improperly relies on a settlement agreement between Jackson and various state insurance departments elsewhere, but a settlement is not evidence of wrongdoing and this particular settlement did not involve Georgia or Georgia law. (*See* Brief at 11 citing *In re Jackson Nat'l Life Ins. Co.*, No. INS-2015-00209, 2016 Va. PUC Lexis 19 (Va. Corp. Comm'n Jan 8, 2016).) Moreover, the cases and settlement Crum references relate to the notion that an insurer that elects to conduct a mortality search on its annuities (which cost the insurer money while the annuitant is alive) must conduct parallel searches on its life insurance policies (which do *not*

*Third*, unlike Jackson, Crum and Jantos had Couch's Social Security card with a Social Security Number ("SSN") ending 7981, and they knew Couch used an SSN ending 8600 for the Policy. (Ex. A, N.T. Vol. I at 114:5-22; Ex. R (SSN card ending 7981 sent to Jackson with Crum's claim); Ex. W (Trial Ex. J-1, App.).)[8] Thus, only Crum and Jantos—and not Jackson—could have searched the Death Master File using the number appearing on Couch's Social Security card, and, later, *on Couch's death certificate*. (*See* Ex. C, N.T. Vol. III at 79:2-7 (Jantos believed Couch's SSN ended 7981); Ex. R (*7981 card); Ex. Q (death certificate SSN ending 7981).)

### D. Crum fails to show that Jackson did not suffer prejudice.

Crum argues that Jackson suffered no prejudice because the Georgia Supreme Court would not have invalidated the Policy because Crum was the initial beneficiary and because Jackson did not seek evidence from certain other entities. Both of these arguments are meritless.

*First*, the Georgia Supreme Court's opinion confirmed exactly why Jackson needed access to the evidence that has been lost to the passage of time. *See Crum v.*

---

cost the insurer money while the insured is alive) on the same person. Here, there is no Jackson annuity on Couch, further distinguishing the settlement from this matter.
[8] Crum also makes the absurd argument that Jackson has acted inequitably because it is pursuing its legal arguments in this Court and it did not return approximately $4,000 in premiums paid after Couch had died. Notably, Crum has no evidence that he demanded a return of the post-death premiums or that Jackson refused to refund those specific premiums when requested.

*Jackson Nat'l Life Ins. Co*, 315 Ga 67, 80 (2022). Specifically, the Court explained that the "new statute carried forward . . . the strawman version of the cover for a wager proviso," which Jackson would have relied on if the lost evidence existed. *Id.*[9]

*Second*, until the Georgia Supreme Court clarified Georgia law, Jackson had no reason to pursue additional third parties because Jackson believed (because the Honorable Steve C. Jones of this Court had held) that the Policy could be invalidated based solely on Couch's unilateral actions and intent. *See Jackson Nat'l Life Ins. Co. v. Crum*, No. 1:17-cv-03857, 2018 WL 6380774, at *3 (N.D. Ga. Apr. 13, 2018).[10]

*Third*, the notion that the delay here caused no prejudice is facially without basis. The delay was *twelve years*. No one can legitimately argue that memories have not faded and that evidence is otherwise equally accessible, especially when one of the central participants, Associates Trust, no longer exists, and the parties have zero

---

[9] At most, the impact of naming Couch as beneficiary is an issue that was not directly answered by the Georgia Supreme Court. *Crum*, 315 Ga at 81, n.9. Either way, Jackson has been denied the opportunity to prove its third-party involvement case.

[10] Jackson noted at the start of trial that additional discovery could be needed if the governing wagering standard changed. (Ex. A, N.T. Vol. I, 26:2-9.) If the Court accepts Crum's arguments on wagering and the standard for prejudice, the Court should reopen the record. Crum's argument that Jackson should have further pursued various third parties if it wished to allege prejudice is factually incorrect as well—in 2017 and 2018, Jackson did seek to contact and interview certain of these sources, but by then, *almost twenty years after the relevant 1998-1999 pre-inception facts*, these sources had little or no helpful information.

evidence from its principal, Keith Thomas.[11] This is why prejudice is presumed in these cases and should be presumed here. *See Sailors*, 26 S.E.2d at 561.

*Fourth*, the record shows that Crum is *factually* incorrect, because there is actual prejudice. The critical facts that are now gone, forgotten, or otherwise unavailable include those related to the involvement of Crum, his broker John Frick, his doctor David Dickensheets, and as noted, Associates Trust and Keith Thomas.[12]

All of these entities had relevant records and other information that is now unavailable. Notably, Crum and Frick worked together with Associates Trust to cause Couch to transfer the Crum Policy, but it cannot be known when those parties began working together because complete records from that time period are not available. The only available documentation of the transfer from Associates Trust,

---

[11] There are many examples of recent life-wagering cases involving policies issued between 2003 and 2008 where old evidence led to insurer wins *because the investors and originating companies and their principals were still available* at the time of litigation. *See, e.g.*, *Sun Life v. U.S. Bank,* 2016 WL 161598 (S.D. Fla. Jan. 14, 2016), *aff'd on policy invalidity*, 693 Fed. App'x 838 (11th Cir. 2017); *U.S. Bank v. Sun Life*, 2016 WL 8116141, at *15 (E.D.N.Y. Aug. 30, 2016); *Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601, 609-10 (D. Del. 2019); *Sun Life v. Wells Fargo Bank*, 44 F.4th 1024 (7th Cir. 2022); *Sun Life v. Wilmington Trust,* 2022 WL 179008 (Del. Super. Ct. Jan. 12, 2022); *Sun Life v. Conestoga Trust Servs, LLC*, 263 F. Supp. 3d 695 (E.D. Tenn. 2017), *aff'd*, 717 Fed. App'x 600 (6th Cir. 2018).

[12] Crum argues Jackson admitted that Crum's emails were available from other sources, but the transcript portion cited by Crum is argument by Jackson's lawyer regarding Crum's credibility, not an admission. (Ex. A, N.T. Vol. I at 37:19-22.)

through Frick, to Crum is only two pages (a one-page offer sheet and a one page contract *between Crum and Frick* with zero evidence of how Frick acquired any rights from Associates Trust that he could transfer to Crum). (Exs. H, I.) Similarly, it cannot be known when Associates Trust first obtained records from Dr. Dickensheets's practice (*i.e.*, the practice at which Couch sought treatment for HIV) and whether that request was pre-inception because no records are available.[13]

With respect to Associates Trust, Crum overstates the trial record by claiming that Associates Trust gave Crum's counsel its entire file. The record discloses only that Crum's lawyer, James Jantos, worked with another (now-deceased) lawyer, Kenneth Riser, who received two boxes of files from Associates Trust. (*See* Ex. C, N.T. Vol. III, 36:16-39:23.) Due to the passage of time, there is no testimony in the record as to whether the files are complete vis-à-vis Associates Trust or complete vis-à-vis the materials initially in Mr. Riser's possession. To the contrary, there is evidence that such records are *incomplete* because the Jantos documents do not show how Associates Trust acquired an interest in the Policy such that it could work with

---

[13] Crum mischaracterizes Jackson's argument on this issue. If the medical and administrative records of Dr. Dickensheets's treatment showed that Associates Trust requested Couch's records prior to inception, the outcome of this case should be different, under the new standard articulated by the Georgia Supreme Court. The fact that a LabCorp fax was *also* sent in November 1999—*i.e.*, after the Policy was incepted *and after Crum acquired an* interest—does not change this fact.

Frick on Crum's behalf, and the Jantos documents do not show how Associates Trust obtained all of the medical information appearing in Frick's CPI. (Ex. H.)

Crum also says that Jackson cannot prove that Keith Thomas (the principal of Associates Trust) is dead based on hearsay, but there is no dispute that someone named Keith Thomas was involved with this Policy at or near the time of its inception. Given that Crum's arguments here challenge the conduct of Jackson's counsel and not the case merits, the Court at least should be able to take judicial notice of Crum's belief that Thomas is dead, Jantos's belief that Thomas is dead, and/or the representation of Jackson's counsel that they have been unable to find Keith Thomas since becoming involved with this case in 2017.

Perhaps the most compelling proof of prejudicial delay is the lack of evidence from Frick, Crum's broker on viatical deals (including this one) and the go-between connecting Crum and Associates Trust on this deal. (Ex. A, N.T. Vol. I at 85:14-16, 86:6-12, 89:2-8.) Despite the fact that Frick was centrally involved, Frick produced no documents because his filing cabinet unsurprisingly did not contain any responsive documents in 2018, and because the computer Frick used when this transaction took place was replaced by Frick in 2010. (Ex. J, Frick at 40:3-42:11.) Moreover, due to the passage of so much time, when Frick was examined in 2018 about the Policy facts from 1998 and potentially earlier, *he repeatedly admitted that*

14

*he did not recall even the most basic facts about this transaction and its participants—including himself*! The transcript of trial designations is worth reviewing in its entirety to appreciate the scope and magnitude of Frick's loss of memory (*see generally* Ex. J); however, for ease of reference, a partial list of what Frick no longer recalls is attached as Exhibit X. The lost Frick-related testimony, documents, and other evidence should alone be dispositive on the issue of prejudice.

Last but not least, Crum admitted he "likely" had emails relating to the Couch transaction, but he could no longer access those because he got a new computer in 2015. (Ex. B., N.T. Vol. II at 30:2-4, 32:12-33:9.) Crum also admitted that he could not remember information from fifteen to twenty years prior. (*Id.* at 33:4-5.)

### E.  Crum is not entitled to any interest without additional briefing.

The issues of interest and calculations are in dispute. If Crum succeeds on his Counterclaim (and he should not), the parties should be heard on these issues.

### F.  Conclusion

For these reasons, and as stated in Jackson's opening memorandum, the Court should rule in Jackson's favor on Crum's Counterclaim.

Dated March 7, 2023                    Respectfully submitted,

                          BY:   /s/ *Eileen H. Rumfelt*

                                **MILLER & MARTIN, PLLC**
                                James T. Williams (No. 185084)
                                Eileen H. Rumfelt (No. 04608)
                                1180 W. Peachtree Street, N.W., Ste 2100
                                Atlanta, Georgia 30309
                                T: (404) 962-6100; F: (404) 962-6300
                                Eileen.Rumfelt@millermartin.com
                                James.Williams@millermartin.com


                                *and*

                                **COZEN O'CONNOR**
                                Michael J. Miller (*pro hac vice*)
                                Michael J. Broadbent (*pro hac vice*)
                                1650 Market Street, Suite 2800
                                Philadelphia, PA 19103
                                T: (215) 665-2000; F: (215) 665-2013
                                MJMiller@cozen.com
                                MBroadbent@cozen.com

                                *Attorneys for Plaintiff/Counterclaim
                                Defendant, Jackson National Life Insurance
                                Company*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to N.D. Ga. Local Rule 7.1D, I certify that the foregoing **JACKSON NATIONAL LIFE INSURANCE COMPANY'S REPLY BRIEF IN SUPPORT OF JUDGMENT ON THE BASIS OF LACHES AND DELAY** was prepared using Times New Roman 14 point font, a font and point selection approved by the Court in Local Rule 5.1B.

By: /s/ *Eileen H. Rumfelt*

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

_____

|  |  |  |
|---|---|---|
| JACKSON NATIONAL LIFE INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff/Counterclaim Defendant, | : | |
| | : | |
| v. | : | Case No.: 1:17-cv-03857 |
| | : | |
| STERLING CRUM, | : | |
| | : | |
| Defendant/Counterclaim Plaintiff. | : | |

_____

## JACKSON NATIONAL LIFE INSURANCE COMPANY'S RENEWED MOTION FOR JUDGMENT ON THE BASIS OF LACHES AND DELAY ON STERLING CRUM'S COUNTERCLAIM

Plaintiff/Counterclaim Defendant, Jackson National Life Insurance Company ("Jackson"), hereby renews its motion for judgment in its favor on the Counterclaim of Defendant/Counterclaim Plaintiff, Sterling Crum, on the basis of laches and delay. In support of this motion, Jackson relies on the brief filed herewith and the exhibits filed herewith.

Dated January 31, 2023                    Respectfully submitted,

                                BY:   /s/ *Eileen H. Rumfelt*

                                      **MILLER & MARTIN, PLLC**
                                      James T. Williams (No. 185084)
                                      Eileen H. Rumfelt (No. 04608)
                                      1180 W. Peachtree Street, N.W., Ste 2100
                                      Atlanta, Georgia 30309
                                      T: (404) 962-6100; F: (404) 962-6300
                                      Eileen.Rumfelt@millermartin.com
                                      James.Williams@millermartin.com

                                      **COZEN O'CONNOR**
                                      Michael J. Miller (*pro hac vice*)
                                      Laura M. Zulick (*pro hac vice*)
                                      Michael J. Broadbent (*pro hac vice*)
                                      1650 Market Street, Suite 2800
                                      Philadelphia, PA 19103
                                      T: (215) 665-2000; F: (215) 665-2013
                                      MJMiller@cozen.com
                                      LZulick@cozen.com
                                      MBroadbent@cozen.com

                                      *Attorneys for Plaintiff, Jackson National*
                                      *Life Insurance Company*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to N.D. Ga. Local Rule 7.1D, I certify that the foregoing **JACKSON NATIONAL LIFE INSURANCE COMPANY'S RENEWED MOTION FOR JUDGMENT ON THE BASIS OF LACHES AND DELAY ON STERLING CRUM'S COUNTERCLAIM** was prepared using Times New Roman 14 point font, a font and point selection approved by the Court in Local Rule 5.1B.

By: */s/ Eileen H. Rumfelt*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

_____

|  |  |  |
|---|---|---|
| JACKSON NATIONAL LIFE INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff/Counterclaim Defendant, | : | |
| | : | |
| v. | : | Case No.: 1:17-cv-03857 |
| | : | |
| STERLING CRUM, | : | |
| | : | |
| Defendant/Counterclaim Plaintiff. | : | |

_____

## PLAINTIFF JACKSON NATIONAL LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT ON THE BASIS OF LACHES AND DELAY ON STERLING CRUM'S COUNTERCLAIM

**COZEN O'CONNOR**
*Attorneys for Plaintiff*
Michael J. Miller (*pro hac vice*)
Michael J. Broadbent (*pro hac vice*)
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel. (215) 665-2000
Fax (215) 665-2013
MJMiller@cozen.com
MBroadbent@cozen.com

**MILLER & MARTIN, PLLC**
*Attorneys for Plaintiff*
Eileen H. Rumfelt (No. 04608)
James T. Williams (No. 185084)
1180 W. Peachtree Street, N.W.
Suite 2100
Atlanta, Georgia 30309
Tel. (404) 962-6100
Fax (404) 962-6300
Eileen.Rumfelt@millermartin.com
James.williams@millermartin.com

Dated: January 31, 2023

# <u>TABLE OF CONTENTS</u>

Page

I.   PROCEDURAL HISTORY ...........................................................................1

II.  STATEMENT OF FACTS............................................................................4

   A.   Couch applied for the Policy using a clean-sheeting scheme. .......................4

   B.   Despite knowing of the HIV-related fraud, Crum acquired the Policy
       through transactions concealed from Jackson for which virtually no
       documents are now available. ......................................................................5

   C.   Crum's deliberate lack of diligence caused his unreasonable delay.............7

   D.   Crum's concealment and twelve-year delay evidence to disappear and
       memories to fade. ........................................................................................9

       1. Jackson lost access to relevant medical records likely revealing the
       timing of the involvement of Associates Trust. ...........................................10

       2. Jackson lost access to evidence from Associates Trust and its
       principal, the third-parties with whom Couch worked worked. ..................11

       3. Jackson lost access to evidence from Crum's broker John Frick, the
       only person with whom Crum had an agreement........................................12

       4. Jackson lost access to evidence from Crum.............................................12

III. ARGUMENT ...........................................................................................13

   A.   Crum's unreasonable delay constitutes laches because it violates the
       implied terms of the Policy. ........................................................................14

   B.   Crum's claims are barred by the statute of limitations. .............................17

   C.   Crum's unreasonable delay defeats his claim under a traditional laches
       analysis based on presumed or actual prejudice. ........................................18

i

1. Prejudice is presumed from unreasonable delay. .....................................20

2. Jackson can establish actual prejudice if required. .................................21

D.   Crum is not entitled to an award of interest. ...............................................25

IV.   CONCLUSION ...........................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AC & R Insulation Co. v. Pa. Mfrs. Ass'n Ins. Co.*,
  993 F. Supp. 2d 539 (D. Md. 2014) ................................................................19

*Banks v. Aetna Life Ins. Co.*,
  56 Ga. App. 760, 194 S.E. 34 (1937) ..............................................................18

*Burton v. Metropolitan Life Ins. Co.*,
  48 Ga. App. 828, 173 S.E. 922 (1934) .......................................................*passim*

*Childs v. Armour Food Co.*,
  175 Ga. App. 455, 333 S.E.2d 377 (1985) ...............................................13, 17

*E.E.O.C. v. Firestone Tire & Rubber Co.*,
  626 F. Supp. 90 (M.D. Ga. 1985) ....................................................................22

*Ehrhart v. Brooks*,
  231 Ga. 272, 201 S.E.2d 464 (1973) ...............................................................19

*Foster v. Metro. Life Ins. Co.*,
  243 Fed. App'x 208 (9th Cir. 2007) .................................................................18

*Goodwin v. First Baptist Church of Augusta*,
  225 Ga. 448, 169 S.E.2d 334 (1969) ...............................................................22

*Harrison v. Masonic Mut. Ben. Soc'y*,
  59 Kan. 29 (1898) ............................................................................................14

*Hillis v. Parrish*,
  228 Ga. 161, 184 S.E.2d 464 (1971) ...............................................................19

*Lester v. Aetna Life Ins. Co.*,
  172 Ga. App. 486, 323 S.E.2d 655 (1984) .......................................................17

i

*Nw. Mut. Life Ins. Co. v. Lowry's Adm'x*,
   20 S.W. 607 (Ky. 1892) ........................................................................20

*Pilgrim Health & Life Ins. Co. v. Chism*,
   49 Ga. App. 121, 174 S.E. 212 (1934) .............................................16

*Progressive Life Ins. Co. v. Haygood*,
   53 Ga. App. 231, 185 S.E. 534 (1936) .............................................15

*Prudential Ins. Co. v. Sailors*,
   69 Ga. App. 628, 26 S.E.2d 557 (1943) ...........................................13

*Redfern v. Huntcliff Homes Assn*,
   524 S.E.2d 464 (Ga. 1999) ...............................................................19

*Shearlock v. Mut. Life Ins. Co.*,
   193 Mo. App. 430 (Mo. Ct. App. 1916) ............................................14

*Stanley v. Whitfield Life Ins. Co.*,
   89 Ga. App. 160, 78 S.E.2d 821 (1953) ...........................................17

*VATACS Group, Inc. v. Homeside Lending, Inc.*,
   281 Ga. 50, 635 S.E.2d 758 (2006) ..................................................19

*Welch v. Welch*,
   215 Ga. 198, 109 S.E.2d 757 (1959) ...........................................19, 20

*Woods v. State Farm Mut. Auto. Ins. Co.*,
   234 Ga. 782, 218 S.E.2d 65 (1975) ..................................................16

**Statutes**

O.C.G.A. § 31-33-2 .............................................................................11, 23

**Other Authorities**

20af-389f APPLEMAN ON INS. LAW & PRAC. ARCHIVE § 11584
   (2nd 2011) ......................................................................................15, 18

8 NEW APPLEMAN ON INS. LAW LIBRARY ED. § 86.02 (2022) ................14

46A C.J.S. Ins. § 2127 .............................................................................................18

In 2017, Defendant/Counterclaim Plaintiff, Sterling Crum ("Crum"), submitted a claim under a $500,000 life insurance policy (the "Policy") issued by Plaintiff/Counterclaim Defendant, Jackson National Life Insurance Company ("Jackson"), on the life of Kelly Couch ("Couch"). But Couch had died more than twelve years before Crum submitted his claim, and the Policy had lapsed more than eight years before Crum submitted his claim. Crum has no valid excuse for his unreasonable delay in notifying Jackson of Couch's death, and the law of Georgia and the facts of this case are clear that Crum is therefore not entitled to the Policy's death benefit. Judgment must be entered for Jackson.

## I.  **PROCEDURAL HISTORY**

Jackson initially filed a declaratory action seeking a determination that the Policy was void *ab initio* because it lacked an insurable interest at inception and because it was a human life wager contrary to Georgia law and public policy. [1] (ECF #1.) Crum later filed his Answer and Affirmative Defenses together with a Counterclaim seeking a declaration that he is entitled to the death benefit plus interest and other compensation. (ECF # 30.) In its Answer and Affirmative Defenses to Crum's Counterclaim, Jackson asserted timeliness defenses based on,

---

[1] A more detailed summary of the history of this matter appears in the decisions of this Court and the Eleventh Circuit. (ECF #116; Appeal #45, 49-1.)

*inter alia*, the terms and conditions of the Policy, Crum's failure to act reasonably and in good faith, waiver and/or estoppel, laches, and statute of limitations. (ECF #34, Aff. Defs ¶¶ 4, 5, 7, 8, 12.) After denying both parties' summary judgment motions, the Court conducted a three-day bench trial in August 2019 followed by post-trial briefing, amended proposed findings of fact and conclusions of law, and finally by closing arguments on November 5, 2019. (ECF #106-109, 114.)

Before, during, and after trial, Jackson raised the delay issues under the general description of "laches" and with reference to the statute of limitations. (*See, e.g.*, ECF #34, Aff. Defs ¶¶ 4, 5, 7, 8, 12; ECF #90, Pretrial Findings of Fact and Conclusions of Law ¶ 205; Ex. A, N.T. Vol. I at 44:6-44:14 ("There's a laches component to this, Your Honor, and an unreasonableness that prevents them from proceeding. We pled laches in our answer to their counterclaim, and there's a statute of limitations issue."); Ex. A, N.T. Vol. I at 44:15-45:6; Ex. C, Vol. III at 72:19-73:13 and Vol. III-A at 25:1-34:5; Ex. D, Jackson Closing Presentation at Slides 14-17; 23 (addressing delay issues)).[2]

On March 2, 2020, this Court declared the Policy void *ab initio* as an illegal wagering contract and directed the clerk to enter judgment in favor of Jackson. (ECF

---

[2] The trial transcripts are attached as Exhibit A (N.T. Vol. I), Exhibit B (N.T. Vol. II), and Exhibit C (N.T. Vols. III and III-A).

#116.) The Court did not address Jackson's delay and laches arguments because the Court declared the Policy void *ab initio*. (*Id.* at 24.)

Crum appealed to the Eleventh Circuit, arguing that the Court erred as a matter of law in declaring the Policy void. (Appeal #15 at 2.) The Eleventh Circuit certified questions to the Georgia Supreme Court regarding the standard for determining whether a life insurance policy was void *ab initio* as an illegal wagering contract. (Appeal #45 at 18-19.) The Eleventh Circuit noted that the Georgia Supreme Court's answer would be relevant to the laches defense, which "the district court did not reach given its decision that the policy was void." (*Id.* at 19 n.11.)

The Georgia Supreme Court held that "under Georgia law, a life-insurance policy taken out by the insured on his own life with the intent to sell the policy to a third party with no insurable interest, but without a third party's involvement when the policy was procured, is not void as an illegal wagering contract." (Appeal #46 at 1.) The Eleventh Circuit adopted this view in reversing and remanding the matter to this Court "for further proceedings consistent with [its] opinion [on policy validity], including a determination as to whether Crum's claim to benefits under the policy is barred by laches." (Appeal #49-1 at 5.)

3

## II.   STATEMENT OF FACTS

### A.   Couch applied for the Policy using a clean-sheeting scheme.

On August 31, 1998, Jackson received an application for a 10-year term, $500,000 life insurance policy on the life of Kelly Couch.[3] (ECF #116 at 5.) Unbeknownst to Jackson at the time, Couch applied for the Policy intending to sell it for a quick profit through a viatical settlement transaction. (*Id.* at 20-22.) "A viatical settlement often involves a chronically ill policy holder selling his or her life insurance policy, which was acquired when the policy holder was healthy, to a third party for a lump sum." (*Id.* at 4.) Due to excessive demand, the viatical settlement industry was rife with "clean sheeting" schemes in which an insured with HIV would "fraudulently obtain a clean blood test to acquire a life insurance policy and later sell it on the open market." (*Id.* at 3-5.) The Policy was procured exactly this way: the HIV-positive Couch provided Jackson with an HIV-negative blood test in October 1998; the Policy was issued by Jackson in January 1999; and, by August 1999, Crum through various third parties somehow became the Policy's beneficiary, although there is almost zero documentation of this. (*Id.* at 7; *see also* Ex. E (Trial Ex. P-11, Oct. 1998/Nov. 1998 HIV-positive blood tests); Ex. F (Trial Ex. J-3, (Oct. 1998

---

[3] Jackson's predecessor, Midland Life Insurance Company, issued the Policy. For ease of reference, Jackson refers to both companies as "Jackson."

negative blood tests); Ex. G (Trial Ex. J-4, Policy); Ex. H (Trial Ex. P-3, purported

offer); Ex. I (Trial Ex. J-6, agreement by Crum and his broker).)

**B. Despite knowing of the HIV-related fraud, Crum acquired the Policy through transactions concealed from Jackson for which virtually no documents are now available.**

Crum is an experienced viatical settlement investor, having been involved in

over one hundred viatical settlements for his estate planning entity, and at least six

or seven viatical transactions for his own account. (Ex. A, N.T. Vol. I at 86:17-19,

90:2-11.) Crum's focus was on acquiring interests in policies on young HIV-positive

insureds through a broker named John Frick. (*Id.* at 85:14-16, 86:6-12, 89:2-8.) Frick

in turn worked on these deals with other secondary market entities, including one

known as Associates Trust that was owned and controlled by its principal, Keith

Thomas. (*See* Ex. J, Frick Desig. at 55:17-22.) Once a policy was identified by a

seller, Frick would prepare and fax a single-page Contestable Policy Inventory

("CPI") document for Crum's consideration. (*Id.* at 85:6-18; Ex. H (CPI).)[4]

---

[4] Crum admitted Keith Thomas was the principal of Associates Trust, and further admitted that he and Frick were regularly working with and did business with Associates Trust on viatical deals including but not limited to the Policy. (*See* Ex. A, N.T. Vol. I at 96:6-13; Ex. K (Trial Ex. P-2, Crum 1998-2001 policy ledger); Ex. L (Trial Ex. P-25, official documents for Associates Trust with Keith Thomas as President, Secretary, and Treasurer).)

Crum acquired his interest in the Policy as part of a settlement with Associates Trust after it sold Crum an invalid policy on a different insured. Specifically, working with Frick in December 1998, Crum wired funds to Associates Trust for the other policy; when Crum learned that the other policy was invalid, he demanded a refund from Associates Trust. (Ex. A, N.T. Vol. I at 97:5-17, 98:11-14; Ex. K (ledger).) To resolve the dispute, Associates Trust proposed to Frick that Crum acquire the Policy from Associates Trust along with yet another policy on Couch's life issued by different insurer. (Ex. B, N.T. Vol. II at 96:11-24.) Frick thereafter sent Crum a single-page CPI disclosing, *inter alia*, Couch's supposed HIV diagnosis prior to issuance of the Policy. (Ex. H.) Based on the CPI, Crum agreed to acquire an interest in the Policy by executing a single-page agreement *with Frick*. (Ex. I.) To prove his interest, which Crum repeatedly admits came from Associates Trust, Crum offered his testimony, the one-page CPI, the one-page Frick agreement, and nothing else. There was no evidence regarding how or when Associates Trust (or its principal Keith Thomas) acquired an interest in the Policy to be transferred to Crum via Frick.

Thus, unlike Jackson, Crum has always known the truth: Couch was not a heathy 32-year-old man expected to live for many years; instead, Couch was HIV-positive and expected to die within 24-36 months, well before the expiration of the

Policy's initial ten-year term. (Ex. A, N.T. Vol. I at 10-13, 87:22-24, 90:2-25; 102:4-104:1; Ex. B, Vol. II at 91:23-92:3; Ex. H, CPI with HIV diagnosis and life expectancy).) Indeed, the first three years of premium payments were made through a premium reserve account designed to make it appear that Couch was paying the premiums during that 36-month period, concealing from Jackson the involvement of Associates Trust, Frick, and Crum. (*See* Ex. M (Trial Ex. J-10); Ex. H; Ex. L; Ex. A, N.T. Vol. I at 120:4-9.) Then, after the premium reserve ran out in 2002, Crum paid the premiums under the pretense of living at the same address as Couch, who falsely remained as the named Policy owner and alleged payor. (*See* Ex. N (Trial Ex. P-12, 1/17/03 file reflecting address change).) In 2006, making the first premium payment after Couch's death in 2005, Crum changed Couch's address (as Policy owner, insured, and payor) so that any Jackson mail for Couch would be sent to Crum's lawyer, James Jantos. (*See* Ex. O (Trial Ex. P-14, 1/1/06 change form); Ex. B, N.T. Vol. II at 11:1-18.) After three more years, in 2009, Crum stopped paying premiums altogether and allowed the Policy to lapse, suggesting Couch outlived the Policy's term. (Ex. A, N.T. Vol. I at 120:4-121:4; Ex. P (Trial Ex. J-21).)

## C. **Crum's deliberate lack of diligence caused his unreasonable delay.**

Couch died on June 10, 2005. (Ex. Q (Trial Ex. J-12).) His obituary was published and available online almost immediately thereafter. (*See* Ex. R (Trial Ex.

J-20A, claim with copy of online obituary published June 14, 2005).) Jackson learned of Couch's death in 2017 when Crum submitted his claim. (*Id.*) According to Crum, he too was unaware of Couch's death until 2017. (Ex. B, N.T. Vol. II at 38:9-19.) If Crum did not know Couch had died, however, it was only because Crum failed miserably at tracking Couch's mortality from the moment he acquired his interest in the Policy in 1999. Crum admittedly took no action himself; he maintained during this litigation that he relied solely on Jantos to determine when Couch died. (*Id.* at 35:15-22; 38:1-4.) According to Jantos, however, Crum never actually asked him to monitor Couch's mortality, and, instead, Jantos simply decided on his own to take a handful of (ineffective) steps to determine if Couch was dead. (Ex. C, N.T. Vol. III at 42:14-23.) Crum admitted he did not know what Jantos was doing and that he did nothing to ensure Jantos was doing an adequate job monitoring Couch's life. (Ex. B, N.T. Vol. II at 38:1-11.) Had Crum cared enough to inquire, he would have discovered that Jantos had done less than the bare minimum.

In fact, Jantos identified only two actions he took over nearly twenty years: on an unknown number of unspecified occasions, Jantos (1) reviewed a Social Security Index he admitted was unreliable, and (2) ran a "Google search" on Couch's name. Jantos did not consult Lexis or even one of the many other available vendors and web services that he knew existed for the purposes of tracking mortality, nor did

he take any other steps to determine if Couch was still alive. (Ex. C, N.T. Vol. III at 46:8-47:16; 54:10-24; 53:3-54:9.) Jantos later said he stumbled upon Couch's death in 2017 while trying a new Lexis search tool he had acquired. (*Id.* at 47:23-25.) Jantos and Crum have no explanation for missing the obituary published online just days after Couch died, despite that it was discoverable via the type of Google search Jantos says he ran. Indeed, Jantos admits he obtained the copy of the obituary he attached to Crum's claim in 2017 through a Google search. (*Id.* at 48:11-15.)

### D. Crum's concealment and twelve-year delay evidence to disappear and memories to fade.

As explained, the Policy was procured through a clean-sheeting scheme in which the HIV-positive Couch provided HIV-negative blood to Jackson, causing Jackson to issue a Policy with a death benefit that Associates Trust and Couch could sell to Crum through Frick. A key issue in this case has always been whether Jackson could show that, *prior to inception of the Policy*, Couch was working with a third-party (*i.e.*, Associates Trust). (*See, e.g.*, ECF #109 ¶¶ 39-46.) Indeed, if Jackson had been able to show such pre-inception Associates Trust involvement at trial, the Policy would have been irreversibly void *ab initio*. Importantly, however, Crum's 12-year delay has resulted in the loss of critical evidence regarding this issue.

9

### 1. Jackson lost access to relevant medical records likely revealing the timing of the involvement of Associates Trust.

Like other entities engaged in clean-sheeting transactions, Associates Trust was doing this viatical deal because Associates Trust believed Couch was HIV positive. (*See* Ex. H.) There also can be no question that Associates Trust would have wanted to confirm, *before it acquired an interest in the Policy* for sale to Crum, that Couch was actually HIV-positive and was likely to die soon—which is what makes such a policy valuable.

Before the Policy existed, Couch was treated for HIV by Dr. David Dickensheets at Infectious Disease Services of Georgia, P.C. (*See* Ex. E (labs noting Dickensheets as physician).) Accordingly, the most logical and likely way for Associates Trust to confirm Couch's HIV diagnosis and to learn when Couch was likely to die was to access the records of Dr. Dickensheets. Because health records are carefully guarded, if Associates Trust sought this information, *Dr. Dickensheets's files would have contained dated documentation of any records request from, and disclosure of records to Associates Trust and a dated record of Couch's permission for that disclosure*. If dated prior the inception of the Policy, those records would be a key piece of proof showing that there indeed was third-party involvement in this transaction by Associates Trust prior to policy inception.

In 2018, Jackson sent a subpoena to Dr. Dickensheets's practice, but Jackson was informed the records were no longer available. (Ex. S (Trial Ex. D-32).) If Crum had not waited twelve years to submit this claim, Jackson likely would have been able to see all of Dr. Dickensheets's records because, under current Georgia law, such records must be retained for ten years. O.C.G.A. § 31-33-2.

### 2. Jackson lost access to evidence from Associates Trust and its principal, the third-parties with whom Couch worked.

Crum had access to the Policy solely because Couch and Frick worked with Associates Trust and its principal Keith Thomas, who served as President, Treasurer, Secretary, and Director. (Ex. L at 1, 2, 18, 21-22.) After Crum submitted his claim, Jackson sought records or testimony from Associates Trust and Keith Thomas to establish when the relationship began, but such evidence was long gone. Although Associates Trust was still doing business in 2005, it collapsed in 2009, and according to Jantos at least, Keith Thomas is dead. (*Id.*; Ex. C, N.T. Vol. III at 57:4-11.)[5] As with the missing medical records, a complete set of documents or relevant testimony from Associates Trust or Keith Thomas would have established when Couch began working with Associates Trust, a critical question under the Georgia standard as announced by the Georgia Supreme Court in this case.

---

[5] Jantos volunteered this information at trial with no objection from Crum, who has never denied this fact in this litigation. (Ex. C, N.T. Vol. III at 57:4-11.)

### 3. Jackson lost access to evidence from Crum's broker John Frick, the only person with whom Crum had an agreement.

The CPI sent by Frick to Crum and Crum's agreement with Frick are the only documents evidencing Crum's purported acquisition of the Policy. (Ex. H; Ex. I.) Jackson could not access other evidence of this transaction. In addition to Frick's faded memory, Frick's testimony showed he no longer had access to documents that could have been relevant to the transactions that provided Crum with his interest in the Policy. (Ex. J, Frick Desig. at 40:3-42:11.) Accurate and complete evidence from Frick was essential to Jackson's claims and defenses, because, without these documents, there is no evidence showing how (or when) Frick acquired an interest in (or other rights in connection with) the Policy to transfer an interest to Crum.

### 4. Jackson lost access to evidence from Crum.

Jackson could not explore the relationship between Crum, Couch, Associates Trust, and Frick, nor could Jackson challenge the truth of Crum's testimony, because Crum's own records and memory were incomplete. For example, Crum had email communications "in connection with [his] acquisition of the Jackson Couch policy" that were still in his possession at the time Couch died in 2005, but he no longer had those emails by the time he submitted his claim. (Ex. B, N.T. Vol. II at 32:12-33:7; 34:14-18.) Crum acknowledged at trial that he did not produce any of those documents because he "got a new computer [in 2015], and . . . lost [his] old emails."

(*Id.* at 34:11-21.) Crum blamed the loss of information (and his inability to remember) on the passage of time. As with the other missing evidence, Jackson could have gained access to the missing records had Crum brought his claims at or around the time of Couch's death in 2005. (*Id.* at 34:16-21.)

## III.  **ARGUMENT**

The Court should rule in Jackson's favor on Crum's Counterclaim because he failed to submit a death claim on the Policy for more than twelve years after Couch died. Georgia courts have addressed delayed claims in connection with life insurance policies via three different but overlapping theories. First, courts apply a laches rule as an implied contractual term in the relevant policy, barring recovery based on an unreasonable delay without considering whether the insurer was prejudiced. *Burton v. Metropolitan Life Ins. Co.*, 48 Ga. App. 828, 173 S.E. 922, 923 (1934). Second, courts bar life insurance claims under the applicable six-year statute of limitations. *See, e.g., Childs v. Armour Food Co.*, 175 Ga. App. 455, 455, 333 S.E.2d 377, 377 (1985) ("Where a policy of insurance contains no limitation as to when suit thereon shall be filed, the period of limitation of action thereon is six years."). Third, courts apply a traditional laches rule which can require a showing of prejudice, but which also allows prejudice to be presumed from lengthy delays. *See Prudential Ins. Co. v. Sailors*, 69 Ga. App. 628, 26 S.E.2d 557, 561 (1943) ("there must appear, in

addition to mere lapse of time, some circumstances from which the defendant or some other person may be prejudiced, or there must be such lapse of time that it may be ***reasonably supposed*** that such prejudice will occur if the remedy is allowed" (emphasis added)). Crum's claim is untimely under each one of these doctrines.

### A.  Crum's unreasonable delay constitutes laches because it violates the implied terms of the Policy.

Jackson contested Crum's right to the death benefit on grounds of laches, which, in the insurance context, includes the requirement under Georgia law that policyholders must submit their claims timely and without unexcused and unreasonable delay. *See Burton v. Metropolitan Life Ins. Co.*, 48 Ga. App. 828, 173 S.E. 922, 923 (1934) ("plaintiff had waited an unreasonable length of time . . . and should be barred by laches"); *see also* 8 NEW APPLEMAN ON INS. LAW LIBRARY ED. § 86.02 (2022) ("Where there is no statutory provision or policy provision, proof of death generally must be produced within a reasonable time. What constitutes a 'reasonable time' will depend on the facts and circumstances of each individual case."); *Harrison v. Masonic Mut. Ben. Soc'y*, 59 Kan. 29, 31 (1898) (ten-year delay for death claim unreasonable); *Shearlock v. Mut. Life Ins. Co.,* 193 Mo. App. 430, 433 (Mo. Ct. App. 1916) (seventeen-year delay for death claim unreasonable).

Georgia law has long followed this well-established rule for life insurance claims. "Where a life policy requires notice and proof of death, but furnishes no

specific time therefor, the notice and proof may and must be given within a reasonable time after the death of the insured. Such times as more than seventeen years or more than ten years have been held to be unreasonable." *Burton*, 173 S.E. at 923 (citing 37 C. J. 557, § 311, *Harrison*, and *Shearlock*). This laches rule treats the Policy as including an implied term of reasonableness for making a death claim, s*ee Burton*, 173 S.E. at 923, and prejudice is not required. *See id.* (no consideration of harm in reasonableness analysis).

The delay between Couch's death and Crum's claim was exceptionally long and objectively unreasonable. Crum first notified Jackson of Couch's death *twelve years* after it occurred. "[T]imes as more than seventeen years or more than ten years have been held to be unreasonable." *Burton*, 173 S.E. at 923; *see also* 20af-389f APPLEMAN ON INS. LAW & PRAC. ARCHIVE § 11584 (2nd 2011) ("where no action is brought on a life insurance policy for ten years after the right accrues, the plaintiff is guilty of such laches as to prevent a recovery"). Even if the Court found Crum had acted quickly after learning of Couch's death in 2017, Crum cannot cure the decade-plus delay between Couch's death and submission of his claim.

Crum claims he was unaware of Couch's death, but unreasonable delay can be excused for ignorance only where the beneficiary is without fault. *See Progressive Life Ins. Co. v. Haygood*, 53 Ga. App. 231, 185 S.E. 534, 535 (Ga. Ct.

App. 1936); *Pilgrim Health & Life Ins. Co. v. Chism*, 49 Ga. App. 121, 174 S.E. 212, 212 (Ga. Ct. App. 1934); *see also Woods v. State Farm Mut. Auto. Ins. Co.*, 234 Ga. 782, 218 S.E.2d 65, 68 (Ga. 1975). From the moment he became the beneficiary, Crum had the motive and means to monitor Couch's mortality, but he simply chose not to do so. Crum admits he did nothing himself to determine whether Couch was alive or dead, and he might not have even asked his attorney Jantos to take any action (because Jantos says he was acting voluntarily). (Ex. C, N.T. Vol. III at 42:14-23.)

At most, Crum was relying solely on Jantos and never checked what Jantos was doing in this regard. (Ex. B, N.T. Vol. II at 38:1-19.) Further, the record is clear that Jantos was doing a poor job, as he was relying on a Social Security index he admits was unreliable, and his testimony that he ran a Google search or two is not credible. The record shows that a simple Google search would have revealed Couch's obituary within days of his death, as it did in 2017. (*See* Ex. R (claim with copy of obituary); Ex. C, N.T. Vol. III at 48:11-15.) Because Crum concealed the truth, Jackson had no reason or duty to independently monitor Couch's mortality during the initial ten-year term of the Policy or after the Policy lapsed in 2009. Lacking any excuse for his excessive delay, Crum's claim is barred by laches under the implied reasonableness analysis.

**B.** <u>**Crum's claims are barred by the statute of limitations.**</u>

Jackson asserted a statute of limitations defense in its Answer to Crum's Counterclaims and at trial. (ECF #34, Aff. Defs. ¶ 12; Ex. A, N.T. Vol. I at 44:6-45:6; Ex. C, N.T. Vol. III at 72:19-73:13 and Vol. III-A at 25:1-34:5.) The statute of limitations should bar Crum's claim now because Couch died in 2005, Crum's claim was submitted twelve years later in 2017, and his Counterclaim was filed thereafter. This Counterclaim is barred by the applicable six-year statute of limitations on the Policy, calculated from the date of Couch's death rather than the date Crum allegedly discovered Couch's death. *See Childs v. Armour Food Co.*, 175 Ga. App. 455, 455, 333 S.E.2d 377, 377 (1985) ("Where a policy of insurance contains no limitation as to when suit thereon shall be filed, the period of limitation of action thereon is six years. Since this action was brought more than six years after the collision which gave rise to plaintiff's claim for personal injury protection benefits, it is time barred." (quotation marks and citations omitted)); *Lester v. Aetna Life Ins. Co.*, 172 Ga. App. 486, 486, 323 S.E.2d 655, 657 (1984) (rejecting son's suit as time-barred based on claim submitted twenty years after father's death); *Stanley v. Whitfield Life Ins. Co.*, 89 Ga. App. 160, 160, 78 S.E.2d 821, 822 (1953) ("As the copy of the policy attached to the petition contained no provision limiting the time within which suit must be brought on the contract of insurance, the suit was maintainable at any time within

six years from the date of the insured's death."); *Burton*, 173 S.E. at 923 ("In the absence of any policy provision postponing the time of payment of the insurance, the statutory period of limitation runs from the time of the insured's death, if on such date the demand could be made payable by presenting proper proofs of death."); *see also Banks v. Aetna Life Ins. Co.*, 56 Ga. App. 760, 194 S.E. 34, 34–35 (1937) (approving *Burton* holding and rejecting argument that limitations period should only run from the date the claim is made—since such a rule would "destroy the object and purpose of the statute of limitations" by allowing the claimant to unreasonably delay her claim).

### C. <u>Crum's unreasonable delay defeats his claim under a traditional laches analysis based on presumed or actual prejudice.</u>

This Court should refuse to award Crum the death benefit even if it analyzes Jackson's defenses under a traditional laches analysis. *See* 20af-389f APPLEMAN ON INS. LAW & PRAC. ARCHIVE § 11584 (2nd 2011) ("where no action is brought on a life insurance policy for ten years after the right accrues, the plaintiff is guilty of such laches as to prevent a recovery") (citing *Nw. Mut. Life Ins. Co. v. Lowry's Adm'x*, 20 S.W. 607, 608 (Ky. 1892)); 46A C.J.S. INS. § 2127 ("Independently of the statute of limitations or of any provision of the policy, the right to maintain an action on an insurance policy may be lost by plaintiff's laches."); *Foster v. Metro. Life Ins. Co.*, 243 Fed. App'x 208, 209–10 (9th Cir. 2007) (laches as valid defense

18

to policyholder's declaratory judgment claim against life insurer); *AC & R Insulation Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 993 F. Supp. 2d 539, 549 (D. Md. 2014) (asbestos-related claim that could have been asserted twenty-five years prior barred by laches).

Under traditional laches principles, "various factors are to be considered, including: duration of delay in asserting claim; sufficiency of excuse offered in extenuation thereof; whether during delay evidence has been lost or become obscure; whether the plaintiff or the defendant was in possession of property at issue during the delay; whether the party charged with laches had an opportunity to have acted sooner, and whether the party charged with laches acted at the first possible opportunity." *Welch v. Welch*, 215 Ga. 198, 202, 109 S.E.2d 757, 759 (1959); *see also Redfern v. Huntcliff Homes Assn*, 524 S.E.2d 464, 472 (Ga. 1999); *Ehrhart v. Brooks*, 231 Ga. 272, 275-276, 201 S.E.2d 464, 467 (1973).[6]

These considerations weigh in favor of Jackson regardless of whether the prejudice component is considered because Jackson has demonstrated that the "duration of delay in asserting [the death] claim" was an unreasonable twelve years,

---

[6] Jackson acknowledges cases broadly stating traditional laches is not available in legal declaratory judgment actions. *E.g.*, *VATACS Group, Inc. v. Homeside Lending, Inc.*, 635 S.E.2d 758 (2006). *But see Hillis v. Parrish*, 184 S.E.2d 464 (1971) (affirming dismissal of declaratory judgment and injunctive based on laches). As *Burton* and other authorities recognize, laches in the insurance policy context is different, because it can be analyzed as an implied term or traditional laches.

that Crum's claimed ignorance was deliberate and is merely a poor "excuse offered in extenuation thereof," and, importantly, that Crum "had an opportunity to have acted sooner" because he could have discovered Couch's death through the online obituary in 2005 or other ordinary means of mortality monitoring. *Welch*, 109 S.E.2d at 759 (factors). As explained below, Jackson has established prejudice as well.

### 1. Prejudice is presumed from unreasonable delay.

In barring an insurance claim based on laches, Georgia courts recognize that actual prejudice is not a *prima facie* element of the case. Instead, courts will bar a claimant's recovery if there is "such lapse of time that it may be reasonably supposed that such prejudice will occur if the remedy is allowed." *Sailors*, 26 S.E.2d at 561. As *Sailors* recognizes, when a great deal of time has elapsed, a court should presume prejudice—not only because evidence will no longer be available (as occurred here), but also because the insurer is entitled to arrange its finances without the expectation of unknown and stale claims.

Cases with years-long delays are rare, but other courts addressing similar facts in the past have ruled that prejudice is presumed. *See Nw. Mut. Life Ins. Co. v. Lowry's Adm'x*, 20 S.W. 607, 608 (Ky. 1892) ("[A]s the plaintiff in this case did not, in a reasonable time after her cause of action accrued, sue for the amount now claimed to be due, the company had a right to presume it never would be done, and

20

therefore proceeded to adjust its accounts of profit and dividends, without reference to the claim of the plaintiff.") "[T]o permit any person whose life is assured for a term of years, or a representative of such person, to delay presenting a claim, or suing for amount of insurance money, for such length of time as to create a reasonable presumption the claim had been waived or abandoned, would necessarily result in deranging the business of the company, endangering its existence, and also prejudice the interest of other policy holders." *Id.*

Here, Crum not only abandoned his interest in the Policy by failing to monitor Couch's mortality, he also took steps that would lead Jackson only to the conclusion that no claim would ever be submitted—specifically, by continuing to pay the premium without regard for Couch's mortality and then allowing the Policy to lapse eight years before submitting a claim. Accordingly, the decade-plus delay between Couch's death and Crum's claim is presumed to be prejudicial.

### 2. Jackson can establish actual prejudice if required.

In its answer to the certified questions, the Georgia Supreme Court found that the unilateral actions of an insured are insufficient to invalidate a life insurance policy as a human life wager, but under certain circumstances, an insurer may still invalidate a policy as a human life wager if it can demonstrate that a third party was involved in the inception of the policy. *Crum v. Jackson Nat'l Life Ins. Co.*, 315 Ga.

67, 880 S.E.2d 205 (2022). The record here is clear that Crum's actions damaged Jackson's ability to investigate the Policy's origination and issuance, thus impairing Jackson's ability to prove when and how a third-party became involved.

Prejudice for purposes of laches arises where the "long delay renders the ascertainment of the truth difficult…." *Goodwin v. First Baptist Church of Augusta*, 169 S.E.2d 334, 336 (1969) (citation and quotation marks omitted). Prejudice has been found based on the loss of documents and other evidence, or where the delay diminished the available testimony based on a change in witness attitudes due to intervening events, "advancing age and poor health conditions" impacting witnesses' memories, and the inability to locate witnesses. *See, e.g.*, *E.E.O.C. v. Firestone Tire & Rubber Co.*, 626 F. Supp. 90, 93 (M.D. Ga. 1985).

Here, Jackson was forced to investigate facts in 2017 and 2018 that occurred almost twenty years previously. If Crum had submitted his claim in 2005 when Couch died, the facts would have still been fresh in the minds of potential witnesses. Thus, the simple reality that Crum waited for over twelve years establishes that memories had faded, and witnesses and documents were harder to find—or gone entirely. Jackson can establish that Crum's delay resulted in the specific loss of evidence relevant to this claim from Couch's physician (Dr. Dickensheets), Couch's

viatical counter-party (Associates Trust), Crum's viatical broker (John Frick), and Crum himself. This loss of evidence creates prejudice to Jackson.

*Jackson could not access medical records from Couch's physician Dr. Dickensheets.* (Ex. S.) In 2005, Jackson could have accessed these records because they were still within the required ten-year retention period under Georgia law. O.C.G.A. § 31-33-2. With these records, Jackson could have confirmed Couch's diagnosis (challenged by Crum here) and identified when Associates Trust or others ordered Dr. Dickensheets's records to determine Couch's expected lifespan for the purpose of obtaining, marketing, and selling an interest in the Policy to Crum.

*Jackson lost access to evidence from Associates Trust, the third-party with whom Couch worked to sell the Policy.* Crum could not have acquired an interest in the Policy unless Associates Trust did so first, because whatever rights Frick had to transfer came from Associates Trust. (*See, e.g.*, Ex. B, N.T. Vol. II at 86:16-17.) Associates Trust and its principal Keith Thomas were still doing business in 2005, but not in 2017 when Jackson learned of Crum's claim and Couch's death.[7]

---

[7] Jantos claimed to have documents from Associates Trust. Even putting aside questions of his credibility and self-interest, these documents were incomplete. The Jantos documents do not establish how Associates Trust acquired an interest in the Policy such that it could work with Frick on Crum's behalf. The Jantos documents do not show how Associates Trust obtained medical information appearing in Frick's CPI (Ex. H) but not appearing in the lab reports (Ex. E.) In fact, the Jantos documents include unexplained and incomplete records related to other efforts by

23

Associates Trust collapsed in 2009, and at least according to Jantos, Keith Thomas is dead. (*See* Ex. L at 21-22; Ex. C, N.T. Vol. III at 57:4-11.)

*The delay also prevented Jackson from accessing information from Crum's broker Frick, another critical link between Associates Trust, Couch, and Crum.* Frick could not remember events of twenty years prior, and his testimony revealed he had lost access to documents that could have been relevant to the transactions leading to Crum's interest in the Policy. (Ex. J, Frick Desig. at 40:3-42:11.) As with Associates Trust, evidence from Frick would have filled in the gap between Couch and Crum.

*Similarly, Jackson could not obtain essential evidence from Crum himself, nor could Jackson fully challenge the accuracy or credibility of Crum's inexplicable actions.* Under oath, Crum admitted that he no longer had emails related to the transaction, and he complained that the events were too long ago for him to remember. (Ex. B, N.T. Vol. II at 32:12-33:7; 34:11-21.)

While there was no dispute at trial that Couch worked with Associates Trust to sell his Policy, the parties did dispute when Couch began that relationship—before or after Policy issuance. The lost evidence would have answered the key questions

---

Couch's wager his life. (*See* Ex. T (Trial Ex. P-27, Nov. 1999 viatical settlement application); Ex. U (Trial Ex. P-29, Undated and blank beneficiary change form executed by Couch).)

addressed to that issue, and had Crum brought his claim anywhere near Couch's death, Jackson could have collected this information. By 2017, there was no chance.

### D.   Crum is not entitled to an award of interest.

Although not yet before the Court, Jackson notes that Crum should not receive any interest if his claim for the death benefit succeeds. If interest is awarded, however, the maximum rate should be 3%, and Crum's long delay should be factored in such that interest is calculated from the date of his claim.

## IV.   CONCLUSION

For the reasons set forth herein, judgment must be entered in Jackson's favor on Crum's Counterclaim.


Dated January 31, 2023                    Respectfully submitted,

                                    BY:   /s/ *Eileen H. Rumfelt*

                                    **MILLER & MARTIN, PLLC**
                                    James T. Williams (No. 185084)
                                    Eileen H. Rumfelt (No. 04608)
                                    1180 W. Peachtree Street, N.W., Ste 2100
                                    Atlanta, Georgia 30309
                                    T: (404) 962-6100; F: (404) 962-6300
                                    Eileen.Rumfelt@millermartin.com
                                    James.Williams@millermartin.com


                                    *and*

**COZEN O'CONNOR**
Michael J. Miller (*pro hac vice*)
Michael J. Broadbent (*pro hac vice*)
1650 Market Street, Suite 2800
Philadelphia, PA 19103
T: (215) 665-2000; F: (215) 665-2013
MJMiller@cozen.com
MBroadbent@cozen.com

*Attorneys for Plaintiff/Counterclaim
Defendant, Jackson National Life Insurance
Company*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to N.D. Ga. Local Rule 7.1D, I certify that the foregoing **JACKSON NATIONAL LIFE INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT ON THE BASIS OF LACHES AND DELAY ON STERLING CRUM'S COUNTERCLAIM** was prepared using Times New Roman 14 point font, a font and point selection approved by the Court in Local Rule 5.1B.

By: /s/ *Eileen H. Rumfelt*

# EXHIBIT 3



November 30, 2023

**Chase A. Howard**
Direct Phone    215-665-2147
Direct Fax       267-507-1547
chasehoward@cozen.com

**VIA EMAIL**

Yanett Quiroz, LL. M.
AAA Director
Tel. (832) 308-5626
Email. YanettQuiroz@adr.org

      Re:    *Achenbach, et al. v. Liberty One Fund. Trust, et al.*, **Case No. 01-23-0004-4523**

Ms. Quiroz—

We write on behalf of Claimants in the above-captioned action. This is to inform the American Arbitration Association ("AAA") that Claimant Bruce Achenbach has passed away. Bruce Achenbach's brother and sole surviving next of kin, Brian Achenbach, will pursue the claims as an heir of their father, Walter Achenbach. Claimants intend on filing an amended Statement of Claim in the near future.

Sincerely,

Chase A. Howard

cc:
Thorn Rosenthal, Esq. (trosenthal@cahill.com)
Lauren Perlgut, Esq. (lperlgut@cahill.com)
Joel Kurtzberg, Esq. (jkurtzberg@cahill.com)
Margaret Barone, Esq. (mbarone@cahill.com)
Jonathan P. Hersey, Esq. (jonathan.hersey@klgates.com)